## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.,* | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |
| | § | |

### EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BUSINESS FORMS, (C) CONTINUE INTERCOMPANY ARRANGEMENTS, AND (D) CONTINUE UTILIZING CORPORATE CREDIT CARDS; AND (II) GRANTING RELATED RELIEF

EMERGENCY RELIEF HAS BEEN REQUESTED.  A VIDEO/TELEPHONIC HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 4, 2020 AT 2:00 P.M. (PREVAILING CENTRAL TIME).  PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 954554.  PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE HTTPS://WWW.GOTOMEETING.COM/MEETING/JOIN-MEETING AND ENTERING MEETING CODE "JudgeIsgur."

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 4, 2020.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

Fieldwood Energy LLC ("**Fieldwood Energy**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Background**

1.      Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are an independent exploration and production ("**E&P**") company in the Gulf of Mexico.  The Company is focused on the exploration and development of offshore oil and gas assets in the shallow water and deepwater Gulf of Mexico and the Gulf Coast region in the U.S.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "**Dane Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Dane Declaration.

**Jurisdiction**

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 363(b)(1), 363(c)(1), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry of interim and final orders (i) authorizing them to (a) continue to operate their existing cash management system (the "**Cash Management System**"), as described herein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**") with Capital One, National Association ("**Capital One**"), U.S. Bank National Association ("**U.S. Bank**") and JPMorgan Chase Bank, N.A. ("**JPM**" and, together with Capital One and U.S. Bank, collectively, the "**Banks**"), (b) maintain their existing Business Forms (as defined below), (c) continue certain intercompany arrangements, including transferring funds among the Debtors and certain non-Debtor affiliates and managed entities (the "**Non-Debtor Affiliates**"), and (d) continue utilizing Corporate Credit Cards (as defined below) and pay all obligations related thereto, each in the ordinary course of business and consistent with the Debtors' prepetition practices, and (ii) granting related relief.  The Debtors also request that the Court authorize the Banks to continue to charge Bank Fees (as defined below), if any, and to charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

6.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**").

**Cash Management System**

7.      In the ordinary course of their businesses, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain Non-Debtor Affiliates.  The Cash Management System is tailored to meet the Debtors' needs as an owner and operator of, among other assets, oil and natural gas producing properties.  The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their businesses and pay their financial and other obligations.  It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of their Bank Accounts.  A general overview of the movement of cash through the Cash Management System is illustrated by the flow of funds diagram attached as **Exhibit C** hereto.

8.      The Cash Management System includes six bank accounts (the "**Bank Accounts**"): (i) one Bank Account serves as the Debtors' main revenue collecting and concentration account; (ii) one Bank Account serves as the Debtors' main operating and disbursement account; (iii) one Bank Account serves to facilitate certain employee benefits; (iv) one Bank Account will serve to facilitate certain of the Debtors' cash obligations during the pendency of these chapter 11 cases;[3] and (v) the remaining two Bank Accounts are escrow accounts (each, an "**Escrow Account**") that the Debtors maintain in connection with certain

---

[3] The Debtors previously utilized this account to facilitate certain payments and obligations during the Company's previous chapter 11 cases, and it has generally been otherwise unused since the closing of those cases.  Going forward, the Debtors intend to use this Bank Account to hold the Adequate Assurance Deposit as defined and for the purposes set forth in the Debtors' *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*, filed contemporaneously herewith.

contractual and/or governmental obligations that require the Debtors to segregate certain funds.[4] All Bank Accounts other than the two Escrow Accounts are maintained at Capital One.[5]  Capital One is an authorized depository under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**").

9.      The Cash Management System is designed to facilitate the Debtors' receipts and disbursement of funds.  The Debtors' cash receipts are generally derived from (i) the sale of oil and natural gas from wells operated by the Debtors; (ii) working interest and other disbursements from wells in the Gulf of Mexico in which the Debtors have a non-operating interest; (iii) regular cash payments to the Debtors derived from the use of various pipelines in which the Debtors own a minority equity interest; and (iv) payment of joint interest billings to the Debtors.

