IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

EMERGENCY MOTION OF DEBTORS FOR INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO
PAY (A) PREPETITION INTEREST OWNER OBLIGATIONS,
JOINT INTEREST  BILLINGS, AND E&P OPERATING EXPENSES
AND (B) 503(b)(9) CLAIMS, AND (II) GRANTING RELATED RELIEF

EMERGENCY RELIEF HAS BEEN REQUESTED.  A VIDEO/TELEPHONIC HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 4, 2020 AT 2:00 P.M. (PREVAILING CENTRAL TIME).  PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 954554.  PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE HTTPS://WWW.GOTOMEETING.COM/MEETING/JOIN-MEETING AND ENTERING MEETING CODE "JudgeIsgur."

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 4, 2020.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Background

1.      Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are an independent exploration and production ("**E&P**") company in the Gulf of Mexico. The Company is focused on the exploration and development of offshore oil and gas assets in the shallow water and deepwater Gulf of Mexico and the Gulf Coast region in the U.S.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of the Debtors' Chapter 11 Petitions and First Day*

*Relief* (the "**Dane Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

### Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

5.      By this Motion, pursuant to sections 105(a), 363(b), 503(b)(9), and 541 of title 11 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rules 4002-1 and 9013-1, the Debtors request entry of interim and final orders (i) authorizing, but not directing, them to pay, in the ordinary course of business, their undisputed, liquidated amounts owing to (a) holders of royalty, working, and other interests, including Suspense Obligations (as defined below), as required by the Debtors' various leases and related agreements (each as defined below and, collectively, the "**Interest Owner Payments**"), (b) operators for unpaid joint interest billings and related obligations (the "**Joint Interest Billings**"), and (c) certain third parties for lease operating expenses, gathering, transportation, and processing expenses, capital expenditures, Supplemental Workforce Obligations (as defined below), and related costs (the "**E&P Operating Expenses**" and, collectively, with the Interest Owner Payments and Joint Interest Billings, the "**Prepetition Obligations**"), including to certain vendors, contractors, subcontractors, drillers, haulers, and suppliers of oil- and gas-related services, labor, supplies, and materials ("**E&P Claimants**"); (ii) authorizing, but not directing, the Debtors to pay certain claims entitled to

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Dane Declaration.

priority under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**"); and (iii) granting related relief.

6.   The estimated amounts for Prepetition Obligations and outstanding 503(b)(9) Claims as of the Petition Date and coming due in the first 21 days after the Petition Date are summarized in the following table.

| Category | Description | Estimated Amount Outstanding as of the Petition Date | Estimated Amounts Due Within 21 Days |
|---|---|---|---|
| **Prepetition Obligations** | | | |
| Interest Owner Payments | Payments in the ordinary course to holders of royalty, working, and other interests as required by the Debtors' various leases and related agreements, including Suspense Obligations. | $8.2 million | $0 |
| Joint Interest Billings | Payments in the ordinary course to Operators for the Debtors' share of operating expenses owned for non-operated wells and leases. | $32.5 million | $9.6 million |
| E&P Operating Expenses | Payments in the ordinary course to third parties for certain gathering, transportation and processing expenses, Supplemental Workforce Obligations, lease operating expenses, other exploration and production costs, capital expenditures, and related costs. | $152.2 million | $59.4 million |
| **Total Estimated Prepetition Obligations** | | **$193.0 million** | **$69.1 million** |
| 503(b)(9) Claims | Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code for goods delivered within 20 days of the Petition Date | $7.5 million | $4.6 million |

7.   The Debtors also request that the Court authorize financial institutions (the "**Banks**") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the Prepetition Obligations and 503(b)(9) Claims to the extent the Debtors have sufficient funds on deposit with such Bank, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and that all such financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

8.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**").

