### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION OF DEBTORS FOR AN ORDER (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION, (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED OBLIGATIONS, AND (C) PAY PREPETITION EMPLOYMENT AND TRAINING EXPENSES, AND (II) GRANTING RELATED RELIEF**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A VIDEO/TELEPHONIC HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 4, 2020 AT 2:00 P.M. (PREVAILING CENTRAL TIME). PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 954554. PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE HTTPS://WWW.GOTOMEETING.COM/MEETING/JOIN-MEETING AND ENTERING MEETING CODE "JudgeIsgur."**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 4, 2020.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1.      Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are an independent exploration and production ("**E&P**") company in the Gulf of Mexico.  With operations in both the United States and Mexico, the Company is focused on the exploration and development of offshore oil and gas assets in the shallow and deepwater Gulf of Mexico and the Gulf Coast region.

3.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and Related*

*Requests for Relief* (the "**Dane Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## Jurisdiction

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.      By this Motion, pursuant to sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1(b), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Obligations, Other Compensation Obligations, and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.  The Debtors further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to the such fees, costs, expenses and obligations.

6.      A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Dane Declaration.

**Debtors' Workforce**

7.     The Debtors comprise the largest offshore oil and gas exploration and production organization with approximately 635 employees (each, an "**Employee**").   All Employees are employed full-time.  Over half of the Employees are offshore workers (each, an "**Offshore Employee**")—workers and other skilled professionals who either (i) perform rotations on various offshore platforms and wells related to drilling, safety, maintenance, and decommissioning work or (ii) perform functions related to offshore operations that are based at onshore field locations—all of which are critical to the ongoing business operations of the Debtors. The remaining Employees provide a variety of engineering, management, administrative, and other support services in offices in Houston, Texas and Lafayette, Louisiana (each, an "**Office Employee**").  Collectively, the Employees' skills and knowledge of the Debtors' infrastructure, customers, and business operations are essential to the continued operation of the Debtors' businesses and preserving the value of the estates for the benefit of creditors and other stakeholders.   With the Employees' continued, uninterrupted services, an effective restructuring will not be possible.

8.     In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation ("**Employee Compensation Obligations**"), benefits ("**Employee Benefits Obligations**"), and onboarding of new employees ("**Employee Onboarding Obligations,**" collectively, the "**Employee Obligations**").  The Debtors estimate that they owe approximately $9,652,600 in prepetition Employee Obligations and Other Compensation Obligations (as defined below) as of the Petition Date.

9.     The estimated outstanding prepetition amounts for Employee Obligations and Other Compensation Obligations are summarized in the following chart, and are described in further detail below:

| Prepetition Obligations | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Employee Compensation Obligations | Obligations related to Employee salaries and wages, expenses, payroll taxes, and severance. | $7,060,000 |
| Employee Benefits Obligations | Obligations related to Employee health and welfare benefits, and retirement benefits. | $2,512,600 |
| Employee Onboarding Obligations | Obligations owed to Onboarding Firms for background checks, safety training, and various other Employee onboarding services. | $20,000 |
| Other Compensation Obligations | Other compensation obligations | $60,000 |
| **Total Estimated Prepetition Employee Obligations and Other Compensation Obligations** | | $9,652,600 |

### Employee Compensation Obligations

10.     A description of the Employee Compensation Obligations and the estimated outstanding prepetition amounts owed as of the Petition Date are summarized in the following chart.  Each of the various categories of Employee Compensation Obligations is described in further detail below.

| Prepetition Obligations | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Wages and Compensation Obligations | Obligations related to Employee salaries and wages and, for certain eligible Employees, paid leave and overtime. | $2,500,000 |
| Expenses | Obligations related to advances or the reimbursement of certain expenses incurred by Employees in the performance of their employment duties, such as job-related travel and meal expenses. | $90,000 |

| Prepetition Obligations | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Deductions and Payroll Taxes | Wage-based taxes owing pursuant to applicable federal and local laws. | $170,000 |
| Employee Severance Obligations | Obligations related to outstanding severance payments for Employees separated from the Company prior to the Petition Date. | $50,000 |
| Employee Bonus Programs | Obligations related to Employee bonus payments. | $4,250,000 |
| **Total Estimated Employee Compensation Obligations** | | $7,060,000 |

