## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)
AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363,
364 AND 507(b) AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. A VIDEO/TELEPHONIC HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 4, 2020 AT 2:00 P.M. (PREVAILING CENTRAL TIME). PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 954554. PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE HTTPS://WWW.GOTOMEETING.COM/MEETING/JOIN-MEETING AND ENTERING MEETING CODE "JudgeIsgur."**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN AUGUST 4, 2020.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.      As further described in the Dane Declaration (as defined below), the Debtors entered into a restructuring support agreement (the "**Restructuring Support Agreement**") with Consenting FLTL Lenders holding approximately 67.63% ($773,053,055) of the Company's secured debt under the FLTL Credit Agreement (as defined below), the Consenting SLTL Lenders hold approximately 25.73% ($133,171,252) of the Company's secured debt under the SLTL Credit Agreement, and Apache Corporation, the predecessor in interest of the majority of the Debtors' shallow water assets in the Gulf of Mexico, pursuant to which the parties have agreed to support restructuring transactions.  After conducting a solicitation process to obtain post-petition financing and in connection with negotiating the Restructuring Support Agreement, the Debtors and the DIP Lenders[2] reached an agreement on the terms of the DIP Facility (as defined below), which is available for participation by all Prepetition FLTL Lenders and is backstopped by certain members of the Ad Hoc Group of Secured Lenders.  As set forth in further detail below, the Debtors have satisfied the requirements under section 364 of the Bankruptcy Code to obtain approval of the DIP Facility.  Substantially all of the Debtors' assets are already encumbered by liens in favor of the Debtors' prepetition secured lenders.  As a result, the Debtors could only obtain postpetition financing either on an unsecured or junior priority basis, not on a priming basis.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Interim DIP Order.

2.      In connection therewith, as described in greater detail in the DIP Declaration (as defined below), the Debtors, through their investment banker, Houlihan Lokey Capital, Inc. ("**Houlihan**"), solicited offers for debtor-in-possession financing from seven parties, including the Debtors' Prepetition FLFO Lenders and the Prepetition FLTL Lenders (each as defined below).   Only two offers for debtor-in-possession financing were received: (i) one from the Prepetition FLFO Lenders (the "**FLFO Proposal**") and (ii) the other from the Ad Hoc Group of Secured Lenders (the "**FLTL Proposal**").   After careful consideration and multiple rounds of negotiations with each group, the Debtors determined that the FLTL Proposal—which ultimately culminated into the DIP Term Sheet, attached hereto as **Exhibit A**—was the best financing alternative available to the Debtors because, among other reasons, it provides the Debtors with sufficient funds to finance these chapters 11 cases and avoids the uncertainty and costs of pursuing the FLFO Proposal, which would require the Debtors to litigate with the Prepetition FLTL Lenders to obtain approval of a nonconsensual priming debtor-in-possession facility.

3.      The DIP Facility also contemplates the consensual use of Cash Collateral, as provided in the order approving the DIP Facility on an interim basis attached hereto as **Exhibit B** (the "**Interim Order**"), and as will be provided in the Final Order (as defined below) substantially similar to the Interim Order.

4.      Access to proceeds of the DIP Facility and Cash Collateral will allow the Debtors to realize value for all stakeholders.   First, access to the DIP Facility and Cash Collateral will help assure employees, trade creditors, customers, and other stakeholders that the Debtors have the financial wherewithal to continue operating in the ordinary course during the pendency of these chapter 11 cases.   Second, entry into the DIP Facility will allow the Debtors (who currently

do not have any active hedges in place) to enter into post-petition hedging agreements with certain hedging counterparties that have indicated that they will not enter into such hedging transactions without committed debtor-in-possession financing.

5.     Additional information regarding the DIP Facility, including the process through which the Debtors solicited lender interest in providing financing, is set forth in the *Declaration of John-Paul Hanson in Support of Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (II) Granting Liens and Super-Priority Claims: (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Granting Related Relief* (the "**DIP Declaration**") filed contemporaneously herewith.

### Relief Requested

6.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, the Bankruptcy Local Rules, and the Complex Case Procedures, the Debtors request entry of an Interim Order granting, among other things, the following relief:

a)   authorization for the Borrower to obtain secured postpetition financing (the "**DIP Financing**") and for Fieldwood Energy Inc. ("**Holdings**") and all domestic subsidiaries of the Borrower (subject to certain exceptions for immaterial subsidiaries that are not Debtors) (each a "**Guarantor**" and collectively, the "**Guarantors**"; the Guarantors collectively with the Borrower, the "**Loan Parties**"), to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with the DIP Financing, consisting of a multiple-draw senior secured term loan facility (the "**DIP Facility**"), in an aggregate principal amount not to exceed $100,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (and, all loans made to and guarantees issued by the Loan Parties pursuant to the DIP Documents, collectively, the "**DIP Loans**"))) on the terms and conditions set forth in the Interim Order and the DIP Documents (each as defined below), pursuant to which DIP Facility the Borrower shall, subject to entry of the Interim Order, borrow from the DIP Lenders an aggregate principal amount equal to $10,000,000 on the Closing Date (as defined in the DIP Credit Agreement), and thereafter, on an interim basis, upon satisfaction of all other applicable conditions precedent in the DIP Documents, be authorized to make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive

Documents (as defined in the DIP Term Sheet) (such date, the "**APA Milestone Satisfaction Date**") in an aggregate principal amount equal to $15,000,000;

b) authorization for the Loan Parties to execute and enter into the DIP Documents and to perform all such other and further acts as may be required in connection with the DIP Documents;

c) authorization for the Loan Parties to grant adequate protection to the Prepetition Secured Parties (as defined below) under or in connection with certain of the following agreements:

> (i) that certain Second Amended and Restated Credit Agreement – First Out, dated as of June 28, 2019 (as amended by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof) and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLFO Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto (the "**Prepetition FLFO Lenders**"), Goldman Sachs Bank USA, as administrative agent (in such capacity, the "**Prepetition FLFO Administrative Agent**") and issuing bank, and Cantor Fitzgerald Securities, as collateral agent (in such capacity, the "**Prepetition FLFO Collateral Agent**", together with Prepetition FLFO Administrative Agent and their successors in such capacities, the "**Prepetition FLFO Agents**" and, the "Secured Parties" under such Prepetition FLFO Credit Agreement the "**Prepetition FLFO Secured Parties**");

> (ii) that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018 (as amended by that certain First Amendment to Amended and Restated First Lien Term Loan Agreement, dated as of July 5, 2018, that certain Second Amendment to Amended and Restated First Lien Term Loan Agreement, dated as of November 11, 2019 and that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLTL Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition FLTL Lenders**") and Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition FLTL Agent**" and, the "Secured Parties" under such Prepetition FLTL Credit Agreement the "**Prepetition FLTL Secured Parties**");

> (iii) that certain Amended and Restated Second Lien Term Loan Agreement dated as of April 11, 2018 (as amended by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the

