## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § § | Case No. 20-33948 (MI) |
| Debtors.[1] | § § § | (Joint Administration Requested) |

**DECLARATION OF JOHN-PAUL HANSON IN SUPPORT OF MOTION OF
DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E)
AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C.
§§ 361, 362, 363, 364 AND 507(B) AND (III) SCHEDULING FINAL
<u>HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)</u>**

I, John-Paul Hanson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Houlihan Lokey Capital, Inc. ("**Houlihan**"), where I am Head of Houlihan's Oil and Gas Group, and am a senior banker in the firm's Financial Restructuring Group with respect to the oil and gas industry and sub-sectors. I am based out of Houlihan's Houston office located at 1001 Fannin St Suite 4650, Houston, TX 77002. Houlihan is the proposed investment banker for the Debtors in these chapter 11 cases. Houlihan and its

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

2.     I submit this declaration (the "**Declaration**") on behalf of Houlihan in support of the relief requested in *Motion of Debtors for Interim Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Motion**").

3.     Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Houlihan employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional.  If called to testify, I could and would testify to each of the facts set forth herein on foregoing bases.  I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional proposed to be retained by the Debtors as the Debtors' investment banker in these chapter 11 cases.

### Qualifications

4.     I specialize in advising public and private oil and gas companies and their lenders and investors, including in the context of complex financial restructurings.  Before joining Houlihan Lokey in 2001, I was a manager of alternative lending at Commonfund Mortgage Corp., where I structured whole loan and portfolio fundings, sales, and securitizations involving a variety

of asset-backed lending transactions.  Earlier in my career, I held a similar position at MoneyLine Lending.  I began my career in finance, trading fixed income securities at NNJ, a private family wealth fund formerly based in San Francisco, California.  I have an M.B.A., with a concentration in Finance, from the University of Maryland's Robert H. Smith School of Business and a dual B.A. degree, *cum laude*, in Italian and International Finance from Brigham Young University.  I am FINRA certified with Series 7 and 63 licenses.

5.     I have extensive experience as an advisor and investor in corporate restructurings, public and private debt and equity offerings, and mergers and acquisitions.  I have advised many companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to offshore Gulf of Mexico businesses, including *ATP Oil & Gas Corp.*; *Bennu Oil & Gas, LLC*; *Energy XXI Ltd.*, *Cobalt International Energy, Inc.*, and Fieldwood Energy LLC's previous restructuring.  In addition, I have advised numerous companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to onshore U.S. and international E&P companies, including *Berry Petroleum, LLC, Sandridge Energy, Inc., Sheridan Production Partners (I and II), PA Resources, Halcon Resources Corporation, BPZ Resources, Inc., Chesapeake Energy Corporation, All American Oil & Gas, Breitburn Energy Partners, Jones Energy Corporation,* and *Endeavour International Corporation*, among  others within the energy industry and a variety of other sectors.  I have previously submitted declarations and/or affidavits and proffered testimony in multiple cases.  I have authored, co-authored, and spoken on various topics, including Trends in Oil & Gas Finance, Capital and Valuation, and financing markets and valuation dynamics in a distressed environment, among others.

6.      In March, 2020, the Debtors retained Houlihan as their investment banker to assist with the Debtors' evaluation of strategic alternatives.  Since that time, members of my team and I have worked closely with the Debtors' management and other professionals the Debtors are seeking, or will seek, to retain in these chapter 11 cases to analyze the Debtors' business affairs, assets and liabilities, financial position, contractual arrangements, and various proposed strategic transactions.  I, and the Houlihan team, have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

7.      I have provided the Debtors with advice on, among other things, transaction alternatives, including with respect to M&A and restructuring options as well as available financing in the current environment.  I have participated in negotiations between and among the Debtors and their creditor constituencies.  Members of the Houlihan team and I have also assisted the Debtors in reviewing the terms, conditions, and the potential impact of various proposed transactions.  I have participated in numerous meetings with the Debtors' board of directors to address, among other things, the Debtors' forecasted liquidity profile and resulting need for, and access to, debtor-in-possession financing ("**DIP Financing**") to fund these chapter 11 cases.

