**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |
| | § | |

**DECLARATION OF MICHAEL DANE IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Michael T. Dane, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am Senior Vice President and Chief Financial Officer of Fieldwood Energy LLC ("**Fieldwood Energy**"), a wholly-owned direct subsidiary of Fieldwood Energy Inc. ("**Parent**"). I have served as Senior Vice President and Chief Financial Officer since March 9, 2016. Prior to my appointment to my current role, I was Vice President of Finance for Fieldwood Energy. Before that, I was Manager of Finance and Planning at Dynamic Offshore Resources, LLC and an equity research analyst at SunTrust Robinson Humphrey with a focus on the exploration and production sector. I hold a Bachelor of Commerce degree from McGill University.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

2.     Commencing on August 3, 2020 (the "**Petition Date**"), Parent and certain of its domestic subsidiaries (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**") filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable about and familiar with the Company's businesses and financial affairs.  I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**").  I am authorized to submit this Declaration on behalf of the Debtors.

3.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Company's advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Jones Walker LLP ("**Jones Walker**"), Houlihan Lokey Capital, Inc. ("**Houlihan**"), and AlixPartners, LLP ("**AlixPartners**").  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.     This Declaration has been organized into five sections.  The first provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring.  The second describes the Company's business, its history and its current operations.  The third summarizes the Company's organizational and capital structure.  The fourth describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  The fifth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I. Overview

5.      The Company is one of the largest oil and gas exploration and production companies in the Gulf of Mexico (the "**GOM**").  Its portfolio of properties includes both deepwater assets and shallow water assets in the GOM.  The majority of the Company's shallow water assets were acquired in 2013 when the Company purchased certain GOM properties from Apache Corporation (together with its subsidiaries and affiliates, "**Apache**" and, the acquired assets, the "**Legacy Apache Properties**").  The Company's other shallow water assets were acquired through multiple other subsequent transactions including its 2014 acquisition of certain subsidiaries of SandRidge Energy, Inc. comprising its Gulf Coast division (the shallow water "**Non-Apache Properties**" and, together with the shallow water Legacy Apache Properties, the "**Shelf Assets**").  The Company subsequently acquired a number of deepwater assets in 2018 when it purchased Noble Energy, Inc.'s deepwater business (the "**Noble Properties**") as part of its previous chapter 11 case discussed below.  Since 2018, the Company has acquired additional interests in its Noble Properties and additional deepwater assets to further diversify and complement its portfolio of properties (together with the Noble Properties, the "**Deepwater Assets**").

6.      Despite the Company's strategic growth plans and diversified mix of properties, the Company's liquidity profile has become volatile in recent years, primarily as a result of (i) the precipitous decline in crude oil prices starting in 2014 and then again in 2020 and (ii) more recently, the effects of the COVID-19 pandemic.  These adverse market conditions first led the Company to restructure its balance sheet pursuant to prepackaged chapter 11 cases commenced in February of 2018 – *In re Fieldwood Energy, LLC*, Case No. 18-30649 (DRJ) (the "**2018 Restructuring**").  In April 2018, this Court entered an order confirming the Company's

plan of reorganization, pursuant to which the Company reduced its funded debt obligations by more than $1.6 billion and acquired the Noble Properties.  Since the 2018 Restructuring, however, worsening market conditions coupled with significant decommissioning costs related to its Shelf Assets have resulted in reduced liquidity for the Company.

7.      Over the past several months, the Company has worked alongside its lenders and other stakeholders to formulate strategic alternatives.  These efforts have culminated in an agreement with Apache—the predecessor in interest of the majority of the Debtors' Shelf Assets—on the framework for a restructuring with respect to the Legacy Apache Properties.  The framework is memorialized in an executed term sheet with Apache (the "**Apache Term Sheet**").[2] Given that the plugging and abandonment and decommissioning obligations (the "**P&A Obligations**") related to the Legacy Apache Properties are among the Company's most significant liabilities, the terms set forth under the Apache Term Sheet form the cornerstone of a comprehensive restructuring plan.

8.      <u>Apache Term Sheet</u>.  The Apache Term Sheet contemplates that the Company's assets will be separated into two or more entities.  The Legacy Apache Properties (except for certain Retained Properties (as defined in the Apache Term Sheet)) will be owned post-confirmation by the surviving entity of a divisional merger of Fieldwood Energy, which entity will continue post-divisional merger but may change its name and will continue to own debtor entity GOM Shelf LLC ("**Fieldwood I**"), and will be responsible for operating and decommissioning the Legacy Apache Properties.  Fieldwood I will not have any business or operations other than operating and decommissioning the Legacy Apache Properties, and will be responsible for all of

---

[2] The Apache Term Sheet is Exhibit B to the Restructuring Term Sheet (as defined herein), which is annexed to **<u>Exhibit A</u>** of this Declaration.

the Company's obligations under the Decommissioning Agreement (as defined below) as it relates to the Legacy Apache Properties.

9.     The Apache Term Sheet contemplates that Fieldwood I will be managed by a sole manager and an independent director, each appointed in accordance with the Apache Term Sheet.  Additionally, certain material decisions regarding Fieldwood I, such as using free cash flow (after operating expenses) for any purpose other than covering P&A Obligations as set forth in that certain *Decommissioning Agreement* by and among Debtor and certain affiliates and Apache and certain affiliates, dated as of September 30, 2013 (as amended from time to time, the "**Decommissioning Agreement**"), and engaging in any activity outside the ordinary course of business, require Apache's consent.  Operations of producing properties and decommissioning activities initially will be performed by the resulting reorganized Debtors under a transition services agreement and may be performed in the future, at Apache's option, by a third-party service provider.  Additionally, Apache retains certain rights under the Decommissioning Agreement related to performing decommissioning activities on the Legacy Apache Properties.

10.     The Company will capitalize Fieldwood I with an amount equal to $50 million less the post-petition decommissioning amounts paid by the Company on the Legacy Apache Properties.  Additional funds will be available to pay for the P&A Obligations of Fieldwood I, including (i) any and all funds in Trust A (defined below), a trust already in existence that secures the Company's performance under the Decommissioning Agreement between the Company and Apache,[3] (ii) cash flow generated from operations at the Legacy Apache Properties,

---

[3] The Apache Term Sheet provides that Apache would only have access to the Trust A funds if (i) Fieldwood I defaults on its decommissioning obligations under the Decommissioning Agreement, (ii) any governmental authority or any other Person or entity seeks to cause Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, and (iii) Apache conducts the decommissioning.

and (iii) funds provided by Apache under the Standby Facility (as defined in the Apache Term Sheet) after exhausting the other sources of funds. Should (i) Fieldwood I default on its decommissioning obligations under the Decommissioning Agreement, (ii) a governmental authority or other entity seeks to require Apache or its affiliates to conduct the decommissioning, and (iii) Apache does, in fact, conduct the decommissioning, Apache will be entitled to draw on cash in Trust A, letters of credit and bonds currently outstanding, totaling approximately $736 million (the "**Decommissioning Security**") in reimbursement of such advances.

11. The Apache Term Sheet represents a major milestone in the Debtors' restructuring efforts by addressing approximately two-thirds of the Debtors' P&A Obligations on the Shelf Assets. In addition, over the past several months, the Company has been in active discussions with the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**"), the two federal regulators responsible for overseeing, among other things, the Debtors' decommissioning operations. In the months leading up to the Petition Date, the Company has been in regular contact with BOEM and BSEE, as well as representatives from the Department of Interior and Department of Justice, to keep the U.S. government apprised of both the Company's restructuring efforts and plans with respect to the Shelf Assets. The Company has shared material terms of the Apache Term Sheet with BOEM and BSEE, and will continue to have discussions toward a consensual resolution of the Company's P&A Obligations.

12. RSA and Restructuring Term Sheet. Over the past few months, the Company has also worked closely with its First Lien First Out Lenders, First Lien Term Lenders, and Second Lien Term Lenders (each as defined below, and collectively, the "**Secured Lenders**") on developing the framework of a global restructuring that incorporates the structure contemplated

by the Apache Term Sheet.  The Company is pleased to announce that, after extensive negotiations, it has reached an agreement with certain of its Secured Lenders, including an ad hoc group of FLTL Lenders represented by Davis Polk & Wardwell LLP and Haynes and Boone, LLP (the "**Ad Hoc Group of Secured Lenders**"), on a restructuring term sheet (the "**Restructuring Term Sheet**") and a restructuring support agreement (the "**RSA**").[4]  The parties to the RSA include Consenting FLTL Lenders holding approximately 67.63% ($773,053,055) of the Company's secured debt under the FLTL Credit Agreement (as defined below) and Consenting SLTL Lenders holding approximately 25.73% ($133,171,252) of the Company's secured debt under the SLTL Credit Agreement (as defined below).

13.     Pursuant to the RSA, the Company, the Consenting FLTL Lenders, the Consenting SLTL Lenders and Apache have agreed to support the transactions set forth in the Restructuring Term Sheet.[5]  The Restructuring Term Sheet contemplates the separation of the Debtors' assets into multiple entities.  First, the Specified Assets (as defined in the Restructuring Term Sheet), including the Debtors' Deepwater Assets, will be transferred to one or more purchasers or a new entity through (i) a standalone sale or sales pursuant to section 363 of the Bankruptcy Code, (ii) a sale or sales pursuant to a plan of reorganization, or (iii) an equitization pursuant to a plan.  Second, the Debtors' Legacy Apache Properties will be owned by Fieldwood I, consistent with the terms of the Apache Term Sheet.  Third, any assets other than the Specified Assets and Legacy Apache Properties will be transferred into one or more limited liability companies, business trusts, or other bankruptcy remote vehicles, through conveyance, disposition or other transfer made in accordance with the Bankruptcy Code.

---

[4] The RSA is attached hereto as **Exhibit A**.  The Restructuring Term Sheet is Exhibit A of the RSA.
[5] RSA discussions with the FLFO Lenders are ongoing but they are not currently a party to the RSA.

14.     <u>M&A Process</u>.  In furtherance of the potential restructuring transactions described above, prior to the Petition Date, the Company commenced a sale and marketing process for the Debtors' Deepwater Assets.  Houlihan, on behalf of the Debtors, launched a sales process for these assets on June 30, 2020.  The Company thus far has received interest from a broad range of potential purchasers, including both national and international strategic and financial sponsors.  Should an asset sale not be consummated, the Debtors, with the consent of the Requisite DIP Commitment Parties and Requisite FLTL Lenders (as defined in the RSA), may seek to equitize their debt in exchange for ownership of the equity of the Reorganized Debtors.

15.     <u>DIP Financing</u>.  As further detailed in the DIP Declaration, the Debtors launched a solicitation process to obtain debtor in possession financing and the consensual use of cash collateral to fund these chapter 11 cases.  The Debtors, through their investment banker, Houlihan, solicited offers for debtor-in-possession financing from seven (7) parties, including the Debtors' existing FLFO Lenders and FLTL Lenders.  Two (2) offers for financing were received, although none from outside the Company's capital structure.  Ultimately, the Debtors were able to secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $100 million (the "**DIP Facility**"), to be provided by certain members of the Ad Hoc FLTL Group (solely in such capacity, the "**DIP Lenders**").  The terms of the DIP Financing are reflected in a term sheet agreed upon by the Company, the DIP Lenders, and Apache (the "**DIP Term Sheet**").[6]  The Debtors and the DIP Lenders are in the process of negotiating a final form credit agreement with

---

[6] The DIP Term Sheet is Exhibit A to the Restructuring Term Sheet.

respect to the DIP Facility (the "**DIP Credit Agreement**") which will be filed with the Court prior to the final hearing on the First Day Motions.

16.     The DIP Term Sheet requires compliance with certain milestones for the Debtors' restructuring as reflected in the RSA, including, among other things: (i) the DIP Closing Date (as defined in the RSA) shall have occurred by no later than fifteen (15) days after the Petition Date; (ii) the completion of definitive documentation with respect to the transactions contemplated by the Apache Term Sheet by no later than seventy-five (75) days after the Petition Date; (iii) the Debtors, at the election of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, will have proposed and filed a plan of reorganization (a "**Plan**"), a disclosure statement, and a motion to approve the disclosure statement by no later than seventy-five (75) days after the Petition Date; (iv) in the event that a Bidding Procedures Motion is filed, a Bidding Procedures Order shall have been entered by the Bankruptcy Court no later than one-hundred (100) days after the Petition Date; (v) approval of the disclosure statement by no later than one-hundred and fifty (150) days after the Petition Date; (vi) confirmation of the Plan by no later than one-hundred and ninety-five (195) days after the Petition Date; and (vii) the Plan becoming effective by no later than two-hundred and ten (210) days after the Petition Date.

## II.  The Debtors' Businesses

17.     Fieldwood Energy was established in December 2012 as a portfolio company of certain energy funds of Riverstone Holdings LLC, a private energy and power-focused investment firm.   The Company operates an energy business focused on the acquisition, development, exploration, and production of oil and natural gas properties.   The Company's oil and natural gas assets consist primarily of producing oil and natural gas properties located primarily off-shore in the GOM.  Fieldwood Energy was initially capitalized in September 2013

in connection with the acquisition of shallow water assets from Apache.[7]  In early 2014, the Company completed an acquisition of certain GOM assets from SandRidge Energy, Inc.[8]  As discussed in further detail below, in connection with the 2018 Restructuring, the Company acquired the deepwater Noble Properties.  Since 2018, the Company has grown its deepwater asset base through opportunistic acquisitions of additional deepwater assets and through a strategic exploration and development program by drilling and completion of five deepwater wells near facilities that Fieldwood Energy either owns, operates, or to which is has a contractual right to flow-back.  The combination of Fieldwood Energy's shallow water and deepwater properties makes it one of the largest oil and gas exploration and production companies in the GOM by leasehold and operated production.

18.     The following map illustrates the locations of the Debtors' oil and natural gas properties as of the Petition Date:



---

[7] Debtor GOM Shelf LLC and FW GOM Pipeline, Inc. were also acquired in this acquisition.

[8] The following Debtors were acquired in this transaction:  Dynamic Offshore Resources NS, LLC, Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC.

19.     As of the date hereof, the Debtors have over 300 operated platforms spread across over 1.5 million gross acres.  The Debtors employ approximately 635 employees across their offices in Houston, Lafayette, and offshore.  In addition, the Debtors have approximately 500 additional contractor personnel on their facilities on a daily basis.  The Debtors maintain operational control over greater than 95% of their diversified asset base.  During the first three months of 2020, the Debtors have produced on average 79,410 barrels of oil equivalent per day.  In a typical year, the Debtors spend significant sums on helicopters, drilling rigs, and various marine vessels to support operations, which include support for producing fields, workovers, recompletions, ongoing maintenance, drilling, and decommissioning activities.

20.     Additionally, as one of the largest facility and well owners in the GOM, the Debtors have an extensive well plugging and abandonment ("**P&A**") and decommissioning programs.  In recent years, the Company has maintained a robust staff specifically dedicated to managing P&A and decommissioning operations.  The Company has performed a significant amount of well-P&A work in-house using Company-owned spreads and specialized employees.

21.     The Company prides itself on being an industry leader in establishing vigorous systems to manage its risk associated with offshore GOM operations effectively and is committed to maintaining safe and efficient operations, with the paramount goal of protecting personnel, the environment and its facilities.  To mitigate risk and support the Company's daily operations, the Company maintains a multi-tier insurance program.  The Company's current energy package policy includes insurance coverage for pollution as well as third-party pollution liabilities, control of well, and property damage from operational and windstorm risk.  In addition, the Company requires each of its contractors working on its facilities to maintain insurance coverage appropriate for the services provided by the contractor and for the contractor to name the

Company as an additional insured under its insurance policies.  The Company also requires each contractor to provide contractual indemnification to the Company for bodily injury and property damage arising out of the contractor's operations.

**A.     Regulation of Debtors' Businesses and Decommissioning Obligations**

22.     The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions where they operate.  The laws and regulations that impact the Debtors' operations include those relating to the operation of wells and facilities (including platforms, pipelines, and gathering or processing units), environmental protection, health and safety, and oil and natural gas exploration and development.

23.     The Company's operations in the GOM include a substantial number of oil and gas leases situated in federal waters and issued by the U.S. Department of the Interior. Specifically, the Company owns an interest in over 350 oil, gas, and mineral leases ("**Oil and Gas Leases**"), and is party to hundreds of joint operating agreements, unitization agreements, and farm-out agreements governing operations of the Oil and Gas Leases.  Of their Oil and Gas Leases, almost all are offshore leases granted by BOEM or its predecessor entity.  Operation of the Oil and Gas Leases is subject to regulation by BOEM and BSEE and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act.  For offshore operations, lessees must obtain BOEM approval for exploration, development, and production plans before the commencement of such operations.  In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE before commencing drilling and must comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, P&A, and removal of infrastructure facilities.

**B.**     **Obligations to the United States Government**

24.     To cover the various obligations of lessees, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease, BOEM may require that lessees post surety bonds or other acceptable financial assurances that such obligations will be met.  As of the Petition Date, the Debtors have obtained approximately $177 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A Obligations. For properties acquired from third parties, BOEM may require surety bonds but also may rely on adequate assurances that the obligations are covered based on the contractual arrangement between the parties.

**C.**     **Obligations to Third Parties**

25.     Pursuant to BOEM regulations, the Company is jointly and severally liable for its P&A obligations with all current and prior owners in the chain of title who were owners at the time and after such facilities and wells were put in place.  Therefore, in connection with many of its acquisitions of oil and gas properties, the Company has entered into various arrangements with the sellers that establish how the decommissioning of the subject oil and gas properties will be addressed in compliance with BOEM regulations, including (as discussed below) with Apache.

26.     Obligations to Third Parties Excluding Apache.  As stated, the Debtors have entered into various arrangements with third parties to cover P&A Obligations assumed or that may arise during the Debtors' ownership of any acquired assets.  In connection with the P&A Obligations to third parties (other than Apache), the Debtors have obtained approximately $494 million in surety bonds and maintain less than $10 million in escrow deposits, in each case for the benefit of such third parties.

13

27. <u>Obligations to Apache</u>. As explained above, the Company, in 2013, purchased the Legacy Apache Properties from Apache and agreed to assume decommissioning liabilities for certain properties that Apache previously owned and operated (the Legacy Apache Properties together with the previously owned and operated properties, the "**Apache Properties**"). The Debtors' decommissioning obligations with respect to the Apache Properties is governed by the provisions of the Decommissioning Agreement.

28. Under the Decommissioning Agreement, the Debtors must spend a minimum amount ($80 million through 2022) each year on decommissioning the Apache Properties or fund any shortfall into a decommissioning trust for which Apache holds a beneficial interest (the "**Trust A**"). If the Company fails to perform the decommissioning required by the government, Apache may perform the decommissioning itself and seek reimbursement from the Company. If the Debtors fail to reimburse Apache, then Apache may then seek reimbursement first from proceeds held in Trust A and then from certain letters of credit or surety bonds issued for its benefit and described below. Any amounts collected by Apache under the letters of credit or surety bonds, but not used for reimbursement for Apache decommissioning work, are required to be deposited into Trust A.

29. Under the Decommissioning Agreement and related documents, as amended in connection with the 2018 Restructuring, the Company has provided Apache with the following security and credit support relating to decommissioning of the Apache Properties:

- Approximately $498 million in letters of credit, provided that the Company has the right to replace up to $150 million of letters of credit with an equivalent amount of surety bonds in form and substance acceptable to Apache, which the Debtors have exercised;

- The conveyance of net profits interests into Trust A; and

- A first-priority springing lien on the assets of Trust A upon certain conditions being fulfilled, including the condition that the NPIs are recharacterized by the Court.

30.     Each month, the Debtors are obligated to deposit certain of the net profits generated by certain of the Apache Properties into Trust A.  Certain funds in Trust A may be reimbursed to the Debtors if the Company certifies that the required minimum spend on decommissioning will be performed in the applicable year, and other funds in Trust A continue to accrue until the amounts therein equal approximately $300 million.  As the Company decommissions the Apache Properties, funds in Trust A and the amount of the letters of credit or surety bonds may be reduced if they together exceed 125% of the Debtors' remaining decommissioning liabilities under the Decommissioning Agreement.  Under Fieldwood's decommissioning program, the Company has performed approximately $1.4 billion of decommissioning work, and has plugged and abandoned over 1,100 wells, 400 pipelines, and 380 platforms and other facilities through year-end 2019.

31.     In connection with the 2018 Restructuring, the Debtors and Apache amended the Decommissioning Agreement to its current form.

32.     Under the Apache Term Sheet, all of the Debtors' obligations under the Decommissioning Agreement will continue with Fieldwood I.

**D.      2018 Restructuring**

33.     On February 15, 2018, the Debtors commenced the 2018 Restructuring in this Court.  Pursuant to a pre-packaged plan of reorganization (the "**2018 Plan**"), the Debtors reduced their total funded debt from approximately $3.3 billion to $1.7 billion and reduced the Company's annual debt service obligations by up to $128 million.

15

34.     Additionally, pursuant to the 2018 Plan, the Company acquired the deepwater Noble Properties for a purchase price of approximately $480 million, prior to customary adjustments.  The Noble Properties have increased the Company's base of cash-flow positive assets meaningfully and have provided accretive value to the Debtors through operational efficiencies and synergies with the Debtors' existing assets.  The Company's purchase of the Noble Properties was funded by a portion of the proceeds from an equity rights offering to certain of the Company's then-second lien lenders (the "**2018 Rights Offering**").

E.     **Other Matters**

35.     Fieldwood Energy is the indirect owner of economic interests in approximately 10% of Fieldwood Energy E&P Mexico, S. de R.L. de C.V. ("**Fieldwood Mexico**"), with the remaining 90% owned primarily by Riverstone V FW Holdings, LLC and its affiliates.  Fieldwood Mexico is not a debtor in these chapter 11 cases.  Fieldwood Mexico is the designated operator of the undeveloped Ichalkil and Pokoch fields in Mexico and splits all costs and profits equally with its Mexican partner, PetroBal, S.A.P.I. de C.V.  Fieldwood Energy manages Fieldwood Mexico and provides technical and administrative services to Fieldwood Mexico pursuant to various service agreements on arm's-length terms.

### III.  Corporate and Capital Structure

A.  **Corporate Structure**

36.     Parent is approximately 49% owned by Riverstone Holdings LLC and certain of its affiliates, approximately 49.5% owned by its previous lenders and participants of the 2018 Rights Offering, and approximately 1.5% owned by employees through settlements of restricted stock units issued under a management incentive plan.

37.     Collectively, the Debtors consist of 14 entities registered under the laws of Delaware, Texas, and Louisiana.  The Debtors also own two wholly-owned, non-debtor, domestic affiliates formed in Delaware and a wholly-owned, non-debtor, non-domestic affiliate formed in the Netherlands.  A chart illustrating the Debtors' domestic organizational structure as of the Petition Date is attached as **Exhibit B** to this Declaration.

38.     All of the other Debtors are wholly-owned direct or indirect subsidiaries of Parent.  Parent's Board of Directors (the "**Board**") functions as the Debtors' governing board with respect to the decision-making underlying these chapter 11 cases.  The Board has seven members. Prior to July 8, 2020, G.M. McCarroll served as the Chairman of the Board.  He was also the Debtors' President and Chief Executive Officer.  G.M. McCarroll resigned his positions effective as of July 1, 2020 pursuant to a separation agreement with the Company and continues to provide transition services at the Board's direction under a consulting agreement.  The Board thereafter resolved to create an Executive Leadership Team (the "**ELT**") in lieu of appointing an individual to replace G.M. McCarroll as CEO.  The Board has appointed Michael T. Dane (Senior Vice President and Chief Financial Officer), Thomas R. Lamme (Senior Vice President and General Counsel), and Gary D. Mitchell (Senior Vice President – Production) to serve on the ELT.  In addition, the Board formed the Leadership Transition Committee (the "**LTC**") to oversee the ELT. Jim LaChance, an independent director, who joined the Board on July 8, 2020, is the sole member of the LTC.

39.     The Debtors' core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Michael T. Dane | Senior Vice President and Chief Financial Officer |
| Thomas R. Lamme | Senior Vice President, General Counsel, and Secretary |
| Gary D. Mitchell | Senior Vice President, Production |
| Gary Janik | Senior Vice President, Reservoir Engineering, Acquisitions and Mexico |
| John Seeger | Senior Vice President, Operations |
| John Smith | Senior Vice President, Business Development |

## B. Capital Structure

40.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  The following table provides a summary of the Debtors' capital structure, as described in more detail below.

| Facility | Maturity | Principal |
|----------|----------|-----------|
| Fieldwood - First Lien Debt Obligations | | |
| First Lien First Out Term Loans | 12/31/2021 | $139 million |
| First Lien Last Out Term Loans | 04/11/2022 | $1,143 million |
| Fieldwood - Second Lien Debt Obligations | | |
| Second Lien Term Loans | 04/11/2023 | $518 million |
| Total Funded Debt | | $1,800 million |

41.     <u>First Lien First Out Credit Agreement</u>.  Certain of the Debtors are parties to that certain *Second Amended and Restated Credit Agreement- First Out*, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Credit Agreement**") between Fieldwood Energy, as borrower, Parent, as holdings, Goldman Sachs Bank USA, as administrative agent (the "**FLFO Administrative Agent**"), Cantor Fitzgerald Securities. ("**CFS**"), as collateral agent (in its capacity as such, the "**FLFO Collateral Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**FLFO Lenders**").  The Prepetition FLFO Credit Agreement establishes (i) a term loan credit facility that matures on December 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (the "**Initial FLFO Term Loans**") are

18

outstanding, (ii) a multi-draw term loan credit facility that matures on December, 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (the "**Multi Draw FLFO Term Loans**" and, together with the Initial FLFO Term Loans, the "**FLFO Term Loans**") are outstanding, and (iii) a revolving credit facility that matures on December 31, 2021, pursuant to which (a) an aggregate principal amount of approximately $17 million in revolving loans is outstanding (the "**FLFO Revolving Loans**")  and (b) a reimbursement obligation in favor of the Prepetition FLFO Administrative Agent with respect to approximately $22 million in drawn letters of credit is outstanding, plus, in each case, any applicable interest, fees, and other amounts (the claims arising under the Prepetition FLFO Credit Agreement, collectively, the "**FLFO Claims**").

42.     Certain of the Debtors guaranteed the Obligations (as defined in the Prepetition FLFO Credit Agreement (the "**FLFO Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**FLFO Guarantors**") and the FLFO Collateral Agent.  In order to secure the FLFO Obligations and the guarantee provided with respect to the FLFO Obligations, each of Fieldwood Energy and the FLFO Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Second Amended and Restated Collateral Agreement, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Collateral Agreement**") among Fieldwood Energy, the FLFO Guarantors, the FLFO

19

Administrative Agent, and the FLFO Collateral Agent.  In addition to the liens and security interests granted pursuant to the FLFO Collateral Agreement, Fieldwood Energy and certain of the FLFO Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLFO Credit Agreement, the "**FLFO Mortgages**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

43.    First Lien Term Loan Agreement.  Certain of the Debtors are parties to that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**FLTL Credit Agreement**"), among Fieldwood Energy, as borrower, Parent, as holdings, the lenders from time to time party thereto (the "**FLTL Lenders**" and, together with the FLFO Lenders, the "**First Lien Lenders**"), and CFS, as administrative agent and collateral agent (the "**FLTL Administrative Agent**" and, together with the FLFO Administrative Agent and the FLFO Collateral Agent, the "**First Lien Agents**").  As of the Petition Date, the aggregate amount outstanding under the FLTL Credit Agreement is approximately $1,142,688,815.28, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**FLTL Claims**").

44.    Certain of the Debtors guaranteed the Obligations (as defined in the FLTL Credit Agreement (the "**FLTL Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**FLTL Guarantors**") and the FLTL Administrative Agent. In

order to secure the FLTL Obligations and the guarantee provided with respect to the FLTL Obligations, each of Fieldwood Energy and the FLTL Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Collateral Agreement**", and, together with the FLFO Collateral Agreement, the "**First Lien Collateral Agreements**") among Fieldwood Energy, the FLTL Guarantors and the FLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the FLTL Collateral Agreement, Fieldwood Energy and certain of the FLTL Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLTL Credit Agreement, the "**FLTL Mortgages**", and, together with the FLFO Mortgages, the "**First Lien Mortgages**", the First Lien Mortgages, together with the First Lien Collateral Agreements and any other "Security Documents" as defined in the FLFO Credit Agreement and FLTL Credit Agreement, respectively, the "**First Lien Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required.  The security interest and lien securing the FLTL Obligations is pari passu with the security interest and lien securing the FLFO Obligations; however, the FLTL Obligations are subordinate in right of payment to the FLFO Obligations pursuant to the terms of the Pari Passu Intercreditor Agreement (as defined below).

45.     Second Lien Term Loan Agreement.  Certain of the Debtors are parties to that certain *Amended And Restated Second Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time,

the "**SLTL Credit Agreement**" and, together with the FLFO Credit Agreement and FLTL Credit Agreement, the "**Credit Agreements**"), among Fieldwood Energy, as borrower, Parent, as holdings, the lenders from time to time party thereto (the "**Second Lien Lenders**" and, together with the First Lien Lenders, the "**Lenders**"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (the "**SLTL Administrative Agent**" and, together with the First Lien Agents, the "**Administrative Agents**").  As of the Petition Date, the aggregate amount outstanding under the SLTL Credit Agreement is approximately $517,500,000, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**SLTL Claims**").

