IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| FIELDWOOD ENERGY LLC, *et al.,* | § § | Case No. 20-33948 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

## DECLARATION OF MICHAEL DANE IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Michael T. Dane, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am Senior Vice President and Chief Financial Officer of Fieldwood Energy LLC ("**Fieldwood Energy**"), a wholly-owned direct subsidiary of Fieldwood Energy Inc. ("**Parent**"). I have served as Senior Vice President and Chief Financial Officer since March 9, 2016. Prior to my appointment to my current role, I was Vice President of Finance for Fieldwood Energy. Before that, I was Manager of Finance and Planning at Dynamic Offshore Resources, LLC and an equity research analyst at SunTrust Robinson Humphrey with a focus on the exploration and production sector. I hold a Bachelor of Commerce degree from McGill University.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

2.     Commencing on August 3, 2020 (the "**Petition Date**"), Parent and certain of its domestic subsidiaries (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**") filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable about and familiar with the Company's businesses and financial affairs.  I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**").  I am authorized to submit this Declaration on behalf of the Debtors.

3.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Company's advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Jones Walker LLP ("**Jones Walker**"), Houlihan Lokey Capital, Inc. ("**Houlihan**"), and AlixPartners, LLP ("**AlixPartners**").  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.     This Declaration has been organized into five sections.  The first provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring.  The second describes the Company's business, its history and its current operations.  The third summarizes the Company's organizational and capital structure.  The fourth describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  The fifth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I. Overview

5.     The Company is one of the largest oil and gas exploration and production companies in the Gulf of Mexico (the "**GOM**").  Its portfolio of properties includes both deepwater assets and shallow water assets in the GOM.  The majority of the Company's shallow water assets were acquired in 2013 when the Company purchased certain GOM properties from Apache Corporation (together with its subsidiaries and affiliates, "**Apache**" and, the acquired assets, the "**Legacy Apache Properties**").  The Company's other shallow water assets were acquired through multiple other subsequent transactions including its 2014 acquisition of certain subsidiaries of SandRidge Energy, Inc. comprising its Gulf Coast division (the shallow water "**Non-Apache Properties**" and, together with the shallow water Legacy Apache Properties, the "**Shelf Assets**").  The Company subsequently acquired a number of deepwater assets in 2018 when it purchased Noble Energy, Inc.'s deepwater business (the "**Noble Properties**") as part of its previous chapter 11 case discussed below.  Since 2018, the Company has acquired additional interests in its Noble Properties and additional deepwater assets to further diversify and complement its portfolio of properties (together with the Noble Properties, the "**Deepwater Assets**").

6.     Despite the Company's strategic growth plans and diversified mix of properties, the Company's liquidity profile has become volatile in recent years, primarily as a result of (i) the precipitous decline in crude oil prices starting in 2014 and then again in 2020 and (ii) more recently, the effects of the COVID-19 pandemic.  These adverse market conditions first led the Company to restructure its balance sheet pursuant to prepackaged chapter 11 cases commenced in February of 2018 – *In re Fieldwood Energy, LLC*, Case No. 18-30649 (DRJ) (the "**2018 Restructuring**").  In April 2018, this Court entered an order confirming the Company's

plan of reorganization, pursuant to which the Company reduced its funded debt obligations by more than $1.6 billion and acquired the Noble Properties.  Since the 2018 Restructuring, however, worsening market conditions coupled with significant decommissioning costs related to its Shelf Assets have resulted in reduced liquidity for the Company.

7.     Over the past several months, the Company has worked alongside its lenders and other stakeholders to formulate strategic alternatives.  These efforts have culminated in an agreement with Apache—the predecessor in interest of the majority of the Debtors' Shelf Assets—on the framework for a restructuring with respect to the Legacy Apache Properties.  The framework is memorialized in an executed term sheet with Apache (the "**Apache Term Sheet**").[2] Given that the plugging and abandonment and decommissioning obligations (the "**P&A Obligations**") related to the Legacy Apache Properties are among the Company's most significant liabilities, the terms set forth under the Apache Term Sheet form the cornerstone of a comprehensive restructuring plan.

8.     <u>Apache Term Sheet</u>.  The Apache Term Sheet contemplates that the Company's assets will be separated into two or more entities.  The Legacy Apache Properties (except for certain Retained Properties (as defined in the Apache Term Sheet)) will be owned post-confirmation by the surviving entity of a divisional merger of Fieldwood Energy, which entity will continue post-divisional merger but may change its name and will continue to own debtor entity GOM Shelf LLC ("**Fieldwood I**"), and will be responsible for operating and decommissioning the Legacy Apache Properties.  Fieldwood I will not have any business or operations other than operating and decommissioning the Legacy Apache Properties, and will be responsible for all of

---

[2] The Apache Term Sheet is Exhibit B to the Restructuring Term Sheet (as defined herein), which is annexed to **<u>Exhibit A</u>** of this Declaration.

the Company's obligations under the Decommissioning Agreement (as defined below) as it relates to the Legacy Apache Properties.

9.      The Apache Term Sheet contemplates that Fieldwood I will be managed by a sole manager and an independent director, each appointed in accordance with the Apache Term Sheet.  Additionally, certain material decisions regarding Fieldwood I, such as using free cash flow (after operating expenses) for any purpose other than covering P&A Obligations as set forth in that certain *Decommissioning Agreement* by and among Debtor and certain affiliates and Apache and certain affiliates, dated as of September 30, 2013 (as amended from time to time, the "**Decommissioning Agreement**"), and engaging in any activity outside the ordinary course of business, require Apache's consent.  Operations of producing properties and decommissioning activities initially will be performed by the resulting reorganized Debtors under a transition services agreement and may be performed in the future, at Apache's option, by a third-party service provider.  Additionally, Apache retains certain rights under the Decommissioning Agreement related to performing decommissioning activities on the Legacy Apache Properties.

10.     The Company will capitalize Fieldwood I with an amount equal to $50 million less the post-petition decommissioning amounts paid by the Company on the Legacy Apache Properties.  Additional funds will be available to pay for the P&A Obligations of Fieldwood I, including (i) any and all funds in Trust A (defined below), a trust already in existence that secures the Company's performance under the Decommissioning Agreement between the Company and Apache,[3] (ii) cash flow generated from operations at the Legacy Apache Properties,

---

[3] The Apache Term Sheet provides that Apache would only have access to the Trust A funds if (i) Fieldwood I defaults on its decommissioning obligations under the Decommissioning Agreement, (ii) any governmental authority or any other Person or entity seeks to cause Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, and (iii) Apache conducts the decommissioning.

and (iii) funds provided by Apache under the Standby Facility (as defined in the Apache Term Sheet) after exhausting the other sources of funds. Should (i) Fieldwood I default on its decommissioning obligations under the Decommissioning Agreement, (ii) a governmental authority or other entity seeks to require Apache or its affiliates to conduct the decommissioning, and (iii) Apache does, in fact, conduct the decommissioning, Apache will be entitled to draw on cash in Trust A, letters of credit and bonds currently outstanding, totaling approximately $736 million (the "**Decommissioning Security**") in reimbursement of such advances.

11. The Apache Term Sheet represents a major milestone in the Debtors' restructuring efforts by addressing approximately two-thirds of the Debtors' P&A Obligations on the Shelf Assets. In addition, over the past several months, the Company has been in active discussions with the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**"), the two federal regulators responsible for overseeing, among other things, the Debtors' decommissioning operations. In the months leading up to the Petition Date, the Company has been in regular contact with BOEM and BSEE, as well as representatives from the Department of Interior and Department of Justice, to keep the U.S. government apprised of both the Company's restructuring efforts and plans with respect to the Shelf Assets. The Company has shared material terms of the Apache Term Sheet with BOEM and BSEE, and will continue to have discussions toward a consensual resolution of the Company's P&A Obligations.

12. <u>RSA and Restructuring Term Sheet</u>. Over the past few months, the Company has also worked closely with its First Lien First Out Lenders, First Lien Term Lenders, and Second Lien Term Lenders (each as defined below, and collectively, the "**Secured Lenders**") on developing the framework of a global restructuring that incorporates the structure contemplated

6

by the Apache Term Sheet. The Company is pleased to announce that, after extensive negotiations, it has reached an agreement with certain of its Secured Lenders, including an ad hoc group of FLTL Lenders represented by Davis Polk & Wardwell LLP and Haynes and Boone, LLP (the "**Ad Hoc Group of Secured Lenders**"), on a restructuring term sheet (the "**Restructuring Term Sheet**") and a restructuring support agreement (the "**RSA**").[4] The parties to the RSA include Consenting FLTL Lenders holding approximately 67.63% ($773,053,055) of the Company's secured debt under the FLTL Credit Agreement (as defined below) and Consenting SLTL Lenders holding approximately 25.73% ($133,171,252) of the Company's secured debt under the SLTL Credit Agreement (as defined below).

