**<u>Exhibit A</u>**

Restructuring Support Agreement

**RESTRUCTURING SUPPORT AGREEMENT**

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of August 4, 2020, is entered into by and among:

(i) Fieldwood Energy LLC ("*FWE*"), Fieldwood Energy Inc. ("*Parent*"), Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, Fieldwood Offshore LLC, Dynamic Offshore Resources NS, LLC, FW GOM Pipeline, Inc., GOM Shelf LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC (collectively, the "*Company*");

(ii) the undersigned lenders, or investment advisors or managers for the account of such lenders, party to that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018, among FWE, as borrower, Parent, as holdings, Parent, FWE, Cantor Fitzgerald Securities as administrative agent (the "*Prepetition FLTL Agent*"), the Lenders (as defined therein) party thereto (the "*Prepetition FLTL Lenders*" and the undersigned Prepetition FLTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition FLTL Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting FLTL Lenders*") and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "*Prepetition FLTL Agreement*" and the loans outstanding thereunder the "*Prepetition FLTL Loans*");

(iii) the undersigned lenders, or investment advisors or managers for the account of such lenders, party to that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018, (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, the "*Prepetition SLTL Agreement*" and the loans outstanding thereunder the "*Prepetition SLTL Loans*"), among FWE, as borrower, Parent, as holdings, Cortland Capital Market Services LLC, as administrative agent and collateral agent thereunder (in such capacity, the "*Prepetition SLTL Agent*"), and the Lenders (as defined therein) from time to time party thereto (the "*Prepetition SLTL Lenders*" and the undersigned Prepetition SLTL Lenders, together with their respective successors and permitted assigns and any subsequent Prepetition SLTL Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting SLTL Lenders*", and together with the Consenting FLTL Lenders, the "*Consenting Creditors*"); and

(iv) Apache Corporation ("*Apache*");

The Company, Apache, each Consenting Creditor and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "*Parties*" and individually as a "*Party*." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below) attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto). The terms of the Restructuring Term Sheet are hereby incorporated and included in the terms of this Agreement.

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS**, the Parties have negotiated in good faith at arm's length and agreed to undertake a restructuring of the Company in accordance with the terms set forth below and in the Restructuring Term Sheet (the "***Restructuring***"), which is anticipated to be effected through a sale pursuant to section 363 of the Bankruptcy Code (as defined below) and/or a plan of reorganization (as may be amended or modified from time to time, the "***Plan***") and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***");

**WHEREAS**, subject to the terms hereof, each Party desires to enter into certain transactions in furtherance of the Restructuring (the "***Restructuring Transactions***");

**WHEREAS,** as of the date hereof, the Consenting FLTL Lenders hold, in the aggregate, approximately 67.63% of the aggregate outstanding principal amount of the Prepetition FLTL Loans;

**WHEREAS,** as of the date hereof, the Consenting SLTL Lenders hold, in the aggregate, approximately 25.73% of the aggregate outstanding principal amount of the Prepetition SLTL Loans;

**WHEREAS**, certain of the Consenting FLTL Lenders or their affiliates or related funds (in such capacity, each Consenting FLTL Lender or its affiliate or related fund which has indicated that it elects to provide a DIP Backstop Commitment (as defined below) on the Effective Date below its name on the signature page hereto, a "***DIP Backstop Party***") have, severally and not jointly, agreed to commit to provide the DIP Facility (as defined below) (such commitment, in each case, a "***DIP Backstop Commitment***"), and the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code), in each case on the terms set forth in the DIP Term Sheet (as defined below) attached as Exhibit A to the Restructuring Term Sheet and set forth in the DIP Orders;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Restructuring Term Sheet and hereunder.

2

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>**Certain Definitions.**</u>

As used in this Agreement, the following terms have the following meanings:

"***Ad Hoc Group of Secured Lenders***" means the ad hoc group of holders of Prepetition FLTL Loans and Prepetition SLTL Loans that is represented by the Ad Hoc Group of Secured Lenders Advisors.

"***Ad Hoc Group of Secured Lenders Advisors***" means Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Financial Partners, LLC and any local or foreign advisors.

"***Additional Consenting Lender***" has the meaning set forth in <u>Section 3(e)</u>.

"***Agreement***" has the meaning set forth in the Preamble hereto and, for the avoidance of doubt, includes all the exhibits and schedules attached hereto.

"***Alternative Restructuring***" has the meaning set forth in <u>Section 3(a)</u>.

"***Apache***" means the Apache Corporation and certain of its affiliates under that certain Decommissioning Agreement dated September 30, 2013 with Parent and certain of its affiliates.

"***Apache Counsel***" means Hunton Andrews Kurth, LLP as counsel to Apache and Looper Goodwine as special BOEM and BSEE counsel to Apache.

"***Apache Definitive Documents***" means the definitive documents implementing the transactions contemplated by or relating to the Apache Term Sheet.

"***Apache Term Sheet***" means the term sheet attached as <u>Exhibit B</u> to the Restructuring Term Sheet.

"***Backstop Fee***" has the meaning set forth in <u>Section 3(h)</u>.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas (Houston Division) presiding over Chapter 11 Cases.

"***Bidding Procedures***" means the procedures governing the sale and marketing process for the Specified Assets Sale.

"***Bidding Procedures Motion***" means the motion seeking approval of the Bidding Procedures.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court approving the Bidding Procedures and establishing deadlines for the submission of bids and the auction in accordance with such procedures.

"***Capital Stock***" means the issued and outstanding shares of capital stock of Parent or any option thereon or any right or interest therein."

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claims***" means all claims arising under the Loans or any option thereon or any right or interest therein or any other claims against or interests in the Company.

"***Closing***" means the consummation of the Plan.

"***Commencement Date***" has the meaning set forth in Section 2(c).

"***Company***" has the meaning set forth in the Preamble to this Agreement.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

"***Consenting Class***" means either the Prepetition FLTL Lenders or the Prepetition SLTL Lenders, as applicable.

"***Consenting Creditors***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting FLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting SLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Consenting Party Counsel***" means Davis Polk & Wardwell LLP, as counsel to the Ad Hoc Group of Secured Lenders.

"***Definitive Documents***" has the meaning set forth in Section 2(b).

"***DIP Backstop Commitment***" has the meaning set forth in the recitals to this Agreement.

"***DIP Backstop Party***" has the meaning set forth in the recitals to this Agreement.

"***DIP Commitment Parties***" means, collectively, the DIP Backstop Parties and the Joining DIP Commitment Parties.

"***DIP Closing Date***" has the meaning set forth in Section 3(g).

"***DIP Credit Agreement***" means the credit agreement executed in connection with the DIP Facility.

4

"**DIP Documents**" means the DIP Term Sheet, the DIP Orders, the DIP Motion and the DIP Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, amendments and restatements, supplements or modifications of any of the foregoing) executed pursuant thereto.

"**DIP Election Date**" has the meaning set forth in Section 3(g).

"**DIP Facility**" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, as set forth in the DIP Documents.

"**DIP Motion**" means the motion seeking approval by the Bankruptcy Court of the DIP Facility and the use of cash collateral and the DIP Orders.

"**DIP Orders**" means, collectively, the Interim DIP Order and Final DIP Order.

"**DIP Term Sheet**" means the term sheet setting forth the material terms of the DIP Facility attached as Exhibit A to the Restructuring Term Sheet or as otherwise acceptable to the Requisite DIP Backstop Parties and the Company.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

"**Effective Date**" means the date upon which the Confirmation Order has become a Final Order and all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

"**FLTL Claim**" means any Claim against the Company under the Prepetition FLTL Agreement.

"**Final DIP Order**" means the order of the Bankruptcy Court substantially in the form of **Exhibit B** attached hereto authorizing the use of cash collateral and approving the DIP Facility, and granting the relief requested in the DIP Motion on a final basis.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought.

"**FWE**" has the meaning set forth in the Preamble to this Agreement.

5

"***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

"***Interim DIP Order***" means the order of the Bankruptcy Court substantially in the form of **Exhibit B** attached hereto authorizing the use of cash collateral and approving the DIP Facility and granting the relief requested in the DIP Motion on an interim basis.

"***Joinder Agreement***" has the meaning set forth in Section 3(c), and as attached in the form to this Agreement as **Exhibit C**.

"***Joining DIP Commitment Party***" has the meaning set forth in Section 3(g).

"***Loans***" means, as the context may require, the Prepetition FLTL Loans and the Prepetition SLTL Loans.

"***Loan Documents***" means, as the context may require, the "Loan Documents" as defined in each of the Prepetition FLTL Agreement and the Prepetition SLTL Agreement.

"***Non-Consenting Creditor***" has the meaning set forth in Section 11(c).

"***NY Courts***" has the meaning set forth in Section 13(b).

"***Outside Petition Date***" has the meaning set forth in Section 2(c).

"***Party***" or "***Parties***" has the meaning set forth in the Preamble to this Agreement.

"***Plan***" has the meaning set forth in the recitals to this Agreement.

"***Plan Supplement***" means the supplement to the Plan as set forth in Section 2(b)(iv).

"***Prepetition Credit Agreements***" means the the Prepetition FLTL Agreement and the Prepetition SLTL Agreement.

"***Prepetition FLTL Agent***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Agreement***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition FLTL Loans***" has the meaning set forth in the Preamble to this Agreement.

"***Prepetition SLTL Agent***" has the meaning set forth in the Preamble to this Agreement.

6

"*Prepetition SLTL Agreement*" has the meaning set forth in the Preamble to this Agreement.

"*Prepetition SLTL Lenders*" has the meaning set forth in the Preamble to this Agreement.

"*Prepetition SLTL Loans*" has the meaning set forth in the Preamble to this Agreement.

"*Purchase Agreement(s)*" means the purchase agreement(s) pursuant to which the Company will effectuate the Specified Assets Sale.

"*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims (or enter with customers into long and short positions in Claims), in its capacity as a dealer or market maker in Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Requisite DIP Backstop Parties*" means DIP Backstop Parties holding at least a majority in aggregate principal amount of the DIP Backstop Commitments held by the DIP Backstop Parties as of the date of determination.

"*Requisite DIP Commitment Parties*" means, (i) prior to the DIP Closing Date, the Requisite DIP Backstop Parties, and (ii) on or after the DIP Closing Date, the Required DIP Lenders.

"*Required DIP Lenders*" means, at any time, the "Required Lenders" as determined under the DIP Credit Agreement at such time.

"*Requisite FLTL Lenders*" means, as of the date of determination, Consenting FLTL Lenders holding at least a majority of the outstanding Prepetition FLTL Loans (inclusive of validly executed but unsettled trades) held by the Consenting FLTL Lenders as of such date.

"*Requisite SLTL Lenders*" means, as of the date of determination, Consenting SLTL Lenders holding at least a majority of the outstanding Prepetition SLTL Loans held by the Consenting SLTL Lenders as of such date.

"*Restructuring*" has the meaning set forth in the recitals to this Agreement.

"*Restructuring Term Sheet*" means the term sheet (including any schedules and exhibits attached thereto), attached hereto as **Exhibit A**, which contains the material terms and provisions of the Restructuring.

"*Restructuring Transactions*" has the meaning set forth in the recitals to this Agreement.

"*Sale Documents*" has the meaning set forth in Section 2(b)(vii).

"*Sale Order*" means the order of the Bankruptcy Court authorizing the Company to enter into the Purchase Agreement(s), which order may be the Confirmation Order.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*SLTL Claim*" means any Claim against the Company under the Prepetition SLTL Agreement.

"*Specified Assets*" means the Company's deepwater assets and any other business or assets as determined and agreed by the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders.

"*Specified Assets Sale*" means the sale, transfer or other disposition of all or substantially all of the Company's Specified Assets.

"*Support Effective Date*" means the earliest date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting FLTL Lenders holding at least 50%, in aggregate principal amount outstanding as of such date, of the Prepetition FLTL Loans, (iii) Consenting SLTL Lenders holding at least 25%, in aggregate principal amount outstanding as of such date, of the Prepetition SLTL Loans and (iv) Apache.

"*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in full with respect to all parties in accordance with Section 7 hereof and (ii) the Effective Date.

"*Transfer*" has the meaning set forth in Section 3(c)(i).

"*Weil*" means Weil, Gotshal & Manges LLP, counsel to the Company.

## 2.    **Chapter 11 Process.**

(a)    The Restructuring Term Sheet.   The Restructuring Term Sheet is expressly incorporated herein and made a part of this Agreement.   The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet.   In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of this Agreement shall govern.

(b)    The definitive documents (the "*Definitive Documents*") with respect to the Restructuring shall include this Agreement and any material documents (including any material related orders, agreements, instruments, schedules or exhibits) that are described in or contemplated by this Agreement and necessary or desirable to implement the Restructuring, including, without limitation:

(i)    the DIP Documents;

(ii)    the first day motions, second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions;

(iii)    the Plan and the Disclosure Statement;

(iv)     the supplement to the Plan (the "***Plan Supplement***"), including, without limitation, the organizational and governance documents governing the reorganized Company, including any shareholders agreement or registration rights agreement, if any, (in each case, which will include customary minority protections), and any and all exit financing documents;

(v)     the Confirmation Order;

(vi)     the Disclosure Statement Order;

(vii)     all motions, filings, documents and agreements related to the Specified Assets Sale, including the Purchase Agreement(s), the Bidding Procedures Motion, the Bidding Procedures Order and the Sale Order (the "***Sale Documents***");

(viii)     the Apache Term Sheet and the Apache Definitive Documents; and

(ix)     any other documents, instruments, schedules or exhibits described in, related to, contemplated in, or necessary to implement, each of the foregoing.

Each of the Definitive Documents shall (1) contain terms and conditions consistent with this Agreement and (2) otherwise be acceptable or reasonably acceptable (as applicable) to the applicable Consenting Creditors or Apache as set forth in this Section 2(b). The Definitive Documents not executed or in a form attached to this Agreement as of the date hereof remain subject to negotiation and completion. Upon completion, the Definitive Documents shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the Restructuring Term Sheet), as it may be modified, amended, or supplemented in accordance with Section 11, and (i) in the case of the Plan, Plan Supplement, Confirmation Order, Disclosure Statement, DIP Documents, the Sale Documents, in each case including any modifications, amendments or supplements thereto, be in form and substance acceptable to the Company and the Requisite FLTL Lenders and the Requisite DIP Commitment Parties at all times, (ii) any provision in the Plan or the Confirmation Order that directly affects the structure of Fieldwood I outlined in the Apache Term Sheet or the economic treatment of Apache, such provision shall be in form and substance reasonably acceptable to Apache, (iii) in the case of the Apache Definitive Documents, be reasonably acceptable to the Company, Apache, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders and (iv) in the case of all other Definitive Documents, be in form and substance reasonably acceptable to the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders at all times.

Notwithstanding anything to the contrary in this Agreement, the DIP Documents shall contain terms and conditions consistent in all respects with this Agreement and otherwise be in form and substance acceptable to the Company and the Requisite DIP Backstop Parties.

(c)     Commencement of the Chapter 11 Cases. Provided that the Support Effective Date has occurred, the Company agrees that, by a date to be agreed between the Company and the Consenting Creditors, but in no event later than August 4, 2020 (the "***Outside Petition Date***") (the date on which such filing occurs, the "***Commencement Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(d) <u>DIP Financing and Cash Collateral</u>. No later than the close of business on the next business day following the Commencement Date, the Parties shall file the DIP Motion.

**3.**      **Agreements of the Consenting Creditors.**

(a)      <u>Voting; Support</u>. Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor (acting severally and not jointly with the other Consenting Creditors) shall:

    (i)      support and take all actions reasonably necessary or reasonably requested by the Company to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement;

    (ii)      not directly or indirectly, through any person or entity (including any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Restructuring and Restructuring Transactions as contemplated under this Agreement (each, an "***Alternative Restructuring***") or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Restructuring and Restructuring Transactions as contemplated under this Agreement;

    (iii)      timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of the Plan;

    (iv)      not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by any Consenting Creditor at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Creditor;

    (v)      timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

    (vi)      support and take all actions necessary or reasonably requested by the Company to facilitate the solicitation of the Plan, obtain approval of the Disclosure Statement and the Specified Assets Sale and confirmation and consummation of the Plan;

    (vii)      not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting

10

Creditor shall use its commercially reasonable efforts to request that such administrative agent or collateral agent cease and refrain from taking any such action; and

(viii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)    <u>Rights of Consenting Creditors Unaffected</u>.  Nothing contained herein shall limit:

(i)    the rights of a Consenting Creditor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and such Consenting Creditor's obligations hereunder;

(ii)    the ability of a Consenting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)    subject to the terms and obligations hereof and applicable law, any right of a Consenting Creditor under the Prepetition Credit Agreements, any other applicable agreement, instrument or document that gives rise to a Consenting Creditor's Claims or Interests, as applicable, or constitutes a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)    subject to any confidentiality provisions in this Agreement and the Prepetition Credit Agreements, the ability of a Consenting Creditor to consult with any other Parties or entities; or

(v)    the ability of a Consenting Creditor to enforce any right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents.

(c)    <u>Transfers</u>.

(i)    Each Consenting Creditor agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other Claims against or Interests in the Company (including grant any proxy or deposit any Claims against or Interests in the Company into a voting trust or entry into a voting agreement with respect thereto), unless the transferee thereof either (A) is a Consenting Creditor or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all Claims or Interests it already may hold against or in the

Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit C** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (i) Weil and (ii) Consenting Party Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Claim or Interest that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.

(ii) Notwithstanding anything herein to the contrary: (A) a Consenting Creditor may settle or deliver any Claims to settle any confirmed transaction pending as of the date of such Consenting Creditor's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such Claims so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement); (B) a Consenting Creditor may Transfer its right, title, or interest in Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided that (1)(x) such Qualified Marketmaker must Transfer such right, title, or interest in such Claims within the earlier of (A) ten (10) business days of its acquisition and (B) three (3) days before the Plan voting deadline, in each case, to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated entity with a common investment advisor and (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such transfer, or (2) the Qualified Marketmaker will be required to execute and deliver a Joinder Agreement; and (C) to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or become a Consenting Creditor or execute a Joinder Agreement.

(d) Additional Claims or Interests. Nothing in this Agreement shall be construed to preclude a Consenting Creditor or Apache from (i) acquiring additional Claims, (ii) holding or acquiring any other Claims against the Company entitled to vote on the Plan, (iii) holding or acquiring any Interests in the Company entitled to vote on the Plan or (iv) Transferring any Claims; provided, that, in each case, each such Consenting Creditor shall promptly notify Weil and each such Consenting Creditor agrees that such additional Claims or other Claims or Interests shall be subject to this Agreement and that, for so long as this Agreement has not been terminated pursuant to the terms hereof with respect to such Consenting Creditor, it shall vote (or cause to be voted) any such additional Claims or other Claims or Interests entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3 hereof.

(e) Additional Lenders. Any Prepetition FLTL Lender or Prepetition SLTL Lender may, at any time after the Support Effective Date, become a party to this Agreement as a

Consenting Creditor, as applicable, (an "**Additional Consenting Lender**") by executing a Joinder Agreement substantially in the form attached hereto as **Exhibit C**, pursuant to which such Additional Consenting Lender shall be bound by the terms of this Agreement as a Consenting Creditor hereunder.

(f)     Forbearance.  For the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Consenting Party, each Consenting Creditor agrees to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by the Company; provided that, in accordance with the Prepetition FLTL Agreement, the accrual of interest shall be unaffected by the terms hereof and continue during the Support Period with respect to the Prepetition FLTL Loans in accordance with its terms.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.

(g)     DIP Backstop Commitments; Joining DIP Commitment Parties.  Subject to the termination rights set forth in Section 7, each of the DIP Backstop Parties, severally and not jointly, subject to the conditions described in the DIP Term Sheet, agrees to provide (or cause any of its affiliates or related funds to provide, it being understood that the DIP Facility will initially be funded by the DIP Facility Agent  (as defined in the DIP Term Sheet) or any other seasoning agent reasonably acceptable to the Requisite DIP Backstop Parties and the Company) its allocable share of the DIP Facility as set forth in **Exhibit D** attached hereto on the terms and conditions substantially as set forth in the DIP Term Sheet and the DIP Order; provided that any Consenting FLTL Lender that executes a Joinder Agreement on or before August 14, 2020 at 5:00 p.m. (the "**DIP Election Date**"), New York Time, may, by making the appropriate election on such Joinder Agreement, commit to provide (or cause any of its affiliates or related funds to provide, it being understood that the DIP Facility will initially be funded by the DIP Facility Agent or any other seasoning agent reasonably acceptable to the Requisite DIP Backstop Parties and the Company) a portion of the DIP Facility in an amount equal to the pro rata percentage of Prepetition FLTL Loans held by such Consenting FLTL Lender as of the Effective Date, on the terms and conditions agreed to by the Requisite DIP Backstop Parties and the Company in the DIP Documents, as applicable (any Consenting FLTL Lender that elects to make such a commitment, a "**Joining DIP Commitment Party**"); provided, further, that, no later than one business day after the DIP Election Date, each DIP Backstop Party's commitment to provide its portion of the DIP Facility shall be reduced, pro rata, based on the percentages set forth on **Exhibit D** attached hereto, for the share of the DIP Facility to be provided by each Joining DIP Commitment Party and the commitment of each Joining DIP Commitment Party (and corresponding reduction of the commitment and exposure of each DIP Backstop Party provided for in **Exhibit D**) shall be pro rata across funded and unfunded portions of the  DIP Facility and, in respect  of any funded portion, shall include an obligation to purchase such loans pro rata and in the case of unfunded portions, to assume commitments to make future fundings, all at the dates and times and pursuant to documentation required by the Requisite DIP Commitment Parties and the DIP Facility Agent; provided, further, that upon termination or expiration of this Agreement in accordance with its terms prior to the

13

Closing Date, as defined in the DIP Term Sheet (the "**DIP Closing Date**"), the commitment of the DIP Backstop Parties and Joining DIP Commitment Parties made pursuant to this <u>Section 3(g)</u> with respect to the DIP Facility shall terminate.

