*Execution Version*

**PARI PASSU INTERCREDITOR AGREEMENT**

among

FIELDWOOD ENERGY INC.,
as Holdings,

FIELDWOOD ENERGY LLC,
as the Borrower,

the other Grantors party hereto,

CANTOR FITZGERALD SECURITIES,
as First-Lien Term Loan Collateral Agent

CANTOR FITZGERALD SECURITIES
as Authorized Representative for the First-Lien Term Loan Secured Parties,

CANTOR FITZGERALD SECURITIES,
as the Additional First-Lien Collateral Agent

CANTOR FITZGERALD SECURITIES,
as the LC Facility Authorized Representative,

and

each additional Authorized Representative from time to time party hereto

dated as of April 11, 2018

**PARI PASSU INTERCREDITOR AGREEMENT**, dated as of April 11, 2018 (this "Agreement"), among **FIELDWOOD ENERGY INC.**, a Delaware corporation ("Holdings"), **FIELDWOOD ENERGY LLC**, a Delaware limited liability company (the "Borrower"), the other Grantors (as defined below) from time to time party hereto, Cantor Fitzgerald Securities ("Cantor Fitzgerald Securities"), as collateral agent for the First-Lien Term Loan Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "First-Lien Term Loan Collateral Agent"), Cantor Fitzgerald Securities, as Authorized Representative (as defined below) for the First-Lien Term Loan Secured Parties (the "First-Lien Term Loan Authorized Representative"), Cantor Fitzgerald Securities, as Additional First-Lien Collateral Agent and LC Facility Collateral Agent (each as defined below), Cantor Fitzgerald Securities, as Authorized Representative for the LC Facility Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "LC Facility Authorized Representative") and each additional Authorized Representative from time to time party hereto for the other Additional First-Lien Secured Parties of the Series (as defined below) with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First-Lien Term Loan Collateral Agent (for itself and on behalf of the First-Lien Term Loan Secured Parties), the LC Facility Authorized Representative (for itself and on behalf of the LC Facility Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Additional First-Lien Secured Parties of the applicable Series) agree as follows:

ARTICLE I

Definitions

SECTION 1.01    Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the First-Lien Term Loan Agreement and, if defined in the New York UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"Additional First-Lien Class Debt" has the meaning assigned to such term in Section 5.13.

"Additional First-Lien Class Debt Parties" has the meaning assigned to such term in Section 5.13.

"Additional First-Lien Class Debt Representative" has the meaning assigned to such term in Section 5.13.

"Additional First-Lien Collateral Agent" means the collateral agent for the Additional First-Lien Secured Parties, together with its successors in such capacity.

"Additional First-Lien Collateral Documents" means any security agreement or any other document now existing or entered into after the date hereof that create Liens on any assets or properties of any Grantor to secure the Additional First-Lien Obligations.

1

"Additional First-Lien Documents" means, with respect to the LC Facility Obligations or any Series of Additional First-Lien Class Debt, the notes, credit agreements, loan agreements, note purchase agreements, indentures, security documents and other operative agreements evidencing or governing such indebtedness and liens securing such indebtedness, including the LC Facility Documents and the Additional First-Lien Collateral Documents and each other agreement entered into for the purpose of securing the LC Facility Obligations or any Series of Additional First-Lien Class Debt; provided that, in each case, the Indebtedness thereunder (other than the LC Facility Obligations) has been designated as Additional First-Lien Obligations pursuant to Section 5.13 hereto.

"Additional First-Lien Obligations" means all amounts owing to any Additional First-Lien Secured Party (including the LC Facility Secured Parties) pursuant to the terms of any Additional First-Lien Document (including the LC Facility Documents), including, without limitation, all amounts in respect of any principal, premium, interest (including any interest accruing subsequent to the commencement of a Bankruptcy Case at the rate provided for in the respective Additional First-Lien Document, whether or not such interest is an allowed claim under any such proceeding or under applicable state, federal or foreign law), penalties, fees, expenses, indemnifications, reimbursements, damages and other liabilities, and guarantees of the foregoing amounts.

"Additional First-Lien Secured Party" means the holders of any Additional First-Lien Obligations and any Authorized Representative and Collateral Agent with respect thereto, and shall include the LC Facility Secured Parties.

"Administrative Agent" has the meaning assigned to such term in the definition of "First-Lien Term Loan Agreement".

"Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Applicable Authorized Representative" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First-Lien Term Loan Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Administrative Agent and (ii) from and after the earlier of (x) the Discharge of First-Lien Term Loan Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"Applicable Collateral Agent" means at any time, the Collateral Agent with respect to the Series of First-Lien Obligations represented by the Authorized Representative that is the Applicable Authorized Representative at such time.

"Applicable Number of Days" means, with respect to any Non-Controlling Authorized Representative, (i) in the event that there are any outstanding "Loans" at the time of the applicable "Event of Default" (each capitalized term in this clause (i) refers to the corresponding term (or equivalent term) under and as defined in the Additional First-Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative), 30 calendar days and (ii) otherwise, 90 calendar days.

2

"<u>Authorized Representative</u>" means, at any time, (i) in the case of any First-Lien Term Loan Obligations or the First-Lien Term Loan Secured Parties, the Administrative Agent, (ii) in the case of the LC Facility Obligations or the LC Facility Secured Parties, the LC Facility Authorized Representative, and (iii) in the case of any other Series of Additional First-Lien Obligations or Additional First-Lien Secured Parties that become subject to this Agreement after the date hereof, the Authorized Representative named for such Series in the applicable Joinder Agreement.

"<u>Bankruptcy Case</u>" has the meaning assigned to such term in Section 2.05(b).

