IN  THE  UNITED  STATES  BANKRUPTCY  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  TEXAS

HOUSTON  DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-33948-H1-11 |
| | § | (JOINTLY ADMINISTERED) |
| FIELDWOOD ENERGY, LLC and | § | HOUSTON, TEXAS |
| DYNAMIC OFFSHORE RESOURCES, | § | TUESDAY, |
| LLC, | § | AUGUST 4, 2020 |
| DEBTORS. | § | 1:28 P.M. TO 3:50 P.M. |

TELEPHONIC  FIRST  DAY  HEARINGS

BEFORE  THE  HONORABLE  MARVIN  ISGUR
UNITED  STATES  BANKRUPTCY  JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:           RECORDED THROUGH COURTSPEAK
                                NO LOG NOTES

(Audio distortion and glitches noted.)

TRANSCRIPTION  SERVICE  BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES:


FOR THE DEBTORS, FIELDWOOD          WEIL GOTSHAL & MANGES, LLP
ENERGY, LLC, ET AL.:                Alfredo R. Perez, Esq.
                                    Clifford W. Carlson, Esq.
                                    700 Louisiana Street
                                    Suite 1700
                                    Houston, TX 77002
                                    713-546-5040

                                    WEIL GOTSHAL & MANGES, LLP
                                    Matthew Barr, Esq.
                                    Moshe L. Fink, Esq.
                                    Jessica Liou, Esq.
                                    767 Fifth Avenue
                                    New York, NY 10153
                                    212-310-8010


FOR GOLDMAN SACHS BANK,             VINSON & ELKINS, LLP
USA:                                William L. Wallander, Esq.
                                    2001 Ross Avenue, Suite 3900
                                    Dallas, TX 75201
                                    214-220-7905


FOR US SPECIALTY INSURANCE          LOCKE LORD, LLP
COMPANY:                            Philip Eisenberg, Esq.
                                    600 Travis Street, Suite 600
                                    Houston, TX 77002
                                    713-226-1304


FOR THE AD HOC GROUP OF             DAVIS POLK & WARDWELL, LLP
SECURED LENDERS:                    Natasha Tsiouris, Esq.
                                    450 Lexington Avenue
                                    New York, NY 10017
                                    212-450-4580


FOR APACHE CORPORATION:             HUNTON ANDREW KURTH, LLP
                                    Robin Russell, Esq.
                                    600 Travis Street, Suite 4200
                                    Houston, TX 77002
                                    713-220-4200

<u>TELEPHONIC APPEARANCES (CONT'D)</u>:


FOR THE US TRUSTEE:          DEPARTMENT OF JUSTICE
                             OFFICE OF THE US TRUSTEE
                             Hector Duran, Esq.
                             515 Rusk Avenue, Suite 3516
                             Houston, TX 77002
                             713-718-4650


(Please see also electronic appearances.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JOHN-PAUL HANSON | | | | |
| By Mr. Perez | 28 | . | . | . |
| By Mr. Eisenberg | . | 32 | . | 39 |
| By the Court | 38 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| (None offered.) | | | |

...

1         <u>HOUSTON, TEXAS; TUESDAY, AUGUST 4, 2020; 2:10 P.M.</u>

2         THE COURT:  All right.  We are going to call the

3    Fieldwood case.  It is first day hearings, it is Case Number

4    20-33948.  We've taken electronic appearances.  Let's start

5    with Debtor's counsel.  I'll have Debtor's counsel to make any

6    opening statement that it wishes to make and then we will move

7    on from there and allow other people to make opening

8    statements, then we'll move into an evidentiary record.

9         Mr. Perez, go ahead, please.

10        MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

11   Perez.  Can you hear me?

12        THE COURT:  Yes, sir, I can.

13        MR. PEREZ:  Your Honor, before we get started I

14   wanted to express my profound condolences to the Court family.

15   Today I was very saddened by the news this morning.

16        THE COURT:  As we all were.

17        For those of you who that have not received the

18   news, an individual that has been a long-term -- time member

19   of the United States Trustee's Office passed away yesterday

20   from COVID, and it's a really sad day here at the Court and I

21   appreciate you bringing that up, and expressing your

22   condolences not only to her family, but also to other members

23   of the US Trustee's staff.

24        So, thank you, Mr. Perez.

25        MR. PEREZ:  Thank you, Your Honor.

1       Your Honor, first of all we want to apologize for

2   not being able to conclude all the filings in a more timely

3   manner.  We literally worked overnight to get the RSA

4   finalized as well as the DIP motion.  And, Your Honor, you

5   know, had we been able to file this hours earlier, we would

6   have.  And we filed it as quickly as we could once the items

7   were finalized.  So we do ask for your indulgence.  And

8   obviously are prepared to understand, you know, the Court's --

9   any direction that the Court may have with respect to that.

10      Your Honor, we'll begin --

11      THE COURT:  So just so you know where I am,

12  Mr. Perez, I did read both of the declarations that got filed.

13  I will tell you that the larger declaration, the one by your -

14  - the head of your leadership team, I don't know that I

15  absorbed every sentence of that because I had to read it

16  pretty quickly while I was eating lunch, so reading the

17  motions without that didn't make as much sense as reading that

18  first.  So I may need to take a little more time as we go

19  through orders to be sure that we get them done right.  I have

20  though read them both completely, but not what I would call

21  thoroughly because of the press of time.

22      MR. PEREZ:  Thank you, Your Honor.  And we do

23  apologize for that.  Both Mr. Dane and Mr. Hanson (phonetics),

24  who are our two declarants, are on the line, I can see their

25  pictures, and we're certainly happy to submit them to cross-

1    examination or direct exam as the Court wishes to meet our

2    evidentiary burden.

3         Your Honor, once again I've only been asked to do

4    the joint administration which the Court has already granted,

5    and I will turn it over to my partner, Mr. Barr, who will give

6    a little introduction of the case.  And then after that, Your

7    Honor, we will move into the various substantive motions with

8    the Court's permission.

9         THE COURT:  Well, Mr. Barr, why don't we do that.  I

10   know that we have others that may want to make an opening

11   statement, Mr. Wallander has already asked to speak.  So I

12   will start with you, but before we get into any evidence I

13   want to be sure that everyone else has a chance to make any

14   opening statement that they want to make.

15        Mr. Dane, I do see you there, and I did read you

16   declaration.  It just is taking a while to absorb it, it was a

17   pretty heavy piece, that I understand why it took a little

18   while to get it written.

19        So, Mr. Barr, let me get your line activated.

20        MR. PEREZ:  And thank you, Your Honor.  I think

21   we're going to try one more time for Mr. Carlson to be the

22   presenter.

23        THE COURT:  All right.  Will he present to Judge

24   Jones or to me?

25        MR. PEREZ:  Probably neither, Your Honor, based on

1    his track record.

2         (Laughter.)

3         THE COURT:  Let's see, I am -- Mr. Barr.  Mr. Barr,

4    I need you to press five star on your phone if you would,

5    please, so that I can get your audio going.

6         And, Mr. Carlson, I will pass the presenter role on

7    over to you.  So, Mr. Carlson is now the presenter.  Let me

8    get Mr. Barr's line activated.

9         Mr. Wallander, I see that you put your request to

10   speak down, but please feel free to raise it again when the

11   time comes.

12        (Pause in the proceedings.)

13        THE COURT:  All right.  Mr. Barr, we should have you

14   activated at this point.

15        MR. BARR:  Thank you, Your Honor.  It's Matt Barr

16   from Weil Gotshal.  Can you hear me okay, Judge?

17        THE COURT:  Yes, sir, I can.

18        MR. BARR:  Great.  Thank you.

19        And I apologize, Your Honor, I'm on a cell phone

20   unfortunately here in New Jersey.  We had a power outage so

21   (glitch in the audio).

22        THE COURT:  Actually, Mr. Barr, I can't hear you.

23        I heard him say he was on a cell phone and might

24   have a bad connection and that was all I heard.  So what do

25   you want to do, Mr. Perez?

1        MR. PEREZ:  Your Honor, they're having a power

2    outage up there.  Let's see if we can -- because of the

3    hurricane, so maybe Mr. Barr could try again, otherwise I

4    think I could probably take you through it.

5        THE COURT:  We'll certainly accommodate whatever you

6    all need to do, and, Mr. Barr, do you want to give it another

7    shot, and if not, do you want to just wait a few minutes.  You

8    all tell me what we can do.

9        Mr. Barr, can you hear me?

10        MR. BARR:  (No audible response.)

11        THE COURT:  I don't think he's hearing anything.

12    Oh, wait, his line got muted somehow and I'm going to -- maybe

13    he dialed back in, let me try him again.

14        Mr. Barr, let's try that again.

15        MR. BARR:  Yes.  Can you hear me now, Judge?

16        THE COURT:  I can hear you, yeah.

17        MR. BARR:  Great.  This time it wasn't Mr. Carlson's

18    fault.  I guess it was my fault, the Verizon up here in New

19    Jersey.  So good track record, but I do apologize, Judge, for

20    being on the cell phone, and I guess it proved me right

21    because we have a power outage up here in New Jersey given the

22    storms.

23        THE COURT:  Yeah, may I --

24        MR. BARR:  I'm hoping you can hear me okay.

25        THE COURT:  Yeah, I can.  I always hear that

1     hurricanes are worse in New York than they are in other parts

2     of the country.

3          (Laughter.)

4               MR. BARR:  (Glitch in the audio.)

5               THE COURT:  You're gone again.

6               MR. PEREZ:  Okay.

7               THE COURT:  Mr. Perez, you better decide how you

8     want to handle this.  I don't mind if you want to wait a few

9     minutes and let the storm pass and we'll come back, you tell

10    me.

11              MR. PEREZ:  No, we're fine.  No, no, Your Honor, I

12    think we can probably -- I think we can probably proceed.  So

13    if you would, can you -- so, Your Honor, I wanted to just give

14    you a brief introduction to Fieldwood.  As the Court is aware,

15    this is our second Chapter 11 filing.  We're a privately held

16    company, and all of our assets are in the Gulf of Mexico.

17    We're one of the very largest operators of offshore assets.

18    We have over 300 operated platforms and it covers a huge

19    expanse from the Texas border almost all the way to Alabama.

20              Your Honor, we have basically three sets of assets.

21    We have the deep water assets, which we purchased from Apache

22    in connection with the last bankruptcy.  We also have what we

23    refer to as the legacy Apache assets, which form the basis of

24    the company.  Those were purchased in 2012 and that's about --

25    a little bit more than two-thirds of the what we call the

1    shelf assets.  And, Your Honor, technically everything is on

2    the shelf, but when we talk about shelf we're talking about

3    shallow water as opposed to deep water.  And then in addition

4    to the Apache shelf assets we also have additional shelf

5    assets.  In fact, Your Honor, some of those were acquired from

6    Sandridge, which I believe was in your court at one time.

7             So those are the three -- basically the three sets

8    of assets that we have.  We have approximately 635 employees

9    in Houston and Lafayette, but the bulk of our employees and

10   the bulk of the people that we retained are offshore in this

11   vast, you know, in this vast region that we operate.

