**Exhibit A**

**Hedging Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| FIELDWOOD ENERGY LLC, *et al.*, | § § | Case No. 20-33948 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

**DECLARATION OF MICHAEL DANE IN SUPPORT OF EMERGENCY
MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING DEBTORS
TO (A) ENTER INTO AND PERFORM UNDER NEW POSPETITION
HEDING AGREEMENTS, AND (B) GRANT RELATED LIENS
AND SUPERPRIORITY CLAIMS, (II) MODIFYING AUTOMATIC
STAY, AND (III) GRANTING RELATED RELIEF**

I, Michael T. Dane, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am Senior Vice President and Chief Financial Officer of Fieldwood Energy LLC ("**Fieldwood Energy**"), a wholly-owned direct subsidiary of Fieldwood Energy Inc. ("**Parent**"). I have served as Senior Vice President and Chief Financial Officer since March 9, 2016. Prior to my appointment to my current role, I was Vice President of Finance for Fieldwood Energy. Before that, I was Manager of Finance and Planning at Dynamic Offshore Resources, LLC and an equity research analyst at SunTrust Robinson Humphrey with a focus on the exploration and production sector. I hold a Bachelor of Commerce degree from McGill University.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

2. Commencing on August 3, 2020 (the "**Petition Date**"), Parent and certain of its domestic subsidiaries (collectively, the "**Debtors**" and, together with their non-debtor affiliates, the "**Company**") filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable about and familiar with the Company's businesses and financial affairs. I submit this declaration (the "**Declaration**") on behalf of the Debtors in support of the relief requested in *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Enter into and Perform Under New Postpetition Hedging Agreements, and (B) Grant Related Liens and Superpriority Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* (the "**Hedging Motion**").[2]

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial condition, or my discussions with the Company's advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### Debtors' Need for Hedging Activities

4. As is customary in the Debtors' industry, in the ordinary course of business, the Debtors have historically entered into financial derivative contracts primarily to hedge the Debtors' exposure to commodity price risks to their cash flows (collectively, the "**Customary Hedging Agreements**" and the activities related thereto, the "**Hedging Activities**") with creditworthy third parties pursuant to the Hedge Practices (as defined below). The Hedging

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Hedging Motion.

Activities operate to reduce the Debtors' exposure to commodity price fluctuations and provide the Debtors with long-term cash flow predictability to manage their business. Through the Hedging Activities and Customary Hedging Agreements, the Debtors are able to hedge against adverse oil and gas price fluctuations and thereby protect the economic value of their operations by preventing substantial declines in cash flows.

5. Historically, the Debtors' Customary Hedging Agreements consist primarily of swaps, and costless put/call "collars." Swaps are designed so that the Debtors receive or make payments based on a differential between fixed and variable prices for crude oil and natural gas. A costless collar consists of a call, which establishes a maximum price the Debtors will receive for the volumes under contract and a purchased put that establishes a minimum price the Debtors will receive for the volumes under contract. As hedges roll off, the Company's senior management ("**Management**") reassess the type of hedging transactions that will provide the best opportunities for the Company.

6. Historically, the Debtors have entered into transactions under the Customary Hedging Agreements for 30%-60% of projected oil and natural gas production for one to two years into the future. The prepetition Customary Hedging Agreements were typically secured on a first lien basis under that certain *Second Amended and Restated Credit Agreement – First Out*, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**FLFO Credit Agreement**") by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, Goldman Sachs Bank USA, as administrative agent, the Lenders (as defined therein) party thereto and Cantor Fitzgerald Securities, as collateral agent, and the "Loan Documents" (as defined in the FLFO Credit Agreement) with a security interest in substantially all of the assets of the Debtors (the

3

"**Collateral**").  The Debtors' Hedging Activities have generated significant value and are particularly important in times of increased volatility in commodity prices.

7. The Debtors enter into an International Swap and Derivatives Association, Inc. Master Agreement ("**ISDA**") with each counterparty prior to engaging in Hedging Activities with such counterparty.  The ISDA is a standard contract that governs all derivative contracts entered into between the Debtors and the respective counterparty.  The ISDA may allow for offsetting of amounts payable or receivable between the Debtors and the counterparty for transactions that occur on the same date and in the same currency.  As of the Petition Date, the Debtors do not currently have any active hedge positions.

8. The Debtors anticipate entering into amended ISDAs (the "**Amended ISDAs**") with one or more of their Hedge Counterparties, which will amend and restate the Debtors' prior ISDAs with existing Hedge Counterparties and provide the Debtors with the ability to enter into Customary Hedging Agreements after the Petition Date as Management deems appropriate and prudent.

