**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-33948 (MI) |
| FIELDWOOD ENERGY LLC, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |

**AFFIDAVIT OF PUBLICATION**

I, Tessa Mackey, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims, noticing and soliciation agent for the Debtors in the above-captioned chapter 11 cases.

This Affidavit of Publication includes sworn statement verifying that the *Notice of Interim Order,* as conformed for publication, was published August 7, 2020, in (1) the national edition of *The New York Times* as described on **Exhibit A** attached hereto; and (2) the *Houston Chronicle* as described on **Exhibit B** attached hereto.

[ *Remainder of page intentionally left blank*]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

Dated: August 11, 2020

/s/ Tessa Mackey
Tessa Mackey

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on August 11, 2020, by Tessa Mackey,
proved to me on the basis of satisfactory evidence to be the person who appeared before me.


/s/ Liz Santodomingo
Notary Public, State of New York
No. 01SA6301250
Qualified in New York County
Commission Expires April 14, 2022

SRF 44912

**Exhibit A**



**The New York Times**

620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Aug-07,  **20**<u>20</u>

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of **The New York Times**, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

Aug 7, 2020, NYT & Natl, pg B5

Sworn before me the

7 day of August, 2020.

Notary Public

**JAMES W SAPP**
**Notary Public, State of New York**
**NO. 01SA6190150**
**Qualified in New York County**
**Commission Expires 07/14/2024**

ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY FIELDWOOD ENERGY INC. OR ITS AFFILIATED COMPANIES:

Upon the motion (the "**Motion**") of Fieldwood Energy LLC and its affiliated companies (the "**Debtors**"), on August 4, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as *In re Fieldwood Energy LLC, et al.*, Case No. 20-33948 (the "**Chapter 11 Cases**"), entered an interim order establishing procedures (the "**Procedures**") with respect to direct and indirect transfers of common stock of Fieldwood Energy Inc. ("**Common Stock**", including options to acquire beneficial ownership of Common Stock, and certain claims of worthless stock deductions and scheduling a hearing on a final order with respect to such Procedures.

In certain circumstances, the Procedures restrict (i) transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that is or, as a result of such a transaction, would become a Substantial Stockholder of Common Stock and (ii) claims by any Majority Stockholder of a worthless stock deduction under section 165(g) of the Internal Revenue Code of 1986, as amended, with respect to its beneficial ownership of Common Stock. For purposes of the Procedures, a "**Substantial Stockholder**" is any person or entity (including certain persons making a coordinated acquisition) that beneficially owns, directly or indirectly (and/or owns options to acquire) at least 1,450,000 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock), and a "**Majority Stockholder**" is any person that beneficially owns at least 14,500,000 shares of Common Stock (representing approximately 47.5% of all issued and outstanding shares of Common Stock) or any person that would be a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended) of Common Stock (as defined in the Procedures) if such person claimed a worthless stock deduction with respect to such securities. *Any prohibited acquisition or other transfer of, or claim of a worthless stock deduction with respect to, Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.*

*The Procedures, as approved on an interim basis and as requested on a final basis, are available on the website of Prime Clerk LLC, the Debtors' Court-approved claims agent, located at https://cases.primeclerk.com/fieldwoodenergy, and on the docket of the Chapter 11 Cases, Docket No. 20-33948 (MI), which can be accessed via PACER at https://www.pacer.gov.*

A direct or indirect holder of, or prospective holder of, Common Stock that may be or become a Substantial Stockholder, a Majority Stockholder should consult the Procedures.

**PLEASE TAKE NOTICE** that the final hearing on the Motion shall be held on **August 24, 2020**, at **1:30 p.m. (Central Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court (with a copy delivered to Chambers), and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Matthew S. Barr, Esq., Jessica Liou, Esq., Stuart J. Goldring, Esq. and Jonathan J. Macke, Esq.), as proposed counsel to the Debtors, and (ii) the Office of the United States Trustee for the Southern District of Texas, in each case so as to be received no later than **4:00 p.m. (Central Time) on August 20, 2020**.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Procedures are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws and do not excuse non-compliance therewith.

Dated: August 4, 2020      **BY ORDER OF THE COURT**

# At Bon Appétit, Exodus From a Video Series

By MARC TRACY

Two months after Bon Appétit's top editor resigned under pressure amid complaints of racial insensitivity, three journalists of color said they would no longer participate in the magazine's popular video series.

Two of the journalists accused Condé Nast, the magazine's parent company, of failing to offer them pay comparable to that of their white colleagues.

The three journalists, Sohla El-Waylly, Priya Krishna and Rick Martinez, announced their decisions Thursday in statements on their Instagram accounts.

"After five weeks of contract negotiations," Mr. Martinez wrote, "it is clear that I will not get a fair pay rate nor will I get a comparable number of appearances to my colleagues in the test kitchen. Nor would anyone share with me the specifics of the diversity and inclusivity initiatives in video that they claim to be working on."

The three indicated that they have not left the magazine, whose masthead lists Ms. El-Waylly as an assistant food editor, Ms. Krishna as a contributing writer and Mr. Martinez as a contributing food editor. ("Contributing" workers at Condé Nast are contractors, rather than staff employees; Ms. Krishna has contributed frequently to the Food section of The New York Times.)

Bon Appétit's previous editor in chief, Adam Rapoport, left Condé Nast in June after workers at the magazine complained of an entrenched culture of racial insensitivity and boorish office behavior. He stepped down soon after a 2004 photo showing him wearing a racially insensitive costume resurfaced on social media.

Two days later, Matt Duckor, Condé Nast's head of programming, who oversaw video for Bon Appétit and other titles, also resigned, after an online petition called for his removal, accusing him of overseeing a "discriminatory system that paid white editors at Bon Appétit for their video work, while their nonwhite editors received nothing."

SPECIAL SUMMER PARTY GUIDE
bon appétit
THE GRILLING ISSUE
bon appétit

RICHARD DREW/ASSOCIATED PRESS

**Bon Appétit's previous editor in chief, Adam Rapoport, left Condé Nast in June after staff members' complaints of racial insensitivity.**

In meetings with employees in June, Condé Nast's chief executive, Roger Lynch, and its artistic director, Anna Wintour, pledged that the company would emphasize diversity efforts in the future.

Mr. Lynch said the choice of a new Bon Appétit top editor would show the company's commitment to being more inclusive.

The search for a top editor is ongoing. On Thursday the company announced that Sonia Chopra, previously of the food site Eater, would help lead Bon Appétit as its executive editor, a position she is scheduled to start on Aug. 24.

"Sonia's energy and expertise connecting content across platforms is unmatched and will drive the continued success of Bon Appétit and our food brands," Ms. Wintour said in a statement.

Ms. Krishna said in her statement on Thursday that the recent assurances from the company concerning fair pay had turned out to be "all lip service."

"The contract I received was nowhere near equitable," she added, "and actually would potentially allow for me to make even less than I do currently."

A spokesman for Condé Nast said in a statement: "We pay all our employees fairly, and in accordance with their role and experience. Our pay practices are in line with industry standards. To suggest that we are paying individuals differently based on race, gender or any other reason simply isn't true."

Bon Appétit has been a significant part of the company's online video operation. Its test-kitchen videos have minted internet stars and attracted more than six million subscribers. The magazine has not posted a new test-kitchen video since June 5.

