IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-33948-11 |
| | § | HOUSTON, TEXAS |
| FIELDWOOD ENERGY, LLC AND | § | MONDAY, |
| DYNAMIC OFFSHORE RESOURCES | § | SEPTEMBER 14, 2020 |
| NS, LLC, | § | |
| DEBTORS. | § | 1:30 P.M. TO 2:40 P.M. |

TELEPHONIC MOTIONS HEARING

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY/ERO:                 RECORDED REMOTELY
                                      NO LOG NOTES

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Lane, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>TELEPHONIC APPEARANCES</u>:

| | |
|---|---|
| FOR THE DEBTORS, FIELDWOOD ENERGY, LLC, ET AL.: | WEIL GOTSHAL & MANGES, LLP<br>Alfredo R. Perez, Esq.<br>Clifford W. Carlson, Esq.<br>700 Louisiana Street<br>Suite 1700<br>Houston, TX 77002<br>713-546-5040 |
| | WEIL GOTSHAL & MANGES, LLP<br>Matthew Barr, Esq.<br>Jessica Liou, Esq.<br>767 Fifth Avenue<br>New York, NY 10153<br>212-310-8010 |
| FOR US SPECIALTY INSURANCE COMPANY: | LOCKE LORD, LLP<br>Philip Eisenberg, Esq.<br>600 Travis Street, Suite 600<br>Houston, TX 77002<br>713-226-1304 |
| FOR THE AD HOC GROUP OF SECURED LENDERS: | DAVIS POLK & WARDWELL, LLP<br>Damian Schaible, Esq.<br>450 Lexington Avenue<br>New York, NY 10017<br>212-450-4580 |
| FOR APACHE CORPORATION: | HUNTON ANDREW KURTH, LLP<br>Robin Russell, Esq.<br>600 Travis Street, Suite 4200<br>Houston, TX 77002<br>713-220-4200 |
| FOR THE OFFICIAL COMMITTE OF UNSECURED CREDITORS: | STROOCK STROOCK & LAVAN, LLP<br>Kristopher M. Hansen, Esq.<br>180 Maiden Lane<br>New York, NY 10038<br>212-806-6056 |

<u>TELEPHONIC APPEARANCES (CONT'D)</u>:


FOR ASPEN AMERICAN INSURANCE          CHIESA SHAHINIAN & GIANTOMAI PC
COMPANY AND EVEREST                   Scott A. Zuber, Esq.
REINSURANCE COMPANY:                  One Boland Drive
                                      West Orange, NJ 07052
                                      973-530-2046


FOR ECOPETROL AMERICA, LLC:           SQUIRE PATTON BOGGS, LLP
                                      Maura McIntyre, Esq.
                                      4900 Key Tower
                                      127 Public Square
                                      Cleveland, OH 44114
                                      216-479-8715


FOR THE HANOVER INSURANCE             LANGLEY, LLP
COMPANY, TRAVELERS                    Brandon Bains, Esq.
CASUALTY AND SURETY COMPANY           1301 Solana Blvd.
OF AMERICA, ET AL.:                   Bldg. 1, Suite 1545
                                      Westlake, TX 76262
                                      214-722-7171


FOR C-DIVE, LLC:                      CARVER DARDEN, ET AL.
                                      Leann Moses, Esq.
                                      1100 Poydras Street
                                      Suite 3100
                                      New Orleans, LA 70163
                                      504-485-3830


FOR REGIS SOUTHERN:                   BAKER & ASSOCIATES, LLP
                                      Reese W. Baker, Esq.
                                      950 Echo Lane, Suite 300
                                      Houston, TX 77024
                                      713-869-9200


FOR GIBSON APPLIED                    PORTER POWERS, PLLC
TECHNOLOGY AND ENGINEERING:           J. Robert MacNaughton, Esq.
                                      1776 Yorktown, Suite 300
                                      Houston, TX 77056
                                      713-621-0700

1      <u>HOUSTON, TEXAS; MONDAY, SEPTEMBER 14, 2020; 1:30 P.M.</u>

2          THE COURT:  All right.  We're here in the Fieldwood

3      Energy case, it's 20-33948.  I'm going to start by asking

4      Debtors' counsel to press five star on their phone and giving

5      me an update on where we are.  And then if anyone else wishes

6      to speak when in update format, we'll do that, and then we'll

7      move into the motions.

8          Mr. Perez, good afternoon.

9          MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

10     Perez on behalf of the Debtors.  I'm joined by Mr. Barr,

11     Ms. Liou, and Mr. Carlson.

12         Your Honor, we have five matters on the Agenda.  I

13     believe that we are substantially done with all of them, and I

14     think that there might be some tweaks with respect to the

15     language, but I think we're substantially done with all of

16     them.

17         We do have Mr. Dane (phonetic) available to testify

18     to the extent that we need an evidentiary record with respect

19     to some of the motions.  But I think Mr. Carlson and Ms. Liou

20     have been working very diligently to address all of the

21     various concerns.

22         And I think that's kind of where we stand right now.

23         THE COURT:  All right.  If anybody else wants to

24     make any sort of an opening comment, particularly if you think

25     that your matter isn't in the process of being resolved by

1    some language change or something of that nature and you think

2    you have a substantive issue for which we need some evidence,

3    I'd ask that you press five star on your phone, please.

4            Mr. Hansen, good afternoon.

5            MR. HANSEN:  Good afternoon, Your Honor.  This is

6    Kris Hansen with the Stroock firm, proposed counsel to the

7    Official Committee.  Your Honor, Mr. Perez is correct, we've

8    worked hard to try and resolve as many of the issues with

9    respect to the orders on the second day motions, as possible.

10           The Committee does have some concerns with respect

11   to the DIP motion, which we'll get into whenever we get to

12   that one, but we didn't want to let the Court think that we're

13   going to be able to follow through without something, maybe a

14   commentary with respect to that motion.

15           THE COURT:  All right, Mr. Hansen.  Thank you.

16           I've also got somebody from the 973 area code,

17   973-868-4715.  Go ahead, please.

18           MR. ZUBER:  Thank you, Your Honor.  This is Scott

19   Zuber, (indiscernible).  I have been admitted pro hac vice in

20   this matter, and I thank you for that.  Our local counsel

21   (indiscernible) are on the line as well.  We represent several

22   of the surety providers (indiscernible).

23           But we filed a formal objection.  We have been

24   having discussions with Debtors' counsel, you know, on a

25   continual basis, including through the weekend, and while

1    don't have a formal objection, I would like, when get to the

2    motion, to be heard at least with respect to my client's

3    position on the motion.

4              THE COURT:  Of course, Mr. Zuber.  Thank you.

5              MR. ZUBER:  Thank you, Your Honor.

6              THE COURT:  From 713-600-4314.

7              MR. MacNAUGHTON:  Good morning, Your Honor.  My name

8    is Robert MacNaughton.  I represent Gibson Applied Technology

9    & Engineering.  While we don't have a formal objection filed

10   in this matter, we're relying on the Unsecured Creditors

11   Committee's motion and the other creditor's motion.

12             We just now have seen the revised order and our

13   concern is that we don't have a matrix and have no idea where

14   our outstanding amounts due and our continuing operations with

15   the Debtor stand.  We've attempted to contact the Debtor to

16   get their cooperation and communication, and they have failed

17   to do so.  We have talked with the attorneys for the Debtor

18   and they have said: You can't get through with Debtor

19   themselves, kind of the company -- company please call back.

20             We're relying on the Unsecured Creditors Committee

21   to get this ball down the road some more, yet I still don't

22   see anything to address that in the matrix or anything

23   otherwise as to how creditors are to be paid or treated

24   under -- this is under Matter Number -- under Docket -- Item

25   No. 7.  We're a trade creditor, ongoing trade creditor and

1    operating (indiscernible).

2           THE COURT:  So which -- you say it's Item No. 7.

3    I've got a surety bonds motion, a cash management motion, an

4    ongoing interest holder's motion, a DIP motion, and then a

5    stay for relief motion.  I don't see a trade creditors or

6    critical vendor motion.  So maybe you can identify a little

7    more fully for me where you are, Mr. MacNaughton.

8           MR. MacNAUGHTON:  I'm sorry, I apologize, Your

9    Honor.  Under the Agenda filed it would be Item No. 4,

10   emergency motion by -- for Debtors -- for interim Final Order.

11   It's also under the Debtors' pre-petition other obligations

12   (indiscernible) billings and D&D operating expenses and 503(b)

13   claims.  We fall under the latter two.

14          THE COURT:  All right.  I didn't know you had a

15   503(b)(9) kind of claim.

