

**The New York Times**
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

October 16, 2020

I, Shannon Schmidt, in my capacity as a Principal Clerk of the Publisher of **The New York Times** a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

October 16, 2020- pg. B3 (NYT & Natl)

Sworn before me the

16th day of Oct, 20 20

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

SOCIAL MEDIA | RETAIL

# YouTube's Updated Rules Will Prohibit All Content That Promotes QAnon

AL DRAGO FOR THE NEW YORK TIMES

The letter Q, referring to QAnon, the sprawling pro-Trump conspiracy theory community, on a cap at a rally for President Trump in Wisconsin last month.

FROM FIRST BUSINESS PAGE

will be banned. News coverage of these theories and videos that discuss the theories without targeting individuals or groups may still be allowed.

The QAnon movement began in 2017 when an anonymous poster under the handle "Q Clearance Patriot," or "Q," began posting cryptic messages on 4chan, the notoriously toxic message board, claiming to possess classified information about a secret battle between President Trump and a global cabal of pedophiles. QAnon believers — known as "bakers" — began discussing and decoding them in real time on platforms including Reddit and Twitter, connecting the dots on a modern rebranding of centuries-old anti-Semitic tropes that falsely accused prominent Democrats, including Hillary Clinton and the liberal financier George Soros, of pulling the strings on a global sex-trafficking conspiracy.

*Trying to curb the spread of conspiracy theories and misinformation.*

Few platforms played a bigger role in moving QAnon from the fringes to the mainstream than YouTube. In the movement's early days, QAnon followers produced YouTube documentaries that offered an introductory crash course in the movement's core beliefs. The videos were posted on Facebook and other platforms, and were often used to draw recruits. Some were viewed millions of times.

QAnon followers also started YouTube talk shows to discuss new developments related to the theory. Some of these channels amassed large audiences and made their owners prominent voices within the movement.

"YouTube has a huge role in the Q mythology," said Mike Rothschild, a conspiracy theory debunker who is writing a book about QAnon. "There are major figures in the Q world who make videos on a daily basis, getting hundreds of thousands of views and packaging their theories in slick clips that are a world away from the straight-to-camera rambles so prominent in conspiracy theory video making."

YouTube has tried for years to curb the spread of misinformation and conspiracy theories on its platform, and tweak the recommendations algorithm that was sending millions of viewers to what it considered low-quality content. In 2019, the company began to demote what it called "borderline content" — videos that tested its rules, but didn't quite break them outright — and reduce the visibility of those videos in search results and recommendations.

The company says these changes have decreased by more than 70 percent the number of views that borderline content gets from recommendations, although that figure cannot be independently verified. YouTube also says that among a set of pro-QAnon channels, the number of views coming from recommendations dropped more than 80 percent after the 2019 policy change.

Social media platforms have been under scrutiny for their policy decisions in recent weeks, as Democrats accuse them of doing too little to stop the spread of right-wing misinformation, and Republicans, including Mr. Trump, paint them as censorious menaces to free speech.

YouTube, which is owned by Google, has thus far stayed mostly out of the political fray despite the platform's enormous popularity — users watch more than a billion hours of YouTube videos every day — and the surfeit of misinformation and conspiracy theories on the service. Its chief executive, Susan Wojcicki, has not been personally attacked by Mr. Trump or had to testify to Congress, unlike Jack Dorsey of Twitter and Mark Zuckerberg of Facebook.

Vanita Gupta, the chief executive of the Leadership Conference on Civil and Human Rights, a coalition of civil rights groups, praised YouTube's move to crack down on QAnon content.

"We commend YouTube for banning this harmful and hateful content that targets people with conspiracy theories used to justify violence offline, particularly through efforts like QAnon," Ms. Gupta said. "This online content can result in real-world violence, and fosters hate that harms entire communities."

Mr. Rothschild, the QAnon researcher, predicted that QAnon believers who were kicked off YouTube would find ways to distribute their videos through smaller platforms. He also cautioned that the movement's followers were known for trying to evade platform bans, and that YouTube would have to remain vigilant to keep them from restarting their channels and trying again.

"YouTube banning Q videos and suspending Q promoters is a good step," he said, "but it won't be the end of Q. Nothing has been so far."

