**<u>Exhibit 1</u>**

**Michael T. Dane Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | |
| | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | |
| | § | |
| | § | (Jointly Administered) |

## DECLARATION OF MICHAEL T. DANE IN SUPPORT OF EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER EXTENDING THE AUTOMATIC STAY TO CERTAIN OF DEBTORS' CO-WORKING INTEREST OWNERS

I, Michael T. Dane, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am Senior Vice President and Chief Financial Officer of Fieldwood Energy LLC. I submit this declaration (this "**Declaration**") on behalf of the above captioned debtors and debtors in possession (the "**Debtors**") in support of *Emergency Motion Of The Debtors For Entry Of An Order Extending the Automatic Stay To Certain Of Debtors' Co-Working Interest Owners* (the "**Motion**").[2]

2. Unless otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations; (b) information learned from my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

1

review of relevant documents and information concerning the Debtors' operations; and/or (c) my opinions based upon my experience and knowledge.

3.     I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify as to the facts set forth herein.

4.     Debtors are one of the largest producers of oil and gas in the Gulf of Mexico and hold interests in hundreds of offshore blocks covering some two million gross acres, including over 1,000 wells and nearly 500 operated platforms in the United States Gulf of Mexico. To share the cost of developing these interests, Debtors entered into operating agreements with several co-working interest owners, including, as relevant here, Ecopetrol America, LLC, Ridgewood Katmai, LLC, and ILX Prospect Katmai, LLC (collectively, the "**WIOs**"). True and correct copies of excerpts of Debtors' operating agreements with the WIOs are attached as __**Exhibit A**__.

5.     Section 5.4 of the Debtors' operating agreements with the WIOs requires Debtors to, among other things, "endeavor to keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder[.]"  To that end, Section 22.1 of those same operating agreements obligates Debtors to hold the WIOs "harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of [Debtors'] acts or omissions."

6.     Each operating agreement also names Debtors as operator.  In that capacity, Debtors, on behalf of the WIOs, contracted with Atlantic Maritime Services LLC ("**Atlantic**") in October 2018 to provide a drillship, the *Rowan Reliance*[3], to conduct operations on deepwater wells in the United States Gulf of Mexico.  A true and correct copy of the Debtors' October 26,

---

[3] Debtors and Atlantic amended their October 2018 contract in November 2018 to substitute the drillship *Rowan Resolute* for the *Rowan Reliance*.

2018 Master Domestic Offshore Daywork Drilling Contract with Atlantic (the "**Contract**") is attached as **Exhibit B**.

7.     Between February and June of 2020, Atlantic caused at least six separate incidents, which cost the Debtors and WIOs approximately ten million dollars.  Those incidents violated numerous provisions of the Contract, which requires Atlantic to conduct its drilling operations in a safe, workmanlike manner and in accordance with Debtors' safety program and any and all applicable governmental regulations and laws:

- Paragraph 305: [Atlantic] agrees to provide as [Atlantic's] Personnel only persons who are properly qualified, trained, and skilled to perform all material aspects of the jobs for which they are employed by [Atlantic].

- Paragraph 404: The Drilling Unit [i.e. the *Rowan Resolute*] and [Atlantic's] Items shall be provided by [Atlantic] in good and proper operating condition, as necessary to perform the work under this Contract and the applicable Drilling Order and in accordance with all applicable rules, regulations, and requirements of the Contract.

- Paragraph 501: [Atlantic] shall carry out all operations hereunder in a diligent manner and as a prudent drilling contractor on a daywork basis for a specified sum per day as set forth in Article VII and the applicable Drilling Order.

- Paragraph 503(b): [Atlantic] and [Atlantic's] Personnel shall comply with all applicable federal, state, and local laws, ordinances, rules, regulations and lease or contract provisions regarding pollution, safety and the environment.

- Paragraph 509: [Atlantic] shall maintain its blowout and well control equipment listed in Schedules A-1 and A-3 to each Drilling Order in good operating condition at all times and in compliance with all applicable rules and regulations, including, but not limited to API standards and recommendations, the rules and regulations of the BOE and shall use all reasonable means to control and prevent fires and blowouts and to protect the hole.

- Paragraph 1305(d):[Atlantic] shall institute and implement at all times a good, comprehensive safety and training program which complies with all federal, state and local laws, rules and regulations applicable to the work, services and operations contemplated in this Contract, and which further

3

complies with reasonable and current industry recommendations on accident prevention, safe operating practices, and environmental protection.

- Section D.2.4 of Appendix "C[4]": [Atlantic] must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for [Fieldwood].

8.      To ensure Atlantic (and not Debtors or the WIOs) bears financial responsibility for its failure to meet contractual obligations regarding workmanship, safety, and compliance with applicable governmental regulations and laws, the Contract allows Debtors to "withhold, from payments due [Atlantic] under this Contract and any applicable Drilling Order, any amounts owing to [Debtors] by [Atlantic] hereunder and/or any applicable Drilling Order."  But even if Debtors pay an invoice in full, it can still dispute its amount at a later time.  Paragraph 916 of the Contract provides that "[p]ayment of any invoice provided to [Debtors] by [Atlantic] . . . shall not prejudice the right of [Debtors] to question the correctness of any charges herein."

9.      As part of this process, the Contract, in numerous provisions, authorizes Debtors to audit Atlantic's charges:

- Paragraph 507: [Atlantic] shall each day keep and furnish to [Debtors'] Representative two (2) signed copies of daily drilling reports in detail on standard IADC-API Daily Drilling Report Forms, or other equivalent form acceptable to [Debtors].  This report shall specifically include details of time breakdown on all operations and a clear description of all operations.

- Paragraph 1304: For a period of two (2) years from the end of [Debtors'] accounting year in which the work, services, or operations under any applicable Drilling Order are terminated or completed, [Atlantic] shall keep proper books, records, and accounts of work, services or operations under each Drilling Order and shall permit [Debtors] to inspect such records at all reasonable times at [Atlantic's] premises where such records are normally kept for the purpose of determining rates hereunder or charges for reimbursable items.

---

[4] Appendix C sets forth Debtors' "Safety and Environment Requirements."  Paragraph 503(d) of the Contract requires Atlantic to comply with Debtors' "Safety Program as set forth in Appendix 'C.'"

10.     Atlantic failed to adhere to this framework and filed liens on certain wells in which Debtors and the WIOs have an interest, weeks before payment was due, before Debtors could conduct a contractually authorized audit of Atlantic's charges, and less than three weeks before the Debtors filed for bankruptcy protection.  Then, on November 13, 2020, Atlantic filed two *in rem* lawsuits in the United States District for the Eastern District of Louisiana against the WIOs[5] to enforce Atlantic's liens collect millions of dollars from the WIOs under the Louisiana Oil Well Lien Act (La. R.S. 9:4861 *et seq.*) arising out of alleged payments that the Debtors owe Atlantic. True and correct copies of the publicly available complaints in these lawsuits are attached as **Exhibit C**.  Because of the Debtors' obligations in its operating agreements to hold the WIOs harmless from such liens and lawsuits, I anticipate that the WIOs will look to the Debtors' for indemnity from Atlantic's claims.

11.     The amount of Atlantic's liens, however, do not account for offsets and credits to which the Debtors are entitled.

12.     By filing the Lawsuits, Atlantic has already affected the Debtors' ability to conduct their bankruptcy.  The Debtors have been forced to divert their focus from the bankruptcy proceedings and negotiations to the defense of the WIOs under the terms of the joint operating agreements.  Negotiations with parties-in-interest have been disrupted and cash flow to the bankruptcy estate will slow as parties have been forced to react to the specter of similar suits. Indeed, some working interest owners have already decided it is in their best interest to limit operational expenditures as the threat of lawsuits and sequestration evolves.

---

[5] Cause No. 2:20-cv-03097; *Atlantic Maritime Services, LLC v. Ecopetrol America, LLC* and Cause No. 2:20-cv-03099; *Atlantic Maritime Services, LLC v. Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC.*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 20th, 2020
        Houston, Texas

                                      */s/ Michael T. Dane*
                                      Michael T. Dane
                                      Senior Vice President and Chief Financial Officer
                                      Fieldwood Energy, LLC

## Exhibit A

**Excerpts of Operating Agreements**

# Unit Operating Agreement
# Gunflint Prospect
# Gunflint Unit
# Offshore Louisiana

by and between

# FIELDWOOD ENERGY LLC
# ECOPETROL AMERICA LLC

# AND

# TALOS ENERGY OFFSHORE LLC

covering

# S/2N/2 & S/2 of OCS-G 28030, Mississippi Canyon Block 948
# S/2N/2 & S/2 of OCS-G 32363, Mississippi Canyon Block 949
# N/2 of OCS-G 24133, N/2 of Mississippi Canyon Block 992
# N/2 of OCS-G 24134, N/2 of Mississippi Canyon Block 993

# Gunflint Prospect

Gulf of Mexico

effective January 1, 2013

# TABLE OF CONTENTS

ARTICLE 1     CONTRACT APPLICATION ................................................................................ 1

ARTICLE 2     DEFINITIONS ................................................................................................... 1

ARTICLE 3     EXHIBITS ......................................................................................................... 7

ARTICLE 4     SELECTION OF OPERATOR ............................................................................ 8

ARTICLE 5     RIGHTS AND DUTIES OF OPERATOR ......................................................... 11

ARTICLE 6     EXPENDITURES AND ANNUAL OPERATING PLAN ........................................ 16

ARTICLE 7     CONFIDENTIALITY OF DATA ....................................................................... 24

ARTICLE 8     VOTING, ELECTIONS & NOTICES ................................................................ 28

ARTICLE 9     GEOPHYSICAL OPERATIONS ....................................................................... 33

ARTICLE 10    EXPLORATORY OPERATIONS ....................................................................... 35

ARTICLE 11    APPRAISAL OPERATIONS ............................................................................ 44

ARTICLE 12    PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION AFE ................... 54

ARTICLE 13    DEVELOPMENT OPERATIONS ...................................................................... 68

ARTICLE 14    FACILITIES AND GATHERING SYSTEMS ...................................................... 77

ARTICLE 15    DISPOSITION OF HYDROCARBON PRODUCTION........................................... 79

ARTICLE 16    NON-CONSENT OPERATIONS ....................................................................... 81

ARTICLE 17    WITHDRAWAL FROM AGREEMENT.............................................................. 93

ARTICLE 18    ABANDONMENT AND SALVAGE.................................................................... 95

ARTICLE 19    RENTALS, ROYALTIES AND MINIMUM ROYALTIES........................................ 96

ARTICLE 20    TAXES ........................................................................................................... 98

ARTICLE 21    INSURANCE AND BONDS.............................................................................. 99

ARTICLE 22    LIABILITY, CLAIMS, LAWSUITS AND ALTERNATE DISPUTE
              RESOLUTION ................................................................................................. 99

ARTICLE 23    CONTRIBUTIONS ........................................................................................ 101

ARTICLE 24    AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFRENTIAL RIGHT
              TO PURCHASE ............................................................................................. 103

ARTICLE 25    FORCE MAJEURE ......................................................................................... 107

ARTICLE 26    ADMINISTRATIVE PROVISIONS .................................................................. 108

EXHIBIT "A-1"    CONTRACT AREA

EXHIBIT "A-2"    WORKING INTERESTS OF THE PARTIES, OPERATOR AND

                           REPRESENTATIVES

EXHIBIT "B"     OFFSHORE INSURANCE PROVISIONS

EXHIBIT "C"     ACCOUNTING PROCEDURE

EXHIBIT "D"     GAS BALANCING AGREEMENT ("AGREEMENT")

EXHIBIT "E"     CERTIFICATION OF NONSEGRATED FACILITIES

EXHIBIT "F"     NEWS RELEASE GUIDELINE

EXHIBIT "G"     PROJECT TEAM AND TECHNOLOGY SHARING

EXHIBIT "H"     DISPUTE RESOLUTION PROCEDURE

EXHIBIT "I"     MEMORANDUM OF OPERATING AGREEMENT AND FINANCING

                           STATEMENT

EXHIBIT "J"     SAFETY, HEATLTH AND ENVIRONMENT "SHE"

**JOINT OPERATING AGREEMENT**
**OUTER CONTINENTAL SHELF - GULF OF MEXICO**

**THIS AGREEMENT** is dated as of _____, 2019 but effective as of January 1. 2013 by and between **Fieldwood Energy LLC** ("Fieldwood" as successor in interest to Noble), **Ecopetrol America LLC** (formerly known as Ecopetrol America Inc. and hereafter "Ecopetrol") and **Talos Energy Offshore LLC** ("Talos"). The aforementioned parties are sometimes referred to herein individually as "Party" and collectively as the "Parties."

**WHEREAS**, the Parties are the owners of one or more OCS oil and gas Leases identified in Exhibit "A-1" *(Description of Leases) and* desire to jointly explore, develop and operate these Leases lying within the Contract Area for the production of Hydrocarbons.

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification, Amendment and Re-Designation of the Gunflint JOA as the Gunflint Voluntary Unit Operating Agreement, dated January 1, 2011, (the "Gunflint VUOA");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain MC 948 UOA, effective January 1, 2013, whereby the Parties agreed that the Gunflint VUOA shall serve as the Unit Operating Agreement for the Gunflint Unit, with necessary provisions to accommodate the MC 948 UOA;

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification and First Amendment of the MC 948 Unit Operating Agreement, effective January 1, 2013 (the "First Amendment");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Second Amendment to the MC 948 Unit Operating Agreement, effective May 23, 2013 (the "Second Amendment");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification and Third Amendment to the MC 948 Unit Operating Agreement, effective November 30, 2018 (the "Third Amendment", and together with the First Amendment and the Second Amendment, the "Amendments");

**WHEREAS**, Fieldwood was awarded a lease on Mississippi Canyon Block 905, OCS-G 36405 and subsequently assigned 19.12740% record title interest to Samson Offshore Mapleleaf, LLC and 31.5% record title interest to Ecopetrol effective November 1, 2018;

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement effective December 1, 2018, Samson Offshore Mapleleaf, LLC assigned 9.5637% to Fieldwood and 9.5637% to

1

Talos of its undivided 19.1274% interest in the MC 948 UOA, Gunflint VUOA, and the leases covered by both of said agreements;

**WHEREAS**, by letter dated January 14, 2019 Samson Offshore Mapleleaf, LLC, Fieldwood and Ecopetrol relinquished Mississippi Canyon Block 904, OCS-G 33182;

**WHEREAS**, Samson Offshore Mapleleaf, LLC (i) no longer holds an interest in the leases (inclusive of the MC 948 Unit leases) and (ii) is no longer a party to either the MC 948 UOA or the Gunflint VUOA;

**WHEREAS**, Talos now holds an interest in the leases (inclusive of the MC 948 Unit leases) and desires to ratify, confirm and adopt the MC 948 UOA and the Gunflint VUOA, and to be bound by and comply with all of the terms and conditions thereof;

**WHEREAS**, Fieldwood, Ecopetrol and Talos were awarded a lease on Mississippi Canyon Block 904, OCS-G 36566 effective July 1, 2019;

**WHEREAS**,

(a) Fieldwood and Ecopetrol desire to accept Talos's ratification, confirmation and adoption of the MC 948 UOA and Gunflint VUOA; and

(b) Fieldwood, Ecopetrol and Talos desire to amend the MC 948 UOA and Gunflint VUOA to include Talos as a party thereto and to reflect current ownership of the leases;

**WHEREAS**, the Parties desire to amend and restate the MC 948 UOA in its entirety, together with all Amendments; and

**WHEREAS**, the Parties desire to amend the Gunflint VUOA to include Mississippi Canyon Block 904 OCS-G 36566 and Mississippi Canyon Block 905, OCS-G 36405, and to acknowledge that the restated MC 948 UOA is a separate but identical agreement to the Gunflint VUOA, inclusive of all exhibits and Amendments thereto, with the lone exception of the contract areas described on Exhibit A-1 attached to each such agreement, which are different.  This shall apply from this point forward unless otherwise specifically agreed to by the Parties hereto.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to jointly explore, develop and operate the Contract Area according to the following provisions:

# ARTICLE 1
# CONTRACT APPLICATION

1.1     <u>Application in General</u>:  This Agreement applies to the joint exploration, development and operation of the Contract Area for the production of Hydrocarbons therefrom and the transportation of same by pipeline(s) or otherwise from the Contract Area.

1.2     <u>Application to Contract Area</u>:  This Agreement shall apply to the Contract Area as defined in Article 2 below. Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all joint property and all Hydrocarbons produced from the Contract Area shall be owned jointly by the Parties according to their respective Working Interests in the Contract Area.

# ARTICLE 2
# DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the initially capitalized terms listed below shall have the following meanings:

2.1     <u>Additional Testing, Coring or Logging</u>:  shall mean any testing (excluding production testing), coring or logging which is in addition to that approved by virtue of any previously approved AFE.

2.2     <u>Affiliate</u>:  shall mean any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party to this Agreement. The term "Affiliate" of a Party includes any parent corporation, partnership or other entity that directly or indirectly owns or controls greater than fifty percent (50%) of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any other corporation, partnership or other entity in which the parent corporation directly or indirectly owns or controls greater than fifty percent (50%) of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party to this Agreement directly or indirectly owns or controls greater than fifty percent (50%) of the outstanding stock of the corporation having the right to vote for directors of the corporation (or greater than fifty percent (50%) of the interests in the partnership or other entity).

- The stock (or interests in a partnership or other entity) owned or controlled by a Party shall include all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party to this Agreement.

2.3     <u>Agreement</u>:  shall mean this Joint Operating Agreement, together with its attached Exhibits.

2.4     <u>Annual Operating Plan</u>:  shall mean the operational plan and estimate of Costs for joint operations in the next ensuing calendar year as described in Article 6.7 *(Annual Operating Plan)*.

2.5     <u>Appraisal Operations</u>:  shall mean all operations conducted within the Contract Area subsequent to Exploratory operations and proposed pursuant to Article 11 *(Appraisal Operations)*. The terms Appraisal Operations and Appraisal Well are interchangeable throughout this Agreement.

2.6     <u>Appraisal Well</u>:  shall mean any well proposed and drilled as an Appraisal Operation.

2.7     <u>Authorization for Expenditure (AFE)</u>:  shall mean any written proposal made by a Party for the purpose of describing an operation being proposed and estimating the costs to be incurred.   The AFE, when executed by a Party, evidences that Party's Election to participate in the proposed operation and grants the Operator the authority to commit or expend funds, pursuant to this Agreement, for the account of the Participating Parties. Any AFE which proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which Parties are permitted separate Elections under the terms of this Agreement.

2.8     <u>Confidential Data</u>: shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area. The term shall also include (but may not be limited to):

- certain commercial, contractual or financial information;

- analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

- both originals and copies of geological and geophysical data, and well logs; and,

- all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement.

The provisions of this Agreement with respect to Confidential Data shall not be applicable to "Confidential Work Product" as that term is defined in Exhibit *"G' (Project Team and Technology Sharing)*.

2.9     <u>Contract Area</u>:  shall mean the OCS Lease(s) described on Exhibit "A-1" limited to the areas and depths described on Exhibit "A-1".

2.10    Cost(s):  shall mean the monetary amount of all expenses incurred by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement.

2.11    Deepen or Deepening:  shall mean any operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the deepest formation previously encountered in such well.

2.12    Deeper Drilling:  shall mean the drilling of a well below the deepest Producible Reservoir penetrated by a Producible Well within the Contract Area.

2.13    Development Operations:  shall mean all operations within the Contract Area other than an Exploratory Operation or an Appraisal Operation.

2.14    Development Phase:  shall mean Development Operations associated with the design, fabrication or acquisition, and installation of a Production System serving the Contract Area.

2.15    Development Plan:  shall mean the plan for installing a Production System and developing and producing Hydrocarbons from the Contract Area as described in Article 12 *(Project Team, Development Plan and Fabrication AFE).* The Development Plan (as defined herein) is not the Development Plan as required by the BOEM under 30 CFR 550.201(a)(2) nor under the DOCD required under 30 CFR 550.201(a)(3).

2.16    Development Well:  shall mean any well proposed within the Contract Area subsequent to the approval of a Development Plan for such Contract Area.

2.17    Disproportionate Spending Settlement:  shall mean the settlement of all or a portion of the percentage recoupment by a Non-Participating Party paying a disproportionate amount of Costs in the next ensuing operation in which the Non-Participating Party makes an Election to participate.

2.18    Election:  shall mean a decision by a Party to either participate or to become a Non-Participating Party in a proposed operation (including the AFE associated with the operation). An Election to participate is evidenced by a Party's execution of the AFE. An Election not to participate (become a Non-Participating Party) is evidenced either by a Party's written response against a proposal or such Party's failure to timely execute the AFE within the applicable time limit specified in this Agreement or both.

2.19    Exploratory Operations:  shall mean any operation conducted on the Contract Area pursuant to Article 10 (*Exploratory Operations*).

2.20    Exploratory Well:  shall mean any well proposed and drilled as an Exploratory Operation.

2.21    Fabrication AFE:  shall mean the individual AFEs collectively submitted pursuant to an approved Development Plan for the construction, fabrication or acquisition, and installation of a Production System.

2.22    Facilities:    shall mean all production equipment beyond the wellhead connections (excluding Production Systems and Subsea Production Systems, but including injection and disposal wells) installed on or outside the Contract Area to handle or service Hydrocarbon production from the Contract Area. Facilities also include (but are not limited to) the flowlines and gathering lines that transport the Hydrocarbons from the wellhead but exclude pipelines used to transport Hydrocarbons to shore except to the extent the pipeline is required by the Development Plan to transport hydrocarbons from the Contract Area to the pipeline interconnect selected in the Development Plan.

2.23    Final Design AFEs:  shall mean the individual AFEs, collectively submitted pursuant to an approved Development Plan pursuant to Article 12.5 *(Content of the Development Plan).*

2.24    Force Majeure:  shall have the meaning ascribed in Article 25.1 *(Force Majeure).*

2.25    General Matters:  shall mean any matter decided by a vote of the Parties in accordance with Article 8.2 *(Voting Procedures on General Matters and Elections).*  A proposal as a General Matter may or may not include an AFE; depending on the type of proposal. If the nature of the proposal requires that an AFE be submitted with the proposal, an affirmative vote for such proposal shall be evidenced by a Party's execution of the AFE for the proposal.

2.26    Geophysical Operations:  shall mean geophysical surveys proposed pursuant to Article 9 *(Geophysical Operations).*

2.27    Hydrocarbons:  shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

2.28    Joint Account:  shall mean the account maintained by the Operator' showing the charges paid and credits received by each of the Parties in the conduct of the operations hereunder as provided in this Agreement.

2.29    Lease(s):  shall mean each of the OCS federal oil and gas Leases (or portion thereof) identified on Exhibit "A-1" attached hereto.

2.30    Non-Consent Operations:  shall mean Exploratory Operations, Appraisal Operations or Development Operations for which one or more Parties, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation; and where the Participating Parties proceed to conduct the operation at their sole Cost and risk pursuant to provisions of Article 16 *(Non-Consent Operations).*

2.31    Non-Operating Party:  shall mean any Party to this Agreement other than the Operator (or a substitute Operator).

2.32    Non-Participating Party:   shall mean any Party to this Agreement who, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation and who is subject to the provisions of Article 16 *(Non-Consent Operations)*.

2.33    Non-Participating Party's Share:  shall mean the share of Working Interest and Costs that a Non-Participating Party would have assumed if all Parties had made an Election to participate in the proposed operation.

2.34    Objective Depth:  shall mean, for any well, the shallower of the total footage to be drilled (as measured in true vertical depth) or the penetration by the drill bit sufficient to test the stratigraphic equivalent base of the deepest target formation or interval. Said depth, formation or interval (together with a bottomhole location) shall be set forth in the proposed Well Plan and AFE.

2.35    Operator:  shall mean the Party identified in Article 4.1 *(Designation of the Operator)* designated to conduct all operations pursuant to the terms of this Agreement. The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)* or Article 4.5 *(Selection of Successor Operator)*.

2.36    Participating Interest:  shall mean a Participating Party's percentage of participation in the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement; that is, the proportion that the Party's Working Interest bears to the total Working Interest of all the Participating Parties or such different Cost sharing basis that has been agreed upon by the Participating Parties in such operation.

2.37    Participating Party:  shall mean a Party who makes an Election to participate in sharing the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement. If the Parties have agreed upon a different Cost sharing arrangement, those Parties shall be considered Participating Parties for all purposes of this Agreement.

2.38    Producible Reservoir:  shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from and not in oil or gas communication with any other accumulation.

2.39    Producible Well:  shall mean a well producing hydrocarbons or, if not producing, a well that shall meet, according to either the BOEM or the Participating Parties by unanimous agreement, the "well producibility criteria" set forth in Title 30 CFR 550.116 or any succeeding order issued by an appropriate governmental authority.

2.40    <u>Production System</u>:  shall mean an offshore structure (whether fixed, compliant, subsea or floating), and all associated components thereof including the associated Facilities, flowlines, gathering lines, subsea tiebacks to another production system and risers which are used for the production of Hydrocarbons from the Contract Area. This term shall also include the following defined terms:

**Subsea Production System:** shall mean an offshore subsea structure (i.e., where multiple wells or a single well could be utilized) or template and the components thereof (including flowlines and control systems) which are attached to the seafloor for use in obtaining Hydrocarbon production from a well not drilled from a Production System and routed to the Production System;

**Initial Production System:** shall mean the Production System for the Contract Area included in the first approved Development Plan;

**Subsequent Production System:** shall mean any new or expanded Production System proposed after the installation of the Initial Production System for the Contract Area.

2.41    <u>Project Team ("PT")</u>:  shall mean the group of employees, contract employees and/or consultants of the Participating Parties assigned to assist the Operator with preparing a Development Plan for the Contract Area, and for the planning, design, engineering, fabrication, transportation, installation and operation of a Production System for the Contract Area as further provided for in Exhibit *"G" (Project Team and Technology Sharing Provisions)*.  The PT shall be formed pursuant to Article 12 *(Project Team, Development Plan and Fabrication AFE)*.

2.42    <u>Sidetrack or Sidetracking</u>:  shall mean any operation to directionally control and/or intentionally deviate a well so as to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth, excluding intentional deviation done to straighten the hole, drill around junk or to overcome other mechanical difficulties.

2.43    <u>Subsequent Exploratory Operation</u>:  shall mean any operations conducted subsequent to an Exploratory Well reaching its Objective Depth but prior to the plugging and abandonment of such Exploratory Well.

2.44    <u>Well Plan</u>:  shall mean a plan for any proposed Exploratory, Appraisal or Development Well which contains at least the information defined in Article 10.2.1 *(Well Plan's Minimum Specifics)*.

2.45    <u>Withdrawing Party</u>:  shall mean a Party that withdraws from this Agreement under the conditions defined in Article 17.1 *(Right of Withdrawal)* or is deemed to have withdrawn under Article 16.2 *(Acreage Forfeiture Provisions)*.

2.46   <u>Working Interest</u>:      shall mean the percentage interest of each Party in and to the Unit Area (expressed as the percentage described in Article II. of Exhibit "A-2" [*Prospect Area(s), Working Interest of the Parties, Operator and Representatives]* attached hereto)."

# ARTICLE 3
## EXHIBITS

3.1   <u>Exhibits</u>:   All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.  If the provisions of any of the Exhibits conflict with any provisions of this Agreement, the provisions of this Agreement shall prevail with exception of Exhibits "C," "D," and "G", each provision of which shall prevail over any provision of the body of this Agreement.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "G", the provision of Exhibit "G" shall prevail.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "D", the provision of Exhibit "C" shall prevail.

|  |  |
|---|---|
| **Exhibit "A-1"** | Contract Area |
| **Exhibit "A-2"** | Working Interests of the Parties, Operator and Representatives |
| **Exhibit "B"** | Offshore Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Nonsegregated Facilities |
| **Exhibit "F"** | News Release Guidelines |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Memorandum of Operating Agreement and Financing Statement |
| **Exhibit "J"** | Safety, Health and Environment "SHE" |

## ARTICLE 4 SELECTION OF OPERATOR

4.1   <u>Designation of the Operator</u>:  Fieldwood Energy LLC is designated as the Operator for the Contract Area and shall conduct all operations within such Contract Area required or permitted by this Agreement except as noted below in Article 4.2 (*Substitute Operator*). This designation of operatorship is subject to approval by the Bureau of Ocean Energy Management ("BOEM"), and the Parties agree to promptly execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2   <u>Substitute Operator</u>:  If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be selected by the Participating Parties as a

General Matter and designated as the substitute Operator, with the same authority, rights, obligations and duties as the Operator, except when:

(a) the drilling and other contracts for equipment and Facilities to be utilized on the Non-Consent Operation are not assignable; or

(b) the operation is conducted from a Production System being operated by the Operator.

If no substitute Operator is designated by the Participating Parties, then the Operator, at its option, shall conduct such Non-Consent Operations at the sole risk, Costs and expense of the Participating Parties and subject to their control, supervision and direction.   If the Operator conducts Non-Consent Operations on behalf of the Participating Parties (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Parties an estimate of the Costs of the Non-Consent Operation. The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs thereof have been advanced to it by the Participating Parties, to the end that the Operator need not expend any of its own funds for such Non-Consent Operation.  If a Non-Consent Operation conducted by a substitute Operator is completed or results in a producing well, said well shall be turned over to the Operator for future operations within thirty (30) days of completion of such operations.

In the event that the Operator becomes a Non-Participating Party in a Non-Consent Operation but is selected by the Participating Parties to perform the Non-Consent Operation on behalf of the Participating Parties, the Participating Parties indemnity to a Non-Participating Party as set forth in Section 22.6 shall be applicable and extend to Operator while acting on behalf on behalf of the Participating Parties except to the extent any loss or cost is caused by the gross negligence or willful misconduct of the Operator while performing the Non-Consent Operation on behalf of the Participating Parties.

4.2.1   <u>Substitute Operator if Operator Fails to Commence Operations</u>:    If the Operator (or substitute Operator)  fails to timely commence an Exploratory Operation in accordance with Article 10.2.4 *(Timely Operations)*, an Appraisal Operation in accordance with Article 11.1.4 *(Timely Operations)* or a Development Operation in accordance with Article 13.1.2 *(Timely Operations)*, the non-operating Participating Parties may select a substitute Operator in the same manner as provided above and the substitute Operator shall serve as the Operator only:

(a) for such operations through the release of the rig for the operations,

(b) of the Lease on which the operations are conducted, and

(c) with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).

4.3    <u>Resignation of Operator</u>:  The Operator may resign at any time by giving written notice to the Parties;  provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Majeure)*. If the Operator no longer owns an interest in the Contract Area, except as hereinafter provided the Operator shall be deemed to have resigned without any action by the Non-Operating Parties other than the selection of a successor Operator, unless the Operator is transferring its Working Interest to an Affiliate.

4.4    <u>Removal of Operator</u>:  The Operator may be removed either as a result of an assignment of all or a portion of the Operator's Working Interest in the Contract Area or for good cause under the following circumstances.

    4.4.1    <u>Removal Upon Assignment</u>:  If the Operator assigns all or a portion of its Working Interest in the Contract Area (excluding any interest assigned to an Affiliate) which reduces the Operator's Working Interest in a Contract Area to less than the Working Interest of the Participating Party owning the next largest Working Interest owned on the effective date of the Operator's assignment, whether accomplished by single or multiple assignments, then the Operator may be removed by vote of the Parties as a General Matter.

    4.4.2    <u>Removal for Cause by Vote</u>:  The Operator may be removed for cause by vote of the Parties as a General Matter if the Operator commits any of the following acts:

        (a)    allowing one (1) or more materialmen, mechanics or similar liens to be placed on and to remain on the Contract Area for more than ninety (90) days without either posting a bond or initialing other legal action to clear the liens, or becoming insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of bankruptcy or seeks relief under laws providing for the relief of debtors; or,

        (b)    a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

        (c)    the Operator commits an act of gross negligence or willful misconduct; or,

        (d)    the Operator fails or is unable to meet the standards of operation contained in Articles *5.2 (Workmanlike Conduct), 5.3 (Drilling), 5.4 (Liens and Encumbrances)* and *5.6 (Reports to Government Agencies);* or,

        (e)    the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach.  However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or

steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed; or

(f)     the Operator fails to timely commence operations for the production System in accordance with Article 12.14 (*Timely Operations for Production Systems*).

4.5     <u>Selection of Successor Operator</u>:   Upon resignation or removal of the Operator; a successor Operator shall be selected by the Parties as a General Matter.  If the resigned or removed Operator fails to vote or votes only to succeed itself, then the successor Operator shall be selected as a General Matter after excluding the vote of the resigned or removed Operator.  In the event there are only two Parties to this Agreement, the Non-Operating Party shall become the Operator.  If no Party is willing to become Operator, this Agreement shall terminate in accordance with Article 26.1 (*Term of Agreement*).

4.6     <u>Effective Date of Resignation or Removal</u>:  The resignation or removal of the Operator shall become effective at 7:00 a.m. on the first day of the month following a period of sixty (60) days after said notice or vote to remove, unless a longer period of time is required to obtain approval by the BOEM.  Prior to the successor Operator's assumption of the Operator's duties, the previous Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator.  Upon selection of a successor Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities which accrued during the period when the outgoing Operator acted as the Operator.  If the outgoing Operator resigns or is removed, it shall be entitled to charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship.

4.7     <u>Delivery of Property</u>:  On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator possession of everything jointly owned by the Parties, including all funds relating to the Joint Account, all joint Hydrocarbons, all joint equipment, materials and appurtenances used in conducting operations and all books, records and inventories relating to joint operations (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest).  Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator.  The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to joint operations and the successor Operator shall assume all obligations of the Operator thereunder.  As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the Joint Account and conduct an inventory of all joint property and all joint Hydrocarbons, and such inventory shall be used in the return of and the accounting for the joint property and the joint Hydrocarbons by the outgoing Operator.  All Costs incurred in connection with such audit and inventory shall be charged to the Joint Account.

## ARTICLE 5
## RIGHTS AND DUTIES OF OPERATOR

5.1     Exclusive Right to Operate:  Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement.   The Operator shall be and is an independent contractor in the performance of the work hereunder, not subject to the general direction and control of the other Parties, except as specifically described in this Agreement.  With the exception of any team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or contractors shall be the employees or contractors, respectively, of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement; however, if a substitute Operator is designated to conduct an operation, the substitute Operator may, subject to Article 5.3 (*Drilling and Well Operations*), contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the substitute Operator to conduct such operation.

5.2     Workmanlike Conduct:  The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice as would a reasonable and prudent operator under the same or similar circumstances.  The Operator shall not be liable to the Parties for losses sustained or liabilities incurred in the physical operation of the Contract Area, except such as may result from its gross negligence or willful misconduct.  Unless otherwise provided, Operator shall consult with the Parties and keep them all informed of all important matters.

5.3     Drilling and Well Operations:  The Operator may have all drilling and well operations conducted by qualified and responsible independent contractors who are not affiliated with the Operator and are employed under competitive contracts.  A competitive contract is a contract containing current terms, rates and provisions that do not exceed those generally prevailing on the OCS in the Gulf of Mexico for operations involving drilling rigs not over-qualified for the proposed operation in similar environments, and equipped to the Operator's standard conditions which are capable of drilling the proposed well(s) within the time schedule for the operations to be.  The Operator may, however, employ its or an Affiliate's equipment and personnel in the conduct of such operations pursuant to a written agreement among the Participating Parties.

5.4     Liens and Encumbrances:  The Operator shall use reasonable efforts to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons

13

free from all liens and encumbrances, except those provided for in Article 6.3 (Security Rights), which might arise by reason of the operations conducted under this Agreement.

5.5   <u>Records</u>:  The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with the Accounting Procedure in Exhibit "C" *(Accounting Procedure)*.  Unless otherwise provided for in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C" (*Accounting Procedure*).  The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.  The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party.  This provision does not affect a Party's audit rights under this Agreement.  This provision shall also apply to each Non-Operating Party's books, accounts, and records kept to support its charges to a Project Team.

5.6   <u>Reports to Government Agencies</u>:   The Operator shall make timely reports to all governmental authorities that it has a duty to make as Operator and shall furnish copies of such reports to the Participating Parties.  The Operator shall give timely written notice to the Parties of litigation and/or administrative proceedings of which it has notice affecting the Contract Area or operations hereunder.

5.7   <u>Information to Participating Parties</u>:  The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to each well being drilled (provided such information was obtained or received by Operator):

(a)   copy of the application for permit to drill and all amendments thereto;

(b)   daily drilling and workover reports by facsimile or other electronic transmission by 8:00 A.M. which shall include but not be limited to daily mud checks, mud logs, lithological, and Hydrocarbon information; daily casing and cementation tallies and cumulative Costs incurred on the operation;

(c)   complete report of all core analysis;

(d)   copies of any logs or surveys as run (including a complete "library tape" of the digitally recorded data);

(e)   copies of well test results, bottomhole pressure surveys, gas and condensate analyses or similar information;

(f)   copies of relevant well specific written correspondence, plans, permits and reports made to regulatory agencies, including but not limited to relevant well specific containment plan and screening tools used for permitting the well, filings, casing and cementing design certifications from a Professional Engineer, lease

suspensions of operations and/or suspensions of production and plans required under current and future applicable Notices to Lessees (NTLs) and the Drilling Safety Rule and Workplace Safety Rule announced by the BOEMRE on September 30, 2010, and any rules derived therefrom;

(g)     48 hours advance notice of logging, coring or testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, and if sufficient quantifies are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, the requesting Party shall be allowed access to inspect and evaluate said cores; and

(k)     samples of gas, condensate and oil, if sufficient quantities are available;

(l)     well specific risk assessment (as per SEMS) with planned mitigations;

(m)     detailed drilling program which indicates the step by step process on how the well is going to be drilled, at a level of detail equivalent to what the rig personnel are utilizing;

(n)     real time drilling data, including but not limited to LWD, drilling and mudlog data.

Upon written request, the Operator shall use its reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole Cost and expense). The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

5.8     <u>Completed Well Information</u>:   Operator shall, in a timely manner, furnish to each participating Party the following information pertaining to each completed well:

(a)     monthly report of production and injection;

(b)     copies of reports made to regulatory agencies;

(c)     report on status of wells not producing and not abandoned;

(d)     Hydrocarbon status report;

(e)     bottomhole pressure data;

(f)     composite of all logs run (e.g., TDT, Carbon-Oxygen, Spinner Surveys, Casing Collar, etc.); and,

(g)     reports of inventory.

5.9     <u>Information to Non-Participating Parties</u>: The Operator shall furnish to each Non-Participating Party copies of all non-confidential reports made to regulatory agencies.  A Non-Participating Party shall be entitled to receive the information specified in Articles 5.7 and 5.8 only after fulfilling the requirements specified in Article 16 *(Non-Consent Operations)*.  A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles 5.7 and 5.8.

5.10     <u>Cost Information</u>:  Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all Parties an itemized statement of the Cost of such operations and an inventory of the equipment pertaining thereto or, at its option, the Operator in lieu of an itemized statement of such Costs may submit a detailed statement of monthly billings.  For the purposes of calculating recoupment of Costs pursuant to Article 16 *(Non-Consent Operations),* the Operator shall furnish to all Parties a quarterly statement showing operating expenses and the proceeds from the sale of Hydrocarbon production from the wells from which recoupment is being made.

5.11     <u>Managing Production</u>:  All Parties shall cooperate and use due diligence to avoid gas imbalances resulting in pipeline penalties under the provisions of the applicable transportation tariffs of any transporting pipelines.  Any additional costs imposed on Operator as a result of gas pipeline imbalances with transporters shall be borne by the individual Parties in the proportion that each individual Party's over and under deliveries caused such imbalance penalty, except where the imbalance is caused by the gross negligence or willful misconduct of Operator in which case the Operator shall bear the entire penalty.  For purposes of this Article, gas pipeline imbalances shall be defined as the difference between gas nominations accepted by the gas transporter and the actual volume delivered to the gas transporter for each Party's account.

5.12     <u>Safety, Health and Environment</u>: The Operator shall have the primary responsibility for the safety of all operations conducted pursuant to the Agreement.   The Operator shall conduct all operations in compliance with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.  At the Pre-Spud Technical Meeting described in Article 10.2.3 (*Pre-Spud Technical Meeting & Revision of Well Plan*), the Operator shall review the Operator's safety and drilling procedures with the Non-Operators for the purpose of soliciting comments, suggestions and general feedback.

The Operator shall, with the support and cooperation of the Non-Operators, in the conduct of operations pursuant to this Agreement:

(a)   design and manage operations to standards intended to achieve sustained reliability and promote the effective management of safety, health and environmental ("SHE") risks;

(b)   apply structured SHE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage SHE risks and pursue sustained reliability of operations under this Agreement; and

(c)   comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.

In fulfilling its obligations hereunder, the Operator shall act in accordance with the provisions in Exhibit "J" *(Safety, Health and Environment "SHE")*.

5.13   Access to Documents Regarding Drilling Unit: Upon written request, the Operator shall make available to the Participating Parties reasonable access to any inspection, commissioning, testing and acceptance documents pertaining to the drilling unit.   All BOP equipment shall be in material compliance with such manufacturer's specifications and any regulatory requirements in effect at the time the equipment is in use.


## ARTICLE 6
## EXPENDITURES AND ANNUAL OPERATING PLAN

6.1   Basis of Charges to the Parties:  Except as otherwise provided, the Operator shall pay all Costs of joint operations and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest, for the Costs of each joint operation.   The Operator shall have the right to require each Participating Party to advance its respective share of estimated expenditures, as provided in Exhibit "C" *(Accounting Procedure)*. Funds received by the Operator under this Agreement may be commingled with Operator's own funds.  All charges, credits and accounting for expenditures shall be made pursuant to Exhibit "C" *(Accounting Procedure)*, attached hereto.

6.2   Authorization for Expenditure:  The Operator shall not make any single expenditure or undertake any project or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an Authorization for Expenditure (AFE) has either (1) been included in a proposal for an operation and approved by the Participating Parties through their Election

17

to participate in the operation, or (2) been approved by the Parties as a General Matter. For any single expenditure or project costing in excess of Fifty Thousand Dollars ($50,000), but less than Two Hundred Thousand Dollars ($200,000), the Operator need not submit an AFE, but shall furnish written information describing the expenditure to each of the Participating Parties.  In the event of an emergency and notwithstanding the foregoing, the Operator shall be empowered to immediately make such expenditures for the Joint Account of the Participating Parties as, in its opinion as a reasonable and prudent Operator, are required to deal with the emergency.  The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and action taken.

**Notwithstanding anything in this Article 6.2 to the contrary, if less than all the Participating Parties in an operation elect to approve the supplemental AFE for such operation and if there is not agreement among the Parties desiring to continue such operation to each bear their revised proportionate share of one hundred percent (100%) of the liability and Costs of the continued operation, the Operator shall, unless such Parties otherwise agreed to allocate such liability and Costs, terminate the operation.  If the Operator terminates the operation, each of the original Participating Parties shall be obligated to bear and pay their proportionate share of all the liabilities and Costs incurred by the Operator up to and including the termination of the operation, including, if applicable, all Costs associated with any plugging and abandonment of a well, whether or not such Costs exceed the currently approved AFE by greater than the Permitted Over-expenditure amount. Additionally, notwithstanding a Party's Election pursuant to Article 6.2.2 (_Supplemental AFE for Cost Overruns for Wells_) to become a Non-Participating Party once the Permitted Over-expenditure has been exceeded, if at the conclusion of such drilling operation the well is plugged and abandoned, each Participating Party in the original drilling operation shall continue to be obligated to pay for its respective share of all Costs of plugging and abandoning the well (except for any increased plugging and abandonment Costs associated with any subsequent well operations conducted as a Non-Consent Operation).**

6.2.1   AFE Overrun Notice:  For informational purposes only, the Operator shall provide an AFE overrun notice to all Participating Parties whenever it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with any separate AFE will exceed the original AFE by more than ten percent (10%).

6.2.2   Supplemental AFE for Cost Overruns for Wells: If during the drilling of Exploratory Wells, subsequent Exploratory Operations, Appraisal Wells, subsequent Appraisal Operations, Development Wells, or subsequent Development Operations, it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the well by more than fifteen percent (15%) or three million dollars ($3,000,000), whichever is less, (the "Permitted Over-expenditure" for an Exploratory Well, an Appraisal Well or a Development Well, or for operations in that well after its has reached its

18

Objective Depth), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the approved well operation. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.2 shall be subject to (i) the provisions of Article 16 *(Non-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.3   <u>Supplemental AFE for Cost Overruns on Project Team AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual Project Team Costs will exceed the latest approved AFE by more than fifteen percent (15%) or three million dollars ($3,000,000), whichever is less, (the "Permitted Over-expenditure" for a Project Team), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Project Team AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.3 shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)* once the actual costs expended on the activity or operation exceed the Permitted-overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.4   <u>Supplemental AFE for Cost Overruns on Final Design AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual design Costs will exceed the latest approved Final Design AFE by more than fifteen percent (15%) or five million dollars ($5,000,000), whichever is less, (the "Permitted Over-expenditure" for a Final Design AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Final Design AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.4 shall be subject to (i) the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.5   <u>Supplemental AFE for Cost Overruns on Fabrication AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual Costs associated with any separate AFE submitted under the Fabrication AFE will exceed the latest approved Fabrication AFE by more than fifteen percent (15%) or twenty million dollars ($20,000,000), whichever is less, (the "Permitted Over-expenditure" for a

Fabrication AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Fabrication AFE.  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.5 shall be subject to (i) the provisions of Article 16.2 *(Non-Consent Fabrication AFE for the Initial Production System)* for the Initial Production System, or (ii) the provisions of Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate, or (iii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, whichever is applicable.

6.2.6    <u>Supplemental AFE for Cost Overruns on All Other AFEs</u>:  If it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the operation by more than fifteen percent (15%) or one million dollars ($1,000,000), whichever is less, (the "Permitted Over-expenditure" for All Other AFEs), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the operation.  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.6 shall be subject, if applicable, to the provisions of Article 16 *(Non-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.7    <u>Further Operations During a Force Majeure</u>:  No Participating Party shall be allowed to make an Election not to participate in a further operations under Articles 6.2.2 *(Supplemental AFE for Cost Overruns for Wells)*, 6.2.3 *(Supplemental AFE for Cost Overruns on Project Team AFE)*, 6.2.4 *(Supplemental AFE for Cost Overruns on Final Design AFE)*, 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE)* or 6.2.6 *(Supplemental AFE for Cost Overruns on All Other AFEs)* during a Force Majeure or other emergency as described in Article 25.1 *(Force Majeure)*, but may make its Election not to participate after termination of such emergency.

6.2.8    <u>Long Lead Well Operation AFE</u>:  The Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment, materials or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation ("Long Lead Well Operation Items") (a "Long Lead Well Operation AFE").

6.2.8.1    <u>Proposal and Approval of a Long Lead Well Operation AFE</u>: A Long Lead Well Operation AFE proposal shall include a description of the

equipment, materials, or services to be purchased, an estimate of any cancellation fees, and the description and estimated timing for the well or well operation that will utilize such long lead equipment, materials, or services. Each Long Lead Well Operation AFE proposal requires approval by unanimous agreement of the Parties. If the Long Lead Well Operation AFE is not approved by unanimous agreement, then the Long Lead Well Operation AFE proposal shall be deemed withdrawn. Approval of a Long Lead Well Operation AFE shall not be deemed an affirmative vote of Election to participate in any subsequently proposed wells or well operations for which such long lead equipment, material or services are procured.

6.2.8.2  <u>Non-Participating Parties in the Operations Associated with a Long Lead Well Operation AFE:</u> If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Well Operation Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Well Operation Items within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation for their proportionate share of the reimbursement under this Article 6.2.8.2 in accordance with Exhibit "C".

6.2.8.3  <u>Disposition of Long Lead Well Operation Items as Surplus Material:</u> If Long Lead Well Operation Items are not utilized for the well or well operation as proposed and approved, then the disposition of such Long Lead Well Operation Items shall be in accordance with Exhibit "C" Article IV, Paragraph 3 (*Disposition of Surplus*), unless otherwise unanimously agreed to by the Participating Parties."

6.3  <u>Security Rights</u>:  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the following security rights:

6.3.1  <u>Operator's First Lien</u>:  Each Non-Operator grants the Operator a first lien and mortgage upon each Party's Working Interest in the Leases within the Contract Area but only to the extent of the charges and expenses arising under such agreement, (including any interests in the Leases now owned or hereafter acquired), including but not limited to (a) all equipment installed on the Lease(s), (b) all Hydrocarbons or other minerals severed and extracted from or attributable to the Leases, (c) all accounts and proceeds of sale (including, but not limited to, accounts resulting from the sale of such Hydrocarbons or other minerals), contract

rights and general intangibles arising in connection with the sale of such Hydrocarbons or other minerals, (d) fixtures and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. This first lien and mortgage shall secure the payment of all charges against such Party, together with interest thereon at the rate set forth in Exhibit *"C" (Accounting Procedure)* (or the maximum rate allowed by law, whichever is the lesser), reasonable attorneys' fees, court costs and other directly related collection costs. If any Party does not pay such charges when due, the Operator shall have the additional right to collect from the purchaser of defaulting Party's Hydrocarbon production the proceeds from the sale of such Party's share of Hydrocarbon production in the Contract Area until the amount owed has been paid. Each purchaser shall be entitled to rely on the Operator's statement concerning the amount owed.

6.3.2   <u>Non-Operating Party's Security Interest</u>:  Operator grants a like security interest and mortgage to the Non-Operating Parties to secure payment of Operator's proportionate share of expenses. Each Party paying its share of unpaid expenses pursuant to Section 6.5 *(Unpaid Charges)* hereof shall, to obtain reimbursement thereof, be subrogated to the security rights described herein.

6.3.3   <u>Recordation</u>:  To better protect the Parties' security rights created hereunder, the Parties shall promptly join in such reasonable actions as may be necessary to execute and notarize a mutually agreeable Memorandum of Joint Operating Agreement and financing statement on a UCC form ("Memorandum"), similar in all material respects to the form attached hereto as Exhibit "I" as soon as reasonably practical, but prior to commencement of operations. The Memorandum shall be executed by each Party through its duly authorized agent or representative. The Parties hereby authorize the Operator to file the notarized Memorandum in the mortgage, conveyance and UCC records of the pertinent Parishes/Counties having jurisdiction over the Contract Area. The Operator shall provide each Party with a copy of the recorded instrument. Each Party further agrees to provide reasonable written evidence of its authorized signatory's authority to encumber its leasehold interest. In the event that a Memorandum of Joint Operating Agreement is not executed prior to commencement of operations, the Parties agree to execute, notarize and file a Memorandum of Joint Operating Agreement identical to the form attached hereto as Exhibit "I."

6.4   <u>Default</u>:  If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator shall give that Party notice that unless payment is made within thirty (30) days, the non-paying Party shall be in default. Any Party in default shall have no further access to the rig, maps, records, data, interpretations or other information obtained in connection with operations or be allowed to participate in meetings. A Party in default shall not be entitled to vote on any General Matter until such

time as the Party in default is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Participating Interest bears to the total non-defaulting Participating Interests.  As to any operation approved during the time a Party is in default, such Party in default shall be deemed to be a Non-Participating Party.  If a Party notifies the Operator in writing that all or a portion of such payment is being made subject to a good faith dispute over such charges, such dispute shall be subject to an expedited audit process as follows: 1) the Non-operator disputing the charge may require an audit of the matter in dispute be initiated within ninety (90) days after the date Operator receives the notice of the dispute, and 2) the contract committee referred to in "Addendum to Exhibit C. Section 1, Paragraph 5B" shall be required to act upon the audit exceptions, if any, within ninety (90) days after the date of the audit report, and 3) if the contract committee is unable to resolve the dispute within such ninety (90) day period, the dispute shall be handled in accordance with the dispute resolution procedures described in Exhibit "I".

6.5     <u>Unpaid Charges</u>:  If any Participating Party fails to pay its share of the charges due hereunder within thirty (30) days after receipt of a default notice from the Operator, the Operator may take immediate steps to diligently pursue collection and to exercise the Operator's lien and security rights granted by this Agreement.  The Operator shall keep an accurate account of amounts owed (plus interest and costs) by the Party in default and any amounts collected against the indebtedness.  If a Party is in default and any indebtedness remains delinquent for a period of three (3) months, the other Participating Parties shall, upon the Operator's request, pay the unpaid amount in proportion that their Participating Interest bears to all paying Participating Interests.  Each Participating Party paying its share of the unpaid amount shall be subrogated to the Operator's lien and security rights to the extent of such payment.

6.6     <u>Carved-out Interests</u>:  The agreements creating any overriding royalty, production payment, net proceeds interest, carried interest or any other interest carved out of a Working Interest in a Lease(s) shall specifically make such interests inferior to the rights of the Parties to this Agreement.  If any Party whose Participating Interest is so encumbered does not pay its share of expenses, and the proceeds from the sale of its Hydrocarbon production under Article 6.3 (*Security Rights)* are insufficient for that purpose, the security rights provided for herein may be applied against the carved-out interests with which such Working Interest is burdened.  In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by Article 6.3.  Additionally, in the event a Party elects not to participate in any operation hereunder and becomes a Non-Participating Party pursuant hereto, then and in that event, the Participating Parties shall acquire the interests of such Non-Participating Party with respect to such Election, free and clear of any and all obligations created under or pursuant to any carved-out interest as described above.

6.7     <u>Annual Operating Plan</u>:  Beginning in the year in which a Development Plan is approved for the Contract Area, and each subsequent year thereafter, the Operator shall develop an

Annual Operating Plan. The Annual Operating Plan process will be used (1) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities, (2) to review ongoing operations and (3) to forecast activities, anticipated Hydrocarbon production volumes, operating expenses and capital expenditures for the remainder of the current year and the next succeeding calendar year.

6.7.1   <u>Development and Submission of the Annual Operating Plan</u>: Prior to May 1 of each year, the Operator will conduct a meeting with the Non-Operating Parties to review the results of the previous year. The Operator will also provide the Non-Operating Parties with its anticipated activities for the current and following year and solicit input regarding these activities from the Non-Operating Parties. After this meeting, the Operator will prepare and submit its proposed draft for the Annual Operating Plan prior to June 1 of each year.

6.7.2   <u>Review of the Annual Operating Plan</u>: The Non-Operating Parties will provide suggested changes, additions or deletions to the Annual Operating Plan to the Operator and all other Parties prior to July 15 of each year. The Operator will then make any changes it deems necessary and submit the Annual Operating Plan no later than October 1 of each year.

6.7.3   <u>Content of Annual Operating Plan</u>: The Annual Operating Plan will include an estimated capital budget, expense budget and Operator's anticipated forecast as follows:

6.7.3.1   <u>Capital Budget</u>: The Annual Operating Plan shall contain an estimated capital budget that includes the following:

(a)   a list of proposed wells to be drilled including their anticipated order, drilling time, depths, locations, objective sands, type of well (Development, Appraisal, etc.), purpose of well (production, injection, etc.) and estimated Costs;

(b)   capital workovers, which shall be defined as any workover operation conducted to recomplete a well to a new zone or install artificial lift, listed by well, with their estimated Cost;

(c)   other capital projects requiring a gross expenditure greater than three million dollars ($3,000,000). The term "capital project" shall include addition of new equipment, expansion or upgrades of existing equipment; and

(d)   an estimated total amount (in aggregate) for capital projects.

24

6.7.3.2   <u>Expense Budget</u>:  The Annual Operating Plan shall contain an estimated expense budget that includes the following:

    (a)    expense workovers, which shall be defined as any anticipated workover operation which is not a capital workover (such as repair work or reworks within the same zone), listed by well, with their estimated Cost;

    (b)    all expense projects requiring a gross expenditure greater than three million dollars ($3,000,000). The term "expense project" shall include repair, replacement, inspection and maintenance of existing equipment;

    (c)    an estimated total amount (in aggregate) for expense projects; and

    (d)    estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses shall include the ongoing, everyday expenditures necessary to operate the field.

6.7.3.3   <u>Operator Forecasts and Informational Items</u>:  The Annual Operating Plan shall contain the Operator's reasonable forecasts and projections (but are recognized as forecasts and projections only) including the following information:

    (a)    production forecasts;

    (b)    injection forecasts;

    (c)    fuel and flare gas forecasts;

    (d)    scheduled or planned downtime exceeding three (3) days;

    (e)    data collection programs; and

    (f)    other areas deemed of significance by the Operator.

6.7.4   <u>Effect of the Annual Operating Plan</u>:  The Annual Operating Plan shall be primarily for informational and planning purposes and shall not obligate any Party to any expenditures or constitute an Election to participate in any specific operation.  However, the Annual Operating Plan is recognized as the Operator's effort to forecast and plan for activities during the year while providing for input from the Non-Operators.  Pursuant to the terms and conditions of this Agreement, any Party may make proposals for operations which were not included in the

Annual Operating Plan.   Approval of any such operation, under the terms provided in Article *8 (Voting, Election & Notices),* shall be deemed a modification to the Annual Operating Plan.

## ARTICLE 7
## CONFIDENTIALITY OF DATA

7.1   <u>Confidentiality Obligation</u>:   The Parties agree that all Confidential Data acquired or obtained by any Party with respect to the joint operations conducted under this Agreement shall be kept confidential during the term of this Agreement.   Each Party agrees to maintain the secrecy of the Confidential Data using at least the standard of care it normally uses in protecting its own confidential information and trade secrets.   The Confidential Data shall be made available to each Participating Party for its exclusive use. During the confidentiality period, the Confidential Data shall not be disclosed to any third party(ies) (unless disclosed under an "exception to confidentiality" under Article 7.1.1 or as a "permitted disclosure" under Article 7.1.2 or in accordance with Article 7.5).

7.1.1   <u>Exceptions to Confidentiality</u>: The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

(a)   are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party); or

(b)   are now or later become available to a Party on a non-confidential basis from a source, other than a Party hereto, that is legally permitted to disclose the item of Confidential Data; or

(c)   were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

(d)   is independently developed by employees or contractors of a Party who have not had access to Confidential Data.

7.1.2   <u>Permitted Disclosures</u>:   The Operator may disclose items of Confidential Data to such third parties as may be necessary in connection with the operation of the Contract Area**,** provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than two (2) years (or a lesser period if agreed by all Parties).   The Operator shall promptly inform the other Parties hereto of the names of such third parties and list the items of Confidential Data disclosed.   Notwithstanding anything herein to the contrary and subject to the restrictions that: (i) the Confidential Data shall not be removed from the custody and premises of the Party making such disclosure, excepting disclosure made pursuant to items (a), (b), (c), (d) and (e) below; and (ii) that such

26

third party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Data:

(a)     to any Affiliate of such Party provided such Affiliate shall be bound by the confidentiality provision contained herein; or

(b)     to any bona fide, *financially responsible,* prospective assignee of any portion of such Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets in the OCS Gulf of Mexico); or

(c)     to any potential contractors or professional consultants engaged by or on behalf of such Party and acting in that capacity where such disclosure is essential to such contractor's or consultant's work; or

(d)     to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or,

(e)     to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).  If a Party is legally compelled to disclose any Confidential Data, then such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed; or,

(f)     to an entity desiring to transport and/or purchase Hydrocarbons produced hereunder.

7.1.3   <u>Limited Releases to Offshore Scout Association</u>:  The Operator may disclose the following well information at weekly Offshore Oil Scout meetings:

7.1.3.1   <u>Well Location</u>:

(a)     proposed surface location;

(b)     surveyed surface location with X & Y;

(c)     proposed bottom hole location;

27

(d)  KB and water depth;

(e)  OCS number and well number; and

(f)  actual bottom hole location (must be reported within two weeks of reaching total depth of the well).

7.1.3.2   <u>Well Operations</u>:

(a)  rig move in date;

(b)  spud date;

(c)  weekly drilling depth, MW;

(d)  casing depths, cement, EMWs;

(e)  mud weight, sidewall cores, cores, RFTs (only that they were taken);

(f)  logs (only the depths and type run);

(g)  date Total Depth is reached; and

(h)  date rig is released.

7.1.3.3   <u>Well Completion Information</u>:

(a)  any Media Release or public filing of well completion information will be furnished at weekly Scout meetings.

7.1.4  <u>Continuing Confidentiality Obligation</u>:  Any Party who ceases to own a Working Interest in the Contract Area shall nonetheless remain bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement.

7.2  <u>Ownership of Confidential Data</u>:  Except as otherwise provided for in this Article, all Confidential Data produced as a result of a joint operation shall be the joint property of all Participating Parties in that operation.  Any Non-Participating Party shall have no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until the provisions of Article *16 (Non-Consent Operations)* are satisfied.

28

7.2.1 <u>Well Log and Data Trades</u>:  Any Participating Party may propose the exchange or trade of any jointly owned Confidential Data for other similar data and information owned by a third party.  The approval of such exchange or trade shall require unanimous approval of the Participating Parties which own such data.  Upon approval of such trade by the Participating Parties, the Operator shall consummate such exchange or trade with the third party.  The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to such exchange.

7.2.2 <u>Ownership of Non-Consent Data</u>:  When the Non-Participating Party becomes a Participating Party in the operation, as provided herein, such non-consent Confidential Data and information previously withheld from such Non-Participating Party shall thereafter become jointly owned by the Party and in such event the Operator of such operation shall promptly provide the Confidential Data to such Party.

7.3 <u>Access to the Lease and Rig</u>:  Each Participating Party's authorized representatives shall have access to any drilling rig, Production System or Facility serving the Contract Area to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto).  Access by the Participating Party to any drilling rig, Production System or Facility serving the Contract Area shall be arranged through the Operator *twenty-four (24) hours* in advance (or, if conditions do not permit, as much advance notice as is reasonably possible).  Each Party's access will be at its sole risk and expense and at reasonable times and provided such access does not unreasonably interfere with the operations being conducted.

7.4 <u>Development of Proprietary Information and/or Technology</u>:  The ownership, use, treatment and disclosure of any proprietary information and/or technology specific to drilling technology, production technology, production structure and Facilities and their transportation and installation, pipelines, flowlines and offshore oil and gas transportation which are charged to the joint account shall be handled in accordance with Exhibit "G" (*Project Team and Technology Sharing*).

7.5 <u>News Releases</u>:  The Parties shall use reasonable efforts to unanimously agree upon the timing and content of releases to the news media concerning operations covered by this Agreement.  However, in the event the Parties cannot unanimously agree upon either the timing and/or content of the news release within twenty-four (24) hours of receipt of such proposed news release, then, if one (1) or more Parties still desires to make a news release, the news release may be prepared in accordance with Exhibit "F" *(News Release Guidelines)*.

**ARTICLE 8**
**VOTING, ELECTIONS & NOTICES**

8.1     <u>Overall Supervision of Business Affairs</u>:   The activities of the Parties under this Agreement that are not within the scope of the Operator's authority to unilaterally decide under Article 5 *(Rights and Duties of Operator)* or Article 6.2 *(Authorization for Expenditure)* shall be divided into the following broad classes:

(a)     "General Matters" for which a vote for approval is required prior to action, but no accompanying Election regarding participation is required ), or;

(b)     Proposed operations for which both a vote for approval as a General Matter and an accompanying Election regarding participation are required prior to conducting the operation. (An example of such a General Matter is an Appraisal Well proposed, approved and elected upon under Article 11. 1), or;

(c)     Proposed operations for which a vote for approval as a General Matter is <u>not</u> required and where only an Election regarding participation is required for such operation. (An example of such an operation is an Election for a Fabrication AFE proposed pursuant to a previously approved Development Plan under Article 12.8 *(Fabrication AFE)* without the requirement for approval as a General Matter).

The Parties shall decide and take action upon all General Matters and Elections in accordance with the provisions of this Article 8.

8.2     <u>Voting Procedures on General Matters and Elections</u>:   Any General Matter shall require the approval of the Parties and shall be decided by a vote of the Parties as follows:

8.2.1   <u>Voting and Electing Interest</u>:   Each Party shall have a voting interest and/or an electing interest equal to its Working Interest in the Contract Area or, with respect to a Non-Consent Operation, its Participating Interest in such operation, as applicable.

8.2.2   <u>Vote Required</u>:   The Parties shall attempt to reach *unanimous agreement* regarding proposals requiring approval of the Parties.  However, in the event that the Parties cannot unanimously agree, (except as otherwise provided in this Agreement), a General Matter shall be decided by an affirmative vote of either:

(a)     should there be only one (1) Party entitled to vote, a General Matter approval shall require an affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%), including as to any of the following proposed operations which will require the affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%):

Exploratory Operations (Article 10),

Appraisal Operations (Article 11), or

Development Operations (Article 13).

(b)    should there be two (2) or more Parties entitled to vote, a General Matter approval shall require the affirmative vote of two (2) or more of the Parties having a combined voting interest of greater than fifty percent (50%), except in the following instances:

(i)    Proposed Exploratory Operations (Article 10) shall require the affirmative vote of one (1) or more Parties having a combined voting interest of twenty-five percent (25%) or greater;

(ii)    Proposed Appraisal Operations (Article 11) shall require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater;

(iii)    Proposed Development Operations (Article 13) included in an approved Development Plan shall require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater; and

(iv)    Proposed Development Operations (Article 13) not included in an approved Development Plan shall require the affirmative vote of two (2) or more Parties having a combined voting interest of twenty-five percent (25%) or greater provided, however, any subsequent operations proposed under a Development Well not included in an approved Development Plan shall only require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater.

Notwithstanding anything to the contrary in this Article 8.2.2 (b), the term "Vote" in Article 10.2.2 (*Counter Proposals*) and Article 11.1.2 (*Counter Proposals*) shall mean the affirmative vote of two (2) or more of the Parties having a combined voting interest of greater than fifty percent (50%).

8.2.3    <u>Second Opportunity to Participate</u>:  Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by vote or Election but is not approved by all of the Parties, any Party who either:

(i)    voted against the proposal; or

(ii)    failed to vote and/or make an Election;

shall have forty eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of notice from the Operator of the original voting or Election results, to respond with a vote or Election as to its participation in the proposal. Failure to respond in a timely manner shall be deemed a vote or Election not to participate. When a drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.2.4   <u>Participation by Fewer Than All Parties</u>:  Except as otherwise provided in this Agreement, a Participating Party has the right to limit participation to its Working Interest and is not required to assume its proportionate share of the Non-Participating Party's interest. If, after the period provided in Article 8.2.3 elapses there is at least one (1) Non-Participating Party in the approved activity or operation, each Party who made an original or subsequent vote or Election to participate in the approved activity or operation shall have the option to either:

(i)   limit its participation in the approved activity or operation to its Working Interest share, or

(ii)   to assume its proportionate share of the Non-Participating Party's interest and agree to bear its Participating Interest share of the approved activity or operation

by written correspondence to the Operator. Failure to submit that written correspondence shall be deemed a vote or Election under (i). If the Participating Parties fail to assume one hundred percent (100%) of the Cost and risk of the proposed operation within fifteen (15) days following receipt of the written correspondence, the proposal shall have no further effect and it shall be as if the proposal had never been made. Notwithstanding the foregoing, when a drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.3   <u>Response Time for General Matters and Elections</u>:  After receipt of notice pursuant to this Article 8, the Parties shall either: (i) submit their vote in response to a General Matter proposal as described under Article 8. 1 (a) or (b), or (ii) make an Election if the proposal does not require a vote as a General Matter as described under Article 8.1(c). The Operator shall give prompt notice of the results of such voting or Elections to each Party. Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

8.3.1   <u>Well Operation Proposal</u>:  When any proposed well operation does not require construction of a Production System, each Party shall respond with their vote or Election within thirty (30) days after receipt of the proposal. When a drilling rig is on location and standby charges are accumulating, a vote or an Election in

response to the proposal shall be made within forty-eight (48) hours after receipt of the proposal (exclusive of Saturdays, Sundays and federal holidays); provided that the forty-eight (48) hour provision of this Article 8.3.1 shall not apply to a new well (other than a substitute well) proposed under Articles 10.2 (*Proposal of Exploratory Operations*), 11.1 (*Proposal of Appraisal Operations*) or 13.1 (*Proposal of Development Operations*).

8.3.2   <u>Production System Construction/Fabrication AFE</u>:   Elections involving the construction and installation of a Production System shall require a response within one hundred twenty (120) days after receipt of the Fabrication AFEs.

8.3.3   <u>Other AFE Related Operations</u>:   Except as otherwise provided for in Articles 8.3.1 (*Well Operation Proposal*) and 8.3.2 (*Production System Construction*), the response time to a proposed operation will depend upon the AFE gross expenditure amount. Response times will be as follows:

(a)   AFE of $200,000 or more but less than $20,000,000 response will be made within thirty (30) days after receipt of said proposal.

(b)   AFE of $20,000,000 or more but less than $50,000,000 response will be made within sixty (60) days after receipt of said proposal.

(c)   AFE of $50,000,000 or more response will be made within ninety (90) days after receipt of said proposal.

8.3.4   <u>Other Proposals</u>:   For all other proposals requiring notice, each Party shall respond with an Election or vote within thirty (30) days after receipt of the proposal.

8.3.5   <u>Failure to Respond</u>:   Failure of any Party to respond to a proposal within the required period shall be deemed a vote against a General Matter (if required by the nature of the proposal) and, if applicable, an Election not to participate.

8.3.6   <u>Suspensions of Production and Suspensions of Operation</u>:   Anything in this Article 8.3 *(Response Time for General Matters and Elections)* notwithstanding, if the BOEM grants a Suspension of Production (an "SOP") or a Suspension of Operations (an "SOO") or similar regulatory grant for all or any part of the Contract Area and if the SOP, SOO or grant requires the commencement of an activity or operation before the expiration of the period for voting or making an Election for that activity or operation, the deadline for the response time shall precede the commencement date required in the SOP, SOO or grant by thirty (30) days, if reasonably possible, or otherwise any other reasonable shorter timeframe.

8.3.7   <u>Standby Charges</u>:   The Participating Parties in a prior operation shall be responsible for standby charges accrued until all Parties having a right to do so, have made an election to either participate or not participate in a subsequent

proposed operation.   All standby charges accruing after the final election regarding the subsequent operation has been made, shall be the responsibility of the Participating Parties in the subsequent operation.  Notwithstanding anything to the contrary in this Article 8.3.7, if the Operator does not receive the necessary governmental approval(s) and/or permit(s) to commence the subsequent operation within ten (10) days (exclusive of Saturdays, Sundays and federal holidays) after the final election regarding such subsequent operation, then unless agreed otherwise by all Participating Parties the proposal shall be deemed withdrawn and a different operation may be proposed in accordance with the provisions of this Agreement.

8.4    Meetings of the Parties:  In addition to the annual meeting required by Article 6.7 (*Annual Operating Plan*), meetings of the Parties shall be called by the Operator upon its own motion or at the request of any Party.  Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than ten (10) days (exclusive of Saturdays, Sundays and federal holidays) advance notice, and such notice shall include an agenda of the meeting.  The representative of the Operator shall be chairman of each meeting and shall take minutes of each meeting.  Only matters set out in the agenda for the meeting shall be considered at the meeting unless unanimously agreed to by all the Parties to this Agreement.

8.5    Designation of Representatives:  The names, addresses, telephone numbers and facsimile numbers of the representatives to whom notices and responses should be directed are set forth in Article IV of Exhibit "A-2" attached hereto.  The designated representatives may be changed by written notice to the other Parties in accordance with Article 8.7 *(Giving and Responding to Notices)*.

8.6    Participation Elections:   An Election to participate in an Exploratory Operation, an Appraisal Operation and a Development Operation shall include an Election to participate in all necessary expenditures for such operation as set out in the approved proposal for such operation; including but not limited to drilling, testing and logging an Exploratory Well, Appraisal Well and Development Well to its Objective Depth (including plugging/abandonment) as set out in its Well Plan; subject to the provisions of Article 6.2 (*Authorization for Expenditure*).

8.7    Giving and Responding to Notices:    All notices and responses (including notices/proposals of General Matters, Elections) shall be made in writing and delivered in person or by U.S. mail, overnight express, courier service, or facsimile transmission (followed by a phone call confirming receipt), with postage and charges prepaid, addressed to the Parties at the addresses set forth in Article IV of Exhibit "A-2".  When a drilling rig is on location and standby charges are accumulating, all notices and responses shall be given by telephone and immediately confirmed in writing.  Any notices and responses shall be effective only when received by the Party to whom such notice, proposal or response is directed.  Any notice or response transmitted by facsimile shall be deemed given and received only after the receiving Party has confirmed receipt of such

facsimile.  Any notice or response transmitted by overnight express carrier, courier, or certified mail shall be deemed given and received if delivery to the designated address is confirmed by carrier.

8.8     <u>Content of Notice</u>:  Any notice which requires a response within a time period shall indicate which of the response times specified in Article 8.3 *(Response Time for General Matters and Elections)* is required.  If a notice proposes a well operation, the notice shall include the following information:

(a)     the type of well operation being proposed, i.e., Exploratory, Appraisal or Development Operation(s);

(b)     the Well Plan for the proposed operation; and

(c)     an AFE showing the estimated Costs of the operation, including all necessary expenditures associated with the drilling, testing and completing or abandoning the well.

# ARTICLE 9
## GEOPHYSICAL OPERATIONS

9.1     <u>Geophysical Operations</u>:  Any Party may propose to acquire or process geophysical surveys (other than shallow hazard surveys, velocity surveys or other similar well bore geophysical operations) to evaluate all or any portion(s) of the Contract Area at any time during the term of this Agreement.  These geophysical surveys may consist of either conducting "proprietary" surveys, purchasing "speculative" surveys from vendors or participating in "group shoot" surveys. Geophysical Operations are independent operations and are not to be considered Exploratory, Appraisal or Development Operations, and may be conducted simultaneously with Exploratory, Appraisal or Development Operations.

9.1.1     <u>Conduct of Proprietary Geophysical Operations</u>:  The Operator shall conduct all proprietary geophysical surveys (or processing) for the joint account of the Participating Parties based upon their Participating Interest share of the Costs of the surveys.  The Operator shall provide the Participating Parties with copies of all field data and support documentation as appropriate for any and all seismic data collected from the geophysical survey.  The Operator shall obtain all licenses and/or permits from all governmental agencies necessary to support the surveys. The joint ownership of any proprietary geophysical data derived from a proprietary survey shall be limited to the field tapes i.e., raw data and initial processing and subsequent processing conducted at joint expense (not including re-processed or interpreted data obtained by a Party at its sole cost and expense) and owned on the basis of the Parties' Participating Interests in the survey.  If the

geophysical data is acquired by a geophysical contractor instead of through the Operator, then wherever in this Article the word "Operator" appears "Contractor" shall be substituted therefor.  If a Party elects not to participate in a proprietary geophysical survey, then a Participating Party shall elect to either: (i) proceed with the Geophysical Operation with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise agreed, or (ii) change its Election to become a Non-Participating Party.  A Non-Participating Party shall not be entitled to any geophysical data obtained from the proprietary geophysical survey unless the Non-Participating Party agrees to become an underinvested Party per terms of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

9.1.2   Group-Shoot And Speculative Seismic Surveys:  The Parties shall make a good faith effort to coordinate the acquisition of any new group-shoot or speculative seismic surveys covering one or more of the Leases within the Contract Area.  This shall enable all Parties who desire to acquire such data to take advantage of group or partnership rates available from most seismic contractors and will allow each Party a license to use such data.  For such joint seismic data purchases covering the Leases, the acquiring Parties shall mutually agree upon the Cost shares of the total licensing fee (rather than on their Working Interest shares).

# ARTICLE 10
# EXPLORATORY OPERATIONS

10.1   Application:  The Costs, risks and obligations of Exploratory operations conducted in accordance with this Agreement shall be borne by the Parties as provided in Article 10.2.4 *(Exploratory Operations Costs)* below.

10.2   Proposal of Exploratory Operations:  Any Party may propose to conduct an Exploratory Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties  Once an Exploratory Operation is approved (either as a General Matter or as an Election), the Operator (or substitute operator) shall commence the Exploratory Operation at the sole Cost and risk of the Participating Parties.  Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Non-Consent Operations to Maintain Contract Area),* Costs of a non-consent Exploratory Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

36

10.2.1   <u>Well Plan's Minimum Specifics</u>:   The Well Plan for any Exploratory Well(s) and any proposed Subsequent Exploratory Operation shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.   The Well Plan shall include documents reasonably sufficient for the Parties to analyze and evaluate the Well Plan and shall include, at a minimum, the following:

(a)   the surface and target bottomhole locations;

(b)   the expected spud date and the anticipated time necessary to conclude drilling, evaluation, completion and/or abandonment operations;

(c)   the true vertical depth to be drilled, along with the specified Objective Depth (and other target zones to be penetrated);

(d)   the proposed drilling plan, including the casing program and any anticipated Sidetracking operations;

(e)   description of any coring, logging or other evaluation operations to be conducted;

(f)   information concerning the drilling rig to be used, including day rates, water depth rating and other limitations relevant to the drilling operations to be conducted;

(g)   worst case discharge report as provided in NTL No. 2010-N06 submitted (or to be submitted) to the BSEE; and

(h)   basis of well design which includes, but is not limited to, the following:

(i)   list of pertinent offset wells used in designing well,
(ii)   Pore pressure, mud weight, and fracture gradient chart,
(iii)   Temperature profile used to design well,
(iv)   Proposed wellbore schematic including, but not limited to, the following:
   a.   casing and liner sizes, weights, grades, and connections, relative setting depths (true vertical depth and measured depth), and maximum anticipated wellhead and surface pressures,
   b.   liner tops with any proposed rupture disc or other trapped annulus pressure mitigation devices,
   c.   proposed cement design with tops, volumes, and heights,
(v)   Proposed directional plan, and
(vi)   Anticipated Days vs. Depth chart.

10.2.2    <u>Counter Proposals:</u> If, within fifteen (15) days after a proposal for an Exploratory Well has been submitted, any other Party submits a counter proposal for:

    (a)    an alternative surface or bottom hole location; or

    (b)    an alternative Objective Depth

for the proposed Exploratory Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed.  In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach agreement as to which location or Objective Depth shall be proposed for the Exploratory Well.  If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 (*Response Time for General Matters and Elections*), the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election.  After an Exploratory Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

10.2.3    <u>Pre-Spud Technical Meeting & Revision of Well Plan</u>:  Subsequent to the approval of the Exploratory Operation as a General Matter, but prior to commencing such Exploratory Operation (other than a substitute operation), the Participating Parties shall meet for a "Pre-Spud Technical Meeting".  The purpose of the meeting is to review the Well Plan describing the specific operations planned for the Exploratory Well.  Any proposed revision to the operations specified in the original Well Plan and AFE shall require unanimous agreement of the Participating Parties.  Any such revision to the Well Plan shall be evidenced by the joint signature of an amended AFE for the proposed Exploratory Operation.  In the absence of agreement upon a revised Well Plan, the original Well Plan and AFE shall stand as approved. Any revisions to the original Well Plan or AFE by the Participating Parties shall not give any Non-Participating Party an additional opportunity to make a Participation Election unless the Objective Depth is changed, or the target bottom hole location is changed by more than 500 feet, in which case the Exploratory Operation shall be proposed anew.  The Well Plan for an Exploratory Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional Exploratory Operation approved by the Participating Parties.

Notwithstanding anything to the contrary in this Agreement, the Operator may revise the Well Plan to comply with any governmental approval, requirement, notice, mandate, law, order, rule or regulation (the "Directive") without obtaining the approval of the Participating Parties in the approved operation, as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE.  The Operator shall provide the Participating Parties in the approved operation notification in writing detailing the revision and a copy of the Directive requiring such revision as soon as possible, but no later than ten (10) days of the Operator's receipt of same.  If such revision is made:

(a)     prior to the commencement of the approved operations, then a Participating Party shall have  fifteen  (15) days  from receipt of notice from Operator of the revision to the Well Plan, to notify the Operator in writing that it wishes to become a Non-Participating Party in the approved operation with the revised Well Plan, provided, however, that if the drilling rig is on location, then a Participating Party shall have forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of notice from Operator of the revision to the Well Plan, to notify the Operator in writing of its decision whether to become a Non-Participating Party in the approved operation.  Failure to notify the Operator in a timely manner shall be deemed a vote or Election to continue as a Participating Party.  If a Party becomes a Non-Participating Party in the approved operation with the revised Well Plan, such Party will be subject to Article 16 (*Non-Consent Operations*) and the Operator may commence such operation on behalf of the remaining Participating Parties subject to Article 8.2.4 (*Participation by Fewer Than All Parties*); or

(b)     after commencement of the approved operations, then all of the Participating Parties shall remain Participating Parties in the approved operation with the revised Well Plan subject to Article 6.2.2. (*Supplemental AFE for Cost Overruns for Wells*).

10.2.4   Timely Operations:  An Exploratory Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Exploratory Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 (*Force Majeure*).

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Exploratory Operation within that two hundred seventy (270) day period,  the approved Exploratory Operation shall be deemed withdrawn, with the effect as if the Exploratory Operation had never been proposed and approved, and the Non-

39

Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 (*Substitute Operator if Operator Fails to Commence Operations*).

If an approved original or identical Exploratory Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Exploratory Operation, will be chargeable to the Participating Parties.  An Exploratory Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Exploratory Operation are undertaken.

10.2.5   <u>Exploratory Operations Costs</u>:  The Costs, risks and obligations associated with drilling, testing, logging and abandoning (whether permanent or temporary) an Exploratory Well, any substitute well and any subsequent Exploratory Operations shall be borne by the Participating Parties in proportion to their Participating Interest in such Exploratory Operation.

10.2.6   <u>AFE Overruns and Substitute Well</u>:  The Operator shall timely commence an Exploratory Operation and continue the operation with due diligence to the Objective Depth or until:

(a)   a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

(b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

(c)   the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Exploratory Well is abandoned due to the conditions described under 10.2.6 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Exploratory Well shall make an Election whether to participate in the proposed substitute well.  The proposal for a substitute Exploratory Well shall not require approval as a General Matter.  The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate.  Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the Cost percentage recoupment provisions or the acreage forfeiture provisions of Article 16 (*Non-Consent Operations*), whichever is applicable.

10.2.7 <u>Additional Information to Non-Operator(s)</u>**:** Upon written request and **if available**, the Operator shall endeavor to provide the following document(s) to the Non-Operators; however, (i) such document(s) requested are not required for a valid Well Plan under Article 10.2.1 (*Well Plan's Minimum Specifics*) and (ii) the Operator is under no obligation to provide such document(s) to a Party once such Party has Elected not to participate in the Well Plan and AFE:

    (a) Final detailed operational procedure document with associated well design technical documents, *e.g.* drilling fluids, BHA design.

    (b) Wellhead bending load analysis (for DP mobile offshore drilling unit ["MODU"] only).

    (c) Well control and spill containment document for deep water wells drilled in the OCS waters or other complex type wells, including the following information:

        (i) Relief well planning and equipment availability.

        (ii) Spill response and containment method.

        (iii) Well control competency assurance process in place.

        (iv) Blow out contingency plan.

        (v) Well control bridging document for contracted specific DP MODU with regard to drilling, completion, and or well testing or well flow back operations.

    (d) QA/QC processes for acceptance of critical material or equipment.

    (e) Detailed well completion design basis document, including:

        (i) Proposed detailed well completion schematics (lower and upper completion drawings with all completions equipment identified).

        (ii) Completion operational procedure document (upper and lower completion).

        (iii) Well control plan during upper completion (tubing string installation operations), and or well flow-back operations.

    (f) In addition, for proposed well workover, recompletion, or sidetracking (if applicable):

      (i)   Description of proposed work scope, including proposed outcome.

      (ii)  Diagram of proposed well after workover, recompletion, or sidetrack.

      (iii) Detailed operational procedure, including plans for well bore cleanout procedure and fluid loss mitigation method.

      (iv) Proposed well completion schematics (lower and upper completion drawings with all down hole completions equipment identified by name and dimensions).

      (v)  Well control plan during well intervention operations.

10.3   <u>Subsequent Exploratory Operations at Objective Depth</u>: After (i) the Exploratory Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production tests) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)     conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)     sidetrack the well bore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth (however, if a casing string is required to Deepen the well, then option "d" shall precede Deepening the well);

(d)     Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(e)     conduct production testing;

(f)     conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

(h)     permanently plug and abandon the well.

     Unless unanimously agreed otherwise by the Participating Parties, the completion of an Exploratory Well shall be proposed and conducted as a Development Operation. Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of

information resulting from the previously approved operation, then the response periods set forth in this Article 10.3 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

10.3.1   Response to Operator's Proposals: Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct Subsequent Exploratory Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal.  Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

10.3.2   Counterproposals:   If a Participating Party makes a counterproposal for Subsequent Exploratory Operations, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals.   If conflicting proposals for Subsequent Exploratory Operations are made, preference for voting shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 10.3 (*Subsequent Exploration Operations at Objective Depth*).  If different depths or bottom hole locations are proposed for Subsequent Exploratory Operations, preference shall be given to the shallowest depth (or the bottom hole location nearest the existing well bore) and then to other depths or bottom hole locations in descending (or more distant) order. After a decision to conduct a Subsequent Exploratory Operation is made and the Subsequent Exploratory Operation is commenced, the remaining proposals for other types of subsequent Exploratory Operations shall be deemed withdrawn. At the completion of the Subsequent Exploratory Operation, the Operator shall again submit proposal(s) for Subsequent Exploratory Operations to the Participating Parties, through the procedure provided herein, until such time as the well is temporarily or permanently abandoned.

10.3.3   Approval of Subsequent Exploratory Operations by All Parties:  If the proposed Subsequent Exploratory Operation is approved by all the Participating Parties, the Operator shall commence the Subsequent Exploratory Operation at the Cost(s) and risk of the Participating Parties.

10.3.4   Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties:  If a proposal for Subsequent Exploratory Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator (or substitute Operator) shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*), conduct the operation at the sole

43

Cost and risk of the Participating Parties.  Any Non-Participating Party in a Subsequent Exploratory Operation shall be subject to Article 16.5.1 *(Non-Consent Exploratory and Subsequent Exploratory Operations)*.  A Non-Participating Party in a Subsequent Exploratory Operation shall be relieved of the Costs, risks and obligations of the Subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

10.3.5    <u>Subsequent Exploratory Operations If Not Approved as a General Matter</u>:  If no proposed Exploratory Operation (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable) receives sufficient vote to be approved as a General Matter pursuant to Article 10.3.4 *(Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties)*, then prior to an Exploratory Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the proposed Subsequent Exploratory Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Subsequent Exploratory Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 10.3 *(Subsequent Exploratory Operations at Objective Depth)*.  Any Non-Participating Party in such Subsequent Exploratory Operation shall be subject to Article 16 *(Non-Consent Operations)*.  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the Subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

10.4    <u>Permanent Plugging and Abandoning Costs</u>:  The permanent plugging and abandonment of an Exploratory Well that:

(a)    is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 10.2.6(b),

(b)    is to be plugged under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*), or

(c)    has been previously temporarily abandoned under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 10.4. Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*). If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well. If a rig is on location and a proposal to plug and abandon an Exploratory Well under either Article 10.4(a) or 10.4(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Exploratory Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Exploratory Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Exploratory Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning that Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*). The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

10.5    Conclusion of Exploratory Operations:    Except as provided in Article 10.2.6 (*AFE Overruns and Substitute Well*), Exploratory Operations shall cease after the abandonment of the first Producible Well, whether permanent or temporary, and the release of the rig from that Producible Well.

10.6    Subsurface Team:    Within sixty (60) days after release of any rig that drills a newly discovered Producible Reservoir, unless otherwise mutually agreed, the Parties shall form a subsurface team. The subsurface team will include at least one (1) representative from each of the Parties. Each Party shall be responsible for designating its representative(s) for the subsurface team. A Party's representatives for the subsurface team may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of each subsurface team member shall be the responsibility of the Party employing or providing the subsurface team member. The Operator shall serve as the coordinator for the subsurface team. Members of the subsurface team will work independently at office locations provided by the Party designating such member. The responsibilities of the subsurface team shall include but not be limited to the following items:

- making recommendations for Appraisal Operations,

- evaluating potential Producible Reservoirs within the Contract Area, and;

- advising the Project Team regarding subsurface matters so the Project Team can more effectively assist the Operator in the preparation of the Development Plan pursuant to Article 12 *(Project Team, Development Plan and Fabrication AFE).*

The subsurface team will meet as it deems necessary to carry out the above activities.  Once the subsurface team is formed, it will remain in existence until the expiration or dissolution of the Contract Area.

## ARTICLE 11
## APPRAISAL OPERATIONS

11.1 <u>Proposal of Appraisal Operations</u>:  After completion of Exploratory Operations, any Party may propose to conduct an Appraisal Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties.  Once an Appraisal Operation is approved (either as a General Matter or as an Election), the Operator (or substitute Operator) at its sole discretion, may commence actual operations for the Appraisal Operation only after the necessary governmental approval(s) and/or permit(s) required to commence the Appraisal Operation have been secured by the Operator.  Notwithstanding the foregoing, (i) the Operator shall not be entitled to charge the Joint Account for costs accrued in conducting an Appraisal Operation until such time as necessary governmental approval(s) and/or permit(s) are received and (ii) in the event the Operator places the rig on standby prior to receiving necessary governmental approval(s) and/or permit(s) to commence an Appraisal Well, the Operator shall only be entitled to charge the Joint Account for a maximum of three (3) days of standby time, subject to each Party's rights to dispute and audit such charges pursuant to this Agreement.  Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, Costs of a non-consent Appraisal Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

11.1.1 <u>Well Plan's Minimum Specifics</u>:  The Well Plan for the Appraisal Operation shall include at least the information set forth under Article 10.2.1 *(Well Plan's Minimum Specifics).*

11.1.2 <u>Counter Proposals</u>:  If, within fifteen (15) days after a proposal for an Appraisal Well has been submitted, any other Party submits a counter proposal for:

(a) an alternative surface or bottom hole location; or

(b)    an alternative Objective Depth

for the proposed Appraisal Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed.  In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach agreement as to which location or Objective Depth shall be proposed for the Appraisal Well.  If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 (*Response Time for General Matters and Elections)*, the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election.  After an Appraisal Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

11.1.3    <u>Pre-Spud Technical Meeting & Revision of Well Plan</u>:  The Pre-spud Technical Meeting & Revision of the Well Plan shall be in accordance with Article 10.2.3 *(Pre-Spud Technical Meeting & Revision of Well Plan).*

11.1.4    <u>Timely Operations</u>:  An Appraisal Operation shall be commenced within two hundred seventy (270) days following the  end of the period for the approval of the Appraisal Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure)*.

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Appraisal Operation within the two hundred seventy (270) day period, the approved Appraisal Operation shall be deemed withdrawn, with the effect as if the Appraisal Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 (*Substitute Operator if Operator Fails to Commence Operations)*.

If an approved or identical Appraisal Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Operation, will be chargeable to the Participating Parties.   An Appraisal Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Appraisal Operation are undertaken.

11.1.5   <u>AFE Overruns and Substitute Well</u>:  The Operator shall timely commence an Appraisal Operation and continue the operation with due diligence to the Objective Depth or until:

(a)   a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

(b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

(c)   the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Appraisal Well is abandoned due to the conditions described under 11.1.5 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Appraisal Well will make an Election whether to participate in the proposed substitute well.  The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate.  Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 (*Non-Consent Operations*), whichever is applicable..

11.2   <u>Subsequent Appraisal Operations at Objective Depth</u>:  After (i) the Appraisal Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production testing) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties (and Non-Participating Party(ies) in the case of a proposal under 11.2 (c) and (d), if applicable) of the Operator's proposal for one of the following operations:

(a)   conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)   sidetrack the well bore to core the formations encountered;

(c)   Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)   Deepen the well to a new Objective Depth;

48

(e)      conduct production testing;

(f)      conduct other operations on the well not listed;

(g)      temporarily abandon the well; or

(j)      permanently plug and abandon the well.

Unless unanimously agreed otherwise by the Participating Parties, the completion of an Appraisal Well shall be proposed and conducted as a Development Operation.  Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 11.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

11.2.1   <u>Response to Operator's Proposals</u>:  Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Appraisal Operations, the Participating Parties shall respond to the Operator's proposal by making its Election to Operator's proposal or making a counterproposal.  Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

11.2.2   <u>Counterproposals</u>:  If a Participating Party makes a counterproposal for a subsequent Appraisal Operation, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals.   If conflicting proposals for subsequent Appraisal Operations are made, preference for voting shall be given first to operation (a) above, next to operation (b) above, and so forth.  If different depths or locations are proposed for subsequent Appraisal Operations, preference shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order.  After a decision to conduct a subsequent Appraisal Operation is made and the subsequent Appraisal Operation is commenced, the remaining proposals for other types of subsequent Appraisal Operations shall be deemed withdrawn.  At the completion of the subsequent Appraisal Operation, the Operator shall again submit proposal(s) for subsequent Appraisal Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

11.2.3   <u>Approval of Subsequent Appraisal Operations by All Parties</u>:  If the proposed subsequent Appraisal Operation is approved by all the then Participating Parties,

49

the Operator shall commence the subsequent Appraisal Operation at the Cost(s) and risk of the Participating Parties.

11.2.4    <u>Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties</u>:  If a proposal for subsequent Appraisal Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 11.5 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator (or substitute Operator) shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*), conduct the operation at the sole Cost and risk of the Participating Parties.  Any Non-Participating Party in a subsequent Appraisal Operation shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)*.  A Non-Participating Party in a subsequent Appraisal Operation shall be relieved of the Costs, risks and obligations of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

11.2.5    <u>Subsequent Appraisal Operations If Not Approved as a General Matter</u>:  If no proposed Appraisal Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 11.2.4 *(Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties)*, then prior to an Appraisal Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Appraisal Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Appraisal Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 11.2 *(Subsequent Appraisal Operations at Objective Depth)*.  Any Non-Participating Party in such subsequent Appraisal Operation shall be subject to Article 16 *(Non-Consent Operations)*.  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

11.3    <u>Election by Original Non-Participating Parties in Deepening or Sidetracking Appraisal Operations</u>: If an Appraisal Well is drilled to its initial Objective Depth and the Participating Parties have secured the requisite approval to either:

(a)    Sidetrack said well, or

50

(b)    Deepen said well,

then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepen operation,  the Operator shall notify each original Non-Participating Party of the proposal.   Each original Non-Participating Party may respond with an Election regarding such a proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.   Any original Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Appraisal Well shall:

(i)    be deemed to be underinvested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.9 (*Underinvestment of Costs*) (and the Parties that participated in drilling to the initial Objective Depth will be deemed overinvested in that amount), and

(ii)    remain a Non-Participating Party in the Appraisal Well to the initial Objective Depth until the Costs recoverable under Article 16 *(Non-Consent Operations)*, less any payments through a Disproportionate Spending Settlement and/or Article 16.9 *(Underinvestment of Costs)*, have been recouped by the original Participating Parties.

11.4    Deeper Drilling:  A proposal to drill an Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well or to re-enter and Deepen an existing Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well shall require approval as a General Matter and shall be further subject to the following provisions.

11.4.1    Limited Participation in Deeper Drilling:  If a proposal is made pursuant to Article 11.4 *(Deeper Drilling)* above, any Party may either:

(a)    make an Election to participate in the proposed Deeper Drilling operation; or

(b)    make an Election not to participate in the proposed Deeper Drilling operation; or

(c)    make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A party making an Election to limit its participation in a deeper Appraisal Well to the base of the deepest Producible Reservoir under (c) above shall bear its

Participating interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *(Non-Consent Operations).*

11.5   Permanent Plugging and Abandoning Costs:  The permanent plugging and abandonment of an Appraisal Well that:

(a)      is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 11.1.5(b),

(b)      is to be plugged under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*), or

(c)      has been previously temporarily abandoned under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 11.5.  Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraosal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well.  If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.5(a) or 11.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Appraisal Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  The Participating Parties in that Non-Consent Operation are

52

responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

11.6    Feasibility Study:  Any Party may propose a feasibility study (the conduct of such proposal shall not require approval as a General Matter) for any technical, engineering or other issues affecting Appraisal or future Development Operations on the Contract Area. The proposal of a feasibility study shall not cause the formation of the Project Team.  A feasibility study may or may not require a study team, will be of a shorter duration, and will be more narrow in scope than the Project Team.   The process for approving a feasibility study to be charged to the joint account is listed below, however, any Party may prepare its own feasibility study at its sole cost.

11.6.1    Feasibility Study Proposal and Meeting:  A proposal for a feasibility study shall be accomplished by a Party furnishing (1) a memo describing the scope of the feasibility study, and (2) a cost estimate of the feasibility study, to the other Parties.  Within thirty (30) days after the feasibility study proposal, the Operator shall call a meeting of the Parties.  At such meeting, the Parties shall discuss and resolve:

(a)    the positions of all Parties on the proposed feasibility study,

(b)    the necessity of the study,

(c)    composition and organization of any study team, if applicable, associated with the proposed feasibility study, and

(d)    any other related matter(s).

The Operator may modify any proposal for a feasibility study as a result of such meeting.  Operator may, within thirty (30) days after such meeting, submit to the other Parties such feasibility study proposal along with an AFE for approval.

11.6.2    Election on Proposed Feasibility Study:  All Parties shall notify the Operator of their Participation Election in the feasibility study within thirty (30) days after receipt of the AFE for the proposed feasibility study.  If any Party makes an Election not to participate in the feasibility study, then each Participating Party shall elect to either: (i) proceed with the feasibility study with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise agreed, or (ii) change its Election to become a Non-Participating Party.   The Operator shall commence the feasibility study on behalf of all Participating Parties subject to Article 8.2.4 (*Participation by Fewer Than All Parties*).  A Party making an Election not to participate in an approved feasibility study shall become a Non-Participating Party as to the costs of the feasibility study and shall be subject to the provisions of Article 16.5.3 (*Non-Consent Geophysical Operations, Feasibility Study,*

*Project Team and/or Development Plan).*  A Non-Participating Party shall not receive the data, information or results of the feasibility study until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasible Study, Project Team and/or Development Plan).*

11.6.3   <u>Compensation and</u> <u>Costs of Feasibility Study</u>:  Each Participating Party shall be responsible for designating its representative(s), if any, for the feasibility study. A Party's representatives for the feasibility study may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of a Party's employees, including internal engineering support staff assigned to the feasibility study, shall be the responsibility of the Party employing such representatives unless the Participating Parties unanimously agree to bill such Costs to the Participating Parties in accordance with their Participating Interest. Costs and expenses of a feasibility study charged to the Participating Parties in accordance with their Participating Interest shall include, but not be limited to, contract services and related miscellaneous expenses.  All Costs and expenses of the feasibility study shall be handled in accordance with Exhibit "C" (Accounting *Procedure).*

11.7   <u>Conclusion of Appraisal Operations</u>:  Any Party may propose that Appraisal Operations have been concluded on the Contract Area by notifying the other Parties.  Except as provided below in this Article 11.7, Appraisal Operations shall conclude, and all subsequent operations in the Contract Area shall be Development Operations, upon the earliest of:

(a)   the approval of the conclusion of Appraisal Operations which shall require the affirmative vote of two (2) or more Parties with a combined Working Interest of greater than fifty percent (50%); or

(b)   the point in time when no new Appraisal Operation has been approved within twelve (12) months following the rig release (or the cessation of operations) from the previous Appraisal Operation; or

(c)   the abandonment, whether permanent or temporary, of the third Appraisal Well, and the release of the rig from that Appraisal Well (including any substitute well for that Appraisal Well).  For counting purposes, an Appraisal Well and any subsequent Appraisal Operation(s) therein shall collectively count as only one (1) Appraisal Well.

The formation of a Project Team shall not require the conclusion of Appraisal Operations and may occur concurrently with Appraisal Operations.

Notwithstanding anything to the contrary in this Article 11.7, after the conclusion of Appraisal Operations, but prior to the approval of a Development Plan:

54

(i)      any Party may propose the drilling of an additional well or any Participating Party in a well may propose additional well operations in such well as an Appraisal Operation, and

(ii)     the approval of a proposed additional well or a proposed operation in a previously drilled well shall require unanimous agreement except:

> (a)     as otherwise provided in Article 16.4 (*Non-Consent Operations to Maintain the Contract Area*), and

> (b)     with respect to any well that was approved after the conclusion of Appraisal Operations but prior to the approval of a Development Plan, any subsequent operation in such well at Objective Depth proposed in accordance with Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) shall be approved in accordance with either Article 11.2.3 (*Approval of Subsequent Appraisal Operations by All Parties*), Article 11.2.4 (*Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties*) or Article 11.2.5 (*Subsequent Appraisal Operations If Not Approved as a General Matter*), whichever is applicable.

Any such additional well or additional well operation (including a substitute well and all subsequent operations at Objective Depth conducted in or through the well bore of the well) shall be deemed an Appraisal Operation and, unless Article 16.4 (*Non-Consent Operations to Maintain the Contract Area*) applies to the proposed operation, shall be proposed and approved in accordance with this Article 11.7 and conducted as an Appraisal Operation with the intent being that with such approval Appraisal Operations have not concluded and with the exception, however, that the non-consent penalty for an operation proposed to complete the well shall be equivalent to the non-consent penalty for a Development Operation as set forth in Article 16.5.4 (*Non-Consent Development Operations*).

# ARTICLE 12
# PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION AFE

12.1   <u>Phased Development Plans</u>:  The results of Exploratory and/or Appraisal Operations may justify the development of one or more Producible Reservoirs within the Contract Area. The Operator shall prepare for the approval of the Parties a Development Plan in order to pursue such development of the Contract Area.  In order to provide for the orderly preparation of the Development Plan, unless otherwise mutually agreed by all the Parties, the Parties shall form an Project Team, subject to Article 12.2 *(Proposal of Project*

*Team*), whose duties are more specifically set forth in Exhibit "G" *(Project Team and Technology Shaping)* and shall be charged with assisting the Operator in the preparation of a Development Plan and in design, engineering, fabrication, transportation, installation and operation of the Production System for the Contract Area.  In view of the Costs and scope of Development Operations for the Contract Area, the Parties may agree to divide Development Operations into an initial Development Phase and one or more subsequent Development Phases.  Each Development Phase shall be centered upon the installation of a new or expanded Production System for the Contract Area. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be developed, approved and implemented pursuant to this Article 12 *(Project Team, Development Plan and Fabrication AFE).*

12.2    <u>Proposal of Project Team</u>:  No Party may submit a proposal for the formation of a Project Team prior to sixty (60) days following rig release from the first Appraisal Well that reaches a total vertical depth of at least twenty-eight thousand feet (28,000' TVD).  The Operator shall have the exclusive right to submit a proposal for the formation of a Project Team commencing sixty (60) days following rig release from the first Appraisal Well that reaches a total vertical depth of at least twenty-eight thousand feet (28,000' TVD) until six (6) months following conclusion of Appraisal Operations; however, if an Appraisal Operation is approved prior to the approval of the Project Team, the Operator's exclusive period to propose a Project Team shall be extended until six (6) months after rig release from the last approved Appraisal Operation.  If the Operator fails to propose the formation of the Project Team during its exclusive proposal period, then, after expiration of the Operator's exclusive proposal period, any Participating Party in a Producible Well may propose the formation of a Project Team.  If the Operator's exclusive period does not apply, any Participating Party in a Producible Well may propose the formation of a Project Team.

12.3    <u>Project Team Approval</u>:  A Project Team proposal requires approval by Election.  Each Party shall have an Election as to its participation in the AFE for the Project Team, pursuant to Article 8.3.3 *(Other AFE Related Operations).* The formation and administration of the Project Team shall be handled in accordance with Exhibit "G" *(Project Team and Technology Sharing)* with the Costs of the Project Team being charged in accordance with Exhibit "C" *(Accounting Procedure).*  A Party which makes an Election not to participate in the Project Team shall become a Non-Participating Party as to the costs of the Project Team and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*  A Non-Participating Party shall not have access to the data or studies prepared by the Project Team until satisfaction of the requirements of Article *16.5.3 (Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

12.4    <u>Proposal of a Development Plan</u>:  No Party may submit a proposal for a Development Plan prior to the conclusion of Appraisal Operations.  The Operator shall have the exclusive right for a period of twelve (12) months following the conclusion of Appraisal

Operations to submit a Development Plan for the review and approval of the Parties, such proposed Development Plan to be based upon the work and recommendations of the Project Team provided such Project Team is proposed and approved; however, if an additional Appraisal Operation is approved pursuant to Article 11.7(ii) prior to the approval of a Development Plan, then:

(a)    the prior conclusion of Appraisal Operations shall be deemed not to have occurred and Appraisal Operations shall thereafter be deemed to conclude upon rig release from such approved additional Appraisal Operation and any proposed Development Plan shall be deemed withdrawn as if it were never submitted, and

(b)    the Operator's exclusive period to propose a Development Plan shall be extended until twelve (12) months after rig release from the last approved additional Appraisal Operation.

If the Operator has begun preparation of a Development Plan during the first nine (9) months of its twelve (12) month exclusive period to propose a Development Plan, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, then the Operator may request an extension of the exclusive period to allow completion of the work in progress.  Any request for an extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than three (3) months from the expiration of the exclusive submission period. The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's exclusive submission period.

12.4.1    Alternative Development Plans:  If a Development Plan is not timely submitted by the Operator or the Development Plan submitted by the Operator is not approved pursuant to Article 12.6 *(Approval of a Development Plan)* or 12.6.1 *(Amended Approval Requirement for Development Plans)* below, then any Party shall have the option to submit a Development Plan. Development Plans proposed after expiration of the Operator's exclusive period shall be considered for approval by the Parties in the order in which the Development Plans are submitted.

12.5    Content of the Development Plan:   Any Development Plan proposed under this Agreement shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development Plan and Production System.   All Development Plans submitted shall include at least the following information:

(a)    Production System:  Description of the Production System including:

(i)    the type of Production System proposed (i.e., tension leg well jacket, floating production system, spar, compliant tower, subsea, etc.),

57

including the Production System's location, configuration (i.e., number of well slots or subsea tiebacks) and production capacity;

(ii) a description of the Facilities, including the gathering and pipeline system necessary to transport the Hydrocarbons from the well heads to shore;

(iii) a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting and installing the Production System;

(iv) the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter;

(v) the estimated Costs of the Production System not in the form of an AFE;

(vi) a description of any proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii) a description of the proposed well completion techniques (i.e. dual vs. single); and

(viii) the type of Hydrocarbon transmission system (e.g. pipeline vs. tanker, etc.)

(b) Producible Reservoirs: A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c) Recoverable Reserves: An estimated range of recoverable reserves for the proposed Development Plan and a schedule of the initial and estimated daily rate of Hydrocarbon production thereafter;

(d) Predrilling Operations: A reasonable description of predrilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each predrilling operation;

(e) Development Wells: A reasonable description of drilling and completion plans for all Development Wells, including an estimate of the timing, Cost and location of each well;

(f) Temporarily Abandoned Exploratory and/or Appraisal Wells: A reasonable description of the completion plans for any previously temporarily abandoned Exploratory Well and/or Appraisal Well(s) to be completed as part of the

Development Plan, including an estimate of the timing and cost of completing such well(s);

(g)     Tieback Operations: If the Development Plan requires the tieback or use of facilities located outside the Contract Area, a written proposal from the owner(s) of such offsite facilities to process and handle Hydrocarbon production from the Contract Area specifying the capacity to be made available at such "offsite facility" and the amount of all tariffs, processing fees, and other fees and charges to handle or process Hydrocarbon production from the Contract Area;

(h)     Final Design AFE: An AFE for the completion of the detailed design of the Production System including final specifications, blueprints and models suitable for contractors to formulate their bids on the components of the Production System.  The AFE shall also include the Costs of the Project Team from approval of the Development Plan through preparation and approval of the Fabrication AFE and an estimate of the Cost of contract labor and services for the design and testing necessary to adequately define the  proposed Production System for the bidding of fabrication; and

(i)     Other Data:  Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Production System provided for in the Development Plan.

(j)     Field Operating Scheme:  A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(k)     Field Abandonment:  A description of field abandonment plan (if applicable);

(l)     Reservoir Plan:  A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

(i)     an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

(ii)     the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii)     a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

(A)   estimates of oil and gas in place;

(B)   reservoir rock and fluid characteristics;

(C)   depletion mechanism;

(D)   enhanced recovery and pressure maintenance plans and objectives;

(E)   reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;

(F)   well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);

(G)   reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and

(m)   <u>Disposal Wells</u>:  The estimated Cost of disposal wells, if applicable;

12.6   <u>Approval of a Development Plan</u>:  The Operator shall have sixty (60) days to obtain unanimous approval of the Parties for any Development Plan proposal submitted by the Operator during its exclusive period.  If either (i) the Operator fails to gain the unanimous approval of the Parties or (ii) the Operator fails to submit a Development Plan, the Parties shall have a period of sixty (60) days commencing with either the expiration of the Operator's exclusive period or the failure to obtain approval in which either the Operator's Development Plan or an alternate Development Plan may be unanimously approved by the Parties.

12.6.1   <u>Amended Approval Requirement for Development Plans</u>:  If a Development Plan is not unanimously approved upon conclusion of the one hundred twenty (120) day period provided in Article 12.6 *(Approval of Development Plan)* above, then the unanimous agreement requirement, provided for under Article 12.6 *(Approval of a Development* Plan) shall be amended as follows:

(a)   During this amended approval process, consideration for approval by the Parties shall be given first and simultaneously to any previously proposed Development Plan.

(b)   For a sixty (60) day period following expiration of the four (4) month period, approval of a Development Plan shall be by the Parties as a General Matter.

(c)   If a Development Plan is not approved as a General Matter during the sixty (60) day period provided in Article 12.6.1(b), then the Development Plan shall be approved according to the following:

(i)   If there is only one (1) Development Plan submitted and such Development Plan receives an affirmative vote of at least fifty

60

percent (50%) of the voting interest, such Development Plan shall be deemed approved by the Parties.

(ii) If there are two (2) or more Development Plans submitted and one (i) Development Plan receives an affirmative vote of at least fifty percent (50%) of the voting interest and the other Development Plan(s) receives an affirmative vote of less than fifty percent (50%) of the voting interest, then the Development Plan receiving the affirmative vote of at least fifty percent (50%) of the voting interest shall be deemed approved by the Parties.

(iii) If two (2) competing Development Plans each receive an affirmative vote of fifty percent (50%) voting interest, the first proposed Development Plan shall be deemed approved.

(iv) If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article 12.6.1(c)(ii) or Article 12.6.1(c)(iii), then the earliest proposed Development Plan which receives the affirmative vote of at least twenty-five percent (25%) shall be deemed approved.

(v) If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article 12.6.1(c)(ii), Article 12.6.1(c)(iii) or Article 12.6.1(a)(iv), then the Parties will use reasonable efforts to approve a compromise Development Plan pursuant to the terms of Exhibit "H" (*Dispute Resolution Procedure*) attached hereto.

12.7 Approved Development Plan and Final Design AFE:

12.7.1 Final Design AFE: Each Participating Party in an approved Development Plan has committed to participate in the Final Design AFE submitted as a part of the approved Development Plan. Any Non-Participating Party in an approved Development Plan shall be subject to the Non-Consent provisions as set forth in Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)*. Upon approval of a Development Plan, any original Non-Participating Party shall have the opportunity to elect to participate in accordance with Article 8.2.3 (*Second Opportunity to Participate*). If fewer than all Parties approve a Development Plan, such Development Plan shall not be deemed approved unless the obligations set forth in Article 8.2.4 (*Participation by Fewer Than All Parties*) are satisfied.

12.7.2 Long Lead Production System AFE: The Operator has the right, following the conclusion of Exploratory Operations and prior to the approval of the Fabrication AFE, to submit an AFE(s) ("Long Lead Production System AFE") for the

acquisition of long lead-time items for the Production System ("Long Lead Production System Items") as set forth below:

(i)     Prior to approval of the Development Plan, a Lond Lead Production System AFE requires approval by the unanimous agreement of the Parties.

(ii)    After approval of the Development Plan, A Long Lead Production System AFE requires approval by the unanimous agreement of the Participating Parties in the Development Plan.

12.7.2.1    <u>Non-Participating Parties in the Well AFE, Completion AFE, or Fabrication AFE Who Have Previously Approve a Long Lead Production System AFE</u>:   If a Party, who was in unanimous agreement with the other Participating Parties in a Long Lead Production System AFE, does not approve the Well AFE, completion AFE, or Fabrication AFE for which such Long Lead Production System Items were procured, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Production System Items within thirty (30) days following the approval of the Well AFE, completion AFE, or Fabrication AFE, whichever is applicable; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarabon Recoupment, if applicable, to which it is subject to in accordance with Article 16 (*Non-Consent Operations)*. The Operator shall invoice the Participating Parties in the Fabrication AFE for their proportionate share of the reimbursement under this Article 12.7.2.1 in accordance with Exhibit "C".

12.7.2.2    <u>Disposition of Long Lead Production System Items as Surplus Material</u>: If Long Lead Production Systme Items are not utilized for the Production Systema as proposed and approved, then the disposition of such Long Lead Production System Items shall be in accordance with Exhibit "C' Article IV, Paragraph 3 (*Disposition of Surplus)*, unless otherwise unanimously agreed to by the Participating Parties."

12.8    <u>Fabrication AFE</u>:  Within ninety (90) days from the date following approval of the Development Plan as provided in Article 12.6 (*Approval of a Development Plan),* unless such additional time is necessary due to circumstances beyond Operator's control, Operator shall submit a Fabrication AFE that conforms to the Approved Development Plan for the Production System to all Parties for their Election.  The Fabrication AFE shall consist of separate AFEs for each major component in the construction, fabrication or other acquisition and installation of the Production System identified in the approved Development Plan and Final Design AFE.  If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the Development Plan.

The Fabrication AFE shall consist of a separate AFE for: (i) the structural components of the Initial Production System, (ii) the equipment and Facilities to be located on the Contract Area (or located off the Contract Area but serving the Contract Area), (iii) any pipelines or other Facilities for handling Hydrocarbon production, and (iv) installation. The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFEs comprising the Fabrication AFE.  Development Wells shall be subject to separate AFEs and shall not be included within the Fabrication AFE.

12.8.1   Approval of Fabrication AFE:  The Parties shall make their Election as to the Fabrication AFE within the time period as described in Article 8.3.2 (*Production System Construction/Fabrication AFE).*  If all the Parties make an Election to participate in the Fabrication AFE, then the Operator shall proceed to acquire, design, fabricate, construct, transport and install the Initial Production System for the Joint Account of the Parties.  By making an Election to participate in the Fabrication AFE, each Participating Party commits to pay its Participating Interest share of the Costs, risks and liabilities of the Production System as set out in the Fabrication AFE subject to Article 6.2.5 (*Supplemental AFE for Cost Overruns on Fabrication AFE*).  If fewer than all Parties approve the proposed Fabrication AFE, each Participating Party in the Fabrication AFE shall, within fifteen (15) days (exclusive of Saturdays, Sundays and federal holidays), elect to either:

(a)   limit its participation in the proposed Fabrication AFE to its Working Interest share, or

(b)   bear its Participating Interest share of the proposed Fabrication AFE.

Failure to elect shall be deemed an election under (a) above.  If, as a result of the above Elections, the Participating Parties fail to agree to proportionately assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE, then, unless the Participating Parties otherwise agree within ten (10) days (exclusive of Saturdays, Sundays and federal holidays) following the last applicable Election under (a) or (b) above to assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE as set forth in Article 8.2.4 (*Participation by Fewer Than All Parties*), the proposal for the proposed Fabrication AFE shall be deemed withdrawn.  Once the Participating Party(ies) elect to participate in and assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE, the Operator shall proceed to construct, fabricate or acquire and install the Production System for the Joint Account of the Participating Party(ies).

Each Non-Operating Participating Party shall have the option to attend regularly scheduled meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Fabrication AFE as well as visits to the construction sites.

12.9    Assignment of Interest:   If any Party makes an Election not to participate in the Fabrication AFE for the Initial Production System under an approved Development Plan, then the Non-Participating Party shall be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and be deemed a Withdrawing Party subject to Article 17 *(Withdrawal from Agreement)*.  The Participating Parties shall share the interest assigned in the proportion which a Participating Party's Working Interest bears to the sum of the Working Interests of all of the Participating Parties (unless otherwise unanimously agreed by the Participating Parties).   If the Operator makes an Election not to participate in the Fabrication AFE, then the Participating Parties shall select a successor Operator pursuant to Article 4.5 *(Selection of Successor Operator)*.   If Development Operations under the Development Plan are not timely commenced pursuant to Article 12.14 *(Timely Operations for Production Systems)*, the Non-Participating Party shall be entitled to a reassignment of its Working Interest, shall not be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and shall not be deemed a Withdrawing Party subject to Article 17 *(Withdrawal from Agreement)*.

12.10   Minor Modifications and Revisions to Development Plans:   In implementing the Development Plan, the Operator shall advise the Participating Parties of progress. As additional information becomes available, the Operator may make modifications and revisions to the Development Plan subject to the following.

   12.10.1   Minor Modifications to Development Plans:   The Operator may, without the approval of the Participating Parties, make minor modifications to a Development Plan if such minor modifications are both necessary and reasonable to accomplish the Development Plan.   For purposes of this paragraph, a minor modification is one of the following:

   (a)    a modification that does not cause the cumulative estimated Cost of the Fabrication   AFE to increase by more than the amount provided in Article 6.2.5 (*Supplemental AFE for Cost Overruns on Fabrication AFE*), and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*); or

   (b)    a modification that does not cause the cumulative estimated Cost of the Final Design AFE to increase by more than the amount provided in Article 6.2.4 (*Supplemental AFE for Cost Overruns on Final Design AFE*), and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*); or

   (c)    a modification that is necessary for health, safety or environmental reasons or regulatory requirements and does not exceed that does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than ten percent (10%) or ten million dollars ($10,000,000),

64

whichever is less, and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*).

12.10.2   Revisions to Development Plans:   A Development Plan may be revised as needed to accommodate new data, interpretations or other changes not covered by Article 12.10.1 *(Minor Modifications to Development Plans)* or by Article 12.11 *(Major Modifications to Development Plans). Any Participating Party may propose a revision by notifying the Operator.* Any such revision pursuant to this Article 12.10.2 *(Revisions to Development Plans)* shall require General Matter approval of the Participating Parties in the Development Plan.  The Operator shall provide a copy of the revised Development Plan to all Parties, except in the case when the Development Plan is automatically revised as a result of a Development Operation not included in the then current Development Plan being approved as a General Matter as provided in Article 13.1 *(Proposal of Development Operations).*

12.11   Major Modifications to Development Plans: Any Participating Party may propose a major modification by notifying the Operator.   The Operator shall promptly notify the Participating Parties whenever a major modification to a Development Plan is proposed or anticipated and shall furnish to the Participating Parties the proposal to modify the Development Plan (and associated AFE's) along with the basis for the proposal and estimated Costs.  A major modification is one of the following:

(a)       the type of Production System is changed; or

(b)       the number of well slots of the Production System is decreased by at least twenty-five percent (25%); or

(c)       the type of Hydrocarbon transmission system is changed (e.g., pipeline vs. barge, etc.); or

(d)       the Participating Parties in the Development Plan decide to terminate the Development Plan by not initiating production.

(e)       the overall Cost of the Production System is to be increased more than twenty-five percent (25%); or

(f)       the overall Cost of the Production System is to be decreased more than twenty-five percent (25%); or

(g)       the initial selection of the location of the Production System is to be changed by more than five thousand feet (5000') laterally in any direction; or

(h)       the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%); or

(i)       the number of Development Wells is to be increased or decreased by at least twenty-five percent (25%); or

(j)       the proposed hydrate or paraffin control system or technique, pressure maintenance system, or enhanced recovery plan is to be materially changed; or

(k)     the proposed number of well completions per wellbore, that is, dual versus single, is to be changed; or

(l)     the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than one hundred and eighty (180) days; or

(m)    the following changes result in a thirty-five percent (35.00%) or more increase in cost, inclusive of tariffs, fees and related charges, if applicable, to the gathering and pipeline systems: (i) a change in the type, length or route of the gathering and pipeline systems necessary to gather or transport the Hydrocarbons from the wellheads to a pre-existing Development System or an Offsite Host Facility as provided in the Development Plan, in the case of a tieback; or (ii) a change in the type, length or route of the gathering and pipeline system necessary to gather or transport the Hydrocarbons from the production equipment on the Facilities to the interconnect of the selected interconnect to downstream export pipelines; or (iii) a change in the type, length or route of any third party pipeline to be built specifically to transport Hydrocarbons from the Production System to the interconnect with the existing Export Pipelines for those instances that at the time the Development Plan is drafted, no existing Export Pipeline capable of transporting Hydrocarbons from the Production System is within two miles of the planned Production System; or (iv) a change to existing processing, gathering, or transporting contracts included in the approved Development Plan; or

(n)     the estimated capital expenditures in any calendar year are to be increased by at least thirty percent (30%) of the project's estimated total gross capital expenditures.

12.11.1   <u>Major Modifications to Development Plans Prior to Approval of the Fabrication AFE</u>:  Whenever a major modification to a Development Plan is proposed prior to the approval of the Fabrication AFE, the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).  That major modification shall require the unanimous approval of all Participating Parties in the Development Plan.  If such major modification to the Development Plan is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.  The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of the modified Development Plan to notify the Operator in writing that its will participate in the modified Development Plan (and associated AFEs).  If an original Non-Participating Party participates in the modified Development Plan, it shall be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with the original approved Development Plan (and associated AFEs).  An original Non-Participating Party who makes an Election to participate in the modified

Development Plan shall eliminate the Underinvestment through a settlement of Costs pursuant to Article 16.9.1 (*Settlement of Underinvestments*).

12.11.2   <u>Major Modifications to Development Plans After Approval of the Fabrication AFE</u>:   Whenever a major modification to a Development Plan is proposed after the approval of the Fabrication AFE and prior to the installation of the Production System, the Operator shall furnish the Participating Parties in the Fabrication AFE with the proposed modification to the Development Plan (and associated AFEs).   Any major modification shall require the unanimous approval of all Participating Parties in the Fabrication AFE. If a major modification to the initial Development Plan proposed pursuant to Article 12.11(a), Article 12.11(c), or Article 12.11(f) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Fabrication AFE.  The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of such modified Development Plan to notify the Operator in writing that its will participate in such modified Development Plan (and associated AFEs).  If an original Non-Participating Party participates in such modified Development Plan, it shall be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with (a) the original approved Development Plan (and associated AFEs) if it did not participate in that Development Plan and (b) the Fabrication AFE.  An original Non-Participating Party who makes an Election to participate in such modified Development Plan shall eliminate the Underinvestment through a settlement of Costs pursuant to Article 16.9.1 (*Settlement of Underinvestments*).   Within thirty (30) days following the elimination of the Underinvestment, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE who elects to participate in such modified Development Plan (and associated AFEs) for the initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

.   If a major modification to the initial Development Plan proposed pursuant to Article 12.11(d) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan to each Non-Participating Party in the Fabrication AFE and within thirty (30) days following such approval, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE for such initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

If a major modification is approved, the Development Plan (and any associated AFEs) shall be deemed modified and the Operator shall carry out the modified Development Plan.  In the event a major modification is not approved by all Participating Parties, the Operator shall continue to implement the approved Development Plan as it was before the proposed major modification.

A Non-Participating Party in the Fabrication AFE for a Subsequent Production System who elects to participate in a modified Development Plan (and associated AFEs) for that Subsequent Production System shall not be subject to Article 16.5.5 (*Non-Consent Subsequent Production System and Facilities*) in regard to that Subsequent Production System.

12.12   Supplemental AFE for Cost Overruns on Fabrication AFE:  Cost overruns for a Fabrication AFE shall be handled in accordance with in Article 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE)*.

12.13   Termination of a Development Plan:  An approved Development Plan shall remain in force until the earliest of:

(a)      the Participating Parties in the Fabrication AFE for the Development Plan do not agree to bear all costs and risks of the Fabrication AFE,

(b)      the construction or acquisition of the Production System is not commenced within the time frame provided in Article 12.14 (*Timely Operations for Production Systems*),

(c)      the depletion of the reservoirs covered by the Development Plan,

(d)      the approved Development Plan is superseded by a revised Development Plan, or

(e)      the Development Plan is terminated by the unanimous consent of the Participating Parties.

12.13.1   Termination Prior to Approval of Fabrication AFE:  The Costs, risks and liabilities of a Development Plan that is terminated before its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Development Plan.

12.13.2   Termination After Approval of Fabrication AFE:  The Costs, risks and liabilities of a Development Plan that is terminated after its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Fabrication AFE.

12.14   Timely Operations for Production Systems:  The Operator shall commence, or cause to be commenced, the construction of a Production System within one hundred twenty (120)

days from the last Party's Election for the Fabrication AFE.  Such construction shall be deemed commenced on the date the major fabrication contract for the Production System is awarded.  Except for the instance of a Force Majeure, if the Operator fails to timely commence operations for the Production System, the Non-Operating Parties may, within thirty (30) days after the expiration of the commencement period, by a majority Working Interest vote of the Participating Parties in the Fabrication AFE,

(a)     agree to extend the time period for timely operations, or

(b)     select a substitute operator to commence the construction or acquisition of the Production System, which shall be commenced within one hundred twenty (120) days after the selection of the substitute operator.

If the time period for timely operations is not extended or a substitute Operator is not selected or if such construction or acquisition is not commenced in a timely manner by the substitute Operator, then the approved Fabrication AFE shall be deemed withdrawn with the effect as if the Fabrication AFE had never been submitted.  The above notwithstanding, if the BOEM grants a "Suspension of Production" or a "Suspension of Operations" (an SOP/SOO") for an approved Development Plan, any shorter time limits set forth as requirements of the SOP/SOO shall supersede the corresponding longer time limit set forth in this Agreement or the Development Plan.

12.15   Subsequent Development Phases:  At any time after the last Party's Election under the Fabrication AFE for the Initial Production System, any Participating Party may propose an additional Development Phase(s) and the installation of a subsequent or expanded Production System(s).  Upon proposal of a subsequent Development Phase, the Operator shall propose the formation of a Project Team to prepare a Development Plan for the subsequent Development Phase.  The preparation and approval of the Development Plan for a subsequent Development Phase shall follow the same procedures specified in this Article 12 *(Project Team, Development Plan and Fabrication AFE)* for the preparation and approval of the initial Development Plan with the exception however that:

(a)     the Operator's exclusive period to submit a proposal for the formation of an associated Project Team shall commence immediately following rig release from the first well for such Development Phase which would qualify as a Producible Well, and

(b)     a Non-Participating Party(ies) in an approved Fabrication AFE for a Subsequent Production System shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.

12.16   Access to Existing Facilities:  Development Operations in subsequent Development Phases shall have reasonable access (on a space available basis) to gathering, processing and transportation Facilities installed for previous Development Phases.

12.16.1   <u>Non-Consent Operations in Subsequent Development Phases</u>:  If fewer than all Parties make an Election to participate in a subsequent Development Phase, the Operator (or substitute Operator) shall conduct Development Operations in the subsequent Development Phase for the account of the Participating Parties and at their sole Cost and risk.   The Participating Parties shall conduct the subsequent Development Operations with the benefit of the non-consent provisions specified in Article 16 *(Non-Consent Operations)*.   A Non-Participating Party in a subsequent Development Phase shall not be entitled to any information or data from any subsequent Development Operation associated with such Development Phase, unless the Non-Participating Party makes an Election to participate in such subsequent Development Operations pursuant to Article 16.7 *(Operations From a Subsequent Non-Consent Production System)*. Any Non-Participating Party in a subsequent Development Phase may retain its Working Interest in the Contract Area.   However, such a Non-Participating Party shall not unreasonably interfere with Development Operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Parties in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices).   In all events, the sequence and conduct of Development Operations in a subsequent Development Phase shall be controlled by the Participating Parties in the subsequent Development Operation.   Hydrocarbon production volumes shall be measured on the basis of well tests and operating expenses allocated upon the basis of Hydrocarbon production volume throughput.

# ARTICLE 13
# DEVELOPMENT OPERATIONS

13.1   <u>Proposal of Development Operations</u>:  It is the intent of the Parties to proceed with development of the Contract Area in accordance with the approved Development Plan. Any Participating Party may propose specific Development Operations which were included in the Development Plan by giving notice of the proposal and the associated Well Plan, which shall include at least the information set out in Article 10.2.1 *(Well Plan's Minimum Specifics)*, and AFE to the other Participating Parties.   Each Development Operation included in an approved Development Plan, other than a Final Design AFE shall require approval as a General Matter except as otherwise provided herein.   Once a Development Operation is approved (either as a General Matter or as an Election), the Operator (or substitute Operator) at its sole discretion, may commence actual operations for the Development Operation only after the necessary governmental approval(s) and/or permit(s) required to commence the Development Operation have been secured by the Operator.   Notwithstanding the foregoing, (i) the Operator shall not be entitled to charge the Joint Account for costs accrued in conducting a Development

Operation until such time as necessary governmental approval(s) and/or permit(s) are received and (ii) in the event the Operator places the rig on standby prior to receiving necessary governmental approval(s) and/or permit(s) to commence a Development Well, the Operator shall only be entitled to charge the Joint Account for a maximum of three (3) days of standby time, subject to each Party's rights to dispute and audit such charges pursuant to this Agreement. Each Non-Participating Party in an approved Development Operation will be subject to either the acreage forfeiture provisions or the Cost percentage recoupment provisions of Article 16 (*Non-Consent Operations*), whichever is applicable. Any Participating Party in the Development Plan may propose specific Development Operations which were not included in the approved Development Plan. A proposal for a Development Operation not included in an approved Development Plan shall require approval as a General Matter and, if approved, such Development Operation not included in the approved Development Plan shall be deemed an automatic revision to the Development Plan. However, the provisions of this Article 13 *(Development Operations)* shall not apply to the proposal for the Initial Production System or Subsequent Production System in the Contract Area. The Initial Production System or Subsequent Production System shall be proposed in accordance with Article 12 *(Project Team, Development Plan and Fabrication AFE)* of this Agreement.

13.1.1 <u>AFE Overruns and Substitute Wells</u>: The Operator shall timely commence a Development Operation and continue the drilling of such well with due diligence to its Objective Depth or until:

(a) a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

(b) the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

(c) the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Development Well is abandoned due to the conditions described under 13.1.1 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Development Well shall make an Election whether to participate in the proposed substitute well. The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 (Non-Consent Operations), whichever is applicable.

71

13.1.2 <u>Timely Operations</u>:  A Development Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Development Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure)*.

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to timely commence the Development Operation within the two hundred seventy (270) day period, the approved Development Operation shall be deemed withdrawn, with the effect as if the Development Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 *(Substitute Operator if Operator Fails to Commence Operations)*.

If an approved or identical Development Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Operation, will be chargeable to the Participating Parties.  A Development Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Development Operation are undertaken.

13.2   <u>Subsequent Development Operations at Objective Depth</u>:  After a Development Well (or its substitute) has been drilled to its Objective Depth as set forth in the Well Plan (and all logs and tests (excluding production tests) have been distributed to the Participating Parties), the Operator shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)    conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)    complete the well at the Objective Depth in the objective zone or formation;

(c)    Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)    plug back the well and attempt a completion in a shallower zone or formation;

(e)    Deepen the well to a new Objective Depth;

(f)    conduct other operations on the well not listed;

(g)    temporarily abandon the well; or

(h)        permanently plug and abandon the well.

Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 13.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

13.2.1    <u>Response to Operator's Proposal</u>:  Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Development Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal.  Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

13.2.2    <u>Counterproposals</u>:  If a Participating Party makes a counterproposal for subsequent Development Operations, the other Participating Parties shall have an additional twenty four (24) hours to respond thereto.  If conflicting proposals for subsequent Development Operations are made, preference shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 13.2 (*Subsequent Development Operations at Objective Depth*). If different depths or locations are proposed for subsequent Development Operations, preference for voting shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order.  After a decision to conduct a subsequent Development Operation is made and the subsequent Development Operation is commenced, the remaining proposals for other types of subsequent Development Operations shall be deemed withdrawn.  At the completion of the subsequent Development Operation, the Operator shall again submit proposal(s) for subsequent Development Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

13.2.3    <u>Approval of Subsequent Development Operations by All Parties</u>:  If the proposed subsequent Development Operation is approved by all the then Participating Parties, the Operator (or substitute Operator) shall commence the subsequent Development Operation at the Cost(s) and risk of the Participating Parties.

13.2.4    <u>Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties</u>:  If a proposal for subsequent Development Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 13.5 [*Permanent Plugging and Abandoning Costs*] or Article 18.1

73

[*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*),  conduct the operation at the sole Cost and risk of the Participating Parties.   Any Non-Participating Party in a subsequent Development Operation shall be subject to Article 16 *(Non-Consent Operations)*.   A Non-Participating Party in a subsequent Development Operation shall be relieved of the Costs, risks and obligations of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

13.2.5   <u>Subsequent Development Operations If Not Approved as a General Matter</u>:  If no proposed Development Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 13.2.4 *(Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties)*, then prior to an Development Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Development Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Development Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 13.2 *(Subsequent Development Operations at Objective Depth)*.   Any Non-Participating Party in such subsequent Development Operation shall be subject to Article 16 *(Non-Consent Operations)*.  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

13.3   <u>Election by Original Non-Participating Parties in Deepening or Sidetracking Operations</u>:  If a Development Well is drilled to its initial Objective Depth and the Participating Parties have secured the requisite approval to either:

(a)   Sidetrack said well, or

(b)   Deepen said well,

 then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepen operation,  the Operator shall notify each original Non-Participating Party of the proposal.  Each original Non-Participating Party may respond with an Election regarding such a proposal to Deepen or Sidetrack by notifying the

Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.   Any original Non-Participating Party making an Election to participate in such Deepening or Sidetracking of a Development Well shall:

(i)    be deemed to be underinvested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to the Deepening or Sidetracking and subject to Article 16.9 (*Underinvestment of Costs*) (and the Parties that participated in drilling to the initial Objective Depth will be deemed overinvested in that amount), and

(ii)   remain a Non-Participating Party in the Development Well to the initial Objective Depth until the Costs recoverable under Article 16 *(Non-Consent Operations),* less any payments through a Disproportionate Spending Settlement and/or Article 16.9 *(Underinvestment of Costs),* have been recouped by the original Participating Parties.

13.4    <u>Deeper Drilling</u>:  A proposal to drill a Development Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well, or to re-enter and Deepen an existing Development Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well, shall require approval as a General Matter and shall be further subject to the following provisions.

13.4.1    <u>Limited Participation in Deeper Drilling</u>:  If a proposal is made pursuant to Article *13.4 (Deeper Drilling),* any Party may either:

(a)    make an Election to participate in the proposed Deeper Drilling operation; or

(b)    make an Election not to participate in the proposed Deeper Drilling operation; or,

(c)    make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A Party making an Election to limit its participation in a deeper Development Well to the base of the deepest Producible Reservoir under (c) above shall bear its Participating Interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *(Non-Consent Operations).*

13.4.2    Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir:  If a Non-Participating Party in a Deeper Drilling operation below the deepest Producible Reservoir:

> considers the well to be capable of producing at or above the deepest Producible Reservoir, and

> has indicated in writing to the Operator a desire to complete the well at or above the deepest Producible Reservoir,

any further Deeper Drilling operations shall be conducted subject to the following provisions:

(a)    Multiple Completion:  If all the Participating Parties in the well agree that a multiple well completion(s) is possible and practicable involving (i) a completion at or above the deepest Producible Reservoir and (ii) a completion below the deepest Producible Reservoir, the Participating Parties in the Deeper Drilling operation shall bear 100% of the Costs of drilling to an Objective Depth below the deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the deepest Producible Reservoir.

(b)    Single Completions:  If the Participating Parties do not unanimously agree that multiple well completions are possible or practicable, the Non-Participating Party in the Deeper Drilling operation shall be deemed overinvested in the original well in an amount equal to the Non-Participating Party's Share of the original Costs of drilling the well to the deepest Producible Reservoir.  The Participating Parties in the Deeper Drilling operation shall eliminate the Non-Participating Party's overinvestment in accordance with Article 16.9.1 (*Settlement of Overinvestments*).

If, after having been drilled to an Objective depth deeper than the deepest Producible Reservoir, at the first occurrence of the following events:

(i)    the well is not a Producible Well at a depth deeper than the deepest Producible Reservoir and the well is plugged back to a shallower zone; or,

(ii)    the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir, but Hydrocarbon production from the deeper zone is later depleted prior to Non-Consent Recoupment (attributable to Deeper Drilling operation) and the well is plugged back to a shallower zone; or,

(iii)    the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir and the Participating Parties have recovered the applicable non-consent Recoupment (attributable to the Deeper Drilling operation) from Hydrocarbon production from the deeper zone; or,

(iv)    the well, although in a suitable and safe condition for a completion attempt at or above the deepest Producible Reservoir, is plugged and abandoned prior to any such completion attempt,

the Participating Parties as to the depths below the deepest Producible Reservoir shall be deemed overinvested in an amount equal to the Non-Participating Party's Share of the well's Cost down to the deepest Producible Reservoir.  The overinvestment shall be depreciated at the rate of one-half percent (1/2%) per month from the date the Deeper Drilling operation commences to the earlier of the date of (i), (ii) or (iii) above, but such depreciation shall not reduce the overinvestment below forty percent (40.0%) of the original overinvestment. The Non-Participating Parties in the Deeper Drilling operation shall, upon the occurrence of one of the above-noted events, eliminate the Participating Party's overinvestment in accordance with Article 16.9.1 (*Settlement of Overinvestments*).

13.4.3    Completion Attempts At or Above the Deepest Producible Reservoir: If a well drilled below the deepest Producible Reservoir is not completed for production in the deeper depths, then the Participating Parties in said well down to the deepest Producible Reservoir shall have a right to utilize the well for completion in a Producible Reservoir.  In the event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, the Participating Parties in drilling below the deepest Producible Reservoir in said well shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for completion in a Producible Reservoir.  In the event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, but the well drilled below the deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the deepest Producible Reservoir in that well, the Participating Parties in the Deeper Drilling operation shall be obligated, at their sole Cost and risk, to restore the well to its condition prior to the Deeper Drilling operations below the deepest Producible Reservoir. If the damage cannot be repaired, the Participating Parties in the Deeper Drilling Operation shall be obligated to pay for the entire Cost of redrilling the well to the base of the deepest Producible Reservoir less any overinvested amount previously paid pursuant to Article 16.9.1 (*Settlement of Overinvestments*) by such Participating Parties in the Deeper Drilling operation to the Participating

77

Party(ies) in said well down to the deepest Producible Reservoir that have made an Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir.  The Party(ies) that have made an Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir shall be obligated to be a Participating Party in such completion attempt subsequent to said restoration and/or redrill.  Once the well has been either restored to its condition prior to the Deeper Drilling operation or redrilled to the base of the deepest Producible Reservoir, any Non-Participating Party in the completion attempt above the base of the deepest Producible Reservoir shall be subject to the provisions of Article 16 (*Non-Consent Operations*).

13.5    Permanent Plugging and Abandoning Costs:  The permanent plugging and abandonment of a Development Well that:

(a)      is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 13.1.1(b),

(b)      is to be plugged under Article 13.2 (*Subsequent Development Operations at Objective Depth*), or

(c)      has been previously temporarily abandoned under Article 13.2 (*Subsequent Developement Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 13.5. Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If any Participating Party fails to respond within the applicable response period to a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5(a) or 13.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Development Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 (*Subsequent Development Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*). The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14
## FACILITIES AND GATHERING SYSTEMS

14.1  <u>Facilities as a Part of Development Plan</u>:  The Development Plan shall provide for the installation of all basic Facilities necessary to handle or service Hydrocarbon production for the Contract Area.  If the approved Development Plan provides that Hydrocarbon production from the Contract Area can most efficiently be processed and handled at Facilities located off the Contract Area (an "offsite facility"), the Development Plan shall provide for a Production System designed to utilize an "offsite facility".

14.2  <u>Use of Facilities Off the Contract Area</u>:  In the event that excess capacity exists at an "offsite facility" and the approved Development Plan calls for a "tie-back" development of the Contract Area to an "offsite facility", the Operator will use reasonable efforts to secure a "Facilities Use and Production Handling Agreement" from the owners of the "offsite facility" for use in handling Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable efforts to secure access to the "offsite facility" on behalf of the Participating Parties. Any access secured by such "Facilities Use and Production Handling Agreement" to an "offsite facility" shall be shared proportionately by the Parties on the basis of their Participating Interests in the Development Plan.  This Article 14.2 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 (*Disposition of Hydrocarbon Production*).

14.3  <u>Use of Facilities Located on the Contract Area</u>:  The Participating Parties hereto shall have priority access to all jointly owned Facilities and gathering system capacity for use in operating and developing the Contract Area pursuant to an approved Development Plan.  Use of the Facilities on the Contract Area for handling production coming from outside the Contract Area may be granted only if Facility capacity is available beyond the requirements of an approved Development Plan for developing the Contract Area.  Use of excess capacity from Facilities shall be subject to the following priority of usage:

(a)  First priority to Hydrocarbon production jointly owned by the Participating Parties in the Production System from inside the Contract Area.

(b)  Second priority to Hydrocarbon production jointly owned by all of the Participating Parties in the Production System coming from outside the Contract Area.

(c)     Third priority to Hydrocarbon production owned by at least one but less than all of the Participating Part(ies) in the Production System coming from outside the Contract Area.

(d)     Fourth priority to Hydrocarbon Production owned by third parties coming from outside the Contract Area.

Priority "a" is automatic. Priorities "b", "c" and "d" shall require unanimous approval by all the Participating Parties.  In the event that unanimous approval cannot be reached by the Participating Parties under priorities "b" and "c" above, as to the means and methods for utilizing such excess capacity from Facilities, such excess capacity shall be allocated to each Party in accordance with each Party's Participating Interest in the Facilities having excess capacity, and each Party shall be entitled to use its share of excess capacity as it deems appropriate.  Any Hydrocarbon production coming from outside the Contract Area which utilzes the Production System and/or Facilities shall be processed under a facilities and production handling agreement which shall be unanimously agreed to by the owners of such Production System and/or Facilities.  If the owners cannot agree on a facilities and production handling agreement, the unresolved issues in such agreement shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

14.4    <u>Approval of Additional Facilities On or Off the Contract Area</u>:  This Article shall only apply to Facilities located on or off the Contract Area which were not included in the approved Development Plan.  Any Party may propose the installation of additional or expanded Facilities for the Contract Area beyond those specified in the Development Plan by giving notice to the other Participating Parties together with information adequate to describe the proposed Facilities and their estimated Costs.  Except as provided in Article 15.2 *(Facilities to Take In Kind),* the installation of additional Facilities on the Production System beyond the scope of the Development Plan shall require the approval of the Participating Parties in the Fabrication AFE (and all supplemental AFEs therefore) for the Production System as a General Matter, and the availability of sufficient deck space and buoyancy to support the proposed additional Facilities.  Upon approval, the Operator shall proceed to install the additional Facilities for the benefit of the Participating Parties provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area.  The installation of any additional Facilities shall be at the sole Cost and risk of the Participating Parties. Any Non-Participating Party shall be subject to Article 16.5.6 *(Non-Consent Subsequent Production System and Facilities)*

14.5    <u>Contract Area Production</u>:  Notwithstanding any other provision of this Agreement to the contrary, production owned by the Participating Parties from the Contract Area shall at all times have first preference to use capacity over any production from outside the Contract Area.  Further, any production capacity owned by the Participating Parties shall be owned on an undivided basis and any tariffs or production handling fees will be shared by the Participating Parties.

14.6     Expansion, Modification or Repair of an Existing Production System:  Subsequent to the installation of the Production System described and approved in the first Development Plan for the Contract Area, any Party may propose the expansion, modification or repair of any existing Production System in which it has participated by written notice to the other Participating Parties in such Production System.  Such proposal shall be presented in accordance with Articles 6.7 *(Annual Operating Plan)* and 8.3 *(Response Time for General Matters and Elections)* for approval as a General Matter.  If approved as a General Matter**,** it will be binding on all Participating Parties in the Production System and Operator shall proceed with such project for the benefit of the Joint Account and all Cost, risk and expense of such operation shall be borne in proportion to the respective Participating Parties' Working Interest in such Production System unless otherwise agreed.  This Article 14.6 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 *(Disposition of Hydrocarbon Production)*.  The provisions of this Article  14.6 shall not apply to subsequent Development Phase(s).

14.7     Additions, Expansions or Modifications of Production System or Facilities for health, safety or Environmental Reasons:  If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval as a General Matter by the Participating Parties in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System.   If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

14.8     Repairs of Production System or Facilities:  The Operator at its sole discretion shall make repairs on the Production System and Facilities as needed to keep the Production System and Facilities in good working order.  No approval by the Parties is required for the Operator to make those repairs.

## ARTICLE 15
## DISPOSITION OF HYDROCARBON PRODUCTION

15.1     Duty to Take in Kind:  Each Party shall have the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Contract Area, exclusive of Hydrocarbon production which the Operator uses in production or Development Operations, in preparing and treating Hydrocarbons for marketing purposes, and Hydrocarbon production which is unavoidably lost.

15.2 <u>Facilities to Take in Kind</u>:  Any Participating Party in Development Operations shall have the right, at its sole risk and expense, to construct Facilities for purposes of taking its share of Hydrocarbon production in kind, provided that in the judgment of the Operator, the installation of such Facilities do not interfere with continuing operations on the Production System or the Contract Area.  During the construction and operation of such facilities, the Party responsible for the construction or operation shall indemnify and defend the other Parties against any claims or liabilities which may result from such construction or operation and such Party shall be responsible for any damage or losses sustained by the other Parties as a result of the construction or operation of such facilities.

15.3 <u>Failure to Take Oil and/or Condensate in Kind</u>:  If any Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Contract Area, the Operator shall have the right, but never the obligation to market the non-taking Party's share of the oil and/or condensate production at the same price received by the Operator. The non-taking Parties agree to accept Operator's price it receives of the non-taking Party's share of the oil and/or condensate.  If the Operator sells to an Affiliate, then the non-taking Parties shall receive without deduction the market value of the non-taking Parties' share of the oil and/or condensate.  The Operator shall furnish notification to non-taking Party at the time such option is exercised.  All contracts of sale by the Operator of any Party's share of oil and/or condensate production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any contract be for a period in excess of one (1) year.  Proceeds of all sales made by the Operator pursuant to this Article shall be paid to the Parties entitled thereto once in each calendar month.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

15.4 <u>Gas Balancing Provision</u>:  The Parties agree that in the event separate disposition of gaseous Hydrocarbons causes split-stream deliveries to separate pipelines and/or deliveries which on a day to day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it, the gas balancing or accounting between the Parties shall be handled in accordance with Exhibit "D" attached hereto, entitled "Gas Balancing Agreement."

15.5 <u>Expenses of Delivery in Kind</u>:  Any Cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party. Any extra expenditure incurred in the taking in kind or separate disposition by any Party of its proportionate share of Hydrocarbon production shall be borne by such Party.

**ARTICLE 16**
**NON-CONSENT OPERATIONS**

16.1 <u>Conduct of Non-Consent Operations</u>:  If any Party makes an Election to become a Non-Participating Party in an operation, the proposed operation, if approved, shall be conducted as a Non-Consent Operation.  If the Participating Parties timely commence the Non-Consent Operation, then the Non-Participating Parties shall be subject to either the acreage forfeiture provisions of Article 16.2 *(Acreage Forfeiture Provisions)*, 16.4 *(Non-Consent Operations to Maintain the Contract Area)* or the Cost recoupment provisions of Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)* and when applicable Article 16.9 (*Underinvestment of Costs*), each reflecting the increased risks and Costs assumed by the Participating Parties.  Any operation that invokes the provisions of this Article 16 must be proposed in good faith using cost estimates and Objective Depths which are reasonable for the Contract Area considering the geological and geophysical data available at the time of the proposal.  If any proposed operation requires approval as a General Matter, such approval shall be obtained prior to the Participating Parties proceeding with the Non-Consent Operation.  The Operator (or substitute Operator) shall conduct any Non-Consent Operation at the sole risk and expense of the Participating Parties in the Non-Consent Operation.  Any Non-Consent Operations shall not unreasonably jeopardize, hinder or interfere with joint operations conducted by all Parties (unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article *16.4 (Non-Consent Operations to Maintain Contract Area)*.

16.1.1 <u>Indemnity for Non-Consent Operations</u>:  The Participating Parties shall (insofar as it may be within their control) keep the Contract Area free from all liens and encumbrances which might arise by reason of conducting the Non-Consent Operation and indemnify, defend and hold harmless the Non-Participating Parties from any such liens and encumbrances.

16.1.2 <u>Cost Information</u>:  The Costs of any Non-Consent Operation shall be borne by the Participating Parties in the proportion that their Participating Interests bear to the sum of all Participating Interests in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  The Costs of a Non-Consent Operation shall include the Costs of maintaining the drilling equipment on site during the notice period for an Election or vote pursuant to Article 8 *(Voting, Elections and Notices)*, including any response times, and no part of such Costs shall be borne by the Non-Participating Parties.  Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of the equipment pertaining thereto.  The Operator shall furnish to all the Parties a monthly statement showing operating, maintenance and other expenses attributable to the Non-Consent Operations, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to recoupment under this Article 16 *(Non-Consent Operations)*.  The Non-Operating Parties shall furnish the Operator any revenue or price information for their take in kind production.  In accounting for

the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests.

16.1.3   <u>Non-Consent Operations in Producible Well</u>:  Once a Producible Well has been completed and placed on production, Non-Consent Operations shall not be conducted in that well unless approved by all the Participating Parties in such well, unless such well is not capable of producing from its current completion(s).

16.1.4   <u>Non-Consent Operations in Producible Reservoirs</u>:  Unless otherwise agreed by all Parties having a Participating Interest in the production from any existing well that penetrates the subject Producible Reservoir, Non-Consent Operations for a Development Well shall not be conducted in any Producible Reservoir previously penetrated by a Producible Well drilled from or producing through the same Production System serving the Non-Consent Well and the Producible Well unless such Producible Reservoir shall have been designated as an Objective Depth or completion zone in the well proposal.

16.1.5   <u>Multiple Completions</u>:  Non-Consent Operations shall not be conducted in any well having multiple completions unless:

(a)   each of the multiple completions are owned by the same Parties in the same proportion; or,

(b)   none of the previous well completions are capable of producing in paying quantities; or,

(c)   all Participating Parties in the well containing the multiple completions consent to such Non-Consent Operation(s).

For the purposes of this Article 16 *(Non-Consent Operations),* each completion shall be considered as a separate well.

16.2   <u>Acreage Forfeiture Provisions</u>:  In view of the significantly greater risks associated with the initial Exploratory Well drilled in the Contract Area and the Fabrication AFE for the Initial Production System, the Parties agree that upon timely commencement of such operations, the Participating Parties shall be entitled to an assignment of the Non-Participating Party's right, title, and interest (or operating rights if appropriate) in that portion of the Leases comprising the Contract Area. Within thirty (30) days of the timely commencement of the Non-Consent Operation, the Non-Participating Party(s) shall execute and deliver an assignment of its interest to the Participating Parties, with no reimbursement by and at no cost to the Participating Parties.  If an assignment is made pursuant to this Article 16.2, then each Participating Party shall accept its Participating Interest share of the Non-Participating Party's assigned interest as determined by Article

8.2.4 (*Participation by Fewer Than All Parties*).  Except as provided in Article 16.4.3 *(Limitations on Acreage Forfeiture)*, the Non-Participating Party's Election not to participate in the initial Exploratory Well drilled in the Contract Area or the Fabrication AFE for the initial Production System shall be deemed a withdrawal pursuant to Article 17.0 *(Withdrawal From Agreement)*.

16.2.1   <u>Non-Consent Initial Exploratory Well</u>:  If one or more Participating Party(s) proceed with operations for the initial Exploratory Well on the Contract Area as a Non-Consent Operation, any Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area.  Penalties attributable to any Non-Consent Operations performed in the initial Exploratory Well, or its substitute well(s), after the earlier of:

    (a)   the initial Exploratory Well, or its substitute well, has reached its original Objective Depth, or

    (b)   the cumulative Costs of the initial Exploratory Well, and its substitute well(s), if any, equal the sum of the original approved AFE for the well plus the Permitted Over-expenditure for the well as described in Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*),

shall be a percentage penalty in accordance with Article 16.5.1 (*Non-Consent Exploratory and Subsequent Exploratory Operations*).

16.2.2   <u>Non-Consent Initial Production System</u>:  If one or more Participating Party(s) proceed as a Non-Consent Operation with timely operations for the Initial Production System that conforms to the approved Fabrication AFE, the Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area.

16.2.3   <u>Costs of Prior Operations</u>:  Any Non-Participating Party subject to a non-consent provision shall remain liable for its share of previously incurred Costs for operations where it was a Participating Party and there shall be no reallocation of Costs due to the Non-Participating Party's election or assignment.

16.3   <u>Notices and Orders</u>:  If the Operator is required by notice or order (including SOPs and SOOs) from any government agency having jurisdiction over the Contract Area to either drill or rework a well, or conduct other operations to maintain all or a portion of the Contract Area, the Operator shall immediately furnish each of the Parties with a copy of such order or notice.

16.4    <u>Non-Consent Operations to Maintain Contract Area</u>: The following provisions are applicable if:

(a)    an activity or operation is required, pursuant to a governmental agency order, notice, regulation, SOO or SOP requirement or Lease obligation, to maintain all or any portion of the Contract Area; or,

(b)    a proposal is made for an operation within the final twelve (12) months of the primary term of a Lease which has no Producible Well and such Lease is not held by a unit, SOO or SOP,

then such operation must be timely commenced and shall be conducted pursuant to this Article 16.4. The response time for a proposal made hereunder shall be the earlier of,

(c)    the response time provided in Article 8 *(Voting, Election & Notices),* or;

(d)    sixty (60) days before the deadline under the order, notice, regulation, SOO or SOP requirement or Lease obligation, whichever is earlier.

If the proposal requires approval as a General Matter and such approval is not obtained within the applicable response period, then any Party who made an Election to participate in the Non-Consent Operation may proceed with such operation at their sole Cost and risk after giving notice to the other Parties of their intention to commence the activity or operation.  The other Parties will have fifteen (15) days after receipt of the notice to make an Election to participate in such operation.

16.4.1    <u>Acreage Forfeiture in the Entire Contract Area</u>:  If it is necessary to drill or rework a well or conduct other operations to maintain the entire Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area within thirty (30) days after commencement of such well or other operation. Failure to participate in such well or other operations shall be deemed a withdrawal and the provisions of Article 17 *(Withdrawal From Agreement)* shall apply.

16.4.2    <u>Acreage Forfeiture in a Portion of the Contract Area</u>:  If a well is drilled or reworked or other operations are conducted in order to maintain a portion of the Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area within thirty (30) days after commencement of such well or other operation.  If a Party forfeits its Working Interest pursuant to this Article 16.4.2, then such Party shall have no further rights under this Agreement as to the portion of the Contract Area forfeited.  The remaining

86

Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Contract Area and this Agreement shall apply separately to such operational area.

16.4.3   <u>Limitations on Acreage Forfeiture</u>:  Notwithstanding the foregoing, if more than one well is drilled or more than one operation is conducted, any of which would maintain the entire Contract Area or the affected portion of the Contract Area, an assignment shall not be required from any Participating Party in any such well or other operation.  In addition, no Party shall be required to relinquish or assign all or any portion of its Working Interest in the Contract Area if the order, requiring the well or other operation, is appealed and successfully overturned.

16.5   <u>Percentage Hydrocarbon Recoupment for Non-Consent Operations</u>:  Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract* Area), upon the timely commencement of any Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with title to any future Hydrocarbon production therefrom shall be owned by and vested in each Participating Party in the proportion that each Participating Party's Working Interest bears to the total Working Interest of all Participating Parties (unless other proportions are agreed by the Participating Parties) for as long as the Non-Consent Operation originally proposed is being conducted or Hydrocarbon production is obtained from the Non-Consent Operation.  Such interest, rights and title to future Hydrocarbon production shall revert to each Non-Participating Party when the Participating Party has recouped from the Non-Participating Party's Share of proceeds of future Hydrocarbon production from such Non-Consent Operation an amount equal to the product of the Participating Party's share of the Costs of the Non-Consent Operation multiplied by the recoupment percentage for each operation set out below (the "Hydrocarbon Recoupment").

- The Non-Participating Party's Share of the Non-Consent Operation shall be reduced (to the extent of the Non-Participating Party's prior Working Interest) by any third-party cash contribution credited to the Non-Consent Operation.

- A Non-Participating Party's Hydrocarbon Recoupment shall be reduced by any Costs paid by such Non-Participating Party as a settlement of Costs for such Non-Consent Operation pursuant to Article 16.9 (*Underinvestment of Costs*).

Upon recoupment by the Participating Parties of the Hydrocarbon Recoupment, the Working Interest and leasehold operating rights in the Non-Consent Operation, along with the title to any future Hydrocarbon Production therefrom, shall revert to the former Non-Participating Party and the former Non-Participating Party shall become a Participating Party in the Non-Consent Operation.

16.5.1   <u>Non-Consent Exploratory and Subsequent Exploratory Operations</u>:  The Hydrocarbon Recoupment for Non-Consent Exploratory Operations, except as

provided in Article 16.2.1 (*Non-Consent Initial Exploratory Well*), shall be the Non-Participating Party's share of the Costs of Non-Consent Operations conducted including, but not limited to, drilling, evaluating, completing, equipping, plugging back and plugging and abandonment of the Exploratory Operation multiplied by one thousand percent (1000%).  The recoupment amount for Non-Consent Subsequent Exploratory Operations shall be the Non-Participating Party's share of the Costs of operations conducted including, but not limited to, drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Subsequent Exploratory Operation multiplied by seven hundred percent (700%).

16.5.2    <u>Non-Consent Appraisal Operations</u>:  The Hydrocarbon Recoupment for Non-Consent Appraisal Operations shall be the Non-Participating Party's Share of the Costs of drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Appraisal Operation multiplied by five hundred percent (500%).

16.5.3    <u>Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan</u>:  A Party making a revised Election not to participate (except as provided in Article 8.2.3 [*Second Opportunity to Participate*]) in a Geophysical Operations, Feasibility Study, Project Team and/or Development Plan (inclusive of its Final Design AFE) will be an underinvested Party in an amount equal to two hundred percent (200%) of the amount such Party would have paid had it participated in such AFE in that Activity, operation or AFE pursuant to Article 16.9 (*UnderInvestment of Costs*).  Any Underinvestment for a feasibility study shall be eliminated pursuant to Article 16.9 (*Underinvestment of Costs*) prior to the Non-Participating Party receiving such study(ies) and becoming a Participating Party in such feasibility study.  If,

(a)    a Non-Participating Party in a feasibility study makes an Election to participate in an approved Project Team which is based on such previously non-consented feasibility study, or

(b)    a Non-Participating Party in a feasibility study and/or Project Team makes an Election to participate in an approved Development Plan which is based on such previously non-consented feasibility study and/or non-consented Project Team, or

(c)    a Non-Participating Party in a feasibility study and/or Project Team and/or Development Plan makes an Election to participate in an approved Fabrication AFE which is based on such previously non-consented feasibility study and/or non-consented Project Team and/or non-consented Development Plan,

88

the effect shall be as if the Non-Participating Party has revised its previous non-participation Election(s) to become a Participating Party in such previous non-consented activity(ies), operation(s) and/or AFE(s) and shall be an Underinvested Party in an amount had such Party participated and shall eliminate its Underinvestment(s) pursuant to the above and Article 16.9 (*Underinvestment of Costs*

16.5.4 <u>Non-Consent Development Operations</u>: The Hydrocarbon Recoupment for Non-Consent Development Operations (including workovers) shall be the Non-Participating Party's Share of the Costs of the Non-Consent Operations, including but not limited to non-consent drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandoning the Development Operation multiplied by three hundred percent (300%).

16.5.5 <u>Non-Consent Subsequent Production System and Facilities</u>:  The Hydrocarbon Recoupment for any non-consent Subsequent Production System or Non-Consent Facilities shall be the Non-Participating Party's Share of the Cost of designing, fabricating and installing the Subsequent Production System or Facilities, including the Cost of an injection or disposal well, multiplied by two hundred percent (200%).

16.5.6 <u>Additional Production Recoupment</u>:  In addition to the Hydrocarbon Recoupment set forth above for various Non-Consent Operations, the Participating Parties shall be entitled to recoup:

(a) two hundred percent (200%) of the Non-Participating Party's Share of the Cost of Facilities necessary to carry out the Non-Consent Operation; plus,

(b) one hundred percent (100%) of the Non-Participating Party's Share of the Cost of using any Production System already installed for the Contract Area for which the Non-Participating Party has a Participating Interest; or any modifications thereto necessary to carry out the Non-Consent Operation; plus,

(c) one hundred percent (100%) of the Non-Participating Party's Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, production taxes and other governmental fees based on production.

16.5.7 <u>Hydrocarbon Recoupment From Hydrocarbon Production</u>:  Hydrocarbon Recoupment for a Non-Consent Operation which results in a discovery of a new Producible Reservoir or extends an existing Producible Reservoir shall be made

89

from the following portions of the Non-Participating Party's Share of Hydrocarbon production:

(a) <u>Non-Consent Exploratory Operations (other than for the initial Exploratory Well if forfeiture applies), Non-Consent Subsequent Exploratory Operations, Non-Consent Appraisal Operations, or Non-Consent Development Operations</u>:  Each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(i) one hundred percent (100%) of its the Non-Participating interest share of all Hydrocarbon production from the Non-Consent Operation (if the well is completed for Hydrocarbon production), and

(ii) fifty percent (50%) of its Non-Participating interest share  of Hydrocarbon production from all wells subsequently drilled and completed in the Producible Reservoir discovered by said Non-Consent operations or in the extended portion of an existing Producible Reservoir discovered by said Non-Consent Operation.

(b) <u>Non-consent Subsequent Production Systems and Facilities</u>:  If the construction and installation of a Subsequent Production System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(i) one hundred percent (100%) of its Non-Participating interst share of Hydrocarbon production from all wells which are drilled from and/or produced through the Subsequent Production System or Facilities and/or wells benefited from injection or disposal wells.

The interest shall revert to each Non-Participating Party only after the Participating Parties have completely recouped, from Hydrocarbon production, the amounts specified herein.

16.6 <u>Reversion of Interests to Non-Participating Party</u>:  A Non-Participating Party's Working Interest and leasehold operating rights subject to recoupment from future Hydrocarbon production and/or a Disproportionate Spending Settlement, shall revert to the Non-Participating Party upon the occurrence of the first of the following events:

(a) the Non-Consent Operation  does not appear to satisfy the qualifications of a Producible Well and upon permanent plugging and abandonment of such non-consented interval in the wellbore; or,

(b) Hydrocarbon production ceases prior to complete recoupment under Article 16.5.7 (*Hydrocarbon Recoupment from Hydrocarbon Production*) by the Participating Parties; or,

(c)    the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well or Development Well and such Non-Consented Operation does not satisfy the qualifications of a Producible Well; or,

(d)    upon complete Hydrocarbon Recoupment.

16.6.1    <u>Dry Hole Reversion</u>: If a Non-Consent Operation (other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Operations to Maintain Contract Area)* above results in a dry hole and fails to obtain Hydrocarbon production or, if Hydrocarbon production ceases prior to complete Hydrocarbon Recoupment by the Participating Parties, then the Non-Participating Party's Working Interest and leasehold operating rights which have been relinquished shall revert to the Non-Participating Party.  However, all non-consent Wells, Production Systems and Facilities [and rights to future Hydrocarbon production from a Producible Reservoir under Article 16.5.7 *(Hydrocarbon Recoupment From Hydrocarbon Production)*] shall remain vested in the Participating Parties. Any salvage value in excess of complete Hydrocarbon Recoupment shall be credited to all Parties according to their Working Interest and without regard to their participation status.

16.6.2    <u>Sidetracking or Deepening a Non-Consent Well</u>:  If a Non-Participating Party entitled to do so makes an Election to participate in the Sidetracking or Deepening operation, then the Participating Parties shall be deemed overinvested to the extent of the Non-Participating Party's Share of Costs in the original Non-Consent Operation (less any amount recovered by the Participating Parties out of the Non-Participating Party's Share of Hydrocarbon production or through a Disproportionate Spending Settlement).  If the Participating Parties have recouped the Cost of the well at the time they desire to Sidetrack or Deepen the well, then the Non-Participating Party will not be an underinvested Party in the Sidetracking or Deepening of the well.  However, in such case, the Participating Parties in the original well shall still be permitted complete recoupment from the other wells in the Producible Reservoir, discovered or extended by the original well as provided in Article 16.5.7 (a) *(Hydrocarbon Recoupment from Hydrocarbon Production),* until the total non-consent amount to be recouped has been recovered from the Producible Reservoir.

16.7    <u>Operations From a Subsequent Non-Consent Production System</u>:  Any Party who made an Election not to participate in a Subsequent Production System may make an Election to participate in operations from such Subsequent Production System.  If a Non-Participating Party makes an Election to participate in such operations, then the Non-Participating Party may reduce the Hydrocarbon Recoupment amount through a Disproportionate Spending Settlement in accordance with Article 16.9 (*Underinvestment of Costs*) in subsequent Development Operations conducted from the Subsequent Production System and thereby automatically revise its non-participation Election to

become a Participating Party in such Subsequent Production System. Any Disproportionate Spending Settlement amounts shall be subtracted from the Hydrocarbon Recoupment entitled to the Participating Parties in the Subsequent Production System pursuant to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities).*

16.8 <u>Allocation of Production System Costs to Non-Consent Operations</u>: In the event a Non-Consent Well is proposed to be drilled from or produced through a Production System owned by all the Parties, the rights of Participating Parties to use the Production System for the proposed Non-Consent Well and the Costs therefore shall be based on the following:

16.8.1 <u>Investment Charges</u>: If a Non-Consent Well will utilize either a Production System and/or Subsea Production System owned by all the Parties, the Non-Participating Parties in such well shall be deemed to be the overinvested Parties in such Production Systems to the extent the Participating Parties in such well would have paid a charge for the right to use the Production System and/or Subsea Production System and its Facilities as follows:

(a) The Participating Parties shall pay a one-time slot usage fee covering its use of the Production System in an amount equal to two percent (2%) of the Cost of the Production System, the Subsea Production System and its Facilities to the owners of the Production System (to be shared in proportion to the owner's Working Interest in the Production System). For purposes of the slot usage fee, the total Cost of the Production System shall be reduced by .41667% per month commencing upon the first monthly anniversary date of when the Production System was installed and every monthly anniversary thereafter until the total Cost of the Production System is reduced to twenty-five percent (25%) of the original Cost. The Cost of additions to the Production System shall be reduced in the same manner commencing upon the first monthly anniversary after the addition is installed. If the non-consent well is abandoned, then the right of Participating Parties to use that Production System slot shall terminate unless such Parties commence drilling a substitute well from the same slot within ninety (90) days after abandonment. The slot usage fee shall not apply to a slot which is deemed to be "surplus." A slot may be deemed surplus by the unanimous consent of all Parties owning an interest in the Production System.

(b) If Hydrocarbon production from the non-consent well is handled through Facilities owned by all Parties, the Participating Parties shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of such Facilities which one well bears to the total number of wells which the Facilities are designed to accommodate.

16.8.2   <u>Operating and Maintenance Charges</u>:  The Participating Parties in a non-consent well shall pay all Costs necessary to connect their well to the Facilities and the Production System.  The expense of operating and maintaining the Facilities and the Production System shall be allocated equally per active completion among all active completions served.   Subsea Production System operating and maintenance expenses shall be allocated equally per active subsea completion among all active subsea well completions served by such Subsea Production System.

16.8.3   <u>Payments</u>:   The payment of sums pursuant to Article 16.8.1 *(Investment Charges)* shall not be a purchase of an additional interest in the Production System or Facilities.  Such payments shall be included in the total amount which the Participating Parties are entitled to recoup out of Hydrocarbon production from the non-consent well, but only to the extent of actual Costs.  Such charges shall be paid by the Participating Parties in such well by allocating (in addition to any other Costs allocated to them under this Agreement) all Costs attributable to tangible, intangible and other cost categories that would otherwise be allocated to the Non-Participating Parties until all overinvestment is eliminated.

16.9   <u>Underinvestment of Costs</u>:  A Non-Participating Party shall not be liable for settling any underinvestment of its share of the Costs of a Non-Consent Operation unless, having the right to do so under this Agreement,

- the Non-Participating Party makes a revised Participation Election to become a Participating Party, and

- if the applicable Non-Consent Operation is subject to Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*), the total Hydrocarbon Recoupment has not been recouped.

Upon making a revised Participation Election, a Non-Participating Party shall settle any Underinvestment  for its share of the Costs in a Non-Consent Operation as provided in this Article 16.9 (or the balance of any Underinvestment if the applicable Non-Consent Operation is subject to Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*) and the total Hydrocarbon Recoupment has not been recouped) and shall settle the balance of its Hydrocarbon Recoupment as provided in Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*).  Unless otherwise provided in this Agreement, a Non-Participating Party has the right to make a revised Election to become a Participating Party under the following Articles:

(a)   Article 9.1.1 (*Conduct of Proprietary Geophysical Operations*);

(b)   Article 11.3 (*Election by Original Non-Participating Parties in Deepening or Sidetracking Appraisal Operations*);

(c)     Article 11.4 (*Deeper Drilling*);

(d)     Article 11.6.2 (*Election on Proposed Feasibility Study*);

(e)     Article 12.3 (*Project Team Election*);

(f)     Article 12.7 (*Approved Development Plan and Final Design AFE*);

(g)     Article 12.11 (*Major Modification to Development Plans*);

(h)     Article 13.3 (*Election by Original Non-Participating Parties in Deepening or Sidetracking Operations*);

(i)     Article 13.4 (*Deeper Drilling*); and

(j)     Article 16.7 (*Operations from a Non-Consent Subsequent Production System*).

16.9.1  Settlement of Underinvestments:  Except as provided in Article 16.9.2 (*Cash Settlement of Underinvestment*), upon making a revised Participation Election, a Non-Participating Party shall settle any underinvestment for its share of the Costs in a Non-Consent Operation by either:

(a)     making a Disproportionate Spending Settlement by bearing one hundred percent (100%) of the overinvested Parties' share of the Costs (or if there are two or more underinvested Parties, a proportion of such Costs based upon each Party's underinvestment) of all future activities or operations or AFE (and/or future Costs of such Non-Consent Operations if Costs are still being incurred) in which one or more of the overinvested Parties participate until the underinvestment is eliminated, (i.e. one hundred percent (100%) of the Non-Participating Party's share of the Costs of the original operation); or,

(b)     making an immediate cash settlement to the original Participating Parties in the full amount of the under-investment.

Unless otherwise provided in this Agreement, each original Participating Party shall individually select the manner of eliminating the underinvestment at their sole discretion.

16.9.2  Cash Settlement of Underinvestment:  If there are no further proposed or planned operations on the Contract Area for which Costs would be allocated toward the elimination of an under-investment, the underinvested Party shall pay any over-invested Party the remaining under-invested amount in cash.  If operations on the Contract Area, for which Costs are being paid by the underinvested Party and allocated to the underinvestment, do not eliminate the

underinvestment within two (2) years, or any other shorter period specified in this Agreement, from the date the underinvestment accrued, or upon final settlement of this Agreement, or the underinvested Party withdraws from this Agreement, whichever comes first, then the underinvested Party shall pay the overinvested Party the remaining underinvestment in cash.   Hydrocarbon Recoupment for Non-Consent Operations under Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-consent Operations)* shall not be considered an over/underinvestment.

# ARTICLE 17
# WITHDRAWAL FROM AGREEMENT

17.1   <u>Right of Withdrawal</u>:  Subject to the limitations specified in this Article, any Party (the "Withdrawing Party") may withdraw from this Agreement by giving prior written notice to all other Parties (the "Remaining Parties") stating its intention to withdraw from continued joint operations under this Agreement.  The withdrawal notice shall constitute an unconditional and irrevocable offer by the Withdrawing Party to convey to the Remaining Party(ies) the Withdrawing Party's entire Working Interest in all of the Leases, the Production System, the Hydrocarbon production and all other property and equipment within the Contract Area owned under the terms of this Agreement.  The withdrawal notice shall specify an effective date of withdrawal which date shall be at least **sixty (60) days but not more than one hundred eighty (180) days after the date of the withdrawal notice.**

17.2   <u>Response to Withdrawal</u>:  Within thirty (30) days of receipt of the notice of withdrawal, each of the Remaining Parties shall elect in writing either to join in the withdrawal or to remain a Party to this Agreement.  Failure to respond to a withdrawal notice shall be deemed an Election to remain a Party to this Agreement.

17.2.1   <u>Unanimous Withdrawal</u>:  If all the Parties agree to join in the withdrawal, no assignment of Working Interests shall take place and the Parties shall be deemed to have decided to abandon all joint operations within the Contract Area pursuant to Article 18 *(Abandonment and Salvage)* of this Agreement.

17.2.2   <u>Acceptance of Withdrawing Interests</u>:  If fewer than all Parties agree to join in the withdrawal, then within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection of acceptance of its Participating Interest share (or other share agreed to by the Remaining Parties) of the Withdrawing Party(ies)'s Working Interest(s). Failure to make the written rejection or acceptance shall be deemed acceptance of its Participating Interest share of the Withdrawing Party(ies)'s Working Interest(s).   The Withdrawing Party(ies) shall take all necessary steps to accomplish the withdrawal by the effective date and execute and deliver to

95

the Remaining Party(ies) all necessary instruments to assign its Working Interests to the Remaining Party(ies). All expenses associated with the withdrawal and the transfer of Working Interest shall be borne by the Withdrawing Party(ies). If the Remaining Parties are unable to select a successor Operator, if applicable, or the Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party(ies)'s Working Interest(s) within fifteen (15) days following the conclusion of the forty-eight (48) hour period to submit a written rejection, the Remaining Parties shall be deemed to have joined the withdrawal and Article 17.2.1 (*Unanimous Withdrawal*) will apply.

17.3    <u>Limitation Upon and Conditions of Withdrawal</u>:

    17.3.1    <u>Current Operations and Voting</u>:  Any Party withdrawing prior to completion of any operations (pursuant to an AFE) on the Contract Area in which it had previously made an Election to participate shall remain fully liable for its share of the AFE.  After giving its notification of withdrawal, the Withdrawing Party shall not be entitled to make an Election to participate or vote on any General Matter, other than General Matters for which the Withdrawing Party retains a financial responsibility.

    17.3.2    <u>Prior Expenses</u>:  The Withdrawing Party(ies) shall remain responsible for its Participating Interest share of any Costs of operations, rentals, royalties, taxes, damages or other liability or expense accruing or commencing prior to the effective date of the withdrawal.  Prior to the effective date of the withdrawal, the Operator shall render a final statement to the Withdrawing Party(ies) for its share of all identifiable expenses incurred prior to the notice of withdrawal, along with a statement of any deficiency in salvage value.  Prior to any withdrawal, a Withdrawing Party, at its sole expense, shall satisfy or provide security satisfactory to the remaining Party(ies) for all obligations and liabilities it has incurred or which are attributable to it prior to the effective date of the withdrawal. Furthermore, any liens, charges and other encumbrances which the Withdrawing Party(ies) placed (or caused to be placed) on its Working Interest prior to its withdrawal shall be fully satisfied or released prior to its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to such liens). Provided all such expenses (including any deficiency in abandonment Costs) have been paid, the notice of withdrawal and the assignments shall be effective upon the specified effective date.

    17.3.3    <u>Abandonment Costs</u>:  The Withdrawing Party(ies) shall pay to the Operator for the benefit of the Remaining Party(ies) the Withdrawing Party's pro rata Working Interest share of the estimated current Costs of plugging and abandoning all wells and removal of all Production Systems, Facilities and other material and equipment serving the Contract Area, less its pro rata share of the estimated salvage value of the assets at the time of abandonment.  Such Costs

and salvage value shall be prepared by the Operator according with Article IV of Exhibit "C" (*Accounting Procedure*) and approved as a General Matter.

17.3.4   <u>Confidentiality</u>:  A Withdrawing Party shall continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the withdrawal, but, as of the effective date of the withdrawal, shall have no further access to technical information relating to joint operations.  The Withdrawing Party shall not be required to return to the Remaining Party(ies) any Confidential Data acquired prior to the effective date of the withdrawal.  The Remaining Party(ies) shall have no obligation of confidentiality to the Withdrawing Party.

17.3.5   <u>Emergencies and Force Majeure</u>:  No Party shall be allowed to withdraw during a Force Majeure, or other emergency as described in Article 25.1 *(Force Majeure)*, but may withdraw from this Agreement after termination of such emergency.  The Withdrawing Party shall remain liable for its share of all Costs and liabilities arising from said emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the emergency.

# ARTICLE 18
## ABANDONMENT AND SALVAGE

18.1   <u>Abandonment of Wells</u>:  Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of production testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period specified in Article 8.3 *(Response Time for General Matters and Elections)* shall be deemed to have approved the permanent plugging and abandonment of the well.  If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties.   If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C", and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay the abandoning Participating Party a sum equal to the deficiency

18.2   <u>Facilities and Production System Salvage and Removal Costs</u>: When the Parties owning a Production System, Facility or Subsea Production System desire to dispose of such

equipment, such equipment disposal shall be unanimously approved. Upon unanimous approval, the Operator shall dispose of such equipment in the manner approved by the Participating Parties. The Costs, risks and net proceeds, if any, resulting from such disposition shall be shared by the Participating Parties in proportion to their Participating Interests in the equipment.

18.3 <u>Approval Not Required</u>: The Operator may, without prior approval of the Parties, dispose of any items of surplus or obsolete material and equipment if the current price of new materials or equipment similar thereto is less than One Hundred Thousand Dollars ($100,000.00).

18.4 <u>Abandonment Operations Required by Governmental Authority</u>: Any well abandonment or Platform/Production System removal required by a governmental authority shall be accomplished by Operator with the Costs, risks and net proceeds, if any, to be shared by the Parties owning such well, Platform or Production System in proportion to their Participating Interest.

## ARTICLE 19
## RENTALS, ROYALTIES AND MINIMUM ROYALTIES

19.1 <u>Overriding Royalties and Burdens on Production</u>: If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary working interest, net profits interest or other type of burden on Hydrocarbon production in addition to the lessor's royalty stipulated in the Lease(s) (an "Overriding Royalty"), the Party creating the Overriding Royalty shall assume and bear all obligations of the Overriding Royalty regardless of that Party's participation status notwithstanding that an assignment of all or a portion of that Party's Working Interest is made to another Party under this Agreement. The Party creating the Overriding Royalty shall indemnify and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Overriding Royalty. Any such agreements creating these interests shall contain provisions to effect this.

19.1.1 <u>Subsequent Creation of Overriding Royalty</u>: Notwithstanding anything herein to the contrary, if subsequent to the execution of this Agreement, any Party should create an Overriding Royalty, such subsequently created Overriding Royalty shall be made specifically subject to all the terms and provisions of this Agreement and shall be subordinate to the rights of the other Parties to this Agreement.

19.1.2 <u>Subordination of Overriding Royalties</u>: If the Party owning the Working Interest from which the Overriding Royalty is created: (a) fails to pay when due its share of Costs, or (b) withdraws from this Agreement, then the Overriding Royalty shall be chargeable with its pro rata portion of all Costs (equal to its fractional interest in gross production) and the security rights created in Article

6.3 *(Security Rights)* shall be applicable against such Overriding Royalty. The Operator shall have the right to enforce the security rights (and all other rights granted under this Agreement) against the owners of the Overriding Royalty for the purpose of collecting Costs chargeable to the Overriding Royalty.

19.2    <u>Payment of Rentals and Royalties</u>: The Operator shall make all rental payments on behalf of the Parties for the Contract Area. The Operator shall use reasonable care to make proper and timely payment of all rentals, minimum royalties or other similar payments accruing under the terms of the Leases which are included within the Contract Area. Upon receipt of proper evidence of all such payments and the Operator's invoice for its proportionate share of all such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of all such payments. In the event Operator fails to make proper payment of any rental or minimum royalty or similar payments accruing under the terms of the Lease(s) through mistake or oversight where such payment is required to continue a Lease in force, then Operator shall not be liable to the other Parties for any resulting damages or any loss which results from such nonpayment unless that non-payment is due to the gross negligence or intentional misconduct of the Operator.

19.2.1    <u>Non-Participation in Payments</u>: If any Party elects not to pay its share of any rental, minimum royalty or similar payment such Non-Participating Party shall notify the other Parties of its intention not to pay its share of such payment at least sixty (60) days prior to the date on which such payment is due. Upon this occurrence, the Operator shall make such payment solely for the benefit of all the Participating Parties. The Non-Participating Party shall assign to the Participating Parties all of its Working Interest in the Contract Area or portion thereof, maintained by such payment.

19.2.2    <u>Royalty Payments</u>: Each Party shall pay or cause to be paid all royalty and other amounts payable out of Hydrocarbon production taken from the Lease(s) for its account. During any time in which the Participating Parties in a Non-Consent Operation takes a Non-Participating Party's share of Hydrocarbon production, the Participating Parties shall bear the Lease royalty on such Hydrocarbon production. When necessary for calculating the recoupment of a Non-Consent Well, any Non-Operating Party receiving its share of Hydrocarbon production in kind shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for such Hydrocarbon production.

19.2.3    <u>Federal Offshore Oil Pollution Compensation Fund Fee</u>: Each Party agrees to pay and bear the Federal Offshore Oil Pollution Compensation Fund Fee payable on its share of Hydrocarbon production or any fees being required by section 302 of the Outer Continental Shelf Lands Act of 1978, the Oil Pollution Act of 1990 and any subsequent statutes and regulations promulgated pursuant

99

to those statutes.  However, should the oil owned by a Party be reported to the BOEM (or a successor regulatory agency) by another Party in its reporting form, the reporting Party shall pay the required fees on all volumes reported and the non-reporting Party shall reimburse the reporting Party for all fees paid on its behalf

# ARTICLE 20
## TAXES

20.1   <u>Internal Revenue Provision</u>: Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective or that the Agreement and the operations hereunder shall not constitute a partnership under state law, if, for federal income tax purposes, the Agreement and the operations hereunder are regarded as a partnership, each Party, hereby elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws.

20.2   <u>Other Taxes and Assessments</u>:  The Operator, on behalf of the Joint Account, shall file all tax returns and reports required by law and shall pay all applicable taxes, other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes),* or assessments levied with respect to operations conducted under this Agreement.  The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator.  The Operator shall charge each Party its Working Interest share of all taxes and assessments paid and, upon written request from a Non-Operating Party(ies), provide copies of all tax returns, reports, tax statements and receipts for such taxes.  The Operator shall not allow any taxes to become delinquent, unless such nonpayment is approved as a General Matter.

20.2.1   <u>Property Taxes</u>:  The Operator, on behalf of the Joint Account, shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party.  The Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable.  Pending such determination, the Operator may elect to pay under protest.  Upon final determination, the Operator shall pay the taxes and any interest, penalty or cost accrued as a result of such protest.  The Operator shall charge each Party its Working Interest share of such tax payments including interest, penalties and all reasonable Costs in accordance with Exhibit "C" *(Accounting Procedure).*

20.2.2   <u>Production and Severance Taxes</u>:  Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it received pursuant to the terms of this Agreement.  Any Party responsible for such tax payment shall upon written request from the Operator, provide evidence that such taxes have been paid.

## ARTICLE 21
## INSURANCE AND BONDS

21.1    <u>Insurance</u>:  The Parties shall maintain the insurance coverage specified in Exhibit "B".  No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

21.2    <u>Bonds</u>:  Operator shall obtain and maintain any and all bonds at the expense of the Joint Account required to be carried by any applicable law, regulation or rule.  Operator will require all contractors to obtain and maintain all bonds required to be carried by any applicable law, regulation or rule.

## ARTICLE 22
## LIABILITY, CLAIMS, LAWSUITS AND
## ALTERNATE DISPUTE RESOLUTION

22.1    <u>Individual Obligations</u>:  The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and, nothing contained herein shall ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose.  Each Party shall hold all the other Parties harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of its acts or omissions.

22.2    <u>Notice of Claim or Lawsuit</u>:  If a claim is made against any Party or if any Party is sued on account of any matter arising from operations hereunder, or on any matter affecting the Leases or Contract Area, or if any hearings are held pursuant to operations under this Agreement, such Party shall give written notice of the lawsuit or hearing to the other Parties as soon as reasonably practicable.

22.3    <u>Settlements</u>:  The Operator may settle any single damage claim or lawsuit involving operations hereunder if the expenditure does not exceed Two Hundred and Fifty Thousand Dollars ($250,000) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or suit pursuant to Article 22.4 *(Defense of Claims and Lawsuits)* below.

22.4    <u>Defense of Claims and Lawsuits</u>:  The Operator shall supervise the conduct of any claims and litigation.  Claims and suits may be settled in excess of the amount specified in Article 22.3 *(Settlements)* above only with the unanimous consent of all Participating Parties in the operation out of which the claim arose; however, any Party shall have the right to independently compromise or settle any claim or suit that is attributable to its interest alone as long as such compromise or settlement does not directly adversely affect

101

the interest or rights of the other Parties. No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the defense of claims and suits for the Parties, together with the amount paid for compromise, settlement or to discharge any final judgment, shall be considered Costs of operation and shall be paid by the Parties in proportion to their Participating Interest in the operation out of which the claim arose. Outside counsel shall be employed only with the approval of the affected Parties as a General Matter under Article 8.2 *(Voting Procedures on General Matters and Elections)*. If it is agreed that outside counsel is to be employed, the fees and expenses shall be charged to the Parties in proportion to their Participating Interest in the operation out of which such claim or suit arose in accordance with Exhibit "C" *(Accounting Procedure)*. Each Party shall also have the right to hire, at its own expense, its own outside counsel with respect to its own defense.

22.5   <u>Liability for Damages</u>:        To the extent allowed by law, liability for losses, damages, Costs, expenses, claims, liabilities and lawsuits arising from operations under this Agreement not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest in the operations out of which such liability arises, except when such liability results from the gross negligence or willful misconduct of a Party(ies), in which case such Party(ies) shall be solely liable for same. If a Party (the "Indemnified Party") is held liable to a third party as the result of another Party's (the "Indemnifying Party") gross negligence or willful misconduct (the "Indemnified Act"), then the Indemnifying Party shall indemnify, defend and hold harmless the Indemnified Party from and against those losses, damages, penalties, costs, expenses, legal fees, claims, or liabilities to the extent  (1) they are actually incurred by the Indemnified Party, and (2) they are attributable to such Indemnified Act.

22.6   <u>Limitation of Liability – Waiver of Consequential Damages</u>: NOTWITHSTANDING ARTICLE 22.5, EACH PARTY RELEASES AND WAIVES ALL CLAIMS AGAINST THE OTHER PARTY FOR THE RELEASING PARTY'S CONSEQUENTIAL OR INDIRECT DAMAGES, LOSS OF PROFITS,  LOSS OF PRODUCTION OR LOSS OF USE WHETHER BASED ON NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT (WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE) FAULT OR OTHER TORT, STATUTE OR OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY, AND TO THE EXTENT  PERMITTED BY LAW, ANY STATUTORY REMEDIES WHICH ARE INCONSISTENT WITH THE PROVISIONS OF THIS ARTICLE  ARE WAIVED.

22.7   <u>Indemnification for Non-Consent Operations</u>:   To the extent allowed by law, the Participating Parties agree to hold the Non-Participating Parties (and their Affiliates, agents, insurers, directors, officers and employees) harmless and to indemnify and protect them against all claims, demands, liabilities, regulatory decrees and liens for environmental pollution and property damage or personal injury, including sickness and death, caused by or otherwise arising out of Non-Consent Operations, and any loss and

cost suffered by any Non-Participating Party as an incident thereof, except where the gross negligence or willful misconduct of any Non-Participating Party contribute to that loss or cost.  Should any indemnity contained herein be determined to be in violation of law or public policy, the Parties agree that said indemnity(ies) shall then be enforceable only to the maximum extent allowed by law.

22.8    Indemnification for Prior Operations:  To the extent allowed by law, notwithstanding anything to the contrary in this Agreement, a Party shall not be liable to any other Party for any losses, damages, costs, expenses, claims, liabilities or lawsuits arising from operations which occurred prior to the execution of or joinder to this Agreement. Furthermore, the Parties who are responsible for such pre-execution or pre-joinder liability shall indemnify, defend and hold harmless the aforesaid non-responsible Parties. It is understood that the limitation herein provided does not apply to responsibility for existing wells and associated environmental liability, if any.

22.9    Damage to Reservoir, Loss of Reserves and Profits:  Notwithstanding anything to the contrary contained herein, no Party to this Agreement shall be liable to any other Party to this Agreement for loss of or damage to a reservoir(s), loss of Hydrocarbons, or for loss of profits or for other consequential or business interruption damages.

22.10   Non-Essential Personnel:  A Party hereto who is not the Operator and who requests transportation and/or access to a Production System, aircraft, vessel or any other Facility utilized for Lease operations for any employee, contractor, consultant or invitee of such party (hereinafter a "Boarding Party"), agrees to defend, protect and indemnify the other Parties hereto as to any cost, liability or judgment incurred as a result of a claim, demand, cause of action, suit or judgment brought or obtained by a Boarding Party and/or its successor, and assigns and relations arising out of said person's transportation and/or access to a Production System, aircraft, vessel or any Facility utilized for Lease operations regardless of the sole, concurrent, active or passive negligence or fault (including strict liability) of the indemnified parties or any third party, regardless of the unseaworthiness of any vessel or any unairworthiness of any aircraft.

22.11   Dispute Resolution Procedure:  The Parties agree that any claim, controversy or dispute arising out of, relating to or in connection with this Agreement, including the interpretation, validity, termination or breach thereof, shall be resolved solely in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.


# ARTICLE 23
# CONTRIBUTIONS


23.1    Contributions from Third Parties:  The Parties may seek to obtain support from third parties for joint operations through contributions of cash, acreage or data.  Any Party may propose to seek support for joint operations on the Contract Area through contributions

from third parties. Each Party shall notify all other Parties of any contribution offers received from third parties. Any proposal or offer from third parties shall be subject to the General Matter approval of the Parties prior to either accepting the offer or making such a proposal. Upon General Matter approval, the Operator, unless otherwise agreed, shall negotiate all contributions on behalf of the Parties (with prior consultation of the Parties and the prior agreement of the cash equivalent value for any non-cash consideration offered or received). Upon receiving a response from a third party to the Operator's proposal, the Operator shall notify all of the Parties of the proposal and its terms. Within thirty (30) days of receipt of the Operator's notice, the Party's shall vote as a General Matter on the proposal. If a proposal is approved as a General Matter, any Party shall have the right to decline participation in a contribution and be relieved of any obligations and benefits thereunder. The Participating Party(s) shall not be required to obtain the consent of the Non-Participating Party regarding any contribution or trade.

23.1.1   <u>Cash Contributions</u>:  In the event a cash contribution is accepted towards the drilling of a well, in which all Parties are Participating Parties, said cash contribution shall be turned over to the Operator, and the Operator shall credit the amount of the cash contribution against the Costs of the proposed joint operation in proportion to each Party's Participating Interest. In the event the Participating Parties accept a cash contribution toward the drilling of a well where fewer than all Parties are Participating Parties, the cash contribution shall be credited among the Participating Parties in such well to the extent that each Participating Party shall receive a portion of the contribution equal to its Participating Interest in the well. The cash contribution shall be deducted from the cost of drilling and completing the well prior to computation of the Recoupment Amount Participating Parties shall be entitled to receive out of Hydrocarbon production from the Non-Participating Parties in accordance with Article 16 *(Non-Consent Operations).*

23.1.2   <u>Acreage Contributions</u>:  Any contribution of acreage toward the drilling of a joint well shall be offered, without warranty of title, to the Participating Parties in proportion to their Participating Interests. If any acreage contribution involves one hundred percent (100%) of the interest in and to the acreage and all of the Parties to this Agreement participate in accepting their share of the assignment of the acreage, the contiguous acreage shall become a part of the Contract Area and subject to the terms of this Agreement and the non-contiguous acreage shall be deemed governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate. Any acreage contribution of less than one hundred percent (100%) interest in and to the acreage or of contiguous or non-contiguous acreage in which less than all Parties are Participating Parties shall, to the extent possible, be subject to the terms of an Operating Agreement substantially similar to this Agreement, and shall apply separately to the acreage acquired by the Participating Parties.

23.1.3 <u>Data Contributions</u>: Contributions of geoscience or engineering data offered by third parties in support of joint operations shall be handled pursuant to Article 7 *(Confidentiality of Data),* and may be accepted by the Participating Parties so long as the confidentiality of any data belonging to Non-Participating Parties is preserved. No data owned by a Non-Participating Party may be included in any data contribution without the consent of the Non-Participating Party.

23.2 <u>Restricted Bidding</u>: If at any time during the term of this Agreement, more than one of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the BOEM pursuant to 30 CFR 556.44, then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement. In the case of multiple restricted bidders being Parties to this Agreement, the provisions of this Agreement shall be amended to delete those provisions which would otherwise require a transfer of a leasehold interest prohibited by 30 CFR 556.44(c).

# ARTICLE 24
# AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFERENTIAL RIGHT TO PURCHASE

24.1 <u>Assignments and Transfers of Working Interests</u>: Subject to the provisions of this Article 24, all of the Parties to this Agreement agree to give prior written notice to the Operator and the other Parties of any proposed assignment, transfer or other disposition of all or a portion of a Party's Working Interest covered by this Agreement. Any assignment of a Working Interest covered by this Agreement' shall be made to a financially responsible assignee and shall be further subject to this Agreement and the following provisions:

24.2.1 <u>Exceptions to Prior Written Notice</u>: Notwithstanding any provision of this Agreement to the contrary, an assigning Party shall not be required to provide prior written notice with respect to any of the following:

(a) A Party seeking to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest in the Leases, any equipment or Facilities or each Party's share of Hydrocarbon production from the Contract Area. However, any encumbrance arising from the financing transaction shall be expressly subordinated to the rights of the other Parties to this Agreement, and the assigning Party shall ensure that any mortgage or encumbrance shall be without prejudice to the terms of this Agreement; or,

(b) A Party assigning all or an undivided part of its Working Interest to an Affiliate

24.2.2 <u>Effective Date of Assignments</u>: Except as otherwise provided in this Agreement, the effective date for any assignment shall be not more than *one*

*hundred eighty (180)* days after the date of the written notice.  No assignment, other than those allowed by Article 24.1.1 *(Exceptions to Prior Written Notice),* shall be binding upon the Parties unless and until (i) the assignor or assignee provide all remaining Parties with a photocopy of a fully executed assignment, and an executed BOEM Form 1123, Designation of Operator" and (ii) receipt of any necessary approval by the BOEM. The Parties shall promptly join in such reasonable actions as may be necessary to secure such approvals and shall execute and deliver any and all documents reasonably necessary to effect any such assignment.  Any costs attributable to such an assignment shall be the sole obligation of the assignor.

24.2.3   Minimum Transfer of Interest:   Unless unanimously agreed otherwise, no transfer (including partial transfers) to a third party shall be made that:

(a)      is less than an undivided 9.5637%  Working Interest as to all depths in the entire Contract Area; or

(b)      results in the conveying Party retaining less than an undivided 9.5637% Working Interest in the entire Contract Area.

If either conveyance is approved unanimously and if the Working Interesst if any Party is subsequently conveyed or distributed to other entities, so that the conveying Party of any one of the other entities receiving a conveyance from such Party subsequently owns a Working Interest of less than 9.5637% as a result of such conveyance

(i) such entities and, if applicable, the conveying Party, who as a result of such conveyance, each now owns a Working Interest less than 9.5637%, collectively shall be entitled to only a single joint representative at meeting of the Parties and shall Vote or act collectively on all proposals or Participation Elections, and

(ii) such Parties shall be entitled to only a single set of logs, samples, information and reports shall be considered as only one Party for all purposes under this Agreement."

24.2.4   Form of Assignments:   Any assignment of any interest in or subject to this Agreement shall incorporate provisions that the assignment is inferior to and made expressly subject to this Agreement and providing for the assumption by the assignee of the performance of all of assignor's obligations under this Agreement and providing that the assignor is not released from its obligations hereunder.   Any assignment not in compliance with this provision shall be voidable by the non-assigning Parties.

106

24.2.5   <u>Limited Warranty</u>:  Any assignment, vesting or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title; however, all encumbrances made by assignor or known by assignor shall be disclosed to assignee.

24.3   <u>Preferential Right to Purchase</u>:  Subject to the provisions of this Agreement, each Party shall have the right to freely transfer and alienate its Working Interest.  Any transfer of all or an undivided interest in the Party's Working Interest shall be subject to the following provisions:

24.3.1   <u>Notice of Proposed Transaction</u>: Should any Party (the "Assignor") desire to dispose of all or an undivided interest in its Working Interest in the Contract Area (whether offered as a single property disposition or as part of a multi-property disposition) through one of the below listed type transactions, or in any other manner not excluded under Article 24.3.3 (*Transactions Not Affected by the Preferential Right to Purchase*):

farmout(s)

cash sale(s); or,

non-simultaneous like-kind exchange(s)

and has received a bona fide offer (whether from a Party to this Agreement or from a third party) which the Assignor is willing to accept for the purchase or other acquisition of the Working Interest, each of the remaining Parties to this Agreement shall have a preferential right to purchase all or a Party's proportionate share of such Working Interest.  In such case, the Assignor shall promptly give prior written notice of the proposed transaction to the other Parties.  The notice of the proposed transaction shall provide full information concerning the transaction including at least:

the name and address of the prospective purchaser (who must be ready, able and willing to acquire the interest),

the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash and/or consideration received as a result of a transaction under Article 24.3.3 (*Transactions Not Affected by the Preferential Right to Purchase*),

the proposed effective date of the transaction, and

all other material terms of the offer.

107

24.3.2   <u>Exercise of Preferential Right to Purchase</u>:  For a period of thirty (30) days from receipt of the notice, the remaining Parties shall have the optional right to elect to acquire the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions.  The Election to exercise the preferential right shall be made by the exercising Party giving the Assignor written notice of its Election to purchase prior to the expiration of the thirty (30) day period.  If an Election to preferentially purchase is made, the Assignor shall be required to transfer the Working Interest to the Party at the price and on the terms specified in the notice.  The transaction shall be concluded within a reasonable time, but no later than sixty (60) days after receipt of the Election to preferentially purchase (plus a reasonable time to secure all necessary governmental approvals).  If more than one Party elects to acquire the Working Interest offered, then each Party shall acquire a proportion of the Working Interest offered equal to the ratio its own pre-acquisition Working Interest bears to the total pre-acquisition Working Interests of all acquiring Parties (unless the acquiring Parties agree upon a different ratio).  If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest share of the Working Interest offered and/or the non-assigning Parties who wish to exercise their preferential right to purchase do not agree to pay the full consideration and accept all of the terms of the offer within fifteen (15) days following the thirty (30) day period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party may be free to complete the proposed conveyance on the terms disclosed in the notice.  If only one Party elects to acquire the Working Interest offered, it may require the assignor to transfer all of the Working Interest offered, but may not require the transfer of less than all Working Interest offered.

24.3.3   <u>Transactions Not Affected by the Preferential Right to Purchase</u>:  This preferential right to purchase shall not exist or apply when a Party proposes to:

(a)   mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by such device), or

(b)   exchange all or an undivided interest in its Working Interest in the Contract Area for property identified outside the Contract Area at the time of the exchange, or

(c)   dispose of its Working Interest by:

merger, reorganization or consolidation;

a sale or other transfer of substantially all of a Party's exploration and production assets in the Gulf of Mexico; or

a sale or other transfer to an Affiliate.

24.3.4   <u>Completion of the Transaction</u>:   If none of the remaining Parties elect to exercise its preferential right to purchase the Working Interest offered, the Assignor shall be free to complete the proposed transaction on the terms disclosed in the notice. However, if any proposed transaction is not executed and filed of record with the BOEM within one hundred twenty (120) days from the expiration of the thirty (30) day preferential right Election period (plus a reasonable time to secure any necessary governmental approvals) or, if the terms of the proposed transaction are amended in any way, the proposed transaction shall be considered withdrawn and the Working Interest offered shall again be subject to the preferential right to purchase as if the originally proposed transaction had never been proposed.

# ARTICLE 25
# FORCE MAJEURE

25.1   <u>Force Majeure</u>:   If as a result of Force Majeure any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money) then the obligations of the Party giving such notice, so far as and to the extent that the obligations are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period.   For purposes of this Agreement, "Force Majeure" shall be inclusive of but not limited to the following events: flood, hurricane or other acts of God; a fire, blowout, oil spill or other environmental catastrophe; war, civil disturbance, labor dispute, strike, lockout, compliance with any law, order, rule or regulation, governmental action or delay in granting permits or permit approvals as needed; by inability to secure materials or rig including but not limited to delays:

(a)      in the availability of the rig or other equipment or materials,

(b)      due to necessary repairs or modifications to the rig or other equipment, or

(c)      caused by the completion of prior contractual commitments;

or by any other cause, whether similar or dissimilar, beyond the reasonable control of the said Party. The Party claiming Force Majeure shall notify the other Parties of the Force Majeure situation within a reasonable time (not to exceed thirty (30) days) after the occurrence of the facts relied on and shall keep all Parties informed of all significant developments.   The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy

the Force Majeure or to resume performance of its obligations under this Agreement. The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure situation, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

# ARTICLE 26
# ADMINISTRATIVE PROVISIONS

26.1   <u>Term of Agreement</u>: This Agreement shall become binding upon execution by all Parties with an effective date as set forth in the preamble to this Agreement. This Agreement shall remain in effect from the effective date and for so long as any of the Leases in the Contract Area shall remain in effect or until all assets and operations have been turned over to a single Working Interest owner. Termination of this Agreement shall not relieve any Party from any Costs or liability accrued or incurred prior to the termination of this Agreement, and the provisions of this Agreement shall continue in force for such additional time as necessary until:

(a)   all wells have been plugged and abandoned;

(b)   all property and equipment in the Contract Area belonging to the Parties are disposed of by the Operator and all claims or lawsuits have been settled or otherwise disposed of, and,

(c)   a final accounting and settlement has been made under this Agreement (including settlement of any gas imbalances pursuant to Exhibit "D").

The Operator shall have a reasonable period of time after the occurrence of an event of termination in which to conclude the administration of joint operations and to make a distribution of assets. During this period of time, the Operator shall continue to have and shall exercise all powers granted and meet all duties imposed by this Agreement until all provisions of this Agreement are fully executed. In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator effective after all conditions of this provision have been completed.

26.2   <u>Time Limits</u>: Time is of the essence in this Agreement and all time limits shall be strictly construed and enforced. The failure or delay of any Party in the enforcement of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Such Party may exercise its rights under this Agreement despite any delay or failure to enforce the rights when the right or obligation arose.

26.3   <u>Waiver of Right to Partition</u>: Each Party for itself and its successors and assigns waives the right to bring an action for partition of its interest in the Leases and lands or personal property held subject to this Agreement, and covenants that during the existence of this

Agreement it shall not resort at any time to any action at law or in equity to partition any or all of Leases and lands or personal property subject to this Agreement.

26.4   Compliance With Laws and Regulations: This Agreement, and all operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.  No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule or regulation.

26.4.1   Applicable Law: **THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO FEDERAL LAWS AND LAWS OF THE STATE OF LOUISIANA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.**

26.4.2   Severance of Invalid Provisions:  In case of a conflict between the provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations shall govern over the provisions of this Agreement.  If, for any reason and for so long as, any clause or provision of this Agreement is held by court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement shall not be affected by such illegality or invalidity.   Any such invalid provision shall be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated.  The surviving provisions of this Agreement shall remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void.  The Parties shall negotiate in good faith for any required modifications to this Agreement.

26.4.3   Fair and Equal Employment:  Each of the Parties is an Equal Opportunity Employer.  To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference.   If the Non-Discrimination in the OCS provisions of 30 CFR 270 apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference.  To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference.  In performing work under this Agreement, the Parties agree to comply with (and the Operator shall require

111

each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" attached hereto, pertaining to nonsegregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to nondiscrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

26.5    Construction and Interpretation of This Agreement:  The interpretation and construction of the terms of this Agreement will be governed by the following conventions:

26.5.1    Headings for Convenience:  Except for the definition headings contained in Article 2 *(Definitions),* all the table of contents, captions, numbering sequences and paragraph headings used in this Agreement are inserted for convenience only and shall in no way define, limit or describe the scope or intent of this Agreement or any part thereof, nor have any legal effect other than to aid a reasonable interpretation of this Agreement.

26.5.2    Gender and Number:  The use of pronouns in whatever gender or number shall be deemed to be a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof.  Any necessary grammatical changes required to make the provisions of this Agreement refer to the correct gender or number shall in all instances be assumed as though each case was fully expressed.

26.5.3    Independent Representation:  Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.  This Agreement, though drawn by one Party, shall be construed fairly and reasonably and not more strictly against one Party than another.

26.6    Integrated Agreement:  This Agreement and the Exhibits attached thereto contain the final and entire Agreement of the Parties with respect to the subject matter of this contract.  There are no representations, warranties or promises, oral or written between the Parties other than those included in this Agreement with the agreement by the Parties hereto that, upon execution of this Agreement by all Parties:

a.    This Agreement supersedes and replaces all previous negotiations, understandings or promises, whether written or oral, relative to the subject of this Agreement, and

b.    with respect to the Contract Area only, this Agreement supersedes and replaces the Joint Operating Agreement attached as Exhibit "C" to that certain Joint Venture Agreement dated effective November 1, 2005 by and between the Noble Energy and Samson covering, among other lands, the Contract Area (the "Noble Energy – Samson JVA") and referred to in Article 6.2 of that certain Bidding Agreement entered into effective November 1, 2005 by and between Noble Energy and Samson covering certain blocks available for lease at OCS Sale 198, as amended by that

certain Second Amendment to Joint Venture Agreement entered into effective March 20, 2007 by and between the Noble Energy and Samson covering, among other lands, the Contract Area; and

c. [….].

Each of the Parties acknowledges that, to such Party's knowledge, no other Party has made any promise, representation or warranty that is not expressly stated in this Agreement. This Agreement shall not be modified or changed except by a written amendment signed by all the Parties.

26.7 <u>Execution of Documents</u>:

26.7.1 <u>Binding Effect</u>: This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land and Leases comprising the Contract Area. This Agreement does not benefit or create any rights in any person or entity not a Party to this Agreement.

26.7.2 <u>Corporate Authority</u>: If any Party is a legal entity, including but not limited to, an association, corporation, joint venture, limited partnership, partnership or trust, such Party represents to the other Parties that the execution and delivery of this Agreement and the completion of transactions contemplated herein have been duly authorized by all necessary corporate proceedings or have received all necessary management approvals.

26.7.3 <u>Further Assurances</u>: Each Party further agrees to take any and all actions necessary and sign any and all documents necessary to implement the terms of this Agreement. Any necessary documents (e.g., a Designation of Operator, etc.) shall be prepared and executed by all Parties within thirty (30) days from the receipt of a written request for same from any Party.

26.7.4 <u>Multiple Counterparts</u>: This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in multiple counterparts, each counterpart shall be deemed an original and all of which when taken together shall constitute but one and the same Agreement with the same effect as if all Parties had signed the same instrument. This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement. A ratification shall have the same effect as an execution of the original Agreement.

**IN WITNESS WHEREOF**, each Party, through its duly authorized agent or representative, has executed this Agreement effective as of the date first above written.

**FIELDWOOD ENERGY LLC**

BY: _____

NAME: __John H. Smith_____

TITLE: __Senior Vice President – Business Development


**ECOPETROL AMERICA LLC**

BY: _____

NAME: _____

TITLE: _____


**TALOS ENERGY OFFSHORE LLC**

BY: _____

NAME: _____

TITLE: _____

# GC 40 Unit

# UNIT OPERATING AGREEMENT

## by and between

## Fieldwood Energy LLC

## and

## Ridgewood Katmai, LLC

## and

## ILX Prospect Katmai, LLC

## Outer Continental Shelf – Gulf of Mexico

Green Canyon Block 39 (NE/4NE/4 & N/2SE/4NE/4)-OCS-G 34966

Green Canyon Block 40 (SE/4SW/4NW/4, N/2SW/4NW/4, NW/4NW/4, E/2NW/4, E/2, E/2SW/4 & E/2W/2SW/4)-OCS-G 34536

All of Green Canyon Block 41-OCS-G 34537

Ewing Bank Block 1009 (SE/4SE/4)-OCS-G 34878

Ewing Bank Block 1010 (S/2)-OCS-G 34879

Ewing Bank Block 1011 (S/2)-OCS-G 34880

## Dated Effective  April 1, 2018

# Contents

**ARTICLE 1 – CONTRACT APPLICATION** ....................................................**0**
    **1.1    Application in General** ............................................................**0**
    **1.2    Application to the Unit Area** .................................................**0**

**ARTICLE 2 – DEFINITIONS** ....................................................................**1**
    **2.1    Additional Testing, Logging, or Sidewall Coring** .............**1**
    **2.2    Affiliate** ...................................................................................**1**
    **2.3    Agreement** ...............................................................................**1**
    **2.4    Annual Operating Plan** .........................................................**1**
    **2.5    Appraisal Operation** ..............................................................**1**
    **2.6    Appraisal Well** .......................................................................**2**
    **2.7    Authorization for Expenditure (AFE)** ...............................**2**
    **2.8    Claim** ........................................................................................**2**
    **2.9    Complete Recoupment** ...........................................................**2**
    **2.10   Complete, Completion, Completed, Completing** ................**2**
    **2.11   Confidential Data** ...................................................................**2**
    **2.12   Unit Area** .................................................................................**3**
    **2.13   Costs** .........................................................................................**3**
    **2.14   Deepen or Deepening** ............................................................**3**
    **2.15   Deeper Drilling** ......................................................................**3**
    **2.16   Deepest Producible Reservoir** ..............................................**3**
    **2.17   Define AFE** ..............................................................................**3**
    **2.18   Define Stage** ............................................................................**3**
    **2.19   Development Operation** .........................................................**3**
    **2.20   Development Phase** .................................................................**4**
    **2.21   Development Plan** ...................................................................**4**
    **2.22   Development System** ..............................................................**4**
    **2.23   Development Well** ...................................................................**4**
    **2.24   Disproportionate Spending** ...................................................**4**
    **2.25   DOI** ...........................................................................................**4**
    **2.26   Election, Elect, Elects, Elected, Electing** ...........................**4**
    **2.27   Enhanced Recovery Project Team AFE** ..............................**4**
    **2.28   Execution AFE** ........................................................................**5**
    **2.29   Execution Stage** ......................................................................**5**
    **2.30   Exploratory Operation** ..........................................................**5**
    **2.31   Exploratory Well** ....................................................................**5**
    **2.32   Export Pipelines** .....................................................................**5**
    **2.33   Facilities** ..................................................................................**5**
    **2.34   Feasibility AFE** .......................................................................**5**
    **2.35   Feasibility Stage** .....................................................................**6**
    **2.36   Feasibility Team** .....................................................................**6**
    **2.37   Force Majeure** ........................................................................**6**
    **2.38   Gross Negligence** ....................................................................**6**
    **2.39   HSE** ...........................................................................................**6**
    **2.40   Hydrocarbon Recoupment** ...................................................**6**
    **2.41   Hydrocarbons** .........................................................................**6**
    **2.42   Joint Account** ..........................................................................**7**

2.43   Lease ................................................................................................................ 7
2.44   News Release ................................................................................................... 7
2.45   Non-Consent Operation ................................................................................. 7
2.46   Non-Operating Party ..................................................................................... 7
2.47   Non-Participating Party ................................................................................. 7
2.48   Non-Participating Interest Share ................................................................... 7
2.49   Objective Depth ............................................................................................. 7
2.50   OCS ................................................................................................................ 8
2.51   Offsite Host Facilities .................................................................................... 8
2.52   Operator ......................................................................................................... 8
2.53   Overinvested Party ........................................................................................ 8
2.54   Package Sale .................................................................................................. 8
2.55   Participating Interest Share, Participating Interest ....................................... 8
2.56   Participating Party ......................................................................................... 9
2.57   Post-Production Project Team AFE ............................................................... 9
2.58   Producible Reservoir ..................................................................................... 9
2.59   Producible Well ............................................................................................. 9
2.60   Production System ......................................................................................... 9
2.61   Production Testing ....................................................................................... 10
2.62   Project Team ................................................................................................ 10
2.63   Receipt ......................................................................................................... 10
2.64   Recompletion ............................................................................................... 11
2.65   Selection AFE .............................................................................................. 11
2.66   Selection Stage ............................................................................................ 11
2.67   Sidetrack, Sidetracks, Sidetracked, Sidetracking ....................................... 11
2.68   Standby Charges ........................................................................................... 11
2.69   Transfer of Interest ...................................................................................... 11
2.70   Transfer Notice ............................................................................................ 12
2.71   Underinvested Party ..................................................................................... 12
2.72   Underinvestment .......................................................................................... 12
2.73   Vote .............................................................................................................. 12
2.74   Well Control and Containment Requirements ............................................. 12
        The requirements imposed by the Bureau of Ocean Energy Management, Regulation
        and Enforcement's Notice to Lessees and Operators of Federal Oil and Gas
        Leases, Outer Continental Shelf No. 2010-N10 (*Statement of Compliance with
        Applicable Regulations and Evaluation of Information Demonstrating Adequate
        Spill Response and Well Containment Resources*) as from time to time amended,
        and those requirements imposed by any similar laws, orders, rules, or regulations
        pertaining to well control and containment in the OCS. ............................... 12
2.75   Well Plan ...................................................................................................... 13
2.76   Willful Misconduct ...................................................................................... 13
2.77   Working Interest .......................................................................................... 13
2.78   Workover ...................................................................................................... 14

ARTICLE 3 – EXHIBITS ...................................................................................... 14
3.1    Exhibits ........................................................................................................ 14

ARTICLE 4 – SELECTION OF OPERATOR ...................................................... 15
4.1    Designation of the Operator ........................................................................ 15

| 4.2 | Substitute Operator | ............................................................................ | 15 |
| | 4.2.1 | Substitute Operator if Operator is a Non-Participating Party | ...................... 15 |
| | 4.2.2 | Substitute Operator if Operator Fails to Commence Operations | .................. 16 |
| | 4.2.3 | Circumstances Under Which the Operator Must Conduct a Non-Consent Operation | ...................................................................... 16 |
| | 4.2.4 | Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party | .................................................................. 17 |
| | 4.2.5 | Appointment of a Substitute Operator | ................................. 18 |
| | 4.2.6 | Redesignation of Operator | ...................................................... 18 |
| 4.3 | Resignation of Operator | ............................................................................ | 18 |
| 4.4 | Removal of Operator | ............................................................................ | 18 |
| | 4.4.1 | Removal Upon Assignment | .................................................... 19 |
| | 4.4.2 | Removal for Cause by Vote | .................................................. 19 |
| | 4.4.3 | Timing of Vote to Remove Operator | ................................... 20 |
| 4.5 | Selection of Successor Operator | .......................................................... | 20 |
| 4.6 | Effective Date of Resignation or Removal | ........................................ | 20 |
| 4.7 | Delivery of Property | ............................................................................ | 21 |

**ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR** ....................................... 21

| 5.1 | Exclusive Right to Operate | ............................................................... | 21 |
| 5.2 | Workmanlike Conduct | ...................................................................... | 22 |
| 5.3 | Operations | ........................................................................................ | 22 |
| 5.4 | Liens and Encumbrances | ................................................................. | 22 |
| 5.5 | Records | ............................................................................................ | 23 |
| 5.6 | Reports to Government Agencies | .................................................... | 23 |
| 5.7 | Information to Participating Parties | ............................................... | 23 |
| 5.8 | Completed Well Information | ........................................................... | 25 |
| 5.9 | Information to Non-Participating Parties | ....................................... | 26 |
| 5.10 | Health, Safety, and Environment: | .................................................. | 26 |

**ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN** .................. 26

| 6.1 | Basis of Charges to the Parties | ...................................................... | 26 |
| 6.2 | AFEs | ................................................................................................ | 27 |
| | 6.2.1 | AFE Overrun Notice | ............................................................ 28 |
| | 6.2.2 | Supplemental AFEs | .............................................................. 28 |
| | 6.2.3 | Further Operations During a Force Majeure | ...................... 30 |
| | 6.2.4 | Long Lead Well Operation AFEs | ........................................ 31 |
| | 6.2.5 | Unit Area Assessment and Permitting AFEs | ...................... 33 |
| 6.3 | Security Rights | ............................................................................... | 35 |
| 6.4 | Annual Operating Plan | .................................................................. | 35 |
| | 6.4.1 | Effect and Content of Annual Operating Plan | ................... 35 |
| | 6.4.2 | Submission of Draft Annual Operating Plan | ...................... 37 |
| | 6.4.3 | Review of Draft Annual Operating Plan | ............................ 37 |

**ARTICLE 7 – CONFIDENTIALITY OF DATA** ................................................... 37

| 7.1 | Confidentiality Obligation | ............................................................. | 37 |
| | 7.1.1 | Exceptions to Confidentiality | ............................................ 38 |
| | 7.1.2 | Permitted Disclosures | ......................................................... 38 |
| | 7.1.3 | Limited Releases to Offshore Scout Association | ............... 40 |

| | 7.1.4 | Continuing Confidentiality Obligation | 40 |
| 7.2 | **Ownership of Confidential Data** | | **40** |
| | 7.2.1 | Trades of Confidential Data | 40 |
| | 7.2.2 | Ownership of Non-Consent Data | 41 |
| 7.3 | **Access to the Lease and Rig** | | **41** |
| 7.4 | **Development of Proprietary Information and/or Technology** | | **41** |

**ARTICLE 8 – APPROVALS AND NOTICES** ....................................**42**

| 8.1 | **Classes of Matters** | | **42** |
| | 8.1.1 | Voting and Electing Interest | 42 |
| 8.2 | **Voting and Election Procedures** | | **42** |
| | 8.2.1 | Approval by Vote | 43 |
| | 8.2.2 | Approval by Election | 43 |
| 8.3 | **Second Opportunity to Participate** | | **43** |
| 8.4 | **Participation by Fewer Than All Parties** | | **44** |
| 8.5 | **Approval by Unanimous Agreement** | | **44** |
| 8.6 | **Response Time for Notices** | | **45** |
| | 8.6.1 | Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals | 45 |
| | 8.6.2 | Execution AFE | 46 |
| | 8.6.3 | Other AFE Related Operations | 46 |
| | 8.6.4 | Other Proposals | 46 |
| | 8.6.5 | Failure to Vote or Make an Election | 46 |
| | 8.6.6 | Suspensions of Operations and Suspensions of Production | 47 |
| | 8.6.7 | Standby Charges Associated with Immediate Substitute Wells, Subsequent Operations, and/or Supplemental AFE Proposals | 47 |
| 8.7 | **Giving and Receiving Notices and Responses** | | **48** |
| 8.8 | **Content of Notices** | | **48** |
| 8.9 | **Designation of Representatives** | | **49** |
| 8.10 | **Meetings** | | **50** |
| 8.11 | **Obligations of Participation Election** | | **50** |
| | 8.11.1 | Mobilization Charges | 50 |

**ARTICLE 9 – NEWS RELEASES** ...........................................................**50**

| 9.1 | **Proposal of News Releases** | | **50** |
| | 9.1.1 | Operator's News Release | 51 |
| | 9.1.2 | Non-Operating Party's News Release | 52 |
| 9.2 | **Emergency New Releases** | | **52** |
| 9.3 | **Mandatory News Releases** | | **52** |

**ARTICLE 10 – EXPLORATORY OPERATIONS** ..................................**53**

| 10.1 | **Proposal of Exploratory Wells** | | **53** |
| | 10.1.1 | Pre-Exploratory Well AFE Meeting | 53 |
| | 10.1.2 | Revision of Well Plan | 53 |
| | 10.1.3 | Automatic Revision of the Well Plan | 55 |
| | 10.1.4 | Timely Operations | 55 |
| | 10.1.5 | AFE Overruns and Substitute Well | 56 |
| 10.2 | **Exploratory Operations at Objective Depth** | | **57** |
| | 10.2.1 | Response to Operator's Proposal | 58 |

10.2.2    Response to Highest Priority Proposal ................................................ 59
10.2.3    Response on Next Highest Priority Proposal ........................................ 60
10.2.4    Non-Participating Parties in Exploratory Operations at Objective Depth ........ 60
10.2.5    Participation in a Sidetrack or Deepening by a Non-Participating Party in an
         Exploratory Well at Initial Objective Depth ........................................ 61
**10.3    Permanent Plugging and Abandonment and Cost Allocation ........................... 61**
**10.4    Conclusion of Exploratory Operations .............................................. 62**

**ARTICLE 11 – APPRAISAL OPERATIONS ...................................................... 63**
**11.1    Proposal of Appraisal Wells ...................................................... 63**
         11.1.1    Pre-Appraisal Well AFE Meeting ........................................... 63
         11.1.2    Revision of Well Plan ..................................................... 63
         11.1.3    Automatic Revision of the Well Plan ....................................... 63
         11.1.4    Timely Operations ......................................................... 64
         11.1.5    AFE Overruns and Substitute Well .......................................... 64
**11.2    Appraisal Operations at Objective Depth ........................................... 65**
         11.2.1    Response to Operator's Proposal ........................................... 67
         11.2.2    Response to Highest Priority Proposal ..................................... 68
         11.2.3    Response on Next Highest Priority Proposal ................................ 68
         11.2.4    Non-Participating Parties in Appraisal Operations at Objective Depth ........... 69
         11.2.5    Participation in a Sidetrack or Deepening by a Non-Participating Party in an
                   Appraisal Well at Objective Depth ....................................... 69
**11.3    Appraisal Well Proposals That Include Drilling Below the Deepest Producible
         Reservoir ......................................................................... 70**
**11.4    Permanent Plugging and Abandonment and Cost Allocation ........................... 70**
**11.5    Conclusion of Appraisal Operations ............................................... 71**
**11.6    Operations Before the Approval of the Development Plan ........................... 72**

**ARTICLE 12 – DEVELOPMENT PHASES ....................................................... 72**
**12.1    Phased Development ............................................................... 72**
**12.2    Feasibility Team Proposal ........................................................ 72**
         12.2.1    Feasibility AFE Approval .................................................. 74
         12.2.2    Feasibility Team and Feasibility Stage Conclusion ........................ 74
**12.3    Commencement of the Selection Stage .............................................. 74**
         12.3.1    Proposal of a Project Team ................................................ 74
         12.3.2    Selection AFE Approval .................................................... 76
**12.4    Proposal of a Development Plan ................................................... 76**
         12.4.1    Content of the Development Plan ........................................... 77
**12.5    Development Plan Approval ........................................................ 80**
         12.5.1    Unanimous Approval of a Development Plan .................................. 80
         12.5.2    Approval of a Development Plan by Vote .................................... 80
         12.5.3    Approval of a Development Plan if One is Not Approved by Vote ............. 81
         12.5.4    Approved Development Plan ................................................. 82
**12.6.1    Long Lead Development System AFEs ............................................. 82**
**12.7    Define Stage and Execution Stage ................................................. 84**
         12.7.1    Execution AFE ............................................................. 84
         12.7.2    Approval of an Execution AFE and Commencement of the Execution Stage . 84
         12.7.3    Minor Modifications to Development Plans ................................... 85
         12.7.4    Major Modifications to Development Plans ................................... 85

12.7.5    Major Modifications to Development Plans Prior to the Approval of the Execution AFE ........................................................................ 87

12.7.6    Major Modifications to Development Plans After the Approval of the Execution AFE ........................................................................ 87

12.7.7    Approval of Major Modifications ....................................... 88

12.7.8    Termination of a Development Plan ................................... 88

12.7.9    Timely Operations for Development Systems ................... 89

**12.8**    **Post-Production Project Team AFEs** ........................................... **89**

**12.9**    **Subsequent Development Phases** ............................................... **90**

12.9.1    Proposal of a Subsequent Development Phase ................. 90

12.9.2    Execution AFE in a Subsequent Development Phase ....... 90

**12.10**    **Access to Existing Facilities** ..................................................... **91**

**12.11**    **Enhanced Recovery and/or Pressure Maintenance Program Proposals** ............ **91**

**ARTICLE 13 – DEVELOPMENT OPERATIONS** ...................................... **92**

**13.1**    **Proposal of Development Wells and Development Operations** ................ **92**

13.1.1    Proposal of Development Wells Included in a Development Plan ........ 92

13.1.2    Proposal of Development Operations Not Included in a Development Plan .... 93

13.1.3    Pre-Development Well AFE Meeting ............................... 93

13.1.4    Timely Operations ............................................................ 93

13.1.5    AFE Overruns and Substitute Well ................................. 94

**13.2**    **Development Operations at Objective Depth** ............................... **95**

13.2.1    Response to Operator's Proposal ..................................... 96

13.2.2    Response to Highest Priority Proposal ............................ 97

13.2.3    Response on Next Highest Priority Proposal .................. 97

13.2.4    Non-Participating Parties in Development Operations at Objective Depth ...... 98

13.2.5    Participation in a Subsequent Development Operation by a Non-Participating Party in a Development Well at Objective Depth ............ 98

**13.3**    **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir** ...................................................... **99**

13.3.1    Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir ........................................ 99

13.3.2    Completion Attempts At or Above the Deepest Producible Reservoir ......... 100

**13.4**    **Recompletions and Workovers** ................................................. **101**

**13.5**    **Permanent Plugging and Abandonment and Cost Allocation** ............... **101**

**ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS** ..................... **102**

**14.1**    **Facilities as a Part of Development Plan** ................................... **102**

**14.2**    **Use of Offsite Host Facilities** ................................................... **103**

**14.3**    **Use of Development Systems** ................................................... **103**

**14.4**    **Processing Priorities** ................................................................. **103**

**14.5**    **Approval of Additional Facilities** ............................................. **104**

**14.6**    **Expansion or Modification of Existing Production System** ............. **105**

**14.7**    **Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons** ............... **105**

**14.8**    **Repairs of Production System or Facilities** .............................. **106**

**ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION** ............ **106**

**15.1**    **Duty to Take in Kind** ............................................................... **106**

| | | |
|---|---|---|
| **15.2** | **Facilities to Take in Kind**......................................................... | **106** |
| **15.3** | **Failure to Take Oil and/or Condensate in Kind**............................ | **106** |
| **15.4** | **Gas Balancing Provision** | |
| **15.5** | **Expenses of Delivery in Kind** ..................................................... | **107** |
| | | |
| **ARTICLE 16 – NON-CONSENT OPERATIONS** ...................................... | | **107** |
| **16.1** | **Conduct of Non-Consent Operations** ............................................ | **107** |
| | 16.1.1 Costs............................................................................. | 107 |
| | 16.1.2 Multiple Completions .................................................... | 108 |
| **16.2** | **NOTE: It is hereby agreed amongst the signatories of this Unit Operating Agreement that the Acreage Forfeiture Provisions for the First Exploratory Well and Substitute Wells(s) for the First Exploratory Well are not applicable to this Unit Agreement.** ......................... | **109** |
| ~~**Acreage Forfeiture Provisions**~~ ............................................................. | | **109** |
| | ~~16.2.1 First Exploratory Well & Substitute Well(s) for the First Exploratory Well~~.. | 109 |
| | 16.2.2 Execution AFE ............................................................. | 110 |
| **16.3** | **Costs and Liabilities of Prior Operations** ..................................... | **111** |
| **16.4** | **Non-Consent Operations to Maintain Unit Area** ............................. | **111** |
| | 16.4.1 Acreage Forfeiture in the Entire Unit Area...................... | 112 |
| | 16.4.2 Acreage Forfeiture in a Portion of a Unit Area................ | 112 |
| | 16.4.3 Limitations on Acreage Forfeiture ................................. | 113 |
| **16.5** | **Percentage Hydrocarbon Recoupment for Non-Consent Operations**..... | **114** |
| | ~~16.5.1 Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well~~........................... | 114 |
| | 16.5.2 Non-Consent Appraisal Operations ................................ | 115 |
| | 16.5.3 Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs ...................... | 115 |
| | 16.5.4 Non-Consent Development Operations ........................... | 115 |
| | 16.5.5 Non-Consent Subsequent Development System and Additional Facilities .... | 116 |
| | 16.5.6 Additional Hydrocarbon Recoupment ............................ | 116 |
| | 16.5.7 Hydrocarbon Recoupment From Production .................... | 116 |
| **16.6** | **Restoration of Interests to Non-Participating Party** ....................... | **118** |
| | 16.6.1 Dry Hole Reversion ..................................................... | 118 |
| | 16.6.2 Sidetracking or Deepening a Non-Consent Well .............. | 119 |
| **16.7** | **Operations From a Subsequent Non-Consent Development System** ........ | **119** |
| **16.8** | **Allocation of Development System Costs to Non-Consent Operations** ..... | **120** |
| | 16.8.1 Investment Charges...................................................... | 120 |
| | 16.8.2 Payments .................................................................... | 121 |
| | 16.8.3 Operating and Maintenance Charges .............................. | 121 |
| **16.9** | **Settlement of Underinvestments** ................................................... | **122** |
| | 16.9.1 Cash Settlement of Underinvestment.............................. | 123 |
| | | |
| **ARTICLE 17 – WITHDRAWAL FROM AGREEMENT** ............................ | | **123** |
| **17.1** | **Right to Withdraw** ...................................................................... | **123** |
| **17.2** | **Response to Withdrawal Notice** .................................................... | **124** |
| | 17.2.1 Unanimous Withdrawal ................................................ | 124 |
| | 17.2.2 No Additional Withdrawing Parties................................ | 124 |

17.2.3    Acceptance of the Withdrawing Parties' Interests ........................................ 125
17.2.4    Effects of Withdrawal ................................................................................ 125
**17.3    Limitation Upon and Conditions of Withdrawal ..................................... 125**
17.3.1    Prior Expenses .......................................................................................... 125
17.3.2    Confidentiality .......................................................................................... 126
17.3.3    Emergencies and Force Majeure ............................................................... 127

**ARTICLE 18 – ABANDONMENT AND SALVAGE ........................................... 127**
**18.1    Abandonment of Wells ............................................................................... 127**
**18.2    Abandonment of Equipment ...................................................................... 128**
**18.3    Disposal of Surplus Materiel .................................................................... 129**
**18.4    Abandonment Operations Required by Governmental Authority ........... 129**

**ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES ......... 129**
**19.1    Burdens on Hydrocarbon Production ....................................................... 129**
19.1.1    Subsequently Created Lease Burdens ........................................................ 130
**19.2    Payment of Rentals and Royalties ............................................................ 130**
19.2.1    Non-Participation in Payments ................................................................. 131
19.2.2    Royalty Payments ..................................................................................... 131

**ARTICLE 20 – TAXES ........................................................................................ 131**
**20.1    Internal Revenue Provision ...................................................................... 131**
**20.2    Other Taxes and Assessments .................................................................. 131**
20.2.1    Property Taxes .......................................................................................... 132
20.2.2    Production and Severance Taxes ............................................................... 132

**ARTICLE 21 – INSURANCE AND BONDS ....................................................... 132**
**21.1    Insurance ................................................................................................... 132**
**21.2    Bonds ......................................................................................................... 133**

**ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS .................................. 133**
**22.1    Individual Obligations .............................................................................. 133**
**22.2    Notice of Claim ......................................................................................... 133**
**22.3    Settlements ................................................................................................ 133**
**22.4    Defense of Claims ..................................................................................... 133**
**22.5    Liability for Damages ............................................................................... 134**
**22.6    Indemnification for Non-Consent Operations .......................................... 135**
**22.7    Damage to Reservoir and Loss of Reserves ............................................ 135**
**22.8    Non-Essential Personnel ........................................................................... 135**
**22.9    Dispute Resolution Procedure .................................................................. 136**

**ARTICLE 23 – CONTRIBUTIONS ..................................................................... 137**
**23.1    Contributions from Third Parties ............................................................. 137**
**23.2    Methods of Obtaining Contributions ........................................................ 137**
**23.3    Counteroffers ............................................................................................ 137**
**23.4    Approval of Contributions ........................................................................ 138**
**23.5    Cash Contributions ................................................................................... 138**
**23.6    Acreage Contributions .............................................................................. 138**

23.6.1 Two or More Parties Own One Hundred Percent of the Acreage Contribution ..................................................................................... 138

23.6.2 Two or More Parties Own Less Than One Hundred Percent of the Acreage Contribution ..................................................................................... 139

**ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE** .............................................................................................. **139**

**24.1    Transfer of Interest** ....................................................................... **139**
24.1.1 Exceptions to Transfer Notice ..................................................... 140
24.1.2 Effective Date of Transfer of Interest ......................................... 140
24.1.3 Maintenance of Uniform Interest and Minimum Transfer of Interest ........... 141
24.1.4 Form of Transfer of Interest ......................................................... 141
24.1.5 Warranty ....................................................................................... 141
**24.2    Preferential Right to Purchase** .................................................... **141**
24.2.1 Notice of Proposed Transfer of Interest ...................................... 141
24.2.2 Exercise of Preferential Right to Purchase ................................. 142
24.2.3 Transfer of Interest Not Affected by the Preferential Right to Purchase ........ 143
24.2.4 Completion of Transfer of Interest ............................................. 144

**ARTICLE 25 – FORCE MAJEURE** .......................................................... **144**

**25.1    Force Majeure** ................................................................................ **144**

**ARTICLE 26 – ADMINISTRATIVE PROVISIONS** ............................... **145**

**26.1    Term** ................................................................................................ **145**
**26.2    Waiver** ............................................................................................ **145**
**26.3    Waiver of Right to Partition** ....................................................... **145**
**26.4    Compliance With Laws and Regulations** .................................... **145**
26.4.1 Applicable Law ............................................................................ 146
26.4.2 Severance of Invalid Provisions .................................................. 146
26.4.3 Fair and Equal Employment ....................................................... 146
**26.5    Construction and Interpretation of this Agreement** ................ **147**
26.5.1 Headings for Convenience .......................................................... 147
26.5.2 Article References ......................................................................... 147
26.5.3 Gender and Number ..................................................................... 147
26.5.4 Joint Preparation ......................................................................... 147
26.5.5 Integrated Agreement .................................................................. 147
26.5.6 Binding Effect .............................................................................. 147
26.5.7 Further Assurances ...................................................................... 148
26.5.8 Counterpart Execution ................................................................ 148
26.5.9 Currency ....................................................................................... 148
26.5.10 Future References ........................................................................ 148
**26.6    Restricted Bidding** ....................................................................... **148**

**EXHIBIT "C"** ............................................................................................... **155**

**I. GENERAL PROVISIONS** ................................................................ **155**

**EXHIBIT "D"**........................................................................................................**171**

**EXHIBIT "E"**........................................................................................................**177**

**EXHIBIT "F"**........................................................................................................**178**

**EXHIBIT "G"**.......................................................................................................**184**

**EXHIBIT "H"**.......................................................................................................**193**

    **DISPUTE RESOLUTION PROCEDURE** .........................................................**193**

**EXHIBIT "I"**.........................................................................................................**195**

**EXHIBIT "J"** ........................................................................................................**207**

**EXHIBIT "K"**.......................................................................................................**209**

    **MEMORANDUM OF UNIT OPERATING AGREEMENT** ..............................**209**

# UNIT OPERATING AGREEMENT

# OUTER CONTINENTAL SHELF – GULF OF MEXICO

This Unit Operating Agreement (this "Agreement"), effective as of  April 1, 2018 (the "Effective Date"), is between Fieldwood Energy LLC. (referred to herein as "Fieldwood or Operator "),  Ridgewood Katmai, LLC ("Ridgewood", and ILX Prospect Katmai, LLC, ("ILX"), the signers of this Agreement. The companies named above, and their respective successors and assignees (if any), are referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS,** the Parties own the Lease(s) identified on Exhibit "A" (*Unit Area, Description of, the Lease(s), Working Interest of the Parties, Operator and Company Representatives and Notification Information*) located in the Unit Area*,* and desire to jointly explore, appraise, develop, and operate the Lease(s) lying within the Unit Area for the production of Hydrocarbons.

**NOW, THEREFORE,** in consideration of the premises and mutual promises in this Agreement, the Parties agree to explore, appraise, develop, and operate the Lease(s) in the Unit Area under the following provisions:

# ARTICLE 1 – CONTRACT APPLICATION

## 1.1  Application in General

This Agreement governs the rights and obligations of the Parties relating, without limitation, to the joint exploration, appraisal, development, and operation, of the Unit Area for the production of Hydrocarbons there from and the transportation of same by pipeline(s) or otherwise from the Unit Area.  As of the Effective Date, this Agreement supercedes and cancels all previously entered into operating agreements, insofar as these agreements affect any Lease, or portion(s), thereof contributing to the Unit Area.

## 1.2  Application to the Unit Area

This Agreement applies to the entire Unit Area described in Exhibit "A".  Unless otherwise provided in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Unit Area (encompassing the Unit Area), all joint property and all Hydrocarbons produced from the Unit Area shall be owned jointly by the Parties according to their respective Working Interest in the Unit Area.

## ARTICLE 2 – DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the following capitalized terms shall have the meaning ascribed to them below in this Article 2 *(Definitions)*:

**2.1** **Additional Testing, Logging, or Sidewall Coring**

Testing (excluding Production Testing), logging, or sidewall coring that is in addition to that approved by virtue of a previously approved well or subsequent operation.

**2.2** **Affiliate**

A corporation, company, limited liability company, partnership, or other legal entity that:

(a)   is owned or controlled by a Party,

(b)   is owned or controlled by another corporation, company, limited liability company, partnership, or other legal entity that is owned or controlled by a Party,

(c)   owns or controls a Party, or

(d)   is owned or controlled by a corporation, company, limited liability company, partnership, or other legal entity that owns or controls a Party.

For the purposes of this definition, ownership or control means (i) the ownership, directly or indirectly, of fifty percent (50%) or more of the shares, voting rights, or interest in a corporation, company, limited liability company, partnership, or other legal entity; or (ii) any entity managed and/or controlled by a Party whether by contract or otherwise.

**2.3** **Agreement**

This Unit Operating Agreement, together with its attached Exhibits, and any extension, renewal, or amendment agreed to in writing by the Parties.

**2.4** **Annual Operating Plan**

The operational plan and estimate of Costs for activities and operations, as described in Article 6.4 *(Annual Operating Plan)*.

**2.5** **Appraisal Operation**

Any operation within the Unit Area proposed and conducted under Article 11 *(Appraisal Operations)*.

**2.6**     **Appraisal Well**

A well proposed and drilled as an Appraisal Operation [including, but not limited to, a substitute well for an Appraisal Well abandoned under Article 11.1.5 *(AFE Overruns and Substitute Well)*].

**2.7**     **Authorization for Expenditure (AFE)**

An authorization for expenditure consisting of a written description and Cost estimate of a proposed activity or operation accompanying a proposal for that activity or operation.

**2.8**     **Claim**

Any claim, lawsuit, hearing (administrative or judicial) or other proceeding made against a Party or other person or entity on account of a matter involving activities or operations under this Agreement or affecting the Lease(s) or the Unit Area.

**2.9**     **Complete Recoupment**

The point in time when the Participating Parties have been reimbursed, through Hydrocarbon Recoupment, through Disproportionate Spending, or through a lump sum cash settlement, an amount equal to the Non-Participating Party's Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage provided in Article 16 (Non-Consent Operations).

**2.10**    **Complete, Completion, Completed, Completing**

An operation intended to complete a well for the production of Hydrocarbons in one or more geological horizons or zones, including, not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

**2.11**    **Confidential Data**

All proprietary geophysical, geological, geochemical, drilling, or engineering data acquired or derived from joint operations conducted within the Unit Area pursuant to this Agreement and all analyses, compilations, maps, models, interpretations, and other documents that reflect or incorporate that data.  The term also includes, but is not limited to:

(a)     the provisions of this Agreement, subject to Exhibit "I"; and

(b)     commercial, contractual, and financial information acquired or derived from activities or operations conducted under this Agreement;

however, the term does not include the fact that the Operator has let a contract for an activity or operation to be conducted under this Agreement.  The term excludes "Confidential Information" as that term is defined in Exhibit "G."

**2.12**   <u>**Unit Area**</u>

The OCS Lease(s), or portions thereof, listed on Exhibit "A."

**2.13**   <u>**Costs**</u>

The monetary amount of all expenditures (or indebtedness), including any fines or penalties (except to the extent such fines or penalties are attributable to a Party's Gross Negligence or Willful Misconduct), incurred by the Operator and the Participating Parties in the conduct of activities and operations, determined under this Agreement.

**2.14**   <u>**Deepen or Deepening**</u>

An operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the Objective Depth of any prior operation conducted in the well.

**2.15**   <u>**Deeper Drilling**</u>

The drilling of an Appraisal Well or Development Well below the Deepest Producible Reservoir in existence when the well is proposed.

**2.16**   <u>**Deepest Producible Reservoir**</u>

The deepest Producible Reservoir in existence when a drilling or Deeper Drilling proposal is made.

**2.17**   <u>**Define AFE**</u>

The AFE for the Define Stage.

**2.18**   <u>**Define Stage**</u>

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will (a) commence the implementation of a Development Plan, (b) complete enough of the detailed design of the Development System to enable contractors to formulate their bids on the components of the Development System, and (c) submit an Execution AFE to the Parties for their review and approval.

**2.19**   <u>**Development Operation**</u>

Any operation within the Unit Area other than an Exploratory Operation or an Appraisal Operation conducted pursuant to an approved Development Plan.

**2.20**   **Development Phase**

The proposals, activities, and operations associated with determining the feasibility of development and the design, fabrication or acquisition, and installation of a Development System within the Unit Area.

**2.21**   **Development Plan**

The plan for a Development Phase, and developing and producing Hydrocarbons from the Unit Area as described in Article 12 *(Development Phases)*.

**2.22**   **Development System**

A Production System and its associated Facilities.

**2.23**   **Development Well**

A well proposed and drilled as a Development Operation [including, but not limited to, a substitute well for a Development Well abandoned under Article 13.1.4 *(AFE Overruns and Substitute Well)*].

**2.24**   **Disproportionate Spending**

The payment of the Costs of an activity or operation by a Participating Party in excess of its Participating Interest Share of the Costs of that activity or operation in order to settle an Underinvestment previously incurred by that Participating Party.

**2.25**   **DOI**

The United States Department of Interior and the various agencies thereunder responsible for the department's management of energy resources on the Outer Continental Shelf, including (a) Bureau of Ocean Energy Management, (b) Bureau of Safety and Environmental Enforcement, and (c) Office of Natural Resources Revenue, and any predecessor or successor agencies thereto.

**2.26**   **Election, Elect, Elects, Elected, Electing**

A response or deemed response by a Party to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*, or the act by a Party of responding to a proposal requiring approval under Article 8.2.2 *(Approval by Election)*.

**2.27**   **Enhanced Recovery Project Team AFE**

The AFE that is to accompany a proposal for the formation of a Project Team whose sole scope of work is the design of an enhanced recovery and/or pressure maintenance program.

**2.28    Execution AFE**

A collection of AFEs, which, according to the submitting Party's estimates, will cover all of the Costs of the Execution Stage (which do not include the Costs of Development Wells), and which shall be deemed by the Parties to have been submitted as one AFE.

**2.29    Execution Stage**

The final stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will complete the implementation of the Development Plan, implement the Execution AFE, and commence the first production of Hydrocarbons for that particular Development Phase.

**2.30    Exploratory Operation**

Any operation within the Unit Area proposed and conducted under Article 10 *(Exploratory Operations)*.

**2.31    Exploratory Well**

A well proposed and drilled as an Exploratory Operation [including, but not limited to, a substitute well for an Exploratory Well abandoned under Article 10.1.5 *(AFE Overruns and Substitute Well)*].

**2.32    Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Development System is connected and which are used to transport Hydrocarbons or produced water to shore.

**2.33    Facilities**

Production equipment located downstream of the wellhead connections, which is installed on or outside the Unit Area in order to enhance, handle, or process Hydrocarbon production or transport Hydrocarbons to processing facilities.  Facilities include, but are not limited to, control umbilicals, disposal wells and their associated components, flowlines, and gathering lines or lateral lines and their associated components that are paid for by the Joint Account.  Facilities exclude (1) Production Systems, (2) Export Pipelines, (3) the equipment procured and utilized for an enhanced recovery and pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*, and (4) the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.34    Feasibility AFE**

The AFE for the Feasibility Stage.

**2.35** **Feasibility Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Feasibility Team, will attempt to find at least one scenario for the development of Hydrocarbons, which is technologically and economically feasible.

**2.36** **Feasibility Team**

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates that assists the Operator during the Feasibility Stage.

**2.37** **Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause, which includes, but is not limited to, a flood, storm, hurricane, loop current/eddy, or other act of God; a fire, loss of well control, oil spill, or other environmental catastrophe; a war, a civil disturbance, a terrorist act, a labor dispute, a strike, a lockout; an inability to immediately comply with a law, order, rule, or regulation; a governmental action or delay in granting necessary permits or permit approvals; the inability to secure materials or a rig; or the inability to anchor up a rig due to the presence of other rigs or vessels on or around the Unit Area.

**2.38** **Gross Negligence**

With respect to a Party, shall mean any act or failure to act by any person or entity which constitutes gross negligence as defined by applicable law.

**2.39** **HSE**

Health, safety, and environment.

**2.40** **Hydrocarbon Recoupment**

An amount to be recovered by the Participating Parties from all or part of the Non-Participating Interest Share of the proceeds from the sale of future Hydrocarbon production equal to the Non-Participating Interest Share of the Costs of the Non-Consent Operation multiplied by the applicable percentage in Article 16 *(Non-Consent Operations)*.

**2.41** **Hydrocarbons**

The oil, gas, and associated liquid and gaseous by-products (except helium) that may be produced from a well bore on the Unit Area.

**2.42    Joint Account**

The account maintained by the Operator under this Agreement, showing the charges paid and credits received in connection with the joint activities and joint operations conducted under this Agreement.

**2.43    Lease**

Each OCS federal oil and gas lease (or portion thereof) identified in Exhibit "A."

**2.44    News Release**

A press release or other public announcement or disclosure by a Party containing a reference, either directly or by implication, to this Agreement or the activities or operations herein contemplated, including, but not limited to, any public release via print media, broadcast news, internet, extranet, public networks or service providers, and discussions with journalists.

**2.45    Non-Consent Operation**

An activity or operation proposed and approved under this Agreement in which one or more Parties, having the contractual right to do so, Elect or Vote not to participate, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.46    Non-Operating Party**

A Party other than the Operator.

**2.47    Non-Participating Party**

A Party who, having the contractual right to do so, makes or is deemed to have made, an Election or Vote not to participate in sharing the Costs, risks, and benefits (including the rights to Hydrocarbons) of an activity or operation proposed and approved under this Agreement, except when an activity or operation is approved by Vote and the approval binds all Parties.

**2.48    Non-Participating Interest Share**

The percentage of participation in the Costs, risks, and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have had in a proposed activity or operation if all Parties had participated in that proposed activity or operation.

**2.49    Objective Depth**

For each well, the shallower of (a) the total footage to be drilled by that well (as measured in true vertical subsea depth), or (b) the penetration by the drill bit to the base of the deepest target formation or interval in that well, as that depth or target formation or interval is stated

in the AFE for the well, or (c) a shallower depth than either (a) or (b) above, if agreed to by all Parties.

**2.50    OCS**

The Outer Continental Shelf of the Gulf of Mexico.

**2.51    Offsite Host Facilities**

Production equipment that is (a) used to process or handle Hydrocarbon production and (b) owned by one or more third parties or by one or more Participating Parties in an Execution AFE (under which that production equipment is to be utilized for Hydrocarbon production), whose respective ownership interests in the production equipment are not exactly the same as their respective Participating Interest Shares in the Execution AFE.

**2.52    Operator**

The Party designated in Article 4.1 *(Designation of the Operator)*, a successor Operator selected under Article 4.5 *(Selection of Successor Operator)*, and, if applicable, a substitute Operator selected under Article 4.2 *(Substitute Operator)*.

**2.53    Overinvested Party**

A Party entitled to receive its Participating Interest Share of an Underinvestment.

**2.54    Package Sale**

Any Transfer of Interest that includes any non-cash asset(s) (including, but not limited to properties) situated outside of the Unit Area and not related to the activities or operations conducted under this Agreement.

**2.55    Participating Interest Share, Participating Interest**

A Participating Party's percentage of participation in:

(a)    the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b)    if applicable, interests to be assigned to the Parties.

A Participating Party's percentage of participation is either the proportion, expressed as a percentage, that the Participating Party's Working Interest bears to the total Working Interests of all Participating Parties, or such different basis for Cost sharing or assignment as the Participating Parties agree upon.

**2.56**   **Participating Party**

A Party who, having the contractual right to do so, participates in the sharing of:

(a)   the Costs, risks, and benefits (including rights to Hydrocarbons) of an approved activity or operation; or,

(b)   if applicable, the interests to be assigned to the Parties.

The term includes a Party who does not Vote to participate in a proposed activity or operation, but is nonetheless bound to participate in that proposed activity or operation if it is approved by Vote.

**2.57**   **Post-Production Project Team AFE**

An AFE submitted in association with the continuance of the Project Team under Article 12.8 *(Post-Production Project Team AFEs)*.

**2.58**   **Producible Reservoir**

An underground accumulation of Hydrocarbons (a) separate from and not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (b) into which a Producible Well has been drilled.

**2.59**   **Producible Well**

A well on the Unit Area that:

(a)   produces Hydrocarbons;

(b)   meets the "well producibility criteria" in Title 30 CFR 250.116 or any succeeding order or regulation issued by an appropriate governmental authority; or

(c)   the Participating Parties in the subject well unanimously agree is a Producible Well.

**2.60**   **Production System**

A system or combination of systems on or outside the Unit Area to develop, produce, store, distribute, and initiate the transportation of Hydrocarbons.  The term includes:

(a)   an offshore surface structure, whether fixed, compliant, or floating;

(b)   a subsea structure or template designed as a guide to or to provide structural rigidity to one or more wells;

(c)   any combination of the items mentioned in clauses (a) and (b);

(d)     any other type of structure designed to develop and produce Hydrocarbons; and

(e)     all associated components of the items mentioned above, including, but not limited to, a drilling rig, mooring lines, and anchor piles.

Production System excludes Facilities, mobile offshore drilling units, and the facilities referred to in Article 15.2 *(Facilities to Take in Kind)*.

**2.61    Production Testing**

Operations for the controlled flow of Hydrocarbons to the surface for the purpose of measuring flow rates or flowing pressures, or gaining other subsurface data.

**2.62    Project Team**

A group of employees, contractors, and/or consultants of the Participating Parties or their respective Affiliates, who assists the Operator in carrying out the scope of work for the Selection Stage, Define Stage, and Execution Stage and the scope of work under Articles 12.8 *(Post-Production Project Team AFEs)* and 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*.

**2.63    Receipt**

Receipt of a notice or a response to a notice shall mean the following, as applicable, for:

(a)     a written notice or response to a notice (excluding facsimiles and electronic mails), actual delivery of the notice to the Party's address; and

(b)     a facsimile transmission; actual delivery to the Party's facsimile number, and requires:

　　(i)     verbal or written confirmation of its successful delivery to such Party; or

　　(ii)     electronic confirmation of delivery to the  designated facsimile number.

(c)     an electronic mail, actual delivery to the Party's e-mail address, and requires verbal or written confirmation of its successful delivery to such Party;

All notices or responses to notices shall be directed to the Party's representatives as set forth on Exhibit "A."

**2.64**    **Recompletion**

A Development Operation in a single well bore in which a Completion in one Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir.  To "Recomplete" means to conduct a Recompletion.

**2.65**    **Selection AFE**

The AFE for the Selection Stage.

**2.66**    **Selection Stage**

The stage of a Development Phase during which the Operator, with the assistance of the Project Team, if applicable, will recommend to either:

(a)    install a Development System on the Unit Area, or

(b)    tie-back to, and utilize,

      (i)    a Development System resulting from a previous Development Phase or

      (ii)    a Development System and/or Facilities located outside the Unit Area

in order to produce Hydrocarbons.

**2.67**    **Sidetrack, Sidetracks, Sidetracked, Sidetracking**

An operation to directionally control or intentionally deviate a well to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of an operation previously conducted in the well, excluding the intentional deviation that is done to straighten the hole, drill around junk, or overcome other mechanical difficulties. To "Sidetrack" means to conduct a Sidetracking.

**2.68**    **Standby Charges**

The charges incurred under the applicable drilling and/or service contract in order to maintain a rig and/or any other support equipment (including, but not limited to, any vessels or helicopters) on standby and available to perform an operation in the Unit Area, while that operation is not able to be performed.

**2.69**    **Transfer of Interest**

Any sale, conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's undivided Working Interest and a Party's rights and obligations under this Agreement.

**2.70**   **Transfer Notice**

A written notice from the transferring Party to the non-transferring Parties informing the non-transferring Parties that the transferring Party entered into a binding agreement for a Transfer of Interest.  A Transfer Notice shall contain:

(i)     the transferee's name and address,

(ii)    the nature or type of transfer,

(iii)   the Working Interest being transferred, and

(iv)    the effective date of such transfer,

(v)     a copy of the executed binding agreement for the proposed Transfer of Interest, including exhibits, but excluding any provisions not relevant to the proposed Transfer of Interest,

(vi)    the cash consideration, if applicable, and

(vii)   identification of any non-cash consideration and its Equivalent Cash Value, as determined in accordance with Article 24.2.1 (*Notice of Proposed Transfer of Interest).

**2.71**   **Underinvested Party**

A Party with an Underinvestment.

**2.72**   **Underinvestment**

A monetary obligation incurred under this Agreement to be settled under Article 16.9 (*Settlement of Underinvestments).

**2.73**   **Vote**

As a noun, a response or deemed response by a Party to a proposal requiring approval under Article 8.2.1 (*Approval by Vote)*; as a verb, to respond to a proposal requiring approval under Article 8.2.1 (*Approval by Vote)*.

**2.74**   **Well Control and Containment Requirements**

The requirements imposed by the Bureau of Ocean Energy Management, Regulation and Enforcement's Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf No. 2010-N10 (*Statement of Compliance with Applicable Regulations and Evaluation of Information Demonstrating Adequate Spill Response and Well Containment Resources)* as from time to time amended, and those requirements imposed

by any similar laws, orders, rules, or regulations pertaining to well control and containment in the OCS.

**2.75    Well Plan**

A detailed written description accompanying a proposal to drill an Exploratory Well, Appraisal Well, or Development Well, or to conduct a Workover, Recompletion, well repair, or subsequent operation at Objective Depth, which must include, at a minimum but only to the extent applicable to the proposed operation:

(a)    the surface and target bottomhole locations of the operation;

(b)    the expected commencement date of the operation and the anticipated time necessary to conclude the operation;

(c)    the total vertical subsea depth to be drilled, along with the specified Objective Depth (and the target zones to be penetrated);

(d)    the proposed drilling and/or completion plan, inclusive of casing and/or liner sizes, anticipated days v. depth graph, estimated depth settings, pore pressure frac gradient curve, estimated mud weights, temperature profile, listing of wells used for pore pressure prediction and well trajectory and directional drilling details;

(e)    details of all coring, logging, and other evaluation operations to be conducted; and

(f)    information about the type of drilling rig to be used, including day rates, water depth rating, and any other rig related capabilities relevant to the proposed operation(s).

**2.76    Willful Misconduct**

With respect to a Party, shall mean any act or failure to act by any person or entity which constitutes willful misconduct as defined by applicable law.

**2.77    Working Interest**

The record title leasehold interest or, where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A").  If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A."

**2.78**  **Workover**

A Development Operation conducted in an existing well after the well has been completed in one or more Producible Reservoirs to restore, maintain, or improve production from one or more of those Producible Reservoirs.

**ARTICLE 3 – EXHIBITS**

**3.1**  **Exhibits**

All references in this Agreement to "Exhibits" without further qualification mean the Exhibits listed below and attached to this Agreement.  Each Exhibit is made a part of this Agreement and is incorporated into this Agreement by this reference.  If any provision of an Exhibit conflicts with any provision of the body of this Agreement, the provision of the body of this Agreement shall prevail, with the exception of Exhibits "C," "D," and "G" each provision of which shall prevail over any provision of the body of this Agreement, except as provided in Article 6.2.4 *(Long Lead Well Operation AFEs)*.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "G," the provision of Exhibit "G" shall prevail.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "D," the provision of Exhibit "C" shall prevail.

| | |
|---|---|
| **Exhibit "A"** | Unit Area, Description of the Lease(s), Working Interests of the Parties, Operator and Company Representatives, and Notification Information |
| **Exhibit "B"** | Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Non-Segregated Facilities |
| **Exhibit "F"** | Security Interest Provisions |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Well Data Trade and Confidentiality Agreement |
| **Exhibit "J"** | Health, Safety and Environment |
| **Exhibit "K"** | Memorandum of Unit Operating Agreement |

## ARTICLE 4 – SELECTION OF OPERATOR

**4.1** **Designation of the Operator**

Fieldwood Energy, LLC is designated as the Operator of the Unit Area.  The Parties shall promptly execute and file all documents required by the DOI in connection with the designation of Fieldwood Energy, LLC as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed otherwise by all the Parties, the Operator shall be classified as the designated applicant for oil spill financial responsibility purposes, and each Non-Operating Party shall promptly execute the appropriate documentation reflecting that classification and promptly provide that documentation to the Operator for filing with the DOI.

**4.2** **Substitute Operator**

**4.2.1** **Substitute Operator if Operator is a Non-Participating Party**

Except as otherwise provided in Article 4.2.3 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*, if the Operator is a Non-Participating Party in a Non-Consent Operation, the Participating Parties may approve by Vote the designation of any Participating Party as the substitute Operator.

The substitute Operator shall serve as the Operator only:

(a)  for the Non-Consent Operation (if the Non-Consent Operation is the drilling of a well, through the release of the drilling rig for that well),

(b)  of the Lease affected by the Non-Consent Operation, and

(c)  with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).

If a Non-Operating Party is the only Participating Party in a Non-Consent Operation, then the Non-Operating Party shall be designated as the substitute Operator for that Non-Consent Operation, with no Vote required, unless the Non-Operating Party elects not to accept the designation. A Non-Operating Party, who is a Participating Party, shall not be designated as a substitute Operator against its will. If a substitute Operator is not designated under the foregoing procedures, the Operator shall, upon the unanimous agreement of the Participating Parties and with the consent of the Operator, conduct the Non-

Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk under Article 16 *(Non-Consent Operations)*.

If the Participating Parties (i) do not approve by Vote a substitute Operator to conduct the Non-Consent Operation; or (ii) do not unanimously agree that the Operator shall conduct the Non-Consent Operation on behalf of the Participating Parties; or (iii) unanimously agree that the Operator shall conduct the Non-Consent Operation on behalf of the Participating Parties, however, the Operator does not consent; then the proposal of the Non-Consent Operation shall be deemed withdrawn, with the effect as if the proposal for the Non-Consent Operation had never been proposed and approved, except as otherwise provided in Article 4.2.3 *(Circumstances Under Which the Operator Must Conduct a Non-Consent Operation)*.

### 4.2.2    Substitute Operator if Operator Fails to Commence Operations

If the Operator fails to timely commence an Exploratory Operation in accordance with Article 10.1.4 *(Timely Operations),* an Appraisal Operation in accordance with Article 11.1.4 *(Timely Operations)* or a Development Operation in accordance with Article 13.1.3 *(Timely Operations)*, the non-operating Participating Parties may select a substitute Operator in the same manner as the selection of a successor Operator under Article 4.5 *(Selection of Successor Operator)*, and the substitute Operator shall serve as the Operator only:

(a)  for such operation and through the release of the rig if such operation is the drilling of a well,

(b)  of the Lease on which the operation is conducted, and

(c)  with the same authority, rights, obligations, and duties as the Operator,

subject to the limitations in (a) and (b).

### 4.2.3    Circumstances Under Which the Operator Must Conduct a Non-Consent Operation

If:

(a)  a rig is on location and the Operator becomes a Non-Participating Party:

(i)     in a supplemental AFE pursuant to the terms of Article 6.2.2 (*Supplemental AFEs*), or

(ii)    after reaching Objective Depth as provided in Article 10.2 (*Exploratory Operations at Objective Depth*), Article 11.2 (*Appraisal Operations at Objective Depth*), or Article 13.2 (*Development Operations at Objective Depth*), or

(b)     the Operator becomes a Non-Participating Party in an operation; however, the rig and/or other contracts for equipment and Facilities to be utilized on the Non-Consent Operation are non-assignable,

(c)     the Operator becomes a Non-Participating Party in an operation to be conducted on or from a Development System operated by the Operator,

the Operator, as a Non-Participating Party, shall conduct the Non-Consent Operation on behalf of the Participating Parties and at the Participating Parties' sole Cost and risk under Article 16 (*Non-Consent Operations*), subject to the Participating Parties' control, supervision and direction, and the other provisions of this Agreement, including, but not limited to, Articles 4.2.4 (*Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party*) and 5.2 (*Workmanlike Conduct*).

Notwithstanding the above, with respect to Operator's contracts for a drilling rig, equipment and other Facilities which could be utilized in a Non-Consent Operation by a substitute Operator, the Operator may, at its discretion, make reasonable attempts to cause such non-assignable rig and/or other contracts to be assignable to any substitute Operator under this Agreement as to such operation.

**4.2.4**     **Operator's Conduct of a Non-Consent Operation in Which it is a Non-Participating Party**

When, under Article 4.2.1 (*Substitute Operator if Operator is a Non-Participating Party*) or Article 4.2.3 (*Circumstances Under Which the Operator Must Conduct a Non-Consent Operation*), the Operator conducts a Non-Consent Operation in which it is a Non-Participating Party:

(a)     The Operator shall follow the practices and standards in Article 5 (*Rights and Duties of Operator*). The Operator shall not be required to proceed with the Non-Consent Operation until the Participating Parties have

advanced the Costs of the Non-Consent Operation to the Operator. The Operator shall never be obligated to expend any of its own funds for the Non-Consent Operation.

(b)     The limitations contained in Article 5.2 *(Workmanlike Conduct),* and the Participating Parties' indemnity to a Non-Participating Party as set forth in Article 22.6 (*Indemnification for Non-Consent Operations*) shall be applicable and extend to the Operator while acting on behalf of the Participating Parties.

### 4.2.5     Appointment of a Substitute Operator

After expiration of all applicable response periods for the Non-Consent Operation and selection of a substitute Operator, each Party shall promptly provide the substitute Operator with the appropriate DOI designation of operator forms and certification of oil spill financial responsibility forms.  The Operator and the substitute Operator shall coordinate the change of operatorship to avoid interfering with ongoing activities and operations, if any, including but not limited to, lease maintenance activities and operations.

### 4.2.6     Redesignation of Operator

Within fifteen (15) days after conclusion of the Non-Consent Operation, all Parties shall execute and provide the Operator with the appropriate DOI designation of operator forms and certification of oil spill financial responsibility forms to return operatorship to the Operator, thereby superseding the Parties' designation of the substitute Operator under Article 4.2.5 *(Appointment of a Substitute Operator).*

## 4.3     Resignation of Operator

Subject to Article 4.5 *(Selection of Successor Operator)*, the Operator may resign at any time by giving written notice to the Parties, except that the Operator may not resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If the Operator ceases to own a Working Interest, the Operator automatically shall be deemed to have resigned as the Operator without any action by the Non-Operating Parties.

## 4.4     Removal of Operator

The Operator may be removed under the following circumstances:

### 4.4.1   Removal Upon Assignment

If the Operator assigns part of its Working Interest (excluding an interest assigned to an Affiliate) and the assignment reduces the Operator's Working Interest to less than the Working Interest of a Non-Operating Party, whether accomplished by one or more assignments, then the removal of the Operator requires approval by Vote.

### 4.4.2   Removal for Cause by Vote

The Operator may be removed for cause if approved by Vote of the Parties after excluding the Vote of the Operator and the Vote of the Operator's Affiliates (if any) under the following circumstances:

(a)     the Operator is found liable by a final judicial decision or a final decision under binding arbitration for an act of Gross Negligence or Willful Misconduct regarding the Unit Area;

(b)     the Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after Receipt of written notice of the breach from a Non-Operating Party.  If the breach specified in the notice reasonably cannot be corrected within the thirty (30) day period, but the Operator within said period begins action to correct the breach and thereafter diligently carries the corrective action to completion, the Operator shall not be removed.  The Operator shall not be removed under this Article 4.4.2 if the Operator is able to prove the non-existence of the alleged breach within thirty (30) days after Receipt of written notice of the alleged breach;

(c)     the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of its creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(d)     a receiver is appointed for the Operator or for substantially all of its property or affairs;

(e)     the Operator fails to timely commence the fabrication or acquisition of the Development System in accordance with Article 12.7.9 *(Timely Operations for Development Systems)*; or

(f)     the Operator fails or is unable to meet the standards of operation contained in Articles 5.2 (*Workmanlike Conduct*), 5.3 (*Operations*), 5.4 (*Liens and Encumbrances*) and/or 5.6 (*Reports to Government Agencies*).

### 4.4.3     <u>Timing of Vote to Remove Operator</u>

A Vote to remove the Operator for cause as provided in this Article 4.4 shall be taken within ninety (90) days after the Non-Operating Party's actual knowledge of the cause.

## 4.5     <u>Selection of Successor Operator</u>

Upon the resignation or removal of the Operator, a successor Operator shall be approved by Vote, subject to this limitation on the Voting right of Operator:  if the resigned or removed Operator is not entitled to Vote, fails to Vote, or Votes only to succeed itself, then the successor Operator shall be approved by Vote after excluding the Vote of the resigned or removed Operator.  If the Operator assigns all or a part of its Working Interest, then under Article 4.3 *(Resignation of Operator)* or Article 4.4.1 *(Removal Upon Assignment)* the Party who acquired all or a part of the former Operator's Working Interest shall not be excluded from Voting for a successor Operator.  If there are only two Parties to this Agreement when the Operator resigns or is removed, then the Non-Operating Party automatically has the right, but not the obligation, to become the Operator.  If no Party is willing to become the Operator, this Agreement shall terminate under Article 26.1 *(Term)*.

## 4.6     <u>Effective Date of Resignation or Removal</u>

The resignation or removal of the Operator shall become effective as of 7:00 a.m. on the first day of the month following a period of ninety (90) days from, and inclusive of, the day of the Parties' Receipt of the applicable notice, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and certification for oil spill financial responsibility purposes by the DOI, in which case the resignation or removal of the Operator shall become effective at 7:00 a.m. on the day immediately following DOI approval. The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities of the outgoing Operator which accrued during its tenure.  The outgoing Operator and the successor Operator may charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship, except when the change of operatorship results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of the Operator.

**4.7     Delivery of Property**

On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement; all Hydrocarbons that are not the separate property of a Party; all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement; and all books, records, and inventories relating to the Joint Account (other than those books, records, and inventories maintained by the outgoing Operator as the owner of a Working Interest).  The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of the Operator that are assignable under the contracts.  The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the return of, and the accounting by the outgoing Operator of, the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C," and all Costs incurred in connection with such audit and inventory shall be charged to the Joint Account.

## ARTICLE 5 – RIGHTS AND DUTIES OF OPERATOR

**5.1     Exclusive Right to Operate**

Except as otherwise provided, the Operator has the exclusive right and duty to conduct (or cause to be conducted) all activities or operations under this Agreement.  In performing services under this Agreement for the Non-Operating Parties, the Operator is an independent contractor, not subject to the control or direction of Non-Operating Parties, except as provided in Article 4.2.3 (*Circumstances Under Which the Operator Must Conduct a Non-Consent Operation*), Article 8.2 *(Voting and Election Procedures)* or Article 8.5 *(Approval by Unanimous Agreement)*.  The Operator is not the agent or fiduciary of the Non-Operating Parties.  With the exception of any Feasibility Team or Project Team formed under this Agreement, the Operator shall select and determine the number of employees, Affiliates, contractors, and/or consultants used in conducting activities or operations under this Agreement and the hours of labor and the compensation for those employees, Affiliates, contractors, and/or consultants.  All of those employees, Affiliates, contractors, and/or consultants shall be the employees, Affiliates, contractors, and/or consultants of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies, and personnel reasonably necessary

for the Operator to conduct the activities or operations provided for in this Agreement; however, if a substitute Operator is designated to drill a well, the substitute Operator may utilize a rig, which it owns or has under contract, for the drilling of that well.

**5.2    Workmanlike Conduct**

The Operator shall timely commence and conduct all activities or operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances. All Costs, damages, losses or liabilities arising out of the activities and operations conducted pursuant to this Agreement shall be shared by the Participating Parties as provided in Article 22.5 (*Liability for Damages*) of this Agreement. The Operator shall never be required to conduct an activity or operation under this Agreement that it, as a reasonable and prudent operator in similar circumstances, believes would be unsafe or would endanger persons, property, or the environment.

**5.3    Operations**

The Operator may have operations conducted by qualified and responsible independent contractors who are not an Affiliate of the Operator and are employed under competitive contracts. A competitive contract is a contract (a) that was entered into within five (5) years before the commencement of the operations and (b) that contains terms, rates, and provisions that, when the contract was entered into, did not exceed those generally prevailing on the OCS for operations involving rigs of an equivalent type, operating in similar environments and water depths, equipped to the Operator's standard conditions, and capable of conducting required operations within the schedule in the well AFE. The Operator may employ its own or its Affiliate's equipment, personnel, rig, Workover rig, and snubbing unit in the conduct of those operations, either under Exhibit "C" or under a written agreement among the Participating Parties. If the Operator's or its Affiliate's equipment, personnel, rig, Workover rig, or snubbing unit is employed in conducting operations under this Agreement, the terms, conditions, and rates for that employment shall be consistent with those currently prevailing in competitive contracts for the deepwater OCS.

**5.4    Liens and Encumbrances**

The Operator shall endeavor to keep the Leases, Production Systems, Facilities, and other equipment purchased for the Joint Account under this Agreement and the Hydrocarbons free from liens and encumbrances (except those provided in Exhibit "F") that might arise by reason of the activities or operations conducted under this Agreement. If a lien is placed

on the Leases, Production Systems, Facilities, other equipment, or any Hydrocarbons, the Operator shall make reasonable efforts to remove the lien.

## 5.5  Records

The Operator shall keep accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C." Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party following reasonable notice during the Operator's normal office hours under Exhibit "C." The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate. The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party. This provision does not affect a Party's audit rights under this Agreement. This provision shall also apply to each Non-Operating Party's books, accounts, and records kept supporting its charges to a Project Team.

## 5.6  Reports to Government Agencies

The Operator shall make timely reports to all governmental authorities to whom it has a duty to make reports and shall furnish copies of the reports to the Participating Parties. As soon as reasonably practicable, the Operator shall provide each Non-Operating Party with a copy of each notice, order, and directive received from the DOI. As soon as reasonably practicable, each Party shall give written notice to the other Parties before each meeting with government authorities of which it has notice and that affect the Unit Area.

## 5.7  Information to Participating Parties

The Operator shall, as soon as reasonably practicable and to the extent that the information has then been obtained or received by the Operator, furnish each Participating Party the following information about well operations:

(a)    a complete copy of each approved permit to drill and all amendments thereto excluding any proprietary information. For purposes of this Article 5.7(a), "Proprietary information" shall mean information that is owned or controlled by a Party that is not in the public domain and has been developed, created or licenses for the specific and private use by a Party;

(b)    drilling and Workover reports, which shall include, but not be limited to, the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks,

mud logs, and Hydrocarbon information, casing and cementation tallies, BOP tests, and estimated cumulative Costs, to be sent by facsimile or electronic transmission within twelve (12) hours (exclusive of Saturdays, Sundays, and federal holidays) of well operations conducted in the preceding twenty-four (24) hour period; provided, however, the information and data set forth in this Article 5.7(b) shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information and data from that "real time system";

(c)     a complete report of all core data and analyses;

(d)     copies of logs and surveys as run, including all digitally recorded data;

(e)     copies of well test results, bottomhole pressure surveys, Hydrocarbon analyses, and other similar information, including PVT analyses;

(f)     copies of relevant well specific written correspondence, plans, permits, and reports made to regulatory agencies, including, but not limited to, relevant well specific containment plan and screening tools used for permitting the well, filings, casing and cementing design certifications from a professional engineer, lease suspensions of operations and/or suspensions of production and plans required under current and future applicable Notices to Lessees (NTL) and the Drilling Safety and Workplace Safety Rule announced by the DOI on September 30, 2010, and any rules derived therefrom;

(g)     forty-eight (48) hours advance notice of logging, coring, or testing operations (or, if conditions do not permit that much advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, and if sufficient quantities are available, samples of cutting and sidewall cores, marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)     copies of drilling prognoses;

(j)     if conventional cores are taken, a Participating Party may be allowed access to the rig to inspect and evaluate said cores;

(k)     samples of Hydrocarbons, if sufficient quantities are available, after performing routine tests;

(l)     well specific risk assessment (as per SEMS) with planned mitigations;

(m)     detailed drilling program which indicates a step by step process on how the well is going to be drilled, at a level equivalent to what the rig personnel are utilizing; and

(n)     real time drilling data, including but not limited to LWD, drilling and mudlog data.

Upon written request, the Operator shall use reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole cost and risk).   The Costs of gathering and furnishing the additional available information shall be charged to the Participating Party that requested it.

**5.8     Completed Well Information**

Operator shall, as soon as reasonably practicable, furnish to each Participating Party the following information pertaining to each Completed well; provided, however, the following information shall be provided in "real time" if it is available to the Operator in "real time" and a Participating Party has contractual rights to utilize the "real time" system that the Operator is utilizing and has agreed to pay any incremental expenses associated with its accessing that information from that "real time system":

(a)     monthly report of production and injection;

(b)     copies of routine reports made to regulatory agencies;

(c)     report on the status of wells not producing and not abandoned;

(d)     report on Hydrocarbons produced during Production Testing;

(e)     bottomhole pressure data and surface pressure data; and

(f)     composite of all logs run (for example, TDT, Carbon-Oxygen, Spinner Surveys, and Casing Collar).

**5.9      Information to Non-Participating Parties**

The Operator shall furnish to each Non-Participating Party:

(a)      as soon as reasonably practicable, copies of all non-confidential reports made to regulatory agencies, and

(b)      if applicable, after Complete Recoupment, the information specified in Articles 5.7 *(Information to Participating Parties)* and 5.8 *(Completed Well Information)*.

**5.10     Health, Safety, and Environment:**

With the goal of achieving safe and reliable activities and operations in compliance with all applicable laws and regulations, including avoiding significant and unintended impact on (i) the health or safety of people, (ii) property, or (iii) the environment, the Operator shall, with the support and cooperation of the Non-Operators, while it conducts activities or operations under this Agreement:

(a)      design and manage activities or operations to standards intended to achieve sustained reliability and promote the effective management of HSE risks;

(b)      apply structured HSE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage HSE risks and pursue sustained reliability of operations under this Agreement; and

(c)      comply with all laws, orders, rules and regulations of any federal, state, or local government authority having jurisdiction over the Unit Area.

In fulfilling its duties and obligations hereunder, the Operator shall act in accordance with the provisions of Exhibit "J."

## ARTICLE 6 – EXPENDITURES AND ANNUAL OPERATING PLAN

**6.1      Basis of Charges to the Parties**

Except as otherwise provided in this Agreement, the Operator shall pay all Costs of all activities and operations under this Agreement, and each Participating Party shall reimburse the Operator in proportion to its Participating Interest Share for the Costs of these activities and operations.  All charges, credits, and accounting for expenditures shall be made under Exhibit "C." Funds received by the Operator under this Agreement may be commingled with the Operator's own funds.

**6.2**     **AFEs**

The Operator shall not undertake an activity or operation whose Costs are five hundred thousand dollars ($500,000) or more, unless an AFE has been included in a proposal for an activity or operation and the proposal has been approved by Vote, Election, or unanimous agreement, whichever is applicable, or the Operator is exercising one of its discretionary powers under this Agreement.   An approved proposal grants the Operator authority to commit or expend funds on the approved proposal for the account of the Participating Parties.   For an activity or operation whose Costs are in excess of two hundred and fifty dollars ($250,000), but less than five hundred thousand dollars ($500,000), the Operator shall furnish the Participating Parties with an AFE for information purposes only. Notwithstanding the foregoing, in the event of an emergency, or if in the sole discretion of the Operator a perceived emergency exists that poses an imminent threat to life, safety, property, or the environment, the Operator may immediately make those expenditures for the Joint Account as, in its opinion as a reasonable and prudent operator, are necessary to deal with the emergency, but only to the extent necessary to stabilize the situation and alleviate the imminent threat.   The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency, the action taken, and the Costs incurred.

Notwithstanding anything in this Article 6.2 to the contrary, if less than all the Participating Parties in an operation elect to approve the supplemental AFE for such operation and if there is not an agreement among the Parties desiring to continue such operation to each bear their revised proportionate share of one hundred percent (100%) of the liability and Costs of the continued operation, the Operator shall, unless such Parties otherwise agreed to allocate such liability and Costs, terminate the operation.   If the Operator terminates the operation, each of the original Participating Parties shall be obligated to bear and pay their proportionate share of all the liabilities and Costs incurred by the Operator up to and including the termination of the operation, including, if applicable, all Costs associated with any plugging and abandonment of a well, whether or not such Costs exceed the currently approved AFE by greater than the permitted over-expenditure amount. Additionally, notwithstanding a Party's Election pursuant to Article 6.2.2 (*Supplemental AFEs for Cost Overruns for Wells*) to become a Non-Participating Party once the permitted over-expenditure has been exceeded, if at the conclusion of such drilling operation the well is plugged and abandoned, each Participating Party in the original drilling operation shall continue to be obligated to pay for its respective share of all Costs of plugging and abandoning the well (except for any increased plugging and abandonment Costs associated with any subsequent well operations conducted as a Non-Consent Operation).

### 6.2.1    **AFE Overrun Notice**

For informational purposes only, the Operator shall provide an AFE overrun notice to all the Participating Parties if it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with an original AFE will exceed the estimated total expenditures in that original AFE by more than ten percent (10%), but will not require the submission of a supplemental AFE under Article 6.2.2 (*Supplemental AFEs*).

### 6.2.2    **Supplemental AFEs**

Except as provided in Article 6.2.3 (*Further Operations During a Force Majeure*), if it appears (based upon the Operator's reasonable estimate) that the actual Costs associated with an original AFE or the latest approved supplemental AFE will exceed the relevant permitted over-expenditure set forth below, the Operator shall promptly submit a supplemental AFE to the Participating Parties. A supplemental AFE shall include the dollar amount of the permitted over-expenditure from the previously approved AFE as part of the dollar amount of that supplemental AFE.  After Receipt of a supplemental AFE each Participating Party has the right to make an Election, in accordance with Article 8 (*Approvals and Notices),* as to its further participation in the approved activity or operation. If a proposed supplemental AFE is approved by Election, the Operator shall continue to conduct the approved activity or operation associated with the supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE.   Any Participating Party making an Election not to participate in an approved supplemental AFE becomes a Non-Participating Party in the activity or operation associated with the original AFE once the actual Costs expended on the activity or operation exceed the permitted over-expenditure amount of the last AFE in which the Non-Participating Party Elected to participate, without regard to whether all the activities or operations in the original AFE have been conducted at the time of its Election not to participate. A Non-Participating Party in a supplemental AFE is subject to the Hydrocarbon Recoupment or Underinvestment provisions of Article 16 *(Non-Consent Operations)* for the:

  i.   Costs expended; and

  ii.   depths drilled in such well bore, if applicable,

after exceeding the permitted over-expenditure amount of the latest approved AFE (i.e., the original AFE or the latest supplemental AFE, if any, whichever is the latest), for that operation in which the Non-Participating Party elected to participate, unless the acreage forfeiture provisions of Article 16.4 (*Non-Consent Operations to Maintain Unit Area*) is applicable and Article 16.4.3 (*Limitations on Acreage Forfeiture*) is not applicable.

If a supplemental AFE is not approved by an Election or Vote, the Operator shall conclude the activity or operation as soon as practical, and each Participating Party will be responsible for its Participating Interest Share of the Costs of the activity or operation, including Costs in excess of the permitted over-expenditure amount.

### 6.2.2.1   Permitted Over-expenditures on Well Operations

The permitted over-expenditure for an Exploratory Operation, an Appraisal Operation, or a Development Operation is an amount equal to ten percent (10%) of the estimated Costs of the latest approved AFE for that operation, including the original AFE or a supplemental AFEs or ten million dollars ($10,000,000), whichever is less.

### 6.2.2.2   Permitted Over-expenditures on the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE

The permitted over-expenditure for the Feasibility AFE, a Post-Production Project Team AFE, or an Enhanced Recovery Project Team AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or five million dollars ($5,000,000), whichever is less.

### 6.2.2.3   Permitted Over-expenditures on a Selection AFE or Define AFE

The permitted over-expenditure for the Selection AFE or the Define AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or eight dollars ($8,000,000), whichever is less.

#### 6.2.2.4    <u>Permitted Over-expenditures on an Execution AFE</u>

The permitted over-expenditure for the Execution AFE is an amount equal to ten percent (10%) of the estimated total Costs of the latest approved AFE, including the original AFE or a supplemental AFEs or twenty million dollars ($20,000,000), whichever is less.

#### 6.2.2.5    <u>Permitted Over-expenditures on All Other AFEs</u>

The permitted over-expenditure for all other AFEs is an amount equal to ten percent (10%) of the estimated total Costs in the latest approved AFE, including the original AFE or a supplemental AFEs or three million dollars ($3,000,000), whichever is less.

### 6.2.3    <u>Further Operations During a Force Majeure</u>

No Party is permitted to make an Election not to participate in further activities or operations under Article 6.2.2 *(Supplemental AFEs)* during a Force Majeure or during an emergency that poses a threat to life, safety, property, or the environment, but may make an Election not to participate in further activities or operations that are to be conducted after the termination of the Force Majeure or emergency.  Notwithstanding any contrary provision of this Agreement, if Costs arising as a result of Force Majeure or emergency cause the amount of an original AFE and its approved supplemental AFEs to exceed their permitted over-expenditure in Article 6.2.2 *(Supplemental AFEs)*, no supplemental AFE will be required; however, once stabilization takes place and Force Majeure or emergency expenditures are no longer being incurred, the Operator shall submit to the Participating Parties a supplemental AFE for the activities or operations that are to be conducted after termination of the Force Majeure or emergency in order for them to make an Election under Article 6.2.2 *(Supplemental AFEs)* as to their participation in those activities or operations. Notwithstanding any contrary provision of this Agreement, the Participating Parties in the operation, which is affected by a Force Majeure event, shall be responsible for all Standby Charges, if any, accruing from when such event affects the operation until the earlier of the following:

(a) the Force Majeure event is remedied and the Operator is able to resume the operation; or

(b) the Participating Parties unanimously agree to terminate the operation.

Notwithstanding the foregoing, in the event the Operator has not received the necessary governmental approval(s) and/or permit(s) to commence an approved operation within fifteen (15) days after the last applicable Election or Vote approving the operation, then the Operator, at its sole discretion, may release the rig from location. In any event, however, and unless otherwise mutually agreed by the then Participating Parties, the Operator shall not keep the rig on location for more than thirty (30) days from the last applicable Election or Vote approving the operation while awaiting the necessary governmental approval(s) and/or permit(s). In the event the Operator releases the rig as provided for above, the Costs of plugging and abandoning (whether temporary or permanent) the well in its then current condition shall be borne by the Participating Parties in proportion to their Participating Interest in the last well operation.

### 6.2.4    Long Lead Well Operation AFEs

In addition to the Operator's right under Article 12.6 *(Long Lead Development System AFEs)* to submit Long Lead Development System AFEs for long lead-time items prior to the submission of the Execution AFE, the Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment, materials or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation   ("Long Lead Well Operation Items") (a "Long Lead Well Operation AFE").

#### 6.2.4.1    Proposal and Approval of a Long Lead Well Operation AFE

A Long Lead Well Operation AFE proposal shall include a description of the equipment, materials, or services to be purchased, an estimate of any cancellation fees, and the description and estimated timing for the well or well operation that will utilize such long lead equipment, materials, or services.  Each Long Lead Well Operation AFE proposal requires approval by Vote of the Parties.   If the Long Lead Well Operation AFE is not approved by Vote, then the Long Lead Well Operation AFE proposal shall be deemed withdrawn.

Approval of a Long Lead Well Operation AFE shall not be deemed an affirmative Vote or Election to participate in any subsequently proposed wells or well operations for which such long lead equipment, material or services are procured.

**6.2.4.2**     **Non-Participating Parties in the Long Lead Well Operation AFE**

A Party who Votes not to participate in an approved Long Lead Well Operation AFE shall become a Non-Participating Party as to the costs of the Long Lead Well Operation AFE, and is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)*. Each Non-Participating Party in a Long Lead Well Operation AFE retains the right to participate in a subsequently proposed well or well operation described in the Long Lead Well Operation AFE proposal, subject to its reimbursement to the Participating Parties in the Long Lead Well Operation AFE of an amount equal to that set forth in Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)*. If a Non-Participating Party in a Long Lead Well Operation AFE Elects or Votes not to participate in the subsequently proposed well or well operation described in the Long Lead Well Operation AFE proposal, Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFE, or Long Lead Well Operation AFEs)* shall not apply, but the Costs incurred pursuant to the Long Lead Well Operation AFE shall be included in the calculations of the applicable Hydrocarbon Recoupment or Underinvestment, whichever is applicable, in such well or well operation as set forth in Article 16 *(Non-Consent Operations)*. If the Long Lead Well Operation AFE benefits more than one well or well operation, the Cost will be allocated, as appropriate, to each well or well operation conducted.

**6.2.4.3**     **Non-Participating Parties in the Operations Associated with a Long Lead Well Operation AFE**

If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Well Operation Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Well Operation Items within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation.  The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.4.3 and in accordance with Exhibit "C."

**6.2.4.4**     **<u>Disposition of Items Associated with the Long Lead Well Operation AFE</u>**

Notwithstanding the provisions of Exhibit "C" and Article 3.1 (*Exhibits)*, the Participating Parties in an approved well or well operation for which Long Lead Well Operation Items were procured shall approve by Vote the disposition of those Long Lead Well Operation Items if they are not utilized for the approved well or well operation.  If the disposition is approved, the disposition will be binding on all Participating Parties in that well or well operation.  The disbursement of the proceeds realized from the disposition of those Long Lead Well Operation Items shall take place in accordance with Exhibit "C."

**6.2.5**     **<u>Unit Area Assessment and Permitting AFEs</u>**

Subject to Article 6.2 (*AFEs*), the Operator may submit an AFE (an "Assessment/Permitting AFE") to the Parties, which will allow the Operator to conduct operations, including, but not limited to, shallow hazard surveys, archeological surveys and shallow water flow assessments that are necessary or reasonable to:

(a)   assess the Unit Area for potential Exploration Operations, Appraisal Operations and/or Development Operations; and/or

(b) prepare Exploration Plans, Applications for Permit to Drill, Development Plans, Development Operation Coordination Documents, and other requisite government filings.

### 6.2.5.1 Proposal and Approval of a Assessment/Permitting AFE

An Assessment/Permitting AFE proposal shall include a description of the services to be performed and the description and estimated timing for the well or well operation that will utilize such services. Each Assessment/Permitting AFE proposal requires approval by Election of the Parties.   If the Assessment/Permitting AFE is not approved by Election, then the Assessment/Permitting AFE proposal shall be deemed withdrawn.

Approval of an Assessment/Permitting AFE shall not be deemed an affirmative Vote or Election to participate in any subsequently proposed wells or well operations for which such services are performed.

### 6.2.5.2 Non-Participating Parties in the Assessment/Permitting AFE

A Party who Elects not to participate in an approved Assessment/Permitting AFE shall become a Non-Participating Party as to the Costs of the Assessment/Permitting AFE, and is subject to same non-consent penalty under Article 16 (*Non-Consent Operations*), as if the Party Elected not to participate in underlying well or well operation. For example, if the Assessment/Permitting AFE relates to the first Exploratory Well drilled upon the Unit Area, the acreage forfeiture provisions of Article 16.2.1 (*First Exploratory Well*) would apply. With the exception of Assessment/Permitting AFEs relating to the first Exploratory Well and/or an operation required to maintain the Unit Area, each Non-Participating Party in an Assessment/Permitting AFE retains the right to participate in a subsequently proposed well or well operation described in the Assessment/Permitting AFE proposal, subject to its reimbursement to the Participating Parties in the Assessment/Permitting AFE of an amount equal to that set forth in the corresponding non-consent provision for such well or well operation. If a Non-Participating Party in an Assessment/Permitting AFE Elects or Votes not to participate

in the subsequently proposed, corresponding well or well operation described in the Assessment/Permitting AFE proposal, the Costs incurred pursuant to the Assessment/Permitting AFE shall be included in the calculations of the Hydrocarbon Recoupment or Underinvestment, if applicable, in such well or well operation as set forth in Article 16 (*Non-Consent Operations*). If the Assessment/Permitting AFE relates to more than one well or well operation, the Cost will be allocated, as appropriate, to each well or well operation conducted.

### 6.2.5.3 Non-Participating Parties in the Operations Associated with an Assessment/Permitting AFE

If a Party, who participated in an Assessment/Permitting AFE, does not participate in an approved well or well operation, for which services were performed under that AFE, the Operator, on behalf of the Participating Parties in such well or well operation, shall reimburse that Party its Participating Interest Share of the Costs of the same within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation. The Operator shall invoice the Participating Parties in that well or well operation for their proportionate share of the reimbursement under this Article 6.2.5.3 and in accordance with Exhibit "C."

## 6.3 Security Rights

Exhibit "F" (LOUISIANA) applies.

## 6.4 Annual Operating Plan

### 6.4.1 Effect and Content of Annual Operating Plan

The Annual Operating Plan is for informational and planning purposes and does not obligate any Party to any course of action or expenditures or constitute a Vote, Election, or unanimous agreement to participate in any specific activity or operation. To the extent known on the date of submission of the Annual Operating Plan, the Annual Operating Plan shall include the following items, without limitation:

### 6.4.1.1   Capital Budget

(a)   a list of proposed wells to be drilled including their anticipated order, drilling time, depths, surface and bottomhole locations, objective sands, type of well (Development, Appraisal), purpose of well (production, injection), and estimated Costs;

(b)   capital well operations listed by well, with their estimated Cost;

(c)   capital projects that have estimated gross Costs greater than two million dollars ($2,000,000). The term "capital project" includes addition of new equipment and expansion or upgrades of existing equipment; and

(d)   an estimated total amount (in aggregate) for capital projects.

### 6.4.1.2   Expense Budget

(a)   expense well operations listed by well, with their estimated Cost;

(b)   expense projects that have estimated gross Costs greater than two million dollars ($2,000,000). The term "expense project" includes repair, replacement, inspection, and maintenance of existing equipment;

(c)   an estimated total amount (in aggregate) for expense projects; and

(d)   estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses include the ongoing, everyday expenditures necessary to operate the field.

### 6.4.1.3   Operator Forecasts and Informational Items

(a)   production forecasts;

(b)   injection forecasts;

(c)   fuel gas forecasts;

      (d)     scheduled or planned downtime exceeding three (3) days;

      (e)     data collection programs;

      (f)     Facility constraint and ullage forecast;

      (g)     geochemical or geophysical survey(s) or special test(s) that might be contemplated; and

      (h)     other areas deemed of significance by the Operator.

**6.4.2**     **Submission of Draft Annual Operating Plan**

Beginning in the year in which a Development Plan is approved, and in each subsequent year, the Operator shall develop and submit to the Non-Operating Parties, by July 1, a draft Annual Operating Plan for the next calendar year.  The Annual Operating Plan process will be used (a) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities and operations, (b) to review ongoing activities and operations, and (c) for the remainder of the current year and the next succeeding calendar year, to forecast and plan activities and operations and to forecast anticipated Hydrocarbon production volumes, operating expenses, and capital expenditures.

**6.4.3**     **Review of Draft Annual Operating Plan**

The Non-Operating Parties may provide suggested changes, additions, or deletions to the Annual Operating Plan to the Operator and all other Parties in writing before September 1 of each year.  The Operator will then make changes that it deems necessary (if any) and submit the final Annual Operating Plan to the Non-Operating Parties no later than November 1 of each year, at which time the Annual Operating Plan is deemed adopted by all Parties.

## ARTICLE 7 – CONFIDENTIALITY OF DATA

**7.1**     **Confidentiality Obligation**

Confidential Data acquired or obtained by a Party shall be kept confidential during the term of this Agreement, and shall not be disclosed to a third party, unless it is disclosed under Article 7.1.1 *(Exceptions to Confidentiality)* or 7.1.2 *(Permitted Disclosures)*.  Each Party shall maintain the secrecy of the Confidential Data, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

### 7.1.1   Exceptions to Confidentiality

The confidentiality obligation shall not apply to Confidential Data that is:

(a)   now or later becomes part of the public domain (other than as a result of a wrongful act or omission by a Party);

(b)   now or later becomes available to a Party on a non-confidential basis from a source, other than a Party, that is legally permitted to disclose the item of Confidential Data;

(c)   known to a Party on a non-confidential basis before disclosure of the Confidential Data to it under this Agreement or to which that Party was otherwise entitled at the time of disclosure; or

(d)   independently developed by employees, Affiliates, contractors, and/or consultants of a Party who have not had access to the Confidential Data.

### 7.1.2   Permitted Disclosures

#### 7.1.2.1   Operator's Permitted Disclosures

The Operator may disclose items of Confidential Data to those third parties as may be necessary to conduct activities and operations under this Agreement, if the third parties are bound by written agreement to keep the Confidential Data secret for:

(a)   the period of time set forth in the Operator's service agreement with those third parties; or

(b)   two (2) years from commencement of services if a service agreement does not exist with those third parties.

Notwithstanding the foregoing, should the Operator disclose Confidential Data to an Affiliate, then the Operator shall require its Affiliate to handle, hold, and protect the Confidential Data as if it were a Party to this Agreement.

#### 7.1.2.2   All Parties' Permitted Disclosures

Subject to the restriction that a third party shall be bound by written agreement not to use or disclose the Confidential Data for a period of two (2) years from Receipt by such third party, except for the express

purpose for which the disclosure is made to such third party, all Parties may disclose, in whole or in part, the Confidential Data to the following receiving parties, who may remove the Confidential Data from the custody and premises of the Party making such disclosure:

(a)    to its Affiliate;

(b)    to a bona fide, financially responsible, prospective assignee of any portion of:

        i.   the Party's Working Interest; or

        ii.  a Non-Consenting Party's Working Interest,

        (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets on the OCS);

(c)    to potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of the Party and acting in a capacity where that disclosure is essential to the contractor's, consultant's, or outside legal counsel's work;

(d)    to an insurance broker or underwriter, bank or other financial institution to the extent appropriate to a Party arranging financing or insurance for its obligations under this Agreement;

(e)    to the extent required by a Lease, or by law, order, decree, regulation, or rule (including, without limitation, those of any regulatory agency, securities commission, stock exchange, judicial, or administrative proceeding). If a Party is required to disclose Confidential Data under this Article 7.1.2.2(e), the Party shall promptly provide all other Parties to this Agreement written notice of those proceedings so that the non-disclosing Parties may seek a protective order or other remedy. A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed;

(f)     to an entity allocating or desiring to transport, process, or purchase Hydrocarbons produced under this Agreement for the purpose of making Hydrocarbon reserve estimates or other technical evaluations or allocating Hydrocarbon products to source points;

(g)     to third parties for benchmarking studies and industry performance reviews; provided that the Confidential Data disclosed does not include competitive information or data and the studies blind the identities of the participants and the origin of the Confidential Data; and

(h)     to a contractor for the purpose of offsite storage of Confidential Data.

### 7.1.3     Limited Releases to Offshore Scout Association

The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well Completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

### 7.1.4     Continuing Confidentiality Obligation

A Party who ceases to own a Working Interest remains bound by the confidentiality and use obligations of this Agreement as to Confidential Data obtained through this Agreement under Article 7.1 *(Confidentiality Obligation)*.

## 7.2     Ownership of Confidential Data

Except as otherwise provided for in this Article 7, all Confidential Data produced as a result of an activity or operation conducted hereunder shall be the property of all Participating Parties in that activity or operation.  A Non-Participating Party has no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until Complete Recoupment has taken place.

### 7.2.1     Trades of Confidential Data

Any Participating Party may propose the exchange or trade of any Confidential Data or other similar data and information owned by a third party.  Upon approval of said exchange or trade by unanimous agreement of the Participating

Parties, that approval shall bind all Participating Parties, and the Operator shall utilize the Well Data Trade and Confidentiality Agreement in Exhibit "I" in order to consummate that exchange or trade with the third party. The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to that exchange or trade.

### 7.2.2   Ownership of Non-Consent Data

After Complete Recoupment has taken place and a Non-Participating Party has become a Participating Party in an activity or operation, that Non-Participating Party shall become an owner of the Confidential Data and information resulting from that activity or operation.   Within fifteen (15) days after Complete Recoupment, the Operator shall furnish that Confidential Data and information to the former Non-Participating Party.

### 7.3   Access to the Lease and Rig

Except as provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party may attend meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Execution AFE as well as access to the construction sites.   Except as otherwise provided in Article 6.3(b) *(Default)* in Exhibit "F," each Participating Party shall have access to all drilling rigs, Production Systems, and Facilities to observe and inspect operations and wells in which it participates (and the pertinent records and other data).   Access by the Participating Party to a drilling rig, Production System, or Facility serving a Unit Area shall be scheduled through the Operator at least forty-eight (48) hours in advance (or, if conditions do not permit that much advance scheduling, with as much advance scheduling as is reasonably possible).   Each Party's access will be at reasonable times and may not unreasonably interfere with operations at the site, and shall be subject to the provisions of Article 22.8.

### 7.4   Development of Proprietary Information and/or Technology

The ownership, use, treatment, and disclosure of proprietary information or technology, including, but not limited to, drilling technology, production technology, production systems and facilities, and their transportation and installation, pipelines, flowlines, and offshore oil and gas transportation that are charged to the Joint Account shall be handled under Exhibit "G."

## ARTICLE 8 – APPROVALS AND NOTICES

**8.1**     **Classes of Matters**

Action will be taken on a proposed activity or operation only after the procedures and approval requirements in this Agreement have been satisfied.   There are four general classes of activities or operations under this Agreement: (a) those requiring approval by Vote, (b) those requiring approval by Election, (c) those requiring approval by unanimous agreement, and (d) those within the discretion of the Operator.

### 8.1.1          **Voting and Electing Interest**

If all Parties are entitled to make an Election or Vote, each Party has an Electing interest or a Voting interest equal to its Working Interest or its Participating Interest Share, as applicable.  If a Party does not have a right to make an Election or Vote, each of the other Parties has an Electing interest or a Voting interest, as applicable, equal to its Working Interest or its Participating Interest Share, as applicable, divided by the total Working Interest or Participating Interest, as applicable, of those Parties who have a right to make an Election or Vote.

**8.2**     **Voting and Election Procedures**

The Parties shall Vote or make an Election on proposals requiring a Vote or Election in the order in which those proposals are submitted, except as specified in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth)*, and 13.2 *(Development Operations at Objective Depth)*.   Subject to Article 6.2 *(AFEs),* after Receipt of a notice properly given for an activity or operation requiring a Vote or Election, the Parties entitled to make that Vote or Election (a) may Vote or make an Election in accordance with this Article 8.2 *(Voting and Election Procedures)* and Article 8.7 *(Giving and Receiving Notices and Responses)* or (b) shall be deemed to have Voted or made an Election as provided in Article 8.6.5 (*Failure to Vote or Make an Election*).

A Vote or Election to participate in a proposal is evidenced by a Party making a written affirmative response to the proposal or by a Party's execution of the AFE associated with the proposal.  Except as otherwise provided in this Agreement, a Vote or Election not to participate in a proposal is evidenced by a Party's written negative response to the proposal, a Party's failure to make a timely written affirmative response to the proposal or to timely execute the AFE associated with the proposal, or a Party's failure to timely make a subsequent Vote or Election under Article 8.3 *(Second Opportunity to Participate).* For the purposes of this Agreement, a Party's approval of an AFE for a well proposal shall be

deemed an approval of the Well Plan associated therewith, including any automatic revisions to the Well Plan as set forth in Article 10.1.2 (*Revision of Well Plan*).

### 8.2.1   Approval by Vote

Approval by Vote shall be decided by a Vote of the Parties as follows:

(a)   when one (1) Party or two (2) Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of one (1) or more Parties with a Voting interest of greater than fifty percent (50%), or if the two (2) Parties entitled to Vote have the same Voting interest, the affirmative Vote of all Parties entitled to Vote; and

(b)   when more than two (2) Parties are entitled to Vote, approval by Vote shall require an affirmative Vote of two (2) or more Parties entitled to Vote with a combined Voting interest of greater than fifty percent (50%).

### 8.2.2   Approval by Election

Approval by Election shall be decided by an affirmative Election by one (1) or more Parties, entitled to make an Election, with a combined Electing interest of twenty-five percent (25%) or more.

## 8.3   Second Opportunity to Participate

Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by Vote or Election but is not approved by all of the Parties, a Party who Voted or Elected not to participate in the approved activity or operation may make a subsequent Vote or Election to participate in the approved activity or operation within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the original Voting or Election results from the Operator; provided, however, if a drilling rig is on location then the response time shall be within twenty-four (24) hours (exclusive of Saturdays, Sundays and federal holidays) after its Receipt of the original Voting or Election results.  If a Party does not exercise its right to make a subsequent Vote or Election to participate, it shall become a Non-Participating Party in the approved activity or operation. If (a) all the Parties entitled to do so make an original Vote or Election or a subsequent Vote or Election to participate in a proposed activity or operation or (b) an approval by Vote is binding on all Parties, then the Operator shall commence the activity or operation in accordance with the applicable timely operations provisions of this Agreement.

**8.4**     **Participation by Fewer Than All Parties**

If, after the period in which a Party may make a subsequent Vote or Election to participate, there is at least one Non-Participating Party in the approved activity or operation, each Party who made an original or a subsequent Vote or Election to participate in the approved activity or operation shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the subsequent Voting or Election results, or, if a rig is on location, within twenty-four (24) hours (exclusive of Saturdays, Sundays and federal holidays) of its Receipt of the subsequent Voting or Election results,

(a)     limit its participation in the approved activity or operation to its Working Interest share, or

(b)     agree to bear its Participating Interest Share of the approved activity or operation

by written correspondence to the Operator.  Failure to submit that written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or a subsequent Vote or Election to participate in the approved activity or operation, submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or a subsequent Vote or Election to participate in the approved activity or operation do not agree to bear all of the remaining Costs of the approved activity or operation within fifteen (15) days after the written correspondence period (or twenty-four (24) hours -exclusive of Saturdays, Sundays and federal holidays- if a rig is on location), the proposal of the approved activity or operation and all Votes and Elections in regard to the approved activity or operation shall be deemed withdrawn.  Once the Parties, who made an original or a subsequent Vote or Election to participate in an approved activity or operation in which there is a Non-Participating Party, agree to bear all of the Costs of the approved activity or operation, the Operator shall commence the activity or operation at the sole Cost and risk of the Participating Parties in accordance with the applicable timely operations provisions of this Agreement. Notwithstanding the foregoing, the election periods in Articles 10.2 *(Exploratory Operations at Objective Depth)*, 11.2 *(Appraisal Operations at Objective Depth),* and 13.2 *(Development Operations at Objective Depth)* shall govern in the event of a conflict.

**8.5**     **Approval by Unanimous Agreement**

After Receipt of a notice for a proposal that requires unanimous agreement, each Party entitled to approve (or disapprove) that activity or operation may indicate its approval or disapproval by providing a written statement in a response.  Unless otherwise specifically provided, failure of a Party to make such a response is deemed its disapproval.

**8.6**     **Response Time for Notices**

After Receipt of an AFE or notice under this Article 8, the Parties may:

(a) submit their Vote,

(b) make an Election,

(c) submit a written statement, or

(d) submit a counter-proposal,

whichever is applicable.  If requested in writing by a Party entitled to (a) submit their Vote, (b) make an Election, (c) submit a written statement, or (d) submit a counter-proposal, as applicable, on an AFE or notice , the Operator shall give prompt notice of the results of those Votes, Elections or written statements to each Party entitled to (a) submit their Vote, (b) make an Election, (c) submit a written statement, (d) submit a counter-proposal, as applicable.  Except as otherwise provided in this Agreement, the response times for each type of proposal shall be as follows:

**8.6.1**     **Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals**

When a well or well operation is proposed, each Party entitled to Vote or make an Election or submit a written statement, whichever is applicable, has, except as provided below, thirty (30) days after Receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays) to respond to it.  With the exception of proposals for new wells (other than a substitute well) proposed under Articles 10.1 (*Proposal of Exploratory Wells*), 11.1 (*Proposal of Appraisal Wells*), 13.1 (*Proposal of Development Wells*), if a drilling rig is on location when a well or well operation is proposed, then a Party entitled to Vote or make an Election or submit a written statement has forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)      Receipt of the proposal; or

(b)      the commencement of Standby Charges,

to respond to it. The response times for subsequent operations at Objective Depth are provided in Article 10.2 *(Exploratory Operations at Objective Depth)*,

Article 11.2 *(Appraisal Operations at Objective Depth)*, and Article 13.2 *(Development Operations at Objective Depth)*.

**8.6.2** **Execution AFE**

Each Party entitled to make an Election on an Execution AFE has one hundred and twenty (120) days after the date of its Receipt of the Execution AFE to make that Election.

**8.6.3** **Other AFE Related Operations**

Except as otherwise provided in Articles 8.6.1 *(Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals)* and 8.6.2 *(Execution AFE)*, the response time to a proposed AFE, activity, or operation will depend upon the gross AFE amount.  Response times will be as follows:

(a) AFE of five hundred thousand dollars ($500,000) or more but less than twenty-five million dollars ($25,000,000); response will be made within thirty (30) days after Receipt of said proposal;

(b) AFE of twenty-five million dollars ($25,000,000) or more but less than one hundred million dollars ($100,000,000); response will be made within ninety (90) days after Receipt of said proposal; and

(c) AFE of one hundred million dollars ($100,000,000) or more; response will be made within one hundred twenty (120) days after Receipt of said proposal.

**8.6.4** **Other Proposals**

For all other proposals requiring notice, and all supplemental AFEs other than those subject to Article 8.6.1 *(Well, Well Operations, or Supplemental AFEs for a Well or Well Operation Proposals)*, each Party has thirty (30) days after Receipt of the proposal to respond to it.

**8.6.5** **Failure to Vote or Make an Election**

Unless otherwise specifically provided, failure of a Party to Vote or make an Election, whichever is applicable, within the period required by this Agreement is deemed to be a Vote or Election not to participate.

### 8.6.6 Suspensions of Operations and Suspensions of Production

Notwithstanding any contrary provision in Article 8.6 (*Response Time for Notices*), if the DOI grants a Suspension of Production ("SOP"), a Suspension of Operations ("SOO"), or similar regulatory grant for all or part of the Unit Area, and if the SOP, SOO, or grant requires the commencement of an activity or operation before the expiration of the period for Voting, making an Election, or submitting a written statement, as provided in Article 8.5 (*Approval by Unanimous Agreement)* for that activity or operation, the Parties shall cast their Votes, make their Elections, or submit their written statement on the activity or operation at least sixty (60) days (inclusive of Saturdays, Sundays and federal holidays) before the commencement date required in the SOO, SOP, or grant.

### 8.6.7 Standby Charges Associated with Immediate Substitute Wells, Subsequent Operations, and/or Supplemental AFE Proposals

The Participating Parties in a well or well operation conducted immediately prior to the Receipt of a:

(a)   proposal for an immediate substitute well or a subsequent operation in a well, or

(b)     supplemental AFE,

are responsible for charges associated with the well or well operation that accrue before that Receipt.

All charges, which accrue after that Receipt, are the responsibility of the Participating Parties in the immediate substitute well, subsequent operation, or supplemental AFE.

If the proposal of:

(a) an immediate substitute well or subsequent operation, or

(b) a supplemental AFE

is not approved, the Participating Parties in the well or well operation conducted immediately prior to the Receipt of that proposal or supplemental AFE are responsible for the charges that accrue after that Receipt.

**8.7**     <u>**Giving and Receiving Notices and Responses**</u>

Except as otherwise provided in this Agreement, all notices and responses required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A." A notice shall be deemed delivered upon Receipt.

**8.8**     <u>**Content of Notices**</u>

A notice requiring a response shall indicate the appropriate response time specified in Article 8.6 *(Response Time for Notices)*.  A well proposal notice shall include the type of well being proposed, (for example, Exploratory Well, Appraisal Well, or Development Well), a Well Plan, and an AFE that includes the Costs of permanently plugging and abandoning the well.  If a proposed activity or operation is subject to Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*, the notice shall specify that the proposal is a Unit Area maintenance activity or operation.

Upon written request and if available, the Operator shall endeavor to provide the following documents to the Non-Operators; however, (i) such documents requested are not required for a valid Well Plan under Article 2.75 (*Well Plan*) and (ii) the Operator is under no obligation to provide such documents to a Party once such Party has elected not to participate in the Well Plan and AFE:

       (a) final detailed operational procedure document with associated well design technical documents, *e.g.* drilling fluids, BHA design;

       (b) wellhead bending load analysis (for DP mobile offshore drilling unit ["MODU"] only);

       (c) well control and spill containment document for deep water wells drilled in the OCS waters or other complex type wells, including the following information:

            i.      relief well planning and equipment availability;

            ii.      spill response and containment method;

            iii.      well control competency assurance process in place;

            iv.      blow out contingency plan; and

        v.     well control bridging document for contracted specific DP MODU with regard to drilling, completion, and or well testing or well flow back operations;

(d) QA/QC processes for acceptance of critical material or equipment:

        i.     detailed well completion design basis document, including:

- proposed detailed well completion schematics (lower and upper completion drawings with all completions equipment identified);

- Completion operational procedure document (upper and lower completion); and

- well control plan during upper completion (tubing string installation operations), and or well flow-back operations;

        ii.    in addition, for proposed well workover, recompletion, or sidetracking (if applicable):

- description of proposed work scope, including proposed outcome;

- diagram of proposed well after workover, recompletion, or sidetrack;

- detailed operational procedure, including plans for well bore cleanout procedure and fluid loss mitigation method;

- proposed well completion schematics (lower and upper completion drawings with all down hole completions equipment identified by name and dimensions); and

- well control plan during well intervention operations.

**8.9**    <u>**Designation of Representatives**</u>

The names, addresses, e-mail addresses and telephone and facsimile numbers of a designated representative and alternate for each Party to whom notices or responses shall be directed, are provided in Exhibit "A." The designated representative and the alternate may be changed by written notice to the other Parties.

**8.10**     **Meetings**

Any Party may call a meeting.  Except in an emergency, no meeting shall be called on less than five (5) days' advance notice (inclusive of Saturdays, Sundays, and federal holidays), and the notice shall include a proposed agenda.  The Operator shall be chairman of each meeting and take minutes of each meeting.  Only matters included in the agenda may be considered at a meeting unless unanimously agreed to by the Parties.

**8.11**     **Obligations of Participation Election**

Subject to Article 6.2 *(AFEs),* a Participating Party in an Exploratory Operation, an Appraisal Operation, or a Development Operation is responsible for its Participating Interest Share of:

(a) all necessary Costs for such operation as set forth in the approved proposal for such operation,

(b) plugging  and abandonment, if applicable;

(c) mobilization charges as set forth in Article 8.11.2; and

(d) well control and containment charges but excluding any Costs incurred by the Operator to acquire an ownership interest in such well control and containment company.

**8.11.1**     **Mobilization Charges**

A Participating Party in an Exploratory Operation, Appraisal Operation, or Development Operation is responsible for its Participating Interest Share of the reasonable allocated Costs to mobilize the rig approved in the Well Plan to location. However, the Operator shall only be entitled to charge Participating Parties for mobilizing such rig within the OCS. Unless otherwise unanimously agreed to by the Participating Parties, in no event shall the Participating Parties be obligated to pay for such rig's mobilization from or to a location outside the OCS.

**ARTICLE 9 – NEWS RELEASES**

**9.1**     **Proposal of News Releases**

Any Party may propose for the issuance of a News Release about the activities or operations covered by this Agreement by submitting the text of the News Release to the

Parties.  A News Release proposal requires the unanimous agreement of the Parties, except as otherwise provided below. The Parties shall respond to a News Release proposal within forty-eight (48) hours of their Receipt of it by agreeing or disagreeing with the text of the proposed News Release, or by submitting alternative text for the News Release.  If a Party submits alternative text for the News Release, the Parties shall have twenty-four (24) hours to agree or disagree with any of the proposed texts of the News Release.  If a Party fails to respond within the appropriate time frame, the Party shall be deemed to have not approved such proposed News Release.

### 9.1.1    <u>Operator's News Release</u>

If the Parties do not unanimously agree to any of the texts of a proposed News Release within the time period set forth in Article 9.1 *(Proposal of News Releases)*, the Operator has the exclusive right for twenty-four (24) hours, following the last response under Article 9.1 *(Proposal of News Releases)*, to submit a News Release on the subject matter of the original proposal to the Parties in accordance with this Article 9.1.1.  If the News Release pertains to a well or an operation in a well, the Operator must limit the content of the News Release to the following information:

(a)  the name of the well or operation and the water depth;

(b)  the location of the well by protraction area, block, and adjacent state;

(c)  the lease bonus paid and the lease acquisition date;

(d)  additional drilling / appraisal plans;

(e)  the participants in, and their Working Interest in, the well or operation; and

(f)  the surrounding acreage controlled by the participants.

If the News Release does not pertain to a well or an operation in a well, it may only contain information that is not Confidential Data or Confidential Information (as defined in Exhibit "G") and does not substantially undermine the Parties' competitive advantage in the area surrounding, or trend or play pertaining to, the Unit Area. The Operator shall transmit the News Release to the Non-Operating Parties not less than twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) before the time at which the Operator wishes to issue it.  Any Party may have its name excluded from the News

Release by notifying the Operator of that desire within twenty (20) hours of that Party's Receipt of the News Release.

### 9.1.2    <u>Non-Operating Party's News Release</u>

If the Operator issues the News Release within its twenty-four (24) hour period referred to in Article 9.1.1 *(Operator's News Release),* thereafter, any Participating Party may issue its own News Release subject to the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release).* If the Operator does not issue the News Release within its twenty-four (24) hour period referred to in Article 9.1.1 *(Operator's News Release),* thereafter, any Participating Party may issue its own News Release subject to the content guidelines and procedures provided in Article 9.1.1 *(Operator's News Release).*

### 9.2    <u>Emergency New Releases</u>

In an emergency involving extensive property damage, loss of human life, or other clear emergency and where there is insufficient time to obtain approval from the other Parties, the Operator may furnish factual information necessary to satisfy legitimate public interest or governmental authorities having jurisdiction.  The Operator shall immediately notify the Parties of the information furnished in response to the emergency.

### 9.3    <u>Mandatory News Releases</u>

Each Party has the right to issue a News Release which contains information not otherwise permitted under Article 9 *(News Releases)* in order to comply with the laws, orders, rules, or regulations of the country in which its parent company is incorporated; provided, however, prior to issuing that News Release, that Party must submit, not less than forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) before issuance of the News Release:

(i)      the text of that News Release to the other Parties, and

(ii)     if a News Release (including its content) is required under the laws, orders, rules, or regulations of a country other than the United States of America, an explanatory statement from a licensed attorney in such country.

### 9.4.    <u>News Release Necessitated by Publication or Announcement by Governmental or Regulatory Authority</u>

Each Party has the right to issue a News Release that contains information not otherwise permitted under Article 9 *(News Releases)* in a situation where a governmental or

regulatory authority publishes or announces information regarding any activities or operations affected by this Agreement, and for which the Party reasonably believes needs to be clarified, further detailed or otherwise commented on to satisfy the legitimate public interest in such information.  In such a situation, a Party may furnish the minimum, strictly factual, information necessary and shall then promptly advise the other Parties of the information furnished in response to the publication or announcement.

## ARTICLE 10 – EXPLORATORY OPERATIONS

### 10.1   Proposal of Exploratory Wells

Any Party may propose drilling an Exploratory Well within the Unit Area by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Exploratory Well requires approval by Election.

Each Non-Participating Party in an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

#### 10.1.1   Pre-Exploratory Well AFE Meeting

Prior to submitting an AFE for a new Exploratory Well (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), the Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Exploratory Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Exploratory Well. Although the Operator may change, modify or alter the preliminary scope of the contemplated new Exploratory Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items the Operator will address at the meeting, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s), and a preliminary zone(s) of interest.  Should a Non-Operator contemplate proposing an AFE for a new Exploratory Well (or its substitute, if applicable), said Non-Operator shall call a meeting as provided in this Article 10.1.1 (*Pre-Exploratory Well AFE Meeting*).

#### 10.1.2   Revision of Well Plan

Except as provided in Article 10.1.3 (*Automatic Revision of the Well Plan*), a revision to an approved well proposal, Well Plan, or AFE prior to the

commencement of actual drilling operations on an Exploratory Well requires the unanimous agreement of the Participating Parties. In the absence of such unanimous agreement on a proposed revision to the well proposal, Well Plan or AFE, the well proposal, Well Plan, or AFE will stand as approved, except as provided in Article 10.1.3 (*Automatic Revision of the Well Plan*).  Only a major revision to an approved well proposal, Well Plan or AFE prior to the commencement of actual drilling operations will give a Non-Participating Party an additional opportunity to participate in the Exploratory Well.  A revision is deemed a major revision only if the Objective Depth of an Exploratory Well is changed or the bottomhole location is moved either vertically or horizontally more than five hundred feet (500'); in which case each Non-Participating Party in the well may, for a period of ten (10) days after Receipt of the revised well proposal, Well Plan, or AFE, notify the Operator in writing that it will participate in the revised Exploratory Well. It is understood, however, in no event shall a Non-Participating Party in a Non-Consent Exploratory Well that is abandoned due to mechanical reasons have the right to participate in a substitute Exploratory Well for such abandoned well by virtue of a major revision to such substitute Exploratory Well's Well Plan.

A Non-Participating Party timely submitting its participation notification under this Agreement due to a major revision in a Well Plan (a) shall become an Underinvested Party for Costs incurred (if any) on the Exploratory Well prior to the approved major revision and (b) with regard to that well, shall no longer be subject to Article 16 (*Non-Consent Operation*s) as to said Costs.  The Non-Participating Party's Underinvestment obligation, resulting from its participation decision, shall be calculated as follows: actual Costs expended on that Exploratory Well multiplied by the Non-Participating Party's percentage Participating Interest Share in the modified Exploratory Well.  In the event the Non-Participating Party forfeited and assigned its right, title, and interest in the Unit Area by not participating in that Exploratory Well, then within thirty (30) days after the Operator's Receipt of the Non-Participating Party's participation notification under this Agreement, the Participating Parties in the Exploratory Well proposal that assumed the Non-Consent interest or any portion thereof shall proportionately assign to the Non-Participating Party one hundred percent (100%) of the Non-Participating Party's former Working Interest in the Unit Area.

### 10.1.3     Automatic Revision of the Well Plan

Prior to or during the drilling of an Exploratory Well, the Well Plan may be revised by the Operator as is necessary for it to employ prudent oilfield practices to conduct safe operations, or as directed, required, mandated and/or advised by the DOI or any other governmental authority having jurisdiction over such operations and those revisions will not require the approval of the Participating Parties as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE, except as provided in Article 6.2.2 (*Supplemental AFEs*).   Moreover, and notwithstanding anything to the contrary in Article 10.1.2, any such automatic revisions made by the Operator prescribed in this Article 10.1.3 prior to the commencement of drilling operations shall not be considered a major revision.

### 10.1.4     Timely Operations

Except as provided below, drilling operations on an Exploratory Well shall be commenced within two hundred and seventy (270) days after the end of the period for the approval of an Exploratory Well. If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on an Exploratory Well within that two hundred and seventy (270) day period, the approved Exploratory Well proposal shall be deemed withdrawn, with the effect as if the Exploratory Well had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*. Within thirty (30) days of the selection of the substitute Operator, the substitute Operator may propose the drilling of an identical Exploratory Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it may commence drilling operations on that well within two hundred and seventy (270) days after the end of the period for the approval of that Well.

If an approved Exploratory Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, the Exploratory Well, will be chargeable to the Participating Parties.   Drilling operations for an Exploratory Well under this Article 10.1.4 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date

when actual drilling operations for the approved Exploratory Well are undertaken.

### 10.1.5    AFE Overruns and Substitute Well

Once an Exploratory Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)    all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)    the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical, and

(c)    the unanimous agreement of the Participating Parties to cease drilling an Exploratory Well before reaching Objective Depth.

If an Exploratory Well is abandoned due to the conditions described under Article 10.1.5(b), then any Participating Party in the abandoned Exploratory Well may, within sixty (60) days after abandonment of the Exploratory Well, propose the drilling of a substitute well for the abandoned Exploratory Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Exploratory Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Exploratory Well. Notwithstanding any contrary provision of Article 10.4 *(Conclusion of Exploratory Operations)*, the substitute well shall be deemed as an Exploratory Well.  The Well Plan for the substitute Exploratory Well shall be substantially the same as the Well Plan for the abandoned Exploratory Well and shall also take into account the conditions that rendered further drilling of the abandoned Exploratory Well impractical. Each Non-Participating Party in a substitute Exploratory Well or an approved supplemental AFE for an Exploratory Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**10.2** **Exploratory Operations at Objective Depth**

After an Exploratory Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to either:

(i)      Sidetrack said well, or

(ii)     Deepen said well,

and, provided that Article 16.2 *(Acreage Forfeiture Provisions)* was not applicable to the drilling of that Exploratory Well, then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepening Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Exploratory Well shall be subject to Article 10.2.5.

The Operator's proposal shall be for one (1) of the following operations:

(a)     conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)     Sidetrack the well bore to conventionally core the formations encountered;

(c)     Deepen the well to a new Objective Depth; provided, however, if in the Operator's sole opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth;

(d)     Sidetrack the well, including the requisite plug back operations related thereto;

(e)     conduct Production Testing;

(f)     Complete the well;

(g)     conduct other operations on the well not listed;

(h)     temporarily abandon the well; or

(i)     permanently plug and abandon the well.

Notwithstanding any contrary provision in this Agreement, the Completion of an Exploratory Well as a Subsequent Exploratory Operation shall require approval by the Vote of the Participating Parties, and a Non-Participating Party in a Completion conducted of an Exploratory Well after it has reached its Objective Depth is:

(i)     subject to a Hydrocarbon Recoupment amount equal to its Non-Participating Interest Share of the Costs of the Completion Operation multiplied by four hundred percent (400%) in lieu of the Hydrocarbon Recoupment penalty set forth in Article 16.5.1.1 (*Non-Consent Exploratory Operations at Objective Depth*), and

(ii)     relieved of the Costs and risks of such Completion Operation, but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well less and except the extra Costs of plugging and abandoning associated solely with the Completion in which it was a Non-Participating Party.

If an Exploratory Well is temporarily abandoned under (h), then any additional operation in that well shall be proposed as a new well operation, and shall be deemed an Exploratory Operation, Appraisal Operation, or Development Operation proposal, as applicable in accordance with the definitions set forth herein.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from an Exploratory Well by the Participating Parties, then any Participating Party may make a proposal.  In that event, the procedures in this Article 10.2 shall apply to that proposal, and any reference in this Article 10.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 10.2.1     Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's

proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 10.2 *(Exploratory Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)   Receipt of the Operator's proposal; or

(b)   the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 10.3 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to that proposal.  If Article 8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to any Election in Article 10.2 *(Exploratory Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth above shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

### 10.2.2   Response to Highest Priority Proposal

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)     Receipt from the Operator of a complete copy of all separate proposals; or

(b)     the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well).  Article 10.2(a) has the highest priority, and Article 10.2(i) has the lowest priority.  If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn.   Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 10.2 *(Exploratory Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

### 10.2.3     Response on Next Highest Priority Proposal

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 10.2.2 *(Response to Highest Priority Proposal)*. This process will continue until a proposal is approved to either Complete, temporarily abandon or permanently plug and abandon the Exploratory Well.

### 10.2.4     Non-Participating Parties in Exploratory Operations at Objective Depth

A Non-Participating Party in an Exploratory Operation conducted on an Exploratory Well after it has reached its Objective Depth [except as provided for in this Article 10.2 *(Exploratory Operations at Objective Depth)*] is subject to Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)* and is relieved of the Costs and risks of that Exploratory Operation, except that a Non-Participating Party in that Exploratory Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Exploratory Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Exploratory Operation in which it was a Non-Participating Party.

### 10.2.5    Participation in a Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth

If an Exploratory Well is drilled to its initial Objective Depth and a Non-Participating Party in that Exploratory Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 10.2(c) or Article 10.2(d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Exploratory Well prior to that Sidetracking or Deepening.   The original Participating Parties in an Exploratory Well are Overinvested Parties in that amount.   A former Non-Participating Party in an Exploratory Well that becomes a Participating Party in an approved Sidetracking or Deepening remains a Non-Participating Party in that Exploratory Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments),* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.1 *(Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well),* less the amount of the Underinvestment, has been recovered by the original Participating Parties.   If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Exploratory Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

### 10.3    Permanent Plugging and Abandonment and Cost Allocation

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of an Exploratory Well that is located on an active lease and:

(a)    is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 10.1.5 (b),

(b)    is to be plugged under Article 10.2 *(Exploratory Operations at Objective Depth)*, or

(c)    has been previously temporarily abandoned under Article 10.2 *(Exploratory Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the unanimous agreement of the Participating Parties.   Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of Production

Testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If a proposal to plug and abandon an Exploratory Well receives the unanimous agreement of the Participating Parties, the approved proposal binds all Parties.  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well.  If a rig is on location, a proposal to plug and abandon an Exploratory Well under either Article 10.3(a) or 10.3(b) does not receive unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Exploratory Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon an Exploratory Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon the Exploratory Well, and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning the Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.2 *(Exploratory Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

**10.4**   **Conclusion of Exploratory Operations**

Except as provided in Article 10.1.5 *(AFE Overruns and Substitute Well)* after the earlier of the Completion, temporary abandonment or permanent plugging and abandonment of the first Producible Well and the release of the drilling rig from that Producible Well, Exploratory Operations conclude, and all subsequent operations in the Unit Area are either Appraisal Operations or Development Operations.

## ARTICLE 11 – APPRAISAL OPERATIONS

### 11.1   Proposal of Appraisal Wells

After the conclusion of Exploratory Operations, any Party may propose drilling an Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. Each proposed Appraisal Well requires approval by Election.

Each Non-Participating Party in an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

#### 11.1.1   Pre-Appraisal Well AFE Meeting

Prior to submitting an AFE for a new Appraisal Well (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Appraisal Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Appraisal Well. Although Operator may change, modify or alter the preliminary scope of the contemplated new Appraisal Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items Operator will address at the meeting, at a minimum, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s) and a preliminary zone(s) of interest.  Should a Non-Operator contemplate proposing an AFE for a new Appraisal Well (or its substitute, if applicable), said Non-Operator shall call a meeting consistent herewith.

#### 11.1.2   Revision of Well Plan

Except as provided in Article 11.1.3 *(Automatic Revision of a Well Plan)*, any revisions of the Well Plan or AFE for an Appraisal Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Revision of Well Plan)*.

#### 11.1.3   Automatic Revision of the Well Plan

The Well Plan for an Appraisal Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.3 *(Automatic Revision of the Well Plan)*.

### 11.1.4     Timely Operations

Except as provided below, drilling operations on an Appraisal Well shall be commenced within two hundred and seventy (270) days after the end of the period for the approval of the Appraisal Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the Appraisal Well within that two hundred and seventy (270) day period, the approved Appraisal Well proposal shall be deemed withdrawn, with the effect as if the Appraisal Well had never been proposed and approved, and then the Non-Operating Parties may then select a substitute Operator under Article 4.2.2 *(Substitute Operator if Operator Fails to Commence Drilling Operations)*. Within thirty (30) days of the selection of the substitute Operator, the substitute Operator shall propose the drilling of an identical Appraisal Well (except for any necessary modifications resulting from a change in the drilling rig to be utilized by the substitute Operator), and it shall commence drilling operations on that well within two hundred and seventy (270) days after the end of the period for the approval of that Well.

If an approved original or identical Appraisal Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Well, will be chargeable to the Participating Parties.  Drilling operations for an Appraisal Well under this Article 11.1.4 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Appraisal Well are undertaken.

### 11.1.5     AFE Overruns and Substitute Well

Once an Appraisal Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)     all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*;

(b)     the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that, in the Operator's sole opinion, render further well operations impractical; and

(c) the unanimous agreement of the Participating Parties to cease drilling an Appraisal Well before reaching Objective Depth.

If an Appraisal Well is abandoned due to the conditions described under Article 11.1.5(b), then any Participating Party in the abandoned Appraisal Well may, within sixty (60) days after abandonment of that Appraisal Well, propose the drilling of a substitute well for the abandoned Appraisal Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Appraisal Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Appraisal Well. Notwithstanding any contrary provision of Article 11.5 *(Conclusion of Appraisal Operations)*, the substitute well shall be an Appraisal Well. The Well Plan for the substitute Appraisal Well shall be substantially the same as the abandoned Appraisal Well's Well Plan and shall also take into account the conditions that rendered further drilling of the abandoned Appraisal Well impractical.

Each Non-Participating Party in a substitute Appraisal Well or an approved supplemental AFE for an Appraisal Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**11.2** **Appraisal Operations at Objective Depth**

After an Appraisal Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well. Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to either:

(i) Sidetrack said well, or

(ii) Deepen said well,

and, provided that Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* was not applicable to the drilling of that Appraisal Well, then, contingent upon the unanimous

approval of the Participating Parties in the approved Sidetrack or Deepening Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Appraisal Well shall be subject to Article 11.2.5.

The Operator's proposal shall be for one of the following operations:

(a)     conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)     Sidetrack the well bore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth; provided, however, if in the Operator's sole reasonable opinion a casing string is required to Deepen the well, then option "d" shall have priority over Deepening the well to a new Objective Depth;

(d)     Sidetrack the well, including the requisite plug back operations related thereto;

(e)     conduct Production Testing;

(f)     Complete the well

(g)     conduct other operations on the well not listed;

(h)     temporarily abandon the well; or

(i)     permanently plug and abandon the well.

Notwithstanding any contrary provision in this Agreement, the Completion of an Appraisal Well as a Subsequent Appraisal Operation shall require approval by the Vote of the Participating Parties, and a Non-Participating Party in a Completion conducted on an Appraisal Well after it has reached its Objective Depth is:

(i)     subject to a Hydrocarbon Recoupment amount equal to its Non-Participating Interest Share of the Costs of the Completion Operation multiplied by four hundred percent (400%) in lieu of the Hydrocarbon Recoupment penalty set forth in Article 16.5.2 (*Non-Consent Appraisal Operations*), and

(ii)    relieved of the Costs and risks of such Completion Operation, but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Appraisal Well less and except the extra Costs of plugging and abandoning associated solely with the Completion in which it was a Non-Participating Party.

If the Appraisal Well is temporarily abandoned under (h), then any additional operation in that well shall be proposed as a new well operation, and shall be deemed an Appraisal Operation or Development Operation proposal, as applicable in accordance with the definitions set forth herein. If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt by the Participating Parties of all logs and test results from an Appraisal Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 11.2 shall apply to that proposal, and any reference in this Article 11.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 11.2.1    Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation, except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 11.2 *(Appraisal Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made. If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)    Receipt of the Operator's proposal; or

(b)    the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 11.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the

approval and Cost allocation provisions of Article 11.4 (*Permanent Plugging and Abandonment and Cost Allocation*) shall apply to that proposal. If Article 8.3 (*Second Opportunity to Participate)* or Article 8.4 (*Participation by Fewer Than All Parties*), or both, apply to any Election in Article 11.2 *(Appraisal Operations at Objective Depth)*, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previously approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election have received the information from the previously approved operation.

**11.2.2**   **Response to Highest Priority Proposal**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)   Receipt from the Operator of a complete copy of all separate proposals;

(b)   the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well). Article 11.2(a) has the highest priority, and Article 11.2(i) has the lowest priority. If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn. Once the approved operation is completed, the Parties shall follow the procedure provided in Article 11.2 *(Appraisal Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

**11.2.3**   **Response on Next Highest Priority Proposal**

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal and it shall be subject to the approval procedure in Article 11.2.2 (*Response to Highest Priority*

*Proposal*).  This process will continue until a proposal is approved to either temporarily abandon or permanently plug and abandon an Appraisal Well.

### 11.2.4   Non-Participating Parties in Appraisal Operations at Objective Depth

A Non-Participating Party in an Appraisal Operation conducted on an Appraisal Well after it has reached its Objective Depth [except as provided for in this Article 11.2 *(Appraisal Operations at Objective Depth)*] is subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* and is relieved of the Costs and risks of that Appraisal Operation, except that a Non-Participating Party in that Appraisal Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning an Appraisal Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Appraisal Operation in which it was a Non-Participating Party.

### 11.2.5   Participation in a Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Objective Depth

If an Appraisal Well is drilled to its Objective Depth and a Non-Participating Party in that Appraisal Well becomes a Participating Party in an approved Sidetracking or Deepening under Article 11.2(c) or Article 11.2(d), that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Appraisal Well to its Objective Depth prior to that Sidetracking or Deepening.  The original Participating Parties in that Appraisal Well are Overinvested Parties in that amount.  A former Non-Participating Party in an Appraisal Well that becomes a Participating Party in an approved Sidetracking or Deepening, remains a Non-Participating Party in the Appraisal Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*, and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.2 *(Non-Consent Appraisal Operations)* less the Underinvestment, has been recovered by the original Participating Parties.  If a former Non-Participating Party becomes a Participating Party in more than one approved Sidetracking or Deepening in the same Appraisal Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first Sidetracking or Deepening it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**11.3** **Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose an Appraisal Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may in writing limit its participation in the drilling of that Appraisal Well to the base of the Deepest Producible Reservoir to be penetrated by that Appraisal Well. A Party who limits its participation in an Appraisal Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Appraisal Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)* in regard to drilling between those depths.

**11.4** **Permanent Plugging and Abandonment and Cost Allocation**

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of an Appraisal Well that is located on an active lease and:

(a) is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 11.1.5 (b),

(b) is to be plugged under Article 11.2 *(Appraisal Operations at Objective Depth)*, or

(c) has been previously temporarily abandoned under Article 11.2 *(Appraisal Operations at Objective Depth)*

and has not produced Hydrocarbons (other than as a result of Production Testing) requires the unanimous agreement of the Participating Parties. Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 *(Abandonment of Wells)*. If a proposal to plug and abandon an Appraisal Well receives approval by unanimous agreement, the approved proposal binds all Parties. If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraisal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well. If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.4(a) or 11.4(b) does not receive approval by unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) from Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that

fact.  If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact.

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 *(Appraisal Operations at Objective Depth)* or Article 6.2.2 *(Supplemental AFEs)*.  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

**11.5**　　**Conclusion of Appraisal Operations**

Upon the earlier of:

(a)　　the approval of the conclusion of Appraisal Operations by Vote regardless of whether Appraisal Operations actually commenced; or

(b)　　the point in time when no Appraisal Operation has been approved within a period of twelve (12) months from the rig release (or cessation of operations) from the previous operation, whether an Exploratory Operation or an Appraisal Operation; or

(c)　　the Completion or abandonment whether permanent or temporary, of the first (1st) Appraisal Well which would qualify as a Producible Well,  and the release of the rig from that Appraisal Well (including any substitute well for that Appraisal Well),

Appraisal Operations for this Development Phase shall conclude and all subsequent operations for:

(i)　　this Development Phase, including operations on temporarily abandoned Exploratory Wells and/or Appraisal Wells, and

(ii)　　any subsequent Development Phase, will be Development Operations.

However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations for this Development Phase shall conclude when the well

bore in which the Appraisal Operation is being conducted is either Completed or abandoned, whether temporarily or permanently.

**11.6**    **Operations Before the Approval of the Development Plan**

After the occurrence of (a), (b), or (c) in Article 11.5 *(Conclusion of Appraisal Operations)* but before the approval of a Development Plan for this Development Phase, any Party may propose the drilling of an additional well as an Appraisal Well.

Unless Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* applies to the proposal of that well, that proposal shall require the unanimous agreement of the Parties. Any substitute well for, and all operations at Objective Depth conducted in or through the well bore of that well shall be deemed Appraisal Operations, and shall be proposed, approved, and conducted accordingly.

## ARTICLE 12 – DEVELOPMENT PHASES

**12.1**    **Phased Development**

In view of the Costs and scope of developing and producing Hydrocarbons from the Unit Area, a Party(ies) may undertake an initial Development Phase and one or more subsequent Development Phases in accordance with the procedures set forth herein. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be generated, approved, and implemented under this Article 12 *(Development Phases)*. Each Development Phase may be comprised of as many as four stages – the Feasibility Stage, the Selection Stage, the Define Stage, and the Execution Stage. For each stage undertaken, subject to the provisions of this Article 12 *(Development Phases),* any Party may submit a proposal and an associated AFE for the Parties' approval. Each stage AFE shall cover all of the estimated Costs to be incurred during that stage, except for the Costs of drilling wells, including those of the Feasibility Team or Project Team.

**12.2**    **Feasibility Team Proposal**

The Feasibility Stage commences upon the approval of a proposal for the formation of a Feasibility Team and the Feasibility AFE. No Party may propose the formation of a Feasibility Team for a Development Phase until such time as any previously formed Feasibility Team for that Development Phase has terminated. For a period of three hundred and sixty-five (365) days from the conclusion of Exploratory Operations, the Operator has the exclusive right to propose the formation of a Feasibility Team and submit to the Parties a Feasibility AFE accompanied by a memorandum describing in detail the anticipated

scope of work to be undertaken by the Feasibility Team and third party contractors and/or consultants during the Feasibility Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Feasibility Stage, and the estimated Costs of the Feasibility Stage.  If the Operator does not propose the formation of a Feasibility Team and submit the Feasibility AFE during its exclusive period, any Party may propose the formation of a Feasibility Team and submit a Feasibility AFE.

The Feasibility Team will operate under the direction of the Operator.  The employees of the Operator and Non-Operators and the contractors and/or consultants, set forth in the Feasibility AFE, shall initially compose the Feasibility Team.  The Operator may, from time to time, revise the membership of the Feasibility Team, at its sole discretion, as long as the revisions are necessary to accomplish the scope of work set forth in the Feasibility AFE.  The Operator shall charge the Joint Account for the labor of the Feasibility Team members in the same manner in which it charges the Joint Account for the labor of the Project Team members.

Each Feasibility Team member remains an employee of its respective employer, and each employer remains responsible for its employee's salaries and benefits, as well as maintaining worker's compensation insurance for its employee.  Accordingly, each employer will continue to administer the compensation, benefits, allowances, and careers of its employees on the Feasibility Team.  However, Feasibility Team members will receive team assignments and general supervision from the Operator in connection with their day-to-day work.  An individual on a Feasibility Team will, insofar as it is possible and consistent with the needs of his or her employer, serve on the Feasibility Team for the duration of the Feasibility Team, unless that individual is designated a temporary Feasibility Team member by his or her employer or the Operator.  If a Feasibility Team member is designated a temporary Feasibility Team member by his or her employer or the Operator, that Feasibility Team member will leave the Feasibility Team upon completion of (a) the term designated by his or her employer for his or her service on the team or (b) the specific task or portion of the Feasibility Team's work assigned to that member by the Operator.

The Feasibility Team shall prepare an in-depth report containing its analyses of all of the development scenarios it considered and its findings as to the existence of at least one development scenario for a Producible Well on the Unit Area, which is technologically and

economically feasible, and shall present a copy of that report to each of the Participating Parties as soon as it is completed.

### 12.2.1    Feasibility AFE Approval

A Feasibility AFE requires approval by Election.

A Non-Participating Party in the Feasibility AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs).*

### 12.2.2    Feasibility Team and Feasibility Stage Conclusion

The Feasibility Team and the Feasibility Stage terminate immediately after (a) the Feasibility Team has (i) completed the scope of work in the Feasibility AFE and its supplemental AFEs and (ii) presented to the Participating Parties the report referred to in Article 12.2 *(Feasibility Team Proposal)* or (b) the Participating Parties Vote to terminate the Feasibility Team prior to the occurrence of both of those events.

## 12.3    Commencement of the Selection Stage

The Selection Stage commences upon the approval of the Selection AFE.

### 12.3.1    Proposal of a Project Team

If a Feasibility AFE is approved, the Operator has an exclusive right to submit a Selection AFE for the Parties' review and approval for a period of one hundred and twenty (120) days from the later of:

(i)   the conclusion of the Feasibility Stage; or

(ii)  the earlier of rig release from the first (1st) Appraisal Well which would qualify as a Producible Well or the conclusion of Appraisal Operations.

If a Feasibility AFE is not approved, the Operator has an exclusive right to submit a Selection AFE for a period of one hundred and eighty (180) days from the earlier of:

(i)   rig release from the first (1st) Appraisal Well which would qualify as a Producible Well; or

(ii)  the conclusion of Appraisal Operations.

The Selection AFE may call for the formation of a Project Team.  It shall be accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Selection Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Selection Stage, and the estimated Costs of the Selection Stage.  If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.

If the Operator does not submit a Selection AFE during its exclusive period referred to in this paragraph, any Party may submit a Selection AFE.  .

If the Selection AFE proposes the formation of a Project Team, the formation and administration of that Project Team shall be handled under Exhibit "G."

The Operator shall directly charge the Joint Account for all Costs associated with the Project Team, including those of Affiliates, for which the Operator is internally billed.  The components of those Costs may include, but are not limited to:

a)   Digital Business

b)   Accounting

c)   Building Services and Building and Grounds Maintenance

d)   Human Resources

e)   Procurement

f)   Government and Public Affairs

g)   Health, Safety and Environment

h)   Security

i)   Audit

j)   Tax

k)   Crisis Management

l)    Environmental Compliance

n)   Marketing of Oil and Gas Production

All other Project Team Costs shall be handled under Exhibit "C."

No Party may propose the formation of a Project Team for a Development Phase until such time as a previously formed Project Team for that Development Phase has terminated.

**12.3.2**   <u>**Selection AFE Approval**</u>

A Selection AFE requires approval by Election.

A Non-Participating Party in a Selection AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs).*

**12.4**   <u>**Proposal of a Development Plan**</u>

The Operator has the exclusive right to submit a Development Plan for the Parties' review and approval for a period of three hundred and sixty-five (365) days from the later of:

(i)      commencement of the Selection Stage; or

(ii)     conclusion of Appraisal Operations.

If the Operator has begun preparation of a Development Plan during the first two hundred and seventy (270) days of such three hundred and sixty-five (365) day period, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, then the Operator may request an extension of the exclusive period to allow completion of the work in progress. Any request for extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than three (3) months from the expiration of the exclusive submission period. The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's submission.

### 12.4.1    Content of the Development Plan

A Development Plan shall contain at a minimum the following information:

(a)  **Development System**:  Description of the Development System including:

    (i)  the type of Production System proposed, for example, tension leg well jacket, floating production system, including the Production System's location, configuration (number of well slots or subsea tiebacks), and production capacity;

    (ii)  the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to one or more interconnects with the pipeline or offtake point servicing the Unit Area;

    (iii)  a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring, transporting, and installing the Development System;

    (iv)  the estimated date of initial Hydrocarbon production and the estimated initial daily rate of Hydrocarbon production;

    (v)  the estimated Costs (not in the form of an AFE) of the Development System;

    (vi)  all proposed hydrate or paraffin control systems or techniques, method of pressure maintenance, or enhanced recovery plan;

    (vii)  a description of the proposed well Completion techniques, that is, dual versus single; and

    (viii)  The equipment and space on, and the weight and the buoyancy of, the Development System, which are required to make the enhanced recovery and pressure maintenance plans and objectives referred to in Article 12.4.1(j)(iii)(D) possible;

(b)  **Producible Reservoirs**:  A description of the Hydrocarbon- bearing geological formations expected to be developed under the Development Plan along with the area and depth of sands or reservoirs to be developed by the Production System;

(c) **Recoverable Reserves and Production Profile:**   An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter;

(d) **Pre-drilling Operations:**  A description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost, and location of each pre-drilling operation;

(e) **Development Wells:**  A description of drilling plans for all Development Wells in the Development Plan and the Completion plans for all temporarily abandoned Exploratory Wells or temporarily abandoned Appraisal Wells that are to be completed and all Development Wells in the Development Plan, including an estimate of the timing, Cost, and surface and bottomhole location of each well;

(f) **Tieback Operations:**  If the Development Plan requires the tieback or use of Offsite Host Facilities, a commitment from the owner of that Offsite Host Facilities to handle or process Hydrocarbons, the amount of all tariffs, processing or other fees the owner of that Offsite Host Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the Offsite Host Facilities for the Hydrocarbons;

(g) **Define AFE:**  An AFE containing the estimated Costs of the Define Stage, accompanied by a memorandum describing in detail the anticipated scope of work to be undertaken during the Define Stage, the estimated type and number of staff required to complete that scope of work, the estimated duration of the Define Stage, and the estimated Costs of the Define Stage; if a Project Team was not formed during the Selection Stage, the proposing Party may submit, along with the Define AFE, a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*;

(h) **Field Operating Scheme:**  A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(i) **Field Abandonment:**   A description of field abandonment plan (if applicable);

(j)   **Reservoir Plan:**  A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

(i)   an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

(ii)   the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

(iii)   a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

(A)   estimates of oil and gas in place;

(B)   reservoir rock and fluid characteristics;

(C)   depletion mechanism;

(D)   enhanced recovery and pressure maintenance plans and objectives;

(E)   reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;

(F)   well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);

(G)   reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and

(H)   other relevant information;

(k)   **Disposal Wells:**  The estimated Cost of disposal wells, if applicable;

(l) **Hydrocarbon Transmission System:**  The type of Hydrocarbon transmission system to be made available to the Participating Parties (for example, pipeline versus barge); and

(m) **Other Data:**  Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Development System provided for in the Development Plan.

**12.5   Development Plan Approval**

**12.5.1   Unanimous Approval of a Development Plan**

The Operator has ninety (90) days after submittal of its Development Plan to obtain the unanimous agreement of the Parties on:

(a) the Development Plan submitted during its exclusive period set forth in Article 12.4 (*Proposal of a Development Plan*); or

(b) the latest amended version of that plan which has been the result of comments by, or discussions among, the other Parties or the Project Team, if one exists, and the Operator (the "Latest Amended Version").    A "Latest Amended Version" shall also include the latest amended version of another Party's plan which has been the result of comments by, or discussions among, the other Parties or the Project Team, if one exists.

**12.5.2   Approval of a Development Plan by Vote**

For the purposes of this Article 12.5.2, if more than one (1) Party submits a Development Plan, each Development Plan shall be considered for approval by the Parties in the order in which they were received by the Parties. If:

(a) the Operator fails within the ninety (90) day period in Article 12.5.1 *(Unanimous Approval of a Development Plan)* to gain the unanimous agreement of the Parties on its Development Plan or its Latest Amended Version, whichever is applicable; or

(b) the Operator fails to submit a Development Plan during its exclusive period set forth in Article 12.4 (*Proposal of a Development Plan*),

any Party may submit a Development Plan and an AFE for the actual Costs it incurred in order to generate that Development Plan, and the Parties have ninety (90) days in which to approve by Vote:

(i) the Operator's Development Plan or its Latest Amended Version, whichever is applicable if any, or

(ii) another Party's Development Plan or its Latest Amended Version, whichever is applicable if any, and its associated AFE.

No new proposed Development Plan may be submitted during the last sixty (60) days of the ninety (90) day period to approve a Development Plan by Vote.

**12.5.3**     **Approval of a Development Plan if One is Not Approved by Vote**

For the purposes of this Article 12.5.3, Development Plans shall be Voted on by the Parties simultaneously. If no Development Plan, or its Latest Amended Version, whichever is applicable, is approved by Vote during the ninety (90) day period in Article 12.5.2 *(Approval of a Development Plan by Vote)*, and if:

(a)     there is only one (1) Development Plan, or its Latest Amended Version, whichever is applicable, submitted, then that Development Plan, or its Latest Amended Version, whichever is applicable, shall be deemed approved;

(b)     there are two (2) or more Development Plans, or Latest Amended Version(s), whichever is applicable, submitted, then the Development Plan, or the Latest Amended Version, whichever is applicable, that receives the largest affirmative Voting interest shall be deemed approved; or

(c)     two (2) or more competing Development Plans, or Latest Amended Version(s), whichever is applicable, , but two (2) or more competing Development Plans, or Latest Amended Version receive an equal largest affirmative Voting Interest, then:

(i)     the Development Plan, or its Latest Amended Version, whichever is applicable, that receives an equal largest affirmative Voting interest, and for which the Operator affirmatively Votes of shall be deemed approved; or

(ii)      if no Development Plan, or its Latest Amended Version,

whichever is applicable, with an equal largest affirmative Voting interest receive the affirmative Vote of the Operator, then such Development Plan, or such Latest Amended Version, whichever is applicable, first submitted, and which received such equal largest affirmative Voting interest shall be deemed approved.

**12.5.4**      **Approved Development Plan**

Each Participating Party in an approved Development Plan also agrees or Votes to participate in its Define AFE, the AFE referred to in Article 12.5.2 *(Approval of a Development Plan by Vote)*, if applicable, and the formation of a Project Team during the Define Stage, if applicable.  If the Parties do not approve a Selection AFE and do not form a Project Team during the Selection Stage and if the Operator's Development Plan or Latest Amended Version, whichever is applicable, is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Operator's Development Plan or Latest Amended Version.  If Appraisal Operations have not previously concluded, then, upon the approval of the Development Plan or Latest Amended Version, whichever is applicable, the Selection Stage concludes and Appraisal Operations are deemed concluded; provided, however, if an Appraisal Operation is being conducted when the Development Plan is approved, Appraisal Operations shall be deemed concluded when the well bore in which the Appraisal Operation is being conducted is either temporarily or permanently abandoned. Any Non-Participating Party in the approved Development Plan's Define AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

**12.6.1** **Long Lead Development System AFEs**

After the conclusion of the Selection Stage, in order to facilitate the early and orderly commencement of the Execution Stage, the Operator has the right, prior to the approval of the Execution AFE, to submit AFEs ("Long Lead Development System AFEs") for:

(a)      the acquisition of long lead-time items for the Development System ("Long Lead Development System Items");

(b)     preliminary activities related to the fabrication, transportation or installation of the Development System; or

(c)     any other activity necessary to assist the Operator in the implementation of the Development Plan.

A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs, does not exceed fifty million dollars ($50,000,000), requires approval by Vote of the Participating Parties in the Development Plan.  A Long Lead Development System AFE, whose total estimated Cost when combined with the estimated Cost of all approved Long Lead Development System AFEs exceeds fifty million dollars ($50,000,000), requires approval by the unanimous agreement of the Participating Parties in the Development Plan.  Any Non-Participating Party in a Long Lead Development System AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

### 12.6.2     Non-Participating Parties in the Execution AFE Who Have Previously Approved Long Lead Development System AFEs

If a Party, who had Voted for or was in unanimous agreement with the other Participating Parties in a Long Lead Development System AFE, does not approve the Execution AFE for which such Long Lead Development System Items were procured, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Development System Items within thirty (30) days following the approval of the Execution AFE; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment, if applicable, to which it is subject to in accordance with Article 16 (*Non-Consent Operations*).  The Operator shall invoice the Participating Parties in the Execution AFE for their proportionate share of the reimbursement under this Article 12.6.1 in accordance with Exhibit "C."

### 12.6.2     Disposition of Long Lead Development System Items

Notwithstanding the provisions of Exhibit "C" or Article 3.1 (*Exhibits*) to the contrary, the Participating Parties in the Execution AFE, for which Long Lead Development System Items were procured, shall approve by Vote the disposition of such Long Lead Development System Items if they are not

utilized for the Development System. If the disposition is approved, the disposition will be binding on all Participating Parties in the Execution AFE. The disbursement of the proceeds realized from the disposition of those Long Lead Development System Items shall take place in accordance with Exhibit "C."

## 12.7 Define Stage and Execution Stage

The Define Stage commences upon the approval of the Development Plan.

### 12.7.1    Execution AFE

The Operator has an exclusive period of one hundred and eighty (180) days from the commencement of the Define Stage to submit an Execution AFE, which conforms with the Development Plan approved during the Selection Stage to all Parties for approval by Election. The Execution AFE shall not include any Cost estimates or AFEs for Development Wells. If the Operator does not submit the Execution AFE during its exclusive period, any Party may submit an Execution AFE, which conforms with the approved Development Plan, and an AFE for the actual Costs it has incurred to generate the Execution AFE. If a Project Team was not formed during the Selection Stage or the Define Stage, the proposing Party may submit as a part of the Execution AFE a proposal for the formation of a Project Team accompanied by a memorandum similar to the one referred to in Article 12.3.1 *(Proposal of a Project Team)*.

### 12.7.2    Approval of an Execution AFE and Commencement of the Execution Stage

By Electing to participate in an Execution AFE, each Participating Party in an approved Execution AFE also Elects to participate in (a) the AFE for the actual Costs incurred by the proposing Party in order to generate the approved Execution AFE, referred to in Article 12.7.1 *(Execution AFE)*, if applicable, and (b) the formation of a Project Team during the Execution Stage, if applicable. If the Parties do not form a Project Team during the Selection Stage or the Define Stage and if the Operator's Execution AFE is approved, the Operator shall directly charge the Joint Account the actual Costs it incurred in order to generate and submit the Execution AFE. The Define Stage concludes and the Execution Stage commences upon the approval of the Execution AFE. A Non-Participating Party in the Execution AFE for the initial Development System is subject to Article 16.2 *(Acreage Forfeiture Provisions)*.

### 12.7.3    Minor Modifications to Development Plans

In implementing a Development Plan, the Operator shall advise the Participating Parties of its own progress and that of the Project Team, if one exists.   As additional information becomes available, the Operator may, prior to the installation of the Development System, make minor modifications to the Development Plan without the approval of the Participating Parties if those minor modifications are both reasonable and prudent.   For purposes of this paragraph, a minor modification is

(a)    a modification, which (i) (A) is proposed prior to the commencement of the Execution Stage and does not cause the estimated Cost of the Define AFE to increase by more than ten percent (10%), or (B) is proposed after the commencement of the Execution Stage and does not cause the estimated Cost of the Execution AFE to increase by more than ten percent (10%), and (ii) is not a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*; or

(b)    a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and does not cause the estimated Cost of the Execution AFE to increase by more than ten percent (10%), even if that modification constitutes a major modification as defined in Article 12.7.4 *(Major Modifications to Development Plans)*.

The "estimated Cost of the Execution AFE" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs.  If the Operator exercises its discretionary right to make a minor modification for health, safety, or environmental reasons or regulatory requirements, the Operator shall give each Participating Party in the Development Plan written notice of that fact.  A minor modification shall not materially change the risk or timing of the Development Plan and is binding on all the Participating Parties in the Development Plan.

### 12.7.4    Major Modifications to Development Plans

A major modification shall be deemed to have occurred when:

(a)    the type of Production System, for example, tension leg well, jacket floating production system, is to be changed; or

(b)     the number of well slots of the Production System is to be changed by at least twenty-five percent (25%);

(c)     the type of Hydrocarbon transmission system is changed (for example, pipeline versus barge);

(d)     the overall Cost of the Development System is to be increased or decreased by twenty percent (20%) or more;

(e)     the initial selection of the location of the Production System is to be changed and the corresponding difference in water depth changes by more than five thousand feet (5,000') laterally in any direction;

(f)     the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%);

(g)     the number of Development Wells is to be increased or decreased by at least twenty percent (20%);

(h)     the proposed hydrate or paraffin control system or technique, pressure maintenance system, or enhanced recovery plan is to be changed;

(i)     the proposed number of well Completions per wellbore, that is, dual versus single, is to be changed;

(j)     the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than one hundred and fifty (150) days;

(k)     in the case of a tieback to an Offsite Host Facility or a pre-existing Development System, the gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to an Offsite Host Facility or a pre-existing Development System, as provided in the Development Plan, is to be changed;

(l)     the estimated capital expenditures in any calendar year are to be increased by at least thirty percent (30%) of the project's estimated total gross capital expenditures; or

(m)     the Operator proposes not to complete a Development Plan.

The "overall Cost of the Development System" is the total dollar amount of the Execution AFE and all approved Long Lead Development System AFEs.

### 12.7.5    Major Modifications to Development Plans Prior to the Approval of the Execution AFE

Whenever a major modification to a Development Plan is proposed during the Define Stage (prior to the approval of the Execution AFE), the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require approval by unanimous agreement of the Participating Parties in the Development Plan. If that major modification is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan. That Non-Participating Party has the right for a period of thirty (30) days, after Receipt of the modified Development Plan (and associated AFEs), in which to notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with the original Development Plan (and associated AFEs).

### 12.7.6    Major Modifications to Development Plans After the Approval of the Execution AFE

Whenever a major modification to a Development Plan is proposed during the Execution Stage (after the approval of an Execution AFE) and prior to the installation of the Development System, the Operator shall furnish the Participating Parties in the Execution AFE with the proposed modification to the Development Plan (and associated AFEs). That major modification shall require unanimous agreement of the Participating Parties in the Execution AFE. If that major modification is as provided in Article 12.7.4 (a), (c), (d), (f), (g), (j), (k) or (m), and is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Execution AFE. For a period of thirty (30) days after Receipt of the modified Development Plan (and associated AFEs), the Non-Participating Party may notify the Operator in writing that it will participate in the modified Development Plan (and associated AFEs). If that Non-Participating Party participates in the

modified Development Plan, it shall be an Underinvested Party in an amount equal to its Non-Participating Interest Share of the actual Costs incurred on activities associated with (a) the Execution AFE and (b) the original Development Plan (and associated AFEs) if it did not participate in that Development Plan. Within thirty (30) days of the elimination of the Underinvestment, the Participating Parties in the Execution AFE for the initial Development Phase shall deliver to that Non-Participating Party an assignment of one hundred percent (100%) of its former Working Interest in the Unit Area, the wells therein and production therefrom. If the Execution AFE was for a subsequent Development Phase, the Non-Participating Party shall not be subject to Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)* in regard to that AFE.

### 12.7.7 Approval of Major Modifications

If the major modification of the Development Plan is approved, the Development Plan (and associated AFEs) shall be deemed modified, and the Operator shall carry out the modified Development Plan. If a major modification is not approved, the Operator shall continue to implement the Development Plan as it was before the proposed major modification.

### 12.7.8 Termination of a Development Plan

A Development Plan terminates if (a) the Execution AFE for that Development Plan is not approved by Election, (b) the Participating Parties in the Define Stage or in the Execution AFE unanimously agree to terminate the Development Plan, or (c) the fabrication or acquisition of the Development System is not commenced within the time frame provided in Article 12.7.9 *(Timely Operations for Development Systems)*.

#### 12.7.8.1 Termination Prior to Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated before its associated Execution AFE has been approved by Election shall be borne by the Parties who participated in the Define AFE and its supplemental AFEs, if any.

#### 12.7.8.2 Termination After Execution AFE Approval

The Costs, risks, and liabilities of generating and implementing a Development Plan that is terminated after its associated Execution AFE has been approved by Election shall be borne by the

Participating Parties in the Execution AFE and its supplemental AFEs, if any.

### 12.7.9    Timely Operations for Development Systems

The Operator shall commence or cause to be commenced the fabrication or acquisition of a Development System (a) one hundred and eighty (180) days after the end of the period for Elections of the Execution AFE or (b) ninety (90) days prior to the date the Operator is required to commence that fabrication or acquisition under an SOP or Unit Plan of Operations, whichever is earlier.  If the Operator, except for an occurrence of Force Majeure, fails to commence the fabrication or acquisition of a Development System within the applicable time period set forth above in this Article 12.7.9, the Non-Operating Parties may then select a successor Operator under Article 4.5 *(Selection of Successor Operator)*. Within ninety (90) days of the selection of the successor Operator, the successor Operator shall commence the fabrication or acquisition of a Development System in the approved Development Plan.  The fabrication or acquisition of a Development System commences on the date the first major fabrication contract for the Development System is awarded or the date the purchase contract for a Development System is executed.

### 12.8  Post-Production Project Team AFEs

The Execution Stage concludes upon the first production of Hydrocarbons from the Development System.  At least sixty (60) days, but not more than one hundred and twenty (120) days, prior to the first production of Hydrocarbons from the Development System, the Operator may propose for approval by Vote the continuance of the Project Team, if one exists, on a much smaller scale, or the formation of the Project Team, if one does not exist, in order to assist the Operator in the drilling of additional Development Wells approved by the Parties, de-bottlenecking the Development System, ramping up Hydrocarbon production, maximizing the recovery of Hydrocarbons during the Development Phase and activities related thereto.  With its proposal, the Operator shall include an initial Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.

At least forty-five (45) days, but not more than  ninety (90) days, prior to the date on which the Operator anticipates the scope of work set forth in its original proposal for the continuance or formation of the Project Team and its associated AFE and memorandum to be completed, the Operator may propose for approval by Vote of the Parties the further

continuance of the Project Team to assist the Operator in reservoir management and production optimizing activities other than contemplated under Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)*. With that proposal, the Operator shall include a second Post-Production Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*. The administration of the Project Team during the period that it carries out the scope of work referred to in this Article 12.8 shall be handled under Exhibit "G." The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*. A Non-Participating Party in either or both of the two Post-Production Project Team AFEs is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.

**12.9    Subsequent Development Phases**

At any time after the installation of the initial Development System for the initial Development Phase, any Participating Party may pursue a subsequent Development Phase and the installation of a subsequent Development System, as set forth herein.

**12.9.1    Proposal of a Subsequent Development Phase**

If a subsequent Development Phase is approved, the procedures specified in this Article 12 *(Development Phases)* shall apply to the proposal of the subsequent Development Phase.

**12.9.2    Execution AFE in a Subsequent Development Phase**

Each Non-Participating Party in an Execution AFE for a subsequent Development Phase is subject to the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities) or Article 16.4 (Non-Consent Operations to Maintain Unit Area)*, but not Article 16.2.2 *(Execution AFE)*. Although a Non-Participating Party in an Execution AFE for a subsequent Development Phase may retain its Working Interest in the Unit Area, that Party will only be entitled to Hydrocarbon production from the subsequent Development Phase, in which it did not participate, after it has satisfied the non-consent provisions in Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*. A Non-Participating Party in a subsequent Development Phase shall not unreasonably interfere with any activities or operations in that subsequent Development Phase. In all events, the

Participating Parties in the Execution AFE for a subsequent Development Phase shall control the sequence of, and shall conduct, all activities and operations in that subsequent Development Phase.

**12.10   Access to Existing Facilities**

A Participating Party in a subsequent Development Phase may propose to access the Facilities installed for a previous Development Phase in accordance with Article 14 *(Facilities and Gathering Systems)*.  The proposal shall require approval by Vote of the Participating Parties in the previous Development Phase and shall include the basic terms under which the access is to be granted.  If the proposal is approved, it shall be incorporated into a formal "Facilities Use and Production Handling Agreement" and shall bind all Parties.

**12.11   Enhanced Recovery and/or Pressure Maintenance Program Proposals**

Any Party may propose the formation of a Project Team separate and apart from any Project Team already in existence for the purpose of assisting the Operator in designing an enhanced recovery and/or pressure maintenance program for a particular Development Phase by submitting to the Parties for approval by Election an Enhanced Recovery Project Team AFE accompanied by a memorandum similar to the one described in Article 12.3.1 *(Proposal of Project Team)*.  Any Non-Participating Party in that Enhanced Recovery Project Team AFE is subject to Article 16.5.3 *(Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs)*.  The formation and administration of a Project Team for an enhanced recovery and/or pressure maintenance program will be handled under Exhibit "G."  The Costs of the Project Team will be handled as they are under Article 12.3.1 *(Proposal of Project Team)*.  After the Operator has designed the enhanced recovery and/or pressure maintenance program with the assistance of that Project Team, the Operator may submit an enhanced recovery and/or pressure maintenance program proposal and AFE to the Parties for approval by Vote.  The program proposal and AFE shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs, and benefits of the proposed program and AFE.  If approved, that proposal and AFE will be binding on all of the Participating Parties in the Execution AFE for that Development Phase, and the Operator shall commence the program at the Cost and risk of those Parties.

## **ARTICLE 13 – DEVELOPMENT OPERATIONS**

**13.1** **Proposal of Development Wells and Development Operations**

It is the intent of the Parties to proceed with the development of the Unit Area under an approved Development Plan.  Development Wells shall be subject to separate AFEs.

Once a Development Well has been completed and placed on production, the Participating Parties in that well must unanimously agree to allow any Party to conduct a Non-Consent Operation in that well, unless that well becomes incapable of producing in paying quantities.  A proposal to conduct Development Operations in a Producible Reservoir requires the unanimous agreement of the Parties, unless the proposing Party designates the Producible Reservoir as an Objective Depth or Completion zone in the proposal.

**13.1.1** **Proposal of Development Wells Included in a Development Plan**

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in a Development Plan and Execution AFE may propose drilling a Development Well that was included in the Development Plan by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties.  Each proposed Development Well that was included in the Development Plan requires approval by Election.

Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment as provided in Article 16 *(Non-Consent Operations)*.

**13.1.1.1** **Revision of Well Plan**

Unless otherwise provided for in the Development Well proposal and AFE, any revisions of the Well Plan or AFE for a Development Well shall take place under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.2 *(Revision of Well Plan)*.

**13.1.1.2** **Automatic Revision of the Well Plan**

The Well Plan for a Development Well shall automatically be revised under the same terms and conditions as those set forth for an Exploratory Well in Article 10.1.3 *(Automatic Revision of the Well Plan)*.

### 13.1.2 Proposal of Development Operations Not Included in a Development Plan

Subject to Article 13.1 *(Proposal of Development Wells and Development Operations)*, any Participating Party in an Execution AFE may propose drilling a Development Well that was not included in the Development Plan associated with that Execution AFE by giving notice of the proposal (along with the associated AFE and Well Plan) to the other Parties. The proposal shall specify that the well was not included in the Development Plan.  Each proposed Development Well that was not included in the Development Plan requires approval by Election.

Each Non-Participating Party in a Development Well will be subject to either acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

### 13.1.3 Pre-Development Well AFE Meeting

Prior to submitting an AFE for a new Development Well under Article 13.1.2 (*Proposal of Development Operations Not Included in a Development Plan*) (including any substitute well, except for a substitute well proposed while a rig is on the Unit Area), Operator shall call a meeting of the Parties entitled to an Election as to the contemplated new Development Well or its substitute, if applicable, to share with said Parties the preliminary scope of the contemplated new Development Well.  Although Operator may change, modify or alter the preliminary scope of the contemplated new Development Well subsequent to the meeting but prior to submission of the AFE associated therewith, as contemplated herein, the general items Operator will address at the meeting, at a minimum, shall consist of a preliminary well design, a preliminary rig selection/type and timing, a preliminary total estimated depth of the well, a preliminary Objective Depth criteria, a preliminary surface and bottomhole location(s) and a preliminary zone(s) of interest.  Should a Non-Operator contemplate proposing an AFE for a new Development Well (or its substitute, if applicable), said Non-Operator shall call a meeting consistent herewith.

### 13.1.4 Timely Operations

Except as provided below, drilling operations on a Development Well shall be commenced within one-hundred and eighty (180) days after the end of the period for the approval of the Development Well.  If the Operator, except for an occurrence of Force Majeure, does not commence drilling operations on the

Development Well within that one-hundred and eighty (180) day period, the approved Development Well proposal shall be deemed withdrawn, with the effect as if the Development Well had never been proposed and approved.

If an approved original or identical Development Well proposal is deemed withdrawn due to a failure to timely commence drilling operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Well, will be chargeable to the Participating Parties. Drilling operations for a Development Well under this Article 13.1.3 shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations for the approved Development Well are undertaken.

**13.1.5**     **AFE Overruns and Substitute Well**

Once a Development Well is commenced, the Operator shall drill the well with due diligence to its Objective Depth, subject to:

(a)     all supplemental AFEs required under Article 6.2.2 *(Supplemental AFEs)*,

(b)     the Operator encountering mechanical difficulties, uncontrolled influx of subsurface water, loss of well control, abnormal well or formation pressures, pressured or heaving shale, granite or other practicably impenetrable substances, or other similar conditions in the well bore or damage to the well bore that render, in the Operator's sole opinion, further well operations impractical, and

(c)     the unanimous agreement of the Participating Parties to cease drilling a Development Well before reaching Objective Depth.

If a Development Well is abandoned due to the conditions described under Article 13.1.4(b), then any Participating Party in the abandoned Development Well may, within sixty (60) days after abandonment of that Development Well, propose the drilling of a substitute well for the abandoned Development Well by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Participating Parties in the abandoned Development Well, and that proposal requires approval by Election of the Participating Parties in the abandoned Development Well.  The Well Plan for the substitute Development Well shall be substantially the same as the abandoned Development Well's Well

Plan and shall also take into account those conditions that rendered further drilling of the abandoned Development Well impractical.

Each Non-Participating Party in a substitute Development Well or an approved supplemental AFE for a Development Well will be subject to either an acreage forfeiture or Hydrocarbon Recoupment, as provided in Article 16 *(Non-Consent Operations)*.

**13.2    Development Operations at Objective Depth**

After a Development Well has been drilled to such Objective Depth and all operations in the controlling AFE have been conducted or terminated (except temporary abandonment and permanent plugging and abandonment) and all logs and test results have been distributed to the Participating Parties, the Operator shall promptly notify the Parties entitled to Vote or make an Election (i.e., the Participating Parties) of its proposal to conduct subsequent operations in the well.  Except for a proposal to permanently plug and abandon the well, the Operator's proposal shall include an associated AFE and a plan for the operation.

If the Participating Parties have secured the requisite approval to perform a subsequent Development Operation, and, provided that Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* was not applicable to the drilling of that Development Well, then, contingent upon the unanimous approval of the Participating Parties in the approved subsequent Development Operation, the Operator shall notify each former Non-Participating Party of the proposal. Each former Non-Participating Party may respond with an Election regarding such a proposal by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holiday) after receiving the Operator's notice. Any former Non-Participating Party making an Election to participate in the subsequent Development Operation shall be subject to Article 13.2.5.

The Operator's proposal shall be for one of the following operations:

(a)    conduct Additional Testing, Sidewall Coring, or Logging of the formations encountered prior to setting production casing;

(b)    Complete the well at the Objective Depth in the objective zone or formation;

(c)    Sidetrack the well, including the requisite plug back operations;

(d)    plug back the well and attempt a Completion in a shallower zone or formation;

(e)     Deepen the well to a new Objective Depth;

(f)     conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

(h)     permanently plug and abandon the well.

If the Operator fails to submit its proposal to the Participating Parties within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after receipt of all logs and test results from a Development Well, then any Participating Party may make a proposal.  In that event, the procedures in this Article 13.2 *(Development Operations at Objective Depth)* shall apply to that proposal, and any reference in this Article 13.2 to the "Operator's proposal" shall include a proposal made by a Participating Party.

### 13.2.1     Response to Operator's Proposal

A Participating Party may, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) of its Receipt of the Operator's proposal, make a separate proposal (along with an associated AFE and a plan for the operation), except if the proposal is to permanently plug and abandon the well) for one of the operations in Article 13.2 *(Development Operations at Objective Depth)*, and the Operator, immediately after the expiration of the twenty-four (24) hour period for making a separate proposal shall provide the Parties entitled to make an Election with a copy of all separate proposals so made.  If no separate proposal is made, the Parties entitled to make an Election shall, within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)  Receipt of the Operator's proposal; or

(b)  the commencement of Standby Charges,

make an Election on the Operator's proposal (except for a proposal to permanently plug and abandon).  If a separate proposal is made, the Parties entitled to make an Election shall make an Election under the procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*.  If a proposal to permanently plug and abandon the well is the only operation proposed, then the approval and Cost allocation provisions of Article 13.5 *(Permanent Plugging and Abandonment and Cost Allocation)* shall apply to the proposal. If Article

8.3 *(Second Opportunity to Participate)* or Article 8.4 *(Participation by Fewer Than All Parties)*, or both, apply to an Election, then the response period in those articles shall be twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) instead of forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays). Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information from the previous approved operation, then the response periods provided above shall not begin until the Parties entitled to make an Election in Article 13.2 *(Development Operations at Objective Depth)* have received the information from the previous approved operation.

**13.2.2**   **Response to Highest Priority Proposal**

If a separate proposal is made, each Party entitled to make an Election shall, within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) following the latter of:

(a)  Receipt from the Operator of a complete copy of all separate proposals; or

(b)  the commencement of Standby Charges,

make its Election on the highest priority proposal (except a proposal to permanently plug and abandon the well).  Article 13.2(a) has the highest priority, and Article 13.2(h) has the lowest priority.  If different depths or locations are proposed for the same type of operation, preference shall be given to the shallowest depth, or the location nearest to the existing well bore, as applicable. If the proposal with the highest priority is approved, then the lower priority proposals shall be deemed withdrawn.   Once the approved operation is completed, the Parties shall follow the procedure provided in this Article 13.2 *(Development Operations at Objective Depth)* for all other proposals for operations in the well bore until such time as the well is Completed, temporarily abandoned or permanently abandoned.

**13.2.3**   **Response on Next Highest Priority Proposal**

If the proposal with the highest priority is not approved, then the next highest priority proposal shall be deemed the highest priority proposal, and it shall be subject to the approval procedure in Article 13.2.2 *(Response to Highest Priority Proposal)*.  This process will continue until a proposal is approved to complete

the Development Well, temporarily plug and abandon the Development Well, or permanently plug and abandon a Development Well.

### 13.2.4    <u>Non-Participating Parties in Development Operations at Objective Depth</u>

A Non-Participating Party in a Development Operation conducted on a Development Well after it has reached its Objective Depth [except as provided for in this Article 13.2 *(Development Operations at Objective Depth)*] is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of that Development Operation, except that a Non-Participating Party in that Development Operation remains responsible for its Participating Interest Share of the Costs of plugging and abandoning a Development Well, less and except all Costs of plugging and abandoning associated solely with the subsequent Development Operation in which it was a Non-Participating Party.

### 13.2.5    <u>Participation in a Subsequent Development Operation by a Non-Participating Party in a Development Well at Objective Depth</u>

If a Development Well is drilled to its Objective Depth and a Non-Participating Party in that Development Well becomes a Participating Party in an approved subsequent Development Operation under Article 13.2, that former Non-Participating Party shall become an Underinvested Party in an amount equal to its Non-Participating Interest Share of the Costs of that Development Well to its Objective Depth prior to that subsequent Development Operation. The original Participating Parties in a Development Well are Overinvested Parties in that amount. A former Non-Participating Party in a Development Well that becomes a Participating Party in an approved subsequent Development Operation remains a Non-Participating Party in that Development Well to initial Objective Depth until (a) its Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)* and (b) the Hydrocarbon Recoupment recoverable under Article 16.5.4 *(Non-Consent Development Operations)* less the Underinvestment, has been recovered by the original Participating Parties. If a former Non-Participating Party becomes a Participating Party in more than one approved subsequent Development Operation in the same Development Well, that former Non-Participating Party shall become an Underinvested Party only with regard to the first subsequent Development Operation it approves; however, that Underinvestment shall not be relieved by an Underinvested Party's subsequent participation.

**13.3** **Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir**

Any Party may propose a Development Well with an Objective Depth below the Deepest Producible Reservoir, and in response to that well proposal each Party may, in writing, limit its participation in the drilling of that Development Well to the base of the Deepest Producible Reservoir to be penetrated by that Development Well.  A Party who limits its participation in a Development Well to the base of the Deepest Producible Reservoir shall bear its Participating Interest Share of the Cost and risk of drilling that Development Well to the base of the Deepest Producible Reservoir (including abandonment), and it shall be a Non-Participating Party for the Deeper Drilling and shall be subject to Article 16.5.4 (*Non-Consent Development Operations*) in regard to the Deeper Drilling.

**13.3.1** **Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir**

If a Party Electing to limit its participation in a well to the base of the Deepest Producible Reservoir to be penetrated by the well under Article 11.3 *(Appraisal Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* or Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* considers the well to be capable of producing at or above the Deepest Producible Reservoir and has notified the Participating Parties down to Objective Depth of its desire to complete the well at or above the Deepest Producible Reservoir, the well will be drilled subject to the following provisions:

(a) **Multiple Completion:**  If before drilling of the well commences, all Participating Parties in the well agree that multiple well Completions are possible and practicable and that those Completions will involve (i) a Completion at or above the Deepest Producible Reservoir and (ii) a Completion below the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling will bear one hundred percent (100%) of the Costs of drilling the well to an Objective Depth below the Deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the Deepest Producible Reservoir.

(b) **Single Completions:**  If prior to the commencement of the drilling of the well, the Participating Parties do not unanimously agree that multiple well Completions are possible, then the first Completion shall be at the

objective deeper than the Deepest Producible Reservoir.   A Non-Participating Party in the Deeper Drilling is an Overinvested Party in the well in an amount equal to its Participating Interest Share of the Costs of drilling the well to the Deepest Producible Reservoir, and the Participating Parties in the Deeper Drilling on the well are Underinvested Parties for that amount upon the first of the following events to occur:

(i)      the well is not a Producible Well at a depth deeper than the Deepest Producible Reservoir and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(ii)     the well is completed as a Producible Well at a depth deeper than Deepest Producible Reservoir, but Hydrocarbon production from that depth is later depleted prior to Complete Recoupment (in regard to Deeper Drilling) and the well is plugged back to a zone at or above the Deepest Producible Reservoir;

(iii)    the well is completed as a Producible Well at a depth deeper than the Deepest Producible Reservoir and the Participating Parties have achieved Complete Recoupment (in regard to the Deeper Drilling) from Hydrocarbon production from a zone deeper than the Deepest Producible Reservoir;

(iv)    the well is plugged and abandoned prior to an attempted Completion at or above the Deepest Producible Reservoir.

The Underinvestment will be depreciated at the rate of one-half of one percent (0.50%) per month from the date the Deeper Drilling commences to the date the Non-Participating Party is entitled to share in the Hydrocarbon production from zones deeper than Deepest Producible Reservoir, but that depreciation will not reduce the Underinvestment below seventy-five percent (75%) of the original Underinvestment.

### 13.3.2     Completion Attempts At or Above the Deepest Producible Reservoir

If a Development Well in which Deeper Drilling is conducted is not completed for production below the Deepest Producible Reservoir, then the Participating Parties in that well down to the Deepest Producible Reservoir may use the well for Completion in a zone at or above the Deepest Producible Reservoir. The

Parties who paid their proportionate share of the drilling Costs to the base of the Deepest Producible Reservoir under Article 13.3 *(Development Well Proposals That Include Drilling Below the Deepest Producible Reservoir)* may participate in the Completion attempt in the zone at or above the Deepest Producible Reservoir.  The Participating Parties in the Deeper Drilling operation shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for its Completion in the zone at or above the Deepest Producible Reservoir.  If a well drilled below the Deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the Deepest Producible Reservoir, the Participating Parties in the Deeper Drilling are obligated to reimburse the Non-Participating Parties in the Deeper Drilling for their Participating Interest Share of the Costs of drilling the well to the base of the Deepest Producible Reservoir.

**13.4**    **Recompletions and Workovers**

Any of the Participating Parties in the subsequent Development Operation, Recompletion, or Workover that resulted in the most recent Hydrocarbon production from a Development Well may propose a Recompletion in or Workover of that Development Well.  Each Recompletion or Workover, including the permanent plugging and abandonment of a Producible Reservoir, requires approval by Vote of those Participating Parties.  A Non-Participating Party in a Recompletion or Workover is subject to Article 16.5.4 *(Non-Consent Development Operations)* and is relieved of the Costs and risks of the Recompletion or Workover but remains responsible for its Participating Interest Share of the Costs of plugging and abandoning the Development Well, less and except any Costs of plugging and abandoning associated solely with a Recompletion or Workover in which it is a Non-Participating Party.

**13.5**    **Permanent Plugging and Abandonment and Cost Allocation**

Except as otherwise provided in this Agreement, the permanent plugging and abandonment of a Development Well that is located on active lease and:

(a)    is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth under Article 13.1.4 (b),

(b)    is to be plugged under Article 13.2 (*Development Operations at Objective Depth*), or

(c)  has been previously temporarily abandoned under Article 13.2 (*Development Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of Production Testing), requires the approval of the Participating Parties by unanimous agreement.  Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of Production Testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If a proposal to plug and abandon a Development Well receives approval by unanimous agreement, the approved proposal binds all Parties.  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5 (a) or 13.5 (b) does not receive approval by unanimous agreement, and if within twenty-four (24) hours (exclusive of Saturdays, Sundays, and federal holidays) after Receipt of that proposal no other operation is proposed (and subsequently approved) for the well by a Party entitled to make a proposal, the Operator may nevertheless proceed to plug and abandon the Development Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of Production Testing) does not receive approval by unanimous agreement, but the Operator, in its sole and reasonable opinion, deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nevertheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

The Participating Parties in a Development Well proposal shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 (*Development Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFEs*).  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

## ARTICLE 14 – FACILITIES AND GATHERING SYSTEMS

### 14.1  Facilities as a Part of Development Plan

The Development Plan shall provide for the installation of all Facilities necessary to handle or service Hydrocarbons produced pursuant to that Development Plan.  If the approved

Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Development Plan shall provide for a Development System designed to use Offsite Host Facilities.

**14.2**   **Use of Offsite Host Facilities**

In the event the approved Development Plan provides that Hydrocarbon production can most efficiently be processed and handled by Offsite Host Facilities, the Participating Parties shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities under the terms submitted to the Parties by the Operator under Article 12.4.1 (f) (*Tieback Operations)*, but no Participating Party shall have a duty (fiduciary or otherwise) to secure capacity in the Offsite Host Facilities on behalf of any other Participating Party.  However, any capacity secured by that "Facilities Use and Production Handling Agreement" to Offsite Host Facilities shall be shared proportionately by the Participating Parties, who executed the "Facilities Use and Production Handling Agreement," on the basis of their Participating Interest Share in the Development System, unless those Parties agree to a different proportionate share of the capacity.  This Agreement shall govern all operations and activities regarding Hydrocarbon production, which are not specifically addressed in the "Facilities Use and Production Handling Agreement." This Article 14.2 shall not constitute a limit on a Party's right to install its own facilities under Article 15 *(Disposition of Hydrocarbon Production)*.

**14.3**   **Use of Development Systems**

The Participating Parties in a Development System have priority access to and utilization of the Facilities associated with the Development System in order to operate and develop the Unit Area under an approved Development Plan.

**14.4**   **Processing Priorities**

The Participating Parties in a Development System jointly own all processing and handling capacity associated with that Development System.  The use of excess processing or handling capacity in that Development System is subject to the following priority of usage:

(a)   First priority to Hydrocarbon production from the Development Phase during which the existing processing Facilities were fabricated and installed;

(b)   Second priority to Hydrocarbon production from a Development Phase during which the existing processing Facilities were not fabricated and installed;

(c)     Third priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by all Participating Parties in the Development System in the same percentage as their ownership in that Development System;

(d)     Fourth priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by all of the Participating Parties in the Development System but not in the same percentage as their ownership in the Development System;

(e)     Fifth priority to hydrocarbon production from outside the Unit Area that is owned by all Participating Parties in the Development System and a third party;

(f)     Sixth priority to hydrocarbon production from outside the Unit Area that is owned by one or more Participating Parties in the Development System, but not by all of them, and a third party; and

(g)     Seventh priority to hydrocarbon production from outside the Unit Area that is owned one hundred percent (100%) by a third party.

Any hydrocarbon production processing and handling capacity offered to parties under (d), (e), (f), and (g) of this Article 14.4 shall be processed and handled under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Execution AFE for that Development System and, if applicable, the Participating Parties in any additional Facilities which are to be used for the processing or handling of those hydrocarbons.

**14.5     Approval of Additional Facilities**

This Article 14.5 shall only apply to Facilities that were not included in an approved Development Plan and are to be utilized for Hydrocarbon production.  Any Participating Party in an Execution AFE for a Development System may propose the installation of additional Facilities beyond those specified in the Development Plan associated with that Development System by giving notice to the other Participating Parties (along with an associated AFE), together with information adequate to describe the proposed Facilities. Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities beyond the scope of a Development Plan requires the approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive the additional Facilities.  Upon approval of such a proposal, the Operator shall proceed to install the additional Facilities, provided that, in the

judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Unit Area and there is sufficient deck space and buoyancy available to support the proposed additional Facilities. A Non-Participating Party in a proposal for additional Facilities shall be subject to Article 16.5.5 *(Non-Consent Subsequent Development System and Additional Facilities)*. If the Facilities proposal is for a disposal well, that Facilities proposal shall contain the same information provided in a Development Well proposal.

**14.6    Expansion or Modification of Existing Production System**

This Article 14.6 shall only apply to expansions or modifications of a Production System that are to be utilized for activities or operations on the Unit Area.  After installation of a Production System described and approved in a Development Plan, any Participating Party in that Production System may propose the expansion or modification of that Production System by written notice (along with its associated AFE) to the other Participating Parties in that Production System.  That proposal requires the approval by Vote of the Participating Parties in that Production System.  If approved, that proposal will be binding on all Participating Parties in that Production System, and the Operator shall commence that expansion or modification at the sole Cost and risk of all of the Participating Parties in that Production System unless otherwise agreed.

**14.7    Additions, Expansion, or Modification of Production System or Facilities for Health, Safety, or Environmental Reasons**

If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval by Vote of the Participating Parties in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System.  If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Execution AFE (and all supplemental AFEs) for the Development System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

**14.8    Repairs of Production System or Facilities**

Subject to Article 6.2 (*AFEs),* the Operator may make repairs to the Production System and/or Facilities as needed to keep the Production System and/or Facilities in good working order, as approved by Election.  A Non-Participating Party as to the Costs to repair the Production System and/or Facilities shall be subject to Article 16.4 (*Non-Consent Operations to Maintain Unit Area*) or 16.5.3 (*Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs, or Long Lead Well Operation AFEs*), as applicable.

## ARTICLE 15 – DISPOSITION OF HYDROCARBON PRODUCTION

**15.1    Duty to Take in Kind**

Each Party has the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Unit Area, excluding (i) Hydrocarbons that are unavoidably lost and (ii) Hydrocarbon production that the Operator uses in production or Development Operations or in preparing and treating Hydrocarbons for marketing or transportation in an Export Pipeline.

**15.2    Facilities to Take in Kind**

Each Participating Party in the Execution AFE for a Development System has the right, at its sole cost and risk, to construct and install facilities on and connect pipelines to the Development System for purposes of taking its share of Hydrocarbon production in kind, provided that, in the judgment of the Operator, the installation and operation of those facilities and pipelines will not unreasonably interfere with continuing operations on the Development System or the Unit Area.

**15.3    Failure to Take Oil and/or Condensate in Kind**

If a Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Unit Area, the Operator shall have the right, but never the obligation, to purchase for its own account, sell to others, or otherwise dispose of all or part of that oil or condensate to others at the prevailing price in the area for oil or condensate of the same kind, gravity, and quality reasonably obtained by the Operator under the circumstances, subject to revocation by the non-taking Party upon thirty (30) days written notice to the Operator but shall not take effect until the Operator's sales contract with a third party terminates.  The Operator is not obligated to obtain a price equal to the price at which its oil or condensate is sold.  The Operator's right to take in kind or dispose of a non-taking

Party's share of the oil or condensate is subject to the non-taking Party's right, at any time and from time to time, to take in kind or dispose of its share of the oil or condensate.  All contracts of sale by the Operator for another Party's oil or condensate shall be only for such reasonable periods not to exceed one hundred and eighty (180) days.  Proceeds of all sales by the Operator under this Article 15.3 shall be paid to the Party entitled thereto once in each calendar month. The Operator shall pay all lessor royalties for oil and/or condensate not taken in kind by the non-taking Party.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with a non-taking Party.

## 15.4   Gas Balancing Provision

If for any reason a Party fails to take or market its full share of gas as produced, the gas balancing and accounting between the Parties shall be handled under Exhibit "D."

## 15.5   Expenses of Delivery in Kind

All Costs incurred by the Operator in making delivery of a Party's share of Hydrocarbon production or disposing of same shall be borne by that Party.

## ARTICLE 16 – NON-CONSENT OPERATIONS

### 16.1   Conduct of Non-Consent Operations

Any activity or operation that invokes this Article 16 *(Non-Consent Operations)* must be proposed by a Party in good faith, using Cost estimates and Objective Depths that are reasonable for the Unit Area.  Non-Consent Operations shall not unreasonably interfere with activities or operations conducted by all Parties, unless the Non-Consent activity or operation will maintain all or a portion of the Unit Area under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.

#### 16.1.1   Costs

The Costs of a Non-Consent Operation shall be borne by the Participating Parties in accordance with their Participating Interest Share in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  Within ninety (90) days after a Non-Consent Operation has been conducted, the Operator shall furnish all other Parties with either (a) an itemized statement of the Cost of the Non-Consent Operation and an inventory of the pertinent equipment or (b) a detailed statement of monthly billings.  The Operator shall furnish to the Parties a monthly statement showing operating, maintenance, and other expenses

attributable to the Non-Consent Operation together with a statement of the quantity of Hydrocarbons produced, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to Hydrocarbon Recoupment under this Article 16.  In accounting for the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests, or as otherwise permitted in the DOI Surface or Subsurface Commingling Approval. Operating expenses shall be allocated under Article 16.8.3 *(Operating and Maintenance Charges)*.  If a Party takes its share of production in kind under Article 15 *(Disposition of Hydrocarbon Production)*, that Party shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for those Hydrocarbons so that the Operator may calculate the balance of any Hydrocarbon Recoupment amounts.

The calculation of the balance of Hydrocarbon Recoupment shall be accomplished as follows:

The Operator shall prepare the monthly statement of the quantities of oil and gas produced and the amounts of the proceeds from the sale of all Non-Participating Parties' relinquished production based on the proceeds received for the Operator's share of production.  When Operator's payout calculation indicates that payout has occurred, the Operator shall promptly notify all Parties.  The Participating Parties shall then provide the Operator all information pertaining to the cumulative proceeds received from the sale of the Non-Participating Parties' relinquished production.  The Operator shall revise the payout date using the actual proceeds from the sale of the Non-Participating Party's relinquished production and administer subsequent adjustments between the Parties.

### 16.1.2    Multiple Completions

Non-Consent Operations shall not be conducted in a well having multiple Completions unless:

(a)    each of the multiple Completions are owned by the same Parties in the same proportion;

(b)     none of the previous well Completions are capable of producing in paying quantities; or

(c)     the Participating Parties in the well containing the multiple Completions unanimously agree to those Non-Consent Operations.

For the purposes of this Article 16, each Completion is a separate well.

**16.2    NOTE: It is hereby agreed amongst the signatories of this Unit Operating Agreement that the Acreage Forfeiture Provisions for the First Exploratory Well and Substitute Wells(s) for the First Exploratory Well are not applicable to this Unit Agreement.**

~~**Acreage Forfeiture Provisions**~~

~~In view of the significantly greater risks associated with the first Exploratory Well and the Execution AFE for the initial Development System, the Participating Parties in the first Exploratory Well or that Execution AFE are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Unit Area of the Non-Participating Parties in that well or AFE as provided below.~~

~~**16.2.1    First Exploratory Well & Substitute Well(s) for the First Exploratory Well**~~

~~**16.2.1.1    First Exploratory Well**~~

~~If a Participating Party proceeds with the timely commencement of the drilling of the first Exploratory Well as a Non-Consent Operation and~~

~~(a)     the first Exploratory Well is drilled to its Objective Depth; or~~

~~(b)     the first Exploratory Well is drilled to a depth shallower than its Objective Depth and one hundred percent (100%) or more of the total amount of the AFE for that Exploratory Well is expended,~~

~~then within thirty (30) days after notice of the occurrence of an event described in clause (a) or (b), a Non-Participating Party in the first Exploratory Well shall execute and deliver an assignment of all of its right, title, and interest in the Unit Area, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date actual drilling operations for the well are commenced, to the Participating Parties in the first Exploratory Well or its substitute well, as applicable, with no reimbursement by and at no Cost to those Participating Parties. If an assignment is made under this Article 16.2.1.1,~~

then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election not to participate in the first Exploratory Well shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement)*, and the Parties shall be subject to Article 17 *(Withdrawal From Agreement)*.  After the satisfaction of Article 16.2.1.1(a), a Non-Consent Operation performed in the first Exploratory Well's well bore or its substitute's well bore, as applicable, shall not be subject to this Article 16.2.1.1 but shall be subject to the Hydrocarbon Recoupment premium provided in Article 16.5.1.1 *(Non-Consent Exploratory Operations at Objective Depth)*, except as provided in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.

**16.2.1.2   Substitute Well(s) for First Exploratory Well**

If all Parties Elect to participate in the First Exploratory Well, and such well is commenced and abandoned under Article 10.1.5 (*AFE Overruns and Substitute Well*) prior to reaching its Objective Depth, and then a Party proposes the drilling of a substitute well for such first Exploratory Well, then any Party that Elects not to participate in such substitute well shall be subject to acreage forfeiture or Hydrocarbon Recoupment as provided in this Article 16.2.1.2.  If, upon abandoning the first Exploratory Well under Article 10.1.4 (*AFE Overruns and Substitute Well*), the Parties have expended an amount equal to or more than fifty percent (50%) of the AFE for such first Exploratory Well, then a Party that Elects not to participate in a substitute well for such first Exploratory Well, shall be subject to the Hydrocarbon Recoupment as provided in Article 16.5.1.2 (*Non-Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well*). If, upon abandoning the first Exploratory Well under Article 10.1.5 (*AFE Overruns and Substitute Well*), the Parties have expended an amount less than fifty percent (50%) of the AFE for such first Exploratory Well, then a Party that Elects not to participate in a substitute well for such first Exploratory Well, shall be subject to acreage forfeiture as provided in Article 16.2.1.1 (*First Exploratory Well*).

**16.2.2     Execution AFE**

Within thirty (30) days of notice of the timely commencement of the activities or operations associated with the Execution AFE for the initial Development System, a Non-Participating Party in that Execution AFE shall execute and

deliver an assignment of all of its right, title, and interest in the Unit Area to the Participating Parties in that Execution AFE, free of all Lease Burdens as defined in Article 19.1 *(Burdens on Hydrocarbon Production)*, effective on the date the construction or acquisition of the initial Development System is commenced, with no reimbursement by and at no Cost to those Participating Parties.  If an assignment is made under this Article 16.2.2, then each Participating Party shall accept its Participating Interest Share, as determined under Article 8.4 *(Participation by Fewer Than All Parties)*, of the Non-Participating Party's assigned interest.  The Non-Participating Party's Election not to participate in the Execution AFE for the initial Development System shall be deemed a withdrawal under Article 17 *(Withdrawal From Agreement),* and the Parties shall be subject to Article 17 *(Withdrawal From Agreement).*

**16.3**  **Costs and Liabilities of Prior Operations**

Subject to Article 6.2.2 *(Supplemental AFEs)*, a Non-Participating Party subject to a non-consent provision remains liable for its share of previously incurred Costs and liabilities for activities and operations in which it was a Participating Party, and there shall be no re-allocation of Costs for activities and operations in which it was a Participating Party, except as provided in Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)*.

**16.4**  **Non-Consent Operations to Maintain Unit Area**

If a proposal is made for

(a)   an activity or operation required under a governmental agency order, notice, regulation, or Lease to maintain all or part of the Unit Area; or

(b)   an activity or operation

(i)    within the final three hundred and sixty-five (365) days of the primary term of a Lease, and if the Lease is not held by any means and will expire under its own terms, or

(ii)   within ninety (90) days prior to the deadline for an activity or operation required under an SOO or SOP activity schedule or a unit plan of operation,

and the proposal requires approval by Vote, Election or unanimous agreement and that approval or agreement is not obtained within the applicable response period, then, notwithstanding any contrary provision of Article 8 *(Approvals and Notices)*, the proposed

activity or operation shall be deemed to have been approved, and all Parties that Voted or Elected or agreed by written statement to participate in the proposed activity or operation may proceed with the proposed activity or operation at their sole Cost and risk. However, before those Parties commence that activity or operation, they shall give written notice to the other Parties of their intention to commence that activity or operation. The other Parties shall have a second opportunity to participate in that activity or operation, under Article 8.3 *(Second Opportunity to Participate)*.

### 16.4.1    Acreage Forfeiture in the Entire Unit Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* in order to maintain the entire Unit Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Unit Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. Failure to participate in that activity or operation is deemed a withdrawal, and the Parties will be subject to Article 17 *(Withdrawal From Agreement)*.

### 16.4.2    Acreage Forfeiture in a Portion of a Unit Area

If it is necessary to conduct an activity or operation referred to in Article 16.4 *(Non-Consent Operations to Maintain Unit Area)* in order to maintain a portion of the Unit Area, then each Non-Participating Party in that activity or operation shall relinquish and permanently assign, effective on the date the operation is commenced, to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Unit Area, including property and equipment acquired under this Agreement, within thirty (30) days of the commencement of that activity or operation. That assignment shall be conveyed to the Participating Parties in proportion to their Participating Interest Share in that activity or operation. The Non-Participating Party shall bear all expenses associated with that assignment and shall be subject to Article 17.3.1 *(Prior Expenses)*, Article 17.3.2 *(Confidentiality)* and Article 17.3.3 *(Emergencies and Force Majeure)* with respect to the assigned acreage. If a Development System does not exist at the time of the forfeiture assignment or if the Non-Participating Party, who forfeited its interest under this Article 16.4, was a Non-Participating Party in the Development System which is located in

the non-forfeited portion of the Unit Area, upon DOI approval of that assignment, the assigned acreage shall be expunged from Exhibit "A," and it shall no longer be included in the Unit Area.  If that assignment is to two or more Participating Parties in that activity or operation, then (a) the assigned acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by those Participating Parties shall be considered a mere formality only, (c) the Operator of the assigned acreage shall promptly prepare that operating agreement, and (d) the Participating Parties shall promptly execute it.  If a Development System is located on the non-forfeited portion of the Unit Area and if the Participating Parties in the operation or activity, which were conducted in order to save the forfeited portion of the Unit Area, are Participating Parties in that Development System, the Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Unit Area and a separate operational area for the non-forfeited portion of the Unit Area, and this Agreement shall apply separately to each operational area; provided however, the Participating Parties in the Development System located on the non-forfeited portion of the Unit Area, who participated in the operation or activity, which were conducted in order to save the forfeited portion of the Unit Area, shall have the same priority of access to that Development System as the Parties in the separate operational area for the non-forfeited portion of the Unit Area.

### 16.4.3    Limitations on Acreage Forfeiture

Notwithstanding the foregoing, if more than one activity or operation is conducted under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*, any one of which would maintain the entire Unit Area or the affected portion of the Unit Area, a Participating Party in any one of those activities or operations shall not be required to make an assignment under Article 16.4 *(Non-Consent Operations to Maintain Unit Area)*.  In addition, no Party is required to relinquish or assign all or any portion of its Working Interest in the Unit Area if a governmental agency order, notice, regulation, Lease provision, SOO or SOP activity schedule, or unit plan of operation requiring the activity or operation is appealed and successfully overturned.

**16.5    Percentage Hydrocarbon Recoupment for Non-Consent Operations**

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, upon the timely commencement of a Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with its title to that portion of future Hydrocarbon production provided in this Article 16.5, if any, shall be owned by and vested in each Participating Party in accordance with its Participating Party Interest Share in the Non-Consent Operation under Article 8.4 *(Participation by Fewer Than All Parties)*. A third-party cash contribution made for Confidential Data from a Non-Consent Operation shall be deducted from the Non-Participating Interest Share of the Costs of the well operation or of drilling and completing the well, as applicable, prior to computation of the Hydrocarbon Recoupment amount.

16.5.1    ~~Non-Consent Exploratory Operations down to Objective Depth in the First Exploratory Well~~

~~Except for the Hydrocarbon Recoupment provided in Articles 16.2.1.2 (*Substitute Well(s) for the First Exploratory Well*) and 16.5.1.2 (*Non Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well*) Since the Participating Parties in the first Exploratory Well are entitled to an assignment of all of the right, title, and interest (including operating rights) in the Unit Area of the Non-Participating Parties in that well as provided in Article 16.2.1.1 (*First Exploratory Well*), there is no Hydrocarbon Recoupment for Non Consent Exploratory Operations conducted in the first Exploratory Well down to its Objective Depth.~~

16.5.1.1    **Non-Consent Exploratory Operations at Objective Depth**

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations conducted after the first Exploratory Well has reached its Objective Depth, be they non-consent Exploratory Wells other than the first Exploratory Well or operations conducted subsequent to an Exploratory Well, including the first Exploratory Well, reaching its Objective Depth, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight hundred percent (800%).

**16.5.1.2** **Non-Consent Exploratory Operations for a Substitute Well(s) for the First Exploratory Well**

The Hydrocarbon Recoupment amount for all non-consent Exploratory Operations down to Objective Depth conducted in a substitute well for the first Exploratory Well, be they non-consent substitute Exploratory Wells other than a substitute well for the first Exploratory Well, is the Non-Participating Interest Share of the Costs of that Non-consent Operation multiplied by eight percent (800%).

**16.5.2** **Non-Consent Appraisal Operations**

The Hydrocarbon Recoupment amount for all Appraisal Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of the Costs of the Appraisal Operation multiplied by six hundred percent (600%).

**16.5.3** **Non-Consent Proprietary Geophysical Operations, Feasibility AFEs, Selection AFEs, Define AFEs, Long Lead Development System AFEs, Post-Production Project Team AFEs, Enhanced Recovery Project Team AFEs or Long Lead Well Operation AFEs**

If a Non-Participating Party in a Proprietary Geophysical Operation, Feasibility AFE, Post-Production Project Team AFE, Enhanced Recovery Project Team AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to one hundred and fifty percent (150%) of the amount it would have paid had it participated in that activity, operation, or AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.   If a Non-Participating Party in a Selection AFE, Define AFE, Long Lead Development System AFE or Long Lead Well Operation AFE takes, or is deemed to have taken, the steps set forth in Article 16.9 *(Settlement of Underinvestments)*, that Party is an Underinvested Party in an amount equal to two hundred percent (200%) of the amount that the it would have paid had it participated in that AFE until the Underinvestment is eliminated under Article 16.9 *(Settlement of Underinvestments)*.

**16.5.4** **Non-Consent Development Operations**

The Hydrocarbon Recoupment amount for all Development Operations conducted as Non-Consent Operations is the Non-Participating Interest Share of

the Costs of the Development Operation multiplied by four hundred percent (400%).

### 16.5.5   Non-Consent Subsequent Development System and Additional Facilities

The Hydrocarbon Recoupment amount for a non-consent Execution AFE for a subsequent Development System or additional Facilities not included in an Execution AFE is the Non-Participating Interest Share of the Cost incurred with respect to that Execution AFE or those additional Facilities not included in an Execution AFE multiplied by three hundred percent (300%).

### 16.5.6   Additional Hydrocarbon Recoupment

In addition to the percentage Hydrocarbon Recoupment for the various Non-Consent Operations set forth above, the Participating Parties are entitled to recoup:

(a)   one hundred and ten percent (110%) of the Non-Participating Interest Share of the Cost of using an existing Development System that is needed to serve a Production System or Facilities installed as a Non-Consent Operation, in which the Non-Participating Party has a Participating Interest; plus

(b)   one hundred and ten percent (110%) of the Non-Participating Interest Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, and production taxes and other governmental fees based on production.

### 16.5.7   Hydrocarbon Recoupment From Production

Hydrocarbon Recoupment for a Non-Consent Operation shall be made from the Hydrocarbon production as follows:

#### 16.5.7.1   Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir

For

(a)   an Exploratory Operation,

(b)   an Appraisal Operation, or

(c)     a Development Operation,

that is conducted as a Non-Consent Operation and discovers a new Producible Reservoir or extends an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from

(i)     one hundred percent (100%) of its Non-Participating Interest Share of all Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production, and

(ii)    fifty percent (50%) of its Participating Interest Share of all Hydrocarbons produced and saved from operations conducted after the Non-Consent Operation that result in Hydrocarbon production from the same Producible Reservoir discovered or extended by the Non-Consent Operation.

### 16.5.7.2     Non-Consent Development Operations in an Existing Producible Reservoir

If a Development Operation is conducted as a Non-Consent Operation and does not discover a new Producible Reservoir and also does not extend an existing Producible Reservoir (as the Producible Reservoirs existed at the time the Development Operation was proposed), each Non-Participating Party shall satisfy Hydrocarbon Recoupment from one hundred percent (100%) of its Non-Participating Interest Share of Hydrocarbons produced and saved from the Non-Consent Operation, if the Non-Consent Operation results in Hydrocarbon production.

### 16.5.7.3     Non-Consent Subsequent Development Systems

If the construction and installation of a subsequent Development System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

(a)     one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all Development

Operations that are conducted from that subsequent Development System, and

(b) one hundred percent (100%) of its Non-Participating Interest Share or its Participating Interest Share (whichever applies) of Hydrocarbons produced and saved from all wells that benefit from injection or disposal wells drilled and/or operated from that subsequent Development System.

**16.6    Restoration of Interests to Non-Participating Party**

Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, a Non-Participating Party's Working Interest and leasehold operating rights revert to the Non-Participating Party, effective at 7:00 a.m. of the day after the occurrence of the first of the following events:

(a) the well bore of the Non-Consent Operation is not a Producible Well on the date the permanent plugging and abandonment of the well concludes;

(b) Hydrocarbon production recouped under Article 16.5.7 *(Hydrocarbon Recoupment From Production)* as result of a Non-Consent Operation ceases prior to Complete Recoupment;

(c) the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well, or Development Well and that well does not qualify as a Producible Well; or

(d) upon Complete Recoupment.

However, only upon Complete Recoupment does a former Non-Participating Party become a Participating Party in the Non-Consent Operation.

**16.6.1    Dry Hole Reversion**

If a Non-Consent Operation, other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Unit Area)*, results in an event provided in Article 16.6 (a) or (b) and a Non-Participating Party's Working Interest and leasehold operating rights revert back to the Non-Participating Party, all well equipment in place as a result of that Non-Consent Operation and all Development Systems fabricated and installed as a result of that Non-Consent Operation and rights to future Hydrocarbon production from a Producible Reservoir discovered or extended by

that Non-Consent Operation as described in Article 16.5.7 *(Hydrocarbon Recoupment From Production)* remain vested in the Participating Parties. Any salvage value in excess of Complete Recoupment will be credited to all Parties according to their Working Interest and without regard to their participation status.

### 16.6.2  Sidetracking or Deepening a Non-Consent Well

If a Non-Participating Party participates in a Sidetracking or Deepening as provided in Article 10.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Exploratory Well at Initial Objective Depth)*, Article 11.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in an Appraisal Well at Objective Depth),* or Article 13.2.5 *(Participation in Sidetrack or Deepening by a Non-Participating Party in a Development Well at Objective Depth)*, and if the Participating Parties have recouped the Cost of the original well down to its Objective Depth at the time the Sidetrack or Deepening is approved by Election, then the Non-Participating Party shall not be an Underinvested Party in the Sidetracking or Deepening of that well, and the Participating Parties in the original well shall achieve Complete Recoupment under Article 16.5.7.1 *(Non-Consent Exploratory Operations, Non-Consent Appraisal Operations, and Non-Consent Development Operations That Discover or Extend a Producible Reservoir)* or Article 16.5.7.2 *(Non-Consent Development Operations in an Existing Producible Reservoir)*, whichever applies.

### 16.7  Operations From a Subsequent Non-Consent Development System

A Party who Elected not to participate in a subsequent Development System may participate in Development Operations from that subsequent Development System. If that Non-Participating Party participates in such a Development Operation, then the Non-Participating Party shall make to the Operator a lump sum payment of any remaining Hydrocarbon Recoupment and Underinvestment under Article 16 *(Non-Consent Operations)* for which it is still liable. The Operator shall then distribute to the Participating Parties in the subsequent Development System their Participating Interest Share of the payment. Upon that payment, the Non-Participating Party will become an owner and a Participating Party in the subsequent Development System.

**16.8    Allocation of Development System Costs to Non-Consent Operations**

In the event a well is drilled from or produced through a Production System or is produced through Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest Shares in that Production System or Facilities are different from their Participating Interest Shares in that well, the rights of the Participating Parties in that well and the Costs to use the Production System or Facilities for that well shall be determined as follows:

**16.8.1    Investment Charges**

(a)    The Participating Parties in that well shall pay to the Operator a one-time slot usage fee for the use of a slot on the Production System equal to two percent (2%) of the Cost of the Production System; provided, however, each Non-Participating Party's share of the slot usage fee shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of the Non-Consent Operation's utilizing that slot.  Within fifteen (15) days of its receipt of that fee, the Operator shall distribute to the Participating Parties in the Production System their Participating Interest Share of that payment.  For purposes of calculating the slot usage fee, the total Cost of the Production System shall be reduced by .416667 percent per month, commencing on the date the Production System was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total Cost of the Production System shall not be reduced by more than twenty-five percent (25%) of the total Production System's costs.  The Cost of additions to the Production System shall be reduced in the same manner commencing the first month after the addition is installed.

If that well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment.  If that substitute well is abandoned, having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Production System slot through which the well was drilled shall terminate.

The slot usage fee shall not apply to a slot deemed to be "surplus." A slot may be deemed surplus only by the unanimous agreement of the owners of the Production System.

(b)    The Participating Parties in that well shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of those Facilities that the throughput volume of the Non-Consent Operation bears to the total design throughput volume of the Facilities. Throughput volume shall be estimated by the Operator in barrels produced per day (5.8 mcf of gas determined at a pressure of 14.73 pounds per square inch atmospheric and a temperature of sixty (60) degrees Fahrenheit equaling one barrel of oil and one barrel of water equaling one barrel of oil), using an average daily volume of the first three months of Hydrocarbon and water production from the Non-Consent Operation. For purposes of calculating the Facilities usage fee, the total Cost of the Facilities shall be reduced by .41667 percent per month, commencing from the date when the Facilities were installed and continuing every month thereafter until the first month during which production from the Non-Consent Operation commences, but the total Cost of the Facilities shall not be reduced more than twenty-five percent (25%) of the total Facilities' Cost. If a modification, expansion, or addition to the Facilities is made after commencing first production and before connection of the Non-Consent Operation to the Facilities, the Facilities investment shall be reduced in the same manner described above, from the month in which the Facilities modification, expansion, or addition is completed until the first month during which production from the Non-Consent Operation is commenced.

**16.8.2    Payments**

Payment of a usage fee shall not be deemed to be a purchase by the Participating Parties of an additional interest in the Production System or Facilities. Payments under Article 16.8.1 *(Investment Charges)* shall be due and payable on commencement of initial production from the Non-Consent Operation.

**16.8.3    Operating and Maintenance Charges**

The Participating Parties in a well drilled as a Non-Consent Operation shall pay all Costs necessary to connect the well to the Production System. The Costs of operating and maintaining the Facilities and the Production System shall be

allocated equally among all active Completions served.  Subsea Production System operating and maintenance Costs shall be allocated equally among all subsea well Completions served by the Subsea Production System.  Operating and maintenance Costs for the Facilities shall be allocated to each well served in the proportion that the volume throughput of the well bears to the total volume throughput of all wells handled by the Facilities.

**16.9**    **Settlement of Underinvestments**

A Non-Participating Party shall become an Underinvested Party and become liable for settling an Underinvestment if it (a) makes a revised Election or Vote to become a Participating Party in an AFE, activity, or operation in which it originally Elected or Voted not to participate, (b) Elects to participate (i) in the Sidetracking or Deepening of a wellbore in which it did not participate to Objective Depth or (ii) in a Sidetracking or Deepening thereafter, (c) Elects to participate in a Development Plan after a Major Modification of that plan has been approved, or (d) Elects to participate in Development Operations from a subsequent Development System in which it did not participate.  A Non-Participating Party in a Feasibility AFE, who elects to participate in the Selection AFE, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Feasibility AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE. A Non-Participating Party in a Selection AFE, who elects to participate in the Define AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Selection AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE.  A Non-Participating Party in a Define AFE, who elects to participate in the Execution AFE, which follows it, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in the Define AFE in which it originally Elected not to participate and (b) become an Underinvested Party in regard to that AFE.  A Non-Participating Party in a Long Lead Development System AFE, who elects to participate in the activity or operation for which the long lead item in the Long Lead Development System AFE was procured, shall automatically be deemed to have submitted to the Operator a written statement memorializing its subsequent Election to (a) participate in that Long Lead Development System AFE, in which it originally Elected not to participate, and (b) become an Underinvested Party in regard to that AFE.  Except as provided in Article 16.9.1 *(Cash Settlement of Underinvestment)*, an Underinvested Party shall settle its Underinvestment through Disproportionate Spending.  The Underinvested Party shall be responsible for and

pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs under this Agreement in which that Underinvested Party and one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated, except under Article 13.3.1 *(Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir)* the Underinvested Party shall be responsible for and pay one hundred percent (100%) of the Overinvested Parties' share of the Costs (or if there are two or more Underinvested Parties, a proportion of those Costs based on each Party's Underinvestment) in subsequent activities or operations or AFEs within the Unit Area in which one or more Overinvested Parties participate until the amount of the Underinvestment is eliminated.

### 16.9.1   <u>Cash Settlement of Underinvestment</u>

If the Parties do not plan or propose further activities or operations under this Agreement (for which Costs would be allocated to the elimination of an Underinvestment), the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment amount in cash under Exhibit "C."   If Disproportionate Spending in the Unit Area does not eliminate an Underinvestment within two (2) years after the date the Underinvestment is incurred, or upon final accounting and settlement under this Agreement, or before the Underinvested Party withdraws from the Unit Area under Article 17 *(Withdrawal From Agreement)*, whichever comes first, the Underinvested Party shall pay the Overinvested Parties the remaining Underinvestment in cash under Article 17 *(Withdrawal From Agreement)* and Exhibit "C."

### ARTICLE 17 – WITHDRAWAL FROM AGREEMENT

### 17.1   <u>Right to Withdraw</u>

Subject to this Article 17.1, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice").   The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice. Within thirty (30) days of Receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to the Operator ("written notice to join in the withdrawal") and upon giving written notice to join in the withdrawal are "Other Withdrawing Parties."   The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the

Withdrawing Party and the Other Withdrawing Parties to convey to the Parties who do not join in the withdrawal (the "Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in all of the Leases, Hydrocarbon production, and other property and equipment owned under this Agreement.

**17.2**   **Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**17.2.1**   **Unanimous Withdrawal**

If all the other Parties join in the withdrawal,

(a)   no assignment of Working Interests shall take place;

(b)   subject to Article 18.4 *(Abandonment Operations Required by Governmental Authority)*, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)   the Parties shall abandon all activities and operations within the Unit Area and relinquish all of their Working Interests to the DOI within fifteen (15) days of the conclusion of the thirty (30) day joining period; and

(d)   notwithstanding anything to the contrary in Article 18 *(Abandonment and Salvage),* the Operator shall:

(i)   furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) days after the conclusion of the thirty (30) day joining period; and

(ii)   cease operations and begin to permanently plug and abandon all wells and remove all Production Systems and Facilities in accordance with the abandonment plan.

**17.2.2**   **No Additional Withdrawing Parties**

If none of the other Parties join in the withdrawal, then the Remaining Parties must accept an assignment of their Participating Interest Share of the Withdrawing Party's Working Interest, unless the Remaining Parties agree to share of the Withdrawing Party's Working Interest in a different percentage.

### 17.2.3    Acceptance of the Withdrawing Parties' Interests

If one or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, then within forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection or acceptance of its Participating Interest Share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within thirty (30) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 17.2.1 *(Unanimous Withdrawal)* will apply.

### 17.2.4    Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Unit Area, other than those activities or operations for which they retain a financial responsibility.  The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 17.1 *(Right to Withdraw)* and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 17.3    Limitation Upon and Conditions of Withdrawal

### 17.3.1    Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their remaining Underinvestments and their Participating Interest Share of the Costs of activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) activities or operations

conducted before the effective date of the withdrawal, (iii) activities or operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) activities or operations commenced by the Operator under one of its discretionary powers under this Agreement before the effective date of the withdrawal.  Before the effective date of the withdrawal, the Operator shall render a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable Costs under this Article 17.3.1 and (2) their respective Participating Interest Shares of the estimated current Costs of plugging and abandoning all wells and removing all Production Systems, Facilities, and other materiel and equipment serving the Unit Area, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by Vote.  This statement of expenses, Costs, and salvage value shall be prepared by the Operator under Exhibit "C."  Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall either pay the Operator, for the benefit of the Remaining Parties, the amounts allocated to them in the statement or provide security satisfactory to the Remaining Parties for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

### 17.3.2 <u>Confidentiality</u>

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired prior to the effective date of the withdrawal.

### 17.3.3     Emergencies and Force Majeure

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all Costs and liabilities arising from the Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution, and all Costs of debris removal made necessary by the Force Majeure or emergency.

## ARTICLE 18 – ABANDONMENT AND SALVAGE

### 18.1     Abandonment of Wells

Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of Production Testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period shall be deemed to have approved the permanent plugging and abandonment of the well. If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties. If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C," and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its Receipt of the estimate. If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the deficiency within thirty (30) days of the abandoning Participating Party's Receipt of the estimate. Each Participating Party desiring to abandon a well shall assign to each non-abandoning Participating Party in that well a portion of its Working Interest in that well and the equipment therein and the Hydrocarbon production therefrom equal to the non-abandoning Party's Participating Interests in that well divided by the entire Participating Interests of the non-abandoning Parties in that well. That assignment shall be effective as of the date of the abandoning Party's response to the well abandonment proposal. The abandoning

Party shall assume and be liable for all obligations pertaining to that well, except liability for payments under this Article 18.1, prior to the effective date of its assignment to the non-abandoning Parties. The abandoning Party shall not assume and be liable for any obligations pertaining to that well, except liability for payments under this Article 18.1, as of the effective date of its assignment to the non-abandoning Parties.

### 18.2    __Abandonment of Equipment__

Any Participating Party in a Production System or Facilities or an enhanced recovery and/or pressure maintenance program described in Article 12.11 *(Enhanced Recovery and/or Pressure Maintenance Program Proposals)* (the "Equipment") may propose the abandonment and disposition of that Equipment.  If that proposal is unanimously agreed to by the Participating Parties, the Operator shall abandon and dispose of that Equipment at the Cost and risk of the Participating Parties.  If a Participating Party fails to respond within the applicable response period, that Participating Party shall be deemed to have approved the abandonment and disposal of the Equipment.  If all Participating Parties do not approve abandoning and disposing of the Equipment, the Operator shall prepare an estimate of the Costs of abandonment, removal, site clearance, and disposition of the Equipment, less the estimated salvage value of the Equipment, as determined under Exhibit "C," and the Participating Party desiring to abandon and dispose of the Equipment shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate within thirty (30) days of its Receipt of the estimate.   If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated costs, the Operator, on behalf of the non-abandoning Participating Parties, shall pay to the abandoning Participating Party a sum equal to the surplus within thirty (30) days of the abandoning Participating Party's Receipt of the estimate.  Each Participating Party desiring to abandon the Equipment shall assign to each non-abandoning Participating Party in the Equipment a portion of its Working Interest in the Equipment equal to the non-abandoning Party's Participating Interests in the Equipment divided by the entire Participating Interests of the non-abandoning Parties in the Equipment.  That assignment shall be effective as of the date of the abandoning Party's response to the Equipment abandonment proposal.  The abandoning Party shall assume and be liable for all obligations pertaining to the Equipment, except liability for payments under this Article 18.2, prior to the effective date of its assignment to the non-abandoning Parties.  The abandoning Party shall not assume and be liable for any obligations pertaining to the Equipment, except liability for payments under this Article 18.2, as of the effective date of its assignment to the non-abandoning Parties.

**18.3** **Disposal of Surplus Materiel**

The Operator may classify materiel acquired under this Agreement as surplus when the Operator deems it is no longer needed in present or foreseeable activities or operations. The Operator shall determine the value and Cost of disposing of the materiel under Exhibit "C." If the materiel is classified as junk or if the value, less the Cost of disposal, is less than or equal to five hundred thousand dollars ($500,000), the Operator may dispose of the surplus materiel in a manner it deems appropriate. If the value, less the Cost of disposal of the surplus materiel, is greater than five hundred thousand dollars ($500,000), the Operator shall give written notice thereof to the Parties owning the materiel, and the surplus materiel shall be disposed of in accordance with the method of disposal approved by the Parties owning the materiel. Proceeds from the sale or transfer of surplus materiel shall be promptly credited to each Party in proportion to its ownership of the materiel at the time of the retirement or disposition of the materiel.

**18.4** **Abandonment Operations Required by Governmental Authority**

The Operator shall conduct the abandonment and removal of any Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] required by a governmental authority, and the Costs, risks, and net proceeds of that abandonment and removal will be shared by the Participating Parties in that Equipment [as defined in Article 18.2 *(Abandonment of Equipment)*] according to their Participating Interest Share.

**ARTICLE 19 – RENTALS, ROYALTIES, AND MINIMUM ROYALTIES**

**19.1** **Burdens on Hydrocarbon Production**

If a Party has previously created or hereafter creates an overriding royalty, production payment, carried or reversionary working interest, net profits interest, mortgage, lien, security interest, or other type of burden on Hydrocarbon production, including, but not limited to, agreements affecting the marketing, processing, or transportation of Hydrocarbon Production, other than the lessor's royalty stipulated in a Lease (a "Lease Burden"), the Party creating the Lease Burden shall assume and bear all liabilities and obligations of the Lease Burden regardless of that Party's participation status and notwithstanding an assignment under this Agreement of all or part of that Party's Working Interest to another party. The Party creating the Lease Burden shall indemnify, release, defend, and hold all other Parties harmless from all Claims and demands for payment asserted by the owners of the Lease Burden.

### 19.1.1     Subsequently Created Lease Burdens

Notwithstanding any contrary provision of this Agreement, if a Party, after executing this Agreement, creates a Lease Burden, that Lease Burden shall be made specifically subject to this Agreement.  If the Party owning the Working Interest from which a Lease Burden is created (a) fails to pay when due its share of Costs, (b) withdraws from this Agreement, or (c) Elects to abandon a well under Article 18.1 *(Abandonment of Wells)*, then the beneficiary of the Lease Burden will be chargeable with Costs equal to its fractional interest in gross production and the security rights created in Exhibit "F" will be applicable against that Lease Burden.  The Operator has the right to enforce the security rights (and all other rights granted under this Agreement) against the beneficiary of a Lease Burden for the purpose of collecting Costs chargeable to the Lease Burden.  The rights of the beneficiary of a Lease Burden are subordinate to the rights of the Parties granted by Exhibit "F."

## 19.2     Payment of Rentals and Royalties

The Operator shall make all rental payments for the Leases on behalf of the Parties.  The Operator shall use reasonable care to make proper and timely payment of the rental payments, all minimum royalties, and all other similar payments accruing under the Leases.  Upon Receipt of proper evidence of those payments and the Operator's invoice for its proportionate share of those payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of those payments.  In the event the Operator fails to make proper payment of a rental, minimum royalty, or other similar payment accruing under a Lease through mistake or oversight where that payment is required to continue that Lease in force and effect, the Operator will not be liable to the other Parties for any resulting damages or any loss that results from the non-payment, unless that non-payment is due to the Operator's Gross Negligence or Willful Misconduct, as determined by a final judicial decision or a final decision under binding arbitration. The loss of a Lease or interest therein that results from the Operator's failure to pay, or the Operator's erroneous payment of, a rental, minimum royalty, or other similar payments is a joint loss, and there will be no readjustment of Working Interests as a consequence thereof.  For production delivered in-kind by the Operator to a Non-Operating Party or to a third party for the account of a Non-Operating Party, the Non-Operating Party shall provide the Operator with information about the proceeds or value of the production in order for the Operator to make payments of all minimum royalties due.

### 19.2.1   Non-Participation in Payments

If a Party notifies the other Parties, in writing at least sixty (60) days before the date the payment is due of its intention not to pay its share of a rental, minimum royalty, or other similar payment, that Party shall be deemed to have given a withdrawal notice under Article 17 *(Withdrawal From Agreement)*, and must withdraw from the entire Unit Area, not just the Lease on which the payment is due.  Upon this occurrence, the Operator shall make the payment solely for the benefit of the Remaining Parties, as defined in Article 17 *(Withdrawal From Agreement)*, and the Remaining Parties shall reimburse the Operator for their respective shares of the payment, based on the procedures in Article 17.2 *(Response to Withdrawal Notice)*.

### 19.2.2   Royalty Payments

Each Party shall pay or cause to be paid all royalty and other amounts payable, which are based on its share of Hydrocarbon production. Adjustments to those payments shall be made among the Parties in accordance with Exhibit "D" (Gas Balancing Agreement).  When the Participating Parties are recouping their Costs from a Non-Consent Operation and an applicable premium under Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)*, each of the Participating Parties shall pay or cause to be paid the Lease royalty on the portion of the Hydrocarbon Recoupment to which it is entitled.

## ARTICLE 20 – TAXES

### 20.1   Internal Revenue Provision

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

### 20.2   Other Taxes and Assessments

The Operator shall file all tax returns and reports required by law and pay all applicable taxes [other than income or other taxes provided in Article 20.2.2 *(Production and*

*Severance Taxes)*] and assessments levied with respect to activities and operations conducted under this Agreement.  The Parties shall promptly furnish the Operator with copies of all notices, assessments, and statements received pertaining to taxes to be paid by the Operator.  The Operator will charge each Party its Working Interest share of all taxes and assessments paid [other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*] and, upon written request from a Non-Operating Party, provide copies of all tax returns, reports, tax statements, and receipts for the taxes.  The Operator shall not allow any taxes to become delinquent unless unanimously agreed to by the Parties.

### 20.2.1    <u>Property Taxes</u>

The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to that taxation and shall pay those property taxes for the benefit of each Party.  The Operator shall timely and diligently protest a valuation of the Leases for tax purposes it deems unreasonable.  Pending final determination of the valuation of the Leases for tax purposes, unless unanimously agreed to by the Parties to the contrary under Article 20.2 *(Other Taxes and Assessments)*, the Operator shall, on or before the due date, pay under protest taxes on the Leases at the assessed value of the Leases.  If upon final determination, additional taxes are due or if interest or a penalty has accrued as a result of the protest, the Operator shall pay the taxes, interest, and penalty and shall charge each Party its Working Interest share of the taxes, interest, and penalty under Exhibit "C."

### 20.2.2    <u>Production and Severance Taxes</u>

Each Party shall pay, or cause to be paid, all production, excise, severance, and other similar taxes due on its share of Hydrocarbon production.  Each Party shall, upon a written request from the Operator, provide evidence that those taxes have been paid.

## <u>ARTICLE 21 – INSURANCE AND BONDS</u>

### 21.1    <u>Insurance</u>

The Parties shall maintain the insurance coverage specified in Exhibit "B." Insurance purchased by the Operator pursuant to Article I of Exhibit "B" shall be charged to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

## 21.2    Bonds

The Costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if the Operator provides that bond or guarantee itself and does not engage a third party to do so.  The Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

## ARTICLE 22 – LIABILITY, CLAIMS, AND LAWSUITS

## 22.1    Individual Obligations

The obligations, duties, and liabilities of the Parties under this Agreement are several, but limited in proportion to each Party's Participating Interest Share, and not joint and several or collective; and, except as otherwise provided in Article 20 *(Taxes)*, nothing in this Agreement shall be construed to create a partnership, joint venture, association, or other form of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective interests.

## 22.2    Notice of Claim

If a Claim is made against or by a Party, that Party shall give written notice of the Claim to the other Parties as soon as reasonably practicable.

## 22.3    Settlements

The Operator may settle a Claim, or multiple Claims, arising out of the same incident, involving activities or operations under this Agreement or affecting the Leases or the Unit Area, if the aggregate expenditure does not exceed one million dollars ($1,000,000) and if the payment is in complete settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 22.4 (*Defense of Claims*).

## 22.4    Defense of Claims

The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Leases or the Unit Area.  Claims may be settled in excess of the amount specified in Article 22.3 (*Settlements*) as follows: (i) if the aggregate expenditure of the settlement is below three million dollars ($3,000,000) it must be approved by Vote; and (ii) if the aggregate expenditure of the settlement is at or above three million dollars ($3,000,000) it must receive unanimous

approval of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest Share alone as long as that settlement does not directly and adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together with the amount paid to discharge a final judgment or other final adjudication or determination of the Claim, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the selection of that counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose. If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which that Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

## 22.5    Liability for Damages

Unless specifically provided otherwise in this Agreement, liability for losses, damages, Costs, expenses or Claims involving activities or operations under this Agreement or affecting the Leases or the Unit Area which are not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest Share in the activity or operation out of which such liability arises, except that when liability results from the Gross Negligence or Willful Misconduct of a Party, such Party shall be solely responsible for liability resulting from its Gross Negligence or Willful Misconduct.

In no event shall an assertion or allegation of Gross Negligence or Willful Misconduct of a Party constitute a defense to the other Parties' obligations to timely reimburse the Operator for its proportionate share of losses, damages, Costs, expenses and Claims in accordance with the provisions of Exhibit "C" (*Accounting Procedure*) to this Agreement. To the contrary, all Parties shall timely pay their proportionate share of such losses, damages, Costs, expenses and Claims until such assertion or allegation results in a final, non-appealable judgment or final determination of the arbitrators pursuant to Exhibit "H" (*Dispute Resolution Procedure*), subject to reimbursement or other adjustment for amounts paid upon such final judgment or arbitration determination, if appropriate. **UNDER NO CIRCUMSTANCES WILL A PARTY BE LIABLE TO ANOTHER PARTY FOR PUNITIVE DAMAGES, CONSEQUENTIAL, INDIRECT, UNFORSEEN, LOSS OF**

**PROFIT, OR OTHER INDIRECT OR PENALTY DAMAGES EITHER IN LAW OR EQUITY.**

**22.6** **Indemnification for Non-Consent Operations**

**TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.**

**22.7** **Damage to Reservoir and Loss of Reserves**

**NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR DAMAGE TO A RESERVOIR OR LOSS OF HYDROCARBONS, NOR DOES A PARTY INDEMNIFY ANY OTHER PARTY FOR THAT DAMAGE OR LOSS, EXCEPT IF THAT DAMAGE OR LOSS ARISES FROM A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

**22.8** **Non-Essential Personnel**

**UNLESS OTHERWISE MUTUALLY AGREED BY THE PARTIES IN WRITING, IN THE EVENT A PARTY REQUESTS TRANSPORTATION OR ACCESS TO ANY DRILLING RIG, PRODUCTION SYSTEM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT FOR ANY PERSON WHO IS NOT EMPLOYED BY, CONTRACTED BY, OR REPRESENTING SUCH PARTY IN CONNECTION WITH AN ACTIVITY OR OPERATION CONDUCTED PURSUANT TO THIS AGREEMENT, OTHER THAN GOVERNMENTAL OFFICIALS OR REPRESENTATIVES OF GOVERNMENTAL OR REGULATORY AGENCIES ("NON-ESSENTIAL PERSONNEL"), THE PARTY REQUESTING SUCH**

**TRANSPORTATION OR ACCESS AGREES TO PROTECT, INDEMNIFY, RELEASE, DEFEND, AND HOLD HARMLESS THE OTHER PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS, CONTRACTORS, SUBCONTRACTORS, INVITEES, INSURERS, AND REPRESENTATIVES FROM AND AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, JUDGMENTS, LIABILITIES, CONTRACTUAL LIABILITIES, AND OTHER COSTS (INCLUDING, WITHOUT LIMITATION, COURT COSTS, JUDICIAL INTEREST, FINES AND PENALTIES OTHER THAN FOR CRIMINAL ACTS, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) FOR DAMAGE TO, DESTRUCTION OR LOSS OF PROPERTY, AND FOR PERSONAL INJURY OR DEATH OF PERSONS, AND FOR DAMAGE OR HARM TO THE ENVIRONMENT (INCLUDING WITHOUT LIMITATION, SPILL RESPONSE, ENVIRONMENTAL POLLUTION AND CONTAMINATION AND CLEAN-UP COSTS) ARISING OUT OF OR RELATED IN ANY WAY TO THE NEGLIGENCE, FAULT, OR LIABILITY WITHOUT FAULT OF THE NON-ESSENTIAL PERSONNEL BROUGHT BY OR ON BEHALF OF ANY PARTY WHOMSOEVER (INCLUDING, WITHOUT LIMITATION, ALL THIRD PARTIES AND GOVERNMENTAL AGENCIES), WITHOUT REGARD TO THE CAUSES THEREOF, INCLUDING PRE-EXISTING CONDITIONS, THE UNSEAWORTHINESS OF ANY VESSEL, THE STRICT LIABILITY, NEGLIGENCE, OR OTHER FAULT OF ANY PARTY, REGARDLESS OF WHETHER THE NEGLIGENCE BE SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE, EXCEPT IF CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED, AS FOUND BY A FINAL JUDICIAL DECISION OR A FINAL DECISION UNDER BINDING ARBITRATION.**

**22.9** **Dispute Resolution Procedure**

Any claim, controversy, or dispute arising out of, relating to, or in connection with this Agreement or an activity or operation conducted under this Agreement shall be resolved under the Dispute Resolution Procedure in Exhibit "H" to this Agreement.

## **ARTICLE 23 – CONTRIBUTIONS**

**23.1**   **Contributions from Third Parties**

A "Contribution" means a bottom hole cash contribution, dry hole cash contribution, or acreage contribution from third parties as consideration for data from wells or well operations on the Unit Area.  This Article 23 does not apply to the following:

(a)   Trades of Confidential Data for other similar geophysical, geological, geochemical, drilling, or engineering data from third parties.  Those trades of Confidential Data are subject to Article 7.2.1 *(Trades of Confidential Data)*;

(b)   Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, as proceeds of loans, or as proceeds of other financial arrangements;

(c)   A farmout of all or a portion of a Party's Working Interest, which is subject to Article 24 *(Transfer of Interest and Preferential Right to Purchase)*.

**23.2**   **Methods of Obtaining Contributions**

The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation.  A Contribution may be obtained in the following ways:

(a)   Any Participating Party in a well or well operation may propose that the Participating Parties in that well or well operation seek a Contribution from a third party towards that well or well operation.

(b)   If a Participating Party in a well or well operation receives a Contribution offer for that well or well operation from a third party, that Party shall notify all other Participating Parties in that well or well operation of the terms of that offer within five (5) days of its Receipt of that offer.

**23.3**   **Counteroffers**

If a third party makes a Contribution counteroffer to the Participating Parties' Contribution offer, or if a Participating Party proposes to make a Contribution counteroffer to a third party Contribution offer, the Operator shall submit the Contribution counteroffer to the other Participating Parties.

**23.4**    **Approval of Contributions**

A Contribution proposal, a Contribution counteroffer to a third party Contribution offer, an acceptance of a Contribution offer from a third party, or a Contribution counteroffer from a third party requires the unanimous agreement of the Participating Parties in the well or well operation affected by the Contribution. Within fifteen (15) days of their Receipt of a notice of a Contribution proposal, Contribution offer, or Contribution counteroffer, those Participating Parties shall respond to the Operator.

**23.5**    **Cash Contributions**

If a bottom hole or dry hole cash Contribution is offered and accepted, that cash Contribution shall be paid to the Operator, and the Operator shall credit the amount of the cash Contribution against the Costs of that well or well operation to each Participating Party in proportion to its Participating Interest Share.

**23.6**    **Acreage Contributions**

Any acreage Contribution, which is offered and accepted under this Article 23 *(Contributions)*, shall be conveyed to the Participating Parties in the well or well operation in proportion to their Participating Interest Share therein. The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Unit Area.

**23.6.1**    **Two or More Parties Own One Hundred Percent of the Acreage Contribution**

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the DOI, those Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then (a) the contributed acreage shall be deemed to be governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate, (b) the execution of the operating agreement by the Parties participating in the acreage Contribution shall be considered a mere formality only, (c) the designated operator shall promptly prepare the operating agreement, and (d) the Parties participating in the acreage Contribution shall promptly execute the operating agreement once it is prepared.

### 23.6.2     <u>Two or More Parties Own Less Than One Hundred Percent of the Acreage Contribution</u>

If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the DOI, those Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then those Parties shall use reasonable efforts to negotiate and execute with the other Working Interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

## <u>ARTICLE 24 – TRANSFER OF INTEREST AND PREFERENTIAL RIGHT TO PURCHASE</u>

### 24.1     <u>Transfer of Interest</u>

Each Party may make a Transfer of Interest of all or part of its Working Interest and its rights and obligations under this Agreement either to a third party or to another Party in accordance with this Agreement, provided that:

(a) except for the conditions set forth in (i) and (ii) of Article 24.1.1 *(Exceptions to Transfer Notice)*, any Transfer of Interest shall be preceded by a Transfer Notice, and

(b) made to a party that is financially responsible and capable of assuming the corresponding obligations under this Agreement unless:

(i) the Transfer of Interest is made pursuant to Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, 18 *(Abandonment and Salvage)*, or 24.2.2 *(Exercise of Preferential Right to Purchase)*.

No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, including its payment obligations, which are incurred or have accrued prior to the effective date of that Transfer of Interest and the security rights under Article 6.3 *(Security Rights)* shall continue to burden the Working Interest transferred and to secure the payment of any retained obligations and liabilities.  Once a Transfer of Interest becomes effective under Article 24.1.2 *(Effective Date of Transfer of Interest)*, except for a Transfer of Interest as a result of a merger, reorganization or consolidation or to an Affiliate, the transferor shall not be responsible for any obligations, debts, or liabilities under this

Agreement, which accrue or are incurred by the Parties on or after the effective date of that Transfer of Interest.

### 24.1.1 **Exceptions to Transfer Notice**

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required: (i) when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), and/or its Participating Interest Share of any Production Systems, Facilities, or equipment; or (ii) when any interest is conveyed in accordance with Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement)*, or 18 *(Abandonment and Salvage)*.  However, the Party creating an encumbrance under (i) above remains liable for all obligations under and pursuant to such encumbrance and an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

### 24.1.2 **Effective Date of Transfer of Interest**

The effective date of a Transfer of Interest shall not be more than one hundred eighty (180) days prior to the date of receipt of the Transfer Notice nor more than one hundred eighty (180) days, after the date of receipt of the Transfer Notice, unless such requirement is waived by the Parties in writing.  A Transfer of Interest, other than those provided in Article 17.1 *(Right to Withdrawal)* and Article 24.1.1 *(Exceptions to Transfer Notice)*, is effective and shall be binding upon the Parties at the latest date of occurrence of all of the following:  (i) the transferor or transferee provides all remaining Parties with a photocopy of the fully executed documents evidencing the Transfer of Interest and an executed DOI Form 1123, "Designation of Operator," and an "Application for Certification of Oil Spill Responsibility" form and (ii) evidence of receipt of all necessary approvals by the DOI.  The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the transferring Party.

### 24.1.3    Maintenance of Uniform Interest and Minimum Transfer of Interest

Except as otherwise provided in this Agreement, a Transfer of Interest shall cover an undivided Working Interest in the entire Unit Area, including such undivided interest of the Party in all leases, wells, equipment, Production and Development Systems, Facilities, Hydrocarbons and other property, both real and personal within the Unit Area.  Prior to the approval of the Execution AFE for the initial Development System, no Transfer of Interest shall be made that is not at least an undivided ten percent (10%) Working Interest, unless the Parties unanimously agree to a different minimum Transfer of Interest. After the Execution AFE Election on the initial Development System, a Transfer of Interest to a third party shall be limited to a minimum Working Interest of ten percent (10%), unless the Parties unanimously agree to a different minimum Transfer of Interest.

### 24.1.4    Form of Transfer of Interest

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the transferee of the performance of all of the transferring Party's obligations under this Agreement, except as to any obligation that the transferring Party may remain liable for, if applicable, in accordance with Article 24.1.  Any Transfer of Interest not in compliance with this Article 24.1.4 is voidable by the non-transferring Parties.

### 24.1.5    Warranty

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as to person claiming by, through or under the transferor, but not otherwise.

## 24.2    Preferential Right to Purchase

Any Transfer of Interest shall be subject to the following provisions:

### 24.2.1    Notice of Proposed Transfer of Interest

Subject to Article 24.2.3 (Transfer of Interest Not Affected by the Preferential Right to Purchase), when a Party and a prospective transferee execute a binding agreement for a proposed Transfer of Interest, the transferring Party shall provide to the other Parties a Transfer Notice. In the case of a Package Sale of oil and gas interests that includes all or part of the assigning Party's Working Interest, and if the proposed Transfer of Interest does not meet the criteria set

forth in Article 24.2.3.(c)(i), the Working Interest that is subject to the Transfer of Interest shall be separately valued and the transfer notice shall state the monetary value attributed to the Working Interest by that prospective assignee. Article 24.2 *(Preferential Right to Purchase)* shall apply only to the Working Interest that is subject to the Transfer of Interest.

**24.2.2**   <u>**Exercise of Preferential Right to Purchase**</u>

For a period of thirty (30) days from receipt of the Transfer Notice ("PRP Period"), each non-transferring Party may exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the Transfer Notice) without reservations or conditions by written notice of that fact to all of the Parties.  No Party has a right or obligation under this Article 24.2 to acquire any asset other than a Working Interest (including a corresponding interest in its Participating Interest Share of any Facilities, Production Systems, wells, equipment, and/or other property located on the Unit Area or governed by this Agreement), regardless of whether the proposed transaction is a Package Sale.

Upon expiration of the PRP Period, if:

(i)   none of the non-transferring Parties elects to exercise its preferential right to purchase its Participating Interest Share of the Working Interest offered or the non-transferring Parties, who wish to exercise their preferential right to purchase, do not agree to pay the full consideration (either the stipulated cash consideration or the equivalent cash value) for the Transfer of Interest and accept all of the other terms of the third party offer as provided in the Transfer Notice, then the transferring Party shall be free to complete the proposed Transfer of Interest on the terms disclosed in the Transfer Notice; or

(ii)   all of the non-transferring Parties agree to pay the full consideration, either the stipulated cash consideration or the equivalent cash value determined pursuant to Article 24.2.1 (*Notice of Proposed Transfer of Interest*), if applicable, for the Transfer of Interest and accept all of the other terms of the third party offer as it pertains to the Transfer of Interest only, the transferring Party shall transfer the Working Interest to the non-

transferring Parties who exercised their preferential right to purchase in accordance with this Article 24; or

(iii)   one or more, but not all, of the non-transferring Parties elect to exercise its[their] preferential right to purchase the Working Interest offered, such electing Party(ies) shall determine amongst themselves the sharing of the Working Interest offered that is attributable to the non-electing Party(ies), with each electing Party having the right to its proportionate share, in an effort to fully subscribe the Working Interest offered.  In such an instance, the electing Parties shall have an additional ten (10) days after the expiration of the PRP Period to jointly provide written notice to all non-electing Parties and the transferring Party stating that (i) all of the Working Interest offered has been fully subscribed stating the breakdown by Party as to the Working Interest to be acquired by each Party or (ii) the electing Parties have failed to fully subscribe the Working Interest offered and therefore the preferential right to purchase will not be exercised.  Failure to provide such notice within the ten (10) day period shall be considered a withdrawal of a non-transferring Party's election or failure of such written notices to collectively fully subscribe the Working Interest offered shall be considered a withdrawal of all non-transferring Parties' election.

The Transfer of Interest shall be concluded within a reasonable time, but no later than one hundred and twenty (120) days after the PRP Period.

**24.2.3**   <u>**Transfer of Interest Not Affected by the Preferential Right to Purchase**</u>

Subject to Article 24.1 (*Transfer of Interest*), Article 24.2 *(Preferential Right to Purchase)* shall not apply when:

Any Party proposes to:

(a) mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by that security device), or

(b) grant an overriding royalty, a net profits interest, or a production payment, or

(c) dispose of a portion or all of its Working Interest by:

    (i)    an exchange of properties of similar value; or

    (ii)    merger, reorganization, or consolidation; or

    (iii)    a Transfer of Interest of all or substantially all of a Party's exploration and production properties in the Gulf of Mexico; or

    (iv)    a Transfer of Interest to an Affiliate; or

    (v)    a Transfer of Interest pursuant to Articles 16 *(Non-Consent Operations)*, 17 *(Withdrawal From Agreement),* and/or 18 *(Abandonment and Salvage)*; or

    (vi)    conveys an interest to another Party in satisfaction of said other Party's security rights under Article 6.3 (Security Rights) of this Agreement, if applicable.

### 24.2.4   <u>Completion of Transfer of Interest</u>

If the proposed Transfer of Interest is not executed and filed of record with the DOI within ninety (90) days after Receipt of the transfer notice by the non-assigning Parties, or if the terms of the proposed Transfer of Interest conveyance are materially altered, the proposed Transfer of Interest shall be deemed withdrawn, and the Working Interest included in the proposed Transfer of Interest shall again be governed by this Article 24.2 (*Preferential Right to Purchase).*

### <u>ARTICLE 25 – FORCE MAJEURE</u>

### 25.1   <u>Force Majeure</u>

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with full particulars about it. Effective upon the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure. Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement. The requirement

that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

## ARTICLE 26 – ADMINISTRATIVE PROVISIONS

**26.1**   **Term**

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Production Systems, Facilities, and equipment have been disposed by the Operator in accordance Article 18 (*Abandonment and Salvage*); (c) all Claims as defined in Article 22 (*Liability, Claims, and Lawsuits*) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement.   In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**26.2**   **Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.   The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.   Time is of the essence in the performance of this Agreement, and all time limits shall be strictly construed and enforced.

**26.3**   **Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Unit Area, Production System, Facilities, and equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Leases and lands or personal property subject to this Agreement.

**26.4**   **Compliance With Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over

the Unit Area.  No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule, or regulation.

### 26.4.1   Applicable Law

THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED UNDER FEDERAL LAWS AND LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION. NOTWITHSTANDING THE FOREGOING, THE PARTIES ACKNOWLEDGE THAT THE LAW OF THE ADJACENT STATE SHALL APPLY TO THE EXTENT REQUIRED BY THE OUTER CONTINENTAL LANDS SHELF ACT.

### 26.4.2   Severance of Invalid Provisions

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by that illegality or invalidity. An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision. The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

### 26.4.3   Fair and Equal Employment

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1 are incorporated in this Agreement by reference.  The affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference.  In performing work under this Agreement, the Parties shall comply with (and the Operator shall require each

independent contractor to comply with) the governmental requirements in Exhibit "E" that pertain to non-segregated facilities.

**26.5    Construction and Interpretation of this Agreement**

    **26.5.1    Headings for Convenience**

    Except for the definition headings in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

    **26.5.2    Article References**

    Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all of the referenced article and its sub-articles.

    **26.5.3    Gender and Number**

    The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof.  Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

    **26.5.4    Joint Preparation**

    This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

    **26.5.5    Integrated Agreement**

    This Agreement contains the final and entire agreement of the Parties for the matters covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements. This Agreement may not be modified or changed except by written amendment signed by the Parties.

    **26.5.6    Binding Effect**

    To the extent it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Unit Area.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 26.5.7   Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within (30) days after their Receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 26.5.8   Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement. No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  A facsimile or electronic transmission of a signed original of this Agreement, and the transmission or re-transmission of a signed facsimile or electronic transmission, shall be deemed to be the same as delivery of a signed original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 26.5.9   Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

### 26.5.10   Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

## 26.6   Restricted Bidding

If more than one Party is ever on the list of restricted joint bidders for OCS lease sales, as issued by the DOI under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

**[Signatures follow on next page]**

**IN WITNESS WHEREOF,** each Party, through its duly authorized agent or representative, has executed this Agreement as of the Effective Date.

WITNESSES:                                    *Fieldwood Energy LLC*

_____          By:_____

_____          Title:_____


WITNESSES:                                    *Ridgewood Katmai, LLC*

_____          By:_____

_____          Title: _____


WITNESSES:                                    *ILX Propsect Katmai, LLC*

_____          By:_____

                                              Title: _____

## **Exhibit B**

**Atlantic Contract**

# MASTER DOMESTIC OFFSHORE DAYWORK DRILLING CONTRACT

between

## FIELDWOOD ENERGY LLC
### (OPERATOR)

and

## ATLANTIC MARITIME SERVICES LLC

dated

October 2~~4~~, 2018
26



# MASTER DOMESTIC OFFSHORE DAYWORK DRILLING CONTRACT

## Table of Contents

Page

ARTICLE I - INTERPRETATION ...................................................... 1
    101. Definitions ............................................................... 1
    102. Currency .................................................................. 4
    103. Conflicts .................................................................. 4
    104. Headings ................................................................. 4
    105. Contractor's Status and Statutory Employee ............... 4
    106. Governing Law ......................................................... 4

ARTICLE II - TERM ....................................................................... 5
    201. Effective Date .......................................................... 5
    202. Duration .................................................................. 5
    203. Termination ............................................................. 5
    204. Option to Extend ...................................................... 7
    205. Continuing Obligations ............................................. 7
    206. Return of Operator's Items ........................................ 7

ARTICLE III - CONTRACTOR'S PERSONNEL .............................. 7
    301. Number, Selection, Hours of Labor and Remuneration ... 7
    302. Contractor's Representatives ..................................... 7
    303. Increase in Contractor's Personnel ............................. 7
    304. Replacement of Contractor's Personnel ....................... 7
    305. Qualifications of Contractor's Personnel ..................... 8
    306. Citizenship of Contractor's Personnel ......................... 8
    307. Contractor's Safety Representative ............................. 8

ARTICLE IV - CONTRACTOR'S ITEMS ....................................... 9
    401. Obligation to Supply ................................................ 9
    402. Maintain Stocks ....................................................... 9
    403. Maintain and Repair Equipment ................................. 9
    403. Right to Inspect and Reject Equipment ....................... 10

ARTICLE V - CONTRACTOR'S GENERAL OBLIGATION ............. 9
    501. Contractor's Standard of Performance ........................ 9
    502. Operation and Control of Contractor's Drilling Unit ...... 9
    503. Compliance with Operator's Instructions ..................... 9
    504. Adverse Weather ...................................................... 10
    505. Drilling Fluids and Casing Program ............................ 10
    506. Cutting/Coring Program ........................................... 11
    507. Records to be Kept and Reports to be Furnished by Contractor ... 11
    508. Difficulties During Drilling ....................................... 11
    509. Well Control Equipment ........................................... 12
    510. Inspection of Materials Furnished by Operator ............ 12

ARTICLE VI - OPERATOR'S OBLIGATIONS ......................................................12
   601. Equipment and Personnel ...................................................................12
   602. Maintenance and Repair .....................................................................12
   603. Operator's Personnel and Operator Representatives .........................12
   604. Drilling Site Access and Surveys ......................................................13

ARTICLE VII - RATES OF PAYMENT ..............................................................13
   701. Payment ...............................................................................................15
   702. Mobilization ........................................................................................15
   703. Demobilization ....................................................................................15
   704. Operating Rate .....................................................................................16
   705. Standby Rate ........................................................................................16
   706. Repair Rate ...........................................................................................17
   707. Force Majeure Rate ..............................................................................17
   708. Move Rate ............................................................................................
   709. Adjustment in Rates .............................................................................18

ARTICLE VIII - INVOICES AND PAYMENTS ..................................................15
   801. Invoices ...............................................................................................15
   802. Payment of Invoices ............................................................................15
   803. Manner of Payment .............................................................................16
   804. Failure of Payment ..............................................................................

ARTICLE IX - LIABILITY .................................................................................16
   901. Indemnity Definitions ..........................................................................20
   902. Indemnity Obligation ...........................................................................20
   903. Equipment or Property .........................................................................21
   904. The Hole, Blowout, Cratering and Cost of Control ............................21
   905. Contractor's Personnel ........................................................................22
   906. Operator's Personnel ...........................................................................22
   907. Personnel and Property of Third Parties ..............................................22
   908. Pollution, Hazardous Materials, Substances Liablity and Environmental Losses ..........23
   909. Debris and Wreck Removal .................................................................24
   910. Underground Damage ..........................................................................24
   911. Patent Liability .....................................................................................24
   912. Consequential Damages .......................................................................25
   913. Benefits for Contractor's Personnel .....................................................25
   914. Taxes and Liens ...................................................................................25
   915. Cross Indemnities between Contractor and Operator's other contractors ..................25
   916. Disputed Amounts, Liens and Withholding .........................................25
   917. Right to Participate in Defense .............................................................26
   918. Attorney's Fees to Enforce Contract ....................................................26

ARTICLE X - INSURANCE .................................................................................24
   1001. Contractor's Insurance .......................................................................24
   1002. Certificates and Policies .....................................................................25
   1003. Subrogation .......................................................................................25
   1004. Additional Insured ............................................................................25



1005. Premiums and Deductibles ................................................................................25
1006. Insurance for Subcontractors ...........................................................................25
1007. Failure to Obtain Insurance .............................................................................26
1008. Financially Responsible Insurers and Amendment to Policies ........................26
1009. Insurance Separate from Indemnity .................................................................26

ARTICLE XI - SUBLETTING AND ASSIGNMENT ..............................................26
1101. Subcontracts ....................................................................................................26
1102. Assignment ......................................................................................................26

ARTICLE XII - NOTICES ...........................................................................................27
1201. Notices ............................................................................................................26

ARTICLE XIII - GENERAL .........................................................................................27
1301. Confidential Information .................................................................................27
1302. Attorneys' Fees ................................................................................................28
1303. Force Majeure ..................................................................................................28
1304. Right to Audit and Conflict of Interest ............................................................29
1305. Compliance with Laws and Industry Standards: Safety and Environmental Protection 29
1306. Waivers ............................................................................................................33
1307. Entire Agreement .............................................................................................31
1308. Inurement .........................................................................................................31
1309. Severability ......................................................................................................31

FORM OF DRILLING ORDER
Appendix A            Commercial Terms and Conditions
        Schedule A-1  General Rig Specifications
        Schedule A-2  Personnel to be provided by Contractor
        Schedule A-3  Checklist of Contractor's and Operator's Obligations
Appendix B            Insurance Requirements
Appendix C            Contractor Safety Program
Appendix D            Operator's Search and Seizure Policy



## MASTER DOMESTIC OFFSHORE DAYWORK DRILLING CONTRACT

THIS MASTER DOMESTIC OFFSHORE DAYWORK DRILLING CONTRACT (the "Master Contract") is made between **FIELDWOOD ENERGY LLC** ("Operator"), a limited liability company organized under the laws of Delaware with an office located at 2000 W. Sam Houston Pkwy South, Suite 1200, Houston, Texas 77042, and **ATLANTIC MARITIME SERVICES LLC** ("Contractor"), a limited liability company organized under the laws of Delaware with an office located at 2800 Post Oak Boulevard, Suite 5450, Houston, Texas 77056. Operator and Contractor may sometimes be individually referred to in this Contract as a "Party" and collectively as the "Parties".

WHEREAS, Operator desires to have one or more offshore wells drilled, recompleted, sidetracked or worked over in the Operating Area, as defined herein, and to have performed or carried out all auxiliary operations and services as detailed in the Appendices hereto or as Operator may require; and

WHEREAS, Contractor is willing to furnish the drilling unit named in the applicable Drilling Order, appurtenances, apparel, furniture, stores and consumables, together with drilling and other equipment included with such drilling unit, personnel, and insurance, all as detailed in the Contract, for the purpose of drilling the well or wells detailed in the applicable Drilling Order and performing said auxiliary operations and services for Operator as provided in this Contract

NOW THEREFORE, for and in consideration of the mutual covenants and agreements as set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I - INTERPRETATION

101.  Definitions

In this Contract, unless the context otherwise requires, the following clauses shall have the meaning specified below and may be used in the singular or plural:

(a)  "Affiliated Company" means a company owning 50% or more of the stock or voting rights of Operator or Contractor, a company in which Operator or Contractor owns 50% or more of its stock or voting rights, or a company 50% or more of whose stock or voting rights is owned by the same company that owns 50% or more of the stock or voting rights of Operator or Contractor.

(b)  "BOE" shall mean the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement and its or their successor agencies.

(c)  "Commencement Date" shall have the meaning ascribed to such term in the Drilling Order.

(d)  "Contract" means this Master Contract including the attached Appendices A, B, C and D and Schedules A-1, A-2 and A-3 attached to Appendix A and any Drilling Order (including any appendices and schedules attached to such Drilling Order) which is signed by the Parties or their respective Affiliated Companies and incorporates this Master Contract.

(e)  "Contractor" shall have the meaning assigned to it in the preamble above; provided that for purposes of any Drilling Order which identifies one of Contractor's Affiliated Companies as the "Contractor", all references to "Contractor" in the Contract shall mean



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

such Affiliated Company. Any provision in this Contract relieving Contractor of liability or responsibility or defending, indemnifying or insuring Contractor shall be deemed to provide for identical relief, and/or indemnification, and/or insurance, as applicable, in favor of: (1) the Drilling Unit and its legal and beneficial owners regardless of whether in rem or in personam, (2) Contractor and Contractor's Affiliated Companies and each of their respective contractors and subcontractors of any tier and suppliers (including suppliers of the Drilling Unit's component parts such as the blowout preventer unit ("BOP") and the top-drive unit regardless of whether such component parts are aboard the Drilling Unit as of the Drilling Order Effective Date or come aboard after the Drilling Order Effective Date), and (3) each of their respective directors, officers, employees, servants, representatives, agents, and insurers.

(f)    "Contractor's Items" means, as to any particular Drilling Order, the Drilling Unit, equipment, material, tools, appliances, supplies, instruments and services provided by Contractor or its subcontractors of any tier, including those which are listed in Schedules A-1 and A-3 to such Drilling Order that are furnished by Contractor.

(g)    "Contractor's Personnel" means, as to any particular Drilling Order, all employees, crewmembers, contractors and subcontractors (of any tier) and other persons provided by or on behalf of Contractor or Contactor's Affiliated Companies from time to time to conduct operations under such Drilling Order, including those personnel listed in Schedule A-2 to such Drilling Order, and includes all employees, crewmembers contractors and subcontractors (of any tier) and other persons provided by Contractor's subcontractors.

(h)    "Designated Well" means the well or wells to be drilled, recompleted, sidetracked or worked over in the Operating Area and specified in the applicable Drilling Order.

(i)    "Drilling Order" means the written agreement that sets forth the specific work to be performed, and the specifications and conditions for conducting such work, and that incorporates all or part of this Master Contract and is entered into by Contractor and Operator or one of their respective Affiliated Companies, from time to time. Each Drilling Order shall be in a form substantially similar to Appendix A and the other appendices and schedules attached hereto and made a part hereof, or any other form the Parties may mutually agree upon in writing. More than one Drilling Order may be effective at a time.

(j)    "Drilling Site" shall be defined as the area within a 1000-foot radius of the Designated Well.

(k)    "Drilling Unit" means Contractor's drilling unit, the specification of which is detailed in the Drilling Order and as named in the Drilling Order and all associated equipment provided by Contractor or its subcontractors of any tier.

(l)    "Gross Negligence" means any act or failure to act (whether sole, joint or concurrent) by any person or entity in reckless disregard of and/or conscious indifference to, harmful consequences which such person or entity knew, or should have known, would occur to persons, property or the environment as a result of such act or failure to act.

(m)    "Operating Area" means the area in federal or state waters specified in the applicable Drilling Order in which Operator is entitled to conduct drilling operations.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

(n)     "Operating Base" means the place onshore designated by Operator and specified in the applicable Drilling Order.

(o)     "Operator" shall have the meaning assigned to it in the preamble above; provided that for purposes of any Drilling Order which identifies one of Operator's Affiliated Companies as the "Operator", all references to "Operator" in the Contract shall mean such Affiliated Company. Any provision in this Contract relieving Operator of liability or responsibility or defending, indemnifying or insuring Operator shall be deemed to provide for identical relief, and/or indemnification, and/or insurance, as applicable, in favor of Operator and Operator's co-lessees, co-owners, partners, joint or co-venturers and Affiliated Companies, and each of their respective directors, officers, employees, servants, representatives, agents, and insurers.

(p)     "Operator's Items" means, as to any particular Drilling Order, the equipment, materials, tools, appliances, supplies, instruments, services and vessels and their appurtenances provided by Operator, including but not limited to those which are listed in Schedule A-3 to the Drilling Order, that are furnished by Operator specifically for wells and operations contemplated under this Contract.

(q)     "Operator's Personnel" means, as to any particular Drilling Order, all employees and crew members of Operator provided from time to time to conduct operations under such Drilling Order and/or related to the Designated Well. In addition, to the extent a Third Party Contractor does not execute the cross indemnification and waiver in favor of Contractor as specified in Paragraph 915 of this Contract, Operator's Personnel will also include such Third Party Contractor and all members of the applicable Third Party Contractor Group.

(r)     "Operator's Representative" shall have the meaning ascribed to such term in Paragraph 603 of this Contract.

(s)     "Personnel" means, as to any particular Drilling Order, Contractor's Personnel and/or Operator's Personnel, as applicable.

(t)     "Termination Date" shall have the meaning ascribed to such term in the Drilling Order.

(u)     "Third Parties" means all persons and entities other than Contractor, Operator, Contractor's Personnel or Operator's Personnel.

(v)     "Third Party Contractor" shall mean any contractor (other than Contractor or any of Contractor's Personnel) used or employed by Operator to perform work for Operator at the Drilling Site.

(w)     "Third Party Contractor Group" shall mean Third Party Contractors and their respective Affiliated Companies, its and their respective subcontractors of any tier, together with its and all of their respective officers, directors, employees, in-house legal counsel, agents, representatives and invitees and the respective successors, spouses, relatives, dependents, heirs and estate of any of the foregoing.

(x)     "Willful Misconduct" means any act or failure to act taken with actual knowledge that such act or failure to act will result in injury to persons or damage to property or the environment.

- 3 -



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

102. Currency

In this Contract or any Drilling Order resulting from this Contract, all amounts expressed in dollars are stated in United States currency.

103. Conflicts

The Appendices and Schedules attached hereto are incorporated herein by reference. However, if there are any provisions of the Schedules or Appendices (with the exception of the Drilling Order) that conflict with the body of this Contract, then the provisions in the body of this Contract shall prevail. For the avoidance of doubt, the Drilling Order shall prevail over this Contract and the attached appendices and schedules in the event of a conflict.

104. Headings

The paragraph headings herein shall not be considered in interpreting the text of this Contract.

105. Contractor's Status and Statutory Employee

(a) Contractor Status - Contractor shall be an independent contractor with respect to performance of all work hereunder. Operator shall have no direction or control of Contractor or Contractor's Personnel except in the results to be obtained.

(b) Statutory Employee - In the event the Work is being performed in or offshore Louisiana, and/or the Louisiana Workers' Compensation Act may be applicable, and/or the laws of the State of Louisiana govern this Contract, the Parties recognize, acknowledge and agree as follows:

(1) The Work performed by Contractor pursuant to the Contract is part of Operator's trade, business or occupation. As such, Contractor's work constitutes an integral part of Operator's business necessary to generate Operator's goods, products and services. The Parties recognize Operator as the statutory employer of the employees of Contractor and its subcontractors (of any tier), if any, whether direct, statutory, borrowed, or otherwise, and Contractor shall ensure that all of its subcontracts contain the same provisions as this Paragraph 105(b).

(2) Operator's legal status as a statutory employer in no way affects the Contractor's status as an independent contractor, nor does it give Operator the right to direct or control the operations of the Contractor, its subcontractors or their employees and agents, except as to the results to be obtained under the Contract.

106. Governing Law

THIS CONTRACT SHALL BE CONSTRUED AND THE RELATIONS BETWEEN THE PARTIES DETERMINED EXCLUSIVELY IN ACCORDANCE WITH THE GENERAL MARITIME LAW OF THE UNITED STATES, NOT INCLUDING ANY OF ITS CONFLICTS OF LAW RULES WHICH WOULD DIRECT OR REFER TO THE LAWS OF ANOTHER JURISDICTION. IN THE EVENT THAT THE GENERAL MARITIME LAW OF THE UNITED STATES IS DETERMINED BY A COURT NOT TO BE APPLICABLE, THEN THE PARTIES AGREE AND STIPULATE THAT THIS CONTRACT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED BY THE LAW OF THE STATE IN WHICH THE WORK IS PERFORMED (OR OF THE ADJACENT STATE, IF THE WORK IS PERFORMED ON THE OUTER CONTINENTAL SHELF OF THE UNITED STATES), NOT INCLUDING,



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

HOWEVER, ITS CONFLICTS OF LAW RULES WHICH MIGHT OTHERWISE REFER TO THE LAW OF ANOTHER FORUM OR JURISDICTION; PROVIDED, HOWEVER, THAT NO LAW, THEORY OR POLICY SHALL BE GIVEN EFFECT WHICH WOULD UNDERMINE, DIMINISH OR REDUCE THE EFFECTIVENESS OF THE WAIVER OF CONSEQUENTIAL DAMAGES PROVIDED IN PARAGRAPH 912, IT BEING THE EXPRESS INTENT, UNDERSTANDING AND AGREEMENT OF THE OPERATOR AND CONTRACTOR THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, "REGARDLESS OF FAULT" (AS SUCH TERM IS DEFINED IN PARAGRAPH 901(c) OF THIS CONTRACT.

## ARTICLE II - TERM

201.  Effective Date

The Parties shall be bound by this Master Contract as of the date the Master Contract is executed by both Parties (hereinafter referred to as "Master Contract Effective Date"). The Parties shall be bound by the applicable Drilling Order as of the date such Drilling Order is executed by both Parties (hereinafter referred to as "Drilling Order Effective Date").

202.  Duration

This Master Contract shall be effective as of the Master Contract Effective Date and shall continue in force until terminated in accordance with the provisions hereof. As a master domestic offshore daywork drilling contract, with respect to potential future work not then the subject of a Drilling Order, this Contract may be terminated prospectively by either Party at any time without cause and without liability upon thirty (30) days' prior written notice to the other Party (subject to Paragraph 205 herein); provided, however, the terms and provisions of this Master Contract shall continue to apply to all Drilling Orders then in existence, and neither Party shall by reason of such prospective termination of this Master Contract be relieved of its respective obligations and liabilities theretofore or thereafter arising from or incident to work performed under any existing Drilling Order. Subject to Paragraphs 203 and 204 below, the duration of any Drilling Order shall be for the term specified in the applicable Drilling Order.

203.  Termination

A Drilling Order shall terminate upon the occurrence of any of the following conditions; provided that the Termination Date will have the meaning ascribed in the Drilling Order:

(a)    If the Drilling Unit becomes a total loss. In the event of actual total loss, the Termination Date shall be the date of actual loss. In the event of a constructive total loss, the Termination Date shall be the date of the casualty which results in the constructive total loss as reasonably determined by Contractor's underwriters or marine surveyor; provided, however, for purposes of the Drilling Order, a constructive total loss will be deemed to have occurred when the Drilling Unit is permanently damaged to such an extent that it is unable to resume drilling operations in a manner consistent with drilling operations conducted prior to such constructive total loss. Operator's obligation to pay any compensation under a particular Drilling Order and the Contract will terminate as of the date of total loss (actual or constructive).

(b)    Upon completion of the term of the Contract specified in the Drilling Order; provided that if such term is for a designated period of time or expires on a designated date and at the



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

end of such period or upon expiration of such date operations are then being conducted on a Designated Well, the Drilling Order shall terminate as soon thereafter as such operations are completed;

(c)     In accordance with Paragraph 707.

(d)     In the event Contractor's Drilling Unit should fail to pass any federal or state inspection or requirement or fails to disclose the information requested in Paragraph 502(c), either of which precludes Contractor from conducting drilling operations under the Contract, and Contractor does not cure such failure within fifteen (15) days, then Operator shall have the right to immediately terminate the Contract and in such event Operator shall be solely responsible to Contractor for the compensation due to Contractor under this Contract up to the date of such termination, plus demobilization as set forth in the Contract and no further compensation shall be due to Contractor following such termination.

(e)     In the event of unreasonably slow progress, carelessness, unsafe operations, inattention or incompetence in the performance of work hereunder and/or any applicable Drilling Order or any default by Contractor of this Contract and/or any applicable Drilling Order, Operator shall provide written notice to Contractor of its reasonable dissatisfaction or of such default.  Contractor shall have fifteen (15) days following its receipt of such notice to cure such dissatisfaction or default.  Should Contractor fail to cure such dissatisfaction or default within such fifteen (15) day period then Operator shall have the right to immediately terminate the Contract and any applicable Drilling Order and in such event Operator shall be solely responsible to Contractor for the compensation due to Contractor under this Contract and any applicable Drilling Order up to the date of such termination, plus demobilization as set forth in the Contract and no further compensation shall be due to Contractor following such termination.

(f)     In the event a breakdown or substantial damage to the Drilling Unit or any of Contractor's Items has occurred which precludes Contractor from conducting drilling operations under this Contract and/or any applicable Drilling Order and Contractor does not cure such failure within fifteen (15) days then Operator shall have the right to immediately terminate the Contract and any applicable Drilling Order and in such event Operator shall be solely responsible to Contractor for the compensation due to Contractor under this Contract and any applicable Drilling Order up to the date of such termination, plus demobilization as set forth in the Contract and no further compensation shall be due to Contractor following such termination.

(g)     If Contractor or its parent company becomes insolvent, bankrupt, goes into liquidation, makes an assignment for the benefit of its creditors, makes an arrangement, composition or compromise with its creditors under any applicable laws or has a receiver appointed in respect of the whole or any part of its assets, then Operator shall have the right to immediately terminate the Contract and any applicable Drilling Order and in such event Operator shall be solely responsible to Contractor for the compensation due to Contractor under this Contract and any applicable Drilling Order up to the date of such termination and no further compensation shall be due to Contractor under this Contract or any applicable Drilling Order following such termination.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

(h)     At any time by Operator for convenience upon ten (10) days' advance written notice of termination to Contractor.

204.    Option to Extend

Operator may extend the duration of a Drilling Order for an additional period or for additional well or wells in accordance with the Drilling Order.

205.    Continuing Obligations

Notwithstanding the termination of this Contract or any Drilling Order, the Parties shall continue to be bound by the obligations and liabilities of this Contract that have been incurred prior to the date of such termination, including but not limited to those set out in Paragraphs 206, 507, 604, 701, and Articles VIII, IX, XI, XII and XIII.

206.    Return of Operator's Items

Upon termination of operations under a Drilling Order, Contractor shall return to Operator on board the Drilling Unit, or as directed by Operator at Operator's sole cost, any of Operator's Items which are in Contractor's possession.  During offloading of Operator's Items, Operator will not incur additional costs and shall not be responsible for the payment of any rates associated with the use of Contractor's Personnel or Contractor's Items.

## ARTICLE III - CONTRACTOR'S PERSONNEL

301.    Number, Selection, Hours of Labor and Remuneration

Unless otherwise provided in this Contract or in an applicable Drilling Order, the number, selection, replacement, hours of labor, remuneration and benefits of Contractor's Personnel shall be determined by Contractor and Contractor's Personnel shall be provided by Contractor at Contractor's expense at all times.  If Contractor does not provide all personnel as set forth in Schedule A-2 to the applicable Drilling Order and such personnel are not replaced within 48 hours, then the applicable day rate will be reduced in an amount equal to the missing crew member's wages specified in such Schedule A-2.

302.    Contractor's Representatives

Contractor shall nominate one of its personnel as Contractor's Representative who shall be named in the applicable Drilling Order and shall be in charge of the remainder of Contractor's Personnel and who shall have full authority to resolve routine day-to-day matters which arise between Operator and Contractor.  Contractor's Representative shall be in charge of assuring compliance with all federal, state and local drug testing laws, regulations and requirements which are applicable to any work performed under this Contract and any applicable Drilling Order.  Contractor's Representative shall not have the authority to amend the Drilling Order or this Contract.

303.    Increase in Contractor's Personnel

Operator may, at any time with Contractor's approval (which shall not be unreasonably withheld or delayed), require Contractor to increase the number of Contractor's Personnel, in which case the day rates provided herein shall be adjusted by an amount equal to the daily sum of the wage rate of each additional Contractor's Personnel specified in Schedule A-2.

304.    Replacement of Contractor's Personnel



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Contractor will remove and replace in reasonable time any of Contractor's Personnel if Operator so requests in writing, if in Operator's reasonable opinion, such Contractor Personnel are incompetent, inefficient, conduct themselves in a manner inconsistent with Operator's interests or policies or do not meet the requirements of this Contract and/or any applicable Drilling Order.

305. Qualifications of Contractor's Personnel

Contractor agrees to provide as Contractor's Personnel only persons who are properly qualified, trained, and skilled to perform all material aspects of the jobs for which they are employed by Contractor.

306. Citizenship of Contractor's Personnel

Contractor certifies that none of Contractor's employees and crewmembers who perform work pursuant to this Contract are unauthorized aliens as defined in The Immigration Reform and Control Act of 1986, as amended from time to time, and the rules and regulations promulgated pursuant thereto. Contractor further agrees, if requested, to provide proof of citizenship of Contractor's Personnel who perform work pursuant to this Contract.

307. Contractor's Safety Representative

Contractor shall provide and assign to the Drilling Unit, a properly trained safety and/or medical representative whose responsibilities shall be defined in Appendix A of the applicable Drilling Order, as well as to promote and oversee the overall safety of the work, services, and operations under each Drilling Order and on board the Drilling Unit and to supervise compliance with the applicable laws and safety obligations set forth in this Contract.

## ARTICLE IV - CONTRACTOR'S ITEMS

401. Obligation to Supply

Contractor shall provide Contractor's Items and Contractor's Personnel and perform the services to be performed by it in accordance with this Contract and any applicable Drilling Order.

402. Maintain Stocks

Contractor shall be responsible, at its cost, for maintaining adequate stock levels of Contractor's Items and replenishing as necessary in a timely manner to ensure continuous drilling operations.

403. Maintain and Repair Equipment

Contractor shall be responsible for the maintenance and repair of all Contractor's Items and shall provide all spare parts and materials required therefor at Contractor's expense unless otherwise specified in the applicable Drilling Order. Contractor shall, if requested by Operator, also maintain or repair any of Operator's Items on board the Drilling Unit which Contractor is qualified to and can maintain or repair with Contractor's normal complement of personnel and equipment on board the Drilling Unit; provided, however, that Operator shall, at its cost, provide all spare parts and materials required to maintain or repair Operator's Items, and responsibility and liability for furnishing and maintaining such items shall remain with the Operator.

404. Right to Inspect and Reject Equipment

Prior to the Commencement Date, Operator shall have the right at its sole expense to inspect the Drilling Unit and Contractor's Items, including drill pipe. The Drilling Unit and Contractor's Items shall be provided by the Contractor in good and proper operating condition, as necessary to



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

perform the work under this Contract and the applicable Drilling Order and in accordance with all applicable rules, regulations and requirements of this Contract. Any modifications which are related to regulatory compliance, as necessary to place the Drilling Unit in good operating condition as required under this Paragraph 404, or as necessary for the performance of the work under this Contract and the applicable Drilling Order shall be for Contractor's account. Operator shall conduct all such inspections in a manner which does not delay the Commencement Date or ongoing operations under the Contract. In the event Operator's inspections result in any such delay of the Commencement Date in excess of the period specified in Appendix A, Operator shall pay Contractor the Standby Rate for the duration of such excess delay.

## ARTICLE V - CONTRACTOR'S GENERAL OBLIGATION

501.   Contractor's Standard of Performance

This is a contract for drilling services and is not to be construed as a charter of a vessel by Operator. Nothing herein stated is to be construed as a bareboat charter, demise or lease of the Drilling Unit or any other of Contractor's Items. Contractor shall carry out all operations hereunder in a diligent manner and as a prudent drilling contractor on a daywork basis for a specified sum per day as set forth in Article VII and the applicable Drilling Order. Operator or its employees, who have a need to be onboard the Drilling Unit, shall have unlimited access to the Drilling Unit to determine whether work is being performed by Contractor or Contractor's Personnel in accordance with all of the provisions of this Contract and the applicable Drilling Order.

502.   Operation and Control of Contractor's Drilling Unit

(a)     Operations under this Contract and the applicable Drilling Order will be performed on a twenty-four (24) hour per day basis, seven (7) days a week. Contractor shall be responsible for the operation and control of the Drilling Unit, including supervising moving operations and positioning on drilling locations and, accordingly, shall have final authority and responsibility for the safety and operation of all systems and all personnel associated with operation of the Drilling Unit and Contractor's Items.

(b)     Contractor shall use and operate Contractor's Items and the Drilling Unit within their normal operating capacities and geographical and operating limits, and such limits imposed by Contractor's insurers.

(c)     Before the commencement of any work, services or operations under this Contract and the applicable Drilling Order, Contractor shall notify Operator in writing of any such operational, geographical or other limitations imposed by Contractor's insurers that preclude the drilling of the Designated Well.

503.   Compliance with Operator's Instructions

(a)     Contractor shall comply with all instructions of Operator consistent with the provisions of this Contract and the applicable Drilling Order. Such instructions shall, if Contractor so requires, be confirmed in writing by Operator's Representative. In the event that Operator directs Contractor to perform any work, services or operations under conditions or at locations which exceed the rated capacities or geographical or operational limits of Contractor's Items or the Drilling Unit as such limitations have been provided to Operator



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

pursuant to Paragraph 502(c), then Contractor shall immediately so notify Operator of its inability to perform the directed work, services or operations.

(b)   Contractor and Contractor's Personnel shall comply with all applicable federal, state, and local laws, ordinances, rules, regulations and lease or contract provisions regarding pollution, safety and the environment.

(c)   Contractor and/or Contractor's Personnel shall notify Operator immediately of any occurrence or event, arising out of performance under this Contract, which results in a violation of environmental laws.

(d)   Contractor shall comply with Operator's Safety Program as set forth in Appendix C and incorporated by reference and with Operator's Search and Seizure Policy as set forth in Appendix D and incorporated by reference (unless otherwise set forth in a bridging document between the Parties).  If Operator's procedures, guidelines or policies are inconsistent with Contractor's own written procedures, guidelines and policies, then the more restrictive of the two shall apply to this Contract and Contractor's performance of work under this Contract and any applicable Drilling Order (unless otherwise set forth in a bridging document between the Parties).  This provision constitutes a minimum standard and shall not be construed so as to provide Operator any right of, or actual, control over any of Contractor's safety or other policies or practices.

(e)   To the extent that any work is to be performed pursuant to this Contract and any applicable Drilling Order by or on behalf of Contractor, Contractor agrees that it has or will have, prior to conducting any such work, (i) complied with the applicable Data Integrity Security Administration ("DISA") Compliance Program sponsored by DISA, Inc. (the "DISA Compliance Program") and the ISNetworld Health and Safety Review and Verification Program (the "ISNetworld Program" and, together with the DISA Compliance Program, the "Compliance Programs") and (ii) represents that all of Contractor's Personnel who perform any such work or portion thereof have enrolled in the applicable DISA Compliance Program (either DOT or non-DOT) and ISNetworld Program.  Contractor expressly acknowledges and agrees that (i) its failure to comply with the provisions of this Paragraph 503(e) shall be cause for Company to terminate this Contract and Contractor's performance of any work hereunder and under the applicable Drilling Order pursuant to Paragraph 203(e); and (ii) the failure of any of Contractor's Personnel to enroll or maintain its current enrollment in the applicable Compliance Programs shall constitute cause for Company to deny access to such member of Contractor's Personnel or to otherwise require that such member of Contractor Personnel be excluded from the performance of work hereunder and under the applicable Drilling Order.

504.   Adverse Weather

Contractor will be responsible for the evaluation and monitoring of current and developing weather conditions and deciding when, in the face of impending adverse weather conditions, to institute precautionary measures in order to safeguard the well, the well equipment, Contractor's Items, Operator's Items and personnel to the fullest possible extent.

505.   Drilling Fluids and Casing Program

- 10 -

Contractor shall follow the Operator's instructions with respect to the drilling fluid and casing program as specified by Operator.  Operator shall provide Contractor with these programs reasonably in advance of the spud date of each well to be drilled hereunder and under any applicable Drilling Order.

506.  <u>Cutting/Coring Program</u>

Contractor shall save and identify cutting and/or coring samples according to Operator's instructions and place them in containers furnished by Operator.

507.  <u>Records to be Kept and Reports to be Furnished by Contractor</u>

(a)  Contractor shall each day keep and furnish to Operator's Representative two (2) signed copies of daily drilling reports in detail on standard IADC-API Daily Drilling Report Forms, or other equivalent form acceptable to Operator.  This report shall specifically include details of time breakdown on all operations and a clear description of all operations.

(b)  Contractor shall notify Operator immediately of any accident whatsoever involving injury or death to anyone, and shall furnish to Operator a copy of Contractor's "Employer's First Report of Accident" as soon as possible following any accident resulting in injury or death to any of Contractor's Personnel, Operator's Personnel or Third Parties, during the progress of work, services or operations under this Contract.  Contractor shall also furnish to Operator copies of any other non-confidential reports, statements or information, in Contractor's possession which may have a bearing on any accident involving injury or death to anyone.  With respect to accidents involving material damage to property of Contractor, Contractor's Personnel, Operator, Operator's Personnel or Third Parties, Contractor shall have the same obligations and duties as required herein for accidents resulting in injury or death.

(c)  Operator shall have a right to all data and information (not to include trade secrets or other information that specifically relates to Contractor's drilling processes and is proprietary and confidential to Contractor) gathered during the drilling of any Designated Well or used in connection with preparing to drill any Designated Well pursuant to this Contract and/or any applicable Drilling Order.

508.  <u>Difficulties During Drilling</u>

(a)  In the event of any difficulty which precludes either continued drilling under reasonably normal procedures or the performance of any other operations planned for a Designated Well, Contractor may suspend the work in progress and shall immediately notify the representative of Operator, in the meantime exerting reasonable effort to overcome the difficulty.  Contractor shall, if requested by Operator, perform all necessary work to remedy the difficulty, including but not limited to relief well(s) or well control activities subject to Contractor's underwriters approval.

(b)  In the event a well to be drilled under this Contract is a relief well directly related to a Designated Well, any additional premiums assessed by Contractor's insurers shall be for the account of the Operator.

(c)  Contractor and Operator agree that in the event Operator requests Contractor to drill a relief well with the Drilling Unit, under this Contract, at a location other than at or in



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

direct relationship to the Designated Well, such operation will be subject to mutually agreed terms and conditions between Contractor and Operator.

509.   Well Control Equipment

Contractor shall maintain its blowout and well control equipment listed in Schedules A-1 and A-3 to each Drilling Order in good operating condition at all times and in compliance with all applicable rules and regulations, including, but not limited to API standards and recommendations, the rules and regulations of the BOE and shall use all reasonable means to control and prevent fires and blowouts and to protect the hole. Contractor shall test blowout preventer assemblies, surface control equipment and accessories, such as flow line, valves, choke manifolds and connections, to pressures specified by Operator, but within the manufacturer's equipment ratings and in compliance with all applicable rules and regulations, including, but not limited to the rules and regulations of the BOE. Contractor shall use reasonable diligence to (a) keep the hole and all strings of casing filled with drilling mud at all times and (b) use (and maintain in good working order) all alarm equipment furnished by Operator.

510.   Inspection of Materials Furnished by Operator

Contractor agrees to visually inspect and examine all Operator's Items before using them in connection with work under this Contract and any applicable Drilling Order and shall report to Operator any apparent defects therein. Contractor shall make no use of any such apparently defective material, equipment or supplies. However, Contractor shall not be liable for any loss or damage resulting from the inspection or examination as set forth in this Paragraph 510.

## ARTICLE VI - OPERATOR'S OBLIGATIONS

601.   Equipment and Personnel

Operator shall, at its cost, provide Operator's Items and Operator's Personnel and perform the services to be provided or performed by it according to Schedule A-3 of the applicable Drilling Order. In addition to providing the initial supply of Operator's Items, Operator shall be responsible, at its cost, for maintaining adequate stock levels and replenishing as necessary. When, at Operator's request and with Contractor's agreement, in writing by an authorized representative of Contractor, Contractor furnishes or subcontracts for certain items which Operator is required herein to provide, for purposes of this Contract said items or services shall be deemed to be Operator's Items and/or Operator's Personnel. Operator shall reimburse Contractor its actual cost plus a handling charge as specified in the applicable Drilling Order.

602.   Maintenance and Repair

Operator shall be responsible, at its cost, for the maintenance and repair of all Operator's Items onboard the Drilling Unit which Contractor is not qualified to or cannot maintain or repair with Contractor's normal complement of personnel and the equipment on board.

603.   Operator's Personnel and Operator Representatives

Operator shall, as to each Drilling Order, designate a senior representative, called Operator's Representative, to resolve routine day-to-day matters requiring decision by Operator, who will be present on board the Drilling Unit. In addition, Operator may, from time to time, designate representatives for the purpose of each Drilling Order who shall at all times have access to the

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Drilling Unit and may, among other things, observe tests, examine cuttings and cores, inspect the work performed by Contractor, or examine the records kept on the Drilling Unit by Contractor.

604.   Drilling Site Access and Surveys

Operator will be responsible for designating the Drilling Site and providing proper and sufficient certificates, permits or permission necessary to enter upon and operate on the Drilling Site. Contractor will be responsible all approvals, licenses, permits, authorizations and/or filings as necessary for carrying out the work under this Contract and any applicable Drilling Order other than as provided in the preceding sentence.

## ARTICLE VII - RATES OF PAYMENT

701.   Payment

Operator shall pay to Contractor during the term of this Contract the amounts from time to time due calculated and prorated to the nearest half-hour according to the rates of payment set forth in the applicable Drilling Order, in accordance with the other provisions hereof.  No other payments shall be due from Operator unless specifically provided for in the applicable Drilling Order, or agreed to in writing by Operator.

702.   Mobilization Fee

With respect to the mobilization of the Drilling Unit from the location referred to in the applicable Drilling Order (the "Mobilization Location") to Operator's first Designated Well, the Mobilization Fee (the "Mobilization Fee") is specified in the applicable Drilling Order and shall commence and cease in accordance with the Drilling Order.

703.   Demobilization Fee

With respect to the demobilization of the Drilling Unit from Operator's final Designated Well to the location referred to in the applicable Drilling Order (the "Demobilization Location"), the Demobilization Fee (the "Demobilization Fee") is specified in the applicable Drilling Order and shall commence and cease in accordance with the Drilling Order.

Notwithstanding the foregoing paragraph, if after the release of the Drilling Unit by Operator under any applicable Drilling Order, Contractor is obligated to a third party to move the Drilling Unit to another location within the Operating Area instead of returning said Drilling Unit to the Demobilization Location, then Operator shall not be obligated to pay the Demobilization Fee for the transportation of the Drilling Unit to that third party location.  In such case, Operator shall remain obligated to pay the applicable tug charges until the Drilling Unit is free, afloat and under tow from Operator's location to the third party location.

704.   Operating Rate

The Operating Rate (the "Operating Rate") is specified in the applicable Drilling Order and shall commence and cease in accordance with the Drilling Order.  The Operating Rate shall continue to be payable throughout the term of the applicable Drilling Order, except as otherwise provided herein or in the applicable Drilling Order.

705.   Standby Rate

The Standby Rate (the "Standby Rate") specified in the applicable Drilling Order will be payable as follows:

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

(a)    during any period drilling operations under the applicable Drilling Order are shut down or suspended as a result of wind, storm, or other similar adverse or violent weather or sea conditions (including loop and eddy currents) which conditions prevent Contractor from conducting drilling operations.

(b)    during any period drilling operations under the applicable Drilling Order are shut down or suspended (including periods to repair the Drilling Unit or other Contractor's Items) solely due to blowout of the Designated Well or cratering, shifting or other conditions related to the Drilling Site (*e.g.*, unmarked pipelines and other subsea obstructions); provided that, as to each such occasion of shut down or suspension for repair of the Drilling Unit or other Contractor's Items, the number of days for which the Standby Rate is paid by Operator shall not exceed fifteen (15), following which no payments shall be due to Contractor until the Drilling Unit is in operation pursuant to the specifications of this Contract and the applicable Drilling Order.

(c)    during any period operations under the applicable Drilling Order are shut down or suspended as a direct result of an act, instruction or omission of Operator including, but not limited to, the failure of Operator's Items or the failure of Operator to issue instructions or provide Operator's Items or Operator's Personnel.

(d)    as specified in Paragraph 404.

706.  Repair Rate

Subject to Paragraphs 705(b) and 709(b), the Repair Rate (the "Repair Rate") specified in the applicable Drilling Order will be payable when operations are suspended in order for Contractor to comply with federal or state orders or to permit necessary replacement of Contractor's Items or repair or maintenance of Contractor's Items. Contractor shall be paid at the Repair Rate for time consumed in complying with federal or state orders, the necessary replacement of Contractor's Items or repair or maintenance of Contractor's Items up to the maximum allowances specified in the Drilling Order. Operator shall not pay the Repair Rate for suspensions in excess of such maximum allowances. No rates will be incurred by Operator for any downtime exceeding such maximum allowances until operations are resumed. Suspensions of operations due to routine maintenance and inspections such as lubrication of the Drilling Unit, packing of swivels, changing of pump parts, cleaning or clearing the Drilling Unit's mud system, or cutting and slipping lines shall not be considered as a suspension of operations for purposes of this Paragraph 706 and instead the Operating Rate shall apply. In the event the Drilling Unit is equipped with dual BOPs and operations are suspended to permit necessary replacement, repair or maintenance of one of Contractor's BOPs, and the other BOP provided by Contractor is not able to immediately replace the first BOP and commence drilling operations, then, notwithstanding any allowance in the Drilling Order, Operator shall not pay the Repair Rate for any of the time operations are suspended and will incur no rate. Further, in such event, no rates will be incurred by Operator until such time as operations have commenced from the depth at which drilling progress ceased.

707.  Force Majeure Rate

The Force Majeure Rate (the "Force Majeure Rate") specified in the applicable Drilling Order will be payable during any period in which operations are not being carried on because of a Force Majeure event, as defined in Paragraph 1303 of this Contract. After the suspension of operations

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

for the maximum number of days specified in the applicable Drilling Order and during the continuous existence of the Force Majeure condition, the applicable Drilling Order may be terminated at the option of either Party by giving written notice to the other Party and in such event Operator shall be solely responsible to Contractor for the compensation due to Contractor under the applicable Drilling Order up to the date of such termination plus demobilization and no further compensation shall be due to Contractor under the Contract or the applicable Drilling Order following such termination.

708.    Move Rate

The Move Rate (the "Move Rate") specified in the applicable Drilling Order will be payable during the following and shall commence and cease in accordance with the Drilling Order:

(a)    Moves of the Drilling Unit as may be necessary from time to time to reposition the Drilling Unit at a Drilling Site;

(b)    Moves of the Drilling Unit occasioned by emergency, severe weather or sea conditions, hurricanes or sea bottom conditions; and

(c)    Moves of the Drilling Unit between Drilling Sites.

709.    Adjustments in Rate

The rates and payment herein set forth shall be revised by the actual amount of the change in Contractor's cost if an event as described below occurs:

(a)    if Operator requires Contractor to increase the number of Contractor's Personnel to a number greater than the amount set forth in the applicable Drilling Order; or

(b)    if there is any material change in laws, rules, regulations, legislation or classification society rules within the Operating Area after the Drilling Order Effective Date, including the enforcement or interpretation thereof, which material change could not have been reasonably foreseeable by a prudent drilling contractor acting with all due skill and care and in accordance with good industry practice, and which materially increases Contractor's financial burden in providing the drilling operations under this Contract; provided, however, Operator's liability for such cost increase(s) shall be capped at ten percent (10%) of the Contractor's applicable day rates.

## ARTICLE VIII - INVOICES AND PAYMENTS

801.    Invoices

Contractor shall bill Operator as set forth in the applicable Drilling Order for all daily rates as provided herein and the applicable Drilling Order earned by Contractor under this Contract and the applicable Drilling Order. Billings for daily rates will reflect details of the time spent and the rate charged for that time and shall be supported by the appropriate daily drilling reports. Billings for other charges will be accompanied by invoices supporting costs incurred for Operator or other substantiation as reasonably required by Operator. A separate invoice shall be provided for each Drilling Order.

802.    Payment of Invoices

Operator shall pay all undisputed portions of invoices within forty-five (45) days following Operator's receipt of a true and correct statement of account from Contractor and the supporting

- 15 -

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

documentation, including the daily drilling reports; provided however, Operator is authorized to withhold, from payments due Contractor under this Contract and any applicable Drilling Order, any amounts owing to Operator by Contractor hereunder and/or any applicable Drilling Order. Operator shall notify Contractor promptly of any such amounts withheld. Any such amounts wrongfully withheld will earn interest at the annual rate of ten percent (10%) unless a lower annual rate is specified in the applicable Drilling Order.

803.   Manner of Payment

All payments due by Operator to Contractor hereunder and/or the applicable Drilling Order shall be payable in the manner and at the address as specified in the applicable Drilling Order.

## ARTICLE IX – LIABILITY

901.   Indemnity Definitions

In this Contract, specifically including, but not limited to Articles IX, X and XIII:

(a)   The phrase **"BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY"** means the indemnifying Party shall be solely responsible for and assume all liability for and defend (including payment of reasonable attorneys' fees and other costs of litigation), release and indemnify and hold harmless the indemnified Party and the other entities and individuals specified in Paragraphs 101(e) and 101(o).

(b)   **"CLAIM"** or **"CLAIMS"** means, unless specifically provided otherwise, all claims, damages, liabilities, losses, demands, liens, encumbrances, causes of action of any kind, obligations, costs, judgments, interest, and awards or amounts, of any kind or character (including fines, penalties and punitive and exemplary damages to the extent allowed by applicable laws, rules and regulations), including, without limitation, those made or enjoyed by dependents, heirs, claimants, executors, administrators, successors, survivors or assigns, whether under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any person or persons or any Party or Parties, breach of representation or warranty (expressed or implied), under any theory of tort, contract, breach of contract (including any CLAIMS which arise by reason of indemnification or assumption of liability contained in other contracts entered into between an indemnified Party hereunder and their respective personnel and/or a Third Party) arising out of, or incident to or in connection with this Contract or the performance of work, services or operations under this Contract.

(c)   The phrase **"REGARDLESS OF FAULT"** means WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, WITHOUT LIMITATION, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY:

(i)   THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS, OR OTHERWISE), STRICT LIABILITY, OR OTHER FAULT OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, OR



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

     (ii)    PRE-EXISTING DEFECT OR OTHER CONDITION, WHETHER PATENT OR LATENT, OF THE PREMISES OR ITEMS OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY; OR

     (iii)    THE UNSEAWORTHINESS OF ANY VESSEL (INCLUDING THE DRILLING UNIT) OR UNAIRWORTHINESS OF ANY AIRCRAFT OF ANY PARTY WHETHER OR NOT CHARTERED, OWNED, OR PROVIDED BY ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY OR ITS PERSONNEL OR ITS CONTRACTORS OR THEIR PERSONNEL.

902.   Indemnity Obligation

    (a)    It is the intention of the Parties hereto that the provisions and the indemnities contained in this Article IX shall exclusively govern the allocation of risks and liabilities of the Parties REGARDLESS OF FAULT (as more particularly specified in Paragraph 901(c) above), it being acknowledged that the compensation payable to Contractor as specified herein has been based on the express understanding that risks and liabilities shall be determined in accordance with the provisions of this Contract.

    (b)    Not Used

    (c)    An indemnifying Party's obligations contained in this Contract shall extend to the indemnified Party and the entities and individuals specified in Paragraphs 101(e) and 101(o) (as applicable).

    (d)    The Parties agree that the indemnity obligations under this Contract are effective to the maximum extent permitted by law, even if such indemnity obligation is held to be invalid or unenforceable, such holding shall not affect the remaining indemnity obligations between the Parties.

    (e)    Each Party agrees to promptly notify the other Party after receipt of any CLAIM for which it may seek indemnification.

**THE INDEMNITY OBLIGATIONS SET OUT HEREINABOVE SHALL ONLY BE EFFECTIVE TO THE MAXIMUM EXTENT PERMITTED BY THE APPLICABLE LAW. IN PARTICULAR, BUT WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, IF IT IS JUDICIALLY DETERMINED THAT THE MONETARY LIMITS OF INSURANCE REQUIRED HEREUNDER OR THE INDEMNITIES VOLUNTARILY ASSUMED HEREUNDER EXCEED THE MAXIMUM LIMITS PERMITTED UNDER APPLICABLE LAW, THE PARTIES HEREBY AGREE THAT SAID INDEMNITIES OR INSURANCE REQUIREMENT SHALL AUTOMATICALLY BE AMENDED TO CONFORM, TO THE MAXIMUM EXTENT PERMITTED, TO APPLICABLE LAW.**

903.   Equipment or Property

    (a)    Operator shall at all times BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor from and against all loss or damage of equipment or property owned or provided by or belonging to Operator, Operator's Affiliated Companies, Operator's Personnel, co-lessees, co-owners, partners and co-venturers and their respective officers, directors and employees REGARDLESS OF FAULT.

    (b)    Contractor shall at all times BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against all loss or damage of equipment or property owned or provided by or belonging to Contractor, Contractor's Affiliated Companies and Contractor's Personnel (including the Drilling Unit and Contractor's or its Personnel's in-

- 17 -



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

hole equipment when such equipment is above the rotary table) REGARDLESS OF FAULT; provided that Operator shall, REGARDLESS OF FAULT, BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor for all damage or loss (including all applicable transportation costs but excluding damage or loss attributable to normal wear as well as amounts paid to Contractor by its insurers for such damage or loss) of:

(1)     Contractor's drill pipe, drill collars, subs, reamers, bumper subs, stabilizers and other in-hole equipment when such equipment is being used in the hole below the rotary table, but only at the lesser of the actual repair costs and the percent (%) of the replacement cost specified in Appendix A of the Drilling Order.  Abnormal wear and/or damage for which Operator shall be responsible hereunder shall mean wear and/or damage resulting from the presence of H2S or other corrosive elements in the hole including those introduced into the drilling fluid, excessive wear caused by sandcutting, damage resulting from excessive or uncontrolled pressures such as those encountered during testing, blowout, or in a well out of control, excessive deviation of the hole from vertical, dog-leg severity, fishing, cementing or testing operations, and from any unusual drilling practices employed at Operator's request.  Operator's responsibility for such abnormal wear and/or damage as referred to herein shall include abnormal wear and/or damage to Contractor's choke hoses and manifolds, BOP and other appurtenant equipment.

(2)     Contractor's riser and related components, slip joints, upper flex joint, choke and kill lines, flexible hoses, hydraulic hoses, the BOPs, MUX cables and the lower marine riser package (the "Subsea Equipment") occurring while such Subsea Equipment is below the water line, but only at the lesser of the actual repair costs and the percent (%) of the replacement cost specified in Appendix "A" of the Drilling Order.

The Operator's obligations for Contractor's equipment and property set forth in this Paragraph 903(b) shall not be due or payable to the extent such loss or damage is caused by the Gross Negligence and/or Willful Misconduct of Contractor and/or its Personnel and Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against any such loss or damage under this Paragraphs 903(b) to the extent caused by the Gross Negligence and/or Willful Misconduct of Contractor and/or any of its Personnel.  In the event that Operator rents (or requests Contractor to rent) equipment or property while such Contractor's lost or damaged equipment or property is being repaired or replaced, Operator shall pay all costs related to such substitute equipment or property.

Notwithstanding anything in Paragraph 903(b), Operator's liability in respect of any loss or destruction of, or damage to, Contractor's equipment or property under Paragraph 903(b)(1) shall be limited to the first Ten Million Dollars ($10,000,000) on a per occurrence basis.  Notwithstanding anything in Section 903(b), Operator's liability in respect of any loss or destruction of, or damage to, Contractor's Subsea Equipment under Section 903(b)(2) shall be limited to the first Thirty-Five Million Dollars ($35,000,000) on a per occurrence basis.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

During suspensions in drilling operations pending the repair or replacement of Contractor's equipment or property under this Paragraph 903, subject to its maximum allowances, the Repair Rate shall be payable; provided that, for the avoidance of doubt, Paragraph 705(b) shall control to the extent of a conflict with this paragraph.

904. The Hole, Blowout, Cratering and Cost of Control

In the event loss of or damage to the hole or the Designated Well occurs, or in the event any Designated Well being drilled by Contractor under this Contract and any applicable Drilling Order shall blowout or crater from any cause whatsoever, by whomsoever, while work, services or operations are being performed under this Contract, Operator shall bear the entire cost and expense of killing the well or otherwise bringing the well under control, and shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor for all such CLAIMS for loss of or damage to the hole or the Designated Well, including the casing therein, REGARDLESS OF FAULT; provided, however, in the event that the loss of or damage to the hole or the Designated Well is due to the negligence, breach of contract, breach of warranty or other fault of Contractor and/or any of Contractor's Personnel, then Contractor shall, as Operator's sole and exclusive liability for such loss or damage, drill a new hole on the same location or redrill such damaged section of the hole as Operator may require, in either case, subject to all the terms of this Contract, at the Re-Drill Rate set forth in Appendix A of the Drilling Order and provided further that in the event that the loss of or damage to the hole or the Designated Well is due to the Gross Negligence or Willful Misconduct of Contractor and/or any of Contractor's Personnel then Contractor shall drill a new hole on the same location or re-drill such section of the hole as Operator may require, in either case, subject to all the terms of this Contract, at sixty-two and one-half percent (62.5%) of the Operating Rate as set forth in Appendix A of the Drilling Order. The indemnity and responsibility undertaken by Operator in this Paragraph 904 applies only to the liability for the loss of or damage to the hole or Designated Well (and the applicable redrilling, repair or other remedial activities) as well as the cost and expense of killing the well or otherwise bringing the well under control and is not to be interpreted as an assumption by the Operator of any liability for CLAIMS arising out of loss of life, injuries or damage to people or property caused by such blowout or crater and shall in no event alter or effect the indemnities and liabilities of Contractor or Operator as set forth elsewhere in this Article IX.

905. Contractor's Personnel

Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator against all CLAIMS (including, but not limited to, those for bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium, loss of support, death, and wrongful termination of employment) by or in favor of or incurred or sustained by Contractor's Personnel REGARDLESS OF FAULT. The indemnity obligation set forth in this Paragraph 905 shall apply even if such employee is determined to be the borrowed or statutory employee of Operator or any other member of Operator's Personnel. This indemnity obligation shall be supported by the Contractor's liability insurance coverage in the amounts shown for Commercial General Liability Insurance on Appendix B, including coverage for contractual liability coverage made applicable to the obligations of this Paragraph 905.

906. Operator's Personnel

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor against CLAIMS (including, but not limited to, those for bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium, loss of support, death, and wrongful termination of employment) by or in favor of or incurred or sustained by Operator's Personnel REGARDLESS OF FAULT. The indemnity obligations set forth in this Paragraph 906 shall apply even if such employee is determined to be the borrowed or statutory employee of Contractor or any other member of Contractor's Personnel. This indemnity obligation shall be supported by the Operator's liability insurance coverage in the amounts shown for Commercial General Liability Insurance on Appendix B for Contractor, including coverage for contractual liability coverage made applicable to the obligations of this Paragraph 906.

907.   Personnel and Property of Third Parties

Subject to Paragraphs 908, 909, 910, 911 and 913, Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against all CLAIMS (including, but not limited to, those for bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium, loss of support, death, property damage, and wrongful termination of employment) by or in favor of or incurred or sustained by any Third Party to the extent such CLAIM is caused by the negligence or other fault of Contractor or Contractor's Personnel.

Subject to Paragraphs 908, 909, 910, 911 and 913, Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor from and against all CLAIMS (including, but not limited to, those for bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium, loss of support, death, property damage, and wrongful termination of employment) by or in favor of or incurred or sustained by any Third Party to the extent such CLAIM is caused by the negligence or other fault of Operator or Operator's Personnel.

908.   Pollution, Hazardous Materials, Substances Liability and Environmental Losses

Notwithstanding anything herein to the contrary, the liability of Contractor and Operator for pollution, contamination and other ENVIRONMENTAL LOSSES (as defined below) is as follows:

(a)   Contractor's Liabilities

Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator for CLAIMS and/or ENVIRONMENTAL LOSSES, including but not limited to control, removal, restoration and cleanup of all pollution or contamination, arising from or on account of pollution or contamination which originates or emanates directly from Contractor's Items, including but not limited to spills or leaks of fuel, lubricants, motor oils, normal water base drilling fluids and attendant cuttings, pipe dope, paints, solvents, ballasts, bilge, garbage or sewerage, REGARDLESS OF FAULT. For purposes hereof, the term "normal water base drilling fluid" means drilling fluid which does not exceed toxicity limits specified for offshore discharges by the environmental protection entity having jurisdiction over the Operating Area.

(b)   Operator's Liabilities

Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor for CLAIMS and/or ENVIRONMENTAL LOSSES, including but not limited

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

to control, removal, restoration and cleanup of all pollution or contamination, arising from or on account of all pollution or contamination other than as specified in Paragraph 908(a), including that resulting from fire, blowout, cratering, seepage, leakage or any other uncontrolled flow of oil, gas, water or other substances and that which originates or emanates directly from from Operator's Items or Operator's Designated Well located within the Drilling Site, REGARDLESS OF FAULT.

(c)    Not Used

(d)    "ENVIRONMENTAL LOSSES" means all CLAIMS for damage or harm to the environment (including, without limitation, all costs to respond to, contain, assess, remove, clean up, remediate and dispose of environmental pollution and/or contamination) and any related natural resources damage or loss, incurred or imposed (i) pursuant to any order, notice of responsibility, directive (including requirements embodied in environmental laws), injunction, judgment or similar act (including settlements) by any governmental authority or governmental agency, including, but not limited to the BOE, and/or any court of competent jurisdiction or (ii) pursuant to any claim or cause of action by a governmental authority or other person for personal injury, property damage, damage to natural resources, remediation or response costs.

909.    Debris and Wreck Removal

Contractor shall promptly remove all debris and/or wreckage of Contractor's Items to the extent required by a governmental authority or requested by Operator in order to perform ongoing operations.    Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator for the costs of removal of such Contractor's Items and from and against any CLAIMS arising out of Contractor's or Operator's obligation to remove said debris and/or wreckage REGARDLESS OF FAULT.

Operator shall promptly remove all debris and/or wreckage of Operator's Items to the extent required by a governmental authority or in order to perform ongoing operations.  Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor for the costs of removal of such Operator's Items and from and against any CLAIMS arising out of Contractor's or Operator's obligation to remove said debris and/or wreckage REGARDLESS OF FAULT.

910.    Underground Damage

Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor from and against any and all CLAIMS resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the seabed, and for any loss or damage to any formation, strata, or reservoir beneath the seabed REGARDLESS OF FAULT.

911.    Patent Liability

Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator against CLAIMS arising from infringement or alleged infringements of patents of the



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

United States or other countries covering the property, equipment, methods or processes furnished by Contractor.

Contractor hereby grants to Operator an irrevocable, worldwide, royalty-free, non-exclusive license in and to all inventions, whether patentable or not, created or developed as part of the contracted-for work under this Contract and any applicable Drilling Order, and Operator shall be permitted to manufacture, construct, operate, maintain and repair such licensed items in the conduct of its business.

Operator shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor against CLAIMS arising from infringement or alleged infringements of patents of the United States or other countries covering the property, equipment, methods or processes furnished by Operator or Operator's Personnel REGARDLESS OF FAULT.

912.   Consequential Damages

Notwithstanding any other provisions contained in this Article IX, Operator shall at all times BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor from and against all special, indirect or consequential damages incurred by Operator, Operator's Affiliated Companies, Operator's Personnel, co-lessees, co-owners, partners and co-venturers resulting from or arising out of this Contract or any Drilling Order, including but not limited to loss of profits, loss of product or production, the cost of or loss of use of property, equipment or services (*e.g.,* Operator's "spread" costs for the ongoing supply of helicopters, vessels and fuel incurred during delays or suspensions in operations), or business interruptions, REGARDLESS OF FAULT.

Notwithstanding any other provisions contained in this Article IX, Contractor shall at all times BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against all special, indirect or consequential damages incurred by Contractor, Contractor's Affiliated Companies and Contractor's Personnel resulting from or arising out of this Contract or any Drilling Order, including but not limited to loss of profits, loss of product or production, the cost of or loss of use of property, equipment or services, or business interruptions, REGARDLESS OF FAULT.

913.   Benefits for Contractor's Personnel

Contractor agrees to accept full and exclusive liability for the payment of any and all premiums, contributions and taxes for Workers' Compensation Insurance, Unemployment Insurance and for old age pensions, annuities and retirement benefits now or hereafter imposed by or pursuant to federal or state law, which are measured by wages, salaries or other remuneration paid to Contractor's Personnel in connection with the performance of work, services or operations under this Contract; and Contractor further shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against CLAIMS for such taxes, benefits, or contributions which may be assessed against Operator.

914.   Taxes and Liens

(a)   Contractor agrees to pay and BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator against all CLAIMS for labor, material, services and supplies to all workmen, laborers, mechanics, subcontractors and all other persons furnishing labor, materials, services or supplies for Contractor or its subcontractors in fulfilling this Contract; and Contractor further agrees not to allow any related lien, claim or charge to be



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

fixed upon the lease on which operations are performed, any Designated Well, the property on which any Designated Well is to be drilled, or other property of Operator.

(b) Contractor agrees to BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against all income taxes, social security taxes employment, and social insurance organization charges which may be applicable to or arise from its operations hereunder and any applicable Drilling Order, and shall withhold from wages and salaries of Contractor's Personnel all sums required by law to be withheld; shall pay the same promptly when due to the proper authorities and shall furnish Operator evidence of such payments when required; shall comply with all accounting and reporting required of any government having jurisdiction and shall pay the cost of such compliance.

915. Cross Indemnities between Contractor and Operator's other contractors.

(a) To the extent Operator's Third Party Contractor(s) execute cross indemnification and waivers in favor of Contractor and Contractor's Personnel which are substantially similar to those assumed by Contractor in this Paragraph 915(a) in favor of such Third Party Contractor(s), Contractor hereby agrees to BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY such other Third Party Contractor(s) (and any such Third Party Contractor Group) from and against any and all CLAIMS for: (1) the injury, illness or death of any of Contractor's Personnel; (2) the loss, damage, destruction and/or wreck and debris removal of any property belonging to Contractor and/or any of Contractor's Personnel; and (3) Contractor's and Contractor's Personnel own special, indirect or consequential damages resulting from or arising out of this Contract, in all 3 cases REGARDLESS OF FAULT, but excluding Gross Negligence and Willful Misconduct of Contractor's Personnel.

(b) Contractor agrees that it will support its mutual indemnity obligations of Paragraph 915(a) with insurance with the minimum limits not less than those set forth in Article X and Appendix B obtained for the benefit of such Third Party Contractor(s) (and any such Third Party Contractor Group) but such minimum insurance requirements shall not limit Contractor's indemnity obligations except to the extent mandated by law.

(c) The Parties intend to create a third party beneficiary obligation of Contractor in favor of such other Third Party Contractor(s) (and any such Third Party Contractor Group) that have included reciprocal cross indemnity, insurance support and waiver provisions in their respective contracts with Operator in favor of Contractor and its Personnel (and to extend such third party beneficiary obligation of Contractor to such other Third Party Contractor Group).

916. <u>Disputed Amounts, Liens and Withholding</u>

Payment of any invoice provided to Operator by Contractor pursuant to Article VIII herein shall not prejudice the right of Operator to question the correctness of any charges therein. If Operator disputes an item invoiced, Operator shall notify Contractor of the amount disputed, specifying the reason therefor, and payment of the disputed amount may be withheld until settlement of the dispute. However, in the event any liens which Operator reasonably believes may affect the operations hereunder have not been satisfied and discharged by Contractor at the time Operator receives any of Contractor's statements or invoices referenced to above, Operator may withhold



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

payment to Contractor of any compensation or reimbursement payable hereunder until such liens are no longer pending or Contractor has posted bond sufficient to protect Operator.

917.   Right to Participate in Defense

The indemnifying Party shall, at its sole cost and expense, investigate, handle, respond to and provide defense for any CLAIM for which it gives indemnity herein; provided that the Party being indemnified shall be afforded the right and opportunity, at its expense, to participate in any such investigation or defense and may, at its option and at its expense, elect to conduct any litigation regarding a CLAIM for which it is indemnified through counsel of its own choosing.

918.   Attorneys' Fees to Enforce Contract

In the event either Party, after receipt of notice of a CLAIM, fails to furnish a defense and indemnity as provided for herein, the other Party shall be entitled to receive from the offending Party, in addition to its attorneys' fees, costs, expenses and any amounts paid in judgment or settlement, all costs, expenses, and attorneys' fees incurred in the enforcement of this Contract, including specifically but not limited to claims for contractual indemnity and insurance coverage.

919.   Gross Negligence and Willful Misconduct

Notwithstanding anything in this Contract to the contrary, where Operator is required to BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor for CLAIMS under Paragraphs 904, 908(b) and 910, Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator from and against all such CLAIMS as follows:

(a)   to the extent the CLAIMS are caused by the Gross Negligence of Contractor or Contractor's Personnel, Contractor will assume the first Fifty Million Dollars ($50,000,000) of such CLAIMS on a "per occurrence basis" with Operator assuming all liability in excess of such Fifty Million Dollars ($50,000,000) limit; and

(b)   to the extent the CLAIMS are caused by the Willful Misconduct of Contractor or Contractor's Personnel, Contractor will assume the first One Hundred Million Dollars ($100,000,000) of such CLAIMS on a "per occurrence basis" with Operator assuming all liability in excess of such Seventy-Five Million Dollars ($100,000,000) limit.

For the avoidance of doubt, "per occurrence basis" means the limit of liability assumed by Contractor under this Paragraph 919 applies to the occurrence or series of occurrences resulting in the incident giving rise to the CLAIMS and does not apply on a per CLAIM basis (e.g., if Contractor commits a series of acts constituting Gross Negligence resulting in a blowout and numerous CLAIMS under Paragraphs 904, 908(b) and 910, Contractor's liability in total for all such CLAIMS will be capped at the Fifty Million Dollars ($50,000,000) limit specified in Paragraph 919(a) above). For the further avoidance of doubt, the limits of liability cannot be accumulated to increase Contractor's liability in excess of One Hundred Million Dollars ($100,000,000) (e.g., if Contractor commits both Gross Negligence and Willful Misconduct resulting in CLAIMS under Paragraphs 904, 908(b) and 910, Contractor's liability will be capped at the One Hundred Million Dollars ($100,000,000) limit specified in Paragraph 919(b) above and the Fifty Million Dollars ($50,000,000) limit in Paragraph 919(a) will not be added).

## ARTICLE X - INSURANCE

1001.   Contractor's Insurance

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Contractor shall, during the progress of the work hereunder and throughout the term of this Contract, carry and maintain insurance coverage as required in Appendix "B", attached hereto and by this reference fully incorporated into this Contract. Contractor's insurance policies as required herein and in Appendix "B" shall provide that such insurance coverage shall be primary over any insurance coverage that may be maintained by Operator, but only as to those liabilities specifically assumed by Contractor under this Contract. Contractor has the right to self-insure any or all of the specified coverages and any decision by Contractor to self-insure shall be solely for Contractor's account. Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY from and against any CLAIMS arising out of or related to Contractor's decision to self-insure the coverages as required under this Contract and Appendix B. Operator will maintain, throughout the term of the Contract, insurance of the types, in the amounts, and with endorsements, all as specified in Appendix B for Contractor, covering the liabilities assumed by Operator under this Contract. Operator has the right to self-insure any or all of the specified coverages.

1002. Certificates and Policies

At the inception of this Contract and annually thereafter, and whenever requested by Operator, Contractor shall furnish Operator with a certificate of insurance evidencing the fact that all of the required insurance coverages are or remain in full force and effect.

1003 Subrogation

For liabilities specifically assumed hereunder by Contractor, the required insurance shall provide that the insurers of Contractor will waive their right of subrogation against Operator, as set forth in Appendix B. For liabilities specifically assumed hereunder by Operator, the required insurance shall be endorsed to provide that the insurers of Operator will waive their right of subrogation against Contractor, as set forth in Appendix B for Contractor.

1004. Additional Insured

Except with respect Workers Compensation and Employer's Liability Insurance, for liabilities specifically assumed hereunder by Contractor, the required insurance shall provide that the insurers of Contractor will include Operator as additional insureds, as set forth in Appendix B. Except with respect Workers Compensation and Employer's Liability Insurance, for liabilities specifically assumed hereunder by Operator, the required insurance shall be endorsed to provide that the insurers of Operator will include Contractor as additional insured, as set forth in Appendix B for Contractor.

1005. Premiums and Deductibles

Operator shall have no obligation to pay any premiums, franchise amounts, deductibles, self-insured retentions or other charges due with respect to any policies of insurance required of Contractor in Appendix B. All such charges in every insurance policy required of Contractor herein shall be the sole obligation of Contractor and shall be for Contractor's account.

1006. Insurance for Subcontractors

Contractor shall require and assure that each and every subcontractor employed by Contractor to perform work, services or operations under this Contract shall carry and pay for insurance in amounts necessary to cover the work and the obligations of the particular subcontractor. Any



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

deficiencies in its subcontractors' insurance programs shall be the sole responsibility of Contractor.

1007.   Failure to Obtain Insurance

Failure to carry the insurance coverages as required herein and in Appendix B, or the failure to comply fully with any of the insurance requirements of this Contract and Appendix B, or the failure to secure such endorsements on the required policies as required pursuant to the terms and conditions of this Contract, shall in no way act to relieve Contractor from the obligations of this Contract, any provisions hereof to the contrary notwithstanding.  In the event that liability for any loss or damage be denied by the insurer or insurers, in whole or in part, because of breach of said insurance by Contractor, or for any other reason, including the insolvency or liquidation of the insurer, or if Contractor fails to maintain any of the insurance herein required, Contractor shall BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Operator against all CLAIMS which would otherwise be covered by said insurance to the extent otherwise required hereunder.

1008.   Financially Responsible Insurers and Amendment to Policies

All policies of insurance required herein and in Appendix B shall be carried by insurers who are reliable and financially responsible, authorized to do business in the state or area in which the work or operations under this Contract and any applicable Drilling Order are to be performed, and acceptable to Operator.  Contractor's insurance broker will endeavor to give thirty (30) days' written notice to Operator of non-renewal, cancellation, or material change of said policy but ten (10) days written notice of cancellation due to non-payment of premium and seven (7) days written notice of cancellation due to War Risks.

1009.   Insurance Separate from Indemnity

The insurance obligations of Contractor are separate from Contractor's indemnity obligations under Article IX of this Contract, and the limits of insurance set forth in Appendix B are in no way intended to limit Contractor's indemnity obligations under Article IX of this Contract.

## ARTICLE XI - SUBLETTING AND ASSIGNMENT

1101.   Subcontracts

Operator may employ other contractors to perform any of the operations or services to be provided or performed by it under this Contract and any applicable Drilling Order.  Contractor may employ other contractors to perform any of the operations or services to be provided or performed by it under this Contract and any applicable Drilling Order only with the prior written consent of Operator; provided, however, Contractor shall remain fully liable and responsible under the terms and conditions of this Contract for the acts and omissions of  any other contractors or subcontractors employed by Contactor as though such acts and omissions were the acts and omission of the Contactor.

1102.   Assignment

This Contract shall be binding on the Parties hereto, their successors and assigns.  This Contract is personal and (i) Contractor may not assign in whole or in part its rights under the Contract without Operator's prior written consent, which consent should not be unreasonable withheld or delayed, and (ii) except as to an assignment to an Affiliated Company, co-lessees, co-owners,



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

partners, joint or co-venturers or in the event of an initial public offering, merger, consolidation or sale of all or substantially all of its assets, Operator may not assign in whole or in part its rights under the Contract without Contractor's written consent. Such consent, as required above, shall not be unreasonably withheld or delayed.

## ARTICLE XII - NOTICES

1201. Notices

Notices, reports and other communications required or permitted by this Contract to be given or sent by one Party to the other shall be delivered by hand, mailed, or telecopied to the address as specified in the applicable Drilling Order. Either Party may, by written notice to the other Party, change its address. Notices shall be effective upon confirmation of receipt.

## ARTICLE XIII - GENERAL

1301. Confidential Information

During the term of this Contract and any applicable Drilling Order, Operator may provide information to Contractor. As a result of Contractor's work, services or operations under this Contract, Contractor may develop additional information. All such information, including but not limited to depth, formations penetrated, the results of coring, testing and surveying, whether provided to or developed by Contractor, shall be the property of Operator and shall be kept confidential by Contractor in addition to the following:

(a) All technical data, designs, drawing and information developed for the purpose of work, services or operations under this Contract or any applicable Drilling Order shall be, and shall remain the sole property of Operator and shall be returned to Operator when an applicable Drilling Order or this Contract is terminated.

(b) All technical data, designs, drawings and information connected with this Contract and obtained by Contractor or developed for the purpose of this Contract or any applicable Drilling Order shall be kept in secrecy and confidence and shall not be reproduced or used other than for the purpose of this Contract and any applicable Drilling Order and shall not be divulged to any third person, save and except Contractor's subcontractors and consultants and their respective employees, servants or agents who are actively engaged in the performance of work, services or operations under this Contract to the extent that they need to know, without the written consent of Operator.

(c) Contractor shall not publish or permit to be published or supplied to the press or other news media (including internal company magazines) any information or photographs or data regarding the work, services or operations under this Contract or any applicable Drilling Order, including the award of this Contract, the terms and conditions of this Contract or regarding Operator's business, nor take any photographs thereof without the written approval of Operator; provided that Contractor may disclose basic commercial information about this Contract or any Drilling Order in its web-based fleet status report.

(d) Contractor shall ensure that the provisions of this Paragraph 1301 are adhered to by Contractor, Contractor's Personnel, Contractor's Affiliated Companies and each of their respective consultants, invitees, employees, servants and agents.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

(e)    Nothing in this Article 1301 will be deemed to pertain to or include Contractor's inventions, trade secrets or other information that specifically relates to Contractor's drilling methods or processes and is proprietary and confidential to Contractor.

(f)    Each Party to this Contract agrees that the terms of this Contract are confidential and shall not be disclosed to any individual, entity or other third party without the prior written consent of the other Party; provided, however, either Party may disclose the terms of this Contract as follows: (i) to its officers, directors, employees and agents, provided that each such person agrees to keep any such information confidential; (ii) if required by law, governmental rule or regulation (including those of any regulatory agency, securities commission, or stock exchange); or (iii) if required by outside auditors and counsel to the extent necessary to perform their respective duties; provided that each such person agrees to keep any such information confidential.   The Parties shall provide notice of the confidentiality requirements set forth in this Paragraph 1301 to each of their respective employees, officers, directors, agents, subcontractors, consultants, representatives, successors and assigns with access to any such confidential information.

1302.   <u>Attorneys' Fees</u>

If this Contract is placed in the hands of an attorney on account of any dispute under this Contract, or if suit is brought on same, or if sums due under this Contract are collected through bankruptcy or probate proceedings, then the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs from the other Party.

1303.   <u>Force Majeure</u>

(a)    Except for the duty of Operator or Contractor to make payment hereunder when such payment is due, and except as may be provided in this Paragraph 1303, neither Party shall be liable for failure to perform the terms of this Contract when such performance is prevented, delayed or rendered impossible by a condition of Force Majeure.   Force Majeure shall mean Acts of God (including hurricanes, named tropical depressions, and named tropical storms), war, terrorist acts, strikes (excluding strikes, lock-outs or other industrial disputes or action solely amongst employees of Contractor and/or its subcontractors), acts of the public enemy, quarantine, epidemic, blockade, civil disturbance, riots, insurrection, rules or regulations of any governmental authority having or claiming jurisdiction or control in the premises, the compliance with which makes continuance of operations impossible, an inability to secure government permits from the BOE, stop work orders or any other governmental agency as required for the work, services or operations under this Contract or any other cause beyond the reasonable control of such Party, whether or not similar to the causes specified herein.

(b)    In the event either Party hereto is rendered unable, wholly or in part, by Force Majeure to perform its obligations under this Contract, it is agreed that such Party shall give notice and details of the Force Majeure circumstances in writing to the other Party as promptly as possible after its occurrence.   In such cases, the obligations which cannot be carried out by the Party giving the written notice shall be suspended during the continuance of any inability so caused except that Operator shall be obliged to pay to Contractor the Force Majeure Rate provided for in Paragraph 707.   Nothing in this Paragraph 1303 shall be construed to relieve either Party of its indemnity and insurance obligations contained in



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

this Contract. The Party claiming Force Majeure shall make all reasonable efforts to overcome the event of Force Majeure as soon as possible and shall resume performance immediately after such event of Force Majeure has ended or been removed.

1304. Right to Audit and Conflict of Interest

(a) For a period of two (2) years from the end of Operator's accounting year in which the work, services or operations under any applicable Drilling Order are terminated or completed, Contractor shall keep proper books, records and accounts of work, services or operations under such Drilling Order and shall permit Operator to inspect such records at all reasonable times at Contractor's premises where such records are normally kept for the purpose of determining rates hereunder or charges for reimbursable items.

(b) Contractor shall not pay any commissions, fees or grant any rebates to any of Operator's Personnel or Operator's co-lessees, co-owners, partners or joint venturers, or any of their respective Affiliated Companies, associates, directors, officers, employees, servants or agents; nor shall Contractor favor Operator's Personnel or Operator's co-lessees, co-owners, partners or joint venturers, or any of their respective Affiliated Companies, associates, directors, officers, employees, servants or agents with gifts or entertainment of significant cost or value nor enter into any business arrangements (other than the purchase and ownership of non-material shares of common stock) with Operator's Personnel or their Affiliated Companies, other than as a representative of Contractor, without Operator's written approval.

(c) The obligations in this Paragraph 1304 shall apply to the activities of Contractor's Personnel and their agents in their relations with Operator's Personnel (and their families), vendors, and third parties providing, performing, or accomplishing work, services, or operations under this Contract. Contractor's efforts shall include, but not be limited to, establishing precautions to prevent Contractor's Personnel and their agents from making, receiving, providing, or offering substantial gifts, entertainment, payments, loans, or other considerations to Operator's Personnel (or their families) for any purpose whatsoever. Contractor shall not, under any conditions, employ any person or persons who are employed by Operator. Any such person so found in the employ of Contractor shall be immediately dismissed by Contractor.

1305. Compliance with Laws and Industry Standards: Safety and Environmental Protection

(a) Certification with Laws

Contractor hereby agrees to comply with, and shall instruct Contractor's Personnel to comply with all applicable federal, state and municipal laws, rules and regulations, and those of any other governmental body having jurisdiction over the work, services or operations under this Contract, including but not limited to environmental and safety laws and regulations relating to the prevention, containment, reporting and cleanup of pollution. Subject to the release, defense and indemnity obligations assumed by the Parties in Article IX of this Contract, in the event Operator is assessed a civil penalty, fee, fine or other civil charge ("Civil Penalty"), then to the extent such Civil Penalty is due to the failure of Contractor's Personnel to adhere to any laws or regulations applicable herein or otherwise governing the work or services or activity being conducted, Contractor shall



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

pay (or reimburse Operator) that portion of the Civil Penalty which is attributable to Contractor's failure to so adhere.

Operator hereby agrees to comply with, and shall instruct Operator's Personnel to comply with all applicable federal, state and municipal laws, rules and regulations, and those of any other governmental body having jurisdiction over the work, services or operations under this Contract, including but not limited to environmental and safety laws and regulations relating to the prevention, containment, reporting and cleanup of pollution. Subject to the release, defense and indemnity obligations assumed by the Parties in Article IX of this Contract, in the event Contractor is assessed a Civil Penalty, then to the extent such Civil Penalty is due to the failure of Operator's Personnel to adhere to any laws or regulations applicable herein or otherwise governing the work or services or activity being conducted, Operator shall pay (or reimburse Contractor) that portion of the Civil Penalty which is attributable to Operator's failure to so adhere.

(b)     Equal Opportunity and Affirmative Action

Contractor hereby certifies that it is an equal opportunity employer and will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, handicap or status as a Vietnam Era Veteran. To the extent required by applicable law, Contractor will comply with Executive Order 11,246 "Non-Discrimination in Employment and Affirmative Action by Government Contractors and Sub-Contractors", Executive Order 11,626 "National Program for Minority Business Enterprise", the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, as they may be amended from time to time and including all amendments, orders, rules and regulations issued thereunder or in connection therewith.

(c)     Certification of Non-Segregated Facilities

Contractor further certifies that it does not and will not maintain or provide for its employees any facilities which are segregated by race, color, religion or national origin or permit its employees to perform any services at any location, under Contractor's control where segregated facilities are maintained; and, if applicable, Contractor will obtain a similar certification for all non-exempt subcontracts.

(d)     Safety and Environmental Protection

Contractor shall institute and implement at all times a good, comprehensive safety and training program which complies with all federal, state and local laws, rules and regulations applicable to the work, services and operations contemplated in this Contract, and which further complies with reasonable and current industry recommendations on accident prevention, safe operating practices, and environmental protection. Contractor shall make each of its employees and subcontractors aware of all such safety and environmental rules and regulations, and all safety meetings and drills conducted shall be entered on the IADC Daily Drilling Report. Contractor shall furnish such additional safety and environmental reports and records as Operator may request. Contractor shall fully comply with the terms of the Fieldwood Energy LLC's Contractor Safety Program attached as Appendix C. Contractor further agrees to subject all Contractor's Personnel to pre-employment or other drug tests as required by federal, state and local drug testing



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

laws, regulations and requirements, and those of any governmental body which has jurisdiction over the work under this Contract.

1306.   Waivers

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either Party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the Party. The waiver of any requirement or provision in this Contract on any particular occasion shall not be deemed a waiver of such requirement or provision, or serve as a precedent, for other work, service or operations under this Contract on other occasions.

1307.   Entire Agreement

This Contract supersedes and replaces all prior contracts between the Parties and any other oral or written communications heretofore made between the Parties relating to the subject matter hereof. No variations hereto shall be valid unless in writing and executed by the Parties. Each Party expressly represents and warrants that no promise or agreement which is not expressed herein has been made to them in executing this Agreement and each Party is relying upon its own judgment in entering into this Agreement and is not relying upon any statement or representation of any of the other Party that is not expressly contained herein.

1308.   Inurement

This Contract shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties.

1309.   Severability

In case any one or more of the provisions contained in this Contract should be held or determined invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or underlying rights and obligations referred to herein shall not in any way be affected, modified, or impaired thereby.

*Signatures on following page*



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

IN WITNESS WHEREOF, THE PARTIES HERETO UNDERSTAND, APPROVE AND
SPECIFICALLY AGREE UPON ALL OF THE ABOVE TERMS AND CONDITIONS, INCLUDING
ALL ADDENDA, SCHEDULES AND APPENDICES AND HAVE EXECUTED THIS CONTRACT
BY THEIR RESPECTIVE AUTHORIZED REPRESENTATIVES ON THE DAY AND YEAR FIRST
WRITTEN BELOW.

OPERATOR: FIELDWOOD ENERGY LLC

By: _____
    Duly Authorized Representative
Name: _John Seeger_____
Title: _SVP Operations_____
Date: _10/26/2018_____

CONTRACTOR: ATLANTIC MARITIME SERVICES LLC

By: _____
Duly Authorized Representative
Name: _Joseph Pope_____
Title: _VP Sales & Marketing_____
Date: _10/28/2018_____

- 32 -

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

**Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract between Fieldwood Energy LLC and Atlantic Maritime Services LLC dated October XX, 2018**

## FORM OF DRILLING ORDER

This Drilling Order is entered into and effective this XX day of XX 20XX (the "Drilling Order Effective Date") by and between [INSERT NAME OF FIELDWOOD ENTITY] and [INSERT NAME OF ROWAN ENTITY] in connection with the operation of the offshore drilling unit named the XX at one or more of the designated locations.

This Drilling Order hereby incorporates the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 (the "Master Contract") by and between Fieldwood Energy LLC and Atlantic Maritime Services LLC and is comprised of all of the following attachments:

Appendix A   Commercial Terms and Conditions
    Schedule A-1   General Rig Specifications
    Schedule A-2   Personnel to be provided by Contractor
    Schedule A-3   Checklist of Contractor's and Operator's Obligations
Appendix B   Insurance Requirements
Appendix C   Contractor's Safety Program
Appendix D   Operator's Search and Seizure Policy

All references in the Master Contract and this Drilling Order to:

(a)   "Contract" shall mean the Master Contract and this Drilling Order (including the attached appendices and schedules);

(b)   "Contractor" shall mean [INSERT NAME OF ROWAN ENTITY]; and

(c)   "Operator" shall mean [INSERT NAME OF FIELDWOOD ENTITY].

All other capitalized clauses used in this Drilling Order shall have the same meaning as such clause is ascribed in the Master Contract unless such clause is otherwise defined in this Drilling Order.

In witness whereof, the Parties hereto understand, approve and specifically agree upon all of the above terms and conditions, including all addenda, schedules and appendices and have executed this Drilling Order by their respective authorized representatives on the day and year first written below.

FIELDWOOD ENERGY LLC          ATLANTIC MARITIME SERVICES LLC

By:_____      By:_____
   Duly Authorized Representative        Duly Authorized Representative

Name:_____      Name:_____

Title:_____      Title:_____

Date:_____      Date:_____



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

Appendix A
Commercial Terms and Conditions

Paragraph Reference
in Master Contract

| 101(c) | Commencement Date: | |
|---|---|---|
| 101(e) | Contractor | |
| 101(h) | Designated Well: | |
| 101(k) | Drilling Unit: | |
| 101(m) | Operating Area: | U.S. Gulf of Mexico. |
| 101(n) | Operating Base: | U.S. Gulf of Mexico. |
| 101(o) | Operator | |
| 202 | Contract Term: | |
| 203(b)(ii) | Termination Date: | |
| 203(h) | Early Termination Fee | |
| 204 | Option to Extend: | |
| 302 | Contractor's Representative | |
| 307 | Contractor's Safety Representative: | |
| 404 | Inspection Delay | |
| 601 | Handling Charge: | |
| 603 | Operator's Representative | |
| 702 | Mobilization Location: | |
| 702(a) | Mobilization Fee (Lump Sum): | $ |
| | • Commencement | |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

|   |   |   |
|---|---|---|
| | • Cessation | _____ |
| | or | |
| 702(b) | Mobilization Rate:<br> • Commencement<br> • Cessation | $_____ per day.<br>_____<br>_____ |
| 703 | Demobilization Location: | _____ |
| 703(a) | Demobilization Fee (Lump Sum): | _____ |
| | or | |
| 703(b) | Demobilization Rate: | $_____ per day. |
| 703(c) | Tug Charges (including "running time" and all other towing charges): | shall be the responsibility of Operator. |
| 704 | Operating Rate: | $_____ per day. |
| 705 | Standby Rate: | $_____ per day. |
| 706 | Repair Rate: | $_____ per day. Maximum repair time allowances are __ hours per occurrence and __ hours per calendar month. Thereafter, Contractor shall go on Zero Rate for downtime. |
| 707 | Force Majeure Rate: | $_____ per day. |
| 707 | Force Majeure Termination: | _____ |
| 708 | Move Rate: | $_____ per day. |
| 801 | Contractor Invoices | Contractor to invoice Company six (6) months following completion of operations under this Drilling Order. |
| 802. | Interest Rate | _____ |
| 803 | Manner & Address for Payment: | _____<br>ABA No.: _____<br>For the account of: _____<br>Acct No.: _____ |
| 903 | In-Hole/Subsea Equipment: | Percentage of Replacement Cost: |
| 904 | Re-Drill Rate | $_____ per day. |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

1201          Address for Notices:

Operator:
Fieldwood Energy LLC
2000 W. Sam Houston Pkwy South, Suite 1200,
Houston, Texas 77042
Telephone: (713) 969 ____
Facsimile: (713) 969 ____
Email:
Attention:

Contractor:
Atlantic Maritime Services LLC
2800 Post Oak Boulevard, Suite 5450
Houston, Texas 77056
Telephone:
Facsimile:
Email:
Attention:



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

<u>Schedule A-1</u>
<u>General Rig Specifications</u>

The listing of the Drilling Unit's equipment, as detailed in this Schedule A-1, is indicative of the equipment normally carried aboard the Drilling Unit. Contractor may, in its sole discretion and at any time, remove and/or replace any of the Drilling Unit's equipment with comparable substitutes as operationally required. The specifications of the Drilling Unit's equipment, as detailed in this Schedule A-1, are indications of the equipment's maximum rating. Pursuant to customary industry practice, Contractor does not in the course of normal operations operate its equipment at its maximum rating.

Schedule A-1 will be attached the applicable Drilling Order.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

Schedule A-2
Personnel to be provided by Contractor

Schedule A-2 will be attached the applicable Drilling Order.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

### Schedule A-3
### Checklist of Contractor's and Operator's Obligations

|  |  | Category |
|---|---|---|
| Furnished by Contractor and paid by Contractor | | 1 |
| Furnished by Contractor, paid by Operator, plus handling charge | | 2 |
| Furnished by Contractor, paid by Operator, no handling charge | | 3 |
| Furnished by Operator, paid by Operator | | 4 |
| Furnished by Operator, paid by Contractor | | 5 |
| 1. | Contractor's Items as set forth in Appendix B. | 1 |
| 2. | Except as otherwise specified, maintenance and repair including repair parts of Contractor's Items. | 1 |
| 3. | Maintenance and repair including repair parts of Operator's Items except as provided in Paragraph 403. | 4 |
| 4. | All charges relative to acquisition, shipping and land transportation (except charges as provided in Items 61, 62, 64, 65, 66, 70 and 73) of all Contractor's Items required as replacements or spare parts. | 1 |
| 5. | Contractor's Personnel including replacement, subsistence, insurance, wages, benefits, and all other costs related thereto, except for increases pursuant to Paragraph 709. | 1 |
| 6. | Extra personnel in excess of the complement of personnel set forth in Appendix C when requested in writing by Operator. | 3 |
| 7. | Overtime beyond normal work schedule, as set forth in Appendix C, for Contractor's personnel when requested in writing by Operator. | 3 |
| 8. | Required licenses, permits, certificates of financial responsibility and clearances to enter upon and depart from drilling location, pursuant to Paragraph 604. | 4 |
| 9. | Surveying service and marker buoys to mark drilling location. | 4 |
| 10. | Sea floor surveys required by Contractor's Marine Surveyor. | 4 |
| 11. | Sea bottom coring services at the drilling location if required by Contractor. | 4 |
| 12. | Fuel, oil, greases, lubes and hydraulic fluid for Contractor's equipment and Operator's equipment. | |
| | (a) All fuel (including mobilization fuel) | 4 |
| | (b) Oil, greases, lubes & hydraulic fluids for Contractor's Items. | 1 |
| | (c) Oil, greases, lubes & hydraulic fluids for Operator's Items. | 4 |
| | (d) Soap, degreasers, cleaner solvents, and pipe dope. | 1 |
| 13. | Water (in excess of rig's capacity) for drilling, wash down and cementing. | 4 |
| 14. | Drilling fluid and additives including lost circulation material. | 4 |
| 15. | Mud logging services. | 4 |
| 16. | Normal welding services required on Operator's Items to the extent available from Contractor's Personnel. | 1 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

| 17. | Welding materials used on Operator's Items. | 3 |
|---|---|---|
| 18. | Pneumatic hoses between supply vessels and Drilling Unit for unloading fuel, water, bulk cement and mud materials including repair and replacement of same. | |
| | (a) Initial Hoses. | 1 |
| | (b) All Replacements. | 2 |
| 19. | Mooring system between supply vessels and Drilling Unit including repair and replacement: | |
| | (a) Initial Mooring System. | 1 |
| | (b) All Replacements. | 2 |
| 20. | Pre-slung cargo and pre-slung cargo baskets for use in transporting Contractor's Items to and from supply vessels. | 1 |
| 21. | Pre-slung cargo and pre-slung cargo baskets for use in transporting Operator's Items to and from supply vessels. | 4 |
| 22. | Towing service for all Drilling Unit moves, as approved by Contractor's insurance underwriters. | 4 |
| | (a) Rig Movers, as approved by Contractor's insurance underwriters. | 1 |
| 23. | Tow lines and bridles. | 3 |
| 24. | Anchor setting and retrieving with marine vessels including anchor handling crews if required. | 4 |
| 25. | Additional anchors and buoy lines, if required, including all repairs and replacement. | 3 |
| 26. | Transportation and inspection of Contractor's drill pipe, drill collars and other in-hole equipment (per Appendix B) according to API-IADC standards before operations commence under this Contract, if required. | 1 |
| 27. | Inspection, transportation, repairs and/or replacement of Contractor's drill pipe, drill collars and other in-hole equipment (per Appendix A-1) according to the same API-IADC and DS1 Category 5 standards | |
| | (a) Before the Commencement Date. | 1 |
| | (b) After operations commence under this Contract at reasonable intervals as may be requested by Operator and upon termination of this Contract. | 4 |
| 28. | Drill pipe casing protectors on Contractor's drill pipe (one per joint inside casing). | 4 |
| 29. | Drill pipe casing protectors on other drill pipe furnished by Operator, if required. | 4 |
| 30. | Kelly saver-sub rubbers and replacements for kellys furnished by Contractor. | 1 |
| 31. | Drill pipe wipers. | 1 |
| 32. | Fishing tools other than provided by Contractor as set forth in Appendix B. | 4 |
| 33. | Repair and/or replacement parts for any Contractor-furnished fishing tools. | 3 |
| 34. | Drilling bits, stabilizers, hole openers, reamers, under-reamers, well scrapers, drilling bumper subs, drilling safety joints, hydraulic drilling jars, and other special in-hole equipment, including replacement parts and repairs for same. | 4 |
| 35. | Directional surveying equipment and service. | 4 |
| 36. | Deflection drilling tools and service. | 4 |
| 37. | Drill pipe, drill collars and handling tools other than those specified in Appendix B. | 4 |
| 38. | Blowout prevention equipment other than as listed in Appendix B. | 4 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

| 39. | Wellhead equipment and supplies. | 4 |
|---|---|---|
| 40. | Tubular goods, hangers, packers and accessories. | 4 |
| 41. | Casing shoes, float collars, baskets, centralizers, scratchers, scrapers, baffles and other casing accessories. | 4 |
| 42. | All casing tools for all sizes of casing. | 4 |
| | (a) All transportation, repairs and replacements, if used. | 4 |
| 43. | Tubing tools, including slips, elevators, power tongs (or jaws for Contractor's power tongs), wrenches, tubing pipe wipers and tong dies. | 4 |
| 44. | Swabbing equipment, including lubricator, swab valve, swabs, oil savers, sinker bars, rope sockets and jars, if required (except sand line). | 4 |
| 45. | Swab rubbers and oil saver rubbers. | 4 |
| 46. | Core barrels and handling tools. | 4 |
| 47. | Core heads and core catchers. | 4 |
| 48. | Electric logging unit, maintenance of unit and logging services. | 4 |
| 49. | Wire line formation testing and sidewall sampling equipment and services. | 4 |
| 50. | Drill stem test equipment and services. | 4 |
| 51. | Gun and perforating services. | 4 |
| 52. | Cement and cementing services. | 4 |
| 53. | Cement Unit.* <br><br> *NOTE: If Operator uses the services of a cementing service company other than the owner of the cementing unit on board, any charges imposed upon Contractor by the owner of the cementing unit as consequence thereof shall be for the Operator's account. | 3 |
| 54. | Repair and maintenance of Contractor-furnished cementing unit. | N/A |
| 55. | Labor (other than Rig Crew) to install servicing equipment by Operator aboard the Drilling Unit and for later removal, if required, such as, but not limited to: Cementing Unit, Electric Logging Unit, Mud Logging Unit, Diving Equipment, Well Testing System. | 4 |
| 56. | Supplies and materials for initial installation of Operator's Items. | 4 |
| 57. | Well testing system complete with separators, heaters, gas vents, metering, piping and valves, oil and/or gas burner, necessary booms, piping igniters, fabrication and installation. | 4 |
| 58. | Test tanks for well fluid. | 4 |
| 59. | Administrative center including offices, office furniture, equipment and supplies for Contractor's Personnel, warehousing and storage yard at Operating Base for Contractor's Items, if required. | 1 |
| 60. | Administrative center including offices, office furniture, equipment and supplies for Operator's Personnel, warehousing and storage yard facilities for Operator's Items. | 4 |
| 61. | Port facilities and dockside area in vicinity of Operating Base for loading and unloading of Contractor's and Operator's Items on and off supply vessels. | 4 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

| 62. | Transportation for Contractor's Items and Personnel: | |
|---|---|---|
| | (a) Routine transportation from point of origin to Operating Base. | 1 |
| | (b) Routine transportation from Operating Base to & return from dockside and/or heliport. | 4 |
| | (c) Routine transportation from one Operating Base to another. | 1 |
| | (d) Temporary lodging including meals, if required, and transportation from Operating Base to and return from dockside and/or heliport and between Operating Base during evacuation due to weather or other safety reasons. | 3 or 4 |
| | (e) Emergency transportation for both Operator (and Operator's Personnel), as required. | 4 |
| | (f) Emergency transportation for Contractor (and Contractor's Personnel), as required. | 4 |
| | (g) Special transportation for crews to Operator's shore base if rig personnel's cars are at a different location because of rig moving locations including initial mobilization to Operator's first location. | 4 |
| 63. | Transportation for Operator's Items and Personnel to dockside at Operating Base or point of departure and return. | 4 |
| 64. | Dockside labor and equipment at Operating Base to load and unload Contractor's and Operator's Items from or to land transportation and from or to supply vessels. | 4 |
| 65. | Marine transportation for Contractor's and Operator's Items and Personnel from dockside to Drilling Unit and return with supply vessels supplied by Operator: | 4 |
| | (a) Crew boats to transport personnel of Operator and Contractor, if required; | 4 |
| | (b) Standby boat, if required. | 4 |
| 66. | Marine transportation for Contractor's Personnel between Drilling Unit and Operations Base during evacuation due to weather or other safety reasons. | 4 |
| 67. | Storage space at dock site for Contractor's Items. | 1 |
| 68. | Storage space at dock site and Operating Base for Operator's Items. | 4 |
| 69. | Onshore transportation for Contractor's shore based personnel. | 1 |
| 70. | Onshore transportation for Operator's shore based personnel. | 4 |
| 71. | Fees, licenses, port fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Contractor's Items and replacements or spare parts. | 1 |
| 72. | Fees, licenses, pilotage fees, wharfage fees, harbor fees and cost or similar charges including any sales taxes or clearing agent or brokerage fees relating to Operator's Items and replacements or spare parts. | 4 |
| 73. | Communication Systems: | |
| | (a) Radio system from Drilling Unit to supply vessel and supply vessel to Operator's Operating Base office or direct to Operating Base, including permits and licenses. | 4 |
| | (b) Radio system from Drilling Unit to Contractor's office or shore base, including permits and licenses. | 1 |
| | (c) Radio operators. | 4 |
| | (d) Rig based telephone and computer lines for Operator and Contractor use. | 4 |
| | (e) Gai-tronics phone system on rig. | 1 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

| 74. | All helicopter transportation as required including medical evacuation | 4 |
|---|---|---|
|  | (a)  Non-directional beacon for helicopter operations. | 4 |
| 75. | Helicopter refueling system aboard Drilling Unit including helicopter fuel tanks, fuel tank stand, fuel pump filters, hoses and grounding systems. | 4 |
| 76. | Helicopter fuel and lubes. | 4 |
| 77. | Special or additional helicopter safety equipment aboard Drilling Unit. | 4 |
| 78. | Diver services as required. | 4 |
| 79. | Meals and quarters for all of Contractor's Personnel and up to and including two (2) per day Operator's Personnel. | 1 |
| 80. | Meals and quarters for Operator's Personnel and Operator's third party personnel in excess of two (2) per day to be charged at: | |
|  | (a)  $35 per meal | 3 |
|  | (b)  $35 per bed per day | 3 |
|  | (c)  $140 per person per day for three meals and a bed | 3 |
| 81. | Waste storage, removal and disposal, including any required registration and permits. | 4 |
| 82. | Insurance as provided in Appendix E. | 1 |
| 83. | Additional Galley & BR. personnel per Appendix C. | 3 |
| 84. | Maintenance, replacement and repair including repair parts: | |
|  | (a) Of Contractor's surface equipment; | 1 |
|  | (b) Rams in Contractor's BOP's except for initial sizes. | 3 |
|  | (c) Replacement of Contractor's Annular BOP rubber if damaged by stripping pipe. | 3 |
| 85. | Extra labor (in excess of supply vessel's personnel) required aboard supply vessels when alongside Drilling Unit to unload or load Contactor's and/or Operator's Items. | 4 |
| 86. | Anchor piles, if required, and placement of same. | 4 |
| 87. | Subsea and well control equipment: | |
|  | (a) Well head equipment; | 4 |
|  | (b) Wellhead connector from BOP stack to wellhead; | 4 |
|  | (c) Subsea running tools for wellheads if required; | 4 |
|  | (d) Wellhead temporary guidebase, if required; | 4 |
|  | (e) Wellhead guidepost structure, if required; | 4 |
|  | (f) Jetting tools for drilling in conductor casing, if required; | 4 |
|  | (g) Guide arms and bushings for drilling conductor hole and running conductor. | 4 |
|  | (h) Casing if required. | 4 |
|  | (i) 11" blowout preventors, 5,000 p.s.i. | 4 |
|  | (j) 7-1/16" blowout preventors, 5,000 p.s.i. | 4 |
|  | (k) Repair and/or replacement for items for (a) through (j). | 4 |
| 88. | Screens | |
|  | (a) For shale shakers, above 80 mesh. | 3 |
|  | (b) All mud cleaners. | 3 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

| 89. | Weather forecast services (if required). | 4 |
|---|---|---|
| 90. | Engineering drawings as may be required by Contractor for Operator's location showing rig elevation and plan views including any and all sea floor and platform required views. | 1 |
| 91. | Conductor drive hammer and accessories (if applicable), including: transportation repairs and/or replacement. | 4 |
| 92. | Trash compactor. | 1 |
| 93. | Trash compactor bags. | 2 |
| 94. | Swaco Hydraulic Choke. | 1 |
| 95. | Mud Pump Liners & Swabs, other than the initial size. | 3 |
| 96. | Casing rams for all casing sizes. | 4 |
| 97. | Additional Mud Pump other than in Appendix B. | 4 |
| 98. | Hydraulic Power Swivel for workover (other than Top Drive Unit). | 4 |
| 99. | Boots, coveralls, slicker suits, safety glasses, safety goggles & face shields and all personal protective equipment (PPE) for personnel exposed to oil base mud or completion fluids. Including additional "housekeeping" items. | 4 |
| 100. | Instrumentation on board unit, pvt, chart recorders, gas detectors. | 1 |
| 101. | Porta-Powers, four (4) – 100 ton for lifting rig floor for caisson driving. | 4 |
| 102. | Beam clamps to secure false rotary for caisson driving. | 4 |
| 103. | Diverter system including valves, overboard lines, controls and replacement parts. | 4 |



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

Appendix B
Insurance Requirements

The terms and conditions of each type of insurance coverage required by Article X of the Master Domestic Offshore Daywork Drilling Contract (the "Master Contract") and this Appendix B are set forth below.  Contractor represents that the navigation and territorial limits of such insurance coverage are sufficient to cover all work considered under this Contract.  "Operator" as used in this Appendix "B" shall have the same meaning as the definition set forth in Paragraph 101(o) of the Master Contract.

1.  Workers' Compensation Insurance, with statutory limits in accordance with all applicable State, Federal and Maritime laws, and Employer's Liability Insurance in an amount of at least $25,000,000 for each occurrence. Such insurance shall be endorsed specifically to include coverage for the following:

   (a)  Occupational disease.

   (b)  U. S. Longshore's and Harbor Workers' Compensation Act.

   (c)  Outer Continental Shelf Lands Act.

   (d)  Jones Act, General Maritime laws and Death on the High Seas Act coverage.

   (e)  Transportation, wages, maintenance and cure endorsements.

   (f)  Voluntary Compensation endorsement.

   (g)  "In rem" endorsement stating that an action "in rem" shall be treated as a claim against the insured "in personam."

   (h)  Alternate employer " endorsement.

   (i)  All states endorsement.

2.  Commercial General Insurance, in an amount of at least USD $25,000,000 for any one accident. Such insurance shall be amended specifically to include coverage for the following:

   (a)  Sudden and accidental pollution liability.

   (b)  "In rem" endorsement stating that an action "In rem" shall be treated as a claim against the insured "in personam".

   (c)   "Watercraft exclusion" for owned and non-owned vessels provided by Contractor shall be deleted.

3.  Business Automobile Liability Insurance, including but not limited to all owned, hired and non-owned vehicles or mobile equipment operated or provided by Contractor, with minimum limits of $10,000,000 for each accident.

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

4.     <u>Equipment/Drilling Unit Endorsement</u>, covering "all risks" of physical loss or damage for the Drilling Unit and Contractor's Items used during operations for work under this Contract.

5.     <u>Removal of Debris and/or Wreck Insurance</u> in an amount of at least $40,000,000 (excluding Named Windstorms). Such insurance shall be endorsed specifically to include coverage for the following:

      (a)     Coverage for costs and expenses in connection with removal of debris and/or wreckage where required by law, governmental regulations, or contract.

      (b)     Coverage for cost and expenses in connection with removal of debris and/or wreckage where required for the continuation of Operator's ongoing operations or required by law.

6.     <u>Excess Liability Insurance</u> in addition to and in excess of the liability coverages required in item numbers 1-5 above, with a combined single limit of liability for bodily injury and property damage of not less than $50,000,000 any one occurrence. It is hereby agreed by the Contractor that should the excess liability insurance coverage in Contractor's insurance policies purport to limit Company Group's coverage to any minimum limits or coverage amounts required by written contract, then the minimum limits and/or coverage required in this Contract shall automatically be amended to the maximum limits and coverage in Contractor's insurance policies.

7.     Operator shall be included as additional insured for Items #2-6 above, but only to the extent of the liabilities assumed by Contractor under this Contract. In addition, Contractor's insurers will waive their rights of subrogation in favor of Operator, but only in respect of operations by or on behalf of Contractor or facilities owned or provided by Contractor and only to the extent of the liabilities assumed by Contractor under this Contract.

8.     Any other insurance required by the laws of any location where Contractor is operating the Drilling Unit. Insurance required herein are the minimum limit and types of coverage required of Contractor and Contractor shall obtain any additional limits or type of coverage which shall protect Operator and itself from the hazards of its operations.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

Appendix C
Contractor Safety Program

**A.    Purpose and Scope**

A.1    The purpose and scope of these requirements is to establish safety and environmental requirements for contractors to be able to work on Fieldwood Energy owned or managed properties.

The objectives of these requirements are to ensure that all contractors and subcontractors working on Fieldwood Energy's facilities/work sites have programs in place to comply with the Bureau of Safety and Environmental Enforcement (BSEE) Safety and Environmental Management Systems (SEMS) requirements or other applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations, their employees are adequately skilled and knowledgeable to safely perform their assigned job task functions, to ensure that safety and environmental policies have been established and to ensure that contractor's management is committed to safety.

**B.    Written Safety and Environmental Programs**

B.1    Contractors shall develop and implement written safety and environmental management programs which must include but not be limited to the following:

- Management Commitment
- Written Safe Work Practices specific for work to be performed in compliance with applicable OSHA, BSEE, U.S. Coast Guard, EPA and other applicable government agencies.
- Training Program to include an employee Skills and Knowledge Verification process
- Drug and Alcohol Prevention Program (DISA)
- Hazard Recognition Program to include JSA (Job Safety Analysis)
- Stop Work Authority Program
- Incident Reporting and Investigation Program
- Operating Procedures for Equipment
- Mechanical Integrity Program
- Management of Change (MOC)

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

## C.   Training Requirements

C.1   Contractor's personnel (and those of all subcontractors) shall be skilled and knowledgeable for the tasks or activities to be accomplished.   This includes being in compliance with appropriate safety and environmental training codes, standards, laws and regulations as required by governmental agencies having jurisdiction at the work site (e.g., BSEE, USCG, EPA, DOT, OSHA) as well as Fieldwood Energy's Contractor Training Requirements.

C.2   A Training Matrix has been established to identify minimal training requirements for contractor personnel performing work on Fieldwood Energy properties.   Contractors should refer to Fieldwood Energy's SEMS portal for the latest version of the Training Matrix and must verify the training requirements are met for the appropriate job titles (functions).

## D.   Safety and Environmental Management Systems (SEMS) - Contractor Requirements

D.1   Fieldwood Energy has established very specific contractor safety and environmental management requirements in order to provide for the safety of all personnel and to comply with current safety and environmental regulations.  Below are specific requirements as part of the SEMS contractor agreement/bridging process.  A detailed description and compliance guide can be obtained from the Fieldwood Energy SEMS portal or by calling Fieldwood's EH&S department.

D.2   Requirements

D.2.1   Contractors performing activities on-site offshore must participate in the ISNetworld Review and Verification, as well as the Training Qualification (TQ) processes;

D.2.2   Contractor must review Fieldwood Energy's Safety and Environmental Management System (SEMS), related  SEMS requirements, Safe Work Practices and must perform all contractual obligations in accordance with such Fieldwood Energy programs;

D.2.3   The Contractor must communicate identified hazards to all affected personnel (including Contractor, Operator and 3rd Party personnel) prior to performing oil, gas and sulphur operations for Fieldwood Energy;

D.2.4   The Contractor must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for the Operator;

D.2.5   The Contractor must verify and provide documentation upon request that its personnel and any subcontractors performing work for Fieldwood Energy have the skills and knowledge to perform their assigned duties in a safe and environmentally sound manner, has documented such, and that the information contained therein is accurate, timely and reflective of all appropriate safety and environmental training codes, standards, laws and regulations as required by governmental or regulatory agencies having jurisdiction at the work site (e.g., BOEM, BSEE, USCG, EPA, DOT, OSHA);



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

D.2.6   The Contractor must have written safe work practices that help minimize the risk to personnel and the environment for all work conducted for Fieldwood Energy, and all activities performed by the Contractor will be conducted in accordance with those safe work practices;

D.2.7   The Contractor must require all personnel performing work for Fieldwood Energy to undergo periodic retraining and skill assessments, in accordance with Fieldwood Energy's Training Requirements for On-Site Contractors (Training Matrix), to ensure adequate retention of the skills and knowledge required to perform their assigned duties;

D.2.8   The Contractor must obtain and/or develop written operating procedures to ensure the safe operation of critical equipment that is operated and maintained by the Contractor whether or not that equipment is owned by the Contractor or any Third Party. Critical equipment, per Appendix D of API RP 75, is defined as: "Equipment and other systems determined to be essential in preventing the occurrence of or mitigating the consequences of an uncontrolled release." Such equipment may include vessels, machinery (compressors, mud pumps, fire pumps, etc.), piping, blowout preventers, wellheads and related valving, flares, wireline equipment, coil tubing equipment, fluid management equipment, safety systems, alarms, interlocks, fire protection equipment and other monitoring, control and response systems.

D.2.9   The Contractor must periodically review their written operating procedures used to operate critical equipment to ensure they reflect actual operating conditions;

D.2.10  The Contractor must develop and implement a written mechanical integrity program for any critical equipment that will be maintained and operated by the Contractor. Such a program must include, as applicable:

- The design, fabrication, procurement, installation, testing, calibration and inspection criteria and limits;
- The basis for maintenance (manufacturer's recommendation, industry standards, etc.
- A quality assurance program to ensure the mechanical integrity and safe operation of the Equipment;

D.2.11  All documents required per 30 CFR 250, Subpart S and API RP 75 will be maintained in an orderly manner, will be readily identifiable, retrievable, and legible, and will be available for review on request by Fieldwood Energy or appropriate regulatory authorities. Examples of such documentation include, but are not limited to:

- Safe work practices and policies;
- Training records, including certifications for specialty work, as applicable;
- Verifications that personnel are skilled and knowledgeable in their assigned duties;
- Approved Job Safety Analyses (JSAs) as required;



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

D.2.12  For oil, gas and sulphur activities performed on Fieldwood Energy's *facilities* and on a Contractor's *facility* on the OCS the Contractor agrees to the following, where "facilities" is defined to include all types of offshore structures permanently or temporarily attached to the seabed (*i.e.*, mobile offshore drilling units; floating production systems; floating production, storage and offloading facilities; tension-leg platforms; spars used for exploration, development, production, and transportation activities for oil, gas, or sulphur from areas leased in the OCS, as well as wells, structures, living quarters, drilling and workover packages, process equipment, utilities and DOI regulated pipelines (except as noted in API RP 75 section 1.3.1.1):

D.2.13  The Contractor must conduct, keep current and provide upon request to Fieldwood Energy Hazards Analyses (including Mitigation plans) of the Contractor's facilities and ongoing operations;

D.2.14  The Contractor must manage and document all changes to the Contractor's facility that are directly involved in performing oil, gas and sulphur activities for Fieldwood Energy;

D.2.15  The Contractor must develop and communicate an Emergency Action Plan to all personnel on the Contractor's facilities;

D.2.16  The Contractor must conduct Job Safety Analysis (JSA) to identify potential task specific hazards associated with the work to be performed and must include the steps required to mitigate the hazards identified. Copies of all JSAs must be kept at the work site and be readily accessible for at least 30 days to all personnel involved with the work. The Contractor must also maintain copies of all completed JSAs for at least 2 years.

D.2.17  The Contactor must conduct routine safety meetings to communicate safety expectations, incidents, near miss reports, prevention, safety alerts, etc.

D.2.18  The Contractor must immediately notify a Fieldwood Energy representative by whatever means of communication is most expedient, and shall maintain written records in addition thereto, of any incidents resulting in the following:

- Fatalities
- All injuries that require the evacuation of the injured person(s) from the facility to shore or to another offshore facility
- All losses of well control
- All fires and explosions
- All reportable releases of H2S gas
- All collisions
- All incidents involving severe structural damage
- All incidents involving crane or personnel/material handling operations
- All incidents that damage or disable safety systems or equipment

D.2.19  Contractor is required to complete Fieldwood Energy incident reports and provide additional information as necessary in order to determine root cause and corrective



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

actions.

## E.    Personal Protective Equipment (PPE)

Contractor shall provide its employees and personnel with proper PPE for them to perform their jobs safely.  Contractor shall also ensure that its employees and personnel are trained in the proper use and maintenance of all PPE issued.   The following is only the minimum PPE required to work on facilities owned, operated or managed by Operator or any of its affiliated or subsidiary companies. Any additional job specific PPE (face shields, goggles, respiratory protection, fall protection, hand protection, gas monitors, etc.) required by Operator, governmental regulations or hazard assessments shall also be provided by Contractor.

*Minimal PPE Requirements for contractors*:

- Safety Glasses - Safety Glasses shall comply with ANSI Z87.1 - 1989, as such may be updated or modified from time to time, and shall be worn in areas where personnel are exposed to flying particles and/or when working  around pressurized process equipment, piping, pumps, etc.

- Hard Hat - Hard hats shall comply with ANSI Z89.1 - 1997, Type 1 requirements, as such may be updated or modified from time to time, and shall be worn at all times when working on Operator facilities or work sites.

- Safety/Steel Toe Shoes / Boots - Safety/Steel toe shoes / boots shall comply with ANSI Z41 – 1991, as such may be updated or modified from time to time, and shall be worn at all times when working at any facility or work site owned, operated or managed by  Operator or any of its affiliated or subsidiary companies.

- Hearing Protection - Hearing protection is required in high noise areas or areas that are posted as requiring hearing protection.

- Personal Flotation Devices (PFD's) - USCG Type 1 or 5 are necessary for any Work or portion thereof that is to be performed outside the handrails, on +10 level of offshore platforms, during personnel transfers to and from offshore platforms and while boarding and exiting boats from boat landings.

## F.    Inspections/Audits

In addition to any right provided elsewhere in the Contract or otherwise available by law, Operator reserves the right to inspect/audit the Environmental, Health and Safety activities of all contractors and subcontractors who work on any properties, facilities or premises owned, operated or managed by Operator or any of its affiliated or subsidiary companies.  Operator or third party auditing teams or individuals may conduct these inspections/audits.

Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

The objective of conducting an inspection/audit is to assess Contractor's compliance with applicable Operator, governmental and regulatory requirements and to prevent adverse environmental and safety incidents.

F.1     Field Inspections/audits

Operator may have field inspections conducted so that the inspector(s)/auditor(s) can:

- Physically observe the Work or any part thereof that Contractor, or any of its subcontractors or personnel, is performing.
- Assess Contractor's performance of Work, or any part thereof, according to applicable Operator, governmental or regulatory requirements.
- Advise Contractor regarding any deficiencies that are observed and require that such be corrected.

Operator may conduct field inspections at any time and from time to time as Operator, in its sole discretion, may deem necessary or appropriate to maintain compliance with the applicable requirements of Operator or any governmental or regulatory agency or body.

F.2     Office Audits

Operator may have office audits conducted:

- To verify information that Contractor certifies as having when completing this Contractor Safety Program Requirements agreement.
- To check Contractor's documentation of training, safety meeting attendance, accidents, equipment inspections, safety program elements, etc.
- To share environmental, safety and health philosophies.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

### G.    Contractor's Acknowledgement and Agreement

Contractor hereby acknowledges receipt, recognition and understanding of the minimal safety and environmental requirements set forth in this Contractor Safety and Environmental Requirements for working on any facilities/ work sites owned, operated or managed by Operator or any of its affiliated or subsidiary companies. Contractor represents and warrants that it is currently in compliance with the requirements set forth herein and that Contractor shall continue to comply with these requirements for so long as Contractor may perform work for or on behalf of Operator or any of its affiliated or subsidiary companies. Contractor further recognizes and acknowledges that the requirements set forth herein are minimal requirements and additional precautions or safety procedures may be needed to secure the safety of Contractor's employees and personnel; and Contractor agrees that it will establish such additional precautions or safety procedures as necessary or appropriate.

Contractor's Management Signature

Print Name:_____          Title:_____
Signature:_____            Date:_____
Phone Number:_____         Fax:_____


Contractor's Safety Management Signature

Print Name:_____          Title:_____
Signature:_____            Date:_____
Phone Number:_____         Fax:_____


Contractor's Information

Name of Contractor:_____
Type of Work Provided to Operator:_____



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

Attached to and made part of the Master Domestic Offshore Daywork Drilling Contract dated October XX, 2018 between Fieldwood Energy LLC and Atlantic Maritime Services LLC

Appendix D
Operator's Search and Seizure Policy

## NOTICE TO ALL PERSONNEL WORKING ON OPERATOR OWNED OR OPERATED PROPERTIES

It is the Operator's belief that the misuse of drugs, alcohol, or any substance having a physiological, psychological, or biochemical effect impairs a person's health and performance and creates unsafe working conditions. Operator is committed to maintaining a productive, safe and healthy work environment, free of unauthorized drug and alcohol usage. In order to achieve this objective, Operator has adopted a Drug and Alcohol Policy. All Operator Personnel and Contractor Personnel are required to comply with the policy.

The use, possession, distribution or sale of unauthorized drugs by anyone while on Operator premises or while engaged in Operator business is prohibited. A person reporting for work on Operator premises with unauthorized drugs and/or alcohol in his/her body is in violation of this policy.

Reporting to work while under the influence of alcohol by any person is prohibited. The consumption or possession of alcohol in unsealed or opened containers on Operator premises is prohibited. No alcohol is allowed at any offshore location.

For the purpose of this policy, the term "unauthorized drugs" shall mean any substance, other than an authorized substance, which has the effect on the human body of being a narcotic, depressant, stimulant, hallucinogen or cannabinoid, their precursors, derivatives or analogues, and includes, but is not limited to, those substances scheduled as controlled substances pursuant to the Federal Controlled Substances Act.

"Authorized substances" are substances having a physiological, psychological, or biochemical effect that are lawfully prescribed or that are available without a prescription, that are lawfully obtained by an individual and that the individual possesses and uses in the appropriate manner, in the dosages and for the purposes for which the substances were prescribed or manufactured.

It is each person's responsibility to notify his or her supervisor in writing when that person is taking any prescription or non-prescription medicine or substance which may impair judgment or performance or otherwise adversely affect the normal functions or his or her mental faculties or physical abilities.
In enforcing the policy, searches of persons and their property on Operator premises, work area searches, and laboratory testing are authorized. Any person who refuses, when requested, to cooperate with a search or to submit to laboratory testing shall be deemed to be in violation of the policy. Operator reserves the right to conduct unannounced personal searches. Entry upon Operator's premises by Contractor Personnel will be deemed to constitute consent by such persons to personal searches pursuant to this policy.



Master Domestic Offshore Daywork Drilling Contract
Fieldwood Energy LLC and Atlantic Maritime Services LLC

A personal search includes inspection of any personal property of Contractor Personnel located on Operator premises including, but not limited to, their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, billfolds, parcels, or vehicles if on Operator premises.

Any person charged with or under investigation in connection with a drug-related or alcohol-related criminal offense may be required to submit to laboratory testing.

Any person possessing food, supplies, or tools not belonging to them, at a time when such items should not be in their possession, is subject to disciplinary action.

Firearms are prohibited on all Operator premises.  Without limiting the generality of the foregoing, Contractor Personnel may not possess firearms on their person, or in their personal effects, lockers, baggage, desks, lunch boxes, containers, purses, parcels, or vehicles if on Operator premises.

Operator shall have the right to require a Contractor to remove from the operations under this Contract any of Contractor's or Contractor's own contractors' or subcontractor's, employees, servants, agents or invitees, which Operator in its sole judgment, shall consider in violation of this policy.



## **Exhibit C**

### **Complaints**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ATLANTIC MARITIME SERVICES, LLC** | § | **CIVIL ACTION No.** |
| | § | |
| Plaintiff, | § | **SECTION " "** |
| **VS.** | § | |
| | § | **DIVISION " "** |
| **ECOPETROL AMERICA, LLC,** | § | |
| | § | **JUDGE:** |
| *in rem* | § | **MAGISTRATE:** |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

**VERIFIED COMPLAINT IN REM SEEKING RECOGNITION AND ENFORCEMENT
OF ATLANTIC MARITIME SERVICE, LLC'S LIEN AND PRIVILEGE RIGHTS
SOLELY WITH RESPECT TO THE SUBJECT INTERESTS OF ECOPETROL
AMERICA, LLC AND ENFORCING SUCH RIGHTS
BY WRIT OF SEQUESTRATION**

**NOW HERE COMES** Atlantic Maritime Services, LLC (the "***Plaintiff***") and files this

Verified Complaint seeking recognition of the Plaintiff's lien and privilege rights solely with

respect to the Subject Interests (defined hereinbelow) of Ecopetrol America, LLC ("***Ecopetrol***"),

and enforcing such rights by writ of sequestration, specifically reserving any and all rights to seek

additional legal or equitable relief against other property or persons accountable for the claims

stated herein. In support of the Verified Complaint, the Plaintiff respectfully shows as follows:

**Parties**

1.     The Plaintiff is a Delaware limited liability company with its principal place of

business located at 5847 San Felipe Street, Suite 3300, Houston, TX 77057. The Plaintiff is a

wholly-owned subsidiary of Valaris plc, debtor-in-possession in bankruptcy case no. 20-34114,

pending before the Bankruptcy Court for the Southern District of Texas. (Bankr. S.D. Tex. 20-

34114, ECF Doc. 1).

2.     Ecopetrol is a Delaware limited liability company with a principal place of business

1

located at 2800 Post Oak Boulevard, Suite 5110, Houston, TX 77056.

## Jurisdiction and Venue

3.     This Court has jurisdiction over this matter because the case and controversy herein arises out of, and in connection with, operations conducted on the Outer Continental Shelf for the exploration, development, or production of minerals, subsoil, and seabed of the Outer Continental Shelf.  Thus, jurisdiction exists pursuant to the Outer Continental Shelf and Lands Act, 43 U.S.C. §1349(b)(1).

4.     Venue is proper in this District under 43 U.S.C. §1349(b)(1) because this is the "judicial district of the State nearest the place the cause of action arose."

## Factual Allegations

5.     The Plaintiff is lawfully engaged in the business of furnishing labor, equipment, machinery, materials, and services, including drilling services, in support of drilling, development, exploration and/or operation of oil and gas wells.

6.     Based on the records of the Bureau of Ocean Energy Management ("**BOEM**"), Ecopetrol holds a 31.5% working interest in a certain lease situated in the Outer Continental Shelf, OCS-G-28030, Mississippi Canyon Area, Block 948 (the "**Lease**"), containing Well #4 (API 608174129900) (the "**Well**"), for which Fieldwood Energy, LLC (the "**Operator**") serves as operator of record.

7.     Between June 4, 2020 and July 4, 2020, the Plaintiff furnished goods, equipment, supplies, and services for and in connection with the drilling and/or operation of the Lease and Well in the total principal amount of $5,824,744.68, as reflected in the invoices and work tickets attached hereto. *See* Exhibits 1-4, pp. 5-17, pp. 5-17, pp. 5-17, and pp. 4-16, respectively.

8.     Pursuant to La. R.S. § 9:4861, *et seq.* ("**LOWLA**"), the Plaintiff is granted a

privilege and lien (the "***Lien***") to secure payment owed for the goods, equipment, supplies, services, and other materials provided by the Plaintiff for the benefit of the Lease and Ecopetrol.

9.      The Plaintiff properly preserved, perfected, and maintained the perfection of the Lien by filing and recording the following lien affidavits (the "***Lien Affidavits***") on July 16, 2020:

> (i)   Statement of Privilege in the amount of $5,824,744.68, in favor of the Plaintiff, against Lease No. OCS-G-28030, Mississippi Canyon, Block 948, filed and recorded in the mortgage records of St. Tammany Parish, as Instrument No. 2215417, Reg. No. 2705279 (attached hereto and incorporated by reference as **Exhibit 1**);

> (ii) Statement of Privilege in the amount of $5,824,744.68, in favor of the Plaintiff, against Lease No. OCS-G-28030, Mississippi Canyon, Block 948, Orleans Parish as Instrument No. 2020-24965, MIN: 1334982 (attached hereto and incorporated by reference as **Exhibit 2**);

> (iii) Statement of Privilege in the amount of $5,824,744.68, in favor of the Plaintiff, against Lease No. OCS-G-28030, Mississippi Canyon, Block 948, filed and recorded in St. Bernard Parish as File No. 633342, Book 1945, Pages 454-470 (attached hereto and incorporated by reference as **Exhibit 3**); and

> (iv) Statement of Privilege in the amount of $5,824,744.68, in favor of the Plaintiff, against Lease No. OCS-G-28030, Mississippi Canyon, Block 948, filed and recorded in Plaquemines Parish, as File #2020-00002805, Book 772, Pages 616-632 (attached hereto and incorporated by reference as **Exhibit 4**).

10.      The Lien Affidavits were each filed within 180 days of the completion of the work, materials, tools, and equipment supplied by the Plaintiff in connection with the drilling, development, exploration and/or the operation of the Lease on July 4, 2020. The Plaintiff provided notice to the Operator by certified mail, delivered on July 20, 2020.

11.      On August 3, 2020, the Operator filed a voluntary petition for bankruptcy relief, commencing case no. 20-33948 (the "***Bankruptcy Case***") before the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").[1] (Bankr. S.D. Tex. 20-33948,

---

[1] As reflected in the reservations of rights throughout this Verified Complaint, the Plaintiff does not seek recognition or enforcement of its Lien against the Operator or any of its property interests; however, the Plaintiff expressly reserves the right, to the extent necessary, to seek relief from the automatic stay in the Bankruptcy Case to enforce its rights against Ecopetrol's interest in the hydrocarbons produced with respect to the Lease and the Subject Interests, as well

ECF Doc. 1).

12.    The principal amount owed for the work described above, $5,824,744.68, remains past due and owing, together with attorneys' fees up to ten percent (10%) of the amount due, costs for preparing the Lien Affidavits and notice of *lis pendens*, and interest.

## CLAIMS FOR RELIEF

### Count I: Recognition and Enforcement of Plaintiff's Lien against the Subject Interests

13.    The Plaintiff incorporates hereinbelow all allegations in the preceding paragraphs.

14.    LOWLA grants claimants like the Plaintiff a privilege and lien to secure payment for their work by operation of law.

15.    The lien and privilege afforded under LOWLA is established over:

(1) "The operating interest under which the operations giving rise to the claimant's privilege are conducted, together with the interest of the lessee of such interest in a:

(a) Well, building, tank, leasehold pipeline, and other construction or facility on the well site.

(b) Movable on a well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use.

(c) Tract of land, servitude, and lease described in R.S. 9:4861(12)(c) covering the well site of the operating interest.

(2) Drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the privilege emanate.

(3) The interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege.

---

as the proceeds of the sales of such hydrocarbons to third-party purchasers. The Plaintiff further reserves the right to seek any other relief from the Bankruptcy Court or otherwise with respect to the Operator or any other persons or properties accountable for the claims herein.

(4) The proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege." (together, the "***LOWLA Properties***").

La. R.S. § 9:4683(A)(1-4).

16.    In this lawsuit, the Plaintiff seeks recognition and enforcement of its Lien solely with respect to Ecopetrol's interest in the specific property interests of Ecopetrol included within La. R.S. § 9:4683(A)(1-4) (collectively the "***Subject Interests***"), expressly reserving any and all rights to seek recovery of additional amounts associated with any sales proceeds derived from the sale of the hydrocarbons produced from the Lease, insofar as the automatic stay arguably prevents Plaintiff from seizing and garnishing such proceeds to the extent such proceeds are commingled with proceeds attributable to the sale of hydrocarbons owned by the Operator in the absence of an order from the Bankruptcy Court modifying or lifting the automatic stay as to such proceeds.

17.    Additionally, pursuant to La. R.S. § 9:4862(B)(3), the Plaintiff seeks recognition of its right to recover against the Subject Interests the cost of preparing and filing the Lien Affidavits and the notice of *lis pendens* authorized to be filed under La. R.S. § 9:4865(c), which the Plaintiff intends to file during the period allotted thereunder.

18.    Furthermore, pursuant to La. R.S. § 9:4862(B)(2) and (4), the Plaintiff seeks recognition of its right to enforce against the Subject Interests claims to recover reasonable attorneys' fees not to exceed ten percent (10%), as well as interest.

### Count II: Request for Writ of Sequestration against the Subject Interests

19.    The Plaintiff incorporates hereinbelow all allegations in the preceding paragraphs.

20.    Louisiana law recognizes that sequestration is warranted when a plaintiff claims a privilege against the property of a defendant, and "it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from

5

the parish, during the pendency of the action." La. Code Civ. P. art. 3571.

21.    Additionally, Louisiana law provides that, for liens and privileges under LOWLA, "[a] claimant may enforce his privilege by a writ of sequestration, without the necessity of furnishing security." La. R.S. § 9:4871.

22.    Through this action, the Plaintiff seeks to enforce the Lien against property of Ecopetrol, the Subject Interests, except that Plaintiff does not seek to seize any of the Subject Interests to the extent such Subject Interests are commingled with property of the Operator and the seizure thereof would potentially violate the automatic stay in the Operator's Bankruptcy Case.

23.    As holder of the Subject Interests, Ecopetrol has the power to alienate or encumber the Subject Interests.

24.    To protect the Plaintiff's Lien, it is necessary that a Writ of Sequestration issue, in accordance with La. Code Civ. P. Art. 3571, *et seq.*, and without security in accordance with La. R.S. § 9:4871, directing the United States Marshal to seize and to hold the Subject Interests until further Order from this Court, and to record the Writ of Sequestration in the records of the Clerks of Court for the Parishes of Orleans, St. Tammany, St. Bernard, and Plaquemines, and in the records of BOEM.

25.    The Plaintiff reserves the right to amend the Verified Complaint to name as defendants all other working-interest owners of the Lease, including the Operator,[2] and all purchasers of the gas, oil and distillate produced and saved from wells located on the Lease, for the purpose of this Court entering judgment against those purchasers, ordering them to turn over to the Plaintiff all proceeds derived from the Lease in an amount sufficient to pay the full amount

---

[2] Inclusion of the Operator in this lawsuit shall be subject in all respects to the automatic stay associated with the Operator's Bankruptcy Case and Plaintiff shall seek such relief as is required from the Bankruptcy Court prior to amending this Verified Complaint to include any request for relief with respect to the Operator or the Operator's property.

of the indebtedness owed to the Plaintiff, including principal, interest, expenses, attorneys' fees and costs, as permitted by law.

26.     The Plaintiff further reserves all rights to file a motion to lift or otherwise modify the automatic stay in the Bankruptcy Case, seeking the sequestration and garnishment of the proceeds of the other working-interest owners from sale of the hydrocarbons in connection with the Lease.

27.     Therefore, on the basis of the allegations above, verified by the Plaintiff's authorized representative, Ben Rose, and further supported by the Exhibits attached hereto, the Plaintiff respectfully prays for recognition and enforcement of its Lien and issuance of a writ of sequestration solely with respect to the Subject Interests, in substantially the same form as the Writ of Sequestration attached hereto.

**WHEREFORE**, the Plaintiff, Atlantic Maritime Services, LLC, respectfully prays that this Court:

(i)     Recognize the lien and privilege in favor of Atlantic Maritime Services, LLC in the amount of $5,824,744.68, together with interest, attorneys' fees, the costs of preparing and filing the lien affidavits, and all court costs, solely with respect to Ecopetrol America, LLC's interest in the specific property interests of Ecopetrol America, LLC included within La. R.S. § 9:4683(A)(1-4) (the "***Subject Interests***");

(ii)    Issue a writ of sequestration, the requirement of security having been dispensed with by law, directing the United States Marshal to serve or cause to be served the Writ of Sequestration on Ecopetrol America, LLC and to record the Writ of Sequestration in the records of the Clerks of Court for the Parishes of St. Tammany, Orleans, St. Bernard, and Plaquemines, and in the records of the United States of America, Bureau of Ocean Energy Management; and

(iii)   Issue final judgment in favor of Atlantic Maritime Services, LLC and against the Subject Interests in the amount of $5,824,744.68, together with interest, attorneys' fees, the costs of preparing and filing the lien affidavits, and all court costs.

Respectfully submitted,

LUGENBUHL, WHEATON, PECK
RANKIN & HUBBARD

*/s/ Stewart F. Peck*
STEWART F. PECK (#10403)
JAMES W. THURMAN (#38494)
601 Poydras Street Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email:speck@lawla.com;
jthurman@lawla.com

*Counsel for Atlantic Maritime Services, LLC*

**PLEASE ISSUE SUMMONS:**

**Ecopetrol America, LLC**
Care of its Registered Agent,
C T Corporation System
1999 Bryan Street, Suite 900
Dallas, Texas 75201-3136

8

(Mississippi Canyon 948 #4)

## STATEMENT OF PRIVILEGE

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified for the County of Harris, State of Texas, personally came and appeared:

**ATLANTIC MARITIME SERVICES LLC**, a Delaware limited liability company ("Claimant")

who states that it has a claim, lien and privilege pursuant to La. R.S. 9:4861 et seq., as follows:

1)  Name and Address of Claimant:

    Atlantic Maritime Services LLC
    5847 San Felipe, Suite 3300
    Houston, TX 77057

2)  Nature and amount of the obligation for which Claimant's privilege is claimed:

    Labor, materials, services and related supplies and expenses, in connection with offshore drilling services under a contract between Claimant and the Operator for the Well (as defined in Section 5 below) in the amount of **$5,824,744.68**, plus contractually owed interest at the rate of 10 percent per annum, and contractually owed attorneys' fees and expenses (collectively, the "Obligations"). The Obligations include, but are not limited to obligations owed to Claimant (a) as a contractor for the price of its contract with Operator for operations with respect to the Well; and (b) as a seller for the price of movables sold to Operator that are incorporated in the Well or in a facility located on the well site; consumed in operations; and/or consumed at the site of the Well by a person performing labor or services on the site of the Well located in the waters of the State of Louisiana. Invoices evidencing the Obligations are attached hereto. The date of the last activity giving rise to Claimant's privilege set forth in this Statement of Privilege is July 4, 2020.

3)  Name and address of the person owing the amount for which Claimant's privilege is claimed:

    Fieldwood Energy LLC
    2000 W. Sam Houston Parkway South, Suite 1200
    Houston, TX 77042

4)  Name and address of the operator of the well as shown by the records of the Commission of Conservation:

1

EXHIBIT
1

St. Tammany Parish 2018
Instrmnt #: 2215417
Registry #: 2705279 ptr
7/16/2020 3:30:00 PM
MB X CB    MI    UCC

Not applicable as this well is located on the Outer Continental Shelf; however, the Operator of the Well is as follows:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway South, Suite 1200
Houston, TX 77042

5)  Description of the Operating Interest Upon Which the Privilege is Claimed, or of the Well with Respect to Which the Operations Giving Rise to Claimant's Privilege were Performed:

The privilege is claimed upon the operating interest of Fieldwood Energy LLC in **Mississippi Canyon Block 948, Lease No. OCS-G-28030** (the "Lease"), and **Well #4 (OCS-G-28030)** drilled by Claimant on behalf of Fieldwood Energy LLC during the time from June 4, 2020, until July 4, 2020 (the "Well"), including the operating interest under which the operations giving rise to the Claimant's privilege are conducted together with the interest of the lessee and/or operator of such interest in any (a) well, building, tank, leasehold pipeline, and other construction or facility on the well site; (b) movable on the well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use; (c) tract of land, servitude, and lease described in La. R.S. 9:4861(12)(c) covering the well site of the operating interest; (d) drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the Claimant's privilege emanate; (e) the interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege; and (f) the proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege.

This Statement of Privilege is made by Claimant for the purpose of preserving its claim, lien and privilege as a provider of materials, labor and services for and to the Operator and Well described above, including, without limitation, all claims, liens and privileges under La. R.S. 9:4861 et seq., and all claims for interest due on the obligations, along with the cost of preparing and filing this Statement of Privilege, and attorneys' fees and costs, to the fullest extent permitted by applicable law.

[ remainder of page intentionally blank - signature follows on next page ]

EXHIBIT
1

2

Date: July _15_, 2020          **ATLANTIC MARITIME SERVICES LLC**,
                               a Delaware limited liability company

By: _____
Name: _JASON R. MORGANELLI_
Title: _PRESIDENT_

Sworn to and subscribed before me, Notary Public,
this _15th_ day of July 2020.

_____
Notary Public
Notary Bar Roll No. _11589836_
My Commission Expires: _4/19/2023_

JUANITA FLOOR
Notary Public, State of Texas
Comm. Expires 04-19-2023
Notary ID 11589836

EXHIBIT
1

3



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone:  (281) 809-0377

**INVOICE**

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

| | |
|---|---|
| INVOICE NO: | FWD2007260 |
| INVOICE DATE: | 7/1/2020 |
| CUSTOMER NUMBER: | 1348 |
| PAYMENT TERM: | **45 DAYS** |
| RIG: | Resolute - DS-16 |
| WELL NUMBER: | MC-948 #4 |
| LOCATION: | MC-948 #4 |

AFE: FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JUNE
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 16:00 HOURS ON 06/04/2020 THRU 24:00 HOURS ON 06/30/2020

DAYRATE EFFECTIVE

| | | DAYRATE | |
|---|---|---|---|
| 568.0 | HOURS OPERATING AT | $185,000.00 | $4,378,333.31 |
| 0.0 | HOURS STANDBY AT | $181,300.00 | $0.00 |
| 0.0 | HOURS REDRILL | $166,500.00 | $0.00 |
| 16.0 | HOURS REPAIR SUBSEA  RATE | $185,000.00 | $123,333.28 |
| 0.5 | HOURS REPAIR SURFACE RATE | $185,000.00 | $3,854.17 |
| 47.5 | HOURS MOVE RATE | $181,300.00 | $   358,822.92 |
| 0.0 | HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 632.0 | TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:          $    4,864,343.68

REMIT ACH PAYMENTS TO:
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

*[signature]* Digitally signed
by Ben
Date:
2020.07.02
09:26:38 -05'00'

Coding: BU10079

| | | |
|---|---|---|
| (4,378,333.31) | 10417- | 110-4202-810101 |
| - | 10417- | 110-4202-810102 |
| - | 10417- | 110-4202-810110 |
| (127,187.45) | 10417- | 110-4202-810103 |
| (358,822.92) | 10417- | 110-4202-810104 |
| | ED | |

**EXHIBIT**
**1**

R202 Billing worksheet_2020 - June 4-30, 2020

FIELDWOOD
Resolve

June 2020

WELL NAME / LOCATION:    MC-948 #4
AFE    FW205014

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $166,500 | MOVE RATE $181,300 | REPAIR SURFACE $185,000 | REPAIR SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 June 2020 | | | | | | | | | | 0.0 |
| 2 June 2020 | | | | | | | | | | 0.0 |
| 3 June 2020 | | | | | | | | | | 0.0 |
| 4 June 2020 | Moving as directed | | | | 8.0 | | | | | 8.0 |
| 5 June 2020 | Working as directed, Moved and Repaired(Changing out Blue Max cable) | 10.0 | | | 2.0 | | 12.0 | | | 24.0 |
| 6 June 2020 | Working as directed and Repaired(Changing out Blue Max cable) | 20.0 | | | | | 4.0 | | | 24.0 |
| 7 June 2020 | Working as directed and Moved | 24.0 | | | | | | | | 24.0 |
| 8 June 2020 | Working as directed and Moved | 20.0 | | | 4.0 | | | | | 24.0 |
| 9 June 2020 | Working as directed, repaired and Moved | 16.5 | | | 7.0 | 0.5 | | | | 24.0 |
| 10 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 11 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 12 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 13 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 14 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 15 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 16 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 17 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 18 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 19 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 20 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 21 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 22 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 23 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 24 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 25 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 26 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 27 June 2020 | Working as directed and Moved | 20.5 | | | 3.5 | | | | | 24.0 |
| 28 June 2020 | Working as directed and Moved | 13.0 | | | 11.0 | | | | | 24.0 |
| 29 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 30 June 2020 | Working as directed and Moved | 12.0 | | | 12.0 | | | | | 24.0 |
| 31 June 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 568.0 | 0.0 | 0.0 | 47.5 | 0.5 | 16.0 | 0.0 | 0.0 | 632.0 |
| AMOUNTS | | $4,378,333.31 | $0.00 | $0.00 | $358,822.92 | $3,854.17 | $123,333.28 | $0.00 | $0.00 | $4,864,343.68 |

EXHIBIT 1

# Valaris DS-16 MONTHLY BILLING SUMMARY



AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE: 7300-15

BARRY GABOURIE
7-1-2020

Dinny Sharry
07-02-2020

David Dowell
7-1-2020

EXHIBIT
1



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

| | |
|---|---|
| INVOICE NO: | FWD2007261 |
| INVOICE DATE: | 7/6/2020 |
| CUSTOMER NUMBER: | 1348 |
| PAYMENT TERM | 45 DAYS |

Rig: Resolute - DS-16
WELL NUMBER: MC-948#4
LOCATION: MC-948#4

AFE: FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JULY
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 00:00 HOURS ON 07/01/2020 THRU 24:00 HOURS ON 07/04/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 0.0 HOURS OPERATING AT | $185,000.00 | $0.00 |
| 96.0 HOURS STANDBY AT | $181,300.00 | $725,200.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 0.0 HOURS REPAIR SUBSEA  RATE | $185,000.00 | $0.00 |
| 0.0 HOURS REPAIR SURFACE RATE | $185,000.00 | $0.00 |
| 0.0 HOURS ZERO RATE | $0.00  $ | - |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 96.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE: $   725,200.00

Digitally signed
by Ben
Date:
2020.07.06
08:34:09 -05'00'

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

| Coding: BU10079 | |
|---|---|
| - | 10417- 110-4202-810101 |
| (725,200.00) | 10417- 110-4202-810102 |
| - | 10417- 110-4202-810110 |
| - | 10417- 110-4202-810103 |
| | 10417- 110-4202-810104 |
| ED | |

EXHIBIT
1

EXHIBIT 1

# Valaris DS-16 MONTHLY BILLING SUMMARY

Monthly: July 2020
Contract #: OCS-G 28930
Customer: Fieldwood
Well name: M.C. 948 Completion, Gunflint 4

Cost Center:
AFE Number: FW 205014
Work Order:
Purchase Order:

| DATE | OPR 70A 100% | STBY 705 @ 98% | RPR SURFACE 706 (12 hour allowances per month) thereafter 0 rate | RPR SUBSEA 706 (36 hour allowances per month) thereafter 0 rate | FORCE MAJEURE 707 @ 90% | In-hole Subsea Equip 503 @97% | No-rate earned: All repair rate in excess of monthly allotted hours | TOTAL HOURS | Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | OPERATOR THIRD PARTY | BILLABLE EXTRA LABOR (see legend below) | NON BILLABLE EXTRAS (see legend below) | CREW SHORTAGES (see legend below) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 24.00 | | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | Offload Drill Pipe. Assist subsea with Preservation of Bops. Prep equipment for backload. Remove BOP hoses. |
| 7/2/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Demobe rig of Fieldwood associated equipment. Offload Valaris drill pipe in preparation for course. Prep pads for paint on Jewelry deck. Assist 3's with BOP Main preservation. |
| 7/3/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 15.00 | 1.00 | - | | | | Offload Valaris DP. Remove Derrick Stabilizer to moonpool. Perform main on BOP #1 for preservation. Tank on fuel 9194 G. |
| 7/4/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | - | | | | Install Blind Flanges on Dump lines Rem to moonpool. Cable Valaris Drill Pipe. Assist 3's with # L14 preservation. Begin Cleaning in Derrick. |
| TOTALS | | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | |
| | | 0.00% | 6.00% | 6.00% | 0.00% | 0.00% | 0.00% | 50.00% | | | | | | | | | |

$ 376,500.00
$ 185,000.00

100%/Day
In hole/Subsea 105 / Day MPD      $ 320,000.00
In hole/Subsea 105%/Day           $ 185,000.00
100%/hr MPD                       $ 8,333.33
100%/hr                           $ 7,708.33
95%/hr                            $ 7,054.17
95%/hr MPD                        $ 8,166.67

Total Billable for the Month:  $ 715,200.00

Fieldwood Client Representative: BARRY J GABOURIE
Fieldwood Client Representative Signature:
Date: 07/04/2020

Fieldwood Drilling Supt.:

Fieldwood Drilling Supt. Signature:

Date:

DS-16 Rotating Supt.: Robert Ray
DS-16 Rotating Supt. Signature: Robert Ray
Date: 07-4-2020

Rig Manager:

Big Manager Signature:

Date:

AFE:     FW205014
Lease:   MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE.7300-15
7-4-2020

R202 Billing worksheet_2020 - July 2020

FIELDWOOD
Rosslure

WELL NAME / LOCATION:

AFE

MC-94B#4
FV205014

July 2020

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $166,500 | Zero rate $0 | REPAIR SURFACE $185,000 | REPAIRS SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 2 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 3 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 4 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 5 July 2020 | Standby as directed | | | | | | | | | 0.0 |
| 6 July 2020 | | | | | | | | | | 0.0 |
| 7 July 2020 | | | | | | | | | | 0.0 |
| 8 July 2020 | | | | | | | | | | 0.0 |
| 9 July 2020 | | | | | | | | | | 0.0 |
| 10 July 2020 | | | | | | | | | | 0.0 |
| 11 July 2020 | | | | | | | | | | 0.0 |
| 12 July 2020 | | | | | | | | | | 0.0 |
| 13 July 2020 | | | | | | | | | | 0.0 |
| 14 July 2020 | | | | | | | | | | 0.0 |
| 15 July 2020 | | | | | | | | | | 0.0 |
| 16 July 2020 | | | | | | | | | | 0.0 |
| 17 July 2020 | | | | | | | | | | 0.0 |
| 18 July 2020 | | | | | | | | | | 0.0 |
| 19 July 2020 | | | | | | | | | | 0.0 |
| 20 July 2020 | | | | | | | | | | 0.0 |
| 21 July 2020 | | | | | | | | | | 0.0 |
| 22 July 2020 | | | | | | | | | | 0.0 |
| 23 July 2020 | | | | | | | | | | 0.0 |
| 24 July 2020 | | | | | | | | | | 0.0 |
| 25 July 2020 | | | | | | | | | | 0.0 |
| 26 July 2020 | | | | | | | | | | 0.0 |
| 27 July 2020 | | | | | | | | | | 0.0 |
| 28 July 2020 | | | | | | | | | | 0.0 |
| 29 July 2020 | | | | | | | | | | 0.0 |
| 30 July 2020 | | | | | | | | | | 0.0 |
| 31 July 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 0.0 | 96.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 |
| AMOUNTS: | | $0.00 | $725,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $725,200.00 |

EXHIBIT
1

# Valaris DS-16 MONTHLY BILLING SUMMARY

Monthly: July 2020
Contract #: DSLE 38030
Customer: Fieldwood
Well name: M C 1004 Completion, Castle 1

Cost Center:
AFE Number: FW 295014
Work Order:
Purchase Order:

| DATE | OPR 794 100% | STBY 705 @ 90% | OPERATING HOURS | | | | | | HEADCOUNT | | | | | | | BILLABLE EXTRA LABOR | NON BILLABLE EXTRAS | CREW SHORTAGES | Comments (required for any rate other than Operating)" |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BPR SURFACE 706 (12 hour allowances per month ) thereafter 0 rate | RPR SUBSEA 706 (36 hour allowances pd/month ) thereafter 0 rate | FORCE MAJEURE 707 @ 90% | Include Subsea Equip.? 907 @ 97% | No rate earned: All repair rate in excess of monthly /Allotted hours. | TOTAL HOURS | Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | OPERATOR THIRD PARTY | | (see legend below) | (see legend below) | (see legend below) | |
| 7/1/2020 | 24.00 | | | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | Oilfield Emit Page. Assist subsea with Preservation of Bop. Prep equipment for backload Remove ROV hours. |
| 7/2/2020 | | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Stencils rig # Preload associated equipment. Offload Valaris drill pipe to preservation for torrent. Prep tools for point Re monthly deck. Float Q's with BOP fluid preservations. |
| 7/3/2020 | | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Offload Valaris DP. Remove O'gage hoses re-interval Perform reset on BOP #1 for preservations. Tank on fuel 33.% G. |
| 7/4/2020 | | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | - | | | | Install steel flanges on O-ring hose lines re-torqued. Cellar Valaris Drill Pipe. Assit Co. w/BOP #1 LH preservation. Begin Christmas w/stencils. |
| 7/5/2020 | | | | | | | | | | | | | | | | | | |
| 7/6/2020 | | | | | | | | | | | | | | | | | | |
| 7/7/2020 | | | | | | | | | | | | | | | | | | |
| 7/8/2020 | | | | | | | | | | | | | | | | | | |
| 7/9/2020 | | | | | | | | | | | | | | | | | | |
| 7/10/2020 | | | | | | | | | | | | | | | | | | |
| 7/11/2020 | | | | | | | | | | | | | | | | | | |
| 7/12/2020 | | | | | | | | | | | | | | | | | | |
| 7/13/2020 | | | | | | | | | | | | | | | | | | |
| 7/14/2020 | | | | | | | | | | | | | | | | | | |
| 7/15/2020 | | | | | | | | | | | | | | | | | | |
| 7/16/2020 | | | | | | | | | | | | | | | | | | |
| 7/17/2020 | | | | | | | | | | | | | | | | | | |
| 7/18/2020 | | | | | | | | | | | | | | | | | | |
| 7/19/2020 | | | | | | | | | | | | | | | | | | |
| 7/20/2020 | | | | | | | | | | | | | | | | | | |
| 7/21/2020 | | | | | | | | | | | | | | | | | | |
| 7/22/2020 | | | | | | | | | | | | | | | | | | |
| 7/23/2020 | | | | | | | | | | | | | | | | | | |
| 7/24/2020 | | | | | | | | | | | | | | | | | | |
| 7/25/2020 | | | | | | | | | | | | | | | | | | |
| 7/26/2020 | | | | | | | | | | | | | | | | | | |
| 7/27/2020 | | | | | | | | | | | | | | | | | | |
| 7/28/2020 | | | | | | | | | | | | | | | | | | |
| 7/29/2020 | | | | | | | | | | | | | | | | | | |
| 7/30/2020 | | | | | | | | | | | | | | | | | | |
| 7/31/2020 | | | | | | | | | | | | | | | | | | |
| TOTALS | 0.00 | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 96.00 | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | |
| | 0.00% | | 0.00% | 0.00% | 0.00% | 0.00% | 0.20% | 50.00% | | | | | | | | | | |

Total Billable for the Month: $ 715,200.00

| | | |
|---|---|---|
| 100%/Day | $ 183,000.00 | 25%/hour $ |
| In %obc/Subsea 100 / Day &APD | $ 200,000.00 | |
| In %obc/Subsea 100%/Day | $ 185,000.00 | |
| 100%/hr %FD | $ 8,333.33 | |
| 100%/hr | $ 7,708.33 | |
| 90%/hr | $ 7,554.17 | |
| 90%/hr &APD | $ 8,166.67 | |

Dinny Sharry

EXHIBIT 1

Fieldwood Client Representative: _____

Fieldwood Client Representative (Signature): _____

DS-16 Rotating Supt.: _____          Date: _____

Do 16 Rotating Supt. Signature: _____

Fieldwood Drilling Supt.: _____          Date: _____

Fieldwood Drilling Supt. Signature: _____

Rig Manager: _____          Date: _____

Rig Manager Signature: _____

Date: 06-05-2020


**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
**ATTN: ACCOUNTS PAYABLE**

INVOICE NO: FWD2007263
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM **45 DAYS**
RIG: DS₇16 Resolute

WELL NUMBER MC-948 #4

**AFE #: FW205014**

**TO INVOICE YOU FOR THIRD PARTY CATERING JULY 1-4, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS**

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | |
| 27 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 3,780.0( |

AMOUNT DUE: $ 3,780.0(

Rig Manager's Approval: _____

**REMIT ACH PAYMENTS TO:**
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code: WFBIUS6S
ABA #121000248
Account # 4669481673

| | | |
|---|---|---|
| $ | (3,780.00) | 810620.10417.4202.110 |
| $ | - | 912812.10417.4202-110 |
| $ | - | 919220.10417.4202.110 |
| $ | - | 912814.10417.4202.110 |
| $ | - | 919220.10417.4202.110 |

ED

EXHIBIT

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOV | | | | | | 6 | | | | | | | | | | | | | | | | | | | | | | | | | |
| NSI Fracturing | | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oilstates | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OTC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Petrolink | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Proserve | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| QES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RigNet | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Perf | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TIW | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Veris Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workstrings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wellbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL | 18 | 9 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL OVER CONTRACT | 16 | 7 | 2 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | TOTAL: | 35 |

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE 3025-45
J. Bulow
7-2-2020

TOTAL: 27
TOTAL BILLABLE $ $3,780.00

OIM APPROVAL
2020 3rd Party Book Verification

Company Man APPROVAL

**EXHIBIT 1**

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

Started Gunfl 1600 on 6

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugwire | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cetco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clairant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dril-Quip | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dynamic Industries | 7 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ecoserv | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | | | 2 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FMC | 3 | 3 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fugro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GAIA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HyroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpark | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

C:\Users\rwils292\Desktop\June 2020 3rd Party Bunk Meals.xlsx

EXHIBIT 1



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX  77057
Phone:  (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
**ATTN: ACCOUNTS PAYABLE**

INVOICE NO:  FWD2007262
INVOICE DATE:  07/09/20
CUSTOMER NUMBER:  1348
PAYMENT TERM  **45 DAYS**
RIG:  DS-16 Resolute

WELL NUMBER  MC-948 #4

**AFE #:** FW205014

TO INVOICE YOU FOR THIRD PARTY CATERING  JUNE 5-30, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | |
| 1653 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 231,420.00 |

**AMOUNT DUE:**  $  231,420.00

Rig Manager's Approval:  _____

**REMIT ACH PAYMENTS TO:**

Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:   WFBIUS6S
ABA #121000248
Account # 4669481673

| | |
|---|---|
| $  (231,420.00) | 810620.10417.4202.110 |
| $   (34,089.65) | 912812.10417.4202-110 |
| $    34,089.65 | 919220.10417.4202.110 |
| ($43,469.00) | 912814.10417.4202.110 |
| $43,469.00 | 919220.10417.4202.110 |

**EXHIBIT**

ED

# Rowan Resolute

**CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020  Well Name: Gunflint,  AFE: FW205014  Routing#580047**

| Group | Date (1–31) |
| --- | --- |
| NOV | |
| NSI Fracturing | |
| OCEANEERING | |
| OES | |
| Oilstates | |
| One Subsea | |
| OFI (Oil Field Instr.) | |
| OGEC | |
| One Surface | |
| OTC | |
| Pharmasafe | |
| PHI Helicopters | |
| Pinnacle | |
| Petrolink | |
| Precision Rental | |
| Premium | |
| Protechnics | |
| Proserve | |
| Professional Rental Tools | |
| PRT | |
| Quality Energy | |
| QES | |
| Rig Chem | |
| RigNet | |
| RPS Group Inc. | |
| Schlumberger | |
| Scientific Drilling | |
| SGS | |
| Subsea Partners LLC | |
| Subsea Solutions | |
| Sunbelt | |
| Superior | |
| Superior Energy | |
| Superior Perf. | |
| Southern Fab | |
| Teledyne | |
| TEMS | |
| Tetra | |
| TIW | |
| Total Safety | |
| Tristate | |
| TSI | |
| Tubular Solutions | |
| Veris Global | |
| Workstrings | |
| Weatherford | |
| Welltec | |
| WFR | |
| TOTAL | |
| TOTAL OVER CONTRACT | |

AFE:       FW205014
Lease:     MC-948 #4
Project:   Gunflint (STIM)
Engineer:  J. Perroux
Routing #: 580047

ACCT CODE 7300-45
J. Button 7-2-2002

TOTAL: 16
TOTAL BILLABLE $:  $231,420.00

Company Man APPROVAL

OIM APPROVAL

**EXHIBIT 1**

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020  Well Name: Gunflint, AFE: FW205014  Routing#580047

Started Gunfl 1600 on 6

| Group | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | 1 | 1 | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugvare | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | 2 | 2 | 2 | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | 2 | 2 | | | | | |
| Cetco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | 1 | | | | 1 | | | | | 1 | 1 | 1 | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clariant | | | | | | | | | | | | | | | | | | | | | 1 | 1 | 1 | 1 | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 4 | | | | | | |
| Dynamic Industries | | | | | | | | | | | | | | 4 | 4 | 4 | 4 | 4 | | | | | | 4 | 4 | | | | | | |
| Dril-Quip | | | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 8 | 8 | 6 | 6 | 6 | 6 | 7 | |
| Ecoserv | | | | | | | | | | | | | | | | | | | | | | | | | | 10 | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | | | | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 5 | 5 | 6 | 6 | 6 | 7 | 5 | 5 | 4 | 4 | 4 | | 3 | |
| FMC | | | | 7 | 7 | 7 | 7 | 7 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 2 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 2 | 1 | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fugro | | | | | | | | 6 | 14 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 11 | 11 | 11 | 11 | 8 | 8 | 8 | | | | | | | |
| GAIA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | 2 | 2 | 2 | | 2 | 2 | 2 | | | | | | | | | | | | | | 8 | 2 | | | | | 2 | |
| HyroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | | | | | | | | | 1 | 1 | 1 | | | | | | | | | | | 1 | 1 | 1 | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | 1 | 1 | 1 | | 1 | | | | | | | | 1 | 1 | | 1 | 1 | 1 | |
| Newpark | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

C:\Users\rules\2020\workflow\June 2020 3rd Party Bunk Meals.xlsx

EXHIBIT
1

**EXHIBIT**

**1**

STATE OF LOUISIANA PARISH OF ST. TAMMANY
I HEREBY CERTIFY that the above is a true and
correct copy of the original as recorded at
instrument #2215417 of the original
records. Given under my hand and seal of office
this 16 day of July 20 20

Dy Clerk and Ex-Officio Recorder
Jaynie Rollins, Deputy Clerk



1340 Poydras Street, 4th Floor
New Orleans, Louisiana 70112

Land Records Division
Telephone (504) 407-0005

# Chelsey Richard Napoleon
### Clerk of Court and Ex-Officio Recorder
Parish of Orleans

## DOCUMENT RECORDATION INFORMATION

Instrument Number: 2020-24965

Recording Date: 7/16/2020 01:40:54 PM

Document Type: LABOR/MATERIAL LIEN

Addtl Titles Doc Types:

Mortgage Instrument Number: 1334982

Filed by: SHER GARNER

909 POYDRAS ST 28TH FLOOR

NEW ORLEANS, LA 70112

## THIS PAGE IS RECORDED AS PART OF YOUR DOCUMENT AND SHOULD BE RETAINED WITH ANY COPIES.

EXHIBIT
2

(Mississippi Canyon 948 #4)

## STATEMENT OF PRIVILEGE

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified for the County of Harris, State of Texas, personally came and appeared:

**ATLANTIC MARITIME SERVICES LLC**, a Delaware limited liability company ("Claimant")

who states that it has a claim, lien and privilege pursuant to La. R.S. 9:4861 et seq., as follows:

1) Name and Address of Claimant:

   Atlantic Maritime Services LLC
   5847 San Felipe, Suite 3300
   Houston, TX 77057

2) Nature and amount of the obligation for which Claimant's privilege is claimed:

   Labor, materials, services and related supplies and expenses, in connection with offshore drilling services under a contract between Claimant and the Operator for the Well (as defined in Section 5 below) in the amount of **$5,824,744.68**, plus contractually owed interest at the rate of 10 percent per annum, and contractually owed attorneys' fees and expenses (collectively, the "Obligations"). The Obligations include, but are not limited to obligations owed to Claimant (a) as a contractor for the price of its contract with Operator for operations with respect to the Well; and (b) as a seller for the price of movables sold to Operator that are incorporated in the Well or in a facility located on the well site; consumed in operations; and/or consumed at the site of the Well by a person performing labor or services on the site of the Well located in the waters of the State of Louisiana. Invoices evidencing the Obligations are attached hereto. The date of the last activity giving rise to Claimant's privilege set forth in this Statement of Privilege is July 4, 2020.

3) Name and address of the person owing the amount for which Claimant's privilege is claimed:

   Fieldwood Energy LLC
   2000 W. Sam Houston Parkway South, Suite 1200
   Houston, TX 77042

4) Name and address of the operator of the well as shown by the records of the Commission of Conservation:

1

Chelsey Richard Napoleon
CLERK OF CIVIL DISTRICT COURT
INST #: 2020-24965  07/16/2020  01:40:54 PM
TYPE: LABOR 17 PG(S)

MIN#: 1334982

EXHIBIT
2

Not applicable as this well is located on the Outer Continental Shelf; however, the Operator of the Well is as follows:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway South, Suite 1200
Houston, TX 77042

5) Description of the Operating Interest Upon Which the Privilege is Claimed, or of the Well with Respect to Which the Operations Giving Rise to Claimant's Privilege were Performed:

The privilege is claimed upon the operating interest of Fieldwood Energy LLC in **Mississippi Canyon Block 948, Lease No. OCS-G-28030** (the "Lease"), and **Well #4 (OCS-G-28030)** drilled by Claimant on behalf of Fieldwood Energy LLC during the time from June 4, 2020, until July 4, 2020 (the "Well"), including the operating interest under which the operations giving rise to the Claimant's privilege are conducted together with the interest of the lessee and/or operator of such interest in any (a) well, building, tank, leasehold pipeline, and other construction or facility on the well site; (b) movable on the well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use; (c) tract of land, servitude, and lease described in La. R.S. 9:4861(12)(c) covering the well site of the operating interest; (d) drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the Claimant's privilege emanate; (e) the interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege; and (f) the proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege.

This Statement of Privilege is made by Claimant for the purpose of preserving its claim, lien and privilege as a provider of materials, labor and services for and to the Operator and Well described above, including, without limitation, all claims, liens and privileges under La. R.S. 9:4861 et seq., and all claims for interest due on the obligations, along with the cost of preparing and filing this Statement of Privilege, and attorneys' fees and costs, to the fullest extent permitted by applicable law.

[ remainder of page intentionally blank - signature follows on next page ]

2

EXHIBIT
2

Date: July _15_, 2020        **ATLANTIC MARITIME SERVICES LLC,**
                             a Delaware limited liability company

By: _____
Name: _JASON R. MORGANELLI_
Title: _PRESIDENT_

Sworn to and subscribed before me, Notary Public,
this _15th_ day of July 2020.

_____
Notary Public
Notary Bar Roll No. _11589836_
My Commission Expires: _4/19/2023_

```
JUANITA FLOOR
Notary Public, State of Texas
Comm. Expires 04-19-2023
Notary ID 11589836
```

3

EXHIBIT
2



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

| | |
|---|---|
| TO: FIELDWOOD ENERGY LLC | INVOICE NO:  FWD2007260 |
| 2000 W.SAM HOUSTON PARKWAY SOUTH | INVOICE DATE:  7/1/2020 |
| SUITE 1200 | CUSTOMER NUMBER:  1348 |
| HOUSTON, TX 77042 | PAYMENT TERM  45 DAYS |

RIG: Resolute - DS-16
ATTN: AP DEPARTMENT
WELL NUMBER: MC-948 #4
LOCATION: MC-948 #4

AFE: FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JUNE
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 16:00 HOURS ON 06/04/2020 THRU 24:00 HOURS ON 06/30/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 566.0 HOURS OPERATING AT | $185,000.00 | $4,378,333.31 |
| 0.0 HOURS STANDBY AT | $181,300.00 | $0.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 16.0 HOURS REPAIR SUBSEA  RATE | $185,000.00 | $123,333.28 |
| 0.5 HOURS REPAIR SURFACE RATE | $185,000.00 | $3,854.17 |
| 47.5 HOURS MOVE RATE | $181,300.00 | $  358,822.92 |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 632.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:  $  4,864,343.68

REMIT ACH PAYMENTS TO:
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

Digitally signed
by Ben
Date:
2020.07.02
09:26:38 -05'00'

Coding: BU10079
| | |
|---|---|
| (4,378,333.31) | 10417- 110-4202-810101 |
| - | 10417- 110-4202-810102 |
| - | 10417- 110-4202-810110 |
| (127,187.45) | 10417- 110-4202-810103 |
| (358,822.92) | 10417- 110-4202-810104 |

ED

EXHIBIT
2

R202 Billing worksheet_2020 - June 4-30, 2020

FIELDWOOD
Resolute

WELL NAME / LOCATION:  AFE

MC-948 #4
FW205014

June 2020

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $166,500 | MOVE RATE $181,300 | REPAIR SURFACE $185,000 | SUBSEA REPAIRS $185,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 June 2020 | | | | | | | | | | 0.0 |
| 2 June 2020 | | | | | | | | | | 0.0 |
| 3 June 2020 | | | | | | | | | | 0.0 |
| 4 June 2020 | Moving as directed | | | | 8.0 | | | | | 8.0 |
| 5 June 2020 | Working as directed, Moved and Repaired(Changing out Blue Max cable) | 10.0 | | | 2.0 | | 12.0 | | | 24.0 |
| 6 June 2020 | Working as directed and Repaired(Changing out Blue Max cable) | 20.0 | | | | | 4.0 | | | 24.0 |
| 7 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 8 June 2020 | Working as directed and Moved | 20.0 | | | 4.0 | | | | | 24.0 |
| 9 June 2020 | Working as directed, repaired and Moved | 16.5 | | | 7.0 | 0.5 | | | | 24.0 |
| 10 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 11 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 12 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 13 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 14 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 15 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 16 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 17 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 18 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 19 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 20 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 21 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 22 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 23 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 24 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 25 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 26 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 27 June 2020 | Working as directed and Moved | 20.5 | | | 3.5 | | | | | 24.0 |
| 28 June 2020 | Working as directed and Moved | 13.0 | | | 11.0 | | | | | 24.0 |
| 29 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 30 June 2020 | Working as directed and Moved | 12.0 | | | 12.0 | | | | | 24.0 |
| 31 June 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 568.0 | 0.0 | 0.0 | 47.5 | 0.5 | 16.0 | 0.0 | 0.0 | 632.0 |
| AMOUNTS: | | $4,378,333.31 | $0.00 | $0.00 | $358,822.92 | $3,854.17 | $123,333.28 | $0.00 | $0.00 | $4,864,343.68 |

EXHIBIT
2

## Valaris DS-16 MONTHLY BILLING SUMMARY

AFE:      FW205014
Lease:   MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #:   580047

ACCT CODE: 7500-15

Danny Boswell

Barry LaBourie
7-1-2020

Dinny Sharry
07-02-2020

EXHIBIT 2



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

| | |
|---|---|
| TO: FIELDWOOD ENERGY LLC | |
| 2000 W.SAM HOUSTON PARKWAY SOUTH | INVOICE NO: FWD2007261 |
| SUITE 1200 | INVOICE DATE: 7/6/2020 |
| HOUSTON, TX 77042 | CUSTOMER NUMBER: 1348 |
| | PAYMENT TERM  45 DAYS |
| | |
| | RIG: Resolute - DS-16 |
| ATTN: AP DEPARTMENT | WELL NUMBER: MC-94864 |
| | LOCATION: MC-94864 |

AFE: FW205014

DAYWORK BILLING FOR ROWAN RESOLUTE FOR THE MONTH OF JULY
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 00:00 HOURS ON 07/01/2020 THRU 24:00 HOURS ON 07/04/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 0.0 HOURS OPERATING AT | $185,000.00 | $0.00 |
| 96.0 HOURS STANDBY AT | $181,300.00 | $725,200.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 0.0 HOURS REPAIR SUBSEA RATE | $185,000.00 | $0.00 |
| 0.0 HOURS REPAIR SURFACE RATE | $185,000.00 | $0.00 |
| 0.0 HOURS ZERO RATE | $0.00  $ | - |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 96.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:   $   725,200.00

Digitally signed
by Ben
Date:
2020.07.06
08:34:09 -05'00'

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

| Coding: BU10079 | | |
|---|---|---|
| - | 10417- 110-4202-810101 | |
| (725,200.00) | 10417- 110-4202-810102 | |
| - | 10417- 110-4202-810110 | |
| - | 10417- 110-4202-810103 | |
| | 10417- 110-4202-810104 | |
| | ED | |

EXHIBIT
2

## Valaris DS-16 MONTHLY BILLING SUMMARY

Month: July 2020
Contract #:
Customer:
Well name: MC-948 Completion, Gunflint

Cost Center:
AFE Number: FW 205014
Work Order:
Purchase Order:

| Date | STBY 70% @ 95% | RPR SURFACE 706 (12-hour allowances per month) thereafter 0 rate | RPR SUBSEA 706 (12-hour allowance per month) thereafter 0 rate | FORCE MAJEURE 707 @ 90% | In-hole Subsea Equip. 705 @ 95% | Non-rate earned / All repair rate in excess of monthly allotted hours | TOTAL HOURS | Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | OPERATOR THIRD PARTY | BILLABLE EXTRA LABOR | NON BILLABLE EXTRAS | CREW SHORTAGES | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | 24.00 | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | |
| 7/2/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 18.00 | 3.00 | | | | | |
| 7/3/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | | | | | |
| 7/4/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | | | | | |
| TOTALS | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 335.00 | 14.00 | 74.00 | 5.00 | 5.00 | | | | |
| | 0.00% | 0.00% | 8.00% | 0.00% | 0.00% | 0.00% | | | | | | | | | | |

$ 375,340.00
100%/Day $ 185,000.00
In-hole/Subsea 100 / Day MPD $ 200,000.00
In-hole/Subsea 80% MPD $ 185,000.00
100%/hr MPD $ 8,333.33
90%/hr $ 7,708.33
98%/hr $ 7,504.17
90%/hr MPD $ 8,165.67
90%/hr MPD $

Total #Billable for the Month: $ 715,500.00

DS-16 Rotating Supt. Signature: Robert Korn
Fieldwood Client Representative: BARRY GASBOURIE
Date: 07-4-2020
Fieldwood Client Representative Signature: [signature]
Date: 07/04/2020

Rig Manager Signature:
Fieldwood Drilling Supt.:
Fieldwood Drilling Supt. Signature:
Date:

Rig Manager Signature:
Date:

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

*ACCT CODE 7300-15*
*7-4-2020*

EXHIBIT
2

R202 Billing worksheet_2020 - July 2020

FIELDWOOD
Resolute

July 2020

WELL NAME / LOCATION:     AFE     MC-J46844     FIV205014

| DATE | DESCRIPTION OF WORK | OPERATING $186,000 | STANDBY $181,300 | REDRILL RATE $166,500 | Zero rate $0 | REPAIR SURFACE $186,000 | REPAIRS SUBSEA $186,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 2 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 3 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 4 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 5 July 2020 | | | | | | | | | | 0.0 |
| 6 July 2020 | | | | | | | | | | 0.0 |
| 7 July 2020 | | | | | | | | | | 0.0 |
| 8 July 2020 | | | | | | | | | | 0.0 |
| 9 July 2020 | | | | | | | | | | 0.0 |
| 10 July 2020 | | | | | | | | | | 0.0 |
| 11 July 2020 | | | | | | | | | | 0.0 |
| 12 July 2020 | | | | | | | | | | 0.0 |
| 13 July 2020 | | | | | | | | | | 0.0 |
| 14 July 2020 | | | | | | | | | | 0.0 |
| 15 July 2020 | | | | | | | | | | 0.0 |
| 16 July 2020 | | | | | | | | | | 0.0 |
| 17 July 2020 | | | | | | | | | | 0.0 |
| 18 July 2020 | | | | | | | | | | 0.0 |
| 19 July 2020 | | | | | | | | | | 0.0 |
| 20 July 2020 | | | | | | | | | | 0.0 |
| 21 July 2020 | | | | | | | | | | 0.0 |
| 22 July 2020 | | | | | | | | | | 0.0 |
| 23 July 2020 | | | | | | | | | | 0.0 |
| 24 July 2020 | | | | | | | | | | 0.0 |
| 25 July 2020 | | | | | | | | | | 0.0 |
| 26 July 2020 | | | | | | | | | | 0.0 |
| 27 July 2020 | | | | | | | | | | 0.0 |
| 28 July 2020 | | | | | | | | | | 0.0 |
| 29 July 2020 | | | | | | | | | | 0.0 |
| 30 July 2020 | | | | | | | | | | 0.0 |
| 31 July 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 0.0 | 96.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 |
| AMOUNTS: | | $0.00 | $725,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $725,200.00 |

EXHIBIT
2

# Valaris DS-16 MONTHLY BILLING SUMMARY

Cost Center:
AFE Number: FW P00514
Work Order:
Purchase Order:

| DATE | OPR PD 100% | STBY 70% @ 90% | APS STBY/ZLD 70% (36 hour allowance per month) (cumulative if over) | OPERATING HOURS PER BUNDLE 70% (6 hour allowance per month) (cumulative if over) | FORCE MAJEURE 70% @ 90% | In Hole Above Water 95% @70% | No rate earned All repair rig to Account of monthly billed hours | TOTAL HOURS | HEADCOUNT Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | OPERATOR THIRD PARTY | BILLABLE EXTRA LABOR (see legend below) | NON-BILLABLE EXTRA LABOR (see legend below) | CREW DISCHARGED (see legend below) | Comment (required for any rate other than Operating) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/1/2020 | | 24.00 | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | Diesel Drill Pipe. Avoid failure with Preservation of Unit. Prep equipment for freshwater. Remove BOP Stacks |
| 7/2/2020 | | 24.00 | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | | | | | Cleanse gap unit. Official heavy rain hours to reopen rate for circ. Prep pods for part on transfer rink. Auto ck with BOP hours connection. |
| 7/3/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 5.00 | 19.00 | 1.00 | | | | | Official returns OR Remove Ocean heavy to reopened. Perform route on BOP Kit to preservation hours set on 12/4 G. |
| 7/4/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 5.00 | 19.00 | 2.00 | | | | | Mount Wind hangar set. Days later flow to reopened. Cable returns Drill flow. Aux ck 18 w/BOP Kit 1 of preservation. Begin Cleaning of Deck. |
| 7/5/2020 | | | | | | | | | | | | | | | | | |
| 7/6/2020 | | | | | | | | | | | | | | | | | |
| 7/7/2020 | | | | | | | | | | | | | | | | | |
| 7/8/2020 | | | | | | | | | | | | | | | | | |
| 7/9/2020 | | | | | | | | | | | | | | | | | |
| 7/10/2020 | | | | | | | | | | | | | | | | | |
| 7/11/2020 | | | | | | | | | | | | | | | | | |
| 7/12/2020 | | | | | | | | | | | | | | | | | |
| 7/13/2020 | | | | | | | | | | | | | | | | | |
| 7/14/2020 | | | | | | | | | | | | | | | | | |
| 7/15/2020 | | | | | | | | | | | | | | | | | |
| 7/16/2020 | | | | | | | | | | | | | | | | | |
| 7/17/2020 | | | | | | | | | | | | | | | | | |
| 7/18/2020 | | | | | | | | | | | | | | | | | |
| 7/19/2020 | | | | | | | | | | | | | | | | | |
| 7/20/2020 | | | | | | | | | | | | | | | | | |
| 7/21/2020 | | | | | | | | | | | | | | | | | |
| 7/22/2020 | | | | | | | | | | | | | | | | | |
| 7/23/2020 | | | | | | | | | | | | | | | | | |
| 7/24/2020 | | | | | | | | | | | | | | | | | |
| 7/25/2020 | | | | | | | | | | | | | | | | | |
| 7/26/2020 | | | | | | | | | | | | | | | | | |
| 7/27/2020 | | | | | | | | | | | | | | | | | |
| 7/28/2020 | | | | | | | | | | | | | | | | | |
| 7/29/2020 | | | | | | | | | | | | | | | | | |
| 7/30/2020 | | | | | | | | | | | | | | | | | |
| 7/31/2020 | | | | | | | | | | | | | | | | | |
| TOTALS | 0.00 | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 96.00 | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | |
| | 0.00% | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 50.00% | | | | | | | | | |

$ 33% per qtr $
In Hole/Subsea 100 / Day MPD          $ 145,000.00
                                      $ 200,000.00
In Hole/Subsea 100%/Day               $ 185,000.00
100%/hr MPD               $ 8,333.33
                         $ 7,708.33
50%/hr                   $ 7,554.17
50%/hr MPD               $ 5,166.67

Total Billable for the Month          $ 725,500.00

Rig Manager: Dinny Sharry

Rig Manager (Signature):
Date: 06-05-2020

DS-16 Rotating Supt:
DS-16 Rotating Supt (Signature):
Date:

Flatbound Client Representative:
Flatbound Client Representative (Signature):
Date:

Flatbound Drilling Supt:
Flatbound Drilling Supt (Signature):
Date:

EXHIBIT
2



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX  77057
Phone:  (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
**ATTN: ACCOUNTS PAYABLE**

INVOICE NO: FWD2007263
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM **45 DAYS**
RIG: DS-16 Resolute

WELL NUMBER  MC-948 #4

<u>AFE #:</u> <u>FW205014</u>

TO INVOICE YOU FOR THIRD PARTY CATERING  JULY 1-4, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | - |
| 27 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 3,780.00 |

AMOUNT DUE:  $  3,780.00

Rig Manager's Approval: _____

**REMIT ACH PAYMENTS TO:**
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:   WFBIUS6S
ABA #121000248
Account # 4669481673

| | | |
|---|---|---|
| $ | (3,780.00) | 810620.10417.4202.110 |
| $ | - | 912812.10417.4202.110 |
| $ | - | 919220.10417.4202.110 |
| $ | - | 912814.10417.4202.110 |
| $ | - | 919220.10417.4202.110 |
| | ED | |

EXHIBIT
2

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOV | | | | | | 6 | | | | | | | | | | | | | | | | | | | | | | | | | |
| NSI Fracturing | | 1 | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oilstates | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pentronix | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Prosavo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| QES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RigMax | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Perf. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TGI Max | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Vertx Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workstrings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wellbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL | 18 | 9 | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL OVER CONTRACT | 16 | 7 | 2 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | |

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE 302.5-45
S. Button
7-2-2020

TOTAL: 35
TOTAL: 27
TOTAL BILLABLE $ $3,780.00

Company Man APPROVAL:

EXHIBIT 2

# Rowan Resolute

Started Gunfl 1600 on 6

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July, 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugware | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cetco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clariant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dril-Quip | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dynamic Industries | | | | | | | 7 | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDP Pipe Washing | 3 | 3 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FMC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GAIA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HyroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Internal | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Invista Register | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpark | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

EXHIBIT 2


# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
    2000 W.SAM HOUSTON PARKWAY SOUTH
    SUITE 1200
    HOUSTON, TX 77042
    ATTN: ACCOUNTS PAYABLE

INVOICE NO: FWD2007262
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM **45 DAYS**
RIG: DS-16 Resolute

WELL NUMBER MC-948 #4

AFE #: FW205014

TO INVOICE YOU FOR THIRD PARTY CATERING  JUNE 5-30, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| MEALS @ | 35 MEAL / COURTESY | $ | - |
| 1653 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 231,420.0( |

AMOUNT DUE:  $            231,420.00

Rig Manager's Approval: _____

**REMIT ACH PAYMENTS TO:**
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:   WFBIUS6S
ABA #121000248
Account # 4669481673

| | |
|---|---|
| $ (231,420.00) | 810620.10417.4202.110 |
| $  (34,089.65) | 912812.10417.4202.110 |
| $   34,089.65 | 919220.10417.4202.110 |
| ($43,469.00) | 912814.10417.4202.110 |
| $43,469.00 | 919220.10417.4202.110 |
| | ED |

EXHIBIT
2

# Rowan Resolute

**CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047**

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NSI Fracturing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oilstates | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OTO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Petrolin | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Proserve | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| QES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RigNet | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Perf | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TIW | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Varis Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wellbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL OVER CONTRACT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

*ACCT CODE 7300-45*
*J. Button 7-2-2002*

TOTAL BILLABLE $ $231,420.00

Company Man APPROVAL:

EXHIBIT 2

Case 20-33948 Document 566-1 Filed in TXSB on 11/13/20 Page 16 of 17

# Rowan Resolute

Started Gunfl on 6
1800 on 6

**CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020 Well Name: Gunflint, AFE: FW205914 Routing#8590047**

| Group | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABS LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Amool | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BTSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugware | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | 3 | 3 | 3 | | 3 | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | | 2 | | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cameron | | | | | | | | | | | | | | | | 1 | | | | | | 1 | | | | | | | | | |
| Cetco | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clariant | | | | | | | | | | | | | | | | | | | | | | 1 | 1 | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Denos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | 3 | 3 | | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | | | | |
| Dril-Quip | | | | | | | | | | | | | | | | | | | | | | | | 4 | | | | | | | |
| Dynamic Industries | | | | | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 8 | 8 | 4 | 4 | 4 | 4 | 4 | 8 | 8 | 8 | 7 | 7 | 8 | 6 | 6 | 6 | 6 | 6 | 7 | |
| Ecoserv | | | | | | 6 | | 6 | | 8 | | 8 | | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 10 | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | | | | | 5 | 5 | 5 | 5 | 6 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 5 | 5 | 6 | 6 | 6 | 5 | 5 | 5 | 5 | 4 | 4 | 4 | 3 | |
| Fieldwood | | | | | 7 | 7 | 7 | 7 | 7 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 1 | 1 | | | | |
| FMC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | 8 | 7 | 8 | | | 7 | | 8 | | | | | 17 | | | 11 | | 8 | | 8 | | | | | | | |
| Furmanite | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GAIA | | | | | | | | | | | | 1 | 1 | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | |
| HALLIBURTON /Sperry | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HydroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Liberty Register | | | | | | 2 | 2 | | 2 | 2 | 2 | | | 1 | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MITSRE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | 1 | 1 | 1 | | 1 | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpark | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

© VoyenAnalta/OOVSheets/June 2020 3rd Party Bunk Meals.xlsx

EXHIBIT
2

1340 Poydras Street, 4th Floor
New Orleans, Louisiana 70112



Land Records Division
Telephone (504) 407-0005

# Chelsey Richard Napoleon
## Clerk of Court and Ex-Officio Recorder
Parish of Orleans

## DOCUMENT RECORDATION INFORMATION

Instrument Number: 2020-24965

Recording Date: 7/16/2020 01:40:54 PM

Document Type: LABOR/MATERIAL LIEN
Addtl Titles Doc Types:

Mortgage Instrument Number: 1334982

Filed by: SHER GARNER
909 POYDRAS ST 28TH FLOOR

NEW ORLEANS, LA 70112

THIS PAGE IS RECORDED AS PART OF YOUR DOCUMENT AND
SHOULD BE RETAINED WITH ANY COPIES.

Steven Hoerner, Deputy Clerk
A True and Correct Copy
Chelsey Richard Napoleon, Clerk, Civil District Court

EXHIBIT
2

**St. Bernard Parish Certified Copy**

**Randy S. Nunez**
**Clerk of Court**
St. Bernard Parish Courthouse
Chalmette, LA 70044
(504) 271-3434

**Received From :**
  SHER GARNER
  909 POYDRAS STREET
  SUITE 2800
  NEW ORLEANS, LA 70112

**First MORTGAGOR**
| FIELDWOOD ENERGY LLC |
|---|

**First MORTGAGEE**
| ATLANTIC MARITIME SERVICES LLC |
|---|

**Index Type :**    MORTGAGES                          **File Number :** 633342

**Type of Document :** LIEN

                                                       **Book :** 1945        **Page :** 454

**Recording Pages :**        17
**Description :**  STATEMENT OF PRIVILEGE

**Recorded Information**

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for  St. Bernard Parish, Louisiana.

On (Recorded Date) : 07/16/2020

At (Recorded Time) : 12:15:50PM

CLERK OF COURT
RANDY S. NUNEZ
Parish of St. Bernard
I certify that this is a true copy of the attached
document that was filed for registry and
Recorded 07/16/2020 at 12:15:50
Recorded in Book 1945 Page 454
File Number     633342

Deputy Clerk
/S/MANDY B. FLEETWOOD

Doc ID - 008075760017

**Return To :**
  SHER GARNER
  909 POYDRAS STREET
  SUITE 2800
  NEW ORLEANS, LA 70112

Do not Detach this Recording Page from Original Document

EXHIBIT
3

(Mississippi Canyon 948 #4)

## STATEMENT OF PRIVILEGE

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified for the County of Harris, State of Texas, personally came and appeared:

**ATLANTIC MARITIME SERVICES LLC**, a Delaware limited liability company ("Claimant")

who states that it has a claim, lien and privilege pursuant to La. R.S. 9:4861 et seq., as follows:

1)     Name and Address of Claimant:

        Atlantic Maritime Services LLC
        5847 San Felipe, Suite 3300
        Houston, TX 77057

2)     Nature and amount of the obligation for which Claimant's privilege is claimed:

        Labor, materials, services and related supplies and expenses, in connection with offshore drilling services under a contract between Claimant and the Operator for the Well (as defined in Section 5 below) in the amount of **$5,824,744.68**, plus contractually owed interest at the rate of 10 percent per annum, and contractually owed attorneys' fees and expenses (collectively, the "Obligations"). The Obligations include, but are not limited to obligations owed to Claimant (a) as a contractor for the price of its contract with Operator for operations with respect to the Well; and (b) as a seller for the price of movables sold to Operator that are incorporated in the Well or in a facility located on the well site; consumed in operations; and/or consumed at the site of the Well by a person performing labor or services on the site of the Well located in the waters of the State of Louisiana. Invoices evidencing the Obligations are attached hereto. The date of the last activity giving rise to Claimant's privilege set forth in this Statement of Privilege is July 4, 2020.

3)     Name and address of the person owing the amount for which Claimant's privilege is claimed:

        Fieldwood Energy LLC
        2000 W. Sam Houston Parkway South, Suite 1200
        Houston, TX 77042

4)     Name and address of the operator of the well as shown by the records of the Commission of Conservation:

1

EXHIBIT
3

Not applicable as this well is located on the Outer Continental Shelf; however, the Operator of the Well is as follows:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway South, Suite 1200
Houston, TX 77042

5)    Description of the Operating Interest Upon Which the Privilege is Claimed, or of the Well with Respect to Which the Operations Giving Rise to Claimant's Privilege were Performed:

    The privilege is claimed upon the operating interest of Fieldwood Energy LLC in **Mississippi Canyon Block 948, Lease No. OCS-G-28030** (the "Lease"), and **Well #4 (OCS-G-28030)** drilled by Claimant on behalf of Fieldwood Energy LLC during the time from June 4, 2020, until July 4, 2020 (the "Well"), including the operating interest under which the operations giving rise to the Claimant's privilege are conducted together with the interest of the lessee and/or operator of such interest in any (a) well, building, tank, leasehold pipeline, and other construction or facility on the well site; (b) movable on the well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use; (c) tract of land, servitude, and lease described in La. R.S. 9:4861(12)(c) covering the well site of the operating interest; (d) drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the Claimant's privilege emanate; (e) the interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege; and (f) the proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege.

    This Statement of Privilege is made by Claimant for the purpose of preserving its claim, lien and privilege as a provider of materials, labor and services for and to the Operator and Well described above, including, without limitation, all claims, liens and privileges under La. R.S. 9:4861 et seq., and all claims for interest due on the obligations, along with the cost of preparing and filing this Statement of Privilege, and attorneys' fees and costs, to the fullest extent permitted by applicable law.

    [ remainder of page intentionally blank - signature follows on next page ]

EXHIBIT
3

Date: July *15*, 2020      **ATLANTIC MARITIME SERVICES LLC,**
a Delaware limited liability company

By: _____
Name: JASON R MORGANELLI
Title: PRESIDENT

Sworn to and subscribed before me, Notary Public,
this 15th day of July 2020.

_____
Notary Public
Notary/Bar Roll No. 11589836
My Commission Expires: 4/19/2023

```
┌─────────────────────────────────┐
│         JUANITA FLOOR            │
│   Notary Public, State of Texas  │
│    Comm. Expires 04-19-2023      │
│       Notary ID 11589836         │
└─────────────────────────────────┘
```

3

EXHIBIT
3



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX  77057
Phone:  (281) 809-0377

# INVOICE

TO:  FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

INVOICE NO:   FWD2007260
INVOICE DATE:   7/1/2020
CUSTOMER NUMBER: 1348
PAYMENT TERM   45 DAYS

RIG: Resolute - DS-16
WELL NUMBER: MC-948 #4
LOCATION: MC-948 #4

AFE:  FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JUNE
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 16:00 HOURS ON 06/04/2020 THRU 24:00 HOURS ON 06/30/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 568.0 HOURS OPERATING AT | $185,000.00 | $4,378,333.31 |
| 0.0 HOURS STANDBY AT | $181,300.00 | $0.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 16.0 HOURS REPAIR SUBSEA  RATE | $185,000.00 | $123,333.28 |
| 0.5 HOURS REPAIR SURFACE RATE | $185,000.00 | $3,854.17 |
| 47.5 HOURS MOVE RATE | $181,300.00 | $  358,822.92 |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 632.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:   $   4,864,343.68

REMIT ACH PAYMENTS TO:
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

Digitally signed
by Ben
Date:
2020.07.02
09:26:38 -05'00'

Coding: BU10079
(4,378,333.31)   10417- 110-4202-810101
-   10417- 110-4202-810102
-   10417- 110-4202-810110
(127,187.45)   10417- 110-4202-810103
(358,822.92)   10417- 110-4202-810104

ED

EXHIBIT
3

FIELDWOOD
Resolute

R202 Billing worksheet_2020 - June 4-30, 2020

WELL NAME / LOCATION:
AFE

MC-J43 #4
FW205914

June 2020

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $166,500 | MOVE RATE $181,300 | REPAIR SURFACE $185,000 | REPAIRS SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 June 2020 | | | | | | | | | | 0.0 |
| 2 June 2020 | | | | | | | | | | 0.0 |
| 3 June 2020 | | | | | | | | | | 0.0 |
| 4 June 2020 | Moving as directed | | | | 8.0 | | | | | 8.0 |
| 5 June 2020 | Working as directed, Moved and Repaired(Changing out Blue Max cable) | 10.0 | | | 2.0 | | 12.0 | | | 24.0 |
| 6 June 2020 | Working as directed and Repaired(Changing out Blue Max cable) | 20.0 | | | | | 4.0 | | | 24.0 |
| 7 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 8 June 2020 | Working as directed and Moved | 20.0 | | | 4.0 | | | | | 24.0 |
| 9 June 2020 | Working as directed, repaired and Moved | 16.5 | | | 7.0 | 0.5 | | | | 24.0 |
| 10 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 11 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 12 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 13 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 14 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 15 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 16 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 17 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 18 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 19 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 20 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 21 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 22 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 23 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 24 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 25 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 26 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 27 June 2020 | Working as directed and Moved | 20.5 | | | 3.5 | | | | | 24.0 |
| 28 June 2020 | Working as directed and Moved | 13.0 | | | 11.0 | | | | | 24.0 |
| 29 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 30 June 2020 | Working as directed and Moved | 12.0 | | | 12.0 | | | | | 24.0 |
| 31 June 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 568.0 | 0.0 | 0.0 | 47.5 | 0.5 | 16.0 | 0.0 | 0.0 | 632.0 |
| AMOUNTS: | | $4,378,333.31 | $0.00 | $0.00 | $358,822.92 | $3,854.17 | $123,333.28 | $0.00 | $0.00 | $4,864,343.68 |

EXHIBIT
3

**Valaris DS-16 MONTHLY BILLING SUMMARY**

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE: 7300-15

BARRY GABOURIE
7-1-2020

DAVID DONNELL
AUL GABOURIE
7-1-2020

Dinny Sharry

07-02-2020

EXHIBIT
3



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

| | |
|---|---|
| INVOICE NO: | FWD2007261 |
| INVOICE DATE: | 7/6/2020 |
| CUSTOMER NUMBER: | 1348 |
| PAYMENT TERM | 45 DAYS |
| RIG: | Resolute - DS-16 |
| WELL NUMBER: | MC-948#4 |
| LOCATION: | MC-948#4 |

AFE: FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JULY
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 00:00 HOURS ON 07/01/2020 THRU 24:00 HOURS ON 07/04/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 0.0 HOURS OPERATING AT | $185,000.00 | $0.00 |
| 96.0 HOURS STANDBY AT | $181,300.00 | $725,200.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 0.0 HOURS REPAIR SUBSEA  RATE | $185,000.00 | $0.00 |
| 0.0 HOURS REPAIR SURFACE RATE | $185,000.00 | $0.00 |
| 0.0 HOURS ZERO RATE | $0.00 | $ - |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 96.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:  $   725,200.00

Digitally signed
by Ben
Date:
2020.07.06
08:34:09 -05'00'

REMIT ACH PAYMENTS TO:
Beneficiary:  Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

| Coding: BU10079 | | |
|---|---|---|
| - | 10417- 110-4202-810101 | |
| (725,200.00) | 10417- 110-4202-810102 | |
| - | 10417- 110-4202-810110 | |
| - | 10417- 110-4202-810103 | |
| | 10417- 110-4202-810104 | |
| | ED | |

EXHIBIT
3

# Valaris DS-16 MONTHLY BILLING SUMMARY

Monthly: July 2020
Contract #: DO5-C 28000
Customer: Fieldwood
Well name: M.C. 9004 Completion, Gunflint

Cost Center:
AFE Number: FW 205014
Work Order:
Purchase Order:

| DATE | OPR 70X 100% | STBY 70X @ 90% | PPR SUBRATE 70X (12 hour allowances per month) - thereafter 0 rate | PPR SUBTEAL 70X (36 hour allowance per month) - thereafter 0 rate | FORCE MAJEURE 707 @ 90% | Inshde Subsea Equip 90X @ 75% | No rate earned: All repair rate in excess of monthly allotted hours. | TOTAL HOURS | Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | OPERATOR THIRD PARTY | BILLABLE EXTRA LABOR | NON BILLABLE EXTRAS | CREW SHORTAGES | Comments (required for any rate other than Operating) |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 7/1/2020 | - 24.00 | | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | Offload Drill Pipe. Assist subsea with Preservation of Bops. Prep equipment for lockdown. Remove EQH hoses. |
| 7/2/2020 | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Develop rig of Fieldwood provided shipment. Offload Valves. Ed Bish in preparation for break. Prep pads for jewelry deck. Assist SS with BOP Maint preservation. |
| 7/3/2020 | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Offload Valves SP. Remove Dope hoses in moonpool. Perform maint on BOP #2 for preservation. Task on reel STM 6. |
| 7/4/2020 | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | - | | | | Install Blind Flanges on Dump New Stort in moonpool. Collar Valves Drill Pipe. Assist SS w/BOP #1 LMs preservation. Begin Cleaning in Derrick. |
| | | | | | | | | | | | | | | | | | |
| TOTALS | 0.00 | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | |
| | 0.00% | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | | | | | | | | | | |

$ 579,5000.0 $
100%/Day $ 185,000.00
In hole/Subsea 100 / Day MPD $ 200,000.00
In hole/Subsea 100%/Day $ 185,000.00
100%/hr MPD $ 8,333.33
100%/hr $ 7,708.33
95%/hr $ 7,554.17
90%/hr MPD 95%/hr MPD $ 8,166.67

Total Billable for the Month $ 725,500.00

DS-16 Rotating Supt.: Robert Roy
DS-16 Rotating Supt. Signature: Robert Roy
Date: 07-4-2020

Fieldwood Client Representative: BARRY GABOURIE

Fieldwood Client Representative Signature: _____
Date: 07 / 04 / 2020

Fieldwood Drilling Supt.:

Fieldwood Drilling Supt. Signature:

Date:

Rig Manager:

Rig Manager Signature:

Date:

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE. 7300-15
7-4-2020

EXHIBIT 3

R202 Billing worksheet_2020 - July 2020

FIELDWOOD
Resolute

July 2020

WELL NAME / LOCATION: AFE

MC-94884
FW205014

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY REDRILL RATE $181,300 | STANDBY REDRILL RATE $166,500 | Zero rate $0 | REPAIR SURFACE $185,000 | REPAIRS SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $166,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 2 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 3 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 4 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 5 July 2020 | | | | | | | | | | 0.0 |
| 6 July 2020 | | | | | | | | | | 0.0 |
| 7 July 2020 | | | | | | | | | | 0.0 |
| 8 July 2020 | | | | | | | | | | 0.0 |
| 9 July 2020 | | | | | | | | | | 0.0 |
| 10 July 2020 | | | | | | | | | | 0.0 |
| 11 July 2020 | | | | | | | | | | 0.0 |
| 12 July 2020 | | | | | | | | | | 0.0 |
| 13 July 2020 | | | | | | | | | | 0.0 |
| 14 July 2020 | | | | | | | | | | 0.0 |
| 15 July 2020 | | | | | | | | | | 0.0 |
| 16 July 2020 | | | | | | | | | | 0.0 |
| 17 July 2020 | | | | | | | | | | 0.0 |
| 18 July 2020 | | | | | | | | | | 0.0 |
| 19 July 2020 | | | | | | | | | | 0.0 |
| 20 July 2020 | | | | | | | | | | 0.0 |
| 21 July 2020 | | | | | | | | | | 0.0 |
| 22 July 2020 | | | | | | | | | | 0.0 |
| 23 July 2020 | | | | | | | | | | 0.0 |
| 24 July 2020 | | | | | | | | | | 0.0 |
| 25 July 2020 | | | | | | | | | | 0.0 |
| 26 July 2020 | | | | | | | | | | 0.0 |
| 27 July 2020 | | | | | | | | | | 0.0 |
| 28 July 2020 | | | | | | | | | | 0.0 |
| 29 July 2020 | | | | | | | | | | 0.0 |
| 30 July 2020 | | | | | | | | | | 0.0 |
| 31 July 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 0.0 | 96.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 |
| AMOUNTS: | | $0.00 | $725,200.00 | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $725,200.00 |

EXHIBIT 3

# Valaris DS-16 MONTHLY BILLING SUMMARY

Cost Center:
AFE Number: FW 205014
Work Order:
Purchase Order:

Monthly: July 2020
Contract #: CQ-42 28590
Customer: Fieldwood
Well Name: S.S. 204 Completion, Conflict 6

| DATE | OPR 706 100% | STBY 705 @ 98% | 98% SUBHALTAG ON (24 hour allowances per month) thereafter @ rate | 95% SUBHALTAG ON (24 hour allowances per month) thereafter @ rate | FORCE MAJEURE 707 @ 90% | In-hole Subsea Equip 702 @75% | No rig available: All repair rents in excess of monthly allowed hours | TOTAL HOURS | Valaris | *OPERATOR | Valaris OFFSHORE | Valaris THIRD PARTY | OPERATOR THIRD PARTY | (see legend below) | (see legend below) | (see legend below) | Comments (required for any rate other than Operating) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | OPERATING HOURS | | | | | | HEADCOUNT | | | | BILLABLE EXTRA LABOR | NON BILLABLE EXTRAS | CREW SHORTAGES | |
| 7/1/2020 | 24.00 | | | | | | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | Offshd Drill Pipe. Apply subsea with Preservation of Rigs. Prep equipment for backload. Remove NSH hours. |
| 7/2/2020 | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Genalis rig All maximum operation adjustment. Offshd Valaris and pipe in preservation for trneeds. Prep pods for parts on Standby deck. Hour 10 with ROP Subsea preservation. |
| 7/3/2020 | | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | - | | | | Offshd Valaris DP. Forward Drlpe Nears in maxregard. Perform nuova on ROP #1 for preservation. Task at 3 at 5/5-C. |
| 7/4/2020 | 24.00 | | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | - | | | | Hour Wind Ranges on Order bins hours in maxregard. Cable Valaris Drill Pipe. Assis ID w/ROP #1 for preservation. Apply Gunning to subsea. |
| 7/5/2020 | | | | | | | | - | | | | | | | | | |
| 7/6/2020 | | | | | | | | - | | | | | | | | | |
| 7/7/2020 | | | | | | | | - | | | | | | | | | |
| 7/8/2020 | | | | | | | | - | | | | | | | | | |
| 7/9/2020 | | | | | | | | - | | | | | | | | | |
| 7/10/2020 | | | | | | | | - | | | | | | | | | |
| 7/11/2020 | | | | | | | | - | | | | | | | | | |
| 7/12/2020 | | | | | | | | - | | | | | | | | | |
| 7/13/2020 | | | | | | | | - | | | | | | | | | |
| 7/14/2020 | | | | | | | | - | | | | | | | | | |
| 7/15/2020 | | | | | | | | - | | | | | | | | | |
| 7/16/2020 | | | | | | | | - | | | | | | | | | |
| 7/17/2020 | | | | | | | | - | | | | | | | | | |
| 7/18/2020 | | | | | | | | - | | | | | | | | | |
| 7/19/2020 | | | | | | | | - | | | | | | | | | |
| 7/20/2020 | | | | | | | | - | | | | | | | | | |
| 7/21/2020 | | | | | | | | - | | | | | | | | | |
| 7/22/2020 | | | | | | | | - | | | | | | | | | |
| 7/23/2020 | | | | | | | | - | | | | | | | | | |
| 7/24/2020 | | | | | | | | - | | | | | | | | | |
| 7/25/2020 | | | | | | | | - | | | | | | | | | |
| 7/26/2020 | | | | | | | | - | | | | | | | | | |
| 7/27/2020 | | | | | | | | - | | | | | | | | | |
| 7/28/2020 | | | | | | | | - | | | | | | | | | |
| 7/29/2020 | | | | | | | | - | | | | | | | | | |
| 7/30/2020 | | | | | | | | - | | | | | | | | | |
| 7/31/2020 | | | | | | | | - | | | | | | | | | |
| TOTALS | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 96.00 | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | |
| | 0.00% | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | | | | | | | | |

$ 195,000.00    $    $    $    $    $    $

| | |
|---|---|
| 100%/Day | $ 195,000.00 |
| In hole/Subsea 100%/Day | 200,000.00 |
| In hole/Subsea 100%/Day | 195,000.00 |
| 100%/hr MPD | 8,333.33 |
| 100%/hr MPD | 7,760.33 |
| 90%/hr | 7,564.17 |
| 90%/hr MPD | 6,566.67 |

Total Billable for the Month: $ 725,000.00

Fieldwood Client Representative:

Fieldwood Client Representative Signature: _____ Date: _____

Fieldwood Drilling Supt: _____

Fieldwood Drilling Supt. Signature: _____ Date: _____

DS-16 Rabeling Supt.: _____

On DS Rabeling Supt. Signature: _____ Date: _____

Rig Manager: Dinny Sharry

Rig Manager Signature: _____ Date: 06-05-2020

EXHIBIT 3



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
ATTN: ACCOUNTS PAYABLE

INVOICE NO: FWD2007263
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM 45 DAYS
RIG: DS-16 Resolute

WELL NUMBER MC-948 #4

AFE #: FW205014

TO INVOICE YOU FOR THIRD PARTY CATERING JULY 1-4, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | - |
| . 27 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 3,780.0 |

AMOUNT DUE: $ 3,780.0

Rig Manager's Approval: _____

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code: WFBIUS6S
ABA #121000248
Account # 4669481673

| | | |
|---|---|---|
| $ | (3,780.00) | 810620.10417.4202.110 |
| $ | - | 912812.10417.4202-110 |
| $ | - | 919220.10417.4202-110 |
| $ | - | 912814.10417.4202.110 |
| $ | - | 919220.10417.4202.110 |
| | | ED |

EXHIBIT
3

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group | Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NSI Fracturing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | 6 | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oilstates | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OTC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Petrolink | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Preserve | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| QES | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RigNet | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Perf | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TIW | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Veris Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workstrings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wellbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **TOTAL** | | 18 | 9 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

TOTAL OVER CONTRACT: 16 7 2 2

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

COMPANY MAN APPROVAL:

ACCT CODE 3025-45
J. Butler
7-2-2020

OIM APPROVAL:
_____ OIM _____

TOTAL: 35
TOTAL: 27
TOTAL BILLABLES $ $3,780.00

EXHIBIT

# Rowan Resolute

Started Gunfl 1600 on 6

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugware | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cargo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clairant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dril-Quip | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dynamic Industries | 7 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ecoserv | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | 3 | 3 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FMC | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fugro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GAJA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HydroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpark | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

EXHIBIT 3



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
ATTN: ACCOUNTS PAYABLE

INVOICE NO: FWD2007262
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM 45 DAYS
RIG: DS-16 Resolute

WELL NUMBER  MC-948 #4

AFE #: FW205014

TO INVOICE YOU FOR THIRD PARTY CATERING  JUNE 5-30, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | - |
| 1653 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 231,420.0 |

AMOUNT DUE:  $  231,420.0

Rig Manager's Approval: _____

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:   WFBIUS6S
ABA #121000248
Account # 4669481673

| | |
|---|---|
| $  (231,420.00) | 810620.10417.4202.110 |
| $   (34,089.65) | 912812.10417.4202.110 |
| $    34,089.65 | 919220.10417.4202.110 |
| ($43,469.00) | 912814.10417.4202.110 |
| $43,469.00 | 919220.10417.4202.110 |

ED

EXHIBIT
3

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group | Totals |
|---|---|
| NOV | |
| NSI Fracturing | |
| OCEANEERING | |
| OES | |
| Oilstates | |
| One Subsea | |
| OFI (Oil Field Instr.) | |
| OGEC | |
| One Surface | |
| OTC | |
| Pharmasafe | |
| PHI Helicopters | |
| Pinnacle | |
| Petrolink | |
| Precision Rental | |
| Premium | |
| Pyrotechnics | |
| Preserve | |
| Professional Rental Tools | |
| PRT | |
| Quality Energy | |
| QES | |
| Rig Chem | |
| RigNet | |
| RPS Group Inc. | |
| Schlumberger | |
| Scientific Drilling | |
| SCS | |
| Subsea Partners LLC | |
| Subsea Solutions | |
| Sunbelt | |
| Superior | |
| Superior Energy | |
| Superior Perf. | |
| Southern Fab | |
| Teledyne | |
| TEMS | |
| Tetra | |
| TIW | |
| Total Safety | |
| Tristate | |
| TSI | |
| Tubular Solutions | |
| Verts Global | |
| Workstrings | |
| Weatherford | |
| Welltec | |
| WFR | |

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE 7300-45
J. Button 7-2-2002

TOTAL: 1705
TOTAL: 1653
TOTAL BILLABLES $231,420.00

# Rowan Resolute

Started Gunfl 1600 on 6

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020 Well Name: Gunflint, AFE: FW205014 Routing#580047

| Group | Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | 1 | | | | | 1 | | 1 | 1 | 1 | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugware | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cebo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | 1 | | 1 | 1 | | | | | 1 | 1 | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clairant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | 8 | 8 | 8 | 8 | 8 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 4 | 2 | 2 | | | | | |
| CoreLab | | | | | | | 8 | 8 | 8 | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 8 | 8 | 8 | 10 | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dril-Quip | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dynamic Industries | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ecoserv | | | | | | 5 | 5 | 5 | 6 | 6 | 6 | 8 | 8 | 8 | 8 | 4 | 7 | 5 | 5 | 5 | 5 | 6 | 6 | 5 | 5 | 5 | 6 | 4 | 4 | 4 | | |
| Elite Comms | | | | | | 7 | 7 | 7 | 7 | 7 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 2 | 2 | 1 | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | | | | | | 7 | 7 | 7 | 6 | 6 | 8 | 8 | 8 | 8 | 8 | 7 | 7 | 5 | 5 | 5 | 5 | 6 | 6 | 7 | 5 | 4 | 8 | 4 | 4 | 4 | 3 | |
| FMC | | | | | | | | | | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 4 | 4 | | | 4 | 4 | 4 | 2 | 1 | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fugro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GAIA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | | | 2 | 2 | 2 | 6 | | 2 | 17 | 17 | 17 | 17 | 17 | 17 | 11 | 11 | 11 | 11 | 17 | 8 | 8 | 8 | | | | | | | |
| HycroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | | 1 | | | | | 1 | | 1 | 1 | 1 | 1 | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpark | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

C:\Users\mleola\2020\worktop\June 2020 3rd Party Bank Meals.xlsx

**EXHIBIT 3**

# Plaquemines Parish Recording Page

**Kim Turlich-Vaughan**
**Clerk of Court**
PO Box 40
Belle Chasse, LA 70037
(504) 934-6610

**Received From :**
SHER, GARNER, CAHILL, RICHTER, KLEIN
& HILBERT, L.L.C.
909 POYDRAS ST., 28TH FLOOR
NEW ORLEANS, LA 70112

**First MORTGAGOR**

FIELDWOOD ENERGY LLC

**First MORTGAGEE**

ATLANTIC MARITIME SERVICES LLC

**Index Type :**   MORTGAGE

**Type of Document :** MATERIALMANS LIEN

**Recording Pages :**          17

**File # :** 2020-00002805

**Book :**   772      **Page :**  616

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Plaquemines Parish, Louisiana.

On (Recorded Date) : 07/16/2020

At (Recorded Time) : 10:47:54AM

Doc ID - 005320630017

CLERK OF COURT
KIM TURLICH-VAUGHAN
Parish of Plaquemines
I certify that this is a true copy of the attached
document that was filed for registry and
Recorded 07/16/2020 at 10:47:54
Recorded in Book 772 Page 616
File Number 2020-00002805

Deputy Clerk

EXHIBIT
4

**Return To :**

(Mississippi Canyon 948 #4)

## STATEMENT OF PRIVILEGE

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified for the County of Harris, State of Texas, personally came and appeared:

**ATLANTIC MARITIME SERVICES LLC**, a Delaware limited liability company ("Claimant")

who states that it has a claim, lien and privilege pursuant to La. R.S. 9:4861 et seq., as follows:

1) Name and Address of Claimant:

> Atlantic Maritime Services LLC
> 5847 San Felipe, Suite 3300
> Houston, TX 77057

2) Nature and amount of the obligation for which Claimant's privilege is claimed:

> Labor, materials, services and related supplies and expenses, in connection with offshore drilling services under a contract between Claimant and the Operator for the Well (as defined in Section 5 below) in the amount of **$5,824,744.68**, plus contractually owed interest at the rate of 10 percent per annum, and contractually owed attorneys' fees and expenses (collectively, the "Obligations"). The Obligations include, but are not limited to obligations owed to Claimant (a) as a contractor for the price of its contract with Operator for operations with respect to the Well; and (b) as a seller for the price of movables sold to Operator that are incorporated in the Well or in a facility located on the well site; consumed in operations; and/or consumed at the site of the Well by a person performing labor or services on the site of the Well located in the waters of the State of Louisiana. Invoices evidencing the Obligations are attached hereto. The date of the last activity giving rise to Claimant's privilege set forth in this Statement of Privilege is July 4, 2020.

3) Name and address of the person owing the amount for which Claimant's privilege is claimed:

> Fieldwood Energy LLC
> 2000 W. Sam Houston Parkway South, Suite 1200
> Houston, TX 77042

4) Name and address of the operator of the well as shown by the records of the Commission of Conservation:

EXHIBIT
4

Not applicable as this well is located on the Outer Continental Shelf; however, the Operator of the Well is as follows:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway South, Suite 1200
Houston, TX 77042

5)      Description of the Operating Interest Upon Which the Privilege is Claimed, or of the Well with Respect to Which the Operations Giving Rise to Claimant's Privilege were Performed:

The privilege is claimed upon the operating interest of Fieldwood Energy LLC in **Mississippi Canyon Block 948, Lease No. OCS-G-28030** (the "Lease"), and **Well #4 (OCS-G-28030)** drilled by Claimant on behalf of Fieldwood Energy LLC during the time from June 4, 2020, until July 4, 2020 (the "Well"), including the operating interest under which the operations giving rise to the Claimant's privilege are conducted together with the interest of the lessee and/or operator of such interest in any (a) well, building, tank, leasehold pipeline, and other construction or facility on the well site; (b) movable on the well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use; (c) tract of land, servitude, and lease described in La. R.S. 9:4861(12)(c) covering the well site of the operating interest; (d) drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the Claimant's privilege emanate; (e) the interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege; and (f) the proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege.

This Statement of Privilege is made by Claimant for the purpose of preserving its claim, lien and privilege as a provider of materials, labor and services for and to the Operator and Well described above, including, without limitation, all claims, liens and privileges under La. R.S. 9:4861 et seq., and all claims for interest due on the obligations, along with the cost of preparing and filing this Statement of Privilege, and attorneys' fees and costs, to the fullest extent permitted by applicable law.

[ remainder of page intentionally blank - signature follows on next page ]

2

EXHIBIT
4

Date: July 15, 2020          **ATLANTIC MARITIME SERVICES LLC,**
                             a Delaware limited liability company

By: _____
Name: JASON R. MORGANELLI
Title: PRESIDENT

Sworn to and subscribed before me, Notary Public,
this 15th day of July 2020.

_____
Notary Public
Notary Bar Roll No. 11589836
My Commission Expires: 4/19/2023

JUANITA FLOOR
Notary Public, State of Texas
Comm. Expires 04-19-2023
Notary ID 11589836

3

EXHIBIT
4



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 609-0377

**INVOICE**

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

INVOICE NO:   FWD2007260
INVOICE DATE:   7/1/2020
CUSTOMER NUMBER: 1348
PAYMENT TERM   45 DAYS

RIG: Resolute - DS-16
WELL NUMBER: MC-948 #4
LOCATION: MC-948 #4

AFE: FW205014

DAYWORK BILLING FOR ROWAN RESOLUTE FOR THE MONTH OF JUNE
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 16:00 HOURS ON 06/04/2020 THRU 24:00 HOURS ON 06/30/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 568.0 HOURS OPERATING AT | $185,000.00 | $4,378,333.31 |
| 0.0 HOURS STANDBY AT | $181,300.00 | $0.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 16.0 HOURS REPAIR SUBSEA RATE | $185,000.00 | $123,333.28 |
| 0.5 HOURS REPAIR SURFACE RATE | $185,000.00 | $3,854.17 |
| 47.5 HOURS MOVE RATE | $181,300.00 | $   358,822.92 |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 632.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:   $   4,864,343.68

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

Digitally signed
by Ben
Date:
2020.07.02
09:26:38 -05'00'

Coding: BU10079
(4,378,333.31) 10417- 110-4202-810101
  -   10417- 110-4202-810102
  -   10417- 110-4202-810110
(127,187.45) 10417- 110-4202-810103
(358,822.92) 10417- 110-4202-810104

ED

**EXHIBIT**
**4**

R202 Billing worksheet_2020 - June 4-30, 2020

FIELDWOOD
Resolute

WELL NAME / LOCATION: AFE    MC-948 #4   FW265914

June 2020

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $168,500 | MOVE RATE $181,300 | REPAIR SURFACE $185,000 | REPAIRS SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $168,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 June 2020 | | | | | | | | | | 0.0 |
| 2 June 2020 | | | | | | | | | | 0.0 |
| 3 June 2020 | | | | | | | | | | 0.0 |
| 4 June 2020 | Moving as directed | | | | 8.0 | | | | | 8.0 |
| 5 June 2020 | Working as directed, Moved and Repaired(Changing out Blue Max cable) | 10.0 | | | 2.0 | | 12.0 | | | 24.0 |
| 6 June 2020 | Working as directed and Repaired(Changing out Blue Max cable) | 20.0 | | | | | 4.0 | | | 24.0 |
| 7 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 8 June 2020 | Working as directed and Moved | 20.0 | | | 4.0 | | | | | 24.0 |
| 9 June 2020 | Working as directed, repaired and Moved | 16.5 | | | 7.0 | 0.5 | | | | 24.0 |
| 10 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 11 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 12 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 13 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 14 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 15 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 16 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 17 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 18 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 19 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 20 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 21 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 22 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 23 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 24 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 25 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 26 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 27 June 2020 | Working as directed and Moved | 20.5 | | | 3.5 | | | | | 24.0 |
| 28 June 2020 | Working as directed and Moved | 13.0 | | | 11.0 | | | | | 24.0 |
| 29 June 2020 | Working as directed | 24.0 | | | | | | | | 24.0 |
| 30 June 2020 | Working as directed and Moved | 12.0 | | | 12.0 | | | | | 24.0 |
| 31 June 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 568.0 | 0.0 | 0.0 | 47.5 | 0.5 | 18.0 | 0.0 | 0.0 | 622.0 |
| AMOUNTS: | | $4,378,333.31 | $0.00 | $0.00 | $356,822.92 | $3,854.17 | $123,333.28 | $0.00 | $0.00 | $4,864,343.68 |

EXHIBIT
4

## Valero DS-16 MONTHLY BILLING SUMMARY

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE: 7300-15

BARRY GABOURIE
7-1-2020

Davin Bowell

Dinny Sharry
07-02-2020

EXHIBIT 4



**VALARIS**

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042

ATTN: AP DEPARTMENT

| | |
|---|---|
| INVOICE NO: | FWD2007261 |
| INVOICE DATE: | 7/6/2020 |
| CUSTOMER NUMBER: | 1348 |
| PAYMENT TERM | 45 DAYS |

RIG: Resolute - DS-16
WELL NUMBER: MC-948#4
LOCATION: MC-948#4

AFE: FW205014

DAYWORK BILLING FOR ROWAN  RESOLUTE FOR THE MONTH OF JULY
PER ARTICLE OF THE OFFSHORE DAYWORK DRILLING CONTRACT
AND SIGNED RIG TIMESHEET ATTACHED.

FROM 00:00 HOURS ON 07/01/2020 THRU 24:00 HOURS ON 07/04/2020

DAYRATE EFFECTIVE

| | DAYRATE | |
|---|---|---|
| 0.0 HOURS OPERATING AT | $185,000.00 | $0.00 |
| 96.0 HOURS STANDBY AT | $181,300.00 | $725,200.00 |
| 0.0 HOURS REDRILL | $166,500.00 | $0.00 |
| 0.0 HOURS REPAIR SUBSEA  RATE | $185,000.00 | $0.00 |
| 0.0 HOURS REPAIR SURFACE RATE | $185,000.00 | $0.00 |
| 0.0 HOURS ZERO RATE | $0.00 $ | - |
| 0.0 HOURS FORCE MAJEURE | $166,500.00 | $0.00 |
| 96.0 TOTAL HOURS | | |

Crew Shortage

AMOUNT DUE:     $     725,200.00

Digitally signed
by Ben
Date:
2020.07.06
08:34:09 -05'00'

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:WFBIUS6S
ABA #121000248
Account # 4669481673

Coding: BU10079

| | |
|---|---|
| - | 10417- 110-4202-810101 |
| (725,200.00) | 10417- 110-4202-810102 |
| - | 10417- 110-4202-810110 |
| - | 10417- 110-4202-810103 |
| | 10417- 110-4202-810104 |

ED

EXHIBIT
4

## Valaris DS-16 MONTHLY BILLING SUMMARY

Monthly: July 2020
Contract #: CCS-C 28530
Contractor: Fieldwood
Field Name: MC 5001 Completion, Gunflint

Cost Center:
AFE Number: FW 205014
Work Order:
Purchase Order:

| Date | | OPERATING HOURS | | | | | | | HEADCOUNT | | | | | | | | | Comments (required for any rate other than Operating) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OPR 704 100% | STBY 705 @ 95% | RPR SURFACE 704 (12 hour allowance per month) - thereafter 0 rate | RPR SUBSEA 704 (24 hour allowance per month) - thereafter 0 rate | FORCE MAJEURE 707 @ 90% | Intsvle Subsea Eqpt 808 @ 95% | No rate earned; All repair rate in excess of monthly allotted hours. | | Vslrs | OPERATOR | Vslrs CATERING | Vslrs THIRD PARTY | OPERATOR THIRD PARTY | BILLABLE EXTRA LABOR (as logged below) | NON BILLABLE EXTRAS (risk logged below) | CREW SHORTAGES (as logged below) | | |
| 7/1/2020 | . 24.00 | | . | | | . | | 24.00 | 80.00 | 5.00 | 19.00 | 1.00 | 5.00 | | | | | Offload Drill Pipe. Assist subsea with Preservation of Bops. Prep equipment for lockdown. Remove RBX hangers. |
| 7/2/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 8.00 | 18.00 | 1.00 | . | | | | | Transfer Rig off Fieldwood requested equipment. Offload/Work drill pipe in preservation to transit. Prep pads for paint on Jewelry deck. Assist 1's with BOP slave preservation. |
| 7/3/2020 | | 24.00 | | | | | | 24.00 | 85.00 | 3.20 | 15.00 | 1.00 | . | | | | | Offload Valaris 2" Annular/Choke line skid measured, between trans on 504 #1 for preservation. Took on tool 9/M #1. |
| 7/4/2020 | | 20.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 2.00 | . | | | | | Waterblasted Flanges on Snarps bend line to re-preserved. Color Valaris Drill Pipe. Assist 1's w/BOP #1 LDS preservation. Begin cleaning to transit. |
| TOTALS | 0.00 | 56.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 333.00 | 14.00 | 76.00 | 5.00 | 5.00 | | | | | |
| | 0.00% | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 50.00% | | | | | | | | | |

$ 175,500.00 $
100%/Day $ 185,500.00
in hrs/Subsea 100 / Day MPD $ 200,000.00
in hrs/Subsea 100%/Day $ 185,500.00
100%/hr MPD $ 8,333.33
100%/hr $ 7,708.33
95%/hr $ 7,354.17
95%/hr MPD 95%/hr MPD $ 8,145.83

Total billable for the Month: $ 715,500.00

BARRY GASBOURLE

Fieldwood Client Representative:

DS-16 Routing Supt.: Robert Ray
Fieldwood Client Representative Signature: _____
Date: 07/04/2020

Dv-16 Routing Supt. Signature: Robert Ray

Date: 07-4-2020

Fieldwood Drilling Supt.:
Fieldwood Drilling Supt. Signature:
Date:

Rig Manager:
Rig Manager Signature:
Date:

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE. 7300-15
7-4-2020

EXHIBIT 4

FIELDWOOD
Rosebue

July 2020

WELL NAME / LOCATION: _____    AFE    MC-948#4
FW20S014

| DATE | DESCRIPTION OF WORK | OPERATING $185,000 | STANDBY $181,300 | REDRILL RATE $165,500 | Zero rate $0 | REPAIR SURFACE $185,000 | REPAIRS SUBSEA $185,000 | MOVE $181,300 | FORCE MAJEURE $165,500 | TOTAL HOURS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 2 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 3 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 4 July 2020 | Standby as directed | | 24.0 | | | | | | | 24.0 |
| 5 July 2020 | | | | | | | | | | 0.0 |
| 6 July 2020 | | | | | | | | | | 0.0 |
| 7 July 2020 | | | | | | | | | | 0.0 |
| 8 July 2020 | | | | | | | | | | 0.0 |
| 9 July 2020 | | | | | | | | | | 0.0 |
| 10 July 2020 | | | | | | | | | | 0.0 |
| 11 July 2020 | | | | | | | | | | 0.0 |
| 12 July 2020 | | | | | | | | | | 0.0 |
| 13 July 2020 | | | | | | | | | | 0.0 |
| 14 July 2020 | | | | | | | | | | 0.0 |
| 15 July 2020 | | | | | | | | | | 0.0 |
| 16 July 2020 | | | | | | | | | | 0.0 |
| 17 July 2020 | | | | | | | | | | 0.0 |
| 18 July 2020 | | | | | | | | | | 0.0 |
| 19 July 2020 | | | | | | | | | | 0.0 |
| 20 July 2020 | | | | | | | | | | 0.0 |
| 21 July 2020 | | | | | | | | | | 0.0 |
| 22 July 2020 | | | | | | | | | | 0.0 |
| 23 July 2020 | | | | | | | | | | 0.0 |
| 24 July 2020 | | | | | | | | | | 0.0 |
| 25 July 2020 | | | | | | | | | | 0.0 |
| 26 July 2020 | | | | | | | | | | 0.0 |
| 27 July 2020 | | | | | | | | | | 0.0 |
| 28 July 2020 | | | | | | | | | | 0.0 |
| 29 July 2020 | | | | | | | | | | 0.0 |
| 30 July 2020 | | | | | | | | | | 0.0 |
| 31 July 2020 | | | | | | | | | | 0.0 |
| HOURS: | | 0.0 | 96.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 96.0 |
| AMOUNTS: | | $0.00 | $725,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $725,200.00 |

R202 Billing worksheet_2020 - July 2020

EXHIBIT
4

# Valaris DS-16 MONTHLY BILLING SUMMARY

Month: July 2020
Contract #: C6543 13099
Contractor:
Well Name: AT C-1014 Completions Cardili-4

Cost Center:
AFE Number: 108 105344
Work Order:
Purchase Order:

| DRK RATE 100% | LTRP 70% @ 95% | WEL SURFACE 70% (13 hour allowance per month) – thereafter 0 RH | RATE GREATER THAN 24 hour allowance per month) – thereafter 0 rate | FORCE MAJEURE 70% @ 95% | Zero Rate (Above Revision) 70.0 @95% | No rate normal (All needs this in excess of monthly allotted hours | TOTAL HOURS | Valaris | OPERATOR | Valaris CATERING | Valaris THIRD PARTY | Vehicle THIRD PARTY Cat/h | OPERATION THIRD PARTY | (see legend below) | (see legend below) | (see legend below) | (see legend below) | Comment (required for any rate other than those billing) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | HEADCOUNT | | | | BILLABLE EXTRA LABOR | NON BILLABLE EXTRAS | CREW SHORTAGES | | |
| 7/1/2020 | 24.00 | | | | | | 24.00 | 80.00 | 5.50 | 19.00 | | 1.00 | 5.00 | | | | | Offload Drill Pipe. Build in/back with Preservation of Rigs. Pre-requirement for load out. Remove Rigid Beam. |
| 7/2/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | 1.00 | | | | | | Transfer of Offload assorted materials. Offload pipe with pipe to preservation for Vessel. Prep pins for pass via transits dock. Assist 3 units 882 hours preservation. |
| 7/3/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 19.00 | 1.00 | | | | | | | Offload Valaris 20. Remove large from in-transit deck. Preserve units at 88P of the preservation. Load in/out 50 MLS. |
| 7/4/2020 | 24.00 | | | | | | 24.00 | 85.00 | 3.00 | 15.00 | 2.00 | | | | | | | Install drill barges on Rope tour. Prep in rod spool. Entire Valaris Drill Rate. Assist to add 88 PI preserve in. Rig it (Grease in force). |
| 7/5/2020 | | | | | | | | | | | | | | | | | | |
| 7/6/2020 | | | | | | | | | | | | | | | | | | |
| 7/7/2020 | | | | | | | | | | | | | | | | | | |
| 7/8/2020 | | | | | | | | | | | | | | | | | | |
| 7/9/2020 | | | | | | | | | | | | | | | | | | |
| 7/10/2020 | | | | | | | | | | | | | | | | | | |
| 7/11/2020 | | | | | | | | | | | | | | | | | | |
| 7/12/2020 | | | | | | | | | | | | | | | | | | |
| 7/13/2020 | | | | | | | | | | | | | | | | | | |
| 7/14/2020 | | | | | | | | | | | | | | | | | | |
| 7/15/2020 | | | | | | | | | | | | | | | | | | |
| 7/16/2020 | | | | | | | | | | | | | | | | | | |
| 7/17/2020 | | | | | | | | | | | | | | | | | | |
| 7/18/2020 | | | | | | | | | | | | | | | | | | |
| 7/19/2020 | | | | | | | | | | | | | | | | | | |
| 7/20/2020 | | | | | | | | | | | | | | | | | | |
| 7/21/2020 | | | | | | | | | | | | | | | | | | |
| 7/22/2020 | | | | | | | | | | | | | | | | | | |
| 7/23/2020 | | | | | | | | | | | | | | | | | | |
| 7/24/2020 | | | | | | | | | | | | | | | | | | |
| 7/25/2020 | | | | | | | | | | | | | | | | | | |
| 7/26/2020 | | | | | | | | | | | | | | | | | | |
| 7/27/2020 | | | | | | | | | | | | | | | | | | |
| 7/28/2020 | | | | | | | | | | | | | | | | | | |
| 7/29/2020 | | | | | | | | | | | | | | | | | | |
| 7/30/2020 | | | | | | | | | | | | | | | | | | |
| 7/31/2020 | | | | | | | | | | | | | | | | | | |
| TOTALS | 96.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 335.00 | 14.00 | 76.00 | 5.00 | 5.00 | 5.00 | | | | | |
| | 0.00% | TOTALS DURATION | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 10.00% | | | | | | | | | | |

| $ | 191.880 $ | | | | | | | | | | | | | | | | |
| 100%/Day | 185,000.00 | | | | | | | | | | | | | | | | |
| In Rate/Subsea 100%/Day NPD | 285,000.00 | Total billable for the Month | $ | 723,100.00 | | | | | | | | | | | | | |
| In Rate/Subsea 100%/Day | 185,000.96 | | | | | | | | | | | | | | | | |
| 100%/Hr NPD | 8,333.33 | | | | | | | | | | | | | | | | |
| 100%/Hr | 7,708.33 | | | | | | | | | | | | | | | | |
| 50%/Hr | 7,551.17 | | | | | | | | | | | | | | | | |
| 100%/Hr NPD | 98%/Hr NPD | 4,166.67 | | | | | | | | | | | | | | | | |

Valaris Client Representative Signature:

Valaris Client Representative Signature: _____

Farlwood Drilling Supt.:

Farlwood Drilling Supt. Signature: _____     Date:

Rig Mooring Supt. Signature: _____

DS-16 Mooring Supt.:

DS-16 Mooring Supt. Signature: _____     Date:

Rig Manager: _____     Date:

Rig Manager Signature: _____

Rig Manager Signature:  Danny Sharry

Date: 06-05-2020

EXHIBIT
4



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
ATTN: ACCOUNTS PAYABLE

INVOICE NO: FWD2007263
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM 45 DAYS
RIG: DS-16 Resolute

WELL NUMBER MC-948 #4

AFE #: FW205014

TO INVOICE YOU FOR THIRD PARTY CATERING JULY 1-4, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | - |
| 27 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 3,780.0 |

AMOUNT DUE: $ 3,780.0

Rig Manager's Approval: _____

REMIT ACH PAYMENTS TO: _____
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code: WFBIUS6S
ABA #121000248
Account # 4669481673

| | | |
|---|---|---|
| $ | (3,780.00) | 810620.10417.4202.110 |
| $ | - | 912812.10417.4202-110 |
| $ | - | 919220.10417.4202.110 |
| $ | - | 912814.10417.4202.110 |
| $ | - | 919220.10417.4202.110 |
| | | ED |

EXHIBIT
4

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing# 580047

| Group / Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOV | | | | | | 6 | | | | | | | | | | | | | | | | | | | | | | | | | |
| NSI Fracturing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oilstates | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OTC | 1 | 1 | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Petrolink | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Proserve | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| QES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RigNet | | | 1 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Perf. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TIW | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Verts Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workstrings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wallbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL | 18 | 9 | 4 | 2 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 16 | 7 | 2 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | 35 |

TOTAL OVER CONTRACT

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 580047

ACCT CODE 3025-45
B. Butler
7-2-2020

TOTAL: 27
TOTAL BILLABLE $: $3,780.00

OIM APPROVAL

Company Man APPROVAL:

EXHIBIT 4

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: July 2020 Well Name: Gunflint, AFE: FW205014 Routing#560047

Started Gunfl
1600 on 6

| Group | Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugvare | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cetco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clairant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea DS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dril-Quip | 7 | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dynamic Industries | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ecoserv | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Expro | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FDF Pipe Washing | 3 | | 3 | 2 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fieldwood | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FMC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Frogto | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GANA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HALLIBURTON /Sperry | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| HycoCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpork | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

C:\Users\Vzafr\2020\Desktop\June 2020 3rd Party Days Meals.xlsx

EXHIBIT
4



# VALARIS

Atlantic Maritime Service LLC
5847 San Felipe , Suite 3500
Houston, TX 77057
Phone: (281) 809-0377

# INVOICE

TO: FIELDWOOD ENERGY LLC
2000 W.SAM HOUSTON PARKWAY SOUTH
SUITE 1200
HOUSTON, TX 77042
ATTN: ACCOUNTS PAYABLE

INVOICE NO: FWD2007262
INVOICE DATE: 07/09/20
CUSTOMER NUMBER: 1348
PAYMENT TERM 45 DAYS
RIG: DS-16 Resolute

WELL NUMBER  MC-948 #4

AFE #: <u>FW205014</u>

TO INVOICE YOU FOR THIRD PARTY CATERING  JUNE 5-30, 2020 PER ATTACHED THE COMPANY
MEAL TICKETS

| | | | |
|---|---|---|---|
| MEALS @ | 35 MEAL / COURTESY | $ | - |
| 1653 COST/DAY/PERSON | 140 COST/DAY/PERSON | $ | 231,420.0 |

AMOUNT DUE:  $   231,420.0

Rig Manager's Approval: _____

REMIT ACH PAYMENTS TO:
Beneficiary: Atlantic Maritime Service LLC
Wells Fargo Bank, N.A.
San Fransisco, CA
SWIFT Code:  WFBIUS6S
ABA #121000248
Account # 4669481673

| | | |
|---|---|---|
| $ | (231,420.00) | 810620.10417.4202.110 |
| $ | (34,089.65) | 912812.10417.4202-110 |
| $ | 34,089.65 | 919220.10417.4202-110 |
| | ($43,469.00) | 912814.10417.4202.110 |
| | $43,469.00 | 919220.10417.4202.110 |

ED

**EXHIBIT**
**4**

# Rowan Resolute

Case 20-33948-Document 566-1 Filed in TXSB 11/13/21 Page 423 of 438

**CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020  Well Name: Gunflint,  AFE: FW205014  Routing#5800047**

| Group | Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NOV | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NSI Fracturing | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OCEANEERING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OES | | | | | 6 | 6 | 6 | 6 | 3 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | 6 | 6 | | |
| Oilstates | | | | | 2 | 2 | 2 | 5 | 5 | 2 | 2 | | 2 | 2 | 3 | 2 | 3 | | 2 | | | | 3 | | 3 | 1 | 1 | | | | | |
| One Subsea | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OFI (Oil Field Instr.) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CGEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| One Surface | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| OTC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmasafe | | | | | 1 | | | 1 | | 1 | | 1 | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | | |
| PHI Helicopters | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pinnacle | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Petrolirx | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Precision Rental | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Premium | | | | | | | | | | | | 2 | | 2 | 2 | 2 | 2 | | | | | 2 | 2 | 2 | 2 | | | | | | | |
| Protechnics | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Proserve | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional Rental Tools | | | | | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | |
| PRT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quality Energy | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 1 | 1 | | |
| QES | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rig Chem | | | | | | | 1 | | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | | |
| RigNet | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| RPS Group Inc. | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Schlumberger | | | | | 15 | 15 | 15 | 16 | 15 | 15 | 17 | 17 | 17 | 17 | 17 | 17 | 16 | 14 | 14 | 15 | 16 | 17 | 17 | 17 | 17 | 10 | 10 | | | | | |
| Scientific Drilling | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Partners LLC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Subsea Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sunbelt | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Superior Energy | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | |
| Superior Perf. | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | | |
| Southern Fab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Teledyne | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TEMS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tetra | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TIW | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Safety | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tristate | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tubular Solutions | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Varis Global | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Workstrings | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Weatherford | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Wellbore | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Welltec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WFR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL | 0 | 0 | 0 | 0 | 62 | 62 | 62 | 64 | 63 | 65 | 65 | 73 | 75 | 78 | 81 | 83 | 86 | 88 | 66 | 64 | 66 | 69 | 76 | 78 | 71 | 69 | 67 | 49 | 41 | 16 | 17 | 1705 |
| TOTAL OVER CONTRACT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1663 |

AFE: FW205014
Lease: MC-948 #4
Project: Gunflint (STIM)
Engineer: J. Perroux
Routing #: 5800047

ACCT CODE 7300-45
J. Button 7-2-2002

TOTAL BILLABLE $ 1663
TOTAL: $231,420.00

EXHIBIT 4

# Rowan Resolute

CLIENT THIRD PARTY ROOM AND MEAL CHARGE-OFF FOR: June 2020 Well Name: Gunflint, AFE: FW206014 Routing#580047

Started Gunfl 1600 on 6

| Group \ Date | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABB LTD | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ABS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ampol | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airgas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aker | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aqua Tech | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automated Production | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Archer | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baileys | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Baker Hughes | | | | | | | | | | | | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | | | | | | | | | |
| Bedrock Petroleum | | | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | |
| BHGE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Blackhawk | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BSEE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bugware | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Burner Fire Control | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cajun Cutters | | | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | |
| Cameron | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cetco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ChampionX | | | | | | | | | | | | | | 1 | 1 | 1 | 1 | | | | | 1 | 1 | 1 | | | | | | | |
| Chouest | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Clariant | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cavins | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| CoreLab | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Danos | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Deep Sea OS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DGO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Diversified | | | | | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 4 | 4 | 4 | | | | 3 | |
| Dril-Quip | | | | | 8 | 8 | 8 | 8 | 8 | 8 | | 8 | 4 | 4 | 8 | 4 | 4 | 4 | | | | 8 | | | 6 | 6 | 4 | 8 | 6 | 7 | |
| Dynamic Industries | | | | | | | | | | | | | 4 | | | | 8 | 8 | | | | 7 | 7 | 8 | 8 | 8 | | | | | |
| Ecosery | | | | | | | | | | 7 | | 8 | | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 8 | 8 | 10 | | | | | |
| Elite Comms | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EPS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EVO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EXO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FTV Pipe Washing | | | | | 5 | 7 | 5 | 6 | 6 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 6 | 5 | 6 | 6 | 6 | 7 | 5 | 6 | 6 | 4 | 8 | | | |
| Fieldwood | | | | | 7 | 7 | 7 | 7 | 7 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 2 | 3 | 4 | 4 | 4 | 4 | 4 | 5 | 8 | 4 | 4 | 4 | 3 | |
| FMC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| FRANKS INTL | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fugro | | | | | | | | | | | | | | | | | | | | | | | 8 | 8 | | 2 | | | | | |
| GAIA | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GE Oil & Gas | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GSI | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gulfstream | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 1 | 1 | 1 | |
| HALLIBURTON /Sperry | | | | | 5 | 7 | 5 | 6 | 6 | 14 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 11 | 11 | 11 | 11 | 17 | | | | | | | | | |
| HyroCarbon | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Impact Selector | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Interwell | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Lloyds Register | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | | 1 | 1 | 1 | | | | | | | | 1 | 1 | 1 | 1 | 1 | 1 | |
| MAKO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Master Flo | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MI Swaco | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| MISTRAS Group | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| NALCO | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Newpak | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

EXHIBIT 4

C:\Users\jak\2020\DeskJune\June 2020 3rd Party Bunk Meals.xlsx

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ATLANTIC MARITIME SERVICES, LLC,** | § | CIVIL ACTION No. |
| | § | |
| Plaintiff, | § | SECTION " " |
| **VS.** | § | |
| | § | DIVISION " " |
| | § | |
| **ECOPETROL AMERICA, LLC,** | § | JUDGE: |
| *in rem* | § | MAGISTRATE: |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

## VERIFYING DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. § 1746, I, Ben Rose, declare under penalty of perjury that the following is true and correct.

I am the Vice President and Treasurer of Atlantic Maritime Services, LLC, Plaintiff herein. I have read the foregoing Verified Compliant and know the contents thereof, have examined the exhibits and evidence attached thereto, and the same are true and correct. The sources of any information and grounds for my belief as to all matters stated in the Verified Complaint are derived from the Plaintiff's books and records.

Executed in Houston, Texas, this 13th day of November, 2020.

Ben Rose
Atlantic Maritime Services, LLC
Vice President and Treasurer

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Atlantic Maritime Services, LLC

**(b)** County of Residence of First Listed Plaintiff    Harris, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lugenbuhl Wheaton Peck Rankin & Hubbard; 601 Poydras St. Ste. 2775, New Orleans, LA 70130; (504) 368-1990

## DEFENDANTS

Ecopetrol America, LLC

County of Residence of First Listed Defendant    Unknown
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [x] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
43 U.S.C. § 1349(b)(1)

Brief description of cause:
Enforcement of lien rights solely against the interest of the defendant in the specific property interests included within La. R.S. § 9:4863(A)(1)-(4).

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $5,824,744.68
(In Rem)

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
Nov 13, 2020

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

    United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

    United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

    Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

    Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**   **Origin.** Place an "X" in one of the seven boxes.

    Original Proceedings. (1) Cases which originate in the United States district courts.

    Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

    Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

    Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

    Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

    Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

    Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

    **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

    Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

    Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ATLANTIC MARITIME SERVICES, LLC** | § | **CIVIL ACTION No.** |
| | § | |
| Plaintiff, | § | **SECTION " "** |
| **VS.** | § | |
| | § | **DIVISION " "** |
| **ECOPETROL AMERICA, LLC** | § | |
| | § | **JUDGE:** |
| | § | **MAGISTRATE:** |
| *in rem* | § | |
| Defendant. | § | |

## WRIT OF SEQUESTRATION

TO:   United States Marshal
        For the United States District Court
        For the Eastern District of Louisiana

You are hereby commanded, in the name of the United States District Court for the Eastern

District of Louisiana, to seize and sequester and take into your possession and safely hold, until

further order of the Court, the following property:

> All interests held by Ecopetrol America, LLC in the specific property
> interests of Ecopetrol America, LLC included within La. R.S. § 4863(A)(1)-
> (4) associated with the operating interest covering the lease situated in the
> Outer Continental Shelf, OCS-G-28030, Mississippi Canyon Area, Block
> 948 (the "*Lease*"), containing Well #4 (API 608174129900) (the "*Well*") (the
> "*Subject Interests*").

**IT IS ORDERED** that a Writ of Sequestration is hereby issued as prayed for in the above-

captioned matter, the requirement of security having been dispensed with by law; and

**IT IS FURTHER ORDERED** that the United States Marshal is hereby directed to (i)

serve or cause to be served this Writ of Sequestration on Ecopetrol America, LLC, and (ii) record

or cause to be recorded this Writ of Sequestration in the records of the Clerks of Court for the

Parishes of Orleans, St. Tammany, St. Bernard, and Plaquemines, and in the records of the United

States of America, Bureau of Ocean Energy Management.

New Orleans, Louisiana, this _____ day of _____, 2020.

_____
JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ATLANTIC MARITIME SERVICES, LLC** | § | **CIVIL ACTION No.** |
| | § | |
| Plaintiff, | § | **SECTION " "** |
| **VS.** | § | |
| | § | **DIVISION " "** |
| **RIDGEWOOD KATMAI, LLC, and** | § | |
| **ILX PROSPECT KATMAI, LLC** | § | **JUDGE: MAGISTRATE:** |
| *in rem* | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**VERIFIED COMPLAINT IN REM SEEKING RECOGNITION AND ENFORCEMENT
OF ATLANTIC MARITIME SERVICE, LLC'S LIEN AND PRIVILEGE RIGHTS
SOLELY WITH RESPECT TO THE SUBJECT INTERESTS OF THE
DEFENDANTS AND ENFORCING SUCH RIGHTS
BY WRIT OF SEQUESTRATION**

**NOW HERE COMES** Atlantic Maritime Services, LLC (the "*Plaintiff*") and files this

Verified Complaint seeking recognition of the Plaintiff's lien and privilege rights solely with

respect to the Subject Interests (defined hereinbelow) of Ridgewood Katmai, LLC ("*Ridgewood*")

and ILX Prospect Katmai, LLC ("*Prospect*," and together with Ridgewood, the "*Defendants*"),

and enforcing such rights by writ of sequestration, specifically reserving any and all rights to seek

additional legal or equitable relief against other property or persons accountable for the claims

stated herein. In support of the Verified Complaint, the Plaintiff respectfully shows as follows:

**Parties**

1.      The Plaintiff is a Delaware limited liability company with its principal place of

business located at 5827 San Felipe Street, Suite 3300, Houston, TX 77057. The Plaintiff is a

wholly-owned subsidiary of Valaris plc, debtor-in-possession in bankruptcy case no. 20-34114,

pending before the Bankruptcy Court for the Southern District of Texas. (Bankr. S.D. Tex. 20-

1

34114, ECF Doc. 1).

2.     Ridgewood is a Delaware limited liability company with a principal place of business located at 1254 Enclave Parkway, Houston, Texas 77077.

3.     Prospect is a Delaware limited liability company with a principal place of business located in Houston, Texas.

<u>**Jurisdiction and Venue**</u>

4.     This Court has jurisdiction over this matter because the case and controversy herein arises out of, and in connection with, operations conducted on the Outer Continental Shelf for the exploration, development, or production of minerals, subsoil, and seabed of the Outer Continental Shelf.     Thus, jurisdiction exists pursuant to the Outer Continental Shelf and Lands Act, 43 U.S.C. §1349(b)(1).

5.     Venue is proper in this District under 43 U.S.C. §1349(b)(1) because this is the "judicial district of the State nearest the place the cause of action arose."

<u>**Factual Allegations**</u>

6.     The Plaintiff is lawfully engaged in the business of furnishing labor, equipment, machinery, materials, and services, including drilling services, in support of drilling, development, exploration and/or operation of oil and gas wells.

7.     Based on the records of the Bureau of Ocean Energy Management ("***BOEM***"), the Defendants together hold a 50% working interest (25% each) in a certain lease situated in the Outer Continental Shelf, OCS-G-34536, Green Canyon Area, Block 40 (the "***Lease***"), containing Well #1 (API 608114062300) (the "***Well***"), for which Fieldwood Energy, LLC ("***Operator***") serves as operator of record.

8.     Between April 6, 2020 and June 4, 2020, the Plaintiff furnished goods, equipment,

2

supplies, and services for and in connection with the drilling and/or operation of the Lease and
Well in the total principal amount of $7,111,706.55, as reflected in the invoices and work tickets
attached hereto. *See* Exhibits 1-8, pp. 5-54, pp. 4-53, pp. 6-55, pp. 5-54, pp. 5-50, pp. 4-50, pp. 6-
51, and pp. 5-50, respectively.

9.      Pursuant to La. R.S. § 9:4861, *et seq.* ("*LOWLA*"), the Plaintiff is granted a
privilege and lien (the "*Lien*") to secure payment owed for the goods, equipment, supplies,
services, and other materials provided by the Plaintiff for the benefit of the Lease and the
Defendants.

10.     The Plaintiff properly preserved, perfected, and maintained the perfection of the
Lien by filing and recording the following lien affidavits (the "*Lien Affidavits*"):

(a) Statement of Privilege in the amount of $6,973,379.03, in favor of the Plaintiff, against
Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage
records of Plaquemines Parish on July 16, 2020, as File #2020-00002808, Book 772,
Pages 683-736 (attached hereto and incorporated by reference as **Exhibit 1**);

(b) Statement of Privilege in the amount of $6,973,379.03, in favor of the Plaintiff, against
Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage
records of Jefferson Parish on July 16, 2020 as Instrument No. 12032371, Book 4886,
Pages 226-278 (attached hereto and incorporated by reference as **Exhibit 2**);

(c) Statement of Privilege in the amount of $6,973,379.03, in favor of the Plaintiff, against
Lease No OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage
records of Lafourche Parish on July 16, 2020 as File No. 1298859, Book 2056, Pages
519-572 (attached hereto and incorporated by reference as **Exhibit 3**);

(d) Statement of Privilege in the amount of $6,973,379.03, in favor of the Plaintiff, against
Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage
records of Terrebonne Parish on July 16, 2020, as File #1606305, Book 3165, Pages
405-458 (attached hereto and incorporated by reference as **Exhibit 4**);

(e) Statement of Privilege in the amount of $138,327.52, in favor of the Plaintiff, against
Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage
records of Plaquemines Parish on July 23, 2020, as File #2020-00002925, Book 773,
Pages 76-125 (attached hereto and incorporated by reference as **Exhibit 5**);

(f) Statement of Privilege in the amount of $138,327.52, in favor of the Plaintiff, against

3

Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage records of Jefferson Parish on July 23, 2020 as Instrument No. 12033590, Book 4887, Pages 125-174 (attached hereto and incorporated by reference as **Exhibit 6**);

(g) Statement of Privilege in the amount of $138,327.52, in favor of the Plaintiff, against Lease No OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage records of Lafourche Parish on July 23, 2020 as File No. 1299324, Book 2058, Pages 411-461 (attached hereto and incorporated by reference as **Exhibit 7**); and

(h) Statement of Privilege in the amount of $138,327.52, in favor of the Plaintiff, against Lease No. OCS-G-34536, Green Canyon, Block 40, filed and recorded in the mortgage records of Terrebonne Parish on July 23, 2020 as File # 1606885, Book 3167, Pages 464-513 (attached hereto and incorporated by reference as **Exhibit 8**).

11.     The Lien Affidavits were each filed within 180 days of the completion of the work, materials, tools, and equipment supplied by the Plaintiff in connection with the drilling, development, exploration and/or the operation of the Lease on June 4, 2020. The Plaintiff provided notice to the Operator by certified mail, delivered on July 20, 2020 and July 28, 2020.

12.     On August 3, 2020, the Operator filed a voluntary petition for bankruptcy relief, commencing case no. 20-33948 (the "***Bankruptcy Case***") before the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***").[1] (Bankr. S.D. Tex. 20-33948, ECF Doc. 1).

13.     The principal amount owed for the work described above, $7,111,706.55, remains past due and owing, together with attorneys' fees up to 10% of the amount due, costs for preparing the Lien Affidavits and notice of *lis pendens*, and interest.

---

[1] As reflected in the reservations of rights throughout this Verified Complaint, the Plaintiff does not seek recognition or enforcement of its Lien against the Operator or any of its property interests; however, the Plaintiff expressly reserves the right, to the extent necessary, to seek relief from the automatic stay in the Bankruptcy Case to enforce its rights against the Defendants' interests in the hydrocarbons produced with respect to the Lease and the Subject Interests, as well as the proceeds of the sales of such hydrocarbons to third-party purchasers. The Plaintiff further reserves the right to seek any other relief from the Bankruptcy Court or otherwise with respect to the Operator or any other persons or properties accountable for the claims herein

## CLAIMS FOR RELIEF

### Count I: Recognition and Enforcement of Plaintiff's Lien against the Subject Interests

14.    The Plaintiff incorporates hereinbelow all allegations in the preceding paragraphs.

15.    LOWLA grants claimants like the Plaintiff a privilege and lien to secure payment

for their work by operation of law.

16.    The lien and privilege afforded under LOWLA is established over:

(1) "The operating interest under which the operations giving rise to the claimant's privilege are conducted, together with the interest of the lessee of such interest in a:

(a) Well, building, tank, leasehold pipeline, and other construction or facility on the well site.

(b) Movable on a well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use.

(c) Tract of land, servitude, and lease described in R.S. 9:4861(12)(c) covering the well site of the operating interest.

(2) Drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the privilege emanate.

(3) The interest of the operator and participating lessee in hydrocarbons produced from the operating interest and the interest of a non-participating lessee in hydrocarbons produced from that part of his operating interest subject to the privilege.

(4) The proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege." (together, the "***LOWLA Properties***").

La. R.S. § 9:4683(A)(1-4).

17.    In this lawsuit, the Plaintiff seeks recognition and enforcement of its Lien solely

with respect to the Defendants' interests in the specific property interests of the Defendants

included within La. R.S. § 9:4683(A)(1-4) (collectively, the "***Subject Interests***"), expressly

reserving any and all rights to seek recovery of additional amounts associated with the sales proceeds derived from the sale of the hydrocarbons produced from the Lease, insofar as the automatic stay arguably prevents the Plaintiff from seizing and garnishing such proceeds to the extent such proceeds are commingled with proceeds attributable to the sale of hydrocarbons owned by the Operator in the absence of an order from the Bankruptcy Court modifying or lifting the automatic stay as to such proceeds.

18.     Additionally, pursuant to La. R.S. § 9:4862(B)(3), the Plaintiff seeks recognition of its right to recover against the Subject Interests the cost of preparing and filing the Lien Affidavits and the notice of *lis pendens* authorized to be filed under La. R.S. § 9:4865(c), which the Plaintiff intends to file during the period allotted thereunder.

19.     Furthermore, pursuant to La. R.S. § 9:4862(B)(2) and (4), the Plaintiff seeks recognition of its right to enforce against the Subject Interests claims to recover reasonable attorneys' fees not to exceed ten percent (10%), as well as interest.

### Count II: Request for Writ of Sequestration against the Subject Interests

20.     The Plaintiff incorporates hereinbelow all allegations in the preceding paragraphs.

21.     Louisiana law recognizes that sequestration is warranted when a plaintiff claims a privilege against the property of a defendant, and "it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property form the parish, during the pendency of the action." La. Code Civ. P. art. 3571.

22.     Additionally, Louisiana law provides that, for liens and privileges under LOWLA, "[a] claimant may enforce his privilege by a writ of sequestration, without the necessity of furnishing security." La. R.S. § 9:4871.

23.     Through this action, the Plaintiff seeks to enforce the Lien against property of the

Defendants, the Subject Interests, except that the Plaintiff does not seek to seize any of the Subject Interests to the extent such Subject Interests are commingled with property of the Operator and the seizure thereof would potentially violate the automatic stay in the Operator's Bankruptcy Case.

24.     As holder of the Subject Interests, the Defendants have the power to alienate or encumber the Subject Interests.

25.     To protect the Plaintiff's Lien, it is necessary that a Writ of Sequestration issue, in accordance with La. Code Civ. P. Art. 3571, *et seq.*, and without security in accordance with La. R.S. § 9:4871, directing the United States Marshal to seize and to hold the Subject Interests until further Order from this Court, and to record the Writ of Sequestration in the records of the Clerks of Court for the Parishes of Plaquemines, Jefferson, Lafourche, and Terrebonne, and in the records of BOEM.

26.     The Plaintiff reserves the right to amend the Verified Complaint to name as defendants all other working-interest owners of the Lease, including the Operator,[2] and all purchasers of the gas, oil and distillate produced and saved from wells located on the Lease, for the purpose of this Court entering judgment against those purchasers, ordering them to turn over to the Plaintiff all proceeds derived from the Lease in an amount sufficient to pay the full amount of the indebtedness owed to the Plaintiff, including principal, interest, expenses, attorneys' fees and costs, as permitted by law.

27.     The Plaintiff further reserves all rights to file a motion to lift or otherwise modify the automatic stay in the Bankruptcy Case, seeking the sequestration and garnishment of the proceeds of the other working-interest owners from sale of the hydrocarbons in connection with

---

[2] Inclusion of the Operator in this lawsuit shall be subject in all respects to the automatic stay associated with the Operator's Bankruptcy Case, and Plaintiff shall seek such relief as is required from the Bankruptcy Court prior to amending this Verified Complaint to include any request for relief with respect to the Operator or the Operator's property.

7

the Lease.

28.     Therefore, on the basis of the allegations above, verified by the Plaintiff's authorized representative, Ben Rose, and further supported by the Exhibits attached hereto, the Plaintiff respectfully prays for recognition and enforcement of its Lien and issuance of a writ of sequestration solely with respect to the Subject Interests, in substantially the same form as the Writ of Sequestration attached hereto.

**WHEREFORE**, the Plaintiff, Atlantic Maritime Services, LLC, respectfully prays that this Court:

(i)     Recognize the lien and privilege in favor of Atlantic Maritime Services, LLC in the amount of $7,111,706.55, together with interest, attorneys' fees, the costs of preparing and filing the Lien Affidavits, and all court costs, solely with respect to the interests of Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC (collectively, the "*Defendants*") in the specific property interests of the Defendants included within La. R.S. § 9:4683(A)(1-4) (the "*Subject Interests*");

(ii)    Issue a writ of sequestration, the requirement of security having been dispensed with by law, directing the United States Marshal to serve or cause to be served the Writ of Sequestration on the Defendants and to record or cause to be recorded the Writ of Sequestration in the records of the Clerks of Court for the Parishes of Plaquemines, Jefferson, Lafourche, and Terrebonne, and in the records of the United States of America, Bureau of Ocean and Energy Management; and

(iii)   Issue final judgment in favor of Atlantic Maritime Services, LLC and against the Subject Interests in the amount of $7,111,706.55, together with interest, attorneys' fees, the costs of preparing and filing the lien affidavits, and all court costs.

Respectfully submitted,

LUGENBUHL, WHEATON, PECK          */s/ Stewart F. Peck*
RANKIN & HUBBARD                  STEWART F. PECK (#10403)
                                 JAMES W. THURMAN (#38494)
                                 601 Poydras Street Suite 2775
                                 New Orleans, LA 70130
                                 Telephone: (504) 568-1990
                                 Facsimile: (504) 310-9195
                                 Email:speck@lawla.com;
                                 jthurman@lawla.com
                                 *Counsel for Atlantic Maritime Services, LLC*

**PLEASE ISSUE SUMMONSES:**

**Ridgewood Katmai, LLC**
Care of its Registered Agent,
Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

AND

**ILX Prospect Katmai, LLC**
Care of its Registered Agent,
Corporation Service Company
Corporation Trust Center 1209 Orange Street
Wilmington, Delaware 19801