IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC, et al.,** | § | |
| | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | |
| | § | **(Jointly Administered)** |

**ATLANTIC MARITIME SERVICES, LLC'S INITIAL OBJECTION TO
EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER
EXTENDING THE AUTOMATIC STAY TO CERTAIN OF
DEBTORS' CO-WORKING INTEREST OWNERS**
[Related to ECF No. 563]

Now, through undersigned counsel, comes Atlantic Maritime Services, LLC, ("***Atlantic***")

and files this Initial Objection to the Debtors' *Emergency Motion for Entry of an Order Extending*

*the Automatic Stay to Certain of Debtors' Co-Working Interest Owners* (the "***Emergency***

***Motion***"),  and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      The Emergency Motion is an attempt by the Debtors to bluff and bluster their way

into obtaining extraordinary relief to which they could never show they are entitled if Debtors were

required put forward evidence and fully brief the issues in a separate adversarial proceeding

brought on a non-emergency basis. In support of the Emergency Motion, Debtors levy a series of

very serious allegations while simultaneously signaling that they never intend to prove them at a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

hearing (let alone a trial). Debtors suggest Atlantic has violated the automatic stay (but do not seek remedy for a stay violation under 11 U.S.C. § 362),[2] claim Atlantic's conduct is sanctionable (but do not seek sanctions),[3] and allege that approximately $10 million of Atlantic's $12 million claim is subject to offset because Atlantic performed in an unsafe, imprudent or illegal manner (but do not attempt to explain how or when Atlantic did so, or why these claims by Debtors have not been waived as a matter of law and contract).[4]

2.      The Debtors' briefing raises the question—why would the Debtors merely *imply* a violation of Section 362 but seek relief under Section 105?  The answer is simple: Atlantic has not violated the stay. Indeed, throughout the Emergency Motion, Debtors imply misconduct on Atlantic's part, but hedge because Debtors know that they will not actually be able to  support their allegations with evidence or applicable law.

3.      Fortunately, safeguards in the Bankruptcy Local Rules and the Federal Rules of Bankruptcy Procedure foreclose the Debtors' strategy of obtaining equitable relief through such gamesmanship. First, Bankruptcy Local Rule 9013-1(i) requires a movant seeking relief on emergency basis to provide "a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency." Bankr. LR 9013-1(i). This is something Debtors have not done and cannot do because the proceedings Debtors seek to enjoin have been *explicitly* limited so as to not seek any relief against the Debtors or their estates. Indeed, the action

---

[2] Emergency Motion, at p. 3, § 1, ECF No. 563 ("Atlantic's actions are, at best, an attempt to circumvent the Debtor's Automatic Stay and, at worst, a violation of the Automatic Stay.").

[3] Emergency Motion, at p. 12 § 27, ECF No. 563 ("[T]he Court could sanction Atlantic for its actions. Debtors, however, do not seek that relief.").

[4] Emergency Motion, at p. 7 § 14, ECF No. 563 ("Atlantic's failure to adhere to these [contract] provisions caused at least six separate incidents from February to June of 2020, which cost the Debtors and the WIOs approximately ten million dollars in addition to clear and undisputed offsets which are not reflected in Atlantic's invoices."). As explained below, the drilling contract at issue contains substantial indemnity and limitation of liability provisions. For example, if any part of the $10 million in asserted damages constitutes consequential damages, these damages have been waived as a matter of contract and cannot provide a basis for offset.

that seemingly prompted the Emergency Motion was Atlantic's seeking *constructive* sequestration of non-Debtor assets. The Debtors will not be impacted by this relief and certainly the Debtors cannot show why this relief is such an imminent threat as to require hearing on an emergency basis. Debtors claim they are impacted now because they have a duty to indemnify the non-Debtor defendants in these proceedings from "payments that [the non-Debtors] make for costs, expenses, fees, and liabilities to which they may be subjected in the Lawsuits," but Debtors do not cite to any provision in any indemnity agreement which expressly obligates the Debtors to do this.[5] Instead, Debtors cite to a generic "hold harmless" clause that on its face appears to require Debtors to pay a resulting judgment against the non-Debtor defendants, at most.[6] Debtors have not explained why the clause requires them to do more than satisfying a rendered judgment against the non-Debtor defendants. Accordingly, the issues raised in the Emergency Motion should be resolved not on an emergency basis, but in a separate adversary proceeding, where the parties will have equal opportunity to review the indemnity agreements and brief the applicable law.

4.      Second, the Federal Rules of Bankruptcy Procedure do not allow Debtors to use a motion filed in the main bankruptcy case (brought on an emergency basis, no less) to obtain the injunctive relief they seek. Federal Rule of Bankruptcy Procedure 7001 provides that "a proceeding to obtain an injunction or other equitable relief, except when a . . . chapter 11 . . . plan provides for the relief," is an "adversary proceeding[]." Fed. R. Bankr. Proc. 7001(7). At the least, Rule 7001 makes the Emergency Motion an improper vehicle for Debtors obtaining the equitable relief they seek. At most, this Court lacks jurisdiction to grant the requested equitable and injunctive relief outside the confines of an adversary proceeding. *See In re Entz*, 44 B.R. 483, 485

---

[5] Emergency Motion, at p. 11, § 25, ECF No. 563.
[6] *See* Emergency Motion, at p. 10, § 24, ECF No. 563.

(Bankr. D. Ariz. 1984) (declining to grant equitable relief and observing that the court might lack jurisdiction to grant the relief in any case because the movant had not commenced an adversary proceeding in accordance with Rule 7001). This procedural defect is another reason the Emergency Motion should be summarily denied.

5.     In any case—although Atlantic objects that the hearing on the Emergency Motion is not the proper forum to decide the merits—the Debtors' request for extraordinary relief should be denied simply because the Debtors have failed to carry their burden.  A stay of actions against non-debtors is "an extraordinary remedy to be granted only when a significant and direct impact on the reorganization proceedings is threatened." *In re Tribeca Lofts LP*, No. 10-40799 (Bankr. S.D. Tex. Aug. 30, 2011) (Isgur, J.) (quotation omitted). And Debtors have failed to show that the proceedings the Debtors seek to enjoin threaten reorganization in any way.

