## Exhibit 4

# Unit Operating Agreement
# Gunflint Prospect
# Gunflint Unit
# Offshore Louisiana

by and between

# FIELDWOOD ENERGY LLC
# ECOPETROL AMERICA LLC

# AND

# TALOS ENERGY OFFSHORE LLC

covering

# S/2N/2 & S/2 of OCS-G 28030, Mississippi Canyon Block 948
# S/2N/2 & S/2 of OCS-G 32363, Mississippi Canyon Block 949
# N/2 of OCS-G 24133, N/2 of Mississippi Canyon Block 992
# N/2 of OCS-G 24134, N/2 of Mississippi Canyon Block 993

# Gunflint Prospect

Gulf of Mexico

effective January 1, 2013

EXHIBIT 4

# TABLE OF CONTENTS

ARTICLE 1    CONTRACT APPLICATION ....................................................................... 1

ARTICLE 2    DEFINITIONS ........................................................................................... 1

ARTICLE 3    EXHIBITS ................................................................................................. 7

ARTICLE 4    SELECTION OF OPERATOR .................................................................. 8

ARTICLE 5    RIGHTS AND DUTIES OF OPERATOR ................................................ 11

ARTICLE 6    EXPENDITURES AND ANNUAL OPERATING PLAN ......................... 16

ARTICLE 7    CONFIDENTIALITY OF DATA ............................................................. 24

ARTICLE 8    VOTING, ELECTIONS & NOTICES ...................................................... 28

ARTICLE 9    GEOPHYSICAL OPERATIONS ............................................................. 33

ARTICLE 10   EXPLORATORY OPERATIONS ............................................................ 35

ARTICLE 11   APPRAISAL OPERATIONS ................................................................... 44

ARTICLE 12   PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION AFE ................... 54

ARTICLE 13   DEVELOPMENT OPERATIONS ............................................................ 68

ARTICLE 14   FACILITIES AND GATHERING SYSTEMS ......................................... 77

ARTICLE 15   DISPOSITION OF HYDROCARBON PRODUCTION ............................ 79

ARTICLE 16   NON-CONSENT OPERATIONS ............................................................ 81

ARTICLE 17   WITHDRAWAL FROM AGREEMENT ................................................. 93

ARTICLE 18   ABANDONMENT AND SALVAGE ....................................................... 95

ARTICLE 19   RENTALS, ROYALTIES AND MINIMUM ROYALTIES ...................... 96

ARTICLE 20   TAXES .................................................................................................... 98

ARTICLE 21   INSURANCE AND BONDS .................................................................... 99

ARTICLE 22   LIABILITY, CLAIMS, LAWSUITS AND ALTERNATE DISPUTE
             RESOLUTION ........................................................................................ 99

ARTICLE 23   CONTRIBUTIONS ................................................................................. 101

ARTICLE 24   AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFRENTIAL RIGHT
             TO PURCHASE ...................................................................................... 103

ARTICLE 25   FORCE MAJEURE .................................................................................. 107

ARTICLE 26   ADMINISTRATIVE PROVISIONS ....................................................... 108

**EXHIBIT 4**

EXHIBIT "A-1"    CONTRACT AREA

EXHIBIT "A-2"    WORKING INTERESTS OF THE PARTIES, OPERATOR AND REPRESENTATIVES

EXHIBIT "B"    OFFSHORE INSURANCE PROVISIONS

EXHIBIT "C"    ACCOUNTING PROCEDURE

EXHIBIT "D"    GAS BALANCING AGREEMENT ("AGREEMENT")

EXHIBIT "E"    CERTIFICATION OF NONSEGRATED FACILITIES

EXHIBIT "F"    NEWS RELEASE GUIDELINE

EXHIBIT "G"    PROJECT TEAM AND TECHNOLOGY SHARING

EXHIBIT "H"    DISPUTE RESOLUTION PROCEDURE

EXHIBIT "I"    MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

EXHIBIT "J"    SAFETY, HEATLTH AND ENVIRONMENT "SHE"

# JOINT OPERATING AGREEMENT
# OUTER CONTINENTAL SHELF - GULF OF MEXICO

**THIS AGREEMENT** is dated as of _____, 2019 but effective as of January 1. 2013 by and between **Fieldwood Energy LLC** ("Fieldwood" as successor in interest to Noble), **Ecopetrol America LLC** (formerly known as Ecopetrol America Inc. and hereafter "Ecopetrol") and **Talos Energy Offshore LLC** ("Talos"). The aforementioned parties are sometimes referred to herein individually as "Party" and collectively as the "Parties."

**WHEREAS**, the Parties are the owners of one or more OCS oil and gas Leases identified in Exhibit "A-1" *(Description of Leases) and* desire to jointly explore, develop and operate these Leases lying within the Contract Area for the production of Hydrocarbons.

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification, Amendment and Re-Designation of the Gunflint JOA as the Gunflint Voluntary Unit Operating Agreement, dated January 1, 2011, (the "Gunflint VUOA");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain MC 948 UOA, effective January 1, 2013, whereby the Parties agreed that the Gunflint VUOA shall serve as the Unit Operating Agreement for the Gunflint Unit, with necessary provisions to accommodate the MC 948 UOA;

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification and First Amendment of the MC 948 Unit Operating Agreement, effective January 1, 2013 (the "First Amendment");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Second Amendment to the MC 948 Unit Operating Agreement, effective May 23, 2013 (the "Second Amendment");

**WHEREAS**, the Parties and/or their predecessor(s) in interest entered into that certain Ratification and Third Amendment to the MC 948 Unit Operating Agreement, effective November 30, 2018 (the "Third Amendment", and together with the First Amendment and the Second Amendment, the "Amendments");

**WHEREAS**, Fieldwood was awarded a lease on Mississippi Canyon Block 905, OCS-G 36405 and subsequently assigned 19.12740% record title interest to Samson Offshore Mapleleaf, LLC and 31.5% record title interest to Ecopetrol effective November 1, 2018;

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement effective December 1, 2018, Samson Offshore Mapleleaf, LLC assigned 9.5637% to Fieldwood and 9.5637% to

1

EXHIBIT 4

Talos of its undivided 19.1274% interest in the MC 948 UOA, Gunflint VUOA, and the leases covered by both of said agreements;

**WHEREAS**, by letter dated January 14, 2019 Samson Offshore Mapleleaf, LLC, Fieldwood and Ecopetrol relinquished Mississippi Canyon Block 904, OCS-G 33182;

**WHEREAS**, Samson Offshore Mapleleaf, LLC (i) no longer holds an interest in the leases (inclusive of the MC 948 Unit leases) and (ii) is no longer a party to either the MC 948 UOA or the Gunflint VUOA;

**WHEREAS**, Talos now holds an interest in the leases (inclusive of the MC 948 Unit leases) and desires to ratify, confirm and adopt the MC 948 UOA and the Gunflint VUOA, and to be bound by and comply with all of the terms and conditions thereof;

**WHEREAS**, Fieldwood, Ecopetrol and Talos were awarded a lease on Mississippi Canyon Block 904, OCS-G 36566 effective July 1, 2019;

**WHEREAS**,

(a) Fieldwood and Ecopetrol desire to accept Talos's ratification, confirmation and adoption of the MC 948 UOA and Gunflint VUOA; and

(b) Fieldwood, Ecopetrol and Talos desire to amend the MC 948 UOA and Gunflint VUOA to include Talos as a party thereto and to reflect current ownership of the leases;

**WHEREAS**, the Parties desire to amend and restate the MC 948 UOA in its entirety, together with all Amendments; and

**WHEREAS**, the Parties desire to amend the Gunflint VUOA to include Mississippi Canyon Block 904 OCS-G 36566 and Mississippi Canyon Block 905, OCS-G 36405, and to acknowledge that the restated MC 948 UOA is a separate but identical agreement to the Gunflint VUOA, inclusive of all exhibits and Amendments thereto, with the lone exception of the contract areas described on Exhibit A-1 attached to each such agreement, which are different. This shall apply from this point forward unless otherwise specifically agreed to by the Parties hereto.

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to jointly explore, develop and operate the Contract Area according to the following provisions:

2

EXHIBIT 4

# ARTICLE 1
# CONTRACT APPLICATION

1.1     <u>Application in General</u>:  This Agreement applies to the joint exploration, development and operation of the Contract Area for the production of Hydrocarbons therefrom and the transportation of same by pipeline(s) or otherwise from the Contract Area.

1.2     <u>Application to Contract Area</u>:  This Agreement shall apply to the Contract Area as defined in Article 2 below. Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all joint property and all Hydrocarbons produced from the Contract Area shall be owned jointly by the Parties according to their respective Working Interests in the Contract Area.

# ARTICLE 2
# DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto), the initially capitalized terms listed below shall have the following meanings:

2.1     <u>Additional Testing, Coring or Logging</u>:  shall mean any testing (excluding production testing), coring or logging which is in addition to that approved by virtue of any previously approved AFE.

2.2     <u>Affiliate</u>:  shall mean any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party to this Agreement. The term "Affiliate" of a Party includes any parent corporation, partnership or other entity that directly or indirectly owns or controls greater than fifty percent (50%) of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any other corporation, partnership or other entity in which the parent corporation directly or indirectly owns or controls greater than fifty percent (50%) of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party to this Agreement directly or indirectly owns or controls greater than fifty percent (50%) of the outstanding stock of the corporation having the right to vote for directors of the corporation (or greater than fifty percent (50%) of the interests in the partnership or other entity).

- The stock (or interests in a partnership or other entity) owned or controlled by a Party shall include all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party to this Agreement.

3

EXHIBIT 4

2.3  <u>Agreement</u>:  shall mean this Joint Operating Agreement, together with its attached Exhibits.

2.4  <u>Annual Operating Plan</u>:  shall mean the operational plan and estimate of Costs for joint operations in the next ensuing calendar year as described in Article 6.7 *(Annual Operating* Plan).

2.5  <u>Appraisal Operations</u>:  shall mean all operations conducted within the Contract Area subsequent to Exploratory operations and proposed pursuant to Article 11 *(Appraisal Operations)*. The terms Appraisal Operations and Appraisal Well are interchangeable throughout this Agreement.

2.6  <u>Appraisal Well</u>:  shall mean any well proposed and drilled as an Appraisal Operation.

2.7  <u>Authorization for Expenditure (AFE)</u>:  shall mean any written proposal made by a Party for the purpose of describing an operation being proposed and estimating the costs to be incurred.  The AFE, when executed by a Party, evidences that Party's Election to participate in the proposed operation and grants the Operator the authority to commit or expend funds, pursuant to this Agreement, for the account of the Participating Parties. Any AFE which proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which Parties are permitted separate Elections under the terms of this Agreement.

2.8  <u>Confidential Data</u>: shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area. The term shall also include (but may not be limited to):

- certain commercial, contractual or financial information;

- analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

- both originals and copies of geological and geophysical data, and well logs; and,

- all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement.

The provisions of this Agreement with respect to Confidential Data shall not be applicable to "Confidential Work Product" as that term is defined in Exhibit *"G' (Project Team and Technology Sharing)*.

2.9  <u>Contract Area</u>:  shall mean the OCS Lease(s) described on Exhibit "A-1" limited to the areas and depths described on Exhibit "A-1".

4

EXHIBIT 4

2.10   Cost(s):  shall mean the monetary amount of all expenses incurred by the Operator and the Participating Parties for (or on account of) any and all operations conducted pursuant to this Agreement.

2.11   Deepen or Deepening:  shall mean any operation to drill an existing well (including sidetracking a well) deeper than the stratigraphic equivalent of the deepest formation previously encountered in such well.

2.12   Deeper Drilling:  shall mean the drilling of a well below the deepest Producible Reservoir penetrated by a Producible Well within the Contract Area.

2.13   Development Operations:  shall mean all operations within the Contract Area other than an Exploratory Operation or an Appraisal Operation.

2.14   Development Phase:  shall mean Development Operations associated with the design, fabrication or acquisition, and installation of a Production System serving the Contract Area.

2.15   Development Plan:  shall mean the plan for installing a Production System and developing and producing Hydrocarbons from the Contract Area as described in Article 12 *(Project Team, Development Plan and Fabrication AFE).* The Development Plan (as defined herein) is not the Development Plan as required by the BOEM under 30 CFR 550.201(a)(2) nor under the DOCD required under 30 CFR 550.201(a)(3).

2.16   Development Well:  shall mean any well proposed within the Contract Area subsequent to the approval of a Development Plan for such Contract Area.

2.17   Disproportionate Spending Settlement:  shall mean the settlement of all or a portion of the percentage recoupment by a Non-Participating Party paying a disproportionate amount of Costs in the next ensuing operation in which the Non-Participating Party makes an Election to participate.

2.18   Election:  shall mean a decision by a Party to either participate or to become a Non-Participating Party in a proposed operation (including the AFE associated with the operation). An Election to participate is evidenced by a Party's execution of the AFE. An Election not to participate (become a Non-Participating Party) is evidenced either by a Party's written response against a proposal or such Party's failure to timely execute the AFE within the applicable time limit specified in this Agreement or both.

2.19   Exploratory Operations:  shall mean any operation conducted on the Contract Area pursuant to Article 10 *(Exploratory Operations)*.

2.20   Exploratory Well:  shall mean any well proposed and drilled as an Exploratory Operation.

EXHIBIT 4

2.21   <u>Fabrication AFE</u>:  shall mean the individual AFEs collectively submitted pursuant to an approved Development Plan for the construction, fabrication or acquisition, and installation of a Production System.

2.22   <u>Facilities</u>:   shall mean all production equipment beyond the wellhead connections (excluding Production Systems and Subsea Production Systems, but including injection and disposal wells) installed on or outside the Contract Area to handle or service Hydrocarbon production from the Contract Area. Facilities also include (but are not limited to) the flowlines and gathering lines that transport the Hydrocarbons from the wellhead but exclude pipelines used to transport Hydrocarbons to shore except to the extent the pipeline is required by the Development Plan to transport hydrocarbons from the Contract Area to the pipeline interconnect selected in the Development Plan.

2.23   <u>Final Design AFEs</u>:  shall mean the individual AFEs, collectively submitted pursuant to an approved Development Plan pursuant to Article 12.5 *(Content of the Development Plan)*.

2.24   <u>Force Majeure</u>:  shall have the meaning ascribed in Article 25.1 *(Force Majeure)*.

2.25   <u>General Matters</u>:  shall mean any matter decided by a vote of the Parties in accordance with Article 8.2 *(Voting Procedures on General Matters and Elections)*.  A proposal as a General Matter may or may not include an AFE; depending on the type of proposal. If the nature of the proposal requires that an AFE be submitted with the proposal, an affirmative vote for such proposal shall be evidenced by a Party's execution of the AFE for the proposal.

2.26   <u>Geophysical Operations</u>:  shall mean geophysical surveys proposed pursuant to Article 9 *(Geophysical Operations)*.

2.27   <u>Hydrocarbons</u>:  shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

2.28   <u>Joint Account</u>:  shall mean the account maintained by the Operator' showing the charges paid and credits received by each of the Parties in the conduct of the operations hereunder as provided in this Agreement.

2.29   <u>Lease(s)</u>:  shall mean each of the OCS federal oil and gas Leases (or portion thereof) identified on Exhibit "A-1" attached hereto.

2.30   <u>Non-Consent Operations</u>:  shall mean Exploratory Operations, Appraisal Operations or Development Operations for which one or more Parties, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation; and where the Participating Parties proceed to conduct the operation at their sole Cost and risk pursuant to provisions of Article 16 *(Non-Consent Operations)*.

**EXHIBIT 4**

2.31   <u>Non-Operating Party</u>:  shall mean any Party to this Agreement other than the Operator (or a substitute Operator).

2.32   <u>Non-Participating Party</u>:   shall mean any Party to this Agreement who, having the contractual right to do so, makes or is deemed to have made, an Election not to participate in the proposed operation and who is subject to the provisions of Article 16 *(Non-Consent Operations)*.

2.33   <u>Non-Participating Party's Share</u>:  shall mean the share of Working Interest and Costs that a Non-Participating Party would have assumed if all Parties had made an Election to participate in the proposed operation.

2.34   <u>Objective Depth</u>:  shall mean, for any well, the shallower of the total footage to be drilled (as measured in true vertical depth) or the penetration by the drill bit sufficient to test the stratigraphic equivalent base of the deepest target formation or interval. Said depth, formation or interval (together with a bottomhole location) shall be set forth in the proposed Well Plan and AFE.

2.35   <u>Operator</u>:  shall mean the Party identified in Article 4.1 *(Designation of the Operator)* designated to conduct all operations pursuant to the terms of this Agreement. The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)* or Article 4.5 *(Selection of Successor Operator)*.

2.36   <u>Participating Interest</u>:  shall mean a Participating Party's percentage of participation in the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement; that is, the proportion that the Party's Working Interest bears to the total Working Interest of all the Participating Parties or such different Cost sharing basis that has been agreed upon by the Participating Parties in such operation.

2.37   <u>Participating Party</u>:  shall mean a Party who makes an Election to participate in sharing the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement. If the Parties have agreed upon a different Cost sharing arrangement, those Parties shall be considered Participating Parties for all purposes of this Agreement.

2.38   <u>Producible Reservoir</u>:  shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and which is separated from and not in oil or gas communication with any other accumulation.

2.39   <u>Producible Well</u>:  shall mean a well producing hydrocarbons or, if not producing, a well that shall meet, according to either the BOEM or the Participating Parties by unanimous agreement, the "well producibility criteria" set forth in Title 30 CFR 550.116 or any succeeding order issued by an appropriate governmental authority.

EXHIBIT 4

2.40 <u>Production System</u>:  shall mean an offshore structure (whether fixed, compliant, subsea or floating), and all associated components thereof including the associated Facilities, flowlines, gathering lines, subsea tiebacks to another production system and risers which are used for the production of Hydrocarbons from the Contract Area. This term shall also include the following defined terms:

**Subsea Production System:** shall mean an offshore subsea structure (i.e., where multiple wells or a single well could be utilized) or template and the components thereof (including flowlines and control systems) which are attached to the seafloor for use in obtaining Hydrocarbon production from a well not drilled from a Production System and routed to the Production System;

**Initial Production System:** shall mean the Production System for the Contract Area included in the first approved Development Plan;

**Subsequent Production System:** shall mean any new or expanded Production System proposed after the installation of the Initial Production System for the Contract Area.

2.41 <u>Project Team ("PT")</u>:  shall mean the group of employees, contract employees and/or consultants of the Participating Parties assigned to assist the Operator with preparing a Development Plan for the Contract Area, and for the planning, design, engineering, fabrication, transportation, installation and operation of a Production System for the Contract Area as further provided for in Exhibit *"G" (Project Team and Technology Sharing Provisions)*.  The PT shall be formed pursuant to Article 12 *(Project Team, Development Plan and Fabrication AFE)*.

2.42 <u>Sidetrack or Sidetracking</u>:  shall mean any operation to directionally control and/or intentionally deviate a well so as to change the bottomhole location to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth, excluding intentional deviation done to straighten the hole, drill around junk or to overcome other mechanical difficulties.

2.43 <u>Subsequent Exploratory Operation</u>:  shall mean any operations conducted subsequent to an Exploratory Well reaching its Objective Depth but prior to the plugging and abandonment of such Exploratory Well.

2.44 <u>Well Plan</u>:  shall mean a plan for any proposed Exploratory, Appraisal or Development Well which contains at least the information defined in Article 10.2.1 *(Well Plan's Minimum Specifics)*.

2.45 <u>Withdrawing Party</u>:  shall mean a Party that withdraws from this Agreement under the conditions defined in Article 17.1 *(Right of Withdrawal)* or is deemed to have withdrawn under Article 16.2 *(Acreage Forfeiture Provisions)*.

8

EXHIBIT 4

2.46   <u>Working Interest</u>:        shall mean the percentage interest of each Party in and to the Unit Area (expressed as the percentage described in Article II. of Exhibit "A-2" [*Prospect Area(s), Working Interest of the Parties, Operator and Representatives]* attached hereto)."

**ARTICLE 3**
**EXHIBITS**

3.1   <u>Exhibits</u>:  All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.  If the provisions of any of the Exhibits conflict with any provisions of this Agreement, the provisions of this Agreement shall prevail with exception of Exhibits "C," "D," and "G", each provision of which shall prevail over any provision of the body of this Agreement.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "G", the provision of Exhibit "G" shall prevail.  If any provision of Exhibit "C" conflicts with any provision of Exhibit "D", the provision of Exhibit "C" shall prevail.

| | |
|---|---|
| **Exhibit "A-1"** | Contract Area |
| **Exhibit "A-2"** | Working Interests of the Parties, Operator and Representatives |
| **Exhibit "B"** | Offshore Insurance Provisions |
| **Exhibit "C"** | Accounting Procedure |
| **Exhibit "D"** | Gas Balancing Agreement |
| **Exhibit "E"** | Certification of Nonsegregated Facilities |
| **Exhibit "F"** | News Release Guidelines |
| **Exhibit "G"** | Project Team and Technology Sharing |
| **Exhibit "H"** | Dispute Resolution Procedure |
| **Exhibit "I"** | Memorandum of Operating Agreement and Financing Statement |
| **Exhibit "J"** | Safety, Health and Environment "SHE" |

**ARTICLE 4 SELECTION OF OPERATOR**

4.1   <u>Designation of the Operator</u>:  Fieldwood Energy LLC is designated as the Operator for the Contract Area and shall conduct all operations within such Contract Area required or permitted by this Agreement except as noted below in Article 4.2 (*Substitute Operator*).  This designation of operatorship is subject to approval by the Bureau of Ocean Energy Management ("BOEM"), and the Parties agree to promptly execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2   <u>Substitute Operator</u>:  If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be selected by the Participating Parties as a

9

EXHIBIT 4

General Matter and designated as the substitute Operator, with the same authority, rights, obligations and duties as the Operator, except when:

(a) the drilling and other contracts for equipment and Facilities to be utilized on the Non-Consent Operation are not assignable; or

(b) the operation is conducted from a Production System being operated by the Operator.

If no substitute Operator is designated by the Participating Parties, then the Operator, at its option, shall conduct such Non-Consent Operations at the sole risk, Costs and expense of the Participating Parties and subject to their control, supervision and direction.   If the Operator conducts Non-Consent Operations on behalf of the Participating Parties (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Parties an estimate of the Costs of the Non-Consent Operation. The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs thereof have been advanced to it by the Participating Parties, to the end that the Operator need not expend any of its own funds for such Non-Consent Operation.  If a Non-Consent Operation conducted by a substitute Operator is completed or results in a producing well, said well shall be turned over to the Operator for future operations within thirty (30) days of completion of such operations.

In the event that the Operator becomes a Non-Participating Party in a Non-Consent Operation but is selected by the Participating Parties to perform the Non-Consent Operation on behalf of the Participating Parties, the Participating Parties indemnity to a Non-Participating Party as set forth in Section 22.6 shall be applicable and extend to Operator while acting on behalf on behalf of the Participating Parties except to the extent any loss or cost is caused by the gross negligence or willful misconduct of the Operator while performing the Non-Consent Operation on behalf of the Participating Parties.

4.2.1   <u>Substitute Operator if Operator Fails to Commence Operations</u>:   If the Operator (or substitute Operator)  fails to timely commence an Exploratory Operation in accordance with Article 10.2.4 *(Timely Operations)*, an Appraisal Operation in accordance with Article 11.1.4 *(Timely Operations)* or a Development Operation in accordance with Article 13.1.2 *(Timely Operations)*, the non-operating Participating Parties may select a substitute Operator in the same manner as provided above and the substitute Operator shall serve as the Operator only:

(a)   for such operations through the release of the rig for the operations,

(b)   of the Lease on which the operations are conducted, and

(c)   with the same authority, rights, obligations, and duties as the Operator, subject to the limitations in (a) and (b).

EXHIBIT 4

4.3    <u>Resignation of Operator</u>:  The Operator may resign at any time by giving written notice to the Parties; provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Majeure)*. If the Operator no longer owns an interest in the Contract Area, except as hereinafter provided the Operator shall be deemed to have resigned without any action by the Non-Operating Parties other than the selection of a successor Operator, unless the Operator is transferring its Working Interest to an Affiliate.

4.4    <u>Removal of Operator</u>:  The Operator may be removed either as a result of an assignment of all or a portion of the Operator's Working Interest in the Contract Area or for good cause under the following circumstances.

    4.4.1    <u>Removal Upon Assignment</u>:  If the Operator assigns all or a portion of its Working Interest in the Contract Area (excluding any interest assigned to an Affiliate) which reduces the Operator's Working Interest in a Contract Area to less than the Working Interest of the Participating Party owning the next largest Working Interest owned on the effective date of the Operator's assignment, whether accomplished by single or multiple assignments, then the Operator may be removed by vote of the Parties as a General Matter.

    4.4.2    <u>Removal for Cause by Vote</u>:  The Operator may be removed for cause by vote of the Parties as a General Matter if the Operator commits any of the following acts:

        (a)    allowing one (1) or more materialmens, mechanics or similar liens to be placed on and to remain on the Contract Area for more than ninety (90) days without either posting a bond or initialing other legal action to clear the liens, or becoming insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of bankruptcy or seeks relief under laws providing for the relief of debtors; or,

        (b)    a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

        (c)    the Operator commits an act of gross negligence or willful misconduct; or,

        (d)    the Operator fails or is unable to meet the standards of operation contained in Articles *5.2 (Workmanlike Conduct), 5.3 (Drilling), 5.4 (Liens and Encumbrances)* and *5.6 (Reports to Government Agencies);* or,

        (e)    the Operator commits a substantial breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach.  However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or

EXHIBIT 4

steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed; or

(f)    the Operator fails to timely commence operations for the production System in accordance with Article 12.14 (*Timely Operations for Production Systems*).

4.5    <u>Selection of Successor Operator</u>:  Upon resignation or removal of the Operator; a successor Operator shall be selected by the Parties as a General Matter.  If the resigned or removed Operator fails to vote or votes only to succeed itself, then the successor Operator shall be selected as a General Matter after excluding the vote of the resigned or removed Operator.  In the event there are only two Parties to this Agreement, the Non-Operating Party shall become the Operator.  If no Party is willing to become Operator, this Agreement shall terminate in accordance with Article 26.1 (*Term of Agreement*).

4.6    <u>Effective Date of Resignation or Removal</u>:  The resignation or removal of the Operator shall become effective at 7:00 a.m. on the first day of the month following a period of sixty (60) days after said notice or vote to remove, unless a longer period of time is required to obtain approval by the BOEM.  Prior to the successor Operator's assumption of the Operator's duties, the previous Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator.  Upon selection of a successor Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities which accrued during the period when the outgoing Operator acted as the Operator.  If the outgoing Operator resigns or is removed, it shall be entitled to charge the Joint Account for the reasonable Costs incurred in connection with the change of operatorship.

4.7    <u>Delivery of Property</u>:  On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator possession of everything jointly owned by the Parties, including all funds relating to the Joint Account, all joint Hydrocarbons, all joint equipment, materials and appurtenances used in conducting operations and all books, records and inventories relating to joint operations (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest).  Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator.  The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to joint operations and the successor Operator shall assume all obligations of the Operator thereunder.  As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the Joint Account and conduct an inventory of all joint property and all joint Hydrocarbons, and such inventory shall be used in the return of and the accounting for the joint property and the joint Hydrocarbons by the outgoing Operator.  All Costs incurred in connection with such audit and inventory shall be charged to the Joint Account.

EXHIBIT 4

## ARTICLE 5
## RIGHTS AND DUTIES OF OPERATOR

5.1    Exclusive Right to Operate:  Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement.  The Operator shall be and is an independent contractor in the performance of the work hereunder, not subject to the general direction and control of the other Parties, except as specifically described in this Agreement.  With the exception of any team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or contractors shall be the employees or contractors, respectively, of the Operator.  The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement; however, if a substitute Operator is designated to conduct an operation, the substitute Operator may, subject to Article 5.3 (*Drilling and Well Operations*), contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the substitute Operator to conduct such operation.

