IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | |
| | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | |
| | § | |
| | § | (Jointly Administered) |
| ------------------------------------------------------ | § | |
| | § | **Adversary Proc. No. 20-____** |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | **(Emergency Hearing Requested)** |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **ATLANTIC MARITIME SERVICES, LLC,** | § | |
| | § | |
| Defendant. | § | |
| ------------------------------------------------------ | § | |

## ADVERSARY COMPLAINT

Fieldwood Energy LLC ("**Fieldwood**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and as Plaintiffs in the above-captioned adversary proceeding (the "**Adversary Proceeding**"), hereby file this complaint (the "**Complaint**") against Atlantic Maritime Services, LLC ("**Atlantic**" or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

"**Defendant**") and the *Declaration of Michael T. Dane in Support of Debtors' Adversary Complaint* attached hereto as **Exhibit 1**, and allege as follows:

## INTRODUCTION

1. By this Complaint, the Debtors seek to extend the automatic stay (the "**Automatic Stay**") under section 362(a) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to Debtors' co-working interest owners Ecopetrol America, LLC, Ridgewood Katmai, LLC, and ILX Prospect Katmai, LLC (collectively, the "**WIOs**") in connection with *in rem* lawsuits filed on November 13, 2020 against the WIOs in the United States District Court for the Eastern District of Louisiana by Atlantic.[2] Atlantic's actions are plainly an attempt to circumvent the Debtor's Automatic Stay. This is precisely the situation where the Automatic Stay should be extended.

2. The Lawsuits arise out of alleged amounts that the Debtors owe Atlantic and seek to enforce Atlantic's alleged liens on the WIO's interests in certain offshore wells in the Gulf of Mexico and to collect millions of dollars from the WIOs by sequestering and selling certain assets under the Louisiana Oil Well Lien Act (La. R.S. 9:4861 et seq.) ("**LOWLA**"). Each of Atlantic's liens were filed against Fieldwood weeks before payment was due and without accounting for offsets and credits to which the Debtors are entitled.

3. Importantly, the Debtors must indemnify the WIOs under joint operating agreements that Debtors have with the WIOs. Thus, the claims in the Lawsuits are to collect the obligations of the Debtors' and, for all practical purposes, claims against the Debtors.

---

[2] The two lawsuits are as follows: Cause No. 2:20-cv-03097; *Atlantic Maritime Services, LLC v. Ecopetrol America, LLC* and Cause No. 2:20-cv-03099; *Atlantic Maritime Services, LLC v. Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC* (collectively, the "**Lawsuits**").

2

4. Allowing the Lawsuits to be litigated will eviscerate the benefits of the Debtors' Automatic Stay because the Debtors will be forced to defend the Lawsuits. Extending the Automatic Stay to the WIOs would relieve the Debtors' estates not only of the distraction of dealing with the Lawsuits, but also of the cost and expense of the indemnification of the WIOs at this very critical juncture in these chapter 11 cases, and alleviate the administrative burdens and costs associated with the Lawsuits while the Debtors' focus their efforts on administering their chapter 11 cases. In short, extension of the Automatic Stay here is essential to afford the Debtors the necessary "breathing spell" intended by the Automatic Stay. The continuation of the Lawsuits will not only distract the Debtors' senior management team during this time in the Debtors' reorganization efforts, but it may, if unabated, jeopardize the Debtors' liquidity.

5. The Lawsuits seek to bring an in rem action with respect to operating assets jointly owned by the Debtors and the WIOs. Without the relief requested, the Debtors will be forced to participate in the Lawsuits or, worse, lose certain assets of the Debtors' estates, depriving the Debtors of one of the fundamental debtor protections provided by the Bankruptcy Code.

## PARTIES

6. Fieldwood is a Delaware limited liability company with its principal place of business located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

7. Atlantic is a Delaware limited liability company with its principal place of business located at 5847 San Felipe Street, Suite 3300, Houston, TX 77057. Atlantic is a wholly-owned subsidiary of Valaris plc, debtor-in-possession in bankruptcy case no. 20-34114, pending before the Bankruptcy Court for the Southern District of Texas. (Bankr. S.D. Tex. 20-34114, ECF No. 1).

