UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 20-33948 |
|  | . | Chapter 11 |
|  | . |  |
| FIELDWOOD ENERGY, LLC, | . | (Jointly administered) |
| et al., | . |  |
|  | . |  |
| Debtors. | . |  |
|  | . |  |
| . . . . . . . . . . . . . . | . |  |
|  | . |  |
| FIELDWOOD ENERGY, LLC, | . | Adv. No. 20-03476 |
| et al., | . |  |
|  | . |  |
| Plaintiffs, | . |  |
|  | . |  |
| v. | . |  |
|  | . |  |
| ATLANTIC MARITIME SERVICES, | . |  |
| LLC, | . | 515 Rusk Street |
|  | . | Houston, TX  77002 |
| Defendant. | . |  |
|  | . | Wednesday, November 25, 2020 |
| . . . . . . . . . . . . . . | . | 8:58 a.m. |

TRANSCRIPT OF DEBTORS' EMERGENCY MOTION TO EXTEND THE AUTOMATIC
STAY TO CERTAIN OF THE DEBTORS' CO-WORKING INTEREST OWNERS [3]
**BEFORE THE HONORABLE DAVID R. JONES (VIA VIDEO CONFERENCE)**
**UNITED STATES BANKRUPTCY COURT JUDGE**

Audio Operator:              Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                                      10110 Youngwood Lane
                                      Fishers, IN 46038
                                      (855) 873-2223
                                      www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES: (Continued)                              2

For the Debtors:            Weil, Gotshal & Manges LLP
                            By:  ALFREDO R. PEREZ, ESQ.
                                 CLIFFORD W. CARLSON, ESQ.
                            700 Louisiana, Suite 1700
                            Houston, TX 77002
                            (713) 546-5040

For Atlantic Maritime       Lugenbuhl, Wheaton, Peck, Rankin &
Services, LLC:               Hubbard
                            By:  STEWART F. PECK, ESQ.
                            601 Poydras Street, Suite 2775
                            New Orleans, LA 70130
                            (504) 568-1990

                            Jackson Walker LLP
                            By:  MATTHEW D. CAVENAUGH, ESQ.
                            1401 McKinney Street, Suite 1900
                            Houston, TX 77010
                            (713) 752-4200

                            Kirkland & Ellis LLP
                            By:  ROSS M. KWASTENIET, P.C.
                                 JEFFREY J. ZEIGER, P.C.
                            300 North LaSalle
                            Chicago, IL 60654
                            (312) 862 2000

For Ecopetrol America       Squire Patton Boggs LLP
LLC:                        By:  TRAVIS A. MCROBERTS, ESQ.
                            2000 McKinney Avenue, Suite 1700
                            Dallas, TX 75201
                            (214) 758-3593

                            Squire Patton Boggs LLP
                            By:  KELLY E. SINGER, ESQ.
                            1 E. Washington Street, Suite 2700
                            Phoenix, AZ 85004
                            (602) 528 4000

For the Official            Stroock & Stroock & Lavan LLP
Committee of Unsecured      By:  KENNETH PASQUALE, ESQ.
Creditors:                  180 Maiden Lane
                            New York, NY 10038-4982
                            (212) 806-5562

TELEPHONIC APPEARANCES: (Continued)                    3

For ILX Prospect         Sidley Austin LLP
Katmai, LLC and          By:  MICHAEL FISHEL, ESQ.
Ridgewood Katmai, LLC:        DUSTON K. MCFAUL, ESQ.
                         1000 Louisiana Street, Suite 6000
                         Houston, TX 77002
                         (713) 495-4645

Also Present:            ROBERT SERGESKETTER, ESQ.
                         Fieldwood Energy LLC
                         Deputy General Counsel

**<u>I N D E X</u>**
**<u>11/25/20</u>**

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>FOR THE DEBTORS</u>: | | | | |
| Michael T. Dane | 15 | 21 | -- | -- |

| <u>EXHIBITS</u> | <u>ADMITTED</u> |
|---|---|
| 20-03476 ECF 1-1 | 15 |
| 20-03476 ECF 1-2 through 1-11 | 32 |
| 20-33948 ECF 570-1 through 570-11 | 32 |

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1          (Proceedings commence at 8:58 a.m.)

2               THE COURT:  All right.  We're going to start the

3    Fieldwood Energy adversary proceeding 20-3476.  Let's take

4    appearances.  We'll start with you, Mr. Perez.

5               MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

6    and Cliff Carlson on behalf of the debtors.  And with me is

7    Mr. Mike Dane, who is our declarant and our witness, and

8    Mr. Bob Sergesketter, who is counsel for Fieldwood.

9               THE COURT:  Good morning.

10              All right.  Mr. Cavenaugh, Mr. Peck.  Who wants to go

11   first?

12              MR. PECK:  Your Honor, Stewart Peck --

13              MR. CAVENAUGH:  Good morning. Your Honor.  Matthew

14   Cavenaugh -- I'll let Mr. Peck go first.

15              MR. PECK:  I'm older.  Good morning, Your Honor.

16   Stewart Peck for Atlantic Maritime Services, the objector in

17   this --

18              THE COURT:  Thank you.

19              MR. CAVENAUGH:  Thank you, Your Honor.  Matthew

20   Cavenaugh from Jackson Walker, also on behalf of Atlantic

21   Maritime Services.  And Your Honor, we're also joined on the

22   phone by Mr. Ross Kwasteniet and Jeffrey Zeiger from Kirkland &

23   Ellis, also on behalf of Atlantic Maritime.

24              THE COURT:  Thank you.

25              Does anyone else wish to make an appearance this

6

1  morning in the adversary proceeding?

2          Mr. Fishel.  Mr. Fishel?  Mr. Fishel, you may have

3  your own line muted, if you want to try that again.

4          Mr. Singer.

5          MR. SINGER:  Thank you, Your Honor.  Kelly Singer and

6  Travis McRoberts on behalf of Ecopetrol America, LLC.  Thank

7  you, Judge.

8          THE COURT:  Good morning.

9          Mr. Fishel.  Mr. Fishel, I can't hear you yet.  I've

10 got your line unmuted here, Mr. Fishel.  Are you sure you don't

11 have your own handset muted?  I can't hear a word you're

12 saying, Mr. Fishel.

13      (Pause)

14          THE COURT:  Mr. Pasquale, good morning.

15          MR. PASQUALE:  Good morning, Your Honor.  Ken

16 Pasquale, Stroock & Stroock & Lavan, for the Official Committee

17 of Unsecured Creditors in the Fieldwood cases.

18          THE COURT:  Thank you.

19          We'll wait for Mr. Fishel to reconnect.

20          Mr. Fishel, do we have you now?

21          MR. FISHEL:  All right.  Your Honor, can you hear me?

22          THE COURT:  I can.

23          MR. FISHEL:  All right.  Cell phone, not the landline

24 worked.  That was weird.  Michael Fishel here on behalf of

25 Ridgewood Katmai, LLC and ILX Prospect Katmai, LLC.  And also

1 on the line is my colleague, Duston McFaul.

