To the extent that they are not in conflict with the above terms, all other terms shall be as per Conoco's General Provisions dated January 1993, with the following amendments:

**C.**     **Rules and Regulations:**  The third sentence of Section C is deleted in its entirety.

**E.**     **Force Majeure:**  Delete in its entirety and replace with the following:
"Except for payment due hereunder, either party hereto shall be relieved from liability for failure to perform hereunder for the duration and to the extent such failure is occasioned by war, riots, insurrections, fire, explosions, sabotage, strikes, and other labor or industrial disturbances, acts of God or the elements, governmental laws, regulations, or requests, acts in furtherance of the International Energy Program, disruption or breakdown of production or transportation facilities, delays of pipeline carrier in receiving and delivering crude oil tendered, or by any other cause, whether similar or not, reasonably beyond the control of such party.  Any such failures to perform shall be remedied with all reasonable dispatch, but neither party shall be required to supply substitute quantities from other sources of supply.  Failure to perform due to events of Force Majeure shall not extend the terms of this Agreement; provided, however, the term of the Agreement shall be extended to the extent necessary to comply with the provisions of Section J. Buy/Sell and Exchange Balancing.

In addition to the above, and in the event substantially similar volumes are intended to be bought and sold or exchanged under this Agreement, the parties shall have the rights and obligations set forth in the circumstances described below:
    (1)    If, because of Force Majeure, a party (the "Delivering Party") is unable to deliver part or all of the quantity of crude oil which it is obligated to deliver under this Agreement, the other party (the "Receiving Party") shall have the right, but not the obligation, to reduce its deliveries of crude oil under this Agreement by an amount not to exceed the number of barrels of crude oil that the Delivering Party fails to deliver.
    (2)    If, because of Force Majeure, the Receiving Party is unable to take delivery of part or all of the quantity of crude oil to be delivered by the Delivering Party under this Agreement, the Delivering Party shall have the right, but not the obligation, to reduce its receipts of crude oil under this Agreement by an amount not to exceed the number of barrels of crude oil that the Receiving Party fails to take delivery of."

**F.**     **Payment:**  The first sentence of Section F is deleted in its entirety and replaced with the following sentence:
"Unless otherwise specified in the Special Provisions of this Agreement, Buyer agrees to make payment against Seller's invoice for the crude oil purchased hereunder to a bank designated by Seller in U.S. dollars by telegraphic transfer in immediately available funds, in full, without discount, withholding, setoff or counterclaim (except as otherwise provided herein)."

Third paragraph, delete "Morgan Guaranty Trust Company of New York" and replace with "JP Morgan Chase Bank, New York, N.Y. (or Citibank N.A. New York, N.Y., if the JP Morgan Chase Bank interest rate is unknown)".

**G.**     **Financial Responsibility:**  Delete in its entirety and replace with the following:
        "(1)    Adequate Assurance.  Seller may, within Seller's full discretion, at any time request and Buyer shall, not later than two (2) Banking Days after request by Seller, provide Adequate Assurance of Performance.  After such request, and in the event that title has not already been transferred, Seller may withhold performance until such Adequate Assurance of Performance shall have been received by it.  Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of Buyer."

        (2)    Financial Responsibility. Notwithstanding anything to the contrary in this Agreement, if in the reasonable opinion of a party (the "Secured Party") at any time the reliability or the financial responsibility of the other party ("Posting Party") (or of any guarantor or other person furnishing security in support of Posting Party) is or becomes impaired or unsatisfactory, Adequate Assurance of Performance shall be given by Posting Party to Secured Party on demand by Secured Party in respect of each or any

Exhibit 3

cargo or any portion thereof. Any amounts specified in such demand shall thereby become due and payable no later than two (2) Banking Days from the date of the demand. After such demand, and in the event that title has not already been transferred, Secured Party may withhold performance until such Adequate Assurance of Performance shall have been received by it. Any cost, expense, or charges associated with any letter of credit procured pursuant to this Section shall be for the account of the party providing the letter of credit. If Buyer exceeds the credit line Seller established for Buyer, which Seller may establish and modify in its sole discretion from time to time, Seller may deem the financial responsibility of Buyer to be unsatisfactory and demand Adequate Assurance of Performance pursuant to the Financial Responsibility provision set forth in the contract."

