# OFFSHORE OPERATING AGREEMENT

## CITRINE PROSPECT
## Green Canyon Block 157

BETWEEN

**LLOG Exploration Offshore, Inc.**

AS OPERATOR

AND

**Davis Offshore, L.P.**

AS NON-OPERATOR

## TABLE OF CONTENTS

ARTICLE 1.0  CONTRACT APPLICATION ................................................................1

    1.1    **Application in General** ................................................................1

    1.2    **Application to the Contract Area** ................................................1

ARTICLE 2.0  DEFINITIONS ................................................................2

    2.1    **Affiliate** ................................................................2

    2.2    **Agreement** ................................................................3

    2.3    **Annual Operating Plan** ................................................3

    2.4    **Appraisal Operation/Well** ................................................3

    2.5    **Authorization For Expenditure (AFE)** ................................3

    2.6    **Confidential Data** ................................................4

    2.7    **Contract Area** ................................................4

    2.8    **Costs** ................................................4

    2.9    **Deepwater Operations Plan (DWOP)** ................................4

    2.10    **Deepen or Deepening** ................................................5

    2.11    **Deeper Drilling** ................................................5

    2.12    **Development and Production Plan** ................................5

    2.13    **Development Operation/Well** ................................5

    2.14    **Development Phase** ................................................5

    2.15    **Development Plan** ................................................5

    2.16    **Election** ................................................6

    2.17    **Exploration Plan** ................................................6

    2.18    **Exploratory Operation/Well** ................................6

    2.19    **Fabrication AFE** ................................................7

    2.20    **Facilities** ................................................7

    2.21    **Feasibility Study** ................................................7

    2.22    **Final Design AFE** ................................................7

    2.23    **General Matters** ................................................7

    2.24    **Hydrocarbon(s)** ................................................8

2.25 Integrated Project Team ...................................................................8

2.26 Lease .............................................................................................8

2.27 MMS ..............................................................................................8

2.28 Non-Consent Operations ...................................................................8

2.29 Non-Operating Party .........................................................................8

2.30 Non-Participating Party .....................................................................8

2.31 Non-Participating Party's Share ..........................................................9

2.32 Objective Depth ...............................................................................9

2.33 Operator .........................................................................................9

2.34 Participating Interest .........................................................................9

2.35 Participating Party ..........................................................................10

2.36 Party ............................................................................................10

2.37 Plan of Operation ...........................................................................10

2.38 Production System ..........................................................................10

   Surface Production System ...............................................................10

   Subsea Production System ................................................................10

   Initial Production System .................................................................11

   Subsequent Production System .........................................................11

2.39 Producible Reservoir .......................................................................11

2.40 Producible Well ..............................................................................11

2.41 Recoupment Amount ......................................................................11

2.42 Sidetracking ..................................................................................11

2.43 Well Plan ......................................................................................12

2.44 Working Interest .............................................................................12

ARTICLE 3.0  EXHIBITS ....................................................................12

 3.1 Exhibits ........................................................................................12

ARTICLE 4.0  SELECTION OF OPERATOR ...........................................13

2

| | | |
|---|---|---|
| 4.1 | Designation of the Operator | 13 |
| 4.2 | Substitute Operator | 13 |
| 4.3 | Resignation or Removal of Operator and Selection of Successor Operator | 15 |
| | 4.3.1 Resignation of Operator | 15 |
| | 4.3.2 Removal Upon Assignment | 15 |
| | 4.3.3 Removal for Cause by Vote | 15 |
| | 4.3.4 Selection of Successor Operator | 16 |
| 4.4 | Effective Date of Resignation or Removal | 17 |
| 4.5 | Delivery of Property | 17 |

**ARTICLE 5.0  RIGHTS AND DUTIES OF OPERATOR** ........................ 18

| | | |
|---|---|---|
| 5.1 | Exclusive Right to Operate | 18 |
| 5.2 | Workmanlike Conduct | 19 |
| 5.3 | Drilling | 19 |
| 5.4 | Liens and Encumbrances | 20 |
| 5.5 | Records | 20 |
| 5.6 | Reports to Government Agencies | 20 |
| 5.7 | Notices and Orders | 21 |
| 5.8 | Information to Participating Parties | 21 |
| 5.9 | Completed Well Information | 22 |
| 5.10 | Information to Non-Participating Parties | 23 |

**ARTICLE 6.0 EXPENDITURES, SECURITY RIGHTS AND ANNUAL OPERATING PLAN** ........................ 23

| | | |
|---|---|---|
| 6.1 | Basis of Charges to the Parties | 23 |
| 6.2 | Authorization for Expenditure | 24 |
| | 6.2.1 Supplemental AFE for Cost Overruns for Other Wells | 25 |
| | 6.2.2 Supplemental AFE for Cost Overruns on Integrated Project Team | |

3

AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE..................................................................................**25**

6.2.3   Supplemental AFE for Cost Overruns on  Fabrication AFE.............**26**

6.2.4   Supplemental AFE for Cost Overruns on all other AFE's (not listed above)...............................................................................**26**

6.2.5   Emergency Expenditures..................................................**26**

6.3   Security Rights..................................................................**27**

6.4   Annual Operating Plan......................................................**27**

6.4.1   Submission of Annual Operating Plan................................**27**

6.4.2   Adoption of Annual Operating Plan..................................**28**

6.4.3   Content of the Annual Operating Plan..............................**28**

6.4.4   Effect of Annual Operating Plan......................................**29**

6.4.5   MMS Plan of Operation Consistent with the Annual Operating Plan**29**

ARTICLE 7.0   CONFIDENTIALITY OF DATA.................................................30

7.1   Confidentiality Obligation................................................**30**

7.1.1   Exceptions to Confidentiality..........................................**30**

7.1.2   Permitted Disclosures....................................................**31**

7.1.3   Limited Releases to Offshore Oil Scouts Association............**33**

7.1.4   Continuing Confidentiality Obligation..............................**33**

7.2   Ownership of Confidential Data.........................................**33**

7.2.1   Well Log and Data Trades..............................................**33**

7.3   Access to the Lease, Rig and Construction Site....................**34**

7.4   Development of Proprietary Information and/or Technology......**34**

7.5   News Releases................................................................**35**

ARTICLE 8.0   VOTING, ELECTIONS AND NOTICES........................................35

8.1   Overall Supervision of Business Affairs..............................**35**

8.2   Voting Procedures on General Matters................................**35**

4

        8.2.1  **Voting Interest** ......................................................................36

        8.2.2  **Vote Required** ......................................................................36

        8.2.3  **Second Opportunity to Participate** ..................................37

        8.2.4  **Participation By Fewer Than All Parties** ........................37

  8.3    **Elections** ........................................................................................38

        8.3.1  **Second Opportunity to Participate** ..................................39

        8.3.2  **Participation By Fewer Than All Parties** ........................40

  8.4    **Response Time For General Matters and Elections** ....................40

        8.4.1  **Well Operation Proposal** ..................................................41

        8.4.2  **Production System Construction** ......................................41

        8.4.3  **Other AFE Related Operations** ........................................41

        8.4.4  **Other Proposals** ..................................................................42

        8.4.5  **Failure to Respond** ............................................................42

        8.4.6  **Suspensions of Production** ................................................42

        8.4.7  **Standby Charges** ................................................................42

  8.5    **Meetings of the Parties** ................................................................43

  8.6    **Designation of Representatives** ....................................................43

  8.7    **Giving and Responding to Notices** ..............................................43

  8.8    **Content of Notice** ..........................................................................44

**ARTICLE 9.0  GEOPHYSICAL OPERATIONS** ....................................................45

  9.1    **Geophysical Operations** ................................................................45

        9.1.1  **Conduct of Proprietary Geophysical Operations** ..........45

        9.1.2  **Group-Shoot And Speculative Seismic Surveys** ............46

  9.2    **Utilization of Data Outside the Contract Area** ..........................46

**ARTICLE 10.0  EXPLORATORY OPERATIONS** ................................................47

  10.1    **Application** ....................................................................................47

  10.2    **Proposal of Exploratory Operations** ..........................................47

10.2.1 Initial Exploratory Well.................................................................47

10.2.2 Well Plan's Minimum Specifics.......................................................47

10.2.3 Revision of Well Plan...................................................................48

10.2.4 Timely Operation........................................................................48

10.2.5 Exploratory Operations Costs.......................................................49

10.2.6 Substitute Exploratory Well.........................................................49

10.3 Subsequent Exploratory Operations at Objective Depth...............................50

10.3.1 Response to Operator's Proposals.................................................52

10.3.2 Counterproposal for Subsequent Exploratory Operations..................52

10.3.3 Approval of Subsequent Exploratory Operations by All Parties.......52

10.3.4 Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties.................................................................53

10.3.6 Additional Subsequent Exploratory Operations................................53

10.4 Election by Non-Participating Parties in Deepening or Sidetracking Operations.................................................................................53

10.5 Plugging and Abandoning Costs........................................................54

10.6 Conclusion of Exploratory Operations.................................................54

ARTICLE 11.0 APPRAISAL OPERATIONS.........................................................55

11.1 Proposal of Appraisal Operations.....................................................55

11.1.1 Revision of Well Plan.................................................................55

11.1.2 Timely Operation.......................................................................55

11.1.3 Substitute Appraisal Well...........................................................56

11.2 Subsequent Appraisal Operations at Objective Depth.............................57

11.2.1 Response to Operator's Proposals.................................................58

11.2.2 Counterproposal.......................................................................58

11.2.3 Approval of Subsequent Appraisal Operations by All Parties...........58

11.2.4 Approval of Subsequent Appraisal Operations as a General Matter by

Fewer than All Parties ..................................................................**59**

11.2.5 **Additional Subsequent Appraisal Operations**.............................**59**

11.3 **Election by Non-Participating Parties in Deepening or Sidetracking Appraisal Operations** ..................................................................**59**

11.4 **Deeper Drilling** ..........................................................................**60**

11.4.1 **Limited Participation in Deeper Drilling** ...............................**60**

11.5 **Completion of an Appraisal Well** ...............................................**61**

11.6 **Plugging and Abandoning Costs** ...............................................**61**

11.7 **Conclusion of Appraisal Operations** .........................................**61**

**ARTICLE 12.0 FEASIBILITY STUDY, INTEGRATED PROJECT TEAM AND DEVELOPMENT PLAN** .......................................................................**62**

12.1 **Proposal for Feasibility Study**...................................................**62**

12.1.1 **Meeting With Parties on Proposed Feasibility Study** ...........**63**

12.1.2 **Election on Proposed Feasibility Study** ................................**63**

12.1.3 **Election on Feasibility Study AFE's after the Formation of the Feasibility Study**.........................................................................**64**

12.2 **Phased Development Operations**...............................................**65**

12.3 **Proposal of Integrated Project Team** .......................................**65**

12.4 **Integrated Project Team Election**............................................**66**

12.4.1 **Pre-Development AFE's**.........................................................**67**

12.5 **Submission of a Development Plan** ...........................................**67**

12.6 **Content of the Development Plan** ..............................................**68**

**Production System** ......................................................................**68**

12.7 **Approval of a Development Plan**................................................**72**

12.7.1 **Alternative Development Plans** ............................................**72**

12.7.2 **Approval of a Development Plan by Three or more Parties if One is not Approved as a General Matter** .........................................**73**

7

12.7.3 **Failure to Approve Development Plan** ...................................................**74**

12.8 **Development Well Proposals** ...................................................**74**

12.9 **Fabrication AFE** ...................................................**74**

12.9.1 **Failure to Approve** ...................................................**75**

12.9.2 **Resubmittal of the Fabrication AFE** ...................................................**75**

12.10 **Assignment of Interest** ...................................................**76**

12.11 **Timely Operations for Production Systems** ...................................................**76**

12.12 **Minor Modifications to Development Plans** ...................................................**77**

12.13 **Major Modifications to Development Plans** ...................................................**77**

12.14 **Supplemental AFE for Cost Overruns on Fabrication AFE** ...................................................**79**

12.15 **Termination of a Development Plan** ...................................................**79**

12.16 **Subsequent Development Phases** ...................................................**80**

**ARTICLE 13.0  DEVELOPMENT OPERATIONS** ...................................................81

13.1 **Proposal of Development Operations** ...................................................**81**

13.1.1 **Operator's Counterproposal** ...................................................**82**

13.1.2 **Substitute Development Well** ...................................................**83**

13.1.3 **Timely Operations** ...................................................**84**

13.2 **Subsequent Development Operations at Objective Depth** ...................................................**84**

13.2.1 **Response to Operator's Proposals** ...................................................**85**

13.2.2 **86**

13.2.3 **Approval of Subsequent Development Operations by All Parties** ......**86**

13.2.4 **Approval of Subsequent Development Operations as a General Matter by Fewer than All Parties** ...................................................**86**

13.2.5 **Additional Subsequent Development Operations** ...................................................**87**

13.3 **Election by Non-Participating Parties in Deepening or Sidetracking Development Operations** ...................................................**87**

13.4 **Deeper Drilling** ...................................................**88**

8

13.4.1 Limited Participation in Deeper Drilling ................................................. 88

13.4.2 Multiple Completion Alternatives Above and Below the Deepest
      Producible Reservoir ........................................................................... 89

13.4.3 Completion Attempts At or Above the Deepest Producible Reservoir 91

13.5    Plugging and Abandoning Costs ...................................................................... 92

ARTICLE 14.0 FACILITIES AND GATHERING SYSTEMS ................................................. 92

14.1    Facilities as a Part of Development Plan ....................................................... 92

14.2    Use of Facilities Off the Contract Area ......................................................... 92

14.3    Approval of Additional Facilities on the Contract Area ................................ 93

14.4    Expansion, Modification or Repair of an Existing Production System ........ 93

14.5    Use of Facilities on the Contract Area .......................................................... 94

14.6    Processing Hydrocarbon Production From Outside the Contract Area ...... 94

ARTICLE 15.0 DISPOSITION OF HYDROCARBON PRODUCTION ........................... 95

15.1    Duty to Take in Kind ........................................................................................ 95

15.2    Facilities to Take in Kind ................................................................................ 95

15.3    Failure to Take Oil and/or Condensate in Kind ........................................... 95

15.4    Gas Balancing Provision ................................................................................. 96

15.5    Expenses of Delivery in Kind .......................................................................... 96

ARTICLE 16.0 NON-CONSENT OPERATIONS ................................................................... 97

16.1    Conduct of Non-Consent Operations ............................................................. 97

16.1.1 Indemnity for Non-Consent Operations ................................................. 97

16.1.2 Cost Information .................................................................................... 98

16.1.3 Non-Consent Operations in Producible Reservoirs .............................. 99

16.1.4 Multiple Completions .............................................................................. 99

16.2    Non-Consent of Initial Exploratory Well ...................................................... 100

16.3    Non-Consent Operations for the Initial Fabrication AFE ........................... 100

16.4    Non-Consent Operations to Maintain the Contract Area ........................... 101

16.4.1 Acreage Forfeiture In The Entire Contract Area..............................101

16.4.2 Acreage Forfeiture In A Portion Of The Contract Area ..................101

16.4.3 Limitations on Acreage Forfeiture......................................................102

16.5 Recoupment of Costs from Future Hydrocarbon Production ....................102

16.5.1 Non-Consent Subsequent exploratory Operations............................103

16.5.2 Non-Consent Appraisal Operations.....................................................104

16.5.3 Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE.......................................104

16.5.4 Non-Consent Development Operations ................................................105

16.5.5 Non-Consent Subsequent Production System and Facilities.............105

16.5.6 Additional Production Recoupment ....................................................105

16.6 Settlement of Under-investment of Costs......................................................106

16.6.1 Cash Settlement of Under-investment .................................................106

16.7 Reversion of Interests ......................................................................................107

16.8 Operations from a Subsequent Non-Consent Production System ..............108

16.9 Allocation of Production System Costs to Non-Consent Operations .........108

16.9.1 Investment Charges................................................................................108

16.9.2 Operating and Maintenance Charges...................................................110

16.9.3 Payments ................................................................................................110

ARTICLE 17.0  WITHDRAWAL FROM AGREEMENT .................................................110

17.1 Right of Withdrawal ........................................................................................110

17.2 Response to Withdrawal ..................................................................................111

17.2.1 Unanimous Withdrawal.........................................................................111

17.2.2 Acceptance of Withdrawing Interests .................................................111

17.3 Limitation Upon and Conditions of Withdrawal..........................................111

17.3.1 Current Operations and Voting............................................................111

17.3.2 Prior Expenses .......................................................................................112

17.3.3 Abandonment Costs ...................................................................113

17.3.4 Confidentiality ........................................................................113

17.3.5 Emergencies and Force Majeure ...........................................113

**ARTICLE 18.0  ABANDONMENT AND SALVAGE** ...........................................113

18.1     **Abandonment of Non-Producing Wellbore**...............................113

18.2     **Abandonment of Producing Wellbores**...................................114

