# Exhibit C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC**, *et al.*, | § | **Case No. 20-33948 (MI)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |
| **Debtors.**[1] | § | |
| | § | |

## EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE INSURANCE PROGRAMS AND THE SURETY BOND PROGRAM, AND (B) PAY CERTAIN OBLIGATIONS WITH RESPECT THERETO; (II) GRANTING RELIEF FROM AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS; AND (III) GRANTING RELATED RELIEF

EMERGENCY RELIEF HAS BEEN REQUESTED. A **VIDEO/TELEPHONIC** HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 4, 2020 AT 2:00 P.M. (PREVAILING CENTRAL TIME). PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 954554. PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE HTTPS://WWW.GOTOMEETING.COM/MEETING/JOIN-MEETING AND ENTERING MEETING CODE "JudgeIsgur."

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 4, 2020.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Background

1. Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases. The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2. The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are an independent exploration and production ("**E&P**") company in the Gulf of Mexico. The Company is focused on the exploration and development of offshore oil and gas assets in the shallow water and deepwater Gulf of Mexico and the Gulf Coast region of the U.S.

3. Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of the Debtors' Chapter 11 Petitions and First Day*

*Relief* (the "**Dane Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

**Jurisdiction**

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

5.      By this Motion, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors request entry of interim and final orders (i) authorizing, but not directing them to (a) continue their Insurance Programs and Surety Bond Program (each as defined below) in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay certain prepetition obligations arising under the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the limited extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief.  The Debtors further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to such obligations.

6.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**").

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Dane Declaration.

**Debtors' Insurance Programs**

7.     In the ordinary course of their oil and natural gas E&P operations, the Debtors maintain workers' compensation insurance, third party liability, property, and other insurance programs (the "**Insurance Programs**") and incur certain obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker or advisor fees, taxes, other fees, and deductibles (collectively, the "**Insurance Obligations**"), in accordance with or relating to their respective insurance policies (each, an "**Insurance Policy**") through several insurance carriers (each, an "**Insurance Carrier**").  The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third party liability in connection with the Debtors' businesses (the "**General Liability Program**"); (iii) coverage of the Debtors' vehicles (the "**Automobile Program**"); (iv) coverage for liability from the Debtors' use of non-Debtor owned aircraft (the "**Non-Owned Aircraft Liability Program**"); (v) coverage evidencing the Debtors' financial responsibility in the event of an offshore oil spill or other oil pollution event, as required under the Oil Pollution Act of 1990 (the "**Oil Spill Financial Responsibility Program**"); (vi) coverage for losses from named windstorms or operational risks and hazards (the "**Named Windstorm & Operational Risk Program**"); (vii) coverage in connection with a recently completed subsea construction project (the "**Katmai Policy**"); (viii) coverage for risks and damages arising from data breaches and other data losses (the "**Cyber Risk Liability Programs**"); (ix) coverage for losses of office property and equipment (the "**Office Contents & Equipment Program**"); (x) coverage of management and directors' and officers' liability (the "**Management Liability Program**"); and (xi) umbrella and excess coverage for various casualty Insurance Policies, as described below (the "**Umbrella Liability Program**").  A detailed list of the Insurance Programs is attached as **<u>Exhibit C</u>** hereto.  The Debtors also retain the services of various insurance

brokers in connection with maintaining the Debtors' Insurance Programs. The Insurance Programs and the role of each insurance broker are discussed below.

8.     The Debtors are obligated to make premium installment payments related to several Insurance Policies, which the Debtors renewed prior to the Petition Date. The Insurance Policies subject to these installment payments cover both pre- and postpetition periods. Accordingly, by this Motion, the Debtors are seeking authority, but not direction, to pay all premium installment payments related to their Insurance Policies, including those that came due prior to the Petition Date. The Debtors estimate that the total amount of Insurance Obligations to be paid within twenty-one (21) days after the Petition Date is approximately $8,400,000.

