## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | Re: ECF No. 683 |
| | § | |

## DEBTORS' OBJECTION TO LLOG EXPLORATION OFFSHORE, L.L.C.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Fieldwood Energy LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this objection (the "**Objection**") to *LLOG Exploration Offshore, L.L.C.'s Motion for Relief from the Automatic Stay* [ECF No. 683] (the "**Motion**") filed by LLOG Exploration Offshore, L.L.C. ("**LLOG**"). In support of the Objection, the Debtors respectfully represent as follows.

## PRELIMINARY STATEMENT

1.  Pursuant to the Motion, LLOG seeks relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code due to lack of adequate protection in an alleged security interest to permit LLOG to (i) provide notice of Fieldwood Energy Offshore LLC's ("**Fieldwood**") default under that certain Offshore Operating Agreement dated December 2, 2002 (the "**OOA**"), as amended, for Fieldwood's failure to pay alleged, pre-

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

petition outstanding joint interest billings ("**JIBs**") owed to LLOG in the amount of $902,490.92 to the first purchaser of production at Green Canyon Block 201, Lease No. OCS-G 12210 (the "**GC 201 Lease**"), insofar and only insofar the such lease covers and affects the NE/4 of Green Canyon Block 201 from the surface down to 17,000' SSTVD and (ii) escrow the proceeds from the Debtors' interests in an overriding royalty interest (the "**Fieldwood ORRI**") in the GC 201, which interest was acquired by Fieldwood in 2015, as described below.  The extraordinary relief requested by LLOG should be denied because (i) LLOG has not met its initial burden to establish that a *prima facie* case exists for cause due to lack of adequate protection and (ii) even if LLOG was able to establish such *prima facie* case, the balance of harms weighs heavily against lifting the automatic stay to allow LLOG to exercise remedies against estate property.

2.    To establish a *prima facie* case for cause due to a lack of adequate protection, LLOG must initially demonstrate that it holds a claim, secured by a valid, perfected lien upon estate property and that a decline in the value of its collateral is either occurring or is threatened, against which the creditor is precluded from protecting its interests due to the existence of the automatic stay.  LLOG has failed to meet its burden with respect to each of these elements:

- First, while LLOG arguably may have a validly created mortgage lien on the Debtors' *working interest* in the GC 201 Lease (as between the parties), LLOG has not demonstrated that it holds a valid security interest in and to the Debtors' interest in the ORRI (as defined below) and/or the proceeds related thereto (the "**ORRI Collateral**," and together with the ORRI, the "**ORRI Assets**") under the terms of the OOA, the ORRI Assignments (defined below) or the OOA Amendment (defined below).

2

- Second, even if LLOG holds a valid mortgage lien and/or security interest (collectively, the mortgage lien and security interest, the "**Security Rights**") in the ORRI Assets, the express terms of the ORRI preclude LLOG from enforcing such Security Rights to satisfy LLOG's claim.

- Third, to the extent LLOG holds any valid Security Rights in *any* of the Debtors' interests (whether their working interest or the ORRI Assets) in the GC 201 Lease that can be enforced to satisfy LLOG's claim for unpaid JIBs, LLOG has not demonstrated that it properly perfected any such Security Rights under Louisiana law.

- Fourth, even if LLOG can overcome each of the preceding points raised above, LLOG has not demonstrated that a decline in the value of its collateral is either occurring or is threatened to occur.

- Fifth, LLOG has failed to demonstrate that it is owed $902,490.92 in unpaid JIBs. Indeed, the Debtors dispute the alleged amount owed and assert that, after accounting for certain offsets to which the Debtors are entitled, LLOG's claim is substantially less than the amount asserted by LLOG.

3.    For each of the foregoing reasons, LLOG has not established its *prima facie* case to lift the stay for cause due to a lack of adequate protection.

4.    Moreover, even if LLOG could demonstrate that it holds a claim that is secured by valid, perfected Security Rights in the Debtors' interest in the ORRI Assets, the Motion should be denied because (1) lifting the stay will significantly interfere with the administration of these chapter 11 cases and the Debtors' efforts towards confirming the chapter 11 plan it filed on January 1, 2021, and (2) LLOG will not be injured if the stay remains in place.

5.     Accordingly, because LLOG has not met, and cannot meet, its burden of showing cause for relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code, the Motion should be denied.

## BACKGROUND

### A.     Debtors' Chapter 11 Cases

6.     On August 3 and 4, 2020, the Debtors each commenced in this Court a voluntary case under title 11 of the United States Code (the "**Bankruptcy Code**").   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

### B.     Debtors' Proposed Joint Chapter 11 Plan and Disclosure Statement

8.     On January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [ECF No. 722] (as it may be amended, modified, or supplemented, the "**Plan**") and *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (as it may be amended, modified, or supplemented, the "**Disclosure Statement**") (ECF No. 723).   A hearing to consider approval of the Disclosure Statement is scheduled for February 3, 2020 at 2:30 p.m. (prevailing Central Time).

4

9. The Plan provides, in relevant part, that holders of "Other Secured Claims"[2] in Class 1, which include allowed secured claims similar to those allegedly held by co-working interest owners such as LLOG, shall be unimpaired and receive:

> either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired; *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

10. In addition, Article 7.8 of the Plan governs the procedures for disputed claims and provides, among other provisions:

> If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

11. To the extent that LLOG's claim becomes an Allowed Other Secured Claim, Article 7.9 of the Plan provides for due distribution:

> To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

---

[2] Other Secured Claim is defined as "any Secured Claim against a Debtor other than a Priority Tax Claim, FLFO Claim, FLTL Claim, and SLTL Claim."

