# OFFSHORE OPERATING AGREEMENT

## CITRINE PROSPECT
## Green Canyon Block 157

BETWEEN

## LLOG Exploration Offshore, Inc.

### AS OPERATOR

### AND

## Davis Offshore, L.P.

### AS NON-OPERATOR

## TABLE OF CONTENTS

ARTICLE 1.0  CONTRACT APPLICATION ...................................................................1
   1.1    Application in General ..............................................................1
   1.2    Application to the Contract Area ..........................................1

ARTICLE 2.0  DEFINITIONS ...............................................................................2
   2.1    Affiliate ...........................................................................2
   2.2    Agreement ......................................................................3
   2.3    Annual Operating Plan .....................................................3
   2.4    Appraisal Operation/Well .................................................3
   2.5    Authorization For Expenditure (AFE) ...............................3
   2.6    Confidential Data ............................................................4
   2.7    Contract Area .................................................................4
   2.8    Costs ..............................................................................4
   2.9    Deepwater Operations Plan (DWOP) ...............................4
   2.10   Deepen or Deepening ....................................................5
   2.11   Deeper Drilling ..............................................................5
   2.12   Development and Production Plan ...................................5
   2.13   Development Operation/Well ..........................................5
   2.14   Development Phase ........................................................5
   2.15   Development Plan ..........................................................5
   2.16   Election .........................................................................6
   2.17   Exploration Plan ...........................................................6
   2.18   Exploratory Operation/Well ...........................................6
   2.19   Fabrication AFE ............................................................7
   2.20   Facilities .......................................................................7
   2.21   Feasibility Study ...........................................................7
   2.22   Final Design AFE .........................................................7
   2.23   General Matters ............................................................7
   2.24   Hydrocarbon(s) ............................................................8

2.25    **Integrated Project Team** ................................................................8

2.26    **Lease** ................................................................................8

2.27    **MMS** ................................................................................8

2.28    **Non-Consent Operations** ................................................8

2.29    **Non-Operating Party** ......................................................8

2.30    **Non-Participating Party** ..................................................8

2.31    **Non-Participating Party's Share** ....................................9

2.32    **Objective Depth** ..............................................................9

2.33    **Operator** ..........................................................................9

2.34    **Participating Interest** ......................................................9

2.35    **Participating Party** ........................................................10

2.36    **Party** ..............................................................................10

2.37    **Plan of Operation** ..........................................................10

2.38    **Production System** ..........................................................10

       **Surface Production System** ..........................................10

       **Subsea Production System** ............................................10

       **Initial Production System** ..............................................11

       **Subsequent Production System** ....................................11

2.39    **Producible Reservoir** ....................................................11

2.40    **Producible Well** ............................................................11

2.41    **Recoupment Amount** ....................................................11

2.42    **Sidetracking** ..................................................................11

2.43    **Well Plan** ......................................................................12

2.44    **Working Interest** ..........................................................12

**ARTICLE 3.0  EXHIBITS** ................................................................12

3.1    **Exhibits** ........................................................................12

**ARTICLE 4.0  SELECTION OF OPERATOR** ..............................13

4.1     Designation of the Operator ................................................................13

4.2     Substitute Operator ............................................................................13

4.3     Resignation or Removal of Operator and Selection of Successor Operator 15

    4.3.1   Resignation of Operator ..........................................................15

    4.3.2   Removal Upon Assignment.....................................................15

    4.3.3   Removal for Cause by Vote .....................................................15

    4.3.4   Selection of Successor Operator..............................................16

4.4     Effective Date of Resignation or Removal .........................................17

4.5     Delivery of Property.............................................................................17

ARTICLE 5.0  RIGHTS AND DUTIES OF OPERATOR ...................................18

5.1     Exclusive Right to Operate ..................................................................18

5.2     Workmanlike Conduct ........................................................................19

5.3     Drilling ................................................................................................19

5.4     Liens and Encumbrances ....................................................................20

5.5     Records.................................................................................................20

5.6     Reports to Government Agencies ........................................................20

5.7     Notices and Orders ..............................................................................21

5.8     Information to Participating Parties ...................................................21

5.9     Completed Well Information ...............................................................22

5.10    Information to Non-Participating Parties............................................23

ARTICLE 6.0 EXPENDITURES, SECURITY RIGHTS AND ANNUAL OPERATING

PLAN ................................................................................................................23

6.1     Basis of Charges to the Parties ...........................................................23

6.2     Authorization for Expenditure ............................................................24

    6.2.1   Supplemental AFE for Cost Overruns for Other Wells .......25

    6.2.2   Supplemental AFE for Cost Overruns on Integrated Project Team

AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE..................................................................................25

6.2.3   Supplemental AFE for Cost Overruns on  Fabrication AFE..............26

6.2.4   Supplemental AFE for Cost Overruns on all other AFE's (not listed above) .......................................................................................26

6.2.5   Emergency Expenditures......................................................26

6.3      Security Rights ......................................................................27

6.4      Annual Operating Plan ..........................................................27

6.4.1   Submission of Annual Operating Plan ..................................27

6.4.2   Adoption of Annual Operating Plan......................................28

6.4.3   Content of the Annual Operating Plan...................................28

6.4.4   Effect of Annual Operating Plan ..........................................29

6.4.5   MMS Plan of Operation Consistent with the Annual Operating Plan29

ARTICLE 7.0   CONFIDENTIALITY OF DATA ................................................30

7.1      Confidentiality Obligation .....................................................30

7.1.1   Exceptions to Confidentiality ...............................................30

7.1.2   Permitted Disclosures..........................................................31

7.1.3   Limited Releases to Offshore Oil Scouts Association............33

7.1.4   Continuing Confidentiality Obligation .................................33

7.2      Ownership of Confidential Data.............................................33

7.2.1   Well Log and Data Trades....................................................33

7.3      Access to the Lease, Rig and Construction Site .....................34

7.4      Development of Proprietary Information and/or Technology....34

7.5      News Releases ......................................................................35

ARTICLE 8.0   VOTING, ELECTIONS AND NOTICES ....................................35

8.1      Overall Supervision of Business Affairs ................................35

8.2      Voting Procedures on General Matters ...................................35

4

|       | 8.2.1 | Voting Interest ................................................................ | 36 |
|       | 8.2.2 | Vote Required ................................................................ | 36 |
|       | 8.2.3 | Second Opportunity to Participate ................................. | 37 |
|       | 8.2.4 | Participation By Fewer Than All Parties ......................... | 37 |
| 8.3   |       | Elections ........................................................................ | 38 |
|       | 8.3.1 | Second Opportunity to Participate ................................. | 39 |
|       | 8.3.2 | Participation By Fewer Than All Parties ......................... | 40 |
| 8.4   |       | Response Time For General Matters and Elections ................. | 40 |
|       | 8.4.1 | Well Operation Proposal ................................................ | 41 |
|       | 8.4.2 | Production System Construction .................................... | 41 |
|       | 8.4.3 | Other AFE Related Operations ...................................... | 41 |
|       | 8.4.4 | Other Proposals ............................................................ | 42 |
|       | 8.4.5 | Failure to Respond ........................................................ | 42 |
|       | 8.4.6 | Suspensions of Production ............................................. | 42 |
|       | 8.4.7 | Standby Charges ............................................................ | 42 |
| 8.5   |       | Meetings of the Parties .................................................... | 43 |
| 8.6   |       | Designation of Representatives ......................................... | 43 |
| 8.7   |       | Giving and Responding to Notices .................................... | 43 |
| 8.8   |       | Content of Notice ............................................................ | 44 |
| ARTICLE 9.0 | | GEOPHYSICAL OPERATIONS ................................................ | 45 |
| 9.1   |       | Geophysical Operations ................................................... | 45 |
|       | 9.1.1 | Conduct of Proprietary Geophysical Operations ............ | 45 |
|       | 9.1.2 | Group-Shoot And Speculative Seismic Surveys ............. | 46 |
| 9.2   |       | Utilization of Data Outside the Contract Area .................... | 46 |
| ARTICLE 10.0 | | EXPLORATORY OPERATIONS ............................................... | 47 |
| 10.1  |       | Application ..................................................................... | 47 |
| 10.2  |       | Proposal of Exploratory Operations ................................ | 47 |

10.2.1 Initial Exploratory Well................................................................47

10.2.2 Well Plan's Minimum Specifics.....................................................47

10.2.3 Revision of Well Plan..................................................................48

10.2.4 Timely Operation........................................................................48

10.2.5 Exploratory Operations Costs......................................................49

10.2.6 Substitute Exploratory Well.........................................................49

10.3 Subsequent Exploratory Operations at Objective Depth.............................50

10.3.1 Response to Operator's Proposals.................................................52

10.3.2 Counterproposal for Subsequent Exploratory Operations.................52

10.3.3 Approval of Subsequent Exploratory Operations by All Parties.......52

10.3.4 Approval of Subsequent Exploratory Operations as a General Matter by Fewer Than All Parties.............................................................53

10.3.6 Additional Subsequent Exploratory Operations...............................53

10.4 Election by Non-Participating Parties in Deepening or Sidetracking Operations........................................................................................53

10.5 Plugging and Abandoning Costs.........................................................54

10.6 Conclusion of Exploratory Operations.................................................54

ARTICLE 11.0  APPRAISAL OPERATIONS.........................................................55

11.1 Proposal of Appraisal Operations.......................................................55

11.1.1 Revision of Well Plan..................................................................55

11.1.2 Timely Operation........................................................................55

11.1.3 Substitute Appraisal Well.............................................................56

11.2 Subsequent Appraisal Operations at Objective Depth..............................57

11.2.1 Response to Operator's Proposals.................................................58

11.2.2 Counterproposal...........................................................................58

11.2.3 Approval of Subsequent Appraisal Operations by All Parties...........58

11.2.4 Approval of Subsequent Appraisal Operations as a General Matter by

   Fewer than All Parties .................................................................59

  11.2.5 Additional Subsequent Appraisal Operations .................................59

 11.3 Election by Non-Participating Parties in Deepening or Sidetracking
   Appraisal Operations ...............................................................59

 11.4 Deeper Drilling ...............................................................................60

  11.4.1 Limited Participation in Deeper Drilling .................................60

 11.5 Completion of an Appraisal Well ....................................................61

 11.6 Plugging and Abandoning Costs .....................................................61

 11.7 Conclusion of Appraisal Operations ...............................................61

ARTICLE 12.0 FEASIBILITY STUDY, INTEGRATED PROJECT TEAM AND
DEVELOPMENT PLAN ........................................................................62

 12.1 Proposal for Feasibility Study .........................................................62

  12.1.1 Meeting With Parties on Proposed Feasibility Study .............63

  12.1.2 Election on Proposed Feasibility Study .................................63

  12.1.3 Election on Feasibility Study AFE's after the Formation of the
   Feasibility Study ..................................................................64

 12.2 Phased Development Operations ......................................................65

 12.3 Proposal of Integrated Project Team ..............................................65

 12.4 Integrated Project Team Election ...................................................66

  12.4.1 Pre-Development AFE's ........................................................67

 12.5 Submission of a Development Plan ...................................................67

 12.6 Content of the Development Plan ....................................................68

  Production System ...........................................................................68

 12.7 Approval of a Development Plan ......................................................72

  12.7.1 Alternative Development Plans ..............................................72

  12.7.2 Approval of a Development Plan by Three or more Parties if One is not
   Approved as a General Matter ...........................................73

7

12.7.3 Failure to Approve Development Plan ...................................................**74**

12.8 **Development Well Proposals**.................................................................**74**

12.9 **Fabrication AFE**......................................................................................**74**

12.9.1 Failure to Approve .........................................................................**75**

12.9.2 Resubmittal of the Fabrication AFE...............................................**75**

12.10 **Assignment of Interest** ...........................................................................**76**

12.11 **Timely Operations for Production Systems**..........................................**76**

12.12 **Minor Modifications to Development Plans** .........................................**77**

12.13 **Major Modifications to Development Plans** .........................................**77**

12.14 **Supplemental AFE for Cost Overruns on Fabrication AFE**...............**79**

12.15 **Termination of a Development Plan**......................................................**79**

12.16 **Subsequent Development Phases** ..........................................................**80**

ARTICLE 13.0  DEVELOPMENT OPERATIONS.............................................81

13.1 **Proposal of Development Operations**....................................................**81**

13.1.1 Operator's Counterproposal..........................................................**82**

13.1.2 Substitute Development Well .........................................................**83**

13.1.3 Timely Operations..........................................................................**84**

13.2 **Subsequent Development Operations at Objective Depth** .............**84**

13.2.1 Response to Operator's Proposals .................................................**85**

13.2.2 86

13.2.3 Approval of Subsequent Development Operations by All Parties......**86**

13.2.4 Approval of Subsequent Development Operations as a General Matter by Fewer than All Parties...........................................................**86**

13.2.5 Additional Subsequent Development Operations ...........................**87**

13.3 **Election by Non-Participating Parties in Deepening or Sidetracking Development Operations** .....................................................................**87**

13.4 **Deeper Drilling** ......................................................................................**88**

8

13.4.1 Limited Participation in Deeper Drilling .................................................. 88

13.4.2 Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir ........................................................................... 89

13.4.3 Completion Attempts At or Above the Deepest Producible Reservoir 91

13.5 Plugging and Abandoning Costs ........................................................................ 92

ARTICLE 14.0 FACILITIES AND GATHERING SYSTEMS ................................ 92

14.1 Facilities as a Part of Development Plan ........................................................... 92

14.2 Use of Facilities Off the Contract Area ............................................................ 92

14.3 Approval of Additional Facilities on the Contract Area ................................. 93

14.4 Expansion, Modification or Repair of an Existing Production System ........ 93

14.5 Use of Facilities on the Contract Area ............................................................. 94

14.6 Processing Hydrocarbon Production From Outside the Contract Area ...... 94

ARTICLE 15.0  DISPOSITION OF HYDROCARBON PRODUCTION ............. 95

15.1 Duty to Take in Kind ........................................................................................... 95

15.2 Facilities to Take in Kind ................................................................................... 95

15.3 Failure to Take Oil and/or Condensate in Kind ............................................. 95

15.4 Gas Balancing Provision .................................................................................... 96

15.5 Expenses of Delivery in Kind ............................................................................ 96

ARTICLE 16.0  NON-CONSENT OPERATIONS ................................................. 97

16.1 Conduct of Non-Consent Operations ............................................................... 97

16.1.1 Indemnity for Non-Consent Operations .......................................... 97

16.1.2 Cost Information ................................................................................... 98

16.1.3 Non-Consent Operations in Producible Reservoirs ........................ 99

16.1.4 Multiple Completions .......................................................................... 99

16.2 Non-Consent of Initial Exploratory Well ...................................................... 100

16.3 Non-Consent Operations for the Initial Fabrication AFE ........................... 100

16.4 Non-Consent Operations to Maintain the Contract Area ............................ 101

9

16.4.1 Acreage Forfeiture In The Entire Contract Area...............................101

16.4.2 Acreage Forfeiture In A Portion Of The Contract Area ..................101

16.4.3 Limitations on Acreage Forfeiture.....................................................102

16.5 Recoupment of Costs from Future Hydrocarbon Production ....................102

16.5.1 Non-Consent Subsequent exploratory Operations............................103

16.5.2 Non-Consent Appraisal Operations....................................................104

16.5.3 Non-Consent Integrated Project Team AFE, Pre-Development AFE's,
Feasibility Study AFE or Final Design AFE......................................104

16.5.4 Non-Consent Development Operations ...............................................105

16.5.5 Non-Consent Subsequent Production System and Facilities.............105

16.5.6 Additional Production Recoupment ...................................................105

16.6 Settlement of Under-investment of Costs...................................................106

16.6.1 Cash Settlement of Under-investment ...............................................106

16.7 Reversion of Interests .....................................................................................107

16.8 Operations from a Subsequent Non-Consent Production System ..............108

16.9 Allocation of Production System Costs to Non-Consent Operations .........108

16.9.1 Investment Charges............................................................................108

16.9.2 Operating and Maintenance Charges................................................110

16.9.3 Payments ............................................................................................110

ARTICLE 17.0  WITHDRAWAL FROM AGREEMENT ................................................110

17.1 Right of Withdrawal .......................................................................................110

17.2 Response to Withdrawal .................................................................................111

17.2.1 Unanimous Withdrawal......................................................................111

17.2.2 Acceptance of Withdrawing Interests ...............................................111

17.3 Limitation Upon and Conditions of Withdrawal..........................................111

17.3.1 Current Operations and Voting.........................................................111

17.3.2 Prior Expenses ...................................................................................112

17.3.3 Abandonment Costs ......................................................................... 113

17.3.4 Confidentiality ............................................................................... 113

17.3.5 Emergencies and Force Majeure ..................................................... 113

ARTICLE 18.0  ABANDONMENT AND SALVAGE ......................................... 113

18.1    Abandonment of Non-Producing Wellbore ....................................... 113

18.2    Abandonment of Producing Wellbores .............................................. 114

18.2.1 Settlement of Wellbore Abandonment Costs ..................................... 114

18.2.2 Assignment of Interest .................................................................... 115

18.3    Facilities, Production System and Pipeline Salvage and Removal Costs .... 116

18.4    Approval Not Required .................................................................... 116

18.5    Abandonment Operations Required by Governmental Authority ............. 116

ARTICLE 19.0  RENTALS, ROYALTIES AND MINIMUM ROYALTIES .......... 117

19.1    Overriding Royalties and Burdens on Production ............................... 117

19.1.1 Subsequent Creation of Overriding Royalty ..................................... 118

19.2    Payment of Rentals and Royalties .................................................... 118

19.2.1 Non-Participation in Payments ........................................................ 119

19.2.2 Royalty Payments .......................................................................... 119

19.2.3 Federal Offshore Oil Pollution Compensation Fund Fee .................... 120

ARTICLE 20.0  TAXES ............................................................................... 120

20.1    Internal Revenue Provision ............................................................. 120

20.2    Other Taxes and Assessments ......................................................... 121

20.2.1 Property Taxes ............................................................................... 122

20.2.2 Production and Severance Taxes ..................................................... 122

ARTICLE 21.0  INSURANCE AND BONDS ................................................... 122

21.1    Insurance ...................................................................................... 122

21.2    Bonds ........................................................................................... 122

**ARTICLE 22.0  LIABILITY, CLAIMS AND LAWSUITS** ...................................... 123

    **22.1**   **Individual Obligations** ................................................................ 123

    **22.2**   **Notice of Claim or Lawsuit** ....................................................... 123

    **22.3**   **Settlements** ................................................................................. 123

    **22.4**   **Defense of Claims and Lawsuits** ............................................... 123

    **22.5**   **Liability for Damages** ................................................................ 124

    **22.6**   **Indemnification** ......................................................................... 124

    **22.7**   **Loss of or Damage to Reservoir, Loss of Reserves and Profits** ..... 125

    **22.8**   **Non-Essential Personnel** ........................................................... 125

**ARTICLE 23.0  FARM-INS AND CONTRIBUTIONS** ..................................... 126

    **23.1**   **Farm-ins and Contributions from Third Parties** ...................... 126

    **23.2**   **Methods of Obtaining Contributions** ....................................... 126

    **23.2**   **Counteroffers** ............................................................................ 127

    **23.4**   **Approval of Contributions** ....................................................... 127

    **23.5**   **Cash Contributions** ................................................................... 127

    **23.6**   **Acreage Contributions** ............................................................. 127

        **23.6.1 Two or More Parties Own 100% of the Acreage Contribution** ........ 128

        **23.6.2 Two or More Own Less Than 100% of the Acreage Contribution** .. 128

    **23.7**   **Restricted Bidding** .................................................................... 128

    **23.8**   **Area of Mutual Interest**                            128

**ARTICLE 24.0 ASSIGNMENTS AND PREFERENTIAL RIGHT TO PURCHASE** ...... 130

    **24.1**   **Assignments and Transfers of Working Interests** ...................... 130

        **24.1.1 Consent to Assignment** ................................................................. 130

        **24.1.2 Exceptions to Consent** ................................................................... 131

        **24.1.3 Effective Date of Assignments** ..................................................... 131

        **24.1.5 Form of Assignments** .................................................................... 132

        **24.1.6 Limited Warranty** ......................................................................... 132

**ARTICLE 25.0 FORCE MAJEURE**......................................................................133

    25.1   **Force Majeure** ..............................................................................133

**ARTICLE 26.0   ADMINISTRATIVE PROVISIONS** ........................................134

    26.1   **Term of Agreement**....................................................................134

    26.2   **Time Limits**................................................................................135

    26.3   **Waiver of Right to Partition** ....................................................135

    26.4   **Compliance with Laws and Regulations**..................................135

          26.4.1 **Applicable Law** ................................................................136

          26.4.2 **Severance of Invalid Provisions** ....................................136

          26.4.3 **Fair and Equal Employment**..........................................136

    26.5   **Construction and Interpretation of This Agreement** ...............137

          26.5.1 **Headings for Convenience** .............................................137

          26.5.2 **Gender and Number**........................................................137

          26.5.3 **Independent Representation** ...........................................138

    26.6   **Integrated Agreement**................................................................138

    26.7   **Execution of Documents** ...........................................................138

          26.7.1 **Binding Effect** ................................................................138

          26.7.2 **Corporate Authority** .......................................................139

          26.7.3 **Further Assurances**.........................................................139

          26.7.4 **Multiple Counterparts** ....................................................139

    23.8   **Area of Mutual Interest**           **132**

## OFFSHORE OPERATING AGREEMENT
## OUTER CONTINENTAL SHELF - GULF OF MEXICO

**THIS AGREEMENT** is entered into as of the 12th day of December, 2002, by and between Davis Offshore, L.P. ("DAVIS") and, LLOG Exploration Offshore, Inc. ("LLOG ") the signers hereof, herein referred to collectively as "Parties", and individually as "Party".

**WHEREAS,** the Parties desire to jointly explore, develop and operate one or more OCS oil and gas leases, identified in Exhibit "A" *(Description of Leases, Working Interest of the Parties, Operator and Representatives)* for the production of Hydrocarbons in commercially producible quantities.

**NOW, THEREFORE,** in consideration of the premises and of the mutual promises exchanged and contained within this Agreement, the Parties agree to jointly explore, develop and operate the Lease(s) within the Contract Area according to the following provisions:

## ARTICLE 1.0  CONTRACT APPLICATION

1.1  **Application in General:**  This Agreement applies to the joint exploration, appraisal, development, operation and abandonment of the Contract Area for the production, treatment, transportation and storage of Hydrocarbons produced from the Contract Area.  The Parties agree that this Agreement shall be the sole and only basis for determining the rights and obligations of the Parties regarding the ownership and operation of the Lease(s) within the Contract Area.

1.2  **Application to the Contract Area:**  This Agreement shall apply to the entire Contract Area, as to all depths, (whether one or more Lease(s)) as defined below in Article 2.7 *(Contract Area).*  Unless otherwise provided for in this Agreement, all the rights and obligations in and under the Lease(s) comprising the Contract Area, all joint property and all

Hydrocarbons produced from the Contract Area shall be owned jointly by the Parties according to their respective Working Interests.

## ARTICLE 2.0  DEFINITIONS

As used in this Agreement (or in the Exhibits attached hereto) the initially capitalized terms listed below shall have the following meanings:

2.1   **Affiliate:** shall mean:

(a)   any corporation, limited liability company or Partnership (including a limited Partnership), or other entity owned or controlled by a Party to this Agreement. Ownership or control by a Party is deemed to exist if a Party to this Agreement owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation (or fifty percent [50%] or more of the interests in the Partnership or other entity).  The stock (or interests in a Partnership or other entity) owned or controlled by a Party shall include all stock (or other interests) directly or indirectly owned or controlled by any other corporation, Partnership, or other entity owned or controlled by a Party to this Agreement; and,

(b)   any "parent" corporation, Partnership, or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any "sister" corporation, Partnership or other entity in which the parent corporation directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in such sister corporation.

2

**2.2**    <u>**Agreement**</u>:  shall mean this Offshore Operating Agreement, together with its attached Exhibits.

**2.3**    <u>**Annual Operating Plan**</u>:  shall mean the operational plan and estimate of Costs for joint operations in the next ensuing calendar year as described in Article 6.4 *(Annual Operating Plan)*.

**2.4**    <u>**Appraisal Operation/Well**</u>:  shall mean all operations conducted within the Contract Area subsequent to Exploratory Operations and proposed pursuant to Article 11.0 *(Appraisal Operations)*.  The terms Appraisal Operation and Appraisal Well are used interchangeably throughout this Agreement (unless the context requires otherwise).  An Appraisal Well shall include all necessary Appraisal Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments, and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Appraisal Well.

**2.5**    <u>**Authorization For Expenditure (AFE)**</u>:  shall mean the written description of a proposed operation along with an estimate of Costs for an operation that, when executed by a Party, evidences that Party's commitment to participate in the proposed operation and grants the Operator the authority to commit or expend funds, incur Costs on behalf of the Participating Party(s) in the operation and charge the joint account for such Costs.  Any AFE which proposes more than one (1) operation shall be considered a separate AFE as to each operation in which the Parties are permitted a General Matters vote or Election as provided for by this Agreement.

3

2.6     **Confidential Data:** shall mean all proprietary geophysical, geological, geochemical, drilling or engineering data owned or developed by the Parties relating to operations conducted within the Contract Area.  The term shall also include (but may not be limited to):

- certain commercial, contractual or financial information;

- analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Data;

- both originals and copies of geological and geophysical data, and well logs; and,

- all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement.

2.7     **Contract Area:** shall mean the Outer Continental Shelf (OCS) blocks listed on Exhibit "A", covered by the Lease(s) subject to this Agreement.

2.8     **Costs:** shall mean the monetary amount of all expenditures incurred by the Operator and the Participating Party(s) for (or on account of) any and all operations conducted pursuant to this Agreement and its Exhibits.

2.9     **Deepwater Operations Plan (DWOP):** shall mean that information required to be filed with the MMS as set forth in <u>Notice to Lessees and Operators of Federal Oil and Gas Leases in the Outer Continental Shelf</u> (NTL 96-4N), effective August 19, 1996, or any succeeding order issued by the MMS.

4

2.10   **Deepen or Deepening**:  shall mean any operation to drill an existing well deeper than the stratigraphic equivalent of the deepest formation previously encountered in such well.

2.11   **Deeper Drilling**:  shall mean the drilling of a new well or the Deepening of an existing well below the deepest Producible Reservoir penetrated by a Producible Well within the Contract Area.

2.12   **Development and Production Plan**:  shall mean that information required to be filed with the MMS as set forth in Title 30 CFR 250.34 (effective May 31, 1988) or any succeeding order issued by the MMS.

2.13   **Development Operation/Well**:  shall mean operations conducted subsequent to Appraisal Operations and proposed pursuant to Article 13.0 *(Development Operations)*.   The terms Development Operations and Development Well are used interchangeably throughout this Agreement (unless the context requires otherwise).  A Development Well shall include all necessary Development Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of the Development Well.

2.14   **Development Phase**:  shall mean Development Operations associated with the design, fabrication, and installation of the Initial Production System or any Subsequent Production System within the Contract Area.

2.15   **Development Plan**:  shall mean the plan for installing a Production System (whether the Initial Production System or a Subsequent Production System) and developing and producing

5

Hydrocarbons from the Contract Area as described in Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

2.16   **Election:**  shall mean a written decision made to the Operator by a Party to become either a Participating Party or a Non-Participating Party in a proposed joint operation (including the AFE associated with the operation) that does not require approval as a General Matter.  An Election to participate (to become a Participating Party) may be evidenced by a Party's written Election made to the Operator to participate or its execution of the AFE.  An Election not to participate (become a Non-Participating Party) may be evidenced by a Party's written Election made to the Operator not to participate or its failure to timely execute the AFE.

2.17   **Exploration Plan:** shall mean that information required to be filed with the MMS as set forth in Title 30 CFR 250.33 (effective May 31, 1988) or any succeeding order issued by the MMS.

2.18   **Exploratory Operation/Well:** shall mean any well proposed and drilled as an Exploratory Operation on the Contract Area subsequent to the drilling of the Initial Exploratory Well drilled pursuant to the Participation Agreement.  An Exploratory Well shall include all necessary Exploratory Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting, shallow water flow assessments, and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Exploratory Well.  After drilling an Exploratory Well to its Objective Depth, and completing all logging, testing, and other evaluation of an Exploratory Well (as described in the AFE and Well Plan for an Exploratory Well) and the completion of any subsequent Exploratory Operations conducted pursuant to Article 10.3 and an Exploratory Well meets the criteria of a Producible Well, Exploratory Operations shall cease pursuant to Article 10.6 *(Conclusion of Exploratory*

6

*Operations*) and all further operations on the Contract Area shall be classified as Appraisal Operations pursuant to Article 11.0 *(Appraisal Operations)*.  The terms Exploratory Operations and Exploratory Well are used interchangeably throughout this Agreement (unless the context requires otherwise).

2.19   **Fabrication AFE:**  shall mean the AFE's collectively submitted pursuant to an approved Development Plan for the construction and installation of a Production System but treated as a single AFE for Election purposes.

2.20   **Facilities:**  shall mean all production handling and processing equipment (excluding flowlines, gathering lines and risers) located on the surface deck of a processing vessel or structure serving the Contract Area.

2.21   **Feasibility Study:**  shall mean any study directed toward resolving issues affecting operations on the Contract Area while an Integrated Project Team has not been formed, including but not limited to conceptual and/or preliminary engineering study and design work for the identification and selection of a recommended Production System as described in Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

2.22   **Final Design AFE:**  shall mean the AFE included as part of the Development Plan pursuant to Article 12.6 *(Content of the Development Plan)* and any supplements thereto.

2.23   **General Matters:**  shall mean all matters that require the approval of the Parties and are determined by a vote of the Parties in accordance with Article 8.2. *(Voting Procedures on General Matters)*.

7

2.24   **Hydrocarbon(s):**  shall mean the oil and gas and associated liquid and gaseous by-products (except helium) which may be produced from a wellbore located on the Contract Area.

2.25   **Integrated Project Team:**  shall mean the group of management, supervisory, technical and support personnel assigned to assist the Operator in the preparation of a Development Plan and the designing, engineering, fabrication, transportation and installation of a Production System and Facilities pursuant to Exhibit "H" *(Integrated Project Team Exhibit)*.

2.26   **Initial Exploratory Well (IEW):**  shall mean the first well drilled on the Contract Area, which shall be drilled pursuant to the Participation Agreement.

2.27   **Lease:**  shall mean each OCS federal oil and gas Lease identified in Article I of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)* attached hereto and the lands covered by the Lease(s) that are within the Contract Area.

2.28   **MMS:**  shall mean the U.S. Department of the Interior, Minerals Management Service or its successor(s).

2.29   **Non-Consent Operations:**  shall mean any operation which one or more Parties, having the contractual right to do so, exercises its right not to participate in the proposed operation; and where the Participating Party(s) proceed to conduct the operation at their sole Cost and risk with the benefit of the provisions of either Article 9.0 *(Geophysical Operations)* or Article 16.0 *(Non-Consent Operations)*.

2.30   **Non-Operating Party:**  shall mean any Party to this Agreement other than the Operator.

2.31   **Non-Participating Party:**  shall mean any Party to this Agreement who, having the contractual right to do so, exercises its right not to participate in the proposed operation and

8

who thereby becomes subject to either the provisions of Article 9.0 *(Geophysical Operations)* or Article 16.0 *(Non-Consent Operations)*.

2.32 **Non-Participating Party's Share:** shall mean the percentage share of the Costs, risks and benefits (including rights to Hydrocarbons) that a Non-Participating Party would have assumed if all Parties, having the contractual right to do so, had exercised their right to participate in the Costs, risks and benefits of the proposed operation.

