# Terrebonne Parish Recording Page

**Theresa A. Robichaux**
**Clerk Of Court**
P.O. Box 1569
Houma, LA 70361-1569
(985) 868-5660

**Received From :**
LLOG EXPLORATION COMPANY  LLC
1001 OCHSNER BLVD SUITE 100
COVINGTON, LA 70433

**First MORTGAGOR**

LLOG EXPLORATION OFFSHORE INC

**First MORTGAGEE**

-DAVIS OFFSHORE L P

| | |
|---|---|
| **Index Type :** MORTGAGES | **File # :** 1328132 |
| **Type of Document :** AGREEMENTS | **Book :** 2201    **Page :** 579 |
| **Recording Pages :** 15 | |

## Recorded Information

I hereby certify that the attached document was filed for registry and recorded in the Clerk of Court's office for Terrebonne Parish, Louisiana.

*Theresa A. Robichaux*
Clerk of Court

On (Recorded Date) : 07/27/2009

At (Recorded Time) : 9:27:33AM



Doc ID - 010798840015

CLERK OF COURT
THERESA A. ROBICHAUX
Parish of Terrebonne
I certify that this is a true copy of the attached document that was filed for registry and Recorded 07/27/2009 at 9:27:33
Recorded in Book 2201  Page  579
File Number    1328132

Deputy Clerk

### Additional Index Recordings

| Index Type | Book | Page | File # |
|---|---|---|---|
| CON | 2161 | 634 | 1328132 |
| UCC | | | 1328132 |

**Return To :** LLOG EXPLORATION COMPANY  LLC
1001 OSCHNER BLVD SUITE 200
COVINGTON, LA 70433

Do not Detach this Recording Page from Original Document

**STATE OF LOUISIANA**
**UNIFORM COMMERCIAL CODE - FINANCING STATEMENT**
**UCC-1**

Important - Read Instructions before filing out form.

Follow instructions carefully.
1. Debtor's exact full legal name - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names.

| 1a Organization's Name | | | | | | |
|---|---|---|---|---|---|---|
| LLOG Exploration Offshore, Inc. | | | | | | |
| 1b Individual's Last Name (and Title of Lineage (e.g. Jr., Sr., III, if applicable) | | First Name | | | Middle Name | |
| 1c Mailing Address | City | | | State | Postal Code | Country |
| 1001 Ochsner Blvd., Suite 200 | Covington | | | LA | 70433 | USA |
| 1d Tax ID #: SSN or EIN 72-1322580 | Add'l info re Organization Debtor: | 1e Type of Organization corporation | 1f Jurisdiction of Organization Louisiana | | 1g Organizational ID # if any LA34525211D | ☐ None |

2. Additional debtor's exact full legal name - insert only <u>one</u> debtor name (2a or 2b) - do not abbreviate or combine names.

| 2a Organization's Name | | | | | | |
|---|---|---|---|---|---|---|
| See attached Sheet "A" for additional debtors | | | | | | |
| 2b Individual's Last Name (and Title of Lineage (e.g. Jr., Sr. III), if applicable) | | First Name | | | Middle Name | |
| 2c Mailing Address | City | | | State | Postal Code | Country |
| 2d Tax ID #: SSN or EIN | Add'l info re Organization Debtor: | 2e Type of Organization | 2f Jurisdiction of Organization | | 2g Organizational ID #, if any | ☐ None |

3. Secured Party's Name (or Name of Total Assignee of Assignor S/P) - insert only <u>one</u> secured party name (3a or 3b)

| 3a Organization's Name | | | | | |
|---|---|---|---|---|---|
| LLOG Exploration Offshore, Inc. | | | | | |
| 3b Individual's Last Name (and Title of Lineage (e.g. Jr., Sr., III), if applicable | | First Name | | Middle Name | |
| 3c Mailing Address 1001 Ochsner Blvd, Suite 200 | City Covington | | State LA | Postal Code 70433 | Country USA |

4. This FINANCING STATEMENT covers the following collateral:
See attached Memorandum of Operating Agreement and Financing Statement

5a Check if applicable and attach legal description of real property:  ☒ Fixture filing   ☒ As-extracted collateral   ☐ Standing timber constituting goods
☐ The debtor(s) do not have an interest of record in the real property (Enter name of an owner of record in 5b)

5b Owner of real property (if other than named debtor)

6a Check <u>only</u> if applicable and check <u>only</u> one box
☐ Debtor is a Transmitting Utility. Filing is Effective Until Terminated
☐ Filed in connection with a public finance transaction. Filing is effective for 30 years

