Direct Access - Filing Details                                      Page 1 of 1

**Louisiana Secretary of State**
**UCC Filing Detail**
**(Not a Certified Copy)**

Notice: All Filings after 1/7/2021 are subject to change or removal.

| | |
|---|---|
| **Original File#:** | 26-310705 |
| **Filed:** | 1/11/2010 at 11:45 AM |
| **Parish:** | JEFFERSON |

**Debtors: (1)**

LLOG EXPLORATION OFFSHORE, L.L.C.
Tax ID: #####0000
1001 OCHSNER BOULEVARD, SUITE 200
COVINGTON, LA 70433

**Original Secured Parties: (1)**

JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT
Tax ID#: #####0000
712 MAIN STREET, 8TH FLOOR
HOUSTON, TX 77002-3009

**Property: FIXTURE FILING**

NLL RIGHT,TITLE AND INTEREST IN AND TO ALL OF THE MORTGAGED PROPERTY AS DEFINED IN,AND
MORE SPECIFICALLY DESCRIBED IN,THAT CERTAIN MORTGAGE,DEED OF TRUST,ASSIGNMENT,SECURITY
AGREEMENT,FINANCING STATEMENT AND FIXTURE FILING ATTACHED ----ETC

**Subsequent Filings: (5)**

| Type | Details |
|---|---|
| **Assignment:** | 26-320033 filed on 7/11/2011 at 10:12 AM |
| | Debtors: (1)<br>LLOG EXPLORATION OFFSHORE, L.L.C.<br>Tax ID: #####0000Tax ID:    1001 OCHSNER BOULEVARD, SUITE 200<br>COVINGTON, LA 70433 |
| | Assignees: (1)<br>MACQUARIE BANK LIMITED, AS ADMINISTRATIVE AGENT<br>Tax ID: #####0000<br>C/O MACQUARIE BANK LIMITED - REPRESENTATIVE OFFICE<br>ONE ALLEN CENTER, 500 DALLAS STREET, SUITE 3250<br>HOUSTON, TX 77002 |
| **Assignment:** | 26-333014 filed on 6/28/2013 at 3:15 PM |
| | Assignees: (1)<br>CITIBANK, N.A., AS ADMINISTRATIVE AGENT<br>Tax ID: #####0000<br>1615 BRETT RD<br>NEW CASTLE, DE 19720 |
| **Amendment:** | 26-334540 filed on 9/6/2013 at 12:22 PM<br>COLLATERAL DELETED THE PROPERTY INTEREST DESCRIBED IN THAT CERTAIN<br>PARTIAL RELEASE OF MORTGAGE FROM CITIBANK, NA., AS ADMINISTRATIVE AGENT,<br>AS MORTGAGEE, ATTACHED HERETO AS EXHIBIT A AND MADE A PART HEREOF |
| **Continuation:** | 26-340094 filed on 7/21/2015 at 12:37 PM |
| **Continuation:** | 26-388712 filed on 10/24/2019 at 3:34 PM |

[Print]

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
Suzanne Snow (713) 236-2688

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
┌                                              ┐
         Return acknowledgment to:
                    ★
         Capitol Services, Inc.
         P.O. Box 1831   Austin, TX 78767
              800/345-4647
└                                              ┘
```

26310705

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LLOG EXPLORATION OFFSHORE, L.L.C. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|
| 1001 Ochsner Boulevard, Suite 200 | Covington | LA | 70433 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Limited Liability Company | LOUISIANA | 34525311K ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTALCODE | COUNTRY |
|---|---|---|---|---|
| 712 MAIN STREET, 8TH FLOOR | HOUSTON | TX | 77002-3009 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All right, title and interest in and to all of the Mortgaged Property as defined in, and more specifically described in, that certain Mortgage, Deed of Trust, Assignment, Security Agreement, Financing Statement and Fixture Filing attached hereto as Annex A, including, without limitation, all of Debtor's oil and gas leases and all fee, mineral overriding royalty and royalty interests related thereto, unitization, unit operating and communitization and pooling agreements, production sale contracts, operating equipment, permits, water rights, joint operating agreements, material contracts and all equipment, inventory, fixtures, accounts, as extracted collateral, chattel paper, documents and instruments, goods, contract rights, intellectual property, general intangibles, and other personal property related thereto, and all products and proceeds of, and accessions to, any of the foregoing, whether now owned or hereafter acquired or coming into existence, wherever located.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]
7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
FILE IN   Jefferson Parish, LA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

24684355 05055970

01/11/2010 11:45:15 AM JEFF PAR 2494078 LDR
26310705 BOOK PAGE

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | LLOG EXPLORATION OFFSHORE, L.L.C. | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

**10. MISCELLANEOUS:**

LLOG Exploration Offshore, L.L.C., is the successor by conversion to LLOG Exploration Offshore, Inc., pursuant to a Conversion Application effective as of December 31, 2009, a copy of which is attached hereto as Annex B.

### 26310705

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – insert only one name (11a or 11b) – do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | □ NONE |
|---|---|---|---|---|---|

**12.** □ ADDITIONAL SECURED PARTY'S  or  □ ASSIGNOR S/P'S   NAME – insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**13.** This FINANCING STATEMENT covers □ timber to be cut or ☒ as-extracted collateral, or is filed as a ☒ fixture filing.

**14.** Description of real estate:

See Exhibit A to the Mortgage, Deed of Trust, Assignment, Security Agreement, Financing Statement and Fixture Filing attached hereto as Annex A.

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check only if applicable and check only one box.

Debtor is a □ Trust or □ Trustee acting with respect to property held in trust □ Decedent's Estate

**18.** Check only if applicable and check only one box.

□ Debtor is a TRANSMITTING UTILITY

□ Filed in connection with a Manufactured-Home Transaction – effective 30 years

□ Filed in connection with a Public-Finance Transaction – effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

24684355 05055970

ANNEX A

**2**6310705

**MORTGAGE, DEED OF TRUST, ASSIGNMENT, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING**

FROM

LLOG EXPLORATION OFFSHORE, INC.
(Taxpayer I.D. No. 72-1322580)
(Organizational No.34525311D )

TO

Ronald Dierker, Trustee

AND

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent
(Taxpayer I.D. No. 13-4994650)

Dated as of December 18, 2009

---

A CARBON, PHOTOGRAPHIC, FACSIMILE, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.

THIS INSTRUMENT SECURES PAYMENT OF FUTURE ADVANCES. THE MAXIMUM PRINCIPAL AMOUNT SECURED BY THIS MORTGAGE IS SET FORTH IN ARTICLE I HEREOF. THIS MORTGAGE ALSO SECURES OTHER AMOUNTS PROVIDED HEREIN AND AT LAW. THIS INSTRUMENT SECURES AN OBLIGATION THAT MAY INCREASE OR DECREASE FROM TIME TO TIME.

THOSE PORTIONS OF THE MORTGAGED PROPERTY THAT ARE MINERALS OR OTHER SUBSTANCES OF VALUE THAT MAY BE EXTRACTED FROM THE EARTH (INCLUDING, WITHOUT LIMITATION, OIL AND GAS), AND THE ACCOUNTS RELATING THERETO, WILL BE FINANCED AT THE WELLHEADS OF THE WELLS LOCATED NOW OR HEREAFTER ON THE PROPERTIES DESCRIBED IN EXHIBIT A HERETO. THIS INSTRUMENT ALSO COVERS AS-EXTRACTED COLLATERAL AND GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN. THIS INSTRUMENT IS TO BE FILED OF RECORD, AMONG

26310705

OTHER PLACES, IN THE REAL ESTATE RECORDS OF THE COUNTIES, RECORDING DISTRICTS AND/OR PARISHES REFERENCED IN EXHIBIT A HERETO AND SUCH FILING SHALL SERVE, AMONG OTHER PURPOSES, AS A FIXTURE FILING.  THE MORTGAGOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE CONCERNED, WHICH INTEREST IS DESCRIBED IN EXHIBIT A HERETO.

A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE MORTGAGOR UNDER THIS MORTGAGE.

THIS INSTRUMENT WAS PREPARED BY AND

WHEN RECORDED AND/OR FILED
RETURN TO:

Anne Kersch, Esq.
Mayer Brown LLP
700 Louisiana, Suite 3400
Houston, Texas  77002-2730

24683876 05055970

26310705

## MORTGAGE, DEED OF TRUST, ASSIGNMENT, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING

THIS MORTGAGE, DEED OF TRUST, ASSIGNMENT, SECURITY AGREEMENT, FINANCING STATEMENT AND FIXTURE FILING (this "Mortgage"), dated as of December 18, 2009, is from LLOG EXPLORATION OFFSHORE, INC., a Louisiana corporation having its principal office and mailing address at 1001 Ochsner Boulevard, Suite 200, Covington, Louisiana, 70433, (herein called the "Mortgagor"), to Ronald Dierker, of Houston, Harris County, Texas, as trustee, whose mailing address is c/o JPMorgan Chase Bank, N.A., 712 Main Street, 8th Floor South, Houston, Harris County, Texas 77002-3009 ("Trustee"), and JPMORGAN CHASE BANK, N.A., having its principal office and mailing address at 712 Main Street, 8th Floor South, Houston, Harris County, Texas 77002-3009, as administrative agent for the Lender Parties referred to below (herein, in such capacity, together with any successor(s) thereto in such capacity, called the "Administrative Agent").

1.     LLOG Exploration Company, L.L.C. (the "Borrower"), a Louisiana limited liability company and an Affiliate (as defined in the Credit Agreement and used herein with the same meaning) of the Mortgagor, Mortgagor and the other Guarantors (as defined below) party thereto (such other Guarantors collectively with the Borrower and Mortgagor, the "Credit Parties"), the Administrative Agent and such other various financial institutions as are or may become parties thereto, as lenders (collectively, together with their respective successors and permitted assigns, the "Lenders"), and JPMorgan Chase Bank, N.A., as letter of credit issuing bank (in such capacity together with its successors in such capacity, the "Issuing Bank") have entered into a certain Amended and Restated Credit Agreement, dated as of June 27, 2008 and as amended by that certain First Amendment, Limited Waiver and Assignment, dated as of March 13, 2009, that certain Second Amendment to Credit Agreement, dated as of August 26, 2009 and that certain Third Amendment to Credit Agreement, dated as of October 7, 2009 (as the same may be amended, modified, supplemented or restated from time to time, herein called the "Credit Agreement"), pursuant to which, upon the terms and subject to the conditions therein set forth (i) the Lenders have agreed to make Loans (as defined in the Credit Agreement and used herein with the same meaning) to the Borrower, and (ii) Issuing Bank has agreed to issue, under the several responsibilities of the Lenders, one or more Letters of Credit (as defined in the Credit Agreement and used herein with the same meaning) for the account and in the name of the Borrower (and for the benefit of Mortgagor, Borrower and the other Guarantors).

2.     The Mortgagor or other Credit Parties have entered into or may enter into certain Swap Agreements with one or more Lenders or Affiliates of the Lenders (the "Lender Counterparties") pursuant to the terms of the Credit Agreement (the "Lender Group Swap Agreements").

3.     Some or all of the Loans to be made by the Lenders pursuant to the terms of the Credit Agreement may be evidenced by certain promissory notes (the "Notes") issued by the Borrower from time to time (if any), each of which shall be payable to the order of a Lender, each bearing interest at the rates provided for therein, and containing provisions for payment of attorneys' fees and acceleration of maturity upon an Event of Default, as therein set forth.

26310705

4.     The Mortgagor is an Affiliate of Borrower and has guaranteed the indebtedness of the Borrower and each other Credit Party arising under the Credit Agreement, each other Loan Document and the Lender Group Swap Agreements and all other obligations of the Borrower and each other Credit Party arising in connection with the Credit Agreement, each other Loan Document and each Lender Group Swap Agreement.

5.     The Mortgagor has covenanted and agreed in the Credit Agreement to deliver this Mortgage and the Mortgagor has duly authorized the execution, delivery and performance of this Mortgage.

6.     Capitalized terms not otherwise defined herein shall have the respective meanings provided for such terms in the Credit Agreement.  For all purposes of this instrument, unless the context otherwise requires:

A.     "Guarantor" means Mortgagor, LLOG Exploration & Production Co., a Louisiana corporation, LLOG Exploration Texas, LP, a Texas limited partnership, LLOG Resources, LLC, a Louisiana limited liability company, LLOG 2007-2008 Program, L.L.C., a Louisiana limited liability company, LLOG Energy, L.L.C., a Louisiana limited liability company or any Person that now or hereafter executes and delivers a guaranty to Administrative Agent in accordance with the Credit Agreement.

B.     "Hydrocarbons" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons, and all products refined or separated therefrom.

C.     "lands described in Exhibit A" shall include any lands that are either described in Exhibit A or the description of which is incorporated in Exhibit A by reference to another instrument or document, and shall also include any lands now or hereafter unitized or pooled with lands that are either described in Exhibit A or the description of which is incorporated in Exhibit A by reference to another instrument or document.

D.     "Lender Group Swap Agreement" shall have the meaning set forth in the second recital hereof.

E.     "Lender Parties" shall mean the Administrative Agent, any Issuing Bank, any Lender, any Lender Counterparty (so long as Lender Counterparty, or an Affiliate thereof, is a Lender under the Credit Agreement) and each of their respective successors, transferees and assigns.  "Lender Party" means any of the Lender Parties.

F.     "Mortgaged Property" shall mean the properties, rights and interests hereinafter described and defined as the Mortgaged Property.

G.     "oil and gas leases" shall include oil, gas and mineral leases, subleases and assignments thereof, operating rights, and shall also include subleases and assignments of operating rights.

26310705

H.    "Operating Equipment" shall mean all surface or subsurface machinery, goods, equipment, fixtures, inventory, facilities, supplies or other property of whatsoever kind or nature (excluding drilling rigs, trucks, automotive equipment or other property taken to the premises to drill a well or for other similar temporary uses) now or hereafter located on or under any of the lands described in Exhibit A that are useful for the production, gathering, treatment, processing, storage or transportation of Hydrocarbons (together with all accessions, additions and attachments to any thereof), including, but not by way of limitation, all oil wells, gas wells, water wells, injection wells, casing, tubing, tubular goods, rods, pumping units and engines, christmas trees, platforms, derricks, separators, compressors, gun barrels, flow lines, tanks, gas systems (for gathering, treating and compression), pipelines (including gathering lines, laterals and trunklines), chemicals, solutions, water systems (for treating, disposal and injection), power plants, poles, lines, transformers, starters and controllers, machine shops, tools, storage yards and equipment stored therein, buildings and camps, telegraph, telephone and other communication systems, roads, loading docks, loading racks and shipping facilities.

I.    "Permitted Encumbrances" shall mean the Liens described in and permitted pursuant to the terms of Section 7.02 of the Credit Agreement.

J.    "Production Sale Contracts" shall mean contracts now in effect, or hereafter entered into by the Mortgagor, or entered into by the Mortgagor's predecessors in interest, for the sale, purchase, exchange, gathering, transportation, treating or processing of Hydrocarbons produced from the lands described in Exhibit A attached hereto and made a part hereof.

K.    "Secured Indebtedness" shall have the meaning set forth in Section 1.2 hereof.

L.    "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of Texas (as the Uniform Commercial Code – Secured Transactions), and the terms "Account", "Account Debtor", "As-Extracted Collateral", "Chattel Paper", "Contract Rights", "Deposit Account", "Document", "General Intangibles", "Goods", "Equipment", "Fixtures", "Inventory", "Instrument", and "Proceeds" shall have the respective meanings assigned to such terms in the Uniform Commercial Code.

