property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties. For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain. The allocations described in this Section 5.03(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.03(b) and 5.03(c). The provisions of this Section 5.03(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company. Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company. The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto. When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.03(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.03 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.04   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the

EMF_US 81719156v10
#93633328v11

provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01    General.**

    (a)    Subject to Section 6.02, distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Transition Services Agreement or the Service Provider Agreement, (ii) the repayment in full to Apache of any outstanding principal amounts borrowed by the Company under the Standby Facility and the payment of any accrued interest or premium thereon, in each case, pursuant to the Standby Facility Documentation, (iii) the reimbursement to Apache and its Affiliates for any and all costs and expenses incurred by Apache or any of its Affiliates (A) in performing services on behalf of the Company in connection with the Legacy Apache Properties or the GOM Shelf Properties pursuant to a services contract between Apache or any of its Affiliates and the Company, (B) pursuant to the penultimate sentence of Section 12.01 in connection with evaluating any matter specified in Section 7.06 for which Apache's consent is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, and (C) pursuant to or as may be required in connection with the Decommissioning Agreement or plugging and abandonment and decommissioning of the Legacy Apache Properties or the GOM Shelf Properties, unless otherwise reimbursed in accordance with the Decommissioning Agreement, and (iv) the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties.  After making all distributions required for a given Fiscal Year under Section 6.02 and repaying/paying all amounts then due and outstanding under the Standby Facility as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

    (b)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02    Tax Advances.**

    (a)    Subject to (i) any restrictions in the Company's then applicable debt-financing arrangements, including, but not limited to, the Standby Facility Documentation, (ii) the prior repayment in full to Apache of any outstanding principal amounts borrowed

by the Company under the Standby Facility and the payment of any accrued interest or premium thereon, in each case, pursuant to the Standby Facility Documentation, (iii) the prior reimbursement to Apache and its Affiliates for any and all costs and expenses incurred by Apache or any of its Affiliates (A) in performing services on behalf of the Company in connection with the Legacy Apache Properties or the GOM Shelf Properties pursuant to a services contract between Apache or any of its Affiliates and the Company, (B) pursuant to the penultimate sentence of Section 12.01 in connection with evaluating any matter specified in Section 7.06 for which Apache's consent is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, and (C) pursuant to or as may be required in connection with the Decommissioning Agreement or plugging and abandonment and decommissioning of the Legacy Apache Properties or the GOM Shelf Properties, unless otherwise reimbursed in accordance with the Decommissioning Agreement, (iv) the prior cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties, and (v) the Sole Manager's determination to retain any other amounts necessary to satisfy the Company's obligations, from and after such time, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)     If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)     Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

EMF_US 81719156v10
#93633328v11

**Section 6.03   Tax Withholding; Withholding Advances.**

(a)      **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)      **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative) based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)      **Indemnification.**  Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d)      **Overwithholding.**  None of the Company, the Sole Manager or the Independent Director shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind.**

(a)      Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of

24

securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b)    Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

<h3 style="text-align:center">ARTICLE VII<br>MANAGEMENT</h3>

**Section 7.01    Management of the Company.**  The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of the Sole Manager ("**Sole Manager**"). Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02    Independent Director.**

(a)    The Independent Director shall (i) be a natural person who is not, nor for the prior five years has been, a director, officer, employee, trade creditor or equityholder (or spouse, parent, sibling or child of any of the foregoing) of (A) Fieldwood or any Affiliate of Fieldwood or (B) any prior or current lender of Fieldwood (a natural person satisfying such condition set forth in this clause (i), a "**Qualified Person**") and (ii) be provided by Citadel SPV, Global Securitization Services, LLC, Corporation Service Company, CT Corporation, [Lord Securities Corporation][3], Wilmington Trust Company, or, if none of those companies is then in the service of providing professional independent directors, another nationally recognized company selected by Fieldwood (or, following the divisive merger of Fieldwood pursuant to § 10.008 of the BOC, Fieldwood II) subject to Apache's prior consent, which may be given or withheld in its sole discretion (such providers collectively, the "**Approved Providers**"). [●] is the Qualified Person provided by an Approved Provider that, as of the date of this Agreement, has been appointed to serve as the initial Independent Director and has also been approved to serve as the initial Independent Director for the Company in connection with the Confirmation Order entered

---

[3] NTD: Does this entity still exist?

EMF_US 81719156v10
#93633328v11

by the Bankruptcy Court for the Southern District of Texas before which the reorganization of Fieldwood was being conducted.

(b)     The Independent Director may not be removed without Apache's prior written consent, which may be given or withheld in its sole discretion. If the Independent Director is removed with Apache's written consent or the Independent Director resigns or otherwise ceases to serve in such capacity, then the Company (acting by majority vote of its Members) shall select another Qualified Person from the Approved Providers to serve as the Independent Director.

**Section 7.03   Sole Manager.**   The Company shall not have any officers or employees other than a Sole Manager. In accordance with the procedure for the selection of the Sole Manager set forth in the Term Sheet, [●] has been selected and designated to serve as the initial Sole Manager. The Sole Manager may not be removed without Apache's prior written consent, which may be given or withheld in its sole discretion. In the event that the Sole Manager is removed with Apache's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure: Apache and the Company (acting through the Independent Director for all purposes under this Section 7.03, who shall solicit input from Fieldwood II for all purposes under this Section 7.03) shall each provide the other with a list of three natural persons, each having a minimum of five years of relevant experience in the energy sector; and if one or more names appear on both Apache's and the Company's lists, then the Company will select, and the Member(s) shall cause the Company to select, the new Sole Manager from those common names; if, however, there are no common names between Apache's and the Company's lists, then Apache and the Company (acting through the Independent Director, who shall solicit input from Fieldwood II) shall each have the right to strike two names from the other's list, and the new Sole Manager shall be selected by the Independent Director from the remaining two names.

**Section 7.04   Service Provider.**

(a)     Subject to the Transition Services Agreement described below in Section 7.04(b), the Sole Manager shall hire one or more third-party service provider(s) (whether one or more, collectively, the "**Service Provider**") to perform all operations and plugging and abandonment and decommissioning activities with respect to the Company's and GOM Shelf's properties or assets in a manner consistent with the procedures set forth in this Section 7.04. The Sole Manager shall solicit and obtain a bid for the work to be performed by each Service Provider from not less than three qualified candidates, each of which must (i) have a minimum of five years of relevant experience and (ii) not be, as of such date when bids are submitted, an Affiliate of Apache; such bids shall detail the scope, terms and conditions of the work to be performed, along with the price to be paid for the performance of such work. The Company shall share copies of each such bid received with Apache promptly following receipt thereof. Following the receipt of such bids, with Apache's prior written consent (which may be given or withheld in its sole discretion), the Sole Manager shall select the candidate whose bid contains the lowest price and best terms for the work to be performed, in view of their relevant experience (all as determined in good faith by the Sole Manager and consented to by Apache), to serve as the Service Provider, and shall

26

cause the Company to enter into an agreement with such Service Provider (such agreement, a "**Service Provider Agreement**") to provide services contemplated in this Section 7.04; provided that, immediately prior to executing such Service Provider Agreement, the Sole Manager shall have confirmed that the proposed Service Provider satisfies the candidate qualifications detailed in clause (ii) of the immediately prior sentence (as if being considered on the date of such Service Provider Agreement rather than the date when bids are submitted), and if the proposed Service Provider does not satisfy such candidate qualifications, the Sole Manager shall then reconsider the submitted bids and select another candidate in accordance with the requirements of this sentence as if the previously selected candidate had not submitted a bid. Any Service Provider Agreement shall be in such form and contain such terms as the Sole Manager determines in good faith to be appropriate and consistent with this Section 7.04. In the event that the Sole Manager elects to remove the Service Provider or the Service Provider otherwise ceases to provide its services in such capacity, then the Sole Manager shall again bid out the work, and shall select the Person to serve as the successor Service Provider, in accordance with the foregoing procedures of this Section 7.04.

(b)    Upon the effectiveness of the Plan of Reorganization, the Company shall enter into the Transition Services Agreement with Fieldwood II pursuant to which Fieldwood II shall provide transitional operations for the Company in accordance with the terms of the Transition Services Agreement. The Company and Fieldwood II (in its sole discretion) may mutually agree that Fieldwood II shall become the Service Provider, at the effective time of which the Transition Services Agreement shall terminate, and the Sole Manager shall cause the Company to enter into the Service Provider Agreement with Fieldwood II. Furthermore, as provided in the Transition Services Agreement, the Transition Services Agreement may be terminated by the Company, in its sole discretion, in accordance with the terms of the Transition Services Agreement.

**Section 7.05 Actions Requiring Independent Director Consent and Service Provider.** Without the prior consent of the Independent Director (which consent may be given or withheld in the sole discretion of the Independent Director), and the Company shall not do, or enter into any commitment to do, and shall not cause or permit GOM Shelf to do, or enter into any commitment to do, any of the following:

(a)    amend, modify, supplement or waive the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries;

(b)    remove or replace the Sole Manager or the Service Provider;

(c)    enter into a fundamental business transaction (as such term is defined in the BOC), including a merger, consolidation, interest exchange, conversion or sale of all or substantially all of the Company's or GOM Shelf's properties or assets;

(d)    wind-up, dissolve, liquidate or terminate the Company or any of its Subsidiaries prior to the occurrence of any event set forth in Section 11.01 or enter into a

27

receivership or initiate a bankruptcy proceeding involving the Company or any of its Subsidiaries;

       (e)    revoke a voluntary decision to wind up the Company or GOM Shelf or cancel the required winding up of the Company due to an event specified in § 11.051 of the BOC; or

       (f)    reinstate the Company or GOM Shelf after termination.

Except as provided in the fourth sentence of Section 9.02(a), in exercising its rights and performing its duties under this Agreement (including pursuant to this Section 7.05), the Independent Director shall have fiduciary duties of loyalty and care similar to that of a director of a business corporation organized under the BOC.

**Section 7.06  Actions Requiring Apache Consent.** Without the prior written consent of Apache (which written consent may be given or withheld in Apache's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, and shall not cause or permit GOM Shelf to do, or enter into any commitment to do, any of the following:

       (a)    conduct or be involved in any business or operations other than (i) operating or plugging and abandoning and decommissioning the Legacy Apache Properties and (ii) causing GOM Shelf to operate or plug and abandon and decommission the GOM Shelf Properties;

       (b)    purchase or farm-in any properties or assets or sell any of the Company's or GOM Shelf's properties or assets; provided that, following receipt of any such written consent from Apache to purchase or farm-in any properties or assets, other than with respect to usual and ordinary G&A and operating expenditures required to own and maintain such properties or assets, no additional funds of, or available to, the Company or GOM Shelf shall be spent with respect to such properties or assets without the prior written consent of Apache (which written consent may be given or withheld in Apache's sole discretion), provided further, however, that if any Person makes an unsolicited proposal to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties on fair market terms and conditions (including fair market rates of return), then the Company shall be obligated to market (or cause GOM Shelf to market) such farm-in opportunity and accept (or cause GOM Shelf to accept) the highest and best offer for such farm-in opportunity as long as the farm-in transaction would be accretive to the Company's consolidated cash flow, and in such instance no consent from Apache will be required if Apache has made or bid on such farm-in opportunity;

       (c)    farm-out any of the Company's or GOM Shelf's properties or assets; provided, however, if any Person makes an unsolicited proposal to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties on fair market terms and conditions (including fair market rates of return), then the Company shall be obligated to market (or cause GOM Shelf to market) such farm-in opportunity and accept (or cause GOM Shelf to accept) the highest and best offer for such farm-in opportunity as long as

28

the farm-in transaction would be accretive to the Company's consolidated cash flow, and in such instance no consent from Apache will be required if Apache has made or bid on such farm-in opportunity;

        (d)      incur indebtedness for borrowed money other than pursuant to the Standby Facility, pledge or grant Liens on any properties or assets of the Company or GOM Shelf other than those provided pursuant to the Standby Facility Documentation and the Recharacterization Mortgages, or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person;

        (e)      issue additional Membership Interests or any other Equity Securities or admit additional Members to the Company, or issue additional equity interests of or admit additional members to GOM Shelf;

        (f)      use its free cash flow (after operating expenses) for any purposes other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation for so long as the obligations thereunder have yet to be satisfied in full (for the avoidance of doubt, Apache's consent shall be required for any development activities proposed by Fieldwood II under the Farmout Agreement);

        (g)      make any loan, advance, or capital contribution or make any investment in any Person;

        (h)      enter into, amend, waive, or terminate any Related Party Agreement;

        (i)      amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement, or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without Apache's prior written consent shall be void *ab initio* and without effect);

        (j)      engage in any activity or take any action with respect to its properties or assets, other than in the ordinary course of business;

        (k)      select, remove, or replace, or change the work to be performed by, the Service Provider;

        (l)      remove, replace, or change the powers, rights, or responsibilities of, the Sole Manager or the Independent Director;

        (m)      establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.09;

        (n)      settle any lawsuit, action, dispute, or other proceeding or otherwise assume any liability or agree to the provision of any equitable relief by the Company or GOM Shelf;

EMF_US 81719156v10
#93633328v11

(o)      enter into a fundamental business transaction (as such term is defined in the BOC), including a merger, consolidation, interest exchange, conversion, or sale of all or substantially all of the Company's or GOM Shelf's properties or assets;

(p)      wind-up, dissolve, liquidate, or terminate the Company or any of its Subsidiaries or initiate a bankruptcy proceeding involving the Company or any of its Subsidiaries;

(q)      revoke a voluntary decision to wind up the Company or GOM Shelf or cancel the required winding up of the Company due to an event specified in § 11.051 of the BOC; or

(r)      reinstate the Company or GOM Shelf after termination.

In addition to the foregoing, if (i)(A) the Company or GOM Shelf defaults on its plugging and abandonment and decommissioning obligations under the Decommissioning Agreement, (B) any Governmental Authority or any other Person seeks to cause Apache or its Affiliates to conduct plugging and abandonment or decommissioning activity that is required in accordance with Applicable Law or contract in respect of any of the Legacy Apache Properties or the GOM Shelf Properties, and (C) Apache conducts such plugging and abandonment or decommissioning activity or activities, or (ii) prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties, any letter of credit or bond that is part of the Decommissioning Security is not renewed in a manner consistent in all respects with the existing terms of such letter of credit or bond, then the Company shall, and the Independent Director and the Sole Manager shall cause the Company to: (x) if applicable, as promptly as practicable after the Independent Director or the Sole Manager becomes aware of an event described in clause (ii) immediately above, provide written notice to Apache of the upcoming expiration of, and inability to renew, such letter of credit or bond in a manner consistent in all respects with the existing terms of such letter of credit or bond, and use its best efforts to assist Apache in drawing under the expiring letter of credit or bond so that drawn funds can be contributed to Trust A; (y) take any action reasonably requested by Apache to entitle Apache to be reimbursed by the Company or to draw on the cash in Trust A or the other Decommissioning Security to pay or reimburse Apache for the costs (which costs shall include, without limitation, costs of compensation and benefits of officers and employees of Apache and its Affiliates that devote any of their productive time to performing or overseeing any of the plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties in accordance with the provisions on Schedule D attached hereto applied in a consistent manner as the application of COPAS procedures, which costs shall be determined in good faith by Apache based on the time spent by such employees in performing or overseeing such activities) and expenses incurred in conducting such activity or activities or, if such costs have been paid by Trust A or reimbursed to Apache with funds from Trust A, then to contribute funds to Trust A; and (z) not take any position in any proceeding opposed to or that is otherwise inconsistent with Apache's ability to draw on the cash in Trust A or the other Decommissioning Security to pay or reimburse Apache for such costs and expenses incurred in conducting such activity or activities or to contribute funds to Trust A.

EMF_US 81719156v10
#93633328v11

Furthermore, the Company shall provide written notice to Apache of (i) each request or proposal the Company or GOM Shelf receives from a Person to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties and (ii) each prospective joint development under the Farmout Agreement. In connection with each of the foregoing, the Company shall, and shall cause GOM Shelf to, provide Apache full and open access to all information that the Company or GOM Shelf has regarding each such opportunity.

**Section 7.07  Compensation and Reimbursement of the Independent Director, the Sole Manager, the Service Provider and Fieldwood II.**  The Independent Director shall be compensated for the services provided by such individual as the Independent Director of the Company in the amount as specified in Schedule B attached hereto. The Sole Manager shall be compensated for the services provided by such individual as the Sole Manager of the Company in the amount as specified in Schedule C attached hereto.  The Company shall reimburse the Independent Director and the Sole Manager for all ordinary, necessary, and direct third-party expenses incurred by the Independent Director and the Sole Manager, respectively, on behalf of the Company in carrying out the Company's business activities.  All reimbursements for expenses shall be reasonable in amount and shall not exceed $[●] in the aggregate for any Fiscal Year.  The Service Provider shall be compensated for the services provided by the Service Provider and reimbursed for the out-of-pocket costs and expenses incurred in connection therewith as shall be set forth in the applicable Service Provider Agreement.  Fieldwood II shall be compensated for its services under the Transition Services Agreement and reimbursed for the out-of-pocket costs and expenses incurred in connection therewith as set forth in the Transition Services Agreement.

**Section 7.08  No Personal Liability.**  Except as otherwise provided in the BOC, by Applicable Law, or expressly in this Agreement, neither the Independent Director nor the Sole Manager will be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Independent Director or the Sole Manager, as applicable.

**Section 7.09  Funding Capital Expenditures.**  Prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties, if the Company receives a proposal that the Company engage in any project that is forecast to increase production or cash flow generated from the Legacy Apache Properties or the GOM Shelf Properties (excluding any proposed development activities pursuant to the Farmout Agreement), then the Sole Manager shall, through a written notice, offer to Apache the opportunity to fund the capital expenditures related to such project on behalf of the Company on terms and subject to conditions to be mutually agreed between the Company and Apache; provided that the Company acknowledges and agrees that if any such capital expenditures are funded, in whole or in part, out of funds then available to be borrowed by the Company under the Standby Facility, any additional properties or assets obtained or that come into existence as a result of the use of such borrowed amounts under the Standby Facility, including, without limitation, any increased production or cash amounts generated thereby, shall be pledged as additional security under the Standby Facility Documentation.  Such written notice provided to Apache shall include all available details about such opportunity, including, but not limited to, the forecast impact on production and cash flow from the Legacy Apache Properties or

31

the GOM Shelf Properties, as appropriate. Apache shall have a reasonable period (not to exceed 20 Business Days) following its receipt of such written notice to provide written notice to the Company of (a) Apache's election to fund any such capital expenditures and the terms and conditions that Apache proposes to apply thereto, including whether it will fund such capital expenditure, in whole or in part, using amounts then available to be borrowed by the Company under the Standby Facility (such notice, an "**Acceptance Notice**"), (b) Apache's election not to fund any such capital expenditures (such notice, a "**Rejection Notice**"), or (c) Apache's request for additional information it requires to fully evaluate the proposed project (such notice, an "**Information Notice**"). If Apache provides a timely Acceptance Notice, then the Company and Apache shall endeavor in good faith to negotiate the proposed terms and conditions that will apply thereto, and if mutually satisfactory terms are agreed to by the Company and Apache, such terms and conditions shall be documented as promptly as practicable and the closing of such agreement and funding(s) of such capital expenditures shall occur as so agreed. If (i) Apache timely provides to the Company a Rejection Notice, (ii) Apache timely provides an Acceptance Notice but the Company and Apache are unable within 60 Business Days after the Company's receipt of the Acceptance Notice to agree upon mutually satisfactory terms and conditions applicable thereto, or (iii) Apache does not submit a timely response to the offer, then the offer for Apache to fund the capital expenditures of the Company in the applicable project shall be deemed rejected by Apache and the Company shall have 180 days within which to obtain third-party funding for such capital expenditures subject to, and in accordance with, the other terms and conditions of this Agreement (including, without limitation, Section 7.06); provided, however, if the Company is unable to obtain such funding subject to, and in accordance with, the other terms and conditions of this Agreement within such 180-day period, then the Company must again follow the procedures in this Section 7.09 and offer Apache the opportunity to fund such expenditures. If Apache timely provides the Company with an Information Notice, then the Company shall endeavor in good faith to promptly provide the requested information to Apache, and following Apache's receipt of such information, Apache shall have the right to accept or reject such offer on the terms set forth in this Section 7.09.

## ARTICLE VIII
## TRANSFER

### Section 8.01  General Restrictions on Transfer.

(a)      No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of:

(i)      Apache and the Company prior to (A) the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties, (B) the repayment in full of any and all amounts outstanding under the Standby Facility and the satisfaction of all obligations under the Standby Facility Documentation, (C) the payment or reimbursement by the Company or from funds available under the Decommissioning Security of the costs (which costs shall include, without limitation, costs of compensation and benefits of officers and employees of Apache and its Affiliates that devote any of their productive time to performing or

32

overseeing any of the plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties in accordance with the provisions on Schedule D attached hereto applied in a consistent manner as the application of COPAS procedures) and expenses incurred by Apache and its Affiliates (1) in performing any plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties or (2) pursuant to or as may be required in connection with the Decommissioning Agreement, and (D) the reimbursement to Apache and its Affiliates for any and all costs and expenses incurred by Apache or any of its Affiliates pursuant to the penultimate sentence of Section 12.01 in connection with evaluating any matter specified in Section 7.06 for which Apache's consent is requested or required; and

> (ii)    thereafter, the Company.

(b)    Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

> (i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

> (ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

> (iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

> (iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

> (v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

> (vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on

EMF_US 81719156v10
#93633328v11

the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)     Subject to Section 7.06(e), no Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)     For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01     Exculpation of Covered Persons.**

(a)     **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director (including the Independent Director), shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)     **Standard of Care.**   Subject to Section 9.02(a) with respect to the Independent Director, no Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)     **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence

34

shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02  Liabilities and Duties of Covered Persons.**

(a)  **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.  Notwithstanding anything to the contrary in this Article IX, to the fullest extent permitted by Applicable Law, and notwithstanding any duty otherwise existing at law or in equity, the Independent Director shall consider only the interests of the Company, including its creditors, in acting or otherwise consenting to matters requiring the consent of the Independent Director in this Agreement.  Except for duties to the Company as set forth in the immediately preceding sentence (including duties to the Members and the Company's creditors solely to the extent of their respective economic interests in the Company but excluding (i) all other interests of the Members, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part) and in the last sentence of Section 7.05, the Independent Director shall not have any fiduciary duties to the Members or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.  To the fullest extent permitted by law, the Independent Director shall not be liable to the Company, the Members or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

(b)  **Duties.**  Except as provided in Section 9.02(a) with respect to the Independent Director, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03 Indemnification.**

(a) **Indemnification.** To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii) such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Control of Defense.** Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding, provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby. The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense. After notice from the Company to the Covered Person of its election to assume the defense of any such claim,

36

lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding. If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)  **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)  **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)  **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)  **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal

liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.   No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, and termination of the Company.

**ARTICLE X**
**ACCOUNTING; TAX MATTERS**

**Section 10.01 Financial Statements and Other Information.**   The Company shall furnish to each Member and Apache the following reports:

(a)     **Annual Financial Statements.**  As soon as available, and in any event within 105 days after the end of each Fiscal Year, its audited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared under AICPA auditing standards, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by independent public accountants acceptable to each Member and Apache (without a "going concern" or like qualification, commentary, or exception (except to the extent that any such qualification, commentary, or exception expressly indicates that after giving effect to the exclusion of asset retirement obligations reflected on the accompanying balance sheet, there would be no such qualification, commentary, or exception), and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of the Company and GOM Shelf in accordance with GAAP consistently applied;

(b)     **Quarterly Financial Statements.**  As soon as available, and in any event within 50 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and

38

cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company and GOM Shelf in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; and

(c)     **Monthly Operating Data.**  As soon as available, but in no event later than 15 Business Days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and Apache showing all operating data for the Company and GOM Shelf, including operating expenses and revenue for each of the Company and GOM Shelf, for such calendar month.

(d)     **Operating Budget.**  As soon as available, but in any event no later than 60 days after the end of each Fiscal Year of the Company, a detailed operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter in form reasonably satisfactory to each Member and Apache.

(e)     **Additional Information.**  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of each of the Company and GOM Shelf, as any Member or Apache may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**  Upon reasonable notice from a Member or Apache, the Company shall afford each Member or Apache and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members or the Sole Manager or Independent Director, and to permit each Member or Apache and their respective Representatives to examine such documents and make copies thereof; and (c) any officers, senior employees, and public accountants of the Company, and to afford each Member or Apache and their respective Representatives the opportunity to discuss and advise on the affairs, finances, and accounts of the Company with such officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or Apache and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.**  It is the intent of the Company and the Members that the Company shall be treated as a partnership or a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

## Section 10.04 Tax Matters Representative.

(a)    **Appointment.**   The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").    If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)    **Tax Examinations and Audits.**   The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

(c)    **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such

40

amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment. To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c). The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member Interest who may be considered current or former partners of the Company for federal tax purposes.

(d) **Tax Returns.** Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e) **Section 754 Election.** The Tax Matters Representative will make an election under Code Section 754, if the Company is to be taxed as a partnership for federal tax purposes.

(f) **Indemnification**. The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.** At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

**Section 10.06 Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

41

## ARTICLE XI
## WINDING UP AND TERMINATION

**Section 11.01 Events Requiring Winding Up.** The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.06):

(a) upon the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties;

(b) the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c) the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which Apache has been given notice and an opportunity to participate.

Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and each of Apache, the Sole Manager, and the Independent Director provide their prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

**Section 11.02 Effectiveness of Termination.** The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.** If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a) **Liquidator.** The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a person to act as the Liquidator. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting.** As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities,

42

and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)     **Notice.**  The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)     **Distribution of Proceeds.**  The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)     First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)     Second, to Trust A until the aggregate funds in Trust A are in an amount equal to 125% of the then Remaining Decommissioning (as defined in the Decommissioning Agreement);

(iii)     Third, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iv)     Fourth, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)     **Discretion of Liquidator.**  Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities, Trust A, and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.**  Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as

43

may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator, the Independent Director, or any other Member.

**ARTICLE XII**
**MISCELLANEOUS**

**Section 12.01 Expenses.** Except as otherwise expressly provided herein, in the Restructuring Support Agreement, or in the Confirmation Order, all costs and expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses. In addition to the immediately preceding sentence and the payment or reimbursement to Apache and its Affiliates for the costs and expenses of performing any plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties as provided in the final paragraph of Section 7.06, from time to time as Apache evaluates any matter specified in Section 7.06 for which its consent is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, the Company shall reimburse Apache for all costs and expenses incurred in connection therewith, with such reimbursement to be made regardless of whether Apache consents to such matter or provides an Acceptance Notice, Rejection Notice, or Information Notice to the Company with respect to such proposal. Apache's costs shall include, without limitation, third-party costs and the reimbursable costs of compensation and benefits of employees of Apache and its Affiliates who devote productive time to evaluating any matter specified in Section 7.06 for which the consent of Apache is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, which costs shall be determined in good faith by Apache based on the time spent by such employees in conducting such evaluation. The reimbursement to be made pursuant to the immediately preceding sentences shall be made within 30 days of the Company's receipt of a statement from Apache specifying the costs to be so reimbursed.

**Section 12.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments,

44

conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 12.03 Confidentiality.**

(a)  Each Member acknowledges that, during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)  Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

45

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);or

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

| | |
|---|---|
| **If to the Company:** | Fieldwood Energy I LLC<br>[COMPANY ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |

EMF_US 81719156v10<br>#93633328v11

|                                                          |                                                                                                                           |
| -------------------------------------------------------- | ------------------------------------------------------------------------------------------------------------------------- |
| with a copy to: <br> (which shall not constitute notice) | Hunton Andrews Kurth LLP <br> 600 Travis Street <br> Suite 4200 <br> Houston, TX 77002 <br> Attention: G. Michael O'Leary |
| **If to the Independent Director:**                      | [INDEPENDENT DIRECTOR ADDRESS] <br> Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]                                       |
| with a copy to: <br> (which shall not constitute notice) | Hunton Andrews Kurth LLP <br> 600 Travis Street <br> Suite 4200 <br> Houston, TX 77002 <br> Attention: G. Michael O'Leary |
| **If to a Member**:                                      | To the Member's respective mailing address as set forth on the Members Schedule.                                          |

**Section 12.05  Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06  Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07  Entire Agreement.**  This Agreement, together with the Certificate of Formation and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

EMF_US 81719156v10 <br> #93633328v11

**Section 12.08 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.** Except (a) with respect to certain rights reserved to Apache as set forth in this Agreement, which shall be for the benefit of and enforceable by Apache, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 12.10 Amendment.** Subject to Sections 2.02 and 7.06(i), no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Independent Director without the consent of or execution by the Members.

**Section 12.11 Waiver.** No waiver by any party or Apache of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or Apache, respectively. No waiver by any party or Apache shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate

EMF_US 81719156v10
#93633328v11

appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

Section 12.14 **Waiver of Jury Trial**.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.15 **Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or Apache, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and Apache shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 12.16 **Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

Section 12.17 **Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

Section 12.18 **Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

EMF_US 81719156v10
#93633328v11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY I LLC,
a Texas limited liability company


By:_____
[NAME]
[TITLE]


**The Initial Member:**

[_____]
a [_____]


By:_____
[NAME]
[TITLE]

EMF_US 81719156v10
#93633328v11

**EXHIBIT A**

**FORM OF TRANSITION SERVICES AGREEMENT**

EMF_US 81719156v10
#93633328v11

## SCHEDULE A

## MEMBERS SCHEDULE

| Member Name, and Address | Capital Contribution | Membership Interest |
|---|---|---|
| [_____]<br>[ADDRESS] | $[AMOUNT] | 100% |
| Total: | $[AMOUNT] | 100% |

Sch. A-1

**SCHEDULE B**

**INDEPENDENT DIRECTOR'S COMPENSATION**

[To be the market compensation needed to attract a qualified candidate to accept the position.]

EMF_US 81719156v10
#93633328v11

**SCHEDULE C**

**SOLE MANAGER'S COMPENSATION**

[To be the market compensation needed to attract a qualified candidate to accept the position.]

EMF_US 81719156v10
#93633328v11

**SCHEDULE D**

**ACCOUNTING PROCEDURES FOR APACHE OFFICERS AND EMPLOYEES**

I.    DIRECT CHARGES

1.    LABOR

A.    Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)    Apache's field employees directly employed on-site in the conduct of plugging and abandonment and decommissioning activities with respect to the applicable Legacy Apache Property or the GOM Shelf Property, and

(2)    Apache's employees providing First Level Supervision.

Charges for Apache's employees identified in Section I.1.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing Apache's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section I.1.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section I.1.

B.    Apache's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable under Section I.1.A, excluding severance payments or other termination allowances. Such costs under this I.1.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Section I.1.A. If percentage assessment is used, the rate shall be based on Apache's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable under Sections I.1.A and B.

D.    Personal expenses of personnel whose salaries and wages are chargeable under Section I.1.A when the expenses are incurred in connection with directly chargeable activities.

E.    Apache's cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to Apache's labor costs chargeable under Sections I.1.A and B based on Apache's actual cost not to exceed 40%.

Sch. D-1

F.      Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section I.1.A.

II. OVERHEAD

As compensation for costs not specifically identified as chargeable pursuant to Section I (Direct Charges), Apache shall be reimbursed in accordance with this Section II.

Functions included in the overhead rates regardless of whether performed by Apache, Apache's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- design and drafting
- inventory costs
- procurement
- administration
- accounting and auditing
- human resources
- management
- supervision not directly charged under Section I.1 (Labor)
- in-house legal services
- taxation
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the applicable Legacy Apache Property or GOM Shelf Property, other than on-site inspections.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and personal expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

To compensate Apache for overhead costs incurred in connection with any particular plugging and abandonment or decommissioning project conducted on any applicable Legacy Apache Property or GOM Shelf Property, the following overhead rates shall be applied to those costs incurred in the performance of such plugging, abandonment, and decommissioning activities:

(1)     5% of total costs if such costs are less than $100,000; plus

(2)     3% of total costs in excess of $100,000 but less or equal to $1,000,000; plus

(3)     2% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project

Sch. D-2

**<u>Exhibit 7</u>**

**ST 308 Bond Form**

# PERFORMANCE BOND

**Bond Number:** _____

## KNOW ALL MEN BY THESE PRESENTS:

**That** we, [Fieldwood Energy II LLC, a Texas limited liability company] with its principal office at [_____] (hereinafter called the "***Principal***") and [_____] with its principal mailing address at [_____] (hereinafter called the "***Surety***") are held and firmly bound unto Apache Corporation, with its principal office at 2000 Post Oak Blvd., Suite 100, Houston, TX 77056 (hereinafter called the "***Obligee***"), in the penal sum of Thirteen Million Two Hundred Thousand and 00/100 Dollars ($13,200,000.00) (the "***Amount***") lawful money of the United States of America for the payment of which penal sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

**WHEREAS**, pursuant to the terms of that certain [_____ dated effective _____ by and between Fieldwood Energy LLC ("***Fieldwood***") and Principal (the "***Purchase Agreement***")], Principal acquired from Fieldwood certain interests in the lease described on Exhibit "A" attached hereto and in the wells, facilities, platforms, structures, pipelines, and associated equipment located thereon (such interests so acquired collectively, the "***Property***"); and

**WHEREAS**, in accordance with the terms of the Purchase Agreement and the documents executed in connection therewith, Principal (i) assumed the obligations attributable to the Property to perform and complete the plugging, abandonment, decommissioning, and site clearance for the Properties in compliance with all applicable law, rules, and regulations (the "***P&A Obligations***") (for the avoidance of doubt, the P&A Obligations do not include any obligations of, or any obligations attributable to the interests of, Apache Shelf Exploration LLC or any other current co-owner or their successors or assigns in the Property other than Principal), including but not limited to, the rules and regulations of the Bureau of Ocean Energy Management ("***BOEM***"), the Bureau of Safety and Environmental Enforcement ("***BSEE***"), and their respective successor agencies and (ii) agreed to deliver to Obligee this Performance Bond to secure the performance of the P&A Obligations;

**NOW THEREFORE**, notwithstanding anything contained herein to the contrary, if the P&A Obligations are satisfied (as evidenced by providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, satisfied, and extinguished, together with an affidavit signed by an officer of Principal attesting to such performance), then this Bond and the obligations hereunder shall be null and void; otherwise, this Bond shall remain in full force and effect in the amount hereof; provided that if Principal performs or causes to be performed operations and activities to satisfy any part of the P&A Obligations, then following BSEE's approval of the performance of such operations or activities, the Amount will be automatically reduced to an amount equal to the lesser of (i) the Amount or (ii) one hundred twenty-five percent (125%) of BSEE's then current decommissioning cost estimate for the remaining P&A Obligations.

**FURTHERMORE,** if as to any Property, a Principal Default, as defined below, occurs and is not cured and Obligee is required by BOEM, BSEE, or any governmental authority, to perform any of the P&A Obligations (or a demand is made upon Obligee by a co-obligor of Principal to perform or contribute toward the costs of performing any of the P&A Obligations following such Principal Default and

Obligee is required by law or contract to so perform or contribute), then prior to any performance by Obligee of any such P&A Obligations (or payment of Obligee to such co-obligor of a share of the estimated costs of performing such P&A Obligations if such demand for such payment is made on Obligee), Surety agrees to pay to Obligee an amount reasonably estimated by Obligee as necessary or appropriate to perform such P&A Obligations (or to pay its share of the estimated costs of such P&A Obligations if such demand is made by such co-obligor following such failure) in an amount up to, but not exceeding, the Amount. The Amount shall be automatically reduced by any and all amounts paid by Surety to Obligee.

**FURTHERMORE**, it is agreed that the Surety shall have no obligation to the Principal, the Obligee, or any other person or entity for any loss suffered by the Principal, the Obligee, or any other person or entity by reason of acts or omissions for which Obligee receives payment from the Principal's general liability insurance, products liability insurance, or completed operations insurance. In no event shall the Surety be obligated to incur Surety Costs and/or pay**,** in the aggregate, for all claims hereunder, an amount exceeding the Amount.

It is further agreed that the Surety shall not be liable for any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in forming the P&A Obligations.

If Principal fails to perform any of the P&A Obligations in accordance with the terms of the Purchase Agreement and/or any applicable laws, rules, regulations, or governmental orders (or to pay its share of the estimated costs for the P&A Obligations if demand is made by the Principal's co-obligor which share is otherwise payable by Obligee upon Principal's failure to pay) then Principal shall have thirty (30) days following receipt of notice of default from Obligee in which to fully cure or remedy such default, provided that the Surety shall have the option to either cure or remedy such default within such thirty (30) day period by hiring a contractor (subject to Obligee's prior, reasonable written approval) to perform such P&A Obligations in accordance with the terms and conditions of the Purchase Agreement and all applicable laws, rules, regulations, or governmental orders (any such costs incurred by the Surety to so cure or remedy such default, the "***Surety Costs***") or by making payment to Obligee for such P&A Obligations in an amount reasonably estimated by Obligee as necessary or appropriate to perform such P&A Obligations (or to pay its share of the estimated costs for such P&A Obligations if demand is made by the Principal's co-obligor in connection with such co-obligor's performance of such P&A Obligations) in an amount up to, but not exceeding, the Amount. Obligee agrees to provide Surety with a copy of each such default notice. If the default covered by such default notice is not cured or remedied within such thirty (30) day period then upon the expiration of such thirty (30) day period such default shall constitute a "***Principal Default***" for purposes of this Bond.

No amendment of or supplement to the terms or provisions of the Purchase Agreement, the agreements and instruments entered into in association therewith, or the exhibits or schedules attached thereto shall release the Principal and the Surety or any of them from their liability under this Performance Bond, notice to the Surety of any such amendment or supplement being hereby waived.

No (i) assignment of the Purchase Agreement, the agreements and instruments entered into in association therewith, or of the Properties by the Principal, its successors and assigns, (ii) delay, neglect or failure of the Obligee to proceed promptly to enforce any rights it might have against Principal under the Purchase Agreement or otherwise or to proceed promptly in the premises in case of any default on the part of the Principal, (iii) lack of enforceability or other defense or offset right in respect of any

obligation of Principal or any right to Obligee under the Purchase Agreement or otherwise in respect of the P&A Obligations, or (iv) the insolvency, bankruptcy, or receivership of Principal, shall in any degree relieve the Principal and the Surety or any of them of their obligations under this Performance Bond; and Principal and Surety hereby waive any defense or argument they may in relation to their obligations under this Performance Bond in connection with any of the foregoing.

**HOWEVER**, if upon assignment of the Property or any part thereof by the Principal, its successors, or assigns, the Principal shall cause its assignee (i) to post security with Obligee, in a form and amount reasonably satisfactory to Obligee and otherwise containing terms and issued by the parties that are reasonably satisfactory to Obligee (including terms no less favorable in the aggregate to Obligee than those contained in this Performance Bond and from a surety or other party issuing the applicable security having a [S&P rating of A- or better or an A.M. Best rating of A- or better and, in either case, listed on the Federal Register as acceptable to the U.S. Treasury to issue bonds for U.S. government obligees (T-listed)]) and (ii) to assume (in a written instrument approved by Obligee) all P&A Obligations, then the Obligee will accept such security in lieu of this Bond and issue an unconditional release of the Bond within thirty (30) days of Obligee's acceptance of such other security.

**NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY**, in the event one or more dual obligee bonds in favor of Obligee and the United States of America acting through and by the Bureau of Ocean Energy Management ("***BOEM***") (i) are delivered to BOEM and Obligee, (ii) contain terms no less favorable in the aggregate to Obligee than those contained in this Performance Bond, (iii) are issued by a surety having a [S&P rating of A- or better or an A.M. Best rating of A- or better and, in either case, listed on the Federal Register as acceptable to the U.S. Treasury to issue bonds for U.S. government obligees (T-listed)], (iv) cover all or part of the P&A Obligations, and (v) do not cover any other obligations (other than the P&A Obligations) such that the penal sum of such bond could be reduced as a result of the satisfaction or reduction of such other obligations, then the Amount of this Performance Bond shall automatically be reduced to the positive difference, if any, between the current Amount and the penal sum of such dual obligee bond(s).

No right or action shall accrue on this Performance Bond to or for the use of any person or corporation other than the Principal, the Obligee, and their respective heirs, executors, administrators, successors, and assigns.

This Performance Bond may not be amended, supplemented, or modified except pursuant to a written instrument duly executed by the Principal, Surety, and Obligee. No course of conduct, dealing, or performance shall amend, supplement, or modify this Performance Bond unless incorporated into a written instrument referenced in the preceding sentence.

This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws rules and principles. Principal, Surety, and Obligee agree that any dispute arising out of this Performance Bond shall be brought and heard exclusively in the state or federal courts sitting in Harris County, Texas, and all of them irrevocably consent to the jurisdiction of said courts and do hereby waive any objections they may have to the laying of venue in such courts, including objections based upon grounds that such venue is inconvenient.

The Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) its receipt of satisfactory evidence of the full performance, satisfaction, and extinguishment of the P&A Obligations in accordance with all applicable laws, rules, regulations, and orders, (ii) the full performance by Surety of its obligations under this Bond and (iii) the incurrence of Surety Costs and/or the making of payments by the Surety under the Bond of an amount equal to the Amount, in each case,

no later than thirty (30) days after Obligee's receipt of evidence reasonably satisfactory to Obligee reflecting that the P&A Obligations have been fully performed, satisfied, and extinguished in accordance with all applicable laws, rules, regulations, and orders, which evidence shall include a report from the proper regulatory authority reflecting such performance, and an affidavit signed by an officer of the Principal attesting to such performance.

Notwithstanding anything herein to the contrary, Obligee will issue a release of this Bond within a reasonable time period following the reduction of the Amount to zero.

The Principal and the Surety agree that, notwithstanding any termination of any of the leases or rights of way that may comprise any part of the Properties, whether pursuant to their terms, by operation of law, or otherwise, this Performance Bond shall remain in full force and effect until the earlier of to occur of (i) all P&A Obligations having been truly and faithfully performed, satisfied, and extinguished, (ii) the full performance by Surety of its obligations under this Bond and (iii) Surety incurring Surety Costs and/or making payments under this Bond in an amount equal to the Amount.

Surety represents that it (i) is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Performance Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; (ii) has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or processing against such Surety in any court or before ay officer, arising out of or founded upon this Performance Bond or any liability hereunder; and (iii) does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

*[remainder of page blank; signature page follows]*

**IN WITNESS WHEREOF,** the above bound parties have executed this instrument under their several seals this [●] day of [●], 2021, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

[_____]
Principal

Attest:

_____       By: _____

                                     Name: _____
                                     Title: _____

[_____]
Surety

Attest:

_____       By: _____

                                     Name: _____
                                     Title: _____

**Apache Corporation**
Obligee

Attest:

_____       By: _____

                                     Name: _____
                                     Title: _____

**Exhibit "A"**

Attached to and made a part of that certain Performance Bond No. _____ dated [●] [●], 2021, by [_____], as Principal, [_____], as Surety and Apache Corporation, as Obligee.

### THE PROPERTY

Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated effective June 1, 2000 by and between the United States of America as Lessor and Anadarko Petroleum Corporation as Lessee, bearing Serial No. OCS-G 21685 and covering all of Block 308, South Timbalier Area, South Additional, OCS Leasing Map, Louisiana Map No. 6A.

[Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated effective May 1, 2003 by and between the United States of America as Lessor and Magnum Hunter Production, Inc., as Lessee, bearing Serial No. OCS-G 24987 and covering all of Block 287, South Timbalier Area, South Additional, OCS Leasing Map, Louisiana Map No. 6A.]

[End of Exhibit "A"]

## Exhibit 8

## Standby Loan Agreement

STANDBY LOAN AGREEMENT

dated as of

_____, 2020

between

FIELDWOOD ENERGY I LLC,
and
GOM SHELF LLC

as Borrowers,

and

APACHE CORPORATION,

as Lender

# TABLE OF CONTENTS

Page

Article I Definitions .................................................................................................................1
    Section 1.01    Defined Terms.................................................................................1
    Section 1.02    Terms Generally.............................................................................13
    Section 1.03    Accounting Terms; GAAP ...........................................................13

Article II The Advances.........................................................................................................14
    Section 2.01    Loans; Commitment Increase .......................................................14
    Section 2.02    The Note........................................................................................14
    Section 2.03    Borrowing Procedures; Requests for Borrowings ........................15
    Section 2.04    Funding of Borrowings .................................................................15
    Section 2.05    Repayment of Loans .....................................................................15
    Section 2.06    Prepayment of Loans ....................................................................15
    Section 2.07    Interest...........................................................................................15
    Section 2.08    Payments Generally; Allocation of Proceeds...............................16
    Section 2.09    Indemnity for Returned Payments ................................................16

Article III Representations and Warranties.............................................................................17
    Section 3.01    Organization; Powers....................................................................17
    Section 3.02    Authorization; Enforceability .......................................................17
    Section 3.03    Governmental Approvals; No Conflicts .......................................17
    Section 3.04    Properties ......................................................................................17
    Section 3.05    Litigation and Environmental Matters .........................................18
    Section 3.06    Compliance with Laws and Agreements; No Default ...................18
    Section 3.07    Taxes.............................................................................................18
    Section 3.08    ERISA ...........................................................................................18
    Section 3.09    Disclosure.....................................................................................18
    Section 3.10    Material Contracts ........................................................................19
    Section 3.11    Insurance.......................................................................................19
    Section 3.12    Security Interest in Collateral ......................................................19
    Section 3.13    Use of Proceeds............................................................................19
    Section 3.14    Anti-Corruption Laws and Sanctions ..........................................19
    Section 3.15    Affiliate Transactions...................................................................19
    Section 3.16    Solvency........................................................................................20

Article IV Conditions.............................................................................................................20
    Section 4.01    Effective Date ...............................................................................20
    Section 4.02    Each Credit Event .........................................................................22

Article V Affirmative Covenants............................................................................................24
    Section 5.01    Financial Statements and Other Information .................................24
    Section 5.02    Notices of Material Events............................................................25
    Section 5.03    Existence; Conduct of Business.....................................................26
    Section 5.04    Payment of Obligations.................................................................26

i

| | | |
|---|---|---|
| Section 5.05 | Maintenance of Properties | 26 |
| Section 5.06 | Books and Records; Inspection Rights | 26 |
| Section 5.07 | Compliance with Laws and Material Contractual Obligations | 26 |
| Section 5.08 | Use of Proceeds | 26 |
| Section 5.09 | Accuracy of Information | 27 |
| Section 5.10 | Insurance | 27 |
| Section 5.11 | Further Assurances | 27 |
| | | |
| Article VI Negative Covenants | | 27 |
| Section 6.01 | Indebtedness | 27 |
| Section 6.02 | Liens | 27 |
| Section 6.03 | Fundamental Changes | 28 |
| Section 6.04 | Investments, Loans, Advances, Guarantees and Acquisitions | 28 |
| Section 6.05 | Asset Sales | 28 |
| Section 6.06 | Sale and Leaseback Transactions | 29 |
| Section 6.07 | Swap Agreements | 29 |
| Section 6.08 | Restricted Payments; Certain Payments of Indebtedness | 29 |
| Section 6.09 | Transactions with Affiliates | 29 |
| Section 6.10 | Restrictive Agreements | 29 |
| Section 6.11 | Amendment of Organizational Documents; Material Contracts | 29 |
| Section 6.12 | Amendment or Termination of Material Relationships | 29 |
| Section 6.13 | Excess Cash Flow | 30 |
| | | |
| Article VII Events of Default | | 30 |
| | | |
| Article VIII Miscellaneous | | 32 |
| Section 8.01 | Notices | 32 |
| Section 8.02 | Waivers; Amendments | 33 |
| Section 8.03 | Expenses; Indemnity; Damage Waiver | 34 |
| Section 8.04 | Successors and Assigns | 35 |
| Section 8.05 | Survival | 35 |
| Section 8.06 | Counterparts; Integration; Effectiveness | 36 |
| Section 8.07 | Severability | 36 |
| Section 8.08 | Right of Setoff | 36 |
| Section 8.09 | Governing Law; Jurisdiction; Consent to Service of Process | 36 |
| Section 8.10 | WAIVER OF JURY TRIAL | 37 |
| Section 8.11 | Headings | 37 |
| Section 8.12 | Interest Rate Limitation | 37 |
| Section 8.13 | No Advisory or Fiduciary Responsibility | 38 |
| Section 8.14 | Joint and Several Liability | 38 |
| Section 8.15 | NOTICE OF FINAL AGREEMENT | 40 |

SCHEDULES:
Schedule 3.04(a) – Real Property
Schedule 3.04(b) – Intellectual Property
Schedule 3.11 – Insurance
Schedule 3.16 – Affiliate Transactions


EXHIBITS:
Exhibit A – Note
Exhibit B – Borrowing Request
Exhibit C – Compliance Certificate

iii

# STANDBY LOAN AGREEMENT

STANDBY LOAN AGREEMENT dated as of _____, 2020 (as it may be amended, supplemented or otherwise modified from time to time, this "Agreement"), among FIELDWOOD ENERGY I LLC, a Texas limited liability company ("Fieldwood"), GOM SHELF LLC, a Delaware limited liability company ("GOM", together with Fieldwood, the "Borrowers") and APACHE CORPORATION, a Delaware corporation, as Lender.

The parties hereto agree as follows:

## ARTICLE I

### Definitions

Section 1.01   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.  For the avoidance of doubt, no Co-Borrower shall constitute an Affiliate of Lender nor shall Lender constitute an Affiliate of any Co-Borrower.

"Anti-Corruption Laws" means all state or federal laws, rules, and regulations of any jurisdiction applicable to the Borrowers from time to time concerning or relating to bribery or corruption.

"Apache Bond Rate" means the stated per annum rate of interest charged on the debt securities most recently issued under an indenture of Apache Corporation or successor thereto as of the date immediately preceding each Borrowing Request, and if two series of such debt securities are issued on the same day, the stated per annum rate of interest on the series with a tenor most comparable to the remaining tenor hereof.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitment.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"BOC" means the Texas Business Organizations Code, as amended and in effect at the time of this Agreement.

"Borrower Guarantee" means each certain Guarantee, dated as of the date hereof, by each Co-Borrower of the other Borrower's Secured Obligations for the benefit of the Lender, as each such Guarantee may be amended, restated, supplemented, or otherwise modified from time to time.

"Borrowing Request" means a request by any Co-Borrower for a Loan in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Houston, Texas are authorized or required by law to remain closed.

"Change in Control" means _____[1] shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of Fieldwood and indirectly through Fieldwood, 100% of the outstanding voting Equity Interests of GOM Shelf, in each case, on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty or (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority.

"Co-Borrower" means any one of the Borrowers.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned by any Co-Borrower, whether now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations.

"Collateral Documents" means, collectively, the Mortgages, the Security Agreement, the Deposit Account Control Agreement, and any other agreements, instruments, and documents executed and delivered by the Borrowers in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, pledges, collateral assignments, and financing statements, now or hereafter executed by the Borrowers and delivered to the Lender.

"Commitment" means the commitment of the Lender to make Loans hereunder in an aggregate principal amount at any time outstanding up to $200,000,000, as such amount may be increased pursuant to Section 2.01(b).

"Compliance Certificate" has the meaning assigned to such term in Section 5.01(c).

"Confirmation Order" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, et al, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which, if and to the extent such confirmation order directly affects the Lender in its capacity as such or pertains to any of the Loan Documents or other Apache Definitive Documents (as defined in that certain Apache Term Sheet Implementation Agreement, dated October ____, 2020, by and among Borrowers, Lender,

---

[1] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Apache Shelf, Inc., and Apache Deep Water LLC), shall be in form and substance reasonably acceptable to the Lender.

"Consolidated EBITDA" means for the Borrowers, for any period, the sum of (a) Consolidated Net Income for such period, plus (b) without duplication and to the extent deducted in determining such Consolidated Net Income (i) interest expense for such period, plus (ii) income tax expense for such period, plus (iii) consolidated depreciation and amortization for such period.

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of Fieldwood and its consolidated subsidiaries for such period, as determined in accordance with GAAP.

"Contractor" means a Person which is a party in the capacity as prime contractor under the Decommissioning Contract with any Co-Borrower.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Decommissioning" has the meaning given to such term in the Decommissioning Agreement.

"Decommissioning Agreement" means that certain Decommissioning Agreement dated as of September 30, 2013 by and among Apache Corporation, a Delaware corporation, Apache Shelf, Inc., a Delaware corporation, and Apache Deepwater LLC, a Delaware limited liability company, Apache Shelf Exploration LLC, a Delaware limited liability company, Fieldwood Energy LLC, a Delaware limited liability company, and GOM Shelf LLC, a Delaware limited liability company, as amended by (i) that certain First Amendment to Decommissioning Agreement dated as of September 30, 2013, (ii) that certain Second Amendment to Decommissioning Agreement dated as of September 30, 2013, (iii) that certain Third Amendment to Decommissioning Agreement dated effective as of April 25, 2017, (iv) that certain Fourth Amendment to Decommissioning Agreement dated effective as of September 1, 2017 (as such Fourth Amendment to Decommissioning Agreement was amended by that certain Letter Agreement by and among the Parties dated January 3, 2018), and (v) that certain Fifth Amendment to Decommissioning Agreement dated effective as of April 11, 2018.

"Decommissioning Contract" means each services contract in effect from time to time by and between either or both of the Co-Borrower and any Contractor for all or any portion of the Decommissioning remaining to be conducted on or after the Effective Date.

"Decommissioning Plan" has the meaning assigned to such term in Section 4.01(k).

"Debtor" means Fieldwood Energy LLC.

3

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Divisive Merger Documents" means the certificate of division, the plan of division, the certificate of merger and all other documents filed with respect to the Borrowers with the Texas Secretary of State related to the creation of Fieldwood Energy I LLC and Fieldwood Energy III LLC.

"Document" has the meaning assigned to such term in the UCC.

"dollars" or "$" refers to lawful money of the U.S.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02), which shall also be the date on which the plan of reorganization confirmed by the Confirmation Order becomes effective.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Co-Borrower, directly or indirectly, resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the Security Agreement.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Co-Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Cash Flow" means for any fiscal quarter of the Borrowers, the sum, without duplication, of (a) Consolidated EBITDA for such period, minus (b) voluntary payments on Indebtedness made by any Co-Borrower minus (c) interest expense paid in cash by any Co-Borrower during such period, minus (d) the amount of taxes paid in cash by any Co-Borrower for such period, minus (e) the aggregate amount of interest payments and operating expenditures estimated for the following three (3) month period, minus (f) the amount of working capital needed by the Borrowers for the following three (3) months for performance of Borrowers' obligations under the Decommissioning Agreement.

"Financial Statements" has the meaning assigned to such term in Section 5.01.

"Funding Account" has the meaning assigned to such term in Section 4.01(g).

"GAAP" means generally accepted accounting principles in the U.S in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement or any other Loan Document, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be Indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter), in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"GOM Shelf Properties" has the meaning given to such term in the Limited Liability Company Agreement of Fieldwood.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means: (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste,"

"toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed (to the extent of the value of the property of such Person securing such Indebtedness), (g) all Guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (k) obligations under any liquidated earn-out.

"Indemnitee" has the meaning assigned to such term in Section 8.03(b).

"Inventory" has the meaning assigned to such term in the UCC.

"Farmout Agreement" means that certain Farmout Agreement dated as of the Effective Date by and among the Borrowers and [Fieldwood Energy II LLC].

"JOA" means each and every Joint Operating Agreement in effect from time to time by and among the Borrowers, [Fieldwood Energy II LLC] and third parties, if any.

"Leases" has the meaning given to such term in the Decommissioning Agreement.

"LC Drawing Amount" has the meaning given to such term in the Decommissioning Agreement.

"Legacy Apache Properties" has the meaning given to such term in the Limited Liability Company Agreement of Fieldwood.

"Lender" means Apache Corporation, its successors and permitted assigns.

"<u>Letters of Credit</u>" has the meaning given to such term in the Decommissioning Agreement and includes all letters of credit outstanding from time to time pursuant to the Decommissioning Agreement.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Limited Liability Company Agreement of Fieldwood</u>" or "<u>Fieldwood's Limited Liability Company Agreement</u>" means that certain Limited Liability Company Agreement of Fieldwood dated as of the date hereof, as may be amended, supplemented, or otherwise modified from time to time with the prior written approval of Lender.

"<u>Loan Documents</u>" means, collectively, this Agreement, the promissory note issued pursuant to this Agreement, each Collateral Document, each Borrower Guarantee, and each other agreement, instrument, document and certificate identified in <u>Section 4.01</u> executed and delivered by the Borrowers to, or in favor of, the Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, and each other agreement, now or hereafter executed by or on behalf of the Borrowers and delivered to the Lender in connection with this Agreement. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Loans</u>" means any loan made pursuant to <u>Section 2.01</u>.

"<u>Manager</u>" has the meaning given to such term in Fieldwood's Limited Liability Company Agreement.

"<u>Master Facilities Agreement</u>" means the Master Facilities Use, Access, Production Handling and Transportation Agreement dated as of September 30, 2013 by and among Lender, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM.

"<u>Material Adverse Effect</u>" means a circumstance or condition that could, individually or in the aggregate, materially adversely affect the business, assets, operations, properties, or condition (financial or otherwise) of the Borrowers and their subsidiaries, taken as a whole.

"<u>Material Contract</u>" means each of (i) the Decommissioning Agreement, (ii) the Decommissioning Contract, (iii) the JOA, (iv) the Farmout Agreement, (v) the Turnkey Removal Contract, (vi) the Trust A Trust Agreement, (vii) the Trust A NPI Conveyance, (viii) the Trust A-1 NPI Conveyance (ix) the Letters of Credit, (x) the Permitted Surety Bonds, (xi) the Recharacterization Mortgages, (xii) the PSA, (xiii) the Master Facilities Agreement and (xiv) other Transaction Documents, in each case, as in effect from time to time.

"Maturity Date" means the earliest to occur of (a) termination of the Decommissioning Agreement, (b) expiration of the period comprised of the fifth (5th) anniversary of the Effective Date (the "Initial Period") and automatic successive 12-month periods thereafter until the tenth (10th) anniversary of the Effective Date, each expiring on the next anniversary of the Effective Date (each an "Annual Period"), unless no later than 60 days before expiration of the Initial Period or the then Annual Period, as applicable, Lender has delivered written notice to Borrowers that the Maturity Date will occur upon expiration of the Initial Period or the then Annual Period, respectively (if the same is a Business Day, or if not then the immediately next succeeding Business Day), and (c) any date on which the Commitment is reduced to zero or otherwise terminated pursuant to the terms of Article VII.

"Maximum Rate" means the maximum rate of nonusurious interest permitted from day to day by applicable law, including Chapter 303 of the Texas Finance Code (the "Finance Code") (and as the same may be incorporated by reference in other Texas statutes). To the extent that Chapter 303 of the Finance Code is relevant to Lender for the purposes of determining the Maximum Rate, the Lender may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right the Lender may have subsequently, under applicable law, to change the method of determining the Maximum Rate.

"Mortgages" means, collectively, the mortgages or deed of trust executed by the Borrowers to the Lender providing a Lien on all Real Property owned or leased by such Borrowers.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Note" means the promissory note executed by the Borrowers payable to the Lender, in substantially the form of Exhibit A attached hereto, as same may be amended, extended or modified and all promissory notes executed in renewal, extension, modification or substitution thereof.

"Permitted Liens" means, with respect to any Person, (a) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business; (b) Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review; (c) Liens for taxes, assessments or other governmental charges not yet due or payable or that are being contested in good faith by appropriate

proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; (d) Liens pursuant to partnership agreements, oil, gas and/or mineral leases, farm-out agreements, division orders, contracts for the sale, delivery, purchase, exchange, or processing of oil, gas and/or other hydrocarbons, unitization and pooling declarations and agreements, operating agreements, development agreements, area of mutual interest agreements, forward sales of oil, natural gas and natural gas liquids, and other agreements which are customary in the oil, gas and other mineral exploration, development and production business and in the business of processing of gas and gas condensate production for the extraction of products therefrom; (e) any easements, rights of way, restrictions, defects or other exceptions to title and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount, are not incurred to secure Indebtedness, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the businesses of the Borrowers; (f) Liens existing by operation of law that cannot be abrogated by contract for rights of setoff in a depository relationship with banks and non-negotiable contractual rights of setoff in customary documentation establishing a depository account with a bank, in each case, not granted in connection with the issuance of Indebtedness, and bankers Liens and rights and remedies as to deposit accounts and (g) Liens created under the Recharacterization Mortgages.

"Permitted Surety Bonds" has the meaning given to such term in the Decommissioning Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Co-Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Projections" has the meaning assigned to such term in Section 3.09.

"PSA" has the meaning given to such term in the Decommissioning Agreement.

"Real Property" means all real property that was, is now, or may hereafter be owned, occupied, or otherwise controlled by any Co-Borrower pursuant to any contract of sale, lease or other conveyance of any legal interest in any real property to any Co-Borrower.

"Recharacterization Mortgages" has the meaning given to such term in the Decommissioning Agreement.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Related Party Agreement" means any agreement, arrangement, or understanding between or among any Co-Borrower or any of its Affiliates, on the one hand, and the independent director of Fieldwood, the sole manager of Fieldwood or any member or officer of any Co-Borrower or any of its Affiliates, or any Affiliate of the independent director of Fieldwood, the sole manager of Fieldwood or any member or officer of a Co-Borrower or any of its Affiliates, on the other.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any Hazardous Materials into the environment.

"Remaining Decommissioning" has the meaning given to such term in the Decommissioning Agreement.

"Requirement of Law" means, with respect to any Person, any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated as of August 4, 2020, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company, and including the Fieldwood PSA Parties (as defined therein); (b) the Consenting FLTL Lenders (as defined therein); (c) the Consenting SLTL Lenders (as defined therein); and (d) Lender.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Secured Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and

other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Agreement, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Agreement, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Secured Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Secured Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Secured Obligations is reduced to judgment, or (iv) such Secured Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

"Secured Parties" means (a) the Lender, (b) Apache Shelf, Inc., Apache Deepwater LLC and Apache Shelf Exploration LLC, and (c) the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Borrowers and the Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any Co-Borrower (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Lender, on behalf of the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Service Provider" means, collectively, any service provider hired by the sole manager of Fieldwood pursuant to Section 7.04 of the Limited Liability Company Agreement of Fieldwood to perform all operations and plugging and abandonment and decommissioning activities with respect to the Borrowers' properties or assets.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the

ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Suspension Period" has the meaning given to such term in the Decommissioning Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Texas Divided LLC" means any Texas LLC which has been formed upon consummation of a Texas LLC Division.

"Texas LLC" means any limited liability company organized or formed under the laws of the State of Texas.

"Texas LLC Division" means the statutory division of any Texas LLC into two or more Texas LLC's pursuant to the BOC.

"Transaction Documents" has the meaning given to such term in the Decommissioning Agreement.

"Transactions" means the execution, delivery and performance by the Borrowers of this Agreement and the other Loan Documents, the borrowing of Loans and the use of the proceeds thereof.

"Trust A" has the meaning given to such term in the Decommissioning Agreement.

"Trust A Account" has the meaning given to such term in the Decommissioning Agreement.

"Trust A NPI Conveyance" has the meaning given to such term in the Decommissioning Agreement.

"Trust A-1 NPI Conveyance" has the meaning given to such term in the Decommissioning Agreement.

"Trust A Trust Agreement" has the meaning given to such term in the Decommissioning Agreement.

"Turnkey Removal Contract" has the meaning given to such term in the Decommissioning Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"U.S." means the United States of America.

Section 1.02    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.03    Accounting Terms; GAAP.    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP; provided that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrowers notify the Lender that the Borrowers request an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrowers that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (a) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrowers at

13

"fair value", as defined therein and (b) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

ARTICLE II

The Advances

Section 2.01    Loans; Commitment Increase.

(a)    Subject to the terms and conditions set forth herein, the Lender agrees to make one or more revolving loans to the Borrowers from time to time during the Availability Period in an aggregate principal amount at any time outstanding up to but not exceeding the Commitment. The Lender shall have no obligation to make any Loan if a Default or Event of Default has occurred and is continuing.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow hereunder.

(b)    At any time prior to the Maturity Date, the Borrowers, acting jointly, may request an increase in the Commitment (the "Commitment Increase"); provided that the Commitment Increase shall be subject to Lender's approval and satisfaction of each of the following conditions, all in Lender's sole discretion: (i) the Commitment Increase shall not cause the Commitment to exceed $400,000,000, (ii) at the time of such request and on the effective date of the Commitment Increase, both before and after giving effect thereto, no Default or Event of Default shall exist, (iii) the Borrowers shall deliver to Lender a joint written request for the Commitment Increase at least ten (10) Business Days prior to the desired effective date thereof, and (iv) together with such request, Borrowers shall deliver (A) a certificate of the Manager of each Co-Borrower stating that (1) the representations and warranties of such Co-Borrower contained in the Loan Documents are true and correct as though made on and as of the effective date of such Commitment Increase (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date, and (2) on the effective date of the Commitment Increase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, and (B) resolutions of each Co-Borrower authorizing the Commitment Increase, in form and substance reasonably satisfactory to Lender.  Upon Lender's approval of the Commitment Increase in its sole discretion, satisfaction of each of the foregoing conditions in Lender's sole discretion, and delivery to Lender of a duly executed amended and restated Revolving Note in the amount of the Commitment (upon giving effect to the Commitment Increase), the Commitment Increase shall become effective.

Section 2.02    The Note.  The obligation of the Borrowers to repay the Loans shall be evidenced by the Note executed by the Borrowers, payable to the Lender, in the principal amount of the Commitment.

Section 2.03    Borrowing Procedures; Requests for Borrowings.  To request a Loan, any Co-Borrower shall notify the Lender of such request in writing (delivered by hand, fax or e-mail) in the form attached hereto as Exhibit B and signed by such Co-Borrower not later than 10:00 a.m., Houston time, five (5) Business Days before the date of the proposed Loan.  Each such Borrowing Request shall be irrevocable.  Each such written Borrowing Request shall specify the following information:

(a)      the aggregate amount of the requested Loan, which amount shall be consistent with the applicable Borrowing Package;

(b)      the date of such Loan, which shall be a Business Day; and

(c)      the aggregate principal amount of all Loans then outstanding.

Section 2.04    Funding of Borrowings.  The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the requesting Co-Borrower by wire transfer to the Funding Account.

Section 2.05    Repayment of Loans.

(a)      Borrowers, jointly and severally, hereby unconditionally promises to pay the Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b)      Repayments of Loans shall be accompanied by accrued interest on the amounts repaid.

Section 2.06    Prepayment of Loans.

(a)      The Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, without penalty or premium.

(b)      Within five (5) Business Days after the quarterly financial statements have been delivered pursuant to Section 5.01(b), the Borrowers shall prepay the Loans in an amount equal to 100% of Excess Cash Flow for the immediately preceding fiscal quarter.  Each Excess Cash Flow payment shall be accompanied by a certificate signed by the Manager certifying the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance reasonably satisfactory to Lender.

Section 2.07    Interest.

(a)      Each Loan shall bear interest at a rate per annum equal to the applicable Apache Bond Rate plus 4%.  Following receipt of any Borrowing Request, Lender shall promptly notify Borrowers of the Apache Bond Rate that will be applicable to the requested Loan.

(b)      Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrowers, declare that all Loans shall bear interest at a rate per annum equal to 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraph of this Section.

15

(c)     All accrued unpaid interest on each Loan shall be payable semiannually on January 31st and July 31st of each year during the term of this Agreement (unless such date is not a Business Day in which the payment is due on the next succeeding Business Day) and on the Maturity Date, with the first installment of interest due and payable on the first such date following the making of the initial Loan hereunder until the principal amount of each such Loan is paid in full.  Notwithstanding the forgoing, interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.08    Payments Generally; Allocation of Proceeds.

(a)     Each Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or otherwise) prior to 5:00 p.m., Houston time, on the date when due, in immediately available funds, without set-off or counterclaim, and each Borrower shall be jointly and severally liable for all such payment obligations.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender to such account as the Lender shall from time to time specify in a notice to the Borrowers.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)     Any proceeds of Collateral received by the Lender after an Event of Default has occurred and is continuing and if the Lender so elects, such funds shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lender, in its capacity as such, from the Borrowers, second, to pay interest then due and payable on the Loans ratably, third, to prepay principal on the Loans, and fourth, to the payment of any other Secured Obligation due to the Secured Parties from the Borrowers, and finally, to the Borrowers or otherwise as required by law or court order.  The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all proceeds and payments received pursuant to the first sentence of this clause (b) to any portion of the Secured Obligations.

Section 2.09    Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Secured Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Secured Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by

16

the Lender.  The provisions of this <u>Section 2.09</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds.  The provisions of this <u>Section 2.09</u> shall survive the termination of this Agreement.

ARTICLE III

<u>Representations and Warranties</u>

To induce Lender to enter into this Agreement, each Co-Borrower represents and warrants to the Lender that:

Section 3.01   <u>Organization; Powers</u>.  Each Co-Borrower (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and (iii) is in good standing in every jurisdiction where such qualification is required.

Section 3.02   <u>Authorization; Enforceability</u>.  The Transactions are within each Co-Borrower's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which such Co-Borrower is a party has been duly executed and delivered by such Co-Borrower and constitutes a legal, valid and binding obligation of such Co-Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03   <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate such Co-Borrower's organizational documents or any Requirement of Law applicable to such Co-Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon a Co-Borrower or the assets of such Co-Borrower, or give rise to a right thereunder to require any payment to be made by such Co-Borrower, and (d) will not result in the creation or imposition of any Lien on any asset of such Co-Borrower, except Liens created pursuant to the Loan Documents.

Section 3.04   <u>Properties</u>.

(a)     As of the date of this Agreement, <u>Schedule 3.04(a)</u> sets forth the address of each parcel of Real Property that is owned or leased by any Co-Borrower.  Each of the leases and subleases listed on <u>Schedule 3.04(a)</u> is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each Co-Borrower has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property.

(b)      Each Co-Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 3.04(b), and the use thereof by such Co-Borrower does not infringe in any material respect upon the rights of any other Person, and each Co-Borrower's rights thereto are not subject to any licensing agreement or similar arrangement.

Section 3.05    Litigation and Environmental Matters.

(a)      Except as disclosed to the Lender in writing, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or to the knowledge of any Co-Borrower, threatened against or affecting such Co-Borrower or that involve any Loan Document or the Transactions.

(b)      Except as disclosed to the Lender in writing, no Co-Borrower (1) has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability, and (2) no Co-Borrower (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or (ii) has become subject to any Environmental Liability, except, in the case of each of (1) and (2)(i) and (ii), as would not reasonably be expected to have a Material Adverse Effect.

Section 3.06    Compliance with Laws and Agreements; No Default.  Except as disclosed to the Lender in writing, each Co-Borrower is in compliance in all material respects with all Requirements of Law applicable to it or its property, except for Decommissioning obligations for which Lender has received notice of such Co-Borrower's non-compliance from the applicable Governmental Authority. No Default has occurred and is continuing.

Section 3.07    Taxes.  Each Co-Borrower has timely filed or caused to be filed all income and other material Tax returns and reports required to have been filed and has paid or caused to be paid all income and other material Taxes required to have been paid by it, except Taxes that are not yet delinquent or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside by such Co-Borrower on its books.  No Tax liens have been filed on the assets of any Co-Borrower, and no claims are being asserted in writing by any Governmental Authority with respect to any unpaid Taxes of such Co-Borrower (other than those being contested in good faith by appropriate proceedings).

Section 3.08    ERISA.    No Co-Borrower nor any ERISA Affiliate maintains or contributes to, or has any obligation under, any Plan.

Section 3.09    Disclosure.    The reports, financial statements, certificates and other information (other than forward-looking information (the "Projections") or information of a general economic or industry specific nature) furnished in writing by or on behalf of the Borrowers to the Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, do not contain any material misstatement of fact or omit to state any material fact necessary to make

18

the statements therein, taken as a whole, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to Projections, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered.

Section 3.10   Material Contracts.   No Co-Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Material Contract (excluding any default resulting from such Co-Borrower's failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement). Except as disclosed on Schedule 3.10, no Co-Borrower is obligated by more than (i) $100,000 under any individual contract, commitment, or other liability or obligation or (ii) $500,000 in the aggregate under all such contracts, commitments, liabilities, or obligations, and in the case of (i) and (ii), excluding Material Contracts, this Agreement, and any other contract to which Co-Borrower is a party or by which it or its properties are bound and which was entered into in the ordinary course of business, is not material to Co-Borrower, and will not adversely affect its ability to perform its obligations under the Loan Documents.

Section 3.11   Insurance.   Schedule 3.11 sets forth a description of all insurance maintained by or on behalf of the Borrowers as of the Effective Date.  As of the Effective Date, all premiums in respect of such insurance have been paid.  Each Co-Borrower believes that the insurance maintained by it is adequate and is customary for companies engaged in the same or similar businesses operating in the same or similar locations.

Section 3.12   Security Interest in Collateral.   The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Lender and such Liens constitute (or will constitute upon completion of the filings and other actions required pursuant to the Loan Documents) perfected and continuing Liens on the Collateral to the extent required to be perfected pursuant to the Loan Documents, securing the Secured Obligations, (a) enforceable against the Borrowers and all third parties in accordance with the terms hereof and thereof, subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and (b) having priority over all other Liens (other than Permitted Liens) on the Collateral.

Section 3.13   Use of Proceeds.   The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in Section 5.08.

Section 3.14   Anti-Corruption Laws and Sanctions.   Each Co-Borrower is in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  No Borrowing, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

Section 3.15   Affiliate Transactions.   Other than any transaction permitted pursuant to Section 6.09, there are no existing or proposed agreements, arrangements, understandings or transactions between or among any Co-Borrower and any Affiliates of a Co-Borrower, or between or among any Affiliate of a Co-Borrower or any subsidiary of any Co-Borrower.

HOU 3972592v21

Section 3.16   <u>Solvency</u>.  The fair market value of each Co-Borrower's assets exceeds, and after giving effect to each Loan will exceed, such Co-Borrower's total liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations).  The fair saleable value of each Co-Borrower's property exceeds, and after giving effect to each Loan will exceed, the amount required to pay its debts and other liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) as such debts and other liabilities mature.  Each Co-Borrower is, and after giving effect to each Loan will be, able to pay its debts and liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) as such debts and other liabilities mature.  Each Co-Borrower's assets do not, after giving effect to each Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted, excluding only asset retirement obligations from such determination.  For purposes of this Section, each reference to asset retirement obligations mean those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 hereof.

ARTICLE IV

Conditions

Section 4.01   <u>Effective Date</u>.  The obligations of the Lender to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 8.02</u>) and, subject thereto, shall become effective simultaneously with confirmation of the plan of reorganization pursuant to the Confirmation Order:

(a)      <u>Credit Agreement and Loan Documents</u>.  The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed by the Borrowers and (ii) duly executed copies of the other Loan Documents in form and substance satisfactory to Lender.

(b)      <u>Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lender shall have received (i) a certificate of each Co-Borrower, dated the Effective Date and executed by an authorized Person of such Co-Borrower, which shall (A) certify the resolutions adopted by written consent of the Manager of such Co-Borrower authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signature of each Person authorized to sign on behalf of such Co-Borrower the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the Divisive Merger Documents certified by the Texas Secretary of State and a true and correct copy of its limited liability company agreement, and (ii) a certificate of fact for of such Co-Borrower from the Texas Secretary of State.

(c)      <u>Manager's Certificate</u>.  The Lender shall have received a certificate, signed by the Manager or other appropriately authorized Person of each Co-Borrower, dated as of the Effective Date (i) stating that no Default has occurred and is continuing, and (ii) stating that the representations and warranties contained in the Loan Documents are true and correct as of such date.

(d)     _Fees and Expenses_.  The Lender shall have received all fees required to be paid and all expenses required to be reimbursed for which invoices have been submitted on or prior to the Effective Date (including the reasonable fees and expenses of legal counsel).

(e)     _Confirmation Order_.  The Lender or its counsel shall have received a signed copy of the Confirmation Order and notice that the effective date of the plan of reorganization contained therein has occurred.

(f)     _Lien Releases_.  The Lender shall have received satisfactory evidence that all Liens granted upon any of the property of the Borrowers constituting Collateral (other than Permitted Liens) are terminated as of the Effective Date.

(g)     _Funding Account_.  The Lender shall have received a notice setting forth the deposit account of each Co-Borrower (each a "_Funding Account_", collectively, the "_Funding Accounts_") to which the Lender is authorized by such Co-Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

(h)     _Control Agreements_.  The Lender shall have received deposit account control agreements for the Funding Accounts and each operating account of Borrowers required to be provided pursuant to the Security Agreement.

(i)     _Filings, Registrations and Recordings_.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(j)     _Insurance_.  The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.10 of this Agreement.

(k)     _Decommissioning Plan_.  Lender and Borrowers shall have agreed to a decommissioning plan in form and substance reasonably acceptable to Lender (the "_Decommissioning Plan_").

(l)     _Capitalization_.  Lender shall have received written evidence, in form and substance satisfactory to Lender, that the capitalization funds received by the Borrowers upon their formation in the amount of $50,000,000 has been fully utilized under the Decommissioning Plan during the bankruptcy of the Debtor or any unused amount has been funded to the Funding Account.

(m)     _Material Contracts_.  Lender shall have received copies of all Material Contracts.

(n)     _Financial Information_. The Lender shall have received (i) an unaudited consolidated balance sheet of Borrowers and their subsidiaries as of the Effective Date and (ii) historical lease operating statements for the assets of each Co-Borrower and its subsidiaries for

each month during the 24-month period immediately preceding the Effective Date, and in the case of (i) and (ii), in form and substance reasonably satisfactory to Lender and after giving effect to the divisive merger that is part of the plan of reorganization confirmed by the Confirmation Order.

(o)     _Other Documents_.  The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested, including a customary written opinion or opinions of the Borrowers' counsel as to due authorization, execution and delivery, and enforceability of the Loan Documents and perfection of the security interests granted thereby, addressed to the Lender, in form and substance satisfactory to the Lender, and rendered by Weil Gotshal & Manges LLP or a comparable law firm satisfactory to Lender.

The Lender shall notify the Borrowers of the Effective Date, and such notice shall be conclusive and binding.

Section 4.02   _Each Credit Event_.  The obligation of the Lender to make each Loan under Article II hereof is subject to the satisfaction of the following conditions:

(a)     The representations and warranties of each Co-Borrower set forth in the Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date.

(b)     At the time of and immediately after giving effect to such Loan, no Default shall have occurred and be continuing.

(c)     All amounts in the Trust A Account, the Letters of Credit, and the Permitted Surety Bonds have been fully exhausted or are not available to pay or reimburse Lender for Decommissioning.

(d)     The Decommissioning Agreement is in full force and effect, has not been terminated and has become the obligation of the Borrowers under the Confirmation Order and/or the Divisive Merger Documents.

(e)     Other than any Co-Borrower's failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement, there are no uncured events that constitute or would result in the nonperformance, default, or breach by any Co-Borrower under the Decommissioning Agreement.

(f)     Since the Effective Date, none of the events set forth in Article VII of the Decommissioning Agreement have occurred, nor has any Co-Borrower assigned, conveyed, sold, farmed out or otherwise transferred any of the Leases other than with respect to (i) farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood and (ii) conveyances or other transfers consummated in accordance with the JOA or Farmout Agreement.

HOU 3972592v21

(g)     Since the Effective Date, no Co-Borrowers has received cash from the Trust A Account, including, but not limited to, pursuant to <u>Section 4.3(b)</u> and <u>Section 4.5</u> of the Decommissioning Agreement.

(h)     Since the Effective Date, no Co-Borrowers has caused a reduction in the LC Drawing Amount, including, not limited to, pursuant to Section 4.3(b) of the Decommissioning Agreement.

(i)     A Suspension Period shall not have commenced and be continuing.

(j)     Lender has received a copy of the Decommissioning Contract, in form and substance satisfactory to the Lender, for the Decommissioning to be funded with a borrowing, together with a schedule showing (i) all subcontracts awarded as of the Borrowing Request, including names, types of work, subcontract amounts and percentage retainage provided in said subcontracts, (ii) the amount of general conditions and an estimate of value for each subcontract not awarded as of such date, and (iii) a total overall schedule of value.

(k)     Lender shall have received the following in form and substance reasonably satisfactory to Lender (collectively, a "<u>Borrowing Package</u>", together with any amendments, modifications or supplements of the same) at least ten (10) Business Days prior to the date of the requested Loan (which, for the avoidance of doubt, may be submitted in advance of the identification of a proposed borrowing date):

(i)     a certification from Borrowers in favor of Lender that (i) the Decommissioning to be made with the proceeds of a proposed Borrowing Request is contemplated by the Decommissioning Plan then in effect (both as to amount of such requested Loan and as to the timing of such requested Loan), (ii) that the proposed use of the proceeds therefrom is for cost and expenses in compliance with the Decommissioning Plan then in effect and (iii) Borrowers shall have sufficient funds (on a pro forma basis (reasonably projected, on a good faith basis) after giving effect to the Loan requested) to pay all accrued interest due under <u>Section 2.07(c)</u> for the following six (6) month period;

(ii)     a certification from the Contractor in the form acceptable to Lender with respect to the requested Loan, detailing the Decommissioning covered or to be covered by the Borrowing, itemizing any estimated costs and expenses of such Decommissioning and/or including copies of invoices itemizing costs and expenses incurred with respect to such Decommissioning, as applicable;

(iii)     partial lien waivers or releases of lien for all lienable work done and materials delivered with respect to such Decommissioning covered in the request, to the extent applicable (for purposes of clarity, this only applies to work performed prior to the date of the Borrowing Package);

(iv)     to the extent not previously delivered to Lender, copies of all permits, orders, certificates, licenses and approvals required under applicable Requirements of Law for the Decommissioning (collectively, the "Required Approvals") as of the date of the requested Loan and copies of all subcontracts; *provided, however*, with respect to any

Required Approvals that have not been issued as of the date of submission of a Borrowing Package, Co-Borrower shall include with the Borrowing Package Co-Borrower's certification and covenant in form and substance reasonably satisfactory to Lender that (i) Co-Borrower has received from the applicable Governmental Authority indication that such Required Approvals will be issued to Co-Borrower, specifying the expected time of issuance thereof, (ii) Co-Borrower diligently shall pursue such Required Approvals, and (iii) Co-Borrower promptly shall deliver to Lender copies of such Required Approvals upon receipt thereof; *provided further, however*, Lender shall have discretion to decline any Borrowing Request that is not preceded or accompanied by copies of all Required Approvals; and

(v)     such additional documentation reasonably requested by Lender.

ARTICLE V

Affirmative Covenants

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, in each case without any pending draw, each Co-Borrower covenants and agrees with the Lender that:

Section 5.01     Financial Statements and Other Information.   Fieldwood will furnish to the Lender:

(a)     within 105 days after the end of each fiscal year, its audited consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows as of the end of and for such year prepared under AICPA auditing standards, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants acceptable to the Lender (without a "going concern" or like qualification, commentary, or exception (except to the extent that any such qualification, commentary, or exception expressly indicates that after giving effect to the exclusion of asset retirement obligations reflected on the accompanying balance sheet, there would be no such qualification, commentary, or exception), and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of the Borrowers in accordance with GAAP consistently applied;

(b)     within 50 days after the end of each of its fiscal quarters (including the fourth quarter), its consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by Fieldwood as presenting fairly in all material respects the consolidated financial condition and results of operations of the Borrowers in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

24

(c)       concurrently with any delivery of financial statements under clause (a) or (b) above (collectively or individually, as the context requires, the "Financial Statements"), a certificate of the Manager of Fieldwood in substantially the form of Exhibit C (the "Compliance Certificate") (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) to the extent any Loan has been advanced hereunder, certifying that Borrowers have sufficient funds to pay all accrued interest due under Section 2.07(c) for the following six (6) month period;

(d)       as soon as available, but in any event no later than 60 days after the end of each fiscal year, commencing with the fiscal year ending December 31, 2020, a detailed operating budget for the next fiscal year forecasting revenue, operating costs, and capital expenses for each fiscal quarter in form reasonably satisfactory to the Lender;

(e)       as soon as available, but in no event later than 15 Business Days after the end of each calendar month, a statement in a form reasonably satisfactory to Lender showing all operating data including operating expenses and revenue for each Co-Borrower for such calendar month; and

(f)       promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of each Co-Borrower, or compliance with the terms of this Agreement, as the Lender may reasonably request, including, without limitation, Decommissioning cost estimates and calculations.

Section 5.02    Notices of Material Events.  Each Co-Borrower will furnish to the Lender prompt (but in any event within five (5) Business Days) after each Co-Borrower obtains knowledge thereof) written notice of the following:

(a)       the occurrence of any Default;

(b)       receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Co-Borrower that (i) seeks damages in excess of $250,000, (ii) alleges criminal misconduct by any Co-Borrower, (iii) alleges the violation of, or seeks to impose remedies under any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, or (iv) asserts liability on the part of any Co-Borrower in excess of $250,000 in respect of any tax, fee, assessment, or other governmental charge; or

(c)       a breach by any Co-Borrower of any covenant under the Decommissioning Agreement (other than Borrowers' failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement); provided that, if a written notice of such breach has been given to Lender in connection with the Decommissioning Agreement, such notice shall not be required to be provided under this Section 5.02.

Each notice delivered under this Section shall be accompanied by a statement of the applicable authorized Person of each Co-Borrowers setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03   Existence; Conduct of Business.  Each Co-Borrower will (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

Section 5.04   Payment of Obligations.  Each Co-Borrower will pay or discharge all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except those which are being contested by Borrowers in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

Section 5.05   Maintenance of Properties.  The Borrowers will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear and performance of its obligations under the Decommissioning Agreement excepted; provided, however, that nothing in this Agreement shall provided, however, that nothing in this Agreement shall prevent the Borrowers from relinquishing or allowing any Leases to expire or terminate, in each case in the ordinary course of the Borrowers' business.

Section 5.06   Books and Records; Inspection Rights.  Each Co-Borrower will (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, during normal business hours, to visit and inspect its properties, conduct at such Co-Borrower's premises field examinations of such Co-Borrower's assets, liabilities, books and records, including examining and making extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times, as often as reasonably requested at the Borrowers' expense.

Section 5.07   Compliance with Laws and Material Contractual Obligations.  Each Co-Borrower will (a) comply with each Requirement of Law applicable to it or its property (including, without limitation, Environmental Laws) in all material respects and (b) perform in all material respects its obligations under material agreements to which it is a party.  Each Co-Borrower will enforce policies and procedures designed to ensure compliance by such Co-Borrower, and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.08   Use of Proceeds.

(a)     The proceeds of the Loans will be used only for payment or reimbursement of cost associated with plugging, facility and well removal and abandonment, and other actions permitted or required by the Decommissioning Agreement.

26

HOU 3972592v21

(b)      No Co-Borrower will request or use any Borrowing and shall procure that its directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.09   Accuracy of Information.  Each Co-Borrower will ensure that, other than the Projections described below, any information, including financial statements or other documents, material to the Loan Documents or the transactions contemplated thereby, furnished in writing to the Lender by the Manager of such Co-Borrower in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder contains no material misstatement of fact or omits to state any material fact, in each case necessary to make the statements therein, in the light of the circumstances under which they were made and taken as a whole, not misleading; provided that, with respect to the Projections, each Co-Borrower will cause the Projections to be prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.10   Insurance.  Each Co-Borrower will maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  Each Co-Borrower will furnish to the Lender information in reasonable detail as to the insurance so maintained.

Section 5.11   Further Assurances.  Each Co-Borrower will execute and deliver such further instruments as may be reasonably requested by Lender to carry out the provisions and purposes of this Agreement and the other Loan Documents and to preserve and perfect the Liens of Lender in the Collateral.

## ARTICLE VI

## Negative Covenants

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document shall have been paid in full, each Co-Borrower covenants and agrees with the Lender that:

Section 6.01   Indebtedness.  No Co-Borrower will create, incur, assume or suffer to exist any Indebtedness, except the Secured Obligations.

Section 6.02   Liens.  No Co-Borrowers will create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except for Permitted Liens.

HOU 3972592v21

Section 6.03   <u>Fundamental Changes</u>.

(a)      No Co-Borrower will enter into a fundamental business transaction (as defined in the BOC) including a merger, consolidation, interest exchange, conversion or sale of all or substantially all of such Co-Borrower's Real Property or other assets (including, in each case, pursuant to a Texas LLC Division).

(b)      No Co-Borrower will wind-up, dissolve, liquidate, or terminate or initiate any bankruptcy, insolvency or similar proceeding.

(c)      No Co-Borrower will file any motion seeking to amend, modify or alter, in any way, the Confirmation Order.

(d)      No Co-Borrower will (i) revoke any voluntary decision to wind-up or cancel the required winding up of such Co-Borrower due to an event specified in Section 11.051 of the BOC or (ii) reinstate such Co-Borrower after termination.

(e)      No Co-Borrower will (i) conduct or be involved in any business or operations other than operating or plugging and abandoning and decommissioning the Legacy Apache Properties or the GOM Shelf Properties or (ii) engage in any activity or take any action with respect to its properties or assets, other than in the ordinary course of business.

(f)      No Co-Borrower will change its fiscal year or any fiscal quarter from the basis in effect on the date hereof.

(g)      No Co-Borrowers will change the accounting basis upon which its financial statements are prepared.

Section 6.04   <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.   No Co-Borrower will form any subsidiary or enter into any joint venture or similar business arrangement after the date hereof, or purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans, advances or capital contributions to, Guarantee (except for the Borrower Guarantees) any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase, farm-in or otherwise acquire any assets of any other Person, except:

(a)      farm-in or farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood; and

(b)      conveyances or other transfers consummated in accordance with the JOA or Farmout Agreement.

Section 6.05   <u>Asset Sales</u>.   No Co-Borrower will sell, transfer (including any disposition of property to a Texas Divided LLC pursuant to a Texas LLC Division), farmout, lease or otherwise dispose of any asset, including any Equity Interest owned by it, except:

(a)     farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood; and

(b)     conveyances or other transfers consummated in accordance with the JOA or Farmout Agreement.

Section 6.06    Sale and Leaseback Transactions.   No Co-Borrower will enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 6.07    Swap Agreements.   No Co-Borrower will enter into any swap agreement (other than for physical swaps of less than one year in duration) without the Lender's prior consent in its sole discretion.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.    No Co-Borrower will declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

Section 6.09    Transactions with Affiliates.   No Co-Borrower will (a) enter into, amend, waive any provision of, or any of its rights under, or terminate any Related Party Agreement or (b) sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood, (ii) conveyances or other transfers consummated in accordance with the JOA or Farmout Agreement and (iii) the transition services agreement entered into between any Co-Borrower and [Fieldwood Energy II LLC] as of even date herewith, as may be amended or replaced in its entirety.

Section 6.10    Restrictive Agreements.   No Co-Borrower will enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of such Co-Borrower to create, incur or permit to exist any Lien upon any of its property or assets securing the Secured Obligations.

Section 6.11    Amendment of Organizational Documents; Material Contracts.   (a) No Co-Borrower will (i) amend, modify, supplement or waive any provision of, or any of its rights under, its certificate of formation or organization, as applicable, its limited liability company agreement or any other organizational document of such Co-Borrower or (ii) issue additional Equity Interests or admit additional Persons as members under the limited liability company agreement of such Co-Borrower.

(b)     No Co-Borrower will (i) amend, modify, supplement, or waive any provision of, or any of its rights under, or terminate any Material Contract, or (ii) enter into any joint operating agreement with respect to the operatorship of the Real Properties or any joint development agreement relating to the Real Properties except as otherwise permitted in Sections 6.04 or 6.05 hereof.

Section 6.12    <u>Amendment or Termination of Material Relationships</u>.  No Co-Borrower will (a) remove, replace or materially change the work to be performed by the Service Provider or (b) remove, replace or materially change the powers, rights or responsibilities of the sole manager or independent director of Fieldwood.

Section 6.13    <u>Excess Cash Flow</u>.  No Co-Borrower shall use Excess Cash Flow for any purpose other than fulfilling its Secured Obligations and obligations under the Decommissioning Agreement.

ARTICLE VII

Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrowers shall fail to pay (i) any principal of any Loan or (ii) any interest on any Loan or other amount payable under this Agreement or any other Loan Document when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and, in the case of clause (ii), such failure shall continue for five (5) Business Days;

(b)    any representation or warranty made or deemed made by or on behalf of any Co-Borrower in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished by any Co-Borrower pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(c)    any Co-Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Sections 5.01, 5.02(a)</u>, <u>5.03</u>, <u>5.08</u> or <u>5.10</u> or in <u>Article VI</u>;

(d)    any Co-Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause <u>(a)</u> or <u>(c)</u> of this Article), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of such Co-Borrower's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement or of any other Loan Document;

(e)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Co-Borrower or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Co-Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

30

(f)      any Co-Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (e) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Co-Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(g)      any Co-Borrower shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts as they become due;

(h)      one or more judgments for the payment of money in an aggregate amount in excess of $250,000 (to the extent not covered by insurance) shall be rendered against any Co-Borrower and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Co-Borrower to enforce any such judgment or any Co-Borrower shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders;

(i)      a Change in Control shall occur;

(j)      except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien;

(k)      any Collateral Document or any Borrower Guarantee shall (other than pursuant to the terms thereof) fail to remain in full force or effect or any action shall be taken by any Co-Borrower to discontinue or to assert the invalidity or unenforceability of any Collateral Document or any Borrower Guarantee;

(l)      any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Co-Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(m)      any default (other than a failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement) by any Co-Borrower shall occur under the Decommissioning Agreement;

(n)      any default under a Material Contract which could result in the termination of such Material Contract; and

31

    (o)    any breach of Article VII (Management) of Fieldwood's Limited Liability Company Agreement or any failure to obtain Lender's prior written consent in accordance with any provision of Fieldwood's Limited Liability Company Agreement;

then, and in every such event (other than an event with respect to a Co-Borrower described in clause (e) or (f) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and in the case of any event with respect to a Co-Borrower described in clause (e) or (f) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers.  Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Secured Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII

Miscellaneous

Section 8.01    Notices.

    (a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or electronic communication (to the extent provided in clause (b) below), as follows:

    (i)    if to Borrowers at:

                _____

                _____

                _____

                Attention: _____

    (ii)    if to the Lender at:

                Apache Corporation
                2000 Post Oak Boulevard, Suite 100
                Houston, Texas 77056

Attention: Treasurer and Nora Dobin
e-mails: ben.rodgers@apachecorp.com and nora.dobin@apachecorp.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by fax shall be deemed to have been given when sent, <u>provided</u> that if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through electronic communication to the extent provided in paragraph <u>(b)</u> below shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications (including e-mail); <u>provided</u> that the foregoing shall not apply to notices pursuant to <u>Article II</u> unless otherwise agreed by the Lender.  Each of the Lender or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(c)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 8.02   <u>Waivers; Amendments</u>.

(a)     No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Co-Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph <u>(b)</u> of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and the Lender.

Section 8.03     Expenses; Indemnity; Damage Waiver.

(a)     Borrowers shall pay or reimburse Lender for any and all out-of-pocket expenses (including attorneys', auditors', and accountants' fees, charges, and disbursements) incurred or paid by Lender in connection with the preparation, execution, and delivery of the Loan Documents, subject to the $4,000,000 cap specified in the Restructuring Support Agreement or the Confirmation Order for fees and expenses of Lender related to the formation of Borrowers and restructuring of Debtor.  Borrowers also shall pay or reimburse Lender for any and all out-of-pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) incurred or paid by Lender in connection with the administration of the Loan Documents and the enforcement, collection, or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of pocket expenses incurred during any workout, restructuring, or negotiations in respect of such Loans.

(b)     The Borrowers, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Co-Borrower, or any Environmental Liability related in any way to any Co-Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE BORROWERS AND EACH CO-BORROWER AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

(c)     To the extent permitted by applicable law, each of the Co-Borrower and the Lender agrees that it shall not assert, and hereby waives, any claim against the other, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result

34

of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Co-Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)     All amounts due under this Section shall be payable promptly after written demand therefor.

Section 8.04     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Co-Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by any Co-Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Borrowers, provided that the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Lender within five (5) Business Days after having received notice thereof, and provided further that no consent of the Borrowers shall be required if an Event of Default has occurred and is continuing.

(c)     The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender.

Section 8.05     Survival.    All covenants, agreements, representations, and warranties made by the Borrowers in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and so long as the Commitment has not expired or terminated. The provisions of Section 8.03 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 8.06    Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.   Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.   THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 8.07    Severability.   Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.08    Right of Setoff.   If an Event of Default shall have occurred and be continuing, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by the Lender, to or for the credit or the account of any Co-Borrower against any of and all the Secured Obligations, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender may have.

Section 8.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Texas, but giving effect to federal laws applicable to national banks.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. federal or Texas State court sitting in Houston, Texas in any action or proceeding arising out of or relating to any Loan Documents, or

for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such state court or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment, non-appealable in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Co-Borrower or its properties in the courts of any jurisdiction.

(c)      Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 8.10   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 8.11   Headings.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 8.12   Interest Rate Limitation.   No provision of this Agreement or of any other Loan Documents shall require the payment or the collection of interest in excess of the Maximum Rate.  If any excess of interest in such respect is hereby provided for, or shall be adjudicated to be so provided, in any other Loan Documents or otherwise in connection with this Agreement, the provisions of this Section shall govern and prevail and no Co-Borrower or the sureties, guarantors, successors or assigns of such Co-Borrower shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance or detention

37

of sums loaned pursuant hereto.  In the event Lender ever receives, collects or applies as interest any such sum, such amount which would be in excess of the maximum amount permitted by applicable law shall be applied as a payment and reduction of the principal of the indebtedness evidenced by the Note; and, if the principal of the Note been paid in full, any remaining excess shall forthwith be paid to Borrowers.  In determining whether or not the interest paid or payable exceeds the Maximum Rate, Borrowers and Lender shall, to the extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the indebtedness evidenced by the Note so that interest for the entire term does not exceed the Maximum Rate

Section 8.13   No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Co-Borrower acknowledges and agrees that:  (a) (i) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between the Borrowers, on the one hand, and the Lender, on the other hand, (ii) the Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrowers are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, or any other Person and (ii) the Lender has no obligation to the Borrowers with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Lender may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, and the Lender has no obligation to disclose any of such interests to the Borrowers.  To the fullest extent permitted by law, each Co-Borrower hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 8.14   Joint and Several Liability.

(a)      Each Co-Borrower acknowledges and agrees that it is the intent of the parties that each Co-Borrower be primarily liable for the Secured Obligations as a joint and several obligor. It is the intention of the parties that, with respect to liability of any Co-Borrower hereunder arising solely by reason of its being jointly and severally liable for Loans and other Secured Obligations by other Borrower, the obligations of such Co-Borrower shall be absolute, unconditional, and irrevocable irrespective of:

(i)      any lack of validity, legality, or enforceability of this Agreement or any Loan Document as to any other Co-Borrower;

(ii)      the failure of the Lender: (A) to enforce any right or remedy against any Co-Borrower or any other Person (including any surety) under the provisions of this

Agreement or otherwise, or (B) to exercise any right or remedy against any surety of, or Collateral securing, any obligations;

(iii)    any change in the time, manner, or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other extension, compromise, or renewal of any Secured Obligations;

(iv)    any reduction, limitation, impairment, or termination of any Secured Obligations with respect to any other Co-Borrower for any reason, including any claim of waiver, release, surrender, alteration, or compromise, and shall not be subject to (and each Co-Borrower hereby waives any right to or claim of) any defense (other than the defense of payment in full of the Secured Obligations) or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations with respect to any other Co-Borrower;

(v)    any addition, exchange, release, surrender, or nonperfection of any Collateral, or any amendment to, or waiver or release or addition of, or consent to departure from, any guaranty held by the Lender securing any of the Secured Obligations; or

(vi)    any other circumstance which might otherwise constitute a defense (other than the defense of payment in full of the Secured Obligations) available to, or a legal or equitable discharge of, any other Co-Borrower, any surety or any guarantor.

(b)    Each Co-Borrower agrees that its liability hereunder and its liability under any of the Loan Documents shall continue to be effective or be reinstated, as the case may be, if at any time any payment (in whole or in part) of any of the Secured Obligations is rescinded or must be restored by Lender upon the insolvency, bankruptcy, or reorganization of any Co-Borrower as though such payment had not been made.

(c)    Each Co-Borrower hereby expressly waives: (i) notice of the Lender's acceptance of this Agreement; (ii) notice of the existence or creation or non-payment of all or any of the Secured Obligations other than notices expressly provided for in this Agreement; (iii) presentment, demand, notice of dishonor, protest, acceleration and the notice of intent to accelerate, and all other notices whatsoever other than notices expressly provided for in this Agreement; and (iv) all diligence in collection or protection of, or realization upon, the Secured Obligations or any part thereof, any obligation hereunder, or any security for or Guarantee of any of the foregoing, subject, however, in the case of Collateral in the possession of Lender to such Person's duty to use reasonable care in the custody and preservation of such Collateral.

(d)    No delay on the Lender's part in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by any of the Lenders of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.  No action of Lender permitted hereunder shall in any way affect or impair any such Lender's rights or any Co-Borrower's Secured Obligations under this Agreement or the other Loan Documents.

Section 8.15   <u>NOTICE OF FINAL AGREEMENT</u>.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWERS:

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By:_____
Name: _____
Title: _____

GOM SHELF LLC,
a Delaware limited liability company

By:_____
Name: _____
Title: _____

*[Signature Page to Standby Loan Agreement]*

LENDER:

APACHE CORPORATION,
a Delaware corporation, as Lender

By: _____

Name: _____

Title: _____

*Signature Page to Standby Loan Agreement*

**SCHEDULE 3.04[2]**

<u>Properties</u>

---

[2] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.04 - 1

## SCHEDULE 3.11[3]

Insurance

---

[3] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.11 - 1

**SCHEDULE 3.16[4]**

<u>Affiliate Transactions</u>

---

[4] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.16 - 1

**EXHIBIT A**

Form of Note

NOTE

$200,000,000                                                          _____, 20[●]


        FOR VALUE RECEIVED, each of the undersigned, FIELDWOOD ENERGY I LLC, a Texas limited liability company ("Fieldwood") and GOM SHELF LLC, a Delaware limited liability company ("GOM" together with Fieldwood, the "Borrowers"), jointly and severally, promises to pay to APACHE CORPORATION, a Delaware corporation (the "Lender"), at the place and times provided in the Loan Agreement referred to below, the principal sum of TWO HUNDRED MILLION DOLLARS ($200,000,000) or, if less, the unpaid principal amount of all Loans made by the Lender from time to time pursuant to that certain Standby Loan Agreement, dated as of _____, 20[●] (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") by and among the Borrowers and the Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Loan Agreement.

        The unpaid principal amount of this Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Loan Agreement and shall bear interest as provided in Section 2.07 of the Loan Agreement.  All payments of principal and interest on this Note shall be payable in lawful currency of the United States in immediately available funds to the Lender in accordance with the Loan Agreement.

        This Note is entitled to the benefits of, and evidences the Secured Obligations incurred under, the Loan Agreement, to which reference is made for a statement of the terms and conditions on which each Borrower is permitted and required to make prepayments and repayments of principal of the Secured Obligations evidenced by this Note and under which such Secured Obligations may be declared to be immediately due and payable.

        This Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note shall be governed by, and construed in accordance with, the law of the State of Texas.

        The Borrowers hereby waive all requirements as to diligence, presentment, demand of payment, protest and, except as required by the Loan Agreement, notice of any kind with respect to this Note.

        This Note may be transferred or assigned solely in accordance with the terms and provisions of the Loan Agreement.

Exhibit A - 1

HOU 3972592v21

This Note may be executed in multiple counterparts, each of which, for all purposes, shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Note as of the day and year first above written.

> **FIELDWOOD ENERGY I LLC,**
> a Texas limited liability company
>
> By:_____
> Name:_____
> Title:_____
>
>
> **GOM SHELF LLC,**
> a Delaware limited liability company
>
> By:_____
> Name:_____
> Title:_____

Exhibit A - 2

**EXHIBIT B[5]**

Form of Borrowing Request

BORROWING REQUEST

_____, 20__

Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056
Attention:        Treasurer and Nora Dobin
Email: ben.rodgers@apachecorp.com and nora.dobin@apachecorp.com

Apache Corporation,

      Reference is made to that certain Loan Agreement, dated as of _____ (the "Loan Agreement"), among Fieldwood Energy I LLC ("Fieldwood"), GOM Shelf LLC ("GOM", together with Fieldwood, the "Borrowers" and each individually, a "Co-Borrower") and Apache Corporation ("Lender").  Terms defined in the Loan Agreement are used herein with the same meanings.  This notice constitutes a Borrowing Request and Borrowers hereby request a Loan under the Loan Agreement, and in that connection Borrowers specify the following information with respect to the Loan requested hereby:

    (A)    Principal amount of the requested Loan: _____

    (B)    Effective date of such requested Loan (which is a Business Day): _____

    (C)    the aggregate principal amount of all Loans then outstanding: _____

      Borrowers hereby represent and warrant that all conditions in Section 4.02 of the Loan Agreement are satisfied.

      Borrowers have caused this Borrowing Request to be executed and delivered by its [Authorized Officer/Manager] this ___ day of _____, 20__.

               Very truly yours,

               [FIELDWOOD ENERGY I LLC]

               By: _____
               Name:
               Title:

---

[5] Form to be mutually agreeable to all parties as a condition to Apache's execution.

Exhibit B - 1

[GOM SHELF LLC]

By: _____
Name:
Title:

Exhibit B - 2

EXHIBIT C[6]

Form of Compliance Certificate

COMPLIANCE CERTIFICATE

In connection with that certain Standby Loan Agreement, dated as of _____ (the "Loan Agreement"), among Fieldwood Energy I, LLC ("Fieldwood"), GOM Shelf LLC ("GOM", together with Fieldwood, the "Borrowers") and Apache Corporation ("Lender"), the undersigned, the Manager of Fieldwood does hereby certify, pursuant to Section 5.01(c) of the Loan Agreement, as follows (capitalized terms hereinafter used having the meaning specified in the Loan Agreement):

1.     In accordance with Sections 5.01(a) or (b) of the Loan Agreement, the consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows financial statements of Fieldwood and its consolidated Subsidiaries as of _____, 20__ present fairly in all material respects their consolidated financial condition and results of operations in accordance with GAAP at such date.

2.     No Default has occurred and is continuing [other than _____].[7]

3.     As of the date hereof, the outstanding principal balance of all Loan advanced under the Loan Agreement is $_____. The Borrowers have sufficient funds to pay all accrued interest due under Section 2.07(c) of the Loan Agreement for the following six (6) month period.

IN WITNESS WHEREOF, I have hereunto set my hand as of this ____ day of _____, _____.

_____
Name:
Title: Manager

---

[6] Form to be mutually agreeable to all parties as a condition to Apache's execution.

[7] If Default has occurred, Borrower shall specify details thereof and any action taken or proposed to be taken with respect thereto.

Exhibit C - 1

**<u>Exhibit 9</u>**

**Security Agreement**

# SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (this "Security Agreement") is entered into as of [●] by and among **FIELDWOOD ENERGY I LLC**, a Texas limited liability company ("Fieldwood"), **GOM SHELF LLC**, a Delaware limited liability company ("GOM", together with Fieldwood, the "Grantors") and **APACHE CORPORATION**, a Delaware corporation ("Lender") on behalf of itself and the other Secured Parties (as defined in the Loan Agreement (as defined below)).

## RECITALS

**WHEREAS**, the Grantors and Lender are entering into a Standby Loan Agreement dated as of [●] (the "Loan Agreement").

**WHEREAS**, the Grantors are entering into this Security Agreement in order to induce Lender to enter into and extend credit under the Loan Agreement.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1. **DEFINITIONS**.

1.1 **Reference to Security Agreement**. Unless otherwise specified, all references herein to Articles, Sections, Recitals, and Schedules refer to Articles and Sections of, and Recitals and Schedules to, this Security Agreement. All Schedules include amendments and supplements thereto from time to time.

1.2 **Principles of Construction**. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neutral, as the context indicates is appropriate. Whenever the words "include," "includes" or "including" are used in this Security Agreement, they shall be deemed to be followed by the words "without limitation". All references to agreements and other contractual Instruments shall be deemed to include subsequent amendments, permitted assignments, and other modifications thereto, but only to the extent such amendments, assignments, and other modifications are not prohibited by the terms of any Loan Document. Furthermore, any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time.

1.3 **Definitions**. Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in either the Loan Agreement or the UCC is used in this Security Agreement with the same meaning; *provided that*, if the definition given to such term in the Loan Agreement conflicts with the definition given to such term in the UCC, the Loan Agreement definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail. As used herein, the following terms have the meanings indicated:

"Account" means any "account," as such term is defined in Section 9.102(a)(2) of the UCC.

"Account Debtor" means any person who is obligated on a Receivable.

"Cash Collateral Account" has the meaning set forth in Section 5.5.

"Chattel Paper" means any "chattel paper", as such term is defined in Section 9.102(a)(11) of the UCC, including all Electronic Chattel Paper and Tangible Chattel Paper.

"Collateral" has the meaning set forth in Section 2.1.

"Collateral Records" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all property (real or personal) assigned, hypothecated, or otherwise securing any Collateral and shall include any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"Commercial Tort Claims" means any "commercial tort claim", as such term is defined in Section 9.102(a)(13) of the UCC, including all commercial tort claims listed on Schedule 3.8.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Control" has the meaning set forth in Sections 7.106, 8.106, 9.104, 9.105, 9.106, or 9.107 of the UCC, as applicable.

"Copyright Licenses" means any and all agreements providing for the granting of any right in or to Copyrights, including each agreement referred to on Schedule 3.15.

"Copyrights" means all United States and foreign copyrights, including copyrights in software and databases, whether registered or unregistered, and, with respect to any and all of the foregoing:  (a) all registrations and applications therefor, including the registrations and applications referred to on Schedule 3.15; (b) all extensions and renewals thereof; (c) all rights corresponding thereto throughout the world; (d) all rights to sue for past, present and future infringements thereof; and (e) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Copyright or any Copyright licensed under any Copyright License.

"Default Rate" means a rate of interest equal to 2% plus the highest rate otherwise applicable to any Loan advanced to a Grantor under the Loan Agreement.

"Deposit Accounts" means any "deposit account", as such term is defined in Section 9.102(a)(29) of the UCC, including those deposit accounts identified on Schedule 3.8, and any account which is a replacement or substitute for any of such accounts, together with all monies, Instruments, certificates, checks, drafts, wire transfer receipts, and other property deposited therein and all balances therein.

"Documents" means any "document", as such term is defined in Section 9.102(a)(30) of the UCC.

"Electronic Chattel Paper" means any "electronic chattel paper", as such term is defined in Section 9.102(a)(31) of the UCC.

2

"Equipment" means: (a) any "equipment", as such term is defined in Section 9.102(a)(33) of the UCC; (b) all machinery, equipment, furnishings, Fixtures, motor vehicles, rolling stock; and (c) any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (in each case, regardless of whether characterized as equipment under the UCC).

"Excluded Accounts" means (a) any deposit accounts exclusively used for employee trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Grantors, (b) any deposit account which is used as an escrow account or fiduciary or trust account and solely contains deposits made for the benefit of another Person (other than any Grantor), and in which such deposits are held on behalf of, and for the benefit of, such other Person, including, but not limited to working interest owners, royalty owners and the like, and (c) any other deposit account that is pledged to a third party to the extent such Lien is a Permitted Lien.

"Excluded Property" means, collectively, (a) any permit or license or any Contractual Obligation of any Grantor (i) that prohibits or requires the consent of any Person other than the Grantors or their Affiliates which has not been obtained as a condition to the creation by such Grantor of a Lien on any right, title, or interest in such permit, license, or Contractual Obligation related thereto or (ii) to the extent that any Requirement of Law applicable thereto prohibits the creation of a Lien thereon, but only to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other Requirement of Law; provided, however, "Excluded Property" shall not include any proceeds, products, substitutions, or replacements of Excluded Property (unless such proceeds, products, substitutions, or replacements would otherwise constitute Excluded Property) and (b) Excluded Accounts.

"Fixtures" means any "fixtures", as such term is defined in Section 9.102(a)(41) of the UCC.

"General Intangibles" means: (a) any "general intangibles", as such term is defined in Section 9.102(a)(42) of the UCC; and (b) all interest rate or currency protection or hedging arrangements, computer software, computer programs, all tax refunds and tax refund claims, all licenses, permits, concessions and authorizations, all contract rights, all joint venture interests, partnership interests, or membership interests that do not constitute a Security, all Material Contracts, and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" means: (a) "goods", as that term is defined in Section 9.102(a)(44) of the UCC; (b) all Inventory; and (c) all Equipment (in each case, regardless of whether characterized as goods under the UCC).

"Grantors" has the meaning set forth in the preamble, and "Grantor" means any one of the Grantors.

"Instrument" means any "instrument", as such term is defined in Section 9.102(a)(47) of the UCC.

"Intellectual Property" means, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses.

"Inventory" means any "inventory", as such term is defined in Section 9.102(a)(48) of the UCC.

"Investment Related Property" means: (a) any "investment property", as such term is defined in Section 9.102(a)(49) of the UCC; and (b) all Pledged Equity Interests (regardless of whether such interest is classified as investment property under the UCC).

"Letter-of-Credit Right" means any "letter-of-credit right", as such term is defined in Section 9.102(a)(51) of the UCC.

"Material Contracts" means: (a) all of Grantors' rights, titles, and interests in, to, and under those contracts listed on Schedule 3.8, including all rights of any Grantor to receive moneys due and to become due under or pursuant to the Material Contracts; (b) all rights of Grantors to receive Proceeds of any insurance, indemnity, warranty, or guaranty with respect to the Material Contracts; (c) all claims of Grantors for damages arising out of or for breach of or default under the Material Contracts; and (d) all rights of Grantors to compel performance and otherwise exercise all rights and remedies under the Material Contracts.

"Maximum Liability" has the meaning set forth in Section 6.2(a).

"Money" means "money" as defined in Section 1.201(b)(24) of the UCC.

"Patent Licenses" means all agreements providing for the granting of any right in or to Patents, including each agreement referred to on Schedule 3.15.

"Patents" means all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including: (a) each patent and patent application referred to on Schedule 3.15; (b) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof; (c) all rights corresponding thereto throughout the world; (d) all inventions and improvements described therein; (e) all rights to sue for past, present and future infringements thereof; (f) all licenses, claims, damages, and Proceeds of suit arising therefrom; and (g) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Patent or any Patent licensed under any Patent License.

"Pledged Equity Interests" means all Pledged Stock, Pledged LLC Interests, and Pledged Partnership Interests.

"Pledged LLC Interests" means all membership interests owned by a Grantor in any limited liability company, including all membership interests listed on Schedule 3.8 and the certificates, if any, representing such membership interests as such interest may be increased or otherwise adjusted from time to time, including (a) all of such Grantor's right, title, and interest in any and all distributions, issues, profits, and shares (including rights in the nature of warrants, purchase options, or options to acquire any property or further interest in such limited liability company) payable or distributable by such limited liability company, whether in cash or otherwise, whether for capital or income or surplus or otherwise, including distributions upon liquidation, dissolution, revision, reclassification, split-up, or other change or transaction affecting such limited liability company, or as a sale, refinancing, or other capital transaction affecting any assets or property of such limited liability company; (b) all of such Grantor's right, title, and interest as a member with respect to such limited liability company and the company agreement, operating agreement, or limited liability company agreement; (c) all of such Grantor's rights under the company agreement, operating agreement, or limited liability company agreement; (d) all of such Grantor's right to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the company agreement, operating agreement, or limited liability company agreement, or otherwise to control, manage, or direct the affairs of such limited liability company; and (e) all of such Grantor's right to terminate, amend, supplement, modify or waive performance under, the company agreement, operating agreement, or limited liability company agreement, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder; and (f) all Proceeds therefrom.

4

"Pledged Partnership Interests" means all partnership interests owned by a Grantor in any general partnership, limited partnership, limited liability partnership, or other partnership, including all partnership interests listed on Schedule 3.8 and the certificates, if any, representing such partnership interests as such interests may be increased or otherwise adjusted from time to time, including (a) all of such Grantor's right, title, and interest in any and all distributions, issues, profits, and shares (including rights in the nature of warrants, purchase options, or options to acquire any property or further interest in such partnership) payable or distributable by such partnership, whether in cash or otherwise, whether for capital or income or surplus or otherwise, including distributions upon liquidation, dissolution, revision, reclassification, split up, or other change or transaction affecting such partnership, or as a sale, refinancing, or other capital transaction affecting any assets or property of such partnership; (b) all of Grantor's right, title, and interest as a partner with respect to such partnership and the partnership agreement or other agreement governing such partnership; (c) all of Grantor's rights under the partnership agreement or other agreement governing such partnership; (d) all of Grantor's right to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the partnership agreement or other agreement governing such partnership, or otherwise to control, manage, or direct the affairs of such partnership; and (e) all of Grantor's right to terminate, amend, supplement, modify, or waive performance under, the partnership agreement or other agreement governing such partnership, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder; and (f) all Proceeds therefrom.

"Pledged Stock" means all shares of capital stock owned by a Grantor, including all shares of capital stock described on Schedule 3.8, and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, including all voting rights with respect to such Pledged Stock and all dividends, distributions, cash, warrants, rights, options, Instruments, securities, and other property or Proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such shares.

"Proceeds" means any "proceeds," as such term is defined in Section 9.102(a)(65) of the UCC and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to a Grantor from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to a Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Receivables" means the Accounts, Chattel Paper, Documents, Instruments, Investment Related Property, or Commercial Tort Claims, and any other rights or claims to receive Money which are General Intangibles or which are otherwise included as Collateral, together with all of the applicable Grantor's rights, if any, in all Collateral Support and Supporting Obligations related thereto.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Requirement of Law" means, with respect to any Person, any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Secured Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Security Agreement or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Grantor following the occurrence of an Event of Default, (e) obligations and liabilities of the Grantors to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Security Agreement, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Grantor under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Secured Obligations arise or accrue before or after the filing by or against any Grantor of a petition under the Bankruptcy Code, or any similar filing by or against any Grantor under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Secured Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Secured Obligations is reduced to judgment, or (iv) such Secured Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.:

"Security" has the meaning set forth in Section 8.102(a)(15) of the UCC.

"Supporting Obligation" means all "supporting obligations" as defined in Section 9.102(a)(78) of the UCC.

"Tangible Chattel Paper" means any "tangible chattel paper", as such term is defined in Section 9.102(a)(79) of the UCC.

"Trademark Licenses" means any and all agreements providing for the granting of any right in or to Trademarks, including each agreement referred to on Schedule 3.15.

"Trademarks" means all United States and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing, including: (a) the registrations and applications referred to on Schedule 3.15; (b) all extensions or renewals of any of the foregoing; (c) all of the goodwill of the business connected with the use of and symbolized by the foregoing; (d) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill; and (e) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Trademark or any Trademark licensed under any Trademark License.

"Trade Secret Licenses" means any and all agreements providing for the granting of any right in or to Trade Secrets, including each agreement referred to on Schedule 3.15.

6

"Trade Secrets" means all trade secrets and all other confidential or proprietary information and know-how, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all Documents and things embodying, incorporating, or referring in any way to such Trade Secret, including: (a) the right to sue for past, present, and future misappropriation or other violation of any Trade Secret; and (b) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Trade Secrets or any Trade Secrets licensed under any Trade Secret License.

2.      **GRANT OF SECURITY INTEREST**.

2.1      **Security Interest**.  To secure the prompt and complete payment and performance of the Secured Obligations when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under <u>Section 362(a)</u> of the Bankruptcy Code or any similar provisions of other applicable laws), each Grantor hereby grants to Lender a continuing security interest in, a Lien upon, and a right of set off against, and hereby assigns to Lender as security, all personal property of such Grantor, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Secured Obligations at any time granted to or held or acquired by Lender, collectively, the "<u>Collateral</u>"), including:

(a)      Accounts;

(b)      Chattel Paper;

(c)      Commercial Tort Claims;

(d)      Deposit Accounts;

(e)      Documents;

(f)      General Intangibles;

(g)      Goods;

(h)      Instruments;

(i)      Letter of Credit Rights;

(j)      Money;

(k)      Fixtures;

(l)      Intellectual Property;

(m)      Material Contracts;

(n)      Investment Related Property;

(o)      to the extent not otherwise included above, all Collateral Records, Collateral Support, and Supporting Obligations relating to any of the foregoing; and

(p)    to the extent not otherwise included above, all accessions to, substitutions for, and all replacements, products, Proceeds of the foregoing, including Proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage, or destruction of any Collateral.

If the security interest granted hereby in any rights of any Grantor under any contract included in the Collateral is expressly prohibited by such contract, then the security interest hereby granted therein nonetheless remains effective to the extent allowed by Article 9 of the UCC or other applicable law but is otherwise limited by that prohibition. Notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property; *provided* that with respect to Excluded Property to be covered by clause (a)(i) of the definition thereof, such Excluded Property shall be identified on Schedule 3.16; *provided further that* if and when any Property shall cease to be Excluded Property, a Lien on and security in such Property shall be deemed granted therein. Furthermore, notwithstanding any contrary provision, each Grantor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

2.2    **Grantor Remains Liable**. Notwithstanding anything to the contrary contained herein, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Lender of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, and Lender shall not be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.3    **Authorization to File Financing Statements**. Each Grantor hereby irrevocably authorizes Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by Subchapter E of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Each Grantor agrees to furnish any such information to Lender promptly upon request.

3.    **REPRESENTATIONS AND WARRANTIES**. Each Grantor represents and warrants to Lender that:

3.1    **Title; Authorization; Enforceability; Perfection**. (a) Each Grantor has good and valid rights in and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Permitted Liens, and has full power and authority to grant to Lender the security interest in such Collateral; (b) the execution and delivery by each Grantor of this Security Agreement has been duly authorized, and this Security Agreement constitutes a legal, valid and binding obligation of such Grantor and creates a security interest enforceable against such Grantor in all

now owned and hereafter acquired Collateral subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law; (c)(i) upon the filing of all UCC financing statements naming each Grantor as "debtor" and Lender as "secured party" and describing the Collateral in the filing offices set forth opposite such Grantor's name on Schedule 3.4 hereof, (ii) upon delivery of all Instruments, Chattel Paper, and certificated Pledged Equity Interest, (iii) upon sufficient identification of Commercial Tort Claims, (iv) upon execution of a control agreement establishing Lender's Control with respect to any Deposit Account, (v) upon consent of the issuer or any nominated person with respect to Letter of Credit Rights, and (vi) to the extent not subject to Article 9 of the UCC, upon recordation of the security interests granted hereunder in Intellectual Property in the applicable intellectual property registries, including the United States Patent and Trademark Office and the United States Copyright Office, the security interests granted to Lender hereunder constitute valid and perfected first priority Liens, subject only to Permitted Liens.

3.2     **Conflicting Legal Requirements and Contracts.**  Neither the execution and delivery by any Grantor of this Security Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof (a) will not violate such Grantors organizational documents or any Requirement of Law applicable to such Grantor, (b) will not violate or result in a default under any indenture, agreement or other Instrument binding upon a Grantor or the assets of such Grantor, or give rise to a right thereunder to require any payment to be made by such Grantor, and (a) will not result in the creation or imposition any Lien on any asset of such Grantor, except Liens created pursuant to the Loan Documents.

3.3     **Governmental Authority.** No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents is required either (a) for the pledge by any Grantor of the Collateral pursuant to this Security Agreement or for the execution, delivery, or performance of this Security Agreement by any Grantor, or (b) for the exercise by Lender of the rights provided for in this Security Agreement or the remedies in respect of the Collateral pursuant to this Security Agreement.

3.4     **Grantor Information.**  Each Grantor's exact legal name, jurisdiction of organization, type of entity, state issued organizational identification number and the location of its principal place of business, or chief executive office  and of the books and records relating to the Receivables, are disclosed on Schedule 3.4; no Grantor has other places of business except those set forth on Schedule 3.4.  Except as noted on Schedule 3.4 hereto, all such books, records, and Collateral are in such Grantor's possession.  No Grantor has done business under any other name (including any trade-name or fictitious business name) except for those names set forth on Schedule 3.4.  Except as provided on Schedule 3.4, no Grantor has changed its name, jurisdiction of organization, principal place of business, or chief executive office or its corporate structure in any way.

3.5     **Property Locations.**  The Inventory, Equipment, and Fixtures are located solely at the locations described on Schedule 3.5.

3.6     **No Financing Statements or Control Agreements.**  Other than (i) the financing statements and control agreements with respect to this Security Agreement and (ii) financing statements or control agreements exclusively for Permitted Liens, there are no other financing statements or control agreements covering any Collateral.

9

3.7    **Maintenance of Collateral**.  All tangible Collateral which is necessary to any Grantor's business is in good repair and condition, ordinary wear and tear excepted, and none thereof is a Fixture except as specifically referred to herein on Schedule 3.5.

3.8    **Collateral**.  Schedule 3.8 accurately lists all Deposit Accounts, Commercial Tort Claims, Material Contracts, Pledged Equity Interests and all letters of credit, in which any Grantor has any right, title, or interest.  All information supplied by any Grantor to Lender with respect to any of the Collateral is true, correct, and complete in all material respects.

3.9    **Deposit, Commodity, and Securities Accounts**.  Schedule 3.8 correctly identifies all Deposit Accounts in which a Grantor has an interest and the institutions holding such accounts, including whether any such Deposit Account is an Excluded Account.  Each Grantor is the sole account holder of each such account and such Grantor has not consented to, and is not otherwise aware of, any person (other than Lender) having Control over, or any other interest in, any such account or the property credited thereto.

3.10    **Receivables**.  Each Receivable (a) is the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor, (b) is and will be enforceable in accordance with its terms, (c) is not subject to any setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business), and (d) is in compliance with all applicable laws, whether federal, state, local or foreign.

3.11    **Letter of Credit Rights**.  All letters of credit to which any Grantor has rights is listed on Schedule 3.8, and such Grantor has obtained the consent of each issuer or the nominated person of any letter of credit to the assignment of the Proceeds of the letter of credit to Lender.

3.12    **Instruments and Chattel Paper**.  All Instruments and Chattel Paper have been delivered to Lender, together with corresponding endorsements duly executed by the applicable Grantor in favor of Lender, and such endorsements have been duly and validly executed and are binding and enforceable against such Grantor in accordance with their terms.

3.13    **Material Contracts**.  All Material Contracts to which any Grantor is a party are set forth on Schedule 3.8.  True and correct copies of all such Material Contracts have been furnished to Lender.  Each Material Contract is in full force and effect; there have been no amendments, modifications, or supplements to any Material Contract of which Lender has not been advised in writing; and no default, breach, or potential default or breach has occurred and is continuing under any Material Contract, except as disclosed on Schedule 3.8.  No Material Contract prohibits assignment or requires consent of or notice to any person in connection with the assignment to Lender hereunder, except such as has been given or made.

3.14    **Investment Related Property**.

(a)    Schedule 3.8 sets forth all of the Pledged Stock, Pledged LLC Interests, and Pledged Partnership Interests owned by any Grantor, and such Pledged Equity Interests constitute the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests, or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule.

(b)    Except as set forth on Schedule 3.8, no Grantor has acquired any equity interests of another entity or substantially all the assets of another entity within the past five (5) years.

(c)     Each Grantor is the record and beneficial owner of the Pledged Equity Interests owned by it free of all Liens (other than Permitted Liens), rights or claims of other persons, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests.

(d)     No consent of any person including any other partner (general, limited, or otherwise), any other member of a limited liability company, any other shareholder, or any other trust beneficiary is necessary or desirable in connection with the creation, perfection, or first priority status of the security interest of Lender in any Pledged Equity Interests or the exercise by Lender of the voting or other rights provided for in this Security Agreement or the exercise of remedies in respect thereof.

(e)     None of the Pledged Equity Interests are or represent interests in issuers that (i) are registered as investment companies or (ii) are dealt in or traded on securities exchanges or markets.

(f)     Except as otherwise set forth on <u>Schedule 3.8</u>, all of the Pledged Equity Interests are or represent interests in issuers that have not opted to be treated as securities under the UCC of any jurisdiction.

(g)     (i) Each Grantor has delivered to Lender all stock, member certificates, or other Instruments or Documents representing or evidencing the Pledged Equity Interests, *together with* corresponding assignment or transfer powers duly executed in blank by such Grantor, and such powers have been duly and validly executed and are binding and enforceable against such Grantor in accordance with their terms and (ii) to the extent such Pledged Equity Interests are uncertificated, each Grantor has taken all actions necessary or desirable to establish Lender's Control over such Pledged Equity Interests.

3.15    **Intellectual Property**.

(a)     All of the Intellectual Property is subsisting, valid, and enforceable. The information contained on <u>Schedule 3.15</u> is true, correct, and complete. All issued Patents, Patent Licenses, Trademarks, Trademark Licenses, Copyrights, Copyright Licenses, Trade Secret, and Trade Secret Licenses of each Grantor are identified on <u>Schedule 3.15</u>.

(b)     Each Grantor is the sole and exclusive owner of the entire and unencumbered right, title, and interest in and to the Intellectual Property purported to be owned by such Grantor free and clear of any Liens, including any pledges, assignments, licenses, user agreements, and covenants by such Grantor not to sue third persons, other than Permitted Liens.

(c)     No third party is infringing, or in such Grantor's reasonable business judgment, may be infringing, any of such Grantor's rights under the Intellectual Property.

(d)     Each Grantor has performed and will continue to perform all acts and has paid and will continue to pay all required fees and taxes to maintain each and every item of the Intellectual Property in full force and effect throughout the world, as applicable.

(e)     Each of the Patents and Trademarks identified on <u>Schedule 3.15</u> has been properly registered with the United States Patent and Trademark Office and in corresponding offices throughout the world (where appropriate) and each of the Copyrights identified on <u>Schedule 3.15</u>

has been properly registered with the United States Copyright Office and in corresponding offices throughout the world (where appropriate).

(f)  To the best of each Grantor's knowledge, no claims with respect to the Intellectual Property have been asserted and are pending (i) to the effect that the sale, licensing, pledge, or use of any of the products of such Grantor's business infringes any other party's valid copyright, trademark, service mark, trade secret, or other intellectual property right, (ii) against the use by such Grantor of any Intellectual Property used in such Grantor's business as currently conducted, or (iii) challenging the ownership or use by such Grantor of any of the Intellectual Property that Grantor purports to own or use, nor, to such Grantor's knowledge, is there a valid basis for such a claim described in this Section 3.15.

3.16  **Excluded Property**.  Except as set forth on Schedule 3.16, the Grantors do not own or have any right, title, or interest in any Excluded Property.

4.  **COVENANTS**.  From the date of this Security Agreement, and thereafter until this Security Agreement is terminated:

4.1  **General**.

(a)  **Inspection**.  Each Grantor will permit representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, during normal business hours, (a) to inspect the Collateral, (b) to examine and make copies of the records of such Grantor relating to the Collateral, and (c) to discuss the Collateral and the related records of such Grantor with, and to be advised as to the same by, such Grantor's officers, employees, and accountants (and, in the case of any Receivable, with any Account Debtor), all at such reasonable times, as often as reasonably requested by the Lender at the Grantors' expense.

(b)  **Records and Reports; Notification of Default or Event of Default**.  Each Grantor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Lender such reports relating to the Collateral at such intervals as Lender shall from time to time request.  Each Grantor will give prompt (but in any event, with five (5) Business Days after each Grantor obtains knowledge thereof) notice in writing to Lender of the occurrence of any Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral.  Each Grantor shall mark its books and records to reflect the security interest of Lender under this Security Agreement.

(c)  **Financing Statements and Other Actions; Defense of Title**.  Each Grantor will deliver to Lender all financing statements and execute and deliver control agreements and other Documents and take such other actions as may from time to time be requested by Lender in order to maintain a first priority (subject to Permitted Liens)perfected security interest in and, in the case of Investment Related Property, Deposit Accounts (other than Excluded Accounts), Letter-of-Credit Rights, and Electronic Chattel Paper, Control of, the Collateral.  Each Grantor will take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of Lender in the Collateral and the priority thereof against any Lien.

(d)  **Disposition of Collateral**.  No Grantor will sell, lease, license, or otherwise dispose of the Collateral except dispositions specifically permitted pursuant to the Loan Agreement.

(e)     **Lien**s.  No Grantor will create, incur, or suffer to exist any Lien on the Collateral except the security interest created by this Security Agreement or a Permitted Lien.

(f)     **Change in Location, Jurisdiction of Organization or Name**.  No Grantor will (i) have any Inventory, Equipment, Fixtures, or Proceeds or products thereof (other than Inventory and Proceeds thereof disposed of as permitted by Section 4.1(d)) at a location other than a location specified on Schedule 3.5, (ii) maintain records relating to the Receivables at a location other than at the location specified on Schedule 3.8, (iii) maintain a place of business at a location other than a location specified on Schedule 3.5, (iv) change its name or taxpayer identification number, (v) change its mailing address, or (vi) change its jurisdiction of organization, unless such Grantor shall have given Lender not less than thirty (30) days' prior written notice thereof, and Lender shall have determined that such change will not adversely affect the validity, perfection, or priority of Lender's security interest in the Collateral.  Prior to making any of the foregoing changes, each Grantor shall execute and deliver all such additional Documents and perform all additional acts as Lender, in its sole discretion, may request in order to continue or maintain the existence and priority of its security interest in all of the Collateral.

(g)     **Taxe**s.  Each Grantor will pay when due all taxes, assessments, and governmental charges and levies upon the Collateral in accordance with the Loan Agreement.

(h)     **Other Financing Statement**s.  No Grantor will authorize any other financing statement naming it as debtor covering all or any portion of the Collateral other than a financing statement exclusively for a Permitted Lien.

4.2     **Receivable**s.  No Grantor will make or agree to make any discount, credit, rebate, or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except in accordance with its present policies and in the ordinary course of business.  Except as otherwise provided in this Security Agreement, each Grantor will, at such Grantor's sole expense, collect all amounts due or hereafter due to such Grantor under the Receivables and enforce such Grantor's rights under all Collateral Support or Supporting Obligation with respect to the Receivables.

4.3     **Inventory and Equipment**.

(a)     **Maintenance of Good**s.  Each Grantor will do all things necessary to maintain, preserve, protect, and keep the Inventory and the Equipment in good repair and working and saleable condition.

(b)     **Insurance**.  Each Grantor will maintain insurance coverage in accordance with the terms of the Loan Agreement.

(c)     **Certificate**s **of Title**.  With respect to any item of Equipment which is covered by a certificate of title and indication of a security interest on such certificate is required as a condition of perfection, upon the request of Lender, each Grantor shall cause Lender's security interest to be properly indicated thereon.

4.4     **Account**s.

(a)     **Verification of Account**s.  Lender shall have the right, at any time or times hereafter, in its name or in the name of a nominee of Lender, to verify the validity, amount, or any other matter relating to any Accounts, by mail, telephone, telegraph, or otherwise.

(b)     **Disputed Accounts; Limitation on Modification of Accounts**.  No Grantor will, without Lender's prior written consent, grant any extension of the time for payment of any of the Accounts, compromise, compound, or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts granted in the ordinary course of business of such Grantor.

(c)     **Notice to Account Debtor**.  Lender may, in its sole discretion, at any time or times after an Event of Default has occurred, and without prior notice to any Grantor (i) notify any or all Account Debtors that the Accounts have been assigned to Lender and that Lender has a security interest therein and (ii)  direct any or all Account Debtors to make all payments upon the Accounts directly to Lender.  Lender shall furnish Grantors with a copy of any such notice.

4.5     **Intellectual Property**.

(a)     **Maintenance of Rights**.  Each Grantor shall preserve and maintain all of its material rights in the Intellectual Property and protect its Intellectual Property from infringement, unfair competition, cancellation, or dilution by all appropriate action necessary in such Grantor's reasonable business judgment, including the commencement and prosecution of legal proceedings to recover damages for infringement and to defend and preserve its rights in the Intellectual Property.

(b)     **No Abandonment**.  No Grantor shall abandon any of the Intellectual Property necessary to the conduct of its business.

(c)     **Licenses**.  (i) No Grantor shall sell or assign any of its interest in any of the Intellectual Property other than in the ordinary course of business for full and fair consideration without the prior written consent of Lender; (ii) no Grantor shall grant any license or sublicense with respect to any of its Intellectual Property without the prior written consent of Lender; and (iii) each Grantor shall maintain the quality of any and all products and services with respect to which the Intellectual Property is used.

(d)     **No Conflicting Agreements**.  No Grantor shall enter into any agreement, including any licensing agreement, that is or may be inconsistent with such Grantor's obligations under this Security Agreement or any of the other Loan Documents.

(e)     **Additional Intellectual Property**.  Each Grantor shall give Lender prompt written notice if such Grantor shall obtain rights to or become entitled to the benefit of any Intellectual Property not identified on Schedule 3.15.  Each Grantor shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements, or Trademark Security Agreements, each in form and substance satisfactory to Lender, as Lender may request to evidence Lender's Lien on such Intellectual Property.

(f)     **Obligation upon Default**.  On and after the occurrence of an Event of Default, each Grantor shall obtain any consents, waivers, or agreements necessary to enable Lender to exercise its rights and remedies with respect to the Intellectual Property.

4.6     **Instruments; Chattel Paper; and Documents**.  Each Grantor will (a) deliver to Lender immediately upon execution of this Security Agreement the originals of all Chattel Paper and Instruments (if any then exists), (b) hold in trust for Lender upon receipt and immediately thereafter deliver to Lender any Chattel Paper and Instruments constituting Collateral, (c) mark conspicuously all Chattel Paper and Instruments (other than any delivered to Lender) with an appropriate reference to the security interest of

Lender, and (d) upon Lender's request, deliver to Lender (and thereafter hold in trust for Lender upon receipt and immediately deliver to Lender) any Document evidencing or constituting Collateral.

4.7 **Deposit Accounts**. With respect to any Deposit Account (other than an Excluded Account), each Grantor shall (a) maintain such accounts at the institutions described on Schedule 3.8, (b) deliver to each depository bank a control agreement in form and substance satisfactory to Lender with respect to Lender's rights in such account and obtain the execution of such control agreement by each institution stating that the pledge of such account has been recorded in the books and records of such institution and that Lender shall have exclusive Control over such deposit account, and (c) deliver to Lender all certificates or Instruments, if any, now or hereafter representing or evidencing such deposit accounts, accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Lender. Without Lender's consent, no Grantor shall establish any additional deposit accounts (other than an Excluded Account), unless such deposit accounts are subject to Lender's exclusive Control.

4.8 **Commercial Tort Claims**. If any Grantor at any time holds or acquires a Commercial Tort Claim, such Grantor shall (a) immediately forward to Lender written notification of any and all Commercial Tort Claims, including any and all actions, suits, and proceedings before any court or Governmental Authority by or affecting such Grantor; and (b) execute and deliver such statements, Documents and notices and do and cause to be done all such things as may be required by Lender, or required by law, including all things which may from time to time be necessary under the UCC to fully create, preserve, perfect, and protect the priority of Lender's security interest in any Commercial Tort Claims.

4.9 **Letter-of-Credit Rights**. If any Grantor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of any Grantor, such Grantor shall promptly notify Lender thereof in writing and, at Lender's request, such Grantor shall, pursuant to an agreement in form and substance satisfactory to Lender, either (a) arrange for the issuer or any confirmer of such letter of credit to consent to an assignment to Lender of the Proceeds of any drawing under the letter of credit or (b) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the Proceeds of any drawing under the letter of credit are to be applied to the Secured Obligations as provided in the Loan Agreement.

4.10 **Investment Related Property**.

(a) **No Modification of Rights and Obligation**. Without the prior written consent of Lender, no Grantor shall vote to enable or take any other action to: (i) amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any Investment Related Property or adversely affects the validity, perfection or priority of Lender's security interest; (ii) permit any issuer of any Pledged Equity Interest to issue any additional stock, partnership interest, limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any stock or other equity interest of any nature of such issuer; (iii) permit any issuer of any Pledged Equity Interest to dispose of all or a material portion of its assets; (iv) waive any default under or breach of any terms of organizational document relating to the issuer of any Pledged Equity Interest; or (v) cause any issuer of any Pledged Equity Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Equity Interests to be treated as securities for purposes of the UCC; *provided*, *however*, notwithstanding the foregoing, if any issuer of any Pledged Equity Interests takes any such action in violation of the foregoing in this clause (v), such Grantor shall promptly notify Lender in writing of any such

election or action and, in such event, shall take all steps necessary, advisable, or requested to establish Lender's Control thereof.

(b)      **Performance of Underlying Obligation**s.  Each Grantor shall comply with all of its obligations under any shareholders' agreement, limited liability company agreement, partnership agreement, or other agreement relating to Pledged Equity Interests and shall enforce all of its rights with respect to any Investment Related Property.

(c)      **Changes in Capital Structure of Issuer**s.  Without the prior written consent of Lender, no Grantor shall permit any issuer of any Pledged Equity Interest to merge or consolidate.

(d)      **Consent of Grantor**.  To the extent the consent of a Grantor, whether in its capacity as a partner, member, general partner, managing member, shareholder, issuer, or otherwise, is required for the transfer, conveyance, or encumbrance of all or any portion of the Pledged Equity Interests in any corporation, partnership, or limited liability company, such Grantor hereby irrevocably (a) consents to the transfer or conveyance of the Pledged Equity Interests pursuant to Lender's exercise of its rights and remedies under this Security Agreement or any of the other Loan Documents, at law or in equity, (b) consents to the admission of Lender, its nominees, or any other transferee of any Pledged Equity Interest as a shareholder, member (including as the managing member), or partner (including as the general partner) of such corporation, limited liability company, or partnership, and (c) agrees that all terms and conditions in the constituent documents applicable to the pledge of any Pledged Equity Interest, the enforcement thereof, the transfer of any Pledged Equity Interest or the admission of Lender, its nominees, or any other transferee of any Pledged Equity Interest as a shareholder, member (including as the managing member), or partnership (including as the general partner) of such corporation, limited liability company, or partnership have been satisfied or waived.  Each Grantor hereby irrevocably agrees not to vote to amend the applicable constituent documents to provide that its equity interests are securities governed by Article 8 of the UCC, and hereby agrees and acknowledges that any such vote shall be invalid and any such amendment shall be void ab initio.

(e)      **Voting of Securitie**s.  Prior to the occurrence of an Event of Default, each Grantor is entitled to exercise all voting rights pertaining to any Pledged Equity Interests; *provided*, *however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Lender which would (i) be inconsistent with or violate any provision of this Security Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of the certificate of incorporation, bylaws, certificate of formation, or other charter document, or other agreement relating to, evidencing, providing for the issuance of, or securing any Collateral; and *provided further* that such Grantor shall give Lender at least ten (10) Business Days' prior written notice that it intends to exercise, or the reasons for refraining from exercising, any voting or other consensual rights pertaining to the Collateral or any part thereof which might have a material adverse effect on the value of the Collateral or any part thereof.  On and after the occurrence of an Event of Default and if Lender elects to exercise such right, the right to vote any Pledged Equity Interests shall be vested exclusively in Lender.  To this end, each Grantor hereby irrevocably constitutes and appoints Lender the proxy and attorney-in-fact of such Grantor, with full power of substitution, to vote, and to act with respect to, any and all Collateral that is Investment Related Property Interests standing in the name of such Grantor or with respect to which such Grantor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred.  The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the termination of this Security Agreement pursuant to <u>Section 6.13</u>.

4.11    **Fixtures**.  For any Collateral that is a Fixture or an accession which has been attached to real estate or other goods prior to the perfection of the security interest of Lender, Grantor shall furnish Lender, upon demand, a disclaimer of interest in each such Fixture or accession and a consent in writing to the security interest of Lender therein, signed by all persons having any interest in such Fixture or accession by virtue of any interest in the real estate or other goods to which such Fixture or accession has been attached.

4.12    **Use and Operation of Collateral**.  Should any Collateral come into the possession of Lender, Lender may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Lender in respect of such Collateral.  Each Grantor covenants to promptly reimburse and pay to Lender, at Lender's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Lender in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Default Rate until repaid and, together with such interest, shall be payable by Grantor to Lender upon demand and shall become part of the Secured Obligations.  However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Grantors, and Lender shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured.  With respect to the Collateral that is in the possession of Lender, Lender shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral.  The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

4.13    **Certain Proceeds**.  Notwithstanding any contrary provision herein, any and all Proceeds of any Collateral consisting of cash, checks and other non-cash items shall be part of the Collateral hereunder.  Any cash Proceeds of the Collateral which come into the possession of Lender on and after the occurrence of an Event of Default (including insurance Proceeds) may, at Lender's option, be applied in whole or in part to the Secured Obligations (to the extent then due), be released in whole or in part to or on the written instructions of such Grantor for any general or specific purpose, or be retained in whole or in part by Lender as additional Collateral.

4.14    **Further Assurances**.  At any time and from time to time, upon the request of Lender, and at the sole expense of Grantors, each Grantor shall promptly execute and deliver all such further Instruments and Documents and take such further actions as Lender may reasonably request or deem necessary or desirable (a) to assure Lender that its security interests hereunder are perfected with a first priority Lien (subject only to Permitted Liens), (b) to carry out the provisions and purposes of this Security Agreement, including (i) the filing of such financing statements as Lender may require, (ii) executing control agreements with respect to the Collateral, in each case naming Lender, as secured party, in form and substance satisfactory to Lender, (iii) furnishing to Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail, (iv) the deposit of all certificates of title issuable with respect to any of the Collateral and noting thereon the security interest hereunder, (v) taking all actions required by law in any relevant UCC, and (vi) to ensure that a Lien and security interest is granted on any of the Excluded Property set forth in clause (a) of the definition of "Excluded Property", such Grantor shall use its best efforts to obtain any required consents from any Person with respect to any permit or license or any Contractual Obligation with such Person entered into by such Grantor that requires such consent as a condition to the creation by such Grantor of a Lien on any right, title or interest in such permit, license or Contractual Obligation related thereto.  A carbon, photographic, or other reproduction of this Security Agreement or of any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement and may be filed as a financing statement.

17

5.      **REMEDIES UPON EVENT OF DEFAULT**

5.1      **Remedies**.  On and after the occurrence of an Event of Default under the Loan Agreement or any other Loan Document, Lender may exercise any or all of the following rights and remedies:

(a)      **Contractual Remedies**.  Those rights and remedies provided in this Security Agreement, the Loan Agreement, or any other Loan Document, *provided that* this Section 5.1(a) shall not limit any rights or remedies available to Lender prior to the occurrence of an Event of Default.

(b)      **Legal Remedies**.  Those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement.

(c)      **Disposition of Collateral**.  Without notice except as specifically provided in Section 5.2(c) or elsewhere herein, sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as Lender may deem commercially reasonable.  Neither Lender's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale.  Each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(d)      **Distributions**.  On and after the occurrence of an Event of Default, all payments and distributions made to any Grantor upon or with respect to the Collateral shall be paid or delivered as directed by Lender, and each Grantor agrees to take all such action as Lender may deem necessary or appropriate to cause all such payments and distributions to be made to Lender.  Further, Lender shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Lender.  Such issuer shall be fully protected in relying on the written statement of Lender that it then holds a security interest which entitles it to receive such payments and distributions.  Any and all Money and other property paid over to or received by Lender hereunder shall be retained by Lender as additional collateral hereunder and may be applied in accordance with Section 5.10 hereof.

(e)      **Use of Premises**.  Lender shall be entitled to occupy and use any premises owned or leased by any Grantor where any of the Collateral or any records relating to the Collateral are located until the Secured Obligations are paid or the Collateral is removed therefrom, whichever first occurs, without any obligation to pay such Grantor for such use and occupancy.

5.2      **Grantor's Obligations Upon Event of Default**.  Upon the request of Lender on and after the occurrence of an Event of Default, each Grantor will:

(a)      **Assembly of Collateral**.  Assemble and make available to Lender the Collateral and all records relating thereto at any place or places specified by Lender.

(b)      **Lender Access**.  Permit Lender, by Lender's representatives and agents, to enter any premises where all or any part of the Collateral, or the books and records relating thereto, or

both, are located, to take possession of all or any part of the Collateral and to remove all or any part of the Collateral.

       (c)     **Notice of Disposition of Collateral**.  Each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to any Grantor, addressed in accordance with Section 6.13, at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.  Lender shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  Subject to the provisions of applicable law, Lender may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Lender may further postpone such sale by announcement made at such time and place.

      5.3     **Condition of Collateral; Warrantie**s.  Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.  Lender may sell the Collateral without giving any warranties as to the Collateral.  Lender may specifically disclaim any warranties of title or the like.  This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

      5.4     **Collection of Receivable**s.  On and after the occurrence of an Event of Default, Lender may at any time in its sole discretion, by giving Grantors written notice, elect to require that the Receivables be paid directly to Lender.  In such event, each Grantor shall, and shall permit Lender to, promptly notify the Account Debtors under the Receivables of Lender's interest therein and direct such Account Debtors to make payment of all amounts then or thereafter due under the Receivables directly to Lender.  Upon receipt of any such notice from Lender, each Grantor shall thereafter hold in trust for Lender, all amounts and Proceeds received by it with respect to the Receivables and immediately and at all times thereafter deliver to Lender all such amounts and Proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements.  Lender shall hold and apply funds so received as provided by the terms of Section 5.10.  If after the occurrence of an Event of Default, any Account Debtor fails or refuses to make payment on any Collateral when due, Lender is authorized, in its sole discretion, either in its own name or in the name of Grantors, to take such action as Lender shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists.  Each Grantor agrees that Lender may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as Lender in its sole discretion shall determine or abandon any Receivable, and any such action by Lender shall be commercially reasonable so long as Lender acts in good faith based on information known to it at the time it takes any such action.  Regardless of any other provision hereof, however, Lender shall never be (a) liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, or (b) under any duty whatsoever to anyone except Grantors to account for funds that it shall actually receive hereunder.

      5.5     **Cash Collateral Account**.  On and after the occurrence of an Event of Default, Lender shall have, and each Grantor hereby grants to Lender, the right and authority to transfer all funds on deposit in the Deposit Accounts to a "Cash Collateral Account" (herein so called) maintained with a depository institution acceptable to Lender and subject to the exclusive direction, domain, and Control of Lender, and no disbursements or withdrawals shall be permitted to be made by any Grantor from such Cash Collateral Account.  Such Cash Collateral Account shall be subject to the security interest in favor of Lender herein created, and each Grantor hereby grants a security interest to Lender in and to such Cash Collateral Account and all checks, drafts, and other items ever received by any Grantor for deposit therein.  Furthermore, if an

Event of Default has occurred, Lender shall have the right, at any time in its discretion without notice to any Grantor, (a) to transfer to or to register in the name of Lender or nominee any certificates of deposit or deposit instruments constituting Deposit Accounts and shall have the right to exchange such certificates or Instruments representing Deposit Accounts for certificates or Instruments of smaller or larger denominations and (b) to take and apply against the Secured Obligations any and all funds then or thereafter on deposit in the Cash Collateral Account or otherwise constituting Deposit Accounts.

      5.6    **Intellectual Property**.  For purposes of enabling Lender to exercise its rights and remedies under this Security Agreement and enabling Lender and its successors and assigns to enjoy the full benefits of the Collateral, each Grantor hereby grants to Lender an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Grantor) to use, license, or sublicense any of the Intellectual Property.  Each Grantor shall provide Lender with reasonable access to all media in which any of the Intellectual Property may be recorded or stored and all computer programs used for the completion or printout thereof.  This license shall also inure to the benefit of all successors, assigns, and transferees of Lender.  On and after the occurrence of an Event of Default, Lender may require that Grantor assign all of their right, title, and interest in and to the Intellectual Property or any part thereof to Lender or such other person as Lender may designate pursuant to Documents satisfactory to Lender.  If no Event of Default has occurred, Grantors shall have the exclusive, non-transferable right and license to use the Intellectual Property in the ordinary course of business and the exclusive right to grant to other persons licenses and sublicenses with respect to the Intellectual Property for full and fair consideration.

      5.7    **Investment Related Property**.  Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "Securities Act") and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If Lender determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Equity Interest to be sold hereunder from time to time to furnish to Lender all such information as Lender may request in order to determine the number and nature of interest, shares, or other Instruments included in the Investment Related Property which may be sold by Lender in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder.  In case of any sale of all or any part of the Investment Related Property on credit or for future delivery, such Collateral so sold may be retained by Lender until the selling price is paid by the purchaser thereof, but Lender shall not incur any liability in case of the failure of such purchaser to take up and pay for such assets so sold and in case of any such failure, such Collateral may again be sold upon like notice.  Lender, instead of exercising the power of sale herein conferred upon them, may proceed by a suit or suits at law or in equity to foreclose security interests created hereunder and sell such Investment Related Property, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

5.8    **Record Ownership of Securities**.  On and after the occurrence of an Event of Default, Lender at any time may have any Collateral that is Pledged Equity Interests and that is in the possession of Lender, or its nominee or nominees, registered in its name, or in the name of its nominee or nominees, as Lender; and, as to any Collateral that is Pledged Equity Interests so registered, each Grantor shall execute and deliver (or cause to be executed and delivered) to Lender all such proxies, powers of attorney, dividend coupons, or orders, and other Documents as such Lender may reasonably request for the purpose of enabling Lender to exercise the voting rights and powers which it is entitled to exercise under this Security Agreement or to receive the dividends and other distributions and payments in respect of such Collateral that is Pledged Equity Interests or Proceeds thereof which it is authorized to receive and retain under this Security Agreement.

5.9    **Sales on Credit**.  If Lender sells any of the Collateral upon credit, Grantors will be credited only with payments actually made by the purchaser, received by Lender, and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Lender may resell the Collateral and Grantors shall be credited with the Proceeds of the sale.

5.10    **Application of Proceeds**.  On and after the occurrence of an Event of Default, the Proceeds of the Collateral shall be applied by Lender to payment of the Secured Obligations in accordance with Section 2.08 of the Loan Agreement.  If the Proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be liable for the deficiency and the fees of any attorneys employed by Lender to collect such deficiency.

5.11    **Power of Attorney**.  Each Grantor hereby appoints Lender and Lender's designee as its attorney, with power: (a) on and after the occurrence of an Event of Default, to endorse such Grantor's name on any checks, notes, acceptances, money orders, or other forms of payment or security that come into Lender's possession; (b) to sign such Grantor's name on any invoice, bill of lading, warehouse receipt, or other negotiable or non-negotiable Document constituting Collateral, on drafts against customers, on assignments of Accounts, on notices of assignment, financing statements, and other public records, and to file any such financing statements by electronic means with or without a signature as authorized or required by applicable law or filing procedure; (c) so long as any Event of Default has occurred, to notify the post office authorities to change the address for delivery of any Grantor's mail to an address designated by Lender and to receive, open, and dispose of all mail addressed to any Grantor; (d) to send requests for verification of Accounts to customers or Account Debtors; (e) to complete in any Grantor's name or Lender's name, any order, sale, or transaction, obtain the necessary Documents in connection therewith, and collect the Proceeds thereof; (f) to clear Inventory through customs in any Grantor's name, Lender's name, or the name of Lender's designee, and to sign and deliver to customs officials powers of attorney in any Grantor's name for such purpose; (g) to the extent that any Grantor's authorization given in Section 2.3 of this Security Agreement is not sufficient, to file such financing statements with respect to this Security Agreement, with or without such Grantor's signature, or to file a photocopy of this Security Agreement in substitution for a financing statement, as Lender may deem appropriate, and to execute in such Grantor's name such financing statements and amendments thereto and continuation statements which may require such Grantor's signature; and (h) subject to the terms and conditions of this Security Agreement and, if applicable, after Lender has determined that any Grantor has failed to take any action required under the Loan Agreement, this Security Agreement or any other Loan Documents, to do all things reasonably necessary to carry out the terms and conditions of the Loan Agreement and this Security Agreement.  Each Grantor ratifies and approves all acts of such attorney.  None of Lender or a Secured Party or their attorneys will be liable for any acts or omissions or for any error of judgment or mistake of fact or law except for their willful misconduct, or gross negligence as determined by a court of competent jurisdiction in final and non-appealable judgment.  This power, being coupled with an interest, is irrevocable until this Security Agreement is terminated in accordance with Section 6.16.

6.      **GENERAL PROVISIONS**.

6.1      **Joint and Several Obligations of Grantors**.

(a)      Each Grantor is accepting joint and several liability hereunder with other persons that have executed or will execute a Security Agreement in consideration of the financial accommodation to be provided by the holders of the Secured Obligations, for the mutual benefit, directly and indirectly, of each Grantor and in consideration of the undertakings of each Grantor to accept joint and several liability for the Secured Obligations of each of them.

(b)      Each Grantor, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Secured Obligations, it being the intention of the parties hereto that all the Secured Obligations shall be the joint and several Secured Obligations of each Grantor without preferences or distinction among them.

6.2      **Limitation of Obligations**.

(a)      The provisions of this Security Agreement are severable, and in any action or proceeding involving any applicable law affecting the rights of creditors generally, if the Secured Obligations of any Grantor under this Security Agreement would otherwise be held or determined to be avoidable, invalid, or unenforceable on account of the amount of such Grantor's liability under this Security Agreement, then, notwithstanding any other provision of this Security Agreement to the contrary, the amount of such liability shall, without any further action by Grantors or Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Grantor's "Maximum Liability"). This Section 6.2 with respect to the Maximum Liability of each Grantor is intended solely to preserve the rights of Lender hereunder to the maximum extent not subject to avoidance under applicable law, and none of Grantors or any other Person shall have any right or claim under this Section 6.2(a) with respect to the Maximum Liability, except to the extent necessary to ensure that the Secured Obligations of Grantors hereunder shall not be rendered voidable under applicable law.

(b)      Each Grantor agrees that the Secured Obligations may at any time and from time to time exceed the Maximum Liability of such Grantor, and may exceed the aggregate Maximum Liability of all other Grantors, without impairing this Security Agreement or affecting the rights and remedies of Lender. Nothing in this Section 6.2(b) shall be construed to increase any Grantor's Secured Obligations hereunder beyond its Maximum Liability.

(c)      Notwithstanding any or all of the Secured Obligations becoming unenforceable against any Grantor or the determination that any or all of the Secured Obligations shall have become discharged, disallowed, invalid, illegal, void, or otherwise unenforceable as against any Grantor (whether by operation of any present or future law or by order of any court or governmental agency), the Secured Obligations shall, for the purposes of this Security Agreement, continue to be outstanding and in full force and effect.

6.3      **NO RELEASE OF GRANTORS**. THE OBLIGATIONS OF GRANTORS UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED, OR TERMINATED, AND GRANTORS SHALL NOT BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (other than pursuant to Section 6.16), including (and whether or not the same

22

shall have occurred or failed to occur once or more than once and whether or not Grantors shall have received notice thereof):

        (a)     (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance, or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition, or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of, the Secured Obligations;

        (b)     (i) any failure to obtain, (ii) any release, composition, or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of, any Loan Documents;

        (c)     (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any release, compromise, settlement, or extension of the time of payment of any Secured Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any Lien upon, (iv) any subordination of any Lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of any Lien or intended Lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

        (d)     any termination of or change in any relationship between Grantors and Lender or the addition or release (subject to Section 6.5) of any other Grantor;

        (e)     any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of, or other indulgence with respect to, any right, remedy, or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment, or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Lender in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

        (f)     ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF GRANTORS UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF GRANTORS HEREUNDER OR DISCHARGE GRANTORS FROM ANY OBLIGATION HEREUNDER.

     6.4    **Subordination of Certain Claim**s.  Any and all rights and claims of a Grantor against another Grantor or against any other Person or property, arising by reason of any payment by any Grantors to Lender pursuant to the provisions, or in respect, of this Security Agreement shall be subordinate, junior, and subject in right of payment to the prior and indefeasible payment in full of all Secured Obligations to Lender, and until such time, each Grantor defers all rights of subrogation, contribution, or any similar right and until such time, agrees not to enforce any such right or remedy Secured Party may now or hereafter have against another Grantor or any endorser of all or any part of the Secured Obligations and any right to participate in, or benefit from, any security given to Lender to secure any of the Secured Obligations.  All Liens and security interests of each Grantor, whether now or hereafter arising and howsoever existing, in assets of another Grantor or any assets securing the Secured Obligations shall be and hereby are subordinated to the rights and interests of Lender and in those assets until the prior and indefeasible final

payment in full of all Secured Obligations to Lender. If any amount shall be paid to any Grantor contrary to the provisions of this Section 6.4 at any time when any of the Secured Obligations shall not have been indefeasibly paid in full, such amount shall be held in trust for the benefit of Lender and shall forthwith be turned over in kind in the form received to Lender (duly endorsed if necessary) to be credited and applied against the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Loan Agreement.

6.5    **Recovered Payment**s. The Secured Obligations shall be deemed not to have been paid, observed, or performed, and Grantors' Secured Obligations under this Security Agreement in respect thereof shall continue and not be discharged, to the extent that any payment, observance, or performance thereof by any Grantor is recovered from or paid over by or for the account of Lender for any reason, including as a preference or fraudulent transfer or by virtue of any subordination (whether present or future or contractual or otherwise) of the Secured Obligations, whether such recovery or payment over is effected by any judgment, decree, or order of any court or governmental agency; by any plan of reorganization; or by settlement or compromise by Lender (whether or not consented to by Grantors) of any claim for any such recovery or payment over. Each Grantor hereby expressly waives the benefit of any applicable statute of limitations and agrees that it shall be liable hereunder whenever such a recovery or payment over occurs.

6.6    **No Waiver**. No delay or omission of Lender to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment, or other variation of the terms, conditions, or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Lender and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Lender until the Secured Obligations have been paid in full.

6.7    **Lender Performance of Grantor's Obligation**s. Without having any obligation to do so, Lender may perform or pay any Secured Obligation which any Grantor has agreed to perform or pay in this Security Agreement and each Grantor shall, jointly and severally, reimburse Lender for any amounts paid by Lender pursuant to this Section 6.7. Each Grantor's Secured Obligation to reimburse Lender pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

6.8    **Specific Performance of Certain Covenant**s. Each Grantor acknowledges and agrees that a breach of any of the covenants contained in Sections 4.1(c), 4.1(e), 4.6, 5.4, 5.5, 5.6, 5.10, 5.11, or 6.9 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breaches; therefore each Grantor further agrees, without limiting the right of Lender to seek and obtain specific performance of other Secured Obligations of such Grantor contained in this Security Agreement, that the covenants of such Grantor contained in the Sections referred to in this Section 6.8 shall be specifically enforceable against such Grantor.

6.9    **Disposition**s **Not Authorized**. No Grantor is authorized to sell or otherwise dispose of the Collateral except as permitted in the Loan Agreement. Notwithstanding any course of dealing between any Grantor and Lender or other conduct of Lender, no authorization to sell or otherwise dispose of the Collateral shall be binding upon Lender unless such authorization is in writing signed by Lender.

6.10    **Waiver**s. Except to the extent expressly otherwise provided herein or in other Loan Documents and to the fullest extent permitted by applicable law, each Grantor waives (a) any right to require Lender to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Lender may have; (b) with respect to the Secured Obligations, presentment and demand for payment,

protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

6.11    **Benefit of Agreement**.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of Grantors, Lender, the Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign its rights or delegate its Secured Obligations or duties under this Security Agreement or any interest herein, without the prior written consent of Lender.

6.12    **Survival**.  All representations and warranties of each Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement. Without prejudice to the survival of any other Secured Obligation of each Grantor hereunder, the Secured Obligations and any other obligations of each Grantor under Sections 6.14 and 6.18 shall survive termination of this Security Agreement.

6.13    **Sending Notices**.  Whenever any notice is required or permitted to be given under the terms of this Security Agreement, the same shall be given in accordance with the Loan Agreement.

6.14    **Taxes and Expenses**.  Any taxes (including income taxes) payable or ruled payable by federal or state authority in respect of this Security Agreement shall be paid by each Grantor, together with interest and penalties, if any.  Grantors shall, jointly and severally, reimburse Lender for any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Security Agreement in accordance with Section 8.03 of the Loan Agreement. Grantors also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with the administration of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral).  In addition, Grantors shall be, jointly and severally, obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Grantor concerning any matter arising out of or connected with this Security Agreement, any Collateral or the Secured Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law.  Any and all costs and expenses incurred by each Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by such Grantor.

6.15    **Headings**.  The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

6.16    **Termination**.  This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (a) the Loan Agreement has terminated pursuant to its express terms and (b) all of the Secured Obligations have been indefeasibly paid and performed in full and no commitments of Lender which would give rise to any Secured Obligations are outstanding; *provided that* the termination of this Security Agreement under this Section 6.16 is subject to Section 6.5.

6.17    **GOVERNING LAW/VENUE**.

(A)    THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(C)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(a)    EACH PARTY TO THIS SECURITY AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

6.18    **Indemnity**. EACH GRANTOR DOES HEREBY ASSUME ALL LIABILITY FOR THE COLLATERAL, FOR THE SECURITY INTEREST OF LENDER, AND FOR ANY USE, POSSESSION, MAINTENANCE, AND MANAGEMENT OF ALL OR ANY OF THE COLLATERAL, INCLUDING ANY TAXES ARISING AS A RESULT OF, OR IN CONNECTION WITH, THE TRANSACTIONS CONTEMPLATED HEREIN, AND HEREBY ASSUMES LIABILITY FOR, AND SHALL INDEMNIFY AND HOLD LENDER AND ITS SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, ANY AND ALL CLAIMS, CAUSES OF ACTION, OR LIABILITY FOR INJURIES TO, OR DEATHS OF, PERSONS AND DAMAGE TO PROPERTY, HOWSOEVER ARISING FROM OR INCIDENT TO SUCH USE, POSSESSION, MAINTENANCE, AND MANAGEMENT, WHETHER SUCH PERSONS BE AGENTS OR

HOU 3972802v7

EMPLOYEES OF GRANTOR OR OF THIRD PARTIES, OR SUCH DAMAGE BE TO PROPERTY OF
GRANTOR OR OF OTHERS.

THE GRANTORS, JOINTLY AND SEVERALLY, SHALL INDEMNIFY THE LENDER, AND EACH
RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE")
AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES,
CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED
EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR
ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT
OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE
LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY,
THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS
THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER
TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS
THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS
MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR
ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY
ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING
RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY
OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO;
PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE
TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR
RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY
FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS
NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. WITHOUT LIMITATION
OF THE FOREGOING, IT IS THE INTENTION OF THE GRANTORS AND EACH GRANTOR
AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH
RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED
EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR
PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT
OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

WITHOUT LIMITING ANY OTHER PROVISION OF THIS SECURITY AGREMEENT, TO
THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE GRANTORS AND THE
LENDER AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM
AGAINST THE OTHER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF
INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS,
ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE
INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT,
CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL
DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS SECURITY
AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT
CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF
THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL
RELIEVE ANY GRANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN
INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES
ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

6.19 **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY WAIVES, TO THE
FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL
BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR

27

RELATING TO THIS SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

6.20 **FINAL AGREEMENT**. THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.**
**SIGNATURE PAGE TO FOLLOW.**

**IN WITNESS WHEREOF**, Grantors and Lender have executed this Security Agreement as of the date first above written.

GRANTOR:

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By: _____
Name; _____
Title: _____

GOM SHELF LLC,
a Delaware limited liability company

By: _____
Name; _____
Title: _____

*[Signature Page to Security Agreement]*

LENDER:

APACHE CORPORATION

By: _____
Name: _____
Title: _____

# SCHEDULE 3.4[1]

## GRANTOR INFORMATION

1.   Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive Office / Place of Business and Organizational Identification Number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Place of Business | Organization I.D.# |
|---|---|---|---|---|
| FIELDWOOD ENERGY I LLC | Limited Liability Company | Texas | 2000 W. Sam Houston Pkwy S., Suite 1600, Houston, Texas 77042 | [●] |
| GOM SHELF LLC | Limited Liability Company | Delaware | 2000 W. Sam Houston Pkwy S., Suite 1600, Houston, Texas 77042 | [●] |

2.   Other Names (including any Trade-Name or Fictitious Business Name) under which each Grantor has conducted business:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
| [●] | [●] |

3.   Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business and Corporate Structure within past five (5) years:

| Full Legal Name | Change in Name, Jurisdiction, Chief Executive Office, Sole Place of Business or Corporate Structure |
|---|---|
| [●] | [●] |

4.   Financing Statements:

| Name of Grantor | Filing Jurisdiction(s)[2] |
|---|---|
| FIELDWOOD ENERGY I LLC | Texas |

---

[1] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.
[2] Solely with respect to personal property

| GOM SHELF LLC | Delaware |

## SCHEDULE 3.5[3]

**PROPERTY LOCATIONS**

1.      Locations owned by Grantor

      None.

2.      Locations leased by Grantor as lessee

| Name of Grantor | Location of Equipment, Inventory, and Fixtures |
|---|---|
| [•] | [•] |

---

[3]To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

## SCHEDULE 3.8[4]

## COLLATERAL

1.      1.      Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name | Excluded (Y/N) |
|---------|------------------------|----------------|--------------|----------------|
| [•] | [•] | [•] | [•] | [•] |

2.      Commercial Tort Claims:

      None.

3.      Material Contracts:

| Name of Grantor | Material Contracts |
|-----------------|--------------------|
|  |  |

4.      Letters of Credit:

      None.

5.      Investment Related Property:

| Grantor | Issuer | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | % of Outstanding LLC Interests of the Limited Liability Company |
|---------|--------|--------------------|--------------------------|----------------------|----------------------------------------------------------------|
| [•] | [•] | [•] | [•] | [•] | [•] |

---

[4] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

**SCHEDULE 3.15**

**INTELLECTUAL PROPERTY
PATENTS AND PATENT LICENSES**

1.      Patents

      None.

2.      Patent Licenses

      None.

## TRADEMARKS AND TRADEMARK LICENSES

3.      Trademarks

      None.

4.      Trademark Licenses

      None.

## COPYRIGHTS AND COPYRIGHT LICENSES

5.      Copyrights

      None.

6.      Copyright Licenses

      None.

## TRADE SECRETS AND TRADE SECRET LICENSES

7.      Trade Secrets

      None.

8.      Trade Secret Licenses

      None

**SCHEDULE 3.16**[5]

**EXCLUDED COLLATERAL**

| Name of Grantor | Description of Excluded Collateral |
|---|---|
|  |  |

---

[5] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

**Exhibit 10**

**Guarantee (Fieldwood Energy I LLC)**

# GUARANTEE

**THIS GUARANTEE** (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Guarantee") is executed as of_____, 20[●], by FIELDWOOD ENERGY I LLC, a Texas limited liability company ("Guarantor"), in favor of APACHE CORPORATION, a Delaware corporation ("Lender"), on behalf of itself and the other Secured Parties (as defined in the Loan Agreement described below).

## INTRODUCTORY PROVISIONS:

A.      This Guarantee is given in connection with that certain Standby Loan Agreement dated as of _____, 20[●] among Guarantor, GOM Shelf LLC, a Delaware limited liability company ("GOM"), and the Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement").

B.      GOM is (i) a Co-Borrower under the Loan Agreement and (ii) a wholly owned subsidiary of Guarantor.

C.      Guarantor will derive substantial direct and indirect benefit from the transactions contemplated by the Loan Agreement and the other Loan Documents.

D.      Guarantor is executing and delivering this Guarantee to induce the Lender to provide Loans to Borrowers, including GOM, under the Loan Agreement.

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor hereby guarantees to Lender the prompt payment and performance of the Guaranteed Obligations, this Guarantee being upon the following terms and conditions:

1.      **Defined Terms**.  Any capitalized term used in this Guarantee and not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.  In addition, the following terms have the following meanings:

"Dispute" means any action, dispute, claim, or controversy of any kind, whether in contract or tort, statutory, or common law, legal or equitable, now existing or hereafter arising, under or in connection with, or in any way pertaining to, this Guarantee and each other document, contract, and instrument required hereby, or now or hereafter delivered to Lender in connection herewith, or any past, present, or future extensions of credit and other activities, transactions, or obligations of any kind related directly or indirectly to any of the foregoing documents, including, without limitation, any of the foregoing arising in connection with the exercise of any self-help, ancillary, or other remedies pursuant to any of the foregoing documents.

"Guaranteed Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Guarantee, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified

party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Guarantee, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Guaranteed Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Guaranteed Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Guaranteed Obligations is reduced to judgment, or (iv) such Guaranteed Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

2.      **Payment**.  Guarantor hereby unconditionally and irrevocably guarantees to Lender, for itself and the other Secured Parties, as a guaranty of payment and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, by lapse of time, by acceleration of maturity, demand, or otherwise, and at all times thereafter, of the Guaranteed Obligations. This Guarantee covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by Lender in stages or installments.  The guaranty of Guarantor as set forth in this Guarantee is a continuing guaranty of payment and performance.  Guarantor acknowledges and agrees that Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from any Co-Borrower or any other party.  Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity, or otherwise, Guarantor shall immediately pay the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth in the Loan Agreement.

3.      **Primary Liability of Guarantor**.

(a)      This Guarantee is an absolute, irrevocable, and unconditional guaranty of payment and performance.  Guarantor is and shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guarantee, as a primary obligor.

(b)      In the event of default, including, but without limitation, an Event of Default, in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due, whether by their terms, by acceleration, or otherwise, Guarantor shall, without notice or demand of any kind or nature (other than as required by the Loan Agreement), promptly pay the amount due thereon to Lender in lawful money of the United States of America and perform the obligations to be performed hereunder, and it shall not be necessary for Lender in order to enforce such payment and performance by Guarantor first, or contemporaneously, to institute suit or exhaust remedies against the Borrowers or any other Person liable on the Guaranteed Obligations, or to enforce any rights, remedies, powers, privileges, or benefits of Lender against any collateral or any other security or collateral which shall ever have been given to secure the Guaranteed Obligations.

(c) Suit may be brought or demand may be made against Guarantor or any other guaranty in favor of Lender covering all or any part of the Guaranteed Obligations, or against any one or more of them, separately or together, without impairing the rights of Lender against Guarantor. Any time that Lender is entitled to exercise its rights or remedies hereunder, Lender may in its sole discretion elect to demand payment and/or performance. If Lender elects to demand performance, then it shall at all times thereafter have the right to also demand payment until all of the Guaranteed Obligations have been paid and performed in full. If Lender elects to demand payment, then it shall at all times thereafter have the right to also demand performance until all of the Guaranteed Obligations have been paid and performed in full.

4. **Other Guaranteed Obligations**. If Guarantor becomes liable for any indebtedness owing by any other Co-Borrower to Lender by endorsement or otherwise, other than under this Guarantee, such liability shall not in any manner be impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by Lender.

5. **Waiver of Subrogation**. Notwithstanding anything to the contrary contained herein, until the Guaranteed Obligations and any amounts payable under this Guarantee have been indefeasibly paid and performed in full and any commitments of Lender with respect to the Guaranteed Obligations are terminated, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, or contribution arising from the existence or performance of this Guarantee or any of the Loan Documents. This waiver is given to induce Lender to make the Loans to Borrowers.

6. **Subordinated Debt**. All indebtedness, liabilities, and obligations of any Co-Borrower or its Affiliates to Guarantor (the "Subordinated Debt") now or hereafter existing, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations. Until such time as the Guaranteed Obligations are paid and performed in full and all commitments to lend under the Loan Documents have terminated, Guarantor agrees not to receive or accept any payment from any Co-Borrower with respect to the Subordinated Debt at any time an Event of Default exists before or after giving effect thereto; and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender in the form received, to be applied to the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under this Guarantee.

7. **Obligations Not to be Diminished**. Guarantor hereby agrees that its obligations under this Guarantee shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event (other than Payment and Performance in Full (as defined below)), including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor: (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any full or partial release of the liability of any Co-Borrower or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the dissolution, insolvency, or bankruptcy of any Co-Borrower, any other guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to any Co-Borrower, Guarantor, or any other party ever liable for any or all of

3

the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by any Co-Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the non-perfection of any security interest or Lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of Lender to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate, partnership, or limited liability company, as applicable, existence, structure, or ownership of any Co-Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, any Co-Borrower or Guarantor.

8.      **Waiver**s.  Guarantor waives for the benefit of Lender and the other Secured Parties:  (a) any right to revoke this Guarantee with respect to future indebtedness; (b) any right to require Lender to do any of the following before Guarantor is obligated to pay the Guaranteed Obligations or before Lender may proceed against Guarantor: (i) sue or exhaust remedies against any Co-Borrower or any other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies or (iii) enforce rights against any Co-Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of Lender's enforcement of rights against Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (d) if both Guarantor and any Co-Borrower or any other Person have pledged assets to secure the Guaranteed Obligations, any right to require Lender to proceed first against any such other collateral before proceeding against any collateral pledged by Guarantor; (e) except as expressly required hereby, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guarantee, presentment, notice of protest, notice of dishonor, notice of the incurring by any Co-Borrower of additional indebtedness, notice of any suit or other action by Lender against any Co-Borrower or any other Person, any notice to any Person liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guarantee; (f) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, other than the defense that the Guaranteed Obligations has been fully performed and indefeasibly paid in full in cash; (g) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, and (iii) any requirement that Lender protect, secure, perfect, or insure any security interest or Lien or any property subject thereto; and (h) each of the foregoing rights or defenses regardless whether they arise under (i) *Section 43.001–005* of the Tex. Civ. Prac. & Rem. Code, as amended, (ii) *Section 17.001* of the Tex. Civ. Prac. & Rem. Code as amended, (iii) *Rule 31* of the Texas Rules of Civil Procedure, as amended, and (iv) common law, in equity, under contract, by statute, or otherwise.

This Guarantee shall not be affected by the genuineness, validity, regularity, or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection, or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of Guarantor under this Guarantee, and Guarantor hereby

4

irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

9.       **Insolvency**.  Should Guarantor become insolvent (as such concept is described in Section 3.16 of the Loan Agreement, including, for the avoidance of doubt, excepting asset retirement obligations from Guarantor's liabilities), or fail to pay Guarantor's debts (including, but without limitation, subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Lender granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between Guarantor and Lender, a fully matured, due, and payable obligation of Guarantor to Lender (without regard to whether Borrowers are then in default under the Loan Agreement or whether the Obligations, or any part thereof is then due and owing by Borrowers to Lender), payable in full by Guarantor to Lender upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.  For purposes of this Section, each reference to asset retirement obligations means those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 of the Loan Agreement.

10.       **Termination; Reinstatement**.  Guarantor's obligations hereunder shall remain in full force and effect until all commitments to lend under the Loan Documents have terminated and the Guaranteed Obligations have been paid and performed in full ("Payment and Performance in Full").  If at any time any payment of the principal or interest or any other amount payable by Borrowers under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of any Co-Borrower or otherwise, then Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

11.       **Stay of Acceleration**.  Should any other Co-Borrower voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant), all Guaranteed Obligations shall nonetheless be payable by Guarantor immediately if requested by Lender.

12.       **Representations and Warranties**. The representations and warranties made by Guarantor in Article III of the Loan Agreement are hereby incorporated by reference as if stated verbatim herein.

13.       **No Fraudulent Transfer**.  It is the intention of Guarantor and Lender that the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to Guarantor (collectively, "Fraudulent Transfer Laws").  Accordingly, notwithstanding anything to the contrary contained in this Guarantee or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations but subject to the following proviso, the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be limited to that amount which after giving effect thereto would not (a) render Guarantor insolvent, (b) result in the fair saleable value of the assets of Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b), and (c) of this Section 13 are determined under the Fraudulent Transfer Laws or other applicable law by a court of competent jurisdiction in a proceeding actually pending before such court; *provided, however*, that such limitation shall apply if and only to the extent that by reason of such clauses (a), (b), or (c), the obligations of Guarantor hereunder would otherwise be set aside, terminated,

annulled, or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court. For purposes of this Guarantee, the term "applicable law" means as to Guarantor each statute, law, ordinance, regulation, order, judgment, injunction, or decree of the United States or any state or commonwealth, any municipality, any foreign country, or any territory, possession, or governmental authority applicable to Guarantor.

14.    **Successors and Assigns**.  This Guarantee is for the benefit of Lender and the other Secured Parties and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the Loan Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred therewith. This Guarantee is binding on Guarantor and Guarantor's successors and permitted assigns; *provided that*, Guarantor may not assign its obligations under this Guarantee without obtaining Lender's prior written consent, and any assignment purported to be made without Lender's prior written consent shall be null and void.

15.    **LOAN AGREEMENT**.  THE LOAN AGREEMENT, AND ALL OF THE TERMS THEREOF, ARE INCORPORATED HEREIN BY REFERENCE, THE SAME AS IF STATED VERBATIM HEREIN, AND GUARANTOR AGREES THAT LENDER MAY EXERCISE ANY AND ALL RIGHTS GRANTED TO IT UNDER THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WITHOUT AFFECTING THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTEE.

16.    **Setoff Rights**.  If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by Lender to or for the credit or the account of Guarantor against any and all the Guaranteed Obligations, irrespective of whether or not Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured. The rights of Lender hereunder are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

17.    **Time of Essence**.  Time shall be of the essence in this Guarantee with respect to all of Guarantor's obligations hereunder.

18.    **GOVERNING LAW; VENUE; SERVICE OF PROCESS**.

(a)    THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(b)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. GUARANTOR AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY

OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH   PARTY   HERETO   HEREBY   IRREVOCABLY   AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. GUARANTOR HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY TO THIS GUARANTEE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTEE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.THIS GUARANTEE AND ANY CONTROVERSY, DISPUTE, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS GUARANTEE, THE OTHER LOAN DOCUMENTS, ANY BREACH THEREOF, THE TRANSACTIONS CONTEMPLATED THEREBY, OR ANY OTHER DISPUTE BETWEEN OR AMONG THE PARTIES HERETO (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND INTERPRETED PURSUANT TO THE LAWS OF THE STATE OF TEXAS; PROVIDED THAT LENDER SHALL RETAIN ALL RIGHTS UNDER FEDERAL LAW.  THE PARTIES HEREBY AGREE THAT ANY LAWSUIT, ACTION, OR PROCEEDING THAT IS BROUGHT (WHETHER IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING   TO   ANY   OF   THE   LOAN   DOCUMENTS,   THE   TRANSACTIONS CONTEMPLATED THEREBY, OR THE ACTS, CONDUCT, OR OMISSIONS OF LENDER OR ANY OF ITS AGENTS, SUCCESSORS, OR ASSIGNS OR OF ANY OF THE OBLIGATED PARTIES IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT OF ANY OF THE LOAN DOCUMENTS SHALL BE BROUGHT IN A STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN HOUSTON, TEXAS. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF SUCH COURTS, (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH LAWSUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, AND (C) FURTHER WAIVES ANY CLAIM THAT IT MAY NOW OR HEREAFTER HAVE THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. GUARANTOR AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED AT THE ADDRESS FOR NOTICES REFERENCED IN THE LOAN AGREEMENT.

19.     **Notices**.  Whenever any notice is required or permitted to be given under the terms of this Guarantee, the same shall be given in accordance with the Loan Agreement.

20.     **Expenses**.  Guarantor hereby agrees to pay on demand any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Guarantee in accordance with Section 8.03 of the Loan

Agreement. Guarantor also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with the administration of this Guarantee.  In addition, Guarantor shall be obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Guaranteed Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Guarantor concerning any matter arising out of or connected with this Guarantee, any Collateral, or the Guaranteed Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law.  Any and all costs and expenses incurred by Guarantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Guarantor.

21.     **Indemnification and Survival**.  GUARANTOR SHALL INDEMNIFY THE LENDER, AND EACH RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.  WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF GUARANTOR AND GUARANTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

THE OBLIGATIONS AND LIABILITIES OF GUARANTOR UNDER THIS SECTION 20 SHALL NOT BE LIMITED OR RESTRICTED BY THE EXISTINCE OF, OR ANY TERMS OF, THE GUARANTY OF PAYMENT UNDER SECTION 2 OF THIS GUARANTEE AND SHALL SURVIVE THE PAYMENT AND PERFORMANCE  IN FULL OF THE GUARANTEED OBLIGATIONS AND TERMINATION OF THIS GUARANTEE.

22.     **Amendments; Counterparts**.  This Guarantee may be amended only by an instrument in writing executed by Guarantor and acknowledged by Lender.

015292.0273537 HOU 3973071v5

23.     **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION.

24.     **Limitation on Liability**.  WITHOUT LIMITING ANY OTHER PROVISION OF THIS GUARANTEE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE LENDER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS GUARANTEE, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL RELIEVE GUARANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

25.     **FINAL AGREEMENT**.  THIS GUARANTEE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW]**

**EXECUTED** as of the first date herein set forth.

**GUARANTOR:**

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By:_____
Name:_____
Title:_____

Guarantee – Signature Page

**Exhibit 11**

**Guarantee (GOM Shelf LLC)**

## GUARANTEE

**THIS GUARANTEE** (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Guarantee") is executed as of _____, 20[●], by GOM SHELF LLC, a Delaware limited liability company ("Guarantor"), in favor of APACHE CORPORATION, a Delaware corporation ("Lender"), on behalf of itself and the other Secured Parties (as defined in the Loan Agreement described below).

## INTRODUCTORY PROVISIONS:

A.    This Guarantee is given in connection with that certain Standby Loan Agreement dated as of _____, 20[●] among Guarantor, Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood"), and the Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement").

B.    Fieldwood is a Co-Borrower under the Loan Agreement.

C.    Guarantor is a wholly owned subsidiary of Fieldwood and will derive substantial direct and indirect benefit from the transactions contemplated by the Loan Agreement and the other Loan Documents.

D.    Guarantor is executing and delivering this Guarantee to induce the Lender to provide Loans to Borrowers, including Fieldwood, under the Loan Agreement.

**NOW, THEREFORE,** for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor hereby guarantees to Lender the prompt payment and performance of the Guaranteed Obligations, this Guarantee being upon the following terms and conditions:

1.    **Defined Term**s.  Any capitalized term used in this Guarantee and not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.  In addition, the following terms have the following meanings:

"Dispute" means any action, dispute, claim, or controversy of any kind, whether in contract or tort, statutory, or common law, legal or equitable, now existing or hereafter arising, under or in connection with, or in any way pertaining to, this Guarantee and each other document, contract, and instrument required hereby, or now or hereafter delivered to Lender in connection herewith, or any past, present, or future extensions of credit and other activities, transactions, or obligations of any kind related directly or indirectly to any of the foregoing documents, including, without limitation, any of the foregoing arising in connection with the exercise of any self-help, ancillary, or other remedies pursuant to any of the foregoing documents.

"Guaranteed Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Guarantee, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect,

joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Guarantee, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Guaranteed Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Guaranteed Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Guaranteed Obligations is reduced to judgment, or (iv) such Guaranteed Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

2.      **Payment**.  Guarantor hereby unconditionally and irrevocably guarantees to Lender, for itself and the other Secured Parties, as a guaranty of payment and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, by lapse of time, by acceleration of maturity, demand, or otherwise, and at all times thereafter, of the Guaranteed Obligations. This Guarantee covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by Lender in stages or installments.  The guaranty of Guarantor as set forth in this Guarantee is a continuing guaranty of payment and performance.  Guarantor acknowledges and agrees that Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from any Co-Borrower or any other party.  Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity, or otherwise, Guarantor shall immediately pay the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth in the Loan Agreement.

3.      **Primary Liability of Guarantor**.

(a)      This Guarantee is an absolute, irrevocable, and unconditional guaranty of payment and performance.  Guarantor is and shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guarantee, as a primary obligor.

(b)      In the event of default, including, but without limitation, an Event of Default, in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due, whether by their terms, by acceleration, or otherwise, Guarantor shall, without notice or demand of any kind or nature (other than as required by the Loan Agreement), promptly pay the amount due thereon to Lender in lawful money of the United States of America and perform the obligations to be performed hereunder, and it shall not be necessary for Lender in order to enforce such payment and performance by Guarantor first, or contemporaneously, to institute suit or exhaust remedies against the Borrowers or any other Person liable on the Guaranteed Obligations, or to enforce any rights, remedies, powers, privileges, or benefits of Lender against any collateral or any other security or collateral which shall ever have been given to secure the Guaranteed Obligations.

(c)      Suit may be brought or demand may be made against Guarantor or any other guaranty in favor of Lender covering all or any part of the Guaranteed Obligations, or against any

one or more of them, separately or together, without impairing the rights of Lender against Guarantor.  Any time that Lender is entitled to exercise its rights or remedies hereunder, Lender may in its sole discretion elect to demand payment and/or performance.  If Lender elects to demand performance, then it shall at all times thereafter have the right to also demand payment until all of the Guaranteed Obligations have been paid and performed in full.  If Lender elects to demand payment, then it shall at all times thereafter have the right to also demand performance until all of the Guaranteed Obligations have been paid and performed in full.

4.      **Other Guaranteed Obligations**.  If Guarantor becomes liable for any indebtedness owing by any other Co-Borrower to Lender by endorsement or otherwise, other than under this Guarantee, such liability shall not in any manner be impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by Lender.

5.      **Waiver of Subrogation**.  Notwithstanding anything to the contrary contained herein, until the Guaranteed Obligations and any amounts payable under this Guarantee have been indefeasibly paid and performed in full and any commitments of Lender with respect to the Guaranteed Obligations are terminated, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, or contribution arising from the existence or performance of this Guarantee or any of the Loan Documents.  This waiver is given to induce Lender to make the Loans to Borrowers.

6.      **Subordinated Debt**.  All indebtedness, liabilities, and obligations of any Co-Borrower or its Affiliates to Guarantor (the "Subordinated Debt") now or hereafter existing, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations.  Until such time as the Guaranteed Obligations are paid and performed in full and all commitments to lend under the Loan Documents have terminated, Guarantor agrees not to receive or accept any payment from any Co-Borrower with respect to the Subordinated Debt at any time an Event of Default exists before or after giving effect thereto; and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender in the form received, to be applied to the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under this Guarantee.

7.      **Obligations Not to be Diminished**.  Guarantor hereby agrees that its obligations under this Guarantee shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event (other than Payment and Performance in Full (as defined below)), including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor:  (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any full or partial release of the liability of any Co-Borrower or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the dissolution, insolvency, or bankruptcy of any Co-Borrower, any other guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to any Co-Borrower, Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or

3

prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by any Co-Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the non-perfection of any security interest or Lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of Lender to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate, partnership, or limited liability company, as applicable, existence, structure, or ownership of any Co-Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, any Co-Borrower or Guarantor.

8.      **Waiver**s.  Guarantor waives for the benefit of Lender and the other Secured Parties:  (a) any right to revoke this Guarantee with respect to future indebtedness; (b) any right to require Lender to do any of the following before Guarantor is obligated to pay the Guaranteed Obligations or before Lender may proceed against Guarantor: (i) sue or exhaust remedies against any Co-Borrower or any other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies or (iii) enforce rights against any Co-Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of Lender's enforcement of rights against Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (d) if both Guarantor and any Co-Borrower or any other Person have pledged assets to secure the Guaranteed Obligations, any right to require Lender to proceed first against any such other collateral before proceeding against any collateral pledged by Guarantor; (e) except as expressly required hereby, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guarantee, presentment, notice of protest, notice of dishonor, notice of the incurring by any Co-Borrower of additional indebtedness, notice of any suit or other action by Lender against any Co-Borrower or any other Person, any notice to any Person liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guarantee; (f) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, other than the defense that the Guaranteed Obligations has been fully performed and indefeasibly paid in full in cash; (g) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, and (iii) any requirement that Lender protect, secure, perfect, or insure any security interest or Lien or any property subject thereto; and (h) each of the foregoing rights or defenses regardless whether they arise under (i) *Section 43.001–005* of the Tex. Civ. Prac. & Rem. Code, as amended, (ii) *Section 17.001* of the Tex. Civ. Prac. & Rem. Code as amended, (iii) *Rule 31* of the Texas Rules of Civil Procedure, as amended, and (iv) common law, in equity, under contract, by statute, or otherwise.

This Guarantee shall not be affected by the genuineness, validity, regularity, or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection, or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of Guarantor under this Guarantee, and Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

9.      **Insolvency**. Should Guarantor become insolvent (as such concept is described in Section 3.16 of the Loan Agreement, including, for the avoidance of doubt, excepting asset retirement obligations from Guarantor's liabilities), or fail to pay Guarantor's debts (including, but without limitation, subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Lender granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between Guarantor and Lender, a fully matured, due, and payable obligation of Guarantor to Lender (without regard to whether Borrowers are then in default under the Loan Agreement or whether the Obligations, or any part thereof is then due and owing by Borrowers to Lender), payable in full by Guarantor to Lender upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder. For purposes of this Section, each reference to asset retirement obligations means those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 of the Loan Agreement.

10.     **Termination; Reinstatement**. Guarantor's obligations hereunder shall remain in full force and effect until all commitments to lend under the Loan Documents have terminated and the Guaranteed Obligations have been paid and performed in full ("Payment and Performance in Full"). If at any time any payment of the principal or interest or any other amount payable by Borrowers under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of any Co-Borrower or otherwise, then Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

11.     **Stay of Acceleration**. Should any other Co-Borrower voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant), all Guaranteed Obligations shall nonetheless be payable by Guarantor immediately if requested by Lender.

12.     **Representations and Warranties**. The representations and warranties made by Guarantor in Article III of the Loan Agreement are hereby incorporated by reference as if stated verbatim herein.

13.     **No Fraudulent Transfer**. It is the intention of Guarantor and Lender that the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to Guarantor (collectively, "Fraudulent Transfer Laws"). Accordingly, notwithstanding anything to the contrary contained in this Guarantee or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations but subject to the following proviso, the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be limited to that amount which after giving effect thereto would not (a) render Guarantor insolvent, (b) result in the fair saleable value of the assets of Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b), and (c) of this Section 13 are determined under the Fraudulent Transfer Laws or other applicable law by a court of competent jurisdiction in a proceeding actually pending before such court; *provided, however*, that such limitation shall apply if and only to the extent that by reason of such clauses (a), (b), or (c), the obligations of Guarantor hereunder would otherwise be set aside, terminated, annulled, or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court. For purposes of this Guarantee, the term "applicable law" means as to Guarantor each statute, law, ordinance, regulation, order, judgment, injunction, or decree of the United States or any state

Case 20-33948   Document 725-2   Filed in TXSB on 01/01/21   Page 153 of 204

or commonwealth, any municipality, any foreign country, or any territory, possession, or governmental authority applicable to Guarantor.

14.     **Successors and Assigns**.  This Guarantee is for the benefit of Lender and the other Secured Parties and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the Loan Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred therewith. This Guarantee is binding on Guarantor and Guarantor's successors and permitted assigns; *provided that*, Guarantor may not assign its obligations under this Guarantee without obtaining Lender's prior written consent, and any assignment purported to be made without Lender's prior written consent shall be null and void.

15.     **LOAN AGREEMENT**.  THE LOAN AGREEMENT, AND ALL OF THE TERMS THEREOF, ARE INCORPORATED HEREIN BY REFERENCE, THE SAME AS IF STATED VERBATIM HEREIN, AND GUARANTOR AGREES THAT LENDER MAY EXERCISE ANY AND ALL RIGHTS GRANTED TO IT UNDER THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WITHOUT AFFECTING THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTEE.

16.     **Setoff Rights**.  If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by Lender to or for the credit or the account of Guarantor against any and all the Guaranteed Obligations, irrespective of whether or not Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of Lender hereunder are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

17.     **Time of Essence**.  Time shall be of the essence in this Guarantee with respect to all of Guarantor's obligations hereunder.

18.     **GOVERNING LAW; VENUE; SERVICE OF PROCESS**.

(a)     THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. GUARANTOR AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTEE OR

HOU 3973079v2

ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. GUARANTOR HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY TO THIS GUARANTEE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTEE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.THIS GUARANTEE AND ANY CONTROVERSY, DISPUTE, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS GUARANTEE, THE OTHER LOAN DOCUMENTS, ANY BREACH THEREOF, THE TRANSACTIONS CONTEMPLATED THEREBY, OR ANY OTHER DISPUTE BETWEEN OR AMONG THE PARTIES HERETO (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND INTERPRETED PURSUANT TO THE LAWS OF THE STATE OF TEXAS; PROVIDED THAT LENDER SHALL RETAIN ALL RIGHTS UNDER FEDERAL LAW. THE PARTIES HEREBY AGREE THAT ANY LAWSUIT, ACTION, OR PROCEEDING THAT IS BROUGHT (WHETHER IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, OR THE ACTS, CONDUCT, OR OMISSIONS OF LENDER OR ANY OF ITS AGENTS, SUCCESSORS, OR ASSIGNS OR OF ANY OF THE OBLIGATED PARTIES IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT OF ANY OF THE LOAN DOCUMENTS SHALL BE BROUGHT IN A STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN HOUSTON, TEXAS. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF SUCH COURTS, (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH LAWSUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, AND (C) FURTHER WAIVES ANY CLAIM THAT IT MAY NOW OR HEREAFTER HAVE THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. GUARANTOR AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED AT THE ADDRESS FOR NOTICES REFERENCED IN THE LOAN AGREEMENT.

19.     **Notices.**  Whenever any notice is required or permitted to be given under the terms of this Guarantee, the same shall be given in accordance with the Loan Agreement.

20.     **Expenses.**  Guarantor hereby agrees to pay on demand any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Guarantee in accordance with Section 8.03 of the Loan Agreement. Guarantor also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with

the administration of this Guarantee.  In addition, Guarantor shall be obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Guaranteed Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Guarantor concerning any matter arising out of or connected with this Guarantee, any Collateral, or the Guaranteed Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law.  Any and all costs and expenses incurred by Guarantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Guarantor.

21.     **Indemnification and Survival**.  GUARANTOR SHALL INDEMNIFY THE LENDER, AND EACH RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF GUARANTOR AND GUARANTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

THE OBLIGATIONS AND LIABILITIES OF GUARANTOR UNDER THIS SECTION 21 SHALL NOT BE LIMITED OR RESTRICTED BY THE EXISTENCE OF, OR ANY TERMS OF, THE GUARANTY OF PAYMENT UNDER SECTION 2 OF THIS GUARANTEE AND SHALL SURVIVE THE PAYMENT AND PERFORMANCE  IN FULL OF THE GUARANTEED OBLIGATIONS AND TERMINATION OF THIS GUARANTEE.

22.     **Amendments; Counterparts**.  This Guarantee may be amended only by an instrument in writing executed by Guarantor and acknowledged by Lender.

23.     **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING

TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION.

24.    **Limitation on Liability**.  WITHOUT LIMITING ANY OTHER PROVISION OF THIS GUARANTEE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE LENDER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS GUARANTEE, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL RELIEVE GUARANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

25.    **FINAL AGREEMENT**.  THIS GUARANTEE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW]

HOU 3973079v2

**EXECUTED** as of the first date herein set forth.

**GUARANTOR:**

GOM SHELF LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**<u>Exhibit 12</u>**

**Form of Mortgages**

(AL, LA, MS, TX)

PREPARED BY, AND WHEN RECORDED
OR FILED, PLEASE RETURN TO:

Hunton Andrews Kurth LLP
600 Travis, Suite 4200
Houston, Texas 77002
Attn: Harve Truskett
Phone: (713) 220-4532

MORTGAGE, DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL,
SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT
(Standby Loan Agreement)

FROM

FIELDWOOD ENERGY I LLC
(Organizational ID: [_____])

| | |
|---|---|
| Address: | 2000 W. Sam Houston Pkwy S. |
| | Suite 1600 |
| | Houston, TX 77042 |
| Telephone No.: | (713) 630-8914 |

AND

GOM SHELF LLC
(Organizational ID: 3250958)

| | |
|---|---|
| Address: | 2000 W. Sam Houston Pkwy S. |
| | Suite 1600 |
| | Houston, TX 77042 |
| Telephone No.: | (713) 630-8914 |

1

TO

[_____], TRUSTEE

Address:          2000 Post Oak Boulevard,
                  Suite 100
                  Houston, TX 77056
Telephone No.:    (713) 296-6000


AND TO

APACHE CORPORATION,
as Collateral Agent

Address:          2000 Post Oak Boulevard,
                  Suite 100
                  Houston, TX 77056
Telephone No.:    (713) 296-6000

2

**A CARBON, PHOTOGRAPHIC, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.**

**A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT. IN CERTAIN STATES, A POWER OF SALE MAY ALLOW THE TRUSTEE OR THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE MORTGAGOR UNDER THIS INSTRUMENT.**

**THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.**

**THIS INSTRUMENT SECURES PAYMENT OF FUTURE ADVANCES.**

**THIS INSTRUMENT COVERS PROCEEDS OF MORTGAGED PROPERTY.**

**THIS INSTRUMENT COVERS MINERALS, AS EXTRACTED COLLATERAL AND OTHER SUBSTANCES OF VALUE THAT MAY BE EXTRACTED FROM THE EARTH (INCLUDING WITHOUT LIMITATION OIL AND GAS) AND THE ACCOUNTS RELATED THERETO, WHICH WILL BE FINANCED AT THE WELLHEADS OF THE WELL OR WELLS LOCATED ON THE PROPERTIES DESCRIBED IN <u>EXHIBIT A</u> HERETO. THIS FINANCING STATEMENT IS TO BE FILED OR FILED FOR RECORD, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF THE RECORDERS OF THE COUNTIES OR PARISHES LISTED ON THE EXHIBITS HERETO AND IN THE UCC RECORDS OF ANY LOUISIANA PARISH. THE MORTGAGOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE AND IMMOVABLE PROPERTY CONCERNED, WHICH INTEREST IS DESCRIBED IN THE EXHIBITS ATTACHED HERETO.**

**PORTIONS OF THE MORTGAGED PROPERTY ARE GOODS THAT ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND DESCRIBED IN OR REFERRED TO IN THE EXHIBIT HERETO. THIS FINANCING STATEMENT IS TO BE FILED FOR RECORD OR RECORDED, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF EACH COUNTY OR PARISH IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED OR WHICH IS ADJACENT TO THE OUTER CONTINENTAL SHELF AND IN THE UCC RECORDS OF ANY LOUISIANA PARISH. THE MORTGAGOR IS THE OWNER OF RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS OR THE UCC RECORDS.**

To the Chancery Clerk of the Judicial Districts of Mississippi Counties, if any, referred to on <u>Exhibit A</u> attached hereto: The real property described herein lies offshore within the reasonable projected seaward extension of the relevant county or parish boundary.

**Line of Credit Mortgage.** THIS MORTGAGE ALSO SECURES A LINE OF CREDIT AS DEFINED IN MISS. CODE ANN. § 89-1-49 SUCH THAT SATISFACTION OF RECORD SHALL ONLY BE ACCOMPLISHED AND EXTINGUISHMENT SHALL ONLY OCCUR AS PROVIDED IN SUBSECTION (5) OF MISS. CODE ANN. § 89-5-21.

HOU 3972706v13

HOU 3972706v13

**THIS MORTGAGE, DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT** (this "Mortgage") is entered into effective as of [_____, 20[●]] (the "Effective Date") by Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood"), and GOM Shelf LLC, a Delaware limited liability company ("GOM" and collectively with Fieldwood, the "Mortgagor"), (i) in favor of [_____], as Trustee for the benefit of Apache Corporation, in its capacity as collateral agent for itself and the other Secured Parties (as such term is defined in the Loan Agreement), together with its successors and assigns in such capacity, the "Mortgagee"), for its benefit and the benefit of the other Secured Parties, and (ii) in favor of Mortgagee, for its benefit and the benefit of the other Secured Parties, in each case with respect to all Mortgaged Properties (as hereinafter defined) and with respect to all UCC Collateral (as hereinafter defined).

## RECITALS

A.    Fieldwood, GOM, and Apache Corporation, as the Lender (as such term is defined in the Loan Agreement) executed a Standby Loan Agreement dated as of [_____, 20[●]] (such agreement, as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") pursuant to which, upon the terms and conditions stated therein, the Lender agreed to make loans and other extensions of credit to the Mortgagor.

B.    GOM is a wholly-owned subsidiary of Fieldwood.

C.    The Loan Agreement, the Note (as such term is defined in the Loan Agreement) issued pursuant thereto, the other Loan Documents (as such term is defined in the Loan Agreement), the Decommissioning Agreement (as such term is defined in the Loan Agreement), and any other agreement, instrument, document, or certificate executed by the Buyer (as such term is defined in the Decommissioning Agreement) or its Affiliates and delivered to Mortgagee or its Affiliates under or in connection with the Decommissioning Agreement or transactions contemplated by the Decommissioning Agreement are collectively referred to herein as the "Secured Transaction Documents".

D.    The Mortgagee and the Secured Parties have conditioned their obligations under the Secured Transaction Documents upon the execution and delivery by the Mortgagor of this Mortgage, and the Mortgagor has agreed to enter into this Mortgage to secure all obligations owing to the Mortgagee and the Secured Parties under the Secured Transaction Documents.

**THEREFORE,** in order to comply with the terms and conditions of the Secured Transaction Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor hereby agrees as follows:

SECTION 1
DEFINITIONS

1.1.    Terms Defined Above. As used in this Mortgage, each term defined above has the meaning indicated above.

1

1.2.   <u>UCC and Other Defined Terms</u>. Each capitalized term used in this Mortgage and not defined in this Mortgage shall have the meaning ascribed to such term in the Loan Agreement. Any capitalized term not defined in either this Mortgage or the Loan Agreement shall have the meaning ascribed to such term in the Applicable UCC. The rules of construction and other interpretive provisions specified in Article I of the Loan Agreement and Section 8.11 of the Loan Agreement shall apply to this Mortgage, including terms defined in the preamble and recitals to this Mortgage.

1.3.   <u>Definitions</u>.

"<u>Applicable UCC</u>" means the provisions of the Uniform Commercial Code presently in effect in the jurisdiction in which the relevant UCC Collateral is situated or that otherwise is applicable to the creation or perfection of the Liens described herein or the rights and remedies of Mortgagee under this Mortgage.

"<u>Collateral</u>" means collectively all the Mortgaged Property and all the UCC Collateral.

"<u>Contractual Obligations</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its property is bound.

"<u>Deed of Trust Properties</u>" means that portion of the Mortgaged Property located in the States of Texas or Mississippi, or which are located within (or cover or relate to properties located within) the Outer Continental Shelf or other offshore area adjacent to the States of Texas or Mississippi over which the United States of America asserts jurisdiction and to which the laws of the States of Texas or Mississippi are applicable with respect to this Mortgage and/or the Liens or security interests created hereby.

"<u>Event of Default</u>" has the meaning ascribed to such term in <u>Section 5.1</u>.

"<u>Fixture</u>" means any Oil and Gas Property, fixtures or immovable properties which as a result of being incorporated into realty or structures or improvements located therein or thereon, with the intent that they remain there permanently, constitute fixtures or immovable properties under the laws applicable where such Oil and Gas Property is located.

"<u>Future Advances</u>" means future obligations and future advances that the Mortgagee or any Secured Party may make pursuant to any Secured Transaction Document.

"<u>Hydrocarbon Interests</u>" means all rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to the oil and gas leases, oil, gas and mineral leases, wellbore interests, and/or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, and other interests and estates and the lands and premises covered or affected thereby, including any reserved or residual interests of whatever nature, in each case, that are described on <u>Exhibit A</u> (or in any instrument or document described or referred to in <u>Exhibit A</u>).

2

"Hydrocarbons" means all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals that may be produced and saved from or attributable to the Oil and Gas Properties, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests or other properties constituting Oil and Gas Properties.

"Indemnified Parties" means the Trustee, the Mortgagee, each Secured Party and their Related Parties.

"Mortgaged Property" means the Oil and Gas Properties and other properties and assets described in Section 2.1(a) through Section 2.1(f).

"Obligations" has the meaning assigned to such term in Section 2.3.

"Oil and Gas Properties" means (a) the Hydrocarbon Interests; (b) the properties now or hereafter pooled or unitized with the Hydrocarbon Interests; (c) all presently existing or future unitization, communitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules or other official acts of any Governmental Authority and units created solely among working interest owners pursuant to operating agreements or otherwise) that may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including, without limitation, production sharing contracts and agreements, production sales contracts, farmout agreements, farm-in agreements, area of mutual interest agreements, and equipment leases, described or referred to in this Mortgage or that relate to any of the Hydrocarbon Interests or interests in the Hydrocarbon Interests or the production, sale, purchase, exchange, processing, handling, storage, transporting or marketing of the Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, the lands pooled or unitized therewith and the Mortgagor's interests therein, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, the lands pooled or unitized therewith and the Mortgagor's interests therein; and (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, the rights, titles, interests and estates described or referred to above, that are now owned or that are hereafter acquired by the Mortgagor, including, without limitation, any and all property, real or personal, immoveable or moveable, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property or the lands pooled or unitized therewith, including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants, pipeline systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements, servitudes, licenses and other surface and subsurface rights, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Mortgaged Properties" means that portion of the Mortgaged Property

HOU 3972706v13

located in the States of Alabama or Louisiana, or which are located within (or cover or relate to properties located within) the Outer Continental Shelf or other offshore area adjacent to the States of Alabama or Louisiana over which the United States of America asserts jurisdiction and to which the laws of the States of Alabama or Louisiana are applicable with respect to this Mortgage and/or the Liens or security interests created hereby.

"Permitted Encumbrances" means "Permitted Liens" as such term is defined in the Loan Agreement.

"Termination Date" shall mean the date on which all Obligations are paid or, as applicable, performed in full.

"Trustee" means [_____] of Apache Corporation whose address for notice hereunder is c/o Apache Corporation, 2000 Post Oak Boulevard, Suite 100, Houston, TX 77056, and any successors and substitutes in trust hereunder.

"UCC Collateral" means the property and other assets described in Section 2.2.

SECTION 2
GRANT OF LIEN AND OBLIGATIONS

2.1.   Grant of Liens. To secure payment of the Obligations when due, the Mortgagor does by these presents hereby:

GRANT, BARGAIN, SELL, WARRANT, MORTGAGE, ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE and CONVEY to the Trustee WITH A POWER OF SALE, for the use and benefit of the Mortgagee and the Secured Parties, all of the following properties, rights and interests relating to the Deed of Trust Properties; and

GRANT, BARGAIN, SELL, CONVEY, MORTGAGE, ASSIGN, WARRANT, PLEDGE AND HYPOTHECATE to Mortgagee, with mortgage covenants, and upon the statutory mortgage condition for the breach of which this Mortgage may be subject to foreclosure as provided by law, and grant to Mortgagee a POWER OF SALE (pursuant to this Mortgage and applicable law) with respect to, all of the following properties, rights and interests relating to the Other Mortgaged Properties:

(a)      All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to the Oil and Gas Properties.

(b)      All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to all geological, geophysical, engineering, accounting, title and other technical or business data concerning the Oil and Gas Properties or the Hydrocarbons, and all books, files, records, magnetic media, computer records and other forms of recording or obtaining access to such data.

4

(c)  All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to all Hydrocarbons.

(d)  Any property that may from time to time hereafter, by delivery or by writing of any kind, be subjected to the Liens hereof by the Mortgagor or by anyone on the Mortgagor's behalf; and the Trustee and/or the Mortgagee are hereby authorized to receive the same at any time as additional security hereunder.

(e)  All of the rights, titles and interests of every nature whatsoever now owned or hereafter acquired by the Mortgagor in and to the Oil and Gas Properties and all other rights, titles, interests and estates and every part and parcel thereof, including, without limitation, any rights, titles, interests and estates as the same may be enlarged by the discharge of any payments out of production or by the removal of any charges or Permitted Encumbrances to which any of such Oil and Gas Properties or other rights, titles, interests or estates are subject or otherwise; all rights of the Mortgagor to Liens securing payment of proceeds from the sale of production from any of such Oil and Gas Properties, together with any and all renewals and extensions of any of such related rights, titles, interests or estates; all contracts and agreements supplemental to or amendatory of or in substitution for the contracts and agreements described or mentioned above; and any and all additional interests of any kind hereafter acquired by the Mortgagor in and to such related rights, titles, interests or estates.

(f)  All of the Mortgagor's rights, titles and interests in and to all surface fees and fee estates described in Exhibit A (or in any instrument or document described or referred to in Exhibit A), if any, compressor sites, settling ponds, equipment or pipe yards, office sites and all property and fixtures located thereon, whether such surface fees, fee estates, compressor sites, settling ponds, equipment or pipe yards, office sites, office buildings, fee simple estates, leasehold estates or otherwise, together with all present and future rights, titles, easements and estates now owned or hereafter acquired by the Mortgagor under or in connection with such interest.

TO HAVE AND TO HOLD (i) the Deed of Trust Properties unto Trustee, and its successors or substitutes in this trust, and to its or their successors and assigns, in trust, for the benefit of the Mortgagee, as agent for the Mortgagee and Secured Parties, however, upon the terms, provisions and conditions herein set forth, and (ii) the Other Mortgaged Properties unto Mortgagee, and Mortgagee's successors and assigns, for the ratable benefit of the Mortgagee and Secured Parties, upon the terms, provisions and conditions herein set forth.

It is the intention of the Mortgagor and the Mortgagee herein to cover and affect hereby all interests that the Mortgagor may now own or may hereafter acquire in and to the interests and Oil and Gas Properties described on Exhibit A (or in any instrument or document described or referred to in Exhibit A), even though the Mortgagor's interests or the property be incorrectly described on Exhibit A (or in any instrument or document described or referred to in Exhibit A) or a description of a part or all of the interests or property described on Exhibit A (or in any instrument or document described or referred to in Exhibit A) or the Mortgagor's interests therein be omitted, and notwithstanding that the interests as specified on Exhibit A (or in any instrument or document described or referred to in Exhibit A) may be limited to particular lands, specified depths or particular types of property interests.

5

2.2.    <u>Grant of Security Interest</u>. To further secure payment of the Obligations when due, the Mortgagor hereby grants to the Mortgagee, for its benefit and the benefit of the Secured Parties, a security interest in and to all of the following (whether now or hereafter acquired by operation of law or otherwise):

(a)    all As-Extracted Collateral from or attributable to the Oil and Gas Properties;

(b)    all Fixtures on the Mortgaged Property described or to which reference is made herein or on <u>Exhibit A</u>; and

(c)    to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing.

2.3.    <u>Obligations</u>. This Mortgage is executed and delivered by the Mortgagor to secure the payment and performance when due of the following (the "<u>Obligations</u>"):

(a)    the Secured Obligations;

(b)    all sums advanced or costs or expenses incurred by Mortgagee, any of the Secured Parties, or the Related Parties of the Mortgagee or such Secured Party (whether by it directly or on its behalf by the Trustee), which are made or incurred pursuant to, or allowed by, the terms of this Mortgage plus interest thereon from the date of the advance or incurrence until reimbursement of Mortgagee, such Secured Party, or such Related Party charged at a per annum rate equal to the maximum nonusurious interest rate under applicable law; and

(c)    all renewals, extensions, modifications, amendments, rearrangements and substitutions of all or any part of the above whether or not Mortgagor or any other obligor thereof executes any agreement or instrument.

2.4.    <u>Fixture Filing, Etc.</u> Without in any manner limiting the generality of any of the other provisions of this Mortgage: (i) some portions of the goods described or to which reference is made herein are or are to become Fixtures on the land described or to which reference is made herein or on <u>Exhibit A</u>; (ii) the security interests created hereby under applicable provisions of the Applicable UCC will attach to all As-Extracted Collateral and all other Hydrocarbons; (iii) this Mortgage is to be filed of record in the real estate records or other appropriate records as a financing statement; and (iv) the Mortgagor is the record owner of the real estate or interests in the real estate or immoveable property comprised of the Mortgaged Property.

2.5.    <u>Pro Rata Benefit</u>. This Mortgage is executed and granted for the pro rata benefit and security of the Mortgagee and the Secured Parties to secure the Obligations for so long as same remains unsatisfied or unpaid, as applicable, and thereafter until the Termination Date.

2.6.    <u>Excluded Properties</u>. Notwithstanding anything herein to the contrary, in no event shall the Mortgaged Property include, and the Mortgagor shall not be deemed to have granted a Lien under this Mortgage in, any of the Mortgagor's right, title or interest in any of the following property but only to the extent such property constitutes personal property (collectively, "<u>Excluded</u>

6

Property"), and for the avoidance of doubt, Excluded Property shall not include real or immovable property, including the Hydrocarbon Interests, Hydrocarbons, or As-Extracted Collateral or Fixtures:

(a)     any permit or license or any Contractual Obligation of Mortgagor (i) that prohibits or requires the consent of any Person other than Mortgagor or any Affiliate of Mortgagor which has not been obtained as a condition to the creation by Mortgagor of a Lien on any right, title, or interest in such permit, license, or Contractual Obligation or (ii) to the extent that any Requirement of Law applicable thereto prohibits the creation of a Lien thereon, but only to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the Applicable UCC or any other Requirement of Law; provided, however, Excluded Property shall not include any proceeds, products, substitutions, or replacements of Excluded Property (unless such proceeds, products, substitutions, or replacements would otherwise constitute Excluded Property); or

(b)     any personal property constituting "Excluded Property" as such term is defined in the Security Agreement.

2.7.    Maturity. The Obligations have a maximum maturity date of the tenth (10th) anniversary of the Effective Date, subject to the terms and conditions of the Loan Agreement, including without limitation, (a) Lender's right to decline to extend the maturity date of the Obligations beyond the fifth (5th) anniversary date of the Effective Date and each such anniversary date thereafter, (b) earlier termination of the Decommissioning Agreement, and (c) rights of acceleration or prepayment.

2.8.    Loans; Maximum Amount.

(a)     As to all Mortgaged Property, including without limitation, such Mortgaged Property located in the State of Louisiana, or located within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such State are applicable, the Obligations secured by such Mortgaged Property shall not, at any time or from time to time, exceed an aggregate maximum amount of $2,000,000,000.

(b)     As to all other Mortgaged Property the Mortgagor declares that the principal amount of all loans that the Lender has committed to advance on the date hereof shall not exceed $200,000,000, as such amount may be increased with Lender's approval pursuant to the Loan Agreement to $400,000,000.

SECTION 3
ASSIGNMENT OF AS-EXTRACTED COLLATERAL

3.1.    Assignment.

(a)     The Mortgagor has absolutely and unconditionally assigned, transferred, conveyed and granted a security interest, and does hereby absolutely and unconditionally assign, transfer, convey and grant a security interest, to the Mortgagee, for its benefit and the benefit of the Secured Parties in and to the property described in Sections 2.1 and 2.2, including, without

7

limitation, all of its As-Extracted Collateral from or attributable to the Oil and Gas Properties and all of the revenue and proceeds now and hereafter attributable to such Oil and Gas Properties.

(b)     If an Event of Default shall occur and only for so long as such event shall be continuing, after written notice is provided to the Mortgagor by the Mortgagee, and to the extent permitted by applicable law:

(i)     All Hydrocarbons and products thereof shall be delivered into pipe lines connected with the Mortgaged Property, or to the purchaser thereof, to the credit of the Mortgagee, for its benefit and the benefit of the Secured Parties and all such revenues and proceeds thereof shall be paid directly to the Mortgagee, at its offices as designated by Mortgagee from time to time, with no duty or obligation of any party paying the same to inquire into the rights of the Mortgagee to receive the same, what application is made thereof, or as to any other matter;

(ii)     The Mortgagor agrees to perform all such acts, and to execute all such further assignments, transfers and division orders and other instruments as may be reasonably required or desired by the Mortgagee, after receipt of a written request from the Mortgagee, in order to have said proceeds and revenues so paid to the Mortgagee and, in addition to any and all rights of a secured party under Sections 9-607 and 9-609 of the Applicable UCC, the Mortgagee is fully authorized to receive and receipt for said revenues and proceeds, to endorse and cash any and all checks and drafts payable to the order of the Mortgagor or the Mortgagee for the account of the Mortgagor received from or in connection with said revenues or proceeds and to hold the proceeds thereof in a Deposit Account of the Mortgagee, Secured Party, or any Related Party at an acceptable commercial bank at Mortgagee's selection as additional collateral securing the Obligations, and to execute transfer and division orders in the name of the Mortgagor, or otherwise, with warranties binding the Mortgagor (all proceeds received by the Mortgagee pursuant to this grant and assignment shall be applied as provided in Section 5.14);

(iii)     The Mortgagee shall not be liable for any delay, neglect or failure to effect collection of any proceeds or to take any other action in connection therewith or hereunder, but the Mortgagee shall have the right, at its election after written notice is provided to the Mortgagor, in the name of the Mortgagor or otherwise, to prosecute and defend any and all actions or legal proceedings deemed advisable by the Mortgagee in order to collect such funds and to protect the interests of the Mortgagee and/or the Mortgagor, with all costs, expenses and attorneys' fees incurred in connection therewith being paid by the Mortgagor; and

(iv)     The Mortgagor hereby appoints the Mortgagee as its attorney-in-fact to pursue any and all rights of the Mortgagor to Liens in the Hydrocarbons securing payment of proceeds of runs attributable to the Hydrocarbons, which power of attorney shall be coupled with an interest and shall be irrevocable until the Termination Date.

(c)     The Mortgagor does hereby specifically agree that third-parties shall be entitled to rely, and shall be fully protected in relying, upon any written notice by the Mortgagee that an Event of Default has occurred and is continuing for the purposes of clause (b) above.

3.2.     No Modification of Payment Obligations. Nothing herein contained shall modify or otherwise alter the obligation of the Mortgagor to make prompt payment of all amounts

constituting Obligations when and as the same become due regardless of whether the proceeds of the As-Extracted Collateral and Hydrocarbons are sufficient to pay the same and the rights provided in accordance with the foregoing assignment provision shall be cumulative of all other security of any and every character now or hereafter existing to secure payment of the Obligations. Nothing in <u>Section 3.1</u> or this <u>Section 3.2</u> is intended to be an acceptance of Collateral in satisfaction of the Obligations.

SECTION 4
REPRESENTATIONS, WARRANTIES AND COVENANTS

The Mortgagor hereby represents, warrants and covenants as follows:

4.1.    <u>Title</u>. The Mortgagor has good and defensible title to and is possessed of the Hydrocarbon Interests and has good title to the UCC Collateral. The Collateral is free of all Liens except Permitted Encumbrances.

4.2.    <u>Defend Title</u>. This Mortgage is, and always will be kept, as a first priority Lien upon the Collateral, subject to the Permitted Encumbrances. The Mortgagor will not create or suffer to be created or permit to exist any Lien, security interest or charge prior or junior to or on a parity with the Lien of this Mortgage upon the Collateral or any part thereof other than Permitted Encumbrances. Subject to any Permitted Encumbrances, the Mortgagor will warrant and defend the title to the Collateral against the claims and demands of all other Persons whomsoever and will maintain and preserve the Lien created hereby (and its priority) until the Termination Date. If (i) an adverse claim be made against or a cloud develop upon the title to any part of the Collateral other than a Permitted Encumbrance or (ii) any Person shall challenge the priority or validity of the Liens created by this Mortgage, then the Mortgagor agrees to defend immediately against such adverse claim or take appropriate action to remove such cloud, in each case, at the Mortgagor's sole cost and expense. The Mortgagor further agrees that the Trustee and/or the Mortgagee may take such other action as they deem advisable to protect and preserve their interests in the Collateral, and in such event the Mortgagor will indemnify the Trustee and/or the Mortgagee against any and all cost, attorneys' fees and other expenses that they may incur in defending against any such adverse claim or taking action to remove any such cloud. For the avoidance of doubt, <u>Section 4.1</u> and this <u>Section 4.2</u> shall not restrict, and are subject to, any disposition permitted by the Loan Agreement.

4.3.    <u>Not a Foreign Person</u>. The Mortgagor is not a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e., the Mortgagor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and any regulations promulgated thereunder).

4.4.    <u>Excluded Properties</u>. Except as set forth on <u>Schedule 4.4</u>, the Mortgagor does do not own or have any right, title, or interest in any Excluded Property.

SECTION 5
RIGHTS AND REMEDIES

5.1.    <u>Event of Default</u>. An Event of Default under the Loan Agreement shall be an "<u>Event of Default</u>" under this Mortgage.

9

5.2.   Foreclosure and Sale.

(a)      If an Event of Default shall occur and be continuing, to the extent provided by applicable Requirement of Law, the Mortgagee shall have the right and option to proceed with foreclosure by directing the Trustee to proceed with foreclosure and to sell all or any portion of such Mortgaged Property at one or more sales, as an entirety or in parcels, at such place or places in otherwise such manner and upon such notice as may be required by law, or, in the absence of any such requirement, as the Mortgagee may deem appropriate, and to make conveyance to the purchaser or purchasers. Where the Mortgaged Property is situated in (or adjacent to, in the case of offshore properties) more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by law), and all such Mortgaged Property may be sold in any such jurisdiction and any such notice shall designate the jurisdiction where such Mortgaged Property is to be sold. Nothing contained in this Section 5.2 shall be construed so as to limit in any way any rights to sell the Mortgaged Property or any portion thereof by private sale if and to the extent that such private sale is permitted under the Requirement of Law of the applicable jurisdiction or by public or private sale after entry of a judgment by any court of competent jurisdiction so ordering. The Mortgagor hereby irrevocably appoints, effective upon the occurrence and during the continuance of an Event of Default, the Trustee and the Mortgagee, with full power of substitution, to be the attorney-in-fact of the Mortgagor and in the name and on behalf of the Mortgagor to execute and deliver any deeds, transfers, conveyances, assignments, assurances and notices that the Mortgagor ought to execute and deliver and do and perform any and all such acts and things that the Mortgagor ought to do and perform under the covenants herein contained and generally, to use the name of the Mortgagor in the exercise of all or any of the powers hereby conferred on the Trustee and/or the Mortgagee. At any such sale: (i) whether made under the power herein contained or any other legal enactment, or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for the Trustee or the Mortgagee, as appropriate, to have physically present, or to have constructive possession of, the Mortgaged Property (the Mortgagor hereby covenanting and agreeing to deliver any portion of the Mortgaged Property not actually or constructively possessed by the Trustee or the Mortgagee immediately upon the Mortgagee's demand) and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually present and delivered to purchaser at such sale, (ii) each instrument of conveyance executed by the Trustee or the Mortgagee shall contain a special warranty of title, binding upon the Mortgagor and its successors and assigns, (iii) each and every recital contained in any instrument of conveyance made by the Trustee or the Mortgagee shall conclusively establish the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law and appointment of any successor trustee hereunder, (iv) any and all prerequisites to the validity thereof shall be conclusively presumed to have been performed, (v) the receipt of the Trustee, Mortgagee or of such other party or officer making the sale shall be a sufficient discharge to the purchaser or purchasers for its purchase money and no such purchaser or purchasers, or its assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money, or be in any way answerable for any loss, misapplication or nonapplication thereof, (vi) to the fullest extent permitted by law, the Mortgagor shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against the Mortgagor, and against any and all other persons claiming or to claim the property sold or any part thereof, by,

10

through or under the Mortgagor, and (vii) to the extent and under such circumstances as are permitted by law, the Mortgagee may be a purchaser at any such sale, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the Obligations (in the order of priority set forth in <u>Section 5.14</u>) in lieu of cash payment.

(b)     If an Event of Default shall occur and be continuing, then (i) the Mortgagee shall be entitled to all of the rights, powers and remedies afforded a secured party by the Applicable UCC with reference to the UCC Collateral and/or (ii) the Trustee or the Mortgagee may proceed as to any Collateral in accordance with the rights and remedies granted under this Mortgage or applicable law in respect of the Collateral. Such rights, powers and remedies shall be cumulative and in addition to those granted to the Trustee or the Mortgagee under any other provision of this Mortgage or under any other Loan Document or Secured Transaction Document. Written notice mailed to the Mortgagor as provided herein at least ten (10) days prior to the date of public sale of any part of the Collateral that is personal property subject to the provisions of the Applicable UCC, or prior to the date after which private sale of any such part of the Collateral will be made, shall constitute reasonable notice.

(c)     Cumulative of the foregoing and the other provisions of this <u>Section 5.2</u>:

(i)     <u>State of Texas</u>: As to any portion of the Deed of Trust Properties located in the State of Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), such sales of all or any part of such Deed of Trust Properties shall be conducted within any county (whether or not the counties in which such Deed of Trust Properties are located are contiguous) in the State of Texas in which any part of such Deed of Trust Properties is situated or which lies shoreward of any Deed of Trust Property (i.e., to the extent a particular Deed of Trust Mortgaged Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), in accordance with the provisions of Chapter 51 of the Texas Property Code (or any successor statutes of the State of Texas then in force governing sales of real estate under powers conferred by deed of trust), after having given notice of such sale in accordance with such statutes.

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW TRUSTEE TO TAKE THE MORTGAGED PROPERTIES AND SELL THEM WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON A DEFAULT BY MORTGAGOR UNDER THIS MORTGAGE.**

(ii)     <u>State of Louisiana</u>: As to any portion of the Other Mortgaged Properties located in the State of Louisiana (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), Mortgagee may foreclose this Mortgage by executory process, or any other process, subject to, and on the terms and conditions required or permitted by, applicable law, and shall have the right to appoint a keeper of such Other Mortgaged Properties. Solely for purposes of Louisiana executory process, Mortgagor acknowledges the Obligations, whether now existing or to arise hereafter, and for

11

Mortgagor, Mortgagor's personal representatives, successors and assigns, hereby confesses judgment for the full amount of the Obligations in favor of the Mortgagee for the benefit of the Mortgagee and Secured Parties. Mortgagor further agrees that Mortgagee may cause all or any part of the applicable Other Mortgaged Properties to be seized and sold after due process of law, Mortgagor waiving the benefit of all laws or parts of laws relative to the appraisement of property seized and sold under executory process or other legal process, and consenting that all or any part of such Other Mortgaged Properties may be sold without appraisement, either in its entirety or in lots and parcels, as Mortgagee may determine, to the highest bidder for cash or on such terms as the plaintiff in such proceedings may direct. Mortgagor hereby waives (i) the benefit of appraisement provided for in articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure and all other laws conferring the same; (ii) the notice of seizure provided for in articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iii) the three (3) days delay provided for in articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (iv) all other laws providing rights of notice, demand, appraisement, or delay. Mortgagor expressly authorizes and agrees that Mortgagee shall have the right to appoint a keeper of such Other Mortgaged Properties pursuant to the terms and provisions of La. R.S. 9:5131 et seq. and La. R.S. 9:5136 et seq., which keeper may be Mortgagee, any agent or employee thereof, or any other person, firm, or corporation. Compensation for the services of the keeper is hereby fixed at five percent (5%) of the amount due or sued for or claimed or sought to be protected, preserved, or enforced in the proceeding for the recognition or enforcement of this Mortgage and shall be secured by the Liens and security interests of this Mortgage.

(iii)    State of Mississippi: As to any portion of the Deed of Trust Properties located in the State of Mississippi (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), any sale of any part of such Deed of Trust Properties shall be made after having published notice of the day, time, place and terms of sale in a newspaper published in the county in which the Deed of Trust Property is situated or which lies shoreward of such Deed of Trust Properties (i.e. to the extent a particular Deed of Trust Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), or, if none is so published, in some paper having a general circulation therein, for three consecutive weeks preceding the date of sale; and by posting one notice of such sale at the courthouse of such county for said period of time. Trustee shall have the power to select the county or judicial district in which the sale shall be made, newspaper advertisement published, and notice of sale posted in the event the Deed of Trust Property is located in, or lies seaward from, more than one county or in two judicial districts in the same county. Trustee in said trust shall have the full power to fix the day, time, place and terms of sale and may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices in the conduct of the sale but in the name of and on behalf of Trustee, his substitute or successor. In connection with the foregoing, Mortgagor waives the provisions of Section 89-1-55 of the Mississippi Code of 1972, recompiled and laws amendatory thereto, if any, as far as said section restricts the right of Trustee to offer at sale more than 160 acres at one time and Trustee may, in his discretion, offer the Mortgaged Property as a whole or in such part or parts as he may deem desirable regardless of the manner in which it may be described. Any sale made by Trustee hereunder may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. Mortgagor also waives the provisions of Section 89-1-59 of the Mississippi Code of 1972,

12

recompiled and laws amendatory thereto, insofar as said section allows Mortgagor to reinstate an accelerated debt. Subject to the requirement under Section 89-5-45 of the Mississippi Code of 1972 which requires that an appointment be recorded prior to the commencement of foreclosure proceedings, if Trustee shall have given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

(iv)     State of Alabama: As to any portion of the Other Mortgaged Properties located in the State of Alabama (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), expenses of retaking, holding, preparing for sale, selling or the like shall be borne by Mortgagor and shall include Mortgagee's attorney's fees and legal expenses, all of which shall be secured by this Mortgage. Upon the occurrence of an Event of Default, Mortgagee shall have the right to cause any of the Other Mortgaged Properties which are subject to the security interest of Mortgagee hereunder to be sold at any one or more public or private sales as permitted by applicable law. Any such disposition may be conducted by an employee or agent of the Mortgagee. Any person, including Mortgagor or Mortgagee, shall be eligible to purchase any part or all of such property at any such sale. Mortgagee shall give Mortgagor at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such property or of the time of or after which any private sale or other intended disposition is to be made, and if such notice is sent to the Mortgagor as provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notification to Mortgagor. Notwithstanding any contrary provision in this Mortgage, the Decommissioning Agreement, or any of the other Secured Transaction Documents, if an Event of Default shall have occurred, this Mortgage shall be subject to foreclosure and may be foreclosed as now provided by law in the case of past-due mortgages; and the Mortgagee shall be authorized to take possession of the Other Mortgaged Property and, after giving at least twenty-one (21) days' notice of the time, place and terms of sale by publication once a week for three consecutive weeks in some newspaper published in the county in which the Other Mortgaged Property is situated or which lies shoreward of such Other Mortgaged Property (i.e. to the extent a particular Other Mortgaged Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), to sell the Other Mortgaged Property in front of the courthouse door of said county, at public outcry, to the highest bidder for cash, and to apply the proceeds of such sale as specified herein. The Mortgagor agrees that the Mortgagee may bid at any sale had under the terms of this Mortgage and may purchase the Other Mortgaged Properties if the highest bidder therefor. At the foreclosure sale the Other Mortgaged Properties may be offered for sale and sold as a whole without first offering it in any other manner or it may be offered for sale and sold in any other manner the Mortgagee may elect. The power of sale granted herein is a continuing power and shall not be fully exercised until all of the Other Mortgaged Properties not previously sold shall have been sold or all of the secured indebtedness and other obligations secured hereby have been satisfied in full.

5.3.     Substitute Trustees and Agents. The Trustee or Mortgagee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee or Mortgagee, including the posting of notices and the conduct of sale, but in the name and on behalf of the Trustee or Mortgagee. If the Trustee or Mortgagee shall have given notice of sale hereunder, any successor or substitute trustee or mortgagee agent thereafter

13

appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute trustee or mortgagee agent conducting the sale.

5.4.     Judicial Foreclosure; Receivership. Upon the occurrence of and during the continuance of an Event of Default, the Mortgagee shall have the right and power to proceed by a suit or suits in equity or at law, whether for the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, or for any foreclosure hereunder or for the sale of the Collateral under the judgment or decree of any court or courts of competent jurisdiction, or for the appointment of a receiver pending any foreclosure hereunder or the sale of the Collateral under the order of a court or courts of competent jurisdiction or under executory or other legal process, or for the enforcement of any other appropriate legal or equitable remedy.

5.5.     Foreclosure for Installments. Upon the occurrence of and during the continuance of an Event of Default, the Mortgagee shall also have the option to proceed with foreclosure in satisfaction of any installments of the Obligations that have not been paid when due either through the courts or by directing the Trustee to proceed with foreclosure in satisfaction of the matured but unpaid portion of the Obligations as if under a full foreclosure, conducting the sale as herein provided and without declaring the entire principal balance and accrued interest and other Obligations then due; such sale may be made subject to the unmatured portion of the Obligations, and any such sale shall not in any manner affect the unmatured portion of the Obligations, but as to such unmatured portion of the Obligations this Mortgage shall remain in full force and effect just as though no sale had been made hereunder. It is further agreed that upon the occurrence of and during the continuance of an Event of Default, several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Obligations, it being the purpose hereof to provide for a foreclosure and sale of the security for any matured portion of the Obligations without exhausting the power to foreclose and sell the Mortgaged Property for any subsequently maturing portion of the Obligations.

5.6.     Separate Sales. Upon the occurrence of and during the continuance of an Event of Default, the Collateral may be sold in one or more parcels and to the extent permitted by applicable Requirement of Law in such manner and order as the Mortgagee, in its sole discretion, may elect, it being expressly understood and agreed that the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

5.7.     Possession of Mortgaged Property. If an Event of Default shall have occurred and be continuing, then, to the extent permitted by applicable law, the Trustee or the Mortgagee shall have the right and power to enter into and upon and take possession of all or any part of the Collateral in the possession of the Mortgagor, its successors or assigns, or its or their agents or servants, and may exclude the Mortgagor, its successors or assigns, and all persons claiming under the Mortgagor, and its or their agents or servants wholly or partly therefrom; and, holding the same, the Mortgagee may use, administer, manage, operate and control the Collateral and conduct the business thereof to the same extent as the Mortgagor, its successors or assigns, might at the time do and may exercise all rights and powers of the Mortgagor, in the name, place and stead of the Mortgagor, or otherwise as the Mortgagee shall deem best.

14

5.8.    Occupancy After Foreclosure. In the event there is a foreclosure sale hereunder and at the time of such sale the Mortgagor or the Mortgagor's heirs, devisees, representatives, successors or assigns or any other person claiming any interest in the Collateral by, through or under the Mortgagor, are occupying or using the Mortgaged Property or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either the landlord or tenant, or at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; to the extent permitted by applicable law, the purchaser at such sale shall, notwithstanding any language herein apparently to the contrary, have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the Mortgaged Property (such as an action for forcible entry and detainer) in any court having jurisdiction. Furthermore, notice of termination by the Trustee or the Mortgagee to the Mortgagor shall be deemed to be written demand for the premises pursuant to Ala. Code Section 6-5-233.

5.9.    Remedies Cumulative, Concurrent and Nonexclusive. Every right, power, privilege and remedy herein given to the Trustee or the Mortgagee shall be cumulative and in addition to every other right, power and remedy herein specifically given or now or hereafter existing in equity, at law or by statute (including specifically those granted by the Applicable UCC in effect and applicable to the Collateral or any portion thereof). Each and every right, power, privilege and remedy whether specifically herein given or otherwise existing may be exercised from time to time and so often and in such order as may be deemed expedient by the Trustee or the Mortgagee, and the exercise, or the beginning of the exercise, or the abandonment, of any such right, power, privilege or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter any other right, power, privilege or remedy. No delay or omission by the Trustee or the Mortgagee or any Secured Party in the exercise of any right, power or remedy shall impair any such right, power, privilege or remedy or operate as a waiver thereof or of any other right, power, privilege or remedy then or thereafter existing.

5.10.    Discontinuance of Proceedings. If the Trustee or the Mortgagee shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under any Loan Document or Secured Transaction Document or available at law and shall thereafter elect to discontinue or abandon same for any reason, then it shall have the unqualified right so to do and, in such an event, the parties shall be restored to their former positions with respect to the Obligations, this Mortgage, the Loan Agreement, the Collateral and otherwise, and the rights, remedies, recourses and powers of the Trustee and the Mortgagee, as applicable, shall continue as if same had never been invoked.

5.11.    No Release of Obligations. Neither the Mortgagor nor any other Person hereafter obligated for payment of all or any part of the Obligations shall be relieved of such obligation, to the extent the Obligations remain due and owing, by reason of: (a) the release, regardless of consideration, of the Mortgaged Property or any portion thereof or interest therein or the addition of any other property to the Mortgaged Property; (b) any agreement or stipulation between any subsequent owner of the Mortgaged Property and the Mortgagee extending, renewing, rearranging or in any other way modifying the terms of this Mortgage without first having obtained the consent of, given notice to or paid any consideration to the Mortgagor or such other Person, and in such

15

event the Mortgagor and all such other Persons shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged in writing by the Mortgagee; or (c) by any other act or occurrence save and except upon the Termination Date.

5.12.   <u>Release of and Resort to Collateral</u>. The Mortgagee may release, regardless of consideration, any part of the Collateral without, as to the remainder, in any way impairing, affecting, subordinating or releasing the Lien created in or evidenced by this Mortgage or its stature as a prior Lien, in and to the Collateral, provided that Permitted Encumbrances may exist, and without in any way releasing or diminishing the liability of any Person liable for the repayment of the Obligations. For payment of the Obligations, the Mortgagee may resort to any other security therefor held by the Mortgagee in such order and manner as the Mortgagee may elect.

5.13.   <u>Waiver of Redemption, Notice and Marshalling of Assets, Etc.</u> To the fullest extent permitted by law, the Mortgagor hereby irrevocably and unconditionally waives and releases (a) all benefits that might accrue to the Mortgagor by virtue of any present or future moratorium law or other law exempting the Collateral from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment and (b) any right to a marshalling of assets or a sale in inverse order of alienation. If any law referred to in this Mortgage and now in force, of which the Mortgagor or its successor or successors might take advantage despite the provisions hereof, shall hereafter be repealed or cease to be in force, such law shall thereafter be deemed not to constitute any part of the contract herein contained or to preclude the operation or application of the provisions hereof. If the laws of any state that provides for a redemption period do not permit the redemption period to be waived, the redemption period shall be specifically reduced to the minimum amount of time allowable by statute.

5.14.   <u>Application of Proceeds</u>. The proceeds of any sale of the Mortgaged Property or any part thereof and all other monies received in any proceedings for the enforcement hereof or otherwise, whose application has not elsewhere herein been specifically provided for, shall be applied:

(a)      First, to the payment of all reasonable expenses incurred by the Trustee or the Mortgagee incident to the enforcement of this Mortgage, the Loan Agreement, or any other Loan Document or Secured Transaction Document to collect any portion of the Obligations, including expenses of any entry or taking of possession, of any sale, of advertisement thereof, and of conveyances, and court costs, compensation of agents and employees, a reasonable commission to the Trustee acting and reasonable legal fees, and to the payment of all other reasonable charges, expenses, liabilities and advances incurred or made by the Trustee or the Mortgagee under this Mortgage or in executing any trust or power hereunder; and

(b)      Second, as set forth in the Loan Agreement.

5.15.   <u>Resignation of Operator</u>. In addition to all rights and remedies under this Mortgage, at law and in equity, if any Event of Default shall occur and be continuing and the Trustee or the Mortgagee shall exercise any remedies under this Mortgage with respect to any portion of the Mortgaged Property (or the Mortgagor shall transfer any Mortgaged Property "in lieu of"

16

foreclosure) whereupon the Mortgagor is divested of its title to any of the Collateral, the Mortgagee shall have the right to request that any operator of any Mortgaged Property that is either the Mortgagor or any Affiliate of the Mortgagor to resign as operator under the joint operating agreement applicable thereto, and no later than 60 days after receipt by the Mortgagor of any such request, the Mortgagor shall resign (or, to the extent it is able to do so, cause such other Person to resign) as operator of such Collateral.

5.16.   Indemnity.  THE INDEMNIFIED PARTIES SHALL NOT BE LIABLE, IN CONNECTION WITH ANY ACTION TAKEN, FOR ANY LOSS SUSTAINED BY THE MORTGAGOR RESULTING FROM AN ASSERTION THAT THE MORTGAGEE HAS RECEIVED FUNDS FROM THE PRODUCTION OF HYDROCARBONS CLAIMED BY THIRD PERSONS OR ANY ACT OR OMISSION OF ANY INDEMNIFIED PARTY IN ADMINISTERING, MANAGING, OPERATING, OR CONTROLLING THE MORTGAGED PROPERTY **INCLUDING SUCH LOSS THAT MAY RESULT FROM THE ORDINARY NEGLIGENCE OF AN INDEMNIFIED PARTY** UNLESS SUCH LOSS IS CAUSED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE INDEMNIFIED PARTY SEEKING INDEMNITY OR ANY OF ITS RELATED PARTIES. NO INDEMNIFIED PARTY SHALL BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY, OR LIABILITY OF THE MORTGAGOR. EACH OF FIELDWOOD AND GOM AGREES TO PAY, SHALL INDEMNIFY THE INDEMNIFIED PARTIES FROM, AND HOLDS EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGEMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS', AUDITORS', AND ACCOUNTANTS' FEES) TO WHICH ANY OF THEM MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO PREPARATION, EXECUTION, AND DELIVERY OF THIS MORTGAGE, TO THE EXTENT THE MORTGAGOR WOULD BE REQUIRED TO DO SO PURSUANT TO (i) SECTION 8.03 OF THE LOAN AGREEMENT, (ii) THE DECOMMISSIONING AGREEMENT, OR (iii) ANY OTHER SECURED TRANSACTION DOCUMENT. EACH OF FIELDWOOD AND GOM AGREES TO PAY, SHALL INDEMNIFY THE INDEMNIFIED PARTIES FROM, AND HOLD EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGEMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS', AUDITORS', AND ACCOUNTANTS' FEES) TO WHICH ANY OF THEM MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO THE ENFORCEMENT, PERFORMANCE, AND ADMINISTRATION OF THIS MORTGAGE TO THE EXTENT THE MORTGAGOR WOULD BE REQUIRED TO DO SO PURSUANT TO (i) SECTION 8.03 OF THE LOAN AGREEMENT, (ii) THE DECOMMISSIONING AGREEMENT, OR (iii) ANY OTHER SECURED TRANSACTION DOCUMENT. THE LIABILITIES OF THE MORTGAGOR AS SET FORTH IN THIS SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS MORTGAGE.

5.17.   Failure to Perform.  The Mortgagor agrees that if it fails to perform any act or to take any action that it is required to perform or take hereunder or pay any money that the Mortgagor is required to pay hereunder, the Mortgagee, in the Mortgagor's name or its or their own name or names, may, but shall not be obligated to, perform or cause to perform such act or take such action or pay such money.

SECTION 6
THE TRUSTEE

6.1.    Duties, Rights, and Powers of Trustee. The Trustee shall have no duty to see to any recording, filing or registration of this Mortgage or any other instrument in addition or supplemental thereto, or to give any notice thereof, or to see to the payment of or be under any duty in respect of any tax or assessment or other governmental charge that may be levied or assessed on the Mortgaged Property, or any part thereof, or against the Mortgagor, or to see to the performance or observance by the Mortgagor of any of the covenants and agreements contained herein. The Trustee shall not be responsible for the execution, acknowledgment or validity of this Mortgage or of any instrument in addition or supplemental hereto or for the sufficiency of the security purported to be created hereby, and makes no representation in respect thereof or in respect of the rights of the Mortgagee. The Trustee shall have the right to consult with counsel upon any matters arising hereunder and shall be fully protected in relying as to legal matters on the advice of counsel. The Trustee shall not incur any personal liability hereunder except for the Trustee's own willful misconduct; and the Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine.

6.2.    Successor Trustee. The Trustee may resign by written notice addressed to the Mortgagee or be removed at any time with or without cause by an instrument in writing duly executed on behalf of the Mortgagee. In case of the death, resignation or removal of the Trustee, a successor may be appointed by the Mortgagee by instrument of substitution complying with any Requirement of Law, or, in the absence of any such requirement, without formality other than appointment and designation in writing. Written notice of such appointment and designation shall be given by the Mortgagee to the Mortgagor, but the validity of any such appointment shall not be impaired or affected by failure to give such notice or by any defect therein. Such appointment and designation shall be full evidence of the right and authority to make the same and of all the facts therein recited. Upon the making of any such appointment and designation, this Mortgage shall vest in the successor all the estate and title in and to all of the Mortgaged Property, and the successor shall thereupon succeed to all of the rights, powers, privileges, immunities and duties hereby conferred upon the Trustee named herein, and one such appointment and designation shall not exhaust the right to appoint and designate an additional successor but such right may be exercised repeatedly until the Termination Date has occurred. To facilitate the administration of the duties hereunder, the Mortgagee may appoint multiple trustees to serve in such capacity or in such jurisdictions as the Mortgagee may designate.

6.3.    Retention of Moneys. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and the Trustee shall be under no liability for interest on any moneys received by him hereunder.

SECTION 7

18

MISCELLANEOUS

7.1.    Releases.

(a)    Full Release. On the Termination Date, the Mortgagee shall forthwith cause satisfaction and discharge of this Mortgage to be entered upon the record at the expense of the Mortgagor and shall execute and deliver or cause to be executed and delivered such instruments of satisfaction and reassignment as may be reasonably necessary or desirable for the release of the Liens created hereby on the Mortgaged Property. Other than as set forth in the foregoing sentence, this Mortgage shall remain and continue in full force and effect and be binding in accordance with and to the extent of its terms upon the Mortgagor and the successors and assigns thereof and shall inure to the benefit of the Mortgagee and the Secured Parties and their respective successors, indorsees, transferees and assigns; notwithstanding that from time to time prior to the Termination Date, the Mortgagor may be free from any Obligations.

(b)    Other Releases. The Mortgagee, at the request and sole expense of the Mortgagor, shall promptly execute and deliver to the Mortgagor all releases, re-conveyances or other documents reasonably necessary or desirable for the release of the Liens created hereby on the Mortgaged Property, which shall include, without limitation, the agreement of the Mortgagee (on behalf of itself and on behalf of the Secured Parties) to release the security interests in, and the Liens on, the Collateral granted herein and created hereby, (i) upon any disposition by the Mortgagor of any Mortgaged Property (other than to each other or any subsidiary of Fieldwood or GOM) that is permitted under the Loan Agreement and (ii) to the extent that the Loan Agreement provides for such release with respect to the Mortgaged Property.

(c)    Possession of Notes. The Mortgagor acknowledges and agrees that possession of any promissory note issued to the Lender that evidences the Loans extended by the Lender to the Mortgagor (or any replacements of any said promissory note or other instrument evidencing any part of the Obligations) at any time by the Mortgagor or any other guarantor shall not in any manner extinguish the Obligations or this Mortgage, and the Mortgagor shall have the right to issue and reissue any of such promissory notes from time to time as its interest or as convenience may require, without in any manner extinguishing or affecting the Obligations or the Lien of this Mortgage.

7.2.    Severability. If any provision hereof is invalid or unenforceable in any jurisdiction, the other provisions hereof shall remain in full force and effect in such jurisdiction and the remaining provisions hereof shall be liberally construed in favor of the Mortgagee and the Secured Parties in order to effectuate the provisions hereof. The invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of any such provision in any other jurisdiction.

7.3.    Successors and Assigns. The terms used to designate any party or group of persons shall be deemed to include the respective heirs, legal representatives, successors and assigns of such Persons.

7.4.    Satisfaction of Prior Encumbrance. To the extent that proceeds of the Loan Agreement are used to pay any indebtedness secured by any outstanding Lien against the

19

Mortgaged Property then the parties agree that: (a) such proceeds have been advanced at the Mortgagor's request, and (b) the Mortgagee and the Secured Parties shall be subrogated to any and all rights and Liens owned by any owner or holder of such outstanding Liens, irrespective of whether said Liens are or have been released. It is expressly understood that, in consideration of the payment of such other indebtedness, the Mortgagor hereby waives and releases all demands and causes of action for offsets and payments to, upon and in connection with the said indebtedness. This Mortgage is made with full substitution and subrogation of the Trustee and the Mortgagee and their successors and assigns in and to all covenants and warranties by others heretofore given or made in respect of the Mortgaged Property or any part thereof.

7.5. <u>Application of Payments to Certain Obligations</u>. If any part of the Obligations cannot be lawfully secured by this Mortgage or if any part of the Collateral cannot be lawfully subject to the Lien hereof to the full extent of the Obligations, then all payments made shall be applied on said Obligations first in discharge of that portion thereof that is not secured by this Mortgage.

7.6. <u>Nature of Covenants</u>. The covenants and agreements herein contained shall constitute covenants running with the land and interests covered or affected hereby and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto.

7.7. <u>Notices</u>. All notices, requests and demands pursuant hereto shall be made in accordance with Section 8.01 of the Loan Agreement.

7.8. <u>Expenses</u>. The Mortgagor agrees to pay any and all reasonable and documented out of pocket expenses (including attorneys', auditors' and accountants' fees, charges, and disbursements) that may be paid or incurred by the Mortgagee in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Mortgagor under this Mortgage to the extent the Mortgagor would be required to do so pursuant to (i) Section 8.03 of the Loan Agreement, (ii) the Decommissioning Agreement, or (iii) any other Secured Transaction Document.

7.9. <u>Counterparts</u>. This Mortgage is being executed in several counterparts, all of which are identical, except that to facilitate recordation, if the Mortgaged Property is situated in (or adjacent to, in the case of offshore properties) more than one county or parish, descriptions of only those portions of the Mortgaged Property located in the county or parish in which a particular counterpart is recorded may be attached as <u>Exhibit A</u> to such counterpart. Each of such counterparts shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same instrument. Complete copies of this Mortgage containing the entire <u>Exhibit A</u> have been retained by the Mortgagee.

7.10. <u>Governing Law</u>. This Mortgage shall be governed and construed in accordance with the laws of the State of Texas, without regard to the laws that might be applicable under conflicts of laws principles; provided, however, that, with respect to any portion of the Mortgaged Property located outside of the State of Texas, the laws of the place in which such property is located in, or offshore area adjacent to (and State law made applicable as a matter of Federal law), shall apply

20

to the extent of procedural and substantive matters relating only to the creation, perfection, foreclosure of Liens and enforcement of rights and remedies against the Mortgaged Property.

7.11.    Financing Statement; Fixture Filing. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all Fixtures included within the Mortgaged Property and is to be filed or filed for record in the real estate records, mortgage records or other appropriate records of each jurisdiction where any part of the Mortgaged Property (including said fixtures) are situated (or adjacent to, in the case of offshore properties), and may also be filed in the offices of the Bureau of Land Management and/or the Bureau of Ocean Energy Management. This Mortgage shall also be effective as a financing statement covering As-Extracted Collateral (including oil and gas and all other substances of value that may be extracted from the ground) and accounts financed at the wellhead or minehead of wells or mines located on the properties subject to the Applicable UCC and is to be filed for record in the real estate records, UCC records or other appropriate records of each jurisdiction where any part of the Mortgaged Property is situated (or adjacent to, in the case of offshore properties). This Mortgage also constitutes a security agreement under the Applicable UCC, and creates a security interest in all that property (and the proceeds thereof) included in the Mortgaged Property which might otherwise be deemed "personal property". Notwithstanding any release of any or all of that property included in the Mortgaged Property which is deemed "real property", any proceedings to foreclose this Mortgage or its satisfaction of record, the terms hereof shall survive as a security agreement with respect to the security interests created hereby and referred to above until the repayment or satisfaction in full of the obligations of Mortgagor as are now or hereafter evidenced by the Secured Transaction Documents.

7.12.    Filing of Financing Statements. Pursuant to the Applicable UCC, the Mortgagor authorizes the Mortgagee, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Mortgaged Property without the signature of the Mortgagor in such form and in such offices as the Mortgagee reasonably determines appropriate to perfect the security interests of the Mortgagee under this Mortgage. The Mortgagor also authorizes the Mortgagee, its counsel or its representative, at any time and from time to time, to file or record such financing statements that describe the collateral covered thereby as "all assets of the Mortgagor", "all personal property of the Mortgagor" or words of similar effect. The Mortgagor shall pay all costs associated with the filing of such instruments.

In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor: | Fieldwood Energy I LLC |
| Address of Debtor: | 2000 W. Sam Houston Pkwy S., Suite 1600 Houston, Texas 77042 Attention: _____ |
| State of Formation/Location: | Texas |

21

| | |
|---|---|
| Name of Debtor: | GOM Shelf LLC |
| Address of Debtor: | 2000 W. Sam Houston Pkwy S., Suite 1600 Houston, Texas 77042 Attention: _____ |
| State of Formation/Location: | Delaware |
| Name of Secured Party: | Apache Corporation As Collateral Agent |
| Address of Secured Party: | 2000 Post Oak Boulevard Suite 100 Houston, Texas 77056 |
| Owner Record of Real Property: | Fieldwood Energy I LLC and GOM Shelf LLC |

7.13.   Limit on Obligations and Collateral. It is the intention of the Mortgagor, the Mortgagee and the Secured Parties that this Mortgage not constitute a fraudulent transfer or fraudulent conveyance under any state or federal law that may be applied hereto. The Mortgagor and, by the Mortgagee's acceptance hereof, the Mortgagee and the Secured Parties hereby acknowledge and agree that, notwithstanding any other provision of this Mortgage, the indebtedness secured hereby shall be limited to the maximum amount of indebtedness that can be incurred or secured by the Mortgagor without rendering this Mortgage voidable under applicable law relating to fraudulent conveyances or fraudulent transfers.

7.14.   Appearance, Resolutions. For purposes of Louisiana law, including but not limited to the availability of executory process, Mortgagor has appeared on this date before the undersigned Notary Public and witnesses in order to execute this Mortgage. Mortgagor also attaches hereto, as Annex I, a written consent authorizing the execution and delivery of this Mortgage.

7.15.   Paraph. Mortgagor acknowledges that no promissory note or other instrument has been presented to the undersigned Notary Public to be paraphed for identification herewith.

7.16.   Acceptance by Mortgagee. In accordance with the provisions of Louisiana Civil Code article 3289, Mortgagee has accepted the benefits of the Mortgage without the necessity of execution by Mortgagee.

7.17.   Notary Public. The parties relieve and release the undersigned notary public of any duty to produce and attach mortgage or conveyance certificates.

HOU 3972706v13

7.18. <u>Appointment of Mortgagee as Collateral Agent</u>. By accepting the benefits hereof or any other Collateral Document, each other Secured Party hereby appoints Apache Corporation to act as collateral agent on its behalf hereunder and thereunder, and authorizes Apache Corporation, as Mortgagee, to take such actions on its behalf and to exercise such powers as are delegated to the Mortgagee by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.

7.19. <u>Joint and Several Obligations of Mortgagor</u>.

(a) Each of Fieldwood and GOM is accepting joint and several liability hereunder with each other and other Persons that have executed or will execute a Mortgage in consideration of the financial accommodation to be provided by the holders of the Obligations, for the respective mutual benefit, directly and indirectly, of Fieldwood and GOM and in consideration of the respective undertakings of Fieldwood and GOM to accept joint and several liability for the Obligations of each of them.

(b) Each of Fieldwood and GOM, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other and each other Person that have executed or will execute a Mortgage with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several Obligations of Fieldwood, GOM, and each other Person that have executed or will execute a Mortgage without preferences or distinction among them.

7.20. <u>Decommissioning Obligations</u>. In all instances where Fieldwood defaults on its decommissioning obligations (including, with respect to the Mortgaged Property) and, in response to an order by the Bureau of Safety and Environmental Enforcement ("<u>BSEE</u>"), the Bureau of Ocean Energy Management ("<u>BOEM</u>"), their respective successor agencies, any other governmental authority having jurisdiction over such decommissioning obligations or other applicable governmental authority, or to a contractual obligation (in each case, a "<u>Decommissioning Obligation</u>"), Mortgagee or another third party (as the case may be, the "<u>Applicable Decommissioning Operator</u>") conducts or seeks to conduct such decommissioning operations as the then-present designated operator or as the decommissioning operator specifically appointed for such operations by BOEM, BSEE or other applicable governmental authority, Mortgagor shall fully cooperate with and support in all respects the Applicable Decommissioning Operator and shall make available to the Applicable Decommissioning Operator and, upon its request, to the extent such activity is permitted under the underlying agreement, assign to the Applicable Decommissioning Operator all documentation, plans, files, permits, contracts, contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to Mortgagor in connection with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation, each such assignment made solely as the rights relate to such Decommissioning Obligation. In furtherance of these obligations imposed on Mortgagor, but not by way of limitation in any way, Mortgagor hereby:

HOU 3972706v13

(a)     Authorizes the Applicable Decommissioning Operator to perform all required decommissioning operations on any Mortgagor property or infrastructure (including all Mortgaged Property) that is the subject of a Decommissioning Obligation.

(b)     Provides and grants boarding access to the Applicable Decommissioning Operator for any infrastructure owned by Mortgagor, or to which Mortgagor has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of Mortgagor.  The foregoing boarding access rights shall automatically apply to any infrastructure designated by the Applicable Decommissioning Operator as being necessary or convenient to support such decommissioning operations.

(c)     Assigns and quitclaims any salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator so that such value can be monetized by the Applicable Decommissioning Operator and applied to each Mortgagor's defaulting share of the applicable Decommissioning Obligations.

(d)     Grants to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and, upon notice from the Applicable Decommissioning Operator, shall assign to the Applicable Decommissioning Operator, solely as they relate to such Decommissioning Obligation, any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who might have obligations to pay for or contribute to all or any part of the Decommissioning Obligations.

(e)     Assigns, whether or not covered by clause (d) above, all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses which may be available to Mortgagor for any property (including all Mortgaged Property) made the subject of a Decommissioning Obligation.

In addition, each Mortgagor hereby agrees to (i) fully release and hold the Applicable Decommissioning Operator harmless from any claims associated in any way with any operation conducted by the Applicable Decommissioning Operator in the performance of Decommissioning Obligations **(INCLUDING SUCH CLAIMS THAT MAY RESULT FROM THE ORDINARY NEGLIGENCE OF THE APPLICABLE DECOMMISSIONING OPERATOR)** and (ii) execute one or more counterparts of the certificate attached hereto as Exhibit B evidencing each Mortgagor's agreements, assignments, and designations hereunder, from time to time, immediately upon request of the Applicable Decommissioning Operator.  Each Mortgagor further agrees to execute such other agreements or instruments as may be requested by the Applicable Decommissioning Operator to effectuate or carry out the intents and agreements set forth in this Section 7.20.  The liabilities of Mortgagor as set forth in this Section 7.20 shall survive the termination of this Mortgage.  The provisions of this Section 7.20 of this Mortgage shall be binding on all successors and assigns of Mortgagor for all purposes.

24

[SIGNATURES BEGIN NEXT PAGE]

HOU 3972706v13

THUS DONE AND PASSED in the foregoing jurisdiction this [_____], 20[●] to be effective for all purposes as of the Effective Date, in my presence and in the presence of the undersigned competent witnesses who hereunto sign their names with Mortgagor and me, Notary, after reading of the whole.

WITNESSES                                    FIELDWOOD ENERGY I LLC


_____               By: _____
Printed Name:                                Name: _____
                                             Title: _____

_____
Printed Name:


                                             GOM SHELF LLC


                                             By: _____
                                             Name: _____
                                             Title: _____



                    _____
                    NOTARY PUBLIC for the State of _____

                    Full name printed: _____


Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral,
Security Agreement, Fixture Filing and Financing Statement

STATE OF TEXAS                    §
                                 §
COUNTY OF [HARRIS]               §

**TEXAS**          This instrument was acknowledged before me on this ___ day of _____, 20[●], by _____, _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, on behalf of said limited liability company.

**MISSISSIPPI**    Personally appeared before me, the undersigned authority in and for said county and state, on this ____ day of _____, 20[●], within my jurisdiction, the within named _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed [he/she] executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

**ALABAMA**        I, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, is signed to the foregoing instrument or conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument/conveyance, [he/she], as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.


    Given under my hand this ___ day of _____, 20[●].

    IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the [City of Houston, Harris County, Texas] on [_____, 20[●]].


                                     _____
                                     NOTARY PUBLIC, State of Texas

                                     Printed Name: _____

_____
[SEAL]


Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral,
Security Agreement, Fixture Filing and Financing Statement

| STATE OF TEXAS | § |
| COUNTY OF [HARRIS] | § § |

**TEXAS**      This instrument was acknowledged before me on this ___ day of _____, 20[●], by _____, _____ of GOM SHELF LLC, a Delaware limited liability company, on behalf of said limited liability company.

**MISSISSIPPI**    Personally appeared before me, the undersigned authority in and for said county and state, on this ____ day of _____, 20[●], within my jurisdiction, the within named _____ of GOM SHELF LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed [he/she] executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

**ALABAMA**     I, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as _____ of GOM SHELF LLC, a Delaware limited liability company, is signed to the foregoing instrument or conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument/conveyance, [he/she], as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand this ___ day of _____, 20[●].

IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the [City of Houston, Harris County, Texas] on [_____, 20[●]].

_____
NOTARY PUBLIC, State of Texas

Printed Name: _____

_____
[SEAL]

Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement

**<u>EXHIBIT A</u>**[1]

**LEGAL DESCRIPTION**

[TO COME]

---

[1] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

## EXHIBIT B

## CERTIFICATION OF RIGHTS

With respect to any decommissioning obligations for which Apache Corporation, or any of its subsidiaries, or a third party designated by Apache Corporation or one of its subsidiaries (as the case may be, the "Applicable Decommissioning Operator") either (a) conducts or seeks to conduct pursuant to an order from the Bureau of Safety and Environmental Enforcement ("BSEE"), the Bureau of Ocean Energy Management ("BOEM"), their respective successor agencies, or any other governmental authority having jurisdiction over such decommissioning obligations or (b) becomes obligated to perform pursuant to any contractual obligation (in each case, such decommissioning obligations being hereinafter referred to as "Decommissioning Obligations"), Fieldwood Energy I LLC ("FWE I") hereby certifies that it has:

1.  Assigned to such Applicable Decommissioning Operator all documentation, plans, files, permits, decommissioning spreads, contracts, and contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to FWE I in conjunction with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation;

2.  Authorized the Applicable Decommissioning Operator to perform all required decommissioning operations on any FWE I property or infrastructure that is the subject of a Decommissioning Obligation;

3.  Granted boarding access to the Applicable Decommissioning Operator for any infrastructure owned by FWE I, or to which FWE I has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of FWE I;

4.  Assigned and quitclaimed to the Applicable Decommissioning Operator any salvaged property or materials and the salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator;

5.  Granted to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and assigned to the Applicable Decommissioning Operator any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who have obligations to pay for or contribute to all or any part of the Decommissioning Obligations; and

6. Assigned all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses available to FWE I for any property made the subject of a Decommissioning Obligation.

FWE I further authorizes any co-owner, counterparty, contractor, or other person or entity to rely on the foregoing certifications in taking in action or making any payment or contribution as may be requested or directed by the Applicable Decommissioning Operator toward the fulfillment of the applicable Decommissioning Obligations.

FIELDWOOD ENERGY I LLC

_____

By: _____

Name: _____

Title: _____

**SCHEDULE 4.4[2]**

**EXCLUDED PROPERTIES**

| Name of Mortgagor | Description of Excluded Property |
|---|---|
|  |  |

---

[2] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

## Exhibit 13

**Form of Amendment to Unit Operating Agreement**

# AMENDMENT TO
# UNIT OPERATING AGREEMENT

This Amendment to the Unit Operating Agreement (this "Amendment") is made and entered into effective the _____ day of_____, 202__ (the "Effective Date"), by and between [Fieldwood Energy II LLC], ("Fieldwood"), GOM Shelf LLC, ("GOM Shelf"), and Apache Shelf Exploration LLC, ("Apache").  The entities named hereinabove are hereinafter sometimes referred individually as "Party" and collectively as "Parties".

## WITNESSETH

WHEREAS, Conoco Inc. ("Conoco"), Atlantic Richfield Company, ("ARCO"), Texaco Producing Inc. ("Texaco") and Oxy USA Inc. ("Oxy") entered into a Unit Operating Agreement dated January 1, 1989, ("the West Delta Grand Isle Unit Agreement"); and

WHEREAS, Fieldwood, GOM Shelf, and Apache are successors in interest to Conoco, ARCO, Texaco, and OXY in the West Delta Grand Isle Unit Operating Agreement insofar and only insofar as it covers the depths described on Exhibit ___ hereto[1] (the West Delta Grand Isle Unit Operating Agreement insofar as it covers these depths, the "Operating Agreement"); and

WHEREAS, Fieldwood, GOM Shelf, and Apache desire to amend the West Delta Grand Isle Unit Operating Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby amend the Unit Operating Agreement insofar as it pertains to, covers, and burdens the interests of the Parties in and to the lands, leases, and depths covered by the Unit Operating Agreement as follows:

## ARTICLE 3.1
## EXHIBITS

**Article 3.1 Exhibits** is amended by inserting the following immediately following "3.1.5  Exhibit "E".  Gas Balancing Agreement.":

"3.1.6    Exhibit "F".  Form of Surety Bond.

3.1.7    Exhibit "G" Form of Assignment."

## ARTICLE 4
## OPERATOR

**Article 4.1** is amended by deleting the entire Article and replacing it with the following:[2]

"[Fieldwood Energy II LLC] is hereby designated as Operator."

## ARTICLE 11
## DEVELOPMENT OPERATIONS

**Article 11.8 Facilities** is amended by deleting such Article in its entirety and replacing it with the following:

---

[1] Note to Draft: Exhibit to cover those depths which are only owned by the parties to this amendment.

The affirmative vote of all Parties having a combined Participating Interest of one hundred percent (100%) in the wells to be served by the proposed Facilities shall constitute approval.

**ARTICLE 12**
**NON-CONSENT OPERATIONS**

**Article 12.2.1 Production Reversion Penalties** is amended by deleting the entire Article and replacing it with the following:

"Such interest, rights and title shall remain vested in each Participating Party until the wells comprising such Non-Consent Operations are plugged and abandoned and decommissioned. Upon the commencement of such Non-Consent Project, the Non-Participating Party(ies) shall execute and deliver to the Participating Parties an assignment of their interest, rights and title in the Non-Consent Project on the form of Assignment attached hereto as Exhibit G."

**ARTICLE 14**
**WITHDRAWAL**

**Article 14 Withdrawal** is amended by deleting the Article in its entirety and replacing it with the following:

"**14.1 Withdrawal.**  Subject to this Article 14.1, any Party may withdraw from this Agreement as to the Unit Area and the Leases, wells, Platforms and Facilities used in operations on such Unit Area (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw (the "withdrawal notice").  The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice.  Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties".  The withdrawal notice and the written notice(s) to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Unit Area, Leases, wells, Platforms, Facilities, Production, and other property and equipment owned under this Agreement.

**14.2    Response to Withdrawal Notice.**  Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

    **14.2.1 Unanimous Withdrawal.**  If all the other Parties join in the withdrawal,

        (a)      no assignment of Working Interests shall take place;

        (b)      subject to Article 13.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

        (c)      the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEM or the applicable successor agency within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

        (d)      notwithstanding anything to the contrary in Article 13 (Abandonment and Salvage), Operator shall:

            1)      furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and

            2)      cease operations and begin to permanently plug and abandon all

wells and remove all Facilities and Platforms in accordance with the abandonment plan.

**14.2.2  No Additional Withdrawing Parties.**  If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

**14.2.3   Acceptance of the Withdrawing Parties' Interests.**  If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty- (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 14.2.1 (Unanimous Withdrawal) will apply.

**14.2.4   Effects of Withdrawal**.  Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility.  The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 14.1 (Withdrawal) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties, including, without limitation, assignments of their Working Interests in substantially the same form as attached hereto as Exhibit "G".  Additionally, the Parties shall take such further actions as are necessary or appropriate to register the assignment of the Withdrawing Party's and Other Withdrawing Parties' Working Interests with BOEM or the applicable successor agency.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

### 14.3    Limitation on and Conditions of Withdrawal

**14.3.1  Prior Expenses**.  The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages, Production imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, or (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal.  Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 14.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Facilities, and other materiel and equipment in which such Withdrawing Party or Other Withdrawing Party, as applicable, has an ownership interest as part of the Joint Account, less their respective Participating Interest shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote of one or more Parties having a majority interest.  This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C".  At its option, before withdrawing, each of the Withdrawing Party and Other Withdrawing Parties shall either (i) pay Operator, (ii) provide Operator with a surety bond in substantially the same form as attached hereto as Exhibit "F" in an penal sum equal to, or (iii) deposit into an escrow account, in each case for the benefit of the Remaining Parties, the amount allocated to such Withdrawing Party or Other Withdrawing Party as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to such Party before the effective date of the withdrawal; provided, however, that the Withdrawing Party or Other Withdrawing Party may condition its delivery of such payment or bond upon the Remaining Parties' acceptance of the assignment made pursuant to Article 14.2.4.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**14.3.2  Confidentiality.**  The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement.  The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**14.4  Emergencies and Force Majeure.**  Notwithstanding anything herein to the contrary, no Party may withdraw during an event of force majeure as described in Article 24.1 or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the force majeure event or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the force majeure event or emergency, including but not limited to the drilling of relief wells, containment, and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the force majeure event or emergency."

### ARTICLE 21
### DISPOSITION OF PRODUCTION

**Article 21.1 Facilities to Take in Kind** is deleted in its entirety.

**ARTICLE 25**
**SUCCESSORS, ASSIGNS AND PREFERENTIAL RIGHT TO PURCHASE**

**Article 25.3 Transfer of Interest** is deleted in its entirety and replaced with the following:

"25.3  Transfer of Interest.  Subject to the provisions of Section 25.2 hereof and except as provided in 25.3.1 (Exceptions to Transfer Notice), notice of any Party's attempted transfer of Working Interest in the Unit Area, whether directly through an assignment, transfer, or conveyance or indirectly through a merger, consolidation, or similar transaction or series of transactions, (a "Transfer of Interest") shall be provided by written notice to Operator and the other Parties ("the transfer notice").  Any Transfer of Interest shall be made to a party qualified by the BOEM and any other applicable regulatory agency to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Operating Agreement.  All Transfers of Interest must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties ("Consent").  Such Consent shall not be unreasonably withheld, delayed, or conditioned, and shall not require remuneration of any kind except for amounts owed pursuant to the terms hereof.  Notwithstanding the foregoing, the non-transferring Parties' Consent can be conditioned on requiring reasonable proof of the prospective transferee's ability to perform its obligations under this Agreement and reasonable financial assurances from such prospective transferee.  Such financial assurances required by the non-transferring Parties may include bonds, letters of credit, and other conditions providing sufficient evidence of such prospective transferee's ability to perform its obligations under this Operating Agreement to the reasonable satisfaction of the non-transferring Parties.[3]  Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part, and shall also include a provision that the transferee be bound by all the terms and conditions of this Operating Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities accrued under this Agreement prior to the effective date of the Transfer of Interests, and the security rights under Article 8.6 (Security Rights) shall continue to burden the working interest transferred and to secure the payment of those obligations and liabilities. Subject to the immediately preceding sentence, but otherwise notwithstanding anything to the contrary herein, the restrictions and obligations in this Article 25.3 shall not apply to any Transfer of Interest from a Party to an Affiliate of such Party.

25.3.1  Exceptions to Transfer Notice. Notwithstanding any contrary provision of this Agreement, the transfer notice and the Consent are not required when a Party proposes to (i) mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of oil or gas production executed as further security for the debt secured by that security device, collectively a "Financing Transaction"), any wells, Platforms, Facilities, or other equipment, or (ii) transfer, assign, or otherwise convey all or a portion of its Working Interests to either Affiliates or pursuant to the preferential rights purchase; provided that the penultimate sentence of Section 25.3 shall apply to any such transfer, assignment, or conveyance of a Party's Working Interest to an Affiliate or pursuant to a preferential right to purchase.  However, an assignment of Working Interest arising from a Financing Transaction shall be expressly made subject and subordinated to this Agreement.

25.3.2  Effective Date of Transfer of Interest.  Subject to the requirements in this Article 25.3, a Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the transfer notice.  No Transfer of Interest, other than those provided in Article 14 (Withdrawal), is binding on the Parties unless and until (i) the non-transferring Parties have provided their Consent to the Transfer of Interest (other than those provided in Article 25.3.1), (ii) if necessary, the assignor or assignee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest, an fully executed BOEM "Designation of Operator" form and a designation of oil spill responsibility form, and (iii) evidence of

---

[3] NTD: This amendment will be signed by FWE I and [FWE II] upon the divisive merger and after the Credit Bid Sale.  As a result, this provision will not be in place so as to apply to the Credit Bid Sale.  However, it should apply to all subsequent transfers.

receipt of all necessary approvals by the BOEM or any applicable successor agency.  The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

25.3.3  Form of Transfer of Interest.  Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Operating Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Operating Agreement.  Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

## Exhibit "A"

Exhibit "A" to the Operating Agreement containing the Description of Leases, Working Interests, and Unit Area Interests of the Parties and Designated Representatives is hereby deleted and replaced in its entirety with Exhibit "A" attached hereto and made a part of this Amendment.

## Exhibit "B"

Exhibit "B" to the Operating Agreement containing the Insurance Requirements is hereby deleted and replaced in its entirety with Exhibit "B" attached hereto and made a part of this Amendment.

## Exhibit "C"

Exhibit "C" to the Operating Agreement containing the Accounting Procedures is hereby deleted and replaced in its entirety with Exhibit "C" attached hereto and made a part of this Amendment.

## Exhibit "F"

Exhibit "F" containing the form of Surety Bond attached hereto and made a part of this Amendment is hereby attached to and made a part of the Operating Agreement as Exhibit "F" thereto.

## Exhibit "G"

Exhibit "F" containing the form of Assignment attached hereto and made a part of this Amendment is hereby attached to and made a part of the Operating Agreement as Exhibit "G" thereto.

This Amendment may be executed in separate counterparts, each of which, when executed, shall be deemed to be an original and all of which when together shall constitute one and the same Amendment.  An email copy or printable PDF version of a counterpart executed by a Party shall be acceptable evidence of the execution of that counterpart by that Party and shall be binding upon that Party.

This Amendment shall be binding on the Parties as to all of their respective interests covered and burdened by the Unit Operating Agreement.  To the extent any other person, entity, or party holding interests that are included in and bound and burdened by in and to the Unit Operating Agreement, this Amendment shall not be binding on such other person, entity, or party unless or until they ratify and adopt this Amendment; provided, however, this Amendment shall bind and burden each Party executing a counterpart hereof or such other person, entity, or party so ratifying and adopting this Amendment and the respective interests held by such Party or other person, entity, or party.

The captions in this Amendment are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Amendment.

Except as expressly amended in this Amendment, all other terms and conditions of the Unit Operating Agreement remain in full force and effect as originally executed.  Except as otherwise defined in this Amendment, capitalized terms used herein shall have the same meaning as defined in the Operating Agreement.  In the event of a conflict between the terms and conditions of this Amendment and the terms and conditions of this Unit Operating Agreement, then the terms and conditions of this Amendment shall prevail.

Upon execution by the Parties, this Amendment shall be binding upon and inure to the benefit of the Parties and their respective approved successors and assigns.

This Amendment shall be governed by and construed in accordance with the Applicable Law provisions set forth in Article 22 of the Unit Operating Agreement, *mutatis mutandis*.

Each Party represents that upon execution of this Amendment, it has secured all necessary management approvals or other corporate approvals necessary to make this Amendment a fully binding contract.

**IN WITNESS WHEREOF**, the Parties have executed this Amendment on the day and year set forth below, effective as of the Effective Date.

**GOM SHELF LLC**                                    **[FIELDWOOD ENERGY II LLC]**

By:_____            By:_____

Title:_____            Title:_____

Date:_____            Date:_____


**APACHE SHELF EXPLORATION LLC**

By:_____

Title:_____

Date:_____

# EXHIBIT "2"

**Attached to and made a part of that certain Amendment to [Unit Operating Agreement] dated [●], by and between (among) [●], as Operator, and [●].**

# EXHIBIT "B"

## INSURANCE PROVISIONS

I.    Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account.  Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Section A.   Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

    A..   <u>Workers' Compensation and Employer's Liability</u>.

        1..   Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

        2.   Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

        3..   Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.    Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder.  With the exception of [●] and/or [●] which shall have the option to self insure, each Party, at its own expense, must carry its own coverage for the types of insurance and with limits as set forth in each Paragraphs A-G below.  Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability.   All uninsured losses and all damages to jointly owned property shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto.

Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to effect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

    A.   <u>Commercial General Liability and Business Automobile Liability</u>.  Coverage for all operations conducted hereunder with a combined single limit each occurrence of $1,000,000 ("for assured's interest").   Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.   Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

    B.   <u>Vessels</u>. All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of at least $1,000,000 ("for assured's interest") per occurrence.

    C.   <u>Aircraft</u>. All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of at least $5,000,000 ("for assured's interest") per occurrence.

    D.   <u>Excess Liability</u>. Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence ("for assured's interest"), excess of all primary liability limits in the insurance specified in Paragraphs A-C.

E.    <u>Extra Expense Liability</u>.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and $5,000,000 per occurrence for Care, Custody and Control coverage.

F.    <u>Financial Responsibility Insurance</u>:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.    <u>Contractors</u>:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.

END OF EXHIBIT "B"



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**EXHIBIT "3"**

**Attached to and made a part of that certain Amendment to |●| dated effective |●|, by and between |●|, as Operator, and |●|, as Non-Operator.**

# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of _that certain [●]dated [_____] , by and between [_____],_

As Operator and [_____] as Non-Operators

_____

_____

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

1. **DEFINITIONS**

   All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

   **"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

   **"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

   **"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

   **"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

   **"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

   **"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

   **"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

   - Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
   - Responsibility for day-to-day direct oversight of rig operations
   - Responsibility for day-to-day direct oversight of construction operations
   - Coordination of job priorities and approval of work procedures
   - Responsibility for optimal resource utilization (equipment, Materials, personnel)
   - Responsibility for meeting production and field operating expense targets
   - Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
   - Responsibility for all emergency responses with field staff
   - Responsibility for implementing safety and environmental practices
   - Responsibility for field adherence to company policy
   - Responsibility for employment decisions and performance appraisals for field personnel

- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper

copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3.   ADVANCES AND PAYMENTS BY THE PARTIES**

A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.   Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)   being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)   being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)   being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)   charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.   ADJUSTMENTS**

A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.   All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)   a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)   an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)   a government/regulatory audit, or

(4)   a working interest ownership or Participating Interest adjustment.

**5.   EXPENDITURE AUDITS**

A.   A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section 1.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.   ☐ *(Optional Provision – Forfeiture Penalties)*
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**6.   APPROVAL BY PARTIES**

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____one_____ (___1%___) or more Parties, one of which is the Operator, having a combined working interest of at least _____fifty_____ percent (__50__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.   RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.   LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently  apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

not to exceed _____eight_____ percent (__8%) per annum; provided, however, depreciation shall not be charged when the equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.  In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

7.   **AFFILIATES**

A.  Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $__50,000.00_____  If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.  For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $__50,000.00_____ in a given calendar year.

C.  The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

8.   **DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

9.   **LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

10.  **TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

• human resources
• management
• supervision not directly charged under Section II.2 (*Labor*)
• legal services not directly chargeable under Section II.9 (*Legal Expense*)
• taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
• preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

1. **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

   As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

   ☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

   A. TECHNICAL SERVICES

   (i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

   ☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

   (ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

   ☑ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

   ☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

   Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

   B. OVERHEAD—FIXED RATE BASIS

   (1) The Operator shall charge the Joint Account at the following rates per well per month:

      Drilling Well Rate per month $  40,000.00            (prorated for less than a full month)

      Producing Well Rate per month $  4,000.00           

   (2) Application of Overhead—Drilling Well Rate shall be as follows:

   (a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

   (b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

   (3) Application of Overhead—Producing Well Rate shall be as follows:

   (a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b)   Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)   An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)   Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)   The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

## 2.   OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____2_____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____2_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3. AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

  (a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

  (b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

3.   **DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

4.   **SPECIAL PRICING PROVISIONS**

A.   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

1.   **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

2.   **NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

**Exhibit "F"**

**PERFORMANCE BOND**

Bond No._____                                          Amount _____

**Know All by These Presents,**

That we,          [Name]
                 [Address]
                 [Address]

(hereinafter called the Principal), as Principal, and Surety


a corporation duly organized under the laws of the State of [●] (hereinafter called the Surety), as Surety, are held and firmly bound unto

                 [Name]
                 [Address]
                 [Address]

(hereinafter called the Obligee), in the maximum penal sum of            ($      ) (hereinafter called the Maximum Penal Sum); for the payment of which we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

Sealed with our seals and dated this          day of September, 2020.

WHEREAS, the Principal and Obligee are parties to that certain Joint Operating Agreement dated effective as of [_____] (the "Agreement") covering in relevant part the oil and gas lease covering the properties described on Exhibit "A" attached hereto and made a part hereof (the "Property");

WHEREAS, pursuant to the Agreement, Principal has exercised its right to withdraw from the Agreement and to assign to Obligee its interests in and to the Property and associated equipment and facilities that are subject to and covered by the Agreement as of the effective date of the Principal's withdrawal from the Agreement (the "Facilities"); and

WHEREAS, pursuant to the Agreement, Principal has agreed to provide this surety bond as security for Principal's obligation to pay for its proportionate share of the costs to complete the plugging, abandonment, decommissioning, and site clearance of the Property and Facilities (the "Commitment") insofar as such have accrued as of the effective date of Principal's withdrawal from the Agreement.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly keep, duly, and timely pay its Commitment upon the completion of the plugging, abandonment, decommissioning, and site clearance of the Lease and Facilities, then this obligation shall be null and void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1)      In the event the Principal fails to timely pay the Commitment and the Obligee has presented to the Surety a written notice that the Principal is in default, and such condition has persisted for

thirty (30) days after written notice of such default has been given by certified mail to Principal and to the Surety at their last known addresses, the Surety shall pay to the Obligee an amount equal to the Principal's working interest share of the actual charges incurred by Obligee in performing the plugging, abandonment, decommissioning, and site clearance for the Property and the Facilities insofar as such obligations comprised a part of the Commitment hereunder within twenty (20) days of Surety's receipt of Obligee's invoice for such operations, but not exceeding the Penal Sum (reduced, as applicable) and the obligations associated with this Bond shall then be considered null and void to the extent paid.

2)   Principal shall have the right to post security, in substantially the same form of a bond hereof or other acceptable security in the Obligee's reasonable discretion in the amount necessary to replace this Bond.  If so posted, the Obligee will not unreasonably withhold acceptance of such security in lieu of this Bond and issue unconditional release of this bond within thirty (30) days of its acceptance of such other security.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE AGREEMENT TO THE CONTRARY, THE LIABILITY OF THE PRINCIPAL AND SURETY UNDER THIS BOND IS CONTINUOUS UNTIL THE COMMITMENT IS SATISFACTORILY COMPLETED.**

No (i) delay, neglect, or failure of the Obligee to proceed promptly to enforce any rights it might have against Principal under the Agreement or otherwise or to proceed promptly in the premises in case of any default on the part of the Principal, (ii) lack of enforceability or other defense or offset right in respect of any obligation of Principal or any right to Obligee under the Agreement or otherwise in respect of the Commitment, or (iii) the insolvency, bankruptcy, or receivership of Principal, shall in any degree relieve the Principal and the Surety or any of them of their obligations under this Performance Bond; and Principal and Surety hereby waive any defense or argument they may in relation to their obligations under this Performance Bond in connection with any of the foregoing.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee named herein, as the case may be, or their respective heirs, executors, administrators, or successors of the Obligee, as the case may be.

This Performance Bond may not be amended, supplemented, or modified except pursuant to a written instrument duly executed by the Principal, Surety, and Obligee. No course of conduct, dealing, or performance shall amend, supplement, or modify this Performance Bond unless incorporated into a written instrument referenced in the preceding sentence.

This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws rules and principles. Principal, Surety, and Obligee agree that any dispute arising out of this Performance Bond shall be brought and heard exclusively in the state or federal courts sitting in Harris County, Texas, and all of them irrevocably consent to the jurisdiction of said courts and do hereby waive any objections they may have to the laying of venue in such courts, including objections based upon grounds that such venue is inconvenient.

The Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) the full performance, satisfaction, and extinguishment of the Commitment in accordance with all applicable laws, rules, regulations, and orders and (ii) the full performance by Surety of its obligations under this Bond, in each case, no later than thirty (30) days after the Commitment or such performance has been completed.

The Principal and the Surety agree that, notwithstanding any termination of any of the leases or rights of way that may comprise any part of the Property, whether pursuant to their terms, by operation of law, or

otherwise, this Performance Bond shall remain in full force and effect until the earlier of to occur of (i) the Commitment having been truly and faithfully performed, satisfied, and extinguished and (ii) the full performance by Surety of its obligations under this Bond.

Surety represents that it (i) is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Performance Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; (ii) has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or processing against such Surety in any court or before ay officer, arising out of or founded upon this Performance Bond or any liability hereunder; and (iii) does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

This bond may signed by the Principal and Surety with either a digital or original signature, either of which shall be legally-valid and enforceable. This bond may be transmitted to the Obligee by mail, fax, or electronic transmission. For the avoidance of doubt, any electronic PDF version of this bond received by the Obligee shall be an operative instrument and may be used by the Obligee as it would a hardcopy original.

**PRINCIPAL**

By: _____

**SURETY**
 **COMPANY**

By: _____

**EXHIBIT A**

**THE PROPERTY**

**Exhibit "G"**

**ASSIGNMENT AND BILL OF SALE**

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [●], 20[●], but effective as of 12:01 a.m. Central Standard Time, on [●] (the "**Effective Time**"), is from [●], a [●] [●], with an office at [●] ("**Assignor**") to [●], a [●] [●], with an office at [●] ("**Assignee**"), Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, effective as of the Effective Time, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assets. For the purposes of this Assignment, "**Assets**" means all of all of Assignor's right, title, and interests (real personal, mixed, contractual or otherwise) in, to and under or derived from the following:

1. The oil and gas lease(s) (whether one or more, the "**Lease**,") described on Exhibit "A" attached hereto and made a part hereof.

2. Any and all wells, whether producing, shut-in, temporarily abandoned, plugged and abandoned, or otherwise located on the Lease (the "**Wells**");

3. All equipment and facilities associated with or used in connection with the production and operation of the Wells;

4. Any and all contracts and agreements governing or pertaining to the Lease or the Wells (collectively, the "**Contracts**"), including, without limitation, that certain Joint Operating Agreement dated as of [●] by and between [●] and [●], as amended, insofar and only insofar as such Contracts apply to the Lease or the Wells.

Assignor warrants title to the Assets, unto Assignee, its successors and assigns, against all persons claiming or to claim the same or any part thereof BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE. THE ASSETS ARE ASSIGNED "AS IS, WHERE IS", AND, EXCEPT AS PROVIDED FOR HEREIN, ASSIGNOR MAKES NO, AND EXPRESSLY DISCLAIMS AND NEGATES ANY, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (a) MERCHANTABILITY OF THE ASSETS, (b) FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (c) CONDITION OF THE ASSETS, AND (d) CONFORMITY OF THE ASSETS TO MODELS OR SAMPLES OF MATERIALS.

TO HAVE AND TO HOLD the Assets subject to the following terms and conditions:

1. <u>Agreements</u>. This Assignment is made subject to and is burdened by the terms, covenants, and conditions contained in the Contracts. Assignee agrees to be bound by, assume the obligations arising under, and perform all of the terms, covenants, and conditions contained in the Contracts to the extent same relate to the Lease and the Wells.

2.     Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued, or enacted by a governmental entity having jurisdiction; and Assignee agrees to comply with the same on and after the Effective Time.

2.     Successors and Assigns.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

3.     Redhibition Waiver.   ASSIGNEE: (i) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (ii) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (iii) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR THE ASSETS.

4.     UTPCPL Waiver.  TO THE EXTENT APPLICABLE TO THE ASSETS OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (i) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (ii) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (iii) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

5.     Separate Assignments Required by Government Entities. Some of the properties conveyed by this Assignment may require approval to transfer by a government entity, and as such may require separate assignment instruments made on officially approved forms, or forms acceptable to such government entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements. The interests conveyed by such separate assignments are the same, and not in addition to, the interests conveyed in this Assignment.  Assignor and Assignee agree to execute such additional instruments as may be necessary to obtain the approval of the applicable governmental entities for such assignment; and Assignor shall be responsible for recording such assignments.  In addition, it is contemplated that this Assignment will be recorded in the appropriate Parish within the State of Louisiana and the interests conveyed pursuant hereto are the same, and not in addition to, and this assignment shall not constitute multiple transfers of such interests by virtue of the recordation of this Assignment in more than one Parish.

2

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

**ASSIGNOR:**

**WITNESSES:**

[●]

_____     By: _____
Name: _____     Name: [●]
                                                      Title:   [●]

_____
Name: _____

**ASSIGNEE:**

**WITNESSES:**

[●]

_____     By: _____
Name: _____     Name: [●]
                                                      Title:   [●]

_____
Name: _____

3

STATE OF [●]                                          §

COUNTY OF [●]                          §

       On this _____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

 

                                        _____

                                        NOTARY PUBLIC
                                        STATE OF [●]
                                        COUNTY OF [●]
                                        Printed Name: _____

 

STATE OF [●]                                          §

COUNTY OF [●]                          §

       On this _____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

 

                                          _____

                                        NOTARY PUBLIC
                                        STATE OF [●]
                                        COUNTY OF [●]
                                        Printed Name: _____

**EXHIBIT A**

**THE LEASE**

**Exhibit 14**

**Farmout Agreement**

## FARMOUT AGREEMENT

This Farmout Agreement ("**Agreement**") dated as of [_____], 2021 ("**Execution Date**"), but effective as of the Effective Date, is by and among [Fieldwood Energy I LLC, a Texas limited liability company, and GOM Shelf LLC, a Delaware limited liability company] (collectively "**Owner**") and [Fieldwood Energy II LLC, a Texas limited liability company] ("**Fieldwood II**"). Owner and Fieldwood II may each be referred to herein as a "**Party**" and collectively as the "**Parties**".

## W I T N E S S E T H

WHEREAS, Fieldwood II desires to farm into the development of, operation of, and production of hydrocarbons from the Development Area, subject to the terms and conditions set forth herein; and

WHEREAS, Owner and Fieldwood II desire to set forth their agreements regarding their joint participation in the development of, operation of, and production of hydrocarbons from the Development Area.

NOW, THEREFORE, in consideration of the mutual benefits to each Party, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS

**Section 1.1.    Defined Terms**.   As used in this Agreement, each of the following terms is defined below:

"**Abandonment Notice**" is defined in <u>Section 4.10(a)</u>.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Owner shall not be deemed an Affiliate of Fieldwood II, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" is defined in the preamble above.

"**Apache**" means Apache Corporation, a Delaware corporation, and/or its designated Affiliate that is a predecessor of Owner in the chain of title of any applicable property of Owner.

"**Base Assignment Form**" is defined in <u>Section 4.5(b)</u>.

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior, and any successor Governmental Authorities thereto.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas.

"**Capital Development Project**" means either a (i) Rework or Recompletion Project or (ii) a Sidetrack, Bypass, Or Deepening Project.

"**Capital Development Project Costs**" means any and all out-of-pocket costs and expenses incurred in developing, preparing for, and completing a Capital Development Project and conducting all other operations set forth in the applicable Proposal attributable to Owner Interests in the Project, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Commence(s)**" means (i) with respect to any Rework or Recompletion Project, the entry into the well using the equipment necessary to begin the operation to either rework or plug back the existing completion, as applicable, and (ii) with respect to a Sidetrack, Bypass, or Deepening Project or an Election Well, the commencement of actual drilling of new hole through the turning of a drill bit into the earth, in each case, with a rig, coiled tubing unit, or other equipment capable of completing the applicable Project.

"**Company Agreement**" means that certain Limited Liability Company Agreement of Fieldwood Energy I LLC, a Texas limited liability company, dated [•], 2021.

"**Decommissioning Agreement**" means that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC, as amended from time to time.

"**Development Area**" means the state submerged lands and Outer Continental Shelf blocks and acreage held by the leases set forth on Exhibit A.

"**Effective Date**" means [EMERGENCE DATE].

"**Election Period**" is defined in Section 4.1.

"**Election to Participate**" means the form presented by Fieldwood II to Owner with a Proposal pursuant to which Owner can elect to participate in a Proposal.

"**Election Well**" means a new well in the Development Area.

"**Election Well Costs**" means, subject to the terms of the applicable Operating Agreement, any and all out-of-pocket costs and expenses attributable to Owner Interests incurred in drilling, evaluating, completing, and equipping an Election Well to its Objective Depth and conducting all other operations set forth in the applicable Proposal, including, without limitation,

2

all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Evaluation Data**" means Seismic Data and other data and information relating to a Prospect Area or, if applicable, the Objective Formation(s) as to a Capital Development Project or an Election Well in the possession of Fieldwood II that was materially relied upon by Fieldwood II in the determination of the Prospect, including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (*e.g.*, migration, AVO, *etc.*).

"**Execution Date**" is defined in the preamble above.

"**Excess Net Profit**" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Agreement, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Fieldwood II, or another operator pursuant to Section 4.4, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"**Existing Burdens**" means the following, to the extent that Owner Interests are burdened by or subject to them as of the time a Proposal is made with respect to such Owner Interests:

(a)     Lessors' royalties (including, without limitation, sliding scale royalties and royalties measured by net profits), overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and similar burdens on or measured by production from or allocated to the proceeds thereof;

(b)     The terms of leases, unit agreements, pooling agreements, operating agreements, production sales contracts, areas of mutual interest or similar obligations entered into in the ordinary course of the oil and gas industry, and any other contracts, agreements, rights, and instruments applicable to the Owner Interests that are binding on Owner;

(c)     Preferential rights to purchase all or any portion of the Owner Interests;

(d)     Third Party consent requirements and similar restrictions that are applicable to any transfer of all or any portion of the Owner Interests; and

(e)     Rights of reassignment arising upon final intention to abandon or release the Owner Interests.

3

Notwithstanding anything herein to the contrary, as provided in Section 4.5(h), the term "**Existing Burdens**" when used in connection with an Election Well or the FWII Earned Interest shall not include the Trust NPIs.

"**Expert**" means Netherland, Sewell & Associates or such other reservoir engineering consultant as may be mutually agreed by the Parties or determined pursuant to Section 4.12.

"**Fieldwood II**" is defined in the preamble above.

"**Force Majeure**" means any event or circumstance or combination thereof beyond the reasonable control of the Party claiming to be impacted by such event or circumstance that prevents such Party from performing its obligations under this Agreement, but only to the extent such Party is actually prevented or hindered from so performing, which events or circumstances include acts of God, fires, floods, hurricanes, storms, tornados, earthquakes, landslides, lightning, loop currents, washouts, epidemics, pandemics, or other natural disaster; arrests, restraints, actions, delays, or inaction of any Governmental Authority; strikes, lockouts, or other industrial disturbances; acts of the public enemy, wars, invasions, blockades, embargos, sanctions, sabotage, insurgency, terrorism, civil wars, civil disturbances, riots, malicious mischief, or insurrections of any kind; explosions; breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe; refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability or delays of a Party to obtain rights of way, necessary materials, supplies or permits not caused by the failure of the Party claiming to have been affected by Force Majeure to pay for or take diligent and prompt actions to obtain such rights of way, necessary materials, supplies, or permits; or labor strikes or work stoppages.

"**FWII Earned Interest**" means with respect to an Election Well (a) one hundred percent (100%) of Owner Interests (determined at the time the Election Well Proposal is made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in the Prospect Area associated with the Prospect to be developed by such Election Well until Fieldwood II has reached the Recovery Threshold relative to such Election Well, and reducing to (b) fifty percent (50%) of Owner Interests (determined at the time the Election Well Proposal was made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in such Prospect Area from and after that time at which Fieldwood II has reached the Recovery Threshold relative to such Election Well.  For the avoidance of doubt, Owner's working interest, for purposes of the foregoing calculations and otherwise, excludes (i) Owner Interests insofar as they relate to any other wells that are located within the applicable Prospect Area and in existence as of the time the Election Well Proposal is made, regardless of whether such other wells are then or may thereafter be completed within any Objective Formation in the Prospect Area and (ii) Owner's ORRI.

"**FWII NPI**" means, with respect to the production resulting from any Capital Development Project, a net profits interest equal to (i) 100% of the Excess Net Profit until Fieldwood II has reached the Recovery Threshold and (ii) from and after such time that Fieldwood II has reached the Recovery Threshold, fifty percent (50%) of the Excess Net Profit.

"**Governmental Authority**" means any federal, state, municipal, tribal, local, or similar governmental authority, regulatory or administrative agency, court or arbitral body, or any subdivision of any of the foregoing.

"**Law**" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination, or decree of a Governmental Authority.

"**MCFD**" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60°F) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"**Net Profit**" means, with respect to production attributable to Owner Interests obtained as a result of a Capital Development Project, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the well that is the subject of the Capital Development Project during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such well, (3) all severance or other taxes measured or calculated based upon production from such well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Owner's net revenue interest in the proceeds of production from the completion resulting from such Capital Development Project received for that applicable production month.

"**Objective Depth**" means, with respect to an Election Well, the depth that is sufficient to test the applicable Objective Formation(s), or the specific footage depth set forth in the Proposal, whichever is the greater depth, for such Election Well.

"**Objective Formation(s)**" means, with respect to an Election Well, the formations, intervals, or sands that are proposed to be tested, as set forth in the Proposal for such Election Well.

"**Operating Agreement**" means any Subject Operating Agreement or Third Party Operating Agreement.

"**Operating Costs**" has the meaning set forth in the definition of "Net Profits."

"**ORRI**" means, with respect to any FWII Earned Interest or any FWII NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the FWII Earned Interest or FWII NPI, as applicable and further proportionately reduced as the FWII Earned Interests or the FWII NPI may be reduced pursuant to the terms of this Agreement as a result of Fieldwood II achieving the Recovery Threshold with respect to any Project, which ORRI shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI for the completed interval that is the subject of the particular Capital Development Project is an Existing Burden

5

and, as a result, shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"**Owner**" is defined in the preamble above.

"**Owner Interests**" means, with respect to any Proposal and the Project to be carried out pursuant to such Proposal, the rights, title, and interests of Owner in the lands and leases in the applicable portion of the Development Area that is to be developed by such Project, determined as of the date such Proposal is made (reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Proposal was made), and including the Owner's proportionate share of any non-consenting party's interest in the applicable Project that may be allocable to Owner under an applicable Third Party Operating Agreement for only so long as such interest is allocated to Owner in accordance with the terms of such Third Party Operating Agreement.

"**Owner Percentage**" means the difference between (i) the Owner Interests in a Prospect Area that is developed by an Election Well and (ii) the FWII Earned Interest.

"**P&A**" means the plugging, abandonment, and removal of any wells, facilities, platforms, pipelines, or other equipment and the restoration and remediation of the land and seabed in accordance with all applicable Laws and the terms and conditions of any applicable leases, contracts, and agreements, including the removal, surface and subsurface restoration, site clearance, and disposal of the wells, well cellars, fixtures, platforms, flowlines, pipelines, structures, and personal property located on or associated with assets and properties and the lands burdened thereby, the flushing, pickling, burial, removal, or capping of all associated flowlines, field transmission and gathering lines, pipelines, pit closures, the restoration of the surface and seabed, site clearance, and any disposal of related waste materials and hazardous substances.

"**P&A Costs**" means the costs and expenses to conduct P&A.

"**P&A Well**" is defined in Section 4.10(a).

"**Party**" or "**Parties**" is defined in the preamble above.

"**Permitted Encumbrances**" means the following:

(a)     The Existing Burdens;

(b)     Liens for current taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions diligently pursued;

(c)     Materialmen's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law) or if delinquent, being contested in good faith by appropriate actions diligently pursued;

6

(d)      All rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the transfer of the Owner Interests;

(e)      All rights reserved to or vested in any Governmental Authorities to control or regulate any of the Development Area in any manner and all obligations and duties under all applicable Laws, rules, and orders of any such Governmental Authorities or under any franchise, grant, license or permit issued by any such Governmental Authorities; and

(f)      Easements, rights-of-way, servitudes, and permits or other burdens or encumbrances that individually or in the aggregate would not be reasonably likely to materially detract from the value of or materially interfere with the use, development, operation or ownership of the Development Area subject thereto or affected thereby.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"**Pre-Existing Net Profit**" means the forecast of Net Profit that would have been realized over the applicable period in which Excess Net Profit is being calculated if the Capital Development Project had not been undertaken, as such forecast is agreed upon by and between the Parties using the forward strip pricing for crude oil and natural gas as provided by NYMEX as of the date the Proposal for such Capital Development Project was delivered to Owner.  If, after ten (10) Business Days following the expiration of the Election Period applicable to a Capital Development Project, the Parties have not yet agreed on the Pre-Existing Net Profit for the well that is the subject of such Capital Development Project, then either Party may submit the determination of such Pre-Existing Net Profit to the Expert pursuant to Section 4.12 below.

"**Project**" means either an Election Well or a Capital Development Project, as applicable.

"**Project Notice**" is defined in <u>Section 3.2</u>.

"**Project Security**" means security, in form and amount reasonably acceptable to Owner (with Apache's reasonable consent), to cover Fieldwood II's obligations and liabilities hereunder associated with (i) with respect to an Election Well, Owner's share of the P&A obligations and liabilities, including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party, for such Election Well and (ii) with respect to a Sidetrack, Bypass, or Deepening Project, the well that is sidetracked, bypassed, or deepened, including, without limitation, Owner's share of incremental P&A obligations and liabilities (including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party) for such sidetrack, bypass, or deepening well.

"**Proposal**" means a proposal to drill, evaluate, complete, and equip an Election Well or undertake a Capital Development Project, as the case may be, proposed by Fieldwood II to the Owner on lands or facilities in the Development Area.  For the avoidance of doubt, a Proposal may not include more than one Election Well or one proposed completion or recompletion of an existing well, as applicable.

"**Prospect**" means a geologic structural or stratigraphic trap located within any Development Area that is believed to have the potential for accumulations of hydrocarbons, to the extent such Development Area also covers or includes such geologic structure or stratigraphic trap.

"**Prospect Area**" is defined in Section 4.5(a).

"**Recovery Threshold**" means, with respect to a Capital Development Project, Fieldwood II's recovery from the Net Profit it receives attributable to such project of an amount equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Fieldwood II in performing the relevant Project and, with respect to an Election Well, Fieldwood II's recovery from the FWII Earned Interest it receives attributable to such well of an amount equal to one hundred percent (100%) of the Election Well Costs incurred by Fieldwood II in performing the relevant Project.

"**Representatives**" means a Person's directors, officers, partners, members, managers, employees, agents, investors, or advisors (including attorneys, accountants, consultants, bankers, and financial advisors) and any representatives of those advisors, and, in the case of Owner, expressly includes its contractor providing contract operating services for Owner together with such contractor's employees, agents, and representatives.

"**Revenue**" has the meaning set forth in the definition of "Net Profits."

"**Rework or Recompletion Project**" means a development operation on an existing well in the Development Area to either (i) work-over the then-current completion in such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or extend the productive life of such completion or (ii) plug and abandon the then-current completion in such existing well and recomplete the well at a shallower interval.

"**Seismic Data**" means any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shot hole drilling information, digital shot point locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing or other like information customarily used in connection with oil and/or gas exploration.

"**Sidetrack, Bypass, or Deepening Project**" means a development operation on an existing well in the Development Area to plug and abandon the then-current completion and conduct sidetracking, bypassing, or deepening operations on such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or to extend the productive life of such well.

"**Subject Operating Agreement**" is defined in Section 4.5(a).

"**Technical Review Meeting**" is defined in Section 3.2(b).

8

"**Term**" is defined in <u>Section 2.1</u>.

"**Third Party**" means any Person that is not a Party or any Affiliate of any Party.

"**Third Party Operating Agreement**" is defined in <u>Section 4.5(c)</u>.

"**Transaction Documents**" means this Agreement, the TSA, and each other agreement, document, certificate, or instrument delivered pursuant hereto or thereto.

"**Trust A NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

"**Trust A-1 NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"**Trust NPIs**" means the Trust A NPI and the Trust A-1 NPI, collectively.

"**TSA**" means that certain Transition Services Agreement by and among the Parties dated [•], 2020.

"**Well Data**" means any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports), and any related reports filed with the BOEM.

**Section 1.2.**    <u>**Exhibits**</u>.  The following exhibits are incorporated herein and made a part hereof:

Exhibit A        Development Area (Including Oil and Gas Leases)

Exhibit B        Form of Net Profits Interest Assignment

Exhibit C        Form of Election Well Assignment

Exhibit D        Form of Operating Agreement

9

**ARTICLE II.**
**TERM**

**Section 2.1.** **Term**.  This Agreement shall be effective for a period commencing on the Effective Date and expiring upon the earlier to occur of (i) the date two (2) years after the Effective Date, and (ii), as to each lease, the expiration of such lease comprising a part of the Development Area (including any and all renewals, replacements, and extensions of such lease) (the "**Term**").

**Section 2.2.** **Effect of Termination**.  After the expiration of the Term, this Agreement shall terminate and be of no further force and effect; provided, however, that (i) the provisions of this Section 2.2 and Sections 3.2(d), 3.3, 4.8, 4.11, 5.3, 5.4, 5.5, and 5.14, the proviso in the third sentence of Section 3.2(a) and the last sentence of Section 4.5(g), and (ii) any and all rights, obligations and remedies hereunder that have accrued on or prior to the expiration of the Term of this Agreement, shall survive the termination of this Agreement indefinitely; and, provided, further, that any rights, obligations, and remedies in any Transaction Document that by their nature are intended to survive termination or expiration of this Agreement shall so survive. Notwithstanding anything herein to the contrary, termination of this Agreement will not affect the rights of Fieldwood II hereunder to any Proposals presented to Owner before the end of the Term.

**ARTICLE III.**
**PROSPECT GENERATION**

**Section 3.1.** **Evaluation of Possible Prospect.** To assist Fieldwood II in its evaluation of the Development Area, Owner will exercise reasonable efforts to provide Fieldwood II with access to all materials either in its possession or those materials which it is entitled to review regarding the Development Area, including any Evaluation Data, but only to the extent Fieldwood II is permitted to view such materials pursuant to any contract or agreement to which such materials may be subject.  In the event that Fieldwood II desires to present a Proposal, it shall provide a notice to Owner as set forth below.

**Section 3.2.** **Notice of Prospects or Capital Development Project**.

(a)    Notice.  With respect to any Proposal being made by Fieldwood II, Fieldwood II shall provide a written notice to the Owner (a "**Project Notice**"), which shall include the following information:

(i)    a description of the Proposal in reasonable detail (including, if such Proposal relates to an Election Well, all potentially productive zones, the proposed Objective Depths, the proposed Objective Formations, together with descriptions of the Prospect(s) and the associated Prospect Area(s));

(ii)    a good faith, preliminary estimate of Capital Development Project Costs or the Election Well Costs, as the case may be;

10

(iii)    a good faith, preliminary estimate of any and all P&A Costs for a Sidetrack, Bypass or Deepening or Election Well, as the case may be, and

(iv)    an Election to Participate.

For the avoidance of doubt, the following shall be void and deemed automatically withdrawn by Fieldwood II: (i) Proposals for which Owner does not have the requisite authority, under the applicable Operating Agreement, to make such Proposal and (ii) Proposals that conflict with any ongoing, approved, or previously proposed operations under any applicable Operating Agreement.  If Owner receives a Proposal for a Capital Development Project to be performed on a well which Owner either (A) desires to continue producing from its then-current completion or (B) desires to conduct an operation that is in conflict with the Capital Development Project proposed by Fieldwood II, Owner may, on or before the expiration of the Election Period for such Proposal, send written notice to Fieldwood II that it rejects the Proposal pursuant to the foregoing grounds, in which case the applicable Proposal shall be deemed to have been withdrawn and void; *provided* that if Owner rejects such a Proposal and undertakes or agrees to participate in the Project that was the subject of such rejected Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such opportunity on the same terms as set forth in the original Proposal and this Agreement.  If, after diligent efforts, Fieldwood II or the Parties are unable to proceed with the operations contemplated under a Proposal because of conflicts with existing operating agreements (or other restrictions affecting the applicable Owner Interests) that existed as of the time the Proposal was made, either Party may send notice to the other Party terminating the affected Proposal.  For the avoidance of doubt, the Parties recognize and agree that nothing in this Agreement shall prevent an Owner from conducting any projects, operations, or activities or from participating in projects, operations, or activities that may be proposed or offered by a Third Party or from entering into any agreements or contracts, including, without limitation, farmouts, sales, or assignments, affecting the Owner Interests, in all cases, without any obligation to offer Fieldwood II the opportunity to participate in any such project, operations, or activities or to obtain the consent of Fieldwood II, unless (x) any such project, operations, or activities were proposed by Fieldwood II under a Proposal received by Owner prior to such Owner's receipt of the proposal from a Third Party and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

(b)    Technical Review Meeting.  Fieldwood II will present the Proposal and all related Evaluation Data to the Owner and to Apache (for purposes of obtaining its consent) at an in-person meeting at the offices of Fieldwood II (a "**Technical Review Meeting**") to be held on a mutually agreed Business Day during Fieldwood II's normal business hours no later than ten (10) Business Days after delivery of the applicable Project Notice.  At either Party's request, the meeting may be held online via technology that allows a Party to share screens with the other Party and Apache, such as Zoom, Skype, WebEx, or Microsoft Teams.  Each Party shall use reasonable efforts to ensure that the Technical Review Meeting is attended by a reasonably sufficient number of technical representatives of such Party and, in the case of Owner, Apache, who are familiar with and capable of presenting and/or discussing the Proposal with the other Party and Apache.

11

(c)    <u>Access to Evaluation Data</u>.  Until the end of the Election Period, Fieldwood II shall make Evaluation Data with respect to a Proposal available for review and evaluation by the Owner, at the Owner's expense, in Fieldwood II's offices during Fieldwood II's normal business hours or available through a virtual data room or similar electronic platform. Likewise, Owner will provide Fieldwood II with reasonable access to any Evaluation Data in its possession with respect to a Proposal, including but not limited to well files, logs, and data. Notwithstanding the foregoing, neither Party shall be obligated to disclose such Evaluation Data when such disclosure would violate any Third Party contract or agreement binding on a Party or applicable to such Evaluation Data.

(d)    <u>Confidentiality</u>.  Each Party shall, and shall cause its Affiliates and its and their respective Representatives (and Owner shall cause Apache) to, keep the Proposals, all Evaluation Data, Well Data, and Seismic Data of the other Party, information relating to the Proposal and information from the Technical Review Meeting, to the extent prepared by or received from the other Parties, strictly confidential, and no Party or any of its Affiliates or any of its or their respective Representatives shall disclose such Proposals, Evaluation Data, Well Data, or Seismic Data, information relating to the Proposal, or information from the Technical Review Meeting to any Third Party other than Apache or except as required under a Third Party Operating Agreement.  With respect to Evaluation Data, Well Data, and Seismic Data, these disclosure restrictions shall terminate upon the later to occur of (i) two years after the date on which the Technical Review Meeting took place with respect to the applicable Proposal and (ii) the date on which such Evaluation Data, Well Data, or Seismic Data, as applicable, is no longer subject to disclosure restrictions under an agreement or contract with a Third Party.  With respect to the Proposal itself, these disclosure restrictions shall terminate upon the later to occur of (x) the date on which the Project that is the subject of such Proposal is Commenced and (y) that date on which such Proposal terminates, is withdrawn, or is deemed to have been withdrawn.

**Section 3.3.    <u>Waiver of Liability with Respect to Evaluation Data</u>.**  The information included in a Project Notice and any other Evaluation Data or Well Data furnished by Fieldwood II or Owner, as applicable, pursuant to this Agreement shall be provided for informational purposes only.  Each Party is responsible for and shall make its own decisions with respect to Evaluation Data, Well Data, or the opinions or analysis of the other Party that may be provided. (A) FIELDWOOD II DOES NOT MAKE, AND THE OWNER WAIVES AND REPRESENTS AND WARRANTS THAT OWNER HAS NOT AND WILL NOT RELY UPON, AND (B) OWNER DOES NOT MAKE, AND FIELDWOOD II WAIVES AND REPRESENTS AND WARRANTS THAT FIELDWOOD II HAS NOT AND WILL NOT RELY UPON: ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT OR ANY OTHER INSTRUMENT, AGREEMENT, OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE EVALUATION DATA, WELL DATA, OR ANY OTHER OPINION OR ANALYSIS THAT MAY BE PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) THE CONTENTS, CHARACTER, OR NATURE OF ANY DESCRIPTIVE SUMMARY, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL DATA, SEISMIC DATA, WELL DATA, EVALUATION    DATA,    RESERVE    DATA,    RESERVE    REPORTS,    RESERVE

12

INFORMATION (AND ANY ANALYSIS OR INTERPRETATION OF ANY OF THE FOREGOING) RELATING TO ANY SEISMIC DATA OR EVALUATION DATA OR ANY OF THE PROPOSALS, (II) THE QUANTITY, QUALITY, OR RECOVERABILITY OF HYDROCARBONS IN OR FROM ANY PROPOSAL, (III) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM ANY PROPOSAL, OR ANY PRODUCTION OR DECLINE RATES, OR (IV) ANY OTHER RECORD, FILES, MATERIALS, OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE, DELIVERED, OR COMMUNICATED TO THE OTHER PARTY IN CONNECTION WITH THE REVIEW AND EVALUATION OF THE SEISMIC DATA, WELL DATA, OR EVALUATION DATA PURSUANT TO THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT ANY PARTY'S RIGHTS OR REMEDIES PURSUANT TO ANY OTHER AGREEMENT BETWEEN THE PARTIES OTHER THAN THIS AGREEMENT OR PURSUANT TO ANY INSTRUMENT OR AGREEMENT DELIVERED PURSUANT TO THIS AGREEMENT.

## ARTICLE IV.
## JOINT DEVELOPMENT OPERATIONS

**Section 4.1.   Election to Participate**.  The Owner may elect to participate in a valid Proposal by delivering its written Election to Participate to Fieldwood II no later than 5:00 p.m. in Houston, Texas on the first Business Day that is on or after the date thirty (30) days after the Business Day the Owner received the applicable Project Notice (the "**Election Period**"). The failure of Owner to make a timely written election to participate in a valid Proposal by the expiration of the Election Period shall be deemed to be Owner's election not to participate in such Proposal.  If the Owner delivers to Fieldwood II prior to the expiration of the applicable Election Period a valid written Election to Participate, then, subject to the terms of any applicable Third Party Operating Agreement and the terms and conditions of this Agreement, such election shall constitute a valid and binding obligation of the Parties to participate in the operations set forth in such Proposal upon the terms of this Agreement.

**Section 4.2.   Rework or Recompletion Projects.**   If the Proposal is for a Rework or Recompletion Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Rework or Recompletion Project at its sole risk and expense only after the Pre-Existing Net Profit relating to such Rework or Recompletion Project has been determined either by agreement of the Parties or by the Expert.  In such event (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Rework or Recompletion Project and attributable to Owner Interests and (ii) upon completing the Rework or Recompletion Project as a successful completion, Fieldwood will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Rework or Recompletion Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%).  The assignment of the FWII NPI to Fieldwood II pursuant to this Section 4.2 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner

13

hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, (i) upon completion of the Rework or Recompletion Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project and attributable to Owner Interests and (ii) if the Rework or Recompletion Project results in a dry hole or if Fieldwood II does not reach the Recovery Threshold relative to a Rework or Recompletion Project, Fieldwood II shall be solely responsible for any loss it incurred as a result of conducting such Project and shall have no right of recovery or recourse against Owner relative to such loss; provided that Fieldwood II shall not be responsible for paying for or conducting P&A activities on such well, except that, in the event of a dry hole or unsuccessful completion attempt, prior to removing any equipment used to conduct the applicable Rework or Recompletion Project, Fieldwood II shall, at its sole cost and expense, take such additional actions as are necessary to leave the well in a condition that will not require Owner to take additional actions or perform any additional operations on such well in order to leave the well in a satisfactory condition under then-current regulations. For the avoidance of doubt, for the purpose of this <u>Section 4.2</u>, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.3.** <u>**Sidetrack, Bypass, or Deepening Project.**</u> If the Proposal is for a Sidetrack, Bypass, or Deepening Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Sidetrack, Bypass, or Deepening Project at its sole risk and expense; provided, however, that before it may proceed with such Proposal, within thirty (30) days of the expiration of the Election Period, (a) Fieldwood II must provide Owner with Project Security for the operations contemplated under such Proposal and (b) the Pre-Existing Net Profit relating to such Sidetrack, Bypass, or Deepening Project shall have been determined either by agreement of the Parties or by the Expert. If Fieldwood II fails to timely provide Owner with Project Security with respect to any Proposal, then such Proposal shall automatically terminate and have no further or ongoing force or effect and shall be deemed to have been withdrawn by Fieldwood II; and, in such event, Fieldwood II may not proceed with the Project contemplated under the applicable Proposal. In the event Fieldwood II proceeds with a Sidetrack, Bypass, or Deepening Project as permitted herein, (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Sidetrack, Bypass, or Deepening Project and attributable to Owner Interests, (ii) following the completion of the Sidetrack, Bypass, or Deepening Project as a successful completion, Fieldwood II will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI, (iii) except for P&A Costs as set forth below in clause (iv), upon either completion or termination of the Sidetrack, Bypass, or Deepening Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project, and (iv) at such time as P&A work and activities are performed on the well that is the subject of such Sidetrack, Bypass, or Deepening Project, Fieldwood II shall pay to Owner fifty percent (50%) of Owner's share of the incremental P&A Costs, if any, incurred by the Sidetrack, Bypass, or Deepening Project. Owner shall have the right to cash call Fieldwood II for its share of P&A Costs due hereunder; and, in such event, Fieldwood II shall pay Owner such cash called amounts within thirty (30) days of its receipt of such cash call request. Owner shall promptly following completion of the P&A notify

14

Fieldwood II of the incremental costs incurred and reimburse Fieldwood II for any overpayment, if applicable. For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Sidetrack, Bypass, or Deepening Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%). The assignment of the NPI to Fieldwood II pursuant to this Section 4.3 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, with respect to any Sidetrack, Bypass, or Deepening Project undertaken by Fieldwood II, (A) Owner shall have no liability or responsibility to Fieldwood II in the event Fieldwood II is unable to reach the Recovery Threshold relative to such Project, and (B) regardless of whether Fieldwood II reaches the Recovery Threshold relative to such Project, Fieldwood II shall be responsible for fifty percent (50%) of Owner's share of the incremental P&A Costs caused by the subject of the Sidetrack, Bypass, or Deepening Project. For the avoidance of doubt, for the purpose of this Section 4.3, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.4.    Fieldwood II Project Manager**.   In the event Fieldwood II is not the contract operator of an Owner Interest at the time of a Proposal or at the time a Capital Development Project is performed, Fieldwood II shall be the project manager on behalf of Owner for the operation, and Owner shall take reasonable actions necessary to cause the then current operator or contract operator to promptly proceed with the operations described in the Proposal at Fieldwood II's direction. In furtherance of such right of Fieldwood II to be the project manager for such operation, Owner, to the extent it has the ability to do so, hereby grants to Fieldwood II the following rights as the project manager: (i) the right to directly consult with, advise, and direct the then current operator or contract operator, as applicable, regarding such operation, provided that Owner's Representatives shall be included in any such consultations, (ii) access to all books, records, data, and information relating to such operation (including any daily or other periodic operations reports), provided that such access shall be subject to the same restrictions on access and disclosure as apply to Evaluation Data under Section 3.2, and (iii) access to all facilities relating to such operation subject to Fieldwood II's execution of a mutually agreeable boarding agreement. All reasonable out-of-pocket costs incurred by Fieldwood II in performing the foregoing activities as such project manager shall be included in the Capital Development Project Costs for the applicable Project.

**Section 4.5.    Election Well.**

(a)    Operating Agreement.  If the Proposal is for the drilling of an Election Well, then contemporaneously with Owner electing to participate in an Election Well, to the extent not in conflict with any existing Third Party Operating Agreements, the Parties shall execute and deliver to each other an operating agreement in substantially the form attached hereto as Exhibit D (each, a "**Subject Operating Agreement**") setting forth the Owner Percentage and FWII Earned Interest, and the "Contract Area" under such Subject Operating Agreement shall be limited to the Prospect Area to be assigned to Fieldwood II under this Section 4.5(a) if Fieldwood II were to become entitled to such assignment hereunder; provided, however, if

15

Fieldwood II does not earn the assignment to be made pursuant to Section 4.5(b) with respect to any Proposal for which the Parties have executed a Subject Operating Agreement, then such Subject Operating Agreement shall be deemed to have terminated, and the Parties shall take such further actions and execute such additional documents as may be necessary or appropriate to evidence the termination of such Operating Agreement.  With respect to each Prospect that may be the subject of a Proposal for an Election Well, the "**Prospect Area**" associated with any such Prospect shall be limited to (i) such area as may be reasonably developed and drained by such individual well without need for further development within the applicable Prospect Area and (ii) depths from the top of shallowest Objective Formation tested by such Election Well down to the stratigraphic equivalent of one hundred (100) feet below the base of the deepest Objective Formation tested by such Election Well from which production is commenced within two (2) years after spudding such Election Well.

(b)    _Owner Participation_. If Owner elects to participate in an Election Well, then Fieldwood II shall provide Owner with Project Security for the Election Well, and then, only after providing Owner with such Project Security, may proceed with the Election Well at its sole risk and expense.  In such event, (i) Fieldwood II (A) shall pay 100% of the Election Well Costs associated with the Election Well and attributable to Owner Interests and (B) upon completing the Election Well as a successful completion, will receive an assignment of the FWII Earned Interest applicable to such Election Well in a form substantially the same as Exhibit C attached hereto (the "**Base Assignment Form**"), subject to Section 4.9(c), and shall receive the FWII Earned Interest share of Revenue and bear the FWII Earned Interests share of Operating Costs relative to the Project until Fieldwood II has reached the Recovery Threshold relative to such Project, and (ii) thereafter, the ongoing Revenue and Operating Costs, and including P&A Costs, associated with the Project shall be received and borne by the Parties in accordance with the Owner Percentage and FWII Earned Interest, provided that Owner shall not bear any portion of the ORRI or the Operating Costs incurred prior to Fieldwood II reaching the Recovery Threshold.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Election Well, the FWII Earned Interest will be reduced from one hundred percent (100%) of the applicable Owner Interests to fifty percent (50%) of such Owner Interests, in each case still subject to the ORRI.  The assignment of the FW II Earned Interest to Fieldwood II pursuant to this Section 4.5(b) shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) reserve unto Owner the ORRI, and (4) convey the applicable FWII Earned Interest as further described in Section 4.9(b).  For the avoidance of doubt, if the Election Well is a dry hole or results in a completion for which Fieldwood does not reach the Recovery Threshold, then Fieldwood II shall be solely responsible for bearing such loss and for performing the P&A associated with Owner Interests in such well, including paying all such associated P&A Costs.

(c)    _Third Party Operating Agreements_.   During the Term, in the event that any Prospect Area is subject to any existing operating agreement other than a Subject Operating Agreement (each a "**Third Party Operating Agreement**"), then the terms of such Third Party Operating Agreement shall govern and control.  In the event the Prospect Area for a Proposal is subject to a Third Party Operating Agreement, Owner agrees to take such reasonable actions as may be required by the terms of such agreement to propose the Proposal to the other parties to

16

such agreement; provided, that Fieldwood II shall assist Owner in taking such actions as may reasonably be requested by Owner.

(d)    Operating Agreement Conflicts.   To the extent that the provisions of this Agreement conflict with the provisions of any Third Party Operating Agreement, then solely between the Parties, the provisions of this Agreement shall govern and control, *mutatis mutandis*; provided, however, upon commencement of any Election Well, the provisions of any applicable Operating Agreement shall govern all further elections and operations with respect to such Election Well and any subsequent operations within a Prospect Area.

(e)    Operator Designation.   To the extent permitted by applicable Law and subject to the terms of any Third Party Operating Agreement, upon written request of Owner (with the consent of Apache acting reasonably) for each Prospect Area associated with an Election Well pursuant to which Fieldwood II earns a FWII Earned Interest, Fieldwood II shall be designated and assume the responsibilities of operator of each such Prospect Area. In such event, Owner agrees to take reasonable actions in assisting Fieldwood II in having all co-owners of such Prospect Area agree to such designation and to execute the required documentation for such designation.

(f)    Existing Facilities.   Subject to (i) the terms of any applicable Third Party Operating Agreement and applicable Law and (ii) the condition of the applicable facilities and any operations then being conducted thereon, to the extent Owner has the ability to grant Fieldwood II such rights, Fieldwood II shall be entitled to access and use existing facilities owned by Owner to the extent necessary to drill, evaluate, complete, equip, and produce any Election Well, free of costs except Third Party costs and the fees described in Section 4.11 (which costs shall be Election Well Costs), and Owner shall take commercially reasonable actions to help facilitate Fieldwood II's right to access such facilities.  In so accessing any of Owner's facilities, Fieldwood II shall execute and deliver to Owner a boarding agreement or such other instrument as may be reasonably required by Owner in its reasonable discretion to permit Fieldwood II's access to such facilities and to allocate risks associated with Fieldwood II's operations on such facilities.

(g)    Elections Not to Participate.   Notwithstanding anything herein to the contrary, if the Proposal is to drill an Election Well and Owner does not elect to participate within the Election Period, then the Proposal shall expire, and neither Party shall have any obligation to the other with respect to the Proposal and Fieldwood II shall have no right to proceed with drilling the Election Well.  If Owner or its successors or assigns undertake to drill the Election Well described in the Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such Election Well on the same terms as set forth in the original Proposal and this Agreement.

(h)    Trust NPIs.   The Parties recognize and agree that this Agreement constitutes a "Farmout Agreement" under Section 7.4 of the Decommissioning Agreement with respect to Election Wells and the FWII Earned Interests earned by Fieldwood II.  As a result, the FWII

17

Earned Interests to be transferred to Fieldwood II pursuant to Section 4.5(b) shall be transferred free and clear of the Trust NPIs.

**Section 4.6.** **Withdrawal or Termination of Proposals**.

(a)     Subject to any applicable Third Party Operating Agreement, Fieldwood II may withdraw a Proposal at any time prior to the mobilization of materials and equipment toward the commencement of operations under the Proposal.  If a Proposal is withdrawn by Fieldwood II or deemed to have been withdrawn as provided in this Agreement, then all terms of this Agreement shall be interpreted as if such Proposal was never made.

(b)     Notwithstanding Section 4.6(a), with respect to any Project for which Fieldwood II has the right to proceed hereunder, the Proposal for such Project shall be deemed to have automatically terminated and been withdrawn if Fieldwood II does not (i) Commence the applicable Project within one hundred twenty (120) days (excluding any extension expressly agreed to in writing by the Parties) following Fieldwood II's making of such Proposal and (ii) thereafter diligently and continuously perform such Project until completed, subject to extensions of the foregoing time period to the extent Fieldwood II is prevented from either Commencing or performing such Project by events of Force Majeure; provided that Fieldwood II shall make reasonably diligent efforts to overcome such events of Force Majeure.  In the event any Project is deemed terminated or withdrawn, Owner shall promptly return to Fieldwood II any Project Security it provided to Owner under this Agreement in connection with such Proposal.

(c)     If a Proposal is terminated pursuant to Section 4.6(b) as a result of Fieldwood II's failure to timely Commence performance of a Project, then (i) the applicable Owner may elect to conduct the Project that was the subject of such Proposal without any obligation to offer Fieldwood II the opportunity to participate in such Project notwithstanding any term in this Agreement to the contrary and (ii) if Owner has not so elected and Fieldwood II desires to conduct the Project that was the subject of such terminated Proposal, it must resubmit a new Proposal for such Project which shall be subject to the terms of this Agreement in all respects.

**Section 4.7.** **Project Security**.  With respect to any Project for which Fieldwood II has provided Owner with Project Security hereunder, upon the occurrence of the Recovery Threshold for such Project, the Owner agrees that the principal amount of such Project Security shall be proportionately reduced in an amount corresponding to the reduction of Fieldwood II's responsibility for costs and expenses attributable to such Project including the reduction of its P&A obligations; and the Parties agree to execute such instruments or take such other actions as may be reasonably necessary to evidence such reduction.

**Section 4.8.** **Liability for Operations**.

(a)     **With respect to any operations conducted by Fieldwood II or its contractors on any Capital Development Project or Election Well, as between Owners and Fieldwood II, Fieldwood II shall be solely responsible and liable for, and shall fully indemnify, defend, and hold harmless Owners, their affiliated and subsidiary companies, contractors (other than Fieldwood II), representatives, and consultants, and all of their respective**

18

officers, directors, and employees, from and against any and all claims, demands, suits, causes of action, judgments, fines, penalties, or orders relating to or arising out of the operations so conducted by Fieldwood II or its contractors, including, without limitation, incidents of non-compliance, civil penalties, personal injuries, property damage, or pollution, without regard to the negligence (whether sole, joint, or concurrent, or active or passive), strict liability, or other fault of the foregoing indemnified Persons, <u>except to the extent resulting from the gross negligence or willful misconduct of any of the foregoing indemnified Persons.</u>

      (b)    Notwithstanding anything herein to the contrary, in no event shall Fieldwood II be liable for any damages or claims arising in whole or in part from its failure or inability to reach the Objective Depths or Objective Formations.

Section 4.9.    <u>Assignments</u>.

      (a)    <u>NPI Assignments</u>.  If Fieldwood II is entitled to receive an assignment of a FWII NPI in connection with any Capital Development Project, such assignment shall be limited to the interval completed or worked over as a result of such operation.

      (b)    <u>Election Well Assignments</u>.  If Fieldwood II is entitled to receive an assignment from Owner in connection with any Proposal for an Election Well, such assignment shall, subject to Section 4.9(c) below, be limited to the applicable oil and gas lease(s) insofar as it pertains to each Prospect Area that is developed by the Election Well and the depths as specified in Section 4.5(a) above.

      (c)    <u>BOEM Assignments</u>.  To the extent any Prospect Area in which Fieldwood II earns an assignment of the FWII Earned Interest hereunder covers all or a part of one or more aliquots in which BOEM would recognize Fieldwood II's ownership, then in conjunction with the assignment of the FWII Earned Interest and notwithstanding the Base Assignment Form, the Parties agree to execute and file appropriate BOEM-0150 forms from the pertinent Owner to Fieldwood II and covering fifty percent (50%) of Owner's BOEM recognized operating rights in and to such aliquot(s) from the surface to one hundred feet (100') below the deepest depth drilled of the applicable Election Well (utilizing the Base Assignment Form attached as Exhibit A thereto) ("***BOEM OR Assignments***"). In such event, the Parties recognize and agree that such BOEM OR Assignments must be filed with BOEM or such other required Governmental Authorities.  In the event any such Governmental Authorities fail to accept or approve any such BOEM OR Assignments, the Parties will fully cooperate in the development of an assignment and any other filings or instruments that will comply with the requirements of such Governmental Authority's filing and approval procedures (or such other filing procedures as may be hereafter promulgated) or as will accomplish the intent of this Agreement, together with assignments to be filed in the adjacent county or parish records reasonably necessary to give effect to the intent of this Agreement and provide Third Parties with notice of any such assignments.  Notwithstanding the foregoing, if, as a result of circumstances beyond the reasonable control of Owner and Fieldwood II, the assignment will not be approved by BOEM, the Parties will file the BOEM OR Assignment in the non-required records maintained by BOEM for the applicable lease or leases.

19

(d)     ORRI.  It is understood and agreed that the ORRI reserved by the applicable Owner under any certain assignment made pursuant to the terms of this Agreement shall apply to all renewals, extensions, and other similar arrangements (and/or interests therein) of the applicable subject lease(s).  Only a new lease taken by Fieldwood II, its successors or assigns, within one (1) year after expiration or release of a such applicable subject lease and which covers the same lands, shall be considered a renewal or extension for the purposes hereof.

**Section 4.10.   Rights upon Abandonment of Certain Wells.**

(a)     Abandonment Notice.    Subject to the terms of all applicable Third Party Operating Agreements, in the event that Owner and/or the other joint owners in any of the Owner Interests, if any, desire to permanently plug and abandon a well in the Development Area that was producing on the Execution Date (each a "**P&A Well**"), Owner (or, if the TSA is then in effect, Fieldwood II) shall provide Fieldwood II, no later than the earlier of (A) fifteen (15) days prior to the election deadline set forth in the applicable Third Party Operating Agreement, if any, for which the Owner must elect whether to permanently plug and abandon such well and (B) one hundred and twenty (120) days prior to the commencement of such plugging, abandonment, dismantling, or decommissioning, a written notice to Fieldwood II (with a copy to Owner and Apache) ("**Abandonment Notice**") that identifies such P&A Well and, if there are no other then-completed wells within such applicable aliquot, the leasehold interests in the aliquot within which such P&A Well is then completed and for which BOEM would recognize an assignment of such interest to Fieldwood II (the "**P&A Leasehold**"); provided that if the TSA is then in effect or if Fieldwood II or its Affiliate is then the contract service provider to Owners, Owners shall not be obligated to provide any such Abandonment Notice to Fieldwood II.  Notwithstanding anything herein to the contrary, Owners shall have no liability or obligations to Fieldwood II as a result of the failure to provide Fieldwood II with any Abandonment Notice.

(b)     Right to Acquire P&A Well.  Subject to the terms of any Third Party Operating Agreement, Fieldwood II may elect to acquire all or any P&A Well and the corresponding P&A Leasehold, if any, by delivering a written election to acquire same no later than ten (10) days after Fieldwood II's receipt of an Abandonment Notice.  If Fieldwood II fails to deliver a written election to acquire any P&A Well prior to or on the date ten (10) days after receipt of an Abandonment Notice, such failure shall be deemed an election not to acquire any such P&A Well.  Notwithstanding anything in this Agreement to the contrary, Fieldwood II's election to acquire any P&A Well may be accepted or rejected by Owner in Owner's sole discretion.

(c)     Effect of Exercise.  If Fieldwood II validly elects to acquire any P&A Well and the corresponding P&A Leasehold, if any, such election shall constitute a binding obligation of Fieldwood II to acquire Owner Interests in same no later than the later of (i) sixty (60) days after Fieldwood II's election or (ii) the date Fieldwood II obtains all applicable pre-assignment approvals, qualifications, right of use easements, and permits required under applicable Laws and contracts to acquire and operate (if applicable) such P&A Well and P&A Leasehold, if any.  Owner and Fieldwood II shall execute and deliver to Fieldwood II such forms and instruments reasonably requested by Fieldwood II or Owner, including an assignment in form mutually agreeable to the Parties; provided, however, that the P&A Well and P&A Leasehold, if any,

20

shall be assigned subject to this Agreement, "as-is" and without warranties of any kind, and expressly subject to all agreements and matters of record and all existing encumbrances. In consideration for such assignment, Fieldwood II shall assume, and perform and indemnify, defend, and hold harmless Owner, from the P&A Costs with respect to such P&A Well and P&A Leasehold, if any; however, Owner shall retain liability for and indemnify, defend, and hold harmless Fieldwood II for all other obligations related to the time period prior to the assignment. In connection with delivery of the assignment hereunder, at the sole cost and expense of Fieldwood II, the Owner shall deliver to, or cause to be delivered to, Fieldwood II all Well Data and all other records and information in its possession with respect to the P&A Well in a manner reasonably agreed to by the Parties. Owner shall cooperate with Fieldwood II to execute any assignment, designation of operator, or any other instrument reasonably required by Fieldwood II to consummate the intent of this <u>Section 4.10</u>, including Fieldwood II becoming the owner and designated operator of the P&A Well and P&A Leasehold, if any.

**Section 4.11.   <u>Processing Fees</u>.** Subject to any applicable Third Party Operating Agreement and in the absence of any other agreement between the Parties governing the processing of production at any facility owned or operated by Owner, Fieldwood II agrees to pay Owner the following fees for the FWII Earned Interest share of production processed at any facility owned by Owner:

(a)   $2.00 per barrel for oil/condensate;

(b)   $1.50 per barrel for water; and

(c)   $0.20 per MCF for gas.

As used herein, "MCF" means one thousand cubic feet measured at standard pressure and temperature, defined to as cubic feet of volume at 60 degrees Fahrenheit and 14.7 pounds per square inch and a "barrel" is 42 U.S. gallons.

Effective March 1 of each year during which any production from a Project conducted under this Agreement is processed under this Section 4.11, the fees to be charged hereunder shall be adjusted by multiplying the rates then in effect by the percentage increase, if any, in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor for all Urban Consumers, specifically, the "All Items" Unadjusted Expenditure Category (the "CPI-U"), from (i) December 31 of the year immediately preceding the year then just ended to (ii) December 31 of the year just ended. For the avoidance of doubt, no adjustment will be made in the event of a decrease in the CPI-U for an applicable year.

For the avoidance of doubts, the "Operating Costs" used for the purpose of calculating the FWII NPI and for determining when Fieldwood II has reached the Recovery Threshold shall include the processing fees provided herein with respect to FWII NPI share of production resulting from the Capital Development Project. For the purpose of this Section 4.11, the FWII NPI share means fifty percent (50%) of Owner's Interest in the production.

**Section 4.12.   <u>Expert Determination of Pre-Existing Net Profit</u>.** If, as contemplated in the definition of Pre-Existing Net Profit, a Party submits the determination of Pre-Existing Net Profit

21

with respect to any Capital Development Project to the Expert, the procedures set forth in this Section 4.12 shall apply.  Prior to submitting such matter to the Expert, the Party intending to make the submission shall provide written notice to the other Party of such intent.  If the Parties are still unable to agree upon the Pre-Existing Net Profit within five (5) Business Days following the other Party's receipt of the notice provided herein, then the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination.  To submit the determination of Pre-Existing Net Profit to the Expert, the submitting Party shall provide the Expert and the other Party with written notice of its request to have the Expert determine Pre-Existing Net Profit.  Within five (5) Business Days of providing that notice, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the Pre-Existing Net Profit, which data and information shall include applicable Well Data, Evaluation Data, and production data relating to the well that is the subject of such proposed Capital Development Project and (b) such Party's estimate of the Pre-Existing Net Profit.  The Expert shall, within five (5) Business Days of receiving such data and information, make its calculation of the Pre-Existing Net Profit using the data and information it has received from the Parties and the most recently available forward curve strip pricing for crude oil and natural gas as provided by NYMEX as of the date preceding the Expert's determination.   In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 4.12 and the related definitions and (ii) may not assign a value to the Pre-Existing Net Profit greater than the value provided by Owner or less than the value provided by Fieldwood II.   If, prior to the Expert finalizing its determination of the Pre-Existing Net Profit, the Parties reach agreement, then they may withdraw the matter from the Expert.   The determination of the Expert shall be (x) final and binding on the Parties and (y) final and non-appealable for all purposes hereunder.   The fees and expenses of the Expert under this Section 4.12 shall be borne one half by the Owner and one half by Fieldwood II.   If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder, then the Expert shall be selected by lot among the nationally recognized independent reserves or reservoir engineering firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1.   Notices**.  All notices, copies, and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) shall be (a) sufficient in all respects if given in writing, in English, and delivered by both email and, additionally, by mail, facsimile, or recognized courier service to the Party to be noticed or copied pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt, facsimile record, or similar electronic receipt (as to email transmissions) or without receipt of invalid delivery):

    If to Fieldwood II:

    _____

    _____

22

```
_____
Attn: _____
Telephone:  (___) ___-____
Fax:  (___) ___-____
Email:  _____
```

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

If to Owner:

```
Attn:  _____
Telephone:
Fax:  (___) ___-____
Email:  _____
```

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

or to such other address or addresses as the Parties or Apache may from time to time designate in writing.

**Section 5.2.    Conflicts**.  To the extent that any provision of this Agreement conflicts with the provisions of the TSA, then as solely between the Parties, the provisions of this Agreement shall govern and control.    Additionally, Owner's elections in this Agreement are subject to the Company Agreement, and Fieldwood II hereby acknowledges the approval rights of Apache contained therein.

**Section 5.3.    Governing Law**.  This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

**Section 5.4.    Venue**.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute,

Error! Unknown document property name.

claim, or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action instituted by it against the other with respect to any such dispute, controversy, or claim will be instituted exclusively in the state and federal district courts located in Harris County, Texas.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

**Section 5.5.    Waiver of Jury Trial**.  EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT THEREOF.

**Section 5.6.    Expenses**.  Except as provided in another agreement, all fees, costs, and expenses incurred by Fieldwood II and Owner in negotiating this Agreement shall be paid by the Party incurring the same, including, without limitation, legal fees, costs, and expenses.

**Section 5.7.    Compliance with Law**.  Each Party agrees that it will comply with applicable Laws, rules, regulations, and orders of Governmental Authority in the performance of this Agreement.

**Section 5.8.    Amendment**.  This Agreement may be amended or modified only by a duly authorized agreement in writing that makes reference to this Agreement executed by each Party and consented to by Apache acting reasonably.

**Section 5.9.    Waiver**.  Any failure by any Party to comply with any of its obligations, agreements, or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner.  No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 5.10.  Entire Agreement**.  This Agreement (together with the Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any term sheets or oral agreements that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

**Section 5.11.  Assignment**.  No Party may assign any interest in this Agreement without the prior written consent of the other Party(ies).  This Agreement is personal to the Parties, and any attempted assignment shall be void *ab initio*; provided that the foregoing shall not apply if Fieldwood II assigns this Agreement along with its personnel to an Affiliate.  Neither assignment

24

nor consent to assignment shall relieve or release the assignor from its obligations under this Agreement, without an express written release signed by the other Party or Parties. Notwithstanding anything herein to the contrary, this Agreement is personal between Owner and Fieldwood II and shall not constitute a covenant running with the lands included in the Development Area or a burden on any Owner Interests except as to a particular Owner Interest for which (x) Owner has received a Proposal from Fieldwood II relating to such Owner Interest and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

**Section 5.12.  Binding Effect**.   The covenants, provisions, and conditions contained in each Assignment given pursuant to this Agreement are agreed and acknowledged to be covenants running with the land and the respective interests of the Parties and will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

**Section 5.13.  Further Assurances**.   Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the transactions contemplated by this Agreement.  The Parties agree to and shall execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement in accordance with the terms hereof.

**Section 5.14.  Construction**.

(a)   All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The Schedules and Exhibits attached to this Agreement shall not amend or modify this Agreement, but the facts (as distinguished from agreements) stated therein are incorporated herein for all purposes.

(b)   Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)   If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation."  The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.  The term "or" is not exclusive.

(d)   The terms "day" and "days" mean and refer to calendar day(s).  The terms "year" and "years" mean and refer to calendar year(s).  If any action is to be taken or given on or by a

25

Error! Unknown document property name.

particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e)    Owner and Fieldwood II have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)    The phrase "made available" means that such Party or one of its Affiliates or Representatives has had the opportunity prior to the date hereof to review such documents or materials at the offices of another Party or its Affiliates.

(h)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(i)    The serial comma is sometimes included and sometimes omitted.  Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.15.    No Partnership**.  Except as otherwise expressly provided in this Agreement, (a) nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit, or other business entity between or among the Parties and (b) for federal and state income tax purposes, the Parties do not intend that the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder apply to the transactions described in this Agreement.

**Section 5.16.    Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 5.17.    Third Party Beneficiaries**.  Apache is an express third-party beneficiary of all of the representations and covenants of Owner and Fieldwood II contained in this Agreement. However, Owner and Fieldwood II acknowledge and agree that, except for the third-party beneficiary rights expressly granted to Apache in this Section, this Agreement is entered solely for the benefit of the Parties hereto and shall not create any rights, including without limitation third-party beneficiary rights, in favor of any other party.

26

**Section 5.18.   <u>Counterparts</u>**.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

[Remainder of Page Intentionally Blank]

27

**Error! Unknown document property name.**

Executed as of the Execution Date but effective as of the Effective Date.

<b><u>OWNER:</u></b>

**[FIELDWOOD ENERGY I LLC]**


By: _____
Name:
Title:

**GOM SHELF LLC**


By: _____
Name:
Title:



<b><u>FIELDWOOD II:</u></b>

**[FIELDWOOD ENERGY II LLC]**


By: _____
Name:
Title:

Signature Page to Farmout Agreement

**EXHIBIT A**

**<u>DEVELOPMENT AREA (INCLUDING OIL AND GAS LEASES)</u>**

[See Attached]

ADD:

| | |
|---|---|
| Exhibit B | Form of Net Profits Interest Assignment |
| Exhibit C | Form of Election Well Assignment |
| Exhibit D | Form of Operating Agreement |

## ASSIGNMENT OF NET PROFITS INTEREST

This ASSIGNMENT OF NET PROFITS INTEREST ("**Assignment**") dated [_____, 202_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time**[1]"), is from [Fieldwood Energy I LLC, a Texas limited liability company / GOM Shelf LLC, a Delaware limited liability company], with an office at [●] ("**Assignor**") to [Fieldwood Energy II LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042][2] ("**Assignee**").  Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned NPI (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned NPI under Assignee subject to the ORRI and the following terms and conditions:

1. As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"<u>Assigned NPI</u>" means with respect to production from the Interval, a net profits interest equal to (i) one hundred percent (100%) of the Excess Net Profit until Assignee has reached the Recovery Threshold with respect to such Interval and (ii) from and after such time that Assignee has reached the Recovery Threshold with respect to such Interval, automatically reducing to fifty percent (50%) of the Excess Net Profit.

"<u>Capital Development Project</u>" means the Capital Development Project (as defined in the Farmout Agreement) resulting in this Assignment.

---

[1] Note to Draft: Effective Time shall be the date the Proposal was made.
[2] Note to Draft: Entity name to be determined.

"Capital Development Project Costs" means any and all out-of-pocket costs and expenses incurred in (i) developing, preparing for, and completing the Capital Development Project and (ii) conducting all other operations set forth in the Proposal which costs and expenses are, in each case, attributable to Assignor's right, title, and interest in and to the Interval, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"Excess Net Profit" means the Net Profit from the Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Assignment, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Assignee, or another operator pursuant to Section 4.4 of the Farmout Agreement, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"Existing Burdens" has the meaning given such term in the Farmout Agreement, as such is applied to Assignor's interest in the Well at the time the Proposal was made.

"Farmout Agreement" means that certain Farmout Agreement dated [●] by and between Fieldwood Energy I LLC and GOM Shelf, collectively as Owner, and [Fieldwood Energy II LLC].

"Interval" means the completed or reworked interval from [●] feet TVDSS to [●] feet TVDSS in the Lease as such production is obtained from the Well.

"Lease" means that oil and gas lease [OCS or State of Louisiana No.  ] dated       granted by     in favor of    .

"MCFD" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60°F) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"Net Profit" means, with respect to Assignor's rights, title, and interest in and to the production from the Interval, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the Well during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such Interval, (3) all severance or other taxes measured or calculated based upon production from such Interval (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable

to Assignor's net revenue interest in the proceeds of production from the Interval for that applicable production month.

"ORRI" means, with respect to the Assigned NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned NPI, as applicable and further proportionately reduced as the Assigned NPI may be reduced pursuant to the terms of the Farmout Agreement as a result of Assignee achieving the Recovery Threshold with respect to the Interval; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI with regard to production from the Interval shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Pre-Existing Net Profit" means _____[3].

"Proposal" means the Proposal (as defined in the Farmout Agreement) for the Capital Development Project.

"Recharacterization Mortgages" means those certain Mortgages and Deeds of Trust from Fieldwood Energy LLC and GOM Shelf LLC to Matthew Dundrea, Trustee, and Apache Corporation, as Collateral Agent, dated as of September 30, 2013, as amended, covering and securing the Trust A NPI and the Trust A-1 NPI.

"Recovery Threshold" means, with respect to the Capital Development Project, Assignee's recovery from the Assigned NPI equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Assignee in performing such Capital Development Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Trust A NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

---

[3] Note to Draft: Since this will be determined prior to the time this assignment is made, suggest that we include this information in the assignment so that the amount of the Assigned NPI can be determined.

#93828439v11

"Trust A-1 NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"Well" means the [●] well located on [●].

2.    Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Farmout Agreement.

3.    ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.    Warranties.  EXCEPT AS SET FORTH BELOW, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED NPI IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED NPI SHALL BE ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC AND/OR ASSIGNOR AND ANY OF THEIR AFFILIATES, EXCLUDING THE TRUST A NPI, THE TRUST A-1 NPI, AND THE RECHARACTERIZATION MORTGAGES WHICH SHALL CONTINUE TO BURDEN THE ASSIGNED NPI, BUT WHICH WILL AFFECT THE ORRI IN THE MANNER DESCRIBED IN THE DEFINITION OF ORRI.

5.    Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.    Successors and Assigns.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.    <u>Redhibition Waiver</u>.  ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.    <u>UTPCPL Waiver</u>.  TO THE EXTENT APPLICABLE TO THE ASSIGNED NPI OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.    <u>Further Assurances</u>.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.    <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.    <u>Jurisdiction and Venue</u>.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.    <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Page to Follow]*

#93828439v11

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

<strong>ASSIGNOR:</strong>

**WITNESSES:**

**[FIELDWOOD ENERGY I LLC / GOM SHELF LLC]**

_____
Name: _____

By: _____
Name: _____
Title: _____

_____
Name: _____

STATE OF [●]            §
                        §
COUNTY OF [●]           §

On this \_\_\_\_ day of _____, 202\_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy I LLC / GOM Shelf LLC], a [Texas / Delaware] limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

Page <strong>6</strong> of <strong>7</strong>

**WITNESSES:**

**ASSIGNEE:**

**[FIELDWOOD ENERGY II LLC]**

By: _____
Name: _____
Title: _____

Name: _____

Name: _____

STATE OF [●]                                   §
                                               §
COUNTY OF [●]                                  §

      On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy II LLC], a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.