UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY, LLC, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

**PRELIMINARY OBJECTION OF BP EXPLORATION & PRODUCTION INC. TO EMERGENCY MOTION TO COMPEL BP EXPLORATION & PRODUCTION INC. TO PERFORM PRE-PETITION CONTRACTS**
[Relates to Docket Nos. 792; 821]

BP Exploration & Production Inc. ("BP" or the "Operator") files the preliminary objection (the "Objection") to the *Emergency Motion to Compel BP Exploration & Production Inc. to Perform Pre-Petition Contracts* and the *Supplement to Emergency Motion to Compel BP Exploration & Production Inc. to Perform Pre-Petition Contracts* (collectively, the "Motion") and respectfully states as follows:

**Preliminary Statement**[2]

1.  The Motion should be denied because it improperly seeks to (a) compel operations that violate the express terms of the LSPS Agreements; (b) cause BP irreparable harm absent an order authorizing the LSPS Operator to restore the LSPS to its original condition; (c) obtain injunctive relief compelling performance from BP that is not contractually due; and (d) avoid the binding arbitration provisions agreed to by the parties. To justify this extraordinary relief,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Fieldwood Energy LLC (6778), Fieldwood Energy Inc. (4991), Fieldwood Onshore LLC (3489), Fieldwood SD Offshore LLC (8786), Fieldwood Energy Offshore LLC (4494), Fieldwood Offshore LLC (2930), GOM Shelf LLC (8107), FW GOM Pipeline, Inc. (8440), Galveston Bay Procession LLC (5703), Galveston Bay Procession LLC (0422), Fieldwood Energy SP LLC (1971), Dynamic Offshore Resources NS, LLC (0158), Bandon Oil and Gas, LP (9266), and Bandon Oil and Gas GP, LLC (9172). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] All otherwise undefined terms have the meanings set forth in the Motion. Exhibits referenced herein, but not otherwise attached hereto, are attached to the Motion.

Fieldwood proffers nothing more than unsupported (and, as set forth below, contradicted) speculation that the Department of the Interior will act in an arbitrary and capricious manner and deny Fieldwood's (as of yet) unsubmitted request for a suspension of production. These bald allegations and supposition are an insufficient basis for this Court to disregard the parties' binding agreements to arbitrate and otherwise cast aside BP's due process rights to adequate notice by initially seeking to conduct an evidentiary hearing on less than 45 hours' notice and instead now proceeding with an evidentiary hearing on less than six days' notice. Such relief is particularly inappropriate given the fact that the requested work cannot even begin until the requisite permitting has been applied for and granted.[3] In sum, the Debtors are concerned that the repairs to allow the Genovesa well to come online are not progressing as quickly as they would like, and now, citing as the sole basis for an emergency a January 20, 2021 Department of Interior Order the impact of which is *vastly* overstated, seek to compel BP, at great cost and potential risk to safety and the environment, to move faster or get out of the way.

**Background**

2.  The Motion contains numerous inaccuracies, including assertions that BP has somehow failed to comply with its responsibilities under the Agreements as a result of its "actions (or inactions)." BP's actions to date have always been consistent with its obligations under the parties' Agreements. BP has honored and intends to continue honoring its obligations under the Agreements, while ensuring it adheres to all applicable safety, operational, permitting, regulatory, and legal requirements associated with the safe operation and maintenance of the LSPS and Genovesa well.

---

[3] On February 1, 2021, BP submitted the two permits that are within its control. Upon information and belief, the Debtors have not yet submitted the permits they are required to prepare and submit (and obtain approval of) before any work may commence.

3.  The Motion also references as the basis for this purported emergency the Department of Interior's ("DOI") January 20, 2021 Order and suggests that, as a result of the Order, there is a real risk that a Fieldwood-requested Suspension of Production ("SOP") in respect of the Genovesa well will not be authorized (and, as a result, the underlying lease is at risk of termination).  The Debtors' January 24 letter, annexed to the Motion as Exhibit E, also notes that Fieldwood "will take the actions necessary to request an SOP" but it has not yet done so, despite Fieldwood acknowledging that it has been aware of this issue for several months and SOPs "have previously been granted as a matter of course."  As a reasonable and prudent operator, BP has been willing to discuss with Fieldwood sensible, appropriate, and safe options to resolve Fieldwood's concerns.  That Fieldwood now desires BP to take immediate action to address a timing issue of Fieldwood's own making ignores the reality of what brought the parties to this point, the productive discussions in which the parties have been engaged to date, and the practical impact of ensuring a properly-conducted, safe repair.  Fieldwood could have (and should have) sought an SOP before the issuance of the DOI Order yet it chose not to do so.  Notwithstanding the issuance of the DOI Order, however, Fieldwood can and should still seek an SOP and BP will gladly assist Fieldwood in its efforts to obtain an SOP.  Indeed, undersigned counsel is informed that BP has been in communication with the applicable regulatory authorities and, based on these discussions, BP does not believe that the DOI has adopted a policy of arbitrary denials of SOP requests.  As set forth below, this is further evidenced by recent public reporting that has demonstrated the Debtors' concerns to be completely unfounded.

