**Amended Exhibit B**

**PHA**

EXECUTION VERSION

PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

FOR

MISSISSIPPI CANYON BLOCK 562 (ISABELA)

AND

MISSISSIPPI CANYON 519 UNIT (MC 519 UNIT)

PRODUCTION HANDLING

AT THE MISSISSIPPI CANYON BLOCK 474 NA KIKA (HOST)

BY AND BETWEEN

BP EXPLORATION & PRODUCTION, INC.
(NA KIKA HOST OWNER)
AND

NOBLE ENERGY, INC.,
BP EXPLORATION & PRODUCTION, INC.,
RED WILLOW OFFSHORE, LLC AND
HOUSTON ENERGY DEEPWATER VENTURES I, LLC
("MC 519 UNIT PRODUCERS")

AND

NOBLE ENERGY, INC. AND
BP EXPLORATION & PRODUCTION, INC.
("ISABELA PRODUCERS")

AND

NOBLE ENERGY, INC., BP EXPLORATION & PRODUCTION, INC.,
RED WILLOW OFFSHORE, LLC AND
HOUSTON ENERGY DEEPWATER VENTURES I, LLC
("LSPS OWNERS")

EFFECTIVE SEPTEMBER 21, 2010

Execution Version

**EXECUTION VERSION**

# TABLE OF CONTENTS
Production Handling and Operating Services Agreement

**ARTICLE I – CONTRACT APPLICATION** .................................................................... 2

   1.1    APPLICATION IN GENERAL ............................................................................. 2
   1.2    APPLICATION TO OTHER AGREEMENTS ....................................................... 3

**ARTICLE II – DEFINITIONS AND EXHIBITS** ............................................................ 4

   2.1    PREFACE ......................................................................................................... 4
   2.2    DEFINITIONS .................................................................................................. 5
   2.3    EXHIBITS ...................................................................................................... 19

**ARTICLE III – INFRASTRUCTURE AND FACILITIES** .......................................... 20

   3.1    SATELLITE WELL SYSTEM .......................................................................... 20
   3.2    LOOP SUBSEA PRODUCTION SYSTEM ........................................................ 21
   3.3    FACILITY ACCESS MODIFICATIONS ............................................................ 22

**ARTICLE IV - SERVICES** ............................................................................................. 25

   4.1    GENERAL ...................................................................................................... 25
   4.2    WELL UNLOADING ...................................................................................... 26
   4.3    PARTIES RESPONSIBILITIES ........................................................................ 26
   4.4    USE OF PLATFORM/RISER SPACE ............................................................... 26
   4.5    ENERGY SOURCES ....................................................................................... 27
   4.6    COMMUNICATION EQUIPMENT .................................................................. 27
   4.7    EMERGENCY RESPONSE .............................................................................. 27

**ARTICLE V – FEES & EXPENSES** .............................................................................. 28

   5.1    OPERATING AND MAINTENANCE EXPENSES .............................................. 28
   5.2    FUEL, FLARE AND VENT GAS ................................................................... 39
   5.3    INFRASTRUCTURE ACCESS AND HANDLING FEES ..................................... 39
   5.4    FUTURE GOVERNMENTAL REGULATIONS .................................................. 43
   5.5    OWNER'S EXPENSE ..................................................................................... 44
   5.6    HOST SHUT DOWN COMPENSATION ........................................................... 44
   5.7    ROYALTIES AND TAXES .............................................................................. 47
   5.8    THIRD PARTY CONTRACTORS ..................................................................... 47
   5.9    ALLOCATION FACTORS ............................................................................... 47

**ARTICLE VI - CAPACITY** ........................................................................................... 48

   6.1    HOST CAPACITY .......................................................................................... 48
   6.2    SATELLITE LEASES CAPACITY ................................................................... 48
   6.3    INTERRUPTIBLE CAPACITY ......................................................................... 49
   6.4    PRODUCTION PRIORITIZATION .................................................................... 49
   6.5    PRODUCTION COMPATIBILITY .................................................................... 50

**ARTICLE VII – PROCEDURES AND PERMITTING** ................................................ 52

   7.1    METERING AND ALLOCATION PROCEDURES .............................................. 52
   7.2    PERMITS ....................................................................................................... 53
   7.3    COMMINGLING OF PRODUCTION ................................................................ 53
   7.4    RE-ALLOCATIONS ....................................................................................... 54
   7.5    OIL QUALITY BANK AND NGL BANK ....................................................... 54
   7.6    LSPS LINE FILL .......................................................................................... 54

**DEBTORS' EX. NO. 02**
**Page 3 of 153**

EXECUTION VERSION

ARTICLE VIII – GATHERING AND TRANSPORTATION ............................................................. 54

| | | |
|---|---|---|
| 8.1 | PRODUCT DISPOSITION ......................................................................... | 54 |
| 8.2 | GAS IMBALANCES ................................................................................. | 55 |
| 8.3 | PRODUCT TRANSPORTATION ................................................................ | 55 |
| 8.4 | PIPELINE PENALTIES ............................................................................ | 55 |

ARTICLE IX – SUSPENSION OF OPERATIONS AND FORCE MAJEURE ......................... 56

| | | |
|---|---|---|
| 9.1 | NOTICE ................................................................................................. | 56 |
| 9.2 | SUSPENSION OF OBLIGATION ............................................................. | 56 |
| 9.3 | RESOLUTION ........................................................................................ | 56 |
| 9.4 | SUSPENSION OF OPERATION .............................................................. | 57 |

ARTICLE X – TERM, DEFAULT, AND TERMINAITON ........................................................ 59

| | | |
|---|---|---|
| 10.1 | TERM OF AGREEMENT ......................................................................... | 59 |
| 10.2 | DEFAULT .............................................................................................. | 59 |
| 10.3 | TERMINATION BY OWNER .................................................................. | 60 |
| 10.4 | TERMINATION BY PRODUCERS .......................................................... | 61 |
| 10.5 | RESPONSIBILITIES AND OBLIGAITONS AT TERMINATION .............. | 62 |

ARTICLE XI – LIABILITIES AND INDEMNIFICAITON ...................................................... 64

| | | |
|---|---|---|
| 11.1 | LIABILITIES ......................................................................................... | 64 |
| 11.2 | INDEMNIFICATION WITH RESPECT TO WARRANTY OF TITLE ......... | 68 |
| 11.3 | WAIVER OF CONSEQUENTIAL DAMAGES ......................................... | 69 |
| 11.4 | INDIVIDUAL OBLIGATIONS ................................................................ | 69 |
| 11.5 | GROSS NEGLIGENCE/WILLFUL MISCONDUCT .................................. | 70 |

