#### 4.1.3   Operating Services for Satellite Well System

The Owner will provide through the Host Operator the Operating Services for the Satellite Well System in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the Satellite Well System, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

### 4.2   Well Unloading

The unloading of completion fluids (e.g. chemicals, fracture fluids, acids, and/or water, etc.) associated with Satellite Leases shall be carried out only with the Host Operator's prior consent. In connection with the granting of such consent, the Host Operator may require the Satellite Operators to comply with such standards and procedures as set by the Host Operator in its sole discretion.

### 4.3   Parties' Responsibilities

#### 4.3.1   Producers' Responsibilities

The Producers will retain responsibility for all Satellite Well System operations that are not performed from or on the Host including, but not limited to, downhole well operations and flowline repairs and maintenance.

#### 4.3.2   LSPS Owners' Responsibilities

The LSPS Owners will retain responsibility for all LSPS operations that are not performed from or on the Host including, but not limited to flowline repairs and maintenance.

### 4.4   Use of Platform/Riser Space

#### 4.4.1   Sufficient weight capacity, buoyancy, and deck space exists on the Host, within the rights of the Owner under the Na Kika Obligations, for the installation of the Facility Access Modifications.

#### 4.4.2   If sufficient weight capacity, buoyancy and deck space is unavailable in the future to allow the Host Operator to perform the Services because of additional Host Leases Production being handled on the Host pursuant to Section 6.4 (*Production Prioritization*) of this Agreement, or if costs and expenses are required to construct and/or make such sufficient weight

**DEBTORS' EX. NO. 02**
**Page 31 of 153**

capacity, buoyancy and deck space available, because of such occurrence, then the Host Operator is responsible for the design, procurement, fabrication and construction or removal of equipment required to create the required sufficient weight capacity, buoyancy and deck space to allow the Host Operator to perform the Services. However, the Producers and the LSPS Owners are responsible for all actual costs incurred by the Owner in and for such activities and operations referenced above and required to allow the Host Operator to perform the Services. The Host Operator in accordance with Exhibit "B" (*Accounting Procedures*) to this Agreement will directly charge and invoice the Producers of the Isabella Lease for fifty percent (50%) of such costs and the Producers of the MC 519 Unit Leases for fifty percent (50%) of such costs. All Host modifications made under Sections 4.4.1 and 4.4.2 will be owned by Owner.

4.4.3   The Producers and/or the LSPS Owners have the right to use only so much of the weight capacity, buoyancy and deck space on the Host which is essential for the installation of the Facility Access Modifications on the Host.

### 4.5   Energy Sources

The Owner will provide energy sources for carrying out of the Services, as may be necessary to fulfill the obligations set forth pursuant to this Agreement from Owner's existing energy sources.

### 4.6   Communication Equipment

The Owner, through Host Operator, will provide access, at the Producers' or the LSPS Owners' sole cost and expense, to the existing communication equipment (i.e. telephones) on the Host, subject to the Host Operator's guidelines, for use by the Satellite Operator(s) or the LSPS Operator associated with the performance of Operating Services by the Host Operator. The Owner may also provide to the Producers and LSPS Owners, at their sole cost and expense, and subject to any mutually acceptable agreement(s) that may be required, data transmission communication line(s), as well as other forms of communication (e.g. microwave transmissions, fiber optic) which are part of the design and specifications contemplated in Section 3.2 (*Loop Subsea Production System*) of this Agreement Section 3.3 (*Facility Access Modification*) of this Agreement, and Section 3.1 (*Satellite Well System*) of this Agreement.

### 4.7   Emergency Response

4.7.1   In the event of an emergency, including, but not limited to, a hydrocarbon leak, explosion, fire, storm, inclement weather or any other situation

DEBTORS' EX. NO. 02
Page 32 of 153

which threatens life, the environment, or property, the Host Operator, with no admission or presumption of liability, may promptly take such action as is deemed appropriate by the Host Operator under the circumstances to remedy or alleviate such emergency. Such action includes, but is not limited to, discontinuing the Services, shutting-in the Satellite Leases' subsea wells and/or the LSPS, and initiating emergency response operations. The Host Operator will promptly notify, given the emergency circumstances, the Satellite Operator(s) and/or the LSPS Operator of such emergency by telephone, followed by written notification of the emergency and remedial actions taken.

4.7.2   All emergency response costs incurred by the Host Operator which are attributable to the LSPS and/or the Satellite Well System(s) will be reimbursed to the Host Operator by the LSPS Owners and/or the respective Producers, as the case may be. Accordingly, the Host Operator will directly charge and invoice the LSPS Operator on behalf of the LSPS Owners and/or the Satellite Operator(s), on behalf of the respective Producers for such costs.

4.7.3   Each Satellite Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the respective Satellite Well System. The LSPS Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the LSPS. The Host Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the Host. The Parties will cooperate to the extent necessary in preparing such reports. All Parties will be provided a copy of any reports filed with governmental agencies in connection with emergency response operations.

4.7.4   Subsequent to the emergency, the Host Operator will have the option to conduct a root cause analysis of the event, activity or equipment from which the emergency arose. The cost of the root cause analysis, and any mitigation measures taken to address the issue raising the emergency, shall be paid for by the Owner and/or the Producers and/or the LSPS Owners who caused the emergency, as determined by the Host Operator.

## ARTICLE V - FEES & EXPENSES

### 5.1   Operating and Maintenance Expenses

The Producers and the LSPS Owners shall reimburse the Host Operator, on a monthly basis for expenses incurred for the direct or indirect benefit of each Party as illustrated on Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement and as defined in this Article V (*Fees & Expenses*).

Execution Version                                        28

### 5.1.1  Producers' Expenses

The Producers are solely responsible for (i) the Satellite Lease Direct Expenses; (ii) Facility Access Modifications Dedicated System expenses; (iii) the Host Dedicated Facility expenses; and (iv) the Host Common Facilities expenses which are allocated to the Producers pursuant to Section   5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice each Satellite Operator, on behalf of the Producers, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

### 5.1.2  LSPS Owners' Expenses

The LSPS Owners are solely responsible for the LSPS Direct Expenses which are allocated to the LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement..

### 5.1.3  General Principles for Cost Charging. The following general principles are applicable to the charging of all expenses (exclusive of Capital Expenditure) incurred by the Host Operator:

(a)  Costs for the direct and exclusive benefit of either the LSPS or any one of the Satellite Leases will be charged directly to the respective LSPS Operator or Satellite Operator.

(b)  Costs incurred for the benefit of multiple fields will be treated as indirect costs and subject to an allocation procedure.  Indirect costs will be charged based on allocated production, as determined by the Expense Type (as defined herein below) and Expense Category (as defined herein below) of the costs incurred.

i.  The "**Expense Type**" will be determined based upon the initial estimated cost of any project or single expenditure. All associated expenditures will retain such expense classification even if the actual total expenditure level would have resulted in a different Expense Type. However, if there is a material variance between the actual total expenditure and the initial estimate for the project or single expenditure that was originally classified as Routine Expense, these costs will be re-allocated as a Non-Routine Expense if the re-allocation would materially alter the

DEBTORS' EX. NO. 02
Page 34 of 153

charges to the applicable Producers and Host Leases. Expense Type will determine the period of throughput to be taken into consideration and will be classified into the following:

(a)  Routine Expenses are projects or single expenditures estimated to cost less than or equal to Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the total gross Latest Fully Allocated Production Month; and

(b)  Non-Routine Expenses are projects or single expenditures estimated to cost in excess of Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the Prior Twelve Months Allocated Production prior to the Host Operators' approval of the expenditure.

ii.  The **"Expense Category"** will determine the type of throughput (oil, gas, or LEB of entitlement production) which will be used to allocate costs. Operating expenses will be classified into the following "Expense Category":

(a)  **"Satellite Leases Direct Expense"** includes costs relative to a specific well or group of wells on a Satellite Lease that produce bulk production to the Host for initial separation and processing. Activities included in the Satellite Leases Direct Expense Category include, but are not limited to, the following that are solely attributable to specific Satellite Lease(s):

i.  All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii.  Expenses for labor, spare parts, replacement parts, tools and equipment rental.

iii.  All intervention, remote operating vehicle, facility repairs (including subsea components and control systems located on the Host), non-routine well or fluid testing (beyond that required for measurement and allocation of production), and unloading and commissioning expenses.

DEBTORS' EX. NO. 02
Page 35 of 153

   iv. Emergency response.

   v. Expenses for chemicals (excluding MEG that is injected into the umbilical distribution header) and fluid disposal costs. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as set forth on Exhibit "E" (*Host Services*) to this Agreement.

   vi. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Satellite Leases' requirements) of consumables, equipment and supplies.

   vii. Non-Routine Expenses for operations at the Host to assist in the diagnosis of subsea and operational problems (e.g. special monitoring of pressures, temperatures and flow rates).

   viii. Software design and modification costs, including but not limited to, programming costs to incorporate a new well from an existing Satellite Lease.

   ix. Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable well or its associated jumper where the problem is located.

