1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                  HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 20-33948-11
                              §      HOUSTON, TEXAS
5   FIELDWOOD ENERGY, LLC,    §      TUESDAY,
    ET AL,                     §      FEBRUARY 2, 2021
6          DEBTORS.           §      3:00 P.M. TO 10:03 P.M.

7

8                  MOTION HEARING (VIA ZOOM)

9          BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE

10

11

12     APPEARANCES:                  SEE NEXT PAGE

13     RECORDED VIA COURTSPEAK; NO LOG NOTES

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24

25     Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

1                         APPEARANCES (VIA ZOOM):

2

3  FOR THE DEBTORS:                  WEIL GOTSHAL & MANGES, LLP
                                     Paul R. Genender, Esq.
4                                    Alfredo Perez, Esq.
                                     200 Crescent Court, Ste. 300
5                                    Dallas, TX  75201-6950
                                     214-748-7700
6
   FOR BP EXPLORATION &
7  PRODUCTION, INC.:                 GREENBERG TRAURIG, LLP
                                     Katie Tipper-McWhorter, Esq.
8                                    Bill Stark, Esq.
                                     Shari L. Heyen, Esq.
9                                    1000 Louisiana St., Ste. 1700
                                     Houston, TX  77002
10                                   713-374-3500

11 FOR RED WILLOW OFFSHORE,
   LLC AND HOUSTON ENERGY
12 DEEPWATER VENTURES I, LLC:        BARNET B. SKELTON, JR., PC
                                     Barnet B. Skelton, Esq.
13                                   712 Main Street, Ste. 1610
                                     Houston, TX  77002
14                                   713-659-8761

15

16

17

18 (Please also see Electronic Appearances.)

19

20

21

22

23

24

25

<pre>
1                              INDEX

2

3    WITNESS:            Direct    Cross     Redirect    Recross

4    MICHAEL DANE
        By Mr. Perez     7          .         .           .
5       By Mr. Stark     .         14         .           .

6    VENKATESH BHAT
        By Mr. Genender 41          .         .           .
7       By Mr. Stark     .         66         .           .

8    NATHAN MICHAEL VAUGHN
        By Mr. Genender 80          .         .           .
9       By Mr. Stark     .         85         .           .

10   KAMIL GURSES
        By Mr. Stark     98         .        143          .
11      By Mr. Genender  .        110         .          146
        By Mr. Skelton   .        140         .          147
12      By Mr. Stark     .        143         .           .

13   CRAIG REDDING
        By Mr. Stark    149         .        191, 202     .
14      By Mr. Genender  .        172         .          194
        By the Court    188         .         .           .
15      By Mr. Skelton   .        197         .           .

16

17
     EXHIBITS:                   Marked     Offered     Received
18

19   Defendant's Exhibit 16        55         55          55

20   832-1 through -14            209        209         209
     832-16 through -22           209        209         209
21   832-24                       209        209         209
     834-1 through -13            206        206         206
22
     BP's Exhibit 5 (832-5)       134        134         134*
23   *Received under seal

24

25



                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC
</pre>

1          HOUSTON, TEXAS; TUESDAY, FEBRUARY 2, 2021; 3:00 P.M.

2          (Conference recording started.)

3          THE COURT:  All right.  We're here in the

4  Fieldwood Energy case, it's 20-33948.  I've enabled certain

5  parties that appeared yesterday phones to be activated, you

6  should have gotten the message on your phone.  If your line

7  hasn't been activated and you want to be authorized to speak

8  during the course of today's hearing, please press five star

9  one time on your phone and I will enable the additional

10 telephones.

11          Yes.  From 713-374-3672 who do we have?

12          MS. TIPPER-MCWHORTER:  Yes.  Katie

13 Tipper-McWhorter on behalf of BP.

14          THE COURT:  All right.  Good morning, or good

15 afternoon.

16          MS. TIPPER-MCWHORTER:  Good afternoon.

17          THE COURT:  From the 214 area code, it's

18 214-665-3735, who do we have?

19          MR. STARK:  Your Honor, Bill Stark with Greenberg

20 Traurig on behalf of BP Exploration and Production.

21          THE COURT:  Good afternoon, Mr. Stark.

22          MR. STARK:  Good afternoon, Your Honor.

23          THE COURT:  All right.  Mr. Genender, tell me

24 where we are?

25          MR. GENENDER:  Good afternoon, Your Honor.  Paul

1  Genender for the Debtors.

2          Your Honor, we spoke with BP's counsel around the

3  noon hour, and they indicated there were a number of issues

4  that prevent them from agreeing to the proposal or to the

5  draft -- the Court's notice of draft possible order.  And we

6  talked through those things, the Debtors are in agreement

7  with the document you filed at 825.  We would agree to be

8  bound by it, the Debtors would.  But my understanding is

9  that BP is not and we're prepared to proceed.

10         THE COURT:  All right.  Ms. Heyen, is that

11 correct?  Is that the way you think we ought to move ahead?

12         MS. HEYEN:  Yes, Your Honor.  And we sincerely

13 appreciate the Court's diligence and efforts regarding the

14 draft order, but in the limited time between last night and

15 this morning we were unable to reach an agreement.  So, Your

16 Honor, we are ready to proceed with a hearing.

17         THE COURT:  I think you have someone else that

18 wishes to participate from the 214 area code, who do we

19 have?

20     (No audible response.)

21         THE COURT:  All right.  I don't know who that was.

22 Let me try that again.

23         From the 214 area code, do we have someone else

24 who wishes to speak?

25     (No audible response.)

1          THE COURT:  All right.  Who's going to be your

2    first witness, Mr. Genender?

3          MR. GENENDER:  Your Honor, we're going to call

4    Mike Dane and my partner, Alfredo Perez, is going to handle

5    Mr. Dane's examination.

6          THE COURT:  All right.  Mr. Dane, would you raise

7    your hand please, sir?  Oh.  I don't have my camera on, I

8    apologize for that, hold on.

9          Okay.  Let's try that again, Mr. Dane.

10         Do you swear to tell the truth, the whole truth,

11   and nothing but the truth -- and I guess I need you to

12   activate your line before you can answer that.

13      (No audible response.)

14         THE COURT:   All right.  Mr. Dane?

15      (Witness sworn.)

16         THE WITNESS:  Yes, I do.  Thank you, Your Honor.

17         THE COURT:  Thank you, sir.

18         All right.  Mr. Genender.

19         MR. GENENDER:  Your Honor, Mr. Perez is going to

20   proceed.

21         THE COURT:  I'm sorry, Mr. Perez.

22         MR. PEREZ:  Good afternoon, Your Honor.  Can you

23   hear me?

24         THE COURT:  I can.

25         MR. PEREZ:  Thank you, Your Honor.

1            DIRECT EXAMINATION OF MICHAEL T. DANE

2  BY MR. PEREZ:

3  Q     Would you please state your name?

4  A     Michael T. Dane.

5  Q     Mr. Dane, how are you employed?

6  A     I'm the Senior Vice President, Chief Financial Officer

7  at Fieldwood.

8  Q     And are you familiar with the motion that brings us

9  here today?

10 A     Yes.  I am.

11 Q     All right.  What is the nature of the emergency relief

12 being sought, Mr. Dane?

13 A     Fieldwood has a well, which is a very important asset

14 to the company, to our estate, it's called the Genovesa

15 well.  And do the timing that we face today, which

16 compounded by recent Department of Interior orders that have

17 been issued, we have serious concern about our ability to

18 bring that well online in a timely basis in order to

19 maintain the value of that lease in that well.

20 Q     And what is the precise nature of the emergency?

21 A     So there's a critical date, which is April 5th, which

22 is a date in which our lease is subject to expire subject to

23 an extension on the lease, which comes in from the

24 Suspension of Production and if our -- Right now we're in a

25 period of heightened uncertainty given the Department of

1 Interior recent orders, which have introduced a lot of

2 ambiguity as to if and how a Suspension of Production can be

3 obtained, and denotes no sure course of action to make sure

4 that we can maintain the value of our well just to make sure

5 that this well is brought online prior to that date.  Which

6 we think, given where we sit today is very reasonable.

7           So we are seeking action in order to bring our

8 well online to make sure that we don't risk any value that's

9 associated with that really important well, Genovesa.

10 Q    Okay.  And  when was the Genovesa well drilled?

11 A    It was drilled between June to July of 2019.

12 Q    All right.  And what have you done since that time with

13 respect to trying to bring it online?  I'm sorry.

14 A    Sure.  Thank you.  So the well was drilled in June to

15 July of 2019 and, then since that time, pending completion

16 operations and some other activities that were necessary to

17 help with this well produce.  We thought that this well

18 would have been capable producing at the very end of 2019.

19 We are, the well produces into the BP operated subsea loop

20 system which we are also co-owner in.  And it will produce

21 into the operating ECO facility.  So we did need some level

22 of cooperation from BP in order to assist with the post

23 drilling and completion activities to bring the well online.

24 And those are the challenges that we have been facing since

25 we drilled this well in July of 2019.

1   Q     Has Fieldwood attempted to tie the Genovesa well into

2   the subsea loop system?

3   A     We have.  We have conducted a number of activities

4   since we drilled and completed the well.  The last activity

5   that we directly completed to attempt to tie this well into

6   -- to produce into (indiscernible) was an activity that BP

7   permitted Fieldwood to take, to tie the well in.  This

8   happened in April of 2020.  And during that time of that

9   activity, there was an anomaly that was observed.  A well

10  into the subsea system at the Fieldwood and BP.  This

11  anomaly was acknowledged not to be the result of any actions

12  taken by Fieldwood in those operations that was something

13  that was stated by both parties.  But as a result of that

14  anomaly, which was observed, we have been pursuing other

15  activities to be able to produce the well since April of

16  2020 in conjunction with BP.

17  Q     So have you tried to work around the anomaly in order

18  to bring the well into production?

19  A     Yes.  We have.

20  Q     And what have you done?

21  A     So we've been in a very lengthy and ongoing dialogue

22  with BP, since we need them to assist us with completing the

23  operations that would allow us to tie in the well at this

24  point.  Since April of 2020, there have been a number of

25  activities.  Initially there was -- there was some finger

1   pointing and uncertainty as to what caused the anomaly that

2   was observed in which was previously determined not to be

3   anything that Fieldwood caused.  There was some

4   investigation that took place over that period of time.

5          There were a number of campaigns that took place

6   over a lengthy period of time during the summer.

7   Ultimately, in the September-October time period it was

8   identified as the best option to bring the well online, as

9   identified by the Fieldwood and BP, was what we call a

10  single flow line option.  Which is what BP and Fieldwood

11  have been working towards since that time and what Fieldwood

12  formerly proposed back in November of 2020.

13  Q    And when BP proposed that in November of 2020, what did

14  Fieldwood do?

15  A    So this was something that had been verbally discussed

16  as the best option back, I believe and to my knowledge, in

17  the September-October time frame.  In October of 2020 during

18  an update meeting between our operations team, BP had more

19  formally suggested that the single flow line plan was their

20  recommendation for the best way to address the issues that

21  we were having.  That aligned with the discussions that we

22  had, had with BP over the couple months since some of these

23  issues have been better understood given the operational

24  activity that took place prior to September.

25          And in order to push that solution forward, which

1  BP had suggested in October would be completed, in the first

2  quarter of this year, through written materials that they

3  provided us in discussion, Fieldwood took the initiative to

4  do everything within our capabilities to move forward with

5  that action.  We submitted a formal proposal on November 2nd

6  to BP outlining every step that was necessary, in order to

7  accomplish certain tasks.  And in order to make certain that

8  they happened as expedited manner as possible, Fieldwood

9  actually committed significant resources both financial and

10  operational to advancing these work streams.

11        We submitted purchase orders for the material, we

12  started our vendors with respect to fabrication efforts that

13  were required.  We began doing the work that was required

14  for various permitting processes.  So it was our attempt all

15  along to try to move this forward on a parallel path,

16  recognizing that the dates we were looking at in the October

17  time frame, as suggested by BP, was the first quarter.  At

18  that point in time, we believed that it was very reasonable

19  we could have had this well online prior to the end of the

20  year, but we know that BP was operating under different

21  timing assumptions.

22  Q    All right.  Does BP have any wells tied to the loop

23  system, the subsea loop system?

24  A    They do.  They have a well called Isabella which is

25  also tied into the subsea loop system.

1  Q     And was that well impacted by the anomaly?

2  A     That well was.  The whole loop system was impacted by

3  the anomaly.  However, BP undertook, on a much expedited

4  basis, the activities, which were required to be able to

5  produce their own well Isabella, through a separate single

6  flow line on the loop, which is similar to what Fieldwood is

7  trying to accomplish on the other side of the loop, albeit

8  it, it's a somewhat different operational activity necessary

9  to establish that production.  And to my knowledge they've

10 been producing that well since the fourth quarter of last

11 year.

12 Q     Now from a -- from the standpoint of agreeing to the

13 various agreements that existed between BP and Fieldwood.

14 Is Fieldwood prepared to abide by those agreements in

15 connection with the single flow line and the other items

16 that have to be done in connection with the loop system?

17 A     Certainly.  We recognize that.

18 Q     And has that ever been communicated to BP?

19 A     Absolutely.  We have talked on an ongoing basis about

20 our obligations under these agreements.  And that's been

21 well communicated to BP.

22 Q     Now speaking from a financial standpoint, does

23 Fieldwood have the resources in order to complete the

24 various work that needs to be done?

25 A     Yes.  As I mentioned, back in early November, alongside

1   submitting a very detailed operational plan and proposal to

2   BP, outlining every step that was required to be taken to

3   bring our well online through the single flow line option,

4   which we both identified as being a solution.  Fieldwood

5   also offered on an ongoing basis to conduct those activities

6   ourselves in a similar manner to how Fieldwood conducted

7   previous operations which BP consented to Fieldwood

8   operating.  So that has been something we have been standing

9   by ready to do if given consent by BP in order to operate

10  and we've clearly had our plans on how we would accomplish

11  those operations.

12  Q    Is the Genovesa well material to BP's -- I'm sorry --

13  to Fieldwood's ongoing plan of reorganization?

14  A    Yeah.  So this is a very material well for Fieldwood.

15  Fieldwood and our partners have invested over $160 million

16  in this project to date.  We own, as I mentioned, 65 percent

17  of this well in terms of our working interest.  Our co-

18  working interest owners own 35 percent in this well.  So our

19  net investment is over $100 million.  The production that is

20  associated with this well is a very significant amount of

21  our production today and what is going to be our reorganized

22  company.  Is a very important driver of not only our near-

23  term production but our long-term value.  And I think that

24  the delays that we've been experiencing have a cash flow

25  impact on the company.  But more so than that, the status of

1  this lease potentially be in jeopardy as would have you the

2  very serious potentially irreparable consequences to our

3  overall restructuring.

4  Q    And do you have an estimate as to what you think the

5  overall value of this lease and this prospects are with

6  respect to the company on a go forward basis?

7  A    So I mentioned we've invested, us and our partners,

8  over $150 million.  I think that our view of the value of

9  this well is multiples of that.  We certainly think that

10 this is a very, very material contributor in the hundreds of

11 millions of dollars to the value of our estate and to the

12 reorganized company which is a critical part of our

13 restructuring -- our contemplated restructuring plan.

14           MR. PEREZ:  Nothing further, Your Honor.  I pass

15 the witness.

16           THE COURT:  All right.  Thank you.

17           Who's going to cross-examine Mr. Dane.

18           MR. STARK:  Yes, Your Honor.  This is Bill Stark,

19 I will.

20           THE COURT:  Thank you, Mr. Stark.

21           MR. STARK:  Thank you, Your Honor.

22             CROSS-EXAMINATION OF MICHAEL T. DANE

23 BY MR. STARK:

24 Q    Thank you, Mr. Dane.  I want to make sure I accurately

25 understand the nature of the emergency that's brought us

Case 20-33948   Document 854   Filed in TXSB on 02/04/21   Page 15 of 234

MICHAEL T. DANE - CROSS BY MR. STARK                    15

1  here today.  I believe you testified that's as a result of

2  the recent January DOI order is that correct?

3  A    That's one reason that we feel that there's such

4  emergency.

5  Q    Okay.  What are the other reasons that there's an

6  emergency?

7  A    Well as of -- we have certain standards under

8  agreements of how operators need to conduct operations.  In

9  the ordinary course, we would never put a lease potentially

10  in jeopardy or susceptible to only having it extended by

11  virtue of having an SOP granted.  In any event, where it's

12  within certain operator controls to not suspect a leak to

13  that type of jeopardy.  So just being in this circumstance

14  in the first place, where we have a lease that's coming up

15  on a critical lease expiration date at a point when it's

16  been a year-and-a-half since that well has been drilled is

17  not how we view certain operations.

18          The DOI order activates this issue to an even

19  greater magnitude, because there's been a tremendous amount

20  out of uncertainty that's been introduced as to how and

21  under what conditions leases will be granted, extended, and

22  how regulators will be doing things going forward.  That may

23  be different than they've done in the past.  I think

24  industry in general is pretty unanimous with respect to the

25  fact that the ambiguity through some of these orders that

1  have been issued is just an unknown and we don't quite know

2  how it will all work going forward.

3  Q    Okay.  I want to make sure I understand everything I

4  heard.  Other reasons that you believe create an emergency

5  (indiscernible)?

6  A    The nature of the timing of the lease, both with

7  respect to the lease expiration date and the uncertainty of

8  getting an SOP, is why we feel -- and the timing in which we

9  will know when we would get an SOP which is typically only

10  at or around the actual date of the expiration of the lease.

11  So that's predominantly the reasons why we are here today on

12  an emergency basis.

13  Q    What was the first time that Fieldwood alleged that BP

14  failed to act as a reasonably prudent operator?

15           MR. PEREZ:  -- the question.

16           THE COURT:  Sustained.

17           MR. PEREZ:  Object to the form of the question.

18  Misstates --

19           THE COURT:  Sustained.

20           MR. PEREZ:  -- the testimony.

21           THE COURT:  Sustained.

22  BY MR. STARK:

23  Q    Is it Fieldwood's contention that BP has failed to act

24  as a reasonably prudent operator?

25  A    In my view, jeopardizing a lease with this significant

1  value by inaction is not acting as a reasonably prudent

2  operator.

3  Q    So is that a yes?

4  A    I'm sorry, could you repeat your question?

5  Q    Is that a yes that you are -- that Fieldwood is

6  alleging that BP has failed to act as a reasonably prudent

7  operator?

8  A    Yes.

9  Q    When was the first time Fieldwood made that allegation?

10 A    Fieldwood expressed its concerns about how operations

11 had been handled with respect to Genovesa, dating back all

12 the way to after having drilled and completed this well, and

13 then having had an experience of in excess of a year in

14 which we have not been able to bring this well online.  So

15 it's been a continuous dialog with respect to BP as to their

16 inaction to allow us to produce this well.

17 Q    I appreciate that.  My question is a little different.

18 When was the first time that Fieldwood made the allegation

19 that BP failed to act as a reasonably prudent operator?

20        MR. PEREZ:  Objection to form of the question.

21 Misstates the testimony.

22        THE COURT:  Sustained.  I'm sustaining not because

23 it misstates the testimony, but because it assumes a fact

24 not in evidence.

25 BY MR. STARK:

1  Q    Has Fieldwood alleged that BP has failed to act as a

2  reasonably prudent operator?

3            MR. GENENDER:  Object to the form of the question,

4  Your Honor, vague.

5            THE COURT:  Overruled.

6  BY MR. STARK:

7  A    With all companies that we try and operate with --

8  excuse me Your Honor -- have partnerships with, we don't

9  usually start from the posture of trying to go down a legal

10 road and make allegations that folks aren't operating within

11 the requirements of certain agreements.  I can't tell you

12 that from the beginning of this process we have alleged that

13 BP has not been acting as a reasonably prudent operator,

14 because our objective throughout this entire year-and-a-half

15 long process has been to work as constructively as we can in

16 order to get this well online and not to be sitting here

17 today with the types of risks we're facing.  So the

18 allegations have arisen, because over an extended period of

19 time with this inaction, and we're sitting here today with a

20 very real deadline which we can avoid by working

21 cooperatively over several months --

22            THE COURT:  Mr. Dane, I'm going to --

23 BY MR. STARK:

24 A    -- and our view today --

25            THE COURT:  Mr. Dane, I'm going to interrupt you.

1  I made Mr. Stark ask the right question.  He asked the right

2  question, go ahead and answer his question please.

3  BY MR. STARK:

4  A    I'm sorry, Mr. Stark.  Can you repeat the question?

5  Q    I'm not sure I remember.  I'll give it a shot.  Has

6  Fieldwood alleged that BP failed to act as a reasonably

7  prudent operator?

8  A    I believe that our motion that we filed has that

9  allegation in it.

10 Q    In fact, the emergency motion was the first time

11 Fieldwood made that allegation, isn't it?

12 A    It's the first -- that motion is the first time that we

13 brought this issue in front of the Court.

14 Q    And it's also the first time that Fieldwood's alleged

15 that BP failed to act as a reasonably prudent operator isn't

16 it?

17        MR. PEREZ:  Object to the question.  Ask and

18 answered, Your Honor.

19        THE COURT:  Overruled.

20 BY MR. STARK:

21 A    I'm not aware if we made that formal allegation.  I

22 know that -- I know that our legal department has exchanged

23 a number of notices over the course of many months.  I'm not

24 aware if specifically identifying failure to act as a

25 reasonably prudent operator was in those notices or not.

1  Q    You discussed the anomaly that was discovered in April

2  of 2020, do you recall that?

3  A    Yes, sir.

4  Q    Was it reasonably prudent for BP to investigate the

5  nature of that anomaly?

6  A    Absolutely.

7  Q    Was it reasonably prudent for BP to investigate

8  ultimately the source of a leak?

9  A    Yes.

10  Q    Was it reasonably prudent not to flow the Genovesa well

11  during those investigations?

12  A    Yes.

13  Q    Was it reasonably prudent for BP to suggest the single

14  flow line alternative?

15  A    Yes.  Although I believe that, that was something that

16  was suggested by both parties.

17  Q    Are you aware of the bolt tightening attempt?

18  A    Yes.  I am.

19  Q    And that occurred in early January of this year, is

20  that correct?

21  A    Yes.

22  Q    Was it reasonably prudent for BP to attempt the bolt

23  tightening?

24  A    Fieldwood would have likely attempted that same

25  operation.  I think that, that was reasonably prudent.

1  Q    You're aware that -- notwithstanding the fact that it

2  was reasonably prudent to attempt that ultimately was not

3  successful.  Are you aware of that?

4  A    I am aware.

5  Q    And you're aware that BP suggested that Fieldwood

6  should engage with the regulators at BSEE regarding an SOP,

7  are you aware of that?

8  A    Yes.

9  Q    Was it reasonably prudent for BP to suggest that

10 Fieldwood engage with BSEE regarding an SOP?

11 A    Yes.

12 Q    And in fact Fieldwood attempted to engage with BSEE

13 regarding an SOP in mid to late January, is that correct?

14 A    I'm sorry can you repeat that question one more time?

15 Q    Fieldwood intended to engage with BSEE regarding an SOP

16 in mid to late January of this year, correct?

17        THE COURT:  So Mr. Stark, I just want to -- the

18 first time you asked the question you said attempted and

19 this time you said intended, I just want a clear record as

20 to what question you were asking him.  Sometimes it's tough

21 on the recording and I may have heard you wrong.  But let me

22 just get you to try again, just to be sure we get the right

23 question.

24        MR. STARK:  Thank you, Your Honor.  I apologize.

25 BY MR. STARK:

1  Q    Fieldwood intended to engage with BSEE regarding an SOP

2  in mid to late January of this year, correct?

3  A    No.  So an SOP is only required when you don't believe

4  that you can conduct the operations in time in order to

5  accomplish preserving a lease without the need for an SOP.

6  And so Fieldwood's primary objective was to encourage the

7  actions that are required in order to avoid an SOP, and

8  utilize an SOP in the point in time when it's clear that

9  those actions will not be successful with meeting the

10 deadlines that are otherwise required.

11       And so there's been a difference of opinion about

12 what the appropriate time is to apply for an SOP.  We've had

13 a lot of dialog with respect to the regulators about what

14 that timing is.  But to be clear we believe it is -- if it

15 becomes to necessary to get an SOP it's absolutely something

16 that we will and should do.  We don't believe it's necessary

17 to get an SOP, when you can take other actions that would

18 avoid the need for an SOP.  And that's the same way that the

19 regulators view the process for receiving an SOP as we

20 understand it.

21 Q    Just so I'm clear, it is your testimony that Fieldwood

22 did not intend to engage with BSEE in mid to late January of

23 this year regarding an SOP is that correct?

24 A    That's not correct?

25 Q    So Fieldwood did intend to engage with BSEE mid to late

1  January of this year regarding an SOP?

2          MR. PEREZ:  Objection to the question, Your Honor.

3  Asked and answered.

4          THE COURT:  Overruled.

5          You can answer, Mr. Dane.

6  BY MR. STARK:

7  A    So Fieldwood has engaged with BSEE --

8          THE WITNESS:  I'm sorry, Your Honor.

9          THE COURT:  I just said you can answer.

10         THE WITNESS:  Okay.  Thank you.

11 BY MR. STARK:

12 A    So Fieldwood has engaged with BSEE on the appropriate

13 way to obtain an SOP.  We've had dialog with the department

14 that issues those SOPs where we sought guidance from them.

15 We have filled out an application and paid for it and taken

16 a number of steps to submit an SOP, if and when that SOP

17 becomes necessary, under the terms of which the regulators

18 have explained to Fieldwood is the appropriate way to submit

19 an SOP.

20 Q    Well help me understand.  We're having an emergency

21 hearing, is this not the time to submit an SOP?

22 A    In our opinion, this is not the time to submit an SOP.

23 Q    Why is that?

24 A    The regulators have told us, and it is our experience

25 through SOP submissions on a host of other leases over an

1  extended period of time, that an SOP is supposed to be

2  submitted once it becomes clear that the activities that

3  would otherwise require the SOP can't be conducted.  So if

4  the lease -- if the operations can be conducted that

5  mitigate the need for an SOP, an SOP is not supposed to be

6  submitted until that time -- until that time at which is

7  becomes clear that the actions will not be successful, by

8  the key milestone dates.

9          What we have been advised and we have seen

10 published literature by BOEM and BSEE is that typically SOPs

11 are submitted three to four weeks ahead of the lease

12 expiration deadlines, and that they require a schedule that

13 shows how the activities that will be conducted in order to

14 (indiscernible) production.

15 Q    Now although three to four weeks may be typical, this

16 is an untypical time if I understand your prior testimony

17 regarding the January DOI order, is that correct?

18 A    That's correct.

19 Q    So not withstanding what may be typical but why would

20 Fieldwood not yet submitted for an SOP?

21 A    Fieldwood hasn't submitted an SOP, because we can't

22 seem to get alignment with BP on a schedule to attach to

23 that SOP.  It's our view that the schedule that BP is

24 seeking to impose upon Fieldwood, artificially extends the

25 timing that's necessary to conduct these operations.  And

1  our concern is that, if we submit that SOP, which would not

2  be following the regular guidance that we've gotten from

3  BSEE about the timing and conditions under which you're

4  supposed to, but nevertheless if we submit that SOP with

5  this artificially extended timing that BP will not work

6  towards a reasonable schedule to preserve the lease.

7           And in any event the decision on an SOP will not

8  be given until the time at which the lease is otherwise set

9  to expire.  Which gives us even further concern about the

10 schedule that BP is suggesting that Fieldwood attach to that

11 SOP.  But to be clear, Mr. Stark, we don't have an issue

12 with submitted an SOP.

13 Q    Now you don't know when an SOP would be granted or

14 denied do you?

15 A    No.  That's precisely the problem.

16 Q    So Fieldwood could submit for an SOP today and it could

17 be granted later this week?

18 A    Correct.  And if we had an agreed schedule, Fieldwood

19 would do exactly that.

20 Q    What is Fieldwood's objections -- or excuse me -- what

21 are Fieldwood's objections to the schedule BP provided?

22 A    The schedule that BP provided has a number of

23 activities, particularly the things that happen after the

24 lease expiration date, which are clearly entirely with in

25 the control of BP.  And those activities are things that in

1 our view take a very abbreviated amount of time in order to

2 do.  Things that should have been already done or can be

3 done today and over the course of a very brief period of

4 time.  And so to put those activities at the very end of the

5 schedule and suggest that's not within our control to do

6 that today, we think is disingenuous and unnecessary.

7 Q    Which activities specifically are those?

8 A    Those specific activities were the host readiness

9 activities that -- I'm doing from memory because I don't

10 have the schedule right in front of me -- but it's the last

11 activity that was in the BP schedule.  That's not the only

12 activity, we have a general disagreement with respect to the

13 activity schedule, but that specific activity we feel like

14 is an item that should be brought forward.

15 Q    What are the other disagreements?

16 A    Well the disagreements are the activities that would

17 not take place sooner than the schedule that Fieldwood has

18 submitted to BP since November.

19 Q    So any date that doesn't meat Fieldwood's schedule of

20 November is objectionable, is that correct?

21 A    No.

22 Q    Well, apparently, I don't understand.  What are the

23 other disagreements Fieldwood has with the schedule BP

24 proposed?

25 A    Well the primary --

1        MR. PEREZ:  Object to the question.  Asked and

2   answered.

3        THE COURT:  Sustained.

4        And Mr. Stark, the reason I'm sustaining, I just

5   want to explain it so if you want to redo your question you

6   can.  He said from memory this one, but if I see the

7   schedule there's more.  And then you're asking him for more

8   without showing him the schedule.  He's already answered

9   that.  But if you were to show him the schedule I would let

10  you then ask him more questions.  I just don't want you to

11  be misled about what my ruling means.

12        MR. STARK:  Thank you, Your Honor.  I appreciate

13  that.

14        Rachel, if you will, please pull Exhibit 23?

15        THE COURT:  I need to give her the presenter role,

16  who is -- what's the name of the person I'm looking for?

17        MR. STARK:  Rachel Himmel (phonetic).

18        THE COURT:  All right. Just a moment.

19        MR. STARK:  Thank you, Your Honor.

20        MS. HIMMEL:  Bill, do you want the most recent

21  schedule proposal pulled up?

22        MR. STARK:  It's Exhibit 23.

23        MS. HIMMEL:  Yeah.  Okay.  Got it, just a second.

24        THE COURT:  In the meantime, Mr. Dane, you're

25  going to get a message on your phone, I want you to go ahead

1   and ignore it, just trying to get my system online.

2              THE WITNESS:  All right.

3              MR. GENENDER:  Your Honor, Paul Genender.  I don't

4   have an Exhibit 23.  The list that I have from BP says

5   Exhibit 23 is not used.

6              I think it's Exhibit 24, Mr. Stark.

7              THE COURT:  What got put up on the --

8              MR. STARK:  I apologize --

9              THE COURT:  -- screen is called Exhibit 20.

10             MR. STARK:  It's 24, I apologize.

11             THE COURT:  So what's this exhibit number again?

12             MR. STARK:  24, Your Honor.

13             THE COURT:  24.  Thank you.

14             MR. STARK:  Can we blow that up?  Can we zoom in

15  on this?

16             THE COURT:  Ms. Himmel, I think, if you'll see to

17  it that, that exhibit takes up more of your screen, it will

18  then take up more of our screen.  I think you can make it

19  bigger on your computer screen.  Like the whole page bigger.

20  Maybe not.  Okay.

21  BY MR. STARK:

22  Q    So, Mr. Dane, if I understand you correctly, Fieldwood

23  disagreed with the health facility readiness and well start

24  up date of May 15, 2021, is that correct?

25  A    That's one item on the schedule that we disagree with,

1   correct.

2   Q    What are the other items on the schedule that Fieldwood

3   disagrees with?

4   A    So I'm not the operational expert.  We have -- we've

5   laid out a very detailed critical path plan that BP's had

6   since November, and we've also proposed a separate SOP

7   schedule, which again in our view is not the schedule that

8   should dictate the operational timing, but it's the back-up

9   plan in the event that it doesn't happen.  And the schedule

10  that we proposed is the schedule that we think is

11  immediately achievable and any discrepancies between the two

12  are what we believe are not reasonable.

13  Q    So do I understand you correctly, that looking at this

14  exhibit you can't identify for me the other items Fieldwood

15  finds objectionable?

16  A    I know that from conversation the timing of the host

17  facility readiness and well startup, it's the timing and

18  duration is one of the more significant variances between

19  our schedules.  And I believe that the timing with respect

20  to a number of these other items is slightly different than

21  what Fieldwood believes is appropriate.

22  Q    Which other items are those?

23  A    I would have to see our schedule to be able to compare

24  them.

25  Q    What about the health facility readiness and well start

1  up that Fieldwood believes is objectionable in terms of

2  timing and duration?

3  A    So that's outside my area of expertise.

4  Q    Fair enough.

5         Other than Fieldwood's subjective concern with the

6  January DOI order, what else is there to substantiate

7  Fieldwood's fear that there's been some sort of change in

8  how the DOI issues SOPs?

9  A    I think SOPs, in general, are not a place that you want

10 to find yourself with respect to critical lease situations.

