**Attachment 3**

**Replacement Declaration Exhibit A – LSPS OA**

GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM

CONSTRUCTION AND OPERATING AGREEMENT

FOR

MISSISSIPPI CANYON BLOCK 562 (**"ISABELA LEASE"**)

AND

MISSISSIPPI CANYON BLOCK 519 UNIT (**"MC 519 UNIT LEASES"**)

BY AND BETWEEN

BP EXPLORATION & PRODUCTION, INC. (**"LSPS OPERATOR"**)

AND

NOBLE ENERGY, INC.

BP EXPLORATION & PRODUCTION, INC.

RED WILLOW OFFSHORE, LLC AND

HOUSTON ENERGY DEEPWATER VENTURES I, LLC

(**"MC 519 UNIT LEASE OWNERS"**)

AND

NOBLE ENERGY, INC. AND

BP EXPLORATION & PRODUCTION, INC.

(**"ISABELA LEASE OWNERS"**)

AND

NOBLE ENERGY, INC.

BP EXPLORATION & PRODUCTION, INC.

RED WILLOW OFFSHORE, LLC AND

HOUSTON ENERGY DEEPWATER VENTURES I, LLC

(**"LSPS OWNERS"**)

EFFECTIVE DECEMBER 1, 2011

Execution Version

## Table of Contents

Article I. DEFINITIONS AND CONTRACT APPLICATION ................................................. 2

Article II. EXHIBITS ...................................................................................................... 14

Article III. SELECTION AND REMOVAL OF LSPS OPERATOR ..................................... 14

Article IV. RIGHTS AND DUTIES OF OPERATOR ........................................................ 16

Article V. LSPS BUILDING AFES .................................................................................. 22

Article VI. RIGHTS AND OBLIGATIONS OF THE LSPS OWNERS ................................ 24

Article VII. RIGHTS AND OBLIGATIONS OF SATELLITE LEASES ................................ 24

Article VIII. OPERATING EXPENDITURES AND ANNUAL OPERATING PLAN ............... 26

Article IX. RIGHTS OF USE OF THE LSPS ................................................................... 29

Article X. METERING AND ALLOCATION ..................................................................... 29

Article XI. VOTING AND APPROVAL ........................................................................... 31

Article XII. WITHDRAWAL ........................................................................................... 34

Article XIII. OWNERSHIP AND CONFIDENTIALITY OF INFORMATION ........................ 38

Article XIV. INDEMNITIES ........................................................................................... 40

Article XV. ABANDONMENT AND SALVAGE ................................................................ 45

Article XVI. TAXES ...................................................................................................... 46

Article XVII. ASSIGNMENTS ........................................................................................ 47

Article XVIII. INSURANCE AND LIMITATIONS OF INDEMNITY .................................... 47

Article XIX. FORCE MAJEURE ..................................................................................... 48

Article XX. DEFAULT ................................................................................................... 48

Article XXI. SECURITY RIGHTS ................................................................................... 49

Article XXII. GENERAL PROVISIONS ........................................................................... 49

**GALAPAGOS AREA**

**LOOP SUBSEA PRODUCTION SYSTEM**

**CONSTRUCTION AND OPERATING AGREEMENT**

### PREAMBLE

This Galapagos Area Loop Subsea Production System Construction and Operating Agreement together with its attached Exhibits ("**Agreement**") effective as of December 1, 2011 ("**Effective Date**"), between **BP Exploration & Production Inc.**, ("**BP**") hereinafter referred to as "**LSPS Operator**" in its capacity as operator of the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined) and "**Satellite Lease Operator**" in its capacity as operator of the Isabela Lease; and BP, Noble Energy, Inc., ("**Noble**") hereinafter referred to as "**Satellite Lease Operator**" in its capacity as operator of the MC 519 Unit Leases, Red Willow Offshore, LLC, ("**Red Willow**"), and Houston Energy Deepwater Ventures I, LLC ("**HEDV**") hereinafter referred to singularly as "**Satellite Lease Owner**" and collectively as "**Satellite Lease Owners**", in their respective capacities as co-owners of their respective "**Satellite Lease**" (as hereinafter defined) or "**Satellite Leases**" (as hereinafter defined); and BP, Noble, Red Willow and HEDV hereinafter referred to singularly as "**LSPS Owner**" or collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined). Each signatory hereto is sometimes referred to singularly as a "**Party**" and collectively as the "**Parties**".

### RECITALS:

**WHEREAS**, the LSPS Owners desire to enter into an agreement concerning their joint participation in the "**Building**", "**Operation**" (as such terms are defined herein below), ownership and use of a common pipeline system known as the "**Loop Subsea Production System**" or "**LSPS**" (as hereinafter defined);

**WHEREAS**, BP, Noble, Red Willow and HEDV are the co-owners of the "**MC 519 Unit Leases**" (as hereinafter defined);

**WHEREAS**, BP and Noble are the co-owners of the "**Isabela Lease**" (as hereinafter defined);

**WHEREAS**, the "**MC 519 Unit Leases**" and the "**Isabela Lease**" are sometimes referred to herein singularly as a "**Satellite Lease**" or collectively as the "**Satellite Leases**";

**WHEREAS**, the LSPS Owners wish to Build and Operate the LSPS to gather "**Satellite Production**" (as hereinafter defined) from the Satellite Leases and deliver the Satellite Production (in a raw stream) to the "**Host**" (as hereinafter defined);

1

Execution Version

WHEREAS, the LSPS Owners commenced the Building of the LSPS pursuant to the terms and conditions of the "**Isabela JOA**" (as hereinafter defined) and will complete Building and Operating the LSPS pursuant to this Agreement;

WHEREAS, the Satellite Lease Owners have executed a "**PHA**" (as hereinafter defined) dated effective September 21, 2010 with BP, in its capacity as a co-owner of the Host;

WHEREAS, the LSPS Owners desire that BP, as LSPS Operator, Build and Operate the LSPS, all in accordance with the terms and conditions of this Agreement; and

WHEREAS, the LSPS Owners desire to set forth their agreements with respect to their respective rights, duties and obligations concerning the Building, Operating, ownership and use of the LSPS.

NOW THEREFORE, in consideration of the premises and of the mutual promises and covenants to be kept and performed by the Parties and contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Article I.   DEFINITIONS AND CONTRACT APPLICATION

1.01   <u>Definitions</u>.   For the purposes of this Agreement the following definitions shall be applicable:

"**Abandonment Costs**" has the meaning set forth in Section 15.01.

"**Adversely Impact**" or "**Adverse Impact**" means any event caused by any Satellite Lease or the operation or condition of the LSPS, other than those expressly excluded on Exhibit "J", which adversely impacts or is reasonably expected to adversely impact, as determined by the LSPS Operator, the Operation or condition of the LSPS or the Host.

"**AFE**" or "**Authorization for Expenditure**" means any written proposal made by a Party for the purpose of describing an operation being proposed and estimating the costs to be incurred.

"**Affiliate**" means any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party to this Agreement. The term "Affiliate" of a Party includes any parent corporation, partnership or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party to this Agreement, and also includes any other corporation, partnership or other entity in which such parent corporation directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in the other corporation.

Execution Version

(a) Ownership or control by a Party is deemed to exist if a Party to this Agreement directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation or fifty percent (50%) or more of the interests in the partnership, general partner of a limited partnership, or other entity.

(b) The stock (or interests in a partnership or other entity) owned or controlled by a Party includes all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party to this Agreement.

"**Agreement**" has the meaning set forth in the Preamble.

"**ALARP**" means as low as reasonably possible.

"**Annual Operating Plan**" has the meaning set forth in Section 8.01(a).

"**Barrel Oil Equivalent**" or "**BOE**" means one (1) oil equivalent barrel determined by treating as one (1) BOE each; one (1) barrel of Oil or five and eight tenths (5.8) MSCF of gas.

"**BOEMRE**" means the United States Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement or any successor thereof with jurisdictional authority over the matters governed by this Agreement.

"**BP**" has the meaning set forth in the Preamble.

"**British Thermal Unit**" or "**Btu**" means the quantity of heat required to raise the temperature of one (1) pound in weight of pure water one degree Fahrenheit (1°F) from fifty-eight and five-tenths degrees (59.5°) Fahrenheit at a constant pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia at sea level) and determined on a gross, dry basis.

"**Build**" or "**Building**" means the operations and activities arising out of or in connection with the design, engineering, construction, installation and Commissioning through Completion of the LSPS.

"**Building AFEs**" means the AFEs attached as Exhibit "C" and further described in Section 5.01.

"**Business Day**" means any Day exclusive of Saturdays, Sundays and legal holidays.

"**Capital Expenditure**" means any expenditure, except for those made in connection with repair operations that are intended to put or return the LSPS to its normal use condition,

that: (a) is made in connection with the Building of the LSPS; (b) extends the useful life of the LSPS as it then exists (or any material portion thereof) beyond one (1) year; or (c) materially enhances the useful life of the LSPS as it then exists (or any material portion thereof).

"**Change Order AFE**" has the meaning set forth in Section 5.03(b).

"**Change Order Costs**" has the meaning set forth in Section 5.03(d).

"**Claim/Loss**" and "**Claims/Losses**" means all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage, regardless of how such claims and/or losses may be characterized. Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, demands, suits, causes of action (including actions in rem or in personam, at law or in equity), obligations, judgments, interest, costs, expenses, fines, penalties, losses, assessments, judgments and awards whether created by law, equity, contract, tort, arbitration, voluntary settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity, the unseaworthiness of any vessel, the unairworthiness of any aircraft or any condition or pre-existing condition (whether known or unknown). The terms also include reasonable attorneys' fees, court costs, and other reasonable costs of litigation resulting from the defense of any Claim/Loss or cause of action within the scope of the indemnities in this Agreement.

"**Commissioning**" shall mean all activities (including, without limitation, testing, line filling, producing, gathering, metering, and processing) necessary to be performed by the LSPS Operator, the Satellite Lease Owners or the Satellite Lease Operators hereunder after the LSPS is filled with Satellite Production in order to achieve Startup.

"**Completion**" means that certain condition and time after Startup when all work associated with the Building AFE's and Supplemental Building AFE's is complete.

"**Confidential Information**" means all proprietary geophysical, geological, geochemical, drilling, engineering data or other data owned or developed by the Parties relating to operations conducted within the Satellite Well System, Satellite Leases and the Building and Operation of the LSPS. The term shall also include, but not be limited to:

(a)     certain commercial, contractual or financial information;

(b)     analyses, compilations, maps, models, interpretations or other documents that reflect or incorporate Confidential Information;

(c)     both originals and copies of geological and geophysical data and well logs;

4

Execution Version

(d)     all other subsurface, seismic and related data acquired or derived from operations conducted pursuant to this Agreement, the MC 519 Unit Operating Agreement or the Isabela JOA;

(e)     Background Technology as described in Exhibit "K"; and

(f)     the terms and conditions of this Agreement.

"**Connected With**" shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to". For avoidance of doubt, the indemnities in this Agreement are intended to be broad and cover all Claims/Losses in any way connected to the performance of this Agreement, including any Claims/Losses associated with any presence on any premises, including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the LSPS, the Satellite Well System or the Host.

"**Day**" means a period of twenty-four (24) consecutive hours, beginning at 12:00 a.m. central time.

"**Defend**" or "**Defense**" shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a result of defending against a Claim/Loss as required by this Agreement, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Agreement.

"**Default**" means (a) non-payment of any charges authorized under this Agreement when due, after the LSPS Operator has given written notice to the non paying Party that payment must be made within sixty (60) days from delivery of the notice; (b) the continuation of a material breach or non-performance (other than matters covered by (a), above) under this Agreement for more than thirty (30) days after receipt of written notice thereof, by the LSPS Operator or an LSPS Owner; or (c) the LSPS Operator or any LSPS Owner becoming bankrupt or insolvent, committing or suffering any act of bankruptcy or insolvency, being placed in receivership, seeking debt or relief protection under any applicable legislation, the preceding of which are not rectified within thirty (30) Days of such event.

"**Default Date**" has the meaning set forth in Section 20.01.

"**Delivery Point(s)**" means:

(a)     for Gas, the point where the Gas departs the Host as set forth on Exhibit "A-1"; and

(b)     for Oil, the point where the Oil departs the Host as set forth on Exhibit "A-1".

Execution Version

"**Design Basis Document**" means the basis of design for the LSPS attached hereto as Exhibit "D".

"**Effective Date**" has the meaning set forth in the Preamble.

"**Enhanced Risk**" means that the overall level of risk of an Adverse Impact to the LSPS due to a proposed activity or occurrence is greater than the risk that would normally be assumed by an operator under similar circumstances.

"**Entry Point(s)**" means the point(s) at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth in Exhibit "A-1".

"**Equity Interest**" means with respect to each LSPS Owner, the interest set forth in Exhibit "B" for such LSPS Owner.

The phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall, except to the extent expressly otherwise provided, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply as follows:

(a)     without regard to any conflicting rules of liability under any applicable law or regulation;

(b)     without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention; and

(c)     without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall not apply to or include the gross negligence or willful misconduct of any Indemnitee.

"**Facility Access Modifications**" means all facilities and equipment added to and located on the Host required for the production handling services provided pursuant to the PHA.

"**Force Majeure**" means events which are beyond the reasonable control of the Party claiming suspension and which, by the exercise of due diligence, such Party would not have been able to avoid or overcome, and only if such events materially affect a Party's ability to perform

Execution Version

its obligations hereunder, including but not limited to:

    (a)    flood, storm, loop current, eddy, hurricane, earthquake, adverse weather conditions, high sea states, or other acts of God;

    (b)    fire, explosion, loss of well control, oil spill, or other environmental catastrophe, natural or man made;

    (c)    war, terrorist actions, actions of the public enemy, blockade, insurrection, civil disturbance, labor dispute, strike, lockout, or other industrial disturbance, compliance with any law, order rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

    (d)    inability to secure materials or equipment; or

    (e)    any other causes (other than a cause arising under a contract with a Third Party), whether similar or dissimilar.

"**Gas**" or "**gas**" means any mixture of gaseous hydrocarbons, consisting of methane and heavier liquefiable hydrocarbons and inert and noncombustible gases which are extracted from the subsurface of the earth, including any condensate recovered on the Host and re-injected in a down stream pipeline.

"**Gas Field Imbalance**" has the meaning set forth in Section 10.05(b).

"**HEDV**" has the meaning set forth in the Preamble.

"**Host**" means all equipment and facilities located between the Entry Point(s) and the Delivery Point, including the offshore semi-submersible floating platform located on Mississippi Canyon Block 474 and the Facility Access Modifications, but excluding the LSPS and Satellite Well System.

"**Host M&A**" means the measurement and allocation procedures and/or methodologies implemented by the Host Operator for the allocation of production to all inlet sources on the Host, as may be amended from time to time.

"**Host Operator**" means the operator of the Host named pursuant to the Na Kika Obligations which, as of the Effective Date, is BP or its successors or assigns.

"**Host Owner**" means any party who has an ownership interest in the Host.

"**Indemnify**" or "**Indemnification**" shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless." For avoidance of

7

doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term "Indemnify" or "Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct are alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct. However, in the event that the Indemnitee is found by a final and unappealable decision of a court of competent jurisdiction to have been grossly negligent or to have acted with willful misconduct, then the Indemnitee shall refund all Defense costs attributable to the defense of the Indemnitee's gross negligence or willful misconduct.

"**Indemnitee**" means the Person seeking indemnity (or release) under this Agreement.

"**Indemnitor**" means the Party against whom indemnity (or release) is sought under this Agreement.

"**Isabela JOA**" means the Isabela Operating Agreement, Isabela Prospect, Mississippi Canyon Block 562, Gulf of Mexico, by and between BP and Noble dated effective as of April 2, 2007 and attached hereto as Exhibit "L".

"**Isabela Lease**" means the oil and gas lease OCS-G 19966 covering and affecting Mississippi Canyon Block 562 in the Gulf of Mexico.

"**Isabela Lease Owners**" mean the owners of the Isabela Lease, currently BP and Noble.

"**Isabela Lease Owners' Group**" means the following entities and Persons individually and collectively: each of the Isabela Lease Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**Joint Operating Agreement**" means either the Isabela JOA or the MC 519 UOA, whichever is applicable.

"**Laws**" means any laws, rules and regulations of the United States of America or any duly constituted instrumentality thereof and all other governmental bodies, agencies and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended, enacted, promulgated or issued.

"**Letter of Intent**" or "**LOI**" means that certain Letter of Intent for the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated September 21, 2010, by and among Noble Energy, Inc., Houston Energy Deepwater Ventures I, LLC, Red Willow Offshore, LLC, and BP Exploration & Production Inc.

"**Loop Subsea Production System**" or "**LSPS**" means the common production system

Execution Version

known as the Galapagos Area Loop Subsea Production System, the umbilical system from the topsides umbilical termination assembly to the infield umbilical termination assemblies and more particularly described in Exhibit "A", Exhibit "A-1" and Exhibit "A-2" hereto, additionally and any and all permits, Right-of-Ways, and other authorizations necessary for the Building and Operation thereof.

"**LSPS Delivery Points**" mean the points at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth on Exhibit "A-2".

"**LSPS Entry Points**" means the hubs located at the subsea PLEMs where the Satellite Well System connects to the LSPS as set forth on Exhibit "A-2".

"**LSPS Operating Guidelines and Standards**" means those included in Exhibit "J" as may be amended from time to time.

"**LSPS Operator**" means that Person designated as operator and identified in Section 3.01 or in any amendment to this Agreement.

"**LSPS Operator Group**" means the following entities and Persons individually and collectively:  the LSPS Operator and its respective parent, subsidiaries and Affiliates (including any after acquired companies), partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**LSPS Owner**" or "**LSPS Owners**" has the meaning set forth in the Preamble.

