**<u>Attachment 5</u>**

**Replacement Declaration Exhibit B – PHA**

*Contains Limited Redactions*

EXECUTION VERSION

## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

### FOR

### MISSISSIPPI CANYON BLOCK 562 (ISABELA)

### AND

### MISSISSIPPI CANYON 519 UNIT (MC 519 UNIT)

### PRODUCTION HANDLING

### AT THE MISSISSIPPI CANYON BLOCK 474 NA KIKA (HOST)

### BY AND BETWEEN

### BP EXPLORATION & PRODUCTION, INC.
### (NA KIKA HOST OWNER)
### AND

### NOBLE ENERGY, INC.,
### BP EXPLORATION & PRODUCTION, INC.,
### RED WILLOW OFFSHORE, LLC AND
### HOUSTON ENERGY DEEPWATER VENTURES I, LLC
### ("MC 519 UNIT PRODUCERS")

### AND

### NOBLE ENERGY, INC. AND
### BP EXPLORATION & PRODUCTION, INC.
### ("ISABELA PRODUCERS")

### AND

### NOBLE ENERGY, INC., BP EXPLORATION & PRODUCTION, INC.,
### RED WILLOW OFFSHORE, LLC AND
### HOUSTON ENERGY DEEPWATER VENTURES I, LLC
### ("LSPS OWNERS")

### EFFECTIVE SEPTEMBER 21, 2010

Execution Version

EXECUTION VERSION

## TABLE OF CONTENTS
Production Handling and Operating Services Agreement

**ARTICLE I – CONTRACT APPLICATION** ....................................................................................... 2

   1.1   APPLICATION IN GENERAL ........................................................................................ 2
   1.2   APPLICATION TO OTHER AGREEMENTS ..................................................................... 3

**ARTICLE II – DEFINITIONS AND EXHIBITS** ................................................................................ 4

   2.1   PREFACE ................................................................................................................ 4
   2.2   DEFINITIONS .......................................................................................................... 5
   2.3   EXHIBITS ............................................................................................................. 19

**ARTICLE III – INFRASTRUCTURE AND FACILITIES** ................................................................... 20

   3.1   SATELLITE WELL SYSTEM ...................................................................................... 20
   3.2   LOOP SUBSEA PRODUCTION SYSTEM ...................................................................... 21
   3.3   FACILITY ACCESS MODIFICATIONS ......................................................................... 22

**ARTICLE IV - SERVICES** ...................................................................................................... 25

   4.1   GENERAL .............................................................................................................. 25
   4.2   WELL UNLOADING ................................................................................................. 26
   4.3   PARTIES RESPONSIBILITIES .................................................................................... 26
   4.4   USE OF PLATFORM/RISER SPACE ............................................................................ 26
   4.5   ENERGY SOURCES .................................................................................................. 27
   4.6   COMMUNICATION EQUIPMENT ................................................................................ 27
   4.7   EMERGENCY RESPONSE ......................................................................................... 27

**ARTICLE V – FEES & EXPENSES** ......................................................................................... 28

   5.1   OPERATING AND MAINTENANCE EXPENSES .............................................................. 28
   5.2   FUEL, FLARE AND VENT GAS .................................................................................. 39
   5.3   INFRASTRUCTURE ACCESS AND HANDLING FEES ...................................................... 39
   5.4   FUTURE GOVERNMENTAL REGULATIONS .................................................................. 43
   5.5   OWNER'S EXPENSE ................................................................................................ 44
   5.6   HOST SHUT DOWN COMPENSATION ........................................................................ 44
   5.7   ROYALTIES AND TAXES ......................................................................................... 47
   5.8   THIRD PARTY CONTRACTORS ................................................................................. 47
   5.9   ALLOCATION FACTORS .......................................................................................... 47

**ARTICLE VI - CAPACITY** ..................................................................................................... 48

   6.1   HOST CAPACITY .................................................................................................... 48
   6.2   SATELLITE LEASES CAPACITY ................................................................................ 48
   6.3   INTERRUPTIBLE CAPACITY ..................................................................................... 49
   6.4   PRODUCTION PRIORITIZATION ................................................................................ 49
   6.5   PRODUCTION COMPATIBILITY ................................................................................ 50

**ARTICLE VII – PROCEDURES AND PERMITTING** ...................................................................... 52

   7.1   METERING AND ALLOCATION PROCEDURES .............................................................. 52
   7.2   PERMITS .............................................................................................................. 53
   7.3   COMMINGLING OF PRODUCTION ............................................................................. 53
   7.4   RE-ALLOCATIONS ................................................................................................. 54
   7.5   OIL QUALITY BANK AND NGL BANK ..................................................................... 54
   7.6   LSPS LINE FILL .................................................................................................... 54

ARTICLE VIII – GATHERING AND TRANSPORTATION ................................................................. 54

| | | |
|---|---|---|
| 8.1 | PRODUCT DISPOSITION | 54 |
| 8.2 | GAS IMBALANCES | 55 |
| 8.3 | PRODUCT TRANSPORTATION | 55 |
| 8.4 | PIPELINE PENALTIES | 55 |

ARTICLE IX – SUSPENSION OF OPERATIONS AND FORCE MAJEURE ................................... 56

| | | |
|---|---|---|
| 9.1 | NOTICE | 56 |
| 9.2 | SUSPENSION OF OBLIGATION | 56 |
| 9.3 | RESOLUTION | 56 |
| 9.4 | SUSPENSION OF OPERATION | 57 |

ARTICLE X – TERM, DEFAULT, AND TERMINAITON ................................................................ 59

| | | |
|---|---|---|
| 10.1 | TERM OF AGREEMENT | 59 |
| 10.2 | DEFAULT | 59 |
| 10.3 | TERMINATION BY OWNER | 60 |
| 10.4 | TERMINATION BY PRODUCERS | 61 |
| 10.5 | RESPONSIBILITIES AND OBLIGAITONS AT TERMINATION | 62 |

ARTICLE XI – LIABILITIES AND INDEMNIFICAITON ................................................................. 64

| | | |
|---|---|---|
| 11.1 | LIABILITIES | 64 |
| 11.2 | INDEMNIFICATION WITH RESPECT TO WARRANTY OF TITLE | 68 |
| 11.3 | WAIVER OF CONSEQUENTIAL DAMAGES | 69 |
| 11.4 | INDIVIDUAL OBLIGATIONS | 69 |
| 11.5 | GROSS NEGLIGENCE/WILLFUL MISCONDUCT | 70 |

ARTICLE XII – INSURANCE AND BONDS .................................................................................... 70

| | | |
|---|---|---|
| 12.1 | INSURANCE | 70 |
| 12.2 | BONDS | 70 |

ARTICLE XIII – SUCCESSORS AND ASSIGNS ............................................................................ 71

| | | |
|---|---|---|
| 13.1 | SUCCESSORS AND ASSIGNS | 71 |
| 13.2 | ASSIGNMENT | 71 |

ARTICLE XIV - NOTICES ............................................................................................................... 72

| | | |
|---|---|---|
| 14.1 | GIVING AND RESPONDING TO NOTICES | 72 |
| 14.2 | CONTENT OF NOTICE | 76 |

ARTICLE XV - ADMINISTRATIVE AND MISCELLANEOUS........................................................ 76

| | | |
|---|---|---|
| 15.1 | INFRASTRUCTURE DISCLAIMER | 76 |
| 15.2 | DISCLAIMER OF WARRANTIES | 76 |
| 15.3 | HOST ACCESS & BOARDING | 77 |
| 15.4 | REPRESENTATIONS AND WARRANTIES | 78 |
| 15.5 | WARRANTY OF TITLE | 79 |
| 15.6 | STANDARD OF PERFORMANCE | 79 |
| 15.7 | PRODUCERS' EMPLOYEES, CONSULTANTS, AND CONTRACTORS | 79 |
| 15.8 | HOST OPERATOR'S EMPLOYEES, CONSULTANTS, AND CONTRACTORS | 79 |
| 15.9 | FURTHER ASSURANCES | 80 |
| 15.10 | NON-COMPLIANCE CITATIONS | 80 |
| 15.11 | DISPUTE RESOLUTION | 80 |
| 15.12 | WAIVERS | 80 |
| 15.13 | REMEDIES | 81 |
| 15.14 | NO THIRD PARTY BENEFICIARIES | 81 |
| 15.15 | CONFIDENTIALITY PROVISIONS | 81 |

EXECUTION VERSION

15.16    COMMITMENT OF OIL AND GAS RESERVES ................................................................ 82
15.17    COMPLIANCE WITH LAWS AND REGULATIONS ...................................................... 83
15.18    CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT ............................. 85
15.19    INTEGRATED AND ENTIRE AGREEMENT ............................................................... 86
15.20    AMENDMENT AND MODIFICATION ...................................................................... 86
15.21    SURVIVABILITY ................................................................................................ 86
15.22    EXISTING AGREEMENTS .................................................................................... 87

ARTICLE XVI - EXECUTION ........................................................................................ 87

16.1    EFFECT ............................................................................................................ 87
16.2    COUNTERPARTS ............................................................................................... 87

## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

### PREAMBLE

This **PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT** together with its attached Exhibits ("**Agreement**") effective as of September 21, 2010, ("**Effective Date**") is entered into by and between BP EXPLORATION & PRODUCTION, INC. ("**BP**"), hereinafter referred to as the "**Owner**", in its capacity as a co-owner of the "**Host**" (as defined herein below), and BP; NOBLE ENERGY, INC. ("**Noble**"); RED WILLOW OFFSHORE, LLC ("**Red Willow**"); and HOUSTON ENERGY DEEPWATER VENTURES I, LLC ("**HEDV**"), hereinafter referred to collectively as the "**Producers**", in their respective capacity as co-owners of each of the "**Satellite Leases**" (as defined herein below); and BP, Noble, Red Willow, and HEDV, hereinafter referred to collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**"(as defined herein below). Each signatory hereto is sometimes referred to singularly as a "**Party**" or collectively as the "**Parties**".

