**5.6.5**   In no event shall Host Operator charge overhead for DOPC and DGPC set forth in Section 5.6.2 (*Compensation Methodology*) of this Agreement.

## 5.7   Royalties and Taxes

**5.7.1**   Each Producer will be solely responsible for payment of the royalties and taxes attributable to its share of Oil Production and Gas Production.

**5.7.2**   This Agreement and the operations hereunder are not intended to create, and will not be construed to create a joint venture, association or partnership with respect to the Parties. If, for United States federal income tax purposes, this Agreement is regarded as a partnership, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter "K", Chapter 1, Subtitle "A" of the United States Internal Revenue Code of 1986, as amended ("**Code**"), to the extent permitted and authorized by Section 761(a) of the Code and the regulations promulgated thereunder, or similar provisions of applicable state laws.

## 5.8   Third Party Contractors

The Host Operator may, in its sole discretion, utilize the services of Third Party contractors for the purposes of providing the Services and/or implementing this Agreement. The costs of such Third Party services shall be chargeable in accordance with Exhibit "E" (*Operating and Maintenance Expenses*) to this Agreement.

## 5.9   Allocation Factors.

The following allocation factors will be used throughout this Agreement in accordance with Section 7.1 (Measurement and Allocation Procedures) of this Agreement:

(a)   Each lease LEB allocation factor shall be the sum of the barrel equivalent of entitlement production (Oil Production, Gas Production, and allocated water), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

(b)   Each lease Gas Production allocation factor shall be the entitlement gas production (sales, fuel, flare, vent, and gas lift allocated to gas wells and to oil wells), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

(c)    Each lease Oil Production allocation factor shall be the entitlement oil production (sales, fuel, flare, vent, and hot oiling allocated to gas wells as condensate and to oil wells as crude oil), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

## ARTICLE VI - CAPACITY

**6.1    Host Capacity**

Subject to the remaining provisions of this Article VI, (Capacity) of this Agreement the Owner will provide, but does not warrant or guarantee, to the Producers capacity for production processing and handling on the Host for Satellite Production. However, upon partial or entire loss of or damage to the Host (or any component of the Host) resulting from any incident, the Owner will have no obligation to repair or replace the Host or any component thereof for purposes of (i) re-connecting the LSPS to the Host, (ii) re-installing the Facility Access Modifications on the Host, (iii) resuming the Production Handling Services or (iv) re-initiating the Operating Services. Notwithstanding the foregoing, nothing contained in this Agreement limits or restricts the Owner from entering into other agreements for the utilization of the Host and/or its related equipment and facilities.

**6.2    Satellite Leases Capacity**

Contingent upon the Producers delivering Satellite Production to the Host that conforms to the operating and fluid parameters set forth on Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, and subject to Section 6.4 (*Production Prioritization*) of this Agreement the Owner agrees to process and handle Satellite Production at production rates not to exceed each of Isabela Capacity or MC 519 Unit Capacity respectively. Producers' utilization of Isabela Capacity and MC 519 Unit Capacity for Satellite Production is subject to curtailment as provided in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity and MC 519 Unit Capacity will be determined individually for each of the Satellite Leases and for each product (Oil, Gas, and water) on a daily throughput basis.

(a)    The amount of Isabela Capacity and MC 519 Unit Capacity for any single product (i.e. Oil, Gas, or water) will not be exceeded by the respective Satellite Leases in order to allow the Producers of such Satellite Leases to fully utilize the Satellite Capacity for another product from such Satellite Leases.

(b)     In the event the Producers do not utilize the Isabela Capacity and MC 519 Unit Capacity, respectively, during a calendar month, the Owner has the right to utilize, as it deems necessary and free of cost, any unused capacity for such calendar month on an interruptible basis and the Producers will not have the right to make-up such production capacity.

**6.2.1   Initial Satellite Fields Capacity**

Initial Isabela Capacity shall be the capacity required for processing Isabela Production on the Host and shall be set initially at the volumes set forth in Section 2.2.53 (*Isabella Capacity)* of this Agreement. Initial MC 519 Unit Capacity shall be the capacity required for processing MC 519 Unit Production on the Host and shall be set initially at the volumes set forth in Section 2.2.73(*MC 519 Unit Capacity*) of this Agreement.

**6.2.2   Adjusted Satellite Capacity**

Every calendar year after the later of Dec 31st, 2014 or the year in which Isabella First Production or MC 519 Unit First Production occurs, the Isabella Capacity and the MC 519 Unit Capacity will be re-determined individually for the next calendar year. The Adjusted Isabela Capacity and the Adjusted MC 519 Unit Capacity will be defined as one hundred percent (100%) of the actual average daily production for such Satellite Field (excepting Satellite Fields or Host related downtime and/or curtailment) processed at the Host during the expiring calendar year. However, in no event will the quantity of adjusted capacity for Isabela Production handling or MC 519 Unit Production handling exceed the quantity of initial capacity set forth in Section 2.2.53 (*Isabella Capacity*) of this Agreement and Section 2.2.73 (*MC 519 Unit Capacity*) of this Agreement respectively.

**6.3   Interruptible Capacity**

Subject to Section 6.4 (*Production Prioritization*) of this Agreement, Satellite Leases can use available Host Capacity in excess of Isabela Capacity (or Adjusted Isabela Capacity, if applicable) and MC 519 Unit Capacity (or Adjusted MC 519 Unit Capacity, if applicable) respectively on an interruptible basis, without additional approval from Owner. All terms and conditions from this Agreement apply to production using interruptible capacity.

**6.4   Production Prioritization**

At all times Host Leases Production shall have priority use of the Host and Host Capacity over any Satellite Production. At all times Isabela Production shall have priority use of Owner's share of Host and Host Capacity over MC 519 Unit

Production and Third Party Production. At all times, MC 519 Unit Production shall have priority use of Owner's share of Host and Host Capacity over any Third Party Production processed and handled on the Host after the Effective Date. In the event of an interruption or reduction in Host Capacity, Isabela Capacity and MC 519 Unit Capacity for Oil, Gas and water will be reduced ("**Reduced Satellite Fields Capacity**") as set forth below. Notwithstanding the foregoing, the Host Operator shall endeavor to ensure that the Isabela Capacity and the MC 519 Unit Capacity shall not be less than "production in paying quantities" as stipulated by the BOEMRE for such Satellite Lease.

**6.4.1   Processing Facility Constraints**

(a)   In the event of an interruption or reduction, whether permanent or temporary, in the Host Capacity due to: (i) a Force Majeure event or in preparation for a Force Majeure event, (ii) a planned or unplanned partial or complete shutdown of the Host or any component of the Host for maintenance, repair, replacement, construction or inspections, (iii) a constraint in the Oil Export Pipeline or Gas Export Pipeline, or (iv) a Host equipment/facility upset or other such operating problems, then the Host Operator may make reasonable and prudent efforts to promptly restore normal operations while maintaining safe and efficient production handling operations and in a manner facilitating the resumption of normal operations. During such interruption or reduction in Host Capacity, the Host Operator will allocate the available Host Capacity to the extent it is safe and practical to do so, in accordance with the priorities provided in Section 6.4 (*Product Prioritization*) of this Agreement.

**6.4.2**   During time periods when the Host or any component thereof is partially or totally shut-in, the Isabela Capacity and MC 519 Unit Capacity will be adjusted in accordance with the priorities provided in Section 6.4.(*Production Prioritization*) of this Agreement to the extent necessary and the Producers will not have the right to make-up such production.

**6.5   Production Compatibility**

The Producers' access to capacity for production processing and handling on the Host set forth in this Article VI (*Capacity*) assumes that the operating parameters/conditions of the Satellite System, and each of the Isabela Production and the MC 519 Unit Production arriving at the Entry Point(s) fully conform to specifications and characteristics stipulated in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement. Additionally, the terms and conditions of this Agreement were established and agreed to by the Parties based on the assumption that the operating parameters/conditions of the Satellite System and the Satellite Production arriving at all Entry Point(s) fully conform to such specifications and characteristics.

### 6.5.1   Conforming Fluids

If Satellite Production arriving at an Entry Point(s) conforms to all of the specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, then any incremental operating costs which may result from handling Satellite Production on the Host, which are not classified as  Satellite Leases Direct Expense in Exhibit "F" (*Operating and Maintenance Expenses*) or otherwise designated as costs to be borne solely by the Producers, will be treated as Host Common Facilities in Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement.

### 6.5.2   Non-Conforming Satellite Production

If Satellite Production arriving at an Entry Point(s) does not conform to one or more of the operating parameters and/or specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement ("**Non-Conforming Production**"), as evidenced to the extent possible by at least three (3) fluid samples taken within a period of seven (7) consecutive Days, and such non-conformance (i) results in incremental Host operating costs, (ii) causes a reduction in the Host Capacity,  (iii) causes other operational problems on the Host, or (iv) causes any problem with the Oil Export Pipeline and/or Gas Export Pipeline (hereinafter collectively or individually referred to as a "**Satellite Operating Problem**"), the Host Operator may endeavor, but the Owner is not obligated, to accept and handle such Non-Conforming Production or at its sole discretion may decide to shut-in the well(s) or curtail Isabela Production and/or MC 519 Unit Production, as the case may be, until the Satellite Operating Problem has been rectified by the corresponding Producers in accordance with the following:

(a)     The applicable Producers are solely responsible for all costs and expenses incurred by the Host Operator and/or the Owner:

   (i)     directly resulting from the Satellite Operating Problem (including, without limitation, deferred production); and/or

   (ii)    for reasonable measures taken to rectify or mitigate the Satellite Operating Problem, and/or

   (iii)   which are associated with the Satellite Operating Problem until such problem has been rectified.

