5. **Expenditure Audits**

A.  A Non-Operator, upon notice in writing to Host Operator, Owner, and other Non-Operators, shall have the right to audit the Owner's and/or the Host Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Owner and/or Host Operator. The Owner and Host Operator shall bear no portion of the Non-Operator's audit costs incurred under this paragraph unless agreed to by the Owner and/or Host Operator. The audits shall not be conducted more than once each year without prior approval of the Owner and/or Host Operator, whichever is applicable, except upon the resignation or removal of the Host Operator, and shall be made at the expense of those Non-Operators approving such audit. The lead audit company's audit report shall be issued within one hundred and eighty (180) days after completion of the audit field work provided, however, the one hundred and eighty (180) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required by Paragraph 4.A. above. All claims shall be supported with sufficient documentation. Failure to issue the report within the prescribed time or to take specific written exception within the twenty-four (24) month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

B.  A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report. While any audit claim is being resolved, the applicable statute of limitations will be suspended. Failure, however, to comply with the deadlines provided herein shall cause the statue to commence running again.

The Owner and/or Host Operator, whichever is applicable, shall allow or deny all exceptions in writing to an audit report within one hundred and eighty (180) days after receipt of such report. Denied exceptions should be accompanied by a substantive response.

C.  The lead audit company shall reply to the Owner's and/or Host Operator's response to an audit report within ninety (90) days of receipt, and the Owner and/or Host Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt.

D.   The lead audit company or Owner and/or Host Operator may call an audit resolution conference for the purpose of resolving audit issues/exceptions that are outstanding at least eighteen (18) months after the date of the audit report. The meeting will require one month's written notice to the Owner and/or Host Operator and all audit participants, be held at the Owner's and/or Host Operator's office or other mutually agreed upon location, and require the attendance of representatives of the Owner and/or Host Operator and each audit participant responsible for the area(s) in which the exceptions are based and who have authority to resolve issues on behalf of their company.    The lead audit company will coordinate the response/position of the Non-Operators and continue to maintain its traditional role throughout the audit resolution process.

Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position.  An audit resolution conference may be held as often as agreed to by the Parties.  Issues unresolved at one conference can be discussed at subsequent conferences until each such issue is resolved.

E.   Non-Operator charges shall be subject to the above audit requirements.

F.   The preceding provisions shall not preclude the Parties from conducting revenue audits.

## 6.   Approval by Parties

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Host Operator shall notify all Parties of the proposal, and the agreement or approval of a majority in interest of the Parties shall be controlling.

## II. DIRECT CHARGES

The Host Operator shall directly charge the Joint Account with the following items in accordance with the Agreement:

## 1.   Rentals and Royalties

Lease rentals, royalties, rights of use and easements paid by the Operator, on behalf of Joint Operations.

2.  **Labor**

A.  Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 (Chargeability of Incentive Compensation Programs), for:

    (1)  Operator's field employees directly employed in the conduct of Joint Operations.

    (2)  Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses or other facilities serving the Joint Property if such costs are not included in rates charged under Section II.6 (Equipment and Facilities Furnished by Operator).

    (3)  Operator's employees providing First Level Supervision.

    (4)  Salaries and wages of Technical Employees providing On-site and Off-site technical services for Joint Operations.

B.  Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2 of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2. of this Section II. If percentage assessment is used, the rate shall be based on the Host Operator's cost experience.

C.  Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Section II.2.

D.  Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Paragraph 2 of this Section 2.

E.  Relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2. Relocation costs may only be charged for a domestic employee transferred within the United States and assigned to the Joint Property full-time for a minimum of twelve (12) months.

F.  Training costs as specified in COPAS MFI-35 (Charging of Training Costs to the Joint Account) for personnel whose salaries and wages are

chargeable under Section II.2. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Current cost of established plans for employee benefits, as described in COPAS MFI-27 (Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation), applicable to the Host Operator's or Owner's labor costs chargeable to the Joint Account under Sections II.2. based on the Host Operator's or Owner's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, whose salaries and wages are chargeable under Section II.2 to the extent such awards pertain to services provided for activities or operations conducted under the Agreement.

3.   **Material**

Material purchased or furnished by the Host Operator for Joint Operations as provided under Section IV. Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **Transportation**

Transportation of the Host Operator or Owner employees, Affiliates, or contractor personnel necessary for Joint Operations. Transportation of Material between the Joint Property and another property, or from the Host Operator/Owner's warehouse or other storage point to the Joint Property, shall be charged to the receiving property, and transportation of Material from the Joint Property to Host Operator / Owner's warehouse or other storage point shall be paid for by the Joint Property using the methods in Section IV.1 for freight associated with Direct Purchases and Section IV.2.B for freight associated with transfers.

5.   **Services**

The cost of goods, services, equipment and utilities provided by third parties except for goods and services covered by Section III (Overhead), or Section II.7 (Affiliates), or Section II.9 (Legal Expense). Awards paid to contractors shall be chargeable to the extent such awards pertain to services provided for activities or operations conducted under this Agreement.

**6.   Equipment and Facilities Furnished by Host Operator**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Host Operator or Owner will be charged as follows and / or as indicated in Appendix B to this Exhibit C:

A.   Operator shall charge the Joint Account for use of Host Operator-owned equipment and facilities, including but not limited to Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses used to store Joint Property, or other facilities at rates commensurate with the costs of ownership and operation.  Equipment and facilities owned by the Host Operator, will be charged to the Joint Account at the Host Operator's actual cost.  Such costs may include all expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed twelve percent (12%) per annum.  In addition, for platforms, subsea production systems, and production facilities the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement.  Charges for depreciation will no longer be allowable once the equipment has been fully depreciated.  Actual cost shall not exceed the average prevailing commercial rate.