10.      The Debtors' cash disbursements generally include (i) the expenses of exploring, developing, and operating their offshore oil and natural gas wells and platforms, including various government and/or contractually required plugging, abandonment, and decommissioning ("**P&A**") obligations; (ii) joint interest billings owed to parties that operate wells in which the Debtors have a non-operating interest; (iii) royalties and working interest payments owed in accordance with the Debtors' oil and gas leases or under grants of various forms of royalty interests; (iv) insurance and surety bonding expenses; (v) employee wages and benefits; (vi) various third-party vendor and contractor expenses; (vii) taxes and regulatory fees;

---

[4] The Cash Management System also includes certain Non-Debtor Affiliate accounts controlled by the Debtors, which are discussed in more detail below.

[5] As discussed in further detail below, as of the Petition Date, the Escrow Accounts maintained a total aggregate balance of approximately $9 million.

(viii) corporate overhead expenses; and (ix) payments on account of funded indebtedness. As discussed below, each component of the Cash Management System is integral to the Debtors' businesses.

## A.      Cash Collection & Concentration

11.      The Debtors' receipts enter the Cash Management System via check, wire transfer, or automated clearing house ("**ACH**") transfer. The Debtors collect the vast majority of their receipts into a Bank Account maintained with Capital One (Acct. No. x4666) (the "**Revenue Account**"). As discussed above, the funds received in the Revenue Account are primarily derived from the sale of oil and natural gas from the Debtors' offshore assets. The Debtors also collect a portion of their cash receipts into a Bank Account maintained with Capital One (Acct. No. x2209) (the "**Operating Account**"). The cash received in the Operating Account generally includes receipts for joint interest billings on behalf of certain of the Debtors holding leases and other assets. As discussed below, the Operating Account also collects a limited amount of cash from an account owned by Non-Debtor Affiliate SP 49 Pipeline LLC ("**SP 49 Pipeline**"), also maintained with Capital One (Acct. No. x4712) (the "**SP 49 Pipeline Account**") and controlled by Fieldwood Energy.[6] As of the Petition Date, the Revenue Account and Operating Account together held an aggregate cash balance of approximately $133,000,000.

12.      In addition to the majority of their cash collections, the Debtors use the Revenue Account as their primary cash concentration account. Generally, the Debtors transfer funds from the Revenue Account to the Operating Account required for the Debtors' estimated

---

[6] Fieldwood Energy is party to the Master Receivables Purchase Agreement, dated as of December 23, 2019 by and among Fieldwood Energy, Non-Debtor Affiliate FW Finco LLC, Deutsche Bank AG New York Branch and Deutsche Bank Trust Company Americas. The Debtors do not anticipate making use of this facility during the pendency of the chapter 11 cases and do not plan to renew the facility upon its expiration. There are no amounts outstanding under this facility.

cash disbursements made from that account, on a weekly basis.  On average, this transfer is approximately $10 to $30 million each week.

**B.      Cash Disbursements**

13.      Cash disbursements are primarily made from the Operating Account using funds from the Revenue Account and other amounts directly received into the Operating Account. The Debtors separately pay royalty obligations directly from the Revenue Account.  As discussed above, the majority of the Operating Account's cash disbursements are made in connection with the Debtors' oil and gas operations and corporate overhead maintenance and expenditures.  Cash disbursements are generally made weekly; typically, via ACH transfer, but also by check or wire transfer.   Any amounts that are retained by the Operating Account after each week's cash disbursements are not typically transferred back to the Revenue Account, and are maintained in the Operating Account.  As discussed further below, the Operating Account also disburses a limited amount of funds to the SP 49 Pipeline Account.

14.      The Operating Account also transfers funds to a Bank Account with Capital One (Acct. No. x2306) (the "**FSA Account**") in connection with certain employee benefits. Specifically, the FSA Account is used to process and transmit cash disbursements to the Debtors' employees who participate in the flexible spending account plan provided by the Debtors.[7]  Upon a withdrawal request by an employee to the FSA Account, funds are transferred to the FSA Account from the Operating Account.  Such funds are then transferred from the FSA Account to

---

[7] These flexible spending accounts and further relief sought from this Court in connection therewith are discussed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employment and Training Expenses, and (II) Granting Related Relief*, filed contemporaneously hereto.

the requesting employee.  The FSA Account is a zero-balance account.  Accordingly, the FSA

Account has no standing balance.