### The Debtors' Oil and Gas Leases and Operations

9.     As discussed in the Dane Declaration, the Debtors' operations are focused on the acquisition, development, exploitation, and production of oil and natural gas properties.  As of the date hereof, the Debtors have over 300 operated platforms spread across over one and a half million gross acres.  The Debtors own an interest in 364 oil, gas, and mineral leases ("**Oil and Gas Leases**"), a substantial number of which are granted by the Bureau of Ocean Energy Management ("**BOEM**"). The Debtors maintain operational control over greater than 95% of their diversified asset base.

10.     The Debtors' leasehold interests are subject to, or burdened by, royalty interests retained by the federal government or applicable state (a "**Royalty Interest**"), fractional interests in the right to participate or receive proceeds from the sale of oil and gas (an "**Overriding Royalty Interest**" or "**ORRI**") and/or Working Interests (as defined below).

11.     The Debtors hold working interests and similar operating rights interests (collectively, the "**Working Interests**") in various Oil and Gas Leases.  Generally, a Working Interest entitles the owner of that interest to a portion of the mineral production from the property or the proceeds thereof subject to the costs of exploration, development, and operation of the property.  *See McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 310 n.3 (S.D.N.Y. 2011), *aff'd*, 509 F. App'x 62 (2d Cir. 2013); *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 869 n.3 (Tex. App. 2009); *Kansas City Royalty Co., L.L.C. v. Thoroughbred Assocs., L.L.C.*, 215 F.R.D. 628, 631 (D. Kan. 2003).  Certain of the Debtors' Working Interests are subject to net profits

interests ("**NPIs**")—the holders of which are entitled to a share of the profits from the Debtors' Working Interests.

12.     Operating Agreements govern the relationship between joint interest holders in an oil and gas lease and memorialize the terms under which revenues and costs from an oil and gas lease are apportioned.[3]   An Operating Agreement typically designates one working interest holder as the operator of an oil and gas lease (an "**Operator**"), *i.e.*, the party that assumes responsibility for the physical operation and control of a well.  The Operator conducts the day-to-day business of producing oil and gas at the site and initially covers expenses incurred on the oil and gas lease on account of its Working Interest as well as the holders of the Non-Operating Working Interests (as defined below), from whom the Operator then seeks repayment.

13.     Other parties to an Operating Agreement each hold a non-operating working interest (a "**Non-Operating Working Interest**") in the oil and gas lease.  The primary obligation of a holder of a Non-Operating Working Interest (a "**Non-Operating Working Interest Holder**") is to pay its *pro rata* portion of the Joint Interest Billings to the Operator.  Non-Operating Working Interest Holders are billed for these Joint Interest Billings on terms contained in the Operating Agreement.

### The Debtors' Prepetition Obligations

14.     As described more fully herein, the Debtors estimate that, as of the Petition Date, the aggregate amount of Prepetition Obligations outstanding is approximately $193.0

---

[3]  Standard operating agreements contain a bankruptcy clause providing, among other consequences, that if the operator commences a bankruptcy case, "it shall be deemed to have resigned without any action" by the non-operators (the "**Resignation Provision**").  The Debtors submit that such Resignation Provisions are unenforceable ipso facto clauses against the Debtors in their capacity as operator.  See 11 U.S.C. § 365(e)(1); *Wilson v. TXO Prod. Corp. (In re Wilson)*, 69 B.R. 960, 963 (Bankr. N.D. Tex. 1987) (joint operating agreements uniformly held to be executory contracts and can thus be assumed or rejected under Section 365 of the Bankruptcy Code).

million, of which approximately $69.1 million will become due and payable in the first 21 days after the Petition Date.

15.     The various components of the Prepetition Obligations related to the Debtors' capital-intensive operations are described in further detail below.