## A.     Salaries and Wages

11.     In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries, wages and other compensation, including for certain non-exempt Employees, paid leave and overtime (the "**Wages and Compensation Obligations**").  Wages and Compensation Obligations are paid on a bi-weekly schedule, for a total of 26 payments per year. The Office Employees work a compressed work schedule which consists of eight 9-hour days, one 8-hour day, and one day off in a two week period.  In contrast, Offshore Employees typically work in rotations, generally either 14 days on rotation and 14 days off, or for some Offshore Employees, seven days on rotation and seven days off.   As discussed in the Dane Declaration, the Debtors recently "shut-in" a number of its deepwater wells and furloughed members of their workforce. During this shut-in period, the Offshore Employees are working 21 days on rotation and 21 days off.  The amounts each of these Offshore Employees earn each payroll period is based on how much time was spent "on rotation" during that payroll period, including what day their rotation began.  This causes variation in the Offshore Employees' payroll each week.

12. The Debtors' average payroll for Wages and Compensation Obligations is approximately $7,000,000 per month. All of the Debtors' payroll is made by direct deposit through electronic transfers of funds to Employees' accounts, although the Debtors maintain the ability to make payroll payments to Employees by check or wire in the event a direct deposit fails. As of the Petition Date, the Debtors owe approximately $2,500,000 in prepetition Wages and Compensation Obligations to Employees and seek authority to pay those obligations pursuant to the Motion.

**B.     Expenses**

13. Employees are entitled to advances for, and reimbursement of, certain reasonable and necessary expenses incurred while performing their employment duties, including job-related travel and meal expenses (the "**Expenses**"). The majority of the Expenses incurred are travel expenses, including rooms, meals, and incidentals such as gas expenses, with the remainder focused primarily on ongoing educational seminars for continuing Employee-skills and operations training. Because of the irregular nature of requests for Expense reimbursements, it is difficult for the Debtors to determine the amount of unpaid Expenses at any given time. As of the Petition Date, the Debtors estimate that approximately $90,000 in prepetition Expenses is owed to their Employees. The Debtors seek authority to reimburse all outstanding prepetition Expenses pursuant to the Motion.

**C.     Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes**

14. For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefits plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible

spending plans and retirement savings plan, legally ordered deductions, and other miscellaneous deductions) (collectively, the "**Deductions**").[3]   The Debtors make a total of approximately $860,000 in Deductions from Employees' pay per month, which the Debtors remit to the appropriate third-party recipients.  It is possible the Debtors may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date.

15.     In addition to the Deductions, certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**").[4]   The Debtors must then match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "**Employer Payroll Taxes**," and together with the Withholdings, the "**Payroll Taxes**").  In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $2,190,000 per month.  As of the Petition Date, the Debtors estimate they owe, or are required to remit, approximately $170,000 on account of prepetition Employer Payroll Taxes.

16.     To the extent any of the Deductions or Withholdings may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward the prepetition Deductions and Withholdings (and to continue to forward the Deductions and Withholdings on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past

---

[3] Certain of the Deductions, particularly with respect to the Health Benefits Plans and Consumer Choice Health Accounts (each, as defined below) are discussed further below in connection with the Employee Benefits Obligations.

[4] In addition, the Debtors pay certain withholdings on behalf of one employee who is employed by one of the Debtors' non-debtor subsidiaries ("**Fieldwood Mexico**").  The Debtors are reimbursed from Fieldwood Mexico for such withholdings.

practice.  Further, the Debtors seek authority to pay all prepetition Employer Payroll Taxes pursuant to the Motion.

**D.      Employee Severance Obligations**

17.      The Debtors do not maintain a formal severance policy.  However, the Debtors have a general practice of paying severance to certain non-insider Employees (such practice, the "**Severance Program**" and the related payment obligations, the "**Severance Obligations**").  Under the Severance Program, upon termination, eligible Employees generally enter into Employee Release and Settlement Agreements (each, a "**Severance Agreement**" and collectively, "**Severance Agreements**") that provide for a severance amount determined by seniority and length of service payable in installments.