"**Prepetition SLTL Credit Agreement**"[3]), among, *inter alia*, Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition SLTL Lenders**"[4]) and Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition SLTL Agent**"[5] and, the "Secured Parties" under such Prepetition SLTL Credit Agreement the "**Prepetition SLTL Secured Parties**"[6]); and

(iv) that certain Decommissioning Agreement, dated as of September 30, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, and together with the Existing Decommissioning Related Agreements (as defined in the DIP Credit Agreement), the "**Apache Decommissioning Agreement**"), by and among Apache Corporation ("**APA**"), Apache Shelf, Inc. ("**APSH**"), Apache Deepwater LLC ("**APDW**"), Apache Shelf Exploration LLC (together with APA, APSH and APDW, the "**Apache Secured Parties**"), the Borrower and GOM Shelf LLC.

d) subject to the restrictions set forth in the DIP Documents and the Interim Order, authorization for the Loan Parties to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

e) subject to certain challenge rights of parties in interest set forth herein, approval of certain stipulations by the Debtors with respect to the Prepetition Credit Agreements and the liens and security interests arising therefrom;

f) the grant of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than certain excluded property as provided in the DIP Documents) and all proceeds thereof (including subject only to and effective upon entry of the Final Order, any Avoidance Proceeds), subject only to the Carve-Out;

---

[3] The agreements described in the preceding paragraphs (c)(i)-(iii) above are collectively referred to as the "**Prepetition Credit Agreements**," and all "Collateral" securing the obligations under the Prepetition Credit Agreements described in the preceding paragraphs (c)(i)-(iii) is collectively referred to as the "**Prepetition Collateral**". The Trust A NPI, Trust A-1 NPI, the Trust A Account, any interest in Trust A, the Permitted Surety Bonds or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) are collectively referred to as the "**Apache Collateral**" and, for the avoidance of doubt, the Prepetition Collateral does not include the Apache Collateral.

[4] The Prepetition FLFO Lenders, the Prepetition FLTL Lenders and the Prepetition SLTL Lenders are collectively referred to as the "**Prepetition Lenders**".

[5] The Prepetition FLFO Agents, the Prepetition FLTL Agent and the Prepetition SLTL Agent are collectively referred to as the "**Prepetition Agents**".

[6] The Prepetition FLFO Secured Parties, the Prepetition FLTL Secured Parties and the Prepetition SLTL Secured Parties are collectively referred to as the "**Prepetition Secured Parties**".

g) the waiver of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and of any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code subject to the provisions set forth below;

h) the waiver of the equitable doctrine of "marshaling" and other similar doctrines as to the DIP Secured Parties and the Prepetition Secured Parties, subject to the provisions set forth below;

i) modification of the automatic stay to the extent set forth herein and in the DIP Documents;

j) pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of the Interim Order granting the Motion on an interim basis and authorizing the Borrower to borrow from the DIP Lenders under the DIP Documents forthwith an aggregate principal amount equal to $10,000,000 on the Closing Date and, on or prior to the APA Milestone Satisfaction Date, an additional principal amount equal to $15,000,000, of the DIP Financing and the Guarantors to unconditionally guaranty such obligations owing to the DIP Lenders under the DIP Documents on a joint and several basis; and

k) that this Court schedule a final hearing (the "**Final Hearing**") to consider entry of a final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**")) approving the relief granted herein on a final basis and authorizing the Borrower to forthwith borrow from the DIP Lenders under the DIP Documents up to the full principal amount of the DIP Financing and the Guarantors to unconditionally guaranty all obligations owing to the DIP Lenders under the DIP Documents on a joint and several basis; and due and appropriate notice of the Motion and the Interim Hearing having been served by the Debtors on the parties identified in the Motion; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Interim Hearing having been held by this Court on [•], 2020; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Cases; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, in the DIP Declaration, in the Dane Declaration and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

<u>**Summary of Terms of DIP Facility
and Use of Cash Collateral**</u>

7.     In accordance with Rules 4001(b)-(d) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and the *Procedures for Complex Chapter 11 Bankruptcy*

*Cases* (the "**Complex Case Procedures**"), as incorporated by Rule 1075 of the Bankruptcy Local

Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the below chart summarizes the significant terms of the Interim Order and the DIP Term Sheet.[7]

| MATERIAL TERMS | | Location |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Fieldwood Energy LLC (the "**Borrower**"). | Interim Order, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the other Debtors (the "**Guarantors**"). | Interim Order ¶ A |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The lenders that are signatories to the DIP Credit Agreement (the "**DIP Lenders**"). | Interim Order ¶ B |
| **DIP Facility Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Cantor Fitzgerald Securities (the "**DIP Agent**"). | Interim Order ¶ B |
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | A multiple-draw senior secured debtor-in-possession facility not to exceed $100 million.  On entry of the Interim Order, the Borrower shall make one incremental draw for $10 million on the Closing Date upon satisfaction of all other applicable conditions precedent in the DIP Documents.  Thereafter, upon satisfaction of all other applicable conditions precedent, the Borrower may make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive Documents (such date, the "**APA Milestone Satisfaction Date**") in an aggregate amount equal to $15,000,000. Upon entry of the Final Order, the Borrower may draw up to the full amount of the DIP Commitments in $20 million increments. | Interim Order ¶ A |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | Use of Cash Collateral and proceeds of the DIP Facility are subject to a proposed budget "**Budget**," (subject to permitted variances) the initial of such attached hereto as **Exhibit C**, consisting of consolidated 13-week cash flow forecast statements of the Debtors, to be delivered to the DIP Agent on or prior to the Closing Date (as defined below) and every two weeks thereafter.  The Debtors' actual (a) receipts and (b) operating disbursements (excluding allowed professional fees and expenses and adequate protection payments) may not exceed (or be less than in the case of receipts) 7.50% (as compared to the Budget) in any bi-weekly test period (a "**Test Period**").  The Debtors are permitted to carry forward any variance during any two-week period before any Test Period into such Test Period. | DIP Term Sheet p. 9 |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | LIBOR (subject to a 1% floor) + 8.75% per annum, or ABR + 7.75%, in each case payable monthly in cash.<br><br>During the continuance of an event of default, all overdue amounts under the DIP Facility will bear interest at a rate equal to (i) in the case of principal, 2.00% per annum, plus the otherwise applicable rate or (ii) in the case of any obligations other than principal, the | DIP Term Sheet p. 3 |

---

[7] The following summary of the terms of the DIP Facility is subject entirely to the express terms of the DIP Term Sheet.  If there are any inconsistencies between the summary below and the DIP Term Sheet, then the DIP Term Sheet shall control.