### Debtors' Need for DIP Financing and Use of Cash Collateral

8.      Pursuant to the DIP Motion, the Debtors request entry of an interim order (the "**Interim DIP Order**") authorizing the Debtors to, among other things, (a) obtain DIP Financing, consisting of a multiple-draw senior secured debtor-in-possession term loan credit facility (the "**DIP Facility**") in an aggregate principal not to exceed $100 million from the DIP Lenders[2] on the terms and conditions set forth in the Interim Order and the DIP Documents, (b) to

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Interim DIP Order.

enter into a Senior Secured Debtor-in-Possession Term Loan Credit Agreement (the "**DIP Credit Agreement**") upon terms and conditions consistent in all material respects with those set forth in the DIP Term Sheet (attached as **Exhibit A** to the DIP Motion), (c) grant adequate protection to the Prepetition Secured Parties, and (d) continue to use cash collateral during the pendency of these chapter 11 cases.  It is my opinion, based on my experience, that the proposed DIP Facility is the product of an arm's-length negotiation process, represents the best post-petition financing alternative available to the Debtors under the circumstances, and in the best interest of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

9.      The Debtors require access to the DIP Facility and the authority to use cash collateral throughout the chapter 11 process to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course for the duration of these chapter 11 cases.  Although the Debtors are entering chapter 11 with approximately $135 million of cash on hand, their operating cash flow, as currently projected, may not be sufficient to fund ongoing operations and expenses for the projected duration of the chapter 11 cases, including costs associated with these chapter 11 cases.  Moreover, the Debtors' business is subject to substantial volatility based on fluctuating market conditions in the oil & gas industry.

10.      The Debtors' pre-petition capital structure is described in detail in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "**First Day Declaration**") filed contemporaneously herewith.  As set forth therein, substantially all of the Debtors' assets, including their cash (the "**Cash Collateral**"), are subject to pre-petition security interests and liens in favor of the lenders under (i) that certain Second Amended and Restated Credit Agreement – First Out, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the

5

"**Prepetition FLFO Credit Agreement**"), among others, Fieldwood Energy Inc., as holdings, Fieldwood Energy LLC, as borrower, the lenders party thereto (the "**Prepetition FLFO Lenders**"), Goldman Sachs Bank USA, as administrative agent (in such capacity, the "**Prepetition FLFO Administrative Agent**") and issuing bank, and Cantor Fitzgerald Securities, as collateral agent (in such capacity, the "**Prepetition FLFO Collateral Agent**", together with Prepetition FLFO Administrative Agent and their successors in such capacities, the **"Prepetition FLFO Agents**" and, the "Secured Parties" under such Prepetition FLFO Credit Agreement the "**Prepetition FLFO Secured Parties**"), (ii) that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLTL Credit Agreement**"), among others, Fieldwood Energy Inc., as holdings, Fieldwood Energy LLC, as borrower, the lenders party thereto from time to time (the "**Prepetition FLTL Lenders**") and Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "Prepetition FLTL Agent" and, the "Secured Parties" under such Prepetition FLTL Credit Agreement the "**Prepetition FLTL Secured Parties**") and (iii) that certain Amended and Restated Second Lien Term Loan Agreement dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior, the "**Prepetition SLTL Agreement**" and, together with the Prepetition FLFO Credit Agreement and the Prepetition FLTL Credit Agreement, the "**Prepetition Credit Agreements**"), among others,  Fieldwood Energy Inc., as holdings, Fieldwood Energy LLC, as borrower, the lenders party thereto from time to time (the "**Prepetition SLTL Lenders**") and Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "Prepetition SLTL Agent" and, the

"Secured Parties" under such Prepetition SLTL Credit Agreement the "**Prepetition SLTL Secured Parties**") (the Prepetition SLTL Secured Parties, together with the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties, the "**Prepetition Secured Lenders**").

11.     As further described in the Dane Declaration, among other things, the distressed and volatile market conditions in the oil and gas industry have adversely affected the Debtors' cash flow.  As a result, the Debtors hired Houlihan to assist the Debtors in exploring strategic and financial alternatives, including the sale of the Company, the sale of select assets including the deepwater assets in the Gulf of Mexiso (the "**Deepwater Assets**"), and/or other restructuring and financing options.