46.    Certain of the Debtors guaranteed the Obligations (as defined in the SLTL Credit Agreement (the "**SLTL Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (the "**SLTL Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**SLTL Guarantors**") and the SLTL Administrative Agent. In order to secure the SLTL Obligations and the guarantee provided with respect to the SLTL Obligations, each of Fieldwood Energy and the SLTL Guarantors granted, or confirmed their continuing grant of, a second priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**SLTL Collateral Agreement**") among Fieldwood Energy, the SLTL Guarantors and the SLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the SLTL Collateral Agreement, Fieldwood Energy and certain of the SLTL Guarantors granted, or

confirmed their continuing grant of, second priority Mortgages (as defined in the SLTL Credit Agreement, the "**Second Lien Mortgages**", and, together with the First Lien Mortgages, the "**Mortgages**", the Mortgages, together with the First Lien Security Documents and any other "Security Documents" as defined in the SLTL Credit Agreement, the "**Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

47. <u>Pari Passu Intercreditor Agreement</u>. The relative contractual rights of the FLFO Lenders, on the one hand, and the FLTL Lenders, on the other hand, are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**"). The Pari Passu Intercreditor Agreement controls the rights and obligations as among the holders of the FLFO Obligations (the "**FLFO Secured Parties**"), the holders of the FLTL Obligations (the "**FLTL Secured Parties**" and, together with the FLFO Secured Parties, the "**First Lien Credit Agreement Secured Parties**") and certain other providers of Secured Hedge Agreements (as defined in the Pari Passu Intercreditor Agreement) with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

48. <u>Senior Intercreditor Agreement</u>. The relative contractual rights of the First Lien Credit Agreement Secured Parties, on the one hand, and holders of the SLTL Obligations (the "**Second Lien Secured Parties**"), on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Senior Intercreditor Agreement**"). The Intercreditor Agreement controls the rights and obligations of the First Lien Credit Agreement

Secured Parties and the Second Lien Secured Parties with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

49.    DB Receivables Facility.  Certain of the Debtors and a non-Debtor affiliate are parties to that certain *Master Receivables Purchase Agreement* dated as of December 23, 2019 among Fieldwood Energy, as originator, FW FinCo LLC, as seller, Deutsche Bank AG New York Branch, as administrative agent, Deutsche Bank Trust Company Americas, as a purchaser and the other purchasers party thereto (the "**DB Receivables Facility**").  As of the Petition Date, there are no amounts due and owing on the DB Receivables Facility.

50.    Surety Bonds.  The Company has approximately $1.165 billion in surety bonds that it maintains to satisfy various contractual and regulatory requirements.  As stated, this includes approximately $177 million in surety bonds for the benefit of BOEM.  This also includes $498 million in surety bonds and contracts similar to surety bonds, which either have been issued directly to Apache on the Company's behalf or have been issued to Deutsche Bank as collateral for an equal dollar amount of letters of credit that Deutsche Bank has issued to Apache on the Company's behalf.

## IV.  Key Events Leading to Chapter 11

51.    The Company proactively took a number of steps prior to filing these chapter 11 cases in an effort to deleverage its balance sheet, bolster liquidity, address near-term interest payments, and maximize value for stakeholders.  The Company, however, has continued to face a challenging commodity price environment, which has constrained its liquidity and affected operations.  Ultimately, the precipitous decline in oil prices from the combined effect of the COVID-19 pandemic and general deterioration of commodity prices forced the Company to pursue restructuring transactions.

24

**A.  Cost Reduction**

52.     The Company commenced production shut-ins during late March 2020 in response to the deteriorating price environment.  Initially, twenty-nine (29) low-margin shelf fields were shut-in, resulting in approximately $5 million of monthly operating expense savings.  The Company, thereafter, commenced a broad shut-in during late April 2020 due to the continued oil price collapse.  The Company effectively shut-in all operated production fields other than eight (8) dry gas fields and one shelf field.  For deepwater assets, all properties except for one non-operated field were shut-in from late April 2020 to June 2020.  The Company was able to limit its operating expense during the shut-in period.

53.     In addition to the shut-ins, the Company has implemented other cost savings measures, such as a reduction in force, salary reductions for certain staff and contractors, including a 10% salary cut for corporate employees earning more than $150,000 per year, and stricter vendor management practices.

**B.  Vendor and Surety Issues**

54.     As a result of the foregoing, several of the Company's vendors and surety providers have taken action, or threatened to take action, to secure payments of alleged amounts that are either due and owing or may become due and owing in the future.  For example, the Company has received numerous demands from several of its surety providers requesting that the Company either release them from their bonds, or in the alternative, post collateral in the amounts of their unreleased bonds.  In fact, after sending one or more demand letters, two sureties filed lawsuits against the Company.  In one lawsuit filed in the United States District Court for the Southern District of Texas (Houston Division), Travelers Casualty and Surety Company of America ("**Travelers**") alleges that defendants have breached certain obligations under an

indemnity agreement and seeks, among other relief, an injunction requiring the defendants to either release Travelers from certain performance bonds or provide collateral to secure defendants' obligations under the indemnity agreements in the amount of $60,000,000. Fieldwood Energy is also a defendant in a lawsuit filed by Aspen American Insurance Company ("**Aspen**") in the District Court of Harris County, Texas. Aspen's complaint alleges Fieldwood Energy breached its contract with Aspen by failing to post collateral sufficient to protect Aspen in the event of claims being made under certain performance bonds issued by Aspen. Aspen seeks monetary damages as a result of the alleged breach. The Debtors have filed answers to both lawsuits, contesting (among other allegations) that they breached the indemnity agreements and that the surety providers are entitled to any equitable relief such as an injunction.

## C.  Prepetition Restructuring Efforts

55.    Prior to filing these chapter 11 cases, the Company took several steps to try to address its capital structure and liquidity needs without a comprehensive in-court restructuring. Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service their outstanding debt on a go-forward basis and to maintain the liquidity necessary to operate their businesses and preserve long-term viability and enterprise value.

56.    As a result, the Company determined that a restructuring transaction was necessary to position itself for long term success. In March 2020, the Debtors retained Weil, as restructuring counsel, and Houlihan, as investment banker, to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to restructure its balance sheet. In April 2020, the Debtors retained AlixPartners, as financial advisor, to assist them in preparing their operations for a potential chapter 11 restructuring as part of their contingency plan.

57.     As discussions over a potential restructuring transaction were ongoing, it became necessary for the Company to seek forbearances under its Credit Agreements to provide additional time for negotiations over potential restructuring transactions to develop.  On May 7, 2020, the Company entered into certain *Temporary Limited Forbearance and Amendment* agreements (collectively, the "**TLF Agreements**") with consenting lenders for each Credit Agreement (collectively, the "**Consenting Lenders**").   The TLF Agreements required the Consenting Lenders to forbear from exercising their respective rights and remedies under the Credit Agreements with respect to certain defaults by the Company under the various Credit Agreements.  Among the defaults were the Company's failure to deliver a Conforming Audit Opinion (as defined under the TLF Agreements) to the FLFO Administrative Agent, the Company's failure to satisfy its reimbursement obligations with respect to payment under a certain letter of credit in accordance with the FLFO Credit Agreement, and the Company's failure to make certain interest payments under the Credit Agreements, including interest payments that became due on April 30, 2020 in the amount of approximately $1.3 million under the FLFO Credit Agreement, $20 million under the FLTL Credit Agreement, and $11.7 million under the SLTL Credit Agreement.

58.     As part of the Consenting Lenders' agreement to forbear from exercising their contractual rights with respect to defaults under the Credit Agreements, the Consenting Lenders and the Company agreed to certain forbearance milestones.  The milestones were intended to help facilitate negotiations to ensure continued progress toward a potential restructuring transaction. The milestones included, among other things, the Company's requirement to deliver to the Consenting Lenders and/or their agents or advisors by dates certain a strategic monthly

operating plan, a comprehensive restructuring term sheet, a 13-week consolidated weekly cash flow forecast, and a DIP budget.

59.    On May 26, 2020, the Company and the Consenting Lenders for each respective Credit Agreement executed amendments to the TLF Agreements, extending the forbearances under each of the Agreements to June 15, 2020.  Thereafter, the Company and Consenting Lenders executed three additional amendments to the TLF Agreements, with the most recent amendments extending the forbearance period to July 31, 2020.  The forbearances have since been further extended by email.

60.    On July 31, 2020, the Company and Apache executed the Apache Term Sheet.  As explained above, the Apache Term Sheet is the cornerstone of the Debtors' restructuring and provides a resolution for one of the Debtors' most significant liabilities.  The Company thereafter executed an RSA with Apache and the Ad Hoc Group of Secured Lenders, which further refined the terms of the Debtors' reorganization.  With the framework for the Debtors' restructuring in place, the Debtors filed for chapter 11.

## V. The First Day Motions

61.    The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in the success of these chapter 11 cases, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

28

A.      **Joint Administration Motion**

62.      Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule* 1015-*1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  There are fourteen (14) Debtors, and I have been informed that there are thousands of creditors and other parties in interest in these cases. I believe that joint administration of these chapter 11 cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for Region 7 and other parties in interest would similarly benefit from joint administration of these chapter 11 cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

63.      I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

B.      **Cash Management Motion**

64.      Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, and (D) Continue Using Corporate Credit Cards; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request interim and final orders (i) authorizing

them to (a) continue to operate their existing cash management system (the "**Cash Management System**"), as described therein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**") with Capital One, National Association ("**Capital One**"), U.S. Bank National Association ("**U.S. Bank**") and JPMorgan Chase Bank, N.A. ("**JPM**" and, together with Capital One and U.S. Bank, collectively, the "**Banks**"), (b) maintain their existing business forms, (c) continue certain intercompany arrangements, including transferring funds among the Debtors and certain non-Debtor affiliates and managed entities (the "**Non-Debtor Affiliates**"), and (d) continue utilizing Corporate Credit Cards (as defined below) and pay all obligations related thereto, each in the ordinary course of business and consistent with the Debtors' prepetition practices, and (ii) granting related relief.  The Debtors are also requesting that the Court authorize the Banks to continue to charge bank fees, if any, and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

       65.     As described more fully in the Cash Management Motion, in the ordinary course of their businesses, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain non-Debtor affiliates.  The Cash Management System is tailored to meet the Debtors' needs as an owner and operator of, among other assets, oil and natural gas producing properties.  The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their businesses and pay their financial and other obligations.  It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of their Bank Accounts.

66.     The Cash Management System includes six Bank Accounts: (i) one Bank Account serves as the Debtors' main revenue collecting and concentration account; (ii) one Bank Account serves as the Debtors' main operating and disbursement account; (iii) one Bank Account serves to facilitate certain employee benefits; (iv) one Bank Account will serve to facilitate certain of the Debtors' cash obligations during the pendency of these chapter 11 cases; and (v) the remaining two Bank Accounts are escrow accounts (each, an "**Escrow Account**") that the Debtors maintain in connection with certain contractual and/or governmental obligations that require the Debtors to segregate certain funds.  All Bank Accounts other than the two Escrow Accounts are maintained at Capital One.   Capital One is an authorized depository under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7.

67.     In addition, the Debtors maintain company-paid credit cards (the "**Corporate Credit Cards**").  The Corporate Credit Cards are issued by Capital One (the "**Credit Card Provider**").   In general, the Corporate Credit Cards are used by certain of the Debtors' employees for various corporate expenses including, but not limited to, certain regulatory permit fees, office supplies, pool-vehicle maintenance, and other required business expenses.  As of the Petition Date, there are five issued and active Corporate Credit Cards.  As more fully described in the Cash Management Motion, the Debtors are requesting authority to continue to make all prepayments and payments in connection with the Corporate Credit Cards on a postpetition basis in the ordinary course of business and consistent with the Debtors' past practices, including on account of any expenses related to the prepetition period.

68.     In the ordinary course of business, intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated

pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) Fieldwood Energy receives funds on behalf of Debtor and Non-Debtor Affiliates, (ii) Fieldwood Energy makes payments and disbursements on behalf of Debtor and Non-Debtor Affiliates, and (iii) funds are transferred between and among the Debtors and the Non-Debtor Affiliates (primarily between Fieldwood Energy, Fieldwood Mexico, and SP 49 Pipeline). The Debtors maintain records of all transactions processed through their Cash Management System. During these chapter 11 cases, the Debtors will keep records of any postpetition Intercompany Transactions and implement any additional accounting procedures required to identify and distinguish between prepetition and postpetition Intercompany Transactions.

69.     Out of an abundance of caution, the Debtors are requesting express authority to engage in Intercompany Transactions postpetition as set forth in the Cash Management Motion. The Debtors are also requesting that the Court grant administrative expense status to all intercompany claims against a Debtor by another Debtor or non-Debtor affiliate that arise postpetition as a result of an Intercompany Transaction; *provided, however*, that nothing therein shall authorize the payment by any of the Debtors of prepetition or postpetition obligations owed by any of the Debtors inconsistent with the Debtors' past practices. If the Debtors' intercompany claims are accorded such status, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its ordinary-course transactions with affiliates.

70.     I am advised by the Debtors' attorneys that the Bank Accounts are required to comply with section 345(b) of the Bankruptcy Code unless the Court orders otherwise for "cause." With the exception of the two Escrow Accounts, all of the Debtors' active Bank Accounts are maintained with Authorized Depositories under the UST Operating Guidelines. Accordingly,

32

I believe that the funds deposited into such Bank Accounts comply with section 345 of the Bankruptcy Code.  To the extent any of the Debtors' Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors are requesting a 45-day extension of the deadline to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines, which deadline may be further extended by written stipulation between the Debtors and the U.S. Trustee without further order of the Court.

71.    The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions.  Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

72.    I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**C.    JIB/Royalty Interests Motion**

73.    Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Interest Owner Obligations, Joint Interest Billings, E&P Operating Expenses and (B) 503(b)(9) Claims; and (II) Granting Related Relief* filed contemporaneously herewith (the "**JIB/Royalty Interest Motion"**), the Debtors are requesting entry of interim and final order (i) authorizing, but not directing, them to pay in the ordinary course of business amounts payable to (a) holders of royalty, working, and other interests, including

33

Suspense Obligations (as defined below), as required by the Debtors' various leases and related agreements (each as defined below, and collectively, the "**Interest Owner Payments**"), (b) operators for unpaid joint interest billings and related obligations (the "**Joint Interest Billings**"), and (c) certain third parties for lease operating expenses, gathering, transportation, and processing expenses, capital expenditures, Supplemental Workforce Obligations (as defined below), and related costs (the "**E&P Operating Expenses**" and, collectively with the Interest Owner Payments and Joint Interest Billings, the "**Prepetition Obligations**"), including to certain vendors, contractors, subcontractors, drillers, haulers, and suppliers of oil- and gas-related services, labor, supplies, and materials ("**E&P Claimants**"); (ii) authorizing, but not directing, the Debtors to pay certain claims entitled to priority under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**"); and (iii) granting related relief.  The Debtors are further requesting that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the Prepetition Obligations and 503(b)(9) Claims to the extent the Debtors have sufficient funds standing to their credit with such bank, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and that all such financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the JIB/Royalty Interest Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

74.     As of the Petition Date, the Debtors estimate the aggregate amount of Prepetition Obligations is approximately $193.0 million, of which approximately $69.1 million will come due in the first 21 days of these chapter 11 cases.  The components of the Prepetition Obligations are described below.

75.     <u>Joint Interest Billings</u>.  The Debtors hold working interests and similar operating rights interests (collectively, the "**Working Interests**") in various Oil and Gas Leases. Generally, a Working Interest entitles the owner of that interest to a portion of the mineral production from the property or the proceeds thereof subject to the costs of exploration, development, and operation of the property.  Certain of the Debtors' Working Interests are subject to net profits interests ("**NPIs**")—the holders of which are entitled to a share of the profits from the Debtors' Working Interests.  The Debtors hold Operating and Non-Operating Working Interests (including operating rights interests).  In respect of their Non-Operating Working Interests, in the twelve months preceding the Petition Date, the Debtors paid approximately $79.2 million in Joint Interest Billings.  Joint Interest Billings vary in amount and are not entirely predictable on a month-to-month basis.  It is my understanding that failure to timely pay the Joint Interest Billings may provide grounds for contractual or statutory lien rights in favor of the Operator against the Debtors' Non-Operating Working Interest in the associated Oil and Gas Lease or the Debtors' *pro rata* portion of the production therefrom.

76.     I understand that, as of the Petition Date, the Debtors estimate they owe approximately $32.5 million in Joint Interest Billings under the terms of their Operating Agreements with respect to the period prior to the Petition Date, approximately $9.6 million of which will become due and owing during the first 21 days of these chapter 11 cases.

77.     Payment of Joint Interest Billings is necessary to prevent Operators from ceasing or altering their revenue payments to the Debtors and potentially asserting liens against the Debtors' property.  Payment of Joint Interest Billings is also necessary to continue to receive their share of the Working Interests and maintain their relationships with the Operators of these properties, both during and after the pendency of their chapter 11 cases.

78.     <u>Obligations to Mineral and Other Interest Owners</u>.  The Debtors' leasehold interests are subject to or burdened by mineral interests retained by the lessor (a "**Royalty Interest**"), fractional interests in the right to participate or receive proceeds from the sale of oil and gas (an "**Overriding Royalty Interest**" or "**ORRI**") and/or Working Interests.  The Debtors are obligated to remit to holders of Royalty Interests, ORRIs, Working Interests, and NPIs (collectively, the "**Interest Owners**") their share of revenue from the producing wells located on the respective leases (collectively, the "**Interest Owner Payments**").

79.     It is my understanding that failure to make all required Interest Owner Payments could have a material adverse effect upon the Debtors and their operations including, without limitation, potential cancellation, forfeiture, or termination of Oil and Gas Leases, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation and, in some instances, attempted removal of the Debtors as Operator.

80.     The Debtors make Interest Owner Payments each month.  Such payments are generally paid two months in arrears.  Amounts owed are calculated as provided for in the underlying Oil and Gas Lease, Operating Agreement, or other underlying contract, and are typically based on the production revenue received by the Debtors from purchasers, less applicable severance taxes and, in some instances, certain post-production charges.  In certain circumstances, the Debtors have received payment for the share of proceeds due to Interest Owners; however, due to timing, such Interest Owner Payments were not made prior to the Petition Date.

81.     I understand that, as of the Petition Date, the Debtors estimate they owe approximately $6.9 million on account of accrued and undisputed Interest Owner Payments, none of which is estimated to become due and payable during the first 21 days after the Petition Date.

However, out of an abundance of caution, the Debtors seek authority to continue to honor any Interest Owner Payments that may become due in the ordinary course whether such amounts relate to the prepetition or postpetition period.

82.     The Debtors hold certain Interest Owner Payments in "suspense" when (i) they are too small to warrant payment under the terms of an Operating Agreement or other applicable agreement, (ii) the Debtors have determined they should not be paid because of a dispute or for other legal reasons, or (iii) the Debtors are unable to identify or properly pay the relevant Interest Owner (such amounts held in suspense, the "**Suspense Obligations**").

83.     The Suspense Obligations are accrued but unpaid liabilities of the Debtors. The Debtors estimate that approximately $1.3 million in Suspense Obligations have accrued as of the Petition Date.  In light of the difficulty in estimating precisely when, and to what extent, Suspense Obligations will become due and payable and, out of an abundance of caution, the Debtors seek authority to continue to negotiate, resolve, settle, and honor the full amount of the outstanding Suspense Obligations accrued in the ordinary course postpetition.

84.     E&P Operating Expenses.  In the ordinary course of business, in their role as operators of certain Oil and Gas Leases, the Debtors contract with E&P Claimants for goods and services necessary to operate wells.  Where production is sold at the wellhead, the purchaser of the production takes ownership at the wellhead and the Debtors do not incur transportation costs.  In instances where production is not sold at the wellhead, the Debtors are obligated under various agreements (the "**GTP Agreements**") to pay certain costs associated with the gathering, transportation, and processing of oil and gas, including settlement, if required, of monthly pipeline imbalances (the "**GTP Costs**"). In addition, certain pipelines have established quality banks-systems designed to measure quality changes across crude production in common stream

operations. Based on the calculated differences, the pipelines collect from, and remit monetary adjustments to, the crude oil shippers (the "**Quality Bank Adjustments**" and, together with the GTP Costs, the "**GTP Costs and Adjustments**" or "**GTP Expenses**"). Additionally, the Debtors are obligated to pay certain capital expenditures ("**Capex**") and lease operating expenses ("**LOEs**"). Pursuant to the applicable Operating Agreement, a holder of a Non-Operating Working Interest either (i) pre-funds or reimburses the Debtors for its *pro rata* share of the cost of production or (ii) nets its share of production revenue against its share of E&P Operating Expenses.

85.     Furthermore, in connection with operating their E&P business, the Debtors rely on services provided by certain vendors, including temporary labor, contractors, or consultants related to the Debtors' onshore and offshore operations. The Debtors procure the temporary workforce through a number of different vendors and generally employ skilled workers necessary for their offshore operations and, on occasion, administrative staff on a temporary basis. The Debtors remit compensation for the temporary workforce to the vendors on a regular basis through the Debtors' accounts payable system (the "**Supplemental Workforce Obligations**"). The Debtors pay approximately $13.6 million per month in Supplemental Workforce Obligations

86.     It is my understanding that, as of the Petition Date, the Debtors owe approximately $152.2 million in outstanding prepetition E&P Operating Expenses. The Debtors estimate that approximately $59.4 million of the E&P Operating Expenses will become due during the 21 days of these chapter 11 cases.

87.     <u>503(b)(9) Claims.</u>  Additionally, I understand that, as of the Petition Date, the Debtors estimate they owe approximately $7.5 million on account of certain goods and materials received by the Debtors in the ordinary course of business from various vendors within the 20 days before the Petition Date (the "**503(b)(9) Claims**"). I understand that payment of the

Prepetition Obligations and 503(b)(9) Claims is necessary to prevent counterparties from ceasing or altering their relationships with Debtors and potentially asserting liens against the Debtors' property.  Payment is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

88.     I understand that payment of the Prepetition Obligations and 503(b)(9) Claims is necessary to prevent counterparties from ceasing or altering their relationships with Debtors and potentially asserting liens against the Debtors' property.  Payment is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

89.     Additionally, I understand that as a condition to payment of any prepetition amounts owed on account of goods or services provided to the Debtors prior to the Petition Date, the Debtors will enter into customary trade agreements (the "**Trade Agreements**") with such parties on terms consistent with the historical practice between the parties.  Such Trade Agreements will require the claimants to agree that the payment to be made will be in full satisfaction of any prepetition amounts allegedly owed to such claimants by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date.  Further, the Debtors will request authorization, but not direction, to negotiate, modify, or amend the form of a Trade Agreement in its reasonable business judgment.

D.     **Insurance and Surety Bond Motion**

90.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Pay Certain Obligations with Respect thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims;* and *(III) Granting Related Relief* filed contemporaneously herewith (the "**Insurance and Surety Bond Motion**"), the Debtors are

39

requesting entry of interim and final orders (i) authorizing, but not directing them to (a) continue their Insurance Programs and Surety Bond Program (each as defined below) in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay any prepetition obligations arising in connection with the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief

91.     In the ordinary course of their oil and natural gas E&P operations, the Debtors maintain workers' compensation insurance, third party liability, property, and other insurance programs (each, an "**Insurance Program**") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker or advisor fees, taxes, other fees, and deductibles (collectively, the "**Insurance Obligations**"), in accordance with or relating to their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**").  Each of these is described below and more fully in the Insurance and Surety Bond Motion.

92.     The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third party liability in connection with the Debtors' businesses (the "**General Liability Program**"); (iii) coverage of the Debtors' vehicles (the "**Automobile Program**"); (iv) coverage for liability from the Debtors' use of non-Debtor owned aircraft (the "**Non-Owned Aircraft Liability Program**"); (v) coverage evidencing the Debtors' financial responsibility in the event of an offshore oil spill or other oil pollution event, as required under the Oil Pollution Act of 1990

40

(the "**Oil Spill Financial Responsibility Program**"); (vi) coverage for losses from named windstorms or operational risks and hazards (the "**Named Windstorm & Operational Risk Program**"); (vii) coverage in connection with a recently completed subsea construction project (the "**Katmai Policy**"); (viii) coverage for risks and damages arising from data breaches and other data losses (the "**Cyber Risk Liability Programs**"); (ix) coverage for losses of office property and equipment (the "**Office Contents & Equipment Program**"); (x) coverage of management and directors' and officers' liability (the "**Management Liability Program**"); and (xi) umbrella and excess coverage for various casualty Insurance Policies, as described below (the "**Umbrella Liability Program**").

93.     In the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from or related to employment by the Debtors (the "**Workers' Compensation Claims**"). In many instances, applicable law in the jurisdictions in which the Debtors operate—including Texas and Louisiana law for the Debtors' onshore and corporate operations, and United States law, for their offshore operations in the GOM—requires that the Debtors maintain the Workers' Compensation Program. The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors.  It is my understanding that, under applicable workers' compensation laws, the Debtors or the applicable Insurance Carrier may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Although unlikely, it is possible that an event giving rise to an obligation of the Debtors' Insurance Carriers to make such a payment—for example, for injury or disease of an employee—could have occurred prepetition without the

41

Debtors' knowledge.  To that end, out of an abundance of caution, the Debtors are seeking relief from the automatic stay for authorization to pay such Workers' Compensation Claims and related costs, and for the associated Insurance Carrier to have authorization to do the same.

94.     The Debtors contract with (i) in the United States, USI Southwest, Alliant, Inc. CAC Specialty, and Willis Towers Watson; and (ii) in the United Kingdom, Price Forbes & Partners Ltd and Bishopsgate Insurance Brokers, to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "**Insurance Broker**").  The Debtors pay the Insurance Brokers commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance premiums.  As of the Petition Date, the Debtors owe approximately $250,000 in commissions to the Insurance Brokers, which the Debtors are requesting authority to pay in full in the ordinary course of business.

95.     In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' performance of certain obligations (the "**Surety Bond Program**").  The Surety Bond Program covers obligations in connection with two general categories of third parties:  (i) federal and state governmental units and other public agencies; and (ii) contract counterparties for whom the Debtors have agreed to perform various plugging, abandonment, and decommissioning obligations in connection with offshore properties.  The obligations secured by the Surety Bond Program relate to, among other things, (i) oil and natural gas drilling and exploration operations; (ii) plugging and abandonment obligations; (iii) conservation; (iv) rights-of-way; (v) land use; (vi) taxes; and (vii) utilities.

96.     Under each Surety Indemnity Agreement, the Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors (the "**Indemnity Obligations**").  Each Surety Indemnity

42

Agreement also permits the surety to request collateral security from the Debtors from time to time in connection with the Indemnity Obligations.  The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis.  Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal, typically 90 days prior to such renewal.  As of the Petition Date, the Debtors have approximately $1,164,000,000 in outstanding surety bonds.  The Debtors estimate that the Surety Bond Obligations over the next six months will amount to approximately $10,400,000, and that the Surety Bond Obligations in the twenty-one (21) days following the Petition Date will total approximately $450,000.

97.     As discussed further above, certain of the Surety Bonds support letters of credit issued by Deutsche Bank AG New York Branch ("**Deutsche Bank**") in an aggregate amount of $350,000,000 (the "**Letters of Credit**") for the benefit of Apache Corporation ("**Apache**").  The Letters of Credit serve as security for various plugging, abandonment, and decommissioning obligations incurred by Fieldwood Energy in connection with that certain Decommissioning Agreement, dated as of September 30, 2013, between Fieldwood Energy as Buyer and Apache as Seller.  The Letters of Credit are fully secured by surety bonds in favor of Deutsche Bank issued through the Debtors' Surety Bond Program—$300,000,000 in surety bonds issued by Zurich and $50,000,000 by HCC International Insurance Company PLC.

98.     In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay certain obligations related thereto, including outstanding payments to the Insurance Brokers. Without authority to maintain and pay amounts owed in connection with the Insurance Programs

43

and the Surety Bond Program, the ability of the Debtors to conduct business operations in many locations would come to a halt to the detriment and prejudice of all parties in interest.  Additionally, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors would be able to renew or replace their existing Insurance Programs or the Surety Bonds on more favorable terms. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Bond Program to comply with the U.S. Trustee's operating guidelines, applicable state and federal laws, requirements from state and federal regulatory agencies, and other prepetition contracts.  Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### E.     Wages Motion

99.     Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Obligations, and (C) Pay Prepetition Employment And Training Expenses, and (II) Granting Related Relief* filed concurrently herewith (the "**Wages Motion**"), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Obligations and Other Compensation Obligations (each as defined below) and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.

44

100.    As described more fully in the Wages Motion, the Debtors' employ approximately 635 employees (each, an "**Employee**").  Over half of the Employees are offshore workers—workers and other skilled professionals who either (i) perform rotations on various offshore platforms and wells related to drilling, safety, maintenance, and decommissioning work or (ii) perform functions related to offshore operations and that are based at onshore field locations—all of which are critical to the ongoing business operations of the Debtors.   The remaining Employees provide a variety of engineering, management, administrative, and other support services in offices in Houston, Texas and Lafayette, Louisiana.   Collectively, the Employees' skills and knowledge of the Debtors' infrastructure, customers, and business operations are essential to the continued operation of the Debtors' business.   Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible.  In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation ("**Employee Compensation Obligations**"), benefits ("**Employee Benefits Obligations**"), and onboarding of new employees ("**Employee Onboarding Obligations,**" collectively, the "**Employee Obligations**").