13. Pursuant to the RSA, the Company, the Consenting FLTL Lenders, the Consenting SLTL Lenders and Apache have agreed to support the transactions set forth in the Restructuring Term Sheet.[5] The Restructuring Term Sheet contemplates the separation of the Debtors' assets into multiple entities. First, the Specified Assets (as defined in the Restructuring Term Sheet), including the Debtors' Deepwater Assets, will be transferred to one or more purchasers or a new entity through (i) a standalone sale or sales pursuant to section 363 of the Bankruptcy Code, (ii) a sale or sales pursuant to a plan of reorganization, or (iii) an equitization pursuant to a plan. Second, the Debtors' Legacy Apache Properties will be owned by Fieldwood I, consistent with the terms of the Apache Term Sheet. Third, any assets other than the Specified Assets and Legacy Apache Properties will be transferred into one or more limited liability companies, business trusts, or other bankruptcy remote vehicles, through conveyance, disposition or other transfer made in accordance with the Bankruptcy Code.

---

[4] The RSA is attached hereto as **Exhibit A**. The Restructuring Term Sheet is Exhibit A of the RSA.
[5] RSA discussions with the FLFO Lenders are ongoing but they are not currently a party to the RSA.

14.     <u>M&A Process</u>.  In furtherance of the potential restructuring transactions described above, prior to the Petition Date, the Company commenced a sale and marketing process for the Debtors' Deepwater Assets.  Houlihan, on behalf of the Debtors, launched a sales process for these assets on June 30, 2020.  The Company thus far has received interest from a broad range of potential purchasers, including both national and international strategic and financial sponsors. Should an asset sale not be consummated, the Debtors, with the consent of the Requisite DIP Commitment Parties and Requisite FLTL Lenders (as defined in the RSA), may seek to equitize their debt in exchange for ownership of the equity of the Reorganized Debtors.

15.     <u>DIP Financing</u>.  As further detailed in the DIP Declaration, the Debtors launched a solicitation process to obtain debtor in possession financing and the consensual use of cash collateral to fund these chapter 11 cases.  The Debtors, through their investment banker, Houlihan, solicited offers for debtor-in-possession financing from seven (7) parties, including the Debtors' existing FLFO Lenders and FLTL Lenders.  Two (2) offers for financing were received, although none from outside the Company's capital structure.  Ultimately, the Debtors were able to secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $100 million (the "**DIP Facility**"), to be provided by certain members of the Ad Hoc FLTL Group (solely in such capacity, the "**DIP Lenders**").  The terms of the DIP Financing are reflected in a term sheet agreed upon by the Company, the DIP Lenders, and Apache (the "**DIP Term Sheet**").[6]  The Debtors and the DIP Lenders are in the process of negotiating a final form credit agreement with

---

[6] The DIP Term Sheet is Exhibit A to the Restructuring Term Sheet.

respect to the DIP Facility (the "**DIP Credit Agreement**") which will be filed with the Court prior to the final hearing on the First Day Motions.

16.     The DIP Term Sheet requires compliance with certain milestones for the Debtors' restructuring as reflected in the RSA, including, among other things: (i) the DIP Closing Date (as defined in the RSA) shall have occurred by no later than fifteen (15) days after the Petition Date; (ii) the completion of definitive documentation with respect to the transactions contemplated by the Apache Term Sheet by no later than seventy-five (75) days after the Petition Date; (iii) the Debtors, at the election of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, will have proposed and filed a plan of reorganization (a "**Plan**"), a disclosure statement, and a motion to approve the disclosure statement by no later than seventy-five (75) days after the Petition Date; (iv) in the event that a Bidding Procedures Motion is filed, a Bidding Procedures Order shall have been entered by the Bankruptcy Court no later than one-hundred (100) days after the Petition Date; (v) approval of the disclosure statement by no later than one-hundred and fifty (150) days after the Petition Date; (vi) confirmation of the Plan by no later than one-hundred and ninety-five (195) days after the Petition Date; and (vii) the Plan becoming effective by no later than two-hundred and ten (210) days after the Petition Date.

## II.  The Debtors' Businesses

17.     Fieldwood Energy was established in December 2012 as a portfolio company of certain energy funds of Riverstone Holdings LLC, a private energy and power-focused investment firm.   The Company operates an energy business focused on the acquisition, development, exploration, and production of oil and natural gas properties.   The Company's oil and natural gas assets consist primarily of producing oil and natural gas properties located primarily off-shore in the GOM.  Fieldwood Energy was initially capitalized in September 2013

in connection with the acquisition of shallow water assets from Apache.[7]   In early 2014, the Company completed an acquisition of certain GOM assets from SandRidge Energy, Inc.[8]   As discussed in further detail below, in connection with the 2018 Restructuring, the Company acquired the deepwater Noble Properties.  Since 2018, the Company has grown its deepwater asset base through opportunistic acquisitions of additional deepwater assets and through a strategic exploration and development program by drilling and completion of five deepwater wells near facilities that Fieldwood Energy either owns, operates, or to which is has a contractual right to flow-back.  The combination of Fieldwood Energy's shallow water and deepwater properties makes it one of the largest oil and gas exploration and production companies in the GOM by leasehold and operated production.

18.     The following map illustrates the locations of the Debtors' oil and natural gas properties as of the Petition Date:



---

[7] Debtor GOM Shelf LLC and FW GOM Pipeline, Inc. were also acquired in this acquisition.

[8] The following Debtors were acquired in this transaction:  Dynamic Offshore Resources NS, LLC, Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC.

19.     As of the date hereof, the Debtors have over 300 operated platforms spread across over 1.5 million gross acres.  The Debtors employ approximately 635 employees across their offices in Houston, Lafayette, and offshore.  In addition, the Debtors have approximately 500 additional contractor personnel on their facilities on a daily basis.  The Debtors maintain operational control over greater than 95% of their diversified asset base.  During the first three months of 2020, the Debtors have produced on average 79,410 barrels of oil equivalent per day.  In a typical year, the Debtors spend significant sums on helicopters, drilling rigs, and various marine vessels to support operations, which include support for producing fields, workovers, recompletions, ongoing maintenance, drilling, and decommissioning activities.

20.     Additionally, as one of the largest facility and well owners in the GOM, the Debtors have an extensive well plugging and abandonment ("**P&A**") and decommissioning programs.  In recent years, the Company has maintained a robust staff specifically dedicated to managing P&A and decommissioning operations.  The Company has performed a significant amount of well-P&A work in-house using Company-owned spreads and specialized employees.

21.     The Company prides itself on being an industry leader in establishing vigorous systems to manage its risk associated with offshore GOM operations effectively and is committed to maintaining safe and efficient operations, with the paramount goal of protecting personnel, the environment and its facilities.  To mitigate risk and support the Company's daily operations, the Company maintains a multi-tier insurance program.  The Company's current energy package policy includes insurance coverage for pollution as well as third-party pollution liabilities, control of well, and property damage from operational and windstorm risk.  In addition, the Company requires each of its contractors working on its facilities to maintain insurance coverage appropriate for the services provided by the contractor and for the contractor to name the

Company as an additional insured under its insurance policies. The Company also requires each contractor to provide contractual indemnification to the Company for bodily injury and property damage arising out of the contractor's operations.

## A. Regulation of Debtors' Businesses and Decommissioning Obligations

22. The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions where they operate. The laws and regulations that impact the Debtors' operations include those relating to the operation of wells and facilities (including platforms, pipelines, and gathering or processing units), environmental protection, health and safety, and oil and natural gas exploration and development.

23. The Company's operations in the GOM include a substantial number of oil and gas leases situated in federal waters and issued by the U.S. Department of the Interior. Specifically, the Company owns an interest in over 350 oil, gas, and mineral leases ("**Oil and Gas Leases**"), and is party to hundreds of joint operating agreements, unitization agreements, and farm-out agreements governing operations of the Oil and Gas Leases. Of their Oil and Gas Leases, almost all are offshore leases granted by BOEM or its predecessor entity. Operation of the Oil and Gas Leases is subject to regulation by BOEM and BSEE and requires compliance with BOEM and BSEE regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act. For offshore operations, lessees must obtain BOEM approval for exploration, development, and production plans before the commencement of such operations. In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE before commencing drilling and must comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, P&A, and removal of infrastructure facilities.

**B.     Obligations to the United States Government**

24.     To cover the various obligations of lessees, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease, BOEM may require that lessees post surety bonds or other acceptable financial assurances that such obligations will be met.  As of the Petition Date, the Debtors have obtained approximately $177 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A Obligations. For properties acquired from third parties, BOEM may require surety bonds but also may rely on adequate assurances that the obligations are covered based on the contractual arrangement between the parties.

**C.     Obligations to Third Parties**

25.     Pursuant to BOEM regulations, the Company is jointly and severally liable for its P&A obligations with all current and prior owners in the chain of title who were owners at the time and after such facilities and wells were put in place.  Therefore, in connection with many of its acquisitions of oil and gas properties, the Company has entered into various arrangements with the sellers that establish how the decommissioning of the subject oil and gas properties will be addressed in compliance with BOEM regulations, including (as discussed below) with Apache.

26.     Obligations to Third Parties Excluding Apache.  As stated, the Debtors have entered into various arrangements with third parties to cover P&A Obligations assumed or that may arise during the Debtors' ownership of any acquired assets.  In connection with the P&A Obligations to third parties (other than Apache), the Debtors have obtained approximately $494 million in surety bonds and maintain less than $10 million in escrow deposits, in each case for the benefit of such third parties.