(h)    On the DIP Closing Date, the Company shall pay to each DIP Backstop Party or its designee a backstop fee equal to 4.00% of the amount of such DIP Backstop Party's DIP Backstop Commitment on the date hereof (the "**Backstop Fee**"). The Backstop Fee shall be fully and irrevocably due and payable in cash on the DIP Closing Date. The Backstop Fees shall be earned by each DIP Backstop Party on the date hereof as a fee in consideration of the DIP Backstop Commitments of such DIP Backstop Party and payable in cash on the DIP Closing Date and may be withheld by each DIP Backstop Party from the proceeds of the Loans made by such DIP Backstop Party or its designee on the DIP Closing Date. The Company expressly waives the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Backstop Fees to the extent permitted by applicable law. The parties hereto expressly agree that the Backstop Fees are reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel, the Backstop Fees shall be payable notwithstanding the then prevailing market rates at the time payment is made, there has been a course of conduct between the DIP Backstop Parties and the Company giving specific consideration in this transaction for such agreement to pay the Backstop Fees, the Backstop Fee shall be in addition to any other fees as described in the DIP Term Sheet and the Company shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Company expressly acknowledges that its agreement to pay the Backstop Fees to the DIP Backstop Parties as herein described is a material inducement for the DIP Backstop Parties to provide the DIP Backstop Commitment and consideration for the DIP Backstop Commitments.

**4.    <u>Agreements of the Parties</u>.**

(a)    <u>Covenants</u>.  Each Party agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to such Party, such Party shall use its commercially reasonable efforts to:

(i)    support and take all commercially reasonable actions necessary to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement, including approval of the Disclosure Statement, the Specified Assets Sale and any Apache Definitive Documents and confirmation and consummation of the Plan;

(ii)    provide reasonably prompt written notice (in accordance with <u>Section 21</u> hereof) to the Company between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

14

(b)     Hedging.  Notwithstanding anything to the contrary in this Agreement, each Party agrees that the Company may enter into new commodity price hedging arrangements in the ordinary course of business consistent with the Company's past practices and interest rate hedging arrangements consistent with industry practices and, in each case, not for speculative purposes and solely as permitted by the DIP Documents; provided, however, that hedging arrangements related to Legacy Apache Properties shall be subject to the approval of Apache, which approval shall not be unreasonably withheld.

**5.     Agreements of the Company.**

(a)     Covenants.  The Company agrees that, for the duration of the Support Period, the Company shall, and shall cause each of its subsidiaries included in the definition of Company, to:

(i)     support and take all commercially reasonable actions necessary to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement;

(ii)     use commercially reasonable efforts to (A) consummate the Restructuring and obtain approval of the Specified Assets Sale, the transactions contemplated under the Apache Definitive Documents and Plan, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (1) is inconsistent with this Agreement in any respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring; and (B) obtain orders of the Bankruptcy Court in respect of the Restructuring;

(iii)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring;

(iv)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably necessary and coordinate its activities with the other Parties hereto (subject to the terms hereof) in respect of all matters concerning the implementation and consummation of the Restructuring Transactions, and take any and all appropriate actions in furtherance of this Agreement;

(v)     (A) subject to professional ethical responsibilities, seek entry of the DIP Orders and, if necessary, timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person or entity with respect to entry of the DIP Orders or with respect to any adequate protection proposed to be granted or granted to the Consenting Creditors pursuant to the DIP Orders, (B) subject to professional responsibilities, prosecute and defend any appeals related to the Restructuring, (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring and (D) operate its business in the ordinary course, taking into account the Restructuring;

15

(vi)    subject to professional ethical responsibilities, timely file a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the claims of the Consenting Creditors;

(vii)    provide reasonably prompt written notice (and within 2 business days) (in accordance with <u>Section 21</u> hereof) to the Consenting Creditors and Apache between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (1) any covenant of the Company contained in this Agreement not to be satisfied in any material respect or (2) any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (B) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any material notice, including from any governmental unit with jurisdiction, of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any respect the transactions contemplated by the Restructuring and (D) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(viii)    subject to compliance with all applicable confidentiality agreements or obligations, provide to the Consenting Creditors, Apache and/or their respective professionals, upon reasonable advance notice to the Company, (A) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring, (B) prompt access to any information provided to any existing or prospective financing sources (including lenders under any exit financing) and (C) timely and reasonable responses to all diligence requests;

(ix)    not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or any other document related to the DIP Facility, the Sale Documents, the Apache Definitive Documents or the Restructuring in a manner that is inconsistent with this Agreement;

(x)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Restructuring Term Sheet;

(xi)    not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with the Restructuring, including, without limitation, the Sale Documents, the Apache Definitive Documents, approval of the DIP Orders or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Company; <u>provided</u> that the Company shall not be obligated

16

to agree to any modification of any document that is inconsistent with the Restructuring Term Sheet;

(xii)    provide draft copies of (i) the Disclosure Statement, the Plan and the confirmation order (and any proposed amended version of the Plan, Disclosure Statement and confirmation order) and (ii) all motions, applications or other documents which relate to the Fieldwood I (as defined in the Apache Term Sheet) structure outlined in the Apache Term Sheet or the economic treatment of Apache, to Apache Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document, and shall consult in good faith with Apache Counsel regarding the form and substance of such drafts;

(xiii)    provide draft copies of all material motions or applications, Definitive Documents and other documents (including, without limitation, all first day and second day motions and orders of the Bankruptcy Court approving any first day motions or second day motions, the Plan, the Disclosure Statement, ballots and other solicitation materials in respect of the Plan, any proposed amended version of the Plan or the Disclosure Statement, a proposed disclosure statement order and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to the Consenting Party Counsel at least two (2) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, the Sale Documents, a disclosure statement order, a confirmation order or adequate protection order) at least two (2) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; and

(xiv)    pay all the reasonable and documented fees and expenses, subject to the terms of any applicable engagement letter or reimbursement letter, as the case may be, of (a) the Ad Hoc Group of Secured Lenders Advisors, and (b) Apache Counsel and its financial advisor as provided for in the Apache Term Sheet; provided that the Company shall pay any accrued but unpaid amounts owing under such engagement and/or fee letters to the extent required under the terms thereof upon the termination of this Agreement, but shall not be responsible for any fees and expenses incurred after termination; provided further that any invoices shall not be required to contain individual time detail.

(b)    <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)    <u>Fiduciary Duties</u>. Nothing in this Agreement shall require any director or officer of the Company to take any action or inaction that would be, based on the advice of counsel,

17

inconsistent with their fiduciary duties to the Company. No action or inaction on the part of any director or officer of the Company that such officer or director believes is, based on the advice of counsel, consistent, their fiduciary duties shall be limited or precluded by this Agreement.

**6.**     **Agreements of Apache**.

(a)     <u>Voting; Support</u>. Apache agrees that, for the period commencing on the date of this Agreement and ending on the earlier of (x) the expiration of the Support Period and (y) the date upon which this Agreement is validly terminated pursuant to the terms hereof with respect to Apache, Apache shall:

(i)     support and take all actions necessary or reasonably requested by the Company to facilitate the finalization of the Apache Definitive Documents on or prior to the date that is 75 days after the Commencement Date as contemplated under this Agreement;

(ii)     support and take all actions necessary or reasonably requested by the Company to facilitate the Restructuring and Restructuring Transactions, as contemplated under this Agreement, including all transactions contemplated under the Apache Definitive Documents;

(iii)     not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of an Alternative Restructuring or take any other action that would reasonably be expected to prevent, interfere with, delay or impede the Restructuring and Restructuring Transactions as contemplated under this Agreement;

(iv)     timely vote or cause to be voted its Claims and Interests to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis;

(v)     not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote may, upon written notice to the Company, the Consenting Creditors and the other Parties, be revoked (and, upon such revocation, deemed void ab initio) by Apache at any time following the expiration of the Support Period or upon termination of this Agreement pursuant to the terms hereof with respect to Apache;

(vi)     timely vote (or cause to be voted) its Claims or Interests against any Alternative Restructuring;

(vii)     not to object to, hinder or delay the Specified Assets Sale or the execution of any of the Sale Documents except to the extent such action is taken to advance or preserve the rights of Apache under the Apache Term Sheet; and

(viii)     support and take all actions necessary or reasonably requested by the Company to facilitate the solicitation of the Plan, obtain approval of the Disclosure

18

Statement, and confirmation and consummation of the Plan, approval of the Specified Assets Sale and any Apache Definitive Documents;

(ix)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediments.

(b)     <u>Other Agreements</u>.  Pursuant to the Apache Term Sheet, Apache agrees that if the Plan is confirmed and the Definitive Documents are consistent with the terms herein unless otherwise agreed and grant Apache all the rights and protections provided for in the Apache Term Sheet unless otherwise agreed, then Apache will waive any claims against the Company based on any alleged prepetition breach of that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, FWE, and the other parties thereto (the "***Decommissioning Agreement***") or any related agreement, and any right of reimbursement, subrogation or any other claims related to the Legacy Apache Properties (as defined in the Apache Term Sheet) and shall release any and all claims against the debtors and all other released parties  (and such releases shall be mutual with Apache benefiting as a released party) under the Plan but only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security, in any respect;

(c)     <u>Rights of Apache Unaffected</u>.  Nothing contained herein shall limit:

(i)     the rights of Apache under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with this Agreement and Apache's obligations hereunder;

(ii)     the ability of Apache to purchase, sell, or enter into any transactions in connection with its Claims or Interests, in compliance with the terms hereof and applicable law;

(iii)     subject to the terms and obligations hereof and applicable law, any right of Apache under the Decommissioning Agreement or any other applicable agreement, instrument or document that gives rise to Apache's Claims or Interests, as applicable, or constitutes a waiver or amendment of any provision of any such agreement, instrument or document;

(iv)     the ability of Apache to enforce any applicable right, remedy, condition, consent or approval requirement under this Agreement or under any of the Definitive Documents; or

(v)     subject to any confidentiality provisions in this Agreement, the ability of Apache to consult with any other Parties or entities and their professionals.

WEIL:\97578907\3\45327.0005
#93462797v19

7.     **Termination of Agreement**.

(a)     This Agreement shall terminate two (2) business days following the delivery of notice, delivered in accordance with Section 21 hereof: (i) from the Company to the other Parties at any time after and during the continuance of a Company Termination Event (as defined below), (ii) from Apache to the other Parties at any time after and during the continuance of an Apache Termination Event (as defined below), (iii) from the Requisite FLTL Lenders to the other Parties at any time after and during the continuance of any Consenting FLTL Lenders Termination Event (as defined below), (v) from the Requisite SLTL Lenders to the other Parties at any time after and during the continuance of any Consenting SLTL Lenders Termination Event (as defined below), (vi) from the Requisite DIP Commitment Parties at any time after and during the continuance of any DIP Commitment Parties Termination Event (as defined below) (it being understood that, after the DIP Closing Date, any termination of the commitments under the DIP Credit Agreement shall be subject to the terms specified therein), and (vi) from Apache to the other Parties at any time after and during the continuance of any Apache Termination Event (as defined below); provided, that (A) termination by Apache shall only be effective as to Apache, and (B) termination by the Requisite SLTL Lenders shall only be effective as to the Requisite SLTL Lenders. Notwithstanding any provision to the contrary in this Section 7, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Apache Termination Event, Consenting FLTL Lenders Termination Event, Consenting SLTL Lenders Termination Event, DIP Commitment Parties Termination Event or Company Termination Event.  In addition, this Agreement shall terminate automatically on the later of the Effective Date of the Plan and the date on which the Confirmation Order has become a Final Order.

(b)     A "Company Termination Event" shall mean any of the following:

(i)     the breach by one or more of the Consenting FLTL Lenders or Apache, of any of the undertakings, representations, warranties or covenants of the Consenting FLTL Lenders or Apache, as applicable, set forth herein in any material respect which remains uncured for a period of ten (10) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable), but with respect to the Consenting FLTL Lenders and the DIP Commitment Parties, only if the non-breaching Consenting FLTL Lenders or DIP Commitment Parties hold less than 66⅔% the aggregate principal amount of FLTL Loans or the DIP Facility, as applicable;

(ii)     the board of directors, managers, members or partners, as applicable, of the Company reasonably determine in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the

WEIL:\97578907\3\45327.0005
#93462797v19

consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iv)    as of 11:59 p.m. prevailing Eastern Time on August 4, 2020 the Support Effective Date shall not have occurred;

(v)    as of 11:59 p.m. prevailing Eastern Time on the date that is two hundred and ten (210) days after the Commencement Date, the Effective Date shall not have occurred;

(vi)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases; or

(vii)    an Apache Termination Event, a DIP Commitment Parties Termination Event or a Consenting FLTL Lender Termination Event has occurred and has not been waived or tolled after any applicable cure period.

(c)    An "Apache Termination Event" shall mean any of the following:

(i)    the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which breach (A) affects the Fieldwood I structure outlined in the Term Sheet and related economic terms, and (B) remains uncured ten (10) business days after the receipt of written notice of such breach from Apache to the breaching Party;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(d)    A "DIP Commitment Parties Termination Event" shall mean any of the following:

(i)    the breach by the Company of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)    the Company withdraws the Plan, the Disclosure Statement or the Sale Documents, publicly announces its intention not to support the Restructuring Transactions, the Plan or the Specified Assets Sale, or the Company files any Definitive Document (including amendments, modifications or supplements thereto), motion or pleading with the Bankruptcy Court that is not consistent with this Agreement, the Restructuring Term Sheet or the DIP Documents or is not at all times acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, and such filing has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite DIP Commitment Parties (in accordance with <u>Section 21</u> hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such filing;

(iv)    the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(v)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(vi)    the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement, the Definitive Documents or the Restructuring Transactions in any material respect or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(vii)    the Company files, propounds, or otherwise supports an Alternative Restructuring;

(viii)    the occurrence of an "Event of Default" under the DIP Credit Agreement that has not been waived or timely cured in accordance therewith;

(ix)    the Interim DIP Order or the Final DIP Order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner that is not acceptable to the Requisite DIP Commitment Parties;

22

(x)     any debtor-in-possession financing is entered into, or the Company files a motion seeking approval of debtor-in-possession financing, on terms that are inconsistent with this Agreement or otherwise not acceptable to the Requisite DIP Commitment Parties;

(xi)     the Company enters into a material executory contract, lease, any new key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business without obtaining the prior written consent of the Requisite DIP Commitment Parties;

(xii)     on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as would be permitted under the DIP Documents or (C) with the consent of the Requisite DIP Commitment Parties;

(xiii)     the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan;

(xiv)     on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xv)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order acceptable to the Requisite DIP Commitment Parties within ten (10) business days; or

(xvi)     a Company Termination Event, an Apache Termination Event or a Consenting FLTL Lenders Termination Event has occurred and has not been waived or tolled after any applicable cure period; or

(xvii)     if the Company shall not have complied with each of the following milestones (the "***Milestones***"):

(1)     no later than the Outside Petition Date, the Chapter 11 Cases shall have been filed;

(2)     no later than the date that is five (5) days after the Commencement Date, the Interim DIP Order shall have been entered by the Bankruptcy Court;

(3)     no later than the date that is fifteen (15) days after the Commencement Date, the DIP Closing Date shall have occurred;

(4)     no later than the date that is forty-five (45) days after the Commencement Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

23

(5) no later than the date that is forty-five (45) days after the Commencement Date, the Company shall have disclosed to the DIP Backstop Parties and the Consenting FLTL Lenders progress with respect to negotiations with Non-APA Owners and other parties in interest with respect to the Non-APA Remaining Assets and such progress shall be satisfactory to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders;

(6) no later than the date that is seventy-five (75) days after the Commencement Date, the Apache Definitive Documentation shall be finalized;

(7) no later than the date that is seventy-five (75) days after the Commencement Date, at the election of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Company shall have either (x) filed the Plan, Disclosure Statement and a motion seeking approval of the Disclosure Statement and, at the option of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Bidding Procedures Motion; or (y) the Bidding Procedures Motion;

(8) in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred (100) days after the Commencement Date, the Bidding Procedures Order shall have been entered by the Bankruptcy Court;

(9) in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred and twenty (120) days after the Commencement Date, the bid deadline set forth in Bidding Procedures Order shall have passed;

(10) in the event the Bidding Procedures Motion is filed, no later than the date that is one hundred and thirty (130) days after the Commencement Date, the auction (the "*Auction*"), if any, on the terms set forth in Bidding Procedures Order shall have occurred;

(11) in the event the Bidding Procedures Motion is filed, the Auction has occurred or been canceled, and the winning bid contemplates a sale that is not pursuant to a Plan, no later than the date that is one hundred and forty (140) days after the Commencement Date, the Sale Order have been entered;

(12) in the event the Bidding Procedures Motion is filed and the winning bid contemplates a Specified Assets Sale that is not pursuant to the Plan, no later than the date that is fourteen (14) days after the entry of the Sale Order, the Specified Assets Sale shall have been consummated; provided that, if such failure is due solely to additional time required to obtained pending regulatory approvals, such date shall be extended solely for the additional time as necessary to complete such regulatory approvals;

(13) no later than the date that is one hundred and fifty (150) days after the Commencement Date, the Disclosure Statement Order shall have been entered;

(14) no later than the date that is one hundred and ninety-five (195) days after the Commencement Date, the Confirmation Order shall have been entered; and

(15)    no later than the date that is two hundred and ten (210) days after the Commencement Date, the Effective Date shall have occurred.

So long as any amounts or commitments under the DIP Facility remain outstanding, the Company may extend a Milestone only with the prior written consent of the Requisite DIP Commitment Parties.  Following any termination of the commitments under DIP Credit Agreement and the repayment in full of all amounts thereunder, the Company may extend a Milestone only with the prior written consent of the Requisite FLTL Lenders.  In each case, consent may be provided via email from counsel to the Ad Hoc Group of Secured Lenders to Weil.

(e)    A "Consenting FLTL Lenders Termination Event" shall mean any of the following:

(i)    the breach by the Company of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof (as applicable);

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance;

(iii)    the Company withdraws the Plan, the Disclosure Statement or the Sale Documents, publicly announces its intention not to support the Restructuring Transactions, the Plan or the Specified Assets Sale, or the Company files any Definitive Document (including amendments, modifications or supplements thereto), motion or pleading with the Bankruptcy Court that is not consistent with this Agreement, the Restructuring Term Sheet or the DIP Documents or is not at all times acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, and such filing has not been withdrawn prior to the earlier of (A) two (2) business days after the Company receives written notice from the Requisite FLTL Lenders (in accordance with Section 21 hereof) that such motion or pleading is inconsistent with this Agreement or the Plan and (B) entry of an order of the Bankruptcy Court approving such filing;

(iv)    the Company files any motion for the (A) conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) appointment of an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code or a trustee or receiver in one or more of the Chapter 11 Cases or (C) dismissal of one or more of the Chapter 11 Cases;

(v)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

WEIL:\97578907\3\45327.0005
#93462797v19

(vi)     the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement, the Definitive Documents or the Restructuring Transactions or (B) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Company has sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(vii)    the Company files, propounds, or otherwise supports an Alternative Restructuring;

(viii)   if the Company shall not have complied with the Milestones, unless such Milestone was otherwise extended in accordance with 7(d)(xvii);

(ix)     the occurrence of an "Event of Default" under the DIP Credit Agreement that has not been waived or timely cured in accordance therewith;

(x)      the Interim DIP Order or the Final DIP Order is reversed, stayed, dismissed, vacated, reconsidered, modified or amended in a manner that is not acceptable to the Requisite DIP Commitment Parties and the Requisite FLTL Lenders;

(xi)     any debtor-in-possession financing is entered into, or the Company files a motion seeking approval of debtor-in-possession financing, on terms that are inconsistent with this Agreement or otherwise not acceptable to the Requisite FLTL Lenders;

(xii)    the Company enters into a material executory contract, lease, any new key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business without obtaining the prior written consent of the Requisite FLTL Lenders;

(xiii)   the Company (A) files any motion seeking to avoid, disallow, subordinate or recharacterize any claim, lien, or interest held by any Consenting FLTL Lender arising under or relating to the Prepetition FLTL Agreement, or (B) shall have supported any application, adversary proceeding or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents (without the consent of any affected Consenting FLTL Lender) to the standing of any such third party to bring such application, adversary proceeding or cause of action;

(xiv)    on or after the date hereof, the Company engages in any material merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business other than (A) the commencement of the Chapter 11 Cases, (B) as would be permitted under the DIP Documents or (C) with the consent of the Requisite FLTL Lenders;

(xv)     the Company loses the exclusive right to file and solicit acceptances of a chapter 11 plan;

(xvi)   the failure of the Company to promptly pay the reasonable fees and expenses of the Consenting FLTL Lenders in accordance with this Agreement;

(xvii)   the Commencement Date shall not have occurred on or before the Outside Petition Date;

(xviii)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement;

(xix)   the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order acceptable to the Requisite FLTL Lenders within ten (10) business days;

(xx)   the Effective Date has not occurred by the date that is two hundred and ten (210) days after the Commencement Date; or

(xxi)   a Company Termination Event, an Apache Termination Event or a DIP Commitment Parties Termination Event has occurred and has not been waived or tolled after any applicable cure period.