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as amended.

"<u>Bankruptcy Law</u>" means the Bankruptcy Code, and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"<u>Borrower</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Collateral</u>" means all assets and properties subject to Liens created pursuant to any First-Lien Collateral Document to secure one or more Series of First-Lien Obligations.

"<u>Collateral Agent</u>" means (i) in the case of any First-Lien Term Loan Obligations, the First-Lien Term Loan Collateral Agent and (ii) in the case of the Additional First-Lien Obligations, the Additional First-Lien Collateral Agent.

"<u>Collateral Agreement</u>" means the Amended and Restated Collateral Agreement dated as of April 11, 2018 among the First-Lien Term Loan Collateral Agent and the Grantors party thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"<u>Controlling Secured Parties</u>" means, with respect to any Shared Collateral, (i) at any time when the First-Lien Term Loan Collateral Agent is the Applicable Collateral Agent, the First-Lien Term Loan Secured Parties and (ii) at any other time, the Series of First-Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"<u>DIP Financing</u>" has the meaning assigned to such term in Section 2.05(b).

"<u>DIP Financing Liens</u>" has the meaning assigned to such term in Section 2.05(b).

"<u>DIP Lenders</u>" has the meaning assigned to such term in Section 2.05(b).

"<u>Discharge</u>" means, with respect to any Shared Collateral and any Series of First-Lien Obligations, the date on which such Series of First-Lien Obligations is no longer secured by such Shared Collateral.  The term "<u>Discharged</u>" shall have a corresponding meaning.

"<u>Discharge of First-Lien Term Loan Obligations</u>" means, with respect to any Shared Collateral, the Discharge of the First-Lien Term Loan Obligations with respect to such Shared Collateral; <u>provided</u> that the Discharge of First-Lien Term Loan Obligations shall not be deemed to have occurred in connection with a Refinancing of such First-Lien Term Loan Obligations with additional First-Lien Obligations secured by such Shared Collateral under an Additional First-Lien Document which has been designated in writing by the Administrative Agent (under the First-Lien Term Loan Agreement so Refinanced) to each Authorized Representative as the "First-Lien Term Loan Agreement" for purposes of this Agreement.

"<u>Event of Default</u>" means an "Event of Default" (or similarly defined term) as defined in any Secured Credit Document.

"<u>First-Lien Collateral Documents</u>" means, collectively, (i) the First-Lien Term Loan Collateral Documents and (ii) the Additional First-Lien Collateral Documents.

"<u>First-Lien Obligations</u>" means, collectively, (i) the First-Lien Term Loan Obligations and (ii) each Series of Additional First-Lien Obligations (which for the avoidance of doubt shall include LC Facility Obligations).

"<u>First-Lien Secured Parties</u>" means (i) the First-Lien Term Loan Secured Parties and (ii) the Additional First-Lien Secured Parties with respect to each Series of Additional First-Lien Obligations.

"<u>First-Lien Term Loan Agreement</u>" means that certain Amended and Restated First Lien Term Loan Agreement, dated as of April 11, 2018, among the Borrower, the banks, financial institutions and other investors from time to time party thereto, Cantor Fitzgerald Securities, as administrative agent and collateral agent, and the other parties thereto.

"<u>First-Lien Term Loan Authorized Representative</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>First-Lien Term Loan Collateral Documents</u>" means the Collateral Agreement and any security documents and other operative agreements evidencing or governing the Indebtedness thereunder, and the liens securing such Indebtedness, including any agreement entered into for the purpose of securing the First-Lien Term Loan Obligations.

"<u>First-Lien Term Loan Obligations</u>" means the "Loan Obligations" as such term is defined in the First-Lien Term Loan Agreement.

"<u>First-Lien Term Loan Secured Parties</u>" means the First-Lien Term Loan Authorized Representative, the holders of the First-Lien Term Loan Obligations issued pursuant to the First-Lien Term Loan Agreement and the Collateral Agent for the First-Lien Term Loan Obligations.

"<u>Grantors</u>" means the Borrower, Holdings and each of the other Guarantors (as defined in the First-Lien Term Loan Agreement) and each other Subsidiary of the Borrower which has granted a security interest pursuant to any First-Lien Collateral Document to secure

4

any Series of First-Lien Obligations.  The Grantors existing on the date hereof are set forth in Annex I hereto.

"Hedge Agreements" means, with respect to any Grantor, (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.  Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Holdings" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Impairment" has the meaning assigned to such term in Section 1.03.

"Insolvency or Liquidation Proceeding" means:

(1)     any case commenced by or against the Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to the Borrower or any other Grantor or any similar case or proceeding relative to the Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of the Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Intervening Creditor" has the meaning assigned to such term in Section 2.01(a).

"Joinder Agreement" means a joinder to this Agreement substantially in the form of Annex II hereof required to be delivered by an Authorized Representative to each Collateral Agent and each Authorized Representative pursuant to Section 5.13 hereof in order to establish an additional Series of Additional First-Lien Obligations and add Additional First-Lien Secured Parties hereunder.

"LC Facility Collateral Agent" means Cantor Fitzgerald Securities as the collateral agent under the LC Facility Credit Agreement.

"LC Facility Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of April 11, 2018, among Holdings, the Borrower, the banks, financial institutions and other investors from time to time party thereto, Cantor Fitzgerald Securities, as administrative agent and collateral agent, and the other parties thereto.

"LC Facility Documents" means the LC Facility Credit Agreement, the other "Security Documents" (as defined in the LC Facility Credit Agreement) and each other agreement entered into in favor of the LC Facility Collateral Agent for the purpose of securing any LC Facility Obligations.