12            We have -- we are the operators, Your Honor, of over

13   95 percent of our asset base, and although we've had some

14   very, very trying times earlier this year as a result of the

15   commodity price, we still produce almost 80,000 barrels per

16   day in the first three months of 2022 (sic).

17            Your Honor, one of our -- one of the things that

18   this company has done very well is that we have an extensive

19   plug and abandoning and decommissioning program.  We probably

20   plug and abandon more wells than most companies have in the

21   Gulf, and we do that, you know, officially and in a very

22   workman-like and efficient manner.

23            Turn to the next page.

24            Your Honor, this -- I know that you probably saw

25   this in Mr. Dane's declaration, but this gives you an idea of

1          the expanse of our footprint in the Gulf and the various --

2          all of the various platforms and wells.

3                    Turn to the next page.

4                    So, Your Honor, after our 2018 bankruptcy, the

5          company significantly de-levered and we nevertheless ended up

6          with almost $2 billion worth of debt, a little under $2

7          billion worth of debt.  We have picked a first lien that has a

8          first lien, first out, and then the first lien term loan,

9          which we referred to that, and then we have a second lien.

10         Your Honor, this is a pictorial graph, I suspect we might come

11         back to that at some time during the case, but it's probably a

12         little too small to see on the screen.

13                   So turn to the next page.

14                   So why are we here.  Your Honor, I think the Court

15         is well aware just because of the volume of business that

16         exists today in our bankruptcy courts in Houston that, kind of

17         the combined effect of the decline in oil prices, many, many

18         multiple of which happened over one weekend back in March or

19         late February, as well as the impact of the global pandemic

20         that really deteriorated -- have really deteriorated the

21         price.

22                   The company took very significant steps to mitigate

23         this drop in commodity price, but they proved not to be

24         sufficient.  The company shut in 29 of the production

25         platforms, there was reductions in force, all employees that

1    made over 150,000 took a 10 percent salary cut, and we

2    implemented much stricter purchasing programs and vendor

3    management programs.  As a result of all of that and

4    unfortunately the bad press, there was an article in the *Wall*

5    *Street Journal* yesterday that we're about to imminently file

6    bankruptcy which had some repercussions.  Many of the vendors

7    and the surety providers in which we have significant opt-outs

8    have expressed their concern and have taken actions to either

9    limit their exposure or obtain collateral.

10           Your Honor, our capital structure, we have the first

11   lien, the first-out loans which are funded in the amount of

12   139 million.  There is about 8- or $9 million of letters of

13   credit, so sometimes you will see that the FLFOs, as we refer

14   to them, sometimes their exposure is 147 and that includes 139

15   million in funded debt plus the LC.  The pre-petition first

16   lien term loan we -- those are approximately a billion forty-

17   three, and then our second lien term loans are a little over

18   500 million.

19           THE COURT:  Let me interrupt you for a second.

20           MR. PEREZ:  Sure, Your Honor.

21           THE COURT:  This table --

22           MR. PEREZ:  Yes.

23           THE COURT:   -- I believe uses different

24   nomenclature than in the declarations, and I just want to be

25   sure that I've got the right liens with the right initials.

1      What is denominated on here as pre-petition first lien term

2      loans are the FLFOs in the declaration, and what are

3      denominated as the FLFO's are actually the FLTLs in the

4      first --

5                MR. PEREZ:  Yeah.

6                THE COURT:   -- in the declarations.  And if I'm

7      incorrect about that, then I'm incorrect about what I figured

8      out when I was reading stuff.  So I want to be sure that this

9      is different than what I read, but that I've got the right

10     actual structure in my mind.

11               MR. PEREZ:  You absolutely do, Your Honor.  I

12     apologize, but we were -- we just didn't have time to make

13     everything the same.

14               THE COURT:  I'm not -- I'm not worried about it from

15     that point of view, I'm worried about it to be sure I know

16     what structure I'm dealing with.

17               MR. PEREZ:  Yes, Your Honor.

18               THE COURT:  So I've got some first-out term loans of

19     about 140 million, and I've got some regular term loans that

20     are not first out that are about 1.1 billion --

21               MR. PEREZ:  Right.

22               THE COURT:   -- in that range.

23               MR. PEREZ:  Correct, Your Honor.  And just so the

24     Court understands who we're talking about, the 140 million is

25     primarily Goldman Sachs Cantor, primarily Goldman Sachs, and

1    that's represented by Mr. Wallander.  Whereas, the billion one

2    forty-three and the five eighteen, which are kind of together,

3    they're represented by Davis Polk, Mr. Shuriat (phonetic), as

4    well as Mr. Schaible.  They represent those -- the entities,

5    both below that.  So those are the persons.

6          And the other key party is Apache, Your Honor, and

7    that's represented by Ms. Robin Russell of Hunton Andrews &

8    Kurth.  So those are kind of the three parties-in-interest in

9    this case.

10          So next page, please.

11          So, Your Honor, I think that this slide basically

12   shows that, you know, beginning in March we began engaging

13   with the lenders, we tried to so some management transactions,

14   we entered into multiple forbearance agreements trying to come

15   up with an out-of-court solution.  We were unable to do that,

16   and so we have forbearances literally through Sunday and then

17   through yesterday in order to be able to file.

18          Back in June of this year Houlihan, who had been

19   retained a couple of months earlier, actually started a base

20   sales and marketing process for the deep water assets, and

21   that marketing process is continuing and will be -- in essence

22   be brought in parallel with the other milestones that we have

23   in the case.

24          Next slide, please.

25

1          So what is it that we want to accomplish?  Your

2     Honor, key to us is trying to in essence rationalize the three

3     sets of assets.  I think the fundamental cornerstone of our

4     restructuring is going to be the transaction that we're going

5     to do with Apache that's reflected in the Apache term sheet

6     that was accepted.  And the arm's length negotiations with

7     Apache represented by counsel, represented by their investment

8     advisor, that term sheet was signed last Friday, and we've

9     been working together.

10          Second, Your Honor, we have an RSA with

11     approximately 67-1/2 percent of our first lien term lenders.

12     Here we use the other nomenclature.  And approximately

13     25 percent of the second lien term lenders, and, Your Honor,

14     many of those are cross-over lenders that have positions in

15     both places.  And they -- the first lien term lenders have

16     provided

17     $100 million of DIP financing that will be the subject of one

18     of the motions.

19          The goal of these cases is obviously to maximize

20     value, to preserve jobs and -- but a third -- a fourth very

21     important party are the regulators of both BOEM and BSEE, and

22     so are one of our key incentives to ensure that the P&A

23     obligations are handled in a responsible manner, you know,

24     with their consent and approval.

25          So turn to the next page, please.

1          So, Your Honor, in connection with the RSA we have

2     certain milestones and basically I think that in essence we're

3     going to run a dual fact process.  One of the milestones will

4     help, I'll highlight a couple of them.  We did 75 days, we

5     want to have definitive documentation with Apache.  We also

6     want to have a plan and Disclosure Statement to handle the bid

7     procedures motion on 75 days.  That basically gives us two and

8     a half months.  Then after that, Your Honor, we run, you know,

9     depending on what path we go -- and, Your Honor, we take up

10    both paths because if the trail that is currently contemplated

11    is just of the deep water assets, so there will be other

12    assets to be disposed of and to address and to reorganize.

13         So, Your Honor, we have in essence, you know, a

14    nine-month process.  We're hoping very much that we're able

15    to, you know, exit bankruptcy in the first quarter of next

16    year, we certainly don't want to be around for nine months.

17    But we do have a sufficient time.  A lot of the items that

18    we're planning on doing, you know, are not dependent.  We are

19    in control, dependent on cooperation and agreement by other

20    parties.

21         So with that, Your Honor, unless the Court has any

22    questions, I would turn it over I think to anyone else.

23         THE COURT:  Well, let me go back to Mr. Barr, and

24    since you were having to sub for him, see if Mr. Perez blew

25    it, Mr. Barr.

1           MR. BARR:  Can you hear me okay, Judge?  I want to

2   make sure I'm getting this right.

3           THE COURT:  I can because you haven't discounted now

4   in about 20 minutes and you were disconnecting every minute or

5   two before, so.

6           MR. BARR:  And now it's sunny out, so I don't know

7   what's going on.  No, it was -- I had nothing else to cover

8   other than just to remind Mr. Perez if I get cut off after

9   other openings to make sure wee move the declarations into

10   evidence, and then turn everything over to Mr. Carlson.  But

11   thank you, Judge, for asking.

12           THE COURT:  All right.  Thank you.

13           So I know that we did have some people that wanted

14   to make comments.  Mr. Wallander, let me go ahead and activate

15   your line.  Are you able to hear me all right, Mr. Wallander?

16           MR. WALLANDER:  (No audible response.)

17           THE COURT:  Mr. Wallander, if you have your own line

18   muted, or just don't want to talk to me anymore, that's okay,

19   but we're not hearing you.

20           MR. WALLANDER:  I was on mute, Your Honor.  I did

21   that for appearances purposes.  I don't have an opening

22   statement.  We are working with the Debtors and with the other

23   first-day lenders to see if we can get something sorted out in

24   the matter, and hopefully we'll work forward on a consensual

25   basis with each other.  Thank you.

1          THE COURT:  Mr. Wallander, thank you.  You did file

2     your electronic appearance, so you have appeared, as has

3     everyone that has does that.  If anyone failed to do an

4     electronic appearance, it's not too late, go ahead and do it.

5          Let me see who else might want to make a comment.

6     Mr. Eisenberg, I saw you watching and was surprised you were

7     being silent.  So go ahead, please.

8          MR. EISENBERG:  Your Honor, did you say my name?

9          THE COURT:  I did, yes, sir.

10          MR. EISENBERG:  Thank you, Your Honor.  Philip

11     Eisenberg on behalf of the US Specialty Insurance Company.  We

12     are one of the surety companies that extend over a billion

13     dollars in financial accommodations to Fieldwood in this

14     matter, Your Honor.  And we're still trying to figure out what

15     happened.  We understand you have to start somewhere, and

16     things have to get filed and people have to read things.

17          But we're just not sure yet what the Debtors are

18     asking for today, and we certainly don't feel that on this

19     short notice that our rights are being impaired in any way.  I

20     also represent a joint interest owner, WNP, and really haven't

21     had time to look through the interim order to make sure that

22     any of our lien rights, recoupment rights, set off rights and

23     rights of that nature would also be fully preserved, and don't

24     want to be -- have any marshaling issue on an interim order

25     affect us.