9. Agreements like the Customary Hedging Agreements are common in the Debtors' industry and are routinely used in the ordinary course of business to mitigate exposure to fluctuating commodity prices.  The board of directors for Fieldwood Energy, Inc. (the "**Board**") has delegated authority to Management to engage in Hedging Activities, as Management deems appropriate.  As is typical in the Debtors' industry, Management has established certain customary practices (the "**Hedge Practices**") to ensure that such agreements are in the best interests of all of the Company's stakeholders.  The Hedge Practices are described below.

10. ***Limited Scope of Hedging Activities***.  Historically, Management has limited Customary Hedging Agreements to (a) swaps, (b) swaptions, (c) costless put/call collars, and (d) put options.

11. ***Approval Process***.  The Debtors' Customary Hedging Agreements are approved by me, as Senior Vice President and Chief Financial Officer.

12. ***Reporting***.  Reports on Hedging Activities are provided quarterly to the Board and the Audit Committee of Fieldwood Energy, Inc. and include disclosures regarding: (a) monthly operating revenue related to hedge settlements; (b) the percent of production hedged; and (c) estimated monthly cash flow forecasts related to hedge settlements.  The Debtors also provide semiannual reports on Hedging Activities to the Debtors' secured lenders as part of their reserve report certificates, which include disclosures regarding:  (a) a list of all material commodity Customary Hedging Agreements and their material terms and (b) the net mark-to-market value of such Customary Hedging Agreements.

13. The Debtors do not engage in speculative Hedging Activities.  Management typically hedges around material acquisitions, during the Company's annual budgeting process, and opportunistically as attractive market terms and prices arise.  The Hedging Activities are directly tied to the Debtors' forecasted future oil and gas production levels.  Management continually assesses the appropriate level of production to hedge and bases its decisions on a variety of factors, including current and future expected commodity market prices, cost and availability of costless put/call collars and swap contracts, forecasted drilling activity, liquidity, and the level of acquisition activity.

14. Consistent with our past practices and the terms of the DIP Credit Agreement the Debtors anticipate closing later this week pursuant to the *Interim Order*

*(I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) and (b) to Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**Interim DIP Order**"), the Debtors target hedging approximately 50% of our projected oil and natural gas production over the next six months.

15.     Over the past several weeks, Management has engaged in discussions with potential hedge counterparties (collectively, the "**Hedge Counterparties**") regarding the terms of potential Postpetition Hedging Agreements. I believe it is likely that the Debtors will, in the near future, be able to enter into Postpetition Hedging Agreements with one or more Hedge Counterparties. The Debtors expect that the Postpetition Hedging Agreements will be on terms generally consistent with the Customary Hedging Agreements, except to the extent that they contain additional termination events and covenants unique to hedging agreements filed during chapter 11 cases.

16.     In accordance with the Interim DIP Order, the Debtors seek authority to secure and otherwise ensure payment of the Hedging Obligations by providing the Postpetition Hedge Counterparties: (a) superpriority administrative claims (the "**Superpriority Claims**") on account of the Hedging Obligations under section 364(c)(1) of the Bankruptcy Code, which shall be *pari passu* with the DIP Obligations (as defined in the DIP Orders) provided under the applicable DIP Order, and (b) first-priority liens in the DIP Collateral which shall be *pari passu* with the DIP Liens (the "**Postpetition Hedging Liens**").

17. In light of the foregoing, the Debtors seek authority to enter into Postpetition Hedging Agreements in the ordinary course of business. The Hedging Agreements are essential to the continued prudent operation of the Debtors' businesses and provide revenue and cash flow stability for the Debtors' estates. The Debtors believe that postpetition Hedging Activities will be a low-risk means of reducing the impact of volatile commodity prices on the Debtors' cash flow during the pendency of these chapter 11 cases. Without the ability to continue and maintain Hedging Activities postpetition, the Debtors would be vulnerable to fluctuations in prices of oil and natural gas that could result in significant diminution in the value of their estates. Moreover, I believe that, if the Debtors do not enter into Postpetition Hedging Agreements in the near future, the Debtors and their estates may be significantly harmed. Accordingly, I believe the relief requested in the Hedging Motion is essential to avoid the immediate and irreparable harm and will yield benefits that are in the best interests of the Debtors, their estates, and all parties in interest.

Dated: August 18, 2020
       Houston, Texas

                                                   */s/ Michael Dane*
                                                   Michael Dane
                                                   Senior Vice President and Chief Financial Officer
                                                 Fieldwood Energy LLC