# Notable News Media Critic Is Starting His Own Outlet

By MARC TRACY

Over the last 15 years, Ken Doctor has made his living as a critic of the news industry. A onetime media executive who started out as a publisher and editor of an alt weekly, Mr. Doctor regularly warns against hedge-fund ownership of news outlets in a column he writes for Harvard University's Nieman Journalism Lab. Media companies hire him as a consultant, and he is often quoted in articles on the dismal state of local news coverage in America.

Now, at age 70, Mr. Doctor is leaving his life as an armchair expert and starting a local news company, Lookout Local, he said on Thursday. Its flagship site, Lookout Santa Cruz, will cover the California county where he lives, an area he likens to a "news desert" because it does not have enough journalists covering it.

"I came to the epiphany of putting both sides of my brain together," Mr. Doctor said. "I'm an analyst. I understand the business. At the same time, I realized I lived in a worsening and worsening news desert."

The new role will put Mr. Doctor in direct competition with Alden Global Capital, a New York hedge fund that he has often criticized in his column. Alden controls MediaNews Group, the parent company of The Santa Cruz Sentinel, which will be the main rival of Lookout Santa Cruz.

Mr. Doctor's start-up is a for-profit, public-benefit company. It has funding from the Knight Foundation, the Google News Initiative Innovation Challenge, the Lenfest Institute for Journalism and others. He said he plans to start Lookout Santa Cruz in the fall with a staff of eight to 10 journalists. The site has a deal with The Los Angeles Times to use its content management system, Graphene, and to run some of its content.

Some people advised Mr. Doctor to start smaller, with two or three journalists, but he decided to heed the advice he had laid out in a January column arguing that in-depth coverage will attract subscribers and ultimately pay for itself. If Lookout Santa Cruz is a success, he plans to start sibling sites.

**Ken Doctor's Lookout Local is a for-profit, public-benefit company.**

"I set upon figuring out, first, as an intellectual exercise, and then in reality, what it would take to create a new news institution," Mr. Doctor said.

Mr. Doctor said he drew inspiration from the 1975 Bend in the River conference led by the author Ken Kesey (and his Merry Pranksters), a gathering of activists in Bend, Ore., who sought to shape what life would be like in the 21st century. ("Baby Boomers are grandiose," Mr. Doctor said.)

After the conference, Mr. Doctor helped found The Willamette Valley Observer in Eugene, Ore., an alternative paper that lasted from 1975 to 1982. He later worked at The Boulder Daily Camera and The St. Paul Pioneer Press, both published by Knight Ridder, before working as an executive at the chain until 2005, a year before it was bought by the McClatchy Company.

Mark Zusman, the publisher of Willamette Week, a Portland, Ore., alt-weekly who knew Mr. Doctor in the '70s, said the Lookout Local venture was in keeping with the person he knew back then.

"He struck me then, despite however long his hair was, as having the heart of a genuine journalist," Mr. Zusman said, "which is why I'm not surprised to see him jumping back in."

# Uber's Food Delivery Brightened a Grim Quarter

By KATE CONGER

OAKLAND, CALIF. — Uber is synonymous around the world with ride hailing. But as the coronavirus pandemic shows few signs of loosening its grip, the company may become more closely associated with another business: delivery.

Uber said on Thursday that its ride-hailing business had cratered in the second quarter as people traveled less in the pandemic. The company's revenue fell 29 percent to $2.2 billion from a year ago — the steepest decline since its initial public offering last May — as its net loss totaled $1.8 billion.

But its Uber Eats food delivery service surged, with revenue more than doubling from a year ago to exceed that of ride hailing for the first time. Revenue for Uber Eats soared to $1.2 billion, while rides came in at $790 million.

Dara Khosrowshahi, Uber's chief executive, said in a call with investors on Thursday that the varied pandemic responses around the world had created "a tale of 10,000 cities" for the company, with business recovering in some regions and not in others.

In spite of the challenges, he said delivery was "a very high-potential opportunity" for Uber to expand even further by offering deliveries of home goods, prescription medications and pet supplies.

Uber has doubled down on food delivery in recent months. In May, Mr. Khosrowshahi sought to acquire Grubhub, a delivery service, but the companies struggled to agree on terms and to deal with potential antitrust scrutiny. Last month, Uber said it would instead acquire the delivery service Postmates in an all-stock deal valued at $2.65 billion.

Buying Postmates is expected to give Uber roughly 35 percent of the U.S. food delivery market, analysts said. That would allow Uber to challenge the delivery leader, DoorDash, which is estimated to have a 45 percent market share.

The mixed results sent Uber's share price down more than 4 percent in after-hours trading.

"Right now, they are swimming in the red ink," said Dan Ives, managing director of equity research at Wedbush Securities. "Investors are still giving them the benefit of the doubt because of Uber Eats."

MARK ABRAMSON FOR THE NEW YORK TIMES

**The company's overall revenue fell 29 percent to $2.2 billion from a year ago, but Uber Eats's revenue surged, besting the ride hailing business.**

Uber has consistently lost money, and Mr. Khosrowshahi remains under pressure to make it profitable. The company's net loss in the second quarter narrowed from $5.2 billion a year ago, when it was dealing with stock-based compensation costs from its initial public offering. Uber said it still intended to become profitable sometime next year.

The company also said there were some signs that its ride business was improving internationally. In France, business had recovered about 70 percent, it said, while rides to work and to social gatherings in places such as Hong Kong, New Zealand and Sweden were higher than they had been before the pandemic.

But in the United States, which is one of Uber's largest markets, rides were down 50 percent to 85 percent in many major cities.

Uber also faces legal challenges in California and Massachusetts, where the state attorneys general have sued Uber and Lyft for violating labor law. Drivers should be classified as employees and be entitled to full employment benefits, the states have said.

If the lawsuits succeed, they could diminish Uber's business because it would make it more expensive to operate, analysts said.

Most drivers prefer to remain independent contractors, Mr. Khosrowshahi said, adding, "We are confident in our position."

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: NEIMAN MARCUS GROUP LTD LLC, *et al.*,[1] | ) | Chapter 11 |
| | ) | Case No. 20-32519 (DRJ) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on July 30, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 1400] (the "Disclosure Statement Order"): (a) authorizing Neiman Marcus Group LTD LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **September 4, 2020, at 9:00 a.m.,** prevailing Central Time, before Judge David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 400, Houston, Texas 77002.

**PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date.** The voting record date is **July 15, 2020**, which is the date for determining which Holders of Claims and Interests in Classes 3, 4, 5, 6, 7, 8, 9, 10, and 11, as applicable, are entitled to vote on the Plan.

**Voting Deadline.** The deadline for voting on the Plan is on **August 31, 2020, at 4:00 p.m.,** prevailing Central Time (the "Voting Deadline").[3] If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you ***must***: (a) follow the instructions carefully; (b) complete ***all*** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is ***actually received*** by the Debtors' Balloting agent, Stretto (the "Balloting Agent") on or before the Voting Deadline. ***A failure to follow such instructions may disqualify your vote***.