16          Okay.  When we get there, let me ask you to raise

17   your objection, Mr. MacNaughton.  I don't have you having made

18   an electric appearance, so if at some point this afternoon you

19   can go to our website and get that done, we need to get those

20   appearances made.

21          Anybody else have any comment that you wish to make?

22       (No audible response.)

23          THE COURT:  All right.  Who's going to take the lead

24   on presenting the motions then, Mr. Perez, and we'll take

25   objections as we go through them.

1          MR. PEREZ:  Yes, Your Honor.  Mr. Carlson is going

2     to do the first two, then I'm going to do cash management, and

3     Ms. Liou is going to do the vendor motion.

4          THE COURT:  All right.  Mr. Carlson.

5          For those of you that have already spoken, I'm going

6     to leave all of your lines unmuted and just ask that you

7     regulate your own sound there to be sure we don't interrupt.

8          Mr. Carlson, go ahead, please.

9          MR. CARLSON:  Your Honor, the first item on the

10    Agenda is the Debtors' DIP motion, filed at Docket No. --

11    well, the proposed Form of Order is filed at Docket No. 333.

12          Before I get into the motion, just as a housekeeping

13    matter, the Debtors move to introduce the Declarations into

14    evidence, the Declaration of Mike Dane at ECF No. 29, and the

15    Declaration of J.P. Hansen in support of the DIP motion that's

16    filed at Docket No. 23.

17          THE COURT:  Does anyone object to admitting the

18    Declarations at 23 and 29 solely for the purpose of today's

19    hearing?

20     (No audible response.)

21          THE COURT:  All right.  The two Declarations filed

22    at ECF 23 and 29 are admitted for the purposes of today's

23    hearing.

24          Go ahead, Mr. Carlson.

25          MR. CARLSON:  Thank you.

1          So, Your Honor, the Form of Order that we filed at

2      Docket No. 333, that is supported by the Creditors Committee

3      and our DIP Lenders.  And I believe we have resolved most of,

4      if not all of the objections that have been filed.  There were

5      a number of vendors and other parties.  We are working with, I

6      think, two objecting parties to finalize some agreed language,

7      that's Equifax and J. Aron (phonetic), but that's the most two

8      objecting parties where we are very close to agreeing on

9      language that's not already agreed.  I believe that -- I'm not

10     aware of any other objections outstanding for this Form of

11     Order.

12          THE COURT:  So before we get into other parties'

13     issues, I don't think this is intended by the Order, but I am

14     concerned that some of the default language which says that

15     the Debtors may not propose an alternative plan that doesn't

16     pay us in full, stuff like that.  I don't have a problem that

17     those are defaults.  I'm a little worried -- I have a problem

18     that they're defaults, but you all have agreed they're

19     defaults, and that's part of the process as you can all agree

20     to that.

21          I'm a little worried that I think some of the

22     language has me order you all not to speak, and I don't

23     believe that I should order anyone that they can't raise any

24     issue before the Court.  It's okay with me that you all agree

25     that it's a default, and I don't -- and I think that was the

1    only intent, but if we look at the language, I think some of

2    it would actually make me order you not to do that.  And

3    although I know no one intended that, I don't think I should

4    ever do something to put fear in someone for speaking.

5        I see Mr. Schaible shaking his head, yes, that I

6    think that if the language says that, it would have been

7    inadvertent.

8        Mr. Schaible, could I get you to press -- maybe you

9    already have, I've got somebody pressing five star.  That was

10   I think Mr. Eisenberg, and there's Mr. Schaible.  Let me start

11   with Mr. Schaible if we could, and then we'll come back to

12   you, Mr. Eisenberg.

13       MR. SCHAIBLE:  Thank you, Your Honor.  Damian

14   Schaible, Davis Polk.

15       We'll fix the language.  We know that you are

16   concerned about that and actually we're not trying to have you

17   order anyone to not speak.  So we can fix the language and

18   send a revised form or (indiscernible) prefer, Your Honor.

19       THE COURT:  Thank you.  Mr. Eisenberg, you had an

20   issue you wanted to raise?

21       MR. EISENBERG:  Yes, Your Honor.  It's not an issue

22   at all, Your Honor.

23       We have obviously been active at the first-day

24   hearings on this, and we have been working with the Debtors in

25   a very cooperative way, and they have made numerous edits to

1    the Order that we found acceptable and let them know that

2    we're not objecting.  They're obviously still in the process

3    of finalizing it with regards to the those parties, and we

4    simply -- they've given us an opportunity to review it at

5    every turn and I expect that they'll hold to any other further

6    edits prior to filing it.  I simply want to reserve my rights

7    if we were able to say finally file once they resolve the rest

8    of these pieces.

9                THE COURT:  All right.  Thank you.

10               So perhaps it makes some sense, Mr. Carlson, for you

11   to describe on the two remaining parties where the language

12   isn't yet in here what the deal is.  People can then review

13   the language to be sure it reflects the deal, but let's see if

14   we have any deal objections to what you're going to do for

15   those two parties.

16               MR. CARLSON:  Sure.  I'm happy to do it.  So, Your

17   Honor, for Jay Aron (phonetic), it's clarifying language to

18   make aware that the collateral for (indiscernible) allegations

19   and that'll be the  DIP collateral, and those will be hard to

20   sue with the DIP Lenders.  So that's something we're building

21   in.  It still needs to be finalized with the DIP Lenders and

22   Jay Aron (phonetic) at that point.

23               For (indiscernible) Petrol, it's really just a

24   reservation of rights making clear that the DIP Order does not

25   affect certain of their contract rights under the Joint

1    Operating Agreement with the third-parties.

2         THE COURT:  All right.  Assuming that the language

3    implements what Mr. Carlson has represented, does anyone have

4    any objection to entry of the DIP Order that's going to

5    include that language and the language that I just discussed

6    with Mr. Schaible to make it clear that, you know, the Order

7    does not preclude people from -- by Order from speaking.

8    There may be a price to them speaking, they may be in default

9    of the loan, but they're free to speak to me.  That's just an

10   economic question for them.

11        So other than that, does anyone have any objections?

12   Please go ahead and voice them.  I do have somebody else that

13   wants to speak, but go ahead.

14        MR. EISENBERG:  Your Honor, this is Philip Eisenberg

15   again on behalf of W&T.  We don't have -- again, I don't have

16   an objection.  The Order was entered and it had certain

17   language in it and we simply want to confirm whatever language

18   gets put into the DIP Order is consistent with the language

19   from that (indiscernible).

20        THE COURT:  Thank you.

21        From 818-212-6374.

22        MS. McINTYRE:  Good afternoon, Your Honor.  This is

23   Maura McIntyre from Squire Patton Boggs on behalf of

24   Echopetrol.

25        THE COURT:  Ms. McIntyre --

1          MS. McINTYRE:  Good afternoon.

2          THE COURT:   -- good afternoon.

3          MS. McINTYRE:  I understand the representation

4     provided that the language that we've agreed to cure the

5     emails gets incorporated into the Order, and consistent with

6     the confirmation from both Debtors' counsel and the DIP

7     Lenders that the Proposed Order does not purport to grant

8     leave and that it would be my client's property interest, we

9     have no further objection to entry of this Order.

10         THE COURT:  Thank you, Ms. McIntyre.

11         Anyone else?

12         MR. PEREZ:  Your Honor, this is Alfredo Perez.  We

13    did tell Ms. Russell that we would make a statement with

14    respect to her clients, so I don't know whether Mr. Carlson

15    was going to do that or I can do it.

16         THE COURT:  Well, or Ms. Russell can do it.  She's

17    usually not too shy about speaking up.

18         Ms. Russell, did you want to speak for yourself or

19    do you trust Mr. Carlson?  How's that for a loaded question?

20    I need you to press five star, Ms. Russell.

21         MS. RUSSELL:  (No audible response.)

22         THE COURT:  Ms. Russell, if you could press five

23    star just one time on your phone, I'm not seeing you yet.

24         There we go, I've got you.

25         Good afternoon, Ms. Russell.

1          MS. RUSSELL:  Your Honor, I think that someone from

2     the Estate of Woodside needs to make this statement for the

3     Record.

4          THE COURT:  Thank you.

5          Mr. Perez, Mr. Carlson, whoever wants to make the

6     statement telling Ms. Russell she got what she needed, you all

7     go ahead.

8          MR. CARLSON:  Sure.  So that statement is that the

9     Debtors intend to pay fees and acceptance in accordance with

10    the Restructure and Support Agreement that the Debtors

11    (indiscernible).  You'll recall that's attached to

12    (indiscernible) separation.