# Store Employees Will Get New Training: How to Handle Fights Over Masks

By SAPNA MAHESHWARI

Many retail workers will receive a new sort of preparation for this year's holiday season: training on how to manage conflicts with customers who resist mask-wearing, social distancing and store capacity limits.

The National Retail Federation, a trade group representing about 16,000 retailers, said on Thursday that it had teamed up with the Crisis Prevention Institute, a company focused on reducing workplace violence, to help retail workers learn how to prevent and de-escalate shopper disputes that emerge from pandemic restrictions.

The training puts a spotlight on the unexpected challenges that store workers have been forced to grapple with during the pandemic. Most retailers were early to require masks and distancing in stores, but some shoppers have flouted the rules, putting employees in uncomfortable and sometimes frightening positions. Altercations with belligerent customers have regularly gone viral on social media this year and have even led to violence, spooking staff and other shoppers just as stores try to drum up foot traffic.

In the online training, "one of the major scenarios is around an employee asking a customer to wear a mask, and he reacts," said Adam Lukoskie, vice president of the NRF Foundation, the trade group's nonprofit arm. "There's another scenario where a mother and child are there and are upset this gentleman is not wearing a mask so then the employee has to help make peace."

Susan Driscoll, president of the Crisis Prevention Institute, said the online training program and accompanying Covid-19 Customer Conflict Prevention credential are "really focused on how to engage your thinking brain over your emotional brain." It teaches employees how to recognize what stage of a crisis a consumer may be in, and what they can do to defuse the situation, she said.

WELCOME BACK!!!
Step 1 PLEASE USE HAND SANITIZER
Step 2 GRAB A MASK
Step 3 RETAIL THERAPY
• CASHLESS FOR YOUR SAFETY •
#KEEPAUBURNSAFE

JULIE BENNETT FOR THE NEW YORK TIMES

Masks were required at Behind the Glass in Auburn, Ala., in July.

"It is very practical," Ms. Driscoll said. For example, she said, if a shopper is very distressed, the program offers tips on "how to verbally and nonverbally communicate empathy and support" while wearing a mask.

Or, Ms. Driscoll said, "when someone is defensive and losing their rationality, you give them a choice or set a limit."

"Say, 'Would you like to get out of the line and talk this through, or would you like to talk to a manager?'" she continued. "Giving them a choice puts them back in control, and you get them out of the way and out of the line from customers and help de-escalate the crisis."

The Crisis Prevention Institute has focused on training health care workers and employees working with children with special needs but was intrigued by the situation facing retailers, Ms. Driscoll said, adding that inquiries to the organization for de-escalation information have doubled since the pandemic started.

The National Retail Federation said it did not have data on disputes at retailers. But its research showed that consumers wanted to know what measures retailers were taking to ensure their safety in stores, said Bill Thorne, executive director of the NRF Foundation.

*Facing the unexpected challenge of having to manage conflicts.*

"This is one additional opportunity for our retailers to say: 'Our staff members are trained. If there is an incident, they will handle it and you will be safe shopping,'" Mr. Thorne said. The program adds to training at several large retailers, he said.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

**In re: Fieldwood Energy LLC, *et al.*, Debtors.**[1] § **Chapter 11** § **Case No. 20-33948 (MI)** § **(Jointly Administered)**

**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). Set forth below are the name, federal tax identification number and the case number for each of the Debtors: **DEBTOR, EIN, CASE NO.:** Fieldwood Energy LLC, 46-1326778, 20-33948; Bandon Oil and Gas GP, LLC, 20-4839172, 20-33955; Bandon Oil and Gas, LP, 20-4839266, 20-33956; Dynamic Offshore Resources NS, LLC, 35-2190158, 20-33947; Fieldwood Energy Inc., 46-1694991, 20-33949; Fieldwood Energy Offshore LLC, 26-1084494, 20-33950; Fieldwood Energy SP LLC, 16-1671971, 20-33958; Fieldwood Offshore LLC, 35-2492930, 20-33961; Fieldwood Onshore LLC, 47-0953489, 20-33951; Fieldwood SD Offshore LLC, 11-3758786, 20-33952; Galveston Bay Pipeline LLC, 76-0595703, 20-33959; Galveston Bay Processing LLC, 76-0570422, 20-33960; GOM Shelf LLC, 76-0648107, 20-33954; FW GOM Pipeline, Inc., 38-3718440, 20-33953.