6.     Nevertheless, Debtors ask the Court to extend the stay to non-Debtor defendants because the Debtors claim they share an "identity of interests" with these co-working interest holders or because Atlantic's proceedings threaten to inadvertently impact estate property. These arguments fail. First, as noted above, Debtors have not established that the simple "hold harmless" provision encompasses a duty to defend the non-Debtors or to advance defense costs on a rolling basis. And any payment obligations thereunder under the debtors' indemnity agreements with the non-Debtors would merely give rise to prepetition claims. The prospect that Atlantic's conduct could potentially generate additional pre-petition liability for the Debtors is not a legal basis for the extraordinary remedy the Debtors seek. Second, the remedies afforded under LOWLA are severable in nature. *See Bordelon Marine, L.L.C. v. Devon Energy Prod. Co., L.P.*, No. CIV.A. 14-1784, 2015 WL 1509493, at *3 (E.D. La. Apr. 1, 2015). Meaning a LOWLA lien and privilege may be asserted against a non-debtor mineral lessee notwithstanding the fact that the operator has

4

sought bankruptcy protection. *Id.* Accordingly, the proceedings which Debtors seek to enjoin do not threaten the Debtors or estate property, and they absolutely do not threaten the Debtors' entire reorganization. So, should the Court be willing to consider the merits, the Emergency Motion should still be denied.

7.      Additionally, Atlantic objects to the Debtors conveniently raising never-before heard complaints regarding Atlantic's performance as a basis for vitiating Atlantic's right to seek remedy from non-Debtors. The claims set forth as a basis for offset are an artifice to distract the Court from the significant and extraordinary relief the Debtors seek. Atlantic can prove they it is entitled to the full sum of its invoiced services and Atlantic will seek opportunity to so through discovery and a trial, if necessary.

8.      Based on all of the above, and as discussed more fully below, the Emergency Motion should be denied.

## **BACKGROUND**

### *i.      Atlantic Provides Services to Fieldwood and Fieldwood "Could Not be More Pleased"*

9.      Atlantic is in the business of providing drilling vessels, drilling equipment, and other related materials and labor in support of the development and operation of oil and gas wells. It is a wholly owned subsidiary of Valaris plc ("***Valaris***").

10.     On October 26, 2018, Atlantic entered into a *Master Domestic Offshore Daywork Drilling Contract* (the "***Atlantic Contract***") with Fieldwood Energy, LLC ("***Fieldwood***"), pursuant to which Atlantic agreed to deploy a "Drilling Unit" to drill offshore wells in connection with certain of Fieldwood's operating interests in the Gulf of Mexico.[7]

---

[7] Atlantic Contract, attached hereto as **Exhibit 1** and incorporated herein by reference.

11.     On August 19, 2020, Atlantic and Valaris, among other related entities, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"). Atlantic and Valaris' bankruptcy cases are jointly administered under Case No. 20-34114 before this Court.

12.     Between April 6, 2020 and July 4, 2020, pursuant to the Atlantic Contract, Atlantic provided a "Drilling Unit" and related goods, equipment, supplies, services, and other materials (the "***Services***") to Fieldwood in support of certain of Fieldwood's operating interests covering two offshore leases: Lease No. OCS-G-28030, Mississippi Canyon, Block 948 (the "***MC 948 Lease***") and Lease No. OCS-G-28030, Mississippi Canyon, Block 948 (the "***GC 40 Lease***," and together with the MC 948 Lease, the "***Subject Leases***"). Atlantic provided the *Rowan Resolute*[8] as the Drilling Unit for the work to be undertaken at the Subject Leases. Atlantic's Services in support of the MC 948 Lease are valued at $5,824,744.68 and in support of the GC 40 Lease, $7,111,706.55, for a total principal value of $12,936,451.23. To date, this amount is still due and owing from Fieldwood.

13.     Soon after Atlantic completed its work under the Atlantic Contract, Fieldwood expressed its satisfaction with Atlantic's work. In an email dated July 7, 2020 from Fieldwood's Senior Vice President of Operations, John Seeger, to Tom Burke, President and Chief Executive Officer of Atlantic's parent entity, Valaris, (the "***Seeger Email***"), Mr. Seeger wrote:

> [T]hank you for all the great work you and your team did with the DS16/Resolute in the +1 year we had it under contract. The Valaris team performed admirably and we could not have been more pleased. Certainly, I hope we can do further business in the near future. Both our team's [sic] worked through some tough challenges collaboratively and at the end of [the] day, everyone accomplished their mission.[9]

---

[8] The *Rowan Resolute*, which is also known as the *Valaris DS-16*, was a substitute for the *Rowan Reliance*, the Drilling Unit originally contemplated to be used in drilling operations. *See* Emergency Motion, p. 5, fn. 4.

[9] Seeger Email, attached hereto as **Exhibit 2** and incorporated by reference

Consistent with Fieldwood's opinion that Atlantic had "accomplished [its] mission" and that it "could not have been more pleased," Fieldwood **never** raised **any** material issue with Atlantic's performance under the Atlantic Contract—that is, until Atlantic dared to exercise its statutory rights against certain non-Debtor entities.

### ii.   Atlantic has Valid and Perfected Statutory Liens Securing its Services

14.   Pursuant to the Louisiana Oil Well Lien Act ("***LOWLA***"), La. R.S. § 9:4861, *et seq.*, Atlantic is granted a privilege and lien to secure payment owed for the Services Atlantic provided in support of the Subject Leases on behalf of Fieldwood.

15.   In July 2020, Atlantic timely[10] and properly[11] preserved, perfected, and maintained the perfection of its LOWLA privilege *vis-à-vis* third parties by filing and recording lien affidavits (collectively, the "***Atlantic Liens***")[12] in the appropriate parishes.

---

[10] In the Emergency Motion, the Debtors' seemingly suggest the Liens were filed prematurely because Atlantic "filed its liens weeks before payment was due." *See* Emergency Motion, p. 7, § 17, ECF No. 563.  However, this type of argument was explicitly rejected by the Sixth Circuit in *In re Century Offshore Management Corp.,* 83 F.3d 140, 144 (6th Cir. 1996). The *Century Offshore* court rejected the argument that a statutory privilege only comes into existence when amounts actually come due; instead, it held that (i) the privilege "secures the entire cost of labor or services, not just the unpaid amounts" and (ii) that the privilege is effective when "the claimant, who is a contractor, laborer, or employee *begins rendering services at the well site*." *In re Century Offshore Management Corp.,* 83 F.3d at 144 (emphasis added).