5.2    Workmanlike Conduct:  The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice as would a reasonable and prudent operator under the same or similar circumstances.  The Operator shall not be liable to the Parties for losses sustained or liabilities incurred in the physical operation of the Contract Area, except such as may result from its gross negligence or willful misconduct.  Unless otherwise provided, Operator shall consult with the Parties and keep them all informed of all important matters.

5.3    Drilling and Well Operations:  The Operator may have all drilling and well operations conducted by qualified and responsible independent contractors who are not affiliated with the Operator and are employed under competitive contracts.  A competitive contract is a contract containing current terms, rates and provisions that do not exceed those generally prevailing on the OCS in the Gulf of Mexico for operations involving drilling rigs not over-qualified for the proposed operation in similar environments, and equipped to the Operator's standard conditions which are capable of drilling the proposed well(s) within the time schedule for the operations to be.  The Operator may, however, employ its or an Affiliate's equipment and personnel in the conduct of such operations pursuant to a written agreement among the Participating Parties.

5.4    Liens and Encumbrances:  The Operator shall use reasonable efforts to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons

13

EXHIBIT 4

free from all liens and encumbrances, except those provided for in Article 6.3 (Security Rights), which might arise by reason of the operations conducted under this Agreement.

5.5     Records:  The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with the Accounting Procedure in Exhibit "C" *(Accounting Procedure)*.  Unless otherwise provided for in this Agreement, all records of the Joint Account shall be available to a Non-Operating Party at all reasonable times during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C" (*Accounting Procedure*).  The Operator shall use good-faith efforts to ensure the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.  The Operator shall notify the other Parties promptly upon the discovery of any error or omission pertaining to the settlements, billings, and reports rendered to each Party.  This provision does not affect a Party's audit rights under this Agreement.  This provision shall also apply to each Non-Operating Party's books, accounts, and records kept to support its charges to a Project Team.

5.6     Reports to Government Agencies:   The Operator shall make timely reports to all governmental authorities that it has a duty to make as Operator and shall furnish copies of such reports to the Participating Parties.  The Operator shall give timely written notice to the Parties of litigation and/or administrative proceedings of which it has notice affecting the Contract Area or operations hereunder.

5.7     Information to Participating Parties:  The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to each well being drilled (provided such information was obtained or received by Operator):

(a)     copy of the application for permit to drill and all amendments thereto;

(b)     daily drilling and workover reports by facsimile or other electronic transmission by 8:00 A.M. which shall include but not be limited to daily mud checks, mud logs, lithological, and Hydrocarbon information; daily casing and cementation tallies and cumulative Costs incurred on the operation;

(c)     complete report of all core analysis;

(d)     copies of any logs or surveys as run (including a complete "library tape" of the digitally recorded data);

(e)     copies of well test results, bottomhole pressure surveys, gas and condensate analyses or similar information;

(f)     copies of relevant well specific written correspondence, plans, permits and reports made to regulatory agencies, including but not limited to relevant well specific containment plan and screening tools used for permitting the well, filings, casing and cementing design certifications from a Professional Engineer, lease

14

EXHIBIT 4

suspensions of operations and/or suspensions of production and plans required under current and future applicable Notices to Lessees (NTLs) and the Drilling Safety Rule and Workplace Safety Rule announced by the BOEMRE on September 30, 2010, and any rules derived therefrom;

(g)     48 hours advance notice of logging, coring or testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, and if sufficient quantifies are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, the requesting Party shall be allowed access to inspect and evaluate said cores; and

(k)     samples of gas, condensate and oil, if sufficient quantities are available;

(l)     well specific risk assessment (as per SEMS) with planned mitigations;

(m)     detailed drilling program which indicates the step by step process on how the well is going to be drilled, at a level of detail equivalent to what the rig personnel are utilizing;

(n)     real time drilling data, including but not limited to LWD, drilling and mudlog data.

Upon written request, the Operator shall use its reasonable efforts to furnish to a requesting Participating Party any additional available information (including a complete slabbed section of all recovered cores, if requested and available), acquired by the Operator for the Participating Parties, not otherwise furnished under this Article (not including any derivative information independently developed at Operator's sole Cost and expense).  The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

5.8     <u>Completed Well Information</u>:   Operator shall, in a timely manner, furnish to each participating Party the following information pertaining to each completed well:

(a)     monthly report of production and injection;

(b)     copies of reports made to regulatory agencies;

(c)     report on status of wells not producing and not abandoned;

EXHIBIT 4

(d)     Hydrocarbon status report;

(e)     bottomhole pressure data;

(f)     composite of all logs run (e.g., TDT, Carbon-Oxygen, Spinner Surveys, Casing Collar, etc.); and,

(g)     reports of inventory.

5.9     <u>Information to Non-Participating Parties</u>:  The Operator shall furnish to each Non-Participating Party copies of all non-confidential reports made to regulatory agencies.  A Non-Participating Party shall be entitled to receive the information specified in Articles 5.7 and 5.8 only after fulfilling the requirements specified in Article 16 *(Non-Consent Operations)*.  A Party which has permanently relinquished all of its Working Interest in the Contract Area shall not be entitled to receive any information specified in Articles 5.7 and 5.8.

5.10    <u>Cost Information</u>:  Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all Parties an itemized statement of the Cost of such operations and an inventory of the equipment pertaining thereto or, at its option, the Operator in lieu of an itemized statement of such Costs may submit a detailed statement of monthly billings.  For the purposes of calculating recoupment of Costs pursuant to Article 16 *(Non-Consent Operations)*, the Operator shall furnish to all Parties a quarterly statement showing operating expenses and the proceeds from the sale of Hydrocarbon production from the wells from which recoupment is being made.

5.11    <u>Managing Production</u>:  All Parties shall cooperate and use due diligence to avoid gas imbalances resulting in pipeline penalties under the provisions of the applicable transportation tariffs of any transporting pipelines.  Any additional costs imposed on Operator as a result of gas pipeline imbalances with transporters shall be borne by the individual Parties in the proportion that each individual Party's over and under deliveries caused such imbalance penalty, except where the imbalance is caused by the gross negligence or willful misconduct of Operator in which case the Operator shall bear the entire penalty.  For purposes of this Article, gas pipeline imbalances shall be defined as the difference between gas nominations accepted by the gas transporter and the actual volume delivered to the gas transporter for each Party's account.

5.12    <u>Safety, Health and Environment</u>: The Operator shall have the primary responsibility for the safety of all operations conducted pursuant to the Agreement.   The Operator shall conduct all operations in compliance with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.  At the Pre-Spud Technical Meeting described in Article 10.2.3 (*Pre-Spud Technical Meeting & Revision of Well Plan*), the Operator shall review the Operator's safety and drilling procedures with the Non-Operators for the purpose of soliciting comments, suggestions and general feedback.

16

EXHIBIT 4

The Operator shall, with the support and cooperation of the Non-Operators, in the conduct of operations pursuant to this Agreement:

(a)  design and manage operations to standards intended to achieve sustained reliability and promote the effective management of safety, health and environmental ("SHE") risks;

(b)  apply structured SHE management systems and procedures consistent with those generally applied in the petroleum industry to effectively manage SHE risks and pursue sustained reliability of operations under this Agreement; and

(c)  comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.

In fulfilling its obligations hereunder, the Operator shall act in accordance with the provisions in Exhibit "J" *(Safety, Health and Environment "SHE")*.

5.13  Access to Documents Regarding Drilling Unit: Upon written request, the Operator shall make available to the Participating Parties reasonable access to any inspection, commissioning, testing and acceptance documents pertaining to the drilling unit.   All BOP equipment shall be in material compliance with such manufacturer's specifications and any regulatory requirements in effect at the time the equipment is in use.

**ARTICLE 6**
**EXPENDITURES AND ANNUAL OPERATING PLAN**

6.1  Basis of Charges to the Parties:  Except as otherwise provided, the Operator shall pay all Costs of joint operations and each Participating Party shall reimburse the Operator, in proportion to its Participating Interest, for the Costs of each joint operation.   The Operator shall have the right to require each Participating Party to advance its respective share of estimated expenditures, as provided in Exhibit "C" *(Accounting Procedure)*. Funds received by the Operator under this Agreement may be commingled with Operator's own funds.  All charges, credits and accounting for expenditures shall be made pursuant to Exhibit "C" *(Accounting Procedure),* attached hereto.

6.2  Authorization for Expenditure:  The Operator shall not make any single expenditure or undertake any project or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an Authorization for Expenditure (AFE) has either (1) been included in a proposal for an operation and approved by the Participating Parties through their Election

17

EXHIBIT 4

to participate in the operation, or (2) been approved by the Parties as a General Matter. For any single expenditure or project costing in excess of Fifty Thousand Dollars ($50,000), but less than Two Hundred Thousand Dollars ($200,000), the Operator need not submit an AFE, but shall furnish written information describing the expenditure to each of the Participating Parties. In the event of an emergency and notwithstanding the foregoing, the Operator shall be empowered to immediately make such expenditures for the Joint Account of the Participating Parties as, in its opinion as a reasonable and prudent Operator, are required to deal with the emergency. The Operator shall report to the Participating Parties, as promptly as possible, the nature of the emergency and action taken.

**Notwithstanding anything in this Article 6.2 to the contrary, if less than all the Participating Parties in an operation elect to approve the supplemental AFE for such operation and if there is not agreement among the Parties desiring to continue such operation to each bear their revised proportionate share of one hundred percent (100%) of the liability and Costs of the continued operation, the Operator shall, unless such Parties otherwise agreed to allocate such liability and Costs, terminate the operation. If the Operator terminates the operation, each of the original Participating Parties shall be obligated to bear and pay their proportionate share of all the liabilities and Costs incurred by the Operator up to and including the termination of the operation, including, if applicable, all Costs associated with any plugging and abandonment of a well, whether or not such Costs exceed the currently approved AFE by greater than the Permitted Over-expenditure amount. Additionally, notwithstanding a Party's Election pursuant to Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*) to become a Non-Participating Party once the Permitted Over-expenditure has been exceeded, if at the conclusion of such drilling operation the well is plugged and abandoned, each Participating Party in the original drilling operation shall continue to be obligated to pay for its respective share of all Costs of plugging and abandoning the well (except for any increased plugging and abandonment Costs associated with any subsequent well operations conducted as a Non-Consent Operation).**

6.2.1   <u>AFE Overrun Notice</u>:  For informational purposes only, the Operator shall provide an AFE overrun notice to all Participating Parties whenever it appears (based upon Operator's reasonable estimate) that the actual total Costs associated with any separate AFE will exceed the original AFE by more than ten percent (10%).

6.2.2   <u>Supplemental AFE for Cost Overruns for Wells</u>:  If during the drilling of Exploratory Wells, subsequent Exploratory Operations, Appraisal Wells, subsequent Appraisal Operations, Development Wells, or subsequent Development Operations, it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the well by more than fifteen percent (15%) or three million dollars ($3,000,000), whichever is less, (the "Permitted Over-expenditure" for an Exploratory Well, an Appraisal Well or a Development Well, or for operations in that well after its has reached its

18

**EXHIBIT 4**

Objective Depth), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the approved well operation. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.2 shall be subject to (i) the provisions of Article 16 *(Non-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.3    <u>Supplemental AFE for Cost Overruns on Project Team AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual Project Team Costs will exceed the latest approved AFE by more than fifteen percent (15%) or three million dollars ($3,000,000), whichever is less, (the "Permitted Over-expenditure" for a Project Team), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Project Team AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.3 shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)* once the actual costs expended on the activity or operation exceed the Permitted-overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.4    <u>Supplemental AFE for Cost Overruns on Final Design AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual design Costs will exceed the latest approved Final Design AFE by more than fifteen percent (15%) or five million dollars ($5,000,000), whichever is less, (the "Permitted Over-expenditure" for a Final Design AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Final Design AFE. Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.4 shall be subject to (i) the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.5    <u>Supplemental AFE for Cost Overruns on Fabrication AFE</u>: If it appears (based upon Operator's reasonable estimate) that the actual Costs associated with any separate AFE submitted under the Fabrication AFE will exceed the latest approved Fabrication AFE by more than fifteen percent (15%) or twenty million dollars ($20,000,000), whichever is less, (the "Permitted Over-expenditure" for a

19

EXHIBIT 4

Fabrication AFE), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Fabrication AFE.  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.5 shall be subject to (i) the provisions of Article 16.2 *(Non-Consent Fabrication AFE for the Initial Production System)* for the Initial Production System, or (ii) the provisions of Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)* once the actual costs expended on the activity or operation exceed the Permitted-Overexpenditure amount of the last AFE in which the Non-Participating Party elected to participate, or (iii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, whichever is applicable.

6.2.6   <u>Supplemental AFE for Cost Overruns on All Other AFEs</u>:  If it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the operation by more than fifteen percent (15%) or one million dollars ($1,000,000), whichever is less, (the "Permitted Over-expenditure" for All Other AFEs), Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the operation.  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.6 shall be subject, if applicable, to the provisions of Article 16 *(Non-Consent Operations)* once the actual costs expended on the activity or operation exceed the Permitted-Over-expenditure amount of the last AFE in which the Non-Participating Party elected to participate or (ii) the acreage forfeiture provisions of Article 16.4 *(Non-Consent Operations to Maintain Contact Area)*, if applicable.

6.2.7   <u>Further Operations During a Force Majeure</u>:  No Participating Party shall be allowed to make an Election not to participate in a further operations under Articles 6.2.2 *(Supplemental AFE for Cost Overruns for Wells)*, 6.2.3 *(Supplemental AFE for Cost Overruns on Project Team AFE),* 6.2.4 *(Supplemental AFE for Cost Overruns on Final Design AFE),* 6.2.5 *(Supplemental AFE for Cost Overruns on Fabrication AFE)* or 6.2.6 *(Supplemental AFE for Cost Overruns on All Other AFEs)* during a Force Majeure or other emergency as described in Article 25.1 *(Force Majeure),* but may make its Election not to participate after termination of such emergency.

6.2.8   <u>Long Lead Well Operation AFE</u>:  The Operator may submit an AFE to the Parties, which will allow the Operator to make advance commitments for or purchases of equipment, materials or services, which are commercially reasonable and necessary to facilitate the early and orderly commencement of any kind of well or well operation ("Long Lead Well Operation Items") (a "Long Lead Well Operation AFE").

6.2.8.1   <u>Proposal and Approval of a Long Lead Well Operation AFE</u>: A Long Lead Well Operation AFE proposal shall include a description of the

equipment, materials, or services to be purchased, an estimate of any cancellation fees, and the description and estimated timing for the well or well operation that will utilize such long lead equipment, materials, or services. Each Long Lead Well Operation AFE proposal requires approval by unanimous agreement of the Parties. If the Long Lead Well Operation AFE is not approved by unanimous agreement, then the Long Lead Well Operation AFE proposal shall be deemed withdrawn. Approval of a Long Lead Well Operation AFE shall not be deemed an affirmative vote of Election to participate in any subsequently proposed wells or well operations for which such long lead equipment, material or services are procured.

6.2.8.2 <u>Non-Participating Parties in the Operations Associated with a Long Lead Well Operation AFE:</u> If a Party, who participated in a Long Lead Well Operation AFE, does not participate in an approved well or well operation, for which Long Lead Well Operation Items were procured under that AFE, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Well Operation Items within thirty (30) days of the approval of such well or well operation; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarbon Recoupment to which it is subject as a result of such well or well operation for their proportionate share of the reimbursement under this Article 6.2.8.2 in accordance with Exhibit "C".

6.2.8.3 <u>Disposition of Long Lead Well Operation Items as Surplus Material:</u> If Long Lead Well Operation Items are not utilized for the well or well operation as proposed and approved, then the disposition of such Long Lead Well Operation Items shall be in accordance with Exhibit "C" Article IV, Paragraph 3 (*Disposition of Surplus*), unless otherwise unanimously agreed to by the Participating Parties."

6.3 <u>Security Rights</u>:  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the following security rights:

6.3.1 <u>Operator's First Lien</u>:  Each Non-Operator grants the Operator a first lien and mortgage upon each Party's Working Interest in the Leases within the Contract Area but only to the extent of the charges and expenses arising under such agreement, (including any interests in the Leases now owned or hereafter acquired), including but not limited to (a) all equipment installed on the Lease(s), (b) all Hydrocarbons or other minerals severed and extracted from or attributable to the Leases, (c) all accounts and proceeds of sale (including, but not limited to, accounts resulting from the sale of such Hydrocarbons or other minerals), contract

21

EXHIBIT 4

rights and general intangibles arising in connection with the sale of such Hydrocarbons or other minerals, (d) fixtures and (e) any and all accessions, additions and attachments thereto and the proceeds and products therefrom. This first lien and mortgage shall secure the payment of all charges against such Party, together with interest thereon at the rate set forth in Exhibit *"C" (Accounting Procedure)* (or the maximum rate allowed by law, whichever is the lesser), reasonable attorneys' fees, court costs and other directly related collection costs. If any Party does not pay such charges when due, the Operator shall have the additional right to collect from the purchaser of defaulting Party's Hydrocarbon production the proceeds from the sale of such Party's share of Hydrocarbon production in the Contract Area until the amount owed has been paid.  Each purchaser shall be entitled to rely on the Operator's statement concerning the amount owed.

6.3.2   <u>Non-Operating Party's Security Interest</u>:  Operator grants a like security interest and mortgage to the Non-Operating Parties to secure payment of Operator's proportionate share of expenses.  Each Party paying its share of unpaid expenses pursuant to Section 6.5 *(Unpaid Charges)* hereof shall, to obtain reimbursement thereof, be subrogated to the security rights described herein.

6.3.3   <u>Recordation</u>:  To better protect the Parties' security rights created hereunder, the Parties shall promptly join in such reasonable actions as may be necessary to execute and notarize a mutually agreeable Memorandum of Joint Operating Agreement and financing statement on a UCC form ("Memorandum"), similar in all material respects to the form attached hereto as Exhibit "I" as soon as reasonably practical, but prior to commencement of operations. The Memorandum shall be executed by each Party through its duly authorized agent or representative. The Parties hereby authorize the Operator to file the notarized Memorandum in the mortgage, conveyance and UCC records of the pertinent Parishes/Counties having jurisdiction over the Contract Area. The Operator shall provide each Party with a copy of the recorded instrument.  Each Party further agrees to provide reasonable written evidence of its authorized signatory's authority to encumber its leasehold interest. In the event that a Memorandum of Joint Operating Agreement is not executed prior to commencement of operations, the Parties agree to execute, notarize and file a Memorandum of Joint Operating Agreement identical to the form attached hereto as Exhibit "I."

6.4   <u>Default</u>:  If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator shall give that Party notice that unless payment is made within thirty (30) days, the non-paying Party shall be in default.  Any Party in default shall have no further access to the rig, maps, records, data, interpretations or other information obtained in connection with operations or be allowed to participate in meetings.  A Party in default shall not be entitled to vote on any General Matter until such

22

EXHIBIT 4

time as the Party in default is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Participating Interest bears to the total non-defaulting Participating Interests.  As to any operation approved during the time a Party is in default, such Party in default shall be deemed to be a Non-Participating Party.  If a Party notifies the Operator in writing that all or a portion of such payment is being made subject to a good faith dispute over such charges, such dispute shall be subject to an expedited audit process as follows: 1) the Non-operator disputing the charge may require an audit of the matter in dispute be initiated within ninety (90) days after the date Operator receives the notice of the dispute, and 2) the contract committee referred to in "Addendum to Exhibit C. Section 1, Paragraph 5B" shall be required to act upon the audit exceptions, if any, within ninety (90) days after the date of the audit report, and 3) if the contract committee is unable to resolve the dispute within such ninety (90) day period, the dispute shall be handled in accordance with the dispute resolution procedures described in Exhibit "I".

6.5    <u>Unpaid Charges</u>:  If any Participating Party fails to pay its share of the charges due hereunder within thirty (30) days after receipt of a default notice from the Operator, the Operator may take immediate steps to diligently pursue collection and to exercise the Operator's lien and security rights granted by this Agreement.  The Operator shall keep an accurate account of amounts owed (plus interest and costs) by the Party in default and any amounts collected against the indebtedness.  If a Party is in default and any indebtedness remains delinquent for a period of three (3) months, the other Participating Parties shall, upon the Operator's request, pay the unpaid amount in proportion that their Participating Interest bears to all paying Participating Interests.  Each Participating Party paying its share of the unpaid amount shall be subrogated to the Operator's lien and security rights to the extent of such payment.

6.6    <u>Carved-out Interests</u>:    The agreements creating any overriding royalty, production payment, net proceeds interest, carried interest or any other interest carved out of a Working Interest in a Lease(s) shall specifically make such interests inferior to the rights of the Parties to this Agreement.   If any Party whose Participating Interest is so encumbered does not pay its share of expenses, and the proceeds from the sale of its Hydrocarbon production under Article 6.3 (*Security Rights)* are insufficient for that purpose, the security rights provided for herein may be applied against the carved-out interests with which such Working Interest is burdened.  In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by Article 6.3.  Additionally, in the event a Party elects not to participate in any operation hereunder and becomes a Non-Participating Party pursuant hereto, then and in that event, the Participating Parties shall acquire the interests of such Non-Participating Party with respect to such Election, free and clear of any and all obligations created under or pursuant to any carved-out interest as described above.

6.7    <u>Annual Operating Plan</u>:  Beginning in the year in which a Development Plan is approved for the Contract Area, and each subsequent year thereafter, the Operator shall develop an

EXHIBIT 4

Annual Operating Plan.  The Annual Operating Plan process will be used (1) as a reporting mechanism by which the Operator will inform the Non-Operating Parties of results of the previous year's activities, (2) to review ongoing operations and (3) to forecast activities, anticipated Hydrocarbon production volumes, operating expenses and capital expenditures for the remainder of the current year and the next succeeding calendar year.

6.7.1   <u>Development and Submission of the Annual Operating Plan</u>:  Prior to May 1 of each year, the Operator will conduct a meeting with the Non-Operating Parties to review the results of the previous year.  The Operator will also provide the Non-Operating Parties with its anticipated activities for the current and following year and solicit input regarding these activities from the Non-Operating Parties.  After this meeting, the Operator will prepare and submit its proposed draft for the Annual Operating Plan prior to June 1 of each year.

6.7.2   <u>Review of the Annual Operating Plan</u>:  The Non-Operating Parties will provide suggested changes, additions or deletions to the Annual Operating Plan to the Operator and all other Parties prior to July 15 of each year.  The Operator will then make any changes it deems necessary and submit the Annual Operating Plan no later than October 1 of each year.

6.7.3   <u>Content of Annual Operating Plan</u>:  The Annual Operating Plan will include an estimated capital budget, expense budget and Operator's anticipated forecast as follows:

    6.7.3.1   <u>Capital Budget</u>:  The Annual Operating Plan shall contain an estimated capital budget that includes the following:

        (a)   a list of proposed wells to be drilled including their anticipated order, drilling time, depths, locations, objective sands, type of well (Development, Appraisal, etc.), purpose of well (production, injection, etc.) and estimated Costs;

        (b)   capital workovers, which shall be defined as any workover operation conducted to recomplete a well to a new zone or install artificial lift, listed by well, with their estimated Cost;

        (c)   other capital projects requiring a gross expenditure greater than three million dollars ($3,000,000).  The term "capital project" shall include addition of new equipment, expansion or upgrades of existing equipment; and

        (d)   an estimated total amount (in aggregate) for capital projects.

EXHIBIT 4

6.7.3.2   Expense Budget:  The Annual Operating Plan shall contain an estimated expense budget that includes the following:

(a)   expense workovers, which shall be defined as any anticipated workover operation which is not a capital workover (such as repair work or reworks within the same zone), listed by well, with their estimated Cost;

(b)   all expense projects requiring a gross expenditure greater than three million dollars ($3,000,000). The term "expense project" shall include repair, replacement, inspection and maintenance of existing equipment;

(c)   an estimated total amount (in aggregate) for expense projects; and

(d)   estimated Operations and Maintenance (O&M) expenditures for the year may be shown in the aggregate. O&M expenses shall include the ongoing, everyday expenditures necessary to operate the field.

6.7.3.3   Operator Forecasts and Informational Items:  The Annual Operating Plan shall contain the Operator's reasonable forecasts and projections (but are recognized as forecasts and projections only) including the following information:

(a)   production forecasts;

(b)   injection forecasts;

(c)   fuel and flare gas forecasts;

(d)   scheduled or planned downtime exceeding three (3) days;

(e)   data collection programs; and

(f)   other areas deemed of significance by the Operator.

6.7.4   Effect of the Annual Operating Plan:  The Annual Operating Plan shall be primarily for informational and planning purposes and shall not obligate any Party to any expenditures or constitute an Election to participate in any specific operation.  However, the Annual Operating Plan is recognized as the Operator's effort to forecast and plan for activities during the year while providing for input from the Non-Operators.  Pursuant to the terms and conditions of this Agreement, any Party may make proposals for operations which were not included in the

25

EXHIBIT 4

Annual Operating Plan.   Approval of any such operation, under the terms provided in Article *8 (Voting, Election & Notices),* shall be deemed a modification to the Annual Operating Plan.

## ARTICLE 7
## CONFIDENTIALITY OF DATA

7.1     <u>Confidentiality Obligation</u>:   The Parties agree that all Confidential Data acquired or obtained by any Party with respect to the joint operations conducted under this Agreement shall be kept confidential during the term of this Agreement.  Each Party agrees to maintain the secrecy of the Confidential Data using at least the standard of care it normally uses in protecting its own confidential information and trade secrets.   The Confidential Data shall be made available to each Participating Party for its exclusive use.  During the confidentiality period, the Confidential Data shall not be disclosed to any third party(ies) (unless disclosed under an "exception to confidentiality" under Article 7.1.1 or as a "permitted disclosure" under Article 7.1.2 or in accordance with Article 7.5).

   7.1.1     <u>Exceptions to Confidentiality</u>: The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

      (a)     are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party); or

      (b)     are now or later become available to a Party on a non-confidential basis from a source, other than a Party hereto, that is legally permitted to disclose the item of Confidential Data; or

      (c)     were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

      (d)     is independently developed by employees or contractors of a Party who have not had access to Confidential Data.

   7.1.2     <u>Permitted Disclosures</u>:   The Operator may disclose items of Confidential Data to such third parties as may be necessary in connection with the operation of the Contract Area**,** provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than two (2) years (or a lesser period if agreed by all Parties).   The Operator shall promptly inform the other Parties hereto of the names of such third parties and list the items of Confidential Data disclosed.   Notwithstanding anything herein to the contrary and subject to the restrictions that: (i) the Confidential Data shall not be removed from the custody and premises of the Party making such disclosure, excepting disclosure made pursuant to items (a), (b), (c), (d) and (e) below; and (ii) that such

26

EXHIBIT 4

third party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Data:

(a)    to any Affiliate of such Party provided such Affiliate shall be bound by the confidentiality provision contained herein; or

(b)    to any bona fide, *financially responsible,* prospective assignee of any portion of such Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets in the OCS Gulf of Mexico); or

(c)    to any potential contractors or professional consultants engaged by or on behalf of such Party and acting in that capacity where such disclosure is essential to such contractor's or consultant's work; or

(d)    to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or,

(e)    to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding). If a Party is legally compelled to disclose any Confidential Data, then such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy. A disclosing Party shall furnish only such Confidential Data as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Data disclosed; or,

(f)    to an entity desiring to transport and/or purchase Hydrocarbons produced hereunder.

7.1.3   <u>Limited Releases to Offshore Scout Association</u>:  The Operator may disclose the following well information at weekly Offshore Oil Scout meetings:

7.1.3.1   <u>Well Location</u>:

(a)    proposed surface location;

(b)    surveyed surface location with X & Y;

(c)    proposed bottom hole location;

27

<b>EXHIBIT 4</b>

(d)   KB and water depth;

(e)   OCS number and well number; and

(f)   actual bottom hole location (must be reported within two weeks of reaching total depth of the well).