## JURISDICTION AND VENUE

8. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and Federal Rules of Bankruptcy Procedure 7001(7) and 7065. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Debtors consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

**Debtors' Chapter 11 Cases and Vendor Program**

10. On August 3 and 4, 2020, the Debtors each commenced in this Court a voluntary case under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

12. On August 4, 2020, the Debtors filed, among other first-day motions, the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Prepetition Interest Owner Obligations, Joint Interest Billings, and E&P Operating Expenses and (B) 503(b)(9) Claims; and (II) Granting Related Relief* (Docket No. 7) (the "**Critical Vendor Motion**"). On September 14, 2020, the Court entered the *Final Order (I) Authorizing Debtors to Pay (A) Prepetition Interest Owner Obligations, Joint Interest Billings,*

4

*and E&P Operating Expenses and (B) 503(b)(9) Claims; and (II) Granting Related Relief* (Docket No. 342) (the "**Final Vendor Order**"), which authorized, but not directed, the Debtors to pay prepetition amounts owed to any E&P Claimant (as defined in the Critical Vendor Motion) or § 503(b)(9) claimant; provided, that, as a condition to making such pre-petition payments, the Debtors are required to enter into Trade Agreements (as defined in the Critical Vendor Motion) with such claimants on terms consistent with the historical practice between the parties. As of the date hereof, the Debtors have completed 97 Trade Agreements resolving approximately $100 million of prepetition claims. The Debtors are working to complete an additional 48 Trade Agreements representing an additional $41 million of prepetition claims. Moreover, a total of approximately 144 statutory liens were filed by certain of the Debtors' vendors and counterparties on account of their prepetition claims, many of which are either party to completed Trade Agreements or are in the process of negotiating a Trade Agreement with the Debtors. The Debtors are current on all their post-petition obligations.

**Debtors' Relationship with Atlantic**

13. Debtors are one of the largest producers of oil and gas in the Gulf of Mexico and hold interests in hundreds of offshore blocks covering some two million gross acres, including over 1,000 wells and nearly 500 operated platforms in the United States Gulf of Mexico. As part of their operations, Debtors, as operator and on behalf of the WIOs, contracted with Atlantic in October 2018 to provide a drillship, the *Rowan Reliance*[3], to conduct operations on deepwater wells in the United States Gulf of Mexico.

---

[3] Debtors and Atlantic amended their October 2018 contract in November 2018 to substitute the drillship *Rowan Resolute* for the *Rowan Reliance*.

14. Debtors and Atlantic are parties to an October 26, 2018 Master Domestic Offshore Daywork Drilling Contract (the "**Contract**"). The Contract requires Atlantic to conduct its drilling operations in a safe, workmanlike manner and in accordance with Debtors' safety program and any and all applicable governmental regulations and laws:

- Paragraph 305: [Atlantic] agrees to provide as [Atlantic's] Personnel only persons who are properly qualified, trained, and skilled to perform all material aspects of the jobs for which they are employed by [Atlantic].

- Paragraph 404: The Drilling Unit [i.e. the *Rowan Resolute*] and [Atlantic's] Items shall be provided by [Atlantic] in good and proper operating condition, as necessary to perform the work under this Contract and the applicable Drilling Order and in accordance with all applicable rules, regulations, and requirements of the Contract.

- Paragraph 501: [Atlantic] shall carry out all operations hereunder in a diligent manner and as a prudent drilling contractor on a daywork basis for a specified sum per day as set forth in Article VII and the applicable Drilling Order.

- Paragraph 503(b): [Atlantic] and [Atlantic's] Personnel shall comply with all applicable federal, state, and local laws, ordinances, rules, regulations and lease or contract provisions regarding pollution, safety and the environment.

- Paragraph 509: [Atlantic] shall maintain its blowout and well control equipment listed in Schedules A-1 and A-3 to each Drilling Order in good operating condition at all times and in compliance with all applicable rules and regulations, including, but not limited to API standards and recommendations, the rules and regulations of the BOE and shall use all reasonable means to control and prevent fires and blowouts and to protect the hole.