2          THE COURT:  Thank you.  Good morning.

3          MR. FISHEL:  Good morning.  Sorry about that.

4          THE COURT:  Before we start the argument, I want to

5 get a little clarity as to what is being sought in the

6 adversary -- excuse me, in the federal court complaints that

7 are filed in Louisiana.  So I don't know if that's

8 Mr. Cavenaugh, Mr. Peck, or someone else.  Who wants to take

9 the lead on that?

10          MR. CAVENAUGH:  That would be Mr. Peck, Your Honor.

11          MR. PECK:  Stewart Peck, Your Honor.  We have filed a

12 lawsuit --

13          THE COURT:  So Mr. Peck, here's my question for you.

14 I'm looking at Paragraph 15 -- excuse me.  Paragraph 16.  Are

15 you seeking any relief under 16-1 (audio interference) --

16          MR. PECK:  I'm seeking their -- no.  We're not.  That

17 -- (audio interference)

18          THE COURT:  Okay.

19          MR. PECK:  We are seeking -- Fieldwood is seeking --

20          THE COURT:  Okay.  Hold on.  So the answer is no.

21 Are you seeking any relief under 16-2?

22          MR. PECK:  No, Your Honor.

23          THE COURT:  Are you seeking any relief under 16-3?

24          MR. PECK:  Yes, Your Honor.  The interest of

25 participating lessees, only to the extent -- not to the

1  hydrocarbons at this time and -- because we can't do that

2  because it's commingled.  But only as to the interest of the

3  co-lessees in the lease itself.

4            THE COURT:  Are you seeking any relief under 16-4?

5            MR. PECK:  We are, Your Honor.  Both the hydrocarbons

6  and proceeds.  We recognize they're commingled and we could not

7  -- we reserved our rights (audio interference) motion to -- for

8  modification --

9            THE COURT:  Okay.  So --

10            MR. PECK:  -- (audio interference) we understand --

11            THE COURT:  -- under 16 -- okay.  Under 16-3, tell me

12  exactly what you want from Ecopetrol.

13            MR. PECK:  We are seeking -- in 16-1, Your Honor --

14            THE COURT:  Sorry.  16-3 I thought you said?  I

15  thought you said --

16            MR. PECK:  No (audio interference) --

17            THE COURT:  -- you're seeking nothing under 16-1.

18            MR. PECK:  (Audio interference)

19            THE COURT:  So under 16-3, what --

20            MR. PECK:  We're not seeking any (audio

21  interference) --

22            THE COURT:  -- are you seeking from Ecopetrol?  Okay.

23            MR. PECK:  At this time nothing, because it's

24  hydrocarbons and they're commingled and there's a stay.  We're

25  seeking on 16-1 because we want (audio interference) schedule

1  -- the interests of the lessees in that interest, okay?  But

2  (audio interference) 16 --

3              THE COURT:  Hold on.

4              MR. PECK:  -- (audio interference) --

5              THE COURT:  Hold on.  Stop.  I started and asked you

6  what are you seeking under Paragraph 1 and you said nothing.

7              MR. PECK:  Well, I looked at it now, Judge.  I am

8  seeking something on 1 at the end, the interest of the lessees

9  in the interest.  I'm seeking that.

10             THE COURT:  It says together --

11             MR. PECK:  They're not --

12             THE COURT:  -- with the -- it says together with it,

13  right?  Okay.  So but you have to start with the operating

14  interest.

15             MR. PECK:  Right.

16             THE COURT:  You can only take the interest of the

17  lessee together with the operating interest.  But you're not

18  seeking together with the operating interest?

19             MR. PECK:  I'm seeking the release -- their rights to

20  the lease --

21             THE COURT:  Okay.  So my question -- answer my

22  question.

23             MR. PECK:  No, I -- we're not.  We're not, Judge.

24             THE COURT:  And if you're not, then you can't seek

25  anything under 16-1.  That's why I don't understand why this

1  isn't just a transparent violation of the stay.  Because when I

2  went through your paragraph I couldn't see any way you were

3  getting the relief you wanted without also invading the

4  estate's rights.

5          MR. PECK:  Well, I was careful not --

6          THE COURT:  You can't just take -- it says you can't

7  -- well, you were careful because you knew that you didn't want

8  to get in trouble.  But the fact is you can't take the interest

9  of the lessee under 16-1.  You can only take that interest

10  together with the operating interest.  And you're disclaiming

11  the operating interest.  Therefore, you can't take it.  Which

12  means you're backdoor trying to take the operating interest.

13  Why aren't you violating the stay?

14          MR. PECK:  We -- at no point do we want to go against

15  anything involving Fieldwood, Your Honor.

16          THE COURT:  Then you better dismiss this lawsuit.

17          MR. PECK:  Pardon?

18          THE COURT:  Then you need to dismiss the lawsuit,

19  right?  Because you don't have any relief you can seek without

20  violating the stay.

21          MR. PECK:  Well, we're not going to do anything to

22  violate the stay, Your Honor.

23          THE COURT:  Well, from what -- I mean, that's why I

24  went through 16-1, 2, 3, and 4.  And if what you're seeking is

25  the interest of the lessee under 16-1, you can't do that

without also taking the operating interest.  And you're telling
me doing that would violate the stay.  Therefore, this is an
action that is designed to violate the stay.  Tell me what's
wrong with that logic.

MR. PECK:  Your Honor, we also have a right against
their -- it's a leasehold interest.  They're co-lessees --

THE COURT:  So let's go through it again.  16-1, 2,
3, and 4.  Tell me which paragraph you're seeking something
under.

MR. PECK:  Well, I think that the operating interest,
isn't it indivisible (audio interference) --

THE COURT:  16-1, 2, 3, or 4.  I just need to take it
one step at a time.  I'm a simple guy.  16-1, 2, 3, or 4.

MR. PECK:  I think it's 1, Your Honor.  I think it's
-- I think that they're -- they have a right -- under the BLAM
they have a certain percentage right to the lease.  And I'm
taking that.  Not Fieldwood's rights.  And I think they're
severable there.  So --

THE COURT:  So are you taking --

MR. PECK:  (Audio interference)

THE COURT:  Are you taking, then, their operating
interest?

MR. PECK:  Well, I have to go look -- I don't have
the lien statute.  The definition of operating interest is
defined under the lien statute.

1              THE COURT:  Are you taking --

2              MR. PECK:  So I'm not taking --

3              THE COURT:  -- the operating interest?

4              MR. PECK:  I'm not taking any interest of the

5    operator.  Again (audio interference) --

6              THE COURT:  I didn't ask that question.  Are you

7    taking the operating interest?