**H.** **Liquidation:** Delete in its entirety and replace with the following new section:
**"H. Default and Liquidation; Termination:**
    (1)    For purposes of this Agreement, an event of default ("Event of Default") shall mean with respect to a party or, the guarantor of such party, if any, any of the following: (a) the failure by such party or its guarantor, if any, to make, when due, any payment required under this Agreement, or any guaranty given in support of this Agreement, if such failure is not remedied within five (5) Banking Days after receipt of written notice; (b) the failure by such party to provide Adequate Assurance of Performance when due, if such failure is not cured within five (5) Banking Days after receipt of written notice; or (c) the occurrence of an Insolvency Event.

    (2)    If an Event of Default occurs and is continuing, the non-defaulting party may, without limiting any other rights and remedies that may be available to the non-defaulting party under this Agreement or otherwise, (a) offset all or any portion of any amounts owed by the defaulting party to the non-defaulting party against any amounts owed by the non-defaulting party to the defaulting party, (b) apply any prepayments made, or Adequate Assurance of Performance posted, by the defaulting party to the non-defaulting party against any amounts that are owed to the non-defaulting party, (c) if the non-defaulting party is the Seller, suspend deliveries until all amounts due for all previous deliveries to the defaulting party have been paid in full; provided, however, to the extent the non-defaulting party sustains damages related to the suspension of deliveries, the defaulting party shall pay such damages to the non-defaulting party, (d) place the defaulting party on a pre-pay basis, if the defaulting party is the Buyer, and/or (e) terminate this Agreement pursuant to Section H(5) or terminate all Transactions pursuant to Section H(3), as applicable.

    (3)    If an Insolvency Event occurs and is continuing, the non-defaulting party ("Liquidating Party") may, by written notice to the defaulting party, designate a day no earlier than the day such notice is effective and no later than twenty (20) days after such notice is effective as an early termination date ("Early Termination Date"). On the Early Termination Date, all transactions between the parties for the purchase and sale of all crude oils, whether governed by these Provisions or otherwise, including the Transactions, shall be terminated except as provided herein ("Terminated Transactions"). If an Early Termination Date has been designated, the Liquidating Party shall in good faith calculate the Settlement Amount of all Terminated Transactions as of the Early Termination Date (or as soon thereafter as reasonably practicable). The Liquidating Party shall aggregate all amounts due between the Parties into a single net amount (the "Termination Payment") by aggregating or setting off, as appropriate, (i) the Settlement Amount for each Terminated Transaction, (ii) all Unpaid Amounts owed to the Liquidating Party, and (iii) all Unpaid Amounts owed to the defaulting party; provided, however, if the net of the Settlement Amounts for all such Terminated Transactions would be an amount owing to the defaulting party, then such net amount shall be zero for purposes of determining the Termination Payment. The Liquidating Party shall notify the defaulting party in writing of the amount of the Termination Payment due from the defaulting party, along with reasonable detail regarding the calculation of such amount. The defaulting party shall pay the Termination Payment to the Liquidating Party within two (2) Banking Days after receipt of such notice, with interest (as provided in Section F) from the Early Termination Date until paid. If an Early Termination Date is designated, the Liquidating Party shall be entitled, in its sole discretion, to set-off any amount payable by the Liquidating Party or any of its Affiliates to the defaulting party under this Agreement or otherwise, against any amounts payable by the defaulting party to the Liquidating Party or any of its Affiliates under this Agreement or otherwise. The Liquidating Party shall also be entitled to apply any Adequate Assurance of Performance posted by the defaulting party to the

Liquidating Party or any of its Affiliates against any amounts owed to the Liquidating Party. This Section H(3) shall be in addition to any right of setoff or other rights and remedies to which any Party is otherwise entitled (whether under this Agreement, by operation of law, contract, normal business practice, or otherwise). If an obligation is unascertained, the Liquidating Party may in good faith estimate that obligation and set-off in respect of the estimate, subject to the Liquidating Party accounting to the defaulting party when the obligation is ascertained.