18.2.1 Settlement of Wellbore Abandonment Costs........................114

18.2.2 Assignment of Interest ..........................................................115

18.3     **Facilities, Production System and Pipeline Salvage and Removal Costs**....116

18.4     **Approval Not Required** .............................................................116

18.5     **Abandonment Operations Required by Governmental Authority** .............116

**ARTICLE 19.0  RENTALS, ROYALTIES AND MINIMUM ROYALTIES** ...................117

19.1     **Overriding Royalties and Burdens on Production** .......................117

19.1.1 Subsequent Creation of Overriding Royalty ........................118

19.2     **Payment of Rentals and Royalties** ...........................................118

19.2.1 Non-Participation in Payments ............................................119

19.2.2 Royalty Payments ................................................................119

19.2.3 Federal Offshore Oil Pollution Compensation Fund Fee .................120

**ARTICLE 20.0  TAXES** ...........................................................................120

20.1     **Internal Revenue Provision** ....................................................120

20.2     **Other Taxes and Assessments** ................................................121

20.2.1 Property Taxes .....................................................................122

20.2.2 Production and Severance Taxes ..........................................122

**ARTICLE 21.0  INSURANCE AND BONDS** ....................................................122

21.1     **Insurance** ..............................................................................122

21.2     **Bonds**....................................................................................122

11

**ARTICLE 22.0  LIABILITY, CLAIMS AND LAWSUITS** ................................. 123

    **22.1**   **Individual Obligations** ................................................................ 123

    **22.2**   **Notice of Claim or Lawsuit** ....................................................... 123

    **22.3**   **Settlements** ................................................................................. 123

    **22.4**   **Defense of Claims and Lawsuits** ............................................... 123

    **22.5**   **Liability for Damages** ................................................................ 124

    **22.6**   **Indemnification** ......................................................................... 124

    **22.7**   **Loss of or Damage to Reservoir, Loss of Reserves and Profits** .................... 125

    **22.8**   **Non-Essential Personnel** ........................................................... 125

**ARTICLE 23.0  FARM-INS AND CONTRIBUTIONS** ................................. 126

    **23.1**   **Farm-ins and Contributions from Third Parties** ..................... 126

    **23.2**   **Methods of Obtaining Contributions** ....................................... 126

    **23.2**   **Counteroffers** ............................................................................ 127

    **23.4**   **Approval of Contributions** ....................................................... 127

    **23.5**   **Cash Contributions** ................................................................... 127

    **23.6**   **Acreage Contributions** ............................................................. 127

        **23.6.1 Two or More Parties Own 100% of the Acreage Contribution** ........ 128

        **23.6.2 Two or More Own Less Than 100% of the Acreage Contribution** .. 128

    **23.7**   **Restricted Bidding** .................................................................... 128

    **23.8**   **Area of Mutual Interest** _____ 128

**ARTICLE 24.0 ASSIGNMENTS AND PREFERENTIAL RIGHT TO PURCHASE** ...... 130

    **24.1**   **Assignments and Transfers of Working Interests** ...................... 130

        **24.1.1 Consent to Assignment** ................................................... 130

        **24.1.2 Exceptions to Consent** ..................................................... 131

        **24.1.3 Effective Date of Assignments** ........................................ 131

        **24.1.5 Form of Assignments** ...................................................... 132

        **24.1.6 Limited Warranty** .......................................................... 132

12

ARTICLE 25.0 FORCE MAJEURE.................................................................................133

    25.1   Force Majeure ...............................................................................133

ARTICLE 26.0  ADMINISTRATIVE PROVISIONS ....................................................134

    26.1   Term of Agreement.......................................................................134

    26.2   Time Limits.....................................................................................135

    26.3   Waiver of Right to Partition ........................................................135

    26.4   Compliance with Laws and Regulations......................................135

          26.4.1 Applicable Law .............................................................136

          26.4.2 Severance of Invalid Provisions .................................136

          26.4.3 Fair and Equal Employment ......................................136

    26.5   Construction and Interpretation of This Agreement .................137

          26.5.1 Headings for Convenience ..........................................137

          26.5.2 Gender and Number......................................................137

          26.5.3 Independent Representation .......................................138

    26.6   Integrated Agreement...................................................................138

    26.7   Execution of Documents ...............................................................138

          26.7.1 Binding Effect ...............................................................138

          26.7.2 Corporate Authority ....................................................139

          26.7.3 Further Assurances ......................................................139

          26.7.4 Multiple Counterparts .................................................139

    23.8   Area of Mutual Interest                  132

## OFFSHORE OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF - GULF OF MEXICO

**THIS AGREEMENT** is entered into as of the 12th day of December, 2002, by and between Davis Offshore, L.P. ("DAVIS") and, LLOG Exploration Offshore, Inc. ("LLOG ") the signers hereof, herein referred to collectively as "Parties", and individually as "Party".

**WHEREAS,** the Parties desire to jointly explore, develop and operate one or more OCS oil and gas leases, identified in Exhibit "A" *(Description of Leases, Working Interest of the Parties, Operator and Representatives)* for the production of Hydrocarbons in commercially producible quantities.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to jointly explore, develop and operate the Lease(s) within the Contract Area according to the following provisions:

## ARTICLE 1.0  CONTRACT APPLICATION

1.1     **Application in General:**  This Agreement applies to the joint exploration, appraisal, development, operation and abandonment of the Contract Area for the production, treatment, transportation and storage of Hydrocarbons produced from the Contract Area.  The Parties agree that this Agreement shall be the sole and only basis for determining the rights and obligations of the Parties regarding the ownership and operation of the Lease(s) within the Contract Area.

1.2     **Application to the Contract Area:**  This Agreement shall apply to the entire Contract Area, as to all depths, (whether one or more Lease(s)) as defined below in Article 2.7 *(Contract Area)*.  Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all joint property and all

Hydrocarbons produced from the Contract Area shall be owned jointly by the Parties according to their respective Working Interests.

## ARTICLE 2.0  DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto) the initially capitalized terms listed below shall have the following meanings:

2.1   **Affiliate:** shall mean:

(a)   any corporation, limited liability company or Partnership (including a limited Partnership), or other entity owned or controlled by a Party to this Agreement. Ownership or control by a Party is deemed to exist if a Party to this Agreement owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation (or fifty percent [50%] or more of the interests in the Partnership or other entity).  The stock (or interests in a Partnership or other entity) owned or controlled by a Party shall include all stock (or other interests) directly or indirectly owned or controlled by any other corporation, Partnership, or other entity owned or controlled by a Party to this Agreement; and,

(b)   any "parent" corporation, Partnership, or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any "sister" corporation, Partnership or other entity in which the parent corporation directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in such sister corporation.

2

2.2   **Agreement:**  shall mean this Offshore Operating Agreement, together with its attached Exhibits.

2.3   **Annual Operating Plan:**  shall mean the operational plan and estimate of Costs for joint operations in the next ensuing calendar year as described in Article 6.4 *(Annual Operating Plan).*

2.4   **Appraisal Operation/Well:**  shall mean all operations conducted within the Contract Area subsequent to Exploratory Operations and proposed pursuant to Article 11.0 *(Appraisal Operations).*  The terms Appraisal Operation and Appraisal Well are used interchangeably throughout this Agreement (unless the context requires otherwise).  An Appraisal Well shall include all necessary Appraisal Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments, and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Appraisal Well.

2.5   **Authorization For Expenditure (AFE):**  shall mean the written description of a proposed operation along with an estimate of Costs for an operation that, when executed by a Party, evidences that Party's commitment to participate in the proposed operation and grants the Operator the authority to commit or expend funds, incur Costs on behalf of the Participating Party(s) in the operation and charge the joint account for such Costs.  Any AFE which proposes more than one (1) operation shall be considered a separate AFE as to each operation in which the Parties are permitted a General Matters vote or Election as provided for by this Agreement.

3

2.6    **Confidential Data:**  shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area.  The term shall also include (but may not be limited to):

- certain commercial, contractual or financial information;

- analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Data;

- both originals and copies of geological and geophysical data, and well logs; and,

- all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement.

2.7    **Contract Area:**  shall mean the Outer Continental Shelf (OCS) blocks listed on Exhibit "A", covered by the Lease(s) subject to this Agreement.

2.8    **Costs:**  shall mean the monetary amount of all expenditures incurred by the Operator and the Participating Party(s) for (or on account of) any and all operations conducted pursuant to this Agreement and its Exhibits.

2.9    **Deepwater Operations Plan (DWOP):**  shall mean that information required to be filed with the MMS as set forth in Notice to Lessees and Operators of Federal Oil and Gas Leases in the Outer Continental Shelf (NTL 96-4N), effective August 19, 1996, or any succeeding order issued by the MMS.

4

**2.10**   **Deepen or Deepening**:  shall mean any operation to drill an existing well deeper than the stratigraphic equivalent of the deepest formation previously encountered in such well.

**2.11**   **Deeper Drilling**:  shall mean the drilling of a new well or the Deepening of an existing well below the deepest Producible Reservoir penetrated by a Producible Well within the Contract Area.

**2.12**   **Development and Production Plan**:  shall mean that information required to be filed with the MMS as set forth in Title 30 CFR 250.34 (effective May 31, 1988) or any succeeding order issued by the MMS.

**2.13**   **Development Operation/Well**:  shall mean operations conducted subsequent to Appraisal Operations and proposed pursuant to Article 13.0 *(Development Operations)*.  The terms Development Operations and Development Well are used interchangeably throughout this Agreement (unless the context requires otherwise).  A Development Well shall include all necessary Development Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of the Development Well.

**2.14**   **Development Phase**:  shall mean Development Operations associated with the design, fabrication, and installation of the Initial Production System or any Subsequent Production System within the Contract Area.

**2.15**   **Development Plan**:  shall mean the plan for installing a Production System (whether the Initial Production System or a Subsequent Production System) and developing and producing

Hydrocarbons from the Contract Area as described in Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

2.16 **Election:** shall mean a written decision made to the Operator by a Party to become either a Participating Party or a Non-Participating Party in a proposed joint operation (including the AFE associated with the operation) that does not require approval as a General Matter.  An Election to participate (to become a Participating Party) may be evidenced by a Party's written Election made to the Operator to participate or its execution of the AFE.  An Election not to participate (become a Non-Participating Party) may be evidenced by a Party's written Election made to the Operator not to participate or its failure to timely execute the AFE.

2.17 **Exploration Plan:** shall mean that information required to be filed with the MMS as set forth in Title 30 CFR 250.33 (effective May 31, 1988) or any succeeding order issued by the MMS.

2.18 **Exploratory Operation/Well:** shall mean any well proposed and drilled as an Exploratory Operation on the Contract Area subsequent to the drilling of the Initial Exploratory Well drilled pursuant to the Participation Agreement.  An Exploratory Well shall include all necessary Exploratory Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments, and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Exploratory Well.  After drilling an Exploratory Well to its Objective Depth, and completing all logging, testing, and other evaluation of an Exploratory Well (as described in the AFE and Well Plan for an Exploratory Well) and the completion of any subsequent Exploratory Operations conducted pursuant to Article 10.3 and an Exploratory Well meets the criteria of a Producible Well, Exploratory Operations shall cease pursuant to Article 10.6 *(Conclusion of Exploratory*

6

*Operations*) and all further operations on the Contract Area shall be classified as Appraisal Operations pursuant to Article 11.0 *(Appraisal Operations)*.   The terms Exploratory Operations and Exploratory Well are used interchangeably throughout this Agreement (unless the context requires otherwise).

**2.19**   **Fabrication AFE:**   shall mean the AFE's collectively submitted pursuant to an approved Development Plan for the construction and installation of a Production System but treated as a single AFE for Election purposes.

**2.20**   **Facilities:**   shall mean all production handling and processing equipment (excluding flowlines, gathering lines and risers) located on the surface deck of a processing vessel or structure serving the Contract Area.

**2.21**   **Feasibility Study:**   shall mean any study directed toward resolving issues affecting operations on the Contract Area while an Integrated Project Team has not been formed, including but not limited to conceptual and/or preliminary engineering study and design work for the identification and selection of a recommended Production System as described in Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

**2.22**   **Final Design AFE:**   shall mean the AFE included as part of the Development Plan pursuant to Article 12.6 *(Content of the Development Plan)* and any supplements thereto.

**2.23**   **General Matters:**   shall mean all matters that require the approval of the Parties and are determined by a vote of the Parties in accordance with Article 8.2. *(Voting Procedures on General Matters)*.

2.24   **Hydrocarbon(s):** shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

2.25   **Integrated Project Team:** shall mean the group of management, supervisory, technical and support personnel assigned to assist the Operator in the preparation of a Development Plan and the designing, engineering, fabrication, transportation and installation of a Production System and Facilities pursuant to Exhibit "H" *(Integrated Project Team Exhibit)*.

2.26   **Initial Exploratory Well (IEW):** shall mean the first well drilled on the Contract Area, which shall be drilled pursuant to the Participation Agreement.

2.27   **Lease:** shall mean each OCS federal oil and gas Lease identified in Article I of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)* attached hereto and the lands covered by the Lease(s) that are within the Contract Area.

2.28   **MMS:** shall mean the U.S. Department of the Interior, Minerals Management Service or its successor(s).

2.29   **Non-Consent Operations:** shall mean any operation which one or more Parties, having the contractual right to do so, exercises its right not to participate in the proposed operation; and where the Participating Party(s) proceed to conduct the operation at their sole Cost and risk with the benefit of the provisions of either Article 9.0 *(Geophysical Operations)* or Article 16.0 *(Non-Consent Operations)*.

2.30   **Non-Operating Party:** shall mean any Party to this Agreement other than the Operator.

2.31   **Non-Participating Party:** shall mean any Party to this Agreement who, having the contractual right to do so, exercises its right not to participate in the proposed operation and

8

who thereby becomes subject to either the provisions of Article 9.0 *(Geophysical Operations)* or Article 16.0 *(Non-Consent Operations)*.

2.32    **Non-Participating Party's Share:**  shall mean the percentage share of the Costs, risks and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have assumed if all Parties, having the contractual right to do so, had exercised their right to participate in the Costs, risks and benefits of the proposed operation.

2.33    **Objective Depth:**  shall mean for any well, the shallower of the total footage to be drilled (as measured in true vertical depth) or the penetration by the drill bit to a depth sufficient to test the deepest target formation or interval at the bottomhole location specified in the Well Plan and AFE for that well.

2.34    **Operator:**  shall mean the Party identified in Article 4.1 *(Designation of the Operator)* charged with the responsibility of conducting all joint operations on behalf of the Participating Party(s).  The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)* or Article 4.3.4 *(Selection of Successor Operator)*.

2.35    **Participating Interest:**  shall mean a Participating Party's percentage share of the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement; that is, the proportion that the Participating Party's Working Interest bears to the total Working Interest of all the Participating Party(s) (unless a different Cost sharing basis has been agreed upon by the Participating Party(s) in such operation).

2.36   **Participating Party**:  shall mean, with respect to any proposed operation hereunder,  any Party to this Agreement who, having the contractual right to do so, exercises its right to participate in such proposed operation.

2.37   **Participation Agreement:**  shall mean that Participation Agreement dated December 12, 2002 between the Parties to which this Agreement is attached as Exhibit "C".

2.38   **Party**:  shall mean Davis Offshore, L.P. ("DAVIS") and LLOG Exploration Offshore, Inc. ("LLOG "), and their successors and assigns.

2.39   **Plan of Operation**:  shall mean the plan submitted to the MMS by the Operator as described in Article 6.4.5 *(MMS Plan of Operation Consistent with the Annual Operating Plan)*.

2.40   **Production System**:  shall mean an offshore structure (whether fixed, compliant, subsea or floating or a combination thereof) and all associated components thereof including the associated Facilities, flowlines, gathering lines and risers which are used for the production of Hydrocarbons from the Contract Area.  The term includes:

   (a)   **Surface Production System**:  A Production System which utilizes a floating vessel or surface penetrating structure (whether fixed or compliant).  A Surface Production System shall include all forms of floating Production Systems.

   (b)   **Subsea Production System**:  A Production System which utilizes a non-surface penetrating subsea structure to support single or multiple wells with associated Facilities located some distance from the wellheads on a host structure, with the Hydrocarbon production routed from the wellheads to the Facilities through flowlines and/or gathering lines.

10

    **(c)**    <u>**Initial Production System**</u>**:** The Production System (whether a Surface and/or Subsea Production System) for the Contract Area included in the first approved Development Plan.

    **(d)**    <u>**Subsequent Production System**</u>**:** Any new Production System proposed after the installation of the Initial Production System for the Contract Area.

**2.41**    <u>**Producible Reservoir**</u>**:** shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and that is separated from and is not in oil or gas communication with any other such accumulation and is identified as a Hydrocarbon bearing accumulation expected to be developed under any Development Plan or any other such accumulation from which Hydrocarbons are ultimately produced.

**2.42**    <u>**Producible Well**</u>**:** shall mean a well producing Hydrocarbons or if not producing Hydrocarbons, a well that shall at least meet the "well producibility" criteria set forth in Title 30 CFR 250.11 (effective May 31, 1988) or any succeeding order issued by the MMS or its successor.