## A.     Workers' Compensation Insurance

9.     In the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from or related to employment by the Debtors (the "**Workers' Compensation Claims**"). The Insurance Carrier for the Workers' Compensation Program is Zurich American Insurance Company of Illinois ("**Zurich Illinois**"). In many instances, applicable law in the jurisdictions in which the Debtors operate—including Texas and Louisiana law for the Debtors' onshore and corporate operations, and United States law, for their offshore operations in the Gulf of Mexico—requires that the Debtors maintain the Workers' Compensation Program. The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, disability, death, or disease sustained by employees in the course of their employment with the Debtors. Pursuant to the Workers' Compensation Program, the Debtors pay an annual premium of approximately $1,400,000. The full premium on account of this program for the current coverage period was due July 30, 2020 and remains outstanding as of the Petition Date.

Accordingly, the Debtors are requesting authority, but not direction, to pay the unpaid premium pursuant to this Motion.

10.     Due to the nature of their businesses, some of the Debtors' employees may be exposed to certain occupational hazards related to the operation of offshore rigs. The Workers' Compensation Program requires no deductible and, thus, the Debtors owe no amounts for Workers' Compensation Claims. Amounts owed for Workers' Compensation Claims are paid by Zurich Illinois.

11.     Under applicable workers' compensation laws, the Debtors or the applicable Insurance Carrier may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. Although unlikely, it is possible that an event giving rise to an obligation of the Debtors' Insurance Carriers to make such a payment—for example, for injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge. To that end, out of an abundance of caution, the Debtors seek relief from the automatic stay for authorization to pay such Workers' Compensation Claims and related costs, and for Zurich Illinois to have authorization to do the same.

**B.     General Liability Programs**

12.     The General Liability Program provides coverage for legal or contractual liability or other damages to third parties arising from or incurred to third parties in connection with the Debtors' offshore oil and gas operations or the Debtors' premises. This Insurance Program accordingly covers damages from the following:

- General commercial liability, including injuries to third parties arising out of the Debtors' operations. This liability is generally covered up to $1,000,000 per occurrence, up to a general aggregate limit of $2,000,000, and the Debtors must pay a deductible of $100,000 for each liability occurrence.

- Vessel charterer's liability, including legal liability arising from accidents involving vessels the Debtors' charter. This liability is covered up to $1,000,000, and the Debtors must pay a deductible of $10,000 for each accident or other liability occurrence.

- Maritime employers' liability, including indemnification and expenses for any investigations and defense in connection with accidents or illnesses hereunder. This liability is covered up to $1,000,000, and the Debtors must pay a deductible of $250,000 for each accident or illness occurrence.

13.     The Insurance Carrier for the General Liability Programs is Markel International Insurance Company Limited. The coverage period is July 1, 2020 through June 30, 2021, with an annual premium of approximately $300,000. The full premium on account of this program will come due August 29, 2020. Accordingly, the Debtors request authority but not direction to pay this amount in full in the ordinary course of business.

## C.     Automobile Program

14.     The Automobile Program provided by Zurich American Insurance Company ("**Zurich**") covers liabilities to third parties resulting from the operation, use, or maintenance of Debtor-owned, non-owned, or hired vehicles. This program covers liability up to $1,000,000 for any one accident or occurrence, and up to $5,000 with respect to medical payments for each such accident or occurrence. There is an applicable $1,000 comprehensive deductible and a $1,000 collision deductible under this program. The coverage period is July 1, 2020 through June 30, 2021, with an annual premium of approximately $50,000. The full premium on account of this program became due July 30, 2020, and remains outstanding as of the Petition Date. Accordingly, the Debtors request authority, but not direction, to pay the unpaid premium to avoid potential penalties or termination of the policy.

## D.     Non-Owned Aircraft Liability Program

15.     The Non-Owned Aircraft Liability Program covers liabilities to third parties resulting from bodily injury or property damage from the Debtors' use of non-Debtor owned

aircraft. This program generally covers liability (i) for property or personal injury damages up to $10,000,000 for any one accident or occurrence; (ii) up to $1,000,000 for care, custody, and control of any non-Debtor owned aircraft after any one occurrence;[3] (iii) up to $25,000 each for medical payments and family assistance per passenger for each occurrence; and (iv) up to $10,000 for loss of personal effects for each passenger in each occurrence. The Insurance Carrier is Starr Indemnity & Liability Company (through Starr Aviation). The coverage period is July 1, 2020 through June 30, 2021, with an annual premium of approximately $18,000. As of the Petition Date, the full premium on account of this program was unpaid and came due July 30, 2020. Accordingly, the Debtors request authority, but not direction, to pay the unpaid premium.