**C.      The Operating Agreement Between Davis and LLOG in December 2002**

12.      On December 12, 2002, LLOG, as operator, and Davis Offshore, L.P. ("**Davis**"), as non-operator, entered into the OOA covering only the Green Canyon Block 157 Lease No. OCS-G 24154 (the "**GC 157 Lease**").

13.      Under the OOA, Davis, as non-operator, granted LLOG, as operator, "a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and the products thereof, whether now existing or hereinafter acquired," including "in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease[s] or the Contract Area or attributable to the lease or the Contract Area when produced, . . . and (c) all cash and other proceeds from the sale of such oil and gas once produced . . ." *See* ECF No. 683-2, Exhibit I, § A(ii) (OOA).

14.      The security interest granted by Davis to LLOG also covers "all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present future operating, farmout…assignments, and subleases…hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area…" *Id*. at Exhibit I § A(ii)(1).  The OOA covered only the GC 157 Lease in the respective definitions of "Contract Area" and "Lease."  See *Id*. at Exhibit A; ECF No. 683-1 at §§ 2.7, 2.27 (OOA).

15.      Exhibit I of the OOA states that "[a]ny agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Lease or the Contract Area shall

6

specifically make such interests inferior to the rights of the Parties to this Agreement." ECF No. 683-2, Exhibit I § D. If a party does not pay its share of the costs under the OOA, and proceeds from the sale of Hydrocarbon production are insufficient to pay those costs, then "security rights provided for…may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Lease or the Contract Area is burdened." *Id*.

16.     In addition, Section 19.1 of the OOA provides that, "[i]f any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary Working Interest, net profits interest or other type of burden on Hydrocarbon production in addition to the lessor's royalty stipulated in the Lease(s) (an "**Overriding Royalty**") . . . . such Overriding Royalty shall be considered a Subsequently Created Interest."

## D.     The 2008 Farmout Agreement Between Shell, Marathon, LLOG, and Davis and Creation of the ORRI

17.     On October 1, 2008, Shell Offshore Inc. ("**Shell**"), Marathon Oil Company ("**Marathon**"), LLOG, and Davis entered into a Farmout Agreement covering the GC 201 Lease (the "**Farmout Agreement**"), insofar and only insofar as the GC 201 Lease covers NE/4 of Green Canyon Block 201 for the depths from the surface down to 17,000 SSTVD (the "**Farmout Area**"). Pursuant to the terms and conditions of the Farmout Agreement, once LLOG and Davis satisfied the earning requirements thereunder, Shell and Marathon would assign 100% of their operating and working interest rights in the Farmout Area to LLOG (85%) and Davis (15%) and would reserve to themselves a 6.5% of 8/8ths overriding royalty interest in and to all production from such assigned Operating Rights Interest applicable to the first 1 million Barrels of Oil Equivalent produced from the Farmout Area, which overriding royalty interest would

escalate to 9.75% of 8/8ths for all production above 1 million Barrels of Oil Equivalent produced

from the Farmout Area, and LLOG was designated as the operator of the GC 201 Lease.  *See*

Exhibit A (Farmout Agreement, § 1.3).

18.     Upon earning their interest in the Farmout Area under the Farmout

Agreement, LLOG and Davis were assigned their respective Operating Rights Interests by Shell

and Marathon pursuant to that certain Assignment of Operating Rights Interest in Federal OCS

Oil and Gas Lease, dated April 2, 2009, effective October 1, 2008.  *See* Exhibit B (First

Assignment of Operating Rights).   Simultaneously therewith, LLOG and Davis assigned the

overriding royalty interest (the "**ORRI**") to Shell and Marathon pursuant to the certain

Assignment and Conveyance of Overriding Royalty Interest, dated February 19, 2009, effective

October 1, 2008 (the "**Shell/Marathon ORRI Assignment**").  *See* Exhibit C (Shell/Marathon

ORRI Assignment).   Notably, the Assignment of Operating Rights (and the interests acquired

thereunder by LLOG and Davis in the GC 201 Lease) was made, and accepted by LLOG and

Davis, expressly subject to the Shell/Marathon ORRI Assignment.  *See* Exhibit A (Farmout

Agreement, 1.3).

19.     Further, the Shell/Marathon ORRI Assignment provides, in relevant part,

that the ORRI "…shall be free and clear of all costs of exploring, operating, developing,

producing and maintaining the Contract Area[3] in force and effect, abandoning the Contract Area

---

[3] The "Contract Area" as defined in the Shell/Marathon ORRI Assignment is "Federal Lease No. OCS-G 12210 dated effective May 1, 1990, between the United States of America and BP Exploration Inc., as original lessee, covering all of Block 201, Green Canyon, as shown on OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar and only insofar as to the northeast quarter (NE/4) of said Lease, covering depths from surface to 17,000 feet subsea true vertical depth."

and all costs of compressing, dehydrating, treating or otherwise rendering the production therefrom marketable…" *Id.* at § (i).