2.33 **Objective Depth:** shall mean for any well, the shallower of the total footage to be drilled (as measured in true vertical depth) or the penetration by the drill bit to a depth sufficient to test the deepest target formation or interval at the bottomhole location specified in the Well Plan and AFE for that well.

2.34 **Operator:** shall mean the Party identified in Article 4.1 *(Designation of the Operator)* charged with the responsibility of conducting all joint operations on behalf of the Participating Party(s). The term shall also refer to any successor or substitute Operator selected pursuant to Article 4.2 *(Substitute Operator)* or Article 4.3.4 *(Selection of Successor Operator)*.

2.35 **Participating Interest:** shall mean a Participating Party's percentage share of the Costs, risks and benefits (including rights to Hydrocarbons) of an operation conducted pursuant to this Agreement; that is, the proportion that the Participating Party's Working Interest bears to the total Working Interest of all the Participating Party(s) (unless a different Cost sharing basis has been agreed upon by the Participating Party(s) in such operation).

2.36   **Participating Party:**  shall mean, with respect to any proposed operation hereunder,  any Party to this Agreement who, having the contractual right to do so, exercises its right to participate in such proposed operation.

2.37   **Participation Agreement:**  shall mean that Participation Agreement dated December 12, 2002 between the Parties to which this Agreement is attached as Exhibit "C".

2.38   **Party:**  shall mean Davis Offshore, L.P. ("DAVIS") and LLOG Exploration Offshore, Inc. ("LLOG "), and their successors and assigns.

2.39   **Plan of Operation:**  shall mean the plan submitted to the MMS by the Operator as described in Article 6.4.5 *(MMS Plan of Operation Consistent with the Annual Operating Plan).*

2.40   **Production System:**  shall mean an offshore structure (whether fixed, compliant, subsea or floating or a combination thereof) and all associated components thereof including the associated Facilities, flowlines, gathering lines and risers which are used for the production of Hydrocarbons from the Contract Area.  The term includes:

   **(a)**   **Surface Production System:**  A Production System which utilizes a floating vessel or surface penetrating structure (whether fixed or compliant).  A Surface Production System shall include all forms of floating Production Systems.

   **(b)**   **Subsea Production System:**  A Production System which utilizes a non-surface penetrating subsea structure to support single or multiple wells with associated Facilities located some distance from the wellheads on a host structure, with the Hydrocarbon production routed from the wellheads to the Facilities through flowlines and/or gathering lines.

10

(c)     **Initial Production System:** The Production System (whether a Surface and/or Subsea Production System) for the Contract Area included in the first approved Development Plan.

(d)     **Subsequent Production System:** Any new Production System proposed after the installation of the Initial Production System for the Contract Area.

2.41    **Producible Reservoir:** shall mean a Hydrocarbon accumulation into which a Producible Well has been drilled and that is separated from and is not in oil or gas communication with any other such accumulation and is identified as a Hydrocarbon bearing accumulation expected to be developed under any Development Plan or any other such accumulation from which Hydrocarbons are ultimately produced.

2.42    **Producible Well:** shall mean a well producing Hydrocarbons or if not producing Hydrocarbons, a well that shall at least meet the "well producibility" criteria set forth in Title 30 CFR 250.11 (effective May 31, 1988) or any succeeding order issued by the MMS or its successor.

2.43    **Recoupment Amount:** shall mean for a Non-Consent Operation that is not subject to Articles 16.1.1 *(Indemnity for Non-Consent Operations)* or 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, an amount to be recovered from the Non-Participating Party's Share of proceeds of future Hydrocarbon production equal to the product of the Non-Participating Party's Share of the Costs of each Non-Consent Operation multiplied by the risk premium percentage applicable to such operation.

2.44    **Sidetracking:** shall mean an operation to directionally control or intentionally deviate the drilling of a well from its original well bore for the purpose of reaching a new bottomhole

11

location different from the bottomhole location specified in the Well Plan for that well, but not deeper than the stratigraphic equivalent of the Objective Depth previously specified in the Well Plan for that well. Sidetracking excludes: (i) deviated drilling to core an objective zone; (ii) deviated drilling to avoid obstructions or other mechanical difficulty; or (iii) deviated drilling to complete the well as a "horizontal well".

2.45   **Well Plan:**  shall mean the description of operations, tests, evaluations and other activities described in Article 10.2.2 *(Well Plan's Minimum Specifics)* which a proposing Party intends to conduct as a part of a single Exploratory, Appraisal or Development Operation.

2.45   **Working Interest:**  shall mean the record leasehold equity interest and operating rights of each Party in and to each Lease within the Contract Area expressed as the percentage described in Article II of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)* attached hereto and established pursuant to this Agreement.  In the event that a Party's record title interest is different than its operating rights, the Working Interest of each Party shall be the interest set forth in Article II of Exhibit "A" *(Description of Lease(s), Working Interest of the Parties, Operator and Representatives)*.

## ARTICLE 3.0  EXHIBITS

3.1   **Exhibits:**  All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement.  In the event there is a conflict between the provisions of this Agreement and the attached Exhibits, the provisions of this Agreement shall prevail unless a different priority of interpretation is stated herein or in the attached Exhibits.

12

| | | |
|---|---|---|
| **Exhibit "A"** | I. | Description of Contract Area and Leases |
| | II. | Working Interest of the Parties |
| | III. | Operator |
| | IV. | Representatives and Addresses |
| **Exhibit "B"** | | Offshore Insurance Provisions |
| **Exhibit "C"** | | Accounting Procedure |
| **Exhibit "D"** | | Gas Balancing Agreement |
| **Exhibit "E"** | | Equal Opportunity Certificate |
| **Exhibit "F"** | | News Release Guidelines |
| **Exhibit "G"** | | Integrated Project Team and Technology Sharing |
| **Exhibit "H"** | | Dispute Resolution Procedure |
| **Exhibit "I"** | | Security Rights Provision |
| **Exhibit "J"** | | Memorandum of Operating Agreement |
| **Exhibit "K"** | | UCC Form |

## ARTICLE 4.0  SELECTION OF OPERATOR

4.1   **Designation of the Operator:**   LLOG Exploration Offshore, Inc. is designated as the Operator of the Contract Area and shall conduct all operations within the Contract Area for the joint account of the Participating Party(s).  This designation of operatorship is subject to approval by the MMS and the Parties agree to execute and file such documents as may be required to gain approval of this designation of operatorship.

4.2   **Substitute Operator:**  If the Operator becomes a Non-Participating Party in a Non-Consent Operation, any Participating Party may be selected by the Participating Party(s) as a General

13

Matter and designated as the substitute Operator for such Non-Consent Operation only, with the same authority, rights, obligations and duties as the Operator, except when:

(a)     the drilling and other contracts for equipment and facilities to be utilized on the Non-Consent Operation are not assignable; or

(b)     the operation is conducted from a Surface Production System being operated by the Operator.

In the event of Article 4.2 (a) or 4.2 (b) above, the Operator shall conduct such Non-Consent Operation at the sole risk, Cost and expense of the Participating Party(s) and subject to the Participating Party(s)' control, supervision and direction. For situations other than Article 4.2 (a) or 4.2 (b) above where the Operator becomes a Non-Participating Party and if no substitute Operator is designated by the Participating Party(s), then the Operator, at its option, shall conduct such Non-Consent Operation at the sole risk, Cost and expense of the Participating Party(s) and subject to the Participating Party(s)' control, supervision and direction. If the Operator conducts Non-Consent Operations on behalf of the Participating Party(s) (when the Operator is a Non-Participating Party), the Operator shall furnish the Participating Party(s) an estimate of the Costs of the Non-Consent Operation. The Operator shall not be required to proceed with such Non-Consent Operations unless and until the Costs of the Non-Consent Operation have been advanced to the Operator by the Participating Party(s), to the end that the Operator need not expend any of its own funds for such Non-Consent Operation. If a Non-Consent Operation conducted by a substitute Operator is completed or results in a Producible Well that will utilize a jointly owned Production System or Facilities, control of the well shall be delivered to the Operator for future operations within thirty (30) days of completion of the operation.

14

4.3 **Resignation or Removal of Operator and Selection of Successor Operator**:   The Operator may resign, be removed upon assignment or be removed for cause and a successor Operator selected as provided below:

    4.3.1 **Resignation of Operator**:   The Operator may resign at any time by giving written notice to the other Party(s); provided, however, the Operator shall not resign during a Force Majeure situation described in Article 25.1 *(Force Majeure)*.   If the Operator no longer owns an interest in the Contract Area, the Operator shall be deemed to have resigned (upon the effective date of the assignment of its interest) without any action by the Non-Operating Party(s) and a successor Operator will be selected pursuant to Article 4.3.4 *(Selection of Successor Operator)*.

    4.3.2 **Removal Upon Assignment**:   If the Operator assigns a portion of its Working Interest in the Contract Area (excluding any interest assigned to an Affiliate) which reduces the Operator's Working Interest in the Contract Area to less than twenty-five percent (25%), whether accomplished by single or multiple assignments, then the Operator may be removed by vote of the Parties as a General Matter.

    4.3.3 **Removal for Cause by Vote**:   The Operator may be removed for cause by vote of the Parties remaining after excluding the Operator as a General Matter if the Operator commits any of the following acts:

        (a)    the Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits any act of bankruptcy, or seeks relief under laws providing for the relief of debtors; or,

15

(b)     a receiver is appointed for the Operator or for substantially all of its property and/or affairs; or,

(c)     the Operator commits an act of gross negligence or willful misconduct; or,

(d)     the Operator is unable to meet the standards of operation contained in Articles 5.2 *(Workmanlike Conduct)*, 5.3 *(Drilling)*, 5.4 *(Liens and Encumbrances)*, and 5.6 *(Reports to Government Agencies)*; or,

(e)     the Operator commits a breach of a material provision of this Agreement and fails to cure same within thirty (30) days after receipt of notice of such breach. However, if the breach specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) day period, and the Operator within said period begins corrective action or steps to correct the breach and thereafter diligently carries such corrective action to completion, the Operator shall not be removed.

**4.3.4    Selection of Successor Operator:**   Upon the occurrence of either Article 4.3.1 *(Resignation of Operator)*, Article 4.3.2 *(Removal upon Assignment)* or 4.3.3 *(Removal for Cause by Vote)*, a successor Operator shall be selected by the Parties as a General Matter. If the former Operator fails to vote or votes only to succeed itself (if applicable), then the successor Operator shall be selected by vote as a General Matter after excluding the Working Interest of the former Operator. Any new Non-Operating Party acquiring all or a part of the former Operator's Working Interest shall not be excluded from voting. In the event that there are only two Parties each owning an equal Working Interest after the removal or resignation of the Operator, the successor Operator shall be selected by mutual agreement of the two Parties.

16

Notwithstanding anything to the contrary contained herein, if there are only two (2) Parties to this Agreement and a situation as described by Article 4.3.1 *(Resignation of Operator)*, Article 4.3.2 *(Removal upon Assignment)* or 4.3.3 *(Removal for Cause by Vote)* should occur, then in those circumstances the Non-Operating Party shall become the Operator.

4.4     **Effective Date of Resignation or Removal:**  The resignation or removal of the Operator shall become effective as soon as practicable but no later than 7:00 a.m. on the first day of the month following a period of three (3) months after notice of the Operator's resignation or removal, unless a longer period of time is required to obtain approval of the change in Operator by the MMS.  Prior to the successor Operator's assumption of the Operator's duties, the former Operator (the "outgoing Operator") shall continue to exercise its authorities and meet its duties as Operator.  Upon the resignation or removal of the Operator, the outgoing Operator shall be bound by the terms of this Agreement as a Non-Operating Party if the outgoing Operator retains any Working Interest in the Contract Area.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations or liabilities that accrued during the period when the outgoing Operator acted as the Operator.

4.5     **Delivery of Property:**  On the effective date of resignation or removal of the Operator, the outgoing Operator shall deliver to the successor Operator, possession of everything jointly owned by the Parties, including:

- all funds relating to the joint account;

- all jointly owned Hydrocarbons;

17

- all jointly owned equipment, materials, appurtenances and any other Facilities used in conducting operations; and

- original copies of all books, records, and inventories relating to joint operations (other than those books, records and inventories maintained by the outgoing Operator as the owner of a Working Interest).

Upon such delivery, the outgoing Operator shall be discharged from all future rights and obligations as the Operator. The outgoing Operator shall use reasonable efforts to transfer to the successor Operator, effective as of the effective date of such resignation or removal, its rights as the Operator under all contracts exclusively relating to joint operations and the successor Operator shall assume all obligations of the Operator under such contracts which are assignable. As soon as practicable after the effective date of such resignation or removal, the Parties shall audit the joint account and conduct an inventory of all jointly owned property and all jointly owned Hydrocarbons, and such inventory shall be used in the return of and the accounting for the jointly owned property and the jointly owned Hydrocarbons by the outgoing Operator. All reasonable Costs and expenses incurred in connection with such audit and inventory shall be charged to the joint account.

## ARTICLE 5.0  RIGHTS AND DUTIES OF OPERATOR

5.1     **Exclusive Right to Operate:**  Except as otherwise provided, the Operator shall have the exclusive right and duty to conduct (or cause to be conducted) all operations pursuant to this Agreement. With the exception of each Party's staff assigned to any team formed pursuant to this Agreement, the number of employees or contractors used by the Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or

18

contractors shall be the employees or contractors, respectively, of the Operator. The Operator shall contract for and employ any drilling rigs, tools, machinery, equipment, materials, supplies and personnel reasonably necessary for the Operator to conduct the operations provided for in this Agreement.

5.2     **Workmanlike Conduct**:   The Operator shall conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound offshore oil and gas field practice and with that degree of diligence reasonably and ordinarily exercised by an experienced prudent operator engaged in a similar activity under the same or similar circumstances. The Operator shall not be liable to the Parties for losses sustained or liabilities incurred as a result of its actions as the Operator, except such as may result from its gross negligence or willful misconduct. Unless otherwise provided, Operator shall consult with the Parties and keep them informed of all important matters.

5.3     **Drilling**:   The Operator may have all drilling operations conducted by qualified and responsible independent contractors, who are not affiliated with the Operator, and are employed under competitive contracts. A competitive contract is a contract at the time of its execution, that contains current terms, rates, and provisions that do not exceed those generally prevailing in the OCS Gulf of Mexico for operations involving drilling rigs of an equivalent type, operating in similar environments, and equipped to the Operator's standard conditions which are capable of drilling the proposed well(s) within the time schedule for the operations to be conducted. Upon request, the Operator shall furnish each Non-Operator copies of all contracts, drilling or otherwise, which are entered into by Operator for the joint account, but only in the event the Operator has the right to do so. The Operator may utilize or employ its own equipment, personnel, and/or Operator-owned drilling rig, workover rig or other similar equipment in the conduct of such operations in accordance with Exhibit "C" *(Accounting Procedure)* or pursuant to a written agreement among the Participating Party(s).

19

If the Operator's equipment, personnel, and/or drilling rig, workover rig or snubbing unit are utilized or employed in conducting operations under this Agreement, the terms, rates and provisions for use shall be consistent with the then current competitive contracts prevailing in similar environments of the OCS Gulf of Mexico.

5.4     **Liens and Encumbrances**:  The Operator shall use reasonable efforts to keep the Lease(s), Production Systems, Facilities and other equipment and any jointly owned Hydrocarbons free from all liens and encumbrances, except those provided for in Article 6.3 *(Security Rights)*, which might arise by reason of the operations conducted under this Agreement.

5.5     **Records**:  The Operator shall keep accurate books, accounts and records of operations hereunder in compliance with Exhibit "C" *(Accounting Procedure)*.  Unless otherwise provided for in this Agreement, all records of the joint account shall be available to a Non-Operating Party at all reasonable times and during the Operator's normal office hours pursuant to the provisions contained in Exhibit "C" *(Accounting Procedure)*.  The Operator agrees that all financial settlements, billings, and reports rendered to each Party, as provided in this Agreement or any amendments to it, shall, to the best of Operator's knowledge and belief, reflect properly the facts about all activities and transactions handled for the account of a Party, which data may be relied upon as being complete and accurate in any further recording and reporting made by the Party for whatever purpose.  The Operator agrees to notify the other Parties promptly upon the discovery of any instance where the Operator fails to comply with the provisions of this Article.  This provision is not intended to affect a Party's audit rights under this Agreement.

5.6     **Reports to Government Agencies**:  The Operator shall make timely reports to all governmental authorities that it has a duty to make as the Operator and shall furnish, in a timely manner, copies of such reports to the Participating Party(s).

20

5.7     **Notices and Orders**:  If the Operator is required by notice or order (including SOP's and SOO's) from the government agency having jurisdiction over the Contract Area to either drill or rework a well, or conduct other operations to maintain all or a portion of the Contract Area, the Operator shall immediately furnish each of the Parties with a copy of such order or notice.

5.8     **Information to Participating Parties**:  The Operator shall, in a timely manner, furnish each Participating Party the following information pertaining to operations being conducted (provided such information was obtained):

(a)     copy of the application for permit to drill and all amendments thereto;

(b)     daily drilling and workover reports; daily mud checks, mud logs, Hydrocarbon shows and lithological data; daily casing and cementation tallies and estimated cumulative Costs incurred during the operation;

(c)     complete report of all core data and analysis;

(d)     copies of any logs or surveys as run (including all digitally recorded data);

(e)     copies of well test results, bottom-hole pressure surveys, Hydrocarbon analyses, or similar information including any PVT analysis;

(f)     copies of reports made to and orders received from regulatory agencies;

21

(g)     48 hours advance notice of logging, coring, and testing operations (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible);

(h)     upon written request, if sufficient quantities are available, samples of cutting and sidewall cores marked as to depth, to be packaged and shipped at the expense of the requesting Party;

(i)     copies of the drilling prognosis;

(j)     if conventional cores are taken, a requesting Participating Party shall be allowed access to inspect and evaluate said cores; and,

(k)     samples of any Hydrocarbons, if sufficient quantities are available, after performing routine tests.

Upon written request, the Operator shall use reasonable efforts to furnish a requesting Participating Party any additional available information including a complete slabbed section of all recovered cores, if available, acquired by the Participating Party(s) not otherwise furnished under this Agreement (but not including any information independently developed at Operator's sole Cost and expense). The Costs of gathering and furnishing such additional available information shall be charged to the requesting Participating Party.

**5.9    Completed Well Information:**   Operator shall furnish in a timely fashion to each Participating Party the following information pertaining to each well completed for the production of Hydrocarbons:

(a)     a monthly report of production and injection;

(b)     copies of all reports made to regulatory agencies;

(c)     a report on status of wells not producing and not abandoned;

(c)     a gas balancing status report;

(d)     all bottomhole pressure data and surface pressure data;

(f)     a composite of all logs; and,

(g)     reports of inventories of stored Hydrocarbons.

5.10    **Information to Non-Participating Parties:**  Within sixty (60) days after conclusion of a non-consent operation, the Operator shall furnish to each Non-Participating Party, copies of all information specified in Article 5.8 *(Information to Participating Parties)* and 5.9 *(Completed Well Information)*  provided that such Non-Participating Party has not permanently relinquished all of its Working Interest in the Contract Area.

## ARTICLE 6.0
## EXPENDITURES, SECURITY RIGHTS AND ANNUAL OPERATING PLAN

6.1     **Basis of Charges to the Parties:**  Except as otherwise provided, the Operator shall pay all Costs of joint operations and each Participating Party, in proportion to its Participating Interest, shall reimburse the Operator for the Costs of each joint operation.  The Operator shall have the right to require each Participating Party to advance its respective share of the

estimated Costs of the joint operation, as provided in Exhibit "C" *(Accounting Procedure)*. Funds received by the Operator under this Agreement may be commingled with Operator's own funds. All charges, credits, and accounting for the Costs of any operation shall be made pursuant to Exhibit "C" *(Accounting Procedure)*, attached hereto.

6.2 **Authorization for Expenditure:** The Operator shall not make any single expenditure or undertake any project or operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an Authorization for Expenditure (AFE) has either: (1) received the approval of the Parties as a General Matter, or (2) been included in a proposal for an operation for which an Election by the Parties is required. Operator shall furnish written information describing any expenditure, project or operation costing less than Two Hundred Thousand Dollars ($200,000), but in excess of One Hundred Thousand Dollars ($100,000).

If it appears (based upon the Operator's reasonable estimates) that the actual Costs associated with an original AFE or its latest approved supplemental AFE will exceed the relevant amount, as defined below, the Operator shall submit a supplemental AFE to the Participating Parties in order for them to make an Election as to their further participation in the activity or operation covered by the original AFE. Once the Operator has received all Elections pursuant to the proposed supplemental AFE, the Operator shall continue to conduct the operation associated with such supplemental AFE at the sole Cost and risk of the Participating Parties in the supplemental AFE. Any Participating Party in an original AFE who elects not to participate in a supplemental AFE becomes a Non-Participating Party in the operation associated with the original AFE from and after the date when the actual Costs associated with the latest approved AFE for such operation which has been executed by the Non-Participating Party exceeds such approved AFE, plus the permitted over-expenditure for such operation.

**6.2.1**     **Supplemental AFE for Cost Overruns for Other Wells:** If during the drilling of Subsequent Exploratory Wells, Appraisal Wells, Development Wells, or during subsequent Exploratory Operations, subsequent Appraisal Operations, or subsequent Development Operations it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the well by twenty-five percent (25%) or seven million dollars ($7,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in such operation in accordance with Article 6.2 (*Authorization for Expenditure*).  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.1, shall be subject to the applicable provisions of Article 16.0 *(Non-Consent Operations)* only for the actual supplemental Costs incurred.

**6.2.2**     **Supplemental AFE for Cost Overruns on Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE:** If it appears (based upon Operator's reasonable estimate) that the actual Integrated Project Team, Pre-Development, Feasibility Study or Final Design Costs will exceed the latest approved AFE by twenty-five percent (25%) or seven million dollars ($7,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the respective AFE in accordance with Article 6.2 (*Authorization for Expenditure*).  Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.2, shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility study AFE or Final Design AFE)* only for the amount of the actual supplemental Costs incurred.

6.2.3   **Supplemental AFE for Cost Overruns on Fabrication AFE:** If it appears (based upon Operator's reasonable estimate) that the actual Costs associated with the Fabrication AFE exceed the latest approved Fabrication AFE by twenty-five percent (25%) or twenty million dollars ($20,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the Fabrication AFE in accordance with Article 6.2 *(Authorization for Expenditure)*.   Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.3, shall be subject to the provisions of Article 12.10 *(Assignment of Interest)*.   No Party shall be allowed to make an Election to discontinue its participation in a Fabrication AFE (or Development Operations) during a Force Majeure or other emergency as described in Article 25.0 *(Force Majeure)*, but may make its Election to discontinue its participation after termination of such emergency.

6.2.4   **Supplemental AFE for Cost Overruns on all other AFE's (not listed above):** If it appears (based upon Operator's reasonable estimate) that the actual Costs will exceed the latest approved AFE for the operation by twenty-five percent (25%) or two million dollars ($2,000,000), whichever is less, Operator shall submit a supplemental AFE to the Participating Parties to make an Election as to their further participation in the operation in accordance with Article 6.2 (Authorization for Expenditure).   Any Participating Party which becomes a Non-Participating Party as to such further operation under this Article 6.2.4, shall be subject to the provisions of this Agreement and, if applicable, only for the amount of the actual supplemental Costs incurred.

6.2.5   **Emergency Expenditures:**   In the event of an emergency and notwithstanding the foregoing, the Operator is empowered to immediately make such expenditures and incur Costs for the joint account of the Participating Party(s) as the Operator decides

26

(in its opinion as a reasonable and prudent operator) are required to deal with the emergency. The Operator shall report (and submit any required AFE) to each of the Participating Party(s), as promptly as possible, describing the nature of the emergency, any action taken and any Costs incurred for the joint account.

6.3    **Security Rights:**  In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, the Parties shall have the security rights as set forth in the attached Exhibit "I" (Security Rights Provision).

6.4    **Annual Operating Plan:**   Beginning in the year in which installation of the Initial Production System within the Contract Area is scheduled, and each subsequent year thereafter, the Operator shall develop an Annual Operating Plan and submit the plan to the Non-Operating Party(s). Any Party may request a meeting to review the results of the past year's operations and to review the Operator's proposed Annual Operating Plan. The Annual Operating Plan process will be used 1) as a reporting mechanism by which the Operator will inform the Non-Operating Party(s) of results of the previous year's activities; 2) to review ongoing operations; and 3) to forecast proposed activities, anticipated Hydrocarbon production volumes, operating expenses and capital expenditures for the remainder of the current year and the next succeeding calendar year.

6.4.1    **Submission of Annual Operating Plan:**  Prior to September 1st of each year, the Operator shall submit its draft of the next calendar year's proposed Annual Operating Plan for review by each Non-Operating Party. The Non-Operating Party(s) will have up to forty-five (45) days from the Operator's submission of the Annual Operating Plan to submit in writing to the Operator suggested changes, additions or deletions to the Annual Operating Plan.

27

6.4.2   **Adoption of Annual Operating Plan:**  Within forty-five (45) days from the Operator's receipt of suggested changes, additions or deletions to the Annual Operating Plan, but no later than July 1st, the Operator will submit to each Party the final Annual Operating Plan incorporating all changes previously submitted and agreed to by the Operator, at which time the Annual Operating Plan shall be deemed adopted by all Parties.

6.4.3   **Content of the Annual Operating Plan:**  The Annual Operating Plan shall present the Operator's proposed operating expense and capital expense budgets for joint operations, as well as a schedule of anticipated Appraisal Operations and Development Operations and expenditures (if applicable for the subject year).  To the extent known at the date of adoption and for each operation proposed in the Annual Operation Plan, the plan shall indicate:

(a)   a list of proposed wells to be drilled, including a drilling schedule, locations (if known), depths and types of wells;

(b)   capital workovers, which shall be defined as any workover operation conducted to recomplete a well to a new zone or install artificial lift, with estimated Cost;

(c)   expense workovers, which shall be defined as any anticipated workover which is not a capital workover, with estimated Cost;

(d)   any geophysical survey(s) and special test(s) which might be contemplated;

28

(e)     all expense projects requiring a gross expenditure greater than two million dollars ($2,000,000); and,

(f)     other capital projects requiring a gross expenditure greater than two million dollars ($2,000,000).

**6.4.4**   **Effect of Annual Operating Plan:**   The Annual Operating Plan shall be for informational and planning purposes only and will not obligate any Party to incur any Costs or constitute approval of any specific operation.  Pursuant to the terms and conditions of this Agreement, any Party may make proposals for operations which were not included in the Annual Operating Plan.  Additionally, the Annual Operating Plan will not preclude the implementation of other operations and expenditures during a given year through the procedures set forth elsewhere in this Agreement.

**6.4.5**   **MMS Plan of Operation Consistent with the Annual Operating Plan:**   The Parties recognize that any Exploration Plan, Development and Production Plan or Deepwater Operation Plan submitted to the MMS pursuant to this Agreement may differ from and not contain all elements of a previous Annual Operating Plan. However, to the extent reasonable and practical, any Annual Operating Plan will be amended to be consistent with the plan required to be submitted to the MMS.  The Operator shall submit the Annual Operating Plan to the Non-Operators for their comments and recommendations, at least thirty (30) days prior to submitting the plan to the MMS.  Within fifteen (15) days after receipt of Operator's plan, each Non-Operator may (a) advise the Operator in writing of any recommended changes to the plan, and/or (b) call a meeting of the Parties to discuss the plan.  The content of the plan shall be voted on as a General Matter.

## ARTICLE 7.0  CONFIDENTIALITY OF DATA

7.1     **Confidentiality Obligation**:  Upon execution of this Agreement, the Parties agree that any prior confidentiality agreements between the Parties (or any combination of the Parties) as to the Contract Area shall terminate and the confidentiality obligations of each Party to the other Parties shall be governed by the terms of this Agreement alone.  The Parties agree that all Confidential Data acquired or obtained by any Party in respect of the joint operations conducted under this Agreement shall be considered confidential and shall be kept confidential during the term of this Agreement.  Each Party agrees to maintain the secrecy of the Confidential Data using the standard of care it normally uses in protecting its own confidential information and trade secrets.  The Confidential Data shall be made available to each Participating Party for its exclusive use.   During the confidentiality period, the Confidential Data shall not be disclosed to any third party (unless disclosed under an "exception to confidentiality" or as a "permitted disclosure" as provided below).

7.1.1     **Exceptions to Confidentiality**:  The confidentiality obligation shall not apply to the extent that particular items of Confidential Data:

(a)     are now or later become part of the public domain (other than as a result of a wrongful act or omission by the disclosing Party); or,

(b)     are now or later become available to the disclosing Party on a non-confidential basis from a source that is legally permitted to disclose the item of Confidential Data; or,

30

(c)    were known to the disclosing Party on a non-confidential basis prior to the disclosure of the Confidential Data to it under the terms of this Agreement, or to which such Party was otherwise entitled at the time of disclosure; or,

(d)    is independently developed by employees or contractors of a disclosing Party who have not had access to the Confidential Data; or,

(e)    information relating to the existence of the transaction, its proposed structure and other matters of a general nature as may be discussed by a Party with a nationally recognized statistical rating agencies consistent with the Party's and industry practice.

7.1.2    **Permitted Disclosures:**  The Operator may disclose items of Confidential Data to such third parties as may be necessary in connection with the operation of the Contract Area, provided such third parties are bound by written agreement to keep secret the Confidential Data for a period of time not less than is set forth in this Agreement (or a lesser period if agreed by all Parties).  The Operator shall promptly inform the other Parties hereto of the names of such third parties and list the items of Confidential Data disclosed.  Notwithstanding anything herein to the contrary, and subject to the restrictions that:  (i)  the Confidential Data shall not be removed from the custody and premises of the Party making such disclosure (excepting disclosures made pursuant to items (1), (4) and (5) below); and (ii)  that such third party be bound by written agreement not to use or disclose the Confidential Data except for the express purpose for which such disclosure is to be made, any Party may disclose the Confidential Data, in whole or in part:

(1)     to any Affiliate of such Party, provided such Affiliate is bound by the confidentiality provisions contained herein; or,

(2)     to any potential or current contractors or professional consultants engaged by or on behalf of such Party and acting in that capacity where such disclosure is essential to such contractor's or consultant's work; or,

(3)     to any bona fide prospective assignee of any portion of such Party's Working Interest (including but not limited to an entity with whom a Party or its Affiliates is conducting bona fide negotiations directed toward a merger, consolidation, sale, exchange or combination thereof, of a Party's or an Affiliate's shares or substantially all of its assets in the OCS Gulf of Mexico), provided that the disclosing Party shall give all other Parties to this Agreement not less than fifteen (15) days advance written notice specifying the extent to which that Party intends to disclose the Confidential Data to the prospective assignee and the name of such prospective assignee; or,

(4)     to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or,

(5)     to the extent required by the terms of any Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).  If a Party is legally compelled to disclose any Confidential Data, such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such

Confidential Data as is legally required and will use its best efforts to obtain confidential treatment for any Confidential Data disclosed; or,

(6)     to an entity desiring to transport and/or purchase Hydrocarbons produced under this Agreement for the purpose of making Hydrocarbon reserve estimates and other technical evaluations.

**7.1.3   Limited Releases to Offshore Oil Scouts Association:** The Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their weekly meetings. The Confidential Data disclosed shall be limited to information concerning well locations, well operations and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

**7.1.4   Continuing Confidentiality Obligation:** Any Party who ceases to own a Working Interest in the Contract Area shall nonetheless remain bound by the confidentiality and use obligations of this Agreement as to any Confidential Data obtained through this Agreement.