6b Check <u>only</u> if applicable and check <u>only</u> one box
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

7. ALTERNATIVE DESIGNATION (If applicable):
☐ CONSIGNEE/CONSIGNOR   ☐ LESSEE/LESSOR
☐ SELLER/BUYER   ☐ AG. LIEN   ☐ BAILEE/BAILOR   ☐ NON-UCC-FILING

8. Name and Phone Number to contact filer
Kay Bonura   985-801-4300

9. Send Acknowledgment To: (Name and Address)
Attention: Kay Bonura
LLOG Exploration Company, L.L.C.
1001 Ochsner Blvd, Suite 200
Covington, LA 70433

10. The space below is for Filing Office Use Only

11. ☐ CHECK TO REQUEST SEARCH REPORT(S) ON DEBTORS
(ADDITIONAL FEE REQUIRED) ☐ ALL DEBTORS ☐ DEBTOR1 ☐ DEBTOR2

550        LOUISIANA SECRETARY OF STATE JAY DARDENNE 11/11/2006        635

## INSTRUCTIONS FOR LOUISIANA UCC FINANCING STATEMENT (FORM UCC 1)

Please type or laser print this form. Be sure it is completely legible. Read all instructions, especially instruction 1; correct Debtor name is crucial. Follow instructions completely.

Fill in form very carefully; mistakes may have important legal consequences. If you have questions, consult your attorney. Filing office cannot give legal advice.

If you need to use attachments, use 8-1/2 x 11 inch sheets of paper and put at the top of each sheet the name of the first Debtor, formatted exactly as it appears in Item 1 of this form.

If an Acknowledgment copy is to be returned to other than the Secured Party, please indicate the name and mailing address of the person or firm to whom the copy is to be returned in Item No. 9.

If filer desires (at filer's option), check appropriate box in Item No. 11 to request Search Reports(s) on all or some of the Debtors named in this Financing Statement. The report will list all Financing Statements on file against the designated Debtor on the date of the Report; including this Financing Statement. There is an additional fee for each Report. If you have checked a box in Item No. 11, file Search Request Copy together with the Filing Officer Copy (and Acknowledgment Copy).

1. **Debtor Name** - Enter only one Debtor name in Item 1, (organization's name (1a) or individual's name (1b)). Enter Debtor's exact full legal name. Do not abbreviate.

1a. **Organization Debtor** - "Organization" means an identity having legal identity separate from its owner. A partnership is an organization; a sole proprietorship is not an organization, even if it does business under a trade name. If Debtor is a partnership enter exact full legal name of partnership; you need not enter names of partners as additional Debtors. If Debtor is a registered organization (e.g., corporation, limited partnership, limited liability company, (it is advisable to examine Debtor's current filed charter documents to determine Debtor's correct name, organization type and jurisdiction.)

1b. **Individual Debtor** - "Individual" means a natural person; this includes a sole proprietorship, whether or not operating under a trade name. Don't use refixes (Mr., Mrs.) or titles (e.g., M.D.) Titles of lineage (e.g., Jr., Sr., III) are included in the last name field following the family name and preceded by a comma (Smith, Jr.). Use married woman's personal name (Mary Smith, not Mrs. John Smith). Enter individual Debtor's family name in the Last Name box (followed by a title of lineage, if applicable), first given name in First Name box and all additional given names in Middle Name box. Do not use Debtor's trade name, DBA, AKA, PKA, division names, etc. in place of or combined with Debtor's legal name; you may add such other names as additional Debtors if you wish (but this is neither required nor recommended).

1c. An address is always required for the Debtor(s) named in 1a or 1b.

1d. Louisiana law does not require Debtor's taxpayer identification number-social security or employer identification number, however; it may be required in some states.

1e,f,g. "Additional information re organization Debtor" is always required. Type of organization and jurisdiction of organization as well as Debtor's exact legal name can be determined from Debtor's current filed charter document. Organization ID#, if any, is assigned by the agency where the charter document was filed; this is different from tax ID#. This should be entered preceded by the 2-charter U.S. Postal identification of state of organization if one of the United States (e.g., CA 12345, for California Corporation whose organization ID# is 12345. If agency does not assign organizational #, check box in Item 1g indicating "none".

2. If an additional Debtor is included, complete Item 2, determined and formatted per instruction 1. To include further additional Debtors, or one or more additional Secured Parties, attach a 8-1/2 x 11 inch sheet of paper. Head each additional sheet with the Debtor's name. Follow instruction 1 for determining and formatting additional names or use of the National UCC Financing Statement Addendum (UCC1ad) is also acceptable.