NOW, THEREFORE, the Mortgagor, for and in consideration of the premises and of the debts and trusts hereinafter mentioned, has GRANTED, BARGAINED, SOLD, WARRANTED, MORTGAGED, ASSIGNED, PLEDGED, HYPOTHECATED, TRANSFERRED AND CONVEYED, and by these presents does GRANT, BARGAIN, SELL, WARRANT, MORTGAGE, ASSIGN, PLEDGE, HYPOTHECATE, TRANSFER AND CONVEY: (i) unto the Trustee, in trust, with a POWER OF SALE, for the use and benefit of the Administrative Agent, for itself and as agent for the Lender Parties, all the Mortgagor's right, title and interest, whether now owned or hereafter acquired, in and to all of the hereinafter described properties, rights and interests that are located in (or cover properties located within) the State of Texas or that are located within (or cover property located within) the offshore area over which the United States of America asserts jurisdiction and to which the laws of the State of Texas are applicable

**26310705**

with respect to this Mortgage and/or the lien or security interests created hereby;· (ii) unto the Administrative Agent, for itself and as agent for the Lender Parties, all the Mortgagor's right, title and interest, whether now owned or hereafter acquired, in and to all of the hereinafter described properties, rights and interests that are located in (or cover properties located within) the State of Louisiana, or that are located within (or cover property located within) the offshore area over which the United States of America asserts jurisdiction and to which the laws of any of such states are applicable with respect to this Mortgage and/or the lien or security interests created hereby; and, (iii) insofar as such properties, rights and interests consist of Equipment, General Intangibles, Accounts, Inventory, Fixtures, As-Extracted Collateral, Chattel Paper, Contract Rights, Documents, Deposit Accounts, Goods, Instruments, Proceeds of collateral or any other personal property of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code, rights and interests (collectively, the "Collateral"), the Mortgagor hereby grants to Administrative Agent, for itself and as agent for the Lender Parties, a security interest in the Collateral to the full extent of Mortgagor's legal and beneficial interest therein, whether now owned or hereafter acquired; namely:

(a)    the lands described in Exhibit A, and the oil and gas leases, the fee, mineral, overriding royalty, royalty and other interests that are specifically described in Exhibit A,

(b)    the presently existing and (subject to the terms of Section 2.7 hereof) hereafter arising unitization, unit operating, communitization and pooling agreements and the properties covered and the units created thereby (including, without limitation, all units formed under orders, regulations, rules, approvals, decisions or other official acts of any federal, state or other governmental agency having jurisdiction) that are specifically described in Exhibit A or that relate to any of the properties and interests specifically described in Exhibit A,

(c)    the Hydrocarbons that are in, under, upon, produced or to be produced from the lands described in Exhibit A,

(d)    the Production Sale Contracts,

(e)    the Operating Equipment,

(f)    without duplication of any other provision of this granting clause, Equipment, Fixtures and other Goods necessary or used in connection with, and Inventory, Accounts, General Intangibles, As-Extracted Collateral, Chattel Paper, Deposit Accounts, Documents, Instruments and Proceeds arising from, or relating to, the properties and other interests described in Exhibit A, and

(g)    any and all liens and security interests in Hydrocarbons securing the payment of Proceeds from the sale of Hydrocarbons, including but not limited to those liens and security interests provided by the statutes of Texas or Louisiana, as applicable;

together with any and all corrections or amendments to, or renewals, extensions or ratifications of, or replacements or substitutions for, any of the same, or any instrument relating thereto, and all accounts, contracts, contract rights, options, nominee agreements, operating agreements,

26310705

processing agreements, farmin agreements, farmout agreements, joint venture agreements, exploration agreements, bottomhole agreements, dryhole agreements, support agreements, acreage contribution agreements, insurance policies, title opinions, title abstracts, title materials and information, files, records, writings, data bases, information, systems, logs, well cores, fluid samples, production data and reports, well testing data and reports, maps, seismic and geophysical, geological and chemical data and information, interpretative and analytical reports of any kind or nature (including, without limitation, reserve studies and reserve evaluations), computer hardware and software and all documentation therefor or relating thereto (including, without limitation, all licenses relating to or covering such computer hardware, software and/or documentation), trade secrets, trademarks, service marks and business names and the goodwill of the business relating thereto, copyrights, copyright registrations, unpatented inventions, patent applications and patents, rights-of-way, franchises, easements, servitudes, surface leases, permits, licenses, tenements, hereditaments, appurtenances, general intangibles, rents, issues, profits, products and proceeds, whether now or hereafter existing or arising, used or useful in connection with, covering, relating to, or arising from or in connection with, any of the aforesaid in this granting clause referenced, and all other things of value and incident thereto (including, without limitation, any and all liens, lien rights, security interests and other rights and interests) that the Mortgagor might at any time have or be entitled to, all the aforesaid properties, rights and interests, to the full extent of Mortgagor's right, title and interest, including Mortgagor's entire legal and beneficial interest therein, whether now owned or hereafter acquired, together with any additions thereto that may be subjected to the lien and security interest of this instrument by means of supplements hereto, being hereinafter called the "Mortgaged Property".

Subject, however, to (i) the Permitted Encumbrances (other than with respect to any working interests beneficially owned by any Insider (as such term is defined in the Credit Agreement)), (ii) the assignment of production contained in Article III hereof, but only insofar and so long as said assignment of production is not inoperative under the provisions of Section 3.5 hereof, and (iii) the condition that none of the Trustee, the Administrative Agent or any of the Lender Parties shall be liable in any respect for the performance of any covenant or obligation of the Mortgagor in respect of the Mortgaged Property.

TO HAVE AND TO HOLD the Mortgaged Property unto the Trustee and the Administrative Agent (as the case may be) forever to secure the payment of the Secured Indebtedness and to secure the performance of the obligations of the Mortgagor herein contained. The Mortgaged Property is to remain so specially mortgaged, affected and hypothecated unto and in favor of the Administrative Agent to secure payment of the Secured Indebtedness (and the performance of the obligations of the Mortgagor herein contained) until full and final payment or discharge of the Secured Indebtedness.

The Mortgagor, in consideration of the premises, and to induce the Lenders to make the Loans to the Borrower, and to induce each Issuing Bank to issue Letters of Credit for the account of the Borrower and for the benefit of the Mortgagor, Borrower and the other Guarantors, and to induce the Lender Counterparties to enter into hedging arrangements with Mortgagor and the other Credit Parties pursuant to the Lender Group Swap Agreements, hereby covenants and agrees with the Trustee, the Administrative Agent and the other Lender Parties as follows:

26310705                ARTICLE I

Indebtedness Secured

1.1    Items of Indebtedness Secured.  The following items of indebtedness are secured hereby:

(a)    all Obligations, Guaranteed Obligations and all other obligations and liabilities of the Mortgagor, the Borrower or any other Guarantor to any Lender Party under and in connection with the Credit Agreement, any of the other Loan Documents or any Lender Group Swap Agreements;

(b)    any sums advanced or expenses or costs incurred by the Trustee, the Administrative Agent or the Lender Parties (or any receiver appointed hereunder) that are made or incurred pursuant to, or permitted by, the terms hereof, plus interest thereon at the rate herein specified or otherwise agreed upon, from the date of the advances or the incurring of such expenses or costs until reimbursed; and

(c)    any extensions, renewals, continuations, rearrangements or restructurings of any item of indebtedness described in the immediately preceding subparagraphs above, whether or not each Mortgagor executes any extension agreement or renewal instruments.

1.2    Indebtedness Defined.  All the above items of indebtedness are hereinafter collectively referred to as the "Secured Indebtedness".

1.3    Limit on Principal Amount of Secured Indebtedness; Future Advances.  This instrument is given by Mortgagor to secure the Secured Indebtedness, including indebtedness in the principal amount outstanding from time to time under the Credit Agreement, any Notes and the Letters of Credit.  The Mortgagor, the Trustee, the Administrative Agent and the other Lender Parties expressly intend that this instrument secure, and this instrument shall secure, a line of credit and other additional amounts advanced, from time to time, or other sums that may be advanced or otherwise become due to the Trustee, the Administrative Agent and the other Lender Parties under the Credit Agreement, this instrument or any other Loan Document, or any extension, renewal or modification thereof, including, without limitation, loans made on demand or on a term or revolving credit basis.  The maximum principal amount secured by this instrument, inclusive of interest thereon, unpaid balances of advances made with respect to the Mortgaged Property for the payment of taxes, assessments, insurance premiums, amounts owing with respect to indemnity obligations of the Mortgagor, Borrower or any other Guarantors under the Credit Agreement, this instrument, or any of the other Loan Documents or Lender Group Swap Agreements, costs incurred for the protection of the Mortgaged Property and all other costs, fees or expenses that the Trustee, the Administrative Agent, the Issuing Bank or the other Lender Parties are authorized to pay on Mortgagor's behalf or for which the Mortgagor, Borrower or any other Guarantor is liable under the Credit Agreement, the other Loan Documents, the Lender Group Swap Agreements or this instrument, all of which shall also be secured by this Mortgage, is $750,000,000.  The principal amount of the Secured Indebtedness matures no later than June 27, 2011.

**℥63 1 0 7 0 5**

1.4    <u>Benefit to Mortgagor</u>.  Mortgagor acknowledges and agrees that it is in the best interest of Mortgagor to execute and deliver this instrument, as Mortgagor will receive substantial benefits as a result of the Borrower entering into the borrowing base, revolving credit facility with the Lenders provided for in and evidenced by the Credit Agreement.  Mortgagor further acknowledges and agrees that the value of the consideration received and to be received by Mortgagor is reasonably worth at least as much as the liability and obligation of Mortgagor incurred or arising under Mortgagor's guaranty in the Credit Agreement and this Mortgage, the other Security Instruments, and all related papers and arrangements.  Mortgagor's shareholders, partners, members, directors, and officers (as applicable) have determined that such liability and obligation may reasonably be expected to substantially benefit Mortgagor directly or indirectly.  Mortgagor has had full and complete access to the underlying papers relating to the Loans to Borrower hereinabove described, and all other papers executed by Borrower or any other Guarantor, or any other Person in connection with such Loans, has reviewed them and is fully aware of the meaning and effect of their contents.  Mortgagor is fully informed of all circumstances that bear upon the risks of executing Mortgagor's guaranty and this Mortgage and that a diligent inquiry would reveal.  Mortgagor has adequate means to obtain from Borrower on a continuing basis information concerning such Borrower's financial condition, and is not depending on the Lenders, the Issuing Bank, the Trustee or the Administrative Agent to provide such information, now or in the future.  Mortgagor agrees that neither the Lenders, the Lender Counterparties, the Issuing Bank, the Trustee nor the Administrative Agent shall have any obligation to advise or notify Mortgagor or to provide Mortgagor with any such financial data or information.

### ARTICLE II

### Particular Covenants and Warranties
### of the Mortgagor

2.1    <u>Payment of the Secured Indebtedness</u>.  The Mortgagor will duly and punctually pay all Secured Indebtedness, and duly and punctually perform each and every obligation performable under the Credit Agreement, each other Loan Document and the Lender Group Swap Agreements to which Mortgagor is a party.

2.2    <u>Warranties</u>.  The Mortgagor warrants and represents to the Trustee, the Administrative Agent, the Issuing Bank and the other Lender Parties that (a) the oil and gas leases described in <u>Exhibit A</u> hereto are valid, subsisting leases, superior and paramount to all other oil and gas leases respecting the properties to which they pertain, (b) all producing wells located on the lands described in <u>Exhibit A</u> have been drilled, operated and produced in conformity with all applicable laws, rules and regulations of all authorities having jurisdiction, and are subject to no penalties on account of past production, and such wells are in fact bottomed under and are producing from, and the well bores are wholly within, the lands described in <u>Exhibit A</u>, (c) the Mortgagor, to the extent of the interest specified in <u>Exhibit A</u>, has valid and defensible title to each property right or interest constituting the Mortgaged Property and has a good and legal right to grant and convey the same to the Trustee, it being understood that the Mortgagor's interest in each oil and gas lease shall exceed the Mortgagor's net interest in production from such lease to the extent of the Mortgagor's proportionate share of the burden of all royalties, overriding royalties and other such payments out of production, and (d) the

26310705

Mortgaged Property is free from all encumbrances or liens whatsoever, except as may be specifically set forth in Exhibit A or as permitted by the provisions of Section 2.5(e) hereof. The Mortgagor will warrant and forever defend the Mortgaged Property unto the Trustee against every person whomsoever lawfully claiming the same or any part thereof, and the Mortgagor will maintain and preserve the lien and security interest hereby created so long as any of the Secured Indebtedness remains unpaid.

2.3    Further Assurances. The Mortgagor will

(a)    execute and deliver such other and further instruments and will do such other and further acts as in the opinion of the Trustee or the Administrative Agent may be necessary or desirable to carry out more effectually the purposes of this instrument, including, without limiting the generality of the foregoing, (i) prompt correction of any defect that may hereafter be discovered in the execution and acknowledgment of this instrument, any Note, the Credit Agreement or any other document executed in connection herewith, and (ii) prompt execution and delivery of all notices to parties producing, purchasing or receiving proceeds of production from the Mortgaged Property, and all division orders or transfer orders, any of which, in the opinion of the Administrative Agent, is needed to transfer effectually or to assist in transferring effectually to the Administrative Agent, subject to Section 3.5 hereof, the assigned proceeds of production from the Mortgaged Property; and

(b)    notify the Administrative Agent if at any time Mortgagor shall hold or acquire a "commercial tort claim" (as defined in the Uniform Commercial Code) with respect to or concerning any of the Mortgaged Property within a reasonable time following discovery of the same in a writing signed by the Mortgagor of the brief details thereof and will grant to the Administrative Agent, for the benefit of the Lender Parties, in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Mortgage, with such writing to be in form and substance satisfactory to the Administrative Agent.

2.4    Taxes. Subject to the Mortgagor's right to contest the same, the Mortgagor will promptly pay all taxes, assessments and governmental charges legally imposed upon this instrument or upon the Mortgaged Property, or upon the interest of the Trustee, the Administrative Agent or the other Lender Parties therein, or upon the income and profits thereof.

2.5    Operation of the Mortgaged Property. So long as the Secured Indebtedness or any part thereof remains unpaid, and whether or not the Mortgagor is the operator of the Mortgaged Property, the Mortgagor shall, at the Mortgagor's own expense:

(a)    do all things necessary to keep unimpaired the Mortgagor's rights in the Mortgaged Property and not, except in the ordinary course of business, abandon any well or forfeit, surrender or release any oil and gas lease or any rights in the Mortgaged Property, or enter into any operating agreement with respect to the Mortgaged Property, without the prior written consent of the Administrative Agent;

(b)    cause the lands described in Exhibit A to be maintained, developed, protected against drainage, and continuously operated for the production of Hydrocarbons in a good and workmanlike manner as would a prudent operator, and in accordance with generally

26310705

accepted practices, applicable operating agreements, and all applicable federal, state and local laws, rules and regulations, excepting those being contested in good faith;

(c)     cause to be paid, promptly as and when due and payable, all rentals and royalties payable in respect of the Mortgaged Property, and all expenses incurred in or arising from the operation or development of the Mortgaged Property, except in those being contested in good faith;

(d)     cause the Operating Equipment to be kept in good and effective operating condition, and all repairs, renewals, replacements, additions and improvements thereof or thereto, needful to the production of Hydrocarbons from the lands described in Exhibit A, to be promptly made;

(e)     cause the Mortgaged Property to be kept free and clear of liens, charges and encumbrances of every character, other than (1) the lien and security interest hereof and (2) the Permitted Encumbrances;

(f)     carry and maintain insurance as required by Section 6.05 of the Credit Agreement; and

(g)     as to any part of the Mortgaged Property that may be comprised of interests in the oil and gas leases that are other than working interests or that may be operated by a party or parties other than Mortgagor, Mortgagor's covenants as expressed in this Article II are modified to require that Mortgagor use its best efforts to obtain compliance with such covenants by the working interest owners or the operator or operators of such oil and gas leases or properties, including, without limitation, the exercise by Mortgagor of all rights available to Mortgagor under any operating agreements to which Mortgagor is a party.

2.6     Recording, etc.  The Mortgagor will promptly, and at the Mortgagor's expense, record, register, deposit and file this and every other instrument in addition or supplemental hereto in such offices and places and at such times and as often as may be necessary to preserve, protect and renew the lien and security interest hereof as a valid first lien on and prior perfected security interest in real or personal property (subject in each case to the Permitted Encumbrances other than with respect to any working interests beneficially owned by any Insider (as such term is defined in the Credit Agreement)), as the case may be, and the rights and remedies of the Trustee and of the Administrative Agent, the Issuing Bank and the other Lender Parties, and otherwise will do and observe all things or matters necessary or expedient to be done or observed by reason of any law or regulation of any State or of the United States of America or of any other competent authority, for the purpose of effectively creating, maintaining and preserving the lien and security interest hereof on and in the Mortgaged Property.

2.7     Sale or Mortgage of the Mortgaged Property.  Except as expressly permitted by Section 7.04 of the Credit Agreement, the lien and security interest created by this instrument and the other Permitted Encumbrances, the Mortgagor will not sell, convey, mortgage, pledge, or otherwise dispose of or encumber the Mortgaged Property nor any portion thereof, nor any of the Mortgagor's right, title or interest therein, without first securing the written consent of the Administrative Agent as provided in the Credit Agreement.  The Mortgagor will use

26310705

commercially reasonable efforts not to enter into any arrangement with any gas pipeline company or other consumer of Hydrocarbons produced from the Mortgaged Property whereby said gas pipeline company or consumer may set off any claim against the Mortgagor by withholding payment for any Hydrocarbons actually delivered.