4.  BP and the other LSPS Owners, including Fieldwood, have been engaged in regular discussions for months concerning an appropriate and safe resolution of these issues.  Notably, in an early-January 2021, an operation conducted by BP following months of other operations leading

to the identification of the leak source in November 2020 (and numerous December 2020 discussions among the parties), BP mobilized a vessel to attempt an on-site repair of the LSPS. This repair operation was supported by Fieldwood via an approved Authorization for Expenditure ("AFE"). Exh. A. Dec. 2020 AFE. Unfortunately, the repair operation was not successful.

5. As recently as January 14, 2021, less than two weeks before the filing of the Motion, the LSPS Owners held a meeting at which, during its portion of the presentation, BP reported on the results of its repair attempt and presented a realistic projected schedule that would ensure any repairs are undertaken in an appropriate and safe manner. Exh. B. Jan. 14, 2021 LSPS Owners Presentation. Thereafter, on January 18, 2021, nine days before the Motion was filed, BP presented Fieldwood with a proposed agreement for the long-term repair of the LSPS and the Genovesa temporary flowline AFEs, as required by section 7.08 of the LSPS. Fieldwood responded with comments and BP had been working on its latest turn of the documents at the time the Debtors' January 24 letter was received. Notwithstanding the litigation commenced here by Fieldwood, on January 31, 2021, BP sent Fieldwood comments to the draft agreement as a Rule 408 settlement communication, which Fieldwood proceeded to then attach to its supplemental filing with the Court on February 1, 2021 [ECF No. 822], erroneously claiming in the filing that BP did not respond.

6. Despite the picture the Debtors would like to paint, BP has not sat idly by as repair obligations go unaddressed. As described herein, BP has devoted significant time and resources to reaching a resolution of these issues, and has at all times conducted itself in a manner consistent with its obligations under the Agreements and that of a reasonably prudent operator. BP continues to stand ready to work collaboratively with Fieldwood and the other LSPS Owners to reach an agreeable resolution that includes the necessary repairs consistent with the terms of the parties'

4

Agreements, BP's status as Operator, and all applicable safety, permitting, regulatory and legal requirements, and operational protocols. Any such resolution must also be consistent with those actions that a reasonable and prudent operator would take under the same or similar circumstances. BP should not be compelled to take any actions that are not contemplated by the Agreements and which, by extension, may create serious environmental and safety risks.

## Objection

### A.     The Requested Relief Violates the Express Terms of the LSPS OA

7.     The Motion should be denied because the requested relief violates the terms of the LSPS OA. The Debtors' proposed operation constitutes a "Sole Benefit Operation" under the LSPS OA governed by Section 7.08 and requires the LSPS Operator obtain AFEs under Section 8.01(c). This section provides:

> <u>7.08 Sole Benefit Operation</u>. Subject to the other provisions of this Article VII, during Operation any LSPS Owner(s) shall have the right to request that the LSPS Operator conduct an Operation for the benefit of less than all Parties ("**Sole Benefit Operation**"), provided such Sole Benefit Operation does not have an Adverse Impact on the LSPS. The proposed Sole Benefit Operation request shall be submitted to the LSPS Operator for determination that such operation satisfies the following criteria: (a) such operation has mitigated the risk of an Adverse Impact to the LSPS to a level that is ALARP for such type of planned activity; (b) the planned activity is in compliance with the Exhibit "J"; and (c) such operation either: (i) poses no Enhanced Risk; or (ii) does pose an Enhanced Risk and the conduct of such operation is approved by a Majority Interest. ***The LSPS Operator shall undertake such Sole Benefit Operation, in accordance with the plans and procedures approved by both the LSPS Operator and the LSPS Owner(s) requesting the Sole Benefit Operation, as soon as reasonably practical unless such delay is occasioned by Force Majeure.*** The Sole Benefit Operation shall be at the sole risk, cost and expense (including, as applicable, the future cost of restoring the LSPS to its condition prior to the conduct of such Sole Benefit Operation unless otherwise agreed to pursuant to the terms hereof) of the LSPS Owner(s) requesting such Sole Benefit Operation. Any incidental operational benefit derived from such Sole Benefit Operation and ownership of any equipment and/or infrastructure installed as a result of such Sole Benefit Operation, shall be owned by all LSPS Owners on an Equity Interest basis.