ARTICLE XII – INSURANCE AND BONDS ........................................................................ 70

| | | |
|---|---|---|
| 12.1 | INSURANCE .......................................................................................... | 70 |
| 12.2 | BONDS ................................................................................................. | 70 |

ARTICLE XIII – SUCCESSORS AND ASSIGNS ................................................................ 71

| | | |
|---|---|---|
| 13.1 | SUCCESSORS AND ASSIGNS .............................................................. | 71 |
| 13.2 | ASSIGNMENT ....................................................................................... | 71 |

ARTICLE XIV – NOTICES .................................................................................................. 72

| | | |
|---|---|---|
| 14.1 | GIVING AND RESPONDING TO NOTICES ........................................... | 72 |
| 14.2 | CONTENT OF NOTICE .......................................................................... | 76 |

ARTICLE XV – ADMINISTRATIVE AND MISCELLANEOUS ............................................ 76

| | | |
|---|---|---|
| 15.1 | INFRASTRUCTURE DISCLAIMER ........................................................ | 76 |
| 15.2 | DISCLAIMER OF WARRANTIES .......................................................... | 76 |
| 15.3 | HOST ACCESS & BOARDING .............................................................. | 77 |
| 15.4 | REPRESENTATIONS AND WARRANTIES ............................................ | 78 |
| 15.5 | WARRANTY OF TITLE ........................................................................ | 79 |
| 15.6 | STANDARD OF PERFORMANCE ......................................................... | 79 |
| 15.7 | PRODUCERS' EMPLOYEES, CONSULTANTS, AND CONTRACTORS ..... | 79 |
| 15.8 | HOST OPERATOR'S EMPLOYEES, CONSULTANTS, AND CONTRACTORS .... | 79 |
| 15.9 | FURTHER ASSURANCES ...................................................................... | 80 |
| 15.10 | NON-COMPLIANCE CITATIONS .......................................................... | 80 |
| 15.11 | DISPUTE RESOLUTION ........................................................................ | 80 |
| 15.12 | WAIVERS .............................................................................................. | 80 |
| 15.13 | REMEDIES ............................................................................................ | 81 |
| 15.14 | NO THIRD PARTY BENEFICIARIES .................................................... | 81 |
| 15.15 | CONFIDENTIALITY PROVISIONS ....................................................... | 81 |

DEBTORS' EX. NO. 02
Page 4 of 153

EXECUTION VERSION

15.16   COMMITMENT OF OIL AND GAS RESERVES.................................................................. 82
15.17   COMPLIANCE WITH LAWS AND REGULATIONS.................................................... 83
15.18   CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT .......................... 85
15.19   INTEGRATED AND ENTIRE AGREEMENT ............................................................... 86
15.20   AMENDMENT AND MODIFICATION......................................................................... 86
15.21   SURVIVABILITY............................................................................................................ 86
15.22   EXISTING AGREEMENTS ............................................................................................ 87

ARTICLE XVI - EXECUTION ............................................................................................ 87

16.1   EFFECT......................................................................................................................... 87
16.2   COUNTERPARTS ......................................................................................................... 87

**DEBTORS' EX. NO. 02**
**Page 5 of 153**

## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

### PREAMBLE

This **PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT** together with its attached Exhibits (**"Agreement"**) effective as of September 21, 2010, (**"Effective Date"**) is entered into by and between BP EXPLORATION & PRODUCTION, INC. (**"BP"**), hereinafter referred to as the "**Owner**", in its capacity as a co-owner of the "**Host**" (as defined herein below), and BP; NOBLE ENERGY, INC. (**"Noble"**); RED WILLOW OFFSHORE, LLC (**"Red Willow"**); and HOUSTON ENERGY DEEPWATER VENTURES I, LLC (**"HEDV"**), hereinafter referred to collectively as the **"Producers"**, in their respective capacity as co-owners of each of the "**Satellite Leases**" (as defined herein below); and BP, Noble, Red Willow, and HEDV, hereinafter referred to collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**"(as defined herein below). Each signatory hereto is sometimes referred to singularly as a "**Party**" or collectively as the "**Parties**".

### WITNESSETH:

**WHEREAS**, BP and Noble are the co-owners of the Isabela Lease; and

**WHEREAS**, BP, Noble, Red Willow and HEDV are the co-owners of the MC-519 Unit Leases; and

**WHEREAS**, the LSPS Owners are the co-owners of the "**Loop Subsea Production System**" or "**LSPS**"; and

**WHEREAS**, the Satellite Leases and the "**Satellite Well System**" (as defined herein below) are operated by the "**Satellite Operators**" (as defined herein below); and

**WHEREAS**, the "**Loop Subsea Production System**" or "**LSPS**" (as defined herein below) is operated by the "**LSPS Operator**" (as defined herein below); and

**WHEREAS**, the Owner is a co-owner of the "**Host Leases**" (as defined herein below) and the Host; and

**DEBTORS' EX. NO. 02**
**Page 6 of 153**

1    **WHEREAS**, the Host Leases and the Host are operated by the **"Host Operator"**
2    (as defined herein below); and

3    **WHEREAS**, the Producers desire to deliver **"Satellite Production"** (as defined
4    herein below) to the Host at the **"Entry Point(s)"** (as defined herein below) via the
5    **"LSPS"**; and

6    **WHEREAS**, the Producers desire to utilize the Host for the processing and
7    handling of Satellite Production so as to deliver Oil and Gas allocated to the Satellite
8    Leases to the **"Delivery Point(s)"** (as defined herein below); and

9    **WHEREAS**, the Producers desire that the Owner (i) connect the **"Satellite**
10   **System"** to the Host and (ii) install control, monitoring and maintenance equipment
11   associated with the **"Satellite System"** on the Host; and

12   **WHEREAS**, the Owner and Host Operator are willing to accommodate these
13   desires and requests under the terms and conditions set forth below.