  (b) "**LSPS Direct Expense**" includes costs relative to the LSPS. Activities included in the LSPS Direct Expense include, but are not limited to, the following that are solely attributable to the LSPS:

   i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

   ii. Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

   iii. Expenses for chemicals and fluid disposal costs. Charge the LSPS and not the specific well in which chemicals are injected to facilitate delivery to the LSPS, if the sole

Execution Version

31

purpose of the chemical injection is for the benefit of the entire LSPS. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as per Exhibit "E" (*Host Services*) to this Agreement.

  iv. All intervention, remote operated vehicle, pigging (including freeing stuck pigs), hot oiling, emergency response, repairs, and unloading & commissioning expenses.

  v. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the LSPS's requirements) of consumables, equipment and supplies.

  vi. Expenses for services on gas lift risers and injection equipment not associated with compression.

  vii. Expenses for operation and maintenance inspection of the loop pigging systems.

  viii. Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning of the LSPS shall be charged to the LSPS Direct Expense as a Non Routine expense, if the location can be identified to the source of the problem.

 (c) "**Facility Access Modifications Dedicated System**" includes costs relative to the Facility Access Modifications. Activities included in the Facility Access Modifications Dedicated System, include, but are not limited to, the following that are solely attributable to the Facility Access Modifications:

  i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

  ii. Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

  iii. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to

Execution Version

32

accommodate the Facility Access Modifications Dedicated System's requirements of consumables, equipment and supplies.

iv. Expenses for gas lift equipment and services on gas lift injection equipment not associated with compression.

v. Special fluid sampling from Facility Access Modifications separators beyond that required under the measurement and allocation procedures.

vi. Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable Facility Access Modifications Dedicated System as a Non Routine Expense, if the location can be identified to the source of the problem.

(d) "**Host Dedicated Facility**" includes costs relative to equipment located on the Host that is dedicated to service specific oil or gas processing, handling and delivery to the Delivery Point(s). Activities included in the Host Dedicated Facility category include, but are not limited to, the following that are solely attributable to specific Host Dedicated Facility:

i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures.)

ii. Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii. Expenses for chemicals and fluid disposal.

iv. All intervention, non-routine testing (including fluid tests not required by the measurement and allocation of production), emergency response, repairs and commissioning.

v. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Host Dedicated Facilities'

Execution Version                                33

requirements) of consumables, equipment and supplies.

vi.    Expenses for riser gas lift compression.

vii.    Expenses for the Gas System Host Dedicated Facility includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger and condensate free water knock out.

viii.    Expenses for the Oil System Host Dedicated Facility includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps.

(e)    "Host Common Facilities" include costs relative to equipment located on the Host that is shared or provides service to a combination of the Host Leases, Satellite Leases, and/or Third Party Production. Activities included in Host Common Facilities include, but are not limited to, the following that are solely attributable to Host Common Facilities, unless otherwise indicated:

i.    All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures) not specifically identified as Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

ii.    Expenses for labor, spare parts, replacement parts, tools, equipment rental, and other consumables.

iii.    Expenses for chemicals associated with processing or chemicals not specifically associated with a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated Facility, or Host Dedicated Facility.

iv.    Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

Execution Version                    34

v.   All ROV, structure or intervention, non-routine testing (including fluid tests not required by the Host M&A), emergency response, unloading, repairs and commissioning.

vi.   Routine well testing, surface fluid sampling (BS&W, gas, water, etc) on inlet separators, metering, allocation of production and reporting as required per the Host M&A or other governing agreement. (Does not include routine maintenance of meters and samplers associated with inlet separators).

vii.   Expenses related to the documenting and reporting routine well performance of the subsea wells tied back to the Host and performance of the Host.

viii.   Produced water and solids handling, treating and disposal expenses (excluding well unloading expenses).

ix.   Utilities (Electrical power, instrument air, control systems, office, quarters, galley, crane, communications center, potable water, ventilation systems, etc.).

x.   Transportation for personnel, equipment, spare parts and consumables to and from shore base, except for rig operations and except for special trips benefiting only a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

xi.   On-site (on the host) instruction and training of operations personnel on the host.

xii.   Expenses for routine on-site operation and maintenance benefiting all subsea production system components installed on the Host.

xiii.   General administrative services for all operations based on the Host including, but not limited to order, receipt and verification of receipt of parts, tools, supplies and services and manage on-site inventories of such items.

Execution Version

35

xiv.   Simulator and production allocation software costs not associated with a tie-in of a new production steam.

xv.   General emergency response preparedness on the Host (availability of materials, etc.).

**5.1.4   Cost Charging Procedure.** The following cost charging procedure will be implemented by the Host Operator for the different possible permutations of Expense Type and Expense Category for costs and expenses incurred by the Host Operator.

(a)   Satellite Leases Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of either the Isabela Lease or MC 519 Unit Leases will be borne by the respective Producers but billed to the Satellite Operator. The Satellite Operator(s) will not reapply an overhead charge to Satellite Leases Direct Expense for charges passed down to Producers, once overhead has been applied from the Host Operator.

i.   Costs for Isabela Lease well(s) associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the Isabela Producers but billed to the Isabela Satellite Operator.

ii.   Costs for the MC 519 Unit Leases well(s), associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the MC 519 Unit Producers but billed to the MC 519 Unit Operator.

(b)   LSPS Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the LSPS will be borne by the respective LSPS Owners but billed to the LSPS Operator. The LSPS Operator will not reapply an overhead charge to LSPS Direct Expense for charges passed down to LSPS Owners, once overhead has been applied from the Host Operator.

i.   Routine Expenses shall be allocated to the LSPS Owners utilizing the LSPS based on the proportion between i) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the LSPS and ii) the total OEB throughput in the LSPS during such month.

DEBTORS' EX. NO. 02
Page 41 of 153

ii.     Non-Routine Expenses shall be allocated to the LSPS Owners utilizing (or that have utilized) the LSPS based on the proportion between (a) the Prior Twelve Months Allocated Production on an OEB basis for the respective LSPS Owners utilizing the LSPS and (b) the total OEB throughput in the LSPS during such period.

(c)     Facility Access Modifications Dedicated System (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the Facility Access Modifications will be borne by the respective Producers but billed to the applicable Satellite Operator(s). The applicable Satellite Operator(s) will not reapply an overhead charge to Facility Access Modifications Dedicated System costs for charges passed down to Producers, once overhead has been applied from the Host Operator.

i.     Routine Expenses shall be allocated to the Producers utilizing the Facility Access Modifications based on the proportion between (a) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Satellite Production on an OEB basis in the Facility Access Modifications during such month.

ii.     Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Facility Access Modifications based on the proportion between (a) the Prior Twelve Months Allocated Produced on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Prior Twelve Months Allocated Production of Satellite Production on an OEB basis in the Facility Access Modifications.

(d)     Expenses for the Gas System Host Dedicated Facility, which includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger & condensate free water knock out as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement  and shall be allocated to the Satellite Leases connected to the Gas System Host Dedicated Facility in accordance with the following:

i.     Routine Expenses shall be allocated to the Satellite Leases utilizing the Gas System Host Dedicated Facility based on the proportion between (a) the Latest Fully Allocated

DEBTORS' EX. NO. 02
Page 42 of 153

Production Month Gas Production for the respective Satellite Leases and (b) the total Gas Production throughput at the Host during such month.

ii.     Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Gas System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Gas Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Gas Production throughput at the Host.

A well is considered to be connected to the Gas System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the condensate free water knock out, and/or Gas from the inlet separator flows to the booster gas compressor or the dehydration system.

(e)     Expenses for the Oil System Host Dedicated Facility, which includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement  and shall be allocated to the Satellite Leases connected to the Oil System Host Dedicated Facility in accordance with the following:

i.      Routine Expenses shall be allocated to the Satellite Leases utilizing the Oil System Host Dedicated Facility based on the proportion between (a) Latest Fully Allocated Production Month Oil Production for the respective Satellite Leases and (b) the total Oil Production throughput at the Host during such month.

ii.     Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Oil System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Oil Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Oil Production throughput at the Host.

A well is considered to be connected to the Oil System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the oil free water knock out.

DEBTORS' EX. NO. 02
Page 43 of 153

(f)    Expenses for the Host Common Facilities shall be allocated to the Satellite Leases connected to the Host in accordance with the following:

    i.    Routine Expenses shall be allocated to the Satellite Leases utilizing the Host based on the proportion between (a) the Latest Fully Allocated Production Month relative LEB throughput for the respective Satellite Leases and (b) the total LEB throughput at the Host during such month.

    ii.    Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Host based on the proportion between (a) the Prior Twelve Months Allocated Production of LEB throughput for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total LEB throughput at the Host.

**5.2    Fuel, Flare and Vent Gas**

Host fuel, flare and vent gas consumption will be allocated on a monthly basis to the Owner for Non-Satellite Production handling and to the Producers for Satellite Production handling in accordance with this Section 5.2. The value of such gas is not included in Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

**5.2.1**    Fuel, flare and vent gas consumed by certain production handling equipment and facilities located on the Host will be allocated to each Satellite Lease in accordance with the Host M&A.