11 It's an extension when you cannot conduct an activity, and

12 there's never an assurance that an SOP will be granted.

13 Today's environment and that order and the several orders

14 that we've seen from the Department of Interior and the

15 Executive order that's been issued, introduces additional

16 uncertainty that we think is unnecessary given the fact that

17 we know these activities can be conducted in a way that

18 doesn't introduce that type of risk.

19 Q    Now you reference other orders, which other orders are

20 those?

21 A    There was an executive order that was issued on climate

22 day surrounding leasing moratoriums and other fossil fuels,

23 you know, changes to the regulatory framework.

24 Q    What sort of changes to regulatory framework?

25 A    We know that there's going to be a moratorium on

1  leasing subject to further review.  We know that there's

2  going to be a review of loyalty rates, there's going to be a

3  review of fossil fuel subsidies, a review of emissions.

4  Q    Mr. Dane, have you ever personally been involved in

5  applying for an SOP?

6  A    Would you mind clarifying for me what that means?

7  Q    Have you personally been involved in creating materials

8  that are submitted in hopes of obtaining an SOP?

9  A    I've not personally filled out a form, but I've been

10  involved in the process of submitting an SOP.

11  Q    When you say involved in the process, what was your

12  involvement?

13  A    To understand this SOP was necessary, when and how we

14  would (indiscernible), and following up on the process to

15  understand if it was granted or denied.

16  Q    Did you ever discuss SOPs with anyone at BSEE?

17  A    I have not personally discussed SOPs with anyone at

18  BSEE.

19  Q    Are you aware that notwithstanding Fieldwood's November

20  proposal regarding the single flow line, BP continued to

21  request additional information from Fieldwood?

22  A    We have an ongoing relationship with the teams, and I

23  know that requests on both sides have been a feature of that

24  relationship.

25  Q    You said that Fieldwood has -- strike that.  I recall

1 │ you testified that Fieldwood has the resources necessary to

2 │ complete the single flow line, is that correct?

3 │ A    That's right.

4 │ Q    In the unfortunate event that something goes wrong

5 │ during the process to implement the single flow line, who

6 │ pays for that?

7 │         MR. PEREZ:  Objection to the question, Your Honor,

8 │ to the extent it calls for a legal conclusion.

9 │         THE COURT:  Sustained.

10 │ BY MR. STARK:

11 │ Q    In the event something goes horribly wrong during the

12 │ operations to implement the single flow line, do you have an

13 │ understanding of who would be responsible to pay for it?

14 │         MR. PEREZ:  Same objection, Your Honor.

15 │         THE COURT:  I'm going to overrule it and I want to

16 │ explain why, because usually I do sustain when you get those

17 │ follow up questions.  But Mr. Dane is said to the have the

18 │ resources in order to do this and within that I need to know

19 │ whether his understanding of the required resources includes

20 │ the ability to handle any sort of catastrophic leak that

21 │ might occur.  I don't know whether that was included or not

22 │ included, so it's a fair question given his testimony.

23 │ Therefore, I'm going to allow his understanding to come in,

24 │ not as to the legal conclusion of the actual facts but as to

25 │ what he's thinking of when he says they have resources.  So

1  the objection's overruled on that limited basis.

2          Mr. Dane.

3  BY MR. STARK:

4  A    Mr. Stark, do you mind repeating the question one more

5  time?

6  Q    I'll do my best, sir.  In the event something goes

7  horribly wrong during the installation of the single flow

8  line, do you have an understanding as to who would be

9  responsible for those costs?

10  A    So our agreements govern the liability of certain

11  parties and the indemnifications that may be appropriate.  I

12  think it depends -- I can't tell you if things go horribly

13  wrong, I think that would depend on the circumstances that

14  cause that issue to arise.  But I do generally -- what

15  Fieldwood has proposed in doing these operations is

16  indemnifying BP in the same manner in which it has -- BP has

17  agreed for Fieldwood to do these similar types of operations

18  in the past.  And I think your statement of, if things go

19  horribly wrong, needs to be put in the context of the type

20  of operation that we're discussing which are not down hole

21  operations or drilling operations, it is the replacement of

22  a piece of empty pipe to another pipe.

23  Q    So in the event something does go horribly wrong, does

24  Fieldwood have the resources to pay for that should they be

25  found liable?

1  A    So Fieldwood has extensive insurance, we have a very

2  adequate current liquidity and resources in order to conduct

3  these types of operations.  And we believe we do have the

4  resources required with reasonable -- with the reasonable

5  risks that we think that these operations entail, which we

6  don't view any different than the ordinary risks that we

7  assume by being a current operator in the shallow and

8  deepwater of the Gulf of Mexico.

9  Q    So I understand you correctly, Fieldwood specifically

10 has insurance coverage that would cover the unfortunate

11 event that something went horribly wrong and Fieldwood were

12 determined to be responsible, is that correct?

13          MR. PEREZ:  Object to the form of the question, I

14 think it misstates his testimony.

15          THE COURT:  Sustained.

16 BY MR. STARK:

17 Q    Does Fieldwood have insurance policies that would cover

18 the unfortunate event where there were a catastrophic

19 failure or a catastrophic result during the installation of

20 the single flow line and Fieldwood was determined to be

21 responsible?

22          MR. PEREZ:  Same objection, Your Honor.

23          THE COURT:  I need to understand better what

24 you're getting at Mr. Stark.  He testified that this is only

25 the laying of an empty pipe.  And so if you're talking about

1  a catastrophic result, I could think of, you know, a diver

2  perishing through an accident.  I can think of the pipe not

3  working, because you can't connect one end to the other.

4  Which is you know, sort of catastrophic for the project but

5  not catastrophic for life.

6            I have difficulty thinking of a catastrophic

7  environmental problem if all that we're doing is laying an

8  empty pipe.  So I want you to define a little better what

9  you're asking him about in a context of his testimony.  Or

10 maybe you want to disagree and push him a little bit on

11 whether all this is, is the laying of any empty pipe.  But

12 the risks are different between laying an empty pipe and

13 laying a pipe that is under pressure where you're doing

14 repair to it.

15           MR. STARK:  I appreciate that, Your Honor.

16 BY MR. STARK:

17 Q    Mr. Dane, on what do you base the belief that this is

18 an empty pipe?

19 A    Well on facts.  And it's not a pipe that has

20 hydrocarbons in it.  It's a pipe that to my knowledge --

21 again I'm not the operational expert.  This is an activity

22 that we've run numerous times.  This is a piece of pipe

23 that's being connected from on piece of the subsea

24 infrastructure to another piece of subsea the

25 infrastructure.  These types of operations to my knowledge

1   never involve a piece of -- a pipe that has hydrocarbons at

2   the time of installation.

3   Q    So I appreciate that you are not a technical expert in

4   this area.  So if the technical experts in this area told us

5   that the pipe did contain hydrocarbons, would you defer to

6   their expertise?

7   A    Yes.

8   Q    And what sort of insurance coverage is available if

9   these pipes to contain hydrocarbons and there were a

10  catastrophic event?

11  A    So I don't have all the details of our various

12  insurance policies, but we have a very, very robust set of

13  policies.  All operators in the Gulf of Mexico are required

14  to have a minimum level of insurance which we do.  And so I

15  would have to defer to our risk management group on the

16  specifics of our insurance policies.

17  Q    Do you know the policy limits on the policies?

18  A    Off hand, I cannot tell you the policy limits under

19  each of our policies here today.

20  Q    Can you tell us under any of them?

21  A    Yes.  I can.

22  Q    What are those?

23  A    We have a wind storm insurance which doesn't which

24  doesn't seem like it's appropriate here, but has a 300 plus

25  million dollar limit.  We have operators extra expense and

1  general liability which I believe has a $500 billion limit

2  offhand.  We have numerous other policies, but I can't tell

3  you the details of them without consulting our risk

4  management group or for all our policies and such.

5  Q    Does Fieldwood intend to reject the LSP operating

6  agreement?

7           MR. PEREZ:  Object to the form of the question,

8  Your Honor, relevancy.

9           THE COURT:  Tell me the relevance, Mr. Stark?

10           MR. STARK:  Your Honor, it's relevant to the

11  extent that there are obligations under the operating

12  agreement for Fieldwood to be responsible for the cost of

13  these sorts of events.  And if we begin taking the event and

14  Fieldwood rejects the policy, then BP may be left holding

15  the bag.

16           THE COURT:  I'm not entering an order that leaves

17  BP holding the bag.  I made clear yesterday that any order

18  that I entered, that any risk that you are asked to take by

19  Fieldwood post-petition, will be a post-petition payment

20  obligation against Fieldwood and I will not back off that

21  position.  So I think we can move ahead.  Because I'm not

22  ask -- I will not ask you to do that.

23           MR. STARK:  Thank you, Your Honor.

24           Pass the witness.

25           THE COURT:  Mr. Dane, I don't know if this is a

1  question for you or if it needs to be differed for a

2  technical person.  How long is this pipe, roughly?  Are we

3  talking a 100-yard pipe or a 100-mile pipe?

4          THE WITNESS:  We have our expert Venkatesh Bhat on

5  the phone.  I believe that he would have the correct answer

6  to that question.  It is not a multi-mile section of pipe.

7  But Mr. Bhat would be the correct person to answer that

8  question.

9          THE COURT:  And the procedure -- in the terms of

10 the process where you said that Fieldwood will undertake it.

11 In my own mind, I'm thinking of the following, and maybe I'm

12 thinking of this wrong.  I've got a piece of pipe.  And on

13 one end it's going to connect up to the production from the

14 well, and on the other end it's going to connect up to some

15 sort of a gathering system.  Is Fieldwood proposing to lay

16 the pipe to hook up on the production end or to hook up on

17 the gathering end?  You know, which of those, if I can

18 divide this into those three major tasks, is Fieldwood

19 saying it will undertake?

20          THE WITNESS:  So the piece of pipe that's being

21 replaced is a jumper, which is a small section of pipe

22 between the well head and another subsea piece of

23 infrastructure.  We're basically just rerouting one section

24 of pipe that's already in place, due to where the leak event

25 is.  And we are taking -- the connections don't happen

1   directly to the loop system, they happen to various

2   components of subsea infrastructure, and we're just

3   rerouting two jumpers to form one connection.  I believe we

4   have a schematic that may be helpful.

5           THE COURT:  But are you -- is Fieldwood proposing

6   -- first of all are those three broad components of work

7   that I described a reasonable way for a lay guy like me to

8   think of this?

9           THE WITNESS:  It is, Your Honor.

10          THE COURT:  So I know that -- or at least I think

11  you're proposing that you'll lay the pipe, right?

12          THE WITNESS:  Correct.  The operation is taking an

13  existing jumper and removing it and connecting a new jumper

14  in a different location.

15          THE COURT:  So let's start then with connecting it

16  to the well head.  Under your proposal, who connects it at

17  the well head?

18          THE WITNESS:  So Fieldwood is the operator of the

19  well itself.  But because BP is the operator of the loop

20  system which Fieldwood owns an interest in, BP as operator

21  of that loop system under our agreements as they are today

22  would be the one that would conduct those operations.  In

23  the past, BP has agreed to let Fieldwood do these operations

24  and the operation that we did in April of this year was

25  effectively the same operation that we're talking about

1  doing now.  So BP would do it --

2          THE COURT:  I'm asking -- I'm asking are you

3  volunteering or offering to lay the pipe?  To lay the pipe

4  and hook it up at the well head?  Or to lay the pipe and

5  hook it up to the well head and hook it up at the other end

6  of the jumper.  I just want to know what it is that

7  Fieldwood is saying it can do if BP doesn't want to do it?

8          THE WITNESS:  The technicalities of where these

9  jumpers intersect the different subsea equipment is the only

10 thing that's giving me pause to answer your question.  But

11 to answer your question, we are proposing to undertake all

12 of the operational activities associated with removing the

13 jumper that needs to be removed and then replacing it with

14 the rerouted jumper to make the correct connection.  So all

15 the subsea activities is what Fieldwood would be providing.

16         THE COURT:  Thank you.

17         All right.  Any follow ups, Mr. Perez?

18         MR. PEREZ:  Nothing else, Your Honor, thank you.

19         THE COURT:  Mr. Stark any follow ups with the

20 questions that I asked?

21         MR. STARK:  Not at this time, Your Honor.

22         THE COURT:  Thank you, Mr. Perez.

23         MR. PEREZ:  Your Honor, nothing further.  May

24 Mr. Dane be excused?

25         THE COURT:  Yes.  Thank you.

```
 1            THE WITNESS:  Thank you.

 2            MR. PEREZ:  -- going anywhere but --

 3            MR. GENENDER:  Your Honor, may I call my next

 4  witness?

 5            THE COURT:  Yes.

 6            MR. GENENDER:  Thank you, Your Honor.  Paul

 7  Genender for the Debtors we would call Venkatesh Bhat

 8  please, Your Honor.

 9            THE COURT:  Mr. Bhat, would you press five-star

10  one time on your phone please?  Thank you.

11       (Witness sworn.)

12            THE COURT:  Thank you, Mr. Bhat

13            Go ahead please, Mr. Genender.

14            MR. GENENDER:  Thank you, Your Honor.  Could I ask

15  that Ms. Choi -- Erin Choi, be the presenter?

16            THE COURT:  Of course.  All right.  She's a

17  presenter.

18            MR. GENENDER:  Thank you, Your Honor.

19              DIRECT EXAMINATION OF VENKATESH BHAT

20  BY MR. GENENDER:

21  Q   Mr. Bhat can you please state your full name for the

22  record, and for the benefit of the record can you spell your

23  first and last name please?

24  A   Venkatesh Bhat.  V-E-N-K-A-T-E-S-H that's my first

25  name.  Last name is Bhat, B-H-A-T.
```

1   Q     Thank you, sir.  How are you employed, Mr. Bhat?

2   A     I'm a Senior Subsea Engineer for Genovesa with

3   Fieldwood.

4   Q     And what is -- what does that role entail?

5   A     My job is to execute the project from concept to the

6   first production.  Essentially, that's the role I'm in.

7   Q     How long have you been with Fieldwood, sir?

8   A     It's two years and five months.

9   Q     And what is your prior experience before joining

10  Fieldwood?

11  A     I worked for (indiscernible) energy for five years,

12  same role.

13  Q     What about before that?

14  A     I was with BP as a subsea engineer.

15  Q     And how long -- how long have you worked in the energy

16  industry as an engineer?

17  A     Sixteen years.

18  Q     And what is your educational background, sir?

19  A     I did my bachelor's in mechanical engineering from

20  India.  I did my masters here in the US, five year in it --

21  Q     And your masters, was it in engineering?

22  A     Yeah.  That's right.

23  Q     Thank you.  And, sir, are you familiar with the single

24  flow line option that's been proposed by Fieldwood?

25  A     Yes.

1   Q     And you heard Mr. Dane's testimony just now, is that

2   right?

3   A     Yes.

4   Q     Do you have an understanding of how long it's going to

5   take to get Genovesa online from an operational perspective,

6   sir?

7   A     Yes.

8   Q     And what is that understanding?

9   A     It takes -- if we do have to do this project, we should

10  be able to get the well flowing and commissioning by the

11  March.

12  Q     Okay.

13          THE COURT:  I'm sorry.  By when?  I didn't hear by

14  when.

15          THE WITNESS:  End of March.  Sorry, sir.  End of

16  March.

17  BY MR. GENENDER:

18  Q     Mr. Bhat, I'm going to actually ask you maybe a similar

19  or maybe the exact question that Judge Isgur asked Mr. Dane.

20  Can you describe for the Court which of the necessary

21  operations Fieldwood can undertake in connection with the

22  simple flow line option?

23  A     Yes.  Are you asking the whole scope of work or

24  specific to certain activities like jumper decomissioning

25  that Fieldwood will undertake?

1  Q    I think I'm going to ask you to explain the total scope

2  of work.  And go into as much detail -- you proceed through

3  that however it makes sense to you, sir.

4  A    Okay.  So today we have the scope of work entails two

5  jumpers that need to be decommissioned.  One of the jumpers

6  belongs to Fieldwood Genovesa project, we call that the

7  Genovesa push jumper.  The second jumper is BP's LSPS jumper

8  that connects San Diego Flem (phonetic) one to San Diego

9  Flem two.  Those are the jumpers need to be recovered.  Once

10 we recovered we do methodology and then the new jumper is

11 being fabricated in (indiscernible) and once we get the

12 final metrology -- metrology is nothing but you measure two

13 ends of the connections system to the very fine accurate

14 number subsea by some scanning equipment, we actually

15 fabricate the jumper above 90 percent.  Last 10 percent the

16 final weld is (indiscernible) and once we have this data we

17 make that fine tune inspected (indiscernible) jumper and

18 then you install the subsea.  So that's one aspect of it as

19 far as installing of the subsea (indiscernible).  The jumper

20 is 116 foot long, Judge, you asked that before.  So once the

21 jumper is installed, we are saying jumper can be installed

22 by March, about March 24th.  And the well is ready to bring

23 on.  So whatever activities that need to happen

24 simultaneously is there are certain readiness documentation

25 that need to happen.  So that (indiscernible) as a facility

1   is ready to take a hydrocarbon.  (Indiscernible) training,

2   all the MOCs has been checked, (indiscernible) set in place,

3   operator training is in place, operating manuals are in

4   place, (indiscernible) diagrams has been done.  So we've

5   been working on this for quite a long time on a regular

6   project.

7            For single flow lines, some of those documents

8   will need to be redlined, so I would start those activities

9   right away, if it's not started already, so that you can

10  merge when we install this jumper and where (indiscernible)

11  the well once we install, test the jumper, retest the

12  jumper, and if it successfully passes in two days of time

13  we'll gather all of those testing documents (indiscernible)

14  and we can (indiscernible) the well.  So that's what I'll do

15  (indiscernible).

16           THE COURT:  Mr. Bhat, what's the diameter?

17  BY MR. GENENDER:

18  Q    Thank you.

19           THE COURT:  What's the diameter of the pipe?  Of

20  the jumper?

21           THE WITNESS:  I believe it's 85.

22           THE COURT:  How much?

23           THE WITNESS:  Eight inch, Judge.

24           THE COURT:  Eight inch.

25           THE WITNESS:  Yeah.

1            THE COURT:  Thank you.

2            MR. GENENDER:  Your Honor, are you good or can I

3   keep going?

4            THE COURT:  No.  I just I'm trying to visualize

5   what we're doing here.  And just I know that may not effect

6   much, but it helps me to get a visual image in my mind of

7   what's going on sort of like laying a landscape pipe in my

8   own yard, right.  So just trying to understand.

9            MR. GENENDER:  I'm not familiar with legos in my

10  house, but I won't go there.

11  BY MR. GENENDER:

12  Q    Mr. Bhat, have you prepared a schedule that would

13  reflect the timeline you were just alluding to when you

14  referenced March 24th?

15  A    Correct.

16  Q    Okay.

17            MR. GENENDER:  If I can get -- Ms. Choi if I can

18  get you to put up the first page of our demonstrative.

19  BY MR. GENENDER:

20  Q    All right.  Mr. Bhat, can you see this page on your

21  screen?

22  A    Yes, sir.

23  Q    Okay.  And there's two columns.  One says Fieldwood

24  operating and one says BP's current proposal, do you see

25  that?

1   A    Yes.

2   Q    Mr. Dane was asked about -- he was asked about dates

3   from BP's Exhibit 24, which do you see whether or not those

4   correspond with the dates on the right-hand column?

5   A    Yes.  I see those dates.

6   Q    Okay.  And I want to ask you about the dates on the

7   left-hand column which says Fieldwood operating.  Are those

8   dates that came from you and your team, sir?  On the

9   operation side?

10  A    Yes.  That's me and my team.

11  Q    And how did your team go about coming up with these

12  dates, Mr. Bhat?

13  A    These dates are based on our past experience at

14  Fieldwood, outside Fieldwood.  It's business as usual.  We

15  have recovered as many as four to five jumpers in last two

16  years, decommission, and installed more than eight jumpers.

17  In Genovesa field itself, we have installed three jumpers.

18  So these dates are based on our past experience.

19  Q    Thank you.

20  A    Yeah.  One correction.

21  Q    Please.

22  A    Just a -- sorry to interrupt you, one quick correction.

23  The host facility readiness and start up is not specific to

24  Fieldwood.  It's a BP facility but all the other facilities

25  was Fieldwood and partner facilities.

1   Q     Okay.  Thank you.  At a high level, looking at the

2   first entry, what is commencement of jumper fabrication,

3   what does that entail?

4   A     Commencement of jumper fabrication, so before we get

5   into any kind of fabrication, we start our process with

6   collecting the design requirements, what's the pipe size

7   need to be, how strong the pipe needs to be so that it

8   withstand the pressure and other loading conditions.  So we

9   collect the -- and we collect the requirement.  Based on

10  that, we come up with design document so -- as part of the

11  engineering.

12       So once we are comfortable with the engineering, which

13  we work with heavily with a subsea -- which is one of the

14  major vendors in the Gulf of Mexico for all the majors and

15  independents, they come up with the drawings and the

16  fabrication drawings.  And subsea seven -- is contracted to

17  fabricate this jumper.  They're fabricating this jumper in

18  new industries as in modern setting which is a facility

19  where majority of the operators perform their jumper

20  fabrication, pipe fabrication.

21       So where this is basically you are welding your pipes,

22  you have certain templates, skids where you use the

23  qualified belt with the metallurgist and other qualified

24  welders, project managers to make this piece of pipe that's

25  "M"-shaped or "V"-shaped based on  right now "M"-shaped.

1       So that's where that jumper is being fabricated.  We

2   have started fabricating on 28.  That's the day when we

3   issued  but we've been engaged with the vendor since January

4   to get up to speed with all requirements and prospects and,

5   you know, drawings and resources all whole kind of different

6   things.

7               THE COURT:  Mr. Bhat, again, just so I can get a

8   picture in my mind, is this a series of shorter links of

9   pipes that are joined together, or is this one continuous

10  pipe that is fabricated?  What do I see in my 116 feet of

11  link?

12              THE WITNESS:  You see different sections of

13  straight pipes joined together with bends and "T".

14              THE COURT:  With what now?  Joined together with

15  what?

16              THE WITNESS:  Bends, like bends, 90 degree bends

17  with five diameter and the "T," just like "T"-shape.  So it

18  has variety of different shapes.  The majority three

19  different shapes here, one is a 90-degree bend with a

20  radius, next one could be a "T," and the other could be a

21  straight pipe.  So there's different kinds of pipe that's

22  joined together with a welding process.

23              THE COURT:  And what's the function of not having

24  a straight pipe?  Just as layperson as you can --

25              THE WITNESS:  Because you --

1          THE COURT:  -- describe that to me, why is this

2   not a straight pipe?

3          THE WITNESS:  Because you need those bends.  If

4   there's no way to bend this thick pipe, you need those

5   right-angle bends so that it connects to the connectors and

6   at the same time it has that 90-degree connection.

7          THE COURT:  Is that because the subsurface level

8   is different and on the front end than the back end and so

9   you have to get it higher or lower?

10         THE WITNESS:  Yes, depending on jumper design

11  basis document there are certain shapes (indiscernible) the

12  jumper so usually the jumper -- this jumper is "M"-shaped so

13  it goes up and come down all the way to the seabed

14  (indiscernible) and then goes up back to the next leg of the

15  "M."  So in this cause, you have bend straight sections that

16  you weld together.  So next (indiscernible) doesn't have

17  (indiscernible) that is it depends on design criteria like

18  pressure, vibration, you know, the fatigue life.  There's

19  many different aspects you know vibration-induced failures.

20  We look at everything.  Based on that you design this piece

21  of pipe.

22         THE COURT:  All right, thanks.  Go ahead, please.

23         THE WITNESS:  Yeah.

24         MR. GENENDER:  Thank you.  Thank you.  Ms. Choi,

25  if you can put up Debtors' Exhibit 16, which is at

1  ECF 834.18, please?

2  BY MR. GENENDER:

3  Q    Mr. Bhat, do you recognize this document, sir?

4  A    Yes.

5  Q    Who prepared it?

6  A    I prepared it.

7          MR. GENENDER:  Okay.  Can we turn to the second

8  page, please, Ms. Choi?  All right.

9  BY MR. GENENDER:

10  Q    And, Mr. Bhat, can you by directing where on this page,

11  does this page depict any of the -- any aspects of what you

12  were just explaining to Judge Isgur?

13  A    That is correct.  So --

14  Q    Can you -- can you put this picture to your words that

15  you just used, please?

16  A    Yeah, I'll try my best.  So this is we call this P and

17  ID, piping and instrumentation diagram.  The shapes we just

18  we talked about is not shown here.  It's just a schematic.

19  So basically the red line, the two red rectangles you're

20  seeing right now is basically the disconnect and connection

21  points for LSPS jumper and a Genovesa jumper.

22      And the well, the Genovesa well, is now connected, the

23  line is connected directly to the right side, rightmost

24  side, and that's where it need to be connected Santiago

25  PLEM2, so that's where it's going to be connected with 116-

1   feet jumper back into a cliff point.

2       Genovesa is a 10,000-foot offset leg from LSPS.  So

3   well is 10,000 feet away from this connection point.  And we

4   have -- we try connecting to LSPS.  We have something called

5   a cliff.  It is nothing but a concrete structure where we

6   have a connection point so that conveyor, it's going to be

7   connected with LSPS.  So that's what we are seeing right now

8   on the rightmost side, it's a LSPS loop where it's

9   connected.  On left most side is going back to Genovesa

10  point.

11  Q    Can you -- Mr. Bhat, can you direct the Court to where

12  the leak is on this schematic or diagram?

13  A    Correct.  I can direct that to try my best.  So I'll

14  walk you through this.  We have two red rectangles so that

15  rectangles are we call it as a tie-in structure is called a

16  Santiago PLEM1 plan one.

17      So from that rectangle, it's in a straight line of

18  approximately 4,000 foot of flowline, you see another

19  rectangle.  That's -- is a Santa Cruz -- it's called a

20  (indiscernible) and this particular rectangle structure is

21  called a Santa Cruz -- Santa Cruz PLEM.  That's wall --

22  that's where we have a leaky valve and there's a compromise

23  in the integrity of the system so the Genovesa jumper was

24  connected to the red-filled rectangle that's on the left

25  side, call it a leaf where that rectangle is, that's where

1  it was connected.

2      If I have connect my Genovesa jumper there, it's

3  directly being exposed to -- not directly but there's one

4  there, the green, the connection point the leaky,

5  compromised valve.  So we would like to -- we need to have

6  two values requirement so that's why we came up with that

7  option where we recover that time, recover that jumper, you

8  know, put a cap on, catch a cap, and then directly connect

9  it to the next tie point where it's -- it has many barriers.

10  But in order to do that, we couldn't do that because there's

11  already a jumper in place.

12      It's called a LSPS jumper, BP jumper, so it connects

13  from the STPC to where the red line is shown.  It's

14  currently (indiscernible) there so we need to recover that

15  so that we empty that spot and come up with a new Genovesa

16  PLIS.

17          MR. GENENDER:  Can we turn for a moment to the --

18  to page three of this document?

19  BY MR. GENENDER:

20  Q   Mr. Bhat, does this page assist you in explaining what

21  the necessary repair is?

22  A   Yes.

23  Q   How's -- can you please describe that for the Court?

24  A   Absolutely.  So this is a -- of the Genovesa for

25  Santiago and Santa Cruz area.  The left-hand side shows

1  before, right-hand side shows after we do the repair and we

2  install the new jumper.  So on the left side, we have "V"-

3  shaped jumper.  So on the left side at the bottom most,

4  there is a pipe that comes up heading towards west

5  southwest.  So that's where your Santa Cruz well is, that's

6  where the compromised valve is.  So we have 4,000-foot leg

7  of flowline coming in and connecting to Santiago PLEM1.  So

8  Santiago PLEM1 right now has two lines connected to it:  one

9  is that "V"-shaped line connected up on north and there is a

10  straight line connected with cell.

11      So basically that straight line connected to the cell

12  is where the Genovesa well tie-in point is.  The Genovesa

13  well is coming from east side.  If you look at the red line

14  at the right bottom corner, that's where the Genovesa well

15  is coming from.  There is 10,000-foot offset from that point

16  comes there, the flowline terminates, and there is a one

17  green line that's an intermediate jumper, and there's other

18  green  line that's  so that's what we need to take it out.

19  We also need to take out the "V"-shaped jumper and we need

20  to install 116-foot long straight jumper from PLIS to

21  Santiago PLEM2, which you're seeing on the right-hand side.

22  So two jumpers are gone, one jumper's installed.

23      That basically is -- of course, there is a few other

24  activity here that need to be installed prior to doing this.

25  We just -- our Genovesa jumper -- jumper is filled with

1  certain fluids; LSPS jumper has certain fluids, certain

2  flushing operation need to be done, you know, permit

3  application need to be applied.  And (indiscernible)

4  permission these operations need to be.

5       But as far as these schematics, do I have any

6  questions, is it little bit more clear?

7  Q    Sorry, you're asking -- make sense to me but I'm not

8  the -- I'm -- I know Judge Isgur will jump if he has a

9  question.

10          MR. GENENDER:  But, your Honor, as a housekeeping

11 matter, I would offer into evidence Debtors' Exhibit 16,

12 which is at 834-18.

13          THE COURT:  Sixteen or 116?

14          MR. GENENDER:  No, Exhibit 16 at 834-18.

15          THE COURT:  Any objection to 834-18 being

16 admitted?

17          MR. STARK:  No objection, Your Honor.

18          THE COURT:  Thank you.  It's admitted.

19      (Debtors' Exhibit Number 16 received in evidence.)

20          MR. GENENDER:  Thank you.  If we can go back to

21 the -- Ms. Choi, to the demonstrative, please.  All right,

22 let me --

23 BY MR. GENENDER:

24 Q    Mr. Bhat, I know we -- you probably hit a number of

25 these things in your last answer, haven't you?

1   A     Yes.

2   Q     Can you just -- let me just -- the things you didn't

3   hit, can you just walk through what are the things that are

4   necessary and how you believe that they can be done by the

5   dates that you're suggesting under the Fieldwood operating

6   column?

7   A     Yes, sure.  So we just talked about commencement of

8   jumper fabrication already in progress.

9   Q     Yes.

10  A     The jumper decommission permit, it is basically a

11  application you provide to BSEE showing that, hey, we are

12  going to decommission this jumper in this course of time,

13  there are some fluids inside this pipe, we'll have to flush

14  it with the certain fluids, and then we'll perform two or

15  three cut and will recover in section or we'll recover in

16  full one length.

17       And this is how we are going to do it.  And there is

18  other environmental permits that goes with it.  So those

19  permits, those applications you need to apply with BSEE.

20  They typically in my experience we have received our permits

21  very quickly --

22  Q     Let me stop you.  Can I stop you?  Has Fieldwood

23  applied for those permits, sir?

24  A     Yes.

25  Q     Thank you.  Go ahead, please.

1  A    Yes.  Fieldwood has already applied for that permit.

2  They're looking for a full permit.  So after we have that

3  permit, the next thing we will do is I believe on the BP

4  side for the LSPS jumper, they'll have us take same actions.

5  And the next step will be you work with a vessel company.

6  Basically we use Oceaneering -- I think -- partners BP, they

7  also use (indiscernible), pretty competent company,

8  competent crew.

9      So we will (indiscernible) vessel scale available,

10 there's quite a few vessels available between different

11 vendor but typically with  a vessel window so we'll take

12 that -- we will block that vessel, have right tooling, and

13 go ahead  like to go and recover the Genovesa jumper and by

14 6 March, if we will definitely recover both the jumpers --

15 and, you know, we can start into installation of new jumper

16 which is  and installation of new jumper which is another

17 three weeks' process for field work, bringing it to 24th of

18 March.

19     After that, we will do a leak test, making sure the

20 stuff we are installed is good, it has integrity built into

21 the system.  We will take -- we'll pressure test it as per

22 BSEE government guidelines.  And we'll provide that

23 paperwork to government and keep a copy on the platform.

24 And we'll double-check all the documentation one last time

25 and slowly amp up the well.

1  Q    Mr. Bhat, would the entry Genovesa jumper

2  reinstallation March 24, 2021, there's 18 days between the

3  prior entry?  Will take that 18 days for the Genovesa jumper

4  reinstallation?  Based on your experience.

5  A    No, it doesn't.  But we have some other contingencies

6  there, about seven days of other contingencies, vessel

7  delays, stuff like that.  So it's jumper installation is --

8  especially 116-foot jumper is a very, you know, tricky

9  operation.  You need to have right -- use right

10 (indiscernible) for ROE's (indiscernible) ROE's to operate

11 to monitor the operation.  And then it has lot of rigging,

12 you know, there's kind of things that goes with it.

13      We do -- we perform a detailed higher analysis

14 (indiscernible) hazard inputs and risk study for this

15 operations.  So all in all I think that's why we have some

16 extra time there.  Sorry for the long answer.

17 Q    Well, so you have an extra week in there.  And then

18 obviously your schedule says commencement on March 26, 2021,

19 and there's time between that date and April 5th, right?

20 A    Yeah, that's right.

21 Q    And so based on your experience, is it customary to

22 have some cushion built in like you did in the schedule?