"**LSPS Owners Group**" means the following entities and Persons individually and collectively: each of the LSPS Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

"**Major Modification**" means a modification to the Design Basis Document that:

(a)     changes the diameter of the flowlines by more than one-half inch (1/2");

(b)     changes the number of PLEMs;

(c)     is expected to increase the overall cost of the LSPS by more than fifteen percent (15%) of the aggregate of the Building AFEs attached as Exhibit "C";

(d)     changes the initial selection of the location of the LSPS by more than three thousand feet (3000') laterally in any direction; or

9

Execution Version

(e)    is expected to delay Startup of the LSPS by more than one (1) year from January 1, 2012.

**"Majority Interest"** means two (2) or more LSPS Owners which are not Affiliates of each other having among them more than fifty percent (50%) of the Equity Interests of all LSPS Owners entitled to vote (i.e., not in Default).

**"Major Non-Routine Expense"** means expenses for any repair or replacement activity associated with the LSPS as part of the Operation of the LSPS pursuant to the terms of this Agreement for which the total gross cost charged or chargeable to LSPS Owners is expected to exceed Five Million and No/100 Dollars ($5,000,000).

**"MC 519 Unit"** means the unit formed by that certain MC 519 Unit Operating Agreement.

**"MC 519 Unit Leases"** means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519 and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico.

**"MC 519 Unit Lease Owners"** means the owners of the MC 519 Unit Leases, currently, Noble, BP, Red Willow and HEDV.

**"MC 519 Unit Lease Owners' Group"** means the following entities and Persons individually and collectively: each of the MC 519 Unit Lease Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

**"MC 519 Unit Operating Agreement"** or **"MC 519 UOA"** means that certain Unit Operating Agreement by and between BP, Noble, Red Willow and HE&D Offshore, L.P. covering the MC 519 Unit Leases dated effective January 1, 2009 and bearing BOEMRE Contract Number 754309001.

**"Minor Modification"** has the meaning set forth in Section 4.09.

**"MMBtu"** means one million (1,000,000) Btus.

**"MSCF"** means thousand standard cubic feet.

**"Na Kika HUA"** means that certain Guiding Principles for a Na Kika Host Utilization Agreement by and between BP and Shell Offshore Inc., effective as of May 17, 2004.

Execution Version

"**Na Kika JOA**" means that certain Na Kika Complex Joint Operating Agreement by and between Shell Deepwater Development Inc., predecessor-in-interest to Shell Offshore Inc., and Amoco Production Company, predecessor-in-interest to BP, effective as of April 30, 1998, as amended.

"**Na Kika Obligations**" means all rights, duties and obligations (existing or future) between Shell Offshore Inc. and BP (or their respective successors or assigns) related to, or in connection with, the Host, including without limitation the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement (including exhibits), and any gas balancing procedures, oil quality bank, and/or natural gas liquids bank, which might be implemented by the Host Owner.

"**Noble**" has the meaning set forth in the Preamble.

"**Oil**" or "**oil**" means any mixture of hydrocarbons, regardless of gravity, originally and naturally occurring as liquids and includes all condensate, distillate and other liquid hydrocarbons recovered by use of conventional separators on the Host.

"**Operate**", "**Operating**" or "**Operation**" means the operations and activities arising out of or in connection with the operation, maintenance, use, repair, replacement, modification, enhancement, dismantlement, disposal, disconnection or abandonment of the LSPS.

"**Operating Expenses**" means the expenses and costs, other than Capital Expenditures, relating to the Operation of the LSPS. Notwithstanding the foregoing, Operating Expenses shall include: (a) any expenditures made to Operate the LSPS in or to its original condition or capacity; or (b) any item that is put into service that has an expected useful life of less than one (1) year.

"**Operating Standards and Guidelines**" has the meaning set forth in Exhibit "J".

"**Parties**" shall have the meaning ascribed to it in the Preamble.

"**Party**" shall have the meaning ascribed to it in the Preamble.

"**Person**" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, governmental authority, or other entity.

"**PHA**" means that certain Production Handling and Operating Services Agreement by and between BP, as Host Owner, the Satellite Lease Owners and the LSPS Owners covering the Satellite Leases dated effective September 21, 2010.

"**PLEM**" means pipeline end manifold.

11

"**Production**" means the stream of Oil, Gas, water and associated substances produced from a Satellite Lease wellbore.

"**Project Services**" has the meaning set forth Section 4.01(a).

"**Project Team**" means that certain Project Team formed pursuant to Exhibit "K".

"**Records**" means all contracts, agreements, data, charts, records, filings, accounting books, books or accounts, plans, designs, material documentation, studies, reports, operating and procedure manuals, procedures, plans and supporting documentation created or obtained by the LSPS Operator pursuant to this Agreement.

"**Remaining Owners**" has the meaning set forth in Section 12.03(a)(ii).

"**Remaining Parties**" has the meaning set forth in Section 12.02.

"**Rights-of-Way**" means those certain rights-of-way that have been or will be obtained by the LSPS Operator for the Building and Operation of the LSPS as set forth Exhibit "A".

"**Satellite Lease**" and "**Satellite Leases**" has the meaning set forth in the Recitals.

"**Satellite Lease Operator(s)**" means the operator of the Isabela Lease and the operator of the MC 519 Unit Leases or any successors thereof selected pursuant to the terms and provisions of the Isabela JOA and the MC 519 UOA respectively.

"**Satellite Lease Owner**" and "**Satellite Lease Owners**" has the meaning set forth in the Preamble.

"**Satellite Production**" means the stream of Oil, Gas, water and associated substances produced from the Satellite Leases.

"**Satellite Well System**" means the subsea system and any modifications thereto of a Satellite Lease which includes, but is not limited to all facilities and equipment upstream of the LSPS Entry Points.

"**Services**" means collectively the operational, management, and administrative services set forth in Section 4.01(b).

"**Single Satellite Lease Change Order**" has the meaning set forth in Section 5.03(a).

"**Sole Benefit Operation**" has the meaning set forth in Section 7.08.

12

Execution Version

"**Startup**" means that certain condition and time when the LSPS is ready for service and capable of receiving Satellite Production on a continued basis including the completion of any and all pre-commissioning and Commissioning activities performed by the LSPS Operator. Startup shall occur regardless of whether or not all billings, payments, and demands under this Agreement have been finally resolved.

"**Supplemental Building AFEs**" means any AFE which supplements any of the Building AFEs and is further described in Section 5.02.

"**Supplemental Change Order AFE**" means any AFE which supplements the Change Order AFE and is further described in Section 5.03(d).

"**Tax**" or "**Taxes**" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to Indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Third Party**" means any Person other than the Parties hereto.

"**Unanimity**" or "**Unanimous**" means the mutual agreement of all LSPS Owners, entitled to vote (i.e. not in Default).

"**Withdrawing Party**" has the meaning set forth in Section 12.02.

"**Withdrawal Interest**" has the meaning set forth in Section 12.02.

"**Withdrawal Notice**" has the meaning set forth in Section 12.02.

"**Work Product**" means all design, technical, scientific, analytical, and other information including, but not limited to plans, drawings, research data, design criteria, profile and alignment sheets, engineering studies and reports, cost studies, specifications, engineering diagrams, permit applications and other documents to be submitted to governmental agencies, records and documentation of construction and testing activities, and similar documents, whether preliminary or final, related to or necessary for Project Services or Services and other work product conceived, originated or prepared for or by the LSPS Operator for performance of the Project Services or Services, but excluding LSPS Operator's computer programs and other proprietary data which were not specifically prepared for the performance of Project Services or Services.

Execution Version

## Article II.  **EXHIBITS**

2.01    Exhibits.  All references in this Agreement to "Exhibits" without further qualification shall mean the Exhibits listed below and attached to this Agreement.  Each of the Exhibits listed below are made a part of this Agreement and shall be deemed incorporated into the body of this Agreement by this reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.  If the provisions of any of the Exhibits conflict with the body of this Agreement, the provisions of the body of this Agreement will prevail, except as to Exhibits "G", "H" and "J", each provision of which shall prevail over any provision of the body of this Agreement.

| | | |
|---|---|---|
| (a) | Exhibit "A": | Galapagos Area Loop Subsea Production System Description |
| | Exhibit "A-1": | Delivery Points |
| | Exhibit "A-1": | Entry Points |
| | Exhibit "A-2": | LSPS Delivery Points |
| | Exhibit "A-2": | LSPS Entry Points |
| (b) | Exhibit "B": | LSPS Equity Interests |
| (c) | Exhibit "C": | Building AFEs |
| (d) | Exhibit "D": | LSPS Design Basis Document |
| (e) | Exhibit "E": | LSPS Accounting Procedures |
| (f) | Exhibit "F": | Dispute Resolution Procedures |
| (g) | Exhibit "G": | Insurance |
| (h) | Exhibit "H": | Memorandum of Agreement and Financing Statement |
| (i) | Exhibit "I": | Certification of Non-Segregated Facilities |
| (j) | Exhibit "J": | Operating Guidelines and Standards |
| (k) | Exhibit "K": | Project Team and Technology Sharing |
| (l) | Exhibit "L": | Isabela JOA |

## Article III.  **SELECTION AND REMOVAL OF LSPS OPERATOR**

3.01    Designation of LSPS Operator.  The LSPS Owners hereby designate BP as LSPS Operator of the LSPS.

3.02    Resignation or Removal of LSPS Operator.    The LSPS Operator may resign or be removed subject to the following:

(a)    Removal for Cause.  The LSPS Operator may be removed without the necessity of a vote of the LSPS Owners upon written notice by any Party during the continuation of one (1) of the following circumstances: (i) the LSPS Operator has been found liable by a final judgment of a court of competent jurisdiction or an arbitration panel for an act of gross negligence or willful misconduct hereunder; (ii) the LSPS Operator is in Default hereunder or has been found to have committed a substantial breach of a material provision of this Agreement by a final judgment of a court of competent jurisdiction or an arbitration panel; or (iii) upon thirty (30) Days written notice by any Party if the LSPS Operator assigns all or a portion of its Equity Interest in the LSPS (excluding any Equity

Execution Version

Interest assigned to an Affiliate) which reduces the LSPS Operator's Equity Interest in the LSPS to less than the Equity Interest of the LSPS Owner owning the next largest Equity Interest owned on the effective date of the LSPS Operator's assignment, whether accomplished by single or multiple assignments; or

(b)      Resignation of LSPS Operator.   The LSPS Operator may resign at any time by giving at least sixty (60) Days prior written notice to the other LSPS Owners; provided, however, the LSPS Operator shall not resign during Force Majeure or an emergency which poses a threat to life, safety, property or the environment.  If the LSPS Operator ceases to own an interest in the LSPS or in all Satellite Leases, the LSPS Operator shall be deemed to have resigned without any action by the LSPS Owners. The withdrawal or deemed withdrawal from this Agreement pursuant to Article XII of an LSPS Owner which is the same Person as the LSPS Operator shall constitute the resignation of the LSPS Operator for purposes of this paragraph.

3.03     Selection of Successor LSPS Operator.   Upon the resignation or removal of the LSPS Operator, a successor LSPS Operator will be selected by vote of a Majority Interest of the LSPS Owners, provided, however, in the event the resigned or removed LSPS Operator fails to vote or votes only to succeed itself or an Affiliate, then the successor LSPS Operator will be selected after excluding the vote of the resigned or removed LSPS Operator or an Affiliate.  In the event that no Party receives a Majority Interest vote, the Party receiving the highest total Equity Interest vote will become the successor LSPS Operator.  It shall be the responsibility of the LSPS Owner with the greatest Equity Interest in the LSPS (other than the resigned or removed LSPS Operator) to administer the election of the new LSPS Operator.

3.04     Effective Date of Resignation or Removal.   The resignation or removal of the LSPS Operator will become effective as soon as practical but no later than 7:00 a.m. on the first Day of the month following a period of sixty (60) Days after said notice of resignation or removal.  The resignation or removal of the outgoing LSPS Operator will not prejudice any rights, obligations or liabilities resulting from its duties as LSPS Operator.  The successor LSPS Operator will be entitled to charge the LSPS Owners for the reasonable costs it incurs in connection with the change of LSPS Operator.

3.05     Delivery of Property.   On the effective date of resignation or removal of the LSPS Operator, the outgoing LSPS Operator shall deliver to the successor LSPS Operator possession of everything jointly owned by the LSPS Owners, including all funds relating to the LSPS, all joint equipment, materials and appurtenances used in conducting Project Services and Services, and all books, Records, Work Product and inventories relating to Project Services and Services other than those books, records and inventories maintained by the outgoing LSPS Operator in its capacity as the owner of its Equity Interest, or as a Satellite Lease Owner.  The outgoing LSPS Operator will further use its reasonable efforts to transfer to the successor LSPS Operator, as of the effective date of such resignation or removal, its rights as LSPS Operator under all contracts, Rights-of-Way, easements, licenses, permits and governmental approvals exclusively relating to Services or Project Services conducted pursuant to this Agreement, and the successor LSPS Operator will assume all obligations of the LSPS Operator thereunder.  The LSPS Owners may

Execution Version

audit the books and conduct an inventory of all joint property, and such inventory shall be used in the return of and the accounting for the joint property by the outgoing LSPS Operator. Such inventory and audit shall be completed, if possible, no later than the effective date of the resignation or removal of the LSPS Operator. All costs incurred in connection with such audit, delivery and inventory shall be charged to the LSPS Owners. The LSPS Owners agree to promptly execute and file such documents as may be necessary to change operatorship.

### Article IV.  RIGHTS AND DUTIES OF OPERATOR

4.01    Duties and Responsibilities of the LSPS Operator. Subject to the terms and conditions of this Agreement, the LSPS Owners hereby engage and authorize the LSPS Operator to perform, and the LSPS Operator hereby accepts such engagement and authorization, and agrees to:

(a)    Build the LSPS. Build the LSPS in accordance with the Design Basis Document, for and on behalf of the LSPS Owners, including, but not limited to, the pre-lay route survey, engineering, planning, design, bidding of construction, permitting, inspections, installations, start-up operations, (including any Commissioning activities), acquisition of materials, pipe, meters and equipment and the management of all contractors involved in Building the LSPS ("**Project Services**"). The LSPS Operator shall manage and direct the Project Services in an efficient, safe and economical manner and in conformity with generally accepted industry practices and standards in the United States portion of the Gulf of Mexico utilizing personnel experienced in the applicable technical fields and in accordance with all valid and applicable laws, rules and regulations of governmental authorities and in accordance with the same business ethics and environmental policies the LSPS Operator adheres to in the conduct of its own business. Without limitation of the foregoing, and in addition to obligations contained in other provisions of this Agreement, as part of the Project Services the LSPS Operator shall be responsible for the following:

(i)    supervise, direct, oversee, coordinate, approve and obtain all design and engineering work necessary for the Completion of the LSPS;

(ii)    supervise, direct, oversee, coordinate, approve and obtain the procurement and purchase of, all materials, components and equipment, including line fill, required for Completion of the LSPS;

(iii)    supervise, direct, oversee, coordinate, approve, and obtain all construction, fabrication and installation of the LSPS to Completion;

(iv)    supervise, direct, oversee, coordinate, approve, and obtain all testing and calibration of the LSPS during construction and installation and/or necessary for Completion;

16

(v)    provide or perform any and all support for pre-commissioning and Commissioning activities for the LSPS;

(vi)    prepare and maintain on behalf of the LSPS Owners all appropriate Records related to the Building of the LSPS that a prudent operator would maintain regarding an offshore gathering system and related facilities similar to the LSPS, including, without limitation, "as built" survey, underwater surveys and engineering by Third Parties; and all operating and procedure manuals, procedures and plans, which Records shall be the property of the LSPS Owners and which Records or copies thereof shall be made available to each LSPS Owner upon reasonable request;

(vii)    procure such Rights-of-Way, easements, licenses, permits and governmental approvals as are necessary for Building and Completion of the LSPS; and

(viii)    perform such additional services not specifically enumerated herein necessary for the Building of the LSPS, including, without limitation, accounting services and coordination of all Project Services with Host Operator and the Satellite Lease Operators.

(b)    <u>Operate and Administer the LSPS</u>.  Operate and administer the LSPS, for and on behalf of the LSPS Owners, including, but not limited to, execution of contracts, obtaining and maintaining all necessary Rights-of-Way, licenses, permits and governmental approvals and managing and directing such Operation of the LSPS ("**Services**").  Without limitation of the foregoing, and in addition to obligations contained in other provisions of this Agreement, as part of the Services the LSPS Operator shall be responsible for the following:

(i)    management and administrative services of the LSPS, including: accounting; tax filings; cash management; review of significant operating and financial matters; contract administration services;

(ii)    management of Third Party operations related to the LSPS;

(iii)    coordinating with the Satellite Lease Operators and the Host Operator, the scheduling of Production from the Satellite Leases into and out of the LSPS, including, but not limited to, gathering Production from the LSPS, including, but not limited to, gathering Production from the Satellite Leases; transportation and delivery of Production from the Satellite Leases to the Host; metering and allocations; invoicing and furnishing daily production reports to each Satellite Lease Operator;

(iv)    ordering, purchasing, receiving and verifying receipt of parts, materials, production chemicals (to the extent not otherwise provided under the

17

Execution Version

PHA), including line fill, spare parts, insurance (to the extent required by this Agreement), tools, supplies and services;

(v)    preparing and maintaining on behalf of the LSPS Owners all appropriate Records related to Operating the LSPS that a prudent operator would maintain regarding an offshore gathering system and related facilities similar to the LSPS, including, without limitation, "as built" survey, underwater surveys and engineering by Third Parties; and all operating and procedure manuals, procedures and plans, which Records shall be the property of the LSPS Owners and which Records or copies thereof shall be made available to each LSPS Owner upon reasonable request;

(vi)    preparing and maintaining on behalf of the LSPS Owners all necessary Records and filings with all governmental entities, including, but not limited to certification obligations required by the BOEMRE provided for under the Oil Pollution Act of 1990;

(vii)    management of all environmental and all other applicable statutory compliance for the LSPS;

(viii)    coordination of emergency response;

(ix)    operating and maintaining all communications, inspection, maintenance, surveillance, flow control, corrosion control, cathodic protection and monitoring systems of the LSPS, including, without limitation, the control system;

(x)    coordinating with the Host Operator and the Satellite Lease Operators all matters related to the operation, inspection and maintenance of the LSPS, including, but not limited to: (A) flow assurance procedures; (B) injection of chemicals and corrosion inhibitors; (C) pigging; (D) operation and maintenance of valves, and safety and safety shutdown devices and other controls and equipment; and (E) scheduling, performing and reporting all required tests on safety systems;

(xi)    shutting in of wells that Adversely Impact the LSPS;

(xii)    visually inspecting surface piping and equipment;

(xiii)    providing personnel;

(xiv)    providing consumables required for Production from the Satellite Leases;

Execution Version

(xv)   providing routine helicopter and boat transportation or coordinating same with the Host Operator;

(xvi)   conducting inspection of the LSPS;

(xvii)   surveillance and operation of the control system;

(xviii) performing all routine maintenance of the LSPS, including pigging and corrosion control;

(xix)   perform such additional services not specifically enumerated herein, including accounting services and services relating to the PHA, including coordinating with the Host Operator and the Satellite Lease Operators in relation to the interface between the LSPS, the Host and the Satellite Leases, which may be reasonably necessary for Operation of the LSPS; and

(xx)   such other operational, administrative, maintenance and repair services not described in this Section 4.01 as are required for Operating the LSPS;

4.02   <u>Overhead Rates</u>.  Notwithstanding anything to the contrary contained herein, the Satellite Lease Owners shall pay the LSPS Operator the overhead rates as provided under the accounting procedures attached as Exhibit "E".