### WITNESSETH:

**WHEREAS**, BP and Noble are the co-owners of the Isabela Lease; and

**WHEREAS**, BP, Noble, Red Willow and HEDV are the co-owners of the MC-519 Unit Leases; and

**WHEREAS**, the LSPS Owners are the co-owners of the "**Loop Subsea Production System**" or "**LSPS**"; and

**WHEREAS**, the Satellite Leases and the "**Satellite Well System**" (as defined herein below) are operated by the "**Satellite Operators**" (as defined herein below); and

**WHEREAS**, the "**Loop Subsea Production System**" or "**LSPS**" (as defined herein below) is operated by the "**LSPS Operator**" (as defined herein below); and

**WHEREAS**, the Owner is a co-owner of the "**Host Leases**" (as defined herein below) and the Host; and

1   **WHEREAS**, the Host Leases and the Host are operated by the **"Host Operator"**
2   (as defined herein below); and

3   **WHEREAS**, the Producers desire to deliver **"Satellite Production"** (as defined
4   herein below) to the Host at the **"Entry Point(s)"** (as defined herein below) via the
5   **"LSPS"**; and

6   **WHEREAS**, the Producers desire to utilize the Host for the processing and
7   handling of Satellite Production so as to deliver Oil and Gas allocated to the Satellite
8   Leases to the **"Delivery Point(s)"** (as defined herein below); and

9   **WHEREAS**, the Producers desire that the Owner (i) connect the **"Satellite**
10  **System"** to the Host and (ii) install control, monitoring and maintenance equipment
11  associated with the **"Satellite System"** on the Host; and

12  **WHEREAS**, the Owner and Host Operator are willing to accommodate these
13  desires and requests under the terms and conditions set forth below.

14  **NOW, THEREFORE**, in consideration of the premises, the mutual covenants
15  and agreements contained herein, and other good and valuable consideration, the receipt
16  and sufficiency of which are hereby acknowledged, the Parties agree as follows:

17
18
19  ## ARTICLE I - CONTRACT APPLICATION
20
21  **1.1   Application in General**

22  This Agreement governs and applies to the rights and obligations of the Parties
23  relating, without limitation, to the (i) connection of the Satellite System to the
24  Host, (ii) installation of Facility Access Modifications on the Host, (iii)
25  processing and handling on the Host of Satellite Production delivered to the Entry
26  Point(s) via the LSPS, (iv) the delivery by the Owner to the Producers at the
27  Delivery Point of Oil and Gas allocated to the Satellite Leases, (v) Production
28  Handling Services by the Owner as set forth in Section 4.1.1 (*Production
29  Handling Services*) of this Agreement and (vi) Operating Services by the Owner
30  as described in Section 4.1.2 (*Operating Services for LSPS*) of this Agreement
31  and Section 4.1.3 (*Operating Service for Satellite Well System*) of this Agreement.
32  Conversely, this Agreement does not apply to the processing and handling of
33  **"Third Party Production"** (as defined herein below) on the Host or to the
34  operation of a Third Party Production system connected to the LSPS and/or the
35  Host. Accordingly, the Producers and/or the LSPS Owners do not have the right
36  to sublease all or part of their rights hereunder except as set forth in Article XIII

1    (*Successors and Assigns*) of this Agreement; and therefore, the Producers and/or
2    the LSPS Owners, either individually or jointly, are prohibited from becoming
3    and do not hold the right to become a sublessor for all or any portion of their
4    rights hereunder. ***Notwithstanding anything to the contrary herein, the rights,***
5    ***duties, and obligations of the Parties under this Agreement shall be subject and***
6    ***subordinate to the Na Kika Obligations (as defined herein below), however,***
7    ***nothing in this Agreement shall be construed as Noble, Red Willow or HEDV***
8    ***contractually assuming the Na Kika Obligations.***  Owner, in its capacity as co-
9    owner of the Host, will endeavor to secure approval from Shell Offshore Inc. to
10   share copies of the redacted Na Kika Obligations with Producers for
11   informational purposes only.   Owner will endeavor to ensure that subsequent
12   modifications to the Na Kika Obligations will not materially adversely impact the
13   Parties rights under this Agreement, to the extent possible.
14
15   **1.2**    **Application to Other Agreements**
16
17   **1.2.1**   Except for the Operating Services with respect to the LSPS described in
18   Article IV (*Services*) of this Agreement which shall be performed by the Host
19   Operator hereunder, the provisions of the Galapagos Area Loop Subsea
20   Production System Construction and Operating Agreement ("**LSPSOA**") being
21   negotiated by and among the LSPS Owners shall govern the rights, duties and
22   obligations among the LSPS Owners associated with: (i) the building and
23   operation of the LSPS; and (ii) the decision-making process among the LSPS
24   Owners related to this Agreement
25
26   **1.2.2**   Except for the Operating Services with respect to the Isabela Lease
27   described in Article IV (*Services*) of this Agreement which shall be performed by
28   the Host Operator hereunder, the provisions of the Isabela Joint Operating
29   Agreement ("**Isabela JOA**") attached as Exhibit "L" to this Agreement and
30   effective as of April 2, 2007  by and between BP and Noble as the owners of the
31   Isabela Lease   shall govern the rights, duties and obligations among such
32   Producers associated with: (i) operations on the Isabela Lease; (ii) those portions
33   of the Satellite Well System located on the Isabela Lease; and (iii) the decision-
34   making process between the owners of the Isabela Lease related to this
35   Agreement.
36
37   **1.2.3**   Except for the Operating Services with respect to the MC 519 Unit Leases
38   described in Article IV (*Services*) of this Agreement which shall be performed by
39   the Host Operator hereunder, the provisions of the MC 519 Unit Operating
40   Agreement ("**MC 519 UOA**") effective as of January 1, 2009 by and between the
41   BP, Noble, Red Willow and HEDV as the owners of the MC 519 Unit Leases
42   shall govern the rights, duties and obligations among such Producers associated
43   with: (i) operations on the MC 519 Unit Leases; (ii) those portions of the Satellite
44   Well System located on the MC 519 Unit Leases; and (iii) the decision-making
45   process between the owners of the MC 519 Unit Leases related to this Agreement.

**1.2.4** It is not the intention of the Parties to amend or otherwise modify the terms and conditions of the LSPSOA, the Isabela JOA or the MC 519 UOA, except where expressly stated herein.

**1.2.5** Except for the Operating Services agreed to be performed by the Host Operator hereunder, it is not the intent or purpose of this Agreement, nor should it be construed as expanding or reducing, the rights and duties of any of the Parties to conduct operations associated with: (i) the LSPS pursuant to the LSPSOA; (ii) the Isabela Lease pursuant to the Isabela JOA; or (iii) the MC 519 Unit Leases pursuant to the MC 519 UOA. As between the parties to such agreements, the provisions of those agreements shall continue to govern the authority delegated to the operators under those agreements and the approval of any operations or authority for expenditures required by the terms of those agreements.

**1.2.6** In the event of a conflict between the terms of this Agreement and the terms of the Isabela JOA, the MC 519 UOA or the LSPSOA relative to the Producers' and LSPS Owners' utilization of the Host and the Services and related activities that are described in this Agreement, the terms of this Agreement shall prevail over the terms of such agreements.

**1.2.7** Notwithstanding anything to the contrary in this Agreement, it is the intent of the Parties hereto that if any of the Producers are liable to the Owner or Host Operator for overhead on a cost or an expenditure incurred under the terms of this Agreement, then such Producers shall not be liable for overhead on such cost or expenditure under the terms of the LSPSOA, the Isabela JOA or the MC 519 UOA.

**1.2.8** Except as otherwise expressly provided for in this Agreement, it is the intent of the Parties hereto that all costs and expenses charged by the Owner or the Host Operator   under this Agreement will be charged to the respective Satellite Operator or the LSPS Operator. Subsequently, the respective Satellite Operator shall charge such costs and expenses (without the application of overhead) to the respective Producer, and the LSPS Operator shall charge such costs and expenses (without the application of overhead) to the respective LSPS Owner.

## ARTICLE II - DEFINITIONS AND EXHIBITS

**2.1**   **Preface**

As used in this Agreement (or in the Exhibits attached hereto), the terms **"Agreement"**, **"Effective Date"**, **"Owner"**, **"Parties"**, **"Party"**, **"LSPS Owners"** and **"Producers"** have the meanings set forth hereinabove.   Other capitalized

terms used throughout this Agreement (or in the Exhibits attached hereto) and not listed in Section 2.2 (*Definitions*) of this Agreement have the meanings ascribed to them elsewhere in this Agreement (or in the Exhibits attached hereto).

## 2.2    Definitions

The following capitalized terms have the meanings ascribed to them.

2.2.1    "**Abandonment Notice**" has the meaning ascribed to it in Section 10.5.4(a) (*Responsibilities and Obligations at Termination)* of this Agreement.

2.2.2    "**Adjusted Isabela Capacity**" means Isabela Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Isabela Lease after December 31, 2014, all as further described in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.3    "**Adjusted MC 519 Unit Capacity**" means MC 519 Unit Capacity for each (a) oil, (b) gas, and (c) water, which is available to the MC 519 Unit Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.4    "**Adjusted Satellite Capacity**" means Satellite Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Satellite Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.5    "**Affiliate**" means any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party.  The term "**Affiliate**" of a Party includes any parent corporation(s), partnership or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party, and also includes any other corporation, partnership or other entity in which the parent corporation(s) directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation [or fifty percent (50%) or more of the interests in the partnership or other entity].

- The stock  (or interests in a partnership or other entity) owned or controlled by a Party includes all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party.