The Host Operator will directly charge and invoice the applicable Satellite Operator(s), on behalf of the corresponding Producers, for such costs and expenses.

(b) Subject to the emergency provisions included in Section 4.7 (*Emergency Response*) of this Agreement and after identifying the Satellite Operating Problem, but prior to initiating any measures to rectify such problem which would result in material expenditures, the Host Operator will provide the respective Producers (with an information copy to the Owner) with a written proposal for measures to rectify the Satellite Operating Problem and an estimate of the associated costs. Notwithstanding the foregoing, the respective Producers shall be responsible for all costs and expenses of all damages or repairs to the Host in connection with Satellite Operating Problems.

(c) The Producers will have thirty (30) Days from their receipt of the Host Operator's written proposal submitted pursuant to Section 6.5.2(b) (*Non-Conforming Satellite Production*) of this Agreement to approve such proposal in writing. Failure to respond shall be deemed a non-approval. Should the respective Producers and the Owner fail to determine a mutually acceptable technical alternative to mitigate the incompatibility, the Host Operator has the right to discontinue the Services set forth in Section 4.1.1 (*Production Handling Services*) of this Agreement and Section 4.1.3 (*Operating Services for Satellite Well System*) of this Agreement with respect to the Satellite Production causing the Satellite Operating Problems.

## ARTICLE VII - PROCEDURES AND PERMITTING

**7.1 Measurement and Allocation Procedures**

**7.1.1** Satellite Production and Non-Satellite Production will be sampled, metered and allocated in accordance with procedures developed and implemented by the Host Operator in compliance with the commingling permit issued by the BOEMRE. The allocation of Satellite Production to the Entry Point will be handled in accordance with the Host M&A. The Host M&A will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS, and the Satellite Well System will apportion Host Production to the Satellite Leases in the same manner as other Host Production is apportioned to the Host Leases and Third Party Leases.

**7.1.2** The implementation of the Host M&A is (i) conditioned upon approval by the BOEMRE of the surface commingling application referred to in Section 7.2.1 (*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto; (ii) subject to and in accordance with the BOEMRE approved surface commingling application referred to in Section 7.2.1(*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto, and (iii) in accordance with BOEMRE requirements set forth in 30 CFR Part 250 Subpart L and any subsequent amendments and/or waivers thereof.

**7.2 Permits**

**7.2.1 Surface Commingling Permit**

Satellite Production will not be accepted at the Entry Point(s) and will not flow across the Host without first obtaining all required surface commingling permits. The Host Operator will prepare and submit, or cause to be prepared and submitted, any and all required surface commingling permit applications to the BOEMRE (for surface commingling of Satellite Production with Non-Satellite Production) in accordance with all applicable laws, rules and regulations of governmental bodies having jurisdictional authority. The Producers and Owner will cooperate with the Host Operator to the extent necessary to achieve BOEMRE approval of the initial surface commingling application, amendment thereto or subsequently required applications.

**7.2.2 Other Permits**

The Satellite Operators, on behalf of the relevant Producers, and the LSPS Operator, as applicable, will obtain, or caused to be obtained, all other required approvals, permits, consents, orders or other documents, without limitation, from all appropriate jurisdictional authorities to produce the Satellite Leases, transport Satellite Production to the Host, and dispose/transport Satellite Production from the Host. Each Satellite Operator, the LSPS Operator, and the Host Operator will cooperate with each other to the extent necessary to obtain such permits, licenses, authorizations and regulatory approvals.

**7.3 Commingling of Production**

At the sole discretion of the Host Operator, the Host Operator may elect to commingle Satellite Production on the Host with Non-Satellite Production. At the direction of the LSPS Operator to the Host Operator, the Host Operator shall commingle MC 519 Unit Production with Isabela Production.

**7.4    Re-Allocations**

Notwithstanding the audit time period set forth in Exhibit "C" (*Accounting Procedures*) to this Agreement, in the event: (i) the BOEMRE requires the Host Operator for any reason to re-allocate production between the Host Leases, Satellite Leases, and/or Third Party Leases; or (ii) a re-allocation is required as the result of a re-allocation pursuant to the Host M&A, the Host Operator has the right to re-allocate production to/from the Host Leases and the Satellite Leases and/or Third Party Leases by implementing: (i) the requirements of the approved surface commingling permit, as may be amended from time to time; or (ii) the Host M&A re-allocations, utilizing reasonable industry practices/standards and regulatory requirements.

**7.5    Oil Quality Bank and NGL Bank**

The Host Operator reserves the right to develop and implement procedures for an oil quality bank and/or a natural gas liquid(s) ("**NGL**") bank (or gas processing plant NGL sub-allocation) to address quality differences between Host Leases Production, Satellite Production and/or Third Party Production.  Such procedures will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS and the Satellite Well System, will have the objective of providing a fair and equitable compensation methodology among all sources of Host Production.

**7.6    LSPS Line Fill**

Owner shall provide, via Host dry oil hull inventory, LSPS line fill after installation of the LSPS. After Satellite First Production, the volume of Host dry oil hull inventory used for LSPS line fill will be credited back to the Owner.

## ARTICLE VIII - GATHERING AND TRANSPORTATION

**8.1    Product Disposition**

Commencing at the Delivery Point, the Producers will (i) take in kind and remain solely and separately responsible for the disposition, transportation, and sale of Satellite Production and (ii) bear all costs and liabilities associated with such disposition, transportation, and sale.  The Owner will have no liability for any costs of production transportation, production processing, penalties and/or associated costs downstream of the Delivery Point which are attributable to the Satellite Production and/or allocated to the Producers (individually and/or jointly).

**8.2**   **Gas Imbalances**

Owner will endeavor to implement a Gas balancing procedure at the Host to handle Gas imbalances between Host Lease Production, Satellite Production and Third Party Production on a commercially reasonable basis. Until such Gas balancing procedure has been agreed upon by the Parties and the Host Operator, the Host Operator will timely provide to the Parties a record of any Gas production imbalances created on the Host on a monthly basis. The Parties taking Gas production above their entitlements shall pay royalties on such production, and the Parties and Host Operator will make a good faith effort to resolve any imbalances for a month in the succeeding month.

**8.3**   **Product Transportation**

Each of the Producers will enter into transportation arrangements or agreements with the owners of the Oil Export Pipeline and/or the Gas Export Pipeline, as appropriate, at its own sole cost and expense for its share of Satellite Production.

**8.3.1**   The Parties, independently, will be responsible for submitting, or causing to be submitted, Gas and/or Oil nominations, as applicable, to the transporter(s) of such product for their individual respective share of the appropriate Satellite Production and Host Leases, and for advising the Host Operator of such nomination. The Parties, independently, will also be responsible for cooperating with the Host Operator and the transporters of the Gas and/or Oil to keep their nominations in balance with their respective deliveries on the Gas and/or Oil transporters' pipeline system. The Parties will, to the extent possible, endeavor to cause the nominations of their respective Gas and/or Oil production to closely approximate their actual production.

**8.3.2**   To the extent required under this Agreement, the Host Operator will furnish test and production information to the Parties to adjust nominations.

**8.4**   **Pipeline Penalties**

**8.4.1**   Any penalties assessed by Gas or Oil transporters attributable to the Satellite Production will be the responsibility of the Producers, unless such penalties are attributable to the Host Operator's sole fault, and then Host Operator will be responsible for such penalties. Any penalties assessed by the Gas or Oil transporters attributable to the Host Leases Production will be the responsibility of the Owner.

**8.4.2**   Any costs or penalties imposed by the Gas Export Pipeline or the Oil Export Pipeline on the Host Operator as a result of operational flow

orders, unscheduled Gas, unauthorized Gas, Gas pipeline imbalances, or Oil pipeline imbalances with transporters, as described herein, will be borne by each Party, independently, in the proportion that its nomination, failure to nominate, failure to properly regulate production volumes, fault, negligence, or liability without fault, caused such imbalance and/or penalties, except such as may result from the Host Operator's gross negligence or willful misconduct.

## ARTICLE IX - SUSPENSION OF OPERATIONS AND FORCE MAJEURE

**9.1 Notice**

A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure will promptly give written notice to that effect to the other Party or Parties stating in reasonable detail the circumstances underlying such Force Majeure.

**9.2 Suspension of Obligation**

The obligations of the Party giving such notice as provided in Section 9.1 *(Notice)* of this Agreement, so far as they are affected by such Force Majeure, will be suspended during the continuance of any liability so caused, but for no longer period, and such cause will be remedied with all reasonable diligence. If such Party is a Producer, then the suspended obligations include the payment of the minimum monthly fee as provided in Section 5.3.5(b) *(Isabela Lease Minimum Monthly Fee)* and Section 5.3.6(b) *(MC 519 Unit Lease Minimum Monthly Fee)*. No Party is liable to the other Party or Parties for failure to perform any of its obligations under this Agreement, other than the obligation to pay monies due hereunder (except as provided in the foregoing sentence) to the extent such performance is hindered, delayed or prevented by Force Majeure.

**9.3 Resolution**

A Party claiming Force Majeure will: (i) diligently use all reasonable and prudent efforts to remedy or remove the cause, condition, or event or circumstance of such Force Majeure, (ii) promptly give written notice to the other Parties of the anticipated termination of the Force Majeure, (iii) resume performance of any suspended obligation as soon as reasonably possible after termination of the Force Majeure, and (iv) not be obligated to settle any labor dispute except on terms acceptable to it in its sole discretion.