B.   In lieu of charges in Paragraph 6.A. above, equipment and facilities, including Shore Base and Offshore Facilities, owned by the Host Operator may be charged to the Joint Account at the average prevailing commercial rate for such equipment or facility.  If an average commercial rate is used to bill the Joint Account, the Host Operator shall adequately document and support such rate and periodically review and update the rate.

C.   When applicable for Host Operator owned or leased motor vehicles, the Host Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates.  When such rates are not available, the Host Operator shall comply with the provisions of Paragraph 6.A. or 6.B. above.

**7.   Affiliates**

Affiliate Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

A.   An Affiliate of the Host Operator providing services for Joint Operations regardless of work location, shall be chargeable to the Joint Account at the

rate and/or amount that the Affiliate customarily charges the Host Operator for its services.

B. The Parties agree that Affiliate records relating to Materials, facilities or services provided by an Affiliate are not subject to and will not be made available for audit. However, if Affiliate charges are based on rates, the audit of the Affiliate charges shall be limited to verification that the units or basis to which the rates were applied are correct. Upon request by any Party, the Host Operator or Owner shall furnish a certificate of its independent accounting firm confirming that rates or amounts charged by an Affiliate reflect actual cost and do not include any element of profit.

8. **Damages and Losses To Joint Property**

Costs or expenses necessary to repair, replace or abandon the Joint Property resulting from damages or losses incurred, except to the extent such costs result from a Party's gross negligence or willful misconduct.

9. **Legal Expense**

The Host Operator may not charge for services of the Host Operator's legal staff or fees and expenses of outside attorneys unless approved by the Parties, except that title examinations and curative work shall be chargeable, unless otherwise provided for in the Agreement. Other types of legal expense, other than attorney fees, such as recording fees and handling, settling, or otherwise discharging litigation, claims, and liens necessary to protect or recover the Joint Property shall be chargeable

10. **Taxes and Permits**

All taxes and permits of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Host Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the Host Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11. **Insurance**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the

Host Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Host Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

### 12. Communications

Costs of acquiring, leasing, installing, operating, repairing, maintaining dismantling or abandoning communication facilities or systems including radio, microwave, satellite and fiber optics cable systems / facilities between the Joint Property and the Host Operator's offices. In the event communication facilities systems serving the Joint Property are Host Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 6 of this Section II.

### 13. Computer Systems

Costs of purchasing, leasing, installing, operating, repairing, maintaining, dismantling or abandoning computer systems including hardware, software, system support and personnel in direct support of Joint Operations. If the computer systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (Equipment and Facilities Furnished by Operator

### 14. Ecological, Environmental and Safety

A.   Costs incurred for technical services, engineering and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety Hazards Act (OSHA) or other regulatory authorities.

Ecological and Environmental costs incurred for the benefit of the Joint Property resulting from laws, rules, regulations, or orders for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority.

Also, costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations are chargeable.

Ecological and environmental costs incurred by the Host Operator as deemed by the Host Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

B.  Safety costs incurred for the benefit of the Joint Property to conduct and/or implement safe operational practices/guidelines as a result of laws, rules, regulations, or orders or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies. Safety costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

C.  Environmental, ecological, and safety training costs for personnel whose time would otherwise be chargeable under Paragraph 14.A or B above, regardless of whether training is mandated by statute or regulatory agency, is chargeable to the Joint Account.

D.  Safety and other team accomplishment awards for personnel chargeable to the Joint Account shall be chargeable to the Joint Account.

In the event of a conflict between the provisions of this Section II, Paragraph 14 and Section III, Paragraphs i. and ii., Section II, Paragraph 14 shall prevail.

15.  **Abandonment and Reclamation**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental, regulatory, or judicial authority.

16.  **Other Expenditures**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Host Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, the Host Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

    i.    Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

        ( ) shall be covered by the overhead rates.

        (X) shall not be covered by the overhead rates.

    ii.    Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

        ( ) shall be covered by the overhead rates.

        (X) shall not be covered by the overhead rates.

**1.    Overhead – Operating, Major Construction and Catastrophe**

As compensation for overhead in connection with Operating, Major Construction and Catastrophe operations, the Host Operator shall charge on a:

(X) Percentage Basis as follows:

**2.    Overhead - Operating**

An Operating Rate of <u>thirteen</u> percent (<u>13</u>%) of the cost of operating the Joint Property. The cost of operating the Joint Property includes, but is not limited to, the costs described in these sections of Article V.5.1.3 (b) ii of the Agreement: (a) Satellite Leases Direct Expense, (b) LSPS Direct Expense, (c) Facility Access Modifications Dedicated System, (d) Host Dedicated Facility and (e) Host Common Facilities and 5.4.2 - Future Governmental Regulations and as described in Article IV Section 4.7.2 - Emergency Response.

The Operating Rate shall be applied to all costs in connection with Joint Operations, except those costs of Major Construction and Catastrophes.

The cost of Infrastructure Access and/or Handling Fees, Compensation for Deferred Host Leases Oil Production and for Deferred Host Leases Gas Production, Minimum Monthly Fees, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property shall be excluded from the calculation of overhead.