## C.  Escrow Accounts and Non-Debtor Affiliate Accounts

15.  In addition to the main functions of the Cash Management System for

collections, concentration, and disbursements described above, the Debtors' Cash Management

System maintains or interfaces with a number of other accounts or services that provide a variety

of necessary functions for the Debtors' overall business operations.

16.  *Escrow Accounts*:  The Debtors maintain the Escrow Accounts in

connection with certain statutory and contractual obligations to various government authorities

and contract counterparties that require the Debtors to segregate certain funds.  If the Debtors

default on such obligations, an Escrow Account's beneficiaries may seek to recover the funds in

such account.  Interest accrues on the funds held in the Escrow Accounts.  The Debtors accordingly

request authority to maintain each of the following Escrow Accounts as Bank Accounts:

- An account maintained by Debtor Fieldwood SD Offshore LLC ("**Fieldwood SD**") with JPM (Acct. No. x5624), holding approximately $8.25 million as of the Petition Date.  This account secures Fieldwood SD's compliance with certain P&A obligations incurred as part of an asset acquisition for the benefit of RLI Insurance Company, Panaco, Inc., BP Exploration & Oil Inc., and Foothill Capital Corporation.  Amounts held in this Escrow Account will be released upon completion of the relevant P&A obligations and acknowledgement from the beneficiaries.

- An account maintained by Debtor Fieldwood Energy Offshore LLC ("**FEO**") with U.S. Bank (Acct. No. x6000), holding approximately $800,000 as of the Petition Date.  This account secures FEO's compliance with certain P&A obligations incurred as part of an asset acquisition for the benefit of Chevron U.S.A. Inc. ("**Chevron**").  Fieldwood Energy makes monthly deposits in this Escrow Account of approximately 4% of the revenue produced from the underlying assets, or average monthly deposits of approximately $2,000 - $4,000.  Amounts held in this Escrow Account will be released upon completion of the relevant P&A obligations and Chevron's acknowledgement to release funds.

17.  *SP 49 Pipeline Account*:  As mentioned above, the Operating Account

periodically receives a limited amount of funds from, and disburses funds to, the SP 49 Pipeline

Account.  SP 49 Pipeline is a Non-Debtor Affiliate that is a joint venture between Fieldwood Energy, Energy XXI GOM, LLC, and Stone Energy Offshore, L.L.C. (collectively, the "**SP 49 Partners**"), each of which owns a one-third equity interest in SP 49 Pipeline.  Pursuant to the terms of an operating agreement among the SP 49 Partners, Fieldwood Energy is required to manage, control, and operate SP 49 Pipeline, including the SP 49 Pipeline Account.  Accordingly, Fieldwood Energy is contractually required to collect revenue for SP 49 Pipeline and to disburse net proceeds to the SP 49 Partners, while also managing SP 49 Pipeline's business affairs, preparing its financial statements, and making expense disbursements from SP 49 Pipeline's revenues.

18.    The transactions between the SP 49 Pipeline Account, which is owned by SP 49 Pipeline, and the Operating Account generally function as follows:  (i) revenue is received into the SP 49 Pipeline Account; (ii) revenue receipts are swept from the SP 49 Pipeline Account into the Operating Account; (iii) Fieldwood Energy pays expenses in connection with SP 49 Pipeline's operations from such revenues maintained in the Operating Account; (iv) Fieldwood Energy prepares quarterly financials on behalf of SP 49 Pipeline; and (v) after creating the quarterly financials, Fieldwood Energy transfers the net proceeds for that quarterly period that are owed to the other two SP 49 Partners from the Operating Account to the SP 49 Pipeline Account, which are then transferred to such SP 49 Partners.  Fieldwood Energy retains its one-third of such net proceeds in the Operating Account.  The aggregate and average quarterly net proceeds transferred to the other SP 49 Partners is less than $550,000.  Except for the one-third of net proceeds due to Fieldwood Energy each quarter, the revenue generated by SP 49 Pipeline is the property of SP 49 Pipeline and/or the other two non-Debtor SP 49 Partners.