**A.     Joint Interest Billings**

16.     The Debtors hold Working Interests and Non-Operating Working Interests. In respect of their Non-Operating Working Interests, in the 12 months preceding the Petition Date, the Debtors paid approximately $79.2 million in Joint Interest Billings.  Joint Interest Billings vary in amount and are not entirely predictable on a month-to-month basis.  Nonetheless, failure to timely pay the Joint Interest Billings may provide grounds for contractual or statutory lien rights in favor of the Operator against the Debtors' Non-Operating Working Interest in the associated Oil and Gas Lease or the Debtors' *pro rata* portion of the production therefrom.

17.     To continue to receive their share of the Working Interests and maintain their relationships with the Operators of these properties, both during and after the pendency of their chapter 11 cases, the Debtors request authority, but not direction, to pay approximately $32.5 million in undisputed, liquidated, and prepetition Joint Interest Billings in the ordinary course when due.  Of this amount, the Debtors request authority, but not direction, under the Proposed Interim Order to pay approximately $9.6 million to Interest Owners (as defined below) as those amounts become due in the ordinary course during the first 21 days after the Petition Date.

**B.     Obligations to Mineral and Other Interests Owners**

**1.     Interest Owner Payments**

18.     Pursuant to various Operating Agreements, Oil and Gas Leases, and other contractual obligations and arrangements, the Debtors are obligated to remit to holders of Royalty

Interests, ORRIs, Working Interests, and NPIs (collectively, the "**Interest Owners**") their Interest Owner Payments.

19.     Failure to make all required Interest Owner Payments could have a material adverse effect upon the Debtors and their operations including, without limitation, potential cancellation, forfeiture, or termination of Oil and Gas Leases, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation and, in some instances, attempted removal of the Debtors as Operator.

20.     The Debtors make Interest Owner Payments each month.  Such payments are generally paid two months in arrears.  Amounts owed are calculated as provided for in the underlying Oil and Gas Lease, Operating Agreement, or other underlying contract, and are typically based on the production revenue received by the Debtors from purchasers, less applicable severance taxes and, in some instances, certain post-production charges.  In certain circumstances, the Debtors have received payment for the share of proceeds due to Interest Owners, however, due to the timing of the commencement of these chapter 11 cases, such Interest Owner Payments were not made prior to the Petition Date.

21.     As of the Petition Date, the Debtors estimate they owe approximately $6.9 million on account of accrued and undisputed Interest Owner Payments, none of which is estimated to become due and payable during the first 21 days after the Petition Date.

**2.     Suspense Obligations**

22.     The Debtors hold certain Interest Owner Payments in "suspense" when (i) they are too small to warrant payment under the terms of an Operating Agreement or other applicable agreement, (ii) the Debtors have determined they should not be paid because of a

dispute or other legal reasons, or (iii) the Debtors are unable to identify or properly pay the relevant Interest Owner (such amounts held in suspense, "**Suspense Obligations**").

23.     The Suspense Obligations are accrued but unpaid liabilities of the Debtors. The Debtors estimate that approximately $1.3 million in Suspense Obligations have accrued as of the Petition Date.   In light of the difficulty in estimating precisely when, and to what extent, Suspense Obligations will become due and payable and, out of an abundance of caution, the Debtors seek authority to continue to negotiate, resolve, settle, and honor the full amount of the outstanding Suspense Obligations accrued in the ordinary course postpetition.

**C.      E&P Operating Expenses**

24.     In the ordinary course of business, in their role as operators of certain Oil and Gas Leases, the Debtors contract with E&P Claimants for goods and services necessary to operate wells.   Where production is sold at the wellhead, the purchaser of the production takes ownership at the wellhead and the Debtors do not incur transportation costs.   In instances where production is not sold at the wellhead, the Debtors are obligated under various agreements (the "**GTP Agreements**") to pay certain costs associated with the gathering, transportation, and processing of oil and gas, including settlement, if required, of monthly pipeline imbalances (the "**GTP Costs**"). In addition, certain pipelines have established quality banks-systems designed to measure quality changes across crude production in common stream operations.   Based on the calculated differences, the pipelines collect from, and remit monetary adjustments to, the crude oil shippers (the "**Quality Bank Adjustments**" and, together with the GTP Costs, the "**GTP Costs and Adjustments**" or "**GTP Expenses**"). Additionally, the Debtors are obligated to pay certain capital expenditures ("**Capex**") and lease operating expenses ("**LOEs**").   Pursuant to the applicable Operating Agreement, a holder of a Non-Operating Working Interest either (i) pre-funds

or reimburses the Debtors for its *pro rata* share of the cost of production or (ii) nets its share of

production revenue against its share of E&P Operating Expenses.