18.      As of the Petition Date, the Debtors are party to Severance Agreements with five former non-insider Employees, each of whom was terminated in the months leading up to the Petition Date (the "**Existing Severance Agreements**").  The Existing Severance Agreements award the former Employees one month of salary for every year of service, with a maximum of four months of salary.  As of the Petition Date, the Debtors owe approximately $50,000 with respect to Existing Severance Agreements, all of which will become due on August 7, 2020.  By this Motion, the Debtors seek authority to continue payments pursuant to the Existing Severance Agreements in the ordinary course and to continue the Severance Program in the ordinary course consistent with past practices.[5]  For the avoidance of doubt, the Debtors are not seeking authority to pay severance obligations owed to any "insider," as that term is defined by section 101(31) of the Bankruptcy Code.

---

[5] One of the former Employees party to an Existing Severance Agreement will be owed an amount approximately $1,100 above the $13,650 limit per individual.

E.      **Employee Bonus Programs**

19.      As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, three discretionary employee bonus programs for their Employees to incentive and recognize performance: (i) a program for employees who work in one of the Debtors' corporate offices (the "**Office Bonus Program**"), (ii) a program for offshore employees who are assigned to a platform (the "**Field Bonus Program**"), and (iii) a program for employees who rotate to different wells, as needed, to conduct plugging and abandonment activities (the "**P&A Bonus Program**," collectively, the "**Employee Bonus Programs**").  The Office Bonus Program and the Field Bonus Program have a similar scorecard construct that considers safety, operational, financial and individual performance metrics; each criterion is weighted, and there are four levels of potential payout for each.  The P&A Bonus Program assesses four performance metrics, each comprising 25% of the total bonus opportunity.  Unlike the Office Bonus Program and Field Bonus Program, there is no scorecard with specific performance multipliers under the P&A Bonus Program.  Management considers overall factors and may discount an individual award target opportunity if performance falls short of expectations.  Both the Office Bonus Program and P&A Bonus Programs are based on a target percentage of annual salary.  The Field Bonus Program is based on a fixed annual dollar amount that varies by department.

20.      In 2019, the Debtors paid, in the aggregate, approximately $15,600,000 to eligible Employees under the Employee Bonus Programs.  Bonuses paid in accordance with the Office Bonus Program are typically determined and paid in April of each year as part of the Employee's overall compensation package, with the requirement that the eligible Employee is a current Employee and was also an Employee of the Company at some point in the preceding year.  Bonuses paid in accordance with the Field Bonus Program are typically determined and paid semi-

annually. Bonuses paid in accordance with the P&A Bonus Program are typically determined and paid quarterly.

21.    As of the Petition Date, the Debtors estimate that they have accrued approximately $4,250,000 on account of the Employee Bonus Programs that may become due and owing in the ordinary course postpetition. The Debtors seek authority to pay those obligations pursuant to the Motion, solely to the extent that the applicable performance metrics are achieved with respect to the applicable participant in each Employee Bonus Program and consistent with past practice. The Debtors intend to continue their Employee Bonus Programs in the ordinary course postpetition.

22.    In addition, the Debtors have also agreed to provide certain bonus payments tied to milestones associated with a development project in Mexico. The employee responsible for overseeing the development project is entitled to receive $50,000 upon successful project sanction, $100,000 upon successful delivery of platform installation within budget allocation, and $200,000 upon first production. The determination of whether a milestone has been achieved is at the full discretion of Fieldwood Energy LLC. At this time, no amounts are owed by the Debtors in respect of these milestones. The Debtors intend to honor these obligations in the ordinary course postpetition.

23.    In addition, prior the Petition Date, the Debtors have implemented a key employee retention program (the "**KERP**") for 36 non-insider Employees, pursuant to which retention awards are paid quarterly in arrears.[6] In the event that any Employee subject to the KERP is terminated for cause or voluntarily terminates, such Employee is required to forfeit any

---

[6] In addition, prior to the Petition Date, the Debtors implemented a similar key employee retention program for their insider employees. The total amount of $2,152,500 under this program was paid in full prior to the Petition Date.

outstanding unpaid award.  The average total award under the KERP is approximately $84,738, or 37% of the eligible Employee's salary.  The total amount to be paid to non-insider Employees under the KERP is $3,050,550. At this time, no amounts are owed under the KERP by the Debtors. The Debtors intend to honor these obligations in the ordinary course postpetition.[7]

24.     In addition, the Debtors maintain a long-term incentive plan (the "**LTIP**") pursuant to which the members of the Debtors' senior management team receive equity interests in the Debtors.  The Debtors are not seeking any relief with respect to the LTIP at this time.  To the extent that the Debtors intend to pay any further amounts pursuant to the LTIP at a later time, the Debtors reserve all rights to seek appropriate relief from the Court.