| MATERIAL TERMS | Location |
|---|---|
| | then applicable rate for ABR DIP Loans plus 2.00% per annum, which in each case shall be payable on demand from time to time. | |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B) | Upfront Fee: An upfront fee in an amount equal to 3.00% of the DIP Commitments shall be due and payable to the DIP Lenders in cash on the Closing Date ratably based on their respective DIP Commitments on the Closing Date.<br><br>Unused Commitment Fee: An unused commitment fee equal to 3.00% per annum on the actual daily amount of the unused DIP Commitments shall be paid on a monthly basis to the DIP Lenders in cash ratably based on their respective DIP Commitments.<br><br>Backstop Fees: A backstop fee in an amount equal to 4.00% of the DIP Commitments shall be due and payable to each DIP Lender providing a backstop commitment (a "**DIP Backstop Commitment**") under the Restructuring Support Agreement in respect of the DIP Facility in cash on the Closing Date ratably based on their respective DIP Backstop Commitments on the Petition Date (the "**Backstop Fee**").<br><br>Fees and Expenses: The Debtors shall pay all reasonable and documented out of pocket fees, costs, and expenses incurred or accrued by the DIP Facility Agent and the DIP Lenders, including (i) costs for seasoning of the DIP Facility, (ii) the fees incurred from counsel and financial advisor to the DIP Facility Agent in connection with the DIP Documents. | DIP Term Sheet p. 10 |
| **Maturity Date; Duration for Use of DIP Collateral** Bankruptcy Rule 4001(c)(1)(B) | The earliest of (i) the date falling 12 months after the Petition Date, (ii) the effective date of any chapter 11 plan for the reorganization of the Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all (x) assets or (y) Specified Assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the DIP Loans and termination of the DIP Commitments upon and during the continuance of an event of default under the DIP Facility and (v) 45 days after the Petition Date (or such later date as agreed to by the Required DIP Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date. | DIP Term Sheet p. 2 |
| **Prepayments** Bankruptcy Rule 4001(c)(1)(B) | Voluntary Prepayments: Permitted at any time, without premium or penalty.<br><br>Mandatory Prepayments: Except for certain exceptions, required with 100% of the net cash proceeds from (a) the issuance of any indebtedness and (b) asset sales or other dispositions (including casualty events), in each case subject to customary exceptions and minimum liquidity thresholds and other thresholds to be agreed. | DIP Term Sheet p. 3. |
| **Conditions to Closing** Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type, the date of completion of all conditions precedent referred to as the "**Closing Date**," including, among other things: (a) execution and delivery of the DIP Credit Agreement and the other DIP Documents; (b) entry of the Interim Order; and (c) delivery of a Budget. | DIP Term Sheet p. 9. |
| **Superpriority Expense Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out, the DIP Facility Agent and DIP Facility Lenders are granted superpriority administrative expense claims for DIP Obligations in each of the chapter 11 cases of the Loan Parties. | Interim Order ¶ 8 |

9

| MATERIAL TERMS | | Location |
|---|---|---|
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | The DIP Obligations are secured by substantially all assets of the Debtors (the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility, the "**DIP Liens**"), except for (a) causes of action under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law and (b) the Apache Collateral.<br><br>The DIP Obligations shall, subject to the Carve-Out, at all times:<br>• be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party;<br>• be secured by a perfected first priority security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions) *pari passu with* valid and perfected liens in favor of hedge counterparties in connection with secured hedging transactions entered into by the Debtors on a post-petition basis in accordance with the DIP Credit Agreement;<br>• except as otherwise provided below with respect to the existing liens of the Prepetition Secured Parties and Apache Secured Parties, be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (i) valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreements, (ii) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "Permitted Prior Liens"), subject as to priority to such liens in favor of such third parties; and<br>• pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral (which DIP Collateral, for the avoidance of doubt, excludes the Apache Collateral) of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations of the Prepetition Secured Parties and the obligations of the Apache Secured Parties. | DIP Term Sheet p. 5 |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative and negative covenants usual and customary for financings of this type, including, without limitation, to use commercially reasonable efforts to obtain facility ratings from S&P and Moody's within 45 days of the date of the entry of the Final DIP Order and not to enter into any compensation arrangements (or modify any existing compensation arrangements) with senior management of the Company without the prior consent of the Required DIP Lenders (subject to certain exceptions to be agreed). | DIP Term Sheet p. 8 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type. | DIP Term Sheet p. 8 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The DIP Documents shall require compliance with milestones consistent with the "Milestones" (as defined in the Restructuring Support Agreement) to be included in the DIP Credit Agreement. | DIP Term Sheet p. 8 |

| MATERIAL TERMS | | Location |
|---|---|---|
| **Carve-Out**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iii) | The "**Carve-Out**" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, and (iii) to the extent allowed by the Bankruptcy Court at any time, and whether allowed before or after delivery of a Trigger Notice, (A) all allowed and unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtors is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $6,000,000, of professionals retained by the Debtors, in each case subject to the limits imposed by the DIP Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party. | DIP Term Sheet p. 5 |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The Debtors may use proceeds of the DIP Facility to pay working capital and general corporate purposes, to fund debt service or fees and expenses under the DIP Loans and DIP Facility, to pay allowed fees and expenses of retained professionals, and to provide for Adequate Protection. | Interim Order ¶ 6 |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(1)(B)(i) | Prepetition Secured Parties. | Interim Order ¶ 4 |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(1)(B)(iv) | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors, the Prepetition Secured Parties, and the DIP Lenders agree, subject to Bankruptcy Court approval of the Interim DIP Order, to the following forms of adequate protection (the "**Adequate Protection**"):<br><br>Prepetition FLTL Secured Parties:<br><br>(a) all accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to Davis Polk & Wardwell LLP, as primary outside legal counsel, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, as regulatory legal counsel, Haynes and Boone, LLP, as local legal counsel, and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors for the Prepetition FLTL Secured Parties and Shipman & Goodwin LLP, as primary legal counsel for the Prepetition FLTL Agent (the foregoing, collectively, the "**FLTL Advisors**");<br><br>(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLTL Agent, | DIP Term Sheet p. 6-8 |

| MATERIAL TERMS | Location |
|---|---|

including all such fees and expenses of the FLTL Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure FLTL Secured Party Adequate Protection Claims (as defined below) (the "**FLTL Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLFO Secured Party Adequate Protection Liens (as defined below);

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLTL Secured Party Adequate Protection Claims**");

(e) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the Borrower under the DIP Facility;

(f) the FLTL Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLTL Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLTL Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, Prepetition FLTL Secured Parties and Prepetition FLFO Secured Parties collectively holding greater than 50% of the sum of the outstanding principal amount of the loans under the Prepetition FLTL Credit Agreement plus the outstanding principal amount of the loans under the Prepetition FLFO Credit Agreement the "**Required AP Secured Parties**"); and

(g) Any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets shall be deemed to reduce dollar-for-dollar the value of the DIP Collateral that is not Prepetition Collateral until such value is zero and thereafter shall reduce the value of the remaining DIP Collateral.