12.     In June 2020, Houlihan, with the assistance of the Debtors' management and AlixPartners, LLP ("**AlixPartners**"), evaluated the Debtors' forecasted cash flow and liquidity needs in a chapter 11 scenario to determine the amount of post-petition financing that would be required to operate the Debtors' businesses and pay administrative costs during a chapter 11 process.  Based on this analysis, the Debtors and their advisors concluded that the Debtors would require approximately $100 million of new money, post-petition financing and access to cash collateral to finance their operations and maintain sufficient liquidity assuming a potential 9-12 month duration for these chapter 11 cases.  The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these chapter 11 cases.  The Debtors' current budget is attached to the DIP Motion as **Exhibit C** (the "**DIP Budget**").  The DIP Budget reflects the Debtors' need for DIP Financing to fund the Debtors' chapter 11 process, while maintaining an adequate liquidity cushion.  The DIP Budget, along with previous iterations thereof, was shared with certain of the Prepetition Secured Lenders in

accordance with the terms set forth in certain *Temporary Limited Forbearance and Amendment* agreements (collectively, as amended, supplemented or otherwise modified prior to the date hereof, the "**TLF Agreements**").

13.      I believe the proposed DIP Facility is essential to fund these chapter 11 cases and provides significant benefit to the Debtors and their estates.  First, as evidenced by the recent frequency of chapter 11 filings among oil and gas companies, the current commodity price and resulting capital market conditions in the oil and gas industry are volatile and distressed.  Entry into the DIP Facility provides an upfront commitment from the DIP Lenders who are also party to the Restructuring Support Agreement, to provide a $100 million DIP Facility (subject to the terms and conditions for each draw as set forth in the DIP Documents).  Given current market conditions and the uncertainty regarding the Debtors' ability to obtain financing in the future, securing a $100 million DIP financing commitment at the outset of these chapter 11 cases provides a degree of certainty regarding the restructuring process and instills confidence in the Debtors' vendors, customer base, employees, counterparties, regulators, and business partners by assuring them that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date.

14.      Second, certain of the Debtors' hedge counterparties (the "**Hedge Counterparties**") have indicated that they will not enter into post-petition hedging agreements (the "**Postpetition Hedging Agreements**") with the Debtors until entry of the Interim DIP Order. Historically, the Debtors have generally entered into hedging transactions for 40%-60% of the Debtors' projected oil and natural gas production for one to two years into the future.  Moreover, the pre-petition hedging agreements were typically secured on a first lien basis under the Prepetition FLFO Credit Agreement, with a security interest in substantially all of the Debtors'

assets.  However, prior to the Petition Date, the Debtors and J. Aron & Company LLC ("**J. Aron**"), the Debtors' largest Hedge Counterparty, agreed to crystallize the parties' outstanding hedges in connection with a forbearance agreement entered into between Fieldwood Energy LLC and J. Aron on May 13, 2020.  Consequently, as of the Petition Date, the Debtors do not have any active hedge positions.  Hedging transactions play a critical role in the Debtors' business, particularly under current market conditions, by allowing the Debtors to reduce their exposure to commodity price fluctuations and providing the Debtors with long-term cash flow predictability to manage their business.  With committed financing in place and the ability to grant Hedge Counterparties first-priority liens in the DIP Collateral *pari passu* with the DIP Liens (as provided under the Interim DIP Order), the Debtors will be in a much better position to enter into post-petition hedging transactions.

15.     Based on the foregoing, it is my belief that the DIP Facility will satisfy the Debtors' post-petition liquidity needs, will provide the Debtors with sufficient flexibility to operate their business in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

### Initial Draw

16.     The DIP Term Sheet provides for an initial interim funding under the DIP Facility of $10 million following entry of the Interim DIP Order and entry into the DIP Credit Agreement (the "**Initial Draw**").  An immediate infusion of liquidity will help provide confidence to the market and employees and will help ensure stable access to capital, all of which will maximize the potential value of their assets for the benefit of their estates and creditors.  Moreover, certain of the DIP Lenders are investment funds that have policies limiting their ability to provide unfunded commitments for a material period of time.  Consequently, by seeking the Initial Draw,

the Debtors were able to induce these funds to participate in the DIP Loans and the Debtors were able to obtain more favorable economic terms on the DIP Facility.  Absent the Initial Draw, the Debtors do not believe it would have been possible to obtain a committed DIP facility on economic terms as favorable as those in the proposed DIP Financing. Importantly, the relief requested in the DIP Motion also reflects an agreement between the Debtors and the affected lenders regarding the use of cash collateral during these Chapter 11 Cases and is, therefore, consensual.