101.    The Debtors' Employees are the most important part of their business.  I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations could also inflict a significant financial hardship on the families of the Employees.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship.  Without the relief requested in the Wages Motion, otherwise-

loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

102.    In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries, wages and other compensation, including for certain non-exempt Employees, paid leave and overtime.   Additionally, Employees are entitled to advances for, and reimbursement of, certain reasonable and necessary expenses incurred while performing their employment duties, including job-related travel and meal expenses (the "Expenses").  I believe that payment of prepetition Expenses is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce.  Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost of the Expenses, especially because those Employees incurred such Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

103.    In addition, the Debtors have certain independent directors who are paid regular fees in compensation for their service (the "**Other Compensation Obligations**").  One director is owed approximately $60,000 on account of his prepetition services, and the Debtors are seeking relief to pay this amount in accordance with the terms of his agreement.

104.    In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed in the Wages Motion (collectively,

46

the "**Deductions**").  In addition to the Deductions, certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**").  I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

105.    As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, three discretionary employee bonus programs (the "**Employee Bonus Programs**") and have a general practice of paying severance to certain non-insider Employees (such practice, the "**Severance Program**").  The Employee Bonus Programs and the Severance Program are necessary for maintaining positive Employee morale and loyalty, and failure to honor obligations under these programs could cause severe hardship to the Debtors' workforce in a critical time; the programs are integral and necessary for maintaining a stable workforce and the ultimate successful operation of the Debtors' business.

106.    In addition, prior the Petition Date, the Debtors have implemented a key employee retention program (the "**KERP**") for 36 non-insider Employees, pursuant to which retention awards are paid quarterly in arrears.[9]  In the event that any Employee subject to the KERP

---

[9] In addition, prior to the Petition Date, the Debtors implemented a similar key employee retention program for their insider employees. The total amount of $2,152,500 under this program was paid in full prior to the Petition Date.

is terminated for cause or voluntarily terminates, such Employee is required to forfeit any outstanding unpaid award.  The average total award under the KERP is approximately $84,738, or 37% of the eligible Employee's salary.  The total amount to be paid to non-insider Employees under the KERP is $3,050,550. At this time, no amounts are owed under the KERP by the Debtors. The Debtors intend to honor these obligations in the ordinary course postpetition.

107.   The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories:  (i) paid time off, including personal time off and holidays; (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts; (iii) retirement savings plans including a 401(k) plan, and (iv) certain other benefits (collectively, the "**Employee Benefits**").   Although most eligible Employees participate in the Employee Benefits, certain Employees elect to opt-out of particular programs.  I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

108.   As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensations Obligations, Employee Benefits, and Employee Onboarding Obligations.  Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Claims (as defined in the Wages Motion) and administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with Employee Obligations.  I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators,

the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

109.    I believe that, with the exception of obligations to one Employee and one independent director as more fully described in the Wages Motion, no Employees are owed prepetition amounts exceeding the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code and that, accordingly, the Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of such cap.  I also believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.  Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

## F.    **Taxes Motion**

110.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments and (II) Granting Related Relief* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request entry of an order (i) authorizing, but not directing, them to satisfy, or use tax credits to offset, all Taxes (as defined below) due and owing to various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**")[10] that arose prior to the Petition Date, including all Taxes subsequently

---

[10] The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth in the Taxing Authority List (as defined herein). The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) granting related relief.

111.    I understand that the Taxes the Debtors typically incur generally fall into the following categories:  Franchise Taxes, Severance Taxes, Property Taxes, Income Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and, collectively, the "**Taxes**").  I understand that approximately $2,710,000 in Taxes relating to periods prior to the Petition Date will come due and owing to the taxing Authorities after the Petition Date.

112.    Further, I understand that failure to pay the aforementioned Taxes may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

## G.    Utilities Motion

113.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below), (ii) establishing procedures for resolving objections by the Utility Companies

relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) granting related relief.

114.    As more fully described in the motion, the Debtors obtain telecommunications, information technology services, water, fuel and power, electricity and other utility services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**").   I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases.   Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted.   The Debtors operate a complex business with significant operations throughout the GOM and along the Gulf Coast of Texas and Louisiana.   Interruption of the Utility Services provided at any of their locations would disrupt necessary communication and coordination between the Debtors' employees, vendors, customers, and various regulatory authorities, and would prevent the provision of necessary support to these same parties.   I believe that any such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.   As a result, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

115.    I believe that there are no material defaults or significant arrearages with respect to the undisputed invoices for prepetition Utility Services.   Based on a monthly average for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next 30 days will be approximately $662,500.

116.    I believe and am advised that the Adequate Assurance Procedures are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

117.    Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' businesses at this critical juncture as the Debtors transition into chapter 11.  Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional adequate assurance.  Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

## H.    Schedules and Statements Motion

118.    Pursuant to the *Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Current Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Reports* filed contemporaneously herewith (the "**Schedules and Statements Motion**") the Debtors seek entry of an order extending the deadline by which the Debtors must file their (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "**Schedules and Statements**") by 30 days, for a total of 44 days from the Petition Date, through and including September 16, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown.

119.    I am advised that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) generally requires debtors to file Schedules and Statements within 14 days after their petition date.  I am also advised that under Bankruptcy Rule 1007(c), the Court has the authority to extend the time required for filing the Schedules and Statements "for cause."  I believe cause exists for granting the extensions requested in the Schedules and Statements Motion because of the voluminous information the Debtors must compile to complete the Schedules and Statements. Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations.

120.    Additionally, pursuant to the Schedules and Statements Motion, the Debtors request the Court grant them an extension of the time until the later of (i) 15 days after the initial meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**341 Meeting**") and (ii) 45 days from the Petition Date, for the Debtors to either file their initial reports of financial information in respect of entities in which their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), or file a motion with the Court seeking a modification of such reporting requirements for cause.

121.    I have been advised that Bankruptcy Rule 2015.3 requires a debtor, by no later than seven days prior before the date set for the 341 Meeting and no less than every six months thereafter, to file periodic financial reports of the value, operations and profitability of each entity that is not a publicly traded corporation or a debtor in the chapter 11 cases, and in which the estate holds a substantial or controlling interest.  I am also advised that pursuant to Bankruptcy Rule 9006(b)(1), the Court has the authority to enlarge the period of time to file the 2015.3 Reports "for cause" and that under Bankruptcy Rule 2015.3(d), the Court can modify the reporting requirements for cause,

including that the debtor is "not able, after a good faith effort, to comply with those reporting requirements, or that the information . . . is publicly available."

122.   I believe cause exists to extend the deadline for filing the Rule 2015.3 Reports based on (a) the size and complexity of the Debtors' businesses and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.  Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the Office of the United States Trustee for the Southern District of Texas to determine the appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

**I.**      **Creditor List Motion**

123.   Pursuant to the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to File a* Consolidated *Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (II) Authorizing Debtors to Redact Certain Personal Identification Information of Employees* filed concurrently herewith, the Debtors are seeking entry of an order authorizing the Debtors to (i) file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and (ii) redact certain personal identification information of the Debtors' employees.

124.   I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H . . . ."  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix (a "**Consolidated Creditor Matrix**").  I believe that preparing separate lists of creditors for each Debtor would be unduly expensive, time consuming, and

administratively burdensome.   The Debtors, therefore, request authority to file a single Consolidated Creditor Matrix for all Debtors.

125.    Further, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . .".  Because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of the top 30 unsecured creditors for all Debtors collectively.  Such a list would help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

126.    Finally, I am advised that section 107(c)(1)(A) of the Bankruptcy Code provides that the Court "for cause, may protect an individual" with respect to the following types of information "to the extent the court finds that disclosure of such information would create undue risk of identity theft . . . [a]ny means of identification . . . contained in a paper filed," or to be filed, in a case under the Bankruptcy Code.  Here, the Debtors seek authority to redact the address information of the Debtors' current and former employees from the Consolidated Creditor Matrix and from the Debtors' lists of equity security holders.  I believe such relief is appropriate because such information could be used to perpetrate identity theft.

## J.    Trading Procedures Motion

127.    Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors and (B) Claims of Certain Worthless Stock Deductions* (the "**Trading Procedures Motion**"), the Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' (i) consolidated net operating loss carryforwards ("**NOLs**"), (ii) business interest expense carryforwards and (iii) other tax  benefits, including tax basis in excess of the fair market value of

the assets (collectively, the "Tax Attributes"), for use during the pendency of these chapter 11 cases and in connection with a reorganization of the Debtors. The Procedures apply to transfers of, and claims of worthless stock deduction with respect to, beneficial ownership of common stock of Fieldwood Energy Inc. and any options or similar rights (within the meaning of applicable treasury regulations) to acquire such stock (collectively, the "**Common Stock**") and allow the Debtors to monitor the transfer of, and claims of worthless stock deduction with respect to, beneficial ownership of Common Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) or claim(s) may jeopardize the Debtors' ability to utilize their Tax Attributes.

128.    It is my understanding that the Debtors possess certain Tax Attributes, including, as of the Petition Date, estimated federal NOLs in excess of $170 million and estimated federal interest expense carryforwards in excess of $465 million. The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors can carry forward certain Tax Attributes to offset taxable income in future years, and such Tax Attributes may also be utilized by the Debtors to offset any taxable income that may be generated by transactions consummated during these chapter 11 cases. If and to the extent the Tax Attributes can be used to offset taxable income in current and future tax periods and reduce tax liability of the Debtors, I believe the Tax Attributes are valuable assets. Further, I understand and am advised that the Debtors' ability to utilize the Tax Attributes is subject to certain statutory limitations—*namely*, sections 382 and 383 of Title 26 of the U.S. Code (the "**Tax Code**"), which limit a corporation's ability to utilize its NOLs and certain other tax benefits to offset future income once the corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "**Ownership Change**").

129.     I believe that, by establishing and implementing such Procedures, the Debtors will be in a position to object to any potential Ownership Change resulting from a transfer of, or claims of worthless stock deduction with respect to, beneficial ownership of Common Stock. It is critical for the Debtors to closely monitor any such activity involving the Common Stock, so that they may be in a position to act expeditiously to preserve the value of their Tax Attributes. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**K.     Claims Agent Retention Application**

130.     Pursuant to Debtors' *Emergency Application of Debtors for Entry of an Order Authorizing Retention and Appointment of* Prime *Clerk LLC as Claims, Noticing, and Solicitation Agent* filed concurrently herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as the claims, noticing, and solicitation agent ("**Claims and Noticing Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

131.     As more fully described in the Claims Agent Retention Application, the Claims Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors and other parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

132.     The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities during the pendency of these chapter 11 cases.  The appointment of Prime Clerk as the Claims Agent will provide the most effective and efficient means of providing that notice, as well as

soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Prime Clerk as the Claims Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

L.      **Request for Emergency Consideration**

133.    Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the Cash Collateral Motion; the Cash Management Motion; the JIB/Royalty Interests Motion; the Insurance and Surety Bond Motion; the Wages Motion; the Taxes Motion; the Utilities; the Schedules and Statements Motion; the Creditor List Motion; the Trading Procedures Motion, and the Claims Agent Retention Application. I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

<div align="center">

**Conclusion**

</div>

134.    The above describes the Debtors' businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, the terms of the Debtors' balance sheet restructuring, and the critical need for the Debtors to restructure their financial affairs and operations. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

<div align="center">

58

</div>

DocuSign Envelope ID: 5912EA06-51E9-4C6B-A04D-4E39D8C34D20

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 4, 2020
        Houston, Texas

Michael Dane
Senior Vice President and Chief Financial Officer
Fieldwood Energy LLC

**<u>Certificate of Service</u>**

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


   */s/ Alfredo R. Pérez*
Alfredo R. Pérez

## **Exhibit A**

Restructuring Support Agreement

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of August 4, 2020, is entered into by and among:

(i) Fieldwood Energy LLC ("*FWE*"), Fieldwood Energy Inc. ("*Parent*"), Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, Fieldwood Offshore LLC, Dynamic Offshore Resources NS, LLC, FW GOM Pipeline, Inc., GOM Shelf LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC (collectively, the "*Company*");

(ii) the undersigned lenders, or investment advisors or managers for the account of such lenders, party to that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018, among FWE, as borrower, Parent, as holdings, Parent, FWE, Cantor Fitzgerald Securities as administrative agent (the "*Prepetition FLTL Agent*"), the Lenders (as defined therein) party thereto (the "*Prepetition FLTL Lenders*" and the undersigned Prepetition FLTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition FLTL Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting FLTL Lenders*") and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "*Prepetition FLTL Agreement*" and the loans outstanding thereunder the "*Prepetition FLTL Loans*");

(iii) the undersigned lenders, or investment advisors or managers for the account of such lenders, party to that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018, (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "*Prepetition SLTL Agreement*" and the loans outstanding thereunder the "*Prepetition SLTL Loans*"), among FWE, as borrower, Parent, as holdings, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (in such capacity, the "*Prepetition SLTL Agent*"), and the Lenders (as defined therein) from time to time party thereto (the "*Prepetition SLTL Lenders*" and the undersigned Prepetition SLTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition SLTL Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting SLTL Lenders*", and together with  the Consenting FLTL Lenders, the "*Consenting Creditors*"); and

(iv) Apache Corporation ("*Apache*");

The Company, Apache, each Consenting Creditor and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "*Parties*" and individually as a "*Party*."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below) attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto). The terms of the Restructuring Term Sheet are hereby incorporated and included in the terms of this Agreement.

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to undertake a restructuring of the Company in accordance with the terms set forth below and in the Restructuring Term Sheet (the "***Restructuring***"), which is anticipated to be effected through a sale pursuant to section 363 of the Bankruptcy Code (as defined below) and/or a plan of reorganization (as may be amended or modified from time to time, the "***Plan***") and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

**WHEREAS**, subject to the terms hereof, each Party desires to enter into certain transactions in furtherance of the Restructuring (the "***Restructuring Transactions***");

**WHEREAS,** as of the date hereof, the Consenting FLTL Lenders hold, in the aggregate, approximately 67.63% of the aggregate outstanding principal amount of the Prepetition FLTL Loans;

**WHEREAS**, as of the date hereof, the Consenting SLTL Lenders hold, in the aggregate, approximately 25.73% of the aggregate outstanding principal amount of the Prepetition SLTL Loans;

**WHEREAS**, certain of the Consenting FLTL Lenders or their affiliates or related funds (in such capacity, each Consenting FLTL Lender or its affiliate or related fund which has indicated that it elects to provide a DIP Backstop Commitment (as defined below) on the Effective Date below its name on the signature page hereto, a "***DIP Backstop Party***") have, severally and not jointly, agreed to commit to provide the DIP Facility (as defined below) (such commitment, in each case, a "***DIP Backstop Commitment***"), and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code), in each case on the terms set forth in the DIP Term Sheet (as defined below) attached as Exhibit A to the Restructuring Term Sheet and set forth in the DIP Orders;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Restructuring Term Sheet and hereunder.

WEIL:\97578907\3\45327.0005
#93426797v19

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>**Certain Definitions.**</u>

As used in this Agreement, the following terms have the following meanings:

"*Ad Hoc Group of Secured Lenders*" means the ad hoc group of holders of Prepetition FLTL Loans and Prepetition SLTL Loans that is represented by the Ad Hoc Group of Secured Lenders Advisors.

"*Ad Hoc Group of Secured Lenders Advisors*" means Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Financial Partners, LLC and any local or foreign advisors.

"*Additional Consenting Lender*" has the meaning set forth in <u>Section 3(e)</u>.

"*Agreement*" has the meaning set forth in the Preamble hereto and, for the avoidance of doubt, includes all the exhibits and schedules attached hereto.

"*Alternative Restructuring*" has the meaning set forth in <u>Section 3(a)</u>.

"*Apache*" means the Apache Corporation and certain of its affiliates under that certain Decommissioning Agreement dated September 30, 2013 with Parent and certain of its affiliates.

"*Apache Counsel*" means Hunton Andrews Kurth, LLP as counsel to Apache and Looper Goodwine as special BOEM and BSEE counsel to Apache.

"*Apache Definitive Documents*" means the definitive documents implementing the transactions contemplated by or relating to the Apache Term Sheet.

"*Apache Term Sheet*" means the term sheet attached as <u>Exhibit B</u> to the Restructuring Term Sheet.

"*Backstop Fee*" has the meaning set forth in <u>Section 3(h)</u>.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas (Houston Division) presiding over Chapter 11 Cases.

"*Bidding Procedures*" means the procedures governing the sale and marketing process for the Specified Assets Sale.

"***Bidding Procedures Motion***" means the motion seeking approval of the Bidding Procedures.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court approving the Bidding Procedures and establishing deadlines for the submission of bids and the auction in accordance with such procedures.

"***Capital Stock***" means the issued and outstanding shares of capital stock of Parent or any option thereon or any right or interest therein."

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claims***" means all claims arising under the Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company.

"***Closing***" means the consummation of the Plan.

"***Commencement Date***" has the meaning set forth in Section 2(c).

"***Company***" has the meaning set forth in the Preamble to this Agreement.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

"***Consenting Class***" means either the Prepetition FLTL Lenders or the Prepetition SLTL Lenders, as applicable.

"***Consenting Creditors***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting FLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting SLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting Party Counsel***" means Davis Polk & Wardwell LLP, as counsel to the Ad Hoc Group of Secured Lenders.

"***Definitive Documents***" has the meaning set forth in Section 2(b).

"***DIP Backstop Commitment***" has the meaning set forth in the recitals to this Agreement.

"***DIP Backstop Party***" has the meaning set forth in the recitals to this Agreement.

"***DIP Commitment Parties***" means, collectively, the DIP Backstop Parties and the Joining DIP Commitment Parties.

"***DIP Closing Date***" has the meaning set forth in Section 3(g).

"***DIP Credit Agreement***" means the credit agreement executed in connection with the DIP Facility.

4

"***DIP Documents***" means the DIP Term Sheet, the DIP Orders, the DIP Motion and the DIP Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, amendments and restatements, supplements or modifications of any of the foregoing) executed pursuant thereto.

"***DIP Election Date***" has the meaning set forth in Section 3(g).

"***DIP Facility***" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Documents.

"***DIP Motion***" means the motion seeking approval by the Bankruptcy Court of the DIP Facility and the use of cash collateral and the DIP Orders.

"***DIP Orders***" means, collectively, the Interim DIP Order and Final DIP Order.

"***DIP Term Sheet***" means the term sheet setting forth the material terms of the DIP Facility attached as Exhibit A to the Restructuring Term Sheet or as otherwise acceptable to the Requisite DIP Backstop Parties and the Company.

"***Disclosure Statement***" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto.

"***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement.

"***Effective Date***" means the date upon which the Confirmation Order has become a Final Order and all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

"***FLTL Claim***" means any Claim against the Company under the Prepetition FLTL Agreement.

"***Final DIP Order***" means the order of the Bankruptcy Court substantially in the form of **Exhibit B** attached hereto authorizing the use of cash collateral and approving the DIP Facility, and granting the relief requested in the DIP Motion on a final basis.

"***Final Order***" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought.

"***FWE***" has the meaning set forth in the Preamble to this Agreement.

"***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

"***Interim DIP Order***" means the order of the Bankruptcy Court substantially in the form of **Exhibit B** attached hereto authorizing the use of cash collateral and approving the DIP Facility and granting the relief requested in the DIP Motion on an interim basis.

"***Joinder Agreement***" has the meaning set forth in Section 3(c), and as attached in the form to this Agreement as **Exhibit C**.

"***Joining DIP Commitment Party***" has the meaning set forth in Section 3(g).

"***Loans***" means, as the context may require, the Prepetition FLTL Loans and the Prepetition SLTL Loans.

"***Loan Documents***" means, as the context may require, the "Loan Documents" as defined in each of the Prepetition FLTL Agreement and the Prepetition SLTL Agreement.

"***Non-Consenting Creditor***" has the meaning set forth in Section 11(c).

"***NY Courts***" has the meaning set forth in Section 13(b).

"***Outside Petition Date***" has the meaning set forth in Section 2(c).

"***Party***" or "***Parties***" has the meaning set forth in the Preamble to this Agreement.

"***Plan***" has the meaning set forth in the recitals to this Agreement.

"***Plan Supplement***" means the supplement to the Plan as set forth in Section 2(b)(iv).

"***Prepetition Credit Agreements***" means the the Prepetition FLTL Agreement and the Prepetition SLTL Agreement.

"***Prepetition FLTL Agent***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Agreement***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Loans***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition SLTL Agent***" has the meaning set forth in the Preamble to this Agreement.

6

"*Prepetition SLTL Agreement*" has the meaning set forth in the Preamble to this Agreement.

"*Prepetition SLTL Lenders*" has the meaning set forth in the Preamble to this Agreement.

"*Prepetition SLTL Loans*" has the meaning set forth in the Preamble to this Agreement.

"*Purchase Agreement(s)*" means the purchase agreement(s) pursuant to which the Company will effectuate the Specified Assets Sale.

"*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims (or enter with customers into long and short positions in Claims), in its capacity as a dealer or market maker in Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Requisite DIP Backstop Parties*" means DIP Backstop Parties holding at least a majority in aggregate principal amount of the DIP Backstop Commitments held by the DIP Backstop Parties as of the date of determination.

"*Requisite DIP Commitment Parties*" means, (i) prior to the DIP Closing Date, the Requisite DIP Backstop Parties, and (ii) on or after the DIP Closing Date, the Required DIP Lenders.

"*Required DIP Lenders*" means, at any time, the "Required Lenders" as determined under the DIP Credit Agreement at such time.

"*Requisite FLTL Lenders*" means, as of the date of determination, Consenting FLTL Lenders holding at least a majority of the outstanding Prepetition FLTL Loans (inclusive of validly executed but unsettled trades) held by the Consenting FLTL Lenders as of such date.

"*Requisite SLTL Lenders*" means, as of the date of determination, Consenting SLTL Lenders holding at least a majority of the outstanding Prepetition SLTL Loans held by the Consenting SLTL Lenders as of such date.

"*Restructuring*" has the meaning set forth in the recitals to this Agreement.

"*Restructuring Term Sheet*" means the term sheet (including any schedules and exhibits attached thereto), attached hereto as **Exhibit A**, which contains the material terms and provisions of the Restructuring.

"*Restructuring Transactions*" has the meaning set forth in the recitals to this Agreement.

"*Sale Documents*" has the meaning set forth in Section 2(b)(vii).

"*Sale Order*" means the order of the Bankruptcy Court authorizing the Company to enter into the Purchase Agreement(s), which order may be the Confirmation Order.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*SLTL Claim*" means any Claim against the Company under the Prepetition SLTL Agreement.

"*Specified Assets*" means the Company's deepwater assets and any other business or assets as determined and agreed by the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders.

"*Specified Assets Sale*" means the sale, transfer or other disposition of all or substantially all of the Company's Specified Assets.

"*Support Effective Date*" means the earliest date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting FLTL Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition FLTL Loans, (iii) Consenting SLTL Lenders holding at least 25%, in aggregate principal amount outstanding as of such date, of the Prepetition SLTL Loans and (iv) Apache.

"*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in full with respect to all parties in accordance with Section 7 hereof and (ii) the Effective Date.

"*Transfer*" has the meaning set forth in Section 3(c)(i).

"*Weil*" means Weil, Gotshal & Manges LLP, counsel to the Company.

## 2.    **Chapter 11 Process.**

(a)    The Restructuring Term Sheet.  The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of this Agreement shall govern.

(b)    The definitive documents (the "*Definitive Documents*") with respect to the Restructuring shall include this Agreement and any material documents (including any material related orders, agreements, instruments, schedules or exhibits) that are described in or contemplated by this Agreement and necessary or desirable to implement the Restructuring, including, without limitation:

(i)    the DIP Documents;

(ii)    the first day motions, second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions;

(iii)    the Plan and the Disclosure Statement;

WEIL:\97578907\3\45327.0005
#93462797v19

(iv)    the supplement to the Plan (the "***Plan Supplement***"), including, without limitation, the organizational and governance documents governing the reorganized Company, including any shareholders agreement or registration rights agreement, if any, (in each case, which will include customary minority protections), and any and all exit financing documents;

(v)    the Confirmation Order;

(vi)    the Disclosure Statement Order;

(vii)    all motions, filings, documents and agreements related to the Specified Assets Sale, including the Purchase Agreement(s), the Bidding Procedures Motion, the Bidding Procedures Order and the Sale Order (the "***Sale Documents***");

(viii)    the Apache Term Sheet and the Apache Definitive Documents; and

(ix)    any other documents, instruments, schedules or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing.

Each of the Definitive Documents shall (1) contain terms and conditions consistent with this Agreement and (2) otherwise be acceptable or reasonably acceptable (as applicable) to the applicable Consenting Creditors or Apache as set forth in this <u>Section 2(b)</u>.  The Definitive Documents not executed or in a form attached to this Agreement as of the date hereof remain subject to negotiation and completion. Upon completion, the Definitive Documents shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the Restructuring Term Sheet), as it may be modified, amended, or supplemented in accordance with <u>Section 11</u>, and (i) in the case of the Plan, Plan Supplement, Confirmation Order, Disclosure Statement, DIP Documents, the Sale Documents, in each case including any modifications, amendments or supplements thereto, be in form and substance acceptable to the Company and the Requisite FLTL Lenders and the Requisite DIP Commitment Parties at all times, (ii) any provision in the Plan or the Confirmation Order that directly affects the structure of Fieldwood I outlined in the Apache Term Sheet or the economic treatment of Apache, such provision shall be in form and substance reasonably acceptable to Apache, (iii) in the case of the Apache Definitive Documents, be reasonably acceptable to the Company, Apache, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders and (iv) in the case of all other Definitive Documents, be in form and substance reasonably acceptable to the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders at all times.

Notwithstanding anything to the contrary in this Agreement, the DIP Documents shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the Company and the Requisite DIP Backstop Parties.

(c)    <u>Commencement of the Chapter 11 Cases</u>.  Provided that the Support Effective Date has occurred, the Company agrees that, by a date to be agreed between the Company and the Consenting Creditors, but in no event later than August 4, 2020 (the "***Outside Petition Date***") (the date on which such filing occurs, the "***Commencement Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

<div align="center">9</div>

(d)      <u>DIP Financing and Cash Collateral</u>.  No later than the close of business on the next business day following the Commencement Date, the Parties shall file the DIP Motion.

3.      **Agreements of the Consenting Creditors.**

(a)      <u>Voting; Support</u>.  Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor (acting severally and not jointly with the other Consenting Creditors) shall:

(i)      support and take all actions reasonably necessary or reasonably requested by the Company to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement;

(ii)      not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Restructuring and Restructuring Transactions as contemplated under this Agreement (each, an "***Alternative Restructuring***") or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Restructuring and Restructuring Transactions as contemplated under this Agreement;

(iii)      timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of the Plan;

(iv)      not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by any Consenting Creditor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

(v)      timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(vi)      support and take all actions necessary or reasonably requested by the Company to facilitate the solicitation of the Plan, obtain approval of the Disclosure Statement and the Specified Assets Sale and confirmation and consummation of the Plan;

(vii)      not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting

10

Creditor shall use its commercially reasonable efforts to request that such administrative agent or collateral agent cease and refrain from taking any such action; and

(viii)   to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)   <u>Rights of Consenting Creditors Unaffected</u>.  Nothing contained herein shall limit:

(i)   the rights of a Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and such Consenting Creditor's obligations hereunder;

(ii)   the ability of a Consenting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)   subject to the terms and obligations hereof and applicable law, any right of a Consenting Creditor under the Prepetition Credit Agreements, any other applicable agreement, instrument or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitutes a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)   subject to any confidentiality provisions in this Agreement and the Prepetition Credit Agreements, the ability of a Consenting Creditor to consult with any other Parties or entities; or

(v)   the ability of a Consenting Creditor to enforce any right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents.

(c)   <u>Transfers</u>.

(i)   Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other Claims against or Interests in the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the

11

Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit C** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Weil and (ii) Consenting Party Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Claim or Interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(ii)     Notwithstanding anything herein to the contrary: (A) a Consenting Creditor may settle or deliver any Claims to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Claims so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement); (B) a Consenting Creditor may Transfer its right, title, or interest in Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided that (1)(x) such Qualified Marketmaker must Transfer such right, title, or interest in such Claims within the earlier of (A) ten (10) business days of its acquisition and (B) three (3) days before the Plan voting deadline, in each case, to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated entity with a common investment advisor and (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such transfer, or (2) the Qualified Marketmaker will be required to execute and deliver a Joinder Agreement; and (C) to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or become a Consenting Creditor or execute a Joinder Agreement.

(d)     Additional Claims or Interests.  Nothing in this Agreement shall be construed to preclude a Consenting Creditor or Apache from (i) acquiring additional Claims, (ii) holding or acquiring any other Claims against the Company entitled to vote on the Plan, (iii) holding or acquiring any Interests in the Company entitled to vote on the Plan or (iv) Transferring any Claims; provided, that, in each case, each such Consenting Creditor shall promptly notify Weil and each such Consenting Creditor agrees that such additional Claims or other Claims or Interests shall be subject to this Agreement and that, for so long as this Agreement has not been terminated pursuant to the terms hereof with respect to such Consenting Creditor, it shall vote (or cause to be voted) any such additional Claims or other Claims or Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3 hereof.