13

27.   <u>Obligations to Apache</u>.   As explained above, the Company, in 2013, purchased the Legacy Apache Properties from Apache and agreed to assume decommissioning liabilities for certain properties that Apache previously owned and operated (the Legacy Apache Properties together with the previously owned and operated properties, the "**Apache Properties**"). The Debtors' decommissioning obligations with respect to the Apache Properties is governed by the provisions of the Decommissioning Agreement.

28.   Under the Decommissioning Agreement, the Debtors must spend a minimum amount ($80 million through 2022) each year on decommissioning the Apache Properties or fund any shortfall into a decommissioning trust for which Apache holds a beneficial interest (the "**Trust A**").   If the Company fails to perform the decommissioning required by the government, Apache may perform the decommissioning itself and seek reimbursement from the Company.   If the Debtors fail to reimburse Apache, then Apache may then seek reimbursement first from proceeds held in Trust A and then from certain letters of credit or surety bonds issued for its benefit and described below.   Any amounts collected by Apache under the letters of credit or surety bonds, but not used for reimbursement for Apache decommissioning work, are required to be deposited into Trust A.

29.   Under the Decommissioning Agreement and related documents, as amended in connection with the 2018 Restructuring, the Company has provided Apache with the following security and credit support relating to decommissioning of the Apache Properties:

- Approximately $498 million in letters of credit, provided that the Company has the right to replace up to $150 million of letters of credit with an equivalent amount of surety bonds in form and substance acceptable to Apache, which the Debtors have exercised;

- The conveyance of net profits interests into Trust A; and

- A first-priority springing lien on the assets of Trust A upon certain conditions being fulfilled, including the condition that the NPIs are recharacterized by the Court.

30.     Each month, the Debtors are obligated to deposit certain of the net profits generated by certain of the Apache Properties into Trust A.  Certain funds in Trust A may be reimbursed to the Debtors if the Company certifies that the required minimum spend on decommissioning will be performed in the applicable year, and other funds in Trust A continue to accrue until the amounts therein equal approximately $300 million.  As the Company decommissions the Apache Properties, funds in Trust A and the amount of the letters of credit or surety bonds may be reduced if they together exceed 125% of the Debtors' remaining decommissioning liabilities under the Decommissioning Agreement.  Under Fieldwood's decommissioning program, the Company has performed approximately $1.4 billion of decommissioning work, and has plugged and abandoned over 1,100 wells, 400 pipelines, and 380 platforms and other facilities through year-end 2019.

31.     In connection with the 2018 Restructuring, the Debtors and Apache amended the Decommissioning Agreement to its current form.

32.     Under the Apache Term Sheet, all of the Debtors' obligations under the Decommissioning Agreement will continue with Fieldwood I.

**D.**     **2018 Restructuring**

33.     On February 15, 2018, the Debtors commenced the 2018 Restructuring in this Court.  Pursuant to a pre-packaged plan of reorganization (the "**2018 Plan**"), the Debtors reduced their total funded debt from approximately $3.3 billion to $1.7 billion and reduced the Company's annual debt service obligations by up to $128 million.

15

34.     Additionally, pursuant to the 2018 Plan, the Company acquired the deepwater Noble Properties for a purchase price of approximately $480 million, prior to customary adjustments.  The Noble Properties have increased the Company's base of cash-flow positive assets meaningfully and have provided accretive value to the Debtors through operational efficiencies and synergies with the Debtors' existing assets.  The Company's purchase of the Noble Properties was funded by a portion of the proceeds from an equity rights offering to certain of the Company's then-second lien lenders (the "**2018 Rights Offering**").

**E.     Other Matters**

35.     Fieldwood Energy is the indirect owner of economic interests in approximately 10% of Fieldwood Energy E&P Mexico, S. de R.L. de C.V. ("**Fieldwood Mexico**"), with the remaining 90% owned primarily by Riverstone V FW Holdings, LLC and its affiliates.  Fieldwood Mexico is not a debtor in these chapter 11 cases.  Fieldwood Mexico is the designated operator of the undeveloped Ichalkil and Pokoch fields in Mexico and splits all costs and profits equally with its Mexican partner, PetroBal, S.A.P.I. de C.V.  Fieldwood Energy manages Fieldwood Mexico and provides technical and administrative services to Fieldwood Mexico pursuant to various service agreements on arm's-length terms.

### III.  Corporate and Capital Structure

**A.  Corporate Structure**

36.     Parent is approximately 49% owned by Riverstone Holdings LLC and certain of its affiliates, approximately 49.5% owned by its previous lenders and participants of the 2018 Rights Offering, and approximately 1.5% owned by employees through settlements of restricted stock units issued under a management incentive plan.

16

37.     Collectively, the Debtors consist of 14 entities registered under the laws of Delaware, Texas, and Louisiana.  The Debtors also own two wholly-owned, non-debtor, domestic affiliates formed in Delaware and a wholly-owned, non-debtor, non-domestic affiliate formed in the Netherlands.  A chart illustrating the Debtors' domestic organizational structure as of the Petition Date is attached as **Exhibit B** to this Declaration.

38.     All of the other Debtors are wholly-owned direct or indirect subsidiaries of Parent.  Parent's Board of Directors (the "**Board**") functions as the Debtors' governing board with respect to the decision-making underlying these chapter 11 cases.  The Board has seven members. Prior to July 8, 2020, G.M. McCarroll served as the Chairman of the Board.  He was also the Debtors' President and Chief Executive Officer.  G.M. McCarroll resigned his positions effective as of July 1, 2020 pursuant to a separation agreement with the Company and continues to provide transition services at the Board's direction under a consulting agreement.  The Board thereafter resolved to create an Executive Leadership Team (the "**ELT**") in lieu of appointing an individual to replace G.M. McCarroll as CEO.  The Board has appointed Michael T. Dane (Senior Vice President and Chief Financial Officer), Thomas R. Lamme (Senior Vice President and General Counsel), and Gary D. Mitchell (Senior Vice President – Production) to serve on the ELT.  In addition, the Board formed the Leadership Transition Committee (the "**LTC**") to oversee the ELT. Jim LaChance, an independent director, who joined the Board on July 8, 2020, is the sole member of the LTC.

39.     The Debtors' core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Michael T. Dane | Senior Vice President and Chief Financial Officer |
| Thomas R. Lamme | Senior Vice President, General Counsel, and Secretary |
| Gary D. Mitchell | Senior Vice President, Production |
| Gary Janik | Senior Vice President, Reservoir Engineering, Acquisitions and Mexico |
| John Seeger | Senior Vice President, Operations |
| John Smith | Senior Vice President, Business Development |

## B.  Capital Structure

40.    The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  The following table provides a summary of the Debtors' capital structure, as described in more detail below.

| Facility | Maturity | Principal |
|----------|----------|-----------|
| Fieldwood - First Lien Debt Obligations | | |
| First Lien First Out Term Loans | 12/31/2021 | $139 million |
| First Lien Last Out Term Loans | 04/11/2022 | $1,143 million |
| Fieldwood - Second Lien Debt Obligations | | |
| Second Lien Term Loans | 04/11/2023 | $518 million |
| Total Funded Debt | | $1,800 million |

41.    <u>First Lien First Out Credit Agreement</u>.  Certain of the Debtors are parties to that certain *Second Amended and Restated Credit Agreement- First Out*, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Credit Agreement**") between Fieldwood Energy, as borrower, Parent, as holdings, Goldman Sachs Bank USA, as administrative agent (the "**FLFO Administrative Agent**"), Cantor Fitzgerald Securities. ("**CFS**"), as collateral agent (in its capacity as such, the "**FLFO Collateral Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**FLFO Lenders**").  The Prepetition FLFO Credit Agreement establishes (i) a term loan credit facility that matures on December 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (the "**Initial FLFO Term Loans**") are

outstanding, (ii) a multi-draw term loan credit facility that matures on December, 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (the "**Multi Draw FLFO Term Loans**" and, together with the Initial FLFO Term Loans, the "**FLFO Term Loans**") are outstanding, and (iii) a revolving credit facility that matures on December 31, 2021, pursuant to which (a) an aggregate principal amount of approximately $17 million in revolving loans is outstanding (the "**FLFO Revolving Loans**")  and (b) a reimbursement obligation in favor of the Prepetition FLFO Administrative Agent with respect to approximately $22 million in drawn letters of credit is outstanding, plus, in each case, any applicable interest, fees, and other amounts (the claims arising under the Prepetition FLFO Credit Agreement, collectively, the "**FLFO Claims**").