(f)     A "Consenting SLTL Lenders Termination Event" shall mean any of the following:

(i)     the breach by any of the other Parties hereto, of any of the undertakings, representations, warranties or covenants of such Party set forth herein in any material respect which remains uncured for a period of ten (10) business days after the receipt of written notice which breach adversely affects the treatment of the Consenting SLTL Lender under the Plan and remains uncured for a period of ten (10) days after the receipt of written notice of such breach pursuant to Sections 7(a) and 21 hereof;

(ii)     the Company files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Plan, in each case, that materially adversely impacts or would reasonably be expected to materially adversely impact the Consenting SLTL Lender;

(iii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) days after such issuance; or

(iv)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) that has a material and adverse impact on the rights or treatment of the Consenting SLTL Lender in this Agreement.

(g)    <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of the Company, Apache and the Requisite FLTL Lenders upon the receipt of written notice delivered in accordance with <u>Section 21</u> hereof.

(h)    <u>Effect of Termination</u>.  Subject to the proviso contained in <u>Section 7(a)</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 7</u>, and except as provided in <u>Section 15</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon a termination of this Agreement, each Consenting Creditor and Apache may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement. If this Agreement has been terminated as to any Consenting Creditor or Apache in accordance with <u>Section 7</u> hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor or Apache to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 14</u> hereof.

(i)    If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 8.    <u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Restructuring, including the Plan, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

WEIL:\97578907\3\45327.0005
#93462797v19

9.     **Representations and Warranties**.

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)     Each Consenting Creditor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner, or has validly executed unsettled trades, of the principal amount of each Loan set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other loans, and/or (ii) has, with respect to the beneficial owners of such Loans, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Loans or to exchange, assign and transfer such Loans, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in <u>Section 22</u> hereof, in each case, to the other Parties.

29

(d)     The Company represents and warrants that, as of the date hereof, Parent has no assets, other than its ownership of 100% of the Capital Stock of FWE or as set forth in its governing documents, and no material liabilities, other than its obligations as a guarantor under the Company's current letters of credit facility, and is not a party to, or beneficiary under, any agreements, contracts, licenses, franchises, permits, certificates, approvals or other similar authorizations other than as required by applicable law, rule, or regulation, or which have been entered into with its members or FWE.

**10.     Disclosure; Publicity.**

The Company shall submit drafts to Consenting Party Counsel and Apache Counsel of any press releases that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Loans held by all the Consenting Creditors, collectively, on a facility by facility basis.  Notwithstanding the provisions in this Section 10, any Party may disclose, to the extent consented to in writing by a Consenting Creditor, such Consenting Creditor's individual holdings.

**11.     Amendments and Waivers.**

(a)     Other than as set forth in Section 11(b), this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company, the Requisite FLTL Lenders, the Requisite DIP Commitment Parties, the Requisite SLTL Lenders (solely to the extent such amendments, modifications and supplements materially and adversely affect any rights under this Agreement of the Consenting SLTL Lenders, and such consent not to be unreasonably withheld, conditioned or delayed) and Apache (solely to the extent such amendments, modifications and supplements relate to the Fieldwood I structure outlined in the Apache Term Sheet or the economic terms  applicable thereto, not to be unreasonably withheld, conditioned or delayed).

(b)     Notwithstanding Section 11(a):

(i)     any change, modification or amendment to this Section 11 shall require the written consent of all of the Parties directly and adversely affected thereby;

(ii)     any change, modification or amendment to the definition of "Requisite DIP Commitment Parties", "Requisite DIP Backstop Parties", "Requisite FLTL Lenders",

30

"Requisite SLTL Lenders" shall require the written consent of each individual Consenting Creditor, DIP Commitment Party or DIP Backstop Party included in such definition;

(iii)    any change, modification or amendment to this Agreement that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Company and the recoveries contemplated by the Restructuring Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor; and

(iv)    (a) any change, modification, or amendment to **Exhibit D** hereto that affects the rights or obligations of any DIP Backstop Party shall require the consent of such DIP Backstop Party and (b) any change, modification, or amendment of the interest rate or fees set forth in the DIP Term Sheet or the amount of the Backstop Fee payable pursuant to Section 3(h) shall require the consent of each DIP Backstop Party and, if such consent is withheld, the commitment of any DIP Backstop Party to provide (or cause to be provided) its portion of the DIP Facility may be terminated by such DIP Backstop Party; provided that any portion of such commitment that has been terminated in accordance with the foregoing clause (b) may be reallocated amongst the group of DIP Backstop Parties who otherwise consent to such change in accordance with Section 3(g), with the consent of such remaining DIP Backstop Parties.

(c)    In the event that an adversely affected Consenting Creditor ("*Non-Consenting Creditor*") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors (i) owning at least 66⅔% of the outstanding relevant Claims of the applicable Class of which such Non-Consenting Creditor is a member, and (ii) representing at least a majority in number of claimants in such Class, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other members of the Consenting Class who have so consented.

**12.**    **Effectiveness.**

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors in a redacted form that removes the details of such Consenting Creditors' holdings and (b) the Company, Weil, Consenting Party Counsel in an unredacted form (to be held by Weil and Consenting Party Counsel on a professionals' eyes only-basis).

**13.**    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to any

principles of conflicts of law thereunder that would result in the application of the laws of any other jurisdiction.

(b) Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(b) shall be brought in the Bankruptcy Court.

(c) EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14. **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not

32

seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

15. **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, the agreements and obligations of the Parties in this Section 15, and Sections 7(j), 10, 12, 13, 14, 16, 17, 18, 19, 20, 21 and 22 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16. **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17. **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 17 shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18. **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19. **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect.

33

20. **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

21. **Notices**.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

      (1)     If to the Company, to:

      Fieldwood Energy LLC
      2000 W. Sam Houston Parkway, S. Suite 1200
      Houston, Texas 77042
      Attention:  Michael Dane and Thomas R. Lamme

      With a copy to:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY 10153
      Attention:   Matt Barr, Esq.
                (matt.barr@weil.com)
                -and-
                Jessica Liou, Esq.
                (jessica.liou@weil.com)

      (2)     If to Apache, to:

      Apache Corporation
      2000 Post Oak Boulevard, Suite 100
      Houston, Texas 77056-4400

      Attention:   Anthony Lannie and Brett Cupit

      With a copy to:

      Hunton Andrews Kurth LLP
      600 Travis
      Suite 4200
      Houston, Texas 77002
      Attention: Robin Russell, Esq.
                (rrussell@huntonak.com)

WEIL:\97578907\3\45327.0005
#93462797v19

-and-
Catherine Diktaban
(cdiktaban@huntonak.com)


(3)    If to the Consenting FLTL Lenders, or a transferee thereof, to the addresses set forth below such Consenting FLTL Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:   Damian Schaible, Esq.
          (damian.schaible@davispolk.com)
          -and-
          Natasha Tsiouris, Esq.
          (natasha.tsiouris@davispolk.com)


(4)    If to Cantor Fitzgerald Securities, the administrative agent and collateral agent for the Prepetition FLTL Lenders, to:

Shipman & Goodwin LLP
400 Park Ave - 5th Floor
New York, NY 10022
Attention:  Nathan Plotkin
          (Nplotkin@goodwin.com)


(5)    If to Cortland Capital Market Services LLC, the administrative agent and collateral agent for the Prepetition SLTL Lenders, to:

Holland & Knight LLP
150 N Riverside Plaza
Chicago, IL 60606
Attention:  Joshua Spencer
          (Joshua.Spencer@hklaw.com)
          Anasthasia Sotiropolous
          (Anastasia.Sotiropoulos@hklaw.com)


Any notice given by delivery, mail or courier shall be effective when received. Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**22.**   **Conflicts**.

In the event the terms and conditions set forth in the Restructuring Term Sheet and in this Agreement are inconsistent, this Agreement shall control. In the event the terms and conditions set forth in the Apache Term Sheet and in this Agreement are inconsistent, the Apache Term Sheet shall control. In the event of any conflict among the terms and provisions of this Agreement, the

WEIL:\97578907\3\45327.0005
#93462797v19

Restructuring Term Sheet and the DIP Orders, the terms and provisions of the DIP Orders shall control. In the event of any conflict among the terms and provisions of this Agreement, the Restructuring Term Sheet and the Sale Documents, the terms and provisions of the Sale Documents shall control. Upon execution of the Definitive Documents, in the event of any conflict among the terms and provisions thereof and of this Agreement or the Restructuring Term Sheet, the applicable Definitive Document shall control. Upon execution of the Apache Definitive Documents, in the event of any conflict among the terms and provisions thereof and of this Agreement, the Apache Term Sheet, the Plan or the Confirmation Order, the applicable Apache Definitive Document shall control. Notwithstanding the foregoing, nothing contained in this Section 22 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement.

**23.**      **No Solicitation; Representation by Counsel; Adequate Information**.

(a)      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Creditors. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials.

(b)      Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)      Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring Transactions, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

## FIELDWOOD PARTIES

### FIELDWOOD ENERGY LLC

By: Fieldwood Energy Inc., its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

### FIELDWOOD ENERGY INC.

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

### FIELDWOOD ENERGY OFFSHORE LLC

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

### FIELDWOOD ONSHORE LLC

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

### FIELDWOOD SD OFFSHORE LLC

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FIELDWOOD OFFSHORE LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**DYNAMIC OFFSHORE RESOURCES NS, LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**FW GOM PIPELINE, INC.**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**GOM SHELF LLC**

By: Fieldwood Energy LLC, its managing member

By: Fieldwood Energy Inc., it managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Senior Vice President and General Counsel

**BANDON OIL AND GAS GP, LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:    Vice President

**BANDON OIL AND GAS, LP**

By: Bandon Oil and Gas, LLC, its general partner

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**FIELDWOOD ENERGY SP LLC**

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PIPELINE LLC**

By: Fieldwood Onshore LLC, its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**GALVESTON BAY PROCESSING LLC**

By: Fieldwood Onshore LLC, its managing member

By: _Thomas R. Lamme_
Name:  Thomas R. Lamme
Title:   Vice President

**APACHE**

**APACHE CORPORATION**

By: _____

Name:  P. Anthony Lannie

Title:  Executive Vice President and General Counsel

**[Lender signature pages intentionally omitted]**

# SCHEDULE 1

## Restructuring Subsidiaries

| |
|---|
| Dynamic Offshore Resources NS, LLC |
| Fieldwood Energy LLC |
| Fieldwood Energy Inc. |
| Fieldwood Energy Offshore LLC |
| Fieldwood Onshore LLC |
| Fieldwood SD Offshore LLC |
| Fieldwood Offshore LLC |
| FW GOM Pipeline, Inc. |
| GOM Shelf LLC |
| Bandon Oil and Gas GP, LLC |
| Bandon Oil and Gas, LP |
| Fieldwood Energy SP LLC |
| Galveston Bay Pipeline LLC |
| Galveston Bay Processing LLC |

# EXHIBIT A

**RESTRUCTURING TERM SHEET**

Attached.

---

**Restructuring Term Sheet**
**August 3, 2020**

---

This restructuring term sheet (this "**Term Sheet**") presents the principal terms of a proposed restructuring (the "**Restructuring**") of the existing indebtedness and operations of Fieldwood Energy Inc. ("**Parent**") and certain of its direct and indirect subsidiaries set forth herein, which Restructuring will be consummated on the terms set forth herein.

This is the Term Sheet referred to in, and appended to, the Restructuring Support Agreement dated as of August 3, 2020, by and among the Company (as defined below) and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "**Restructuring Support Agreement**"). Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the Restructuring Support Agreement.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY, EXCEPT AS REQUIRED BY LAW, OR AS PERMITTED UNDER AN EXISTING CONFIDENTIALITY AGREEMENT WITH THE COMPANY.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS TERM SHEET IS INCONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Overview | |
|---|---|
| **Company Entities** | Parent; Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC (collectively, the "**Debtors**" or the "**Company**"). |
| **Restructuring Overview** | |
| **Funded Debt Claims[1] and Equity Interests to be Restructured** | The Company's current capital structure consists of: |

The Company's current capital structure consists of:

- Prepetition FLFO Loans: Claims in the aggregate principal amount of approximately $139,000,000.00, plus accrued and unpaid interest, arising under that certain Second Amended and Restated Credit Agreement-First Out, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition FLFO Credit Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition FLFO Credit Agreement and related documents, the "**FLFO Claims**") among Parent, Fieldwood Energy LLC, as borrower, Goldman Sachs Bank USA, as administrative agent (the "**Prepetition FLFO Administrative Agent**"), Cantor Fitzgerald Securities ("**Cantor**"), as collateral agent (in its capacity as such, the "**Prepetition FLFO Collateral Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**Prepetition FLFO Lenders**").

- Prepetition FLTL Loans: Claims in the aggregate principal amount of approximately $1,143,000,000.00, plus accrued and unpaid interest, arising under  that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition FLTL Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition FLTL Credit Agreement and related documents, the "**FLTL Claims**"), among Parent, Fieldwood Energy LLC, as borrower, Cantor, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Agent**"), and the Lenders (as defined therein) party thereto from time to time holding the Prepetition First Lien Term Loans (the "**Prepetition FLTL Lenders**").

- Prepetition SLTL Loans: Claims in the aggregate principal amount of approximately $518,000,000.00, plus accrued and unpaid interest, that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition SLTL Agreement**" and such Claims, together with all fees, expenses and all other Claims arising under and in accordance with the Prepetition SLTL Credit Agreement and related documents, the "**SLTL Claims**"), among

---

[1] "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

2

|  | Parent, Fieldwood Energy LLC, as borrower, Cortland Capital Market Services, LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**Prepetition SLTL Lenders**").<br><br>• DB Receivables Claims:  Any Claims arising under that certain Master Receivables Purchase Agreement, dated as of December 23, 2019, among Fieldwood Energy LLC, as originator, FW FinCo LLC, as seller, Deutsche Bank AG New York Branch, as administrative agent, and Deutsche Bank Trust Company Americas, as a purchaser ("**DB**," such facility, the "**DB Receivables Facility**" and such Claims, the "**DB Receivables Claims**").<br><br>• Existing Equity Interests:  Existing Interests[2] in Parent (the "**Existing Equity Interests**"). |
| --- | --- |
| **Implementation** | As set forth herein, the Restructuring shall be implemented through one of, or a combination of, the following options subject to all consent rights of the applicable Consenting Creditors under the Restructuring Support Agreement: (i) a standalone asset sale or sales pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), (ii) a sale or sales or conveyance, disposition or other transfer pursuant to the Plan and/or (iii) an equitization transaction pursuant to the Plan, in each case, in chapter 11 cases to be commenced by the Debtors in the United States Bankruptcy Court for the Southern District of Texas (the "**Chapter 11 Cases**"). |
| **DIP Financing** | The Restructuring will be financed by (i) cash on hand, (ii) use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), and (iii) a postpetition senior secured superpriority debtor-in-possession credit facility (the "**DIP Facility**") on terms and conditions acceptable to the Company and the Requisite DIP Commitment Parties and consistent with the term sheet annexed hereto as **Exhibit A** (the "**DIP Term Sheet**"). |
| **Separation of Assets** | The Restructuring may include the following transactions:<br><br>1. **Specified Assets:**  As determined and agreed by the Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders, through conveyance(s) or divisional merger(s), the transfer or other disposition of all or substantially all of the Specified Assets to one or more purchasers or a new entity ("**Lender NewCo**") to be formed at the direction of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders through (i) a standalone sale or sales pursuant to section 363 of the Bankruptcy Code either via a credit bid or otherwise, (ii) a sale or sales |

---

[2] "**Interest**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

pursuant to a Plan either via a credit bid or otherwise, or (ii) an equitization transaction pursuant to a Plan.

2. **Fieldwood I**: Through conveyance(s) and/or divisional merger(s), the separation of the assets conveyed by Apache Corporation ("**Apache**") pursuant to the Purchase and Sale Agreement dated as of July 18, 2013 ("**PSA**") (and as further specified in the Apache Term Sheet, excluding any assets sold, assigned, used, decommissioned, or otherwise disposed of by the Company to third parties, collectively, the "**Legacy Apache Properties**") into a limited liability company, business trust or other bankruptcy remote vehicle ("**Fieldwood I**") or as otherwise reasonably agreed by Apache, the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. The terms of the Apache Definitive Documents implementing such separation shall be consistent with the Apache Term Sheet (as defined below) and shall be subject to the consent rights of the Requisite DIP Commitment Parties and Requisite FLTL Lenders set forth in the Restructuring Support Agreement.

3. **Non-APA Remaining Assets**: As determined and agreed by the Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders, through conveyance(s) and/or divisional merger(s), the separation or disposition of assets conveyed by non-Apache predecessors–in-title, co-lessees or joint working interest owners (collectively, the "**Non-APA Owners**") other than the Specified Assets and Legacy Apache Properties (such remaining assets, the "**Non-APA Remaining Assets**") and the related liabilities into one or more limited liability companies, business trusts or other bankruptcy remote vehicles, or through any conveyance, disposition or other transfer made in accordance with the Bankruptcy Code.

"**Reorganized Fieldwood**" means the entity or entities that post-Effective Date[3] may directly or indirectly hold all or a portion of the Specified Assets, Fieldwood I, and/or Non-APA Remaining Assets.

The (i) allocation of Company assets among the Specified Assets, Legacy Apache Properties and the Non-APA Remaining Assets and (ii) determination of the corporate structure of Reorganized Fieldwood and Lender NewCo remains subject to further diligence, the Apache Term Sheet and the consent rights set forth in the Restructuring Support Agreement.

The Company shall pursue the necessary regulatory approvals of the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**") with respect to each of the above transactions.

| | |
|---|---|
| **Specified Assets Sale Process** | The Company shall continue postpetition to conduct the marketing and sale process for certain of the Specified Assets initiated prepetition. |

---

[3] "**Effective Date**" means the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

4

| | The Specified Assets Sale shall be conducted in accordance with the Milestones, Sale Documents and other terms and consent rights set forth in the Restructuring Support Agreement. |
|---|---|
| **Equitization Transaction for Specified Assets** | With the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders, the Company may seek to consummate a transaction pursuant to a Plan equitizing debt in exchange for ownership of the equity of any of Reorganized Fieldwood or another transaction as agreed to by Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders (the "**Equitization Transaction**"). |
| | The Company and the Ad Hoc Group of Secured Lenders shall discuss a new money investment by certain of the FLTL Lenders in Reorganized Fieldwood (the "**New Money Investment**"); provided that, this Term Sheet does not bind any party to make the New Money Investment. |
| **Treatment of Fieldwood I** | Fieldwood I and the Legacy Apache Assets shall be treated in accordance with the term sheet annexed hereto as **Exhibit B** (the "**Apache Term Sheet**"), subject to the consent rights set forth in the Restructuring Support Agreement. |
| **Treatment of Claims and Interests** | |
| **Administrative, Priority Tax, and Priority Non-Tax Claims** | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed[4] Administrative Expense Claim,[5] Allowed Priority Tax Claim,[6] and Allowed Priority Non-Tax Claim[7] agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims** | Allowed Claims arising under the DIP Facility (the "**DIP Claims**") shall (i) be paid in full in Cash on the Effective Date, (ii) if acceptable to the Requisite DIP Commitment Parties, converted into a new loan facility or other securities issued at Lender NewCo in form and on terms acceptable to the Company and the Requisite DIP Commitment Parties, or (iii) shall receive such other treatment acceptable to the Company and the Requisite DIP Commitment Parties. |
| **Other Secured Claims** | On or as soon as practicable after the Effective Date, to the extent any other secured claims exist (exclusive of the FLFO Claims, the FLTL Claims, and the SLTL |

---

[4] "**Allowed**" means, with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

[5] "**Administrative Expense Claims**" means any Claim for costs or expenses of administration incurred during the Chapter 11 Cases of a kind specified under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors and (b) Professional Fee Claims.

[6] "**Priority Tax Claim**" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

[7] "**Priority Non-Tax Claim**" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim, (ii) a Priority Tax Claim, or (iii) a DIP Claim.