"LC Facility Obligations" means "Obligations" as defined in the LC Facility Credit Agreement.

"LC Facility Secured Parties" means the "Secured Parties" as defined in the LC Facility Credit Agreement.

"Lien" means any mortgage, pledge, security interest, hypothecation, assignment, lien (statutory or other) or similar encumbrance, and any easement, right-of-way, license, restriction (including zoning restrictions), defect, exception or irregularity in title or similar charge or encumbrance (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof); provided that in no event shall an operating lease be deemed to be a Lien.

"Major Non-Controlling Authorized Representative" means, with respect to any Shared Collateral, the Authorized Representative of the Series of Additional First-Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Additional First-Lien Obligations with respect to such Shared Collateral; provided, however, that if there are two outstanding Series of Additional First-Lien Obligations which have an equal outstanding principal amount, the Series of Additional First-Lien Obligations with the earlier maturity date shall be considered to have the larger outstanding principal amount for purposes of this definition.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Controlling Authorized Representative" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

6

"Non-Controlling Authorized Representative Enforcement Date" means, with respect to any Non-Controlling Authorized Representative, the date which is the Applicable Number of Days after the occurrence of both (i) an Event of Default (under and as defined in the Additional First-Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) and (ii) each Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Additional First-Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (y) the Additional First-Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Additional First-Lien Document; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Shared Collateral (1) at any time the Administrative Agent or the Applicable Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to all or a substantial portion of the  Shared Collateral or (2) at any time the Grantor which has granted a security interest in such Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Non-Controlling Secured Parties" means, with respect to any Shared Collateral, the First-Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"Possessory Collateral" means any Shared Collateral in the possession of a Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction.  Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of the Collateral Agent under the terms of the First-Lien Collateral Documents.

"Proceeds" has the meaning assigned to such term in Section 2.01(a).

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement.   "Refinanced" and "Refinancing" have correlative meanings.

"Secured Credit Document" means (i) the First-Lien Term Loan Agreement and each First-Lien Term Loan Collateral Document, (ii) each LC Facility Document and (iii) each Additional First-Lien Document.

OMM_US:76158679.11

"<u>Secured Hedge Agreement</u>" means (i) "Secured Hedge Agreements" as defined in the LC Facility Agreement and (ii) other Hedge Agreements that are secured by the Shared Collateral on a "first out" basis in accordance with the Secured Credit Documents.

"<u>Secured Hedge Agreement Obligations</u>" means, with respect to any Secured Hedge Agreement, any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Secured Hedge Agreement other than Excluded Swap Obligations (as defined in the LC Facility Credit Agreement).

"<u>Series</u>" means (a) with respect to the First-Lien Secured Parties, each of (i) the First-Lien Term Loan Secured Parties (in their capacities as such), (ii) the LC Facility Secured Parties (in their capacities as such) and (iii) the Additional First-Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First-Lien Secured Parties) and (b) with respect to any First-Lien Obligations, each of (i) the First-Lien Term Loan Obligations, (ii) the LC Facility Obligations and (iii) the Additional First-Lien Obligations incurred pursuant to any Additional First-Lien Document, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First-Lien Obligations).

"<u>Shared Collateral</u>" means, at any time, Collateral in which the holders of two or more Series of First-Lien Obligations hold a valid and perfected security interest at such time. If more than two Series of First-Lien Obligations are outstanding at any time and the holders of less than all Series of First-Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First-Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

SECTION 1.02    <u>Terms Generally</u>.   The rules of interpretation set forth in Article I of the First-Lien Term Loan Agreement are incorporated herein, *mutatis mutandis*.

SECTION 1.03    <u>Impairments</u>.   It is the intention of the First-Lien Secured Parties of each Series that the holders of First-Lien Obligations of such Series (and not the First-Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First-Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of First-Lien Obligations), (y) any of the First-Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First-Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First-Lien Obligations) on a basis ranking prior to the security interest of such Series of First-Lien Obligations but junior to the security interest of any other Series of First-Lien Obligations or (ii) the existence of any Collateral for any other Series of First-Lien Obligations that is not Shared Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First-Lien Obligations, an "<u>Impairment</u>"

8

of such Series); provided, that the existence of a maximum claim with respect to any real property subject to a mortgage which applies to all First-Lien Obligations shall not be deemed to be an Impairment of any Series of First-Lien Obligations.  In the event of any Impairment with respect to any Series of First-Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First-Lien Obligations, and the rights of the holders of such Series of First-Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First-Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First-Lien Obligations subject to such Impairment.  Additionally, in the event the First-Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First-Lien Obligations or the First-Lien Collateral Documents governing such First-Lien Obligations shall refer to such obligations or such documents as so modified.

ARTICLE II

Priorities of Payment and Agreements with Respect to Shared Collateral

SECTION 2.01          Priority of Payment.