1       We're listening very carefully here.  We do see a

2   little bit of a lack of transparency.  We're reading as fast

3   as we can, Your Honor, but in the budget we can't tell during

4   the nine months what the company is proposing to do with

5   regard to actually performing its current P&A obligations.  We

6   do know that they are a very good company and they do act very

7   responsibly and they do their P&A, and having read what they

8   have, I did see that they do have provisions for actually

9   doing P&A during the process.  But we don't have any

10  transparency into what's going to happen there, Your Honor.

11  It's very much like the first-day in the ATP hearing.

12      So I just wanted to kind of raise that with the

13  Court right now because of the timing.  And they've been at

14  this for several months and we've had a couple of hours, and

15  we're doing the best we can.

16      THE COURT:  Thank you, Mr. Eisenberg.  I'll just let

17  you take those one step at a time as we get to them.  My

18  understanding though is that the fundamental piece that we're

19  being asked to do today is a non-roll up DIP approval on an

20  interim basis where there would be cumulative draws under the

21  interim period that could total 15 million and then a short

22  draw of 10.  It's not rolled up, but essentially it is

23  priming.  I don't know whether it primes anything that you all

24  have, and the fees on it I did in my head, I think they're

25  about 9- of the $10 million.  So --

1          MR. EISENBERG:  Well, I didn't want to get into

2     those details, Your Honor, but I did the same math and I asked

3     the question:  Why do we need this interim debt at this point

4     right now on such short notice?  But I'll leave that --

5          THE COURT:  All right.

6          MR. EISENBERG:   -- alone.

7          THE COURT:  All right.  Thank you.

8          Ms. Russell, I see that you have visually appeared.

9     Let me see if you've also pressed five star on your line.  If

10    you wish -- I have somebody from the 917 area code, I'm going

11    to go ahead and recognize them.  I don't think that's you,

12    Ms. Russell.  If you wanted to talk, let me get you to press

13    five star.

14          From 917-602-9986 who do we have?

15          MS. TSIOURIS:  Yeah, hi, Your Honor.  Good

16    afternoon.  It's Natasha Tsiouris from Davis Polk & Wardwell.

17          THE COURT:  Good afternoon again, Ms. Tsiouris.

18          MS. TSIOURIS:  Good afternoon.  Well, I just wanted

19    to take a moment to make a few brief statements before we

20    launch into the rest of the presentation and just explain

21    that -- our group is who we represent here.

22          So the Ad Hoc Group represents (indiscernible)

23    covered it, but approximately 67 percent of the first lien

24    term loans, 25 percent of the second lien term loans.  This

25    group has been a group of lenders who have been working with

1    the company, many of them have been working with the company

2    in its last restructuring, and they've been involved in quite

3    some time.  They've had been working very constructively the

4    company.

5         This particular group started to form in early March

6    when the company approached its lenders about a potential

7    waiver under various credit agreements.  And they group came

8    together very quickly and very cooperatively to help to

9    provide that waiver.  And then also Mr. Perez covered in his

10   statement, you know, after the negotiations the first lien

11   lenders and the second lien lenders that are approved are

12   reaching forebear on the interest payments because the company

13   (indiscernible) and to show further to the board for the

14   company's long term success.

15        A few weeks after that we signed the forbearance

16   agreements and also found out the person to which they quickly

17   got to work going through diligence materials that are being

18   (indiscernible) diligence session with advisors.  And the

19   lenders that have led up to the RSA.

20        There is -- remains a lot of work to be done.  We

21   are confident that the company, Apache, and our group have

22   accomplished a great deal the past few months, and again,

23   Mr. Perez noted, you know, the agreement that was reached in

24   principle with Apache with respect to (indiscernible)

25   obligation, and the Apache assets that were conveyed to the

1    Debtor in 2013 was pretty remarkable and came together very

2    quickly and our group is fully supportive of.  But obviously,

3    as we've seen, reaches backstop $100 million DIP financing

4    that ensured that the company will transition (indiscernible)

5    keep it and give that company -- that they want assurance that

6    they'll have sufficient liquidity going forward to restructure

7    the operation properly and to do it over the next few months,

8    which we think gives the company enough time to adequately

9    repay all of its stakeholders.

10            And, you know, we do intend to work quickly, but we

11   don't want the company (indiscernible) obviously, and we think

12   that the liquidity share provided on day one gives the company

13   that assurance and comfort that it can work through all the

14   other creditors in addition.

15            So we do, you know, have a very strong commitment to

16   this company, and we do recognize that a lot of work remains

17   to be done under the RSA.  But we think it was a very

18   significant achievement and request to continue to be partners

19   with the Debtors on a go-forward basis, so.

20            THE COURT:  All right.  Ms. Tsiouris, thank you for

21   that opening.

22            MS. TSIOURIS:  Thank you.

23            THE COURT:  From 802-843-1260 who do we have?

24            MS. RUSSELL:  Good afternoon, Your Honor.  This is

25   Robin Russell representing Apache Corporation and certain of

1      its affiliates.  And Mr. --

2                  THE COURT:  So, Ms. Russell, I'm going to interrupt

3      you for a minute.  So this morning, or this afternoon I guess,

4      when I started reading about what this case was about, I have

5      no idea whether the deal with Apache works technically,

6      whether I should approve it.  But I said to myself, what

7      brilliant person from Apache decided this was the right thing

8      to do, this is such a good move to get an up front for having

9      to do the P&A and get that solved instead of cases where it

10     becomes the last issue resolved.  And now I know, so.

11                 MS. RUSSELL:  Well, thank you, Your Honor.  Apache

12     has a very savvy general counsel, Anthony Lannie, have worked

13     very hard over the last few months with our team which

14     includes not only Hunton Andrews Kurth, but Parkman Whaley as

15     our financial advisor, and P.J. Goodwine of Looper, who is our

16     special BOEM and BSEE counsel.

17                 We are committed to working with the Debtor and

18     other constituents to implement the Apache term sheet and

19     negotiate -- finish a few documents.  We are going to do that

20     in the next 75 days.  And I'm available to answer questions,

21     but that's all we have to say for this afternoon.

22                 THE COURT:  All right.  Thank you.

23                 No one else has asked to make an opening statement.

24     So let me ask Mr. Perez or Mr. Barr where you all want to go

25     in the case at this point.

1          MR. PEREZ:  Your Honor, Alfredo Perez.  We would

2     move into evidence for the purposes of the first day hearings,

3     both the declaration of Mr. Dane and the declaration of

4     Mr. Hanson, and then the first matter is going to be the DIP

5     motion and that's going to be handled by Mr. Carlson.

6          THE COURT:  All right.  So we have a motion to admit

7     ECF Number 29 which is the declaration of Mr. Dane, and ECF

8     Number 23 which is the declaration of Mr. Hanson.  Are there

9     any objections to the admission of the two declarations solely

10    for the purposes of today's hearing, and they will need to be

11    readmitted at any future hearing if we're going to apply them

12    there.

13          (No audible response.)

14          THE COURT:  All right.  With no objections the two

15    declarations are admitted.  Does any party have any cross-

16    examination for either Mr. Hanson or Mr. Dane?  If so, please

17    press five star.

18          MR. EISENBERG:  Your Honor.

19          THE COURT:  Mr. Eisenberg, go ahead.

20          MR. EISENBERG:  Thank you, Your Honor.  I didn't

21    know if my line still live.  I'm trying to get the Debtors to

22    stipulate to the fees we see, $5 million of the $10 million

23    today, so I don't have to cross-examine Mr. Hanson.

24          MR. PEREZ:  Your Honor, I'm happy to take Mr. Hanson

25    through the -- how the fees were negotiated and what the fees

1       are.  I think they're a little bit less than 9 million, but

2       they're certainly not materially less.  But if the Court --

3       with the Court's permission I'd like to just ask Mr. Hanson a

4       few questions so that we can have that -- the discussion about

5       the fees and the amounts.

6               THE COURT:  Mr. Eisenberg, it's your request, do you

7       mind doing it that way?

8               MR. EISENBERG:  No, I don't at all, Your Honor.

9       Thank you very much.

10              THE COURT:  All right.  And you said both Mr. Dane's

11      name and Mr. Hanson's name, who do you want to give that

12      testimony?

13              MR. EISENBERG:  Mr. Hanson.  I apologize.

14              THE COURT:  No, that's okay.

15              Mr. Hanson, would you raise your right hand please,

16      sir.

17              THE COURT:  Do you swear to tell the truth, the

18      whole truth, and nothing but the truth, and before you answer

19      I need to turn on your phone, so you need to press five star

20      if you would.

21          (Pause in the proceedings.)

22              THE COURT:  I haven't seen you come up yet with the

23      five star, but if you just pressed it one time, that'll work.

24          (Pause in the proceedings.)

25              THE COURT:  Can somebody tell me what -- I don't

1    know, let me see.

2              MR. PEREZ:  Probably a 203 number, Judge.

3              THE COURT:  Okay.  I'll find him.

4         (Pause in the proceedings.)

5              THE COURT:  So I'm having -- this is an internet

6    connection problem here, give me just a second, let me get my

7    controller restarted.

8         (Pause in the proceedings.)

9              MR. PEREZ:  Yeah, when you're ready I have various

10   numbers here that I could help you with.

11             THE COURT:  No, I think that this is -- it's just my

12   own connection to -- there's a separated telephone control

13   that --

14             MR. PEREZ:  Your telephone --

15             THE COURT:   -- that I need to get through the

16   internet.  It somehow went down, but I'm getting back up on

17   it.

18             And I've got him now, I just need to click on him.

19             MR. PEREZ:  Thank you.

20             THE COURT:  Thank you.

21             All right.  Mr. Hanson, so do you swear to tell the

22   truth?

23             THE WITNESS:  Yes, I do.

24             THE COURT:  Thank you, Mr. Hanson.

25             Go ahead, please, Mr. Perez.

1               DIRECT EXAMINATION OF JOHN-PAUL HANSON

2    BY MR. PEREZ:

3    Q    Would you please state your name for the Record?

4    A    John-Paul Hanson, J-O-H-N hyphen P-A-U-L, H-A-N-S-O-N.

5              THE COURT:  Mr. Hanson, let me get you to pick up

6    your phone or bring it closer to your mouth if you would,

7    please.

8              THE WITNESS:  Is that better?

9              THE COURT:  It is a whole lot better.  Thank you,

10    sir.

11    BY MR. PEREZ:

12    Q    Mr. Hanson, what is you involvement with respect to the

13    Fieldwood matter?

14    A    I am seeking to be retained as investment banker and

15    financial advisor to Fieldwood Energy.

16    Q    And, Mr. Hanson, are you -- did you conduct the process

17    to obtain DIP financing in this case?

18    A    Yes, I (indiscernible).

19    Q    And did you file a declaration in connection with

20    obtaining the DIP financing?

21    A    Yes, I did.

22    Q    And, Mr. Hanson, can you describe to the Court briefly

23    what was the process that you undertook to obtain the DIP

24    financing.