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**Article VIII.D of the Plan contains the following provision regarding Third Party Releases:** **As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:**

**(a) the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;**

**(b) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;**

**(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

**(d) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and do not release any agreements under the Transaction Support Agreement or any documents or agreements executed in connection therewith related to any party's rights, claims, and controls with respect to MyTheresa (including but not limited to the waterfall and turnover provisions set forth in the Existing MyT Transaction Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements, except to the extent expressly waives in the Plan).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

* * *

**UNDER THE PLAN, "RELEASING PARTY" MEANS EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) THE CONSENTING STAKEHOLDERS; (D) THE SPONSORS; (E) THE TERM LOAN LENDERS; (F) THE 2028 DEBENTURES HOLDERS; (G) THE SECOND LIEN NOTEHOLDERS; (H) THE THIRD LIEN NOTEHOLDERS; (I) THE CONSENTING NOTEHOLDER GROUP; (J) THE CONSENTING TERM LOAN LENDER GROUP; (K) THE DIP LENDERS; (L) EACH AGENT AND TRUSTEE; (M) ALL HOLDERS OF CLAIMS AND INTERESTS; (N) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (O); AND (O) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH THIS CLAUSE (O), EACH OF THEIR RESPECTIVE CURRENT AND FORMER DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, PARTNERS, MANAGERS, INDEPENDENT CONTRACTORS, AGENTS, REPRESENTATIVES, PRINCIPALS, PROFESSIONALS, ADVISORY BOARD MEMBERS, CONSULTANTS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS (INCLUDING ANY OTHER ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANGER IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER OF AN ENTITY), ACCOUNTANTS, INVESTMENT BANKERS, AND OTHER PROFESSIONAL ADVISORS; PROVIDED THAT IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (X) ELECTS TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN; OR (Y) TIMELY FILES WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.**

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT (A) ELECT TO OPT OUT OF THE RELEASES CONTAINED IN THE PLAN OR (B) TIMELY FILE WITH THE BANKRUPTCY COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

**Plan Objection Deadline.** The deadline for filing objections to the Plan is **August 31, 2020, at 4:00 p.m.,** prevailing Central Time (the "Plan Objection Deadline"). All objections to the relief sought at the Confirmation Hearing ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; ***and*** (d) be filed with the Court and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline: (i) ***Co-Counsel to the Debtors:*** Anup Sathy, P.C., Chad J. Husnick, P.C., **KIRKLAND & ELLIS LLP,** 300 North LaSalle, Chicago, Illinois 60654 -and- Matthew C. Fagen, **KIRKLAND & ELLIS LLP,** 601 Lexington Avenue, New York, New York 10022 -and- Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, Veronica A. Polnick, **JACKSON WALKER LLP,** 1401 McKinney Street, Suite 1900, Houston, Texas 77010; (ii) ***U.S. Trustee:*** Hector Duran, Clarissa Waxton, **OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF TEXAS,** 515 Rusk Street, Suite 3516, Houston, Texas 77002; and (iii) ***Counsel to the Consenting Stakeholders:*** Ryan J. Maierson, Michael J. Chambers, **Latham & Watkins LLP,** 811 Main Street, Suite 3700, Houston, TX 77002 -and- Jeff Bjork, **Latham & Watkins LLP,** 355 South Grand Avenue, Suite 100, Los Angeles, CA 90071-1560 -and- Joshua A. Feltman, Emil A. Kleinhaus, Michael S. Benn, **Wachtell, Lipton, Rosen & Katz,** 51 West 52nd Street, New York, NY 10019 -and- Andrew N. Rosenberg, Alice Belisle Eaton, **Paul, Weiss, Rifkind, Wharton & Garrison LLP,** 1285 Avenue of the Americas, New York, NY 10019-6064 -and- Dennis F. Dunne, Michael Price, **Milbank,** 55 Hudson Yards, New York, NY 10001-2163 -and- Adam R. Moses, **Milbank,** 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067-3019 -and- Jasmine Ball, **Debevoise & Plimpton LLP,** 919 Third Avenue, New York, New York 10022.

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM or flash drive), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at http://cases.stretto.com/NMG; (b) writing to Stretto Re: Neiman Marcus Group LTD LLC, et al., c/o Stretto, 410 Exchange, Suite 100, Irvine, California 92602; (c) emailing NMGInquiries@stretto.com; and/or (d) calling the Debtors' restructuring hotline at the following number: **US TOLL FREE: (877) 670-2127; INTERNATIONAL: (949) 504-4475.**

You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before August 21, 2020, and will serve notice on all Holders of Claims and Interests entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN:**

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Houston, Texas, August 3, 2020, */s/ Matthew D. Cavenaugh* , **JACKSON WALKER L.L.P.,** Matthew D. Cavenaugh (TX Bar No. 24062656), Jennifer F. Wertz (TX Bar No. 24072822), Kristhy M. Peguero (TX Bar No. 24102776), Veronica A. Polnick (TX Bar No. 24079148), 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Telephone: (713) 752-4200, Facsimile: (713) 752-4221, Email: mcavenaugh@jw.com, jwertz@jw.com, kpeguero@jw.com, vpolnick@jw.com, *Co-Counsel to the Debtors and Debtors in Possession* -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Anup Sathy, P.C. (admitted *pro hac vice*), Chad J. Husnick, P.C. (admitted *pro hac vice*), 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: anup.sathy@kirkland.com, chad.husnick@kirkland.com -and- Matthew C. Fagen (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: matthew.fagen@kirkland.com, *Co-Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

[3] The Voting Deadline for any counterparty to an Unexpired Lease which is identified as rejected on a Schedules of Assumed and Rejected Contracts filed later than one Business Day prior to the Voting Deadline shall be extended to the date of the Confirmation Hearing.

**ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY FIELDWOOD ENERGY INC. OR ITS AFFILIATED COMPANIES:**

Upon the motion (the "**Motion**") of Fieldwood Energy LLC and its affiliated companies (the "**Debtors**"), on August 4, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as *In re Fieldwood Energy LLC, et al.*, Case No. 20-33948 (the "**Chapter 11 Cases**"), entered an interim order establishing procedures (the "**Procedures**") with respect to direct and indirect transfers of common stock of Fieldwood Energy Inc. ("**Common Stock**"), including options to acquire beneficial ownership of Common Stock, and certain claims of worthless stock deductions and scheduling a hearing on a final order with respect to such Procedures.

In certain circumstances, the Procedures restrict (i) transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that is or, as a result of such a transaction, would become a Substantial Stockholder of Common Stock and (ii) claims by any Majority Stockholder of a worthless stock deduction under section 165(g) of the Internal Revenue Code of 1986, as amended, with respect to its beneficial ownership of Common Stock. For purposes of the Procedures, a "**Substantial Stockholder**" is any person or entity (including certain persons making a coordinated acquisition) that beneficially owns, directly or indirectly (and/or owns options to acquire) at least 1,450,000 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock), and a "**Majority Stockholder**" is any person that beneficially owns at least 14,500,000 shares of Common Stock (representing approximately 47.5% of all issued and outstanding shares of Common Stock) or any person that would be a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended) of Common Stock (as defined in the Procedures) if such person claimed a worthless stock deduction with respect to such securities. ***Any prohibited acquisition or other transfer of, or claim of a worthless stock deduction with respect to, Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.***

***The Procedures, as approved on an interim basis and as requested on a final basis, are available on the website of Prime Clerk LLC, the Debtors' Court-approved claims agent, located at https://cases.primeclerk.com/fieldwoodenergy, and on the docket of the Chapter 11 Cases, Docket No. 20-33948 (MI), which can be accessed via PACER at https://www.pacer.gov.***

**A direct or indirect holder of, or prospective holder of, Common Stock that may be or become a Substantial Stockholder, a Majority Stockholder should consult the Procedures.**

**PLEASE TAKE NOTICE** that the final hearing on the Motion shall be held on **August 24, 2020,** at **1:30 p.m. (Central Time),** and any objections or responses to the Motion shall be in writing, filed with the Court (with a copy delivered to Chambers), and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Matthew S. Barr, Esq., Jessica Liou, Esq., Stuart J. Goldring, Esq. and Jonathan J. Macke, Esq.), as proposed counsel to the Debtors, and (ii) the Office of the United States Trustee for the Southern District of Texas, in each case so as to be received no later than **4:00 p.m. (Central Time) on August 20, 2020**.