13         THE COURT:  Ms. Russell?

14         MS. RUSSELL:  Yes, Your Honor.  That confirms our

15    understanding that although the RSA has not yet been assumed,

16    and consistent with the Local Rules, that is the Court's

17    preference that it not be, the parties are still authorized to

18    perform under it, and would intend to do with respect to the

19    professional fees for Apache.

20         THE COURT:  Thank you, Ms. Russell.

21         MS. RUSSELL:  All right.

22         THE COURT:  All right.  Does anyone else have any

23    issue you want to raise?

24         (No audible response.)

25         THE COURT:  Okay.  What is the timing of when I need

1    to get this Order entered to be sure that the Debtor retains

2    its ability to spend cash and have access to its DIP?  I'm

3    here all week, I'm just -- I'm trying to figure out when I

4    need to get this order uploaded with these very minor changes,

5    I think.

6         MR. CARLSON:  So, Your Honor, Woodside will file

7    today.  I think by tomorrow would be fine.  I don't have the

8    milestones in front of me, I don't think it expires today, so

9    we have a little bit time.

10        THE COURT:  Mr. Schaible, if the milestone expires

11   before I can get this signed, I assume there's no problem.

12   Right?

13        MR. SCHAIBLE:  No problem at all, Your Honor.

14        THE COURT:  Thank you.

15        MR. SCHAIBLE:  We're going to pull the leg out from

16   under it.

17        THE COURT:  All right.

18        MR. SCHAIBLE:  (Indiscernible).

19        THE COURT:  Mr. Carlson, if you would contact Ms. Do

20   when you get the order that conforms with the announcements

21   uploaded, let Mr. Eisenberg and Mr. Schaible and anyone else

22   that sends you a formal request, review it in advance, and

23   then get it filed if you will before you go to sleep tonight.

24        MR. CARLSON:  We'll do that.

25        THE COURT:  Thank you.

1           All right.  Where do you all want to go next?

2           MR. CARLSON:  We're going to go to the Debtors'

3    motion to approve the Debtors' insurance and surety programs.

4    The motion was filed at Docket 4 and then we filed the

5    proposed form of Final Order at ECF No. 332.  The Proposed

6    Order that we've uploaded does resolve the only five

7    objections, which was by J.C. Nixon (phonetic).  We have been,

8    I think as has been alluded to earlier, we have been in

9    discussions with several of the surety providers, and we've

10   worked with them to incorporate several of their comments.  I

11   believe though that some of the sureties still have some

12   outstanding issues with the Form of Order that we've uploaded.

13   We'll welcome to address those (indiscernible).

14           THE COURT:  All right.  Let me hear the remaining

15   objections then to the insurance motion -- I'm sorry, the

16   insurance and surety bond motion.

17           MR. ZUBER:  Your Honor, this is Scott Zuber.  Can

18   you hear me okay?

19           THE COURT:  I can.  Yes, sir.

20           MR. ZUBER:  Okay.  Thank you.

21           So as indicated a little bit earlier that we had

22   been having discussions with Debtors' counsel for some time

23   now, including, you know, through the weekend about the Form

24   of Final Bonding Order.  But unfortunately we were not able to

25   reach an agreement on language that the sureties wanted.  We

1     would, you know, we would respectfully submit that some of the

2     provisions of the Final Bonding Order that allow, but do not

3     require, the Debtors to do certain things, for instance the

4     pre-petition bonding program really don't go far enough out.

5           The Debtors note in the motion that they have over

6     $1.1 billion in (indiscernible) and surety bonds and we note

7     that they're failure to provide any date or time and place of

8     those surety bonds may prevent the Debtors from undertaking

9     the essential functions related to their operations.  And the

10    sureties would wholeheartedly agree with that statement.

11          The Debtor-in-Possession's right to maintain and

12    retain surety bonds is not without reciprocal obligations.  A

13    surety bond with the pre-petition Debtor entities, the

14    sureties did not bond the Debtor-in-Possession.  If the

15    Debtor-in-Possession want to continue to operate by relying

16    upon post-petition surety credit, the sureties are entitled to

17    adequate protection.  Not adequate protection for the

18    (indiscernible), not either an agreement by the Debtors to

19    affirmatively honor the pre-petition bonding obligations.

20          It's my client's view the sureties believe that the

21    extension of post-petition credit is no different than any

22    other post-petition loan or line of credit.  It doesn't come

23    without some cost.  So the Final Order that potentially

24    allowed the Debtor to do certain things, but doesn't obligate

25    them to do anything really, in our view, doesn't go far.

1          But having said that, we're willing to live with the

2     Form of Order for now, but again, we believe that we are

3     entitled to adequate protection, we intend to raise those

4     issues to the extent they haven't already been made, we're

5     going to make it happen, but we intend continue with Debtors'

6     counsel and see if we can come to some sort of agreement on a

7     form of adequate protection.  And if not, then the likely

8     result of that would be that my clients and perhaps some of

9     the other sureties would likely move to Your Honor for

10    whatever you deem appropriate (indiscernible) for adequate

11    protection.

12         So again, we won't file a formal objection, we're

13    essentially running out of time.  So we're getting closer to a

14    form which we can agree to, but we didn't get there.  So I'm

15    not going to get in the way today and ask the Court not to

16    enter a Final Order because I understand that the Debtors do

17    need some comfort that they can proceed with their bonding

18    program (indiscernible) that from my client's perspective.

19         And I don't know that I ever said that I represent

20    Aspen American Insurance Company, Everest Reinsurance Company

21    and Berkeley Insurance Company, which collectively have about

22    $185 million in sureties (indiscernible).  So in terms of this

23    objection, we just kind of anticipate previewing for the Court

24    (indiscernible) what the likely (indiscernible) some

25    cooperation, further cooperation from the Debtors.

1    So with that I don't believe (indiscernible) this

2    will go any further, that wants to reach a consensus on the

3    Record to give you some sort of sense whether my clients and

4    probably other sureties are coming from this case.

5    THE COURT:  No, look, I very much appreciate your

6    speaking up because this is an area that I deal with a lot and

7    I would appreciate some education about it from you.

8    It has been my view I the past that if you have a

9    pre-petition surety bond, and if there's any call on the

10   surety bond, that your client would be entitled to a

11   pre-petition claim only and not to a post-petition claim.  And

12   that your remedy is to not renew your bond, at which point the

13   entity in whose favor you issued the bond would simply make

14   you put cash up and the Debtors would then have, in effect,

15   cash that would secure their future obligations.

16   And I'm very interested in learning why what I've

17   been doing in the past is incorrect because it's important to

18   me to get the right thing done here.  So do you disagree that

19   the pre-petition surety bond would only give rise to a

20   pre-petition claim?

21   MR. ZUBER:  I think it depends, Your Honor, of when

22   the claim arose.  I certainly would not want to concede that

23   if a post-petition claim arose after a post-petition

24   (indiscernible) that would be deemed a pre-petition claim in

25   terms of pre-petition agreement.  I would not concede that

1       today.  With the loss motion --

2                   THE COURT:  But wait --

3                   MR. ZUBER:  -- (indiscernible)?

4                   THE COURT:  -- wait.  You may want to concede it,

5       but tell me why it isn't.  I mean, your bonding obligation

6       doesn't arise post-petition, the claim under the bond arises

7       post-petition.  You made the financial -- you've already taken

8       the financial risk.  So why isn't that --

9                   MR. ZUBER:  Your Honor --

10                  THE COURT:  -- a claim under 101 of the Code?

11                  MR. ZUBER:  -- well, the -- Your Honor, you know, we

12      took (indiscernible) the bond the Debtors prior to them

13      filing.  Once they filed bankruptcy, the Debtor-in-Possession

14      is a separate legal entity.  We did not bond with entities.

15                  This is -- if the Debtor wanted to continue to

16      generate revenue in order for the business operations, and in

17      order to generate revenue they need certain permits.  And when

18      they get permits, they need bonds.  So we are essentially

19      providing post-petition credit to the benefit of the Debtor's

20      estate.  Not -- somewhat of a nuance and a little bit

21      different than having underpaid the pre-petition risk.

22                  In addition, Your Honor, I'm sure you've noticed, a

23      surety bond is a two-party arrangement, it is not like

24      insurance.  It's like insurance, but it's insurance.  The

25      Debtor remains the primary obligor at all times.  We stay

1    behind the Debtor as a second obligor.  So if the Debtor wants

2    to continue to operate and do -- bind oil exploration in the

3    Gulf of Mexico, relying upon a pre-petition surety bond and

4    generate revenue they need to protect us.

5         We are providing post-petition surety credit.  You

6    know, I agree with you, Your Honor, that to the extent we

7    provided pre-petition credit, that's something, but we didn't

8    provide pre-petition credit to the Debtor-in-Possession.  We

9    will not bond with entities.  And if they want to continue to

10   rely upon our credit, they need to adequately protect us.