2. On October 14, 2020, the Court entered an order (Docket No. 466) (the "**Bar Date Order**")[2] establishing certain deadlines for the filing of proofs of claim in the Debtors' chapter 11 cases.

3. Pursuant to the Bar Date Order, all persons, entities, and governmental units who have a claim or potential claim, including any claims under section 503(b)(9) of the Bankruptcy Code,[3] against any of the Debtors that arose prior to the Petition Date, no matter how remote or contingent such right to payment or equitable remedy may be, **MUST FILE A PROOF OF CLAIM** on or before **November 25, 2020 at 5:00 p.m. (prevailing Central Time)** for general creditors (the "**General Bar Date**") and **February 1, 2021** for governmental units (the "**Governmental Bar Date**," and together with the General Bar Date, the "**Bar Dates**"), by (i) filing such Proof(s) of Claim electronically through Prime Clerk, at https://cases.primeclerk.com/fieldwoodenergy/; (ii) filing such Proof(s) of Claim electronically through PACER (Public Access to Court Electronic Records), at https://ecf.txsb.uscourts.gov; or (iii) mailing the original Proof(s) of Claim to Prime Clerk at the following address: **Prime Clerk:** Fieldwood Claims Processing Center, c/o Prime Clerk LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232. **PROOFS OF CLAIM SENT BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.**

4. The Bar Dates apply to all claims against the Debtors arising under section 503(b)(9) of the Bankruptcy Code; provided, however, that the Bar Dates do not apply to the Excluded Claims listed in paragraph 8 of the Bar Date Order.

5. **ANY PERSON OR ENTITY (EXCEPT A PERSON OR ENTITY WHO IS EXCUSED BY THE TERMS OF THE BAR DATE ORDER) WHO FAILS TO FILE A PROOF OF CLAIM ON OR BEFORE THE APPLICABLE BAR DATE IN ACCORDANCE WITH THE INSTRUCTIONS ABOVE WILL NOT BE TREATED AS A CREDITOR FOR PURPOSES OF VOTING UPON, OR RECEIVING DISTRIBUTIONS UNDER, ANY PLAN OR PLANS OF REORGANIZATION OR LIQUIDATION IN THE CHAPTER 11 CASES.**

6. Proof of claim forms and a copy of the Bar Date Order may be obtained by visiting https://cases.primeclerk.com/fieldwoodenergy/, maintained by the Debtors' claims and noticing agent, Prime Clerk LLC ("**Prime Clerk**"). Questions concerning the contents of this Notice and requests for copies of filed proofs of claim should be directed to Prime Clerk through email at fieldwoodinfo@primeclerk.com. Please note that neither Prime Clerk's staff, counsel to the Debtors, nor the Clerk of the Court's Office is permitted to give you legal advice. Prime Clerk cannot advise you how to file, or whether you should file, a proof of claim.

**A HOLDER OF A POSSIBLE CLAIM AGAINST THE DEBTORS SHOULD CONSULT AN ATTORNEY REGARDING ANY MATTERS NOT COVERED BY THIS NOTICE, SUCH AS WHETHER THE HOLDER SHOULD FILE A PROOF OF CLAIM.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bar Date Order.

[3] A claim arising under section 503(b)(9) of the Bankruptcy code is a claim arising from the value of any goods received by the Debtors within twenty (20) days before Petition Date, provided that the goods were sold to the Debtors in the ordinary course of the Debtors' business.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: COVIA HOLDINGS CORPORATION, *et al.*,[1] Debtors. ) Chapter 11, Case No. 20-33295 (DRJ) ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE DEBTORS**

**PLEASE TAKE NOTICE THAT** on **October 13, 2020**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. 683] (the "Disclosure Statement Order") that, among other things: (a) approved the *Disclosure Statement Relating to the Chapter 11 Plan of Reorganization of Covia Holdings Corporation and Its Debtor Affiliates* [Docket No. 628] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125(a) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); and (b) authorized the above-captioned debtors and debtors in possession (the "Debtors") to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of Covia Holdings Corporation and Its Debtor Affiliates* [Docket No. 584] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **December 7, 2020 at 9:00 a.m.** prevailing Central Time, before the Honorable David R. Jones, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Houston, Texas 77002.