[11] The Debtors, in an attempt to avoid the inevitable application of LOWLA, state that "the Lawsuits may have been brought under inapplicable Louisiana statute, because the Bureau of Ocean Energy Management classifies certain of the blocks in question as "Alabama [Coastal Zone Management] Block," notwithstanding their proximity to Louisiana. Emergency Motion, p. 8, § 19, ECF No. 563. The Debtors are wrong. The Fifth Court has repeatedly made clear that insofar as causes of action or rights arise out of or in connection with oil and gas leases located on the outer continental shelf, the law of the adjacent state—here, Louisiana—applies. *See Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990) ("We find it beyond any doubt that OCLSA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary."); *see also Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) ("Congress declared that '[t]o the extent that they are applicable and not inconsistent with [federal law],' the laws of the adjacent states are 'the law[s] of the United States' on the OCS.") (citing 43 U.S.C. § 1333(a)(2)(A)); *Chevron U.S.A., Inc. v. Santa Fe Snyder Corp.*, 69 Fed. Appx. 658, 2003 WL 21355979 *2 (5th Cir. May 22, 2003) (unpublished) ("Because the agreement originates from a federal lease on the outer continental shelf-off the coast of Louisiana-the choice-of-law provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1333(a)(2)(A), 1349(b)(1), apply, so construction of the agreement is governed by Louisiana law to the extent such law is not inconsistent with federal law.") (citing *Union Texas Petroleum*, 895 F.2d at 1050).

[12] *See* Exhibits 1-4 to Ecopetrol Complaint; No. 20-3097 (E.D. La.), ECF No. 1, attached hereto as **Exhibit 9** and incorporated herein; *see also* Exhibits 1-8 to Ridgewood Complaint, No. 20-3099 (E.D. La.), ECF No. 1, attached hereto as **Exhibit 10** and incorporated herein.

### iii.  The Fieldwood Bankruptcy

16.    After Atlantic preserved and perfected the Atlantic Liens—and with sums still owing for the Services—on  August 3-4, 2020, Fieldwood and certain of its affiliates (collectively, the "**Debtors**") filed voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code, which cases are being jointly-administered under the above-entitled bankruptcy case (the "**Bankruptcy Case**").

17.    Among their initial pleadings, the Debtors filed an *Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Prepetition Interest Owner Obligations, Joint Interest Billings, and E&P Operating Expenses and (B) 503(b)(9) Claims, and (II) Granting Related Relief* (ECF No. 7) (the "**Vendor Motion**") seeking, *inter alia*:

> [E]ntry of interim and final orders (i) authorizing, but not directing, them to pay, in the ordinary course of business, their undisputed, liquidated amounts owing to (a) holders of royalty, working, and other interests, including Suspense Obligations (as defined below), as required by the Debtors' various leases and related agreements (each as defined below and, collectively, the "Interest Owner Payments"), (b) operators for unpaid joint interest billings and related obligations (the "Joint Interest Billings"), and (c) certain third parties for lease operating expenses, gathering, transportation, and processing expenses, capital expenditures, Supplemental Workforce Obligations (as defined below), and related costs (the "E&P Operating Expenses" and, collectively, with the Interest Owner Payments and Joint Interest Billings, the "Prepetition Obligations"), including to certain vendors, contractors, subcontractors, drillers, haulers, and suppliers of oil- and gas-related services, labor, supplies, and materials ("E&P Claimants"). . . .[13]

18.    In support of this request, the Debtors extolled the virtues and necessity for paying E&P Operating Expenses (like Fieldwood's debt for the Services):

> Payment of E&P Operating Expenses will...ensure that the Debtors maintain strong relationships with the E&P Claimants that will inure to the benefit of all parties in interest. The Debtors' ongoing operations depend, to a significant degree, on their relationships with the parties to which E&P Operating Expenses are owed. If these

---

[13] Vendor Motion at p. 3, § 5 ECF No. 7 (emphasis removed).

relationships are harmed, either through non-payment of E&P Operating Expenses as they become due or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors may encounter particularized controversies with each counterparty, unnecessary costs and distractions, and corresponding harm to their business with the possible loss of the Debtors' going-concern value.[14]

19.     The Debtors' statement regarding the critical importance of satisfying E&P Operating Expenses is unequivocal, and it is fully in line with the opinions of several parties-in-interest, including Atlantic. For example, the Official Committee of Unsecured Creditors (the "*UCC*") in its objection to the Vendor Motion opined on the severe consequences that could occur if the Debtors failed to satisfy E&P Operating Expenses.[15] The Court itself, partly in response to the UCC's comments, admonished the Debtors during the final hearing on the Vendor Motion that adverse consequences to the Debtors could result should the Debtors not satisfy the E&P Operating Expenses.[16] And consistent with payment of E&P Operating Expenses being a matter of vital importance, the Court granted to the Debtors broad authority pursuant to the Interim and Final Orders (collectively, the "*Vendor Order*") (ECF Nos. 62 and 342) to pay qualifying vendors.

20.     In spite of all this—the Debtors' own representations and the Court's explicit grant of authority—the Debtors have not paid any of the outstanding amounts due to Atlantic on account of the Services.

          *iv.*    *Atlantic Makes Demand on Certain Non-Debtor Working Interest Owners*

21.     In light of the Debtors' failure and refusal to satisfy the outstanding amounts due to Atlantic for its Services—despite ability and authority to pay—Atlantic has elected to exercise certain rights and remedies against non-Debtor property available to Atlantic under the LOWLA that are not precluded by the Bankruptcy Code.   These efforts include making demand upon, and

---

[14] Vendor Motion at p. 14, § 36, ECF No. 7.
[15] UCC's Objection, ECF No. 308.
[16] *See* Transcript of September 14, 2020 Hearing, attached hereto as **Exhibit 4**, p. 47-49.

filing suit against, certain non-operating, non-Debtor holders of working interests in the Subject Leases.

22.     Based upon the books and records of the Bureau of Ocean Energy Management (the "**BOEM**"), Ecopetrol America, LLC ("**Ecopetrol**") holds a 31.5% working interest in the MC 948 Lease, and Ridgewood Katmai, LLC ("**Ridgewood**") and ILX Prospect Katmai, LLC ("**Prospect**," and together with Ecopetrol and Ridgewood, the "**Working Interest Owners**") each hold a 25% working interest in the GC 40 Lease.