7.1.3.2   <u>Well Operations</u>:

(a)   rig move in date;

(b)   spud date;

(c)   weekly drilling depth, MW;

(d)   casing depths, cement, EMWs;

(e)   mud weight, sidewall cores, cores, RFTs (only that they were taken);

(f)   logs (only the depths and type run);

(g)   date Total Depth is reached; and

(h)   date rig is released.

7.1.3.3   <u>Well Completion Information</u>:

(a)   any Media Release or public filing of well completion information will be furnished at weekly Scout meetings.

7.1.4   <u>Continuing Confidentiality Obligation</u>:  Any Party who ceases to own a Working Interest in the Contract Area shall nonetheless remain bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement.

7.2   <u>Ownership of Confidential Data</u>:  Except as otherwise provided for in this Article, all Confidential Data produced as a result of a joint operation shall be the joint property of all Participating Parties in that operation.  Any Non-Participating Party shall have no rights in or access to Confidential Data produced or derived from a Non-Consent Operation unless and until the provisions of Article *16 (Non-Consent Operations)* are satisfied.

28

EXHIBIT 4

7.2.1   <u>Well Log and Data Trades</u>:  Any Participating Party may propose the exchange or trade of any jointly owned Confidential Data for other similar data and information owned by a third party.  The approval of such exchange or trade shall require unanimous approval of the Participating Parties which own such data.  Upon approval of such trade by the Participating Parties, the Operator shall consummate such exchange or trade with the third party.  The Operator shall promptly provide all Participating Parties copies of the third party data obtained along with copies of any agreement relating to such exchange.

7.2.2   <u>Ownership of Non-Consent Data</u>:  When the Non-Participating Party becomes a Participating Party in the operation, as provided herein, such non-consent Confidential Data and information previously withheld from such Non-Participating Party shall thereafter become jointly owned by the Party and in such event the Operator of such operation shall promptly provide the Confidential Data to such Party.

7.3   <u>Access to the Lease and Rig</u>:  Each Participating Party's authorized representatives shall have access to any drilling rig, Production System or Facility serving the Contract Area to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto).  Access by the Participating Party to any drilling rig, Production System or Facility serving the Contract Area shall be arranged through the Operator *twenty-four (24) hours* in advance (or, if conditions do not permit, as much advance notice as is reasonably possible).  Each Party's access will be at its sole risk and expense and at reasonable times and provided such access does not unreasonably interfere with the operations being conducted.

7.4   <u>Development of Proprietary Information and/or Technology</u>:  The ownership, use, treatment and disclosure of any proprietary information and/or technology specific to drilling technology, production technology, production structure and Facilities and their transportation and installation, pipelines, flowlines and offshore oil and gas transportation which are charged to the joint account shall be handled in accordance with Exhibit "G" (*Project Team and Technology Sharing*).

7.5   <u>News Releases</u>:  The Parties shall use reasonable efforts to unanimously agree upon the timing and content of releases to the news media concerning operations covered by this Agreement.  However, in the event the Parties cannot unanimously agree upon either the timing and/or content of the news release within twenty-four (24) hours of receipt of such proposed news release, then, if one (1) or more Parties still desires to make a news release, the news release may be prepared in accordance with Exhibit "F" (*News Release Guidelines*).

**ARTICLE 8**
**VOTING, ELECTIONS & NOTICES**

29

EXHIBIT 4

8.1   <u>Overall Supervision of Business Affairs</u>:  The activities of the Parties under this Agreement that are not within the scope of the Operator's authority to unilaterally decide under Article 5 *(Rights and Duties of Operator)* or Article 6.2 *(Authorization for Expenditure)* shall be divided into the following broad classes:

    (a)   "General Matters" for which a vote for approval is required prior to action, but no accompanying Election regarding participation is required ), or;

    (b)   Proposed operations for which both a vote for approval as a General Matter and an accompanying Election regarding participation are required prior to conducting the operation. (An example of such a General Matter is an Appraisal Well proposed, approved and elected upon under Article 11. 1), or;

    (c)   Proposed operations for which a vote for approval as a General Matter is <u>not</u> required and where only an Election regarding participation is required for such operation. (An example of such an operation is an Election for a Fabrication AFE proposed pursuant to a previously approved Development Plan under Article 12.8 *(Fabrication AFE)* without the requirement for approval as a General Matter).

The Parties shall decide and take action upon all General Matters and Elections in accordance with the provisions of this Article 8.

8.2   <u>Voting Procedures on General Matters and Elections</u>:  Any General Matter shall require the approval of the Parties and shall be decided by a vote of the Parties as follows:

    8.2.1  <u>Voting and Electing Interest</u>:  Each Party shall have a voting interest and/or an electing interest equal to its Working Interest in the Contract Area or, with respect to a Non-Consent Operation, its Participating Interest in such operation, as applicable.

    8.2.2  <u>Vote Required</u>:  The Parties shall attempt to reach *unanimous agreement* regarding proposals requiring approval of the Parties.  However, in the event that the Parties cannot unanimously agree, (except as otherwise provided in this Agreement), a General Matter shall be decided by an affirmative vote of either:

        (a)   should there be only one (1) Party entitled to vote, a General Matter approval shall require an affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%), including as to any of the following proposed operations which will require the affirmative vote of one (1) Party having a voting interest of greater than zero percent (0%):

            Exploratory Operations (Article 10),

            Appraisal Operations (Article 11), or

30

**EXHIBIT 4**

Development Operations (Article 13).

    (b)    should there be two (2) or more Parties entitled to vote, a General Matter approval shall require the affirmative vote of two (2) or more of the Parties having a combined voting interest of greater than fifty percent (50%), except in the following instances:

        (i)    Proposed Exploratory Operations (Article 10) shall require the affirmative vote of one (1) or more Parties having a combined voting interest of twenty-five percent (25%) or greater;

        (ii)    Proposed Appraisal Operations (Article 11) shall require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater;

        (iii)    Proposed Development Operations (Article 13) included in an approved Development Plan shall require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater; and

        (iv)    Proposed Development Operations (Article 13) not included in an approved Development Plan shall require the affirmative vote of two (2) or more Parties having a combined voting interest of twenty-five percent (25%) or greater provided, however, any subsequent operations proposed under a Development Well not included in an approved Development Plan shall only require the affirmative vote of one (1) or more Parties having a combined voting interest of eleven and one-fifth percent (11.2%) or greater.

Notwithstanding anything to the contrary in this Article 8.2.2 (b), the term "Vote" in Article 10.2.2 (*Counter Proposals*) and Article 11.1.2 (*Counter Proposals*) shall mean the affirmative vote of two (2) or more of the Parties having a combined voting interest of greater than fifty percent (50%).

8.2.3   <u>Second Opportunity to Participate</u>:  Unless otherwise provided to the contrary in this Agreement, if an activity or operation is approved by vote or Election but is not approved by all of the Parties, any Party who either:

    (i)   voted against the proposal; or

    (ii)   failed to vote and/or make an Election;

EXHIBIT 4

shall have forty eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of notice from the Operator of the original voting or Election results, to respond with a vote or Election as to its participation in the proposal.  Failure to respond in a timely manner shall be deemed a vote or Election not to participate.  When a drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.2.4   <u>Participation by Fewer Than All Parties</u>:  Except as otherwise provided in this Agreement, a Participating Party has the right to limit participation to its Working Interest and is not required to assume its proportionate share of the Non-Participating Party's interest.  If, after the period provided in Article 8.2.3 elapses there is at least one (1) Non-Participating Party in the approved activity or operation, each Party who made an original or subsequent vote or Election to participate in the approved activity or operation shall have the option to either:

(i)   limit its participation in the approved activity or operation to its Working Interest share, or

(ii)   to assume its proportionate share of the Non-Participating Party's interest and agree to bear its Participating Interest share of the approved activity or operation

by written correspondence to the Operator.  Failure to submit that written correspondence shall be deemed a vote or Election under (i).  If the Participating Parties fail to assume one hundred percent (100%) of the Cost and risk of the proposed operation within fifteen (15) days following receipt of the written correspondence, the proposal shall have no further effect and it shall be as if the proposal had never been made.  Notwithstanding the foregoing, when a drilling rig is on location and standby charges are accumulating, the time permitted for such a response shall not exceed twenty-four (24) hours (inclusive of Saturday, Sunday or legal holidays).

8.3   <u>Response Time for General Matters and Elections</u>:  After receipt of notice pursuant to this Article 8, the Parties shall either: (i) submit their vote in response to a General Matter proposal as described under Article 8. 1 (a) or (b), or (ii) make an Election if the proposal does not require a vote as a General Matter as described under Article 8.1(c).  The Operator shall give prompt notice of the results of such voting or Elections to each Party. Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

8.3.1   <u>Well Operation Proposal</u>:  When any proposed well operation does not require construction of a Production System, each Party shall respond with their vote or Election within thirty (30) days after receipt of the proposal.  When a drilling rig is on location and standby charges are accumulating, a vote or an Election in

EXHIBIT 4

response to the proposal shall be made within forty-eight (48) hours after receipt of the proposal (exclusive of Saturdays, Sundays and federal holidays); provided that the forty-eight (48) hour provision of this Article 8.3.1 shall not apply to a new well (other than a substitute well) proposed under Articles 10.2 (*Proposal of Exploratory Operations*), 11.1 (*Proposal of Appraisal Operations*) or 13.1 (*Proposal of Development Operations*).

8.3.2   <u>Production System Construction/Fabrication AFE</u>:   Elections involving the construction and installation of a Production System shall require a response within one hundred twenty (120) days after receipt of the Fabrication AFEs.

8.3.3   <u>Other AFE Related Operations</u>:   Except as otherwise provided for in Articles 8.3.1 (*Well Operation Proposal*) and 8.3.2 (*Production System Construction*), the response time to a proposed operation will depend upon the AFE gross expenditure amount. Response times will be as follows:

  (a)     AFE of $200,000 or more but less than $20,000,000 response will be made within thirty (30) days after receipt of said proposal.

  (b)     AFE of $20,000,000 or more but less than $50,000,000 response will be made within sixty (60) days after receipt of said proposal.

  (c)     AFE of $50,000,000 or more response will be made within ninety (90) days after receipt of said proposal.

8.3.4   <u>Other Proposals</u>:   For all other proposals requiring notice, each Party shall respond with an Election or vote within thirty (30) days after receipt of the proposal.

8.3.5   <u>Failure to Respond</u>:   Failure of any Party to respond to a proposal within the required period shall be deemed a vote against a General Matter (if required by the nature of the proposal) and, if applicable, an Election not to participate.

8.3.6   <u>Suspensions of Production and Suspensions of Operation</u>:   Anything in this Article 8.3 *(Response Time for General Matters and Elections)* notwithstanding, if the BOEM grants a Suspension of Production (an "SOP") or a Suspension of Operations (an "SOO") or similar regulatory grant for all or any part of the Contract Area and if the SOP, SOO or grant requires the commencement of an activity or operation before the expiration of the period for voting or making an Election for that activity or operation, the deadline for the response time shall precede the commencement date required in the SOP, SOO or grant by thirty (30) days, if reasonably possible, or otherwise any other reasonable shorter timeframe.

8.3.7   <u>Standby Charges</u>:   The Participating Parties in a prior operation shall be responsible for standby charges accrued until all Parties having a right to do so, have made an election to either participate or not participate in a subsequent

EXHIBIT 4

proposed operation.   All standby charges accruing after the final election regarding the subsequent operation has been made, shall be the responsibility of the Participating Parties in the subsequent operation.   Notwithstanding anything to the contrary in this Article 8.3.7, if the Operator does not receive the necessary governmental approval(s) and/or permit(s) to commence the subsequent operation within ten (10) days (exclusive of Saturdays, Sundays and federal holidays) after the final election regarding such subsequent operation, then unless agreed otherwise by all Participating Parties the proposal shall be deemed withdrawn and a different operation may be proposed in accordance with the provisions of this Agreement.

8.4    Meetings of the Parties:  In addition to the annual meeting required by Article 6.7 (*Annual Operating Plan*), meetings of the Parties shall be called by the Operator upon its own motion or at the request of any Party.  Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than ten (10) days (exclusive of Saturdays, Sundays and federal holidays) advance notice, and such notice shall include an agenda of the meeting.  The representative of the Operator shall be chairman of each meeting and shall take minutes of each meeting.  Only matters set out in the agenda for the meeting shall be considered at the meeting unless unanimously agreed to by all the Parties to this Agreement.

8.5    Designation of Representatives:  The names, addresses, telephone numbers and facsimile numbers of the representatives to whom notices and responses should be directed are set forth in Article IV of Exhibit "A-2" attached hereto.  The designated representatives may be changed by written notice to the other Parties in accordance with Article 8.7 *(Giving and Responding to Notices).*

8.6    Participation Elections:   An Election to participate in an Exploratory Operation, an Appraisal Operation and a Development Operation shall include an Election to participate in all necessary expenditures for such operation as set out in the approved proposal for such operation; including but not limited to drilling, testing and logging an Exploratory Well, Appraisal Well and Development Well to its Objective Depth (including plugging/abandonment) as set out in its Well Plan; subject to the provisions of Article 6.2 (*Authorization for Expenditure*).

8.7    Giving and Responding to Notices:   All notices and responses (including notices/proposals of General Matters, Elections) shall be made in writing and delivered in person or by U.S. mail, overnight express, courier service, or facsimile transmission (followed by a phone call confirming receipt), with postage and charges prepaid, addressed to the Parties at the addresses set forth in Article IV of Exhibit "A-2".  When a drilling rig is on location and standby charges are accumulating, all notices and responses shall be given by telephone and immediately confirmed in writing.  Any notices and responses shall be effective only when received by the Party to whom such notice, proposal or response is directed.  Any notice or response transmitted by facsimile shall be deemed given and received only after the receiving Party has confirmed receipt of such

34

EXHIBIT 4

facsimile.  Any notice or response transmitted by overnight express carrier, courier, or certified mail shall be deemed given and received if delivery to the designated address is confirmed by carrier.

8.8    Content of Notice:   Any notice which requires a response within a time period shall indicate which of the response times specified in Article 8.3 *(Response Time for General Matters and Elections)* is required.  If a notice proposes a well operation, the notice shall include the following information:

(a)    the type of well operation being proposed, i.e., Exploratory, Appraisal or Development Operation(s);

(b)    the Well Plan for the proposed operation; and

(c)    an AFE showing the estimated Costs of the operation, including all necessary expenditures associated with the drilling, testing and completing or abandoning the well.


# ARTICLE 9
## GEOPHYSICAL OPERATIONS

9.1    Geophysical Operations:   Any Party may propose to acquire or process geophysical surveys (other than shallow hazard surveys, velocity surveys or other similar well bore geophysical operations) to evaluate all or any portion(s) of the Contract Area at any time during the term of this Agreement.  These geophysical surveys may consist of either conducting "proprietary" surveys, purchasing "speculative" surveys from vendors or participating in "group shoot" surveys. Geophysical Operations are independent operations and are not to be considered Exploratory, Appraisal or Development Operations, and may be conducted simultaneously with Exploratory, Appraisal or Development Operations.

9.1.1    Conduct of Proprietary Geophysical Operations:   The Operator shall conduct all proprietary geophysical surveys (or processing) for the joint account of the Participating Parties based upon their Participating Interest share of the Costs of the surveys.  The Operator shall provide the Participating Parties with copies of all field data and support documentation as appropriate for any and all seismic data collected from the geophysical survey.  The Operator shall obtain all licenses and/or permits from all governmental agencies necessary to support the surveys.  The joint ownership of any proprietary geophysical data derived from a proprietary survey shall be limited to the field tapes i.e., raw data and initial processing and subsequent processing conducted at joint expense (not including re-processed or interpreted data obtained by a Party at its sole cost and expense) and owned on the basis of the Parties' Participating Interests in the survey.  If the

35

EXHIBIT 4

geophysical data is acquired by a geophysical contractor instead of through the Operator, then wherever in this Article the word "Operator" appears "Contractor" shall be substituted therefor.  If a Party elects not to participate in a proprietary geophysical survey, then a Participating Party shall elect to either: (i) proceed with the Geophysical Operation with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise agreed, or (ii) change its Election to become a Non-Participating Party.  A Non-Participating Party shall not be entitled to any geophysical data obtained from the proprietary geophysical survey unless the Non-Participating Party agrees to become an underinvested Party per terms of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

9.1.2   <u>Group-Shoot And Speculative Seismic Surveys</u>:  The Parties shall make a good faith effort to coordinate the acquisition of any new group-shoot or speculative seismic surveys covering one or more of the Leases within the Contract Area. This shall enable all Parties who desire to acquire such data to take advantage of group or partnership rates available from most seismic contractors and will allow each Party a license to use such data.  For such joint seismic data purchases covering the Leases, the acquiring Parties shall mutually agree upon the Cost shares of the total licensing fee (rather than on their Working Interest shares).

# ARTICLE 10
# EXPLORATORY OPERATIONS

10.1   <u>Application</u>:  The Costs, risks and obligations of Exploratory operations conducted in accordance with this Agreement shall be borne by the Parties as provided in Article 10.2.4 *(Exploratory Operations Costs)* below.

10.2   <u>Proposal of Exploratory Operations</u>:  Any Party may propose to conduct an Exploratory Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties  Once an Exploratory Operation is approved (either as a General Matter or as an Election), the Operator (or substitute operator) shall commence the Exploratory Operation at the sole Cost and risk of the Participating Parties.  Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Non-Consent Operations to Maintain Contract Area),* Costs of a non-consent Exploratory Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

36

EXHIBIT 4

10.2.1   <u>Well Plan's Minimum Specifics</u>:   The Well Plan for any Exploratory Well(s) and any proposed Subsequent Exploratory Operation shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.   The Well Plan shall include documents reasonably sufficient for the Parties to analyze and evaluate the Well Plan and shall include, at a minimum, the following:

(a)   the surface and target bottomhole locations;

(b)   the expected spud date and the anticipated time necessary to conclude drilling, evaluation, completion and/or abandonment operations;

(c)   the true vertical depth to be drilled, along with the specified Objective Depth (and other target zones to be penetrated);

(d)   the proposed drilling plan, including the casing program and any anticipated Sidetracking operations;

(e)   description of any coring, logging or other evaluation operations to be conducted;

(f)   information concerning the drilling rig to be used, including day rates, water depth rating and other limitations relevant to the drilling operations to be conducted;

(g)   worst case discharge report as provided in NTL No. 2010-N06 submitted (or to be submitted) to the BSEE; and

(h)   basis of well design which includes, but is not limited to, the following:

    (i)   list of pertinent offset wells used in designing well,
    (ii)   Pore pressure, mud weight, and fracture gradient chart,
    (iii)   Temperature profile used to design well,
    (iv)   Proposed wellbore schematic including, but not limited to, the following:
        a.   casing and liner sizes, weights, grades, and connections, relative setting depths (true vertical depth and measured depth), and maximum anticipated wellhead and surface pressures,
        b.   liner tops with any proposed rupture disc or other trapped annulus pressure mitigation devices,
        c.   proposed cement design with tops, volumes, and heights,
    (v)   Proposed directional plan, and
    (vi)   Anticipated Days vs. Depth chart.

EXHIBIT 4

10.2.2    Counter Proposals:  If, within fifteen (15) days after a proposal for an Exploratory Well has been submitted, any other Party submits a counter proposal for:

(a)    an alternative surface or bottom hole location; or

(b)    an alternative Objective Depth

for the proposed Exploratory Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed.  In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach agreement as to which location or Objective Depth shall be proposed for the Exploratory Well.  If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 (*Response Time for General Matters and Elections*), the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election.  After an Exploratory Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

10.2.3    Pre-Spud Technical Meeting & Revision of Well Plan:  Subsequent to the approval of the Exploratory Operation as a General Matter, but prior to commencing such Exploratory Operation (other than a substitute operation), the Participating Parties shall meet for a "Pre-Spud Technical Meeting".  The purpose of the meeting is to review the Well Plan describing the specific operations planned for the Exploratory Well.  Any proposed revision to the operations specified in the original Well Plan and AFE shall require unanimous agreement of the Participating Parties.  Any such revision to the Well Plan shall be evidenced by the joint signature of an amended AFE for the proposed Exploratory Operation.  In the absence of agreement upon a revised Well Plan, the original Well Plan and AFE shall stand as approved. Any revisions to the original Well Plan or AFE by the Participating Parties shall not give any Non-Participating Party an additional opportunity to make a Participation Election unless the Objective Depth is changed, or the target bottom hole location is changed by more than 500 feet, in which case the Exploratory Operation shall be proposed anew.  The Well Plan for an Exploratory Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional Exploratory Operation approved by the Participating Parties.

38

EXHIBIT 4

Notwithstanding anything to the contrary in this Agreement, the Operator may revise the Well Plan to comply with any governmental approval, requirement, notice, mandate, law, order, rule or regulation (the "Directive") without obtaining the approval of the Participating Parties in the approved operation, as long as the Operator's revisions carry out the scope and intent of the approved Well Plan and AFE.  The Operator shall provide the Participating Parties in the approved operation notification in writing detailing the revision and a copy of the Directive requiring such revision as soon as possible, but no later than ten (10) days of the Operator's receipt of same.  If such revision is made:

(a)     prior to the commencement of the approved operations, then a Participating Party shall have  fifteen  (15) days  from receipt of notice from Operator of the revision to the Well Plan, to notify the Operator in writing that it wishes to become a Non-Participating Party in the approved operation with the revised Well Plan, provided, however, that if the drilling rig is on location, then a Participating Party shall have forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) from receipt of notice from Operator of the revision to the Well Plan, to notify the Operator in writing of its decision whether to become a Non-Participating Party in the approved operation.  Failure to notify the Operator in a timely manner shall be deemed a vote or Election to continue as a Participating Party.  If a Party becomes a Non-Participating Party in the approved operation with the revised Well Plan, such Party will be subject to Article 16 (*Non-Consent Operations*) and the Operator may commence such operation on behalf of the remaining Participating Parties subject to Article 8.2.4 (*Participation by Fewer Than All Parties*); or

(b)     after commencement of the approved operations, then all of the Participating Parties shall remain Participating Parties in the approved operation with the revised Well Plan subject to Article 6.2.2. (*Supplemental AFE for Cost Overruns for Wells*).

10.2.4   Timely Operations:  An Exploratory Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Exploratory Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 (*Force Majeure*).

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Exploratory Operation within that two hundred seventy (270) day period,  the approved Exploratory Operation shall be deemed withdrawn, with the effect as if the Exploratory Operation had never been proposed and approved, and the Non-

39

EXHIBIT 4

Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 (*Substitute Operator if Operator Fails to Commence Operations*).

If an approved original or identical Exploratory Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Exploratory Operation, will be chargeable to the Participating Parties.  An Exploratory Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Exploratory Operation are undertaken.

10.2.5   <u>Exploratory Operations Costs</u>:  The Costs, risks and obligations associated with drilling, testing, logging and abandoning (whether permanent or temporary) an Exploratory Well, any substitute well and any subsequent Exploratory Operations shall be borne by the Participating Parties in proportion to their Participating Interest in such Exploratory Operation.

10.2.6   <u>AFE Overruns and Substitute Well</u>:  The Operator shall timely commence an Exploratory Operation and continue the operation with due diligence to the Objective Depth or until:

(a)   a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

(b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

(c)   the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Exploratory Well is abandoned due to the conditions described under 10.2.6 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Exploratory Well shall make an Election whether to participate in the proposed substitute well.  The proposal for a substitute Exploratory Well shall not require approval as a General Matter.  The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate.  Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the Cost percentage recoupment provisions or the acreage forfeiture provisions of Article 16 (*Non-Consent Operations*), whichever is applicable.

40

EXHIBIT 4

10.2.7   <u>Additional Information to Non-Operator(s)</u>**:** Upon written request and **if available**, the Operator shall endeavor to provide the following document(s) to the Non-Operators; however, (i) such document(s) requested are not required for a valid Well Plan under Article 10.2.1 (*Well Plan's Minimum Specifics*) and (ii) the Operator is under no obligation to provide such document(s) to a Party once such Party has Elected not to participate in the Well Plan and AFE:

    (a)   Final detailed operational procedure document with associated well design technical documents, *e.g.* drilling fluids, BHA design.

    (b)   Wellhead bending load analysis (for DP mobile offshore drilling unit ["MODU"] only).

    (c)   Well control and spill containment document for deep water wells drilled in the OCS waters or other complex type wells, including the following information:

        (i)   Relief well planning and equipment availability.

        (ii)   Spill response and containment method.

        (iii)  Well control competency assurance process in place.

        (iv)  Blow out contingency plan.

        (v)   Well control bridging document for contracted specific DP MODU with regard to drilling, completion, and or well testing or well flow back operations.

    (d)   QA/QC processes for acceptance of critical material or equipment.

    (e)   Detailed well completion design basis document, including:

        (i)   Proposed detailed well completion schematics (lower and upper completion drawings with all completions equipment identified).

        (ii)   Completion operational procedure document (upper and lower completion).

        (iii)  Well control plan during upper completion (tubing string installation operations), and or well flow-back operations.

    (f)   In addition, for proposed well workover, recompletion, or sidetracking (if applicable):

41

**EXHIBIT 4**

(i)     Description of proposed work scope, including proposed outcome.

(ii)    Diagram of proposed well after workover, recompletion, or sidetrack.

(iii)   Detailed operational procedure, including plans for well bore cleanout procedure and fluid loss mitigation method.

(iv)    Proposed well completion schematics (lower and upper completion drawings with all down hole completions equipment identified by name and dimensions).

(v)     Well control plan during well intervention operations.

10.3    <u>Subsequent Exploratory Operations at Objective Depth</u>:  After (i) the Exploratory Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production tests) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)     conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)     sidetrack the well bore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth (however, if a casing string is required to Deepen the well, then option "d" shall precede Deepening the well);

(d)     Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(e)     conduct production testing;

(f)     conduct other operations on the well not listed;

(g)     temporarily abandon the well; or

(h)     permanently plug and abandon the well.

Unless unanimously agreed otherwise by the Participating Parties, the completion of an Exploratory Well shall be proposed and conducted as a Development Operation.   Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of

42

EXHIBIT 4

information resulting from the previously approved operation, then the response periods set forth in this Article 10.3 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

10.3.1    Response to Operator's Proposals: Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct Subsequent Exploratory Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal. Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

10.3.2    Counterproposals:    If a Participating Party makes a counterproposal for Subsequent Exploratory Operations, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals. If conflicting proposals for Subsequent Exploratory Operations are made, preference for voting shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 10.3 (*Subsequent Exploration Operations at Objective Depth*). If different depths or bottom hole locations are proposed for Subsequent Exploratory Operations, preference shall be given to the shallowest depth (or the bottom hole location nearest the existing well bore) and then to other depths or bottom hole locations in descending (or more distant) order. After a decision to conduct a Subsequent Exploratory Operation is made and the Subsequent Exploratory Operation is commenced, the remaining proposals for other types of subsequent Exploratory Operations shall be deemed withdrawn. At the completion of the Subsequent Exploratory Operation, the Operator shall again submit proposal(s) for Subsequent Exploratory Operations to the Participating Parties, through the procedure provided herein, until such time as the well is temporarily or permanently abandoned.

10.3.3    Approval of Subsequent Exploratory Operations by All Parties: If the proposed Subsequent Exploratory Operation is approved by all the Participating Parties, the Operator shall commence the Subsequent Exploratory Operation at the Cost(s) and risk of the Participating Parties.