- Paragraph 1305(d): [Atlantic] shall institute and implement at all times a good, comprehensive safety and training program which complies with all federal, state and local laws, rules and regulations applicable to the work, services and operations contemplated in this Contract, and which further complies with reasonable and current industry recommendations on accident prevention, safe operating practices, and environmental protection.

- Section D.2.4 of Appendix "C[4]": [Atlantic] must comply with all applicable safety and environmental regulations, laws, rules and standards of agencies having jurisdiction at locations where work is conducted for [Fieldwood].

15. Atlantic's failure to adhere to these provisions caused at least six separate incidents from February to June of 2020 when the drilling campaign concluded, which cost the Debtors and the WIOs approximately ten million dollars. In addition, the Debtors have certain offsets which are not reflected in Atlantic's invoices.

16. To ensure Atlantic (and not Debtors or the WIOs) bears financial responsibility for its failure to meet contractual obligations regarding workmanship, safety, and compliance with applicable governmental regulations and laws, the Contract allows Debtors to "withhold, from payments due [Atlantic] under this Contract and any applicable Drilling Order, any amounts owing to [Debtors] by [Atlantic] hereunder and/or any applicable Drilling Order." (Contract, ¶ 802.) But even if Debtors pay an invoice in full, it can still dispute its amount at a later time. (*Id.* at ¶ 916) ("Payment of any invoice provided to [Debtors] by [Atlantic] . . . shall not prejudice the right of [Debtors] to question the correctness of any charges herein.").

17. As part of this process, the Contract, in numerous provisions, authorizes Debtors to audit Atlantic's charges:

- Paragraph 507: [Atlantic] shall each day keep and furnish to [Debtors'] Representative two (2) signed copies of daily drilling reports in detail on standard IADC-API Daily Drilling Report Forms, or other equivalent form acceptable to [Debtors]. This report shall specifically include details of time breakdown on all operations and a clear description of all operations.

- Paragraph 1304: For a period of two (2) years from the end of [Debtors'] accounting year in which the work, services, or operations under any applicable Drilling Order are terminated or completed, [Atlantic] shall keep proper books, records, and accounts of work, services or operations under each Drilling Order and shall permit [Debtors] to inspect such records at all

---

[4] Appendix C sets forth Debtors' "Safety and Environment Requirements." Paragraph 503(d) of the Contract requires Atlantic to comply with Debtors' "Safety Program as set forth in Appendix 'C.'"

reasonable times at [Atlantic's] premises where such records are normally kept for the purpose of determining rates hereunder or charges for reimbursable items.

18. Atlantic failed to adhere to this framework and filed its liens weeks before payment was due, before Debtors could conduct a contractually authorized audit of Atlantic's charges, and less than three weeks before the Debtors filed for bankruptcy protection. Furthermore, Atlantic filed the Lawsuits on November 13, 2020 in an attempt to circumvent the Debtors' Automatic Stay and recover monies to which it is not entitled.

**Debtors' Joint Operating Agreements**

19. As noted above, Plaintiff is required to indemnify each of the WIOs under joint operating agreements that Plaintiff has with each of the WIOs.

20. Plaintiff, Ecopetrol America LLC, and Talos Energy Offshore LLC are party to that *Unit Operating Agreement Gunflint Prospect Gunflint Unit Offshore Louisiana* (the "**Gunflint JOA**") covering, among other properties, Mississippi Canyon Block 948. Excerpts of the Gunflint JOA are attached hereto as **Exhibit 2**.

21. The Gunflint JOA provides, in relevant part:

- Section 5.4 – Liens and Encumbrances: The Operator shall use reasonable efforts to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons free from all liens and encumbrances, except those provided for in Article 6.3 (Security Rights), which might arise by reason of the operations conducted under [the Gunflint JOA].

- Section 22.1 – Individual Obligations: The obligations, duties and liabilities of the Parties shall be several and not joint or collective; and, nothing contained in [the Gunflint JOA] shall ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose. Each Party shall hold all the other Parties harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of its acts or omissions.