8              MR. PECK:  (Audio interference)

9              THE COURT:  I'm sorry.  I can't hear you.

10             MR. PECK:  The scope of our lien is broader than what

11   we're foreclosing on (audio interference) the scope of our lien

12   goes to their -- the lease --

13             THE COURT:  I really need you -- I need you to answer

14   my questions.  Are you seeking to take the operating interest

15   under which the operations giving rise to the privilege are

16   conducted?

17             MR. PECK:  Foreclosing on the working interest owners

18   interests in the lease -- totally.  The operating interest --

19             THE COURT:  I don't understand.  I don't understand

20   whether that's an answer to my question or not.  Let me just --

21   this is a yes or no.  You either are or you are not.  Are you

22   seeking the operating interest under which the operations

23   giving rise to the claimants' privilege are conducted?

24             MR. PECK:  So the operating interest under the

25   statute, the definitions, is a mineral lease or sublease of a

1  mineral lease or interest of -- in a lease or sublease that

2  gives a lessee either singly or associated with the right to

3  conduct operations giving rise to the claimed privilege.

4         So it is a mineral lease or sublease.  And

5  technically, they have a right under their operating agreement

6  to take over operations of the lease.  So it's broader than

7  just the operator. It deals with and talks about sublease or

8  co-lessees.

9         THE COURT:  So are you telling me you're just not

10 going to answer my question?

11        MR. PECK:  I'm going to say, Judge, what's the

12 definition of operating interests?  I am not going against the

13 operator's interest, Fieldwood --

14        THE COURT:  Are you going to answer my question,

15 Mr. Peck?

16        MR. PECK:  Well, the way that reads, Judge, if you

17 take operating interest to mean the operating --

18        THE COURT:  So you're not going to answer --

19        MR. PECK:  -- interest in Fieldwood --

20        THE COURT:  You're not going to answer my question.

21 Okay.  If you're not going to answer my --

22        MR. PECK:  The question --

23        THE COURT:  -- question, then I don't need to talk to

24 you anymore.  Thank you.

25        Mr. Perez, go ahead with your case.  I'm not going to

14

1  let them --

2          MR. PEREZ:  Yes, Your Honor.

3          THE COURT:  -- (audio interference) they don't answer

4  my questions.

5          MR. PEREZ:  Your Honor, it's unfortunate that we're

6  here today.  I do have Mr. Dane to testify to meet our burden

7  under the preliminary injunction standard.  But Your Honor, I

8  do want to highlight something that -- I mean, I'm not sure

9  exactly -- you know, other than trying to collect money from

10  us, I'm not sure exactly what these lawsuits attempt to do.

11  You know, we're splitting way too many hairs here --

12          THE COURT:  Mr. Perez.  Mr. Perez.

13          MR. PEREZ:  Yes, Your Honor.

14          THE COURT:  He didn't answer my question.  And I'm

15  not going to let him answer it again -- or not answer it again.

16  Do you have any evidence you want to introduce today?

17          MR. PEREZ:  Yes, Your Honor.  I would call Mr. Dane.

18  First I would move his declaration into evidence, Your Honor,

19  and then I would call him as a witness.

20          THE COURT:  And where is this declaration?

21          MR. PEREZ:  Your Honor, it is attached to the

22  complaint as Exhibit 1 -- I apologize.  We have not yet filed

23  the -- I think we may have filed a witness and exhibit list.

24          THE COURT:  All right.  Is there any objection to

25  Exhibit 1-1, ECF 1-1 as an exhibit?

1          All right.  1-1 is admitted.

2          THE COURT:  Oh, hold on.  I've got somebody else that

3  wants to appear.  I apologize.  Oh, that's just Mr. Dane and

4  we've got him here.

5          1-1 is admitted.

6     (20-03476 ECF Number 1-1 admitted into evidence)

7          THE COURT:  What do you want to do next, Mr. Perez?

8          MR. PEREZ:  Your Honor, I would like to call Mr. Dane

9  for just a couple or three questions, Your Honor.

10          THE COURT:  Mr. Dane, would you raise your right

11  hand, please, sir.

12          MICHAEL T. DANE, DEBTORS' WITNESS, SWORN

13          THE COURT:  Thank you.

14          All right.  Let's go ahead.

15                    DIRECT EXAMINATION

16  BY MR. PEREZ:

17  Q    Mr. Dane, could you please state your name for the record.

18  A    It's Michael T. Dane.

19  Q    And how are you employed, sir?

20  A    I'm the Senior Vice President and Chief Financial Officer

21  of Fieldwood Energy, LLC.

22  Q    All right.  Mr. Dane, is -- the declaration that is on the

23  Court's screen, is that the declaration that you approved for

24  filing last night?

25  A    Yes, it is.

Dane - Direct                                   16

1  Q    All right.  I just want to highlight a couple of things at
2  the -- in connection with your declaration.  Would you please
3  tell the Court what the impact of these lawsuits have been on
4  Fieldwood?
5  A    Yes.  Thanks.  I mean, these lawsuits have obviously -- we
6  believe they've had a significant harm to our overall process
7  and this is really across a number of different ways.  To begin
8  with, we're really at a critical juncture in our restructuring.
9  We're working with a number of our stakeholders and our process
10  to try and finish a plan of reorganization.  We recently got an
11  extension to that plan of reorganization and we're trying to
12  conclude that by early December.  And so we're really -- we're
13  really in the throes of those negotiations with all of our
14  secured lenders today.
15      Unfortunately, a lot of our attention over the last week
16  or two has really been sidetracked with the senior management
17  team that's focused on those conversations to addressing how we
18  respond to these actions that Atlantic and Valaris have taken.
19      But, you know, more importantly, we think that these
20  actions are really causing our company to have a lot of
21  strains.  To begin with, they've really -- obviously they've
22  had an impact with our co-working interest owners.  They are
23  looking to us under the terms of our joint operating agreements
24  where we have indemnities.  And to the extent that these
25  actions are successful and there's any damages, we think that

Dane - Direct                          17

1  they're going to be coming right back around to us, which is

2  exactly the concern we have about the violation of the

3  automatic stay and the benefits that we anticipate getting

4  through this process to organize a successful plan of

5  reorganization.

6      Beyond that, it's affecting us operationally with respect

7  to how we're conducting our business.  We are very dependent

8  from a liquidity standpoint to getting cash to reimburse the

9  company from our co-working interest owners related to these

10 properties.  We can't afford to just pay gross expenses and not

11 collect our working interest owners' share.

12     Several of the working interest owners have expressed

13 reservations about continuing to pay for these expenses while

14 they're under the threat of these types of lawsuits, which to

15 us is understandable but problematic.  And we have some

16 specific operations that we currently are contemplating which

17 this impacts.

18     And more broadly, with respect to the operating agreements

19 that it impacts, it is very troublesome for us as we evaluate

20 how we're going to continue under those operating agreements,

21 and if we choose to assume them, any potential cure costs that

22 could be involved.