(4)     The Parties acknowledge and agree that this Agreement is a "Forward Contract" as defined in the Bankruptcy Code and that each Party is a "Forward Contract Merchant" as defined the Bankruptcy Code.

(5)     Notwithstanding anything to the contrary contained in this Agreement, if an Event of Default (other than an Insolvency Event) occurs and has not been remedied pursuant to Section H(1), the non-defaulting party shall be entitled to terminate this Agreement, whereupon the non-defaulting party shall have all remedies that may be available to it under this Agreement or by law."

**J.     Buy/Sell and Exchange Balancing**: Delete in its entirety and replace with the following:
"The terms of this Section J shall only apply to this Agreement if substantially similar volumes are intended to be bought and sold or exchanged under this Agreement:
Each party shall be responsible for maintaining the volumes bought and sold or exchanged in balance on a month-to-month basis, as near as reasonably possible. If a party fails to deliver or take its required volume during any month (Shortfall Month), including a failure to deliver or take due to an event of Force Majeure, despite reasonable efforts to remain in balance, such volumes (Imbalance Volumes) shall be delivered and taken as soon thereafter as is reasonably practicable, and the term of this Agreement shall be extended for the sole purpose of balancing deliveries. The parties shall endeavor to cause the Imbalance Volumes confirmed by the 20th of the month to be delivered during the following calendar month, and the Imbalance Volumes confirmed after the 20th of the month to be delivered during the second following calendar month, except to the extent prevented by the continuation of the event of Force Majeure.

An event of Force Majeure shall not relieve either Party from its obligations under this Section J. to balance deliveries once the event of Force Majeure has passed and the imbalance created during said period is known. For avoidance of doubt, a declaration of Force Majeure is not required for the terms of this provision to apply. If Imbalance Volumes created as a result of an event of Force Majeure have not been delivered within three months after the Shortfall Month, and no other resolution of the Imbalance Volumes has been agreed between the Parties, during the fourth month following the Shortfall Month, the Delivering Party shall deliver, and the Receiving Party shall take, an amount of crude oil equal to the Imbalance Volumes of the same type, at the same location and at the same price as was received by the Delivering Party during the Shortfall Month.

For all imbalances, if the price specified in this Agreement is a fixed price, or a formula price which is based on fixed calendar dates (eg. April 12, 2009 or April 12-19, 2009), the price of the Imbalance Volumes shall be equal to such price without regard to the month of actual delivery. However, if the price specified in the Agreement is a formula price not based on fixed calendar dates, that formula, based on prices for the month of actual delivery, will be used to calculate the price for the Imbalance Volumes, unless specified otherwise in the Special Provisions of this Agreement.

The foregoing notwithstanding, for any Imbalance Volumes existing at the end of this Agreement less than 1000 barrels, the obligation of either party to deliver or take such Imbalance Volumes shall be excused."

**P.     Assignment:  Delete Section P in its entirety and replace with the following language:**
"This Contract shall extend to and be binding upon the successors and assigns of the parties, but neither this Contract nor any part, including any rights, interests or obligations hereunder (unless expressly set forth herein), shall be assigned or transferred by either party or by operation of law, merger or otherwise without the prior written consent of the other party, which shall not be unreasonably withheld. Any

assignment or transfer made by either party without the other party's written consent need not be recognized by and shall not be binding upon the other party. Upon the making of any such assignment, unless otherwise agreed by the parties, the assignor shall remain bound to perform or procure performance of the said obligations (as so accepted) by the assignee. For the purpose of this Contract, a merger constitutes an assignment subject to this provision. Notwithstanding the foregoing, Seller may without Buyer's consent assign all or a portion of its rights to receive and obtain payment under the Contract in connection with any finance, securitization or bank funding arrangements, always providing such assignment does not contravene any applicable law, regulation or decree binding upon Buyer. Any payment made by Buyer to the payee specified in Seller's invoice in respect of crude oil delivered under the Contract shall be in full discharge of Buyer's payment obligations to Seller under the Contract. Any such assignment will not detract from Seller's obligations under the Contract."