**2.43**    <u>**Recoupment Amount**</u>**:** shall mean for a Non-Consent Operation that is not subject to Articles 16.1.1 *(Indemnity for Non-Consent Operations)* or 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, an amount to be recovered from the Non-Participating Party's Share of proceeds of future Hydrocarbon production equal to the product of the Non-Participating Party's Share of the Costs of each Non-Consent Operation multiplied by the risk premium percentage applicable to such operation.

**2.44**    <u>**Sidetracking**</u>**:** shall mean an operation to directionally control or intentionally deviate the drilling of a well from its original well bore for the purpose of reaching a new bottomhole

location different from the bottomhole location specified in the Well Plan for that well, but not deeper than the stratigraphic equivalent of the Objective Depth previously specified in the Well Plan for that well. Sidetracking excludes: (i) deviated drilling to core an objective zone; (ii) deviated drilling to avoid obstructions or other mechanical difficulty; or (iii) deviated drilling to complete the well as a "horizontal well".

2.45    **Well Plan:**  shall mean the description of operations, tests, evaluations and other activities described in Article 10.2.2 *(Well Plan's Minimum Specifics)* which a proposing Party intends to conduct as a part of a single Exploratory, Appraisal or Development Operation.

2.45    **Working Interest:**  shall mean the record leasehold equity interest and operating rights of each Party in and to each Lease within the Contract Area expressed as the percentage described in Article II of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)* attached hereto and established pursuant to this Agreement.  In the event that a Party's record title interest is different than its operating rights, the Working Interest of each Party shall be the interest set forth in Article II of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)*.

## ARTICLE 3.0  EXHIBITS

3.1    **Exhibits:**  All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement.  In the event there is a conflict between the provisions of this Agreement and the attached Exhibits, the provisions of this Agreement shall prevail unless a different priority of interpretation is stated herein or in the attached Exhibits.

| | | |
|---|---|---|
| **Exhibit "A"** | I. | Description of Contract Area and Leases |
| | II. | Working Interest of the Parties |
| | III. | Operator |
| | IV. | Representatives and Addresses |
| **Exhibit "B"** | | Offshore Insurance Provisions |
| **Exhibit "C"** | | Accounting Procedure |
| **Exhibit "D"** | | Gas Balancing Agreement |
| **Exhibit "E"** | | Equal Opportunity Certificate |
| **Exhibit "F"** | | News Release Guidelines |
| **Exhibit "G"** | | Integrated Project Team and Technology Sharing |
| **Exhibit "H"** | | Dispute Resolution Procedure |
| **Exhibit "I"** | | Security Rights Provision |
| **Exhibit "J"** | | Memorandum of Operating Agreement |
| **Exhibit "K"** | | UCC Form |

## ARTICLE 4.0  SELECTION OF OPERATOR

4.1    **Designation of the Operator:** LLOG Exploration Offshore, Inc. is designated as the Operator of the Contract Area and shall conduct all operations within the Contract Area for the joint account of the Participating Party(s). This designation of operatorship is subject to approval by the MMS and the Parties agree to execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2    **Substitute Operator:** If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be selected by the Participating Party(s) as a General

Matter and designated as the substitute Operator for such Non-Consent Operation only, with the same authority, rights, obligations and duties as the Operator, except when:

(a)      the drilling and other contracts for equipment and facilities to be utilized on the Non-Consent Operation are not assignable; or

(b)      the operation is conducted from a Surface Production System being operated by the Operator.

In the event of Article 4.2 (a) or 4.2 (b) above, the Operator shall conduct such Non-Consent Operation at the sole risk, Cost and expense of the Participating Party(s) and subject to the Participating Party(s)' control, supervision and direction.  For situations other than Article 4.2 (a) or 4.2 (b) above where the Operator becomes a Non-Participating Party and if no substitute Operator is designated by the Participating Party(s), then the Operator, at its option, shall conduct such Non-Consent Operation at the sole risk, Cost and expense of the Participating Party(s) and subject to the Participating Party(s)' control, supervision and direction.  If the Operator conducts Non-Consent Operations on behalf of the Participating Party(s) (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Party(s) an estimate of the Costs of the Non-Consent Operation.  The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs of the Non-Consent Operation have been advanced to the Operator by the Participating Party(s), to the end that the Operator need not expend any of its own funds for such Non-Consent Operation.  If a Non-Consent Operation conducted by a substitute Operator is completed or results in a Producible Well that will utilize a jointly owned Production System or Facilities, control of the well shall be delivered to the Operator for future operations within thirty (30) days of completion of the operation.

14

**4.3**    **Resignation or Removal of Operator and Selection of Successor Operator:** The Operator may resign, be removed upon assignment or be removed for cause and a successor Operator selected as provided below:

    **4.3.1**   **Resignation of Operator:** The Operator may resign at any time by giving written notice to the other Party(s); provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Majeure)*. If the Operator no longer owns an interest in the Contract Area, the Operator shall be deemed to have resigned (upon the effective date of the assignment of its interest) without any action by the Non-Operating Party(s) and a successor Operator will be selected pursuant to Article 4.3.4 *(Selection of Successor Operator)*.

    **4.3.2**   **Removal Upon Assignment:** If the Operator assigns a portion of its Working Interest in the Contract Area (excluding any interest assigned to an Affiliate) which reduces the Operator's Working Interest in the Contract Area to less than twenty-five percent (25%), whether accomplished by single or multiple assignments, then the Operator may be removed by vote of the Parties as a General Matter.

    **4.3.3**   **Removal for Cause by Vote:** The Operator may be removed for cause by vote of the Parties remaining after excluding the Operator as a General Matter if the Operator commits any of the following acts:

        (a)     the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of bankruptcy, or seeks relief under laws providing for the relief of debtors; or,

15

(b)     a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

(c)     the Operator commits an act of gross negligence or willful misconduct; or,

(d)     the Operator is unable to meet the standards of operation contained in Articles 5.2 *(Workmanlike Conduct)*, 5.3 *(Drilling)*, 5.4 *(Liens and Encumbrances)*, and 5.6 *(Reports to Government Agencies)*; or,

(e)     the Operator commits a breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed.

**4.3.4   Selection of Successor Operator:**   Upon the occurrence of either Article 4.3.1 *(Resignation of Operator)*, Article 4.3.2 *(Removal upon Assignment)* or 4.3.3 *(Removal for Cause by Vote)*, a successor Operator shall be selected by the Parties as a General Matter. If the former Operator fails to vote or votes only to succeed itself (if applicable), then the successor Operator shall be selected by vote as a General Matter after excluding the Working Interest of the former Operator. Any new Non-Operating Party acquiring all or a part of the former Operator's Working Interest shall not be excluded from voting. In the event that there are only two Parties each owning an equal Working Interest after the removal or resignation of the Operator, the successor Operator shall be selected by mutual agreement of the two Parties.

16

Notwithstanding anything to the contrary contained herein, if there are only two (2) Parties to this Agreement and a situation as described by Article 4.3.1 *(Resignation of Operator)*, Article 4.3.2 *(Removal upon Assignment)* or 4.3.3 *(Removal for Cause by Vote)* should occur, then in those circumstances the Non-Operating Party shall become the Operator.

4.4 **Effective Date of Resignation or Removal:**  The resignation or removal of the Operator shall become effective as soon as practicable but no later than 7:00 a.m. on the first day of the month following a period of three (3) months after notice of the Operator's resignation or removal, unless a longer period of time is required to obtain approval of the change in Operator by the MMS.  Prior to the successor Operator's assumption of the Operator's duties, the former Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator.  Upon the resignation or removal of the Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party if the outgoing Operator retains any Working Interest in the Contract Area.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities that accrued during the period when the outgoing Operator acted as the Operator.

4.5 **Delivery of Property:**  On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator, possession of everything jointly owned by the Parties, including:

- all funds relating to the joint account;

- all jointly owned Hydrocarbons;

17

- all jointly owned equipment, materials, appurtenances and any other Facilities used in conducting operations; and

- original copies of all books, records, and inventories relating to joint operations (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest).

Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator. The outgoing Operator shall use reasonable efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to joint operations and the successor Operator shall assume all obligations of the Operator under such contracts which are assignable. As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the joint account and conduct an inventory of all jointly owned property and all jointly owned Hydrocarbons, and such inventory shall be used in the return of and the accounting for the jointly owned property and the jointly owned Hydrocarbons by the outgoing Operator. All reasonable Costs and expenses incurred in connection with such audit and inventory shall be charged to the joint account.

## ARTICLE 5.0  RIGHTS AND DUTIES OF OPERATOR

5.1 **Exclusive Right to Operate:** Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement. With the exception of each Party's staff assigned to any team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or

18

contractors shall be the employees or contractors, respectively, of the Operator. The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement.

5.2    **Workmanlike Conduct**:  The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound offshore oil and gas field practice and with that degree of diligence reasonably and ordinarily exercised by an experienced prudent operator engaged in a similar activity under the same or similar circumstances. The Operator shall not be liable to the Parties for losses sustained or liabilities incurred as a result of its actions as the Operator, except such as may result from its gross negligence or willful misconduct. Unless otherwise provided, Operator shall consult with the Parties and keep them informed of all important matters.

5.3    **Drilling**:  The Operator may have all drilling operations conducted by qualified and responsible independent contractors, who are not affiliated with the Operator, and are employed under competitive contracts. A competitive contract is a contract at the time of its execution, that contains current terms, rates, and provisions that do not exceed those generally prevailing in the OCS Gulf of Mexico for operations involving drilling rigs of an equivalent type, operating in similar environments, and equipped to the Operator's standard conditions which are capable of drilling the proposed well(s) within the time schedule for the operations to be conducted. Upon request, the Operator shall furnish each Non-Operator copies of all contracts, drilling or otherwise, which are entered into by Operator for the joint account, but only in the event the Operator has the right to do so. The Operator may utilize or employ its own equipment, personnel, and/or Operator-owned drilling rig, workover rig or other similar equipment in the conduct of such operations in accordance with Exhibit "C" *(Accounting Procedure)* or pursuant to a written agreement among the Participating Party(s).

19

If the Operator's equipment, personnel, and/or drilling rig, workover rig or snubbing unit are utilized or employed in conducting operations under this Agreement, the terms, rates and provisions for use shall be consistent with the then current competitive contracts prevailing in similar environments of the OCS Gulf of Mexico.

5.4  **Liens and Encumbrances:**  The Operator shall use reasonable efforts to keep the Lease(s), Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons free from all liens and encumbrances, except those provided for in Article 6.3 *(Security Rights)*, which might arise by reason of the operations conducted under this Agreement.

5.5  **Records:**  The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with Exhibit "C" *(Accounting Procedure)*.  Unless otherwise provided for in this Agreement, all records of the joint account shall be available to a Non-Operating Party at all reasonable times and during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C" *(Accounting Procedure)*.  The Operator agrees that all financial settlements, billings, and reports rendered to each Party, as provided in this Agreement or any amendments to it, shall, to the best of Operator's knowledge and belief, reflect properly the facts about all activities and transactions handled for the account of a Party, which data may be relied upon as being complete and accurate in any further recording and reporting made by the Party for whatever purpose.  The Operator agrees to notify the other Parties promptly upon the discovery of any instance where the Operator fails to comply with the provisions of this Article.  This provision is not intended to affect a Party's audit rights under this Agreement.

5.6  **Reports to Government Agencies:**  The Operator shall make timely reports to all governmental authorities that it has a duty to make as the Operator and shall furnish, in a timely manner, copies of such reports to the Participating Party(s).

**5.7**     **Notices and Orders:**  If the Operator is required by notice or order (including SOP's and SOO's) from the government agency having jurisdiction over the Contract Area to either drill or rework a well, or conduct other operations to maintain all or a portion of the Contract Area, the Operator shall immediately furnish each of the Parties with a copy of such order or notice.

**5.8**     **Information to Participating Parties:**  The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to operations being conducted (provided such information was obtained):

(a)     copy of the application for permit to drill and all amendments thereto;

(b)     daily drilling and workover reports; daily mud checks, mud logs, Hydrocarbon shows and lithological data; daily casing and cementation tallies and estimated cumulative Costs incurred during the operation;

(c)     complete report of all core data and analysis;

(d)     copies of any logs or surveys as run (including all digitally recorded data);

(e)     copies of well test results, bottom-hole pressure surveys, Hydrocarbon analyses, or similar information including any PVT analysis;

(f)     copies of reports made to and orders received from regulatory agencies;

21

(g)     48 hours advance notice of logging, coring, and testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, if sufficient quantities are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, a requesting Participating Party shall be allowed access to inspect and evaluate said cores; and,

(k)     samples of any Hydrocarbons, if sufficient quantities are available, after performing routine tests.

Upon written request, the Operator shall use reasonable efforts to furnish a requesting Participating Party any additional available information including a complete slabbed section of all recovered cores, if available, acquired by the Participating Party(s) not otherwise furnished under this Agreement (but not including any information independently developed at Operator's sole Cost and expense). The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

**5.9     Completed Well Information:**   Operator shall furnish in a timely fashion to each Participating Party the following information pertaining to each well completed for the production of Hydrocarbons:

(a)     a monthly report of production and injection;

(b)     copies of all reports made to regulatory agencies;

(c)     a report on status of wells not producing and not abandoned;

(c)     a gas balancing status report;

(d)     all bottomhole pressure data and surface pressure data;

(f)     a composite of all logs; and,

(g)     reports of inventories of stored Hydrocarbons.

5.10   **Information to Non-Participating Parties:**  Within sixty (60) days after conclusion of a non-consent operation, the Operator shall furnish to each Non-Participating Party, copies of all information specified in Article 5.8 *(Information to Participating Parties)* and 5.9 *(Completed Well Information)*  provided that such Non-Participating Party has not permanently relinquished all of its Working Interest in the Contract Area.

## ARTICLE 6.0
## EXPENDITURES, SECURITY RIGHTS AND ANNUAL OPERATING PLAN

6.1    **Basis of Charges to the Parties:**  Except as otherwise provided, the Operator shall pay all Costs of joint operations and each Participating Party, in proportion to its Participating Interest, shall reimburse the Operator for the Costs of each joint operation.  The Operator shall have the right to require each Participating Party to advance its respective share of the

23

estimated Costs of the joint operation, as provided in Exhibit "C" *(Accounting Procedure)*. Funds received by the Operator under this Agreement may be commingled with Operator's own funds. All charges, credits, and accounting for the Costs of any operation shall be made pursuant to Exhibit "C" *(Accounting Procedure)*, attached hereto.

6.2    **Authorization for Expenditure:**  The Operator shall not make any single expenditure or undertake any project or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an Authorization for Expenditure (AFE) has either: (1) received the approval of the Parties as a General Matter, or (2) been included in a proposal for an operation for which an Election by the Parties is required.  Operator shall furnish written information describing any expenditure, project or operation costing less than Two Hundred Thousand Dollars ($200,000), but in excess of One Hundred Thousand Dollars ($100,000).

If it appears (based upon the Operator's reasonable estimates) that the actual Costs associated with an original AFE or its latest approved supplemental AFE will exceed the relevant amount, as defined below, the Operator shall submit a supplemental AFE to the Participating Parties in order for them to make an Election as to their further participation in the activity or operation covered by the original AFE.  Once the Operator has received all Elections pursuant to the proposed supplemental AFE, the Operator shall continue to conduct the operation associated with such supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE.  Any Participating Party in an original AFE who elects not to participate in a supplemental AFE becomes a Non-Participating Party in the operation associated with the original AFE from and after the date when the actual Costs associated with the latest approved AFE for such operation which has been executed by the Non-Participating Party exceeds such approved AFE, plus the permitted over-expenditure for such operation.

**6.2.1**   **Supplemental AFE for Cost Overruns for Other Wells:** If during the drilling of Subsequent Exploratory Wells, Appraisal Wells, Development Wells, or during subsequent Exploratory Operations, subsequent Appraisal Operations, or subsequent Development Operations it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the well by twenty-five percent (25%) or seven million dollars ($7,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in such operation in accordance with Article 6.2 (*Authorization for Expenditure*).   Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.1, shall be subject to the applicable provisions of Article 16.0  *(Non-Consent Operations)* only for the actual supplemental Costs incurred.

**6.2.2**   **Supplemental AFE for Cost Overruns on Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE:** If it appears (based upon Operator's reasonable estimate) that the actual Integrated Project Team, Pre-Development, Feasibility Study or Final Design Costs will exceed the latest approved AFE by twenty-five percent (25%) or seven million dollars ($7,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the respective AFE in accordance with Article 6.2 (*Authorization for Expenditure*).  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.2, shall be subject to the provisions of Article 16.5.3  *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility study AFE or Final Design AFE)* only for the amount of the actual supplemental Costs incurred.