**E.     Oil Spill Financial Responsibility Program**

16.     The Debtors must maintain the Oil Spill Financial Responsibility Program to comply with the Oil Pollution Act of 1990, 33 U.S.C. § 2716, in connection with the Debtors' offshore oil and gas production operations. That act requires that the responsible party for offshore facilities, such as the Debtors, must maintain evidence of financial responsibility equaling $150,000,000 in the event of an offshore oil spill or other oil discharge event. The Oil Spill Financial Responsibility Program provides coverage for such pollution occurrences up to $150,000,000, with a $100,000 deductible for each such occurrence. The Insurance Carriers are primarily Lloyd's Syndicates. The coverage period under this program is July 1, 2020 through June 30, 2021, with an annual premium of approximately $2,000,000. The full premium on account of this program will come due August 29, 2020. Accordingly, the Debtors request

---

[3] This coverage for care, custody, and control requires the Debtors to pay a $2,500 deductible for each non-Debtor owned aircraft involved in each occurrence. No other deductible is required under the Non-Owned Aircraft Liability Program.

authority but not direction to pay such premium when it comes due in the ordinary course of business.

**F.      Named Windstorm & Operational Risk Program**

17.     The Named Windstorm & Operational Risk Program is broadly designed to protect the Debtors from various risks and hazards, both natural and mechanical, which can occur to any business involved in oil and gas exploration and production in and around the Gulf of Mexico.  Risks and hazards of this type can be highly debilitating to the Debtors' business operations, and as the potential liabilities tend to be high, the Debtors have obtained a great degree of protection to limit, if not nullify, the economic dangers associated with their industry.  This program covers three primary areas in connection with such risks and hazards:

- <u>Named Windstorm Coverage</u>:  This coverage provides protection for physical loss or damages associated with named windstorms, such as hurricanes and other named tropical storms.  The coverage is for $225,000,000 in damages, in various layers, in excess of a $50,000,000 retention and is subject to 15% coinsurance.

- <u>Operational Risk Coverage</u>:  This coverage provides protection of physical loss or damages for various operational risks associated with the Debtors' onshore and offshore oil and gas operations.  Among other things, this would include damage to onshore oil and gas facilities, offshore platforms and pipelines.  Coverage for wells is also provided with Operator's Extra Expense, including cost of well control, redrilling expenses and seepage and pollution clean-up.  Subject to various sublimits for certain portions of this coverage, the general coverage provided is up to $500,000,000 for 100% interest as a single limit to any one accident or occurrence in respect of Deepwater wells, and $150,000,000 for 100% interest for all other wells.  There is an operational deductible of $10,000,000.

18.     The coverage period for the Named Windstorm & Operational Risk Program is June 1, 2020 through May 31, 2021, with a yearly premium of approximately $13,400,000, due in semi-annual installments.  As of the Petition Date, the Debtors have paid the first installment and no further installments will come due until January 2021.  The Debtors request authority, but not direction, to pay the remaining premium when it comes due in the ordinary course of business.

9

### G. Cyber Risk Liability Programs

19. The Cyber Risk Liability Programs covers two broad areas of liability. The first area is cyber gap coverage, which provides protection for liability arising from cyber risks that lead to physical damage, well malfunctions, or well pollution. This coverage area has an overall annual aggregate coverage limit of $50,000,000, and is subject to a $10,000,000 deductible. The second area is associated with liability and damages arising from data breaches, including corporate damages, cyber extortion, privacy and confidentiality damages, and other associated damages. This coverage area has an annual aggregate coverage sub-limit of $10,000,000, and is subject to a $100,000 deductible. The Insurance Carriers are primarily Lloyd's Syndicates. The coverage period for the Cyber Risk Liability Programs is June 1, 2020 through May 31, 2021, and has a total yearly premium of approximately $300,000 due on a quarterly basis. The next quarterly payment of approximately $76,000 is due in October 2020. The Debtors request authority, but not direction, to continue to pay the Cyber Risk Liability Programs and to pay any premiums, including any amounts that may relate to the prepetition period, in the ordinary course of business.