E.    **Fieldwood's Acquisition of Davis in August 2014 and Ratification and Amendment of the OOA in December 2014**

20.    On August 5, 2014, Davis Petroleum Acquisition Corp., as seller, Davis Offshore Partners, LLC ("**Davis Offshore Partners**"), and Davis entered into an Equity Purchase Agreement with Fieldwood, as buyer, for all partnership equity of the three Davis entities and for, among other things, the "oil, gas, and mineral leases, subleases, royalties, overriding royalties, production payments, net profits interests, carried interests, reversionary interests, and all other interests of any kind or character in Hydrocarbons in place and the leasehold estates created thereby…" for a purchase price totaling $36,500,000. *See* Exhibit D §§ 2.1, 3.1 (Davis Equity Purchase Agreement). Among the subject leases Fieldwood purchased was the J. Bellis Field, which included Davis's working interest (15%) in the GC 201 Lease. *Id.* at Schedule 2.1(a) (Davis Equity Purchase Agreement).

21.    In December 2014, LLOG and Fieldwood ratified and amended the OOA pursuant to the Ratification and First Amendment to Operating Agreement (the "**OOA Amendment**") to, among other things, ratify the OOA and add the GC 201 Lease to the Contract Area. *See* ECF No. 683-3 (OOA Amendment). The OOA Amendment is dated back to the effective date of the OOA, December 12, 2002.

22.    The OOA states that any Overriding Royalty created subsequent to the date of the OOA shall be subject to the terms of the OOA and shall be subordinate to the rights of the other parties to the OOA. *See* ECF No. 683-2, § 19.1.1 (OOA). However, the

9

ORRI was created prior to the execution of the OOA Amendment (the date on which Fieldwood became party to the OOA), and Shell and Marathon were not parties to either the OOA Amendment or the OOA and did not agree that the ORRI was subject to the terms of the OOA, as amended by the OOA Amendment, and the terms of the OOA (as amended by the OOA Amendment) do not override or supersede the language used by LLOG and Davis in the Shell/Marathon ORRI Assignment as described in paragraph 19 above.

23.   Moreover, provision 4 of the OOA Amendment provides that "LLOG and Fieldwood hereby agree the Farmors' ORI [the ORRI] is not to be considered a Subsequently Created Interest as described in Article 19.1 of the OA [the OOA]."   *Id.*   Although "Subsequently Created Interest" is not a defined term in the OOA, this provision appears to be the parties' attempt to provide clarity in the OOA Amendment that the ORRI would not be subject to the terms of the OOA.

**F.      Shell's Assignment of its Interests in the ORRI to Fieldwood in Connection with Fieldwood's Purchase of the Hickory Unit in January 2015**

24.   In connection with the Debtors' purchase of certain assets related to the Hickory Unit from Shell (the "**Hickory Unit APA**"), in July 2015, Shell entered into an Overriding Royalty Assignment (the "**Fieldwood ORRI Assignment**," and together with the Shell/Marathon ORRI Assignment, the "**ORRI Assignments**") under which it sold and conveyed to Fieldwood, effective as of January 1, 2015, among other interests, all right, title, and interest in its portion (4.87999%) of the ORRI created pursuant to the Farmout Agreement on October 1, 2008.   *See* Exhibit E, Attachment A (Fieldwood ORRI Assignment).   The Fieldwood ORRI Assignment did not create a new overriding royalty interest or include any

language to amend the terms of the Shell/Marathon ORRI Assignment or make it subject to the terms of the OOA. *Id.* As such, the Fieldwood ORRI Assignment, like the ORRI (and the ORRI Assets), is not subject to or burdened by the terms of the OOA.

## OBJECTION

### A.   Legal Standard

25.   Section 362(d) of the Bankruptcy Code provides that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay
>
> > (1) for cause, including lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section if:
> >
> > > (A) the debtor does not have any equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization.

26.   The movant bears the initial burden of showing "cause" for relief from the automatic stay. *In re Baytown Nav., Inc.*, No. BR 11-35926, 2012 WL 1123047, at *3 (S.D. Tex. Apr. 3, 2012) (citing 11 U.S.C.§ 362(g)(1)); *see also In re Gramercy Court, Ltd.*, No. 07-80177-G3-11, 2007 WL 2126493, at *5 (Bankr. S.D. Tex. July 19, 2007) ("[e]very party seeking relief from the automatic stay under section 362(d)(1) must carry the initial burden of showing that it is entitled to relief before the debtor is obligated to go forward with its proof.").

11

27.  If the movant fails to make a *prima facie* case, the court should deny relief.  *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990) ("[i]f the movant fails to make an initial showing of cause, . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); *In re Gramercy Court, Ltd.*, 2007 WL 2126493 at *5.

28.  The Bankruptcy Code does not define "cause," therefore the courts must interpret its meaning on a case by case basis.  *See, e.g.*, *In re Reitnauer*, 152 F.3d 341, 343 n.4 (5th Cir. 1998) ("Because [section] 362 does not offer guidance as to what constitutes 'cause,' reviewing courts must determine whether cause existed on a case-by-case basis."); *In re Mendoza*, 111 F.3d 1264, 1271 (5th Cir. 1997) ("The Bankruptcy Act does not specify what constitutes cause to modify a stay, other than 'lack of adequate protection of an interest in property of such party in interest.'").

**B.**     **LLOG Cannot Establish A *Prime Facie* Case for "Cause" to Lift the Stay Due to Lack of Adequate Protection**

29.  To establish a *prima facie* case for cause due to a lack of adequate protection, a movant must initially demonstrate that it (i) holds a claim, (ii) secured by a valid, perfected lien upon estate property and that (iii) a decline in the value of its collateral is either occurring or is threatened, against which the creditor is precluded from protecting its interests due to the existence of the automatic stay.  *In re Kowalsky*, 235 B.R. 590, 595 (Bankr. E.D. Tex. 1999).