**7.2     Ownership of Confidential Data:** Except as otherwise provided for in Article 5.10 *(Information to Non-Participating Parties),* all Confidential Data produced as a result of a joint operation shall be the joint property of all Party(s).

**7.2.1   Well Log and Data Trades:** Any Participating Party may propose the exchange or trade of any jointly owned Confidential Data for other similar data and information owned by third party(s). Upon unanimous approval of such trade by the Participating Party(s) (and without requiring the prior consent of any Non-Participating Party), the

Operator shall consummate such exchange or trade with the third party. The Operator shall promptly provide all Participating Party(s) copies of the third party data obtained along with copies of any agreement relating to such exchange.

7.3     **Access to the Lease, Rig and Construction Site:** Each Participating Party shall have the option to attend regular meetings between the Operator and any contractors constructing the Production System or Facilities specified in the Fabrication AFE as well as regular visits to the construction sites. Upon forty-eight (48) hours notice (or, if conditions do not permit such advance notice, as much advance notice as is reasonably possible) each Participating Party or its representatives shall have access to any drilling rig, Production System, or Facility located on the Contract Area to observe and inspect operations and wells in which it participates (and the records and other data pertaining thereto). Prior to any logging or testing operation, the Operator shall give the other Participating Party(s) forty-eight (48) hours notice (or, if conditions do not permit such advance notice, as much advance notice as is possible) so the Party's representatives may be present to observe such operations. Access to the rig, Production System or Facilities will be at each Party's (and its representative's) sole risk and expense and at reasonable times and provided such access does not unreasonably interfere with the operation being conducted.

7.4     **Development of Proprietary Information and/or Technology:** Nothing in this Agreement shall require a Party to divulge independently developed trade secrets, proprietary information and/or technology to the other Parties. However, where the development of the proprietary information and/or technology has been charged to the joint account, the ownership and treatment of any such proprietary information and/or technology relating specifically to drilling technology, production technology, production structures, facilities, pipelines, flowlines, the transportation and installation of such items and the offshore

34

transportation of Hydrocarbons shall be governed by Exhibit "H" *(Integrated Project Team Exhibit)*.

7.5    **News Releases:** All news releases (and their timing and/or content) shall be governed by Exhibit "F" *(News Release Guidelines)*.  Provided, however the Parties may make required releases to the extent otherwise required by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, security commission, stock exchange or judicial or administrative body) requiring such statement or news release.

## ARTICLE 8.0  VOTING, ELECTIONS AND NOTICES

8.1    **Overall Supervision of Business Affairs:**    The activities of the Parties under this Agreement that are not within the scope of the Operator's authority to unilaterally decide shall be divided into the following two (2) broad classes:

(1)    "General Matters" for which a vote for approval is required, and;

(2)    "Elections" where no vote for approval is required.

The Parties shall decide and take action upon General Matters and Elections in accordance with the provisions of this Article 8.0 *(Voting, Elections and Notices)*.

8.2    **Voting Procedures on General Matters:**  Action on any General Matter shall require the approval of the Parties which shall be decided by a vote of the Parties as follows:

8.2.1   **Voting Interest:** Each Party shall have a voting interest equal to its Working Interest or, with respect to a Non-Consent Operation, its Participating Interest in such operation, as applicable.

8.2.2   **Vote Required:** A General Matter shall require approval of the Parties and shall be decided as follows:

(a)   Should there be only 2 (two) Parties to this Agreement:
By an affirmative vote of one (1) or more Parties owning a combined working interest of fifteen percent (15%) or more (but not including any reversionary rights) in the Contract Area.

(b)   Should there be 3 (three) or more Parties to this Agreement:
By an affirmative vote of one (1) or more Parties owning a combined working interest of fifteen percent (15%) or more (but not including any reversionary rights) in the Contract Area.

Each Party voting to approve a General Matter where an AFE is required shall execute the AFE evidencing its General Matter vote for approval and its commitment to participate in the proposal. For General Matters where an AFE is not required with the proposal, a Party shall evidence its vote for approval along with its commitment to participate in writing. A Party failing to vote or respond timely to a vote on a General Matter shall be deemed to have voted against the proposed action. The Parties may vote in person at meetings, by telephone (promptly confirmed in writing to Operator), or by U.S. mail, overnight express, courier, telecopier, or facsimile.

36

8.2.3  **Second Opportunity to Participate:**  Unless otherwise provided to the contrary in this Agreement, if an operation is approved as a General Matter but is not approved by all the Parties, a Party who voted not to participate in the approved operation shall have the right to make a subsequent election to participate in the approved operation within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays), of its receipt of the original General Matter Vote  results from the Operator.  If a Party does not exercise its right to make a subsequent election to participate, it shall become a Non-Participating Party in the approved operation.

8.2.4  **Participation By Fewer Than All Parties:**  Upon conclusion of the period provided for in Article 8.2.3 (*Second Opportunity to Participate*) if there is at least one (1) Non-Participating Party in the approved operation, each Party who voted as a General Matter or elected to participate pursuant to Article 8.2.3 (*Second Opportunity to Participate*) shall within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) of its receipt of the subsequent General Matter vote results,

(a)  limit its participation in the approved operation to its Working Interest share, or

(b)  agree to bear its Participating Interest share of the approved operation.

By written correspondence to the Operator.  Failure to submit written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or subsequent General Matter vote or election pursuant to Article 8.2.3 (*Second Opportunity to Participate*), submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or subsequent General Matter vote or election pursuant to Article 8.2.3 (*Second Opportunity to*

37

*Participate*), to participate in the approved operation do not agree to bear all of the remaining Costs of the approved operation within two (2) days of the conclusion of the written correspondence period, the proposal and approval of the proposed operation shall be deemed withdrawn.  The Participating Parties in an approved operation shall bear all of the Costs and risk of the approved operation.

8.3    **Elections:**  For all proposals where approval as a General Matter is not required, each Party shall make an Election as to its participation in a proposed operation. Proposals that require an Election shall include, but are not limited to the following:

(1)    Exploratory Operations pursuant to Article 10. *(Exploratory Operations)*, Appraisal Operations pursuant to Article 11 *(Appraisal Operations)*, Geophysical Operations pursuant to Article 9.0 *(Geophysical Operations)*; or,

(2)    Substitute wells pursuant to Article 13.1.2 *(Substitute Development Well)*; or,

(3)    The formation of an Integrated Project Team pursuant to Article 12.3 *(Proposal of Integrated Project Team)*; or,

(4)    A Fabrication AFE pursuant to Article 12.9 *(Fabrication AFE)*; or Article 12.16.2 *(Non-Consent Operations in Subsequent Development Phases)*; or,

(5)    Where a Non-Participating Party in a Fabrication AFE after a major modification to a Development Plan has been approved by the Participating Party(s) pursuant to Article 12.13 *(Major Modifications to the Development Plan)*; or,

38

(6)     A supplemental AFE pursuant to a Article 12.14 *(Supplemental AFE for Cost Overruns on Fabrication AFE);* or,

(7)     A Fabrication AFE pursuant to Article 12.16.2 *(Non-Consent Operations in Subsequent Development Phases)*; or,

(8)     Withdrawal pursuant to Article 17.2 *(Response to Withdrawal)*; or

Each Party electing to participate where an AFE is required shall execute the AFE evidencing its Election to participate and its commitment to participate in the proposal.  For Elections where an AFE is not required with the proposal, a Party shall evidence its Election to participate by placing its commitment to participate in writing.  A Party failing to respond timely to an Election shall be deemed to have elected not to participate in the proposed action.  The Parties may make an Election in person at meetings, by telephone (promptly confirmed in writing to Operator), or by U.S. mail, overnight express, courier, telecopier, or facsimile.

**8.3.1    <u>Second Opportunity to Participate</u>:**  Unless otherwise provided to the contrary in this Agreement, if all Parties do not elect to participate in the operation then, a Party who elected not to participate in the approved operation shall have the right to make a subsequent Election to participate in the operation within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays), of its receipt of the original Election results from the Operator.  If a Party does not exercise its right to make a subsequent Election to participate, it shall become a Non-Participating Party in the operation.

39

8.3.2    **Participation By Fewer Than All Parties**:  Upon conclusion of the period provided for in Article 8.3.1 (*Second Opportunity to Participate*) if there is at least one (1) Non-Participating Party in the operation, each Party who elected to participate pursuant to Article 8.3.1 (*Second Opportunity to Participate*) shall within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) of its receipt of the subsequent Election results,

(a)    limit its participation in the operation to its Working Interest share, or

(b)    agree to bear its Participating Interest share of the operation.

By written correspondence to the Operator.  Failure to submit written correspondence shall be deemed a written correspondence under (a).  If a Party, who made an original or subsequent Election pursuant to Article 8.3.1 (*Second Opportunity to Participate*), submits or is deemed to have submitted a written correspondence under (a) and the other Parties who made an original or subsequent Election pursuant to Article 8.3.1 (*Second Opportunity to Participate*), to participate in the operation do not agree to bear all of the remaining Costs of the operation within two (2) days of the conclusion of the written correspondence period, the proposal and approval of the proposed operation shall be deemed withdrawn.  The Participating Parties in an operation shall bear all of the Costs and risk of the operation

8.4    **Response Time For General Matters and Elections**:  After receipt of notice pursuant to this Article 8.0 *(Voting, Elections and Notices)*, the Parties shall either: (i) submit their vote to the Operator in response to a General Matter proposal; or (ii) make an Election if the proposal does not require approval as a General Matter.  The Operator shall give prompt

40

notice of the results of such voting or Elections to each Party.  Unless specified otherwise herein, the response times required for each type of proposal shall be as follows:

**8.4.1**   **Well Operation Proposal**:  When any proposed well operation does not require construction of a Production System, each Party shall respond with their vote within thirty (30) days after receipt of the proposal.  When a drilling rig is on location a vote in response to the proposal or a counterproposal shall be made within forty-eight (48) hours after receipt of the proposal (inclusive of Saturdays, Sundays, and federal holidays); provided that the forty-eight (48) hour provision of this Article 8.4.1 shall not apply to a new well (other than a substitute well) proposed under Articles 10.2 *(Proposal of Exploratory Operations),* 11.1 *(Proposal of Appraisal Operations)*, or 13.1 *(Proposal of Development Operations)*.

**8.4.2**   **Production System Construction**:  An Election regarding the Fabrication AFE for the construction and installation of the Initial Production System shall require a response within sixty (60) days after receipt of the Fabrication AFE, and a Fabrication AFE involving the construction and installation of a Subsequent Production System shall require a response within sixty (60) days after receipt of the Fabrication AFE.

**8.4.3**   **Other AFE Related Operations**:  Except as otherwise provided for in this Article, the response time to a proposed operation will depend upon the AFE gross expenditure amount.  Response times will be as follows:

(a)   AFE's greater than $300,000 but less than $25,000,000, the response will be made within thirty (30) days after receipt of said proposal.

41

(b)    AFE's of $25,000,000 or more, the response will be made within sixty (60) days after receipt of said proposal.

**8.4.4    Other Proposals:**  For all other proposals requiring notice, each Party shall respond within thirty (30) days after receipt of the proposal, except that each Party shall have ten (10) days to respond after receipt of a request for revisions to the initial Development Plan.

**8.4.5    Failure to Respond:**  Failure of any Party to respond to a proposal within the required period shall be deemed either a vote against the proposal, or an Election not to participate in the proposed operation.

**8.4.6    Suspensions of Production:**  Notwithstanding anything to the contrary provided herein, if the MMS grants a Suspension of Production (an "SOP") or a Suspension of Operations (an "SOO") for all or any part of the Contract Area, shorter time limits set forth as requirements of the SOP/SOO shall supersede the longer time periods for a Party's response as provided for under this Agreement.

**8.4.7    Standby Charges:**  The Participating Party(s) in an operation shall be responsible for standby charges accrued until all Parties having a right to do so, have made an Election to either participate or not participate in a proposed subsequent operation. All standby charges accruing after the final Election regarding the subsequent operation has been made, shall be the responsibility of the Participating Party(s) in the subsequent operation.

42

8.5    **Meetings of the Parties**:  Meetings of the Parties shall be called by the Operator upon its own motion or at the request of any Party.  Except in the case of emergency, or except when agreed by unanimous consent, no meeting shall be called on less than five (5) days (exclusive of Saturdays, Sundays and federal holidays) advance notice, and such notice shall include an agenda and location of the meeting.  The representative of the Operator shall be chairman of each meeting and shall take minutes of each meeting and furnish copies to all participants.  Only matters set out in the agenda for the meeting shall be considered at the meeting unless unanimously agreed to by all the Parties to this Agreement.

8.6    **Designation of Representatives**:  The names and addresses of the representatives of the Parties or their alternates are set forth in Article IV of Exhibit "A" *(Description of Leases, Working Interest of the Parties, Operator and Representatives)* attached hereto. The designated representatives may be changed by written notice to the other Parties in accordance with Article 8.7 *(Giving and Responding to Notices)*.

8.7    **Giving and Responding to Notices**:  All notices and responses (including notices and proposals for General Matters and Elections) shall be made in writing and delivered to the designated representative of the other Party in person or by facsimile transmission (followed by a phone call confirming receipt), U.S. Mail, overnight express, or courier.  When a drilling rig is on location, all notices and responses shall be given by telephone and immediately confirmed in writing.  Any notices and responses shall be effective only when received by the designated representative of the Party to whom such notice, proposal, or response is directed unless receipt is presumed under one (1) of the following circumstances:

- Any notice or response transmitted by facsimile shall be deemed given and received only after the receiving Party has confirmed receipt of such facsimile by telephone.

- Any notice or response transmitted by overnight express or courier shall be deemed given and received twenty-four (24) hours (inclusive of Saturdays, Sundays, and federal holidays) after such notice or response is deposited or transmitted and the receiving Party has confirmed receipt by telephone.

- Any notice or response by U.S. Mail (other than overnight express) that is not sent "return receipt requested" shall be deemed given and received only after the receiving Party has confirmed receipt by telephone.

8.8   **Content of Notice:**  Any notice which requires a response within a time period shall indicate which of the response times specified in Article 8.4 *(Response Time For General Matters and Elections)* is required.  If a notice proposes a well operation, the notice shall include the following information:

(a)   The type of well operation being proposed (i.e., Exploratory, Appraisal, or Development Operation(s)); and,

(b)   An AFE showing the estimated Costs of the operation, including all necessary expenditures associated with the drilling, testing and completing or abandoning the well.

(c)   A Well Plan pursuant to Article 10.2.2 *(Well Plan's Minimum Specifics)*.

(d)   If the notice proposes a Production System, Subsea Production System, Subsequent Production System or Facilities, the notice shall include the following information: 1) the type of system or Facility being proposed; and 2)  a description of same,

44

including location, estimated Costs of operation, including design, engineering, fabrication, transportation and installation.

## ARTICLE 9.0  GEOPHYSICAL OPERATIONS

9.1     **Geophysical Operations:**  In the event any Party desires to acquire, process, or reprocess a geophysical survey (other than shallow hazard survey's), velocity surveys or other well bore geophysical operations) to evaluate all or any portion(s) of the Contract Area, that Party shall notify the other Parties and provide the associated AFE.  Each Party shall respond to said notice by making an Election to participate or not participate in said operation pursuant to Article 8.0 *(Voting, Elections and Notices)*.  These geophysical surveys may consist of either conducting proprietary surveys, purchasing speculative surveys from vendors or participating in group shoot surveys. Geophysical Operations are independent operations and are not considered Exploratory, Appraisal or Development Operations, and may be conducted simultaneously with Exploratory, Appraisal or Development Operations.  The Participating Party(s) in any geophysical survey shall pay their Participating Interest share of the Costs of the survey.

9.1.1     **Conduct of Proprietary Geophysical Operations:**  The proposing Party shall be responsible for conducting all proprietary geophysical surveys (or data processing) on behalf of the Participating Party(s).   The proposing Party shall provide the Participating Party(s) with copies of all field data and support documentation as appropriate for any and all seismic data collected from the proprietary geophysical survey.   The proposing Party shall obtain all licenses and/or permits from all governmental agencies necessary to support the surveys.  The joint ownership of any proprietary geophysical data derived from a proprietary survey shall be limited to the field tapes; i.e., raw data and initial processing (not including re-processed or

45

interpreted data) and owned on the basis of the Parties' Participating Interests in the survey.  If the geophysical data is acquired by a geophysical contractor instead of through the proposing Party, then wherever in this Article the term "proposing Party" appears, the word "Contractor" shall be substituted therefore.  If a Party elects not to participate in a proprietary geophysical survey, then the Participating Party(s) shall assume their proportionate share of the Non-Participating Party's Interest on a Participating Interest basis.  A Non-Participating Party shall not be entitled to any geophysical data obtained from the proprietary geophysical survey.

**9.1.2** **Group-Shoot And Speculative Seismic Surveys:** The Parties shall make a good faith effort to coordinate the acquisition of any new group-shoot or speculative seismic surveys to evaluate one (1) or more of the Lease(s) within the Contract Area. This shall enable all Parties who desire to acquire such data to take advantage of group or Partnership rates available from most seismic contractors and will allow each Party a license to use such data.  For such joint seismic data purchases used to evaluate the Lease(s), each acquiring Party shall pay an equal share of the total licensing fee (rather than its Working Interest share).

**9.2** **Utilization of Data Outside the Contract Area:** In the event any data is acquired pursuant to this Article 9.0 *(Geophysical Operations)* which covers lands outside the Contract Area, a Participating Party in said data shall not be obligated to obtain permission from the other Participating Party(s) to disclose data covering lands outside the Contract Area to third parties.

46

## ARTICLE 10.0  EXPLORATORY OPERATIONS

**10.1**   **Application:**  Exploratory Operations shall mean all operations conducted in the Contract Area pursuant to this Article 10.0 *(Exploratory Operations)*.  The Costs, risks and obligations of Exploratory Operations conducted in accordance with this Agreement shall be borne by the Parties as provided in Article 10.2.5 *(Exploratory Operations Costs)* below.

**10.2**   **Proposal of Exploratory Operations:**  Any Party may propose to conduct an Exploratory Operation by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties.  The Exploratory Operation proposed shall require an Election by each party as to its participation in such operation.   Once all Elections have been received by the Operator, the Operator or substitute Operator shall commence the Exploratory Operation at the sole Cost and risk of the Participating Party(s).   A Non-Participating Party in any Exploratory Well other than the initial Exploratory Well shall be subject to Article 16.4 *(Non-Consent Operations to Maintain the Contract Area)* or Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations)*, whichever is applicable.

   **10.2.1**   **Initial Exploratory Well**:  The Initial Exploratory Well is an obligatory well and will be drilled pursuant to the Participation Agreement.

   **10.2.2**   **Well Plan's Minimum Specifics:**  The Well Plan for any Exploratory Well(s) and any proposed subsequent Exploratory Operation will include at least the following information:

   (a)      the surface and target bottomhole locations;

47

(b)     the expected spud date and the anticipated time necessary to conclude drilling, preliminary evaluation, completion, and/or abandonment operations;

(c)     the true vertical depth to be drilled, along with the specified Objective Depth and formation (and other target zones to be penetrated);

(d)     the proposed drilling plan, including the casing program, and any anticipated Sidetracking operations;

(e)     details of any coring, logging or other evaluation operations to be conducted; and,

(f)     information concerning the drilling rig to be used, including day rates, water depth rating and other limitations relevant to the drilling operations to be conducted. If the drilling rig to be used in the proposed operation is currently under a long term contract, the proposing Party shall have no obligation to guarantee the availability of the rig past the completion of the proposed operation.

**10.2.3  Revision of Well Plan:**  The Well Plan for an Exploratory Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional Exploratory Operation approved by the Participating Party(s).

**10.2.4  Timely Operation:**  A proposed Exploratory Operation shall be commenced within one hundred twenty (120) days from the date upon which it is approved.  Except as a result of Article 25.0 (*Force Majeure*), if operations have not commenced in a timely manner, the approved Exploratory Operation shall be deemed withdrawn, with the

48

effect as if the Exploratory Operation had never been approved.  If an approved Exploratory Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred during said one hundred twenty (120) day period which are attributable to the proposed operation shall still be chargeable to the Participating Party(s).  An Exploratory Operation for the drilling of an Exploratory Well shall be deemed to have commenced on the day charges commence under the drilling contract for the proposed operation which shall be when the rig has been made ready for tow and moved at least one hundred (100) yards from its current location towards the approved location or a shipyard for rig modifications.

10.2.5  **Exploratory Operations Costs**:  The Costs, risks and obligations associated with drilling, testing, logging, evaluating and abandoning (whether permanent or temporary) of the Initial Exploratory Well shall be borne by the parties as set out in the Participation Agreement.  In the event a subsequent Exploratory Operation is proposed (other than a proposal to plug and abandon or temporary abandonment), the costs subsequent to such proposal will be borne by the Participating Party(s) in proportion to their Participating Interest in such Exploratory Operation as shown on Exhibit "A".

10.2.6  **Substitute Exploratory Well**:  Subject to the terms of the Participation Agreement, the Operator shall timely commence an Exploratory Operation and continue the operation with due diligence: (i) to the Objective Depth; (ii) a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*); or (iii) until the Operator encounters mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite or other practicably impenetrable substances or other similar conditions prevail in the hole that render further drilling impracticable or the Operator deems the wellbore not to be in a safe

49

or satisfactory condition for it to perform further operations without risk to safety or the environment ("Gulf Coast Conditions"). If the Exploratory Well is abandoned due to the conditions described under 10.2.6 (iii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Exploratory Well and each Participating Party in the abandoned Exploratory Well shall make an Election whether to participate in the proposed substitute well. However, if the total costs theretofore incurred in the drilling of the Exploratory Well have not exceeded 110% of the amount of the Exploratory Well AFE, then the costs of drilling the Substitute Exploratory Well shall be borne in the same fashion as the costs to drill the Exploratory Well, until such time as a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*). Further, during said ninety (90) day period, no Party may propose any additional drilling. The Operator shall commence the substitute well at the sole Cost and risk of the Party or Parties making an Election to participate. A Non-Participating Party in a substitute well for: (i) the initial Exploratory Well shall be subject to Article 16.2 (*Non-Consent of Initial Exploratory Well*); and (ii) any other Exploratory Well shall be subject to the penalties set forth in Article 10.2 (*Proposal of Exploratory Operations*). Any well drilled as a substitute for the Initial Exploratory Well shall be drilled pursuant the Participation Agreement.

10.3    **Subsequent Exploratory Operations at Objective Depth:** After (i) the Exploratory Well (or its substitute) has been drilled to its Objective Depth, and (ii) all operations in the controlling AFE and Well Plan have been completed or terminated (except plug and abandon); and (iii) all logs and test results have been distributed to the Participating Party(s), the Operator, shall promptly notify the Participating Party(s) of any proposal to conduct the following operations:

(a)     conduct additional testing, coring or logging of the formations encountered prior to setting production casing;

(b)     sidetrack the wellbore to core the formations encountered;

(c)     Deepen the well to a new Objective Depth ; (however, if a casing string is required to Deepen the well, then option (d) shall precede Deepening the well);

(d)     Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(e)     conduct production testing;

(f)     set production casing;

(g)     conduct other operations on the well not listed;

(h)     temporarily abandon the well; or,

(i)     permanently plug and abandon the well.

If the Exploratory Well is temporarily abandoned under (h), then such well shall be subject to and completed as a Development Operation under Article 13.2 (*Subsequent Development Operations at Objective Depth*).

51

**10.3.1** **Response to Operator's Proposals:**  Within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of a proposal to conduct subsequent Exploratory Operations, each Participating Party shall make and Election as to such proposal or make a counterproposal.  Failure of a Participating Party to respond to such proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered an Election not to approve such proposal and to become a Non-Participating Party in the proposal.

**10.3.2** **Counterproposal for Subsequent Exploratory Operations:**  If a Participating Party makes a counterproposal for subsequent Exploratory Operations, the other Participating Party(s) shall have an additional twenty-four (24) hours to respond thereto.  If conflicting proposals for subsequent Exploratory Operations are made, preference for conducting such proposal shall be given first to operation (a) above, next to operation (b) above, and so forth, in decreasing order of priority.  If different depths or locations are proposed for subsequent Exploratory Operations, preference shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order with the exception of operations (c) and (d) of Article 10.3 (*Subsequent Exploratory Operations at Objective Depth*) which priority shall be the deepest depth proposed in ascending order. After all Elections have been received and the subsequent Exploratory Operation is commenced, the remaining proposals for other types of subsequent Exploratory Operations shall be deemed withdrawn.

**10.3.3** **Approval of Subsequent Exploratory Operations by All Parties:**  Once all Elections have been received for such Subsequent Exploratory Operation, the Operator shall commence the subsequent Exploratory Operation at the Costs and risk of the Participating Party(s).

**10.3.4** **Approval of Subsequent Exploratory Operations by Fewer Than All Parties:** If a proposal for subsequent Exploratory Operations (except a proposal to plug and abandon), is approved by fewer than all Parties, then the Operator shall conduct the operation at the sole Cost and risk of the Participating Party(s).  Costs of subsequent Exploratory Operations (except a proposal to plug and abandon) will be recouped from the Non-Participating Party(s) in accordance with Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations)*.  A Non-Participating Party in a subsequent Exploratory Operation shall be relieved of the Costs, risks and obligations of the subsequent Exploratory Operation, except as to its share of the Costs of plugging and abandoning the Exploratory Well in its then-current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

**10.3.5** **Additional Subsequent Exploratory Operations:**   At the completion of the subsequent Exploratory Operation, the Operator shall again submit proposal(s) for subsequent Exploratory Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is abandoned, whether permanent or temporary.

**10.4** **Election by Non-Participating Parties in Deepening or Sidetracking Operations:** If (i): an Exploratory Well other than the initial Exploratory Well is drilled to its initial Objective Depth; and (ii) if a proposal is made to either: (i) Deepen such Exploratory Well, or (ii) Sidetrack such Exploratory Well, as provided in Article 10.3(c) or (d), then the Operator shall notify each original Non-Participating Party of the proposed operation.  Each original Non-Participating Party may respond with an Election regarding such operation to Deepen or

53

Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice. Any original Non-Participating Party making an Election to participate in the Deepening or Sidetracking of an Exploratory Well shall:  (i) be deemed to be under-invested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs);* and (ii) remain a Non-Participating Party in the Exploratory Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.1 *(Non-Consent Subsequent Exploratory Operations)* less the recoupment under Article 16.6 (*Under-investment of Costs*) has been recovered by the original Participating Party(s). The Participating Parties in the Sidetrack or Deepening are over-invested Parties.

10.5    **Plugging and Abandoning Costs:**  If the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6, which make further drilling impracticable, then the Operator may propose to plug and abandon the well.  Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well.  The Participating Party(s) in the original operation shall pay all Costs of plugging and abandoning the Exploratory Well (except any increased plugging and abandoning Costs associated solely with a subsequent Exploratory Operation conducted as a Non-Consent Operation).  The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

10.6    **Conclusion of Exploratory Operations:**  Exploratory Operations shall cease after the abandonment of the first Producible Well, whether permanent or temporary, and the release of the rig from the first Producible Well (including any substitute well and any subsequent

54

Exploratory Operations conducted pursuant to Article 10.3) or the well is completed for production.

## ARTICLE 11.0  APPRAISAL OPERATIONS

**11.1**  **Proposal of Appraisal Operations:** After completion of Exploratory Operations any Party may propose to conduct an Appraisal Operation within the Contract Area by giving notice of the proposal (along with the associated AFE and Well Plan) to all other Parties. The Appraisal Operation proposed shall require an Election by each party as to its participation in such operation.  Once all Elections have been received by the Operator, the Operator shall commence the Appraisal Operation at the sole Cost and risk of the Parties who exercised their right to participate.  Costs of a Non-Consent Appraisal Operation will be recouped in accordance with Article 16.5.2 *(Non-Consent Appraisal Operations)*.

**11.1.1**  **Revision of Well Plan:** The Well Plan for an Appraisal Operation shall be deemed automatically revised with each Sidetracking, Deepening or additional evaluation operation approved by the Participating Party(s).  An Appraisal Well shall include all necessary Appraisal Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting and shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of an Appraisal Well.

**11.1.2**  **Timely Operation:** An approved Appraisal Operation shall be commenced within one hundred twenty (120) days from the date upon which all Elections have been received unless provided under Article 25.0 *(Force Majeure)*.  If operations have not commenced within one hundred twenty (120) days, the Appraisal Operation shall be

55

deemed withdrawn.  If an approved Appraisal Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred in the preparation for or in furtherance of the operation shall still be chargeable to the Participating Party(s).  An Appraisal Operation for the drilling of an Appraisal Well shall be deemed to have commenced on the day charges commence under the drilling contract for the proposed operation which shall be when the rig has been made ready for tow and moved at least one hundred (100) yards from its current location towards the approved location or a shipyard for rig modifications.

**11.1.3  Substitute Appraisal Well:** The Operator shall timely commence an Appraisal Operation and continue the operation with due diligence to the Objective Depth or until: (i) a supplemental AFE is required pursuant to Article 6.2 (*Authorization for Expenditure*); or (ii) until the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6.  If the Appraisal Well is abandoned due to the conditions described in (ii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Appraisal Well and each Participating Party in the abandoned Appraisal Well shall make an Election whether to participate in the proposed substitute well. Further, during said ninety (90) day period, no Party may propose any additional drilling.  The Well Plan for said substitute well shall be substantially similar to the previously approved Well Plan, taking into account those conditions which rendered further drilling impractical.  The Operator shall commence the substitute well at the sole Cost and risk of the Party or Parties making an Election to participate.  Costs of Non-Consent Operations for a substitute Appraisal Well will be recouped in accordance with Article 16.5.2 (*Non-Consent Appraisal Operations*).

56

**11.2** **Subsequent Appraisal Operations at Objective Depth:** After (i) the Appraisal Operation has been drilled to its Objective Depth; (ii) all operations in the controlling AFE and Well Plan have been completed; and, (iii) all logs and test results have been distributed to the Parties, the Operator, shall promptly notify the Participating Party(s) of any proposal to conduct the following operations:

(a)     conduct additional testing, coring, or logging of the formations encountered prior to setting production casing;

(b)     sidetrack the wellbore to core the formations encountered;

(c)     Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the original Objective Depth;

(d)     Deepen the well to a new objective depth;

(e)     conducting production testing;

(f)     setting casing to below the objective zone or formation for the purpose of acquiring cased-hole wire line formation test samples;

(g)     setting production casing to below the objective zone or formation;

(h)     plugging back and setting production casing to below a shallower zone or formation;

(i)     conducting other operations on the well not listed;

(j)     temporarily abandoning the well; or

57

(k)     permanently plug and abandon the well.

**11.2.1  Response to Operator's Proposals:**  Within forty-eight (48) hours (inclusive of Saturdays, Sundays or federal holidays) after receipt of the proposal to conduct subsequent Appraisal Operations, the Participating Party(s) shall make their Election as to such proposal, or make a counterproposal.  Failure of a Participating Party to respond to the proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered an Election to become a Non-Participating Party in the proposal.

**11.2.2  Counterproposal:**  If one or more counterproposals for subsequent Appraisal Operations are made, preference shall be given first to a proposal for operation (a) above, next to operation (b) above, and so forth in decreasing order of priority.  If different depths or locations are proposed for subsequent Appraisal Operations, preference shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order, with the exception of operations (b) and (c) of Article 11.2 (*Subsequent Appraisal Operations at Objective Depth*) which priority shall be given to the deepest depth proposed in ascending order. After all Elections have been received and the subsequent Appraisal Operation is commenced, the remaining proposals for other types of subsequent Appraisal Operations shall be deemed withdrawn.