3. Enter information for Secured Party or Total Assignee, determined and formatted per instruction 1. If there is more than one Secured Party, see instruction 2. If there has been a total assignment of the Secured Party's interest; prior to filing this form, you may enter Total Assignee's name and address in Item 3.

4. Use Item 4 to indicate the collateral covered by the Financing Statement. If space in Item 4 is insufficient, attach a 8 1/2 x 11 additional sheet of paper.

5. If collateral is timber to be cut or as-extracted collateral, or if this Financing Statement is filed as a fixture filing, check appropriate box in Item 5; attach a description of the real estate; and if Debtor is not a record owner of the described real estate, also provide in Item 5b, the name of the record owner. Note: Louisiana law does not require these financing statements to be filed in the real estate records even though the immovable property legal description is required to be attached; instead they are filed in the UCC records of any Louisiana filing office (see below).

6a. This applies if Debtor is a Transmitting Utility or if the Financing Statement relates to a Public Finance Transaction. Check only if applicable and check only one box.

6b. This applies if Debtor is a trust or Trustee acting with respect to property held in trust or is a decedent's estate. Check if applicable and check only one box.

7. If filer desires (at filer's option) to use titles of lessee and lessor, or consignee and consignor, or seller and buyer (in case of accounts or chattel paper) or bailee and bailor instead of Debtor and Secured Party, check appropriate box in Item 7. If this is an agricultural lien (as defined in applicable Commercial Code) filing or is otherwise not a UCC security interest filing (e.g., a tax lien, etc.) check appropriate box in Item 7.

8. **PROPER PLACE TO FILE:** UCC-1 Financing Statement and attachments may be filed with any Louisiana Parish Clerk of Court or with the Recorder of Mortgages in Orleans Parish (without regard to the debtor's address or the location of the collateral or of any related immovable).
   **DO NOT FILE WITH THE SECRETARY OF STATE.**

636

581

## SHEET "A"

### FIRST DEBTOR: LLOG Exploration Offshore, Inc.

### ADDITIONAL DEBTOR

Davis Offshore, L.P.
1360 Post Oak Boulevard, Suite 2400
Houston, Texas 77056

### ADDITIONAL SECURED PARTY

Davis Offshore, L.P.
1360 Post Oak Boulevard, Suite 2400
Houston, Texas 77056

582

637

# MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT
## (LOUISIANA)

To be filed in the conveyance records and in the mortgage records and as a non-standard financing statement in accordance with Paragraph 6.0 herein.

**This document will serve to amend and replace that Memorandum of Operating Agreement and Financing Statement (Louisiana) filed in Conveyance Book No. 1865, Entry No. 1171844, Mortgage Book No. 1638, Entry 1171844, and Uniform Commercial Code Book under Entry No. 55 1171844 of the parish records of Terrebonne Parish, Louisiana.**

**1.0**  This Memorandum of Operating Agreement and Financing Statement (Louisiana) (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of LLOG Exploration Offshore, Inc., Louisiana corporation, whose taxpayer identification number is 72-1322580 and whose address is 1001 Ochsner Boulevard, Suite 200, Covington, Louisiana 70433 (the "Operator"), and the undersigned, duly authorized representative of Davis Offshore, L.P., whose taxpayer identification number is 94-3374031 and whose address is 1360 Post Oak Blvd, Suite 2400, Houston, Texas 77056 (the "Non-Operating Party").

**2.0**  The Operator and the Non-Operating Party are parties to that certain Operating Agreement dated the 12th day of December, 2002 (the "Operating Agreement"), which Operating Agreement provides for the development and production of crude oil, natural gas and associated substances from the lands and oil and gas leases described in Exhibit "A" of the Operating Agreement and in Attachment "1" to this Memorandum (hereinafter called the "Contract Area") and which designates LLOG Exploration Offshore, Inc. as the Operator, to conduct such operations for itself and the Non-Operating Party. All such leases and any future oil and gas leases covering lands included within the Contract Area that may be acquired by the Operator and the Non-Operating Party (including substitutions for or replacements of existing leases) are hereinafter called the "Lease."

**3.0**  Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the parties of their respective share of costs and performance of other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, (c) includes non-consent clauses which establish that parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Leases or portions thereof involved in such operations, (d) grants each party to the Operating Agreement the right to take in kind its proportionate share of all oil and gas produced from the Contract Area, and (e) includes a

1

volumetric Gas Balancing Agreement which is attached as Exhibit "D" to the Operating Agreement.