2.8     [Intentionally Omitted].

2.9     No Governmental Approvals.  The Mortgagor warrants and represents that no approval or consent of any regulatory or administrative commission or authority, or of any other governmental body, is necessary to authorize the execution and delivery of this instrument or any other Loan Document or Lender Group Swap Agreement to which Mortgagor is a party, or to authorize the observance or performance by the Mortgagor of the covenants herein contained and that such approvals and consents that are required have been obtained or will be obtained promptly.

2.10    Right of Entry.  The Mortgagor will permit the Trustee, the Administrative Agent, the Issuing Bank or the other Lender Parties, or the agents of any of them, at the cost and expense of the Mortgagor, upon prior reasonable written notice to enter upon the Mortgaged Property, and all parts thereof at reasonable times as reasonably requested for the purpose of investigating and inspecting the condition and operation thereof.

2.11    Qualification of Mortgagor.  (a) The cover page to this instrument lists the legal name of the Mortgagor as registered in the jurisdiction in which the Mortgagor is organized, formed or incorporated, the Mortgagor's organizational identification number and taxpayer identification number, (b) the Mortgagor's state of incorporation, formation or organization and its principal place of business (or, if it has more than one place of business, its chief executive office) are as set forth in the preamble hereto, and (c) the Mortgagor is not now and has not been known by any trade name or assumed name.

### ARTICLE III

### Assignment of Production

3.1     Assignment.  As further security for the payment of the Secured Indebtedness and performance of Mortgagor's obligations under the Credit Agreement, the other Loan Documents and the Lender Group Swap Agreements to which Mortgagor is a party, the Mortgagor hereby transfers, assigns, warrants and conveys to the Administrative Agent for the use and benefit of the Lender Parties, effective as of the date hereof, at 7:00 A.M., local time, all Hydrocarbons that are thereafter produced from and that accrue to the Mortgaged Property (the "Production"), and all Proceeds therefrom.  MORTGAGOR IRREVOCABLY APPOINTS THE ADMINISTRATIVE AGENT AS THE AGENT AND ATTORNEY-IN-FACT OF MORTGAGOR FOR THE PURPOSE OF EXECUTING ANY TRANSFER ORDERS, PAYMENT ORDERS, DIVISION ORDERS, RECEIPTS, RELEASES OR OTHER INSTRUMENTS (COLLECTIVELY, "RECEIPTS") THAT THE ADMINISTRATIVE AGENT DEEMS REASONABLY NECESSARY IN ORDER FOR THE ADMINISTRATIVE AGENT TO DEMAND, COLLECT, RECEIVE AND RECEIPT FOR PRODUCTION AND PROCEEDS DURING THE CONTINUANCE OF AN EVENT OF DEFAULT.  In addition,

**26310705**

Mortgagor agrees that, upon the Administrative Agent's request, Mortgagor shall promptly execute and deliver to the Administrative Agent such receipts as the Administrative Agent may deem reasonably necessary in connection with the payment and delivery directly to the Administrative Agent of all Production and Proceeds and to effectuate the purposes of this paragraph. Administrative Agent is authorized to receive, collect and receipt for the Proceeds, and all parties producing, purchasing or receiving any such Production, or having such Production or Proceeds therefrom in their possession for which they or others are accountable to the Administrative Agent by virtue of the provisions of this Article, are authorized and directed to treat and regard the Administrative Agent as the assignee and transferee of the Mortgagor and entitled in the Mortgagor's place and stead to receive such Production and all Proceeds therefrom; and said parties and each of them shall be fully protected in so treating and regarding the Administrative Agent and shall be under no obligation to see to the application by the Administrative Agent of any such Proceeds or payments received by it.

3.2     Application of Proceeds.  All payments received by the Administrative Agent pursuant to Section 3.1 hereof shall be applied as provided in Section 9.02 of the Credit Agreement.

3.3     No Liability of the Administrative Agent in Collecting.  The Administrative Agent is hereby absolved from all liability for failure to enforce collection of any Production or Proceeds so assigned (and no such failure shall be deemed to be a waiver of any right of the Administrative Agent or the Lenders or Lender Counterparties under this Article) and from all other responsibility in connection therewith, except the responsibility to account to the Mortgagor for funds actually received.

3.4     Assignment Not a Restriction on the Administrative Agent's Rights.  Nothing herein contained shall detract from or limit the absolute obligation of the Mortgagor or the Borrower (as the case may be) to make payment of the Secured Indebtedness, regardless of whether the Production and Proceeds assigned by this Article are sufficient to pay the same, and the rights under this Article shall be in addition to all other security now or hereafter existing to secure the payment of the Secured Indebtedness.

3.5     Status of Assignment.  Notwithstanding the other provisions of this Article, the Trustee, the Administrative Agent or any receiver appointed in judicial proceedings for the enforcement of this instrument shall have the right to receive all of the Hydrocarbons herein assigned and the Proceeds therefrom after an Event of Default has occurred and while it is continuing and to apply all of said Proceeds as provided in Section 3.2 hereof; provided, however, that neither the Trustee nor the Administrative Agent shall exercise any right to receive any assigned Hydrocarbons and Proceeds therefrom unless and until an Event of Default shall have occurred and shall then be continuing.  Upon any sale of the Mortgaged Property or any part thereof pursuant to Article V, the Hydrocarbons thereafter produced from the property so sold and the Proceeds therefrom shall be included in such sale and shall pass to the purchaser free and clear of the assignment contained in this Article.

3.6     Indemnity.  (a) The Mortgagor agrees to indemnify the Trustee, the Administrative Agent, the Issuing Bank, the Lenders, the Lender Counterparties and their respective Affiliates, directors, officers, employees, counsel, agents and attorneys-in-fact, or any of the foregoing

26310705

Persons (each such Person being called an "<u>Indemnitee</u>") against all issues, claims, damages, actions, liabilities, judgments, costs, attorneys' fees or other charges of whatsoever kind or nature (all hereinafter in this Section 3.6(a) called "<u>claims</u>") made against or incurred by them or any of them and arising out of, in connection with or as a result of (i) the assertion, either before or after the payment in full of the Secured Indebtedness, that any Indemnitee received Production or Proceeds claimed by third persons, or (ii) any actual or prospective claims, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided that</u> such indemnity shall not, as to any Indemnitee, be available to the extent that such claims are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee (IT BEING UNDERSTOOD THAT IT IS THE INTENTION OF THE PARTIES HERETO THAT EACH OF THE INDEMNITEES BE INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL). All amounts due under this Section shall be payable not later than thirty (30) days after written demand therefor. The obligations of the Mortgagor as hereinabove set forth in this Section 3.6(a) shall survive the release, termination, foreclosure or assignment of this instrument or any sale hereunder.

(b)     Additionally, the Mortgagor agrees to indemnify and hold each Indemnitee harmless from and against each Indemnitee with respect to, any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including reasonable attorney's fees and court costs) of any and every kind or character, known or unknown, fixed or contingent, out-of-pocket or consequential, asserted against or by the Indemnitee, at any time and from time to time by reason of or arising out of any violation of any Environmental Laws applicable to the Mortgagor and/or the Mortgaged Property (including, without limitation, the presence on the Mortgaged Property or Release (as defined in any applicable Environmental Law) from the Mortgaged Property of Hazardous Materials disposed of or otherwise Released) prior to, or during the six (6)-month period immediately following, the time that the Administrative Agent, the Trustee or their successors or assigns take possession and control of the Mortgaged Property, regardless of whether the act, omission, event or circumstance constituted a violation of any Environmental Law at the time of its existence or occurrence. If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Mortgagor hereby agrees to make the maximum contribution to the payment and satisfaction of the indemnified claims, demands, causes of action, losses, damages, liabilities, costs, expenses and fees that is permissible under applicable law. The obligations of the Mortgagor as set forth in this Section 3.6(b) shall survive the release, termination, assignment or foreclosure of this instrument or any sale hereunder, <u>provided that</u>, in the event that the Trustee or Administrative Agent, or its or their successors or assigns, shall have taken possession of, foreclosed upon, or transferred to a purchaser at foreclosure, the Mortgaged Property, such indemnity shall terminate with respect to any claims, demands, causes of action, losses, damages, liabilities, costs, expenses or fees related to the Mortgaged Properties or operations thereon arising after the date that is six (6) months immediately following the date of such taking of possession, foreclosure or sale.

**26310705**

3.7 <u>Rights Under Statutes</u>. The Mortgagor hereby appoints the Administrative Agent as its attorney-in-fact during the continuance of an Event of Default to pursue any and all lien rights of the Mortgagor to liens and security interests in the Mortgaged Property securing payment of Production and Proceeds attributable to the Mortgaged Property, including, but not limited to, those liens and security interests provided by the statutes of Texas or Louisiana, as applicable. The Mortgagor further hereby assigns to the Administrative Agent, as security for payment of the Secured Indebtedness, any and all such liens, security interests, financing statements, or similar interests of the Mortgagor attributable to its interests in the Mortgaged Property and Production and Proceeds therefrom arising under or created by said statutory provisions, judicial decisions, or otherwise.

## ARTICLE IV

### Events of Default

4.1 <u>Events of Default Hereunder</u>. Upon the occurrence of an Event of Default under the terms and provisions of the Credit Agreement (an "<u>Event of Default</u>") and the continuance of such Event of Default for the applicable period of grace (if any), then and in any such event the Administrative Agent at its option may declare the entire unpaid principal of and the interest accrued on any Notes, all amounts payable under the Credit Agreement (including pursuant to Mortgagor's guaranty contained in the Credit Agreement) and all other Secured Indebtedness secured hereby to be forthwith due and payable, without any notice or demand of any kind, both of which are hereby expressly waived.

## ARTICLE V

### Enforcement of the Security

5.1 <u>Power of Sale and Foreclosure of Real Property Constituting a Part of the Mortgaged Property</u>.

(a) During the continuation of an Event of Default, the Trustee shall have the right and power to sell, to the extent permitted by law, at one or more sales, as an entirety or in parcels, as it may elect, that portion of the Mortgaged Property situated within the State of Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Texas are applicable with respect to this Mortgage and/or the liens or security interests created hereby), at such place or places and otherwise in such manner and upon such notice as may be required by law or, in the absence of any such requirement, as the Trustee may deem appropriate and to make conveyance to the purchaser or purchasers without any covenant or warranty, express or implied. The Trustee may postpone the sale of all or any portion of such real property by public announcement at the time and place of such sale and from time to time thereafter may further postpone such sale by public announcement made at the time of sale fixed by the preceding postponement. The right of sale hereunder shall not be exhausted by one or any sale and the Trustee may make other and successive sales until all of the trust estate be legally sold.

## 26310705

(b)     With respect to that portion, if any, of the Mortgaged Property situated within the State of Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Texas are applicable with respect to this Mortgage and/or the liens or security interests created hereby), the Trustee and any successors or substitutes are hereby authorized and empowered to sell such Mortgaged Property at public sale to the highest bidder for cash in the area at the county courthouse of the county in Texas in which the Texas portion of the Mortgaged Property or any part thereof is situated, or adjacent to or in such county adjacent to the offshore area over which the U.S. asserts jurisdiction as herein described, designated by such county's commissioner's court for such proceedings, or if no area is so designated, at the door of the county courthouse of said county, at a time between the hours of 10:00 A.M. and 4:00 P.M. which is no later than three (3) hours after the time stated in the notice described immediately below as the earliest time at which such sale would occur on the first Tuesday of any month after advertising the earliest time at which said sale would occur, the place and terms of said sale and the portion of the Mortgaged Property to be sold, by (i) posting (or by having some person or persons acting for the Trustee post) for at least twenty-one (21) days preceding the date of the sale, written or printed notice of the proposed sale at the courthouse door of said county in which the sale is to be made. If such portion of the Mortgaged Property lies in or adjacent to more than one county, one such notice of sale shall be posted at the courthouse door of each county in which such part of the Mortgaged Property is situated or adjacent to and such part of the Mortgaged Property may be sold in the area at the county courthouse of any one of such counties designated by such county's commissioner's court for such proceedings, or if no area is so designated, at the courthouse door of such county, and the notice so posted shall designate in which county such property shall be sold, and (ii) filing a copy of the notice posted in accordance with the preceding clause (i) in the office of the county clerk of each county in which any part of the Texas portion of the Mortgaged Property that is to be sold at such sale is situated or adjacent to. In addition to such posting and filing of notice, the Administrative Agent shall, at least twenty-one (21) days preceding the date of sale, serve or cause to be served written notice of the proposed sale by certified mail on the Mortgagor and on each other debtor, if any, obligated to pay the Secured Indebtedness according to the records of the Administrative Agent or other holder of the Secured Indebtedness. Service of such notice shall be completed upon deposit of the notice, enclosed in a postpaid wrapper properly addressed to the Mortgagor and such other debtors at their most recent address or addresses as shown by the records of the Administrative Agent or other holder of the Secured Indebtedness, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such a service was completed shall be prima facie evidence of the fact of service. The Mortgagor agrees that no notice of any sale of Mortgaged Property situated in the State of Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Texas are applicable with respect to this Mortgage and/or the liens or security interests created hereby), other than as set out in this paragraph, need be given by the Trustee, the Administrative Agent, the other Lender Parties or any other Person. The Mortgagor hereby designates as its address for the purpose of such notice the address set forth in the Credit Agreement and agrees that such address may be changed only in the manner set forth in the Credit Agreement. The Mortgagor authorizes and empowers the Trustee to sell the Texas portion of the Mortgaged Property in lots or parcels or in its entirety as the Trustee shall deem expedient and to execute and deliver to the purchaser or purchasers thereof deeds conveying the property, but without any covenant or

**263**10705

warranty, express or implied. Where portions of the Mortgaged Property lie in or adjacent to different counties, sales in such counties may be conducted in any order that the Trustee may deem expedient; and one or more such sales may be conducted in the same month or in successive or different months as the Trustee may deem expedient. The Trustee may postpone the sale provided for in this Section 5.1(b) by public announcement at the time and place of such sale and from time to time thereafter may further postpone such sale by public announcement made at the time of sale fixed by the preceding postponement. The provisions hereof with respect to the posting and giving of notices of sale are intended to comply with the provisions of Section 51.002 of the Property Code of the State of Texas, effective January 1, 1984, and in the event the requirements, or any notice, under such Section 51.002 of the Property Code of the State of Texas shall be eliminated or the prescribed manner of giving such notices modified by future amendment to, or adoption of any statute superseding, Section 51.002 of the Property Code of the State of Texas, the requirement for such particular notices shall be deemed stricken from or modified in this instrument in conformity with such amendment or superseding statute, effective as of the effective date thereof.

      (c)    During the continuation of an Event of Default, the Administrative Agent shall have the right to foreclose any portion of the Mortgaged Property by executory or other judicial process (as applicable) subject to, and on the terms and conditions required or permitted by, applicable law, whether movable (personal) or immovable (real) and whether corporeal (tangible) or incorporeal (intangible), that is subject to the laws of the State of Louisiana, including but not limited to any Mortgaged Property situated within the State of Louisiana or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Louisiana are applicable with respect to this Mortgage and/or the liens or security interests created hereby, and shall have the right to appoint and/or have appointed a keeper and/or receiver (as applicable) of such Mortgaged Property. For purposes of Louisiana executory process, the Mortgagor acknowledges the Secured Indebtedness if not paid in full at maturity (regardless of how brought about), whether now existing or arising hereafter, and the Mortgagor, for itself and its successors and assigns, hereby confesses judgment for the full amount of the Secured Indebtedness in favor of the Administrative Agent. The Mortgagor further agrees that, to the extent permitted by applicable law, the Administrative Agent may cause all or any part of the Mortgaged Property to be seized and sold after due process of law, the Mortgagor waives the benefit of all laws or parts of law relative to the appraisement or property seized and sold under executory process or other legal process and consents that all or any part of the Mortgaged Property may be sold without appraisement, either in its entirety or in lots or parcels, as the Administrative Agent may determine, to the highest bidder for cash. The Mortgagor hereby waives (i) the benefit of appraisement provided for in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure and all other laws conferring the same; (ii) the demand and three (3) days notice of demand as provided in Article 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure provided for in Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days delay provided for in Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) all other laws providing rights of notice, demand, appraisement, or delay. Pursuant to Louisiana Revised Statutes 9:5131-5135 and 9:5136-5140.2, in the event of the Mortgaged Property or any part thereof is seized as an incident to an action for the recognition or enforcement of this Mortgage by executory process, ordinary process, sequestration, writ of fieri facias, or otherwise, Mortgagor agrees that the Court issuing any such order shall, if petitioned for by the Administrative Agent or other holder of the

**63 10 705**

Secured Indebtedness, direct the applicable sheriff to appoint as a keeper of the Mortgaged Property the holder or any agent or other Person designated by holder at the time such seizure is effected. Mortgagor agrees that such keeper shall be entitled to receive its compensation in excess of its reasonable costs and expenses incurred in the administration or preservation of the Mortgaged Property payable on a monthly basis to the extent permitted by applicable law. The designation of a keeper made herein shall not be deemed to require the holder to provoke the appointment of such a keeper.