LSPS OA § 7.08 (emphasis added).

8. Here, despite BP's efforts, it has not reached an agreement with LSPS Owners on the "plans and procedures" for the Debtors' Sole Benefit Operation (the "SBO Plan") required to commence a Sole Benefit Operation under section 7.08 of the LSPS OA. As set forth above, BP has sent to the Debtors numerous drafts of a proposed agreement for the long-term repair of the LSPS and the Genovesa temporary flowline AFEs, including as recently as January 31, 2021. Rather than respond and work with BP toward a consensual resolution, the Debtors attached BP's draft to a filing with the Court and proceeded full speed ahead with their unnecessary Motion to pressure BP to conduct work in a way that violates the parties' Agreements.

9. Further, BP, as Operator, is precluded from even beginning work under an approved SBO Plan until the relevant AFEs are approved under Section 8.02 of the LSPS OA:

8.02 Authority for Expenditures.

    (c) Operating and Capital Expenses.

    (i) AFE Approval. The LSPS Operator ***shall not incur any single expenditure costing One Million and No/100 Dollars ($1,000,000) or more, unless the LSPS Operator submits an AFE for prior approval by a Majority Interest of the LSPS Owners***. For any single expenditure costing in excess of Fifty Thousand and No/100 Dollars ($50,000) and less than One Million and No/100 Dollars ($1,000,000), the LSPS Operator shall furnish written information describing the expenditure to each of the LSPS Owners and no approval from the LSPS Owners shall be required. Total costs associated with any single LSPS Owner approved AFE ***shall not*** exceed the budgeted amount by more than fifteen percent (15%) or Five Hundred Thousand and No/100 Dollars ($500,000), which ever is less, without prior approval of a Majority Interest of the LSPS Owners.

LSPS OA § 8.02(c) (emphasis added).

10. To date, despite BP's continued good faith efforts, no AFEs have been approved by BP and the applicable LSPS Owners.[4] In the absence of an approved SBO Plan and approved AFEs, there is no contractual performance to be compelled under the LSPS OA. Consequently,

---

[4] Curiously, in a counterproductive action that is contrary to customary practice, Fieldwood and the other LSPS Owners recently signed *draft* AFEs and sent them back to BP.

6

requiring BP to perform unapproved Sole Benefit Operations under these circumstances would contravene the provisions of the LSPS OA – as opposed to compelling BP's performance thereunder. Such extra-contractual remedies are inappropriate and should not be approved.

> **B.  The Requested Relief Would Cause BP Irreparable Harm Absent an Order Authorizing the LSPS Operator to Restore the LSPS to its Original Condition**

11.  The Debtors' Motion would require BP to expend millions of dollars that BP has no assurance will be paid by the Debtors. To the extent any SBO operations are ordered by the Court, the Debtors should be required to assume the Agreements and provide funding for, *inter alia*, all costs for the SBO, including all costs for the restoration activities resulting from the SBO, and any related costs and expenses required under the terms of the parties' Agreements. Without such assurance, BP would be compelled to take actions and make expenditures that run contrary to the terms of the LSPS OA without any assurance whatsoever that the Debtors will honor their obligations under the Agreements.

> **C.  The Motion Effectively Seeks an Injunction, Without Pleading any of the Requirements for Injunctive Relief**

12.  Because BP's performance is not contractually due (as explained above), the Motion constitutes a de facto request for injunctive relief from this Court seeking to either (a) compel BP to bring the Genovesa well online by April 5, 2021, or (b) replace BP with the Debtors as operator to allow the Debtors to make repairs to bring the Genovesa well online. Neither form of relief is available under the parties' Agreements and any attempted replacement of BP as operator is effectively an injunction for which the Debtors have not met any of the requirements.[5]

---

[5] As a procedural gating item, if the Debtors intended to seek injunctive relief against BP it should have been done through the filing of an adversary proceeding initiated with the filing of a verified complaint.

7

13. An injunction may be issued under section 105 of the Bankruptcy Code, pursuant to which the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" Under Fifth Circuit precedent, injunctive relief is an extraordinary remedy that should only be granted if the movant has "clearly carried the burden of persuasion" on the following four requirements: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm the injunction may cause the defendant; and (4) granting relief is in the public interest. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

14. <u>First</u>, because the Debtors have not even pleaded an underlying cause of action for which there could be a substantial likelihood that they would prevail on the merits, the Debtors fail to satisfy the first element.