14   **NOW, THEREFORE**, in consideration of the premises, the mutual covenants
15   and agreements contained herein, and other good and valuable consideration, the receipt
16   and sufficiency of which are hereby acknowledged, the Parties agree as follows:

17
18
19                           **ARTICLE I - CONTRACT APPLICATION**
20
21   **1.1    Application in General**

22   This Agreement governs and applies to the rights and obligations of the Parties
23   relating, without limitation, to the (i) connection of the Satellite System to the
24   Host, (ii) installation of Facility Access Modifications on the Host, (iii)
25   processing and handling on the Host of Satellite Production delivered to the Entry
26   Point(s) via the LSPS, (iv) the delivery by the Owner to the Producers at the
27   Delivery Point of Oil and Gas allocated to the Satellite Leases, (v) Production
28   Handling Services by the Owner as set forth in Section 4.1.1 (*Production*
29   *Handling Services*) of this Agreement and (vi) Operating Services by the Owner
30   as described in Section 4.1.2 (*Operating Services for LSPS*) of this Agreement
31   and Section 4.1.3 (*Operating Service for Satellite Well System*) of this Agreement.
32   Conversely, this Agreement does not apply to the processing and handling of
33   **"Third Party Production"** (as defined herein below) on the Host or to the
34   operation of a Third Party Production system connected to the LSPS and/or the
35   Host. Accordingly, the Producers and/or the LSPS Owners do not have the right
36   to sublease all or part of their rights hereunder except as set forth in Article XIII

**DEBTORS' EX. NO. 02**
**Page 7 of 153**

(*Successors and Assigns*) of this Agreement; and therefore, the Producers and/or the LSPS Owners, either individually or jointly, are prohibited from becoming and do not hold the right to become a sublessor for all or any portion of their rights hereunder. *Notwithstanding anything to the contrary herein, the rights, duties, and obligations of the Parties under this Agreement shall be subject and subordinate to the Na Kika Obligations (as defined herein below), however, nothing in this Agreement shall be construed as Noble, Red Willow or HEDV contractually assuming the Na Kika Obligations.* Owner, in its capacity as co-owner of the Host, will endeavor to secure approval from Shell Offshore Inc. to share copies of the redacted Na Kika Obligations with Producers for informational purposes only.   Owner will endeavor to ensure that subsequent modifications to the Na Kika Obligations will not materially adversely impact the Parties rights under this Agreement, to the extent possible.

## 1.2   Application to Other Agreements

**1.2.1**   Except for the Operating Services with respect to the LSPS described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("**LSPSOA**") being negotiated by and among the LSPS Owners shall govern the rights, duties and obligations among the LSPS Owners associated with: (i) the building and operation of the LSPS; and (ii) the decision-making process among the LSPS Owners related to this Agreement

**1.2.2**   Except for the Operating Services with respect to the Isabela Lease described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the Isabela Joint Operating Agreement ("**Isabela JOA**") attached as Exhibit "L" to this Agreement and effective as of April 2, 2007  by and between BP and Noble as the owners of the Isabela Lease   shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the Isabela Lease; (ii) those portions of the Satellite Well System located on the Isabela Lease; and (iii) the decision-making process between the owners of the Isabela Lease related to this Agreement.

**1.2.3**   Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the MC 519 Unit Operating Agreement ("**MC 519 UOA**") effective as of January 1, 2009 by and between the BP, Noble, Red Willow and HEDV as the owners of the MC 519 Unit Leases shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on the MC 519 Unit Leases; and (iii) the decision-making process between the owners of the MC 519 Unit Leases related to this Agreement.

DEBTORS' EX. NO. 02
Page 8 of 153

**1.2.4**  It is not the intention of the Parties to amend or otherwise modify the terms and conditions of the LSPSOA, the Isabela JOA or the MC 519 UOA, except where expressly stated herein.

**1.2.5**  Except for the Operating Services agreed to be performed by the Host Operator hereunder, it is not the intent or purpose of this Agreement, nor should it be construed as expanding or reducing, the rights and duties of any of the Parties to conduct operations associated with: (i) the LSPS pursuant to the LSPSOA; (ii) the Isabela Lease pursuant to the Isabela JOA; or (iii) the MC 519 Unit Leases pursuant to the MC 519 UOA. As between the parties to such agreements, the provisions of those agreements shall continue to govern the authority delegated to the operators under those agreements and the approval of any operations or authority for expenditures required by the terms of those agreements.

**1.2.6**  In the event of a conflict between the terms of this Agreement and the terms of the Isabela JOA, the MC 519 UOA or the LSPSOA relative to the Producers' and LSPS Owners' utilization of the Host and the Services and related activities that are described in this Agreement, the terms of this Agreement shall prevail over the terms of such agreements.

**1.2.7**  Notwithstanding anything to the contrary in this Agreement, it is the intent of the Parties hereto that if any of the Producers are liable to the Owner or Host Operator for overhead on a cost or an expenditure incurred under the terms of this Agreement, then such Producers shall not be liable for overhead on such cost or expenditure under the terms of the LSPSOA, the Isabela JOA or the MC 519 UOA.

**1.2.8**  Except as otherwise expressly provided for in this Agreement, it is the intent of the Parties hereto that all costs and expenses charged by the Owner or the Host Operator  under this Agreement will be charged to the respective Satellite Operator or the LSPS Operator. Subsequently, the respective Satellite Operator shall charge such costs and expenses (without the application of overhead) to the respective Producer, and the LSPS Operator shall charge such costs and expenses (without the application of overhead) to the respective LSPS Owner.

## ARTICLE II - DEFINITIONS AND EXHIBITS

**2.1**  **Preface**

As used in this Agreement (or in the Exhibits attached hereto), the terms **"Agreement"**, **"Effective Date"**, **"Owner"**, **"Parties"**, **"Party"**, **"LSPS Owners"** and **"Producers"** have the meanings set forth hereinabove.  Other capitalized

Execution Version                4

terms used throughout this Agreement (or in the Exhibits attached hereto) and not listed in Section 2.2 (*Definitions*) of this Agreement have the meanings ascribed to them elsewhere in this Agreement (or in the Exhibits attached hereto).

## 2.2   Definitions

The following capitalized terms have the meanings ascribed to them.

2.2.1   "**Abandonment Notice**" has the meaning ascribed to it in Section 10.5.4(a) (*Responsibilities and Obligations at Termination*) of this Agreement.

2.2.2   "**Adjusted Isabela Capacity**" means Isabela Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Isabela Lease after December 31, 2014, all as further described in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.3   "**Adjusted MC 519 Unit Capacity**" means MC 519 Unit Capacity for each (a) oil, (b) gas, and (c) water, which is available to the MC 519 Unit Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.4   "**Adjusted Satellite Capacity**" means Satellite Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Satellite Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.5   "**Affiliate**" means any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party. The term "**Affiliate**" of a Party includes any parent corporation(s), partnership or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party, and also includes any other corporation, partnership or other entity in which the parent corporation(s) directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation [or fifty percent (50%) or more of the interests in the partnership or other entity].