**5.2.2**    Each calendar month, the Host Operator will allocate and deduct from each Satellite Lease's share of Gas available for sale its allocated share of fuel, flare and vent gas.

**5.3    Infrastructure Access and Handling Fees**

In addition to the direct expenses and indirect expenses provided for in Section 5.1 (*Operating and Maintenance* Expenses) of this Agreement and in consideration for: (i) access to the Host; (ii) utilization of Host facilities, including, but not limited to, riser porches and umbilical boarding facilities; (iii) utilization of buoyancy and riser space for the LSPS; (iv) utilization of buoyancy and deck space for the Facility Access Modifications; and (v) for the Services provided by the Owner, the Satellite Operators on behalf of the Producers will pay the Owner consistent with the Host M&A and in accordance with Exhibit "C" (*Accounting Procedures*) to this Agreement, an Infrastructure Access Fee ("IAF"

**DEBTORS' EX. NO. 02**
**Page 44 of 153**

or "Infrastructure Access Fee") and Handling Fee ("HF" or "Handling Fee") for those committed oil and gas reserves set forth only in Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement on a monthly basis, as follows:

### 5.3.1 Infrastructure Access Fee for Isabela Production

   (a)   Isabela Producers will pay an IAF of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

   (b)   Isabela Producers will pay an IAF of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

   (c)   The IAF for Isabela Oil and Gas within this Section 5.3.1 will be adjusted starting on April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 1.

### 5.3.2 Infrastructure Access Fee for MC 519 Unit Production

   (a)   MC 519 Unit Producers will pay an IAF of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

   (b)   MC 519 Unit Producers will pay an IAF of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

   (c)   The IAF for MC 519 Unit Oil and Gas within this Section 5.3.2 will be adjusted starting on April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 2.

### 5.3.3 Handling Fee for Isabela Production

   (a)   Isabela Producers will pay an Oil handling fee of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

   (b)   Isabela Producers will pay a Gas handling fee of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

   (c)   Isabela Producers will pay a water handling fee of ▮▮▮ per Barrel of water allocated to each Producer on a monthly basis.

DEBTORS' EX. NO. 02
Page 45 of 153

(d)     The handling fees for Isabela Oil, Gas, and water within this Section 5.3.3 will be adjusted April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 3.

### 5.3.4   Handling Fee for MC 519 Unit Production

(a)     MC 519 Unit Producers will pay an Oil handling fee of ███ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)     MC 519 Unit Producers will pay a Gas handling fee of ███ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)     MC 519 Unit Producers will pay a water handling fee of ███ per Barrel of water allocated to each Producer on a monthly basis.

(d)     The handling fees for MC 519 Unit Oil, Gas, and water within this Section 5.3.4 will be adjusted April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 4.

### 5.3.5   Isabela Lease Minimum Monthly Fee

(a)     Effective as of the first Day of the month following Isabela Lease First Production, if the summation of (i) Infrastructure Access Fees for Isabela Production for each product (Oil, Gas) set forth in Section 5.3.1 (*Infrastructure Access Fee for Isabela Production)* of this Agreement, and (ii) Handling Fees for Isabela Production for each product (Oil, Gas, and water) set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement is less than Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) in any calendar month, the Isabela Operator on behalf of the Producers will be charged and agree to pay to the Host Operator, a fee of Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for Isabela Production set forth in Section 5.3.1 and Section 5.3.3 of this Agreement.

DEBTORS' EX. NO. 02
Page 46 of 153

(b)    The Isabela Producer's obligation to pay the Host Operator the Isabela Lease minimum monthly fee set forth in Section 5.3.5 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling Isabela Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by Isabela Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

(c)    The Isabela Lease minimum monthly fee will be adjusted April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.5 (a) of this Agreement.

### 5.3.6    MC 519 Unit Leases Minimum Monthly Fee

(a)    Effective as of the first Day of the month following MC 519 Unit First Production, if the summation of (i) Infrastructure Access Fees for MC 519 Unit Production for each product (Oil, Gas) set forth in Section 5.3.2; and (ii) Handling Fees for MC 519 Unit Production for each product (Oil, Gas, and water) set forth in Section 5.3.4 is less than One Hundred and Fifty Thousand and No/100 Dollars ($150,000) in any calendar month the MC 519 Unit Operator on behalf of the MC 519 Unit Producers will be charged and agree to pay to the Host Operator, a fee of One Hundred and Fifty Thousand and No/100 Dollars ($150,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for MC 519 Unit Production set forth in Sections 5.3.2 and 5.3.4 of this Agreement.

(b)    The MC 519 Producer's obligation to pay the Host Operator the minimum monthly fee set forth in Section 5.3.6 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling MC 519 Unit Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by MC 519 Unit Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

DEBTORS' EX. NO. 02
Page 47 of 153

(c)     The MC 519 Unit Leases minimum monthly fee will be adjusted April 1, 2010 and annually thereafter.   The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.6 (a) of this Agreement.

5.3.7   Payment of the minimum monthly fees set forth in Section 5.3.5 (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6 (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement does not mitigate, eliminate or be in lieu of any obligation to deliver Satellite Production to the Host pursuant to this Agreement, including but not limited to Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement.

5.3.8   In no event shall Host Operator charge overhead for Infrastructure Access Fees and Handling Fees set forth in Section 5.3 (*Infrastructure Access Fee and Handling Fees*) of this Agreement.

5.4   **Future Governmental Regulations**

5.4.1   The Parties agree that the Handling Fee for produced water, as escalated, attributable to the Satellite Leases as set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement and Section 5.3.4 (*Handling Fee for MC 519 Unit Production*) of this Agreement will be increased to reflect future increased costs associated with modifications due to government regulations or Laws affecting discharge requirements of treated produced water into the Gulf of Mexico, which are verifiable and attributable to Satellite Production.   Such modifications could involve monitoring, testing, or treating (includes adding chemicals) the produced water.   The Host Operator will provide justification and a rationale for such cost increase for the Producers' review.

5.4.2   In addition to Section 5.4.1 (*Future Governmental Regulations*) of this Agreement, the Parties recognize that the regulatory environment could change during the term of the Agreement and such change could result in unforeseen costs to the Owner in order to maintain compliance therewith. Accordingly, the Parties do hereby agree that in the event the Owner incurs additional costs due to changes in federal, state or industry regulations, rules or codes set forth by the Environmental Protection Agency ("**EPA**"), BOEMRE, Department of Homeland Security, or similar governing authority which regulations are directly related to the provision of Services hereunder, then the Parties will agree on a methodology similar to the methodology set forth in this Article V (*Fees*

DEBTORS' EX. NO. 02
Page 48 of 153

& *Expenses*) of this Agreement by which such costs will be recovered by the Owner.

**5.5    Owner's Expenses**

The Owner is responsible for expenses not allocated to the Producers and LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

**5.6    Host Shut Down Compensation**

**5.6.1    Compensation for Owner**

(a)    The Owner shall be compensated by the Producers for any and all Host Leases Oil and Gas Production which is deferred due to Host downtime that is solely attributable to the fabrication, construction, installation, hookup, tie-in, inspection, commissioning and/or operation of facilities (including, without limitation, the LSPS and Facility Access Modifications) required to handle Satellite Production. As calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement, the Host Operator will directly charge and invoice the Producers for deferred production compensation and the corresponding Producer will pay such invoice as provided herein. The deferred production compensation calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement will be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers.

(b)    In addition to deferred Production compensation, the Owner shall be reimbursed by the Producers for any incremental costs incurred by the Owner because of:

(i)    the costs associated with Host shutdown which are solely attributable to the Producers' related work activities or operations shall be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers. The Host Operator will directly charge and invoice each of the Satellite Operator for its share of such incremental costs; and

(ii)    the costs associated with Host shutdown which are solely attributable to a Producer's related work activities or operations on either the Isabela Lease or the MC 519 Unit Leases shall be billed one hundred percent (100%) to the

DEBTORS' EX. NO. 02
Page 49 of 153

Satellite Operator whose Satellite Lease was responsible for the Host shutdown. The Host Operator will directly charge and invoice the applicable Satellite Operator.

(c)     The Owner shall be reimbursed by the LSPS Owners for any incremental costs incurred by the Owner because of a Host shutdown which is solely attributable to LSPS work activities or operations and not directly attributable to any of the Satellite Leases. The Host Operator will directly charge and invoice each of the LSPS Owners, for its share of such incremental costs which the LSPS Owners will pay as provided herein.

**5.6.2   Compensation Methodology**

(a)     Compensation for Deferred Host Leases Oil Production ("**DOPC**") as outlined in Section 5.6.1(a) (*Compensation for Owner*) of this Agreement is equal to:

$$DOPC = (AOPR) \times (SDD) \times (POP) \times (0.35)$$

Where:  AOPR  =  the average daily volume of Host Leases Oil Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in gross Barrels per Day, i.e., without any reduction for royalty),

SDD   =  the duration of such Host shutdown (expressed in Days to the nearest one-hundredth of a Day), and

POP   =  the average Prevailing Oil Price during the duration of such Host shutdown (expressed in Dollars per Barrel).