23 A    Yeah.  It's always we building -- we always build

24 cushions in schedules because we can't control the weather

25 or weather delays due to unforeseen reasons.

1  Q    Okay.  Sir, I want to look at a couple places where

2  there are differences between Fieldwood's schedule and BP's

3  schedule.  Were you just -- the process you just described

4  for Genovesa jumper reinstallation, you allot 18 days and

5  said it might take, what, seven to ten days of that and then

6  there's some cushion.  Do you see where BP allots a month

7  from March 15 to April 15?

8  A    Yes.

9  Q    Do you have a view as to whether or not that's

10 reasonable?

11 A    I don't think it's reasonable.

12 Q    Okay.  And then looking at the next one for host

13 facility readiness of well startup, you're saying that

14 should be done by the 25th of March, and BP is saying by the

15 15th of May.  Do you have a view as to whether or not that's

16 reasonable?

17 A    That is not reasonable either because I don't think

18 it's reasonable.  The --

19 Q    Well can you explain --

20 A    Excuse me, sorry, go ahead.

21 Q    I was just going to ask you to explain why you feel

22 that way.

23 A    Yeah, because the Na Kika readiness depends on, you

24 know, like I said before you bring any well online, you need

25 -- you check number of things.  You need to make sure you

1  have proper resources in place, meaning people are trained,

2  you have right (indiscernible), right documentation,

3  documentation, we have standard operating procedures, you

4  know, MOC's in place whose -- so there's many different

5  things  items, making sure everything is teed up.  But that

6  -- those activities you can do, you can start right now.

7  You don't have wait until jumper is installed.  You can do

8  -- you can start with activities right away.  There are some

9  things you have --

10         THE COURT:  Let me interrupt you.  Someone has a

11 cell phone that is buzzing.  Would you please be sure your

12 line is muted if you're not speaking?

13         THE WITNESS:  Sorry.

14         THE COURT:  Go ahead, Mr. Bhat.

15 BY MR. GENENDER:

16 A   So -- yeah, so basically I kind of lost my thought

17 train.

18 Q   Okay.  Mr. Bhat, you were --

19         MR. GENENDER:  If I may, Your Honor?

20 BY MR. GENENDER:

21 Q   You were answering a question about the May 15th

22 deadline and whether that host facility readiness of well

23 startup were --

24 A   Yeah.

25 Q   -- whether it was -- why it wasn't reasonable for it to

1   take that long.

2           MR. GENENDER:  Thank you, Your Honor.

3   BY MR. GENENDER:

4   A    Yeah, thank you very much.

5        Yeah, so point is we can start some of those activities

6   now, except the jumper pressure testing which you can't do

7   it now because the jumper is not installed, which the leak

8   test, documentation, and few other things (indiscernible)

9   and typically we take two days to finish those activities.

10  Q    Mr. Bhat, Mr. Dane was asked some questions about the

11  safety issues associated and that things could go horribly

12  wrong in connection with this single flowline option.  Do

13  you -- did you hear that testimony?

14  A    Yes.

15  Q    And can you describe in your mind do you have a view as

16  to what the risks are compared to what they could be for

17  different operations?

18  A    Yeah.  Can you repeat your question?

19  Q    Sure.  Can you describe the -- what are the risks from

20  this repair, this single flowline project, as opposed to

21  other types of operations that might be more dangerous?

22  A    Yeah, yeah.  So I can go through that really quick.  So

23  this is not -- there are certain risks, okay, there are

24  risks in drilling in completion activity when you have a

25  drill  a well and you're drilling the  zone and there is --

1   you're exposed to hydrocarbons and there's a blowout.  So

2   those kind of risks which is very greater risk.  And then

3   that's doing (indiscernible) completion catastrophic risks.

4   And also there are risks that you have to do a total

5   investigation, identify them throughout the design

6   operations reviews processes that we do as a team, which is,

7   for example in this case for installing the equipment, for

8   example I'm installing the jumper.

9       The risks could be, you know, there's a safety risk,

10  jumper rigging failed, falls on somebody.  There is a risk

11  of doing pressure testing onshore, the pipe doesn't hold,

12  the pipe doesn't hold the pressure it can blow out onshore

13  causing, you know, harm to people, environment.  There is a

14  risk to the equipment while installing the jumper, you know.

15  The rigging, it fails, and jumper might be get damaged.

16      There is a risk to the infrastructure where rigging may

17  fail and jumper can go loose and, you know, damage the

18  (indiscernible) or create an event.  For that we have a

19  mitigation when we identify all those (indiscernible) the

20  project and work through them.  For example, the one I just

21  mentioned, the jumper rigging mail fail and it would fall

22  down on the infrastructure, right?  So we don't deploy

23  jumpers in the area where the infrastructure -- SOZ, Safe

24  Operating Zones, where we have a ten degree -- from the

25  vessel where if we deploy if it falls, it won't fall on any

1  infrastructure.  So those kind of things.  And once we start

2  it, there is a risk of damaging the equipment that's already

3  there; for example, the hub.

4       So for that we take enough precautions.  These

5  equipment, what we are trying to install here, this is not

6  -- number one.  These equipment connection points have been

7  installed in the Gulf of Mexico for many years, you know,

8  number 1500 or maybe 200, so this is a standard equipment.

9  We are not doing any technology here so that's -- eliminates

10 majority of those risks.  So even we exposed to these kind

11 of risks such as damaged jumper or damaged connection point,

12 for the majority of the time it's fixable, either we have

13 repair or contingency method which usually  have as a backup

14 option because these things do happen.  And financial

15 impacts are not as great as compared to other areas of

16 drilling and completion is my understanding.

17 Q    Just, Mr. Bhat, have you done other operations similar

18 to this single flowline option that you're testifying about

19 here today?

20 A    Yes.

21 Q    And do you know how many similar operations you've

22 overseen from an operations perspective?

23 A    Yeah.  In the Fieldwood itself, we have done this is my

24 fifth project in last two years.

25 Q    Okay.  And do those experiences inform your testimony

1  about these deadlines on this demonstrative, that this can

2  be done by the 26th of March?

3  A    Yes, sir, I do.

4  Q    And do you have a view as to whether this can be done

5  by the -- by April 5th in a safe manner?

6  A    I do, absolutely.

7  Q    And what is that view, what is that view?

8  A    We don't install or take up any kind of operations that

9  would harm our people, environment, or equipment.  We do a

10 very detailed risk assessment of every corner, everything

11 that including (indiscernible) perform everything operation

12 we need to have, and we look at everything.  And we mitigate

13 that risk operationally.  It's a risk assessment.

14     Safety is in-built into these equipment because we

15 comply with industry standard.  On top of that, we have a

16 vendor standard, we have Fieldwood, we have own standards.

17 So safety is inherent to these equipment.  What we do is

18 capture the risk of making sure (indiscernible) the whole

19 system over the period of time before we go sanction the

20 project, doing the engineering.

21     And same thing operationally, before my (indiscernible)

22 fails or before we start testing any equipment, we

23 continuously de-risk with the right people, right experience

24 (indiscernible) and we have done these things with BP while

25 we install these (indiscernible) jumpers -- a 10,000-foot

1   flowline and 10,000-foot umbilical and many other things as

2   (indiscernible) and we didn't have any kind of issues while

3   we did it in last year and a half with the BP team.

4   Q    Mr. Bhat, are there -- in order to do this with

5   Fieldwood handling the operations, are there areas where

6   Fieldwood will need cooperation from BP?

7   A    Yes, absolutely.  We need to work as one team with

8   common goal.

9   Q    What are some of the areas that you -- where you would

10  still need some cooperation from BP?

11  A    We need to apply for decommissioning permits as soon as

12  possible.  We need to work on, you know, readiness efforts,

13  making sure all the documentation and all the checklist,

14  Na Kika, standard operation procedures are in place by the

15  time the jumper is installed and ready to flow.  We need BP

16  to work with the vessel vendor because BP's going to be

17  decommissioning these jumpers and identify the right vessels

18  for Campaign 1 and Campaign 2.  You know, work with us in

19  finalizing the procedures, risk assessments, and making sure

20  Na Kika has POB's when we're ready to flow the valve the

21  last week of March.

22  Q    Mr. Bhat, do you have a view as to whether if Fieldwood

23  is allowed to do the necessary work, if it can safely get

24  Genovesa online before April 5th?

25  A    Yes.

1  Q     What is that view?

2  A     I do believe that we can get this well online by end of

3  March as stated in the presentation.

4           MR. GENENDER:  Okay, thank you.  I'll pass the

5  witness, Your Honor.

6           THE COURT:  Thank you.  Mr. Stark.

7           MR. STARK:  Thank you, Your Honor.

8              CROSS-EXAMINATION OF VENKATESH BHAT

9  BY MR. STARK:

10 Q     Mr. Bhat, what's your experience bringing wells online?

11 A     Can you please discuss that question bit more detailed?

12 It's a wide breadth of question from wellhead to on the

13 platform.

14 Q     Fair enough.  What's your experience on the platform

15 side of bringing a well online?

16 A     I've been engaged with Fieldwood and other operators in

17 last -- from 2012, 2014 timeframe in variety of different

18 fields in Gulf of Mexico.  And as a project manager, project

19 engineer, I'm experienced to deal with these activities.

20 Q     Have you ever been responsible for the host platform

21 portion of bringing a well online?

22 A     I am not responsible for host facilities.  I am not

23 directly responsible.  Usually in a project organization you

24 will have a lead for the host facility where they will have

25 a  line to you and they will take the ball forward, directly

1  work with the field ops at the platform, and carry that --

2  and then process that work.

3  Q    So earlier in your testimony there was some

4  conversation about the jumper; do you recall that?

5  A    Yes.

6  Q    The physical characteristics.

7  A    Yeah.

8  Q    And at least one of the two jumpers to be removed is

9  filled with oil; is that correct?

10  A    BP's jumper is filled with oil, you're exactly right.

11  Q    And what about the other jumper; is it dry or is it

12  absolute as well?

13  A    It has flushed with MEG, mono-ethylene glycol, or .

14  Q    So neither of the jumpers are dry.

15  A    No.  Jumpers cannot be dry because it has to contain

16  fluids.

17  Q    And then these jumpers are connected to a seven-mile-

18  long pipe; is that correct?

19  A    Which specific jumper, Genovesa jumper or LSPS jumper,

20  sir?

21  Q    Well the LSPS jumper is, isn't it?

22  A    LSPS jumper is connected to I believe it's a 4,000-foot

23  leg to Santa Cruz .

24  Q    And what about the other jumper?

25  A    Genovesa jumper is connected to a fixed structure

1  called pipeline  that's a structure and it's a fixed

2  structure connected with that.

3  Q    There's also a riser involved in this operation; is

4  that correct?

5  A    There is also a riser involved in this operation, I

6  don't recall, you know, remembering the riser in this

7  operation.

8  Q    I believe you testified earlier about permits; do you

9  recall that testimony?

10 A    Yes.

11 Q    And am I correct, the permits are a gating issue

12 insofar as the -- most of the activities cannot occur until

13 the appropriate permits are issued; is that true?

14 A    Hundred percent.

15 Q    You testified that Fieldwood has applied for a

16 decommissioning permit; is that correct?

17 A    Yes.

18 Q    Now, when did Fieldwood submit for the permit?

19 A    Fieldwood submitted permit on Monday.  We provided

20 permits to BP earlier and we had a discussion on Friday and

21 BP gave back the comments and based on those comments, we

22 changed it and submitted BSEE on Monday.

23 Q    And just so I'm clear, that's Monday as in yesterday.

24 A    Correct.

25 Q    Do you know what the current status of that permit is?

1  A    I don't know.

2  Q    Do you have any understanding of when that permit may

3  be issued?

4  A    Speculation.  I can speculate we can get the permit

5  approved within next, you know, two weeks at the most  --

6  Q

7  A    Yeah.

8  Q    Sorry, I didn't mean to cut you off.  Has Fieldwood

9  also submitted permits for its lease term applications for

10  the new jumper?

11  A    Yes, sir, that's right.

12  Q    When were those submitted?

13  A    I believe was submitted Jan. 28th.

14  Q    Do you know the status of those permits?

15  A    Well, it's in progress.  We've been talking to BSEE

16  and, you know, it's work in progress.

17  Q    Do you have an understanding of when those permits will

18  be issued?

19  A    No, sir.  On the -- just adding to your two questions,

20  I just want to throw it out there.  We deal with BSEE quite

21  a bit here.  They're really helpful, responsive.  Typically

22  the decommissioning permits are the way it's routed to a

23  different department, it's pretty straightforward.  Our

24  experience is less than a week on all the different

25  projects.  Lease term you -- typically it takes little bit

1    more time because more eyes will see that.  So usually

2    sometimes it's two weeks, sometimes it's three weeks.  But

3    it's not 60 days, 90 days' timeframe.

4    Q    Although it could be.

5    A    It could be, yes, it could be.

6    Q    Does Fieldwood have all of the necessary equipment

7    already on-hand?

8    A    Fieldwood to perform what, sir?

9    Q    The jumper removal.

10   A    Yes.  We have all the equipment to  of this jumper.

11   Q    And how many pressure caps does Fieldwood have on-hand

12   for that operation?

13   A    We have one pressure cap for that operation for

14   Genovesa  jumper.

15   Q    And what is a pressure cap?

16   A    Pressure cap is two rectangle I show you on here to cap

17   the ends when we close the jumper.  And these pressure caps

18   typically these are high commodity items.  We at Fieldwood

19   is independent oil and gas company in Gulf of Mexico,

20   likewise we have other peers, Murphy and our many  we have

21   we can always post it with our peer, so those items are

22   really not a issue.  If you know you need them, you can get

23   them.

24   Q    And Fieldwood has one on-hand; is that correct?

25   A    Yes, that's correct.

1  Q    You feel it's reasonably prudent to attempt the jumper

2  recovery with only one pressure cap on-hand?

3  A    Yes, I think so.

4  Q    What happens in the event the pressure cap fails or

5  there's some issue with it?

6  A    If pressure cap fails, you can change out the seals and

7  install it.

8  Q    And what if that's unsuccessful?

9  A    If it's successful, then it's not an issue of pressure

10 cap, there might be something else.

11 Q    Has Fieldwood asked any of its sourcing partners for

12 additional pressure caps?

13 A    Yes.

14 Q    Have they offered to provide any?

15 A    Yes.

16 Q    Has Fieldwood taken them up on that offer?

17 A    We can if given the opportunity if we get opportunity

18 to pull these jumpers, definitely we can source those within

19 two to three days.

20 Q    From where?

21 A    From our operator community we have.  Since we are

22 independent -- so in Gulf of Mexico, we're fortunate to have

23 a independent small operator community where everybody don't

24 keep spares, we can't afford to have ten spares or ten

25 spares like major for every project.  So we share, we have

1  pool, and we try to share from that pool.

2  Q    I appreciate that.  But among that community, who has

3  pressure caps available that Fieldwood could obtain?

4  A    I checked out with Talos (phonetic) and there's one

5  other opportunity so, you know, those are the only two

6  places I checked and it seems like it's available.

7  Q    From which of those opportunities?

8  A    From Talos.

9  Q    Does Fieldwood intend to obtain that additional

10  pressure cap before attempting the jumper recovery if

11  allowed to?

12  A    Absolutely.  I mean, we have done operations with team

13  of pressure cap.  We just need to do a risk assessment.  And

14  we may choose to have second pressure cap if required.  But

15  most of the times it's not required.

16  Q    Well, you say "required;" required by whom?

17  A    Required is dictated by the asset, the operation you

18  are going to do.

19  Q    Is that a requirement based on Fieldwood policies,

20  regulators, where did the requirement come from?

21  A    It's a bit a Fieldwood policy.  Sometimes it's

22  operator.  Or sometimes it could be (indiscernible) in the

23  line.  If you are doing that on a flushed line, you know,

24  might be okay having one pressure cap, you don't need a

25  second pressure cap.  But you go with for the change out.

1  Q    Earlier you testified regarding Fieldwood's proposed

2  schedule and BP's proposed schedule; do you recall that?

3  A    Yes.

4  Q    And I believe you testified that under the Fieldwood

5  schedule, to get the well safely online by late March; is

6  that accurate?

7  A    End of March.

8  Q    End of March.  Can you guarantee that?

9  A    Yes.

10  Q    You're representing to this Court that you guarantee

11  that can be done by the end of March.

12  A    Yes.  If we don't have any (indiscernible) obstacles.

13  I mean, these operations always have some risks and if all

14  operations goes smooth, which typically do with a good

15  planning, risk assessment, we can definitely bring this well

16  online by end of March.

17  Q    If everything goes well.

18  A    Yes.

19  Q    Well that's assuming there are not abnormal weather

20  delays, correct?

21  A    There could be normal weather delays or maybe your

22  remotely operated vehicle, ROV's, don't work, or you have

23  some incident like, for example, like I said, you know,

24  unfortunately you broke something.  Stuff happens.  If that

25  happens it (indiscernible) and it just like the LSPSC

1  (phonetic), correct?  So it could be one of those events

2  where it could delay.

3  Q    You could have delays related to COVID, correct?

4  A    Yes, exactly.  That's a good one, too, yeah.

5  Q    So there are any number of factors that could --

6  A    Yes.

7  Q    -- delay the schedule and prevent completing it by the

8  end of March, correct?

9  A    Yes, any number of issues that we typically don't

10  capture on the risk assessment chart.  We didn't have risk

11  assessment when we started this project in 2020, January for

12  COVID.

13  Q    Understandably.  What level of -- what probability of

14  success do you attach to the Fieldwood proposed schedule?

15  A    Fieldwood, right now hundred percent.  Based on our

16  risk assessment, we can definitely get it done.

17  Q    Well I want to make sure I understand.  You say a

18  hundred percent but we also discussed that schedule could be

19  delayed as a result of any number of factors.

20  A    That's uncontrolled items that's out of my control.  So

21  if it's in my control, I can definitely get it done by end

22  of March.  But uncontrolled events like COVID or weather or

23  a number of other things can happen that related to

24  unforeseen things that never happened before or very rarely

25  happened before, those are not in my hands to be really

1   honest.  So I can't see that, I can't predict that, I don't

2   have crystal ball.

3   Q     You can't attach any sort of degree of probability to

4   those uncontrolled events; is that correct?

5   A     We have some contingencies built into the schedule like

6   I said -- like somebody seven, like seven days, you know.

7   And I just make sure I'm not over-speaking, once again,

8   before coming into the meeting I checked with my team and

9   they're confident as well.

10  Q     Can you assess an overall prospect of success that

11  includes the uncontrollable events?

12  A     Yes.  Can you define your statement, please, little bit

13  more -- can you give me a little bit more explanation for

14  the question?

15  Q     Can you tell us how likely is -- it is to achieve this

16  schedule when you also account for uncontrollable events?

17  A     I'd say in that case probability comes down to maybe,

18  you know, 75, 80 percent because, for example, I count the

19  weather delays, you know, weather delays can make you move

20  your schedule to the right but seven to -- sometimes about

21  seven days, eight what we have seen in past.  COVID-related

22  issues, you know, for example we have a COVID person on the

23  boat, that means we have to take appropriate steps

24  (indiscernible) that we need to trigger, certain things need

25  to happen.  So that probably about seven, eight days.  So

1    I'm roughly, you know, you need to pencil it down but I

2    think it could be about 80 percent chance if those kind of

3    uncontrolled events kicks in.

4    Q    And everything else goes perfectly, the permit comes in

5    on time or early, equipment's available, vessels are

6    available.

7    A    Yeah.

8    Q    As I understand it, there are two broad parts to this

9    operation.  There is the subsea portion and the host

10   platform portion; is that although maybe not technically

11   correct, roughly accurate?

12   A    Yeah, you're -- I don't know how to put it but host

13   platform is independent of the subsea portion for majority

14   of the part.  Hosted facility, the second -- I think the

15   second line item, it says pre-commissioning and other things

16   that need to happen for the host facility.  That's basically

17   -- that's about to happen in February, that can happen

18   February.  So BP's, you know, working on to commission the

19   tree that's installed, make sure we can talk to the tree

20   hydraulically and electrically.  So that's the host facility

21   work.  And after that, once we install the jumper, host

22   facility, you know, it plays a very important role.

23   Q    And even if Fieldwood were allowed to conduct the

24   subsea portion, BP would still have to conduct the host

25   facility portion; is that correct?

1    A    Yes.

2    Q    Do you have any --

3    A    (Indiscernible) facility, BP has to conduct host

4    facility portion of this work because they are the

5    owner/operator of the Na Kika.

6    Q    What's your understanding of BP's policies, procedures,

7    protocols related to the host platform portion of bringing

8    this particular well online?

9    A    We've been working with BP from last close to a year on

10   the readiness.  We understand what are the documents that's

11   required to prep the Na Kika for this operation of bringing

12   the well online.  So I'm -- BP has (indiscernible) dashboard

13   with the readiness team and it's very up-to-date, mine --

14   I'm very up to date on that.

15   Q    And BP's alleged ability to bring this well online from

16   a host platform perspective at least under your schedule

17   does not account for other commitments and responsibilities;

18   is that correct?

19   A    Can you repeat that question, please?

20   Q    Yeah, it wasn't a very good question.  Under

21   Fieldwood's proposed schedule, does the host commissioning

22   portion include BP's other planned work, obligations, and

23   responsibilities?

24   A    I'm not aware of that.

25   Q    You're not aware of whether that's included in the

1  Fieldwood schedule or you're not aware of whether BP has

2  those other obligations and responsibilities?

3  A    BP don't share their obligation with other operators.

4  It's confidential information.

5  Q    So that's not in Fieldwood's schedule, correct?

6  A    That is not in Fieldwood's schedule.  We talked to our

7  product team point of contact for those discussions and they

8  give us the window of these operations, how it's going to

9  happen, and they prioritize based on fieldwork or base

10 production or, you know, different kind of activities that's

11 happening there.  So that's our line of communication for

12 the -- for that question.

13 Q    Are you aware of whether there are any issues unique to

14 bringing this well online after the single flowline fix is

15 installed?

16 A    So there's a flow  work that we have done for this well

17 so BP  has worked on that and come up with a solution of  a

18 plan, unplanned shutdowns, for (indiscernible) mitigation

19 and number of other things.  So it's no different than what

20 it was before, but with this single flowline option, it kind

21 of elevates the problem.  That's why we'll work with BP to

22 come up with the solution.

23 Q    Does this well particularly operating in a single

24 flowline environment require any particular training for the

25 operators?

1   A    Yes.

2   Q    Okay.  And what's that training?

3   A    For planned and unplanned shutdowns, they have to take

4   certain measures because it's based on the (indiscernible)

5   strategy.  So -- and they need to understand overall, you

6   know, overall risk for the Na Kika platform itself, for

7   planned shutdowns  and they need to manage that.  So that's

8   the training part.

9   Q    And that's work that absolutely has to be done,

10  correct?

11  A    Yes.

12          MR. STARK:  Pass the witness.

13          THE COURT:  Thank you.  Any other questions for

14  Mr. Bhat?

15          MR. GENENDER:  Your Honor, I do not, thank you.

16  May Mr. Bhat be excused?

17          THE COURT:  Yes, he may.  Thank you.

18      (Witness excused.)

19          THE WITNESS:  Thank you.

20          THE COURT:  Any further evidence, Mr. Genender?

21          MR. GENENDER:  Yes, Your Honor.  We'd like to call

22  Nathan Vaughn, please.

23          THE COURT:  All right.

24          MR. GENENDER:  Thank you.

25          THE COURT:  Mr. Vaughn, would you press five, star

1    one time on your phone, please?  Thank you.  Mr. Vaughn,

2    would you raise your right hand, please, sir?  Mr. Vaughn,

3    thank you.

4         (Witness sworn.)

5              THE COURT:  Thank you, Mr. Vaughn.  Go ahead,

6    please, Mr. Genender.

7              MR. GENENDER:  Thank you, Your Honor.

8              DIRECT EXAMINATION OF NATHAN MICHAEL VAUGHN

9    BY MR. GENENDER:

10   Q    Will you please state your full name for the Record?

11   A    Nathan Michael Vaughn.

12   Q    Mr. Vaughn, how are you employed?

13   A    I'm employed with Deepwater Land Advisor.

14   Q    And what are your responsibilities at the Deepwater

15   Land Advisor?

16   A    My job is primarily to manage Fieldwood's oil and gas

17   leases, the relationships amongst partners, and engagement

18   with the regulator.

19   Q    How long have you been at Fieldwood?

20   A    March, 2018.

21   Q    How long have you worked in the energy industry?

22   A    Coming up on 16 years.

23   Q    What's your educational background?

24   A    I have a bachelor of science in industrial engineering

25   and a MBA, both from the University of Alabama.

1  Q    Did you hear Mr. Dane's testimony earlier this

2  afternoon?

3  A    I did.

4  Q    Do you have familiarity with the Genovesa well and

5  Na Kika platform, the PHA, and the LSPS, and the LSPS

6  operating agreement, things like that, those terms that you

7  (indiscernible).

8  A    Yes, every day indeed.

9  Q    And how are you familiar with those items, sir?

10 A    So it's my primary role to make sure that Fieldwood is

11 following the terms of the contract and also managing our

12 obligations thereon and ensuring that the benefits that

13 accrue to Fieldwood under those contracts are also realized

14 as well.

15 Q    Do you work on the commercial side?

16 A    Primarily from up until the marketing, I don't handle

17 marketing.

18 Q    Okay.  What is an SOP, Mr. Vaughn?

19 A    An SOP in my context would stand for Suspension of

20 Production.

21 Q    And are you familiar with the process of obtaining an

22 SOP?

23 A    I am.

24 Q    Have you done it before?

25 A    Yes, I have.

1   Q     Have you prepared an SOP in connection with this single

2   flowline option?

3   A     I have.  I prepared the SOP.  It's completely filled

4   out save for the agreement on the schedule.  And we have

5   paid all required fees and it's ready, like I said, pending

6   agreement on the schedule with BSEE.

7   Q     And what does BSEE stand for?  Just so we're clear for

8   the record.

9   A     Oh, I'm sorry, the Bureau of Safety and Environmental

10  Enforcement.  It's a bureau, it's part of US Department

11  Interior, and it's one of two primary regulators that we

12  deal with in the US Gulf of Mexico.

13  Q     Okay.  Do you know under the prior administration,

14  based on your experience, has BSEE followed a discernible

15  pattern in how they respond to SOP requests from your

16  experience?

17  A     Yes, they have.

18  Q     And what was that pattern?

19  A     It's an engagement with BSEE, you follow the

20  requirements laid out in the Code of Federal Regulations.

21  Also, BSEE's quite helpful in providing industry guidance

22  through NPL's and also pretty good presentations that

23  they've given to industry  and that along with engaging with

24  the individuals inside of BSEE, that's the process we work

25  through.

1  Q    Do you -- so you have -- do you have an expectation as

2  to whether that pattern of conduct is going to continue in

3  the current administration?

4  A    I have an expectation that that pattern of conduct will

5  change in the current administration or may change.

6  Q    What do you base that on?

7  A    The secretarial order 3395 that was issued uses

8  specific language around the term "extension of leases."

9  And a simple reference to the Code of Federal Regulations

10  refers to an SOP as a "extension of a lease" or an act to be

11  (indiscernible).

12  Q    Okay.  Mr. Vaughn, once you file an SOP, do you have an

13  expectation as to whether it would be granted --

14  A    No.

15  Q    -- in connection with -- okay.  In other words, if

16  Fieldwood were to file an SOP tomorrow, do you know whether

17  it would be granted?

18  A    The discretion is with -- at least it has been in

19  previous administrations, the discretion with -- was with

20  the regional supervisor.  Like I said, the secretarial order

21  appears to have (indiscernible) that discretion upward.  So,

22  no, I do not have certainty if we were to file it today or

23  any day that it would be awarded.

24  Q    And I asked you about your expectation as to whether it

25  would be awarded.  Do you have any expectation as to if it

Case 20-33948   Document 854   Filed in TXSB on 02/04/21   Page 84 of 234

NATHAN MICHAEL VAUGHN - DIRECT BY MR. GENENDER                84


1  were awarded, when it would be awarded?

2  A    My experience with BSEE is those SOP's are not awarded

3  until they are needed.  And by the very definition of an

4  SOP, it's only needed after the lease has expired.  So my

5  expectation would be that BSEE and both in practice in the

6  event they were going to award it in a more predictable

7  administration, that it would be awarded at or very, very

8  near the April 5th date.

9  Q    Okay.  Mr. Vaughn, there was some questioning of

10 Mr. Dane about if horrible things happen in connection with

11 this single flowline option project; did you hear that

12 testimony?

13 A    I did, yeah.

14 Q    Do you have a view as to whether there's a material

15 risk of a catastrophic runaway well here?

16 A    My understanding, and this is as a commercial person

17 but with a engineering background, is that there is more

18 than adequate barriers, both down hole through the SCSSC

19 (phonetic) valve sliding  and also in the wellhead where

20 there is a main valve and a main valve.  So, no, there is

21 absolutely as far as I can see no risk or very, very, very

22 little risk.  I mean, this is something that's done all the

23 time, bringing wells online in the Gulf of Mexico.

24         MR. GENENDER:  Thank you, Mr. Vaughn.

25         Your Honor, I'll pass the witness.

1           THE COURT:  Thank you.

2           Mr. Stark?

3           MR. STARK:  Thank you, Your Honor.

4           CROSS-EXAMINATION OF NATHAN MICHAEL VAUGHN

5    BY MR. STARK:

6    Q     In light of the current uncertainty you've described

7    about how the regulators will act under the current

8    administration, isn't that all the more reason to submit for

9    an SOP earlier rather than later?

10   A     It's my responsibility as a land advisor for Fieldwood

11   but also obligations in front of BSEE is to submit an SOP --

12   all the elements of submitting an SOP.  Thus far I've been

13   unable to submit that only -- we've only had the schedule

14   despite asking for it since last Thursday.  And the key part

15   of submitting an SOP is that the schedule has to be

16   reasonable.  And as my colleagues have all testified and I

17   will say here that the schedule that BP provided was not

18   reasonable.

19   Q     And on what do you base your belief that the schedule

20   BP provided is not reasonable?

21   A     Based on experience.

22   Q     Which portions of BP's proposed schedule do you find

23   unreasonable?

24   A     The portions that my colleague just pointed out in

25   terms of the operations and activities that could be done as

```
1  the host facility could take place now.

2  Q    That's based on his testimony rather than your personal

3  experience; is that correct?

4  A    It's based on both.

5  Q    What's your personal subsea experience?

6  A    I embedded with a subsea team.

7  Q    For how long?

8  A    In this role for three -- coming up on three years.

9  Q    When you say embedded with a subsea team, you mean you

10 have subsea people who work for you.

11 A    I work with.

12 Q    Work with.  And are you similarly embedded with a host

13 platform team?

14 A    I do have colleagues that work with host facility

15 (indiscernible).

16 Q    You have colleagues who work with host platform teams.

17 A    The team that I'm a part of looks after both subsea --

18 all aspects, subsea and facility.

19 Q    And is it correct that Fieldwood knew as early as

20 November of last year that it may need to apply for an SOP?

21 A    I -- yes, I flagged the -- I flagged that as a very,

22 very far tail risk to my colleagues in BP.

23 Q    What do you mean you say very, very far tail risk?

24 A    In early -- in November, based on the discussions that

25 BP had given us showing a slide that said that they would
```

1  have Genovesa online in the first quarter, and given the

2  early date, it was flagged as a risk.  But in no event did I

3  think that we would actually find ourselves in the position

4  that we find ourselves today.  But as part of my

5  responsibilities at Fieldwood, it ensures that we are

6  looking at these things way in advance.

7  Q    In fact Fieldwood intended to engage with BSEE

8  regarding an SOP in mid to late January of this year; is

9  that correct?

10 A    Yes.

11 Q    But that didn't occur, did it?

12 A    No, to the contrary.  I'd engaged personally with BSEE

13 several times.

14 Q    Regarding an SOP for this lease?

15 A    Absolutely.

16 Q    And when was the first time?

17 A    I don't have the -- I believe it was either very early

18 last week.  I don't know the exact date but it was -- it's

19 been -- I believe it's early last week.

20 Q    What resulted from those communications?

21 A    My goal in engaging with BSEE, and I found that this

22 works and I've used this in previous experience, is to give

23 them a heads-up, let them know, give them a status, let them

24 understand what's going on, and all the relevant history of

25 the lease.  And then to let them know that, you know, we

NATHAN MICHAEL VAUGHN - CROSS BY MR. STARK

1  intend and we're working towards bringing this lease back on

2  production prior to the expiry date.  But I wanted to, "A,"

3  get guidance from them on certain submission criteria and

4  then, second, let them know that there could be a chance

5  that we would be submitting an SOP depending on how the

6  operations developed.

7  Q    Do you know whether any SOP's have been issued

8  following the January 20 order?

9  A    I'm not sure.

10  Q    Do you know whether the administration has issued any

11  new drilling permits since the January 20 order?

12  A    I'm unaware.  And besides I don't file a plan or are

13  involve with the drilling permitting process.

14  Q    So you don't know one way or the other whether new

15  drilling permits have been issued.

16  A    As it relates to drilling permits I'm not sure what the

17  relevance of drilling permits are to an SOP here.  We have

18  no plans to drill.