4.03   <u>Exclusive Rights</u>.  In connection with its performance under Section 4.01, the LSPS Operator will have the exclusive right to: (a) enter into and administer all related contracts; (b) administer and direct all contractors and support personnel related to such performance; and (c) request that the Host Operator provide certain services pursuant to Exhibit "E" of the PHA and to direct the Host Operator with respect to such services.

4.04   <u>Independent Contractor</u>.  The LSPS Operator shall be an independent contractor and not an employee, agent or servant of the LSPS Owners.  This Agreement does not create any partnership or joint venture between the LSPS Operator and the LSPS Owners.  All actions of the LSPS Operator undertaken pursuant to this Agreement shall be subject to the general direction of the LSPS Owners in accordance with the provisions of this Agreement, but except as otherwise expressly provided in this Agreement, the LSPS Owners shall not have the right to supervise, direct or control the LSPS Operator's day-to-day performance of its duties and responsibilities under this Agreement or to exercise such general direction contrary to the provisions of this Agreement.

4.05   <u>Performance of Services</u>.  For the purposes of providing the Services or Project Services necessary in connection with the LSPS, the LSPS Operator may utilize its employees, employees of its Affiliates or leased employees.  It may also utilize independent subcontractors who are not employees to perform the Services or Project Services.  To the extent that some of the Services

Execution Version

described in this Article IV are to be performed from time to time by the Host Operator in accordance with Exhibit "E" of the PHA, the LSPS Operator will oversee the supervision and administrative functions relating to these duties.

4.06   Workmanlike Conduct. The LSPS Operator agrees to conduct all Services and Project Services in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice as would a reasonable and prudent operator under the same or similar circumstances. The LSPS Operator shall not be liable to the Parties for losses sustained or liabilities incurred in connection with the performance of the Services and Project Services, except as may result from its gross negligence or willful misconduct. Notwithstanding the foregoing, to the extent that the LSPS Operator conducts Services in accordance with the expressly applicable provisions of Exhibit "J", the LSPS Operator shall be deemed to have met the foregoing standard.

4.07   [Intentionally Omitted]

4.08   Major Non-Routine Expenses and Operations.

(a)   Major Non-Routine Expenses. Subject to the provisions of Section 8.02, the LSPS Operator shall give the LSPS Owners notice, including the rationale for conducting the activity and a description of the LSPS Operator's planned method of repair, before incurring any Major Non-Routine Expenses, except for emergencies and necessary engineering costs required to develop the LSPS Operator's planned method of repair, other than those previously approved by an AFE. Within seven (7) Days after receipt of such notice in accordance with this Section 4.08 any LSPS Owner may request and the LSPS Operator shall schedule and hold a meeting of the LSPS Owners to discuss the proposed Major Non-Routine Expense. In the event that a Satellite Lease well, or group of Satellite Lease wells, is curtailed or shut-in and an unanticipated Major Non-Routine Expense is to be incurred, then the notice shall be given as soon as is reasonably practical. The Parties shall endeavor to meet to discuss same as soon thereafter as is reasonably practical and operations may begin subsequent to the meeting as soon as approval is obtained, if required pursuant to Article VIII.

(b)   Operations. The LSPS Operator shall notify, seventy two (72) hours in advance, the applicable Satellite Lease Operator(s) when the LSPS Operator is going to be conducting operations in or within three thousand feet (3000') of any of the Satellite Well System. Such operations shall be conducted in compliance with Exhibit "J".

4.09   Minor Modifications to the Design Basis Document. As additional information becomes available to the LSPS Operator, the LSPS Operator may, prior to the Completion of the LSPS, make Minor Modifications to the Design Basis Document without the approval of the LSPS Owners which such Minor Modification shall be binding on all the LSPS Owners. For purposes of this paragraph, a "**Minor Modification**" is:

20

(a)     a modification which does not cause the estimated amount of any Building AFE (by itself or when added to other concurrent Minor Modifications) to increase by more than fifteen percent (15%) or Thirty Million Four Hundred Thousand and No/100 Dollars ($30,400,000), whichever is less, and is not a Major Modification;

(b)     a modification that is necessary for health, safety, or environmental reasons or regulatory requirements and is not anticipated to exceed fifteen percent (15%) of the cumulative amounts set forth in Exhibit "C", even if that expenditure constitutes a Major Modification; or

(c)     a modification that is not a Major Modification.

4.10    Major Modifications to the Design Basis Document. A Major Modification shall require the unanimous agreement of the LSPS Owners. When a Major Modification to the LSPS is proposed prior to the Completion of the LSPS, the LSPS Operator shall furnish the LSPS Owners with the proposed Major Modification to the LSPS (and associated AFEs). If a Major Modification to the Design Basis Document is approved, the Design Basis Document (and associated AFEs) shall be deemed modified, and the LSPS Operator shall carry out the modified Design Basis Document.  If a Major Modification is not approved, the LSPS Operator shall continue to implement the Design Basis Document as it was before such proposed Major Modification.

4.11    Meetings. The LSPS Operator shall also be responsible for holding quarterly meetings with the LSPS Owners during Building and Operations (or such other frequency as agreed by a Majority Interest) and notifying each LSPS Owner of such meeting at least seven (7) Days prior to such meeting.

4.12    Liens and Encumbrances. The LSPS Operator shall use reasonable efforts to keep the LSPS free from all liens and encumbrances which might arise under the Building and Operation of the LSPS. In the event a lien is placed on the LSPS, the LSPS Operator shall make reasonable efforts to remove such lien.

4.13    Execute and Negotiate Agreements. The LSPS Operator will negotiate, prepare, and enter into all agreements in connection with authorized expenditures under this Agreement.

4.14    Authorization to Enter. Subject to any limitations or restrictions imposed by law or by the terms or conditions of any license or right granted by any governmental authority, the LSPS Owners hereby grant to LSPS Operator to the extent necessary for the purposes of this Agreement and allowed by law, the non-exclusive right to enter upon any portion of the Rights-of-Way and the Satellite Leases for the purposes of performing Project Services and Services pursuant to this Agreement.

4.15    Shutting-in Satellite Leases. In accordance with Exhibit "J" of this Agreement and Exhibit "E" of the PHA and this Section 4.15, the LSPS Operator has the right to shut-in any

21                              Execution Version

Satellite Lease or Satellite Lease well as a prudent operator would have under the same or similar circumstances upon indication of a problem or operating condition that is having or could have an Adverse Impact on the LSPS or the Host. In so doing, the LSPS Operator will adhere to the Operating Guidelines and Standards set forth in Exhibit "J" of this Agreement. A Satellite Lease Operator intending a re-start of a shut-in Satellite Lease well or Satellite Lease must first demonstrate to the satisfaction of the LSPS Operator that such re-start is in compliance with the Exhibit "J".

4.16   Notice. The LSPS Operator shall promptly provide written notice to the LSPS Owners setting forth the estimated date of Completion.

## Article V.   LSPS BUILDING AFES

5.01   Building AFEs. The LSPS Operator has charged and invoiced, and will continue to charge and invoice, the LSPS Owners, as set forth in the Isabela JOA and Exhibit "C" (Accounting Procedure) of the Isabela JOA, for each LSPS Owner's Equity Interest share of costs and expenses for the Building and Completion of the LSPS. The LSPS Owners have approved the Building AFEs set forth in Exhibit "C" and paid a portion of the Building AFEs set forth in Exhibit "C."

5.02   Supplemental Building AFEs. Should the LSPS Operator anticipate that Building and Completion expenditures made pursuant to this Agreement will exceed any of the Building AFEs, exclusive of Change Order Costs, by more than fifteen percent (15%) or Thirty Million Five Hundred Thousand and No/100 Dollars ($30,500,000), whichever is less, the LSPS Operator shall submit a Supplemental Building AFE to the LSPS Owners in accordance with the Isabela JOA to make an election as to their further participation in the Building of the LSPS. Should less than all of the Parties approve the Supplemental Building AFE, the approving Parties will pay their proportionate share of the costs in excess of one hundred fifteen percent (115%) of the previously approved Building AFE in the proportion that the interest of each approving Party bears to the aggregate interest of all approving Parties. The non-approving Parties shall be deemed to have withdrawn from this Agreement, and the provisions of Article XII shall apply to such withdrawal. Any Supplemental Building AFE will be charged and invoiced in accordance with the Isabela JOA and Exhibit "C" (Accounting Procedure) of the Isabela JOA.

5.03   Single Satellite Lease Change Order Procedures During the Building and Through Completion of the LSPS.

    (a)   Single Satellite Lease Change Orders.  If, during the Building and through Completion of the LSPS, the Satellite Lease Owners of a single Satellite Lease desire a change which may result in a change to the Design Basis Document for the benefit of that Single Satellite Lease ("Single Satellite Lease Change Order") then the Satellite Lease Operator of the Single Satellite Lease requesting the Single Satellite Lease Change Order shall notify the LSPS Operator of such Single Satellite Lease Change Order.

(b) <u>Change Order AFE</u>. The LSPS Operator shall prepare a Single Satellite Lease Change Order AFE ("Change Order AFE") in accordance with Exhibit "C" (Accounting Procedure) of the Isabela JOA and submit it to such Satellite Lease Operator for approval. The Satellite Lease Operator shall submit the Change Order AFE to the Satellite Lease Owners for approval pursuant to the Joint Operating Agreement governing operations of such single Satellite Lease.

(c) <u>Approval of Change Order AFE</u>.

    (i) If the Change Order AFE is approved by the Satellite Lease Owners the Satellite Lease Operator shall notify the LSPS Operator of such approval and all Satellite Lease Owners shall be deemed to have approved the Change Order AFE.

    (ii) If the Change Order AFE is approved by the Satellite Lease Owners, LSPS Operator shall submit the Change Order AFE to the LSPS Owners for Majority Interest approval. If the LSPS Owners approve the Change Order AFE by a Majority Interest then the LSPS Operator shall conduct the activities approved pursuant to the Change Order AFE. If the Change Order AFE does not receive Majority Interest approval by the LSPS Owners then the LSPS Operator shall not conduct the activities set forth in the Change Order AFE.

(d) <u>Change Order Costs</u>. All Building and Completion costs and expenses relating to the Single Satellite Change Order and subsequent Change Order AFE ("Change Order Costs") shall be borne by the respective Satellite Lease Owners requesting the Single Satellite Lease Change Order. Should the LSPS Operator anticipate that Change Order Costs will exceed the total estimated amount of the Change Order AFE by at least fifteen percent (15%), the LSPS Operator shall promptly prepare a revised cost estimate evidenced by a Supplemental Change Order AFE to be submitted to the Satellite Lease Operator for Satellite Lease Owner approval. Should the Supplemental Change Order AFE be approved by Satellite Lease Owners constituting more than fifty percent (50%) of the voting interest under the respective Joint Operating Agreement for the Satellite Lease, all such Satellite Lease Owners will be deemed to have approved the Supplemental Change Order AFE. Should less than such ownership interest approve the Supplemental Change Order the non-approving Parties shall be deemed to be approving Parties and shall be deemed to have approved the Supplemental Change Order. All Satellite Lease Owners in such Satellite Lease will pay their proportionate share of the costs in excess of one hundred fifteen percent (115%) of the Change Order AFE.

Execution Version

5.04    Other Costs. All costs not otherwise allocated to specific LSPS Owner(s) pursuant to this Agreement shall be borne by all of the LSPS Owners based on their Equity Interests in the LSPS and such Equity Interests shall not be reallocated pursuant to any action taken in accordance with Section 5.03.

## Article VI.   RIGHTS AND OBLIGATIONS OF THE LSPS OWNERS

6.01    Allocation Costs and Expenses of the LSPS. Except as expressly provided otherwise in this Agreement, all the costs and expenses connected with the Building of the LSPS shall be borne by the LSPS Owners in accordance with the Equity Interests. All the costs and expenses connected with the Operation of the LSPS shall be borne by the LSPS Owners as provided by this Agreement.

6.02    Progress Reports and Inspections.

(a)    Work Product Review. Upon request by any LSPS Owner, the LSPS Operator shall make available to such LSPS Owner for review any or all Work Product.

(b)    Progress Reports. During Building operations, the LSPS Operator shall furnish written progress reports to the LSPS Owners on a monthly basis.

6.03    Access. Subject to the provisions of the PHA with respect to access to the Host, during Building of any LSPS facilities, each LSPS Owner, at its sole cost, risk, and expense, shall have the right of access to the offshore Building site(s) and the right to inspect all phases of Building operations and all Records pertaining thereto at all such times and locations as to not unreasonably interfere with such Building operations and are within the logistic limitations of offshore sites. The LSPS Operator shall advise each LSPS Owner in writing when installation of all or a major portion of the LSPS has been completed and the date, time and place of any testing of the LSPS, or any portion thereof, sufficiently in advance to allow a LSPS Owner the option to be present and witness any and all such testing, within the logistic limitations of offshore sites. Further, upon written request to the LSPS Operator, any LSPS Owner will have the right to receive, without cost to the requesting LSPS Owner, "as built" drawings and data relating to engineering calculations, specifications, materials and equipment installation and testing of the LSPS and an itemized inventory and documentation of the LSPS.

## Article VII.   RIGHTS AND OBLIGATIONS OF SATELLITE LEASES

7.01    Rights and Obligations of the Satellite Leases. Subject to the terms and conditions of this Agreement and Exhibit "J" attached hereto, the Satellite Lease Operators on behalf of the Satellite Lease Owners hereby agree to operate, maintain, use, repair, replace, modify, enhance, dismantle, dispose, disconnect and abandon the Satellite Well System so as to minimize any Adverse Impact to the LSPS and the Host. Each Satellite Lease Operator shall make every reasonable effort to isolate any specific Satellite Well System problem thereby mitigating any Adverse Impact to the LSPS and the Host until the Satellite Lease Operator has performed the

24                                    Execution Version

work necessary to rectify the problem. All such work shall be performed in an efficient, safe manner and in conformity with the usual practices in the industry and in accordance with the Satellite Lease Operator's safety and environmental policies. Subject to the provisions of this Section 7.01, it is the intent of the LSPS Operator and the LSPS Owners to not unduly restrict, impede, or otherwise delay the activities of the Satellite Lease Operators with respect to operations conducted on the Satellite Leases.

7.02   Connection of a Satellite Well System to the LSPS.

(a)   Scheduling. The LSPS Operator shall determine the timing and scheduling of all activities and operations involving the connection of the Satellite Well System to the LSPS.

(b)   Specifications. Each Satellite Operator shall provide to the LSPS Operator, in a timely manner and as requested by the LSPS Operator, the design and specifications of its respective Satellite Well System. The LSPS Operator shall review the design and specifications of the respective Satellite Well System and, if necessary, shall submit LSPS Operator's required modifications to each Satellite Lease Operator within ninety (90) Days of its receipt of each Satellite Well System's design and specifications. Such required modifications shall be limited to those which are necessary to prevent Adverse Impacts or Enhanced Risk to the ongoing operations of the LSPS, in LSPS Operator's reasonable judgment. Each Satellite Operator shall revise its design and specifications to conform to the required modifications submitted by the LSPS Operator.

7.03   Authorization to Enter. Subject to any limitations or restrictions imposed by the PHA, by law or by the terms or conditions of any license or right granted by any governmental authority, the LSPS Operator hereby grants to the Satellite Lease Operators on behalf of the Satellite Lease Owners to the extent necessary for the purposes of this Agreement and allowed by law, the non-exclusive right upon reasonable prior written notice to enter upon any portion of the Rights-of-Way for the purposes of complying with their responsibilities pursuant to this Agreement. The Satellite Lease Operators agree to exercise these rights in a manner which is in compliance with: (a) this Agreement; (b) all applicable laws, rules, regulations, leases, licenses, permits; (c) the LSPS Operator's standard and reasonable safety procedures; and (d) the Satellite Lease Operator's standard and reasonable safety procedures.

7.04   [Intentionally Omitted]

7.05   [Intentionally Omitted]

7.06   Gathering, Handling and Transporting Production Downstream. Each Satellite Lease Owner will be responsible for all commercial terms and arrangements for the processing, handling, marketing, gathering and transporting of its respective Production downstream of the LSPS Delivery Point.