2.2.6     "**Barrel**" or "**Bbl**" means forty-two (42) United States standard gallons at standard conditions of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia) at sea level at sixty degrees Fahrenheit (60°F).

2.2.7     "**British Thermal Unit**" or "**Btu**" means the quantity of heat required to raise the temperature of one (1) pound in weight of pure water one degree Fahrenheit (1°F) from fifty-eight and five-tenths degrees (58.5°) Fahrenheit to fifty-nine and five-tenths degrees (59.5°) Fahrenheit at a constant pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia at sea level) and determined on a gross, dry basis.

2.2.8     "**Business Day**" means a period of twenty-four (24) consecutive hours exclusive of Saturdays, Sundays and legal holidays.

2.2.9     "**BOEMRE**" means the United States Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement or any successor thereof with jurisdictional authority over the matters governed by this Agreement.

2.2.10     "**Capital Expenditure**" means any expenditure, except for those made in connection with repair operations that are intended to put or return the Host to its normal use conditions, that: (a) extends the useful life of the Host as it then exists (or any material portion thereof) beyond one (1) year; or (b) that materially enhances the useful life of the Host as it then exists (or any material portion thereof).

2.2.11     "**Claim/Loss**" and "**Claims/Losses**" shall mean all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage, regardless of how such claims and/or losses may be characterized. Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, demands, suits, causes of action (including actions in rem or in personam, at law or in equity), obligations, judgments, interest, costs, expenses, fines, penalties, losses, assessments, judgments and awards whether created by law, equity, contract, tort, arbitration, voluntary

settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity, the unseaworthiness of any vessel, the unairworthiness of any aircraft or any condition or pre-existing condition (whether known or unknown). The terms also include reasonable attorneys' fees, court costs, and other reasonable costs of litigation resulting from the defense of any Claim/Loss or cause of action within the scope of the indemnities in this Agreement.

2.2.12    "**Confidential Information**" means (i) the terms and conditions of this Agreement, (ii) the production profiles provided by Satellite Operator or their representatives pursuant to this Agreement, (iii) the measurement and allocation reports and data (including, without limitation, data associated with production quality), and (iv) the well test data.

2.2.13    "**Connected With**" shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to."  For avoidance of doubt, the indemnities in this Agreement are intended to be broad and cover all Claims/Losses in any way connected to the performance of the Agreement, including any Claims/Losses associated with any presence on any premises, and including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the Host.

2.2.14    "**COPAS**" means the Council of Petroleum Accountants Societies Inc.

2.2.15    "**COPAS Adjustment**" means the adjustment factor provided by Model Form Interpretation 50 "Overhead Adjustment Index ("**MFI-50**")" which is effective April 1st of each calendar year, as published by COPAS or any replacement overhead adjustment guideline document published by COPAS.

2.2.16    "**Day**" means a period of twenty-four (24) consecutive hours, beginning at 12:00 a.m. central time.

2.2.17    "**Default**" has the meaning ascribed to it in Section 10.2 (*Default*) of this Agreement.

2.2.18    "**Defend**" or "**Defense**" shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a

result of defending against a Claim/Loss as required by this Agreement, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Agreement.

**2.2.19**   **"Deferred Host Leases Gas Production"** or **"DGPC"** shall have the meaning ascribed to it in Section 5.6.2(b) *(Compensation Methodology)* of this Agreement.

**2.2.20**   **"Deferred Host Leases Oil Production"** or **"DOPC"** shall have the meaning ascribed to it in Section 5.6.2(a) *(Compensation Methodology)* of this Agreement.

**2.2.21**   **"Delivery Point(s)"** means:

(a)   for Gas, the point  where the Gas departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

(b)   for Oil, the point where the Oil departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

**2.2.22**   **"Dollar"** and **"$"** means the lawful currency of the United States of America.

**2.2.23**   **"Entry Point(s)"** means the point(s) at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth on Exhibit "A-2" *(Entry Point)* to this Agreement.

**2.2.24**   **"Environmental Protection Agency"** or **"EPA"** shall have the meaning ascribed to it in Section 5.4.2 *(Future Governmental Regulations)* of this Agreement.

**2.2.25**   The phrases **"even if caused by the Negligence/Fault"** or **"even if contributed to by the joint or concurrent Negligence/Fault"** shall, except to the extent expressly otherwise provided for in this Agreement, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply:

(a)   without regard to any conflicting rules of liability under any applicable law or regulation;

(b) without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention; and

(c) without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall not apply to or include the gross negligence or willful misconduct of any member of the Owner's Group, Host Operator, or any member of the Satellite Group, whichever is seeking indemnity.

2.2.26 "**Expense Category**" has the meaning ascribed to it in Section 5.1.3(b)(ii) (*General Principle for Costs Charging*) of this Agreement.

2.2.27 "**Expense Type**" has the meaning ascribed to it in Section 5.1.3(b)(i) (*General Principle for Costs Charging*) of this Agreement.

2.2.28 "**Facility Access Modifications**" has the meaning ascribed to it in Section 3.3.1 (*Facility Access Modifications*) of this Agreement.

2.2.29 "**Facility Access Modifications Dedicated System**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(c) (*General Principle for Costs Charging*) of this Agreement

2.2.30 "**Force Majeure**" means events which are beyond the reasonable control of the Party claiming suspension and which, by the exercise of due diligence, such Party would not have been able to avoid or overcome, and only if such events materially affects a Party's ability to perform its obligations hereunder, including but not limited to:

(a) flood, storm, loop current, eddy, hurricane, earthquake, adverse weather conditions, high sea states, or other acts of God;

(b)     fire, explosion, loss of well control, oil spill, or other environmental catastrophe, natural or man made;

(c)     war, terrorist actions, actions of the public enemy, blockade, insurrection, civil disturbance, labor dispute, strike, lockout, or other industrial disturbance, compliance with any law, order rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

(d)     inability to secure materials or equipment; or

(e)     any other causes (other than a cause arising under a contract with a Third Party), whether similar or dissimilar.

2.2.31     "Galapagos Area Loop Subsea Production System Construction and Operating Agreement" or "LSPSOA" has the meaning ascribed to it in Section 1.2.1 (*Application of Other Agreements*) of this Agreement.

2.2.32     "Gas" or "gas" means any mixture of gaseous hydrocarbons, consisting of methane and heavier liquefiable hydrocarbons and inert and noncombustible gases which are extracted from the subsurface of the earth, including any condensate recovered on the Host and re-injected in a downstream pipeline.

2.2.33     "Gas Export Pipeline" means the gas export pipeline that transports Gas from the Gas Delivery point (currently owned and operated by the Okeanos Gas Gathering Company, LLC) which originates at the Host, and terminates at the connection to Main Pass Block 260.

2.2.34     "Gas Production" means the Gas and associated substances produced from the Host Leases, both or each of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.35     "Gas System Host Dedicated Facility" has the meaning ascribed to it in Section 5.1.4(d) (*Cost Charging Procedure*) of this Agreement.

2.2.36     "Handling Fee" or "HF" has the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

2.2.37     "Host" means all equipment and facilities located between the Entry Point(s) and the Delivery Point, including the offshore semi-

submersible floating platform located on Mississippi Canyon Block 474, and the Facility Access Modifications, but excluding the LSPS and the Satellite Well System.

2.2.38    "**Host Capacity**" means the capacity available as stated for (a) Oil, (b) Gas and (c) water produced as a component of hydrocarbon production, all as further described in Exhibit "B" (*Host Capacity*) to this Agreement.

2.2.39    "**Host Common Facilities**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(e) (*General Principles for Costs Charging*) of this Agreement.

2.2.40    "**Host Dedicated Facility**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(d) (*General Principles for Costs Charging*) of this Agreement.

2.2.41    "**Host Gas Production**" means Gas attributable to Host Production.

2.2.42    "**Host Leases**" means the oil and gas leases that are governed by the Na Kika JOA, as such may be amended from time to time, including but not limited to OCS-G 07937, OCS-G 07938, OCS-G 07944, OCS-G 09808, OCS-G 09821, OCS-G 08823, OCS-G 08831, OCS-G 09837 and, OCS-G 09838 covering and affecting Mississippi Canyon Blocks 383, 385, 429, 430, 520, 522, 566, 607, and 608, respectively, in the Gulf of Mexico.

2.2.43    "**Host Leases Production**" means Oil, Gas, water, and associated substances produced from the Host Leases and processed and handled on the Host.

2.2.44    "**Host Measurement and Allocation Procedures**" or "**Host M&A**" means the measurement and allocation procedures and/or methodologies implemented by the Host Operator for the allocation of production to all inlet sources on the Host, as may be amended from time to time.

2.2.45    "**Host Oil Production**" means Oil attributable to Host Production.

2.2.46    "**Host Operator**" means the operator of the Host named pursuant to the Na Kika Obligations, currently BP or its successors or assigns.

2.2.47     "**Host Production**" means all Oil, Gas, water, and associated substances processed and handled on the Host.

2.2.48     [**Intentionally omitted.**]

2.2.49     "**Indemnify**" or "**Indemnification**" shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless."

2.2.50     "**Indemnitee**" shall refer to the Person seeking indemnity (or release) under this Agreement.

2.2.51     "**Indemnitor**" shall refer to the Party against whom indemnity (or release) is sought under this Agreement.

2.2.52     "**Infrastructure Access Fee**" or "**IAF**" shall have the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

2.2.53     "**Isabela Capacity**" means 20 MBO/d (gross), 20 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of Isabela Production. Isabela Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.54     "**Isabela First Production**" means the date of the initial introduction of Isabela Production at the Entry Point(s).

2.2.55     "**Isabela JOA**" has the meaning ascribed to it in Section 1.2.2 (*Application to Other Agreements*) of this Agreement.