9.4    **Suspension of Operations**

**9.4.1**    In addition to the rights granted under Section 4.7 (*Emergency Response*) of this Agreement and Section 9.2 (*Suspension of Obligations*) of this Agreement, the Host Operator has the right to suspend the Services set forth in this Agreement to the extent necessary, at its sole discretion, for only the following:

(a)    To ensure the safety of persons, property or the environment; or

(b)    To address the operational integrity or operational problems on the Host, or any other equipment or facilities located on the Host or connected thereto, including the Satellite System and any other production system(s) and/or downstream operations, facilities, or equipment; or

(c)    To remedy conditions which render the Host, Satellite System, any other production system(s) and/or downstream operations, facilities, or equipment unsafe; or

(d)    To access or conduct an analysis (e.g. root cause analysis) of any incident on the Host and take whatever action is necessary to ensure re-occurrence of the incident is minimized or eliminated.

(e)    To conduct any construction, modifications, maintenance, repairs, change or addition to the Host, or any other equipment or facilities located on the Host, connected thereto (including, without limitation the Satellite System) and/or on or in connection with downstream facilities; or

(f)    To prepare for or respond to the existence of a Force Majeure condition, as further described in Section 2.2.30 (*Force Majeure*) of this Agreement; or

(g)    To comply with Laws; or

(h)    To avoid participating in un-permitted operations due to the failure of the LSPS Operator or the Satellite Operator(s) to obtain necessary permits, authorizations or approvals to conduct an operation or if the permit is suspended; or

(i)    To address a Satellite Operating Problem; or

(j)    Due to any material breach of this Agreement by the Producers or the LSPS Owners, including, but not limited to, the failure by the

Satellite Operators or the LSPS Operator to pay invoices submitted under Article V (*Fees & Expenses*) of this Agreement and Exhibit "C" (*Accounting Procedures*) to this Agreement subject to Section 9.4.4 herein below; or

(k) Due to the failure by the Parties to mutually agree on a fair methodology by which the Owner will recover any increased costs associated with changes in governmental regulations as described in Section 5.4 (*Future Governmental Regulations*) of this Agreement, subject to Section 9.4.4 herein below; or

(l) The Producers' or the LSPS Owners' failure to provide proper notice in connection with the Services set forth in this Agreement; or

(m) The Producers' or the LSPS Owners' failure to conduct operations in accordance with this Agreement, subject to Section 9.4.4 herein below.

9.4.2 The Producers specifically understand that operations and activities on facilities downstream of the Host may impact operations on the Host. Further, at is sole discretion, the Host Operator has the right to shut down the Host and temporarily discontinue the Services contemplated by this Agreement for any necessary repairs or changes to the Host or any downstream facility. In such cases neither the Host Operator nor the Owner will have any liability to the Producers for deferred production, lost production, or any other direct, indirect or consequential damages.

9.4.3 The Host Operator will notify the relevant Parties in writing in the event of any of the occurrences listed above in Section 9.4.1 (*Suspension of Operations*) of this Agreement. The Host Operator has no liability to the Producers or the LSPS Owners for deferred production, lost production, deferred revenue, loss of revenue, damage to flowlines, wells or reservoirs, loss of wells or any direct, indirect or consequential damages arising from such shutdowns. Whenever reasonably possible, the Host Operator agrees to give the Producers, the LSPS Operator and the Satellite Operators reasonable advance notice of any scheduled shutdowns of the Host.

9.4.4 In the event of the occurrence of one (1) or more of the events listed in Sections 9.4.1(j), 9.4.1(k), 9.4.1(l) and 9.4.1(m) of this Agreement, prior to shutting down any operations and activities on the Host or discontinuing the Services, the Host Operator will give the LSPS Operator and/or the respective Satellite Operator(s), as the case may be, written notice of the occurrence of such event. In the event the LSPS Owners

and/or the Producers, as the case may be, do not cure same within thirty (30) Days after receipt of such written notice, the Host Operator has the right to shutdown the operations and activities and/or discontinue the Services without incurring any liability or obligation to the Producers. However, if the event specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) Day period (other than the Producers' obligations to make payments of money due hereunder) and the Producers begin within said period and continue to take corrective action and thereafter diligently carry such corrective action to completion, the Host Operator will not shutdown the operations and activities on the Host or discontinue the Services related to the Host.

9.4.5   Should the Host Operator suspend the Services for reasons described in Section 9.4.1 (*Suspension of Operations*) of this Agreement, the Host Operator will as soon as reasonably possible after the shutdown event has been addressed, re-establish such Services; provided, however, notwithstanding the provisions of Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement, in the event the duration of such suspension of operations continues for more than ninety (90) consecutive Days, then the affected Producer(s) shall have the right to temporarily re-deliver the Isabela Production and/or the MC 519 Unit Production, as the case may be, to an alternate facility for the provisions of services, similar in nature to the Production Handling Services. Upon withdrawal of the suspension of operations, then such temporary re-delivery will be suspended as soon as reasonably possible and the Isabela Production and MC 519 Unit Production will be delivered back to the Host for Production Handling Services.

## ARTICLE X - TERM, DEFAULT, AND TERMINATION

**10.1   Term of Agreement**

As of the Effective Date, this Agreement will continue to be in force and effect until it is terminated pursuant to the voluntary and involuntary provisions set forth in Sections 10.2 (*Default*) of this Agreement, 10.3 (*Termination by Owner*) of this Agreement, and 10.4 (*Termination by Producers*) of this Agreement.

**10.2   Default**

A Party ("**Non-Performing Party**") shall be in default hereunder ("**Default**") upon the occurrence of any of the following events:

10.2.1 The failure to perform or comply with any material covenant, term, condition, obligation or other material provision contained in this

Agreement when such failure has not been remedied by the Non-Performing Party within sixty (60) Days ("**Notice Period**") following receipt of written notice from another Party describing the alleged non-performance or non-compliance with particularity and demanding that such non-performance or non-compliance be cured or remedied; provided, however, that there is no Default if the failure cannot reasonably be cured within such Notice Period so long as:

(a) the Non-Performing Party commences and continues reasonable efforts to remedy or cure said failure promptly upon receipt of the written notice;

(b) the Non-Performing Party continues these efforts after the Notice Period and until the failure has been cured or remedied; and

(c) such remedy or cure has been affected within a reasonable period of time.

**10.2.2** The entry of a Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; or

**10.2.3** The material breach of any representation or warranty contained in Section 15.4 (*Representations and Warranties*) of this Agreement and Section 15.5 (*Warranty of Title*) of this Agreement.

In the event a Non-Performing Party is in Default, any performing Party may terminate this Agreement upon written notice thereof to the Non-Performing Party as per the terms of this Section 10.2 (*Default*) of this Agreement; provided, however, that if the owners of one of the Satellite Leases are the Non-Performing Party, any performing Party may terminate this Agreement only as to such owners. In the event of termination for Default, the Non-Performing Party remains liable for all duties, obligations and liabilities incurred prior to the termination date.

**10.3    Termination by Owner**

**10.3.1** The Owner has the right to terminate this Agreement with respect to the Isabela Lease and its respective Satellite Well System or with respect to the MC 519 Unit Leases and its respective Satellite Well System or with respect to the LSPS, without penalty, as applicable, in the following circumstances:

(a) In the event the respective Satellite Operator(s), Producers, LSPS Operator or LSPA Owners are in Default; or

      (b)    On not less than ninety (90) Days written notice by the Host Operator to the relevant Satellite Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

      (c)    On not less than sixty (60) Days written notice by the Host Operator to the relevant Satellite Operator, if no Satellite Production is delivered to the respective Entry Point for any reason attributable to such Satellite Field Operator, including Force Majeure, for any period of twelve (12) consecutive calendar months during which the Host was available to receive Satellite Production, following the Effective Date of this Agreement.

**10.3.2** This Agreement terminates with respect to the Isabela Lease and its respective Satellite Well System and/or with respect to the MC 519 Unit Leases and its respective Satellite Well System and/or with respect to the LSPS, without penalty on not less than one hundred and twenty (120) Days written notice by the Host Operator to the LSPS Operator and/or the relevant Satellite Operator, if destruction of, major damage to, or total or constructive loss of the Host occurs and the Owner elects to not repair or replace the Host for use to provide the Services. The Owner has no obligation to replace or repair the Host.

**10.4**   **Termination by Producers**

**10.4.1** The Producers of each of the Isabela Lease and the MC 519 Unit Leases, upon their respective unanimous agreement, have the right to terminate this Agreement with respect to the Isabela Lease and/or the MC 519 Unit Leases, as the case may be, in the following circumstances:

      (a)    The Owner is in Default; or

      (b)    On not less than ninety (90) Day(s) written notice by the respective Satellite Operator to the Host Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

(c)    On not less than sixty (60) Day(s) written notice by the respective Satellite Operator to the Host Operator, if no production handling capacity is available for Satellite Production for any reason, including Force Majeure following Satellite First Production equal to the lesser of (i) twelve (12) consecutive calendar months, (ii) the time period set forth in a suspension of production issued to the respective Satellite Operator by the BOEMRE, or (iii) the time period allowed for suspension of operations or production by the relevant Satellite Lease in the event the BOEMRE refused to issue a suspension of production.