3.   **Overhead - Major Construction**

To compensate the Host Operator for overhead costs incurred in the construction and installation of  fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities,  the Host Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead in accordance with the   following for any Major Construction project.  Major Construction projects include, but are not limited to, work described in these sections of Article III - Infrastructure and Facilities of the Agreement:  3.1 - Satellite Well System, 3.2 - Loop Subsea Production System, 3.3 - Facility Access Modifications, 4.4 - Use of Platform/Riser Space.

Since the Host Operator will charge engineering, design and drafting costs related to the project directly to the Joint Account:

4 % of total costs

Total cost shall mean the gross cost of any one project.  For the purpose of this paragraph, the component parts of a single project shall not be treated separately.

In the event of any conflict between the provisions of this Section III and any of the provisions under Section II, the provisions of Section II shall govern.

4.   **Overhead - Catastrophe**

To compensate Host Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Host Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following:

Catastrophe Overhead will be charged at the same applicable rates and terms as Section III Paragraphs 2 and 3 (Operating and Major Construction).

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

5.   **Amendment of Rates**

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

## IV. MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Host Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Host Operator normally provides all Material for use on the Joint Property but does not warrant the Material furnished.   At the Host Operator's option, Material may be supplied by Non-Operators.

1.   **Direct Purchases**

Direct purchases shall be charged to the Joint Account at the price paid by the Host Operator after deduction of all discounts received.   A direct purchase is determined to occur when an agreement is made between the Host Operator and a third party for the acquisition of Materials for a specific well site or location. Material provided by the Host Operator under "vendor stocking programs," where the initial use if for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase.   If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Host Operator from the manufacturer, distributor, or agent.

2.   **Transfers**

A transfer is determined to occur when the Host Operator furnishes     Material from its storage facility or from another operated property.   Additionally, the Host Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material.   Similarly, the removal of Material from a Joint Property to the Host Operator's facility or to another operated property is also considered a transfer.   Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.   Pricing

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer.  Transfers of new Material will be priced using one of the following new Material bases:

(1)   Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).  The HPMs and the associated date of published price to which they should be applied will be published by COPAS periodically.

(a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

(b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint Property (where material is normally available) capable of supplying the material, or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2)   A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3)   Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement.  Sufficient price documents should be available to Non-operators for purposes of verifying Material transfer valuation.

(4)   As agreed to by the Parties.

(5)   When higher than specification grade or size tubulars from Host Operator's inventory are used on the Joint Property, Host Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B.   Freight

Transportation costs should be added to the Material transfer price based on one of the following:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and current interpretations.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property. For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3) Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas, to the railway receiving point nearest the Joint Property.

(4) Transportation costs for Material other than that described in Section IV, Paragraphs 2.B(1) through (3), if applicable, shall be calculated from the supply store or point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint Property.

C. Condition

(1) Condition "A" - New and unused Material in sound and serviceable condition shall be charged at one hundred percent of the price as determined in Section IV, Paragraphs 2.A and B. Material transferred from the Joint Property that was not placed in service on the Joint Property shall be credited as charged without gain or loss. Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charge. All refurbishing costs required or necessary to return the material to original condition, or to correct handling or transportation damages and other related costs will be born by the divesting property. The Joint Account is responsible for Material preparation, handling and transportation costs for new and unused Material charged to the property either through a direct purchase or transfer. Any preparation costs performed, including any internal or external coating and wrapping, will be credited on new Material provided these costs were not repeated for the receiving property.

(2)    Condition "B" - Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined by the pricing guidelines in Section IV, Paragraphs 2.A and B. All refurbishing costs required or necessary to return the material to Condition B, or to correct handling or transportation damages and other related costs will be born by the divesting property.

If the Material was originally charged to the joint Account as used Material and placed in service on the Joint Property, the Material will be credited at the condition percentage most recently recommended by COPAS times the price as determined in Section IV, Paragraphs 2.A and B.

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)    Condition "C" - Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined in Section IV, Paragraphs 2.A and B. The cost of reconditioning shall be charged to the receiving property provided Condition C value, plus cost of recondition, does not exceed Condition B value.

(4)    Condition "D" - Other Material that is no longer suitable for its original purpose but usable for some other purpose is considered Condition D Material. Included under Condition "D" are also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5)    Condition "E" - Junk shall be priced at prevailing scrap value prices.

D.    Other Pricing Provisions

    (1)    Preparations Costs

        Costs incurred by the Host Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices reflective of the Host Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged per Section IV, Paragraph 2.A.

    (2)    Loading and Unloading Costs

        Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS Bulletin 21.

3.    **Disposition of Surplus**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Host Operator may purchase, but shall be under no obligation to purchase, the interest of Non-operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Host Operator. To avoid the accumulation of surplus materials, the Host Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sale to a third party, division in-kind, or other dispositions as agreed to by the Parties.

The Host Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Host Operator's expenditure limit as set forth in the Operating Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Operating Agreement expenditure limit, the disposal must be agreed to by the Parties.

The Host Operator may dispose of Condition D and E Material under procedures normally utilized by the Host Operator without prior approval.

4. **Special Pricing Provisions**

A. Premium Pricing

Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the Host

Operator has no control, the Host Operator may charge the Joint Account for the required Material at the Host Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use and to billing Non-Operators for such Material. During premium pricing periods, each Non-Operator shall have the right to furnish in-kind all or part of his share of such Material suitable for use and acceptable to the Host Operator by so electing and notifying the Host Operator within ten (10) days after receiving notice from the Host Operator.