19.     The financial transactions set forth above in connection with SP 49 Pipeline are necessary because SP 49 Pipeline is functionally incapable of making the expense disbursements and creating the financial statements set forth above.  The Debtors are contractually required to maintain these financial transactions, manage the required financial statements, and continue to make the required disbursements in connection with SP 49 Pipeline and the other SP 49 Partners.  Accordingly, the Debtors request authority to continue their maintenance and control over the SP 49 Pipeline Account as a part of the Debtors' Cash Management System.

20.     *Dutch Accounts*:  The Debtors, through their wholly owned subsidiary and Non-Debtor Affiliate Fieldwood Cooperatief U.A. ("**Fieldwood Netherlands**"), hold a minority (approximately 10%) interest in Fieldwood Mexico B.V. ("**Fieldwood Mexico**").  The Debtors have the right, pursuant to certain contractual arrangements, to fund periodic capital calls to Fieldwood Mexico (the "**Mexico Capital Calls**") to maintain their interest in Fieldwood Mexico. In the ordinary course, the Debtors fund the Mexico Capital Calls into a Fieldwood Netherlands bank account ("**Dutch Account 1**") and further into a Fieldwood Mexico bank account ("**Dutch Account 2**", and collectively with Dutch Account 1, the "**Dutch Accounts**").  The Debtors anticipate funding approximately $20 to $25 million of Fieldwood Mexico Capital Calls for the entire year in 2020, of which approximately $12 to $14 million remains to be funded as of the Petition Date.  The Debtors request authority to continue funding the Mexico Capital Calls in the ordinary course postpetition.

**Corporate Credit Card Program**

21.     In the ordinary course business, the Debtors maintain company-paid credit cards (the "**Corporate Credit Cards**").  The Corporate Credit Cards are issued by Capital One (the "**Credit Card Provider**").  In general, the Corporate Credit Cards are used by certain of the Debtors' employees for various corporate expenses including, but not limited to, certain regulatory

permit fees, office supplies, pool-vehicle maintenance, and other required business expenses.  As of the Petition Date, there were five issued and active Corporate Credit Cards.

22.      The Debtors estimate that they incur total liabilities of approximately $275,000 per month on account of the Corporate Credit Cards.  Prior to the Petition Date, the Debtors engaged in a practice of prepaying the Corporate Credit Cards based on the estimated liabilities each month.  Accordingly, the Debtors believe that as of the Petition Date, no amounts relating to prepetition purchases and payments are outstanding on account of the Corporate Credit Cards.  The Debtors request authority to continue to make all prepayments and payments on a postpetition basis in the ordinary course of business and consistent with the Debtors' past practices, including on account of any expenses related to the prepetition period.

## Bank Fees

23.      In the ordinary course of business, the Debtors may incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain service charges and other fees, costs, and expenses charged by the Bank (collectively, the "**Bank Fees**").  The Bank Fees are *de minimis*.  To maintain the integrity of their Cash Management System, the Debtors respectfully request authority to pay the full amount of the Bank Fees, if any, during the interim period, including fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition.

## Debtors' Existing Business Forms and Checks

24.      In the ordinary course of their business, the Debtors utilize numerous preprinted business forms.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors respectfully request that the Court authorize the Debtors to continue to use all preprinted checks, correspondence, and other business forms (collectively, the "**Business Forms**")

11

including, without limitation, business cards, letterhead, envelopes, expense reports, and invoices as such forms were in existence immediately before the Petition Date, *provided*, that once the Debtors' existing check stock has been exhausted, the Debtors shall include, or direct others to include, the designation "Debtor-in-Possession" and the corresponding bankruptcy case number on all checks as soon as reasonably practicable to do so, and *provided further,* that with respect to any Business Forms that exist or are generated electronically, the Debtors shall use reasonable efforts to ensure that such electronic Business Forms are labeled "Debtor In Possession" in accordance with the requirements of the U.S. Trustee.