      25.    In connection with operating their E&P business, the Debtors rely on

services provided by certain vendors, including temporary labor, contractors, or consultants related

to the Debtors' onshore and offshore operations.  The Debtors procure the temporary workforce

through a number of different vendors and generally employ skilled workers necessary for their

offshore operations and, on occasion, administrative staff on a temporary basis.  The Debtors remit

compensation for the temporary workforce to the vendors on a regular basis through the Debtors'

accounts payable system (the "**Supplemental Workforce Obligations**").  The Debtors pay

approximately $13.6 million per month in Supplemental Workforce Obligations.

      26.    As of the Petition Date, the Debtors estimate that they have approximately

$152.2 million in outstanding prepetition E&P Operating Expenses as set forth in the table below.

The Debtors estimate that approximately $59.4 million of the E&P Operating Expenses will

become due and payable during the first 21 days after the Petition Date.

| Category | Description of E&P Operating Expenses | Estimated Amount Outstanding as of the Petition Date | Estimated Amount Due Within 21 Days |
|---|---|---|---|
| GTP Expenses | Payments necessary to transfer oil and natural gas to production market or otherwise associated with gathering, transportation, and processing of oil and gas, including settlement, if necessary, of monthly pipeline balances and treating, dehydration, compression, separation, fractionation and other services. | $10.3 million | $8.6 million |
| Capex | Capital expenses for drilling and completions, fluid management/flowback, major work over expense, wellhead facilities, production equipment, etc. | $43.9 million | $16.4 million |
| LOEs | Lease operating expenses, such as salt water disposal, equipment rentals, materials used in production, chemicals, facility and subsurface maintenance, fuel, generators rentals, etc. | $80.7 million | $24.3 million |

| Category | Description of E&P Operating Expenses | Estimated Amount Outstanding as of the Petition Date | Estimated Amount Due Within 21 Days |
|---|---|---|---|
| Supplemental Workforce Obligations | Payments in the ordinary course to vendors that provide temporary workers, contractors and consultants to the Debtors. | $17.3 million | $10.1 million |
| **Total Estimated Prepetition E&P Operating Expenses:** | | $152.2 million | $59.4 million |

27.     The Debtors request authority, but not direction, to pay approximately $152.2 million in prepetition E&P Operating Expenses. Of this amount, the Debtors request authority, but not direction, to pay approximately $59.4 million under the Proposed Interim Order on account of E&P Operating Expenses that will become due and payable during the first 21 days after the Petition Date.

28.     As a condition to payment of any amounts owed to E&P Claimants on account of goods or services provided to the Debtors prior to the Petition Date, the Debtors will enter into customary trade agreements (the "**Trade Agreements**") with such E&P Claimants on terms consistent with the historical practice between the parties. Such Trade Agreements will require the E&P Claimants to agree that the payment to be made will be in full satisfaction of any prepetition amounts allegedly owed to such E&P Claimants by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date. Further, the Debtors request authorization, but not direction, to negotiate, modify, or amend the form of a Trade Agreement in its reasonable business judgment.

### Basis for Relief

**A.     The Debtors Should be Authorized to Make Interest Owner Payments**

29.     Failure to make all requested Interest Owner Payments could have a material adverse effect upon the Debtors and their operations, including, without limitation,

potential cancellation, forfeiture, or termination of the Oil and Gas Leases, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation and, in some instances, attempted removal of the Debtors as Operator.