**Other Compensation Obligations**

25.     In addition, the Debtors have certain independent directors who are paid regular fees in compensation for their service (the "**Other Compensation Obligations**").  One director is owed approximately $60,000 on account of his prepetition services, and the Debtors are seeking relief to pay this amount in accordance with the terms of his agreement.

**Employee Benefits Obligations**

26.     A description of the Employee Benefits Obligations and the estimated amounts outstanding as of the Petition Date are summarized in the following chart, and described in further detail below:

| Prepetition Obligations | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Health Benefits Plan | Obligations related to payment of self-funded benefit plan claims. | $1,830,000 |

---

[7] Additional information on the KERP will be provided to the Office of the United States Trustee for the Southern District of Texas and, upon request, will be provided to any official committee appointed in these chapter 11 cases.

| Prepetition Obligations | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Health Benefits Plan Administrative Fees | Obligations for administrative fees related to benefit plans. | $90,000 |
| Health Benefits Plan Stop-Loss Policy Fees | Obligations for fees related to stop loss policy for self-funded health plans. | $100,000 |
| Government Health Care Expenses | Obligations related to Patient-Centered Outcomes Research Trust Fund fee (PCORI). | $5,000 |
| Flexible Spending Accounts | Obligations for Flexible Spending Account reimbursements. | $35,000 |
| Retirement Benefits | Obligations related to Employee 401(k) Plan. | $320,000 |
| Life Insurance, AD&D Insurance, and Disability Insurance | Obligations related to Life Insurance, AD&D insurance, and disability plans. | $130,000 |
| Additional Benefits | Obligations related to other benefits premiums and fees, including telemedicine and business travel insurance. | $2,600 |
| **Total Estimated Employee Benefits Obligations** | | **$2,512,600** |

27.     In the ordinary course of business, the Debtors make various benefits plans available to their Employees.  These benefits plans (collectively, the "**Employee Benefits Plans**") generally fall within the following categories: (i) paid time off, including personal time off and holidays (collectively, the "**Employee Leave Benefits**"); (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment ("**AD&D**") insurance, disability insurance, and health savings accounts (collectively, the "**Health and Welfare Benefits**"); (iii) retirement savings plans including a 401(k) plan (the "**Retirement Benefits**"); and (iv) certain other benefits (each of (i)–(iv), an "**Employee Benefit**").  Although the Debtors maintain most Employee Benefits Plans themselves, certain other Employee Benefits Plans, such as certain of the Health and Welfare Benefits, are maintained by third parties.  The Employee Benefits and Employee Benefits Plans are described in further detail below.

A.    **Employee Leave Benefits**

28.    The Employee Leave Benefits are provided and administered by the Debtors and include, among other things, personal time off, employee and family sick leave, federal and state holidays, bereavement leave, jury duty, time off to vote, and military service.

29.    The Debtors generally do not provide for payments in lieu of leave, except pursuant to Louisiana state law in the case of vacation leave, and then only upon termination of employment.  The Debtors request authority to continue such Employee Leave Benefits in the ordinary course of business.

B.    **Health and Welfare Benefits**

30.    The Debtors sponsor several Health and Welfare Benefits plans to provide benefits to eligible Employees.  The Health and Welfare Benefits include: medical, vision, dental, and prescription drug plans; life insurance and AD&D insurance; short-term and long-term disability benefits; flexible spending accounts; and other voluntary health and welfare programs. The Health and Welfare Benefits are more fully described below.

31.    <u>Medical, Vision, Dental and Prescription Drug Benefits</u>.  The Debtors administer the following health benefits plans (each, a "**Health Benefits Plan**") through various insurers to Employees and their families:

| <u>Type of Benefits</u> | <u>Benefits Provider</u> |
|---|---|
| Medical | BlueCross BlueShield of Texas |
| High Deductible Medical | BlueCross BlueShield of Texas |
| Prescription Drugs | CVS/Caremark |
| Dental | Delta Dental Insurance Company |
| Vision | Vision Service Plan Insurance Company ("**VSP**") |
| Health Flexible Savings Accounts | TaxSaver Plan |
| Health Savings Account | Fidelity Investments Institutional Operations Company LLC |

14

32.     The main benefits providers listed above (each a "**Health Benefits Provider**") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider within a network of preferred providers.  In the ordinary course of business, each Health Benefits Provider's premium and administrative fees may vary as the number of Employees enrolled in the Health Benefits Provider's plans changes and as the Health Benefits Providers change their prices.