Prepetition FLFO Secured Parties:

(a) all accrued and unpaid reasonable and documented fees and disbursements incurred prior to the Petition Date owed to Vinson & Elkins LLP, as primary legal counsel, and Opportune LLP, as financial advisor, for the Prepetition FLFO Agent (the foregoing, collectively, the "**FLFO Advisors**");

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLFO Agent, including all such fees and expenses of the FLFO Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, current payment in cash of post-petition interest at the non-default interest rate provided in the Prepetition FLFO Credit Agreement (based on the "LIBOR" rate, as

| MATERIAL TERMS | Location |
|---|---|
| provided in the Prepetition FLFO Credit Agreement); <br><br> (d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the FLFO Secured Party Adequate Protection Claims (as defined below) (the "**FLFO Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLTL Secured Party Adequate Protection Liens; <br> (e) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLFO Secured Party Adequate Protection Claims**"); <br><br> (f) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the Borrower under the DIP Facility; and <br><br> (g) the FLFO Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLFO Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLFO Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, the Required AP Secured Parties). <br><br> Prepetition SLTL Secured Parties: <br><br> (a) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility. <br><br> In addition, the Interim DIP Order shall provide for customary prepetition secured lender protections, including, but not limited to, (i) the right to seek additional forms of adequate protection, (ii) provision that any payments received as Adequate Protection shall be free and clear of all liens and claims, (iii) effective upon entry of the Interim DIP Order, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code, and the equitable doctrine of marshaling (subject to modification under the Final DIP Order with respect to the period following entry of the Final DIP Order), (iv) limitations on the use of collateral and (v) stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties. <br><br> For the avoidance of doubt, the FLTL Secured Party Adequate Protection Claims, the FLFO Secured Party Adequate Protection Claims and the SLTL Secured Party Adequate Protection Claims shall in all cases have the same relative priority as the FLTL Secured Party | |

| MATERIAL TERMS | | Location |
|---|---|---|
| | Adequate Protection Liens, the FLFO Secured Party Adequate Protection Liens and the SLTL Secured Party Adequate Protection Liens, respectively. | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including those related to the validity and enforceability of the Debtors' prepetition secured obligations. | Interim Order, ¶ 5 |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Facility Agent and the DIP Lenders will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. | Interim Order, ¶ 8 |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | Subject to the Challenge Period, the stipulations and admissions contained in the Interim Order shall be binding upon the Debtors, parties to the DIP Credit Agreement, and any other party-in-interest. The "**Challenge Period**" shall be no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 75 days after entry of the Interim Order and (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, (ii) any such later date as has been agreed to, in writing, and (iii) any such later date as has been ordered by the Court. | Interim Order, ¶ 23 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified solely to the extent necessary to permit the Debtors to grant the DIP Liens and Adequate Protection, and to permit the exercise of remedies upon five business days' notice. | Interim Order, ¶ 10 |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | Filing a plan of reorganization, requesting the use of cash collateral, and requesting authority to obtain credit pursuant to section 364 of the Bankruptcy Code under certain circumstances can each constitute an Event of Default which could terminate the Debtors' access to the DIP Facility and use of Cash Collateral. | Interim Order ¶ 22 |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests in and liens on collateral securing the obligations under the DIP Credit Agreement shall be valid and perfected upon entry of the Interim Order. | Interim Order, ¶ 9 |

14

| MATERIAL TERMS | | Location |
|---|---|---|
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Upon entry of the Interim Order, each Debtor, on behalf of itself, its estate, and its representatives provides for a general release to each Prepetition Secured Party and their respective representatives. | Interim Order, ¶ 5(f) |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Loan Parties will indemnify the DIP Facility Agent and DIP Lenders, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except solely for gross negligence, willful misconduct of such indemnified party or willful and material breach by such indemnified party of the DIP Documents to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment. | DIP Term Sheet p. 10 |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order (except with respect to payments of interest, fees, expenses and disbursements set forth in paragraphs **Error! Reference source not found.**, **Error! Reference source not found.** and **Error! Reference source not found.** of the Interim Order made between now and the entry of the Final Order), any and all payments or proceeds remitted to the Prepetition FLFO Administrative Agent on behalf of Prepetition FLFO Secured Parties or to the Prepetition FLTL Agent on behalf of any Prepetition FLTL Secured Parties, pursuant to the provisions of the Interim Order, the Final Order (if and when entered), any subsequent order of the Court or the Prepetition Debt Documents, shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code (subject to modification under the Final Order with respect to any payments or proceeds remitted following entry of the Final Order), whether asserted or assessed by, through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects. | Interim Order, ¶ 17 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties or the Prepetition Obligations, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order. | Interim Order, ¶ 18 |

## **Statement Regarding Significant Provisions**

8.      Pursuant to paragraph 23 of the Complex Case Procedures, the DIP Term

Sheet and/or DIP Orders contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones**<br>Complex Case<br>Procedures ¶ 23(a) | The DIP Term Sheet, attached hereto as **Exhibit A**, requires the Debtors to comply with the following milestones in the Restructuring Support Agreement including:<br><br>(i) no later than the Outside Petition Date, the Chapter 11 Cases shall have been filed;<br>(ii) entry of the Interim Order no later than 5 days of the Petition Date,<br>(iii) no later than the date that is 15 days after the Petition Date, the DIP Closing Date shall have occurred;<br>(iv) entry of the Final Order no later than 45 days of the Petition Date,<br>(v) no later than the date that is 45 days after the Petition Date, the Company shall have disclosed to the DIP Backstop Parties and the Consenting FLTL Lenders progress with respect to negotiations with Non-APA Owners and other parties in interest with respect to the Non-APA Remaining Assets and such progress shall be satisfactory to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders;<br>(vi) no later than the date that is 75 days after the Petition Date, the Apache Definitive Documentation shall be finalized<br>(vii) no later than the date that is 75 days after the Petition Date, at the election of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Company shall have either (x) filed the Plan, Disclosure Statement and a motion seeking approval of the Disclosure Statement and, at the option of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Bidding Procedures Motion; or (y) the Bidding Procedures Motion;<br>(viii) in the event the Bidding Procedures Motion is filed, no later than the date that is 100 days after the Petition Date, the Bidding Procedures Order shall have been entered by the Bankruptcy Court;<br>(ix) in the event the Bidding Procedures Motion is filed, no later than the date that is 120 days after the Petition Date, the bid deadline set forth in Bidding Procedures Order shall have passed;<br>(x) in the event the Bidding Procedures Motion is filed, no later than the date that is 130 days after the Petition Date, the auction (the "*Auction*"), if any, on the terms set forth in Bidding Procedures Order shall have occurred;<br>(xi) in the event the Bidding Procedures Motion is filed, the Auction has occurred or been canceled, and the winning bid contemplates a sale that is not pursuant to a Plan, no later than the date that is 140 days after the Petition Date, the Sale Order have been entered;<br>(xii) unless such failure is due to additional time required to obtain pending regulatory approvals, in the event the Bidding Procedures Motion is filed and the winning bid contemplates a Specified Assets Sale that is not pursuant to the Plan, no later than the date that is 14 days after the entry of the Sale Order, the Specified Assets Sale shall have been consummated;<br>(xiii) no later than the date that is 150 days after the Petition Date, the Disclosure Statement Order shall have been entered; |