<u>**Debtors' Efforts to Obtain Postpetition Financing**</u>

17.     On July 6 2020, the Debtors, through Houlihan, launched a solicitation process to obtain post-petition financing and commenced negotiations with potential lenders. Houlihan contacted seven parties that it believed would be interested in providing the Debtors post-petition financing: the Prepetition FLFO Lenders, the Prepetition FLTL Lenders, and five external parties.  The Debtors received two proposals for DIP Financing: (i) one from the Prepetition FLFO Lenders (the "**FLFO Proposal**") and (ii) the other from an ad hoc group (the "**Secured Lender Ad Hoc Group**") comprised primarily of Prepetition FLTL Lenders (the "**FLTL Proposal**").  None of the five external parties elected to make a proposal due to, among other things, the lack of desire to seek a nonconsensual priming DIP facility.

18.     The FLFO Proposal consists of a priming secured and superpriority debtor-in-possession delayed-draw term loan facility that included, among other terms, (i) a $100 million new-money DIP commitment, (ii) that all of the pre-petition obligations under the FLFO Credit Agreement would be rolled up (the "**Roll-up**") into the proposed DIP facility (upon each advance under the facility, in an amount equal to $1.50 per $1.00 of the principal amount of the new money DIP loan then-advanced, with substantially all of the remaining amount of the FLFO Obligations rolled up into the DIP facility upon entry of a final order), (iii) an upfront fee of 1.25% and an

annual interest rate of LIBOR plus 5.5%, (iv) an unused commitment fee of 0.75%, and (v) that the proposed DIP financing was subject to various milestones related to the sale process for the Deepwater Assets and confirmation of a chapter 11 plan.

19.     The FLTL Proposal, which consists of a $100 million multiple-draw superpriority debtor-in-possession term loan credit facility, is available for participation by all Prepetition FLTL Lenders and is backstopped by certain members of the Secured Lender Ad Hoc Group.  The DIP Facility provides for funding based on the following schedule (subject to certain conditions, including various milestones and compliance with covenants, for each draw): (i) a mandatory initial draw of $10 million following entry of the Interim DIP Order and upon execution of the DIP Credit Agreement, (ii) an additional $15 million is available prior to finalizing the Apache Definitive Documents (including under the Interim DIP Order, if applicable), and (iii) subject to entry of the Final DIP Order, up to five additional draws of DIP Loans, each in an aggregate amount equal to $20 million (and a lesser amount under the final draw up to the total $100 million DIP Facility).  The DIP Facility also requires a 3% upfront fee, a 3% annual unused line fee, a 4% backstop fee, and an annual interest of LIBOR plus 8.75% (subject to a LIBOR floor of 1.0%), and various milestones related to the sale process for the Deepwater Assets and confirmation of a chapter 11 plan.

20.     After engaging in multiple rounds of discussions with the Secured Lender Ad Hoc Group and the Prepetition FLFO Lenders and careful consideration, the Debtors ultimately determined that the FLTL Proposal—which was ultimately negotiated to the DIP Term Sheet— was the best financing alternative available to the Debtors because, among other reasons, (i) it provides the Debtors with the funds necessary to finance these chapter 11 cases at the least level of execution risk, including with respect to litigation regarding the pre-petition intercreditor

11

agreement between the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties (the "**Pari Passu Intercreditor Agreement**"), (ii) it did not require a Roll-Up of any prepetition debt,  and (iii) the DIP Term Sheet was negotiated in the context of a larger restructuring transaction and was ultimately agreed to as part of the restructuring support agreement between the Debtors and the Secured Lender Ad Hoc Group (the "**Restructuring Support Agreement**").  Although the FLFO Proposal offers a lower interest rate and fees than the DIP Facility, the FLFO Proposal carries with it a requirement for a substantial Roll-Up and significant execution risk as it would likely require the Debtors to seek approval of a DIP facility that would prime the Prepetition FLTL Lenders' pre-petition liens on a nonconsensual basis.  The Pari Passu Intercreditor Agreement does not restrict the Prepetition FLTL Lenders from objecting to the terms of any DIP financing provided by the Prepetition FLFO Lenders and the Prepetition FLTL Lenders would not consent to any DIP financing provided by the Prepetition FLFO Lenders which would prime the prepetition liens of Prepetition FLTL Lenders.