(e)     Additional Lenders.  Any Prepetition FLTL Lender or Prepetition SLTL Lender may, at any time after the Support Effective Date, become a party to this Agreement as a

12

Consenting Creditor, as applicable, (an "***Additional Consenting Lender***") by executing a Joinder Agreement substantially in the form attached hereto as **Exhibit C**, pursuant to which such Additional Consenting Lender shall be bound by the terms of this Agreement as a Consenting Creditor hereunder.

(f)     Forbearance.  For the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Party, each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by the Company; provided that, in accordance with the Prepetition FLTL Agreement, the accrual of interest shall be unaffected by the terms hereof and continue during the Support Period with respect to the Prepetition FLTL Loans in accordance with its terms.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.

(g)     DIP Backstop Commitments; Joining DIP Commitment Parties. Subject to the termination rights set forth in Section 7, each of the DIP Backstop Parties, severally and not jointly, subject to the conditions described in the DIP Term Sheet, agrees to provide (or cause any of its affiliates or related funds to provide, it being understood that the DIP Facility will initially be funded by the DIP Facility Agent  (as defined in the DIP Term Sheet) or any other seasoning agent reasonably acceptable to the Requisite DIP Backstop Parties and the Company) its allocable share of the DIP Facility as set forth in **Exhibit D** attached hereto on the terms and conditions substantially as set forth in the DIP Term Sheet and the DIP Order; provided that any Consenting FLTL Lender that executes a Joinder Agreement on or before August 14, 2020 at 5:00 p.m. (the "***DIP Election Date***"), New York Time, may, by making the appropriate election on such Joinder Agreement, commit to provide (or cause any of its affiliates or related funds to provide, it being understood that the DIP Facility will initially be funded by the DIP Facility Agent or any other seasoning agent reasonably acceptable to the Requisite DIP Backstop Parties and the Company) a portion of the DIP Facility in an amount equal to the pro rata percentage of Prepetition FLTL Loans held by such Consenting FLTL Lender as of the Effective Date, on the terms and conditions agreed to by the Requisite DIP Backstop Parties and the Company in the DIP Documents, as applicable (any Consenting FLTL Lender that elects to make such a commitment, a "***Joining DIP Commitment Party***"); provided, further, that, no later than one business day after the DIP Election Date, each DIP Backstop Party's commitment to provide its portion of the DIP Facility shall be reduced, pro rata, based on the percentages set forth on **Exhibit D** attached hereto, for the share of the DIP Facility to be provided by each Joining DIP Commitment Party and the commitment of each Joining DIP Commitment Party (and corresponding reduction of the commitment and exposure of each DIP Backstop Party provided for in **Exhibit D**) shall be pro rata across funded and unfunded portions of the  DIP Facility and, in respect  of any funded portion, shall include an obligation to purchase such loans pro rata and, in the case of unfunded portions, to assume commitments to make future fundings, all at the dates and times and pursuant to documentation required by the Requisite DIP Commitment Parties and the DIP Facility Agent; provided, further, that upon termination or expiration of this Agreement in accordance with its terms prior to the

Closing Date, as defined in the DIP Term Sheet (the "***DIP Closing Date***"), the commitment of the DIP Backstop Parties and Joining DIP Commitment Parties made pursuant to this Section 3(g) with respect to the DIP Facility shall terminate.

(h)     On the DIP Closing Date, the Company shall pay to each DIP Backstop Party or its designee a backstop fee equal to 4.00% of the amount of such DIP Backstop Party's DIP Backstop Commitment on the date hereof (the "***Backstop Fee***"). The Backstop Fee shall be fully and irrevocably due and payable in cash on the DIP Closing Date. The Backstop Fees shall be earned by each DIP Backstop Party on the date hereof as a fee in consideration of the DIP Backstop Commitments of such DIP Backstop Party and payable in cash on the DIP Closing Date and may be withheld by each DIP Backstop Party from the proceeds of the Loans made by such DIP Backstop Party or its designee on the DIP Closing Date. The Company expressly waives the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Backstop Fees to the extent permitted by applicable law. The parties hereto expressly agree that the Backstop Fees are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, the Backstop Fees shall be payable notwithstanding the then prevailing market rates at the time payment is made, there has been a course of conduct between the DIP Backstop Parties and the Company giving specific consideration in this transaction for such agreement to pay the Backstop Fees, the Backstop Fee shall be in addition to any other fees as described in the DIP Term Sheet and the Company shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Company expressly acknowledges that its agreement to pay the Backstop Fees to the DIP Backstop Parties as herein described is a material inducement for the DIP Backstop Parties to provide the DIP Backstop Commitment and consideration for the DIP Backstop Commitments.

**4.     Agreements of the Parties.**

(a)     Covenants.  Each Party agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Party, such Party shall use its commercially reasonable efforts to:

(i)     support and take all commercially reasonable actions necessary to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement, including approval of the Disclosure Statement, the Specified Assets Sale and any Apache Definitive Documents and confirmation and consummation of the Plan;

(ii)     provide reasonably prompt written notice (in accordance with Section 21 hereof) to the Company between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

(b)      Hedging.  Notwithstanding anything to the contrary in this Agreement, each Party agrees that the Company may enter into new commodity price hedging arrangements in the ordinary course of business consistent with the Company's past practices and interest rate hedging arrangements consistent with industry practices and, in each case, not for speculative purposes and solely as permitted by the DIP Documents; provided, however, that hedging arrangements related to Legacy Apache Properties shall be subject to the approval of Apache, which approval shall not be unreasonably withheld.

**5.      Agreements of the Company**.

(a)      Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall, and shall cause each of its subsidiaries included in the definition of Company, to:

(i)      support and take all commercially reasonable actions necessary to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement;

(ii)      use commercially reasonable efforts to (A) consummate the Restructuring and obtain approval of the Specified Assets Sale, the transactions contemplated under the Apache Definitive Documents and Plan, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (1) is inconsistent with this Agreement in any respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring; and (B) obtain orders of the Bankruptcy Court in respect of the Restructuring;

(iii)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring;

(iv)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably necessary and coordinate its activities with the other Parties hereto (subject to the terms hereof) in respect of all matters concerning the implementation and consummation of the Restructuring Transactions, and take any and all appropriate actions in furtherance of this Agreement;

(v)      (A) subject to professional ethical responsibilities, seek entry of the DIP Orders and, if necessary, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person or entity with respect to entry of the DIP Orders or with respect to any adequate protection proposed to be granted or granted to the Consenting Creditors pursuant to the DIP Orders, (B) subject to professional responsibilities, prosecute and defend any appeals related to the Restructuring, (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring and (D) operate its business in the ordinary course, taking into account the Restructuring;

15

(vi)     subject to professional ethical responsibilities, timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the claims of the Consenting Creditors;

(vii)     provide reasonably prompt written notice (and within 2 business days) (in accordance with Section 21 hereof) to the Consenting Creditors and Apache between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any material notice, including from any governmental unit with jurisdiction, of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any respect the transactions contemplated by the Restructuring and (D) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(viii)     subject to compliance with all applicable confidentiality agreements or obligations, provide to the Consenting Creditors, Apache and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring, (B) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing) and (C) timely and reasonable responses to all diligence requests;

(ix)     not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP Facility, the Sale Documents, the Apache Definitive Documents or the Restructuring in a manner that is inconsistent with this Agreement;

(x)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Restructuring Term Sheet;

(xi)     not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with the Restructuring, including, without limitation, the Sale Documents, the Apache Definitive Documents, approval of the DIP Orders or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Company; provided that the Company shall not be obligated

16

to agree to any modification of any document that is inconsistent with the Restructuring Term Sheet;

(xii)    provide draft copies of (i) the Disclosure Statement, the Plan and the confirmation order (and any proposed amended version of the Plan, Disclosure Statement and confirmation order) and (ii) all motions, applications or other documents which relate to the Fieldwood I (as defined in the Apache Term Sheet) structure outlined in the Apache Term Sheet or the economic treatment of Apache, to Apache Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document, and shall consult in good faith with Apache Counsel regarding the form and substance of such drafts;

(xiii)    provide draft copies of all material motions or applications, Definitive Documents and other documents (including, without limitation, all first day and second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions, the Plan, the Disclosure Statement, ballots and other solicitation materials in respect of the Plan, any proposed amended version of the Plan or the Disclosure Statement, a proposed disclosure statement order and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to the Consenting Party Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, the Sale Documents, a disclosure statement order, a confirmation order or adequate protection order) at least two (2) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; and

(xiv)    pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of (a) the Ad Hoc Group of Secured Lenders Advisors, and (b) Apache Counsel and its financial advisor as provided for in the Apache Term Sheet; provided that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; provided further that any invoices shall not be required to contain individual time detail.

(b)    Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)    Fiduciary Duties. Nothing in this Agreement shall require any director or officer of the Company to take any action or inaction that would be, based on the advice of counsel,

inconsistent with their fiduciary duties to the Company. No action or inaction on the part of any director or officer of the Company that such officer or director believes is, based on the advice of counsel, consistent, their fiduciary duties shall be limited or precluded by this Agreement.

6.    **Agreements of Apache**.

(a)    <u>Voting; Support</u>. Apache agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to Apache, Apache shall:

(i)    support and take all actions necessary or reasonably requested by the Company to facilitate the finalization of the Apache Definitive Documents on or prior to the date that is 75 days after the Commencement Date as contemplated under this Agreement;

(ii)    support and take all actions necessary or reasonably requested by the Company to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement, including all transactions contemplated under the Apache Definitive Documents;

(iii)    not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of an Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Restructuring and Restructuring Transactions as contemplated under this Agreement;

(iv)    timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis;

(v)    not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company, the Consenting Creditors and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by Apache at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to Apache;

(vi)    timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(vii)    not to object to, hinder or delay the Specified Assets Sale or the execution of any of the Sale Documents except to the extent such action is taken to advance or preserve the rights of Apache under the Apache Term Sheet; and

(viii)    support and take all actions necessary or reasonably requested by the Company to facilitate the solicitation of the Plan, obtain approval of the Disclosure

18

Statement, and confirmation and consummation of the Plan, approval of the Specified Assets Sale and any Apache Definitive Documents;

(ix)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)     <u>Other Agreements</u>.  Pursuant to the Apache Term Sheet, Apache agrees that if the Plan is confirmed and the Definitive Documents are consistent with the terms herein unless otherwise agreed and grant Apache all the rights and protections provided for in the Apache Term Sheet unless otherwise agreed, then Apache will waive any claims against the Company based on any alleged prepetition breach of that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, FWE, and the other parties thereto (the "***Decommissioning Agreement***") or any related agreement, and any right of reimbursement, subrogation or any other claims related to the Legacy Apache Properties (as defined in the Apache Term Sheet) and shall release any and all claims against the debtors and all other released parties  (and such releases shall be mutual with Apache benefiting as a released party) under the Plan but only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security, in any respect;

(c)     <u>Rights of Apache Unaffected</u>.  Nothing contained herein shall limit:

(i)     the rights of Apache under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and Apache's obligations hereunder;

(ii)     the ability of Apache to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)     subject to the terms and obligations hereof and applicable law, any right of Apache under the Decommissioning Agreement or any other applicable agreement, instrument or document that gives rise to Apache's Claims or Interests, as applicable, or constitutes a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)     the ability of Apache to enforce any applicable right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents; or

(v)     subject to any confidentiality provisions in this Agreement, the ability of Apache to consult with any other Parties or entities and their professionals.

7.      **Termination of Agreement**.

(a)      This Agreement shall terminate two (2) business days following the delivery of notice, delivered in accordance with Section 21 hereof: (i) from the Company to the other Parties at any time after and during the continuance of a Company Termination Event (as defined below), (ii) from Apache to the other Parties at any time after and during the continuance of an Apache Termination Event (as defined below), (iii) from the Requisite FLTL Lenders to the other Parties at any time after and during the continuance of any Consenting FLTL Lenders Termination Event (as defined below), (v) from the Requisite SLTL Lenders to the other Parties at any time after and during the continuance of any Consenting SLTL Lenders Termination Event (as defined below), (vi) from the Requisite DIP Commitment Parties at any time after and during the continuance of any DIP Commitment Parties Termination Event (as defined below) (it being understood that, after the DIP Closing Date, any termination of the commitments under the DIP Credit Agreement shall be subject to the terms specified therein), and (vi) from Apache to the other Parties at any time after and during the continuance of any Apache Termination Event (as defined below); provided, that (A) termination by Apache shall only be effective as to Apache, and (B) termination by the Requisite SLTL Lenders shall only be effective as to the Requisite SLTL Lenders. Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Apache Termination Event, Consenting FLTL Lenders Termination Event, Consenting SLTL Lenders Termination Event, DIP Commitment Parties Termination Event or Company Termination Event.  In addition, this Agreement shall terminate automatically on the later of the Effective Date of the Plan and the date on which the Confirmation Order has become a Final Order.

(b)      A "Company Termination Event" shall mean any of the following:

(i)      the breach by one or more of the Consenting FLTL Lenders or Apache, of any of the undertakings, representations, warranties or covenants of the Consenting FLTL Lenders or Apache, as applicable, set forth herein in any material respect which remains uncured for a period of ten (10) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but with respect to the Consenting FLTL Lenders and the DIP Commitment Parties, only if the non-breaching Consenting FLTL Lenders or DIP Commitment Parties hold less than 66⅔% the aggregate principal amount of FLTL Loans or the DIP Facility, as applicable;

(ii)      the board of directors, managers, members or partners, as applicable, of the Company reasonably determine in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

20

consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iv)    as of 11:59 p.m. prevailing Eastern Time on August 4, 2020 the Support Effective Date shall not have occurred;

(v)    as of 11:59 p.m. prevailing Eastern Time on the date that is two hundred and ten (210) days after the Commencement Date, the Effective Date shall not have occurred;

(vi)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases; or

(vii)    an Apache Termination Event, a DIP Commitment Parties Termination Event or a Consenting FLTL Lender Termination Event has occurred and has not been waived or tolled after any applicable cure period.

(c)    An "Apache Termination Event" shall mean any of the following:

(i)    the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which breach (A) affects the Fieldwood I structure outlined in the Term Sheet and related economic terms, and (B) remains uncured ten (10) business days after the receipt of written notice of such breach from Apache to the breaching Party;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(d)    A "DIP Commitment Parties Termination Event" shall mean any of the following:

(i)    the breach by the Company of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

<div align="center">21</div>

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)     the Company withdraws the Plan, the Disclosure Statement or the Sale Documents, publicly announces its intention not to support the Restructuring Transactions, the Plan or the Specified Assets Sale, or the Company files any Definitive Document (including amendments, modifications or supplements thereto), motion or pleading with the Bankruptcy Court that is not consistent with this Agreement, the Restructuring Term Sheet or the DIP Documents or is not at all times acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, and such filing has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite DIP Commitment Parties (in accordance with <u>Section 21</u> hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such filing;

(iv)     the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(v)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(vi)     the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement, the Definitive Documents or the Restructuring Transactions in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(vii)     the Company files, propounds, or otherwise supports an Alternative Restructuring;

(viii)     the occurrence of an "Event of Default" under the DIP Credit Agreement that has not been waived or timely cured in accordance therewith;

(ix)     the Interim DIP Order or the Final DIP Order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner that is not acceptable to the Requisite DIP Commitment Parties;

WEIL:\97578907\3\45327.0005
#93462797v19

(x)     any debtor-in-possession financing is entered into, or the Company files a motion seeking approval of debtor-in-possession financing, on terms that are inconsistent with this Agreement or otherwise not acceptable to the Requisite DIP Commitment Parties;

(xi)     the Company enters into a material executory contract, lease, any new key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business without obtaining the prior written consent of the Requisite DIP Commitment Parties;

(xii)     on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as would be permitted under the DIP Documents or (C) with the consent of the Requisite DIP Commitment Parties;

(xiii)     the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan;

(xiv)     on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xv)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order acceptable to the Requisite DIP Commitment Parties within ten (10) business days; or

(xvi)     a Company Termination Event, an Apache Termination Event or a Consenting FLTL Lenders Termination Event has occurred and has not been waived or tolled after any applicable cure period; or

(xvii)     if the Company shall not have complied with each of the following milestones (the "*Milestones*"):

(1)     no later than the Outside Petition Date, the Chapter 11 Cases shall have been filed;

(2)     no later than the date that is five (5) days after the Commencement Date, the Interim DIP Order shall have been entered by the Bankruptcy Court;

(3)     no later than the date that is fifteen (15) days after the Commencement Date, the DIP Closing Date shall have occurred;

(4)     no later than the date that is forty-five (45) days after the Commencement Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

23

(5)     no later than the date that is forty-five (45) days after the Commencement Date, the Company shall have disclosed to the DIP Backstop Parties and the Consenting FLTL Lenders progress with respect to negotiations with Non-APA Owners and other parties in interest with respect to the Non-APA Remaining Assets and such progress shall be satisfactory to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders;

(6)     no later than the date that is seventy-five (75) days after the Commencement Date, the Apache Definitive Documentation shall be finalized;

(7)     no later than the date that is seventy-five (75) days after the Commencement Date, at the election of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Company shall have either (x) filed the Plan, Disclosure Statement and a motion seeking approval of the Disclosure Statement and, at the option of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Bidding Procedures Motion; or (y) the Bidding Procedures Motion;

(8)     in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred (100) days after the Commencement Date, the Bidding Procedures Order shall have been entered by the Bankruptcy Court;

(9)     in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred and twenty (120) days after the Commencement Date, the bid deadline set forth in Bidding Procedures Order shall have passed;

(10)    in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred and thirty (130) days after the Commencement Date, the auction (the "*Auction*"), if any, on the terms set forth in Bidding Procedures Order shall have occurred;

(11)    in the event the Bidding Procedures Motion is filed, the Auction has occurred or been canceled, and the winning bid contemplates a sale that is not pursuant to a Plan, no later than the date that is one hundred and forty (140) days after the Commencement Date, the Sale Order have been entered;

(12)    in the event the Bidding Procedures Motion is filed and the winning bid contemplates a Specified Assets Sale that is not pursuant to the Plan, no later than the date that is fourteen (14) days after the entry of the Sale Order, the Specified Assets Sale shall have been consummated; provided that, if such failure is due solely to additional time required to obtained pending regulatory approvals, such date shall be extended solely for the additional time as necessary to complete such regulatory approvals;

(13)    no later than the date that is one hundred and fifty (150) days after the Commencement Date, the Disclosure Statement Order shall have been entered;

(14)    no later than the date that is one hundred and ninety-five (195) days after the Commencement Date, the Confirmation Order shall have been entered; and

(15)     no later than the date that is two hundred and ten (210) days after the Commencement Date, the Effective Date shall have occurred.

So long as any amounts or commitments under the DIP Facility remain outstanding, the Company may extend a Milestone only with the prior written consent of the Requisite DIP Commitment Parties.  Following any termination of the commitments under DIP Credit Agreement and the repayment in full of all amounts thereunder, the Company may extend a Milestone only with the prior written consent of the Requisite FLTL Lenders.  In each case, consent may be provided via email from counsel to the Ad Hoc Group of Secured Lenders to Weil.

(e)     A "Consenting FLTL Lenders Termination Event" shall mean any of the following:

(i)     the breach by the Company of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)     the Company withdraws the Plan, the Disclosure Statement or the Sale Documents, publicly announces its intention not to support the Restructuring Transactions, the Plan or the Specified Assets Sale, or the Company files any Definitive Document (including amendments, modifications or supplements thereto), motion or pleading with the Bankruptcy Court that is not consistent with this Agreement, the Restructuring Term Sheet or the DIP Documents or is not at all times acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, and such filing has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite FLTL Lenders (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such filing;

(iv)     the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(v)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(vi)   the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement, the Definitive Documents or the Restructuring Transactions or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(vii)   the Company files, propounds, or otherwise supports an Alternative Restructuring;

(viii)   if the Company shall not have complied with the Milestones, unless such Milestone was otherwise extended in accordance with 7(d)(xvii);

(ix)   the occurrence of an "Event of Default" under the DIP Credit Agreement that has not been waived or timely cured in accordance therewith;

(x)   the Interim DIP Order or the Final DIP Order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner that is not acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders;

(xi)   any debtor-in-possession financing is entered into, or the Company files a motion seeking approval of debtor-in-possession financing, on terms that are inconsistent with this Agreement or otherwise not acceptable to the Requisite FLTL Lenders;

(xii)   the Company enters into a material executory contract, lease, any new key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business without obtaining the prior written consent of the Requisite FLTL Lenders;

(xiii)   the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting FLTL Lender arising under or relating to the Prepetition FLTL Agreement, or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of any affected Consenting FLTL Lender) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(xiv)   on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as would be permitted under the DIP Documents or (C) with the consent of the Requisite FLTL Lenders;

(xv)   the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan;

26

(xvi)   the failure of the Company to promptly pay the reasonable fees and expenses of the Consenting FLTL Lenders in accordance with this Agreement;

(xvii)   the Commencement Date shall not have occurred on or before the Outside Petition Date;

(xviii)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xix)   the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order acceptable to the Requisite FLTL Lenders within ten (10) business days;

(xx)   the Effective Date has not occurred by the date that is two hundred and ten (210) days after the Commencement Date; or

(xxi)   a Company Termination Event, an Apache Termination Event or a DIP Commitment Parties Termination Event has occurred and has not been waived or tolled after any applicable cure period.

(f)   A "Consenting SLTL Lenders Termination Event" shall mean any of the following:

(i)   the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of ten (10) business days after the receipt of written notice which breach adversely affects the treatment of the Consenting SLTL Lender under the Plan and remains uncured for a period of ten (10) days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof;

(ii)   the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to materially adversely impact the Consenting SLTL Lender;

(iii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iv)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) that has a material and adverse impact on the rights or treatment of the Consenting SLTL Lender in this Agreement.

(g)      Mutual Termination.  This Agreement may be terminated by mutual agreement of the Company, Apache and the Requisite FLTL Lenders upon the receipt of written notice delivered in accordance with Section 21 hereof.

(h)      Effect of Termination.  Subject to the proviso contained in Section 7(a) hereof, upon the termination of this Agreement in accordance with this Section 7, and except as provided in Section 15 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon a termination of this Agreement, each Consenting Creditor and Apache may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement. If this Agreement has been terminated as to any Consenting Creditor or Apache in accordance with Section 7 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor or Apache to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 14 hereof.

(i)      If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 8.      **Definitive Documents; Good Faith Cooperation; Further Assurances**.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Restructuring, including the Plan, as well as the negotiation, drafting, execution and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

WEIL:\97578907\3\45327.0005
#93462797v19

9.    **Representations and Warranties**.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner, or has validly executed unsettled trades, of the principal amount of each Loan set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other loans, and/or (ii) has, with respect to the beneficial owners of such Loans, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign and transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in <u>Section 22</u> hereof, in each case, to the other Parties.

(d)     The Company represents and warrants that, as of the date hereof, Parent has no assets, other than its ownership of 100% of the Capital Stock of FWE or as set forth in its governing documents, and no material liabilities, other than its obligations as a guarantor under the Company's current letters of credit facility, and is not a party to, or beneficiary under, any agreements, contracts, licenses, franchises, permits, certificates, approvals or other similar authorizations other than as required by applicable law, rule, or regulation, or which have been entered into with its members or FWE.

**10.**     **Disclosure; Publicity**.

The Company shall submit drafts to Consenting Party Counsel and Apache Counsel of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all the Consenting Creditors, collectively, on a facility by facility basis.  Notwithstanding the provisions in this Section 10, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

**11.**     **Amendments and Waivers**.

(a)     Other than as set forth in Section 11(b), this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company, the Requisite FLTL Lenders, the Requisite DIP Commitment Parties, the Requisite SLTL Lenders (solely to the extent such amendments, modifications and supplements materially and adversely affect any rights under this Agreement of the Consenting SLTL Lenders, and such consent not to be unreasonably withheld, conditioned or delayed) and Apache (solely to the extent such amendments, modifications and supplements relate to the Fieldwood I structure outlined in the Apache Term Sheet or the economic terms  applicable thereto, not to be unreasonably withheld, conditioned or delayed).

(b)     Notwithstanding Section 11(a):

(i)     any change, modification or amendment to this Section 11 shall require the written consent of all of the Parties directly and adversely affected thereby;

(ii)     any change, modification or amendment to the definition of "Requisite DIP Commitment Parties", "Requisite DIP Backstop Parties", "Requisite FLTL Lenders",

"Requisite SLTL Lenders" shall require the written consent of each individual Consenting Creditor, DIP Commitment Party or DIP Backstop Party included in such definition;

(iii)    any change, modification or amendment to this Agreement that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Company and the recoveries contemplated by the Restructuring Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)    (a) any change, modification, or amendment to **Exhibit D** hereto that affects the rights or obligations of any DIP Backstop Party shall require the consent of such DIP Backstop Party and (b) any change, modification, or amendment of the interest rate or fees set forth in the DIP Term Sheet or the amount of the Backstop Fee payable pursuant to Section 3(h) shall require the consent of each DIP Backstop Party and, if such consent is withheld, the commitment of any DIP Backstop Party to provide (or cause to be provided) its portion of the DIP Facility may be terminated by such DIP Backstop Party; provided that any portion of such commitment that has been terminated in accordance with the foregoing clause (b) may be reallocated amongst the group of DIP Backstop Parties who otherwise consent to such change in accordance with Section 3(g), with the consent of such remaining DIP Backstop Parties.

(c)    In the event that an adversely affected Consenting Creditor ("*Non-Consenting Creditor*") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors (i) owning at least 66⅔% of the outstanding relevant Claims of the applicable Class of which such Non-Consenting Creditor is a member, and (ii) representing at least a majority in number of claimants in such Class, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other members of the Consenting Class who have so consented.

## 12.    **Effectiveness**.

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors in a redacted form that removes the details of such Consenting Creditors' holdings and (b) the Company, Weil, Consenting Party Counsel in an unredacted form (to be held by Weil and Consenting Party Counsel on a professionals' eyes only-basis).

## 13.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to any

31

principles of conflicts of law thereunder that would result in the application of the laws of any other jurisdiction.

(b)     Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**14.     Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not

seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

15.     **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15, and Sections 7(j), 10, 12, 13, 14, 16, 17, 18, 19, 20, 21 and 22 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.     **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.     **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.     **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.     **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

20.     **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

21.     **Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)     If to the Company, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  Michael Dane and Thomas R. Lamme

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Matt Barr, Esq.
             (matt.barr@weil.com)
             -and-
             Jessica Liou, Esq.
             (jessica.liou@weil.com)

(2)     If to Apache, to:

Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400

Attention:   Anthony Lannie and Brett Cupit

With a copy to:

Hunton Andrews Kurth LLP
600 Travis
Suite 4200
Houston, Texas 77002
Attention: Robin Russell, Esq.
             (rrussell@huntonak.com)

WEIL:\97578907\3\45327.0005
#93462797v19

-and-
Catherine Diktaban
(cdiktaban@huntonak.com)

(3)      If to the Consenting FLTL Lenders, or a transferee thereof, to the addresses set forth below such Consenting FLTL Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:   Damian Schaible, Esq.
                   (damian.schaible@davispolk.com)
                   -and-
                   Natasha Tsiouris, Esq.
                   (natasha.tsiouris@davispolk.com)

(4)      If to Cantor Fitzgerald Securities, the administrative agent and collateral agent for the Prepetition FLTL Lenders, to:

Shipman & Goodwin LLP
400 Park Ave - 5th Floor
New York, NY 10022
Attention:   Nathan Plotkin
                   (Nplotkin@goodwin.com)

(5)      If to Cortland Capital Market Services LLC, the administrative agent and collateral agent for the Prepetition SLTL Lenders, to:

Holland & Knight LLP
150 N Riverside Plaza
Chicago, IL 60606
Attention:   Joshua Spencer
                   (Joshua.Spencer@hklaw.com)
                   Anasthasia Sotiropolous
                   (Anastasia.Sotiropoulos@hklaw.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

## 22.   **Conflicts**.

In the event the terms and conditions set forth in the Restructuring Term Sheet and in this Agreement are inconsistent, this Agreement shall control.  In the event the terms and conditions set forth in the Apache Term Sheet and in this Agreement are inconsistent, the Apache Term Sheet shall control.  In the event of any conflict among the terms and provisions of this Agreement, the

35

Restructuring Term Sheet and the DIP Orders, the terms and provisions of the DIP Orders shall control. In the event of any conflict among the terms and provisions of this Agreement, the Restructuring Term Sheet and the Sale Documents, the terms and provisions of the Sale Documents shall control. Upon execution of the Definitive Documents, in the event of any conflict among the terms and provisions thereof and of this Agreement or the Restructuring Term Sheet, the applicable Definitive Document shall control. Upon execution of the Apache Definitive Documents, in the event of any conflict among the terms and provisions thereof and of this Agreement, the Apache Term Sheet, the Plan or the Confirmation Order, the applicable Apache Definitive Document shall control. Notwithstanding the foregoing, nothing contained in this Section 22 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement.

23. **No Solicitation; Representation by Counsel; Adequate Information**.