42. Certain of the Debtors guaranteed the Obligations (as defined in the Prepetition FLFO Credit Agreement (the "**FLFO Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**FLFO Guarantors**") and the FLFO Collateral Agent.  In order to secure the FLFO Obligations and the guarantee provided with respect to the FLFO Obligations, each of Fieldwood Energy and the FLFO Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Second Amended and Restated Collateral Agreement, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLFO Collateral Agreement**") among Fieldwood Energy, the FLFO Guarantors, the FLFO

Administrative Agent, and the FLFO Collateral Agent. In addition to the liens and security interests granted pursuant to the FLFO Collateral Agreement, Fieldwood Energy and certain of the FLFO Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLFO Credit Agreement, the "**FLFO Mortgages**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

43. <u>First Lien Term Loan Agreement</u>. Certain of the Debtors are parties to that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**FLTL Credit Agreement**"), among Fieldwood Energy, as borrower, Parent, as holdings, the lenders from time to time party thereto (the "**FLTL Lenders**" and, together with the FLFO Lenders, the "**First Lien Lenders**"), and CFS, as administrative agent and collateral agent (the "**FLTL Administrative Agent**" and, together with the FLFO Administrative Agent and the FLFO Collateral Agent, the "**First Lien Agents**"). As of the Petition Date, the aggregate amount outstanding under the FLTL Credit Agreement is approximately $1,142,688,815.28, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**FLTL Claims**").

44. Certain of the Debtors guaranteed the Obligations (as defined in the FLTL Credit Agreement (the "**FLTL Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**FLTL Guarantors**") and the FLTL Administrative Agent. In

order to secure the FLTL Obligations and the guarantee provided with respect to the FLTL Obligations, each of Fieldwood Energy and the FLTL Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**FLTL Collateral Agreement**", and, together with the FLFO Collateral Agreement, the "**First Lien Collateral Agreements**") among Fieldwood Energy, the FLTL Guarantors and the FLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the FLTL Collateral Agreement, Fieldwood Energy and certain of the FLTL Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLTL Credit Agreement, the "**FLTL Mortgages**", and, together with the FLFO Mortgages, the "**First Lien Mortgages**", the First Lien Mortgages, together with the First Lien Collateral Agreements and any other "Security Documents" as defined in the FLFO Credit Agreement and FLTL Credit Agreement, respectively, the "**First Lien Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required. The security interest and lien securing the FLTL Obligations is pari passu with the security interest and lien securing the FLFO Obligations; however, the FLTL Obligations are subordinate in right of payment to the FLFO Obligations pursuant to the terms of the Pari Passu Intercreditor Agreement (as defined below).

45. <u>Second Lien Term Loan Agreement</u>. Certain of the Debtors are parties to that certain *Amended And Restated Second Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time,

the "**SLTL Credit Agreement**" and, together with the FLFO Credit Agreement and FLTL Credit Agreement, the "**Credit Agreements**"), among Fieldwood Energy, as borrower, Parent, as holdings, the lenders from time to time party thereto (the "**Second Lien Lenders**" and, together with the First Lien Lenders, the "**Lenders**"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (the "**SLTL Administrative Agent**" and, together with the First Lien Agents, the "**Administrative Agents**").  As of the Petition Date, the aggregate amount outstanding under the SLTL Credit Agreement is approximately $517,500,000, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**SLTL Claims**").

46.     Certain of the Debtors guaranteed the Obligations (as defined in the SLTL Credit Agreement (the "**SLTL Obligations**")) of Fieldwood Energy pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018 (the "**SLTL Guarantee**"), among Fieldwood Energy, Parent, certain other Debtors as guarantors (collectively, with Fieldwood Energy Inc., the "**SLTL Guarantors**") and the SLTL Administrative Agent. In order to secure the SLTL Obligations and the guarantee provided with respect to the SLTL Obligations, each of Fieldwood Energy and the SLTL Guarantors granted, or confirmed their continuing grant of, a second priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "**SLTL Collateral Agreement**") among Fieldwood Energy, the SLTL Guarantors and the SLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the SLTL Collateral Agreement, Fieldwood Energy and certain of the SLTL Guarantors granted, or

confirmed their continuing grant of, second priority Mortgages (as defined in the SLTL Credit Agreement, the "**Second Lien Mortgages**", and, together with the First Lien Mortgages, the "**Mortgages**", the Mortgages, together with the First Lien Security Documents and any other "Security Documents" as defined in the SLTL Credit Agreement, the "**Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

47. <u>Pari Passu Intercreditor Agreement</u>. The relative contractual rights of the FLFO Lenders, on the one hand, and the FLTL Lenders, on the other hand, are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**"). The Pari Passu Intercreditor Agreement controls the rights and obligations as among the holders of the FLFO Obligations (the "**FLFO Secured Parties**"), the holders of the FLTL Obligations (the "**FLTL Secured Parties**" and, together with the FLFO Secured Parties, the "**First Lien Credit Agreement Secured Parties**") and certain other providers of Secured Hedge Agreements (as defined in the Pari Passu Intercreditor Agreement) with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

48. <u>Senior Intercreditor Agreement</u>. The relative contractual rights of the First Lien Credit Agreement Secured Parties, on the one hand, and holders of the SLTL Obligations (the "**Second Lien Secured Parties**"), on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Senior Intercreditor Agreement**"). The Intercreditor Agreement controls the rights and obligations of the First Lien Credit Agreement

Secured Parties and the Second Lien Secured Parties with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

49.     _DB Receivables Facility_.  Certain of the Debtors and a non-Debtor affiliate are parties to that certain *Master Receivables Purchase Agreement* dated as of December 23, 2019 among Fieldwood Energy, as originator, FW FinCo LLC, as seller, Deutsche Bank AG New York Branch, as administrative agent, Deutsche Bank Trust Company Americas, as a purchaser and the other purchasers party thereto (the "**DB Receivables Facility**").  As of the Petition Date, there are no amounts due and owing on the DB Receivables Facility.

50.     _Surety Bonds_.  The Company has approximately $1.165 billion in surety bonds that it maintains to satisfy various contractual and regulatory requirements.  As stated, this includes approximately $177 million in surety bonds for the benefit of BOEM.  This also includes $498 million in surety bonds and contracts similar to surety bonds, which either have been issued directly to Apache on the Company's behalf or have been issued to Deutsche Bank as collateral for an equal dollar amount of letters of credit that Deutsche Bank has issued to Apache on the Company's behalf.

## IV.  Key Events Leading to Chapter 11

51.     The Company proactively took a number of steps prior to filing these chapter 11 cases in an effort to deleverage its balance sheet, bolster liquidity, address near-term interest payments, and maximize value for stakeholders.  The Company, however, has continued to face a challenging commodity price environment, which has constrained its liquidity and affected operations.  Ultimately, the precipitous decline in oil prices from the combined effect of the COVID-19 pandemic and general deterioration of commodity prices forced the Company to pursue restructuring transactions.

## A. Cost Reduction

52.     The Company commenced production shut-ins during late March 2020 in response to the deteriorating price environment.  Initially, twenty-nine (29) low-margin shelf fields were shut-in, resulting in approximately $5 million of monthly operating expense savings.  The Company, thereafter, commenced a broad shut-in during late April 2020 due to the continued oil price collapse.  The Company effectively shut-in all operated production fields other than eight (8) dry gas fields and one shelf field.  For deepwater assets, all properties except for one non-operated field were shut-in from late April 2020 to June 2020.  The Company was able to limit its operating expense during the shut-in period.

53.     In addition to the shut-ins, the Company has implemented other cost savings measures, such as a reduction in force, salary reductions for certain staff and contractors, including a 10% salary cut for corporate employees earning more than $150,000 per year, and stricter vendor management practices.

## B. Vendor and Surety Issues

54.     As a result of the foregoing, several of the Company's vendors and surety providers have taken action, or threatened to take action, to secure payments of alleged amounts that are either due and owing or may become due and owing in the future.  For example, the Company has received numerous demands from several of its surety providers requesting that the Company either release them from their bonds, or in the alternative, post collateral in the amounts of their unreleased bonds.  In fact, after sending one or more demand letters, two sureties filed lawsuits against the Company.  In one lawsuit filed in the United States District Court for the Southern District of Texas (Houston Division), Travelers Casualty and Surety Company of America ("**Travelers**") alleges that defendants have breached certain obligations under an

indemnity agreement and seeks, among other relief, an injunction requiring the defendants to either release Travelers from certain performance bonds or provide collateral to secure defendants' obligations under the indemnity agreements in the amount of $60,000,000. Fieldwood Energy is also a defendant in a lawsuit filed by Aspen American Insurance Company ("**Aspen**") in the District Court of Harris County, Texas. Aspen's complaint alleges Fieldwood Energy breached its contract with Aspen by failing to post collateral sufficient to protect Aspen in the event of claims being made under certain performance bonds issued by Aspen. Aspen seeks monetary damages as a result of the alleged breach. The Debtors have filed answers to both lawsuits, contesting (among other allegations) that they breached the indemnity agreements and that the surety providers are entitled to any equitable relief such as an injunction.

## C. Prepetition Restructuring Efforts

55. Prior to filing these chapter 11 cases, the Company took several steps to try to address its capital structure and liquidity needs without a comprehensive in-court restructuring. Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service their outstanding debt on a go-forward basis and to maintain the liquidity necessary to operate their businesses and preserve long-term viability and enterprise value.