5

| | Claims, the "**Other Secured Claims**"), except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, each holder thereof shall be satisfied by either (i) payment in full in Cash or (ii) such other treatment necessary to satisfy section 1124 of the Bankruptcy Code. |
|---|---|
| *Unimpaired, Presumed to Accept* | |
| **DB Receivable Claims**<br><br>*[Voting TBD]* | Unless previously terminated by DB, on the Effective Date, the DB Receivables Facility shall either be (i) replaced on terms to be mutually agreed upon between the Company, DB and the Requisite FLTL Lenders and Requisite DIP Commitment Parties, (ii) reinstated in accordance with section 1124 of the Bankruptcy Code, or (iii) terminated in accordance with its terms. |
| **FLFO Claims**<br><br>*[Voting TBD]* | Treatment of Allowed FLFO Claims to be agreed between the Company and the Prepetition FLFO Lenders and subject to the consent of the Requisite FLTL Lenders and Requisite DIP Commitment Parties. |
| **FLTL Claims**<br><br>*Impaired, Entitled to Vote* | Treatment of Allowed FLTL Claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **SLTL Claims**<br><br>*Impaired, Entitled to Vote* | Treatment of Allowed SLTL Claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **General Unsecured Claims**<br><br>*[Impaired, Voting TBD]* | Treatment of Allowed general unsecured claims to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Intercompany Claims**<br><br>*Impaired and Deemed to Reject / Unimpaired and Presumed to Accept* | All Intercompany Claims[8] shall be adjusted, settled, reinstated, discharged, or eliminated as determined by the Debtors with the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Intercompany Interests**<br><br>*Impaired and Deemed to Reject / Unimpaired and Presumed to Accept* | All Intercompany Interests[9] shall be adjusted, settled, reinstated, discharged, or eliminated as determined by the Debtors with the consent of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Existing Equity Interests**<br><br>*Impaired, Deemed to Reject* | Treatment of Existing Equity Interests to be agreed between the Company, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Subordinated Securities Claims**<br><br>*Impaired, Deemed to Reject* | Holders of Subordinated Securities Claims[10] shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. |

---

[8] "**Intercompany Claims**" shall mean any Claim held by a Debtor against another Debtor arising before the Commencement Date.

[9] "**Intercompany Interests**" means any Interest in a Debtor held by another Debtor.  For the avoidance of doubt, an Intercompany Interest shall exclude equity interests of Parent.

[10] "**Subordinated Securities Claim**" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

6

| Governance/Employee Matters | |
|---|---|
| **Key Employee Retention Program ("KERP") and Key Employee Incentive Program ("KEIP")** | KERP:   The Company may implement a KERP for certain employees on substantially the terms previously agreed to with the Prepetition FLFO Lenders and the Requisite FLTL Lenders.<br><br>KEIP:   During the pendency of the Chapter 11 Cases, the Debtors may seek Bankruptcy Court approval of a KEIP for certain employees on terms to be mutually agreed upon between the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **New Board** | The initial board of directors of Lender NewCo, or if an Equitization Transaction is consummated, Reorganized Fieldwood (the "**New Board**"), shall consist of 7 members, 2 of which shall be appointed by Invesco Senior Secured Management, Inc., 1 of which shall be appointed by Franklin Advisers, Inc., 1 of which shall be appointed by Symphony Asset Management LLC, 2 of which shall be appointed by the Requisite FLTL Lenders, and 1 of which shall be the Chief Executive Officer. |
| **Management Incentive Plans** | The terms of a post-emergence management incentive Plan for Reorganized Fieldwood to be mutually agreed upon between the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| General Provisions | |
| **Compromise and Settlement** | The Plan shall contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Treatment of Executory Contracts and Unexpired Leases** | The Debtors shall seek to assume or reject executory contracts and unexpired leases with the consent of the Requisite DIP Commitment Parties and the consent of the Requisite FLTL Lenders. |
| **Conditions Precedent to Effective Date** | Effectiveness of the Plan shall be subject to the satisfaction of customary conditions, including, without limitation, the following (as applicable):<br><br>a.   The Definitive Documents shall be consistent with the Restructuring Support Agreement and otherwise acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement.<br><br>b.   the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect; |

7

|  | c.  The Bankruptcy Court shall have entered the Confirmation Order,[11] which order shall be a Final Order; and |
|  | d.  All governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring shall have been obtained or otherwise waived. |
|  | The conditions to effectiveness may be waived, in whole or in part, by the Debtors with the prior written consent of the Requisite FLTL Lenders and the Requisite DIP Commitment Parties. |
| **Releases** | The Plan will contain debtor releases and third-party releases, mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Exculpation** | The Plan shall contain standard and customary exculpation provisions mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Injunction** | The Plan shall contain standard and customary injunction provisions mutually acceptable to the Debtors, the Requisite DIP Commitment Parties and the Requisite FLTL Lenders. |
| **Definitive Documentation** | This Term Sheet is indicative, and any final agreement shall be subject to the Definitive Documents.  All organizational and governance documents, including any shareholders agreement or registration rights agreements, if any, (in each case, which will include customary minority protections) and exit financing documents shall be in form and substance acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement. |
| **Regulatory Approvals** | All of the terms set forth herein shall be subject to applicable regulatory approvals, including from BOEM and BSEE, as applicable. |
| **Exemption from SEC Registration** | The issuance and distribution of new securities under the Plan, if any, will be issued in reliance on the exemption from registration under the Securities Act or applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or any other applicable exemption therefrom, subject to applicable diligence. |
| **Tax Structure** | The terms of the Plan and the transactions contemplated therein shall be structured in a tax efficient manner as to the Debtors and the Requisite DIP Commitment Parties and Requisite FLTL Lenders to the extent reasonably practicable. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the Restructuring Support Agreement. |

---

[11] "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases.

WEIL:\97482252\28\45327.0005
#93480605v12

Exhibit A to Restructuring Term Sheet

**DIP Term Sheet**

**FIELDWOOD ENERGY LLC**
**DIP FACILITY TERM SHEET**

This term sheet (the "**DIP Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession credit facility (the "**DIP Facility**") and consent to use of the Prepetition Collateral (as defined below). The DIP Credit Agreement (as defined below) evidencing the DIP Facility shall be entered into with the DIP Facility Borrower (as defined below), certain of its subsidiaries, and Fieldwood Energy Inc. in connection with their respective cases under chapter 11 (the "**Chapter 11 Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Facility and the Debtors' use of Prepetition Collateral will be subject to the approval of the Bankruptcy Court (as defined below) and consummated in the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") in accordance with (i) the Interim DIP Order (as defined below) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility and use the Prepetition Collateral on an interim basis prior to entry of the Final DIP Order, (ii) the Final DIP Order (as defined below) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility on a final basis and (ii) the DIP Documents (as defined below) to be executed by the Debtors. Capitalized terms used and not defined in this DIP Facility Term Sheet shall have their respective meanings as defined in the Restructuring Support Agreement to which this DIP Facility Term Sheet is attached (the "**Restructuring Support Agreement**").

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Facility Borrower** | Fieldwood Energy LLC, as a debtor and debtor-in-possession (the "**DIP Facility Borrower**"). |
| **Guarantors** | Fieldwood Energy Inc. and each subsidiary of the DIP Facility Borrower that is a Debtor, each as a debtor and debtor-in-possession (the "**Guarantors**" and, together with the DIP Facility Borrower, the "**Loan Parties**"), it being understood and agreed that each subsidiary of the DIP Facility Borrower that is an obligor under any of the Prepetition Facilities (as defined below) shall be a Guarantor. |
| **DIP Facility Agent** | Cantor Fitzgerald Securities ("**Cantor**"), as administrative agent and collateral agent (in such capacities, the "**DIP Facility Agent**"). |
| **DIP Lenders** | The entities specified on Exhibit D to the Restructuring Support Agreement, each of which is a lender (or manages funds or other entities that are lenders) under the Prepetition FLTL Credit Agreement (as defined below) on the Petition Date (as defined below), or an affiliate or related fund that is a designee of any of the foregoing, as lenders under the DIP Facility (in such capacities, together with their successors and permitted assigns, collectively, the "**DIP Lenders**"). |
| | On the Closing Date (as defined below), the Initial DIP Loan (as defined below) will be made, and all DIP Commitments (as defined below) will be held, by Cantor or another initial DIP Lender as determined by the Requisite DIP Backstop Parties. The Initial DIP Loan will be assigned among the DIP Lenders in accordance with their allocated commitments after the Closing Date. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession US dollar term loan credit facility in an aggregate principal amount not to exceed $100 million (the commitments under the DIP Facility, the "**DIP Commitments**"; the loans under the DIP Facility, the "**DIP Loans**"), subject to the terms and conditions of this DIP Facility Term Sheet and the DIP Documents. The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and any DIP Loans repaid may not be reborrowed. |

|  | Upon the Bankruptcy Court's entry of the Interim DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower shall make an initial draw of DIP Loans in an aggregate amount equal to $10,000,000 (the "**Initial DIP Loan**").  Thereafter, upon satisfaction of all other applicable conditions precedent described below, the DIP Facility Borrower may make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive Documents (such date, the "**APA Milestone Satisfaction Date**") in an aggregate amount equal to $15,000,000 (the "**Incremental DIP Loan**").  For the avoidance of doubt, the amount of DIP Loans that may be made prior to the entry of the Final DIP Order shall not exceed $25,000,000. |
|--|--|
|  | Subject to the Bankruptcy Court's entry of the Final DIP Order (as defined below) and upon satisfaction of all other applicable conditions precedent (excluding, for the avoidance of doubt, the occurrence of the APA Milestone Satisfaction Date solely in respect of the Incremental DIP Loan), the DIP Facility Borrower may make up to 5 additional draws of DIP Loans on any date prior to the DIP Termination Date (as defined below), each in an aggregate amount equal to $20,000,000 (*provided* that such amount may be less than $20,000,000 if such amount represents either the Incremental DIP Loan or all remaining availability under the DIP Facility). The DIP Commitments will automatically terminate on the earlier of the DIP Termination Date and the date on which any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor is confirmed. |
| **Use of Proceeds** | Solely to (i) make payments for general corporate or working capital purposes in a manner consistent with the then current Approved Budget (as defined below) (subject to any permitted variance), (ii) pay required debt service on the DIP Loans, (iii) pay the fees, costs and expenses of the DIP Facility Agent and the DIP Lenders, (iv) pay fees and expenses of professionals associated with the Chapter 11 Cases and (v) provide Adequate Protection (as defined below). No part of the proceeds of the DIP Loans may be used by the DIP Facility Borrower or any other Loan Party, whether directly or indirectly, in a manner contrary to the DIP Orders. |
| **DIP Termination Date** | The earliest of (i) the date falling 12 months after the commencement of the Chapter 11 Cases (such commencement date, the "**Petition Date**"), (ii) the effective date of any Chapter 11 plan for the reorganization of the DIP Facility Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all (x) assets or (y) Specified Assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the DIP Loans and termination of the DIP Commitments upon and during the continuance of an event of default under the DIP Facility and (v) 45 days after the Petition Date (or such later date as agreed to by the Required DIP Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date  (such earliest date, the "**DIP Termination Date**"). |
| **Interest Rate** | LIBOR + 8.75% per annum, or ABR + 7.75%, in each case payable monthly in cash. |
|  | During the continuance of an event of default, all overdue amounts under the DIP Facility will bear interest at a rate equal to (i) in the case of principal, 2.00% per annum, plus the otherwise applicable rate or (ii) in the case of any obligations other than principal, the then applicable rate for ABR DIP Loans plus 2.00% per annum, which in each case shall be payable on demand from time to time. |
| **LIBOR Floor** | 1.00% |

| | |
|---|---|
| **Amortization** | None. |
| **Mandatory Prepayments** | Subject to the terms of the DIP Orders, mandatory prepayments under the DIP Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted indebtedness) and (b) sales or other dispositions (including casualty events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions, minimum liquidity thresholds and other thresholds to be agreed). |
| **Voluntary Prepayments** | Amounts outstanding under the DIP Facility may be voluntarily repaid at any time without premium or penalty. |
| **Interim DIP Order** | The interim order approving the DIP Facility and the Debtor's use of Prepetition Collateral, which shall be in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Interim DIP Order**"), shall, among other things, authorize and approve (i) the full amount of the DIP Commitments and the borrowing and making of the DIP Loans in an amount up to $100 million, (ii) the DIP Facility Borrower to draw the Initial DIP Loan, (iii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Facility Term Sheet and the DIP Documents, (iv) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Facility Agent and the DIP Lenders as described in "Fees and Expenses Indemnification" by the Debtors, in the case of expenses incurred on or prior to the Closing Date, to the extent invoiced at least two business days prior to the Closing Date (or any later date reasonably acceptable to the DIP Facility Borrower), (v) the use of cash collateral, *provided* that the Adequate Protection (as defined below) shall be granted in accordance with the terms set forth in this DIP Facility Term Sheet and (vi) the payment of the Upfront Fees and the Backstop Fees (each as defined below), which payment shall not be subject to reduction, setoff or recoupment. |
| **Final DIP Order** | The final order approving the DIP Facility, which shall be substantially in the same form as the Interim DIP Order (with such modifications as are necessary to convert the Interim DIP Order into a final order) and in form and substance acceptable to the Required DIP Lenders and the Debtors (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**")), shall, among other things, authorize and approve the DIP Facility Borrower to draw the full amount of the DIP Commitments. |
| **Prepetition Facilities** | "**Prepetition FLFO Credit Agreement**" – that certain Second Amended and Restated Credit Agreement- First Out, dated as of June 28, 2019, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Goldman Sachs Bank USA, as administrative agent (the "**Prepetition FLFO Agent**"), the Lenders and Issuing Banks (each as defined therein) party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and the "Secured Parties" thereunder the "**Prepetition FLFO Secured Parties**." |
| | "**Prepetition FLTL Credit Agreement**" – that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Cantor Fitzgerald Securities as administrative agent (the "**Prepetition FLTL Agent**"), the lenders party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof, including by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended prior to the date hereof, the "**Prepetition FLTL Forbearance Agreement**")), and the "Secured Parties" thereunder the "**Prepetition FLTL Secured Parties**". |

3

| | |
|---|---|
| | "**Prepetition SLTL Credit Agreement**" – that certain Amended and Restated Second Lien Term Loan Agreement, dated as of April 11, 2018, among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Cortland Capital Market Services LLC, as administrative agent and collateral agent, the lenders party thereto and the other agents party thereto from time to time (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and the "Secured Parties" thereunder the "**Prepetition SLTL Secured Parties**" (the Prepetition SLTL Secured Parties, together with the Prepetition FLTL Secured Parties and Prepetition FLFO Secured Parties, the "**Prepetition Secured Parties**").<br><br>Collectively, the agreements described above are referred to herein as the "**Prepetition Credit Agreements**," and the secured obligations thereunder, collectively, the "**Prepetition Secured Obligations**" and all "Collateral" securing such Prepetition Secured Obligations, the "**Prepetition Collateral**". |
| **Apache Decommissioning Agreement** | "**Apache Decommissioning Agreement**" – that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache Corporation, a Delaware corporation ("**APA**"), Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), Apache Shelf Exploration LLC, a Delaware limited liability company ("**ASE**"), the DIP Facility Borrower and GOM Shelf LLC (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the date hereof), and ASE together with APA, APSH and APDW, the "**Apache Secured Parties**". |
| **DIP Collateral** | Substantially all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, deposit accounts, inventory, equipment, capital stock in subsidiaries of the Loan Parties, including, for the avoidance of doubt, any equity or other interests owned by the Loan Parties in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries (other than FW Finco, LLC), with limitations on the pledge of equity or other interests in foreign subsidiaries consistent with the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein), investment property (including securities accounts and commodity accounts), instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding (i) any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof, and (ii) the Trust A NPI, the Trust A-1 NPI, the Trust A Account, any interest in Trust A, the Permitted Surety Bonds or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) (the collateral described in clause (ii), the "**Apache Collateral**") (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facility, the "**DIP Liens**").  The Debtors agree that the DIP Credit Agreement shall provide for the negative pledges set forth in Section 4(f) the Prepetition FLTL Forbearance Agreement as in effect during the "Restriction Period" (as defined therein) and shall obtain the collateral arrangements and negative pledges set forth in Section 6(a)(iii) of the Prepetition FLTL Forbearance Agreement (subject to any limitations under applicable law). |
| **Priority Under the DIP Facility** | All obligations of the DIP Facility Borrower and the Guarantors to the DIP Lenders and to the DIP Facility Agent (collectively, the "**DIP Obligations**") shall, subject to the Carve-Out (as defined below), at all times: |

#93351493v29

(a) be entitled to superpriority administrative expense claim status in the Chapter 11 Case of such Loan Party;

(b) be secured by a perfected first priority security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions) *pari passu with* valid and perfected liens in favor of hedge counterparties in connection with secured hedging transactions entered into by the Debtors on a post-petition basis in accordance with the DIP Credit Agreement;

(c) except as otherwise provided below with respect to the existing liens of the Prepetition Secured Parties and Apache Secured Parties, be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (i) valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Credit Agreements, (ii) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((i) and (ii) together, the "**Permitted Prior Liens**"), subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral (which DIP Collateral, for the avoidance of doubt, excludes the Apache Collateral) of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations of the Prepetition Secured Parties and the obligations of the Apache Secured Parties.

The "**Carve-Out**" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000, and (iii) to the extent allowed by the Bankruptcy Court at any time, and whether allowed before or after delivery of a Trigger Notice, (A) all allowed and unpaid claims for fees, costs, disbursements and expenses of professionals whose retention by the Debtors is approved by the Bankruptcy Court pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $5,000,000, of professionals retained by the Debtors (the "**Carve-Out Cap**"), in each case subject to the limits imposed by the DIP Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party.

"**Trigger Notice**" shall mean a written notice delivered by the DIP Facility Agent describing the event of default that is alleged to continue under the DIP Documents (or, after the payment in full of the DIP Obligations, delivered by the administrative agents under the Prepetition Credit Agreements (the "**Prepetition Agents**") describing the reason for termination of the use of cash collateral); *provided* that under no circumstances shall any success, completion or similar fee be payable from the Carve-Out following delivery of a Trigger Notice.

For the avoidance of doubt, the DIP Liens shall not be secured by the Apache Collateral nor prime any unavoidable, valid and properly perfected lien existing as of the Petition Date in respect of the Apache Collateral.

5

| Adequate Protection | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors, the Prepetition Secured Parties, and the DIP Lenders agree, subject to Bankruptcy Court approval of the Interim DIP Order, to the following forms of adequate protection (the "**Adequate Protection**"):

Prepetition FLTL Secured Parties:

(a) all accrued and unpaid reasonable and documented fees and expenses incurred prior to the Petition Date owed to Davis Polk & Wardwell LLP, as primary outside legal counsel, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, as regulatory legal counsel, Haynes and Boone, LLP, as local legal counsel, and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors for the Prepetition FLTL Secured Parties and Shipman & Goodwin LLP, as primary legal counsel for the Prepetition FLTL Agent (the foregoing, collectively, the "**FLTL Advisors**");

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLTL Agent, including all such fees and expenses of the FLTL Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure FLTL Secured Party Adequate Protection Claims (as defined below) (the "**FLTL Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLFO Secured Party Adequate Protection Liens (as defined below);

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLTL Secured Party Adequate Protection Claims**");

(e) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility;

(f) the FLTL Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLTL Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLTL Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, Prepetition FLTL Secured Parties and Prepetition FLFO Secured Parties collectively holding greater than 50% of the sum of the outstanding principal amount of the loans under the Prepetition FLTL Credit Agreement plus the outstanding principal amount of the loans under the Prepetition FLFO Credit Agreement the "Required AP Secured Parties"); and

(g) Any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets shall be deemed to reduce dollar-for-dollar the value of the DIP Collateral that is not Prepetition Collateral until such value is zero and thereafter shall reduce the value of the remaining DIP Collateral. |

Prepetition FLFO Secured Parties:

(a) all accrued and unpaid reasonable and documented fees and disbursements incurred prior to the Petition Date owed to Vinson & Elkins LLP, as primary legal counsel, and Opportune LLP, as financial advisor, for the Prepetition FLFO Agent (the foregoing, collectively, the "**FLFO Advisors**");

(b) when due, current payment of all reasonable and documented fees and out-of-pocket expenses payable to the Prepetition FLFO Agent, including all such fees and expenses of the FLFO Advisors;

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, current payment in cash of post-petition interest at the non-default interest rate provided in the Prepetition FLFO Credit Agreement (based on the "LIBOR" rate, as provided in the Prepetition FLFO Credit Agreement);

(d) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral to secure the FLFO Secured Party Adequate Protection Claims (as defined below) (the "**FLFO Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (x) the Carve-Out, (y) the Permitted Prior Liens and (z) the DIP Liens, and ranking *pari passu* with the FLTL Secured Party Adequate Protection Liens;

(e) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**FLFO Secured Party Adequate Protection Claims**");

(f) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility; and

(g) the FLFO Secured Parties shall have the benefit of the Milestones, Financial Covenants, Hedging Covenant, and Financial Reporting (each, as set forth below), which shall continue to remain in effect with respect to the FLFO Secured Parties following any termination of the DIP Facility (each of which may be amended, modified, waived or extended, in each case, as to the Prepetition FLFO Secured Parties by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Lenders (or, following any termination of the DIP Facility, the Required AP Secured Parties).

Prepetition SLTL Secured Parties:

(a) financial reporting and other reports and notices initially provided by the Debtors, and, upon incurrence of the DIP Facility, delivered by the DIP Facility Borrower under the DIP Facility.