(a)      Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.03), if an Event of Default has occurred and is continuing, and the Applicable Collateral Agent or any First-Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of Holdings, the Borrower or any other Grantor or any First-Lien Secured Party receives any payment pursuant to any intercreditor agreement (including this Agreement) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Collateral by any First-Lien Secured Party or received by the Applicable Collateral Agent or any First-Lien Secured Party pursuant to any such intercreditor agreement with respect to such Shared Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following) to which the First-Lien Obligations are entitled under any intercreditor agreement (including this Agreement) (all proceeds of any sale, collection or other liquidation of any Shared Collateral and all proceeds of any such distribution being collectively referred to as "Proceeds"), shall be applied:

(i)      FIRST, to the payment in full in cash of all amounts owing to each Collateral Agent (in its capacity as such) pursuant to the terms of any Secured Credit Document;

(ii)      SECOND, subject to Section 1.03, to the payment in full in cash on a pro rata basis of (a) the LC Facility Obligations, (b) any Secured Hedge Agreement Obligations other than Excluded Swap Obligations (as defined in the LC Facility Credit Agreement) and (c) any other First-Lien Obligations that are secured by the Shared Collateral on a "first out" basis in accordance with the Secured Credit Documents;

9

(iii)     THIRD, subject to Section 1.03, to the payment in full in cash on a pro rata basis of (a) the First-Lien Term Loan Obligations and (b) any other First-Lien Obligations that are secured by the Shared Collateral on a "last out" basis in accordance with the Secured Credit Documents; and

(iv)     after payment in full in cash of all First-Lien Obligations, to the Borrower and the other Grantors or their successors or assigns, as their interests may appear, or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

If, despite the provisions of this Section 2.01(a), any First-Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First-Lien Obligations to which it is then entitled in accordance with this Section 2.01(a), such First-Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First-Lien Secured Parties for distribution in accordance with this Section 2.01(a). Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First-Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of First-Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First-Lien Obligations (such third party, an "Intervening Creditor"), the value of any Shared Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First-Lien Obligations with respect to which such Impairment exists.

(b)     It is acknowledged that the First-Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First-Lien Secured Parties of any Series.

(c)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First-Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First-Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each First-Lien Secured Party hereby agrees that the Liens securing each Series of First-Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.02     Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)     Only the Applicable Collateral Agent shall act or refrain from acting with respect to any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral). At any time when the First-Lien Term Loan Collateral Agent is the Applicable Collateral Agent, no Additional First-Lien Secured Party shall or shall instruct

10

any Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Additional First-Lien Collateral Document, applicable law or otherwise, it being agreed that only the First-Lien Term Loan Collateral Agent, acting in accordance with the First-Lien Term Loan Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral at such time.

(b)     With respect to any Shared Collateral at any time when the Additional First-Lien Collateral Agent is the Applicable Collateral Agent, (i) the Applicable Collateral Agent shall act only on the instructions of the Applicable Authorized Representative, (ii) the Applicable Collateral Agent shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First-Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First-Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Applicable Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First-Lien Collateral Document, applicable law or otherwise, it being agreed that only the Applicable Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the Additional First-Lien Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral.

(c)     Notwithstanding the equal priority of the Liens securing each Series of First-Lien Obligations, the Applicable Collateral Agent (in the case of the Additional First-Lien Collateral Agent, acting on the instructions of the Applicable Authorized Representative) may deal with the Shared Collateral as if such Applicable Collateral Agent had a senior Lien on such Collateral; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any Authorized Representative to enforce this Agreement, including, without limitation, the agreements with respect to priority of payment set forth in Section 2.01 hereof.   No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Applicable Collateral Agent, the Applicable Authorized Representative or the Controlling Secured Party or any other exercise by the Applicable Collateral Agent, the Applicable Authorized Representative or the Controlling Secured Party of any rights and remedies relating to the Shared Collateral, or to cause the Applicable Collateral Agent to do so.  The foregoing shall not be construed to limit the rights and priorities of any First-Lien Secured Party, the Applicable Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

11

(d)     Each of the First-Lien Secured Parties agrees that it will not (and hereby waives any right to) question or contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the First-Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any Authorized Representative to enforce this Agreement, including, without limitation, the agreements with respect to priority of payment set forth in Section 2.01 hereof.

SECTION 2.03          No Interference; Payment Over.

(a)     Each First-Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First-Lien Obligations of any Series or any First-Lien Collateral Document or the validity, attachment, perfection or priority of any Lien under any First-Lien Collateral Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any Disposition of the Shared Collateral by the Applicable Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Applicable Collateral Agent or any other First-Lien Secured Party to exercise any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Applicable Collateral Agent or any other First-Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Applicable Collateral Agent or any other First-Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Applicable Collateral Agent, any Applicable Authorized Representative or any other First-Lien Secured Party shall be liable for any action taken or omitted to be taken by the Applicable Collateral Agent, such Applicable Authorized Representative or other First-Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Applicable Collateral Agent or any other First-Lien Secured Party to enforce this Agreement, including, without limitation, the agreements with respect to priority of payment set forth in Section 2.01 hereof.

(b)     Each First-Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First-Lien Collateral Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First-Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First-Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the

Applicable Collateral Agent, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04    Automatic Release of Liens; Amendments to First-Lien Collateral Documents.

(a)    If, at any time the Applicable Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the other Collateral Agent for the benefit of each Series of First-Lien Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens of the Applicable Collateral Agent on such Shared Collateral are released and discharged; provided that any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01.

(b)    Each Collateral Agent and Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Applicable Collateral Agent or the Applicable Authorized Representative to evidence and confirm any release of Shared Collateral provided for in this Section.

SECTION 2.05    Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against Holdings, the Borrower or any of its Subsidiaries.

(b)    If Holdings, the Borrower and/or any other Grantor shall become subject to a case (a "Bankruptcy Case") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First-Lien Secured Party (other than any Controlling Secured Party or Authorized Representative of any Controlling Secured Party) agrees that it will raise no objection to any such financing or to the Liens on the Shared Collateral securing the same ("DIP Financing Liens") or to any use of cash collateral that constitutes Shared Collateral, unless the Authorized Representative of any Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First-Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank pari passu with the Liens on any such Shared Collateral granted to secure the First-Lien Obligations of the Controlling

13

Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First-Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First-Lien Secured Parties (other than any Liens of the First-Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First-Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First-Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First-Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First-Lien Obligations, such amount is applied pursuant to Section 2.01, and (D) if any First-Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01; provided that the First-Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First-Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided, further, that the First-Lien Secured Parties receiving adequate protection shall not object to any other First-Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First-Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06    Reinstatement.   In the event that any of the First-Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First-Lien Obligations shall again have been paid in full in cash.