25    A    Starting with our initial retention and working with the

1       Debtors we, as is typical, started looking at the company's

2       operating plans, business plans, and forecasts.  We noticed

3       that there were upcoming forecasted periods where liquidity

4       would be tied to negative based on forecasted cash flows and

5       cash on hand.

6            At that point we started working with Mr. Dane and the

7       finance team at Fieldwood as well as with AlixPartners to

8       determine a potential liquidity need if we were to go out and

9       raise third-party financing after sizing the liquidity need.

10      We put together solicitation materials and reached out to

11      third parties to provide that potential financing.  That

12      financing was sought to be raised on a debtor-in-possession

13      financing basis.  We reached out to a total of seven parties

14      including two of the existing creditors/lenders to Fieldwood

15      Energy.

16      Q    All right.  And did you receive any proposals?

17      A    We did, we received two proposals.

18      Q    All right.  And did you -- were you able to negotiate the

19      proposals?

20      A    Yes, we negotiated several in each of two proposal

21      counterparties.

22      Q    And why did the Debtor finally decide to go with the

23      proposal provided by the FLTL lenders?

24      A    It came down to a number of factors, primarily the FLTL

25      proposals were similar in size and amount, it did not require

1    a roll up of pre-petition close, and given the pre-petition

2    existing intercreditor agreement among the existing lenders to

3    Fieldwood Energy, it would not result in a non-consensual

4    (indiscernible) and litigation around the provision of the DIP

5    financing, which we viewed as being of substantial value to

6    the estates.

7    Q    Okay.  So Mr. Eisenberg pointed out that the fees are

8    approximately $9 million.  Can you go through the analysis of,

9    first of all how, the fees were negotiated and then the

10    analysis of the payments that are being made.

11    A    The fees were negotiated -- the fees themselves and

12    overall financing was negotiated at arm's length, both with

13    our financial advisor to the FLTL group as well as directly

14    with principals in the FLTL group.  As mentioned, that was all

15    conducted on an arm's length basis.  It started with a very

16    different, as you can imagine, proposal in terms of both fees

17    and financing costs overall.  Through a series of protracted

18    negotiations where we resolved in terms of the fee side is a 3

19    percent up front fee, a 4 percent backstop fee, and a 3

20    percent unused loan fee, all charged against the 100 million

21    of the DIP financing being provided.

22    THE COURT:  Let me just clarify one thing so that I

23    can get the Record right on this.  My understanding is that

24    the unused loan fee was payable monthly on unused amounts, but

25    the other two fees were paid up front, so that if you were to

1    draw everything in theory at the end of month one, that unused

2    loan fee would only be 1/12 of 3 percent in total.  Is that

3    right, or did I misunderstand how that works?

4              THE WITNESS:  That's correct, Your Honor.  I

5    appreciate the clarification.

6              THE COURT:  Okay.  Thank you.

7    BY MR. PEREZ:

8    Q    And, Mr. Hanson, do you believe that the Debtors were

9    able to obtain the best rate possible in connection with this

10   DIP loan?

11   A    Under the circumstances and given the protracted

12   negotiations and where we were able to finally negotiate the

13   fees and possibly the financing (indiscernible) that we

14   believe this the best outcome achievable.

15   Q    Now there is an interim draw of $10 million that has to

16   occur within 15 days.  Do you know of any reason why this has

17   to be done?

18   A    It is really for two reasons.  Number one, to solidify

19   the DIP financing, demonstrate to the market, to employees, to

20   regulators and members that the financing is fully available.

21   A secondary reason is, but of no less importance, is that

22   certain of the providers of the DIP cannot be providing

23   uncommitted funds, or making commitments on undrawn funds I

24   should say.  And so there needed to be an initial draw in

25   order to seize the commitment to provide the entire

1      100 million should it be needed.

2      Q    Now if the Debtors elected not to have the DIP now and a

3      DIP were not available in the future, would that have any

4      potential business impact on Fieldwood?

5      A    It would have a dramatic impact on Fieldwood, both in

6      terms of immediate liquidity needs and you can see from the

7      DIP budget.  But there are periods where liquidity becomes

8      tight under the forecasted 13 weeks, and the loss of liquidity

9      can have a material impact on long term value of the

10     operations and the underlying business.

11     Q    Now are oil and gas companies in the Gulf susceptible to

12     significant liquidity swings?

13     A    Absolutely.  Oil and gas companies can be subject to very

14     significant swings, first and foremost due to the commodity

15     price, but also driven by a variety of other operational and

16     production factors.  And the Gulf of Mexico producers are no

17     less, in fact, arguably they are even more susceptible.

18              MR. PEREZ:  Thank you, Your Honor.  We have nothing

19     further from Mr. Hanson.

20              THE COURT:  Thank you.

21              Mr. Eisenberg.

22              MR. EISENBERG:  Yes, Your Honor.

23                  CROSS-EXAMINATION OF JOHN-PAUL HANSON

24     BY MR. EISENBERG:

25     Q    Mr. Hanson, three months ago before the petition date,

1    what was the available liquidity for Fieldwood?

2    A    40 months ago -- I'm sorry, three months ago,

3    Mr. Eisenberg?

4    Q    Yes, sir.

5    A    If I recall, it was approximately 180 million.

6    Q    How much cash does Fieldwood have sitting here on day one

7    of the budget that was provided?

8    A    Approximately 135 million, that constitutes both

9    international operations, as well as the liquidation of

10   significant hedges which occurred in late May of this year.

11   Q    And the forecasted periods when you will have liquidity

12   problems, those are not in the first 30 days after the filing

13   of the bankruptcy -- or of that budget, sir.

14   A    Not -- it depends on what you're classifying as liquidity

15   problems, but within the next 30 days it is not forecasted

16   that liquidity becomes dramatically tight, but there is a cash

17   burn forecasted in the next 30 days.

18   Q    And so looking at the 13-week budget when does that

19   liquidity problem that you talked about occur?

20   A    Where liquidity becomes the tightest in the forecasted

21   period is late September, early October time frame.

22   Q    So maybe eight weeks in.

23   A    Correct, depending on a variety of factors including

24   (glitch in the audio).

25   Q    I'm trying to understand what roll up.  I heard that

1   there's no roll up at least on an interim basis.  Is that

2   correct?

3   A    Not under the presented and agreed to DIP financing.

4   There was under none of the competing proposals.

5   Q    Okay.  And so then -- and then there's a second tranche

6   that's available upon the satisfaction, I've got to get the

7   term right, there's a satisfaction event that occurs and

8   that's another $15 million that would become available at that

9   point.  Correct?

10  A    Well, there's 15 million of incremental availability

11  during the interim period, but prior to the signing of

12  definitive documentation around the Apache DIP agreement.

13  That 15 million is subject to conditions, but it is available

14  within the next 75 days should the company need it.

15  Q    Is there a roll up on that amount, or any piece of this

16  DIP loan?

17  A    Not under this proposed DIP, no.

18  Q    Okay.  Now the fees, there's the initial 3 percent fee,

19  and then there's a 4 percent backstop fee.  Can you describe

20  to the Court what a DIP backstop fee is?

21  A    That is a fee that is provided to the parties without

22  backstopping the full 100 million, so they are committing to

23  provide the full $100 million DIP.

24  Q    So they're just -- they're just parties who are providing

25  the DIP and they're getting an additional 4 percent because

1    someone else is not providing the DIP?

2    A    But it's an agreed fee in order to incentivize the

3    parties to provide the DIP financing which is necessary.

4    Q    Well, let's talk about that.  The second tier of the debt

5    structure, which is the term loan, that basically -- would you

6    call the value of the offshore assets that have been marketed

7    by Houlihan would -- do you know whether the value was less

8    than the full amount of the term loan at this point?

9         MR. PEREZ:  Your Honor, I'm going to object to the

10    question.  I think it goes beyond the scope and it's not -- I

11    don't believe that this is an appropriate line of questioning

12    on a DIP hearing.

13         THE COURT:  Does this relate to -- how does this

14    relate to the DIP, Mr. Eisenberg?

15         MR. EISENBERG:  Certainly.  My next question, Your

16    Honor, is, is it true that all these terms loans parties are

17    doing is supporting their own collateral and so it's in their

18    interest to actually do this, and why would they be entitled

19    to this backstop fee as part of this on such short notice when

20    the money is not there and there's no liquidity need.

21         THE COURT:  Why don't you just go directly to that

22    question.

23         MR. EISENBERG:  Okay.

24    BY MR. EISENBERG:

25    Q    Isn't it true, Mr. Hanson, that all the term loan members

1    are doing is supporting their own collateral here?

2    A    There's a subset of the FLTL lenders who are providing

3    this DIP financing.

4    Q    And they're supporting their own collateral.  Correct?

5    A    They are supporting the underlying difference which

6    constitutes their collateral.

7    Q    All right.  So there a motion you understand today to

8    give the employees comfort with regard to their wages.  Are

9    you aware of that motion, sir?

10   A    Yes, it's part of the first DIP finance.

11   Q    All right.  And the $10 million from the interim DIP is

12   not necessary for the company to actually satisfy the needs of

13   (glitch in the audio), sir.

14           MR. PEREZ:  I object to the form of the question,

15   Your Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  I'm not sure exactly which dollars are

18   going to pay the employee wages.  But the DIP as stated in my

19   declaration provides comfort to the employees, vendors, other

20   parties-in-interest that there's sufficient long term

21   liquidity to support the operations and provide stand-by

22   capital as necessary for the ongoing business on a long term

23   basis.

24   BY MR. EISENBERG:

25   Q    So the answer is no, the DIP is not necessary on an

1    interim basis to satisfy the cash needs under that motion

2    currently.

3              MR. PEREZ:  Object to the form of the question --

4              THE COURT:  Sustained.

5              MR. PEREZ:   -- Your Honor, as stated.

6              THE COURT:  Sustained.

7              MR. EISENBERG:  All right.  I'll move on, Your

8    Honor.

9    BY MR. EISENBERG:

10   Q    You mentioned that Fieldwood is a private company.

11   Correct?

12   A    It is not publicly traded, correct.

13   Q    And so it's not traded on an open market, is it?

14   A    The equity is not publicly traded.

15   Q    And sitting here today do have any reason to believe that

16   the term loan lenders will be unwilling to provide a DIP a

17   month from now?

18             MR. PEREZ:  Object to the question, it calls for

19   speculation.

20             THE COURT:  Sustained.

21   BY MR. EISENBERG:

22   Q    Aren't you just speculating, Mr. Hanson, that another DIP

23   might not be available 30 days from now?