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Procedures are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities, corporate, and other laws and do not excuse non-compliance therewith.

Dated: August 4, 2020 **BY ORDER OF THE COURT**

**NOTICE OF PUBLIC DISPOSITION OF COLLATERAL UNDER UNIFORM COMMERCIAL CODE**

***NOTICE IS HEREBY GIVEN*** that at 12:00 p.m. (Central Time) on August 20, 2020, Accel-KKR Credit Partners SPV, LLC ("Secured Party") intends to offer to sell, or cause to be sold, at a public sale conducted in accordance with Article 9 of the Uniform Commercial Code, as enacted in all applicable jurisdictions ("UCC"), at the offices of Goldberg Kohn Ltd., located at 55 E. Monroe, Ste. 3300, Chicago, IL 60603 ("Sale"), all right, title, and interest of EFREIGHT, LLC, EFSWW, LLC ("Borrower"), Cartage Now, LLC, Archgate TMS, LLC, You & I Logistics, LLC, ExactDirect, LLC, efreightsolutions, LLC, and Efreightsolutions Holdings, LLC ("Holdings") (collectively, "Companies"), in, under, and to the Collateral Assets (as defined below) (collectively, "Sale Assets"); provided, however, unless otherwise expressly agreed to by Secured Party, in writing, in its sole discretion, the Sale Assets expressly exclude the Excluded Assets (as defined below). The Sale Assets may be sold in one or more lots as part of the Sale as Secured Party may determine in its discretion, and the Sale Assets may be subject to certain additional inclusions and exclusions to be negotiated with Secured Party.

Subject to the terms herein (capitalized terms used but not otherwise defined in this paragraph have the meanings given to them in the Security Agreement (defined below)): (i) "Collateral Assets" means and refers to, collectively, the Collateral other than the Excluded Assets (as defined below), including all Accounts, Books, Chattel Paper, Equipment, Farm Products, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property (including all Patents, Copyrights, Trademarks, trade secrets, know-how, inventions, algorithms, software programs (including all source code and object code), processes, data, customer lists, URLs and domain names, specifications, documentations, reports, literature, and any other forms of technology or proprietary information of any kind, including all rights therein), Intellectual Property Licenses, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, and products and Proceeds of the foregoing, in each case, capable of being sold by Secured Party pursuant to Section 9-610 and other provisions of the UCC; and (ii) "Excluded Assets" means and refers to, collectively, (a) any non-assignable, non-transferrable right of any Company under any Designated Agreement (as defined below), (b) any securities, (c) any money, cash, and Cash Equivalents, (d) any claims or causes of action of any kind against Secured Party, any of its affiliates, and various related parties, (e) any Commercial Tort Claims, other claims, and causes of action of any kind of any Company, including any claims or causes of action against any of the Companies' respective officers, directors, or employees or any of their respective affiliates or insiders, (f) any insurance policies and Proceeds, including any unearned premiums, (g) any Deposit Accounts, and (h) any assets not capable of being sold by Secured Party pursuant to Section 9-610 and other provisions of the UCC. Notwithstanding anything herein to the contrary, Secured Party may, in its sole discretion, elect to include any of the Excluded Assets in any credit bid by Secured Party or its designee for all or any portion of the Sale Assets.

Pursuant to (i) that Credit Agreement dated December 3, 2018 (as modified from time to time, "Credit Agreement"), among Borrower, Holdings, and Secured Party, (ii) that Guaranty and Security Agreement dated December 3, 2018 (as modified from time to time, "Security Agreement"), made by each Company, in its capacity as a grantor (collectively, "Grantors"), in favor of Secured Party, and (iii) the other "Financing Documents" (as defined in the Credit Agreement), Secured Party has extended secured loans to Borrower, and the Grantors have granted Secured Party continuing security interests in, and liens on, among other things, the Sale Assets to secure the full payment and performance when due of all "Liabilities" (as defined in the Credit Agreement) under the Credit Agreement and the other Financing Documents. As of August 3, 2020, the aggregate amount owed by the Borrower and the other Grantors under the Financing Documents is not less than $15,700,000. Each Grantor is in default of such Liabilities under the Credit Agreement and the other Financing Documents.

***THE SALE OF ANY SALE ASSETS EXPRESSLY EXCLUDES CERTAIN RIGHTS UNDER LEASES AND OTHER AGREEMENTS.*** On information and belief, the Companies currently operate pursuant to one or more non-residential leases of commercial property and other agreements, documents and instruments (collectively, "Designated Agreements"). No rights under any Designated Agreement are or will be included in the Sale Assets, except to the extent that any such rights are assignable under applicable law, including with the consent of the non-Company party as may be required.

**THE SALE ASSETS ARE AND WILL BE OFFERED FOR PURCHASE AT THE SALE ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS, AND WITHOUT ANY RECOURSE, REPRESENTATION, GUARANTEE, OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION, GUARANTEE, OR WARRANTY AS TO, OR RELATING TO, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT, TITLE, POSSESSION, OR THE LIKE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SECURED PARTY DISCLAIMS ANY AND ALL REPRESENTATIONS, GUARANTEES AND WARRANTIES OF ANY KIND OR NATURE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY AND ALL REPRESENTATIONS, GUARANTEES AND WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, AND OF QUIET ENJOYMENT, TITLE, POSSESSION, AND THE LIKE. SECURED PARTY WILL NOT BE, AND WILL NOT BE DEEMED TO BE, LIABLE OR OBLIGATED IN ANY MANNER WHATSOEVER FOR ANY CONSEQUENTIAL OR INCIDENTAL DAMAGES WHATSOEVER. SECURED PARTY WILL NOT INCUR ANY FEES, COSTS OR EXPENSES, OR BE LIABLE OR RESPONSIBLE IN ANY MANNER FOR ANY LIABILITIES, WHATSOEVER WITH RESPECT TO, OR RELATED TO, THE TRANSFER, DELIVERY, OR PERFORMANCE OF ANY OF THE SALE ASSETS.**

Secured Party expressly reserves the right, in its sole discretion, to withdraw all or any portion of the Sale Assets from the Sale at any time. In all events, Secured Party, or its designee, may credit bid all or any portion of the Liabilities at the Sale, and reserves the right to provide financing to any bidder in its sole discretion. Secured Party, or its designee, will be deemed to be a qualified bidder at the Sale.

Subject to the terms and conditions hereof, the Sale Assets will be offered and sold at the Sale for cash only unless otherwise expressly agreed to in writing by Secured Party in its sole discretion. All offers must contain no contingencies that are unsatisfactory to Secured Party in its discretion, and all offers will be subject to such other or additional bid procedures as Secured Party may establish or otherwise announce from time to time in its discretion.