11   This is no different in my view, Your Honor, than the argument

12   that this is 364 Debtor-in-Possession financing.  It's really

13   no different.

14        THE COURT:  So --

15        MR. ZUBER:  And in addition, Your Honor -- I'm

16   sorry, go ahead.

17        THE COURT:  No, under applicable non-bankruptcy law,

18   what's your remedy if the Debtors don't -- let's say they

19   choose not to renew a bond, what's your remedy?

20        MR. ZUBER:  Well, I think that we would have to deal

21   with the obligee and (indiscernible) bankruptcy law the bonds

22   may not be cancelled, we'd have to get permission from the

23   obligee.  Well, my response to that, Your Honor, would be that

24   simply because the bonds may not be cancelled under the non-

25   bankruptcy law, which is between the surety and the obligee,

1     that doesn't necessarily inure to the benefit of the bond

2     principal of the Debtor.  Just because we don't think

3     (indiscernible) the Debtor comes and says, well, the retention

4     bond.  If that bond became cancelled, it's not fundable.

5         So I said that may be right, but that's between me

6     and the bond obligee.  That doesn't mean that you, Debtor,

7     could continue to operate post-petition using my credit

8     without protecting me.

9         THE COURT:  Yeah, no, I get the argument, I'm just

10    not -- I'm really puzzled that between you and the obligee I

11    completely agree, you have the right under non-bankruptcy law

12    to not issue a renewal bond and they would have the right --

13    and I haven't read you bonds -- but they would then typically

14    have the right when you don't issue a renewal bond to require

15    you to put up cash equal to the pre-petition stated amount of

16    the bond.  And I don't think bankruptcy would change that.

17    But I'm wondering if you think it would.

18        MR. ZUBER:  Well, I looked at these changes, but I

19    think that there were other arguments in favor of the sureties

20    for adequate protection.  I mean, another argument is that

21    when Your Honor is trying to (indiscernible) argument is that

22    our surety bonds is largely announcing the financial

23    accommodation.  And some courts have held that since

24    (indiscernible) 355(c)(2), that that calls for stay relief.

25    And if you don't want stay relief, that in order to -- the

1    Debtor don't want (indiscernible) to be approved and

2    therefore, no longer be able to operate, they have to provide

3    us with adequate protection.  I'm talking about adequate

4    protection for post-petition expense in the surety credit.

5            THE COURT:  No, but --

6            MR. ZUBER:  (Indiscernible) --

7            THE COURT:  I'm sorry.

8            MR. ZUBER:   -- (indiscernible).

9            THE COURT:  But the stay of relief would be to do

10   what?  It would be to cancel your bond.

11           MR. ZUBER:  Well, to cancel our bond and if we

12   cancel the bond, that doesn't mean we get away from the claims

13   that have accrued up to that point, and we no longer would not

14   extend the line of credit.

15           In other words, if we met -- if Your Honor

16   were (indiscernible) and Your Honor were to approve stay

17   relief, that would then give us the right to cancel the bond.

18   Certainly that means they be calling on the bond, and we can't

19   get away from this claim, but it doesn't mean that we have to

20   continue to pay on their claims on extend our liabilities

21   without being protected.  So --

22           THE COURT:  Okay.

23           MR. ZUBER:   -- Your Honor, (indiscernible) --

24           THE COURT:  No, no, look, I --

25           MR. ZUBER:   -- (indiscernible) --

1          THE COURT:   -- I really appreciate the -- no, I

2    appreciate the discussion and you, you know, foretelling

3    what's going to happen in the future.  I just -- it's

4    something I need to constantly learn more about and your

5    explanation is helpful to my understanding.

6          So if you want to say anything else, go ahead, but

7    you've certainly dealt with me on a forthright basis and I

8    appreciate it.

9          MR. ZUBER:  No, thank you, Your Honor.

10          I don't -- like I said, I really just wanted to kind

11    of, you know, attempt to maybe preview where we may be going

12    (indiscernible).  You know, I hope we will work together

13    cooperatively.  But we were, as the surety group, a little

14    disappointed that we couldn't come to some long reaching

15    sureties that would be a little more protective.

16          And (indiscernible) certainly within the Committees

17    to which an (indiscernible), you know, get involved in the

18    case, you've got the time and sometimes the Debtors

19    (indiscernible) to give the sureties (indiscernible).  You

20    know, it's not (indiscernible) and we can't (indiscernible)

21    post-petition status for pre-petition claims and, you know, so

22    if we catch things.  These are always subject to negotiations.

23          But, you know, we're talking about over a billion

24    dollars in surety bonds, we're talking about a fast track case

25    and you know, (indiscernible), but I haven't seen that there,

1     you know, it looks to bifurcate certain companies and move

2     liabilities around in these notes.  You know, we're trying to

3     adjust to that, but it gives us some concern.  We are not

4     trying to get in the way of the final bonding order but --

5               THE COURT:  No, no, I -- I got that.

6               MR. ZUBER:   -- we wanted to (indiscernible) clear

7     up some issues with --

8               THE COURT:  No, let's just hope that Mr. Perez can

9     do a good job and get them out quick and then you don't have

10    to raise the question.  And if he blows it, we probably will

11    hear back from you.  But we'll blame him if we do.

12              MR. ZUBER:  Okay.  (Indiscernible), Your Honor, I

13    really appreciate the opportunity to at least get on the

14    Record some of these (indiscernible).

15              THE COURT:  No, thank you.

16              Mr. Bains, I think you had an issue that you wanted

17    to raise as well.

18              MR. BAINS:  (No audible response.)

19              THE COURT:  Mr. Bains?

20              MR. BAINS:  (No audible response.)

21              THE COURT:  Well, did I blow that?  Let me try

22    again.

23          (Pause in the proceedings.)

24              THE COURT:  Now let's try it.  Mr. Bains, that was

25    my fault, I apologize.  Go ahead, please.

1          MR. BAINS:  That's (indiscernible).  This is Brandon

2    Bains, I represent four sureties who have allowed $225 million

3    in exposure.  I just wanted to (indiscernible) Mr. Zuber's

4    comments and just let the Court know that we're all on the

5    same page, the same -- really I think all of the sureties.

6    You know, we've been (indiscernible) surety on a number of

7    occasions with similar motions.  I guess I'd note that often

8    the language in the order is stronger than I think we're even

9    looking for here.

10          I don't think it's non-controversial to have the

11   Debtor say that, yes, they'll pay premiums; yes, they're bound

12   by indemnity agreements.  So I don't know why that was an

13   issue that really came to light, at least for me, until late

14   Friday evening.  We filed -- we hadn't filed an formal

15   objection but I thought we had to.  I don't know that what

16   we're looking for in this surety order is something that is

17   crazy, or we're just (indiscernible) $1 billion in credit when

18   we haven't expected the to pay a premium.

19         We expect them to remain (indiscernible) agreement

20   considering an indemnity at the back bone of suretyship.

21   Surety should never suffer a loss, ever.  And we're just

22   wanting the Debtors to confirm that and they have not agreed

23   to do so, and that's the order we have in front of you today.

24         THE COURT:  So, look, this is similar to the

25   discussion we just had.  I don't think there's any question

1  but that the indemnity applies.  But you want it to become a

2  post-petition administrative indemnity rather than a pre-

3  petition unsecured indemnity and that's where I think the hard

4  question for me will have to be answered if we ever get there.

5  As I've said before, I've always believed it to be a pre-

6  petition indemnity and not a post-petition one.  Renewal is a

7  different question when it expires.

8          But I guess we'll cross that bridge when we get

9  there.  I do think it's difficult to suddenly say that those

10  pre-petition bonds take on administrative status merely by the

11  filing of the petition.  But I'm also hearing, you know, you

12  all want to argue that, and you're free to, but I just --

13  that's what I'm trying to learn about and that's why I was

14  asking Mr. Zuber.  And if you want to add anything to that

15  discourse, please go ahead.

16          MR. BAINS:  Well, I think the only thing I'd say,

17  Your Honor, is, you know, I'm trying to remember if this is a

18  case from you or Judge Jones, I think it was with you, it's

19  the *Ultra* matter, but simply there was a big dispute over the

20  DIP financing and all the costs and charges, and I think your

21  (indiscernible) was it's really hard to get credit in today's

22  market, and if you're going to give credit of $100 million as

23  it was in that case, you just (indiscernible) attached.  And I

24  don't think it's any different here with even a billion

25  dollars in credit.  And we're not asking for much in return.