**PLEASE BE ADVISED: THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.**

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date.** The voting record date is **September 30, 2020**, which is the date for determining which Holders of Claims in Classes 4, 5A, 5B, and 5C are entitled to vote on the Plan.

**Voting Deadline.** The deadline for voting on the Plan is **November 27, 2020, at 11:59 p.m.**, prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan you ***must***: (a) follow the instructions carefully; (b) complete ***all*** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is ***actually received*** by the Debtors' Claims, Noticing, and Solicitation Agent, Prime Clerk LLC (the "Claims, Noticing, and Solicitation Agent") on or before the Voting Deadline. ***A failure to follow such instructions may disqualify your vote.***

**Confirmation Objection Deadline.** The deadline for filing objections to the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, is **November 28, 2020, at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").[3] Any objection to the relief sought at the Confirmation Hearing ***must***: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Bankruptcy Local Rules for the Southern District of Texas; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the **Confirmation Objection Deadline.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:**

**RELEASES BY THE DEBTORS. Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to or related to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**This Article VIII.B shall not operate to waive or release any right, Claim, or Cause of Action (i) in favor of any Debtor or Reorganized Debtor, as applicable, arising in the ordinary course of business under any contractual obligation owed to such Debtor or Reorganized Debtor (including any such accounts receivables obligations carried on the Debtors' books and records and any such obligations under any Executory Contract or Unexpired Lease assumed by a Debtor or Reorganized Debtor, as applicable) that is not satisfied or discharged under the Plan or (ii) as expressly set forth herein, any Definitive Documents, the Confirmation Order, or the Plan Supplement.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) and Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**RELEASES BY HOLDERS OF CLAIMS AND INTERESTS. On and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Debtors that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Term Loan Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the L/C Facility, the New Employment Agreements, or any Definitive Document, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the Definitive Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Nothing in the Plan, the Confirmation Order, or Section 1141 of the Bankruptcy Code shall be construed as discharging, releasing or relieving the Reorganized Debtors, or their successors, from any liability imposed under ERISA or the Tax Code with respect to the Pension Plan solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability as a result of the Plan or Confirmation Order. Notwithstanding anything to the contrary in the foregoing, the releases set forth above provided by any Holders of Covia Interests (other than Covia Interests held by SRC-Sibelco NV and its Affiliates) do not release any Entity from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or Reorganized Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.**

**UNDER THE PLAN, "*RELEASED PARTY*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) EACH OF THE REORGANIZED DEBTORS; (C) EACH HOLDER OF A L/C FACILITY CLAIM; (D) EACH HOLDER OF A TERM LOAN CLAIM; (E) EACH HOLDER OF A SWAP AGREEMENTS CLAIM; (F) EACH CONSENTING STAKEHOLDER; (G) EACH OF THE TERM LOAN CREDIT AGREEMENT AGENTS; (H) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (G), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES; AND (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH (H); *PROVIDED* THAT ANY HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS THAT IS NOT A RELEASING PARTY THAT (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN THE PLAN OR (Y) FILES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN SHALL NOT BE A "RELEASED PARTY."**

**UNDER THE PLAN, "*RELEASING PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) EACH OF THE REORGANIZED DEBTORS; (C) EACH HOLDER OF A L/C FACILITY CLAIM; (D) EACH HOLDER OF A TERM LOAN CLAIM; (E) EACH HOLDER OF A SWAP AGREEMENTS CLAIM; (F) EACH CONSENTING STAKEHOLDER; (G) EACH OF THE TERM LOAN CREDIT AGREEMENT AGENTS; (H) EACH HOLDER OF CLAIMS OR INTERESTS WHO (I) VOTES IN FAVOR OF THE PLAN OR (II) ABSTAINS FROM VOTING, ARE NOT ENTITLED TO VOTE, OR VOTE TO REJECT THE PLAN *AND* DO NOT OPT OUT OF THE THIRD PARTY RELEASE ON A TIMELY SUBMITTED BALLOT OR OPT-OUT FORM; (I) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (H), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES; AND (K) EACH RELATED PARTY OF EACH DEBTOR, EACH REORGANIZED DEBTOR, AND EACH ENTITY IN CLAUSE (A) THROUGH (I); *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT (X) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN THE PLAN OR (Y) FILES AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN SHALL NOT BE A "RELEASING PARTY"; *PROVIDED, FURTHER*, THAT FOR THE AVOIDANCE OF DOUBT, NO HOLDER OF A CLAIM THAT IS PARTY TO OR HAS OTHERWISE SIGNED THE RESTRUCTURING SUPPORT AGREEMENT MAY OPT OUT OF THE RELEASES.**