23.     Upon information and belief, the rights and obligations of parties holding ownership or operational interests in the MC 948 Lease, as well as certain other associated leases collectively referred to as the "Gunflint Prospect," are governed by that certain *Unit Operating Agreement – Gun Flint Prospect – Gunflint Unit – Offshore Louisiana*, by and between Fieldwood, Ecopetrol, and Talos Energy Offshore, dated January 1, 2013 (the "**Gunflint Operating Agreement**").[17]

24.     Upon further information and belief, the rights and obligations of parties holding ownership or operational interests in the GC 40 Lease, as well as certain other associated leases collectively referred to as the "Katmai Prospect," are governed by that certain *Unit Operating Agreement*, by and between Fieldwood, Ridgewood, and Prospect dated April 1, 2018 (the "**Katmai Operating Agreement**," and together with the Gunflint Operating Agreement, the "**Operating Agreements**").[18]

25.     On or about October 30, 2020, Atlantic delivered a written demand (the "**Ecopetrol Demand Letter**") to Ecopetrol for payment of $5,852,744.68, together with interest, costs and fees,

---

[17] Gunflint Operating Agreement, attached hereto as **Exhibit 5** and incorporated by reference.
[18] Katmai Operating Agreement,  attached hereto as **Exhibit 6** and incorporated herein by reference.

on account of the Services Atlantic provided in connection with the drilling and exploration of the

MC 948 Lease and the Gunflint Prospect.[19]

26.     Also on October 30, 2020, Atlantic delivered written demands to Ridgewood (the

"***Ridgewood Demand Letter*"**) and Prospect (the "***Prospect Demand Letter***," and collectively with

the Ecopetrol Demand Letter and Ridgewood Demand Letters, the "***WIO Demand Letters***") to

Ridgewood for payment of $6,973379.03, together with interest, costs and fees, on account of the

Services Atlantic provided in connection with the drilling and exploration of the GC 40 Lease and

the Katmai Prospect.[20]

27.     In each of the WIO Demand Letters, Atlantic made clear that it was not pursuing

any claims against or seeking any remedies from the Debtors, and that nothing in the WIO Demand

Letters "shall be construed as Atlantic taking any action whatsoever against the Operator,

Fieldwood Energy, LLC or any of its affiliates or any of their interests or rights they may have in

the above-described property as Atlantic is stayed from proceeding against same pursuant to 11

U.S.C. § 362."[21]

28.     The Working Interest Owners did not satisfy Atlantic's demands.

        *v.     Atlantic Files Suit against the Non-Debtor Working Interest Owners*

29.     On November 13, 2020, Atlantic filed two separate complaints against the Working

Interest Owners (collectively, the "***WIO Litigation***"), seeking recognition and enforcement of the

Atlantic Liens "solely with respect to the [Working Interest Owners'] interests in the specific

property interests of the non-debtor Defendants included within La. R.S. § 9:4863(A)(1-4)

---

[19] Ecopetrol Demand Letter, attached hereto as **Exhibit 7** and incorporated by reference.
[20] Ridgewood Demand Letter and Prospect Demand Letters, attached hereto as **Exhibit 8** and incorporated by reference.
[21] *See* Ecopetrol Demand Letter, Ex. 7, at p. 2, Ridgewood Demand Letter and Prospect Demand Letters, Ex. 8, at p. 2.

(collectively, the "***Subject Interests***"). . . ."[22]

30.     In its complaints commencing WIO Litigation (the "***WIO Complaints***"), as an item of relief, Atlantic requested the sequester of property belonging to the Working Interest Owners. However, Atlantic specifically pleaded its request for sequestration so as to exclude all interests in property held by Fieldwood that may be subject to the Atlantic Liens. Atlantic took exceptional care so that the WIO Complaints would not violate the automatic stay in the Bankruptcy Case.

31.     Furthermore and notwithstanding the protestations of the Debtors in the Emergency Motion and Ecopetrol in its *Statement in Support of the Debtors' Emergency Request to Extend the Automatic Stay*, ECF No. 572, Atlantic stated explicitly in each of the WIO Complaints and the associated Sequestration Motions (as defined below) that it was not seeking, at that time, to sequester any property of the Debtors or ***any*** hydrocarbons or proceeds thereof belonging to the Working Interest Owners without seeking relief from the automatic stay[23]:

> As reflected in the reservations of rights throughout this Verified Complaint, the Plaintiff does not seek recognition or enforcement of its Lien against the Operator or any of its property interests; however, the Plaintiff expressly reserve[s] the right, to the extent necessary, to seek relief from the automatic stay in the Bankruptcy Case to enforce its rights against the Defendants' interests in the hydrocarbons produced with respect to the Lease and the Subject Interests, as well as the proceeds of the sales of such hydrocarbons to third-party purchasers. The Plaintiff further reserves the right to seek any other relief from the Bankruptcy Court or otherwise with respect to the Operator or any other persons or properties accountable for the claims herein.[24]

32.     In each of the WIO Complaints, Atlantic acknowledged that "[i]nclusion of [Fieldwood] in this lawsuit shall be subject in all respects to the automatic stay associated with

---

[22] *See* Ecopetrol Complaint, No. 20-3097 (E.D. La.), ECF No. 1, attached hereto as **Exhibit 9** and incorporated herein; *see also* Ridgewood Complaint, No. 20-3099 (E.D. La.), ECF No. 1, attached hereto as **Exhibit 10** and incorporated herein.

[23] Atlantic forwent sequestration of the hydrocarbons or proceeds of the Working Interest Owners to avoid even an inadvertent impact on the Debtors because hydrocarbons and proceeds belonging to the Debtors might be commingled with hydrocarbons and proceedings belonging to the Working Interest Owners.

[24] Ecopetrol Complaint, Ex. 8 at p. 4, fn. 1, Ridgewood Complaint, Ex. 9 at p. 4, fn. 1.

[Fieldwood's] Bankruptcy Case, and [Atlantic] shall seek such relief as is required from the Court prior to amending this Verified Complaint to include any request for relief with respect to [Fieldwood] or [Fieldwood's] property."[25]

33.     Furthermore, Atlantic stated explicitly in each of the WIO Complaints that it did not "seek to seize any of the Subject Interests to the extent such Subject Interests are commingled with property of [Fieldwood] [such that] seizure thereof would potentially violate the automatic stay in [Fieldwood's] bankruptcy case.[26]

34.     On November 18, 2020, Atlantic filed Motions for Issuance of Writs of Sequestration, (the "*Sequestration Motions*") in the WIO Litigation.[27]  Once again, Atlantic painstakingly made clear that its request for relief was circumscribed so as to not violate the automatic stay in the Bankruptcy Case. Specifically, the Sequestration Motions do not seek to physically detain any of the Subject Interests—which were already limited to non-debtor property and only working interests of the Working Interest Owners. Rather, the Sequestration Motions sought *constructive* sequestration of certain Subject Interests through an order directing the United States Marshal "to serve or cause to be served the Writ of Sequestration on the Defendants and to record or cause to be recorded the Writ of Sequestration in the records."