10.3.4    Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties: If a proposal for Subsequent Exploratory Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator (or substitute Operator) shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*), conduct the operation at the sole

43

EXHIBIT 4

Cost and risk of the Participating Parties. Any Non-Participating Party in a Subsequent Exploratory Operation shall be subject to Article 16.5.1 *(Non-Consent Exploratory and Subsequent Exploratory Operations)*. A Non-Participating Party in a Subsequent Exploratory Operation shall be relieved of the Costs, risks and obligations of the Subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

10.3.5 <u>Subsequent Exploratory Operations If Not Approved as a General Matter</u>: If no proposed Exploratory Operation (except a proposal to plug and abandon which shall be approved in accordance with Article 10.4 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable) receives sufficient vote to be approved as a General Matter pursuant to Article 10.3.4 *(Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties)*, then prior to an Exploratory Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the proposed Subsequent Exploratory Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Subsequent Exploratory Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 10.3 *(Subsequent Exploratory Operations at Objective Depth)*. Any Non-Participating Party in such Subsequent Exploratory Operation shall be subject to Article 16 *(Non-Consent Operations)*. Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the Subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

10.4 <u>Permanent Plugging and Abandoning Costs</u>: The permanent plugging and abandonment of an Exploratory Well that:

(a) is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 10.2.6(b),

(b) is to be plugged under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*), or

(c) has been previously temporarily abandoned under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*)

44

EXHIBIT 4

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 10.4. Approval to plug and abandon an Exploratory Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*). If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Exploratory Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Exploratory Well. If a rig is on location and a proposal to plug and abandon an Exploratory Well under either Article 10.4(a) or 10.4(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Exploratory Well, and shall give each Participating Party notice of that fact. If the proposal to plug and abandon an Exploratory Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Exploratory Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Exploratory Well proposal shall pay all Costs of plugging and abandoning that Exploratory Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*). The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

10.5 <u>Conclusion of Exploratory Operations</u>: Except as provided in Article 10.2.6 (*AFE Overruns and Substitute Well*), Exploratory Operations shall cease after the abandonment of the first Producible Well, whether permanent or temporary, and the release of the rig from that Producible Well.

10.6 <u>Subsurface Team</u>: Within sixty (60) days after release of any rig that drills a newly discovered Producible Reservoir, unless otherwise mutually agreed, the Parties shall form a subsurface team. The subsurface team will include at least one (1) representative from each of the Parties. Each Party shall be responsible for designating its representative(s) for the subsurface team. A Party's representatives for the subsurface team may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of each subsurface team member shall be the responsibility of the Party employing or providing the subsurface team member. The Operator shall serve as the coordinator for the subsurface team. Members of the subsurface team will work independently at office locations provided by the Party designating such member. The responsibilities of the subsurface team shall include but not be limited to the following items:

45

EXHIBIT 4

- making recommendations for Appraisal Operations,

- evaluating potential Producible Reservoirs within the Contract Area, and;

- advising the Project Team regarding subsurface matters so the Project Team can more effectively assist the Operator in the preparation of the Development Plan pursuant to Article 12 *(Project Team, Development Plan and Fabrication AFE).*

The subsurface team will meet as it deems necessary to carry out the above activities. Once the subsurface team is formed, it will remain in existence until the expiration or dissolution of the Contract Area.

## ARTICLE 11
## APPRAISAL OPERATIONS

11.1 <u>Proposal of Appraisal Operations</u>: After completion of Exploratory Operations, any Party may propose to conduct an Appraisal Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties. Once an Appraisal Operation is approved (either as a General Matter or as an Election), the Operator (or substitute Operator) at its sole discretion, may commence actual operations for the Appraisal Operation only after the necessary governmental approval(s) and/or permit(s) required to commence the Appraisal Operation have been secured by the Operator. Notwithstanding the foregoing, (i) the Operator shall not be entitled to charge the Joint Account for costs accrued in conducting an Appraisal Operation until such time as necessary governmental approval(s) and/or permit(s) are received and (ii) in the event the Operator places the rig on standby prior to receiving necessary governmental approval(s) and/or permit(s) to commence an Appraisal Well, the Operator shall only be entitled to charge the Joint Account for a maximum of three (3) days of standby time, subject to each Party's rights to dispute and audit such charges pursuant to this Agreement. Except as provided in Article 16.2 *(Acreage Forfeiture Provisions)* and Article 16.4 *(Non-Consent Operations to Maintain Contract Area)*, Costs of a non-consent Appraisal Operation will be recouped in accordance with Article 16 *(Non-Consent Operations).*

11.1.1 <u>Well Plan's Minimum Specifics</u>: The Well Plan for the Appraisal Operation shall include at least the information set forth under Article 10.2.1 *(Well Plan's Minimum Specifics).*

11.1.2 <u>Counter Proposals</u>: If, within fifteen (15) days after a proposal for an Appraisal Well has been submitted, any other Party submits a counter proposal for:

(a) an alternative surface or bottom hole location; or

46

EXHIBIT 4

(b)      an alternative Objective Depth

for the proposed Appraisal Well, then the Operator shall call for a meeting of the Parties (to be held within five (5) days of the receipt of the last counter proposal) for the purpose of determining by the Vote of the Parties, which location or Objective Depth shall be proposed.  In the event neither the original proposal nor any counter proposal(s) receive approval by Vote, there shall be a period of twenty (20) days from receipt by the other Party(s) of the last counter proposal, during which the Parties shall use good faith efforts to reach agreement as to which location or Objective Depth shall be proposed for the Appraisal Well.  If, at the conclusion of said twenty (20) day period the Parties have not reached agreement, the Operator shall select the proposal upon which the Parties make their Election and, notwithstanding the provisions of 8.3 (*Response Time for General Matters and Elections)*, the Parties shall have fifteen (15) days after receipt of notice of the Operator's selection in which to make an Election.  After an Appraisal Well has been approved by Election and operations have commenced, the remaining counter proposals shall be deemed withdrawn.

11.1.3    <u>Pre-Spud Technical Meeting & Revision of Well Plan</u>:  The Pre-spud Technical Meeting & Revision of the Well Plan shall be in accordance with Article 10.2.3 *(Pre-Spud Technical Meeting & Revision of Well Plan).*

11.1.4    <u>Timely Operations</u>:  An Appraisal Operation shall be commenced within two hundred seventy (270) days following the  end of the period for the approval of the Appraisal Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure)*.

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to commence the Appraisal Operation within the two hundred seventy (270) day period, the approved Appraisal Operation shall be deemed withdrawn, with the effect as if the Appraisal Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 (*Substitute Operator if Operator Fails to Commence Operations*).

If an approved or identical Appraisal Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Appraisal Operation, will be chargeable to the Participating Parties.   An Appraisal Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Appraisal Operation are undertaken.

47

EXHIBIT 4

11.1.5   <u>AFE Overruns and Substitute Well</u>:  The Operator shall timely commence an Appraisal Operation and continue the operation with due diligence to the Objective Depth or until:

    (a)   a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

    (b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

    (c)   the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Appraisal Well is abandoned due to the conditions described under 11.1.5 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Appraisal Well will make an Election whether to participate in the proposed substitute well.  The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate.  Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 (*Non-Consent Operations*), whichever is applicable.*

11.2   <u>Subsequent Appraisal Operations at Objective Depth</u>:  After (i) the Appraisal Well (or its substitute) has been drilled to its Objective Depth, (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon) and (iii) all logs and tests (excluding production testing) have been distributed to the Participating Parties, the Operator, shall promptly notify the Participating Parties (and Non-Participating Party(ies) in the case of a proposal under 11.2 (c) and (d), if applicable) of the Operator's proposal for one of the following operations:

    (a)   conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

    (b)   sidetrack the well bore to core the formations encountered;

    (c)   Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

    (d)   Deepen the well to a new Objective Depth;

48

EXHIBIT 4

(e)       conduct production testing;

(f)       conduct other operations on the well not listed;

(g)       temporarily abandon the well; or

(j)       permanently plug and abandon the well.

Unless unanimously agreed otherwise by the Participating Parties, the completion of an Appraisal Well shall be proposed and conducted as a Development Operation. Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 11.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

11.2.1    <u>Response to Operator's Proposals</u>:  Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Appraisal Operations, the Participating Parties shall respond to the Operator's proposal by making its Election to Operator's proposal or making a counterproposal.  Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

11.2.2    <u>Counterproposals</u>:  If a Participating Party makes a counterproposal for a subsequent Appraisal Operation, the other Participating Parties shall have an additional twenty-four (24) hours to respond to all counterproposals.  If conflicting proposals for subsequent Appraisal Operations are made, preference for voting shall be given first to operation (a) above, next to operation (b) above, and so forth.  If different depths or locations are proposed for subsequent Appraisal Operations, preference shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order.  After a decision to conduct a subsequent Appraisal Operation is made and the subsequent Appraisal Operation is commenced, the remaining proposals for other types of subsequent Appraisal Operations shall be deemed withdrawn.  At the completion of the subsequent Appraisal Operation, the Operator shall again submit proposal(s) for subsequent Appraisal Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

11.2.3    <u>Approval of Subsequent Appraisal Operations by All Parties</u>:  If the proposed subsequent Appraisal Operation is approved by all the then Participating Parties,

EXHIBIT 4

the Operator shall commence the subsequent Appraisal Operation at the Cost(s) and risk of the Participating Parties.

11.2.4  Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties:  If a proposal for subsequent Appraisal Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 11.5 [*Permanent Plugging and Abandoning Costs*] or Article 18.1 [*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator (or substitute Operator) shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*), conduct the operation at the sole Cost and risk of the Participating Parties.  Any Non-Participating Party in a subsequent Appraisal Operation shall be subject to Article 16.5.2 *(Non-Consent Appraisal Operations)*.  A Non-Participating Party in a subsequent Appraisal Operation shall be relieved of the Costs, risks and obligations of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

11.2.5  Subsequent Appraisal Operations If Not Approved as a General Matter:  If no proposed Appraisal Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 11.2.4 *(Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties)*, then prior to an Appraisal Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Appraisal Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Appraisal Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 11.2 *(Subsequent Appraisal Operations at Objective Depth)*.  Any Non-Participating Party in such subsequent Appraisal Operation shall be subject to Article 16 *(Non-Consent Operations)*.  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

11.3  Election by Original Non-Participating Parties in Deepening or Sidetracking Appraisal Operations: If an Appraisal Well is drilled to its initial Objective Depth and the Participating Parties have secured the requisite approval to either:

(a)  Sidetrack said well, or

EXHIBIT 4

(b)    Deepen said well,

then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepen operation,  the Operator shall notify each original Non-Participating Party of the proposal.   Each original Non-Participating Party may respond with an Election regarding such a proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.   Any original Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Appraisal Well shall:

(i)    be deemed to be underinvested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.9 (*Underinvestment of Costs*) (and the Parties that participated in drilling to the initial Objective Depth will be deemed overinvested in that amount), and

(ii)    remain a Non-Participating Party in the Appraisal Well to the initial Objective Depth until the Costs recoverable under Article 16 *(Non-Consent Operations),* less any payments through a Disproportionate Spending Settlement and/or Article 16.9 *(Underinvestment of Costs),* have been recouped by the original Participating Parties.

11.4    Deeper Drilling:  A proposal to drill an Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well or to re-enter and Deepen an existing Appraisal Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well shall require approval as a General Matter and shall be further subject to the following provisions.

11.4.1    Limited Participation in Deeper Drilling:  If a proposal is made pursuant to Article 11.4 *(Deeper Drilling)* above, any Party may either:

(a)    make an Election to participate in the proposed Deeper Drilling operation; or

(b)    make an Election not to participate in the proposed Deeper Drilling operation; or

(c)    make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A party making an Election to limit its participation in a deeper Appraisal Well to the base of the deepest Producible Reservoir under (c) above shall bear its

51

EXHIBIT 4

Participating interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *(Non-Consent Operations).*

11.5   Permanent Plugging and Abandoning Costs:  The permanent plugging and abandonment of an Appraisal Well that:

(a)   is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 11.1.5(b),

(b)   is to be plugged under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*), or

(c)   has been previously temporarily abandoned under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 11.5.  Approval to plug and abandon an Appraisal Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If any Participating Party fails to respond within the applicable response period for a proposal to plug and abandon an Appraosal Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Appraisal Well.  If a rig is on location and a proposal to plug and abandon an Appraisal Well under either Article 11.5(a) or 11.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Appraisal Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon an Appraisal Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Appraisal Well and shall give each Participating Party notice of that fact.

The Participating Parties in an Appraisal Well proposal shall pay all Costs of plugging and abandoning that Appraisal Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  The Participating Parties in that Non-Consent Operation are

52

EXHIBIT 4

responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

11.6     Feasibility Study:   Any Party may propose a feasibility study (the conduct of such proposal shall not require approval as a General Matter) for any technical, engineering or other issues affecting Appraisal or future Development Operations on the Contract Area. The proposal of a feasibility study shall not cause the formation of the Project Team.  A feasibility study may or may not require a study team, will be of a shorter duration, and will be more narrow in scope than the Project Team.   The process for approving a feasibility study to be charged to the joint account is listed below, however, any Party may prepare its own feasibility study at its sole cost.

11.6.1     Feasibility Study Proposal and Meeting:  A proposal for a feasibility study shall be accomplished by a Party furnishing (1) a memo describing the scope of the feasibility study, and (2) a cost estimate of the feasibility study, to the other Parties.  Within thirty (30) days after the feasibility study proposal, the Operator shall call a meeting of the Parties.  At such meeting, the Parties shall discuss and resolve:

(a)     the positions of all Parties on the proposed feasibility study,

(b)     the necessity of the study,

(c)     composition and organization of any study team, if applicable, associated with the proposed feasibility study, and

(d)     any other related matter(s).

The Operator may modify any proposal for a feasibility study as a result of such meeting.  Operator may, within thirty (30) days after such meeting, submit to the other Parties such feasibility study proposal along with an AFE for approval.

11.6.2     Election on Proposed Feasibility Study:  All Parties shall notify the Operator of their Participation Election in the feasibility study within thirty (30) days after receipt of the AFE for the proposed feasibility study.  If any Party makes an Election not to participate in the feasibility study, then each Participating Party shall elect to either: (i) proceed with the feasibility study with the interest of the Non-Participating Party shared by the Participating Parties on the basis of their respective Working Interests, unless otherwise agreed, or (ii) change its Election to become a Non-Participating Party.   The Operator shall commence the feasibility study on behalf of all Participating Parties subject to Article 8.2.4 (*Participation by Fewer Than All Parties*).  A Party making an Election not to participate in an approved feasibility study shall become a Non-Participating Party as to the costs of the feasibility study and shall be subject to the provisions of Article 16.5.3 (*Non-Consent Geophysical Operations, Feasibility Study,*

53

EXHIBIT 4

*Project Team and/or Development Plan).*  A Non-Participating Party shall not receive the data, information or results of the feasibility study until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasible Study, Project Team and/or Development Plan).*

11.6.3   <u>Compensation and</u> <u>Costs of Feasibility Study</u>:  Each Participating Party shall be responsible for designating its representative(s), if any, for the feasibility study.  A Party's representatives for the feasibility study may be changed at any time.  The salaries, burdens, benefits, other compensation and expenses of a Party's employees, including internal engineering support staff assigned to the feasibility study, shall be the responsibility of the Party employing such representatives unless the Participating Parties unanimously agree to bill such Costs to the Participating Parties in accordance with their Participating Interest.  Costs and expenses of a feasibility study charged to the Participating Parties in accordance with their Participating Interest shall include, but not be limited to, contract services and related miscellaneous expenses.  All Costs and expenses of the feasibility study shall be handled in accordance with Exhibit "C" (Accounting *Procedure).*

11.7   <u>Conclusion of Appraisal Operations</u>:  Any Party may propose that Appraisal Operations have been concluded on the Contract Area by notifying the other Parties.  Except as provided below in this Article 11.7, Appraisal Operations shall conclude, and all subsequent operations in the Contract Area shall be Development Operations, upon the earliest of:

(a)   the approval of the conclusion of Appraisal Operations which shall require the affirmative vote of two (2) or more Parties with a combined Working Interest of greater than fifty percent (50%); or

(b)   the point in time when no new Appraisal Operation has been approved within twelve (12) months following the rig release (or the cessation of operations) from the previous Appraisal Operation; or

(c)   the abandonment, whether permanent or temporary, of the third Appraisal Well, and the release of the rig from that Appraisal Well (including any substitute well for that Appraisal Well).  For counting purposes, an Appraisal Well and any subsequent Appraisal Operation(s) therein shall collectively count as only one (1) Appraisal Well.

The formation of a Project Team shall not require the conclusion of Appraisal Operations and may occur concurrently with Appraisal Operations.

Notwithstanding anything to the contrary in this Article 11.7, after the conclusion of Appraisal Operations, but prior to the approval of a Development Plan:

54

EXHIBIT 4

(i)      any Party may propose the drilling of an additional well or any Participating Party in a well may propose additional well operations in such well as an Appraisal Operation, and

(ii)     the approval of a proposed additional well or a proposed operation in a previously drilled well shall require unanimous agreement except:

(a)      as otherwise provided in Article 16.4 (*Non-Consent Operations to Maintain the Contract Area*), and

(b)      with respect to any well that was approved after the conclusion of Appraisal Operations but prior to the approval of a Development Plan, any subsequent operation in such well at Objective Depth proposed in accordance with Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) shall be approved in accordance with either Article 11.2.3 (*Approval of Subsequent Appraisal Operations by All Parties*), Article 11.2.4 (*Approval of Subsequent Appraisal Operations as a General Matter by Fewer Than All Parties*) or Article 11.2.5 (*Subsequent Appraisal Operations If Not Approved as a General Matter*), whichever is applicable.

Any such additional well or additional well operation (including a substitute well and all subsequent operations at Objective Depth conducted in or through the well bore of the well) shall be deemed an Appraisal Operation and, unless Article 16.4 (*Non-Consent Operations to Maintain the Contract Area*) applies to the proposed operation, shall be proposed and approved in accordance with this Article 11.7 and conducted as an Appraisal Operation with the intent being that with such approval Appraisal Operations have not concluded and with the exception, however, that the non-consent penalty for an operation proposed to complete the well shall be equivalent to the non-consent penalty for a Development Operation as set forth in Article 16.5.4 (*Non-Consent Development Operations*).

# ARTICLE 12
# PROJECT TEAM, DEVELOPMENT PLAN AND FABRICATION AFE

12.1     <u>Phased Development Plans</u>:  The results of Exploratory and/or Appraisal Operations may justify the development of one or more Producible Reservoirs within the Contract Area. The Operator shall prepare for the approval of the Parties a Development Plan in order to pursue such development of the Contract Area.  In order to provide for the orderly preparation of the Development Plan, unless otherwise mutually agreed by all the Parties, the Parties shall form an Project Team, subject to Article 12.2 (*Proposal of Project*

EXHIBIT 4

*Team)*, whose duties are more specifically set forth in Exhibit "G" *(Project Team and Technology Shaping)* and shall be charged with assisting the Operator in the preparation of a Development Plan and in design, engineering, fabrication, transportation, installation and operation of the Production System for the Contract Area.  In view of the Costs and scope of Development Operations for the Contract Area, the Parties may agree to divide Development Operations into an initial Development Phase and one or more subsequent Development Phases.  Each Development Phase shall be centered upon the installation of a new or expanded Production System for the Contract Area. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be developed, approved and implemented pursuant to this Article 12 *(Project Team, Development Plan and Fabrication AFE).*

12.2   <u>Proposal of Project Team</u>:  No Party may submit a proposal for the formation of a Project Team prior to sixty (60) days following rig release from the first Appraisal Well that reaches a total vertical depth of at least twenty-eight thousand feet (28,000' TVD).  The Operator shall have the exclusive right to submit a proposal for the formation of a Project Team commencing sixty (60) days following rig release from the first Appraisal Well that reaches a total vertical depth of at least twenty-eight thousand feet (28,000' TVD) until six (6) months following conclusion of Appraisal Operations; however, if an Appraisal Operation is approved prior to the approval of the Project Team, the Operator's exclusive period to propose a Project Team shall be extended until six (6) months after rig release from the last approved Appraisal Operation.   If the Operator fails to propose the formation of the Project Team during its exclusive proposal period, then, after expiration of the Operator's exclusive proposal period, any Participating Party in a Producible Well may propose the formation of a Project Team.  If the Operator's exclusive period does not apply, any Participating Party in a Producible Well may propose the formation of a Project Team.

12.3   <u>Project Team Approval</u>:  A Project Team proposal requires approval by Election.  Each Party shall have an Election as to its participation in the AFE for the Project Team, pursuant to Article 8.3.3 *(Other AFE Related Operations).* The formation and administration of the Project Team shall be handled in accordance with Exhibit "G" *(Project Team and Technology Sharing)* with the Costs of the Project Team being charged in accordance with Exhibit "C" *(Accounting Procedure).*  A Party which makes an Election not to participate in the Project Team shall become a Non-Participating Party as to the costs of the Project Team and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*  A Non-Participating Party shall not have access to the data or studies prepared by the Project Team until satisfaction of the requirements of Article *16.5.3 (Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*

12.4   <u>Proposal of a Development Plan</u>:  No Party may submit a proposal for a Development Plan prior to the conclusion of Appraisal Operations.  The Operator shall have the exclusive right for a period of twelve (12) months following the conclusion of Appraisal

Operations to submit a Development Plan for the review and approval of the Parties, such proposed Development Plan to be based upon the work and recommendations of the Project Team provided such Project Team is proposed and approved; however, if an additional Appraisal Operation is approved pursuant to Article 11.7(ii) prior to the approval of a Development Plan, then:

(a)     the prior conclusion of Appraisal Operations shall be deemed not to have occurred and Appraisal Operations shall thereafter be deemed to conclude upon rig release from such approved additional Appraisal Operation and any proposed Development Plan shall be deemed withdrawn as if it were never submitted, and

(b)     the Operator's exclusive period to propose a Development Plan shall be extended until twelve (12) months after rig release from the last approved additional Appraisal Operation.

If the Operator has begun preparation of a Development Plan during the first nine (9) months of its twelve (12) month exclusive period to propose a Development Plan, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, then the Operator may request an extension of the exclusive period to allow completion of the work in progress.  Any request for an extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than three (3) months from the expiration of the exclusive submission period. The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's exclusive submission period.

12.4.1   Alternative Development Plans:  If a Development Plan is not timely submitted by the Operator or the Development Plan submitted by the Operator is not approved pursuant to Article 12.6 *(Approval of a Development Plan)* or 12.6.1 *(Amended Approval Requirement for Development Plans)* below, then any Party shall have the option to submit a Development Plan. Development Plans proposed after expiration of the Operator's exclusive period shall be considered for approval by the Parties in the order in which the Development Plans are submitted.

12.5   Content of the Development Plan:   Any Development Plan proposed under this Agreement shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development Plan and Production System.   All Development Plans submitted shall include at least the following information:

(a)     Production System:  Description of the Production System including:

(i)      the type of Production System proposed (i.e., tension leg well jacket, floating production system, spar, compliant tower, subsea, etc.),

57

EXHIBIT 4

including the Production System's location, configuration (i.e., number of well slots or subsea tiebacks) and production capacity;

(ii)    a description of the Facilities, including the gathering and pipeline system necessary to transport the Hydrocarbons from the well heads to shore;

(iii)    a projected time schedule for designing, contracting, fabricating, constructing, or otherwise acquiring,  transporting and installing the Production System;

(iv)    the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter;

(v)    the estimated Costs of the Production System not in the form of an AFE;

(vi)    a description of any proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)    a description of the proposed well completion techniques (i.e. dual vs. single); and

(viii)    the type of Hydrocarbon transmission system (e.g. pipeline vs. tanker, etc.)

(b)    <u>Producible Reservoirs</u>:  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c)    <u>Recoverable Reserves</u>: An estimated range of recoverable reserves for the proposed Development Plan and a schedule of the initial and estimated daily rate of Hydrocarbon production thereafter;

(d)    <u>Predrilling Operations</u>:  A reasonable description of predrilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each predrilling operation;

(e)    <u>Development Wells</u>:  A reasonable description of drilling and completion plans for all Development Wells, including an estimate of the timing, Cost and location of each well;

(f)    <u>Temporarily Abandoned Exploratory and/or Appraisal Wells</u>:  A reasonable description of the completion plans for any previously temporarily abandoned Exploratory Well and/or Appraisal Well(s) to be completed as part of the

58

EXHIBIT 4

Development Plan, including an estimate of the timing and cost of completing such well(s);

(g)   <u>Tieback Operations</u>: If the Development Plan requires the tieback or use of facilities located outside the Contract Area, a written proposal from the owner(s) of such offsite facilities to process and handle Hydrocarbon production from the Contract Area specifying the capacity to be made available at such "offsite facility" and the amount of all tariffs, processing fees, and other fees and charges to handle or process Hydrocarbon production from the Contract Area;

(h)   <u>Final Design AFE</u>: An AFE for the completion of the detailed design of the Production System including final specifications, blueprints and models suitable for contractors to formulate their bids on the components of the Production System.  The AFE shall also include the Costs of the Project Team from approval of the Development Plan through preparation and approval of the Fabrication AFE and an estimate of the Cost of contract labor and services for the design and testing necessary to adequately define the  proposed Production System for the bidding of fabrication; and

(i)   <u>Other Data</u>:  Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Production System provided for in the Development Plan.

(j)   <u>Field Operating Scheme</u>:  A description of the field operating scheme, its method, requirements, expected frequencies of intervention, and Costs;

(k)   <u>Field Abandonment</u>:  A description of field abandonment plan (if applicable);

(l)   <u>Reservoir Plan</u>:  A reservoir plan that provides strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and that includes, but is not limited to:

    (i)   an estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

    (ii)   the planned bottomhole locations and timing of each anticipated well for each Producible Reservoir;

    (iii)   a reservoir management and depletion strategy for each Producible Reservoir addressing issues that include, but are not limited to:

        (A)   estimates of oil and gas in place;

        (B)   reservoir rock and fluid characteristics;

        (C)   depletion mechanism;

59

**EXHIBIT 4**

<ol type="A" start="4">
<li>enhanced recovery and pressure maintenance plans and objectives;</li>
<li>reservoir surveillance programs (for example, cased-hole logging, static pressures) and their objectives;</li>
<li>well performance goals (for example, target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets);</li>
<li>reservoir performance goals (for example, target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals); and</li>
</ol>

(m)     <u>Disposal Wells</u>:  The estimated Cost of disposal wells, if applicable;

12.6    <u>Approval of a Development Plan</u>:  The Operator shall have sixty (60) days to obtain unanimous approval of the Parties for any Development Plan proposal submitted by the Operator during its exclusive period.  If either (i) the Operator fails to gain the unanimous approval of the Parties or (ii) the Operator fails to submit a Development Plan, the Parties shall have a period of sixty (60) days commencing with either the expiration of the Operator's exclusive period or the failure to obtain approval in which either the Operator's Development Plan or an alternate Development Plan may be unanimously approved by the Parties.

12.6.1   <u>Amended Approval Requirement for Development Plans</u>:  If a Development Plan is not unanimously approved upon conclusion of the one hundred twenty (120) day period provided in Article 12.6 *(Approval of Development Plan)* above, then the unanimous agreement requirement, provided for under Article 12.6 *(Approval of a Development* Plan) shall be amended as follows:

(a)     During this amended approval process, consideration for approval by the Parties shall be given first and simultaneously to any previously proposed Development Plan.

(b)     For a sixty (60) day period following expiration of the four (4) month period, approval of a Development Plan shall be by the Parties as a General Matter.

(c)     If a Development Plan is not approved as a General Matter during the sixty (60) day period provided in Article 12.6.1(b), then the Development Plan shall be approved according to the following:

(i)     If there is only one (1) Development Plan submitted and such Development Plan receives an affirmative vote of at least fifty

60

**EXHIBIT 4**

percent (50%) of the voting interest, such Development Plan shall be deemed approved by the Parties.

(ii) If there are two (2) or more Development Plans submitted and one (i) Development Plan receives an affirmative vote of at least fifty percent (50%) of the voting interest and the other Development Plan(s) receives an affirmative vote of less than fifty percent (50%) of the voting interest, then the Development Plan receiving the affirmative vote of at least fifty percent (50%) of the voting interest shall be deemed approved by the Parties.