- Section 22.4 – Defense of Claims and Lawsuits: The Operator shall supervise the conduct of any claims and litigation. Claims and suits may be settled in excess of the amount specified in Article 22.3 (Settlements) only with the unanimous consent

8

of all Participating Parties in the operation out of which the claim arose; however, any Party shall have the right to independently compromise or settle any claim or suit that is attributable to its interest alone as long as such compromise or settlement does not directly adversely affect the interest or rights of the other Parties. No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the defense of claims and suits for the Parties, together with the amount paid for compromise, settlement or to discharge any final judgment, shall be considered Cost of operation out of which the claim arose. Outside counsel shall be employed only with the approval of the affected Parties as a General Matter under Article 8.2 (Voting Procedures on General Matters and Elections). If it is agreed that outside counsel is to be employed, the fees and expenses shall be charged to the Parties in proportion to their Participating Interest in the operation out of which such claim or suit arose in accordance with Exhibit "C" (Accounting Procedure). Each Party shall also have the right to hire, at its own expense, its own outside counsel with respect to its own defense.

22. In addition, Plaintiff, Ridgewood Katmai, LLC, and ILX Prospect Katmai, LLC are party to that GC 40 Unit Operating Agreement (the "**GC 40 JOA**") covering, among other properties, Green Canyon Block 40. Excerpts of the GC 40 JOA are attached hereto as **Exhibit 3**.

23. The GC 40 JOA provides, in relevant part:

- Section 5.4 – Liens and Encumbrances: The Operator shall endeavor to keep the Leases, Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons free from all liens and encumbrances that might arise by reason of the activities or operations conducted under [the GC 40 JOA]. If a lien is placed on the Leases, Production Systems, Facilities, other equipment or any Hydrocarbons, the Operator shall make reasonable efforts to remove the lien.

- Section 22.1 – Individual Obligations: The obligations, duties and liabilities of the Parties under [the GC 40 JOA] are several, but limited in proportion to each Party's Participating Interest Share, and not joint and several or collective; and, except as otherwise provided in Article 20 (Taxes), nothing contained in [the GC 40 JOA] shall be construed to create a partnership, joint venture, association or other form of business entity recognizable in law for any purpose. In their relations with each other under [the GC 40 JOA], the Parties are not fiduciaries, but rather are free to act at arm's length in accordance with their own respective interests.

- Section 22.4 – Defense of Claims: The Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under [the GC 40 JOA] or affecting the Leases or the Unit Area. Claims may be settled in excess of the amount specified in Article 22.3 (Settlements) as follows: (i) if the

9

aggregate expenditure of the settlement is below three million dollars ($3,000,000) it must be approved by Vote; and (ii) if the aggregate expenditure of the settlement is at or above three million dollars ($3,000,000) it must receive unanimous approval of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim which is attributable to its Participating Interest Share alone as long as that settlement does not directly and adversely affect the interest or rights of the other Participating Parties.  No charge shall be made for services performed by the staff attorneys of a Party, but all other expenses incurred by the Operator in the prosecution or defense of Claims for the Parties, together the amount paid to discharge a final judgment or other final adjudication or determination of the Claim, are Costs and shall be paid by the Parties in proportion to their Participating Interest Share in the activity or operation out of which the Claim arose.  The employment of outside counsel, but not the selection of that counsel, requires approval by Vote of the Participating Parties in the activity or operation out of which the Claim arose.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the Parties in proportion to their Participating Interest Share in the activity or operation out of which that Claim arose.  Each Party has the right to hire its own outside counsel at its sole cost with respect to its own defense.