23     So there's a number of different ways which these actions

24 have really caused us to be distracted from the other parts of

25 our business and evaluate the consequences of these types of

Dane - Direct                                    18

1  actions.

2  Q     Have these actions -- have you been working with your

3  vendors in order to address some of the concerns with respect

4  to the vendors of Fieldwood?

5  A     Yes.  We -- I think we put in place a very methodical and

6  comprehensive vendor management program.  Frankly, it's been

7  one of the most challenging parts of this process is dealing

8  with vendors that we know are a very important part of our

9  business.  We think that they are, you know, key to our

10 success.  And frankly, we've had to have a number of really

11 difficult conversations with them because we know that our

12 restructuring presents a number of challenges to their

13 businesses as well.

14       But I think we've handled that in a very successful way to

15 date.  We've had conversations with them.  The way they

16 generally go is we express the process that we're going

17 through.  We talk to them about the circumstances of our

18 company, the importance of our company to maintain liquidity

19 through this process.  We talk to them about what we're trying

20 to achieve with our stakeholders in terms of putting in place a

21 plan of reorganization and why that's a benefit to trying to

22 have a going concern entity that can employ over 650 employees

23 and give them the prospect of work during the course of our

24 restructuring and after, on the other side.

25       And you know, generally speaking, those conversations,

Dane - Direct                                          19

1  while really difficult, have gone well.  And to date we've

2  signed 97 trade agreements, which represent about $100 million

3  of prepetition claims, and we're working to complete another 40

4  trade agreements -- or excuse me, almost 50 trade agreements,

5  which represent another 40 plus million dollars of prepetition

6  claims.

7       And all of that work has been conducted pursuant to the

8  vendor order and the process that the Court set out for us to

9  address these prepetition claims.  And I think to date we've

10 been able to operate the business successfully, using those

11 procedures.

12 Q   One last question.  Do these -- would these -- are these

13 lawsuits having an impact on your operations or liquidity?

14 A   We're concerned that they would have an impact on our

15 liquidity.  As I mentioned, it's hard for our co-working

16 interest owners to continue to fund projects where they are

17 under threat of suit and may not see the benefit of those

18 properties.

19      We do have some -- you know, we do have one specific

20 property which we have to make some decisions on related to

21 these actions that have been taken.  As an example, one of the

22 properties that Atlantic has filed a lien on, the Gunflint

23 Number 4 well, that well recently went offline.  And we are

24 determining procedures in order to remediate those -- the

25 issues with that well and bring the well back online.

Dane - Direct                              20

1     And the challenges that we have are -- those are costly

2  operations.  To do this, we expect it's going to cost half a

3  million to a million dollars, part of which is our expense and

4  part of which is attributable to our co-working interest

5  owners.

6     And given the reservations that we've heard from at least

7  one of our co-working interest owners and continuing to fund

8  those operations while these actions are outstanding, we're

9  faced with a decision on the one hand of going forward with

10  these type of operations while there may be a financial risk

11  associated with collecting our co-working interest owners'

12  share, or, on the other hand, assuming that potential risk and

13  -- assuming that potential risk or not conducting that

14  operation at all and depriving our company of valuable revenue

15  that we really need.

16     So these are -- these actions are having an impact on how

17  we're having to think about our business from an operational

18  standpoint and from a liquidity standpoint.

19           MR. PEREZ:  Your Honor, I have nothing further from

20  this witness.

21           THE COURT:  Thank you.

22           Is there cross-examination for Mr. Dane?

23           MR. PECK:  Yes, Your Honor.  But first, Your Honor,

24  if the Court thinks that we --

25           THE COURT:  Is there cross-examination from -- is

Dane - Cross                                21

1  there cross-examination -- I don't understand, Mr. Peck.  You

2  think I'm not in charge of this hearing, and I think I am.

3          MR. PECK:  No, Your Honor.

4          THE COURT:  I made that clear to you.  I made that to

5  Mr. Perez.  And my question is, is there cross-examination for

6  Mr. Dane, not first, Your Honor, I want to do something

7  different.  Is there cross-examination for Mr. Dane?

8          MR. PECK:  Yes, Your Honor.

9          THE COURT:  Go.

10                    CROSS-EXAMINATION

11 BY MR. PECK:

12 Q   Mr. Dane, when you filed bankruptcy, you had about

13 $160 million in cash.  Did you not?

14 A   I don't know if it was exactly 160, but we did have an

15 amount of cash that I believe was over $130 million.

16 Q   And isn't it true that you have $100 million line of

17 credit?

18 A   We have a DIP facility that has $90 million of

19 availability.

20 Q   Isn't it true at the end of your September 30th MOR you

21 had cash equivalents of about -- cash and cash equivalents of

22 $204 million?

23 A   That's correct.

24 Q   Isn't it true that you have working capital of

25 approximately $170 -- a little over $170 million, that is

Dane - Cross                          22

1 current assets minus current liability?

2          MR. PEREZ:  Your Honor, I'm going to object to these

3 questions as being relevant -- on relevance grounds.

4          THE COURT:  Overruled.

5          MR. PECK:  They talked about (audio interference) and

6 how it's affecting liquidity of the company.  I'm going to

7 establish they had tons of liquidity relative to what our claim

8 is.

9          THE COURT:  I overruled the objection.  Go ahead.

10 BY MR. PECK:

11 Q    So you have approximately over $170 million in working

12 capital, correct?

13 A    No.  That may have been correct as of the date of that

14 last filing, but -- and I don't have those numbers right in

15 front of me to look at the, you know, net working capital that

16 you're citing.  But you know, today we have $127 million of

17 cash and our forecast -- one of the reasons why it's so

18 critical that we're protecting our liquidity is that our

19 forward-looking forecasts anticipate that over our 13-week cash

20 flow forecast period we're effectively exhausting all of our

21 cash liquidity.

22          So, you know, we are very careful about every dollar

23 that's going out the door because we have very limited and

24 depleting liquidity, unfortunately.

25 Q    You have $90 million of availability of your DIP loan

Dane - Cross                                        23

 1 line, correct?

 2 A    That's correct, if we choose to -- if we have to utilize

 3 that and incur additional debt, that is available to us.

 4 Q    Now, isn't it true that -- if you talked about this trade

 5 -- vendor program.  Let's get into it.  Okay.  So you have

 6 basically three baskets of assets of this company.  Do you not?

 7 You have the P&A Apache assets, correct?

 8 A    That's one set of properties, yes.

 9 Q    You have the shelf -- those assets you bought from

10 Enbridge, correct?

11 A    I'm not familiar with any assets we bought from Enbridge.

12 Q    You have -- okay.  You have shelf assets, on the shelf,

13 correct?

14 A    Correct.  We have assets on the shelf.

15 Q    And then the final basket you have deepwater assets,

16 correct?

17 A    Yes, that's correct.

18 Q    When you entered this case, you had about $160 million of

19 trade debt.  Did you not?