**R.     Definitions:** Amend by adding the following definitions in their appropriate alphabetical order:

"Adequate Assurance of Performance" means either (i) an irrevocable stand-by letter of credit in a form and for a commercially-reasonable amount acceptable to Secured Party opened or confirmed by a "Qualified Institution" acceptable to Secured Party or (ii) cash or prepayment in immediately available funds in a commercially-reasonable amount acceptable to the Secured Party, at the option of the Party providing the Adequate Assurance.

"Affiliate" means, in relation to any person, an entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"Agreement" means these GTC's (including, where applicable, the Attachments attached hereto) together with a Confirmation;

'Banking Day" means a day other than a Saturday or Sunday when federal banks are open for business in New York, NY.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time.

"Product" means any commodity or commodities bought or sold between the parties as identified in a particular Confirmation;

"Provisions" means these Conoco General Provisions for Domestic Crude Oil Agreements dated January 1, 1993, as amended.

"Insolvency Event" means the Party or its guarantor (i) makes a general assignment for the benefit of its creditors, (ii) commences a proceeding under applicable bankruptcy law or other law for the relief of debtors, (iii) files a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts, (iv) has a trustee, custodian, conservator, receiver or similar official appointed for it, or for a substantial part of its property; (v) becomes insolvent or is unable to pay its debts as they become due; or (vi) becomes subject to any involuntary bankruptcy, reorganization, debt arrangement, or other proceeding under any applicable bankruptcy, insolvency or other similar law for the relief of debtors or any dissolution or liquidation proceeding is instituted against the party or its guarantor;

"Qualified Institution" means (i) the U.S. office of a commercial bank or trust company (which is not an Affiliate of either Party) organized under the laws of the United States (or any state or political subdivision thereof), or (ii) the U.S. branch of a foreign bank (which is not an Affiliate of either Party), in each case having assets of at least ten billion dollars ($10,000,000,000), and having a credit rating of at least A- by Standard's & Poor's and at least A3 by Moody's.

"Settlement Amount" of a Terminated Transaction means the amount, as calculated by the Liquidating Party in a commercially reasonable manner, which the Liquidating Party would pay to or receive from a third party in an arm's-length transaction as consideration for the third party's entering into a new transaction (discounted to net present value as of the Early Termination Date) in which: (a) the Liquidating Party holds the same position as it currently holds in the subject Terminated Transaction; (b) the third party holds the same position as the Defaulting Party holds in the subject Terminated Transaction; and (c) the new transaction has economic terms and conditions substantially the same in all respects to the economic terms and conditions of the subject Terminated Transaction; provided, however, that in making such determination, the Liquidating Party may consider, among other things, quotations from leading dealers in the relevant market, and/or its own internal valuation for such Terminated Transaction kept in the ordinary course of its business; provided, further, that nothing herein shall require the Liquidating Party to enter into any replacement Transactions for the Terminated Transactions;

"Transaction" means any purchase or sale of crude oils between the Parties that is evidenced by a written confirmation that incorporates the Provisions.

"Unpaid Amounts" means any unpaid amounts due and payable under this Agreement and all Terminated Transactions, whether due prior to or after any Early Termination Date (but excluding any Settlement Amounts), including but not limited to attorneys' fees and other expenses payable, as well as any other amounts due and payable by the Defaulting Party to the Liquidating Party."