**6.2.3**   **Supplemental AFE for Cost Overruns on  Fabrication AFE:** If it appears (based upon Operator's reasonable estimate) that the actual Costs associated with the Fabrication AFE exceed the latest approved Fabrication AFE by twenty-five percent (25%) or twenty million dollars ($20,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Fabrication AFE  in accordance with Article 6.2 *(Authorization for Expenditure)*.  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.3, shall be subject to the provisions of Article 12.10 *(Assignment of Interest)*.  No Party shall be allowed to make an Election to discontinue its participation in a Fabrication AFE (or Development Operations) during a Force Majeure or other emergency as described in Article 25.0 *(Force Majeure)*, but may make its Election to discontinue its participation after termination of such emergency.

**6.2.4**   **Supplemental AFE for Cost Overruns on all other AFE's (not listed above):** If it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the operation by twenty-five percent (25%) or two million dollars ($2,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the operation in accordance with Article 6.2 (Authorization for Expenditure).  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.4, shall be subject to the provisions of this Agreement and, if applicable, only for the amount of the actual supplemental Costs incurred.

**6.2.5**   **Emergency Expenditures:**  In the event of an emergency and notwithstanding the foregoing, the Operator is empowered to immediately make such expenditures and incur Costs for the joint account of the Participating Party(s) as the Operator decides

(in its opinion as a reasonable and prudent operator) are required to deal with the emergency. The Operator shall report (and submit any required AFE) to each of the Participating Party(s), as promptly as possible, describing the nature of the emergency, any action taken and any Costs incurred for the joint account.

6.3     **Security Rights:**  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the security rights as set forth in the attached Exhibit "I" (Security Rights Provision).

6.4     **Annual Operating Plan:**  Beginning in the year in which installation of the Initial Production System within the Contract Area is scheduled, and each subsequent year thereafter, the Operator shall develop an Annual Operating Plan and submit the plan to the Non-Operating Party(s). Any Party may request a meeting to review the results of the past year's operations and to review the Operator's proposed Annual Operating Plan. The Annual Operating Plan process will be used 1) as a reporting mechanism by which the Operator will inform the Non-Operating Party(s) of results of the previous year's activities; 2) to review ongoing operations; and 3) to forecast proposed activities, anticipated Hydrocarbon production volumes, operating expenses and capital expenditures for the remainder of the current year and the next succeeding calendar year.

   6.4.1   **Submission of Annual Operating Plan:**  Prior to September 1st of each year, the Operator shall submit its draft of the next calendar year's proposed Annual Operating Plan for review by each Non-Operating Party. The Non-Operating Party(s) will have up to forty-five (45) days from the Operator's submission of the Annual Operating Plan to submit in writing to the Operator suggested changes, additions or deletions to the Annual Operating Plan.

27

**6.4.2** **Adoption of Annual Operating Plan:**  Within forty-five (45) days from the Operator's receipt of suggested changes, additions or deletions to the Annual Operating Plan, but no later than July 1st, the Operator will submit to each Party the final Annual Operating Plan incorporating all changes previously submitted and agreed to by the Operator, at which time the Annual Operating Plan shall be deemed adopted by all Parties.

**6.4.3** **Content of the Annual Operating Plan:**  The Annual Operating Plan shall present the Operator's proposed operating expense and capital expense budgets for joint operations, as well as a schedule of anticipated Appraisal Operations and Development Operations and expenditures (if applicable for the subject year).  To the extent known at the date of adoption and for each operation proposed in the Annual Operation Plan, the plan shall indicate:

(a)     a list of proposed wells to be drilled, including a drilling schedule, locations (if known), depths and types of wells;

(b)     capital workovers, which shall be defined as any workover operation conducted to recomplete a well to a new zone or install artificial lift, with estimated Cost;

(c)     expense workovers, which shall be defined as any anticipated workover which is not a capital workover, with estimated Cost;

(d)     any geophysical survey(s) and special test(s) which might be contemplated;

28

(e)     all expense projects requiring a gross expenditure greater than two million dollars ($2,000,000); and,

(f)     other capital projects requiring a gross expenditure greater than two million dollars ($2,000,000).

**6.4.4**   **Effect of Annual Operating Plan**:   The Annual Operating Plan shall be for informational and planning purposes only and will not obligate any Party to incur any Costs or constitute approval of any specific operation.   Pursuant to the terms and conditions of this Agreement, any Party may make proposals for operations which were not included in the Annual Operating Plan.   Additionally, the Annual Operating Plan will not preclude the implementation of other operations and expenditures during a given year through the procedures set forth elsewhere in this Agreement.

**6.4.5**   **MMS Plan of Operation Consistent with the Annual Operating Plan**:   The Parties recognize that any Exploration Plan, Development and Production Plan or Deepwater Operation Plan submitted to the MMS pursuant to this Agreement may differ from and not contain all elements of a previous Annual Operating Plan. However, to the extent reasonable and practical, any Annual Operating Plan will be amended to be consistent with the plan required to be submitted to the MMS.   The Operator shall submit the Annual Operating Plan to the Non-Operators for their comments and recommendations, at least thirty (30) days prior to submitting the plan to the MMS.   Within fifteen (15) days after receipt of Operator's plan, each Non-Operator may (a) advise the Operator in writing of any recommended changes to the plan, and/or (b) call a meeting of the Parties to discuss the plan.   The content of the plan shall be voted on as a General Matter.

## ARTICLE 7.0  CONFIDENTIALITY OF DATA

7.1    **Confidentiality Obligation:**  Upon execution of this Agreement, the Parties agree that any prior confidentiality agreements between the Parties (or any combination of the Parties) as to the Contract Area shall terminate and the confidentiality obligations of each Party to the other Parties shall be governed by the terms of this Agreement alone.  The Parties agree that all Confidential Data acquired or obtained by any Party in respect of the joint operations conducted under this Agreement shall be considered confidential and shall be kept confidential during the term of this Agreement.  Each Party agrees to maintain the secrecy of the Confidential Data using the standard of care it normally uses in protecting its own confidential information and trade secrets.  The Confidential Data shall be made available to each Participating Party for its exclusive use.   During the confidentiality period, the Confidential Data shall not be disclosed to any third party (unless disclosed under an "exception to confidentiality" or as a "permitted disclosure" as provided below).

7.1.1    **Exceptions to Confidentiality:**  The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

(a)    are now or later become part of the public domain (other than as a result of a wrongful act or omission by the disclosing Party); or,

(b)    are now or later become available to the disclosing Party on a non-confidential basis from a source that is legally permitted to disclose the item of Confidential Data; or,

30

(c)     were known to the disclosing Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement, or to which such Party was otherwise entitled at the time of disclosure; or,

(d)     is independently developed by employees or contractors of a disclosing Party who have not had access to the Confidential Data; or,

(e)     information relating to the existence of the transaction, its proposed structure and other matters of a general nature as may be discussed by a Party with a nationally recognized statistical rating agencies consistent with the Party's and industry practice.

7.1.2   **Permitted Disclosures:**  The Operator may disclose items of Confidential Data to such third parties as may be necessary in connection with the operation of the Contract Area, provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than is set forth in this Agreement (or a lesser period if agreed by all Parties).  The Operator shall promptly inform the other Parties hereto of the names of such third parties and list the items of Confidential Data disclosed.  Notwithstanding anything herein to the contrary, and subject to the restrictions that:  (i) the Confidential Data shall not be removed from the custody and premises of the Party making such disclosure (excepting disclosures made pursuant to items (1), (4) and (5) below); and (ii)  that such third party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose the Confidential Data, in whole or in part:

(1)     to any Affiliate of such Party, provided such Affiliate is bound by the confidentiality provisions contained herein; or,

(2)     to any potential or current contractors or professional consultants engaged by or on behalf of such Party and acting in that capacity where such disclosure is essential to such contractor's or consultant's work; or,

(3)     to any bona fide prospective assignee of any portion of such Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation, sale, exchange or combination thereof, of a Party's or an Affiliate's shares or substantially all of its assets in the OCS Gulf of Mexico), provided that the disclosing Party shall give all other Parties to this Agreement not less than fifteen (15) days advance written notice specifying the extent to which that Party intends to disclose the Confidential Data to the prospective assignee and the name of such prospective assignee; or,

(4)     to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or,

(5)     to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).  If a Party is legally compelled to disclose any Confidential Data, such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such

32

Confidential Data as is legally required and will use its best efforts to obtain confidential treatment for any Confidential Data disclosed; or,

(6)    to an entity desiring to transport and/or purchase Hydrocarbons produced under this Agreement for the purpose of making Hydrocarbon reserve estimates and other technical evaluations.

**7.1.3**    **Limited Releases to Offshore Oil Scouts Association:**  The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings. The Confidential Data disclosed shall be limited to information concerning well locations, well operations and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.1.4**    **Continuing Confidentiality Obligation:**  Any Party who ceases to own a Working Interest in the Contract Area shall nonetheless remain bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement.

**7.2**    **Ownership of Confidential Data:**  Except as otherwise provided for in Article 5.10 *(Information to Non-Participating Parties)*, all Confidential Data produced as a result of a joint operation shall be the joint property of all Party(s).

**7.2.1**    **Well Log and Data Trades:**  Any Participating Party may propose the exchange or trade of any jointly owned Confidential Data for other similar data and information owned by third party(s).  Upon unanimous approval of such trade by the Participating Party(s) (and without requiring the prior consent of any Non-Participating Party), the

33

Operator shall consummate such exchange or trade with the third party. The Operator shall promptly provide all Participating Party(s) copies of the third party data obtained along with copies of any agreement relating to such exchange.

7.3   **Access to the Lease, Rig and Construction Site:** Each Participating Party shall have the option to attend regular meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Fabrication AFE as well as regular visits to the construction sites. Upon forty-eight (48) hours notice (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible) each Participating Party or its representatives shall have access to any drilling rig, Production System, or Facility located on the Contract Area to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto). Prior to any logging or testing operation, the Operator shall give the other Participating Party(s) forty-eight (48) hours notice (or, if conditions do not permit such advance notice, as much advance notice as is possible) so the Party's representatives may be present to observe such operations. Access to the rig, Production System or Facilities will be at each Party's (and its representative's) sole risk and expense and at reasonable times and provided such access does not unreasonably interfere with the operation being conducted.

7.4   **Development of Proprietary Information and/or Technology:** Nothing in this Agreement shall require a Party to divulge independently developed trade secrets, proprietary information and/or technology to the other Parties. However, where the development of the proprietary information and/or technology has been charged to the joint account, the ownership and treatment of any such proprietary information and/or technology relating specifically to drilling technology, production technology, production structures, facilities, pipelines, flowlines, the transportation and installation of such items and the offshore

34

transportation of Hydrocarbons shall be governed by Exhibit "H" *(Integrated Project Team Exhibit)*.

7.5     **News Releases:** All news releases (and their timing and/or content) shall be governed by Exhibit "F" *(News Release Guidelines)*.  Provided, however the Parties may make required releases to the extent otherwise required by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, security commission, stock exchange or judicial or administrative body) requiring such statement or news release.

## ARTICLE 8.0  VOTING, ELECTIONS AND NOTICES

8.1     **Overall Supervision of Business Affairs:**   The activities of the Parties under this Agreement that are not within the scope of the Operator's authority to unilaterally decide shall be divided into the following two (2) broad classes:

(1)      "General Matters" for which a vote for approval is required, and;

(2)      "Elections" where no vote for approval is required.

The Parties shall decide and take action upon General Matters and Elections in accordance with the provisions of this Article 8.0 *(Voting, Elections and Notices)*.

8.2     **Voting Procedures on General Matters:**  Action on any General Matter shall require the approval of the Parties which shall be decided by a vote of the Parties as follows:

**8.2.1**    **Voting Interest:** Each Party shall have a voting interest equal to its Working Interest or, with respect to a Non-Consent Operation, its Participating Interest in such operation, as applicable.

**8.2.2**    **Vote Required:** A General Matter shall require approval of the Parties and shall be decided as follows:

    (a)     Should there be only 2 (two) Parties to this Agreement:

           By an affirmative vote of one (1) or more Parties owning a combined working interest of fifteen percent (15%) or more (but not including any reversionary rights) in the Contract Area.

    (b)     Should there be 3 (three) or more Parties to this Agreement:

           By an affirmative vote of one (1) or more Parties owning a combined working interest of fifteen percent (15%) or more (but not including any reversionary rights) in the Contract Area.

Each Party voting to approve a General Matter where an AFE is required shall execute the AFE evidencing its General Matter vote for approval and its commitment to participate in the proposal. For General Matters where an AFE is not required with the proposal, a Party shall evidence its vote for approval along with its commitment to participate in writing. A Party failing to vote or respond timely to a vote on a General Matter shall be deemed to have voted against the proposed action. The Parties may vote in person at meetings, by telephone (promptly confirmed in writing to Operator), or by U.S. mail, overnight express, courier, telecopier, or facsimile.

8.2.3   <u>**Second Opportunity to Participate:**</u>   Unless otherwise provided to the contrary in this Agreement, if an operation is approved as a General Matter but is not approved by all the Parties, a Party who voted not to participate in the approved operation shall have the right to make a subsequent election to participate in the approved operation within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays), of its receipt of the original General Matter Vote  results from the Operator.  If a Party does not exercise its right to make a subsequent election to participate, it shall become a Non-Participating Party in the approved operation.

8.2.4   <u>**Participation By Fewer Than All Parties:**</u>   Upon conclusion of the period provided for in Article 8.2.3 (*Second Opportunity to Participate*) if there is at least one (1) Non-Participating Party in the approved operation, each Party who voted as a General Matter or elected to participate pursuant to Article 8.2.3 (*Second Opportunity to Participate*) shall within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) of its receipt of the subsequent General Matter vote results,

    (a)    limit its participation in the approved operation to its Working Interest share, or

    (b)    agree to bear its Participating Interest share of the approved operation.

By written correspondence to the Operator.  Failure to submit written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or subsequent General Matter vote or election pursuant to Article 8.2.3 (*Second Opportunity to Participate*), submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or subsequent General Matter vote or election pursuant to Article 8.2.3 (*Second Opportunity to*

37

*Participate*), to participate in the approved operation do not agree to bear all of the remaining Costs of the approved operation within two (2) days of the conclusion of the written correspondence period, the proposal and approval of the proposed operation shall be deemed withdrawn. The Participating Parties in an approved operation shall bear all of the Costs and risk of the approved operation.

8.3 **Elections:** For all proposals where approval as a General Matter is not required, each Party shall make an Election as to its participation in a proposed operation. Proposals that require an Election shall include, but are not limited to the following:

(1)     Exploratory Operations pursuant to Article 10. *(Exploratory Operations)*, Appraisal Operations pursuant to Article 11 *(Appraisal Operations)*, Geophysical Operations pursuant to Article 9.0 *(Geophysical Operations)*; or,

(2)     Substitute wells pursuant to Article 13.1.2 *(Substitute Development Well)*; or,

(3)     The formation of an Integrated Project Team pursuant to Article 12.3 *(Proposal of Integrated Project Team)*; or,

(4)     A Fabrication AFE pursuant to Article 12.9 *(Fabrication AFE)*; or Article 12.16.2 *(Non-Consent Operations in Subsequent Development Phases)*; or,

(5)     Where a Non-Participating Party in a Fabrication AFE after a major modification to a Development Plan has been approved by the Participating Party(s) pursuant to Article 12.13 *(Major Modifications to the Development Plan);* or,

38

(6)     A supplemental AFE pursuant to a Article 12.14 *(Supplemental AFE for Cost Overruns on Fabrication AFE);* or,

(7)     A Fabrication AFE pursuant to Article 12.16.2 *(Non-Consent Operations in Subsequent Development Phases)*; or,

(8)     Withdrawal pursuant to Article 17.2 *(Response to Withdrawal)*; or

Each Party electing to participate where an AFE is required shall execute the AFE evidencing its Election to participate and its commitment to participate in the proposal. For Elections where an AFE is not required with the proposal, a Party shall evidence its Election to participate by placing its commitment to participate in writing. A Party failing to respond timely to an Election shall be deemed to have elected not to participate in the proposed action. The Parties may make an Election in person at meetings, by telephone (promptly confirmed in writing to Operator), or by U.S. mail, overnight express, courier, telecopier, or facsimile.

8.3.1   **Second Opportunity to Participate:**  Unless otherwise provided to the contrary in this Agreement, if all Parties do not elect to participate in the operation then, a Party who elected not to participate in the approved operation shall have the right to make a subsequent Election to participate in the operation within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays), of its receipt of the original Election results from the Operator. If a Party does not exercise its right to make a subsequent Election to participate, it shall become a Non-Participating Party in the operation.

**8.3.2** **Participation By Fewer Than All Parties:**  Upon conclusion of the period provided for in Article 8.3.1 (*Second Opportunity to Participate*) if there is at least one (1) Non-Participating Party in the operation, each Party who elected to participate pursuant to Article 8.3.1 (*Second Opportunity to Participate*) shall within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) of its receipt of the subsequent Election results,

(a)     limit its participation in the operation to its Working Interest share, or

(b)     agree to bear its Participating Interest share of the operation.