### H. Office Contents & Equipment Program

20. The Office Contents & Equipment Program provides coverage protection against all risks of physical loss or damage to scheduled office contents and equipment. This coverage provides protection for physical property in an aggregate amount of approximately $11,000,000 and software in the amount of approximately $4,240,000. The deductible is $5,000 per any one accident or occurrence, and the Debtors have a coinsurance obligation of 80%. The Insurance Carrier is the Travelers Lloyd's Insurance Company. The coverage period is September 30, 2019 to September 29, 2020, and the annual premium of approximately $37,000 was paid in full prepetition. Thus, the Debtors do not believe they owe any prepetition premium amounts on account of this program as of the Petition Date. To the extent there are any other amounts that

relate to the prepetition period that become due and owing postpetition (including deductibles), the Debtors request authority, but not direction, to pay such amounts in the ordinary course of business.

## I.  Management Liability Program

21.  The Management Liability Program provides preventative protection against a variety of liability and damages that could be associated with the Debtors' directors, officers, and other senior management, including:

- Directors and Officers Liability (D&O):  This provides coverage for the liability arising from the Debtors' directors and officers for alleged wrongful acts.  Liability is covered up to $40,000,000 in the aggregate for the coverage period.  The Debtors maintain a $30,000,000 aggregate limit covering for both balance sheet protection for the Company and personal asset protection for insured individuals (Side A, B. C limit) and an excess $10,000,000 limit covering only personal asset protection for insured individuals (Side A-only) in excess of the $30,000,000. The Debtors are subject to a $100,000 retention per occurrence, except for the Side A excess policy, for which there is no retention.  The coverage period is June 1, 2020 through May 31, 2021, with a premium of $1,327,875 paid on an annual basis.  This premium also includes the premium payments for the employment practices, and fiduciary duty coverages discussed below.

- Employment Practices Liability:  This provides coverage against claims made by employees alleging discrimination, wrongful termination, harassment, and other employment-related issues against the Debtors.  Liability is covered up to $10,000,000 in the aggregate for the coverage period, with a $150,000 retention for each claim.  The coverage period is June 1, 2020 through May 31, 2020.

- Fiduciary Duty Liability:  This provides coverage for claims of mismanagement of the Debtors' employee benefit plans.  Liability is covered up to $5,000,000 in the aggregate for the coverage period, with a $25,000 retention for each claim.  The coverage period is June 1, 2020 through May 31, 2021.

- Commercial Crime Insurance:  This provides coverage through Great American Insurance Group for liability accruing to the Debtors from an employee's alleged dishonesty, forgery or alteration, and computer fraud.  Liability is covered up to $5,000,000 in the aggregate for the coverage period, with a $100,000 retention applicable for each claim.  The coverage period is July 1, 2020 through September 20, 2020, with an associated premium of $3,372, which was paid in full prepetition.

22.  The Debtors have seven layers of coverage exclusively for the directors and officers liability indicated above, providing aggregate coverage of $40,000,000 for the coverage

period, which runs from July 1, 2020 through June 30, 2021. The insurance premiums are invoiced on an annual basis, for a total annual premium of approximately $1,327,875. The Insurance Carriers are as follows: SOMPO International (layer 1), Starr Indemnity & Liability Company (layer 2), Chubb Limited (layer 3), XL Specialty Insurance Company (layer 4), Arch Insurance Company (layer 5), Old Republic Insurance Company (layer 6), and Berkshire Hathaway Specialty Insurance Company (layer 7). As of the Petition Date, there are no premiums owed on account of these policies.

23. The Management Liability Program also provides coverage for damages in connection with the kidnap, ransom, and threat response to the same for the Debtors' directors and officers. Coverage for these damages is provided by U.S. Specialty Insurance Company, is up to $15,000,000 in the aggregate amount for the coverage period, and no deductibles are owed. The coverage period is December 18, 2018 through December 17, 2021, and the premium of approximately $17,000 was paid in full prepetition.

**J.    Umbrella and Excess Liabilities Program**

24. The Umbrella Liability Program provides coverage that supplements the coverage provided in the casualty programs above, including the employers' liability insurance under the Workers' Compensation Program, the Automobile Program, the Non-Owned Aircraft Liability Program, and the General Liability Programs (the "**Underlying Policies**"). The annual aggregate coverage provided over the Underlying Policies' coverage is $1,000,000,000, split into various layers of coverage. The layers are covered primarily to varying percentages by the following Insurance Carriers: American International Group UK Ltd., Apollo Marine & Energy Consortium, Arch Insurance International, Convex Insurance UK Limited, Ironshore, Liberty Specialty Markets, Markel International Insurance Company Limited, OIL Casualty Company, and Lloyd's Syndicates. The coverage period for the Umbrella Liability Program is July 1, 2020

through June 30, 2021, with an annual premium of approximately $3,800,000, which will come due August 29, 2020. The Debtors request authority, but not direction, to pay such premium when it comes due in the ordinary course of business.