30.  Here, LLOG has not established a *prima facie* case for cause due to lack of adequate protection because (1) it has failed to demonstrate that LLOG holds valid Security

12

Rights in the ORRI Assets, (2) even if LLOG holds Security Interests in the ORRI Assets, the express terms of the ORRI expressly preclude LLOG from enforcing any such Security Rights to satisfy LLOG's claim for unpaid JIBs, (3) to the extent LLOG does hold a valid Security Right in any interest of the Debtors in the GC 201 Lease, LLOG has failed to show that such interests were properly perfected under Louisiana law, (4) it has not demonstrated that a decline in the value of any of its collateral has occurred or is threatened, against which LLOG is precluded from protecting its interests due to the existence of the automatic stay, and (5) LLOG has not demonstrated that it is owed $902,490.92 under the OOA.

1. **LLOG Has Not Demonstrated that a Valid Security Right in the ORRI Assets was Established in its Favor**

31. LLOG has failed to show that it holds any Security Rights in any of the ORRI Assets. The terms and provisions of the OOA, as amended by the OOA Amendment, and ORRI Assignments demonstrate that LLOG does not hold any Security Rights in the ORRI Assets.

32. When LLOG and Davis originally entered into the OOA in December of 2002, the Contract Area only covered GC Block 157. The OOA's Contract Area did not cover the GC 201 Lease until LLOG and Fieldwood entered into the OOA Amendment in December of 2014. The rights created under the OOA created by, and in favor of, LLOG and Davis, are separate, independent and distinct from the rights created by LLOG and Davis in favor of Shell and Marathon under Farmout Agreement and the Shell/Marathon ORRI Assignment – they do not intersect or overlap. The Assignment of Operating Rights (and the interests acquired thereunder by LLOG and Davis in the GC 201 Lease) was made, and

accepted by LLOG and Davis, expressly subject to the Shell/Marathon ORRI Assignment. *See* Exhibit A (Farmout Agreement, § 1.3).

33. Nothing in the Fieldwood ORRI Assignment or the OOA Amendment altered or amended any of the terms of the Shell/Marathon ORRI Assignment. Therefore, Fieldwood, when it acquired its interest in the ORRI in 2015, acquired it unencumbered by any lien or other encumbrance created or evidenced by the OOA. *See* Exhibit E (Fieldwood ORRI Assignment). Indeed, the Fieldwood ORRI Assignment expressly states that the overriding royalty conveyed thereunder "…shall be free and clear of all costs of exploring, **operating**, developing, producing and maintaining the Contract Area[4] in force and effect, **abandoning** the Contract Area and all costs of compressing, dehydrating, treating or otherwise rendering the production therefrom marketable…" *Id*. at ¶ (i) (Fieldwood ORRI Assignment) (emphasis added). Plugging and abandonment are operations within the Contract Area, as anticipated in the ORRI, and are performed as a part of operating and abandonment of wells within the Contract Area.

34. In addition, the parties appeared to have intended to make it clear in the OOA Amendment that the ORRI would be kept free and clear of the terms and provisions of the OOA by expressly providing that "LLOG and Fieldwood hereby agree the Farmors' ORI [the ORRI] is not to be considered a Subsequently Created Interest as described in Article 19.1 of OA [the OOA]." *See* ECF No. 683-3 ¶ 4 (OOA Amendment).

---

[4] The "Contract Area" as defined in the Farmout Agreement is "Federal Lease No. OCS-G 12210 dated effective May 1, 1990, between the United States of America and BP Exploration Inc., as original lessee, covering all of Block 201, Green Canyon, as shown on OCS Official Protraction Diagram, NG 15-3, containing approximately 5,760 acres, insofar and only insofar as to the northeast quarter (NE/4) of said Lease, covering depths from surface to 17,000 feet subsea true vertical depth." *See* Exhibit A (Farmout Agreement, Exhibit A, § I).

35.   LLOG now argues that because the OOA Amendment between LLOG and Fieldwood expanded the OOA's Contract Area to include the GC 201 Lease, it somehow supersedes the express terms of the Shell/Marathon ORRI Assignment and the parties' apparent attempt to clarify in the OOA Amendment that the ORRI shall remain unencumbered.

36.   The parties' intent to keep the ORRI unencumbered becomes even more apparent when considering how the ORRI was first created in 2008 and the unanticipated effect of subsequently assigning Shell's interest in the ORRI to Fieldwood, who had just recently acquired a working interest in the GC 201 Lease in connection with a separate transaction.  At no time was the ORRI ever held or owned by a working interest owner party to the OOA prior to the Fieldwood ORRI Assignment, which was likely was not expected to occur.  But, the mere fact that Fieldwood, as a working interest owner in the GC 201 Lease, did later acquire Shell's interest in the ORRI, should not by such acquisition alone, change the nature of the ORRI or the intent of the parties to any of the ORRI Assignments or the OOA, as amended by the OOA Amendment, that the ORRI was to remain unencumbered by the terms and provisions of the OOA.