**11.2.3  Approval of Subsequent Appraisal Operations by All Parties:** Once all Elections have been received for such Subsequent Appraisal Operation, the Operator shall commence the subsequent Appraisal Operation at the Costs and risk of the Participating Party(s).

58

11.2.4 **Approval of Subsequent Appraisal Operations by Fewer than All Parties**: If a proposal for subsequent Appraisal Operations (except a proposal to plug and abandon), is approved by fewer than all Parties, then the Operator shall conduct the operation at the sole Cost and risk of the Participating Party(s). Costs of subsequent Appraisal Operations (except a proposal to plug and abandon) will be recouped from the Non-Participating Party(s) in accordance with Article 16.5.2 *(Non-Consent Subsequent Appraisal Operations)*. A Non-Participating Party in a subsequent Appraisal Operation shall be relieved of the Costs, risks and obligations of the subsequent Appraisal Operation, except as to its share of the Costs of plugging and abandoning the Appraisal Well in its then-current condition. No operation shall be performed on the well unless deemed by the Operator to be safe and the well bore is in a condition to perform the proposed operation.

11.2.5 **Additional Subsequent Appraisal Operations**: At the completion of the subsequent Appraisal Operation, the Operator will again submit proposal(s) for subsequent Appraisal Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is temporarily abandoned or plugged and abandoned.

11.3 **Election by Non-Participating Parties in Deepening or Sidetracking Appraisal Operations**: Upon an Appraisal Well being drilled to its initial Objective Depth, and if the Participating Party(s) propose to either: (i) Deepen said Appraisal Well; or, (ii) Sidetrack said Appraisal Well, then the Operator shall notify each original Non-Participating Party of the approved operation. Each original Non-Participating Party may respond with an Election regarding an approved proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice. Any original Non-Participating Party making an

59

Election to participate in the Deepening or Sidetracking of an Appraisal Well shall: (i) be deemed to be under-invested in an amount equal to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs)*, and, (ii) remain a Non-Participating Party in the Appraisal Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.2 *(Non-Consent Appraisal Operations)*, less the recoupment under Article 16.6 *(Under-investment of Costs)* has been recovered by the original Participating Party(s). The Participating Parties in the Sidetrack or Deepening are overinvested Parties.

11.4    **Deeper Drilling**:  A proposal to drill an Appraisal Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well or a proposal to re-enter and Deepen an existing Appraisal Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well shall be subject to the following provisions.

11.4.1    **Limited Participation in Deeper Drilling**:  If a proposal is approved pursuant to Article 11.4 *(Deeper Drilling)* above, any Party may either:

- make an Election to participate in the proposed Deeper Drilling operation; or

- make an Election to not participate in the proposed Deeper Drilling operation; or,

- make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

60

A Party making an Election in limiting its participation in a Deeper Drilling operation shall bear its Participating Interest share of the Cost and risk of drilling (including completion or abandonment) to the base of the deepest Producible Reservoir and shall be a Non-Participating Party subject to Article 16.5.2 (*Non-Consent Appraisal Operations*) as to those operations in such well below the base of the deepest Producible Reservoir. If a Party exercises its right not to participate in the Deeper Drilling operation, the operation shall be conducted pursuant to Article 16.5.2 (*Non-Consent Appraisal Operations*).

11.5 **Completion of an Appraisal Well**: In the event an Appraisal Well has not been permanently plugged and abandoned, such well shall be completed as a Development Operation pursuant to an approved Development Plan, or proposed as a Development Operation if not included in an approved Development Plan.

11.6 **Plugging and Abandoning Costs**: If the Operator encounters mechanical difficulties or impenetrable conditions, which makes further drilling impractical, then the Operator may propose to plug and abandon the well. Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well. The Participating Party(s) in the original operations shall pay all Costs of plugging and abandoning the Appraisal Well (except any increased plugging and abandoning Costs associated solely with a subsequent Appraisal Operation conducted as a Non-Consent Operation). The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

11.7 **Conclusion of Appraisal Operations**: Appraisal Operations shall conclude upon the earlier of:

(a)     unanimous approval of the conclusion of Appraisal Operations; or

(b)     approval of the initial Development Plan; or

(c)     that point in time when no Appraisal Operation has been conducted for a period of one hundred eighty (180) days from the rig release (or cessation of operations) of the previous Appraisal Operation; or

(d)     after the abandonment of the second Appraisal Well, whether permanent or temporary, and the release of the rig from such second Appraisal Well (including any substitute well), unless otherwise mutually agreed.

However, if an Appraisal Operation is being conducted at the occurrence of either (a) or (b) above, Appraisal Operations shall conclude when such Appraisal Well is either temporarily or permanently abandoned.

## ARTICLE 12.0
## FEASIBILITY STUDY, INTEGRATED PROJECT TEAM AND DEVELOPMENT PLAN

**12.1   Proposal for Feasibility Study:**  Prior to the formation of an Integrated Project Team, any Party may propose a "Feasibility Study", defined below for the resolution of any issues affecting operations on the Contract Area.  A Feasibility Study shall not require the formation of an Integrated Project Team.   The proposal for a Feasibility Study shall include the following:

(a)     the purpose of the Feasibility Study;

62

(b)     the anticipated scope of the work of the Feasibility Study including a schedule of the work activities;

(c)     an estimate of the type and number of staff required to complete the Feasibility Study; and,

(d)     an estimate of third party costs and activities to complete the Feasibility Study (i.e. Feasibility Study AFE), if any.

12.1.1 **Meeting With Parties on Proposed Feasibility Study:** If requested by any Party, the Operator will call a meeting of the Parties within ten (10) days after the Feasibility Study proposal has been furnished to the Parties. At such meeting, the Parties shall discuss and resolve: (a) the positions of all Parties on the proposed Feasibility Study; (b) the necessity of the study; (c) composition and organization of any proposed Feasibility Study; and (d) any other related matter. The proposing Party may at its discretion modify any proposed Feasibility Study as a result of such meeting and shall within ten (10) days after such meeting submit to the other Parties such modified Feasibility Study proposal.

12.1.2 **Election on Proposed Feasibility Study:** After receipt of a proposal for a Feasibility Study, all Parties shall notify the Operator of their Election to participate in the Feasibility Study in accordance with Section 8.3 *(Elections)*. The Operator, or the proposing Party if the Operator is a Non-Participating Party, shall commence the Feasibility Study on behalf of all Participating Party(s). Each Participating Party shall be responsible for designating its representative(s) for the Feasibility Study. A Party's representatives for the Feasibility Study may be changed at any time. The salaries, burdens, benefits, other compensation and expenses of a Party's employees,

63

including internal engineering support staff, assigned to the Feasibility Study shall be the responsibility of the Party employing such representative. In the event the Feasibility Study requires third party services, a Feasibility Study AFE shall be furnished to all Parties as provided in Article 12.1 *(Proposal for Feasibility Study)*. Costs and expenses attributable to an approved AFE shall be handled in accordance with Exhibit "C" (Accounting Procedure). Overhead shall be charged pursuant to pursuant to Article III 3. A. or B., as applicable, of Exhibit "C" (Accounting Procedure). The Participating Party(s) shall bear the costs associated with the Feasibility Study AFE proportionately on a Participating Interest basis.

(a)     If a Party does not participate in a proposed Feasibility Study that does not include a Feasibility Study AFE, then such Non-Participating Party shall not have access to the data or studies.

(b)     If a Party does not participate in a proposed Feasibility Study that includes a Feasibility Study AFE, then such Non-Participating Party shall not have access to the data or studies until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE).*

**12.1.3   Election on Feasibility Study AFE's after the Formation of the Feasibility Study:** In the event it is determined by the Participating Party(s) to a Feasibility Study that a Feasibility Study AFE or additional Feasibility Study AFE's are necessary to continue the study as approved, the Participating Party(s) shall make an Election as to their continued participation in the Feasibility Study by approval of the Feasibility Study AFE. Upon such Election, the Participating Party(s) shall bear the costs associated with the Feasibility Study AFE proportionately on a Participating

64

Interest basis.   In the event an original Participating Party does not continue participation in the Feasibility Study, such Non-Participating Party shall not have access to data or studies as provided in Article 12.1.2(b).

**12.2**   **Phased Development Operations:**  The results of Exploratory and/or Appraisal Operations may justify the development of one (1) or more Producible Reservoirs within the Contract Area.  The Operator shall prepare for the approval of the Parties a Development Plan in order to pursue such development of the Contract Area.  In view of the Costs and scope of Development Operations for the Contract Area, the Parties may agree to divide Development Operations into an initial Development Phase and one or more subsequent Development Phases.  Each Development Phase shall be centered upon the installation of a new Production System for the Contract Area.  A separate Development Plan shall be prepared for each Development Phase, and each Development Plan shall be developed, approved and implemented pursuant to this Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)*.

**12.3**   **Proposal of Integrated Project Team:**  In order to provide for the orderly preparation of the Development Plan, the Operator shall propose the formation of an Integrated Project Team whose duties are more specifically set forth in Exhibit "H " *(Integrated Project Team and Technology Sharing)*.  The Operator shall have an exclusive period of ninety (90) days following rig release from the first Producible Well to submit a proposal for the formation of the Integrated Project Team.  However, if an Appraisal Operation is approved by the Parties prior to the proposal for the formation of the Integrated Project Team, the Operator's exclusive proposal period shall be extended until ninety (90) days after rig release of the last approved Appraisal Operation.  If the Operator does not submit an Integrated Project Team AFE during its exclusive period, then any Party may submit an Integrated Project Team proposal.

A proposal for an Integrated Project Team shall include at least the following information:

(a)     anticipated scope of the work of the Integrated Project Team including a schedule of the work activities;

(b)     an estimate of the type and number of staff required to complete the assignment; and,

(c)     an Integrated Project Team AFE which shall include the estimated Costs of the Integrated Project Team and third party Costs and activities to complete the assignment of the Integrated Project Team.

12.4   **Integrated Project Team Election:**  A proposal for the formation of the Integrated Project Team shall not require the approval of the Parties as a General Matter. Each Party shall have an Election as to its participation in the AFE for the Integrated Project Team, pursuant to Article 8.4.3 *(Other AFE Related Operations)*.  The formation and administration of the Integrated Project Team shall be handled in accordance with Exhibit "H " *(Integrated Project Team and Technology Sharing)* with the Costs of the Integrated Project Team being charged in accordance with Exhibit "C" *(Accounting Procedure)*.  A Party which makes an Election not to participate in the Integrated Project Team shall become a Non-Participating Party as to the Costs of the Integrated Project Team and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.  A Non-Participating Party shall not have access to the data or studies prepared by the Integrated Project Team until satisfaction of the requirements of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.

66

**12.4.1** **Pre-Development AFE's:** In order to facilitate the early and orderly commencement of Development Operations under this Agreement, the Operator shall have the right to submit Pre-Development AFE's prior to the approval of a Development Plan. These Pre-Development AFE's will be used to approve the costs of engineering design studies, long lead time items or any other operation necessary to assist the Operator in the preparation and completion of the Development Plan.   Pre-Development AFE's shall require approval as a General Matter by the Participating Party(s) in the Integrated Project Team.   Costs and expenses attributable to an approved AFE shall be handled in accordance with Exhibit "C" (Accounting Procedure).  Overhead on the Costs of engineering or design studies shall be charged pursuant to pursuant to Article III 3. A. or B., as applicable, of Exhibit "C" (Accounting Procedure).  A Party which does not participate in a Pre-Development AFE shall become a Non-Participating Party and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE).*

**12.5** **Submission of a Development Plan:** The Operator shall have the exclusive right for a period of ninety (90) days from the formation of an Integrated Project Team to submit a Development Plan for the review and approval of the Parties. The Operators proposed Development Plan shall be based upon the work and recommendations of the Integrated Project Team.  If the Operator has begun preparation of a Development Plan, but the Development Plan will not be completed and submitted by the end of the Operator's exclusive period, the Operator may request an extension of the exclusive period to allow completion of the work in progress.  Any request for an extension shall include a report of the progress to date and specify a date for submission of the Development Plan not more than ninety (90) days from the expiration of the exclusive submission period.  The Parties shall not arbitrarily or unreasonably refuse a request for extension of the Operator's submission

period. If no Parties elect to participate in an Integrated Project Team and an Integrated Project Team is not formed, then the Operator shall have the exclusive right to propose a Development Plan for a period of ninety (90) days following conclusion of the Exploratory Operations or Appraisal Operations, whichever is later.

12.6    **Content of the Development Plan:** Any Development Plan proposed under this Agreement shall contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, Costs and capacity of the proposed Development Plan and Production System. All Development Plans submitted shall include at least the following information:

(a)    **Production System:** Description of the Production System including:

(i)    the type of Production System proposed (i.e., tension leg well jacket, floating production system, etc.), including the Production System's location, configuration (i.e., number of well slots or subsea tiebacks) and production capacity;

(ii)    a description of the Facilities and their daily processing capacity for Hydrocarbon production and the gathering system necessary to transport the Hydrocarbons from the well heads to the interconnect with the pipeline(s) servicing the Contract Area;

(iii)    a projected time schedule for designing, contracting, fabricating, constructing, transporting and installing the Production System;

(iv)    the estimated date of initial Hydrocarbon production and the estimated daily rate of Hydrocarbon production thereafter; and,

68

(v)     the estimated Costs of the Production System not in the form of an AFE, including the contract strategy anticipated for construction and installation.

(vi)    A description of the proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

(vii)   A description of the proposed well completion techniques (i.e. dual vs. single);

(b)     **Producible Reservoirs:**  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c)     **Recoverable Reserves and Production Profile:**  An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter,

(d)     **Pre-drilling Operations:**  A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e)     **Development Wells:**  A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and location of each well;

69

  (v)  the estimated Costs of the Production System not in the form of an AFE, including the contract strategy anticipated for construction and installation.

  (vi)  A description of the proposed hydrate or paraffin control system or technique, method of pressure maintenance, or enhanced recovery plan;

  (vii)  A description of the proposed well completion techniques (i.e. dual vs. single);

(b) **Producible Reservoirs:**  A description of the Hydrocarbon bearing geological formations expected to be developed under the Development Plan along with the general area and depth of sands or reservoirs to be developed by the Production System;

(c) **Recoverable Reserves and Production Profile:**  An estimate of recoverable reserves for the proposed Development Plan and a schedule of the estimated daily rate of Hydrocarbon production thereafter,

(d) **Pre-drilling Operations:**  A reasonable description of pre-drilling operations, if any, planned in support of later development, including an estimate of the timing, Cost and location of each pre-drilling operation;

(e) **Development Wells:**  A reasonable description of drilling plans for all Development Wells and the completion plans for any temporarily abandoned Appraisal Wells which are to be completed and all Development Wells, including an estimate of the timing, Cost and location of each well;

(f)     **Tieback Operations:**  If the Development Plan requires the tieback or use of Facilities located outside the Contract Area, a written commitment from the owner of such offsite Facilities to handle or process Hydrocarbons, the amount of any tariffs, processing or other fees the owner of such offsite Facilities will charge the Participating Parties to handle or process Hydrocarbons, and the guaranteed capacity on the offsite Facilities for the Hydrocarbons;

(g)     **Final Design AFE:**  An AFE for the completion of the detailed design of the Production System, including final specifications, blueprints and models with which contractors will be able to formulate their bids on the components of the Production System;

(h)     **Field Operating Scheme:**  a description of the field operating scheme, its method, requirements, expected frequencies of intervention and Costs;

(i)     **Field Abandonment:**  a description of field abandonment plan (if applicable);

(j)     **Reservoir Plan:**  A reservoir plan which shall provide strategies, objectives, and methods for developing, managing, and depleting each Producible Reservoir during its producible life and shall include, but not be limited to:

    (i)     An estimate of the number of wells slots dedicated to each reservoir, including the planned number of producers and injectors;

    (ii)    The planned drilling locations and timing of each anticipated well for each Producible Reservoir;

70

(iii)   A reservoir management and depletion strategy for each Producible Reservoir addressing issues which shall include, but not be limited to:

    (A)   estimates of oil and gas in place;

    (B)   reservoir rock and fluid characteristics;

    (C)   depletion mechanism;

    (D)   water and gas injection plans and objectives;

    (E)   reservoir surveillance programs (e.g., cased-hole logging, static pressures, etc.) and their objectives;

    (F)   well performance goals (e.g., target production rates, target injection rates, maximum rates or drawdown limits, maximum GOR, maximum water cut, gas-lift targets, etc.);

    (G)   reservoir performance goals (e.g., target pressures or pressure profiles, target voidage replacement ratios, gas cap maintenance goals, etc.); and

    (H)   other relevant information;

(k)   the estimated Cost of disposal wells, if applicable;

71

(1)     the type of Hydrocarbon transmission system to be made available to the Participating Parties (e.g., pipeline vs. barge, etc.); and

(m)     Other Data:   Provided such information is available, any other information reasonably necessary to perform an evaluation of the technical and economic feasibility of the Production System provided for in the Development Plan.

12.7    **Approval of a Development Plan:**  Upon the submission of a proposed Development Plan, the Operator shall have sixty (60) days to obtain the unanimous approval of the Party(s) of any Development Plan submitted by the Operator during its exclusive period.  Approval of a Development Plan includes the approval of the Final Design AFE submitted as a part of the Development Plan.  Any Party may submit a written request for material conceptual revisions to an approved Development Plan.  Each Party shall have thirty (30) days to review and suggest modifications to the submitted revisions.  Upon the approval of the revisions pursuant to Article 12.12 (*Minor Modifications to Development Plans*) or Article 12.13 (*Major Modifications to Development Plans*), as applicable, the Development Plan shall be considered amended to the extent approved by the Parties.

12.7.1  **Alternative Development Plans:**  If a Development Plan is not timely submitted by the Operator during its exclusive period or the Development Plan is not unanimously approved during the sixty (60) day period provided in Article 12.7 *(Approval of a Development Plan)* above, then any Party shall have a period of sixty (60) days, commencing with either the expiration of the Operator's exclusive period or its failure to obtain unanimous approval of the Development Plan it submitted during its exclusive period, to submit an alternative Development Plan.  If, at the conclusion of the sixty (60) day period, no alternative Development Plan has been proposed, then the Operator's Development Plan, if any, proposed during the Operator's exclusive

period shall be deemed approved. Alternative Development Plans proposed after the expiration of the Operator's exclusive submission period shall be considered for unanimous approval by the Parties in the order in which the Development Plans are submitted. All Parties shall respond to any proposal for an alternative Development Plan within sixty (60) days from receipt of an alternative Development Plan. If the sixty (60) day period terminates and the Parties still have not unanimously approved a Development Plan, then the Parties shall have sixty (60) days in which to approve any Development Plan submitted as a General Matter. No new Development Plans shall be submitted during this time period. In the event of a tie vote, the first Development Plan submitted shall be deemed approved. All Parties shall respond to any proposal for an alternative Development Plan within the time period provided in Article 12.7 *(Approval of a Development Plan)*.

**12.7.2** **Approval of a Development Plan by Three or more Parties if One is not Approved as a General Matter:** If there are three (3) or more Parties subject to this Agreement and a Development Plan is not approved in the time period set forth in Article 12.7.1 (*Alternative Development Plans*), and if there is only one Development Plan submitted and such Development Plan receives an affirmative Election of at least thirty-three percent (33%) of the voting interest, such Development Plan shall be deemed approved by the Parties. If there are two (2) or more Development Plans submitted and one Development Plan receives an affirmative Election of at least thirty-three percent (33%) of the voting interest and the other Development Plan receives an affirmative Election of less than thirty-three percent (33%) of the voting interest, then the Development Plan receiving the affirmative Election of at least thirty-three percent (33%) of the voting interest shall be deemed approved by the Parties. If two competing Development Plans each receive an affirmative Election of

thirty-three percent (33%) voting interest, the first Development Plan submitted shall be deemed approved by the Parties.

**12.7.3   Failure to Approve Development Plan:**  If a Development Plan is approved, any Party who does not approve such Development Plan shall become a Non-Participating Party in the Final Design AFE and Development Plan and shall be subject to the provisions of Article 16.5.3 *(Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE)*.  The Participating Party(s) shall proceed with the Final Design AFE with the interest of the Non-Participating Party shared by the Participating Party(s) on the basis of their respective Participating Interests, unless otherwise mutually agreed.

**12.8   Development Well Proposals:**  The approval of the Development Plan shall not eliminate the requirement that Development Wells must be separately proposed and approved as a General Matter.

**12.9   Fabrication AFE:**  Within sixty (60) days from the date of approval of the Development Plan, unless such additional time is necessary due to Article 25.0 *(Force Majeure)*, Operator shall submit a Fabrication AFE to all Parties. If the Operator does not timely submit the Fabrication AFE, any Party may submit a Fabrication AFE for the approved Development Plan.  The Fabrication AFE shall consist of separate AFE's, if appropriate, for: (i) the structural components of the Production System; (ii) the equipment and Facilities to be located on the Contract Area (or located off the Contract Area but serving the Contract Area), including any Subsea Production System; (iii) any flowlines, gathering lines, risers or other Facilities for handling Hydrocarbon production; (iv) any other components of the Production System; and (v) installation. The Parties shall respond to the Fabrication AFE with their Election in accordance with the response time provided in Article 8.4.2 *( Production System*

74

*Construction)*.  The Election regarding the Fabrication AFE shall be a single Election and not an Election as to the individual AFE's comprising the Fabrication AFE.  Development Wells shall be subject to separate AFE's and shall not be included within the Fabrication AFE.  If all Parties make an Election to participate in the Fabrication AFE, then the Operator shall proceed to design, fabricate, construct, transport and install the Production System for the joint account of the Parties.  By making an Election to participate in the Fabrication AFE, each Participating Party commits to pay its Participating Interest share of the Costs, risks and liabilities of the Initial Production System as set out in the Fabrication AFE.

12.9.1  **Failure to Approve:**  If fewer than all the Parties make an Election to participate in the Fabrication AFE, then the Party making an Election not to participate in the Fabrication AFE may submit with its Election any objections to the Fabrication AFE and its associated materials.  The Operator shall attempt to resolve these objections and, if necessary, modify the Fabrication AFE to address these objections.  The Operator may, at its discretion, submit to the Parties either the original Fabrication AFE or revise and resubmit an amended Fabrication AFE within thirty (30) days of Operator's receipt of said objections.  In the event the Operator does not resubmit an amended Fabrication AFE, the Operator shall notify each disapproving Party.  Any disapproving Party shall then have ten (10) days after receipt of such notice in which to reconsider its Election.

12.9.2  **Resubmittal of the Fabrication AFE:**  In the event the amount of the resubmitted Fabrication AFE is equal to or less than the previously submitted Fabrication AFE, all Parties shall respond with their Election within thirty (30) days of the receipt of the resubmitted Fabrication AFE.  In the event the amount of the resubmitted Fabrication AFE is greater than the previously submitted Fabrication AFE, all Parties

shall respond with their Election within thirty (30) days of receipt of the resubmitted Fabrication AFE.

**12.10** **Assignment of Interest**: If any Party makes an Election not to participate in the Fabrication AFE under an approved Development Plan, then the Non-Participating Party shall be deemed a Withdrawing Party subject to Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)* and Article 17.0 *(Withdrawal from Agreement)*. The Participating Party(s) shall have ninety (90) days in which to either:

(i)     proceed with the Fabrication AFE with the interest of the Non-Participating Party shared by the Participating Party(s) in accordance with Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)*, unless otherwise mutually agreed, or

(ii)    change its Election to become a Non-Participating Party and become a Withdrawing Party in accordance with this Article 12.10 *(Assignment of Interest)*.

If the Operator makes an Election not to participate in the Fabrication AFE, then the Participating Party(s) shall select a successor Operator pursuant to Article 4.3.4 *(Selection of Successor Operator)*.

**12.11** **Timely Operations for Production Systems**: Development Operations requiring the construction of a Production System shall be commenced within one hundred eighty (180) days from the last Party's Election for the Fabrication AFE. Construction shall be deemed timely commenced on the date the major fabrication contract for the Production System is awarded. In the event the Operator fails to timely commence the construction (contract award), then all the Non-Operating Party(s) may either select a substitute Operator to implement the Development Plan or rescind their previous approval of the Development Plan

with the effect as if the Development Plan and the associated Fabrication AFE had not been submitted  The above notwithstanding, if the MMS grants a SOP/SOO  for the Contract Area, any shorter time limits set forth as requirements of the SOP/SOO shall supersede the corresponding longer time limit set forth in this Agreement or the Development Plan.

12.12  **Minor Modifications to Development Plans**:  In implementing the Development Plan, the Operator shall advise the Participating Party(s) of progress.  As additional information becomes available, the Operator may, without the approval of the Participating Party(s), make minor modifications to a Development Plan if such minor modifications are both necessary and reasonable to accomplish the Development Plan.  For purposes of this paragraph, a minor modification shall mean a modification which does not cause the cumulative estimated Cost of the Fabrication AFE or the Final Design AFE with its supplements to increase by more than twenty-five percent (25%) or ten million dollars ($10,000,000), whichever is less, and is not a major modification as defined in Article 12.13 *(Major Modification to Development Plan)*.  Such minor modifications also shall not materially change the risk or timing of the Development Plan. Minor modification shall also include changes for reasons of safety or regulatory requirements.

12.13  **Major Modifications to Development Plans**:   For purposes of this paragraph, a "Major Modification" shall mean: (i) a modification which  cause the cumulative estimated Cost of the Fabrication AFE or the Final Design AFE with its supplements to increase by more than twenty-five percent (25%) or ten million dollars ($10,000,000), whichever is less; or (ii) a modification to the Development Plan prior to the installation of the Production System which changes:

(i)      the type of Production System (i.e. tension leg well jacket, floating production system, etc.), is to be changed; or,

77

(ii)     the number of well slots of the Production System is to be increased by at least fifty percent (50%) or decreased by twenty percent (20%) or,

(iii)    the initial selection of the location of the Production System is to be changed by more than 2,500 feet in any direction; or,

(iv)    the initial daily production processing capacity of any Facilities is to be changed by at least fifty percent (50%); or,

(v)     the number of Development Wells is to be increased or decreased by at least fifty percent (50%); or,

(vi)    the proposed hydrate or paraffin control system or technique; or

(vii)   the proposed well completion techniques (i.e. dual vs. single) is to be changed; or

(viii)  the timing of the installation of the Production System or the timing of initial Hydrocarbon production from the Production System is to be changed by more than two hundred (200) days; or

(ix)    the type of gathering and pipeline system necessary to transport the Hydrocarbons from the wellheads to the interconnect with the export pipelines servicing the Contract Area as provided in the Development Plan in the case of a tieback is to be changed.

Major Modifications to the Development Plan shall require the unanimous consent of the Participating Party(s). Any Participating Party may propose such Major Modification by notifying the Operator. The Operator shall submit said modification for the consideration of the Participating Party(s). If a Major Modification proposed pursuant to this Article 12.13 is unanimously approved by the Participating Party(s), then the Operator shall immediately advise any Party who made an Election not to participate in the Fabrication AFE for the original approved Development Plan and provide the modified Fabrication AFE. Any Non-Participating Party shall have the right for a period of thirty (30) days, after receipt of the revised Fabrication AFE from the Operator, in which to make an Election to participate in the modified Fabrication AFE. Any Non-Participating Party making an Election to participate in the modified Fabrication AFE shall be under-invested in an amount equal to one hundred percent (100%) of such Non-Participating Party's share of the actual Costs incurred for the Fabrication AFE. The Non-Participating Party who makes an Election to participate in the modified Development Plan shall eliminate the under-investment through a settlement of Costs pursuant to Article 16.6.1 *(Settlement of Under-investments)*. The Participating Party(s) shall deliver to the Non-Participating Party who makes an Election to participate in the modified Fabrication AFE an assignment of one hundred percent (100%) of such Non-Participating Party's former Working Interest in the Contract Area, the wells therein and production therefrom within thirty (30) days after elimination of the under-investment.

12.14 **Supplemental AFE for Cost Overruns on Fabrication AFE:** A supplemental AFE for cost overruns for the Fabrication AFE shall be provided as set forth in Article 6.2.4 (Supplemental AFE for Cost Overruns on Fabrication AFE).

12.15 **Termination of a Development Plan:** The termination of an approved Development Plan shall require the unanimous consent of the Participating Party(s).

79

**12.16** **Subsequent Development Phases:** At any time after the last Party's Election under the Fabrication AFE for the Initial Development System, any Participating Party may propose an additional Development Phase(s) and the installation of a subsequent Production System(s). Upon proposal of a subsequent Development Phase, the Operator shall propose the formation of an Integrated Project Team to prepare a Development Plan for the subsequent Development Phase. The preparation, approval and implementation of the Development Plan for a subsequent Development Phase shall follow the same procedures specified in this Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)* for the preparation, approval and implementation of the initial Development Plan.

**12.16.1** **Access to Existing Facilities:** Development Operations in subsequent Development Phases shall have reasonable access (on a space available basis) to gathering, processing and transportation Facilities installed for previous Development Phases.

**12.16.2** **Non-Consent Operations in Subsequent Development Phases:** If fewer than all Parties make an Election to participate in a Fabrication AFE for a subsequent Development Phase, the Operator shall implement the Fabrication AFE in the subsequent Development Phase for the account of the Participating Party(s) and at their sole Cost and risk. The Participating Party(s) shall conduct the subsequent Development Operations with the benefit of the non-consent provisions specified in Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*. A Non-Participating Party in a subsequent Development Phase shall not be entitled to any information or data from any subsequent Development Operation associated with such Development Phase, unless the Non-Participating Party participates

80

in such subsequent Development Operations pursuant to Article 16.8 *(Operations From a Subsequent Non-Consent Production System)*. Any Non-Participating Party in a subsequent Development Phase will remain a Participating Party in any Development Plan in which it participated. However, such Non-Participating Party shall not unreasonably interfere with Development Operations in the subsequent Development Phase (including making any claim for drainage upon the Participating Party(s) in the subsequent Development Phase, so long as the subsequent Development Phase is conducted according to prudent operating practices). In all events, the sequence and conduct of Development Operations in a subsequent Development Phase shall be controlled by the Participating Party(s) in the subsequent Development Operation.

## ARTICLE 13.0  DEVELOPMENT OPERATIONS

13.1  **Proposal of Development Operations:**  It is the intent of the Parties to proceed with development of the Contract Area in accordance with the approved Development Plan; however, subsequent to the conclusion of Appraisal Operations and prior to the approval of a Development Plan any Party may propose to conduct Development Operations, which shall require General Matter approval. Any Participating Party in the approved Development Plan may propose to conduct specific Development Operations which were included in the Development Plan by giving notice of the proposal, along with the associated AFE and if applicable, the associated Well Plan to the other Participating Party(s). In the event of a conflict between a Development Well AFE and the Development Plan, the Development Well AFE shall prevail. A Development Well proposal shall include all necessary Development Operations and expenditures for drilling the well to its Objective Depth (as set forth in the associated AFE), including without limitation, all Costs of permitting and

81

shallow hazard work and all logging and "open hole" evaluations and the plugging and abandonment of the Development Well. Each Development Operation except a substitute Development Well proposal shall require approval as a General Matter. Once a Development Operation is approved as a General Matter, the Operator shall commence the Development Operation at the sole Cost and risk of the Participating Party(s). Costs of a Non-Consent Development Operation will be recouped in accordance with Article 16.5.4 *(Non-Consent Development Operations)*. Any Participating Party in the approved Development Plan may propose to conduct specific Development Operations which were not included in the Development Plan. Such a proposal shall specify that it is not for an operation included in the Development Plan and such proposal shall require approval as a General Matter. A proposal for a Development Operation not included in the Development Plan which is approved as a General Matter shall automatically revise the Development Plan. However, the provisions of this Article 13.0 *(Development Operations)* shall not apply to the proposal for the Initial Production System or any Subsequent Production System in the Contract Area. The Initial Production System or any Subsequent Production System shall be proposed as a part of a Development Plan in accordance with Article 12.0 *(Feasibility Study, Integrated Project Team and Development Plan)* of this Agreement.