**4.0** The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

**5.0** In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operating Party set forth in the Operating Agreement, the Operator and the Non-Operating Party hereby agree as follows:

    **5.1** Each Non-Operating Party hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Lease or included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

    **5.2** Each Non-Operating Party hereby grants to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the Lease or the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof. The interest of the Non-Operating Party in and to the oil and gas produced from or attributable to the Lease or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent susceptible under applicable law, the security interest granted by each Non-Operating Party hereunder covers (i) all substitutions, replacements, and accessions to the property of such Non-Operating Party described herein and is intended to cover all of the rights, titles, and interests of such Non-Operating Party in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-Operating Party in connection with the Lease or the Contract Area, or the oil and gas produced from or

584     639

attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-Operating Party in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of such Non-Operating Party in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease or the Contract Area.

5.3 To the extent susceptible under applicable law, the mortgage and the security interest granted by each Non-Operating Party in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by such Non-Operating Party to the Operator of all of its obligations and indebtedness of every kind and nature, whether now owed by such Non-Operating Party or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all expenses incurred by the Operator and the Participating Party for (or on account of) any and all operations conducted pursuant

3

to the Operating Agreement ("Costs") and other expenses properly charged to such Non-Operating Party together with (1) interest on such indebtedness, Costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.4 This Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana, with the Operator being the secured party and the Non-Operating Party being the debtors with respect to such filing.

5.5 The maximum amount for which the mortgage herein granted by each Non-Operating Party shall be deemed to secure the obligations and indebtedness of such Non-Operating Party to the Operator as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 (the "Limit of the Mortgage of each Non-Operating Party"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of each Non-Operating Party to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of each Non-Operating Party, the liability of each Non-Operating Party under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against such Non-Operating Party for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of such Non-Operating Party pursuant to the Operating Agreement.

5.6 The Operator hereby grants to each Non-Operating Party a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Lease or included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.7 The Operator hereby grants to each Non-Operating Party a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the offshore blocks covered by the Lease or the Contract Area or attributable to the Lease or the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale

4

of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Lease or the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Lease or the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease or the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof. The interest of the Operator in and to the oil and gas produced from or attributable to the Lease or the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease or the Contract Area. To the extent susceptible under applicable law, the security interest granted by the Operator hereunder covers (i) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Lease or the Contract Area, or the oil and gas produced from or attributable to the Lease or the Contract Area, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area, including the following:

(1) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease or the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease or the Contract Area;

(2) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and

5

gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1," to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Lease or the Contract Area; and

(3) all of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease or the Contract Area.

5.8 To the extent susceptible under applicable law, the mortgage and the security interest granted by the Operator in the Operating Agreement and this Memorandum shall secure (a) the complete and timely performance of and payment by the Operator to the Non-Operating Party of all of its obligations and indebtedness of every kind and nature, whether now owed or hereafter arising pursuant to the Operating Agreement and this Memorandum, and (b) the payment of all Costs and other expenses properly charged to the Operator, together with (1) interest on such indebtedness, Costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (2) reasonable attorneys' fees, (3) court costs, and (4) other directly related collection costs.

5.9 For the purposes of the security interest in favor of the Non-Operating Party, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana, with the Non-Operating Party being the secured parties and the Operator being the debtor with respect to such filing.

5.10 The maximum amount for which the mortgage herein granted by the Operator shall be deemed to secure the obligations and indebtedness of the Operator to all Non-Operating Party as stipulated herein is hereby fixed in an amount equal to $25,000,000.00 in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of non-operators party to the Operating Agreement at any time. Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operating Party is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operating Party shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6

588    643

6.0     To serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operating Party to their interests in and to the Lease and the Contract Area and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the offshore blocks covered by the Lease or included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish or parishes, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0     If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each party to the Operating Agreement and any successor to such party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured party under the Uniform Commercial Code. If any Non-Operating Party does not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of such Non-Operating Party's production and collect such indebtedness out of the proceeds from the sale of such Non-Operating Party's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of such Non-Operating Party's share of production. Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by such Non-Operating Party and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and such Non-Operating Party.