 5.2    <u>Rights of the Administrative Agent with Respect to Personal Property Constituting a Part of the Mortgaged Property</u>. (a) During the continuation of an Event of Default, the Administrative Agent will have all rights and remedies granted by law and particularly by the Uniform Commercial Code including, but not limited to, to the extent permitted by applicable law, the right to take possession of all Collateral constituting a part of the Mortgaged Property, and, for this purpose, to the extent permitted by applicable law, the Administrative Agent may enter upon any premises on which any or all of such Collateral is situated and take possession of and operate such Collateral (or any portion thereof) or remove it therefrom (or, to the extent and for those items of the Collateral permitted under applicable law, render such Collateral unusable). The Administrative Agent may require the Mortgagor to assemble such Collateral and make it available to the Administrative Agent at a place to be designated by the Administrative Agent that is reasonably convenient to all parties. Unless such Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Administrative Agent will give the Mortgagor reasonable notice of the time and place of any public sale or of the time after which any private sale or other disposition of such Collateral is to be made. This requirement of sending reasonable notice will be met if the notice is mailed by first-class mail, postage prepaid, to the Mortgagor at the address provided pursuant to the Credit Agreement at least ten (10) days before the time of the sale or disposition.

 (b)    In the event of a foreclosure sale, whether made by the Trustee or the Administrative Agent under the terms hereof or under judgment of a court, the Collateral and the other Mortgaged Property may, at the option of Administrative Agent, be sold as a whole. It shall not be necessary that the Administrative Agent take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this Section 5.2 is conducted and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale. With respect to the application of proceeds of disposition of the Collateral under Section 5.9 hereof, the costs and expenses incident to disposition shall include the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by the Trustee or the Administrative Agent, as applicable. Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the Secured Indebtedness, the occurrence of any default, Administrative Agent having declared all of such Secured Indebtedness to be due and payable, notice of time, place and terms of sale and of the properties to be sold having been duly given, or any other act or thing having been duly done by the Trustee or the Administrative Agent, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and Administrative Agent may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by

263 10 7 0 5

Administrative Agent, including the sending of notices and the conduct of the sale, but in the name and on behalf of Administrative Agent.

5.3    Rights of the Trustee with Respect to Fixtures Constituting a Part of the Mortgaged Property.  During the continuation of an Event of Default, the Trustee and the Administrative Agent may elect to treat the fixtures constituting a part of the Mortgaged Property as either real property collateral or personal property collateral and then proceed to exercise such rights as apply to such type of collateral.

5.4    Judicial Proceedings.  During the continuation of an Event of Default, the Trustee (with respect to that portion of the Mortgaged Property situated within Texas or situated within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Texas are applicable with respect to this Mortgage and/or the lien or security interests created hereby) or the Administrative Agent (with respect to that portion of the Mortgaged Property situated within Louisiana, or situated within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Louisiana are applicable with respect to this Mortgage and/or the lien or security interests created hereby), in lieu of or in addition to exercising any power of sale hereinabove given, may proceed by a suit or suits in equity or at law, whether for a foreclosure hereunder, for the sale of the Mortgaged Property, for the specific performance of any covenant or agreement herein contained, in aid of the execution of any power herein granted, for the appointment of a receiver pending any foreclosure hereunder or the sale of the Mortgaged Property or for the enforcement of any other appropriate legal or equitable remedy.  The Mortgagor hereby acknowledges the Secured Indebtedness secured hereby, whether now existing or to arise hereafter, and, to the extent not prohibited by applicable law, for purposes of Louisiana executory process, confesses judgment thereon in the full amount of the Secured Indebtedness in favor of the Administrative Agent if such obligations are not paid at maturity.

5.5    Possession of the Mortgaged Property.  It shall not be necessary for the Trustee or the Administrative Agent to have physically present or constructively in their possession any or all of the Mortgaged Property at any sale held by the Trustee, Administrative Agent or by any court, receiver or public officer and the Mortgagor shall deliver to the purchasers at such sale on the date of sale the Mortgaged Property purchased by such purchasers at such sale and, if it should be impossible or impracticable for any of such purchasers to take actual delivery of the Mortgaged Property, then the title and right of possession to the Mortgaged Property shall pass to such purchaser at such sale as completely as if the same had been actually present and delivered.

5.6    Certain Aspects of a Sale.  The Administrative Agent shall have the right to become the purchaser at any sale held by the Trustee or by any court, receiver or public officer and the Administrative Agent shall have the right to credit upon the amount of the bid made therefor the amount payable out of the net proceeds of such sale to it.  Recitals contained in any conveyance made to any purchaser at any sale made hereunder shall be prima facie evidence of the truth and accuracy of the matters therein stated including, without limiting the generality of the foregoing, nonpayment of the unpaid principal sum of, and the interest accrued on, the Guaranteed Obligations and the other Secured Indebtedness after the same have become due and payable, advertisement and conduct of such sale in the manner provided herein or appointment of any successor Trustee hereunder.

26310705

5.7     Receipt to Purchaser.   Upon any sale, whether made under the power of sale herein granted and conferred or by virtue of judicial proceedings, the receipt of the Trustee, or of the officer making sale under judicial proceedings, shall be sufficient discharge to the purchaser or purchasers at any sale for his or their purchase money and such purchaser or purchasers, or his or their assigns or personal representatives shall not, after paying such purchase money and receiving such receipt of the Trustee or of such officer therefor, be obliged to see to the application of such purchase money or be in anywise answerable for any loss, misapplication or nonapplication thereof.

5.8     Effect of Sale.   Any sale or sales of the Mortgaged Property, whether under the power of sale herein granted and conferred or by virtue of judicial proceedings, shall operate to divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of the Mortgagor of, in and to the premises and the property sold and shall be a perpetual bar, both at law and in equity, against the Mortgagor, the Mortgagor's successors or assigns and any and all persons claiming or who shall thereafter claim all or any of the property sold from, through or under the Mortgagor or the Mortgagor's successors or assigns.  Nevertheless, the Mortgagor, if requested by the Trustee, shall join in the execution and delivery of all proper conveyances, assignments and transfers of the properties so sold.

5.9     Application of Proceeds.   The proceeds of any sale of the Mortgaged Property, or any part thereof, whether under the power of sale herein granted and conferred or by virtue of judicial proceedings, shall be applied by the Trustee or the Administrative Agent as provided in Section 9.02 of the Credit Agreement (unless otherwise required by applicable law).

5.10    The Mortgagor's Waiver of Appraisement, Marshalling and Other Rights.   The Mortgagor agrees, to the full extent that the Mortgagor may lawfully so agree, that the Mortgagor will not at any time insist upon, or plead or in any manner whatever claim the benefit of any appraisement, valuation, stay, extension or redemption law now or hereafter in force in order to prevent or hinder the enforcement or foreclosure of this instrument or the absolute sale of the Mortgaged Property or the possession thereof by any purchaser at any sale made pursuant to any provision hereof or pursuant to the decree of any court of competent jurisdiction, but the Mortgagor, for the Mortgagor and all who may claim through or under the Mortgagor, so far as the Mortgagor or those claiming through or under the Mortgagor now or hereafter lawfully may, hereby waives the benefit of all such laws.  The Mortgagor, for the Mortgagor and all who may claim through or under the Mortgagor, waives, to the extent that the Mortgagor may lawfully do so, any and all right to have the Mortgaged Property marshaled upon any foreclosure of the lien hereof or sold in inverse order of alienation and agrees that the Trustee or any court having jurisdiction to foreclose such lien may sell the Mortgaged Property as an entirety.  The Mortgagor, for the Mortgagor and all who may claim through or under the Mortgagor, further waives, to the full extent that the Mortgagor may lawfully do so, any requirement for posting a receiver's bond or replevin bond or other similar type of bond if the Trustee commences an action for appointment of a receiver or an action for replevin to recover possession of any of the Mortgaged Property.

5.11    Costs and Expenses.   All costs and expenses (including reasonable attorneys' fees) incurred by the Trustee, the Administrative Agent or any other Lender Party in protecting and enforcing their rights hereunder, shall constitute a demand obligation owing by the

**263 10 705**

Mortgagor to the party incurring such costs and expenses and shall draw interest at an annual rate equal to the Default Rate (as defined in the Credit Agreement) until paid, all of which shall constitute a portion of the Secured Indebtedness.

5.12    Operation of the Mortgaged Property by the Trustee or the Administrative Agent. During the continuance of an Event of Default, and in addition to all other rights herein conferred on the Trustee and/or the Administrative Agent (as the case may be), to the extent permitted by applicable law, the Trustee and the Administrative Agent (or any person, firm or corporation designated by the Trustee or the Administrative Agent) shall have the right and power, but shall not be obligated, to enter upon and take possession of any of the Mortgaged Property, and to exclude the Mortgagor, and the Mortgagor's agents or servants, wholly therefrom and to hold, use, administer, manage and operate the same, to the extent that the Mortgagor shall be at the time entitled and in its place and stead.   The Trustee or the Administrative Agent, as applicable, or any person, firm or corporation designated by the Trustee or the Administrative Agent, as applicable, may, to the extent permitted by applicable law, operate the same without any liability to the Mortgagor in connection with such operations, except to use ordinary care in the operation of such properties.    The Trustee or the Administrative Agent, as applicable, or any person, firm or corporation designated by the Trustee or the Administrative Agent, as applicable, shall have the right to collect, receive and receipt for all Hydrocarbons produced and sold from said properties, to the extent permitted by applicable law, to make repairs, purchase machinery and equipment, conduct work-over operations, drill additional wells and to exercise every power, right and privilege of the Mortgagor with respect to the Mortgaged Property.    When and if the expenses of such operation and development (including costs of unsuccessful work-over operations or additional wells) have been paid and the Secured Indebtedness paid, said properties shall, if there has been no sale or foreclosure, be returned to the Mortgagor.

5.13    Other Jurisdictions.   In the event the Mortgaged Property, or any part thereof, shall be located in any state other than the States of Texas or Louisiana, the procedures for foreclosure and all other provisions of this Article V relating to remedies upon default and related matters shall be modified to the extent necessary to comply with the laws of the state in which such properties are located. It is the intent of Mortgagor that this Mortgage shall be legal and enforceable in any state in which the Mortgaged Property, or any part thereof, is located and that the provisions hereof shall be modified only to the extent necessary to comply with the laws of such state and that all other provisions contained herein shall be in no way affected or impaired by the necessity to so modify some or all of the provisions of this Article V.

### ARTICLE VI

### Miscellaneous Provisions

6.1    Successor Trustee.   Any Trustee may resign in a writing addressed to the Administrative Agent or may be removed at any time with or without cause by an instrument in writing duly executed by the Administrative Agent.   In case of the death, resignation or removal of a Trustee, a successor Trustee may be appointed by the Administrative Agent by instrument of substitution complying with any applicable requirements of law and, in the absence of any such requirement, without formality other than appointment and designation in writing.    Such

26310705

appointment and designation shall be full evidence of the right and authority to make the same and of all facts therein recited and, upon the making of any such appointment and designation, this conveyance shall vest in the named successor Trustee all the estate and title of the prior Trustee in all of the Mortgaged Property and he or they shall thereupon succeed to all the rights, powers, privileges, immunities and duties hereby conferred upon the prior Trustee.  All references herein to the Trustee shall be deemed to refer to the Trustee from time to time acting hereunder.

6.2    <u>Actions or Advances by the Administrative Agent or the Trustee</u>.  Each and every covenant herein contained shall be performed and kept by the Mortgagor solely at the Mortgagor's expense.  If the Mortgagor shall fail to perform or keep any of the covenants of whatsoever kind or nature contained in this instrument, and any such failure shall be continuing after any applicable cure period has expired, the Trustee, the Administrative Agent, any other Lender Party or any receiver appointed hereunder, may, but shall not be obligated to, take action and/or make advances to perform the same in the Mortgagor's behalf and the Mortgagor hereby agrees to repay the expense of such action and such advances on or before ten (10) days following written demand therefor plus interest at an annual rate equal to the Default Rate until paid or, in the event any promissory note evidences such indebtedness, upon the terms and conditions thereof.  The Administrative Agent shall notify the Mortgagor as soon as practicable of any such action taken; <u>provided, however</u>, that the failure of Administrative Agent to so notify Mortgagor shall not relieve Mortgagor of any of its obligations hereunder.  No such advance or action by the Trustee, Administrative Agent, any other Lender Party or any receiver appointed hereunder shall be deemed to relieve the Mortgagor from any default hereunder.

6.3    <u>Defense of Claims</u>.  The Mortgagor will promptly notify the Trustee and the Administrative Agent in writing of the commencement of any legal proceedings affecting the lien or security interest hereof or the Mortgaged Property, or any part thereof, and will take such action as may be necessary or appropriate to preserve the Mortgagor's, the Trustee's, the Administrative Agent's, and the other Lender Parties' rights affected thereby and/or to hold harmless the Trustee, the Administrative Agent and the other Lender Parties in respect of such proceedings.  Should the Mortgagor fail or refuse to take any such action, the Trustee or the Administrative Agent may, upon giving prior written notice thereof to the Mortgagor, take such action on behalf and in the name of the Mortgagor and at the Mortgagor's expense.  Moreover, the Administrative Agent, or the Trustee on behalf of the Administrative Agent, the Issuing Bank and the other Lenders, may take such independent action in connection therewith as it or they may in its or their discretion deem proper, the Mortgagor hereby agreeing that all sums advanced or all expenses incurred in such actions plus interest at the Default Rate until paid, will, on demand, be reimbursed, as appropriate, to the Trustee, the Administrative Agent, any other Lender Party or any receiver appointed hereunder.  The obligations of the Mortgagor as hereinabove set forth in this Section 6.3 shall survive the release, termination, foreclosure or assignment of this instrument or any sale hereunder.

6.4    <u>The Mortgaged Property to Revert</u>.  If the Secured Indebtedness shall be fully paid, then all of the Mortgaged Property shall revert to the Mortgagor and the entire estate, right, title and interest of the Trustee, the Administrative Agent and the Lender Parties shall thereupon cease.  The Trustee and the Administrative Agent (for itself and as agent for the Lender Parties)

**26310705**

in such case shall, upon the request of the Mortgagor and at the Mortgagor's cost and expense, deliver to the Mortgagor proper instruments acknowledging satisfaction of this instrument.

6.5     <u>Renewals, Amendments and Other Security</u>.  Renewals and extensions of the Secured Indebtedness may be given at any time and amendments may be made to agreements relating to any part of such Secured Indebtedness (in accordance with such agreements) or the Mortgaged Property and the Trustee and the Administrative Agent may take or may now hold other security for the Secured Indebtedness, all without notice to or consent of the Mortgagor. The Trustee and the Administrative Agent may resort first to such other security or any part thereof or first to the security herein given or any part thereof, or from time to time to either or both, even to the partial or complete abandonment of either security, and such action shall not be a waiver of any rights conferred by this instrument, which shall continue as a valid lien upon and perfected security interest in the Mortgaged Property not expressly released until any Notes and all other Secured Indebtedness secured hereby are fully paid.

6.6     <u>Instrument an Assignment, etc</u>.  This instrument shall be deemed to be and may be enforced from time to time as an assignment, chattel mortgage, contract, deed of trust, financing statement, real estate mortgage or security agreement, and from time to time as any one or more thereof.