15. <u>Second</u>, the Debtors suggest that the Motion must be granted to avoid irreparable harm to the estates. However, the Debtors have failed to provide any evidence of such harm (beyond their subjective concerns) or that they are actually capable of completing the temporary repairs to bring the Genovesa well online in a safe manner, in compliance with applicable laws and regulations under their envisioned timeline. Indeed, upon information and belief, the Debtors have not even taken the appropriate steps to apply for the permitting necessary to begin work on this temporary repair. Moreover, as set forth in more detail below, BP takes issue with the Debtors' interpretation of the DOI Order and the purported emergency it creates. The Debtors have not even attempted to apply for an SOP – this should be their first order of business and would allow

8

the parties the time to undertake the repairs in a safe manner. In fact, Debtors' counsel, in open Court on January 28, 2021, agreed to submit an SOP. The Debtors must be compelled to file an SOP by February 3, 2021.

16. <u>Third</u>, any purported injury the Debtors may face does not outweigh the harm the relief sought in the Motion would cause BP. If, on the one hand, BP were compelled to adhere to the Debtors' unreasonable demands, it could interfere with previously scheduled activities and operations for other parties related to the Na Kika platform, and require BP to expend significant sums with no assurance of payment. On the other hand, if BP was temporarily involuntarily replaced as operator to permit the Debtors to make temporary repairs to bring the Genovesa well online, BP could be exposed to significant liability in the event an accident occurs during the repairs undertaken by Fieldwood. Granting the Motion and ignoring the terms of the parties' Agreements (with which BP presently remains in complete compliance) would create a dangerous precedent for future counterparties who may not like the speed with which their operator is conducting its legitimate, safety-conscious operations and embolden such counterparties to seek relief of the Court.

17. <u>Finally</u>, granting the relief requested in the Motion cannot reasonably be found to be in the public interest. To the contrary, granting the relief requested could result in serious harm to the public. BP as operator under the LSPS OA is uniquely situated to coordinate and implement the required temporary repairs. The heightened risk for safety issues and devastating accidents that could arise if the Debtors were permitted to operate and make temporary repairs to bring the Genovesa well online could have catastrophic consequences. Indeed, there are recent examples of the Debtors and their personnel acting imprudently and flouting regulations. In April 2020, pursuant to a narrowly-tailored letter agreement, BP permitted the Debtors to serve as operator for

the sole purpose of installing certain equipment at the Genovesa well.  Exh. C. Jan. 28, 2020 Letter Agreement.  During the course of this installation, the Debtors caused the improper underwater release of hydraulic fluid.  Upon information and belief, the Debtors reported this release to their regulators.  Then, less than two weeks ago, two of the Debtors' supervisors were indicted on multiple federal charges alleging that, in separate incidents occurring in 2015 and 2018, they knowingly permitted the continued discharge of hazardous substances from Fieldwood offshore platforms into the Gulf of Mexico, failed to report such discharges, and subsequently intentionally misled federal regulators who were investigating the situation.  Exh. D. Jan. 20, 2021 Article.

18. In addition to the fact that there is no basis at law or in equity to substitute the Debtors as an operator without BP's consent, BP has grave concerns regarding the heightened risk of environmental and safety risks that could result if the Debtors are permitted to make repairs to bring the Genovesa well online in contravention of the parties' Agreements.  These concerns are exacerbated by the fact that, if the Debtors had sought injunctive relief through the proper procedural mechanisms they would be required to post a bond or other form of security to secure the injunction.  Because the Motion is procedurally infirm, however, the Debtors do not make any representation that they would be willing or even able to post such a bond or security.

**D.     The Requested Relief is Improperly Asserted in this Court and Should be Compelled to Arbitration or, in the Alternative, Litigated through an Adversary Proceeding**

19. The underlying disputes alleged in the Motion must be compelled to arbitration pursuant to the terms of the Agreements[6] upon which the Debtors' claims are based and consistent

---

[6] Both section 22.28 of the LSPS OA and section 15.11 of the PHA, each entitled "Dispute Resolution" are effectively identical and provide that *"[a]ny claim, controversy or dispute arising out of, relating to or in connection with the interpretations of this Agreement or any activity or operation conducted or to be conducted hereunder*, shall be resolved in accordance with the mediation and binding arbitration provision set forth in Exhibit "F" (*Dispute Resolution Procedures*) to this Agreement." LSPS OA § 22.28 (emphasis added).

with the requirements of the Federal Arbitration Act (the "FAA") and the strong public policy to enforce agreements to arbitrate.