DEBTORS' EX. NO. 02
Page 10 of 153

- The stock  (or interests in a partnership or other entity) owned or controlled by a Party includes all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party.

2.2.6     "**Barrel**" or "**Bbl**" means forty-two (42) United States standard gallons at standard conditions of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia) at sea level at sixty degrees Fahrenheit (60°F).

2.2.7     "**British Thermal Unit**" or "**Btu**" means the quantity of heat required to raise the temperature of one (1) pound in weight of pure water one degree Fahrenheit (1°F) from fifty-eight and five-tenths degrees (58.5°) Fahrenheit to fifty-nine and five-tenths degrees (59.5°) Fahrenheit at a constant pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia at sea level) and determined on a gross, dry basis.

2.2.8     "**Business Day**" means a period of twenty-four (24) consecutive hours exclusive of Saturdays, Sundays and legal holidays.

2.2.9     "**BOEMRE**" means the United States Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement or any successor thereof with jurisdictional authority over the matters governed by this Agreement.

2.2.10     "**Capital Expenditure**" means any expenditure, except for those made in connection with repair operations that are intended to put or return the Host to its normal use conditions, that: (a) extends the useful life of the Host as it then exists (or any material portion thereof) beyond one (1) year; or (b) that materially enhances the useful life of the Host as it then exists (or any material portion thereof).

2.2.11     "**Claim/Loss**" and "**Claims/Losses**" shall mean all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage, regardless of how such claims and/or losses may be characterized.  Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, demands, suits, causes of action (including actions in rem or in personam, at law or in equity), obligations, judgments, interest, costs, expenses, fines, penalties, losses, assessments, judgments and awards whether created by law, equity, contract, tort, arbitration, voluntary

settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity, the unseaworthiness of any vessel, the unairworthiness of any aircraft or any condition or pre-existing condition (whether known or unknown). The terms also include reasonable attorneys' fees, court costs, and other reasonable costs of litigation resulting from the defense of any Claim/Loss or cause of action within the scope of the indemnities in this Agreement.

2.2.12 **"Confidential Information"** means (i) the terms and conditions of this Agreement, (ii) the production profiles provided by Satellite Operator or their representatives pursuant to this Agreement, (iii) the measurement and allocation reports and data (including, without limitation, data associated with production quality), and (iv) the well test data.

2.2.13 **"Connected With"** shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to." For avoidance of doubt, the indemnities in this Agreement are intended to be broad and cover all Claims/Losses in any way connected to the performance of the Agreement, including any Claims/Losses associated with any presence on any premises, and including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the Host.

2.2.14 **"COPAS"** means the Council of Petroleum Accountants Societies Inc.

2.2.15 **"COPAS Adjustment"** means the adjustment factor provided by Model Form Interpretation 50 "Overhead Adjustment Index ("MFI-50")" which is effective April 1st of each calendar year, as published by COPAS or any replacement overhead adjustment guideline document published by COPAS.

2.2.16 **"Day"** means a period of twenty-four (24) consecutive hours, beginning at 12:00 a.m. central time.

2.2.17 **"Default"** has the meaning ascribed to it in Section 10.2 (*Default*) of this Agreement.

2.2.18 **"Defend"** or **"Defense"** shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a

DEBTORS' EX. NO. 02
Page 12 of 153

result of defending against a Claim/Loss as required by this Agreement, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Agreement.

2.2.19   **"Deferred Host Leases Gas Production" or "DGPC"** shall have the meaning ascribed to it in Section 5.6.2(b) *(Compensation Methodology)* of this Agreement.

2.2.20   **"Deferred Host Leases Oil Production" or "DOPC"** shall have the meaning ascribed to it in Section 5.6.2(a) *(Compensation Methodology)* of this Agreement.

2.2.21   **"Delivery Point(s)"** means:

   (a)   for Gas, the point where the Gas departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

   (b)   for Oil, the point where the Oil departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

2.2.22   **"Dollar" and "$"** means the lawful currency of the United States of America.

2.2.23   **"Entry Point(s)"** means the point(s) at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth on Exhibit "A-2" *(Entry Point)* to this Agreement.

2.2.24   **"Environmental Protection Agency" or "EPA"** shall have the meaning ascribed to it in Section 5.4.2 *(Future Governmental Regulations)* of this Agreement.

2.2.25   The phrases **"even if caused by the Negligence/Fault"** or **"even if contributed to by the joint or concurrent Negligence/Fault"** shall, except to the extent expressly otherwise provided for in this Agreement, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply:

   (a)   without regard to any conflicting rules of liability under any applicable law or regulation;

DEBTORS' EX. NO. 02
Page 13 of 153

(b)     without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention; and

(c)     without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall not apply to or include the gross negligence or willful misconduct of any member of the Owner's Group, Host Operator, or any member of the Satellite Group, whichever is seeking indemnity.

2.2.26   "**Expense Category**" has the meaning ascribed to it in Section 5.1.3(b)(ii) (*General Principle for Costs Charging*) of this Agreement.

2.2.27   "**Expense Type**" has the meaning ascribed to it in Section 5.1.3(b)(i) (*General Principle for Costs Charging*) of this Agreement.

2.2.28   "**Facility Access Modifications**" has the meaning ascribed to it in Section 3.3.1 (*Facility Access Modifications*) of this Agreement.

2.2.29   "**Facility Access Modifications Dedicated System**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(c) (*General Principle for Costs Charging*) of this Agreement

2.2.30   "**Force Majeure**" means events which are beyond the reasonable control of the Party claiming suspension and which, by the exercise of due diligence, such Party would not have been able to avoid or overcome, and only if such events materially affects a Party's ability to perform its obligations hereunder, including but not limited to:

(a)     flood, storm, loop current, eddy, hurricane, earthquake, adverse weather conditions, high sea states, or other acts of God;

**DEBTORS' EX. NO. 02**
**Page 14 of 153**

(b)    fire, explosion, loss of well control, oil spill, or other environmental catastrophe, natural or man made;

(c)    war, terrorist actions, actions of the public enemy, blockade, insurrection, civil disturbance, labor dispute, strike, lockout, or other industrial disturbance, compliance with any law, order rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

(d)    inability to secure materials or equipment; or

(e)    any other causes (other than a cause arising under a contract with a Third Party), whether similar or dissimilar.