(b)     Compensation for Deferred Host Leases Gas Production ("**DGPC**") as outlined in Section 5.6.1(a) of this Agreement is equal to:

$$DGPC = (AGPR) \times (HV) \times (SDD) \times (PGP) \times (0.35)$$

Where:  AGPR  =  the average daily volume of Host Leases Gas Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown

DEBTORS' EX. NO. 02
Page 50 of 153

(expressed in gross MSCF per Day, i.e., without any reduction for royalty),

HV  =  the average daily Btu content of the Host Lease Gas Production during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in MMBtu per MSCF),

SDD  =  the duration of the Host shutdown (expressed in Days, to the nearest one-hundredth of a day), and

PGP  =  the average Prevailing Gas Price during the duration of the Host shutdown (expressed in Dollars per MMBtu).

### 5.6.3   Duration of Shutdown

(a)   At least thirty (30) Days prior to a scheduled shutdown of the Host, the Host Operator will provide the Producers and Owner an estimate of the duration of such shutdown which is solely attributable to LSPS and/or Satellite Leases' related work activities.

(b)   Within sixty (60) Days immediately following completion of a shutdown of the Host, the Host Operator will provide the Producers and Owner with a final report and statement of amounts due as per Section 5.6 (*Host Shut Down Compensation*) reflecting the actual work done and its duration.   As per Exhibit "C" (*Accounting Procedures*) each Producer shall pay the amount invoiced.

### 5.6.4   Deferred Compensation for Producers

If operations are conducted on the Host to provide for handling of Third Party Production, and such operations result in Satellite Production being shut-in, then the Producers shall be entitled to share in any deferred compensation paid by such Third Party to the Owner because of such operations.   The sharing of future deferred compensation shall be in the ratio of Satellite Leases Oil Production and Gas Production to total Oil Production and Gas Production processed and handled at the Host prior to the shutdown.

DEBTORS' EX. NO. 02
Page 51 of 153

**5.6.5**   In no event shall Host Operator charge overhead for DOPC and DGPC set forth in Section 5.6.2 (*Compensation Methodology*) of this Agreement.

**5.7**   **Royalties and Taxes**

**5.7.1**   Each Producer will be solely responsible for payment of the royalties and taxes attributable to its share of Oil Production and Gas Production.

**5.7.2**   This Agreement and the operations hereunder are not intended to create, and will not be construed to create a joint venture, association or partnership with respect to the Parties. If, for United States federal income tax purposes, this Agreement is regarded as a partnership, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter "K", Chapter 1, Subtitle "A" of the United States Internal Revenue Code of 1986, as amended ("**Code**"), to the extent permitted and authorized by Section 761(a) of the Code and the regulations promulgated thereunder, or similar provisions of applicable state laws.

**5.8**   **Third Party Contractors**

The Host Operator may, in its sole discretion, utilize the services of Third Party contractors for the purposes of providing the Services and/or implementing this Agreement. The costs of such Third Party services shall be chargeable in accordance with Exhibit "E" (*Operating and Maintenance Expenses*) to this Agreement.

**5.9**   **Allocation Factors.**

The following allocation factors will be used throughout this Agreement in accordance with Section 7.1 (Measurement and Allocation Procedures) of this Agreement:

(a)   Each lease LEB allocation factor shall be the sum of the barrel equivalent of entitlement production (Oil Production, Gas Production, and allocated water), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

(b)   Each lease Gas Production allocation factor shall be the entitlement gas production (sales, fuel, flare, vent, and gas lift allocated to gas wells and to oil wells), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

DEBTORS' EX. NO. 02
Page 52 of 153

(c)   Each lease Oil Production allocation factor shall be the entitlement oil production (sales, fuel, flare, vent, and hot oiling allocated to gas wells as condensate and to oil wells as crude oil), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

## ARTICLE VI - CAPACITY

**6.1   Host Capacity**

Subject to the remaining provisions of this Article VI, (Capacity) of this Agreement the Owner will provide, but does not warrant or guarantee, to the Producers capacity for production processing and handling on the Host for Satellite Production.  However, upon partial or entire loss of or damage to the Host (or any component of the Host) resulting from any incident, the Owner will have no obligation to repair or replace the Host or any component thereof for purposes of (i) re-connecting the LSPS to the Host, (ii) re-installing the Facility Access Modifications on the Host, (iii) resuming the Production Handling Services or (iv) re-initiating the Operating Services. Notwithstanding the foregoing, nothing contained in this Agreement limits or restricts the Owner from entering into other agreements for the utilization of the Host and/or its related equipment and facilities.

**6.2   Satellite Leases Capacity**

Contingent upon the Producers delivering Satellite Production to the Host that conforms to the operating and fluid parameters set forth on Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, and subject to Section 6.4 (*Production Prioritization*) of this Agreement the Owner agrees to process and handle Satellite Production at production rates not to exceed each of Isabela Capacity or MC 519 Unit Capacity respectively. Producers' utilization of Isabela Capacity and MC 519 Unit Capacity for Satellite Production is subject to curtailment as provided in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity and MC 519 Unit Capacity will be determined individually for each of the Satellite Leases and for each product (Oil, Gas, and water) on a daily throughput basis.

(a)   The amount of Isabela Capacity and MC 519 Unit Capacity for any single product (i.e. Oil, Gas, or water) will not be exceeded by the respective Satellite Leases in order to allow the Producers of such Satellite Leases to fully utilize the Satellite Capacity for another product from such Satellite Leases.

**DEBTORS' EX. NO. 02**
**Page 53 of 153**

(b) In the event the Producers do not utilize the Isabela Capacity and MC 519 Unit Capacity, respectively, during a calendar month, the Owner has the right to utilize, as it deems necessary and free of cost, any unused capacity for such calendar month on an interruptible basis and the Producers will not have the right to make-up such production capacity.

**6.2.1   Initial Satellite Fields Capacity**

Initial Isabela Capacity shall be the capacity required for processing Isabela Production on the Host and shall be set initially at the volumes set forth in Section 2.2.53 (*Isabella Capacity*) of this Agreement. Initial MC 519 Unit Capacity shall be the capacity required for processing MC 519 Unit Production on the Host and shall be set initially at the volumes set forth in Section 2.2.73 (*MC 519 Unit Capacity*) of this Agreement.

**6.2.2   Adjusted Satellite Capacity**

Every calendar year after the later of Dec 31st, 2014 or the year in which Isabela First Production or MC 519 Unit First Production occurs, the Isabela Capacity and the MC 519 Unit Capacity will be re-determined individually for the next calendar year. The Adjusted Isabela Capacity and the Adjusted MC 519 Unit Capacity will be defined as one hundred percent (100%) of the actual average daily production for such Satellite Field (excepting Satellite Fields or Host related downtime and/or curtailment) processed at the Host during the expiring calendar year. However, in no event will the quantity of adjusted capacity for Isabela Production handling or MC 519 Unit Production handling exceed the quantity of initial capacity set forth in Section 2.2.53 (*Isabella Capacity*) of this Agreement and Section 2.2.73 (*MC 519 Unit Capacity*) of this Agreement respectively.

**6.3   Interruptible Capacity**

Subject to Section 6.4 (*Production Prioritization*) of this Agreement, Satellite Leases can use available Host Capacity in excess of Isabela Capacity (or Adjusted Isabela Capacity, if applicable) and MC 519 Unit Capacity (or Adjusted MC 519 Unit Capacity, if applicable) respectively on an interruptible basis, without additional approval from Owner. All terms and conditions from this Agreement apply to production using interruptible capacity.

**6.4   Production Prioritization**

At all times Host Leases Production shall have priority use of the Host and Host Capacity over any Satellite Production. At all times Isabela Production shall have priority use of Owner's share of Host and Host Capacity over MC 519 Unit

DEBTORS' EX. NO. 02
Page 54 of 153

Production and Third Party Production. At all times, MC 519 Unit Production shall have priority use of Owner's share of Host and Host Capacity over any Third Party Production processed and handled on the Host after the Effective Date. In the event of an interruption or reduction in Host Capacity, Isabela Capacity and MC 519 Unit Capacity for Oil, Gas and water will be reduced ("**Reduced Satellite Fields Capacity**") as set forth below. Notwithstanding the foregoing, the Host Operator shall endeavor to ensure that the Isabela Capacity and the MC 519 Unit Capacity shall not be less than "production in paying quantities" as stipulated by the BOEMRE for such Satellite Lease.