19  Q    I understand.  But you don't know one way or the other,

20  is it correct, whether new drilling permits have been issued

21  since the January 20 order.

22            MR. GENENDER:  Objection, asked and answered.

23            THE WITNESS:

24            THE COURT:  Overruled, --

25            MR. STARK:  Hang on.

1          THE COURT:  -- he didn't answer it.  He said

2    something different than an answer.  He needs to answer the

3    question.

4          THE WITNESS:  No, I'm not aware.

5    BY MR. STARK:

6    Q    And you're familiar with the bolt tightening project;

7    is that correct?

8    A    Yes, I am.

9    Q    And you're aware that BP progressed the single flowline

10   in parallel with the bolt tightening, correct?

11   A    Define "progressed in parallel."

12   Q    Sure.  Began work on.

13   A    When?  I'm not -- I guess I'm not following the

14   question.

15   Q    Sure.  Let me -- in December of last year, BP was

16   working on both the bolt tightening project and the single

17   flowline, correct?

18   A    That's my understanding, yes.

19   Q    What's your understanding of what it will cost to

20   effect the single flowline?

21   A    To effect the single flowline.

22   Q    Yes, sir.

23   A    There's two parts.  Which part are you asking, the

24   single flowline or the part that relates to the loop working

25   interest?

1  Q    Okay, will you explain for us what those two parts are?

2  A    I'm sorry?

3  Q    Can you explain for us what those two parts are?

4  A    Based on the AFE's that we received from BP, there's

5  two components.  There's the temporary Genovesa single

6  flowline install and then removal, and then there is a

7  component which is for the Santiago jumper removal and then

8  reinstall.

9  Q    What are the costs for each of those items?

10 A    I don't have the AFE's in front of me, but if I recall

11 the temporary single flowline is around ten million, and the

12 SA jumper I think is four and a half million.

13             MR. STARK:  Thank you.  Pass the witness.

14             THE COURT:  Anything further, Mr. Genender?

15             MR. GENENDER:  Your Honor, no.  The only thing I

16 wanted to do before I rest is offer our Exhibits 834-1

17 through 834-17.

18             THE COURT:  Hold on.  Anything further for

19 Mr. Vaughn.

20             MR. GENENDER:  No, sir, no, sir.

21             THE COURT:  All right.  Mr. Vaughn is excused.

22      (Witness excused.)

23             THE COURT:  And you wanted to offer some

24 additional exhibits?

25             MR. GENENDER:  Yes, Your Honor, 834-1 through 17.

1          THE COURT:  Mr. Stark.

2          MR. STARK:  Your Honor, if you don't mind, can we

3  take a brief recess both so I can grab a glass of water and

4  take a quick skim through those exhibits?

5          THE COURT:  Sounds like it makes a lot of sense to

6  me.  What time you want to come back?

7          MR. STARK:  You tell me, Your Honor.

8          THE COURT:  Is ten minutes enough?  You need 15?

9  You tell me.  I'm trying to be -- give you the time you need

10  so what you want?

11          MR. STARK:  I appreciate it.  Fifteen minutes

12  would be great.

13          THE COURT:  Okay.  We'll come back in 15 minutes.

14  Thank you.

15          MR. STARK:  Thank you, Your Honor.

16          MR. GENENDER:  Thank you.

17       (Recess taken from 5:23 p.m. to 5:38 p.m.)

18                    AFTER RECESS

19          THE COURT:  All right.  Mr. Stark?

20          MR. STARK:  Thank you, Your Honor.  I think I

21  would object to the last four on the grounds of relevance

22  and that would be 834-14, 15, 16 and 17.  And then

23  additionally I would ask if Your Honor were going to admit

24  the last one that it be under seal.

25          THE COURT:  All right.  Mr. Genender?  By the way,

1  your camera is not on, Mr. Genender.  I'm not sure here.

2          MR. GENENDER:  Is that on now?

3          THE COURT:  It is not.

4      (Pause/equipment being prepared.)

5          MR. GENENDER:  Your Honor, my response is that

6  those 14, 15 and 16 are the AFEs that were signed and sent

7  in.  That's the only purpose.  They're just offered for the

8  limited purpose to show that they were sent back in.  If

9  they're making an issue of it, that's the relevance.

10          And then 17 is -- Your Honor, 17 is -- 17 I

11  withdraw.  I don't think it is relevant actually.  I'll

12  agree with Mr. Stark.

13          THE COURT:  Can we be sure we're talking about the

14  same thing?  Are we talking about 834-17, which is your

15  Exhibit 15; is that right?

16          MR. GENENDER:  Yes, Your Honor.

17          THE COURT:  Okay.  We'll show that 834-17 is

18  withdrawn and is not offered.

19          Is there a dispute that all the AFEs were signed

20  and returned, Mr. Stark?  If there is, then I'll go ahead

21  and admit 14, 15 and 16.  If that's a stipulated fact,

22  there's no need to admit them.

23          MR. STARK:  Well, I think the rub, Your Honor, is

24  that they are draft AFEs that were signed and returned.

25  There's no dispute as to the fact that they were signed and

1  returned.

2          THE COURT:  Sorry, tell me what the dispute it.

3  I'm not sure what the problem is with those.

4          MR. STARK:  Your Honor, those were draft AFEs that

5  were circulated to Fieldwood for their review as part of the

6  broader conversation on an agreement.  I don't know why, but

7  Fieldwood and the other owners signed them and sent them

8  back.  I don't know how that's relevant to any of the

9  testimony that we've heard today or the matters at hand.

10         THE COURT:  I'm overruling the objection.  You

11  specifically asked questions about when they were planning,

12  whether they were acting prudently and whether they were

13  assisting in causing delay and this goes to that so I will

14  admit 14, 15 and 16.

15     (Debtors' Exhibit Nos. 834-14, 834-15 and 834-16

16  received in evidence.)

17         THE COURT:  17 is not admitted.

18         Any further evidence, Mr. Genender?

19         MR. GENENDER:  No, Your Honor.  Thank you.

20         THE COURT:  All right.

21         MR. GENENDER:  So we rest on our primary case.

22         THE COURT:  Is there any party in the case that

23  has any additional evidence that they wish to introduce in

24  support of the Debtors' Motion?

25     (No audible response.)

1          THE COURT:  All right.  Mr. Stark?

2          MR. STARK:  Your Honor, two brief matters if I

3    may?  First, I'd like to move for a directed verdict if you

4    will on the grounds that the Motion is based on the claim

5    that BP failed to act as a reasonably prudent operator and

6    that it failed to produce on a BOE basis.  There's been no

7    evidence as to the allegations that it failed to produce on

8    a BOE basis under the Production Handling Agreement and

9    similarly there's been no evidence that BP failed to act as

10   a reasonably prudent operator under the Operating Agreement.

11   It's the Movant's burden to carry.  They failed to do so and

12   I'd ask Your Honor to just deny the Motion at this point.

13          THE COURT:  Would you respond to the BOE portion

14   of that, Mr. Genender?  I don't need a response on

15   reasonable and prudent operator portion.  I have

16   overwhelming evidence, if it isn't rebutted, that BP is not

17   operating as a reasonable and prudent operator by not

18   proceeding as fast as it can to get this done subject to

19   also trying to get something else done, which is maybe an

20   SOP, but I don't think it's reasonably prudent -- reasonable

21   and prudent to plan -- unless there's some reason for it, to

22   plan to miss the deadline for the expiration of the lease.

23          And right now the evidence I have, which is

24   undisputed at this point, is that one could plan and

25   complete the project and not risk the expiration of the

1  lease.  That by definition to me is not operating as a

2  reasonable and prudent operator.

3          Having said that, all the evidence -- all the

4  opportunity in the world to demonstrate that what you did

5  was in fact reasonably prudent, but haven't had a chance to

6  rebut it.  But I'm certainly not going to grant that Motion

7  now.

8          What about the BOE portion, Mr. Genender?

9          MR. GENENDER:  Your Honor, under the PHA

10  section -- I'm sorry -- the LSPSOA Section 9.01(b) and (d),

11  which speak to that, Your Honor, (b) says:

12      "LSPS operator will endeavor to operate the LSPS so as

13      to maximize production on a BOE basis."

14          And then (d) says:

15      "Notwithstanding anything in this Agreement to the

16      contrary, if any leg of the LSPS is not operational or

17      has impaired capacity which restricts the flow of one

18      leg of the LSPS regardless of the cause, then the LSPS

19      operator will endeavor to operate the LSPS so as to

20      maximize production on a BOE basis subject to

21      endeavoring to ensure that the Isabela lease and the

22      MC 519 Unit leases will each be afforded the

23      opportunity to produce not less than production and

24      paying quantities as set forth in NTL No. 2010-G05

25      issued September 15, 2010 or subsequently amended by

1          the BOE MRE or any successor thereof.  The LSPS

2          operator will endeavor to place the LSPS back into full

3          operational service as soon as practically possible."

4          Your Honor, we have put forth evidence that they

5     have not done that.

6          THE COURT:  I agree.  I'm going to deny both

7     Motions.

8          Let's move ahead then with your evidence,

9     Mr. Stark.  I'm denying them because I haven't heard your

10    side of the case yet basically.

11         MR. STARK:  I understand, Your Honor.  One other

12    thing.  We have a couple of exhibits that we may offer that

13    would need to be filed under seal.

14         Do you want to take that up at the end or on an

15    exhibit-by-exhibit basis?

16         THE COURT:  No, we have those procedures in place.

17    You just -- you're supposed to, as you know, send two copies

18    of them to the Clerk by hand-delivery and then the Clerk

19    will deliver the sealed copy to me.  We consider them

20    temporarily under seal and then we'll take them up later as

21    to whether we'll permanently seal them.  I'm not going to

22    bother anybody to worry about sealing right now, but those

23    procedures are well established and I'm sure you've probably

24    already complied with them although you may not personally

25    know that your firm probably has already done that.  I would

1  just guess it has.

2          MR. STARK:  Thank you, Your Honor.  In that case,

3  we will call Kamil Gurses.

4          THE COURT:  All right.  Can you turn on your

5  camera please?  There you are.  And would you press five

6  star on your phone please?

7          I apologize to everybody.  Mr. Statham had wanted

8  to speak and I'm going to do that before you go next.  I

9  must have missed him.

10          Mr. Statham, go ahead please.

11          MR. STATHAM:  Thank you, Your Honor.

12  Steve Statham.  I think time has passed my interest.  As I

13  understand, the Court's going to consider the sealing piece

14  of this later so I'll stand down on that point.  Thank you.

15          THE COURT:  Let me just say what I normally do,

16  Mr. Statham, and I think you know I know normally do this

17  is: I let a motion to seal sit normally for 21 days and then

18  I take it up at the expiration of 21 days so people can

19  object to it.  But in the meantime under our procedures, it

20  remains sealed so that we can consider.

21          Is that going to cause any heartburn to the UST?

22          MR. STATHAM:  No, sir.  That's an abundant time to

23  address it at the appropriate time.  Thank you very much.

24          THE COURT:  All right.  Thank you.

25          All right.  Mr. Gurses, if you would raise your

1  right hand please?

2       (Witness sworn.)

3            THE COURT:  All right.  Mr. Stark?

4            MR. STARK:  Thank you, Your Honor.

5                 DIRECT EXAMINATION OF KAMIL GURSES

6  BY MR. STARK:

7  Q    Please state and spell your name for the Record.

8  A    My name is Kamil Gurses.  That's spelled K-A-M-I-L.

9  Surname G-U-R, S for sugar, E for echo, S for sugar.

10 Q    How are you employed, sir?

11 A    I am BP's senior finance manager covering Na Kika and

12 OBO meaning our Gulf of Mexico non-operated assets and

13 portfolio.

14 Q    How long have you held that position?

15 A    Since May of 2018.  It's coming on to three years.

16 Q    Prior to that, what were your -- excuse me.  What were

17 your prior positions?

18 A    Prior to that, I worked for two years in the Gulf of

19 Mexico in the exploration business.  And prior to that, I've

20 worked for BP since 1999 in a variety of different roles.

21 Q    Now what does your role as senior finance manager for

22 Na Kika and OBO entail?

23 A    In my portfolio, I cover the planning and -- financial

24 planning and performance management of the business.  I also

25 cover -- I'm responsible to ensure that we conduct our

1  business in line with our Agreements and I oversee our

2  partner relationships.

3  Q    Your responsibilities, does that include working with

4  Fieldwood?

5  A    It does.

6  Q    How often do you coordinate with Fieldwood

7  representatives?

8  A    Periodically so that the actual coordination is done

9  through my land colleague, Daniel Scott, most often but I

10  will coordinate with them as needed to conduct our business

11  and at scheduled co-owner meetings.

12  Q    How often are co-owner meetings held?

13  A    For this piece of business, typically it's twice a year

14  although recently it's been more often given the

15  (indiscernible) the LSPS and the conversations we've had to

16  progress those operations.

17  Q    How often have you been meeting in the past six months?

18  A    Regularly.  I would say we've had five or six formal

19  co-owner calls.  I have spoken regularly with my Fieldwood

20  counterpart and I know that my technical colleagues have met

21  with their counterparts on a (indiscernible) on a weekly

22  basis.

23  Q    When you say your Fieldwood counterpart, who is that?

24  A    That is Nathan Vaughn.

25  Q    You're familiar with the LSPS Operating Agreement?

KAMIL GURSES - DIRECT BY MR. STARK                    100

1  A    I am.

2  Q    And similarly you're familiar with the Production

3  Handling Agreement?

4  A    I am.

5  Q    Now are you familiar with the standard of a reasonably

6  prudent operator?

7  A    I am.

8  Q    In your words, what does that standard require?

9  A    I understand that a company that operates in a safe

10 manner in a commercially reasonable manner and in a manner

11 that's consistent with the generally accepted industry

12 practices.

13 Q    You heard the testimony from earlier today, have you?

14 A    I have.

15 Q    And you heard the testimony to the effect that

16 Fieldwood has failed -- strike that.

17           And have you heard testimony to the effect that BP

18 has failed to act as a reasonably prudent operator with

19 respect to the Genovesa well?

20 A    I have not heard testimony that BP has failed to act as

21 a reasonably prudent operator.  In my view, BP has acted as

22 a reasonably prudent operator.

23 Q    Why do you say that?

24 A    Because we have progressed this piece of business in

25 line with the Agreements that we have in place and we've

1   worked to execute our capacity as LSPS operator and host

2   facility operator.

3   Q    When you say you've worked to progress it in accordance

4   with the Agreements, what do you mean?

5   A    Under the Agreements, we operate the host and we

6   operate the LSPS and there are various projects that -- with

7   various departments that feed into the host and BP executes

8   its responsibilities as operator in line with the Agreements

9   for all those parties and integrate that.

10  Q    And those parties include more than just BP and

11  Fieldwood; is that true?

12  A    They do.

13  Q    You're familiar with the single flow line operations

14  been discussed, aren't you?

15  A    I am.

16  Q    Are there any particular provisions of the LSPS

17  Operating Agreement that addressed this sort of undertaking?

18  A    Yes, there are.

19  Q    Which section would you identify?

20  A    Yes.  So this operation has been proposed as a sole

21  benefit operation so that would be covered under 7.08 of the

22  LSPS Operating Agreement.

23        MR. STARK:  Rachel, can you pull up Exhibit 1

24  please and flip to page 26?

25  BY MR. STARK:

1  Q    What does it mean for it to be a "sole benefit

2  operation"?

3  A    It means it's an operation that is for the benefit of a

4  subset of the owners of the LSPS.  In this case with this

5  proposal, it is for the owners of the LSPS that are the

6  owners of the Genovesa well which are Fieldwood

7  (indiscernible).

8         MR. STARK:  Will you scroll down to 7.08 please?

9  You passed it.  No, I'm sorry, 7.08, I apologize.

10 BY MR. STARK:

11 Q    I'll direct your attention to the first line that

12 reads:

13      "Subject to the provisions of this Article 7, during

14      the operation any LSPS owners shall have the right to

15      request that the LSPS operator conduct an operation for

16      the benefit of less than all parties provided such sole

17      benefit operation does not have an adverse impact on

18      the LSPS."

19         Do you see that?

20 A    I do.

21 Q    What is an adverse impact on the LSPS?

22 A    An adverse impact would be something that, in the

23 determination of the LSPS operator, would either create an

24 enhanced risk for the LSPS or the host, in this case

25 Na Kika, or some other adverse impact for the -- adverse

1  operational commercial impact for the host or the LSPS

2  (indiscernible).

3  Q    Did BP reach a determination as to whether there was an

4  adverse impact with respect to the single flow line that's

5  been proposed?

6  A    It did.

7  Q    And what was that determination?

8  A    That there was impact from the sole benefit operation

9  that was proposed.

10  Q    What is that adverse impact?

11  A    It's twofold.  One is the temporary single flow line is

12  -- and I'm talking here as a commercial person I'll say and

13  so this is what I understand from the technical colleagues I

14  work with is: this is an abnormal operation flowing

15  condition so it requires different procedures and abnormal

16  way of operation so it creates extra complexity and

17  operational issues for the Na Kika host so that is one way

18  in which it's an adverse impact.  And then the other way is

19  that this operation requires the changing of the condition

20  of the LSPS effectively removing a section of flow line so

21  it is no longer a loop, which absent some commitment to

22  restore the loop means that the value of this asset as a

23  loop is reduced for all the owners of the LSPS and it

24  creates risks for other wells on the loop.

25  Q    Now if you refer back to 7.08, it continues:

KAMIL GURSES - DIRECT BY MR. STARK                104

1    "The proposed sole benefit operation request shall be

2    submitted to the LSPS operator for determination that

3    such operation satisfies the following criteria:

4    "(a) Such operation has mitigated the risk of an

5    adverse impact to the LSPS to a level that is ALARP for

6    such type of planned activity."

7         Do you see that?

8  A    I do.

9  Q    What do you understand that to mean?

10 A    There are conditions in the Agreement that you need to

11 mitigate the risk so when there is an adverse impact, that

12 adverse impact needs to be mitigated to a normal level of

13 risk.

14 Q    And so in this case, has there been any proposals as to

15 how to mitigate that adverse impact?

16 A    There has.

17 Q    What are the proposals that have been made?

18 A    So BP has proposed an agreement between the parties

19 called a "loop restoration agreement" that simultaneously

20 with executing the proposed (indiscernible) operation will

21 also commit the parties to a restoration of a loop thereby

22 mitigating the adverse impact.

23 Q    How does that mitigate the adverse impact?

24 A    Absent that Agreement, you would -- to restore the

25 loop, you would need to make a separate proposal and that

1  proposal would be subject to majority approval of all the

2  co-owners so in the future, that proposal could be blocked

3  depending on the determination the parties make at the time.

4  So this Agreement would commit the parties today to that

5  loop restoration and thereby protect the value of the asset

6  to the owners.

7  Q     And as we sit here today, is there an agreement in

8  place to mitigate the adverse impact?

9  A     There is not.  A proposal has been discussed and the

10  parties have exchanged drafts of that proposal, but there is

11  not an agreement in place.

12  Q     Will you look at the next sentence?  It reads:

13        "The LSPS operator shall undertake such sole benefit

14        operation in accordance with the plans and procedures

15        approved by both the LSPS operator and the LSPS owners

16        requesting the sole benefit operation as soon as

17        reasonably practical unless such delay is occasioned by

18        force majeure."

19            Do you see that?

20  A     I do.

21  Q     Have the LSPS operator and the LSPS owners approved the

22  plans and procedures?

23  A     No, they haven't yet.

24  Q     Do you know why that has not occurred yet?

25  A     Well, discussions are ongoing about the plan, but --

1  the frequent exchange about the plan, but there is a

2  disagreement on the timing for that in which that operation

3  can be done.

4  Q    And when it says that the LSPS operator shall undertake

5  such sole benefit operation in accordance with those plans

6  and procedures as soon as reasonably practical, what do you

7  mean as -- what do you understand "as soon as reasonably

8  practical" to mean?

9  A    That those plans and procedures need to be developed in

10 accordance with or in a way that is consistent with a

11 reasonably prudent operator developing those procedures in

12 line with everything else that needs to be done.

13          THE COURT:  Where does it say that?  I don't see

14 that.  It says you have to -- as I read it, it says you have

15 to undertake the operation as soon as reasonably practical.

16 And the whole thing we're talking here about today is

17 timeline.  I don't know why we're talking about agreements.

18 Everybody's agreed in principle on the Agreements.  I don't

19 understand why you haven't proposed a timeline that works.

20          Why haven't you?

21          THE WITNESS:  We believe we have proposed a

22 reasonably practical timeline, Your Honor.

23          THE COURT:  That is not my question to you.

24          Why haven't you proposed a timeline that expects

25 to finish the project before the lease expires?

1            THE WITNESS:  Because we don't believe we can

2    deliver that timeline without doing -- deferring activities

3    to safety related or breaching the PHA insofar as we have

4    other commitments to other ventures that carry high

5    priority.

6            THE COURT:  All right.

7            MR. STARK:  Let's turn to the PHA while we're

8    here.

9            Rachel, can you bring up I believe it's Exhibit 2?

10   BY MR. STARK:

11   Q    But where in the PHA does it address the priority you

12   just referred to?

13   A    There were a couple of places right up front in the

14   Agreement.  The entire PHA Agreement is subject to the

15   Na Kika obligations, which are the obligations that Na Kika

16   has to its host business so steadily Na Kika is there for

17   the base business, that's its primary purpose.  And also

18   this is dealt with in I believe Section 6.4 which talks

19   prioritization.

20           MR. STARK:  Let's go to Section 6.4 please on page

21   49 and continuing on 50.

22   BY MR. STARK:

23   Q    So, Mr. Gurses, can you walk us through this and how

24   this addresses the contractual prioritization that BP is

25   required to follow?

1  A    Yes.  So the prioritization of activity and production

2  at Na Kika starts with the base unit leases, the host unit

3  leases.  They are a series of leases that are jointly owned

4  by BP and Shell and Na Kika is there for the purpose of

5  developing those leases so those leases carry first

6  priority.  And then this section further explains the

7  prioritization of activity for the Galapagos leases being

8  Isabela and the MC 519 lease.  So the next priority off of

9  the base leases is Isabela and then after that, the next

10 priority is the MC 519 lease, which includes Santiago,

11 Santa Cruz, which are the existing wells, and the Genovesa

12 well.

13 Q    So I understand from your prior testimony that BP could

14 not safely propose a more aggressive schedule without

15 violating commitments to other parties; is that correct?

16        MR. GENENDER:  Your Honor, I'm going to object to

17 the leading nature of the question.

18        THE COURT:  Sustained.

19 BY MR. STARK:

20 Q    In light of the requirements of Section 6.4, why can BP

21 not propose a more aggressive schedule to bring the Genovesa

22 well online?

23        MR. GENENDER:  Objection.  Calls for a legal

24 conclusion, Your Honor.

25        THE COURT:  Overruled.

1          THE WITNESS:  May I answer?

2          THE COURT:  You may answer, Mr. Gurses.  Thank

3   you.

4          THE WITNESS:  Thank you, Your Honor.  So the

5   schedule that's been proposed by BP is the one that we can

6   execute as quickly as possible without either deferring

7   safety critical activity at the host -- this is quite an old

8   facility -- or deferring activities that -- for business

9   that carries a higher priority.

10  BY MR. STARK:

11  Q    When you say, "Higher priority," that's pursuant to

12  Section 6.4.

13  A    That is correct.  So if we were defer those activities

14  in favor of something with a lower priority, then we would

15  breach the terms as stated here.

16  Q    In your understanding, would it be reasonably prudent

17  for BP to breach the prioritizations of Section 6.4 and its

18  obligations to other parties?

19  A    No, it would not.

20  Q    Are you aware of any way that BP could propose -- could

21  safely propose a more aggressive schedule to bring Genovesa

22  online while still attending to the safety critical work and

23  work with a higher priority?

24  A    I'm not.

25          MR. STARK:  Pass the witness.

1          THE COURT:  Thank you.  Mr. Genender?

2          MR. GENENDER:  Thank you, Your Honor.

3              CROSS-EXAMINATION OF KAMIL GURSES

4   BY MR. GENENDER:

5   Q    Mr. Gurses, good evening.  How are you?

6   A    I'm well.  Thank you.  Good evening.

7   Q    Can you identify what the -- specifically what the

8   higher priority items are that BP contends take priority

9   over taking those actions to get this lease online by

10  April 5th?

11  A    There are a number of safety critical activities at the

12  host and I would have to defer to my technical colleagues to

13  be able to describe those safety critical activities in

14  detail.  It is an 18-year-old facility.  And then there are

15  a number of projects going on in the base business of

16  Na Kika.  It is a very busy time for the asset and there are

17  a number of wells or -- and activities that are being

18  brought online in this period.

19  Q    Okay.  Mr. Gurses, I'm going to ask you my question

20  again.

21          Can you specifically identify what the higher

22  priority projects are that you're saying justify not taking

23  those steps to get this well online by April 5th?

24  A    Yes.  So there is one project, a major project called

25  "Manuel" that's a project on the base leases.  There are --

1  there's a host facility like extension project that's going

2  on that is designed to extend the life of the host.  And

3  there are other well work activities and associated ramp-ups

4  that are being progressed.  And I'm not sure I'm allowed

5  under confidentiality under those Agreements to talk about

6  the specific details.

7  Q    Mr. Gurses, is that as specific an answer as you can

8  give me?

9  A    I believe so.  And I can be specific on Manuel because

10 that's an announced project that we're developing and I

11 believe the safety critical items on the host is just

12 outside my knowledge to talk about specifically what those

13 activities are.  I believe there's a series of them.  And

14 then the details of the other base activities I think with

15 any joint venture, I'm subject to confidentiality provisions

16 under the Agreements to the extent I can talk about the

17 details of those activities, but there are a number.

18 Q    Well, let's talk about Manuel for a minute, Mr. Gurses.

19         BP has no ownership interest in the Genovesa well,

20 correct?

21 A    We do not.  BP does not.

22 Q    Yes, thank you.

23         BP does however have an ownership interest in the

24 Manuel well that you just referred to, correct?

25 A    It does.  It's part --

1    Q    And you'd agree --

2    A    -- of BP's host leases.

3    Q    Okay.  And you'd agree with me that Section 6.4 of the

4    PHA that you were just asked about it doesn't indicate that

5    you can provide priority use for Manuel at the expense of

6    MC 519, does it?

7    A    It provides the activities need to happen in a certain

8    order to comply with the provision of the Agreement so --

9    Q    But there's -- okay.

10         THE COURT:  Can I get 6.4 put back up on the board

11   please?  Thank you.

12         MR. GENENDER:  Thank you.

13         THE COURT:  Mr. Stark, could you have your person

14   put 6.4 back up for me?

15         MR. STARK:  I apologize.  Rachel, can you pull up

16   Exhibit 2, the PHA, and put the 6.4, which is on pages 49

17   and 50?

18         MS. SPEAKER:  We're pulling it up right now,

19   Your Honor.

20         THE COURT:  What is that?

21         MS. SPEAKER:  We're pulling it up right now,

22   Your Honor.

23         THE COURT:  Thank you.

24     (Pause in the proceedings.)

25         THE COURT:  Go ahead please.  I just wanted to be

1   able to look at that while you're asking.

2          MR. GENENDER:  Okay.  Sorry, Judge, I didn't know

3   if you had a question or not.  Okay.

4   BY MR. GENENDER:

5   Q    Mr. Gurses, when is -- my question is: 6.4 doesn't

6   state that you have -- that you can provide -- that BP can

7   provide priority to Manuel at the expense of the lease

8   MC 519, does it?

9   A    I'm not sure what you mean by the question.  My

10  understanding of this is that activities need to progress

11  and be prioritized in a certain order that's consistent with

12  this Agreement (indiscernible).

13  Q    But an activity on -- excuse me.  An activity on

14  Isabela, for example, here is not mutually exclusive with an

15  activity on MC 519, is it?

16  A    Well, it isn't so far as that there was a certain level

17  of activity that given the amount of space and the amount of

18  people that can be on the platform.  There is a limit to the

19  amount of activity that can happen at any one time so

20  because of that limit, by definition if you schedule

21  activity in accordance with this provision, then other

22  activities need to move out in time.

23  Q    So, sir, let me ask you about Manuel.

24          THE COURT:  I need to interrupt you for a minute.

25          Mr. Skelton, I apologize, you've had your hand

1  raised for a while.  Go ahead.  I just saw that.

2          MR. SKELTON:  Judge, I'd just like to have an

3  opportunity to cross-examine this witness at such time as

4  Mr. Genender has passed the witness.

5          THE COURT:  All right.  Thank you.  Go ahead

6  please.

7          MR. GENENDER:  Thank you.

8  BY MR. GENENDER:

9  Q    So this Manuel well that you refer to is owned

10  50 percent by BP and 50 percent by Shell, correct?

11  A    That is correct.

12  Q    And the Genovesa and Manuel wells are both drilled into

13  the same reservoir, aren't they?

14  A    That is my understanding.

15  Q    And is the Manuel well online?

16  A    As of today, it is not.

17  Q    When is it supposed to be online?

18  A    I don't believe under the confidential -- so Manuel is

19  a separate joint venture and separate partners and I believe

20  under the confidentiality provisions of that Agreement, I

21  can't talk to the specifics of that project between --

22  beyond what's been publically announced or discussed.

23  Q    Okay.  If Manuel comes online before Genovesa, it will

24  drain that reservoir, won't it?

25  A    Yes.

1  Q    And that would benefit economically BP and Shell,

2  correct?

3  A    Yes, insofar as that project is owned by BP and Shell,

4  yes.

5  Q    And that would -- and if that well were drained -- if

6  that reservoir, excuse me, were drained without Genovesa

7  being online, that in turn would hurt Fieldwood

8  economically, wouldn't it?

9  A    Yes.

10 Q    Thank you, sir.  The schedule that BP is proposing was

11 shared with Fieldwood on January 28th, last Thursday; are

12 you aware of that?

13 A    I am aware of that, yes.

14 Q    And from the very, very end of January until the end of

15 May when BP says this well can come online is four months,

16 correct?

17 A    Yes.

18 Q    You'd agree with me that if BP had proposed an

19 exactly -- a schedule of exactly the same length to

20 Fieldwood on November 15th instead of January 28th, this

21 well would come online, wouldn't it, by -- before the lease

22 expires, wouldn't it?

23 A    Yeah.  I don't know if that was possible at that time

24 given our state of knowledge.  And let -- so may I just add

25 in clarification to the schedule?  I believe there's an SOP

1  timeline.  That is a deadline by which it would come on, but

2  not -- it may happen sooner than that, but that's the --

3  Q    Okay.

4  A    -- deadline to which we could commit as a reasonably

5  prudent operator.

6  Q    Mr. Gurses, you're an honorable man, I appreciate that.

7         So actually you think BP could get it online in

8  less than four months, don't you?

9  A    I don't know.  I'm not -- I'm a commercial person.

10  You'd have to ask my technical colleagues as to what is

11  possible, but my understanding is that is the schedule that

12  we can commit to as a reasonably prudent operator.

13  Q    In light of other commitments that you all think may

14  have higher priority, right?

15  A    In light of safety activities that need to be conducted

16  and the priority of -- prioritization of activity at

17  Na Kika, yes, sir.

18  Q    And one of those higher priorities is the Manuel well,

19  correct?

20  A    Yes, as a base activity, post-lease activity, yes.

21  Q    A well that if it comes online --

22         THE COURT:  Mr. Gurses, just in terms of your

23  business decision here, what about 6.4 makes you think that

24  Manuel can be given priority over Genovesa?  Can you just

25  explain to me in your own words why 6.4 allows Manuel to

1  have priority?  Forget the safety issue.  I understand you

2  said "safety" a few times and I understand --

3           THE WITNESS:  Yes.

4           THE COURT:  -- that's critical, but I want to

5  start with priority of Manuel over priority of Genovesa.

6           What about 6.4 gives Manuel priority over

7  Genovesa?

8           THE WITNESS:  Yes, Your Honor.  Manuel is on a

9  lease that is called "MC 520" and that is a host lease so by

10 definition it is host lease production and therefore carries

11 priority under this provision Article 6.4, Your Honor.

12          THE COURT:  I thought you said it was on 520, not

13 on 519.

14          THE WITNESS:  Yes, Your Honor, Manuel is on

15 MC 520, which is the adjacent lease and that is a host

16 lease.

17          THE COURT:  So which language here says that host

18 capacity in 520 has priority over 519 production?  Where are

19 you reading that?

20          THE WITNESS:  Yeah.  So from the beginning, at all

21 times host leases production shall have priority use of the

22 host and host capacity over satellite production.  And then

23 further down in the article, it talks about then the

24 activities that -- the next priority and that would be

25 Isabela, which is a lease called "MC 562."  And then it

1  talks about the third priority being the MC 519 lease and

2  Genovesa is on the MC 519 lease.

3          THE COURT:  And is "satellite production" a term

4  that you are familiar with and know what that means?

5  Because I'm not.

6          THE WITNESS:  Yes, Your Honor, I believe.

7          THE COURT:  And what is satellite production in

8  your mind?