Execution Version

7.07   <u>Modifications to the LSPS to Meet Regulatory Royalty Requirements.</u>   Notwithstanding the provisions of Section 7.08 hereof, should any Satellite Lease(s) incur a royalty obligation when the other Satellite Lease(s) have no such obligation, the respective Satellite Lease Owners shall have the right to cause the LSPS Operator to implement modifications or additions to the LSPS necessary to meet BOEMRE and/or other regulatory requirements at the Satellite Lease Owners sole risk, cost and expense.

7.08   <u>Sole Benefit Operation.</u>   Subject to the other provisions of this Article VII, during Operation any LSPS Owner(s) shall have the right to request that the LSPS Operator conduct an Operation for the benefit of less than all Parties ("**Sole Benefit Operation**"), provided such Sole Benefit Operation does not have an Adverse Impact on the LSPS. The proposed Sole Benefit Operation request shall be submitted to the LSPS Operator for determination that such operation satisfies the following criteria: (a) such operation has mitigated the risk of an Adverse Impact to the LSPS to a level that is ALARP for such type of planned activity; (b) the planned activity is in compliance with the Exhibit "J"; and (c) such operation either: (i) poses no Enhanced Risk; or (ii) does pose an Enhanced Risk and the conduct of such operation is approved by a Majority Interest. The LSPS Operator shall undertake such Sole Benefit Operation, in accordance with the plans and procedures approved by both the LSPS Operator and the LSPS Owner(s) requesting the Sole Benefit Operation, as soon as reasonably practical unless such delay is occasioned by Force Majeure. The Sole Benefit Operation shall be at the sole risk, cost and expense (including, as applicable, the future cost of restoring the LSPS to its condition prior to the conduct of such Sole Benefit Operation unless otherwise agreed to pursuant to the terms hereof) of the LSPS Owner(s) requesting such Sole Benefit Operation. Any incidental operational benefit derived from such Sole Benefit Operation and ownership of any equipment and/or infrastructure installed as a result of such Sole Benefit Operation, shall be owned by all LSPS Owners on an Equity Interest basis.

## Article VIII.   OPERATING EXPENDITURES AND ANNUAL OPERATING PLAN

8.01   Annual Operating Plan and Forecasts.

  (a)   Annual Operating Plan.   Beginning on May 1, 2012 and continuing annually thereafter, the LSPS Operator will furnish the LSPS Owners with a draft of the annual operating plan for the next calendar year ("**Annual Operating Plan**"). The Annual Operating Plan shall include planned Operations and forecasts and other informational items, including but not limited to operational information (such as Production volumes as received from the Satellite Lease Operators) and be accompanied by a budget to carry out such Annual Operating Plan. The Annual Operating Plan will include the following budgetary information:

    (i)   Capital Expenditures anticipated for the next calendar year, which shall include an itemization of each capital project the cost of which is reasonably estimated to exceed Three Million and No/100 Dollars ($3,000,000); and

Execution Version

(ii)    Operating Expenses anticipated for the next calendar year, which shall include an itemization of each Operating project the cost of which is reasonably estimated to exceed One Million and No/100 Dollars ($1,000,000), including Major Non-Routine Expenses, anticipated for the next calendar year.

(b)    <u>Suggested Revisions to Annual Operating Plan</u>.  The LSPS Owners may provide written suggested changes, additions, or deletions to the LSPS Operator's draft of the Annual Operating Plan by July 15th of each year.  The LSPS Operator will make the revisions it deems necessary and furnish the Annual Operating Plan to the LSPS Owners no later than October 1st of each year.

8.02    <u>Authority for Expenditures</u>.

(c)    <u>Operating and Capital Expenses</u>.

(i)    <u>AFE Approval</u>.  The LSPS Operator shall not incur any single expenditure costing One Million and No/100 Dollars ($1,000,000) or more, unless the LSPS Operator submits an AFE for prior approval by a Majority Interest of the LSPS Owners. For any single expenditure costing in excess of Fifty Thousand and No/100 Dollars ($50,000) and less than One Million and No/100 Dollars ($1,000,000), the LSPS Operator shall furnish written information describing the expenditure to each of the LSPS Owners and no approval from the LSPS Owners shall be required. Total costs associated with any single LSPS Owner approved AFE shall not exceed the budgeted amount by more than fifteen percent (15%) or Five Hundred Thousand and No/100 Dollars ($500,000), which ever is less, without prior approval of a Majority Interest of the LSPS Owners.

(ii)    <u>First Four Years</u>.  Not withstanding the above, during each of the first four (4) years (twelve-month periods, not calendar years) following the date of Startup of the LSPS, Operating Expenses up to Five Million and No/100 Dollars ($5,000,000) cumulative per year shall be borne by the LSPS Owners on an Equity Interest basis without further financial approval. Subsequent to said four (4) year-period, any Operating Expense must follow the approval process set forth in this Section 8.02(a).

(d)    <u>Emergencies</u>.  Notwithstanding anything to the contrary contained herein, no prior notice or approval by the LSPS Owners is required if any expenditures or costs related to the LSPS are required due to the urgency of the situation (based on threat to life, safety, property, or the environment).  In the case of such urgent situation, the LSPS Operator may make such commitments or expenditures as it deems to be necessary or appropriate and report to the LSPS Owners, as promptly as possible, the nature of the urgency and the action taken. All costs, risks and

Execution Version

expenses related to such response shall be borne by the LSPS Owners in proportion to their respective Equity Interest.

8.03   Costs, Expenses, Expenditures, Revenues and Reimbursements.   The LSPS Operator shall conduct any and all necessary or appropriate activities to carry out its duties and responsibilities hereunder and is authorized to incur Capital Expenditures and Operating Expenses in connection therewith; provided that such expenditures are in accordance with Section 8.02. In addition to the overhead compensation described in Section 4.02, the LSPS Operator shall be fully reimbursed on a monthly basis by the LSPS Owners (in accordance with the allocation set forth in Section 8.04 for all reasonable and proper actual costs, expenses and expenditures incurred or to be incurred by the LSPS Operator within the scope of its responsibilities under this Agreement in accordance with and pursuant to the procedures set forth in Exhibit "E".

8.04   Costs Responsibilities/Allocations.   Except with respect to those expenses and/or revenues which are expressly provided herein as applicable to only certain LSPS Owner(s), each LSPS Owner will be responsible for its Equity Interest share, as described below, of each of the following:

    (a)    insurance (to the extent obtained for the benefit of all LSPS Owners), and other proceeds, shall be allocated based on Equity Interests;

    (b)    Operating Expenses, including charges to the LSPS Operator from the Host Operator in accordance with the PHA, shall be allocated on an Equity Interest basis;

    (c)    Capital Expenditures shall be allocated based on Equity Interests;

    (d)    Major Non-Routine Expenses shall be allocated based on Equity Interests; and

    (e)    the cost of replacement or refurbishment of primary or spare parts that are used for the LSPS, as needed, will be allocated on an Equity Interest basis.

8.05   Overhead.   Notwithstanding anything to the contrary in this Agreement, it is the intent of the Parties hereto that if any of the LSPS Owners are liable to the LSPS Operator for overhead on a cost or an expenditure incurred under the terms of this Agreement, then the LSPS Owners shall not be liable for overhead on such cost or expenditure under the terms of the PHA, the Isabela JOA, or the MC 519 UOA.

Execution Version

## Article IX.  RIGHTS OF USE OF THE LSPS

9.01    Rights of Use.  The LSPS Owners have the right to use the LSPS capacity to gather Satellite Lease Production based on the following:

(a)     capacity in the LSPS will be available only, and to the extent, that capacity for Satellite Lease Production is available at the Host ;

(b)     the LSPS Operator will endeavor to operate the LSPS so as to maximize production on a BOE basis;

(c)     provided that all legs of the LSPS are operational and are unconstrained, if any Satellite Lease Owner's Production is not, in their view, fully optimized, such Satellite Lease Owner may notify the other Parties and request a meeting to discuss the operational flow of Production on the LSPS.  If mutual agreement is not reached by all the Satellite Lease Owners and LSPS Owners with regard to the operational flow of production on the LSPS within thirty (30) Days of such meeting, then the LSPS Operator shall flow Production from the Isabela Lease up the westernmost leg of the LSPS and flow Production from the MC 519 Unit Leases up the easternmost leg of the LSPS; and

(d)     notwithstanding anything in this Agreement  to the contrary, if any leg of the LSPS is not operational or has impaired capacity which restricts the flow of one leg of the LSPS, regardless of the cause, then the LSPS Operator will endeavor to operate the LSPS so as to maximize production on a BOE basis, subject to endeavoring to ensure that the Isabela Lease and the MC 519 Unit Leases will each be afforded the opportunity to produce not less than "production in paying quantities"  as set forth in NTL No. 2010-G05 issued September 15, 2010 (or as subsequently amended) by the BOEMRE or any successor thereof.  The LSPS Operator will endeavor to place the LSPS back into full operational service as soon as practically possible.

## Article X.  METERING AND ALLOCATION

10.01  Measurement Standards.  The measurement of Production will be as recommended by, and in accordance with and in the following priority: (a) approved BOEMRE surface commingling permit; (b) the Host M&A, as such may be changed or amended from time to time; (c) requirements of this Agreement; (d) recommendations contained in the equipment manufacturers' installation and operation technical manuals to the extent practicable; and (e) API Manual of Petroleum Measurement Standards.  The LSPS Operator shall advise the Satellite Lease Operators should the Host M&A be materially changed or amended.

10.02  Production Allocation.  Subject to the provisions of this Article X, the LSPS Operator will, on a monthly basis, meter and allocate (or cause the Host Operator to have sampled,

29

metered, and allocated) Satellite Lease Production in compliance with the BOEMRE surface commingling permit. The LSPS Operator will on a monthly basis, make an allocation to each Satellite Lease of the total Production allocated to the Satellite Leases according to the Host M&A consistent with the measurement and allocation process as applied to all other production commingled upon the Host. The LSPS Operator will, or cause the Host Operator to, provide, within a reasonable time during the month following the month of production, an allocation statement and well test information, if any, to each Satellite Lease Operator, showing, at a minimum, the following information: (a) Production from all Satellite Lease processed and handled on the Host; (b) choke size; (c) flowing pressure; and (d) test duration. As to Sections 10.02 (b), (c), and (d), such information will be limited to the applicable Satellite Lease. The applicable Satellite Lease Owners will be responsible for all governmental and regulatory agency reporting and filing requirements for each Satellite Lease.

10.03   Btu Adjustments. The Parties recognize that the ultimate gas purchaser will compensate each of the Satellite Lease Owners for the amount of total Btu (units), attributable to and via the allocation process, allocated to their combined stream as an input to content of the common stream of gas passing through the LSPS and the Host, and further recognize that Production from a particular Satellite Lease may either dilute or enrich the Btu content of Production from the other Satellite Leases or other Production utilizing the Host. The LSPS Operator will cause a sample or samples of Production from each Satellite Lease stream to be taken to determine the Btu value thereof. The LSPS Operator will utilize the results of the analysis of the Btu sample for the purpose of adjusting the allocated volume set forth in this Article X. Such Btu analysis shall be the basis for an accounting adjustment which results in a MMBtu allocation of the Production from each of the Satellite Leases. In addition to the allocation of volumes of Production via the Host allocation process to the combined Satellite Leases stream, any allocation of Production will include adjustments in accordance with such Btu content based on such sampling and testing.

10.04   Oil Quality Bank and NGL Bank. In the event that an oil quality bank and/or an NGL bank is implemented by the Host Owners for Production handled on the Host, the LSPS Owners will utilize the same oil quality bank and NGL bank methodologies and procedures to handle oil and gas quality differences between the Satellite Leases.

10.05   Platform and Field Gas Imbalance Settlements.

(a)   Gas Field Imbalance. The Parties recognize that commingled Gas production from all leases processed on the Host will be allocated by the export pipeline company in accordance with its applicable tariff provisions based upon (i) allocation methodology selected by the Host Operator, acting in its capacity as the export pipeline's receipt point operator; and (ii) a party's nominations made in accordance with the applicable tariff. The Host Operator also performs an allocation of the "actual" entitlement Gas sales volumes of each lease based upon the methodology approved by the BOEMRE in the surface commingling permit and the terms and provisions of the PHA. It is the specific intent of the Parties that the imbalance between the two (2) above mentioned allocations be kept to a

minimum by all Parties diligently maintaining their Gas nominations in line with estimated lease Production on a daily and/or monthly basis.

(b) Gas Balancing Procedures. The Parties also recognize that the Host Operator is endeavoring to implement Gas balancing procedures at the Host Facility to handle any Gas imbalances created between the Host Lease Production, Satellite Production, and Third Party Production (as such terms are defined in the PHA and any such Gas imbalance herein referred to as **"Gas Field Imbalance"**) on a commercially reasonable basis, and once this Gas balancing procedure is implemented, the Parties will implement a Gas balancing procedure for the LSPS to handle such Gas Field Imbalances between the Satellite Leases utilizing the same methods of allocation as well as the same methods for resolving such Gas Field Imbalances as those implemented by the Host Operator. Until such Gas balancing procedures are agreed to, the LSPS Operator will allocate any such Gas Field Imbalances between the Satellite Leases in the same manner that the Host Operator allocates the imbalances created between the Host Lease Production, Satellite Production, and Third Party Production (as such terms are defined in the PHA) and provide a monthly statement to the Parties of any Gas Field Imbalances. In regards to a Gas Field Imbalance between the Satellite Leases prior to the Host Operator's implementation of Gas balancing procedures, each Party taking Gas shall pay or cause to be paid all royalty to whom it is accountable based on the volume of Gas actually taken by such Party. The Parties will make a good faith effort to resolve any Gas Field Imbalances between the Satellite Leases for a month in the succeeding month either through in-kind balancing or cash balancing (in the case of any cash balancing the unit price will be the price received and reported to BOEMRE for royalty purposes by the Party taking Gas in excess of its entitlement). The Parties agree that working interest Gas imbalances occurring among the Satellite Lease Owners within a Satellite Lease shall be resolved in accordance with the applicable separately negotiated gas balancing agreement attached to the applicable Joint Operating Agreement.

(c) Costs. The cost of installation, calibration, inspection and maintenance of any metering and sampling equipment for a particular Satellite Lease shall be borne solely by such Satellite Lease Owners. The cost of installation, calibration, inspection and maintenance of any metering and sampling equipment for the LSPS, as well as the costs of sampling and testing, will be an Operating Expense.

## Article XI.   VOTING AND APPROVAL

11.01 Voting. Unless in Default, each LSPS Owner will have a voting interest equal to its Equity Interest. Unless otherwise specifically provided in this Agreement, failure of an LSPS Owner (if entitled to vote) to respond within the period required is deemed to be a vote against the approval of any matter submitted for a vote. Except for matters specified in this Agreement expressly requiring Unanimity or those matters set forth in Section 5.02, all actions under this

Execution Version

Agreement require approval by a Majority Interest. Once a proposed action is approved by a Majority Interest, the proposed action is deemed to have been approved by all LSPS Owners.

(a)  Majority Interest Approval.  Actions requiring Majority Interest approval are as follows:

(i)  approval of Operating and Capital Expense AFE's as set forth in Section 8.02(a);

(ii)  selection of a new LSPS Operator;

(iii)  approval of the disposition of surplus material with a value, less the cost of disposition, if any, of greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000);

(iv)  approval of Change Order AFEs;

(v)  approval of any settlement of any Claim in excess of One Hundred Fifty Thousand and No/100 Dollars ($150,000) (including attorneys' fees incurred);

(vi)  approval of the engagement by the LSPS Operator of outside legal counsel to respond to any Claim to the extent such counsel's fees is expected to exceed Fifty Thousand and No/100 Dollars ($50,000);

(vii)  [intentionally omitted]

(viii)  approval to conduct a Sole Benefit Operation having been determined to pose an Enhanced Risk;

(ix)  approval to re-start a shut-in well or Satellite Lease that has been determined by the LSPS Operator to pose an Enhanced Risk; and

(x)  approval of the initiation of any lawsuit on behalf of the LSPS Owners.

(b)  Unanimous Approval.  Actions requiring Unanimous approval of the LSPS Owners are as follows:

(i)  approval of any Major Modification;

(ii)  any transfer or other alienation of any rights or interest under this Agreement not otherwise expressly permitted by Article XVII;

32                                    Execution Version

       (iii)   abandonment of the LSPS;

       (iv)   approval for accepting Production from any source other than a Satellite Lease; and

       (v)   subsequent to Completion, approval of an expansion adding facilities or equipment to the LSPS.

11.02   <u>AFE Approval Procedure.</u>

    (a)   For Article VIII AFEs, the response time to a proposed operation will depend upon the AFE gross expenditure amount. Response times will be as follows:

       (i)   AFE of One Million and No/100 Dollars ($1,000,000) or more but less than Ten Million and No/100 Dollars ($10,000,000) response will be made within thirty (30) Days of receipt of said proposal;

       (ii)   AFE of Ten Million and No/100 Dollars ($10,000,000) or more but less than Fifty Million and No/100 Dollars ($50,000,000) response will be made within sixty (60) Days of receipt of said proposal;

       (iii)   AFE of Fifty Million and No/100 Dollars ($50,000,000) or more but less than One Hundred Million and No/100 Dollars ($100,000,000) response will be made within ninety (90) Days of receipt of said proposal; and

       (iv)   AFE of One Hundred Million and No/100 Dollars ($100,000,000) or more response will be made within one hundred twenty (120) Days of receipt of said proposal.

    (b)   For Article V AFEs, the response time to a proposed Supplemental Building AFE, Change Order AFE or Supplemental Change Order AFE shall be made within thirty (30) Days of receipt of such proposal.