2.2.56     "**Isabela Lease**" means the oil and gas lease OCS-G 19966 covering and affecting Mississippi Canyon Block 562 in the Gulf of Mexico.

2.2.57     "**Isabela Operator**" means the operator as designated under the terms of the Isabela JOA.

2.2.58     "**Isabela Production**" means Oil, Gas and water produced from the Isabela Lease.

**2.2.59** "**Latest Fully Allocated Production Month**" means the last production month that was reported by a Satellite Lease Operator to the BOEMRE on the Oil & Gas Operations Report (OGOR) Form MMS-4054, or its replacement form as designated by the BOEMRE or its successor agency with jurisdictional control over such matters. For example, February calendar month production is reported to the BOEMRE on the OGOR during the calendar month of April.

**2.2.60** "**Laws**" means any laws, rules and regulations of the United States of America or any duly constituted instrumentality thereof and all other governmental bodies, agencies and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended, enacted, promulgated or issued.

**2.2.61** "**LEB**" means one (1) liquid equivalent Barrel determined by treating as one (1) LEB each: one (1) Barrel of Oil, one (1) Barrel of water, or five and eight tenths (5.8) MSCF of Gas.

**2.2.62** "**Loop Subsea Production System**" or "**LSPS**" has the meaning ascribed to it in Section 3.2 (*Loop Subsea Production System*) of this Agreement.

**2.2.63** "**LSPS Direct Expense**" has the meaning ascribed to it in Section 5.1.3(b)(ii)(b) (*General Principles for Costs Charging*) of this Agreement.

**2.2.64** "**LSPS Operator**" means that Person designated as operator under the terms and provisions of the LSPSOA between the LSPS Owners governing the LSPS or any successor LSPS Operator selected pursuant to the provisions of the LSPSOA. As of the Effective Date the LSPS Operator is BP.

**2.2.65** "**LSPS Owners**" has the meaning ascribed to it in the preamble of this Agreement.

**2.2.66** "**LSPS Owners Group**" means the following entities and Persons individually and collectively: each of the LSPS Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

**2.2.67**    "**LSPSOA**" has the meaning ascribed to it in Section 1.2.1 (*Application to Other Agreements*) of this Agreement.

**2.2.68**    "**MBO/d**" means one thousand (1,000) Barrels of Oil per Day.

**2.2.69**    "**MBtu**" means one thousand (1,000) Btu's.

**2.2.70**    "**MBW/d**" means one thousand (1,000) Barrels of water per Day.

**2.2.71**    "**MC 519 Unit**" means the unit formed by that certain Unit Agreement for Outer Continental Shelf Exploration, Development and Production Operations dated effective January 1, 2009 by and between Noble, Red Willow, HEDV, bearing Contract Number 754309001.

**2.2.72**    "**MC 519 Unit First Production**" means the date of the initial introduction of MC 519 Unit Production at the Entry Point(s).

**2.2.73**    "**MC 519 Unit Capacity**" means 20 MBO/d (gross), 50 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of MC 519 Unit Production. MC 519 Unit Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement. MC 519 Unit Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

**2.2.74**    "**MC 519 Unit Leases**" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519; and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico, insofar and only insofar as such leases cover depths below fifteen thousand (15,000) feet TVD.

**2.2.75**    "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" has the meaning ascribed to it in Section 1.2.3 (*Application of Other Agreements*) of this Agreement.

**2.2.76**    "**MC 519 Unit Operator**" means the operator as designated under the terms of the MC 519 UOA.

**2.2.77**    "**MC 519 Unit Production**" means the Oil, Gas and water produced from MC 519 Unit Leases.

**2.2.78** "**MFI-50**" has the meaning ascribed to it in Section 2.2.14 (*COPAS Adjustment*) of this Agreement.

**2.2.79** "**Minimum Monthly Fee**" has the meaning ascribed to it in Section 5.3.5(a) (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6(a) (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement.

**2.2.80** "**MMBtu**" means one million (1,000,000) Btu's.

**2.2.81** "**MMSCF**" means one million (1,000,000) "**Standard Cubic Feet**" (as defined herein below).

**2.2.82** "**MMSCF/d**" means one million (1,000,000) Standard Cubic Feet per Day.

**2.2.83** "**MSCF**" means one thousand (1,000) Standard Cubic Feet.

**2.2.84** "**MSCF/d**" means one thousand (1,000) Standard Cubic Feet per Day.

**2.2.85** "**Na Kika HUA**" means that certain Guiding Principles for a Na Kika Host Utilization Agreement dated May 17th, 2004, as amended, expanded or replaced, from time to time.

**2.2.86** "**Na Kika JOA**" means that certain Na Kika Complex Joint Operating Agreement dated April 30, 1998 including addendum(s), as amended from time to time (including adding additional leases). As of the Effective Date the parties to the Na Kika JOA are Shell Offshore Inc. and BP.

**2.2.87** "**Na Kika Obligations**" means all rights, duties and obligations (existing or future) between Shell Offshore Inc. and BP (or their respective successors or assigns) related to, or in connection with, the Host, including without limitation the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement (including exhibits), and any gas balancing procedures, oil quality bank, and/or natural gas liquids bank, which might be implemented by the Host owners.

**2.2.88** "**Negligence/Fault**" shall mean and include, except to the extent expressly otherwise provided, negligence, strict liability, other premises liability, unseaworthiness, unairworthiness, liability for defective equipment, and breach of statutory duty, whether or not resulting from preexisting conditions, and, except to the extent

expressly otherwise provided, whether or not such Negligence/Fault is sole, direct, indirect, contributory, concurrent, joint, comparative, active, or passive.

2.2.89   "NGL" means natural gas liquid(s).

2.2.90   "Non-Conforming Production" has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

2.2.91   "Non-Performing Party" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.92   "Non-Satellite Production" means Oil, Gas, water, and all associated substances produced from sources other than the Satellite Leases and processed and handled on the Host.

2.2.93   "Notice Period" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.94   "OEB" means one (1) oil equivalent Barrel determined by treating as one (1) OEB each: one (1) Barrel of Oil or five and eight tenths (5.8) MSCF of Gas.

2.2.95   "Oil" or "oil" means any mixture of hydrocarbons, regardless of gravity, originally and naturally occurring as liquids and includes all condensate, distillate, and other liquid hydrocarbons recovered by use of conventional separators on the Host.

2.2.96   "Oil Export Pipeline" means the oil export pipeline known as Na Kika Oil Pipeline, which originates at the Host and terminates at a connection to the Delta Pipeline System at MP 69P that transports Oil from the Oil Delivery Point.

2.2.97   "Oil Production" means Oil and associated substances produced from the Host Leases, both or either of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.98   "Operating Services" means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.99   "Owner" has the meaning ascribed to it in the preamble of this Agreement.

**2.2.100**   "Owner's Group" means the following entities and Persons individually and collectively: Owner and it's respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

**2.2.101**   [Intentionally Omitted]

**2.2.102**   "Permanent Cessation of Production" means the event which occurs when production has not been restored from the last producing well on the   Isabela Lease or the MC 519 Unit Leases in accordance with 30 CFR Part 250 of the federal regulations concerning suspensions of production or other operations or such other regulations promulgated by the relevant governing authority.

**2.2.103**   "Person" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, governmental authority, or other entity.

**2.2.104**   "Prevailing Gas Price" means the arithmetic average of the high price and the low price, for the pertinent month, of the Destin Pipeline Company L.L.C one hundred percent (100%) index price used for pipeline imbalance settlements, or such other published monthly index price defined in the Na Kika Obligations.

**2.2.105**   "Prevailing Oil Price" means the arithmetic average of the high price and the low price on a day posted in the publication known as Argus Crude, as published by Argus Media, Inc. under the heading HLS ("Heavy Louisiana Sweet") or such other published index defined in the Na Kika Obligations.

**2.2.106**   "Prior Twelve Months Allocated Production" means the twelve (12) prior calendar months of allocated production prior to the Host Operator's approval of the expenditure. If there are less than twelve (12) months of fully allocated production, the allocation volumes from inception of production will be utilized, plus a value of zero given to months with no production. Once the relative throughput is determined for an expenditure, the allocation percentages assigned to the leases / fields will not change for that expenditure.

2.2.107   **"Producers"** has the meaning ascribed to it in the preamble of this Agreement.

2.2.108   **"Producers' Group"** means the following entities and Persons individually and collectively: each of the Producers and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

2.2.109   **[Intentionally Omitted.]**

2.2.110   **"Production Handling Services"** means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.111   **"Reduced Satellite Fields Capacity"** has the meaning ascribed to it in Section 6.4 (*Production Prioritization*) of this Agreement.

2.2.112   **"Satellite Capacity"** means Isabela Capacity and MC 519 Unit Capacity combined.

2.2.113   **"Satellite Field Start Up Agreement"** means that certain Satellite Field Start-Up Agreement between BP and Shell Offshore Inc. dated May 17, 2004 as amended, expanded or replaced from time to time.

2.2.114   **"Satellite First Production"** means the date of the initial introduction of Satellite Production at the Entry Point(s).

2.2.115   **"Satellite Gas Production"** means Gas attributable to Satellite Production.

2.2.116   **[Intentionally Omitted]**

2.2.117   **"Satellite Leases"** means the Isabela Lease and/or the MC 519 Unit Leases.

2.2.118   **"Satellite Lease Direct Expense"** has the meaning ascribed to it in Section 5.1.3(b)(ii)(a) (*General Principles for Costs Charging*) of this Agreement.

2.2.119   **"Satellite Oil Production"** means Oil attributable to Satellite Production.

2.2.120    **"Satellite Operating Problem"** has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

2.2.121    **"Satellite Operator(s)"** means the operator of the Isabela Lease and the operator of the MC 519 Unit Leases or any successors thereof selected pursuant to the terms and provisions of the Isabela JOA and the MC 519 JOA, respectively.