10.4.2 This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the respective Satellite Operator to the Host Operator, if delivery of Isabela Production or MC 519 Unit Production to the Host is not technically feasible or economically justifiable in the sole judgment of the relevant Producers. The Agreement termination in this Section 10.4.2 shall only apply to the Satellite Lease affected with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.3 This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the relevant Satellite Operator to the Host Operator, upon Permanent Cessation of Production, if the Isabela Production or the MC 519 Unit Production, as the case may be. The Agreement termination in this Section 10.4.3 shall only apply to the Satellite Lease affected by the Permanent Cessation of Production with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.4 This Agreement may be terminated with respect to one of the Satellite Leases without affecting the other. This Agreement shall remain in full force and effect with respect to the Satellite Lease not being terminated. This Agreement may not be terminated by a Party for a reason attributable to another Party if such two (2) Parties are the same Person.

## 10.5   Responsibilities and Obligations at Termination

The Parties have the following responsibilities upon termination of this Agreement and/or Permanent Cessation of Production from the Isabela Lease and/or the MC 519 Unit Leases:

10.5.1 Upon termination of this Agreement as to all Satellite Leases, the LSPS Operator is responsible for:

    (a)    the disconnection of the LSPS from the Entry Point(s);

    (b)    the removal of the LSPS located within one thousand and five hundred (1500) feet of the Host; and

    (c)    the repair of any damages to the Host resulting from the operations described in Section 10.5.1(a) and Section 10.5.1(b) above if deemed necessary by the Owner.

The disconnection and removal work contemplated in this Section 10.5.1 shall be at the LSPS Owners sole cost and expense, and shall be performed pursuant to a schedule approved by the Host Operator.

10.5.2 Disconnection of the LSPS in accordance with Section 10.5.1 (*Responsibilities and Obligations at Termination*) of this Agreement will be commenced by the LSPS Operator within twelve (12) months subsequent to the termination of this Agreement as to all Satellite Leases and the LSPS Operator will diligently complete such disconnection and removal. All disconnection and removal work performed by or on behalf of the LSPS Owners will be performed in compliance with all applicable Laws, orders, permits, rules, regulations and requirements of appropriate governmental agencies.

10.5.3 In the event the LSPS Operator fails to timely perform its disconnection and removal obligations within the applicable time periods as specified in Section 10.5.2 (*Responsibilities and Obligations at Termination*) of this Agreement, the Host Operator may at its election perform such work and invoice the LSPS Operator on behalf of the LSPS Owners, for all actual costs and expenses associated with the disconnection and removal work plus a thirteen per cent (13%) overhead. However, prior to the Host Operator performing such disconnection and removal work, the Host Operator is required to give the LSPS Operator written notice of its intent to perform the disconnection and removal work. In the event the LSPS Operator does not commence and continue disconnection and removal work within thirty (30) Days after receipt of such written notice, the Host Operator has the right to perform disconnection and removal work related to the LSPS without incurring any liability or obligation to the LSPS Operator for such disconnection and removal work. In the event the Host Operator conducts the disconnection and removal work, the Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners who are responsible for any costs associated with such disconnection and removal work.

**10.5.4** The Owner is responsible for the abandonment of the Host including, but not limited to, the Facility Access Modifications.

    (a)    During the term hereof, notwithstanding the automatic termination of this Agreement, as specified under Article X (*Term, Default, and Termination*) of this Agreement, if (i) the Owner determines in its sole judgment that it is no longer economic to operate the Host, and (ii) the Owner determines it will permanently cease operations of will abandon the Host then the Host Operator will give written notice thereof to the Producers ("**Abandonment Notice**"). Within ninety (90) Days following the date of the Host Operator's Abandonment Notice, the Parties will mutually agree to pursue one of the following options:

        (i)    Terminate this Agreement as of a mutually acceptable effective date. Failure to reach agreement between the Producers and the Owner on an effective date under this option within such ninety (90) Days shall result in termination of this Agreement; or

        (ii)    Negotiate an agreement to provide otherwise. Failure to reach a definitive agreement between the Producers and Owner on a future course of action under this option within such ninety (90) Days shall result in termination of this Agreement.

**10.5.5** Upon termination of this Agreement, each Party remains responsible for any accrued financial obligations by that Party with respect to another Party under the terms of this Agreement and will promptly settle such obligations, including any unpaid invoices.

## ARTICLE XI - LIABILITIES AND INDEMNIFICATION

**11.1   Liabilities**

For purposes of this Article XI (*Liabilities and Indemnification*), in the event that a Party is a Producer, LSPS Owner and Owner, then all of said Party's actions in performing any of the functions contemplated in Section 11.1.1 are conclusively presumed to have been performed in the role of LSPS Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.2 are conclusively presumed to have been performed in the role of Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.3 are conclusively presumed to have been

performed in the role of Producer.  **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THIS ARTICLE XI** *(LIABILITIES AND INDEMNIFICATION)* **SHALL GOVERN THE INDEMNITY AND DEFENSE OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT.**

11.1.1 LSPS OWNERS' INDEMNITY OBLIGATIONS FOR LSPS OWNERS:  **LSPS OWNERS SHALL INDEMNIFY OWNER'S GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:**

    (a)  **all injuries to, deaths, or illnesses of any member of LSPS Owners Group; and**

    (b)  **all damages to or losses of any property of any member of LSPS Owners Group,**

**EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, LSPS OWNERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.**

11.1.2 OWNER'S INDEMNITY OBLIGATIONS FOR OWNER:  **OWNER SHALL INDEMNIFY LSPS OWNERS GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:**

    (a)  **all injuries to, deaths, or illnesses of any member of Owner's Group; and**

    (b)  **all damages to or losses of any property of any member of Owner's Group,**

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, OWNER SHALL NOT INDEMNIFY LSPS OWNERS GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF LSPS OWNERS GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.

11.1.3 PRODUCERS' GENERAL INDEMNITY OBLIGATIONS FOR PRODUCERS: PRODUCERS SHALL INDEMNIFY OWNER'S GROUP AND LSPS OWNERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

(a) all injuries to, deaths, or illnesses of any member of Producers Group; and

(b) all damages to or losses of any property of any member of Producers Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF THE PRODUCERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, PRODUCERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP FOR SUCH CLAIMS/LOSSES.

### 11.1.4 NOTICE AND DEFENSE

(a)    The Indemnitee shall promptly give to the Indemnitor notice in writing of (i) any Claim/Loss that has been made known to the representative of Indemnitee as referenced in this Article XI (*Liabilities and Indemnification*) of this Agreement, or (ii) proceedings commenced for which Indemnification is claimed. Such notice shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the Claim/Loss against the Indemnitee. Notwithstanding the foregoing, if the Indemnitor is obligated to Indemnify the Indemnitee (or any other Person pursuant to this Agreement), lack of prompt notice shall not be a defense available to the Indemnitor except to the extent prejudice against the Indemnitor has resulted from such lack of prompt notice.

(b)    The Indemnitor shall confer with the Indemnitee concerning the Defense of any such Claim/Loss proceedings but, subject to the provisions of this Article XI (*Liabilities and Indemnification*) of this Agreement and any other applicable provisions of this Agreement, if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitor or its insurer shall retain control of the conduct of such Defense, including but not limited to the selection and management of counsel. The Indemnitee shall cooperate to the extent reasonably necessary to assist the Indemnitor in defending the Claim/Loss. Notwithstanding the foregoing, however, even if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, neither Party shall effect settlement of or compromise any such Claim/Loss proceedings without having obtained the prior written consent of the other Party. If the Indemnitee does not consent to a settlement that the Indemnitor is willing to accept, then the Indemnitor's liability shall be limited to the amount for which the lawsuit could have been settled (including all Defense costs incurred by Indemnitor). If the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitee may, upon written notice to the Indemnitor and at the Indemnitee's sole cost and expense, select its own counsel to participate in and be present for the defense of any such Claim/Loss proceeding, provided such counsel shall not take any action in the course of such Claim/Loss proceeding to prejudice the Indemnitor's Defense of such Claim/Loss proceeding.

(c)    Should the Indemnitor contest the Defense obligation and not assume the full Defense of the Claim/Loss, the Indemnitee may defend such Claim/Loss in such manner as it may deem appropriate, including, without limitation, settling such Claim/Loss, after giving prior written notice of the same to the Indemnitor, on such terms and conditions as the Indemnitee may deem reasonable and appropriate. The Indemnitor shall reimburse the Indemnitee for costs incurred in connection with such Claim/Loss, including the cost of settlement, within thirty (30) Days from receipt of any invoice for such costs.

(d)    For avoidance of doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term ""Indemnify"" or ""Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct is alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct. However, in the event that the Indemnitee is found by a final and unappealable decision of a court of competent jurisdiction to have been grossly negligent or to have acted with willful misconduct, then the Indemnitee shall refund all Defense costs attributable to the defense of the Indemnitee's gross negligence or willful misconduct.

## 11.2   Indemnification With Respect to Warranty of Title

### 11.2.1  Satellite Production

THE RELEVANT PRODUCERS WILL INDEMNIFY, OWNER'S GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF SATELLITE PRODUCTION AND ANY ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

### 11.2.2  Non-Satellite Production

OWNER WILL INDEMNIFY THE RELEVANT PRODUCERS' GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF THE NON-SATELLITE PRODUCTION AND ANY

ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

**11.3   Waiver of Consequential Damages**

(a)   EACH PARTY:

    (i)   AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY'S GROUP EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.; AND

    (ii)   HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT FROM OR AGAINST ANY OTHER PARTY'S GROUP, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR LOSS OR DEFERMENT OF PRODUCTION OR LOST OR DEFERRED PROFITS OR BUSINESS INTERRUPTION, DAMAGE TO WELL(S) OR RESERVOIRS, OR LOSS OF WELL(S), EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(b)   THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT INCLUDE INDEMNIFICATION FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT SUFFERED BY AN UNAFFILIATED THIRD-PARTY AND 11.3(a)(i) AND 11.3(a)(ii), ABOVE, SHALL NOT APPLY TO THE EXTENT SUCH PARTY OWES SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.