B. Shop-Made Items

Shop-made items may be priced using the value of the Material used to construct the item plus labor costs. If the Material is from a scrap or junk account, the Material may be priced at either twenty-five percent of the current price as determined in Section IV, Paragraph 2A, or scrap value, whichever is higher, plus costs to fabricate the item.

C. Mill Rejects

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent of K-55/J-55 price as determined in Section IV, Paragraphs 2.A and B. Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Host Operator shall maintain records of Controllable Material charged to the Joint Account, as defined in the COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Host Operator resulting from a physical inventory of jointly owned Controllable Material are limited to the six months following the taking of the inventory. Charges and credits for overages or shortages will be valued

for the Joint Account based on condition B prices in effect on the date of physical inventory and determined in accordance with Section IV, Paragraphs 2.A and B unless the inventorying Parties can prove another Material condition applies.

1.   **Directed Inventories**

With an interval of not less than five years, physical inventories shall be performed by the Host Operator upon written request of a majority in working interests of the Non-Operators.

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.   Audit per diem rate for each inventory person in line with the auditor rates determined, adjusted, and published each April by COPAS. The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

B.   Actual travel including Host Operator-provided transportation and personal expenses for the inventory team.

C.   Reasonable charges for report typing and processing.

The Host Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs in connection with any post-report follow-up work in settling the inventory will be absorbed by the Non-Operator incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by such inventory.

2.   **Non-Directed Inventories**

A.   Host Operator Inventories

Periodic physical inventories that are not requested by the Non-Operator may be performed by the Host Operator at the Host Operator's discretion. The expenses of conducting such Host Operator inventories shall not be charged to the Joint Account.

B.    Non-Operator Inventories

Any Non-Operator(s) may conduct an inventory at reasonable times, at their sole cost and risk with prior notification to the Host Operator of at least thirty (30) days.

C.    Other Inventories

Other inventories may be taken whenever there is any sale or change of interest. When possible, the selling Party should notify all other owners 30 days prior to the anticipated closing date. When there is a change in Host Operator of the Joint Property, an inventory by the former and new Host Operator should be taken.

The expenses of conducting such other inventories shall be charged to the Joint Account.

**[Remainder of this page intentionally left blank]**

**APPENDIX B**

Attached to and Made a Part of Exhibit C – Accounting Procedure

<u>EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR</u>

A.  Host Operator may charge the Joint Account an allocated portion of the cost of the Preservation and Maintenance Facility (PMF) or successor. The PMF will be used to secure, preserve and maintain Gulf of Mexico materials for drilling and completions, wells, operations and subsea projects. The PMF costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

B.  Host Operator may charge the Joint Account an allocated portion of the cost of the Houma Learning Center (HLC) or successor. The HLC is used to provide training to the Host Operator's personnel. The HLC costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

C.  Host Operator may charge the Joint Account an allocated portion of the cost of the Advanced Collaborative Environments Facility (ACE) or successor. This Remote Technology Center is located offsite of the Joint Property with technology for communicating with field operations and optimizing well performance and reducing field operating expenses on a real time/on-line basis. The ACE costs to be charged shall include all costs (regardless of location) incurred by the Host Operator to operate the ACE and will be charged pursuant to the provisions of Section II.6 of this Accounting Procedure. Such charges shall include, but are not limited, to the following: facilities, communications, computers, software, system support, and ACE personnel provided by the Operator, contract services or Affiliates.

**[Remainder of this page intentionally left blank]**

Execution Version

# EXHIBIT "D"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## HOST FACILITIES SCHEMATIC



## EXHIBIT "E"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## HOST SERVICES

The Owner shall provide the LSPS Owners and Producers with certain Services under the terms of this Agreement.   Said Services shall (i) be implemented in a manner consistent with the general direction provided by the Host Operator, and (ii) follow procedures mutually agreed upon by the LSPS Operator, Satellite Operators, and Host Operator which shall be furnished in written form if requested by the Host Operator. The cost of said Services shall be handled in accordance with Article V of this Agreement. Said Services shall include the following:

1.   Production handling services between the Entry Point and the Delivery Point shall include:

   (a) Operation, inspection, maintenance, and repair of the Host, including utilities necessary for the safe, reliable operation of the Host
   (b) LSPS Production receiving
   (c) Oil inlet heat exchanger
   (d) Separation
   (e) Gas dehydration
   (f) Flash gas compression
   (g) Boost gas compression
   (h) Vapor recovery compression
   (i) Oil treating
   (j) Hot oiling and/or pigging
   (k) Condensate re-injection
   (l) Metering, allocation and shipping
   (m) Solids and produced water treating and disposal
   (n) Utilities (electrical power, instrument air, access to fuel gas system) on the Host from Owner's existing sources
   (o) Pressure relief via the Host flare system
   (p) Bulks (e.g., supplies, materials, chemicals, parts, equipment) handling on the Host
   (q) Bulks (e.g., supplies, materials, chemicals, parts, equipment) transportation and personnel transportation from shore to the Host on a space available basis
   (r) Storage space on the Host for consumables and spare parts on a space available basis

2.   Operation of the Satellite Well Systems and LSPS as can be performed from the Host, including, but not limited to:

    (a) Operation of well controls, valves, chokes and safety devices

    (b) Operation of all platform controls and equipment

    (c) Operation of all safety shutdown devices related to the Satellite Well System and LSPS in accordance with regulations of the BOEMRE

    (d) Reporting to the Satellite Operators, as soon as practicable, any significant well, equipment, production, safety, regulatory or logistical problem associated with the Satellite Well System(s)

    (e) Reporting to the Satellite Operators with daily reports of Satellite Production and maintaining records of all information and reports transmitted, and

    (f) Providing all materials, supplies, labor and supervision required in connection with such activities

3. Normal and routine maintenance of the Satellite Well Systems and LSPS equipment installed on the Host, including, but not limited to,

    (a) Providing consumables such as chokes, orifice plates, glycol and methanol

    (b) Ordering receiving and verifying receipt of parts, tools, supplies and services

    (c) Scheduling, performing and reporting of all required tests on safety systems, and

    (d) Providing all materials, supplies, labor and supervision required in connection with such activities

4. Integrity testing of the subsea Christmas trees and system valves, including, but not limited to, downhole safety valves.