### Intercompany Transactions

25.     In the ordinary course of business, intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) Fieldwood Energy receives funds on behalf of Debtor and Non-Debtor Affiliates, (ii) Fieldwood Energy makes payments and disbursements on behalf of Debtor and Non-Debtor Affiliates, and (iii) funds are transferred between and among the Debtors and the Non-Debtor Affiliates (primarily between Fieldwood Energy, Fieldwood Mexico, and SP 49 Pipeline).

26.     Debtor to Debtor Intercompany Transactions and Intercompany Claims are not generally settled by actual transfers of cash among the Debtors.  Instead, the Debtors track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled.  The accounting system requires that all general ledger entries be balanced at the legal-entity level, and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a

corresponding intercompany payable on the applicable affiliate's balance sheet.  This results in a net balance of zero when consolidating all intercompany accounts.

27.     Intercompany Claims also arise in connection with Intercompany Transactions between the Debtors and their Non-Debtor Affiliates.  These transactions occur primarily in connection with the SP 49 Pipeline Account and the Mexico Capital Calls. Intercompany Transfers from and to the SP 49 Pipeline Account and the Operating Account gives rise to Intercompany Claims by SP 49 Pipeline, a Non-Debtor Affiliate, against Fieldwood Energy. As discussed above, these Intercompany Claims are generally on account of the *de minimis* net proceeds that SP 49 Pipeline owes to the other SP 49 Partners, typically less than $550,000 for each quarterly period.  Likewise, Intercompany Transfers from and to the Dutch Accounts and the Operating Account give rise to Intercompany Claims by Fieldwood Netherlands, a Non-Debtor Affiliate, against Fieldwood Energy.  As between Debtors and Non-Debtor Affiliates, the Intercompany Transactions are generally settled by actual transfers of cash, and are otherwise recorded electronically the same as Debtor to Debtor Intercompany Transactions are recorded.

28.     The Debtors maintain records of all transactions processed through their Cash Management System.  During these chapter 11 cases, the Debtors will keep records of any postpetition Intercompany Transactions and implement any additional accounting procedures required to identify and distinguish between prepetition and postpetition Intercompany Transactions.

### Continuation of the Cash Management System is in the Best Interests of the Debtors and All Other Parties in Interest

29.     The efficient and economical operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of these chapter 11 cases.  As a practical matter, it would be difficult and expensive to establish and maintain a separate cash

management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations. Any such disruption would have a severe and adverse impact upon the success of these chapter 11 cases.  Accordingly, the Debtors seek authority to continue using the Cash Management System in the same manner as the Cash Management System was utilized prior to the Petition Date, and to implement ordinary course changes to it consistent with past practices.  The Bankruptcy Code provides for such relief.

30.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business. . . and may use property of the estate in the ordinary course of business without notice or a hearing."  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *In re HLC Props., Inc.*, 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc.* (*In re Crystal Apparel, Inc.*), 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  A cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets."  *Southmark Corp. v. Grosz (In re Southmark Corp.)*,

49 F.3d 1111, 1114 (5th Cir. 1995).  Accordingly, section 363(c)(1) authorizes the continuation of the Cash Management System as it operated prepetition without the Court's approval.

31.     To the extent the relief requested herein is found to fall outside of the Debtors' ordinary course of business, the Court may grant such relief pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434-35 (5th Cir. 2016); *Institutional Creditors of Cont'l Air Lines v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale.").

32.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc*., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C*., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *See*

*CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also CEI Roofing*, 315 B.R. at 56. Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm." Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor estate.