30.     Interest Owners may assert that the Debtors hold only legal title to the accrued prepetition amounts due to them from the proceeds of oil and gas sales as bailees.  *See, e.g.*, *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (ordering the debtor-operator to turn over amounts due to the interest owners because the debtor-operator had no interest in such amounts beyond a "bare possessory interest as bailee or agent").  Assuming, *arguendo*, amounts owed to Interest Owners are not the Debtors' property, such Interest Owners may assert that certain proceeds of oil and gas sales should be turned over in the ordinary course of business.

31.     Courts have held that section 541 of the Bankruptcy Code expressly provides that if a debtor holds only a legal, but not an equitable, interest in property as of the petition date, such property is not property of the estate.  *See, e.g.*, *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 100 (Bankr. D. Del. 2006).  Because Interest Owners may assert that the Debtors have only legal title, and not an equitable interest, in the proceeds of the oil and gas sales attributable to the Interest Owners, any funds held by the Debtors on account of the Interest Owners may not be property of the Debtors' estates and, thus, the Debtors may not be entitled to distribute any such funds to their creditors.

32.     If the Debtors hold only legal title to the accrued prepetition proceeds of oil and gas sales, no creditors will be prejudiced by the relief requested in this Motion.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to satisfy their prepetition and postpetition obligations to Interest Owners in the ordinary course of business.

**B.    The Debtors Should be Authorized to Make Joint Interest Billings Payments**

33.    Where the Debtors hold a Non-Operating Working Interest, the Operating Agreements and/or applicable law often grant the Operator the right to contractual or statutory liens to secure obligations owed to the Operator based upon the Debtors' interest in the Oil and Gas Lease.  These liens may include (i) all equipment installed on the oil and gas lease, (ii) all hydrocarbons or other minerals severed and extracted from or attributable to the oil and gas lease, (iii) all accounts and proceeds of sale, contract rights, and general intangibles arising in connection with the sale, (iv) fixtures, and (v) any and all accessions, additions, and attachments thereto and the proceeds and products therefrom.  *See generally*, La. Rev. Stat. ANN. § 9:4883; *see also* Tex. Prop. Code ANN. § 56.002 (granting liens to secure payment for labor or services related to mineral activities).[4]

34.    As such, the Debtors' failure to pay Joint Interest Billings timely will likely result in the third-party operators asserting lien rights on the Working Interests in the Oil and Gas Leases or the production therefrom.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  The lien may purport to secure the payment of all charges, fees, court costs, and other directly related collection costs.  If the Debtors do not pay charges when due, the operator may also attempt to assert additional rights to collect from the purchaser of the Debtors' production until the amount owed has been paid (or setoff or recoup

---

[4] For example, the Texas Property Code grants a "mineral contractor" or "mineral subcontractor" a lien to secure payment for labor or services related to "mineral activities." Tex. Prop. Code Ann. § 56.002. Such parties are broadly defined to include, *inter alia*, persons performing labor or furnishing or hauling material, machinery, or supplies used in mineral activities. Id. § 56.001(2), (4). The term "mineral activities" has a similarly expansive definition that includes digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well, an oil or gas pipeline, or a mine or quarry. Id. § 56.001(1).  The Utah Code provides similarly broad protections for contractors and subcontractors for work performed in connection with mineral activities. Utah Code Ann. § 38-10-101.

such amounts from funds owed to the Debtors).  As such, failure to timely pay Joint Interest Billings owing by the Debtors is likely to lead to instances of attempted setoff or recoupment.