33.     Under the Health Benefits Plans, the Debtors pay fees for the administrative services provided by the Health Benefits Providers to Employees who subscribe to the Health Benefits Plans.  Such fees are funded by the Debtors.  Additionally, the Debtors pay a premium in exchange for the vision care coverage, which is insured and administered by VSP.  These premiums are primarily funded by the Debtors; but are also partially subsidized by Employee-contributions withheld from gross pay.  On an average monthly basis, the Debtors' aggregate portion of vision care premiums and administrative fees owed to the Health Benefits Providers on account of the Health Benefits Plans is $80,000.  As of the Petition Date, the Debtors estimate they owe approximately $90,000 in premiums and administrative fees in connection with the Health Benefits Plans relating to the prepetition period.  The Debtors request authority to continuing paying such premiums and administrative fees, including those relating to the prepetition period, as they arise in the ordinary course of business.

34.     With the exception of the vision care component, the Health Benefits Plans are self-funded plans by Fieldwood Energy and administered by the respective Health Benefits Provider.  As self-funded plans, the Debtors fund and insure all medical claims submitted to the relevant Health Benefits Providers by Employee participants (the "**Health Benefits Claims**").  Health Benefits Claims are paid on a weekly basis, but are not always timely submitted by

participants.   The Debtors' average monthly amount of Health Benefits Claims has been approximately $1,220,000 over the last 12 months, with high variability depending on the number, timeliness, and type of Health Benefits Claims submitted.   As of the Petition Date, the Debtors estimate that approximately $1,830,000 of prepetition Health Benefits Claims are outstanding.   The Debtors seek authority to pay all such Health Benefits Claims, including those that relate to the prepetition period, as they come due in the ordinary course of business.

35.   <u>Stop-Loss Policy</u>.   As the Debtors have primarily self-funded Health Benefits Plans, the Debtors maintain a stop-loss policy through Symetra Life Insurance Company ("**Symetra**") to protect against exposure to large medical claims under such plans.   Under the stop-loss policy, if the Debtors pay Employee medical claims in excess of $175,000 for a single event, the Debtors can then make a claim against the stop-loss policy for the amount of the Health Benefits Claim in excess of $175,000.   The Debtors pay Symetra approximately $100,000 at the beginning of each month for the stop-loss policy premium.   As of the Petition Date, the Debtors estimate that up to approximately $100,000 of prepetition amounts related to premiums or fees on account of the Stop-Loss Policy.   The Debtors seek authority to pay any amounts under the Stop-Loss Policy as they come due in the ordinary course of business, including those amounts that relate to the prepetition period.

36.   <u>Government Health Care Expenses</u>.   As a result of the Patient Protection and Affordable Health Care Act (the "**ACA**"), effective January 1, 2014, the Debtors incur expenses for certain employer health care obligations.   More specifically, the ACA requires employers who maintain self-funded group health insurance plans to pay a Patient-Centered Outcomes Research Trust Fund fee (the "**PCORI**").   The amount of the PCORI owed by an employer for any given policy year is based on the average number of covered members under the

health insurance plan multiplied by a pre-established dollar amount. The PCORI is paid in arrears on an annual basis in July. As of the Petition Date, the Debtors estimate that they will owe approximately $5,000 for PCORI, inclusive of prepetition amounts. The Debtors request authority to pay the PCORI in the ordinary course when due, including any prepetition amounts.

37.     <u>Consumer Choice Health Accounts</u>. The Debtors provide the option for eligible Employees to contribute up to $2,750 per plan year to a Flexible Spending Account ("**FSA**") or up to $3,550 per year for individual plans and $7,100 per year for family plans to a health savings account (an "**HSA**", and together with the FSA, the "**Consumer Choice Health Accounts**"). The Consumer Health Choice Accounts allow for pre-tax payroll deductions to pay for qualified health, dental, vision, hearing, and prescription drugs. The FSA is provided by TaxSaver Plan ("**TaxSaver Plan**") and administered by Fieldwood Energy.[8] The HSA is provided by Fidelity Investments and administered by Fieldwood Energy. As of the Petition Date, the Debtors estimate that they are required to reimburse Employees for unclaimed amounts under the Consumer Choice Health Accounts in a total amount of approximately $35,000 relating to the prepetition period. The Debtors are requesting authority to continue to pay reimbursement claims owed to Employees under the Consumer Choice Health Accounts. The Debtors also request authority to pay all amounts in connection with any administrative fees or contributions required to maintain the Consumer Choice Health Accounts in the ordinary course.