| DIP Facility Term | Relief Requested |
|---|---|
| | (xiv) no later than the date that is 195 days after the Petition Date, the Confirmation Order shall have been entered; and <br> (xv) no later than the date that is 210 days after the Petition Date, the Effective Date shall have occurred. <br><br> If such milestones are not met, the Restructuring Support Agreement is subject to termination (*Restructuring Support Agreement* at § 7(a)), which would result in an Event of Default under the DIP Documents. (*See* DIP Term Sheet). <br><br> <u>Justification</u>: The Debtors have included the milestone provisions in the Interim Order because the Debtors believe that the DIP Lenders would not have otherwise provided the DIP Loans.  In the days leading up to the Petition Date, the milestones were heavily negotiated by the parties in the context of negotiating the RSA and the DIP Term Sheet. |
| **Cross-Collateralization** <br> Complex Case <br> Procedures ¶ 23(b) | The Interim Order does not provide for cross collateralization. |
| **Roll-ups** <br><br> Complex Case <br> Procedures ¶ 23(c) | The Interim Order does not provide for any roll up of prepetition debt. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** <br> Complex Case <br> Procedures ¶ 23(d) | The DIP Collateral includes, upon entry of the Final Order, any avoidance actions under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code.  Interim Order ¶ 9(a). <br><br> <u>Justification</u>. The Debtors respectfully submit that granting liens on Avoidance Actions is an appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** <br> Complex Case <br> Procedures ¶ 23(e) | The Interim Order provides for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Interim Order by the Debtors, filing a plan of reorganization that is not acceptable to the DIP Lenders, a sale of substantially all of the Loan Parties' assets (except as allowed under the DIP Documents), or any event of default under the DIP Credit Agreement.  *See* Interim Order, ¶ 22(b). <br><br> <u>Justification</u>.  These Events of Default appropriately balance, in the Debtors' view, the DIP Lenders' need for protection and the Debtors' need for debtor-in-possession financing and continued access to Cash Collateral.  In addition, the DIP Agent must provide five business days' prior written notice prior to exercising its rights under the DIP Documents and file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Credit Agreement) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement.  Therefore, the Interim Order does ***not*** provide for the automatic lifting of the stay upon an Event of Default. |

| DIP Facility Term | Relief Requested |
|---|---|
| **Releases of Claim Against Lender or Others**<br>Complex Case<br>Procedures ¶ 23(f) | Subject to paragraph 24 of the Interim Order, effective as of the Interim DIP Order, the Debtors are releasing claims against the Prepetition Secured Lenders and DIP Secured Parties related to claims related to the DIP Documents and Prepetition Credit Agreements.  Interim Order ¶ 5(f).<br><br>Justification.  The Debtors respectfully submit that this release is appropriate because (i) the Debtors are being provided consideration in the form of the DIP Facility and the DIP Lenders' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 23 of the Complex Case Procedures because the release is subject to the Challenge Period (i.e., no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 75 days after entry of this Interim Order and (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in paragraph 24 of the Interim Order). *See* Interim Order, ¶ 23. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case<br>Procedures ¶ 23(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the Prepetition Secured Parties and DIP Secured Parties (*e.g.*, for investigations and litigation against such parties).  Interim Order ¶ 24.<br><br>Justification.   The Debtors respectfully submit that this limitation is reasonable given the facts and circumstances of these chapter 11 cases. |
| **Priming Liens**<br>Complex Case Procedures ¶ 23(h) | Each Loan Party is provided first priority, senior priming liens on, and security interest in, all Prepetition Collateral to secure the DIP Obligations, *pari passu* with the Hedging Liens.  Interim Order ¶ 9(b). In addition, the Adequate Protection Liens (as defined in the Interim Order) on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties. *See* Interim Order ¶ 9(b).<br><br>Justification. The Debtors respectfully submit that it is appropriate to provide priming liens to the DIP Lenders to secure the DIP Obligations because (i) Prepetition FLFO Lenders are receiving adequate protection in the form of adequate protection liens, superpriority claims, cash payments in the form of postpetition interest, and fees and expenses and (ii) the Prepetition FLFO Lenders cannot object to the proposed DIP financing pursuant to the Pari Passu Intercreditor Agreement, provided that certain requirements are satisfied (which the Debtors assert have been satisfied). |

## Jurisdiction

9.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

**A.      General Background**

10.      On the Petition Date, the Debtors each commenced with the Court a voluntary case under the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

11.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are an independent exploration and production ("**E&P**") company in the Gulf of Mexico. The Company is focused on the exploration and development of offshore oil and gas assets in the shallow water and deepwater Gulf of Mexico and the Gulf Coast region in the U.S.

12.      Additional information regarding the circumstances leading to the commencement of these chapter 11 cases and information regarding the Debtors' businesses and capital structure is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**Dane Declaration**"), which has been filed contemporaneously herewith and is incorporated herein by reference.

**B.      Significant Prepetition Indebtedness**

13.      As of the Petition Date, the Debtors' significant prepetition indebtedness

consisted of the following:

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| FLTL Claims | $1,143 million | First lien on substantially all assets of the Debtors |
| FLFO Claims | $138.6 million | First lien on substantially all assets of the Debtors |
| SLTL Claims | $517.5 million | Second lien on substantially all assets of the Debtors |
| **Total** | $1,800 million | |

a.      FLTL Claims

14.      Certain of the Debtors are parties to the Prepetition FLTL Credit Agreement

between Fieldwood Energy as borrower and the Prepetition FLTL Secured Parties.  Pursuant to

the Prepetition FLTL Credit Agreement, the Debtors are obligated on approximately $1.14 billion,

composed of (a) approximately $755 million of principal amount of senior first-lien secured term

loans outstanding as of the Petition Date, and (b) approximately $388 million of reserve-based

term loans outstanding as of the Petition Date (collectively, the "**FLTL Claims**").  The FLTL

Claims are secured by a first-priority lien on the Prepetition Collateral.

b.      FLFO Claims

15.      Certain of the Debtors are parties to the Prepetition FLFO Credit Agreement

between Fieldwood Energy as borrower and the Prepetition FLFO Secured Parties, pursuant to

which approximately $138.6 million of first lien first out term loans remain outstanding as of the

Petition Date, plus any applicable interest, fees, and other amounts (the "**FLFO Claims**").  The

FLLO Claims are secured by a first-priority lien on the Prepetition Collateral.

c.      SLTL Claims

16.     Certain of the Debtors are parties to the Prepetition SLTL Credit Agreement, between Fieldwood Energy as borrower and the Prepetition SLTL Secured Parties, pursuant to which approximately $517.5 million of second lien term loans are outstanding as of the Petition Date, plus any applicable interest, fees, and other amounts (the "**SLTL Claims**").  The Prepetition Second Lien Term Loans are secured by a second-priority lien on the Prepetition Collateral.

d.      Intercreditor Agreements

17.     The rights of the Prepetition Secured Parties with respect to the Prepetition Collateral are governed by two intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

> (a) The relative contractual rights of the FLFO Lenders, on the one hand, and the FLTL Lenders, on the other hand, are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**").  The Pari Passu Intercreditor Agreement sets forth the rights and obligations as among the Prepetition FLFO Secured Parties, the Prepetition FLTL Secured Parties, and certain other providers of Secured Hedge Agreements (as defined in the Pari Passu Intercreditor Agreement) with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

> (b) The relative contractual rights of the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties, on the one hand, and the Prepetition SLTL Secured Parties, on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Senior Intercreditor Agreement**").  The Intercreditor Agreement sets forth the rights and obligations of the Prepetition FLFO Secured Parties, the Prepetition FLTL Secured Parties, and the Prepetition SLTL Secured Parties with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

The Intercreditor Agreements govern, among other things, the priority of distribution of the Prepetition Collateral and proceeds thereof between the Prepetition Secured Parties.