21.     Given the Prepetition FLTL Lenders' unwillingness to consent to the FLFO Proposal, moving forward with the FLFO Proposal would have required the Debtors to face significant risk of costly and protracted litigation with the Prepetition FLTL Lenders at the outset of their chapter 11 cases regarding the value of the Debtors' assets, the amount of adequate protection to be provided, and the validity of the pre-petition liens.

22.     After careful consideration of each proposal, the Debtors, in consultation with their advisors, determined that the DIP Facility was the best financing alternative available to the Debtors because it (i) avoids the delay and expenses resulting from protracted litigation regarding the terms of any priming lien and adequate protection and (ii) provides the Debtors with the necessary liquidity to fund these chapter 11 cases.

**DIP Facility Was Negotiated in Good Faith and at Arm's Length**

23.     In the days leading up to the Petition Date, my team and I, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facility on behalf of the Debtors.  I believe the process was rigorous and marked by hard bargaining.  Importantly, the Debtors were able to negotiate a material reduction of the interest rate and fees included in the FLTL Proposal, as well as concessions regarding certain covenants and reporting requirements.

24.     This process culminated in the DIP Facility, which I observed to be negotiated in good faith and at arm's-length.  I understand that each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

25.     I believe, based on my observation and professional experience, that the terms of the DIP Term Sheet are reasonable under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors, particularly in this environment and especially for those operating in the upstream oil and gas industry.

**DIP Facility is Best Postpetition**
**Financing Arrangement Available to Debtors**

26.     Based on my experience with DIP Financing transactions, as well as my involvement in the negotiation of the DIP Term Sheet and pursuit of alternative post-petition financing proposals, I believe the DIP Facility is the best financing option available to the Debtors under the circumstances.  I believe the proposed DIP Facility maximizes the value of the enterprise by (a) providing the Debtors with access to committed financing at the outset of these chapter 11 cases and (b) facilitating a consensual restructuring and exit out of chapter 11.

27.     The DIP Lenders agreed to provide the DIP Facility to the Debtors on terms that I consider to be fair and reasonable under the circumstances.

28.     After extensive discussions with the Prepetition FLTL Lenders and the Prepetition FLFO Lenders, it became clear that pursuing the DIP Facility was the Debtors' best option.   As detailed above, a majority of the Prepetition FLTL Lenders had indicated an unwillingness to consent to the FLFO Proposal, which proposed DIP financing would have primed the FLTL Lenders' pre-petition liens.   In short, the Debtors believe the DIP Facility is the more attractive option because the risk of costly and protracted litigation with the Prepetition FLTL Lenders associated with the FLFO Proposal outweighs the benefit of its more favorable pricing terms.

29.     I believe that the Debtors' provision of a perfected first priority security interest and lien on substantially all of the Debtors' assets is also reasonable under the circumstances.   That was also a requirement of the FLFO Proposal, and, in my view and based on my work on this matter, absent such protections, no DIP lenders, including the DIP Lenders, would have agreed to provide the DIP Facility without obtaining such protections.   Moreover, the provision of adequate protection to the Prepetition Secured Parties was necessary to allow the Debtors to continue to use the Cash Collateral.

30.     In addition, based on my experience as a restructuring professional in the oil and gas industry and my understanding of the Debtors' capital structure and need for post-petition financing, the interest rate, fees, and milestones under the DIP Facility are reasonable and in line with other DIP Financings provided on a lien basis.

31.     Finally, and perhaps most importantly, I believe the DIP Facility provides the Debtors with a path toward a successful restructuring.   The DIP Term Sheet was negotiated in the context of a larger restructuring transaction, and the proposed DIP Facility, together with the Restructuring Support Agreement, provide the clearest path to an expeditious and adequately

14

funded exit from chapter 11, which will best preserve the value of the Debtors' businesses and operations.

32.     In sum, it is my professional opinion that the terms of the DIP Facility are reasonable under the circumstances, and were the product of good faith, arm's-length negotiations and that the DIP Facility will benefit all stakeholders in these chapter 11 cases.  For all of the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facility and the use of cash collateral as contemplated by the DIP Motion.

Dated: August 4, 2020

  */s/ John-Paul Hanson*
John-Paul Hanson
Managing Director
Houlihan Lokey Capital, Inc.

15