(a) This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Creditors. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b) Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c) Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring Transactions, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

36

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**FIELDWOOD PARTIES**

**FIELDWOOD ENERGY LLC**

By: Fieldwood Energy Inc., its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY INC.**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**FIELDWOOD ENERGY OFFSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD ONSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD SD OFFSHORE LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD OFFSHORE LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., its managing member

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title:   Senior Vice President and General Counsel

**DYNAMIC OFFSHORE RESOURCES NS, LLC**

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title:   Vice President

**FW GOM PIPELINE, INC.**

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title:   Vice President

**GOM SHELF LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., it managing member

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title:   Senior Vice President and General Counsel

**BANDON OIL AND GAS GP, LLC**

By: _Thomas R. Lamme_
Name: Thomas R. Lamme
Title:   Vice President

**BANDON OIL AND GAS, LP**

By: Bandon Oil and Gas, LLC, its general partner

By: _____

Name:  Thomas R. Lamme

Title:   Vice President

**FIELDWOOD ENERGY SP LLC**

By: _____

Name:  Thomas R. Lamme

Title:   Vice President

**GALVESTON BAY PIPELINE LLC**

By: Fieldwood Onshore LLC, its managing member

By: _____

Name:  Thomas R. Lamme

Title:   Vice President

**GALVESTON BAY PROCESSING LLC**

By: Fieldwood Onshore LLC, its managing member

By: _____

Name:  Thomas R. Lamme

Title:   Vice President

**APACHE**

**APACHE CORPORATION**

By:

Name:   P. Anthony Lannie
Title:   Executive Vice President and General Counsel

**[Lender signature pages intentionally omitted]**

## SCHEDULE 1

### Restructuring Subsidiaries

| |
|---|
| Dynamic Offshore Resources NS, LLC |
| Fieldwood Energy LLC |
| Fieldwood Energy Inc. |
| Fieldwood Energy Offshore LLC |
| Fieldwood Onshore LLC |
| Fieldwood SD Offshore LLC |
| Fieldwood Offshore LLC |
| FW GOM Pipeline, Inc. |
| GOM Shelf LLC |
| Bandon Oil and Gas GP, LLC |
| Bandon Oil and Gas, LP |
| Fieldwood Energy SP LLC |
| Galveston Bay Pipeline LLC |
| Galveston Bay Processing LLC |

## **EXHIBIT A**

**RESTRUCTURING TERM SHEET**

Attached.

**Restructuring Term Sheet**
**August 3, 2020**

This restructuring term sheet (this "**Term Sheet**") presents the principal terms of a proposed restructuring (the "**Restructuring**") of the existing indebtedness and operations of Fieldwood Energy Inc. ("**Parent**") and certain of its direct and indirect subsidiaries set forth herein, which Restructuring will be consummated on the terms set forth herein.

This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of August 3, 2020, by and among the Company (as defined below) and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**Restructuring Support Agreement**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the Restructuring Support Agreement.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY, EXCEPT AS REQUIRED BY LAW, OR AS PERMITTED UNDER AN EXISTING CONFIDENTIALITY AGREEMENT WITH THE COMPANY.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS TERM SHEET IS INCONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Overview | |
|---|---|
| **Company Entities** | Parent; Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC (collectively, the "**Debtors**" or the "**Company**"). |
| **Restructuring Overview** | |
| **Funded Debt Claims[1] and Equity Interests to be Restructured** | The Company's current capital structure consists of:<br><br>• Prepetition FLFO Loans:  Claims in the aggregate principal amount of approximately $139,000,000.00, plus accrued and unpaid interest, arising under that certain Second Amended and Restated Credit Agreement-First Out, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition FLFO Credit Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition FLFO Credit Agreement and related documents, the "**FLFO Claims**") among Parent, Fieldwood Energy LLC, as borrower, Goldman Sachs Bank USA, as administrative agent (the "**Prepetition FLFO Administrative Agent**"), Cantor Fitzgerald Securities ("**Cantor**"), as collateral agent (in its capacity as such, the "**Prepetition FLFO Collateral Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**Prepetition FLFO Lenders**").<br><br>• Prepetition FLTL Loans:  Claims in the aggregate principal amount of approximately $1,143,000,000.00, plus accrued and unpaid interest, arising under  that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition FLTL Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition FLTL Credit Agreement and related documents, the "**FLTL Claims**"), among Parent, Fieldwood Energy LLC, as borrower, Cantor, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Agent**"), and the Lenders (as defined therein) party thereto from time to time holding the Prepetition First Lien Term Loans (the "**Prepetition FLTL Lenders**").<br><br>• Prepetition SLTL Loans:  Claims in the aggregate principal amount of approximately $518,000,000.00, plus accrued and unpaid interest, that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition SLTL Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition SLTL Credit Agreement and related documents, the "**SLTL Claims**"), among |

---

[1] "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

2

| | |
|---|---|
| | Parent, Fieldwood Energy LLC, as borrower, Cortland Capital Market Services, LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**Prepetition SLTL Lenders**").<br><br>• DB Receivables Claims:  Any Claims arising under that certain Master Receivables Purchase Agreement, dated as of December 23, 2019, among Fieldwood Energy LLC, as originator, FW FinCo LLC, as seller, Deutsche Bank AG New York Branch, as administrative agent, and Deutsche Bank Trust Company Americas, as a purchaser ("**DB**," such facility, the "**DB Receivables Facility**" and such Claims, the "**DB Receivables Claims**").<br><br>• Existing Equity Interests:  Existing Interests[2] in Parent (the "**Existing Equity Interests**"). |
| **Implementation** | As set forth herein, the Restructuring shall be implemented through one of, or a combination of, the following options subject to all consent rights of the applicable Consenting Creditors under the Restructuring Support Agreement: (i) a standalone asset sale or sales pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), (ii) a sale or sales or conveyance, disposition or other transfer pursuant to the Plan and/or (iii) an equitization transaction pursuant to the Plan, in each case, in chapter 11 cases to be commenced by the Debtors in the United States Bankruptcy Court for the Southern District of Texas (the "**Chapter 11 Cases**"). |
| **DIP Financing** | The Restructuring will be financed by (i) cash on hand, (ii) use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), and (iii) a postpetition senior secured superpriority debtor-in-possession credit facility (the "**DIP Facility**") on terms and conditions acceptable to the Company and the Requisite DIP Commitment Parties and consistent with the term sheet annexed hereto as **Exhibit A** (the "**DIP Term Sheet**"). |
| **Separation of Assets** | The Restructuring may include the following transactions:<br><br>1. **Specified Assets:**  As determined and agreed by the Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders, through conveyance(s) or divisional merger(s), the transfer or other disposition of all or substantially all of the Specified Assets to one or more purchasers or a new entity ("**Lender NewCo**") to be formed at the direction of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders through (i) a standalone sale or sales pursuant to section 363 of the Bankruptcy Code either via a credit bid or otherwise, (ii) a sale or sales |

---

[2] "**Interest**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

WEIL:\97482252\28\45327.0005<br>#93480605v12

<table>
<tr><td></td><td>

pursuant to a Plan either via a credit bid or otherwise, or (ii) an equitization transaction pursuant to a Plan.

2. **Fieldwood I**:  Through conveyance(s) and/or divisional merger(s), the separation of the assets conveyed by Apache Corporation ("**Apache**") pursuant to the Purchase and Sale Agreement dated as of July 18, 2013 ("**PSA**") (and as further specified in the Apache Term Sheet, excluding any assets sold, assigned, used, decommissioned, or otherwise disposed of by the Company to third parties, collectively, the "**Legacy Apache Properties**") into a limited liability company, business trust or other bankruptcy remote vehicle ("**Fieldwood I**") or as otherwise reasonably agreed by Apache, the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders.  The terms of the Apache Definitive Documents implementing such separation shall be consistent with the Apache Term Sheet (as defined below) and shall be subject to the consent rights of the Requisite DIP Commitment Parties and Requisite FLTL Lenders set forth in the Restructuring Support Agreement.

3. **Non-APA Remaining Assets**: As determined and agreed by the Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders, through conveyance(s) and/or  divisional merger(s), the separation or disposition of assets conveyed by non-Apache predecessors–in-title, co-lessees or joint working interest owners (collectively, the "**Non-APA Owners**") other than the Specified Assets and Legacy Apache Properties (such remaining assets, the "**Non-APA Remaining Assets**") and the related liabilities  into one or more limited liability companies, business trusts or other bankruptcy remote vehicles, or through any conveyance, disposition or other transfer made in accordance with the Bankruptcy Code.

"**Reorganized Fieldwood**" means the entity or entities that post-Effective Date[3] may directly or indirectly hold all or a portion of the Specified Assets, Fieldwood I, and/or Non-APA Remaining Assets.

The (i) allocation of Company assets among the Specified Assets, Legacy Apache Properties and the Non-APA Remaining Assets and (ii) determination of the corporate structure of Reorganized Fieldwood and Lender NewCo remains subject to further diligence, the Apache Term Sheet and the consent rights set forth in the Restructuring Support Agreement.

The Company shall pursue the necessary regulatory approvals of the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**") with respect to each of the above transactions.

</td></tr>
<tr><td>

**Specified Assets Sale Process**

</td><td>

The Company shall continue postpetition to conduct the marketing and sale process for certain of the Specified Assets initiated prepetition.

</td></tr>
</table>

---

[3] "**Effective Date**" means the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

WEIL:\97482252\28\45327.0005
#93480605v12

| | |
|---|---|
| | The Specified Assets Sale shall be conducted in accordance with the Milestones, Sale Documents and other terms and consent rights set forth in the Restructuring Support Agreement. |
| **Equitization Transaction for Specified Assets** | With the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Company may seek to consummate a transaction pursuant to a Plan equitizing debt in exchange for ownership of the equity of any of Reorganized Fieldwood or another transaction as agreed to by Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders (the "**Equitization Transaction**"). <br><br> The Company and the Ad Hoc Group of Secured Lenders shall discuss a new money investment by certain of the FLTL Lenders in Reorganized Fieldwood (the "**New Money Investment**"); provided that, this Term Sheet does not bind any party to make the New Money Investment. |
| **Treatment of Fieldwood I** | Fieldwood I and the Legacy Apache Assets shall be treated in accordance with the term sheet annexed hereto as **Exhibit B** (the "**Apache Term Sheet**"), subject to the consent rights set forth in the Restructuring Support Agreement. |
| **Treatment of Claims and Interests** | |
| **Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed[4] Administrative Expense Claim,[5] Allowed Priority Tax Claim,[6] and Allowed Priority Non-Tax Claim[7] agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims** | Allowed Claims arising under the DIP Facility (the "**DIP Claims**") shall (i) be paid in full in Cash on the Effective Date, (ii) if acceptable to the Requisite DIP Commitment Parties, converted into a new loan facility or other securities issued at Lender NewCo in form and on terms acceptable to the Company and the Requisite DIP Commitment Parties, or (iii) shall receive such other treatment acceptable to the Company and the Requisite DIP Commitment Parties. |
| **Other Secured Claims** | On or as soon as practicable after the Effective Date, to the extent any other secured claims exist (exclusive of the FLFO Claims, the FLTL Claims, and the SLTL |

---

[4] "**Allowed**" means, with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

[5] "**Administrative Expense Claims**" means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors and (b) Professional Fee Claims.

[6] "**Priority Tax Claim**" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

[7] "**Priority Non-Tax Claim**" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim, (ii) a Priority Tax Claim, or (iii) a DIP Claim.

WEIL:\97482252\28\45327.0005
#93480605v12

| | |
|---|---|
| *Unimpaired, Presumed to Accept* | Claims, the "**Other Secured Claims**"), except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder thereof shall be satisfied by either (i) payment in full in Cash or (ii) such other treatment necessary to satisfy section 1124 of the Bankruptcy Code. |
| **DB Receivable Claims** <br><br> *[Voting TBD]* | Unless previously terminated by DB, on the Effective Date, the DB Receivables Facility shall either be (i) replaced on terms to be mutually agreed upon between the Company, DB and the Requisite FLTL Lenders and Requisite DIP Commitment Parties, (ii) reinstated in accordance with section 1124 of the Bankruptcy Code, or (iii) terminated in accordance with its terms. |
| **FLFO Claims** <br><br> *[Voting TBD]* | Treatment of Allowed FLFO Claims to be agreed between the Company and the Prepetition FLFO Lenders and subject to the consent of the Requisite FLTL Lenders and Requisite DIP Commitment Parties. |
| **FLTL Claims** <br><br> *Impaired, Entitled to Vote* | Treatment of Allowed FLTL Claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **SLTL Claims** <br><br> *Impaired, Entitled to Vote* | Treatment of Allowed SLTL Claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **General Unsecured Claims** <br><br> *[Impaired, Voting TBD]* | Treatment of Allowed general unsecured claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Intercompany Claims** <br><br> *Impaired and Deemed to Reject / Unimpaired and Presumed to Accept* | All Intercompany Claims[8] shall be adjusted, settled, reinstated, discharged, or eliminated as determined by the Debtors with the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Intercompany Interests** <br><br> *Impaired and Deemed to Reject / Unimpaired and Presumed to Accept* | All Intercompany Interests[9] shall be adjusted, settled, reinstated, discharged, or eliminated as determined by the Debtors with the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Existing Equity Interests** <br><br> *Impaired, Deemed to Reject* | Treatment of Existing Equity Interests to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Subordinated Securities Claims** <br><br> *Impaired, Deemed to Reject* | Holders of Subordinated Securities Claims[10] shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |

---

[8] "**Intercompany Claims**" shall mean any Claim held by a Debtor against another Debtor arising before the Commencement Date.

[9] "**Intercompany Interests**" means any Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude equity interests of Parent.

[10] "**Subordinated Securities Claim**" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

6

| Governance/Employee Matters | |
|---|---|
| **Key Employee Retention Program ("KERP") and Key Employee Incentive Program ("KEIP")** | KERP:   The Company may implement a KERP for certain employees on substantially the terms previously agreed to with the Prepetition FLFO Lenders and the Requisite FLTL Lenders.<br><br>KEIP:   During the pendency of the Chapter 11 Cases, the Debtors may seek Bankruptcy Court approval of a KEIP for certain employees on terms to be mutually agreed upon between the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **New Board** | The initial board of directors of Lender NewCo, or if an Equitization Transaction is consummated, Reorganized Fieldwood (the "**New Board**"), shall consist of 7 members, 2 of which shall be appointed by Invesco Senior Secured Management, Inc., 1 of which shall be appointed by Franklin Advisers, Inc., 1 of which shall be appointed by Symphony Asset Management LLC, 2 of which shall be appointed by the Requisite FLTL Lenders, and 1 of which shall be the Chief Executive Officer. |
| **Management Incentive Plans** | The terms of a post-emergence management incentive Plan for Reorganized Fieldwood to be mutually agreed upon between the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| General Provisions | |
| **Compromise and Settlement** | The Plan shall contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Treatment of Executory Contracts and Unexpired Leases** | The Debtors shall seek to assume or reject executory contracts and unexpired leases with the consent of the Requisite DIP Commitment Parties and the consent of the Requisite FLTL Lenders. |
| **Conditions Precedent to Effective Date** | Effectiveness of the Plan shall be subject to the satisfaction of customary conditions, including, without limitation, the following (as applicable):<br><br>a.  The Definitive Documents shall be consistent with the Restructuring Support Agreement and otherwise acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement.<br><br>b.  the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect; |

7

|  | c. The Bankruptcy Court shall have entered the Confirmation Order,[11] which order shall be a Final Order; and<br><br>d. All governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained or otherwise waived.<br><br>The conditions to effectiveness may be waived, in whole or in part, by the Debtors with the prior written consent of the Requisite FLTL Lenders and the Requisite DIP Commitment Parties. |
|---|---|
| **Releases** | The Plan will contain debtor releases and third-party releases, mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Exculpation** | The Plan shall contain standard and customary exculpation provisions mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Injunction** | The Plan shall contain standard and customary injunction provisions mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Definitive Documentation** | This Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents. All organizational and governance documents, including any shareholders agreement or registration rights agreements, if any, (in each case, which will include customary minority protections) and exit financing documents shall be in form and substance acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement. |
| **Regulatory Approvals** | All of the terms set forth herein shall be subject to applicable regulatory approvals, including from BOEM and BSEE, as applicable. |
| **Exemption from SEC Registration** | The issuance and distribution of new securities under the Plan, if any, will be issued in reliance on the exemption from registration under the Securities Act or applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or any other applicable exemption therefrom, subject to applicable diligence. |
| **Tax Structure** | The terms of the Plan and the transactions contemplated therein shall be structured in a tax efficient manner as to the Debtors and the Requisite DIP Commitment Parties and Requisite FLTL Lenders to the extent reasonably practicable. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the Restructuring Support Agreement. |

---

[11] "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

WEIL:\97482252\28\45327.0005
#93480605v12

**Exhibit A to Restructuring Term Sheet**

**DIP Term Sheet**

**FIELDWOOD ENERGY LLC**
**DIP FACILITY TERM SHEET**

This term sheet (the "**DIP Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession credit facility (the "**DIP Facility**") and consent to use of the Prepetition Collateral (as defined below).  The DIP Credit Agreement (as defined below) evidencing the DIP Facility shall be entered into with the DIP Facility Borrower (as defined below), certain of its subsidiaries, and Fieldwood Energy Inc. in connection with their respective cases under chapter 11 (the "**Chapter 11 Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**").  The DIP Facility and the Debtors' use of Prepetition Collateral will be subject to the approval of the Bankruptcy Court (as defined below) and consummated in the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") in accordance with (i) the Interim DIP Order (as defined below) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility and use the Prepetition Collateral on an interim basis prior to entry of the Final DIP Order, (ii) the Final DIP Order (as defined below) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility on a final basis and (ii) the DIP Documents (as defined below) to be executed by the Debtors.  Capitalized terms used and not defined in this DIP Facility Term Sheet shall have their respective meanings as defined in the Restructuring Support Agreement to which this DIP Facility Term Sheet is attached (the "**Restructuring Support Agreement**").

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Facility Borrower** | Fieldwood Energy LLC, as a debtor and debtor-in-possession (the "**DIP Facility Borrower**"). |
| **Guarantors** | Fieldwood Energy Inc. and each subsidiary of the DIP Facility Borrower that is a Debtor, each as a debtor and debtor-in-possession (the "**Guarantors**" and, together with the DIP Facility Borrower, the "**Loan Parties**"), it being understood and agreed that each subsidiary of the DIP Facility Borrower that is an obligor under any of the Prepetition Facilities (as defined below) shall be a Guarantor. |
| **DIP Facility Agent** | Cantor Fitzgerald Securities ("**Cantor**"), as administrative agent and collateral agent (in such capacities, the "**DIP Facility Agent**"). |
| **DIP Lenders** | The entities specified on Exhibit D to the Restructuring Support Agreement, each of which is a lender (or manages funds or other entities that are lenders) under the Prepetition FLTL Credit Agreement (as defined below) on the Petition Date (as defined below), or an affiliate or related fund that is a designee of any of the foregoing, as lenders under the DIP Facility (in such capacities, together with their successors and permitted assigns, collectively, the "**DIP Lenders**").

On the Closing Date (as defined below), the Initial DIP Loan (as defined below) will be made, and all DIP Commitments (as defined below) will be held, by Cantor or another initial DIP Lender as determined by the Requisite DIP Backstop Parties.  The Initial DIP Loan will be assigned among the DIP Lenders in accordance with their allocated commitments after the Closing Date. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession US dollar term loan credit facility in an aggregate principal amount not to exceed $100 million (the commitments under the DIP Facility, the "**DIP Commitments**"; the loans under the DIP Facility, the "**DIP Loans**"), subject to the terms and conditions of this DIP Facility Term Sheet and the DIP Documents.  The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and any DIP Loans repaid may not be reborrowed. |

| | |
|---|---|
| | Upon the Bankruptcy Court's entry of the Interim DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower shall make an initial draw of DIP Loans in an aggregate amount equal to $10,000,000 (the "**Initial DIP Loan**").  Thereafter, upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower may make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive Documents (such date, the "**APA Milestone Satisfaction Date**") in an aggregate amount equal to $15,000,000 (the "**Incremental DIP Loan**").  For the avoidance of doubt, the amount of DIP Loans that may be made prior to the entry of the Final DIP Order shall not exceed $25,000,000. |
| | Subject to the Bankruptcy Court's entry of the Final DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent (excluding, for the avoidance of doubt, the occurrence of the APA Milestone Satisfaction Date solely in respect of the Incremental DIP Loan), the DIP Facility Borrower may make up to 5 additional draws of DIP Loans on any date prior to the DIP Termination Date (as defined below), each in an aggregate amount equal to $20,000,000 (*provided* that such amount may be less than $20,000,000 if such amount represents either the Incremental DIP Loan or all remaining availability under the DIP Facility). The DIP Commitments will automatically terminate on the earlier of the DIP Termination Date and the date on which any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor is confirmed. |
| **Use of Proceeds** | Solely to (i) make payments for general corporate or working capital purposes in a manner consistent with the then current Approved Budget (as defined below) (subject to any permitted variance), (ii) pay required debt service on the DIP Loans, (iii) pay the fees, costs and expenses of the DIP Facility Agent and the DIP Lenders, (iv) pay fees and expenses of professionals associated with the Chapter 11 Cases and (v) provide Adequate Protection (as defined below). No part of the proceeds of the DIP Loans may be used by the DIP Facility Borrower or any other Loan Party, whether directly or indirectly, in a manner contrary to the DIP Orders. |
| **DIP Termination Date** | The earliest of (i) the date falling 12 months after the commencement of the Chapter 11 Cases (such commencement date, the "**Petition Date**"), (ii) the effective date of any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all (x) assets or (y) Specified Assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the DIP Loans and termination of the DIP Commitments upon and during the continuance of an event of default under the DIP Facility and (v) 45 days after the Petition Date (or such later date as agreed to by the Required DIP Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date  (such earliest date, the "**DIP Termination Date**"). |
| **Interest Rate** | LIBOR + 8.75% per annum, or ABR + 7.75%, in each case payable monthly in cash. |
| | During the continuance of an event of default, all overdue amounts under the DIP Facility will bear interest at a rate equal to (i) in the case of principal, 2.00% per annum, <u>plus</u> the otherwise applicable rate or (ii) in the case of any obligations other than principal, the then applicable rate for ABR DIP Loans plus 2.00% per annum, which in each case shall be payable on demand from time to time. |
| **LIBOR Floor** | 1.00% |

2

| | |
|---|---|
| **Amortization** | None. |
| **Mandatory Prepayments** | Subject to the terms of the DIP Orders, mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted indebtedness) and (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions, minimum liquidity thresholds and other thresholds to be agreed). |
| **Voluntary Prepayments** | Amounts outstanding under the DIP Facility may be voluntarily repaid at any time without premium or penalty. |
| **Interim DIP Order** | The interim order approving the DIP Facility and the Debtor's use of Prepetition Collateral, which shall be in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Interim DIP Order**"), shall, among other things, authorize and approve (i) the full amount of the DIP Commitments and the borrowing and making of the DIP Loans in an amount up to $100 million, (ii) the DIP Facility Borrower to draw the Initial DIP Loan, (iii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Facility Term Sheet and the DIP Documents, (iv) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Facility Agent and the DIP Lenders as described in "Fees and Expenses Indemnification" by the Debtors, in the case of expenses incurred on or prior to the Closing Date, to the extent invoiced at least two business days prior to the Closing Date (or any later date reasonably acceptable to the DIP Facility Borrower), (v) the use of cash collateral, *provided* that the Adequate Protection (as defined below) shall be granted in accordance with the terms set forth in this DIP Facility Term Sheet and (vi) the payment of the Upfront Fees and the Backstop Fees (each as defined below), which payment shall not be subject to reduction, setoff or recoupment. |
| **Final DIP Order** | The final order approving the DIP Facility, which shall be substantially in the same form as the Interim DIP Order (with such modifications as are necessary to convert the Interim DIP Order into a final order) and in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall, among other things, authorize and approve the DIP Facility Borrower to draw the full amount of the DIP Commitments. |
| **Prepetition Facilities** | "**Prepetition FLFO Credit Agreement**" – that certain Second Amended and Restated Credit Agreement- First Out, dated as of June 28, 2019, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Goldman Sachs Bank USA, as administrative agent (the "**Prepetition FLFO Agent**"), the Lenders and Issuing Banks (each as defined therein) party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and the "Secured Parties" thereunder the "**Prepetition FLFO Secured Parties**." <br><br> "**Prepetition FLTL Credit Agreement**" – that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Cantor Fitzgerald Securities as administrative agent (the "**Prepetition FLTL Agent**"), the lenders party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, including by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended prior to the date hereof, the "**Prepetition FLTL Forbearance Agreement**")), and the "Secured Parties" thereunder the "**Prepetition FLTL Secured Parties**". |

|  | "**Prepetition SLTL Credit Agreement**" – that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Cortland Capital Market Services LLC, as administrative agent and collateral agent, the lenders party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and the "Secured Parties" thereunder the "**Prepetition SLTL Secured Parties**" (the Prepetition SLTL Secured Parties, together with the Prepetition FLTL Secured Parties and Prepetition FLFO Secured Parties, the "**Prepetition Secured Parties**").<br><br>Collectively, the agreements described above are referred to herein as the "**Prepetition Credit Agreements**," and the secured obligations thereunder, collectively, the "**Prepetition Secured Obligations**" and all "Collateral" securing such Prepetition Secured Obligations, the "**Prepetition Collateral**". |
|---|---|
| **Apache Decommissioning Agreement** | "**Apache Decommissioning Agreement**" – that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache Corporation, a Delaware corporation ("**APA**"), Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), Apache Shelf Exploration LLC, a Delaware limited liability company ("**ASE**"), the DIP Facility Borrower and GOM Shelf LLC (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and ASE together with APA, APSH and APDW, the "**Apache Secured Parties**". |
| **DIP Collateral** | Substantially all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests owned by the Loan Parties in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries (other than FW Finco, LLC), with limitations on the pledge of equity or other interests in foreign subsidiaries consistent with the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein), investment property (including securities accounts and commodity accounts), instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding (i) any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof, and (ii) the Trust A NPI, the Trust A-1 NPI, the Trust A Account, any interest in Trust A, the Permitted Surety Bonds or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) (the collateral described in clause (ii), the "**Apache Collateral**") (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility, the "**DIP Liens**"). The Debtors agree that the DIP Credit Agreement shall provide for the negative pledges set forth in <u>Section 4(f)</u> the Prepetition FLTL Forbearance Agreement as in effect during the "Restriction Period" (as defined therein) and shall obtain the collateral arrangements and negative pledges set forth in <u>Section 6(a)(iii)</u> of the Prepetition FLTL Forbearance Agreement (subject to any limitations under applicable law). |
| **Priority Under the DIP Facility** | All obligations of the DIP Facility Borrower and the Guarantors to the DIP Lenders and to the DIP Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times: |

4

(a)  be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party;

(b)  be secured by a perfected first priority security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions) *pari passu with* valid and perfected liens in favor of hedge counterparties in connection with secured hedging transactions entered into by the Debtors on a post-petition basis in accordance with the DIP Credit Agreement;

(c) except as otherwise provided below with respect to the existing liens of the Prepetition Secured Parties and Apache Secured Parties, be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (i) valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreements, (ii) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "**Permitted Prior Liens**"), subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral (which DIP Collateral, for the avoidance of doubt, excludes the Apache Collateral) of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations of the Prepetition Secured Parties and the obligations of the Apache Secured Parties.

The "**Carve-Out**" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, and (iii) to the extent allowed by the Bankruptcy Court at any time, and whether allowed before or after delivery of a Trigger Notice, (A) all allowed and unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtors is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $5,000,000, of professionals retained by the Debtors (the "**Carve-Out Cap**"), in each case subject to the limits imposed by the DIP Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party.

"**Trigger Notice**" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that is alleged to continue under the DIP Documents (or, after the payment in full of the DIP Obligations, delivered by the administrative agents under the Prepetition Credit Agreements (the "**Prepetition Agents**") describing the reason for termination of the use of cash collateral); *provided* that under no circumstances shall any success, completion or similar fee be payable from the Carve-Out following delivery of a Trigger Notice.

For the avoidance of doubt, the DIP Liens shall not be secured by the Apache Collateral nor prime any unavoidable, valid and properly perfected lien existing as of the Petition Date in respect of the Apache Collateral.

| Adequate Protection | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors, the Prepetition Secured Parties, and the DIP Lenders agree, subject to Bankruptcy Court approval of the Interim DIP Order, to the following forms of adequate protection (the "**Adequate Protection**"): |
|---|---|

<div style="margin-left:2em">

Prepetition FLTL Secured Parties:

(a) all accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to Davis Polk & Wardwell LLP, as primary outside legal counsel, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, as regulatory legal counsel, Haynes and Boone, LLP, as local legal counsel, and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors for the Prepetition FLTL Secured Parties and Shipman & Goodwin LLP, as primary legal counsel for the Prepetition FLTL Agent (the foregoing, collectively, the "**FLTL Advisors**");

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLTL Agent, including all such fees and expenses of the FLTL Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure FLTL Secured Party Adequate Protection Claims (as defined below) (the "**FLTL Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLFO Secured Party Adequate Protection Liens (as defined below);

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLTL Secured Party Adequate Protection Claims**");

(e) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility;

(f) the FLTL Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLTL Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLTL Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, Prepetition FLTL Secured Parties and Prepetition FLFO Secured Parties collectively holding greater than 50% of the sum of the outstanding principal amount of the loans under the Prepetition FLTL Credit Agreement plus the outstanding principal amount of the loans under the Prepetition FLFO Credit Agreement the "Required AP Secured Parties"); and

(g) Any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets shall be deemed to reduce dollar-for-dollar the value of the DIP Collateral that is not Prepetition Collateral until such value is zero and thereafter shall reduce the value of the remaining DIP Collateral.