56. As a result, the Company determined that a restructuring transaction was necessary to position itself for long term success. In March 2020, the Debtors retained Weil, as restructuring counsel, and Houlihan, as investment banker, to explore strategic alternatives and assist them in developing and implementing a comprehensive plan to restructure its balance sheet. In April 2020, the Debtors retained AlixPartners, as financial advisor, to assist them in preparing their operations for a potential chapter 11 restructuring as part of their contingency plan.

26

57.     As discussions over a potential restructuring transaction were ongoing, it became necessary for the Company to seek forbearances under its Credit Agreements to provide additional time for negotiations over potential restructuring transactions to develop.  On May 7, 2020, the Company entered into certain *Temporary Limited Forbearance and Amendment* agreements (collectively, the "**TLF Agreements**") with consenting lenders for each Credit Agreement (collectively, the "**Consenting Lenders**").  The TLF Agreements required the Consenting Lenders to forbear from exercising their respective rights and remedies under the Credit Agreements with respect to certain defaults by the Company under the various Credit Agreements.  Among the defaults were the Company's failure to deliver a Conforming Audit Opinion (as defined under the TLF Agreements) to the FLFO Administrative Agent, the Company's failure to satisfy its reimbursement obligations with respect to payment under a certain letter of credit in accordance with the FLFO Credit Agreement, and the Company's failure to make certain interest payments under the Credit Agreements, including interest payments that became due on April 30, 2020 in the amount of approximately $1.3 million under the FLFO Credit Agreement, $20 million under the FLTL Credit Agreement, and $11.7 million under the SLTL Credit Agreement.

58.     As part of the Consenting Lenders' agreement to forbear from exercising their contractual rights with respect to defaults under the Credit Agreements, the Consenting Lenders and the Company agreed to certain forbearance milestones.  The milestones were intended to help facilitate negotiations to ensure continued progress toward a potential restructuring transaction. The milestones included, among other things, the Company's requirement to deliver to the Consenting Lenders and/or their agents or advisors by dates certain a strategic monthly

operating plan, a comprehensive restructuring term sheet, a 13-week consolidated weekly cash flow forecast, and a DIP budget.

59.     On May 26, 2020, the Company and the Consenting Lenders for each respective Credit Agreement executed amendments to the TLF Agreements, extending the forbearances under each of the Agreements to June 15, 2020.  Thereafter, the Company and Consenting Lenders executed three additional amendments to the TLF Agreements, with the most recent amendments extending the forbearance period to July 31, 2020.  The forbearances have since been further extended by email.

60.     On July 31, 2020, the Company and Apache executed the Apache Term Sheet.  As explained above, the Apache Term Sheet is the cornerstone of the Debtors' restructuring and provides a resolution for one of the Debtors' most significant liabilities.  The Company thereafter executed an RSA with Apache and the Ad Hoc Group of Secured Lenders, which further refined the terms of the Debtors' reorganization.  With the framework for the Debtors' restructuring in place, the Debtors filed for chapter 11.

## V. The First Day Motions

61.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in the success of these chapter 11 cases, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

28

A. **Joint Administration Motion**

62.     Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only.  There are fourteen (14) Debtors, and I have been informed that there are thousands of creditors and other parties in interest in these cases. I believe that joint administration of these chapter 11 cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for Region 7 and other parties in interest would similarly benefit from joint administration of these chapter 11 cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

63.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

B. **Cash Management Motion**

64.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms, (C) Continue Intercompany Arrangements, and (D) Continue Using Corporate Credit Cards; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request interim and final orders (i) authorizing

29

them to (a) continue to operate their existing cash management system (the "**Cash Management System**"), as described therein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**") with Capital One, National Association ("**Capital One**"), U.S. Bank National Association ("**U.S. Bank**") and JPMorgan Chase Bank, N.A. ("**JPM**" and, together with Capital One and U.S. Bank, collectively, the "**Banks**"), (b) maintain their existing business forms, (c) continue certain intercompany arrangements, including transferring funds among the Debtors and certain non-Debtor affiliates and managed entities (the "**Non-Debtor Affiliates**"), and (d) continue utilizing Corporate Credit Cards (as defined below) and pay all obligations related thereto, each in the ordinary course of business and consistent with the Debtors' prepetition practices, and (ii) granting related relief.  The Debtors are also requesting that the Court authorize the Banks to continue to charge bank fees, if any, and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

65.     As described more fully in the Cash Management Motion, in the ordinary course of their businesses, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain non-Debtor affiliates.  The Cash Management System is tailored to meet the Debtors' needs as an owner and operator of, among other assets, oil and natural gas producing properties.  The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their businesses and pay their financial and other obligations.  It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of their Bank Accounts.

66.     The Cash Management System includes six Bank Accounts: (i) one Bank Account serves as the Debtors' main revenue collecting and concentration account; (ii) one Bank Account serves as the Debtors' main operating and disbursement account; (iii) one Bank Account serves to facilitate certain employee benefits; (iv) one Bank Account will serve to facilitate certain of the Debtors' cash obligations during the pendency of these chapter 11 cases; and (v) the remaining two Bank Accounts are escrow accounts (each, an "**Escrow Account**") that the Debtors maintain in connection with certain contractual and/or governmental obligations that require the Debtors to segregate certain funds.  All Bank Accounts other than the two Escrow Accounts are maintained at Capital One.  Capital One is an authorized depository under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7.

67.     In addition, the Debtors maintain company-paid credit cards (the "**Corporate Credit Cards**").  The Corporate Credit Cards are issued by Capital One (the "**Credit Card Provider**").  In general, the Corporate Credit Cards are used by certain of the Debtors' employees for various corporate expenses including, but not limited to, certain regulatory permit fees, office supplies, pool-vehicle maintenance, and other required business expenses.  As of the Petition Date, there are five issued and active Corporate Credit Cards.  As more fully described in the Cash Management Motion, the Debtors are requesting authority to continue to make all prepayments and payments in connection with the Corporate Credit Cards on a postpetition basis in the ordinary course of business and consistent with the Debtors' past practices, including on account of any expenses related to the prepetition period.

68.     In the ordinary course of business, intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated

pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) Fieldwood Energy receives funds on behalf of Debtor and Non-Debtor Affiliates, (ii) Fieldwood Energy makes payments and disbursements on behalf of Debtor and Non-Debtor Affiliates, and (iii) funds are transferred between and among the Debtors and the Non-Debtor Affiliates (primarily between Fieldwood Energy, Fieldwood Mexico, and SP 49 Pipeline). The Debtors maintain records of all transactions processed through their Cash Management System. During these chapter 11 cases, the Debtors will keep records of any postpetition Intercompany Transactions and implement any additional accounting procedures required to identify and distinguish between prepetition and postpetition Intercompany Transactions.

69.     Out of an abundance of caution, the Debtors are requesting express authority to engage in Intercompany Transactions postpetition as set forth in the Cash Management Motion. The Debtors are also requesting that the Court grant administrative expense status to all intercompany claims against a Debtor by another Debtor or non-Debtor affiliate that arise postpetition as a result of an Intercompany Transaction; *provided, however*, that nothing therein shall authorize the payment by any of the Debtors of prepetition or postpetition obligations owed by any of the Debtors inconsistent with the Debtors' past practices. If the Debtors' intercompany claims are accorded such status, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its ordinary-course transactions with affiliates.

70.     I am advised by the Debtors' attorneys that the Bank Accounts are required to comply with section 345(b) of the Bankruptcy Code unless the Court orders otherwise for "cause." With the exception of the two Escrow Accounts, all of the Debtors' active Bank Accounts are maintained with Authorized Depositories under the UST Operating Guidelines. Accordingly,

I believe that the funds deposited into such Bank Accounts comply with section 345 of the Bankruptcy Code. To the extent any of the Debtors' Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors are requesting a 45-day extension of the deadline to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines, which deadline may be further extended by written stipulation between the Debtors and the U.S. Trustee without further order of the Court.

71. The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors relating to the relief sought in the First Day Motions. Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

72. I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**C.      JIB/Royalty Interests Motion**

73. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Interest Owner Obligations, Joint Interest Billings, E&P Operating Expenses and (B) 503(b)(9) Claims; and (II) Granting Related Relief* filed contemporaneously herewith (the "**JIB/Royalty Interest Motion"**), the Debtors are requesting entry of interim and final order (i) authorizing, but not directing, them to pay in the ordinary course of business amounts payable to (a) holders of royalty, working, and other interests, including

Suspense Obligations (as defined below), as required by the Debtors' various leases and related agreements (each as defined below, and collectively, the "**Interest Owner Payments**"), (b) operators for unpaid joint interest billings and related obligations (the "**Joint Interest Billings**"), and (c) certain third parties for lease operating expenses, gathering, transportation, and processing expenses, capital expenditures, Supplemental Workforce Obligations (as defined below), and related costs (the "**E&P Operating Expenses**" and, collectively with the Interest Owner Payments and Joint Interest Billings, the "**Prepetition Obligations**"), including to certain vendors, contractors, subcontractors, drillers, haulers, and suppliers of oil- and gas-related services, labor, supplies, and materials ("**E&P Claimants**"); (ii) authorizing, but not directing, the Debtors to pay certain claims entitled to priority under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**"); and (iii) granting related relief. The Debtors are further requesting that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the Prepetition Obligations and 503(b)(9) Claims to the extent the Debtors have sufficient funds standing to their credit with such bank, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and that all such financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to the JIB/Royalty Interest Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

74. As of the Petition Date, the Debtors estimate the aggregate amount of Prepetition Obligations is approximately $193.0 million, of which approximately $69.1 million will come due in the first 21 days of these chapter 11 cases. The components of the Prepetition Obligations are described below.