In addition, the Interim DIP Order shall provide for customary prepetition secured lender protections, including, but not limited to, (i) the right to seek additional forms of adequate protection, (ii) provision that any payments received as Adequate Protection shall be free and clear of all liens and claims, (iii) effective upon entry of the Interim DIP Order, waivers regarding Sections 506(c) and 552(b) of the Bankruptcy Code, and the equitable doctrine of marshaling (subject to modification under the Final DIP Order with respect to the period following entry of the Final DIP Order), (iv) limitations on the use of collateral

| | |
|---|---|
| | and (v) stipulations in respect of the validity of prepetition liens and obligations, in each case, as such may pertain to the claims and liens of the Prepetition Secured Parties.<br><br>For the avoidance of doubt, the FLTL Secured Party Adequate Protection Claims, the FLFO Secured Party Adequate Protection Claims and the SLTL Secured Party Adequate Protection Claims shall in all cases have the same relative priority as the FLTL Secured Party Adequate Protection Liens, the FLFO Secured Party Adequate Protection Liens and the SLTL Secured Party Adequate Protection Liens, respectively. |
| **Milestones** | The DIP Documents shall require compliance with milestones consistent with the "Milestones" (as defined in the Restructuring Support Agreement) to be included in the DIP Credit Agreement. |
| **Events of Default** | Usual and customary for financings of this type. |
| **Conditions Precedent to Closing** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility (which shall include customary closing deliverables in a form and manner to be mutually agreed); (ii) the Petition Date shall have occurred, and the DIP Facility Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) entry of the Interim DIP Order; and (iv) delivery of the Initial Budget (as defined below) acceptable to the Required DIP Lenders in their sole and absolute discretion. The date on which the closing conditions are satisfied is referred to herein as the "**Closing Date**". |
| **Conditions Precedent to the Extension of each DIP Loan** | Conditions precedent customarily found in loan documents for similar debtor-in-possession financings and including, without limitation: (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim DIP Order or the Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Lenders, (iv) with respect to each DIP Loan (other than the Initial DIP Loan or the Incremental DIP Loan), the APA Milestone Satisfaction Date shall have occurred, (v) with respect to each DIP Loan (other than the Initial DIP Loan), (x) Liquidity of less than $50,000,000, prior to giving effect to such borrowing and (y) the DIP Facility Borrower shall, after giving effect to the amount of such borrowing on a pro forma basis, be in pro forma compliance with the minimum Asset Coverage Ratio, and (vi) delivery of a customary notice of borrowing. |
| **Covenants** | Affirmative and negative covenants usual and customary for financings of this type, including, without limitation, to use commercially reasonable efforts to obtain facility ratings from S&P and Moody's within 45 days of the date of the entry of the Final DIP Order and not to enter into any compensation arrangements (or modify any existing compensation arrangements) with senior management of the Company without the prior consent of the Required DIP Lenders (subject to certain exceptions to be agreed). |
| **Financial Covenants** | Minimum Liquidity (as defined below) to be no less than $40,000,000, to be tested twice monthly (the "**Minimum Liquidity Covenant**").<br><br>"**Liquidity**" means, at any time, the sum of (i) unrestricted cash and cash equivalents of the DIP Facility Borrower and its subsidiaries that are Guarantors at such time which are subject to a perfected superpriority DIP Lien (and excluding, for the avoidance of doubt, any cash or cash equivalents that constitute Apache Collateral) and (ii) solely for purposes of determining compliance with the Minimum Liquidity Covenant, the aggregated amount of then unused DIP Commitments. |

| | |
|---|---|
| | Minimum Asset Coverage Ratio (as defined below) of 2.00 to 1.00, tested as of the last day of each fiscal quarter beginning with the first fiscal quarter (including any partial fiscal quarter) ended after the Closing Date.<br><br>"**Asset Coverage Ratio**" means, as of any date of determination, the ratio of (a) the PV-10 value of 2P developed reserves[1] of the Specified Assets (which for the avoidance of doubt shall be burdened by the PV-10 of all plugging and abandonment obligations) calculated as determined by the Approved Reserve Report (as defined below) for such date of determination, <u>plus</u> (or <u>minus</u>, as the case may be) the present value of hedges thereof, to (b) the outstanding amount of all DIP Loans as of the such date.<br><br>"**Approved Reserve Report**" means a reserve report prepared consistent with the requirements for reserve reports under the Prepetition FLTL Credit Agreement and consistent with requirements under the Securities Exchange Act and the rules promulgated thereunder and using strip prices with the final year of the forward curves held constant and adjusted for basis differentials, it being understood that for any determination as of March 31 or September 30 of any year, numbers will be rolled forward and/or updated for production roll-off and pricing.<br><br>Variance covenant, tested as of the last day of each two-week calendar period ending on the Friday immediately preceding the required date of delivery of the applicable Variance Report (as defined below), commencing with the two-week calendar period ended August 14, 2020 (each a "**Test Period**"), requiring in each case for the prior two-week period the positive variance (as compared to the estimated Net Disbursements (as defined below) for such Test Period as set forth in the then current Approved Budget) of actual Net Disbursements during such Test Period not to exceed 7.50%.<br><br>"**Net Disbursements**" means disbursements of the type set forth in the line item in the then current Approved Budget entitled "Net Operating Disbursements" and, for the avoidance of doubt, shall exclude disbursements for fees and expenses of professionals related to the Cases.<br><br>For purposes of testing the variance covenant, an amount equal to 75% of any negative variance of Net Disbursements against the applicable Approved Budget in any Test Period may be carried forward into the succeeding Test Periods. |
| **Hedging Covenant** | Within 30 days of the entry of the Final DIP Order (or such later date as agreed to by the Required DIP Lenders), enter into and thereafter maintain, hedge agreements with counterparties having a rating of BBB- or Baa3 or better or an investment grade-rated participant with respect to at least 50% (on a barrel of oil equivalent basis) of the aggregate oil and natural gas proved developed producing reserves (based on an Approved Reserve Report adjusted for any permanent shut-in of shelf properties) for the next succeeding 6 months, *provided* that such hedge agreements shall be on terms consistent with the Debtors' historical practices. |
| **Representations** | Representations and warranties usual and customary for financings of this type. |

---

[1] Developed non-producing reserves limited to those that require no capital to produce and will include Katmai, Genovesa, and Troika TA3.

| | |
|---|---|
| **and Warranties** | |
| **Voting** | Amendments and waivers of the DIP Facility will require the approval of DIP Lenders (other than Affiliated DIP Lenders (to be defined in a customary manner to be agreed)) holding more than 50% of the outstanding DIP Commitment and DIP Loans (the "**Required DIP Lenders**"), subject to customary exceptions for certain provisions which shall require the consent of each affected DIP Lender or all DIP Lenders and customary protections for the DIP Facility Agent. |
| **Fees and Expenses Indemnification** | Loan Parties obligated under the DIP Facility shall pay all reasonable and documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Facility Agent and the DIP Lenders, including, without limitation, the actual and documented costs for the seasoning of the DIP Facility (currently estimated to be 0.30% with respect to any funded DIP Loans and 0.10% with respect to any unfunded DIP Commitments), the documented fees and expenses of Davis Polk & Wardwell LLP as primary counsel to the DIP Lenders, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, as regulatory legal counsel for the DIP Lenders, Haynes and Boone, LLP, as local legal counsel for the DIP Lenders, Shipman & Goodwin LLP, as primary counsel to the DIP Facility Agent and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors to the DIP Lenders (collectively, the "**Financial Advisor**"), in each case, associated with the syndication of the DIP Facility and the preparation, negotiation, execution, delivery and administration of the DIP Loan Documents, any amendment or waiver with respect thereto or any enforcement with respect thereto.<br><br>The Loan Parties will indemnify the DIP Facility Agent and DIP Lenders, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses and liabilities arising out of or relating to the transactions contemplated hereby, except solely for gross negligence, willful misconduct of such indemnified party or willful and material breach by such indemnified party of the DIP Documents to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment. |
| **Upfront Fees** | An upfront fee in an amount equal to 3.00% of the DIP Commitments shall be due and payable to the DIP Lenders in cash on the Closing Date ratably based on their respective DIP Commitments on the Closing Date (the "**Upfront Fee**"). |
| **Backstop Fees** | A backstop fee in an amount equal to 4.00% of the DIP Commitments shall be due and payable to each DIP Lender providing a backstop commitment (a "**DIP Backstop Commitment**") under the Restructuring Support Agreement in respect of the DIP Facility in cash on the Closing Date ratably based on their respective DIP Backstop Commitments on the Petition Date (the "**Backstop Fee**"). |
| **Unused Commitment Fees** | An unused commitment fee equal to 3.00% per annum on the actual daily amount of the unused DIP Commitments shall be paid on a monthly basis to the DIP Lenders in cash ratably based on their respective DIP Commitments. |
| **Financial Reporting** | (a) Initially, a 13-week cash flow forecast delivered on or prior to the Closing Date, in form and substance acceptable to, and consented to by, the Required DIP Lenders (the "**Initial Budget**") and (b) thereafter, a rolling 13-week cash flow forecast delivered on Wednesday of every two-week anniversary of the Closing Date (commencing with the |

10

| | |
|---|---|
| | third Wednesday following the Closing Date), in each case, setting forth the DIP Facility Borrower's projected cash receipts and cash disbursements during such 13-week period[2] (each such 13-week cash flow forecast, a "**Budget**").

Monthly operating reports and monthly income statements shall be required, in each case within the time periods and in a form and covering items consistent with Section 7(d) of the Prepetition FLTL Forbearance Agreement, together with the accompanying officer's certificate described therein.

The DIP Facility Borrower shall provide to the DIP Lenders a summary report of the Initial Budget, each Budget, each monthly operating report and each monthly income statement concurrently with the delivery thereof to the Financial Advisor, which summary reports shall be consistent with Section 7(e) of the Prepetition FLTL Forbearance Agreement.

Each Budget which is delivered immediately prior to the expiration of the 13-week period covered by the Initial Budget or any subsequent Approved Budget must be acceptable to the Required DIP Lenders and no such Budget shall be effective as the Updated Covenant Testing Budget (as defined below) until so approved (it being understood that if the Required DIP Lenders have not objected to a proposed Updated Covenant Testing Budget within five business days after delivery thereof, the Required DIP Lenders shall be deemed to have approved such updated Budget).  Upon approval or deemed approval of such Budget by the Required DIP Lenders, such Budget shall constitute the "**Updated Covenant Testing Budget**" (and, collectively with the Initial DIP Budget, the "**Approved Budget**").

A variance report (the "**Variance Report**") delivered bi-weekly, commencing August 19, 2020 and every second Wednesday thereafter, comparing for each applicable Test Period the actual disbursements against anticipated disbursements under the Approved Budget on a line item basis and in the same level of detail as set forth in the Initial Budget, or in a form otherwise reasonably acceptable to the Financial Advisor. |
| **Documentation** | The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement (the "**DIP Credit Agreement**"), negotiated in good faith, giving due regard to the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) (with such modifications as are (i) set forth herein, (ii) usual and customary for debtor-in-possession financings of this kind and/or otherwise necessary or desirable to effectuate the financing contemplated hereby and/or to reflect the capital structure and operational requirements of the Debtors and the existence and continuance of the Chapter 11 Cases (including customary representations and warranties, covenants and events of default for debtor-in-possession financings of this kind) and (iii) agreed by the DIP Facility Borrower and the DIP Lenders and/or the DIP Facility Agent) and (b) as applicable, the related notes, security agreements, collateral agreements, pledge agreements, guarantees and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary or desirable to effectuate the financing contemplated hereby, negotiated in good faith, giving due regard to the credit |

---

[2] Any weather event and its effects will not be included in the Budget, but the Required DIP Lenders may agree to a modification of the Budget if a weather event occurs.

11

| | |
|---|---|
| | documentation entered into in connection with the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) (all of the foregoing, together with the DIP Credit Agreement, collectively, the "**DIP Documents**").  Notwithstanding the foregoing or any other provision hereof, certain "baskets" (including for investments in Fieldwood Mexico B.V.), thresholds (other than with respect to material indebtedness or monetary judgments), grace periods, exceptions and materiality qualifiers under the DIP Credit Agreement shall be substantially consistent with those set forth in the Prepetition FLTL Credit Agreement as in effect during the "Restriction Period" (as defined therein) or as otherwise agreed by the DIP Lenders. |
| **Assignments and Participations** | Usual and customary for financings of this type. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Miscellaneous** | The DIP Documents will include yield protection provisions usual and customary for financings of this type. |
| **Counsel to DIP Facility Agent** | Shipman & Goodwin LLP. |
| **Primary Counsel to DIP Lenders** | Davis Polk & Wardwell LLP. |

#93351493v29

**Exhibit B to Restructuring Term Sheet**

**Apache Term Sheet**

# FIELDWOOD ENERGY

Thomas R. Lamme
Senior Vice President and General Counsel
Direct: 713-969-1107
Email: TLamme@fwellc.com

**VIA EMAIL**

July 31, 2020

P. Anthony Lannie
Executive Vice President and General Counsel
Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400

*Re:    Legacy Apache Properties Term Sheet*

Dear Mr. Lannie:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated July 31, 2020, by and between Fieldwood Energy LLC and certain of its affiliates (collectively, the "**Fieldwood PSA Parties**") and Apache Corporation and certain of its affiliates (collectively, the "**Apache PSA Parties**" and, together with the Fieldwood PSA Parties, the "**Parties**") supporting the restructuring of the portion of the Fieldwood PSA Parties' business relating to certain assets described therein as the "Legacy Apache Properties" (the "**Legacy Apache Properties Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Legacy Apache Properties Term Sheet in accordance therewith and (ii) (upon Fieldwood's payment of the retainers to Apache's attorneys and advisors in the amounts submitted to Fieldwood's outside counsel and subject to review and reasonable satisfaction with the restructuring term sheet to be attached to the restructuring support agreement) to execute and support a restructuring support agreement in a final form reasonably acceptable to Apache and consistent in all respects with  the terms of the Legacy Apache Properties Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

Regards,

*Thomas R. Lamme*

Thomas R. Lamme

Enclosure

cc:  Michael T. Dane
     Senior Vice President and Chief Financial Officer

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

**GOM SHELF LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Vice President

**APACHE CORPORATION**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel


**APACHE SHELF, INC.**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel


**APACHE DEEP WATER LLC**

Name: P. Anthony Lannie
Title: Executive Vice President and General Counsel

## Exhibit A

## Term Sheet for Fieldwood Energy LLC Restructuring

## Summary of Principal Terms

| | |
|---|---|
| **Entity Owning Legacy Apache Properties Post-Confirmation** | All oil and gas assets conveyed by Apache Corporation ("Apache") and certain of its affiliates (collectively, the "Apache PSA Parties") in favor of Fieldwood Energy LLC ("Fieldwood" or "debtor") and certain of its affiliates (collectively, the "Fieldwood PSA Parties") pursuant to that Purchase and Sale Agreement dated as of July 18, 2013 between the Apache PSA Parties and the Fieldwood PSA Parties (as amended, "PSA"), plus all leases, wells, fixtures, equipment, permits, ONRR royalty and other deposits, decommissioning bonds with third parties relating to previously sold assets, decommissioning bonds posted by Fieldwood on Legacy Apache Properties, inventory, facilities, easements, pipelines, and related property associated therewith, less and except any such assets sold, assigned, decommissioned, or otherwise disposed of by Fieldwood to third parties or otherwise prior to the date of this Term Sheet or as contemplated in this Term Sheet, and not including the Retained Properties (defined below) (collectively, the "Legacy Apache Properties") shall be owned post-confirmation by a Reorganized Fieldwood unless a different entity is created in accordance with the section entitled "Assumption of Obligations" below (this portion of the business of the Reorganized Fieldwood being referred to hereinafter as "Fieldwood I"). Any outstanding accounts receivable and accounts payable associated with the Legacy Apache Properties as of the effective date of Fieldwood's plan of reorganization shall be retained by Fieldwood II (defined below), and any accounts receivable and accounts payable accruing after the effective date of Fieldwood's plan of reorganization shall accrue to the benefit or obligation of Fieldwood I. Fieldwood I will retain BOEM Operator numbers and Qualification cards for Fieldwood and Fieldwood's affiliate GOM Shelf LLC.<br><br>Fieldwood I shall (i) have no assets or liabilities upon confirmation other than the Legacy Apache Properties and operational liabilities, including plugging and abandonment and decommissioning liabilities relating to the Legacy Apache Properties and certain assets described under "Additional Initial Funding Sources" and "Assumption of Obligations" below, (ii) be a bankruptcy remote business entity with a governance structure which is consistent with the business goals of the parties outlined herein (which includes an independent director or manager whose vote is needed to approve major decisions such as bankruptcy, receivership, liquidation, mergers, and consolidations, and removal and appointment (after the initial appointment) of the sole manager and service provider described below (the "Independent Director")), (iii) not be a reporting entity for SEC purposes, (iv) as of the confirmation date, not create a variable interest entity that Apache is required to consolidate, and (v) is structured in a tax efficient manner within the constraints of the criteria set forth in items (i) through (iv) above. To the extent it will accomplish the goals of the parties outlined herein and is otherwise allowed by applicable law, Fieldwood I and the holder of Fieldwood's other assets not sold during the pendency of the Chapter 11 cases ("Fieldwood II") may be created by a divisional merger of Fieldwood under applicable state law upon the confirmation of Fieldwood's plan of reorganization. |

| | |
|---|---|
| **Management of Fieldwood I** | Fieldwood I will not have employees other than a sole manager. Apache and debtor shall each provide the other with a list of three candidates with a minimum of five (5) years of relevant experience in the energy sector. If one or more names appear on both lists, then the debtor will select the initial sole manager of Fieldwood I from those common name(s). If there are no common names, then each shall have the right to strike two names from the other party's list and the bankruptcy judge shall select the sole manager from the two remaining names (one from each list). In the event the sole manager must be removed (which shall require Apache's consent) and/or replaced or resigns or otherwise no longer serves, then the foregoing procedure will be repeated (except that the Independent Director will replace the bankruptcy court and Fieldwood I will replace the debtor for that purpose). |
| | The initial Independent Director shall be appointed by the debtor and shall be a natural person who is not and, for the prior five years has not been, a director, officer, employee, trade creditor, or shareholder (or spouse, parent, sibling, or child of the foregoing) of Fieldwood, any affiliate of Fieldwood, or any lender to Fieldwood (a "Qualified Person"), and shall be an individual provided by Citadel SPV, Global Securitization Services, LLC, Corporation Service Company, CT Corporation, Lord Securities Corporation, Wilmington Trust Company, or, if none of those companies is then providing professional independent managers, another nationally-recognized company selected by Fieldwood with Apache's consent (the "Approved List") and approved by the bankruptcy court. The Independent Director may not be removed, except with Apache's consent. If the Independent Director is removed, resigns, or otherwise ceases to serve, then Fieldwood I shall select another Independent Director who is a Qualified Person from the Approved List. |
| | The limited liability agreement will specify that the sole manager will have the right to control the business and operations of Fieldwood I at all times prior to the completion of the decommissioning of the Legacy Apache Properties owned by Fieldwood I, subject to compliance with the following covenants which can only be waived with Apache's consent:

1. Fieldwood I shall not have any business or operations other than operating the Legacy Apache Properties and decommissioning them;
2. Fieldwood I shall not purchase, sell, or farm-in any asset;
3. Except in compliance with item 4 immediately below, Fieldwood I shall not farm-out any asset;
4. If anyone makes an unsolicited proposal to farm in to any of the Legacy Apache Properties on fair market terms and conditions (including fair market rates of return), then Fieldwood I shall be obligated to market such farm-in opportunity and accept the highest and best offer for such farm-in opportunity as long as the transaction is accretive to Fieldwood I cashflow;
5. Fieldwood I shall not incur indebtedness for borrowed money other than under the Standby Facility (defined below);
6. Fieldwood I shall not use its free cash flow (after operating expenses) for any purposes other than fulfilling is obligations to Apache under the |

2

| | |
|---|---|
| | Decommissioning Agreement (defined below) and the Standby Facility (defined below) until those obligations have been satisfied in full; |
| | 7. Fieldwood I shall not amend its bylaws, limited liability agreement, or other organizational documents, and any effort to do so shall be ineffective for any purpose; |
| | 8. Fieldwood I shall not engage in any activity or take any action outside the ordinary course of business; and |
| | 9. Fieldwood I shall not dissolve, liquidate, or merge or consolidate with any other entity. |
| **Employee Matters** | Fieldwood shall provide Apache with a list of certain employees involved in the operation and management of the Legacy Apache Properties no later than one month after finalizing definitive documentation for the transactions reflected in this Term Sheet and shall make such employees available on a mutually agreed timeline to be interviewed by Apache for potential employment by Apache following the consummation of the Fieldwood I transaction.  Apache shall have no obligation to hire any such employees. |
| | Fieldwood is willing to consider assigning all or a portion of its existing decommissioning business, including separate P&A equipment and spreads, to Apache in connection with mutually agreeable resolution of Fieldwood I terms and based on Fieldwood II's residual business post-restructuring. Consummation of the transaction outlined herein shall not be conditioned on Apache's potential acquisition of such decommissioning business. |
| **Operations and Decommissioning Activities** | Fieldwood I shall hire an independent third-party service provider to perform all operations and decommissioning on behalf of Fieldwood I.   The work to be performed by the independent service provider shall be bid out to not less than three (3) qualified candidate service providers, each with a minimum of five (5) years of relevant experience. The qualified bidder who bids the lowest price and best terms, in view of relevant experience, shall be selected as the initial service provider.  To facilitate the transition process prior to selection of such service provider, upon the effectiveness of the plan of reorganization, Fieldwood I will enter into a transition services agreement with Fieldwood II to provide operational services for Fieldwood I and the initial service provider.  Such transition services agreement may be terminated by Fieldwood I at any time.  In the event the service provider must be removed (which may be done by the sole manager, but only with Apache's consent) and/or replaced or otherwise no longer serves, then the sole manager shall again bid out the work in accordance with the procedures outlined hereinabove.  No later than 45 days after the Chapter 11 filing date (the "Petition Date"), Fieldwood may select with Apache's consent, which consent may be withheld by Apache in its sole discretion, certain properties (the "Retained Properties") for which Fieldwood II or its successors shall retain operatorship or ownership and operatorship.[1] Properties set forth on <u>Schedule A</u>, attached hereto, constitute the agreed-upon Retained Properties as of the date of this Term Sheet. With regard to ST 308 (identified as a Retained Property on <u>Schedule A</u>), |

---

[1] Properties comprise fields, onshore and offshore facilities, inventory, shore bases, and other assets in which Fieldwood has acquired an incremental working interest separate from the Apache acquisition or have an operational relationship to other Fieldwood properties and which will be operated by or owned and operated by the Fieldwood II or the Fieldwood deepwater business.