SECTION 2.07    Insurance.  As between the First-Lien Secured Parties, the Applicable Collateral Agent, (and in the case of the Additional First-Lien Collateral Agent, acting at the direction of the Applicable Authorized Representative), shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Shared Collateral.

SECTION 2.08    Refinancings.  The First-Lien Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First-Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; provided that the Authorized Representative of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

14

SECTION 2.09        Possessory Collateral Agent as Gratuitous Bailee for Perfection.

(a)        The Possessory Collateral shall be delivered to the First-Lien Term Loan Collateral Agent and the First-Lien Term Loan Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee for the benefit of each other First-Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First-Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.09; provided that at any time the First-Lien Term Loan Collateral Agent is not the Applicable Collateral Agent, the First-Lien Term Loan Collateral Agent shall, at the request of the Additional First-Lien Collateral Agent, promptly deliver all Possessory Collateral to the Additional First-Lien Collateral Agent together with any necessary endorsements (or otherwise allow the Additional First-Lien Collateral Agent to obtain control of such Possessory Collateral). The Borrower shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Collateral Agent for loss or damage suffered by such Collateral Agent as a result of such transfer except for loss or damage suffered by such Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith as determined by a final judgment of a court of competent jurisdiction.

(b)        The Applicable Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee for the benefit of each other First-Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First-Lien Collateral Documents, in each case, subject to the terms and conditions of this Section 2.09.

(c)        The duties or responsibilities of each Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee for the benefit of each other First-Lien Secured Party for purposes of perfecting the Lien held by such First-Lien Secured Parties therein.

SECTION 2.10        Amendments to Security Documents.

(a)        Without the prior written consent of the First-Lien Term Loan Collateral Agent, the Additional First-Lien Collateral Agent agrees that no Additional First-Lien Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Additional First-Lien Collateral Document would be prohibited by, or would require any Grantor to act or refrain from acting in a manner that would violate, any of the terms of this Agreement.

(b)        Without the prior written consent of the Additional First-Lien Collateral Agent, the First-Lien Term Loan Collateral Agent agrees that no First-Lien Term Loan Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First-Lien Term Loan Collateral Document would be prohibited by, or would require any Grantor to act or refrain from

15

acting in a manner that would violate, any of the terms of this Agreement (including, for the avoidance of doubt, any such amendment or other modification that would alter the priority of payment).

(c)     In making determinations required by this Section 2.10, each Collateral Agent and each Authorized Representative may conclusively rely on an Officer's Certificate of the Borrower.

## ARTICLE III

### Existence and Amounts of Liens and Obligations

SECTION 3.01     <u>Determinations with Respect to Amounts of Liens and Obligations</u>.  Whenever a Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First-Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First-Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative or Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; <u>provided</u>, <u>however</u>, that if an Authorized Representative or a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent or Authorized Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Borrower.  Each Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First-Lien Secured Party or any other person as a result of such determination.

## ARTICLE IV

### The Applicable Collateral Agent

SECTION 4.01     <u>Authority</u>.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Applicable Collateral Agent to any Non-Controlling Secured Party or give any Non-Controlling Secured Party the right to direct any Applicable Collateral Agent, except that each Applicable Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.01 hereof.

(b)     In furtherance of the foregoing, each Non-Controlling Secured Party acknowledges and agrees that the Applicable Collateral Agent shall be entitled, for the benefit of the First-Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First-Lien Collateral Documents, as applicable, for which the Applicable Collateral Agent is the collateral agent of such Shared Collateral, without

16

regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled as a result of the First-Lien Obligations held by such Non-Controlling Secured Parties. Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Applicable Collateral Agent, the Applicable Authorized Representative or any other First-Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First-Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First-Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Each of the First-Lien Secured Parties waives any claim it may now or hereafter have against any Collateral Agent or the Authorized Representative of any other Series of First-Lien Obligations or any other First-Lien Secured Party of any other Series arising out of any actions which any Collateral Agent, Authorized Representative or the First-Lien Secured Parties take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First-Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First-Lien Collateral Documents or any other agreement related thereto or to the collection of the First-Lien Obligations or the valuation, use, protection or release of any security for the First-Lien Obligations.

ARTICLE V

<u>Miscellaneous</u>

SECTION 5.01     <u>Notices</u>. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by facsimile and sent to the e-mail address of the applicable recipient specified below (or the email address of a representative of the applicable recipient designated by such recipient from time to time to the parties hereto), as follows:

(a)     if to the First-Lien Term Loan Collateral Agent or the Administrative Agent, to it at:

> Cantor Fitzgerald Securities
> 1801 N. Military Trail, Suite 202
> Boca Raton, Florida  33431
> Attention:     N. Horning (Fieldwood Administrative Agency)
> Telephone:    (212) 829-4489
> Telecopier:    (646) 219-1180
> Facsimile:      (646) 219-1180
> Email:           NHorning@cantor.com
>
> Cantor Fitzgerald Securities
> 900 West Trade Street, Suite 725

17

Charlotte, North Carolina  28202
Attention:       B. Young (Fieldwood Administrative Agency)
Telephone:      (704) 374-0574
Telecopier:      (646) 390-1765
Email:            BYoung@cantor.com

With a copy (which shall not constitute notice) to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut  06103
Attention:       Nathan Plotkin
Email:            Nplotkin@goodwin.com