24             THE COURT:  Same question.  Sustained.

25             MR. EISENBERG:  Well, Your Honor, I would -- I

1        thought he testified on direct that he was -- they weren't
2        sure whether they could get a DIP 30 days from now, and so I
3        was trying to --
4                THE COURT:  I think he did, he said he isn't --
5                MR. EISENBERG:  He did?  All right.
6                THE COURT:  -- he isn't sure.  I don't think that's
7        speculating about anything to say, I'm not sure.
8                MR. EISENBERG:  Okay.  Thank you, Your Honor.  I'll
9        withdraw the question.
10               THE COURT:  Thank you.
11               MR. EISENBERG:  That's all I have for right now.
12       Thank you, Your Honor.
13               THE COURT:  Thank you.
14               Any further questions for Mr. Hanson?
15           (No audible response.)
16                   EXAMINATION OF JOHN-PAUL HANSON
17               THE COURT:  Mr. Hanson, this is a priming loan and I
18       understand that it primes the collateral of the existing
19       funded debt schedule that was shown to me.  So the first out,
20       it primes the non-funding as well as the funding FLTs and it
21       primes the second lienholders.  Does it prime M&M lienholders,
22       does it prime any security that might belong to
23       Mr. Eisenberg's client, or does it only prime if you will the
24       collateral stack that is to the three lenders that are funded
25       debt holders?

1          THE WITNESS:  It primes the existing lenders to the

2     business.  So you mentioned the collateral on the existing

3     funded debt.

4          THE COURT:  So if, without any finding or even

5     allegation by Mr. Eisenberg's client, but I've also got a lot

6     of people that provided goods and services to the company.  If

7     we were to approve the priming lien today, the collateral, or

8     the security interests or the collateral rights or the

9     statutory rights that the M&M lienholders might have or the

10    contractual rights that Mr. Eisenberg might have would be

11    unaffected by the priming part.  They may be affected by the

12    existence of the debt, by the administrative claim, but not

13    affected by the priming part.  Is that right?

14          THE WITNESS:  That is correct.

15          THE COURT:  Okay.  I don't have any more questions.

16          MR. EISENBERG:  Your Honor, that raised another

17    question for me, if I may?

18          THE COURT:  Sure.  Of course.

19          MR. EISENBERG:  I'll just ask.

20          THE COURT:  No, of course.

21            RECROSS-EXAMINATION OF JOHN-PAUL HANSON

22    BY MR. EISENBERG:

23    Q    So the interim order, Mr. Hanson, does it provide

24    releases?

25    A    No, it does not provide releases.

1   Q   Okay.

2           MR. EISENBERG:  All right.  Well, that's the only

3   question that I had left.

4           THE COURT:  Thank you.

5           All right.  Mr. Perez.

6           MR. PEREZ:  Thank you, Your Honor.  We have nothing

7   further for this witness.

8       (Witness steps down.)

9           MR. PEREZ:  May he be excused?

10          THE COURT:  No, but he could be not testifying for

11  another minute.  I don't know what we might need him for

12  today's first day hearings.

13          Can you stick around, Mr. Hanson?

14          MR. HANSON:  Yes, of course, Your Honor.

15          THE COURT:  Thank you.  And I'm sorry to be rude

16  about that, but we're trying to deal with this sort of in real

17  time.

18          Mr. Perez, as you know, we had reserved time for you

19  on Monday I believe, expecting these hearings then.  I have no

20  problem with what we're doing, but I also had some three

21  o'clock hearings scheduled today.  I don't think they're going

22  to take that long.  So I'm going to go ahead and call my three

23  o'clock hearings, and then I'm going to come back to you all,

24  if you all will just kind of stand by on the phone and on the

25  GoToMeeting, that'd be great.  I need to wait --

1          MR. PEREZ:  Thank you, Your Honor.  We will.  Thank
2     you.
3          THE COURT:  So we're going to take about a one or
4     two minute break.
5          Mr. Laws, if you will press five star and let me
6     know when we can begin the BJ Services --
7          (Recess taken from 3:06 p.m. to 3:18 p.m.)
8                          AFTER RECESS
9          THE COURT:  Mr. Laws, are we ready?
10          THE CLERK:  Yes, Your Honor, we're ready.
11          THE COURT:  All right.  Thank you.
12          Okay.  We're going to go back on the Record on the
13     Fieldwood case, it is 20-33948.  I think this means that your
14     CourtSpeak will now be divvied up into segments, but you'll
15     get two different PDFs that will show that if you want
16     CourtSpeak.
17          All right.  Go ahead, please, Mr. Perez.
18          MR. PEREZ:  Yes, Your Honor.  We have no further
19     testimony.  Obviously we'd like to respond to some of the
20     arguments that Mr. Eisenberg made.
21          THE COURT:  So we're dealing with the DIP motion, is
22     that it, and you're resting you evidence on the DIP motion?
23          MR. PEREZ:  Yes, Your Honor.
24          THE COURT:  All right.  Is there any other party
25     that has any evidence on the DIP motion?  Hold on one second.

1          Mr. Laws, do we have an issue?

2          THE CLERK:  (No audible response.)

3          THE COURT:  I guess not.  Okay.  I'm going to re-

4     mute your line, Mr. Laws.

5          Sorry, everyone.  We're doing all of our recording

6     remotely into the sound system here in the courtroom and it's

7     hard to communicate.

8          All right.  So let me hear argument in favor of the

9     DIP by any party that wishes to make it, the interim DIP, and

10    then arguments against it by any party that wishes to make it.

11         MR. PEREZ:  Yes, Your Honor.  Alfredo Perez on

12    behalf of the Debtors.  Your Honor, I believe that the

13    uncontroverted testimony is that that -- the Debtors have

14    engaged in a process where they went out, they solicited bids,

15    they got the best bid -- they got the best bid available, that

16    they're -- that this is a business that has significant

17    liquidity swings.

18         I think the Court can take notice of oil and gas --

19    the volatility of the oil and gas markets in addition to being

20    completely in the Gulf, and that based on Mr. -- and the

21    uncontroverted testimony, Your Honor, it is clear that having

22    that liquidity, having that DIP available will be needed, that

23    the testimony is that he didn't know whether that DIP would be

24    available and there will be times when it will be needed.

25         Obviously, Your Honor, the fees were negotiated at

1    arm's length.  Obviously we would all like to have had lower

2    fees.  Those were the fees that were available.  And the other

3    alternatives would have resulted in a potential priming fight

4    which would have -- which would have had its own issues, not

5    the least of which is the ability to prevail.

6         Your Honor, I think getting the DIP, having the

7    funding as required both, you know, in order to show some

8    stability but also be able to lock in the lenders as well as

9    the testimony.  It is important for this Debtor and I think

10   that that's one of the three stools -- the three legs of this

11   stool that allow us to go forward with Apache, Apache

12   (indiscernible).

13        And, Your Honor, I was reminded during the break

14   that I mis-spoke during my opening.  The deep water assets

15   were purchased by Noble -- from Noble and I think I may have

16   mentioned Apache and I apologize for that.

17        But, Your Honor, I think in connection with the

18   interim DIP, which is what we're here to address, I think the

19   uncontroverted testimony is, is that this is the best DIP

20   available, that from a business standpoint is something that

21   the company needs, and although the cost is relatively high,

22   it's the best available at the time.

23        THE COURT:  Thank you, Mr. Perez.

24        Ms. Tsiouris.

25        MS. TSIOURIS:  Thank you, Your Honor.  So I just

1   want to echo Mr. Perez's comments and to say, no, first the

2   DIP was part of the borrower commitment by the Ad Hoc Group to

3   support the restructure and negotiation process that is still

4   very much ongoing.  They subbed in, despite of, you know,

5   $100 million commitment not knowing what the treatment will be

6   for the DIP commitment, what will be upon the DIP loan, what

7   will be the treatment further (glitch in the audio) LPL loan.

8          Second, I just want to highlight that this DIP does

9   not provide any extra benefit for that offered first lien term

10  loan position.  And just to clarify when Mr. Eisenberg was

11  talking to Mr. Hanson about a roll up, this -- and so maybe

12  but not contemplate a whole lot now, it does not contemplate a

13  whole lot more.  I want to be very clear about that.

14         The adequate protection package that the first day

15  term loaners are getting here are very professional.  We've

16  also agree not to seek ongoing strip payments in connection

17  with their -- with the DIP package.  And it goes into all

18  first lien term lenders, and they have a very active

19  (indiscernible).  They have till August 14 to finance.  And so

20  that it, you know, incurred benefits -- it does not benefit

21  the first lien term lenders that are providing extra benefits

22  (glitch in the audio).

23         And we, you know, certainly aren't looking for any

24  affirmative relief at the first day hearings.  You know, what

25  we are asking for is the interim draw be made within 15 days

1    as we go forward, and part of that is the funds that happen

2    relative to (glitch in the audio) do have internal

3    restrictions which, as you heard from Mr. Hanson, do not allow

4    them to make open-ended commitments, so this was a necessary

5    aspect of the deal.

6           We do think that, you know, it is important for this

7    company for us and the parties that were committed (glitch in

8    the audio) to the ongoing restructuring of this company that

9    if it bears the market that we are (indiscernible) company,

10   that the company has adequate funding for the rest of each

11   (glitch in the audio) to actually effectuate an (glitch in the

12   audio) restructuring.  If we waited until later to provide

13   this funding, it would be uncertain what the funding terms

14   would be at that point, and whether or not the funding would

15   be available at that point.

16          And so given all of that and, you know, the lender

17   group is step up, and have stepped up and have done it in a

18   way that -- in a way that (glitch in the audio).

19          THE COURT:  Thank you, Ms. Tsiouris.

20          Mr. Eisenberg.

21          MS. TSIOURIS:  Thank you.

22          MR. EISENBERG:  Yes, Your Honor.  May I be heard?

23          THE COURT:   Yes, sir.

24          MR. EISENBERG:  Thank you, Your Honor.  You know,

25   the timing of this is very quick.  The economics of it are

1    very tight right now, $10 million for $7-plus million in fees,

2    the need for it is uncertain, the -- whether they would ever

3    get to not be able to have a DIP, the evidence is -- doesn't

4    go one way or the other.  It did take several months to get to

5    where we are now, according to testimony.

6         And so -- and -- but, you know, with the testimony

7    that they're not cutting off rights, they're not giving any

8    releases, they're not blowing this up, I'm not contesting

9    whether or not they solicited properly or that this was the

10   best bid.  The question is whether they actually need it right

11   now.

12        And so if Your Honor believes that they need it

13   right now on the Record that's there, I don't know that that

14   supports it, and -- but, Your Honor, I would like an

15   opportunity to walk through the interim order offline and talk

16   with various counsel about the particular provisions in it

17   based upon the testimony and assure myself of the things that

18   have been represented in court, just to mention the (glitch in

19   the audio).  And that's what I have right now on two hours

20   notice, Your Honor.

21        THE COURT:  Mr. Eisenberg, thank you for such an

22   adult approach about what I probably am faced with right now.

23        We have jurisdiction over this under 28 USC Section

24   1334.  This is a core matter under 28 USC Section 157.  I'm

25   going to announce a preliminary ruling, and I don't want to

1      hear people argue to me against this ruling.