**Any prospective bidder must provide written notice to Secured Party and Grantors' sale advisor, MCA Financial Group, Ltd. ("MCA"), of its interest in qualifying to attend the Sale not less than three business days prior to the date of the Sale by contacting Zach Garrett of Goldberg Kohn Ltd., as counsel for Secured Party (zachary.garrett@goldbergkohn.com), and Stacie Witten (email: switten@mca-financial.com) of MCA.** Prospective bidders may obtain additional information regarding the Sale, including how to qualify for the Sale as a qualified bidder, by contacting Stacie Witten of MCA as set forth in the preceding sentence. Qualified bidders who desire to attend the Sale telephonically or by other means may discuss alternative accommodations with Secured Party.

Secured Party expressly reserves the right, in its sole discretion, to cancel the Sale at any time, or to cause the Sale to be adjourned from time to time, without further notice or publication other than by announcement at or prior to the Sale. Secured Party reserves all of its rights against the Grantors and any other obligor for any and all deficiencies with respect to the Liabilities remaining after the Sale. Secured Party will apply the sale proceeds received for the Sale Assets at the Sale in accordance with the terms of the Financing Documents and applicable law. Grantors are entitled to an accounting of the unpaid indebtedness owing by Grantors to Secured Party, which accounting may be obtained free of charge by contacting Secured Party through its counsel.

T | Store
FROM THE NEW YORK TIMES

The New York Times

Custom Birthday Book.

store.nytimes.com
800.671.4332

**<u>Exhibit B</u>**

SRF 44912



## AFFIDAVIT OF PUBLICATION

### STATE OF TEXAS:

Before me, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared, the Newspaper Representative at the HOUSTON CHRONICLE, a daily newspaper published in Harris County, Texas, and generally circulated in the Counties of: HARRIS, TRINITY, WALKER, GRIMES, POLK, SAN JACINTO, WASHINGTON, MONTGOMERY, LIBERTY, AUSTIN, WALLER, CHAMBERS, COLORADO, BRAZORIA, FORT BEND, GALVESTON, WHARTON, JACKSON, and MATAGORDA and that the publication, of which the annexed herein, or attached to, is a true and correct copy, was published to-wit:

PRIME CLERK                          0034044206    HOUC053759226
RAN A LEGAL NOTICE
SIZE BEING:  2 x5.25 l   (10.50l)

| Product | Date | Class | Page |
|---|---|---|---|
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |
| HOU Chronicle | Aug 7 2020 | Legal Notices | B 4 |

Victoria Dord   A IRClerk

NEWSPAPER REPRESENTATIVE

Sworn and subscribed to before me, this 7th Day of August A.D. 2020

DELILAH METZGER
130823618
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
MAY 19, 2022

Notary Public in and for the State of Texas

**0034044206    PRIME CLERK**

Houston Chronicle
CLASSIFIEDS

**ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PRO-
SPECTIVE HOLDERS OF STOCK ISSUED BY FIELDWOOD
ENERGY INC. OR ITS AFFILIATED COMPANIES:**

Upon the motion (the "**Motion**") of Fieldwood Energy LLC and its
affiliated companies (the "**Debtors**"), on August 4, 2020, the United States
Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy
Court**"), having jurisdiction over the chapter 11 cases of the Debtors,
captioned as *In re Fieldwood Energy LLC, et al.*, Case No. 20-33948 (the
"**Chapter 11 Cases**"), entered an interim order establishing procedures
(the "**Procedures**") with respect to direct and indirect transfers of com-
mon stock of Fieldwood Energy Inc. ("**Common Stock**"), including
options to acquire beneficial ownership of Common Stock, and certain
claims of worthless stock deductions and scheduling a hearing on a final
order with respect to such Procedures.

In certain circumstances, the Procedures restrict (i) transactions involv-
ing, and require notices of the holdings of and proposed transactions
by, any person, group of persons, or entity that is or, as a result of such
a transaction, would become a Substantial Stockholder of Common Stock
and (ii) claims by any Majority Stockholder of a worthless stock deduction
under section 165(g) of the Internal Revenue Code of 1986, as amended,
with respect to its beneficial ownership of Common Stock. For purposes
of the Procedures, a "**Substantial Stockholder**" is any person or entity
(including certain persons making a coordinated acquisition) that benefi-
cially owns, directly or indirectly (and/or owns options to acquire) at least
1,450,000 shares of Common Stock (representing approximately 4.75%
of all issued and outstanding shares of Common Stock), and a "**Majority
Stockholder**" is any person that beneficially owns at least 14,500,000
shares of Common Stock (representing approximately 47.5% of all issued
and outstanding shares of Common Stock) or any person that would be
a "50-percent shareholder" (within the meaning of section 382(g)(4)(D)
of the Internal Revenue Code of 1986, as amended) of Common Stock
(as defined in the Procedures) if such person claimed a worthless stock
deduction with respect to such securities. *Any prohibited acquisition
or other transfer of, or claim of a worthless stock deduction with
respect to, Common Stock (including options to acquire beneficial
ownership of Common Stock) will be null and void ab initio and may
lead to contempt, compensatory damages, punitive damages, or
sanctions being imposed by the Bankruptcy Court.*

*The Procedures, as approved on an interim basis and as
requested on a final basis, are available on the website of Prime
Clerk LLC, the Debtors' Court-approved claims agent, located at
https://cases.primeclerk.com/fieldwoodenergy, and on the docket
of the Chapter 11 Cases, Docket No. 20-33948 (MI), which can be
accessed via PACER at https://www.pacer.gov.*

**A direct or indirect holder of, or prospective holder of, Common
Stock that may be or become a Substantial Stockholder, a Major-
ity Stockholder should consult the Procedures.**

PLEASE TAKE NOTICE that the final hearing on the Motion shall be
held on **August 24, 2020**, at **1:30 p.m. (Central Time)**, and any objec-
tions or responses to the Motion shall be in writing, filed with the Court
(with a copy delivered to Chambers), and served upon (i) Weil, Gotshal &
Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Matthew S. Barr,
Esq., Jessica Liou, Esq., Stuart J. Goldring, Esq. and Jonathan J. Marke, Esq.),
as proposed counsel to the Debtors, and (ii) the Office of the United States
Trustee for the Southern District of Texas, in each case so as to be received
no later than **4:00 p.m. (Central Time) on August 20, 2020**.

PLEASE TAKE FURTHER NOTICE that the requirements set forth in
the Procedures are in addition to the requirements of Bankruptcy Rule
3001(e) and applicable securities, corporate, and other laws and do not
excuse non-compliance therewith.

Dated: August 4, 2020         BY ORDER OF THE COURT

**B4** | Friday, August 7, 2020 | HoustonChronicle.com | Houston Chronicle   ★★



# Legal Notices

To place legal notices
email legals@chron.com or call 713.224.6868.

**BUSINESS**

## EARNINGS

*From page B1*

| Notice to Creditors | Notice to Creditors | Legal Bids & Proposals | Legal Bids & Proposals | Legal Bids & Proposals | Legal Bids & Proposals | Legal Bids & Proposals | Legal Bids & Proposals |

## Notice To Creditors Ad $74.00*

Call the Legals Team
713-224-6868
Ext. 6435 or 4204

*$74.00 includes first 36 lines and 1 Affidavit of Publication

*$1.92 per line over 36 lines

**TABC Notices**   **TABC Notices**

Application has been made with the Texas Alcoholic Beverage Commission for a Package Store Permit and Original Wine and Beer Retailers Permit by Drink Butlers XIII, DBA Drink Butlers, to be located at 5301 Polk Street, Houston , TX 77023. Owner, Lyric Daniel.