1    We're just saying, Thank you, pay your premium, take your

2    (indiscernible) indemnity agreements, which frankly, Your

3    Honor, is the common law.

4         So, yeah, I don't believe that we're going to solve

5    that quandary today.  You know, I don't know why our credit

6    would be treated somehow different than any of the normal

7    creditor deals with on a DIP basis.

8         THE COURT:  If you had a letter of credit

9    outstanding and the letter of credit got called, that'd be

10   pre-petition.  I think the law is unambiguous on that.  Why is

11   this different than a letter of credit?

12        MR. BAINS:  (Indiscernible) because again we're

13   talking a (indiscernible) relationship between surety and

14   Debtor to these obligees.

15        THE COURT:  I meant I have not --

16        MR. BAINS:  And these are required by statute

17   under --

18        THE COURT:  -- I have not seen a letter of credit

19   issued in a large amount that doesn't have a reimbursement

20   agreement that's associated with it.  Which is the same as the

21   reimbursement obligation under the suretyship.

22        MR. BAINS:  Yes, they all say suretyship, but from a

23   common law perspective requires the indemnity, and there's

24   common law indemnity in the absence of an agreement because

25   the surety is a secondary guarantor and should never have any

1    loss.  But that's the whole idea.  But bankruptcy or anything

2    else should not be (indiscernible) for a principal to get

3    around their obligations to the detriment of the surety.

4    That's why we could all (indiscernible) --

5               THE COURT:  Right.  But --

6               MR. BAINS:   -- through the (indiscernible) of the

7    common law.

8               THE COURT:  But the question is whether it's a pre-

9    petition obligation to repay or a post though.  It's the

10   same -- it's the same here for the letter of credit.  I mean

11   you can have -- there are different kinds of letters of credit

12   but let's take a stand-by letter of credit.  On a stand-by

13   letter of credit they should never be out money any more than

14   you should be out money.

15              MR. BAINS:  True, I would agree with you on that, I

16   would agree.

17              THE COURT:  But I think there's a wealth of case law

18   that says those are pre-petition claims and I'm going to want

19   to understand why they ought to be post-petition.  I'm just

20   trying to have a productive hearing when we get there.  I know

21   it's not before us today, but this isn't an issue that I'm new

22   to, but it's an issue I need education about, and if I don't

23   tell you where my concerns are, you're not going to be

24   prepared to educate me, and that's all I'm trying to do today.

25              MR. BAINS:  That's (indiscernible) Your Honor do,

1    and as you noted, it wasn't just (indiscernible).  Seriously

2    we don't want to deal with any of these.  We'd love to not

3    have claims, we'd love for premiums to be paid, and we'd love

4    to all move on.  That's the goal, but --

5         THE COURT:  Yeah.

6         MR. BAINS:  -- just some of our concerns because

7    physically that's something the Debtor agreed to as well.  I

8    mean they're not here.

9         THE COURT:  Yeah, it wasn't in jest.  If Perez posed

10   it, he posed it.  We'll see.  We could --

11        MR. BAINS:  (Indiscernible).

12        THE COURT:  -- we could be here longer than we want

13   to be.

14        All right.  Beyond those announcements do we have

15   anyone that objects to the entry of the Order filed at

16   ECF 332?

17      (No audible response.)

18        THE COURT:  If not, then based on the two

19   Declarations that have been filed and the announcements,

20   including the reservation, the folks who are going to come

21   back and they're going to seek adequate protection and they're

22   seek potential stay relief, I got that, it's on the Record,

23   beyond those I'm going to grant the motion now without

24   objection based on the Declarations that have been filed.

25        Let me get this signed.

1          (Pause in the proceedings.)

2               THE COURT:  All right.  I've signed that order.

3     Where do you all want to go next?

4               MR. PEREZ:  Your Honor, I'm next up with the cash

5     management motion, Your Honor.

6               THE COURT:  All right.

7               MR. PEREZ:  So, Your Honor, the cash management

8     motion was filed originally at Docket No. 6, you entered the

9     interim order at Docket No. 49.  Yesterday we filed a proposed

10    Form of Order at Docket 330 which addressed most of the items,

11    but except the one, so we filed a further revised order at

12    Docket 338.

13              THE COURT:  That must have been very recently

14    because it's not yet on my -- I need to refresh my computer.

15    It must have been after the hearing started.

16              MR. PEREZ:  Yes.  Yes, Your Honor.  I'm specializing

17    in doing that these days.

18              THE COURT:  All right.  So I read the one that you'd

19    filed before.  Obviously I need to know what changes you've

20    made in 338.

21              MR. PEREZ:  Just one change, Your Honor.  If you go

22    to -- it's a new paragraph 16 and that would put in the words,

23    best of the Committee.  And we have a redline as to the end.

24    But that's it right there, Your Honor, Paragraph 16, when

25    everything moved down one paragraph.

1          THE COURT:  Got it.  All right.  With that one

2     change does anyone object to the cash management order?  If

3     so, please press five star on your phone.

4          MR. HANSEN:  Yes, Your Honor.  This is Kris Hansen

5     again with the Stroock firm on behalf of the Creditors

6     Committee.  Your Honor, it's not an objection, I just wanted

7     to highlight a point for the Court.  So we worked with the

8     Debtors to the order really to do two things, and one was to

9     (indiscernible) in advance if most of the payments that are

10    allowed through the cash management system to non-debtors so

11    we could actually verify those payments and determine whether

12    they were appropriate.

13         Even though the Debtors business judgment would be

14    exercised (indiscernible) and the (indiscernible) want to put

15    that reservation rights in at the end because they don't want

16    to disrupt the flow of the Debtors' business, we want to have

17    the opportunity, if we do, to be able to come back to court

18    and seek to pull those payments back against the Debtors'

19    ability to say that we were wrong in that, that we didn't want

20    to the order to take away our post-petition transfer rights.

21    Just give you a little bit background on that, Your Honor.

22         THE COURT:  Thank you, Mr. Hansen.

23         I've got one other party that wants to speak on

24    this.  Oh, that may have been you.  Hold on, let's see.

25         (Pause in the proceedings.)

1          THE COURT:  All right.  I'm seeing and hearing no

2     objections then to entry of the cash management order as

3     revised, and I'm going to go ahead and sign this order.

4          (Pause in the proceedings.)

5          THE COURT:  Again, these are based on the two

6     Declarations that have been admitted into evidence for the

7     purposes of today's hearing.  338 has been signed.  And I've

8     sent it to docketing.

9          Where do you want to go next?

10          MR. PEREZ:  Your Honor, Ms. Liou is going to be

11     handling the vendor motion.

12          THE COURT:  All right.  Ms. Liou, if you would press

13     five star, please.   Ms. Liou, good afternoon.

14          MS. LIOU:  Good afternoon, Your Honor.  Jessica Liou

15     from Weil Gotshal Manges, proposed counsel on behalf of the

16     Debtors.  I can see you, Your Honor, but I'm not sure if you

17     can actually see me on my camera.

18          THE COURT:  I cannot --

19          MS. LIOU:  I apologize --

20          THE COURT:   -- I cannot see you, Ms. Liou.  Do I

21     need to --

22          MS. LIOU:  I apologize.

23          THE COURT:  Is that --

24          MS. LIOU:  I was on the phone with my --

25          THE COURT:   -- does Mr. Barr --

1          MS. LIOU:   -- (indiscernible) and I --

2          THE COURT:   -- does Mr. Barr need to buy you a new

3     camera?

4          MS. LIOU:  No, no, and I've been trying to resolve

5     the issue with IT, but unfortunately we weren't able to, or we

6     thought we had solved it before this hearing, but it's not

7     working now.  So I do apologize.  We will get it working by

8     the time of the next hearing.

9          THE COURT:  No, you don't need to apologize, but Mr.

10    Barr does need to buy you a new camera.

11         MS. LIOU:  So next up is the (indiscernible) vendor

12    motion as I'll call it.  That was filed at Docket No. 7, you

13    did enter an interim order at Docket No. 62, and we -- the

14    Debtors have filed a proposed revised final Form of Order at

15    Docket No. 337 shortly prior to the hearing.

16         As you may see from the Agenda there were several

17    objections filed to this motion.  And (indiscernible) roughly

18    three categories.  We've got objections such as W&T's

19    objection filed at Docket No. 197 which (indiscernible)

20    requests clarification that nothing in the order itself was

21    intended to modify contractual obligations under the joint

22    operating agreement that the Debtors are party to, and we were

23    happy to build in language clarifying that.  So I believe that

24    should be resolved.

25         And that language, and you may see, is built into

1    the redline attached to Docket 337 at Paragraph 10.