**EXCULPATION. Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim or Interest related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, or the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**UNDER THE PLAN, "*EXCULPATED PARTY*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) EACH OF THE DEBTORS; (B) EACH OF THE REORGANIZED DEBTORS; (C) EACH OF THE REQUIRED CONSENTING STAKEHOLDERS; (D) THE TERM LOAN AGENT; (E) THE TERM LOAN LENDERS; (F) THE L/C AGENT; (G) THE L/C FACILITY LENDERS; (H) EACH CURRENT AND FORMER PREDECESSORS, SUCCESSORS, AFFILIATES (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), SUBSIDIARIES, DIRECT AND INDIRECT EQUITY HOLDERS, FUNDS, PORTFOLIO COMPANIES, AND MANAGEMENT COMPANIES OF EACH ENTITY IN CLAUSES (A) THROUGH (G); AND (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (H); *PROVIDED THAT* NO CURRENT OR FORMER HOLDER OF EXISTING EQUITY INTERESTS, EACH IN THEIR CAPACITY AS SUCH, IS AN EXCULPATED PARTY UNLESS SUCH HOLDER IS ALSO A CURRENT DIRECTOR, OFFICER OR EMPLOYEE OF A DEBTOR OR AN AFFILIATE OF A DEBTOR.**

**INJUNCTION.**

**A. Injunction**. Except as otherwise expressly provided in the Plan, the Confirmation **Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action, unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, or compromised pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former directors, managers, officers, principals, predecessors, successors, employees, agents, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this III.F.**

**Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party from enforcing their rights under the Plan or under any document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan, including by bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those included in the Plan Supplement) executed to implement the Plan.**

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain a copy of the Disclosure Statement Order, Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://cases.primeclerk.com/Covia; (b) write to Covia Ballot Processing c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (c) call (877) 756-7779 (toll free) and request to speak with a member of the Solicitation Group; or (d) email coviainfo@primeclerk.com and reference "Covia" in the subject line. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov. Please be advised that the Claims, Noticing, and Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

**The Plan Supplement.** The Debtors will file the Plan Supplement (as defined in the Plan) on or before **November 17, 2020**, and will serve notice on parties in interest, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

**BINDING NATURE OF THE PLAN. IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Houston, Texas, October 13, 2020, /s/ Matthew D. Cavenaugh , **JACKSON WALKER L.L.P.,** Matthew D. Cavenaugh (TX Bar No. 24062656), Vienna F. Anaya (TX Bar No. 24091225), Genevieve M. Graham (TX Bar No. 24085340), Victoria N. Argeroplos (TX Bar No. 24105799), 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Telephone: (713) 752-4200, Facsimile: (713) 752-4221, Email: mcavenaugh@jw.com, vanaya@jw.com, ggraham@jw.com, vargeroplos@jw.com, *Co-Counsel to the Debtors and Debtors in Possession* -and- Jonathan S. Henes, P.C. (admitted *pro hac vice*), **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jonathan.henes@kirkland.com -and- Benjamin M. Rhode (admitted *pro hac vice*), Scott J. Vail (admitted *pro hac vice*), **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: benjamin.rhode@kirkland.com, scott.vail@kirkland.com, *Co-Counsel to the Debtors and Debtors in Possession*

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/Covia. The location of Debtor Covia Holdings Corporation's principal place of business and the Debtors' service address is: 3 Summit Park Drive, Suite 700, Independence, Ohio 44131.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

[3] For the avoidance of doubt, Bankruptcy Rule 9006 shall not apply to the Confirmation Objection Deadline.