35.     For the avoidance of doubt, Atlantic hereby notes that it intends in the near future to seek relief from this Bankruptcy Court from the automatic stay so as to permit the sequestration of any hydrocarbons and associated production proceeds attributable to the operating interests of the Working Interest Owners in the Subject Leases, as such property is depleting in nature and

---

[25] Ecopetrol Complaint, Ex. 8 at p. 7, fn. 2, Ridgewood Complaint, Ex. 9 at p. 7, fn. 2.
[26] Ecopetrol Complaint, Ex. 8 at p. 6-7, fn. 2, Ridgewood Complaint, Ex. 9 at p. 6-7.
[27] *See* Ecopetrol Sequestration Motion, No. 20-3097 (E.D. La.), ECF No. 3 and  Ridgewood Sequestration Motion, No. 20-3099 (E.D. La.), ECF No. 3, attached hereto and incorporated herein as **Exhibit 10** and **Exhibit 11**, respectively.

sequestration thereof is vitally necessary to preserve Atlantic's rights and remedies vis-à-vis the Working Interest Owners under LOWLA.

><br>
> ### vi.      *Debtors File the Emergency Motion Seeking to Preclude Atlantic from Exercising Its Statutory Rights against Non-Debtors' Property*

36.    On November 21, 2020, the Debtors filed the Emergency Motion, asking this Court to grant emergency relief immediately enjoining the WIO Litigation, despite the fact that the WIO Litigation in no way creates a risk that estate property will be diminished or encumbered in any fashion. To reiterate, the WIO Litigation seeks nothing more than constructive sequestration of the Subject Interests and expressly defers pursuit of any claims against the Debtors or estate property until at such point as this relief would be allowable because the automatic has been modified or lifted. The WIO explicitly does ***not***: (a) seek to sequester or seize any hydrocarbons or proceeds thereof attributable to the Subject Interests, (b) name or implicate Fieldwood or any other Debtor or any Debtor's property, or (c) otherwise require the participation of the Debtors in the WIO Litigation.

## LAW AND ARGUMENT

37.    The Emergency Motion should be denied. First, in light of the carefully-pleaded allegations and requests for relief in the WIO Litigation, there is no justification for the Court hearing the Debtors' Emergency Motion or granting extraordinary relief requested therein on an emergency basis. Second, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") require that, unless effected through the terms of a plan of reorganization, any request for extension of the section 362 stay to non-debtors may only be sought through an adversary proceeding, and the Debtors did not file an adversary proceeding here. Third, even if the Debtors had utilized the proper procedural vehicle under the Bankruptcy Rules for seeking the relief sought in the Emergency Motion (which they clearly did not), the Debtors' claim of "identity of interests" on

account of alleged indemnity obligations is illusory, and therefore, insufficient to overcome the strong presumption that the section 362 stay applies only to debtors. Fourth and finally, Debtors' claims to damages which allegedly partially offset Debtors' debt to Atlantic were made from whole cloth and in bad faith so as to minimize the significance of the relief the Debtors have requested.

### i.    There is no Emergency Requiring a Hearing on Two-Business Days' Notice on Such an Extraordinary Request for Relief

38.    As set forth hereinabove, as well as in the WIO Complaints and the Sequestration Motions, Atlantic has not, and is not, currently seeking to sequester or proceed against (i) any property of the Debtors' estates, or (ii) any hydrocarbons or proceeds thereof attributable to the Subject Interests of the Working Interest Owners.

39.    For the avoidance of doubt, and as has been made clear and consistent throughout the Demand Letters, the WIO Complaints, the Sequestration Motions, and this Objection, Atlantic will not seek to sequester any property of the Debtors or *any* hydrocarbons or proceeds thereof belonging to the Working Interest Owners without seeking relief from the automatic stay.

40.    Moreover, each of the WIO Complaints and the Sequestration Motion seek only to effectuate a "constructive seizure" of the Subject Interests so as to insure there is no possible interruption or disruption of operations at the Subject Leases.

41.    This Court's Local Rules require that, in connection with seeking emergency relief, a movant must provide "a ***detailed*** statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency." Bankr. LR 9013-1(i) (emphasis added). The Debtors have not (and cannot) articulate an adequate basis for granting such extraordinary relief as is requested in the Emergency Motion on an emergency basis under Local Rule 9013-1.

42.    Specifically, in light of the narrowly-tailored relief sought in the WIO Litigation and the complete lack of imminent risk to the Debtors or their properties, the Debtors' suggestion

that emergency relief is necessary to "avoid the Debtors having to expend unnecessary costs and expenses related to the [WIO Litigation], preserve the resources of the Debtors' estates, and maintain the viability of the Debtors' operation"[28] should be summarily rejected.

43.     To the contrary, there is no immediate (or any) threat to the Debtors or the Debtors' estates, and any request for the extension of the automatic stay to non-debtor property should only be considered within a context in which each of the impacted parties and this Court have sufficient time to fully consider the basis for, and gravity of, the requested relief.

ii.     *The Debtors' Requested Extension of the Automatic Stay to Non-Debtors (or Non-Debtor Property) Must be Sought in an Adversary Proceeding Pursuant to Bankruptcy Rule 7001.*

44.     The Debtors' request for relief not only violates the Local Rules by being brought on an emergency basis without justification, it is also procedurally infirm under the Bankruptcy Rules.

45.     Bankruptcy Rule 7001 sets forth a list of specific proceedings that must be commenced through an adversary proceeding.

46.     In light of the Debtors' request under 11 U.S.C. § 105 for an extension of the automatic stay to certain non-debtors—and, presumably, the non-debtors' property, given that Atlantic's claims in the WIO Litigation are *in* rem claims against the Working Interest Owners' property—the relief requested by the Debtors in the Emergency Motion is unequivocally intended to "obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief." Fed. R. Bankr. Proc. 7001(7).

47.     A request for injunctive relief pursuant to section 105 is also subject to the standards of Rule 65 of the Federal Rules of Civil Procedure, made applicable through Rule 7065 of the

---

[28] Emergency Motion, p. 14, § 31.

Bankruptcy Rules. Under Rule 65, a movant must show that "irreparable injury would result to the movant in its absence, that the threatened injury to the movant outweighs the harm that the injunction may cause to the nonmovant, that there is a likelihood of success on the merits, and that the public interest would not be adversely affected by the injunction." *Continental Air Lines, Inc.*, 61 B.R. 758, 782 (S.D. Tex. 1986).