(iii) If two (2) competing Development Plans each receive an affirmative vote of fifty percent (50%) voting interest, the first proposed Development Plan shall be deemed approved.

(iv) If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article 12.6.1(c)(ii) or Article 12.6.1(c)(iii), then the earliest proposed Development Plan which receives the affirmative vote of at least twenty-five percent (25%) shall be deemed approved.

(v) If no Development Plan is approved in accordance with Article 12.6.1(c)(i), Article 12.6.1(c)(ii), Article 12.6.1(c)(iii) or Article 12.6.1(a)(iv), then the Parties will use reasonable efforts to approve a compromise Development Plan pursuant to the terms of Exhibit "H" (*Dispute Resolution Procedure*) attached hereto.

12.7 <u>Approved Development Plan and Final Design AFE</u>:

12.7.1 <u>Final Design AFE</u>:  Each Participating Party in an approved Development Plan has committed to participate in the Final Design AFE submitted as a part of the approved Development Plan.   Any Non-Participating Party in an approved Development Plan shall be subject to the Non-Consent provisions as set forth in Article 16.5.3 *(Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan).*  Upon approval of a Development Plan, any original Non-Participating Party shall have the opportunity to elect to participate in accordance with Article 8.2.3 (*Second Opportunity to Participate*).  If fewer than all Parties approve a Development Plan, such Development Plan shall not be deemed approved unless the obligations set forth in Article 8.2.4 (*Participation by Fewer Than All Parties*) are satisfied.

12.7.2 <u>Long Lead Production System AFE</u>:  The Operator has the right, following the conclusion of Exploratory Operations and prior to the approval of the Fabrication AFE, to submit an AFE(s) ("Long Lead Production System AFE") for the

acquisition of long lead-time items for the Production System ("Long Lead Production System Items") as set forth below:

(i)   Prior to approval of the Development Plan, a Lond Lead Production System AFE requires approval by the unanimous agreement of the Parties.

(ii)   After approval of the Development Plan, A Long Lead Production System AFE requires approval by the unanimous agreement of the Participating Parties in the Development Plan.

12.7.2.1   <u>Non-Participating Parties in the Well AFE, Completion AFE, or Fabrication AFE Who Have Previously Approve a Long Lead Production System AFE</u>:   If a Party, who was in unanimous agreement with the other Participating Parties in a Long Lead Production System AFE, does not approve the Well AFE, completion AFE, or Fabrication AFE for which such Long Lead Production System Items were procured, the Operator shall reimburse that Party its Participating Interest Share of the Costs of those Long Lead Production System Items within thirty (30) days following the approval of the Well AFE, completion AFE, or Fabrication AFE, whichever is applicable; provided, however, that Party's share of those Costs shall be included in the calculation of any Hydrocarabon Recoupment, if applicable, to which it is subject to in accordance with Article 16 (*Non-Consent Operations).* The Operator shall invoice the Participating Parties in the Fabrication AFE for their proportionate share of the reimbursement under this Article 12.7.2.1 in accordance with Exhibit "C".

12.7.2.2   <u>Disposition of Long Lead Production System Items as Surplus Material</u>: If Long Lead Production Systme Items are not utilized for the Production Systema as proposed and approved, then the disposition of such Long Lead Production System Items shall be in accordance with Exhibit "C" Article IV, Paragraph 3 (*Disposition of Surplus),* unless otherwise unanimously agreed to by the Participating Parties."

12.8   <u>Fabrication AFE</u>:   Within ninety (90) days from the date following approval of the Development Plan as provided in Article 12.6 (*Approval of a Development Plan),* unless such additional time is necessary due to circumstances beyond Operator's control, Operator shall submit a Fabrication AFE that conforms to the Approved Development Plan for the Production System to all Parties for their Election.   The Fabrication AFE shall consist of separate AFEs for each major component in the construction, fabrication or other acquisition and installation of the Production System identified in the approved Development Plan and Final Design AFE.   If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the Development Plan.

EXHIBIT 4

The Fabrication AFE shall consist of a separate AFE for: (i) the structural components of the Initial Production System, (ii) the equipment and Facilities to be located on the Contract Area (or located off the Contract Area but serving the Contract Area), (iii) any pipelines or other Facilities for handling Hydrocarbon production, and (iv) installation. The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFEs comprising the Fabrication AFE.  Development Wells shall be subject to separate AFEs and shall not be included within the Fabrication AFE.

12.8.1   Approval of Fabrication AFE:  The Parties shall make their Election as to the Fabrication AFE within the time period as described in Article 8.3.2 (*Production System Construction/Fabrication AFE).*  If all the Parties make an Election to participate in the Fabrication AFE, then the Operator shall proceed to acquire, design, fabricate, construct, transport and install the Initial Production System for the Joint Account of the Parties.  By making an Election to participate in the Fabrication AFE, each Participating Party commits to pay its Participating Interest share of the Costs, risks and liabilities of the Production System as set out in the Fabrication AFE subject to Article 6.2.5 (*Supplemental AFE for Cost Overruns on Fabrication AFE*).  If fewer than all Parties approve the proposed Fabrication AFE, each Participating Party in the Fabrication AFE shall, within fifteen (15) days (exclusive of Saturdays, Sundays and federal holidays), elect to either:

(a)   limit its participation in the proposed Fabrication AFE to its Working Interest share, or

(b)   bear its Participating Interest share of the proposed Fabrication AFE.

Failure to elect shall be deemed an election under (a) above.  If, as a result of the above Elections, the Participating Parties fail to agree to proportionately assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE, then, unless the Participating Parties otherwise agree within ten (10) days (exclusive of Saturdays, Sundays and federal holidays) following the last applicable Election under (a) or (b) above to assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE as set forth in Article 8.2.4 (*Participation by Fewer Than All Parties*), the proposal for the proposed Fabrication AFE shall be deemed withdrawn.  Once the Participating Party(ies) elect to participate in and assume one hundred percent (100%) of the Cost and risk of the proposed Fabrication AFE, the Operator shall proceed to construct, fabricate or acquire and install the Production System for the Joint Account of the Participating Party(ies).

Each Non-Operating Participating Party shall have the option to attend regularly scheduled meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Fabrication AFE as well as visits to the construction sites.

EXHIBIT 4

12.9     Assignment of Interest:   If any Party makes an Election not to participate in the Fabrication AFE for the Initial Production System under an approved Development Plan, then the Non-Participating Party shall be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and be deemed a Withdrawing Party subject to Article 17 *(Withdrawal from Agreement)*.   The Participating Parties shall share the interest assigned in the proportion which a Participating Party's Working Interest bears to the sum of the Working Interests of all of the Participating Parties (unless otherwise unanimously agreed by the Participating Parties).   If the Operator makes an Election not to participate in the Fabrication AFE, then the Participating Parties shall select a successor Operator pursuant to Article 4.5 *(Selection of Successor Operator)*.   If Development Operations under the Development Plan are not timely commenced pursuant to Article 12.14 *(Timely Operations for Production Systems)*, the Non-Participating Party shall be entitled to a reassignment of its Working Interest, shall not be subject to Article 16.2 *(Acreage Forfeiture Provisions)* and shall not be deemed a Withdrawing Party subject to Article 17 *(Withdrawal from Agreement)*.

12.10     Minor Modifications and Revisions to Development Plans:   In implementing the Development Plan, the Operator shall advise the Participating Parties of progress. As additional information becomes available, the Operator may make modifications and revisions to the Development Plan subject to the following.

    12.10.1   Minor Modifications to Development Plans:   The Operator may, without the approval of the Participating Parties, make minor modifications to a Development Plan if such minor modifications are both necessary and reasonable to accomplish the Development Plan.   For purposes of this paragraph, a minor modification is one of the following:

        (a)     a modification that does not cause the cumulative estimated Cost of the Fabrication   AFE to increase by more than the amount provided in Article 6.2.5 (*Supplemental AFE for Cost Overruns on Fabrication AFE*), and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*); or

        (b)     a modification that does not cause the cumulative estimated Cost of the Final Design AFE to increase by more than the amount provided in Article 6.2.4 (*Supplemental AFE for Cost Overruns on Final Design AFE*), and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*); or

        (c)     a modification that is necessary for health, safety or environmental reasons or regulatory requirements and does not exceed that does not cause the cumulative estimated Cost of the Fabrication AFE to increase by more than ten percent (10%) or ten million dollars ($10,000,000),

EXHIBIT 4

whichever is less, and is not a major modification as defined in Article 12.11 (*Major Modifications to Development Plans*).

12.10.2   <u>Revisions to Development Plans</u>:   A Development Plan may be revised as needed to accommodate new data, interpretations or other changes not covered by Article 12.10.1 *(Minor Modifications to Development Plans)* or by Article 12.11 *(Major Modifications to Development Plans). Any Participating Party may propose a revision by notifying the Operator.* Any such revision pursuant to this Article 12.10.2 *(Revisions to Development Plans)* shall require General Matter approval of the Participating Parties in the Development Plan.   The Operator shall provide a copy of the revised Development Plan to all Parties, except in the case when the Development Plan is automatically revised as a result of a Development Operation not included in the then current Development Plan being approved as a General Matter as provided in Article 13.1 *(Proposal of Development Operations).*

12.11   <u>Major Modifications to Development Plans</u>: Any Participating Party may propose a major modification by notifying the Operator.   The Operator shall promptly notify the Participating Parties whenever a major modification to a Development Plan is proposed or anticipated and shall furnish to the Participating Parties the proposal to modify the Development Plan (and associated AFE's) along with the basis for the proposal and estimated Costs.  A major modification is one of the following:

(a)      the type of Production System is changed; or

(b)      the number of well slots of the Production System is decreased by at least twenty-five percent (25%); or

(c)      the type of Hydrocarbon transmission system is changed (e.g., pipeline vs. barge, etc.); or

(d)      the Participating Parties in the Development Plan decide to terminate the Development Plan by not initiating production.

(e)      the overall Cost of the Production System is to be increased more than twenty-five percent (25%); or

(f)      the overall Cost of the Production System is to be decreased more than twenty-five percent (25%); or

(g)      the initial selection of the location of the Production System is to be changed by more than five thousand feet (5000') laterally in any direction; or

(h)      the initial daily production processing capacity of the Facilities is to be changed by at least twenty-five percent (25%); or

(i)      the number of Development Wells is to be increased or decreased by at least twenty-five percent (25%); or

(j)      the proposed hydrate or paraffin control system or technique, pressure maintenance system, or enhanced recovery plan is to be materially changed; or

65

EXHIBIT 4

(k)     the proposed number of well completions per wellbore, that is, dual versus single, is to be changed; or

(l)     the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than one hundred and eighty (180) days; or

(m)    the following changes result in a thirty-five percent (35.00%) or more increase in cost, inclusive of tariffs, fees and related charges, if applicable, to the gathering and pipeline systems: (i) a change in the type, length or route of the gathering and pipeline systems necessary to gather or transport the Hydrocarbons from the wellheads to a pre-existing Development System or an Offsite Host Facility as provided in the Development Plan, in the case of a tieback; or (ii) a change in the type, length or route of the gathering and pipeline system necessary to gather or transport the Hydrocarbons from the production equipment on the Facilities to the interconnect of the selected interconnect to downstream export pipelines; or (iii) a change in the type, length or route of any third party pipeline to be built specifically to transport Hydrocarbons from the Production System to the interconnect with the existing Export Pipelines for those instances that at the time the Development Plan is drafted, no existing Export Pipeline capable of transporting Hydrocarbons from the Production System is within two miles of the planned Production System; or (iv) a change to existing processing, gathering, or transporting contracts included in the approved Development Plan; or

(n)     the estimated capital expenditures in any calendar year are to be increased by at least thirty percent (30%) of the project's estimated total gross capital expenditures.

12.11.1   <u>Major Modifications to Development Plans Prior to Approval of the Fabrication AFE</u>:   Whenever a major modification to a Development Plan is proposed prior to the approval of the Fabrication AFE, the Operator shall furnish the Participating Parties in the Development Plan with the proposed modification to the Development Plan (and associated AFEs).   That major modification shall require the unanimous approval of all Participating Parties in the Development Plan.   If such major modification to the Development Plan is approved, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Development Plan.   The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of the modified Development Plan to notify the Operator in writing that its will participate in the modified Development Plan (and associated AFEs).   If an original Non-Participating Party participates in the modified Development Plan, it shall be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with the original approved Development Plan (and associated AFEs).   An original Non-Participating Party who makes an Election to participate in the modified

Development Plan shall eliminate the Underinvestment through a settlement of Costs pursuant to Article 16.9.1 (*Settlement of Underinvestments*).

12.11.2   <u>Major Modifications to Development Plans After Approval of the Fabrication AFE</u>:   Whenever a major modification to a Development Plan is proposed after the approval of the Fabrication AFE and prior to the installation of the Production System, the Operator shall furnish the Participating Parties in the Fabrication AFE with the proposed modification to the Development Plan (and associated AFEs).   Any major modification shall require the unanimous approval of all Participating Parties in the Fabrication AFE. If a major modification to the initial Development Plan proposed pursuant to Article 12.11(a), Article 12.11(c), or Article 12.11(f) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan (and associated AFEs) to each Non-Participating Party in the Fabrication AFE.   The Non-Participating Party has the right for a period of thirty (30) days (exclusive of Saturdays, Sundays and federal holidays) following receipt of such modified Development Plan to notify the Operator in writing that its will participate in such modified Development Plan (and associated AFEs).   If an original Non-Participating Party participates in such modified Development Plan, it shall be an under-invested Party in an amount equal to its Non-Participating Interest share of the actual Costs incurred in activities and operations associated with (a) the original approved Development Plan (and associated AFEs) if it did not participate in that Development Plan and (b) the Fabrication AFE.   An original Non-Participating Party who makes an Election to participate in such modified Development Plan shall eliminate the Underinvestment through a settlement of Costs pursuant to Article 16.9.1 (*Settlement of Underinvestments*).   Within thirty (30) days following the elimination of the Underinvestment, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE who elects to participate in such modified Development Plan (and associated AFEs) for the initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

.         If a major modification to the initial Development Plan proposed pursuant to Article 12.11(d) is approved prior to the installation of the Production System, the Operator shall immediately provide the modified Development Plan to each Non-Participating Party in the Fabrication AFE and within thirty (30) days following such approval, the Participating Parties in the Fabrication AFE for such initial Production System shall deliver to the original Non-Participating Party in the Fabrication AFE for such initial Production System an assignment of one hundred percent (100%) of that original Non-Participating Party's former Working Interest in the Contract Area, the wells therein and the production therefrom.

67

EXHIBIT 4

If a major modification is approved, the Development Plan (and any associated AFEs) shall be deemed modified and the Operator shall carry out the modified Development Plan.  In the event a major modification is not approved by all Participating Parties, the Operator shall continue to implement the approved Development Plan as it was before the proposed major modification.

A Non-Participating Party in the Fabrication AFE for a Subsequent Production System who elects to participate in a modified Development Plan (and associated AFEs) for that Subsequent Production System shall not be subject to Article 16.5.5 (*Non-Consent Subsequent Production System and Facilities*) in regard to that Subsequent Production System.

12.12   Supplemental AFE for Cost Overruns on Fabrication AFE:   Cost overruns for a Fabrication AFE shall be handled in accordance with in Article 6.2.5 (*Supplemental AFE for Cost Overruns on Fabrication AFE).*

12.13   Termination of a Development Plan:  An approved Development Plan shall remain in force until the earliest of:

(a)     the Participating Parties in the Fabrication AFE for the Development Plan do not agree to bear all costs and risks of the Fabrication AFE,

(b)     the construction or acquisition of the Production System is not commenced within the time frame provided in Article 12.14 (*Timely Operations for Production Systems*),

(c)     the depletion of the reservoirs covered by the Development Plan,

(d)     the approved Development Plan is superseded by a revised Development Plan, or

(e)     the Development Plan is terminated by the unanimous consent of the Participating Parties.

12.13.1   Termination Prior to Approval of Fabrication AFE:   The Costs, risks and liabilities of a Development Plan that is terminated before its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Development Plan.

12.13.2   Termination After Approval of Fabrication AFE:  The Costs, risks and liabilities of a Development Plan that is terminated after its associated Fabrication AFE has been approved shall be borne by the Participating Parties in the Fabrication AFE.

12.14   Timely Operations for Production Systems:  The Operator shall commence, or cause to be commenced, the construction of a Production System within one hundred twenty (120)

68

EXHIBIT 4

days from the last Party's Election for the Fabrication AFE. Such construction shall be deemed commenced on the date the major fabrication contract for the Production System is awarded. Except for the instance of a Force Majeure, if the Operator fails to timely commence operations for the Production System, the Non-Operating Parties may, within thirty (30) days after the expiration of the commencement period, by a majority Working Interest vote of the Participating Parties in the Fabrication AFE,

(a)     agree to extend the time period for timely operations, or

(b)     select a substitute operator to commence the construction or acquisition of the Production System, which shall be commenced within one hundred twenty (120) days after the selection of the substitute operator.

If the time period for timely operations is not extended or a substitute Operator is not selected or if such construction or acquisition is not commenced in a timely manner by the substitute Operator, then the approved Fabrication AFE shall be deemed withdrawn with the effect as if the Fabrication AFE had never been submitted. The above notwithstanding, if the BOEM grants a "Suspension of Production" or a "Suspension of Operations" (an SOP/SOO") for an approved Development Plan, any shorter time limits set forth as requirements of the SOP/SOO shall supersede the corresponding longer time limit set forth in this Agreement or the Development Plan.

12.15   <u>Subsequent Development Phases</u>:  At any time after the last Party's Election under the Fabrication AFE for the Initial Production System, any Participating Party may propose an additional Development Phase(s) and the installation of a subsequent or expanded Production System(s). Upon proposal of a subsequent Development Phase, the Operator shall propose the formation of a Project Team to prepare a Development Plan for the subsequent Development Phase. The preparation and approval of the Development Plan for a subsequent Development Phase shall follow the same procedures specified in this Article 12 *(Project Team, Development Plan and Fabrication AFE)* for the preparation and approval of the initial Development Plan with the exception however that:

(a)     the Operator's exclusive period to submit a proposal for the formation of an associated Project Team shall commence immediately following rig release from the first well for such Development Phase which would qualify as a Producible Well, and

(b)     a Non-Participating Party(ies) in an approved Fabrication AFE for a Subsequent Production System shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.

12.16   <u>Access to Existing Facilities</u>:  Development Operations in subsequent Development Phases shall have reasonable access (on a space available basis) to gathering, processing and transportation Facilities installed for previous Development Phases.

69

EXHIBIT 4

12.16.1   <u>Non-Consent Operations in Subsequent Development Phases</u>:  If fewer than all Parties make an Election to participate in a subsequent Development Phase, the Operator (or substitute Operator) shall conduct Development Operations in the subsequent Development Phase for the account of the Participating Parties and at their sole Cost and risk.   The Participating Parties shall conduct the subsequent Development Operations with the benefit of the non-consent provisions specified in Article 16 *(Non-Consent Operations)*.   A Non-Participating Party in a subsequent Development Phase shall not be entitled to any information or data from any subsequent Development Operation associated with such Development Phase, unless the Non-Participating Party makes an Election to participate in such subsequent Development Operations pursuant to Article 16.7 *(Operations From a Subsequent Non-Consent Production System)*.   Any Non-Participating Party in a subsequent Development Phase may retain its Working Interest in the Contract Area.   However, such a Non-Participating Party shall not unreasonably interfere with Development Operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Parties in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices).   In all events, the sequence and conduct of Development Operations in a subsequent Development Phase shall be controlled by the Participating Parties in the subsequent Development Operation.   Hydrocarbon production volumes shall be measured on the basis of well tests and operating expenses allocated upon the basis of Hydrocarbon production volume throughput.

## ARTICLE 13
## DEVELOPMENT OPERATIONS

13.1   <u>Proposal of Development Operations</u>:  It is the intent of the Parties to proceed with development of the Contract Area in accordance with the approved Development Plan.  Any Participating Party may propose specific Development Operations which were included in the Development Plan by giving notice of the proposal and the associated Well Plan, which shall include at least the information set out in Article 10.2.1 *(Well Plan's Minimum Specifics)*, and AFE to the other Participating Parties.   Each Development Operation included in an approved Development Plan, other than a Final Design AFE shall require approval as a General Matter except as otherwise provided herein.  Once a Development Operation is approved (either as a General Matter or as an Election), the Operator (or substitute Operator) at its sole discretion, may commence actual operations for the Development Operation only after the necessary governmental approval(s) and/or permit(s) required to commence the Development Operation have been secured by the Operator.  Notwithstanding the foregoing, (i) the Operator shall not be entitled to charge the Joint Account for costs accrued in conducting a Development

70

EXHIBIT 4

Operation until such time as necessary governmental approval(s) and/or permit(s) are received and (ii) in the event the Operator places the rig on standby prior to receiving necessary governmental approval(s) and/or permit(s) to commence a Development Well, the Operator shall only be entitled to charge the Joint Account for a maximum of three (3) days of standby time, subject to each Party's rights to dispute and audit such charges pursuant to this Agreement.  Each Non-Participating Party in an approved Development Operation will be subject to either the acreage forfeiture provisions or the Cost percentage recoupment provisions of Article 16 (*Non-Consent Operations*), whichever is applicable. Any Participating Party in the Development Plan may propose specific Development Operations which were not included in the approved Development Plan.  A proposal for a Development Operation not included in an approved Development Plan shall require approval as a General Matter and, if approved, such Development Operation not included in the approved Development Plan shall be deemed an automatic revision to the Development Plan.  However, the provisions of this Article 13 *(Development Operations)* shall not apply to the proposal for the Initial Production System or Subsequent Production System in the Contract Area.  The Initial Production System or Subsequent Production System shall be proposed in accordance with Article 12 *(Project Team, Development Plan and Fabrication AFE)* of this Agreement.

13.1.1   <u>AFE Overruns and Substitute Wells</u>:  The Operator shall timely commence a Development Operation and continue the drilling of such well with due diligence to its Objective Depth or until:

> (a)   a supplemental AFE is required pursuant to Article 6.2 *(Authorization for Expenditure)*, or

> (b)   the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable, or

> (c)   the unanimous agreement of the Participating Parties to cease drilling before reaching the Objective Depth.

If the Development Well is abandoned due to the conditions described under 13.1.1 (b), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), and each Participating Party in the abandoned Development Well shall make an Election whether to participate in the proposed substitute well.  The Operator (or substitute Operator) shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate.  Any Party who makes an Election not to participate in either (a) above or a substitute well shall be subject to either the percentage Hydrocarbon recoupment provisions or the acreage forfeiture provisions of Article 16 (Non-Consent Operations), whichever is applicable.

71

EXHIBIT 4

13.1.2 <u>Timely Operations</u>:  A Development Operation shall be commenced within two hundred seventy (270) days following the end of the period for the approval of the Development Operation with the exception that such commencement deadline shall be automatically extended for the time period attributable to Force Majeure (excluding the inability to secure materials or a rig) as provided in Article 25.1 *(Force Majeure)*.

If the Operator, except for an occurrence of Force Majeure (excluding the inability to secure materials or a rig), fails to timely commence the Development Operation within the two hundred seventy (270) day period, the approved Development Operation shall be deemed withdrawn, with the effect as if the Development Operation had never been proposed and approved, and the Non-Operating Parties may then select a substitute Operator in accordance with Article 4.2.1 *(Substitute Operator if Operator Fails to Commence Operations)*.

If an approved or identical Development Operation is deemed withdrawn due to a failure to timely commence operations on that well, all Costs incurred, which are attributable to the preparation for, or in furtherance of, that Development Operation, will be chargeable to the Participating Parties.  A Development Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual operations for the proposed Development Operation are undertaken.

13.2 <u>Subsequent Development Operations at Objective Depth</u>:  After a Development Well (or its substitute) has been drilled to its Objective Depth as set forth in the Well Plan (and all logs and tests (excluding production tests) have been distributed to the Participating Parties), the Operator shall promptly notify the Participating Parties of the Operator's proposal for one of the following operations:

(a)  conduct Additional Testing, Coring or Logging of the formations encountered prior to setting production casing;

(b)  complete the well at the Objective Depth in the objective zone or formation;

(c)  Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)  plug back the well and attempt a completion in a shallower zone or formation;

(e)  Deepen the well to a new Objective Depth;

(f)  conduct other operations on the well not listed;

(g)  temporarily abandon the well; or

72

EXHIBIT 4

(h)     permanently plug and abandon the well.

Notwithstanding any contrary provision of this Agreement, if one or more operations are proposed before the distribution of information resulting from the previously approved operation, then the response periods set forth in this Article 13.2 shall not commence until the Parties entitled to make an Election have received the information from the previously approved operation.

13.2.1   <u>Response to Operator's Proposal</u>:  Within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receipt of Operator's proposal to conduct subsequent Development Operations, each Participating Party shall respond to the Operator's proposal by making its Election to participate in Operator's proposal or by making a counterproposal.  Failure of a Participating Party to respond to a proposal (except a proposal to plug and abandon) shall be deemed an Election not to participate in the Operator's proposal and to become a Non-Participating Party from that point.

13.2.2   <u>Counterproposals</u>:   If a Participating Party makes a counterproposal for subsequent Development Operations, the other Participating Parties shall have an additional twenty four (24) hours to respond thereto.  If conflicting proposals for subsequent Development Operations are made, preference shall be given first to operation (a), next to operation (b), and so forth as set forth in Article 13.2 (*Subsequent Development Operations at Objective Depth*). If different depths or locations are proposed for subsequent Development Operations, preference for voting shall be given to the shallowest depth (or the location nearest the existing well bore) and then other depths or locations in descending (or more distant) order.  After a decision to conduct a subsequent Development Operation is made and the subsequent Development Operation is commenced, the remaining proposals for other types of subsequent Development Operations shall be deemed withdrawn.  At the completion of the subsequent Development Operation, the Operator shall again submit proposal(s) for subsequent Development Operations to the Participating Parties, through the procedure provided herein, until such time as the well is plugged and abandoned.

13.2.3   <u>Approval of Subsequent Development Operations by All Parties</u>:   If the proposed subsequent Development Operation is approved by all the then Participating Parties, the Operator (or substitute Operator) shall commence the subsequent Development Operation at the Cost(s) and risk of the Participating Parties.

13.2.4   <u>Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties</u>:  If a proposal for subsequent Development Operations (except a proposal to plug and abandon which shall be approved in accordance with Article 13.5 [*Permanent Plugging and Abandoning Costs*] or Article 18.1

73

EXHIBIT 4

[*Abandonment of Wells*], whichever is applicable), is approved as a General Matter by fewer than all Parties, then the Operator shall, pursuant to Article 8.2.3 (*Second Opportunity to Participate*) and Article 8.2.4 (*Participation by Fewer Than All Parties*),  conduct the operation at the sole Cost and risk of the Participating Parties.   Any Non-Participating Party in a subsequent Development Operation shall be subject to Article 16 *(Non-Consent Operations)*.    A Non-Participating Party in a subsequent Development Operation shall be relieved of the Costs, risks and obligations of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

13.2.5   <u>Subsequent Development Operations If Not Approved as a General Matter</u>:  If no proposed Development Operation (except a proposal to plug and abandon) receives sufficient vote to be approved as a General Matter pursuant to Article 13.2.4 *(Approval of Subsequent Development Operations as a General Matter by Fewer Than All Parties)*, then prior to an Development Well being plugged and abandoned, Operator (or substitute Operator) shall conduct at the sole Cost and risk of the Participating Parties, the subsequent Development Operation receiving the largest percentage of Working Interest approval, and in the event of a tie vote between two (2) or more of such proposed Development Operations, then preference shall be given first to operation (a) then (b) and so on, as set forth in Article 13.2 *(Subsequent Development Operations at Objective Depth)*.    Any Non-Participating Party in such subsequent Development Operation shall be subject to Article 16 *(Non-Consent Operations)*.  Such Non-Participating Party shall be relieved of the Costs, risk and obligation of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the operation.