**The Lawsuits Were Filed Against the WIOs to Satisfy Atlantic's Alleged Claims Against Debtors**

24. As reflected in each of the Lawsuits, Atlantic alleges, among other things, that it holds claims against Plaintiff in the aggregate amount of approximately $14.1 million and that all or a portion of such claims are secured by liens pursuant to LOWLA.  *See* **Exhibit 5** (alleging Statement of Privilege in the amount of $5,824,744.68 against Mississippi Canyon Block 948); *see also* **Exhibit 6** (alleging Statement of Privilege in the amount of $6,973,379.03 against Green Canyon Block 40).  Notably, Atlantic does not allege any claims against any of the WIOs in either of the Lawsuits and, to the Debtors' knowledge, Atlantic does not have a contractual relationship with either of the WIOs.  Instead, in each of the Lawsuits, Atlantic is seeking, among other things, to enforce its alleged lien and privilege rights against the WIOs by writ of sequestration ***in order to satisfy its claims against Plaintiff***.  *See generally*, **Exhibits 6** and **7**.

**Impact of Lawsuits on the Debtors and their Estates**

25. Allowing Atlantic to move forward with the Lawsuits against the WIOs will cause significant and irreparable harm to the Debtors and their estates in several respects. First, by filing the Lawsuits, Atlantic has already affected the Debtors' ability to conduct their bankruptcy. Indeed, if Atlantic is successful in its strategy, it will have effectively nullified the ability of the Debtors to treat Atlantic's claims under the plan. The Debtors have also been forced to divert their focus from the bankruptcy proceedings and negotiations to the defense of the WIOs under the terms of the joint operating agreements. Allowing the Lawsuits to advance at this stage will, among other things, disrupt the Debtors' vendor program and interfere with the Debtors' chapter 11 plan process by permitting Atlantic to seek remedies against the WIOs in satisfaction of claims against the Debtors where the Debtors dispute both the amount and alleged secured status of such claims. Notably, and as further described below, the Lawsuits may have been brought under inapplicable Louisiana statute, because the Bureau of Ocean Energy Management classifies certain of the blocks in question as "Alabama [Coastal Zone Management] Blocks," notwithstanding their proximity to Louisiana.[5] Moreover, negotiations with parties-in-interest have been disrupted and cash flow to the bankruptcy estate may be impaired as parties have been forced to react to the specter of similar suits. Indeed, some working interest owners have already decided it best to limit operational expenditures as the threat of lawsuits and sequestration evolves.

---

[5] Bureau of Ocean Energy Management's Coastal Zone Management (CZM) – OCS Plans map, https://www.arcgis.com/apps/webappviewer/index.html?id=d076142fda2d46b69f2d6727705fcbb2.

11

## COUNT ONE

### (Extension of Automatic Stay Pursuant to Sections 105 and 362)

26. The Debtors incorporate by reference the allegations in Paragraphs 1-25 as if set forth fully herein.

27. A Bankruptcy Court has the authority to extend the automatic stay to non-debtor third parties. *See Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d 816, 825 (5th Cir. 2003); *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001). "A bankruptcy court may invoke § 362 to stay proceedings against nonbankrupty co-defendants where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" *Reliant Energy Servs. v. Enron Can. Corp.*, 349 F.3d at 825 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). Courts in the Fifth Circuit have held such a relationship exists "when there is a formal or contractual relationship between the debtor and nondebtors such that a judgment against one would in effect be a judgment against the other." *Beran v. World Telemetry, Inc.*, 747 F. Supp. 2d 719, 723 (S.D. Tex. 2010); *see also Nat'l Oilwell Varco, L.P. v. Mud King Prods., Inc.*, No. 4:12-3120, 2013 U.S. Dist. LEXIS 66152, at *18 (S.D. Tex. May 9, 2013) (extending the automatic stay to debtors' officers because "the Amended Bylaws may create potential corporate indemnity obligations to one or more of the [debtors' officers] by virtue of a formal indemnity relationship."); *Am. Honda Fin. Corp. v. Salyer*, No. 3:03-cv-651, 2007 U.S. Dist. LEXIS 29035, at *8 (S.D. Miss. Apr. 18, 2007) ("Fifth Circuit precedent . . . allows a court to extend the automatic stay provision of 11 U.S.C. § 362 by applying the 'identity of interest' exception

in cases in which a contractual indemnification agreement exists between a debtor and non-debtor defendant.").