20 A    I believe we had a lot more than 160 -- of trade debt

21 specifically?  That sounds -- that may be correct.  That was

22 not our only prepetition debt, though --

23 Q    Now isn't it true --

24 A    (Audio interference)

25 Q    -- (audio interference) you went into this case with, I

Dane - Cross                                    24

1  don't know, $1.8 billion in secured debt?  I can't go through

2  (audio interference) over a billion, close to $2 billion in

3  secured debt, right?

4  A    That's correct.

5  Q    And so all the lien creditors -- if I'm a lien creditor

6  vis-a-vis Fieldwood's, the debtors' interests, I would think in

7  most cases, I would be behind that secured debt, would I not?

8           MR. PEREZ:  Your Honor, it's calling for a legal

9  conclusion.  Object to the question.

10           THE COURT:  Sustained.

11  BY MR. PECK:

12  Q    What's your knowledge?  Do you understand how -- do you

13  understand how ranking of mortgages and all and ranking of

14  secured interests?  You're a CFO.  You probably have an

15  understanding of that, don't you?

16           MR. PEREZ:  Your Honor, may I object to the question.

17  It's not a question.  It's a statement.

18           THE COURT:  No, he asked him if he understood how it

19  worked.  He can answer that.

20           THE WITNESS:  Yes, I do.

21  BY MR. PECK:

22  Q    And so the P&A (audio interference) P&A value, right, sir?

23  Those P&A assets --

24           THE COURT:  I'm sorry, Mr. Peck.  You broke up on

25  your question.  If you could get a little close to the mic.

Dane - Cross                              25

BY MR. PECK:

Q    Let's talk about the P&A assets, with the mortgage ahead
of it, with the mortgage ahead of it.  Those P&A assets are
pretty well gone.  Are they not?  They don't have any
production from them?

A    Assets that have depleted and are being held for P&A, I
agree with that -- I agree with that statement.

Q    Now on the shelf assets, there are really not any viable
working interest owners on those assets, are there?  I mean,
the working interest owners are either defunct or went bankrupt
or whatever, correct?

MR. PEREZ:  I'm going to object to the form of the
question, Your Honor.  Vague.

THE COURT:  Sustained.

BY MR. PECK:

Q    Who are the working interest owners in the shelf assets?

A    We have a number of working interest owners in the shelf
assets.  I'd say it's, you know, at least a couple -- few
dozen.  It ranges from companies like W&T Offshore, Arena, Cox,
Renaissance, Sanare.  It's -- there's a laundry list of folks.
It's pretty much -- because our shelf asset base is so expanse
-- it's, for the most part, pretty much every company that
operates in the Gulf of Mexico shelf.

Q    And some of those entities, like Arena and others, have
filed for Chapter 11.  Have they not?

1  A    That's correct.

2  Q    Now, isn't it true that you've been -- and I know that

3  I've heard this -- that you've been settling these lien claims

4  for about 35 cents on the dollar to about 50 cents on the

5  dollar, correct?

6          MR. PEREZ:  Object to the question, Your Honor.

7          THE COURT:  Sustained.  Sustained.  Ask him

8  questions.  Don't make statements.

9  BY MR. PECK:

10 Q    So you have settled these cases out, or a lot of these

11 lien claims out, you said, right?

12 A    That's correct.

13 Q    And you've settled these lien claims for a very

14 substantial discount, have you not?

15         MR. PEREZ:  Object to the form of the question, Your

16 Honor.  What's the relevance of how much they settled the claim

17 for?

18         THE COURT:  What's the relevance (audio

19 interference) --

20         MR. PECK:  The relevance (audio interference) is that

21 they're worried about -- they are making -- they're improving

22 their balance sheet with backs of these trade creditors where

23 they say they have $100 million and they've settled for really

24 low numbers.

25     But the deepwater assets are much different, and there's a

Dane - Cross                            27

 1  lot more value there, Judge, and they're viable working

 2  interest owners, and they haven't done that.  So they talk

 3  about -- they're bragging about their vendor program, but they

 4  really haven't come out of pocket that much.  But what they're

 5  trying to do to Atlantic, to the deepwater ones, is jam us and

 6  so -- to take a substantial discount, when we have viable

 7  working interest owners here.  That's the point.

 8            THE COURT:  I'll sustain the objection.  I'll sustain

 9  the objection on relevance.  Go ahead.

10  BY MR. PECK:

11  Q    Now, you were aware, were you not, at the critical vendor

12  hearing, the statements of the UCC counsel, were you not,

13  regarding not paying the trade?

14            MR. PEREZ:  Your Honor, I apologize, but I didn't

15  hear the question.

16  BY MR. PECK:

17  Q    You were aware of the statements by the UCC counsel at the

18  vendor motion regarding the dangers of not paying the trade.

19  Did you not?

20            MR. PEREZ:  Object to the form of the question, Your

21  Honor.  Relevance again.

22            THE COURT:  Sustained.

23  BY MR. PECK:

24  Q    Now let's -- let's turn to Exhibit 3.  No -- excuse me.

25  Let's turn to our Exhibit 5 --



Dane - Cross                              28

1          THE COURT:  I don't see any exhibits that have been

2    filed by you.  Where would I find those?

3          MR. PECK:  You're right, Your Honor.  That's a good

4    point, Your Honor.  They filed a declaration, Your Honor, that

5    set forth that they filed some exhibits.  Did they not?

6    They --

7          THE COURT:  You said your Exhibit 5 and I'm not

8    locating your Exhibit 5.

9          MR. PECK:  Okay.  On our exhibit list -- okay.  Let's

10   look at their exhibit list, Judge.  Let's look at their Exhibit

11   3, which is Page 22, Section 5.4.  Do you have it?

12         THE COURT:  My 5.4 is on Page 34 and is labeled

13   "Liens and Encumbrances."  Is that where you want me to be?

14         MR. PECK:  The document I have is -- yes, Your Honor.

15   This is on the Ridgewood -- I'm looking for Exhibit 3 on the

16   Ridgewood Katmai --

17         THE COURT:  Just -- if you'll give me an ECF number,

18   I'm happy to pull it up.

19         MR. PECK:  Well, let me look at his declaration.

20   BY MR. PECK:

21   Q    Generally, isn't it true on the Katmai -- there's two

22   joint operating agreements, are there not?  The Katmai

23   operating agreement and the Ecopetrol operating agreement,

24   correct?

25   A    Governing the properties that you filed suit on, that's

Dane - Cross                                29

1  correct.

2  Q    Right.  And on the Katmai operating agreement, it provides

3  that the operator will endeavor -- in Section 5.4 -- the

4  operator will endeavor to keep the leases free from liens and

5  encumbrances, correct?

6  A    If that's the -- I believe that's the correct language.

7  Q    Right.  And then later on it says if a lien is placed on

8  the leases, Fieldwood, the operator, will make reasonable

9  efforts to remove the lien.

10  A    Correct.

11  Q    Okay.  And there's no word "indemnity" in that section, is

12  there?  Does the word "indemnity" appear?