**Insert a new section (Section S) as follows**:
"**S.     LIABILITIES:**  IN NO EVENT SHALL SELLER OR BUYER BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY OR INDIRECT DAMAGES, OR LOST PROFITS."

**Insert a new section (Section T) as follows:**
"**T.     Export Controls:**  The Parties acknowledge that they will comply in all respects with U.S. laws, regulations and administrative requirements applicable to this Contract concerning any export or reexport of the Product, including, but not limited to, the International Traffic in Arms Regulations, the Export Administration Regulations, the Foreign Trade Regulations and the regulations and orders issued and/or administered by the U.S. Department Of The Treasury, Office Of Foreign Assets Control in relation to export control, antiboycott and trade sanctions matters ("US Export Control Laws and Regulations").

Notwithstanding any other provisions herein, this Contract does not constitute an agreement by either Party or any of its affiliates to which this Agreement is assigned to comply with any provisions in this Contract that are inconsistent with U.S. Export Control Laws and Regulations. This Contract does not constitute, and shall not be construed to constitute, an agreement by either Party to take or refrain from taking any action which would constitute non-compliance with any laws, regulations or other official government rules or requirements applicable to such Party which relate to export control, antiboycott or trade sanctions matters."

**Insert a new section (Section U) as follows:**

"**U.     Netting:**

(1) <u>Purpose</u>. The parties are selling to and buying from each other various quantities of crude oil or condensate at stated prices, or are exchanging with each other various quantities of crude oil or condensate at stated differentials under existing agreements (collectively, the "Crude Contracts"). For purposes of this Net Settlement Arrangement (defined below), Crude Contracts shall not include agreements in the nature of division orders. With respect to deliveries of crude oil or condensate under the Crude Contracts, the parties agree to engage in net settlement arrangements (the "Net Settlement Arrangement") for the purpose of making payments (and thereby settling the parties' respective accounts) for (a) all existing Crude Contracts, and (b) for

all future Crude Contracts that do not specifically identify, and reject application of, this netting procedure.

(2) <u>Procedure</u>.  For each calendar month in which sales or exchange transactions occur (a "Transaction Month"), each party shall determine the sales price for the crude oil or condensate sold to the other party and the exchange differentials, if any, due from such other party under the Crude Contracts according to the respective pricing provisions contained therein, to determine the total amount owed by such other party.  The parties shall continue to issue invoices to each other in the normal course of business.  In addition, after the receipt of all invoices and at least three business day before the 20th day of the month following the Transaction Month, each party shall (a) issue a statement showing all invoice amounts for both parties and the difference resulting after offsetting the total amount each party owes to the other party (the "Net Settlement Amount"), and (b) confer by telephone and compare and confirm the Net Settlement Amount.  The Net Settlement Amount shall be paid by the party hereto owing the greater amount by paying such difference to the party hereto owing the lesser amount in accordance with this Agreement.

(3) <u>Disputed or Unverified Amounts</u>.  If any invoice or portion of an invoice is disputed in good faith or cannot be timely verified and approved for payment, such invoice shall not be held for payment under the Net Settlement Arrangement, but shall be settled independently as soon as verified or as soon as any dispute is resolved, provided that an invoice that is partially verified or disputed shall be included in the Net Settlement Arrangement to the extent that it is verified or undisputed.  Notwithstanding the foregoing, each party agrees to use every reasonable effort to achieve the objective of timely verification of invoices in order to permit payment of such invoices pursuant to the terms of this Contract in the month following the Transaction Month and no dispute or lack of verification shall excuse participation in the Net Settlement Arrangement.

(4) <u>Effect on Other Agreements</u>.  Except as expressly provided herein, existing agreements between the parties hereto shall continue in effect and shall not otherwise be affected by this Contract.  Notwithstanding the provisions hereof, nothing in this Contract shall have the effect of amending or modifying the pre-payment provisions or the close out netting provisions under this Contract or any existing or future master agreement between the parties.