By written correspondence to the Operator.  Failure to submit written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or subsequent Election pursuant to Article 8.3.1 (*Second Opportunity to Participate*), submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or subsequent Election pursuant to Article 8.3.1 (*Second Opportunity to Participate*), to participate in the operation do not agree to bear all of the remaining Costs of the operation within two (2) days of the conclusion of the written correspondence period, the proposal and approval of the proposed operation shall be deemed withdrawn.  The Participating Parties in an operation shall bear all of the Costs and risk of the operation

**8.4**    **Response Time For General Matters and Elections:**  After receipt of notice pursuant to this Article 8.0 *(Voting, Elections and Notices)*, the Parties shall either: (i) submit their vote to the Operator in response to a General Matter proposal; or (ii) make an Election if the proposal does not require approval as a General Matter.  The Operator shall give prompt

40

notice of the results of such voting or Elections to each Party.  Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

**8.4.1**   **Well Operation Proposal:**  When any proposed well operation does not require construction of a Production System, each Party shall respond with their vote within thirty (30) days after receipt of the proposal.  When a drilling rig is on location a vote in response to the proposal or a counterproposal shall be made within forty-eight (48) hours after receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays); provided that the forty-eight (48) hour provision of this Article 8.4.1 shall not apply to a new well (other than a substitute well) proposed under Articles 10.2 *(Proposal of Exploratory Operations),* 11.1 *(Proposal of Appraisal Operations)*, or 13.1 *(Proposal of Development Operations).*

**8.4.2**   **Production System Construction:** An Election regarding the Fabrication AFE for the construction and installation of the Initial Production System shall require a response within sixty (60) days after receipt of the Fabrication AFE, and a Fabrication AFE involving the construction and installation of a Subsequent Production System shall require a response within sixty (60) days after receipt of the Fabrication AFE.

**8.4.3**   **Other AFE Related Operations:**  Except as otherwise provided for in this Article, the response time to a proposed operation will depend upon the AFE gross expenditure amount.  Response times will be as follows:

(a)      AFE's greater than $300,000 but less than $25,000,000, the response will be made within thirty (30) days after receipt of said proposal.

41

(b)     AFE's of $25,000,000 or more, the response will be made within sixty (60) days after receipt of said proposal.

**8.4.4   Other Proposals:**  For all other proposals requiring notice, each Party shall respond within thirty (30) days  after receipt of the proposal, except that each Party shall have ten (10) days to respond after receipt of a request for revisions to the initial Development Plan.

**8.4.5   Failure to Respond:**  Failure of any Party to respond to a proposal within the required period shall be deemed either a vote against the proposal, or an Election not to participate in the proposed operation.

**8.4.6   Suspensions of Production:**  Notwithstanding anything to the contrary provided herein, if the MMS grants a Suspension of Production (an "SOP") or a Suspension of Operations (an "SOO") for all or any part of the Contract Area, shorter time limits set forth as requirements of the SOP/SOO shall supersede the longer time periods for a Party's response as provided for under this Agreement.

**8.4.7   Standby Charges:**  The Participating Party(s) in an operation shall be responsible for standby charges accrued until all Parties having a right to do so, have made an Election to either participate or not participate in a proposed subsequent operation. All standby charges accruing after the final Election regarding the subsequent operation has been made, shall be the responsibility of the Participating Party(s) in the subsequent operation.

8.5 **Meetings of the Parties**:  Meetings of the Parties shall be called by the Operator upon its own motion or at the request of any Party.  Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than five (5) days (exclusive of Saturdays, Sundays and federal holidays) advance notice, and such notice shall include an agenda and location of the meeting.  The representative of the Operator shall be chairman of each meeting and shall take minutes of each meeting and furnish copies to all participants. Only matters set out in the agenda for the meeting shall be considered at the meeting unless unanimously agreed to by all the Parties to this Agreement.

8.6 **Designation of Representatives**:  The names and addresses of the representatives of the Parties or their alternates are set forth in Article IV of Exhibit "A" *(Description of Leases, Working Interest of the Parties, Operator and Representatives)* attached hereto. The designated representatives may be changed by written notice to the other Parties in accordance with Article 8.7 *(Giving and Responding to Notices)*.

8.7 **Giving and Responding to Notices**:  All notices and responses (including notices and proposals for General Matters and Elections) shall be made in writing and delivered to the designated representative of the other Party in person or by facsimile transmission (followed by a phone call confirming receipt), U.S. Mail, overnight express, or courier.  When a drilling rig is on location, all notices and responses shall be given by telephone and immediately confirmed in writing.  Any notices and responses shall be effective only when received by the designated representative of the Party to whom such notice, proposal, or response is directed unless receipt is presumed under one (1) of the following circumstances:

- Any notice or response transmitted by facsimile shall be deemed given and received only after the receiving Party has confirmed receipt of such facsimile by telephone.

- Any notice or response transmitted by overnight express or courier shall be deemed given and received twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after such notice or response is deposited or transmitted and the receiving Party has confirmed receipt by telephone.

- Any notice or response by U.S. Mail (other than overnight express) that is not sent "return receipt requested" shall be deemed given and received only after the receiving Party has confirmed receipt by telephone.

8.8    **Content of Notice:**  Any notice which requires a response within a time period shall indicate which of the response times specified in Article 8.4 *(Response Time For General Matters and Elections)* is required.  If a notice proposes a well operation, the notice shall include the following information:

(a)    The type of well operation being proposed (i.e., Exploratory, Appraisal, or Development Operation(s)); and,

(b)    An AFE showing the estimated Costs of the operation, including all necessary expenditures associated with the drilling, testing and completing or abandoning the well.

(c)    A Well Plan pursuant to Article 10.2.2  *(Well Plan's Minimum Specifics).*

(d)    If the notice proposes a Production System, Subsea Production System, Subsequent Production System or Facilities, the notice shall include the following information: 1) the type of system or Facility being proposed; and 2)  a description of same,

44

including location, estimated Costs of operation, including design, engineering, fabrication, transportation and installation.

## ARTICLE 9.0  GEOPHYSICAL OPERATIONS

9.1    **Geophysical Operations:**  In the event any Party desires to acquire, process, or reprocess a geophysical survey (other than shallow hazard survey's), velocity surveys or other well bore geophysical operations) to evaluate all or any portion(s) of the Contract Area, that Party shall notify the other Parties and provide the associated AFE.  Each Party shall respond to said notice by making an Election to participate or not participate in said operation pursuant to Article 8.0 *(Voting, Elections and Notices)*.  These geophysical surveys may consist of either conducting proprietary surveys, purchasing speculative surveys from vendors or participating in group shoot surveys. Geophysical Operations are independent operations and are not considered Exploratory, Appraisal or Development Operations, and may be conducted simultaneously with Exploratory, Appraisal or Development Operations.  The Participating Party(s) in any geophysical survey shall pay their Participating Interest share of the Costs of the survey.

9.1.1    **Conduct of Proprietary Geophysical Operations:**  The proposing Party shall be responsible for conducting all proprietary geophysical surveys (or data processing) on behalf of the Participating Party(s).   The proposing Party shall provide the Participating Party(s) with copies of all field data and support documentation as appropriate for any and all seismic data collected from the proprietary geophysical survey.   The proposing Party shall obtain all licenses and/or permits from all governmental agencies necessary to support the surveys.  The joint ownership of any proprietary geophysical data derived from a proprietary survey shall be limited to the field tapes; i.e., raw data and initial processing (not including re-processed or

45

interpreted data) and owned on the basis of the Parties' Participating Interests in the survey. If the geophysical data is acquired by a geophysical contractor instead of through the proposing Party, then wherever in this Article the term "proposing Party" appears, the word "Contractor" shall be substituted therefore. If a Party elects not to participate in a proprietary geophysical survey, then the Participating Party(s) shall assume their proportionate share of the Non-Participating Party's Interest on a Participating Interest basis. A Non-Participating Party shall not be entitled to any geophysical data obtained from the proprietary geophysical survey.

**9.1.2** **Group-Shoot And Speculative Seismic Surveys:** The Parties shall make a good faith effort to coordinate the acquisition of any new group-shoot or speculative seismic surveys to evaluate one (1) or more of the Lease(s) within the Contract Area. This shall enable all Parties who desire to acquire such data to take advantage of group or Partnership rates available from most seismic contractors and will allow each Party a license to use such data. For such joint seismic data purchases used to evaluate the Lease(s), each acquiring Party shall pay an equal share of the total licensing fee (rather than its Working Interest share).

**9.2** **Utilization of Data Outside the Contract Area:** In the event any data is acquired pursuant to this Article 9.0 *(Geophysical Operations)* which covers lands outside the Contract Area, a Participating Party in said data shall not be obligated to obtain permission from the other Participating Party(s) to disclose data covering lands outside the Contract Area to third parties.

## ARTICLE 10.0  EXPLORATORY OPERATIONS

**10.1**    **Application:**  Exploratory Operations shall mean all operations conducted in the Contract Area pursuant to this Article 10.0 *(Exploratory Operations)*.  The Costs, risks and obligations of Exploratory Operations conducted in accordance with this Agreement shall be borne by the Parties as provided in Article 10.2.5 *(Exploratory Operations Costs)* below.

**10.2**    **Proposal of Exploratory Operations:**  Any Party may propose to conduct an Exploratory Operation by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties.  The Exploratory Operation proposed shall require an Election by each party as to its participation in such operation.   Once all Elections have been received by the Operator, the Operator or substitute Operator shall commence the Exploratory Operation at the sole Cost and risk of the Participating Party(s).   A Non-Participating Party in any Exploratory Well other than the initial Exploratory Well shall be subject to Article 16.4 *(Non-Consent Operations to Maintain the Contract Area)* or Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations)*, whichever is applicable.

**10.2.1**   **Initial Exploratory Well**:  The Initial Exploratory Well is an obligatory well and will be drilled pursuant to the Participation Agreement.

**10.2.2**   **Well Plan's Minimum Specifics:**  The Well Plan for any Exploratory Well(s) and any proposed subsequent Exploratory Operation will include at least the following information:

(a)    the surface and target bottomhole locations;

47

(b)    the expected spud date and the anticipated time necessary to conclude drilling, preliminary evaluation, completion, and/or abandonment operations;

(c)    the true vertical depth to be drilled, along with the specified Objective Depth and formation (and other target zones to be penetrated);

(d)    the proposed drilling plan, including the casing program, and any anticipated Sidetracking operations;

(e)    details of any coring, logging or other evaluation operations to be conducted; and,

(f)    information concerning the drilling rig to be used, including day rates, water depth rating and other limitations relevant to the drilling operations to be conducted. If the drilling rig to be used in the proposed operation is currently under a long term contract, the proposing Party shall have no obligation to guarantee the availability of the rig past the completion of the proposed operation.

**10.2.3** **Revision of Well Plan:** The Well Plan for an Exploratory Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional Exploratory Operation approved by the Participating Party(s).

**10.2.4** **Timely Operation:** A proposed Exploratory Operation shall be commenced within one hundred twenty (120) days from the date upon which it is approved. Except as a result of Article 25.0 (*Force Majeure*), if operations have not commenced in a timely manner, the approved Exploratory Operation shall be deemed withdrawn, with the

48

effect as if the Exploratory Operation had never been approved. If an approved Exploratory Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred during said one hundred twenty (120) day period which are attributable to the proposed operation shall still be chargeable to the Participating Party(s). An Exploratory Operation for the drilling of an Exploratory Well shall be deemed to have commenced on the day charges commence under the drilling contract for the proposed operation which shall be when the rig has been made ready for tow and moved at least one hundred (100) yards from its current location towards the approved location or a shipyard for rig modifications.

10.2.5 **Exploratory Operations Costs:** The Costs, risks and obligations associated with drilling, testing, logging, evaluating and abandoning (whether permanent or temporary) of the Initial Exploratory Well shall be borne by the parties as set out in the Participation Agreement. In the event a subsequent Exploratory Operation is proposed (other than a proposal to plug and abandon or temporary abandonment), the costs subsequent to such proposal will be borne by the Participating Party(s) in proportion to their Participating Interest in such Exploratory Operation as shown on Exhibit "A".

10.2.6 **Substitute Exploratory Well:** Subject to the terms of the Participation Agreement, the Operator shall timely commence an Exploratory Operation and continue the operation with due diligence: (i) to the Objective Depth; (ii) a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*); or (iii) until the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable or the Operator deems the wellbore not to be in a safe

49

or satisfactory condition for it to perform further operations without risk to safety or the environment ("Gulf Coast Conditions"). If the Exploratory Well is abandoned due to the conditions described under 10.2.6 (iii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Exploratory Well and each Participating Party in the abandoned Exploratory Well shall make an Election whether to participate in the proposed substitute well. However, if the total costs theretofore incurred in the drilling of the Exploratory Well have not exceeded 110% of the amount of the Exploratory Well AFE, then the costs of drilling the Substitute Exploratory Well shall be borne in the same fashion as the costs to drill the Exploratory Well, until such time as a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*). Further, during said ninety (90) day period, no Party may propose any additional drilling. The Operator shall commence the substitute well at the sole Cost and risk of the Party or Parties making an Election to participate. A Non-Participating Party in a substitute well for: (i) the initial Exploratory Well shall be subject to Article 16.2 (*Non-Consent of Initial Exploratory Well*); and (ii) any other Exploratory Well shall be subject to the penalties set forth in Article 10.2 (*Proposal of Exploratory Operations*). Any well drilled as a substitute for the Initial Exploratory Well shall be drilled pursuant the Participation Agreement.

10.3 **Subsequent Exploratory Operations at Objective Depth:** After (i) the Exploratory Well (or its substitute) has been drilled to its Objective Depth, and (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon); and (iii) all logs and test results have been distributed to the Participating Party(s), the Operator, shall promptly notify the Participating Party(s) of any proposal to conduct the following operations:

(a)     conduct additional testing, coring or logging of the formations encountered prior to setting production casing;

(b)     sidetrack the wellbore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth ; (however, if a casing string is required to Deepen the well, then option (d) shall precede Deepening the well);

(d)     Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(e)     conduct production testing;

(f)     set production casing;

(g)     conduct other operations on the well not listed;

(h)     temporarily abandon the well; or,

(i)     permanently plug and abandon the well.

If the Exploratory Well is temporarily abandoned under (h), then such well shall be subject to and completed as a Development Operation under Article 13.2 (*Subsequent Development Operations at Objective Depth*).

**10.3.1** **Response to Operator's Proposals**:  Within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of a proposal to conduct subsequent Exploratory Operations, each Participating Party shall make and Election as to such proposal or make a counterproposal.  Failure of a Participating Party to respond to such proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered an Election not to approve such proposal and to become a Non-Participating Party in the proposal.

**10.3.2** **Counterproposal for Subsequent Exploratory Operations**:  If a Participating Party makes a counterproposal for subsequent Exploratory Operations, the other Participating Party(s) shall have an additional twenty-four (24) hours to respond thereto.  If conflicting proposals for subsequent Exploratory Operations are made, preference for conducting such proposal shall be given first to operation (a) above, next to operation (b) above, and so forth, in decreasing order of priority.  If different depths or locations are proposed for subsequent Exploratory Operations, preference shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order with the exception of operations (c) and (d) of Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*) which priority shall be the deepest depth proposed in ascending order. After all Elections have been received and the subsequent Exploratory Operation is commenced, the remaining proposals for other types of subsequent Exploratory Operations shall be deemed withdrawn.

**10.3.3** **Approval of Subsequent Exploratory Operations by All Parties**:  Once all Elections have been received for such Subsequent Exploratory Operation, the Operator shall commence the subsequent Exploratory Operation at the Costs and risk of the Participating Party(s).

**10.3.4** **Approval of Subsequent Exploratory Operations by Fewer Than All Parties:** If a proposal for subsequent Exploratory Operations (except a proposal to plug and abandon), is approved by fewer than all Parties, then the Operator shall conduct the operation at the sole Cost and risk of the Participating Party(s). Costs of subsequent Exploratory Operations (except a proposal to plug and abandon) will be recouped from the Non-Participating Party(s) in accordance with Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations).* A Non-Participating Party in a subsequent Exploratory Operation shall be relieved of the Costs, risks and obligations of the subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

**10.3.5** **Additional Subsequent Exploratory Operations:** At the completion of the subsequent Exploratory Operation, the Operator shall again submit proposal(s) for subsequent Exploratory Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is abandoned, whether permanent or temporary.

**10.4** **Election by Non-Participating Parties in Deepening or Sidetracking Operations:** If (i): an Exploratory Well other than the initial Exploratory Well is drilled to its initial Objective Depth; and (ii) if a proposal is made to either: (i) Deepen such Exploratory Well, or (ii) Sidetrack such Exploratory Well, as provided in Article 10.3(c) or (d), then the Operator shall notify each original Non-Participating Party of the proposed operation. Each original Non-Participating Party may respond with an Election regarding such operation to Deepen or

Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice. Any original Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Exploratory Well shall:  (i) be deemed to be under-invested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs);* and (ii) remain a Non-Participating Party in the Exploratory Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations)* less the recoupment under Article 16.6 (*Under-investment of Costs*) has been recovered by the original Participating Party(s). The Participating Parties in the Sidetrack or Deepening are over-invested Parties.