## K.    Katmai Well Construction Policy

25.    The Debtors maintained a construction insurance policy in connection with a recently completed project relating to the installation of subsea improvements to the Katmai well, in which the Debtors hold a 50% interest (the "**Katmai Policy**"). The Katmai Policy, which expired on July 15, 2020, provided coverage for physical damage to insured property and third party liabilities for the Debtors' interest. The policy also provides coverage for a maintenance period that commenced June 1, 2020 and runs through November 30, 2020. The Insurance Carriers are primarily Lloyds' Syndicates, AIG OIL Rig, Zurich, and Stratford Insurance Companies. The Debtors paid 70% of the total premium for the Katmai Policy at the inception of the project. The final installment for the remaining 30% of the premium, totaling $426,020 will come due upon the Company's receipt of a final invoice, which is expected to arrive in August 2020, after the Petition Date. Accordingly, the Debtors request authority, but not direction, to pay this outstanding amount when it comes due in the ordinary course of business.

### Insurance Broker Services

26.    The Debtors contract with (i) in the United States, USI Southwest, Alliant, Inc. CAC Specialty, and Willis Towers Watson; and (ii) in the United Kingdom, Price Forbes & Partners Ltd and Bishopsgate Insurance Brokers, to serve as their insurance brokers and consultants for the Insurance Programs (each in such capacity, an "**Insurance Broker**"). The Insurance Brokers provide access to specific insurance markets and expertise in certain lines and types of coverage. In addition, the Insurance Brokers often act as the intermediary between the Debtors and the Insurance Carriers, as the Insurance Brokers will often transfer insurance

premiums and claims asserted for various Insurance Programs to the various Insurance Carriers. The Debtors pay the Insurance Brokers commissions up-front as policies are renewed each year, based on the aggregate amount of the Debtors' insurance premiums. As of the Petition Date, the Debtors owe approximately $250,000 in commissions to the Insurance Brokers, which the Debtors request the authority to pay in full in the ordinary course of business.

27. For the avoidance of doubt, the Debtors request authority from this Court to continue making payments to the Insurance Brokers for the Insurance Obligations, as necessary under the Insurance Programs.

### Debtors' Surety Bond Program

28. In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' performance of certain obligations (the "**Surety Bond Program**"). The Surety Bond Program covers obligations in connection with two general categories of third parties: (i) federal and state governmental units and other public agencies; and (ii) contract counterparties for whom the Debtors have agreed to perform various plugging, abandonment, and decommissioning obligations in connection with offshore properties. The obligations secured by the Surety Bond Program relate to, among other things, (i) oil and natural gas drilling and exploration operations; (ii) plugging and abandonment obligations; (iii) conservation; (iv) rights-of-way; (v) land use; (vi) taxes; and (vii) utilities. A list of surety bonds in the Surety Bond Program is attached as **Exhibit D** hereto.

29. The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a surety. Unlike an insurance policy, if a surety incurs a loss on a surety bond due to such nonperformance or nonpayment, the surety is entitled to recover the full amount of that loss from the principal. Moreover, statutes or ordinances often require the Debtors to post surety bonds to secure payment and enforcement of the various obligations

14

discussed above. Failing to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations. In every case, the Debtors are either (i) party to an indemnity agreement that sets forth the surety's rights to recover from the Debtors (collectively, the "**Surety Indemnity Agreements**") or (ii) are fully cash collateralized. Under each Surety Indemnity Agreement, the Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors (the "**Indemnity Obligations**").