### 2.   The Terms of the ORRI Preclude LLOG from Enforcing Any Security Rights Against the ORRI to Satisfy its Claim

37.   Even if LLOG did have Security Rights in the ORRI Assets—which it does not—the express language of the ORRI precludes LLOG from enforcing such Security Rights to collect proceeds of the ORRI for obligations under the OOA.  The Shell/Marathon ORRI Assignment expressly states that the overriding royalty conveyed thereunder "…shall be

15

free and clear of all costs of exploring, operating, developing, producing and maintaining the Contract Area in force and effect, abandoning the Contract Area and all costs of compressing, dehydrating, treating or otherwise rendering the production therefrom marketable…"  *See* Exhibit C, ¶ (i) (Shell/Marathon ORRI Assignment).

> **3.    LLOG has Failed to Demonstrate that Any Lien it May Have in the Debtors' Interests in the GC 201 Lease was Properly Perfected Under Louisiana Law**

38.    Even if LLOG could demonstrate that it was granted Security Rights in and to the ORRI Assets, LLOG has failed to demonstrate that any such Security Rights were properly perfected under Louisiana law.

39.    Under Louisiana law, Security Rights, such as mortgage liens on real/immovable property such as mineral leases and overriding royalty interests ("**Mortgage Liens**"), and security interests in personal/movable collateral such as the ORRI Collateral ("**Security Interests**") are only effective as to third persons (defined as other than the parties to the act or someone who assumes or takes such real/immovable property "subject to" an obligation), if it is recorded of public record as required under the relevant statutes.[5, 6]

40.    With respect to Mortgage Liens, the mortgage instrument must be recorded in the mortgage records of the parish where the encumbered real/immovable property is located:

---

[5] La. R.S. 31:203 provides that mineral rights of all kinds are subject to mortgage, to the extent and with the same effect, and subject to the same effect, provisions of rank, inscription, reinscription, extinguishment, transfer and enforcement as prescribed by law for mortgages of immovable under Louisiana Civil Code article 3286.

[6] In addition, La. R.S. 31:216 and 31:217 provide that instruments such as operating agreements or, in lieu thereof, a declaration of such operating agreements, respectively, must be recorded in the conveyance records of the applicable parish to be effective as against third parties.

Art. 3338.  *Instruments creating real rights in immovables; recordation required to affect third persons*

The rights and obligations established or created by the following written instruments **are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records** pursuant to the provisions of this Title:

(1)  An instrument that transfers an immovable or establishes a real right in or over an immovable.

(2)  The lease of an immovable.

(3)  An option or right of first refusal, or a contract to buy, sell, or lease an immovable or to establish a real right in or over an immovable.

(4)  An instrument that modifies, terminates, or transfers the rights created or evidenced by the instruments described in Subparagraphs (1) through (3) of this Article.

41.  A Mortgage Lien would establish a real right in an immovable under subpart (1) of article 3338.[7]  But, if a Mortgage Lien is not properly recorded in the mortgage records of the appropriate parish, as required by article 3338, then a third person would not be bound by that Mortgage Lien[8] even if the third person had actual knowledge that such a mortgage lien existed.

42.  Louisiana courts have also recognized that if a mortgage instrument must be of record to affect third persons, a mere reference to that unrecorded document in a

---

[7] Civil Code 3280 defines a mortgage as "an indivisible real right."

[8]  *See also*, Article 3340.  *Effect of recording other documents*

 If the law or a recorded instrument expressly makes the recordation of an act or instrument a condition to the creation, extinction, or modification of rights or obligations, such act or instrument is not effective as to a third person until it is recorded.

The recordation of a document, other than an instrument described in Article 3338, that is required by law to be registered, filed, or otherwise recorded with the clerk of court or recorder of conveyances or of mortgages or in the conveyance or mortgage records shall have only the effect provided for by such law.

recorded document is not sufficient to make it effective as to third persons.  *See, e.g., Judice-Henry-May Agency, Inc. v. Franklin*, 376 So. 2d 991 (La. App. 1st Cir. 1979), writ den. 381 So. 2d 508 (La. 1980).

43.   With respect to perfection of Security Interests, to the extent governed by Louisiana law, a UCC-1 financing statement must be filed in the UCC records of any parish in the State of Louisiana to perfect in collateral such as ORRI Assets, in accordance with La. R. S. 10:9-501, *et seq*., which filing, to maintain perfection, must be continued in accordance with La. R.S. 10:9-515 within the 6-month period before the expiration of 5-years after the filing of the UCC-1 financing statement.

44.   Pursuant to the terms of the OOA, LLOG and Davis entered into that certain Memorandum of Operating Agreement and Financing Statement in July 2009, effective as of December 12, 2002, whereby LLOG and Davis granted to each other reciprocal Security Rights in each of their respective real/immovable and personal/movable property interests in and to the Contract Area, all as described therein  (the "**Original MOA**").  *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 205.

45.   In addition, LLOG and Davis also entered into that certain Correction to Memorandum of Operating Agreement and Financing Statement, in September 2009, whereby the parties corrected the erroneous description of the GC 201 Lease provided in the Original MOA (the "**Correction MOA**," and together with the Original MOA, the "**Amended MOA**").  *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 219.

46. In an attempt to support its argument that it currently has perfected Security Rights in collateral such as the ORRI Assets, LLOG attached to its Motion certain instruments that appear to reflect that the Amended MOA was recorded in 2009 in the Mortgage and UCC Records of Terrebonne Parish, Louisiana.[9]  As discussed below, however, neither the Original MOA nor the Correction MOA was ever properly recorded in the mortgage records of Terrebonne Parish, Louisiana.[10]  In addition, the instrument filed in 2009 in the UCC Records of Terrebonne Parish, Louisiana, was not continued and has since lapsed and is of no effect under Louisiana law.