**13.1.1** **Operator's Counterproposal:** If a Non-Operating Party makes a proposal that was not included in the approved Development Plan and such proposal is approved as a General Matter with the Operator being a non-approving Party, the Operator shall have the option to:

a)  participate in the operation proposed by the Non-Operating Party; or,

b)  become a Non-Participating Party pursuant to the provisions of Article 16.5.4 *(Non-Consent Development Operations)*; or,

c)      make a counterproposal within the applicable response time that attempts to satisfy the same or similar objectives (in terms of timing and development of the Contract Area) as would the Non-Operating Party's proposal.

The Operator's counterproposal, if approved as a General Matter, shall have the effect of voiding the Non-Operating Party's proposal.  A Party exercising its right not to participate in the Operator's counterproposal if approved as a General Matter, shall become a Non-Participating Party in the operation subject to Article 16.5.4 *(Non-Consent Development Operations)*.   If the Operator's counterproposal is not approved, the Operator shall commence the previously approved Development Operation proposed by the Non-Operating Party at the sole Cost and risk of the Participating Party(s).

**13.1.2  Substitute Development Well:**    The Operator shall timely commence a Development Operation and continue the operation with due diligence to the Objective Depth or until: (i) a supplemental AFE is required pursuant to Article 6.2 (Authorization for Expenditure); or, (ii) the Operator encounters conditions in the hole that render further drilling impractical, such as mechanical difficulties, uncontrolled influx of subsurface water, abnormal pressures, pressured or heaving shale, salt, granite, other practically impenetrable substances or other similar conditions.  If the Development Well is abandoned due to the conditions described above in Article 13.1.2 (ii), then the Operator or any Participating Party may propose a substitute well (with the associated AFE and Well Plan), within ninety (90) days of the abandonment of the Development Well and each Participating Party in the abandoned Development Well shall make an Election whether to participate in the proposed substitute well.  Further, during said ninety (90) day period, no Party may

propose any additional drilling. The Well Plan for said substitute well shall be substantially similar to the previously approved Well Plan, taking into account those conditions which rendered further drilling impractical. The Operator shall commence the substitute well at the sole Cost and risk of the Parties making an Election to participate. Costs of a Non-Consent substitute well will be recouped in accordance with Article 16.5.4 *(Non-Consent Development Operations)*.

**13.1.3** **Timely Operations:** An approved Development Operation (not requiring the installation of a Production System) shall be commenced within one hundred twenty (120) days from the date upon which it is approved as a General Matter, unless provided under Article 25.0 *(Force Majeure)*. If operations have not commenced within one hundred twenty (120) days, the approved Development Operation shall be deemed withdrawn, with the effect as if the Development Operation had never been approved as a General Matter. If an approved Development Operation is deemed withdrawn due to lack of timely commencement of operations, any Costs incurred in the preparation for or in furtherance of the operation shall still be chargeable to the Participating Party(s). A Development Operation shall be deemed to have commenced on the date the rig arrives on location or, if the rig is already on location, the date when actual drilling operations are begun.

**13.2** **Subsequent Development Operations at Objective Depth:** After (i) the Development Operation has been drilled to its Objective Depth; (ii) all operations in the controlling AFE and Well Plan have been completed; and (iii) all logs and test results have been distributed to the Parties, the Operator, shall promptly notify the Participating Party(s) of the Operator's proposal for one (1) of the following operations:

84

(a) conduct additional testing, logging or coring of the formations encountered prior to setting production casing;

(b) attempt completion at the stratigraphic equivalent of the initial Objective Depth;

(c) Sidetrack the well to another bottomhole location not deeper than the stratigraphic equivalent of the Objective Depth of the AFE, or the stratigraphic equivalent of the deeper depth achieved in item (a) above;

(d) plug back, and attempt completion in a shallower zone or formation;

(e) Deepen the well to a new Objective Depth;

(f) conduct other operations on the well;

(g) temporarily abandon the well in order to test at a later date; or,

(h) permanently plug and abandon the well.

**13.2.1** <u>**Response to Operator's Proposals:**</u>   Within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receipt of the Operator's proposal to conduct subsequent Development Operations, the Participating Party(s) shall either respond to the Operator's proposal, which shall require approval as a General Matter, or make a counterproposal.   Failure of a Participating Party to respond to the Operator's proposal (except a proposal to plug and abandon) or make a counterproposal shall be considered a vote not to approve the Operator's proposal and

a decision to become a Non-Participating Party in the Operator's proposal if the Operator's proposal is approved as a General Matter.

**13.2.2**   **Counterproposal:**  If one (1) or more counterproposal for subsequent Development Operations are made, consideration for approval as a General Matter shall be given first to a proposal for operation (a) above, next to operation (b) above, and so forth in decreasing order of priority.   If different depths or locations are proposed for subsequent Development Operations, consideration for approval as a General Matter shall be given first to the shallowest depth (or the location nearest the existing well bore) and then to other depths or locations in descending (or more distant) order, with the exception of operation (c) of Article 13.2 (*Subsequent Development Operations at Objective Depth*) which priority shall be given to the deepest depth proposed in ascending order.   If the proposal with the highest priority is not approved as a General Matter within the additional twenty-four (24) hour period, then the proposal with the next highest priority shall be given twenty-four (24) hours consideration by the Parties until a proposal is approved as a General Matter.   After a subsequent Development Operation has been approved as a General Matter and the subsequent Development Operation is commenced, the remaining proposals for other types of subsequent Development Operations shall be deemed withdrawn.

**13.2.3**   **Approval of Subsequent Development Operations by All Parties:**  If the proposed subsequent Development Operation is approved as a General Matter by all Parties, the Operator shall commence the subsequent Development Operation at the sole Cost and risk of the Participating Party(s).

**13.2.4**   **Approval of Subsequent Development Operations as a General Matter by Fewer than All Parties:**  If a proposal for subsequent Development Operations (except a

86

proposal to plug and abandon a producing wellbore), is approved as a General Matter by fewer than all Parties, the Operator shall conduct the operation at the joint Cost and risk of the Participating Party(s).  Any Non-Participating Party in a subsequent Development Operation shall be subject to Article 16.5.4 *(Non-Consent Development Operations)*.  A Non-Participating Party in a subsequent Development Operation shall be relieved of the Costs, risks and obligations of the subsequent Development Operation, except as to its share of the Costs of plugging and abandoning the Development Well in its then current condition.  No operation shall be performed on the well unless deemed by the Operator to be safe, and the wellbore in the opinion of the Operator is in a condition to perform the proposed operation.

13.2.5   **Additional Subsequent Development Operations:**   At the completion of the subsequent Development Operation, the Operator will again submit proposal(s) for subsequent Development Operations to the Participating Party(s), through the procedure provided herein, until such time as the well is either temporarily abandoned or plugged and abandoned.

13.3   **Election by Non-Participating Parties in Deepening or Sidetracking Development Operations:**  Upon a Development Well being drilled to its initial Objective Depth, and if the Participating Party(s) approve as a General Matter to either:   (i) Deepen said Development Well; or, (ii) Sidetrack said Development Well, then the Operator shall notify each original Non-Participating Party of the approved operation.   Each original Non-Participating Party may respond with an Election regarding an approved proposal to Deepen or Sidetrack by notifying the Operator of its Election within forty-eight (48) hours (inclusive of Saturdays, Sundays and federal holidays) after receiving the Operator's notice.   Any original Non-Participating Party making an Election to participate in the Sidetracking or Deepening of a Development Well shall be deemed to be under-invested in an amount equal

87

to its share of the Cost incurred in such Non-Consent Well (including but not limited to drilling, testing, logging or coring) prior to such Deepening or Sidetracking and subject to Article 16.6 *(Under-investment of Costs)*.  Any original Non-Participating Party making an Election to participate in the Sidetracking or Deepening of a Development Well shall remain a Non-Participating Party in the Development Well to the initial Objective Depth until the Recoupment Amount under Article 16.5.4 *(Non-Consent Development Operations),* less the recoupment under Article 16.6 *(Under-investment of Costs)* has been recovered by the original Participating Party(s).  The Participating Parties in the Sidetrack or Deepening are overinvested Parties.

13.4    **Deeper Drilling:**  A proposal to drill a Development Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well or a proposal to re-enter and Deepen an existing Development Well to an Objective Depth which is below the deepest Producible Reservoir penetrated by a Producible Well shall require approval as a General Matter and shall be further subject to the following provisions.

13.4.1  **Limited Participation in Deeper Drilling:**  If a proposal is approved pursuant to Article 13.4 *(Deeper Drilling)* above, any Party may either:

- make an Election to participate in the proposed Deeper Drilling operation; or

- make an Election to not participate in the proposed Deeper Drilling operation; or,

- make an Election to limit its participation to drilling to the base of the deepest Producible Reservoir to be penetrated by the Deeper Drilling operation.

88

A Party making an Election in limiting its participation in a Deeper Drilling operation shall bear its Participating Interest share of the Cost and risk of drilling (including completion or abandonment) to the base of the deepest Producible Reservoir and shall be a Non-Participating Party subject to Article 16.5.4 (*Non-Consent Development Operations)* as to those operations in such well below the base of the deepest Producible Reservoir.  If a Party exercises its right not to participate in the Deeper Drilling operation, the operation shall be conducted pursuant to Article 16.5.4 (*Non-Consent Development Operations).*

**13.4.2** **Multiple Completion Alternatives Above and Below the Deepest Producible Reservoir:** If a Non-Participating Party in a Deeper Drilling operation:

- considers the well to be capable of producing at or above the deepest Producible Reservoir, and,

- has notified the Participating Party(s) of its desire to participate in the completion of the well at or above the deepest Producible Reservoir,

then any further Deeper Drilling operations shall be conducted subject to the following provisions:

(a)    Multiple Completion: If all the Participating Party(s) in the well agree that a multiple well completion(s) involving (i)  a completion at or above the deepest Producible Reservoir; and (ii)  a completion below the deepest Producible Reservoir is possible and practicable, the Participating Party(s) in the Deeper Drilling operation shall bear one hundred percent (100%) of the Costs of drilling and completing at an Objective Depth below the deepest

89

Producible Reservoir that are in excess of the original Costs to drill and complete in the deepest Producible Reservoir.

(b)    <u>Single Completions</u>:  If the Participating Party(s) do not mutually agree that such multiple well completions are possible and practicable, the Non-Participating Party in the Deeper Drilling operation shall be deemed over-invested in the original well in an amount equal to the Non-Participating Party's Share of the original Costs of drilling the well to the deepest Producible Reservoir.  The Participating Party(s) in the deepening operation shall assume their proportionate share of the Non-Participating Party's Share of the Costs of other operations conducted under this Agreement until all over-investments are eliminated.

If, after having been deepened to an Objective Depth deeper than the deepest Producible Reservoir, at first occurrence of the following events:

(i)    the well is not a Producible Well in the deeper depths and the well is plugged back to a shallower zone; or,

(ii)    the well is completed as a Producible Well in the deeper depths, but Hydrocarbon production from the deeper zone is later depleted prior to the recovery of the Recoupment Amount (attributable to the Deeper Drilling operation) and the well is plugged back to a shallower zone; or,

(iii)    the well is completed as a Producible Well in the deeper depth and the Participating Party(s) have recovered the applicable Non-Consent

Recoupment (attributable to the Deeper Drilling operation) from Hydrocarbon production from the deeper zone,

the Participating Party(s) as to the depths below the deepest Producible Reservoir shall be deemed over-invested in an amount equal to the Non-Participating Party's Share of the well's Cost down to the deepest Producible Reservoir. The over-investment shall be depreciated at the rate of one-half percent (½%) per month from the date the Deeper Drilling operation commences to the earlier of (i), (ii), or (iii) above, but such depreciation shall not reduce the over-investment below forty percent (40%) of the original over-investment. The Non-Participating Party(s) in the Deeper Drilling operation shall assume their proportionate share of the Participating Party's Share of the Costs of all other operations conducted under this Agreement until all over-investments are eliminated.

**13.4.3** <u>**Completion Attempts At or Above the Deepest Producible Reservoir**</u>: If a well drilled below the deepest Producible Reservoir is not completed for production from the deeper depths, then the Participating Party(s) in said well down to the deepest Producible Reservoir shall have a right to utilize the well for completion in a Producible Reservoir. The Participating Party(s) in drilling below the deepest Producible Reservoir in said well shall bear the Costs (including plugging back Costs) necessary to place the well in proper condition for completion in a Producible Reservoir. If a well deepened below the deepest Producible Reservoir is damaged to the extent that it is rendered incapable of being completed and produced at or above the deepest Producible Reservoir in that well, the Participating Party(s) in the deepening operation shall be obligated, at their sole Cost and risk, to restore the well to its condition prior to the Deepening operations below the deepest Producible Reservoir. The Participating Party(s) in the deepening operation shall be obligated to

91

pay for the entire Cost of re-drilling the well if the damage cannot be repaired. Both the Participating Party(s) in the original drilling operation and the Participating Party(s) in the Deepening operation shall have the opportunity to participate in completion attempts at or above the deepest Producible Reservoir.

13.5    **Plugging and Abandoning Costs:**  If the Operator encounters Gulf Coast Conditions as defined in Article 10.2.6, which makes further drilling impractical, then the Operator may propose to plug and abandon the well.  Upon approval of the well abandonment as a General Matter by the Participating Party(s), the Operator shall commence the plugging and abandonment of the well.  The Participating Party(s) in the original operations shall pay all Costs of plugging and abandoning the Development Well (except any increased plugging and abandoning Costs associated solely with a subsequent Development Operation conducted as a Non-Consent Operation).  The Participating Party(s) in any Non-Consent Operation shall be responsible for the increased plugging and abandoning Costs attributable to the Non-Consent Operation.

## ARTICLE 14.0 FACILITIES AND GATHERING SYSTEMS

14.1    **Facilities as a Part of  Development Plan:**  The Development Plan shall provide for the installation of all basic Facilities necessary to handle or service Hydrocarbon production for the Contract Area.  If the approved Development Plan provides that Hydrocarbon production from the Contract Area can most efficiently be processed and handled at Facilities located off of the Contract Area (an "offsite facility"), the Development Plan shall provide for a Production System designed to utilize an offsite facility.

14.2    **Use of Facilities Off the Contract Area:**  In the event that excess capacity exists at an offsite facility and the approved Development Plan calls for a "tie-back" development of the

Contract Area to an offsite facility, the Development Plan shall include a commitment from the owner of said offsite facility specifying the capacity to be made available at such offsite facility and the amount of tariffs or handling charges to be assessed against any Hydrocarbon production from the Contract Area.  However, the Operator shall have no duty (fiduciary or otherwise) beyond the obligation to utilize reasonable efforts to secure access to the offsite facility on behalf of the Participating Party(s).  Any access secured to an offsite facility shall be shared proportionately by the Parties on the basis of their Participating Interests in the Production System Fabrication AFE.

14.3   **Approval of Additional Facilities on the Contract Area:**  This Article 14.3 (*Approval of Additional Facilities on the Contract Area*) shall only apply to Facilities to be located on the Contract Area which were not included in the approved Development Plan.   Any Participating Party may propose the installation of additional Facilities for the Contract Area beyond those specified in the Development Plan by giving notice to the other Participating Party(s) together with information adequate to describe the proposed Facilities and their estimated Costs.   Except as provided in Article 15.2 *(Facilities to Take In Kind)*, the installation of additional Facilities on the Production System beyond the scope of the Development Plan shall require the approval of the Participating Party(s) as a General Matter.  Upon approval, the Operator shall proceed to install the additional Facilities for the benefit of the Participating Party(s) provided that the additional Facilities do not interfere with continuing operations on the Contract Area.  The installation of any additional Facilities shall be at the sole Cost and risk of the Participating Party(s).  Any Non-Participating Party shall be subject to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)*.

14.4   **Expansion, Modification or Repair of an Existing Production System:**  Subsequent to the installation of the Production System described and approved in the first Development Plan

93

for the Contract Area, any Party may propose the expansion, modification or repair of any existing Production System in which it has participated by written notice to the other Participating Party(s) in such Production System. Such proposal shall be presented in accordance with Articles 6.4 *(Annual Operating Plan)* and 8.4 *(Response Time for General Matters and Elections)* for approval as a General Matter. If approved as a General Matter, it will be binding on all Participating Party(s) in the Production System and Operator shall proceed with such project for the benefit of the joint account and all Cost, risk and expense of such operation shall be borne in proportion to the respective Participating Party's Working Interest in such Production System unless otherwise agreed. This Article 14.4 shall not constitute a limit on a Party's right to install its own facilities under Article 15.0 *(Disposition of Hydrocarbon Production)*.

14.5   <u>**Use of Facilities on the Contract Area:**</u>  It is the intention of the Parties hereto that all Production Systems and accompanying Facilities and pipelines should be used to their capacity and the Parties hereto shall have priority access to all Facilities and gathering system capacity serving the Contract Area for use in operating and developing the Contract Area pursuant to an approved Development Plan. If excess capacity is available beyond the requirements of an approved Development Plan, such excess capacity shall be allocated to each Party in accordance with each Party's Participating Interest in the Production System. Each Party shall have the right to use its proportionate share of excess capacity for processing additional production from within the Contract Area.

14.6   <u>**Processing Hydrocarbon Production From Outside the Contract Area:**</u>  The Parties agree that the use of any Production System and Facility on the Contract Area to process Hydrocarbon production coming from outside the Contract Area will require unanimous approval of all Parties owning an interest in the Production System and/or Facilities. Any Hydrocarbon production coming from outside the Contract Area will be processed under the

terms and conditions of a Production Handling Agreement which shall be approved by all Parties owning such Production System and/or Facilities.

## ARTICLE 15.0  DISPOSITION OF HYDROCARBON PRODUCTION

**15.1**  **Duty to Take in Kind:**  Each Party shall have the right and duty to take in kind or separately dispose of its share of the Hydrocarbons produced and saved from the Contract Area, exclusive of Hydrocarbon production which the Operator uses in producing from the Contract Area or in Development Operations, or in preparing and treating Hydrocarbons for marketing purposes or Hydrocarbon production which is unavoidably lost.  Davis will, in addition to taking and separately disposing of its proportionate share of oil and/or condensate and gas, also take and separately dispose of all the oil and/or condensate and gas attributable to the Davis Overriding Royalty Interest, as defined in Article 19.1.

**15.2**  **Facilities to Take in Kind:**  Any Participating Party in Development Operations shall have the right, at its sole risk and expense, to construct Facilities for purposes of taking its share of Hydrocarbon production in kind, provided such Facilities, at the time of installation, do not unreasonably interfere with existing or future operations on the Contract Area.  During the construction, operation and removal of such Facilities, the owner of such Facilities shall indemnify and defend the other Parties against any claims or liabilities which may result from such construction, operation and removal and such Party shall be responsible for any damages or losses sustained by the other Parties as a result of such construction, operation or removal.

**15.3**  **Failure to Take Oil and/or Condensate in Kind:**  If any Party fails to take in kind or dispose of its share of the oil and/or condensate produced from the Contract Area, the

Operator shall have the right, but not the obligation, to either: (a) purchase the non-taking Party's share of the oil and/or condensate production at the Operator's posted price or, in the absence of a posted price, at the price prevailing in the area for oil and/or condensate of the same kind, gravity, and quality; or (b) sell such oil and/or condensate production to others at the best price obtainable by the Operator, subject to revocation at will by the non-taking Party; provided that the Operator shall have no obligation to share any existing market or to obtain a price equal to the price at which its production is sold. The Operator shall furnish notification to non-taking Party at the time such option is exercised. All contracts of sale by the Operator of any Party's share of oil and/or condensate production shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall any contract be for a period in excess of ninety (90) days. Proceeds of all sales made by the Operator pursuant to this Article shall be paid to the Parties entitled thereto once in each calendar month to allow for the timely payment, without penalty, of Lessor's royalty. Unless required by governmental authority or judicial process, no Party shall be forced to share an available market with any non-taking Party.

15.4   **Gas Balancing Provision**:  The Parties agree that in the event separate disposition of gaseous Hydrocarbons causes split-stream deliveries to separate pipelines and/or deliveries which on a day to day basis for any reason are not equal to a Party's respective proportionate share of total gas sales to be allocated to it, the gas balancing or accounting between the Parties shall be handled in accordance with Exhibit "D" *(Gas Balancing Agreement)*.

15.5   **Expenses of Delivery in Kind**:  Any cost incurred by the Operator in making delivery of any Party's share of Hydrocarbon production or disposing of same shall be borne by such Party.  Any extra expenditure incurred in the taking in kind or separate disposition by any Party of its proportionate share of Hydrocarbon production shall be borne by such Party.

96

## ARTICLE 16.0  NON-CONSENT OPERATIONS

16.1    **Conduct of Non-Consent Operations:**  If any Party becomes a Non-Participating Party in a proposed operation, the proposed operation shall be conducted as a Non-Consent Operation. If the Participating Party(s) timely commence the Non-Consent Operation, then the Non-Participating Party(s) shall be subject to either the acreage forfeiture provisions of Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*  or the Cost recoupment provisions of Article 16.5 *(Recoupment of Costs from Future Hydrocarbon Production)*, as applicable, each reflecting the increased risks and Costs assumed by the Participating Party(s).   If any proposed operation requires approval as a General Matter, such approval shall be obtained prior to the Participating Party(s) proceeding with the Non-Consent Operation.  The Operator shall conduct any Non-Consent Operation at the sole Cost and risk of the Participating Party(s) in the Non-Consent Operation.  Any Non-Consent Operations shall not unreasonably jeopardize, hinder or interfere with joint operations conducted by all Parties (unless the Non-Consent Operation will maintain all or a portion of the Contract Area under Article 16.4 *(Non-Consent Operations to Maintain the Contract Area).*

16.1.1   **Indemnity for Non-Consent Operations:**  The Participating Party(s) in any Non-Consent Operation shall indemnify, defend and hold harmless the Non-Participating Party(s) against all actions, claims and demands whatsoever brought by any third party arising out of or in connection with any Non-Consent Operation.   The Participating Party(s) shall further indemnify, defend and hold harmless the Non-Consenting Parties against all damages, Costs, losses and expenses (excepting damage to the subsurface including any reservoirs), directly or indirectly caused to or

97

incurred by them as a result of any action taken or omitted in the course of carrying out any Non-Consent Operation. The Participating Party(s) shall (insofar as it may be within their control) keep the Contract Area free from all liens and encumbrances which might arise by reason of conducting any Non-Consent Operation and indemnify, defend and hold harmless any Non-Participating Party(s) from any such liens or encumbrances.

16.1.2 **Cost Information:**  The Costs of any Non-Consent Operation shall be borne by the Participating Party(s) in proportion to their Participating Interests (unless otherwise agreed by the Participating Party(s)). Any Non-Participating Party subject to a non-consent provision shall remain liable for its share of previously incurred Costs for operations where it is a Participating Party. Within one hundred twenty (120) days after completion of a Non-Consent Operation, the Operator shall furnish all the Parties an itemized statement of the Cost of the Non-Consent Operation and an inventory of any equipment pertaining thereto. The Operator shall furnish to the Parties a statement, no less than on a quarterly basis showing operating, maintenance and other expenses attributable to the Non-Consent Operation, and the revenues from the sale of Hydrocarbon production for the preceding quarter from operations subject to any Recoupment Amount under this Article 16.0 *(Non-Consent Operations)*. If any Party takes its share of Hydrocarbon production in kind pursuant to Article 15.0 *(Disposition of Hydrocarbon Production)*, that Party shall furnish the Operator the revenue data necessary to calculate the balance of any Recoupment Amount. When necessary for calculating the recovery of a Recoupment Amount for a Non-Consent Well, any Non-Operating Party receiving its share of Hydrocarbon production in kind shall advise the Operator (in writing on or before the thirtieth (30th) day of the month following the month in which the Hydrocarbon production is sold or used off the premises) of the volumes of Hydrocarbons sold or used off the premises and the

revenue received for such Hydrocarbon production. In accounting for the revenues from any Non-Consent Operations, Hydrocarbon production need not be separately metered, but may be allocated upon the basis of monthly well tests.

16.1.3 **Non-Consent Operations in Producible Reservoirs:** Once a Producible Well has been completed and placed on production, Non-Consent Operations shall not be conducted in that Producible Well unless approved unanimously by the Participating Party(s) in such Producible Well. Non-Consent Operations for a Development Well shall not be conducted in any Producible Reservoir previously penetrated by a Producible Well drilled from or producing through the same Production System serving both the proposed Non-Consent Well and the Producible Well unless:

(a)     such Producible Reservoir was designated as an Objective Depth or completion zone in the proposal for the well; and,

(b)     the completion of such well in the Producible Reservoir is in accordance with a well spacing plan approved by the MMS which fixes acreage limitations and/or well density limitations for the drilling of wells (if such a spacing plan exists).

16.1.4 **Multiple Completions:** Non-Consent Operations shall not be conducted in any Producible Well having multiple completions unless:

(a)     each of the multiple completions are owned by the same Parties with the same Participating Interests and none of the previous well completions are capable of producing; or,

99

(b)     all Participating Party(s) in the well containing the multiple completions consent to such Non-Consent Operation(s).

For the purposes of this Article 16.0 (*Non-Consent Operations)*, each completion shall be considered as a separate well.

**16.2   Non-Consent of Initial Exploratory Well:** The Initial Exploratory Well is an obligatory well and is to be drilled pursuant to that Participation Agreement.

**16.3   Non-Consent Operations for the Initial Fabrication AFE:** The Parties agree that upon timely commencement of the construction of the Initial Production System, the Participating Party(s) shall be entitled to an assignment of one hundred percent (100%) of any Non-Participating Party's interest in all of the Lease(s) comprising the Contract Area.  Within thirty (30) days of the timely commencement of the construction of the Initial Production System, the Non-Participating Party(s) shall execute and deliver an assignment of its interest to the Participating Party(s), with no reimbursement by and at no Cost to the Participating Party(s).   If an assignment is made pursuant to this Article 16.3, then each Participating Party shall accept its Participating Interest share of the Non-Participating Party's assigned interest or in the proportions otherwise agreed to by the Participating Party(s).  A Non-Participating Party's Election not to participate in the Fabrication AFE for the Initial Production System shall be deemed a withdrawal pursuant to Article 17.0 *(Withdrawal From Agreement)*.

**16.4**   **Non-Consent Operations to Maintain the Contract Area:**   If either:

(a)   the Parties are required by the MMS to drill a well or conduct an operation in order to avoid surrendering all or a portion of a Lease, as a requirement of a SOO/SOP for a Lease or unit; or,

(b)   any Party proposes an operation during the last year of the primary term of a Lease which operation would extend the term of the expiring Lease; and,

the operation is timely commenced as a Non-Consent Operation, then each Non-Participating Party in the Non-Consent Operation shall relinquish and permanently assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's Working Interest in such Lease or portion of the Contract Area as provided below.

**16.4.1   Acreage Forfeiture In The Entire Contract Area:**   If it is necessary to drill  (or rework) a well or conduct other operations to maintain the entire Contract Area, then each Non-Participating Party in the Non-Consent Operation shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's Working Interest in and to all of the Lease(s) within the entire Contract Area within thirty (30) days after commencement of such well or other operation.  Failure to participate in such well or other operations shall be deemed a withdrawal and the provisions of Article 17.0 *(Withdrawal from Agreement)* shall apply.

**16.4.2   Acreage Forfeiture In A Portion Of The Contract Area:**   If it is necessary to conduct an operation to maintain a portion of the Contract Area, then each Non-

Participating Party in the Non-Consent Operation shall relinquish and assign to the Participating Party(s) one hundred percent (100%) of the Non-Participating Party's Working Interest in the affected portion thereof within thirty (30) days after commencement of such well or other operation. If a Party relinquishes its Working Interest pursuant to this Article 16.4.2, then such Party shall have no further rights under this Agreement as to that portion of the Contract Area relinquished. The remaining Parties shall amend this Agreement to provide for a separate operational area for the relinquished portion of the Contract Area and such amended Agreement shall apply separately to such operational area.

16.4.3 **Limitations on Acreage Forfeiture:** Notwithstanding the foregoing, if more than one (1) well is drilled or more than one (1) operation is conducted, any one (1) of which would maintain the entire Contract Area or an expiring portion of the Contract Area, an assignment shall not be required from any Participating Party in any one (1) operation which maintains all or an expiring portion of the Contract Area.

16.5 **Recoupment of Costs from Future Hydrocarbon Production:** In view of the increased risks and Costs assumed by the Participating Party(s) in conducting Non-Consent Operations, the Participating Party(s) shall recover out of future Hydrocarbon production a Recoupment Amount equal to the Participating Party's increased Costs (in excess of their Working Interest share) incurred in a Non-Consent Operation, multiplied by a "risk premium" percentage as provided below. For purposes of calculating the Recoupment Amount, Hydrocarbon production volumes shall be measured on the basis of well tests if separate metering is not available and operating expenses allocated upon the basis of Hydrocarbon production volume throughput unless other measuring requirements are mandated by the MMS. The provisions of this Article 16.5 shall not apply to Non-Consent Operations covered in Articles 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)* and 16.4 *(Non-Consent*

102

*Operations to Maintain the Contract Area).* Upon timely commencement of any Non-Consent Operation listed below, each Non-Participating Party's Working Interest and leasehold operating rights in the Non-Consent Operation, along with title to the specified share of future Hydrocarbon production from the Non-Consent Operation, shall be owned by and vested in each Participating Party in the proportion to their Participating Interests unless otherwise agreed to. The Participating Party(s) shall own such interests until the interest reverts under Article 16.7 *(Reversion of Interests).* The Costs of the Non-Consent Operation shall be reduced by the amount of any third party cash contribution credited to the Non-Consent Operation. The Recoupment Amount shall be reduced by the amount of any settlement of an under-investment made by a Non-Participating Party under terms of Article 16.6 *(Under-investment of Costs).*

**16.5.1** **Non-Consent Subsequent Exploratory Operations:** The Recoupment Amount for Non-Consent Exploratory Wells drilled after the initial Exploratory Well and for subsequent Exploratory Operations and for Supplemental AFE for Cost Overruns for the initial Exploratory Well shall be the Non-Participating Party's Share of the Costs (as applicable) of drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back, temporarily abandoning and plugging and abandoning multiplied by a risk premium of eight hundred percent **(800%).** The Recoupment Amount shall be recovered from one hundred percent (100%) of the Non-Participating Party's share of Hydrocarbon production from the Non-Consent Subsequent Exploratory Well (if the well is ever completed for Hydrocarbon production), and from fifty percent (50%) of the Non-Participating Party's Share of Hydrocarbon production from all Producible Wells in which the Non-Participating Party has a Participating Interest subsequently drilled and completed in any Producible Reservoir discovered or encountered by the Non-Consent subsequent Exploratory Operation.

103

**16.5.2** **Non-Consent Appraisal Operations:** The Recoupment Amount for Non-Consent Appraisal Operations shall be the Non-Participating Party's Share of the Costs (as applicable) of drilling, evaluating, Deepening, Deeper Drilling, Sidetracking, completing, recompleting, equipping, plugging back, temporarily abandoning, and plugging and abandoning an Appraisal Operation multiplied by a risk premium of six hundred percent **(600%)**. The Recoupment Amount shall be recovered from one hundred percent (100%) of the Non-Participating Party's share of Hydrocarbon production from the Non-Consent Appraisal Well (if the well is ever completed for Hydrocarbon production), and from fifty percent (50%) of the Non-Participating Party's Share of Hydrocarbon production from all Producible Wells in which the Non-Participating Party has a Participating Interest subsequently drilled and completed in any Producible Reservoir discovered or encountered by the Non-Consent Appraisal Operation.