8.0     Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all parties to the Operating Agreement. Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all parties who have executed or ratified this Memorandum. In addition, at any time prior to the filing of such release and termination instrument, each of the Operator and the Non-Operating Party shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

9.0     It is understood and agreed by the parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights

7

589

644

and obligations of the parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

**10.0** This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

**11.0** A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof. By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

**12.0** This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument. For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of each Non-Operating Party, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured party, and another filing for the Non-Operating Party, as secured parties. The respective addresses of the Operator, as both secured party and debtor, and the Non-Operating Party, as both debtors and secured parties, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

**13.0** The Operator and the Non-Operating Party hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

**14.0** Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

8

590                                                                                                          645

EXECUTED on the dates set forth below each signature but effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 above.

**OPERATOR:**

**WITNESSES:**

*[signature]*
Printed Name of Witness: Kay Bonara

*[signature]*
Printed Name of Witness: Alisha Viger

**LLOG Exploration Offshore, Inc.**

By: *[signature]*
Printed Name: Gerald P. Whitman
Title: Vice President - Land
Date: July 15, 2009

**ACKNOWLEDGMENT**

**OPERATOR:**

**STATE OF LOUISIANA**
**PARISH OF ST. TAMMANY**

On this 15 day of July 2009, before me, appeared **Gerald P. Whitman**, to me personally known, who, being by me duly sworn, did say that he is the Vice President - Land of **LLOG Exploration Offshore, Inc.**, a Louisiana corporation, and that the foregoing instrument was signed on behalf of the corporation by authority of its Board of Directors and that he acknowledged the instrument to be the free act and deed of the corporation.

*[signature]*
NOTARY PUBLIC

Judy Reimel
Notary Public - St. Tammany Parish
My Commission Issued for Life
Notary No. 60007

9

591                                                                                                                        646

**WITNESSES:**

*[signature]*
Printed Name of Witness: Earl Strengel

*[signature]*
Printed Name of Witness: J.A. Sansbury

**NON-OPERATING PARTY:**

Davis Offshore, L.P.

By: *[signature]*
Printed Name: George Canjar
Title: Cheif Operating Officer
Date:

## ACKNOWLEDGMENT
## NON-OPERATING PARTY:

**STATE OF TEXAS**
**COUNTY OF HARRIS**

On this 21st day of July, 2009, before me, appeared George Canjar, to me personally known, who, being by me duly sworn, did say that he is the Chief Operating Officer Davis Offshore, L.P., a Limited Partnership, and that the foregoing instrument was signed on behalf of the partnership and that he acknowledged the instrument to be the free act and deed of the partnership.

JEANETTE MCKINZIE
Notary Public, State of Texas
My Commission Expires
July 07, 2013

*[signature]*
Notary Public

10

592

647

## ATTACHMENT "1"

### Attached to and made a part of that certain
### Memorandum of Operating Agreement and Financing Statement (Louisiana)
### dated effective December 12, 2002 by and between
### LLOG Exploration Offshore, Inc. and Davis Offshore, L.P.

## CONTRACT AREA, WORKING INTEREST OF THE PARTIES, OPERATOR AND REPRESENTATIVES

**I.** **Contract Area**:

Oil and Gas Lease dated effective June 1, 2002, bearing Serial No. OCS-G 24154, between the United States of America, acting through the Regional Director, Gulf of Mexico OCS Region, Minerals Management Service, as Lessor, LLOG Exploration Offshore, Inc. and Davis Offshore, L.P., as Lessee, covering and affecting lands described as Green Canyon, Block 157, Official Protraction Diagram, NG 15-03.

Oil and Gas Lease dated effective May 1, 1990, bearing Serial No. OCS-G 12210, between the United States of America, acting through the Regional Director, Gulf of Mexico OCS Region, Minerals Management Service, as Lessor, and BP Exploration Inc., as Lessee, covering and affecting lands described as Garden Banks, Block 201, OCS Official Protraction Diagram, NG 15-3, insofar and only insofar as lease covers the northeast quarter (NE/4) from the surface down to 17,000 feet true vertical depth subsea.

**II.** **Working Interests of the Parties**:

| | |
|---|---|
| LLOG Exploration Offshore, Inc. | 85% |
| Davis Offshore, L.P. | 15% |

**III.** **Operator:** **LLOG Exploration Offshore, Inc.**

**IV.** **Addresses/Names of Representatives:**

LLOG Exploration Offshore, Inc.
11700 Katy Freeway, Suite 295
Houston, Texas 77079
Attn: Mr. Michael Altobelli
Telephone: (281) 752-1105
Facsimile: (281) 752-1190

Davis Offshore, L.P.
1360 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Attn: Mr. Ed Stengel
Telephone: (713) 439-6774
Facsimile: (713) 961-4573

**End of Exhibit**

11