6.7     <u>Limitation on Interest</u>.  It is the intention of the parties hereto to conform strictly to applicable usury laws and, anything herein to the contrary notwithstanding, the obligations of the Mortgagor to the Trustee, the Administrative Agent, each Lender, each Lender Counterparty and the Issuing Bank under this instrument shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of law applicable to such Lender or the Issuing Bank limiting rates of interest that may be charged or collected by such Lender or the Issuing Bank.  Accordingly, if the transactions contemplated hereby would be usurious under applicable law (including the Federal and State laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable) with respect to a Lender or the Issuing Bank then, in that event, notwithstanding anything to the contrary in this instrument, it is agreed as follows:  (i) the provisions of this Section 6.7 shall govern and control; (ii) the aggregate of all consideration that constitutes interest under applicable law that is contracted for, charged, reserved, taken or received under this instrument, or under any of the other aforesaid agreements or otherwise in connection with this instrument by such Lender or the Issuing Bank shall under no circumstances exceed the maximum amount of interest allowed by applicable law (such maximum lawful interest rate, if any, with respect to such Lender or the Issuing Bank herein called the "<u>Highest Lawful Rate</u>"), and any excess shall be credited to the Mortgagor by such Lender or the Issuing Bank (or, if such consideration shall have been paid in full, such excess promptly refunded to the Mortgagor); (iii) all sums paid, or agreed to be paid, to the Lender or the Issuing Bank for the use, forbearance and detention of the indebtedness of the Mortgagor to such Lender or the Issuing Bank hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full so that the actual rate of interest is uniform throughout the full term thereof; and (iv) if at any time the interest provided pursuant to Article III of the Credit Agreement, together with any other fees payable pursuant to the Credit Agreement or this instrument and deemed interest under applicable law, exceeds that amount that would have accrued at the Highest Lawful Rate, the amount of interest

**26310705**

and any such fees to accrue to such Lender or the Issuing Bank pursuant to this instrument shall be limited, notwithstanding anything to the contrary in this instrument to that amount that would have accrued at the Highest Lawful Rate, but any subsequent reductions, as applicable, shall not reduce the interest to accrue to such Lender or the Issuing Bank pursuant to this instrument below the Highest Lawful Rate until the total amount of interest accrued pursuant to this instrument and such fees deemed to be interest equals the amount of interest that would have accrued to such Lender or the Issuing Bank if a varying rate per annum equal to the interest provided pursuant to Article III of the Credit Agreement had at all times been in effect, plus the amount of fees that would have been received but for the effect of this Section 6.7. For purposes of Tex. Fin. Code Ann. Ch. 303, as amended, to the extent, if any, this Section 6.7 is applicable to a Lender or the Issuing Bank, the Mortgagor agrees that the Highest Lawful Rate shall be the "weekly ceiling" as defined in said Article, provided that such Lender and the Issuing Bank may also rely, to the extent permitted by applicable laws, on alternative maximum rates of interest under other laws applicable to such Lender or such Issuing Bank, as the case may be, if greater. Tex. Fin. Code Ann. Ch. 346 (which regulates certain revolving credit loan accounts and revolving tri-party accounts) shall not apply to this instrument, any Notes or the Secured Indebtedness.

      6.8    Unenforceable or Inapplicable Provisions. Any provision hereof held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Any reference herein contained to a statute or law of a state in which no part of the Mortgaged Property is situated shall be deemed inapplicable to, and not used in, the interpretation hereof.

      6.9    Rights Cumulative. Each and every right, power and remedy herein given to the Trustee, the Administrative Agent or any other Lender Party shall be cumulative and not exclusive and each and every right, power and remedy whether specifically herein given or otherwise existing, may be exercised from time to time and so often and in such order as may be deemed expedient by the Trustee, the Administrative Agent or any other Lender Party, as the case may be, and the exercise, or the beginning of the exercise, of any such right, power or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter, any other right, power or remedy. No delay or omission by the Trustee, the Administrative Agent or any other Lender Party in the exercise of any right, power or remedy shall impair any such right, power or remedy or operate as a waiver thereof or of any other right, power or remedy then or thereafter existing.

      6.10    Subrogation. To the extent that any of the Secured Indebtedness represents funds utilized to satisfy any outstanding indebtedness or obligations secured by liens, security interests, rights or claims against the Mortgaged Property or any part thereof, the Trustee, for the use and benefit of the Administrative Agent and the Lender Parties, or the Administrative Agent, for itself and as the agent for the Lender Parties (as the case may be), shall be subrogated to any and all liens, security interests, rights, superior titles and equities owned or claimed by the holder of any such outstanding indebtedness or obligation so satisfied, however remote, regardless of whether said liens, security interests, rights, superior titles and equities are by the holder(s) thereof assigned to the Trustee or the Administrative Agent (as the case may be) or released.

26310705

6.11   <u>Amendments; Waiver by the Administrative Agent or the Trustee</u>.   This instrument may be amended, modified, revised, discharged, released or terminated only by a written instrument or instruments executed by Mortgagor and the Administrative Agent, but without the joinder of the Trustee, which shall not be required.   Any alleged amendment, modification, revision, discharge, release or termination that is not so documented shall not be effective as to any party.   Any and all covenants in this instrument may from time to time by instrument in writing signed by the Trustee or the Administrative Agent, as applicable, be waived to such extent and in such manner as the Trustee or the Administrative Agent, as applicable, may desire, but no such waiver shall ever affect or impair the Trustee's, the Administrative Agent's, or any other Lender Parties' rights or liens or security interests hereunder, except to the extent specifically stated in such written instrument.   Notwithstanding anything contained herein to the contrary, the Administrative Agent shall not be required, except as expressly provided in the Credit Agreement, to obtain the consent of any Lender Party in order to amend, modify, revise, discharge, release or terminate this Mortgage regardless of whether this Mortgage secures Secured Indebtedness owed to such Lender Party.

6.12   <u>Action by Individual Trustee</u>.   Any Trustee from time to time serving hereunder shall have the absolute right, acting individually, to take any action and to give any consent and to exercise any right, remedy, power, privilege or authority conferred upon the Trustee, and any action taken by any Trustee from time to time serving hereunder shall be binding upon any other Trustee and no person dealing with a Trustee from time to time serving hereunder shall be obligated to confirm the power and authority of such Trustee to act without the concurrence of any other Trustee.   In this instrument, the term "Trustee" shall mean the Trustee hereinabove named, or either of them, as the context requires, and any successor Trustee.

6.13   <u>Miscellaneous Warranties</u>.   The Mortgagor additionally warrants and represents to the Trustee, the Administrative Agent and the other Lender Parties that (a) the execution and delivery of this instrument, and the performance by the Mortgagor of its obligations hereunder, are within the corporate, partnership or limited liability company powers, as applicable, of the Mortgagor and have been duly authorized by all necessary corporate, partnership or limited liability company action, as applicable, on the part of the Mortgagor, and (b) this instrument has been duly executed and delivered on behalf of the Mortgagor and is the legal, valid and binding obligation of the Mortgagor, enforceable in accordance with its terms, the making and performance of which do not and will not contravene or conflict with the charter or by-laws of the Mortgagor or violate or constitute a default under any law, any presently existing requirement or restriction imposed by judicial, arbitral or any governmental instrumentality or any agreement, instrument or indenture by which the Mortgagor is bound.

6.14   <u>No Partnership</u>.   Nothing contained in this instrument is intended to, or shall be construed as, creating to any extent and in any manner whatsoever, any partnership, joint venture, or association among the Mortgagor, the Trustee, the Administrative Agent, the other Lender Parties or their respective Affiliates, or in any way as to make the Trustee, the Administrative Agent or the other Lender Parties co-principals with the Mortgagor with reference to the Mortgaged Property and any inferences to the contrary are hereby expressly negated.

26310705

6.15   <u>Successors and Assigns</u>.  This instrument is binding upon the Mortgagor and the Mortgagor's successors and assigns and shall inure to the benefit of the Trustee, any successors, and the Administrative Agent, the Issuing Bank, the Lenders, the Lender Counterparties, their respective successors and assigns, and the provisions hereof shall likewise be covenants running with the land.

6.16   <u>Article and Section Headings</u>.  Article and Section headings used herein are for convenience of reference only, are not part of this instrument and shall not affect the construction of, or be taken into consideration in interpreting, this instrument.

6.17   <u>Execution in Counterparts; Exhibits</u>.  This instrument may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original and all of which are identical except that, to facilitate recordation or filing, in any particular counterpart portions of <u>Exhibit A</u> hereto that describe properties situated in counties or parishes other than the county or parish in which such counterpart is to be recorded or filed may have been omitted. The exhibits referenced in and attached to this instrument shall constitute and be a part of this instrument for all purposes.

6.18   <u>Special Filing as Financing Statement</u>.  This instrument shall likewise be a Security Agreement and a Financing Statement.  This Mortgage shall be filed for record, among other places, in the real estate records of each county or parish in which any portion of the real property covered by the oil and gas leases described in <u>Exhibit A</u> hereto is situated or adjacent to, and, when filed in such counties or parishes shall be effective as a financing statement covering fixtures located on and as-extracted collateral relating to the oil and gas properties described in <u>Exhibit A</u> hereto, including accounts arising from the sale of Hydrocarbons at the wellheads of the wells located on the real property described in <u>Exhibit A</u> hereto.  By the execution and delivery hereof, Mortgagor hereby authorizes the Administrative Agent to file any financing statements, and any amendments or continuation statements with respect thereto, as to the Mortgaged Property pursuant to the Uniform Commercial Code without the Mortgagor's signature thereon.

6.19   <u>Notices</u>.  Except as otherwise specifically provided for herein, all notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be given in accordance with Section 11.01 of the Credit Agreement.

6.20   <u>Reliance</u>.  Notwithstanding any reference herein to the Credit Agreement, no third party shall have any obligation to inquire into the terms or conditions of the Credit Agreement and all third parties shall be fully authorized to rely upon any statement, certificate, or affidavit of the Administrative Agent as to the occurrence of any event such as the occurrence and/or continuation of any Event of Default.

6.21   <u>Effective as Mortgage</u>.  As to that portion of the Mortgaged Property situated within Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of Texas are applicable with respect to this Mortgage and/or the liens or security interests created hereby), this instrument shall be effective as a mortgage as well as a deed of trust and during the continuation of an Event of Default may be foreclosed as to

263 10 7 0 5

such portion of the Mortgaged Property in any manner permitted by applicable law and any foreclosure suit may be brought by the Trustee or by the Administrative Agent. To the extent, if any, required to cause this instrument to be so effective as a mortgage as well as a deed of trust, Mortgagor hereby mortgages such portion of the Mortgaged Property to the Administrative Agent, for itself and as agent for the Lender Parties.

Insofar as any portions of the Mortgaged Property situated in the State of Louisiana (or to which Louisiana law is applicable), and the Hydrocarbons produced therefrom or attributable thereto, are concerned, the general language of conveyance to the Trustee in this Mortgage is intended and shall be construed as words of hypothecation and pledge and not of conveyance and this Mortgage shall be considered under the laws of the State of Louisiana as an Act of Mortgage, Assignment of Production, Security Agreement and Fixture Filing executed by the Mortgagor and all rights and powers herein conferred on the Trustee may be exercised by the Administrative Agent, whether or not expressly so provided herein.

6.22   No Liability for Trustee. THE TRUSTEE SHALL NOT BE LIABLE FOR ANY ERROR OF JUDGMENT OR ACT DONE BY THE TRUSTEES IN GOOD FAITH, OR BE OTHERWISE RESPONSIBLE OR ACCOUNTABLE UNDER ANY CIRCUMSTANCES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, THE TRUSTEE'S NEGLIGENCE), EXCEPT FOR THE TRUSTEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by them hereunder, believed by them in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and the Trustee shall be under no liability for interest on any moneys received by them hereunder.

6.23   GOVERNING LAW. THIS INSTRUMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS; PROVIDED THAT THE ADMINISTRATIVE AGENT, THE ISSUING BANK, EACH LENDER AND EACH LENDER COUNTERPARTY SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW AND, EXCEPT TO THE EXTENT THAT THE LAW OF A STATE IN WHICH A PORTION OF THE MORTGAGED PROPERTY IS LOCATED (OR WHICH IS OTHERWISE APPLICABLE TO A PORTION OF THE MORTGAGED PROPERTY) NECESSARILY GOVERNS WITH RESPECT TO PROCEDURAL AND SUBSTANTIVE MATTERS RELATING TO THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS, SECURITY INTERESTS AND OTHER RIGHTS AND REMEDIES OF THE SECURED PARTIES GRANTED HEREIN, THE LAWS OF SUCH STATE SHALL APPLY AS TO THAT PORTION OF THE MORTGAGED PROPERTY LOCATED IN (OR OTHERWISE SUBJECT TO THE LAWS OF) SUCH STATE.

6.24   Acceptance. In accordance with the provisions of Louisiana Civil Code Article 3289, if the Administrative Agent has not signed this Mortgage, its acceptance, on behalf of the Lender Parties, is presumed and tacit and is evidenced by the execution and delivery of the Credit Agreement.

26310705

6.25    Priority.  The parties hereby acknowledge and agree that this Mortgage shall be entitled to the continuing preference and priority provided by Louisiana Civil Code Article 3298, as it may be amended from time to time.

6.26    Waivers.    The parties hereto expressly waive the production of Mortgage Certificates and hereby release and hold the Notary Public whose name is hereunder signed harmless for and by reason of the nonproduction and nonannexation thereof to this instrument.

6.27    Transfer of Notes without Notarial Act.  The parties hereto agree that any Notes may be transferred without the necessity for a notarial act of transfer thereof and that any such transfer shall carry with it into the hands of any future holder or holders of such Notes full and entire subrogation of title in and to the Notes to any and all rights and privileges under this instrument herein granted to Lenders as the holder of the Notes.  This Mortgage is for the benefit of Lenders and for such other Person or Persons as may from time to time become or be the holders of any of the Secured Indebtedness and this Mortgage shall be transferable and negotiable, with the same force and effect and to the same extent as the Secured Indebtedness may be transferable, it being understood that, upon the transfer or assignment by Lenders of any of the Secured Indebtedness, the legal holder of the Secured Indebtedness shall have all of the rights granted to Lenders under this Mortgage.  Mortgagor specifically agrees that, upon any transfer of all or any portion of the Secured Indebtedness, this Mortgage shall secure the then existing Secured Indebtedness of Mortgagor to the transferee and any and all Secured Indebtedness to such transferee thereafter arising as of the time this Mortgage is established, and with respect to third parties, as of the date it is filed for registry.

6.28    NO UNWRITTEN ORAL AGREEMENTS.  THIS INSTRUMENT, THE CREDIT AGREEMENT AND THE OTHER SECURITY INSTRUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[SIGNATURE PAGES FOLLOW. THE REMAINDER OF THIS PAGE
IS INTENTIONALLY LEFT BLANK.]

26310705

SIGNATURE PAGE

THUS DONE AND SIGNED BY LLOG EXPLORATION OFFSHORE, INC., herein represented by John W. Newman, its Chief Financial Officer and Treasurer, hereunto duly authorized by virtue of a resolution of the Board of Directors, a certified copy of which is attached as Exhibit B to this Mortgage, in the presence of the undersigned Notary Public in and for the State of Louisiana and in the presence of the undersigned competent witnesses, who hereunto sign their names, together with said Appearer and me, Notary, after due reading of the whole, all as of the date hereinabove first written.

Address:
1001 Ochsner Boulevard, Suite 200
Covington, Louisiana, 70433

LLOG EXPLORATION OFFSHORE, INC.

By:
Name: John W. Newman
Title: Chief Financial Officer and Treasurer

ATTESTING WITNESSES TO ALL SIGNATURES:

Name: Aliana Viger

Name: Ashley Hart

NOTARY PUBLIC, STATE OF LOUISIANA
Notarial No.:
Judy Reimel
Notary Public - St. Tammany Parish
My Commission Issued for Life
Notary No. 60807

This instrument was prepared by:

Anne Kersch, Esq.
Mayer Brown LLP
700 Louisiana, Suite 3400
Houston, Texas 77002

26310705

**EXHIBIT A**

To Mortgage, Deed of Trust, Assignment,
Security Agreement, Financing Statement and Fixture Filing,
dated as of December 18, 2009,
from LLOG EXPLORATION OFFSHORE, INC.,
to RONALD DIERKER, Trustee
and JPMORGAN CHASE BANK, N.A., as Administrative Agent

List of Properties

1.      Depth limitations, unit designations, unit tract descriptions and descriptions of undivided leasehold interests, well names, "Operating Interests", "Working Interests" and "Net Revenue Interests" contained in this Exhibit A and the listing of any percentage, decimal or fractional interest in this Exhibit A shall not be deemed to limit or otherwise diminish the interests being subjected to the lien, security interest and encumbrance of this instrument.

2.      Some of the land descriptions in this Exhibit A may refer only to a portion of the land covered by a particular oil and gas lease. This instrument is not limited to the land described in Exhibit A but is intended to cover the entire interest of the Mortgagor in any lease described in Exhibit A even if such interest relates to land not described in Exhibit A. Reference is made to the land descriptions contained in the documents of title recorded as described in this Exhibit A. To the extent that the land descriptions in this Exhibit A are incomplete, incorrect or not legally sufficient, the land descriptions contained in the documents so recorded are incorporated herein by this reference.