20. Under the FAA, there is a strong presumption favoring arbitration. *See, e.g.*, *Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294, 297 (5th Cir. 2004) ("there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity.") (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). Where there is a valid agreement to arbitrate, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

21. Accordingly, under the FAA, when (1) there is a valid agreement to arbitrate between the parties, and (2) the dispute in question falls within the scope of that arbitration agreement, arbitration is proper. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626–28 (1985); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32 (1983); *Graves v. BP America, Inc.*, 568 F.3d 221, 222 (5th Cir. 2009); *In re Dillard Dept. Stores*, 186 S.W.3d 514, 515 (Tex. 2006) (FAA).

22. Here, the Parties voluntarily agreed to the Agreements' mandatory arbitration provisions. *See* LSPS OA § 22.28; PHA § 15.11. The first prong of the analysis is satisfied. Similarly, the disputes alleged by the Debtors' Motion fall within the scope of the arbitration provision. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25 (holding that, under the FAA, arbitration provisions are construed broadly, and "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration").

23. In this case, the Debtors agreed to arbitrate "[a]ny claim, controversy or dispute arising out of, relating to or in connection with the interpretations of this Agreement or any activity or operation conducted or to be conducted hereunder." LSPS OA § 22.28; PHA § 15.11. The Debtors' alleged claims against BP are breaches of the Agreements based on a purported failure to conduct "activities or operations" Fieldwood asserts must be conducted to preserve the asset. It cannot legitimately be disputed that all of Debtors' contentions against BP, and all of BP's forthcoming claims and defenses against the Debtors, fall squarely within the scope of the agreed arbitration provisions. Accordingly, the Motion should be denied and the dispute compelled to arbitration.

E. **Emergency Consideration is not Appropriate Until a Requested SOP has been Denied and the Requisite Permits Have Been Secured**

24. The Debtors' request for emergency consideration of these issues (by Motion and initially on less than 45 hours' notice, and now on less than 6 days' notice) is improper. The Debtors' stated reason for an emergency is the issuance of the DOI Order that the Debtors subjectively interpret as potentially causing difficulty in obtaining an SOP. Recent reporting on this issue, however, suggests otherwise. For example, in the first approximately eight days following the issuance of the DOI Order, the DOI issued more than 30 new drilling permits, including **22 offshore drilling permits in the Gulf of Mexico**, which "have been issued on a steady basis since Biden's inauguration…." Exh. E. Jan. 28, 2021 Bloomberg Article (emphasis added). Since its issuance, the DOI "has maintained that the [DOI Order], which is set to expire on March 20, does not equate to a drilling permit freeze. . . ." *Id.* Thus, the parade of horribles the Debtors suggested would follow announcement of the DOI Order appears to be more fantasy than reality.

25. This entire dispute would be obviated by the granting of an SOP. BP has informed the Debtors, on numerous occasions, that it will support the Debtors in the submission of an application for an SOP. Yet, upon information and belief, the Debtors to date have refused to apply for an SOP because they do not agree with the schedule that BP, in its capacity as an experienced, reasonable and prudent operator, has proposed. The Motion should be denied, or at minimum adjourned to permit the Debtors to request an SOP and for the Debtors' outstanding applications for necessary work permits to be submitted and granted. If the SOP application is denied, then the issues raised in the Motion and this Objection can be heard by the Court at the appropriate time.

## Reservation of Rights

26. BP continues to assess the issues raised in the Motion. As such, this Objection is submitted without prejudice to, and with a full reservation of, BP's rights to supplement this Objection in advance of or in connection with the hearing to consider the Motion. BP reserves all of its claims, defenses, and rights to object to the Motion, whether at law or in equity.

Dated: February 2, 2021                    Respectfully submitted,

                                                                              GREENBERG TRAURIG, LLP

By: /s/ *Shari L. Heyen*
Shari L. Heyen (SBN 09564750)
HeyenS@gtlaw.com
Karl D. Burrer (SBN 24043584)
BurrerK@gtlaw.com
Katie Tipper-McWhorter (SBN 24083974)
(admitted *pro hac vice*)
TipperK@gtlaw.com
Kristen M. Jacobsen (SBN 24101381)
JacobsenK@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505

– and –

P. William Stark (SBN 24046902)
(admitted *pro hac vice*)
StarkB@gtlaw.com
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
Facsimile: (214) 665-3601

**Counsel for BP Exploration & Production Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been served upon the parties eligible to receive notice through the Court's ECF facilities by electronic mail on February 2, 2021.

*/s/ Shari L. Heyen*
Shari L. Heyen