2.2.31    "Galapagos Area Loop Subsea Production System Construction and Operating Agreement" or "LSPSOA" has the meaning ascribed to it in Section 1.2.1 (*Application of Other Agreements*) of this Agreement.

2.2.32    "Gas" or "gas" means any mixture of gaseous hydrocarbons, consisting of methane and heavier liquefiable hydrocarbons and inert and noncombustible gases which are extracted from the subsurface of the earth, including any condensate recovered on the Host and re-injected in a downstream pipeline.

2.2.33    "Gas Export Pipeline" means the gas export pipeline that transports Gas from the Gas Delivery point (currently owned and operated by the Okeanos Gas Gathering Company, LLC) which originates at the Host, and terminates at the connection to Main Pass Block 260.

2.2.34    "Gas Production" means the Gas and associated substances produced from the Host Leases, both or each of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.35    "Gas System Host Dedicated Facility" has the meaning ascribed to it in Section 5.1.4(d) (*Cost Charging Procedure*) of this Agreement.

2.2.36    "Handling Fee" or "HF" has the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

2.2.37    "Host" means all equipment and facilities located between the Entry Point(s) and the Delivery Point, including the offshore semi-

DEBTORS' EX. NO. 02
Page 15 of 153

submersible floating platform located on Mississippi Canyon Block 474, and the Facility Access Modifications, but excluding the LSPS and the Satellite Well System.

2.2.38    "**Host Capacity**" means the capacity available as stated for (a) Oil, (b) Gas and (c) water produced as a component of hydrocarbon production, all as further described in Exhibit "B" (*Host Capacity*) to this Agreement.

2.2.39    "**Host Common Facilities**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(e) (*General Principles for Costs Charging*) of this Agreement.

2.2.40    "**Host Dedicated Facility**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(d) (*General Principles for Costs Charging*) of this Agreement.

2.2.41    "**Host Gas Production**" means Gas attributable to Host Production.

2.2.42    "**Host Leases**" means the oil and gas leases that are governed by the Na Kika JOA, as such may be amended from time to time, including but not limited to OCS-G 07937, OCS-G 07938, OCS-G 07944, OCS-G 09808, OCS-G 09821, OCS-G 08823, OCS-G 08831, OCS-G 09837 and, OCS-G 09838 covering and affecting Mississippi Canyon Blocks 383, 385, 429, 430, 520, 522, 566, 607, and 608, respectively, in the Gulf of Mexico.

2.2.43    "**Host Leases Production**" means Oil, Gas, water, and associated substances produced from the Host Leases and processed and handled on the Host.

2.2.44    "**Host Measurement and Allocation Procedures**" or "**Host M&A**" means the measurement and allocation procedures and/or methodologies implemented by the Host Operator for the allocation of production to all inlet sources on the Host, as may be amended from time to time.

2.2.45    "**Host Oil Production**" means Oil attributable to Host Production.

2.2.46    "**Host Operator**" means the operator of the Host named pursuant to the Na Kika Obligations, currently BP or its successors or assigns.

DEBTORS' EX. NO. 02
Page 16 of 153

2.2.47    **"Host Production"** means all Oil, Gas, water, and associated substances processed and handled on the Host.

2.2.48    **[Intentionally omitted.]**

2.2.49    **"Indemnify"** or **"Indemnification"** shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless."

2.2.50    **"Indemnitee"** shall refer to the Person seeking indemnity (or release) under this Agreement.

2.2.51    **"Indemnitor"** shall refer to the Party against whom indemnity (or release) is sought under this Agreement.

2.2.52    **"Infrastructure Access Fee"** or **"IAF"** shall have the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

2.2.53    **"Isabela Capacity"** means 20 MBO/d (gross), 20 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of Isabela Production. Isabela Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.54    **"Isabela First Production"** means the date of the initial introduction of Isabela Production at the Entry Point(s).

2.2.55    **"Isabela JOA"** has the meaning ascribed to it in Section 1.2.2 (*Application to Other Agreements*) of this Agreement.

2.2.56    **"Isabela Lease"** means the oil and gas lease OCS-G 19966 covering and affecting Mississippi Canyon Block 562 in the Gulf of Mexico.

2.2.57    **"Isabela Operator"** means the operator as designated under the terms of the Isabela JOA.

2.2.58    **"Isabela Production"** means Oil, Gas and water produced from the Isabela Lease.

**DEBTORS' EX. NO. 02**
**Page 17 of 153**

2.2.59    "**Latest Fully Allocated Production Month**" means the last production month that was reported by a Satellite Lease Operator to the BOEMRE on the Oil & Gas Operations Report (OGOR) Form MMS-4054, or its replacement form as designated by the BOEMRE or its successor agency with jurisdictional control over such matters. For example, February calendar month production is reported to the BOEMRE on the OGOR during the calendar month of April.

2.2.60    "**Laws**" means any laws, rules and regulations of the United States of America or any duly constituted instrumentality thereof and all other governmental bodies, agencies and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended, enacted, promulgated or issued.

2.2.61    "**LEB**" means one (1) liquid equivalent Barrel determined by treating as one (1) LEB each: one (1) Barrel of Oil, one (1) Barrel of water, or five and eight tenths (5.8) MSCF of Gas.

2.2.62    "**Loop Subsea Production System**" or "**LSPS**" has the meaning ascribed to it in Section 3.2 (*Loop Subsea Production System*) of this Agreement.

2.2.63    "**LSPS Direct Expense**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(b) (*General Principles for Costs Charging*) of this Agreement.

2.2.64    "**LSPS Operator**" means that Person designated as operator under the terms and provisions of the LSPSOA between the LSPS Owners governing the LSPS or any successor LSPS Operator selected pursuant to the provisions of the LSPSOA. As of the Effective Date the LSPS Operator is BP.

2.2.65    "**LSPS Owners**" has the meaning ascribed to it in the preamble of this Agreement.