### 6.4.1   Processing Facility Constraints

(a)   In the event of an interruption or reduction, whether permanent or temporary, in the Host Capacity due to: (i) a Force Majeure event or in preparation for a Force Majeure event, (ii) a planned or unplanned partial or complete shutdown of the Host or any component of the Host for maintenance, repair, replacement, construction or inspections, (iii) a constraint in the Oil Export Pipeline or Gas Export Pipeline, or (iv) a Host equipment/facility upset or other such operating problems, then the Host Operator may make reasonable and prudent efforts to promptly restore normal operations while maintaining safe and efficient production handling operations and in a manner facilitating the resumption of normal operations. During such interruption or reduction in Host Capacity, the Host Operator will allocate the available Host Capacity to the extent it is safe and practical to do so, in accordance with the priorities provided in Section 6.4 (*Product Prioritization*) of this Agreement.

6.4.2   During time periods when the Host or any component thereof is partially or totally shut-in, the Isabela Capacity and MC 519 Unit Capacity will be adjusted in accordance with the priorities provided in Section 6.4.(*Production Prioritization*) of this Agreement to the extent necessary and the Producers will not have the right to make-up such production.

### 6.5   Production Compatibility

The Producers' access to capacity for production processing and handling on the Host set forth in this Article VI (*Capacity*) assumes that the operating parameters/conditions of the Satellite System, and each of the Isabela Production and the MC 519 Unit Production arriving at the Entry Point(s) fully conform to specifications and characteristics stipulated in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement. Additionally, the terms and conditions of this Agreement were established and agreed to by the Parties based on the assumption that the operating parameters/conditions of the Satellite System and the Satellite Production arriving at all Entry Point(s) fully conform to such specifications and characteristics.

DEBTORS' EX. NO. 02
Page 55 of 153

### 6.5.1 Conforming Fluids

If Satellite Production arriving at an Entry Point(s) conforms to all of the specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, then any incremental operating costs which may result from handling Satellite Production on the Host, which are not classified as Satellite Leases Direct Expense in Exhibit "F" (*Operating and Maintenance Expenses*) or otherwise designated as costs to be borne solely by the Producers, will be treated as Host Common Facilities in Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement.

### 6.5.2 Non-Conforming Satellite Production

If Satellite Production arriving at an Entry Point(s) does not conform to one or more of the operating parameters and/or specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement ("**Non-Conforming Production**"), as evidenced to the extent possible by at least three (3) fluid samples taken within a period of seven (7) consecutive Days, and such non-conformance (i) results in incremental Host operating costs, (ii) causes a reduction in the Host Capacity, (iii) causes other operational problems on the Host, or (iv) causes any problem with the Oil Export Pipeline and/or Gas Export Pipeline (hereinafter collectively or individually referred to as a "**Satellite Operating Problem**"), the Host Operator may endeavor, but the Owner is not obligated, to accept and handle such Non-Conforming Production or at its sole discretion may decide to shut-in the well(s) or curtail Isabela Production and/or MC 519 Unit Production, as the case may be, until the Satellite Operating Problem has been rectified by the corresponding Producers in accordance with the following:

(a) The applicable Producers are solely responsible for all costs and expenses incurred by the Host Operator and/or the Owner:

    (i) directly resulting from the Satellite Operating Problem (including, without limitation, deferred production); and/or

    (ii) for reasonable measures taken to rectify or mitigate the Satellite Operating Problem, and/or

    (iii) which are associated with the Satellite Operating Problem until such problem has been rectified.

**DEBTORS' EX. NO. 02**
**Page 56 of 153**

The Host Operator will directly charge and invoice the applicable Satellite Operator(s), on behalf of the corresponding Producers, for such costs and expenses.

(b)     Subject to the emergency provisions included in Section 4.7 (*Emergency Response*) of this Agreement and after identifying the Satellite Operating Problem, but prior to initiating any measures to rectify such problem which would result in material expenditures, the Host Operator will provide the respective Producers (with an information copy to the Owner) with a written proposal for measures to rectify the Satellite Operating Problem and an estimate of the associated costs.   Notwithstanding the foregoing, the respective Producers shall be responsible for all costs and expenses of all damages or repairs to the Host in connection with Satellite Operating Problems.

(c)     The Producers will have thirty (30) Days from their receipt of the Host Operator's written proposal submitted pursuant to Section 6.5.2(b) (*Non-Conforming Satellite Production*) of this Agreement to approve such proposal in writing. Failure to respond shall be deemed a non-approval.  Should the respective Producers and the Owner fail to determine a mutually acceptable technical alternative to mitigate the incompatibility, the Host Operator has the right to discontinue the Services set forth in Section 4.1.1 (*Production Handling Services*) of this Agreement and Section 4.1.3 (*Operating Services for Satellite Well System*) of this Agreement with respect to the Satellite Production causing the Satellite Operating Problems.

## ARTICLE VII - PROCEDURES AND PERMITTING

**7.1**     **Measurement and Allocation Procedures**

7.1.1   Satellite Production and Non-Satellite Production will be sampled, metered and allocated in accordance with procedures developed and implemented by the Host Operator in compliance with the commingling permit issued by the BOEMRE. The allocation of Satellite Production to the Entry Point will be handled in accordance with the Host M&A. The Host M&A will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS, and the Satellite Well System will apportion Host Production to the Satellite Leases in the same manner as other Host Production is apportioned to the Host Leases and Third Party Leases.

DEBTORS' EX. NO. 02
Page 57 of 153

7.1.2   The implementation of the Host M&A is (i) conditioned upon approval by the BOEMRE of the surface commingling application referred to in Section 7.2.1 (*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto; (ii) subject to and in accordance with the BOEMRE approved surface commingling application referred to in Section 7.2.1(*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto, and (iii) in accordance with BOEMRE requirements set forth in 30 CFR Part 250 Subpart L and any subsequent amendments and/or waivers thereof.

## 7.2   Permits

### 7.2.1   Surface Commingling Permit

Satellite Production will not be accepted at the Entry Point(s) and will not flow across the Host without first obtaining all required surface commingling permits.  The Host Operator will prepare and submit, or cause to be prepared and submitted, any and all required surface commingling permit applications to the BOEMRE (for surface commingling of Satellite Production with Non-Satellite Production) in accordance with all applicable laws, rules and regulations of governmental bodies having jurisdictional authority.  The Producers and Owner will cooperate with the Host Operator to the extent necessary to achieve BOEMRE approval of the initial surface commingling application, amendment thereto or subsequently required applications.

### 7.2.2   Other Permits

The Satellite Operators, on behalf of the relevant Producers, and the LSPS Operator, as applicable, will obtain, or caused to be obtained, all other required approvals, permits, consents, orders or other documents, without limitation, from all appropriate jurisdictional authorities to produce the Satellite Leases, transport Satellite Production to the Host, and dispose/transport Satellite Production from the Host.   Each Satellite Operator, the LSPS Operator, and the Host Operator will cooperate with each other to the extent necessary to obtain such permits, licenses, authorizations and regulatory approvals.

## 7.3   Commingling of Production

At the sole discretion of the Host Operator, the Host Operator may elect to commingle Satellite Production on the Host with Non-Satellite Production. At the direction of the LSPS Operator to the Host Operator, the Host Operator shall commingle MC 519 Unit Production with Isabela Production.

## 7.4   Re-Allocations

Notwithstanding the audit time period set forth in Exhibit "C" (*Accounting Procedures*) to this Agreement, in the event: (i) the BOEMRE requires the Host Operator for any reason to re-allocate production between the Host Leases, Satellite Leases, and/or Third Party Leases; or (ii) a re-allocation is required as the result of a re-allocation pursuant to the Host M&A, the Host Operator has the right to re-allocate production to/from the Host Leases and the Satellite Leases and/or Third Party Leases by implementing: (i) the requirements of the approved surface commingling permit, as may be amended from time to time; or (ii) the Host M&A re-allocations, utilizing reasonable industry practices/standards and regulatory requirements.

## 7.5   Oil Quality Bank and NGL Bank

The Host Operator reserves the right to develop and implement procedures for an oil quality bank and/or a natural gas liquid(s) ("NGL") bank (or gas processing plant NGL sub-allocation) to address quality differences between Host Leases Production, Satellite Production and/or Third Party Production. Such procedures will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS and the Satellite Well System, will have the objective of providing a fair and equitable compensation methodology among all sources of Host Production.

## 7.6   LSPS Line Fill

Owner shall provide, via Host dry oil hull inventory, LSPS line fill after installation of the LSPS. After Satellite First Production, the volume of Host dry oil hull inventory used for LSPS line fill will be credited back to the Owner.

## ARTICLE VIII - GATHERING AND TRANSPORTATION

## 8.1   Product Disposition

Commencing at the Delivery Point, the Producers will (i) take in kind and remain solely and separately responsible for the disposition, transportation, and sale of Satellite Production and (ii) bear all costs and liabilities associated with such disposition, transportation, and sale. The Owner will have no liability for any costs of production transportation, production processing, penalties and/or associated costs downstream of the Delivery Point which are attributable to the Satellite Production and/or allocated to the Producers (individually and/or jointly).