9          THE WITNESS:  Yes.  Satellite production is

10 typically production that is additional or later than the

11 collection of business or collection of leases for which a

12 host was originally designed to develop.  So in this

13 context, the Genovesa, also the Galapagos so Isabela and

14 MC 519 is satellite production.

15          THE COURT:  And tell me --

16          MR. STARK:  Your Honor, "satellite production" is

17 defined in the Agreement.

18          THE COURT:  I understand that.  Let me just -- I'm

19 trying to get his understanding.

20          MR. STARK:  I apologize, Your Honor.

21          THE COURT:  It says post-lease production is

22 priority use of the host and host capacity.

23          Are those also defined in your mind some way?

24 What does that mean?

25          THE WITNESS:  Your Honor, the host -- my

1    understanding the host -- in this context, the host is the

2    Na Kika platform and the host capacity is the capacity of

3    that host to process production and deliver services to the

4    business.

5            THE COURT:  And do you need to use the Na Kika

6    platform to install the jumper?

7            THE WITNESS:  So, Your Honor, that is a question

8    that's probably best asked to my technical colleagues.  I

9    could just explain my understanding, but just saying not

10   from -- that I'm not a technical person, but my

11   understanding is to effectuate the adjustments to the loop,

12   you do not I believe need the host, but you do need the host

13   to be able deliver production or produce because that's

14   where the operators are and all the host procedures that are

15   required to operate that well.

16           THE COURT:  Yeah.  But could you install the

17   entire jumper without putting any flow into it?  Could the

18   entire jumper be installed without the use of the host and

19   the host capacity?

20           THE WITNESS:  Well, I'm not certain of that.  I

21   would have to defer to my technical colleagues to answer

22   that precisely, Your Honor, I'm sorry.

23           THE COURT:  But you're reading this to say that

24   Manuel takes priority over all the work and it doesn't.

25               It only takes priority over the use of the host

1   and host capacity, right?

2            THE WITNESS:  Yes, Your Honor.  So in the --

3            THE COURT:  I don't know why in the world can't we

4   get this timeline going faster?  Why does Manuel affect the

5   timeline if you don't know if it requires the host or host

6   capacity?  I'm not understanding why BP can't connect this

7   up.

8            THE WITNESS:  Because there are activities on that

9   timeline that require the host so, for example, the running

10  of the procedures and the technicians are --

11           THE COURT:  At the end of the timeline.  But the

12  entire jumper can be installed, as far as you know, without

13  using the host, right?  That may not be accurate, but you

14  don't know that the host is needed to install the jumper.

15           So why can't we get the jumper installed now?

16           THE WITNESS:  Well now I believe we can -- the

17  timeline that's being proposed has the jumper being

18  installed earlier in the timeline.  I think there are steps

19  that need to be taken to permit and execute that work and my

20  understanding is that the planning and the permitting of

21  that work is in process, Your Honor.

22           THE COURT:  The timeline, I believe -- and we can

23  look back at it -- we're not having the jumper installed

24  till April 15th, if my memory is right.  I don't understand

25  why it takes that long if there's no priority for Manuel in

1  your mind.

2          You assumed priority for Manuel without it being

3  in the document, right?

4          THE WITNESS:  (No audible response).

5          THE COURT:  I'm not too happy with the fact that

6  BP seems to be making no effort to get this done.

7          How long will it take you to make an effort to

8  come up with a timeline that works instead of deciding not

9  to have a timeline that works, Mr. Gurses?

10         THE WITNESS:  My understanding from my technical

11 colleagues is that we are making an effort, Your Honor,

12 to --

13         THE COURT:  No, you're not.  No, you're not.

14 You're not making an effort to do it.  You're making effort

15 not to do it.  I want to know how long it will take you to

16 come up with something that works instead of something that

17 delays and artificially says you're going to go support some

18 other project.

19         Why can't we get BP's attention?

20         THE WITNESS:  Your Honor, BP has put a lot of

21 attention on this and operator of the host --

22         THE COURT:  No, you're not.  Okay.

23         Go ahead please.  Go ahead, Counsel.

24         MR. GENENDER:  Thank you, Your Honor.

25 BY MR. GENENDER:

1  Q    Mr. Gurses, isn't it the case that the work that has to

2  be done at the host is primarily paperwork in connection

3  with the single flow line plan?

4  A    I'm not really qualified to answer that question, sir.

5  I would defer to my technical colleagues who know the

6  details of them.  The steps that need to be done I'm not

7  familiar with that side of the business in terms of the

8  operation.

9  Q    You'd agree with -- well, if it were just paperwork,

10  then you'd agree the paperwork could be done now instead of

11  having to wait until May, correct?

12  A    I'm not able to answer that question as I'm not

13  familiar with the operation steps and I don't -- that's not

14  my area of expertise.

15  Q    Isn't it the case that the priority in the Section 6.4

16  that you were being asked about is for physical interruption

17  or reduction in capacity at the host if there's something

18  like a hurricane as opposed to based on BP's unilateral

19  prioritization of its own interests?

20  A    That is not the case.

21  Q    Okay.  How much faster than May 31 can BP get this well

22  online?

23  A    So I'm not an operational expert.  My understanding is

24  May 31 is the timeline that we can commit to as a reasonable

25  prudent operator in line with the other commitments that we

1  have at Na Kika.

2          MR. GENENDER:  Your Honor, I'm going to object to

3  the answer as nonresponsive.

4          THE COURT:  Sustained.

5          MR. GENENDER:  Mr. Gurses, I'll re-ask it if I

6  may.

7          THE WITNESS:  Yes.

8  BY MR. GENENDER:

9  Q    How much sooner than May 31 can BP get the Genovesa

10 well online?

11 A    I'm not qualified to answer that question, sir.  I'm a

12 commercial person.  I'm not familiar with the detailed

13 operation steps.

14 Q    Okay.  You have no reason -- do you have any reason to

15 dispute Fieldwood's testimony that it can get the well

16 online with reasonable cooperation from BP by March 26,

17 2021?

18 A    Yes, I do.

19 Q    What's your basis -- if you can't -- what's your basis

20 to dispute that if you can't tell me that the well could

21 come online prior to May 31?

22 A    Based on my understanding and my conversations with

23 technical colleagues when they've looked at that timeline is

24 that it does not take into account the other commitments

25 that --

1        MR. GENENDER:  Your Honor, I'm going to object.

2   Your Honor, excuse me, I'm going to object to the answer as

3   based on hearsay.  I'm asking for his personal knowledge.

4        THE COURT:  You asked him the question.  He gets

5   to answer it.  Go ahead.

6        MR. GENENDER:  Okay.

7        THE WITNESS:  Thank you, Your Honor.  So based on

8   my conversations with my technical colleagues who have

9   considered that timeline is that we cannot deliver that

10  timeline in line with the other commitments that we have

11  with Na Kika host as host operator, LSPS operator.

12  BY MR. GENENDER:

13  Q    When did BP first realize it couldn't bring Genovesa

14  online by April 5th, what day?

15  A    Could you restate the question?  I'm not sure I

16  understand the question.

17  Q    You're testifying before this Court that BP can't bring

18  this well online by April 5th, 2021; is that your testimony?

19  A    Yes, sir.

20  Q    When did you first -- when did BP first come to that

21  realization?

22  A    I would say in the -- as we were planning the --

23  thinking about the options once the source of the

24  abnormality leak on the LSPS was identified or in the

25  process of being identified and as operator, we were

1  thinking through options of how the situation could be

2  further handled, we had -- there was -- it was uncertainty

3  that we would be able to get the well online by the April,

4  its bar date.

5  Q    Okay.  So my question is when --

6  A    I was to -- I would say the answer is late October,

7  early November, sometime in that -- in the fourth quarter,

8  early in the fourth quarter.

9  Q    Well, aren't you aware, sir, that BP promised in

10 writing to have this well online by Q1 2021?

11 A    What I'm aware of is that BP committed to attempt and

12 institute repair of the abnormality or the leak in the LSPS,

13 which we did, and we presented some scoping explanation of

14 the steps that would be needed -- or the options that we

15 hadn't discussed that we need to take in the event that that

16 instituted repair failed.

17 Q    Mr. Gurses, that wasn't my question.

18        My question is: isn't it the case that BP

19 represented in October or November 2020 that this well would

20 be online by Q1 2021?

21        MR. STARK:  Your Honor, I'm going to object.

22 Assumes facts not in evidence.  If there's a writing he'd

23 like to show the witness, feel free.

24        THE COURT:  Overruled.  You know better.  He puts

25 facts in evidence by asking witnesses questions.  He didn't

1    assume anything was true.  Asked him a question.

2              Answer the question, Mr. Gurses.

3              THE WITNESS:  Yes, Your Honor.  So we presented at

4    the October partner meeting a series of options of how we

5    could proceed and one of those -- one or two of those

6    options had the potential for the Genovesa well to come

7    online in 1Q of 2020, as stated (indiscernible).

8              MR. GENENDER:  Thank you, sir.

9    BY MR. GENENDER:

10   Q    And were you present at those meetings?

11   A    I was.

12   Q    Did you tell anyone at Fieldwood during -- did you

13   speak up at those meetings and say, "We're not going to be

14   able to bring Genovesa online by April 5th;" did you say

15   those words?

16   A    There was a discussion at that meeting that that could

17   be a risk and at that time, there was a discussion that an

18   SOP would likely be prudent to guard against that

19   possibility.

20             MR. GENENDER:  I'm going to object to that as

21   nonresponsive.

22             THE COURT:  Sustained.

23   BY MR. GENENDER:

24   Q    My question is: at that meeting in October that you

25   were present at, did you speak up and say, "We're not going

1   to be able to get this well online, Genovesa, by April 5th,

2   2021"?

3   A    I do not have memory that that was said as an absolute

4   statement, but the --

5   Q    You're not aware of anyone -- okay.  But you're not

6   aware of anyone making that statement, are you?

7   A    The risk was discussed.

8   Q    I'm not asking about the risk, sir.

9   A    The nature --

10  Q    Go ahead.

11  A    I'm sorry, I was just going to add that the nature of

12  these operations are that they -- they're in deep water and

13  they carry uncertainties related to all manner of things so

14  it was a -- the timing put was an estimation with the

15  general understanding of the room that there would be

16  timelines subject to operational risk to be able to deliver

17  them.

18  Q    You're not aware of anyone at that meeting from BP

19  telling Fieldwood "This well is not going to be online by

20  April 5th," are you?

21  A    I'm not aware of anyone saying that statement, but

22  along with that the --

23  Q    Thank you, sir.

24        MR. GENENDER:  I'm going to object to the last

25  portion of the answer as nonresponsive.

1              THE COURT:  I'm going to let him finish is answer.

2              Go ahead, Mr. Gurses.

3              THE WITNESS:  Yes, Your Honor.  I was just adding

4    that along with the risk was knowledge of the meeting that

5    although there was a timing estimation given, these things

6    are subject to risk and there are no guarantees to be able

7    to deliver and the uncertainties involved.

8              THE COURT:  Let me tell you why he's asking this

9    question, Mr. Gurses.  You testified about five minutes ago

10   that BP knew in the fourth quarter that it couldn't finish

11   by April the 5th.  His question is: it wasn't that you

12   testified that there was some risk it wouldn't finish, he

13   said you all knew it wouldn't get finished by April the 5th,

14   you knew that in the fourth quarter.  The question basically

15   is, "Well, then why didn't you tell us you knew it?"  Let me

16   ask it that way and maybe it'll make more sense.

17             If you knew in the fourth quarter, why didn't you

18   tell them?

19             THE WITNESS:  Your Honor, I don't think we knew

20   it.  We stated on the slide that the stated estimation was

21   in the first quarter and I believe in correspondence between

22   the parties, there was a recognition that an SOP may be

23   needed if --

24             THE COURT:  No, no, no.  Please try not to answer

25   other questions.  You tend to do this.

1           THE WITNESS:  I'm sorry.

2           THE COURT:  You testified about five minutes ago

3    that BP knew in the fourth quarter that Genovesa would not

4    be online by April the 5th.

5           Why didn't anyone say that to Fieldwood?

6           THE WITNESS:  BP did not know that, Your Honor.

7    We stated on the chart I think in the October co-owner

8    meeting that --

9           THE COURT:  You testified that BP knew that about

10   five minutes ago, seven minutes ago now.

11          Was that wrong when you gave that testimony?

12          THE WITNESS:  Potentially, Your Honor, the correct

13   answer is that at the October --

14          THE COURT:  Why don't you try and -- if you can't

15   answer questions, then you shouldn't be a witness.

16          Was it wrong when you gave that testimony before?

17          THE WITNESS:  Your Honor, please can you remind me

18   the specific testimony that you're referring to?

19          THE COURT:  We're going to just move ahead.

20          Go ahead, Mr. Genender.

21          MR. GENENDER:  I'd like to call up if I can --

22   this is one of BP's exhibits -- BP Exhibit 5 that is at

23   832-5 and I want to go to page -- the first page --

24          THE COURT:  Who's your presenter, Mr. Genender --

25          MR. GENENDER:  I'm sorry.

1          THE COURT:  -- so I can activate it, Ms. Choi?

2          MR. GENENDER:  I apologize, Judge.  It is

3    Ms. Choi.  Thank you, Judge.

4          THE COURT:  All right.

5          MR. GENENDER:  And this is -- I'm told this is an

6    exhibit that was -- that is under seal, Judge.

7          What's my best way to proceed with that?

8          THE COURT:  Well, don't put it up then if it's

9    under seal.

10         MR. GENENDER:  Don't put it up.  I'm sorry, I'm

11   sorry, yeah.

12         Does the witness have access to the --

13         THE COURT:  What is the exhibit number?

14         MR. GENENDER:  It's Exhibit -- it's 832-5, Judge.

15   If the witness has a copy and if you can pull it up, Judge,

16   I -- would that work?

17         THE COURT:  Hold on.  If the witness has a copy,

18   it's going to work.  And I believe I have a copy.

19         MR. GENENDER:  Could I ask opposing counsel to

20   send a copy of this to Mr. Gurses if he doesn't have it

21   please?

22         MR. STARK:  Yeah.  Katie, can you email a copy to

23   him?

24         MS. TIPPER-MCWHORTER:  Yes, I'm doing it right

25   now.

1          MR. GENENDER:  Thank you, Bill.

2          MR. STARK:  Absolutely.

3       (Pause in the proceedings.)

4          THE COURT:  What page are you on on this?

5          MR. GENENDER:  I'm looking at page 18, Your Honor,

6   of the document in the lower right.

7          THE COURT:  Thank you.

8   BY MR. GENENDER:

9   Q    Mr. Gurses, do you have this document in front of you,

10  sir?

11  A    So I can't see the document that you're referring to.

12          Are you sharing something?

13          MS. TIPPER-MCWHORTER:  No.  Kamil --

14          MR. GENENDER:  No, that was the --

15          MS. TIPPER-MCWHORTER:  Sorry, Paul.

16          Kamil, it's under seal.  I just emailed it to you.

17  And, gentlemen, I apologize.  Our email servers are pretty

18  slow with the security protocols.  It might take a few

19  seconds to come through.

20          THE COURT:  No problem.  Thank you.

21          This particular page does it need to be under

22  seal or can we just put up the one page?  Is there a reason

23  why -- there may be.  I don't know, whether this is needing

24  to be sealed or not.

25          MS. TIPPER-MCWHORTER:  I apologize.  What page are

 1  we on?

 2              THE COURT:  18.

 3              MS. TIPPER-MCWHORTER:  All right.  Just a moment.

 4              MR. GENENDER:  Thank you.

 5              THE WITNESS:  Well, everyone, an email has just

 6  come through.  I'm opening it up.  Please bear with me.

 7              THE COURT:  All right.  Thank you.

 8              MR. GENENDER:  Okay.

 9              THE WITNESS:  I have the attachment that was sent

10  opened.

11              MR. GENENDER:  Thank you, Mr. Gurses.

12  BY MR. GENENDER:

13  Q    Mr. Gurses, if you look at the first page, this is a

14  document prepared by BP, correct?

15  A    It is.

16  Q    And it relates to the co-owner meeting that you were

17  just testifying about a few minutes ago, right?

18  A    It does.

19  Q    From October of 2020, right?

20  A    Yes, sir.

21  Q    And you were at that meeting, right?

22  A    I was, sir.

23  Q    And this document was used at that meeting, wasn't it?

24  A    Yes, sir.

25  Q    And if you look at -- if you can turn to page 18 where

1  it says -- the title starts LSPS Narrowed Repair Options; do

2  you see that?

3  A    I'm scrolling to the specific slide.  If you'll just

4  bear with me a moment?

5  Q    Absolutely, sir.

6  A    The next slide, 15, 16, 17.  Yeah, I'm looking at a

7  slide that says, "LSPS Narrowed Repair Options."

8  Q    Okay.  And I'm going to try to not read a bunch of

9  stuff from the document, but I'm going to just reference a

10  couple of things.

11       Do you see one it has Galapagos plan forward and

12  then it has two options under that?  One is loop restoration

13  on the right, the other is LT single line ops; do you see

14  that?

15  A    Yes, I do.

16  Q    And then it refers to Option 1 and it says -- refers to

17  Genovesa, right?

18  A    Yes, it does.

19  Q    And then on the left, it has a box.  It's a little bit

20  dark, but it says, "Startup impacts," right?

21  A    Yes, I see that.

22  Q    There's an asterisk and it -- there's an asterisk and

23  then it refers to costs and schedule references or estimates

24  are only -- and based on early screening and benchmark

25  tests; do you see that?

1  A    I do, sir.

2  Q    And then is says, "1Q '21" for Genovesa, doesn't it?

3  A    It does.

4  Q    But is says, "4Q '20" for Isabela, doesn't it?

5  A    It does.

6  Q    And when did Isabela come online?

7  A    So this is subject to a different joint venture, but I

8  believe it's generally known that it came online in

9  December.

10 Q    So BP met the Isabela deadline, right?

11 A    It came online in the time that is stated here on the

12 slide, yes, sir.

13 Q    But if saying now three or four months later that it

14 can't meet the Genovesa deadline of Q1; is that what --

15 that's your testimony, right?

16 A    Yes, sir.

17        MR. GENENDER:  Your Honor, I'd offer BP -- if

18 offer this document 832-5, BP Exhibit 5, into evidence,

19 Your Honor.

20        THE COURT:  Any objections?

21        MR. STARK:  No objections, Your Honor.

22        THE COURT:  It is admitted.  It is provisionally

23 under seal pending review of the Motion to Seal and any

24 objections to that, but we'll leave it under seal although

25 it's admitted.  Thank you.

1        (BP's Exhibit No. 5, 832-5, received in evidence under

2    seal.)

3    BY MR. GENENDER:

4    Q    You agree, Mr. Gurses, that BP has the contractual

5    right to allow Fieldwood to serve as operator for this

6    project and conduct the single flow line option and execute

7    the single flow line option, right?

8    A    Can you define the question, sir?  When you talk about

9    the single flow line option, what do you mean?

10   Q    I mean exactly the plan to get Genovesa online that

11   we've been talking about all afternoon and evening.

12         You agree that BP has the contractual ability to

13   allow Fieldwood to be the operator, right?

14   A    Oh, that's all been operation.  Yes, it has the ability

15   to do that.

16   Q    Thank you very much, sir.

17         And you'd agree that if Fieldwood were the

18   operator, you, sir, would support BP cooperating reasonably

19   with Fieldwood's efforts to bring Genovesa online before the

20   lease expires, wouldn't you?

21   A    Can you clarify the question, sir, just so I understand

22   what you're asking?

23   Q    Well, if Fieldwood were the operator for the single

24   flow line option to bring Genovesa online, you, sir, as a

25   representative of BP, would favor BP providing reasonable

1   cooperation to allow Fieldwood to achieve its goal, wouldn't

2   you?

3   A    Yeah, if Fieldwood were the operator, then we -- BP

4   would act -- if that permission would be granted, BP would

5   act as a prudent operator to progress, yeah.

6   Q    Well, I'm actually asking a little bit different

7   question.

8            Would you provide reasonable cooperation to allow

9   Fieldwood to reach its goal of saving this lease and

10   bringing this well online by April 5th?

11   A    Yes, we would if that was allowed, yes.

12   Q    Okay.  Do you want -- Mr. Gurses, as you sit here, if

13   you were in control of the world, would you prefer for the

14   Genovesa well to come online by April 5th, 2021?

15   A    If that were possible then, yes.

16   Q    Are you saying it's impossible, there's no way in the

17   world BP could allow that to happen; is that what you're

18   testifying?

19   A    I'm testifying that we cannot commit to a schedule that

20   allows us to do that without breaching safety or our PHA

21   Agreement.

22   Q    Okay.  But you're not saying it's impossible, are you?

23   A    Not qualified to say that, sir.  You'd have to ask my

24   operation colleagues about whether it's possible, but I'm

25   not saying it's impossible, to answer your question.

1  Q    Thank you, sir.  You were asked a number of questions

2  about adverse impacts; do you recall that at the beginning

3  of your examination?

4  A    I do.

5  Q    Is the underlying leak that was uncovered in April

6  2020, is that an adverse -- in the loop, is that an adverse

7  impact?

8  A    Can you define the question a little bit more?  So what

9  are you asking?

10 Q    Well, you testified about adverse impacts on your

11 direct examination; do you recall that?

12 A    I did.  I do.

13 Q    And you said that the temporary single flow line could

14 be an abnormal operation, which could be an adverse impact,

15 and that changing of conditions on the LSPS could be an

16 adverse impact; do you recall testifying to that effect?

17 A    I do.

18 Q    I'm asking you if you go back further to April 2020

19 when the -- when Fieldwood learned about the underlying leak

20 in the loop system, is that an adverse impact?

21 A    I don't believe it's in context of the Agreement.  The

22 leak is something that was discovered and happened and I

23 believe in the context of the Agreement, the way adverse

24 impact is construed it's something that you choose to do and

25 that either does or does not have an adverse impact.  The

1 leak happened.  No one chose that.

2 Q    So the leak that wasn't Fieldwood's -- you'd agree with

3 me the leak wasn't Fieldwood's fault, right?

4 A    Yes, sir.

5 Q    But you're saying the solution to repair it to keep the

6 lease in place that somehow is an adverse impact; is that

7 what you're testifying?

8 A    My testimony is when I was asked is the proposed

9 (indiscernible) operation of the Genovesa single flow line

10 an adverse impact and BP's determination as operator was

11 that it was an adverse impact in the way that I described.

12          MR. GENENDER:  But I'm going to object to that as

13 nonresponsive because I asked a different question.

14          THE COURT:  Overruled.

15 BY MR. GENENDER:

16 Q    Are you testifying that you have -- have you ever

17 expressed a concern about -- a safety concern to Mr. Vaughn,

18 your counterpart, in connection with the single flow line

19 option that -- before this Court?

20 A    My technical colleagues are the people that make a

21 determination what is and what is not a technical or a

22 safety concern so that is a conversation that happens more

23 in the technical realm.  I have not --

24 Q    I want to be clear on this, Mr. Gurses.

25          So your testimony is: you yourself have not spoken

1   to your counterpart, Nathan Vaughn, at Fieldwood and

2   expressed a concern for safety in connection with

3   Fieldwood's proposed schedule to bring Genovesa online,

4   correct?

5   A    Correct.

6   Q    Thank you, sir.

7        MR. GENENDER:  Your Honor, may I just have one

8   moment to look at my notes?

9        THE COURT:  Yes, sir.

10       MR. GENENDER:  Thank you.

11     (Pause in the proceedings.)

12       MR. GENENDER:  Your Honor, I'm going to pass the

13   witness.  Thank you very much.

14       THE COURT:  Thank you.  Mr. Skelton?

15       MR. SKELTON:  Yes.

16            CROSS-EXAMINATION OF KAMIL GURSES

17   BY MR. SKELTON:

18   Q    Mr. Gurses, my name is Barnet Skelton and I represent

19   Red Willow Offshore, LLC and Houston Energy Deepwater

20   Ventures I, LLC; are you familiar with those entities?

21   A    I am, sir.

22   Q    And you're familiar with the fact that Red Willow has

23   a 30 percent working interest with MC 519 and HEDV, which

24   is -- I'll abbreviate, has a 5 percent interest.

25   A    I am.

1   Q    And you're aware that they are parties to the LSPS

2   Agreement and the PHA Agreement, correct?

3   A    I am.

4   Q    All right.  Now you spoke about the Genovesa well and

5   the Manuel well being completed in the same formation; do

6   you recall that?

7   A    I do.

8   Q    And that formation is a middle Miocene reservoir called

9   "M55," isn't it?

10  A    That's the label, yes.

11  Q    All right.  And just to put it in perspective for the

12  Judge, isn't it correct that the Manuel well, the bottom

13  hole location is about say 3600 feet from the Genovesa well

14  bottom hole location?

15  A    I don't know that information, sir.  That would be my

16  subsurface colleagues that could speak to that.  I don't

17  know the --

18  Q    They're closely located, aren't they?

19  A    Well, I guess it would depend on how you would define

20  "close" in this context so --

21  Q    Would you agree they're less than a mile from each

22  other?

23  A    Sir, I don't know that.

24  Q    All right.

25  A    I can't --

KAMIL GURSES - CROSS BY MR. SKELTON                    141

1  Q    Well, you talked about priority of host production and

2  so forth and host leases.

3         Now am I correct that the Manuel well was

4  completed in or around August of 2018?

5  A    I can't recall the exact time, but it may have been

6  around that.  I would have to go back to my notes to see the

7  exact time of the completion, but I can't recall exactly

8  when it was completed.

9  Q    Okay.  Well, can you explain to me why this well

10  completed in August 2018 that BP didn't apply for a permit

11  to lay a pipeline from that well to Na Kika until December

12  of 2020?

13  A    I cannot.  I'm a commercial person so I would defer

14  that to my technical colleagues who are managing that

15  project who have knowledge of that.

16  Q    You wouldn't disagree with me that BP just recently

17  obtained the permit necessary to lay the pipeline to connect

18  up the well, the Manuel well, to the Na Kika.  You'd agree

19  with me that's correct, wouldn't you?

20  A    My role doesn't include permitting so I'm not aware of

21  the exact timelines of the permit that went in.  I just

22  cannot answer.

23  Q    Well, let's put it another way.  Your well that right

24  now there is a ship out in the Gulf of Mexico laying

25  pipeline from the Manuel well to the Na Kika; isn't that

1  true?

2  A    That is my understanding.

3  Q    All right.  And Manuel isn't going to be hooked up with

4  a loop, is it?  It's going to go direct into Na Kika; isn't

5  that true?

6  A    Yes.  The Manuel development doesn't go via the LSPS

7  loop.  It goes direct in.  It will be a (indiscernible) line

8  into Na Kika.

9  Q    And so you mentioned when there was a discussion about

10 priority and I think it was Section 6.4 of the PHA Agreement

11 there is no production from Manuel at this time, is it?

12 A    There is no production from Manuel.

13 Q    And "host production" means production of oil and gas,

14 doesn't it?

15 A    Yes, it means the production of oil and gas I believe

16 current or future, but it means the development of the host

17 leases business.

18 Q    Well, I can -- I imagine Ms. Choi can pull this up, but

19 Section 2.2.483 of the PHA defines "post-lease production"

20 means oil, gas, water and associated substances produced

21 from the host leases and processed and handled on the host.

22         Now there isn't any oil and gas being produced

23 from Manuel at this time, is there?

24 A    There is not, no.

25 Q    But BP is in a big hurry to see that there is such

1  production, isn't it?

2  A    There is a timeline associated with that project that

3  BP is executing as operator.

4  Q    All right.  And so tell me about that timeline.

5          Are you telling the Court that you have

6  prioritized that timeline over the timeline necessary to get

7  the Genovesa well producing by April 5th?

8  A    There are activities associated with that project on

9  the host that carry priority over the MC 519 lease on which

10  Genovesa is on.

11  Q    So the answer is "Yes," you are prioritizing getting

12  the Manuel well on production before Genovesa, correct?

13  A    My answer is as I stated, yes, as I previously stated.

14  Q    God forbid that the MC 519 lease should expire.  BP

15  would be right there to pick up the pieces and have that --

16  and purchase that lease and have two wells sucking from the

17  same formation, wouldn't it?

18          MR. STARK:  Objection, Your Honor.  Calls for

19  speculation.

20          THE COURT:  Sustained.

21          MR. SKELTON:  I'll pass the witness.

22          THE COURT:  Thank you.  Mr. Stark?

23          MR. STARK:  Thank you, Your Honor.

24          REDIRECT EXAMINATION OF KAMIL GURSES

25  BY MR. STARK:

KAMIL GURSES - REDIRECT BY MR. STARK                144

1  Q    Would BP bring the Genovesa well online any faster if

2  it had an ownership interest in it?

3  A    I don't believe it would.  We're executing on a role as

4  operator (indiscernible) and host.

5  Q    BP has a number of different roles in this area as

6  owner, operator, Na Kika host.

7          How does BP balance those roles and obligations?

8  A    It balances them in line with our Agreements.

9  Q    How does staying in compliance with the Agreements

10 help -- or allow BP to balance those roles?

11 A    So as operator, we need to stay in line with our

12 Agreements to make sure we meet our commitments to the

13 various partners that we have at the Na Kika host of which

14 there are a number related to different joint ventures at

15 that host.

16 Q    Fieldwood was aware of the prioritization and the PHA

17 when they signed on, weren't there?

18 A    They were.

19 Q    But you were asked about this concept of draining the

20 reservoir between Genovesa and Manuel.

21          Do you have any understanding as to whether Manuel

22 coming online prior to Genovesa would drain the reservoir?

23 A    I do not.  That's not within my realm of expertise as a

24 commercial person.

25 Q    You were asked if BP proposed the same schedule in

1  November that it's proposing today, would Genovesa be

2  online; do you recall that?

3  A    I'm sorry, sir, could you repeat the question?

4  Q    You were asked whether if BP had proposed the schedule

5  it proposes today, had it proposed that back in November,

6  then Genovesa would be online prior to lease expiration; do

7  you recall that?

8  A    I do recall that.

9  Q    In November, did BP have all of the information it

10  needed from Fieldwood to propose that schedule?

11  A    It did not.

12  Q    Do you recall which information or categories of

13  information BP lacked and requested from Fieldwood in

14  November?

15  A    In November, that proposed operation needed to be --

16  needed to have a feasibility study done and that included

17  work to look at flow assurance but by which I mean the risks

18  associated with flowing a well like that in the single line

19  mode of operation and that -- and in order to do that work,

20  we needed -- BP needed information from the well operator on

21  how that well --

22           THE COURT:  That answer is -- I'm going to strike

23  the answer as nonresponsive.  You can re-ask the question.

24           MR. STARK:  Thank you, Your Honor.

25  BY MR. STARK:

1  Q    But what information did BP need from Fieldwood in

2  November to be able to evaluate the single flow line?

3  A    It needed information on how the well was planned to be

4  operated through the flow line and it needed -- yeah, that

5  was the primary, I believe, information that was needed or

6  one of the pieces of information that was requested.

7  Q    Did Fieldwood provide the information BP requested?

8  A    It did.

9  Q    And when did Fieldwood provide the information BP

10 requested?

11 A    It was over a series of exchanges that happened through

12 late November and December.  Up until the end of December

13 there was an exchange, there was a regular exchange of

14 information between BP and Fieldwood.

15 Q    Do I understand you correctly then that BP finally

16 received all of the information it needed from Fieldwood at

17 the end of December of last year?

18 A    That is my understanding, yeah, the end of December.

19 Q    Thank you.

20        MR. STARK:  I'll pass the witness.

21        THE COURT:  Thank you.  Mr. Genender, anything

22 further?

23        MR. GENENDER:  Just one question, Your Honor, or

24 one --

25            RECROSS-EXAMINATION OF KAMIL GURSES

1  BY MR. GENENDER:

2  Q    Mr. Gurses, do you know whether BP ever told Fieldwood

3  that it could bring Genovesa on earlier if Fieldwood

4  provided an overriding royalty interest on the well?

5  A    I don't know if that was said, no.

6  Q    Have you ever heard anything to that effect?

7  A    There were discussions previously about commercial

8  arrangements around Genovesa and Manuel between the parties.

9  Q    Now how would -- how is it that BP receiving an

10 overriding royalty interest would allow it to move faster to

11 bring this well online?  Would that just increase the

12 priority?

13          MR. STARK:  I'm going to object, Your Honor.  That

14 misstates the witness' testimony.

15          THE COURT:  Overruled.

16          THE WITNESS:  I would say in a commercial

17 negotiation, if all the parties were involved to the

18 agreement, a different priority or a different agreement can

19 be agreed, but that would need to be agreed between the

20 parties to alter the agreement in a commercial matter.

21          MR. GENENDER:  I don't have anything further,

22 Your Honor.

23          THE COURT:  Mr. Skelton?

24              RECROSS-EXAMINATION OF KAMIL GURSES

25 BY MR. SKELTON:

1   Q    Now, Mr. Gurses, BP never even once raised the issue of

2   host production priority with Fieldwood, did it?

3   A    It has on multiple occasions, sir.

4   Q    So you're telling me that BP has told Fieldwood that

5   it's putting its Manuel project in line ahead of Genovesa.

6   A    Sir, that's not what I said.  I said -- or your

7   question, sir, was has BP raised the issue of host lease

8   priority and I answered that.