11.03   <u>Procedure for LSPS Owners' Proposal.</u> Within fifteen (15) Days after the LSPS Operator proposes an AFE pursuant to Article VIII, an LSPS Owner may provide a written counter proposal (and AFE, if required under the terms of this Agreement) to the LSPS Operator and all other LSPS Owners. Within ten (10) Days of receiving such counter proposal, the LSPS Operator shall call a meeting of the Parties for the purpose of determining by Majority Interest approval, which proposal shall be approved.

Execution Version

## Article XII.   WITHDRAWAL

12.01   Right to Withdraw.

(a)     Prior to Completion, no Party shall have the right to withdraw from this Agreement, except that a Party shall be deemed to have withdrawn as provided for in Section 5.02. The non-approval by such Party of any approved Supplemental Building AFE under Section 5.02 shall be deemed to constitute a Withdrawal Notice for purposes of Section 12.01. If a Party is deemed to have withdrawn prior to Completion in accordance with the provisions of Section 5.02, such Party shall be a Withdrawing Party for the purposes of Section 12.03. If such Party is an owner in only one (1) Satellite Lease such Party shall be a Withdrawing Party in accordance with Section 12.03(a). If such Party is an owner in both Satellite Leases, such Party shall be a Withdrawing Party in accordance with Section 12.03(b).The non-approval by such Party of any approved Supplemental Building AFE under Section 5.02 shall be deemed to constitute a Withdrawal Notice in accordance with Section 12.02.

(b)     After Completion, any LSPS Owner may withdraw from this Agreement. If such LSPS Owner is withdrawing from only one (1) Satellite Lease, such withdrawal shall be carried out in accordance with Section 12.03(a). If such LSPS Owner is withdrawing from both Satellite Leases, such Party shall be a Withdrawing Party in accordance with Section 12.03(b).

(c)     The provisions of this Article XII do not apply to the LSPS Operator. The LSPS Operator, however, may resign in accordance with the provisions of Section 3.02(b).

12.02   Withdrawal Notice.   After Completion, and subject to the provisions of this Article XII, any Party may withdraw from this Agreement ("Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("Withdrawal Notice").   The Withdrawal Notice is an unconditional and irrevocable conveyance offer by the Withdrawing Party to convey to the applicable Parties that elect not to join in such withdrawal ("Remaining Parties"), for no consideration, in accordance with Section 12.03 below, the Withdrawing Party's entire: (a) Equity Interest in all of the LSPS and all other property and equipment owned under the terms of this Agreement; (b) interest in this Agreement; and (c) leasehold and ownership interest in the respective Satellite Lease, Satellite Well System, and Satellite Production (collectively, the "Withdrawal Interest").   The Withdrawal Notice shall specify an effective date of withdrawal which date shall be at least sixty (60) Days, but not more than one hundred eighty (180) Days after the delivery of the Withdrawal Notice described above.   If no effective date is specified, the withdrawal shall be effective sixty (60) Days after the delivery of the Withdrawal Notice.   Within thirty (30) Days of receipt of the Withdrawal Notice, each other applicable Party, as described in Section 12.03 below, may elect to join in the withdrawal, by providing written notice to the other Parties.   Failure to respond to a Withdrawal Notice within such thirty (30)

Execution Version

Days is deemed an election not to join in the withdrawal. The LSPS Operator shall immediately advise the Parties in writing of the elections made by the Parties under this Article XII.

12.03   Withdrawal From Single or Both Satellite Leases.

(a)   Withdrawing Party Withdrawing its Interest from a Single Satellite Lease.

(i)   If the Withdrawing Party elects to withdraw from this Agreement with respect to a single Satellite Lease, and one or more of the other Satellite Lease Owners in such Satellite Lease elect not to join in the withdrawal, then such Remaining Parties in the Satellite Lease must accept an assignment from the Withdrawing Party or Withdrawing Parties of the Withdrawal Interest(s) in proportion to the Remaining Party's leasehold interest in such Satellite Lease, and must assume all obligations with respect to such Withdrawing Interest(s).

(ii)   If the Withdrawing Party elects to withdraw from this Agreement with respect to a single Satellite Lease, and all of the other Satellite Lease Owners in such Satellite Lease elect to join in the withdrawal and thus become Withdrawing Parties, then the Satellite Lease Owners of the other Satellite Lease ("Remaining Owners") shall have the election to assume all of the Withdrawal Interests of the Withdrawing Parties, in the proportion that the leasehold interest of each such Remaining Owner bears to the aggregate leasehold interests of all such Remaining Owners. The Remaining Owners shall have forty-eight (48) hours (exclusive of Saturdays, Sundays, and federal holidays) after delivery of the notice from the LSPS Operator of the elections made by the Withdrawing Parties under Section 12.02. Failure to timely make an election shall be deemed an election by a Remaining Owner not to assume its share of the Withdrawal Interests. In the event none of the Remaining Owners elect to assume all of the Withdrawal Interests, then the Withdrawing Parties shall disconnect their respective Satellite Lease from the LSPS under the direction and authority of the LSPS Operator, and such Withdrawing Parties shall remain liable for the abandonment of such Satellite Lease and Satellite Well System in accordance with the provisions of the respective Joint Operating Agreement, and the Remaining Owners shall only assume their share of the Withdrawal Interests described in Section 12.02(a) and Section 12.02(b) in the proportion that the leasehold interest of each such Remaining Owner bears to the aggregate leasehold interests of all such Remaining Owners.

(b)   Withdrawing Party Withdrawing its Interest from Both Satellite Leases.

(i)   If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and one or more of the other Satellite

Execution Version

Lease Owners in either of the Satellite Leases elect not to join in the withdrawal, then such Remaining Parties in each Satellite Lease must accept an assignment from the Withdrawing Party or Withdrawing Parties of the Withdrawal Interest(s) in proportion to the Remaining Party's leasehold interest in each respective Satellite Lease, and must assume all obligations with respect to such Withdrawing Interest(s).

(ii)  If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and one or more of the other Satellite Lease Owners in one of the Satellite Leases elect not to join in the withdrawal, but all of the Satellite Lease Owners in the other Satellite Lease elect to join in the withdrawal, then the Withdrawing Parties and the Remaining Owners shall proceed under Section 12.03(a)(ii) above.

(iii)  If the Withdrawing Party elects to withdraw from this Agreement with respect to both Satellite Leases and all the Satellite Lease Owners of both Satellite Leases elect to join in the withdrawal, then:

(A)  no assignment of the Withdrawal Interests shall take place;

(B)  no further proposals may be made under this Agreement unless agreed by all Parties;

(C)  the Parties shall abandon all operations on the LSPS; and

(D)  the LSPS Operator shall:

(I)  provide all Parties with a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within sixty (60) Days after receipt of the elections to withdraw; and

(II)  cease operations and begin to permanently abandon the LSPS in accordance with the abandonment plan.

12.04  Effects of Withdrawal.  After giving its Withdrawal Notice, a Withdrawing Party is not entitled to make an election or vote on any matter, other than matters for which it retains a financial responsibility.  A Withdrawing Party shall take all necessary steps to accomplish its withdrawal by the effective date referred to in Section 12.02 and shall execute and deliver to the Remaining Parties or Remaining Owners, as the case may be, all necessary instruments to assign its Withdrawal Interest to the Remaining Parties or Remaining Owners, as the case may be.  A Withdrawing Party shall bear all expenses associated with its withdrawal and the transfer of its Withdrawal Interest.  Upon delivery of the necessary instruments to assign its Withdrawal Interest and payment of the sums described in Section 12.05, the Withdrawing Party shall be

Execution Version

relieved of all obligations and liabilities associated with such assigned Withdrawal Interests, whether arising prior to or after the effective date of such withdrawal, and the Remaining Parties or Remaining Owners, as the case may be, shall assume such obligations and liabilities.

12.05   Limitation Upon and Conditions of Withdrawal.

(a)     Prior Expenses. Subject to Section 12.04, a Withdrawing Party remains liable for its participating share of any costs of activities, operations, damages or other liability or expense accruing or relating to operations conducted pursuant to this Agreement prior to the effective date of the withdrawal or in which the Withdrawing Party elected or voted to participate prior to the effective date of the withdrawal. Prior to the effective date of the withdrawal, the LSPS Operator shall render a statement to each Withdrawing Party for: (A) its share of all identifiable expenses which it incurred or approved prior to the Withdrawal Notice or election to withdraw, whichever is applicable; (B) its Equity Interest share of the estimated current costs of abandoning the LSPS and (C) its Equity Interest share of the estimated current salvage value of the LSPS.  Such expenses, costs and salvage value shall be prepared by the LSPS Operator in accordance with Exhibit "E". Prior to accomplishing its withdrawal, a Withdrawing Party shall either (Y) pay to the LSPS Operator for the benefit of the Remaining Parties or Remaining Owners, whichever is applicable, the sum of the amounts described in (A) and (B) less (C) above if the prior expenses and abandonment costs exceed the salvage value of the LSPS, or (Z) receive from the LSPS Operator the sum of (C) less (A) and (B) above if the salvage value exceeds the prior expenses and abandonment costs of the LSPS.  Any liens, charges and other encumbrances which the Withdrawing Party placed (or caused to be placed) on its Withdrawal Interest shall be fully satisfied or released prior to the effective date of its withdrawal (unless the Remaining Parties or Remaining Owners, as the case may be, are willing to accept the Withdrawal Interest subject to such liens, charges and other encumbrances).  The withdrawal provisions of the applicable Joint Operating Agreement shall apply in respect to the transfer of the Withdrawal Interest by a Satellite Lease Owner to the extent not in conflict with the provisions of this Article XII.

(b)     Confidentiality.  A Withdrawing Party will continue to be bound by the confidentiality provisions of Article XIII after the effective date of the withdrawal, but will have no further access to technical information relating to any operations hereunder.  The Withdrawing Party is not required to return to the Remaining Parties, or Remaining Owners, as the case may be, Confidential Data acquired prior to the effective date of the withdrawal.

(c)     Emergencies and Force Majeure. No Party may withdraw during a Force Majeure or emergency which poses a threat to life, safety, property or the environment but may withdraw from this Agreement in accordance with this Article XII after termination of the Force Majeure or emergency.  A Withdrawing Party remains

Execution Version

liable for its share of all costs and liabilities arising from the Force Majeure or emergency, including but not limited to, the containment and cleanup of oil spills and pollution and all costs of debris removal made necessary by the Force Majeure or emergency.

## Article XIII.  OWNERSHIP AND CONFIDENTIALITY OF INFORMATION

13.01  Ownership.  All Records and Work Product, arising out of this Agreement, including that which is obtained pursuant to Exhibit "K" shall be and are the sole and exclusive property of the LSPS Owners.  Upon request of any LSPS Owner, the LSPS Operator shall furnish the requesting LSPS Owner, with copies of Records and Work Product.

13.02  Confidentiality.  Each Party (a) shall hold and maintain the Confidential Information in the strictest of confidence; and (b) without the prior written consent of the other Parties, shall not disclose any such information to any Third Party other than to the officers, employees, counsel, consultants, representatives or agents of such Party or its Affiliates. Additionally, Confidential Information acquired or obtained by any Party shall be kept confidential during the term of this Agreement for a confidentiality period commencing on the date of execution of this Agreement and extending through the later of two (2) years following the termination of the Project Team  or seven (7) years following the date of execution of this Agreement   and shall not be disclosed to any Third Party, unless disclosed under paragraph (a)   (an "exception to confidentiality") or under paragraph (b) (a "permitted disclosure") below.  Each Party shall maintain the secrecy of the Confidential Information, using the standard of care it normally uses in protecting its own confidential information and trade secrets.

(a)     Exceptions to Confidentiality.  The confidentiality obligation shall not apply to the extent that particular items of Confidential Information:

(i)     are now or later become part of the public domain (other than as a result of a wrongful act or omission by a Party hereunder); or

(ii)    are now or later become available to a Party on a non-confidential basis from a Third Party having, to the best knowledge of  the receiving Party, the legal right to do so; or

(iii)   were known to a Party on a non-confidential basis prior to the disclosure of the Confidential Information to it under the terms of this Agreement or to which such Party was otherwise entitled at the time of disclosure; or

(iv)    are independently developed by employees or contractors of a Party who have not had access to the Confidential Information.

(b)     Permitted Disclosures.  The LSPS Operator may disclose items of Confidential Information to such third parties as may be necessary in connection with this

38                              Execution Version

Agreement, provided such Third Parties are bound by written agreement to keep secret the Confidential Information for a period of time not less than the later of two (2) years following the termination of the Project Team or seven (7) years following the date of execution of this Agreement. The LSPS Operator disclosing items of Confidential Information shall promptly inform the other Parties of the names of such third parties and list the items of Confidential Information disclosed. Notwithstanding anything contained herein to the contrary and subject to the restrictions that the Confidential Information shall not be removed from the custody and premises of the Party making such disclosure, and that such Third Party (except under sub-paragraph 13.02(b)(v) below) be bound by written agreement not to use or disclose the Confidential Information except for the express purpose for which such disclosure is to be made, any Party may disclose, in whole or in part, the Confidential Information:

(i)     to any Affiliate of such Party provided such Affiliate is bound by the confidentiality provisions contained herein; or

(ii)    to any bona fide, financially responsible, prospective assignee of any portion of such Party's Equity Interest (including but not limited to an entity with whom a Party or its Affiliate is conducting bona fide negotiations directed toward a merger, consolidation or a sale of a Party's or an Affiliate's shares or substantially all of its assets in the Gulf of Mexico), provided that the disclosing Party shall give all other Parties not less than fifteen (15) Days advance written notice specifying the extent to which that Party intends to disclose the Confidential Information to the prospective assignee and the name of such prospective assignee; or

(iii)   to any potential contractors, professional consultants, or outside legal counsel engaged by or on behalf of such Party and acting in a capacity where such disclosure is essential to such contractor's, consultant's, or outside legal counsel's work; or

(iv)    to any bank or other financial institution to the extent appropriate to a Party arranging financing for its obligations under this Agreement; or

(v)     to the extent required by the terms of any Satellite Lease, or by law, order, decree, regulation or rule (including without limitation, those of any regulatory agency, securities commission, stock exchange, judicial or administrative proceeding).   If a Party is so required to disclose Confidential Information, such Party shall promptly provide all other Parties to this Agreement written notice of such proceedings so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such Confidential Information as is legally required and will use its reasonable efforts to obtain confidential treatment for any Confidential Information disclosed.

Execution Version

(c)     <u>Continuing Confidentiality Obligation</u>. Any Party who ceases to own an Equity Interest in the LSPS remains bound by the confidentiality and use obligations of this Agreement as to any Confidential Information obtained through this Agreement.

(d)     <u>Ownership of Confidential Information</u>. Except as otherwise provided for in this Article XIII all Confidential Information produced as a result of or in connection with an operation under this Agreement shall be the property of all LSPS Owners bearing the cost of that operation.

### Article XIV.   <u>INDEMNITIES</u>

14.01   **LIABILITIES.** For purposes of this Article XIV, in the event that in addition to being a LSPS Owner, a Party is an Isabela Lease Owner and/or MC 519 Unit Lease Owner then all of said Party's actions in performing any of the functions contemplated in Section 14.01(a) are conclusively presumed to have been performed in the role of LSPS Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 14.01(b) are conclusively presumed to have been performed in the role of Isabela Lease Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 14.01(c) are conclusively presumed to have been performed in the role of MC 519 Unit Lease Owner. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THIS ARTICLE XIV SHALL GOVERN THE INDEMNITY AND DEFENSE OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THE INDEMNITY OBLIGATIONS OF THE LSPS OWNERS, THE ISABELA LEASE OWNERS, AND THE MC 519 UNIT LEASE OWNERS SHALL BE SEVERAL AND NOT JOINT OR COLLECTIVE.

(a)     <u>LSPS OWNERS' INDEMNITY OBLIGATIONS</u>: THE LSPS OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE ISABELA LEASE OWNERS' GROUP, AND THE MC 519 UNIT LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

      (i)     all injuries to, deaths, or illnesses of any member of the LSPS Owners' Group; and

      (ii)     all damages to or losses of any property of any member of the LSPS Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, THE ISABELA LEASE OWNERS' GROUP, THE MC 519 UNIT LEASE OWNERS' GROUP, OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM

Execution Version

THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

(b)  ISABELA LEASE OWNERS' INDEMNITY OBLIGATIONS: THE ISABELA LEASE OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS GROUP, AND THE MC 519 UNIT LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

   (i)   all injuries to, deaths, or illnesses of any member of the Isabela Lease Owners' Group; and

   (ii)  all damages to or losses of any property of any member of the Isabela Lease Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS' GROUP, THE MC 519 UNIT LEASE OWNERS' GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

(c)  MC 519 UNIT LEASE OWNERS' INDEMNITY OBLIGATIONS: THE MC 519 UNIT LEASE OWNERS SHALL INDEMNIFY THE LSPS OPERATOR'S GROUP, THE LSPS OWNERS GROUP, AND THE ISABELA LEASE OWNERS' GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

   (i)   all injuries to, deaths, or illnesses of any member of the MC 519 Unit Lease Owners' Group; and

   (ii)  all damages to or losses of any property of any member of the MC 519 Unit Lease Owners' Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, LSPS OWNERS' GROUP, THE ISABELA LEASE OWNERS' GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

Execution Version

(d) **LSPS Owners' Indemnity Obligations to the LSPS Operator Group for Third Parties:** The LSPS Owners shall Indemnify, LSPS Operator Group from and against all Claims/Losses for the following when Connected With this Agreement:

    (i) all injuries to, deaths, or illnesses of any Third Party; and

    (ii) all damages to or losses of any of property of any Third Party.