2.2.122    **"Satellite Production"** means the stream of Oil, Gas, water, and associated substances produced from the Satellite Leases.

2.2.123    **"Satellite System"** means the LSPS and the Satellite Well System.

2.2.124    **"Satellite System Owners"** means all of the Producers (each in its capacity as an owner of the Satellite Leases) and all of the LSPS Owners (each in its capacity as an owner of the LSPS)

2.2.125    **"Satellite Well System"** has the meaning ascribed to it in Section 3.1.1 (*Satellite Well System*) of this Agreement.

2.2.126    **"Services"** means the Production Handling Services and the Operating Services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.127    **"Standard Cubic Foot"** or **"SCF"** means that quantity of Gas that occupies one (1) cubic foot of space when held at a base temperature of sixty degrees (60°) Fahrenheit and a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute (psia).

2.2.128    **"Third Party"** means any Person other than the Owner, the Host Operator, the Producers, and any Party hereto.

2.2.129    **"Third Party Leases"** means oil and gas leases owned by a Third Party, whose production is processed and handled on the Host.

2.2.130    **"Third Party Production"** means Oil, Gas, water, and all associated substances produced from Third Party Leases.

2.3    **Exhibits**

All references in this Agreement to "Exhibits", without further qualification mean the Exhibits listed below and attached to this Agreement. Each Exhibit listed below is made a part of this Agreement, and is deemed incorporated into the body

of this Agreement by reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.

Exhibit "A-1": Delivery Point(s)
Exhibit "A-2": Entry Point(s)
Exhibit "B":   Host Capacity
Exhibit "C":   Accounting Procedures
Exhibit "D":   Host Facilities Schematics
Exhibit "E":   Host Services
Exhibit "F":   Operating & Maintenance Expenses
Exhibit "G":   Host Fluid Limits/Operating Parameters
Exhibit "H":   Insurance Provisions
Exhibit "I":   Dispute Resolution Procedures
Exhibit "J":   Certification of Non-Segregated Facilities
Exhibit "K":   Approved AFE's
Exhibit "L":   Isabela JOA

If the provisions of any of the Exhibits listed above conflict with any provisions of the body of this Agreement, the provisions of the body of this Agreement will prevail except as to Exhibits "G" and "H" each provision of which shall prevail over any provision of the body of this Agreement.


ARTICLE III - INFRASTRUCTURE AND FACILITIES


**3.1**   **Satellite Well System**

**3.1.1**   The Producers at their sole cost, risk, liability, and expense will own, design, procure, fabricate, transport, and install each Satellite Well System ("**Satellite Well System**") and any modifications thereto, which includes, but is not limited to, the following components:

(a)   All facilities and equipment upstream of the LSPS including, but not limited to, the wells, well jumpers, subsea wellheads, choke tie-in bases, umbilicals and terminations, flying leads, flowlines, and wellhead master and wing valves associated with producing and gathering Satellite Production.

**3.1.2**   Each Satellite Operator will provide, in a timely manner, at the Host Operator's discretion, the design and specifications of its respective Satellite Well System to the Owner.  The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to each Satellite Operator within ninety (90) Days of its receipt of each Satellite Wells System design and

specifications. Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's reasonable judgment. Each Satellite Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

3.1.3   The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.1.2 *(Satellite Well System)* of this Agreement.

3.1.4   Each Satellite Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of its respective Satellite Well System and its connection to the LSPS, at the sole cost and expense of the respective Producers.

3.2   **Loop Subsea Production System**

3.2.1   Subject to Section 3.2.4 *(Loop Subsea Production System)* of this Agreement, the LSPS Owners in accordance with provisions of the LSPSOA at their sole cost, risk, liability, and expense will design, procure, fabricate, test, transport, install, or cause to be installed, interconnected and commissioned the Loop Subsea Production System ("**LSPS**") and any modifications thereto, which includes, but is not limited to, the following components:

All facilities and equipment upstream of all Entry Point(s) as set forth on Exhibit "A-2" *(Entry Poin(t)s)* to this Agreement but downstream of the Satellite Well System including, but not limited to, choke tie-in bases, subsea manifolds, umbilicals and terminations, flowlines, flowline risers, associated with producing and gathering Satellite Production. The LSPS will be owned by the LSPS Owners. For purposes herein, "upstream" is from the Entry Point(s) towards the Satellite Leases.

3.2.2   The LSPS Operator will provide, in a timely manner the design and specifications of the LSPS to the Owner. The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to the LSPS Operator within ninety (90) Days of its receipt of the LSPS design and specifications. Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's sole judgment. The LSPS Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

**3.2.3** The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.2.2 *(Loop Subsea Production System)* of this Agreement.

**3.2.4** The LSPS Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the LSPS and its connection to the Host, at the sole cost and expense of the LSPS Owners.

**3.2.5** The Host Operator shall determine the timing and scheduling of all activities and operations involving the connection and commissioning of the LSPS to the Host in order to provide for the safety of individuals involved in such activities and operations, to protect the environment, and to minimize interruption of Host Lease operations, Satellite Lease operations and/or Host downtime.

## 3.3 Facility Access Modifications

**3.3.1** All facilities and equipment added to and located on the Host required for the Production Handling Services and all modification to the Host required for the connection of the LSPS to the Host (collectively, the "**Facility Access Modifications**") will be installed on the Host at a location thereon acceptable to the Owner and Host Operator. The Facility Access Modifications, specifically excluding the LSPS, will be designed, procured, and fabricated by the Host Operator, and will be installed and interconnected with other facilities on the Host, as well as commissioned, by the Host Operator. For reference purposes, an equipment layout and process flow schematic depicting the Host facilities and the interface between the Facility Access Modifications and the Host facilities is included as Exhibit "D" *(Host/Satellite Facilities Schematic)* to this Agreement. For the avoidance of doubt, the Facility Access Modifications are part of the Host and not part of the LSPS. All Facility Access Modifications (including any modifications thereto) will be owned by the Owner whether such facilities are procured and/or funded by the Host Operator, the Owner, the Producers, the LSPS Operator or the LSPS Owners.

The Facility Access Modifications include, but are not limited to:

    (i)      Inlet separator(s);
    (ii)     Process liquids cooling;
    (iii)    Boarding valves and topside choke;
    (iv)    Flowline pig launchers and receivers;
    (v)     Methanol injection;
    (vi)    Subsea chemical injection;
    (vii)    Riser Gas lift compression;

(ix)    Oil, Gas and water metering and fluid sampling equipment;

(x)    Hydraulic Power Unit ("**HPU**");

(xi)    the Topsides Umbilical Termination Assembly ("**TUTA**"); and

(xii)    the Master Control Station ("**MCS**").

**3.3.2**    The Producers of the Isabela Lease have, in accordance with the terms and conditions of the Isabela JOA, each approved and executed the following BP authorization for expenditures ("**AFE**"):

| BP's AFE Number | Description | Gross Amount, ($ million) |
|---|---|---|
| Z1-005DG | Integrated Project Team | 16.3 |
| Z1-0067Y | Integrated Project Mgmt | 9.9 |
| Z1-00601 | Long Leads | 35.0 |
| Z1-006DN | Project Mgmt | 25.2 |
| Z1-006DN (Supplement) | Project Mgmt | 10.8 |
| Z1-006DQ | Topsides | 23.8 |
| Z1-006DQ (Supplement) | Topsides | 5.2 |
| Z1-007DQ | Topsides Fab & Install | 82.4 |

Execution of this Agreement shall be deemed approval by the Producers of the AFE's set forth above ("**Approved AFE's**") attached as Exhibit "K" to this Agreement, in accordance with the Isabela JOA. Approximately One Hundred Twenty Nine Million Six Hundred Thousand and No/100 Dollars ($129,600,000) of the funds contained in the Approved AFE's represent costs that have and/or will be incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components. Upon execution of this Agreement, the Producers of the Isabela Lease and the Producers of the MC 519 Unit Leases agree that the Host Operator shall, in accordance with the Isabela JOA and the Isabela accounting procedures, directly charge and invoice Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Lease fifty percent (50%) of the Approved AFE's as they relate to the Facility Access Modifications. The Producers of the MC 519 Unit Leases agree to reimburse the Producers of the Isabela Lease in accordance with the Isabela JOA, for their 50% share of any of the Approved AFE's set forth in this Section 3.3.2 (*Facility Access Modifications*) of this Agreement as they relate to the Facility Access Modifications that were approved prior to the Effective Date of this Agreement.

Subsequent to the Effective Date of this Agreement, the Host Operator will directly charge and invoice pursuant to the Isabela JOA and Exhibit "C" *(Accounting Procedure)* of the Isabela JOA, Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Leases fifty percent (50%) of all future AFE's in addition to those within the Approved AFE's incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components pursuant to Section 4.4 *(Use of Platform/Riser Space)* of this Agreement. However, the Host Operator shall not be required to proceed with the installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components until the Producers have advanced the estimated costs of such to the Host Operator. The Host Operator shall never be obligated to expend any of its own funds for such costs. The interconnection of the LSPS to the Host shall be carried out by the Host Operator upon receipt of notice of completion of construction of the LSPS from the LSPS Operator. The commissioning of the Satellite System shall be carried out by the LSPS Operator in coordination with the Host Operator. The Host Operator shall determine the timing and scheduling of all activities and operations involving the commissioning of the LSPS and the interconnection of the LSPS to the Host.

3.3.3   The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.3.2 *(Facility Access Modifications)* of this Agreement.

3.3.4   The Host Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the Facility Access Modifications at the sole cost and expense of the Producers.

3.3.5   Owner will endeavor, subject to the Na Kika Obligations, to provide Producers with priority use of the Facility Access Modification for Production Handling Services of Satellite Production during the term of this Agreement.