**11.4   Individual Obligations**

Except as otherwise provided herein, the Owner, LSPS Owners, Isabela Lease owners (collectively) and the MC 519 Unit owners (collectively) will be responsible only for their respective share of the costs and liabilities incurred as provided in this Article XI (*Liabilities and Indemnification*) of this Agreement. Except as provided in Section 5.7 (*Royalty and Taxes*) of this Agreement, nothing contained herein will ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose. Each Party will hold all the other Parties harmless from liens and

1  encumbrances on the Host Leases, Host, Satellite Leases, and LSPS as a result of
2  its acts.
3
4  **11.5   Gross Negligence/Willful Misconduct**

5  The terms "gross negligence" and "willful misconduct" as used in this Agreement
6  shall not include the definition set forth in the Oil Pollution Act of 1990 as
7  amended ("**OPA 90**"). It being the intent of the Parties that even though an act or
8  omission is deemed "gross negligence" or "willful misconduct" under OPA 90,
9  such act or omission must meet the standards set forth by the laws of the State of
10  Texas for "gross negligence" or "willful misconduct" in order to relieve a Party of
11  its indemnification obligations hereunder.
12
13
14  <u>**ARTICLE XII - INSURANCE AND BONDS**</u>
15
16  **12.1   Insurance**

17  **12.1.1** Throughout the term of this Agreement, each Party hereto, at its sole cost
18  and expense, will procure such insurance (or self insure, only allowed if
19  the parent company of an original signatory Party hereto or an Affiliate of
20  an original signatory Party has a credit rating of S&P A- or the equivalent)
21  as it deems necessary in discharging its obligations hereunder, including
22  those necessary to protect against all claims for damages, risk of losses
23  and contractual indemnities covered by this Agreement. All policies of
24  insurance purchased which are intended to cover any damages, liabilities,
25  expenses, losses, claims, costs (including attorneys' fees), suits and causes
26  of action incurred by a Party hereunder will be properly endorsed to waive
27  the insurer's rights of subrogation, under any such policies, against the
28  other Parties hereto (or said Parties' respective insurers) when said Party is
29  released from liability or loss or damage pursuant to this Agreement, and
30  may name the other Parties (subject to such other Parties' approval) as an
31  additional insured in the proportion that indemnity obligations are
32  assumed hereunder.
33
34  **12.1.2** The Host Operator, LSPS Operator, Satellite Operators and Producers will
35  maintain the insurance coverage provided in Exhibit "H" (*Insurance*
36  *Provisions*) to this Agreement.
37
38  **12.2   Bonds**

39  The Host Operator, LSPS Operator and the Satellite Operators will obtain and
40  maintain any and all bonds required to be carried by any applicable law,
41  regulation, or rule. The Host Operator, LSPS Operator and the Satellite Operator

will require all contractors to obtain and maintain all bonds required to be carried by any applicable law, regulation, or rule.

## ARTICLE XIII - SUCCESSORS AND ASSIGNS

**13.1   Successors and Assigns**

This Agreement is binding upon and inures to the benefit of the Parties and their respective heirs, successors and assigns. Each Party will incorporate in any assignment or transfer of its interest in the Host, the Isabela Lease, the MC 519 Unit Leases or the LSPS a provision that such assignment is subject to this Agreement.

**13.2   Assignment**

**13.2.1** The Producers and the LSPS Owners or each individual member of the Producers and the LSPS Owners have the right at any time to assign its or their rights and obligations in this Agreement in whole or in part to an Affiliate without the prior written consent of the Owner, or to any Third Party that is financially responsible with the prior written consent of the Owner, such consent not to be unreasonably withheld. The sale or transfer of any ownership interest in the Satellite Leases and the LSPS will not be subject to the prior written consent of the Owner but will be made subject to the rights, duties and obligations of this Agreement, and any such transferee will be obligated to ratify and join this Agreement. Written notice of the completion of any sale or transfer must be given to the Host Operator within sixty (60) Days of the completion of such transaction and no assignment will be effective until such sixty (60) Days time period concludes. The Producers remain responsible for any costs incurred by the Producers, under the terms of this Agreement prior to (a) the Producers receipt of written consent of the assignment from the Owner, (b) Host Operator's receipt of written notice of the assignment and (c) the assignee's ratification and joinder to this Agreement.

**13.2.2** The sale or transfer by the Owner of any ownership interest in the Host will be made subject to the Owner's rights, duties and obligations under this Agreement, and any such transferee of such rights, duties and obligations is obligated to ratify and join this Agreement. Written notice of the completion of any such sale or transfer must be given to the Producers within thirty (30) Days of the completion of such transaction.

## ARTICLE XIV - NOTICES

**14.1    Giving and Responding to Notices**

Unless otherwise specifically provided herein to the contrary, all notices, responses, demands, waivers, consents and other communications required or permitted to be given under this Agreement will be made in writing, and delivered to the designated representative in person, by facsimile transmission (followed by a telephone call confirming receipt), by U.S. mail, by overnight express or courier, in each instance with proof of delivery. Notices and responses are deemed to have been duly given and to have become effective (i) upon receipt if delivered in person; (ii) upon receipt if given by facsimile so long as receipt is confirmed by telephone, (iii) two (2) Business Days after having been delivered to an air courier for overnight delivery; or (iv) upon receipt after having been deposited in the U.S. mail, in each instance all fees prepaid. Any such notice is required to and will be directed to the Party, or its permitted assignee. Failure to timely respond to any matter requiring consent is deemed a negative response to such proposal. The following addresses will remain effective until such time as a Party changes its address for notice by giving to the other Parties in accordance with this Section 14.1 (*Giving and Responding to Notices*) of this Agreement.

If to the Isabela Operator, to:

Payments:

BP America Production Company
P.O. Box 848129
Dallas, Texas 75284-8129

Operational Matters:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Starlee Waligura, Na Kika Area Operations Manager
Telephone: (281) 366-1494
Facsimile: (281) 366 2512

Notices:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Kemper Howe, Gulf of Mexico Land Manager
Telephone: (281) 366-1278
Facsimile: (281) 366-7569

If to the MC 519 Unit Operator, to:

Payments:

Noble Energy, Inc.
P.O. Box 909
Ardmore, Oklahoma 73042
Attn: Accounts Payable, Deepwater Gulf of Mexico

Operational Matters:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Charles I. Hutto, Deepwater Production Manager
Telephone: (281) 876-6277
Facsimile: (281) 876-3000

Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Daniel S. Mills, Deepwater Land Manager
Telephone: (281) 874-6063
Facsimile: (281) 876-6300

If to the Host Operator, to:

Payments:

BP America Production Company
P.O. Box 848129
Dallas, Texas 75284-8129

Operational Matters:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Starlee Waligura, Na Kika Area Operations Manager
Telephone: (281) 366-1494
Facsimile: (281) 366-2512

1  Notices:

2  BP Exploration & Production, Inc.
3  200 Westlake Park Blvd.
4  Houston, Texas 77079
5  Attn: Kemper Howe, Gulf of Mexico Land Manager
6  Telephone: (281) 366-1278
7  Facsimile: (281) 366-7569
8
9
10  If to the Owner, to:

11  Notices:

12  BP Exploration & Production, Inc.
13  200 Westlake Park Blvd.
14  Houston, Texas 77079
15  Attn: Kemper Howe, Gulf of Mexico Land Manager
16  Telephone: (281) 366-1278
17  Facsimile: (281) 366-7569
18
19
20  If to the Producers and LSPS Owners to:
21
22  (a)  BP Exploration & Production, Inc.
23
24  Notices:

25  BP Exploration & Production, Inc.
26  200 Westlake Park Blvd.
27  Houston, Texas 77079
28  Attn: Kemper Howe, Gulf of Mexico Land Manager
29  Telephone: (281) 366-1278
30  Facsimile: (281) 366-7569
31
32  Production Nomination Notices:

33  BP Exploration & Production, Inc.
34  201 Helios Way
35  Houston, Texas 77079
36  Attn: Tim Cooper, Operations Services Representative
37  Telephone: (713) 323-5824
38  Facsimile: (713) 323-7468
39

(b)     Noble Energy, Inc.

Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Daniel S. Mills, Deepwater Land Manager
Telephone:  (281) 874-6063
Facsimile:  (281) 876-6300

Production Nomination Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Melissa Lawrence, Gas Control Manager
Telephone:  (281)-876-8853
Facsimile:  (281)876-8845

(c)     Red Willow Offshore, LLC

Notices:
1415 Louisiana St., Ste. 3650
Houston, Texas 77002
Attn: Rex Richardson
Telephone: (281)-822-7509
Facsimile: (281)-822-7501

Production Nomination Notices:

14933 Highway 172
P.O. Box 369
Ignacio. Colorado 81137
Attn: Cindy Percell
Telephone:  (970)-563-5212 (Direct)
                    (970)-563-5210 (Main)
Facsimile:  (970)-563-5211

(d)     Houston Energy Deepwater Ventures I, LLC

Notices:

1415 Louisiana St. Ste. 2400
Houston, Texas 77002
Attn: P. David Amend
Telephone: 713-586-5712
Facsimile: 713-650-8305

Production Nomination Notices:

1415 Louisiana St. Ste. 2400
Houston, Texas 77002
Attn: P. David Amend
Telephone: 713-586-5712
Facsimile: 713-650-8305

**14.2    Content of Notice**

Any notice which requires a response within a time period will indicate the applicable response time.  Any notice must contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, costs, etc. of the matter/proposal.