5. Well testing, pressure build-up tests, blowdown operations, monitoring of well parameters (including annulus pressure, downhole pressure and temperature, wellhead pressure, metering data and temperature), and adjustment of normal well parameters.

6. Monitoring of Satellite Well Systems and LSPS parameters, including manifold pressure and temperature, platform arrival pressure and temperature, and other normal parameters.

7. Operations as can be performed from the Host that are needed to assist in the diagnosis of subsea and operational problems (e.g., monitoring of pressures, temperatures, and flowrates).

8. Bulk handling, including the transportation (between shore and the Host) of supplies, chemical (chemical as used throughout this Agreement includes methanol) and equipment required for the support of the Satellite Well System and LSPS.

9.   Storage of chemicals, other consumables, and spare parts on the Host for the Satellite Well System and LSPS on a space-available basis.

10.  Initial response with the Satellite Operator(s) and LSPS Operator's personnel to equipment breakdowns associated with Satellite Well System and LSPS components located on the Host.

11.  Initial response to emergency situations attributable to the Satellite Well System and LSPS equipment located on the Host and to other subsea facilities, as requested by the Satellite Operator(s) and/or LSPS Operator, (e.g., spills, leaks). The Host Operator shall promptly notify the Satellite Operator(s) and LSPS Operator of such emergency situation and consult on response measures taken and planned. The Host Operator shall continue initial emergency response operations until (i) the appropriate Operator's personnel are directing emergency response and inform the Host Operator that the LSPS Operator or Satellite Operator will assume control of the emergency response operations underway and (ii) the appropriate regulatory agency(s) approve the transfer of control of the response operations to the Satellite Operator or LSPS Operator. The impacted Operator will coordinate emergency response with the Host Operator as necessary for all emergency response activities.

12.  At the request of the Satellite Operator and/or the LSPS Operator, the Host Operator shall, at its discretion, perform subsea remote operated vehicle ("**ROV**") inspections of the Satellite Well System and LSPS in connection with regularly scheduled ROV inspections. The LSPS Operator and Satellite Operators and the Host Operator shall use reasonable efforts to minimize associated mobilization/demobilization costs by coordinating such inspections with the Host and Host subsea production system ROV operations. ROV inspections shall be at time intervals prescribed by the BOEMRE and shall include:

     (a) Piping and equipment associated with the Satellite Well System and LSPS;
     (b) The route of the Satellite Well System and LSPS.

13.  Hot oiling/pigging operations associated with the LSPS flowlines at the discretion of the LSPS Operator and coordinated with the Host Operator, pursuant to hot oiling/pigging procedures mutually agreed to between the Host Operator and LSPS Operator.

14.  Gas lift operations associated with the LSPS flowlines/risers at the discretion of the LSPS Operator and coordinated with the Host Operator, pursuant to gas lift procedures mutually agreed to between the Host Operator and LSPS Operator.

15.  Disposal of flowline hydrostatic test water during initial instillation of the Satellite Well System and LSPS.

16. Chemical injection services for the Satellite Well System and LSPS, including the monitoring of injection rates, injection pressures and other typical injection parameters.

17. Utilities and electrical power for the Satellite Well System and LSPS from Host existing sources.

18. Real-time data and documentation relative to the performance of the services listed above:

    (a) that may be required for regulatory compliance reporting,
    (b) that is consistent with the documentation procedures utilized by the Host Operator, and
    (c) as mutually agreed by the Satellite Operators, the LSPS Operator, and Host Operator

19. If subsea isolation valves (SSIVs) are installed then at the discretion of the Host Operator (for the Satellite System) and LSPS Operator (for the Satellite Well System), integrity testing of the flowline SSIVs in accordance with the subsea production system procedures, and monitoring and control of the flowline SSIVs through the Host emergency shutdown system.

20. Upon mutual agreement by the Host Operator and the Satellite Operator(s) on acceptable Satellite Lease Production inlet parameters, the Producers shall be allowed to unload the Satellite Lease wells to the Host upon the conclusion of well completion operations or workovers on the Satellite wells. Such agreement by the Host Operator shall not be unreasonably withheld. After such agreement is reached, said well unloading services shall be performed by the Host Operator. The Satellite Operators shall be solely responsible for all actual incremental costs incurred by the Host Operator in providing the services described in this Section 20, including, but not limited to:

    (a) costs associated with additional and/or third-party equipment and/or personnel the Host Operator may elect to use or have on standby in connection with Satellite well unloading operations, and
    (b) the repair of any damage to, or the replacement of, equipment on the Host and all facilities located thereon, including but not limited to the Facility Access Modifications, Host Dedicated Facility, Host Common Facilities, the Oil Export Pipeline, and the Gas Export Pipeline, to the extent such damage or replacement results from the Satellite Leases unloading operations.