33.     Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved. If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, their operations will experience severe disruptions, which ultimately would frustrate the Debtors' ability to maximize the value of their estates. Further, the Cash Management System provides significant benefits to the Debtors, including the ability to (i) ensure the maximum availability of funds when and where necessary, including distributing funds to Debtors with immediate liquidity needs, and (ii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

34.     Courts in this district and others have approved postpetition continuation of a debtor's cash management system in similar cases. *See, e.g.*, *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re Whiting Petroleum Corporation* No. 20-32021 (DRJ) (Bankr. S.D. Tex. May 6, 2020) (Docket No. 273); *In re Sheridan Holding Co. I, LLC.* No. 20-31884 (DRJ) (Bankr. S.D. Tex. Mar. 24, 2020) (Docket No. 73); *In re EP Energy Corp.,* No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019) (Docket No. 327); and *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018)

(Docket No. 74).   Accordingly, the Court should authorize the Debtors to continue the Cash Management System.

### The Court Should Authorize Debtors to Maintain Their
### Corporate Credit Cards and to Pay All Obligations Related Thereto

35.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order.  Purchases made using the Corporate Credit Cards fall within the ordinary course of business under section 363(c)(1) of the Bankruptcy Code.  The use of credit cards and similar payment methods is widespread as a means of facilitating day-to-day business activities.  As a result, the Debtors believe that they do not require the Court's approval to continue using the Corporate Credit Cards on a postpetition basis.

36.     Nonetheless, out of an abundance of caution, the Debtors request authority to continue using the Corporate Credit Cards in the ordinary course of business, and to pay all obligations related thereto.  Yet, in the event the Court finds that such transactions do not fall within the ordinary course of business, the Debtors request authority pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code.

37.     Continued use of the Corporate Credit Cards is integral to the success and stability of the Debtors' businesses.  The Debtors rely on the ability of their employees to pay for expenses incurred in the ordinary course and to make other reasonable work-related purchases necessary to fulfill their day-to-day professional obligations.  Permitting the Debtors to continue using the Corporate Credit Cards will ensure that the Debtors' employees are able to fulfill their

daily professional obligations and, in turn, prevent significant disruption to the Debtors' business operations.

38.     The Court should also authorize the Debtors to pay all outstanding prepetition amounts owing on the Corporate Credit Cards.  If the Debtors do not pay outstanding amounts owing, there is a significant risk that (i) the Credit Card Provider could set-off amounts owing against cash in the Debtors' Bank Accounts it maintains, and (ii) the Credit Card Provider could restrict the Debtors' access to its Credit Card programs or cease extending credit to the Debtors after the Petition Date.  If that were to occur, it would be costly, disruptive to the Company's operations, burdensome to the Debtors and their estates, and time-consuming for the Debtors to establish new credit card programs with one or more alternative providers.  Courts in this district have permitted debtors to continue using their existing corporate credit cards.  *See, e.g.*, *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re Whiting Petroleum Corp.*, No. 20-32021 (DRJ) (Bankr. S.D. Tex. May 6, 2020) (Docket No. 273); *In re Sheridan Holding Co. I, LLC,* No. 20-31884 (DRJ) (Bankr. S.D. Tex. Mar. 24, 2020) (Docket No. 73); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019) (Docket No. 327); and *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 74).  The same relief is appropriate here.

## The Court Should Authorize the Debtors to Pay Prepetition Bank Fees

39.     The Court should authorize the Debtors to pay Bank Fees and similar service charges, if any, incurred prior to the commencement of these chapter 11 cases.  As the *CoServ* court stated, "it is only logical that the bankruptcy court be able to use section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."  CoServ, 273 B.R. at 497.

40.     Here, payment of any prepetition Bank Fees is in the best interests of the Debtors and all parties-in-interest in these cases because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed. Further, because the Bank may have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these chapter 11 cases.  Courts in this district and in other districts have granted debtors similar relief in other complex chapter 11 cases. *See, e.g.*, *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019) (Docket No. 327); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. June 20, 2019) (Docket No. 79); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 74); and *In re Mem'l Prod. Partners, LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Feb. 8, 2017) (Docket No. 189).  Accordingly, the Court should authorize the Debtors to pay any outstanding prepetition Bank Fees and similar service charges to maintain the Cash Management System.