**C.     The Debtors Should be Authorized to Pay E&P Operating Expenses**

35.     Payment of certain E&P Operating Expenses is critical to the protection of the Debtors' business operations.  State law in the jurisdictions that the Debtors operate grant mineral contractors or subcontractors a lien for labor or services related to mineral activities.  Tex. Prop. Code ANN. § 56.002; La. Rev. Stat. ANN. § 9:4883.  Without the requested relief, E&P Claimants may assert liens on almost every part of the Debtors' business operations, including the Debtors' property or the property of the Debtors' third-party working interest partners, such as wells and the production therefrom.  As such, the Debtors' revenues and their relationships with joint interest owners could be jeopardized if the Court does not grant the relief requested herein.

36.     Payment of the E&P Operating Expenses will also ensure that the Debtors maintain strong relationships with the E&P Claimants that will inure to the benefit of all parties in interest.  The Debtors' ongoing operations depend, to a significant degree, on their relationships with the parties to which E&P Operating Expenses are owed.  If these relationships are harmed, either through non-payment of E&P Operating Expenses as they become due or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors may encounter particularized controversies with each counterparty, unnecessary costs and distractions, and corresponding harm to their businesses with the possible loss of the Debtors' going-concern value.

37.     In addition, if the relationships established by the Debtors with the parties that are owed the E&P Operating Expenses are harmed, whether through non-payment or perceived difficulties of working with chapter 11 debtors, the Debtors may be unable to secure future opportunities with those parties, and other third parties may be unwilling to engage in new

14

business with the Debtors going forward.  If that were to occur, the Debtors' businesses, their estates, and creditors would be negatively impacted.

38.     Furthermore, with respect to E&P Claimants who provide the supplemental workforce to help the Debtors perform their offshore operations, the failure to provide the Debtors the authority to pay, in their discretion, amounts relating to such obligations could be disruptive to their business.  The Debtors may be prevented from finding personnel in numbers sufficient to operate their offshore operations and be forced to cease, or substantially curtail, certain of their offshore operations while they attempt to locate replacement vendors that could supply personnel in sufficient numbers.

39.     Accordingly, paying the E&P Operating Expenses, including prepetition expenses, in the ordinary course of business is a sound exercise of the Debtors' business judgment.

**D.     Payments to Interest Owners and Payments on Account of Joint Interest Billings and E&P Operating Expenses are Authorized Under the Bankruptcy Code**

40.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy

Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

41.    In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  *See CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

42.    Courts in this district and others have granted authority for debtors to pay similar obligations as those sought to be paid hereunder as a routine matter in similar cases.  *See, e.g.*, *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bank. S.D. Tex. May 18, 2020) (Docket No. 121); *In re Whiting Petrouleum Corp.*, No. 20-32021 (DRJ) (Bank. S.D. Tex. Apr. 1, 2020) (Docket No. 47); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019)

(Docket No. 67); *In re Fieldwood Energy LLC*, *et al.*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. March 13, 2018) (Docket No. 203); *In re Cobalt Int'l Energy, Inc.,* No. 1736709 (MI) (Bankr. S.D. Tex. Dec. 14, 2017) (Docket No. 60); *In re Energy XXI Ltd.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (Docket No. 60); *In re Mem'l Prod. Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 17, 2017) (Docket No. 59).  The same relief is also appropriate here.

43.     Accordingly, for the foregoing reasons, payments to Interest Owners and payments on account of prepetition Joint Interest Billings and E&P Operating Expenses are necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases. Accordingly, the Court should authorize, but not direct, the Debtors to make such payments, including on account of prepetition amounts in the ordinary course as they come due.

**E.     Payment of the 503(b)(9) Claims is Warranted and Should be Approved**

44.     Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

45.     The Debtors will be required to pay in full all claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code to confirm any chapter 11 plan filed in the chapter 11 cases. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority in order for a chapter 11 plan to be confirmed).

46.     Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, Bankruptcy Courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a

need to do so. *See In re Glob. Home Prods., LLC*, Case No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court."); *In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *10 (Bankr. S.D. Tex. Mar. 18, 2014) (same). Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if they choose to do so or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan. *See In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").