38.     <u>Life Insurance, AD&D Insurance, and Disability Plans</u>. The Debtors offer life insurance (the "**Life Insurance Plans**"), long-term and short-term disability insurance (the "**Disability Plans**"), and AD&D insurance (the "**AD&D Insurance Plans**") to Employees through

---

[8] The Debtors maintain the FSAs in part through an FSA-specific bank account, discussed further in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, and (D) Continue Using Credit Cards; and (II) Granting Related Relief*, filed contemporaneously herewith.

Guardian Life Insurance Company of America (a Mutual Life Insurance Company) and Zurich American Insurance Company. The chart below outlines the available programs; those paid by the Debtors, and voluntary programs funded through Employee contributions:

| Type of Benefit | Provided by Debtors/Voluntary |
|---|---|
| Basic Life Insurance | Provided by Debtors |
| Basic AD&D | Provided by Debtors |
| Supplemental Life Insurance | Voluntary |
| Supplemental AD&D | Voluntary |
| Long-Term Disability Insurance | Provided by Debtors |
| Short-Term Disability Insurance | Voluntary |

39. As of the Petition Date, the Debtors owe approximately $130,000 in fees relating to the prepetition period in accrued and unpaid premiums and administrative fees related to the Life Insurance Plans, the Disability Plans, and the AD&D Insurance Plans. Such fees are paid monthly at the beginning of the coverage period, and average approximately $130,000. To the extent there are any amounts outstanding relating to the prepetition period, the Debtors seek authority to pay these amounts pursuant to the Motion.

40. _Additional Health and Welfare Benefits_. In addition to the plans described above, the Debtors offer additional benefits to their Employees. Specifically, the Debtors offer services provided by Teladoc, Inc., a medical administration service provider who facilitates consultations by physicians and other professionals under the Health Benefits Plans to the Employees. Finally, the Debtors also offer Business Travelers Accident Insurance to eligible Employees and their dependents and spouses, which covers accidents and injuries or damages in connection therewith that occur while an Employee travels in the course of the Employee's business obligations. As of the Petition Date, the Debtors estimate that approximately $2,600 in

outstanding prepetition fees will be or are due and owing with respect to these additional benefits. The Debtors seek authority to pay these amounts pursuant to the Motion.

## C.    Retirement Benefits

41.    The Debtors provide Retirement Benefits to eligible Employees. In particular, the Debtors participate in a Savings and Retirement Plan comprised of a 401(k) plan for Employees (the "**401(k) Plan**"). The 401(k) Plan is provided by Fidelity Investments and administered by Fieldwood Energy. In 2020, each Employee participant in the 401(k) Plan may elect to contribute up to $19,500 of his or her annual salary to their plan, plus an additional $[6,500] per year in catch-up contributions if the Employee is age 50 and over, subject to limitations under applicable law. Historically, the Debtors matched a percentage of the Employee Contribution to the 401(k) (the "**401(k) Match**"). As of June 1, 2020, the Debtors suspended the 401(k) Match. As of the Petition Date, the Debtors owe approximately $320,000 on account of the 401(k) Match and a *de minimis* amount of certain administration fees associated therewith. The Debtors seek authority to pay these amounts pursuant to the Motion and to continue the Retirement Benefits in the ordinary course.

## Employee Onboarding Obligations

42.    To comply with strict industry standards and governmental regulations, most of the Debtors' new Employees are subject to background checks, drug testing, and rigorous safety training before they are allowed to work. This process—known as "onboarding"—is critical to the Debtors' operations. Without these programs and the incurrence of the Employee Onboarding Obligations for such programs, the Debtors would be unable to ensure the safe and competent operation of their offshore oil and gas operations and comply with applicable industry standards and government regulations.