18.     Pursuant to the Pari Passu Intercreditor Agreement, the Prepetition FLFO Agents, on behalf of the Prepetition FLFO Lenders, agreed not object to any debtor-in-possession financing or use of cash collateral to the extent the Prepetition FLTL Agent does not oppose or object to such debtor-in-possession financing or use of cash collateral so long as (i) the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties retain the benefit of their liens on the Prepetition Collateral that also secures the obligations under the DIP Financing with the same priority vis-à-vis one another (other than in respect of liens constituting DIP Financing liens) as in effect prior to the Petition Date and, if either the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties are granted liens on any additional collateral pledged as adequate protection or otherwise in connection with the DIP Financing, then the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties, as applicable, are also granted a lien with the same priority vis-à-vis one another as in effect prior to the Petition Date and (ii) any amount of the DIP Financing applied to repay the FLTL Claims or the FLFO Claims or, if any adequate protection is granted to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties, such amount or the proceeds thereof, as applicable, is applied in accordance with Section 2.01 of the Pari Passu Intercreditor Agreement.

19.     Pursuant to the Senior Intercreditor Agreement, the Prepetition SLTL Agent, on behalf the of the Prepetition SLTL Lenders, agreed not to object to any debtor-in-possession financing secured by the Prepetition Collateral or use of cash collateral to the extent the Prepetition FLTL Agent does not object to such debtor-in-possession financing or use of cash collateral so long as (i) the aggregate amount of such financing does not exceed the debtor-in-possession financing cap set forth in the Senior Intercreditor Agreement, (ii) the terms of the financing are otherwise consistent with the terms of Section 2.06(a) of the Senior Intercreditor

Agreement, including that the financing does not compel the Debtors to seek confirmation of a specific plan of reorganization for which all the material terms are set forth in the documentations governing such financing or require the collateral securing the financing to be liquidated prior to a default and (iii) the Prepetition SLTL Secured Parties retain the benefit of their liens on the Prepetition Collateral with the same priority vis-à-vis the Prepetition FL Secured Parties (other than in respect of liens constituting DIP Financing liens) as in effect prior to the Petition Date.

## C.    Efforts to Obtain Postpetition Financing

20.    On July 6 2020, the Debtors, through Houlihan, launched a solicitation process to obtain postpetition financing and commenced negotiations with potential lenders. Houlihan contacted seven parties that it believed would be interested in providing the Debtors postpetition financing: the Prepetition FLFO Lenders, the Prepetition FLTL Lenders, and five external parties.  The Debtors received two proposals for DIP Financing: (i) the FLFO Proposal and (ii) the FLTL Proposal. DIP Declaration ¶ 17.

21.    The FLFO Proposal consists of a priming secured and superpriority debtor-in-possession delayed-draw term loan facility that included, among other terms, (i) a $100 million new-money DIP commitment, (ii) that all of the pre-petition obligations under the FLFO Credit Agreement would be rolled up (the "**Roll-up**") into the proposed DIP facility (upon each advance under the facility, in an amount equal to $1.50 per $1.00 of the principal amount of the new money DIP loan then-advanced, with substantially all of the remaining amount of the FLFO Obligations rolled up into the DIP facility upon entry of a final order), (iii) an upfront fee of 1.25% and an annual interest rate of LIBOR plus 5.5%, (iv) an unused commitment fee of 0.75%, and (v) that the proposed DIP financing was subject to various milestones related to the sale process for the Deepwater Assets and confirmation of a chapter 11 plan.

22.     The FLTL Proposal, which consists of a $100 million multiple-draw superpriority debtor-in-possession term loan credit facility, is available for participation by all Prepetition FLTL Lenders and is backstopped by certain members of the Secured Lender Ad Hoc Group.  The DIP Facility provides for funding based on the following schedule (subject to certain conditions, including various milestones and compliance with covenants, for each draw): (i) a mandatory initial draw of $10 million following entry of the Interim DIP Order and upon execution of the DIP Credit Agreement, (ii) an additional $15 million is available prior to finalizing the Apache Definitive Documents (including under the Interim DIP Order, if applicable), and (iii) subject to entry of the Final DIP Order, up to five additional draws of DIP Loans, each in an aggregate amount equal to $20 million (and a lesser amount under the final draw up to the total $100 million DIP Facility).  The DIP Facility also requires a 3% upfront fee, a 3% annual unused line fee, a 4% backstop fee, and an annual interest of LIBOR plus 8.75% (subject to a LIBOR floor of 1.0%), and various milestones related to the sale process for the Deepwater Assets and confirmation of a chapter 11 plan.  *Id*. ¶ 19.

23.     After engaging in multiple rounds of discussions with the Secured Lender Ad Hoc Group and the Prepetition FLFO Lenders and careful consideration, the Debtors ultimately determined that the FLTL Proposal—which was ultimately negotiated to the DIP Term Sheet— was the best financing alternative available to the Debtors because, among other reasons, (i) it provides the Debtors with the funds necessary to finance these chapter 11 cases at the least level of execution risk, including with respect to litigation regarding the pre-petition intercreditor agreement between the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties (the "**Pari Passu Intercreditor Agreement**"), (ii) it did not require a Roll-Up of any prepetition debt,  and (iii) the DIP Term Sheet was negotiated in the context of a larger

restructuring transaction and was ultimately agreed to as part of the restructuring support agreement between the Debtors and the Secured Lender Ad Hoc Group (the "**Restructuring Support Agreement**").  Although the FLFO Proposal offers a lower interest rate and fees than the DIP Facility, the FLFO Proposal carries with it a requirement for a substantial Roll-Up and significant execution risk as it would likely require the Debtors to seek approval of a DIP facility that would prime the Prepetition FLTL Lenders' pre-petition liens on a nonconsensual basis.  The Pari Passu Intercreditor Agreement does not restrict the Prepetition FLTL Lenders from objecting to the terms of any DIP financing provided by the Prepetition FLFO Lenders and the Prepetition FLTL Lenders would not consent to any DIP financing provided by the Prepetition FLFO Lenders which would prime the prepetition liens of Prepetition FLTL Lenders.  *Id*. ¶ 20.