</div>

Prepetition FLFO Secured Parties:

(a) all accrued and unpaid reasonable and documented fees and disbursements incurred prior to the Petition Date owed to Vinson & Elkins LLP, as primary legal counsel, and Opportune LLP, as financial advisor, for the Prepetition FLFO Agent (the foregoing, collectively, the "**FLFO Advisors**");

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLFO Agent, including all such fees and expenses of the FLFO Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, current payment in cash of post-petition interest at the non-default interest rate provided in the Prepetition FLFO Credit Agreement (based on the "LIBOR" rate, as provided in the Prepetition FLFO Credit Agreement);

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the FLFO Secured Party Adequate Protection Claims (as defined below) (the "**FLFO Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLTL Secured Party Adequate Protection Liens;

(e) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLFO Secured Party Adequate Protection Claims**");

(f) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility; and

(g) the FLFO Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLFO Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLFO Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, the Required AP Secured Parties).

Prepetition SLTL Secured Parties:

(a) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility.

In addition, the Interim DIP Order shall provide for customary prepetition secured lender protections, including, but not limited to, (i) the right to seek additional forms of adequate protection, (ii) provision that any payments received as Adequate Protection shall be free and clear of all liens and claims, (iii) effective upon entry of the Interim DIP Order, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code, and the equitable doctrine of marshaling (subject to modification under the Final DIP Order with respect to the period following entry of the Final DIP Order), (iv) limitations on the use of collateral

7

| | |
|---|---|
| | and (v) stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties.<br><br>For the avoidance of doubt, the FLTL Secured Party Adequate Protection Claims, the FLFO Secured Party Adequate Protection Claims and the SLTL Secured Party Adequate Protection Claims shall in all cases have the same relative priority as the FLTL Secured Party Adequate Protection Liens, the FLFO Secured Party Adequate Protection Liens and the SLTL Secured Party Adequate Protection Liens, respectively. |
| **Milestones** | The DIP Documents shall require compliance with milestones consistent with the "Milestones" (as defined in the Restructuring Support Agreement) to be included in the DIP Credit Agreement. |
| **Events of Default** | Usual and customary for financings of this type. |
| **Conditions Precedent to Closing** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility (which shall include customary closing deliverables in a form and manner to be mutually agreed); (ii) the Petition Date shall have occurred, and the DIP Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) entry of the Interim DIP Order; and (iv) delivery of the Initial Budget (as defined below) acceptable to the Required DIP Lenders in their sole and absolute discretion.  The date on which the closing conditions are satisfied is referred to herein as the "**Closing Date**". |
| **Conditions Precedent to the Extension of each DIP Loan** | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and including, without limitation: (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim DIP Order or the Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders, (iv) with respect to each DIP Loan (other than the Initial DIP Loan or the Incremental DIP Loan), the APA Milestone Satisfaction Date shall have occurred, (v) with respect to each DIP Loan (other than the Initial DIP Loan), (x) Liquidity of less than $50,000,000, prior to giving effect to such borrowing and (y) the DIP Facility Borrower shall, after giving effect to the amount of such borrowing on a pro forma basis, be in pro forma compliance with the minimum Asset Coverage Ratio, and (vi) delivery of a customary notice of borrowing. |
| **Covenants** | Affirmative and negative covenants usual and customary for financings of this type, including, without limitation, to use commercially reasonable efforts to obtain facility ratings from S&P and Moody's within 45 days of the date of the entry of the Final DIP Order and not to enter into any compensation arrangements (or modify any existing compensation arrangements) with senior management of the Company without the prior consent of the Required DIP Lenders (subject to certain exceptions to be agreed). |
| **Financial Covenants** | Minimum Liquidity (as defined below) to be no less than $40,000,000, to be tested twice monthly (the "**Minimum Liquidity Covenant**").<br><br>"**Liquidity**" means, at any time, the sum of (i) unrestricted cash and cash equivalents of the DIP Facility Borrower and its subsidiaries that are Guarantors at such time which are subject to a perfected superpriority DIP Lien (and excluding, for the avoidance of doubt, any cash or cash equivalents that constitute Apache Collateral) and (ii) solely for purposes of determining compliance with the Minimum Liquidity Covenant, the aggregated amount of then unused DIP Commitments. |

#93351493v29

|  | Minimum Asset Coverage Ratio (as defined below) of 2.00 to 1.00, tested as of the last day of each fiscal quarter beginning with the first fiscal quarter (including any partial fiscal quarter) ended after the Closing Date.

"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (a) the PV-10 value of 2P developed reserves[1] of the Specified Assets (which for the avoidance of doubt shall be burdened by the PV-10 of all plugging and abandonment obligations) calculated as determined by the Approved Reserve Report (as defined below) for such date of determination, plus (or minus, as the case may be) the present value of hedges thereof, to (b) the outstanding amount of all DIP Loans as of the such date.

"**Approved Reserve Report**" means a reserve report prepared consistent with the requirements for reserve reports under the Prepetition FLTL Credit Agreement and consistent with requirements under the Securities Exchange Act and the rules promulgated thereunder and using strip prices with the final year of the forward curves held constant and adjusted for basis differentials, it being understood that for any determination as of March 31 or September 30 of any year, numbers will be rolled forward and/or updated for production roll-off and pricing.

Variance covenant, tested as of the last day of each two-week calendar period ending on the Friday immediately preceding the required date of delivery of the applicable Variance Report (as defined below), commencing with the two-week calendar period ended August 14, 2020 (each a "**Test Period**"), requiring in each case for the prior two-week period the positive variance (as compared to the estimated Net Disbursements (as defined below) for such Test Period as set forth in the then current Approved Budget) of actual Net Disbursements during such Test Period not to exceed 7.50%.

"**Net Disbursements**" means disbursements of the type set forth in the line item in the then current Approved Budget entitled "Net Operating Disbursements" and, for the avoidance of doubt, shall exclude disbursements for fees and expenses of professionals related to the Cases.

For purposes of testing the variance covenant, an amount equal to 75% of any negative variance of Net Disbursements against the applicable Approved Budget in any Test Period may be carried forward into the succeeding Test Periods. |
| **Hedging Covenant** | Within 30 days of the entry of the Final DIP Order (or such later date as agreed to by the Required DIP Lenders), enter into and thereafter maintain, hedge agreements with counterparties having a rating of BBB- or Baa3 or better or an investment grade-rated participant with respect to at least 50% (on a barrel of oil equivalent basis) of the aggregate oil and natural gas proved developed producing reserves (based on an Approved Reserve Report adjusted for any permanent shut-in of shelf properties) for the next succeeding 6 months, *provided* that such hedge agreements shall be on terms consistent with the Debtors' historical practices. |
| **Representations** | Representations and warranties usual and customary for financings of this type. |

---

[1] Developed non-producing reserves limited to those that require no capital to produce and will include Katmai, Genovesa, and Troika TA3.

| | |
|---|---|
| **and Warranties** | |
| **Voting** | Amendments and waivers of the DIP Facility will require the approval of DIP Lenders (other than Affiliated DIP Lenders (to be defined in a customary manner to be agreed)) holding more than 50% of the outstanding DIP Commitment and DIP Loans (the "**Required DIP Lenders**"), subject to customary exceptions for certain provisions which shall require the consent of each affected DIP Lender or all DIP Lenders and customary protections for the DIP Facility Agent. |
| **Fees and Expenses Indemnification** | Loan Parties obligated under the DIP Facility shall pay all reasonable and documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Facility Agent and the DIP Lenders, including, without limitation, the actual and documented costs for the seasoning of the DIP Facility (currently estimated to be 0.30% with respect to any funded DIP Loans and 0.10% with respect to any unfunded DIP Commitments), the documented fees and expenses of Davis Polk & Wardwell LLP as primary counsel to the DIP Lenders, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, as regulatory legal counsel for the DIP Lenders, Haynes and Boone, LLP, as local legal counsel for the DIP Lenders, Shipman & Goodwin LLP, as primary counsel to the DIP Facility Agent and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors to the DIP Lenders (collectively, the "**Financial Advisor**"), in each case, associated with the syndication of the DIP Facility and the preparation, negotiation, execution, delivery and administration of the DIP Loan Documents, any amendment or waiver with respect thereto or any enforcement with respect thereto.<br><br>The Loan Parties will indemnify the DIP Facility Agent and DIP Lenders, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except solely for gross negligence, willful misconduct of such indemnified party or willful and material breach by such indemnified party of the DIP Documents to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment. |
| **Upfront Fees** | An upfront fee in an amount equal to 3.00% of the DIP Commitments shall be due and payable to the DIP Lenders in cash on the Closing Date ratably based on their respective DIP Commitments on the Closing Date (the "**Upfront Fee**"). |
| **Backstop Fees** | A backstop fee in an amount equal to 4.00% of the DIP Commitments shall be due and payable to each DIP Lender providing a backstop commitment (a "**DIP Backstop Commitment**") under the Restructuring Support Agreement in respect of the DIP Facility in cash on the Closing Date ratably based on their respective DIP Backstop Commitments on the Petition Date (the "**Backstop Fee**"). |
| **Unused Commitment Fees** | An unused commitment fee equal to 3.00% per annum on the actual daily amount of the unused DIP Commitments shall be paid on a monthly basis to the DIP Lenders in cash ratably based on their respective DIP Commitments. |
| **Financial Reporting** | (a) Initially, a 13-week cash flow forecast delivered on or prior to the Closing Date, in form and substance acceptable to, and consented to by, the Required DIP Lenders (the "**Initial Budget**") and (b) thereafter, a rolling 13-week cash flow forecast delivered on Wednesday of every two-week anniversary of the Closing Date (commencing with the |

#93351493v29


| | |
|---|---|
| | third Wednesday following the Closing Date), in each case, setting forth the DIP Facility Borrower's projected cash receipts and cash disbursements during such 13-week period[2] (each such 13-week cash flow forecast, a "**Budget**").<br><br>Monthly operating reports and monthly income statements shall be required, in each case within the time periods and in a form and covering items consistent with Section 7(d) of the Prepetition FLTL Forbearance Agreement, together with the accompanying officer's certificate described therein.<br><br>The DIP Facility Borrower shall provide to the DIP Lenders a summary report of the Initial Budget, each Budget, each monthly operating report and each monthly income statement concurrently with the delivery thereof to the Financial Advisor, which summary reports shall be consistent with Section 7(e) of the Prepetition FLTL Forbearance Agreement.<br><br>Each Budget which is delivered immediately prior to the expiration of the 13-week period covered by the Initial Budget or any subsequent Approved Budget must be acceptable to the Required DIP Lenders and no such Budget shall be effective as the Updated Covenant Testing Budget (as defined below) until so approved (it being understood that if the Required DIP Lenders have not objected to a proposed Updated Covenant Testing Budget within five business days after delivery thereof, the Required DIP Lenders shall be deemed to have approved such updated Budget). Upon approval or deemed approval of such Budget by the Required DIP Lenders, such Budget shall constitute the "**Updated Covenant Testing Budget**" (and, collectively with the Initial DIP Budget, the "**Approved Budget**").<br><br>A variance report (the "**Variance Report**") delivered bi-weekly, commencing August 19, 2020 and every second Wednesday thereafter, comparing for each applicable Test Period the actual disbursements against anticipated disbursements under the Approved Budget on a line item basis and in the same level of detail as set forth in the Initial Budget, or in a form otherwise reasonably acceptable to the Financial Advisor. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement (the "**DIP Credit Agreement**"), negotiated in good faith, giving due regard to the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) (with such modifications as are (i) set forth herein, (ii) usual and customary for debtor-in-possession financings of this kind and/or otherwise necessary or desirable to effectuate the financing contemplated hereby and/or to reflect the capital structure and operational requirements of the Debtors and the existence and continuance of the Chapter 11 Cases (including customary representations and warranties, covenants and events of default for debtor-in-possession financings of this kind) and (iii) agreed by the DIP Facility Borrower and the DIP Lenders and/or the DIP Facility Agent) and (b) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, guarantees and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary or desirable to effectuate the financing contemplated hereby, negotiated in good faith, giving due regard to the credit |

---

[2] Any weather event and its effects will not be included in the Budget, but the Required DIP Lenders may agree to a modification of the Budget if a weather event occurs.

#93351493v29

|  | documentation entered into in connection with the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) (all of the foregoing, together with the DIP Credit Agreement, collectively, the "**DIP Documents**").  Notwithstanding the foregoing or any other provision hereof, certain "baskets" (including for investments in Fieldwood Mexico B.V.), thresholds (other than with respect to material indebtedness or monetary judgments), grace periods, exceptions and materiality qualifiers under the DIP Credit Agreement shall be substantially consistent with those set forth in the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) or as otherwise agreed by the DIP Lenders. |
|---|---|
| **Assignments and Participations** | Usual and customary for financings of this type. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Miscellaneous** | The DIP Documents will include yield protection provisions usual and customary for financings of this type. |
| **Counsel to DIP Facility Agent** | Shipman & Goodwin LLP. |
| **Primary Counsel to DIP Lenders** | Davis Polk & Wardwell LLP. |

12

**Exhibit B to Restructuring Term Sheet**

**Apache Term Sheet**

# FIELDWOOD ENERGY

*Thomas R. Lamme*
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

**VIA EMAIL**

July 31, 2020

P. Anthony Lannie
Executive Vice President and General Counsel
Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400

*Re:*    *Legacy Apache Properties Term Sheet*

Dear Mr. Lannie:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated July 31, 2020, by and between Fieldwood Energy LLC and certain of its affiliates (collectively, the "**Fieldwood PSA Parties**") and Apache Corporation and certain of its affiliates (collectively, the "**Apache PSA Parties**" and, together with the Fieldwood PSA Parties, the "**Parties**") supporting the restructuring of the portion of the Fieldwood PSA Parties' business relating to certain assets described therein as the "Legacy Apache Properties" (the "**Legacy Apache Properties Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Legacy Apache Properties Term Sheet in accordance therewith and (ii) (upon Fieldwood's payment of the retainers to Apache's attorneys and advisors in the amounts submitted to Fieldwood's outside counsel and subject to review and reasonable satisfaction with the restructuring term sheet to be attached to the restructuring support agreement) to execute and support a restructuring support agreement in a final form reasonably acceptable to Apache and consistent in all respects with the terms of the Legacy Apache Properties Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document. This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

Regards,

*Thomas R. Lamme*

Thomas R. Lamme

Enclosure

cc:  Michael T. Dane
     Senior Vice President and Chief Financial Officer

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

**GOM SHELF LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Vice President

[Fieldwood Signature Page to Letter Agreement]

**APACHE CORPORATION**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel


**APACHE SHELF, INC.**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel


**APACHE DEEP WATER LLC**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel

**Exhibit A**

**Term Sheet for Fieldwood Energy LLC Restructuring**

**Summary of Principal Terms**

| | |
|---|---|
| **Entity Owning Legacy Apache Properties Post-Confirmation** | All oil and gas assets conveyed by Apache Corporation ("Apache") and certain of its affiliates (collectively, the "Apache PSA Parties") in favor of Fieldwood Energy LLC ("Fieldwood" or "debtor") and certain of its affiliates (collectively, the "Fieldwood PSA Parties") pursuant to that Purchase and Sale Agreement dated as of July 18, 2013 between the Apache PSA Parties and the Fieldwood PSA Parties (as amended, "PSA"), plus all leases, wells, fixtures, equipment, permits, ONRR royalty and other deposits, decommissioning bonds with third parties relating to previously sold assets, decommissioning bonds posted by Fieldwood on Legacy Apache Properties, inventory, facilities, easements, pipelines, and related property associated therewith, less and except any such assets sold, assigned, decommissioned, or otherwise disposed of by Fieldwood to third parties or otherwise prior to the date of this Term Sheet or as contemplated in this Term Sheet, and not including the Retained Properties (defined below) (collectively, the "Legacy Apache Properties") shall be owned post-confirmation by a Reorganized Fieldwood unless a different entity is created in accordance with the section entitled "Assumption of Obligations" below (this portion of the business of the Reorganized Fieldwood being referred to hereinafter as "Fieldwood I"). Any outstanding accounts receivable and accounts payable associated with the Legacy Apache Properties as of the effective date of Fieldwood's plan of reorganization shall be retained by Fieldwood II (defined below), and any accounts receivable and accounts payable accruing after the effective date of Fieldwood's plan of reorganization shall accrue to the benefit or obligation of Fieldwood I. Fieldwood I will retain BOEM Operator numbers and Qualification cards for Fieldwood and Fieldwood's affiliate GOM Shelf LLC.<br><br>Fieldwood I shall (i) have no assets or liabilities upon confirmation other than the Legacy Apache Properties and operational liabilities, including plugging and abandonment and decommissioning liabilities relating to the Legacy Apache Properties and certain assets described under "Additional Initial Funding Sources" and "Assumption of Obligations" below, (ii) be a bankruptcy remote business entity with a governance structure which is consistent with the business goals of the parties outlined herein (which includes an independent director or manager whose vote is needed to approve major decisions such as bankruptcy, receivership, liquidation, mergers, and consolidations, and removal and appointment (after the initial appointment) of the sole manager and service provider described below (the "Independent Director")), (iii) not be a reporting entity for SEC purposes, (iv) as of the confirmation date, not create a variable interest entity that Apache is required to consolidate, and (v) is structured in a tax efficient manner within the constraints of the criteria set forth in items (i) through (iv) above. To the extent it will accomplish the goals of the parties outlined herein and is otherwise allowed by applicable law, Fieldwood I and the holder of Fieldwood's other assets not sold during the pendency of the Chapter 11 cases ("Fieldwood II") may be created by a divisional merger of Fieldwood under applicable state law upon the confirmation of Fieldwood's plan of reorganization. |

| | |
|---|---|
| **Management of Fieldwood I** | Fieldwood I will not have employees other than a sole manager. Apache and debtor shall each provide the other with a list of three candidates with a minimum of five (5) years of relevant experience in the energy sector. If one or more names appear on both lists, then the debtor will select the initial sole manager of Fieldwood I from those common name(s). If there are no common names, then each shall have the right to strike two names from the other party's list and the bankruptcy judge shall select the sole manager from the two remaining names (one from each list). In the event the sole manager must be removed (which shall require Apache's consent) and/or replaced or resigns or otherwise no longer serves, then the foregoing procedure will be repeated (except that the Independent Director will replace the bankruptcy court and Fieldwood I will replace the debtor for that purpose). |

The initial Independent Director shall be appointed by the debtor and shall be a natural person who is not and, for the prior five years has not been, a director, officer, employee, trade creditor, or shareholder (or spouse, parent, sibling, or child of the foregoing) of Fieldwood, any affiliate of Fieldwood, or any lender to Fieldwood (a "Qualified Person"), and shall be an individual provided by Citadel SPV, Global Securitization Services, LLC, Corporation Service Company, CT Corporation, Lord Securities Corporation, Wilmington Trust Company, or, if none of those companies is then providing professional independent managers, another nationally-recognized company selected by Fieldwood with Apache's consent (the "Approved List") and approved by the bankruptcy court. The Independent Director may not be removed, except with Apache's consent. If the Independent Director is removed, resigns, or otherwise ceases to serve, then Fieldwood I shall select another Independent Director who is a Qualified Person from the Approved List.

The limited liability agreement will specify that the sole manager will have the right to control the business and operations of Fieldwood I at all times prior to the completion of the decommissioning of the Legacy Apache Properties owned by Fieldwood I, subject to compliance with the following covenants which can only be waived with Apache's consent:

1. Fieldwood I shall not have any business or operations other than operating the Legacy Apache Properties and decommissioning them;
2. Fieldwood I shall not purchase, sell, or farm-in any asset;
3. Except in compliance with item 4 immediately below, Fieldwood I shall not farm-out any asset;
4. If anyone makes an unsolicited proposal to farm in to any of the Legacy Apache Properties on fair market terms and conditions (including fair market rates of return), then Fieldwood I shall be obligated to market such farm-in opportunity and accept the highest and best offer for such farm-in opportunity as long as the transaction is accretive to Fieldwood I cashflow;
5. Fieldwood I shall not incur indebtedness for borrowed money other than under the Standby Facility (defined below);
6. Fieldwood I shall not use its free cash flow (after operating expenses) for any purposes other than fulfilling is obligations to Apache under the

2

| | |
|---|---|
| | Decommissioning Agreement (defined below) and the Standby Facility (defined below) until those obligations have been satisfied in full;<br><br>7. Fieldwood I shall not amend its bylaws, limited liability agreement, or other organizational documents, and any effort to do so shall be ineffective for any purpose;<br><br>8. Fieldwood I shall not engage in any activity or take any action outside the ordinary course of business; and<br><br>9. Fieldwood I shall not dissolve, liquidate, or merge or consolidate with any other entity. |
| **Employee Matters** | Fieldwood shall provide Apache with a list of certain employees involved in the operation and management of the Legacy Apache Properties no later than one month after finalizing definitive documentation for the transactions reflected in this Term Sheet and shall make such employees available on a mutually agreed timeline to be interviewed by Apache for potential employment by Apache following the consummation of the Fieldwood I transaction.  Apache shall have no obligation to hire any such employees.<br><br>Fieldwood is willing to consider assigning all or a portion of its existing decommissioning business, including separate P&A equipment and spreads, to Apache in connection with mutually agreeable resolution of Fieldwood I terms and based on Fieldwood II's residual business post-restructuring. Consummation of the transaction outlined herein shall not be conditioned on Apache's potential acquisition of such decommissioning business. |
| **Operations and Decommissioning Activities** | Fieldwood I shall hire an independent third-party service provider to perform all operations and decommissioning on behalf of Fieldwood I.    The work to be performed by the independent service provider shall be bid out to not less than three (3) qualified candidate service providers, each with a minimum of five (5) years of relevant experience. The qualified bidder who bids the lowest price and best terms, in view of relevant experience, shall be selected as the initial service provider.  To facilitate the transition process prior to selection of such service provider, upon the effectiveness of the plan of reorganization, Fieldwood I will enter into a transition services agreement with Fieldwood II to provide operational services for Fieldwood I and the initial service provider.  Such transition services agreement may be terminated by Fieldwood I at any time.  In the event the service provider must be removed (which may be done by the sole manager, but only with Apache's consent) and/or replaced or otherwise no longer serves, then the sole manager shall again bid out the work in accordance with the procedures outlined hereinabove.  No later than 45 days after the Chapter 11 filing date (the "Petition Date"), Fieldwood may select with Apache's consent, which consent may be withheld by Apache in its sole discretion, certain properties (the "Retained Properties") for which Fieldwood II or its successors shall retain operatorship or ownership and operatorship.[1] Properties set forth on <u>Schedule A</u>, attached hereto, constitute the agreed-upon Retained Properties as of the date of this Term Sheet. With regard to ST 308 (identified as a Retained Property on <u>Schedule A</u>), |

---

[1] Properties comprise fields, onshore and offshore facilities, inventory, shore bases, and other assets in which Fieldwood has acquired an incremental working interest separate from the Apache acquisition or have an operational relationship to other Fieldwood properties and which will be operated by or owned and operated by the Fieldwood II or the Fieldwood deepwater business.

3

|  | Fieldwood's interest in such property will be transferred to, or allocated through the divisional merger, and owned and operated by the party who owns the deepwater Katmai project upon effectiveness of Fieldwood's plan of reorganization, and the owner of such property shall provide Fieldwood I with a surety bond in a form acceptable to Fieldwood I securing the decommissioning obligations for the ST 308 lease and associated ROW(s) in the amount of $13.2 million.  With regard to VR 78 and VR 362/371 (each identified as a Retained Property on <u>Schedule A</u>), Fieldwood's interest in such properties will remain with Fieldwood II and be owned and operated by Fieldwood II, and Fieldwood II shall assume the decommissioning obligations with respect to those properties.  With regard to the four properties listed on <u>Schedule A</u> as "Operatorship" in which ownership will be retained by Fieldwood I, a joint operating agreement reasonably satisfactory to Apache will be put in place (or amended) which provides that Fieldwood I as non-operator will have the right to opt in or out of participation in any future capital spending or project related to a work-over or recompletion of an existing well on the property or the drilling of a new well on the property (a "New Project").  If Fieldwood I elects not to participate in accordance with the applicable joint operating agreement, Fieldwood II as Operator may fund (and, if so, it will indemnify Fieldwood I against costs and liabilities associated with) such New Project as an exclusive (sole risk) operation giving Fieldwood II sole right and obligation to any and all risk, costs, liabilities, downside, and upside from such New Project.  Fieldwood I shall retain all of its rights and obligations relating to the property other than those rights and obligations created by the New Project.  Services provided by Fieldwood II under such JOA will be billed to Fieldwood I at Fieldwood II's actual costs without any actual or allocated overhead or additional G&A charges.

Services provided by Apache or its third-party contractors to Fieldwood I will be billed to Fieldwood I at Apache's cost and according to typical industry practices under a joint operating agreement. |
| **Right to Fund Capital Expenditures** | Apache will have the right, but not the obligation, to fund any future capital expenditures related to projects forecast to increase production or cash flow on the Legacy Apache Properties ("Approved CapEx") upon terms and conditions mutually agreed between Apache and Fieldwood I.