75.     <u>Joint Interest Billings</u>.   The Debtors hold working interests and similar operating rights interests (collectively, the "**Working Interests**") in various Oil and Gas Leases. Generally, a Working Interest entitles the owner of that interest to a portion of the mineral production from the property or the proceeds thereof subject to the costs of exploration, development, and operation of the property.   Certain of the Debtors' Working Interests are subject to net profits interests ("**NPIs**")—the holders of which are entitled to a share of the profits from the Debtors' Working Interests.   The Debtors hold Operating and Non-Operating Working Interests (including operating rights interests).   In respect of their Non-Operating Working Interests, in the twelve months preceding the Petition Date, the Debtors paid approximately $79.2 million in Joint Interest Billings.   Joint Interest Billings vary in amount and are not entirely predictable on a month-to-month basis.   It is my understanding that failure to timely pay the Joint Interest Billings may provide grounds for contractual or statutory lien rights in favor of the Operator against the Debtors' Non-Operating Working Interest in the associated Oil and Gas Lease or the Debtors' *pro rata* portion of the production therefrom.

76.     I understand that, as of the Petition Date, the Debtors estimate they owe approximately $32.5 million in Joint Interest Billings under the terms of their Operating Agreements with respect to the period prior to the Petition Date, approximately $9.6 million of which will become due and owing during the first 21 days of these chapter 11 cases.

77.     Payment of Joint Interest Billings is necessary to prevent Operators from ceasing or altering their revenue payments to the Debtors and potentially asserting liens against the Debtors' property.   Payment of Joint Interest Billings is also necessary to continue to receive their share of the Working Interests and maintain their relationships with the Operators of these properties, both during and after the pendency of their chapter 11 cases.

78.     <u>Obligations to Mineral and Other Interest Owners</u>.  The Debtors' leasehold interests are subject to or burdened by mineral interests retained by the lessor (a "**Royalty Interest**"), fractional interests in the right to participate or receive proceeds from the sale of oil and gas (an "**Overriding Royalty Interest**" or "**ORRI**") and/or Working Interests.  The Debtors are obligated to remit to holders of Royalty Interests, ORRIs, Working Interests, and NPIs (collectively, the "**Interest Owners**") their share of revenue from the producing wells located on the respective leases (collectively, the "**Interest Owner Payments**").

79.     It is my understanding that failure to make all required Interest Owner Payments could have a material adverse effect upon the Debtors and their operations including, without limitation, potential cancellation, forfeiture, or termination of Oil and Gas Leases, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the Debtors' estates, litigation and, in some instances, attempted removal of the Debtors as Operator.

80.     The Debtors make Interest Owner Payments each month.  Such payments are generally paid two months in arrears.  Amounts owed are calculated as provided for in the underlying Oil and Gas Lease, Operating Agreement, or other underlying contract, and are typically based on the production revenue received by the Debtors from purchasers, less applicable severance taxes and, in some instances, certain post-production charges.  In certain circumstances, the Debtors have received payment for the share of proceeds due to Interest Owners; however, due to timing, such Interest Owner Payments were not made prior to the Petition Date.

81.     I understand that, as of the Petition Date, the Debtors estimate they owe approximately $6.9 million on account of accrued and undisputed Interest Owner Payments, none of which is estimated to become due and payable during the first 21 days after the Petition Date.

However, out of an abundance of caution, the Debtors seek authority to continue to honor any Interest Owner Payments that may become due in the ordinary course whether such amounts relate to the prepetition or postpetition period.

82.     The Debtors hold certain Interest Owner Payments in "suspense" when (i) they are too small to warrant payment under the terms of an Operating Agreement or other applicable agreement, (ii) the Debtors have determined they should not be paid because of a dispute or for other legal reasons, or (iii) the Debtors are unable to identify or properly pay the relevant Interest Owner (such amounts held in suspense, the "**Suspense Obligations**").

83.     The Suspense Obligations are accrued but unpaid liabilities of the Debtors. The Debtors estimate that approximately $1.3 million in Suspense Obligations have accrued as of the Petition Date.  In light of the difficulty in estimating precisely when, and to what extent, Suspense Obligations will become due and payable and, out of an abundance of caution, the Debtors seek authority to continue to negotiate, resolve, settle, and honor the full amount of the outstanding Suspense Obligations accrued in the ordinary course postpetition.

84.     <u>E&P Operating Expenses</u>.  In the ordinary course of business, in their role as operators of certain Oil and Gas Leases, the Debtors contract with E&P Claimants for goods and services necessary to operate wells.  Where production is sold at the wellhead, the purchaser of the production takes ownership at the wellhead and the Debtors do not incur transportation costs.  In instances where production is not sold at the wellhead, the Debtors are obligated under various agreements (the "**GTP Agreements**") to pay certain costs associated with the gathering, transportation, and processing of oil and gas, including settlement, if required, of monthly pipeline imbalances (the "**GTP Costs**"). In addition, certain pipelines have established quality banks- systems designed to measure quality changes across crude production in common stream

37

operations.  Based on the calculated differences, the pipelines collect from, and remit monetary adjustments to, the crude oil shippers (the "**Quality Bank Adjustments**" and, together with the GTP Costs, the "**GTP Costs and Adjustments**" or "**GTP Expenses**").  Additionally, the Debtors are obligated to pay certain capital expenditures ("**Capex**") and lease operating expenses ("**LOEs**").  Pursuant to the applicable Operating Agreement, a holder of a Non-Operating Working Interest either (i) pre-funds or reimburses the Debtors for its *pro rata* share of the cost of production or (ii) nets its share of production revenue against its share of E&P Operating Expenses.

85.     Furthermore, in connection with operating their E&P business, the Debtors rely on services provided by certain vendors, including temporary labor, contractors, or consultants related to the Debtors' onshore and offshore operations.  The Debtors procure the temporary workforce through a number of different vendors and generally employ skilled workers necessary for their offshore operations and, on occasion, administrative staff on a temporary basis.  The Debtors remit compensation for the temporary workforce to the vendors on a regular basis through the Debtors' accounts payable system (the "**Supplemental Workforce Obligations**").  The Debtors pay approximately $13.6 million per month in Supplemental Workforce Obligations

86.     It is my understanding that, as of the Petition Date, the Debtors owe approximately $152.2 million in outstanding prepetition E&P Operating Expenses.  The Debtors estimate that approximately $59.4 million of the E&P Operating Expenses will become due during the 21 days of these chapter 11 cases.

87.     503(b)(9) Claims.  Additionally, I understand that, as of the Petition Date, the Debtors estimate they owe approximately $7.5 million on account of certain goods and materials received by the Debtors in the ordinary course of business from various vendors within the 20 days before the Petition Date (the "**503(b)(9) Claims**").  I understand that payment of the

Prepetition Obligations and 503(b)(9) Claims is necessary to prevent counterparties from ceasing or altering their relationships with Debtors and potentially asserting liens against the Debtors' property.  Payment is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

88.     I understand that payment of the Prepetition Obligations and 503(b)(9) Claims is necessary to prevent counterparties from ceasing or altering their relationships with Debtors and potentially asserting liens against the Debtors' property.  Payment is also necessary to maintain strong working relationships with the Debtors' partners during and after these chapter 11 cases.

89.     Additionally, I understand that as a condition to payment of any prepetition amounts owed on account of goods or services provided to the Debtors prior to the Petition Date, the Debtors will enter into customary trade agreements (the "**Trade Agreements**") with such parties on terms consistent with the historical practice between the parties.  Such Trade Agreements will require the claimants to agree that the payment to be made will be in full satisfaction of any prepetition amounts allegedly owed to such claimants by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date.  Further, the Debtors will request authorization, but not direction, to negotiate, modify, or amend the form of a Trade Agreement in its reasonable business judgment.

## D.     Insurance and Surety Bond Motion

90.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Pay Certain Obligations with Respect thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims;* and *(III) Granting Related Relief* filed contemporaneously herewith (the "**Insurance and Surety Bond Motion**"), the Debtors are

39

requesting entry of interim and final orders (i) authorizing, but not directing them to (a) continue their Insurance Programs and Surety Bond Program (each as defined below) in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay any prepetition obligations arising in connection with the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief

91.     In the ordinary course of their oil and natural gas E&P operations, the Debtors maintain workers' compensation insurance, third party liability, property, and other insurance programs (each, an "**Insurance Program**") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker or advisor fees, taxes, other fees, and deductibles (collectively, the "**Insurance Obligations**"), in accordance with or relating to their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**").  Each of these is described below and more fully in the Insurance and Surety Bond Motion.