#93441325v24
WEIL:\97575248\2\45327.0005

|  | Fieldwood's interest in such property will be transferred to, or allocated through the divisional merger, and owned and operated by the party who owns the deepwater Katmai project upon effectiveness of Fieldwood's plan of reorganization, and the owner of such property shall provide Fieldwood I with a surety bond in a form acceptable to Fieldwood I securing the decommissioning obligations for the ST 308 lease and associated ROW(s) in the amount of $13.2 million.  With regard to VR 78 and VR 362/371 (each identified as a Retained Property on Schedule A), Fieldwood's interest in such properties will remain with Fieldwood II and be owned and operated by Fieldwood II, and Fieldwood II shall assume the decommissioning obligations with respect to those properties.  With regard to the four properties listed on Schedule A as "Operatorship" in which ownership will be retained by Fieldwood I, a joint operating agreement reasonably satisfactory to Apache will be put in place (or amended) which provides that Fieldwood I as non-operator will have the right to opt in or out of participation in any future capital spending or project related to a work-over or recompletion of an existing well on the property or the drilling of a new well on the property (a "New Project").  If Fieldwood I elects not to participate in accordance with the applicable joint operating agreement, Fieldwood II as Operator may fund (and, if so, it will indemnify Fieldwood I against costs and liabilities associated with) such New Project as an exclusive (sole risk) operation giving Fieldwood II sole right and obligation to any and all risk, costs, liabilities, downside, and upside from such New Project.  Fieldwood I shall retain all of its rights and obligations relating to the property other than those rights and obligations created by the New Project.  Services provided by Fieldwood II under such JOA will be billed to Fieldwood I at Fieldwood II's actual costs without any actual or allocated overhead or additional G&A charges.

Services provided by Apache or its third-party contractors to Fieldwood I will be billed to Fieldwood I at Apache's cost and according to typical industry practices under a joint operating agreement. |
| **Right to Fund Capital Expenditures** | Apache will have the right, but not the obligation, to fund any future capital expenditures related to projects forecast to increase production or cash flow on the Legacy Apache Properties ("Approved CapEx") upon terms and conditions mutually agreed between Apache and Fieldwood I.

At confirmation, to the extent it is formed or the equivalent entity exists, Fieldwood II and Fieldwood I will enter into a Joint Development Agreement ("JDA") whereby Fieldwood II has the right for two years to present capital projects to Fieldwood I relating to Legacy Apache Properties, which will give Fieldwood I, in Fieldwood I's sole discretion, the option to participate or decline participation under terms mutually agreed and set forth in the JDA.  Also, if Fieldwood I intends to decommission a property that was producing at the time Fieldwood I was created, upon notice, Fieldwood II will have the option for a period of time to be agreed on by the parties to request to take over (in the form of participation or conveyance to Fieldwood II) such property in accordance with terms set forth in the JDA. Such request may be accepted or rejected by Fieldwood I in its sole discretion. |

4

| | |
|---|---|
| **Initial Capitalization** | Fieldwood shall deposit into Fieldwood I an amount equal to $50 million minus the actual post-petition decommissioning spend by Fieldwood on the Legacy Apache Properties. |
| **Additional Initial Funding Sources** | In addition to Fieldwood's contribution above, Fieldwood I will be capitalized and funded as follows:<br><br>1) Any and all funds in Trust A shall be made available as described under "Assumption of Obligations" below and<br><br>2) Cash flow from the Legacy Apache Properties shall be reinvested and used for decommissioning activities, to fund Approved CapEx, and to repay amounts outstanding, if any, under the Standby Facility. |
| **Assumption of Obligations** | Fieldwood I shall continue to be responsible for all of Fieldwood's obligations under the Decommissioning Agreement dated as of September 30, 2013 among the Apache PSA Parties and the Fieldwood PSA Parties (as amended, the "Decommissioning Agreement") and the PSA, including all related contracts, and all contracts relating to insurance, surety bonds, letters of credit, and other decommissioning security assets and all other obligations relating to the Legacy Apache Properties (except to the extent reimbursement or indemnification obligations with respect to the surety bonds and letters of credit are discharged through the bankruptcy), but shall not be responsible for any other obligations of Fieldwood related to its other assets. However, if Fieldwood I is created in a manner other than a divisional merger and is not a residual entity from Fieldwood, Fieldwood I shall assume the same obligations described in the immediately preceding sentence, and Fieldwood and Apache will agree on a structure to complete the formation transaction consistent with the intent of this Term Sheet; provided that all necessary consents can be obtained in order to preserve all material rights of Apache under the material contracts described above, including the letters of credit and bonds issued to Apache in support of the Decommissioning Agreement. If the plan of reorganization confirmed by the bankruptcy court and the definitive documents contemplated herein are consistent with the terms herein unless otherwise agreed and grant Apache all the rights and protections provided for in this Term Sheet unless otherwise agreed, then Apache will waive any claims against the debtor based on any alleged prepetition breach of the Decommissioning Agreement or any related agreement and shall release any and all claims against the debtors and all other released parties under Fieldwood's plan of reorganization (and such releases shall be mutual with Apache benefiting as a released party under the plan) but only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security, in any respect.<br><br>If (i) Fieldwood I defaults on its decommissioning obligations under the Decommissioning Agreement, (ii) any governmental authority or any other Person or entity seeks to cause Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, and (iii) Apache conducts the decommissioning, it shall be done in a manner that entitles Apache to draw on cash in Trust A, the letters of credit, and the bonds currently outstanding, totaling approximately $736 million (the "Decommissioning Security") in reimbursement of such advances. Apache shall |

|  | be entitled to draw at any time prior to completion of decommissioning of the Legacy Apache Properties should certain letters of credit or bonds of the Decommissioning Security not be renewed in a manner consistent in all respects with the existing terms of such letters of credit or bonds, and, if drawn in such manner, such funds shall be contributed to Trust A. Fieldwood I shall take any action reasonably requested by Apache to entitle Apache to draw on the Decommissioning Security as contemplated in this Term Sheet and shall not take any position in any proceeding or otherwise inconsistent with Apache's ability to draw on the Decommissioning Security. |
|---|---|
| **Standby Facility** | After the Decommissioning Security has been exhausted or is not available to pay or reimburse Apache for decommissioning, Fieldwood I will have the right to borrow from Apache the funds required to perform decommissioning on the Legacy Apache Properties via a line of credit (the "Standby Facility").<br><br>The Standby Facility shall have a first lien on all the assets of Fieldwood I. Cash advanced shall earn interest at 400 basis points (4% per annum) over the interest rate of Apache's then most recently issued bonds. All principal and interest will be paid in cash from the first available free cash flow of Fieldwood I following each loan. Additional customary terms and conditions TBD. The first lien shall also secure Fieldwood I's obligations to Apache under the Decommissioning Agreement.<br><br>The Standby Facility shall mature at completion of all decommissioning activities. |
| **Beneficiaries of the Fieldwood I** | Fieldwood has the right to designate who shall receive ownership interests entitling the holder to any assets remaining in Fieldwood I after decommissioning is complete and the Standby Facility is repaid. Such interests may be distributed by Fieldwood (consistent with the rules of priority and as may be negotiated under the plan) upon confirmation of Fieldwood's plan of reorganization or as otherwise agreed thereafter but shall thereafter be non-transferable on the books and records of Fieldwood I, it being the goal of all parties that Fieldwood I will not be a reporting entity for SEC purposes and such ownership interests in Fieldwood I shall not be registered or traded on any exchange. Apache understands and agrees that the restructuring transactions currently contemplated by the RSA (defined below) do not provide for the DIP Lenders or the pre-petition FLTL Lenders becoming beneficial owners of Fieldwood I. |
| **Fieldwood's Plan of Reorganization** | Apache will support a Fieldwood Chapter 11 plan of reorganization which provides for the Fieldwood I structure outlined herein and will execute a restructuring support agreement ("RSA") consistent with the terms herein evidencing same. The RSA shall provide that Apache shall have consent rights over all definitive documents related to the Fieldwood I structure outlined herein, and over the portions of the plan of reorganization and the confirmation order that provide for and approve the Fieldwood I structure outlined herein. The RSA shall contain customary termination rights. |
| **Post-Petition Decommissioning Activity** | The DIP Budget shall provide Fieldwood with reasonable funds to accomplish the following during the pendency of the Chapter 11 cases, as it pertains to the Legacy Apache Properties: |

6

|  | |
|---|---|
|  | 1) Maintain and operate the properties as a reasonably prudent operator in the ordinary course of business, <br><br> 2) Maintain all of the assets in their current condition, subject to the Post-Petition Decommissioning Budget (defined below), and insurance upon such assets in amounts and kinds comparable to pre-petition coverage, and <br><br> 3) Perform decommissioning activities consistent with the Decommissioning Agreement in accordance with a budget agreed to in advance between Fieldwood and Apache (the "Post-Petition Decommissioning Budget"), the total amount of which budget shall not be greater than $50 million during the pendency of the case, assuming an emergence by March 31, 2021.  In the event of emergence later than March 31, 2021, Fieldwood and Apache shall (i) work in good faith to agree upon an extended Post-Petition Decommissioning Budget and (ii) in such event, if (a) Fieldwood has insufficient operating income from the Legacy Apache Properties to perform any required decommissioning within respect to any Legacy Apache Property, after mutually agreed upon capital expenditures, and (b) any governmental authority or any other Person or entity causes Apache or its Affiliates to conduct decommissioning that is required in accordance with applicable Law or contract, then Apache will conduct or cause to be conducted such decommissioning in accordance with the terms of the Decommissioning Agreement. |
| **Expense Reimbursement** | Fieldwood will pay up to $4,000,000 of reasonable and documented fees and expenses of Apache related to the formation of Fieldwood I and Fieldwood's restructuring; provided that such fees and expenses shall only be payable so long as Apache is a party to the RSA. |
| **Other Matters** | Briarlake office sublease to be renegotiated (i) to reflect current market rates for remainder of sublease term; and (ii) to reflect reduced square-footage consistent with the scale and business functions of Fieldwood II or its successors as a result of the Chapter 11 plan of reorganization). <br><br> Fieldwood and Apache shall negotiate mutually agreeable definitive documentation for the transactions reflected in this Term Sheet within 45 days of the Petition Date.  Additionally, Apache acknowledges and agrees that the definitive documentation implementing the transactions contemplated under this Term Sheet shall be subject to approval of holders of consent rights as set forth in the RSA, including certain DIP and FLTL Lenders consent rights, which approval shall not be unreasonably withheld, it being understood that good faith negotiations with respect to matters not addressed in this Term Sheet shall not be considered unreasonably withholding approval. |
| **Effectiveness** | The transactions contemplated by this Term Sheet, and as set forth in definitive documentation, shall (i) require that the Decommissioning Agreement and related agreements will not be rejected by the debtor during the Chapter 11 case, and such obligations shall be allocated to, and remain the obligations of, Fieldwood I upon |

7

|  | the consummation of the plan and the divisional merger contemplated herein, (ii) preserve all Apache's rights with respect to Trust A, the net profits interests, and the letters of credit and bonds issued to Apache under the Decommissioning Agreement, and (iii) become effective on the consummation of Fieldwood's plan of reorganization. |

8

## Schedule A: Retained Properties

| Field | Classification |
|---|---|
| ST 308 | Ownership and Operatorship |
| GI 110/116 | Operatorship |
| GI 43 | Operatorship |
| ST 53/67/68 | Operatorship |
| MC 109 | Operatorship |
| VR 78 | Ownership and Operatorship |
| VR 362/371 | Ownership and Operatorship |

**EXHIBIT B**

**FORM OF DIP ORDER**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-_____ (__)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e)
AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES PURSUANT TO
11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion (the "**Motion**")[2] of Fieldwood Energy LLC (the "**Borrower**") and its

affiliated debtors, each as a debtor and debtor-in-possession (collectively, the "**Debtors**") in the

above captioned cases (the "**Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2),

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Bankruptcy Local Rules

for the Southern District of Texas (the "**Local Bankruptcy Rules**") and the Procedures for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Holdings LLC (9264); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the DIP Documents (as defined below).

Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Rules**") promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"), seeking, among other things:

A.      authorization for the Borrower to obtain secured postpetition financing (the "**DIP Financing**") and for Fieldwood Energy Inc. ("**Holdings**") and all domestic subsidiaries of the Borrower (subject to certain exceptions for immaterial subsidiaries that are not Debtors) (each a "**Guarantor**" and collectively, the "**Guarantors**"; the Guarantors collectively with the Borrower, the "**Loan Parties**"), to unconditionally guaranty, on a joint and several basis, the Borrower's obligations in connection with the DIP Financing, consisting of a multiple-draw senior secured term loan facility (the "**DIP Facility**"), in an principal amount not to exceed $100,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)) on the terms and conditions set forth in this Interim Order and the DIP Documents (each as defined below), pursuant to which DIP Facility the Borrower shall, subject to entry of the Interim Order, borrow from the DIP Lenders an aggregate principal amount equal to $10,000,000 on the Closing Date (as defined in the DIP Credit Agreement), and thereafter, on an interim basis, upon satisfaction of all other applicable conditions precedent in the DIP Documents, be authorized to make an additional draw of DIP Loans on or prior to the finalization of the Apache Definitive Documents (as defined in the DIP Term Sheet) (such date, the "**APA Milestone Satisfaction Date**") in an aggregate principal amount equal to $15,000,000;

B.      authorization for the Loan Parties to execute and enter into the Senior Secured Debtor-in-Possession Term Loan Credit Agreement among Holdings, the Borrower, the lenders from time to time thereto (collectively, the "**DIP Lenders**") and Cantor Fitzgerald Securities as

2

administrative agent and collateral agent (in such capacities, the "**DIP Agent**"; the DIP Agent

together with the DIP Lenders, the "**DIP Secured Parties**"), upon the terms and conditions

consistent in all material respects with those set forth in the DIP Term Sheet substantially in the

form attached to the Motion as **Exhibit** [__] (such term sheet, the "**DIP Term Sheet**"; such

senior secured debtor-in-possession term loan credit agreement, as amended, supplemented or

otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP**

**Credit Agreement**" and, together with the schedules and exhibits attached thereto and all

agreements, documents, instruments and/or amendments executed and delivered in connection

therewith, including, without limitation, the Collateral Agreement and the Guarantee Agreement

(each as defined in the DIP Credit Agreement), each to be dated as of the Closing Date (as

defined in the DIP Credit Agreement), the "**DIP Documents**") and to perform all such other and

further acts as may be required in connection with the DIP Documents;

      C.     authorization for the Loan Parties to grant adequate protection to the Prepetition

Secured Parties (as defined below) under or in connection with certain of the following

agreements:

1.     that certain Second Amended and Restated Credit Agreement – First Out, dated as of
June 28, 2019 (as amended by that certain Temporary Limited Forbearance and
Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated,
supplemented or otherwise modified prior to the date hereof) and as otherwise amended,
supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLFO**
**Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party
thereto (the "**Prepetition FLFO Lenders**"), Goldman Sachs Bank USA, as
administrative agent (in such capacity, the "**Prepetition FLFO Administrative Agent**")
and issuing bank, and Cantor Fitzgerald Securities, as collateral agent (in such capacity,
the "**Prepetition FLFO Collateral Agent**", together with Prepetition FLFO
Administrative Agent and their successors in such capacities, the "**Prepetition FLFO**
**Agents**" and, the "Secured Parties" under such Prepetition FLFO Credit Agreement the
"**Prepetition FLFO Secured Parties**");

2.     that certain Amended and Restated First Lien Term Loan Agreement, dated as of April
11, 2018 (as amended by that certain First Amendment to Amended and Restated First
Lien Term Loan Agreement, dated as of July 5, 2018, that certain Second Amendment to

3

Amended and Restated First Lien Term Loan Agreement, dated as of November 11, 2019 and that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition FLTL Credit Agreement**"), among, *inter alia*, Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition FLTL Lenders**") and Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition FLTL Agent**" and, the "Secured Parties" under such Prepetition FLTL Credit Agreement the "**Prepetition FLTL Secured Parties**")

3. that certain Amended and Restated Second Lien Term Loan Agreement dated as of April 11, 2018 (as amended by that certain Temporary Limited Forbearance and Amendment, dated as of May 7, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), and as otherwise amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition SLTL Agreement**"[3]), among, *inter alia*, Holdings, the Borrower, the lenders party thereto from time to time (the "**Prepetition SLTL Lenders**" [4]) and Cortland Capital Markets Services LLC, as administrative agent and collateral agent (in such capacities, together with its successors in such capacities, the "**Prepetition SLTL Agent**"[5] and, the "Secured Parties" under such Prepetition SLTL Credit Agreement the "**Prepetition SLTL Secured Parties**"[6]); and

4. that certain Decommissioning Agreement, dated as of September 30, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, and together with the Existing Decommissioning Related Agreements (as defined in the DIP Credit Agreement), the "**Apache Decommissioning Agreement**"), by and among Apache Corporation ("**APA**"), Apache Shelf, Inc. ("**APSH**"), Apache Deepwater LLC ("**APDW**"), Apache Shelf Exploration LLC (together with APA, APSH and APDW, the "**Apache Secured Parties**"), the Borrower and GOM Shelf LLC.

---

[3] The agreements described in the preceding paragraphs C.1-3 above are collectively referred to as the "**Prepetition Credit Agreements**," and all "Collateral" securing the obligations under the Prepetition Credit Agreements described in the preceding paragraphs C.1-3 is collectively referred to as the "**Prepetition Collateral**". The Trust A NPI, Trust A-1 NPI, the Trust A Account, any interest in Trust A, the Permitted Surety Bonds or the Letters of Credit (each as defined in the Apache Decommissioning Agreement) are collectively referred to as the "**Apache Collateral**" and, for the avoidance of doubt, the Prepetition Collateral does not include the Apache Collateral.

[4] The Prepetition FLFO Lenders, the Prepetition FLTL Lenders and the Prepetition SLTL Lenders are collectively referred to as the "**Prepetition Lenders**".

[5] The Prepetition FLFO Agents, the Prepetition FLTL Agent and the Prepetition SLTL Agent are collectively referred to as the "**Prepetition Agents**".

[6] The Prepetition FLFO Secured Parties, the Prepetition FLTL Secured Parties and the Prepetition SLTL Secured Parties are collectively referred to as the "**Prepetition Secured Parties**".