(b)       if to the LC Facility Authorized Representative, to it at:

Cantor Fitzgerald Securities
1801 N. Military Trail, Suite 202
Boca Raton, Florida  33431
Attention:       N. Horning (Fieldwood Administrative Agency)
Telephone:      (212) 829-4489
Telecopier:      (646) 219-1180
Facsimile:       (646) 219-1180
Email:            NHorning@cantor.com

Cantor Fitzgerald Securities
900 West Trade Street, Suite 725
Charlotte, North Carolina  28202
Attention:       B. Young (Fieldwood Administrative Agency)
Telephone:      (704) 374-0574
Telecopier:      (646) 390-1765
Email:            BYoung@cantor.com

With a copy (which shall not constitute notice) to:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut  06103
Attention:       Nathan Plotkin
Email:            Nplotkin@goodwin.com

(c)       if to any other Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto in accordance with this Section

18

5.01.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) (as reflected by the courier's receipt).  Receipt by email shall not be deemed to be receipt.

SECTION 5.02        Waivers; Amendment; Joinder Agreements.

(a)        No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires the Borrower's consent or which increases the obligations or reduces the rights of the Borrower or any other Grantor, with the consent of the Borrower).

(c)        Notwithstanding the foregoing, without the consent of any First-Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 and upon such execution and delivery, such Authorized Representative and the Additional First-Lien Secured Parties and Additional First-Lien Obligations of the Series for which such Authorized Representative is acting shall be subject to the terms hereof and the terms of the Additional First-Lien Collateral Documents applicable thereto.

(d)        Notwithstanding the foregoing, without the consent of any other Authorized Representative or First-Lien Secured Party, the Collateral Agents may effect amendments and modifications to this Agreement to the extent necessary to reflect any incurrence of any Additional First-Lien Obligations in compliance with the First-Lien Term Loan Agreement and the other Secured Credit Documents.

SECTION 5.03        Parties in Interest.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First-Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

19

SECTION 5.04     <u>Survival of Agreement</u>.    All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05     <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 5.06     <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07     <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

SECTION 5.08     <u>Submission to Jurisdiction Waivers; Consent to Service of Process</u>.  Each Collateral Agent and each Authorized Representative, on behalf of itself and the First-Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the First-Lien Collateral Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York located in the Borough of Manhattan, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address set forth in Section 5.01;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any First-Lien Secured Party) to effect service of process in any other manner permitted by

20

law or shall limit the right of any party hereto (or any First-Lien Secured Party) to sue in any other jurisdiction; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 5.08 any special, exemplary, punitive or consequential damages.

SECTION 5.09     <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR FOR ANY COUNTERCLAIM THEREIN.

SECTION 5.10     <u>Headings</u>.   Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11     <u>Conflicts</u>.   In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the First-Lien Collateral Documents or any of the other Secured Credit Documents, the provisions of this Agreement shall control.

SECTION 5.12     <u>Provisions Solely to Define Relative Rights</u>.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First-Lien Secured Parties in relation to one another.   None of the Borrower, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (<u>provided</u> that nothing in this Agreement (other than Section 2.04, 2.05, 2.08, 2.09 or Article V) is intended to or will amend, waive or otherwise modify the provisions of the First-Lien Term Loan Agreement or any Additional First-Lien Documents), and none of the Borrower or any other Grantor may rely on the terms hereof (other than Sections 2.01(a), 2.04, 2.05, 2.08, 2.09 and Article V).   Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First-Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13     <u>Additional Senior Debt</u>.   To the extent, but only to the extent permitted by the provisions of the First-Lien Term Loan Agreement, the LC Facility Credit Agreement and the Additional First-Lien Documents, the Borrower may incur additional indebtedness after the date hereof that is permitted by the First-Lien Term Loan Agreement, the LC Facility Credit Agreement and the Additional First-Lien Documents to be incurred and secured on an equal and ratable basis by the Liens securing the First-Lien Obligations (such indebtedness referred to as "<u>Additional First-Lien Class Debt</u>").   Any such Additional First-Lien Class Debt may be secured by a Lien and may be guaranteed by the Grantors on a senior basis, in each case under and pursuant to the Additional First-Lien Documents, if and subject to the condition that the Authorized Representative of any such Additional First-Lien Class Debt (each, an "<u>Additional First-Lien Class Debt Representative</u>"), acting on behalf of the holders of such Additional First-Lien Class Debt (such Authorized Representative and holders in respect of any Additional First-Lien Class Debt being referred to as the "<u>Additional First-Lien Class Debt</u>

21

Parties"), and, to the extent not already a party hereto, the collateral agent for any such Additional First-Lien Class Debt, becomes a party to this Agreement by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

In order for an Additional First-Lien Class Debt Representative and, if applicable, the collateral agent for any such Additional First-Lien Class Debt, to become a party to this Agreement,

(i)      such Additional First-Lien Class Debt Representative, each Collateral Agent, each Authorized Representative and each Grantor shall have executed and delivered an instrument substantially in the form of Annex II (with such changes as may be reasonably approved by each Collateral Agent and such Additional First-Lien Class Debt Representative) pursuant to which (a) such Additional First-Lien Class Debt Representative becomes an Authorized Representative hereunder, (b) if applicable, such collateral agent becomes the Additional First-Lien Collateral Agent hereunder, and (c) the Additional First-Lien Class Debt in respect of which such Additional First-Lien Class Debt Representative is the Authorized Representative and the related Additional First-Lien Class Debt Parties become subject hereto and bound hereby;