2           Based on the evidence before me I think that taking

3      out this loan is necessary for the effective reorganization of

4      the Debtor and I'm going to approve it, but I'm approving it

5      with I think some changes that aren't going to do any injury

6      to the important goal that's trying to be accomplished.  Based

7      on the affidavits of Mr. Dane and Mr. Hanson, as well as the

8      oral testimony, approving a $100 million post-petition loan in

9      today's environment adds such vitality to the case and to the

10     likelihood of success of the case it should be approved.

11          This is a terribly unstable time.  The availability

12     of new capital in this marketplace in the oil and gas industry

13     is sparse.  I have either had the good or the bad fortune

14     probably, certainly if you combine my experience with Judge

15     Jones's experience to see more very large post-COVID loans

16     than I think anyone else in the world.  Maybe second to Jones,

17     that's why I'm saying if you combine me with Jones, clearly we

18     have.

19          This is the first post-COVID loan where I've seen

20     competitive bidding for it, and it gives me a lot of comfort,

21     and the end place where this loan ended up I think is just

22     fine.  It is expensive from a fee point of view but it's

23     expensive from a fee point of view in an almost non-existent

24     market which makes it a bargain from a fee point of view if

25     you look at it the other way.  It's not available at any

1       cheaper price.

2               I want to add three restrictions to the loan and to

3       the documents, and I think these are consistent with the

4       testimony, but I want you all to argue against it if I'm

5       wrong.  First, I want there to be a provision that deals with

6       the M&M lienholders and that deals with other statutory rights

7       holders and that deals with the rights of contract holders who

8       aren't in the funded loan stack.  And I want a provision in

9       the interim order that whatever their

10      collateral/lien/statutory rights are are not affected at the

11      interim stage.  I think the deal may be they're not even going

12      to be affected at the final, but at least for interim I want

13      that to be quite clear.

14              It goes hand-in-hand with the second one, which is

15      want it very clear that what we are granting liens on are the

16      same assets that the capital stack has.  So those are

17      basically two provisions to accomplish the same thing on an

18      emergency basis.

19              The third thing is, I want to sign the order right

20      away.  Most orders signed by Bankruptcy Courts have a built-in

21      14-day stay, but most DIP orders have no stay at all.  I want

22      the order effective on entry, but I want the first -- I want

23      it to be stayed as to when the first draw can be made and when

24      the fees can be made until 10:00 a.m. on August 11.  That

25      would give Mr. Eisenberg, as well as other parties, more of an

1    opportunity to review it, and I don't really see anything in

2    the testimony that says the cash is needed before then.  As I

3    understand Mr. Hanson's testimony, the first draw has to occur

4    within 15 days, they'll have the first draw within 7 or 8

5    days, so I think it meets what he told me.

6         And essentially I'm doing this -- this was a deal

7    getting put together more at the last minute than most first

8    day things.  I think one couldn't really get access to the

9    information till about noon.  And given what the testimony is,

10   and I think no need for an immediate draw, but there is a need

11   to have $100 million loan approved, that that type of a stay

12   only -- so people can only ahead and document it, you go ahead

13   and get all your collateral documents filed, you can do all of

14   that.  But to not pay the fees or make the first draw till

15   10:00 a.m. on August 11 seems to be a protected device without

16   much of a cost.

17        So with those three restrictions I think I should

18   approve it, and I wanted to hear arguments against those, or

19   in favor of those restrictions given where we are today.

20        MR. PEREZ:  Your Honor, Alfredo Perez.  I just want

21   to ask a clarifying question.  With respect to your second

22   point -- I understand your first point and the color -- well,

23   whatever of the second point, but there -- to the extent that

24   there are any unencumbered assets obviously the DIP would have

25   a lien over them, on any unencumbered asset.  So I don't think

1    that's what the Court intended.

2              THE COURT:  It is not, and that's fine.

3              MR. PEREZ:  Correct.  Okay.  So that in essence

4    there would be -- to the extent anyone has a prior lien or is

5    entitled -- or that has a prior lien that isn't in the capital

6    stack, they're not being primed.  That's number one.  Number

7    two, with respect to other assets that are potentially

8    unencumbered, they would have a lien on that.

9              And then, Your Honor, as a practical matter, Your

10   Honor, I don't think that this would have funded before the

11   11th, and so the only hesitation that I have with actually the

12   Court imposing a stay is what that does to the -- you know,

13   part of the reason we did this is because some of the funds

14   that are doing this can't have unfunded commitments.  And as a

15   practical matter we knew that they wouldn't be able to fund

16   and that's why there's a 15-day repeal, that we have up to

17   15 days to fund.

18             So the 11th is certainly within the 15 days.  The

19   only concern I have, and I want to consult with counsel for

20   the banks, Ms. Tsiouris, to make sure that that doesn't create

21   an unintended consequence.  As a practical matter, I don't

22   think we were going to fund in any event before the 11th.

23             THE COURT:  Yes, I was trying to fit into that and

24   respect Mr. Eisenberg's argument simultaneously.  It was not

25   my intent to in any way impair the ability of that 100 million

1     to come in.

2          So, Ms. Tsiouris, does that delayed ability to

3     actually pay the fees and draw the money for a week hurt

4     anything?

5          MS. TSIOURIS:  (No audible response.)

6          THE COURT:  You need to un-mute your own line,

7     Ms. Tsiouris.

8          MS. TSIOURIS:  (No audible response.)

9          THE COURT:  Oh, well, let me see.  I apologize, I

10    don't know how that happened, but your line is now active

11    again.  Go ahead.

12         MS. TSIOURIS:  So I think what happened, my line

13    dropped and so I missed two and three.  But I apologize, I

14    can't find -- I didn't hear it.

15         THE COURT:  So here's the issue, what number one

16    was, number one and number two were basically the same thing,

17    saying I wanted to be certain that the priming didn't affect

18    the M&M and the statutory rights holders, and therefore I

19    wanted it clear not only that it didn't affect them, but here

20    is what is primed as the capital stack.  And then Mr. Perez

21    has gotten clarity that in addition of course you can have a

22    lien on unencumbered collateral.  I was only really worried

23    about the priming side.

24         But the third point was I wanted to go ahead and get

25    the deal documented, people can sign things, you can record

1    things, you can have all of your agreements in place, but the

2    actual first draw as well as the actual payment of the fees

3    can't occur until on or after 10:00 a.m. on August 11, which

4    is a week from today.  And I think Mr. Perez's concern is that

5    he knows that certain of your clients can't reserve funds that

6    are unfunded and wanted to be sure that that wasn't going to

7    get in the way of what your needs were.  He also said from a

8    practical point of view is isn't going to get drawn before

9    then.

10         MS. TSIOURIS:  Yeah, I think people understood

11   there's always some, you know, some -- a little bit of some

12   tiny issue with -- you know, in terms of the draw on funding

13   and actual funding.  So I just don't know what, you know, what

14   the actual -- when it hits the point where it's too much.  So

15   I can get back to my clients and confer with them, but that

16   amount of time that they're saying, it will get exercised.

17         THE COURT:  Okay.  Look, if there's a problem, would

18   you all -- if you all submit an order without another hearing,

19   I want it to have those things in it.  It's not my goal to get

20   in the way of the deal.  If there's a problem, would you all

21   request an emergency hearing?

22         Mr. Eisenberg, I think that resolves some of your

23   bigger concerns.  It may not resolve every concern, and I want

24   to be sure that I have done that.

25         MR. EISENBERG:  Well, it gives me an opportunity to

1    have the provision that we want, Your Honor, and to also

2    review the order prior to its entry to make sure it's

3    consistent with the testimony.  So we do appreciate the

4    Court's consideration today.

5         THE COURT:  All right.  Thank you.  So that'll be

6    the ruling.  I'm now going to transfer that from a preliminary

7    ruling to a final ruling.  It is subject of course to an

8    emergency motion if what I've done has impaired the ability to

9    draw the money.  Not my intent.

10        Where do you all want to go?  Mr. Barr, I'm going to

11   reactivate your line, it looks like you had to reconnect as

12   well.

13        MR. BARR:  Thank you, Judge.  I think we're going to

14   turn it over now to Mr. Carlson who's going to complete the

15   agenda.

16        THE COURT:  So, Mr. Carlson, and I'm sorry to put

17   you on the spot on this, but I'm going to, there was very

18   short notice.  What I would like to do is only what we need to

19   do today, not what's convenient to do today.  So if you'll

20   take a minute --  and if you need to take a minute and talk to

21   Mr. Dane or whenever, that's fine, but, and it may be that

22   everything on the agenda has to be done today, and that's

23   okay.

24        But I want to limit what we're doing to what really

25   has to be done today, and then I will bring you back quickly

1    for the rest.  And I can even look and see if I can do that

2    tomorrow.

3         (Pause in the proceedings.)

4              THE COURT:  Yeah, anything that we don't get done,

5    that you can put off till tomorrow, I will bring you back

6    tomorrow morning at eight o'clock in the morning.  So I want

7    to limit to what we need to do today.  But again, the couple

8    of hours is awfully short.

9              Mr. Carlson, I'm not hearing you, so let me --

10         (Pause in the proceedings.)

11              THE COURT:  All right.  From 713-546-5428, is that

12   you, Mr. Carlson?

13              MR. CARLSON:  Yes, it is.  Good afternoon, Your

14   Honor.

15              THE COURT:  Good afternoon, Mr. Carlson.

16              MR. CARLSON:  So, Your Honor, (glitch in the audio)

17   to do today (glitch in the audio) are insurance and our

18   motion.  I just want to make sure I understand what the Court

19   is asking.  (Glitch in the audio) we don't have (glitch in the

20   audio) is that -- is that --

21              THE COURT:  I'm having trouble with your --

22              MR. CARLSON:   -- if you --

23              THE COURT:   -- we're having trouble with your

24   phone, Mr. Carlson.

25              MR. BARR:  Your Honor, if you could hear me, it's

1   Mr. Barr.  I saw that (glitch in the audio) here now, so if

2   you can hear me, I'm happy to go through, subject to Mr. Dane

3   getting certified and Mr. Lannie getting certified to run the

4   company, telling us that there are things that they actually

5   need.

6          I would suggest that what we would need besides the

7   DIP which you just approved, and thank you very much, would be

8   cash management, which would be employee wages, Your Honor,

9   and would be the NOL motion.  Those three are probably, in

10  looking through the list, the most important to get today,

11  with the understanding that we're back on front of you very

12  early tomorrow morning.

13         THE COURT:  Let me start with Mr. Carlson to see if

14  you want to overrule Mr. Barr.  Your job is now --

15         MR. CARLSON:  (Glitch in the audio) --

16         THE COURT:   -- your job --

17         MR. BARR:  And it's totally okay.  No, it's not,

18  it's totally okay if he overrules me.

19         MR. CARLSON:  And he knows me better than that,

20  Judge.  So do you, but it's okay.

21         THE COURT:  Yeah.  Mr. Carlson, if you -- seriously,

22  if you need to overrule him, go ahead.