Humble ISD is accepting electronic responses for the following Request for Proposal:
RFP2021-006-02R – Educational Service Consultants – Due by 4:30 PM on 11/10/2020
Humble ISD is accepting request for proposals:
RFP2021-006-02R Educational Service Consultants on a continual basis from issue date of this RFP until 8/10/25. Initial submission due 11/10/20. Subsequent rolling RFP's will be issued and submissions accepted for the duration of this proposal at the discretion of the District. Proposals may be viewed and submitted electronically through Humble ISD's online bidding system:
https://humbleisd.ionwave.net/Login.aspx. Please register by clicking supplier registration. Once registered you need to view the bid in order to bid.

**Legals/Public Notices**   **Legals/Public Notices**

ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PRO-SPECTIVE HOLDERS OF STOCK ISSUED BY FIELDWOOD ENERGY INC. AND ITS AFFILIATED COMPANIES:

Upon the motion (the "**Motion**") of Fieldwood Energy LLC and its affiliated companies (the "**Debtors**"), on August 4, 2020, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as *In re Fieldwood Energy LLC, et al.*, Case No. 20-33948 (the "**Chapter 11 Cases**"), entered an interim order establishing procedures for transfers of, and declarations of worthlessness with respect to, common stock of Fieldwood Energy Inc. (the "**Common Stock**"), including options to acquire beneficial ownership of Common Stock, and a "Majority Stockholder" is any person that beneficially owns at least 14,500,000 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock) or any person that would be a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the Internal Revenue Code of 1986, as amended (the "Common Stock" (as defined in the Procedures) if such person claimed a worthless stock deduction with respect to such securities. **Any prohibited acquisition or other transfer of, or claim of a worthless stock deduction with respect to, Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.**

The Procedures, as approved on an interim basis and as requested on a final basis, are available on the website of Prime Clerk LLC, the Debtors' Court-appointed claims agent, located at https://cases.primeclerk.com/fieldwoodenergy, and on the docket of the Chapter 11 Cases, Docket No. 20-33948 (BD), which can be accessed via PACER at https://www.pacer.gov.

A direct or indirect holder of, or prospective holder of, Common Stock that may be or become a Substantial Stockholder is required to file a copy pursuant to the Procedures, and served upon (i) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Matthew S. Barr, Esq., Jessica Liou, Esq., Stuart J. Goldring, Esq. and Jonathan J. Rivinski, Esq.), as proposed counsel to the Debtors, and (ii) the Office of the United States Trustee for the Southern District of Texas, in each case so as to be received no later than **4:00 p.m. Central Time on August 20, 2020**. **PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the Procedures are in addition to the requirements of Bankruptcy Rule 3001(e) and applicable securities laws and other rules, and do not excuse non-compliance therewith.

*Dated: August 4, 2020*

**BY ORDER OF THE COURT**

---

**LEGAL NOTICE**
Harris County Department of Education (HCDE) will be accepting proposals for the following:

**Request for Qualification – # 20/055KJ**
**Construction Manager-Agent/Project Manager Services**
All proposals are due, Tuesday, August 25, 2020 @ 2:00 p m central time. Interested proposers may go to https://hcdeinbid.ionwave.net/Login.aspx and register to download the solicitation or call 713-696-0744. It is HCDE policy not to discriminate on the basis of race, color, national origin, gender, limited English proficiency or handicapping condition in its programs.

---

**NOTICE OF COMPETITIVE BIDS**

Harris County is requesting offers for the projects listed below. Other requirements, including item description(s), submission due dates and times, type of pricing, payment method, and any bonding requirements, may be obtained on line at https://purchasing.harriscountytx.gov, or on the Purchasing Agent's office. Return offers to Harris County Purchasing Agent, 1001 Preston, Suite 670, Houston, Texas 77002, no later than 2:00 p.m. local time in Houston, Texas on specified due dates.

**Bids/Proposals Due August 10, 2020**

| Job | 20/0174 | Community Engagement Program |
| Job | 20/0175 | Implementation of the Cisco Contact Center Solution |
| Job | 20/0188 | Drug Testing Services, Kits and Sweat Patches |
| Job | 20/0190 | Elevated Observation Security Tower |
| Job | 20/0192 | Channel Improvement for the Hunting Bayou Federal Flood Risk Management Project (Discrete Segment 105) from US 59 to US Highway 59 to Homestead   Detention Pond Outfall |
| Job | 20/0193 | Provide and Mail Tax Statements |
| Job | 20/0195 | Background Analytical Software |
| Job | 20/0197 | Design and Construction of Water Sanitary Connections between the Cypress Service Center and Northwest Harris County MUD No. 10, Precinct 3 |
| Job | 20/0198 | Mowing and Debris Removal in the Clear Lake Area |
| Job | 20/0199 | Tree and Tree Limb Removal Service |
| Job | 20/0201 | Wrong-Way Detection Systems, Maintenance, Repair, Testing Services and Related Items |
| Job | 20/0205 | Uniforms and Related Items |
| Job | 20/0206 | COVID-19 Surveillance Testing Program |

**Bids/Proposals Due August 17, 2020**

| Job | 20/0207 | Safety Supplies and Related Items |
| Job | 20/0208 | Personal Protective Equipment, Sanitizer, Disinfectant and Related Items |
| Job | 20/0211 | Boat Motors |
| Job | 20/0223 | Breathing Apparatus |
| Job | 20/0224 | Telescales Services |

**Bids/Proposals Due August 24, 2020**

| Job | 20/0199 | Turf Establishment for Storm Water Outfalls |
| Job | 20/0204 | Road Construction at Peek Road from North of Grand Ventana Drive to North of Stockdick School Road, Precinct 3 |
| Job | 20/0210 | Wetland Construction at Katy Hockley Mitigation Bank |
| Job | 20/0212 | Thermoplastic Striping, Pavement Markings, Raised Reflectors, and Related Items, Precinct 3 |
| Job | 20/0212 | Real Estate Appraisal Services |
| Job | 20/0226 | Volatile Organic Compound and Air Toxics Analyzer |

**Bids/Proposals Due August 31, 2020**

| Job | 20/0215 | Conveyance Improvements at Zube Stormwater Detention Basin (Phase 3) |
| Job | 20/0229 | Renovations to Level B of the Institute of Forensic Sciences Building |
| Job | 20/0231 | Renovation of the Emergency Center at Lyndon B. Johnson Hospital |
| Job | 20/0222 | Road Construction at East Kamings Road from Bohemian Hall Road to the Dead End, Precinct 2 |
| Job | 20/0227 | Replacement of the Air Handling Units, Pipe Insulation and Direct Digital Controls System at Annex 40 |

**Bids/Proposals Due September 14, 2020**

| Job | 20/0217 | Office Furniture |

DeWright Dopslauf, C.P.M., CPPO
Purchasing Agent

---

**Legals/Public Notices**   **Legals/Public Notices**

**NOTICE TO PUBLIC AND**
**ALL INTERESTED MORTGAGE LENDERS**

TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS
MORTGAGE CREDIT CERTIFICATE PROGRAM

The Texas Department of Housing and Community Affairs (the "Department") intends to implement a Mortgage Credit Certificate Program (the "Program") to assist eligible very low, low, and moderate income first-time homebuyers with the purchase of a residence located within the State of Texas.