2            The next bucket of objections come from parties like

3    (indiscernible) and those were filed at Docket Numbers 196,

4    212, 284 and 386.  And those relate to protections from

5    creditors speaking (indiscernible) whether or not they

6    actually will be paid pursuant to this motion and as to how

7    much.  As Your Honor can understand, that information

8    (indiscernible) isn't confidential, and as a part of the

9    ongoing negotiations that the company is conducting with a

10   number of creditors, they will need to have this conversation

11   pursuant to confidential settlement discussion with regard to

12   the pre-petition claims owed to creditors and also

13   confidential negotiations with the trade vendor agreement.

14           We don't believe that any of those creditors need to

15   know publicly through either reporting or public filing on

16   this docket whether or not we are going to be paying their

17   claims and in what amount of the claim.  So we would ask Your

18   Honor if you would overrule those objections.

19

20           Lastly, we have the objection filed by the Unsecured

21   Creditors Committee at 308.  And I am happy to report that we

22   have resolved with the Unsecured Creditors Committee their

23   reporting objection and we put language into the proposed

24   Final Order at Paragraph 6 that specified what the additional

25   reporting is.  The Debtors will provide weekly reporting on

1       the (indiscernible) pursuant to this order at right around

2       three months, and also an additional reporting related to the

3       status of the vendor legal information on a summary in an

4       aggregate basis as specified in that paragraph.

5               We have run that language by the Creditors Committee

6       counsel, the US Trustee, and also the ad hoc secured lenders

7       counsel, all have signed off on that language.

8               I will note, and I'm sure Mr. Hansen will also speak

9       up in a moment, this, however, does not necessarily obviate

10      the Creditors Committee counsel's desire to get up and speak

11      and share their concerns and instructions with them the

12      program that the company has currently in place.

13              I'm happy (indiscernible), Your Honor, if you have

14      any questions.

15              THE COURT:  So I do.  I mean we heard earlier today

16      and we've seen in writing that people want to know if they're

17      getting paid, and you addressed that by saying you want to

18      keep that quiet.  Let's assume that somebody has a 503(b)(9)

19      claim, but that we sign this order.  Can you offer to them

20      less than what they want?  Does anything in this order

21      preclude that creditor from proceeding under 503(b)(9) to

22      protect their rights fully?

23              MS. LIOU:  Absolutely not.

24              THE COURT:  So they can file a 503(b(9) motion, they

25      can seen whatever relief they want, and you're not going to

1    come back and say, Well, you already signed an order that deal

2    with that, this is not going to get in their way of doing

3    that.

4              MS. LIOU:  Well, you know, in connection with

5    (indiscernible) these claims and negotiating with the

6    creditors, obviously the creditor may have a view as to what

7    the appropriate amount of their claim is and they're entitled

8    to file something with the Court and assert that amount.

9    Obviously the Debtor will do their own work and then their

10   books and records will determine what amount they believe is

11   an appropriate 503(b)(9) claimant -- (indiscernible).

12             THE COURT:  But this order does not injury to either

13   position, is that your position?

14             MS. LIOU:  That's right.

15             THE COURT:  So what if someone has a 546 perfection

16   right, does this stop them from perfecting under 546(b)?

17             MS. LIOU:  No, no, it does not, Your Honor.

18             THE COURT:  All right.  Let me hear from objecting

19   parties then why this order should not be entered.  And I know

20   if you already made a statement earlier, but please remake it

21   in the context of those answers where at least it's the

22   Debtors' position that this order doesn't in any way limit

23   anyone's right to get a 503(b)(9) claim, it just allows the

24   Debtors to resolve those without a further order of the Court.

25             So I've left your line active.  Go ahead and tell me

1       again what the problem is.

2                    MR. EISENBERG:  Well, Your Honor, this is is Philip

3       Eisenberg for W&T.  If I may be heard with --

4                    THE COURT:  Sure.

5                    MR. EISENBERG:   -- what we're doing right now?

6                    THE COURT:  Go ahead.

7                    MR. EISENBERG:  Okay.  So we do very much appreciate

8       the engaging with the Debtors and the language that they

9       included in Paragraph 10 (indiscernible) we've got the joint

10      operating agreements.  I think (indiscernible) highlighted one

11      of the themes of our discussion with regard to protection

12      under 546.  For lien rights under the joint operating

13      agreement we have given the Debtors a litany of some examples

14      of terms that we thought the payments would not affect.  Such

15      as, including but not limited to (indiscernible) rights, audit

16      rights, and things of that nature.  And obviously Your Honor

17      pointed out 546 lien rights protection.

18                   So we just -- we thought that we wanted to include

19      some of those in there.  They (indiscernible) and I just

20      wanted to make sure that it's not that those examples are

21      missing, we're not eliminating what they're saying in terms of

22      not being (indiscernible) and remaining in full force and

23      effect.  And so I wanted to have an acknowledgment on the

24      Record here that those examples of terms that are contained in

25      the joint operating agreement are terms that are not being

1      modified by the payment provisions here.  And that's the only

2      additional language that would need a clarification, like Your

3      Honor asked for clarification from Debtors.

4              THE COURT:  Is there anything about the order that

5      modifies any JOA, Mr. Eisenberg?

6              MR. EISENBERG:  Well, just it -- there was a litany

7      in there of things that payment didn't do.  It didn't say not

8      modify the JOA, that's why we asked to have that included.

9      Because if they're going to draft it the way they drafted it,

10     I just wanted to make sure that the JOA won't be modified

11     (indiscernible).  Well, I just wanted to make sure that those

12     kind of things were understood to be the kind of things that

13     were not modified under the JOA, that's all.

14             THE COURT:  Ms. Liou?

15             MS. LIOU:  Yeah, Your Honor, I'd respond to that by

16     saying that, you know, to the extent that that's actually in

17     the contract and (indiscernible) operating agreement, and the

18     parties haven't otherwise consensually decided to amend the

19     contract, the JOA, then, yes, it's our view that in making --

20     or having the authority to make payments pursuant to this

21     Final Order doesn't itself modify the JOA.

22             THE COURT:  I think Paragraph 10 says that, in fact,

23     doesn't it, Mr. Eisenberg?

24             MR. EISENBERG:  It does, Your Honor.  I just

25     wanted -- and I appreciate the clarification on the Record,

1    and so I just wanted to be heard on that point, and I

2    appreciate there's efforts here and their cooperation,.

3          THE COURT:  Thank you.

4          Ms. Moses, let me get your line activated.  Go

5    ahead, please.

6          MS. MOSES:  Thank you, Your Honor.  Leann Moses on

7    behalf of C-Dive.  I -- we filed really what was a response

8    asking for clarification on how this motion intends to work

9    and these trade agreements are to basically arrived at.  And,

10   you know, unfortunately the motion never really addresses it.

11   We I think briefly touche on it, which was helpful today, but

12   we weren't really looking necessarily just for a list and how

13   much they were going to pay people.  It was how do you even

14   get to that point to get on the list or who, you know, was my

15   client supposed to be talking to to move this forward.

16          Normally, you know, in these bankruptcies the

17   attorneys will pick up the phone and call Debtors' counsel and

18   try to work out a vendor motion.  You know, and my clients

19   paid the particular -- they were a creditor to first

20   bankruptcy, they worked with the (indiscernible) first

21   bankruptcy and has been working with them thereafter.  And now

22   Fieldwood would like to introduce post-petition work which is

23   required by (indiscernible).

24          So, you know, we're trying to move it forward, but

25   the (indiscernible) in terms of the conference and the

1    criteria are not really spelled out in the motion and that's

2    what (indiscernible) either from Debtors' counsel on how this

3    is really related to work if they feel that providing a list

4    is sensitive and is not something they can.

5            THE COURT:  So the way I understand the order is

6    they're not required to do a trade agreement with anyone.

7    They may do one if they wish, and they may not do one and

8    you're not required to engage in post-petition business with

9    them.  So am I missing something?

10           MS. LIOU:  Your Honor, it's Jessica Liou.  May I

11   speak?

12           THE COURT:  Go ahead, please.

13           MS. LIOU:  All right.  Sorry.  Your Honor, I just

14   want to clarify one thing.  The order does require that we

15   enter into trade agreements to pay pre-petition claims

16   associated with certain categories of expenses and that

17   includes the AP operating expenses and the 503(b)(9) claims.

18           THE COURT:  But you're not required to do a trade

19   agreement with anyone as I understand it.  You may do a trade

20   agreement with people on that list, but you don't have to.

21   You can tell people, We're not doing a trade --

22           MS. LIOU:  I agree.

23           THE COURT:   -- agreement with you, if you want to

24   do business with us post-petition, do, if you don't, don't.