48. Courts have consistently held that requests under section 105 for injunctive and equitable relief extending the automatic stay to non-debtors fall squarely within the ambit of Rule 7001(7), and therefore may only be brought through an adversary proceeding. *See, e.g.*, *State Bank of S. Utah v. Gledhill (In re Gledhill)*, 76 F.3d 1070, 1079 (10th Cir. 1996) ("Courts have uniformly held that a request to reimpose the automatic stay under [§] 105(a) constitutes 'a proceeding to obtain an injunction or other equitable relief' under [Bankruptcy] Rule 7001(7), which requires the filing of an adversary proceeding.") (citing cases); *Nasco P.R., Inc. v. Chemical Bank* (*In re Nasco P.R., Inc.*), 117 B.R. 35, 38 (Bankr. D.P.R. 1990) ("A party wishing to invoke the Court's injunctive power under [§] 105(a) must file an adversary proceeding . . . and must follow the traditional standards for the issuance of an injunction.").

49. The Debtors have violated Bankruptcy Rule 7001(7) by electing to forgo an adversary proceeding in favor of filing the Emergency Motion.

50. Therefore, as made clear by Bankruptcy Rule 7001(7), the Debtors' extraordinary request for use of 11 U.S.C. § 105 to extend the automatic stay to non-debtors and non-debtor property is one that should only be considered within a proceeding in which this Court is afforded an opportunity to fully-examine the relevant facts and law within the context of an adversary proceeding, and the Motion should be denied as a matter of law.

### iii. *The Debtors Have Not Demonstrated, and Cannot Demonstrate, an Identity of Interests between Fieldwood and the Working Interest Owners and Their*

### Property to Support an Extension of the Automatic Stay.

51.     The only grounds identified in the Emergency Motion to extend the automatic stay to the WIO Litigation is that the contractual indemnification between the Debtors and the Working Interests Owners is sufficient to create a complete identity between them such that the Debtors are the "real party defendant."

52.     This argument evidences a fundamental misunderstanding of LOWLA and overstates the significance of the indemnification obligations set forth in the Operating Agreements.

53.     The scope of a claimant's lien and privilege is set forth in La. R.S. § 9:4863. In *Bordelon Marine, L.L.C. v. Devon Energy Production Company, L.P.,* the district court specifically found that "[t]he privilege created by LOWLA attaches to all property listed in the statute, regardless of ownership, and requires no contractual relationship between the supplier of labor, service, or equipment and the owner of the lease or equipment." No. CIV.A. 14-1784, 2015 WL 1509493, at *3 (E.D. La. Apr. 1, 2015) (citing *Oil Well Supply Co. v. Indep. Oil Co.*, 219 La. 936  (1951)).

54.     The court in *Bordelon Marine* further recognized the separable nature of the rights under LOWLA when it found that, first, "under LOWLA a claimant may bring an enforcement action against one of several parties with interest in the subject property." *Id.* at *4 (citing *Guichard Drilling Co. Alpine Energy Servs., Inc.*, 94-1275 (La. 7/3/95); 657 So. 2d 1307, 1318). And second, recognized that "where the action is brought against a third party having no contractual duties owed to the complainant to recover amounts owed by the debtor, there is an independent basis for recovery against the third party and the automatic stay should not extend to that action." *Id.* at *5 (citing *In re Medina*, 413 B.R. 583, 594-95 (Bankr. W.D. Tex. 2009)), 11 U.S.C. § 362(a)(1).

55.     Notably, and similar to the actions of Atlantic in the instant scenario, the *Bordelon Marine* court went one step further in finding that a LOWLA lien and privilege may be asserted against a non-debtor lessee notwithstanding the filing of bankruptcy by the operator. *See Id.*

56.     Given the severable nature of the remedies afforded under LOWLA, as recognized by the court in the *Bordelon Marine* case, there is no reason here for the Court to extend the automatic stay to claims against non-Debtor Working Interests Owners that seek remedies against non-Debtor property merely because the Working Interest Owners may assert an unsecured, pre-petition indemnification claim against the Debtors that the Debtors may well already have the authority to pay under the Vendor Order.

57.     As this Court itself has noted, granting equitable relief in favor of non-debtors is "an extraordinary remedy to be granted only when a significant and direct impact on the reorganization proceedings is threatened." *In re Tribeca Lofts LP*, No. 10-40799 (Bankr. S.D. Tex. Aug. 30, 2011) (quoting *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.)*, 25 B.R. 1018 (D.N.M. 1982)).

58.     "It is a tenet of bankruptcy law that the automatic stay provisions of § 362 of the Bankruptcy Code apply only to debtors and do not prevent litigation from proceeding against non-debtors." *In re DESA Holdings Corp.*, 353 B.R. 419, 425 (Bankr. D. Del. 2006); *see also In re Uni-Marts, LLC*, 399 B.R. 400, 415 (Bankr. D. Del. 2009) ("In general, only the debtor is afforded the protections of the automatic stay under section 362; conversely, third-parties do not receive the protection of the automatic stay.").

59.     "[E]xtensions of the stay to protect non-debtor parties are the exception, not the rule, and are generally not favored." *In re FPSDA I, LLC*, No. 10-75439, 2012 WL 6681794, at *8 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012) (citations omitted); *Saxby's Coffee*

*Worldwide, LLC v. Larson* (*In re Saxby's Coffee Worldwide, LLC*), Adv. No. 09-0340, 2009 WL 4730238 at *5 (Bankr. E.D. Pa.) ("The issuance of an injunction that restrains creditors from enforcing their claims against nondebtors in non-bankruptcy fora is an exception to the general principle that to enjoy the benefits of bankruptcy a recipient needs to suffer the burdens."). Thus, the movant must show by 'clear and convincing evidence' that extension of the stay is warranted. *Id.*

60.     Courts in the Fifth Circuit do, however, recognize a limited exception to that rule under circumstances where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Reliant Energy Servs., Inc. v. Enron Can. Corp.*, 9 F.3d 816, 825 (5th Cir. 2003).

61.     The party seeking to extend the automatic stay beyond its recognized bounds "bear[s] the burden to show that 'unusual circumstances' exist warranting such an extension of the stay to a nondebtor." *Matter of  S.I. Acq., Inc.*, 817 F.2d 1142, n. 7 (5th Cir. 1987).