13.3   <u>Election by Original Non-Participating Parties in Deepening or Sidetracking Operations</u>:  If a Development Well is drilled to its initial Objective Depth and the Participating Parties have secured the requisite approval to either:

(a)      Sidetrack said well, or

(b)      Deepen said well,

 then, contingent upon the unanimous approval of the Participating Parties in the approved Sidetrack or Deepen operation,  the Operator shall notify each original Non-Participating Party of the proposal.  Each original Non-Participating Party may respond with an Election regarding such a proposal to Deepen or Sidetrack by notifying the

EXHIBIT 4

Operator of its Election within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice. Any original Non-Participating Party making an Election to participate in such Deepening or Sidetracking of a Development Well shall:

(i)     be deemed to be underinvested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to the Deepening or Sidetracking and subject to Article 16.9 (*Underinvestment of Costs*) (and the Parties that participated in drilling to the initial Objective Depth will be deemed overinvested in that amount), and

(ii)    remain a Non-Participating Party in the Development Well to the initial Objective Depth until the Costs recoverable under Article 16 *(Non-Consent Operations),* less any payments through a Disproportionate Spending Settlement and/or Article 16.9 *(Underinvestment of Costs),* have been recouped by the original Participating Parties.

13.4    <u>Deeper Drilling</u>:  A proposal to drill a Development Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well, or to re-enter and Deepen an existing Development Well to an Objective Depth below the deepest Producible Reservoir penetrated by a Producible Well, shall require approval as a General Matter and shall be further subject to the following provisions.

13.4.1    <u>Limited Participation in Deeper Drilling</u>:  If a proposal is made pursuant to Article *13.4 (Deeper Drilling),* any Party may either:

(a)     make an Election to participate in the proposed Deeper Drilling operation; or

(b)     make an Election not to participate in the proposed Deeper Drilling operation; or,

(c)     make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A Party making an Election to limit its participation in a deeper Development Well to the base of the deepest Producible Reservoir under (c) above shall bear its Participating Interest share of the Cost and risk of drilling (including abandonment) to the base of the deepest Producible Reservoir subject to the provisions of Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  If a Party makes an Election not to participate in the proposed Deeper Drilling, the proposed operations shall be conducted pursuant to Article 16 *(Non-Consent Operations).*

EXHIBIT 4

13.4.2    Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir:  If a Non-Participating Party in a Deeper Drilling operation below the deepest Producible Reservoir:

> considers the well to be capable of producing at or above the deepest Producible Reservoir, and

> has indicated in writing to the Operator a desire to complete the well at or above the deepest Producible Reservoir,

any further Deeper Drilling operations shall be conducted subject to the following provisions:

(a)    Multiple Completion:  If all the Participating Parties in the well agree that a multiple well completion(s) is possible and practicable involving (i) a completion at or above the deepest Producible Reservoir and (ii) a completion below the deepest Producible Reservoir, the Participating Parties in the Deeper Drilling operation shall bear 100% of the Costs of drilling to an Objective Depth below the deepest Producible Reservoir that are in excess of the original Costs to drill and complete the well in the deepest Producible Reservoir.

(b)    Single Completions:  If the Participating Parties do not unanimously agree that multiple well completions are possible or practicable, the Non-Participating Party in the Deeper Drilling operation shall be deemed overinvested in the original well in an amount equal to the Non-Participating Party's Share of the original Costs of drilling the well to the deepest Producible Reservoir.  The Participating Parties in the Deeper Drilling operation shall eliminate the Non-Participating Party's overinvestment in accordance with Article 16.9.1 (*Settlement of Overinvestments*).

If, after having been drilled to an Objective depth deeper than the deepest Producible Reservoir, at the first occurrence of the following events:

(i)    the well is not a Producible Well at a depth deeper than the deepest Producible Reservoir and the well is plugged back to a shallower zone; or,

(ii)    the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir, but Hydrocarbon production from the deeper zone is later depleted prior to Non-Consent Recoupment (attributable to Deeper Drilling operation) and the well is plugged back to a shallower zone; or,

(iii)    the well is completed as a Producible Well at a depth deeper than the deepest Producible Reservoir and the Participating Parties have recovered the applicable non-consent Recoupment (attributable to the Deeper Drilling operation) from Hydrocarbon production from the deeper zone; or,

(iv)    the well, although in a suitable and safe condition for a completion attempt at or above the deepest Producible Reservoir, is plugged and abandoned prior to any such completion attempt,

the Participating Parties as to the depths below the deepest Producible Reservoir shall be deemed overinvested in an amount equal to the Non-Participating Party's Share of the well's Cost down to the deepest Producible Reservoir.  The overinvestment shall be depreciated at the rate of one-half percent (1/2%) per month from the date the Deeper Drilling operation commences to the earlier of the date of (i), (ii) or (iii) above, but such depreciation shall not reduce the overinvestment below forty percent (40.0%) of the original overinvestment. The Non-Participating Parties in the Deeper Drilling operation shall, upon the occurrence of one of the above-noted events, eliminate the Participating Party's overinvestment in accordance with Article 16.9.1 (*Settlement of Overinvestments*).

13.4.3   <u>Completion Attempts At or Above the Deepest Producible Reservoir</u>: If a well drilled below the deepest Producible Reservoir is not completed for production in the deeper depths, then the Participating Parties in said well down to the deepest Producible Reservoir shall have a right to utilize the well for completion in a Producible Reservoir.  In the event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, the Participating Parties in drilling below the deepest Producible Reservoir in said well shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for completion in a Producible Reservoir.  In the event a Participating Party(ies) in said well down to the deepest Producible Reservoir makes an Election to participate in a shallow completion in a zone above the base of the deepest Producible Reservoir, but the well drilled below the deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the deepest Producible Reservoir in that well, the Participating Parties in the Deeper Drilling operation shall be obligated, at their sole Cost and risk, to restore the well to its condition prior to the Deeper Drilling operations below the deepest Producible Reservoir. If the damage cannot be repaired, the Participating Parties in the Deeper Drilling Operation shall be obligated to pay for the entire Cost of redrilling the well to the base of the deepest Producible Reservoir less any overinvested amount previously paid pursuant to Article 16.9.1 (*Settlement of Overinvestments*) by such Participating Parties in the Deeper Drilling operation to the Participating

Party(ies) in said well down to the deepest Producible Reservoir that have made an Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir.  The Party(ies) that have made an Election to participate in a shallow completion in a zone at or above the deepest Producible Reservoir shall be obligated to be a Participating Party in such completion attempt subsequent to said restoration and/or redrill.  Once the well has been either restored to its condition prior to the Deeper Drilling operation or redrilled to the base of the deepest Producible Reservoir, any Non-Participating Party in the completion attempt above the base of the deepest Producible Reservoir shall be subject to the provisions of Article 16 (*Non-Consent Operations*).

13.5    Permanent Plugging and Abandoning Costs:  The permanent plugging and abandonment of a Development Well that:

(a)      is to be plugged due to mechanical difficulties or impenetrable conditions before the well has been drilled to its Objective Depth in accordance with Article 13.1.1(b),

(b)      is to be plugged under Article 13.2 (*Subsequent Development Operations at Objective Depth*), or

(c)      has been previously temporarily abandoned under Article 13.2 (*Subsequent Developement Operations at Objective Depth*)

and has not produced Hydrocarbons (other than as a result of production testing), requires the unanimous approval of the Participating Parties except as otherwise provided in this Article 13.5.  Approval to plug and abandon a Development Well that has produced Hydrocarbons (other than as a result of production testing) shall be governed by Article 18.1 (*Abandonment of Wells*).  If any Participating Party fails to respond within the applicable response period to a proposal to plug and abandon a Development Well, that Participating Party shall be deemed to have approved the plugging and abandonment of that Development Well.  If a rig is on location and a proposal to plug and abandon a Development Well under either Article 13.5(a) or 13.5(b) does not receive unanimous approval, then, if within twenty-four (24) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of that proposal no other operation is proposed (and subsequently approved) for a well by a Party entitled to make a proposal, the Operator may nonetheless proceed to plug and abandon that Development Well, and shall give each Participating Party notice of that fact.  If the proposal to plug and abandon a Development Well that has not produced Hydrocarbons (other than as a result of production testing) does not receive unanimous approval, but the Operator deems the well bore not to be safe or in sound enough condition for it to perform further operations, the Operator may nonetheless proceed to plug and abandon that Development Well and shall give each Participating Party notice of that fact.

EXHIBIT 4

The Participating Parties in a Development Well shall pay all Costs of plugging and abandoning that Development Well, except all increased plugging and abandoning Costs associated solely with a Non-Consent Operation approved under Article 13.2 (*Subsequent Development Operations at Objective Depth*) or Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*).  The Participating Parties in that Non-Consent Operation are responsible for the increased plugging and abandoning Costs attributable to that Non-Consent Operation.

# ARTICLE 14
## FACILITIES AND GATHERING SYSTEMS

14.1    Facilities as a Part of Development Plan:  The Development Plan shall provide for the installation of all basic Facilities necessary to handle or service Hydrocarbon production for the Contract Area.  If the approved Development Plan provides that Hydrocarbon production from the Contract Area can most efficiently be processed and handled at Facilities located off the Contract Area (an "offsite facility"), the Development Plan shall provide for a Production System designed to utilize an "offsite facility".

14.2    Use of Facilities Off the Contract Area:  In the event that excess capacity exists at an "offsite facility" and the approved Development Plan calls for a "tie-back" development of the Contract Area to an "offsite facility", the Operator will use reasonable efforts to secure a "Facilities Use and Production Handling Agreement" from the owners of the "offsite facility" for use in handling Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable efforts to secure access to the "offsite facility" on behalf of the Participating Parties.  Any access secured by such "Facilities Use and Production Handling Agreement" to an "offsite facility" shall be shared proportionately by the Parties on the basis of their Participating Interests in the Development Plan.  This Article 14.2 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 (*Disposition of Hydrocarbon Production*).

14.3    Use of Facilities Located on the Contract Area:  The Participating Parties hereto shall have priority access to all jointly owned Facilities and gathering system capacity for use in operating and developing the Contract Area pursuant to an approved Development Plan.  Use of the Facilities on the Contract Area for handling production coming from outside the Contract Area may be granted only if Facility capacity is available beyond the requirements of an approved Development Plan for developing the Contract Area.  Use of excess capacity from Facilities shall be subject to the following priority of usage:

(a)    First priority to Hydrocarbon production jointly owned by the Participating Parties in the Production System from inside the Contract Area.

(b)    Second priority to Hydrocarbon production jointly owned by all of the Participating Parties in the Production System coming from outside the Contract Area.

EXHIBIT 4

(c)     Third priority to Hydrocarbon production owned by at least one but less than all of the Participating Part(ies) in the Production System coming from outside the Contract Area.

(d)     Fourth priority to Hydrocarbon Production owned by third parties coming from outside the Contract Area.

Priority "a" is automatic. Priorities "b", "c" and "d" shall require unanimous approval by all the Participating Parties.  In the event that unanimous approval cannot be reached by the Participating Parties under priorities "b" and "c" above, as to the means and methods for utilizing such excess capacity from Facilities, such excess capacity shall be allocated to each Party in accordance with each Party's Participating Interest in the Facilities having excess capacity, and each Party shall be entitled to use its share of excess capacity as it deems appropriate.  Any Hydrocarbon production coming from outside the Contract Area which utilzes the Production System and/or Facilities shall be processed under a facilities and production handling agreement which shall be unanimously agreed to by the owners of such Production System and/or Facilities.  If the owners cannot agree on a facilities and production handling agreement, the unresolved issues in such agreement shall be resolved in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

14.4    <u>Approval of Additional Facilities On or Off the Contract Area</u>:  This Article shall only apply to Facilities located on or off the Contract Area which were not included in the approved Development Plan.  Any Party may propose the installation of additional or expanded Facilities for the Contract Area beyond those specified in the Development Plan by giving notice to the other Participating Parties together with information adequate to describe the proposed Facilities and their estimated Costs.  Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities on the Production System beyond the scope of the Development Plan shall require the approval of the Participating Parties in the Fabrication AFE (and all supplemental AFEs therefore) for the Production System as a General Matter, and the availability of sufficient deck space and buoyancy to support the proposed additional Facilities.  Upon approval, the Operator shall proceed to install the additional Facilities for the benefit of the Participating Parties provided that, in the judgment of the Operator, the additional Facilities do not interfere with continuing operations on the Contract Area.  The installation of any additional Facilities shall be at the sole Cost and risk of the Participating Parties. Any Non-Participating Party shall be subject to Article 16.5.6 *(Non-Consent Subsequent Production System and Facilities)*

14.5    <u>Contract Area Production</u>:  Notwithstanding any other provision of this Agreement to the contrary, production owned by the Participating Parties from the Contract Area shall at all times have first preference to use capacity over any production from outside the Contract Area.  Further, any production capacity owned by the Participating Parties shall be owned on an undivided basis and any tariffs or production handling fees will be shared by the Participating Parties.

80

EXHIBIT 4

14.6   <u>Expansion, Modification or Repair of an Existing Production System</u>:  Subsequent to the installation of the Production System described and approved in the first Development Plan for the Contract Area, any Party may propose the expansion, modification or repair of any existing Production System in which it has participated by written notice to the other Participating Parties in such Production System.  Such proposal shall be presented in accordance with Articles 6.7 *(Annual Operating Plan)* and 8.3 *(Response Time for General Matters and Elections)* for approval as a General Matter.  If approved as a General Matter**,** it will be binding on all Participating Parties in the Production System and Operator shall proceed with such project for the benefit of the Joint Account and all Cost, risk and expense of such operation shall be borne in proportion to the respective Participating Parties' Working Interest in such Production System unless otherwise agreed.  This Article 14.6 shall not constitute a limit on a Party's right to install its own Facilities under Article 15 *(Disposition of Hydrocarbon Production).*  The provisions of this Article  14.6 shall not apply to subsequent Development Phase(s).

14.7   <u>Additions, Expansions or Modifications of Production System or Facilities for health, safety or Environmental Reasons:</u>  If a proposal for additional Facilities or a proposal for the expansion or modification of a Production System does not receive approval as a General Matter by the Participating Parties in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever is applicable, and that proposal is necessary for health, safety, or environmental reasons and has been mandated by governmental authority or judicial process, the Operator may, at its discretion, install those additional Facilities or make those expansions or modifications to the Production System.  If the Operator elects to exercise its discretionary right to make those installations, modifications, or expansions, the Operator shall provide written notice of its decision to each Participating Party in the Fabrication AFE (and all supplemental AFEs) for the Production System that is to receive additional Facilities or have its Production System expanded or modified, whichever applies.

14.8   <u>Repairs of Production System or Facilities:</u>  The Operator at its sole discretion shall make repairs on the Production System and Facilities as needed to keep the Production System and Facilities in good working order.  No approval by the Parties is required for the Operator to make those repairs.

## ARTICLE 15
## DISPOSITION OF HYDROCARBON PRODUCTION

15.1   <u>Duty to Take in Kind</u>:  Each Party shall have the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Contract Area, exclusive of Hydrocarbon production which the Operator uses in production or Development Operations, in preparing and treating Hydrocarbons for marketing purposes, and Hydrocarbon production which is unavoidably lost.

81

EXHIBIT 4

15.2   <u>Facilities to Take in Kind</u>:  Any Participating Party in Development Operations shall have the right, at its sole risk and expense, to construct Facilities for purposes of taking its share of Hydrocarbon production in kind, provided that in the judgment of the Operator, the installation of such Facilities do not interfere with continuing operations on the Production System or the Contract Area.  During the construction and operation of such facilities, the Party responsible for the construction or operation shall indemnify and defend the other Parties against any claims or liabilities which may result from such construction or operation and such Party shall be responsible for any damage or losses sustained by the other Parties as a result of the construction or operation of such facilities.

15.3   <u>Failure to Take Oil and/or Condensate in Kind</u>:  If any Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Contract Area, the Operator shall have the right, but never the obligation to market the non-taking Party's share of the oil and/or condensate production at the same price received by the Operator. The non-taking Parties agree to accept Operator's price it receives of the non-taking Party's share of the oil and/or condensate.  If the Operator sells to an Affiliate, then the non-taking Parties shall receive without deduction the market value of the non-taking Parties' share of the oil and/or condensate.  The Operator shall furnish notification to non-taking Party at the time such option is exercised.  All contracts of sale by the Operator of any Party's share of oil and/or condensate production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any contract be for a period in excess of one (1) year.  Proceeds of all sales made by the Operator pursuant to this Article shall be paid to the Parties entitled thereto once in each calendar month.

Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

15.4   <u>Gas Balancing Provision</u>:  The Parties agree that in the event separate disposition of gaseous Hydrocarbons causes split-stream deliveries to separate pipelines and/or deliveries which on a day to day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it, the gas balancing or accounting between the Parties shall be handled in accordance with Exhibit "D" attached hereto, entitled "Gas Balancing Agreement."

15.5   <u>Expenses of Delivery in Kind</u>:  Any Cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party. Any extra expenditure incurred in the taking in kind or separate disposition by any Party of its proportionate share of Hydrocarbon production shall be borne by such Party.

**ARTICLE 16**
**NON-CONSENT OPERATIONS**

82

EXHIBIT 4

16.1 <u>Conduct of Non-Consent Operations</u>:  If any Party makes an Election to become a Non-Participating Party in an operation, the proposed operation, if approved, shall be conducted as a Non-Consent Operation.  If the Participating Parties timely commence the Non-Consent Operation, then the Non-Participating Parties shall be subject to either the acreage forfeiture provisions of Article 16.2 *(Acreage Forfeiture Provisions),* 16.4 *(Non-Consent Operations to Maintain the Contract Area)* or the Cost recoupment provisions of Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-Consent Operations)* and when applicable Article 16.9 (*Underinvestment of Costs),* each reflecting the increased risks and Costs assumed by the Participating Parties.  Any operation that invokes the provisions of this Article 16 must be proposed in good faith using cost estimates and Objective Depths which are reasonable for the Contract Area considering the geological and geophysical data available at the time of the proposal.  If any proposed operation requires approval as a General Matter, such approval shall be obtained prior to the Participating Parties proceeding with the Non-Consent Operation.  The Operator (or substitute Operator) shall conduct any Non-Consent Operation at the sole risk and expense of the Participating Parties in the Non-Consent Operation.  Any Non-Consent Operations shall not unreasonably jeopardize, hinder or interfere with joint operations conducted by all Parties (unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article *16.4 (Non-Consent Operations to Maintain Contract Area).*

16.1.1 <u>Indemnity for Non-Consent Operations</u>:  The Participating Parties shall (insofar as it may be within their control) keep the Contract Area free from all liens and encumbrances which might arise by reason of conducting the Non-Consent Operation and indemnify, defend and hold harmless the Non-Participating Parties from any such liens and encumbrances.

16.1.2 <u>Cost Information</u>:  The Costs of any Non-Consent Operation shall be borne by the Participating Parties in the proportion that their Participating Interests bear to the sum of all Participating Interests in the Non-Consent Operation (unless otherwise agreed by the Participating Parties).  The Costs of a Non-Consent Operation shall include the Costs of maintaining the drilling equipment on site during the notice period for an Election or vote pursuant to Article 8 *(Voting, Elections and Notices),* including any response times, and no part of such Costs shall be borne by the Non-Participating Parties.  Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of the equipment pertaining thereto.  The Operator shall furnish to all the Parties a monthly statement showing operating, maintenance and other expenses attributable to the Non-Consent Operations, and the revenues from the sale of Hydrocarbon production for the preceding month from operations subject to recoupment under this Article 16 *(Non-Consent Operations).*  The Non-Operating Parties shall furnish the Operator any revenue or price information for their take in kind production.  In accounting for

83

EXHIBIT 4

the revenues from Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be determined upon the basis of monthly well tests.

16.1.3 <u>Non-Consent Operations in Producible Well</u>:  Once a Producible Well has been completed and placed on production, Non-Consent Operations shall not be conducted in that well unless approved by all the Participating Parties in such well, unless such well is not capable of producing from its current completion(s).

16.1.4 <u>Non-Consent Operations in Producible Reservoirs</u>:  Unless otherwise agreed by all Parties having a Participating Interest in the production from any existing well that penetrates the subject Producible Reservoir, Non-Consent Operations for a Development Well shall not be conducted in any Producible Reservoir previously penetrated by a Producible Well drilled from or producing through the same Production System serving the Non-Consent Well and the Producible Well unless such Producible Reservoir shall have been designated as an Objective Depth or completion zone in the well proposal.

16.1.5 <u>Multiple Completions</u>:  Non-Consent Operations shall not be conducted in any well having multiple completions unless:

(a)  each of the multiple completions are owned by the same Parties in the same proportion; or,

(b)  none of the previous well completions are capable of producing in paying quantities; or,

(c)  all Participating Parties in the well containing the multiple completions consent to such Non-Consent Operation(s).

For the purposes of this Article 16 *(Non-Consent Operations),* each completion shall be considered as a separate well.

16.2 <u>Acreage Forfeiture Provisions</u>:  In view of the significantly greater risks associated with the initial Exploratory Well drilled in the Contract Area and the Fabrication AFE for the Initial Production System, the Parties agree that upon timely commencement of such operations, the Participating Parties shall be entitled to an assignment of the Non-Participating Party's right, title, and interest (or operating rights if appropriate) in that portion of the Leases comprising the Contract Area. Within thirty (30) days of the timely commencement of the Non-Consent Operation, the Non-Participating Party(s) shall execute and deliver an assignment of its interest to the Participating Parties, with no reimbursement by and at no cost to the Participating Parties.  If an assignment is made pursuant to this Article 16.2, then each Participating Party shall accept its Participating Interest share of the Non-Participating Party's assigned interest as determined by Article

84

EXHIBIT 4

8.2.4 (*Participation by Fewer Than All Parties*).  Except as provided in Article 16.4.3 *(Limitations on Acreage Forfeiture)*, the Non-Participating Party's Election not to participate in the initial Exploratory Well drilled in the Contract Area or the Fabrication AFE for the initial Production System shall be deemed a withdrawal pursuant to Article 17.0 *(Withdrawal From Agreement)*.

16.2.1   <u>Non-Consent Initial Exploratory Well</u>:  If one or more Participating Party(s) proceed with operations for the initial Exploratory Well on the Contract Area as a Non-Consent Operation, any Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area.  Penalties attributable to any Non-Consent Operations performed in the initial Exploratory Well, or its substitute well(s), after the earlier of:

   (a)   the initial Exploratory Well, or its substitute well, has reached its original Objective Depth, or

   (b)   the cumulative Costs of the initial Exploratory Well, and its substitute well(s), if any, equal the sum of the original approved AFE for the well plus the Permitted Over-expenditure for the well as described in Article 6.2.2 (*Supplemental AFE for Cost Overruns for Wells*),

   shall be a percentage penalty in accordance with Article 16.5.1 (*Non-Consent Exploratory and Subsequent Exploratory Operations*).

16.2.2   <u>Non-Consent Initial Production System</u>:  If one or more Participating Party(s) proceed as a Non-Consent Operation with timely operations for the Initial Production System that conforms to the approved Fabrication AFE, the Non-Participating Party(s) shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's right, title and interest (or operating rights if appropriate) in and to that portion of the Leases comprising the Contract Area.

16.2.3   <u>Costs of Prior Operations</u>:  Any Non-Participating Party subject to a non-consent provision shall remain liable for its share of previously incurred Costs for operations where it was a Participating Party and there shall be no reallocation of Costs due to the Non-Participating Party's election or assignment.

16.3   <u>Notices and Orders</u>:  If the Operator is required by notice or order (including SOPs and SOOs) from any government agency having jurisdiction over the Contract Area to either drill or rework a well, or conduct other operations to maintain all or a portion of the Contract Area, the Operator shall immediately furnish each of the Parties with a copy of such order or notice.

EXHIBIT 4

16.4     <u>Non-Consent Operations to Maintain Contract Area</u>: The following provisions are applicable if:

(a)      an activity or operation is required, pursuant to a governmental agency order, notice, regulation, SOO or SOP requirement or Lease obligation, to maintain all or any portion of the Contract Area; or,

(b)      a proposal is made for an operation within the final twelve (12) months of the primary term of a Lease which has no Producible Well and such Lease is not held by a unit, SOO or SOP,

then such operation must be timely commenced and shall be conducted pursuant to this Article 16.4. The response time for a proposal made hereunder shall be the earlier of,

(c)      the response time provided in Article 8 *(Voting, Election & Notices),* or;

(d)      sixty (60) days before the deadline under the order, notice, regulation, SOO or SOP requirement or Lease obligation, whichever is earlier.

If the proposal requires approval as a General Matter and such approval is not obtained within the applicable response period, then any Party who made an Election to participate in the Non-Consent Operation may proceed with such operation at their sole Cost and risk after giving notice to the other Parties of their intention to commence the activity or operation.  The other Parties will have fifteen (15) days after receipt of the notice to make an Election to participate in such operation.

16.4.1    <u>Acreage Forfeiture in the Entire Contract Area</u>:  If it is necessary to drill or rework a well or conduct other operations to maintain the entire Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the entire Contract Area within thirty (30) days after commencement of such well or other operation. Failure to participate in such well or other operations shall be deemed a withdrawal and the provisions of Article 17 *(Withdrawal From Agreement)* shall apply.

16.4.2    <u>Acreage Forfeiture in a Portion of the Contract Area</u>:  If a well is drilled or reworked or other operations are conducted in order to maintain a portion of the Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Parties one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion of the Contract Area within thirty (30) days after commencement of such well or other operation.  If a Party forfeits its Working Interest pursuant to this Article 16.4.2, then such Party shall have no further rights under this Agreement as to the portion of the Contract Area forfeited.  The remaining

86

EXHIBIT 4

Parties shall amend this Agreement to provide for a separate operational area for the forfeited portion of the Contract Area and this Agreement shall apply separately to such operational area.

16.4.3   <u>Limitations on Acreage Forfeiture</u>:  Notwithstanding the foregoing, if more than one well is drilled or more than one operation is conducted, any of which would maintain the entire Contract Area or the affected portion of the Contract Area, an assignment shall not be required from any Participating Party in any such well or other operation.  In addition, no Party shall be required to relinquish or assign all or any portion of its Working Interest in the Contract Area if the order, requiring the well or other operation, is appealed and successfully overturned.

16.5   <u>Percentage Hydrocarbon Recoupment for Non-Consent Operations</u>:  Except as provided in Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Non-Consent Operations to Maintain Contract* Area), upon the timely commencement of any Non-Consent Operation, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation along with title to any future Hydrocarbon production therefrom shall be owned by and vested in each Participating Party in the proportion that each Participating Party's Working Interest bears to the total Working Interest of all Participating Parties (unless other proportions are agreed by the Participating Parties) for as long as the Non-Consent Operation originally proposed is being conducted or Hydrocarbon production is obtained from the Non-Consent Operation.  Such interest, rights and title to future Hydrocarbon production shall revert to each Non-Participating Party when the Participating Party has recouped from the Non-Participating Party's Share of proceeds of future Hydrocarbon production from such Non-Consent Operation an amount equal to the product of the Participating Party's share of the Costs of the Non-Consent Operation multiplied by the recoupment percentage for each operation set out below (the "Hydrocarbon Recoupment").

- The Non-Participating Party's Share of the Non-Consent Operation shall be reduced (to the extent of the Non-Participating Party's prior Working Interest) by any third-party cash contribution credited to the Non-Consent Operation.

- A Non-Participating Party's Hydrocarbon Recoupment shall be reduced by any Costs paid by such Non-Participating Party as a settlement of Costs for such Non-Consent Operation pursuant to Article 16.9 (*Underinvestment of Costs*).