28. Here, the Debtors and the WIOs share the requisite identity of interests that warrants an extension of the automatic stay. The Debtors have indemnification obligations to each of the WIOs. Section 22.1 of the Gunflint JOA provides, among other things, that the Debtors will hold the WIOs "harmless from liens and encumbrances on the Leases or in the Contract Area arising as a result of [Debtors] actions or omissions." **Exhibit 2**. Similarly, pursuant to section 5.4 of the GC 40 JOA, the Debtors must "keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations . . . ." **Exhibit 3**. Accordingly, a formal relationship exists between the Debtors and the Working Interest Owners such that the Debtors could be said to be the real party defendant in each of the Lawsuits. Should Atlantic succeed in either of the Lawsuits, the Working Interest Owners would hold indemnification claims against the Debtors, rendering any judgment against the WIOs a judgment against the Debtors. *See Beran v. World Telemetry, Inc.*, 747 F. Supp. 2d at 723. The Lawsuits are an attempt to circumvent the Automatic Stay by seeking to recover disputed, prepetition claims against the Debtors vis-à-vis the WIOs.

29. The cases cited by Atlantic to support its argument that the Debtors do not have a sufficient "identity of interest" with the WIOs—*Bordelon* and *Uni-Marts*—are distinguishable for several reasons. *See Borderlon Marine, L.L.C. v. Devon Energy Prod. Co., L.P.*, 2015 WL 1509493 (E.D. La. April 1, 2015); *In re Uni-Marts, LLC*, 399 B.R. 400 (Bankr. D. Del. 2009). First, in *Borderlon*, the debtors (ATP Oil and certain of its affiliates) were not even seeking to extend the automatic stay for the benefit of the debtors' estates. Rather, in an action before the United States District Court for the Eastern District of Louisiana, an alleged lienholder

13

attempted to argue that the automatic stay tolled the running of the prescriptive periods under LOWLA as to non-debtor, third parties. *Id*. at *5. Indeed, the "identity of interests" test was not even invoked in *Borderlon*. Therefore, the holding of *Borderlon* is inapposite to the facts at bar.

30. Atlantic further argues that a "debtor's indemnity obligation to a non-debtor is insufficient by itself to justify extension of the 362 stay to the non-debtor." *In re Uni-Marts, LLC*, 399 B.R. 400, 416-17 (Bankr. D. Del. 2009). The *Uni-Marts* decision is also distinguishable for a number of reasons. In *Uni-Marts*, the debtor owed its president indemnification for claims asserted against him arising out of a sale of certain of the debtor's assets. *Id*. at 416-17. The debtor, however, had sufficient insurance coverage to cover any judgment that would be rendered against the president and, accordingly, the Delaware Bankruptcy Court held that "it [was] difficult to see how the Debtor would sustain any loss, much less one that would materially impair its reorganization." *Id*. Moreover, the *Uni-Marts* court held that the automatic stay could not apply to a non-debtor for an entirely independent basis: the debtor sought to stay an adversary proceeding that was raised in its own bankruptcy cases and the court held that the "filing of an adversary proceeding against a debtor in its bankruptcy case can be equivalent to the filing of a proof of claim and, therefore, does not violate the automatic stay." Finally, the Lawsuits in this case pose far greater harm to the Debtors and their estates than the litigation in *Uni-Marts*. First, the Lawsuits by themselves imperil the ability of the Debtors to reorganize and, potentially, their liquidity. Second, any judgment against the WIOs in the Lawsuits would likely trigger significant indemnification claims against the Debtors, claims that the Debtors may be required to pay in full to cure under section 365 of the Bankruptcy Code to the extent the Debtors seek to assume the operating

14

agreements thereby nullifying any potential plan treatment. Third, allowing the Lawsuits to proceed may disrupt the Debtors' operations to the extent the WIOs refuse to perform or seek to exercise certain rights and remedies under the joint operating agreements. Fourth, the Debtors would be forced to defend the Lawsuits, distracting key personnel at a critical time in the Debtors' reorganization. Finally, should the Court allow the Lawsuits to proceed at this time, there is a material risk that other lienholders will file similar lawsuits against the Debtors' co-interest owners, compounding the aforementioned issues.