13  A    I don't believe the specific word (audio interference) --

14  Q    Is the word "defend" in this section?

15        MR. PEREZ:  Your Honor, the document is the best

16  evidence for what words are there or not, so I would object to

17  the form of the question.

18        MR. PECK:  I'm asking what's not there.

19        THE WITNESS:  I would need to pull up the -- I need

20  to pull up that document --

21        THE COURT:  I'm going to --

22        THE WITNESS:  -- to be able to read for you word to

23  word --

24        THE COURT:  I'm going to overrule the objection.

25  He can ask him if there are words that are there or not there,

1  although the document isn't in evidence, so -- go ahead.

2          MR. CAVENAUGH:  Your Honor, if I -- this is Matthew

3  Cavenaugh.  If I could assist, if Your Honor were willing, I

4  have the document pulled up.  It is Section 5.4, the

5  "Liens and Encumbrances" section that Your Honor referenced,

6  which I believe is Exhibit 3 to Mr. Dane's declaration.  It is

7  Exhibit 5 to our witness and exhibit list that was filed in the

8  main case yesterday.  But I'm happy to pull it up if that would

9  be helpful, Your Honor.

10          THE COURT:  I overruled the objection.  I'm going to

11  let y'all try and get what documents you want introduced.

12          MR. PECK:  Well then I'm going to use this witness.

13  Could we -- Mr. Cavenaugh, since the judge -- we want to get

14  these documents in evidence -- let's start going through our

15  documents with this witness.

16          Could you pull up the -- our Exhibit 1, the Master

17  Drilling Contract?

18          MR. CAVENAUGH:  Your Honor, if you would share the

19  presenter role actually with a different user.  It's my full

20  name, "Matthew Cavenaugh JW."

21          MR. PEREZ:  Your Honor, this is Alfredo Perez.  I can

22  short-circuit this.  We don't have any objection to any of

23  their exhibits, and I think we would move our exhibits, as

24  well.  I think all the -- I mean, I think -- they pretty much

25  overlap.  I don't see any reason to spend a lot of time going

Dane - Cross                                   31

1  through exhibits.

2           MR. PECK:  With that stipulation, Judge, I'd like to

3  offer -- file and introduce all the exhibits on our exhibit

4  list that Mr. Perez stipulated to.

5           MR. PEREZ:  And that's assuming that all the exhibits

6  on our list are admitted, and that --

7           THE COURT:  So I need --

8           MR. PEREZ:  -- that's fine.  The stipulation is good.

9           THE COURT:  I need these identified by ECF numbers or

10 I won't have a good appellate record as to what's being

11 admitted.  So let's get them properly identified, please.  I'm

12 happy with the stipulation.  I just need to know what it is.

13          MR. CAVENAUGH:  Your Honor, the -- for the Atlantic's

14 witness and exhibit list, it appears in the main case at

15 Document -- or sorry, ECF Number 570 and the exhibits are 1

16 through 11.

17          THE COURT:  All right.  And yours, Mr. Perez?

18          MR. PEREZ:  Your Honor, they are the attachments to

19 the complaint and the complaint is at Number 1.  And you've

20 already admitted 1-1, and it would be Exhibits 2 through 11.

21          THE COURT:  Any objection to 570-1 to 11 in the main

22 case being admitted in the adversary, and 1-2 to 11 being

23 admitted in the adversary?

24          All right.  All the exhibits are admitted as offered.

25 Go ahead, please.

1       (20-33948 ECF Numbers 570-1 through 570-11 and

2  20-03476 ECF Numbers 1-2 through 1-11 admitted into evidence)

3  BY MR. PECK:

4  Q    Now, Mr. Dane, now walking through this joint operating

5  agreement, basically Fieldwood as the operator pays the

6  expenses, correct?  Both operating agreements, the Katmai and

7  the Ecopetrol, generally what happens here, you, the operator,

8  pay the expenses, correct?

9  A    Yes, that's correct.

10 Q    And then you get reimbursed, correct?

11 A    Yes.

12 Q    So isn't it true that you all did not pay the expenses or

13 the drilling costs for drilling these wells, but it's --

14 Ecopetrol lease said they paid you for it?  So you took their

15 money, but you didn't turn around and pay Atlantic, correct?

16        MR. PEREZ:  Object to the form -- object to the form

17 of the question, Your Honor.  First of all, there's no time

18 limit involved.  We did file bankruptcy in the interim.  But

19 more importantly, I'm not sure exactly what the question is

20 intended to mean.  I think it's vague.

21        THE COURT:  Overruled.  Go ahead, Mr. Dane.

22        THE WITNESS:  So we operated a year-plus-long

23 contract with Atlantic, and over the course of that contract we

24 paid greater than $60 million under that contract.  Prior to

25 our filing of bankruptcy, we were obviously operating in the

Dane - Cross                                    33

1  ordinary course.  And that means both, you know, paying and

2  receiving money from (audio interference).

3        Obviously, you know, notwithstanding the fact that we

4  were operating in the ordinary course as we got closer to the

5  point at which we ultimately determined we were going to file

6  for bankruptcy, you know, we took a number of measures in order

7  to make sure that we were operating appropriately and

8  preserving liquidity and trying to improve the overall value of

9  the business.

10       We, you know, we cut head count.  We cut operating

11  expenses.  And ultimately we filed for bankruptcy.  And at that

12  point we didn't have the ability to pay for any prepetition

13  expenses other than as the Court laid out in the vendor motion,

14  which requires us to get a trade agreement in place.

15  BY MR. PECK:

16  Q    So isn't it true that you did not pay Atlantic, although

17  Ecopetrol and the joint operator, your co-lessees, paid their

18  joint interest billings to pay that charge, correct?

19       MR. PEREZ:  Object to the form of the question.

20  Assumes facts not in evidence.

21       THE COURT:  Overruled.

22       THE WITNESS:  No, that's not correct.  We operated in

23  the ordinary course prior to -- prior to filing.  We made many

24  payments to Atlantic.  At the point at which we filed, we are

25  prohibited from paying any prepetition claims other than by

Dane - Cross                                    34

1  signing a trade agreement and following the vendor motion.

2           So there may be amounts that are outstanding that,

3  because we have not been successful in negotiating a trade

4  agreement with Atlantic, who hasn't had a desire to engage us

5  in that course, but has chosen to try and collect through a

6  different course, are outstanding, although those amounts are

7  disputed; but I don't -- I don't think I agree with your

8  overall question, but, you know, certainly there are some

9  amounts outstanding, because they are prepetition.

10 BY MR. PECK:

11 Q   Okay.  But let's -- just answer my question.  The working

12 -- the other working interest owners paid you for the Atlantic

13 charge and you didn't pay Atlantic, correct?