10.5   **Plugging and Abandoning Costs:**  If the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6, which make further drilling impracticable, then the Operator may propose to plug and abandon the well.  Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well.  The Participating Party(s) in the original operation shall pay all Costs of plugging and abandoning the Exploratory Well (except any increased plugging and abandoning Costs associated solely with a subsequent Exploratory Operation conducted as a Non-Consent Operation).  The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

10.6   **Conclusion of Exploratory Operations:**  Exploratory Operations shall cease after the abandonment of the first Producible Well, whether permanent or temporary, and the release of the rig from the first Producible Well (including any substitute well and any subsequent

Exploratory Operations conducted pursuant to Article 10.3) or the well is completed for production.

## ARTICLE 11.0  APPRAISAL OPERATIONS

11.1 **Proposal of Appraisal Operations:** After completion of Exploratory Operations any Party may propose to conduct an Appraisal Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties. The Appraisal Operation proposed shall require an Election by each party as to its participation in such operation.  Once all Elections have been received by the Operator, the Operator shall commence the Appraisal Operation at the sole Cost and risk of the Parties who exercised their right to participate.  Costs of a Non-Consent Appraisal Operation will be recouped in accordance with Article 16.5.2 *(Non-Consent Appraisal Operations)*.

11.1.1 **Revision of Well Plan:** The Well Plan for an Appraisal Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional evaluation operation approved by the Participating Party(s).  An Appraisal Well shall include all necessary Appraisal Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Appraisal Well.

11.1.2 **Timely Operation:** An approved Appraisal Operation shall be commenced within one hundred twenty (120) days from the date upon which all Elections have been received unless provided under Article 25.0 *(Force Majeure)*.  If operations have not commenced within one hundred twenty (120) days, the Appraisal Operation shall be

55

deemed withdrawn. If an approved Appraisal Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred in the preparation for or in furtherance of the operation shall still be chargeable to the Participating Party(s). An Appraisal Operation for the drilling of an Appraisal Well shall be deemed to have commenced on the day charges commence under the drilling contract for the proposed operation which shall be when the rig has been made ready for tow and moved at least one hundred (100) yards from its current location towards the approved location or a shipyard for rig modifications.

**11.1.3** **Substitute Appraisal Well:** The Operator shall timely commence an Appraisal Operation and continue the operation with due diligence to the Objective Depth or until: (i) a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*); or (ii) until the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6. If the Appraisal Well is abandoned due to the conditions described in (ii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Appraisal Well and each Participating Party in the abandoned Appraisal Well shall make an Election whether to participate in the proposed substitute well. Further, during said ninety (90) day period, no Party may propose any additional drilling. The Well Plan for said substitute well shall be substantially similar to the previously approved Well Plan, taking into account those conditions which rendered further drilling impractical. The Operator shall commence the substitute well at the sole Cost and risk of the Party or Parties making an Election to participate. Costs of Non-Consent Operations for a substitute Appraisal Well will be recouped in accordance with Article 16.5.2 (*Non-Consent Appraisal Operations*).

56

**11.2** **Subsequent Appraisal Operations at Objective Depth:** After (i) the Appraisal Operation has been drilled to its Objective Depth;  (ii) all operations in the controlling AFE and Well Plan have been completed; and, (iii) all logs and test results have been distributed to the Parties, the Operator, shall promptly notify the Participating Party(s) of any proposal to conduct the following operations:

(a)      conduct additional testing, coring, or logging of the formations encountered prior to setting production casing;

(b)      sidetrack the wellbore to core the formations encountered;

(c)      Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)      Deepen the well to a new objective depth;

(e)      conducting production testing;

(f)      setting casing to below the objective zone or formation for the purpose of acquiring cased-hole wire line formation test samples;

(g)      setting production casing to below the objective zone or formation;

(h)      plugging back and setting production casing to below a shallower zone or formation;

(i)      conducting other operations on the well not listed;

(j)      temporarily abandoning the well; or

57

(k)     permanently plug and abandon the well.

**11.2.1** **Response to Operator's Proposals:**  Within forty-eight (48) hours (inclusive of Saturdays, Sundays or federal holidays) after receipt of the proposal to conduct subsequent Appraisal Operations, the Participating Party(s) shall make their Election as to such proposal, or make a counterproposal.  Failure of a Participating Party to respond to the proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered an Election to become a Non-Participating Party in the proposal.

**11.2.2** **Counterproposal:**  If one or more counterproposals for subsequent Appraisal Operations are made, preference shall be given first to a proposal for operation (a) above, next to operation (b) above, and so forth in decreasing order of priority.  If different depths or locations are proposed for subsequent Appraisal Operations, preference shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order, with the exception of operations (b) and (c) of Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) which priority shall be given to the deepest depth proposed in ascending order. After all Elections have been received and the subsequent Appraisal Operation is commenced, the remaining proposals for other types of subsequent Appraisal Operations shall be deemed withdrawn.

**11.2.3** **Approval of Subsequent Appraisal Operations by All Parties:** Once all Elections have been received for such Subsequent Appraisal Operation, the Operator shall commence the subsequent Appraisal Operation at the Costs and risk of the Participating Party(s).

58

**11.2.4** <u>**Approval of Subsequent Appraisal Operations by Fewer than All Parties**</u>: If a proposal for subsequent Appraisal Operations (except a proposal to plug and abandon), is approved by fewer than all Parties, then the Operator shall conduct the operation at the sole Cost and risk of the Participating Party(s).  Costs of subsequent Appraisal Operations (except a proposal to plug and abandon) will be recouped from the Non-Participating Party(s) in accordance with Article 16.5.2 *(Non-Consent Subsequent Appraisal Operations)*.  A Non-Participating Party in a subsequent Appraisal Operation shall be relieved of the Costs, risks and obligations of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

**11.2.5** <u>**Additional Subsequent Appraisal Operations**</u>:    At the completion of the subsequent Appraisal Operation, the Operator will again submit proposal(s) for subsequent Appraisal Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is temporarily abandoned or plugged and abandoned.

**11.3** <u>**Election by Non-Participating Parties in Deepening or Sidetracking Appraisal Operations**</u>:  Upon an Appraisal Well being drilled to its initial Objective Depth, and if the Participating Party(s) propose to either: (i) Deepen said Appraisal Well; or, (ii) Sidetrack said Appraisal Well, then the Operator shall notify each original Non-Participating Party of the approved operation.  Each original Non-Participating Party may respond with an Election regarding an approved proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.  Any original Non-Participating Party making an

59

Election to participate in the Deepening or Sidetracking of an Appraisal Well shall: (i) be deemed to be under-invested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs),* and, (ii) remain a Non-Participating Party in the Appraisal Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.2 *(Non-Consent Appraisal Operations),* less the recoupment under Article 16.6 *(Under-investment of Costs)* has been recovered by the original Participating Party(s).  The Participating Parties in the Sidetrack or Deepening are overinvested Parties.

11.4    **Deeper Drilling:**   A proposal to drill an Appraisal Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well or a proposal to re-enter and Deepen an existing Appraisal Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well shall be subject to the following provisions.

11.4.1  **Limited Participation in Deeper Drilling:**   If a proposal is approved pursuant to Article 11.4 *(Deeper Drilling)* above, any Party may either:

- make an Election to participate in the proposed Deeper Drilling operation; or

- make an Election to not participate in the proposed Deeper Drilling operation; or,

- make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

60

A Party making an Election in limiting its participation in a Deeper Drilling operation shall bear its Participating Interest share of the Cost and risk of drilling (including completion or abandonment) to the base of the deepest Producible Reservoir and shall be a Non-Participating Party subject to Article 16.5.2 (*Non-Consent Appraisal Operations)* as to those operations in such well below the base of the deepest Producible Reservoir.  If a Party exercises its right not to participate in the Deeper Drilling operation, the operation shall be conducted pursuant to Article 16.5.2 (*Non-Consent Appraisal Operations)*.

11.5   **Completion of an Appraisal Well**:   In the event an Appraisal Well has not been permanently plugged and abandoned, such well shall be completed as a Development Operation pursuant to an approved Development Plan, or proposed as a Development Operation if not included in an approved Development Plan.

11.6   **Plugging and Abandoning Costs**: If the Operator encounters mechanical difficulties or impenetrable conditions, which makes further drilling impractical, then the Operator may propose to plug and abandon the well.  Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well.  The Participating Party(s) in the original operations shall pay all Costs of plugging and abandoning the Appraisal Well (except any increased plugging and abandoning Costs associated solely with a subsequent Appraisal Operation conducted as a Non-Consent Operation).  The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

11.7   **Conclusion of Appraisal Operations**: Appraisal Operations shall conclude upon the earlier of:

61

(a)      unanimous approval of the conclusion of Appraisal Operations; or

(b)      approval of the initial Development Plan; or

(c)      that point in time when no Appraisal Operation has been conducted for a period of one hundred eighty (180) days from the rig release (or cessation of operations) of the previous Appraisal Operation; or

(d)      after the abandonment of the second Appraisal Well, whether permanent or temporary, and the release of the rig from such second Appraisal Well (including any substitute well), unless otherwise mutually agreed.

However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations shall conclude when such Appraisal Well is either temporarily or permanently abandoned.

## ARTICLE 12.0
## FEASIBILITY STUDY, INTEGRATED PROJECT TEAM AND DEVELOPMENT PLAN

12.1   **Proposal for Feasibility Study:**  Prior to the formation of an Integrated Project Team, any Party may propose a "Feasibility Study", defined below for the resolution of any issues affecting operations on the Contract Area.  A Feasibility Study shall not require the formation of an Integrated Project Team.   The proposal for a Feasibility Study shall include the following:

(a)      the purpose of the Feasibility Study;

62

(b)     the anticipated scope of the work of the Feasibility Study including a schedule of the work activities;

(c)     an estimate of the type and number of staff required to complete the Feasibility Study; and,

(d)     an estimate of third party costs and activities to complete the Feasibility Study (i.e. Feasibility Study AFE), if any.

12.1.1  **Meeting With Parties on Proposed Feasibility Study:**  If requested by any Party, the Operator will call a meeting of the Parties within ten (10) days after the Feasibility Study proposal has been furnished to the Parties.  At such meeting, the Parties shall discuss and resolve: (a) the positions of all Parties on the proposed Feasibility Study; (b) the necessity of the study; (c) composition and organization of any proposed Feasibility Study; and (d) any other related matter.  The proposing Party may at its discretion modify any proposed Feasibility Study as a result of such meeting and shall within ten (10) days after such meeting submit to the other Parties such modified Feasibility Study proposal.

12.1.2  **Election on Proposed Feasibility Study:**  After receipt of a proposal for a Feasibility Study, all Parties shall notify the Operator of their Election to participate in the Feasibility Study in accordance with Section 8.3 *(Elections)*.  The Operator, or the proposing Party if the Operator is a Non-Participating Party, shall commence the Feasibility Study on behalf of all Participating Party(s).  Each Participating Party shall be responsible for designating its representative(s) for the Feasibility Study.  A Party's representatives for the Feasibility Study may be changed at any time.  The salaries, burdens, benefits, other compensation and expenses of a Party's employees,

63

including internal engineering support staff, assigned to the Feasibility Study shall be the responsibility of the Party employing such representative. In the event the Feasibility Study requires third party services, a Feasibility Study AFE shall be furnished to all Parties as provided in Article 12.1 *(Proposal for Feasibility Study)*. Costs and expenses attributable to an approved AFE shall be handled in accordance with Exhibit "C" (Accounting Procedure). Overhead shall be charged pursuant to pursuant to Article III 3. A. or B., as applicable, of Exhibit "C" (Accounting Procedure). The Participating Party(s) shall bear the costs associated with the Feasibility Study AFE proportionately on a Participating Interest basis.

(a)     If a Party does not participate in a proposed Feasibility Study that does not include a Feasibility Study AFE, then such Non-Participating Party shall not have access to the data or studies.

(b)     If a Party does not participate in a proposed Feasibility Study that includes a Feasibility Study AFE, then such Non-Participating Party shall not have access to the data or studies until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.

**12.1.3** **Election on Feasibility Study AFE's after the Formation of the Feasibility Study:** In the event it is determined by the Participating Party(s) to a Feasibility Study that a Feasibility Study AFE or additional Feasibility Study AFE's are necessary to continue the study as approved, the Participating Party(s) shall make an Election as to their continued participation in the Feasibility Study by approval of the Feasibility Study AFE. Upon such Election, the Participating Party(s) shall bear the costs associated with the Feasibility Study AFE proportionately on a Participating

64

Interest basis. In the event an original Participating Party does not continue participation in the Feasibility Study, such Non-Participating Party shall not have access to data or studies as provided in Article 12.1.2(b).

12.2 **Phased Development Operations:** The results of Exploratory and/or Appraisal Operations may justify the development of one (1) or more Producible Reservoirs within the Contract Area. The Operator shall prepare for the approval of the Parties a Development Plan in order to pursue such development of the Contract Area. In view of the Costs and scope of Development Operations for the Contract Area, the Parties may agree to divide Development Operations into an initial Development Phase and one or more subsequent Development Phases. Each Development Phase shall be centered upon the installation of a new Production System for the Contract Area. A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be developed, approved and implemented pursuant to this Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

12.3 **Proposal of Integrated Project Team:** In order to provide for the orderly preparation of the Development Plan, the Operator shall propose the formation of an Integrated Project Team whose duties are more specifically set forth in Exhibit "H " *(Integrated Project Team and Technology Sharing)*. The Operator shall have an exclusive period of ninety (90) days following rig release from the first Producible Well to submit a proposal for the formation of the Integrated Project Team. However, if an Appraisal Operation is approved by the Parties prior to the proposal for the formation of the Integrated Project Team, the Operator's exclusive proposal period shall be extended until ninety (90) days after rig release of the last approved Appraisal Operation. If the Operator does not submit an Integrated Project Team AFE during its exclusive period, then any Party may submit an Integrated Project Team proposal.

65

A proposal for an Integrated Project Team shall include at least the following information:

(a)     anticipated scope of the work of the Integrated Project Team including a schedule of the work activities;

(b)     an estimate of the type and number of staff required to complete the assignment; and,

(c)     an Integrated Project Team AFE which shall include the estimated Costs of the Integrated Project Team and third party Costs and activities to complete the assignment of the Integrated Project Team.

**12.4** **Integrated Project Team Election:**  A proposal for the formation of the Integrated Project Team shall not require the approval of the Parties as a General Matter. Each Party shall have an Election as to its participation in the AFE for the Integrated Project Team, pursuant to Article 8.4.3 *(Other AFE Related Operations)*.  The formation and administration of the Integrated Project Team shall be handled in accordance with Exhibit "H " *(Integrated Project Team and Technology Sharing)* with the Costs of the Integrated Project Team being charged in accordance with Exhibit "C" *(Accounting Procedure)*.  A Party which makes an Election not to participate in the Integrated Project Team shall become a Non-Participating Party as to the Costs of the Integrated Project Team and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.  A Non-Participating Party shall not have access to the data or studies prepared by the Integrated Project Team until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.

66

**12.4.1  Pre-Development AFE's:**  In order to facilitate the early and orderly commencement of Development Operations under this Agreement, the Operator shall have the right to submit Pre-Development AFE's prior to the approval of a Development Plan. These Pre-Development AFE's will be used to approve the costs of engineering design studies, long lead time items or any other operation necessary to assist the Operator in the preparation and completion of the Development Plan.   Pre-Development AFE's shall require approval as a General Matter by the Participating Party(s) in the Integrated Project Team.  Costs and expenses attributable to an approved AFE shall be handled in accordance with Exhibit "C" (Accounting Procedure).  Overhead on the Costs of engineering or design studies shall be charged pursuant to pursuant to Article III 3. A. or B., as applicable, of Exhibit "C" (Accounting Procedure).  A Party which does not participate in a Pre-Development AFE shall become a Non-Participating Party and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE).*

**12.5   Submission of a Development Plan:**  The Operator shall have the exclusive right for a period of ninety (90) days from the formation of an Integrated Project Team to submit a Development Plan for the review and approval of the Parties. The Operators proposed Development Plan shall be based upon the work and recommendations of the Integrated Project Team.  If the Operator has begun preparation of a Development Plan, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, the Operator may request an extension of the exclusive period to allow completion of the work in progress.  Any request for an extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than ninety (90) days from the expiration of the exclusive submission period.  The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's submission

67

period. If no Parties elect to participate in an Integrated Project Team and an Integrated Project Team is not formed, then the Operator shall have the exclusive right to propose a Development Plan for a period of ninety (90) days following conclusion of the Exploratory Operations or Appraisal Operations, whichever is later.