30. The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis. Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal, typically 90 days prior to such renewal. In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $15,100,000. As of the Petition Date, the Debtors have approximately $1,164,000,000 in outstanding surety bonds. Certain surety bonds in the Surety Bond Program are scheduled to expire and renew within the next six months. The Debtors anticipate the Surety Bond Obligations over the next six months will amount to approximately $10,400,000. Although the Debtors are not aware of any prepetition obligations arising in connection with the Surety Bond Program, the Debtors request authority, but not direction, to pay certain amounts in connection with the Surety Bond Obligations that the Debtors' believe are necessary to maintain the Surety Bond Program in the ordinary course of business.

31. Certain of the Surety Bonds support letters of credit issued by Deutsche Bank AG New York Branch ("**Deutsche Bank**") in an aggregate amount of $350,000,000 (the "**Letters of Credit**") for the benefit of Apache Corporation ("**Apache**"). The Letters of Credit serve as security for various plugging, abandonment, and decommissioning obligations incurred

15

by Fieldwood Energy in connection with that certain *Decommissioning Agreement*, dated as of September 30, 2013, between Fieldwood Energy as Buyer and Apache as Seller (as amended, the "**Decommissioning Agreement**"). The Letters of Credit are fully secured by surety bonds in favor of Deutsche Bank issued through the Debtors' Surety Bond Program—$300,000,000 in surety bonds issued by Zurich and $50,000,000 by HCC International Insurance Company PLC. The Deutsche Bank Letters of Credit are subject to an annual premium of approximately 1.05%, or approximately $3,500,000, plus any applicable interest, fees, and other amounts.

### Maintaining Insurance Programs and Surety Bond Programs is Required by Law, Bankruptcy Code, and U.S. Trustee Operating Guidelines

32.     Under section 1112(b)(4)(C) of the Bankruptcy Code, a "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). In addition, in many instances, the coverage provided under the Insurance Obligations is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the operating guidelines issued by the Office of the United States Trustee for Region 7, which includes the Southern District of Texas (the "**U.S. Trustee Operating Guidelines**"). Given this backdrop, it is essential to the Debtors' estates and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines that the Debtors be permitted to maintain and continue making all payments required under their Insurance Programs. It is similarly critical that the Debtors have the authority to supplement, amend, extend, renew, or replace their Insurance Programs as needed, in their business judgment, without further order of the Court.

33.     Likewise, certain of the jurisdictions in which the Debtors operate their businesses require the Debtors to maintain the Workers' Compensation Program in accordance with applicable law. If the Debtors fail to maintain the Workers' Compensation Program,

applicable law may prohibit the Debtors from operating in those states. Maintaining the Workers' Compensation Program and the payment of all Workers' Compensation Claims are therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

34.     Finally, certain jurisdictions, including the federal government and states adjacent to the Gulf of Mexico, require the Debtors to maintain the Surety Bond Programs. Failure to maintain the Surety Bond Program in these jurisdictions could cause the revocation of approval for the Debtors' operations in the Gulf of Mexico, increased claims by certain governmental agencies against the Debtors, and make it needlessly onerous for the Debtors to continue their offshore oil and gas business operations. Accordingly, it is critical that the Debtors have the authority to make all payments in connection with the Surety Bond Obligations, and to supplement, amend, extend, renew, or replace their surety bonds under the Surety Bond Program as needed, in their discretion, without further order of the Court.

### Payments Made to Maintain Insurance Programs and Surety Bond Program Are Ordinary Course Transactions Authorized Pursuant to Section 363(c)(1) of Bankruptcy Code

35.     The Debtors believe that payments made to maintain the Insurance Programs and the Surety Bond Program, as well as the payments of any Insurance Obligations and Surety Bond Obligations made in connection therewith, fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.

36.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d

379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).

37.     Here, maintaining the Insurance Programs and the Surety Bond Program and honoring certain obligations arising thereunder, including undertaking renewals as they expire, or entering into new insurance arrangements through the Insurance Brokers or surety, indemnity, or reimbursement agreements, are the type of ordinary-course transactions contemplated by section 363(c)(1).  Accordingly, section 363(c)(1) of the Bankruptcy Code authorizes continuation of the Insurance Programs and the Surety Bond Program without this Court's approval.