47. On December 16, 2014, LLOG, LLOG Energy, L.L.C., and Fieldwood entered into that certain Amendment and Ratification of Memorandum of Operating Agreement and Financing Statement, dated effective June 1, 2014 (the "**Fieldwood Ratification**"), whereby, in part, Fieldwood acknowledged its acquisition of Davis' working interest in the Contract Area and ratified the MOA.  As per the instrument attached to LLOG's Motion, the Fieldwood Ratification, appears to have been recorded in the Mortgage Records of Terrebonne Parish, Louisiana, on February 2, 2015, at MOB 2716, Page 268, File No. 1473360.  *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 225.

48. The Fieldwood Ratification expressly refers to Fieldwood's ownership interest in the GC 201 Lease (being an undivided 15%).  Since acquiring its interest in the ORRI in 2015, Fieldwood has not entered into any agreement to amend the original terms of

---

[9] The copies of the instruments attached to LLOG's Motion also appear to reflect that the Amended MOA was also recorded in 2009 in the Conveyance Records of Terrebonne Parish, Louisiana.

[10] Likewise, neither the Original MOA nor the Correction MOA was properly filed in the Conveyance Records of Terrebonne Parish, Louisiana.

the Shell/Marathon ORRI Assignment (or the OOA or the MOA) to make the ORRI subject to the terms and provisions of the OOA.

49.   LLOG has not provided sufficient documentary evidence of a presently valid Mortgage Lien of Security Interest from the records of Terrebonne Parish, Louisiana (or from any other jurisdiction), to demonstrate that it has perfected Security Rights in any real/immovable or personal/movable property subject to the Amended MOA, including the ORRI Assets.

50.   Although LLOG indicates that the Amended MOA was recorded in the Mortgage and UCC records of Terrebonne Parish, the only instruments that were actually recorded in the Mortgage Records were State of Louisiana UCC Financing Statements, and such recordings have no effect under Louisiana law.  With respect to the Original MOA, the actual instrument that was filed in the Mortgage Records was a UCC-1 initial financing statement ("**2009 UCC-1 Financing Statement**") covering fixtures and as-extracted collateral.  *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 202. As evidenced by Item 4 of the 2009 UCC-1 Financing Statement, a copy of the Original MOA was attached thereto as an exhibit only to provide a description of the covered collateral and a description of the real/immovable property associated therewith.  Notably, the Original MOA instrument itself was not recorded in the Mortgage Records of Terrebonne Parish as an actual mortgage.

51.   With respect to the Correction MOA, the actual instrument that was filed in the Mortgage Records was a UCC-3 financing statement amendment ("**2009 UCC-3**

20

**Financing Statement Amendment**"), amending and restating the collateral description of the 2009 UCC-1 Financing Statement Amendment, as evidenced by Item 8 thereof. *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 217. Also evidenced by Item 8 of the 2009 UCC-3 Financing Statement, a copy of the Correction MOA was attached thereto as an exhibit only to provide a description of the amended/restated collateral and real/immovable property description associated therewith.[11]   Like the Original MOA, the Correction MOA instrument itself was not recorded in the Mortgage Records of Terrebonne Parish as an actual amendment to a mortgage.

52. As previously noted hereinabove, Louisiana Civil Code Article 3340 provides that **instruments** establishing real rights in or over an immovable are without effect as to third persons unless the **instrument** is recorded in the appropriate mortgage or conveyance records as provided pursuant to Louisiana law. Further, Louisiana Civil Code Article 3340 generally provides that the recordation of a document that is required by law to be filed in the conveyance or mortgage records will have only the effect provided for by such law.

53. In addition, Louisiana law requires that **originals** of the actual Original MOA and the Correction MOA instruments be filed of record in the Mortgage Records to make the Mortgage Lien effective against third persons. Nothing under Louisiana law provides that copies of such instruments, attached to UCC financing statements as exhibits

---

[11] Likewise, although LLOG indicates that each of the Amended MOA was recorded in the Conveyance Records of Terrebonne Parish, the only instruments that were actually recorded in the Conveyance Records were the same State of Louisiana UCC Financing Statements as recorded in the Mortgage Records, and, as previously noted, have no effect under Louisiana law. Notably, the Original MOA instrument was not recorded in the Conveyance Records of Terrebonne Parish as an actual notice of the OOA.

merely to provide descriptions of the covered collateral and property descriptions associated therewith, are to be filed in the Mortgage Records to make them effective against third persons.  Louisiana is a "race" state and under the Louisiana public records doctrine, an instrument affecting immovable property that is not properly filed of record pursuant to Louisiana law should not be given effect as to third persons.