**16.5.3** **Non-Consent Integrated Project Team AFE, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE:** A Non-Participating Party in the Integrated Project Team AFE, a Pre-Development AFE, Feasibility Study AFE or Final Design AFE and any supplemental AFE thereto will be an under-invested Party in an amount equal to one hundred fifty percent **(150%)** of the amount such Party would have paid had it participated in such AFE. Any under-investment for the Integrated Project Team, Pre-Development AFE's, Feasibility Study AFE or Final Design AFE and any supplemental AFE thereto shall be eliminated by a Non-Participating Party through a settlement of Costs pursuant to Article 16.6 *(Under-investment of Costs)* before such Non-Participating Party may become a Participating Party in Development Operations.

104

**16.5.4** **Non-Consent Development Operations:**  The Recoupment Amount for a Non-Consent Development Well shall be the Non-Participating Party's Share of the Costs (as applicable) of drilling, evaluating, Deepening, Sidetracking, completing, recompleting, equipping, workover, plugging back and plugging and abandoning the Development Well through the well head connections multiplied by a risk premium of three hundred percent **(300%)**.  The Recoupment Amount for Non-Consent Development Wells shall be recovered from one hundred percent (100%) of the Non-Participating Party's Share of Hydrocarbon production from the Non-Consent Development Well (and not from production from existing or future Development Wells in the Producible Reservoir).

**16.5.5** **Non-Consent Subsequent Production System and Facilities:**  The Recoupment Amount for any Non-Consent Subsequent Production System or Facilities shall be the Non-Participating Party's Share of the Cost of designing, fabricating and installing the Subsequent Production System or Facilities multiplied by two hundred percent **(200%)**.  The Recoupment Amount for a Non-Consent Subsequent Production System and Facilities shall be recovered from one hundred percent **(100%)** of the Non-Participating Party's Share of Hydrocarbon production from all wells which are drilled from or produced through the Subsequent Production System and Facilities installed as Non-Consent Operations.

**16.5.6** **Additional Production Recoupment:**  In addition to the Recoupment Amount set forth above for various Non-Consent Operations, the Participating Party(s) shall be entitled to recoup:

(a)     One hundred percent **(100%)** of the Non-Participating Party's Share of the Cost of utilizing and accessing any Production System already installed on

105

the Contract Area needed to service a Non-Consent Production System or Facility (e.g, production handling fees, power usage fees, water disposal fees, etc.); plus

(b)     One hundred percent **(100%)** of the Non-Participating Party's Share of the Cost of operating expenses, maintenance Costs, royalties, and severance, gathering, production taxes, and other governmental fees based on production.

For the purposes of calculating the Recoupment Amount, Hydrocarbon production volumes shall be measured on the basis of well tests if separate metering is not available and operating expenses allocated upon the basis of Hydrocarbon production volume throughput unless other measuring requirements are mandated by the MMS.

**16.6    Settlement of Under-investment of Costs:**   Except as provided in Article 16.6.1 (*Cash Settlement of Under-investment*), an under-investment shall be settled through disproportionate spending with the under-invested Party being responsible for and paying one hundred percent (100%) of the over-invested Parties' share of the Costs (or if there are two (2) or more under-invested Parties, a proportion of such Costs based on each Party's under-investment) in any subsequent activities or operations or AFE within the Contract Area in which such under-invested Party and any or all over-invested Parties are participating until the amount of the under-investment is eliminated.

**16.6.1  Cash Settlement of Under-investment:**  If there are no further proposed or planned operations on the Contract Area (for which Costs would be allocated toward the elimination of an under-investment), the under-invested Party shall pay any over-invested Party the remaining under-invested amount in cash in accordance with the applicable provisions of Exhibit "C" *(Accounting Procedure).*  If operations on the

Contract Area, for which Costs are being paid by the under-invested Party and allocated to the under-investment, do not eliminate the under-investment within two (2) years, or any other shorter period specified in this Agreement, from the date the under-investment accrued, or upon final settlement of this Agreement, whichever comes first, the under-invested Party shall pay the over-invested Party the remaining under-investment in cash in accordance with the applicable provisions of Exhibit "C" *(Accounting Procedure)*.

16.7 **Reversion of Interests:**   A Non-Participating Party's Working Interest that is subject to a Recoupment Amount to be recovered from future Hydrocarbon production, excluding Non-Consent Operations under Article 16.2 *(Non-Consent of Initial Exploratory Well)*,  Article 16.3 *(Non-Consent Operations for the Initial Fabrication AFE)* and 16.4 *(Non-Consent Operations to Maintain the Contract Area)*, shall revert to the Non-Participating Party upon the occurrence of the first of the following events:

- The Non-Consent Operation results in a dry hole and operations are abandoned; or,

- The Hydrocarbon production from the Non-Consent Operation permanently ceases prior to complete recovery of the Recoupment Amount by the Participating Party(s); or,

- Upon complete recovery of the Recoupment Amount.

Any salvage value in excess of complete recovery of the Recoupment Amount shall be credited to all Parties according to their Working Interest and without regard to their participation status.

107

**16.8**  **Operations from a Subsequent Non-Consent Production System:** Any Party who makes an Election not to participate in a Fabrication AFE for a Subsequent Production System may make an Election to participate in future operations from such Subsequent Production System. If a Non-Participating Party exercises its right to participate in such operations, then the Non-Participating Party may reduce the Recoupment Amount associated with the Subsequent Production System by assuming all Costs for operations under this Agreement that would otherwise be allocated proportionately to the Participating Party(s) in the Subsequent Production System. Any amounts paid disproportionately in accordance with this Article 16.8 shall be subtracted from the Recoupment Amount entitled to the Participating Party(s) in the Subsequent Production System pursuant to Article 16.5.5 *(Non-Consent Subsequent Production System and Facilities)* .

**16.9**  **Allocation of Production System Costs to Non-Consent Operations:** In the event a non-consent Development Well is proposed to be drilled from or produced through a Production System owned by all the Parties, the rights of Participating Party(s) to use the Production System for the proposed non-consent Development Well and the Costs thereof shall be based on the following:

**16.9.1**  **Investment Charges:** If a non-consent Well is drilled from a Production System owned by all the Parties, the Participating Party(s) in such well shall pay for the right to use the Production System and its Facilities as follows:

(a)  The Participating Party(s) shall pay an amount equal to two percent (2%) of the total Cost of the Production System (the "slot usage fee") to the owners of the Production System (to be shared in proportion to the owner's Working Interest in the Production System). For purposes of the slot usage fee, the total Cost of the Production System shall be reduced by .41667% per month

108

commencing upon the first monthly anniversary date of when the Production System was installed and every monthly anniversary thereafter until the total Cost of the Production System is reduced to twenty-five percent (25%) of its original Cost. The Cost of additions to the Production System shall be reduced in the same manner commencing upon the first monthly anniversary after the addition is installed. If the non-consent well is abandoned, the right of the Participating Party(s) to use that Production System slot shall terminate unless such Parties commence drilling a substitute well from the same slot within ninety (90) days after abandonment. The slot usage fee shall not apply to a slot which is deemed to be surplus. A slot may be deemed surplus by the unanimous agreement of all Parties owning an interest in the Production System; and,

(b)     If Hydrocarbon production from the non-consent well is handled through Facilities owned by all Parties, the Participating Party(s) shall pay to the owners of the Facilities an amount equal to that portion of the total Cost of such Facilities which one (1) well bears to the total number of wells which the Facilities are designed to accommodate; and,

(c)     If Hydrocarbon production from the non-consent well is handled through a Subsea Production System owned by all Parties, the Participating Party(s) shall pay to the owners of the Subsea Production System an amount equal to that portion of the total Cost of such Subsea Production System which one (1) well bears to the total number of wells which the Subsea Production System is designed to accommodate.

109

16.9.2 **Operating and Maintenance Charges:** The Participating Party(s) in a non-consent well shall pay all Costs necessary to connect the non-consent well to the Facilities and the Production System. The expense of operating and maintaining the Facilities and the Production System shall be allocated equally among all active completions served. Subsea Production System operating and maintenance expenses shall be allocated equally among all active subsea well completions served by such Subsea Production System.

16.9.3 **Payments:** The payment of sums pursuant to Article 16.9.1 (*Investment Charges*) is not a purchase of an additional interest in the Production System or Facilities. Such payments shall be included in the total Recoupment Amount which the Participating Party(s) in the Non-consent well are entitled to recover out of Hydrocarbon production from the Non-consent well, but only to the extent of actual Costs.

## ARTICLE 17.0  WITHDRAWAL FROM AGREEMENT

17.1 **Right of Withdrawal:** Subject to the limitations specified in this Article, any Party may withdraw from this Agreement (the "Withdrawing Party") by giving prior written notice to all other Parties (the "Remaining Parties") stating its intention to withdraw from continued joint operations under this Agreement. The withdrawal notice shall constitute an unconditional and irrevocable offer by the Withdrawing Party to convey to the Remaining Party(s) the Withdrawing Party's entire Working Interest in all of the Lease(s), the Hydrocarbon production, and all other property and equipment within the Contract Area owned under the terms of this Agreement. The withdrawal notice shall specify an effective date of withdrawal which date shall be at least sixty (60) days, but not more than one hundred eighty (180) days after the date of the withdrawal notice.

**17.2** **Response to Withdrawal:** Within thirty (30) days of receipt of the notice of withdrawal, each of the Remaining Parties shall make an Election in writing either to join in the withdrawal or to remain a Party to this Agreement. Failure to respond to a withdrawal notice shall be deemed an Election to remain a Party to this Agreement.

**17.2.1** **Unanimous Withdrawal:** If all the Parties agree to join in the withdrawal, no assignment of Working Interests shall take place and the Parties shall be deemed to have decided to abandon all joint operations within the Contract Area pursuant to Article 18.0 *(Abandonment and Salvage)* of this Agreement.

**17.2.2** **Acceptance of Withdrawing Interests:** If less than all Parties agree to join in the withdrawal, then, the Remaining Parties must accept an assignment of the Withdrawing Party's Working Interest. Unless otherwise agreed by the Remaining Party(s), the Withdrawing Party's Working Interest shall be shared by the Remaining Party(s) in the proportions which each of their Working Interests (prior to the withdrawal) bear to the sum of the Working Interests of all Remaining Party(s) (prior to the withdrawal). The Withdrawing Party(s) shall take all necessary steps to accomplish the withdrawal by the effective date including executing and delivering to the Remaining Party(s) all necessary instruments to assign its Working Interests to the Remaining Party(s). All expenses associated with the withdrawal and the transfer of Working Interest shall be borne by the Withdrawing Party(s).

**17.3** **Limitation Upon and Conditions of Withdrawal:** The right of any Party to withdraw from this Agreement shall be subject to the following conditions:

**17.3.1** **Current Operations and Voting:** Any Party withdrawing prior to completion of any operations (pursuant to an AFE) on the Contract Area in which it had previously

111

voted to participate shall remain fully liable for its share of the AFE. After giving its notification of withdrawal, the Withdrawing Party shall not be entitled to make an Election to participate or vote on any General Matter.

**17.3.2 Prior Expenses:** The Withdrawing Party(s) shall remain responsible for its Participating Interest share of any Costs of operations, rentals, royalties, taxes, damages or other liability or expense accruing or commencing prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal, the Operator shall render a final statement to the Withdrawing Party(s) for its share of all identifiable and/or estimated expenses and Costs incurred prior to the effective date of the withdrawal, along with a statement of any deficiency in estimated salvage value. Prior to any withdrawal, a Withdrawing Party, at its sole expense, shall satisfy or provide security satisfactory to the Remaining Party(s) for all obligations and liabilities it has incurred or are attributable to it prior to the effective date of the withdrawal. Furthermore, any liens, charges and other encumbrances which the Withdrawing Party(s) placed (or caused to be placed) on its Working Interest prior to its withdrawal shall be fully satisfied or released prior to the effective date of the withdrawal (unless the Remaining Party(s) are willing to accept the Working Interest subject to such liens, charges, or other encumbrances). A Party's withdrawal shall not relieve it from liability to the Remaining Party(s) with respect to obligations or liabilities attributable to the Withdrawing Party(s) which are not identified or identifiable prior to the effective date of the withdrawal, including without limitation liability under environmental laws or the Costs of abandonment of the Contract Area. Provided all such expenses (including any deficiency in abandonment Costs) have been paid, the notice of withdrawal and the assignments shall be effective upon the specified effective date.

17.3.3 **Abandonment Costs:** The Withdrawing Party(s) shall pay to the Operator for the benefit of the Remaining Party(s) the Withdrawing Party's pro-rata Working Interest share of the estimated current Costs of plugging and abandoning all wells and removal of all Production Systems, Facilities and other material and equipment on the Contract Area, less its pro-rata share of the estimated salvage value of the assets at the time of abandonment. Such Costs and salvage value shall be prepared by the Operator according to Exhibit "C" *(Accounting Procedure)*.

17.3.4 **Confidentiality:** A Withdrawing Party shall continue to be bound by the confidentiality provisions of Article 7.0 *(Confidentiality of Data)* after the withdrawal, but, as of the effective date of the withdrawal, shall have no further access to technical information relating to joint operations. The Remaining Party(s) shall have no obligation of confidentiality to the Withdrawing Party.

17.3.5 **Emergencies and Force Majeure:** No Party shall be allowed to withdraw during a Force Majeure or other emergency as described in Article 25.0 *(Force Majeure)*, but may withdraw from this Agreement after termination of such emergency. The Withdrawing Party shall remain liable for its share of all Costs and liabilities arising from said emergency, including but not limited to the drilling of relief wells, containment and cleanup of oil spills and pollution and all Costs of debris removal made necessary by the Force Majeure or other emergency.

### ARTICLE 18.0  ABANDONMENT AND SALVAGE

18.1 **Abandonment of Non-Producing Wellbore:** Any Participating Party may propose the abandonment of a non-producing wellbore which has been drilled as a joint operation by notifying the other Participating Party(s). If the Participating Party(s) approve the

abandonment as a General Matter, the wellbore shall be plugged and abandoned in accordance with applicable regulations at the joint Cost, risk and expense of the Participating Party(s).

18.2    **Abandonment of Producing Wellbores:**    Any Participating Party may propose the abandonment of a producing wellbore which has been drilled as a joint operation by notifying the other Participating Party(s).  If the Participating Party(s) unanimously approve the abandonment, the wellbore shall be plugged and abandoned in accordance with applicable regulations at the joint Cost, risk and expense of the Participating Party(s).  If the Participating Party(s) do not unanimously approve the abandonment of the producing wellbore, those Participating Party(s) electing to continue operations shall assume responsibility for the wellbore (except for a Non-Participating Party's Share of the abandonment Cost to that point).  If any Party fails to respond within the notice period specified in Article 8.4, *(Response Time for General Matters and Elections)*, that Party shall be deemed to have consented to the abandonment of the wellbore.

18.2.1    **Settlement of Wellbore Abandonment Costs:**  If less than all Participating Party(s) agree to the abandonment, the Parties abandoning operations (the "Abandoning Parties") shall settle the Costs of abandonment and salvage value with the Parties continuing operations (the "Remaining Party(s)").  Such Costs of abandonment and salvage value shall be prepared by the Operator according to Exhibit "C" *(Accounting Procedure)* and approved as a General Matter by the Parties.   Within sixty (60) days after acceptance of the assignment by the Remaining Party(s), Operator shall render a final statement to the Abandoning Parties for such Parties' proportionate share of all Costs incurred prior to the first day of the month following acceptance of the assignment, plus any shortage or less any overage, in the salvage value, and the estimated Cost to salvage and abandon the wellbore, Production System or Facility.

114

(a)     In the event the estimated Cost of plugging and abandoning the wellbore plus the estimated Cost of salvaging any equipment are higher than the value of the wellbore salvageable material and equipment, then the Abandoning Parties shall be deemed to be under-invested to the extent of their proportionate share of the difference and all Costs of other operations under this Agreement that would otherwise be allocated to the Remaining Party(s) shall be allocated to the Abandoning Parties (in addition to any other Costs allocated to the Abandoning Parties under this Agreement) until the under-investment is eliminated.

(b)     In the event the estimated Cost of plugging and abandoning the wellbore plus the estimated Cost of salvaging any equipment are lower than the value of the wellbore salvageable material and equipment, then the Remaining Party(s) shall be deemed to be under-invested to the extent of their proportionate share of the difference and all Costs of other operations under this Agreement that would otherwise be allocated to the Abandoning Parties shall be allocated to the Remaining Party(s) (in addition to any other Costs allocated to the Remaining Party(s) under this Agreement) until the under-investment is eliminated.

**18.2.2 <u>Assignment of Interest</u>:** If the wellbore to be abandoned is a producing wellbore, each Abandoning Party shall execute in recordable form and deliver to the Remaining Party(s) taking over the wellbore, an assignment of its Working Interest in the wellbore (and all property and equipment used solely in connection therewith) and an assignment of its interest in the Hydrocarbon production therefrom; however, such assignment shall not affect a) the participation of the Parties in and to the

Hydrocarbons produced from any other portion of the Contract Area; or, b) the ownership in any other property and equipment owned by the Parties. The provisions of this Article 18.2 will not apply if the Abandoning Party maintains any further operational involvement in the producing wellbore (e.g., it would not apply if a Party elects to abandon the current formation and recomplete uphole). Such assignment shall be effective as of the last applicable election date for approval of the abandonment. Thereafter, the Remaining Party(s) shall share the assigned Working Interest in the proportion that each Remaining Party(s) Participating Interest bears to the total of all Participating Interests, unless otherwise agreed by the Remaining Party(s). Any Abandoning Party assigning its Working Interest hereunder shall be relieved from any further liability for said wellbore after making the Cost settlement as provided in Article 18.2.1 *(Settlement of Wellbore Abandonment Costs)*.

18.3    **Facilities, Production System and Pipeline Salvage and Removal Costs:** The disposal of a Production System, Facility, Subsea Production System, or surplus or obsolete material shall be approved by the Participating Party(s) as a General Matter. Upon approval, the Operator shall dispose of such equipment in the manner approved by the Participating Party(s). The Costs, risks, and net proceeds, if any, resulting from such disposition shall be shared by the Participating Party(s) in proportion to their Participating Interests.

18.4    **Approval Not Required:** The Operator may, without approval as a General Matter, dispose of any items of surplus or obsolete material and equipment if the current price of new materials or equipment similar thereto is less than Three Hundred Thousand Dollars ($300,000.00).

18.5    **Abandonment Operations Required by Governmental Authority:** Any wellbore abandonment or Platform/Production System removal required by a governmental authority

116

shall be accomplished by Operator with the Costs, risks, and net proceeds if any, to be shared by the Parties owning such wellbore, Platform or Production System in proportion to their Participating Interest.

## ARTICLE 19.0  RENTALS, ROYALTIES AND MINIMUM ROYALTIES

19.1   **Overriding Royalties and Burdens on Production:**  If any Party has previously created or hereafter creates any overriding royalty, production payment, carried or reversionary Working Interest, net profits interest or other type of burden on Hydrocarbon production in addition to the lessor's royalty stipulated in the Lease(s) (an "Overriding Royalty"), the Party creating the Overriding Royalty shall assume and bear all obligations of the Overriding Royalty regardless of that Party's participation status. The Party creating the Overriding Royalty shall indemnify and hold all other Parties harmless from any and all claims and demands for payment asserted by the owners of the Overriding Royalty and such Overriding Royalty shall be considered a Subsequently Created Interest.   However, it is acknowledged and understood that prior to the execution of this agreement, the Parties have burdened the Lease with a 3% of 8/8ths Overriding Royalty, as described in the Participation Agreement. (Davis Overriding Royalty Interest).   Such Davis Overriding Royalty Interest shall not be considered a Subsequently Created Interest under the terms of this agreement.    The Participating Parties in any operation conducted pursuant to this Agreement shall assume and bear all obligations of such Davis Overriding Royalty Interest according to their elections to participate. Additionally, A Non participating Party in an operation conducted pursuant to

117

this agreement shall not bear any part of such Davis Overriding Royalty Interest while it is a non-participating party in such operation.  Additionally, such Davis Overriding Royalty Interest shall burden any interests acquired pursuant to Article 23 *(Farm-ins and Contributions)*, or any interest acquired pursuant to Article 23.8 (*Area of Mutual Interest*). Such Davis Overriding Royalty Interest shall also apply to any leases or interest in leases acquired on the Blocks identified on Exhibit "A" for a period of two years following expiration or release of the Leases(s). Such ORRI shall be a cost free interest in production from such Leases except as to any such costs which also can be deducted from the royalty interest of the lessor under such Leases and shall be paid in the same manner as the royalties are paid to the lessor under such Leases.  Such Davis Overriding Royalty Interest shall be proportionately shared by Davis and LLOG in accordance with the interests owned by the Parties, their successors and assigns.

**19.1.1  Subsequent Creation of Overriding Royalty:**  Notwithstanding anything herein to the contrary, and excluding the Davis Overriding Royalty Interest, if subsequent to the execution of this Agreement, any Party should create an Overriding Royalty, such subsequently created Overriding Royalty shall be made specifically subject to all the terms and provisions of this Agreement and shall be subordinate to the rights of the other Parties to this Agreement.

**19.2  Payment of Rentals and Royalties:**  The Operator shall use reasonable care to make proper and timely payment of all rentals, minimum royalties, or other similar payments accruing under the terms of the Lease(s).  Upon receipt of proper evidence of all such payments and

the Operator's invoice for its proportionate share of all such payments, each Non-Operating Party shall reimburse the Operator for the Non-Operating Party's Working Interest share of all such payments. In the event Operator fails to make proper payment of any rental or minimum royalty or similar payments accruing under the terms of the Lease(s) through mistake or oversight where such payment is required to continue a Lease in force, then Operator shall not be liable to the other Parties for any resulting damages or any loss which results from such non-payment.

19.2.1 **Non-Participation in Payments:** If a Party desires not to pay its share of any rental, minimum royalty, or similar payment, such Party shall notify the other Parties of its intention to withdraw from this Agreement pursuant to Article 17.0 *(Withdrawal from Agreement)* at least sixty (60) days prior to the date on which such payment is due. In such event, the Operator shall make such payment solely for the benefit of all the Remaining Parties. The Withdrawing Party shall assign to the Participating Party(s) (pursuant to Article 17.0 *[Withdrawal from Agreement]*) all of its Working Interest in the Contract Area within sixty (60) days of the Withdrawing Party's notification of its intention not to pay its share of any rental, minimum royalty, or similar payment.

19.2.2 **Royalty Payments:** Each Party shall pay or cause to be paid all royalty and other amounts payable out of its share of Hydrocarbon production taken from the Lease(s) for its account, including but not limited to, the Davis Overriding Royalty Interest and the lessor's royalty. During any time in which the Participating Party(s) in a Non-Consent Operation are entitled to receive a Non-Participating Party's Share of Hydrocarbon production, the Participating Party(s) shall pay or cause to be paid the lease royalty on such Hydrocarbon production as well as the Davis Overriding Royalty Interest.

**19.2.3  Federal Offshore Oil Pollution Compensation Fund Fee:** Each Party agrees to pay and bear the Federal Offshore Oil Pollution Compensation Fund Fee due on its share of Hydrocarbon production, or any fees being required by section 302 of the Outer Continental Shelf Lands Act of 1978, the Oil Pollution Act of 1990 and any subsequent statutes and regulations promulgated pursuant to those statutes; however, should the oil owned by a Party be reported to the MMS (or a successor regulatory agency) by another Party in its reporting form, the reporting Party shall pay the required fees on all volumes reported and the non-reporting Party shall reimburse the reporting Party for all fees paid on its behalf.

## ARTICLE 20.0  TAXES

**20.1    Internal Revenue Provision:** It is not the intention of the Parties to create, nor shall this Agreement be construed as creating, a Partnership, joint venture, agency relationship or association, or to render the Parties liable as LLOGs, co-venturers, or principals.  The liabilities of the Parties shall be several and not joint or collective, and each Party shall be responsible for its own obligations.

If for Federal income tax purposes, this Agreement and the operations hereunder are regarded as a Partnership, then for Federal income tax purposes, each Party elects to be excluded from the application of all the provisions of Subchapter K, Chapter 1, Subtitle A, Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.  Operator is hereby authorized and directed to execute on behalf of each Party such evidence of this election as may be required by the Federal Internal Revenue Service including specifically, but not by way of limitation, all the returns, statements and data required by Treasury Regulation Section 1.761-2.  Should there be any requirement that each Party furnish evidence of this election, each Party agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal

120

Service. Each Party further agrees not to give any notices or take other actions inconsistent with the election made hereby. If any present or future income tax laws of the United States of America or any state contains provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, under which an election similar to that provided by Section 761 of Subchapter K is permitted, each Party makes such election as may be permitted by such laws. In making this election, each Party states that the income derived by it from the operations under this Agreement can be adequately determined without the computation of Partnership taxable income.

The Parties to this Agreement agree to abide by Treasury Regulation 1.761 - 2(d)(2) by using the cumulative gas balancing method, as described in Treasury Regulation 1.761-2(d)(3), to report gas balancing for tax purposes. In the event of a conflict between the provisions of this Article and any other provisions of this Agreement, the provisions of this Article shall control.

20.2 **Other Taxes and Assessments:** The Operator shall file all tax returns and reports required by law and shall pay all applicable taxes, other than income, franchise or other taxes provided in Article 20.2.2 *(Production and Severance Taxes)*, or assessments levied with respect to operations conducted under this Agreement. The Parties shall promptly furnish the Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the Operator. The Operator shall charge each Party its Working Interest share of all taxes and assessments paid, and upon written request from a Non-Operating Party(s), provide copies of all tax returns, reports, tax statements and receipts for such taxes. The Operator shall not allow any taxes to become delinquent, unless such non-payment is approved as a General Matter.

**20.2.1** **Property Taxes:**  The Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each Party.  The Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable.  Pending such determination, the Operator may elect to pay under protest.  Upon final determination, the Operator shall pay the taxes and any interest, penalty, or Cost accrued as a result of such protest.  The Operator shall charge each Party its Working Interest share of such tax payments including interest, penalties, and all reasonable Costs in accordance with Exhibit "C" *(Accounting Procedure)*.

**20.2.2** **Production and Severance Taxes:**  Each Party shall pay, or cause to be paid, all production, excise, severance and other similar taxes due on any Hydrocarbon production which it received pursuant to the terms of this Agreement.  Any Party responsible for such tax payment shall upon written request from the Operator, provide evidence that such taxes have been paid.

### ARTICLE 21.0 INSURANCE AND BONDS

**21.1** **Insurance:**  The Operator shall maintain the insurance coverage provided in Exhibit "B" *(Offshore Insurance Provisions)* attached hereto and charge each Party its Working Interest share of the Cost of such coverage.

**21.2** **Bonds:**  Operator shall obtain and maintain any and all bonds, certificates of financial responsibility and permits required by any applicable law, regulation or rule.  Operator will require all contractors to obtain and maintain any and all bonds required by any applicable law, regulation or rule.

## ARTICLE 22.0  LIABILITY, CLAIMS AND LAWSUITS

22.1  **Individual Obligations**:  The obligations, duties, and liabilities of the Parties shall be several and not joint or collective; and except as provided in Article 20.0 (*Taxes*) nothing contained herein shall ever be construed as creating a Partnership, joint venture, association, or other character of business entity recognizable in law for any purpose.  Each Party shall hold all the other Parties harmless to the extent of its Working Interest, from liens and encumbrances on the Lease(s) or in the Contract Area arising as a result of its acts.

22.2  **Notice of Claim or Lawsuit**:  If a claim is made against any Party or if any Party is sued on account of any matter arising from operations hereunder, or on any matter affecting the Lease(s) or Contract Area, or if any hearings are held pursuant to operations under this Agreement, such Party shall give written notice of the lawsuit or hearing to the other Parties as soon as is reasonably practicable.

22.3  **Settlements**:  The Operator may settle any single (not involving multiple claims arising out of the same incident) damage claim or lawsuit involving operations hereunder if the expenditure does not exceed Three Hundred Thousand Dollars ($300,000) and if the payment is in complete settlement of such claim or suit.  If the amount required for settlement exceeds such amount, the Parties shall determine the further handling of the claim or lawsuit pursuant to Article 22.4 (*Defense of Claims and Lawsuits*) below.

22.4  **Defense of Claims and Lawsuits**:  The Operator shall supervise the conduct of any litigation.  During litigation, claims and lawsuits may be settled in excess of the amount specified in Article 22.3 (*Settlements*) above only with the unanimous consent of all

123

Participating Party(s) in the operation out of which the claim arose; however, any Party shall have the right to independently settle any claim which is attributable to its interest alone as long as such settlement does not adversely affect the interests or rights of the other Parties. No charge shall be made for services performed by the staff attorneys of any Party, but all other expenses incurred by the Operator in the defense of suits for the Parties, together with the amount paid to discharge any final judgment, shall be considered Costs of operation and shall be paid by the Parties in proportion to their Participating Interest in the operation out of which the claim arose. Outside counsel for the joint account shall be employed only with the approval of the affected Parties as a General Matter. If it is agreed that outside counsel is to be employed, the fees and expenses shall be charged to the Parties in proportion to their Participating Interest in the operation out of which such claim arose in accordance with Exhibit "C" *(Accounting Procedure)*.

**22.5**   <u>**Liability for Damages**</u>**:** To the extent allowed by law, liability for losses, damages, Costs, expenses, claims, liabilities and lawsuits arising from operations under this Agreement not covered by or in excess of the insurance carried for the joint account shall be borne by each Party in proportion to its Participating Interest in the operations out of which such liability arises, except when such liability results from the gross negligence or willful misconduct of a Party(s), in which case such Party(s) shall be solely liable for same.

**22.6**   <u>**Indemnification**</u>**:** To the extent allowed by law, the Participating Party(s) agree to hold the Non-Participating Party(s) (and their Affiliates, agents directors, officers and employees) harmless and to indemnify and protect them against all claims, demands, liabilities, and liens for property damage or personal injury, including sickness and death, caused by or otherwise arising out of Non-Consent Operations, and any loss and Cost suffered by any Non-Participating Party as an incident thereof, except where such loss or Cost results from either the sole, concurring, or joint negligent acts or omissions of any Non-Participating Party, in

124

which case each Party shall then pay or contribute to the settlement or satisfaction of judgment in the proportion that its negligence, fault, or strict liability caused or contributed to the incident.  Should any indemnity contained herein be determined to be in violation of law or public policy, the Parties agree that said indemnity(s) shall then be enforceable only to the maximum extent allowed by law.

22.7   **Loss of or Damage to Reservoir, Loss of Reserves and Profits**:  Notwithstanding anything to the contrary contained herein, no Party to this Agreement shall be liable to any other Party to this Agreement for loss of or damage to a reservoir(s), loss of Hydrocarbons, or for loss of profits or for other consequential or business interruption damages, except if such damage or loss arises from a Party's Willful Misconduct, nor does any Party indemnify any other Party for such damage or loss.