3.      References in Exhibit A to instruments on file in the public records are made for all purposes. Unless provided otherwise, all recording references in Exhibit A are to the official real property records of the county or counties (or parish or parishes) in which the mortgaged property is located and in which records such documents are or in the past have been customarily recorded, whether Deed Records, Oil and Gas Records, Oil and Gas Lease Records or other records.

4.      A statement herein that a certain interest described herein is subject to the terms of certain described or referred to agreements, instruments or other matters shall not operate to subject such interest to any such agreement, instrument or other matter except to the extent that such agreement, instrument or matter is otherwise valid and presently subsisting nor shall such statement be deemed to constitute a recognition by the parties hereto that any such agreement, instrument or other matter is valid and presently subsisting.

[Do not detach this page]

26310705

## LLOG Exploration Offshore, Inc.

### a. Green Canyon 157/201 (OCS-G 24154 and OCS-G 12210)

Lease #1 (OCS-G 24154)
Lessor:       United States of America
Lessee:       LLOG Exploration Offshore, Inc. (50%) and Davis Offshore, L.P. (50%)
Date:         June 1, 2002
Recordation:  July 25, 2005, in Book 1927, beginning at page 652, under Entry No.
1215674 and January 10, 2006, in Book 1951, beginning at page 12, under Entry No.
1227584 (Terrebonne Parish, Louisiana)
Lease Description:    All of Block 157, Green Canyon, OCS Official Protraction
Diagram, NG 15-03.

Lease #2 (OCS-G 12210)
Lessor:       United States of America
Lessee:       BP Exploration Inc.
Date:         May 1, 1990
Recordation:  August 4, 1998, in Book 1614, beginning at page 791, under Entry No.
1026252 (Terrebonne Parish, Louisiana)
Lease Description:    NE/4 of Block 201, Green Canyon, OCS Official Protraction
Diagram, NG 15-3 insofar and only insofar as to depths from surface down to 17,000' SS
TVD.

Assignment #1:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     LLOG Energy, L.L.C. – 1% record title interest in and to Lease No. 1
above.
Eff. Date:    March 13, 2003
Recordation:  March 20, 2003, in Book 1811, beginning at page 771, under Entry No.
1142530 (Terrebonne Parish, Louisiana)

Assignment #2:
Assignor:     Davis Offshore, LP
Assignee:     LLOG Exploration Offshore, Inc. – 35% record title interest in and to
Lease No. 1 above.
Eff. Date:    June 20, 2003
Recordation:  October 9, 2003, in Book 1838, beginning at page 809, under Entry No.
1161371 (Terrebonne Parish, Louisiana)

Assignment #3:
Assignor:     Shell Offshore Inc. and Marathon Oil Company
Assignee:     LLOG Exploration Offshore, Inc., et al – 85% operating rights interest to
LLOG in and to Lease No. 2 above.
Eff. Date:    October 1, 2008
Recordation:  November 17, 2009, in Book 2174, beginning at Page 43, under Entry No.
1335638 (Terrebonne, Louisiana)

263 10705

### b. High Island A-309 (OCS-G 2735)

Lease #1 (OCS-G 2735)
Lessor:        United States of America
Lessee:        Burmah Oil and Gas Company, et al
Date:          July 1, 1974
Recordation:   October 28, 1996 under Entry No. 96-9633091 (Jefferson County, Texas)

Assignment #1:
Assignor:      Texas Pacific Oil Company, Inc.
Assignee:      Sun Oil Company – 15% of assignor's record title interest in Lease No. 1 above.
Eff. Date:     November 1, 1980
Recordation:   December 7, 1999, under Entry No. 1999-046074 (Jefferson County, Texas)

Assignment #2:
Assignor:      El Paso Natural Gas Company
Assignee:      El Paso Exploration Company – 25% of assignor's record title interest in Lease No. 1 above.
Eff. Date:     August 31, 1981
Recordation:   July 29, 2002, under Entry No. 2002-027787 (Jefferson County, Texas)

Assignment #3:
Assignor:      Sun Exploration and Production Company
Assignee:      Sun Operating Limited Partnership – 15% of assignor's right, title and interest in Lease No. 1 above.
Eff. Date:     December 1, 1985
Recordation:   December 7, 1999, under Entry No. 1999-046079 (Jefferson County, Texas)

Assignment #4:
Assignor:      El Paso Natural Gas Company
Assignee:      El Paso Production Company – 11.25% of assignor's record title interest in Lease No. 1 above.
Eff. Date:     August 31, 1991
Recordation:   July 29, 2002, under Entry No. 2002-027793 (Jefferson County, Texas)

Assignment #5:
Assignor:      El Paso Production Company and Meridian Oil Production Inc.
Assignee:      Meridian Oil Offshore Inc. – 15% of assignor's record title interest in Lease No. 1 above.
Eff. Date:     January 1, 1996
Recordation:   July 29, 2002, under Entry No. 2002-027794 (Jefferson County, Texas)

26310705

**Assignment #6:**
Assignor:      Amoco Production Company
Assignee:      Panaco, Inc. – 45% of assignor's record title interest in Lease No. 1 above.
Eff. Date:     September 1, 1996
Recordation:   October 28, 1996, under Entry No. 96-9633104 (Jefferson County, Texas)

**Assignment #7:**
Assignor:      Phillips Petroleum Company
Assignee:      Coastal Oil & Gas USA, L.P. – all of assignor's right, title and interest in
Lease No. 1 above.
Eff. Date:     July 1, 1996
Recordation:   July 23, 1997, under Entry No. 97-9721791 (Jefferson County, Texas)

**Assignment #8:**
Assignor:      Sun Operating Limited Partnership
Assignee:      Coastal Oil & Gas USA, L.P. – 15% of assignor's record title interest in
Lease No. 1 above.
Eff. Date:     November 1, 1996
Recordation:   February 14, 1997, under Entry No. 97-9704117 (Jefferson County,
Texas)

**Assignment #9:**
Assignor:      Coastal Oil & Gas USA, L.P.
Assignee:      Panaco, Inc.- 5% of assignor's record title interest in Lease No.1  above.
Eff. Date:     February 1, 1997
Recordation:   July 30, 1997, under Entry No. 97-9722795 (Jefferson County, Texas)

**Assignment #10:**
Assignor:      Burlington Resources Offshore Inc.
Assignee:      Coastal Oil & Gas USA, L.P. – 15% of assignor's record title interest I
Lease No. 1 above.
Eff. Date:     July 1, 1997
Recordation:   January 20, 1998, under Entry No. 98-9801735 (Jefferson County, Texas)

**Assignment #11:**
Assignor:      Panaco, Inc.
Assignee:      El Paso Production Oil & Gas Company – all of assignor's record title
interest in Lease No. 1 above
Eff. Date:     January 1, 2001
Recordation:   May 9, 2002, under Entry No. 2002-017216 (Jefferson County, Texas)

**Assignment #12:**
Assignor:      El Paso Production Oil & Gas Company
Assignee:      SPN Resources, LLC – 50% of assignor's record title interest in Lease No.
1 above.
Eff. Date:     June 30, 2005
Recordation:   August 1, 2005, under Entry No. 2005-029249 (Jefferson County, Texas)

26310705

<u>Assignment #13:</u>
Assignor:     El Paso Production USA, L.P.
Assignee:     SPN Resources, LLC – 50% of assignor's record title interest in Lease No.
1 above.
Eff. Date:    June 30, 2005
Recordation:  August 1, 2005, under Entry No. 2005-029250 (Jefferson County, Texas)

<u>Assignment #14:</u>
Assignor:     SPN Resources, LLC
Assignee:     LLOG Exploration Offshore, Inc., et al – 100% of assignor's operating
rights in and to NE/4 of Lease No. 1 above, 0-9,600' TVD (60% to LLOG)
Eff. Date:    September 1, 2007
Recordation:  January 11, 2008, under Entry No. 2008-001090 (Jefferson County,
Texas)

<u>Assignment #15:</u>
Assignor:     SPN Resources, LLC
Assignee:     LLOG Exploration Offshore, Inc., et al – 100% of assignor's operating
rights in and to N/2 OF NW/4; N/2 of S/2 of NW/4 of Lease No. 1 above, 0-2,214' TVD
(60% to LLOG)
Eff. Date:    September 1, 2007
Recordation:  January 11, 2008, under Entry No. 2008-001091 (Jefferson County,
Texas)

<u>Assignment #16:</u>
Assignor:     SPN Resources, LLC
Assignee:     LLOG Exploration Offshore, Inc., et al – 100% of assignor's operating
rights in and to S/2 S/2 NW/4; N/2 N/2 SW/4 of Lease No. 1 above, 0-7,300' TVD (60%
to LLOG)
Eff. Date:    January 15, 2009
**Recordation: Presently being recorded**

<u>Assignment #17:</u>
Assignor:     SPN Resources, LLC
Assignee:     LLOG Exploration Offshore, Inc., et al – 100% of assignor's operating
rights in and to S/2 N/2 SW/4; S/2 SW/4; SE/4 of Lease No. 1 above, 0-11,100' TVD
(60% to LLOG)
Eff. Date:    January 15, 2009
**Recordation: Presently being recorded**

26310705

### c. South Marsh Island 15 (OCS-G 09534)

Lease #1 (OCS-G 09534)
Lessor:     United States of America
Lessee:     Corpus Christi Exploration Company
Date:       Effective June 1, 1988
Recordation: November 20, 1990 in COB 1000, page 743, under Entry No. 90-7288
(Iberia Parish); May 26, 2005 under Entry No. 20505984 (Vermilion Parish).
Lease Description: All of Block 15, South Marsh Island Area, OCS Leasing Map,
Louisiana Map No. 6A

Assignment #1:
Assignor:  Corpus Christi Exploration Company
Assignee:  PB – SB 1988 Investment Partnership II – undivided 16.66667% interest
The Northwestern Mutual Life Insurance Company – undivided 50% interest
Date:       October 27, 1989, effective July 11, 1989
Recordation:  May 26, 2005 in COB 1306, page 696, under Entry No. 2005-
00006926 (Iberia Parish); and under Entry No. 20505986 (Vermilion Parish).

Assignment #2:
Assignor:  PB – SB 1988 Investment Partnership II and The Northwestern Mutual
Life Insurance Company
Assignee:  PG&E Resources Offshore Company – undivided 7.4074% interest in
Area "B", being S/2 SW/4 NW/4; SW/4 SE/4 NW/4; NW/4 SW/4; W/2 NE/4 SW/4;
NW/4 SW/4 SW/4
Date:       May 7, 1992, effective January 1, 1991
Recordation:  December 9, 1993 in COB 1065, page 298, under Entry No. 93-8964
(Iberia Parish); and May 26, 2005 under Entry No. 20505987 (Vermilion Parish).

Assignment #3:
Assignor:  PB – SB 1988 Investment Partnership II
Assignee:  Barrett Resources Corporation – all its undivided interest in the lease as to
Area "B", being S/2 SW/4 NW/4; SW/4 SE/4 NW/4; NW/4 SW/4; W/2 NE/4 SW/4;
NW/4 SW/4 SW/4
Date:       November 13, 1997, effective July 1, 1997
Recordation:  Unrecorded. However, an Assignment of all of Assignor's interest in
the Lease and the Block dated November 13, 1997, was recorded as follows:  In
Iberia Parish, on May 26, 2005, in COB 1306, Page 943, under Entry No. 2005-
00006396.  In Vermilion Parish, on December 23, 1997, under Entry No. 9715230.

Assignment #4:
Assignor:  PB – SB 1988 Investment Partnership II
Assignee:  Barrett Resources Corporation – all its undivided interest in the lease less
and except Area "B", being NW/4 NW/4; NE/4 NW/4; N/2 SW/4 NW/4; NW/4 SE/4
NW/4; E/2 SE/4 NW/4; E/2 NE/4 SW/4; NE/4 SW/4 SW/4; S/2 SW/4 SW/4; SE/4
SW/4; E/2
Date:       November 13, 1997, effective July 1, 1997

26310705

Recordation:  Unrecorded.  However, an Assignment of all of Assignor's interest in
the Lease and the Block dated November 13, 1997, was recorded as follows:  In
Iberia Parish, on May 26, 2005, in COB 1306, Page 943, under Entry No. 2005-
00006396.  In Vermilion Parish, on December 23, 1997, under Entry No. 9715230.

Assignment #5:
Assignor:  EEX Corporation (successor in interest to Corpus Christi Exploration
Company)
Assignee:  Energy Resource Technology, Inc. – all of its undivided interest
Date:       February 23, 2000
Recordation:  May 26, 2005 in COB 1306, page 733, under Entry No. 2005-
00006301 (Iberia Parish) and August 10, 2005 under Entry No. 20509210 (Vermilion
Parish).

Assignment #6:
Assignor:  Williams Production RMT Company (successor in interest to Barrett
Resources Corporation)
Assignee:  Energy Resource Technology, Inc. – all of its undivided interest in the
lease as to Area "B"
Date:       June 6, 2002, effective April 1, 2002
Recordation:  May 26, 2005 in COB 1306, page 751, under Entry No. 2005-
00006303 (Iberia Parish); and August 10, 2005 under Entry No. 20509211 in
Vermilion Parish.

Assignment #7:
Assignor:  Williams Production RMT Company (successor in interest to Barrett
Resources Corporation)
Assignee:  Energy Resource Technology, Inc. – all of its undivided interest in the
lease less and except Area "B"
Date:       June 6, 2002, effective April 1, 2002
Recordation:  May 26, 2005 in COB 1306, page 751, under Entry No. 2005-
00006303 and in COB 1306, page 766 under Entry No. 2005-00006304 (Iberia
Parish); and August 10, 2005 under Entry No. 20509212 in Vermilion Parish.

Assignment #8:
Assignor:  The Northwestern Mutual Life Insurance Company
Assignee:  Energy Resource Technology, Inc. – an undivided 5.55555% interest in
the Lease as to Area "A", being SW/4 SW/4 SW/4; NE/4 SW/4 SW/4; NE/4 SW/4
SW/4; NW/4 SE/4 SW/4
Date:       December 13, 2004, effective January 1, 1991
Recordation:  July 25, 2005 under Entry No. 20508391 of the records of Vermilion
Parish and August 10, 2005 in COB 1313, page 525 under Entry No. 2005-00010218
in Iberia Parish.

26310705

<u>Assignment #9:</u>
Assignor:  The Northwestern Mutual Life Insurance Company
Assignee:  Energy Resource Technology, Inc. – an undivided 5.55555% interest in
the Lease as to Area "C", being SE/4 SW/4 SW/4; E/2 SE/4 SW/4; SW/4 SE/4 SW/4;
W/2 SW/4 SE/4
Date:       December 13, 2004, effective January 1, 1991
Recordation:  July 25, 2005 under Entry No. 20508392 of the records of Vermilion
Parish and August 10, 2005 in COB 1313, page 533 under Entry No. 2005-00010219
in Iberia Parish.

<u>Assignment #10:</u>
Assignor:  Energy Resource Technology, Inc. (40%) and The Northwestern Mutual
Life Insurance Company (25%)
Assignee:  Badger Oil Corporation – an undivided 65% operating rights interest in
the Lease as to depths from the surface of the earth down to and including a depth of
11,010' MD/ 9960' TVD as to E/2 NE/4 SW/4; E/2 SE/4; NE/2 SE/4; E/2 SW/4 SE/4
Date:       Effective April 1, 2004
Recordation:. July 28, 2005 under Entry No. 20508648 in Vermilion Parish and July
29, 2005 in COB 1312, page 151 under Entry No. 2005-00009584 in Iberia Parish.

<u>Assignment #11:</u>
Assignor:  Energy Resource Technology, Inc. (44.44444%) and The Northwestern
Mutual Life Insurance Company (22.22223%)
Assignee:  Badger Oil Corporation – an undivided 66.66667% operating rights
interest in the Lease as to depths from the surface of the earth down to and including
a depth of 11,010' MD/ 9960' TVD as to S/2 SW/4; NW/4 SW/4; W/2 NE/4 SW/4;
W/2 SW/4 SE/4
Date:       Effective April 1, 2004
Recordation:  July 28, 2005 under Entry No. 20508647 in Vermilion Parish and July
29, 2005 in COB 1312, page 144 under Entry No. 2005-00009583 in Iberia Parish.