2.2.66    "**LSPS Owners Group**" means the following entities and Persons individually and collectively: each of the LSPS Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

| 2.2.67 | "LSPSOA" has the meaning ascribed to it in Section 1.2.1 (*Application to Other Agreements*) of this Agreement. |
|---|---|
| 2.2.68 | "MBO/d" means one thousand (1,000) Barrels of Oil per Day. |
| 2.2.69 | "MBtu" means one thousand (1,000) Btu's. |
| 2.2.70 | "MBW/d" means one thousand (1,000) Barrels of water per Day. |
| 2.2.71 | "MC 519 Unit" means the unit formed by that certain Unit Agreement for Outer Continental Shelf Exploration, Development and Production Operations dated effective January 1, 2009 by and between Noble, Red Willow, HEDV, bearing Contract Number 754309001. |
| 2.2.72 | "MC 519 Unit First Production" means the date of the initial introduction of MC 519 Unit Production at the Entry Point(s). |
| 2.2.73 | "MC 519 Unit Capacity" means 20 MBO/d (gross), 50 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of MC 519 Unit Production. MC 519 Unit Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement.  MC 519 Unit Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement. |
| 2.2.74 | "MC 519 Unit Leases" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519; and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico, insofar and only insofar as such leases cover depths below fifteen thousand (15,000) feet TVD. |
| 2.2.75 | "MC 519 Unit Operating Agreement" or "MC 519 UOA" has the meaning ascribed to it in Section 1.2.3 (*Application of Other Agreements*) of this Agreement. |
| 2.2.76 | "MC 519 Unit Operator" means the operator as designated under the terms of the MC 519 UOA. |
| 2.2.77 | "MC 519 Unit Production" means the Oil, Gas and water produced from MC 519 Unit Leases. |

DEBTORS' EX. NO. 02
Page 19 of 153

2.2.78  "**MFI-50**" has the meaning ascribed to it in Section 2.2.14 (*COPAS Adjustment*) of this Agreement.

2.2.79  "**Minimum Monthly Fee**" has the meaning ascribed to it in Section 5.3.5(a) (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6(a) (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement.

2.2.80  "**MMBtu**" means one million (1,000,000) Btu's.

2.2.81  "**MMSCF**" means one million (1,000,000) "**Standard Cubic Feet**" (as defined herein below).

2.2.82  "**MMSCF/d**" means one million (1,000,000) Standard Cubic Feet per Day.

2.2.83  "**MSCF**" means one thousand (1,000) Standard Cubic Feet.

2.2.84  "**MSCF/d**" means one thousand (1,000) Standard Cubic Feet per Day.

2.2.85  "**Na Kika HUA**" means that certain Guiding Principles for a Na Kika Host Utilization Agreement dated May 17th, 2004, as amended, expanded or replaced, from time to time.

2.2.86  "**Na Kika JOA**" means that certain Na Kika Complex Joint Operating Agreement dated April 30, 1998 including addendum(s), as amended from time to time (including adding additional leases). As of the Effective Date the parties to the Na Kika JOA are Shell Offshore Inc. and BP.

2.2.87  "**Na Kika Obligations**" means all rights, duties and obligations (existing or future) between Shell Offshore Inc. and BP (or their respective successors or assigns) related to, or in connection with, the Host, including without limitation the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement (including exhibits), and any gas balancing procedures, oil quality bank, and/or natural gas liquids bank, which might be implemented by the Host owners.

2.2.88  "**Negligence/Fault**" shall mean and include, except to the extent expressly otherwise provided, negligence, strict liability, other premises liability, unseaworthiness, unairworthiness, liability for defective equipment, and breach of statutory duty, whether or not resulting from preexisting conditions, and, except to the extent

expressly otherwise provided, whether or not such Negligence/Fault is sole, direct, indirect, contributory, concurrent, joint, comparative, active, or passive.

2.2.89    "NGL" means natural gas liquid(s).

2.2.90    "Non-Conforming Production" has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

2.2.91    "Non-Performing Party" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.92    "Non-Satellite Production" means Oil, Gas, water, and all associated substances produced from sources other than the Satellite Leases and processed and handled on the Host.

2.2.93    "Notice Period" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.94    "OEB" means one (1) oil equivalent Barrel determined by treating as one (1) OEB each: one (1) Barrel of Oil or five and eight tenths (5.8) MSCF of Gas.

2.2.95    "Oil" or "oil" means any mixture of hydrocarbons, regardless of gravity, originally and naturally occurring as liquids and includes all condensate, distillate, and other liquid hydrocarbons recovered by use of conventional separators on the Host.

2.2.96    "Oil Export Pipeline" means the oil export pipeline known as Na Kika Oil Pipeline, which originates at the Host and terminates at a connection to the Delta Pipeline System at MP 69P that transports Oil from the Oil Delivery Point.

2.2.97    "Oil Production" means Oil and associated substances produced from the Host Leases, both or either of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.98    "Operating Services" means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.99    "Owner" has the meaning ascribed to it in the preamble of this Agreement.

DEBTORS' EX. NO. 02
Page 21 of 153

2.2.100   "Owner's Group" means the following entities and Persons individually and collectively: Owner and it's respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

2.2.101   [Intentionally Omitted]

2.2.102   "Permanent Cessation of Production" means the event which occurs when production has not been restored from the last producing well on the   Isabela Lease or the MC 519 Unit Leases in accordance with 30 CFR Part 250 of the federal regulations concerning suspensions of production or other operations or such other regulations promulgated by the relevant governing authority.

2.2.103   "Person" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, governmental authority, or other entity.

2.2.104   "Prevailing Gas Price" means the arithmetic average of the high price and the low price, for the pertinent month, of the Destin Pipeline Company L.L.C one hundred percent (100%) index price used for pipeline imbalance settlements, or such other published monthly index price defined in the Na Kika Obligations.

2.2.105   "Prevailing Oil Price" means the arithmetic average of the high price and the low price on a day posted in the publication known as Argus Crude, as published by Argus Media, Inc. under the heading HLS ("Heavy Louisiana Sweet") or such other published index defined in the Na Kika Obligations.

2.2.106   "Prior Twelve Months Allocated Production" means the twelve (12) prior calendar months of allocated production prior to the Host Operator's approval of the expenditure. If there are less than twelve (12) months of fully allocated production, the allocation volumes from inception of production will be utilized, plus a value of zero given to months with no production. Once the relative throughput is determined for an expenditure, the allocation percentages assigned to the leases / fields will not change for that expenditure.

DEBTORS' EX. NO. 02
Page 22 of 153

**2.2.107**   "**Producers**" has the meaning ascribed to it in the preamble of this Agreement.

**2.2.108**   "**Producers' Group**" means the following entities and Persons individually and collectively: each of the Producers and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

**2.2.109**   **[Intentionally Omitted.]**

**2.2.110**   "**Production Handling Services**" means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

**2.2.111**   "**Reduced Satellite Fields Capacity**" has the meaning ascribed to it in Section 6.4 (*Production Prioritization*) of this Agreement.