DEBTORS' EX. NO. 02
Page 59 of 153

**8.2**   **Gas Imbalances**

Owner will endeavor to implement a Gas balancing procedure at the Host to handle Gas imbalances between Host Lease Production, Satellite Production and Third Party Production on a commercially reasonable basis. Until such Gas balancing procedure has been agreed upon by the Parties and the Host Operator, the Host Operator will timely provide to the Parties a record of any Gas production imbalances created on the Host on a monthly basis. The Parties taking Gas production above their entitlements shall pay royalties on such production, and the Parties and Host Operator will make a good faith effort to resolve any imbalances for a month in the succeeding month.

**8.3**   **Product Transportation**

Each of the Producers will enter into transportation arrangements or agreements with the owners of the Oil Export Pipeline and/or the Gas Export Pipeline, as appropriate, at its own sole cost and expense for its share of Satellite Production.

**8.3.1**   The Parties, independently, will be responsible for submitting, or causing to be submitted, Gas and/or Oil nominations, as applicable, to the transporter(s) of such product for their individual respective share of the appropriate Satellite Production and Host Leases, and for advising the Host Operator of such nomination.  The Parties, independently, will also be responsible for cooperating with the Host Operator and the transporters of the Gas and/or Oil to keep their nominations in balance with their respective deliveries on the Gas and/or Oil transporters' pipeline system. The Parties will, to the extent possible, endeavor to cause the nominations of their respective Gas and/or Oil production to closely approximate their actual production.

**8.3.2**   To the extent required under this Agreement, the Host Operator will furnish test and production information to the Parties to adjust nominations.

**8.4**   **Pipeline Penalties**

**8.4.1**   Any penalties assessed by Gas or Oil transporters attributable to the Satellite Production will be the responsibility of the Producers, unless such penalties are attributable to the Host Operator's sole fault, and then Host Operator will be responsible for such penalties.  Any penalties assessed by the Gas or Oil transporters attributable to the Host Leases Production will be the responsibility of the Owner.

**8.4.2**   Any costs or penalties imposed by the Gas Export Pipeline or the Oil Export Pipeline on the Host Operator as a result of operational flow

DEBTORS' EX. NO. 02
Page 60 of 153

orders, unscheduled Gas, unauthorized Gas, Gas pipeline imbalances, or Oil pipeline imbalances with transporters, as described herein, will be borne by each Party, independently, in the proportion that its nomination, failure to nominate, failure to properly regulate production volumes, fault, negligence, or liability without fault, caused such imbalance and/or penalties, except such as may result from the Host Operator's gross negligence or willful misconduct.

## ARTICLE IX - SUSPENSION OF OPERATIONS AND FORCE MAJEURE

**9.1    Notice**

A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure will promptly give written notice to that effect to the other Party or Parties stating in reasonable detail the circumstances underlying such Force Majeure.

**9.2    Suspension of Obligation**

The obligations of the Party  giving such notice as provided in Section 9.1 *(Notice)* of this Agreement, so far as they are affected by such Force Majeure, will be suspended during the continuance of any liability so caused, but for no longer period, and such cause will be remedied with all reasonable diligence.    If such Party is a Producer, then the suspended obligations include the payment of the minimum monthly fee as provided in Section 5.3.5(b) *(Isabela Lease Minimum Monthly Fee)* and Section 5.3.6(b) *(MC 519 Unit Lease Minimum Monthly Fee)*. No Party is liable to the other Party or Parties for failure to perform any of its obligations under this Agreement, other than the obligation to pay monies due hereunder (except as provided in the foregoing sentence) to the extent such performance is hindered, delayed or prevented by Force Majeure.

**9.3    Resolution**

A Party claiming Force Majeure will: (i) diligently use all reasonable and prudent efforts to remedy or remove the cause, condition, or event or circumstance of such Force Majeure, (ii) promptly give written notice to the other Parties of the anticipated termination of the Force Majeure, (iii) resume performance of any suspended obligation as soon as reasonably possible after termination of the Force Majeure, and (iv) not be obligated to settle any labor dispute except on terms acceptable to it in its sole discretion.

DEBTORS' EX. NO. 02
Page 61 of 153

1  **9.4**   **Suspension of Operations**

2     **9.4.1**  In addition to the rights granted under Section 4.7 (*Emergency Response*)
3  of this Agreement and Section 9.2 (*Suspension of Obligations*) of this
4  Agreement, the Host Operator has the right to suspend the Services set
5  forth in this Agreement to the extent necessary, at its sole discretion, for
6  only the following:
7
8     (a)  To ensure the safety of persons, property or the environment; or
9
10    (b)  To address the operational integrity or operational problems on the
11 Host, or any other equipment or facilities located on the Host or
12 connected thereto, including the Satellite System and any other
13 production system(s) and/or downstream operations, facilities, or
14 equipment; or
15
16    (c)  To remedy conditions which render the Host, Satellite System, any
17 other production system(s) and/or downstream operations,
18 facilities, or equipment unsafe; or
19
20    (d)  To access or conduct an analysis (e.g. root cause analysis) of any
21 incident on the Host and take whatever action is necessary to
22 ensure re-occurrence of the incident is minimized or eliminated.
23
24    (e)  To conduct any construction, modifications, maintenance, repairs,
25 change or addition to the Host, or any other equipment or facilities
26 located on the Host, connected thereto (including, without
27 limitation the Satellite System) and/or on or in connection with
28 downstream facilities; or
29
30    (f)  To prepare for or respond to the existence of a Force Majeure
31 condition, as further described in Section 2.2.30 (*Force Majeure*)
32 of this Agreement; or
33
34    (g)  To comply with Laws; or
35
36    (h)  To avoid participating in un-permitted operations due to the failure
37 of the LSPS Operator or the Satellite Operator(s) to obtain
38 necessary permits, authorizations or approvals to conduct an
39 operation or if the permit is suspended; or
40
41    (i)  To address a Satellite Operating Problem; or
42
43    (j)  Due to any material breach of this Agreement by the Producers or
44 the LSPS Owners, including, but not limited to, the failure by the

57

DEBTORS' EX. NO. 02
Page 62 of 153

Satellite Operators or the LSPS Operator to pay invoices submitted under Article V (*Fees & Expenses*) of this Agreement and Exhibit "C" (*Accounting Procedures*) to this Agreement subject to Section 9.4.4 herein below; or

(k)   Due to the failure by the Parties to mutually agree on a fair methodology by which the Owner will recover any increased costs associated with changes in governmental regulations as described in Section 5.4 (*Future Governmental Regulations*) of this Agreement, subject to Section 9.4.4 herein below; or

(l)   The Producers' or the LSPS Owners' failure to provide proper notice in connection with the Services set forth in this Agreement; or

(m)   The Producers' or the LSPS Owners' failure to conduct operations in accordance with this Agreement, subject to Section 9.4.4 herein below.

9.4.2   The Producers specifically understand that operations and activities on facilities downstream of the Host may impact operations on the Host. Further, at is sole discretion, the Host Operator has the right to shut down the Host and temporarily discontinue the Services contemplated by this Agreement for any necessary repairs or changes to the Host or any downstream facility. In such cases neither the Host Operator nor the Owner will have any liability to the Producers for deferred production, lost production, or any other direct, indirect or consequential damages.

9.4.3   The Host Operator will notify the relevant Parties in writing in the event of any of the occurrences listed above in Section 9.4.1 (*Suspension of Operations*) of this Agreement. The Host Operator has no liability to the Producers or the LSPS Owners for deferred production, lost production, deferred revenue, loss of revenue, damage to flowlines, wells or reservoirs, loss of wells or any direct, indirect or consequential damages arising from such shutdowns. Whenever reasonably possible, the Host Operator agrees to give the Producers, the LSPS Operator and the Satellite Operators reasonable advance notice of any scheduled shutdowns of the Host.

9.4.4   In the event of the occurrence of one (1) or more of the events listed in Sections 9.4.1(j), 9.4.1(k), 9.4.1(l) and 9.4.1(m) of this Agreement, prior to shutting down any operations and activities on the Host or discontinuing the Services, the Host Operator will give the LSPS Operator and/or the respective Satellite Operator(s), as the case may be, written notice of the occurrence of such event. In the event the LSPS Owners

DEBTORS' EX. NO. 02
Page 63 of 153

and/or the Producers, as the case may be, do not cure same within thirty (30) Days after receipt of such written notice, the Host Operator has the right to shutdown the operations and activities and/or discontinue the Services without incurring any liability or obligation to the Producers. However, if the event specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) Day period (other than the Producers' obligations to make payments of money due hereunder) and the Producers begin within said period and continue to take corrective action and thereafter diligently carry such corrective action to completion, the Host Operator will not shutdown the operations and activities on the Host or discontinue the Services related to the Host.