9   Q    All right.  Well, did it ever tell Fieldwood that it

10  was putting the Manuel project and laying that pipeline and

11  completing it to the Na Kika as a higher priority than

12  Genovesa?

13  A    I believe we've always told Fieldwood that we -- as

14  operator that we would act in accordance with our

15  Agreements.

16          MR. SKELTON:  Objection, Your Honor.

17  Nonresponsive.

18          THE COURT:  Sustained.

19  BY MR. SKELTON:

20  Q    You never told them, did you?

21  A    (No audible response).

22          MR. SKELTON:  I'll pass the witness.

23          THE COURT:  Mr. Stark?

24          MR. STARK:  Nothing further, Your Honor.

25          THE COURT:  Thank you.

1        (Witness steps down.)

2             THE COURT:  Mr. Stark, who's your next witness?

3             MR. STARK:  Your Honor, could we take brief

4   recess?

5             THE COURT:  Yes, sir.  How long would you like?

6             MR. STARK:  Five minutes, 10 minutes.

7             THE COURT:  Sure.  We'll come back at 7:22.  Thank

8   you.

9             MR. STARK:  Thank you, Your Honor.

10        (Recess taken from 7:12 p.m. to 7:21 p.m.)

11                      AFTER RECESS

12             THE COURT:  Mr. Stark?

13             MR. STARK:  Yes, Your Honor.

14             THE COURT:  You're up.

15             MR. STARK:  Call Craig Redding, please.

16             THE COURT:  Mr. Redding would you please press

17   five star on your line?

18        (Pause in the proceedings.)

19             THE COURT:  I see you.  Let me get that activated,

20   Mr. Redding.  Good evening, Mr. Redding.

21        (Witness sworn.)

22             THE COURT:  Thank you, sir.

23             DIRECT EXAMINATION OF CRAIG READING

24   BY MR. STARK:

25   Q   Mr. Reading, please state and spell your name.

CRAIG REDDING - DIRECT BY MR. STARK                    150

1   A     My name is Craig Redding.  Spelled, C-R-A-I-G.  Last

2   name Redding, R-E-D-D-I-N-G.

3   Q     How are you employed?

4   A     I am employed by BP.

5   Q     What's your position at BP?

6   A     After the recent reorganization, I became the Subsea

7   Operations Projects Manager for Western Hemisphere.

8   Q     And prior to that, what was your position at BP?

9   A     So prior to that I held roles in Subsea operations for

10  three years building all the global manifold jumpers and

11  valves for all projects and two other major projects as

12  project manager for sub-sea delivery.

13  Q     How long have you been with BP?

14  A     Twelve years.

15  Q     As a project manager, what did your role entail?

16  A     So largely integration.  You know, making sure that

17  folks are paying attention to sort of the technical teams

18  that are developing the solutions.  How those get integrated

19  with cost and schedule as well as the safety performance of

20  the delivery and the installation of those equipment.

21  Q     Does your role involve scheduling with respect to

22  Na Kika?

23  A     I will say in late July I was brought in to support

24  LSPS diagnostics from a long term remediation perspective.

25  Developing cost and schedule estimates for what might be the

CRAIG REDDING - DIRECT BY MR. STARK                    151

1   repair, replacement options for the LSPS.

2   Q    Can you explain for the Court how BP develops its

3   schedules?

4   A    So generally it starts with a defined scope of work at

5   a very high level in concepts.  I think on the order of five

6   to seven concepts were evaluated for the LSPS remediation.

7   All the way from replacing the line to attempted repairing

8   the line to institute repairs.

9        And so as we built those estimates, we narrowed down,

10  based on the scopes of work what we call concept selection.

11  Which is essentially at a high level agreeing a generality

12  of scope in comparing with benchmarks what the actual cost

13  of equipment, engineering and installation costs would be.

14  Q    Are you involved in scheduling for the Genovesa single

15  flow line?

16  A    I am.  In my new role, I manage the resources that

17  perform third party tie backs to our host facilities here in

18  the Gulf of Mexico including Genovesa.

19  Q    What has BP done to bring Genovesa online?

20  A    So I will say, you know, earlier we talked about in

21  October when we realized that the loop was potentially going

22  to have a longer term repair or replacement of a segment, we

23  had proposed at that time a concept that might be able to

24  bring the production on sooner in a temporary case if it

25  were feasible to then enable us to replace the impaired

CRAIG REDDING - DIRECT BY MR. STARK                    152

1    segment which is about a one mile segment of the flow line.

2        So that was what we proposed and I think has been

3    shared in the October meeting.  And then we provided updates

4    throughout November and December on a weekly basis with the

5    technical team meeting with Fieldwood as well as what we did

6    in December and January co-owner meetings.

7    Q    What was the nature of the update you provided during

8    those weekly meetings and the co-owner meetings?

9    A    On the weekly meetings, it was largely technically what

10   we're doing to either perform diagnostics and look at the

11   remediation options.  And most of that was focused in until

12   we found the source of the leak in November on what our next

13   steps were for remediation options as well as the

14   preparation for these kind of *in situ* repairs of the bolt

15   tightening and then options to discuss would we replace the

16   section versus repair a section.

17       So, up and through that point, the focus was largely on

18   what we were doing in the field for diagnostics and trying

19   to get this loop back on line without a major repair.

20   Q    Did BP progress both the bolt tightening option and the

21   single flow line simultaneously?

22   A    Yes.  I think it was in early December after we had

23   proposed that it was looking like the bolt tightening was a

24   campaign we thought might be successful.  But should it not,

25   we started working with the Fieldwood teams to look at the

1  options and the technical feasibility of the flow assurance

2  as well as what we would do from a regulatory perspective as

3  well as what we would do in the case of the future ties ins,

4  right, and what that would entail.

5  Q    What did BP do in January to progress the single flow

6  line?

7  A    So in January, our focus was on progressing some of the

8  procedures as well as the equipment that's needed for the

9  jumper removal.  And we actually kicked those off with the

10 jumper removal with four pressure caps back in September.

11      And in December when we got a -- the vendor that was

12 reworking those, we got a quote -- I think it was early

13 December -- and turned that around in a couple days to have

14 those as contingency parts should we need them either for a

15 bigger de-oiling operation should we have continued leak.

16 Or for the single flow line option.

17      Outside of that, it was largely focused on working

18 through and having several sessions with both Fieldwood and

19 their contractor, Tommy Gulsinsky (phonetic), who was

20 running flow assurance analysis to help with our feasibility

21 assessment.

22 Q    In your estimation, has BP been working diligently to

23 progress the single flow line?

24 A    Absolutely.  I think myself, my team, the installation

25 team that's been, you know, sort of working the diagnostics

CRAIG REDDING - DIRECT BY MR. STARK                    154

1   work and vessel work, they've continued to work through and

2   drive our vendors that are providing this equipment for us

3   and looking at procedures and options.

4        And I think when you look at what we came up with in

5   December and in January greatly simplified what were complex

6   operations as we were learning what single flow line might

7   entail from the risk assessment.

8   Q    Have you been addressing the single flow line on an

9   expedited basis?

10  A    Yes.  Yeah, I think we always have challenges.  I think

11  particularly with the pressure caps that I referenced.  Sort

12  of what took us from the September to December.  Two

13  hurricanes passed through Barwick (phonetic) area and was

14  shut down the plant for two weeks and impacted them quite a

15  bit there for what they were doing in the shop.

16       But outside of that, we've been working diligently with

17  the team, reviewing with them what information we have.  All

18  the way up through Christmas.  Right, so even I recall we

19  had a long session the Friday afternoon just before the

20  Christmas holidays and the Tuesday before Christmas.

21  Q    Now are there any issues with respect to equipment

22  availability?

23  A    There is.  We continue to work and escalate through our

24  senior management as well as ones sub-sea that is the

25  contractor that provides the pressure caps for these.

1  They've had what's a week delay over the last couple of

2  months which puts us at the mid-February to the end of

3  February for the delivery of the four caps we have.

4  Q    Did you hear the prior testimony that pressure caps are

5  apparently available from other companies?

6  A    I did hear Bhat's testimony.  We have inquired in the

7  past if Fieldwood did remove one pressure cap when they

8  installed this jumper back in April -- which was a BP owned

9  pressure cap.  That I think they referenced that they could

10 get refurbished.  Which is what we've done with ours.

11      But we have asked if they had any other equipment with

12 these ones sub-sea caps and there was nothing they had to

13 offer at the time when we made the request.  There is a cap

14 that they do own that we have or that we'll need access to

15 and they're going to release that to us.

16 Q    When you say, "they" I want to make sure we're clear.

17 The "they" is Fieldwood?

18 A    Fieldwood, correct.  Fieldwood works with -- they have

19 one end of their jumper of the Genovesa jumper that's a

20 trend setter connector that we don't have anywhere in our

21 global fleet.

22      As well as then the  other end being a One Subsea CBC

23 connector which we have in our global fleet but don't have a

24 stock of pressure caps available that were ready to run

25 offshore.

CRAIG REDDING - DIRECT BY MR. STARK                    156

1  Q    Even with Fieldwood providing one pressure cap, how

2  many more do you need?

3  A    We need a minimum of two pressure caps for every

4  jumper.  So I think for pulling their jumper, they'll need

5  one trendsetter cap that goes on their plus end and One

6  Subsea cap that goes on the Santiago plum.

7       Then that needs to be a flooding cap that then flushes

8  our flow line jumper before you can get the oil out and

9  flushed into the flow line to pull that.  Then you need two

10 more.

11      So we are progressing a total of four at the moment.

12 Two flooding caps, two pressure caps with one being a spare.

13 Q    I apologize if I've asked you this.  What's the

14 availability of those items?

15 A    So the two flooding caps, we are currently looking a

16 somewhere between the 10th and the 14th of this month.  And

17 the two pressure caps were reported last week as being the

18 very end of February or first of March.

19      And we are doing what we can to expedite that with One

20 Subsea management.

21 Q    If that can't be expedited and they do come in the

22 first of March, do I understand properly that the jumper

23 removals can't begin until the first of March?

24 A    You might be able to progress with the -- one of the

25 jumpers, but you would not be able to progress the flooding

1  of the second jumper.  And right now the way BP has proposed

2  it is, is a sequential operation with a single vessel in the

3  field that would remove a jumper, flush the jumper, and pull

4  the next -- move it into not only two campaigns but

5  potentially three.

6  Q    And what impact would that have on scheduling?

7  A    So again I think it depends on, you know, the next area

8  where we get into -- it's probably not a huge aspect other

9  than your first jumper that you'd be retrieving would be in

10 the first week of March.  You'd be flooding and recovering

11 the next jumper in the second or third week of March.  Then

12 as Bank's described, you've got, you know, somewhere between

13 10 and 14 days of fabrication time to build the final jumper

14 that they would install from their plus to our plum.

15       And then we would have a second campaign to bring that

16 stuff to install and pressure test that jumper.

17 Q    Not sure I followed the math exactly, but that falls

18 after April 5th; is that correct?

19 A    It's right on or about the second week of April based

20 on what I would call determine a thick schedule with some

21 contingency for weather.

22       So I think there's been a lot of discussion around

23 probabilities and schedules and, you know, I think we'll

24 look at the certainty and commitment of what we would do in

25 our schedule that we've been providing.

1      We've been open with Fieldwood, I think, since December

2   and even more so in January, the co-owner meeting, what the

3   timeline would be for this.

4   Q    You talked about schedules.  Have you attempted to put

5   together a schedule that would have Genovesa online by or

6   before April 5th, 2021?

7   A    I have.  I challenged the team to see what's realistic,

8   what's practical, what's safe.  And I think it's really

9   challenging.  I wouldn't say it's impossible.  It's within

10  the realm of possibility, but it is very difficult to

11  achieve.  I think as Bank described, I have different

12  opinion than Mr. Bhat when it comes to the probability.

13      I have a feeling that having the ability to get that

14  well online is probably less than a five percent chance of

15  surety.  But I do believe that in April is more -- by end of

16  April, early May would be a kind of 25 percent chance.

17      Again, all of our schedules take into account risk and

18  typically we plan on what we call a P50 schedule.  Which has

19  allowances for certain things and certain things that we

20  don't, so.

21      Our schedule that we provided to Fieldwood in the five

22  bullet listed, it was proposed in May is what we call a P50

23  schedule.

24  Q    That's a schedule you feel reasonably capable of

25  meeting?

1  A    Absolutely.  There's some risk built into there and I

2  know that we can be beat that schedule.  Normally we plan

3  based on P50 and then we try to set targets earlier than

4  that.

5       But our deterministic schedule today with the team, you

6  know, and it's changing as it develops.  We get more and

7  more certainty.  You know, they've got a schedule of June.

8  I've taken overviews on that schedule and I think that we

9  will be able to deliver in mid-May with the possibility of

10  delivering later in April.

11  Q    The schedule you created by pressing the team to come

12  up with something by April 5, it's obviously not a P50.

13  What's that probability of that schedule being successful?

14  A    I see that as a five percent -- when we deal in those

15  probabilities of P10 or P5 is what we describe it -- there's

16  no room for February and March cold front to come through

17  that would delay the vessel by three or four days.

18       There are risks associated with some of these

19  connectors and the bowels with some of the history in this

20  system and removing these jumpers.  This is not a quite

21  simple task.  Although it's a task that we've performed

22  before to evacuate oil from our flow line jumper.  It's not

23  a simple easy flush, Your Honor.

24       It's -- I think -- we have to alternate chemicals with

25  different density to try and flush the oil out from the top

CRAIG REDDING - DIRECT BY MR. STARK                    160

1    and the bottom of these -- what we call the MJ jumpers.

2    Q    To achieve the schedule for bringing Genovesa online by

3    April 5 is it accurate to say that every thing would have to

4    go -- sorry what was that?

5              MR. GENENDER:  Go ahead.  I was going to object

6    leading, but.

7              MR. STARK:  Fair enough.

8    BY MR. STARK:

9    Q    Would everything have to go perfectly to achieve the

10   schedule that would have Genovesa online by April 5?

11   A    I think perfect is relative, but yes nearly perfectly

12   to achieve that schedule.

13   Q    No room for significant weather?

14   A    Significant weather, COVID, connector issues that we

15   might have, valve issues, potentially having hydrates under

16   valves where you have to bring another piece of equipment

17   out to the field.

18        As well as, you know, there's a piece around getting

19   access to the fabricated jumper and all the documentation

20   that Fieldwood has been providing to close out our MOCs for

21   the startup.

22        So all of that has to go, you know, ahead of plan

23   almost because there's likely some pieces of that as we get

24   into operator training and the final MOCs to get that start

25   up.  I have not done start ups within a day of learning that

1  jumper.

2      There's pre-start up safety reviews that we have that

3  review all that production into documentation.  We are

4  progressing a lot of that stuff in advance and we review

5  that on a weekly basis with Fieldwood.

6  Q    When you say, "MOCs" just so I'm clear, what are MOCs?

7  A    Sorry, MOC is management of change.  So for this

8  project it's, you know, while we had one final step to get

9  the project online, should the LSPS have worked with all the

10 tie in, there's still documentation we've been reviewing.

11 This is a change that now we've got to go back within our

12 process and identify the risk with all of these changes.

13 Particularly removing a section of a loop that we -- the

14 procedures that go along with how we operate the system and

15 the new things that we'll have to do to ensure flow

16 assurance for safe start up and shut down for the operation

17 of the Genovesa well.

18 Q    In addition to kind of everything having to fall

19 properly, do you have any safety concerns in connection with

20 the potential April 5 schedule?

21 A    Yes, I mean there's safety risks all across what we do

22 and we have to be very careful this jumper recovery as well

23 as cutting these jumpers.

24     We -- you're going to involve a vessel, a crane, and as

25 Banks said, you've got equipment that you're bringing up the

1  deck with personnel safety issues.  You've got, you know, a

2  jumper that you'll move into the field with and need to lock

3  onto equipment with a well that's -- the Santiago well just

4  adjacent to this in the field as you're bringing and

5  retrieving these pieces of equipment and relowering.

6      And of course from a hazard operations, we do have to

7  go back and review all of the ways that we operate this

8  well, the valve line ups so that there's no inadvertent, you

9  know, areas where we could end up freezing up or hydrating

10 the line while in production or during a shut down.

11           MR. STARK:  Rachel, can you pull up Exhibit 20,

12 please?  And flip to page three.

13      (Pause in the proceedings.)

14           UNKNOWN FEMALE:  Your Honor, could you please

15 make -- oh there we go.  Thank you.

16      (Pause in the proceedings.)

17 BY MR. STARK:

18 Q    There we go.  Have you seen this schedule before?

19 A    I have.

20 Q    What is this?

21 A    This is the counter proposal from Fieldwood on what

22 they would propose for the SOP activity schedule which we

23 received after we had proposed it a schedule to them at

24 Fieldwood.

25 Q    So if this were the schedule, would it be your role to

CRAIG REDDING - DIRECT BY MR. STARK                    163

1  execute this plan?

2  A    It would.  Working with the facility, managing what we

3  need to get done for both the installation and the

4  installation teams that are working this as well as the

5  facility operations for start up.

6  Q    Does this schedule give you any concerns?

7  A    It does.  The fact that you're installing the jumper

8  and commencing production within the month of April.  I

9  think this one is a little more -- leaves a little leeway.

10  Because that's within a month which this is typical of what

11  BSEE would get in their SOP or at least what they have as

12  their requirements is not a month and a day that we had.

13       So to assume that both of those April things could

14  happen as Fieldwood expressed that both of those would

15  happen in April first to fifth, I would have concerns over.

16  Q    Is there anything missing from this proposal?

17  A    The big -- the piece that's missing for me, there's a

18  line -- the second line the host facility updates ready at

19  the commissioning.  I believe they're teeing off of what

20  we're doing for the tree commissioning of the system.

21       There are a number of other management of change,

22  hazard reviews, start up assurance reviews and the pre-start

23  up safety issues as well as developing the updated operating

24  procedures.  The SOPs, we call them, done in the suspension

25  to operate this well.

CRAIG REDDING - DIRECT BY MR. STARK                    164

1       And I don't see room in here to get those updated in

2   the operators chain to actually start this well up.

3   Q    Is that a safety issue?

4   A    Absolutely.  It's a challenge enough with -- Na Kika is

5   busy as it is.  To try and get the operators off the review,

6   but to try and feel like we would be forced to meet a

7   timeline within a week of having a jumper installed and

8   getting all of those reviews, the operator training,

9   assessment done. Within the first week of April is not

10  realistic.

11  Q    Does this schedule, in your estimation, also require

12  that everything go perfectly or close there to?

13          MR. GENENDER:  Objection, leading Your Honor.

14          THE COURT:  Sustained.

15  BY MR. STARK:

16  Q    In your estimation does this schedule leave any

17  flexibility unforeseen events such as COVID, equipment

18  delays, things of that nature?

19  A    It definitely doesn't leave room for COVID.  In our

20  experience, COVID doesn't come in small batches particularly

21  with the -- our platforms.  We're currently operating on a

22  28 days hitch in rotation.

23      So if you were to have an exposure that infects part of

24  that platform, it's a pretty long duration before you can

25  get the next hitch out there and get the folks that are out

CRAIG REDDING - DIRECT BY MR. STARK                    165

1  there quarantined.

2      I would say even weather for this.  The operations in

3  February and March are a typical month where we get, you

4  know, cool fronts coming through and 15 to 20 foot seas is

5  not where you going to be installing jumpers.

6      And I think Bank had a fair assessment that allowing at

7  least seven days with the kind of vessel that we have is a

8  fair weather assessment.  But I don't believe this includes

9  that.

10 Q    Are you involved in any of the permitting in connection

11 with this project?

12 A    Yes.  Again the team -- I basically lead the team to

13 make sure the permits that we have, we recognize, you know,

14 the timing of those, the criticality of when we needed to

15 get those submitted and also working with our regulatory

16 team and engaging BSEE to look for how to we actually

17 expedite.

18 Q    How many permits are necessary for this project?

19 A    So Fieldwood will at least have -- and there maybe

20 others.  So, I think this is one of the pieces I explained

21 to Fieldwood back in December, January, Keith Rusta, to

22 compare our notes to make sure we're clear on some of the

23 I'd say field wide things, like a D-wap and a DOCD might

24 have updates.

25      While they might be minor updates, we need to make sure

1   we're addressing those while we're not putting the LSPS

2   future remediation at risk as well.  But it's -- they had

3   their lease term, pipeline permit which they indicated they

4   submitted earlier in January.

5         And same as we did yesterday, they submitted their

6   jumper decommissioning permit.  BP also has a corrective

7   action plan that we maintain with BSEE because of the

8   anomaly or the impairment on the segment of the lines

9   between Santiago and Santa Cruz.

10        We continue to update BSEE with our plans for what is

11  the near term and long term remediation.  And that was

12  submitted from BP yesterday as well.

13  Q    Has BP submitted for all of the permits that it needs

14  to at this time?

15  A    No, there are two more minor updates which require

16  other information that will feed into our safety flow

17  diagram as well as a commingling permit.  Essentially the

18  commingling permit could be submitted once we get

19  confirmation on Fieldwood has provided a segment number.

20        Once we're comfortable that that segment number and the

21  information in that lease term application is solid, we can

22  submit that.  It's a short turn around because it's just an

23  update to an existing document.  Same with the safety flow

24  diagrams.

25  Q    For the permits that BP has already submitted, what's

CRAIG REDDING - DIRECT BY MR. STARK                    167

1  the traditional turn around time in your experience?

2  A    So we've had a range of experiences with BP even in the

3  last year partly due to some mammal and acoustic

4  requirements with mammals and leak requirements and leak

5  testing.

6       For jumper decommissioning, we've had experiences up to

7  two months and we've had it as short as a couple of weeks.

8  This one we've kind of taken an overview that we would be

9  able to -- we feel we would get this permit approved in

10 three to four weeks and that includes some contingencies.

11 Q    Three to four weeks would put us at the end of February

12 or into March, correct?

13 A    Correct.  It is possible that they would come earlier.

14 We are scheduling another follow up meeting with BSEE to

15 talk through this.  And look what we need to do to expedite

16 between the BSEE pipeline office and the regional office as

17 well for these.

18       (Pause in the proceedings.)

19          MR. STARK:  Rachel, can you pull up Exhibit 24,

20 please?

21       (Pause in the proceedings.)

22 BY MR. STARK:

23 Q    Are you familiar with Exhibit 24?

24 A    Yes, I created this.

25 Q    What is different about BP's schedule such as it

CRAIG REDDING - DIRECT BY MR. STARK                    168

1  requires an additional -- I'm not much for math.  Let's call

2  it 50 days to get Genovesa online?

3  A    So our -- again it depends on -- I don't know what

4  dates Fieldwood has in their proposal because it goes to

5  just months.  If you look at the dates we currently have for

6  the Genovesa, the host facility, jumper recovery and

7  Genovesa reinstallation they're all in the same month

8  between the two timelines.

9       The only difference is that we've added the step that

10 we call the host facility readiness, which is the operation

11 procedures and has ops which all feed into our safety flow

12 diagrams and how we're going to start up the wells before we

13 actually get to opening up and starting up production for

14 ramp up.

15 Q    Why does that take so long and I guess at the same

16 time, why can't that be moved up into February?

17 A    So we are starting in February with some of those

18 activities.  So for instance right now, some of our key

19 participants we would have in hazad op update.  They're

20 unavailable because the Na Kika's based operations going

21 through a re-assessment, re-validation of the hazard op for

22 the facility in all the sub-sea.

23      So some of the key folks that we would need are just

24 not available for this.  We -- you know, there's other parts

25 of these that we are doing.  So if Fieldwood will develop

1   their updated SOPs and we are scheduling and planning the

2   review process for those with our contractor Wood and then

3   with the BP personnel in our team to make sure that we get

4   the procedures themselves before we actually pull in all the

5   operators in from offshore to do the views, the assessments

6   and the training.

7   Q    Did you hear testimony earlier this evening about the

8   idea that if Manuel came on line before Genovesa it would

9   drain the reservoir?

10  A    I did here that.

11  Q    If Manuel came on line one, two, maybe even three

12  months before Genovesa, would it drain the reservoir?

13  A    You wouldn't gain enough production to drain the

14  reservoir.  I think they are competing potentially from what

15  I understand.  But whether it's five days or a month of

16  production between two different pieces on a well that you'd

17  expect, I would guess, you expect to last for five years I

18  don't think you would see much of a difference in the

19  reservoir pressure.  But not my area of expertise.  I'm a

20  sub-sea.  Relatively short duration, limited production.

21  Q    Thank you.

22         MR. STARK:  Pass the witness.

23         THE COURT:  Thank you.  Mr. Redding, Mr. Bhat's

24  said that it would only take, I believe, two pressure caps.

25  You're saying it takes four pressure caps.  Can you explain

1   to me what that -- how you understand that difference to

2   arise?  I'm just trying to get a better understanding of the

3   pressure cap requirement.

4           THE WITNESS:  So each time you remove a jumper

5   there's two ends.  Each one of those ends you've got to

6   cover up and put a barrier there.  So, you would need -- so

7   when you pull the Genovesa jumper, you need a trendsetter

8   and a One Subsea cap to put in its place.

9           I don't know when Mr. Bhat was referring to the

10  one cap whether he would intend to leave one of those open

11  the environment and not have a barrier or whether he was

12  just referring to the Genovesa cap that they owned and he

13  did mention they would get others from that they would from

14  potentially other operators.  But you need two for each

15  jumper.

16          THE COURT:  Two for each jumper you're removing or

17  two for the new jumper?

18          THE WITNESS:  You need -- when you remove one

19  jumper, you need two.  So the Genovesa you need one

20  trendsetter and One Subsea cap and then we will use the cap

21  that we install there to flush our jumper into the roger

22  flow line section which enables us to remove the Santiago

23  flow line jumper.

24          And to replace that you need two tested barriers,

25  you need two caps there.  So, there's three of the One

CRAIG REDDING - DIRECT BY MR. STARK                171

 1   Subsea caps and one of the trendsetter cap that will be
 2   needed until the replacement jumper is built.  Equals four.
 3          THE COURT:  It sounds to me like that there were
 4   two critical path issues in your testimony.
 5          THE WITNESS:  Yes.
 6          THE COURT:  One -- and I don't have this actually
 7   all drawn out, but one sounds like delivery of sufficient
 8   number of pressure caps.  And another sounds like
 9   permitting.
10          And that if those two things could be accelerated
11   to earlier dates, that the whole schedule would then be
12   completed earlier because those are your two delays in the
13   critical path.
14          Am I right about that or am I not understanding
15   your testimony correctly?
16          THE WITNESS:  You could potentially accelerate so
17   there's three things for these kinds of mobilization.  So
18   you need the equipment, you need the procedures and
19   personnel all in risk assessment, and then you need vessel
20   readiness.
21          Currently we are working on that vessel readiness
22   for the last week of February as a contingency and it could
23   move that forward up to a week.
24          THE COURT:  But if -- again I'm trying to absorb
25   your testimony.  Let's assume that the critical path was the

CRAIG REDDING - DIRECT BY MR. STARK                    172

1    caps.  If Fieldwood delivered you caps tomorrow would your

2    whole schedule then move to an earlier date or am I

3    misunderstanding your testimony?

4            THE WITNESS:  It would move to an earlier date

5    pending the availability of the procedures and the vessel

6    readiness as well.  It would not -- if they gave us caps

7    tomorrow, it would not accelerate 26 days.  It may come

8    forward five or seven days is my estimation based on the

9    knowledge of the other equipment that we need both from

10   Fieldwood and the technician agreement that we'll need in

11   place as well as commercial agreements to access each others

12   equipment.

13           THE COURT:  All right, thank you.  Mr. Genender?

14           MR. GENENDER:  Thank you, Your Honor.

15              CROSS-EXAMINATION OF CRAIG REDDING

16   BY MR. GENENDER:

17   Q    Good evening Mr. Redding, how are you doing?

18   A    Well fine, sir.  How about yourself?

19   Q    I'm doing well, thank you.  So you work -- you knew

20   Mr. Bhat when he worked at BP, didn't you?

21   A    I did not personally know Mr. Bhat, no.

22   Q    How long have you worked with him since he's been at

23   Fieldwood?

24   A    I was introduced to Mr. Bhat it must have been

25   somewhere around September when I started engaging on the

1  diagnostic work.  Somewhere August, September.

2  Q    Now, you went through -- you were asked a number of

3  questions about scheduling and when things could be done in

4  April, May or otherwise.  Those all assumed that BP was the

5  operator, right?

6  A    Correct.

7  Q    Why not let Fieldwood be the operator and then BP

8  operate to support and cooperate with Fieldwood and let

9  Fieldwood then do its best to bring this well on line by

10 April 5th?

11 A    So I don't believe that Fieldwood has an acceleration

12 timing.  We've talked about schedules provided to us with --

13 in our weekly calls and none of the schedules you've

14 provided show that you have the equipment or the

15 availability to do some of this any faster.

16 Q    Did you hear Mr. Bhat's testimony today?

17 A    I did.

18 Q    Did you hear him talk about equipment?

19 A    I did.

20 Q    And did you hear him talk about caps?

21 A    He has inquired with others to -- and I don't know that

22 he's got four.  He's said he has one.

23 Q    Okay, did you hear his testimony that he can get more?

24 A    Yes, that's a possibility.  Yes, I did hear his

25 testimony.

1  Q     Do you take him at his word?

2  A     I do.  But we have asked whether Fieldwood could

3  support us by getting caps earlier back in January and the

4  answer was no, that the one that they had removed was the

5  only one they had access to at that time.

6  Q     You were asked questions about the schedule that you

7  prepared that showed the May 31 date to bring Genovesa

8  online.  That's a schedule that -- you prepared that, right?

9  A     Correct.

10 Q     And you prepared that to be attached to an SOP, right?

11 A     I prepared that as a proposal for you guys as a series

12 of clearly what the BSEE called deadline it's not the

13 earliest possible dates.  It's like I would call the P50 as

14 I don't want to promise or commit to what BSEE has as a

15 required SOP deadline which -- and so we actually have some

16 of that contingency there, yes.

17 Q     Are you aware that BSEE requires a schedule that's

18 submitted to be months year as opposed to a specific day and

19 a month?  Are you aware of that?

20 A     Yes.

21 Q     So your schedule actually doesn't comply with how BSEE

22 would want it because it has specific pinpoint dates within

23 February, March, April and May, right?

24 A     Correct, but we're not submitting the SOP.  We're

25 suggesting dates for you.  That's what you asked for.

1    Q    Well, wasn't that a schedule that you wanted -- excuse

2    me.  Are you taking the position that's not a schedule that

3    was provided to Fieldwood to attach to Fieldwood's SOP?

4    A    It was a schedule that we provided based on a series of

5    milestones we thought we could meet and then Fieldwood would

6    need to meet the SOP requirement.

7    Q    Okay, so when Fieldwood says April 20 -- April 4/21 I

8    should say, that means some date in April, right on an SOP

9    schedule right?

10   A    Correct.

11   Q    And when you're dealing with an SOP, your dealing with

12   a situation in which a well is not brought online by April

13   5th, right?

14   A    Yes.

15   Q    Do you want the well to be brought online by April 5th,

16   sir?

17   A    Absolutely.  I'd like to get -- you know BP has value

18   in production from any of these assets as long as we can do

19   so safely.

20   Q    BP doesn't have ownership in the Genovesa well, does

21   it?

22   A    We don't have ownership in the well, but we do have --

23   it is a source of income for us this year.

24   Q    Now, are you aware that in early November of 2020

25   Fieldwood provided BP a schedule to do the single flow line

1  option?

2  A    Yes.

3  Q    And are you aware that a schedule was provided in

4  earlier January that showed a six to eight week period of

5  time to the single flow line option?

6  A    I am aware, yes.

7  Q    Yeah.  And BP didn't provide a schedule to Fieldwood

8  until January 28th, within an hour of our first status

9  hearing before Judge Isgur.  Are you aware of that?

10 A    For your SOP request but we did provide schedules in

11 the December and January co-owner meetings as well as in a

12 review of the schedule with Bank on December 18th. Friday

13 afternoon where we provided lots of feedback for gaps in the

14 Fieldwood schedule and they were going to address.

15 Q    And you heard the testimony earlier from your colleague

16 about the October 2020 co-owners meeting in which is was

17 represented -- an option was represented whereby Isabella

18 could come online Q4 and Genovesa would come online Q1 of

19 2021.  Do you recall that testimony?

20 A    I do yes.

21 Q    Were you at that meeting?

22 A    Yes.  I believe I presented that -- they introduced

23 that slide.

24 Q    Okay and did you believe it was true at the time you

25 presented it?

1  A    It was best estimate we had based on the knowledge in

2  October where we thought maybe an opportunity depending on

3  when we found what the leak source was and how we would

4  remediate, yes.

5  Q    So you believed it was accurate when you presented it,

6  right, to the best of your knowledge?

7  A    Yes.

8  Q    Thank you.  When was the -- when was the leak in the

9  LL -- in the loop system when was that leak -- when did you

10  first learn about it?

11  A    The leak in the system I learned about it sometime

12  around July 4th, July 7th.  Somewhere right after July 4th.