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OPERATOR GROUP OR ANY OTHER PERSON; EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE, IN WHICH SUCH CASE, SUCH INDEMNITEE SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

14.02 **Notice and Defense.**

(a) LSPS OPERATOR SHALL PROMPTLY GIVE TO THE OTHER PARTIES NOTICE IN WRITING OF (I) ANY CLAIM/LOSS THAT HAS BEEN MADE KNOWN TO THE REPRESENTATIVE OF LSPS OPERATOR, OR (II) PROCEEDINGS COMMENCED FOR WHICH INDEMNIFICATION IS CLAIMED. SUCH NOTICE SHALL STATE WITH AS MUCH DETAIL AS IS REASONABLY PRACTICABLE THE FACTS AND CIRCUMSTANCES GIVING RISE TO THE CLAIM/LOSS AGAINST THE INDEMNITEE. NOTWITHSTANDING THE FOREGOING, IF A PARTY IS OBLIGATED TO INDEMNIFY THE LSPS OPERATOR (OR ANY OTHER PERSON PURSUANT TO THIS AGREEMENT), LACK OF PROMPT NOTICE SHALL NOT BE A DEFENSE EXCEPT TO THE EXTENT PREJUDICE HAS RESULTED FROM SUCH LACK OF PROMPT NOTICE.

(b) THE INDEMNITOR SHALL CONFER WITH THE INDEMNITEE CONCERNING THE DEFENSE OF ANY SUCH CLAIM/LOSS PROCEEDINGS BUT, SUBJECT TO THE PROVISIONS OF THIS Article XIV. AND ANY OTHER APPLICABLE PROVISIONS OF THIS AGREEMENT, IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, THE INDEMNITOR OR ITS INSURER SHALL RETAIN CONTROL OF THE CONDUCT OF SUCH DEFENSE, INCLUDING BUT NOT LIMITED TO THE SELECTION AND MANAGEMENT OF COUNSEL. NOTWITHSTANDING THE FOREGOING, HOWEVER, EVEN IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, NEITHER PARTY SHALL EFFECT SETTLEMENT OF OR COMPROMISE ANY SUCH

Execution Version

CLAIM/LOSS PROCEEDINGS WITHOUT HAVING OBTAINED THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY. IF THE INDEMNITEE DOES NOT CONSENT TO A SETTLEMENT THAT THE INDEMNITOR IS WILLING TO ACCEPT, THEN THE INDEMNITOR'S LIABILITY SHALL BE LIMITED TO THE AMOUNT FOR WHICH THE LAWSUIT COULD HAVE BEEN SETTLED. IF THE INDEMNITOR HAS ASSUMED THE FULL DEFENSE OF THE CLAIM/LOSS WITHOUT QUALIFICATION, THE INDEMNITEE MAY, UPON WRITTEN NOTICE TO THE INDEMNITOR AND AT THE INDEMNITEE'S SOLE COST AND EXPENSE, SELECT ITS OWN COUNSEL TO PARTICIPATE IN AND BE PRESENT FOR THE DEFENSE OF ANY SUCH CLAIM/LOSS PROCEEDING, PROVIDED SUCH COUNSEL SHALL NOT TAKE ANY ACTION IN THE COURSE OF SUCH CLAIM/LOSS PROCEEDING TO PREJUDICE THE INDEMNITOR'S DEFENSE OF SUCH CLAIM/LOSS PROCEEDING. WHERE THE INDEMNITOR'S PROFFERED DEFENSE IS LIMITED TO THE PROPORTIONATE NEGLIGENCE/FAULT OF THE INDEMNITOR, THE INDEMNITEE MAY ELECT TO DEFEND ITSELF AND OBTAIN REIMBURSEMENT OF ITS DEFENSE COSTS IN PROPORTION TO THE PROPORTIONATE FAULT OF THE INDEMNITOR AND ITS GROUP, OR REIMBURSEMENT OF ALL DEFENSE COSTS IF A FULL DEFENSE IS DETERMINED TO HAVE BEEN OWED.

14.03 <u>LSPS OWNERS' OBLIGATIONS FOR CLAIMS</u>: EACH LSPS OWNER SHALL CARRY INSURANCE OR QUALIFIED SELF-INSURANCE WITH MINIMUM LIMITS AS SET FORTH IN EXHIBIT "G". UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, THE LIABILITY FOR ANY CLAIMS CONNECTED WITH THE LSPS, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF ANY LSPS OWNER OR THE LSPS OPERATOR, SHALL BE BORNE BY EACH LSPS OWNER ALLOCATED BASED ON EQUITY INTEREST, EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF AN LSPS OWNER IN WHICH CASE, SUCH LSPS OWNER SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY TO THE EXTENT OF SUCH GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND THE OTHER LSPS OWNERS SHALL HAVE NO RESPONSIBILITY OR LIABILITY WHATSOEVER TO THE EXTENT OF SUCH GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

14.04 <u>Spill Liability</u>. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, INCLUDING SECTION 14.03, LIABILITY FOR CLAIMS IN CONNECTION WITH SPILLS FROM THE LSPS WILL BE BORNE BY THE LSPS OWNERS ON A THROUGHPUT BASIS (AVERAGE THROUGHPUT CALCULATED BASED UPON THE LESSER OF: (A) THE OPERATING LIFE OF THE LSPS OR (B) THREE HUNDRED SIXTY FIVE (365) DAYS BEFORE SPILL) EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF THE LSPS OPERATOR'S GROUP, EXCEPT TO THE EXTENT THAT SUCH LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR

Execution Version

WILLFUL MISCONDUCT OF THE LSPS OPERATOR'S GROUP, IN WHICH CASE, SUCH LSPS OPERATOR'S GROUP SHALL BE SOLELY RESPONSIBLE FOR SUCH DAMAGES AND LIABILITY.

14.05  Notice of Claim.  If, on account of any matter involving operations under this Agreement or in any way related to the LSPS, (a) a Claim is made against any LSPS Owner; (b) any Third Party brings a Claim against a LSPS Owner; (c) any LSPS Owner brings a Claim; or (d) a LSPS Owner receives notice of a Claim, such LSPS Owner shall give written notice of such Claim to all of the other LSPS Owners as soon as reasonably practicable.

14.06  Engaging Counsel.  LSPS Operator has the right and authority to engage the services of outside legal counsel for the purpose of answering or responding to any Claim brought by any Person, or to bring a Claim against any Person, so long as such counsel's fees do not exceed Fifty Thousand and No/100 Dollars ($50,000).  The LSPS Operator shall provide prompt notice to the LSPS Owners of its retention of such counsel.  To the extent such counsel's services are reasonably expected to exceed Fifty Thousand and No/100 Dollars ($50,000) with respect to any individual Claim, the prior approval by a Majority Interest of the LSPS Owners is required.  The failure of any LSPS Owner to vote for approval or rejection of the retention of such counsel shall be deemed to be approval.  If the use of outside counsel is approved, the fees and expenses incurred as a result thereof shall be charged to the LSPS Owners allocated on an Equity Interest basis.  Each LSPS Owner has the right to hire its own outside counsel at its sole cost with respect to its own defense.

14.07  Settlements.  The LSPS Operator may settle any single Claim or multiple Claims arising out of the same incident that involve operations under this Agreement, or that affect or relate to the LSPS if the aggregate expenditure (including attorneys' fees incurred) does not exceed One hundred Fifty Thousand and No/100 Dollars ($150,000) provided that the payment is in complete settlement of such Claim.  However any LSPS Owner shall have the right to independently settle any Claim or the portion of any Claim which is attributable to its interest alone as long as such settlement does not adversely affect the interest or rights of the other LSPS Owners.  No charge shall be made for services performed by the staff attorneys of any LSPS Owner or the LSPS Operator, but all other expenses incurred by the LSPS Operator in the prosecution or defense of Claims for the LSPS Owners or the LSPS, together with the amount paid to discharge any final judgment, are costs and shall be paid by the LSPS Owners allocated on an Equity Interest basis.  If the amount required for settlement exceeds such amount, the approval of a Majority Interest of the LSPS Owners is required.

14.08  Defense of Claims.  The LSPS Operator will supervise the handling, conduct, or prosecution of any Claims involving operations under this Agreement or which affect or in any way relate to the LSPS.

14.09  THE LSPS OWNERS AND SATELLITE LEASE OWNERS AGREE TO SUPPORT THEIR INDEMNITY OBLIGATIONS IN THIS ARTICLE XIV WITH INSURANCE OR QUALIFIED SELF-INSURANCE WITH MINIMUM LIMITS AS SET FORTH IN EXHIBIT "G" OBTAINED FOR THE BENEFIT OF THE INDEMNITEES.

Execution Version

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED, OR OTHERWISE MANDATED BY APPLICABLE LAW, ALL INDEMNITY OBLIGATIONS OF THE LSPS OWNERS AND SATELLITE LEASE OWNERS AS SET OUT IN THIS ARTICLE XIV SHALL BE WITHOUT MONETARY LIMIT. MOREOVER, THE INDEMNITY OBLIGATIONS OF THE LSPS OWNERS AND SATELLITE LEASE OWNERS AS SET OUT IN THIS ARTICLE XIVARE INDEPENDENT OF ANY INSURANCE REQUIREMENTS SET OUT IN THIS ARTICLE XIV AND SUCH INDEMNITY OBLIGATIONS SHALL NOT BE LIMITED BY ANY INSURANCE REQUIREMENTS AND SHALL NOT BE LESSENED OR EXTINGUISHED BY REASON OF THE  LSPS OWNERS AND SATELLITE LEASE OWNERS' FAILURE TO OBTAIN THE REQUIRED INSURANCE COVERAGE OR BY ANY DEFENSES ASSERTED BY THE LSPS OWNERS AND SATELLITE LEASE OWNERS ' INSURERS.

14.10  THE INDEMNITIES SET FORTH HEREIN SHALL NOT SUPERSEDE OR REPLACE ANY INDEMNITY PROVIDED FOR IN THE JOINT OPERATING AGREEMENTS WHICH ARE APPLICABLE TO THE PARTIES HERETO.

## Article XV.  ABANDONMENT AND SALVAGE

15.01  Abandonment of the LSPS.  Any LSPS Owner may propose the abandonment and disposition of the LSPS.  Sixty (60) Days after all the LSPS Owners receive written notice of such proposal, the LSPS Operator shall provide the LSPS Owners with an estimate of the costs of abandonment less the estimated salvage value of the LSPS (no value for the ongoing nature of the LSPS shall be included in this calculation) ("**Abandonment Costs**").  Within thirty (30) Days of receipt of such estimate, the LSPS Owners will vote on such proposal of abandonment. If such proposal is approved by Unanimous vote, the LSPS Operator shall abandon and dispose of the LSPS at the cost and risk of the LSPS Owners based on a LSPS Owner's Equity Interest at the time of abandonment approval.  If the proposed abandonment is not approved by a Unanimous vote of the LSPS Owners, then any LSPS Owner desiring to abandon the LSPS shall be deemed to be a Withdrawing Party under Article XII and such LSPS Owner shall convey its Withdrawal Interest in accordance with Article XII. In such event, the Remaining Parties or Remaining Owners, as the case may be, shall assume such Withdrawal Interest also in accordance with Article XII. If an abandoning LSPS Owner's respective share of the estimated salvage value is greater than its share of the estimated costs of abandonment, the LSPS Operator, on behalf of the non-abandoning LSPS Owners, shall pay to the abandoning LSPS Owner a sum equal to the abandoning LSPS Owners share of such excess.

15.02  Disposal of Surplus Material.  Material acquired under this Agreement may be classified as surplus by the LSPS Operator when deemed no longer needed in present or foreseeable operations.  The LSPS Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "E".  If the material is classified as junk or if the value, less cost of disposal, is less than or equal to Two Hundred Fifty Thousand and No/100 Dollars ($250,000), the LSPS Operator may dispose of the surplus materials in any manner it deems appropriate. If the value, less the cost of disposal of the surplus material, is greater than Two Hundred Fifty Thousand and No/100 Dollars ($250,000), the LSPS Operator shall give written notice thereof to

the LSPS Owners and the surplus material shall be disposed of in accordance with the method of disposal approved by a Majority Interest of the LSPS Owners. Proceeds from the sale or transfer of surplus material shall be promptly credited to each LSPS Owner based on its Equity Interest at the time of the retirement or disposition of the material.

15.03   Abandonment Operations Required by Governmental Authority.   The LSPS Operator shall conduct the abandonment of the LSPS as required by law and any governmental authority, and the Abandonment Costs, risks and net proceeds will be shared by the LSPS Owners based on the LSPS Owner's Equity Interest at the time of abandonment.

## Article XVI.   TAXES

16.01   Internal Revenue Provision.   It is not the intention of the LSPS Owners to create, nor shall this Agreement be construed as creating, a partnership, agency relationship or association, or to render the LSPS Owners liable as partner, co-venturers or principals. The liabilities of the LSPS Owners shall be several and not joint or collective, and each LSPS Owner shall be responsible for its own obligations. If for federal income tax purposes, this Agreement and the operations hereunder are regarded as a partnership, then for federal income tax purposes, each LSPS Owner elects to be excluded from the application of all the provisions of Subchapter K, Chapter 1, Subtitle A, Internal Revenue Code of 1986, as amended, as permitted and authorized by Article 761 of said Code and the regulations promulgated thereunder. The LSPS Operator is hereby authorized and directed to execute on behalf of each LSPS Owner such evidence of this election as may be required by the Federal Internal Revenue Service including specifically, but not by way of limitation, all the returns, statements and data required by Treasury Regulation Article 1.761-2. Should there be any requirement that each LSPS Owner further evidence this election, each LSPS Owner agrees to execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service. Each LSPS Owner further agrees not to give any notices or take other action inconsistent with the election made hereby. If any present or future income tax law of the United States of America or any state contains provisions similar to those contained in Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, under which an election similar to those provided by Article 761 of Subchapter K is permitted, each LSPS Owner will make such election as may be permitted by such laws. In making this election, each LSPS Owner states that the income derived by it from the Operations under this Agreement and related agreements, if any, can be adequately determined without the computation of partnership taxable income.

16.02   Other Taxes and Assessments.   The LSPS Operator shall file all tax returns and reports required by law that apply to the LSPS (other than income, franchise, and similar taxes) and shall pay the tax shown thereon with respect to Operations conducted pursuant to this Agreement. The LSPS Owners shall promptly furnish the LSPS Operator with copies of any notices, assessments or tax statements received pertaining to taxes to be paid by the LSPS Operator. The LSPS Operator shall charge each LSPS Owner its share (based on each LSPS Owner's Equity Interest) of all such taxes paid and, upon written request from a LSPS Owner, provide copies of all tax returns, reports, tax statements and receipt for such taxes. The LSPS Operator shall not allow any taxes to become delinquent, unless such non-payment is approved by the LSPS

Execution Version

Owners. Upon final determination of any audit or protest, the LSPS Operator shall pay the taxes and any interest, penalty, or cost accrued as a result of such audit or protest. The LSPS Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the LSPS Operator may elect to pay under protest. The LSPS Operator shall charge each LSPS Owner its Equity Interest share of tax payments including interest, penalties and all reasonable costs in accordance with Exhibit "E".

16.03   Property Taxes. The LSPS Operator shall render for ad valorem property tax purposes all personal property and/or real property covered by this Agreement as may be subject to such taxation and shall pay such property taxes for the benefit of each LSPS Owner. The LSPS Operator shall timely and diligently protest to a final determination any valuation it deems unreasonable. Pending such determination, the LSPS Operator may elect to pay under protest. Upon final determination, the LSPS Operator shall pay the taxes and any interest, penalty, or cost accrued as a result of such protest. The LSPS Operator shall charge each LSPS Owner its Equity Interest share of such tax payments including interest, penalties and all reasonable costs in accordance with Exhibit "E" attached hereto.

## Article XVII.  ASSIGNMENTS

17.01   Assignment. Any of the LSPS Owners shall have the right to freely assign all or any portion of their interest in a Satellite Lease and/or the LSPS without consent from the other LSPS Owners, provided, however, that an ownership interest in a Satellite Lease shall not be transferred without the simultaneous transfer of a proportionate interest in the LSPS. Notwithstanding the foregoing, any assignment of an interest in a Satellite Lease or an interest in the LSPS: (a) must be made to a party financially capable of assuming the obligations of the assignor under this Agreement; (b) must be expressly made subordinate and subject to this Agreement; (c) must expressly state the portion of the Equity Interest in the LSPS that is being transferred; (d) shall require that the assignee assume the performance of all of the assignor's obligations under this Agreement (to the extent of the interest assigned); and (e) shall be provided to the Parties within fifteen (15) Days after execution thereof. Any assignment not in compliance with this provision is voidable by the non-assigning LSPS Owners. No LSPS Owner assigning all or part of its Equity Interest in the LSPS is released from its obligations and liabilities created under this Agreement attributable to the period of time prior to the date of execution of the assignment (which obligations include liability for abandonment of the LSPS or that portion of the LSPS in existence as of the date of execution of the assignment).

## Article XVIII.  INSURANCE AND LIMITATIONS OF INDEMNITY

18.01   Insurance. Throughout the term of this Agreement, each Party hereto, at its sole cost and expense, will procure such insurance from insurers rated A- by Standard and Poors or A- by A M Best  (or self insure which is only allowed if the parent company of an original signatory Party hereto or an Affiliate of an original signatory hereto has a credit rating of S&P A- or the equivalent) as it deems necessary in discharging its obligations hereunder, including those necessary to protect against all claims for damages, risk of losses and contractual indemnities covered by this Agreement. All policies of insurance purchased which are intended to cover any damages, liabilities, expenses, losses, claims, costs (including attorneys' fees), suits and causes

47                                    Execution Version

of action incurred by a Party hereunder will be properly endorsed to waive the insurer's rights of subrogation, under any such policies, against the other Parties hereto (or said Parties' respective insurers) when said Party is released from liability or loss or damages pursuant to this Agreement, and shall name the other Parties as an additional insured in the proportion that indemnity obligations are assumed hereunder. Each Party shall waive rights of recovery against the other Parties hereto.

18.02  Maintenance of Insurance Coverage.  The LSPS Owners, the Satellite Lease Owners, the Satellite Lease Operators, and the LSPS Operator will maintain the insurance coverage or self insurance provided in Exhibit "G" (*Insurance*) to this Agreement.