## ARTICLE IV - SERVICES

### 4.1 General

Pursuant to the terms of this Agreement, the Owner agrees to provide the Services and the Owner agrees to cause the Host Operator to perform the Services with respect to the Satellite System and the Satellite Production delivered to the Host commencing as soon as reasonably possible after the commissioning of the Satellite System and its connection to the Host. The Owner, the Host Operator, nor anyone employed by them, will be deemed for any purpose to be the employees, contractors, agents, consultants, servants, or representatives of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator in the performance of any Services or part thereof in any manner dealt with hereunder. Except as otherwise provided herein, neither the Producers nor the Satellite Operator(s) nor the LSPS Owners nor the LSPS Operator will have direction or control of the Owner or the Host Operator, their employees, contractors, agents, consultants, servants, or representatives in the performance of any Services or part thereof under this Agreement. Except as provided in Article I, it is not the intent or purpose of this Agreement, nor should it be construed as changing, the rights and duties of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator to conduct operations associated with the Satellite Leases or the Satellite System.

#### 4.1.1 Production Handling Services

The Owner will provide through the Host Operator the Production Handling Services for Satellite Production in accordance with Exhibit "E" (*Host Services*) to this Agreement. The Owner will provide the Production Handling Services for Satellite Production after such production passes through the Entry Point(s) and until production enters the Delivery Point(s).

#### 4.1.2 Operating Services for LSPS

The Owner will provide through the Host Operator the Operating Services for the LSPS in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the LSPS, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

### 4.1.3   Operating Services for Satellite Well System

The Owner will provide through the Host Operator the Operating Services for the Satellite Well System in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the Satellite Well System, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

## 4.2   Well Unloading

The unloading of completion fluids (e.g. chemicals, fracture fluids, acids, and/or water, etc.) associated with Satellite Leases shall be carried out only with the Host Operator's prior consent. In connection with the granting of such consent, the Host Operator may require the Satellite Operators to comply with such standards and procedures as set by the Host Operator in its sole discretion.

## 4.3   Parties' Responsibilities

### 4.3.1   Producers' Responsibilities

The Producers will retain responsibility for all Satellite Well System operations that are not performed from or on the Host including, but not limited to, downhole well operations and flowline repairs and maintenance.

### 4.3.2   LSPS Owners' Responsibilities

The LSPS Owners will retain responsibility for all LSPS operations that are not performed from or on the Host including, but not limited to flowline repairs and maintenance.

## 4.4   Use of Platform/Riser Space

### 4.4.1   Sufficient weight capacity, buoyancy, and deck space exists on the Host, within the rights of the Owner under the Na Kika Obligations, for the installation of the Facility Access Modifications.

### 4.4.2   If sufficient weight capacity, buoyancy and deck space is unavailable in the future to allow the Host Operator to perform the Services because of additional Host Leases Production being handled on the Host pursuant to Section 6.4 (*Production Prioritization*) of this Agreement, or if costs and expenses are required to construct and/or make such sufficient weight

capacity, buoyancy and deck space available, because of such occurrence, then the Host Operator is responsible for the design, procurement, fabrication and construction or removal of equipment required to create the required sufficient weight capacity, buoyancy and deck space to allow the Host Operator to perform the Services. However, the Producers and the LSPS Owners are responsible for all actual costs incurred by the Owner in and for such activities and operations referenced above and required to allow the Host Operator to perform the Services. The Host Operator in accordance with Exhibit "B" (*Accounting Procedures*) to this Agreement will directly charge and invoice the Producers of the Isabella Lease for fifty percent (50%) of such costs and the Producers of the MC 519 Unit Leases for fifty percent (50%) of such costs.  All Host modifications made under Sections 4.4.1 and 4.4.2 will be owned by Owner.

**4.4.3** The Producers and/or the LSPS Owners have the right to use only so much of the weight capacity, buoyancy and deck space on the Host which is essential for the installation of the Facility Access Modifications on the Host.

## 4.5    Energy Sources

The Owner will provide energy sources for carrying out of the Services, as may be necessary to fulfill the obligations set forth pursuant to this Agreement from Owner's existing energy sources.

## 4.6    Communication Equipment

The Owner, through Host Operator, will provide access, at the Producers' or the LSPS Owners' sole cost and expense, to the existing communication equipment (i.e. telephones) on the Host, subject to the Host Operator's guidelines, for use by the Satellite Operator(s) or the LSPS Operator associated with the performance of Operating Services by the Host Operator.  The Owner may also provide to the Producers and LSPS Owners, at their sole cost and expense, and subject to any mutually acceptable agreement(s) that may be required, data transmission communication line(s), as well as other forms of communication (e.g. microwave transmissions, fiber optic) which are part of the design and specifications contemplated in Section 3.2 *(Loop Subsea Production System)* of this Agreement Section 3.3 *(Facility Access Modification)* of this Agreement, and Section 3.1 *(Satellite Well System)* of this Agreement.

## 4.7    Emergency Response

**4.7.1** In the event of an emergency, including, but not limited to, a hydrocarbon leak, explosion, fire, storm, inclement weather or any other situation

which threatens life, the environment, or property, the Host Operator, with no admission or presumption of liability, may promptly take such action as is deemed appropriate by the Host Operator under the circumstances to remedy or alleviate such emergency. Such action includes, but is not limited to, discontinuing the Services, shutting-in the Satellite Leases' subsea wells and/or the LSPS, and initiating emergency response operations. The Host Operator will promptly notify, given the emergency circumstances, the Satellite Operator(s) and/or the LSPS Operator of such emergency by telephone, followed by written notification of the emergency and remedial actions taken.

4.7.2   All emergency response costs incurred by the Host Operator which are attributable to the LSPS and/or the Satellite Well System(s) will be reimbursed to the Host Operator by the LSPS Owners and/or the respective Producers, as the case may be. Accordingly, the Host Operator will directly charge and invoice the LSPS Operator on behalf of the LSPS Owners and/or the Satellite Operator(s), on behalf of the respective Producers for such costs.

4.7.3   Each Satellite Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the respective Satellite Well System. The LSPS Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the LSPS. The Host Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the Host. The Parties will cooperate to the extent necessary in preparing such reports. All Parties will be provided a copy of any reports filed with governmental agencies in connection with emergency response operations.

4.7.4   Subsequent to the emergency, the Host Operator will have the option to conduct a root cause analysis of the event, activity or equipment from which the emergency arose. The cost of the root cause analysis, and any mitigation measures taken to address the issue raising the emergency, shall be paid for by the Owner and/or the Producers and/or the LSPS Owners who caused the emergency, as determined by the Host Operator.

## ARTICLE V - FEES & EXPENSES

**5.1   Operating and Maintenance Expenses**

The Producers and the LSPS Owners shall reimburse the Host Operator, on a monthly basis for expenses incurred for the direct or indirect benefit of each Party as illustrated on Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement and as defined in this Article V (*Fees & Expenses*).

### 5.1.1   Producers' Expenses

The Producers are solely responsible for (i) the Satellite Lease Direct Expenses; (ii) Facility Access Modifications Dedicated System expenses; (iii) the Host Dedicated Facility expenses; and (iv) the Host Common Facilities expenses which are allocated to the Producers pursuant to Section   5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice each Satellite Operator, on behalf of the Producers, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

### 5.1.2   LSPS Owners' Expenses

The LSPS Owners are solely responsible for the LSPS Direct Expenses which are allocated to the LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement..

### 5.1.3   General Principles for Cost Charging. The following general principles are applicable to the charging of all expenses (exclusive of Capital Expenditure) incurred by the Host Operator:

(a)   Costs for the direct and exclusive benefit of either the LSPS or any one of the Satellite Leases will be charged directly to the respective LSPS Operator or Satellite Operator.

(b)   Costs incurred for the benefit of multiple fields will be treated as indirect costs and subject to an allocation procedure. Indirect costs will be charged based on allocated production, as determined by the Expense Type (as defined herein below) and Expense Category (as defined herein below) of the costs incurred.

i.   The "**Expense Type**" will be determined based upon the initial estimated cost of any project or single expenditure. All associated expenditures will retain such expense classification even if the actual total expenditure level would have resulted in a different Expense Type. However, if there is a material variance between the actual total expenditure and the initial estimate for the project or single expenditure that was originally classified as Routine Expense, these costs will be re-allocated as a Non-Routine Expense if the re-allocation would materially alter the

charges to the applicable Producers and Host Leases. Expense Type will determine the period of throughput to be taken into consideration and will be classified into the following:

(a)  Routine Expenses are projects or single expenditures estimated to cost less than or equal to Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the total gross Latest Fully Allocated Production Month; and

(b)  Non-Routine Expenses are projects or single expenditures estimated to cost in excess of Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the Prior Twelve Months Allocated Production prior to the Host Operators' approval of the expenditure.

ii.  The "**Expense Category**" will determine the type of throughput (oil, gas, or LEB of entitlement production) which will be used to allocate costs. Operating expenses will be classified into the following "Expense Category":

(a)  "**Satellite Leases Direct Expense**" includes costs relative to a specific well or group of wells on a Satellite Lease that produce bulk production to the Host for initial separation and processing. Activities included in the Satellite Leases Direct Expense Category include, but are not limited to, the following that are solely attributable to specific Satellite Lease(s):

i.   All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii.  Expenses for labor, spare parts, replacement parts, tools and equipment rental.

iii. All intervention, remote operating vehicle, facility repairs (including subsea components and control systems located on the Host), non-routine well or fluid testing (beyond that required for measurement and allocation of production), and unloading and commissioning expenses.

iv. Emergency response.

v. Expenses for chemicals (excluding MEG that is injected into the umbilical distribution header) and fluid disposal costs. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as set forth on Exhibit "E" (*Host Services*) to this Agreement.

vi. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Satellite Leases' requirements) of consumables, equipment and supplies.

vii. Non-Routine Expenses for operations at the Host to assist in the diagnosis of subsea and operational problems (e.g. special monitoring of pressures, temperatures and flow rates).

viii. Software design and modification costs, including but not limited to, programming costs to incorporate a new well from an existing Satellite Lease.

ix. Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable well or its associated jumper where the problem is located.