## ARTICLE XV - ADMINISTRATIVE AND MISCELLANEOUS

**15.1    Infrastructure Disclaimer**

THE PRODUCERS HAVE INSPECTED THE HOST AND THE PRODUCERS ASSUME ALL RISKS TO THE COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS ATTENDANT   OR RELATED TO THE PLACING OF COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS THEREON, AND WILL HOLD THE OWNER HARMLESS FROM ANY LOSS OR DAMAGE OR DESTRUCTION TO SAID COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS RESULTING FROM, ARISING OUT OF, OR RELATED IN ANY WAY TO THE HOST, OR ANY DEFECT IN, OR FAILURE OF SAME, REGARDLESS OF WHETHER SUCH DEFECT, FAILURE, OR OTHER CONDITION OF THE HOST IS DUE TO THE SOLE OR JOINT NEGLIGENCE OR FAULT OF THE OWNER.

**15.2    Disclaimer of Warranties**

THE PRODUCERS AND THE LSPS OWNERS ACKNOWLEDGE THAT, NOTWITHSTANDING ANY PROVISION HEREIN TO THE CONTRARY, THE HOST AND ANY INFRASTRUCTURE, FLOWLINE, PLATFORM,

FACILITY, EQUIPMENT OR OTHER PROPERTY, PERSONAL OR REAL, MOVABLE OR IMMOVABLE LOCATED THEREON OR CONNECTED THERETO ARE ACCEPTED BY THE PRODUCERS AND BY THE LSPS OWNERS AND ARE PROVIDED "AS IS", "WITH ALL FAULTS", WITHOUT ANY STATUTORY, EXPRESS, OR IMPLIED WARRANTIES OR REPRESENTATIONS INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS, QUALITY, MERCHANTABILITY, OR CONDITION. THE PRODUCERS AND THE LSPS OWNERS ACKNOWLEDGE THAT THE OWNER HAS NOT MADE, AND THE OWNER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES. EXCEPT AS OTHERWISE PROVIDED HEREIN, THE PRODUCERS AND THE LSPS OWNERS EXPRESSLY ASSUME THE RISK THAT ANY DEFECT IN OR FAILURE OF SUCH HOST, INFRASTRUCTURE, PLATFORM, FACILITY, EQUIPMENT, OR PROPERTY MAY RENDER SUCH ITEMS UNFIT FOR THE PURPOSES SET FORTH HEREIN.

**15.3    Host Access & Boarding**

(a)    Each Satellite Operator and the LSPS Operator will provide the Host Operator with at least fifteen (15) Days prior reasonable notice of, and obtain prior permission for, any intent to board the Host to conduct operations as contemplated herein. This notice must include a detailed description of the operation(s) to be conducted, a summary of anticipated work procedures, a summary of the tools and equipment that are anticipated to be used when performing the operation(s), the anticipated work schedule, as well as a brief description of the number of Satellite Operator employees or LPSP Operator employees, or their contractors' or subcontractors' employees or agents requesting boarding permission and the length of stay. Furthermore, this notice must conform to the Host Operator's standard requirements for a "work permit", as amended from time to time. Upon receipt of such prior reasonable notice, and if the Host Operator determines, in its sole discretion, that there will be no unreasonable conflict or interference with its own operations, the Host Operator will provide the Satellite Operator, at the Producers' sole cost, risk, liability and expense, or the LSPS Operator at the LSPS Owners' sole cost, risk, liability and expense, rights of ingress and egress to certain space on the Host for the purposes of installing the LSPS or Facility Access Modifications or the Satellite Well System as provided for herein. Such ingress and egress, and all activities conducted hereunder are subject to the strict observance of all of the Host Operator's safety policies and procedures applicable to the Host including, but not limited to, any required safety training by Host Operator. Furthermore, such visit will be under the direction of and supervised by Host Operator personnel. Except with the express authorization of the Host Operator, neither the Satellite

Operator, nor the LSPS Operator nor their contractor or subcontractor employees or agents, have the right to observe any drilling, workover or other operations conducted by the Host Operator or any Third Parties on the Host.

(b) In the event of an emergency or critical event involving the Satellite System, the Satellite Operator or the LSPS Operator may contact the Host Operator and request immediate ingress and egress to certain space on the Host for purposes of conducting activities to respond to such emergency. If the Host Operator determines, in its sole discretion, that there will be no unreasonable conflict or interference with its own operations and that such ingress and egress is necessary to respond to such emergency or critical event, the Host Operator will provide such temporary rights of ingress and egress at the sole cost, risk, liability and expense of the Satellite Operator and/or the LSPS Operator.

## 15.4   Representations and Warranties

**15.4.1** Each Party represents and warrants to the other Parties that on and as of the Effective Date hereof:

(a) It is duly formed and validly existing and in good standing under the laws of its state or jurisdiction of formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b) The execution and delivery of this Agreement has been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c) It has the entire requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d) The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreement pursuant to which it or its property is bound, to its knowledge, any applicable Laws; and

(e) This Agreement is valid, binding and enforceable against it in accordance with its terms, subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity).

**15.4.2** Owner represents and warrants to the Producers that:

(a) As of the Effective Date, there is no Third Party Production being handled on Owner's share of the Host.

(b) Owner has the power and authority to bind the Host Operator to perform the duties and obligations described for the Host Operator under this Agreement only to the extent Owner has authority to do so pursuant to the Na Kika Obligations.

**15.5  Warranty of Title**

**15.5.1** Each Producer warrants title to its share of Satellite Production to be handled by the Host Operator and indemnifies the Owner pursuant to Section 11.2.1 (*Satellite Production*) of this Agreement.

**15.5.2** Owner warrants title to its share of the Host Production to be handled on the Host and indemnifies the Producers pursuant to Section 11.2.2 (*Non-Satellite Production*) of this Agreement.

**15.6  Standard of Performance**

The Host Operator, the Owner, each Satellite Operator and the LSPS Operator will conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice and with that degree of diligence reasonable and ordinarily exercised by an experienced prudent operator engaged in a similar activity under the same or similar circumstances.

**15.7  Producers' Employees, Consultants, and Contractors**

The Producers will endeavor to keep the Host and all Satellite Production and Non-Satellite Production free from all liens and encumbrances which might arise by reason of the operations conducted under this Agreement or any other agreements affecting the Satellite Leases.

**15.8  Host Operator's Employees, Consultants, and Contractors**

The Owner will endeavor to keep the Host, and all Satellite Production and Non-Satellite Production free from all liens and encumbrances which might arise by reason of the operations conducted under this Agreement affecting the Host Leases.

**15.9   Further Assurances**

Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is deemed necessary or desirable to carry out its purposes, the proper officers, directors, or other appropriate representatives of the Parties will take or cause to be taken all such reasonably necessary action.

**15.10   Non-Compliance Citations**

The respective Satellite Operator will be responsible for any non-compliance citations issued by governmental agencies with respect to the Satellite Well System or the Satellite Leases, and such citations will be promptly reported to the Host Operator. The LSPS Operator will be responsible for any non-compliance citations issued by governmental agencies with respect to the LSPS, and such citations will be promptly reported to the Host Operator. The Owner will be responsible for any non-compliance citations issued by governmental agencies with respect to the Host Leases or the Host and such citations will be promptly reported to the Satellite Operator and the LSPS Operator.

**15.11   Dispute Resolution**

Any claim, controversy or dispute arising out of, relating to or in connection with the interpretation of this Agreement or any activity or operation conducted or to be conducted hereunder, shall be resolved in accordance with the mediation and binding arbitration procedures set forth in Exhibit "I" (*Dispute Resolution Procedures*) to this Agreement. However, claims for Indemnification between or among the Parties shall be excluded from this provision when they arise out of or are related to a lawsuit filed by a Third Party. For economy of legal resources, the Parties' claims for Indemnification shall be resolved in conjunction with such judicial proceeding.

**15.12   Waivers**

Neither action taken (including, without limitation, any investigation by or on behalf of a Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including, without limitation, breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**15.13  Remedies**

The rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity.  Nothing herein will be considered an election of remedies.

**15.14  No Third Party Beneficiaries**

Except to the extent a Third Party is expressly given rights herein, any agreement herein contained, expressed or implied, will be only for the benefit of the Parties and their respective legal representatives, successors, and assigns, and such agreements or assumptions will not inure to the benefit of any other Person whomsoever, it being the intention of the Parties that no Person will be deemed a Third Party beneficiary to this Agreement except to the extent a Third Party is expressly given rights herein.