    Well unloading operations shall conclude when, in the sole judgment of the Host Operator, Production from the well being unloaded is suitable for introduction into the normal process flow for production handling on the Host.

21. The Satellite Operators shall retain responsibility for all Satellite Well System operations that are not performed from or on the Host including, but not limited to, downhole well operations.

**[Remainder of this page intentionally left blank]**

## FIRST AMENDMENT OF THE PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

### PREAMBLE

This **FIRST AMENDMENT OF THE PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT** ("**First Amendment**") effective as of December 1, 2011, ("**Effective Date**") is entered into by and between BP EXPLORATION & PRODUCTION INC. ("**BP**"), hereinafter referred to as the "**Owner**", in its capacity as a co-owner of the "**Host**" (as defined herein below), and BP; NOBLE ENERGY, INC. ("**Noble**"); RED WILLOW OFFSHORE, LLC ("**Red Willow**"); and HOUSTON ENERGY DEEPWATER VENTURES I, LLC ("**HEDV**"), hereinafter referred to collectively as "**Producers**", in their respective capacity as co-owners of each of the "**Satellite Leases**" (as defined herein below); and BP, Noble, Red Willow, and HEDV, hereinafter referred to collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**"(as defined herein below). Each signatory hereto is sometimes referred to singularly as a "**Party**" or collectively as the "**Parties**".

### RECITALS:

**WHEREAS**, BP and Noble are co-owners of the Isabela Lease; and

**WHEREAS**, BP, Noble, Red Willow and HEDV are co-owners of the MC-519 Unit Leases; and

**WHEREAS**, the LSPS Owners are co-owners of the "**Loop Subsea Production System**" or "**LSPS**"; and

**WHEREAS**, Noble, Red Willow, HEDV and BP, in their capacity as Producers, entered into that certain Production Handling and Operating Services Agreement ("**PHA**") dated effective September 21, 2010 with BP in its capacity as co-owner of the Host; and

**WHEREAS**, Noble, Red Willow, HEDV and BP, in their capacity as LSPS Owners, entered into that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("**LSPSOA**") dated effective December 1, 2011 with BP in its capacity as operator of the LSPS; and

**WHEREAS**, the Parties desire to amend the PHA pursuant to the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the premises, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1                           Execution Version

1. **MC 519 Unit Leases Depth.**

   (a)  **Section 2.2.74 "MC519 Unit Leases"** shall be deleted in its entirety and replaced with the following language:

   ""MC 519 Unit Leases" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519 and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico."

   (b)  **Section 15.16 Commitment of Oil and Gas Reserves** shall be deleted in its entirety and replaced with the following language:

   "Subject to Article X (*Term, Default, and Termination*) of this Agreement, for the life of the Satellite Leases, the Producers commit to:  (i) deliver all Satellite Production to the Host for production handling, except that the Producers reserve unto themselves, their successors and assigns, the right: (a) to use quantities of Satellite Production sufficient to satisfy Satellite Leases' development and operations including, but not limited to, additional recovery operations and the use of gas for fuel, flaring, pigging, drilling, deepening, reworking, or other such lease operations; and (b) to use quantities of Satellite Production sufficient to satisfy any royalty interest in Satellite Production that the royalty owner may elect to take in kind."

2. **LSPS Cost Charging Procedure.**

   **Section 5.1.4(b) Cost Charging Procedure** shall be deleted in its entirety and replaced with the following language:

   "(b)  LSPS Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the LSPS will be borne by the respective LSPS Owners but billed to the LSPS Operator.  The LSPS Operator will not reapply an overhead charge to LSPS Direct Expense for charges passed down to LSPS Owners, once overhead has been applied from the Host Operator."

3. **Accounting Procedures.**

   **Exhibit C Accounting Procedures, Article I General Provisions, Section 3. Advanced Payments by Non-Operators** shall be deleted in its entirety and replaced with the following language:

   "A.  Unless otherwise provided for in this Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay (except for expenditures for Facility Access Modifications) for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first Day of the month for which the advance is required, which ever is later. Operator shall adjust each monthly billing to reflect

Execution Version

advances received from the Non-Operators. Non-Operators are required to advance their proportionate share of the estimated costs of any Facility Access Modifications per Section 3.3.2 of this Agreement.

B.  Each Non-Operator shall pay its proportionate share of all bills within thirty (30) days of receipt date. If the payment due date for such bill falls on a weekend or on a statutory holiday, the payment will be due on the preceding business day. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Wall Street Journal on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser. In addition, the delinquent party shall bear attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the Wall Street Journal ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed."

4.    "BP Exploration & Production, Inc." shall be deleted in its entirety and replaced with "BP Exploration & Production Inc.".

5.    Except as set forth herein, all other terms and conditions of the PHA shall remain in full force and effect.

6.    This First Amendment may not be modified or amended except by written agreement executed by the Parties hereto.

7.    This First Amendment may be executed by signing the original or a counterpart thereof. If this First Amendment is executed in multiple counterparts, each counterpart will be deemed an original and all counterparts when taken together will constitute but one and the same Agreement with the same effect as if all of the Parties had signed the same instrument. This First Amendment may also be ratified by separate instrument referring to this First Amendment and adopting by reference all the provisions of this First Amendment. A ratification of this First Amendment will have the same effect as an execution of the original First Amendment.