## Maintenance of the Debtors' Existing Bank Accounts and Business Forms Is Warranted

41.     The UST Operating Guidelines generally require that a chapter 11 debtor, among other things: (i) open new bank accounts at a depository approved by the U.S. Trustee; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (iii) close all existing bank accounts and open new debtor in possession accounts; (iv) maintain a separate debtor in possession account for cash collateral; (v) obtain checks that bear the designation "Debtor in Possession"; and (vi) reference the debtor's bankruptcy

case number and type of account on each such check.  *See* U.S. Dep't of Justice, Region 7 Guidelines for Debtors-in-Possession § IV (2020).[8]

42.     The Debtors request that the Court waive the requirements of the UST Operating Guidelines, which would require, among other things, the closure of the Bank Accounts, the opening of new deposit accounts.  Strict enforcement of the UST Operating Guidelines with respect to the Cash Management System will severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  These chapter 11 cases will be more orderly if the Debtors are permitted to maintain all Bank Accounts with the same account numbers during these cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties-in-interest, including employees, vendors, and customers, will be best served by the relief requested herein.  In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash Management System, such as opening or closing their accounts in accordance with the Debtors' prepetition practices.  Courts in this district and in other districts have granted debtors similar relief in other complex chapter 11 cases.  *See, e.g.*, *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020) (Docket No. 111); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019) (Docket No. 327); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. June 20, 2019) (Docket No. 79); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 74); and *In re Mem'l Prod. Partners, LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Feb. 8, 2017) (Docket No. 189).

---

[8] https://www.justice.gov/ust-regions-r07/file/r07_dip_guidelines.pdf/download

**Continued Performance of Intercompany Transactions Is Warranted,**
**and Intercompany Claims Should Be Granted Administrative Expense Status**

43.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor

in possession "may use property of the estate in the ordinary course of business without notice or

a hearing."  The Debtors believe that they do not require the Court's approval to continue entering

into and performing under their Intercompany Transactions.  The Debtors enter into and perform

under Intercompany Transactions "in the ordinary course of business" within the meaning of

section 363(c)(1) of the Bankruptcy Code.  Intercompany Transactions are not just a matter of

routine in the Debtors' businesses: they are the sort of transactions that are common among many

business enterprises that operate through multiple affiliates.  It is precisely because of their routine

nature that the Intercompany Transactions are integral to the Debtors' ability to operate their

businesses and successfully emerge from these chapter 11 cases.   Accordingly, out of an

abundance of caution, the Debtors request express authority to engage in such transactions

postpetition.

44.     The Debtors also request that the Court grant administrative claim status to

all Intercompany Claims arising postpetition as a result of any Intercompany Transaction under

section 503(b)(1)(A) of the Bankruptcy Code, which provides, "[a]fter notice and a hearing, there

shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses

of preserving the estate . . . ."  If the Intercompany Claims are accorded administrative claim status,

each entity that participates in the Cash Management System and provides benefit to the Debtors'

estate, will be assured that it will be compensated for its efforts.  Courts in this district and in other

districts have granted administrative expense status to postpetition intercompany claims in similar

cases.  *See, e.g.*, *In re Gavilan Res., LLC*, No. 20-32656 (DRJ) (Bankr. S.D. Tex. June 9, 2020)

(Docket No. 111); *In re Whiting Petroleum Corp.*, No. 20-32021 (DRJ) (Bankr. S.D. Tex. May 6,

2020) (Docket No. 273); *In re Sheridan Holding Co. I, LLC*, No. 20-31884 (DRJ) (Bankr. S.D. Tex. Mar. 24, 2020) (Docket No. 73); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Nov. 7, 2019) (Docket No. 327); and *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 74). The same relief is also appropriate here.

**The Debtors Comply with Requirements of**
**Section 345(b) of Bankruptcy Code and UST Operating Guidelines**

45.     Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain, from the entity with which money is deposited or invested, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court, for cause, orders otherwise. *Id.* § 345(b). In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury as an acceptable substitute for a surety bond. *See* 31 U.S.C. §§ 9301, 9303.