47.     Due to the nature of the Debtors' businesses, certain E&P Claimants may have claims that arise from the delivery of goods in the ordinary course to the Debtors within the twenty (20) days prior to the Petition Date. As of the Petition Date, the Debtors estimate that E&P Claimants were owed approximately $7.5 million on account of 503(b)(9) Claims. Payment of any 503(b)(9) Claims merely accelerates the timing of payment and not the ultimate treatment of such claims. Accordingly, the relief should be granted and the Debtors should be authorized to pay the 503(b)(9) Claims of any E&P Claimants upon execution of a Trade Agreement and satisfaction of the other procedures and protocols set forth herein.

### Applicable Financial Institutions Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Prepetition Obligations and 503(b)(9) Claims

48.     The Debtors further request that the Court authorize the Banks to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Prepetition Obligations and 503(b)(9) Claims, to the extent that sufficient funds are on deposit in the applicable bank accounts to cover such payment. The Debtors also seek authority, but not direction, to issue new postpetition checks

or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of Prepetition Obligations and 503(b)(9) Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

## Bankruptcy Rule 6003 Has Been Satisfied

49.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.   As described herein and in the Dane Declaration, it is critical that the Debtors be granted authority to continue to make Interest Owner Payments and Joint Interest Billings under their leases and operating agreements as well as other Prepetition Obligations and otherwise preserve the status quo and avoid the incurrence of unnecessary statutory liens.   Accordingly, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11 and,  the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## Compliance with Bankruptcy Rule 6004(a)
## and Waiver of Bankruptcy Rule 6004(h)

50.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

## DIP Order and DIP Documents Control

51.     Contemporaneously herewith, the Debtors are seeking approval of interim and final orders, which provide for, among other things, the Debtors' entry into a postpetition financing facility (the "**DIP Facility**") and the use of cash collateral (any order entered by the Court approving the Debtors' entry into such postpetition financing facility and/or the use of cash

collateral, the "**DIP Order**" and, the definitive documentation for such facility, the "**DIP Documents**"). The DIP Order and the DIP Documents contain terms that limit and otherwise apply to the Debtors' ability to utilize certain of the relief requested herein. For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to the terms of the DIP Order and the DIP Documents.

### Reservation of Rights

52.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### Notice

53.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn:  William L. Wallander, Esq. and Bradley R. Foxman, Esq.), as counsel to Goldman Sachs Bank USA, the FLFO Administrative Agent;

(iv) (A)  Davis  Polk  &  Wardwell  LLP,  450  Lexington  Avenue,  New  York,  NY  10017 (Attn:  Damian  S.  Schaible,  Esq.  and  Natasha  Tsiouris,  Esq.)  and  (B)  Haynes  and  Boone,  LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham Jr., Esq. and Martha  Wyrick,  Esq.),  as  counsel  to  the  Ad  Hoc  Group  of  Secured  Lenders;  (v)  Shipman  & Goodwin LLP, 400 Park Ave, 5th Floor, New York, NY 10022 (Attn:  Nathan Plotkin, Esq.), as counsel to Cantor Fitzgerald Securities, the FLTL Administrative Agent; (vi) Holland & Knight LLP,  150  N.  Riverside  Plaza,  Chicago,  IL  60606  (Attn:  Joshua  Spencer,  Esq.  and  Anastasia Sotiropolous,  Esq.),  as  counsel  to  Cortland  Capital  Market  Services  LLC,  the  SLTL Administrative  Agent;  (vii)  the  Internal  Revenue  Service;  (viii)  the  United  States  Attorney's Office for the Southern District of Texas; (ix) the Securities and Exchange Commission; (x) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (xi) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

54.     No  previous  request  for  the  relief  sought  herein  has  been  made  by  the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 4, 2020
Houston, Texas

Respectfully submitted,

_/s/ Alfredo Pérez_
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Matt.Barr@weil.com
          Jessica.Liou@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

                                  *_/s/ Alfredo Pérez_____*
                                    Alfredo R. Pérez