43.     Typically, the Employee Onboarding Obligations are owed to a small number of onboarding firms who provide various onboarding services (the "**Onboarding Firms**"),[9] and are necessary to ensure that the new Employees are fit and ready to perform in the conditions required for offshore oil and gas operations.  Because of the irregular timing and number of new hires, it is difficult for the Debtors to determine the amount of unpaid Employee Onboarding Obligations at any given time.  The Debtors estimate that, as of the Petition Date, the Debtors owe or will owe approximately $20,000 in Employee Onboarding Obligations to the Onboarding Firms.  The Debtors seek authority to pay all outstanding Employee Onboarding Obligations pursuant to the Motion.

### Payroll Servicers

44.     To manage efficiently the processing and payment of the various Employee Obligations, the Debtors rely on software provided by Kronos, International ("**Kronos**") and services provided by ADP, LLC ("**ADP**") to facilitate the Debtors' in-house payroll processing and payroll transfer administration.  Each payroll period, the Debtors calculate, using the time-entries and benefits-records maintained in-house, the period's payroll and any appropriate Payroll Taxes or withholding requirements related to Employee Benefits Obligations, and then remit that information to ADP.  ADP then processes a direct deposit transfer for each Employee.

45.     The services that Kronos and ADP provide are critical to the smooth functioning of the Debtors' payroll system.  With their assistance, the Debtors can ensure that (i) Employees are paid on time, (ii) appropriate deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable taxing authorities and other

---

[9] Onboarding Firms include Center for Work Rehabilitation, AHS Walk In Clinic, Inc. and DISA Inc.  To the extent an entity is not listed here who should be considered an Onboarding Firm and who later requires, or has in the past required, the Debtors to pay Onboarding Expenses, the Debtors also request authority under this Motion to pay such Onboarding Expenses.

payees.  The Debtors pay *de minimis* fees to Kronos and ADP for these services.  The Debtors seek authority to pay all such fees, including any prepetition amounts, as Employee Obligations in the ordinary course of business.

### Relief Requested Should Be Granted

46.     Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay," that are "earned within 180 days before" the date on which a debtor's chapter 11 case is commenced are afforded priority unsecured status up to $13,650 per individual.  11 U.S.C. § 507(a)(4)(A).  Similarly, under section 507(a)(5) of the Bankruptcy Code, employees' claims for contributions to certain employee benefits plans are also afforded priority unsecured status to the extent of $13,650 per employee covered by such plans, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.  *Id.* at § 507(a)(5).

47.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than

in the ordinary course of business, but the movant must articulate some business justification for the sale.").

48.    In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

### Payment of Employee Obligations and Other Compensation Obligations Is Essential to Debtors' Successful Reorganization

49.    The Employees are the most important part of the Debtors' businesses.  Any delay in paying, or failure to pay, the Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  It could also inflict a significant financial hardship on their families.  The Debtors

cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship.

50.     Payment of these obligations in the ordinary course of business would enable the Debtors to focus on their restructuring efforts and maximize the value of the estates, which would benefit all parties-in-interest.  Without this relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  The total amount sought to be paid by the Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, failure to timely pay employee obligations may place the Debtors in violation of applicable law in a number of jurisdictions.

51.     In addition, reimbursement of Expenses is necessary because any other treatment of Employees would be highly inequitable.  Employees who have incurred Expenses should not be forced personally to bear the cost of the Expenses, especially because the Employees incurred the Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

52.     Payment of Payroll Taxes would not prejudice other creditors because Payroll Taxes generally give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  In any event, Payroll Taxes that the Debtors withhold are held in trust for the Taxing Authorities.  The withheld funds are not property of the Debtors' estates under section 541 of the Bankruptcy Code.  *See Begier v. IRS*, 496 U.S. 53, 66–67 (1990) (concluding that withholding taxes are property held by a debtor in trust for another and are therefore not property of debtor's estate).

53.     Payment of administrative fees to the administrators and providers of the Employee Benefits Plans is also necessary.  Without the continued service of these administrators

and providers, the Debtors will be unable to continue to honor their obligations to Employees under the Employee Benefits Plans in an efficient and cost-effective manner.  The Debtors do not seek to alter any of the Employee Benefits Plans.  The Motion requests only permission for the Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that such payments could otherwise be inconsistent with the provisions of the Bankruptcy Code and (ii) continue to honor practices, programs, and policies with respect to Employees as such were in effect before the Petition Date.