24.     Given the Prepetition FLTL Lenders' unwillingness to consent to the FLFO Proposal, moving forward with the FLFO Proposal would have required the Debtors to face significant risk of costly and protracted litigation with the Prepetition FLTL Lenders at the outset of their chapter 11 cases regarding the value of the Debtors' assets, the amount of adequate protection to be provided, and the validity of the prepetition liens. Id. ¶ 21.

25.     After careful consideration of each proposal, the Debtors, in consultation with their advisors, determined that the DIP Facility was the best financing alternative available to the Debtors because it (i) avoids the delay and expenses resulting from protracted litigation regarding the terms of any priming lien and adequate protection and (ii) provides the Debtors with the necessary liquidity to fund these chapter 11 cases.  *Id*. ¶ 22.

D.     **Need for DIP Financing**

26.     The Debtors require access to the DIP Facility and the authority to use cash collateral throughout the chapter 11 process to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11

25

cases.  Although the Debtors are entering chapter 11 with approximately $135 million of cash on hand, their operating cash flow, as currently projected, may not be sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases, including costs associated with these chapter 11 cases. Moreover, the Debtors' business is subject to substantial volatility based on fluctuating market conditions in the oil and gas industry.

27.     The Debtors' prepetition capital structure is described in detail in the Dane Declaration filed contemporaneously herewith.  As set forth therein, substantially all of the Debtors' assets, including their cash (the "**Cash Collateral**"), are subject to prepetition security interests and liens in favor of the Prepetition Secured Parties in accordance with the Prepetition FLFO Credit Agreement, the Prepetition FLTL Credit Agreement, or the Prepetition SLTL Credit Agreement as applicable.

28.     As further described in the Dane Declaration, among other things, the distressed and volatile market conditions in the oil and gas industry have adversely affected the Debtors' cash flow.  As a result, the Debtors hired Houlihan to assist the Debtors in exploring strategic and financial alternatives, including the sale of the Company, the sale of select assets including the deepwater assets in the Gulf of Mexiso (the "**Deepwater Assets**"), and/or other financing options.

29.     In June 2020, Houlihan, with the assistance of the Debtors' management and AlixPartners, LLP, evaluated the Debtors' cash flow and liquidity needs in a chapter 11 scenario to determine the amount of postpetition financing that would be required to operate the Debtors' businesses and pay administrative costs during a chapter 11 process.  Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $100 million of new money, postpetition financing and access to cash collateral to finance their

operations and maintain sufficient liquidity assuming a potential 9-12 month duration for these chapter 11 cases. The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these chapter 11 cases. The Budget, which has not yet been agreed to by the DIP Lenders, reflects the Debtors' need for DIP Financing to fund the Debtors' chapter 11 process, while maintaining an adequate liquidity cushion. The Budget, along with previous iterations thereof, was shared with certain of the Prepetition Secured Lenders in accordance with the terms set forth in certain *Temporary Limited Forbearance and Amendment* agreements.

30. The proposed DIP Facility is essential to fund these chapter 11 cases and provides significant benefit to the Debtors and their estates. First, as evidenced by the frequent chapter 11 filings in the industry, the current market conditions in the oil and gas industry are volatile and distressed. Entry into the DIP Facility provides an upfront commitment from the DIP Lenders to provide a $100 million DIP Facility (subject to the terms and conditions for each draw as set forth in the DIP Documents). Given the uncertainty regarding the Debtors' ability to obtain financing in the future, securing a $100 million DIP financing commitment at the outset of these chapter 11 cases provides a degree of certainty regarding the restructuring process and instills confidence in the Debtors' vendors, customer base, employees, counterparties, and business partners by assuring them that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date.

31. Second, certain of the Debtors' hedge counterparties (the "**Hedge Counterparties**") have indicated that they will not enter into postpetition hedging agreements with the Debtors until entry of the Interim DIP Order. Historically, the Debtors have generally entered

into hedging transactions for 40%-60% of the Debtors' projected oil and natural gas production for one to two years into the future. Moreover, the prepetition hedging agreements were typically secured on a first lien basis under the FLFO Credit Agreement, with a security interest in substantially all of the Debtors' assets.  However, prior to the Petition Date, the Debtors and J. Aron & Company LLC ("**J. Aron**"), the Debtors' largest Hedge Counterparty, agreed to crystallize the parties' outstanding hedges in connection with a forbearance agreement entered into between Fieldwood Energy LLC and J. Aron on May 13, 2020.  Consequently, as of the Petition Date, the Debtors do not have any active hedge positions.  Hedging transactions play a critical role in the Debtors' business, particularly under current market conditions, by allowing the Debtors to reduce their exposure to commodity price fluctuations and providing the Debtors with long-term cash flow predictability to manage their business.  With committed financing in place and the ability to grant Hedge Counterparties first-priority liens in the DIP Collateral *pari passu* with the DIP Liens (as provided under the Interim DIP Order), the Debtors will be in a much better position to enter into postpetition hedging transactions.

32.     The DIP Term Sheet provides for an initial interim funding under the DIP Facility of $10 million following entry of the Interim DIP Order and execution of the DIP Credit Agreement (the "**Initial Draw**").  An immediate infusion of liquidity will help provide confidence to the market and employees and will help ensure stable access to capital, all of which will maximize the potential value of their assets for the benefit of their estates and creditors.  Moreover, certain of the DIP Lenders are investment funds that have policies limiting their ability to provide unfunded commitments for a material period of time.  Consequently, by seeking the Initial Draw, the Debtors were able to induce these funds to participate in the DIP Loans and the Debtors were able to obtain more favorable economic terms on the DIP Facility.  Absent the Initial Draw, the

Debtors do not believe it would have been possible to obtain a committed DIP facility on economic terms as favorable as those in the proposed DIP Financing. Importantly, the relief requested in this Motion also reflects an agreement between the Debtors and the affected lenders regarding the use of cash collateral during these Chapter 11 Cases and is, therefore, consensual.

### The DIP Facility Should Be Approved

33.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the DIP Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)-(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lenders to secure the DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

### A.     Entering DIP Facility Is a Sound Exercise of Business Judgment

34.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) [Docket No. 21] (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.”).

35.     Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313. To determine whether the business judgment test is met, “the court ‘is required to examine whether a reasonable business person would make a similar decision under similar circumstances.’” *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into “hard bargains” to acquire funds for its reorganization).

36.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives. Given the nature of the Debtors' prepetition capital structure, the Intercreditor Agreements, and the limited unencumbered asset pool, the Ad Hoc Group of Secured Lenders surfaced as the best available financing source that could move quickly to commit to a facility, and enable the Debtors to avoid

a potentially costly and protracted priming fight at the outset of these chapter 11 cases.  The Debtors negotiated the DIP Term Sheet with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, and on reasonable terms.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

      1.    **Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis**

37.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

38.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL) 2016 WL 2616717, at *11 (Bankr. S.D.N.Y.