At confirmation, to the extent it is formed or the equivalent entity exists, Fieldwood II and Fieldwood I will enter into a Joint Development Agreement ("JDA") whereby Fieldwood II has the right for two years to present capital projects to Fieldwood I relating to Legacy Apache Properties, which will give Fieldwood I, in Fieldwood I's sole discretion, the option to participate or decline participation under terms mutually agreed and set forth in the JDA.  Also, if Fieldwood I intends to decommission a property that was producing at the time Fieldwood I was created, upon notice, Fieldwood II will have the option for a period of time to be agreed on by the parties to request to take over (in the form of participation or conveyance to Fieldwood II) such property in accordance with terms set forth in the JDA. Such request may be accepted or rejected by Fieldwood I in its sole discretion. |

4

| Initial Capitalization | Fieldwood shall deposit into Fieldwood I an amount equal to $50 million minus the actual post-petition decommissioning spend by Fieldwood on the Legacy Apache Properties. |
|---|---|
| Additional Initial Funding Sources | In addition to Fieldwood's contribution above, Fieldwood I will be capitalized and funded as follows:<br><br>1) Any and all funds in Trust A shall be made available as described under "Assumption of Obligations" below and<br><br>2) Cash flow from the Legacy Apache Properties shall be reinvested and used for decommissioning activities, to fund Approved CapEx, and to repay amounts outstanding, if any, under the Standby Facility. |
| Assumption of Obligations | Fieldwood I shall continue to be responsible for all of Fieldwood's obligations under the Decommissioning Agreement dated as of September 30, 2013 among the Apache PSA Parties and the Fieldwood PSA Parties (as amended, the "Decommissioning Agreement") and the PSA, including all related contracts, and all contracts relating to insurance, surety bonds, letters of credit, and other decommissioning security assets and all other obligations relating to the Legacy Apache Properties (except to the extent reimbursement or indemnification obligations with respect to the surety bonds and letters of credit are discharged through the bankruptcy), but shall not be responsible for any other obligations of Fieldwood related to its other assets.  However, if Fieldwood I is created in a manner other than a divisional merger and is not a residual entity from Fieldwood, Fieldwood I shall assume the same obligations described in the immediately preceding sentence, and Fieldwood and Apache will agree on a structure to complete the formation transaction consistent with the intent of this Term Sheet; provided that all necessary consents can be obtained in order to preserve all material rights of Apache under the material contracts described above, including the letters of credit and bonds issued to Apache in support of the Decommissioning Agreement. If the plan of reorganization confirmed by the bankruptcy court and the definitive documents contemplated herein are consistent with the terms herein unless otherwise agreed and grant Apache all the rights and protections provided for in this Term Sheet unless otherwise agreed, then Apache will waive any claims against the debtor based on any alleged prepetition breach of the Decommissioning Agreement or any related agreement and shall release any and all claims against the debtors and all other released parties under Fieldwood's plan of reorganization (and such releases shall be mutual with Apache benefiting as a released party under the plan) but only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security, in any respect.<br><br>If (i) Fieldwood I defaults on its decommissioning obligations under the Decommissioning Agreement, (ii) any governmental authority or any other Person or entity seeks to cause Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, and (iii) Apache conducts the decommissioning, it shall be done in a manner that entitles Apache to draw on cash in Trust A, the letters of credit, and the bonds currently outstanding, totaling approximately $736 million (the "Decommissioning Security") in reimbursement of such advances. Apache shall |

| | |
|---|---|
| | be entitled to draw at any time prior to completion of decommissioning of the Legacy Apache Properties should certain letters of credit or bonds of the Decommissioning Security not be renewed in a manner consistent in all respects with the existing terms of such letters of credit or bonds, and, if drawn in such manner, such funds shall be contributed to Trust A. Fieldwood I shall take any action reasonably requested by Apache to entitle Apache to draw on the Decommissioning Security as contemplated in this Term Sheet and shall not take any position in any proceeding or otherwise inconsistent with Apache's ability to draw on the Decommissioning Security. |
| **Standby Facility** | After the Decommissioning Security has been exhausted or is not available to pay or reimburse Apache for decommissioning, Fieldwood I will have the right to borrow from Apache the funds required to perform decommissioning on the Legacy Apache Properties via a line of credit (the "Standby Facility"). <br><br> The Standby Facility shall have a first lien on all the assets of Fieldwood I. Cash advanced shall earn interest at 400 basis points (4% per annum) over the interest rate of Apache's then most recently issued bonds. All principal and interest will be paid in cash from the first available free cash flow of Fieldwood I following each loan. Additional customary terms and conditions TBD. The first lien shall also secure Fieldwood I's obligations to Apache under the Decommissioning Agreement. <br><br> The Standby Facility shall mature at completion of all decommissioning activities. |
| **Beneficiaries of the Fieldwood I** | Fieldwood has the right to designate who shall receive ownership interests entitling the holder to any assets remaining in Fieldwood I after decommissioning is complete and the Standby Facility is repaid. Such interests may be distributed by Fieldwood (consistent with the rules of priority and as may be negotiated under the plan) upon confirmation of Fieldwood's plan of reorganization or as otherwise agreed thereafter but shall thereafter be non-transferable on the books and records of Fieldwood I, it being the goal of all parties that Fieldwood I will not be a reporting entity for SEC purposes and such ownership interests in Fieldwood I shall not be registered or traded on any exchange. Apache understands and agrees that the restructuring transactions currently contemplated by the RSA (defined below) do not provide for the DIP Lenders or the pre-petition FLTL Lenders becoming beneficial owners of Fieldwood I. |
| **Fieldwood's Plan of Reorganization** | Apache will support a Fieldwood Chapter 11 plan of reorganization which provides for the Fieldwood I structure outlined herein and will execute a restructuring support agreement ("RSA") consistent with the terms herein evidencing same. The RSA shall provide that Apache shall have consent rights over all definitive documents related to the Fieldwood I structure outlined herein, and over the portions of the plan of reorganization and the confirmation order that provide for and approve the Fieldwood I structure outlined herein. The RSA shall contain customary termination rights. |
| **Post-Petition Decommissioning Activity** | The DIP Budget shall provide Fieldwood with reasonable funds to accomplish the following during the pendency of the Chapter 11 cases, as it pertains to the Legacy Apache Properties: |

6

|  | 1) Maintain and operate the properties as a reasonably prudent operator in the ordinary course of business, |
|---|---|
|  | 2) Maintain all of the assets in their current condition, subject to the Post-Petition Decommissioning Budget (defined below), and insurance upon such assets in amounts and kinds comparable to pre-petition coverage, and |
|  | 3) Perform decommissioning activities consistent with the Decommissioning Agreement in accordance with a budget agreed to in advance between Fieldwood and Apache (the "Post-Petition Decommissioning Budget"), the total amount of which budget shall not be greater than $50 million during the pendency of the case, assuming an emergence by March 31, 2021.  In the event of emergence later than March 31, 2021, Fieldwood and Apache shall (i) work in good faith to agree upon an extended Post-Petition Decommissioning Budget and (ii) in such event, if (a) Fieldwood has insufficient operating income from the Legacy Apache Properties to perform any required decommissioning within respect to any Legacy Apache Property, after mutually agreed upon capital expenditures, and (b) any governmental authority or any other Person or entity causes Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, then Apache will conduct or cause to be conducted such decommissioning in accordance with the terms of the Decommissioning Agreement. |
| **Expense Reimbursement** | Fieldwood will pay up to $4,000,000 of reasonable and documented fees and expenses of Apache related to the formation of Fieldwood I and Fieldwood's restructuring; provided that such fees and expenses shall only be payable so long as Apache is a party to the RSA. |
| **Other Matters** | Briarlake office sublease to be renegotiated (i) to reflect current market rates for remainder of sublease term; and (ii) to reflect reduced square-footage consistent with the scale and business functions of Fieldwood II or its successors as a result of the Chapter 11 plan of reorganization).<br><br>Fieldwood and Apache shall negotiate mutually agreeable definitive documentation for the transactions reflected in this Term Sheet within 45 days of the Petition Date.  Additionally, Apache acknowledges and agrees that the definitive documentation implementing the transactions contemplated under this Term Sheet shall be subject to approval of holders of consent rights as set forth in the RSA, including certain DIP and FLTL Lenders consent rights, which approval shall not be unreasonably withheld, it being understood that good faith negotiations with respect to matters not addressed in this Term Sheet shall not be considered unreasonably withholding approval. |
| **Effectiveness** | The transactions contemplated by this Term Sheet, and as set forth in definitive documentation, shall (i) require that the Decommissioning Agreement and related agreements will not be rejected by the debtor during the Chapter 11 case, and such obligations shall be allocated to, and remain the obligations of, Fieldwood I upon |

7

|  | the consummation of the plan and the divisional merger contemplated herein, (ii) preserve all Apache's rights with respect to Trust A, the net profits interests, and the letters of credit and bonds issued to Apache under the Decommissioning Agreement, and (iii) become effective on the consummation of Fieldwood's plan of reorganization. |
| --- | --- |

8

## Schedule A: Retained Properties

| Field | Classification |
|---|---|
| ST 308 | Ownership and Operatorship |
| GI 110/116 | Operatorship |
| GI 43 | Operatorship |
| ST 53/67/68 | Operatorship |
| MC 109 | Operatorship |
| VR 78 | Ownership and Operatorship |
| VR 362/371 | Ownership and Operatorship |

**<u>EXHIBIT B</u>**

**FORM OF DIP ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|                              | §  |                                 |
|------------------------------|----|---------------------------------|
| In re:                       | §  | Chapter 11                      |
|                              | §  |                                 |
| **FIELDWOOD ENERGY LLC,** *et al.*, | §  | Case No. 20-_____ (__)         |
|                              | §  |                                 |
|                              | §  | **(Jointly Administered)**      |
| Debtors.[1]                  | §  | **(Emergency Hearing Requested)** |

INTERIM ORDER (I) AUTHORIZING DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e)
AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES PURSUANT TO
11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon the motion (the "**Motion**")[2] of Fieldwood Energy LLC (the "**Borrower**") and its

affiliated debtors, each as a debtor and debtor-in-possession (collectively, the "**Debtors**") in the

above captioned cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2),

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Bankruptcy Local Rules

for the Southern District of Texas (the "**Local Bankruptcy Rules**") and the Procedures for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the DIP Documents (as defined below).

Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking, among other things:

      A.      authorization for the Borrower to obtain secured postpetition financing (the "**DIP Financing**") and for Fieldwood Energy Inc. ("**Holdings**") and all domestic subsidiaries of the Borrower (subject to certain exceptions for immaterial subsidiaries that are not Debtors) (each a "**Guarantor**" and collectively, the "**Guarantors**"; the Guarantors collectively with the Borrower, the "**Loan Parties**"), to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with the DIP Financing, consisting of a multiple-draw senior secured term loan facility (the "**DIP Facility**"), in an principal amount not to exceed $100,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)) on the terms and conditions set forth in this Interim Order and the DIP Documents (each as defined below), pursuant to which DIP Facility the Borrower shall, subject to entry of the Interim Order, borrow from the DIP Lenders an aggregate principal amount equal to $10,000,000 on the Closing Date (as defined in the DIP Credit Agreement), and thereafter, on an interim basis, upon satisfaction of all other applicable conditions precedent in the DIP Documents, be authorized to make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive Documents (as defined in the DIP Term Sheet) (such date, the "**APA Milestone Satisfaction Date**") in an aggregate principal amount equal to $15,000,000;

      B.      authorization for the Loan Parties to execute and enter into the Senior Secured Debtor-in-Possession Term Loan Credit Agreement among Holdings, the Borrower, the lenders from time to time thereto (collectively, the "**DIP Lenders**") and Cantor Fitzgerald Securities as

administrative agent and collateral agent (in such capacities, the "**DIP Agent**"; the DIP Agent together with the DIP Lenders, the "**DIP Secured Parties**"), upon the terms and conditions consistent in all material respects with those set forth in the DIP Term Sheet substantially in the form attached to the Motion as **Exhibit** [__] (such term sheet, the "**DIP Term Sheet**"; such senior secured debtor-in-possession term loan credit agreement, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Collateral Agreement and the Guarantee Agreement (each as defined in the DIP Credit Agreement), each to be dated as of the Closing Date (as defined in the DIP Credit Agreement), the "**DIP Documents**") and to perform all such other and further acts as may be required in connection with the DIP Documents;

        C.        authorization for the Loan Parties to grant adequate protection to the Prepetition Secured Parties (as defined below) under or in connection with certain of the following agreements:

1.      that certain Second Amended and Restated Credit Agreement – First Out, dated as of June 28, 2019 (as amended by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof) and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLFO Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto (the "**Prepetition FLFO Lenders**"), Goldman Sachs Bank USA, as administrative agent (in such capacity, the "**Prepetition FLFO Administrative Agent**") and issuing bank, and Cantor Fitzgerald Securities, as collateral agent (in such capacity, the "**Prepetition FLFO Collateral Agent**", together with Prepetition FLFO Administrative Agent and their successors in such capacities, the "**Prepetition FLFO Agents**" and, the "Secured Parties" under such Prepetition FLFO Credit Agreement the "**Prepetition FLFO Secured Parties**");

2.      that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018 (as amended by that certain First Amendment to Amended and Restated First Lien Term Loan Agreement, dated as of July 5, 2018, that certain Second Amendment to

Amended and Restated First Lien Term Loan Agreement, dated as of November 11, 2019 and that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLTL Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition FLTL Lenders**") and Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition FLTL Agent**" and, the "Secured Parties" under such Prepetition FLTL Credit Agreement the "**Prepetition FLTL Secured Parties**")

3.      that certain Amended and Restated Second Lien Term Loan Agreement dated as of April 11, 2018 (as amended by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition SLTL Agreement**"[3]), among, *inter alia*,  Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition SLTL Lenders**" [4]) and Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition SLTL Agent**"[5] and, the "Secured Parties" under such Prepetition SLTL Credit Agreement the "**Prepetition SLTL Secured Parties**"[6]); and

4.      that certain Decommissioning Agreement, dated as of September 30, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, and together with the Existing Decommissioning Related Agreements (as defined in the DIP Credit Agreement), the "**Apache Decommissioning Agreement**"), by and among Apache Corporation ("**APA**"), Apache Shelf, Inc. ("**APSH**"), Apache Deepwater LLC ("**APDW**"), Apache Shelf Exploration LLC (together with APA, APSH and APDW, the "**Apache Secured Parties**"), the Borrower and GOM Shelf LLC.

---

[3] The agreements described in the preceding paragraphs C.1-3 above are collectively referred to as the "**Prepetition Credit Agreements**," and all "Collateral" securing the obligations under the Prepetition Credit Agreements described in the preceding paragraphs C.1-3 is collectively referred to as the "**Prepetition Collateral**". The Trust A NPI, Trust A-1 NPI, the Trust A Account, any interest in Trust A, the Permitted Surety Bonds or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) are collectively referred to as the "**Apache Collateral**" and, for the avoidance of doubt, the Prepetition Collateral does not include the Apache Collateral.

[4] The Prepetition FLFO Lenders, the Prepetition FLTL Lenders and the Prepetition SLTL Lenders are collectively referred to as the "**Prepetition Lenders**".

[5] The Prepetition FLFO Agents, the Prepetition FLTL Agent and the Prepetition SLTL Agent are collectively referred to as the "**Prepetition Agents**".

[6] The Prepetition FLFO Secured Parties, the Prepetition FLTL Secured Parties and the Prepetition SLTL Secured Parties are collectively referred to as the "**Prepetition Secured Parties**".

4

D.      subject to the restrictions set forth in the DIP Documents and this Interim Order,

authorization for the Loan Parties to continue to use Cash Collateral (as defined below) and all

other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and

the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*,

such use of their Cash Collateral and the other Prepetition Collateral;

E.      subject to certain challenge rights of parties in interest set forth herein, approval

of certain stipulations by the Debtors with respect to the Prepetition Credit Agreements and the

liens and security interests arising therefrom;

F.      the grant of superpriority administrative claims pursuant to section 364(c)(1) of

the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to

section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section

364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties'

estates (other than certain excluded property as provided in the DIP Documents) and all proceeds

thereof (including subject only to and effective upon entry of the Final Order (as defined below),

any Avoidance Proceeds (as defined below)), subject only to the Carve-Out;

G.      the waiver of the Debtors' right to surcharge the Prepetition Collateral and the

DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and of any right of the Debtors

under the "equities of the case" exception in section 552(b) of the Bankruptcy Code subject to

the provisions set forth below;

H.      the waiver of the equitable doctrine of "marshaling" and other similar doctrines as

to the DIP Secured Parties and the Prepetition Secured Parties, subject to the provisions set forth

below;

5

I.      modification of the automatic stay to the extent set forth herein and in the DIP

Documents;

J.      pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**")

on the Motion to be held before this Court to consider entry of an order granting the Motion on

an interim basis and authorizing the Borrower to borrow from the DIP Lenders under the DIP

Documents forthwith an aggregate principal amount equal to $10,000,000 and, on or prior to the

APA Milestone Satisfaction Date, an additional principal amount equal to $15,000,000, of the

DIP Financing and the Guarantors to unconditionally guaranty such obligations owing to the DIP

Lenders under the DIP Documents on a joint and several basis (this "**Interim Order**"); and

K.      that this Court schedule a final hearing (the "**Final Hearing**") to consider entry of

a final order (the "**Final Order**") approving the relief granted herein on a final basis and

authorizing the Borrower to forthwith borrow from the DIP Lenders under the DIP Documents

up to the full principal amount of the DIP Financing and the Guarantors to unconditionally

guaranty all obligations owing to the DIP Lenders under the DIP Documents on a joint and

several basis; and due and appropriate notice of the Motion and the Interim Hearing having been

served by the Debtors on the parties identified in the Motion; and it appearing that no other or

further notice need be provided; and the Court having reviewed the Motion; and the Interim

Hearing having been held by this Court on [•], 2020; and the relief requested in the Motion being

in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest

in these Cases; and the Court having determined that the relief requested in the Motion is

necessary to avoid immediate and irreparable harm; and the Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and upon the record made by the Debtors in the Motion, in the declaration of [•] of [Houlihan

#93489429v14
WEIL:\97576947\7\45327.0005

Lokey Capital, Inc.] in support of the Motion filed contemporaneously therewith, in the *Declaration of [ •]in Support of Chapter 11 Petitions and Related Requests for Relief* (Docket No. [•] (the "**First Day Declaration**")) and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition.*   The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.      *Jurisdiction*.   This Court has core jurisdiction over the Cases (as defined below), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Committee Formation*.   As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

4.      *Notice*.   Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Complex Case Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this

#93489429v14
WEIL:\97576947\7\45327.0005

Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

5.     *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest and subject to the limitations thereon contained in paragraphs 23 and 24 below, the Debtors admit, stipulate and agree that:

(a)  (i) as of the date (the "**Petition Date**") of the filing of the Cases, the Borrower and the guarantors under the relevant Prepetition Credit Agreement (such guarantors collectively, the "**Prepetition Guarantors**") were justly and lawfully indebted and liable to (A) the Prepetition FLFO Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $147,601,297 in respect of loans made and undrawn letters of credit issued under, and in accordance with the terms of, the Prepetition FLFO Credit Agreement, plus accrued and unpaid interest thereon and fees (including the prepayment fees payable pursuant to the Prepetition FLFO Credit Agreement), reimbursement obligations in respect of drawn letters of credit, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition FLFO Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition FLFO Credit Agreement (collectively, the "**Prepetition FLFO Debt**"), which Prepetition FLFO Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition FLFO Credit Agreement; (B) the Prepetition FLTL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $1,142,688,815.28 in respect of loans made under, and in accordance with the terms of, the

8

Prepetition FLTL Credit Agreement, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition FLTL Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition FLTL Credit Agreement (collectively, the "**Prepetition FLTL Debt**"), which Prepetition FLTL Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition FLTL Credit Agreement; (C) the Prepetition SLTL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $517,500,000 in respect of loans made under, and in accordance with the terms of, the Prepetition SLTL Credit Agreement, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition SLTL Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition SLTL Credit Agreement (collectively, the "**Prepetition SLTL Debt**" and, together with the Prepetition FLFO Debt and the Prepetition FLTL Debt, the "**Prepetition Debt**"), which Prepetition SLTL Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition SLTL Credit Agreement, (ii) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrower and the applicable Prepetition Guarantors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of

9

the obligations owing under the Prepetition Credit Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b) the liens and security interests granted to the Prepetition Secured Parties (the "**Prepetition Liens**") pursuant to and in connection with the Prepetition Credit Agreements, are: (i) valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral; (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to valid, non-avoidable liens permitted under the Prepetition Credit Agreements that (A) were perfected as of the Petition Date or (B) were in existence immediately prior to the Petition Date and are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, to the extent that such permitted liens are senior to liens in favor of the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties (the "**Permitted Prior Liens**");

(c) by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt, none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors;

10

(d) the liens granted to the DIP Agent on behalf of the DIP Secured Parties pursuant to this Interim Order are perfected, valid, enforceable and non-avoidable liens against the Debtors;

(e) no claims or causes of action exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date;

(f) effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, subsidiaries, heirs and assigns, hereby absolutely and unconditionally release and forever discharge and acquit the DIP Secured Parties and Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened (collectively, the "**Released Claims**") including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Credit Agreements, or the transactions contemplated thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their

11

successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured or unmatured or known or unknown;

(g) (i) that certain *Pari Passu* Intercreditor Agreement dated as of April 11, 2018 (as amended by that certain Joinder No. 4 dated as of June 28, 2019 and as otherwise amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**First Lien Pari Passu Intercreditor Agreement**"), and (ii) that certain Intercreditor Agreement, dated as of April 11, 2018 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**Second Lien Intercreditor Agreement**" and, together with the First Lien Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**"), are binding and enforceable against the Borrower, Prepetition Guarantors, and the Prepetition Secured Parties party thereto, in accordance with their terms, and the Borrower, Prepetition Guarantors, and Prepetition Secured Parties are not entitled to take any actions that would be contrary to the provisions thereof; and

(h) all cash, securities or other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan Parties in any account or accounts with any Prepetition Secured Party or any branch or agency thereof (the "**Depository Institutions**") were subject to rights of set-off under the Prepetition Credit Agreements and applicable law, for the benefit of the Prepetition Secured Parties.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to

12

control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

6.      *Findings Regarding the DIP Financing and Cash Collateral.*

(a)  Good and sufficient cause has been shown for the entry of this Interim Order.

(b)  The Loan Parties have an immediate need to continue to use the Prepetition Collateral (including the Cash Collateral) to preserve their estates, including (i) to consummate the prenegotiated plan contemplated under the "**Restructuring Support Agreement**" filed as Exhibit [ ] to the First Day Declaration, (ii) for the orderly continuation of the operation of their businesses, (iii) to preserve business relationships with vendors, suppliers, employees, and customers, and (iv) to satisfy other working capital and operational needs.  The Loan Parties have an immediate need to have available the DIP Facility in case the Prepetition Collateral (including Cash Collateral) is insufficient to meet their capital and liquidity needs.  The access of the Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Loan Parties and to a successful reorganization of the Loan Parties.

(c)  The Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Loan Parties are also unable to obtain secured credit allowable

13

under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Loan Parties granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (as defined below) and incurring the Adequate Protection, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(d)  Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection granted to the Prepetition Secured Parties, and the terms on which the Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)  Upon the terms and conditions set forth herein, the Prepetition Secured Parties have consented, or pursuant to the Intercreditor Agreements are deemed to have consented, to the use of Cash Collateral and the other Prepetition Collateral, the Debtors' entry into the DIP Documents and, in the case of the Prepetition Secured Parties, the priming of the liens granted to the Prepetition Secured Parties pursuant to Section 364(d)(1) of the Bankruptcy Code.

(f)  The DIP Financing, as well as the terms of the Adequate Protection and Adequate Protection Liens (each as defined below), and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Loan Parties, the DIP Agent and the DIP Lenders and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the

14

DIP Documents, including, without limitation: (i) all loans made to and guarantees issued by the Loan Parties pursuant to the DIP Documents (collectively, the "**DIP Loans**") and (ii) any "**Loan Obligations**" (as defined in the DIP Credit Agreement) of the Loan Parties owing to the DIP Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the DIP Documents, including any obligations, to the extent provided for in the DIP Documents, to indemnify the DIP Agent or the DIP Lenders and to pay any fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the DIP Documents), amounts, charges, costs, indemnities and other obligations that are chargeable or reimbursable under this Interim Order, the Final Order or the DIP Documents (the foregoing in clauses (i) and (ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Loan Parties' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection and the granting of the Adequate Protection Liens), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof), and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code

in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g) The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in this Interim Order or the other DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Agreements and upon a change in circumstances, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

(h) The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. For the reasons set forth in the Motion and declarations filed in connection therewith, absent granting the relief set forth in this Interim Order, the Loan Parties' estates would face (i) significant business disruptions from the loss of access to Cash Collateral, (ii) exposure to

16

significant liquidity uncertainty in the current commodities market, and (iii) loss of confidence regarding financial wherewithal by stakeholders, all of which would lead to immediate and irreparable harm.  Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Loan Parties' estates and consistent with the Loan Parties' exercise of their fiduciary duties.

7.      *Authorization of the DIP Financing and the DIP Documents.*

(a)  The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized to forthwith borrow money pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized, on an interim basis, to guaranty the Borrower's obligations with respect to such borrowings in an aggregate principal or face amount equal to $10,000,000, and thereafter, on or prior to the APA Milestone Satisfaction Date, in an additional aggregate principal amount equal to $15,000,000, under the DIP Facility (plus interest, fees, expenses (including professional fees and expenses) and other amounts, in each case, as provided for in the DIP Documents), subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to the terms and conditions set forth herein and therein), including to (v) make payments for general corporate or working capital purposes in a manner consistent with the then-current Approved Budget (as defined in the DIP Term Sheet) subject to permitted variances, (w) pay required debt service on the DIP Loans, (x) pay the fees, costs and expenses of the DIP Agent and the DIP Lenders, (y) pay fees, costs and expenses of professionals associated with the Cases and (z)

#93489429v14
WEIL:\97576947\7\45327.0005

provide adequate protection as provided in paragraphs 14 through 20 of this Interim Order (the "**Adequate Protection**").

(b) In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all agreements, instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees and expenses that may be reasonably required or necessary for the Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications or supplements to and under the DIP Documents, in each case, in such form as the Loan Parties, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications or supplements to and under the DIP Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)     the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all fees including, without limitation, any upfront fee, backstop fee, commitment fee, seasoning fee or agency fee (which fees shall be, and shall be deemed to have

18

been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Loan Parties, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders (including, without limitation, the documented fees and expenses of Shipman & Goodwin LLP, as counsel to the DIP Agent, Davis Polk & Wardwell LLP as primary counsel to certain DIP Lenders, Haynes and Boone LLP as local counsel to certain  DIP Lenders in the State of Texas, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC as regulatory counsel to certain DIP Lenders and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors to certain DIP Lenders), in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and the DIP Superpriority Claims as permitted herein and therein.

(c)  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and non-avoidable obligations of the Loan Parties, enforceable

19

against each Loan Party in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

8.      *DIP Superpriority Claims.*

(a)  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding the Loan Parties' claims and causes of action under sections 502(d), 544, 545,

#93489429v14
WEIL:\97576947\7\45327.0005

547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")), *provided* that the DIP Superpriority Claims shall be subordinated and subject only to payment of the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(b) For purposes hereof, the "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000 (without regard to the notice set forth in (iii) below); and (iii) (A) all unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time, whether by interim order, final order, procedural order or otherwise of persons or firms retained by the Debtors or the Creditors' Committee (if appointed) pursuant to sections 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the Trigger Notice, plus (B) Professional Fees incurred after the Trigger Notice in an amount not to exceed $6,000,000, of professionals retained by the Debtors and the Creditors' Committee (if appointed); *provided,* that under no circumstances shall any success, completion, or similar fees be payable from the Carve-Out following delivery of a

21

Trigger Notice (the "**Carve-Out Cap**"), in each case subject to the limits imposed by this Interim Order, the Final Order (if and when entered) or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any other grounds.

"**Trigger Notice**" shall mean a written notice delivered by the DIP Agent, at the direction of the Required Lenders under the DIP Documents, describing the event of default that is alleged to continue under the DIP Documents.  Immediately upon delivery of a Trigger Notice, and prior to the payment to any Prepetition Secured Party on account of the Adequate Protection or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agent or the Prepetition Agents (the "**Carve-Out Account**"), an amount equal to the Carve-Out Cap. The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and the Prepetition Agents, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out.

(c)  Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, or assertions of any defense or counterclaim, against any of the DIP

22

Lenders, the DIP Agent, the Prepetition Lenders or each of the Prepetition Agents, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Prepetition Credit Agreements (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders, the DIP Agent or the Prepetition Secured Parties; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement or realization upon any DIP Collateral or Prepetition Collateral in accordance with the DIP Documents and the Final Order other than to seek a determination that an Event of Default (as defined in the DIP Credit Agreement) has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Court, and (y) prior to the delivery of the Trigger Notice, the Carve-Out shall not be reduced by the payment or incurrence of Professional Fees allowed at any time by the Court.  Further, notwithstanding anything to the contrary in this Interim Order, the failure of the Carve-Out Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out.  For the avoidance of doubt, nothing herein shall modify or limit the rights of the Loan Parties set forth in the DIP Credit Agreement or limit their use of the Carve-Out in connection with such rights.

9.      *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the

Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b), (c) and (d) below being collectively referred to as the "**DIP Collateral**"; *provided*, that for the avoidance of doubt, the Apache Collateral shall not constitute DIP Collateral and the DIP Collateral shall be subject to the provisions of paragraphs 14(h) and 15(f) herein), in each case subject to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

   (a) <u>First Lien On Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to either (x) valid, perfected and non-avoidable liens as of the Petition Date, or (y) valid and non-avoidable liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (collectively, "**Unencumbered Property**"), in each case other than: (i) the Excluded Assets and Excluded Equity Interests (each as defined in the DIP Credit Agreement), but including any proceeds of Excluded Assets and Excluded Equity Interests that do not otherwise constitute Excluded Assets or

#93489429v14
WEIL:\97576947\7\45327.0005

Excluded Equity Interests and (ii) the Avoidance Actions but subject only to and effective upon entry of the Final Order, including the Avoidance Proceeds;

(b) <u>Liens Priming Certain Prepetition Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and lien upon all pre- and postpetition property of each Loan Party whether now existing or hereafter acquired, of the same nature, scope and type as the collateral securing the Prepetition Debt; *provided*, that such lien shall be (i) junior to the Permitted Prior Liens and (ii) *pari passu* with valid and perfected liens in favor of hedge counterparties in connection with secured hedging transactions entered into by the Debtors on a post-petition basis in accordance with the DIP Documents (the "**Hedging Liens**").  Such security interests and liens shall be senior in all respects to the interests of the Prepetition Secured Parties in such property arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (collectively, the "**Primed Liens**"); *provided,* however, that the DIP Liens shall not be secured by the Apache Collateral and the rights of the Apache Secured Parties set forth in the Restructuring Support Agreement are not amended or modified by the terms of this Interim Order ;

(c) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party other than the property described in clauses (a) and (b) of this paragraph 9 that is subject to either (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or (y) valid and non-avoidable

25

liens (other than Primed Liens) in existence at the time of such commencement that are

perfected subsequent to such commencement as permitted by Section 546(b) of the

Bankruptcy Code, in each case other than (x) the Excluded Assets and the Excluded Equity

Interests, but including any proceeds of Excluded Assets and Excluded Equity Interests that

do not constitute Excluded Assets or Excluded Equity Interests and (y) the Avoidance

Actions, but subject only to and effective upon entry of the Final Order, including the

Avoidance Proceeds, which shall be (i) junior and subordinate to any valid, perfected and

non-avoidable liens (other than the Primed Liens) in existence immediately prior to the

Petition Date, and (ii) any such valid and non-avoidable liens in existence immediately prior

to the Petition Date that are perfected subsequent to the Petition Date as permitted by section

546(b) of the Bankruptcy Code, *provided*, that nothing in the foregoing clauses (i) and (ii)

shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such

liens are not permitted thereunder; and

(d) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (i)

subject or subordinate to or made *pari passu* with (A) any lien or security interest that is

avoided and preserved for the benefit of the Loan Parties and their estates under section 551

of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this

Interim Order, any liens or security interests arising after the Petition Date, including,

without limitation, any liens or security interests granted in favor of any federal, state,

municipal or other governmental unit (including any regulatory body), commission, board or

court for any liability of the Loan Parties, or (C) any intercompany or affiliate liens of the

Loan Parties or security interests of the Loan Parties; or (ii) subordinated to or made *pari*

26

*passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

10.     *Protection of DIP Lenders' Rights.*

(a)  So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreement) (the "**DIP Commitments**") under the DIP Credit Agreement and the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Agreements or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iv), the DIP Agent or the DIP Lenders file financing statements or other documents to evidence the perfection of the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date and (v) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or

27

other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Collateral subject to any sale or disposition.

(b) To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c) If any DIP Loans are outstanding, (i) any proceeds of Prepetition Collateral subject to the Primed Liens received by any Prepetition Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any Prepetition Secured Party, except as specifically provided in this Interim Order as Adequate Protection, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct and (ii) the DIP Agent is hereby authorized to make any such endorsements as agent for any such Prepetition Secured Party and such authorization is coupled with an interest and is irrevocable.