92.     The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third party liability in connection with the Debtors' businesses (the "**General Liability Program**"); (iii) coverage of the Debtors' vehicles (the "**Automobile Program**"); (iv) coverage for liability from the Debtors' use of non-Debtor owned aircraft (the "**Non-Owned Aircraft Liability Program**"); (v) coverage evidencing the Debtors' financial responsibility in the event of an offshore oil spill or other oil pollution event, as required under the Oil Pollution Act of 1990

40

(the "**Oil Spill Financial Responsibility Program**"); (vi) coverage for losses from named windstorms or operational risks and hazards (the "**Named Windstorm & Operational Risk Program**"); (vii) coverage in connection with a recently completed subsea construction project (the "**Katmai Policy**"); (viii) coverage for risks and damages arising from data breaches and other data losses (the "**Cyber Risk Liability Programs**"); (ix) coverage for losses of office property and equipment (the "**Office Contents & Equipment Program**"); (x) coverage of management and directors' and officers' liability (the "**Management Liability Program**"); and (xi) umbrella and excess coverage for various casualty Insurance Policies, as described below (the "**Umbrella Liability Program**").

93.     In the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from or related to employment by the Debtors (the "**Workers' Compensation Claims**"). In many instances, applicable law in the jurisdictions in which the Debtors operate—including Texas and Louisiana law for the Debtors' onshore and corporate operations, and United States law, for their offshore operations in the GOM—requires that the Debtors maintain the Workers' Compensation Program.  The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors.  It is my understanding that, under applicable workers' compensation laws, the Debtors or the applicable Insurance Carrier may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Although unlikely, it is possible that an event giving rise to an obligation of the Debtors' Insurance Carriers to make such a payment—for example, for injury or disease of an employee—could have occurred prepetition without the

Debtors' knowledge. To that end, out of an abundance of caution, the Debtors are seeking relief from the automatic stay for authorization to pay such Workers' Compensation Claims and related costs, and for the associated Insurance Carrier to have authorization to do the same.

94.     The Debtors contract with (i) in the United States, USI Southwest, Alliant, Inc. CAC Specialty, and Willis Towers Watson; and (ii) in the United Kingdom, Price Forbes & Partners Ltd and Bishopsgate Insurance Brokers, to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "**Insurance Broker**"). The Debtors pay the Insurance Brokers commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance premiums. As of the Petition Date, the Debtors owe approximately $250,000 in commissions to the Insurance Brokers, which the Debtors are requesting authority to pay in full in the ordinary course of business.

95.     In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' performance of certain obligations (the "**Surety Bond Program**"). The Surety Bond Program covers obligations in connection with two general categories of third parties: (i) federal and state governmental units and other public agencies; and (ii) contract counterparties for whom the Debtors have agreed to perform various plugging, abandonment, and decommissioning obligations in connection with offshore properties. The obligations secured by the Surety Bond Program relate to, among other things, (i) oil and natural gas drilling and exploration operations; (ii) plugging and abandonment obligations; (iii) conservation; (iv) rights-of-way; (v) land use; (vi) taxes; and (vii) utilities.

96.     Under each Surety Indemnity Agreement, the Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors (the "**Indemnity Obligations**"). Each Surety Indemnity

42

Agreement also permits the surety to request collateral security from the Debtors from time to time in connection with the Indemnity Obligations. The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis. Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal, typically 90 days prior to such renewal. As of the Petition Date, the Debtors have approximately $1,164,000,000 in outstanding surety bonds. The Debtors estimate that the Surety Bond Obligations over the next six months will amount to approximately $10,400,000, and that the Surety Bond Obligations in the twenty-one (21) days following the Petition Date will total approximately $450,000.

97.     As discussed further above, certain of the Surety Bonds support letters of credit issued by Deutsche Bank AG New York Branch ("**Deutsche Bank**") in an aggregate amount of $350,000,000 (the "**Letters of Credit**") for the benefit of Apache Corporation ("**Apache**"). The Letters of Credit serve as security for various plugging, abandonment, and decommissioning obligations incurred by Fieldwood Energy in connection with that certain Decommissioning Agreement, dated as of September 30, 2013, between Fieldwood Energy as Buyer and Apache as Seller. The Letters of Credit are fully secured by surety bonds in favor of Deutsche Bank issued through the Debtors' Surety Bond Program—$300,000,000 in surety bonds issued by Zurich and $50,000,000 by HCC International Insurance Company PLC.

98.     In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay certain obligations related thereto, including outstanding payments to the Insurance Brokers. Without authority to maintain and pay amounts owed in connection with the Insurance Programs

and the Surety Bond Program, the ability of the Debtors to conduct business operations in many locations would come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, I believe it is unlikely that the Debtors would be able to renew or replace their existing Insurance Programs or the Surety Bonds on more favorable terms. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Bond Program to comply with the U.S. Trustee's operating guidelines, applicable state and federal laws, requirements from state and federal regulatory agencies, and other prepetition contracts. Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### E.  **Wages Motion**

99.  Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Obligations, and (C) Pay Prepetition Employment And Training Expenses, and (II) Granting Related Relief* filed concurrently herewith (the "**Wages Motion**"), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Obligations and Other Compensation Obligations (each as defined below) and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.

100.    As described more fully in the Wages Motion, the Debtors' employ approximately 635 employees (each, an "**Employee**").  Over half of the Employees are offshore workers—workers and other skilled professionals who either (i) perform rotations on various offshore platforms and wells related to drilling, safety, maintenance, and decommissioning work or (ii) perform functions related to offshore operations and that are based at onshore field locations—all of which are critical to the ongoing business operations of the Debtors.  The remaining Employees provide a variety of engineering, management, administrative, and other support services in offices in Houston, Texas and Lafayette, Louisiana.  Collectively, the Employees' skills and knowledge of the Debtors' infrastructure, customers, and business operations are essential to the continued operation of the Debtors' business.  Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible.  In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their Employees, including those related to compensation ("**Employee Compensation Obligations**"), benefits ("**Employee Benefits Obligations**"), and onboarding of new employees ("**Employee Onboarding Obligations,**" collectively, the "**Employee Obligations**").

101.    The Debtors' Employees are the most important part of their business.  I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial.  Failure to pay the Employee Obligations could also inflict a significant financial hardship on the families of the Employees.  The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship.  Without the relief requested in the Wages Motion, otherwise-

loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise.  Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

102.    In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries, wages and other compensation, including for certain non-exempt Employees, paid leave and overtime.   Additionally, Employees are entitled to advances for, and reimbursement of, certain reasonable and necessary expenses incurred while performing their employment duties, including job-related travel and meal expenses (the "Expenses").  I believe that payment of prepetition Expenses is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce.  Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost of the Expenses, especially because those Employees incurred such Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

103.    In addition, the Debtors have certain independent directors who are paid regular fees in compensation for their service (the "**Other Compensation Obligations**").  One director is owed approximately $60,000 on account of his prepetition services, and the Debtors are seeking relief to pay this amount in accordance with the terms of his agreement.

104.    In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed in the Wages Motion (collectively,

46

the "**Deductions**").  In addition to the Deductions, certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**").  I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

105.    As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, three discretionary employee bonus programs (the "**Employee Bonus Programs**") and have a general practice of paying severance to certain non-insider Employees (such practice, the "**Severance Program**").  The Employee Bonus Programs and the Severance Program are necessary for maintaining positive Employee morale and loyalty, and failure to honor obligations under these programs could cause severe hardship to the Debtors' workforce in a critical time; the programs are integral and necessary for maintaining a stable workforce and the ultimate successful operation of the Debtors' business.

106.    In addition, prior the Petition Date, the Debtors have implemented a key employee retention program (the "**KERP**") for 36 non-insider Employees, pursuant to which retention awards are paid quarterly in arrears.[9]  In the event that any Employee subject to the KERP

---

[9] In addition, prior to the Petition Date, the Debtors implemented a similar key employee retention program for their insider employees. The total amount of $2,152,500 under this program was paid in full prior to the Petition Date.

is terminated for cause or voluntarily terminates, such Employee is required to forfeit any outstanding unpaid award. The average total award under the KERP is approximately $84,738, or 37% of the eligible Employee's salary. The total amount to be paid to non-insider Employees under the KERP is $3,050,550. At this time, no amounts are owed under the KERP by the Debtors. The Debtors intend to honor these obligations in the ordinary course postpetition.

107.     The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories: (i) paid time off, including personal time off and holidays; (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts; (iii) retirement savings plans including a 401(k) plan, and (iv) certain other benefits (collectively, the "**Employee Benefits**"). Although most eligible Employees participate in the Employee Benefits, certain Employees elect to opt-out of particular programs. I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

108.     As described in the Wages Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensations Obligations, Employee Benefits, and Employee Onboarding Obligations. Third-party administrators assist the Debtors with, among other things, servicing the Health Benefits Claims (as defined in the Wages Motion) and administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with Employee Obligations. I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators,

the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

109.    I believe that, with the exception of obligations to one Employee and one independent director as more fully described in the Wages Motion, no Employees are owed prepetition amounts exceeding the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code and that, accordingly, the Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of such cap.  I also believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.  Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations.  Accordingly, I believe the relief requested in the Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**F.    Taxes Motion**

110.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments and (II) Granting Related Relief* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request entry of an order (i) authorizing, but not directing, them to satisfy, or use tax credits to offset, all Taxes (as defined below) due and owing to various local, state, and federal taxing authorities (collectively, the "**Taxing Authorities**")[10] that arose prior to the Petition Date, including all Taxes subsequently

---

[10] The definition of "Taxing Authorities" includes, but is not limited to, those parties set forth in the Taxing Authority List (as defined herein). The inclusion of any entity on, or the omission of any entity from, the Taxing Authority List is not an admission by the Debtors that such entity is, or is not, a Taxing Authority to which the Debtors owe any amount, and the Debtors reserve all rights with respect to any such determination.

determined by audit or otherwise to be owed for periods prior to the Petition Date, and (ii) granting related relief.