4

D.      subject to the restrictions set forth in the DIP Documents and this Interim Order, authorization for the Loan Parties to continue to use Cash Collateral (as defined below) and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

E.      subject to certain challenge rights of parties in interest set forth herein, approval of certain stipulations by the Debtors with respect to the Prepetition Credit Agreements and the liens and security interests arising therefrom;

F.      the grant of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than certain excluded property as provided in the DIP Documents) and all proceeds thereof (including subject only to and effective upon entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject only to the Carve-Out;

G.      the waiver of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and of any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code subject to the provisions set forth below;

H.      the waiver of the equitable doctrine of "marshaling" and other similar doctrines as to the DIP Secured Parties and the Prepetition Secured Parties, subject to the provisions set forth below;

#93489429v14
WEIL:\97576947\7\45327.0005

I.      modification of the automatic stay to the extent set forth herein and in the DIP

Documents;

J.      pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**")

on the Motion to be held before this Court to consider entry of an order granting the Motion on

an interim basis and authorizing the Borrower to borrow from the DIP Lenders under the DIP

Documents forthwith an aggregate principal amount equal to $10,000,000 and, on or prior to the

APA Milestone Satisfaction Date, an additional principal amount equal to $15,000,000, of the

DIP Financing and the Guarantors to unconditionally guaranty such obligations owing to the DIP

Lenders under the DIP Documents on a joint and several basis (this "**Interim Order**"); and

K.      that this Court schedule a final hearing (the "**Final Hearing**") to consider entry of

a final order (the "**Final Order**") approving the relief granted herein on a final basis and

authorizing the Borrower to forthwith borrow from the DIP Lenders under the DIP Documents

up to the full principal amount of the DIP Financing and the Guarantors to unconditionally

guaranty all obligations owing to the DIP Lenders under the DIP Documents on a joint and

several basis; and due and appropriate notice of the Motion and the Interim Hearing having been

served by the Debtors on the parties identified in the Motion; and it appearing that no other or

further notice need be provided; and the Court having reviewed the Motion; and the Interim

Hearing having been held by this Court on [•], 2020; and the relief requested in the Motion being

in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest

in these Cases; and the Court having determined that the relief requested in the Motion is

necessary to avoid immediate and irreparable harm; and the Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and upon the record made by the Debtors in the Motion, in the declaration of [•] of [Houlihan

#93489429v14
WEIL:\97576947\7\45327.0005

Lokey Capital, Inc.] in support of the Motion filed contemporaneously therewith, in the *Declaration of [ •]in Support of Chapter 11 Petitions and Related Requests for Relief* (Docket No. [•] (the "**First Day Declaration**")) and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Disposition.* The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2. *Jurisdiction.* This Court has core jurisdiction over the Cases (as defined below), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. *Committee Formation.* As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

4. *Notice.* Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Complex Case Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this

#93489429v14
WEIL:\97576947\7\45327.0005

Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

5.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest and subject to the limitations thereon contained in paragraphs 23 and 24 below, the Debtors admit, stipulate and agree that:

(a)  (i) as of the date (the "**Petition Date**") of the filing of the Cases, the Borrower and the guarantors under the relevant Prepetition Credit Agreement (such guarantors collectively, the "**Prepetition Guarantors**") were justly and lawfully indebted and liable to (A) the Prepetition FLFO Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $147,601,297 in respect of loans made and undrawn letters of credit issued under, and in accordance with the terms of, the Prepetition FLFO Credit Agreement, plus accrued and unpaid interest thereon and fees (including the prepayment fees payable pursuant to the Prepetition FLFO Credit Agreement), reimbursement obligations in respect of drawn letters of credit, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition FLFO Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition FLFO Credit Agreement (collectively, the "**Prepetition FLFO Debt**"), which Prepetition FLFO Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition FLFO Credit Agreement; (B) the Prepetition FLTL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $1,142,688,815.28 in respect of loans made under, and in accordance with the terms of, the

8

Prepetition FLTL Credit Agreement, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition FLTL Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition FLTL Credit Agreement (collectively, the "**Prepetition FLTL Debt**"), which Prepetition FLTL Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition FLTL Credit Agreement; (C) the Prepetition SLTL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $517,500,000 in respect of loans made under, and in accordance with the terms of, the Prepetition SLTL Credit Agreement, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition SLTL Credit Agreement), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition SLTL Credit Agreement (collectively, the "**Prepetition SLTL Debt**" and, together with the Prepetition FLFO Debt and the Prepetition FLTL Debt, the "**Prepetition Debt**"), which Prepetition SLTL Debt has been guaranteed on a joint and several basis by the guarantors under the Prepetition SLTL Credit Agreement, (ii) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrower and the applicable Prepetition Guarantors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of

#93489429v14
WEIL:\97576947\7\45327.0005

the obligations owing under the Prepetition Credit Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b) the liens and security interests granted to the Prepetition Secured Parties (the "**Prepetition Liens**") pursuant to and in connection with the Prepetition Credit Agreements, are: (i) valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral; (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to valid, non-avoidable liens permitted under the Prepetition Credit Agreements that (A) were perfected as of the Petition Date or (B) were in existence immediately prior to the Petition Date and are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, to the extent that such permitted liens are senior to liens in favor of the Prepetition FLFO Secured Parties and the Prepetition FLTL Secured Parties (the "**Permitted Prior Liens**");

(c) by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Debt, none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors;

10

(d)  the liens granted to the DIP Agent on behalf of the DIP Secured Parties pursuant to this Interim Order are perfected, valid, enforceable and non-avoidable liens against the Debtors;

(e)  no claims or causes of action exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date;

(f)  effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, subsidiaries, heirs and assigns, hereby absolutely and unconditionally release and forever discharge and acquit the DIP Secured Parties and Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened (collectively, the "**Released Claims**") including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Credit Agreements, or the transactions contemplated thereunder, the negotiation thereof and of the deal reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their

11

successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured or unmatured or known or unknown;

(g) (i) that certain *Pari Passu* Intercreditor Agreement dated as of April 11, 2018 (as amended by that certain Joinder No. 4 dated as of June 28, 2019 and as otherwise amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**First Lien Pari Passu Intercreditor Agreement**"), and (ii) that certain Intercreditor Agreement, dated as of April 11, 2018 (as amended, supplemented or otherwise modified from time to time prior to the date hereof, the "**Second Lien Intercreditor Agreement**" and, together with the First Lien Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**"), are binding and enforceable against the Borrower, Prepetition Guarantors, and the Prepetition Secured Parties party thereto, in accordance with their terms, and the Borrower, Prepetition Guarantors, and Prepetition Secured Parties are not entitled to take any actions that would be contrary to the provisions thereof; and

(h) all cash, securities or other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan Parties in any account or accounts with any Prepetition Secured Party or any branch or agency thereof (the "**Depository Institutions**") were subject to rights of set-off under the Prepetition Credit Agreements and applicable law, for the benefit of the Prepetition Secured Parties.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to

control agreements or otherwise, in each case that constitutes Prepetition Collateral) are

"cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of

the Bankruptcy Code (the "**Cash Collateral**").

6.     *Findings Regarding the DIP Financing and Cash Collateral.*

(a)  Good and sufficient cause has been shown for the entry of this Interim

Order.

(b)  The Loan Parties have an immediate need to continue to use the

Prepetition Collateral (including the Cash Collateral) to preserve their estates, including (i) to

consummate the prenegotiated plan contemplated under the "**Restructuring Support**

**Agreement**" filed as Exhibit [ ] to the First Day Declaration, (ii) for the orderly continuation

of the operation of their businesses, (iii) to preserve business relationships with vendors,

suppliers, employees, and customers, and (iv) to satisfy other working capital and operational

needs.  The Loan Parties have an immediate need to have available the DIP Facility in case

the Prepetition Collateral (including Cash Collateral) is insufficient to meet their capital and

liquidity needs.  The access of the Loan Parties to sufficient working capital and liquidity

through the use of Cash Collateral and other Prepetition Collateral, incurrence of new

indebtedness under the DIP Documents and other financial accommodations provided under

the DIP Documents are necessary and vital to the preservation and maintenance of the going

concern values of the Loan Parties and to a successful reorganization of the Loan Parties.

(c)  The Loan Parties are unable to obtain financing on more favorable terms

from sources other than the DIP Lenders under the DIP Documents and are unable to obtain

adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense.  The Loan Parties are also unable to obtain secured credit allowable

13

under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Loan Parties granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (as defined below) and incurring the Adequate Protection, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(d)  Based on the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection granted to the Prepetition Secured Parties, and the terms on which the Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)  Upon the terms and conditions set forth herein, the Prepetition Secured Parties have consented, or pursuant to the Intercreditor Agreements are deemed to have consented, to the use of Cash Collateral and the other Prepetition Collateral, the Debtors' entry into the DIP Documents and, in the case of the Prepetition Secured Parties, the priming of the liens granted to the Prepetition Secured Parties pursuant to Section 364(d)(1) of the Bankruptcy Code.

(f)  The DIP Financing, as well as the terms of the Adequate Protection and Adequate Protection Liens (each as defined below), and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Loan Parties, the DIP Agent and the DIP Lenders and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the

14

DIP Documents, including, without limitation: (i) all loans made to and guarantees issued by the Loan Parties pursuant to the DIP Documents (collectively, the "**DIP Loans**") and (ii) any "**Loan Obligations**" (as defined in the DIP Credit Agreement) of the Loan Parties owing to the DIP Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the DIP Documents, including any obligations, to the extent provided for in the DIP Documents, to indemnify the DIP Agent or the DIP Lenders and to pay any fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the DIP Documents), amounts, charges, costs, indemnities and other obligations that are chargeable or reimbursable under this Interim Order, the Final Order or the DIP Documents (the foregoing in clauses (i) and (ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Loan Parties' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection and the granting of the Adequate Protection Liens), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof), and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code

#93489429v14
WEIL:\97576947\7\45327.0005

in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g) The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; *provided* that nothing in this Interim Order or the other DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Intercreditor Agreements and upon a change in circumstances, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

(h) The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. For the reasons set forth in the Motion and declarations filed in connection therewith, absent granting the relief set forth in this Interim Order, the Loan Parties' estates would face (i) significant business disruptions from the loss of access to Cash Collateral, (ii) exposure to

16

significant liquidity uncertainty in the current commodities market, and (iii) loss of confidence regarding financial wherewithal by stakeholders, all of which would lead to immediate and irreparable harm.  Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Loan Parties' estates and consistent with the Loan Parties' exercise of their fiduciary duties.

7.      *Authorization of the DIP Financing and the DIP Documents.*

(a)  The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized to forthwith borrow money pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized, on an interim basis, to guaranty the Borrower's obligations with respect to such borrowings in an aggregate principal or face amount equal to $10,000,000, and thereafter, on or prior to the APA Milestone Satisfaction Date, in an additional aggregate principal amount equal to $15,000,000, under the DIP Facility (plus interest, fees, expenses (including professional fees and expenses) and other amounts, in each case, as provided for in the DIP Documents), subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to the terms and conditions set forth herein and therein), including to (v) make payments for general corporate or working capital purposes in a manner consistent with the then-current Approved Budget (as defined in the DIP Term Sheet) subject to permitted variances, (w) pay required debt service on the DIP Loans, (x) pay the fees, costs and expenses of the DIP Agent and the DIP Lenders, (y) pay fees, costs and expenses of professionals associated with the Cases and (z)

17

provide adequate protection as provided in paragraphs 14 through 20 of this Interim Order (the "**Adequate Protection**").

(b) In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all agreements, instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees and expenses that may be reasonably required or necessary for the Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i) the execution and delivery of, and performance under, each of the DIP Documents;

(ii) the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications or supplements to and under the DIP Documents, in each case, in such form as the Loan Parties, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications or supplements to and under the DIP Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii) the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of all fees including, without limitation, any upfront fee, backstop fee, commitment fee, seasoning fee or agency fee (which fees shall be, and shall be deemed to have

18

been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Loan Parties, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders (including, without limitation, the documented fees and expenses of Shipman & Goodwin LLP, as counsel to the DIP Agent, Davis Polk & Wardwell LLP as primary counsel to certain DIP Lenders, Haynes and Boone LLP as local counsel to certain  DIP Lenders in the State of Texas, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC as regulatory counsel to certain DIP Lenders and Rothschild & Co US Inc. and Intrepid Partners, LLC as financial advisors to certain DIP Lenders), in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and the DIP Superpriority Claims as permitted herein and therein.

(c)  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and non-avoidable obligations of the Loan Parties, enforceable

against each Loan Party in accordance with the terms of the DIP Documents and this Interim Order. No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

8.      *DIP Superpriority Claims.*

(a)  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding the Loan Parties' claims and causes of action under sections 502(d), 544, 545,

#93489429v14
WEIL:\97576947\7\45327.0005

547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")), *provided* that the DIP Superpriority Claims shall be subordinated and subject only to payment of the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(b) For purposes hereof, the "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000 (without regard to the notice set forth in (iii) below); and (iii) (A) all unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time, whether by interim order, final order, procedural order or otherwise of persons or firms retained by the Debtors or the Creditors' Committee (if appointed) pursuant to sections 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Professional Fees**") incurred at any time on or prior to the Trigger Notice, plus (B) Professional Fees incurred after the Trigger Notice in an amount not to exceed $6,000,000, of professionals retained by the Debtors and the Creditors' Committee (if appointed); *provided,* that under no circumstances shall any success, completion, or similar fees be payable from the Carve-Out following delivery of a

21

Trigger Notice (the "**Carve-Out Cap**"), in each case subject to the limits imposed by this Interim Order, the Final Order (if and when entered) or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigation of the claims, liens and defenses against any Prepetition Secured Party; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any other grounds. "**Trigger Notice**" shall mean a written notice delivered by the DIP Agent, at the direction of the Required Lenders under the DIP Documents, describing the event of default that is alleged to continue under the DIP Documents. Immediately upon delivery of a Trigger Notice, and prior to the payment to any Prepetition Secured Party on account of the Adequate Protection or otherwise, the Debtors shall be required to deposit, in a segregated account not subject to the control of the DIP Agent or the Prepetition Agents (the "**Carve-Out Account**"), an amount equal to the Carve-Out Cap. The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and the Prepetition Agents, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account and (ii) shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out.

(c) Notwithstanding the foregoing, (x) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, or assertions of any defense or counterclaim, against any of the DIP

Lenders, the DIP Agent, the Prepetition Lenders or each of the Prepetition Agents, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Prepetition Credit Agreements (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders, the DIP Agent or the Prepetition Secured Parties; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement or realization upon any DIP Collateral or Prepetition Collateral in accordance with the DIP Documents and the Final Order other than to seek a determination that an Event of Default (as defined in the DIP Credit Agreement) has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Court, and (y) prior to the delivery of the Trigger Notice, the Carve-Out shall not be reduced by the payment or incurrence of Professional Fees allowed at any time by the Court. Further, notwithstanding anything to the contrary in this Interim Order, the failure of the Carve-Out Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out. For the avoidance of doubt, nothing herein shall modify or limit the rights of the Loan Parties set forth in the DIP Credit Agreement or limit their use of the Carve-Out in connection with such rights.

9. *DIP Liens*. As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the

Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b), (c) and (d) below being collectively referred to as the "**DIP Collateral**"; *provided*, that for the avoidance of doubt, the Apache Collateral shall not constitute DIP Collateral and the DIP Collateral shall be subject to the provisions of paragraphs 14(h) and 15(f) herein), in each case subject to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

      (a) <u>First Lien On Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to either (x) valid, perfected and non-avoidable liens as of the Petition Date, or (y) valid and non-avoidable liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (collectively, "**Unencumbered Property**"), in each case other than: (i) the Excluded Assets and Excluded Equity Interests (each as defined in the DIP Credit Agreement), but including any proceeds of Excluded Assets and Excluded Equity Interests that do not otherwise constitute Excluded Assets or

Excluded Equity Interests and (ii) the Avoidance Actions but subject only to and effective upon entry of the Final Order, including the Avoidance Proceeds;

(b) <u>Liens Priming Certain Prepetition Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and lien upon all pre- and postpetition property of each Loan Party whether now existing or hereafter acquired, of the same nature, scope and type as the collateral securing the Prepetition Debt; *provided*, that such lien shall be (i) junior to the Permitted Prior Liens and (ii) *pari passu* with valid and perfected liens in favor of hedge counterparties in connection with secured hedging transactions entered into by the Debtors on a post-petition basis in accordance with the DIP Documents (the "**Hedging Liens**").  Such security interests and liens shall be senior in all respects to the interests of the Prepetition Secured Parties in such property arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (collectively, the "**Primed Liens**"); *provided,* however, that the DIP Liens shall not be secured by the Apache Collateral and the rights of the Apache Secured Parties set forth in the Restructuring Support Agreement are not amended or modified by the terms of this Interim Order ;

(c) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party other than the property described in clauses (a) and (b) of this paragraph 9 that is subject to either (x) valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or (y) valid and non-avoidable

25

liens (other than Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, in each case other than (x) the Excluded Assets and the Excluded Equity Interests, but including any proceeds of Excluded Assets and Excluded Equity Interests that do not constitute Excluded Assets or Excluded Equity Interests and (y) the Avoidance Actions, but subject only to and effective upon entry of the Final Order, including the Avoidance Proceeds, which shall be (i) junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (ii) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, *provided*, that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder; and

(d) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties, or (C) any intercompany or affiliate liens of the Loan Parties or security interests of the Loan Parties; or (ii) subordinated to or made *pari*

26

*passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

10. *Protection of DIP Lenders' Rights.*

(a) So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreement) (the "**DIP Commitments**") under the DIP Credit Agreement and the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Agreements or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iv), the DIP Agent or the DIP Lenders file financing statements or other documents to evidence the perfection of the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date and (v) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or

27

other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Collateral subject to any sale or disposition.

(b) To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c) If any DIP Loans are outstanding, (i) any proceeds of Prepetition Collateral subject to the Primed Liens received by any Prepetition Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any Prepetition Secured Party, except as specifically provided in this Interim Order as Adequate Protection, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct and (ii) the DIP Agent is hereby authorized to make any such endorsements as agent for any such Prepetition Secured Party and such authorization is coupled with an interest and is irrevocable.

(d) The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent, acting at the direction of the Required Lenders, to enforce all of their rights under the DIP Documents (subject to the

28

terms of this Interim Order) and (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains and (B) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties and (ii) upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtors and the U.S. Trustee to (A) withdraw consent to the Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law (subject to the terms of this Interim Order). Following the delivery of such notice, the DIP Agent may file a motion (the "**Stay Relief Motion**") seeking emergency relief from the automatic stay. In any hearing regarding any exercise of rights or remedies under the DIP Documents, the Debtors may seek relief from the Court seeking to stay the DIP Facility Agent's exercise of any rights and remedies (including seeking to use Cash Collateral on a non-consensual basis). The Debtors shall not object to any motion for such a hearing to be heard on shortened notice. Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Credit Agreement)) or Cash Collateral to fund operations in accordance with the DIP Credit Agreement.

(e) In no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

#93489429v14
WEIL:\97576947\7\45327.0005

(f)  No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Loan Parties' authority to continue to use Cash Collateral  (ii) any actual or purported termination of the Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

11.    *Limitation on Charging Expenses Against DIP Collateral*. Except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, acting at the written direction of the Required Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, or the DIP Lenders. For the avoidance of doubt, consent to the Carve Out or the approval of any budget hereunder shall not be deemed a consent under this paragraph.  Nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent or the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.    *DIP Payments Free and Clear*.  Subject only to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the provisions of this Interim Order or Final Order (if and when entered) or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without

#93489429v14
WEIL:\97576947\7\45327.0005

limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

13.     *Use of Cash Collateral.*  The Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order, to use Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection and (b) except on the terms and conditions of this Interim Order, the Loan Parties shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

14.     *Adequate Protection of Prepetition FLFO Secured Parties.*  The Prepetition FLFO Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, to the extent of diminution in the value of the Prepetition FLFO Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition FLFO Agents' liens on the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition FLFO Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition FLFO Secured Parties are hereby granted the following (collectively, the "**Prepetition FLFO Secured Parties Adequate Protection**"):

#93489429v14
WEIL:\97576947\7\45327.0005

(a) <u>Prepetition FLFO Secured Parties Adequate Protection Liens</u>.  The Prepetition FLFO Agents (for themselves and for the benefit of the Prepetition FLFO Lenders) are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition FLFO Secured Parties Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the DIP Liens, and (iv) the Hedging Liens, and ranking *pari passu* with the Prepetition FLTL Secured Parties Adequate Protection Liens (as defined below) (the "**Prepetition FLFO Secured Parties Adequate Protection Liens**").

(b) <u>Prepetition FLFO Secured Parties 507(b) Claim</u>.  The Prepetition FLFO Agents (for themselves and for the benefit of the Prepetition FLFO Lenders) are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the Prepetition FLFO Secured Parties Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition FLFO Secured Parties 507(b) Claim**"); which Prepetition FLFO Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition FLFO Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve-Out,

32

the Permitted Prior Liens and the DIP Superpriority Claims, and shall be *pari passu* with the Prepetition FLTL Secured Parties 507(b) Claim (as defined below).  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition FLFO Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition FLFO Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

      (c) <u>Prepetition FLFO Secured Parties Cash Payments</u>.  The Prepetition FLFO Secured Parties shall receive current payment in cash on the last business day of each month, or on such other dates as may be provided under the Prepetition FLFO Credit Agreement, in an amount equal to the non-default interest (or letter of credit fees, as applicable) accrued and unpaid payable under the Prepetition FLFO Credit Agreement (based, at the option of the Debtors, on the "LIBOR" rate, as provided in the Prepetition FLFO Credit Agreement); provided, that the payments made under this paragraph 14(c) shall be without prejudice to the right of any party as to whether such payments constitute postpetition interest allowable under section 506(b) of the Bankruptcy Code or are in respect of principal.

      (d) <u>Prepetition FLFO Secured Parties Fees and Expenses</u>.  Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLFO Secured Parties, including all fees and expenses of counsel of the Prepetition FLFO Administrative Agent (Vinson & Elkins, LLP) and [Opportune LLP], and all fees and expenses of counsel of the Prepetition FLFO Collateral Agent (Shipman & Goodwin LLP) (collectively, the

33

"**Prepetition FLFO Advisors**"), that accrued prior to the Petition Date and (ii) the Loan

Parties shall pay in cash all documented out-of-pocket professional fees, expenses and

disbursements payable to the Prepetition FLFO Secured Parties (including all fees and

expenses of the Prepetition FLFO Advisors) that have accrued on or after the Petition Date,

in each case of the foregoing clauses (i) and (ii), in accordance with the Prepetition FLFO

Credit Agreement.