(ii)      the Borrower shall have (x) delivered to each Collateral Agent true and complete copies of each of the Additional First-Lien Documents relating to such Additional First-Lien Class Debt, certified as being true and correct by an authorized officer of the Borrower and (y) identified in a certificate of an authorized officer the obligations to be designated as Additional First-Lien Obligations and the initial aggregate principal amount or face amount thereof;

(iii)      all filings, recordations and/or amendments or supplements to the First-Lien Collateral Documents necessary or desirable in the reasonable judgment of such Additional First-Lien Class Debt Representative to confirm and perfect the Liens securing the relevant obligations relating to such Additional First-Lien Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordings have been taken in the reasonable judgment of such Additional First-Lien Class Debt Representative), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of the Additional First-Lien Class Debt Representative); and

(iv)      the Additional First-Lien Documents, as applicable, relating to such Additional First-Lien Class Debt shall provide, in a manner reasonably satisfactory to each Collateral Agent, that each Additional First-Lien Class Debt Party with respect to such Additional First-Lien Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Additional First-Lien Class Debt.

SECTION 5.14      Agent Capacities.   It is understood and agreed that (i) Cantor Fitzgerald Securities is entering into this Agreement in its capacity as administrative agent and collateral agent under the LC Facility Credit Agreement, and the provisions of Section 12 of the LC Facility Credit Agreement applicable to Cantor Fitzgerald Securities as administrative agent and collateral agent thereunder shall also apply to Cantor Fitzgerald

22

Securities as the LC Facility Collateral Agent and the LC Facility Authorized Representative hereunder, (ii) Cantor Fitzgerald Securities is entering into this Agreement in its capacity as administrative agent and collateral agent under the First-Lien Term Loan Agreement, and the provisions of Article VIII of the First-Lien Term Loan Agreement applicable to Cantor Fitzgerald Securities as administrative agent and collateral agent thereunder shall also apply to Cantor Fitzgerald Securities as the First-Lien Term Loan Collateral Agent and First-Lien Term Loan Authorized Representative hereunder.  Except as expressly set forth herein, none of the Administrative Agent, the First-Lien Term Loan Collateral Agent or the LC Facility Authorized Representative shall have any duties or obligations in respect of any of the Collateral, all of such duties and obligations, if any, being subject to and governed by the applicable Secured Credit Documents.

SECTION 5.15    Senior Lien Intercreditor Agreement.  By its execution and delivery of this Agreement or a Joinder Agreement hereto, each Authorized Representative authorizes and directs the First-Lien Term Loan Authorized Representative to execute and deliver the Senior Lien Intercreditor Agreement and perform its obligations thereunder, binding such Authorized Representatives and their respective First-Lien Secured Parties to the terms thereof.  In the event of any conflict between the Senior Lien Intercreditor Agreement and this Agreement, the First-Lien Collateral Documents, the First-Lien Term Loan Agreement, the LC Facility Credit Agreement or any Additional First-Lien Documents, the provisions of the Senior Lien Intercreditor Agreement shall govern and control.

SECTION 5.16    Integration.  This Agreement together with the other Secured Credit Documents and the First-Lien Collateral Documents represents the agreement of each of the Grantors and the First-Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the First-Lien Term Loan Collateral Agent, or any other First-Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents or the First-Lien Collateral Documents.

[Signature Pages Follow]

OMM_US:76158679.11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

CANTOR FITZGERALD SECURITIES, as
First-Lien Term Loan Collateral Agent

By: _____

    Name:  James Bond
    Title:   Chief Operating Officer


CANTOR FITZGERALD SECURITIES, as
Authorized Representative for the First-Lien
Term Loan Secured Parties

By: _____

    Name:  James Bond
    Title:   Chief Operating Officer


CANTOR FITZGERALD SECURITIES, as
Additional First-Lien Collateral Agent

By: _____

    Name:  James Bond
    Title:   Chief Operating Officer


CANTOR FITZGERALD SECURITIES, as
Authorized Representative for the LC Facility
Secured Parties

By: _____

    Name:  James Bond
    Title:   Chief Operating Officer


[SIGNATURE PAGE TO PARI PASSU INTERCREDITOR AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FIELDWOOD ENERGY INC.

By: _____
Name: Michael T. Dane
Title:  Senior Vice President and Chief
Financial Officer

FIELDWOOD ENERGY LLC

By: _____
Name: Michael T. Dane
Title:  Senior Vice President and Chief
Financial Officer

GOM SHELF LLC
FW GOM PIPELINE, INC.
BANDON OIL AND GAS GP, LLC
BANDON OIL AND GAS, LP
FIELDWOOD OFFSHORE LLC
DYNAMIC OFFSHORE RESOURCES NS,
LLC
GALVESTON BAY PIPELINE LLC
GALVESTON BAY PROCESSING LLC
FIELDWOOD ENERGY OFFSHORE LLC
FIELDWOOD SD OFFSHORE LLC
FIELDWOOD ONSHORE LLC
FIELDWOOD ENERGY SP LLC,