23         MR. CARLSON:  I think Mr. Barr hit the ones that we

24  need today (glitch in the audio) in my mind.

25         THE COURT:  Mr. Dane, do you want to overrule your

1          lawyer on this and tell me there's more important because --

2          go ahead, let me get your line activated.  Mr. Dane, would you

3          press five star for me.  All right.  Mr. Dane, good afternoon.

4          I know we haven't met before, and unfortunately welcome to

5          Bankruptcy Court.

6                    MR. DANE:  Thank you, Your Honor.  I would agree

7          with what Mr. Barr said also.

8                    THE COURT:  All right.  Thank you.  All right.  Then

9          let's do those.

10                   Go ahead, Mr. Carlson.

11                   MR. CARLSON:  Sure, Your Honor.  And I'll actually

12         turn to the podium over to Moshe Fink, who's going to be

13         handling the wages.  I was prepared for motions that are not

14         essential for today.

15              (Laughter.)

16                   THE COURT:  All right.  If you would press five star

17         on your phone whoever's going to be handling these.

18              (Pause in the proceedings.)

19                   THE COURT:  All right.  Who do we have?

20                   MR. FINK:  Good afternoon, Your Honor.  It's Moshe

21         Fink from Weil Gotshal & Manges, proposed counsel for the

22         Debtors.

23                   THE COURT:  Good afternoon.  I can't see you, are

24         you on GoToMeeting?

25                   MR. FINK:  So, Your Honor, I go -- on the screen

1      that I'm on I don't have the video capability, so I'm on

2      GoToMeeting but I am on the phone line as well too.

3                 THE COURT:  Okay.  That's fine.  I'm just going to

4      tell Mr. Perez to spring for a camera for him for next time.

5                 MR. FINK:  Thank you, Your Honor.

6                 THE COURT:  All right.

7                 MR. PEREZ:  I'll write a memo, Your Honor, I'll

8      write a memo.

9                 THE COURT:  Thank you.  Go ahead, please.

10                MR. FINK:  We'll find one tomorrow, no problem.

11                THE COURT:  Go ahead, please.

12                MR. FINK:  Thank you, Your Honor.  So we're going to

13     start with cash management or with wages --

14                THE COURT:  Wherever you want --

15                MR. FINK:   -- or --

16                THE COURT:   -- wherever you choose to go.

17                MR. FINK:  So, sure, Your Honor, I'll start with

18     cash management if that's okay, if it pleases the Court.  The

19     next item on the agenda would be Item Number 5, which is the

20     Debtors' cash management motion, document number six.  By the

21     motion the Debtors request authority to maintain their cash

22     management system, bank accounts, pre-petition bank fees,

23     continuing business (glitch in the audio) in the ordinary

24     course, continue to do intercompany transactions in the

25     ordinary course and continue to retain corporate credit cards.

1          Your Honor, it's got more clearly in the motion and

2     diagram annex to a motion.  The Debtors have a relatively

3     straightforward cash management system.  It's tailored to

4     their business needs and consists of six bank accounts, Your

5     Honor.  I would just point Your Honor just to flag that

6     pursuant to conversations with the US Trustee the Debtors are

7     asking for 45-day extension of the time period to come into

8     compliance with Section 345(b) of the Bankruptcy Code.  But

9     that US Bank, which is the bank where a lot of the bank's cash

10    management system is not an authorized counterparty.  So we

11    have requested that relief.

12          I'm happy to walk Your Honor through some more

13    detail about the motion, but if Your Honor has any other

14    questions, then I'm happy to respectfully request that the

15    motion be granted.

16          THE COURT:  All right.  First, let me hear any

17    objection to the cash management motion.

18         (No audible response.)

19          THE COURT:  If anyone has an objection, if you would

20    please press five star on your phone.

21         (No audible response.)

22          THE COURT:  All right.  Mr. Statham, are you able to

23    hear me all right?

24          MR. STATHAM:  (No audible response.)

25          THE COURT:  Hold on.  Mr. Duran, I'm going to get

1      your line activated, I see you there.

2           (Pause in the proceedings.)

3               THE COURT:  Mr. Duran -- I don't know what happened,

4      Mr. Duran.  I'm going to get it active.  There's something

5      wrong on the system again.

6           (Pause in the proceedings.)

7               THE COURT:  All right.  Mr. Duran, I apologize for

8      the delay in getting you connected, but I think we should be

9      able to hear you now.

10              MR. DURAN:  Hector Duran for the US Trustee.

11              THE COURT:  Mr. Duran --

12              MR. DURAN:  Can you hear me, Your Honor?

13              THE COURT:  I can.  Mr. Duran, thank you for taking

14     the time to appear today.  I know it's a tough day and you

15     certainly have our condolences.

16              MR. DURAN:  Thank you very much for those words,

17     Your Honor.

18              THE COURT:  Mr. Duran --

19              MR. DURAN:  The first --

20              THE COURT:  Go ahead.

21              MR. DURAN:   --  as far as the cash management

22     motion is concerned, the Debtors incorporated all our comments

23     and we're fine with the proposed order.

24              THE COURT:  Thank you, Mr. Duran.

25              When do you want finals, Mr. Carlson, since you were

1    probably going to be in charge of picking that, when do you

2    want your final hearing?

3            MR. FINK:  Subject to the availability of

4    Mr. Hanson, I would think the week of the 24th through the

5    28th.

6            THE COURT:  All right.  Would you like to do it on

7    the 24th at 1:30 in the afternoon?

8            MR. FINK:  That works from my perspective, I just

9    want to make sure that it works for you, Mr. Dane, Mr. Hanson.

10           THE COURT:  Anyone have any --

11           UNIDENTIFIED SPEAKER:  It does, Your Honor.

12           THE COURT:   -- objection to finals on the 24th at

13   1:30?

14       (No audible response.)

15           THE COURT:  All right.  Let me get that done right

16   now and --

17       (Pause in the proceedings.)

18           THE COURT:  All right.  I've signed the cash

19   management motion.  Let me get that sent to docketing.  It has

20   gone to docketing.  Tell me where you want to go next.

21           MR. FINK:  Thank you, Your Honor.  Absolutely.

22   Wages next if that's okay?

23           THE COURT:  All right.  Go ahead, please.

24           MR. FINK:  So, Your Honor, the wages motion, Item

25   Number 7 on the agenda, ties to Docket Number 13.  Pursuant to

1    that motion the Debtors seek authority to pay pre-obligations,

2    related fees, costs and expenses, and maintain and continue to

3    honor and pay amounts with respect to the Debtors' pre-

4    petition business practice, purpose and policy to employees

5    that were very close to the business.

6         As discussed in the motion, Your Honor, the Debtors'

7    employees, approximately 635 FTEs consisting of both offshore

8    employees and office employees.  And, Your Honor, to keep it

9    short, the employees the backbone of the company, that in the

10   ordinary course of business the Debtors maintain the customary

11   employee programs that Your Honor would expect to see in a

12   motion like this, including health and welfare assets,

13   retirement benefits and employee savings plans.

14        The Debtors seek to pay approximately 9.65 million

15   in total estimated obligations, the vast majority of which

16   consists of compensation obligations and benefits obligations.

17        Your Honor, just to give you one update that's

18   occurring in real time is we need to close out one of the

19   final comments of the US Trustee.  The US Trustee has

20   requested to add to the order that for the Debtors to be

21   getting payment after the 25,000 an individual pursuant to any

22   bonus program or severance program, the Debtors will provide

23   five-days advance notice to the Trustee and the Committee.

24   And we'll put various information about the claimant -- about

25   such payment (glitch in the audio).  So, Your Honor, that's

1      occurring in real time and the Debtors will --  we will submit

2      an order with that, a revised order reflecting that change

3      that we negotiated in the last few moments.

4             THE COURT:  So if I could do this, given how

5      important it is to get the employees comfortable and paid, let

6      me be sure I don't have any objection to any of this.  Other

7      than one provision requested by the US Trustee is there any

8      party that has any objection to the employee wages motion?

9          (No audible response.)

10            THE COURT:  All right.  Based on sort of the obvious

11     sense of this --

12            MR. DURAN:  Your Honor --

13            THE COURT:  Yes, sir.

14            MR. DURAN:   -- Hector Duran for the US Trustee.  I

15     note that Paragraph 2 also not only includes the employee

16     bonus programs and the employee severance obligations, it also

17     includes a KERP.  I would want to be notified in connection

18     with the KERP as well.

19            THE COURT:  All right.  Let's do this then, if

20     that's going to -- if there are no other objections I'm going

21     to approve it.  And if I could impose on you, Mr. Duran, I am

22     going to type in the changes myself, if you will dictate them

23     to me, and we'll just get them done.

24            MR. DURAN:  All right, then.

25            THE COURT:  Let me get this active.

1          (Pause in the proceedings.)

2               THE COURT:  Go ahead.  Can you see that on the

3     screen?

4               MR. DURAN:  I can, Your Honor.

5               MR. FINK:  I can as well, Your Honor.

6               THE COURT:  Good.  So, Mr. Duran, you want to

7     dictate to me.

8               MR. DURAN:  Before making any payments in excess of

9     25,000 to any individuals pursuant to the employee bonus

10    program, KERP or the severance program the Debtors shall

11    provide five-days advance notice --

12              THE COURT:  Are those business or calendar days?

13              MR. DURAN:   -- calendar -- to the US Trustee and

14    any statutory committee, A, entitled to claimant --

15              THE COURT:  I just missed a word you said.  To any

16    statutory committee, and then go ahead.

17              MR. DURAN:  And then A will be the entitled to

18    claimant, B the amount of the proposed payment to such

19    claimant, and C, proposed payment date.

20              THE COURT:  All right.  Does that work for the

21    Debtor?

22              MR. FINK:  Your Honor, I think just one minor ting.

23    I believe the employee bonus program and severance program are

24    defined terms in the motion.  If we could capitalize the

25    employee bonus program and the severance program.

1          (Pause in the proceedings.)

2                THE COURT:  Does that work?

3                MR. DURAN:  That works.  Thank you, Your Honor.

4                MR. FINK:  Yes, Your Honor, for me I would just

5     check with Mr. Perez just to make sure that he's also -- he's

6     also in agreement.

7                THE COURT:  Mr. Perez doesn't get to participate in

8     this, he turned this hearing over to you and you're going to

9     do it on your own, sorry.

10                MR. FINK:  I have to treat him nicely so he finds me

11     a video camera, so, you know, I've got to --

12                THE COURT:  Yeah.  I don't.  Yeah.

13          (Laughter.)

14                THE COURT:  All right.  I've signed the wages order.

15     Thank you.  Thank you all for getting this done.

16                MR. FINK:  Thank you, Your Honor.

17                THE COURT:  I do think it's just essential that we

18     do as much as we can to keep the employees knowing that in a

19     second bankruptcy case they're still stable.  I've signed that

20     order.