Under the Program, a first-time homebuyer who satisfies the eligibility requirements described herein may receive a federal income tax credit in an amount equal to the product of the certificate credit rate established under the Program and the interest paid or accrued by the homeowner during the taxable year on the remaining principal of the certified indebtedness amount incurred by the homeowner to acquire the principal residence of the homeowner; provided that, if the certificate credit rate established under the Program exceeds 20%, the amount of such credit allowed in any taxable year may not exceed $2,000. To receive a mortgage credit certificate, the homebuyer must qualify for a conventional, FHA, VA, USDA or other home mortgage loan from a lending institution and must meet the other requirements of the Program.

The mortgage credit certificates will be issued to qualified mortgagors on a first-come, first-served basis by the Department, which will review applications from lending institutions and prospective mortgagors to determine compliance with the requirements of the Program and determine that mortgage credit certificates remain available under the Program. No mortgage credit certificates will be issued prior to ninety (90) days from the date of publication of this notice or after the date that all of the credit certificate amount has been allocated to homebuyers, and in no event will mortgage credit certificates be issued later than the date permitted by federal tax law.

In order to satisfy the eligibility requirements for a mortgage credit certificate under the Program: (a) the prospective residence must be a single-family residence located within the State of Texas that can be reasonably expected to become the principal residence of the mortgagor within a reasonable period of time after the financing is provided; (b) the prospective homebuyer's current income must not exceed, (1) for families of three or more persons, 115% (140% in certain targeted areas or in certain cases permitted under applicable provisions of the Internal Revenue Code of 1986, as amended (the "Code")) of the area median income; and (2) for families of fewer than three persons, 100% (120% in certain targeted areas or in certain cases permitted under applicable provisions of the Code) of the area median income; (c) the prospective homebuyer must not have owned a home as a principal residence during the past three years (except in the case of certain targeted area residences or in certain cases permitted under applicable provisions of the Code); (d) the acquisition cost of the residence must not exceed 90% (110% in the case of certain targeted area residences or in certain cases permitted under applicable provisions of the Code) of the average area purchase price applicable to the residence; and (e) no part of the proceeds of the qualified indebtedness may be used to acquire or replace an existing mortgage (except in certain cases permitted under applicable provisions of the Code). To obtain additional information on the Program, including the boundaries of current targeted areas, as well as the current income and purchase price limits (which are subject to revision and adjustment from time to time by the Department pursuant to changes in applicable federal law and Department policy), please contact Cathy Gutierrez at the Texas Department of Housing and Community Affairs, 221 East 11th Street, Austin, Texas 78701-2410; telephone (512) 475-0277.

The Department intends to maintain a list of single family mortgage lenders that will participate in the Program by making loans to qualified holders of these mortgage credit certificates. Any lender interested in appearing on this list or in obtaining additional information regarding the Program should contact Cathy Gutierrez at the Texas Department of Housing and Community Affairs, 221 East 11th Street, Austin, Texas 78701-2410; (512) 475-0277. The Department may schedule a meeting with lenders to discuss in greater detail the requirements of the Program.

This notice is published in satisfaction of the requirements of Section 25 of the Code and Treasury Regulation Sections 1.25-3T(j)(4) and 1.25-4T promulgated thereunder regarding the public notices prerequisite to the issuance of mortgage credit certificates and to maintaining a list of participating lenders.

---

**ADVERTISEMENT FOR COMPETITIVE SEALED PROPOSALS**

Brookstone, L.P., acting as Construction Manager-At-Risk on behalf of San Jacinto Community College District, will receive proposals from subcontractors and suppliers.

| PROJECT | San Jacinto Community College District Central Campus McCollum Building Renovation GMP-1: Asbestos Abatement, Demolition, Temporary Protection, Fire Suppression, Mechanical, Plumbing, and Electrical |

**OWNER:**   San Jacinto Community College District

**SEALED PROPOSAL TIME & DATE:**  August 26, 2020 @ 2:00 PM Late proposals will not be accepted or acted upon.

**SITE VISIT:** A site visit is strongly recommended to interested bidders. Due to Covid-19, we will only allow a certain number of attendees at a time. Please contact Karli Atkinson at katkinson@brookstone-tx.com for information regarding site visit(s) to verify time availability.

**QUESTIONS:**   Written questions should be addressed to Karli Atkinson,
katkinson@brookstone-tx.com

**LOCATION AND PROPOSAL OPENING:**  Construction Manager
Brookstone, L.P.
3715 Dacoma Street
Houston, TX 77092
Phone: 713.425.0751
Fax: 713.680.0088
Attention: Karli Atkinson
Email: katkinson@brookstone-tx.com

Proposal documents will be available 8/6/2020. Please contact Karli Atkinson for Proposal Documents at katkinson@brookstone-tx.com.

The Construction Manager and Owner reserve the right to reject any and all proposals and to waive any informalities in the Proposal process.

---

Public Notice
Notice of Funding Availability (NOFA)
HCDD Public Services
Solicitation No. T25579 Administrative Department
The City of Houston, Housing and Community Development Department (HCDD) is soliciting nonprofit organizations ("Applicants") with 501(c)(3) non-profit status to provide administrative services for the City of Houston's Child Care, Juvenile Delinquency Prevention, and Homeless Services programs. All programs benefit low-to-moderate income populations. The term of the resulting Agreement will be two-years with an option of one (1) year extension at the discretion of HCDD.
Date Issued: August 3, 2020.
NOFA Conference: August 11, 2020 @ 11:00 a.m.
Hosted by Housing and Community Development Department
Virtual Meeting via Teams Call-In.
Conference Questions Due: August 18, 2020 @ 5 P.M.
Solicitation Due Date: September 3, 2020 @ 2:00 p.m.
Solicitation Contact Person: Tywana Wilson @ 832-394-6204
Tywana.Tchornr@houstontx.gov

---

**Citation by Publication**   **Legals/Public Notices**   **Legals/Public Notices**

**CAUSE NUMBER: 201942807**

**201942807**
**Plaintiff: BUI, BRYAN K.**
**vs.**
**Defendant:**
**VALDEZ,**
**RONAL JOHAN**
**IN THE 127TH JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS**
**127TH JUDICIAL DISTRICT**
**CITATION BY PUBLICATION**
**THE STATE OF TEXAS**
**County of Harris**
**To: VALDEZ, RONAL JOHAN OR WHEREVER HE MAY BE FOUND**
**YOU ARE HEREBY COMMANDED** to be and appear before the 127TH Judicial District Court of Harris County, Texas, in the Courthouse in the city of Houston, Texas at or before 10:00 o'clock A.M. Monday, SEPTEMBER 14, 2020, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the OYB CITATION BY PUBLICATION filed in said court on July 28, 2020, in a suit numbered 201942807 on docket of said court, wherein: BUI, BRYAN Plaintiff(s) and VALDEZ, RONAL JOHAN, Defendant(s), the nature of plaintiff's demand being and the said petition showing:
**ON OR ABOUT MARCH 14, 2018, PLAINTIFF WAS TRAVELING NORTHBOUND NEAR OR AROUND THE 2200 BLOCK OF SOUTH STREET IN HOUSTON, HARRIS COUNTY, TEXAS. SUDDENLY AND WITHOUT WARNING, DEFENDANT FAILED TO MAINTAIN A SAFE DISTANCE FROM PLAINTIFF'S VEHICLE, CAUSING THE VEHICLE BEING OPERATED BY THE DEFENDANT TO STRUCK THE REAR END OF THE PLAINTIFF'S VEHICLE. AS A RESULT OF THE DEFENDANT'S NEGLIGENCE AND THE WRECK, PLAINTIFF SUSTAINED SERIOUS PERSONAL INJURIES.**
Notice hereof shall be given by publishing this Citation once a week for four consecutive weeks previous to SEPTEMBER 14, 2020, in some newspaper published in the County of Harris, if there be a newspaper published therein, but if not, then the nearest county where a newspaper is published... and this Citation shall be returned on SEPTEMBER 14, 2020, which is forty-two days after the date it is issued, and the first publication day shall be at least twenty-eight days before said return day. **HEREIN FAIL NOT**, but have before said court on said return day this Writ with your return thereon, showing how you have executed same.