25           MS. LIOU:  Right.  If the point that Your Honor is

1          making is that we're not required to necessarily pay a pre-

2          petition claim pursuant to this order unless, you know, the

3          company determined it is a claim that they want to pay, then

4          that's correct.  We're not compelled to make payments pursuant

5          to this order.

6                    THE COURT:  Right.  But if you choose to make a

7          payment, then you have to do a trade agreement.

8                    MS. LIOU:  Correct.

9                    THE COURT:  Okay.

10                   MS. LIOU:  Absolutely.

11                   THE COURT:  No, that's right.  So I don't understand

12         what that objection is.  On the other hand from a practical

13         point of view let's tell trade creditors who you want them

14         contacting.  Who do you want the to call if they want to try

15         and do business with you post-petition?

16                   MS. LIOU:  Yeah, so, Your Honor, there are any

17         number of avenues for them to try to reach out.  They can

18         certainly reach out to Weil and we will funnel them to

19         appropriate person at the company.  My understanding is a

20         number of these creditors are already in (indiscernible)

21         discussion with company representatives.  And in addition to

22         that we do have a hotline established through Prime Clerk

23         where a creditor can reach out and would be -- we believe will

24         get funneled to both the Debtors and our firm.

25                   THE COURT:  So tell me one way they can do it

1       actually.  Is it to contact you, Ms. Liou, are you the right

2       person?

3               MS. LIOU:  Well, so I'm volunteering myself, they

4       can email me, I'm more than happy to get them to the right

5       contact person.

6               THE COURT:  And how do they email you?

7               MS. LIOU:  My email address is publicly available

8       but it's jessica.liou@weil.com.

9               THE COURT:  All right.  Now let me hear -- now that

10      people at least know how they can try and get into the system,

11      are there objections to the Form of Order?

12          (No audible response.)

13              THE COURT:  Ms. Moses, does that --

14              MR. MacNAUGHTON:  Your Honor --

15              THE COURT:  I'm sorry.  Go ahead.

16              MR. MacNAUGHTON:  Your Honor, Robert MacNaughton

17      here.  I wanted to echo the last concern expressed.  We are an

18      ongoing trade creditor who's being asked to provide further --

19      apparently representing critical work, engineering work on

20      behalf of the Debtor, and yet we've not been able to get

21      through any -- to anybody to determine whether there is a

22      trade agreement going in works, not in the works, or if they

23      just want us to do post-petition work for them without ever

24      coming to any terms.

25              And I'm glad I now have an email because I've tried

1    to get through and they are -- although they've said that
2    there were many -- had many avenues to talk with the Debtor,
3    none of them have come to any fruition whatsoever from any of
4    our representatives
5              (Indiscernible) concerned with in Paragraph 3
6    (indiscernible) wherein the Debtors are authorized to
7    negotiate, modify or amend the former trade agreement
8    (indiscernible) and may not violate this paragraph
9    (indiscernible) and it doesn't have any time line and it
10   doesn't say, We will contact you by X amount of days or we
11   intend to have 50 percent of these people handled by Y number
12   of days or any sort of schedule for the Debtor to get off it
13   and get to us to talk to us about these deals.
14             I know they're busy and handling other matters.  I
15   think if the order had some sort of (indiscernible) we would
16   appreciate it.  I do highly appreciate your discussion with
17   Debtors counsel on the fact that the 503(b) claim and any 546
18   treatment is still open regardless of this order.  But I would
19   still like the opportunity to be able to come back to this
20   Court and say, Although there authorized to operate under this
21   order, they're not operating.
22             THE COURT:  They don't have to.  Nor do you have
23   to --
24             MR. MacNAUGHTON:  I --
25             THE COURT:   -- nor do you have to do business with

1     them.  And I'm not --

2               MR. MacNAUGHTON:  I understand that.

3               THE COURT:  -- I'm not going to force a Debtor

4     against their business judgment to pay a critical vendor.  I

5     have no way of knowing if your client is a critical vendor

6     even if your client thinks that they are.  They aren't

7     required to do business with the Debtor.  All of that said --

8               MR. MacNAUGHTON:  (Indiscernible).

9               THE COURT:  -- we've now got a person that's a

10    point person and one day she'll have a camera and I'm going to

11    look in her face and ask her why she didn't return your phone

12    calls.  So she's got to return --

13              MR. MacNAUGHTON:  (Indiscernible).

14              THE COURT:  -- she's got to return your phone calls

15    and there is going to be somebody to deal with.  But the

16    answer may be no, and that's what I want to be careful about.

17              MS. MacNAUGHTON:  I understand.

18              THE COURT:  I can't make the answer be yes.

19              MR. MacNAUGHTON:  And, Your Honor, we -- I

20    understand that and we just want to know, if the answer's

21    going to be no, we'd like to know now.  I mean the issue is

22    we'd like to be able to get on down the road with this matter

23    rather than -- if it's going to be no, it's going to be no.

24    And just in limbo is not helpful.

25              THE COURT:  I got it, and I understand it, I agree

1    with you on all of that.  I just -- I'm not going to make them

2    pay a critical vendor but I will make Ms. Liou return your

3    phone call.  And I don't even think I need to, she's going --

4              MR. MacNAUGHTON:  Yes, Judge.

5              THE COURT:   -- to return it.  So I'm going to

6    overrule the objection.  I don't think that your client's

7    knowledge amounts to --

8              MR. HANSEN:  Your Honor, may I be heard?

9              THE COURT:   -- an objection.

10             Go ahead, please.

11             MR. HANSEN:  Yes, Your Honor, it's Kris Hansen with

12   the Creditors Committee again with the Stroock firm.  And so

13   what you're hearing was essentially the substance of our

14   objection that I did want to bring before the Court.  So these

15   are the Debtor's motions.  The overwhelming majority of

16   payments that they ask to be made pursuant to this program,

17   $152 million of (indiscernible) operating expenses out of a

18   total quantum of 192 million requested and (indiscernible)

19   $60 million.

20             But what we've been hearing at the Committee level

21   from creditors who have been (indiscernible) has been that

22   either they have been contacted by the Debtors or that the

23   offers that are being made to them are in their view

24   unreasonably small.  And so the Committee has obviously made

25   very significant terms about having the Debtors

1   (indiscernible) already.  As they say here in the motion to

2   Your Honor that they were critical, they need to get out fast.

3   And they were right because obviously the (indiscernible)

4   providers with respect to all of the, you know, interests that

5   they operate in the Gulf are critically important.

6          And so it's often (indiscernible) those start

7   tomorrow, it looks like they've been (indiscernible) with

8   respect to the name who contacted us.  And one of the things

9   we wanted to point out to the Court, it was obvious that part

10  of the reason for the need for the DIP financing was because

11  they project making these payments.  And so vendors are out

12  there saying, Am I going to get paid, or I'm not going to get

13  paid, and I need (indiscernible) want to continue to do them

14  with you.

15         And one of the issues that we see as a consequence

16  of delay of course, and would be a pretty rough effect of what

17  we do with this kind of impact, this kind (indiscernible) of

18  our bargaining is that these operating counterparties

19  (indiscernible).  So we've got now (indiscernible) prosecuted

20  and the Debtors' assets we're certain (indiscernible).  But

21  they may try to prosecute liens against the interest of the

22  co-owners of any projects, and obviously the impact of that

23  can be not only unnecessary, in this case with DIP Lenders and

24  pre-petition lenders and if they are going to go ahead and

25  sell assets in this case, how we deal with all of that in

1       terms of a sale of assets upon which (indiscernible) alleged.

2               But also you may have a more dire consequence which

3       is the liquidity problem for the Debtor.  Because currently it

4       was linked by service providers and probably not

5       (indiscernible) from the Debtors, and so we did get very

6       worried that we're in a situation where we have, you know, a

7       liquidity shortfall where the DIP was originally, at least in

8       part, asked to be prolonged so that they could actually make

9       these payments.  And that by not making these payments, they

10      may have their own liquidity problem.  And we don't think

11      that's a good way to step out if you will to give people

12      confidence that they're really not in business.

13              And they're also worried that because of our --

14      fairly few within certain sectors of the service providers

15      have alternatives and that the parties who were working with

16      the Debtor are parties to the MSA (indiscernible) finding

17      service providers on a (indiscernible).  But they certainly

18      have a reputation within the industry that people don't want

19      to work with them.  And that also can create liquidity

20      problems for them and whole host of other issues.

21              So our statement was really if they -- the Court --

22      the Debtors have to get going here, and they need to deal with

23      vendor necessary (indiscernible) of how they deal with them,

24      but the vendors are entitled to know whether or not they are

25      going to be dealt with quickly and whether or not they're

1    going to be dealt with fairly.  They need to make a decision.