62.     Courts have recognized that a debtor's indemnity obligation to a non-debtor is insufficient by itself to justify extension of the 362 stay to the non-debtor. *See, e.g.*, *In re Uni-Marts, LLC*, 399 B.R. 400, 416-417 (Bankr. D. Del. 2009). Rather, the touchstone for extending the stay as to a particular action is whether "the action against the non-debtor is sufficiently likely to have a material effect upon reorganization efforts such that debtor protection requires an exception to the usual limited scope of the stay."  *In re Uni-Marts, LLC*, 399 B.R. at 416 (quotation omitted).

63.     Accordingly, and contrary to the implications throughout the Emergency Motion, requests to extend the stay in order to guard against indemnitor liability are not granted as a matter

of course. As an example, such a request has been rejected where insurance policies are available to shoulder the litigation burden. *See, e.g.*, *In re Uni-Marts, LLC*, 399 B.R. 400, 417 (D. Del. 2009) (rejecting request to extend section 362 stay to debtor's president after finding that debtor maintained D&O insurance policies, which, along with "the fact that any [indemnity] claim against the Debtor would be a prepetition claim" made it "difficult to see how the Debtor would sustain any loss, much less one that would materially impair its reorganization").[29]

64.     Throughout the Emergency Motion, the Debtors assert that the indemnity obligations under the Operating Agreements create an identity of interests between themselves and the Working Interest Owners such that any claim against the Working Interest Owners would effectively be claims against the Debtors. The Operating Agreements, however, cast the relationship between Fieldwood and the Working Interest Owners in a very different light, one which reveals no identity of interest between the parties.

65.     The indemnity obligations under the Gunflint Operating Agreement are as follows:

i.      an indemnification and defense obligation for claims made during the construction or operation of development facilities undertaken by a participating party at its sole risk and expense (Gunflint Operating Agreement, Art. 15.2, p. 82) (Emergency Motion, Ex. 1, p. 93);

ii.     indemnity for non-consent operations, for which participating parties "shall (insofar as it may be within their control) keep the [MC 948 Lease] free from all liens and encumbrances which might arise by reason of conducting [ ] Non-Consent Operation[s] and indemnify, defend and hold harmless the Non-Participating Parties from any such liens and encumbrances" (Gunflint Operating Agreement, Art. 16.1.1, p. 83);

iii.    "hold harmless" obligations between the parties to hold each other harmless from liens and encumbrances on the MC 948 Lease arising as a result of its acts or omissions (*Id.* at Art. 22.1, p. 101);

---

[29] The Emergency Motion is noticeably devoid of any reference to the $100 million debtor-in-possession loan obtained by the Debtors in large part to the pay the very sort of E&P Operating Expenses incurred by the Debtors for work performed by entities like Valaris, and it further fails to explain how utilizing these loan proceeds for their stated purpose would materially impair its reorganization.

iv.    indemnity from "any and all demands for payment asserted by the owners of the Overriding Royalty" against parties creating such interests (*Id.* at Art. 19.1, p. 98);

v.    obligation to indemnify, defend, and hold harmless from losses, damages, penalties, costs and legal fees actually incurred in connection with claims arising from the gross negligence or willful misconduct actually incurred by an indemnified party, (*Id.* at Art. 22.5, p. 102);

vi.    indemnity for non-consent operations, defined in the Gunflint Operating Agreement as exploratory operations for which one or more parties to the agreement elected not to participate (*Id.* at Art. 22.7, pp. 102-103);

vii.    indemnity arising from claims made in connection with operations undertaken prior to the effective date of the Gunflint Operating Agreement (*Id.* at Art. 22.8, p. 103); and

viii.    indemnity against claims arising from transportation of non-essential personnel to facilities utilized in connection with the MC 948 Lease; (*Id.*at Art. 22.10, p. 103).

66.    With the sole exception of Article 22.1, none of the triggering events is at issue in the WIO Litigation, and therefore, the Debtors cannot be called to indemnify the Working Interest Owners for Atlantic's claims other than under Article 22.1.

67.    As to the hold harmless obligation under Article 22.1, the Debtors have not explained how such obligation would cause the Debtors to suffer loss that would impair their reorganization.

68.    Fieldwood's responsibility to protect working interest owners from the assertion of lien interests is even more attenuated under the Katmai Operating Agreement, which simply requires Fieldwood to "endeavor to keep the Subject Leases, Production Systems, Facilities and other equipment" free from liens and encumbrances, and to take "reasonable efforts to remove the lien," should one be asserted.[30]

---

[30] Katmai Operating Agreement, Ex. 6, pp. 22-23, § 5.4.

69.     Therefore, by the express terms of the Katmai Operating Agreement, Fieldwood's responsibility in connection with the assertion of lien interests against the GC 40 Lease is aspirational, and therefore does not give rise to a binding indemnity obligation.

70.     Finally, Atlantic's pursuit of severable claims against the severable Subject Interests does not threaten the Debtors' reorganization because any indemnity claims the Working Interest Owners might assert against the Debtors would be limited to prepetition general unsecured claims. *See In re Chateaugay Corp.*, 102 B.R. 335, 352 (Bankr. S.D.N.Y. 1989) (holding that indemnity claims pursuant to agreement executed prepetition were "clearly prepetition claims" and that occurrence of triggering event postpetition did not confer post-petition status to those claims); *see also In re Mobley*, 377 B.R. 406, 408 (Bankr. M.D. Fla. 2007).

71.     A comparative analysis of the claims held by the suing party and the indemnitee against a debtor is also relevant in analyzing whether continued action would have an adverse effect on reorganization. For example, in *Chicago Title Ins. Co. v. Lerner*, 435 B.R 732 (S.D. Fla. 2010), the court found that a guarantor holding an absolute right of indemnity against the debtor "ha[d] not shown any adverse effect enforcement against defendants would have on the debtor or its bankruptcy proceeding. In fact, it appears that enforcing the guaranty would only replace one creditor with another, and there is no evidence that the substituted creditor would have a claim senior in priority to the replaced creditor." *Id.* at 736-37.

72.     Accordingly, to the extent that the Debtors are correct that the Working Interest Owners may assert a viable indemnity claim under the relevant Operating Agreements, such claims will simply be substituted for the current prepetition claim of Atlantic, who is already the holder of significant claims secured by a lien and privilege under LOWLA.

73.     Accordingly, it appears that whatever claims the Working Interest Owners have

pursuant to the Operating Agreements will be classified as unsecured prepetition claims to be treated accordingly under a plan of reorganization, and at worst any indemnity claim of the Working Interest Owners will simply be substituted for the current prepetition claim of Atlantic that is secured by a lien and privilege under LOWLA.