Upon recoupment by the Participating Parties of the Hydrocarbon Recoupment, the Working Interest and leasehold operating rights in the Non-Consent Operation, along with the title to any future Hydrocarbon Production therefrom, shall revert to the former Non-Participating Party and the former Non-Participating Party shall become a Participating Party in the Non-Consent Operation.

16.5.1   <u>Non-Consent Exploratory and Subsequent Exploratory Operations</u>:  The Hydrocarbon Recoupment for Non-Consent Exploratory Operations, except as

87

EXHIBIT 4

provided in Article 16.2.1 *(Non-Consent Initial Exploratory Well)*, shall be the Non-Participating Party's share of the Costs of Non-Consent Operations conducted including, but not limited to, drilling, evaluating, completing, equipping, plugging back and plugging and abandonment of the Exploratory Operation multiplied by one thousand percent (1000%). The recoupment amount for Non-Consent Subsequent Exploratory Operations shall be the Non-Participating Party's share of the Costs of operations conducted including, but not limited to, drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Subsequent Exploratory Operation multiplied by seven hundred percent (700%).

16.5.2 <u>Non-Consent Appraisal Operations</u>: The Hydrocarbon Recoupment for Non-Consent Appraisal Operations shall be the Non-Participating Party's Share of the Costs of drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandonment of the Appraisal Operation multiplied by five hundred percent (500%).

16.5.3 <u>Non-Consent Geophysical Operations, Feasibility Study, Project Team and/or Development Plan</u>: A Party making a revised Election not to participate (except as provided in Article 8.2.3 [*Second Opportunity to Participate*]) in a Geophysical Operations, Feasibility Study, Project Team and/or Development Plan (inclusive of its Final Design AFE) will be an underinvested Party in an amount equal to two hundred percent (200%) of the amount such Party would have paid had it participated in such AFE in that Activity, operation or AFE pursuant to Article 16.9 *(UnderInvestment of Costs)*. Any Underinvestment for a feasibility study shall be eliminated pursuant to Article 16.9 *(Underinvestment of Costs)* prior to the Non-Participating Party receiving such study(ies) and becoming a Participating Party in such feasibility study. If,

(a) a Non-Participating Party in a feasibility study makes an Election to participate in an approved Project Team which is based on such previously non-consented feasibility study, or

(b) a Non-Participating Party in a feasibility study and/or Project Team makes an Election to participate in an approved Development Plan which is based on such previously non-consented feasibility study and/or non-consented Project Team, or

(c) a Non-Participating Party in a feasibility study and/or Project Team and/or Development Plan makes an Election to participate in an approved Fabrication AFE which is based on such previously non-consented feasibility study and/or non-consented Project Team and/or non-consented Development Plan,

88

EXHIBIT 4

the effect shall be as if the Non-Participating Party has revised its previous non-participation Election(s) to become a Participating Party in such previous non-consented activity(ies), operation(s) and/or AFE(s) and shall be an Underinvested Party in an amount had such Party participated and shall eliminate its Underinvestment(s) pursuant to the above and Article 16.9 (*Underinvestment of Costs*

16.5.4   <u>Non-Consent Development Operations</u>: The Hydrocarbon Recoupment for Non-Consent Development Operations (including workovers) shall be the Non-Participating Party's Share of the Costs of the Non-Consent Operations, including but not limited to non-consent drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back and plugging and abandoning the Development Operation multiplied by three hundred percent (300%).

16.5.5   <u>Non-Consent Subsequent Production System and Facilities</u>:  The Hydrocarbon Recoupment for any non-consent Subsequent Production System or Non-Consent Facilities shall be the Non-Participating Party's Share of the Cost of designing, fabricating and installing the Subsequent Production System or Facilities, including the Cost of an injection or disposal well, multiplied by two hundred percent (200%).

16.5.6   <u>Additional Production Recoupment</u>:   In addition to the Hydrocarbon Recoupment set forth above for various Non-Consent Operations, the Participating Parties shall be entitled to recoup:

(a)   two hundred percent (200%) of the Non-Participating Party's Share of the Cost of Facilities necessary to carry out the Non-Consent Operation; plus,

(b)   one hundred percent (100%) of the Non-Participating Party's Share of the Cost of using any Production System already installed for the Contract Area for which the Non-Participating Party has a Participating Interest; or any modifications thereto necessary to carry out the Non-Consent Operation; plus,

(c)   one hundred percent (100%) of the Non-Participating Party's Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, production taxes and other governmental fees based on production.

16.5.7   <u>Hydrocarbon Recoupment From Hydrocarbon Production</u>:   Hydrocarbon Recoupment for a Non-Consent Operation which results in a discovery of a new Producible Reservoir or extends an existing Producible Reservoir shall be made

89

**EXHIBIT 4**

from the following portions of the Non-Participating Party's Share of Hydrocarbon production:

(a) <u>Non-Consent Exploratory Operations (other than for the initial Exploratory Well if forfeiture applies), Non-Consent Subsequent Exploratory Operations, Non-Consent Appraisal Operations, or Non-Consent Development Operations</u>: Each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

   (i) one hundred percent (100%) of its the Non-Participating interest share of all Hydrocarbon production from the Non-Consent Operation (if the well is completed for Hydrocarbon production), and

   (ii) fifty percent (50%) of its Non-Participating interest share of Hydrocarbon production from all wells subsequently drilled and completed in the Producible Reservoir discovered by said Non-Consent operations or in the extended portion of an existing Producible Reservoir discovered by said Non-Consent Operation.

(b) <u>Non-consent Subsequent Production Systems and Facilities</u>: If the construction and installation of a Subsequent Production System is conducted as a Non-Consent Operation, each Non-Participating Party shall satisfy Hydrocarbon Recoupment from:

   (i) one hundred percent (100%) of its Non-Participating interst share of Hydrocarbon production from all wells which are drilled from and/or produced through the Subsequent Production System or Facilities and/or wells benefited from injection or disposal wells.

The interest shall revert to each Non-Participating Party only after the Participating Parties have completely recouped, from Hydrocarbon production, the amounts specified herein.

16.6 <u>Reversion of Interests to Non-Participating Party</u>: A Non-Participating Party's Working Interest and leasehold operating rights subject to recoupment from future Hydrocarbon production and/or a Disproportionate Spending Settlement, shall revert to the Non-Participating Party upon the occurrence of the first of the following events:

(a) the Non-Consent Operation does not appear to satisfy the qualifications of a Producible Well and upon permanent plugging and abandonment of such non-consented interval in the wellbore; or,

(b) Hydrocarbon production ceases prior to complete recoupment under Article 16.5.7 (*Hydrocarbon Recoupment from Hydrocarbon Production*) by the Participating Parties; or,

90

EXHIBIT 4

(c)     the Participating Parties Sidetrack or Deepen an Exploratory Well, Appraisal Well or Development Well and such Non-Consented Operation does not satisfy the qualifications of a Producible Well; or,

(d)     upon complete Hydrocarbon Recoupment.

16.6.1   <u>Dry Hole Reversion</u>: If a Non-Consent Operation (other than a Non-Consent Operation under Articles 16.2 *(Acreage Forfeiture Provisions)* and 16.4 *(Operations to Maintain Contract Area)* above results in a dry hole and fails to obtain Hydrocarbon production or, if Hydrocarbon production ceases prior to complete Hydrocarbon Recoupment by the Participating Parties, then the Non-Participating Party's Working Interest and leasehold operating rights which have been relinquished shall revert to the Non-Participating Party.  However, all non-consent Wells, Production Systems and Facilities [and rights to future Hydrocarbon production from a Producible Reservoir under Article 16.5.7 *(Hydrocarbon Recoupment From Hydrocarbon Production)]* shall remain vested in the Participating Parties. Any salvage value in excess of complete Hydrocarbon Recoupment shall be credited to all Parties according to their Working Interest and without regard to their participation status.

16.6.2   <u>Sidetracking or Deepening a Non-Consent Well</u>:  If a Non-Participating Party entitled to do so makes an Election to participate in the Sidetracking or Deepening operation, then the Participating Parties shall be deemed overinvested to the extent of the Non-Participating Party's Share of Costs in the original Non-Consent Operation (less any amount recovered by the Participating Parties out of the Non-Participating Party's Share of Hydrocarbon production or through a Disproportionate Spending Settlement).  If the Participating Parties have recouped the Cost of the well at the time they desire to Sidetrack or Deepen the well, then the Non-Participating Party will not be an underinvested Party in the Sidetracking or Deepening of the well.  However, in such case, the Participating Parties in the original well shall still be permitted complete recoupment from the other wells in the Producible Reservoir, discovered or extended by the original well as provided in Article 16.5.7 (a) *(Hydrocarbon Recoupment from Hydrocarbon Production),* until the total non-consent amount to be recouped has been recovered from the Producible Reservoir.

16.7   <u>Operations From a Subsequent Non-Consent Production System</u>:  Any Party who made an Election not to participate in a Subsequent Production System may make an Election to participate in operations from such Subsequent Production System.  If a Non-Participating Party makes an Election to participate in such operations, then the Non-Participating Party may reduce the Hydrocarbon Recoupment amount through a Disproportionate Spending Settlement in accordance with Article 16.9 (*Underinvestment of Costs*) in subsequent Development Operations conducted from the Subsequent Production System and thereby automatically revise its non-participation Election to

EXHIBIT 4

become a Participating Party in such Subsequent Production System. Any Disproportionate Spending Settlement amounts shall be subtracted from the Hydrocarbon Recoupment entitled to the Participating Parties in the Subsequent Production System pursuant to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.

16.8   <u>Allocation of Production System Costs to Non-Consent Operations</u>:  In the event a Non-Consent Well is proposed to be drilled from or produced through a Production System owned by all the Parties, the rights of Participating Parties to use the Production System for the proposed Non-Consent Well and the Costs therefore shall be based on the following:

16.8.1   <u>Investment Charges</u>:  If a Non-Consent Well will utilize either a Production System and/or Subsea Production System owned by all the Parties, the Non-Participating Parties in such well shall be deemed to be the overinvested Parties in such Production Systems to the extent the Participating Parties in such well would have paid a charge for the right to use the Production System and/or Subsea Production System and its Facilities as follows:

(a)   The Participating Parties shall pay a one-time slot usage fee covering its use of the Production System in an amount equal to two percent (2%) of the Cost of the Production System, the Subsea Production System and its Facilities to the owners of the Production System (to be shared in proportion to the owner's Working Interest in the Production System). For purposes of the slot usage fee, the total Cost of the Production System shall be reduced by .41667% per month commencing upon the first monthly anniversary date of when the Production System was installed and every monthly anniversary thereafter until the total Cost of the Production System is reduced to twenty-five percent (25%) of the original Cost.  The Cost of additions to the Production System shall be reduced in the same manner commencing upon the first monthly anniversary after the addition is installed. If the non-consent well is abandoned, then the right of Participating Parties to use that Production System slot shall terminate unless such Parties commence drilling a substitute well from the same slot within ninety (90) days after abandonment.  The slot usage fee shall not apply to a slot which is deemed to be "surplus."  A slot may be deemed surplus by the unanimous consent of all Parties owning an interest in the Production System.

(b)   If Hydrocarbon production from the non-consent well is handled through Facilities owned by all Parties, the Participating Parties shall pay to the owners of the Facilities a sum equal to that portion of the total Cost of such Facilities which one well bears to the total number of wells which the Facilities are designed to accommodate.

EXHIBIT 4

16.8.2 <u>Operating and Maintenance Charges</u>:  The Participating Parties in a non-consent well shall pay all Costs necessary to connect their well to the Facilities and the Production System.  The expense of operating and maintaining the Facilities and the Production System shall be allocated equally per active completion among all active completions served.   Subsea Production System operating and maintenance expenses shall be allocated equally per active subsea completion among all active subsea well completions served by such Subsea Production System.

16.8.3 <u>Payments</u>:   The payment of sums pursuant to Article 16.8.1 *(Investment Charges)* shall not be a purchase of an additional interest in the Production System or Facilities.  Such payments shall be included in the total amount which the Participating Parties are entitled to recoup out of Hydrocarbon production from the non-consent well, but only to the extent of actual Costs.  Such charges shall be paid by the Participating Parties in such well by allocating (in addition to any other Costs allocated to them under this Agreement) all Costs attributable to tangible, intangible and other cost categories that would otherwise be allocated to the Non-Participating Parties until all overinvestment is eliminated.

16.9 <u>Underinvestment of Costs</u>:  A Non-Participating Party shall not be liable for settling any underinvestment of its share of the Costs of a Non-Consent Operation unless, having the right to do so under this Agreement,

- the Non-Participating Party makes a revised Participation Election to become a Participating Party, and

- if the applicable Non-Consent Operation is subject to Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*), the total Hydrocarbon Recoupment has not been recouped.

Upon making a revised Participation Election, a Non-Participating Party shall settle any Underinvestment  for its share of the Costs in a Non-Consent Operation as provided in this Article 16.9 (or the balance of any Underinvestment if the applicable Non-Consent Operation is subject to Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*) and the total Hydrocarbon Recoupment has not been recouped) and shall settle the balance of its Hydrocarbon Recoupment as provided in Article 16.5 (*Percentage Hydrocarbon Recoupment for Non-Consent Operations*).  Unless otherwise provided in this Agreement, a Non-Participating Party has the right to make a revised Election to become a Participating Party under the following Articles:

(a) Article 9.1.1 (*Conduct of Proprietary Geophysical Operations*);

(b) Article 11.3 (*Election by Original Non-Participating Parties in Deepening or Sidetracking Appraisal Operations*);

EXHIBIT 4

(c)      Article 11.4 (*Deeper Drilling*);

(d)      Article 11.6.2 (*Election on Proposed Feasibility Study*);

(e)      Article 12.3 (*Project Team Election*);

(f)      Article 12.7 (*Approved Development Plan and Final Design AFE*);

(g)      Article 12.11 (*Major Modification to Development Plans*);

(h)      Article 13.3 (*Election by Original Non-Participating Parties in Deepening or Sidetracking Operations*);

(i)      Article 13.4 (*Deeper Drilling*); and

(j)      Article 16.7 (*Operations from a Non-Consent Subsequent Production System*).

16.9.1   <u>Settlement of Underinvestments</u>:  Except as provided in Article 16.9.2 (*Cash Settlement of Underinvestment*), upon making a revised Participation Election, a Non-Participating Party shall settle any underinvestment for its share of the Costs in a Non-Consent Operation by either:

(a)      making a Disproportionate Spending Settlement by bearing one hundred percent (100%) of the overinvested Parties' share of the Costs (or if there are two or more underinvested Parties, a proportion of such Costs based upon each Party's underinvestment) of all future activities or operations or AFE (and/or future Costs of such Non-Consent Operations if Costs are still being incurred) in which one or more of the overinvested Parties participate until the underinvestment is eliminated, (i.e. one hundred percent (100%) of the Non-Participating Party's share of the Costs of the original operation); or,

(b)      making an immediate cash settlement to the original Participating Parties in the full amount of the under-investment.

Unless otherwise provided in this Agreement, each original Participating Party shall individually select the manner of eliminating the underinvestment at their sole discretion.

16.9.2   <u>Cash Settlement of Underinvestment</u>:  If there are no further proposed or planned operations on the Contract Area for which Costs would be allocated toward the elimination of an under-investment, the underinvested Party shall pay any over-invested Party the remaining under-invested amount in cash.  If operations on the Contract Area, for which Costs are being paid by the underinvested Party and allocated to the underinvestment, do not eliminate the

94

EXHIBIT 4

underinvestment within two (2) years, or any other shorter period specified in this Agreement, from the date the underinvestment accrued, or upon final settlement of this Agreement, or the underinvested Party withdraws from this Agreement, whichever comes first, then the underinvested Party shall pay the overinvested Party the remaining underinvestment in cash. Hydrocarbon Recoupment for Non-Consent Operations under Article 16.5 *(Percentage Hydrocarbon Recoupment for Non-consent Operations)* shall not be considered an over/underinvestment.

## ARTICLE 17
## WITHDRAWAL FROM AGREEMENT

17.1 <u>Right of Withdrawal</u>: Subject to the limitations specified in this Article, any Party (the "Withdrawing Party") may withdraw from this Agreement by giving prior written notice to all other Parties (the "Remaining Parties") stating its intention to withdraw from continued joint operations under this Agreement. The withdrawal notice shall constitute an unconditional and irrevocable offer by the Withdrawing Party to convey to the Remaining Party(ies) the Withdrawing Party's entire Working Interest in all of the Leases, the Production System, the Hydrocarbon production and all other property and equipment within the Contract Area owned under the terms of this Agreement. The withdrawal notice shall specify an effective date of withdrawal which date shall be at least **sixty (60) days but not more than one hundred eighty (180) days after the date of the withdrawal notice.**

17.2 <u>Response to Withdrawal</u>: Within thirty (30) days of receipt of the notice of withdrawal, each of the Remaining Parties shall elect in writing either to join in the withdrawal or to remain a Party to this Agreement. Failure to respond to a withdrawal notice shall be deemed an Election to remain a Party to this Agreement.

17.2.1 <u>Unanimous Withdrawal</u>: If all the Parties agree to join in the withdrawal, no assignment of Working Interests shall take place and the Parties shall be deemed to have decided to abandon all joint operations within the Contract Area pursuant to Article 18 *(Abandonment and Salvage)* of this Agreement.

17.2.2 <u>Acceptance of Withdrawing Interests</u>: If fewer than all Parties agree to join in the withdrawal, then within forty-eight (48) hours (exclusive of Saturdays, Sundays and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to the Operator a written rejection of acceptance of its Participating Interest share (or other share agreed to by the Remaining Parties) of the Withdrawing Party(ies)'s Working Interest(s). Failure to make the written rejection or acceptance shall be deemed acceptance of its Participating Interest share of the Withdrawing Party(ies)'s Working Interest(s). The Withdrawing Party(ies) shall take all necessary steps to accomplish the withdrawal by the effective date and execute and deliver to

EXHIBIT 4

the Remaining Party(ies) all necessary instruments to assign its Working Interests to the Remaining Party(ies). All expenses associated with the withdrawal and the transfer of Working Interest shall be borne by the Withdrawing Party(ies). If the Remaining Parties are unable to select a successor Operator, if applicable, or the Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party(ies)'s Working Interest(s) within fifteen (15) days following the conclusion of the forty-eight (48) hour period to submit a written rejection, the Remaining Parties shall be deemed to have joined the withdrawal and Article 17.2.1 (*Unanimous Withdrawal*) will apply.

17.3    <u>Limitation Upon and Conditions of Withdrawal</u>:

17.3.1    <u>Current Operations and Voting</u>:  Any Party withdrawing prior to completion of any operations (pursuant to an AFE) on the Contract Area in which it had previously made an Election to participate shall remain fully liable for its share of the AFE.  After giving its notification of withdrawal, the Withdrawing Party shall not be entitled to make an Election to participate or vote on any General Matter, other than General Matters for which the Withdrawing Party retains a financial responsibility.

17.3.2    <u>Prior Expenses</u>:  The Withdrawing Party(ies) shall remain responsible for its Participating Interest share of any Costs of operations, rentals, royalties, taxes, damages or other liability or expense accruing or commencing prior to the effective date of the withdrawal.  Prior to the effective date of the withdrawal, the Operator shall render a final statement to the Withdrawing Party(ies) for its share of all identifiable expenses incurred prior to the notice of withdrawal, along with a statement of any deficiency in salvage value.  Prior to any withdrawal, a Withdrawing Party, at its sole expense, shall satisfy or provide security satisfactory to the remaining Party(ies) for all obligations and liabilities it has incurred or which are attributable to it prior to the effective date of the withdrawal. Furthermore, any liens, charges and other encumbrances which the Withdrawing Party(ies) placed (or caused to be placed) on its Working Interest prior to its withdrawal shall be fully satisfied or released prior to its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to such liens). Provided all such expenses (including any deficiency in abandonment Costs) have been paid, the notice of withdrawal and the assignments shall be effective upon the specified effective date.

17.3.3    <u>Abandonment Costs</u>:  The Withdrawing Party(ies) shall pay to the Operator for the benefit of the Remaining Party(ies) the Withdrawing Party's pro rata Working Interest share of the estimated current Costs of plugging and abandoning all wells and removal of all Production Systems, Facilities and other material and equipment serving the Contract Area, less its pro rata share of the estimated salvage value of the assets at the time of abandonment.  Such Costs

96

EXHIBIT 4

and salvage value shall be prepared by the Operator according with Article IV of Exhibit "C" (*Accounting Procedure*) and approved as a General Matter.

17.3.4   <u>Confidentiality</u>:  A Withdrawing Party shall continue to be bound by the confidentiality provisions of Article 7 *(Confidentiality of Data)* after the withdrawal, but, as of the effective date of the withdrawal, shall have no further access to technical information relating to joint operations.  The Withdrawing Party shall not be required to return to the Remaining Party(ies) any Confidential Data acquired prior to the effective date of the withdrawal.  The Remaining Party(ies) shall have no obligation of confidentiality to the Withdrawing Party.

17.3.5   <u>Emergencies and Force Majeure</u>:  No Party shall be allowed to withdraw during a Force Majeure, or other emergency as described in Article 25.1 *(Force Majeure)*, but may withdraw from this Agreement after termination of such emergency.  The Withdrawing Party shall remain liable for its share of all Costs and liabilities arising from said emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the emergency.

## ARTICLE 18
## ABANDONMENT AND SALVAGE

18.1   <u>Abandonment of Wells</u>:  Any Participating Party may propose the permanent plugging and abandonment of a well that has produced Hydrocarbons (other than as a result of production testing) by notifying the other Participating Parties. Any Participating Party that fails to respond within the applicable response period specified in Article 8.3 *(Response Time for General Matters and Elections)* shall be deemed to have approved the permanent plugging and abandonment of the well.  If the permanent plugging and abandonment proposal is unanimously agreed to by the Participating Parties in that well, the well shall be permanently plugged and abandoned under the applicable regulations at the Cost and risk of the Participating Parties.  If the Participating Parties do not unanimously agree to permanently plug and abandon the well, the Operator shall prepare an estimate of the Costs of the permanent plugging and abandonment of the well less the estimated salvage value of the well, as determined under Exhibit "C", and the Participating Party desiring to permanently plug and abandon the well shall pay the Operator, for the benefit of the non-abandoning Participating Parties, its share of that estimate.  If an abandoning Participating Party's respective share of the estimated salvage value is greater than its share of the estimated Costs of the permanent plugging and abandonment, the Operator, on behalf of the non-abandoning Participating Parties, shall pay the abandoning Participating Party a sum equal to the deficiency

18.2   <u>Facilities and Production System Salvage and Removal Costs</u>: When the Parties owning a Production System, Facility or Subsea Production System desire to dispose of such

EXHIBIT 4

equipment, such equipment disposal shall be unanimously approved.  Upon unanimous approval, the Operator shall dispose of such equipment in the manner approved by the Participating Parties.  The Costs, risks and net proceeds, if any, resulting from such disposition shall be shared by the Participating Parties in proportion to their Participating Interests in the equipment.

18.3   <u>Approval Not Required</u>:  The Operator may, without prior approval of the Parties, dispose of any items of surplus or obsolete material and equipment if the current price of new materials or equipment similar thereto is less than One Hundred Thousand Dollars ($100,000.00).

18.4   <u>Abandonment Operations Required by Governmental Authority</u>:  Any well abandonment or Platform/Production System removal required by a governmental authority shall be accomplished by Operator with the Costs, risks and net proceeds, if any, to be shared by the Parties owning such well, Platform or Production System in proportion to their Participating Interest.

## ARTICLE 19
## RENTALS, ROYALTIES AND MINIMUM ROYALTIES

19.1   <u>Overriding Royalties and Burdens on Production</u>:  If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary working interest, net profits interest or other type of burden on Hydrocarbon production in addition to the lessor's royalty stipulated in the Lease(s) (an "Overriding Royalty"), the Party creating the Overriding Royalty shall assume and bear all obligations of the Overriding Royalty regardless of that Party's participation status notwithstanding that an assignment of all or a portion of that Party's Working Interest is made to another Party under this Agreement.  The Party creating the Overriding Royalty shall indemnify and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Overriding Royalty.  Any such agreements creating these interests shall contain provisions to effect this.

19.1.1   <u>Subsequent Creation of Overriding Royalty</u>:  Notwithstanding anything herein to the contrary, if subsequent to the execution of this Agreement, any Party should create an Overriding Royalty, such subsequently created Overriding Royalty shall be made specifically subject to all the terms and provisions of this Agreement and shall be subordinate to the rights of the other Parties to this Agreement.

19.1.2   <u>Subordination of Overriding Royalties</u>:  If the Party owning the Working Interest from which the Overriding Royalty is created: (a) fails to pay when due its share of Costs, or (b) withdraws from this Agreement, then the Overriding Royalty shall be chargeable with its pro rata portion of all Costs (equal to its fractional interest in gross production) and the security rights created in Article

98

EXHIBIT 4

6.3 *(Security Rights)* shall be applicable against such Overriding Royalty.  The Operator shall have the right to enforce the security rights (and all other rights granted under this Agreement) against the owners of the Overriding Royalty for the purpose of collecting Costs chargeable to the Overriding Royalty.

19.2  <u>Payment of Rentals and Royalties</u>:  The Operator shall make all rental payments on behalf of the Parties for the Contract Area.  The Operator shall use reasonable care to make proper and timely payment of all rentals, minimum royalties or other similar payments accruing under the terms of the Leases which are included within the Contract Area.  Upon receipt of proper evidence of all such payments and the Operator's invoice for its proportionate share of all such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of all such payments.  In the event Operator fails to make proper payment of any rental or minimum royalty or similar payments accruing under the terms of the Lease(s) through mistake or oversight where such payment is required to continue a Lease in force, then Operator shall not be liable to the other Parties for any resulting damages or any loss which results from such nonpayment unless that non-payment is due to the gross negligence or intentional misconduct of the Operator.

19.2.1  <u>Non-Participation in Payments</u>:  If any Party elects not to pay its share of any rental, minimum royalty or similar payment such Non-Participating Party shall notify the other Parties of its intention not to pay its share of such payment at least sixty (60) days prior to the date on which such payment is due.  Upon this occurrence, the Operator shall make such payment solely for the benefit of all the Participating Parties.  The Non-Participating Party shall assign to the Participating Parties all of its Working Interest in the Contract Area or portion thereof, maintained by such payment.

19.2.2  <u>Royalty Payments</u>:  Each Party shall pay or cause to be paid all royalty and other amounts payable out of Hydrocarbon production taken from the Lease(s) for its account.  During any time in which the Participating Parties in a Non-Consent Operation takes a Non-Participating Party's share of Hydrocarbon production, the Participating Parties shall bear the Lease royalty on such Hydrocarbon production.  When necessary for calculating the recoupment of a Non-Consent Well, any Non-Operating Party receiving its share of Hydrocarbon production in kind shall advise the Operator (in writing on or before the tenth day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the prices received for such Hydrocarbon production.

19.2.3  <u>Federal Offshore Oil Pollution Compensation Fund Fee</u>:  Each Party agrees to pay and bear the Federal Offshore Oil Pollution Compensation Fund Fee payable on its share of Hydrocarbon production or any fees being required by section 302 of the Outer Continental Shelf Lands Act of 1978, the Oil Pollution Act of 1990 and any subsequent statutes and regulations promulgated pursuant

99

EXHIBIT 4

to those statutes.  However, should the oil owned by a Party be reported to the BOEM (or a successor regulatory agency) by another Party in its reporting form, the reporting Party shall pay the required fees on all volumes reported and the non-reporting Party shall reimburse the reporting Party for all fees paid on its behalf

# ARTICLE 20
# TAXES

20.1    Internal Revenue Provision: Notwithstanding any provisions herein that the rights and liabilities hereunder are several and not joint or collective or that the Agreement and the operations hereunder shall not constitute a partnership under state law, if, for federal income tax purposes, the Agreement and the operations hereunder are regarded as a partnership, each Party, hereby elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws.