## COUNT TWO

### (Preliminary Injunction)

31. The Debtors incorporate by reference the allegations in Paragraphs 1-30 as if set forth fully herein.

32. A Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

33. Plaintiffs meet each of the four requirements for a preliminary injunction: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the [preliminary injunction] is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the [preliminary injunction] is granted, and (4) that the grant of a [preliminary injunction] will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018); *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017).

34. First, for the reasons discussed above in Count I (¶¶ 26-30), Plaintiff is likely to demonstrate that extension of the automatic stay is warranted under applicable case law given that, among other reasons, that the Debtors share an "identity of interest" with the WIOs. Moreover, extension of the automatic stay is necessary to prevent further harm to the Debtors' estates.

35. Further, the failure to extend the automatic stay would irreparably harm the Debtors and their estates for a number of reasons. First, continued prosecution of the Lawsuits has distracted the Debtors' management and possibly imperiled their liquidity and would amount to continued prosecution of Atlantic's claims against the Debtors in light of the Debtors' contractual indemnity obligations to the WIPs. As a result, the Debtors would be required to defend the Lawsuits in the Eastern District of Louisiana and divert the Company's resources at a critical stage of the Debtors' chapter 11 cases. Second, allowing the Defendant to proceed with the Lawsuits and deprive the WIOs of any economic benefits under the subject leases is likely to cause further disruption to the Debtors' operations resulting from one or more WIOs failure to perform under the joint operating agreements. Third, allowing the Defendant to seek satisfaction of its disputed, prepetition claims against the Debtors by enforcing its alleged lien rights against the WIOs interferes with the Debtors' right to complete the vendor program and otherwise address and treat outstanding claims in the chapter 11 plan process. As discussed above, to date, the Debtors have completed 97 Trade Agreements representing approximately $100 million of prepetition claims and are in the process or completing the vendor program by completing an additional 48 Trade Agreements representing an additional $41 million of prepetition claims. A total of approximately 144 statutory liens were filed by certain of the Debtors' vendors and counterparties on account of their prepetition claims, many of which are either party to completed Trade Agreements or are in the process of negotiating a Trade Agreement with the Debtors. Allowing Atlantic to proceed with the Lawsuits deprives the Debtors of their right to dispute the amount and treatment of Atlantic's claims and jeopardizes the Debtors' ability to execute the remaining Trade Agreements and conclude the vendor program.

36. Moreover, the mere delay caused to Defendant by extending the automatic stay to the Lawsuits does not outweigh the irreparable harm to the Debtors and their estates. Indeed, imposition of the automatic stay merely places the Defendant on an equal footing with other vendors in the Debtors' chapter 11 cases.

37. Finally, the public interest weighs in favor of an injunction. There is a strong public interest in a successful chapter 11 reorganization, and injunctive relief is critical to the Debtor's reorganization efforts. Declining to apply the Automatic Stay to the WIOs, who are indemnified by the Debtors, "would defeat the very purpose and intent of the statute" intended to provide the Debtors with repose from litigation and its associated costs and distractions. *See A.H. Robins Co.*, 788 F.2d at 999. It also is in the public interest to promote justice in the court system by resolving all of Atlantic's claims against the Debtors in a fair and equitable manner.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully request relief as follows:

a. that this Court should extend the automatic stay under section 105 of the Bankruptcy Code and preliminarily enjoin the Lawsuits; and

b. award all such other and further relief that this Court deems just and proper.

17

Dated: November 24, 2020
      Houston, Texas

      /s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
        Jessica.Liou@weil.com

-and-

JONES WALKER, LLP
Joseph E. Bain (24085187)
Email: jbain@joneswalker.com
Joshua A. Norris (24027577)
Email: jnorris@joneswalker.com
James W. Noe (24040178)
Email: jnoe@joneswalker.com
Daniel J. Baldwin (24078184)
Email:  dbaldwin@joneswalker.com
811 Main St., Suite 2900
Houston, TX 77002
Telephone: 713.437.1800
Facsimile:  713.437.1810

*Attorneys for Debtors
and Debtors in Possession*