14 A   Okay.  I -- Mr. Peck, I think I answered your question in

15 that we operated the way that a company would operate

16 prepetition.  But once we filed, we are not allowed to pay

17 prepetition expenses other than by signing a trade agreement

18 with Atlantic, and they have been unwilling to sign a trade

19 agreement.

20 Q   So I didn't get your answer.  So is it a yes or no?  Did

21 they pay you and you didn't pay Atlantic?  Did the working

22 interest --

23           MR. PEREZ:  Object --

24 BY MR. PECK:

25 Q    -- pay you for (audio interference) work and you didn't

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Dane - Cross                        35

1  pay Atlantic?  Just answer yes or no.

2           MR. PEREZ:  Object to the form of the question, Your

3  Honor.  Asked and answered.

4           THE COURT:  Sustained.

5  BY MR. PECK:

6  Q    Now when -- so Atlantic finished drilling these wells,

7  correct?

8  A    They weren't drilling operations, but the operations were

9  completed.

10 Q    And these are very successful wells, correct?

11 A    No, that's not correct.  One of them is not presently

12 producing; one of them is at present a pretty successful well

13 for us.

14 Q    Which one is not producing?

15 A    The Gunflint Number 4 well is not producing.

16 Q    And is it going to be shut in or is it just temporarily

17 not producing?

18 A    It's unclear.  We're hoping to turn it back online, but

19 right now it's unclear.

20 Q    But the other one is producing, correct?

21 A    Yes.  That's correct.

22 Q    So Atlantic drilled a well and hydrocarbons are flowing on

23 the Katmai well, correct?

24           MR. PEREZ:  Object to the question --

25           THE WITNESS:  Yes.

Dane - Cross                              36

1            MR. PEREZ:  -- Your Honor, relevancy.

2            THE COURT:  Sustained.

3            THE WITNESS:  That's correct.

4   BY MR. PECK:

5   Q    You're benefitting -- aren't you benefitting from the flow

6   of hydrocarbons flowing from the Katmai well?  Isn't --

7            MR. PEREZ:  Object to the form of the question, Your

8   Honor.  Relevancy.

9            THE COURT:  Sustained.

10  BY MR. PECK:

11  Q    Now you were talking about never engaging.  Isn't it true

12  you all never contacted Atlantic about settlements (audio

13  interference) did you, until we had -- until we said we were

14  going to go after the working -- we were going to file to put

15  demand on the working interest owners.  Isn't that correct?

16  A    I had -- I had several conversations with the CFO of

17  Atlantic, of Valaris.  One of them was prior to our filing of

18  bankruptcy, and one of them was when he reached out probably a

19  month or so ago to connect.  And we did have discussions about

20  potential ways that we may be willing to try and settle these

21  issues.

22       Unfortunately, they were really at a high level.  I was

23  hoping that we would be able to engage further, but there

24  really didn't seem to -- seemed like Atlantic was taking a

25  position that we couldn't currently justify because we have a

Dane - Cross                                      37

1  hard time justifying Atlantic as a critical vendor today,

2  unfortunately.  We don't need their services today.  We may or

3  may not need them in the future.  And so when we think about

4  all the things -- you know, they're substitutable.  There's

5  other vendors that provide these services.

6       You know, we want to maintain a good relationship with

7  Atlantic.  We think that they're generally speaking a good

8  contractor.  But with our circumstances and how we think about

9  critical vendors, you know, we are -- as I told their CFO at

10 the time, we're not in a position to pay them in full at this

11 moment, but we'd be willing to talk about a trade agreement and

12 other arrangements that we can reach with them through the

13 normal process of the vendor motions that may be mutually

14 satisfactory like we've done with a number of other vendors.

15 And so we did have -- we did have those conversations.

16 Q    Only until a month ago.  You didn't have any conversations

17 between the time you filed until a month ago, correct?

18 A    As -- that's correct, because as I mentioned, you know,

19 they're really not, at this moment, a critical vendor for us.

20 And these are all prepetition claims.

21 Q    Now who's Mr. John Seeger?

22 A    John Seeger is our Senior Vice President of Operations.

23 Q    What does his duties entail?

24 A    At the time, he was -- he was over our deepwater

25 organization and was a deepwater operations focused role.

Dane - Cross                                      38

1  Q    And he would know most of -- he would be the best person

2  to know about the drilling operations, would he not?

3  A    I think he -- you know, he's certainly well -- he's

4  certainly very familiar with them.

5  Q    And you're the CFO, right?

6  A    That's correct.

7  Q    And you're charged with financial aspects of the business,

8  correct?

9  A    Among many other responsibilities, that's certainly one of

10 them.

11 Q    Isn't it true, though, on July 7th, 2020, after the (audio

12 interference) operations were done, Mr. Seeger wrote to Mr. Tom

13 -- Dr. Thomas Burke, present CO of Valaris, and lauded the fine

14 work that Atlantic had done in drilling those wells and working

15 for Fieldwood.  Isn't that correct?

16 A    I -- that's correct, and you know, he also mentioned that

17 we worked through some tough challenges together and -- and to

18 be clear, Mr. Peck, I agree that -- you know, overall, for the

19 most part, we had a very good relationship with Valaris while

20 we were utilizing this rig from the first quarter, second

21 quarter of 2019, through the second half of 2020.

22      We did have some specific performance issues, but overall

23 we did -- I agree with the comments that we were pleased with

24 their overall services for the most part.

25 Q    But isn't it true under that Exhibit 1, the Master

Dane - Cross                                    39

1  Drilling Contract, there was a waiver of consequential damages

2  by both parties.

3           MR. PEREZ:  Object to the form of the question, Your

4  Honor.  Relevance --

5           THE COURT:  Sustained.

6           MR. PEREZ:  -- and --

7           THE COURT:  Sustained.  Sustained.

8           MR. PECK:  Your Honor, they throw out a $10 million

9  claim they have and -- you know, we don't know what it is.  I

10 don't know the details.  But that claim was belied by the

11 provisions of the contract.  And I'm trying to -- I mean, they

12 put that in his declaration.  That's one of the centerpieces of

13 their argument.  I have a right to probe -- it's up to the

14 Court.

15          THE COURT:  What's your next question, Mr. Peck?

16          MR. PECK:  That there is a -- well, did you sustain

17 that I can't ask about the consequence of damages, Judge?  I

18 didn't hear the ruling.

19          THE COURT:  I sustained the objection to the

20 question.