12.6    **Content of the Development Plan:** Any Development Plan proposed under this Agreement shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development Plan and Production System.  All Development Plans submitted shall include at least the following information:

(a)    **Production System:** Description of the Production System including:

   (i)    the type of Production System proposed (i.e., tension leg well jacket, floating production system, etc.), including the Production System's location, configuration (i.e., number of well slots or subsea tiebacks) and production capacity;

   (ii)    a description of the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline(s) servicing the Contract Area;

   (iii)    a projected time schedule for designing, contracting, fabricating, constructing, transporting and installing the Production System;

   (iv)    the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter; and,

(v)     the estimated Costs of the Production System not in the form of an AFE, including the contract strategy anticipated for construction and installation.

(vi)    A description of the proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)   A description of the proposed well completion techniques (i.e. dual vs. single);

(b)     **Producible Reservoirs:**  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c)     **Recoverable Reserves and Production Profile:**  An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter,

(d)     **Pre-drilling Operations:**  A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e)     **Development Wells:**  A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and location of each well;

69

(v)     the estimated Costs of the Production System not in the form of an AFE, including the contract strategy anticipated for construction and installation.

(vi)    A description of the proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)   A description of the proposed well completion techniques (i.e. dual vs. single);

(b)   **Producible Reservoirs:**  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c)   **Recoverable Reserves and Production Profile:**  An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter,

(d)   **Pre-drilling Operations:**  A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e)   **Development Wells:**  A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and location of each well;

69

(f)     **Tieback Operations:** If the Development Plan requires the tieback or use of Facilities located outside the Contract Area, a written commitment from the owner of such offsite Facilities to handle or process Hydrocarbons, the amount of any tariffs, processing or other fees the owner of such offsite Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the offsite Facilities for the Hydrocarbons;

(g)     **Final Design AFE:** An AFE for the completion of the detailed design of the Production System, including final specifications, blueprints and models with which contractors will be able to formulate their bids on the components of the Production System;

(h)     **Field Operating Scheme:** a description of the field operating scheme, its method, requirements, expected frequencies of intervention and Costs;

(i)     **Field Abandonment:** a description of field abandonment plan (if applicable);

(j)     **Reservoir Plan:** A reservoir plan which shall provide strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and shall include, but not be limited to:

     (i)     An estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

     (ii)     The planned drilling locations and timing of each anticipated well for each Producible Reservoir;

70

(iii)   A reservoir management and depletion strategy for each Producible Reservoir addressing issues which shall include, but not be limited to:

(A)   estimates of oil and gas in place;

(B)   reservoir rock and fluid characteristics;

(C)   depletion mechanism;

(D)   water and gas injection plans and objectives;

(E)   reservoir surveillance programs (e.g., cased-hole logging, static pressures, etc.) and their objectives;

(F)   well performance goals (e.g., target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets, etc.);

(G)   reservoir performance goals (e.g., target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals, etc.); and

(H)   other relevant information;

(k)   the estimated Cost of disposal wells, if applicable;

71

(1)     the type of Hydrocarbon transmission system to be made available to the Participating Parties (e.g., pipeline vs. barge, etc.); and

(m)     Other Data:   Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Production System provided for in the Development Plan.

12.7    **Approval of a Development Plan:**  Upon the submission of a proposed Development Plan, the Operator shall have sixty (60) days to obtain the unanimous approval of the Party(s) of any Development Plan submitted by the Operator during its exclusive period.  Approval of a Development Plan includes the approval of the Final Design AFE submitted as a part of the Development Plan.  Any Party may submit a written request for material conceptual revisions to an approved Development Plan.  Each Party shall have thirty (30) days to review and suggest modifications to the submitted revisions.  Upon the approval of the revisions pursuant to Article 12.12 (*Minor Modifications to Development Plans*) or Article 12.13 (*Major Modifications to Development Plans*), as applicable, the Development Plan shall be considered amended to the extent approved by the Parties.

12.7.1  **Alternative Development Plans:**  If a Development Plan is not timely submitted by the Operator during its exclusive period or the Development Plan is not unanimously approved during the sixty (60) day period provided in Article 12.7 *(Approval of a Development Plan)* above, then any Party shall have a period of sixty (60) days, commencing with either the expiration of the Operator's exclusive period or its failure to obtain unanimous approval of the Development Plan it submitted during its exclusive period, to submit an alternative Development Plan.  If, at the conclusion of the sixty (60) day period, no alternative Development Plan has been proposed, then the Operator's Development Plan, if any, proposed during the Operator's exclusive

72

period shall be deemed approved.  Alternative Development Plans proposed after the expiration of the Operator's exclusive submission period shall be considered for unanimous approval by the Parties in the order in which the Development Plans are submitted. All Parties shall respond to any proposal for an alternative Development Plan within sixty (60) days from receipt of an alternative Development Plan.  If the sixty (60) day period terminates and the Parties still have not unanimously approved a Development Plan, then the Parties shall have sixty (60) days in which to approve any Development Plan submitted as a General Matter.  No new Development Plans shall be submitted during this time period.  In the event of a tie vote, the first Development Plan submitted shall be deemed approved.  All Parties shall respond to any proposal for an alternative Development Plan within the time period provided in Article 12.7  *(Approval of a Development Plan)*.

**12.7.2**  **Approval of a Development Plan by Three or more Parties if One is not Approved as a General Matter:**  If there are three (3) or more Parties subject to this Agreement and a Development Plan is not approved in the time period set forth in Article 12.7.1 (*Alternative Development Plans*), and if there is only one Development Plan submitted and such Development Plan receives an affirmative Election of at least thirty-three percent (33%) of the voting interest, such Development Plan shall be deemed approved by the Parties.  If there are two (2) or more Development Plans submitted and one Development Plan receives an affirmative Election of at least thirty-three percent (33%) of the voting interest and the other Development Plan receives an affirmative Election of less than thirty-three percent (33%) of the voting interest, then the Development Plan receiving the affirmative Election of at least thirty-three percent (33%) of the voting interest shall be deemed approved by the Parties.  If two competing Development Plans each receive an affirmative Election of

73

thirty-three percent (33%) voting interest, the first Development Plan submitted shall be deemed approved by the Parties.

**12.7.3** **Failure to Approve Development Plan:** If a Development Plan is approved, any Party who does not approve such Development Plan shall become a Non-Participating Party in the Final Design AFE and Development Plan and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*. The Participating Party(s) shall proceed with the Final Design AFE with the interest of the Non-Participating Party shared by the Participating Party(s) on the basis of their respective Participating Interests, unless otherwise mutually agreed.

**12.8** **Development Well Proposals:** The approval of the Development Plan shall not eliminate the requirement that Development Wells must be separately proposed and approved as a General Matter.

**12.9** **Fabrication AFE:** Within sixty (60) days from the date of approval of the Development Plan, unless such additional time is necessary due to Article 25.0 (*Force Majeure*), Operator shall submit a Fabrication AFE to all Parties. If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the approved Development Plan. The Fabrication AFE shall consist of separate AFE's, if appropriate, for: (i) the structural components of the Production System; (ii) the equipment and Facilities to be located on the Contract Area (or located off the Contract Area but serving the Contract Area), including any Subsea Production System; (iii) any flowlines, gathering lines, risers or other Facilities for handling Hydrocarbon production; (iv) any other components of the Production System; and (v) installation. The Parties shall respond to the Fabrication AFE with their Election in accordance with the response time provided in Article 8.4.2 *( Production System*

74

*Construction)*. The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFE's comprising the Fabrication AFE. Development Wells shall be subject to separate AFE's and shall not be included within the Fabrication AFE. If all Parties make an Election to participate in the Fabrication AFE, then the Operator shall proceed to design, fabricate, construct, transport and install the Production System for the joint account of the Parties. By making an Election to participate in the Fabrication AFE, each Participating Party commits to pay its Participating Interest share of the Costs, risks and liabilities of the Initial Production System as set out in the Fabrication AFE.

12.9.1 **Failure to Approve:** If fewer than all the Parties make an Election to participate in the Fabrication AFE, then the Party making an Election not to participate in the Fabrication AFE may submit with its Election any objections to the Fabrication AFE and its associated materials. The Operator shall attempt to resolve these objections and, if necessary, modify the Fabrication AFE to address these objections. The Operator may, at its discretion, submit to the Parties either the original Fabrication AFE or revise and resubmit an amended Fabrication AFE within thirty (30) days of Operator's receipt of said objections. In the event the Operator does not resubmit an amended Fabrication AFE, the Operator shall notify each disapproving Party. Any disapproving Party shall then have ten (10) days after receipt of such notice in which to reconsider its Election.

12.9.2 **Resubmittal of the Fabrication AFE:** In the event the amount of the resubmitted Fabrication AFE is equal to or less than the previously submitted Fabrication AFE, all Parties shall respond with their Election within thirty (30) days of the receipt of the resubmitted Fabrication AFE. In the event the amount of the resubmitted Fabrication AFE is greater than the previously submitted Fabrication AFE, all Parties

shall respond with their Election within thirty (30) days of receipt of the resubmitted Fabrication AFE.

12.10 **Assignment of Interest:**  If any Party makes an Election not to participate in the Fabrication AFE under an approved Development Plan, then the Non-Participating Party shall be deemed a Withdrawing Party subject to Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)* and Article 17.0 *(Withdrawal from Agreement)*.  The Participating Party(s) shall have ninety (90) days in which to either:

(i) proceed with the Fabrication AFE with the interest of the Non-Participating Party shared by the Participating Party(s) in accordance with Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)*, unless otherwise mutually agreed, or

(ii) change its Election to become a Non-Participating Party and become a Withdrawing Party in accordance with this Article 12.10 *(Assignment of Interest)*.

If the Operator makes an Election not to participate in the Fabrication AFE, then the Participating Party(s) shall select a successor Operator pursuant to Article 4.3.4 *(Selection of Successor Operator)*.

12.11 **Timely Operations for Production Systems:**  Development Operations requiring the construction of a Production System shall be commenced within one hundred eighty (180) days from the last Party's Election for the Fabrication AFE. Construction shall be deemed timely commenced on the date the major fabrication contract for the Production System is awarded.  In the event the Operator fails to timely commence the construction (contract award), then all the Non-Operating Party(s) may either select a substitute Operator to implement the Development Plan or rescind their previous approval of the Development Plan

76

with the effect as if the Development Plan and the associated Fabrication AFE had not been submitted  The above notwithstanding, if the MMS grants a SOP/SOO  for the Contract Area, any shorter time limits set forth as requirements of the SOP/SOO shall supersede the corresponding longer time limit set forth in this Agreement or the Development Plan.

12.12   **Minor Modifications to Development Plans**:  In implementing the Development Plan, the Operator shall advise the Participating Party(s) of progress.  As additional information becomes available, the Operator may, without the approval of the Participating Party(s), make minor modifications to a Development Plan if such minor modifications are both necessary and reasonable to accomplish the Development Plan.  For purposes of this paragraph, a minor modification shall mean a modification which does not cause the cumulative estimated Cost of the Fabrication AFE or the Final Design AFE with its supplements to increase by more than twenty-five percent (25%) or ten million dollars ($10,000,000), whichever is less, and is not a major modification as defined in Article 12.13 (*Major Modification to Development Plan*).  Such minor modifications also shall not materially change the risk or timing of the Development Plan. Minor modification shall also include changes for reasons of safety or regulatory requirements.

12.13   **Major Modifications to Development Plans**:   For purposes of this paragraph, a "Major Modification" shall mean: (i) a modification which  cause the cumulative estimated Cost of the Fabrication AFE or the Final Design AFE with its supplements to increase by more than twenty-five percent (25%) or ten million dollars ($10,000,000), whichever is less; or (ii) a modification to the Development Plan prior to the installation of the Production System which changes:

(i)      the type of Production System (i.e. tension leg well jacket, floating production system, etc.), is to be changed; or,

77

(ii)     the number of well slots of the Production System is to be increased by at least fifty percent (50%) or decreased by twenty percent (20%) or,

(iii)    the initial selection of the location of the Production System is to be changed by more than 2,500 feet in any direction; or,

(iv)    the initial daily production processing capacity of any Facilities is to be changed by at least fifty percent (50%); or,

(v)     the number of Development Wells is to be increased or decreased by at least fifty percent (50%); or,

(vi)    the proposed hydrate or paraffin control system or technique; or

(vii)   the proposed well completion techniques (i.e. dual vs. single) is to be changed; or

(viii)  the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than two hundred (200) days; or

(ix)    the type of gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to the interconnect with the export pipelines servicing the Contract Area as provided in the Development Plan in the case of a tieback is to be changed.

Major Modifications to the Development Plan shall require the unanimous consent of the Participating Party(s).  Any Participating Party may propose such Major Modification by notifying the Operator.  The Operator shall submit said modification for the consideration of the Participating Party(s).  If a Major Modification proposed pursuant to this Article 12.13 is unanimously approved by the Participating Party(s), then the Operator shall immediately advise any Party who made an Election not to participate in the Fabrication AFE for the original approved Development Plan and provide the modified Fabrication AFE.  Any Non-Participating Party shall have the right for a period of thirty (30) days, after receipt of the revised Fabrication AFE from the Operator, in which to make an Election to participate in the modified Fabrication AFE.  Any Non-Participating Party making an Election to participate in the modified Fabrication AFE shall be under-invested in an amount equal to one hundred percent (100%) of such Non-Participating Party's share of the actual Costs incurred for the Fabrication AFE.  The Non-Participating Party who makes an Election to participate in the modified Development Plan shall eliminate the under-investment through a settlement of Costs pursuant to Article 16.6.1 *(Settlement of Under-investments)*.  The Participating Party(s) shall deliver to the Non-Participating Party who makes an Election to participate in the modified Fabrication AFE an assignment of one hundred percent (100%) of such Non-Participating Party's former Working Interest in the Contract Area, the wells therein and production therefrom within thirty (30) days after elimination of the under-investment.

12.14  **Supplemental AFE for Cost Overruns on Fabrication AFE:**  A supplemental AFE for cost overruns for the Fabrication AFE shall be provided as set forth in Article 6.2.4 (Supplemental AFE for Cost Overruns on Fabrication AFE).

12.15  **Termination of a Development Plan:**  The termination of an approved Development Plan shall require the unanimous consent of the Participating Party(s).

79

**12.16**    **Subsequent Development Phases:**    At any time after the last Party's Election under the Fabrication AFE for the Initial Development System, any Participating Party may propose an additional Development Phase(s) and the installation of a subsequent Production System(s). Upon proposal of a subsequent Development Phase, the Operator shall propose the formation of an Integrated Project Team to prepare a Development Plan for the subsequent Development Phase.   The preparation, approval and implementation of the Development Plan for a subsequent Development Phase shall follow the same procedures specified in this Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)* for the preparation, approval and implementation of the initial Development Plan.

**12.16.1**        **Access to Existing Facilities:**    Development Operations in subsequent Development Phases shall have reasonable access (on a space available basis) to gathering, processing and transportation Facilities installed for previous Development Phases.

**12.16.2**        **Non-Consent Operations in Subsequent Development Phases:**    If fewer than all Parties make an Election to participate in a Fabrication AFE for a subsequent Development Phase, the Operator shall implement the Fabrication AFE in the subsequent Development Phase for the account of the Participating Party(s) and at their sole Cost and risk.   The Participating Party(s) shall conduct the subsequent Development Operations with the benefit of the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.   A Non-Participating Party in a subsequent Development Phase shall not be entitled to any information or data from any subsequent Development Operation associated with such Development Phase, unless the Non-Participating Party participates

80

in such subsequent Development Operations pursuant to Article 16.8 *(Operations From a Subsequent Non-Consent Production System)*. Any Non-Participating Party in a subsequent Development Phase will remain a Participating Party in any Development Plan in which it participated. However, such Non-Participating Party shall not unreasonably interfere with Development Operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Party(s) in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices). In all events, the sequence and conduct of Development Operations in a subsequent Development Phase shall be controlled by the Participating Party(s) in the subsequent Development Operation.

## ARTICLE 13.0  DEVELOPMENT OPERATIONS

13.1    **Proposal of Development Operations:** It is the intent of the Parties to proceed with development of the Contract Area in accordance with the approved Development Plan; however, subsequent to the conclusion of Appraisal Operations and prior to the approval of a Development Plan any Party may propose to conduct Development Operations, which shall require General Matter approval. Any Participating Party in the approved Development Plan may propose to conduct specific Development Operations which were included in the Development Plan by giving notice of the proposal, along with the associated AFE and if applicable, the associated Well Plan to the other Participating Party(s). In the event of a conflict between a Development Well AFE and the Development Plan, the Development Well AFE shall prevail. A Development Well proposal shall include all necessary Development Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting and

81

shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of the Development Well. Each Development Operation except a substitute Development Well proposal shall require approval as a General Matter. Once a Development Operation is approved as a General Matter, the Operator shall commence the Development Operation at the sole Cost and risk of the Participating Party(s). Costs of a Non-Consent Development Operation will be recouped in accordance with Article 16.5.4 *(Non-Consent Development Operations)*. Any Participating Party in the approved Development Plan may propose to conduct specific Development Operations which were not included in the Development Plan. Such a proposal shall specify that it is not for an operation included in the Development Plan and such proposal shall require approval as a General Matter. A proposal for a Development Operation not included in the Development Plan which is approved as a General Matter shall automatically revise the Development Plan. However, the provisions of this Article 13.0 *(Development Operations)* shall not apply to the proposal for the Initial Production System or any Subsequent Production System in the Contract Area. The Initial Production System or any Subsequent Production System shall be proposed as a part of a Development Plan in accordance with Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)* of this Agreement.