### Continuation of Payments for Insurance Programs and Surety Bond Program, and Payment of Any Prepetition Amounts Owed With Respect Thereto Is Necessary to Protect and Preserve Debtors' Estates

38.     As discussed above, the Debtors believe that payments made to maintain the Insurance Programs and the Surety Bond Program, as well as the payments of any Insurance Obligations and Surety Bond Obligations made in connection therewith, fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.  To the extent any such actions do not constitute ordinary-course transactions, however, the Debtors request that the Court authorize the Debtors to continue payments for the Insurance Programs and the Surety Bond Program, as well as to pay necessary prepetition amounts owed with respect thereto if any come to light postpetition, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code.

39.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

40.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003). Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm." Accordingly, the Bankruptcy Code authorizes the

postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

41.     The Debtors' use of estate funds to pay obligations arising from the Insurance Programs is justified because such obligations are necessary costs of preserving the Debtors' estates.  The Insurance Programs are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Programs were allowed to lapse or terminate.  Such exposure could detrimentally impact the success of these chapter 11 cases.  In addition failure to timely pay the outstanding premium amount could expose the Debtors to potential penalties or termination of the policy.

42.     The Insurance Programs are also vital to the Debtors' continued operations. Applicable law mandates that certain Debtors maintain workers' compensation coverage for their employees.  The Debtors' failure to pay their obligations under the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to significant liability in fines by state workers' compensation boards.  In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of those claimants and, in turn, the Debtors' entire employee base.  This could result in employee departures, causing a significant disruption in the Debtors' businesses with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in these chapter 11 cases.

43.     Similarly, to continue their business operations during the chapter 11 cases, the Debtors must also be able to provide financial assurances to state and federal governments, regulatory agencies, and their contract counterparties.  This requires the Debtors to maintain the

Surety Bond Program in the ordinary course of business.  Accordingly, approval of the relief requested herein with respect to Surety Bond Obligations should be granted.

44.     For the foregoing reasons, payment of the obligations in connection with Insurance Programs and the Surety Bond Program, and Workers' Compensation Program is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties-in-interest in these cases.  Courts in this district have permitted chapter 11 debtors to continue their insurance and surety bond programs and to pay obligations, including prepetition obligations, related thereto as a routine matter in similar cases.  *See, e.g.*, *In re Gavilan Res. LLC,* No. 20-32656 (MI) (Bankr. S.D. Tex. Jul. 6, 2020) (D.I. 154); *In re Whiting Petroleum Corp.,* No. 20-32021 (DRJ) (Bankr. S.D. Tex. Apr. 1, 2020) (D.I. 43); *In re SpeedCast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (D.I. 212) (authorizing debtors to maintain insurance programs, pay prepetition insurance policy premiums, amend existing insurance policies, or enter into new insurance policies); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (D.I. 61) (authorizing debtors to maintain insurance and surety bond programs and to pay prepetition obligations in connection with such programs); *In re Fieldwood Energy LLC*, No. 18-30648 (DRJ) (Bankr. S.D. Tex. Mar. 13, 2018) (D.I. 198) (same).  The same relief is also appropriate here.

45.     Accordingly, based on the foregoing, the Court should authorize the Debtors to maintain all of their Insurance Programs and the Surety Bond Program, and to pay all obligations, including any prepetition obligations, related thereto.

## Automatic Stay Should Be Modified for Workers' Compensation Claims

46.     Section 362(a)(1) of the Bankruptcy Code operates to stay

the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the

case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

Section 362(d), however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause." To the extent the Debtors' employees hold valid claims under the Workers' Compensation Program, the Debtors seek authority under section 362(d) to permit, in the Debtors' sole discretion, those employees to proceed with their Workers' Compensation Claims, each in the appropriate judicial or administrative forum.

47.     There is cause to modify the automatic stay because staying the Workers' Compensation Claims could cause employee departures or otherwise harm employee morale, which could severely disrupt the Debtors' businesses and prevent a successful reorganization. Accordingly, the Court should (i) modify the automatic stay as it relates to valid Workers' Compensation Claims to allow, in the Debtors' sole discretion, any such claims to proceed to resolution and (ii) waive corresponding notice requirements under Bankruptcy Rule 4001. The Court should also authorize the Debtors, as necessary, and to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

48.     Courts in this district have granted similar relief in other complex chapter 11 cases. *See, e.g. In re Gavilan Res. LLC,* No. 20-32656 (MI) (Bankr. S.D. Tex. Jul. 6, 2020) (D.I. 154); *In re Whiting Petroleum Corp.,* No. 20-32021 (DRJ) (Bankr. S.D. Tex. Apr. 1, 2020) (D.I. 43); *In re SpeedCast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (D.I. 212)*,* (modifying the automatic stay pursuant to section 362(d) of the Bankruptcy Code to permit employees to proceed with workers' compensation claims against the debtors and their

applicable insurers); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct 4, 2019)

(D.I. 61) (same). The same relief is also appropriate here.