54. Therefore, regardless of whether copies of the Original MOA and the Correction MOA were attached thereto, the actual instruments that were recorded in the Mortgage Records were UCC financing statements, and such filings are not legally sufficient to make the Mortgage Lien (and any amendment thereto) effective against third persons and have no effect under Louisiana law.[12]

55. In its Motion, LLOG indicates that it filed, in the Terrebonne Parish Mortgage Records, (i) a Reinscription of the Original MOA in April, 2014 (the "**2014 Reinscription**"), and (ii) an Amendment and Ratification of the Original MOA in February, 2015 (the "**2015 Ratification**").  The 2014 Reinscription appears to have been an attempt by LLOG to reinscribe the Original MOA to continue its effectiveness of the Mortgage Lien as to third persons, and the 2015 Ratification appears to have been an attempt to amend and ratify the Amended MOA by the parties thereto.  *See In Re: Fieldwood Energy Offshore LLC*, 4:20-BK-33950, Claim 6-1 at 222 and 224, respectively.  These filings, however, have no real

---

[12] Likewise, Louisiana law requires originals of instruments such as  joint operating agreements (or declarations thereof) be filed in the Conveyance Records to be effective against third-parties thereof; however, no Louisiana law requires instruments such as the 2009 UCC-1 Financing Statement and 2009 UCC-3 Financing Statement Amendment be filed in the Conveyance Records, with or without copies of a joint operating agreement (or a declaration thereof) attached thereto.  Therefore, such filings are also not legally sufficient to constitute effective notice of the OOA, or the Amendment thereto, and have no effect under Louisiana law.

effect, considering the Original MOA and Correction MOA instruments were not properly filed in the Mortgage Records in accordance with Louisiana law to make the Mortgage Lien effective against third persons.[13]

56.   Further, whether the 2009 UCC-1 Financing Statement was properly filed in the Terrebonne Parish UCC records, such that it would have constituted sufficient notice (and perfection) of the Security Interests created under the Original MOA, is of no import, as such 2009 UCC-1 Financing Statement (and all related subsequent filings associated therewith, including the 2009 UCC-3 Financing Statement Amendment) was not continued, and has since lapsed.

57.   Therefore, without properly perfected security rights in any of the real/immovable or personal/movable property described in the OOA or the Original MOA, as amended by the Correction MOA, LLOG is not entitled to adequate protection.  *See, e.g., In matter of Shree Meldikrupa Inc.*, No. 15-41411-EJC, 2016 WL 235205, at *5 (Bankr. S.D. Ga. Jan. 15, 2016) (holding that creditor was not entitled to adequate protection where creditor held an unperfected security interest in debtor's cash and adopting majority of courts' holding "that only an entity with a *perfected* security interest in the subject collateral can have an "interest" in cash collateral within the meaning of § 363(a)"); *see also In re Wright Group*, 443 B.R. 795, 799 (Bankr. N. D. Ind. 2011) ("A predicate for the existence of 'cash collateral' under 11 U.S.C. § 363(a) is that a creditor have a perfected security interest in property of the debtor's estate."); *Southtrust Bank of Sand Mountain v. Fricks (In re Fricks)*, 58 B.R. 883,885

---

[13] Likewise, the 2015 Ratification appears to have been also filed in the Conveyance Records of Terrebonne Parish for notice purposes of same.  This filing is also without effect, as the original filings of the Amended MOA were not properly filed in the Conveyance Records in accordance with Louisiana law to provide effective notice of same.

(Bankr. N.D. Ala. 1986) ("[a]bsent a properly perfected security interest in after-acquired [property], proceeds from [such property] would not be property in which the estate and entity other than the estate have an interest, and, therefore the proceeds would not be subject to the limitations on use sought by the [creditor]"); 3 Collier on Bankruptcy 363.03[3], p. 363–29 (16th ed. 2013) ("Cash collateral also does not include cash to which the creditor's security interest has not attached or is not perfected.").

4. **LLOG has Failed to Demonstrate that the Value of its Alleged Security Rights Have Declined in Value**

58. LLOG does not provide any evidence that the value of any alleged Security Rights has diminished in value. Rather, LLOG provides only general statements about the nature of hydrocarbon production as a business and the state of the oil and gas industry during a pandemic.[14] Even if LLOG can overcome all of the hurdles discussed above, LLOG does not demonstrate how the value of it's alleged collateral–the ORRI Assets– is either currently declining in value or under any particular threat of decline.

59. In order to carry its burden that the value of LLOG's alleged security interest has diminished, "Typically, a creditor will show a property's decline in value by comparing the value of that property at the time of the bankruptcy petition against the value of the property at the time of the lift stay hearing." *In re JCP Properties, Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015). No such evidence has been provided by LLOG.

---

[14] *See* ECF No. 683 at 7 ("LLOG's collateral rights are reliant upon hydrocarbon production, which is an inherently speculative undertaking even in the best of times. The risk of diminishment in value is particularly relevant here given the current challenges impacting the oil and gas industry, including a steep decline in oil prices and an unprecedented global pandemic. Further, due to the finite nature of oil and gas resources, the value of LLOG's collateral is diminishing with every passing day that further production occurs.").

**5.** <u>**LLOG Has Failed to Establish the Amount of its Claim**</u>

60. LLOG has not produced sufficient evidence to support its assertion that it is owed $902,490.92 in unpaid JIBs under the OOA. Instead, LLOG relies on a one-page exhibit summarizing what it believes to be the total amount owed. *See* ECF No. 684-5. As noted above, the Debtors believe that, after accounting for certain offsets to which the Debtors are entitled, LLOG's prepetition claim is substantially less than the amount LLOG contends it is owed.

**C.      The Balance of Harms Weighs Against Lifting the Stay**

61. Even if LLOG could establish a *prima facie* case for cause due to lack of adequate protection (which the Debtors dispute), the balance of harms clearly weighs against lifting the automatic stay under these circumstances.