22.8   **Non-Essential Personnel**:  A Party hereto who requests transportation and/or access to a Production System, vessel, or any other Facility utilized for Lease operations, for any person who is not directly involved with a joint or Non-Consent Operation under this Agreement, agrees to protect, defend and indemnify and hold harmless the other Parties hereto as to any cost, liability, or judgment incurred as a result of a claim, demand, cause of action, or suit brought by such person, his survivor, heirs or family members arising out of said person's transportation and/or access to a Production System, vessel, or any Facility utilized for Lease operations.  Notwithstanding anything to the contrary herein, any such indemnification and/or protection provided herein shall be inapplicable where the claim demand, cause of action, or suit arises out of the willful misconduct, intentional act, or gross negligence of the Party so indemnified and/or protected.

125

## ARTICLE 23.0  FARM-INS AND CONTRIBUTIONS

**23.1**  **Farm-ins and Contributions from Third Parties:** A "Contribution" means a bottom hole contribution, dry hole cash contribution or acreage contribution from third parties as consideration for data from wells or well operations on the Contract Area.  This Article does not apply to the following:

(a)  A "Data Trade" (which means a trade of geoscience or engineering data as consideration for data from wells or well operations on the Contract Area from third parties).  Data Trades are subject to Article 7.2.1 (*Well Log and Data Trades*).

(b)  Contributions received as consideration for entering into a contract for the sale of Hydrocarbon production, loans and other financial arrangements.

(c)  A farmout of all or portion of a Party's Working Interest, which is subject to Article 24 (*Assignments and Preferential Right to Purchase*).

**23.2**  **Methods of Obtaining Contributions:** The Operator shall negotiate all Contributions on behalf of the Participating Parties in the well or well operation.  A Contribution may be obtained in the following ways:

(a)  Any Participating Party in a well or well operation may propose that the Participating Parties in such well or well operation seek a Contribution from a third party towards such well or well operation.

(b)  If a Participating Party in a well or well operation receives a Contribution offer for such well or well operation from a third party, such Party shall notify all the other

126

Participating Parties in such well or well operation of the terms of such offer within five (5) days of receipt of such offer.

23.2   **Counteroffers:** If a third party makes a counteroffer to the Participating Parties' offer, or if a Participating Party proposes to make a counteroffer to a third party offer, the Operator shall submit the counteroffer to the other Participating Parties.

23.4   **Approval of Contributions:** Such proposals and the acceptance of an offer or a counteroffer from a third party require the unanimous agreement of the Participating Parties in the well of well operation, who shall respond within seven (7) days of their receipt of a notice of a Contribution proposal, offer or counteroffer.

23.5   **Cash Contributions:** If a bottom hole or dry hole cash Contribution is offered and accepted, such cash Contribution shall be paid to the Operator and the Operator shall credit the amount of the cash Contribution against the Costs of such well or well operation to each Participating Party in proportion to its Participating Interest share.  Each Non-Participating Party' share of such cash Contribution shall be deducted from such Non-Participating Party's share of the Costs of the well operation or of drilling and completing the well, as applicable, prior to the computation of the Hydrocarbon Recoupment Amount which the Participating Parties are entitled to receive from the Non-Participating Parties in accordance with Article 16.0 (*Non-Consent Operations*).

23.6   **Acreage Contributions:** Any acreage Contribution which is offered and accepted in accordance with this Article 23.0 (*Farm-ins And Contributions*), shall be conveyed to the Participating Parties in the well or well operations in proportion to their Participating Interest share therein.  The leases or portions of leases included in the acreage Contribution shall not be added to Exhibit "A" or included in the Contract Area.

127

**23.6.1** **Two or More Parties Own 100% of the Acreage Contribution:** If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own one hundred percent (100%) of the ownership interest in the contributed acreage, then such Parties shall prepare and execute an operating agreement covering the contributed acreage, which is substantially similar to this Agreement.

**23.6.2** **Two or More Own Less Than 100% of the Acreage Contribution:** If two or more Parties participate in the acreage Contribution and the conveyances to effectuate it, and if, after the conveyances are approved by the MMS, such Parties own less than one hundred percent (100%) of the ownership interest in the contributed acreage, then such Parties shall use reasonable efforts to negotiate and execute with the other working interest owners in the contributed acreage an operating agreement covering the contributed acreage, which is as close in form to this Agreement as possible.

**23.7** **Restricted Bidding:** If at any time during the term of this Agreement, more than one (1) of the Parties are on the list of restricted joint bidders for OCS lease sales as issued by the MMS pursuant to 30 CFR 256.44, then the Parties agree to comply with all statutes and regulations regarding restricted joint bidders on the OCS in effect during the term of this Agreement. In the case of multiple restricted bidders being Parties to this Agreement, the provisions of this Agreement shall be amended to delete those provisions which would otherwise require a transfer of a leasehold interest prohibited by 30 CFR 256.44(c).

**23.8** **Area of Mutual Interest:** The Parties shall be deemed to have created an Area of Mutual Interest (AMI) comprising the NE/4 of Block 201, Garden Banks. The term of such AMI shall be concurrent with the term of this Agreement. Subsequent to the effective date of this

Agreement, should either party by reason of a farm-in agreement or by purchase from third parties, or acquisition at any OCS lease sale, or by any means other than the acquisition of all or substantially all of a Party's interest in the Gulf of Mexico or the stock of another company, acquire an interest in leasehold record title, leasehold operating rights, overriding royalties, reserves, or facilities, as well as any agreement, option or other contractual right to acquire same within the AMI, ("Acquiring Party"), (inclusive of property trades whether or not the Acquiring Party is disposing of property located within or outside the AMI in exchange for property located within the AMI), then the Acquiring Party shall, within thirty (30) days after such acquisition, give written notice of such acquisition including a description of the right, title, and interest, and all terms and conditions relating thereto or equivalent terms for a non-cash transaction to the other party hereto inclusive of the purchase price or other consideration offered (which shall include the monetary equivalent in U.S. Dollars based upon the reasonable market value of any consideration other than cash). The non-acquiring party shall have the option for a period of fifteen (15) days after such notice is received to elect to acquire its pro rata share of the Acquiring Party's interest. Such pro rata share shall be equal to each party's appropriate AMI interest set forth in Exhibit "A" multiplied by the interest acquired by the Acquiring Party. Should the non-acquiring party elect to acquire a pro rata share of the Acquiring Party's interest as aforesaid, then within thirty (30) days after its election to acquire its share, it shall reimburse the Acquiring Party for the pro rata share of the costs attributable to the interest and shall assume its respective pro rata share of the Acquiring Party's obligations, if any, attributable to such interest. Failure to respond within the time period specified shall be deemed to be an election not to participate in such acquisition.

## ARTICLE 24.0
## ASSIGNMENTS

24.1   **Assignments and Transfers of Working Interests:** All of the Parties to this Agreement agree to give prior written notice to the Operator and the other Parties of any proposed assignment, transfer or other disposition of all or a portion of a Party's interest covered by this Agreement.  Any assignment of an interest covered by this Agreement shall be made only to a financially responsible assignee and shall be further subject to the following provisions:

24.1.1   **Consent to Assignment:**   No assignment or transfer of any interest under this Agreement or the Lease(s) may be made without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.   The Parties specifically reserve the right to withhold their consent to a proposed assignment if a Party determines (in good faith) that adequate protections do not exist to guarantee the proper and timely performance of all of assignor's obligations by the proposed assignee under this Agreement.  Upon request, any assignor shall provide information sufficient to permit the other Parties to evaluate the financial responsibility, technical competence and offshore operating experience of any proposed assignee.  Each of the non-assigning Parties shall, within thirty (30) days of the notice of such assignment from the assignor either consent to such assignment in writing or notify the assignor that such consent is withheld.   A failure by a Party to notify the assignor of its consent (or objection) shall be deemed to be consent to the assignment.  Consent granted by the non-assigning Parties to any assignment shall not relieve assignor (or any assignee) from any rights and obligations under this Agreement which accrued prior to the effective date of the assignment or from the future timely and proper performance of any of assignor's obligations under this Agreement.

130

**24.1.2 Exceptions to Consent:** Notwithstanding any provision of this Agreement to the contrary, an assigning Party shall not be required to obtain the prior written consent of the remaining Parties with respect to any of the following types of transactions:

(i)      A Party seeking to mortgage, pledge, hypothecate or grant a security interest in all or a portion of its interest in the Lease(s), any equipment or Facilities or each Party's share of Hydrocarbon production from the Contract Area. However, any encumbrance arising from the financing transaction shall be expressly subordinated to the rights of the other Parties to this Agreement, and the assigning Party shall ensure that any mortgage or encumbrance shall be without prejudice to the terms of this Agreement; or

(ii)     The disposition of a Party's Working Interest by way of sale or assignment of substantially all of its assets in the Gulf of Mexico or by merger, reorganization or consolidation of its corporate structure; or

(iii)    A Party assigning all or a part of its interest to an Affiliate, provided that such proposed assignee has demonstrated (to the reasonable satisfaction of the other Parties) the Affiliates financial and operational capability to meet its obligations under this Agreement.

**24.1.3 Effective Date of Assignments:** Except as otherwise provided for in this Agreement, the effective date for any assignment shall be at least sixty (60) days, but not more than one hundred eighty (180) days after the date of the written notice. No assignment, other than those allowed by Article 24.1.2 *(Exceptions to Consent)*, shall be binding upon the Parties unless and until: (i) receipt of consent from the remaining

131

non-assigning Parties; (ii) the assignor or assignee provides all Remaining Party(s) with a photocopy of a fully executed assignment, and an executed MMS Form 1123, "Designation of Operator"; and, (iii) such assignments have been properly submitted to the MMS for approval. The Parties shall promptly join in such reasonable actions as may be necessary to secure such consents or approvals and shall execute and deliver any and all documents reasonably necessary to effect any such assignment. Any Costs attributable to such an assignment shall be the sole obligation of the assignor.

24.1.4 **Minimum Transfer of Working Interest:** Unless unanimously agreed otherwise, any transfer to a third party shall be limited to a minimum Working Interest of five percent (5%) in the entire Contract Area. This transfer limitation shall not apply to Parties who have made an Election to participate in the Fabrication AFE for the Initial Production System.

24.1.5 **Form of Assignments:** Any assignment of a Working Interest in or subject to this Agreement shall incorporate provisions that the assignment is inferior to and made expressly subject to this Agreement and providing for the assumption by the assignee of the performance of all of assignor's obligations under this Agreement. Any assignment not in compliance with this provision shall be null and void at the option of any non-assigning Party.

24.1.6 **Limited Warranty:** Any assignment, vesting, or relinquishment of Working Interest between the Parties to this Agreement shall be made without warranty of title or any other type of warranty (express or implied); however, all liens and encumbrances known by the assignor or made by the assignor shall be disclosed to the assignee.

132

## ARTICLE 25.0 FORCE MAJEURE

**25.1**   **Force Majeure:**   If as a result of Force Majeure any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money) then the obligations of the Party claiming the Force Majeure shall be suspended so far as and to the extent that the obligations are affected by such Force Majeure, during the continuance of any Force Majeure, but for no longer period.   For purposes of this agreement, "Force Majeure" shall be inclusive of but not limited to the following events:

- flood, hurricane, loop currents or other acts of God;

- a fire, blowout, oil spill or other environmental catastrophe;

- war, civil disturbance, labor dispute, strike, lockout;

- compliance with any law, order, rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

- by inability to secure materials or rig; or,

- by any other cause, whether similar or dissimilar, beyond the reasonable control of the said Party.

The Party claiming Force Majeure shall notify the other Parties of the Force Majeure condition within a reasonable time (not to exceed one [1] month ) after the occurrence. The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy the Force Majeure or to

resume performance of its obligations under this Agreement.  The notifying Party shall keep all other Parties informed of all significant developments.  The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure condition, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

## ARTICLE 26.0  ADMINISTRATIVE PROVISIONS

26.1   **Term of Agreement:**  This Agreement shall become binding upon execution by all Parties with an effective date as set forth in the preamble to this Agreement.  This Agreement shall remain in effect from the effective date and for so long as any of the Lease(s) in the Contract Area shall remain in effect or until all assets and operations have been turned over to a single Working Interest owner.  Termination of this Agreement shall not relieve any Party from any Costs or liability accrued or incurred prior to the termination of this Agreement, and the provisions of this Agreement shall continue in force for such additional time as necessary until:

(a)   all wells have been plugged and abandoned; and,

(b)   all property and equipment in the Contract Area belonging to the Parties are disposed of by the Operator and all claims or lawsuits have been settled or otherwise disposed of; and,

(c)   a final accounting and settlement has been made under this Agreement (including settlement of any gas imbalances pursuant to Exhibit "D" (*Gas Balancing Agreement*)).

134

The Operator shall have a reasonable period of time after the occurrence of an event of termination in which to conclude the administration of joint operations and to make a distribution of assets.  During this period of time, the Operator shall continue to have and shall exercise all powers granted and meet all duties imposed by this Agreement until all provisions of this Agreement are fully executed.

26.2   **Time Limits:**  Time is of the essence in this Agreement and all time limits shall be strictly construed and enforced.  The failure or delay of any Party in the enforcement of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.  Such Party may exercise its rights under this Agreement despite any delay or failure to enforce the rights when the right or obligation arose.

26.3   **Waiver of Right to Partition:**  Each Party for itself and its successors and assigns waives the right to bring an action for partition of its interest in the Lease(s) and lands or personal property held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of Lease(s) and lands or personal property subject to this Agreement.

26.4   **Compliance with Laws and Regulations:**  This Agreement, and all operations conducted by the Parties pursuant to this Agreement, are expressly subject to and shall comply with all laws, orders, rules and regulations of any federal, state or local governmental authority having jurisdiction over the Contract Area.   No Party shall suffer a forfeiture or be liable in damages for failure to comply with any of the provisions of this Agreement if such compliance is prevented or if such failure results from compliance with any applicable law, order, rule or regulation.

135

26.4.1 <u>Applicable Law</u>:  THE PROVISIONS OF THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES SHALL BE GOVERNED AND INTERPRETED ACCORDING TO FEDERAL LAWS AND THE LAWS OF THE STATE OF LOUISIANA WITHOUT REGARD TO PRINCIPLES OF CHOICE OF LAWS THAT WOULD REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION.

26.4.2 <u>Severance of Invalid Provisions</u>:  In case of a conflict between the provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations shall govern over the provisions of this Agreement.  If, for any reason and for so long as, any clause or provision of this Agreement is held by court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement shall not be affected by such illegality or invalidity.  Any such invalid provision shall be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated.  The surviving provisions of this Agreement shall remain in full force and effect unless the removal of the invalid provision destroys the legitimate purposes of this Agreement; in which event this Agreement shall be null and void.  The Parties shall negotiate in good faith for any required modifications to this Agreement.  In the event of a conflict between this Agreement and the Participation Agreement, the Participation Agreement shall be considered the controlling Agreement.

26.4.3 <u>Fair and Equal Employment</u>:  Each of the Parties is an Equal Opportunity Employer.  To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference.  If the Non-Discrimination in the OCS provisions of 30 CFR 270

136

apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference. To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference. In performing work under this Agreement, the Parties agree to comply with (and the Operator shall require each independent contractor to comply with) the governmental requirements set forth in Exhibit "E" *(Equal Opportunity Certificate)* attached hereto, pertaining to non-segregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to non-discrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

**26.5**   **Construction and Interpretation of This Agreement:**   The interpretation and construction of the terms of this Agreement will be governed by the following conventions:

**26.5.1**   **Headings for Convenience:**   Except for the definition headings contained in Article 2.0 *(Definitions)*, all the table of contents, captions, numbering sequences, and paragraph headings used in this Agreement are inserted for convenience only and shall in no way define, limit or describe the scope or intent of this Agreement or any part thereof; nor have any legal effect other than to aid a reasonable interpretation of this Agreement.

**26.5.2**   **Gender and Number:**   The use of pronouns in whatever gender or number shall be deemed to be a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities or groups thereof. Any necessary grammatical

changes required to make the provisions of this Agreement refer to the correct gender or number shall in all instances be assumed as though each case was fully expressed.

**26.5.3   Independent Representation:**   Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement. This Agreement, though drawn by one (1) Party, shall be construed fairly and reasonably and not more strictly against one (1) Party than another.

**26.6   Integrated Agreement:**   This Agreement, and the exhibits attached and incorporated herein, contain the final and entire agreement of the Parties with respect to the subject matter of this contract. There are no representations, warranties or promises, oral or written between the Parties other than those included in this Agreement. Upon execution of this Agreement by all Parties, this contract shall supersede and replace all previous negotiations, understandings or promises, whether written or oral, relative to the subject of this Agreement. Each of the Parties acknowledge that no other Party has made any promise, representation or warranty that is not expressly stated in this Agreement. This Agreement shall not be modified or changed except by a written amendment signed by all the Parties. This Agreement is entire as to all the performances to be rendered under it and breach of any provision shall constitute a breach of the entire Agreement.

**26.7   Execution of Documents:**

**26.7.1   Binding Effect:**   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns and shall constitute a covenant running with the land and Lease(s) comprising the Contract Area. This Agreement does not benefit or create any rights in any person or entity not a Party to this Agreement.

138

**26.7.2** __Corporate Authority__:  If any Party is a legal entity, including but not limited to, an association, corporation, joint venture, limited Partnership, Partnership or trust, such Party represents to the other Parties that the execution and delivery of this Agreement and the completion of transactions contemplated herein have been duly authorized by all necessary corporate proceedings or have received all necessary management approvals.

**26.7.3** __Further Assurances__:  Each Party further agrees to take any and all actions necessary and sign any and all documents necessary to implement the terms of this Agreement.  Any necessary documents (e.g., a Designation of Operator, etc.) shall be prepared and executed by all Parties within thirty (30) days from the receipt of a written request for same from any Party.  Each Party shall refrain from taking any action (or inaction), either express or implied, which would have the effect of prohibiting or hindering the performance of another Party to this Agreement.

**26.7.4** __Multiple Counterparts__:  This Agreement may be executed by signing the original or a counterpart thereof.  If this Agreement is executed in multiple counterparts, each counterpart shall be deemed an original and all of which when taken together shall constitute but one (1) and the same agreement with the same effect as if all Parties had signed the same instrument.  This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement.  A ratification shall have the same effect as an execution of the original Agreement.

IN WITNESS WHEREOF, each Party, through its duly authorized agent or representative, has executed this Agreement effective as of the date first above written.

WITNESSES:

**Davis Offshore, L.P.**

Gregg Davis
President

WITNESSES:

**LLOG Exploration Offshore, Inc.**

Thomas A. Burnett
Manager, Business Development

140

**EXHIBIT "A"**

**Attached to and made a part of that certain Operating Agreement
dated effective December 12, 2002 by and between
Davis Offshore, L.P. and LLOG Exploration Offshore, Inc.**

**CONTRACT AREA, WORKING INTEREST OF THE PARTIES, OPERATOR
AND REPRESENTATIVES**

I.  **Contract Area**:

Oil and Gas Lease dated effective June 1, 2002, bearing Serial No. OCS-G 24154, between the United States of America, acting through the Regional Director, Gulf of Mexico OCS Region, Minerals Management Service, as Lessor, LLOG Exploration Offshore, Inc. and Davis Offshore, L.P., as Lessee, covering and affecting lands described as Green Canyon, Block 157, Official Protraction Diagram, NG 15-03, and containing 5,760.00 acres, more or less.

II.  **Working Interests of the Parties:**

| | |
|---|---|
| LLOG Exploration Offshore, Inc. | 85% |
| Davis Offshore, L.P. | 15% |

III.  **Operator:**   **LLOG Exploration Offshore, Inc.**

IV.  **Addresses/Names of Representatives:**

| Davis Offshore, L.P. | LLOG Exploration Offshore, Inc. |
|---|---|
| 1360 Post Oak Boulevard, | 11700 Old Katy Road |
| Suite 2400, | Suite 295 |
| Houston, Texas 77056 | Houston, Texas  77079 |
| Attention:   Ed Stengel | Attention:      Tom Burnett |
| Telephone: (713) 439-6774 | Telephone:    (281) 596-0266 |
| Facsimile:  (713) 961-4573 | Facsimile:     (281) 596-0264 |

**End of Exhibit**

## EXHIBIT "B"

**Attached to and made a part of that certain Operating Agreement
dated effective December 12, 2002 by and between
Davis Offshore, L.P. and LLOG Exploration Offshore, Inc.**

## OFFSHORE INSURANCE PROVISIONS

A.   Operator shall, at all times while conducting operations on the Lease, carry or cause to be carried, pay for, and charge to the Joint account, premiums for the insurance set forth below.   Notwithstanding the above, LLOG Exploration Offshore, Inc. shall carry and pay for such insurance in the drilling of the Initial Exploratory Well as set forth in Article 10.2.5 and Davis Offshore, L.P. shall be a named insured in all such insurance.

   1.   <u>Workman's Compensation and Employer's Liability Insurance</u> with limits of $1,000,000.00 covering the employees of Operator engaged in operations hereunder in compliance with all applicable Federal and State Laws.  The coverages provided shall include Longshoremen's and Harbor Workers Act and its extension by the Outer Continental Shelf Lands Act.  Operator shall also carry coverage for its employees as "master and member of vessels" - Maritime liability, including transportation, wages, maintenance and care with an aggregate limit of liability of not less than $1,000,000 per accident. Such policies shall contain underwriter's waiver of subrogation in favor of the Parties.   Operator may be self-insured for liability under said compensation laws in which case the only charge made to the joint account shall be as provided for in Exhibit "C".   Operator shall require all contractors engaged in work on or for the contract area to comply with the workmen's compensation laws of the applicable jurisdictions when the operations are being conducted and to maintain such other insurance as the Operator may require.

   2.   Any other insurance which the Parties may mutually agree upon.

B.   In all wells and operations in which the Parties jointly participate and bear their respective share of associated costs and expense, each Party shall at all times carry or cause to be carried the following coverages pertaining to its share of the liability assumed under the Operating Agreement:

   1.   <u>Comprehensive General Liability</u> (including excess liability coverage) endorsed to include offshore operations, covering operations conducted hereunder by Operator for the Parties, with limits of:  Combined Bodily Injury and Property Damage - $5,000,000 per occurrence and $5,000,000 Aggregate

2. <u>Aircraft Liability</u>, including passengers, with $3,000,000.00 (including excess liability coverage) combined single limit bodily injury and property damage for use of owned or non-owned aircraft.

3. <u>Charter's Liability</u> with a limit of $5,000,000 (including excess liability coverage) for any one (1) claim to provide coverage for liabilities arising out of the use of any chartered barges or vessels.

4. <u>Operator's Extra Expense Insurance</u>, including control of well (containing underground blowout coverage) and redrilling of the well (full restoration redrill), with a limit of liability of $40,000,000.

5. <u>Seepage and Pollution and Contamination and Evacuation Expense</u>, with a limit of liability of $35,000,000.

6. <u>Physical Damage and Removal of Wreck Coverage</u> for facilities hereunder, with limits not less than the replacement value thereof.

C. Each Operator and Non-Operator, agree to maintain insurance coverages in full force and effect so long as the above mentioned joint operations are being conducted under this Agreement.

D. Any Party individually may at its own expense acquire such additional insurance as it desires; provided, however that such Party shall make a good faith effort to obtain waivers by the insurer of all rights of subrogation in favor of the other Parties to this Operating Agreement.

E. In the drilling of the Initial Exploratory Well as set forth in Article 10.2.5 and in the event Non-consent Operations are conducted under the terms of this Operating Agreement, the cost of insurance requirements hereunder in regard to such operations, as well as all losses, liabilities and expenses incurred as a result of such operation, shall be the burden of LLOG Exploration Offshore, Inc. in the event of the Initial Exploratory well and the participating Parties in the event of a Non-Consent Operation. As to the insurance coverage obtained in the drilling of the Initial Exploratory Well, Davis Offshore, L.P. shall be a named insured.

F. Any and all losses not covered by insurance or which fall within the applicable policy deductible shall be borne by the Parties hereto in the proportions of their respective interests in the project. Failure of any Party to obtain insurance as required under Exhibit "B" shall not change that Party's responsibility for their portions of the loss.

**End of Exhibit**

2

**EXHIBIT "C"**

**Attached to and made a part of that certain Operating Agreement
dated effective December 12, 2002 by and between
Davis Offshore, L.P. and LLOG Exploration Offshore, Inc.**

**ACCOUNTING PROCEDURE
PROJECT TEAM
JOINT OPERATIONS**

**I. GENERAL PROVISIONS**

1.  DEFINITIONS

    All terms used in this Accounting Procedure, if not otherwise defined in the Agreement to which this Accounting Procedure is attached, shall have the following meaning:

    "Affiliate" shall mean, with respect to any Party, any separate legal entity directly or indirectly controlling, controlled by, or under common control with such Party, unless otherwise defined in the Agreement to which this Accounting Procedure is attached.

    "Controllable Material" shall mean Material that at the time of acquisition or disposition by the Joint Account is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

    "First Level Supervisors" shall mean those employees whose primary function in Joint Operations is the direct supervision of the Operator's field employees and/or contract labor directly employed on the Joint Property in the conduct of Joint Operations.

    "Joint Account" shall mean the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties.

    "Joint Operations" shall mean activities required to handle operating conditions and problems for the exploration, appraisal, development, production, protection, maintenance, abandonment, and restoration of the Joint Property.

    "Joint Property" shall mean the real and personal property subject to the Agreement to which this Accounting Procedure is attached. For operations involving subsea or remote structures, the phrase "on the Joint Property" may include a platform, surface production facility, remote facility, or floating production storage facility, which is the surface location from which Joint Operations are conducted, even if such location is not owned by the Joint Account.

    "Material" shall mean personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

    "Non-Operators" shall mean the Parties to this Agreement other than the Operator.

    "Offshore Facilities" shall mean platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

    "Operator" shall mean the Party designated to conduct the Joint Operations.

Copyright © 1998 by the Council of Petroleum Accountants Societies.

"Parties" shall mean legal entities signatory to the Agreement or their successors or assigns to which this Accounting Procedure is attached.

"Personal Expenses" shall mean reimbursed costs for travel, temporary living, relocation, and other expenses of Operator's employees, as well as similar expenses incurred by a Non-Operator or any Party's Affiliate for personnel assigned to a Project Team.

"Project Team" shall mean employees of the Parties, Affiliates, or contractors assigned to perform work and/or studies as authorized under the terms of the Agreement.

"Shore Base Facilities" shall mean onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions benefiting the Joint Property.

"Technical Employees" shall mean personnel having special and specific engineering, geoscience, or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property.

2.  STATEMENTS AND BILLINGS

    A.  The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. In lieu of detailed descriptions, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

    B.  Non-Operators shall bill the Operator, on a monthly basis, in accordance with the provisions contained herein, for the salaries, wages, payroll burden, and Personal Expenses, if any, of its employees assigned to the Project Team. In a like manner, the Non-Operator shall bill the Operator for such expenses of the Non-Operator's Affiliate employees and/or contractor employees retained by the Non-Operator who are assigned to the Project Team. The Operator shall reimburse the Non-Operators in accordance with Section I, Paragraph 3.B. For the purposes of Paragraphs 3, 4, and 5 of this Section I, the Non-Operator's costs shall be considered a Joint Account.

3.  ADVANCES AND PAYMENTS BY THE PARTIES

    A.  If gross expenditures for the Joint Account are expected to exceed <u>One Hundred Thousand Dollars</u> (<u>$100,000</u>) in the next succeeding month's operations, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for such month's operations. Unless otherwise provided in the Agreement, any billing for such advance shall be payable within 15 days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the excess to subsequent month's billings or advances, unless a refund is specifically requested.

    B.  Except as provided below, each Party shall pay its proportion of all bills within 15 days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly using the U.S. Treasury Bill 13-week discount rate plus 3% in effect on the first day of the month for each month that the payment is delinquent or the maximum contract rate permitted by the applicable usury laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. Interest shall begin accruing on the first day of the month in which the payment was due.

        o   Electronic Fund Transfer (optional)

2

C. Payments by Parties for monthly cash advances and billings shall be made by Electronic Fund Transfer (EFT) or Automated Clearing House (ACH) transaction.

4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements (including payout status statements) rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after 24 months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto requesting review for adjustment.

B. All adjustments initiated by the billing Parties except those described in (1) through (4) below are limited to the 24-month period following the end of the calendar year in which the original charge appeared or should have appeared on the billing Party's Joint Account statement or payout status statement. Adjustments made beyond the 24-month period are limited to the following:

(1) a physical inventory of Controllable Material as provided for in Section V
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Party relating to another property
(3) a government/regulatory audit
(4) working interest ownership adjustments

5. EXPENDITURE AUDITS

A. A Non-Operator, upon notice in writing to the Operator and other Non-Operators including any non-participating Parties, shall have the right to audit the Operator's accounts and records relating to the Joint Account for any calendar year within the 24-month period following the end of such calendar year; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit. The lead audit company's audit report shall be issued within 90 days after completion of the audit testing and analysis but no later than 90 days from the end of the calendar year in which the audit was commenced; however, the 90-day time period shall not extend the 24-month requirement for taking specific detailed written exception as required in Paragraph 4.A above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within the 24-month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended; however, the failure to comply with the deadlines provided herein shall cause the statute to commence running again.

B. The Operator shall allow or deny all exceptions in writing to an audit report within 180 days after receipt of such report. Denied exceptions should be accompanied by a substantive response. Failure to respond to an exception with substantive information on denials within the time provided will result in the Operator paying interest on that exception, if ultimately granted, from the date of the audit report. The interest charged shall be calculated in the same manner as used in Section I, Paragraph 3.B.

3

C.  The lead audit company shall reply to the Operator's response to an audit report within 90 days of receipt, and the Operator shall reply to the lead audit company's follow-up response within 90 days of receipt. If the lead audit company does not provide a substantive response to an exception within 90 days, that unresolved audit exception will be disallowed. If the Operator does not provide a substantive response to lead auditor's follow-up response within 90 days, that unresolved audit exception will be allowed and adjustments made to the Joint Account.

D.  The Operator or any audit participant may call an audit resolution meeting for the purpose of resolving audit issues/exceptions that are outstanding at least 15 months after the date of the audit report. The meeting will require one month's written notice to the Operator and all audit participants, a mutually agreed upon time and location, and attendance by representatives of the Operator and audit participants with authority to resolve such outstanding audit issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will coordinate the response and positions of the audit participants throughout the audit resolution process.

Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting can be discussed at subsequent meetings until each such issue is resolved.

E.  This Accounting Procedure contemplates Non-Operators may incur Project Team expenditures that are subsequently billed to the Operator and charged to the Joint Account pursuant to Section I, Paragraph 2.B. Accordingly, such Non-Operators are required to maintain auditable records supporting such charges. Regarding such charges, the Operator and/or any other Non-Operators are hereby provided the same rights and Obligations as set forth in Section I, Paragraphs 5.A. through 5.D., as pertain to the Non-Operators in audit of the Joint Account. Conversely in such situation, the Non-Operator being audited is hereby provided the same rights and obligations as set forth in Section I, Paragraphs 5.A. through 5.D. for the Operator.

6.  APPROVAL BY PARTIES

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure, the Operator shall notify all Parties of the proposal. If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, an affirmative vote of one hundred percent (100%) or more Parties having a combined participating interest of at least one hundred percent (100%) shall be controlling.

For the purpose of administering the voting procedures of this Paragraph 6, if two or more Parties to this Agreement are Affiliates of each other, such Affiliated Parties shall be treated as a vote by a single Party having the combined interest of the Affiliated Parties.

# II.  DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.  RENTALS AND ROYALTIES

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations

2. LABOR

   A. Salaries and Wages including Incentive Compensation Programs, as set forth in COPAS Interpretation 30, for personnel serving the Joint Property shall be chargeable in accordance with the following provisions.