<u>Assignment #12:</u>
Assignor:  Badger Oil Corporation
Assignee:  LLOG Exploration Offshore, Inc.– an undivided 39% operating rights
interest in the Lease as to depths from the surface of the earth down to and including
a depth of 11,010' MD/ 9960' TVD as to E/2 NE/4 SW/4; E/2 SE/4; NW/4 SE/4; E/2
SW/4 SE/4
Date:       Effective April 1, 2004
Recordation:  August 10, 2005 under Entry No. 20509213 in Vermilion Parish and
August 10, 2005 in COB 1313, page 541 under Entry No. 2005-00010220 in Iberia
Parish.

26310705

Assignment #13:
Assignor: Badger Oil Corporation
Assignee: LLOG Exploration Offshore, Inc.– an undivided 40% operating rights interest in the Lease as to depths from the surface of the earth down to and including a depth of 11,010' MD/ 9960' TVD as to S/2 SW/4; NW/4 SW/4; W/2 NE/4 SW/4; W/2 SW/4 SE/4
Date:       Effective April 1, 2004
Recordation: August 10, 2005 under Entry No. 20509214 in Vermilion Parish and August 10, 2005 in COB 1313, page 547 under Entry No. 2005-00010221 in Iberia Parish.


d. **Vermilion 171 (OCS-G 01130 and OCS-G 21089)**

Lease #1 (OCS-G 01130)
Lessor:     United States of America
Lessee:    Pan American Petroleum Corporation
Date:       Effective June 1, 1962
Recordation: June 7, 1982 under Entry No. 8204555 of the Records of Vermilion Parish.
Lease Description: All of Block 171, Vermilion Area as shown on Official Leasing Map, Louisiana Map No. 3, containing approximately 4,778.47 acres.

Assignment #1:
Assignor: Pan American Petroleum Corporation
Assignee: Amerada Petroleum Corporation – 10%; The Louisiana Land & Exploration Company – 10%; Signal Oil & Gas Company – 10%; Zapata – C&K – 30% record title interest in lease
Date:       January 18, 1966
Recordation: COB 594, Entry No. 183124 of the records of Vermilion Parish.

Assignment #2:
Assignor: Signal Oil & Gas Company
Assignee: C&K Petroleum, Inc. – all of its record title interest in lease
Date:       July 2, 1973
Recordation: COB 837, Entry No. 240171 of the records of Vermilion Parish.

Assignment #3:
Assignor: The Louisiana Land & Exploration Company
Assignee: C&K Petroleum, Inc. – all of its record title interest in lease
Date:       June 27, 1973
Recordation: COB 837, Entry No. 240170 of the records of Vermilion Parish.

Assignment #4:
Assignor: Amerada Petroleum Corporation
Assignee: C&K Petroleum, Inc. – all of its record title interest in lease
Date:       May 25, 1973
Recordation: COB 837, Entry No. 240169 of the records of Vermilion Parish.

**263 10 705**

Assignment #5:
Assignor:  Zapata – C&K
Assignee:  Chambers & Kennedy – 3.304689%; Coastal Production Company –
1.184211%; Waymon G. Peavy – 5.000511%; Harbert Construction Corporation –
1.381581%; Jenny Manufacturing Company – 4.046052%; Kirby Petroleum
Company – 1.184211%; H.C. Price Company – 1.184211%; States Marine Lines, Inc.
– 5.230263%; Zapata Norness Incorporated – 7.484271% record title interest in lease
Date:      February 1, 1969
Recordation:  COB 663, Entry No. 196763 of the records of Vermilion Parish.

Assignment #6:
Assignor:  Amoco Production Company (successor to Pan American Petroleum
Corp.)
Assignee:  C&K Petroleum, Inc. – all of its record title interest in lease
Date:      July 10, 1973
Recordation:  COB 837, Entry No. 240172 of the records of Vermilion Parish.

Assignment #7:
Assignor:  The Louisiana Land & Exploration Company
Assignee:  Energy Resource Technology, Inc. – undivided 98.618419% record title
interest in lease
Date:      February 19, 2002
Recordation:  Entry No. 20202242 of the records of Vermilion Parish.

Assignment #8:
Assignor:  Harbert Energy Corporation
Assignee:  Frank A. Dixon, Jr. – all of its record title interest in lease
Date:      October 27, 1993
Recordation:  May 26, 2005 under Entry No. 20505988 of the records of Vermilion
Parish.

Assignment #9:
Assignor:  Energy Resource Technology, Inc. – 72.80150%; Pengo Petroleum, Inc. –
1.191104%; Frank A. Dixon, Jr. – 5.28746%
Assignee:  Badger Oil Corporation – 80% operating rights interest in S/2 NE/4 SE/4;
NE/4 SE/4 SE/4 as to depths from surface of the earth down to and including a depth
of 11,022' TVD
Date:      January 31, 2005, effective February 15, 2005
Recordation:  March 10, 2005 under Entry No. 20502655 of the records of Vermilion
Parish.

2 6 3 1 0 7 0 5          6 3 1 0 7 0 5

Assignment #10:
Assignor:  Energy Resource Technology, Inc.
Assignee:  Badger Oil Corporation – 68.25141% operating rights interest in N/2 NE/4
SE/4 as to depths from surface of the earth down to and including a depth of 11,022'
TVD
Date:      January 31, 2005, effective February 15, 2005
Recordation:  March 10, 2005 under Entry No. 20502657 of the records of Vermilion
Parish.

Assignment #11:
Assignor:  Energy Resource Technology, Inc. – 70.69110%; Pengo Petroleum, Inc. –
2.55286%; Frank A. Dixon, Jr. – 6.75604%
Assignee:  Badger Oil Corporation – 80% operating rights interest in S/2 NW/4 SE/4;
SW/4 SE/4; W/2 SE/4 SE/4; SE/4 SE/4 SE/4 as to depths from surface of the earth
down to and including a depth of 11,022' TVD
Date:      January 31, 2005, effective February 15, 2005
Recordation:  March 10, 2005 under Entry No. 20502654 of the records of Vermilion
Parish.

Assignment #12:
Assignor:  Energy Resource Technology, Inc.
Assignee:  Badger Oil Corporation – 66.27291% operating rights interest in N/2
NW/4 SE/4; S/2 NE/4 as to depths from surface of the earth down to and including a
depth of 11,022' TVD
Date:      January 31, 2005, effective February 15, 2005
Recordation:  March 10, 2005 under Entry No. 20502656 of the records of Vermilion
Parish.

Assignment #13:
Assignor:  Badger Oil Corporation
Assignee:  LLOG Exploration Offshore – 48% operating rights interest in S/2 NE/4
SE/4; NE/4 SE/4 SE/4 as to depths from surface of the earth down to and including a
depth of 11,022' TVD
Date:      March 14, 2005, effective February 15, 2005
Recordation:  July 28, 2005 under Entry No. 20508645 of the records of Vermilion
Parish.

Assignment #14:
Assignor:  Badger Oil Corporation
Assignee:  LLOG Exploration Offshore – 40.95085% operating rights interest in N/2
NE/4 SE/4 as to depths from surface of the earth down to and including a depth of
11,022' TVD
Date:      March 14, 2005, effective February 15, 2005
Recordation:  July 28, 2005 under Entry No. 20508646 of the records of Vermilion
Parish.

26310705

Assignment #15:
Assignor: Badger Oil Corporation
Assignee: LLOG Exploration Offshore – 48% operating rights interest in S/2 NW/4 SE/4; SW/4 SE/4; W/2 SE/4 SE/4; SE/4 SE/4 SE/4 as to depths from surface of the earth down to and including a depth of 11,022' TVD
Date:        March 14, 2005, effective February 15, 2005
Recordation: July 28, 2005 under Entry No. 20508644 of the records of Vermilion Parish.

Assignment #16:
Assignor: Badger Oil Corporation
Assignee: LLOG Exploration Offshore – 39.76375% operating rights interest in N/2 NW/4 SE/4; S/2 NE/4 as to depths from surface of the earth down to and including a depth of 11,022' TVD
Date:        March 14, 2005, effective February 15, 2005
Recordation: July 28, 2005 under Entry No. 20508643 of the records of Vermilion Parish.

Lease #2 (OCS-G 21089)
Lessor:      United States of America
Lessee:      Seneca Resources Corporation
Date:        Effective July 1, 1999
Recordation: July 6, 2005 under Entry No. 20507685 of the Records of Vermilion Parish.
Lease Description: All of Block 172, Vermilion Area, OCS Leasing Map, Louisiana Map No. 3, containing approximately 4,742.38 acres.

Assignment #1:
Assignor: Seneca Resources Corporation
Assignee: Badger Oil Corporation – all of its operating rights interest in N/2 NE/4 NE/4 as to depths from surface of the earth down to 100 feet below the stratigraphic equivalent of 11,075' MD/ 7,720' TVD as seen on the log of the Badger – OCS-G 21089 No. A-11 Well.
Date:        March 25, 2004, effective February 15, 2004
Recordation: July 25, 2005 under Entry No. 20508399 of the records of Vermilion Parish.

Assignment #2:
Assignor: Badger Oil Corporation
Assignee: LLOG Exploration Offshore, Inc. – 48%; Energy Resource Technology, Inc. – 17.67278%; Pengo Petroleum, Inc. – 0.63821%; Frank A. Dixon, Jr. – 1.68901% operating rights interest in N/2 NE/4 NE/4 as to depths from surface of the earth down to 100 feet below the stratigraphic equivalent of 11,075' MD/ 7,720' TVD as seen on the log of the Badger – OCS-G 21089 No. A-11 Well.
Date:        effective February 15, 2004
Recordation: April 13, 2005 under Entry No. 20504089 of the records of Vermilion Parish

26310705

e.   **Green Canyon 141 (OCS-G 21785)**

Lease #1 (OCS-G 21785)
Lessor:       United States of America
Lessee:       Westport Oil and Gas Company, Inc.
Date:         May 1, 2000
Recordation:  January 6, 2009, in Book 179, beginning at page 453, under Entry No.
302952 (St. Mary Parish, Louisiana)
Lease Description:    All of Block 141, Green Canyon, OCS Official Protraction
Diagram, NG 15-03

Assignment #1:
Assignor:     Westport Oil and Gas Company, L.P.
Assignee:     LLOG Exploration Offshore, Inc. – 50% Record Title in and to the Lease.
Eff. Date:    December 1, 2003
Recordation:  March 29, 2004, in Book 55, beginning at page 237, under Entry No.
285163 (St. Mary Parish, Louisiana)

Assignment #2:
Assignor:     Westport Oil and Gas Company, L.P.
Assignee:     LLOG Exploration Offshore, Inc. – Additional 50% Record Title in and to
the Lease.
Eff. Date:    September 15, 2004
Recordation:  April 8, 2005, in Book 80, beginning at page 360, under Entry No. 288919
(St. Mary Parish, Louisiana)

Assignment #3:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Ridgewood Energy Corporation – 25% Record Title in and to the Lease.
Eff. Date:    March 1, 2008
Recordation:  September 9, 2008, in Book 170, beginning at page 749, under Entry No.
301912 (St. Mary Parish, Louisiana)

Assignment #4:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Ridgewood Energy Corporation – 20% Record Title Interest in and to the
Lease.
Eff. Date:    October 1, 2009
Recordation:  December 7, 2009 in Book 199, beginning at Page 9, under Entry No.
305874 (St. Mary Parish, LA)

Assignment #5:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Ridgewood Energy Corporation – 5% Record Title Interest in and to the
Lease.
Eff. Date:    October 1, 2009
Recordation:  NOT RECORDED (due 12/21/09)

26310705

f.   **Green Canyon 448 (OCS-G 28077)**

Lease #1 (OCS-G 28077)
Lessor:      United States of America
Lessee:      LLOG Exploration Offshore, Inc.
Date:         July 1, 2006
Recordation:   February 29, 2008, in Book 152, beginning at page 343, under Entry No.
299430 (St. Mary Parish, Louisiana)
Lease Description:    All of Block 448, Green Canyon, OCS Official Protraction
Diagram, NG 15-03

Assignment #1:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Nexen Petroleum Offshore USA, Inc. –25% Record Title in and to the
Lease.
Eff. Date:     July 1, 2007
Recordation:   July 30, 2008, in Book 167, beginning at page 724, under Entry No.
301506 (St. Mary Parish, Louisiana)

Assignment #2:
Assignor:     Nexen Petroleum Offshore USA, Inc.
Assignee:     LLOG Exploration Offshore, Inc. –25% Record Title in and to the Lease.
Eff. Date:     May 7, 2009
Recordation:   May 29, 2009, in Book 188, beginning at page 727, under Entry No.
304292 (St. Mary Parish, Louisiana)

Assignment #3:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Deep Gulf Energy LP, Deep Gulf Energy II LLC –12.5% Record Title
each in and to the Lease.
Eff. Date:     May 8, 2009
Recordation:   May 29, 2009, in Book 188, beginning at page 700, under Entry No.
304290 (St. Mary Parish, Louisiana), May 29, 2009, in Book 1430, beginning at page
599, under Entry No. 2009-00005992 (Iberia Parish, Louisiana) and May 29, 2009, in
Book 2152, beginning at page 798, under Entry No. 1323562 (Terrebonne Parish,
Louisiana)

Assignment #4:
Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Ridgewood Energy Corporation – 20% Record Title Interest in and to the
Lease.
Eff. Date:     October 1, 2009
Recordation:   December 7, 2009, in Book 199, beginning at Page 9, under Entry No.
305874 (St. Mary Parish, Louisiana)

Assignment #5:

**26310705**

Assignor:     LLOG Exploration Offshore, Inc.
Assignee:     Ridgewood Energy Corporation – 5% Record Title Interest in and to the
Lease.
Eff. Date:     October 1, 2009
Recordation:  NOT RECORDED (due 12/21/09)

g.   **Mississippi Canyon 754 (OCS-G 24104)**

Lease #1 (OCS-G 24104)
Lessor:       United States of America
Lessee:       Nexen Petroleum Offshore U.S.A. Inc.
Date:         June 1, 2002
Recordation:  January 5, 2009, in Book 1197, beginning at page 258, under Entry No.
2009-00000030 (Plaquemines Parish, Louisiana)
Lease Description:     All of Block 754, Mississippi Canyon, OCS Official Protraction
Diagram, NH 16-10

Assignment #1:
Assignor:     Nexen Petroleum Offshore, Inc.
Assignee:     Newfield Exploration Company –50% Record Title in and to the Lease.
Eff. Date:     October 1, 2004
Recordation:  January 5, 2009, in Book 1197, beginning at Page 270, under Entry No.
2009-00000031 (Plaquemines Parish, Louisiana)

Assignment #2:
Assignor:     Nexen Petroleum Offshore, Inc.
Assignee:     ATP Oil & Gas Corporation – 50% Record Title in and to the Lease.
Eff. Date:     January 23, 2007
Recordation:  February 22, 2008, in Book 1175, beginning at Page 88, under Entry No.
2008-00001204 (Plaquemines Parish, Louisiana)

Assignment #3:
Assignor:     ATP Oil & Gas Corporation
Assignee:     Newfield Exploration Company –25% Record Title in and to the Lease.
Eff. Date:     January 23, 2008
Recordation:  April 24, 2008, in Book 1181, beginning at Page 369, under Entry No.
2008-00002585 (Plaquemines Parish, Louisiana)

Assignment #4:
Assignor:     Newfield Exploration Company
Assignee:     LLOG Exploration Offshore, Inc. –25% Record Title in and to Lease No.
1 above.
Eff. Date:     January 1, 2008
Recordation:  October 9, 2008, in Book 1192, beginning at page 804, under Entry No.