**2.2.112**   "**Satellite Capacity**" means Isabela Capacity and MC 519 Unit Capacity combined.

**2.2.113**   "**Satellite Field Start Up Agreement**" means that certain Satellite Field Start-Up Agreement between BP and Shell Offshore Inc. dated May 17, 2004 as amended, expanded or replaced from time to time.

**2.2.114**   "**Satellite First Production**" means the date of the initial introduction of Satellite Production at the Entry Point(s).

**2.2.115**   "**Satellite Gas Production**" means Gas attributable to Satellite Production.

**2.2.116**   **[Intentionally Omitted]**

**2.2.117**   "**Satellite Leases**" means the Isabela Lease and/or the MC 519 Unit Leases.

**2.2.118**   "**Satellite Lease Direct Expense**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(a) (*General Principles for Costs Charging*) of this Agreement.

**2.2.119**   "**Satellite Oil Production**" means Oil attributable to Satellite Production.

**DEBTORS' EX. NO. 02**
**Page 23 of 153**

2.2.120    **"Satellite Operating Problem"** has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

2.2.121    **"Satellite Operator(s)"** means the operator of the Isabela Lease and the operator of the MC 519 Unit Leases or any successors thereof selected pursuant to the terms and provisions of the Isabela JOA and the MC 519 JOA, respectively.

2.2.122    **"Satellite Production"** means the stream of Oil, Gas, water, and associated substances produced from the Satellite Leases.

2.2.123    **"Satellite System"** means the LSPS and the Satellite Well System.

2.2.124    **"Satellite System Owners"** means all of the Producers (each in its capacity as an owner of the Satellite Leases) and all of the LSPS Owners (each in its capacity as an owner of the LSPS)

2.2.125    **"Satellite Well System"** has the meaning ascribed to it in Section 3.1.1 (*Satellite Well System*) of this Agreement.

2.2.126    **"Services"** means the Production Handling Services and the Operating Services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.127    **"Standard Cubic Foot"** or **"SCF"** means that quantity of Gas that occupies one (1) cubic foot of space when held at a base temperature of sixty degrees (60°) Fahrenheit and a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute (psia).

2.2.128    **"Third Party"** means any Person other than the Owner, the Host Operator, the Producers, and any Party hereto.

2.2.129    **"Third Party Leases"** means oil and gas leases owned by a Third Party, whose production is processed and handled on the Host.

2.2.130    **"Third Party Production"** means Oil, Gas, water, and all associated substances produced from Third Party Leases.

**2.3    Exhibits**

All references in this Agreement to "Exhibits", without further qualification mean the Exhibits listed below and attached to this Agreement.  Each Exhibit listed below is made a part of this Agreement, and is deemed incorporated into the body

DEBTORS' EX. NO. 02
Page 24 of 153

of this Agreement by reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.

Exhibit "A-1": Delivery Point(s)
Exhibit "A-2": Entry Point(s)
Exhibit "B":   Host Capacity
Exhibit "C":   Accounting Procedures
Exhibit "D":   Host Facilities Schematics
Exhibit "E":   Host Services
Exhibit "F":   Operating & Maintenance Expenses
Exhibit "G":   Host Fluid Limits/Operating Parameters
Exhibit "H":   Insurance Provisions
Exhibit "I":   Dispute Resolution Procedures
Exhibit "J":   Certification of Non-Segregated Facilities
Exhibit "K":   Approved AFE's
Exhibit "L":   Isabela JOA

If the provisions of any of the Exhibits listed above conflict with any provisions of the body of this Agreement, the provisions of the body of this Agreement will prevail except as to Exhibits "G" and "H" each provision of which shall prevail over any provision of the body of this Agreement.

## ARTICLE III - INFRASTRUCTURE AND FACILITIES

**3.1     Satellite Well System**

3.1.1   The Producers at their sole cost, risk, liability, and expense will own, design, procure, fabricate, transport, and install each Satellite Well System (**"Satellite Well System"**) and any modifications thereto, which includes, but is not limited to, the following components:

(a)     All facilities and equipment upstream of the LSPS including, but not limited to, the wells, well jumpers, subsea wellheads, choke tie-in bases, umbilicals and terminations, flying leads, flowlines, and wellhead master and wing valves associated with producing and gathering Satellite Production.

3.1.2   Each Satellite Operator will provide, in a timely manner, at the Host Operator's discretion, the design and specifications of its respective Satellite Well System to the Owner.  The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to each Satellite Operator within ninety (90) Days of its receipt of each Satellite Wells System design and

**DEBTORS' EX. NO. 02**
**Page 25 of 153**

specifications.   Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's reasonable judgment. Each Satellite Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

3.1.3   The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.1.2 *(Satellite Well System)* of this Agreement.

3.1.4   Each Satellite Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of its respective Satellite Well System and its connection to the LSPS, at the sole cost and expense of the respective Producers.

**3.2    Loop Subsea Production System**

3.2.1   Subject to Section 3.2.4 *(Loop Subsea Production System)* of this Agreement, the LSPS Owners in accordance with provisions of the LSPSOA at their sole cost, risk, liability, and expense will design, procure, fabricate, test, transport, install, or cause to be installed, interconnected and commissioned the Loop Subsea Production System (**"LSPS"**) and any modifications thereto, which includes, but is not limited to, the following components:

All facilities and equipment upstream of all Entry Point(s) as set forth on Exhibit "A-2" *(Entry Poin(t)s)* to this Agreement but downstream of the Satellite Well System  including, but not limited to, choke tie-in bases, subsea manifolds, umbilicals and terminations, flowlines, flowline risers, associated with producing and gathering Satellite Production.  The LSPS will be owned by the LSPS Owners. For purposes herein, "upstream" is from the Entry Point(s) towards the Satellite Leases.

3.2.2   The LSPS Operator will provide, in a timely manner the design and specifications of the LSPS to the Owner.  The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to the LSPS Operator within ninety (90) Days of its receipt of the LSPS design and specifications.   Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's sole judgment. The LSPS Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

**DEBTORS' EX. NO. 02**
**Page 26 of 153**

**3.2.3**   The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.2.2 *(Loop Subsea Production System)* of this Agreement.

**3.2.4**   The LSPS Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the LSPS and its connection to the Host, at the sole cost and expense of the LSPS Owners.

**3.2.5**   The Host Operator shall determine the timing and scheduling of all activities and operations involving the connection and commissioning of the LSPS to the Host in order to provide for the safety of individuals involved in such activities and operations, to protect the environment, and to minimize interruption of Host Lease operations, Satellite Lease operations and/or Host downtime.