**9.4.5** Should the Host Operator suspend the Services for reasons described in Section 9.4.1 (*Suspension of Operations*) of this Agreement, the Host Operator will as soon as reasonably possible after the shutdown event has been addressed, re-establish such Services; provided, however, notwithstanding the provisions of Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement, in the event the duration of such suspension of operations continues for more than ninety (90) consecutive Days, then the affected Producer(s) shall have the right to temporarily re-deliver the Isabela Production and/or the MC 519 Unit Production, as the case may be, to an alternate facility for the provisions of services, similar in nature to the Production Handling Services. Upon withdrawal of the suspension of operations, then such temporary re-delivery will be suspended as soon as reasonably possible and the Isabela Production and MC 519 Unit Production will be delivered back to the Host for Production Handling Services.

## ARTICLE X - TERM, DEFAULT, AND TERMINATION

**10.1   Term of Agreement**

As of the Effective Date, this Agreement will continue to be in force and effect until it is terminated pursuant to the voluntary and involuntary provisions set forth in Sections 10.2 (*Default*) of this Agreement, 10.3 (*Termination by Owner*) of this Agreement, and 10.4 (*Termination by Producers*) of this Agreement.

**10.2   Default**

A Party ("**Non-Performing Party**") shall be in default hereunder ("**Default**") upon the occurrence of any of the following events:

**10.2.1** The failure to perform or comply with any material covenant, term, condition, obligation or other material provision contained in this

DEBTORS' EX. NO. 02
Page 64 of 153

Agreement when such failure has not been remedied by the Non-Performing Party within sixty (60) Days ("**Notice Period**") following receipt of written notice from another Party describing the alleged non-performance or non-compliance with particularity and demanding that such non-performance or non-compliance be cured or remedied; provided, however, that there is no Default if the failure cannot reasonably be cured within such Notice Period so long as:

(a)   the Non-Performing Party commences and continues reasonable efforts to remedy or cure said failure promptly upon receipt of the written notice;

(b)   the Non-Performing Party continues these efforts after the Notice Period and until the failure has been cured or remedied; and

(c)   such remedy or cure has been affected within a reasonable period of time.

**10.2.2** The entry of a Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; or

**10.2.3** The material breach of any representation or warranty contained in Section 15.4 (*Representations and Warranties*) of this Agreement and Section 15.5 (*Warranty of Title*) of this Agreement.

In the event a Non-Performing Party is in Default, any performing Party may terminate this Agreement upon written notice thereof to the Non-Performing Party as per the terms of this Section 10.2 (*Default*) of this Agreement; provided, however, that if the owners of one of the Satellite Leases are the Non-Performing Party, any performing Party may terminate this Agreement only as to such owners. In the event of termination for Default, the Non-Performing Party remains liable for all duties, obligations and liabilities incurred prior to the termination date.

**10.3**   **Termination by Owner**

**10.3.1** The Owner has the right to terminate this Agreement with respect to the Isabela Lease and its respective Satellite Well System or with respect to the MC 519 Unit Leases and its respective Satellite Well System or with respect to the LSPS, without penalty, as applicable, in the following circumstances:

(a)   In the event the respective Satellite Operator(s), Producers, LSPS Operator or LSPA Owners are in Default; or

**DEBTORS' EX. NO. 02**
**Page 65 of 153**

(b)    On not less than ninety (90) Days written notice by the Host Operator to the relevant Satellite Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

(c)    On not less than sixty (60) Days written notice by the Host Operator to the relevant Satellite Operator, if no Satellite Production is delivered to the respective Entry Point for any reason attributable to such Satellite Field Operator, including Force Majeure, for any period of twelve (12) consecutive calendar months during which the Host was available to receive Satellite Production, following the Effective Date of this Agreement.

10.3.2  This Agreement terminates with respect to the Isabela Lease and its respective Satellite Well System and/or with respect to the MC 519 Unit Leases and its respective Satellite Well System and/or with respect to the LSPS, without penalty on not less than one hundred and twenty (120) Days written notice by the Host Operator to the LSPS Operator and/or the relevant Satellite Operator, if destruction of, major damage to, or total or constructive loss of the Host occurs and the Owner elects to not repair or replace the Host for use to provide the Services. The Owner has no obligation to replace or repair the Host.

**10.4    Termination by Producers**

10.4.1  The Producers of each of the Isabela Lease and the MC 519 Unit Leases, upon their respective unanimous agreement, have the right to terminate this Agreement with respect to the Isabela Lease and/or the MC 519 Unit Leases, as the case may be, in the following circumstances:

(a)    The Owner is in Default; or

(b)    On not less than ninety (90) Day(s) written notice by the respective Satellite Operator to the Host Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

DEBTORS' EX. NO. 02
Page 66 of 153

(c)    On not less than sixty (60) Day(s) written notice by the respective Satellite Operator to the Host Operator, if no production handling capacity is available for Satellite Production for any reason, including Force Majeure following Satellite First Production equal to the lesser of (i) twelve (12) consecutive calendar months, (ii) the time period set forth in a suspension of production issued to the respective Satellite Operator by the BOEMRE, or (iii) the time period allowed for suspension of operations or production by the relevant Satellite Lease in the event the BOEMRE refused to issue a suspension of production.

10.4.2  This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the respective Satellite Operator to the Host Operator, if delivery of Isabela Production or MC 519 Unit Production to the Host is not technically feasible or economically justifiable in the sole judgment of the relevant Producers. The Agreement termination in this Section 10.4.2 shall only apply to the Satellite Lease affected with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.3  This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the relevant Satellite Operator to the Host Operator, upon Permanent Cessation of Production, if the Isabela Production or the MC 519 Unit Production, as the case may be. The Agreement termination in this Section 10.4.3 shall only apply to the Satellite Lease affected by the Permanent Cessation of Production with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.4  This Agreement may be terminated with respect to one of the Satellite Leases without affecting the other. This Agreement shall remain in full force and effect with respect to the Satellite Lease not being terminated. This Agreement may not be terminated by a Party for a reason attributable to another Party if such two (2) Parties are the same Person.

**10.5   Responsibilities and Obligations at Termination**

The Parties have the following responsibilities upon termination of this Agreement and/or Permanent Cessation of Production from the Isabela Lease and/or the MC 519 Unit Leases:

DEBTORS' EX. NO. 02
Page 67 of 153

**10.5.1** Upon termination of this Agreement as to all Satellite Leases, the LSPS Operator is responsible for:

    (a)    the disconnection of the LSPS from the Entry Point(s);

    (b)    the removal of the LSPS located within one thousand and five hundred (1500) feet of the Host; and

    (c)    the repair of any  damages to the Host resulting from the operations described in Section 10.5.1(a) and Section 10.5.1(b) above if deemed necessary by the Owner.

The disconnection and removal work contemplated in this Section 10.5.1 shall be at the LSPS Owners sole cost and expense, and shall be performed pursuant to a schedule approved by the Host Operator.

**10.5.2** Disconnection of the LSPS in accordance with Section 10.5.1 (*Responsibilities and Obligations at Termination*) of this Agreement will be commenced by the LSPS Operator within twelve (12) months subsequent to the termination of this Agreement as to all Satellite Leases and the LSPS Operator will diligently complete such disconnection and removal. All disconnection and removal work performed by or on behalf of the LSPS Owners will be performed in compliance with all applicable Laws, orders, permits, rules, regulations and requirements of appropriate governmental agencies.

**10.5.3** In the event the LSPS Operator fails to timely perform its disconnection and removal obligations within the applicable time periods as specified in Section 10.5.2 (*Responsibilities and Obligations at Termination*) of this Agreement, the Host Operator may at its election perform such work and invoice the LSPS Operator on behalf of the LSPS Owners,  for all actual costs and expenses associated with the disconnection and removal work plus a thirteen per cent (13%) overhead.  However, prior to the Host Operator performing such disconnection and removal work, the Host Operator is required to give the LSPS Operator written notice of its intent to perform the disconnection and removal work.  In the event the LSPS Operator does not commence and continue disconnection and removal work within thirty (30) Days after receipt of such written notice, the Host Operator has the right to perform disconnection and removal work related to the LSPS without incurring any liability or obligation to the LSPS Operator for such disconnection and removal work.  In the event the Host Operator conducts the disconnection and removal work, the Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners who are responsible for any costs associated with such disconnection and removal work.

DEBTORS' EX. NO. 02
Page 68 of 153

**10.5.4** The Owner is responsible for the abandonment of the Host including, but not limited to, the Facility Access Modifications.

(a)     During the term hereof, notwithstanding the automatic termination of this Agreement, as specified under Article X (*Term, Default, and Termination*) of this Agreement, if (i) the Owner determines in its sole judgment that it is no longer economic to operate the Host, and (ii) the Owner determines it will permanently cease operations of will abandon the Host then the Host Operator will give written notice thereof to the Producers ("**Abandonment Notice**"). Within ninety (90) Days following the date of the Host Operator's Abandonment Notice, the Parties will mutually agree to pursue one of the following options:

(i)     Terminate this Agreement as of a mutually acceptable effective date. Failure to reach agreement between the Producers and the Owner on an effective date under this option within such ninety (90) Days shall result in termination of this Agreement; or

(ii)     Negotiate an agreement to provide otherwise. Failure to reach a definitive agreement between the Producers and Owner on a future course of action under this option within such ninety (90) Days shall result in termination of this Agreement.