13  Q    Of what year?

14  A    This year.

15  Q    Well, not this year.  We haven't had that date yet.

16  A    Oh, sorry 2020.  Sorry, yes July 4, 2020 when we were

17  performing dead oil operations is the first time we saw

18  production leaking from that.

19  Q    Do you know -- when was the first time you suspected

20  there was a leak in the loop system?

21  A    April, 2020.

22  Q    Of what year?  Okay.  Have you heard anyone else at BP

23  to have known of the leak in the loop system prior to April

24  of 2020?

25  A    No.  Not --

1 Q    Have you heard anyone mention -- go ahead, please.

2 A    So not in April.  We realized later in July that there

3 were some anomalies that could have been ingress prior to

4 the 2020.

5 Q    Are you aware of anyone at BP knowing of the anomaly

6 prior to April of 2020?

7 A    No.

8 Q    What has BP done to advance Genovesa coming online

9 since January 28th?

10 A    January 28th, we've continued to work on developing an

11 integrated schedule which is kind of the first step in

12 managing the project change.  As well as working without

13 vendor, Sea Innovation.  As well as One Subsea to progress

14 the pressure caps and the mobilization for this.

15      As well as what we're doing on the start-up assurance

16 readiness.  So we revamped and updated last Thursday with

17 Fieldwood to review all of what might be changing or needs

18 to be updated to provide the startup assurance process.

19 Q    What was done on Friday, the 29th by BP?

20 A    I can't recall.  I'd have to look at the schedule for

21 what we had those dates.

22 Q    What was done on Saturday or Sunday, this past weekend,

23 the 30th and 31st to advance Genovesa coming online?

24 A    This Saturday?

25 Q    Yeah, what --

1  A    One Subsea was working on their equipment is all I'm

2  aware of for the weekend.

3  Q    Is BP committed to working 24/7 to bring this well

4  online?

5  A    I don't think that any of our projects -- unless

6  there's life, limb and environmental leakage -- where we

7  operate on a 24/7 basis with ship work and engineers around

8  the clock and through the weekend.  No, that is not out

9  plan.

10  Q    How are you able to meet your target to get Isabella

11  online in Q4, but you can't meet the target to get your Q1

12  2021 target to get Genovesa online?

13  A    So Isabella was a very different start up.  It did not

14  require retrieving any subsea activity to be offshore in the

15  field.  It didn't require revalidation of a full haz op of a

16  loop system or permits for removing or requesting new flow

17  line segments.

18  Q    Are you willing to try and do everything in BP's power

19  to bring this well online by April 5th?

20  A    We are working with our team and the vessel contractors

21  and vendors to do everything we can to bring this in.  And

22  we're working with Fieldwood to generate what we think is a

23  pragmatic schedule that addresses the risks to identify what

24  the real opportunity is there and bring it on as soon as

25  practical in a safe way.

1  Q    Okay, have you ever raised the safety issue with BP, I

2  mean, excuse me, with Fieldwood?

3  A    Not with Fieldwood, no.

4  Q    Okay, thank you.  You have not raised the safety issue

5  with Fieldwood prior to your testimony today; is that right?

6  A    Not on -- no, not with Fieldwood.

7  Q    Thank you, sir.

8       When is Manuel supposed to come online?

9  A    I don't know when it was supposed to come online or

10 when it is.  I'm not involved in the Manuel project nor do I

11 schedule my activities related to any Manuel activity.

12         THE COURT:  So let me ask.  Are you telling me

13 that Manuel does not get priority over Genovesa?

14         THE WITNESS:  So, I'm not involved in the

15 commercial agreements on this.  But as I'm scheduling the

16 technical work that we're performing with both One Subsea

17 and Sea Innovation, there's no interface on this with

18 Manuel.

19         As a matter of fact, if you look at some of the

20 activities that we're doing offshore, we are still

21 maintaining to do your tree commissioning in mid-February.

22 We've got our slot and we're holding to that.

23         We were able to complete your software uploads and

24 updates a week ago for you guys, in addition to what we have

25 for Manuel.

1          THE COURT:  No, I mean the prior witness said that

2    you were giving -- not that you personally, but that BP was

3    giving priority under the agreement to Manuel rather than to

4    this project.

5          And I think I hear you telling me you're the guy

6    out doing it and you're not giving that priority.  And I

7    just want to understand if I follow you right.

8          THE WITNESS:  I would say that's correct.  I think

9    one of the challenges with this project is being a late

10   change as we're getting a schedule.  And we're trying to get

11   activity planned. Right now we are within -- what we've got

12   a six and 12 basis -- so within 12 weeks we schedule

13   activity.

14         So you would look and see that my placeholder

15   forecast a mid-April date currently with the facility.

16   Because I can try to hold that date within the processes we

17   have.  I don't know when Manuel is.  I don't ask that when

18   I'm asking for those dates.

19          THE COURT:  Thank you, sir.

20          Go ahead Mr. Genender.

21          MR. GENENDER:  Can we pull up -- thank you, Your

22   Honor.  Can we pull up, Erin what -- let me get you the

23   number.  Bear with me.  834-9, please.

24          Your Honor, is Ms. Choi the presenter, I hope.

25          UNKNOWN MALE:  I apologize, Your Honor.  I even

1    have a sign on the door.

2            THE COURT:  Sorry, I didn't hear that.  I'm

3    looking for Ms. Choi, I'm not seeing her.  There she is.

4    Got her.  All right, Ms. Choi is the presenter.

5            MR. GENENDER:  Thank you.  834-9, Erin.  Thank

6    you.  All right, if we can go to the next page.

7    BY MR. GENENDER:

8    Q    Mr. Redding have you seen this letter before,

9    November 3rd, 2020 letter from Fieldwood to BP attention

10   Jordan Janic (phonetic)?

11   A    Yes.

12   Q    All right.  And --

13   A    It had a schedule with it.

14   Q    And it does have a schedule -- did you say it does have

15   a schedule with it?

16   A    Yes.  That's the one I recall, yes.

17   Q    Yes it has a schedule with it.  And do you recall when,

18   if ever, BP responded to this letter and this schedule?

19   A    I don't know if -- when we firmly responded.  And we

20   talked about it in our technical meetings.  Not in detail

21   and, you know, in our weekly meetings.

22       I think the first time I went through a detailed

23   schedule with Bank was December 18th.  That was the first

24   time outside of these agreements I had received that

25   detailed schedule.

CRAIG REDDING - CROSS BY MR. GENENDER                    183

1  Q    Okay and if we can go -- and you recall this letter

2  actually attaches some of the diagrams that Mr. Bhat

3  testified to.  If we can go to --

4  A    Sure.

5  Q    -- the first page after the signature, Erin.  Yeah do

6  you recognize that as the same diagram Mr. Bhat was

7  testifying about this afternoon?  It felt like this morning.

8  A    Yeah it looks like without some of the boxes he had,

9  but maybe yeah.  I'm familiar with the layout.

10 Q    Yes and then you see there's a schedule -- there are

11 schedules throughout as you referenced.  Do you recall that

12 in this document?

13 A    I remember a Microsoft project view of a schedule that

14 was attached if this is the same.

15 Q    Yeah.

16       MR. GENENDER:  Erin, if we can get to the page

17 that says, "Genovesa single flow line detailed schedule."

18 If you can just scroll down I'll let you know when we get

19 there.  I don't have the ECF page Erin, I'm sorry.  Keep

20 going.  It's a horizontal page.

21       There we go.  There we go.  Okay.

22 BY MR. GENENDER:

23 Q    Are you able to -- do you recognize that -- thank you.

24 Thank you so much.

25       Mr. Redding, do you -- is this the schedule you're

1  referring to?

2  A    I remember seeing this schedule with it.  This was not

3  what was provided in December.

4  Q    Okay, this was what actually was provided on November

5  3rd, wasn't it?

6  A    Yes.

7  Q    And it talks about something starting -- it talks about

8  a completion -- Genovesa start up happening around February

9  10th, doesn't it?  If you look lower right, Genovesa start

10 up.

11 A    Yeah it does.

12 Q    Okay.  February 11th, I should say.  Do you see that?

13 A    Yeah.

14 Q    It's a pretty detailed schedule isn't it?

15 A    I would say it has some gaps, but yes there's a fair

16 bit of detail focused on the -- only the jumper activities

17 but none of the operational updates and haz ops and start up

18 assurance activities that.

19 Q    So, Mr. Redding, what exactly has BP done since

20 November 3rd to today to move this project along?

21 A    So, our --

22 Q    It doesn't appear -- because it doesn't appear very

23 much.

24 A    Well I'm going to disagree.

25           THE COURT:  I'm going to strike the comment.  Hold

1    on.

2              Mr. Genender, ask him a question.  Don't make a

3    comment like that.

4              MR. GENENDER:  Sure.  Okay, Your Honor.

5    BY MR. GENENDER:

6    Q    Mr. Redding, what exactly has BP done since November

7    3rd until today to bring Genovesa online?

8    A    So our focus was to re-establish loop.  At this time,

9    when this proposal was offered, I don't recall the date.  It

10   was sometime early November, you'll see the start date for

11   moving forward in this proposal was before we had actually

12   finalized and understood what the leak mechanism was for the

13   LSPS and whether or not we could fix that or whether it was

14   going to be a major repair.

15        We did not have that data at the time.  Our focus

16   through November was to find the leak location.  Try to

17   remediate to establish the loop and you guys agreed with us

18   on that in December.

19        That was our focus, not feasibility.

20   Q    Thank you, sir.  This letter -- this November 3rd

21   letter was sometime after you'd already -- you had already,

22   you personally had already presented and said that Genovesa

23   presented an option where Genovesa comes Q1 of 21.

24   A    That is correct.  Yes there was an asterisks in my

25   concept selection that said the schedule and the cost plus

1   or minus 25 percent.

2       And so 1Q could be 2Q when you consider the schedule

3   contingency there with 25 percent.

4   Q    It also could be January, couldn't it?

5   A    It could, yes.  It all depended on what the start date.

6   Q    And you promised -- you committed to Fieldwood to do a

7   parallel path, didn't you?

8   A    We offered it as an option and we looked at what that

9   option would then entail relative to the -- what we were

10  perusing for the leak remediation (indiscernible).  And in

11  December I believe you guys and us agreed that the decision

12  path on feasibility on whether or not that option was even

13  feasible would be decided after you performed your flow

14  assurance analysis which completed December 28th with Rev

15  Sea of your flow assurance report.

16          MR. GENENDER:  If we can put up -- can we put up

17  the demonstrative, please Erin?  First page of the

18  comparable timelines please.

19      (Pause in the proceedings.)

20  BY MR. GENENDER:

21  Q    All right.  So would you agree, Mr. Redding, with this

22  demonstrative on the right hand column is consist with

23  Exhibit 24 that your counsel showed you those dates?

24  A    Correct.

25  Q    Okay and I believe you testified that you agreed with

1  Mr. Bhat that there is some cushion on the deadline between

2  BP jumper recovery and Genovesa jumper reinstallation,

3  right?

4  A    As I assembled that schedule, yes.  But as I think I

5  also testified, the cap availability is currently the

6  critical path.  Which is looking like the pressure cap

7  itself would be critical path to end of February, first of

8  March.

9  Q    Okay.  And as Judge Isgur asked you, if Fieldwood gets

10 you the pressure caps that you need, that issue -- that's

11 not a -- that's no longer an impediment, is it?

12 A    That's correct.  We would move to what the next

13 critical path would be.

14 Q    And you don't need a month between BP jumper recovery

15 and Genovesa jumper reinstallation, do you?

16 A    Well, you may.  Depending on your fabrication and the

17 reinstallation of that and the weather window and vessel for

18 that second mobilization.

19 Q    Because you'd agree with me that when you get through

20 BP jumper recovery Santiago flow line, that the two dates

21 aren't that far apart.  They're nine days apart, right?

22 A    Yeah.  I think once you've finished the Santiago flow

23 line jumper recovery, you've got 10 days of fabrication time

24 is what you guys had indicated to us previously.  Then we

25 built into our schedule and then we've got a jumper

CRAIG REDDING - CROSS BY MR. GENENDER                188

1   installation and the leak testing and we've got some weather

2   contingency built into that.  That's what makes up the

3   month.

4   Q    Okay.  So -- but you'd agree with me that at one point

5   with a line that says, "BP jumper recovery, Santiago flow

6   line" the two -- your timeline and Fieldwood's are only nine

7   days apart, right?

8   A    It appears, yes.

9   Q    Okay.  And if you carried those nine days later for

10   each one of the remaining Fieldwood deadlines and you added

11   it to March 26th, you'd still have this done by April 5th,

12   wouldn't you?

13   A    I don't follow.  So nine days from --

14   Q    So Fieldwood is saying it can have the well online 20

15   days after the BP jumper recovery of Santiago flow line is

16   done.  And if you took 20 -- if you took the same 20 days it

17   would be April 4th, wouldn't it?

18   A    It would.

19   Q    Thank you, sir.

20          MR. GENENDER:  I'll pass the witness.

21               EXAMINATION OF CRAIG REDDING

22          BY THE COURT:  Mr. Redding, I'm going to go back

23   to the critical path for a minute to get a better

24   understanding.  Can we leave that chart up for a minute?

25       (Pause in the proceedings.)

CRAIG REDDING - EXAMINATION BY THE COURT                    189

1          THE COURT:  Would you talk to me about why

2     fabrication needs to wait until the current jumpers are

3     removed rather than the fabrication starting right away?

4          THE WITNESS:  So there's a risk that -- you could

5     take a risk of whether or not you can install if you did it

6     sooner.  But I think as Mr. Bhat had even mentioned, that

7     when we our jumper, we take a scan -- a detailed scan of

8     those measurements between their jumper and ours.

9          Takes into account any flow line movement and

10    that's what you would make your final fabrication welds.  So

11    they would be three welds they should be making after they

12    get those measurements and the analysis that you update for

13    that.  That's what makes it 10 days,

14         THE COURT:  So, would you start the fabrication

15    and then do those final minor measurements?

16         THE WITNESS:  Yes.

17         THE COURT:  And of course that's in both of your

18    different paths here was fabrication would have started much

19    earlier.  That's the finished fabrication.

20         THE WITNESS:  Absolutely a must, yes.  I think

21    there may be somewhere on the order of ten welds or more

22    that you'd have with all the elbows and things to make up

23    this jumper.  And so you wait for those, what we call the

24    final fabrication.

25         So you pre-fabricate the jumper and with the

1  measurements -- what we call metrology -- then you do your

2  final analysis and welding.

3          THE COURT:  And I think you discussed this with

4  your lawyer earlier.  But I'm also looking at the -- all the

5  safety issues on the host facility.  And I heard you say

6  that you can't do the very final ones until you've actually

7  connected.  I believe you've told me that.

8          THE WITNESS:  Yes.

9          THE COURT:  Why can't the vast majority of the

10 host facility readiness work -- start now?  In other words,

11 all the documentation and all the procedures being designed

12 and an awful lot of the training.  Why does that wait and

13 not really start until April 15th?  I'm not following that

14 and I need a better understanding of it.

15         THE WITNESS:  Yeah, it doesn't wait.  So, Your

16 Honor, we have with Fieldwood throughout December a number

17 of the documents.  We create what's called a MDR, a master

18 document register.

19         We work with Fieldwood to come up with a smart way

20 to streamline the documents for this.  In case this

21 operation were to go forward, that we would have documents

22 for this single flow line operation without having to redo

23 all the documents they had already submitted as part of

24 their normal tie-ins.

25         So we have been working with them to progress that

1    as part of the feasibility through December and working to

2    get and receive and distribute those documents in January.

3              THE COURT:  And what's the 30 days then for?

4              THE WITNESS:  So part of this is contingency as

5    well with schedule of ramp up.  So right now we're outside

6    of a 12 week window for planning some of these activities.

7    We will need to make sure we've got operator training, our

8    SOP updates, the review to those SOP updates.

9              We have to revalidate our haz op again with the

10   changes we're making to this facility through our -- what we

11   call our MOC process.  And so each of those has some

12   duration associated with them that we got into the schedule.

13             And currently based on our start up assurance

14   process we've kind of reviewed with Fieldwood what changes

15   and what doesn't.  And this is all an estimate at this

16   point, but it's based on our experience with these types of

17   documents and where we would be able to plan the startup and

18   people that would be out for that start up in the September

19   or April, May time frame.  Sorry.

20             THE COURT:  All right.  Thank you.  Mr. Stark?

21             MR. STARK:  Thank you, Your Honor.

22               REDIRECT EXAMINATION OF CRAIG REDDING

23   BY MR. STARK:

24   Q    Mr. Redding, I know this is not a fair question, but

25   I'll ask it anyway.  Can you list from start to finish

1  everything BP has done to get this well online?

2  A    You're right it's not a fair question without me going

3  back through with the team that we worked.  So things that

4  we did focus on is coming up with a more straightforward and

5  simplified way in December, right.

6       So if Fieldwood in the original proposals when we were

7  considering this concept in October and November we were

8  finding challenges with LDHI that were almost going to make

9  this impractical.

10      And when we shared that, the ability for Fieldwood to

11 operate this well with LDHI like we do some other wells,

12 both Fieldwood and us came to an understanding and agreement

13 that we could operate within a water limit to run methanol.

14      So that was huge because it doesn't require changing

15 tubes outside or subsea that might or installing a new LDHI

16 which could take many months more than the current schedule.

17      So that was one kind of optimization piece that we

18 worked on with Fieldwood as well as the documentation to

19 stream line how they could come up with a clean set of

20 documentation that we could easily reverse out if we found

21 that the remediation worked.

22      Further to that, we assigned an additional project

23 manager focused on just the jumper change out.  So the

24 project manager that reports to me that's been managing the

25 Genovesa broader project activities for the last -- more

1   than a year, Michael Winslow.

2       I added another project manager from IT to deprioritize

3   what he's working on in the near term to come and manage

4   directly the vessel and the readiness for the vessel

5   campaign.  So that Michael can focus on the overall

6   schedule, the operations readiness as well as what

7   Mr. Hermanson (phonetic) would be doing to drive the

8   procedures with our installation vessel team.

9       So we continued to work those.  We've had reviews with

10  our internal groups to test how efficient we can be with

11  MOC's as we develop this schedule and share this schedule

12  with Fieldwood.

13      The deterministic view is going to continue to change

14  every day.  No schedule is right until the work is done.

15  It's unfortunate but -- so we work off of estimations and

16  within our six and 12 process for scheduling work, I think

17  it's key to get placeholders on that schedule as soon as we

18  can.

19      Now, which we have done, as a tentative placeholder

20  until we actually get all the documentation and requirements

21  upfront to get within that six week or the two week window

22  to get the agreement from the APM that owns the priority of

23  all of this.

24      I think, you know, further than that, you know, we

25  continue to be open and collaborative with Bank, Troy and

1   Anne McDonald in sharing -- particularly up through the last

2   week -- you know, what our estimation is on schedule, what

3   our risks are.  And they've been very collaborative in

4   addressing how we would close some of those issues out.

5        And a lot of those you don't see on these schedules,

6   so.

7   Q    Thank you, sir.

8             MR. STARK:  Pass the witness.

9             THE COURT:  Thank you.  Mr. Genender?

10            MR. GENENDER:  Thank you, Your Honor.

11              RECROSS-EXAMINATION OF CRAIG REDDING

12  BY MR. GENENDER:

13  Q    You were asked everything that you've done to get

14  Genovesa online.  But isn't it the case that you-all

15  prioritized Isabella to get it online Q1 even though --

16  right?

17  A    So it wasn't a priority issue.  It was a completely

18  different scope and a different team that was working that

19  to evaluate what they would do.  But yes it did come online

20  in December.  That was five months.  We're looking at doing

21  this in four months.

22  Q    Five months from when?

23  A    Five months from when they started looking at, you

24  know, this issue that we found in July.  And they did not

25  require having to deconstruct the loop or the loop

1  operations.  And so it didn't require offshore activity to

2  remove jumpers like the Genovesa well would have.

3  Q    So you're saying that -- sorry, go ahead.  I didn't

4  mean to step on --

5  A    I'd say at the same time we started to look at the long

6  term operations for Genovesa as well.  Which we proposed in

7  the October meeting as a concept where not only would you be

8  down for two years, but there may be an opportunity for you

9  to get production while we're working to deliver the

10 equipment for the replacement project.

11 Q    But Mr. Redding, you said you went five months for

12 Isabella.  That's from July, I guess you said when you

13 learned of the leak to December.  That leak that you learned

14 about effects Genovesa as well and your proposed schedule

15 April, May is 10 months later, isn't it?

16 A    But the start date for my schedule in Genovesa we made

17 the decision that we would accept the feasibility that we

18 assessed in January.  That was what was communicated and we

19 worked on this since October with you guys.

20 Q    But you guys controlled -- you'd agree Mr. Redding that

21 BP controlled when it decided to finally submit a schedule

22 12 weeks out, like you said.  You only look 12 weeks out.

23 But you guys -- it was your decision when to submit a

24 schedule to Fieldwood, right?  That you would commit to?

25 A    It was my decision -- not my decision, if I read that

1  right, when we would commit to a schedule.  I think in

2  November our focus was to find the leak.  In December it was

3  to try to remediate the leak and assess the feasibility of a

4  single flow line plan that we had proposed to you guys in

5  October.

6  Q    Isn't it the case, Mr. Redding, that Fieldwood paid

7  $500,000 -- took you up on your offer for a parallel path

8  and paid $500,000 for, as part of that?

9  A    Correct.  There was a feasibility ASE assessment where

10 you guys authorized us to work on this feasibility work,

11 yes.

12 Q    Yes.  So you-all found the leak in July.  We took you

13 up on the offer to do a parallel path and paid $500,000 for

14 a single -- what was it called?  A soul benefit ASE, right?

15 A    We did in December, I think it was, yes.

16 Q    Yes.  And we didn't -- from December forward, it took

17 until January 28th when we brought -- came before this Court

18 to get a schedule from you-all, right?

19 A    That's not true.  So we reviewed schedule with you guys

20 December 18th.  You had a schedule that had a number of

21 gaps. I reviewed that with Bank and provided feedback and

22 you guys were going to go remediate that.

23       There were linkages missing on permits.  There were

24 missing opportunities with the operational procedures.  All

25 of the, essentially start up assurance work you guys didn't

1  have in your schedules in November or December.

2     And I don't think you've got them in your schedule

3  today.

4  Q    You're not opposed to letting Fieldwood operate this --

5  operate the single flow line option are you?

6  A    I have some reservations based on the risk of what we

7  experienced in April.  But I'm not completely opposed, no.

8  I think when you say operate to perform jumper change outs,

9  that is something we've talked about and considered what we

10 would use there.

11          MR. STARK:  Pass the witness.  Thank you, Your

12 Honor.

13          THE COURT:  Thank you.

14          Mr. Skelton?

15              CROSS-EXAMINATION OF CRAIG REDDING

16 BY MR. SKELTON:

17 Q    Yes, Mr. Redding you'll agree with me that its not the

18 responsibility of the parties like Fieldwood and my clients

19 -- Red Willow and HEDV -- to maintain the loop.  That's

20 your -- that's BP's responsibility isn't it?

21 A    It is.

22 Q    All right.  And you're aware aren't you that the real

23 root cause of the leak which has necessitated the shutting

24 down of the loop was hydrate formation?

25 A    No.

1  Q     Well, were you involved a presentation to the co-owners

2  on January 21st concerning LSPS investigation update?

3  A     Yes.

4  Q     And did not BP represent to my clients and Fieldwood

5  that internal hydrate formation in the sealing area, bonnet

6  and actuators, supports blockage only allows an ingress leak

7  until system is oils and melts the hydrate.

8        Did you have anything to do with that presentation?

9  A     Yes.

10 Q     And do you agree?  Was that a factually correct

11 statement?

12 A     So it's not the cause as I think -- I don't recall

13 specifically what the slide says.  It's not the cause of the

14 leak.  The cause of the leak is the bonnet field and about.

15 Q     Is the statement I just read to you truthful or not?

16 A     Could you read that again?  I don't -- I was

17 participating in the presentation.  I don't know what the

18 statement.  Read that again, please.

19 Q     Internal hydrate formation in the sealing area, (bonnet

20 and actuator) supports why blockage only allows an ingress

21 leak until sea system is hot oils.  Hot oiled (melts the

22 hydrate.)  Is that true or false?

23 A     I'd say that hydrates can mask the leak or the ability

24 to see that leak, yes.

25            MR. SKELTON:  Objection, non-responsive.

CRAIG REDDING - CROSS BY MR. SKELTON                    199

1   BY MR. SKELTON:

2   Q    Is it true or false?

3   A    It is not true that hydrates cause the leak.

4   Q    Okay well then why would BP make the statement to the

5   other owners of the LSPS to that effect?

6   A    So I don't know if you can bring up the slide.  I

7   probably talked to the slide, I think, because of the leak

8   is a failure of a seal on a valve.  That leak has been

9   masked over time by hydrates that can form when you get

10  water ingressing into the valve.

11       And then you get gas exposure which causes -- which

12  prevents the leak from occurring over time.  So that's why

13  BP didn't recognize the leak previously.

14  Q    Well, okay.  But BP sure recognized the hydrate because

15  your presentation also includes photographs taken in May of

16  2019 showing "hydrate and insulation damage."

17       Why did BP wait from May 2019 to sometime in 2020 to

18  investigate and remediate this hydrate formation in the very

19  location where the leak has been determined to occur?

20  A    So I don't think BP recognized or knew there was a leak

21  at that location.  We did not -- it was -- operations in

22  April of 2020 when Fieldwood was disconnecting valves is

23  what drove us to go look for where the leak would be coming

24  from.

25       So it didn't -- I think what we explained in that

CRAIG REDDING - CROSS BY MR. SKELTON                    200

1  session with the co-owners that we had confirmed that

2  Fieldwood did not cause or exacerbate the leak.  But you

3  enabled an anomaly that drove us to go and discover that

4  leak.

5  Q    Well, certainly you'll agree that Fieldwood and the

6  other working interest owners I represent did not cause the

7  leak, did they?

8  A    Correct.  I think that's what I stated.

9  Q    And the only reason that a single flow line plan is

10 necessary is because of a leak that was no -- not caused by

11 my clients or Fieldwood exist; isn't that correct?

12 A    Correct.

13 Q    And the reason the loop is shut down at least on the

14 side where my clients need to produce is because of the

15 leak?

16 A    That is correct.

17 Q    And the reason Isabella can produce on the other side

18 of the loop is because its production doesn't have to go

19 through the Plim that is leaking?

20 A    Not specific just the Plim, but we have two isolation

21 and a monitor point between those two isolation.  I think

22 Bank had also noted that you need to barriers.  So we do

23 have those two barriers between the Plim that's impaired and

24 the Isabella Plim.

25 Q    And isn't hydrate formations something that BP as LSPS

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

CRAIG REDDING - CROSS BY MR. SKELTON                    201

1  operator should be extremely diligent in identifying and

2  remediate?

3  A    I guess I'm not sure what the question is there.  Yes,

4  if there are hydrates we would remediate.  Our flow

5  assurance strategy avoids that by allowing us the hot oil

6  circulation during any plan shut down or inadvertent shut

7  down within a period of time within the cool down period to

8  prevent hydrate formation in the loop.  Which is why the

9  loop is so beneficial for all of us long term.

10 Q    Okay and but that kind of begs this question.  Why is

11 it that if your ROV down there 5,000 feet, 6,000 feet

12 underwater identified clear hydrate formation in the very

13 location where this leak is occurring.  Why didn't BP do

14 anything about it?

15 A    I can't speak to that --

16           THE COURT:  Why is this relevant to what we're

17 doing, Mr. Skelton?

18           MR. SKELTON:  It's relevant for a couple of

19 reasons.  First of all, the rush -- this witness has

20 testified about 10 days, 15 days, 20 days.  The reason we're

21 in such an all fired hurry here is because BP fell asleep at

22 the switch and didn't do what it was supposed to do.

23           This is nothing to do with any negligence or wrong

24 doing by the working interest owners.

25           THE COURT:  That's not been an issue and by one

1  witness at any point in the day.  This isn't relevant.  Move

2  to something that is.

3          MR. SKELTON:  I'll pass the witness, Your Honor.

4          THE COURT:  Thank you.

5          Mr. Stark?

6          MR. STARK:  Briefly, Your Honor.

7          FURTHER REDIRECT EXAMINATION OF CRAIG REDDING

8  BY MR. STARK:

9  Q    When did BP identify the source of the leak?

10 A    On or about November 14th.

11 Q    So not in July, 2020, correct?

12 A    No.  In July we identified that there was a leak that

13 was occurring.  It took several vessel mobilizations to

14 remove and find -- and pinpoint where and what was causing

15 it.

16 Q    Why did it take several vessel mobilizations between

17 July and November to finally identify the source of the

18 leak?

19 A    So I think first there was an opportunity for what we

20 thought would be -- I hate to say use the term low hanging

21 fruit where there was a known potential grease port that one

22 subsea has had with valves that they've been producing for

23 various operators.  That we thought that that could be the

24 root cause.

25          So that was the initial focus.  At the same time we

CRAIG REDDING - FURTHER REDIRECT BY MR. STARK                203

1  were testing out technologies to remove insulation subsea

2  and get to some of these ports and determine where the leak

3  was coming from.

4      It took several mobilizations to get the tooling we

5  needed to do those and then finally get to a place where

6  even in the final mobilization in November we had done a

7  pressure test and didn't see the leak until we actually

8  circulated the hot oil for a period of -- on the order of

9  two days to heat the system.

10     So it was very difficult to find the leak.

11 Q   Thank you.

12     Did last year's unprecedented storm season delay any of

13 those efforts?

14 A   Yes, yes.  There were several times.  If I remember

15 right, Labor Day weekend we had more in November as well.

16 With eight storms that affected our assets.  Several of

17 those had changed.  Especially mobilizations where we either

18 had delays or we couldn't get folks down to the dock side

19 because of flooding from a passing hurricane.

20 Q   Even if an SOP application is submitted with a May 2021

21 date, will BP continue pushing to bring Genovese online?

22 A   Absolutely.  Everything that we can do.  Again this is,

23 you know, value that we get from the PHA barrels and the --

24 when we're not flowing it doesn't produce anything for us,

25 so.

1  Q     Thank you.

2            MR. STARK:  I'll pass the witness.

3            THE COURT:  Thank you, anything further for

4  Mr. Redding?

5        (No audible response.)

6            THE COURT:  All right, thank you, Mr. Redding.

7        (Witness excused.)

8            THE COURT:  Mr. Stark?

9            MR. STARK:  Your Honor, can we take a brief

10 recess?

11           THE COURT:  Yes, sir.  How long do you need?

12           MR. STARK:  15 minutes, Your Honor.

13           THE COURT:  Are you going to have more witnesses

14 or that what you're taking the recess to decide?

15           MR. STARK:  That's what I'm trying to determine,

16 Your Honor.

17           THE COURT:  All right.  Let's come back at

18 9:00 o'clock.  Thank you.

19           MR. STARK:  Thank you, Your Honor.

20           MR. GENENDER:  Thank you, Your Honor.

21       (Recess taken from 8:43 p.m. to 8:57 p.m.)

22                      AFTER RECESS

23           THE COURT:  All right.  The system disconnected

24 itself, so I've tried to send a message to folks who are

25 watching the video that they can now reconnect.  We'll give

1  it a minute for people to get reconnected.  I think it does

2  that after six hours or something, so you all have been

3  going too long is the main thing this is.

4       (Pause in proceedings)

5          THE COURT:  All right.  I think we have all the

6  teams back on.  I know that Mr. Stark is back on and

7  Mr. Genender is back on.  Let's give it a minute or two.

8  When I came back, the phone had reset and all the lights had

9  turned off, but I decided we could probably continue with

10 the hearing anyway.

11         I think we are now back on.  I assume you can see

12 on the screen the message for people to dial back on.  Is

13 that right?  Everybody can see that?

14         COUNSEL:  Yes, Your Honor.  Yes, Your Honor.

15         THE COURT:  I think I see Mr. Dane still trying to

16 dial in.  Mr. Dane, are you able to hear us and you're

17 playing a video game, which is fine?

18         All right.  Mr. Stark, why don't you tell me what

19 we want to do next.

20         MR. STARK:  No further witnesses, Your Honor.  So,

21 at this time, I would offer our exhibits, which I believe

22 are 832-1 through 22 and 24 through 25.

23         THE COURT:  All right.  Mr. Genender?

24         MR. GENENDER:  Well, I mean, first of all, Judge,

25 I'm going to go through those now quickly.  One thing,

1  Judge, Ms. Choi pointed out that -- I don't know if we

2  formally said the words that 834-1 through 13 of ours were

3  admitted, even though there was no objection to them.  I

4  just wanted to point that out for the Record.

5            THE COURT:  They are admitted, I apologize if I

6  didn't say that.

7       (Exhibits Nos. 834-1 through 13 received in evidence.)

8            MR. GENENDER:  Thank you, thank you.

9            Again, Judge, I'm going to do this very quickly.

10 Okay?

11           THE COURT:  No, take your time.  Let's take a look

12 at them.

13           MR. GENENDER:  It's different.

14      (Pause in proceedings)

15           MR. GENENDER:  5 is already admitted, I know.  I

16 should say yes.