## Article XIX.  FORCE MAJEURE

19.01  Force Majeure.  If, as a result of Force Majeure, any Party is rendered unable, wholly or in part, to carry out its obligations under this Agreement (except for the payment of money), then the obligations of the Party giving the Force Majeure notice detailed in this Section 19.01, so far as and to the extent that the obligations are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period. For purposes of this agreement, the Party claiming Force Majeure shall promptly notify the other Parties in writing of the Force Majeure situation after the occurrence of the facts relied on, and shall keep all Parties informed of all significant developments. The notice of Force Majeure shall give full details of said Force Majeure, and also (if possible) estimate the period of time which said Party will require to remedy the Force Majeure or to resume performance of its obligations under this Agreement. The affected Party shall use all reasonable diligence to remove or overcome the Force Majeure situation, but shall not be obligated to settle any labor dispute except on terms acceptable to it and all such disputes shall be handled within the sole discretion of the affected Party.

## Article XX.  DEFAULT

20.01  Default.  So long as any LSPS Owner is in Default, it shall not be permitted to exercise any of its rights under this Agreement, including, without limitation, the right to vote or to access or utilize the LSPS to gather its Production.  For purposes of this Article XX, the date in which a Default by any LSPS Owner occurs shall be referred to as the "**Default Date**".  Within thirty (30) Days after the Default Date, at the election of any non-defaulting LSPS Owner in the Satellite Lease in which the defaulting LSPS Owner owns an interest, such defaulting LSPS Owner shall be deemed to be a Withdrawing Party under Article XII and such defaulting LSPS Owner shall convey its Withdrawal Interest in accordance with Article XII.  In such event, the Remaining Parties or Remaining Owners, as the case may be, may assume such Withdrawal Interest in accordance with Article XII.  Upon receipt of such election, the defaulting LSPS Owner shall be deemed to have sent the unconditional and irrevocable conveyance offer set forth in Section 12.02.  The application of the foregoing withdrawal provisions shall be the exclusive remedy against a defaulting LSPS Owner.  If no non-defaulting LSPS Owner in the Satellite Lease in which the defaulting LSPS Owner has an interest elects to deem a defaulting LSPS Owner to be a Withdrawing Party within such thirty (30) Day period, the non-defaulting Parties may exercise

Execution Version

any and all remedies available hereunder against the defaulting LSPS Owner, whether in law or in equity. The LSPS Owners hereby agree that any such Default by one LSPS Owner shall not affect the validity or effectiveness of this Agreement as between the other non-defaulting LSPS Owners. In the event that a LSPS Owner is in Default for non-payment of any amounts due under this Agreement, and the defaulting LSPS Owner is not deemed to be a Withdrawing Party pursuant to the foregoing provisions, the other non-defaulting LSPS Owners shall pay their proportionate share (based on their respective Equity Interest) of the defaulting LSPS Owner's share of unpaid amounts upon receiving an invoice from the LSPS Operator. In the event any LSPS Owner believe that any statement of charges under this Agreement is incorrect, the LSPS Owner shall nevertheless pay the amounts due as provided herein, and the LSPS Operator shall attempt to resolve the issue as soon as practicable, but said attempt shall be made no later than ninety (90) Days after receiving notice from the LSPS Owner of such disputed charges.

## Article XXI.  SECURITY RIGHTS

21.01  Security Rights.  In addition to other security rights and remedies provided by law for services rendered, materials and equipment furnished, or the breach of obligations incurred under this Agreement, pursuant to the terms of Exhibit "H", each LSPS Owner grants to the other LSPS Owners a lien in, and mortgages, pledges, affects, and hypothecates all of its respective rights and interest in and to the LSPS, the Rights-of-Way and this Agreement. The LSPS Owners will execute as many originals of Exhibit "H" as required to file and record same in accordance with the terms of Exhibit "H".

21.02  Obligations upon Termination.  Notwithstanding the termination of this Agreement, each Party shall remain responsible for any accrued financial obligations of that Party with respect to another Party under the terms of this Agreement and shall promptly settle such obligations, including any unpaid invoices.

## Article XXII.  GENERAL PROVISIONS

22.01  Entire Agreement.

(a)     The terms of this Agreement, including the Exhibits attached hereto, express and constitute the entire agreement between the Parties with respect to the subject matter hereof and no implied covenants of any kind on the part of the Parties is created or shall arise by reason of anything contained in this Agreement. There are no warranties, representations, promises or other agreements (written or oral) between the Parties in connection with the subject matter hereof except as specifically set forth in this Agreement or in documents delivered pursuant to this Agreement.   This Agreement supersedes all prior or contemporaneous negotiations, communications, understandings, proposals, representations or agreements, whether oral or written, with respect to the subject matter hereof, including, but not limited to, the Letter of Intent. For the avoidance of doubt, this Agreement shall govern over any conflicting provisions in the operating agreements covering the Satellite Leases regarding the Building, Operation and ownership of the LSPS.

Execution Version

(b) Notwithstanding anything to the contrary herein, the Isabela JOA shall govern the rights, duties and obligations among the Isabela Lease Owners associated with: (i) operations on the Isabela Lease; (ii) those portions of the Satellite Well System located on the Isabela Lease; and (iii) the decision-making process between the Isabela Lease Owners related to this Agreement and the MC 519 UOA shall govern the rights, duties and obligations among the MC 519 Unit Lease Owners associated with: (i) operations on the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on the MC 519 Unit Leases; and (c) the decision-making process between the MC 519 Unit Lease Owners related to this Agreement.

22.02 <u>Exclusive Purpose</u>. The sole and exclusive purpose of the joint participation of the LSPS Owners in this Agreement is to Build, Operate and own the LSPS. The LSPS Owners and their Affiliates may engage, directly or indirectly, in other business opportunities, transactions, ventures or other arrangements of any nature or description, independently or with others, including, without limitation, business of a nature which may be competitive with or the same as or similar to the business of the LSPS, regardless of the geographic location of such business, and without any duty or obligation to account to the other LSPS Owners or the LSPS in connection therewith.

22.03 <u>Waiver of Right to Partition</u>. **Each Party waives the right to bring an action for partition of its interest in the LSPS and Satellite Well System held subject to this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to any action at law or in equity to partition any or all of the LSPS or Satellite Well System subject to this Agreement.**

22.04 <u>Access to Books and Records</u>. Upon reasonable request, each LSPS Owner will be permitted to have reasonable access to books and the records relating to the LSPS during normal business hours; provided that such access does not interfere with the operation of the LSPS. All such access is subject to such requesting LSPS Owner having executed and delivered to the Operator a full written release and indemnification covering itself and all of its employees with respect to the proposed access to the facilities.

22.05 <u>Maintenance of Books and Records</u>. The Operator shall keep accurate books, accounts and records of operations on the LSPS in compliance with the procedures contained in Exhibit "E" hereto.

22.06 <u>Audit Rights</u>. Each LSPS Owner shall have the right to inspect and audit the books and records in the custody and control of the LSPS Operator as provided in Exhibit "E" hereto.

22.07 <u>Amendment, Modification and Waiver</u>. This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all of the Parties, or, in the case of a waiver, by or on behalf of the Party waiving compliance. Neither action taken (including, without limitation, any investigation by or on behalf of a Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or

Execution Version

inaction. The failure of any Party at any time or times to require performance of any provisions hereof shall in no manner affect the right at a later time to enforce the same. Any delay, excluding the expiration of any applicable statutory period of limitations, in asserting or enforcing any rights under this Agreement will not be deemed a waiver of such rights. Any waiver by any Party of any condition, or any waiver or failure of a Party to enforce any provisions of this Agreement or to require performance by another Party of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed:

    (a)    as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty;

    (b)    to waive such provision, or to affect the validity of this Agreement or any part thereof, or the right of a Party thereafter to enforce each and every provision hereof.

22.08   Relationship of the Parties.   In performance of their obligations hereunder, the Parties will be completely independent and not employees or agents of any other Party. The duties, obligations and liabilities of the Parties are several and not joint or collective, and nothing herein contained will be construed to create a joint venture, association or partnership, duty, obligation or liability with respect to the Parties and shall not create fiduciary or quasi fiduciary duties or similar duties and obligations. No Party shall control the manner or method of accomplishing the obligations of the other Parties set forth herein.

22.09   Compliance with Laws and Regulations.   This Agreement and all of the terms and conditions contained herein, and the respective obligations of and the Operations and activities conducted by the Parties pursuant to this Agreement, are expressly subject to and will remain subject to and comply with all valid and applicable Laws, orders, rules, and regulations of any federal, state, or local governmental authority having jurisdiction. The Parties hereto will at all times maintain their respective facilities and Satellite Leases and conduct their operations thereon in accordance with all valid and applicable Laws. No Party will suffer a forfeiture or be liable in damages to the other Parties for any delays or damages or any failure to act, due, occasioned or caused by reason of Laws or regulations respecting the activities or Operations covered hereby, and such delays or damages will not be deemed to be a breach of or failure to perform under this Agreement. If any provision is found to conflict with said laws, orders, rules and regulations, such provision will be appropriately modified to adhere to said laws, orders, rules and regulations. Each of the Parties will notify the other Parties promptly upon discovery of any instance where the Party has failed to comply with this Section 22.09.

22.10   Non-Discrimination.   Each of the Parties is an Equal Opportunity Employer. To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41C.F.R.60-1) are incorporated herein by reference. To the extent required by applicable laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era

Execution Version

(41C.F.R.60-250) and the affirmative action clauses concerning employment of the handicapped (41C.F.R.60-741), which clauses are incorporated herein by reference. In the performance of work under this Agreement, the Parties agree to comply, and will require each independent contractor to comply, with the governmental requirements set forth in the attached Exhibit "I" pertaining to non-segregated facilities. This Agreement and the Parties hereto are also subject to any other applicable rules and regulations relating to non-discrimination which may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement.

22.11   Severability.   The Parties intend that every provision of this Agreement, the Exhibits attached hereto, and the documents incorporated herein by reference be severable. If any term or other provision of this Agreement is found to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will remain in full force and effect. The illegality, invalidity or unenforceability of any provisions hereof does not affect the legality, validity or enforceability of the remainder of this Agreement. In the case of conflict between the provisions of this Agreement and the provisions of any applicable Laws or regulations, the provisions of the Laws or regulations govern over the provisions of this Agreement. If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future Law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity. Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated. Any terms or provisions of this Agreement that are invalid or unenforceable in any jurisdiction are ineffective only as to such jurisdiction and then only to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision will be interpreted to be only as broad as is enforceable. A bankruptcy or similar trustee must accept or, to the extent permitted by law, reject this Agreement in its entirety.

22.12   Jointly Drafted Agreement.   All Parties have contributed to the drafting of this Agreement. Each Party has had an adequate opportunity to review each and every provision of this Agreement and to submit the same to legal counsel for review and advice. Based on the foregoing, the rule of construction, if any, that a contract be construed against the drafter shall not apply to interpretation or construction of this Agreement. All Parties agree that it has been purposefully drawn and correctly reflects their understanding of the transaction that it contemplates. This Agreement will be considered for all purposes as prepared through the joint efforts of the Parties, and will not be construed unfairly, unreasonably, and/or more strictly against one Party or another Party as a result of the preparation. Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.

22.13   Notices.   All notices and other communications required or desired to be given hereunder must be in writing and sent (properly addressed as set forth below) by: (a) certified or registered U.S. mail, return receipt requested, with all postage and other charges fully prepaid; (b) hand or courier delivery; or (c) facsimile transmission. Date of service by mail and delivery is the date

Execution Version

on which such notice is received by the addressee and by facsimile is the date sent (as evidenced by fax machine generated confirmation of transmission); provided, however, if such date received is not a Business Day, then date of receipt will be on the next date that is a Business Day. Each Party may change its address by notifying the other Parties in writing of such address change, and the change will be effective ten (10) Days after the other Parties receives such notification.

(i)  BP Exploration & Production Inc.
501 WestLake Park Blvd. 77079-2696
P.O. Box 3092
Houston, Texas 77253-3092
Attn: Mr. Kemper Howe
Telephone: 281-366-1278
Telecopy: 281-366-7569

(ii)  Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Mr. Dan Mills
Telephone: 281-874-6063
Telecopy: 281-876-6300

(iii)  Red Willow Offshore, LLC
1415 Louisiana Street, Suite 3650
Houston, Texas 77002
Attn: Mr. Rex Richardson
Telephone: 281-822-7509
Telecopy: 281-822-7501

(iv)  Houston Energy Deepwater Ventures I, LLC
1415 Louisiana Street, Suite 2400
Houston, Texas 77002
Attn: Mr. David Amend
Telephone: 713-586-5712
Telecopy: 713-650-8305

Or such other address or representative(s) as may be designated in writing, as provided above.

22.14  Further Assurances. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done (without additional cost or charge to any other Party hereto), all things reasonably necessary, proper or advisable under applicable laws to consummate, implement and make effective the terms and conditions of this Agreement. In case, at any time after the execution of this Agreement, any further action, deeds and documents are reasonably necessary or desirable to carry out its purposes, the Parties shall take or cause to be taken all such necessary action or execute and deliver such deeds and documents.

Execution Version

22.15  <u>Waiver of Consequential Damages</u>.

(a)  EACH PARTY: (i) AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY, OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, UNDER THIS AGREEMENT; AND (ii) HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT, FROM OR AGAINST ANY OTHER PARTY OR ITS DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS OR AGENTS, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR LOST OR DEFERRED PRODUCTION OR LOST OR DEFERRED PROFITS OR BUSINESS INTERRUPTION, DAMAGE TO WELLS OR RESERVOIRS OR LOSS OF WELLS (WHETHER BASED ON STATUTE, CONTRACT, TORT OR OTHERWISE, AND WHETHER OR NOT ARISING FROM ANY PARTY'S SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.)

(b)  THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT INCLUDE INDEMNIFICATION FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT SUFFERED BY AN UNAFFILIATED THIRD-PARTY AND SECTION 22.15(a)(i) AND SECTION 22.15(a)(ii), ABOVE, SHALL NOT APPLY TO THE EXTENT SUCH PARTY OWES SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.

22.16  <u>Headings</u>.  All titles or headings to Articles, sub-articles or other divisions of this Agreement except Article I and Article II hereto are only for the convenience of the Parties and will not be construed to have any effect or meaning with respect to the other content of such Articles, sub-articles or other divisions, such other content being controlling as to the agreement between the Parties.

22.17  <u>Article Reference</u>.  Except as otherwise provided in this Agreement, each reference to an Article in this Agreement includes all of the Article including its subArticles.  Except as otherwise provided in this Agreement, each reference to an Exhibit in this Agreement includes the entire Exhibit including Articles and subArticles.

22.18  <u>Number and Gender</u>.  Whenever the singular or masculine or neuter is used in this Agreement, the same shall be construed as meaning plural or feminine or body politic or corporate and vice versa where the context so requires.

22.19  <u>Requisite Authority</u>.  Each Party represents and warrants to the other Parties that on and as of the Effective Date hereof:

(a)    it has the requisite capacity, power and authority to execute this Agreement and to perform the obligations to which it thereby becomes subject;

(b)    this Agreement is valid, binding and enforceable against it in accordance with its terms, subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity);

(c)    if any Party is a legal entity, including, but not limited to, an association, corporation, joint venture, limited partnership, partnership or trust, such Party further represents and warrants to the other Parties that:

    (i)    it is duly formed and validly existing and in good standing under the laws of its state or jurisdiction of formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

    (ii)    the execution and delivery of this Agreement and the completion of the transactions contemplated herein have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action or have received all necessary management approvals;

    (iii)    it has the entire requisite corporate, limited liability company, partnership or similar power, capacity and authority to enter into this Agreement; and

    (iv)    the execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of its organizational documents, any agreement pursuant to which it or its property is bound, or any applicable Laws.

22.20  <u>Terms Binding Upon Leases</u>.  All terms, covenants, provisions and conditions of this Agreement shall run with and be binding upon the Satellite Leases during the term hereof and each Party shall make any assignment, transfer or other disposition of any interest in the Satellite Leases expressly subject to this Agreement and shall provide to the other Parties an express written assumption of all of the assigning Party's obligations under this Agreement from the assignee or transferee.

22.21  <u>Remedies</u>.  The rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available under the Laws or in equity.  Nothing herein will be considered an election of remedies

Execution Version

22.22   Counterpart Execution and Ratification.   This Agreement may be executed in counterparts and, when each Party has executed a counterpart, all counterparts taken together shall constitute one Agreement, provided however, that none of the said counterparts shall be effective until all Parties hereto have executed a counterpart hereof.  Facsimile signatures shall be considered the same as original signatures. This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement. Ratification has the same effect as an execution of the original Agreement.

22.23   No Third Party Beneficiaries.   Any agreement herein contained, expressed or implied, will be only for the sole and exclusive benefit of the Parties and their respective legal representatives, heirs, successors, and assigns, and such agreements or assumptions will not inure to the benefit of any other Person whomsoever, it being the intention of the Parties that no Person will be deemed a Third Party beneficiary to this Agreement and nothing contained in this Agreement entitles anyone other than Parties or their authorized successors and assigns to any claim, cause of action, remedy or right of any kind whatsoever. The Parties expressly stipulate that neither the Host Operator nor the Host Owner shall be held to be a Third Party beneficiary under the terms of this Agreement.

22.24   Survival.   The confidentiality and indemnification obligations of the Parties in this Agreement shall survive the cancellation or termination of this Agreement without regard to any action taken pursuant to this Agreement.