(b) "**LSPS Direct Expense**" includes costs relative to the LSPS. Activities included in the LSPS Direct Expense include, but are not limited to, the following that are solely attributable to the LSPS:

i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii. Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii. Expenses for chemicals and fluid disposal costs. Charge the LSPS and not the specific well in which chemicals are injected to facilitate delivery to the LSPS, if the sole

purpose of the chemical injection is for the benefit of the entire LSPS. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as per Exhibit "E" (*Host Services*) to this Agreement.

iv.    All intervention, remote operated vehicle, pigging (including freeing stuck pigs), hot oiling, emergency response, repairs, and unloading & commissioning expenses.

v.    Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the LSPS's requirements) of consumables, equipment and supplies.

vi.    Expenses for services on gas lift risers and injection equipment not associated with compression.

vii.    Expenses for operation and maintenance inspection of the loop pigging systems.

viii.    Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning of the LSPS shall be charged to the LSPS Direct Expense as a Non Routine expense, if the location can be identified to the source of the problem.

(c)    **"Facility Access Modifications Dedicated System"** includes costs relative to the Facility Access Modifications. Activities included in the Facility Access Modifications Dedicated System, include, but are not limited to, the following that are solely attributable to the Facility Access Modifications:

i.    All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii.    Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii.    Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to

accommodate the Facility Access Modifications Dedicated System's requirements) of consumables, equipment and supplies.

iv. Expenses for gas lift equipment and services on gas lift injection equipment not associated with compression.

v. Special fluid sampling from Facility Access Modifications separators beyond that required under the measurement and allocation procedures.

vi. Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable Facility Access Modifications Dedicated System as a Non Routine Expense, if the location can be identified to the source of the problem.

(d) **"Host Dedicated Facility"** includes costs relative to equipment located on the Host that is dedicated to service specific oil or gas processing, handling and delivery to the Delivery Point(s). Activities included in the Host Dedicated Facility category include, but are not limited to, the following that are solely attributable to specific Host Dedicated Facility:

i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures.)

ii. Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii. Expenses for chemicals and fluid disposal.

iv. All intervention, non-routine testing (including fluid tests not required by the measurement and allocation of production), emergency response, repairs and commissioning.

v. Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Host Dedicated Facilities'

requirements) of consumables, equipment and supplies.

vi.    Expenses for riser gas lift compression.

vii.   Expenses for the Gas System Host Dedicated Facility includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger and condensate free water knock out.

viii.  Expenses for the Oil System Host Dedicated Facility includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps.

(e)    "**Host Common Facilities**" include costs relative to equipment located on the Host that is shared or provides service to a combination of the Host Leases, Satellite Leases, and/or Third Party Production. Activities included in Host Common Facilities include, but are not limited to, the following that are solely attributable to Host Common Facilities, unless otherwise indicated:

i.     All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures) not specifically identified as Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

ii.    Expenses for labor, spare parts, replacement parts, tools, equipment rental, and other consumables.

iii.   Expenses for chemicals associated with processing or chemicals not specifically associated with a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated Facility, or Host Dedicated Facility.

iv.    Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

v. All ROV, structure or intervention, non-routine testing (including fluid tests not required by the Host M&A), emergency response, unloading, repairs and commissioning.

vi. Routine well testing, surface fluid sampling (BS&W, gas, water, etc) on inlet separators, metering, allocation of production and reporting as required per the Host M&A or other governing agreement. (Does not include routine maintenance of meters and samplers associated with inlet separators).

vii. Expenses related to the documenting and reporting routine well performance of the subsea wells tied back to the Host and performance of the Host.

viii. Produced water and solids handling, treating and disposal expenses (excluding well unloading expenses).

ix. Utilities (Electrical power, instrument air, control systems, office, quarters, galley, crane, communications center, potable water, ventilation systems, etc.).

x. Transportation for personnel, equipment, spare parts and consumables to and from shore base, except for rig operations and except for special trips benefiting only a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

xi. On-site (on the host) instruction and training of operations personnel on the host.

xii. Expenses for routine on-site operation and maintenance benefitting all subsea production system components installed on the Host.

xiii. General administrative services for all operations based on the Host including, but not limited to order, receipt and verification of receipt of parts, tools, supplies and services and manage on-site inventories of such items.

xiv.   Simulator and production allocation software costs not associated with a tie-in of a new production steam.

xv.   General emergency response preparedness on the Host (availability of materials, etc.).

**5.1.4   Cost Charging Procedure.** The following cost charging procedure will be implemented by the Host Operator for the different possible permutations of Expense Type and Expense Category for costs and expenses incurred by the Host Operator.

(a)   Satellite Leases Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of either the Isabela Lease or MC 519 Unit Leases will be borne by the respective Producers but billed to the Satellite Operator. The Satellite Operator(s) will not reapply an overhead charge to Satellite Leases Direct Expense for charges passed down to Producers, once overhead has been applied from the Host Operator.

i.   Costs for Isabela Lease well(s) associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the Isabela Producers but billed to the Isabela Satellite Operator.

ii.   Costs for the MC 519 Unit Leases well(s), associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the MC 519 Unit Producers but billed to the MC 519 Unit Operator.

(b)   LSPS Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the LSPS will be borne by the respective LSPS Owners but billed to the LSPS Operator. The LSPS Operator will not reapply an overhead charge to LSPS Direct Expense for charges passed down to LSPS Owners, once overhead has been applied from the Host Operator.

i.   Routine Expenses shall be allocated to the LSPS Owners utilizing the LSPS based on the proportion between i) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the LSPS and ii) the total OEB throughput in the LSPS during such month.

ii.    Non-Routine Expenses shall be allocated to the LSPS Owners utilizing (or that have utilized) the LSPS based on the proportion between (a) the Prior Twelve Months Allocated Production on an OEB basis for the respective LSPS Owners utilizing the LSPS and (b) the total OEB throughput in the LSPS during such period.

(c)    Facility Access Modifications Dedicated System (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the Facility Access Modifications will be borne by the respective Producers but billed to the applicable Satellite Operator(s). The applicable Satellite Operator(s) will not reapply an overhead charge to Facility Access Modifications Dedicated System costs for charges passed down to Producers, once overhead has been applied from the Host Operator.

i.    Routine Expenses shall be allocated to the Producers utilizing the Facility Access Modifications based on the proportion between (a) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Satellite Production on an OEB basis in the Facility Access Modifications during such month.

ii.    Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Facility Access Modifications based on the proportion between (a) the Prior Twelve Months Allocated Produced on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Prior Twelve Months Allocated Production of Satellite Production on an OEB basis in the Facility Access Modifications.

(d)    Expenses for the Gas System Host Dedicated Facility, which includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger & condensate free water knock out as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement and shall be allocated to the Satellite Leases connected to the Gas System Host Dedicated Facility in accordance with the following:

i.    Routine Expenses shall be allocated to the Satellite Leases utilizing the Gas System Host Dedicated Facility based on the proportion between (a) the Latest Fully Allocated

Production Month Gas Production for the respective Satellite Leases and (b) the total Gas Production throughput at the Host during such month.

ii. Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Gas System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Gas Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Gas Production throughput at the Host.

A well is considered to be connected to the Gas System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the condensate free water knock out, and/or Gas from the inlet separator flows to the booster gas compressor or the dehydration system.

(e) Expenses for the Oil System Host Dedicated Facility, which includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement and shall be allocated to the Satellite Leases connected to the Oil System Host Dedicated Facility in accordance with the following:

i. Routine Expenses shall be allocated to the Satellite Leases utilizing the Oil System Host Dedicated Facility based on the proportion between (a) Latest Fully Allocated Production Month Oil Production for the respective Satellite Leases and (b) the total Oil Production throughput at the Host during such month.

ii. Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Oil System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Oil Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Oil Production throughput at the Host.

A well is considered to be connected to the Oil System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the oil free water knock out.

(f)     Expenses for the Host Common Facilities shall be allocated to the Satellite Leases connected to the Host in accordance with the following:

     i.     Routine Expenses shall be allocated to the Satellite Leases utilizing the Host based on the proportion between (a) the Latest Fully Allocated Production Month relative LEB throughput for the respective Satellite Leases and (b) the total LEB throughput at the Host during such month.

     ii.    Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Host based on the proportion between (a) the Prior Twelve Months Allocated Production of LEB throughput for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total LEB throughput at the Host.

**5.2    Fuel, Flare and Vent Gas**

Host fuel, flare and vent gas consumption will be allocated on a monthly basis to the Owner for Non-Satellite Production handling and to the Producers for Satellite Production handling in accordance with this Section 5.2. The value of such gas is not included in Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

**5.2.1**  Fuel, flare and vent gas consumed by certain production handling equipment and facilities located on the Host will be allocated to each Satellite Lease in accordance with the Host M&A.

**5.2.2**  Each calendar month, the Host Operator will allocate and deduct from each Satellite Lease's share of Gas available for sale its allocated share of fuel, flare and vent gas.