**15.15  Confidentiality Provisions**

15.15.1  The Parties agree to keep in secrecy and confidence until the termination of this Agreement the Confidential Information, save and except:

    (a)  to their respective Affiliates, subcontractors and consultants and their respective employees, servants or agents actively engaged in the operations hereunder to the extent that they need to know for purposes related to this Agreement;

    (b)  if and to the extent it is required or requested to do so by any law or by any court or regulatory agency or authority in any jurisdiction, provided that the disclosing Party will, if permitted to do so, notify the other Parties in writing as soon as possible upon becoming aware of any such requirement so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such Confidential Information as is legally required an/or compelled and will use its reasonable efforts to obtain confidential treatment for any Confidential Information disclosed; or

    (c)  to any bona fide financially responsible prospective assignee of all or any portion of a Party's interest in the Host and/or Host Leases or Satellite System and/or Satellite Leases (whichever the case may be) provided that such prospective assignee has executed a confidentiality agreement requiring it to maintain the secrecy and confidentiality of the Confidential Information.

**15.15.2** Notwithstanding the foregoing, the provision of confidentiality, use, and disclosure above will not apply to information:

(a) which was in the public knowledge or literature at the time of disclosure by any Party hereunder;

(b) which was already in the possession of any Party at the time of disclosure hereunder without obligation of confidentiality;

(c) which was or is subsequently developed by any Party without use of the Confidential Information;

(d) which subsequent to disclosure hereunder and without fault of the disclosing Party becomes part of the public knowledge; or

(e) which is disclosed to any Party (without the obligation of confidentiality) by a Third Party having, to the best knowledge of the receiving Party, the legal right to do so.

**15.15.3** Any Party who assigns its interest in this Agreement remains bound by the confidentiality obligations of this Agreement as to any Confidential Information obtained throughout the term of this Agreement.

**15.15.4** All Confidential Information made available to the Parties hereunder will be done so on an "as is" basis without any warranties, either express or implied, as to the accuracy, validity, or utility of such information. In no event will any Party be liable for any damages of whatever nature arising out of, or resulting from, making the Confidential Information available under this Agreement.

## 15.16  Commitment of Oil and Gas Reserves

Subject to Article X (*Term, Default, and Termination*)of this Agreement, for the life of the Satellite Leases, the Producers commit to:  (i) deliver all Satellite Production to the Host for production handling, except that the Producers reserve unto themselves, their successors and assigns, the right : (a) to use quantities of Satellite Production sufficient to satisfy Satellite Leases' development and operations including, but not limited to, additional recovery operations and the use of gas for fuel, flaring, pigging, drilling, deepening, reworking, or other such lease operations, (b) to use quantities of Satellite Production sufficient to satisfy any royalty interest in Satellite Production that the royalty owner may elect to take in kind, and (c) for the Producers of the MC 519 Unit Leases to elect to process at a facility other than the Host any oil and/or gas production from such leases  produced from above the depth of fifteen thousand (15,000) feet total vertical depth.

## 15.17  Compliance with Laws and Regulations

This Agreement and all of the terms and conditions contained herein, and the respective obligations of and the operations conducted by the Parties, are expressly subject to and will remain subject to and comply with all valid and applicable laws, orders, rules, and regulations of any federal, state, or local governmental authority having jurisdiction over the Host Leases and the Satellite Leases, as well as the Host and the LSPS. Each of the Parties hereto agree that they will at all times maintain their respective facilities and leases and conduct their operations thereon in accordance with all valid and applicable laws.

No Party will suffer a forfeiture or be liable in damages to the other Parties for any delays or damages or any failure to act, due, occasioned or caused by reason of laws respecting the activities or operations covered hereby and such delays or damages, will not be deemed to be a breach of or failure to perform under this Agreement.

15.17.1  **Applicable Law**:  TO THE MAXIMUM EXTENT PERMISSIBLE, THE GENERAL MARITIME LAWS OF THE UNITED STATES SHALL GOVERN THE VALIDITY, CONSTRUCTION, INTERPRETATION, AND EFFECT OF THIS AGREEMENT, EXCLUDING ANY CHOICE OF LAW RULES WHICH WOULD OTHERWISE REQUIRE THE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.  IN THE EVENT MARITIME LAW IS HELD TO BE INAPPLICABLE BY A COURT OF COMPETENT JURISDICTION, THE LAWS OF THE ADJACENT STATE OF THE SATELLITE LEASES HEREUNDER SHALL APPLY UNLESS (i) OTHERWISE PROVIDED IN THIS AGREEMENT OR (ii) APPLICATION OF SUCH LAW TO A PARTICULAR PROVISION WOULD PREVENT ENFORCEMENT OF SUCH PROVISION, IN WHICH CASE THE LAW APPLICABLE TO SUCH PROVISION SHALL BE ANY POTENTIALLY APPLICABLE LAW THAT WOULD ALLOW ENFORCEMENT OF SAID PROVISION AS WRITTEN.

15.17.2  **Severance of Invalid Provisions**: The Parties intend that every provision of this Agreement, the Exhibits attached hereto, and the documents incorporated herein by reference be severable. If any term or other provision of this Agreement is found to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will remain in full force and effect.  The illegality, invalidity or unenforceability of any provisions hereof will not affect the legality, validity or enforceability of the remainder of this Agreement.  In the case of conflict between the

provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations will govern over the provisions of this Agreement. If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity. Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated. Any term or provisions of this Agreement that is invalid or unenforceable in any jurisdiction will be ineffective only as to such jurisdiction and then only to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision will be interpreted to be only so broad as is enforceable. A bankruptcy or similar trustee must accept or, to the extent permitted by Law, reject this Agreement in its entirety.

15.17.3 **Fair and Equal Employment**: Each of the Parties is an Equal Opportunity Employer. To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference. If the Non-Discrimination in the OCS provisions of 30 CFR 270 apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference. To the extent required by applicable Laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference. In performing work under this Agreement, the Parties agree to comply with (and the Host Operator and the Satellite Operator, as applicable, will require each independent contractor to comply with) the governmental requirements set forth in Exhibit "J" (*Certification of Non-Segregation of Facilities*) to this Agreement, pertaining to non-segregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to non-discrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement. The Owner and the Producers do not condone in any way the use of illegal drugs or controlled substances. The Host Operator and the Satellite Operator, as applicable, will maintain in effect a drug free workplace policy.

## 15.18   Construction and Interpretation of this Agreement

The construction and interpretation of the terms of this Agreement will be governed by the following conventions:

**15.18.1   Heading for Convenience:** All references in this Agreement to articles, sections, subsections and Exhibits hereof will refer to the corresponding article, section, subsection or Exhibit of this Agreement, unless specific reference is made to such articles, sections, subsection or exhibit of another document or instrument. All titles or headings to Articles, subarticles or other divisions of this Agreement except Article II (*Definitions and Exhibits*) or the Exhibits hereto are only for the convenience of the Parties and will not be construed to have any effect or meaning with respect to the other content of such Articles, subarticles or other divisions, such other content being controlling as to the agreement between the Parties.

Except as otherwise provided in this Agreement, each reference to an article of this Agreement will include the entire referenced article including its sections and subsections. Except as otherwise provided in this Agreement, each reference to a section in this Agreement will include all of the section including its subsections. Except as otherwise provided in this Agreement, each reference to an Exhibit in this Agreement will include all of the Exhibit including articles, sections and subsections.

**15.18.2   Gender:** All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, will include all other genders.

**15.18.3   Number:** Whenever the context requires, reference herein made to the singular will be understood to include the plural, and the plural will likewise be understood to include the singular.

**15.18.4   Independent Representation:** The Owner, the LSPS Owners and each individual Producers declare that they have contributed to the drafting of this Agreement or have had it reviewed by their counsel before signing it. Each agrees that it has been purposefully drawn and correctly reflects their understanding of the transaction that it contemplates. Accordingly, this Agreement, though drawn by one Party, will be considered for all purposes as prepared through the joint efforts of the Parties, and will not be construed unfairly and unreasonably and not more strictly against one Party or another Party as a result of the preparation. Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.

### 15.19   Integrated and Entire Agreement

This Agreement, and the Exhibits attached thereto, constitute the entire and final agreement between the Parties pertaining to the subject matter hereof and as such supersedes all prior agreements, understandings, negotiations, and discussion, whether oral or written.  There are no representations, warranties, promises, or other agreements, oral or written, between the Parties in connection with the subject matter hereof, other than those specifically set forth in this Agreement or in documents delivered pursuant to this Agreement.

Upon execution of this Agreement by all of the Parties, this Agreement will supersede and replace all previous negotiations, understandings, promises, or discussions, whether written or oral, relative to the subject matter of this Agreement.  Each of the Parties acknowledges that no Party has made any promise, representation or warranty that is not expressly stated in this Agreement.

### 15.20   Amendment and Modification

Except as otherwise provided in this Agreement, all amendments, supplements, and modification to this Agreement will be in writing and executed by all of the Parties.  This Agreement will not be modified or changed except by a written amendment signed by all of the Parties.

### 15.21   Survivability

The provisions, including any obligations associated therewith, relating to the payment of invoices, audit, abandonment, indemnity, regulatory compliance, representation, warranty, and confidentiality, will survive the cancellation or termination of this Agreement without regard to any action taken pursuant to this Agreement, including without limitation, the execution of any documents affecting an interest in real property or any investigation made by the Party asserting the breach thereof.  Notwithstanding the foregoing, the indemnification provisions contained in Article XI (*Liabilities and Indemnification*) to this Agreement will survive until the later of (i) judicial declaration of the expiration of the applicable statute of limitations or (ii) all claims arising hereunder have been concluded.  Accordingly, cancellation or termination of this Agreement will not relieve any Party from and costs, expenses, or liability accrued or incurred prior to the cancellation or termination of this Agreement, and the provisions of this Agreement will continue in force for such additional time as necessary until all claims or lawsuits have been settled or otherwise disposed of and a final accounting and settlement has been made under this Agreement.