8.    Capitalized terms used in this First Amendment not defined herein, shall have the same meaning given to them in the PHA.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

3                          Execution Version

**IN WITNESS WHEREOF,** this First Amendment is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.

**OWNER**

**BP EXPLORATION & PRODUCTION INC. (Owner)**

By: _____

Name: _Kemper Howe_

Title: _Attorney-in-Fact_

Date: _1/17/12_

**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION INC. (Isabela Producer and Operator)**

By: _____

Name: _Kemper Howe_

Title: _Attorney-in-Fact_

Date: _1/17/12_

**NOBLE ENERGY, INC. (Isabela Producer)**

By: _____

Name: _____

Title: _____

Date: _____

4                    Execution Version

**IN WITNESS WHEREOF,** this First Amendment is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.

**OWNER**

**BP EXPLORATION & PRODUCTION INC. (Owner)**

By: _____

Name: _____

Title: _____

Date: _____

**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION INC. (Isabela Producer and Operator)**

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC. (Isabela Producer)**

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _January 20, 2012_

4                    Execution Version

**MC 519 UNIT PRODUCERS**

<u>NOBLE ENERGY, INC.</u> (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

<u>BP EXPLORATION & PRODUCTION INC.</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

<u>RED WILLOW OFFSHORE, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

D te: _____

<u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _P. Davio Amend_

Title: _Vice President Land_

Date: ___1-18-12___

5                          Execution Version

**MC 519 UNIT PRODUCERS**

<u>NOBLE ENERGY, INC.</u> (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

<u>BP EXPLORATION & PRODUCTION INC.</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

<u>RED WILLOW OFFSHORE, LLC</u> (MC 519 Unit Producer)

By: _____

Name: Robert J. Voorhees

Title: President

Date: 1/20/12

<u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

5                     Execution Version

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC.** (MC 519 Unit Producer and Operator)

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _January 20, 2012_

**BP EXPLORATION & PRODUCTION INC.** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

5                    Execution Version

**MC 519 UNIT PRODUCERS**

<u>NOBLE ENERGY, INC.</u> (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____


<u>BP EXPLORATION & PRODUCTION INC.</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____


<u>RED WILLOW OFFSHORE, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____


<u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____


Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _~~Rdavid Amend~~_

Name: _P. DAVID Amend_

Title: _Vice President LAND_

Date: _1-18-12_

6                                        Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _Robert J. Voorhees____

Title: _President_____

Date: _1/20/12_____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

6                          Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _John T. Lewis_____

Name: _John T. Lewis_____

Title: _Vice President_____

Date: _January 20, 2012_____

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

6                    Execution Version

## SECOND AMENDMENT TO
## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

This Second Amendment to the Production Handling and Operating Services Agreement (this "**Agreement**") is made effective as of October 15, 2018 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**").  BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

### WITNESSETH

WHEREAS, reference is made to that certain Production Handling and Operating Services Agreement effective as of September 21, 2010, by and between BP, Noble Energy, Inc., Red Willow and HEDV, as amended by that certain First Amendment of the Production Handling and Operating Services Agreement effective as of December 1, 2011, by and between BP, Noble Energy, Inc., Red Willow and HEDV (the "**PHA**"); and

WHEREAS, the Parties desire to amend the definition of MC 519 UOA of the PHA to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, Section 1.2.3 of the PHA shall be deleted in its entirety and replaced with the following:

> Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (Services) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of (a) the MC 519 Unit Operating Agreement effective as of January 1, 2009 by and between BP, Noble, Red Willow and HEDV as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC as the owners of that portion of the MC 519 Unit Leases that does not cover the Operating Rights Interest in the SW4 and S2 NW4 from 0 – 14,000' TVDSS (the "**CPN Prospect**"), hereinafter referred to as (the "**MC 519 Agreement**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on such portions of the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on such portions of the MC 519 Unit Leases; and (iii) the decision-making process between the owners of such portions of the MC 519 Unit Leases related to this Agreement and (b) the provisions of the CPN Prospect Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV as the owners of the MC 519 Unit Leases to the extent covering the CPN Prospect ("**CPN Prospect JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the CPN Prospect; (ii) those portions of the Satellite Well System located on the CPN Prospect; and (iii) the decision-making process between the owners of the CPN Prospect related to this Agreement.  In this Agreement, the term "**MC 519 UOA**" shall refer to both the MC 519 Agreement and CPN Prospect JOA, as applicable.

2.  The Parties hereby ratify Fieldwood as the successor in interest to Noble Energy, Inc. and agree that all references in the PHA to "Noble Energy, Inc." or "Noble" or similar references shall refer to Fieldwood as of the date Fieldwood was assigned its interest in the PHA.  All other terms and provisions of the PHA shall remain in full force and effect.

3.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4.  This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _December 10, 2018_

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

[*Signature Page to the Second Amendment to the PHA*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name: John H. Smith
Title: Sr. V.P. Land + Business Development
Date: 12/6/18

**Red Willow Offshore, LLC**

By: _Richard L Smith_
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 12/4/2018

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

[*Signature Page to the Second Amendment to the PHA*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____


**Fieldwood Energy LLC**

By:_____
Name:_____ John H. Smith _____
Title: Sr. V.P. Land + Business Development
Date: 12/6/18


**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____


**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: P. David Amend
Title: Vice President, Land
Date: November 28, 2018


[*Signature Page to the Second Amendment to the PHA*]

*Execution Version*

## THIRD AMENDMENT TO
## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

This Third Amendment to the Production Handling and Operating Services Agreement (this "**Agreement**") is made effective as of May 1, 2019 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**").  BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