46.     Investment of cash in strict compliance with the requirements of section 345(b) would, in large chapter 11 cases such as these, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide

that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H10,752-01, H10,768 (Oct. 4, 1994), 1994 WL 545773.

47.    Additionally, the UST Operating Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the U.S. Trustee.

48.    As stated above, all of the Debtors' active Bank Accounts are maintained with Capital One, an authorized depository under the UST Operating Guidelines that is insured by the Federal Deposit Insurance Corporation.  Accordingly, the Debtors respectfully submit that funds deposited into such Bank Accounts comply with section 345 of the Bankruptcy Code.  To the extent any of the Debtors' Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors request a 45-day extension of the deadline to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines, which deadline may be further extended by written stipulation between the Debtors and the U.S. Trustee without further order of the Court.

**Bankruptcy Rule 6003(b) Has Been Satisfied**

49.    Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Dane Declaration, the Debtors' business operations rely on the Cash Management System, Bank Accounts, and existing Business Forms.  Any disruption in the continuation of these practices would severely disrupt the Debtors' operations to the detriment and prejudice of all parties in interest.  Accordingly, the relief requested is essential to avoid the immediate and irreparable harm

that would be caused by the Debtors' inability to transition smoothly into chapter 11 and the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a) and
<u>Waiver of Bankruptcy Rule 6004(h)</u>**

50.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

**<u>DIP Order and DIP Documents Control</u>**

51.     Contemporaneously herewith, the Debtors are seeking approval of interim and final orders, which provide for, among other things, the Debtors' entry into a postpetition financing facility (the "**DIP Facility**") and the use of cash collateral (any order entered by the Court approving the Debtors' entry into such postpetition financing facility and/or the use of cash collateral, the "**DIP Order**" and, the definitive documentation for such facility, the "**DIP Documents**").  The DIP Order and the DIP Documents contain terms that limit and otherwise apply to the Debtors' ability to utilize certain of the relief requested herein.  For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to the terms of the DIP Order and the DIP Documents.

**<u>Reservation of Rights</u>**

52.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or

24

interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### Notice

53.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn:  William L. Wallander, Esq. and Bradley R. Foxman, Esq.), as counsel to Goldman Sachs Bank USA, the FLFO Administrative Agent; (iv) (A) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:  Damian S. Schaible, Esq. and Natasha Tsiouris, Esq.), and (B) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham Jr., Esq. and Martha Wyrick, Esq.), as counsel to the Ad Hoc Group; (v) Shipman & Goodwin LLP, 400 Park Ave, 5th Floor, New York, NY 10022 (Attn:  Nathan Plotkin, Esq.), as counsel to Cantor Fitzgerald Securities, the FLTL Administrative Agent; (vi) Holland & Knight LLP, 150 N. Riverside Plaza, Chicago, IL 60606 (Attn:  Joshua Spencer, Esq. and Anastasia Sotiropolous, Esq.), as counsel to Cortland Capital Market Services LLC, the SLTL Administrative Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the Securities and Exchange Commission; (x) the Banks; (xi) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (xiii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Previous Request**

54.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  August 4, 2020
       Houston, Texas

                                              Respectfully submitted,

                                              */s/  Alfredo Pérez*
                                              WEIL, GOTSHAL & MANGES LLP
                                              Alfredo R. Pérez (15776275)
  700 Louisiana Street, Suite 1700
  Houston, Texas 77002
  Telephone:  (713) 546-5000
  Facsimile:  (713) 224-9511
  Email:        Alfredo.Perez@weil.com

  -and-
  WEIL, GOTSHAL & MANGES LLP
  Matthew S. Barr (*pro hac vice* pending)
  Jessica Liou (*pro hac vice* pending)
  767 Fifth Avenue
  New York, New York 10153
  Telephone:  (212) 310-8000
  Facsimile:  (212) 310-8007
  Email:        Matt.Barr@weil.com
                       Jessica.Liou@weil.com

  *Proposed Attorneys for Debtors*
  *and Debtors in Possession*

## **Certificate of Service**

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


  _/s/  Alfredo Pérez_____
Alfredo R. Pérez