54.     In these chapter 11 cases, prepetition Employee Compensation Obligations constitute priority claims under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.  Except as noted above with respect to one former Employee owed a Severance Obligation and one independent director owed prepetition fees, the Debtors are not seeking to pay any single Employee an amount in excess of $13,650 or an amount that falls outside the statutory priorities granted in sections 507(a)(4) and (a)(5).  As priority claims, the Employee Compensation Obligations must be paid in full before the Debtors may make distributions on account of their general unsecured obligations.

55.     The Debtors do not seek to alter their compensation, vacation, or other benefits policies at this time.  The Motion is intended only to permit the Debtors, in their discretion, to (i) make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) honor their practices, programs, and policies with

24

respect to their Employees, as such practices, programs, and policies were in effect as of the Petition Date.[10]

56.     For the foregoing reasons, payment of the Employee Obligations and Other Compensation Obligations, as requested herein and in accordance with the Debtors' prepetition business practices, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the relief requested by the Debtors.  Courts in this district and others have frequently approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein as a routine matter in similar cases.  *See, e.g.*, *In re CEC Ent., Inc.*, No. 20-33163 (MI) (Bankr. S.D. Tex. June 26, 2020) (Docket No. 75); *In re Gavilan Res., LLC*, No. 20-32656 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 53); *In re Speedcast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. April 27, 2020) (Docket No. 115); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (Docket No. 58); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Feb. 16, 2018) (Docket No. 75).  The same relief is also appropriate here. For the reasons set forth above, similar relief is warranted in these chapter 11 cases.

### Applicable Financial Institutions Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Employee Obligations

57.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Employee Obligations and Other Compensation Obligations, to the extent that sufficient funds are

---

[10] Although the Debtors believe continuation of the Employee Benefits Obligations in a manner consistent with their prepetition practices and policies is within the ordinary course of their business, out of an abundance of caution, the Debtors have sought Court authorization for same pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

on deposit in the applicable bank accounts to cover such payment.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Employee Obligations and Other Compensation Obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Bankruptcy Rule 6003(b) Has Been Satisfied

58.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Dane Declaration, the Debtors cannot risk the damage to their businesses that would follow any decline in morale and the resulting attrition that likely would occur if the Debtors fail to pay their Employees.  Accordingly, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11 and the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### Compliance with Bankruptcy Rule 6004(a)
### and Waiver of Bankruptcy Rule 6004(h)

59.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### DIP Order and DIP Documents Control

60.     Contemporaneously herewith, the Debtors are seeking approval of interim and final orders, which provide for, among other things, the Debtors' entry into a postpetition financing facility (the "**DIP Facility**") and the use of cash collateral (any order entered by the

Court approving the Debtors' entry into such postpetition financing facility and/or the use of cash collateral, the "**DIP Order**" and, the definitive documentation for such facility, the "**DIP Documents**"). The DIP Order and the DIP Documents contain terms that limit and otherwise apply to the Debtors' ability to utilize certain of the relief requested herein. For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to the terms of the DIP Order and the DIP Documents.

## **Reservation of Rights**

61.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

62.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**"); (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Vinson & Elkins LLP,

Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn: William L. Wallander, Esq. and Bradley R. Foxman, Esq.), as counsel to Goldman Sachs Bank USA, the FLFO Administrative Agent; (iv) (A) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Damian S. Schaible, Esq. and Natasha Tsiouris, Esq.), and (B) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham Jr., Esq. and Martha Wyrick, Esq.), as counsel to the Ad Hoc Group of Secured Lenders; (v) Shipman & Goodwin LLP, 400 Park Ave, 5th Floor, New York, NY 10022 (Attn: Nathan Plotkin, Esq.), as counsel to Cantor Fitzgerald Securities, the FLTL Administrative Agent; (vi) Holland & Knight LLP, 150 N. Riverside Plaza, Chicago, IL 60606 (Attn: Joshua Spencer, Esq. and Anastasia Sotiropolous, Esq.), as counsel to Cortland Capital Market Services LLC, the SLTL Administrative Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the Securities and Exchange Commission; (x) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (xi) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

63.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  August 4, 2020
       Houston, Texas

Respectfully submitted,

  /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (*pro hac vice* pending)
Jessica Liou (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
       Jessica.Liou@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


_/s/  Alfredo R. Pérez_____
Alfredo R. Pérez