May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

39.     <u>First</u>, as stated above, the Debtors contacted five other financial institutions, excluding the Prepetition Secured Parties, to seek proposals for postpetition financing.  No parties except for the Prepetition FLFO Lenders and the Ad Hoc Group of Secured Lenders submitted DIP proposals (each of which proposed priming secured and superpriority DIP facilities in the amount of $100 million). The Court should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, with (i) first priority senior liens on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code, provided that the Priming Liens shall be junior to the Permitted Prior Liens and *pari passu* with Hedging Liens, (ii) valid priming liens (the "**Priming Liens**") on any property encumbered with an existing lien pursuant to section 364(d)(1) of the Bankruptcy Code, and (iii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the Primed Liens) pursuant to section 364(c)(3) of the Bankruptcy Code.

40.     <u>Second</u>, the DIP Facility is necessary to preserve the Debtors' estates.  The Debtors require access to the DIP Facility and access to Cash Collateral to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11 cases.  Although the Debtors are entering chapter 11 with

approximately $135 million of cash on hand, their operating cash flow, as currently projected, may not be sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases, including costs associated with these chapter 11 cases.

41.     Third, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  As stated, the DIP Facility represents the most favorable source of postpetition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these chapter 11 cases.

**2.  Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens Priming the Prepetition Secured Parties**

42.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>    (A) the trustee is unable to obtain such credit otherwise; and
>
>    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).  "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'"  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to

the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

43.     As discussed above, postpetition credit is not available without the granting the Priming Liens.   In any event, pursuant to the Pari Passu Intercreditor Agreement, the Prepetition FLFO Lenders cannot object to the DIP facility in these circumstances.   Here, the Prepetition FLFO Lenders retaining their prepetition liens and are adequately protected as contemplated by section 364(d) of the Bankruptcy Code.  The Debtors will provide the Prepetition FLFO Lenders with adequate protection as described above and as is customary in similar situations.  What constitutes adequate protection is decided on a case-by-case basis.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr.  D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").

44.     Here, as described above, the Debtors propose providing the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties adequate protection to the extent of any diminution of the their prepetition collateral in the form of superpriority claims and liens, the payment of postpetition interest on a current basis (at the non-default rate, and solely for the Prepetition FLFO Secured Parties), and the payment of reasonable and documented fees, expenses, and disbursements incurred by the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties both before and after the Petition Date.

**B.**     **Debtors Should Be Authorized to Use Cash Collateral**

45.     For the reasons set forth herein, the Debtors require use of Cash Collateral (as well as the DIP Facility) for the continued operation of the Debtors' businesses and smooth entry into the chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

46.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  As noted above, the Debtors intend to provide the appropriate parties with adequate protection for the use of Cash Collateral.  Indeed, the Budget contemplates the use of Cash Collateral to pay such adequate protection as provided in the Interim Order.  Additionally, the Prepetition FLTL Secured Parties consent to the Debtors use of Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

**C.**     **Debtors Should Be Authorized to Pay Fees Required by DIP Documents**

47.     The Debtors have agreed to pay certain interest and fees to the DIP Agent and DIP Lenders as a condition to providing financing.  Such terms are integral to the financing

package.  Under the circumstances, the contemplated fees and other economic terms of the DIP Facility are reasonable and were all negotiated at arm's length.  DIP Decl. ¶ 30.  Accordingly, authorization to pay the fees is warranted.

## D.    Carve-Out Is Appropriate

48.    The DIP Facility subjects the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve Out is appropriate.

## E.    DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)

49.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

      50.    As explained herein and in the DIP Declaration, negotiations of the DIP Facility were conducted in good faith and at arm's length. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

**F.    Modification of Automatic Stay Is Warranted**

      51.    The relief requested herein contemplates a modification of the automatic stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Agent, DIP Lenders, and the Prepetition Secured Parties to exercise rights and remedies under certain circumstances. These provisions were part of the quid pro quo for the Debtors' ability to obtain the DIP Facility and use Cash Collateral as provided therein and in the Interim Order. Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five business days' notice to allow the Debtors to cure or seek other relief. Moreover, following the delivery of such notice, the DIP Agent may file a Stay Relief Motion seeking emergency relief from the automatic stay and until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Credit Agreement)) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement and Budget. *See* Interim DIP Order, ¶ 10(d). Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

52.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

**G.     Debtors Require Immediate Access to Cash Collateral and DIP Facility**

53.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."   Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 36.

54.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  The Debtors have an immediate need for continued access to Cash Collateral, and any disruption to the use of Cash Collateral would destroy value from the Debtors' estates by preventing them from making disbursements necessary to operate in the ordinary course.  Similarly, access to the DIP Facility would (i) provide assurances to employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of these chapter 11 cases and (ii) allow the Debtors to

enter into Postpetition Hedges.  *See* DIP Declaration ¶ 13, 14.  In addition, access to the DIP Facility will provide the Debtors with financial stability in the event of unforeseen circumstances attendant to the uncertain commodities market.  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## H.    Request for Final Hearing

55.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Bankruptcy Rule 6003 Has Been Satisfied

56.    Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Dane Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### Compliance with Bankruptcy Rule 6004(a) and
### <u>Waiver of Bankruptcy Rule 6004(h)</u>

57.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

### <u>Notice</u>

58.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn:  William L. Wallander, Esq. and Bradley R. Foxman, Esq.), as counsel to Goldman Sachs Bank USA, the FLFO Administrative Agent; (iv) (A)  Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:  Damian S. Schaible, Esq. and Natasha Tsiouris, Esq.), and (B) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham Jr., Esq. and Martha Wyrick, Esq.), as counsel to the Ad Hoc Group of Secured Lenders; (v) Shipman & Goodwin LLP, 400 Park Ave, 5th Floor, New York, NY 10022 (Attn:  Nathan Plotkin, Esq.), as counsel to Cantor Fitzgerald Securities, the FLTL Administrative Agent; (vi) Holland & Knight LLP, 150 N. Riverside Plaza, Chicago, IL 60606 (Attn:  Joshua Spencer, Esq. and Anastasia Sotiropolous, Esq.) as counsel to Cortland Capital Market Services LLC, the SLTL Administrative Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the Securities and Exchange Commission; (x) the Prepetition Secured Parties; (xi) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (xii) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**<u>No Previous Request</u>**

59.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 4, 2020
        Houston, Texas

                                    Respectfully submitted,

                                      */s/ Alfredo R. Pérez*
                                    WEIL, GOTSHAL & MANGES LLP
                                    Alfredo R. Pérez (15776275)
                                    700 Louisiana Street, Suite 1700
                                    Houston, Texas 77002
                                    Telephone:  (713) 546-5000
                                    Facsimile:  (713) 224-9511
                                    Email:   Alfredo.Perez@weil.com

                                    -and-

                                    WEIL, GOTSHAL & MANGES LLP
                                    Matthew S. Barr (*pro hac vice* pending)
                                    Jessica Liou (*pro hac vice* pending)
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007
                                    Email:   Matt.Barr@weil.com
                                                Jessica.Liou@weil.com


                                    *Proposed Attorneys for Debtors*
                                    *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


   */s/  Alfredo R. Pérez*
Alfredo R. Pérez