(d) The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required Lenders, to enforce all of their rights under the DIP Documents (subject to the

#93489429v14
WEIL:\97576947\7\45327.0005

terms of this Interim Order) and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains and (B) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties and (ii) upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtors and the U.S. Trustee to (A) withdraw consent to the Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law (subject to the terms of this Interim Order).  Following the delivery of such notice, the DIP Agent may file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay.  In any hearing regarding any exercise of rights or remedies under the DIP Documents, the Debtors may seek relief from the Court seeking to stay the DIP Facility Agent's exercise of any rights and remedies (including seeking to use Cash Collateral on a non-consensual basis).  The Debtors shall not object to any motion for such a hearing to be heard on shortened notice.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Credit Agreement)) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement.

(e)  In no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

#93489429v14
WEIL:\97576947\7\45327.0005

(f)  No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Loan Parties' authority to continue to use Cash Collateral  (ii) any actual or purported termination of the Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses Against DIP Collateral*. Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting at the written direction of the Required Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, or the DIP Lenders. For the avoidance of doubt, consent to the Carve Out or the approval of any budget hereunder shall not be deemed a consent under this paragraph.  Nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent or the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *DIP Payments Free and Clear*.  Subject only to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the provisions of this Interim Order or Final Order (if and when entered) or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without

limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

13.     *Use of Cash Collateral.*  The Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order, to use Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection and (b) except on the terms and conditions of this Interim Order, the Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

14.     *Adequate Protection of Prepetition FLFO Secured Parties.*  The Prepetition FLFO Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, to the extent of diminution in the value of the Prepetition FLFO Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition FLFO Agents' liens on the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition FLFO Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition FLFO Secured Parties are hereby granted the following (collectively, the "**Prepetition FLFO Secured Parties Adequate Protection**"):

31

(a) <u>Prepetition FLFO Secured Parties Adequate Protection Liens</u>.  The Prepetition FLFO Agents (for themselves and for the benefit of the Prepetition FLFO Lenders) are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition FLFO Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the DIP Liens, and (iv) the Hedging Liens, and ranking *pari passu* with the Prepetition FLTL Secured Parties Adequate Protection Liens (as defined below) (the "**Prepetition FLFO Secured Parties Adequate Protection Liens**").

(b) <u>Prepetition FLFO Secured Parties 507(b) Claim</u>.  The Prepetition FLFO Agents (for themselves and for the benefit of the Prepetition FLFO Lenders) are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the Prepetition FLFO Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition FLFO Secured Parties 507(b) Claim**"); which Prepetition FLFO Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition FLFO Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve-Out,

32

the Permitted Prior Liens and the DIP Superpriority Claims, and shall be *pari passu* with the Prepetition FLTL Secured Parties 507(b) Claim (as defined below). Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition FLFO Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition FLFO Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c) <u>Prepetition FLFO Secured Parties Cash Payments</u>. The Prepetition FLFO Secured Parties shall receive current payment in cash on the last business day of each month, or on such other dates as may be provided under the Prepetition FLFO Credit Agreement, in an amount equal to the non-default interest (or letter of credit fees, as applicable) accrued and unpaid payable under the Prepetition FLFO Credit Agreement (based, at the option of the Debtors, on the "LIBOR" rate, as provided in the Prepetition FLFO Credit Agreement); provided, that the payments made under this paragraph 14(c) shall be without prejudice to the right of any party as to whether such payments constitute postpetition interest allowable under section 506(b) of the Bankruptcy Code or are in respect of principal.

(d) <u>Prepetition FLFO Secured Parties Fees and Expenses</u>. Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLFO Secured Parties, including all fees and expenses of counsel of the Prepetition FLFO Administrative Agent (Vinson & Elkins, LLP) and [Opportune LLP], and all fees and expenses of counsel of the Prepetition FLFO Collateral Agent (Shipman & Goodwin LLP) (collectively, the

33

"**Prepetition FLFO Advisors**"), that accrued prior to the Petition Date and (ii) the Loan

Parties shall pay in cash all documented out-of-pocket professional fees, expenses and

disbursements payable to the Prepetition FLFO Secured Parties (including all fees and

expenses of the Prepetition FLFO Advisors) that have accrued on or after the Petition Date,

in each case of the foregoing clauses (i) and (ii), in accordance with the Prepetition FLFO

Credit Agreement.

           (e)  <u>Payment of Fees and Expenses</u>.  The payment of the fees, expenses and

disbursements set forth in paragraphs 14(d) and 15(c) herein (to the extent incurred after the

Petition Date) shall be made within ten (10) days (which time period may be extended by the

applicable professional) after the receipt by the Debtors, the Creditors' Committee (if

appointed) and the U.S. Trustee  (the "**Review Period**") of summary invoices therefor (the

"**Invoiced Fees**") and without the necessity of filing formal fee applications, including such

amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall

include the number of hours billed (except for financial advisors compensated on other than

an hourly basis) and a summary of services provided and the expenses incurred by the

applicable professional; *provided*, *however*, that any such invoice: (i) may be redacted to

protect privileged, confidential or proprietary information and (ii) shall not be required to

contain individual time detail (*provided*, that such invoice shall contain (except for financial

advisors compensated on other than an hourly basis), at a minimum, summary data regarding

hours worked by each timekeeper for the applicable professional).  The Debtors, the

Creditors' Committee (if appointed) and the U.S. Trustee may object to any portion of the

Invoiced Fees (the "**Disputed Invoiced Fees**") within the Review Period by filing with the

Court a motion or other pleading, on at least ten (10) days' prior written notice to the

#93489429v14
WEIL:\97576947\7\45327.0005

applicable Prepetition Agent and the applicable Prepetition Lenders of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided, further,* that the applicable parties shall endeavor in good faith to consensually resolve any such dispute prior to the filing of any such motion or pleading.

(f)  <u>Milestones and Covenants</u>.  The Prepetition FLFO Secured Parties are hereby entitled to performance of those certain terms set forth in the DIP Term Sheet relating to "Milestones", "Financial Reporting", "Financial Covenants" and "Hedging Covenant", each as will be incorporated into the DIP Credit Agreement, when effective (the "**Additional Adequate Protection Provisions**").  While the DIP Facility remains outstanding, such Additional Adequate Protection Provisions may be waived, amended, modified or extended from time to time, in each case, as provided under the DIP Documents.  The Additional Adequate Protection Provisions shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, may be waived, amended, modified or extended from time to time only by (i) order of the Bankruptcy Court or (ii) the prior written consent of Prepetition FLFO Secured Parties and Prepetition FLTL Secured Parties holding greater than 50% of the aggregate outstanding principal amount of loans under both the Prepetition FLFO Credit Agreement and Prepetition FLTL Credit Agreement (the "**Required First Lien Secured Parties**").

(g)  <u>Budget</u>.  The Debtors shall promptly provide the Prepetition FLFO Administrative Agent, on behalf of itself and the Prepetition FLFO Lenders, with all required written financial reporting and other periodic reporting that is delivered by the DIP Borrower

35

under the DIP Credit Agreement, including with respect to the Approved Budget requirements set forth in the DIP Term Sheet, as will be incorporated into the DIP Credit Agreement, when effective (the "**Budget Reporting**"). The Budget Reporting requirement shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, (i) each Approved Budget shall be delivered to counsel for the Prepetition FLFO Secured Parties, and shall be acceptable to the Required First Lien Secured Parties, it being understood that if the Required First Lien Secured Parties have not objected to an updated Budget within five Business Days after delivery thereof, the Required First Lien Secured Parties shall be deemed to have approved such updated Budget, (ii) no such Budget shall be effective until so approved (or deemed approved), and upon approval (or deemed approval) of such Budget by the Required First Lien Secured Parties, shall constitute the Approved Budget for purposes of these Adequate Protection Reporting Obligations and (iii) this Budget Reporting requirement may be waived, amended, modified or extended from time to time with respect to the FLFO Secured Parties solely by the Required First Lien Secured Parties (in their sole discretion).

(h) <u>Payments Attributable to Legacy Assets</u>.  In connection with any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets (each, as defined in the Restructuring Support Agreement), the DIP Agent may use commercially reasonable efforts to first apply proceeds from the DIP Collateral that is not Prepetition Collateral to satisfy such amounts before applying proceeds of DIP Collateral that is Prepetition Collateral to satisfy such amounts.

15.     *Adequate Protection of Prepetition FLTL Secured Parties.*  The Prepetition FLTL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the

Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, to the extent of diminution in the value of the Prepetition FLTL Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition FLTL Agent's liens on the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition FLTL Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition FLTL Secured Parties are hereby granted the following (collectively, the "**Prepetition FLTL Secured Parties Adequate Protection**"):

        (a)    <u>Prepetition FLTL Secured Parties Adequate Protection Liens</u>. The Prepetition FLTL Agent (for itself and for the benefit of the Prepetition FLTL Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition FLTL Secured Parties Adequate Protection Claim, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject and subordinate only to in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens (iii) the DIP Liens, and (iv) the Hedging Liens, and ranking *pari passu* with the Prepetition FLFO Secured Parties Adequate Protection Liens (the "**Prepetition**

**FLTL Secured Parties Adequate Protection Liens**", and together with the Prepetition FLFO Secured Parties Adequate Protection Liens, the "**Adequate Protection Liens**").

(b) <u>Prepetition FLTL Secured Parties 507(b) Claim</u>.  The Prepetition FLTL Agent (for itself and for the benefit of the Prepetition FLTL Lenders) is hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition FLTL Secured Parties Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition FLTL Secured Parties 507(b) Claim**", and together with the Prepetition FLFO Secured Parties 507(b) Claim, the "**507(b) Claims**")); which Prepetition FLTL Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition FLTL Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve-Out, the Permitted Prior Liens and the DIP Superpriority Claims, and shall be *pari passu* with the Prepetition FLFO Secured Parties 507(b) Claim.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition FLTL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition FLTL Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c) <u>Prepetition FLTL Secured Parties Fees and Expenses</u>.  Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of

38

this Interim Order, the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLTL Secured Parties, including all fees and expenses of counsel and other professionals of the Prepetition FLTL Agent (including Shipman & Goodwin LLP) and the ad hoc group of Prepetition FLTL Lenders (including Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Partners, LLC (collectively with Shipman & Goodwin, LLP and any other advisor retained by the Prepetition FLTL Secured Parties, the "**Prepetition FLTL Secured Parties Advisors**")) that accrued prior to the Petition Date and (ii) the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLTL Secured Parties (including all fees and expenses of the Prepetition FLTL Secured Parties Advisors) that have accrued on or after the Petition Date, in each case of the foregoing clauses (i) and (ii), in accordance with the Prepetition FLTL Credit Agreement.

   (d) <u>Milestones and Covenants</u>.  The Prepetition FLTL Secured Parties are hereby entitled to performance of the Additional Adequate Protection Provisions.  While the DIP Facility remains outstanding, such Additional Adequate Protection Provisions may be waived, amended, modified or extended from time to time, in each case, as provided under the DIP Documents.  The Additional Adequate Protection Provisions shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, may be waived, amended, modified or extended from time to time only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required First Lien Secured Parties.

#93489429v14
WEIL:\97576947\7\45327.0005

(e)   <u>Budget</u>.  The Debtors shall promptly provide the Prepetition FLTL Administrative Agent, on behalf of itself and the Prepetition FLTL Lenders, with all required written financial reporting and other periodic reporting that is delivered by the DIP Borrower under the DIP Credit Agreement, including the Budget Reporting. This Budget Reporting requirement shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, (i) each Approved Budget shall be delivered to counsel for the Prepetition FLTL Secured Parties, and shall be reasonably acceptable to the Required First Lien Secured Parties, it being understood that if the Required First Lien Secured Parties have not objected to an updated Budget within five Business Days after delivery thereof, the Required First Lien Secured Parties shall be deemed to have approved such updated Budget, (ii) no such Budget shall be effective until so approved (or deemed approved), and upon approval (or deemed approval) of such Budget by the Required First Lien Secured Parties, shall constitute the Approved Budget for purposes of this Budget Reporting requirement and (iii) this Budget Reporting requirement may be waived, amended, modified or extended from time to time with respect to the FLTL Secured Parties solely by the Required First Lien Secured Parties (in their sole discretion).

(f)  In connection with any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets, the DIP Agent may use commercially reasonable efforts to first apply proceeds from the DIP Collateral that is not Prepetition Collateral to satisfy such amounts before applying proceeds of DIP Collateral that is Prepetition Collateral to satisfy such amounts.

16.   *Limitation on Charging Expenses Against Prepetition Collateral*. In partial consideration for, among other things, the Carve Out and the payments made under the

40

Approved Budget to administer the Cases with the use of Cash Collateral, except to the extent of

the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that

may result therefrom, including liquidation in bankruptcy or other proceedings under the

Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral

(including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar

principle of law, without the prior written consent of the Prepetition Agents or the Prepetition

Lenders, as the case may be, and in each case acting at the written direction of the requisite

percentage of Prepetition FLFO Lenders, Prepetition FLTL Lenders or Prepetition SLTL

Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or

acquiescence by the Prepetition Agents or the Prepetition Lenders, provided that the foregoing

shall be without prejudice to the terms of the Final Order with respect to the period from and

after entry of the Final Order. For the avoidance of doubt, consent to the Carve Out or the

approval of any budget hereunder shall not be deemed a consent under this paragraph.  Nothing

contained in this Interim Order shall be deemed to be a consent by the Prepetition Secured

Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c)

of the Bankruptcy Code or otherwise.

17.     *Adequate Protection Payments Free and Clear.*  Subject to entry of the Final

Order (except with respect to payments of interest, fees, expenses and disbursements set forth in

paragraphs 14(c), 14(d) and 15(c) of this Interim Order made between now and the entry of the

Final Order), any and all payments or proceeds remitted to the Prepetition FLFO Administrative

Agent on behalf of Prepetition FLFO Secured Parties or to the Prepetition FLTL Agent on behalf

of any Prepetition FLTL Secured Parties, pursuant to the provisions of this Interim Order, the

Final Order (if and when entered), any subsequent order of the Court or the Prepetition Debt

Documents, shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code (subject to modification under the Final Order with respect to any payments or proceeds remitted following entry of the Final Order), whether asserted or assessed by, through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

18.     *Limitations on "Equities of the Case" Exception*. The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties or the Prepetition Obligations, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

19.     *Waiver of Marshaling for Prepetition Secured Parties*. In no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the Prepetition Collateral, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

20.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition Secured Parties, upon a

#93489429v14
WEIL:\97576947\7\45327.0005

change in circumstances, may request further or different adequate protection, and the Debtors or

any other party may, subject to and consistent with the terms of the Intercreditor Agreements,

contest any such request.

      21.    *Perfection of DIP Liens and Adequate Protection Liens.*

      (a)  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are

hereby authorized, but not required, to file or record (and to execute in the name of the Loan

Parties, as their true and lawful attorneys, with full power of substitution, to the maximum

extent permitted by law) financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or

control over cash or securities, or take any other action in order to validate and perfect the

liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on

behalf of, or at the direction of, the DIP Lenders or the Prepetition Secured Parties shall, in

their sole discretion, choose to file such financing statements, trademark filings, copyright

filings, mortgages, notices of lien or similar instruments, or take possession of or control over

any cash or securities, or otherwise confirm perfection of the liens and security interests

granted to them hereunder, such liens and security interests shall be deemed valid, perfected,

allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at

the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent,

each of the Prepetition Secured Parties and the Loan Parties, without any further consent of

any party, is authorized to take, execute, deliver and file such instruments (in each case,

without representation or warranty of any kind) to enable the DIP Agent to further validate,

perfect, preserve and enforce the DIP Liens, and such parties shall provide reasonable

#93489429v14
WEIL:\97576947\7\45327.0005

cooperation to the DIP Agent with respect to such matters. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b) A certified copy of this Interim Order may, in the discretion of the DIP Agent, at the direction of the Required Lenders under the DIP Documents, or the Prepetition Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent and the Prepetition Secured Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

22.    *Preservation of Rights Granted Under This Interim Order.*

(a) Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection remain outstanding, and, except as otherwise expressly provided in paragraph 9 of this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in

44

favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Loan Parties.

(b)     The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Loan Parties to use Cash Collateral if any of the Loan Parties, without the prior written consent of the Required Lenders seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)     a failure of the Debtors to make any payment under this Interim Order to any of the DIP Secured Parties when due;

(ii)     a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect;

(iii)     any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

(iv)     an order converting or dismissing any of the Cases;

(v)     an order appointing a chapter 11 trustee in the Cases;

(vi)     an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vii)     a plan of reorganization that constitutes an Alternative Restructuring (as defined in the Restructuring Support Agreement) being proposed by the Debtors or confirmation thereof;

(viii)     the sale of all or substantially all of the assets of the Loan Parties or all Specified Assets (as defined in the Restructuring Support Agreement) (in each case, except to the extent permitted under the

45

DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made); or

(ix)    any "Event of Default" as defined in the DIP Credit Agreement.

(c)    The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Loan Parties to use Cash Collateral if any of the Loan Parties, without the prior written consent of the Prepetition FLTL Agent seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)    a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties when due;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect, and such failure is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties;

(iii)    any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party, and such modification, amendment, or extension is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties;

(iv)    an order converting or dismissing any of the Cases;

(v)    an order appointing a chapter 11 trustee in the Cases; or

(vi)    an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), and such order is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties.

Notwithstanding any order that may be entered dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection or Adequate Protection Liens incurred by the Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in

47

section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

23.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in

#93489429v14
WEIL:\97576947\7\45327.0005

paragraph 5 of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 5 of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (i) such committee or any other party in interest, in each case with requisite standing granted by the Court (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 23) by no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 75 days after entry of this Interim Order and (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (i)-(iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or

49

causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the

Prepetition Secured Parties or their respective subsidiaries and each of their former, current or

future officers, partners, directors, managers, principals, employees, agents, financial advisors,

attorneys, accountants, investment bankers, consultants, representatives and other professionals

and the respective successors and assigns thereof, in each case in their respective capacity as

such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with

matters related to the Prepetition Credit Agreements, the Prepetition Debt, the Prepetition Liens

and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the

plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or

contested matter; provided, however, that any pleadings filed in connection with any Challenge

shall set forth with specificity the basis for such challenge or claim and any challenges or claims

not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived,

released and barred.  If no such Challenge is timely and properly filed during the Challenge

Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the

Debtors' stipulations, admissions, agreements and releases contained in this Interim Order,

including, without limitation, those contained in paragraph 5 of this Interim Order, shall be

binding on all parties in interest; (b) the obligations of the Loan Parties under the Prepetition

Credit Agreements, including the Prepetition Debt, shall constitute allowed claims not subject to

defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all

purposes in the Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the

Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding,

perfected, security interests and liens, not subject to recharacterization, subordination, avoidance

or other defense; and (d) the Prepetition Debt and the Prepetition Liens on the Prepetition

#93489429v14
WEIL:\97576947\7\45327.0005

Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee appointed or formed in the Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committee appointed or formed in the Cases (including the Creditors' Committee, if any), or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Agreements shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 5 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory committee appointed or formed in the Cases, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committee appointed or formed in these Cases (including the Creditors' Committee, if any), standing or authority to pursue any claim or cause

51

of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Agreements, the Prepetition Debt or the Prepetition Liens.

24.    *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Cases, or any trustee appointed in the Cases or any successor case, including any chapter 7 case, or any other person, party or entity (i) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (a) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Debt, liens on the Prepetition Collateral, DIP Obligations, DIP Liens, DIP Superpriority Claims and/or the Adequate Protection, Adequate Protection Liens and superpriority claims granted to the Prepetition Secured Parties under the Interim Order or the Final Order, as applicable, or (b) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Debt, the DIP Obligations and/or the liens, claims, rights, or security interests granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Agreements including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (ii) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims

52

and rights granted to such parties under the Orders, each in accordance with the DIP Documents, the Prepetition Credit Agreements or this Interim Order; (iii) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent or the DIP Lenders under this Interim Order, the Prepetition Credit Agreements or the DIP Documents, as applicable; (iv) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the Definitive Documentation) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, adequate protection liens and superpriority claims and liens granted to the Prepetition Secured Parties, unless all DIP Obligations, Prepetition Debt, adequate protection, and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Lenders; or (vi) to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the DIP Lenders in or are otherwise included in the "**Approved Budget**" (as initially attached to the Motion, and as updated in accordance with the terms of the DIP Documents).  For the avoidance of doubt, nothing herein shall modify or limit the Loan Parties' use of the Carve-Out in connection with such rights.

25.     *Loss or Damage to Collateral*.  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent and the DIP Lenders comply with their

#93489429v14
WEIL:\97576947\7\45327.0005

obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Loan Parties.

26. *Interim Order Governs.* In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents or any other order entered by this Court, the provisions of this Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

27. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition

54

Secured Parties and the Debtors and their respective successors and assigns; *provided* that the

DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to

permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any

financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for

the estates of the Debtors.

> *Limitation of Liability.*  In determining to make any loan or other extension of

credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any

rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents,

the DIP Agent and the DIP Lenders shall not (i) be deemed to be in "control" of the operations of

the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or

estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator"

with respect to the operation or management of the Debtors (as such terms or similar terms are

used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).  The

Prepetition Secured Parties shall not (i) be deemed to be in "control" of the operations of the

Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or

estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator"

with respect to the operation or management of the Debtors (as such terms or similar terms are

used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

28.    *Master Proof of Claim.*  The Prepetition Agents shall not be required to file proofs

of claim in the Cases or any successor case in order to assert claims on behalf of itself and the

Prepetition Secured Parties for payment of the Prepetition Debt arising under the Prepetition

#93489429v14
WEIL:\97576947\7\45327.0005

Credit Agreements.  The statements of claim in respect of the Prepetition Debt set forth in this

Interim Order, together with any evidence accompanying the Motion and presented at the Interim

Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and

such secured status.  However, in order to facilitate the processing of claims, to ease the burden

upon the Court and to reduce an unnecessary expense to the Debtors' estates, each Prepetition

Agent is authorized, but not required, to file in the Debtors' lead chapter 11 case *Fieldwood*

*Energy Inc.,* Case No. 20-_____, a single, master proof of claim on behalf of the relevant

Prepetition Secured Parties on account of any and all of their respective claims arising under the

applicable Prepetition Credit Agreements and hereunder (each, a "**Master Proof of Claim**")

against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the

Debtors, the Prepetition Agents and the Prepetition Secured Parties, and each of their respective

successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth

opposite its name therein in respect of its claims against each of the Debtors of any type or nature

whatsoever with respect to the applicable Prepetition Credit Agreements, and the claim of each

Prepetition Secured Party (and each of its respective successors and assigns), named in a Master

Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of

these Cases.  The Master Proofs of Claim shall not be required to identify whether any

Prepetition Secured Party acquired its claim from another party and the identity of any such party

or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation

among such holders of the claims asserted therein resulting from the transfer of all or any portion

of such claims.  The provisions of this paragraph 28 and each Master Proof of Claim are intended

solely for the purpose of administrative convenience and shall not affect the right of each

Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed

56

in these Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.

29.    *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee for the Prepetition Secured Parties under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and second, to the payment of the Prepetition Debt owed to the Prepetition Secured Parties.

30.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

31.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

32.    *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any Prepetition Secured Party receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of

#93489429v14
WEIL:\97576947\7\45327.0005

DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments in accordance with the DIP Documents, such Prepetition Secured Party shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

33.    *Credit Bidding*.  (a) The DIP Agent, as directed by the Required Lenders under the DIP Documents, shall have the right to credit bid on behalf of the Senior DIP Secured Parties, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (b) subject to any applicable Intercreditor Agreement, the Prepetition Secured Parties shall have the right to credit bid on behalf of the Prepetition Secured Parties, up to the full amount of their Prepetition Debt  in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

34.    *Intercreditor Agreements*. Nothing in this Interim Order shall amend or otherwise modify the terms or enforceability of the Intercreditor Agreements, including without limitation, the turnover and bankruptcy-related provisions contained therein, and the Intercreditor Agreements shall each remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreements.

#93489429v14
WEIL:\97576947\7\45327.0005

35.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

36.     *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

37.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

38.     Subject to Section 553 of the Bankruptcy Code and applicable law, nothing in this Interim Order is intended to limit, impact or affect, in any way, any rights to set off or recoupment that the United States may have, all of which are expressly reserved.

39.     Notwithstanding anything to the contrary in this Order, the liens granted in this Order, if any, against any of the Debtors' interests in the federal leases, grants of pipeline rights of way and rights of use and easement, shall not grant the applicable lender any greater rights or interests in the applicable leases, grants of pipeline rights of way and/or rights of use and easement than those to which the Debtors are entitled.  For the avoidance of any doubt, to the extent that any pre-petition secured parties or post-petition lenders foreclose on any pre-petition liens, adequate protection liens and/or post-petition liens, all regulatory and contractual requirements that apply to such leases, rights of way and rights of use and easement shall be preserved, subject to any defenses that may apply.

40.     *Final Hearing*.  The Final Hearing is scheduled for _____, 2020 at _____ ___.m. (CST) before this Court.

#93489429v14
WEIL:\97576947\7\45327.0005

41.     *Objections.*  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (i) the U.S. Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103 (Attn: Kathleen M. LaManna, Esq. and Nathan Z. Plotkin, Esq.) as counsel to the DIP Agent, the Prepetition FLTL Agent and the FLFO Collateral Agent; (iv) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Damian S. Schaible, Esq., Natasha Tsiouris, Esq. and Joshua Y. Sturm, Esq.) as primary counsel to certain DIP Lenders; (v) Vinson & Elkins, LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn: William L. Wallander, Esq. and Brad Foxman, Esq.)) as primary counsel to the Prepetition FLFO Administrative Agent; (vi) counsel to the Prepetition SLTL Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas, (ix) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002; and (x) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2020 at 4:00 p.m. (CST), prevailing Eastern Time.

42.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court.

#93489429v14
WEIL:\97576947\7\45327.0005

## EXHIBIT C

**FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●], 2020 (as amended, supplemented or otherwise modified from time to time, the "<u>Agreement</u>"), by and among the Company (as defined in the Agreement), and, among others, the holders of the principal amounts outstanding under the [Prepetition FLTL Loans/Prepetition SLTL Loans] (together with their respective successors and permitted assigns, the "<u>Consenting Creditors</u>" and each, a "<u>Consenting Creditor</u>") is executed and delivered by _____ (the "<u>Joining Party</u>") as of [●].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.   <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.   <u>Representations and Warranties</u>.  With respect to [the aggregate principal amount of Prepetition FLTL Loans/Prepetition SLTL Loans], in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 9</u> of the Agreement to each other Party to the Agreement.

3.   <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

4.   <u>Joining DIP Commitment</u>

☐  By checking this box, the Joining Party hereby represents and warrants that as of [_], 2020 (the "<u>Effective Date</u>") it held Prepetition FLTL Loans in the amount set forth below, and hereby commits to provide a share of the DIP Facility as a Joining DIP Commitment Party as provided in and in accordance with <u>Section 3(g)</u> of the Agreement:

(A) Principal Amount of Prepetition FLTL Loans held by Joining   $ _____
Party:

(B) Principal Amount of Prepetition FLTL Loans set forth above
in (A) divided by $[_][1], expressed as a percentage:

_____

---

[1] Amount of all Prepetition FLTL Loans

(C) Amount of the DIP Facility the Joining Party hereby agrees
to commit to, ("***DIP Commitment Amount***"):

_____

    5.  <u>Notice</u>.  All notices and other communications given or made pursuant to the
Agreement shall be sent to:

        To the Joining Party at:

        [JOINING PARTY]
        [ADDRESS]
        Attn:
        Facsimile:
        Email:

              [Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:


**<u>CONSENTING CREDITOR</u>**

**[●]**

By: **[●]**

Name: **[●]**

Title: **[●]**


Principal Amount of Prepetition FLTL Loans:  $_____

Principal Amount of Prepetition SLTL Term Loans:  $_____


<u>Notice Address</u>:
**[●]**


Fax: **[●]**
Attention: **[●]**
Email: **[●]**

WEIL:\97578907\3\45327.0005
#93462797v19

Acknowledged:

**[●]**

By:_____
Name:
Title:

## **EXHIBIT D**

## **DIP BACKSTOP COMMITMENTS**

[Redacted]

## **Exhibit B**

Fieldwood Organizational Chart

# Fieldwood Energy Organization Chart – Debt Overlay



**\*Debtor entities are denoted by a dotted outline**

- Borrower under the FLFO, FLTL and SLTL; Obligor in respect of Apache Decommissioning Agreement
- Holdings under the FLFO, FLTL, and SLTL
- Guarantor under the FLFO, FLTL, and SLTL
- Guarantor under the FLFO, FLTL, and SLTL and Obligor in respect of the Apache Decommissioning Agreement
- Excluded Subsidiary (Immaterial) under the FLFO, FLTL, and SLTL
- Receivables Subsidiary in connection with Qualified Receivables Financing
- Acquired through the Apache Transaction, September 30, 2013
- Acquired through the Sandridge Transaction, February 25, 2014

| Facility | Maturity | Principal |
|---|---|---|
| **Fieldwood - First Lien Debt Obligations** | | |
| First Lien First Out Term Loans ("FLFO") | 12/31/2021 | $139 million |
| First Lien Last Out Term Loans ("FLTL") | 04/11/2022 | $1,143 million |
| **Fieldwood - Second Lien Debt Obligations** | | |
| Second Lien Term Loans ("SLTL") | 04/11/2023 | $518 million |
| **Total Funded Debt** | | **$1,800 million** |