111.    I understand that the Taxes the Debtors typically incur generally fall into the following categories:  Franchise Taxes, Severance Taxes, Property Taxes, Income Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and, collectively, the "**Taxes**").  I understand that approximately $2,710,000 in Taxes relating to periods prior to the Petition Date will come due and owing to the taxing Authorities after the Petition Date.

112.    Further, I understand that failure to pay the aforementioned Taxes may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.  Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**G.    Utilities Motion**

113.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below), (ii) establishing procedures for resolving objections by the Utility Companies

relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) granting related relief.

114.    As more fully described in the motion, the Debtors obtain telecommunications, information technology services, water, fuel and power, electricity and other utility services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**").   I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases.   Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted.   The Debtors operate a complex business with significant operations throughout the GOM and along the Gulf Coast of Texas and Louisiana.   Interruption of the Utility Services provided at any of their locations would disrupt necessary communication and coordination between the Debtors' employees, vendors, customers, and various regulatory authorities, and would prevent the provision of necessary support to these same parties.   I believe that any such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.   As a result, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

115.    I believe that there are no material defaults or significant arrearages with respect to the undisputed invoices for prepetition Utility Services.   Based on a monthly average for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next 30 days will be approximately $662,500.

116.   I believe and am advised that the Adequate Assurance Procedures are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

117.   Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' businesses at this critical juncture as the Debtors transition into chapter 11.  Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional adequate assurance.  Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

## H.   Schedules and Statements Motion

118.   Pursuant to the *Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Current Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Reports* filed contemporaneously herewith (the "**Schedules and Statements Motion**") the Debtors seek entry of an order extending the deadline by which the Debtors must file their (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "**Schedules and Statements**") by 30 days, for a total of 44 days from the Petition Date, through and including September 16, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown.

52

119.     I am advised that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) generally requires debtors to file Schedules and Statements within 14 days after their petition date.  I am also advised that under Bankruptcy Rule 1007(c), the Court has the authority to extend the time required for filing the Schedules and Statements "for cause."  I believe cause exists for granting the extensions requested in the Schedules and Statements Motion because of the voluminous information the Debtors must compile to complete the Schedules and Statements. Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations.

120.     Additionally, pursuant to the Schedules and Statements Motion, the Debtors request the Court grant them an extension of the time until the later of (i) 15 days after the initial meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**341 Meeting**") and (ii) 45 days from the Petition Date, for the Debtors to either file their initial reports of financial information in respect of entities in which their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), or file a motion with the Court seeking a modification of such reporting requirements for cause.

121.     I have been advised that Bankruptcy Rule 2015.3 requires a debtor, by no later than seven days prior before the date set for the 341 Meeting and no less than every six months thereafter, to file periodic financial reports of the value, operations and profitability of each entity that is not a publicly traded corporation or a debtor in the chapter 11 cases, and in which the estate holds a substantial or controlling interest.  I am also advised that pursuant to Bankruptcy Rule 9006(b)(1), the Court has the authority to enlarge the period of time to file the 2015.3 Reports "for cause" and that under Bankruptcy Rule 2015.3(d), the Court can modify the reporting requirements for cause,

including that the debtor is "not able, after a good faith effort, to comply with those reporting requirements, or that the information . . . is publicly available."

122.    I believe cause exists to extend the deadline for filing the Rule 2015.3 Reports based on (a) the size and complexity of the Debtors' businesses and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.  Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the Office of the United States Trustee for the Southern District of Texas to determine the appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

## I.    **Creditor List Motion**

123.    Pursuant to the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to File a* Consolidated *Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (II) Authorizing Debtors to Redact Certain Personal Identification Information of Employees* filed concurrently herewith, the Debtors are seeking entry of an order authorizing the Debtors to (i) file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and (ii) redact certain personal identification information of the Debtors' employees.

124.    I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H . . . ."  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix (a "**Consolidated Creditor Matrix**").  I believe that preparing separate lists of creditors for each Debtor would be unduly expensive, time consuming, and

administratively burdensome. The Debtors, therefore, request authority to file a single Consolidated Creditor Matrix for all Debtors.

125. Further, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders . . . .". Because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of the top 30 unsecured creditors for all Debtors collectively. Such a list would help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

126. Finally, I am advised that section 107(c)(1)(A) of the Bankruptcy Code provides that the Court "for cause, may protect an individual" with respect to the following types of information "to the extent the court finds that disclosure of such information would create undue risk of identity theft . . . [a]ny means of identification . . . contained in a paper filed," or to be filed, in a case under the Bankruptcy Code. Here, the Debtors seek authority to redact the address information of the Debtors' current and former employees from the Consolidated Creditor Matrix and from the Debtors' lists of equity security holders. I believe such relief is appropriate because such information could be used to perpetrate identity theft.

## J.   Trading Procedures Motion

127. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in the Debtors and (B) Claims of Certain Worthless Stock Deductions* (the "**Trading Procedures Motion**"), the Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' (i) consolidated net operating loss carryforwards ("**NOLs**"), (ii) business interest expense carryforwards and (iii) other tax  benefits, including tax basis in excess of the fair market value of

55

the assets (collectively, the "Tax Attributes"), for use during the pendency of these chapter 11 cases and in connection with a reorganization of the Debtors.  The Procedures apply to transfers of, and claims of worthless stock deduction with respect to, beneficial ownership of common stock of Fieldwood Energy Inc. and any options or similar rights (within the meaning of applicable treasury regulations) to acquire such stock (collectively, the "**Common Stock**") and allow the Debtors to monitor the transfer of, and claims of worthless stock deduction with respect to, beneficial ownership of Common Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) or claim(s) may jeopardize the Debtors' ability to utilize their Tax Attributes.

128.    It is my understanding that the Debtors possess certain Tax Attributes, including, as of the Petition Date, estimated federal NOLs in excess of $170 million and estimated federal interest expense carryforwards in excess of $465 million.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors can carry forward certain Tax Attributes to offset taxable income in future years, and such Tax Attributes may also be utilized by the Debtors to offset any taxable income that may be generated by transactions consummated during these chapter 11 cases.  If and to the extent the Tax Attributes can be used to offset taxable income in current and future tax periods and reduce tax liability of the Debtors, I believe the Tax Attributes are valuable assets.  Further, I understand and am advised that the Debtors' ability to utilize the Tax Attributes is subject to certain statutory limitations—*namely*, sections 382 and 383 of Title 26 of the U.S. Code (the "**Tax Code**"), which limit a corporation's ability to utilize its NOLs and certain other tax benefits to offset future income once the corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "**Ownership Change**").

129.     I believe that, by establishing and implementing such Procedures, the Debtors will be in a position to object to any potential Ownership Change resulting from a transfer of, or claims of worthless stock deduction with respect to, beneficial ownership of Common Stock. It is critical for the Debtors to closely monitor any such activity involving the Common Stock, so that they may be in a position to act expeditiously to preserve the value of their Tax Attributes. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**K.     Claims Agent Retention Application**

130.     Pursuant to Debtors' *Emergency Application of Debtors for Entry of an Order Authorizing Retention and Appointment of* Prime *Clerk LLC as Claims, Noticing, and Solicitation Agent* filed concurrently herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Prime Clerk LLC ("**Prime Clerk**") as the claims, noticing, and solicitation agent ("**Claims and Noticing Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

131.     As more fully described in the Claims Agent Retention Application, the Claims Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors and other parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

132.     The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities during the pendency of these chapter 11 cases.  The appointment of Prime Clerk as the Claims Agent will provide the most effective and efficient means of providing that notice, as well as

soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Prime Clerk as the Claims Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

## L.      Request for Emergency Consideration

133.    Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the Cash Collateral Motion; the Cash Management Motion; the JIB/Royalty Interests Motion; the Insurance and Surety Bond Motion; the Wages Motion; the Taxes Motion; the Utilities; the Schedules and Statements Motion; the Creditor List Motion; the Trading Procedures Motion, and the Claims Agent Retention Application. I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## Conclusion

134.    The above describes the Debtors' businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, the terms of the Debtors' balance sheet restructuring, and the critical need for the Debtors to restructure their financial affairs and operations. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 4, 2020
          Houston, Texas

DocuSigned by:

*Michael Dane*

774108423DDA455...

Michael Dane
Senior Vice President and Chief Financial Officer
Fieldwood Energy LLC

## Certificate of Service

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


   */s/ Alfredo R. Pérez*
Alfredo R. Pérez