    (e) <u>Payment of Fees and Expenses</u>.  The payment of the fees, expenses and

disbursements set forth in paragraphs 14(d) and 15(c) herein (to the extent incurred after the

Petition Date) shall be made within ten (10) days (which time period may be extended by the

applicable professional) after the receipt by the Debtors, the Creditors' Committee (if

appointed) and the U.S. Trustee  (the "**Review Period**") of summary invoices therefor (the

"**Invoiced Fees**") and without the necessity of filing formal fee applications, including such

amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall

include the number of hours billed (except for financial advisors compensated on other than

an hourly basis) and a summary of services provided and the expenses incurred by the

applicable professional; *provided*, *however*, that any such invoice: (i) may be redacted to

protect privileged, confidential or proprietary information and (ii) shall not be required to

contain individual time detail (*provided*, that such invoice shall contain (except for financial

advisors compensated on other than an hourly basis), at a minimum, summary data regarding

hours worked by each timekeeper for the applicable professional).  The Debtors, the

Creditors' Committee (if appointed) and the U.S. Trustee may object to any portion of the

Invoiced Fees (the "**Disputed Invoiced Fees**") within the Review Period by filing with the

Court a motion or other pleading, on at least ten (10) days' prior written notice to the

#93489429v14
WEIL:\97576947\7\45327.0005

applicable Prepetition Agent and the applicable Prepetition Lenders of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided, further,* that the applicable parties shall endeavor in good faith to consensually resolve any such dispute prior to the filing of any such motion or pleading.

(f) <u>Milestones and Covenants</u>. The Prepetition FLFO Secured Parties are hereby entitled to performance of those certain terms set forth in the DIP Term Sheet relating to "Milestones", "Financial Reporting", "Financial Covenants" and "Hedging Covenant", each as will be incorporated into the DIP Credit Agreement, when effective (the "**Additional Adequate Protection Provisions**"). While the DIP Facility remains outstanding, such Additional Adequate Protection Provisions may be waived, amended, modified or extended from time to time, in each case, as provided under the DIP Documents. The Additional Adequate Protection Provisions shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, may be waived, amended, modified or extended from time to time only by (i) order of the Bankruptcy Court or (ii) the prior written consent of Prepetition FLFO Secured Parties and Prepetition FLTL Secured Parties holding greater than 50% of the aggregate outstanding principal amount of loans under both the Prepetition FLFO Credit Agreement and Prepetition FLTL Credit Agreement (the "**Required First Lien Secured Parties**").

(g) <u>Budget</u>. The Debtors shall promptly provide the Prepetition FLFO Administrative Agent, on behalf of itself and the Prepetition FLFO Lenders, with all required written financial reporting and other periodic reporting that is delivered by the DIP Borrower

35

under the DIP Credit Agreement, including with respect to the Approved Budget requirements set forth in the DIP Term Sheet, as will be incorporated into the DIP Credit Agreement, when effective (the "**Budget Reporting**"). The Budget Reporting requirement shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, (i) each Approved Budget shall be delivered to counsel for the Prepetition FLFO Secured Parties, and shall be acceptable to the Required First Lien Secured Parties, it being understood that if the Required First Lien Secured Parties have not objected to an updated Budget within five Business Days after delivery thereof, the Required First Lien Secured Parties shall be deemed to have approved such updated Budget, (ii) no such Budget shall be effective until so approved (or deemed approved), and upon approval (or deemed approval) of such Budget by the Required First Lien Secured Parties, shall constitute the Approved Budget for purposes of these Adequate Protection Reporting Obligations and (iii) this Budget Reporting requirement may be waived, amended, modified or extended from time to time with respect to the FLFO Secured Parties solely by the Required First Lien Secured Parties (in their sole discretion).

(h) <u>Payments Attributable to Legacy Assets</u>. In connection with any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets (each, as defined in the Restructuring Support Agreement), the DIP Agent may use commercially reasonable efforts to first apply proceeds from the DIP Collateral that is not Prepetition Collateral to satisfy such amounts before applying proceeds of DIP Collateral that is Prepetition Collateral to satisfy such amounts.

15. *Adequate Protection of Prepetition FLTL Secured Parties.* The Prepetition FLTL Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the

Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, to the extent of diminution in the value of the Prepetition FLTL Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition FLTL Agent's liens on the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition FLTL Secured Parties Adequate Protection Claims**").  In consideration of the foregoing, the Prepetition FLTL Secured Parties are hereby granted the following (collectively, the "**Prepetition FLTL Secured Parties Adequate Protection**"):

   (a) <u>Prepetition FLTL Secured Parties Adequate Protection Liens</u>. The Prepetition FLTL Agent (for itself and for the benefit of the Prepetition FLTL Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition FLTL Secured Parties Adequate Protection Claim, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject and subordinate only to in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens (iii) the DIP Liens, and (iv) the Hedging Liens, and ranking *pari passu* with the Prepetition FLFO Secured Parties Adequate Protection Liens (the "**Prepetition**

37

**FLTL Secured Parties Adequate Protection Liens**", and together with the Prepetition FLFO Secured Parties Adequate Protection Liens, the "**Adequate Protection Liens**").

(b) Prepetition FLTL Secured Parties 507(b) Claim. The Prepetition FLTL Agent (for itself and for the benefit of the Prepetition FLTL Lenders) is hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition FLTL Secured Parties Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition FLTL Secured Parties 507(b) Claim**", and together with the Prepetition FLFO Secured Parties 507(b) Claim, the "**507(b) Claims**")); which Prepetition FLTL Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds. The Prepetition FLTL Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve-Out, the Permitted Prior Liens and the DIP Superpriority Claims, and shall be *pari passu* with the Prepetition FLFO Secured Parties 507(b) Claim. Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition FLTL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition FLTL Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c) Prepetition FLTL Secured Parties Fees and Expenses. Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of

38

this Interim Order, the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLTL Secured Parties, including all fees and expenses of counsel and other professionals of the Prepetition FLTL Agent (including Shipman & Goodwin LLP) and the ad hoc group of Prepetition FLTL Lenders (including Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Partners, LLC (collectively with Shipman & Goodwin, LLP and any other advisor retained by the Prepetition FLTL Secured Parties, the "**Prepetition FLTL Secured Parties Advisors**")) that accrued prior to the Petition Date and (ii) the Loan Parties shall pay in cash all documented out-of-pocket professional fees, expenses and disbursements payable to the Prepetition FLTL Secured Parties (including all fees and expenses of the Prepetition FLTL Secured Parties Advisors) that have accrued on or after the Petition Date, in each case of the foregoing clauses (i) and (ii), in accordance with the Prepetition FLTL Credit Agreement.

(d) <u>Milestones and Covenants</u>.  The Prepetition FLTL Secured Parties are hereby entitled to performance of the Additional Adequate Protection Provisions.  While the DIP Facility remains outstanding, such Additional Adequate Protection Provisions may be waived, amended, modified or extended from time to time, in each case, as provided under the DIP Documents.  The Additional Adequate Protection Provisions shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, may be waived, amended, modified or extended from time to time only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required First Lien Secured Parties.

(e) <u>Budget</u>. The Debtors shall promptly provide the Prepetition FLTL Administrative Agent, on behalf of itself and the Prepetition FLTL Lenders, with all required written financial reporting and other periodic reporting that is delivered by the DIP Borrower under the DIP Credit Agreement, including the Budget Reporting. This Budget Reporting requirement shall survive any termination of the DIP Credit Agreement or the DIP Commitments thereunder, and thereafter, (i) each Approved Budget shall be delivered to counsel for the Prepetition FLTL Secured Parties, and shall be reasonably acceptable to the Required First Lien Secured Parties, it being understood that if the Required First Lien Secured Parties have not objected to an updated Budget within five Business Days after delivery thereof, the Required First Lien Secured Parties shall be deemed to have approved such updated Budget, (ii) no such Budget shall be effective until so approved (or deemed approved), and upon approval (or deemed approval) of such Budget by the Required First Lien Secured Parties, shall constitute the Approved Budget for purposes of this Budget Reporting requirement and (iii) this Budget Reporting requirement may be waived, amended, modified or extended from time to time with respect to the FLTL Secured Parties solely by the Required First Lien Secured Parties (in their sole discretion).

(f) In connection with any amounts paid after the Petition Date by the Debtors and attributable to Legacy Apache Properties or the Non-APA Remaining Assets, the DIP Agent may use commercially reasonable efforts to first apply proceeds from the DIP Collateral that is not Prepetition Collateral to satisfy such amounts before applying proceeds of DIP Collateral that is Prepetition Collateral to satisfy such amounts.

16. *Limitation on Charging Expenses Against Prepetition Collateral*. In partial consideration for, among other things, the Carve Out and the payments made under the

40

Approved Budget to administer the Cases with the use of Cash Collateral, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Prepetition Agents or the Prepetition Lenders, as the case may be, and in each case acting at the written direction of the requisite percentage of Prepetition FLFO Lenders, Prepetition FLTL Lenders or Prepetition SLTL Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the Prepetition Agents or the Prepetition Lenders, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order. For the avoidance of doubt, consent to the Carve Out or the approval of any budget hereunder shall not be deemed a consent under this paragraph. Nothing contained in this Interim Order shall be deemed to be a consent by the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

17.     *Adequate Protection Payments Free and Clear.*  Subject to entry of the Final Order (except with respect to payments of interest, fees, expenses and disbursements set forth in paragraphs 14(c), 14(d) and 15(c) of this Interim Order made between now and the entry of the Final Order), any and all payments or proceeds remitted to the Prepetition FLFO Administrative Agent on behalf of Prepetition FLFO Secured Parties or to the Prepetition FLTL Agent on behalf of any Prepetition FLTL Secured Parties, pursuant to the provisions of this Interim Order, the Final Order (if and when entered), any subsequent order of the Court or the Prepetition Debt

Documents, shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code (subject to modification under the Final Order with respect to any payments or proceeds remitted following entry of the Final Order), whether asserted or assessed by, through or on behalf of the Debtors, and solely in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

18.     *Limitations on "Equities of the Case" Exception.* The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties or the Prepetition Obligations, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

19.     *Waiver of Marshaling for Prepetition Secured Parties.* In no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the Prepetition Collateral, provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after entry of the Final Order.

20.     *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances and given that the Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided* that any of the Prepetition Secured Parties, upon a

42

change in circumstances, may request further or different adequate protection, and the Debtors or any other party may, subject to and consistent with the terms of the Intercreditor Agreements, contest any such request.

21. *Perfection of DIP Liens and Adequate Protection Liens.*

(a) The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent, on behalf of, or at the direction of, the DIP Lenders or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens, and such parties shall provide reasonable

#93489429v14
WEIL:\97576947\7\45327.0005

cooperation to the DIP Agent with respect to such matters.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)  A certified copy of this Interim Order may, in the discretion of the DIP Agent, at the direction of the Required Lenders under the DIP Documents, or the Prepetition Secured Parties, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent and the Prepetition Secured Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

22.  *Preservation of Rights Granted Under This Interim Order.*

(a)  Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection remain outstanding, and, except as otherwise expressly provided in paragraph 9 of this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in

44

favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Loan Parties.

(b)     The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Loan Parties to use Cash Collateral if any of the Loan Parties, without the prior written consent of the Required Lenders seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

> (i)     a failure of the Debtors to make any payment under this Interim Order to any of the DIP Secured Parties when due;
>
> (ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect;
>
> (iii)   any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;
>
> (iv)    an order converting or dismissing any of the Cases;
>
> (v)     an order appointing a chapter 11 trustee in the Cases;
>
> (vi)    an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);
>
> (vii)   a plan of reorganization that constitutes an Alternative Restructuring (as defined in the Restructuring Support Agreement) being proposed by the Debtors or confirmation thereof;
>
> (viii)  the sale of all or substantially all of the assets of the Loan Parties or all Specified Assets (as defined in the Restructuring Support Agreement) (in each case, except to the extent permitted under the

45

DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made); or

(ix) any "Event of Default" as defined in the DIP Credit Agreement.

(c) The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Loan Parties to use Cash Collateral if any of the Loan Parties, without the prior written consent of the Prepetition FLTL Agent seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i) a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties when due;

(ii) a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect, and such failure is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties;

(iii) any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party, and such modification, amendment, or extension is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties;

(iv) an order converting or dismissing any of the Cases;

(v) an order appointing a chapter 11 trustee in the Cases; or

(vi) an order appointing an examiner with enlarged powers in the Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), and such order is materially adverse to the Prepetition FLFO Secured Parties or the Prepetition FLTL Secured Parties.

46

Notwithstanding any order that may be entered dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection or Adequate Protection Liens incurred by the Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in

47

section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

23.     *Effect of Stipulations on Third Parties.*  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in

#93489429v14
WEIL:\97576947\7\45327.0005

paragraph 5 of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 5 of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Cases (including the Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (i) such committee or any other party in interest, in each case with requisite standing granted by the Court (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 23) by no later than a date that is the later of (x) if a Creditors' Committee is not appointed, 75 days after entry of this Interim Order and (y) if a Creditors' Committee is appointed, 60 days after entry of the Final Order, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (i)-(iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or

#93489429v14
WEIL:\97576947\7\45327.0005

causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries and each of their former, current or future officers, partners, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Agreements, the Prepetition Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 5 of this Interim Order, shall be binding on all parties in interest; (b) the obligations of the Loan Parties under the Prepetition Credit Agreements, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Cases, and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (d) the Prepetition Debt and the Prepetition Liens on the Prepetition

#93489429v14
WEIL:\97576947\7\45327.0005

Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee appointed or formed in the Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committee appointed or formed in the Cases (including the Creditors' Committee, if any), or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Agreements shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 5 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory committee appointed or formed in the Cases, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committee appointed or formed in these Cases (including the Creditors' Committee, if any), standing or authority to pursue any claim or cause

#93489429v14
WEIL:\97576947\7\45327.0005

of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Credit Agreements, the Prepetition Debt or the Prepetition Liens.

24. *Limitation on Use of DIP Financing Proceeds and Collateral*. Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Cases, or any trustee appointed in the Cases or any successor case, including any chapter 7 case, or any other person, party or entity (i) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (a) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Debt, liens on the Prepetition Collateral, DIP Obligations, DIP Liens, DIP Superpriority Claims and/or the Adequate Protection, Adequate Protection Liens and superpriority claims granted to the Prepetition Secured Parties under the Interim Order or the Final Order, as applicable, or (b) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Debt, the DIP Obligations and/or the liens, claims, rights, or security interests granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Agreements including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (ii) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims

52

and rights granted to such parties under the Orders, each in accordance with the DIP Documents, the Prepetition Credit Agreements or this Interim Order; (iii) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent or the DIP Lenders under this Interim Order, the Prepetition Credit Agreements or the DIP Documents, as applicable; (iv) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the Definitive Documentation) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, adequate protection liens and superpriority claims and liens granted to the Prepetition Secured Parties, unless all DIP Obligations, Prepetition Debt, adequate protection, and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the DIP Lenders; or (vi) to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the DIP Lenders in or are otherwise included in the "**Approved Budget**" (as initially attached to the Motion, and as updated in accordance with the terms of the DIP Documents). For the avoidance of doubt, nothing herein shall modify or limit the Loan Parties' use of the Carve-Out in connection with such rights.

25. *Loss or Damage to Collateral*. Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the DIP Agent and the DIP Lenders comply with their

53

obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Loan Parties.

26. *Interim Order Governs.* In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents or any other order entered by this Court, the provisions of this Interim Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

27. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition

54

Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

> *Limitation of Liability.* In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute). The Prepetition Secured Parties shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

28. *Master Proof of Claim.* The Prepetition Agents shall not be required to file proofs of claim in the Cases or any successor case in order to assert claims on behalf of itself and the Prepetition Secured Parties for payment of the Prepetition Debt arising under the Prepetition

#93489429v14
WEIL:\97576947\7\45327.0005

Credit Agreements. The statements of claim in respect of the Prepetition Debt set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each Prepetition Agent is authorized, but not required, to file in the Debtors' lead chapter 11 case *Fieldwood Energy Inc.,* Case No. 20-_____, a single, master proof of claim on behalf of the relevant Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Credit Agreements and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors. Upon the filing of a Master Proof of Claim against each of the Debtors, the Prepetition Agents and the Prepetition Secured Parties, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Agreements, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Cases. The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims. The provisions of this paragraph 28 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed

#93489429v14
WEIL:\97576947\7\45327.0005

in these Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.

29. *Insurance*. To the extent that any of the Prepetition Agents is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee for the Prepetition Secured Parties under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and second, to the payment of the Prepetition Debt owed to the Prepetition Secured Parties.

30. *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

31. *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

32. *Payments Held in Trust*. Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any Prepetition Secured Party receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of

#93489429v14
WEIL:\97576947\7\45327.0005

DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments in accordance with the DIP Documents, such Prepetition Secured Party shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

33. *Credit Bidding.* (a) The DIP Agent, as directed by the Required Lenders under the DIP Documents, shall have the right to credit bid on behalf of the Senior DIP Secured Parties, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (b) subject to any applicable Intercreditor Agreement, the Prepetition Secured Parties shall have the right to credit bid on behalf of the Prepetition Secured Parties, up to the full amount of their Prepetition Debt in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

34. *Intercreditor Agreements.* Nothing in this Interim Order shall amend or otherwise modify the terms or enforceability of the Intercreditor Agreements, including without limitation, the turnover and bankruptcy-related provisions contained therein, and the Intercreditor Agreements shall each remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreements.

#93489429v14
WEIL:\97576947\7\45327.0005

35. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

36. *Necessary Action*. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

37. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

38. Subject to Section 553 of the Bankruptcy Code and applicable law, nothing in this Interim Order is intended to limit, impact or affect, in any way, any rights to set off or recoupment that the United States may have, all of which are expressly reserved.

39. Notwithstanding anything to the contrary in this Order, the liens granted in this Order, if any, against any of the Debtors' interests in the federal leases, grants of pipeline rights of way and rights of use and easement, shall not grant the applicable lender any greater rights or interests in the applicable leases, grants of pipeline rights of way and/or rights of use and easement than those to which the Debtors are entitled. For the avoidance of any doubt, to the extent that any pre-petition secured parties or post-petition lenders foreclose on any pre-petition liens, adequate protection liens and/or post-petition liens, all regulatory and contractual requirements that apply to such leases, rights of way and rights of use and easement shall be preserved, subject to any defenses that may apply.

40. *Final Hearing*. The Final Hearing is scheduled for _____, 2020 at _____ __.m. (CST) before this Court.

59

41. *Objections.* Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (i) the U.S. Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103 (Attn: Kathleen M. LaManna, Esq. and Nathan Z. Plotkin, Esq.) as counsel to the DIP Agent, the Prepetition FLTL Agent and the FLFO Collateral Agent; (iv) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Damian S. Schaible, Esq., Natasha Tsiouris, Esq. and Joshua Y. Sturm, Esq.) as primary counsel to certain DIP Lenders; (v) Vinson & Elkins, LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn: William L. Wallander, Esq. and Brad Foxman, Esq.)) as primary counsel to the Prepetition FLFO Administrative Agent; (vi) counsel to the Prepetition SLTL Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas, (ix) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002; and (x) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2020 at 4:00 p.m. (CST), prevailing Eastern Time.

42. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court.

#93489429v14
WEIL:\97576947\7\45327.0005

## EXHIBIT C

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●], 2020 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), by and among the Company (as defined in the Agreement), and, among others, the holders of the principal amounts outstanding under the [Prepetition FLTL Loans/Prepetition SLTL Loans] (together with their respective successors and permitted assigns, the "Consenting Creditors" and each, a "Consenting Creditor") is executed and delivered by _____ (the "Joining Party") as of [●]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. **Agreement to be Bound.** The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. **Representations and Warranties.** With respect to [the aggregate principal amount of Prepetition FLTL Loans/Prepetition SLTL Loans], in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in Section 9 of the Agreement to each other Party to the Agreement.

3. **Governing Law.** This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

4. **Joining DIP Commitment**

☐ By checking this box, the Joining Party hereby represents and warrants that as of [_], 2020 (the "Effective Date") it held Prepetition FLTL Loans in the amount set forth below, and hereby commits to provide a share of the DIP Facility as a Joining DIP Commitment Party as provided in and in accordance with Section 3(g) of the Agreement:

(A) Principal Amount of Prepetition FLTL Loans held by Joining Party: $ _____

(B) Principal Amount of Prepetition FLTL Loans set forth above in (A) divided by $[_][1], expressed as a percentage:

_____

---

[1] Amount of all Prepetition FLTL Loans

(C) Amount of the DIP Facility the Joining Party hereby agrees
to commit to, ("***DIP Commitment Amount***"):

_____

5.  Notice.  All notices and other communications given or made pursuant to the
Agreement shall be sent to:

        To the Joining Party at:

        [JOINING PARTY]
        [ADDRESS]
        Attn:
        Facsimile:
        Email:

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**


By:_____
Name:
Title:


**<u>CONSENTING CREDITOR</u>**

**[●]**

By: **[●]**

Name: **[●]**

Title: **[●]**


Principal Amount of Prepetition FLTL Loans:  $_____

Principal Amount of Prepetition SLTL Term Loans:  $_____


<u>Notice Address</u>:
**[●]**


Fax: **[●]**
Attention: **[●]**
Email: **[●]**

Acknowledged:

[●]

By:_____
Name:
Title:

WEIL:\97578907\3\45327.0005
#93462797v19

Case 20-33948 Document 3292 Filed in TXSB on 08/04/20 Page 204 of 204

# **EXHIBIT D**

## **DIP BACKSTOP COMMITMENTS**

[Redacted]