By: _____
Name: Michael T. Dane
Title:  Vice President

Grantors

1.    Fieldwood Energy Inc.

2.    Fieldwood Energy LLC

3.    FW GOM Pipeline, Inc. (f/k/a Apache GOM Pipeline, Inc.)

4.    Bandon Oil and Gas GP, LLC

5.    Bandon Oil and Gas, LP

6.    Dynamic Offshore Resources NS, LLC

7.    Galveston Bay Pipeline LLC (f/k/a Galveston Bay Pipeline Company)

8.    Galveston Bay Processing LLC (f/k/a Galveston Bay Processing Corporation)

9.    GOM Shelf LLC

10.   Fieldwood Energy Offshore LLC (f/k/a SandRidge Energy Offshore, LLC)

11.   Fieldwood SD Offshore LLC (f/k/a SandRidge Offshore, LLC)

12.   Fieldwood Onshore LLC (f/k/a SandRidge Onshore, LLC)

13.   Fieldwood Energy SP LLC (f/k/a SPN Resources, LLC)

14.   Fieldwood Offshore LLC

[FORM OF] **JOINDER NO. [ ]** dated as of [  ], 20[  ] (the "Joinder Agreement") to the **PARI PASSU INTERCREDITOR AGREEMENT** dated as of April 11, 2018 (the "Pari Passu Intercreditor Agreement"), among **FIELDWOOD ENERGY INC.**, a Delaware corporation ("Holdings"), **FIELDWOOD ENERGY LLC**, a Delaware limited liability company (the "Borrower"), certain subsidiaries and affiliates of the Borrower (each a "Grantor"), Cantor Fitzgerald Securities ("Cantor Fitzgerald Securities"), as collateral agent for the First-Lien Term Loan Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "First-Lien Term Loan Collateral Agent"), Cantor Fitzgerald Securities, as Authorized Representative (as defined below) for the First-Lien Term Loan Secured Parties, Cantor Fitzgerald Securities, as Additional First-Lien Collateral Agent (as defined below), Cantor Fitzgerald Securities, as Authorized Representative for the LC Facility Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "LC Facility Authorized Representative") and each additional Authorized Representative from time to time party thereto.[1]

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Pari Passu Intercreditor Agreement.

B.      As a condition to the ability of the Borrower to incur Additional First-Lien Obligations and to secure such Additional First-Lien Class Debt with the liens and security interests created by the Additional First-Lien Collateral Documents, the Additional First-Lien Class Debt Representative in respect of such Additional First-Lien Class Debt is required to become an Authorized Representative, and such Additional First-Lien Class Debt and the Additional First-Lien Class Debt Parties in respect thereof are required to become subject to and bound by, the Pari Passu Intercreditor Agreement.  Section 5.13 of the Pari Passu Intercreditor Agreement provides that such Additional First-Lien Class Debt Representative may become an Authorized Representative, and such Additional First-Lien Class Debt and such Additional First-Lien Class Debt Parties may become subject to and bound by the Pari Passu Intercreditor Agreement upon the execution and delivery by the Authorized Representative of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 5.13 of the Pari Passu Intercreditor Agreement.  The undersigned Additional First-Lien Class Debt Representative (the "New Representative") is executing this Joinder Agreement in accordance with the requirements of the Pari Passu Intercreditor Agreement and the First-Lien Collateral Documents.

Accordingly, each Collateral Agent, each Authorized Representative and the New Representative agree as follows:

SECTION 1.   In accordance with Section 5.13 of the Pari Passu Intercreditor Agreement, the New Representative by its signature below becomes an Authorized Representative under, and the related Additional First-Lien Class Debt and Additional First-Lien Class Debt Parties become subject to and bound by, the Pari Passu Intercreditor Agreement with the same force and effect as if the New Representative had originally been named therein as an

---

[1]      In the event of (a) a joinder by the Additional First-Lien Collateral Agent or (b) the Refinancing of the First-Lien Term Loan Obligations, revise to reflect joinder by the Additional First-Lien Collateral Agent or a new First-Lien Term Loan Collateral Agent, as applicable.

Authorized Representative and the New Representative, on its behalf and on behalf of such Additional First-Lien Class Debt Parties, hereby agrees to all the terms and provisions of the Pari Passu Intercreditor Agreement applicable to it as Authorized Representative and to the Additional First-Lien Class Debt Parties that it represents as Additional First-Lien Secured Parties. Each reference to an "<u>Authorized Representative</u>" in the Pari Passu Intercreditor Agreement shall be deemed to include the New Representative. The Pari Passu Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2. The New Representative represents and warrants to each Collateral Agent, each Authorized Representative and the other First-Lien Secured Parties, individually, that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent] [trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and (iii) the Additional First-Lien Documents relating to such Additional First-Lien Class Debt provide that, upon the New Representative's entry into this Agreement, the Additional First-Lien Class Debt Parties in respect of such Additional First-Lien Class Debt will be subject to and bound by the provisions of the Pari Passu Intercreditor Agreement as Additional First-Lien Secured Parties.

SECTION 3. This Joinder Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder Agreement shall become effective when each Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signatures of the New Representative. Delivery of an executed signature page to this Joinder Agreement by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

SECTION 4. Except as expressly supplemented hereby, the Pari Passu Intercreditor Agreement shall remain in full force and effect.

SECTION 5. THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6. In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Pari Passu Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Pari Passu Intercreditor Agreement. All communications and notices hereunder to the New Representative shall be given to it at its address set forth below its signature hereto.

SECTION 8.  The Borrower agrees to reimburse each Collateral Agent and each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel.

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as [ ] for the holders of [],

By: _____
     Name:
     Title:

Address for notices:

_____

attention of: _____

Telecopy: _____

Acknowledged by:

CANTOR FITZGERALD SECURITIES,
as the First-Lien Term Loan Collateral Agent and Authorized Representative,


By:_____

    Name:

    Title:



CANTOR FITZGERALD SECURITIES,
as the Additional First-Lien Collateral Agent and LC Facility Authorized Representative,


By:_____

    Name:

    Title:



THE OTHER GRANTORS
LISTED ON SCHEDULE I HERETO


By:_____

    Name:
    Title:

ANNEX II
Schedule I to the
Supplement to the
Pari Passu Intercreditor Agreement

Grantors