21                What do you want to take up next?

22                MR. BARR:  Thank you, Your Honor.

23                Sorry, Moshe.

24                So it's Matt Barr.  I think the only one today, just

25     given the importance of it also would be the NOL motion, the

1    net operating losses motion which are (glitch in the audio).

2         (Pause in the proceedings.)

3              THE COURT:  All right.  Who do we have from

4    917-806-5259?

5              MS. LIOU:  That's correct.  Good afternoon, Your

6    Honor.  Jessica Liou from Weil Gotshal & Manges, co-counsel

7    for the Debtors.

8              THE COURT:  Tell me your last name again, please.

9              MS. LIOU:  It's Liou, L-I-O-U.

10             THE COURT:  Thank you, Ms. Liou.  And, Ms. Liou, no

11   camera for you either?  The Weil Gotshal firm is not springing

12   for that, huh?

13             MS. LIOU:  No, not today, but next time I'll be more

14   prepared to appear.

15             THE COURT:  All right.  So, Mr. Dane, be sure these

16   cameras don't hit your bill.

17             Go ahead, please, Ms. Liou.

18             MS. LIOU:  All right.  Your Honor, the last item on

19   the agenda for today is Item Number 10.  That was the motion

20   filed at Docket Number 8, that is the Debtor's emergency

21   motion.  Quickly going through this motion, the Debtors are

22   seeking to protect the potential value of their time

23   attributes, including net operating losses that have been

24   carried forward and other tax reasons.

25             Just going through the motion, the Debtors have in

1      excess of $ $170 million in estimated federal NOLs, and $460

2      million of estimated business expense carried forward.  These

3      are valuable assets of the estates, and if a change were to

4      occur, or one goes back to production and claim without the

5      (indiscernible) monitoring these valuable assets could be

6      (glitch in the audio).

7            The motion seeks to put in place certain

8      (indiscernible) procedures that provide the Debtors an

9      opportunity to monitor the trading in the Debtor's common

10     stock and also a stockholder's (indiscernible) election to

11     claim the production.  And the features are very plan vanilla,

12     something you would see in over 90 percent of the cases with

13     large Debtors where they keep the release.

14            Parties seeking to (indiscernible), the insurance

15     for a claimed deduction will be required to provide 20

16     business days' notice to the Debtors.  And the Debtors would

17     have 15 business days to object or decide that given the

18     insurance of the Debtors to consent to such a trade or a

19     claiming of a regular stock reduction.

20            If, however, the Debtors choose to retract and

21     there's ability for the parties to go before the Court and

22     have the matter heard before the Court.  A substantial stock

23     holder subject and one of the provisions is any stock holder

24     that would -- that currently holds 4.75 percent (glitch in the

25     audio) would end up owning 4.75 percent of the stock.  A

1      majority stock holder subject to the notice provisions related

2      to (indiscernible) stock deductions would be any stock holder

3      that holds 47.5 percent or more.

4              We did receive some minor comments from the US

5      Trustee's office, which we've put into the proposed interim

6      order.  (Glitch in the audio) comments we have taken and just

7      to highlight for Your Honor, the two changes relate to

8      Paragraph 2 in the interim order.  We added a sentence at the

9      end of the paragraph that clarify that any party-in-interest

10     may request emergency relief from procedure.  And that is

11     common, but we've incorporated the change to Paragraph 6 about

12     the third line down.  We clarified that the interim order

13     would be provided to not only registered holders, but also

14     non-holders of common stock.

15             And with that we believe that any (glitch in the

16     audio) protecting these regarding the value of the Debtors'

17     estates, and  (glitch in the audio) and all the reasons

18     discussed we would ask that the Court approve this motion.

19             THE COURT:  So, Ms. Liou, it's one thing to ask me

20     to restrict people from buying something that they don't have

21     a property interest in, it's another to ask me to restrict

22     people from selling something that they do have a property

23     interest in.  So with respect to notice, due process notice,

24     can you tell me which shareholders you have, how many do you

25     have, that are at 4.75 percent or greater who would be

1     affected by this order?

2              MS. LIOU:  Your Honor, we believe we have roughly

3     three shareholders that would be impacted, and all three of

4     them we can easily get the notice to, they actually -- they

5     are current board members of the company.

6              THE COURT:  So if there's --

7              MS. LIOU:  (Glitch in the audio).

8              THE COURT:  -- if they are all three current board

9     members, did they approve the filing of this motion as the

10    board?

11             MS. LIOU:  Yes, they did.

12             THE COURT:  Yeah, then I think that's pretty good

13    notice to them.  So that was my worry --

14             MS. LIOU:  Yes.

15             THE COURT:  -- was due process notice.  Okay.

16             Let me ask if there's anyone that objects to this

17    relief.

18          (No audible response.)

19             THE COURT:  All right.  Given that the people who

20    are affected by this have authorized the filing of this as

21    members of the Board of Directors, I think due process is, in

22    fact, satisfied and I have no concerns doing this on the first

23    day.  Due process matters if you're going to affect somebody's

24    property rights.

25             In terms of restricting people from buying interest

1    in a company in bankruptcy, I really don't have much

2    hesitation about notice, I just want to be sure that the

3    notices are all going to be put up.  And I assume this will

4    hit -- will you all be doing an 8K so that people will know

5    about it?

6          MS. LIOU:  Yes, the company  (glitch in the audio),

7    so I don't believe an 8K is necessary.  But, Your Honor, I

8    actually do want to clarify for the Record that we're not

9    restricting people from taking any action, we're just

10   requiring they provide notice to us for these procedures.  And

11   to the extent that the Debtors don't consent, there could

12   later be a restriction for  (glitch in the audio) or a court

13   order issued by you  (glitch in the audio).

14         THE COURT:  No, I think you are restricting people

15   from doing something.  If you tell somebody you can't sell

16   your stock for 20 days, I mean unless you're going to

17   guarantee to them that you're going to honor any losses they

18   have, then you're potentially hurting those people and they

19   have a right to notice.  But --

20         MS. LIOU:  That's true, Your Honor.

21         THE COURT:   -- I want to be sure you get notice out

22   to anybody that's going to be selling it so that they are

23   obliged to tell their buyers what's happening.  So how are you

24   going to give notice -- you're right, you're not public so

25   this isn't going to be a normal 8K, how are people going to

1     know --

2              MS. LIOU:  Right.  So on that --

3              THE COURT:   -- that they can't buy the stock?

4              MS. LIOU:  Right.  So, Your Honor, in Paragraph 6 we

5     do provide not only for our whole service with instructions

6     that go down to the beneficial holders of common stock.  There

7     are also publications.

8              THE COURT:  All right.

9          (Pause in the proceedings.)

10             THE COURT:  All right.  I'm going to continue the

11    balances.  I understand that from the Debtors' point of view

12    we're okay doing this.  I'm continuing the balance of the

13    matters till 8:00 a.m. in the morning to allow parties-in-

14    interest to organize any opposition that they might have to

15    the requested relief.  That will put us in sort of a normal

16    frame of first day motions.

17             Mr. Perez, you apologized to me at the beginning of

18    the hearing for the shortened notice.  And that is necessary.

19    I mean you were working hard and you have a complicate, very

20    complicated deal you were putting together.  As I told you at

21    the beginning of the hearing, I read this stuff and I know I

22    didn't absorb it all just going through the first read.  It's

23    hard.  And so I had problem that things are happening at the

24    last minute.  I just want to protect people's rights to come

25    in and objection to it.  So I'm glad that you all can wait

1    till 8:00 in the morning to finish the rest of the things.

2           I hope, Mr. Barr, the technology issues didn't

3    terribly interfere with your ability to participate, but

4    storms happen and so we just all have to deal with it.

5           Mr. Dane --

6           MR. DANE:  Yes, sir.

7           THE COURT:  -- do you have anything you need to add

8    or comment on, do you have any questions about what we're

9    doing or why things were occurring today as they were?

10          MR. DANE:  (No audible response.)

11          THE COURT:  I think your line remains open,

12   Mr. Dane.

13          MR. DANE:  Thank you, Your Honor.  I don't, I just

14   wanted to thank everyone very much for their time today.

15   Things have been very challenging period (glitch in the audio)

16   and our employees are supposed to be dealing with the

17   (indiscernible) and professionals, and if we had stakeholders.

18   I particularly want to express our appreciation to the folks

19   at Apache, and I want to echo Ms. Russell's comments about the

20   talent over there and the dialogue in which we were able to

21   engage.

22          And then just lastly, Your Honor, if I could have

23   one more moment, I just wanted to send a quick message to our

24   employees at Fieldwood.

25          THE COURT:  Go right ahead.

1           MR. DANE:  Thank you.  So we're fortunate that we

2    had some time this morning to hold a town hall with our

3    employees and explain our structuring.  I think Mr. Fink did

4    an excellent job of describing the employees as life blood of

5    the company, because we do have a group of talented employees

6    that are hard working and dedicated at Fieldwood.

7           My main message that I want to reiterate here for

8    Your Honor, for our team, is first and foremost we stress that

9    it's absolutely critical that we continue to focus on safe

10   operations and what we like to call flawless execution.  We

11   have a very challenging business.   These needs are absolutely

12   remain paramount in the eyes of all of our employees and we

13   really ask that -- we didn't want this process to distract

14   from keeping ourselves as safe as possible.

15          Secondly, we talked about the fact that a couple of

16   our main objectives during our restructuring is to, one,

17   preserve jobs, and also have entities that would be able to

18   continue as a going concern, even if some of those entities

19   look different than Fieldwood today.

20          And as Your Honor mentioned, this is obviously a

21   very complex case, it has a number of uncertainties, but it

22   was recommended as the executive leadership team to making a

23   very active and open and transparent dialogue with our

24   employees.  So I wanted to thank Your Honor again for time

25   today, and I want to remind our employees one more time to

1    continue being as safe as possible in everything that they do.

2         THE COURT:  Mr. Dane, what a great comment.  Thank

3    you.

4         All right.  I'm going to go ahead and adjourn the

5    Fieldwood hearings till 8:00 o'clock in the morning.  And

6    we're going to start our 4:00 o'clock hearings.  If you all

7    would, you can just hang up because I'm going to leave all the

8    technology connected up for the 4:00 o'clock hearings.

9         Thank you.

10        MR. PEREZ:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        MR. BARR:  Thank you.

13     (Hearing adjourned at 4:09 p.m.)

14                    *  *  *  *  *

15        *I certify that the foregoing is a correct transcript*

16    *to the best of my ability due to the condition of the*

17    *electronic sound recording of the telephonic proceedings in*

18    *the above-entitled matter.*

19     */S./  MARY D. HENRY*

20    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

21    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

22    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

23    *JTT TRANSCRIPT #62465*

24    *DATE FILED:  AUGUST 6, 2020*

25