**WITNESS, Marilyn Burgess**, District Clerk, Harris County, Texas
**GIVEN UNDER MY HAND AND SEAL OF SAID COURT** at Houston, Texas on July 31, 2020.
(SEAL)
Newspaper: 3
Issued at the request of:
KING, ALLEN ARLEN JR.
2222 E. GOVERNORS
CIRCLE
HOUSTON, TX 77092-0000
Bar Number: 11433490
/s/ Marilyn Burgess
Marilyn Burgess, District Clerk of Harris County, Texas
201 CAROLINE, Houston, Texas 77002
P.O. Box 4651, Houston, Texas 77210
Generated by: BRIANNA J. DENMON

---

**Legals/Public Notices**   **Legals/Public Notices**

**HOUSTON POLICE DEPARTMENT ABANDONED VEHICLE AUCTION**

Notice is hereby given to the owners and lien holders of the vehicles listed below that unless such vehicles are redeemed within 30 days of the date of this notice, they may be sold at public auction. Failure of the owner or lien holder to exercise their right to reclaim the vehicle within the time provided constitutes a waiver by the owner and lien holder of all rights, title and interest in the vehicle at public auction. The last registered owner/lien holder could not be determined on the following vehicles.

| YR, MAKE/MODEL | VEHICLE ID NO |
|---|---|
| '00 NISS | 1N4BL11E13C130653 |
| '02 FORD | 2FTRX08W5YCA21958 |
| '09 ACUR | 19UUA86269A007768 |
| '07 CHEV | 1J4GP48R57B181112 |
| '04 FORD | 1FMZU62K44UB18673 |
| '18 CHEV | 1G1ZT53815F219934 |
| '18 CHEV | 1G1GSCE43J1215817 |
| '16 CHEV | 1GCSCRE42A2276991 |
| '98 CHEV | 1GNDT13W7W2187756 |
| '06 CHEV | 2G1WT58K469135610 |
| '03 MERC | 2MEFM75W23X641854 |
| '17 KIA | 3KPFL4A73HE144701 |
| '10 HYUN | 3N1CE2CP1GL405559 |
| '17 TOYT | 5TFFW5F15HX222767 |
| '07 NISS | JA32U1FU4AU002954 |
| '17 TOYT | 2T2BG22K0V0074615 |
| '99 LEXU | JT8BD32Z2X0069931 |
| '00 TOYT | JTDBT123381204888 |
| '00 TOYT | JTNBE46K73B86649 |
| '03 SATU | 1G8JW54R83Y508940 |

**AUCTIONS ARE HELD DAILY. FOR TIMES AND LOCATIONS CALL 713-247-5812
TERMS ARE CASH AT TIME OF SALE.**

---

$1 million. Westlake Chemical's net sales fell 20 percent to $1.7 billion in the second quarter from $2.1 billion in the same quarter of 2019.

The company said that profits fell primarily because of the economic impact of COVID-19, which drove a significant decline in oil prices, which in turn reduced the competitiveness of natural gas feedstocks used in making ethylene, a chemical building block of plastics.

Targa Resources, a Houston-based natural gas pipeline operator, halted seven quarters of losses to make $48.9 million in the second quarter compared with a $41.2 million loss one year earlier.

The company's second-quarter revenue declined by 25 percent to $1.5 billion from $2 billion during the same quarter of 2019.

Targa took most of its pain during the first quarter, when the company wrote down the value of $2.2 billion worth of assets, cut its budget by more than $1 billion and slashed its dividend to save another $755 million.

Cheniere Energy, the Houston-based liquefied natural gas company, made $197 million during the quarter compared with a $84 million loss during the same quarter a year earlier. The profit came even as dozens of LNG cargoes were canceled during the ongoing pandemic.

Second-quarter revenue increased 5 percent to $2.4 billion from $2.3 billion during the same quarter a year earlier.

Cheniere said exports declined 25 percent to 78 shipments from 104 one year earlier.

Cheniere still earns fees on canceled cargoes, collecting $708 million worth of fees in the second quarter, according to an SEC filing.

Parsley Energy, the Austin-based shale driller, said it lost $356 million during the quarter, compared with a profit of $86 million during the same period a year earlier. Second-quarter revenue fell by more than half to $220 million from $499 million in the same period in 2019.

"From a macro standpoint, the second quarter represented an unforgiving stress test for much of our industry," CEO Matt Gallagher said in a statement. "The worst may be behind us – prices have found firmer footing as oil markets seek a cautious equilibrium. However, at Parsley Energy, we harbor no illusions of the difficulties facing our industry and we remain well-built for that endurance test."

Parsley responded to the oil bust by suspending new drilling and completion operations, and it idled 15 rigs and five hydraulic fracturing equipment sets in May and June. The company also paused 20 percent of its oil production.

Talos Energy, a Houston-based oil and gas company, lost $40.6 million during the quarter, compared with a profit of $94.8 million during the same period a year earlier. Second-quarter revenue fell by more than two-thirds to $88.9 million from $286.8 million in the same period in 2019.

"Although the second quarter presented unprecedented challenges for our industry, we took several actions in the quarter that have made us a stronger company for the remainder of this year and beyond," CEO Timothy Duncan said.

Talos has deferred oil and gas production by 14,400 barrels equivalent per day and permanently shut down production totaling about 600 barrels equivalent per day. It plans to cut administrative costs by about $20 million, or about 25 percent, and reduce operating expenses by $40 million, or about 12 percent.

---



# LEGAL NOTICES
& A SNORING SPOUSE

TWO THINGS THAT KEEP YOU UP AT NIGHT

Stay legal and get noticed by emailing our team at
legals@chron.com
or calling 713.224.6868

HOUSTON★CHRONICLE
HoustonChronicle.com



IF YOU THINK LEGAL NOTICES ARE PAINFUL, WAIT UNTIL YOU PLACE ONE IN THE WRONG PAPER.

Stay legal and get noticed by emailing our team at legals@chron.com or calling 713.224.6868

HOUSTON★CHRONICLE
HoustonChronicle.com



# LEGAL NOTICES & ANNIVERSARIES

TWO THINGS YOU BETTER NOT FORGET

Stay legal and get noticed by emailing our team at legals@chron.com or calling 713.224.6868

HOUSTON★CHRONICLE
HoustonChronicle.com

# LEGAL NOTICES & CLOWNS

TWO THINGS THAT HAVE A RIGHT TIME AND PLACE

Stay legal and get noticed by emailing our team at legals@chron.com or calling 713.224.6868

HOUSTON★CHRONICLE
HoustonChronicle.com



# LEGAL NOTICES & A SNORING SPOUSE

TWO THINGS THAT KEEP YOU UP AT NIGHT

Stay legal and get noticed by emailing our team at legals@chron.com or calling 713.224.6868

HOUSTON★CHRONICLE
HoustonChronicle.com