2    And if the Debtors (indiscernible) ask before we can do

3    (indiscernible) we could wind up with a real problem in the

4    case.

5                THE COURT:  Thank you.

6                Mr. Dane, are you listening?

7                MR DANE:  Yes, Your Honor.

8                THE COURT:  Good.  I would listen.

9                MR. DANE:  Yes.

10               THE COURT:  Thank you.  All right.  I appreciate

11   what people are telling me.  I don't think it goes to whether

12   I ought to sign the order.  It may go to whether management is

13   managing the business correctly, which is an issue for a day

14   in which people choose to raise that question, and we'll

15   listen to it when it gets raised.  I express no view on who

16   ought to be paid and who shouldn't be paid, other than that if

17   someone is going to be paid because the Debtor believes

18   they're a critical vendor, they have to agree to a trade

19   agreement.  I'm not going to compel the Debtor to do that.  I

20   don't think that is within what a bankruptcy judge ought to be

21   doing. If the Debtor can't manage some business there are

22   other remedies within the Bankruptcy Code, and I'll let the

23   worry about that.

24               I'm going to overrule the objections and I'm going

25   to sign the order that was filed at 337.

1          MS. LIOU:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3       (Pause in the proceedings.)

4          THE COURT:  All right.  And I think that takes us

5     then to the Southern motion.  Right?  By Mr. Baker?

6          MR. PEREZ:  Yes, Your Honor, that's perfect.

7          THE COURT:  All right.  Mr. Baker, let me get you to

8     press five star on your phone.

9       (Pause in the proceedings.)

10          THE COURT:  Mr. Baker, go ahead, please.

11          MR. BAKER:  Your Honor, Reese Baker on behalf of Mr.

12     Southern.  We I think have got a resolution to this.  Mr.

13     Perez and Ms. Joy (phonetic) had sent over a Proposed Order

14     with regard to the lifting of the stay.  What it would is it

15     would allow the lawsuit to go forward.  It is a personal

16     injury claim under maritime law that's pending in the United

17     States District Court in the Western District of Louisiana I

18     think it is at this point in time.  And it would allow the --

19     Mr. Regis to pursue that.

20          Mr. Simons -- sorry, Mr. Southern -- Mr. Southern

21     would have the opportunity to close and get information from

22     the Debtor, but the Debtor would not have any claims that

23     would result from the litigation.  My client would look solely

24     to the insurance proceeds for recovery on that.  We have

25     asked, and I think Mr. Perez has agreed they would provide

1     copies of the insurance that's currently in force.  They've

2     already gotten information on it, they just wanted to confirm

3     that the insurance information is consistent with what they

4     had before, that they're going to agree to look solely to the

5     insurance proceeds.

6             They would like to go and try and get an order

7     entered in the next day or two.  There is -- there was and

8     there still is discovery that's pending with depositions I

9     think Thursday of next week and they'd like the opportunity of

10    going forward with it if possible.

11            THE COURT:  Ms. Joy, Mr. Perez, is that your deal?

12            MR. PEREZ:  Yes, Your Honor.  We're in the process

13    of getting -- confirming the insurance information and for

14    that case to proceed.  And, yeah, the Debtors are indemnified

15    that case by the employer, but nevertheless we'll provide our

16    own insurance information for that.  But it shouldn't be -- we

17    should be able to have that order entered today or tomorrow.

18            THE COURT:  Is there any self-insured retention

19    issue that we need to worry about?

20            MR. PEREZ:  Your Honor, we have $100,000 deductible,

21    and I think that the order indicates that they would waive

22    that $100,000 deductible.

23            THE COURT:  Mr. Baker, that's your deal on the

24    deductible?

25            MR. BAKER:  That's my understanding, Your Honor,

1      yes.

2                  THE COURT:  All right.  If you all will get that

3      order uploaded promptly and contact Ms. Do, I'll get it signed

4      within one day of when you all get it filed, if that's the

5      deal.  I assume no one objects to that.

6                  MR. BAKER:  All right.

7                  THE COURT:  All right.  I'll grant the motion.

8      Automatic stay --

9                  MR. PEREZ:  Thank you very much, Your Honor.

10                 THE COURT:   -- remains pending the entry of the

11     order.  Thank you.

12                 What else do we --

13                 MR. BAKER:  Thank you.

14                 THE COURT:   -- need to accomplish today in the

15     Fieldwood case?

16                 MR. PEREZ:  Your Honor, I think we're fine.  I don't

17     think we have anything else.  Thank you very much for your

18     time.

19                 THE COURT:  Does any other party have any issue --

20                 UNIDENTIFIED SPEAKER:  Thank you.

21                 THE COURT:   -- that needs to be raised today?  If

22     so, please speak up, or press five star if you haven't already

23     gotten phone unmuted.

24                 Mr. Hansen, you look like you've something else --

25                 MR. HANSEN:  Your Honor --

53

1          THE COURT:  Yes, who is that?

2          MR. HANSEN:   (Indiscernible).

3          THE COURT:  I'm sorry, I didn't hear you,

4     Mr. Hansen.

5          MR. HANSEN:  I was just thanking Your Honor for

6     listening today.

7          THE COURT:  Oh, no, thank you, Mr. Hansen.

8          Does anyone else have any other issue that needs to

9     be raised?

10          MR. MacNAUGHTON:  Your Honor, one particular one,

11     the order is not in here, I'm not sure what you were

12     referencing when we started with announcements this morning

13     (indiscernible).  Were you saying you had no idea that I made

14     an appearance in this case previously?  I just wanted to point

15     out where I had filed a notice of attorney.

16          THE COURT:  No, appearances at hearings are now done

17     electronically rather than by announcement during the hearing.

18     And if you'll go to our website, you can just click on a

19     button and fill out your appearance to where we know who was

20     here on behalf of what client.

21          MR. MacNAUGHTON:  (Indiscernible) today with now in

22     this process.  I will do so before the end of the day.

23          THE COURT:  It's our attempt under COVID and we've

24     decided it's probably a good idea permanently to not waste

25     45 minutes taking everybody's name at the beginning of the

1     hearing.  I think we had 51 people on the phone and it takes

2     forever to take those.  So we just -- electronic on all of it.

3     It's working great.  So if you just go there, you'll make your

4     appearance.

5                 MR. MacNAUGHTON:  Thank you, Your Honor.

6                 THE COURT:  Thank you, Mr. MacNaughton.

7                 Ms. Liou, go ahead.

8                 MS. LIOU:  Thank you, Your Honor.  I just wanted to

9     (indiscernible).  In connection with the DIP vendor order, it

10    does require that a weekly reporting begin on the Tuesday

11    following the entry of the order.  If the order is entered

12    today or tomorrow, we would request that we begin that weekly

13    reporting next Tuesday so the Debtor has time to get that

14    reporting together, so that won't be --

15                THE COURT:  That's an order -- which ECF number was

16    that?

17                MS. LIOU:  The DIP vendor Final Order?

18                THE COURT:  Yeah.

19                MS. LIOU:  The Proposed Order is 337 but I don't

20    know --

21                THE COURT:  Okay.  So that's --

22                MS. LIOU:  -- (indiscernible) --

23                THE COURT:  -- going to be entered within the next

24    few moments, if it hasn't --

25                MS. LIOU:  Okay.

1          THE COURT:  -- already been entered.  Who's your

2     weekly reporting due to, is it due to Mr. Hansen's client?

3          MS. LIOU:  Yeah, it's due to Mr. Hansen, not his

4     client.  It's going to be on a professional eyes only basis,

5     and the secured lenders and the US Trustee on a professional

6     eyes only basis.

7          THE COURT:  Mr. Hansen, you don't expect a report

8     tomorrow.  Right?  You expect it a week from tomorrow?

9          MR. HANSEN:  A week from tomorrow is fine, Your

10    Honor.

11         THE COURT:  Thank you.

12         Does that work, Ms. Liou?

13         MS. LIOU:  Yes.

14         THE COURT:  Great.  Thank you for the clarification

15    everyone.  Anything else we need to do, let me just be sure.

16    (No audible response.)

17         THE COURT:  All right.  I don't see anyone else

18    requesting to speak.  We'll go ahead and we'll adjourn.

19         (Hearing adjourned at 2:40 p.m.)

20

21

22

23

24

25                        *  *  *  *  *

1          I certify that the foregoing is a correct transcript

2     to the best of my ability due to the condition of the

3     electronic sound recording of the telephonic proceedings in

4     the above-entitled matter.

5       /S./   MARY D. HENRY

6     CERTIFIED BY THE AMERICAN ASSOCIATION OF

7     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9     JTT TRANSCRIPT #62715

10    DATE FILED:  SEPTEMBER 18, 2020