>    **iv.    Debtors' Claims to Offset are Artificial and were Manufactured for the Purposes of the Emergency Motion**

74.    As a red herring, Debtors casually and vaguely assert for the first time that Atlantic owes Debtors "approximately 10 million" for damages Atlantic allegedly caused Debtors while rendering the Services. Specifically, in claiming Fieldwood is entitled to what is effectively an 80% discount for the Services, Debtors reference standard provisions in the Atlantic Contract requiring that Atlantic provide trained personnel, provide blowout and well control equipment in working order, comply with laws and regulations, implement a safety program and generally act as a diligent drilling operator, and allege: "Atlantic[] fail[ed] to adhere to these provisions [which] caused at least six separate incidents from February to June of 2020."[31] Debtors then suggest these non-specified "incidents" afford Fieldwood a contractual right to perpetually withhold payment because Atlantic "bears financial responsibility for its failure to meet contractual obligations regarding workmanship, safety, and compliance with applicable governmental regulations and laws."[32]

75.    Although Debtors do not bother to provide even the faintest sketch as to **how** Atlantic injured the Debtors, the sheer size of Debtors' claim to offset—$10  million of a $12 million claim—suggests that Atlantic's performance fell woefully short of Debtors' expectations. Yet, until Atlantic sought relief from the Working Interest Owners, Fieldwood's expressed

---

[31] Emergency Motion at pp. 6-7, §§ 13-14, ECF No. 563.
[32] Emergency Motion at p. 7, § 15, ECF No. 563.

sentiments were directly to the contrary. Days after Atlantic had finished providing the Services, Mr. Seeger, Fieldwood's Senior Vice President of Operations, unequivocally stated that he and his team "could not have been more pleased" with the Services.[33] The Debtors' current portrayal of Atlantic's Services as being so deficient as to render them almost worthless are belied by Fieldwood's  own operation officer's stated desire that Atlantic and the Debtors "do further business in the near future." Presumably, if Atlantic had provided unsafe, legally non-compliant work, as it now suggests, Fieldwood's team would not be eager to work with Atlantic again.

76.     Fieldwood's tactical change in position regarding the adequacy of Atlantic's work only after Atlantic sought to exercise rights and remedies against the Working Interest Owners is frustrating for a number of reasons. First, Atlantic's ability to obtain work is dependent on Atlantic's reputation as a prudent and diligent drilling operator. Although Atlantic believes it will be able to prove it provided the Services in compliance with the law, safely, and in a workmanlike manner if it is given a full and fair opportunity to provide evidence and testimony regarding the sufficiency its Services and its entitlement to the amounts sought in the WIO Litigation, Debtors have carelessly asserted their unsubstantiated claims and now seek to preclude all relief to Atlantic on an emergency basis, without discovery or trial.

77.     Second, it bears mention again Atlantic has only sought relief against the non-Debtor  Working Interest Owner through the WIO Litigation because Debtors elected not to pay certain of their vendors, including Atlantic, under the Vendor Order. The WIO Litigation poses no threat to the Debtors or their estates. However, if the Debtors so desperately desire to stop Atlantic from exercising its rights against the non-Debtors, then rather than obtaining the extraordinary relief of extending the stay to non-Debtors, Debtors should simply satisfy its obligations to Atlantic

---

[33] Seeger Email, Ex. 2.

so that the Atlantic Liens are released as a matter of law, mooting the WIO Litigation.

78. Third, the opacity of the factual bases for Debtors' offset claim makes it impossible for Atlantic to effectively mount defenses which Atlantic possesses as a matter of law and contract. For example, the Atlantic Contract contains indemnity and limitation of liability provisions which likely preclude Debtors from offsetting the $10,000,000 in alleged damages. Specifically, section 912 of the Atlantic Contract waives all consequential damages:

> Notwithstanding any other provisions contained in this Article IX, Operator shall at all times BE RESPONSIBLE FOR AND HOLD HARMLESS AND INDEMNIFY Contractor from and against all special, indirect or consequential damages incurred by Operator, Operator's Affiliated Companies, Operator's Personnel, co-lessees, co-owners, partners and co-venturers resulting from or arising out of this Contract or any Drilling Order, including but not limited to loss of *profits, loss of product or production, the cost of or loss of use of property, equipment or services* (e.g., Operator's "spread" costs for the ongoing supply of helicopters, vessels and fuel incurred during delays or suspensions in operations), or *business interruptions*, REGARDLESS OF FAULT.[34]

79. To the extent Debtors did indeed suffer approximately $10 million (which Atlantic vehemently disputes) in damages, Debtors will need to prove these damages have not been waived pursuant to section 912, or another of the Atlantic Contract's broad indemnity and limitation of liability clauses.

80. Atlantic again submits the Court should deny the Emergency Motion because of its procedural infirmities alone. However, to the extent it becomes necessary, Atlantic will be able to prove the Debtors' claims to offset are meritless and Atlantic is entitled to the full invoiced sum for its Services.

## CONCLUSION

For the reasons set forth hereinabove, Atlantic respectfully requests that the Court deny the

---

[34] Atlantic Contract, Ex. 1 at p. 22, § 912 (emphasis added).

Debtors' Emergency Motion and any request to extend the automatic stay to non-Debtor working

interest owners, and grant such other relief the Court deems just and appropriate.

Respectfully submitted,

Houston, Texas
November 23, 2020

/s/ *Matthew D. Cavenaugh*
**JACKSON WALKER L.L.P**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve Graham (TX Bar No. 24085340)
Cameron A. Secord (TX Bar No. 24093659)

1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                 kpeguero@jw.com

                 ggraham@jw.com
                 csecord@jw,com

*Co-Counsel to Valaris plc and Atlantic Maritime
Services LLC*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)

Spencer A. Winters (*pro hac vice* pending)

300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           asathy@kirkland.com
                 rkwasteniet@kirkland.com
                 spencer.winters@kirkland.com

*Co-Counsel to Valaris plc and Atlantic Maritime
Services LLC*

-- and --

**LUGENBUHL, WHEATON, PECK, RANKIN
& HUBBARD**
Stewart F. Peck, *pro hac vice*
601 Poydras Street, Suite 2775
New Orleans, LA 70130
(504) 568-1990 – Telephone
(504) 310-9195 – Facsimile
Email: speck@lawla.com

*Counsel for Atlantic Maritime Services LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served a true and correct copy of the above and foregoing via Notice of Electronic Filing on this 23rd day of November 2020.

 _/s/ Matthew D. Cavenaugh_
Matthew D. Cavenaugh