20.2    Other Taxes and Assessments:  The Operator, on behalf of the Joint Account, shall file all tax returns and reports required by law and shall pay all applicable taxes, other than income or other taxes provided in Article 20.2.2 *(Production and Severance Taxes),* or assessments levied with respect to operations conducted under this Agreement.  The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator.  The Operator shall charge each Party its Working Interest share of all taxes and assessments paid and, upon written request from a Non-Operating Party(ies), provide copies of all tax returns, reports, tax statements and receipts for such taxes.  The Operator shall not allow any taxes to become delinquent, unless such nonpayment is approved as a General Matter.

20.2.1    Property Taxes:  The Operator, on behalf of the Joint Account, shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party.  The Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the Operator may elect to pay under protest.  Upon final determination, the Operator shall pay the taxes and any interest, penalty or cost accrued as a result of such protest.  The Operator shall charge each Party its Working Interest share of such tax payments including interest, penalties and all reasonable Costs in accordance with Exhibit "C" *(Accounting Procedure).*

20.2.2    Production and Severance Taxes:  Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it received pursuant to the terms of this Agreement.  Any Party responsible for such tax payment shall upon written request from the Operator, provide evidence that such taxes have been paid.

EXHIBIT 4

# ARTICLE 21
# INSURANCE AND BONDS

21.1   <u>Insurance</u>:  The Parties shall maintain the insurance coverage specified in Exhibit "B". No other insurance shall be carried for the benefit of the Parties under this Agreement unless otherwise agreed by the Parties.

21.2   <u>Bonds</u>:  Operator shall obtain and maintain any and all bonds at the expense of the Joint Account required to be carried by any applicable law, regulation or rule.  Operator will require all contractors to obtain and maintain all bonds required to be carried by any applicable law, regulation or rule.

# ARTICLE 22
# LIABILITY, CLAIMS, LAWSUITS AND
# ALTERNATE DISPUTE RESOLUTION

22.1   <u>Individual Obligations</u>:  The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and, nothing contained herein shall ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose.  Each Party shall hold all the other Parties harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of its acts or omissions.

22.2   <u>Notice of Claim or Lawsuit</u>:  If a claim is made against any Party or if any Party is sued on account of any matter arising from operations hereunder, or on any matter affecting the Leases or Contract Area, or if any hearings are held pursuant to operations under this Agreement, such Party shall give written notice of the lawsuit or hearing to the other Parties as soon as reasonably practicable.

22.3   <u>Settlements</u>:  The Operator may settle any single damage claim or lawsuit involving operations hereunder if the expenditure does not exceed Two Hundred and Fifty Thousand Dollars ($250,000) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or suit pursuant to Article 22.4 *(Defense of Claims and Lawsuits)* below.

22.4   <u>Defense of Claims and Lawsuits</u>:  The Operator shall supervise the conduct of any claims and litigation.  Claims and suits may be settled in excess of the amount specified in Article 22.3 *(Settlements)* above only with the unanimous consent of all Participating Parties in the operation out of which the claim arose; however, any Party shall have the right to independently compromise or settle any claim or suit that is attributable to its interest alone as long as such compromise or settlement does not directly adversely affect

101

EXHIBIT 4

the interest or rights of the other Parties.  No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the defense of claims and suits for the Parties, together with the amount paid for compromise, settlement or to discharge any final judgment, shall be considered Costs of operation and shall be paid by the Parties in proportion to their Participating Interest in the operation out of which the claim arose.  Outside counsel shall be employed only with the approval of the affected Parties as a General Matter under Article 8.2 *(Voting Procedures on General Matters and Elections)*.  If it is agreed that outside counsel is to be employed, the fees and expenses shall be charged to the Parties in proportion to their Participating Interest in the operation out of which such claim or suit arose in accordance with Exhibit "C" *(Accounting Procedure)*.  Each Party shall also have the right to hire, at its own expense, its own outside counsel with respect to its own defense.

22.5    <u>Liability for Damages</u>:        To the extent allowed by law, liability for losses, damages, Costs, expenses, claims, liabilities and lawsuits arising from operations under this Agreement not covered by or in excess of the insurance carried for the Joint Account shall be borne by each Party in proportion to its Participating Interest in the operations out of which such liability arises, except when such liability results from the gross negligence or willful misconduct of a Party(ies), in which case such Party(ies) shall be solely liable for same.  If a Party (the "Indemnified Party") is held liable to a third party as the result of another Party's (the "Indemnifying Party") gross negligence or willful misconduct (the "Indemnified Act"), then the Indemnifying Party shall indemnify, defend and hold harmless the Indemnified Party from and against those losses, damages, penalties, costs, expenses, legal fees, claims, or liabilities to the extent  (1) they are actually incurred by the Indemnified Party, and (2) they are attributable to such Indemnified Act.

22.6    <u>Limitation of Liability – Waiver of Consequential Damages</u>: NOTWITHSTANDING ARTICLE 22.5, EACH PARTY RELEASES AND WAIVES ALL CLAIMS AGAINST THE OTHER PARTY FOR THE RELEASING PARTY'S CONSEQUENTIAL OR INDIRECT DAMAGES, LOSS OF PROFITS,  LOSS OF PRODUCTION OR LOSS OF USE WHETHER BASED ON NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL MISCONDUCT (WHETHER SOLE, CONCURRENT, JOINT, ACTIVE, OR PASSIVE) FAULT OR OTHER TORT, STATUTE OR OTHER THEORY OF LEGAL LIABILITY, INCLUDING STRICT LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY, AND TO THE EXTENT  PERMITTED BY LAW, ANY STATUTORY REMEDIES WHICH ARE INCONSISTENT WITH THE PROVISIONS OF THIS ARTICLE  ARE WAIVED.

22.7    <u>Indemnification for Non-Consent Operations</u>:    To the extent allowed by law, the Participating Parties agree to hold the Non-Participating Parties (and their Affiliates, agents, insurers, directors, officers and employees) harmless and to indemnify and protect them against all claims, demands, liabilities, regulatory decrees and liens for environmental pollution and property damage or personal injury, including sickness and death, caused by or otherwise arising out of Non-Consent Operations, and any loss and

EXHIBIT 4

cost suffered by any Non-Participating Party as an incident thereof, except where the gross negligence or willful misconduct of any Non-Participating Party contribute to that loss or cost.  Should any indemnity contained herein be determined to be in violation of law or public policy, the Parties agree that said indemnity(ies) shall then be enforceable only to the maximum extent allowed by law.

22.8  <u>Indemnification for Prior Operations</u>:  To the extent allowed by law, notwithstanding anything to the contrary in this Agreement, a Party shall not be liable to any other Party for any losses, damages, costs, expenses, claims, liabilities or lawsuits arising from operations which occurred prior to the execution of or joinder to this Agreement. Furthermore, the Parties who are responsible for such pre-execution or pre-joinder liability shall indemnify, defend and hold harmless the aforesaid non-responsible Parties. It is understood that the limitation herein provided does not apply to responsibility for existing wells and associated environmental liability, if any.

22.9  <u>Damage to Reservoir, Loss of Reserves and Profits</u>:  Notwithstanding anything to the contrary contained herein, no Party to this Agreement shall be liable to any other Party to this Agreement for loss of or damage to a reservoir(s), loss of Hydrocarbons, or for loss of profits or for other consequential or business interruption damages.

22.10  <u>Non-Essential Personnel</u>:  A Party hereto who is not the Operator and who requests transportation and/or access to a Production System, aircraft, vessel or any other Facility utilized for Lease operations for any employee, contractor, consultant or invitee of such party (hereinafter a "Boarding Party"), agrees to defend, protect and indemnify the other Parties hereto as to any cost, liability or judgment incurred as a result of a claim, demand, cause of action, suit or judgment brought or obtained by a Boarding Party and/or its successor, and assigns and relations arising out of said person's transportation and/or access to a Production System, aircraft, vessel or any Facility utilized for Lease operations regardless of the sole, concurrent, active or passive negligence or fault (including strict liability) of the indemnified parties or any third party, regardless of the unseaworthiness of any vessel or any unairworthiness of any aircraft.

22.11  <u>Dispute Resolution Procedure</u>:  The Parties agree that any claim, controversy or dispute arising out of, relating to or in connection with this Agreement, including the interpretation, validity, termination or breach thereof, shall be resolved solely in accordance with the Dispute Resolution Procedure set forth in Exhibit "H" to this Agreement.

## ARTICLE 23
## CONTRIBUTIONS

23.1  <u>Contributions from Third Parties</u>:  The Parties may seek to obtain support from third parties for joint operations through contributions of cash, acreage or data.  Any Party may propose to seek support for joint operations on the Contract Area through contributions

103

EXHIBIT 4

from third parties. Each Party shall notify all other Parties of any contribution offers received from third parties. Any proposal or offer from third parties shall be subject to the General Matter approval of the Parties prior to either accepting the offer or making such a proposal. Upon General Matter approval, the Operator, unless otherwise agreed, shall negotiate all contributions on behalf of the Parties (with prior consultation of the Parties and the prior agreement of the cash equivalent value for any non-cash consideration offered or received). Upon receiving a response from a third party to the Operator's proposal, the Operator shall notify all of the Parties of the proposal and its terms. Within thirty (30) days of receipt of the Operator's notice, the Party's shall vote as a General Matter on the proposal. If a proposal is approved as a General Matter, any Party shall have the right to decline participation in a contribution and be relieved of any obligations and benefits thereunder. The Participating Party(s) shall not be required to obtain the consent of the Non-Participating Party regarding any contribution or trade.

23.1.1   <u>Cash Contributions</u>:  In the event a cash contribution is accepted towards the drilling of a well, in which all Parties are Participating Parties, said cash contribution shall be turned over to the Operator, and the Operator shall credit the amount of the cash contribution against the Costs of the proposed joint operation in proportion to each Party's Participating Interest. In the event the Participating Parties accept a cash contribution toward the drilling of a well where fewer than all Parties are Participating Parties, the cash contribution shall be credited among the Participating Parties in such well to the extent that each Participating Party shall receive a portion of the contribution equal to its Participating Interest in the well. The cash contribution shall be deducted from the cost of drilling and completing the well prior to computation of the Recoupment Amount Participating Parties shall be entitled to receive out of Hydrocarbon production from the Non-Participating Parties in accordance with Article 16 *(Non-Consent Operations)*.

23.1.2   <u>Acreage Contributions</u>:  Any contribution of acreage toward the drilling of a joint well shall be offered, without warranty of title, to the Participating Parties in proportion to their Participating Interests. If any acreage contribution involves one hundred percent (100%) of the interest in and to the acreage and all of the Parties to this Agreement participate in accepting their share of the assignment of the acreage, the contiguous acreage shall become a part of the Contract Area and subject to the terms of this Agreement and the non-contiguous acreage shall be deemed governed by an operating agreement incorporating identical provisions as the provisions in this Agreement, except to the extent they are clearly inappropriate. Any acreage contribution of less than one hundred percent (100%) interest in and to the acreage or of contiguous or non-contiguous acreage in which less than all Parties are Participating Parties shall, to the extent possible, be subject to the terms of an Operating Agreement substantially similar to this Agreement, and shall apply separately to the acreage acquired by the Participating Parties.

104

EXHIBIT 4

23.1.3   <u>Data Contributions</u>: Contributions of geoscience or engineering data offered by third parties in support of joint operations shall be handled pursuant to Article 7 *(Confidentiality of Data),* and may be accepted by the Participating Parties so long as the confidentiality of any data belonging to Non-Participating Parties is preserved.  No data owned by a Non-Participating Party may be included in any data contribution without the consent of the Non-Participating Party.

23.2   <u>Restricted Bidding</u>:  If at any time during the term of this Agreement, more than one of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the BOEM pursuant to 30 CFR 556.44*,* then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement.  In the case of multiple restricted bidders being Parties to this Agreement, the provisions of this Agreement shall be amended to delete those provisions which would otherwise require a transfer of a leasehold interest prohibited by 30 CFR 556.44(c).

# ARTICLE 24
# AREA OF MUTUAL INTEREST, ASSIGNMENTS AND PREFERENTIAL RIGHT TO PURCHASE

24.1   <u>Assignments and Transfers of Working Interests</u>:  Subject to the provisions of this Article 24, all of the Parties to this Agreement agree to give prior written notice to the Operator and the other Parties of any proposed assignment, transfer or other disposition of all or a portion of a Party's Working Interest covered by this Agreement. Any assignment of a Working Interest covered by this Agreement' shall be made to a financially responsible assignee and shall be further subject to this Agreement and the following provisions:

24.2.1   <u>Exceptions to Prior Written Notice</u>:  Notwithstanding any provision of this Agreement to the contrary, an assigning Party shall not be required to provide prior written notice with respect to any of the following:

(a)   A Party seeking to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest in the Leases, any equipment or Facilities or each Party's share of Hydrocarbon production from the Contract Area.  However, any encumbrance arising from the financing transaction shall be expressly subordinated to the rights of the other Parties to this Agreement, and the assigning Party shall ensure that any mortgage or encumbrance shall be without prejudice to the terms of this Agreement; or,

(b)   A Party assigning all or an undivided part of its Working Interest to an Affiliate

24.2.2   <u>Effective Date of Assignments</u>:   Except as otherwise provided in this Agreement, the effective date for any assignment shall be not more than *one*

105

EXHIBIT 4

*hundred eighty (180)* days after the date of the written notice.  No assignment, other than those allowed by Article 24.1.1 *(Exceptions to Prior Written Notice),* shall be binding upon the Parties unless and until (i) the assignor or assignee provide all remaining Parties with a photocopy of a fully executed assignment, and an executed BOEM Form 1123, Designation of Operator" and (ii) receipt of any necessary approval by the BOEM. The Parties shall promptly join in such reasonable actions as may be necessary to secure such approvals and shall execute and deliver any and all documents reasonably necessary to effect any such assignment.  Any costs attributable to such an assignment shall be the sole obligation of the assignor.

24.2.3   <u>Minimum Transfer of Interest</u>:   Unless unanimously agreed otherwise, no transfer (including partial transfers) to a third party shall be made that:

(a)      is less than an undivided 9.5637%  Working Interest as to all depths in the entire Contract Area; or

(b)      results in the conveying Party retaining less than an undivided 9.5637% Working Interest in the entire Contract Area.

If either conveyance is approved unanimously and if the Working Interesst if any Party is subsequently conveyed or distributed to other entities, so that the conveying Party of any one of the other entities receiving a conveyance from such Party subsequently owns a Working Interest of less than 9.5637% as a result of such conveyance

(i) such entities and, if applicable, the conveying Party, who as a result of such conveyance, each now owns a Working Interest less than 9.5637%, collectively shall be entitled to only a single joint representative at meeting of the Parties and shall Vote or act collectively on all proposals or Participation Elections, and

(ii) such Parties shall be entitled to only a single set of logs, samples, information and reports shall be considered as only one Party for all purposes under this Agreement."

24.2.4   <u>Form of Assignments</u>:   Any assignment of any interest in or subject to this Agreement shall incorporate provisions that the assignment is inferior to and made expressly subject to this Agreement and providing for the assumption by the assignee of the performance of all of assignor's obligations under this Agreement and providing that the assignor is not released from its obligations hereunder.   Any assignment not in compliance with this provision shall be voidable by the non-assigning Parties.

106

EXHIBIT 4

24.2.5   <u>Limited Warranty</u>:  Any assignment, vesting or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title; however, all encumbrances made by assignor or known by assignor shall be disclosed to assignee.

24.3   <u>Preferential Right to Purchase</u>:  Subject to the provisions of this Agreement, each Party shall have the right to freely transfer and alienate its Working Interest.  Any transfer of all or an undivided interest in the Party's Working Interest shall be subject to the following provisions:

24.3.1   <u>Notice of Proposed Transaction</u>: Should any Party (the "Assignor") desire to dispose of all or an undivided interest in its Working Interest in the Contract Area (whether offered as a single property disposition or as part of a multi-property disposition) through one of the below listed type transactions, or in any other manner not excluded under Article 24.3.3 (*Transactions Not Affected by the Preferential Right to Purchase*):

farmout(s)

cash sale(s); or,

non-simultaneous like-kind exchange(s)

and has received a bona fide offer (whether from a Party to this Agreement or from a third party) which the Assignor is willing to accept for the purchase or other acquisition of the Working Interest, each of the remaining Parties to this Agreement shall have a preferential right to purchase all or a Party's proportionate share of such Working Interest.  In such case, the Assignor shall promptly give prior written notice of the proposed transaction to the other Parties.  The notice of the proposed transaction shall provide full information concerning the transaction including at least:

the name and address of the prospective purchaser (who must be ready, able and willing to acquire the interest),

the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash and/or consideration received as a result of a transaction under Article 24.3.3 (*Transactions Not Affected by the Preferential Right to Purchase*),

the proposed effective date of the transaction, and

all other material terms of the offer.

EXHIBIT 4

24.3.2   <u>Exercise of Preferential Right to Purchase</u>:  For a period of thirty (30) days from receipt of the notice, the remaining Parties shall have the optional right to elect to acquire the Working Interest offered (on the same terms and conditions, or on equivalent terms for a non-cash transaction as stated in the notice) without reservations or conditions.  The Election to exercise the preferential right shall be made by the exercising Party giving the Assignor written notice of its Election to purchase prior to the expiration of the thirty (30) day period.  If an Election to preferentially purchase is made, the Assignor shall be required to transfer the Working Interest to the Party at the price and on the terms specified in the notice.  The transaction shall be concluded within a reasonable time, but no later than sixty (60) days after receipt of the Election to preferentially purchase (plus a reasonable time to secure all necessary governmental approvals).  If more than one Party elects to acquire the Working Interest offered, then each Party shall acquire a proportion of the Working Interest offered equal to the ratio its own pre-acquisition Working Interest bears to the total pre-acquisition Working Interests of all acquiring Parties (unless the acquiring Parties agree upon a different ratio).  If a non-assigning Party does not exercise its preferential right to purchase its Participating Interest share of the Working Interest offered and/or the non-assigning Parties who wish to exercise their preferential right to purchase do not agree to pay the full consideration and accept all of the terms of the offer within fifteen (15) days following the thirty (30) day period in which the non-assigning Parties may exercise their preferential right to purchase, the assigning Party may be free to complete the proposed conveyance on the terms disclosed in the notice.  If only one Party elects to acquire the Working Interest offered, it may require the assignor to transfer all of the Working Interest offered, but may not require the transfer of less than all Working Interest offered.

24.3.3   <u>Transactions Not Affected by the Preferential Right to Purchase</u>:  This preferential right to purchase shall not exist or apply when a Party proposes to:

(a)   mortgage, pledge, hypothecate or grant a security interest in all or a portion of its Working Interest (including assignments of Hydrocarbon production executed as further security for the debt secured by such device), or

(b)   exchange all or an undivided interest in its Working Interest in the Contract Area for property identified outside the Contract Area at the time of the exchange, or

(c)   dispose of its Working Interest by:

merger, reorganization or consolidation;

108

**EXHIBIT 4**

a sale or other transfer of substantially all of a Party's exploration and production assets in the Gulf of Mexico; or

a sale or other transfer to an Affiliate.

24.3.4   <u>Completion of the Transaction</u>:   If none of the remaining Parties elect to exercise its preferential right to purchase the Working Interest offered, the Assignor shall be free to complete the proposed transaction on the terms disclosed in the notice. However, if any proposed transaction is not executed and filed of record with the BOEM within one hundred twenty (120) days from the expiration of the thirty (30) day preferential right Election period (plus a reasonable time to secure any necessary governmental approvals) or, if the terms of the proposed transaction are amended in any way, the proposed transaction shall be considered withdrawn and the Working Interest offered shall again be subject to the preferential right to purchase as if the originally proposed transaction had never been proposed.

# ARTICLE 25
# FORCE MAJEURE

25.1   <u>Force Majeure</u>:   If as a result of Force Majeure any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money) then the obligations of the Party giving such notice, so far as and to the extent that the obligations are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period.  For purposes of this Agreement, "Force Majeure" shall be inclusive of but not limited to the following events: flood, hurricane or other acts of God; a fire, blowout, oil spill or other environmental catastrophe; war, civil disturbance, labor dispute, strike, lockout, compliance with any law, order, rule or regulation, governmental action or delay in granting permits or permit approvals as needed; by inability to secure materials or rig including but not limited to delays:

(a)      in the availability of the rig or other equipment or materials,

(b)      due to necessary repairs or modifications to the rig or other equipment, or

(c)      caused by the completion of prior contractual commitments;

or by any other cause, whether similar or dissimilar, beyond the reasonable control of the said Party. The Party claiming Force Majeure shall notify the other Parties of the Force Majeure situation within a reasonable time (not to exceed thirty (30) days) after the occurrence of the facts relied on and shall keep all Parties informed of all significant developments.  The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy

EXHIBIT 4

the Force Majeure or to resume performance of its obligations under this Agreement. The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure situation, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

## ARTICLE 26
## ADMINISTRATIVE PROVISIONS

26.1   <u>Term of Agreement</u>: This Agreement shall become binding upon execution by all Parties with an effective date as set forth in the preamble to this Agreement. This Agreement shall remain in effect from the effective date and for so long as any of the Leases in the Contract Area shall remain in effect or until all assets and operations have been turned over to a single Working Interest owner. Termination of this Agreement shall not relieve any Party from any Costs or liability accrued or incurred prior to the termination of this Agreement, and the provisions of this Agreement shall continue in force for such additional time as necessary until:

    (a)     all wells have been plugged and abandoned;

    (b)     all property and equipment in the Contract Area belonging to the Parties are disposed of by the Operator and all claims or lawsuits have been settled or otherwise disposed of, and,

    (c)     a final accounting and settlement has been made under this Agreement (including settlement of any gas imbalances pursuant to Exhibit "D").

The Operator shall have a reasonable period of time after the occurrence of an event of termination in which to conclude the administration of joint operations and to make a distribution of assets. During this period of time, the Operator shall continue to have and shall exercise all powers granted and meet all duties imposed by this Agreement until all provisions of this Agreement are fully executed. In accordance with Article 4.5 (*Selection of Successor Operator*), this Agreement will also terminate if no Party is willing to become Operator effective after all conditions of this provision have been completed.

26.2   <u>Time Limits</u>:  Time is of the essence in this Agreement and all time limits shall be strictly construed and enforced. The failure or delay of any Party in the enforcement of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel. Such Party may exercise its rights under this Agreement despite any delay or failure to enforce the rights when the right or obligation arose.

26.3   <u>Waiver of Right to Partition</u>:  Each Party for itself and its successors and assigns waives the right to bring an action for partition of its interest in the Leases and lands or personal property held subject to this Agreement, and covenants that during the existence of this

110

EXHIBIT 4

Agreement it shall not resort at any time to any action at law or in equity to partition any or all of Leases and lands or personal property subject to this Agreement.

26.4 <u>Compliance With Laws and Regulations</u>: This Agreement, and all operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.  No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented by or if such failure results from compliance with any applicable law, order, rule or regulation.

    26.4.1 <u>Applicable Law</u>: **THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO FEDERAL LAWS AND LAWS OF THE STATE OF LOUISIANA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.**

    26.4.2 <u>Severance of Invalid Provisions</u>:  In case of a conflict between the provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations shall govern over the provisions of this Agreement.  If, for any reason and for so long as, any clause or provision of this Agreement is held by court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement shall not be affected by such illegality or invalidity.  Any such invalid provision shall be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated.  The surviving provisions of this Agreement shall remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void.  The Parties shall negotiate in good faith for any required modifications to this Agreement.

    26.4.3 <u>Fair and Equal Employment</u>:  Each of the Parties is an Equal Opportunity Employer.  To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference.  If the Non-Discrimination in the OCS provisions of 30 CFR 270 apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference.  To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference.  In performing work under this Agreement, the Parties agree to comply with (and the Operator shall require

111

**EXHIBIT 4**

each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" attached hereto, pertaining to nonsegregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to nondiscrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

26.5 <u>Construction and Interpretation of This Agreement</u>:  The interpretation and construction of the terms of this Agreement will be governed by the following conventions:

26.5.1 <u>Headings for Convenience</u>:  Except for the definition headings contained in Article 2 *(Definitions)*, all the table of contents, captions, numbering sequences and paragraph headings used in this Agreement are inserted for convenience only and shall in no way define, limit or describe the scope or intent of this Agreement or any part thereof, nor have any legal effect other than to aid a reasonable interpretation of this Agreement.

26.5.2 <u>Gender and Number</u>:  The use of pronouns in whatever gender or number shall be deemed to be a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof.  Any necessary grammatical changes required to make the provisions of this Agreement refer to the correct gender or number shall in all instances be assumed as though each case was fully expressed.

26.5.3 <u>Independent Representation</u>:  Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.  This Agreement, though drawn by one Party, shall be construed fairly and reasonably and not more strictly against one Party than another.

26.6 <u>Integrated Agreement</u>:  This Agreement and the Exhibits attached thereto contain the final and entire Agreement of the Parties with respect to the subject matter of this contract.  There are no representations, warranties or promises, oral or written between the Parties other than those included in this Agreement with the agreement by the Parties hereto that, upon execution of this Agreement by all Parties:

a.  This Agreement supersedes and replaces all previous negotiations, understandings or promises, whether written or oral, relative to the subject of this Agreement, and

b.  with respect to the Contract Area only, this Agreement supersedes and replaces the Joint Operating Agreement attached as Exhibit "C" to that certain Joint Venture Agreement dated effective November 1, 2005 by and between the Noble Energy and Samson covering, among other lands, the Contract Area (the "Noble Energy – Samson JVA") and referred to in Article 6.2 of that certain Bidding Agreement entered into effective November 1, 2005 by and between Noble Energy and Samson covering certain blocks available for lease at OCS Sale 198, as amended by that

EXHIBIT 4

certain Second Amendment to Joint Venture Agreement entered into effective March 20, 2007 by and between the Noble Energy and Samson covering, among other lands, the Contract Area; and

c.  [….].

Each of the Parties acknowledges that, to such Party's knowledge, no other Party has made any promise, representation or warranty that is not expressly stated in this Agreement.  This Agreement shall not be modified or changed except by a written amendment signed by all the Parties.

26.7  <u>Execution of Documents</u>:

26.7.1  <u>Binding Effect</u>:  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land and Leases comprising the Contract Area.  This Agreement does not benefit or create any rights in any person or entity not a Party to this Agreement.

26.7.2  <u>Corporate Authority</u>:  If any Party is a legal entity, including but not limited to, an association, corporation, joint venture, limited partnership, partnership or trust, such Party represents to the other Parties that the execution and delivery of this Agreement and the completion of transactions contemplated herein have been duly authorized by all necessary corporate proceedings or have received all necessary management approvals.

26.7.3  <u>Further Assurances</u>:  Each Party further agrees to take any and all actions necessary and sign any and all documents necessary to implement the terms of this Agreement.  Any necessary documents (e.g., a Designation of Operator, etc.) shall be prepared and executed by all Parties within thirty (30) days from the receipt of a written request for same from any Party.

26.7.4  <u>Multiple Counterparts</u>:  This Agreement may be executed by signing the original or a counterpart thereof.  If this Agreement is executed in multiple counterparts, each counterpart shall be deemed an original and all of which when taken together shall constitute but one and the same Agreement with the same effect as if all Parties had signed the same instrument.  This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement.  A ratification shall have the same effect as an execution of the original Agreement.

EXHIBIT 4

**IN WITNESS WHEREOF**, each Party, through its duly authorized agent or representative, has executed this Agreement effective as of the date first above written.

**FIELDWOOD ENERGY LLC**

BY:       _____

NAME:   _John H. Smith_____

TITLE:   _Senior Vice President – Business Development

**ECOPETROL AMERICA LLC**

BY:       _____

NAME:   _____

TITLE:   _____

**TALOS ENERGY OFFSHORE LLC**

BY:       _____

NAME:   _____

TITLE:   _____

114

EXHIBIT 4