21 BY MR. PECK:

22 Q   Isn't it true the parties can waive consequential damages

23 in the Master Drilling Contract between Atlantic and --

24          THE COURT:  I've already sustained -- I've already

25 sustained the objection to that very question.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Dane - Cross                                 40

1          MR. PECK:  Okay.  I just wanted to make sure it
2  (audio interference).
3  BY MR. PECK:
4  Q    Isn't it true that there are provisions of contract if
5  there are any problems Fieldwood gives notice to Atlantic, the
6  drilling party, and they can cure any problems?
7  A    That's -- that's -- I'm not familiar at that level with
8  this contract, but those are typical provisions that we would
9  see in these type of contracts, and I believe that's correct.
10  Q    Do you know if any -- all these problems you list in the
11  papers you all filed, do you know if any notices of these
12  problems were given to Atlantic?
13  A    Yes, they were.
14  Q    Okay.  And did Atlantic cure those problems?  Do you know
15  whether or not they cured or not?
16  A    Well, we worked through a number of -- some of them they
17  did and some of them they did not.  We worked through a number
18  of those performance issues while we had their rig under
19  contract, but that didn't negate the fact that, you know, we
20  incurred millions of dollars of additional expenses as a result
21  of them.
22         So some of those -- some of those -- operationally, some
23  of those challenges were worked through, but they resulted in
24  -- they resulted in additional expenses to the company.  Some
25  of the issues have not been worked through, and frankly really

Dane - Cross                                              41

1  not acknowledged and really have nothing to do with

2  consequential damages -- consequence of damages.  That's things

3  such as credits that are owed to Fieldwood under the contract,

4  I believe, in an undisputed nature, for things like fuel that

5  we provided and excess fuel that was left on this vessel after

6  we were doing using it.

7       We've received no response from Valaris about -- despite

8  numerous inquiries over several months about those types of

9  credits that are customary and pretty clear.

10 Q    (Audio interference) credit?  I mean what of this

11 $10 million -- I mean, what -- isn't it true that the contract

12 provides that you can't recover spread costs if anything

13 happens, correct?  I mean, spread costs and all your other

14 costs all the other -- the parties' working helicopters, boats

15 and stuff, if there's a problem.  You can't recover those

16 against Atlantic, correct?

17          MR. PEREZ:  Your Honor, I'm going to object to this

18 whole line of questioning.  I'm still -- I don't understand the

19 relevancy of it.

20          THE COURT:  Sustain the objection.

21          MR. PECK:  One moment, Judge.

22     (Pause)

23 BY MR. PECK:

24 Q    Isn't it true, Mr. Dane, that if the working interest

25 owners paid Atlantic on its in rem claim against their

Dane - Cross                                        42

1  interest, that they would have a prepetition claim against

2  Fieldwood?

3           MR. PEREZ:  Object to the form of the question.

4  Calls for a legal conclusion, Your Honor.

5           THE COURT:  Sustained.

6  BY MR. PECK:

7  Q    Isn't it true that these joint operating agreements were

8  executed prior to the bankruptcy?

9  A    Yes.

10 Q    And if there is a right of indemnity (audio interference)

11 by the working interest owners against Fieldwood, that would

12 relate back to those prepetition joint agreements, correct?

13 A    The indemnity rights are included in the operating

14 agreements.

15          MR. PECK:  Just a minute, Judge.  May I have a second

16 just to confer?

17          THE COURT:  Of course.

18      (Pause)

19          MR. PECK:  No further questions, Your Honor.

20          THE COURT:  Thank you.

21          Any follow-up, Mr. Perez?

22          MR. PEREZ:  No, nothing, Your Honor.  Thank you.

23      (Witness excused)

24          THE COURT:  Thank you.  Do you have any further

25 evidence, Mr. Perez?

43

1          MR. PEREZ:  I do not, Your Honor.

2          THE COURT:  Thank you.

3          Any evidence, Mr. Peck?

4          MR. PECK:  May I have two minutes to confer, Judge?

5          THE COURT:  Of course.

6          MR. PECK:  A minute to confer?

7          THE COURT:  Of course.

8      (Pause)

9          MR. PECK:  Judge, no -- we've already got the

10 documents in, our exhibits in.  Nothing further.  That would be

11 (audio interference) --

12          THE COURT:  All right.  Thank you.

13          Both sides rest?

14          MR. PEREZ:  Yes, Your Honor.

15          THE COURT:  All right.  This is actually a very clear

16 answer, and that is that the injunction has to be granted.  The

17 defendants have violated the automatic stay, in my view, by

18 filing these lawsuits in Louisiana, and they've done so

19 transparently.  That became obvious in the opening volley here

20 where I tried to get counsel to tell me how they were fitting

21 under the Louisiana act without violating the stay.  And

22 although they told me they continue to disclaim violating the

23 stay, they can't fit under the act without violating the stay.

24 The disclaimers do them no good.

25          Because it is a violation of the stay and an obvious

1  attempt to attempt to collect debt from the debtors, from

2  parties with whom there is an identity of interest, I conclude

3  that allowing the lawsuits to proceed on an amended basis or on

4  any basis without further leave of this Court would only invite

5  further violations of the automatic stay.

6       I believe that the lawsuits against these folks

7  actually do have an identity of interest with the debtor.  The

8  question of whether or not there is an indemnity that is

9  prepetition or postpetition is the only sort of interesting

10 question about that.  And that interesting question goes away

11 because these contracts are subject to assumption; and if

12 they're assumed, they would then become a postpetition

13 obligation of the debtors.  And I'm not going to allow somebody

14 to come in and upset these contracts.

15      I find that there is a high likelihood of success on

16 the debtors, that this is a stay violation, and will continue

17 to be a stay violation.  There is irreparable injury.  It is

18 undisputed from the evidentiary record, absolutely undisputed,

19 that the debtors' reorganization efforts are being

20 substantially hindered by having to deal with these lawsuits.

21 And although there is argument in the drafting of the answer,

22 there is absolutely no evidence that Mr. Dane, who is a

23 credible witness, is not accurate in his statement.

24      I find that continued prosecution of these lawsuits

25 will harm the debtors and their estates.  They not only will

1 distract management, I think that they would also disrupt the

2 vendor relations, as Mr. Dane has explained, amongst other

3 vendors, and require a huge amount of money potentially to be

4 spent in other lawsuits by opening up this floodgate.

5          These lawsuits should not have been prosecuted.  I'm

6 going to enjoin their continued prosecution.  We will have a --

7 I'm going to limit my order, given the emergency nature of

8 this, even though this is on notice and with evidence, to a

9 14-day order.  So the order will expire on December the 9th.

10 The hearing on whether to extend the term of the order will be

11 on December the 8th, and it will commence at four o'clock in

12 the afternoon.

13          Thank you.  I'm going to enter the order that was

14 proposed by the debtors and add to it that it expires at

15 midnight on December the 8th.  We are in adjournment in this

16 proceeding.  I'm going to move to the next one, once I get this

17 done.

18          MR. CAVENAUGH:  Thank you, Your Honor.

19          MR. PEREZ:  Thank you.

20          COUNSEL:  Thank you, Judge.

21      (Proceedings concluded at 9:56 a.m.)

22                    * * * * *

23

24

25

1                    **C E R T I F I C A T I O N**

2

3           I, Alicia Jarrett, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter, and to the best of my ability.

7

8

9   _____

10  ALICIA JARRETT, AAERT NO. 428      DATE:  November 27, 2020

11  ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