**13.1.1** **Operator's Counterproposal:** If a Non-Operating Party makes a proposal that was not included in the approved Development Plan and such proposal is approved as a General Matter with the Operator being a non-approving Party, the Operator shall have the option to:

a)   participate in the operation proposed by the Non-Operating Party; or,

b)   become a Non-Participating Party pursuant to the provisions of Article 16.5.4 *(Non-Consent Development Operations)*; or,

82

c) make a counterproposal within the applicable response time that attempts to satisfy the same or similar objectives (in terms of timing and development of the Contract Area) as would the Non-Operating Party's proposal.

The Operator's counterproposal, if approved as a General Matter, shall have the effect of voiding the Non-Operating Party's proposal. A Party exercising its right not to participate in the Operator's counterproposal if approved as a General Matter, shall become a Non-Participating Party in the operation subject to Article 16.5.4 *(Non-Consent Development Operations)*. If the Operator's counterproposal is not approved, the Operator shall commence the previously approved Development Operation proposed by the Non-Operating Party at the sole Cost and risk of the Participating Party(s).

**13.1.2** **Substitute Development Well**: The Operator shall timely commence a Development Operation and continue the operation with due diligence to the Objective Depth or until: (i) a supplemental AFE is required pursuant to Article 6.2 (Authorization for Expenditure); or, (ii) the Operator encounters conditions in the hole that render further drilling impractical, such as mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite, other practically impenetrable substances or other similar conditions. If the Development Well is abandoned due to the conditions described above in Article 13.1.2 (ii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Development Well and each Participating Party in the abandoned Development Well shall make an Election whether to participate in the proposed substitute well. Further, during said ninety (90) day period, no Party may

propose any additional drilling. The Well Plan for said substitute well shall be substantially similar to the previously approved Well Plan, taking into account those conditions which rendered further drilling impractical. The Operator shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Costs of a Non-Consent substitute well will be recouped in accordance with Article 16.5.4 *(Non-Consent Development Operations)*.

13.1.3 **Timely Operations:**   An approved Development Operation (not requiring the installation of a Production System) shall be commenced within one hundred twenty (120) days from the date upon which it is approved as a General Matter, unless provided under Article 25.0 *(Force Majeure)*.   If operations have not commenced within one hundred twenty (120) days, the approved Development Operation shall be deemed withdrawn, with the effect as if the Development Operation had never been approved as a General Matter. If an approved Development Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred in the preparation for or in furtherance of the operation shall still be chargeable to the Participating Party(s).   A Development Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations are begun.

13.2 **Subsequent Development Operations at Objective Depth:**   After (i) the Development Operation has been drilled to its Objective Depth; (ii) all operations in the controlling AFE and Well Plan have been completed; and (iii) all logs and test results have been distributed to the Parties, the Operator, shall promptly notify the Participating Party(s) of the Operator's proposal for one (1) of the following operations:

(a)    conduct additional testing, logging or coring of the formations encountered prior to setting production casing;

(b)    attempt completion at the stratigraphic equivalent of the initial Objective Depth;

(c)    Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of the AFE, or the stratigraphic equivalent of the deeper depth achieved in item (a) above;

(d)    plug back, and attempt completion in a shallower zone or formation;

(e)    Deepen the well to a new Objective Depth;

(f)    conduct other operations on the well;

(g)    temporarily abandon the well in order to test at a later date; or,

(h)    permanently plug and abandon the well.

**13.2.1 <u>Response to Operator's Proposals</u>:**  Within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of the Operator's proposal to conduct subsequent Development Operations, the Participating Party(s) shall either respond to the Operator's proposal, which shall require approval as a General Matter, or make a counterproposal.  Failure of a Participating Party to respond to the Operator's proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered a vote not to approve the Operator's proposal and

a decision to become a Non-Participating Party in the Operator's proposal if the Operator's proposal is approved as a General Matter.

**13.2.2** **Counterproposal:** If one (1) or more counterproposal for subsequent Development Operations are made, consideration for approval as a General Matter shall be given first to a proposal for operation (a) above, next to operation (b) above, and so forth in decreasing order of priority. If different depths or locations are proposed for subsequent Development Operations, consideration for approval as a General Matter shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order, with the exception of operation (c) of Article 13.2 (*Subsequent Development Operations at Objective Depth*) which priority shall be given to the deepest depth proposed in ascending order. If the proposal with the highest priority is not approved as a General Matter within the additional twenty-four (24) hour period, then the proposal with the next highest priority shall be given twenty-four (24) hours consideration by the Parties until a proposal is approved as a General Matter. After a subsequent Development Operation has been approved as a General Matter and the subsequent Development Operation is commenced, the remaining proposals for other types of subsequent Development Operations shall be deemed withdrawn.

**13.2.3** **Approval of Subsequent Development Operations by All Parties:** If the proposed subsequent Development Operation is approved as a General Matter by all Parties, the Operator shall commence the subsequent Development Operation at the sole Cost and risk of the Participating Party(s).

**13.2.4** **Approval of Subsequent Development Operations as a General Matter by Fewer than All Parties:** If a proposal for subsequent Development Operations (except a

proposal to plug and abandon a producing wellbore), is approved as a General Matter by fewer than all Parties, the Operator shall conduct the operation at the joint Cost and risk of the Participating Party(s).  Any Non-Participating Party in a subsequent Development Operation shall be subject to Article 16.5.4 *(Non-Consent Development Operations)*.  A Non-Participating Party in a subsequent Development Operation shall be relieved of the Costs, risks and obligations of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe, and the wellbore in the opinion of the Operator is in a condition to perform the proposed operation.

13.2.5  **Additional Subsequent Development Operations:**  At the completion of the subsequent Development Operation, the Operator will again submit proposal(s) for subsequent Development Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is either temporarily abandoned or plugged and abandoned.

13.3  **Election by Non-Participating Parties in Deepening or Sidetracking Development Operations:**  Upon a Development Well being drilled to its initial Objective Depth, and if the Participating Party(s) approve as a General Matter to either:  (i) Deepen said Development Well; or, (ii) Sidetrack said Development Well, then the Operator shall notify each original Non-Participating Party of the approved operation.  Each original Non-Participating Party may respond with an Election regarding an approved proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.  Any original Non-Participating Party making an Election to participate in the Sidetracking or Deepening of a Development Well shall be deemed to be under-invested in an amount equal

87

to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs)*. Any original Non-Participating Party making an Election to participate in the Sidetracking or Deepening of a Development Well shall remain a Non-Participating Party in the Development Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.4 *(Non-Consent Development Operations),* less the recoupment under Article 16.6 (*Under-investment of Costs*) has been recovered by the original Participating Party(s). The Participating Parties in the Sidetrack or Deepening are overinvested Parties.

13.4  **Deeper Drilling:** A proposal to drill a Development Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well or a proposal to re-enter and Deepen an existing Development Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well shall require approval as a General Matter and shall be further subject to the following provisions.

13.4.1  **Limited Participation in Deeper Drilling:** If a proposal is approved pursuant to Article 13.4 *(Deeper Drilling)* above, any Party may either:

- make an Election to participate in the proposed Deeper Drilling operation; or

- make an Election to not participate in the proposed Deeper Drilling operation; or,

- make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

A Party making an Election in limiting its participation in a Deeper Drilling operation shall bear its Participating Interest share of the Cost and risk of drilling (including completion or abandonment) to the base of the deepest Producible Reservoir and shall be a Non-Participating Party subject to Article 16.5.4 (*Non-Consent Development Operations)* as to those operations in such well below the base of the deepest Producible Reservoir.  If a Party exercises its right not to participate in the Deeper Drilling operation, the operation shall be conducted pursuant to Article 16.5.4 (*Non-Consent Development Operations)*.

**13.4.2   Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir:**  If a Non-Participating Party in a Deeper Drilling operation:

- considers the well to be capable of producing at or above the deepest Producible Reservoir, and,

- has notified the Participating Party(s) of its desire to participate in the completion of the well at or above the deepest Producible Reservoir,

then any further Deeper Drilling operations shall be conducted subject to the following provisions:

(a)   Multiple Completion: If all the Participating Party(s) in the well agree that a multiple well completion(s) involving (i)  a completion at or above the deepest Producible Reservoir; and (ii)  a completion below the deepest Producible Reservoir is possible and practicable, the Participating Party(s) in the Deeper Drilling operation shall bear one hundred percent (100%) of the Costs of drilling and completing at an Objective Depth below the deepest

Producible Reservoir that are in excess of the original Costs to drill and complete in the deepest Producible Reservoir.

(b)     <u>Single Completions</u>:  If the Participating Party(s) do not mutually agree that such multiple well completions are possible and practicable, the Non-Participating Party in the Deeper Drilling operation shall be deemed over-invested in the original well in an amount equal to the Non-Participating Party's Share of the original Costs of drilling the well to the deepest Producible Reservoir.  The Participating Party(s) in the deepening operation shall assume their proportionate share of the Non-Participating Party's Share of the Costs of other operations conducted under this Agreement until all over-investments are eliminated.

If, after having been deepened to an Objective Depth deeper than the deepest Producible Reservoir, at first occurrence of the following events:

(i)     the well is not a Producible Well in the deeper depths and the well is plugged back to a shallower zone; or,

(ii)    the well is completed as a Producible Well in the deeper depths, but Hydrocarbon production from the deeper zone is later depleted prior to the recovery of the Recoupment Amount (attributable to the Deeper Drilling operation) and the well is plugged back to a shallower zone; or,

(iii)   the well is completed as a Producible Well in the deeper depth and the Participating Party(s) have recovered the applicable Non-Consent

90

Recoupment (attributable to the Deeper Drilling operation) from Hydrocarbon production from the deeper zone,

the Participating Party(s) as to the depths below the deepest Producible Reservoir shall be deemed over-invested in an amount equal to the Non-Participating Party's Share of the well's Cost down to the deepest Producible Reservoir. The over-investment shall be depreciated at the rate of one-half percent (½%) per month from the date the Deeper Drilling operation commences to the earlier of (i), (ii), or (iii) above, but such depreciation shall not reduce the over-investment below forty percent (40%) of the original over-investment. The Non-Participating Party(s) in the Deeper Drilling operation shall assume their proportionate share of the Participating Party's Share of the Costs of all other operations conducted under this Agreement until all over-investments are eliminated.

**13.4.3** **Completion Attempts At or Above the Deepest Producible Reservoir:** If a well drilled below the deepest Producible Reservoir is not completed for production from the deeper depths, then the Participating Party(s) in said well down to the deepest Producible Reservoir shall have a right to utilize the well for completion in a Producible Reservoir. The Participating Party(s) in drilling below the deepest Producible Reservoir in said well shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for completion in a Producible Reservoir. If a well deepened below the deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the deepest Producible Reservoir in that well, the Participating Party(s) in the deepening operation shall be obligated, at their sole Cost and risk, to restore the well to its condition prior to the Deepening operations below the deepest Producible Reservoir. The Participating Party(s) in the deepening operation shall be obligated to

91

pay for the entire Cost of re-drilling the well if the damage cannot be repaired. Both the Participating Party(s) in the original drilling operation and the Participating Party(s) in the Deepening operation shall have the opportunity to participate in completion attempts at or above the deepest Producible Reservoir.

13.5    **Plugging and Abandoning Costs:**  If the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6, which makes further drilling impractical, then the Operator may propose to plug and abandon the well.  Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well.  The Participating Party(s) in the original operations shall pay all Costs of plugging and abandoning the Development Well (except any increased plugging and abandoning Costs associated solely with a subsequent Development Operation conducted as a Non-Consent Operation).  The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

## ARTICLE 14.0 FACILITIES AND GATHERING SYSTEMS

14.1    **Facilities as a Part of  Development Plan:**  The Development Plan shall provide for the installation of all basic Facilities necessary to handle or service Hydrocarbon production for the Contract Area.  If the approved Development Plan provides that Hydrocarbon production from the Contract Area can most efficiently be processed and handled at Facilities located off of the Contract Area (an "offsite facility"), the Development Plan shall provide for a Production System designed to utilize an offsite facility.

14.2    **Use of Facilities Off the Contract Area:**  In the event that excess capacity exists at an offsite facility and the approved Development Plan calls for a "tie-back" development of the

Contract Area to an offsite facility, the Development Plan shall include a commitment from the owner of said offsite facility specifying the capacity to be made available at such offsite facility and the amount of tariffs or handling charges to be assessed against any Hydrocarbon production from the Contract Area. However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable efforts to secure access to the offsite facility on behalf of the Participating Party(s). Any access secured to an offsite facility shall be shared proportionately by the Parties on the basis of their Participating Interests in the Production System Fabrication AFE.

**14.3** **Approval of Additional Facilities on the Contract Area:** This Article 14.3 (*Approval of Additional Facilities on the Contract Area*) shall only apply to Facilities to be located on the Contract Area which were not included in the approved Development Plan. Any Participating Party may propose the installation of additional Facilities for the Contract Area beyond those specified in the Development Plan by giving notice to the other Participating Party(s) together with information adequate to describe the proposed Facilities and their estimated Costs. Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities on the Production System beyond the scope of the Development Plan shall require the approval of the Participating Party(s) as a General Matter. Upon approval, the Operator shall proceed to install the additional Facilities for the benefit of the Participating Party(s) provided that the additional Facilities do not interfere with continuing operations on the Contract Area. The installation of any additional Facilities shall be at the sole Cost and risk of the Participating Party(s). Any Non-Participating Party shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.

**14.4** **Expansion, Modification or Repair of an Existing Production System:** Subsequent to the installation of the Production System described and approved in the first Development Plan

93

for the Contract Area, any Party may propose the expansion, modification or repair of any existing Production System in which it has participated by written notice to the other Participating Party(s) in such Production System.  Such proposal shall be presented in accordance with Articles 6.4 *(Annual Operating Plan)* and 8.4 *(Response Time for General Matters and Elections)* for approval as a General Matter.  If approved as a General Matter, it will be binding on all Participating Party(s) in the Production System and Operator shall proceed with such project for the benefit of the joint account and all Cost, risk and expense of such operation shall be borne in proportion to the respective Participating Party's Working Interest in such Production System unless otherwise agreed.  This Article 14.4 shall not constitute a limit on a Party's right to install its own facilities under Article 15.0 *(Disposition of Hydrocarbon Production)*.

14.5   **Use of Facilities on the Contract Area:**  It is the intention of the Parties hereto that all Production Systems and accompanying Facilities and pipelines should be used to their capacity and the Parties hereto shall have priority access to all Facilities and gathering system capacity serving the Contract Area for use in operating and developing the Contract Area pursuant to an approved Development Plan. If excess capacity is available beyond the requirements of an approved Development Plan, such excess capacity shall be allocated to each Party in accordance with each Party's Participating Interest in the Production System. Each Party shall have the right to use its proportionate share of excess capacity for processing additional production from within the Contract Area.

14.6   **Processing Hydrocarbon Production From Outside the Contract Area:**  The Parties agree that the use of any Production System and Facility on the Contract Area to process Hydrocarbon production coming from outside the Contract Area will require unanimous approval of all Parties owning an interest in the Production System and/or Facilities.  Any Hydrocarbon production coming from outside the Contract Area will be processed under the

94

terms and conditions of a Production Handling Agreement which shall be approved by all Parties owning such Production System and/or Facilities.

## ARTICLE 15.0  DISPOSITION OF HYDROCARBON PRODUCTION

**15.1**  **Duty to Take in Kind:**  Each Party shall have the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Contract Area, exclusive of Hydrocarbon production which the Operator uses in producing from the Contract Area or in Development Operations, or in preparing and treating Hydrocarbons for marketing purposes or Hydrocarbon production which is unavoidably lost.  Davis will, in addition to taking and separately disposing of its proportionate share of oil and/or condensate and gas, also take and separately dispose of all the oil and/or condensate and gas attributable to the Davis Overriding Royalty Interest, as defined in Article 19.1.

**15.2**  **Facilities to Take in Kind:**  Any Participating Party in Development Operations shall have the right, at its sole risk and expense, to construct Facilities for purposes of taking its share of Hydrocarbon production in kind, provided such Facilities, at the time of installation, do not unreasonably interfere with existing or future operations on the Contract Area.  During the construction, operation and removal of such Facilities, the owner of such Facilities shall indemnify and defend the other Parties against any claims or liabilities which may result from such construction, operation and removal and such Party shall be responsible for any damages or losses sustained by the other Parties as a result of such construction, operation or removal.

**15.3**  **Failure to Take Oil and/or Condensate in Kind:**  If any Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Contract Area, the