### Applicable Financial Institutions Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Insurance Obligations and Surety Bond Obligations

49. The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Insurance Obligations, Surety Bond Obligations, and Workers' Compensation Claims, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Insurance Obligations, Surety Bond Obligations, and Workers' Compensation Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### Bankruptcy Rule 6003 Has Been Satisfied

50. Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm. As described herein and in the Dane Declaration, the Debtors are under a legal obligation to maintain many of their Insurance Policies, the Workers' Compensation Program, and their Surety Bonds. In addition, the termination, suspension, or nonrenewal of any of the Insurance Policies, the Workers' Compensation Program or Surety Bonds as a result of nonpayment could subject the Debtors to substantial administrative liability as well as a potential cessation of operations, to the detriment of all parties in interest.

Accordingly, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Compliance with Bankruptcy Rule 6004(a) and**
**Waiver of Bankruptcy Rule and 6004(h)**

51.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

**DIP Order and DIP Documents Control**

52.     Contemporaneously herewith, the Debtors are seeking approval of interim and final orders, which provide for, among other things, the Debtors' entry into a postpetition financing facility (the "**DIP Facility**") and the use of cash collateral (any order entered by the Court approving the Debtors' entry into such postpetition financing facility and/or the use of cash collateral, the "**DIP Order**" and, the definitive documentation for such facility, the "**DIP Documents**").  The DIP Order and the DIP Documents contain terms that limit and otherwise apply to the Debtors' ability to utilize certain of the relief requested herein.  For the avoidance of doubt, the relief described and requested herein and/or granted by any order issued pursuant hereto is subject in all respects to the terms of the DIP Order and the DIP Documents.

**Reservation of Rights**

53.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) an agreement or obligation to pay any

24

claims, (v) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vi) an admission as to the validity of any liens satisfied pursuant to this Motion, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**Notice**

54.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) Vinson & Elkins LLP, Trammell Crow Center, 2001 Ross Avenue, Suite 3900, Dallas, TX 75201 (Attn:  William L. Wallander, Esq. and Bradley R. Foxman, Esq.), as counsel to Goldman Sachs Bank USA, the FLFO Administrative Agent; (iv) (A)  Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn:  Damian S. Schaible, Esq. and Natasha Tsiouris, Esq.) and (B) Haynes and Boone, LLP, 1221 McKinney Street, Suite 4000, Houston, TX 77010 (Attn: Charles A. Beckham Jr., Esq. and Martha Wyrick, Esq.), as counsel to the Ad Hoc Group of Secured Lenders; (v) Shipman & Goodwin LLP, 400 Park Ave, 5th Floor, New York, NY 10022 (Attn:  Nathan Plotkin, Esq.), as counsel to Cantor Fitzgerald Securities, the FLTL Administrative Agent; (vi) Holland & Knight LLP, 150 N. Riverside Plaza, Chicago, IL 60606 (Attn:  Joshua Spencer, Esq. and Anastasia Sotiropolous, Esq.), as counsel to Cortland Capital Market Services LLC, the SLTL Administrative Agent; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of Texas; (ix) the Securities and Exchange Commission; (x) the Insurance Carriers; (xi) the Insurance Brokers; (xii) Deutsche Bank; (xiii) the sureties to the

Debtors' surety bonds; (xiv) those persons who have formally appeared in these chapter 11 cases and requested service; (xv) any other party entitled to notice pursuant to Bankruptcy Rule 2002; and (xvi) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

### No Previous Request

55.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 4, 2020
     Houston, Texas

Respectfully submitted,

_/s/ Alfredo Pérez_____
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (_pro hac vice_ pending)
Jessica Liou (_pro hac vice_ pending)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
       Jessica.Liou@weil.com

_Proposed Attorneys for Debtors
and Debtors in Possession_

26

## Certificate of Service

I hereby certify that on August 4, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


      _/s/ Alfredo Pérez_
Alfredo R. Pérez