62. In determining whether to grant relief from the automatic stay, this court has considered the following factors: (1) "interference with the bankruptcy; (2) "good or bad faith of the debtor"; (3) "injury to the debtor and other creditors if the stay is modified"; (4) "injury to the movant if the stay is not modified"; and (5) "proportionality of the harms from modifying or continuing the stay[.]" *In re Mosher*, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) (quoting *In re Bovino*, 496 B.R. 492, 502 (Bankr. N.D. Ill. 2013)). No single factor is determinative and they are weighed "within the context of all the relevant circumstances." *Id.*

63. As discussed above, LLOG has not demonstrated that it holds a valid and perfected security interest in the ORRI Assets and, therefore, LLOG has not established a *prima facie* case to lift the automatic stay due to a lack of adequate protection. However, even

if LLOG could establish that it does hold such an interest, the Motion should be denied because (1) lifting the stay will directly and significantly interfere with these chapter 11 cases and the plan confirmation process; and (2) LLOG will not be injured if the stay remains in place.

6. **If the Stay is Modified, LLOG's Subsequent Efforts Will Directly Interfere with the Plan Confirmation Process**

64. The Debtors are currently focusing their time, energy, and resources on confirming the Plan, which embodies a number of highly-complex transactional documents and agreements that will benefit the Debtors' estates and maximize recoveries to the Debtors' creditors. Any distraction from these goals, particularly in this critical period, is unwarranted and contrary to the best interests of the Debtors' estates and their creditors. Granting LLOG relief from the automatic stay to enforce its alleged Security Interests would significantly interfere with Debtors' efforts to confirm the Plan and such relief runs directly contrary to the proposed procedures for determining the Allowed amount of claims for purposes of distribution or other treatment under the Plan.

65. By permitting LLOG to seek remedies against the Debtors' assets where the Debtors dispute both the amount and alleged secured status of such claim, the Debtors will be forced to adjudicate or otherwise resolve the amount of LLOG's claim and the extent to which such claim is secured (if at all) prior to confirmation and defend against LLOG's attempts to require the first purchaser of the GC 201 Lease production to withhold/escrow proceeds from the Fieldwood ORRI in a segregated account. Such efforts would increase costs to the Debtors' estates and would distract the Debtors from the primary objective of

26

confirming a value maximizing chapter 11 plan. Moreover, to the extent LLOG were successful in segregating proceeds from the Fieldwood ORRI in an amount up to the amount of its claim, the Debtors' estates would be deprived access to such cash during the pendency of these chapter 11 cases.

66. Additionally, granting the Motion invites all similarly situated creditors to seek similar relief from the stay. If LLOG is successful in its attempt to segregate or escrow proceeds from the ORRI, the Debtors may be forced to defend against similar remedies exercised by other creditors that allege they hold secured claims. The resulting cost and time to the Debtors to defend against such actions and proceedings would threaten the Debtors' ability to confirm the proposed Plan and disrupt the Debtors' proposed, orderly process for resolving claims for Plan distribution purposes. Courts often refuse to lift the stay when doing so might induce other creditors to request similar relief. *See, e.g., In re Advanced Med. Spa Inc.*, No. 15-27456- B-7, 2016 WL 3003203, at *4 (B.A.P. 9th. Cir. Mar. 30, 2016) (denying a motion to lift the stay where "[a]t a minimum, the debtor . . . would be forced to defend a multitude of stay relief motions which . . . would . . . cause the estate to incur significant administrative expenses for litigation costs…and this is precisely what the automatic stay is designed to prevent"); *In re DBSI, Inc.*, 407 B.R. 159, 167 (Bankr. D. Del. 2009) (denying relief from the automatic stay where lifting the stay may encourage parties seeking similar orders to race to the courthouse). Thus, the Debtors bear significant potential harm if the stay is lifted.

27

7.      **LLOG Will Not be Injured if the Stay Remains in Place**

67.     Because holders of Allowed Other Secured Claims in Class 1 are unimpaired under the Plan, to the extent LLOG's claim becomes an Allowed Other Secured Claim, LLOG's only potential harm in keeping the stay in place is to cause a delay in payment, which would place LLOG in the same position as other holders of alleged secured claims in Class 1.  *See* ECF No. 722, § 4.1.  ("[S]uch holder shall receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired…").   Delay, however, is an insufficient basis for obtaining relief from the automatic stay.  *See In re Madison Hotel Assocs.*, 18 B.R. 218, 219 (Bankr. W.D. Wis. 1982) ("Relief from the automatic stay for 'cause' is not, nor was it intended by the drafters of the Bankruptcy Code, to encompass merely delay in the assertion of rights.").   Therefore, the relief LLOG now seeks is unnecessary to protect its claim or its alleged liens securing such claim.

## CONCLUSION

68.     For the foregoing reasons, cause does not exist to establish that LLOG is entitled to relief from the automatic stay, and the Motion should be denied.

WHEREFORE, the Debtors respectfully request that the Court deny the relief requested in the Motion.

Dated: January 11, 2021
       Houston, Texas

                                       */s/  Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
                Jessica.Liou@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Conference**

The Debtors' counsel and LLOG's counsel conferred on January 8, 2021, in an attempt to resolve the Motion, but were unable to resolve the Motion.

_/s/ Clifford Carlson_
Clifford Carlson

**Certificate of Service**

I hereby certify that, on January 11, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/ Alfredo R. Pérez_
Alfredo R. Pérez