     (1) Project Team

      All salaries and wages of employees of the Operator and Non-Operator assigned to the Project Team on a full-time or part-time basis shall be considered a direct cost and shall be charged to the Joint Account. Such employees shall include personnel who are directly engaged in project management, evaluation, design, construction, and installation activities regardless of location. Part-time Project Team personnel specifically assigned to the Project Team shall be charged to the Joint Account, based on actual days worked, only when such time involves at least one full-day equivalent per month that is devoted to the project. Technical Employees not assigned to the Project Team but working under the direction of the Project Team shall be charged to the Joint Account based on actual days worked, only when such time involves at least one full-day equivalent per month. Contractor and Affiliate charges for personnel assigned to the Project Team are chargeable pursuant to Section II, Paragraphs 5 and 7.

     (2) Other Operations—Non-Project Team

      The following salaries and wages shall be charged for employees:

      (a) Salaries and wages of the Operator's field employees directly employed on the Joint Property in the conduct of Joint Operations

      (b) Salaries and wages of the Operator's employees directly employed on Shore Base Facilities or other Offshore Facilities serving the Joint Property if such costs are not charged under Paragraph 6 of this Section II

      (c) Salaries of First Level Supervisors

      (d) Salaries and wages of Technical Employees directly employed on the Joint Property in the conduct of Joint Operations, or on Offshore Facilities serving the Joint Property, if such charges are excluded from the Overhead rates

      (e) Salaries and wages of Technical Employees either temporarily or permanently assigned to and directly employed in the operation of the Joint Property if such charges are excluded from the overhead rates

   B. Cost of holiday, vacation, sickness and disability benefits, and other customary allowances paid to personnel to the extent their salaries and wages are chargeable to the Joint Account under Paragraph 2.A of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2.A of this Section II. If percentage assessment is used, the rate shall be based on the Operator's or Non-Operators' cost experience, as appropriate.

   C. Expenditures or contributions made pursuant to assessments imposed by governmental authority which are applicable to costs chargeable to the Joint Account under Paragraphs 2.A and 2.B of this Section II

   D. Personal Expenses, other than relocation costs, of personnel whose salaries and wages are chargeable to the Joint Account under Paragraph 2.A of this Section II

5

Relocation costs, consistent with the employer's established policy, are chargeable to the extent their salaries and wages are chargeable, in accordance with the following:

(1) For personnel transferred and assigned to a Project Team for a minimum of 12 consecutive months

    o   shall be charged to the Joint Account
    ☑   shall not be charged to the Joint Account

For those assigned for less than 12 consecutive months shall not be chargeable unless agreed to by the Parties.

(2) For Operator's field employees and/or First Level Supervisors

    ☑   shall be charged to the Joint Account
    o   shall be chargeable for the initial staffing upon commencement of Joint Operations for a given platform, facility, or production system
    o   shall be chargeable for First Level Supervisors
    o   shall not be chargeable to the Joint Account

Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations such as Alaska or overseas, shall be approved by the Parties pursuant to the provisions in Section I, Paragraph 6.

E.   Training costs shall be chargeable as specified in COPAS Interpretation 27 and as provided in Section II, Paragraph 13. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session for personnel to the extent their salaries and wages are chargeable under Paragraph 2.A of this Section II. The cost of the training course will be limited to prevailing commercial rates where available.

F.   Cost of established plans for employees' benefits as described in COPAS Interpretation No. 11, determined by applying the employee benefits limitation percentage most recently recommended by COPAS to the chargeable salaries and wages

3.   MATERIAL

Materials purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV. Only such Materials shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   TRANSPORTATION

Transportation of Operator's, Non-Operator's, Affiliate's or contractor's personnel, and Material necessary for the Joint Operations but subject to the following limitations:

A.   If Material is moved to the Joint Property from the Operator's warehouse or other properties, no charge shall be made to the Joint Account for a distance greater than the distance from the nearest supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties.

    B.  If surplus Material is moved to the Operator's warehouse or other storage point, no charge shall be made to the Joint Account for a distance greater than the distance to the nearest supply store where like Material is normally available or railway receiving point nearest the Joint Property unless agreed to by the Parties. No charge shall be made to the Joint Account for moving Material to other properties unless agreed to by the Parties.

    C.  In the application of Paragraphs 4.A. and 4.B. above, the option to equalize or charge actual trucking cost is available when the actual charge is less than the amount most recently recommended by COPAS, excluding accessorial charges, as set forth in COPAS Bulletin 21.

5.  SERVICES

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations and provided by sources other than the Parties, except for contract services, equipment, and utilities covered by the Section III overhead provisions, Paragraph 7 of this Section II, or excluded under Paragraph 9 of this Section II. Notwithstanding anything herein to the contrary, the cost of contract personnel assigned to the Project Team are directly chargeable to the Joint Account.

6.  EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

    A.  Equipment and facilities owned by the Operator shall be charged to the Joint Account at the average prevailing commercial rate for such equipment. If an average commercial rate is used to bill the Joint Account, the Operator shall adequately document and support such rate and shall periodically review and update the rate and the supporting documentation.

    B.  In lieu of charges in Paragraph 6.A. above, or if a prevailing commercial rate is not available, equipment and facilities owned by the Operator will be charged to the Joint Account at the Operator's actual cost. Such costs shall be limited to expenses that would be chargeable pursuant to this Section II if such equipment and facilities were jointly owned, depreciation using straight line depreciation method, and interest on investment (less gross accumulated depreciation) not to exceed 10% per annum. In addition, for platforms, subsea production systems, and production handling facilities, the rate may include an element of the estimated cost of abandonment, reclamation, and dismantlement. Depreciation shall not be charged when the equipment and facilities investment have been fully depreciated. Charges shall not exceed the average prevailing commercial rate, if available.

    C.  When applicable for Operator-owned or leased motor vehicles, the Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates. When such rates are not available, the Operator shall comply with the provisions of Paragraph 6.A. or 6.B. above.

7.  AFFILIATES

Affiliate Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

    A.  If any Operator Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team that are expected to exceed One Hundred Thousand Dollars ($100,000) per annum, per Affiliate, or if such expenditures exceeded said amount during the preceding 12-month period, such charges to the Joint Account for such Materials, facilities or services shall be pursuant to written agreement between the Parties.

B.  If a Non-Operator's Affiliate provides Materials, facilities, or services for operations not under the direction of a Project Team, charges shall be considered third-party services as provided in Paragraph 5 of this Section II.

C.  An Affiliate of the Operator or Non-Operator working at the request of a Project Team shall be chargeable to the Joint Account using the methods indicated below. If more than one option is selected below, notification of the method to be used shall be required prior to commencement of the activity utilizing the Affiliate.

☑  Fixed Rate Basis

Affiliate Materials, facilities, or services shall be charged based on all-inclusive standard rates. Written approval of the rates shall be required of the Parties. Once established, the rates shall be subject to annual adjustment as of the first day of April each year using the percentage wage index adjustment recommended by COPAS for that year.

Any Party may request adjustments to Affiliate costs or rates at any time it deems appropriate but no more than once per year for a given Affiliate. The Parties shall respond to proposals for revised Affiliate costs or rates within the time prescribed in the Agreement for general voting matters. Approval of proposed Affiliate rates shall be determined in accordance with the provisions of Section I, Paragraph 6 and shall not be unreasonably withheld by the Parties.

☑  Cost Basis

Affiliate services shall be charged to the Joint Account as charged by the Affiliate and include any services or Materials procured for Joint Operations. Parties shall charge the Joint Account for the use of Affiliate-owned equipment and facilities at rates commensurate with costs of ownership and operations, which shall include only those costs that would be chargeable if furnished by the Operator pursuant to Section II, Paragraph 6.B.

Charges to the Joint Account for any Materials, facilities, or services provided by an Affiliate shall not exceed average commercial rates, when such rates are available. In the event a Party determines such charges to be excessive compared with third-party rates, that Party must substantiate that such charges exceed average commercial rates and shall provide sufficient documentation to support all such claims in accordance with Section I, Paragraph 5.

☑  AFE/Project Basis

Prior to the commencement of each project, the proposing Party shall submit an AFE that details each Party's Affiliate Materials, facilities, or services to be provided and the costs/rates charged by such Affiliates. Such AFE and costs/rates contained therein shall require the agreement and written approval of the Parties in accordance with the applicable provisions of the Agreement. Once agreed to, such Affiliate costs/rates shall remain in effect for the duration of the AFE/Project, unless revised by the Parties in accordance with Section I, Paragraph 6 of this Accounting Procedure.

Any Party may request adjustments to Affiliate costs or rates at any time it deems appropriate but no more than once per year for a given Affiliate. The Parties shall respond to proposals for revised Affiliate costs or rates within the time prescribed in the Agreement for general voting matters. Approval of proposed Affiliate rates shall be determined in accordance with the provisions of Section I Paragraph 6 and shall not be unreasonably withheld by the Parties.

D.  Each Party will make a good faith effort to obtain sufficient evidentiary supporting documentation from its Affiliate and shall maintain auditable records to support all Affiliate charges to the Joint Account.

Unless otherwise provided below, such documentation shall be subject to audit in accordance with Section I, Paragraph 5.

If affiliate charges are based on rates established using a fixed rate basis, the audit of the Affiliate charges shall be limited to verification that the rates charged were as agreed to by the Parties, and that the units or basis to which the rates were applied are correct.

If the Cost Basis method is selected, the Parties agree that the Affiliate's records relating to the Materials, facilities, or services provided by the Affiliates

- o   will not be made available for audit
- ☑   will be made available for audit

## 8. DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting because of damages or losses incurred, except to the extent such damages or losses result from a Party's gross negligence or willful misconduct, in which case such Party shall be solely liable.

## 9. LEGAL EXPENSE

The Operator may not charge for services of the Operator's legal staff or fees and expenses of outside attorneys unless approved by the Parties, except that title examinations and curative work shall be chargeable, unless otherwise provided for in the Agreement. Other types of legal expense, other than attorney fees, such as recording fees and handling, settling, or otherwise discharging litigation, claims, and liens necessary to protect or recover the Joint Property shall be chargeable.

## 10. TAXES AND PERMITS

All taxes and permits of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

## 11. INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its workers' compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. Such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication systems, including radio and microwave facilities, between the Joint Property and the Operator's offices directly responsible for field operations. In the event communication systems serving the Joint Property are Operator or Affiliate-owned, charges to the Joint Account shall be made as provided in Section II, Paragraph 6 or 7 as applicable.

9

13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

    A.  Ecological and Environmental costs incurred

        o    for the benefit of the Joint Property
        ☑   on the Joint Property

    resulting from laws, rules, regulations, or orders for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority. Also, costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations are chargeable. Ecological and environmental costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

    B.  Safety costs incurred

        o    for the benefit of the Joint Property
        ☑   on the Joint Property

    to conduct and/or implement safe operational practices/guidelines as a result of laws, rules, regulations, or orders or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies. Safety costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

    C.  Environmental, ecological, and safety training costs for personnel whose time would otherwise be chargeable under Paragraph 13.A or B above, regardless of whether training is mandated by statute or regulatory agency, is chargeable to the Joint Account.

    D.  Safety and other team accomplishment awards for personnel chargeable to the Joint Account

        o    shall be chargeable to the Joint Account
        ☑   shall not be chargeable to the Joint Account

    In the event of a conflict between the provisions of this Paragraph 13 and Section III, Paragraphs i. and ii., the following election shall prevail:

        ☑   Section II, Paragraph 13
        o    Section III, Paragraphs i. and ii.

14. ABANDONMENT AND RECLAMATION

    Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental, regulatory, or judicial authority

# III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, or other costs not specifically identified as being chargeable to the Joint Account pursuant to Section II of this Accounting Procedure, the Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of offices and salaries or wages or expenses of personnel, except those costs identified as directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, purchasing, accounting, administrative or clerical duties, or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account. Costs of functions which solely benefit the Operator are not recoverable from the Joint Account.

    i.    Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden and Personal Expenses of Technical Employees, and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property in the conduct of Joint Operations

        x    shall be covered by the overhead rates
            shall not be covered by the overhead rates

    ii.    Except as otherwise provided in Paragraphs 1 and 3 of this Section III, the salaries, wages, related payroll burden and Personal Expenses of Technical Employees, and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property

        x    shall be covered by the overhead rates
            shall not be covered by the overhead rates

1.    OVERHEAD—PROJECT TEAM

To compensate the Parties for overhead costs incurred to support a Project Team, the Parties shall charge Project Team Overhead. Such overhead costs may include, but shall not be limited to the following: all personnel not directly chargeable to the Project Team, all computer equipment and supplies, office space, utilities, office furniture and equipment, cleaning and general housekeeping, office supplies, conference room facilities, facsimile machines, copy machines, telephones, and other general costs of supporting the Project Team. The overhead recovery shall be pursuant to one of the following options:

          The Operator shall charge a rate of one percent (1%) of the total cost of the Project Team AFE
x    The Parties shall negotiate and document an overhead recovery method for the Project Team AFE when the Project Team AFE is proposed by the Parties. Approval of the overhead recovery method shall be determined in accordance with the Agreement provisions governing approval of the Project Team AFE

11

2.  OVERHEAD—DEVELOPMENT AND OPERATING

As compensation for overhead in connection with drilling and producing operations not covered by other provisions of this Section III, Operator shall charge on either

o   Fixed Rate Basis, Paragraph 2.A.
☑   Percentage Basis, Paragraph 2.B.

A.  OVERHEAD—FIXED RATE BASIS

(1)  The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $_____ (Prorated for less than a full month)

Producing Well Rate per month $_____

(2)  Application of Overhead—Drilling Well Rate shall be as follows:

(a)  Charges for onshore drilling wells shall begin on spud date and terminate on the date the drilling or completion equipment is released, whichever occurs later. Charges for offshore drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location or rig is released, whichever occurs first. No charge shall be made during suspension of drilling or completion operations for 15 or more consecutive calendar days.

(b)  Charges for wells undergoing any type of workover, recompletion, or abandonment for a period of five consecutive work days or more shall be made at the drilling well rate. Such charges shall be applied for the period from date workover operations, with rig or other units used in workover, and commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for 15 or more consecutive calendar days.

(3)  Application of Overhead—Producing Well Rate shall be as follows:

(a)  An active well completion for any portion of the month shall qualify for a one-well charge for the entire month. An active completion is one that is

[1]  produced
[2]  injected into for recovery or disposal
[3]  used to obtain water supply to support production operations

(b)  Each active completion in a multi-completed well shall qualify for a one-well charge providing each completion is considered a separate well by the governing regulatory authority.

(c)  A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well. This one-well charge shall be made whether or not the well has produced except when the drilling well rate applies.

(d)  An active gas well shut in because of overproduction or failure of a purchaser to take production shall be considered as a one-well charge providing the gas well is directly connected to a permanent sales outlet.

(e)  All wells not meeting the criteria set forth in this Paragraph 2.A.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

12

(4) The well rates shall be adjusted on the first day of the production month of April each year following the effective date of the Agreement to which this Accounting Procedure is attached or the effective date of any overhead rate amendment. The adjusted rates shall be the rates on the effective date of the overhead rate, increased or decreased by the COPAS percentage wage index adjustment for each year from such effective date to the date of the adjustment.

B.  OVERHEAD—PERCENTAGE BASIS

(1) Operator shall charge the Joint Account at the following rates:

(a) Development Rate one and one-half Percent (1.5%) of the cost of development of the Joint Property exclusive of costs provided under Section II, Paragraph 9, all salvage credits, and all Project Team expenses and overhead.

(b) Operating Rate eight Percent (8%) of the cost of operating the Joint Property exclusive of costs provided under Section II, Paragraphs 1 and 9; all salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.

(2) Application of Overhead—Percentage Basis shall be as follows:

(a) Development rate shall be applied to all costs in connection with

[1] drilling, redrilling, plugging back, sidetracking, or deepening of a well
[2] workover operations requiring a period of 15 consecutive work days or more on a well
[3] preliminary expenditures necessary in preparation for drilling
[4] expenditures incurred in abandoning when the well is not completed as a producer
[5] original construction or installation of fixed assets, expansion of fixed assets, and any other project clearly discernible as a fixed asset except Major Construction as defined in Section III, Paragraph 3 or any Project Team expenses and overhead.

(b) Operating rate shall be applied to all other costs in connection with Joint Operations except those subject to Section III Paragraphs 1 and 3.

3.  OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

Major Construction is defined as any project requiring an AFE, under the terms of the Agreement to which this Accounting Procedure is attached, for the construction and installation of fixed assets; the expansion of fixed assets; or in the abandonment of fixed assets and any associated reclamation required for the exploration, development, and operation of the Joint Property.

Catastrophe is defined as a calamitous event bringing damage, loss, or destruction resulting from a single occurrence requiring an AFE to restore the Joint Property to the equivalent condition that existed prior to the event causing the damage.

To compensate the Operator for overhead costs incurred in connection with Major Construction and Catastrophes, the Operator shall either negotiate a rate prior to beginning the work or shall charge the Joint Account for overhead based on the following rates:

A.  If the Operator charges, to a Project Team AFE, the engineering, design, and drafting costs associated with a Major Construction or Catastrophe project AFE, the overhead assessment shall be one percent (1%) of total project costs.

13

B.  If the Operator does not charge the engineering, design, and drafting costs related to a Major Construction or Catastrophe project AFE to a separate Project Team AFE, the Operator shall charge the following rates:

If the Operator absorbs engineering, design, and drafting costs related to the project, the overhead assessment shall be two percent (2%) of total project costs.

If the Operator charges engineering, design, and drafting costs related to the project directly to the Joint Account, the overhead assessment shall be one (1%) of total project costs.

For calculating Major Construction overhead, the cost of drilling and workover wells shall be excluded. For calculating Catastrophe overhead the cost of drilling relief wells, substitute wells, or conducting other well operations resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by insurance recoveries. Overhead assessed under the Major Construction and Catastrophe provisions shall be in lieu of all other overhead provisions. In the event of any conflict between the provisions of this paragraph and the provisions of Section II, Paragraphs 2 and 5, the provisions of this paragraph shall govern. Total project costs shall exclude Project Team costs if recorded to a separate Project Team AFE and overhead is charged on Project Team costs pursuant to Section III, Paragraph 1.

4.  AMENDMENT OF RATES

The Overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I, Paragraph 6.


## IV.  MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator normally provides all Material for use in the conduct of Joint Operations but does not warrant the Material furnished. Except as otherwise provided in Section IV, Paragraph 4.A., Material may be supplied by Non-Operators at the Operator's option.

1.  DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. A direct purchase is determined to occur when an agreement is made between an Operator and a third party for the acquisition of Materials for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase. If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Operator from the manufacturer, distributor, or agent.

2.  TRANSFERS

A transfer is determined to occur when the Operator furnishes Material from its storage facility or from another operated property. Additionally, the Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material. Similarly, the removal of Material from a Joint Property to the Operator's facility or to another operated property is also considered a transfer. Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.  PRICING

14

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer. Transfers of new Material will be priced using one of the following new Material bases:

(1) Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS)

The HPMs and the associated date of published price to which they should be applied will be published by COPAS periodically.

    (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

    (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint Property (where like Material is normally available) or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2) A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3) Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement. Sufficient documentation should be available to Non-Operators for purposes of verifying Material transfer valuation.

(4) As agreed to by the Parties

(5) When higher than specification grade or size tubulars from the Operator's inventory are used on the Joint Property in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B. FREIGHT

Transportation costs should be added to the Material transfer price based on one of the following:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and COPAS Interpretations in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property. For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3) Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas to the railway receiving point nearest the Joint Property.

(4) Transportation costs for Material other than that described in Section IV, Paragraphs 2.B (1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint Property.

15

C.  CONDITION

(1)  Condition "A"—New and unused Material in sound and serviceable condition shall be charged at 100% of the price as determined in Section IV, Paragraphs 2.A. and 2.B. Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss. Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charges. All refurbishing costs required or necessary to return the Material to original condition or to correct handling or transportation damages and other related costs will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)  Condition "B"—Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Section IV, Paragraphs 2.A. and 2.B. by

☑    75%
o    the condition percentage most recently recommended by COPAS

All refurbishing cost or reconditioning required to return the Material to Condition "B" or to correct handling or transportation damages and other related costs will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Section IV, Paragraphs 2.A. and 2.B. multiplied by

☑    65%
o    the condition percentage most recently recommended by COPAS

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)  Condition "C"—Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Section IV, Paragraphs 2.A. and 2.B. by

☑    50%
o    the condition percentage most recently recommended by COPAS

The cost of reconditioning shall be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)  Condition "D"—Other Material that is no longer suitable for its original purpose but useable for some other purpose is considered Condition "D" Material. Included under Condition "D" is also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with

16

the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the parties.

(5) Condition "E"—Junk shall be priced at prevailing scrap value prices.

D. OTHER PRICING PROVISIONS

(1) Preparation Costs

Costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged in accordance with Section IV, Paragraph 2.A.

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged at the rate most recently recommended by COPAS in accordance with the methods specified in COPAS Bulletin 21.

3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Materials, the Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sale to a third party, division in-kind, or other dispositions as agreed to by the Parties.

The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Materials.

The Operator may dispose of Condition "D" and "E" Material under procedures normally utilized by the Operator without prior approval.

4. SPECIAL PRICING PROVISIONS

A. PREMIUM PRICING

Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the Operator has no control, the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use and to billing Non-Operators for such Material. During premium pricing periods, each Non-Operator shall have the right to furnish in-kind all or part of its share of such Material suitable for use and acceptable to the Operator by so electing and notifying the Operator within 10 days after receiving notice from the Operator.

17

B.  SHOP-MADE ITEMS

Shop-made items shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either 25% of the current price as determined in Section IV, Paragraph 2.A. or scrap value, whichever is higher, plus the cost of labor to fabricate the item.

C.  MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at 80% of K-55/J-55 price as determined in Section IV, Paragraphs 2.A. and 2.B. Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

# V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account as defined in the most recent COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of jointly owned Controllable Material shall be made within six months following the taking of the inventory or receipt of Non-Operator inventory. Charges and credits for overages or shortages will be valued for the Joint Account based on the Condition "B" prices in effect on the date of physical inventory as determined in accordance with Section IV, Paragraph 2.A. and 2.B. unless the inventorying Parties can prove another Material condition applies.

1.  DIRECTED INVENTORIES

With an interval of not less than five years, physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators.

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.  Audit per diem rate for each inventory person in accordance with the auditor rates recommended by COPAS at the time the inventory is conducted

The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

B.  Actual travel including Operator-provided transportation and Personal Expenses for the inventory team

C.  Reasonable charges for report typing and processing

The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by the results of such inventory.

2.  NON-DIRECTED INVENTORIES

18

A. OPERATOR INVENTORIES

Periodic physical inventories that are not requested by the Non-Operator may be performed by the Operator at the Operator's discretion. The expenses of conducting such Operator inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Any Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk with prior notification to the Operator of at least 90 days. Non-Operator inventory findings shall be furnished to the Operator in writing within 90 days of completing the inventory field work.

C. OTHER INVENTORIES

Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling Party should notify all other owners at least 30 days prior to the anticipated closing date. When there is a change in Operator of the Joint Property, an inventory by the former and new Operator should be taken. The expenses of conducting other inventories shall be charged to the Joint Account in accordance with Section V, Paragraph 1.

19

EXHIBIT "I"

**Attached to and made a part of that certain Operating Agreement
dated effective December 12, 2002 by and between
Davis Offshore, L.P. and LLOG Exploration Offshore, Inc.**

**Security Rights Provisions**

A. <u>**Security Rights - Properties Located Offshore Adjacent to the State of Louisiana**</u>.
In addition to any other security rights and remedies provided by law with respect to
services rendered or materials and equipment furnished under this Agreement, for and in
consideration of the covenants and mutual undertakings of the Operator and the
Non-Operating Parties herein, the Parties shall have the following security rights:

(i)    <u>Mortgage in Favor of the Operator</u>.  Each Non-Operating Party hereby grants to the
Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and
interests in and to  (a) the Lease,  (b) the oil and gas in, on, under, and that may be
produced from the lands covered by the Lease or included within the Contract
Area, and  (c)  all other immovable property susceptible of mortgage situated
within the Contract Area.

This mortgage is given to secure the complete and timely performance of and
payment by each Non-Operating Party of all obligations and indebtedness of every
kind and nature, whether now owed by such Non-Operating Party or hereafter
arising, pursuant to this Agreement.  To the extent susceptible under applicable
law, this mortgage and the security interests granted in favor of the Operator herein
shall secure the payment of all Costs and other expenses properly charged to such
Party, together with  (A)  interest on such indebtedness, Costs, and other expenses
at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or
the maximum rate allowed by law, whichever is the lesser,  (B)  reasonable
attorneys' fees, (C) court costs, and  (D) other directly related collection costs.  If
any Non-Operating Party does not pay such Costs and other expenses or perform its
obligations under this Agreement when due, the Operator shall have the additional
right to notify the purchaser or purchasers of the defaulting Non-Operating Party's
Hydrocarbon production and collect such Costs and other expenses out of the
proceeds from the sale of the defaulting Non-Operating Party's share of
Hydrocarbon production until the amount owed has been paid.  The Operator shall
have the right to offset the amount owed against the proceeds from the sale of such
defaulting Non-Operating Party's share of Hydrocarbon production.  Any purchaser
of such production shall be entitled to rely on the Operator's statement concerning
the amount of Costs and other expenses owed by the defaulting Non-Operating
Party and payment made to the Operator by any purchaser shall be binding and
conclusive as between such purchaser and such defaulting Non-Operating Party.

ExhI(SecurityRightsProvision-LA)

The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.A.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to this Agreement.

(ii)  <u>Security Interest in Favor of the Operator</u>.  To secure the complete and timely performance of and payment by each Non-Operating Party of all obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising, pursuant to this Agreement, each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Non-Operating Parties in and to the oil and gas produced from or attributable to the Lease or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers: (A) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all

2

of the rights, titles and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal;  (B)  all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Lease or the Contract Area, or the oil and gas produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and  (C)  all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease or the Contract Area;

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

3

(iii)   <u>Mortgage in Favor of the Non-Operating Parties</u>.  The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that my be produced from the lands covered by the Lease or included within the Contract Area; and (c) all other immovable property or other property susceptible of mortgage situated within the Contract Area.

This mortgage is given to secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-Operating Party herein shall secure the payment of all Costs and other expenses properly charged to the Operator, together with (A) interest on such indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (B) reasonable attorneys' fees, (C) court costs, and (D) other directly related collection costs.

The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Parties as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Parties is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Parties shall not be entitled to enforce the same against the Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the Memorandum of Operating Agreement and Financing Statement (Louisiana), as such term is defined in Section 6.3.A.(v) hereof) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to this Agreement.

(iv)   <u>Security Interest in Favor of the Non-Operating Parties</u>.  To secure the complete and timely performance of and payment by the Operator of all obligations and indebtedness of every kind and nature, whether now owed by the Operator or hereafter arising, pursuant to this Agreement, the Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or included within the Contract Area or attributable to the Lease or the Contract Area when produced, (b) all accounts

4

receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area and the cash or other proceeds realized from the sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers: (A) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal; (B) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Lease or the Contract Area, the oil and gas produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area; and (C) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1)     all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease or the Contract Area;

5

(2)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3)    all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease or the Contract Area.

(v)    <u>Recordation</u>.  To provide evidence of, and to further perfect the Parties' security rights created hereunder, upon request, each Party shall execute and acknowledge the Memorandum of Operating Agreement and Financing Statement (Louisiana) attached as Exhibit "J" (the "Memorandum of Operating Agreement and Financing Statement (Louisiana)") in multiple counterparts as appropriate.  The Parties authorize the Operator to file the Memorandum of Operating Agreement and Financing Statement (Louisiana) in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of the Operator and the Non-Operating Parties to their interests in the Lease or the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement (Louisiana) to a standard UCC-1 in the form attached as Exhibit K for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Upon the acquisition of a leasehold interest in the Contract Area, the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation such a Memorandum of Operating Agreement and Financing Statement (Louisiana) describing such leasehold interest.  Such Memorandum of Operating Agreement and Financing Statement (Louisiana) shall be amended from time to time upon acquisition of additional leasehold interests in the Contract Area, and the Parties shall, within five business days following request by one of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

(vi)    The Memorandum of Operating Agreement and Financing Statement (Louisiana) is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Lease or contained within the Contract Area pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records.

B. **Default.**  If any Party does not pay its share of the charges authorized under this Agreement when due, the Operator may give the defaulting Party notice that unless payment is made within thirty (30) days from delivery of the notice, the non-paying Party shall be in default.  A Party in default shall have no further access to the rig, any Confidential Data or other maps, records, data, interpretations, or other information obtained in connection with operations hereunder or be allowed to participate in meetings.  A Party in default shall not be entitled to vote on any General Matter or to make an Election until such time as the defaulting Party is no longer in default.  The voting interest of each non-defaulting Party shall be counted in the proportion its Participating Interest bears to the total non-defaulting Participating Interests.  As to any operation approved during the time a Party is in default, such defaulting Party shall be deemed to be a Non-Participating Party. In the event a Party believes that such statement of charges is incorrect, the Party shall nevertheless pay the amounts due as provided herein, and the Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than sixty (60) days after receiving notice from the Party of such disputed charges.

C. **Unpaid Charges.**  If any Participating Party fails to pay its share of the Costs and other expenses authorized under this Agreement within thirty (30) days after receipt of an invoice therefor or to otherwise perform any of its obligations under this Agreement when due, the Party to whom such payment is due, in order to take advantage of the provisions of this Section 6.3, shall notify the other Party by certified or registered U.S. Mail that it is in default and has thirty (30) days from the receipt of such notice to pay.  If such payment is not made timely by the non-paying Party after the issuance of such notice to pay, the Party requesting such payment may take immediate steps to diligently pursue collection at joint account expense of the unpaid Costs and other expenses owed by such Participating Party, to collect consequential damages as a result of the default, and to exercise the mortgage and security rights granted by this Agreement. The bringing of a suit and the obtaining of a judgment by any Party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the security rights granted herein.  In addition to any other remedy afforded by law, each Party shall have, and is hereby given and vested with, the power and authority to foreclose the lien, mortgage, pledge, and security interest established hereby in its favor in the manner provided by law, to exercise the Power of Sale provided for herein, if applicable, and to exercise all rights of a secured party under the Uniform Commercial Code as adopted by the state in which the Contract Area is located or such other states as such Party may deem appropriate.  The Operator shall keep an accurate account of amounts owed by the nonperforming Party (plus interest and costs) and any amounts collected with respect to amounts owed by the nonperforming Party.  In the event and only in the event there become three or more Parties to this Agreement, then if any nonperforming Party's share of Costs remains delinquent for a period of sixty (60) days, each other Participating Party shall, upon the Operator's request, pay the unpaid amount of Costs in the proportion that its Participating Interest bears to the total non-defaulting Participating Interests.  Each

7

Participating Party paying its share of the unpaid amounts of a nonperforming Party shall be subrogated to the Operator's mortgage and security rights to the extent of the payment made by such Participating Party.

**D.** **Carved-out Interests.**   Any agreements creating any overriding royalty, production payment, net proceeds interest, net profits interest, carried interest or any other interest carved out of a Working Interest in the Lease or the Contract Area shall specifically make such interests inferior to the rights of the Parties to this Agreement. If any Party whose Participating Interest is so encumbered does not pay its share of Costs and other expenses authorized under this Agreement, and the proceeds from the sale of its Hydrocarbon production pursuant to this Section are insufficient to pay such Costs and expenses, the security rights provided for in this Section may be applied against the carved-out interests with which the defaulting or non-performing Party's interest in the Lease or the Contract Area is burdened.  In such event, the rights of the owner of such carved-out interest shall be subordinated to the security rights granted by this Section.