2008-00005595 (Plaquemines Parish, Louisiana)

2 6 3 1 0 7 0 5

## EXHIBIT B

To Mortgage, Deed of Trust, Assignment, Security Agreement,
Financing Statement, and Fixture Filing,
dated as of December 18, 2009,
from LLOG EXPLORATION OFFSHORE, INC.,
to RONALD DIERKER, Trustee
and JPMORGAN CHASE BANK, N.A., as Administrative Agent

Certified Resolutions of the Mortgagor
Louisiana requirement only

26310705

## UNANIMOUS WRITTEN CONSENT OF DIRECTOR OF
## LLOG EXPLORATION OFFSHORE, INC.

### IN LIEU OF A MEETING

The undersigned, being the sole director of LLOG Exploration Offshore, Inc., a Louisiana corporation (the "Company"), hereby adopts, by unanimous consent in writing (the "Consent"), in accordance with the laws of the State of Louisiana, the following resolutions with the same force and effect as if they had been adopted at a duly convened meeting of the directors of the Company:

WHEREAS, the Company is a party, as a guarantor, to that certain Credit Agreement dated as of July 14, 2005, as amended from time to time (the "Original Credit Agreement"), among LLOG Exploration Company, L.L.C., a Louisiana limited liability company and affiliate of the Company (the "Borrower"), certain financial institutions from time to time party thereto, certain other guarantors, and JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent");

WHEREAS, the Borrower desires that the Original Credit Agreement be amended and restated in the manner described in that certain Amended and Restated Credit Agreement (the "Credit Agreement") dated as of June 27, 2008, a draft of which has been reviewed by the sole director of the Company pursuant to which the Borrower may borrow from, and receive loans and letters of credit from, various financial institutions from time to time party thereto (hereinafter called the "Lenders") in the original principal sum of up to $300,000,000 (hereinafter called the "Facilities");

NOW, THEREFORE, BE IT:

RESOLVED, that the sole director of the Company hereby approves the Credit Agreement; and

FURTHER RESOLVED, that the President, Chief Financial Officer, Treasurer and Secretary of the Company ("Authorized Officers"), as a guarantor of the Facilities, are each hereby authorized for and on behalf of the Company to negotiate such terms and conditions for the Facilities as such Authorized Officer may deem best, and to execute and deliver for and on behalf of the Company letters of credit, promissory notes, guaranties, security agreements, loan agreements, mortgages, deeds of trust and such other instruments or written obligations of the Company as may be desired or required by the Administrative Agent or the Lenders in connection with the Facilities and containing such terms and conditions as may be acceptable or agreeable to such Authorized Officer, such acceptance and agreement to be conclusively evidenced by the execution and delivery thereof by any of the Authorized Officers, including, but not limited to the Credit Agreement;

FURTHER RESOLVED, that in the judgment of the sole director of the Company (a) the value of the consideration received and to be received by the Company, directly or indirectly, is reasonably worth at least as much as the liability and obligation of the Company under the Credit Agreement and the other Loan Documents to which the Company is a party, and (b) such liability and obligation may reasonably be expected to benefit, directly and indirectly, the Company;

26310705

FURTHER RESOLVED, that each Authorized Officer is authorized to execute and deliver for and on behalf of the Company collateral mortgage notes, collateral mortgages, mortgages, deeds of trust, security or pledge agreements, subordinated agreements, subordinated promissory notes, financing statements and such other instruments as may be required by the Administrative Agent or the Lenders in connection with the Facilities and containing such terms and conditions as may be acceptable or agreeable to such Authorized Officer, such acceptance and agreement to be conclusively evidenced by such Authorized Officer's execution and delivery thereof;

FURTHER RESOLVED, that the sole director of the Company hereby approves and authorizes the Company to enter into one or more interest rate protection agreements, commodity price protection agreements or other interest or currency exchange rate or commodity price hedging arrangements ("Swap Agreements"), including Swap Agreements between the Company and any Lender or any affiliate of any Lender;

FURTHER RESOLVED, that the Company grant to the Lenders a lien upon and/or a security interest upon such assets of the Company as may be agreed upon between any Authorized Officer and the Administrative Agent and the Lenders as security for repayment of the Facilities and any and all extensions for any period, rearrangements or renewals thereof and as security for any and all indebtedness, obligations and liabilities of the Company under any Swap Agreements, promissory notes, security agreements, loan agreements, deeds of trust, mortgages and any other instruments or written obligations of the Company in connection with the Facilities or any other indebtedness, obligations and liabilities of the Company owing to the Administrative Agent, the letter of credit issuing bank, the Lenders, and any affiliates of any of the foregoing party from time to time with a Swap Agreement with the Company, either directly or by assignment;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized for and on behalf of the Company to negotiate such terms and conditions for the grant of liens and/or security interests contemplated hereby as any of said Authorized Officers may deem best, and to execute and deliver for and on behalf of the Company, Swap Agreements, security agreements, mortgages, deeds of trust, financing statements, subordination agreements and such other instruments, agreements or written obligations of the Company as may be desired or required by the Lenders in connection with the grant of liens and/or security interests contemplated hereby and containing such terms, agreements and conditions as may be acceptable or agreeable to any of said Authorized Officers, such acceptance and agreement to be conclusively evidenced by any of said Authorized Officers' execution and delivery thereof;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized in the name of and on behalf of the Company to take such further action and to do all things that may appear in the discretion of any of them to be necessary in connection with amendments, supplements, waivers, renewals, increases, extensions for any period, rearrangements, retirements or compromises of the indebtedness, obligations and liabilities of the Company to the Administrative Agent and the Lenders arising out of the Facilities or any other indebtedness, obligations and liabilities of the Company owing to the Lenders, either directly or by assignment;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized in the name and on behalf of the Company to take such further

26310705

action and do all things that may appear in the discretion of any of them to be necessary, advisable or appropriate in connection with the amendment, modification, increase, replacement of, or any waiver or consent in respect of, any term or provision of, the agreements or instruments executed in connection with the Facilities, including but not limited to the Credit Agreement;

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and empowered to do or cause to be done all such acts or things and to sign and deliver, or cause to be signed and delivered, all such documents, instruments and certificates (including, without limitation, any and all notices and certificates required or permitted to be given or made to the Lenders under the terms of the Credit Agreement or any other instrument executed on behalf of the Company in connection with the Facilities), in the name and on behalf of the Company or otherwise, as the Authorized Officers, in their discretion, may deem necessary, advisable or appropriate to effectuate or carry out the purposes and intent of the foregoing resolutions and to perform the obligations of the Company under all instruments executed on behalf of the Company in connection with the Facilities;

FURTHER RESOLVED, that the execution by any of the Authorized Officers of any document authorized by the foregoing resolutions or any document executed in the accomplishment of any action or actions so authorized, is (or shall become upon delivery) the enforceable and binding act and obligation of the Company, without the necessity of the signature or attestation of any other officer of the Company or the affixing of the corporate seal;

FURTHER RESOLVED, that all acts, transactions, or agreements undertaken by the Authorized Officers in the name of the Company and for the account of the Company with the Lenders in connection with the foregoing matters but prior to the adoption of these resolutions are hereby ratified, confirmed and adopted by the Company;

FURTHER RESOLVED, that the Secretary or Assistant Secretary of the Company is hereby authorized and directed to certify these resolutions to the Lenders; and

FURTHER RESOLVED, that the Lenders be promptly notified in writing by the Secretary or any of the Authorized Officers of any change in these resolutions, and until it has actually received such notice in writing, the Lenders are authorized to act in pursuance of these resolutions.

This Consent may be executed in multiple original counterparts, and each copy of this Consent having attached thereto one or more signature pages containing in the aggregate the signature of every member of the Company shall be effective as an original.

[Remainder of page intentionally blank]

26310705

**IN WITNESS WHEREOF,** this Consent is hereby executed effective as of the 26th day of June, 2008.

By: _____

Name:  Gerald A. Boelte

Title:  Director

**263 10 705**

## NOTARIAL CERTIFICATION

THE STATE OF LOUISIANA                    §
                                          §
PARISH OF ST. TAMMANY                     §

    BEFORE ME, the undersigned Notary Public and the undersigned competent witnesses, personally came and appeared  John W. Newman, its Chief Financial Officer and Treasurer of LLOG EXPLORATION OFFSHORE, INC., in its corporate capacity, who did acknowledge and declare that the foregoing Unanimous Written Consent of Director of LLOG Exploration Offshore, Inc., in Lieu of a Meeting is in full force and effect, has not been revoked, was adopted and is in all respects true and correct.

    THUS DONE AND PASSED in my office in Covington, Louisiana, before me, the undersigned Notary Public, and the undersigned competent witnesses this 2nd day of December, 2009.

WITNESSES:

_Alisha Viger_
Name: Alisha Viger

_Ashley Hart_
Name: Ashley Hart

_John W. [signature]_
Name: John W. Newman
Title: Chief Financial Officer and
      Treasurer

_Judy Reimel_
Notary Public in and for
the State of Louisiana

Judy Reimel
Notary Public - St. Tammany Parish
My Commission Issued for Life
Notary No. 69897

ANNEX B
26310705



UNITED STATES OF AMERICA

State of Louisiana

Jay Dardenne

SECRETARY OF STATE

As Secretary of State of the State of Louisiana, I do hereby Certify that

a copy of a Conversion Application of

LLOG EXPLORATION OFFSHORE, INC.

Organized under the laws of Louisiana,

Converting the corporation to a limited liability company, and changing the name to

**LLOG EXPLORATION OFFSHORE, L.L.C.**

Was filed and recorded in this Office on December 31, 2009, with an effective date of December 31, 2009.

In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,

January 4, 2010

*Secretary of State*

TS 34525311K

Certificate ID:  10033823#I5D30

To validate this certificate, visit the following web site, go to Commercial Division, Certificate Validation, then follow the instructions displayed.
www.sos.louisiana.gov

Page 1 of 1 on 1/4/2010 11:23:32 AM

26310705



## UNITED STATES OF AMERICA
## State of Louisiana

### Jay Dardenne
### SECRETARY OF STATE

*As Secretary of State of the State of Louisiana I do hereby Certify that*

the attached document(s) of

**LLOG EXPLORATION OFFSHORE, L.L.C.**

are true and correct and are filed in the Louisiana Secretary of State's Office.
40082091          CONVT          12/31/2009   5 pages

In testimony whereof, I have hereunto set my
hand and caused the Seal of my Office to be
affixed at the City of Baton Rouge on,

January 4, 2010



*Secretary of State*

TS 34525311K

Certificate ID: 10033824#Q8E40
To validate this certificate, visit the following
web site, go to **Commercial Division,**
**Certificate Validation,** then follow the
instructions displayed.
**www.sos.louisiana.gov**

Page 1 of 1 on 1/4/2010 11:23:32 AM

26310705

## CONVERSION APPLICATION
### of
### LLOG EXPLORATION OFFSHORE, INC.
#### (A Louisiana Corporation)
### into
### LLOG EXPLORATION OFFSHORE, L.L.C.
#### (A Louisiana Limited Liability Company)

**I.**

The name of the converting entity is LLOG Exploration Offshore, Inc., a Louisiana corporation (the "Converting Entity"). The name of the converted entity shall be LLOG Exploration Offshore, L.L.C., a Louisiana limited liability Company (the "Converted Entity").

**II.**

The Converted Entity will be a limited liability company governed by the Louisiana Limited Liability Company Law, La. R.S. 12:1301, *et seq.*

**III.**

The Converting Entity is continuing its existence in the organizational form of the Converted Entity.

**IV.**

Upon effectiveness of the conversion to be effected by this Conversion Application (the "Conversion"), each outstanding share of common stock, no par value per share, of the Converting Entity, shall be converted into one share of membership interest in the Converted Entity.

**V.**

The Conversion has been authorized and approved in accordance with La. R.S. 12:1601, *et seq.*

**VI.**

The Conversion shall be effective on the 31st day of December, 2009, when this application is accepted for filing and recorded by the Secretary of State of the State of Louisiana.

**VII.**

Upon the effectiveness of the Conversion, the Articles of Organization of the Converted Entity, as provided in the Limited Liability Company Law of Louisiana (as amended from time to time or any successor statute, the "Act") shall read in their entirety as follows:

I

[N1885208.4]

12/29/2009 10 19 FAX   504 582 8012        JONES WALKER        Dec 29 2009  10:20        @008/011

26310705

# ARTICLE I
## NAME

The name of this Limited Liability Company (hereinafter, the "Company") shall be:

## LLOG EXPLORATION OFFSHORE, L.L.C.

# ARTICLE II
## PURPOSE

The purpose of the Company shall be to engage in any lawful activity for which limited liability companies may be formed under the Act.

# ARTICLE III
## MANAGEMENT

The Company shall be managed by managers consisting of a board of directors elected by the members as provided in the operating agreement of the Company and (subject to the direction of the board of directors) officers elected as provided in the operating agreement of the Company. The vote, consent, or approval of the members shall not be required for (a) the incurrence of any indebtedness by the Company (whether or not in the ordinary course of business), (b) the sale, exchange, lease, mortgage, pledge or other transfer of all or substantially all of the assets of the Company or (c) the alienation, lease, or encumbrance of any immovable and other real property of the Company, all of which may be authorized by the board of directors.

Persons dealing with the Company may rely upon a certificate of the secretary of the Company to establish the membership of any member, the authenticity of any records of the Company or the authority of any person to act on behalf of the Company.

# ARTICLE IV
## TERM

The Company shall dissolve on December 31, 2059 unless sooner dissolved as provided in the operating agreement of the LLC.

# ARTICLE V
## MEMBERSHIP INTERESTS

The membership interests (as defined in the Act) of the members of the Company shall be divided into and consist of shares ("Shares"). The Company is authorized to issue up to 100 Shares. Each Share shall be in all respects equal to every other Share and members shall be entitled to one vote for each Share held on all matters for which members are entitled to vote. The rights represented by the Shares shall include (a) the right to receive from the Company liquidating distributions and such other dividends and distributions authorized from time to time by the board of directors and (b) all other rights, benefits and privileges enjoyed by the members (under the Act, these Articles of Organization or the operating agreement of the Company) in their capacity as members, including rights to vote, consent and approve. Shares shall be issued,

2

## 26310705

and the holders thereof admitted as members, for such consideration as determined by the board of directors.

All dividends and other distributions made by the Company shall be as determined by the board of directors and shall be identical with respect to each outstanding Share.

Members may not withdraw or resign from the Company, but shall cease to be a member with respect to transferred Shares. No member shall be entitled to a distribution or other payment upon such member ceasing to be a member for any reason.

No member shall be required to make any additional contribution to the capital of the Company after issuance of such member's Shares.

### ARTICLE VI
### AMENDMENT

The approval of two-thirds of the outstanding Shares shall be required to amend these Articles of Organization.

IN WITNESS WHEREOF, the undersigned officer of the Converting Entity has executed this Conversion Application on this 28th day of December, 2009.

LLOG EXPLORATION OFFSHORE, INC.

By: _____
Name: John W. Newman
Title: Treasurer

[NI885308.4]

12/28/2009 10 20 FAX  504 582 8012        JONES WALKER        Dec 29 2009  10:21                    @010/011

26310705

## ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF ST. TAMMANY

    BEFORE ME, the undersigned authority, personally came and appeared John W. Newman, to me known to be the person who signed the foregoing instrument as Treasurer of LLOG Exploration Offshore, Inc., a Louisiana corporation, and who, having been duly sworn, acknowledged and declared, in my presence, that the undersigned signed such instrument as the undersigned's free act and deed for the purposes mentioned therein.

    IN WITNESS WHEREOF, the Appearer and I have hereunto affixed our hands on this 28th day of December, 2009, in the aforesaid parish and state.

                         John W. Newman, Treasurer

                         NOTARY PUBLIC

                  RUDOLPH R. RAMELLI
                     NOTARY PUBLIC
                     State of Louisiana
               My Commission is Issued Fr
                La. Bar Roll No. 11043

4

[N1885208 6]

## INITIAL REPORT BY DOMESTIC LIMITED LIABILITY COMPANY
### (To be filed when the Articles of Organization are filed)
### (R.S. 12:1305)

State of Louisiana
Parish of St. Tammany

To:    The Secretary of State          **26310705**
       Baton Rouge, Louisiana

Complying with R.S. 12:1305, LLOG Exploration Offshore, L.L.C. hereby makes its initial report as follows:

Municipal Address or Location of Its Registered Office:

   1001 Ochsner Boulevard, Suite 200
   Covington, Louisiana 70433

Name and Municipal Address or Location of Each Registered Agent:

   Kemberlia K. Ducote
   1001 Ochsner Boulevard, Suite 200
   Covington, Louisiana 70433

The undersigned accepts the designation as registered agent pursuant to R.S. 12:1305:

I hereby accept the appointment                    Sworn to and subscribed before me,
as registered agent.                               this 28th day of December, 2009.

Registered agent:

_____                    _____
Kemberlia K. Ducote                                Notary Public

Name and Addresses of the First Managers (if selected when articles are filed).

   Kemberlia K. Ducote, 1001 Ochsner Boulevard, Suite 200, Covington, Louisiana 70433
   Scott R. Gutterman, 1001 Ochsner Boulevard, Suite 200, Covington, Louisiana 70433
   John W. Newman, 1001 Ochsner Boulevard, Suite 200, Covington, Louisiana 70433

Dated at Covington, Louisiana on this 28th day of December, 2009.

                                        _____
                                        John W. Newman, Organizer

{N1885200.4}

5