**3.3**   **Facility Access Modifications**

**3.3.1**   All facilities and equipment added to and located on the Host required for the Production Handling Services and all modification to the Host required for the connection of the LSPS to the Host (collectively, the **"Facility Access Modifications"**) will be installed on the Host at a location thereon acceptable to the Owner and Host Operator.   The Facility Access Modifications, specifically excluding the LSPS, will be designed, procured, and fabricated by the Host Operator, and will be installed and interconnected with other facilities on the Host, as well as commissioned, by the Host Operator. For reference purposes, an equipment layout and process flow schematic depicting the Host facilities and the interface between the Facility Access Modifications and the Host facilities is included as Exhibit "D" *(Host/Satellite Facilities Schematic)* to this Agreement. For the avoidance of doubt, the Facility Access Modifications are part of the Host and not part of the LSPS.   All Facility Access Modifications (including any modifications thereto) will be owned by the Owner whether such facilities are procured and/or funded by the Host Operator, the Owner, the Producers, the LSPS Operator or the LSPS Owners.

The Facility Access Modifications include, but are not limited to:

(i)   Inlet separator(s);
(ii)   Process liquids cooling;
(iii)   Boarding valves and topside choke;
(iv)   Flowline pig launchers and receivers;
(v)   Methanol injection;
(vi)   Subsea chemical injection;
(vii)   Riser Gas lift compression;

DEBTORS' EX. NO. 02
Page 27 of 153

(ix) Oil, Gas and water metering and fluid sampling equipment;

(x) Hydraulic Power Unit ("**HPU**");

(xi) the Topsides Umbilical Termination Assembly ("**TUTA**"); and

(xii) the Master Control Station ("**MCS**").

3.3.2 The Producers of the Isabela Lease have, in accordance with the terms and conditions of the Isabela JOA, each approved and executed the following BP authorization for expenditures ("**AFE**"):

| BP's AFE Number | Description | Gross Amount, ($ million) |
|---|---|---|
| Z1-005DG | Integrated Project Team | 16.3 |
| Z1-0067Y | Integrated Project Mgmt | 9.9 |
| Z1-00601 | Long Leads | 35.0 |
| Z1-006DN | Project Mgmt | 25.2 |
| Z1-006DN (Supplement) | Project Mgmt | 10.8 |
| Z1-006DQ | Topsides | 23.8 |
| Z1-006DQ (Supplement) | Topsides | 5.2 |
| Z1-007DQ | Topsides Fab & Install | 82.4 |

Execution of this Agreement shall be deemed approval by the Producers of the AFE's set forth above ("**Approved AFE's**") attached as Exhibit "K" to this Agreement, in accordance with the Isabela JOA. Approximately One Hundred Twenty Nine Million Six Hundred Thousand and No/100 Dollars ($129,600,000) of the funds contained in the Approved AFE's represent costs that have and/or will be incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components. Upon execution of this Agreement, the Producers of the Isabela Lease and the Producers of the MC 519 Unit Leases agree that the Host Operator shall, in accordance with the Isabela JOA and the Isabela accounting procedures, directly charge and invoice Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Lease fifty percent (50%) of the Approved AFE's as they relate to the Facility Access Modifications. The Producers of the MC 519 Unit Leases agree to reimburse the Producers of the Isabela Lease in accordance with the Isabela JOA, for their 50% share of any of the Approved AFE's set forth in this Section 3.3.2 (*Facility Access Modifications*) of this Agreement as they relate to the Facility Access Modifications that were approved prior to the Effective Date of this Agreement.

DEBTORS' EX. NO. 02
Page 28 of 153

Subsequent to the Effective Date of this Agreement, the Host Operator will directly charge and invoice pursuant to the Isabela JOA and Exhibit "C" (*Accounting Procedure*) of the Isabela JOA, Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Leases fifty percent (50%) of all future AFE's in addition to those within the Approved AFE's incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components pursuant to Section 4.4 (*Use of Platform/Riser Space*) of this Agreement. However, the Host Operator shall not be required to proceed with the installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components until the Producers have advanced the estimated costs of such to the Host Operator. The Host Operator shall never be obligated to expend any of its own funds for such costs. The interconnection of the LSPS to the Host shall be carried out by the Host Operator upon receipt of notice of completion of construction of the LSPS from the LSPS Operator. The commissioning of the Satellite System shall be carried out by the LSPS Operator in coordination with the Host Operator. The Host Operator shall determine the timing and scheduling of all activities and operations involving the commissioning of the LSPS and the interconnection of the LSPS to the Host.

3.3.3  The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.3.2 (*Facility Access Modifications*) of this Agreement.

3.3.4  The Host Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the Facility Access Modifications at the sole cost and expense of the Producers.

3.3.5  Owner will endeavor, subject to the Na Kika Obligations, to provide Producers with priority use of the Facility Access Modification for Production Handling Services of Satellite Production during the term of this Agreement.

24

## ARTICLE IV - SERVICES

### 4.1    General

Pursuant to the terms of this Agreement, the Owner agrees to provide the Services and the Owner agrees to cause the Host Operator to perform the Services with respect to the Satellite System and the Satellite Production delivered to the Host commencing as soon as reasonably possible after the commissioning of the Satellite System and its connection to the Host. The Owner, the Host Operator, nor anyone employed by them, will be deemed for any purpose to be the employees, contractors, agents, consultants, servants, or representatives of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator in the performance of any Services or part thereof in any manner dealt with hereunder. Except as otherwise provided herein, neither the Producers nor the Satellite Operator(s) nor the LSPS Owners nor the LSPS Operator will have direction or control of the Owner or the Host Operator, their employees, contractors, agents, consultants, servants, or representatives in the performance of any Services or part thereof under this Agreement. Except as provided in Article I, it is not the intent or purpose of this Agreement, nor should it be construed as changing, the rights and duties of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator to conduct operations associated with the Satellite Leases or the Satellite System.

### 4.1.1    Production Handling Services

The Owner will provide through the Host Operator the Production Handling Services for Satellite Production in accordance with Exhibit "E" (*Host Services*) to this Agreement. The Owner will provide the Production Handling Services for Satellite Production after such production passes through the Entry Point(s) and until production enters the Delivery Point(s).

### 4.1.2    Operating Services for LSPS

The Owner will provide through the Host Operator the Operating Services for the LSPS in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the LSPS, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

Execution Version                          25

DEBTORS' EX. NO. 02
Page 30 of 153