**10.5.5** Upon termination of this Agreement, each Party remains responsible for any accrued financial obligations by that Party with respect to another Party under the terms of this Agreement and will promptly settle such obligations, including any unpaid invoices.

## ARTICLE XI - LIABILITIES AND INDEMNIFICATION

**11.1     Liabilities**

For purposes of this Article XI (*Liabilities and Indemnification*), in the event that a Party is a Producer, LSPS Owner and Owner, then all of said Party's actions in performing any of the functions contemplated in Section 11.1.1 are conclusively presumed to have been performed in the role of LSPS Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.2 are conclusively presumed to have been performed in the role of Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.3 are conclusively presumed to have been

Execution Version                              64

performed in the role of Producer.   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THIS ARTICLE XI *(LIABILITIES AND INDEMNIFICATION)* SHALL GOVERN THE INDEMNITY AND DEFENSE OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT.

11.1.1 LSPS OWNERS' INDEMNITY OBLIGATIONS FOR LSPS OWNERS:  LSPS OWNERS SHALL INDEMNIFY OWNER'S GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

   (a)   all injuries to, deaths, or illnesses of any member of LSPS Owners Group; and

   (b)   all damages to or losses of any property of any member of LSPS Owners Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, LSPS OWNERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.

11.1.2 OWNER'S INDEMNITY OBLIGATIONS FOR OWNER:  OWNER SHALL INDEMNIFY LSPS OWNERS GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

   (a)   all injuries to, deaths, or illnesses of any member of Owner's Group; and

   (b)   all damages to or losses of any property of any member of Owner's Group,

DEBTORS' EX. NO. 02
Page 70 of 153

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, OWNER SHALL NOT INDEMNIFY LSPS OWNERS GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF LSPS OWNERS GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.

11.1.3 PRODUCERS' GENERAL INDEMNITY OBLIGATIONS FOR PRODUCERS: PRODUCERS SHALL INDEMNIFY OWNER'S GROUP AND LSPS OWNERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

    (a)    all injuries to, deaths, or illnesses of any member of Producers Group; and

    (b)    all damages to or losses of any property of any member of Producers Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF THE PRODUCERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, PRODUCERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP FOR SUCH CLAIMS/LOSSES.

DEBTORS' EX. NO. 02
Page 71 of 153

### 11.1.4 NOTICE AND DEFENSE

(a) The Indemnitee shall promptly give to the Indemnitor notice in writing of (i) any Claim/Loss that has been made known to the representative of Indemnitee as referenced in this Article XI (*Liabilities and Indemnification*) of this Agreement, or (ii) proceedings commenced for which Indemnification is claimed. Such notice shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the Claim/Loss against the Indemnitee.   Notwithstanding the foregoing, if the Indemnitor is obligated to Indemnify the Indemnitee (or any other Person pursuant to this Agreement), lack of prompt notice shall not be a defense available to the Indemnitor except to the extent prejudice against the Indemnitor has resulted from such lack of prompt notice.

(b) The Indemnitor shall confer with the Indemnitee concerning the Defense of any such Claim/Loss proceedings but, subject to the provisions of this Article XI (*Liabilities and Indemnification*) of this Agreement and any other applicable provisions of this Agreement, if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitor or its insurer shall retain control of the conduct of such Defense, including but not limited to the selection and management of counsel.   The Indemnitee shall cooperate to the extent reasonably necessary to assist the Indemnitor in defending the Claim/Loss. Notwithstanding the foregoing, however, even if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, neither Party shall effect settlement of or compromise any such Claim/Loss proceedings without having obtained the prior written consent of the other Party.   If the Indemnitee does not consent to a settlement that the Indemnitor is willing to accept, then the Indemnitor's liability shall be limited to the amount for which the lawsuit could have been settled (including all Defense costs incurred by Indemnitor).   If the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitee may, upon written notice to the Indemnitor and at the Indemnitee's sole cost and expense, select its own counsel to participate in and be present for the defense of any such Claim/Loss proceeding, provided such counsel shall not take any action in the course of such Claim/Loss proceeding to prejudice the Indemnitor's Defense of such Claim/Loss proceeding.

**DEBTORS' EX. NO. 02**
**Page 72 of 153**

(c)    Should the Indemnitor contest the Defense obligation and not assume the full Defense of the Claim/Loss, the Indemnitee may defend such Claim/Loss in such manner as it may deem appropriate, including, without limitation, settling such Claim/Loss, after giving prior written notice of the same to the Indemnitor, on such terms and conditions as the Indemnitee may deem reasonable and appropriate. The Indemnitor shall reimburse the Indemnitee for costs incurred in connection with such Claim/Loss, including the cost of settlement, within thirty (30) Days from receipt of any invoice for such costs.

(d)    For avoidance of doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term ""Indemnify"" or ""Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct is alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct. However, in the event that the Indemnitee is found by a final and unappealable decision of a court of competent jurisdiction to have been grossly negligent or to have acted with willful misconduct, then the Indemnitee shall refund all Defense costs attributable to the defense of the Indemnitee's gross negligence or willful misconduct.

**11.2**    **Indemnification With Respect to Warranty of Title**

**11.2.1 Satellite Production**

THE RELEVANT PRODUCERS WILL INDEMNIFY, OWNER'S GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF SATELLITE PRODUCTION AND ANY ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

**11.2.2 Non-Satellite Production**

OWNER WILL INDEMNIFY THE RELEVANT PRODUCERS' GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF THE NON-SATELLITE PRODUCTION AND ANY

**DEBTORS' EX. NO. 02**
**Page 73 of 153**

ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

**11.3    Waiver of Consequential Damages**

(a)    EACH PARTY:

(i)    AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY'S GROUP EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.; AND

(ii)    HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT FROM OR AGAINST ANY OTHER PARTY'S GROUP, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR LOSS OR DEFERMENT OF PRODUCTION OR LOST OR DEFERRED PROFITS OR BUSINESS INTERRUPTION, DAMAGE TO WELL(S) OR RESERVOIRS, OR LOSS OF WELL(S), EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(b)    THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT INCLUDE INDEMNIFICATION FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT SUFFERED BY AN UNAFFILIATED THIRD-PARTY AND 11.3(a)(i) AND 11.3(a)(ii), ABOVE, SHALL NOT APPLY TO THE EXTENT SUCH PARTY OWES SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.

**11.4    Individual Obligations**

Except as otherwise provided herein, the Owner, LSPS Owners,  Isabela Lease owners (collectively) and the MC 519 Unit owners (collectively) will be responsible only for their respective share of the costs and liabilities incurred as provided in this Article XI (*Liabilities and Indemnification*) of this Agreement. Except as provided in Section 5.7 (*Royalty and Taxes*) of this Agreement, nothing contained herein will ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose.  Each Party will hold all the other Parties harmless from liens and

DEBTORS' EX. NO. 02
Page 74 of 153

encumbrances on the Host Leases, Host, Satellite Leases, and LSPS as a result of its acts.

**11.5    Gross Negligence/Willful Misconduct**

The terms "gross negligence" and "willful misconduct" as used in this Agreement shall not include the definition set forth in the Oil Pollution Act of 1990 as amended ("**OPA 90**"). It being the intent of the Parties that even though an act or omission is deemed "gross negligence" or "willful misconduct" under OPA 90, such act or omission must meet the standards set forth by the laws of the State of Texas for "gross negligence" or "willful misconduct" in order to relieve a Party of its indemnification obligations hereunder.

## ARTICLE XII - INSURANCE AND BONDS

**12.1    Insurance**

> **12.1.1**  Throughout the term of this Agreement, each Party hereto, at its sole cost and expense, will procure such insurance (or self insure, only allowed if the parent company of an original signatory Party hereto or an Affiliate of an original signatory Party has a credit rating of S&P A- or the equivalent) as it deems necessary in discharging its obligations hereunder, including those necessary to protect against all claims for damages, risk of losses and contractual indemnities covered by this Agreement. All policies of insurance purchased which are intended to cover any damages, liabilities, expenses, losses, claims, costs (including attorneys' fees), suits and causes of action incurred by a Party hereunder will be properly endorsed to waive the insurer's rights of subrogation, under any such policies, against the other Parties hereto (or said Parties' respective insurers) when said Party is released from liability or loss or damage pursuant to this Agreement, and may name the other Parties (subject to such other Parties' approval) as an additional insured in the proportion that indemnity obligations are assumed hereunder.

> **12.1.2**  The Host Operator, LSPS Operator, Satellite Operators and Producers will maintain the insurance coverage provided in Exhibit "H" (*Insurance Provisions*) to this Agreement.

**12.2    Bonds**

The Host Operator, LSPS Operator and the Satellite Operators will obtain and maintain any and all bonds required to be carried by any applicable law, regulation, or rule. The Host Operator, LSPS Operator and the Satellite Operator

**DEBTORS' EX. NO. 02**
**Page 75 of 153**