17      (Pause in proceedings)

18           THE COURT:  Mr. Redding, I saw you turned off your

19 camera.  It would be helpful to me if you could stay on for

20 a few more moments, please.  Thank you, sir.

21      (Pause in proceedings)

22           MR. GENENDER:  Your Honor, I believe 15 -- and I

23 have 15, the defendant's --

24           THE COURT:  I don't care about duplicates.  I'd

25 rather admit things twice than worry about it.

1          MR. GENENDER:  No.  No, no, I know that.  I know

2  -- sorry, Judge.  I think it's one that I objected to, from

3  us.

4          MR. STARK:  Judge -- Your Honor, I'll withdraw

5  that.  I apologize.

6          MR. GENENDER:  Thank you.  That's okay, it's all

7  right.

8      (Pause in proceedings)

9          MR. GENENDER:  No objection for 24.  25 is

10 hearsay, Your Honor.

11         THE COURT:  Mr. Stark?

12         MR. GENENDER:  I'm sorry, 832-24 is hearsay.

13         THE COURT:  Oh, so you're not objecting to 25, but

14 you are objecting to 24?

15         MR. GENENDER:  Well, it's ECF of 832-24, Biden

16 Administration, that's what I'm objecting to.  But have a --

17 it seems to have an Exhibit 25 sticker on it?  It's 832-24.

18         THE COURT:  Got it.

19         Mr. Stark?

20         MR. GENENDER:  Thank you.

21         MR. STARK:  It's a publication, Your Honor, it's

22 self-authenticating.

23         THE COURT:  It's a Bloomberg article.  Tell me how

24 that's --

25         MR. STARK:  Yes, Your Honor.

1          THE COURT:  -- self-authenticating.  How is that

2    self-authenticating?

3          MR. STARK:  That's a publication under Rule 902, I

4    believe.

5          THE COURT:  I don't believe so, but let me take a

6    look.  902 what?

7       (Pause in proceedings)

8          MR. GENENDER:  Judge, that might authenticate, but

9    it doesn't change the fact it's hearsay.

10          MR. STARK:  902(6), newspapers and periodicals,

11    printed material purporting to be a newspaper or periodical,

12    Your Honor.

13          THE COURT:  All right.  I'll find it's authentic.

14    Why isn't it hearsay?

15          MR. STARK:  Fair enough, Your Honor.  We'll

16    withdraw it.

17          THE COURT:  Thank you.

18          So, just to be clear, what we're admitting -- you

19    offered 832-24 and 25.  There is no 832-25.

20          MR. STARK:  Okay.

21          THE COURT:  Were you offering 23 or not?

22          MR. STARK:  I don't believe there's a 23, Your

23    Honor.

24          THE COURT:  832-23 is Exhibit Number 24 --

25          MR. STARK:  Okay.

1          THE COURT:  -- which is the SOP schedule.

2          MR. GENENDER:  We object to that, too, Judge, on

3   (indiscernible).

4          THE COURT:  Yeah, I just want to be sure that

5   Mr. Stark is offering the same things I think he's offering.

6          MR. STARK:  Yeah.  I apologize.  Yes, Your Honor.

7          THE COURT:  So tell me again.  By eight -- in

8   terms of 832, starting with 1, are you offering 1 to 14, 16

9   to 22 and 23?

10         MR. STARK:  Yes, that's correct, Your Honor.

11         THE COURT:  All right.  832-1 to 14, 832-16 to 22,

12   and 832-24 is -- are each admitted.

13      (Exhibits 832-1 to 14, 832-16 to 22, and 832-23

14   received in evidence.)

15         THE COURT:  Does anyone else have any evidence, or

16   are we going to close the evidentiary record?

17      (No verbal response)

18         THE COURT:  All right.

19         MR. GENENDER:  Your Honor, for the Debtors -- the

20   Debtor would close, of course.

21         THE COURT:  Before I rule -- and I tried this

22   yesterday -- I continue to think that there is a commercial

23   solution that, if you're observing this from afar, it looks

24   pretty obvious to me.  And I think that, either the parties

25   have decided, you know, to not try and get there, or I'm

1  missing something.

2          And this is why I wanted Mr. Redding to stay on.

3  And Mr. Redding, if you'll press five-star, I want you to be

4  free to talk when you want, if Mr. Stark lets you, and he

5  may tell you to keep your mouth shut.  I'll leave that up to

6  you and Mr. Stark, as to how we do that.

7          I don't understand why, from a commercial point of

8  view -- and this can be in your closing arguments, about why

9  I'm missing something, if you want to -- BP and Fieldwood

10  don't agree that Fieldwood does the work, starting tomorrow,

11  if it wants to, so that it's in control of its own destiny,

12  but that for all of the work -- starting tomorrow and going

13  all the way up through the commencement of production --

14  that BP will have the right, but not the requirement, to

15  monitor any safety issues and to call a shutdown, if they

16  think there's a safety violation, just as they would on

17  their own project.  And if there's a dispute about a safety

18  allegation, I'll hear it the same day.  I'm not going to

19  leave you guys hanging out there.

20          But BP -- I mean, this -- I've got to tell you,

21  Mr. Redding is a witness who I believed an awful lot, a very

22  credible witness.  And he even told me he doesn't really

23  have a problem with Fieldwood doing the work, it's just not

24  where things are heading and he doesn't think they'll be

25  able to do it better.

1          I think, from a commercial point of view, I

2    probably don't agree with Mr. Redding's conclusion, not out

3    of any lack of trust for what he's telling me.  But this is

4    critically important to Fieldwood.  They are willing to work

5    24/7 to get it done, they are willing to go scrounge the

6    earth to get pressure caps, and their motivations are just

7    different.  And I don't see any downside of them doing the

8    work, so long as BP can call a safety halt.  So I'm not

9    understanding why you all just haven't agreed to that as a

10   commercial resolution.

11         With all that said, I'll either let you all talk

12   about whether that's a commercial resolution, we'll just

13   proceed with closing arguments, and then I'll rule after the

14   closing arguments.  It's not like I don't want to rule; I

15   just -- you guys don't have very much of a disagreement

16   here.

17         And you know, Mr. Redding thinks -- and I believe

18   him when he tells me this.  If he thinks the probability of

19   getting this finished, if we leave BP in charge, is very

20   low, not nonexistent, but low -- 5 percent he said -- and

21   Fieldwood thinks it's, you know, 80 percent that they'll get

22   finished by this time frame -- and again, I think

23   Fieldwood's witness, Mr. Bhat, was a very credible witness.

24         And Mr. Redding doesn't distrust Fieldwood and I

25   don't distrust Mr. Redding.  And so, if he gets to call

1  safety halts -- and I don't mean him, personally -- if his

2  people get to call safety halts, I don't see why we don't

3  put people where they're maximizing their economic position.

4        So that's my pitch as to I don't under -- maybe

5  this just means I don't really understand the dispute.  If

6  you all want, I will simply call the shot at the end of the

7  day and say who wins and who loses.  But I want to give you

8  all an opportunity for a commercial resolution before I get

9  there.

10        Am I missing something, Mr. Stark and

11  Mr. Genender?

12        MR. GENENDER:  Your Honor, I don't think you are.

13  This is Paul Genender for the Record, for the Debtors.  I

14  don't think you are.  Again I think it's immaterial.

15        THE COURT:  Mr. Stark, do you think I'm missing

16  something?  Because, again, it's -- if I am, I really need

17  to understand it, just in terms of causing arguments,

18  because it means I missed some of the evidence in here.

19        MR. STARK:  Your Honor, I think a major issue is

20  the agreement for the full restoration of the loop.

21  Currently, the loop is not operating as a loop; it's broken,

22  and it's operating as single wags.  Under the way the

23  agreements are set up, BP alone cannot require restoration

24  of the loop.  That would also require one of the other

25  owners to vote with BP.

1          The long-term restoration of the loop will, at

2     least for some period, require wells to be shut in, and BP

3     has a full expectation that, if the single flow line goes

4     forward without addressing the adverse impact, the loop will

5     remain forever broken, thereby damaging its value as a loop.

6          THE COURT:  So, as I indicated yesterday, any

7     incremental costs I would require Fieldwood to bear.  If

8     you're asking me to require them to bear costs that may not

9     be theirs to be borne under the agreements, then I'm not

10    prepared to do that.  I'll just rule, if that's what I need

11    to do.

12         But in terms of requiring them to pay any

13    incremental costs from incorporating the single line, I

14    already said that I would require that.

15         But that may mean that there just isn't a deal,

16    and that's okay.  So I should probably move to closing

17    arguments, unless people want to talk to their clients.

18         MR. STARK:  I do think we're willing to have that

19    conversation, if Your Honor is willing to indulge

20    15 minutes, 20 minutes.

21         THE COURT:  I'm willing to indulge however much

22    time you all want.  I would like to find -- I seriously

23    believe that the parties are better off with a commercial

24    solution and not what I, you know, would rule one way or the

25    other.  And you know, I -- nobody is going to be better off

1   with sort of the tight hands that you tie around the Judge,

2   when the Judge has to make a ruling.  And it may be I

3   can't --

4           MR. STARK:  I --

5           THE COURT:  It may be I can't create a commercial

6   solution in a ruling, one way or the other.

7           And I think, Mr. Stark, I wore on my sleeve my

8   thoughts about your two primary witnesses, right?  And I --

9   your first witness I don't think was telling me the truth.

10  And Mr. Redding I thought told me the truth every time he

11  got the opportunity.  So it's not like that I'm not -- don't

12  -- it's -- I am not certain how I'm going to rule until I

13  hear the closing arguments, that's why we'd prefer there to

14  be a commercial solution.

15          And you've seen -- not me, Mr. Stark, I don't

16  think you've actually argued anything before me before.  But

17  you've seen judges that just get their hands tied.  And all

18  they can do is say, you know, Side A wins, Side B wins.  And

19  I can't help with a commercial solution.  That's why I'm

20  suggesting it, perhaps, from afar.

21          And I will be happy to give you a break because

22  I'm -- I would be happy if the parties could come to a

23  commercial solution.  But if not, you all are each entitled

24  to a ruling and you'll get one.

25          Do you all want the ability to talk to each other

1    or just to your own clients about how this could work?

2         MR. STARK:  I don't know, Your Honor.  First, let

3    me talk to my clients, if you will.  Can I have 20, 30

4    minutes?

5         THE COURT:  Yeah.  The other thing I'm -- I'm just

6    looking at my calendar.  How long are you going to need for

7    closing arguments, assuming that we don't get a resolution

8    of this?  If I give you 15 minutes to each side, is that

9    enough for closing?

10         MR. GENENDER:  I think it's plenty, Judge.

11         MR. STARK:  I agree, Your Honor.

12         THE COURT:  Can we just start in the morning at

13   7:45 with closing arguments?  And if you all want to, at

14   7:45, you can announce that you all have reached a deal;

15   and, if you haven't reached a deal, we'll just go into

16   closing arguments.  That will give you time to talk to your

17   client, it will give you all time to talk to each other,

18   give you all time to write down a term sheet.  I don't think

19   we can wait on this, one way or the other -- or do you want

20   to try and finish it tonight?  I'm okay.

21         MR. STARK:  Your Honor, it would be my preference

22   to finish it tonight, although, if Your Honor wants to

23   reconvene in the morning, we'll obviously do that.

24         THE COURT:  No, I'm going to let you all try and

25   finish tonight.  We'll do that.

1          MR. GENENDER:  Great, great.

2          THE COURT:  Mr. Redding, if you all take the

3  commercial solution, it's because I'm going to put faith in

4  you that whoever is working for you -- and I don't expect

5  you to be out there in the field, personally -- will

6  honestly call safety shots, and I wouldn't expect anything

7  less from somebody that works for you.  So that's part of

8  the deal, is I'm going to give you the right to just call a

9  stop to work and I'm going to make Fieldwood honor your

10 declaration of a work stoppage, if your person thinks

11 something isn't safe going on for, you know, all aspects of

12 safety.  So I want you to know that level of trust.

13         And I'm going to allow them to challenge; just, by

14 nature, I have to allow for challenges.  Challenges will be

15 virtually immediate.  But I'm not asking BP to take safety

16 risks.  So I just want you to understand that when you're

17 talking to Mr. Stark or talking to the other side when I get

18 this implemented.

19         So we'll come back at 9:35.  Will that work for

20 everybody?

21         MR. STARK:  Yeah, certainly, Your Honor.

22         THE COURT:  Okay.  Closing arguments --

23         MR. GENENDER:  Thank you, Judge.

24         THE COURT:  -- at 9:35.  Thank you.

25         MR. STARK:  Thank you, Your Honor.

1          MR. GENENDER:  Thank you.

2       (Recess taken from 9:17 p.m. to 9:34 p.m.)

3                     AFTER RECESS

4          THE COURT:  All right.  We'll go back on the

5   Record in the Fieldwood/BP dispute, and let's go ahead and

6   proceed.

7          Mr. Genender, your closing argument.

8       (No verbal response)

9          THE COURT:  It looks like you're muted.  Hold on.

10  You may have dialed back in, at which point I'll need to

11  reconnect you.

12      (Pause in proceedings)

13         MR. GENENDER:  Thank you, Your Honor.  Can you

14  hear me okay?

15         THE COURT:  Yeah.  I want to make sure I find

16  Mr. Stark's number, and be sure I've got him activated.  He

17  is.

18         All right.  Go ahead, please.

19         MR. GENENDER:  Thank you, Your Honor.

20         And let me start by thanking you for not only

21  hearing us on an expedited basis, but working late to give

22  us an opportunity to conclude this today.  I know I speak

23  for Fieldwood in thanking you for doing that.  I know it's

24  oftentimes par for the course with Your Honor, so thank you

25  for that.

1           I don't want to repeat what's in the evidence

2   because I know you've heard it all over the last six and a

3   half hours.  However, I think, from looking at the evidence,

4   we have what we think -- we do think we've shown an

5   emergency.  We do think that there is a cognizable

6   appropriate solution to the emergency that Your Honor has

7   outlined, and that no one -- that there's not credible

8   testimony that disputes that we can't handle this operation

9   with cooperation from BP.  And certainly, Your Honor's

10  comment about they can monitor -- or BP can monitor safety

11  issues, of course.

12          THE COURT:  But I don't believe --

13          MR. GENENDER:  I think --

14          THE COURT:  I don't think there's anything in the

15  law that lets me order them to let you do the work, is

16  there?

17          MR. GENENDER:  Excuse me, but lets you order them

18  to let us do the work?

19          THE COURT:  Yeah.  What in the law would allow me

20  to require them to let you do the work, as opposed to -- I

21  understand the law may allow me to make them do the work.

22  But what in the law would allow me to make them let you do

23  the work?

24          MR. GENENDER:  They -- the undisputed testimony is

25  that they -- I believe it was -- I believe it was

1  Mr. Redding who testified that they can contractually --

2  they can allow us to do the work.  It's permissible for us

3  to do the work, Your Honor.

4          THE COURT:  That's not my question.

5          MR. GENENDER:  So, under these circumstances --

6          THE COURT:  My question is how can I order them to

7  let you do the work?  I don't know that I can.

8          MR. GENENDER:  Well, when they're not operating as

9  a reasonably prudent operator, and they're not doing the

10 sorts of things -- and otherwise, I think you have -- I

11 think you have a record before you, Your Honor, that, in the

12 event that they -- in they event they're left to their own

13 devices, I think there's significant evidence in front of

14 you that they're not motivated to do it.

15          I'm not talking about mister -- I'm not talking

16 about Mr. Redding.  I'm talking about with Mr. Gurses.

17 They're not motivated.  The testimony was -- the testimony

18 conflicted in a major way.  Mr. Redding didn't have this

19 organization issue, but Mr. Gurses did.  And frankly, we

20 think he's misreading Section 6.4 of the POJ in that regard.

21          And Your Honor, they are trying to --

22          THE COURT:  So --

23          MR. GENENDER:  -- tie --

24          THE COURT:  But no.  I need to --

25          MR. GENENDER:  Sure.

1          THE COURT:  That -- I understand that I,

2   potentially, could order BP to complete the work.  I

3   understand that, if they don't, that they will have

4   problems.  I understand that you may own some of the

5   hydrocarbons that they produce out of another well that is

6   draining the field, and you may have the rights to a lien on

7   that.  I understand that you may have a damages claim

8   against them.

9          What I'm not understanding is how I can order them

10  to let you do the work, and that's what I'm asking you is:

11  What in the law would let me require them to make the choice

12  to let you do the work, as opposed to just requiring them to

13  get the work done?

14          MR. GENENDER:  Your Honor, you -- of course you

15  can order them to do the work by a date-certain and then

16  deal with the consequences if they don't.  We understand

17  that, and of course, we will cooperate if you did that.  I

18  think the testimony before you is that it will be -- it will

19  be more expedient and more likely if we did the work.

20          That said, you are a court of equity, and we are

21  dealing with protecting estate assets and we are dealing

22  with a situation where there's evidence before you that a

23  party did not -- has not and is not operating as a

24  reasonably prudent operator and has delayed.  And we were --

25  we provided a schedule in November, and we didn't get a --

1  really, a response schedule until we had to come before you

2  on an emergency basis.

3          And by the way, Judge, I think there's no question

4  that that schedule -- I believe it was exhibit -- their

5  Exhibit 20 schedule, and that is when they started preparing

6  it, after the hearing ended at 3:45 and filed it at 4:30.

7  So it took this to do that.

8          And you are a court of equity.  And I happen to

9  think and certainly my client thinks that your draft order

10  at ECF 825, that you shared yesterday, is perfectly

11  reasonable because it gives them the option, but also gives

12  us the option.  And I do think it's within the Court's

13  equitable powers and legal powers to order them to do it

14  because you have a record in front of you that they don't

15  think they can do it or they're not willing to do it, to

16  make it happen.

17          And I don't think the Court has to look much

18  farther than their schedule to see all of the back-end

19  activities that -- I think that could be going on now.  And

20  I don't really think the Court got a very credible answer

21  for why that's going to take -- the last 45 or 60 days is

22  really going take that.  And mister -- you know, Mr. Redding

23  was truthful in his testimony that there is a lot of cushion

24  in their schedule.

25          And we get that you might have cushion in a

1   schedule for a SOP.  But the problems are the tension, an

2   inherent tension between an SOP schedule and a schedule to

3   get the work done.  The SOP schedule isn't one you'd even

4   contemplate unless you can't get the work done, and that's

5   the issue.

6            We're deep in, fighting and clawing to protect our

7   asset, the estate asset, and -- from losing its lease.  And

8   the undisputed evidence, the only suggestion is if the lease

9   were lost, we would suffer and BP might actually benefit.

10  And that's why I, again, hang this on the equitable

11  argument, Your Honor, is that they (indiscernible) to do it

12  as a court of equity.  They acknowledge that the contracts

13  permit them to allow us to do it.

14           So, at the end of the day, we're not asking you to

15  order something that the contract forbids.  We're asking you

16  to contemplate ordering, as an alternative at least, as I

17  read your order, if we were to modify the plan, I think

18  we've put that evidence in front of this Court today, to

19  allow us to do the work.

20           I think the evidence is that they're trying --

21  that BP is trying to have us pay for things in the

22  restoration agreement that aren't our obligation, and try

23  our hand with this repair.  And again, I think we go back to

24  this is not a repair -- this is -- we didn't cause the leak

25  in the first place.  And every time BP has been given the

1  choice to be responsive to us or do something that's in

2  their interest, the evidence is they (indiscernible) and

3  pushed us along and here we are.

4        And we could have had a schedule set up in

5  November or December or early January or otherwise.  And now

6  here we are, and we're trying.  And I think we put forward

7  -- or we did put forward three credible witnesses --

8  Mr. Dane, Mr. Bhat, and Mr. Vaughn -- who spoke to all the

9  issues.

10        And I don't think it is a -- I do not think, Your

11  Honor, it is a significant leap for you to enter an order

12  consistent with what you circulated in draft form yesterday

13  at all.  My concern and the Debtors' concern is you order

14  them to do it, and they just don't do it.  There may not be

15  -- there may not be an adequate remedy at law, there may not

16  be.  And I don't know when we'll get there.

17        There is testimony, uncontroverted testimony from

18  Mr. Dane, that jeopardizing this lease to protect the

19  restructuring, the success of the restructuring -- and I

20  don't think we should take that risk, Your Honor.  And

21  frankly, I think the Court can rely on Mr. Redding's

22  testimony that you highlighted before we spoke, that he

23  doesn't really have a major issue with us doing it.  He's

24  not, you know, dead set opposed to it.

25        And I think that -- I think that -- you know, I

1   think one thing is clear from the record, that, in some

2   respects, Mr. Redding's hands are tied from above with the

3   company.  I think that's a fair inference from the testimony

4   that's before the Court.  And we've actually --

5            THE COURT:  Let me -- let me interrupt you just

6   for a moment, Mr. Genender.  Someone raised their hand from

7   713-969-1111.

8            Is there an objection to Mr. Genender's closing?

9            MR. SURGIS:  No, Your Honor.  This is Robert

10  Surgis.  I was going to wait until he finished.  And then,

11  if I could add on something, with the Court's permission, I

12  will do so then.

13           THE COURT:  I will not allow you to do that,

14  Mr. Surgis.  You're have a lawyer, and I'm going to let him

15  speak for you.  Thank you.

16           Go ahead, please, Mr. Genender.

17           MR. GENENDER:  Thank you, Your Honor.

18           So, yes, Judge, I don't want to -- I think

19  anything -- I think it's very telling, Your Honor, when we

20  look at some of the pieces of the evidence.  Mr. Gurses, to

21  my mind, acknowledged that, if BP had gotten royalty

22  interest on Genovesa that they would have moved faster.

23  That, right there, I think provides Your Honor with the

24  equitable powers to craft a remedy, so that we don't find

25  ourselves in a situation where we may not have an adequate

1    remedy at law.

2           And I think that his testimony made clear -- it

3    was rife with contradictions.  And I think it's very

4    important that the people -- we've heard from two witnesses

5    who were there in October of 2020, and they -- at the same

6    time they said Isabella Q4, they said Genovesa Q1 2021, and

7    they did one with the single live solution, and had it done,

8    and are not willing to commit to follow through on what they

9    said.  And that was six months in advance, and here we are.

10          So what they're saying is it's a four-month

11   process using their method.  My goodness, if they had

12   committed to that on December 1st, we would be done by -- we

13   would be done by March 31st at the absolute latest, and the

14   well would come online.

15          And I think Mr. Bhat was exceptionally credible in

16   talking about even his schedule that said March 25th had

17   cushion in it.  It has at least -- he said at least a week

18   of cushion within it, plus ten days on the back end.  And I

19   -- which begs the question:  Why not allow Fieldwood to try

20   to get this done, given the risks?

21          Of course, an SOP would be filed at the

22   appropriate time, to mitigate a situation where it can be

23   done.  The uncontroverted testimony is that if BSEE wants

24   those filed three to four weeks in advance of the deadline;

25   that I think it's ready, it can be filed whenever.  And

1    (indiscernible) again, it's not a substitute, and there's no

2    controverted evidence that an SOP is not -- it's not a

3    solution, it's not a solution to the problem here.  It's, in

4    effect, something that we would do if we fail -- if the

5    Debtors failure and we shouldn't do that and we won't.

6            The evidence is strong, and I'd say, while not

7    contradicted that Fieldwood has acted diligently and that BP

8    has not.  So I think, at that point, Your Honor, I'm going

9    to stop because I don't want to repeat myself further, and I

10   want to -- I have too much respect for you time.  And I

11   think I'm within 15 minutes.  I'm happy to answer any

12   questions.

13           THE COURT:  Thank you.

14           Mr. Stark.

15           MR. STARK:  Thank you, Your Honor.

16           Interestingly, you heard twice that there is no

17   adequate remedy at law, I think a particularly an

18   interesting turn of phrase because it is an implicit

19   admission that what Fieldwood is seeking here is the

20   extraordinary remedy of a mandatory temporary injunction,

21   without having complied with any of the requisite elements

22   for injunctive relief.  We point that out in our objection.

23   And it is telling that you heard that twice in closing

24   because that is what they are seeking, is the truly

25   extraordinary remedy of a mandatory injunction, requiring a

1   variety of acts by BP.

2          With respect to the issue of emergency, it is also

3   telling that there was no emergency before the January 20

4   DOI order.  What happened there, how that created an

5   emergency was Fieldwood's subjective interpretation that it

6   is their belief, without anything more than the text of the

7   Order apparently, is, again, less likely to get an SOP.

8   Fieldwood tells you they are fighting and clawing to protect

9   an estate asset; yet, they still have not submitted for an

10  SOP.

11         I understand that, historically, the process has

12  been to submit three to four weeks in advance.  But if you

13  are that desperate to protect such a valuable asset, and you

14  are in such uncertain and unheralded times, by all means,

15  once you submit for the SOP well in advance of what you

16  might do under normal circumstances.

17         I think Your Honor is correct with respect to the

18  lack of a basis to allow Fieldwood to do the work.  The

19  agreement to provide for the opportunity to remove BP as

20  operator, those efforts have not been shown.  That is not

21  why we are here today.  There is no basis to force BP to

22  step aside and allow Fieldwood to operate.  That is

23  certainly a right BP possesses, but I don't believe there is

24  any law, and I don't believe you've been cited to anything

25  other than the broad concept of equity that would

1   purportedly allow that.

2          You heard from Mr. Redding that BP has done a

3   substantial amount of work and continues to do a substantial

4   amount of work, and you heard a commitment that they will

5   continue to do a substantial amount of work.  But you also

6   heard that there's about a five percent chance of success on

7   meeting the schedule with an April 5 deadline.  Certainly,

8   there's a possibility that it could be sooner than the end

9   of May.  But it's less than a five percent likelihood this

10  could be done by April 5.

11         You heard Mr. Bhat testify that his schedule does

12  not account for uncontrollable events, such as weather

13  delay, equipment delay, plus delays with COVID; the list

14  goes on and on.  Off the cuff, he certainly offered a

15  guesstimate that that might change from a certainty to -- I

16  believe he said somewhere in the 75 to 80 percent range.

17  But that's all that is, that is a best guess, off the cuff,

18  in the midst of a hearing.

19         And what happens if Mr. Bhat is incorrect and

20  Fieldwood has over-promised and they're not able to deliver?

21  BP will be left with someone else operating on their system,

22  with -- I'm not aware of any mechanism to remove them, other

23  than coming back to Your Honor and having another hearing

24  similar to this one.

25         You've heard that compelling BP to meet the April

1  5 deadline would, in all likelihood, require BP to breach

2  its contractual commitments to other parties, for which I

3  don't know whether BP would have protection.  And it's

4  certainly not clear to me that Fieldwood would step up and

5  pay the cost of defense and the damages in that event.

6          If Your Honor were inclined to grant a mandatory

7  temporary injunction, notwithstanding Fieldwood's wholesale

8  failure to satisfy the requirements, I would ask that Your

9  Honor require them to post a substantial bond to protect BP,

10 as is appropriate in injunction situations.  But I would

11 also ask Your Honor to compel Fieldwood to immediately

12 submit an SOP application on the schedule proposed by BP, if

13 for no other reason than to protect this valuable estate

14 asset.

15         And with that, I'll stop here, Your Honor, unless

16 you have questions.

17         THE COURT:  No.  Thank you.

18         We have jurisdiction over this matter under 28

19 U.S.C., Section 1334.

20         This is a core matter under 28 U.S.C., Section

21 157.  It deals with whether a Debtor has the right to compel

22 compliance to an executory contract by its counterparty.

23         In this case, I have BP, who is wilfully failing

24 to comply with a contract, and they are doing so for their

25 own economic benefit.  They are in breach.  And I'm going to

1  grant pretty much all of the relief that is sought by the

2  Debtors.

3          I must begin by saying that I find BP's safety

4  arguments that have been made, in writing and orally, to be

5  quite offensive.  BP has introduced not a scintilla of

6  evidence, none, that Fieldwood would operate in an unsafe

7  manner, or that there are safety risks from allowing

8  Fieldwood to do this.

9          BP cloaks its objection in the grounds of safety.

10  Given BP's history, to come in and just say that it wants to

11  be sure there is safety is the use of an excuse by BP that

12  is so inappropriate.  BP should have learned that safety, in

13  the Gulf and elsewhere, is of paramount importance, and it

14  should not be used as an excuse when it isn't real.  I find

15  that BP is making a safety excuse without any basis and

16  without any reality, and it is inappropriate for BP not to

17  recognize its professed duty of safety in a manner that

18  belittles its own duties.

19          Is there an emergency?  Of course there is.  It is

20  uncontested that, without the granting of an SOP -- which is

21  discretionary with the Government -- that Fieldwood can lose

22  this lease altogether if the work isn't completed timely,

23  under the terms of the lease.  It is essential, according to

24  the only testimony I have -- which is totally contested --

25  to the company's reorganization that this lease not be lost,

1    and that is uncontested evidence.

2           BP's witness acknowledges that he has put the

3    priorities of others ahead of their duties and obligations

4    under their agreements.  And he misinterprets, in my view

5    intentionally, Section 6.4 of the agreement.  That does not

6    give BP the excused not to give this project its full

7    attention.

8           It is telling that Mr. Redding says he's

9    committing his full efforts -- and I believe him -- but his

10   full efforts, as he testifies to it, are within the

11   corporate policies.

12          I find that BP is acting in a manner that is in

13   bad faith under the contract.  It is trying to extort an

14   ORRI.  It has tried to put one of its own wells online

15   before this one, that drains out of the same field.  And no,

16   I didn't take the testimony to mean that the field would be

17   completely drained.  I took the testimony to mean that the

18   BP well would have first access, when they should have equal

19   rights of drainage of the field.

20          And then I find out that BP has decided that

21   consenting to something will leave them in a position where

22   their contractual rights for fixing the loop create a

23   disadvantage for them, so they're trying to extort a change

24   in the contract.  BP needs to stop acting with excuses.

25          I find that the evidence, by a preponderance,

1  demonstrates that this work can be completed by April the

2  5th.

3            I find that BP has delayed things intentionally,

4  to date, and refuses to give this the priority that is

5  needed.  It has Mr. Redding's priority, but within BP's

6  policies.  And BP's policies say we won't work 24/7, we

7  won't go acquire caps outside of the normal course, we're

8  going to live with our standard operating procedure to be

9  sure we don't finish this by April the 5th.

10            This is all BP's responsibility.  They can do it.

11  I accept Mr. Bhat's testimony that this can be easily

12  completed by April the 5th.  BP just needs to decide to do

13  it.

14            Now it may be from the delays that they have

15  caused that BP is going to have to work overtime.  It may be

16  that they have to work 24/7 and it may be that they have to

17  purchase pressure caps outside of their normal purchasing

18  and outside of their normal supplies.  But I find that the

19  caps are available, BP can accomplish this.

20            And I find that filled with excuses as to why BP

21  decides not to perform.  They have the capability; they just

22  need to decide to use it.

23            With respect to uncontrollable delays, it is

24  certainly possible that there are uncontrollable delays that

25  will interfere with the Court's order that this be completed

1  by April the 5th.  But I will say this:  If I end up with BP

2  witnesses who decide not to tell me the truth, I'm not going

3  to believe those delays.  If BP wants to get rid of that as

4  an excuse, it is free, under its contracts, to tell

5  Fieldwood, tomorrow morning by eight o'clock, that Fieldwood

6  can complete the work.  And then the uncontrollable delays,

7  they're all on Fieldwood.

8        BP is behaving in a remarkably poor way here.  I'm

9  ordering them to complete the project.  I'm ordering them to

10 complete it timely, in a manner that the lease is not

11 avoided.  I am waiving any requirement that the Debtors

12 place any bond.  BP needs to do this and it needs to do it

13 now, and it needs to stop giving artifice as excuse.

14       Mr. Genender, I want an order filed, so that I can

15 sign it when I come in at eight o'clock in the morning.  I

16 know that keeps people awake overnight.  Stay awake.  I want

17 an order proposed and filed in this case, so that I can sign

18 it in the morning.

19       I am not requiring any reimbursement of costs

20 until I determine that the costs that are billed are fair.

21 But under the contract, I am requiring that the company,

22 Fieldwood, comply with all of its payment obligations as

23 exist under the contract.  But if they want to challenge

24 those as containing artifice, they may do so; I'll hold

25 prompt hearings.

1    I don't want any interference with this.  I'm not

2  ordering anything about the SOPs.  It's up to Fieldwood as

3  to what it wants to do with the SOP.  They are not the

4  defendant here.  BP is the bad actor, BP is going to do the

5  work, BP is capable of doing the work and it should do the

6  work.  That is the order.

7    We are adjourned.

8    MR. GENENDER:  Thank you, Your Honor.  Good

9  evening.

10    MR. STARK:  Thank you, Your Honor.

11    (Proceedings concluded at 10:03 p.m.)

12                    * * * * *

13    *I certify that the foregoing is a correct*

14  *transcript to the best of my ability produced from the*

15  *electronic sound recording of the ZOOM/telephonic*

16  *proceedings in the above-entitled matter.*

17  */S/ MARY D. HENRY*

18  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21  *JTT TRANSCRIPT #63433*

22  *DATE FILED:  FEBRUARY 4, 2021*

23

24

25