22.25   Applicable Law.   TO THE MAXIMUM EXTENT PERMISSIBLE, THE GENERAL MARITIME LAWS OF THE UNITED STATES SHALL GOVERN THE VALIDITY, CONSTRUCTION, INTERPRETATION, AND EFFECT OF THIS AGREEMENT, EXCLUDING ANY CHOICE OF LAW RULES WHICH WOULD OTHERWISE REQUIRE THE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.  IN THE EVENT MARITIME LAW IS HELD TO BE INAPPLICABLE BY A COURT OF COMPETENT JURISDICTION, THE LAWS OF THE ADJACENT STATE OF THE SATELLITE LEASES HEREUNDER SHALL APPLY UNLESS (i) OTHERWISE PROVIDED IN THIS AGREEMENT; OR (ii) APPLICATION OF SUCH LAW TO A PARTICULAR PROVISION WOULD PREVENT ENFORCEMENT OF SUCH PROVISION, IN WHICH CASE THE LAW APPLICABLE TO SUCH PROVISION SHALL BE ANY POTENTIALLY APPLICABLE LAW THAT WOULD ALLOW ENFORCEMENT OF SAID PROVISION AS WRITTEN.

22.26   Term.   This Agreement shall become effective upon as of the Effective Date and will remain in full force and effective until all of the LSPS is permanently abandoned and all costs, accounts and assets are settled and disposed of.

22.27   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, except where otherwise noted.

22.28   Dispute Resolution.   Any claim, controversy or dispute arising out of, relating to or in connection with the interpretations of this Agreement or any activity or operation conducted or to be conducted hereunder, shall be resolved in accordance with the mediation and binding

Execution Version

arbitration provision set forth in Exhibit "F" (*Dispute Resolution Procedures*) to this Agreement. However, claims for Indemnification between or among the Parties shall be excluded from this provision when they arise out of or are related to a lawsuit filed by a Third Party. For economy of legal resources, the Parties' claims for Indemnification shall be resolved in conjunction with such judicial proceeding.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____


**Noble Energy, Inc.**

By:_____

Print Name: _____John T. Lewis_____

Title: _____Vice President_____

Date: ____December 21, 2011_____


**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____


**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____


**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____


**Noble Energy, Inc.**

By: _____

Print Name: _____John T. Lewis_____

Title: _____Vice President_____

Date: ____December 21, 2011_____

Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _John T. Lewis_____

Print Name: _John T. Lewis_____

Title: _Vice President_____

Date: _December 21, 2011_____

59

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: Robert J. Voorhees

Title: President

Date: December 21, 2011

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

58

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: KEMPER HOWE

Title: ATTORNEY-IN-FACT

Date: 12/21/11

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: KEMPER HOWE

Title: ATTORNEY-IN-FACT

Date: 12/21/11

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: __Robert J. Voorhees__

Title: __President__

Date: __December 21, 2011__

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

59                                    Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _KEMPER HOUSE_

Title: _ATTORNEY-IN-FACT_

Date: _12/21/11_

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _KEMPER HOUSE_

Title: _ATTORNEY-IN-FACT_

Date: _12/21/11_

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

59

Execution Version

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

**LSPS OWNERS:**

**BP Exploration & Production Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____


**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: P. David Amend a.w.

Title: Vice President, Land

Date: 12-21-11

**SATELLITE LEASE OWNERS:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

58                                    Execution Version

**Houston Energy Deepwater Ventures I, LLC**

By: _____

Print Name: P. David Amend O.W.

Title: Vice President, Land

Date: 12-21-11

**Red Willow Offshore, LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**LSPS OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**SATELLITE LEASE OPERATOR:**

**BP Exploration & Production Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Noble Energy, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

Execution Version



**FIRST AMENDMENT OF THE**
**GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM**
**CONSTRUCTION AND OPERATING AGREEMENT**

This First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("First Amendment") is made effective as of October 10, 2014 (the "**Effective Date**"), by and among Noble Energy, Inc. ("**Noble**"), BP Exploration & Production Inc. ("**BP**"), Red Willow Offshore, LLC ("**RWO**"), and Houston Energy Deepwater Ventures I, LLC ("**HEDV**"). Noble, BP, RWO, and HEDV may each be referred to herein as "**Party**" or collectively as "**Parties.**"

WITNESSETH

WHEREAS, reference is herein made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective December 1, 2011, by and among BP, as LSPS Operator, and Noble, BP, RWO, and HEDV, as LSPS Owners; and Noble, BP, RWO, and HEDV, as MC 519 Unit Lease Owners; and Noble and BP, as Isabela Lease Owners (the "**LSPS COA**");

WHEREAS, the following described Oil and Gas Leases are defined in the LSPS COA as being the MC 519 Unit Leases,

Oil and Gas Lease bearing Serial Number OCS-G 27278, dated effective July 1, 2005, granted by the United States of America, as Lessor, in favor of Houston Energy, L.P., et al., as Lessee, covering all of Block 519, Mississippi Canyon, OCS Official Protraction Diagram NH 16-10; and

Oil and Gas Lease bearing Serial Number OCS-G 21176, dated effective July 1, 1999, granted by the United States of America, as Lessor, in favor of Elf Exploration, Inc., as Lessee, covering all of Block 563, Mississippi Canyon, OCS Official Protraction Diagram NH 16-10 (the "**MC 563 Lease**").

WHEREAS, the MC 519 Unit Leases are included under the definition of Satellite Leases under the LSPS COA;

WHEREAS, pursuant to the terms of that certain MC 563 Assignment Agreement dated effective October 10, 2014, by and among BP, Noble, and HEDV ("**MC 563 Assignment Agreement**"), Noble and BP conveyed to HEDV all of their record title and operating rights interests in and to the MC 563 Lease, with Noble and BP each reserving (i) a 2% of 8/8ths proportionately reduced overriding royalty interest from the surface to 19,000' TVDSS in the MC 563 Lease, and (ii) the right to acquire the operating rights in the MC 563 Lease as to depths from 19,001' to 99,999' TVDSS ("**MC 563 Deep Rights**");

WHEREAS, HEDV and RWO subsequently conveyed to Deep Gulf Energy III, LLC ("**DGE**"), Ridgewood South Santa Cruz, LLC ("**Ridgewood**"), and ILX Prospect South Santa Cruz, LLC ("**ILX**") certain undivided record title and operating rights interests in and to the MC 563 Lease;

1

WHEREAS, the LSPS COA states that any conveyance of an interest in a Satellite Lease shall require the simultaneous transfer of a proportionate interest in the Loop Subsea Production System ("LSPS"), as such term is defined in the LSPS COA; and

WHEREAS, the Parties desire to amend the LSPS COA to (i) remove the MC 563 Lease from being a Satellite Lease, and (ii) provide that the conveyances of the MC 563 Lease described above did not require a simultaneous transfer of a proportionate interest in the LSPS.

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. Under Section 1.01 (Definitions), the definitions listed below are revised as follows:

   "**MC 519 Unit Leases**" means the oil and gas lease OCS-G 27278 covering and affecting Mississippi Canyon Block 519 in the Gulf of Mexico.

   "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain Unit Operating Agreement by and between BP, Noble, Red Willow and HE&D Offshore, L.P., covering the MC 519 Unit Leases dated effective January 1, 2009, as amended by First Amendment dated effective October 10, 2014.

2. The following assignments (collectively, the "**Assignments**") did not have to comply with Section 17.01 (Assignment) of the LSPS COA, including, but not limited to, the requirement that a transfer of an ownership interest in a Satellite Lease shall include the simultaneous transfer of a proportionate interest in the LSPS:

   a. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby BP conveyed to HEDV an undivided 46.50% record title interest in and to the MC 563 Lease;

   b. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby BP conveyed to HEDV an undivided 46.50% operating rights interest in and to the MC 563 Lease, limited to the N/2NW/4 of Block 563, Mississippi Canyon, as to all depths from the surface down to 19,000' TVDSS ("**MC 563 Shallow Rights**");

   c. Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby Noble conveyed to HEDV an undivided 23.25% record title interest in and to the MC 563 Lease;

   d. Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective October 10, 2014, whereby Noble conveyed to HEDV an undivided 23.25% operating rights interest in and to the MC 563 Shallow Rights;

2

    e.   Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby HEDV conveyed to DGE, Ridgewood, and ILX a collective 69.75% record title interest in and to the MC 563 Lease;

    f.   Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby HEDV conveyed to DGE, Ridgewood, and ILX a collective 69.75% operating rights interest in and to the MC 563 Shallow Rights;

    g.   Assignment of Record Title Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby RWO conveyed to DGE, Ridgewood, and ILX a collective 11.25% record title interest in and to the MC 563 Lease; and

    h.   Assignment of Operating Rights Interest in Federal OCS Oil and Gas Lease dated effective February 1, 2015, whereby RWO conveyed to DGE, Ridgewood, and ILX a collective 11.25% operating rights interest in and to the MC 563 Shallow Rights.

3.   For clarification, if Noble or BP exercise their individual rights to reacquire the MC 563 Deep Rights under the terms of the MC 563 Assignment Agreement, then the MC 563 Lease, limited to the MC 563 Deep Rights, shall automatically be included as a Satellite Lease under the LSPS COA. The Parties shall thereafter execute the necessary amendment to the LSPS COA.

4.   Notwithstanding anything to the contrary in the Assignments, the record title and operating rights interests held by HEDV, RWO, DGE, Ridgewood and ILX in the MC 563 Lease and the MC 563 Shallow Rights are not subject to, nor burdened by, any obligations, rights or liabilities arising under, or connected with the LSPS COA. DGE, Ridgewood and ILX join in the execution of this First Amendment for the limited purpose of acknowledging this Section 4 of the First Amendment.

5.   Notwithstanding anything to the contrary in this First Amendment, the Equity Interest, as defined in the LSPS COA, of each of the MC 519 Unit Lease Owners and the Isabela Lease Owners is not amended and shall remain as stated in the LSPS COA.

6.   All other terms and provisions of the LSPS COA shall remain in full force and effect.

      This First Amendment may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the parties as attached hereto may be combined in, and treated, and given effect, for all purposes, as a single instrument.

      This First Amendment shall be binding on the signatory parties hereto, their successors and assigns forever.

3

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By: _David G. Peterson (signature)_

Name: <u>David G. Peterson</u>

Title: <u>Attorney-in-Fact</u>

Date: <u>November 3, 2015</u>

**Noble Energy, Inc.**

By:_____

Name: <u>T. Hodge Walker</u>

Title: <u>Vice President</u>

Date: _____

**Deep Gulf Energy III, LLC**

By:_____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By:_____

Name: P. David Amend

Title: Vice President, Land

Date: _____

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By:_____

Name: David G. Peterson

Title: Attorney-in-Fact

Date: _____

**Noble Energy, Inc.**

By:_____

Name: T. Hodge Walker

Title: Vice President

Date: 11-04-2015

**Deep Gulf Energy III, LLC**

By:_____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: 11-10-15

**Houston Energy Deepwater Ventures I, LLC**

By:_____

Name: P. David Amend

Title: Vice President, Land

Date: _____

IN WITNESS WHEREOF, this First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement is executed by each party as of the date set forth below each party's signature, but made effective as of the date hereinabove written.

**BP Exploration & Production Inc.**

By:_____

Name: David G. Peterson

Title: Attorney-in-Fact

Date: _____

**Noble Energy, Inc.**

By:_____

Name: T. Hodge Walker

Title: Vice President

Date: 11-04-2015

**Deep Gulf Energy III, LLC**

By:_____

Name: Thomas E. Young

Title: Vice President – Land and Business Development and Secretary

Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By:_____

Name: P. David Amend

Title: Vice President, Land

Date: 11 - 6 - 15

**Red Willow Offshore, LLC**

By: _Richard L Smith_

Name: _Richard L. Smith_

Title: _Executive Vice President - Offshore_

Date: _11/09/2015_


**Ridgewood South Santa Cruz, LLC**

By: _____

Name: W. Greg Tabor

Title: Executive Vice President

Date: _11-17-2015_


**ILX Prospect South Santa Cruz, LLC**
By: Ridgewood Energy Corporation, Attorney-in-Fact

By: _____

Name: W. Greg Tabor

Title: Executive Vice President

Date: _11-17-2015_

**SECOND AMENDMENT TO**
**GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM CONSTRUCTION AND**
**OPERATING AGREEMENT**

This Second Amendment to the Galapagos Area Loop Subsea Production System Construction and Operating Agreement (this "**Agreement**") is made effective as of October 15, 2018 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**").  BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

<u>WITNESSETH</u>

WHEREAS, reference is made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of December 1, 2011, by and among BP, Noble Energy, Inc., Red Willow and HEDV, as amended by that certain First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 10, 2014, by and among Noble Energy, Inc., BP, Red Willow and HEDV (the "**LSPS Agreement**"); and

WHEREAS, the Parties desire to amend the definitions of MC 519 Unit Operating Agreement and MC 519 UOA of the LSPS Agreement to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, the definitions of MC 519 Unit Operating Agreement and MC 519 UOA appearing in Section 1.01 of the LSPS Agreement shall be deleted in their entirety and replaced with the following:

    "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain (a) Joint Operating Agreement dated October 15, 2018, by and between BP, Fieldwood Energy LLC, Red Willow and HEDV, covering the Operating Rights Interest in the SW4 and S2 NW4 from 0 – 14,000' TVDSS (the "**CPN Prospect**") and (b) Unit Operating Agreement originally by and between BP, Noble, Red Willow and HE&D Offshore, L.P., and bearing BOEMRE Contract Number 754309001, dated effective January 1, 2009 as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC, as the same may be further amended from time to time, which covers that portion of the MC 519 Unit Leases that does not include the CPN Prospect.

2.  The Parties hereby ratify Fieldwood as the successor in interest to Noble Energy, Inc. and agree that all references in the LSPS Agreement to "Noble Energy, Inc." or "Noble" or similar references shall refer to Fieldwood as of the date Fieldwood was assigned its interest in the LSPS Agreement. All other terms and provisions of the LSPS Agreement shall remain in full force and effect.

3.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force

and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4. This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _December 10, 2018_

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

[*Signature Page to the Second Amendment to the LSPS Agreement*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name: _John H. Smith_
Title: _Senior Vice President – Land & Business Development_
Date: _December 6, 2018_

**Red Willow Offshore, LLC**

By:_____
Name: _Richard L. Smith_
Title: _Executive Vice President - Offshore_
Date: _12/4/2018_

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to the Second Amendment to the LSPS Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name: _John H. Smith_
Title: _Senior Vice President – Land & Business Development_
Date: _December 6, 2018_

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: P. David Amend
Title: Vice President, Land
Date: November 28, 2018

*[Signature Page to the Second Amendment to the LSPS Agreement]*

*Execution Version*

### THIRD AMENDMENT TO
### GALAPAGOS AREA LOOP SUBSEA PRODUCTION SYSTEM CONSTRUCTION AND OPERATING AGREEMENT

This Third Amendment to the Galapagos Area Loop Subsea Production System Construction and Operating Agreement (this "**Agreement**") is made effective as of May 1, 2019 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**"). BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

### WITNESSETH

WHEREAS, reference is made to that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of December 1, 2011, by and among BP, Noble Energy, Inc. (as predecessor in interest of Fieldwood), Red Willow and HEDV, as amended by that certain First Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 10, 2014, by and among Noble Energy, Inc. (as predecessor in interest of Fieldwood), BP, Red Willow and HEDV and by that certain Second Amendment of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement dated effective as of October 15, 2018, by and among BP, Fieldwood, Red Willow and HEDV (the "**LSPS Agreement**"); and

WHEREAS, the Parties desire to amend the definitions of MC 519 Unit Operating Agreement and MC 519 UOA of the LSPS Agreement to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. As of the Effective Date, the definitions of MC 519 Unit Operating Agreement and MC 519 UOA appearing in Section 1.01 of the LSPS Agreement shall be deleted in their entirety and replaced with the following:

   "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" means that certain (a) Unit Operating Agreement originally by and between BP, Noble Energy, Inc. (as predecessor interest of Fieldwood Energy LLC), Red Willow and HE&D Offshore, L.P., and bearing BOEMRE Contract Number 754309001, dated effective January 1, 2009 as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC, as the same may be further amended from time to time, which covers the Record Title Interest in and to the Mississippi Canyon Block 519 and the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from 0 – 19,300' True Vertical Depth Subsea; (b) CPN Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SW/4 and S/2 NW/4 of the Mississippi Canyon Block 519 from 0 – 14,000' True Vertical Depth Subsea, (c) Retained Operating Rights Joint

Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in (i) the N/2 NE/4, SW/4 NE/4, N/2 SE/4 NE/4 and N/2 NW/4 of Mississippi Canyon Block 519 and depths extending from the surface to 99,999' True Vertical Depth Subsea, (ii) the S/2 NW/4 of Mississippi Canyon Block 519 and depths extending from 14,000' to 99,999' True Vertical Depth Subsea, and (iii) the S/2 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 and depths extending from 19,300' to 99,999' True Vertical Depth Subsea and (d) SASC Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV, as the same may be further amended from time to time, which covers the Operating Rights Interest in oil and gas lease OCS-G 27278 covering and affecting the Mississippi Canyon Block 519 insofar and only insofar as such lease covers the operating rights interest in the SW/4 of Mississippi Canyon Block 519 and from depths extending from 14,000 – 19,300' True Vertical Depth Subsea.

2. All other terms and provisions of the LSPS Agreement shall remain in full force and effect.

3. This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument.  The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4. This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: *Danielle Scott*
Name: Danielle Scott
Title: Authorized Person
Date: 5/16/2019

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _____
Name: _____
Title: _____
Date: _____

**Fieldwood Energy LLC**

By: _John H. S_____
Name: _John H. Smith_____
Title: _Sr. Vice President_____
Date: _16 May 2019_____

**Red Willow Offshore, LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____
Name: _____
Title: _____
Date: _____

*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By: *Richard L. Smith*
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 5/16/2019

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By: *[signature]*
Name: *P. David Amend*
Title: *Vice President, Land*
Date: *5/16/2019*

*[Signature Page to Third Amendment to Galapagos Area Loop Subsea Production System Construction and Operating Agreement]*