**5.3    Infrastructure Access and Handling Fees**

In addition to the direct expenses and indirect expenses provided for in Section 5.1 (*Operating and Maintenance* Expenses) of this Agreement and in consideration for: (i) access to the Host; (ii) utilization of Host facilities, including, but not limited to, riser porches and umbilical boarding facilities; (iii) utilization of buoyancy and riser space for the LSPS; (iv) utilization of buoyancy and deck space for the Facility Access Modifications; and (v) for the Services provided by the Owner, the Satellite Operators on behalf of the Producers will pay the Owner consistent with the Host M&A and in accordance with Exhibit "C" (*Accounting Procedures*) to this Agreement, an Infrastructure Access Fee ("**IAF**"

or "**Infrastructure Access Fee**") and Handling Fee ("**HF**" or "**Handling Fee**") for those committed oil and gas reserves set forth only in Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement on a monthly basis, as follows:

**5.3.1**   **Infrastructure Access Fee for Isabela Production**

(a)   Isabela Producers will pay an IAF of ███ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)   Isabela Producers will pay an IAF of ███ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)   The IAF for Isabela Oil and Gas within this Section 5.3.1 will be adjusted starting on April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 1.

**5.3.2**   **Infrastructure Access Fee for MC 519 Unit Production**

(a)   MC 519 Unit Producers will pay an IAF of ███ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)   MC 519 Unit Producers will pay an IAF of ███ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)   The IAF for MC 519 Unit Oil and Gas within this Section 5.3.2 will be adjusted starting on April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 2.

**5.3.3**   **Handling Fee for Isabela Production**

(a)   Isabela Producers will pay an Oil handling fee of ███ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)   Isabela Producers will pay a Gas handling fee of ███ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)   Isabela Producers will pay a water handling fee of ███ per Barrel of water allocated to each Producer on a monthly basis.

(d)    The handling fees for Isabela Oil, Gas, and water within this Section 5.3.3 will be adjusted April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 3.

### 5.3.4   Handling Fee for MC 519 Unit Production

(a)    MC 519 Unit Producers will pay an Oil handling fee of ████ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)    MC 519 Unit Producers will pay a Gas handling fee of ████ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)    MC 519 Unit Producers will pay a water handling fee of ████ per Barrel of water allocated to each Producer on a monthly basis.

(d)    The handling fees for MC 519 Unit Oil, Gas, and water within this Section 5.3.4 will be adjusted April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 4.

### 5.3.5   Isabela Lease Minimum Monthly Fee

(a)    Effective as of the first Day of the month following Isabela Lease First Production, if the summation of (i) Infrastructure Access Fees for Isabela Production for each product (Oil, Gas) set forth in Section 5.3.1 (*Infrastructure Access Fee for Isabela Production)* of this Agreement, and (ii) Handling Fees for Isabela Production for each product (Oil, Gas, and water) set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement is less than Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) in any calendar month, the Isabela Operator on behalf of the Producers will be charged and agree to pay to the Host Operator, a fee of Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for Isabela Production set forth in Section 5.3.1 and Section 5.3.3 of this Agreement.

(b)   The Isabela Producer's obligation to pay the Host Operator the Isabela Lease minimum monthly fee set forth in Section 5.3.5 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling Isabela Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by Isabela Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

(c)   The Isabela Lease minimum monthly fee will be adjusted April 1, 2008 and annually thereafter.  The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.5 (a) of this Agreement.

### 5.3.6   MC 519 Unit Leases Minimum Monthly Fee

(a)   Effective as of the first Day of the month following MC 519 Unit First Production, if the summation of (i) Infrastructure Access Fees for MC 519 Unit Production for each product (Oil, Gas) set forth in Section 5.3.2; and (ii) Handling Fees for MC 519 Unit Production for each product (Oil, Gas, and water) set forth in Section 5.3.4 is less than One Hundred and Fifty Thousand and No/100 Dollars ($150,000) in any calendar month the MC 519 Unit Operator on behalf of the MC 519 Unit Producers will be charged and agree to pay to the Host Operator, a fee of One Hundred and Fifty Thousand and No/100 Dollars ($150,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for MC 519 Unit Production set forth in Sections 5.3.2 and 5.3.4 of this Agreement.

(b)   The MC 519 Producer's obligation to pay the Host Operator the minimum monthly fee set forth in Section 5.3.6 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling MC 519 Unit Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by MC 519 Unit Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

(c)     The MC 519 Unit Leases minimum monthly fee will be adjusted April 1, 2010 and annually thereafter.   The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.6 (a) of this Agreement.

5.3.7   Payment of the minimum monthly fees set forth in Section 5.3.5 (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6 (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement does not mitigate, eliminate or be in lieu of any obligation to deliver Satellite Production to the Host pursuant to this Agreement, including but not limited to Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement.

5.3.8   In no event shall Host Operator charge overhead for Infrastructure Access Fees and Handling Fees set forth in Section 5.3 (*Infrastructure Access Fee and Handling Fees*) of this Agreement.

## 5.4     Future Governmental Regulations

5.4.1   The Parties agree that the Handling Fee for produced water, as escalated, attributable to the Satellite Leases as set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement and Section 5.3.4 (*Handling Fee for MC 519 Unit Production*) of this Agreement will be increased to reflect future increased costs associated with modifications due to government regulations or Laws affecting discharge requirements of treated produced water into the Gulf of Mexico, which are verifiable and attributable to Satellite Production. Such modifications could involve monitoring, testing, or treating (includes adding chemicals) the produced water. The Host Operator will provide justification and a rationale for such cost increase for the Producers' review.

5.4.2   In addition to Section 5.4.1 (*Future Governmental Regulations*) of this Agreement, the Parties recognize that the regulatory environment could change during the term of the Agreement and such change could result in unforeseen costs to the Owner in order to maintain compliance therewith. Accordingly, the Parties do hereby agree that in the event the Owner incurs additional costs due to changes in federal, state or industry regulations, rules or codes set forth by the Environmental Protection Agency ("**EPA**"), BOEMRE, Department of Homeland Security, or similar governing authority which regulations are directly related to the provision of Services hereunder, then the Parties will agree on a methodology similar to the methodology set forth in this Article V (*Fees*

& *Expenses*) of this Agreement by which such costs will be recovered by the Owner.

## 5.5    Owner's Expenses

The Owner is responsible for expenses not allocated to the Producers and LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

## 5.6    Host Shut Down Compensation

### 5.6.1    Compensation for Owner

(a)    The Owner shall be compensated by the Producers for any and all Host Leases Oil and Gas Production which is deferred due to Host downtime that is solely attributable to the fabrication, construction, installation, hookup, tie-in, inspection, commissioning and/or operation of facilities (including, without limitation, the LSPS and Facility Access Modifications) required to handle Satellite Production. As calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement, the Host Operator will directly charge and invoice the Producers for deferred production compensation and the corresponding Producer will pay such invoice as provided herein. The deferred production compensation calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement will be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers.

(b)    In addition to deferred Production compensation, the Owner shall be reimbursed by the Producers for any incremental costs incurred by the Owner because of:

(i)    the costs associated with Host shutdown which are solely attributable to the Producers' related work activities or operations shall be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers. The Host Operator will directly charge and invoice each of the Satellite Operator for its share of such incremental costs; and

(ii)    the costs associated with Host shutdown which are solely attributable to a Producer's related work activities or operations on either the Isabela Lease or the MC 519 Unit Leases shall be billed one hundred percent (100%) to the

Satellite Operator whose Satellite Lease was responsible for the Host shutdown. The Host Operator will directly charge and invoice the applicable Satellite Operator.

(c) The Owner shall be reimbursed by the LSPS Owners for any incremental costs incurred by the Owner because of a Host shutdown which is solely attributable to LSPS work activities or operations and not directly attributable to any of the Satellite Leases. The Host Operator will directly charge and invoice each of the LSPS Owners, for its share of such incremental costs which the LSPS Owners will pay as provided herein.

**5.6.2   Compensation Methodology**

(a) Compensation for Deferred Host Leases Oil Production ("**DOPC**") as outlined in Section 5.6.1(a) (*Compensation for Owner*) of this Agreement is equal to:

$DOPC = (AOPR) \times (SDD) \times (POP) \times (0.35)$

Where:  $AOPR$ = the average daily volume of Host Leases Oil Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in gross Barrels per Day, i.e., without any reduction for royalty),

$SDD$ = the duration of such Host shutdown (expressed in Days to the nearest one-hundredth of a Day), and

$POP$ = the average Prevailing Oil Price during the duration of such Host shutdown (expressed in Dollars per Barrel).

(b) Compensation for Deferred Host Leases Gas Production ("**DGPC**") as outlined in Section 5.6.1(a) of this Agreement is equal to:

$DGPC = (AGPR) \times (HV) \times (SDD) \times (PGP) \times (0.35)$

Where:  $AGPR$ = the average daily volume of Host Leases Gas Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown

(expressed in gross MSCF per Day, i.e., without any reduction for royalty),

HV    =  the average daily Btu content of the Host Lease Gas Production during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in MMBtu per MSCF),

SDD   =  the  duration  of  the  Host  shutdown (expressed in Days, to the nearest one-hundredth of a day), and

PGP   =  the average Prevailing Gas Price during the duration of the Host shutdown (expressed in Dollars per MMBtu).

### 5.6.3    Duration of Shutdown

(a)    At least thirty (30) Days prior to a scheduled shutdown of the Host, the Host Operator will provide the Producers and Owner an estimate of the duration of such shutdown which is solely attributable to LSPS and/or Satellite Leases' related work activities.

(b)    Within sixty (60) Days immediately following completion of a shutdown of the Host, the Host Operator will provide the Producers and Owner with a final report and statement of amounts due as per Section 5.6 *(Host Shut Down Compensation)* reflecting the actual work done and its duration.    As per Exhibit "C" *(Accounting Procedures)* each Producer shall pay the amount invoiced.

### 5.6.4    Deferred Compensation for Producers

If operations are conducted on the Host to provide for handling of Third Party Production, and such operations result in Satellite Production being shut-in, then the Producers shall be entitled to share in any deferred compensation paid by such Third Party to the Owner because of such operations.    The sharing of future deferred compensation shall be in the ratio of Satellite Leases Oil Production and Gas Production to total Oil Production and Gas Production processed and handled at the Host prior to the shutdown.