1   **15.22   Existing Agreements**

2   Unless specifically excepted or reserved, and to the extent that they are binding on
3   the Owner, the Producers, the LSPS Owners and the Owner agree that this
4   Agreement will be made subject to (and Producers and the LSPS Owner accepts
5   that this Agreement is subject to) any and all valid and existing reservations,
6   exceptions, limitations, contracts, agreements, licenses, leases, grants and all other
7   agreements or instruments affecting the Host (i) which are of record with the
8   BOEMRE or official county/parish records, (ii) of which Producers have actual or
9   constructive notice or knowledge, including, without limitation, any matter
10  included or referenced in materials made available to Producers by the Owners for
11  their review prior to the execution of this Agreement, or (iii) which are part of the
12  Na Kika Obligations.

13
14
15                      **ARTICLE XVI  -  EXECUTION**
16
17  **16.1   Effect**

18  Upon its execution by all of the Parties, this Agreement will become effective as
19  of the Effective Date and will be binding upon and inure to the benefit of the
20  Parties and their respective legal representatives, successors, and assigns.

21
22  **16.2   Counterparts**

23  This Agreement may be executed by signing the original or a counterpart thereof.
24  If this Agreement is executed in multiple counterparts, each counterpart will be
25  deemed an original and all counterparts when taken together will constitute but
26  one and the same Agreement with the same effect as if all of the Parties had
27  signed the same instrument.  This Agreement may also be ratified by separate
28  instrument referring to this Agreement and adopting by reference all the
29  provisions of this Agreement.  A ratification will have the same effect as an
30  execution of the original Agreement.

31
32
33                  **[Remainder of this page intentionally left blank]**
34

IN WITNESS WHEREOF, this Agreement is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.

**OWNER**

**BP EXPLORATION & PRODUCTION, INC. (Owner)**

By: _____

Name: PETER A ZWART

Title: CFO

Date: 21 SEP 010

**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION, INC. (Isabela Producer and Operator)**

By: _____

Name: PETER A ZWART

Title: CFO

Date: 21 SEP 010

**NOBLE ENERGY, INC. (Isabela Producer)**

By: John T. Lewis

Name: John T. Lewis

Title: Vice President

Date: 9/21/10

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC. (MC 519 Unit Producer and Operator)**

By:  _John T. Lewis_

Name:  _John T. Lewis_

Title:  _Vice President_

Date:  _9/21/10_

**BP EXPLORATION & PRODUCTION, INC. (MC 519 Unit Producer)**

By:  _____

Name:  _PETER A ZWART_

Title:  _CFO_

Date:  _21 SEP 010_

**RED WILLOW OFFSHORE, LLC (MC 519 Unit Producer)**

By:  _____

Name:  _____

Title:  _____

Date:  _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC (MC 519 Unit Producer)**

By:  _____

Name:  _____

Title:  _____

Date:  _____

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION, INC. (LSPS Owner and Operator)** *06*

By: _Peter A Zwart_

Name: _PETER A ZWART_

Title: _CFO_

Date: _21 SEP 010_


**NOBLE ENERGY, INC. (LSPS Owner)**

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _9/21/10_


**RED WILLOW OFFSHORE, LLC (LSPS Owner)**

By: _____

Name: _____

Title: _____

Date: _____


**HOUSTON ENERGY DEEPWATER VENTURES I, LLC (LSPS Owner)**

By: _____

Name: _____

Title: _____

Date: _____


Execution Version

90

MC 519 UNIT PRODUCERS

NOBLE ENERGY, INC. (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

BP EXPLORATION & PRODUCTION, INC. (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

RED WILLOW OFFSHORE, LLC (MC 519 Unit Producer)

By: _____

Name:   Robert J. Voorhees

Title:   President and COO

Date:   September 21, 2010

HOUSTON ENERGY DEEPWATER VENTURES I, LLC (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION, INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____


**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____


**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: __Robert J. Voorhees__

Title: __President and COO__

Date: __September 21, 2010__


**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC.** (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**BP EXPLORATION & PRODUCTION, INC.** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (MC 519 Unit Producer)

By: _~signature~_

Name: _P. DAVID Amend_

Title: _Vice President LAND_

Date: _September 21, 2010_    AMB

Execution Version                    89

1   **LSPS OWNERS**
2
3   **BP EXPLORATION & PRODUCTION, INC.** (LSPS Owner and Operator)
4
5   By: _____
6
7   Name: _____
8
9   Title: _____
10
11  Date: _____
12
13
14  **NOBLE ENERGY, INC.** (LSPS Owner)
15
16  By: _____
17
18  Name: _____
19
20  Title: _____
21
22  Date: _____
23
24
25  **RED WILLOW OFFSHORE, LLC** (LSPS Owner)
26
27  By: _____
28
29  Name: _____
30
31  Title: _____
32
33  Date: _____
34
35
36  **HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)
37
38  By: _____
39
40  Name: _P. DAVID Amend_
41
42  Title: _Vice President LAND_
43
44  Date: _September 21, 2010_          AM
45

Execution Version          90

# EXHIBIT "C"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

Accounting Procedures

## I. GENERAL PROVISIONS

1.    **Definitions**

All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning as in the Agreement to which this Accounting Procedure is attached.

"**Affiliate**" as defined in the Agreement and includes Affiliates as specified herein. Affiliates of the Operator and Non-Operator shall include, but not be limited to, those entities or groups listed on Appendix A to this Exhibit C or their successors.

"**Controllable Material**" means Material which at the time of acquisition or disposition is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's employees and/or contract labor directly employed On-site in a field operating capacity.  First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices

- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"**Joint Operations**" means all operations necessary or proper for the development, operation, protection, maintenance, repair, abandonment and restoration of the Joint Property.

"**Joint Property**" means the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means one (1) or more of the following (exclusive of the Host Operator): (i) Satellite Operator(s), on behalf of the Producers, (ii) the LSPS Operator, on behalf of the LSPS Owners, and/or (iii) the Producers, as applicable and as stipulated in the Agreement..

"**Offshore Facilities**" means platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include, but not be limited to a platform, the Production System, that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, Material storage facilities, staging areas from which Joint Operations are conducted, and other facilities, such as Remote Technology Centers, regardless of its location and whether the facility or equipment is owned by the Joint Account.

"**Personal Expenses**" means travel, transportation, meals, accommodations, temporary living expenses, relocation costs, and other reimbursable expenses of Host Operator's employees, employees of Affiliates, or of third parties performing chargeable functions.

1   "**Remote Technology Center (RTC)**" means a facility, regardless of whether
2   located On-site or Off-site, having dedicated technical and /or operations staffing, that
3   directly monitors and/or controls Joint Operations on a real-time basis.
4
5   "**Shore Base Facilities**" means onshore support facilities that during
6   development, maintenance and producing operations provide such services to the Joint
7   Property as receiving and transshipment point for supplies, materials and equipment;
8   debarkation point for production personnel and services,; communication, scheduling and
9   dispatching center; other associated functions benefiting the Joint Property.
10
11   "**Technical Employees**" means those employees having special and specific
12   engineering, geological or other professional skills, and whose primary function in Joint
13   Operations is the handling of specific operating conditions and problems for the benefit
14   of the Joint Property.  Technical Employees include employees of the Parties, Affiliates
15   and third parties providing services in support of Joint Operations.
16
17   **2.**   **Statements and Billings**
18
19   A.   The Host Operator and Owner shall bill the appropriate Non-Operators on
20      or before the last day of the month for their proportionate share of the
21      Joint Account for the preceding month.  Such bills shall be accompanied
22      by statements which identify the authority for expenditure, lease or
23      facility, and all charges and credits summarized by appropriate categories
24      of investment and expense. Controllable Material may be summarized by
25      major Material classification.  Audit exceptions shall be separately and
26      clearly identified.
27
28   **3.**   **Advances and Payments by Non-Operators**
29
30   A.   If gross expenditures for the Joint Account (except for expenditures for
31      Facility Access Modifications) are expected to exceed $500,000.00 in the
32      next succeeding month's operations, the Operator may require the Non-
33      Operators to advance their share of the estimated cash outlay for the
34      month's operations.   Non-Operators are required to advance their
35      proportionate share of the estimated costs of any Facility Access
36      Modifications per Article 3.3.2 of the Agreement.
37
38      Unless otherwise provided in the Agreement, any billing for such advance
39      shall be payable within fifteen (15) days after receipt of the advance
40      request or by the first day of the month for which the advance is required,
41      whichever is later.  The Host Operator shall adjust each monthly billing to
42      reflect advances received from the Non-Operators for such month.
43
44   B.   Each Non-Operator shall pay its proportionate share of all bills within
45      fifteen (15) days of receipt date. If the payment due date for such bill falls

on a weekend or on a statutory holiday, the payment will be due on the preceding business day.  If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Wall Street Journal on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser.  In addition, the delinquent party shall bear attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.  If the Wall Street Journal ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum.  Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed.

4.   **Adjustments**

A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) related to expenditures rendered during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

B.   All adjustments initiated by the Parties except those described in (1) through (5)     below are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account statement or payout status statement. Adjustments made beyond the twenty-four month period are limited to the following

(1)   a physical inventory of Controllable Material as provided for in Section V.
(2)   an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.
(3)   a government/regulatory audit.
(4)   changes in working interest ownership
(5)   volume or value reallocation pursuant to the terms or procedures of the Agreement which may impact the volume or value used to calculate billings and/or payments for the Joint Account.