<u>WITNESSETH</u>

WHEREAS, reference is made to that certain Production Handling and Operating Services Agreement effective as of September 21, 2010, by and between BP, Noble Energy, Inc. (predecessor in interest of Fieldwood), Red Willow and HEDV, as amended by that certain (a) First Amendment of the Production Handling and Operating Services Agreement effective as of December 1, 2011, by and between BP, Noble Energy, Inc., Red Willow and HEDV and (b) Second Amendment of the Production Handling and Operating Services Agreement effective as of October 15, 2018, by and among BP, Fieldwood, Red Willow and HEDV (the "**PHA**"); and

WHEREAS, the Parties desire to amend the definition of MC 519 UOA of the PHA to reflect newly contemplated joint operating agreements, and to reflect a change in certain handling charges as more specifically set forth herein;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, Section 1.2.3 of the PHA shall be deleted in its entirety and replaced with the following:

    Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of (a) the MC 519 Unit Operating Agreement effective as of January 1, 2009 by and between BP, Noble, Red Willow and HEDV (as the same may be further amended from time to time) as the owners of that portion of the MC 519 Unit Leases that covers the Record Title Interest in all of Mississippi Canyon Block 519, the Operating Rights Interest in the SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from 0 – 19,300' TVDSS (the "**MC 519 Unit Area**"), hereinafter referred to as (the "**MC 519 Agreement**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the MC 519 Unit Area; (ii) those portions of the Satellite Well System located on the MC 519 Unit Area; and (iii) the decision-making process between the owners of the MC 519 Unit Area related to this Agreement; (b) the provisions of the CPN Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the same may be further amended from time to time) as the owners of the MC 519 Unit Leases to the extent covering the SW/4 and S/2 NW/4 of the Mississippi Canyon Block 519 from 0 – 14,000' TVDSS (the "**CPN Prospect**") (such agreement, the "**CPN Prospect JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the CPN Prospect; (ii) those portions of the Satellite Well System located on the CPN Prospect; and (iii) the decision-making process between the owners of the CPN Prospect related to this Agreement, (c) the Retained Operating Rights Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the

same may be further amended from time to time) as the owners of the MC 519 Unit Leases to the extent covering the Operating Rights Interest in (i) the N/2 NE/4, SW/4 NE/4, N/2 SE/4 NE/4 and N/2 NW/4 of Mississippi Canyon Block 519 and depths extending from the surface to 99,999' TVDSS, (ii) the S/2 NW/4 of Mississippi Canyon Block 519 and depths extending from 14,000' to 99,999' TVDSS, and (iii) the S/2 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 and depths extending from 19,300' to 99,999' TVDSS (the "**Retained Operating Rights Area**") (such agreement, the "**Retained Operating Rights JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the Retained Operating Rights Area; (ii) those portions of the Satellite Well System located on the Retained Operating Rights Area; and (iii) the decision-making process between the owners of the Retained Operating Rights Area related to this Agreement and (d) the SASC Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the same may be further amended from time to time) as owners of the MC 519 Unit Leases to the extent covering the Operating Rights Interest in the SW/4 of Mississippi Canyon Block 519 and from depths extending from 14,000 – 19,300' TVDSS (the "**SASC Area**") (such agreement, the "**SASC JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the SASC Area; (ii) those portions of the Satellite Well System located on the SASC Area; and (iii) the decision-making process between the owners of SASC Area related to this Agreement.  In this Agreement, the term "**MC 519 UOA**" shall refer to the MC 519 Agreement, the CPN Prospect JOA, the Retained Operating Rights JOA and the SASC JOA, as applicable.

2.   Notwithstanding anything contained to the contrary in the PHA, effective as of the Effective Date, with respect to the water that is produced from

   a.   that certain well operated by Fieldwood Energy LLC and bearing API Well Number 608174116201 known as the Santa Cruz well, and

   b.   that certain well operated by Fieldwood Energy LLC and bearing API Well Number 608174118401 known as the Santiago well,

the water handling fee set forth in Section 5.3.4(c) of the PHA for such water produced from the wells described in Sections 2(a) and 2(b) above shall be ▇▇▇ per Barrel of such water allocated to each Producer on a monthly basis and Section 5.3.4(d) of the PHA shall no longer apply to such water handling fees for the life of such wells.

3.   Notwithstanding anything contained to the contrary in the PHA, effective as of the Effective Date, with respect to the first well that is successfully completed within the  SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from depths extending from the surface to 19,300' from the surface TVDSS, the fee for the Oil, Gas and water that is produced from such well shall be as follows: (a) the Oil handling fee set forth in Section 5.3.4(a) of the PHA for such Oil shall be ▇▇▇ per Barrel of such Oil Production allocated to each Producer on a monthly basis, (b) the Gas handling fee set forth in Section 5.3.4(b) of the PHA for such Gas shall be ▇▇▇ per MSCF of such Gas Production allocated to each Producer on a monthly basis, (c) the water handling fee set forth in Section 5.3.4(c) of the PHA for such water produced shall be ▇▇▇ per Barrel of such water allocated to each Producer on a monthly basis, and (d) Section 5.3.4(d) of the PHA shall no longer apply to such Oil, Gas and water handling fees for such well.

4.   All other terms and provisions of the PHA shall remain in full force and effect.

5.   This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

6.   This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _5/16/2019_

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:\_\_John H. Smith\_\_
Title:\_\_Sr. Vice President\_\_
Date:\_\_16 May 2019\_\_

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By: _____
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 5/16/2019

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By: *[signature]*
Name: P. David Amend
Title: Vice President, Land
Date: 5/16/2019

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*