## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| FIELDWOOD ENERGY LLC., *et al.*, | Case No. 20-33948 (MI) |
| Debtors.[1] | Jointly Administered |
| | **Related Dkt. Nos.: 723 & 724** |

### OBJECTION BY LEXON INSURANCE COMPANY, IRONSHORE INDEMNITY INC. AND IRONSHORE SPECIALTY INSURANCE COMPANY TO THE MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF DISCLOSURE STATEMENT HEARING; (II) ESTABLISHING SOLICITATION AND VOTING PROCEDURES; (III) SCHEDULING CONFIRMATION HEARING; (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED PLAN; (V) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (VI) APPROVING PROCEDURES FOR OBJECTIONS TO THE ASSIGNMENT AND TRANSFER OF PROPERTY OF THE ESTATE; (VII) APPROVING BID SUBMISSION DEADLINE AND PROCEDURES FOR SUBMISSION OF HIGHER OR BETTER BIDS; AND (VIII) GRANTING RELATED RELIEF

Lexon Insurance Company, Ironshore Indemnity Inc. and Ironshore Specialty Insurance Company (collectively, "Lexon"), by and through their undersigned counsel, Harris Beach PLLC, hereby submit this objection (the "Objection") to the *Motion of Debtors for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

*Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; (VII) Approving Bid Submission Deadline and Procedures for Submission of Higher or Better Bids; and (VIII) Granting Related Relief* (the "Disclosure Statement Motion") [Dkt. No. 724].   In support of its Objection, Lexon shows to the Court as follows:

## BACKGROUND

1.      On August 3, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under Chapter 11 of the Bankruptcy Code[2].

2.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Debtors' cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b).

4.      On August 18, 2020, the U.S. Trustee appointed the Creditor's Committee pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 cases.

5.      The Debtors, together with the non-debtor affiliates (collectively, the "Company"), are an independent exploration and production ("E&P") company in the Gulf of Mexico.  The Company is focused on the exploration and development of offshore oil and gas assets in the shallow water and deep water around the Gulf of Mexico and the Gulf Coast region of the U.S.  Additional information regarding the Debtors' business and the circumstances leading to the commencement of these Chapter 11 cases is set forth in the Dane Declaration.

---

[2] Capitalized terms not defined herein are defined in the Disclosure Statement.

6.     The Debtors are required in the ordinary course of business to provide surety bonds to certain third parties to secure the Debtors' performance of certain obligations (the "Surety Bond Program"). The Surety Bond Program covers obligations in connection with two general categories of third parties: (a) federal and state governmental units and other public agencies; and (b) contract counterparties for whom the Debtors agreed to perform various plugging, abandonment, and decommissioning obligations in connection with offshore properties. *See* Surety Bond Motion[3] at ¶ 28. The obligations secured by the Surety Bond Program are, among other things, (a) oil and natural gas drilling and exploration operations; (b) plugging and abandonment obligations; (c) conservation; (d) rights-of-way; (e) land use; (f) taxes; and (g) utilities (collectively, the "Obligations"). *Id.*

7.     Debtors acknowledge that statutes or ordinances require the Debtors to post surety bonds to secure payment and enforcement of various Obligations to obligees, and that the failure to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations. *See Id.* at ¶ 29.

8.     As stated in the Debtors' Surety Bond Motion, the Debtors are required by the federal government and states adjacent to the Gulf of Mexico to maintain the Surety Bond Program. *Id.* at ¶ 34. "Failure to maintain the Surety Bond Program in these jurisdictions could cause the revocation of approval for the Debtors' operations in the Gulf of Mexico, increased claims by certain governmental agencies against the Debtors, and make it needlessly onerous for the Debtors to continue their offshore oil and gas business." *Id.*

---

[3] *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and the Surety Bond Program, and (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (the "Surety Bond Motion") [Dkt. No. 4].

9. The surety relationship involves three parties: (1) the Principal who is the primary obligor – the Debtors; (2) the Obligee, the party to whom the Principal and the Surety owe the duty – the regulatory authority; and (3) the Surety who is the secondary obligor – Lexon.

10. Notably, the Debtors retain the primary duty to perform their obligations; the obligations may not simply be handed over to the surety to perform.

11. Lexon has issued approximately 36 surety bonds (the "Lexon Bonds") to the Debtors to secure payment or performance of the Obligations to governmental and non-governmental obligees in the total penal sum of approximately $90,327,000. The Lexon Bonds generally cover various oil and gas leases in Texas and Louisiana.

12. Additionally, as partial consideration for the execution of the Lexon Bonds, Debtors and their affiliates, including, without limitation, all wholly or partially owned subsidiaries, divisions or affiliates, and all partnerships, ventures or co-ventures (collectively, the "Indemnitors") executed a "Payment and Indemnity Agreement No. 1055", as supplemented, (the "Indemnity Agreement") in which the Indemnitors, among other things, agreed to indemnify and hold Lexon harmless from every claim that Lexon may pay as a result of the Lexon Bonds. A copy of the Indemnity Agreement is attached hereto as **Exhibit "A"**.

13. The Debtors, through the Surety Bond Motion, recognize that maintaining the Surety Bond Program is necessary and vital to the Debtors and their bankruptcy estates, and is required by state and federal law. *See* Surety Bond Motion at ¶¶ 34-43.

14. On September 14, 2020, this Court entered the *Final Order (I) Authorizing Debtors to (A) Continue Insurance Programs, and Surety Bond Program, and (B) Pay Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* [Dkt. No. 340].

15.     On January 1, 2021, the Debtors filed the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "Disclosure Statement") [Dkt. No. 723].  Also on January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "Plan") [Dkt. No. 722].

16.     Pursuant to the Disclosure Statement, the Debtors are proposing that certain of their assets will either be sold, vest to new companies, or abandoned.  *See* Disclosure Statement at p. 2-3. There are essentially four (4) buckets in which the Debtors are allocating their assets, including their interests in oil and gas leases.

17.     The first bucket involves the Debtors sale of the Purchased Oil & Gas Lease Interests to the Credit Bid Purchaser.  *Id.*  A schedule of the oil and gas leases constituting the Purchased Oil & Gas Lease Interests is attached to the Disclosure Statement as Exhibit C.  *Id.*

18.     After the consummation of the Credit Bid Transaction, a merger will be implemented in which FWE will be divided into FWE I and FWE III.  *Id.*  The second bucket contains the Legacy Apache Properties and related liability and obligations, which will vest to FWE I.  *Id.*  FWE I will own, operate, allegeldy plug and abandon, and decommission the Legacy Apache Properties.  *Id.* A schedule of the oil and gas leases related to the Legacy Apache Properties is attached to the Disclosure Statement as Exhibit D.  *Id.*

19.     The third bucket contains FWE's assets (other than the Purchased Oil & Gas Lease Interests, Legacy Apache Properties and Abandoned Properties), which will vest with FWE III.  *Id.* FWE III will own, operate, allegedly plug and abandon, and decommission the FWE III Properties, and related assets and liabilities.  A schedule of the oil and gas leases related to the FWE III Properties is attached to the Disclosure Statement as Exhibit E.

20.     Lastly, the fourth and most troublesome bucket contains the Abandoned Properties, which will go to the Predecessors.  A schedule of the oil and gas leases related to the Abandoned Properties is attached to the Disclosure Statement as Exhibit F.

21.     Based on a comparison of the Lexon Bonds with the schedules of oil and gas leases attached as Exhibit C-F in the Disclosure Statement, it appears the Abandoned Properties include assets related to oil and gas leases that 19 of the Lexon Bonds, in whole or in part, cover.

## ARGUMENT

### POINT I

### THE DISCLOSURE STATEMENT CANNOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION REQUIRED BY 11 U.S.C. § 1125

22.     The objective of the Disclosure Statement and Plan is a restructuring of the Debtors' assets by way of assets being either sold, vesting to new companies, or abandoned. However, the Disclosure Statement lacks the necessary information that is required in order for it to be approved; accordingly, Lexon opposes the approval of the Disclosure Statement.

The Bankruptcy Code provides that adequate information is:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing addition information.

11 U.S.C. § 1125(a)(1).

23.     "The determination of whether the disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court.  *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 696 (4th Cir. 1989); *see Matter of Texas Extrusion Corp.*,

844 F.2d 1142, 1157 (5th Cir. 1988).  For the reasons set forth below, the Disclosure Statement lacks

adequate information.

24.    As will be explained more fully in subsequent paragraphs below, the deficiencies in the

Disclosure Statement are as follows:

a) The Disclosure Statement does not disclose how the Lexon Bonds that are listed in the "to be transferred" permit schedules in Exhibits C, D & E will be replaced, and how Lexon's rights are protected during the transfer process.

b) The Disclosure Statement does not disclose how Debtors expect to utilize the penal sum of the Lexon Bonds without Lexon's consent and without any indemnification for Lexon.

c) The Disclosure Statement does not disclose how certain Lexon Bonds can be bifurcated and be listed on a "to be transferred" permit schedule of Exhibits D or E, while also be listed in the "to be abandoned" permit schedule of Exhibit F.

d) The Disclosure Statement does not disclose what decommissioning and plugging & abandonment liability (collectively, "P&A") exists on a lease-by-lease basis.

e) The Disclosure Statement does not disclose if the Debtors plan to conduct any P&A activity utilizing the asset base, which would exist at confirmation of the Plan.

f) The Disclosure Statement does not disclose whether any of the leases listed in Exhibits C, D & E have already expired and therefore not eligible to be transferred.

**A.        Treatment of the Lexon Bonds**

25.    As referenced above, the Disclosure Statement sets forth the proposed restructuring of the

Debtors' assets, including their interests in the oil and gas leases, into four (4) buckets for which certain

assets will be sold, vest in new companies, or be abandoned.  However, the Disclosure Statement does

not disclose how the Lexon Bonds are to be treated in the restructuring transactions; rather, the

Disclosure Statement appears to rely on a false assertion that the Lexon Bonds can simply be assumed

and assigned to the Credit Bid Purchaser, FWE I and FWE III.  Additionally, the Disclosure Statement

states nothing relating to the treatment of the Lexon Bonds, which cover the Abandoned Properties.

26.     Since the Lexon Bonds are specific to the individual Debtor named as principal on each bond and are financial accommodations, they cannot simply be transferred to other entities – which appears to be what the Debtors are contemplating under the Disclosure Statement and Plan.

27.     Although the Bankruptcy Code does not define "financial accommodation," courts have held that the obligation to pay money on the obligation of another, such as the Lexon Bonds here, is a financial accommodation. *See, e.g., In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977, 987 (Bankr. N.D. Ga. 1980).

28.     Section 365(c)(2) and Section 365(e)(2)(B) of the Bankruptcy Code prohibit the assumption of financial accommodations by a debtor in bankruptcy.  Numerous courts have held that surety bonds are financial accommodations. *See In re Thomas B. Hamilton Corp.*, 969 F.2d 1013, 1019 (11th Cir. 1992); *In re Wegner Farms*, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985) (in relation to surety bonds as financial accommodations only); *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Falcon V, L.L.C.*, 620 B.R. 256, 265 (Bankr. M.D. La. 2020).

29.     As a result, Lexon's Bonds cannot simply be transferred. A transfer to any entity, including the Credit Bid Purchaser, FWE I and FWE III, does not create any rights to acquire or assume any of Lexon's Bonds.

30.     Lastly, the Disclosure Statement and Plan fail to discuss the requirement that the Credit Bid Purchaser, FWE I and FWE III must demonstrate an ability to obtain government licensing or regulatory approval, as well as an ability to replace the Lexon Bonds. In order for the restructuring to be successful, it is imperative that the Credit Bid Purchaser, FWE I and FWE III, demonstrate an ability to obtain the necessary bonds associated with the Debtors' assets, or provide sufficient proof that the bonds, specifically the Lexon Bonds, can be replaced.

31.     A Surety Bond is issued to a specific principal (in this case certain Debtors) in accordance with extensive underwriting procedures performed by Lexon.  Lexon must ascertain, among other things, whether a principal has sufficient assets to pay the premiums on the surety bonds, and whether the principal has obtained the appropriate governmental approvals and permits before it will agree to issue the surety bond.  Simply allowing the transfer of the Lexon Bonds to a new entity without Lexon being able to complete the same underwriting and due diligence procedures is not permissible. The improper substitution of principal, including the proposed transferees, without Lexon's consent would also give rise to a surety defense that could prevent the governmental obligees from any recovery on the bonds.

### B.     No Environmental Protections

32.     While the Disclosure Statement states that FWE I and FWE III will be performing the P&A obligations associated with the respective assets they are acquiring, it is not clear whether the Credit Bid Purchaser has agreed to perform the same obligations, or how FWE I and FWE III will actually perform the P&A obligations.  Additionally, there is no information in the Disclosure Statement explaining how the Obligations related to the Abandoned Properties will be fulfilled.  As a result, the Debtors could be left without the capabilities to perform their regulatory and environmental Obligations, including the P&A obligations, in violation of the mandate of *Midlantic National Bank vs. New Jersey Department of Environmental Protection,* 474 U.S. 494 (1986)("*Midlantic*"), which prohibits debtors from using the bankruptcy process to avoid such Obligations.  In addition, the abandonment of the Abandoned Properties could violate the Supreme Court mandate in *Ohio v. Kovacs,* which held that a trustee in bankruptcy has an obligation to comply with environmental laws.  469 U.S. 274, 285 (1985).

33.     Section 554 of the Bankruptcy Code allows a trustee to abandon property "that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. §

554(a).  In *Midlantic,* a trustee in a converted Chapter 7 case sought to use § 554 to abandon properties

containing contaminated oil in violation of New York and New Jersey environmental laws.  *Id.* at 496-

99.  The debtor had stored over 70,000 gallons of contaminated oil in deteriorating and leaking

containers. After unsuccessfully trying to sell the property upon which the containers were located, the

Chapter 7 trustee notified the bankruptcy court and creditors that he intended to abandon the property

under 11 U.S.C. § 554(a).  The Supreme Court refused to allow the trustee to abandon the property,

holding that although Congress did not include an explicit exception to a trustee's abandonment power

in § 554, it nonetheless intended to codify pre-Code laws which establish that a trustee cannot "exercise

his abandonment power in violation of certain state and federal laws." 474 U.S. at 501.  The Court

reasoned that Congress did not intend the Bankruptcy Code to displace all other applicable law because

it also enacted 28 U.S.C. § 959(b), which requires debtors to manage their property in accordance with

all state laws.[4]  *Id.* at 502.  Because a debtor cannot manage its property in violation of state laws, the

Court held "a trustee may not abandon property in contravention of a state statute or regulation that is

reasonably designed to protect the public health or safety from identified hazards."  474 U.S. at 507.

While the Supreme Court characterized its holding as a "narrow one," only applying if abandonment

violates a law "reasonably calculated to protect the public health or safety from eminent and identifiable

harm," it nevertheless held that a bankruptcy court does not have the power to authorize abandonment

"without formulating conditions that will adequately protect the public's health and safety." *Id.* at 516.

34.      In reaching this conclusion, the Supreme Court cited its own decision from the preceding

term, *Kovaks,* wherein it had held that a trustee must comply with environmental laws and "may not

maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions."

*See Midlantic,* 474 U.S. at 502.  Clearly, abandoning the Abandoned Assets, which undoubtedly are

---

[4] Section 959(b) provides that "[A] trustee ... including a debtor in possession, shall manage and operate the property in his possession ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor interest in possession thereof."

related to the Debtor's oil and gas exploration, drilling and production activities, would place the Debtors in violation of environmental laws and their P&A obligations.

35.     In *Midlantic*, the court held that where public health or safety is threatened with imminent and identifiable harm, abandonment of the contaminated property must be conditioned on the performance of procedures that will adequately protect public health and safety. *Midlantic* 474 U.S. at 507.

36.     In adopting the holding of *Midlantic*, the Fifth Circuit Court of Appeals held that a trustee was prevented from abandoning unproductive oil and gas wells that have not yet been plugged. *In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998). In particular, the Fifth Circuit held in *HLS Energy* that a trustee cannot abandon its interests in unproductive oil and gas wells and thereby eliminate plugging obligations associated with those wells because such abandonment would "contraven[e] ... a state law reasonably designed to protect public health or safety." *Id.* at 438.   In language equally applicable to the present case, the Fifth Circuit recognized that while "[a]nyone possessing the sole operating interest in an unproductive well surely would be happy to abandon that interest, and the concomitant obligation to plug that well[,] ... he cannot [do so], for [non-bankruptcy] law requires well operators to plug their wells...." *Id.* at 439.   The Fifth Circuit held that the estate had an "inescapable obligation" to plug the unproductive wells under Texas law and *Midlantic*. *Id.* at 438.   The Fifth Circuit also found that, because the unproductive oil and gas wells could not be abandoned under *Midlantic*, the costs associated with plugging them were "necessary" costs of preserving the Debtor's estate that would qualify for administrative expense priority under 11 U.S.C. § 503(b)(1)(a). *Id.* at 438-39.

37.     Similarly, this Court held that a trustee may not abandon unproductive, unplugged oil and gas wells if abandonment would violate laws designed to protect the public health or safety from eminent and identifiable harm. *In re Am. Coastal Energy Inc.*, 399 B.R. 805, 812 (Bankr. S.D. Tex.

2009).  Although the wells addressed in *American Coastal* were not "currently leaking or causing other environmental problems", *Id.* at 808 n.1, the Bankruptcy Court found that it need not determine whether there was in fact an eminent or identifiable harm because *Midlantic* only required a determination as to whether abandonment would violate a "statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 810 (quoting *Midlantic*, 474 U.S. at 507). Consistent with such holding, this Court declined to "replace the legislature's judgment with its own judgment as to what conduct constitutes a sufficient threat to the public," and required the Debtor to plug the wells to prevent violations of laws "designed to protect the public from an identified hazard." *Id.* at 813. *See also In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *8 (S.D. Tex. March 18, 2014) ("ATP, as operator of the *Innovator*, had a *Midlantic* duty to make the Innovator Platform safe for abandonment under state law.").

38.     In this case, there is no information in the Disclosure Statement as to whether the abandonment of the Abandoned Properties would trigger possible regulatory and environmental Obligations for which the Debtors cannot simply abandon.  Additionally, assuming the abandonment of the Abandoned Properties would trigger regulatory and environmental Obligations, the Disclosure Statement fails to provide any information explaining how those Obligations would be satisfied.  Lastly, the Disclosure Statement fails to provide information as to how FWE I and FWE III will perform their P&A obligations.

C.     **Splitting of the Lexon Bonds**

39.     A review of the restructuring transactions, and specifically Exhibits C-F in the Disclosure Statements, reveals that the Debtors are trying to split certain Lexon Bonds between two buckets.  For example, certain assets related to oil and gas lease G1030 are vesting in FWE I, while others are included in the Abandoned Properties.  Upon information and belief, Lexon Bond 1136900 only covers

oil and gas lease G1030, yet the Debtors' proposed treatment of the assets related to said oil and gas lease is to transfer 6% of the lease to Schedule D and 94% to schedule F, thereby improperly splitting the single Lexon Bond amongst two buckets. In total there are seven (7) of the Lexon Bonds which the Debtors are proposing to split, with: (a) six (6) vesting to FWE I and the Abandoned Properties, and (b) one (1) vesting to FEW III and the Abandoned Properties. In addition to Bond 1136900 referenced above there are:

a)   Bond 1136904/Lease G23735 to be split 25% to schedule D and 75% to schedule F

b)   Bond 1136918/Lease G25275 to be split 25% to schedule D and 75% to schedule F

c)   Bond 1136891/Lease G1757 to be split 12.5% to schedule D and 87.5% to schedule F

d)   Bond 1136896/Lease G30282 to be split 70% schedule D and 30% to schedule F

e)   Bond 1136897/Lease G15740 to be split 50% to schedule D and 50% to schedule F

f)   Bond 1126945/(Private Perform) to be split somehow between schedule E and schedule F.

40.   In the first instance, the Lexon Bonds cannot be split amongst various assets. Each Lexon Bond covers the entirety of the corresponding lease. Each Lexon Bond proposed to be split is issued to Fieldwood Energy Offshore, LLC as principal and covers 100% of the Obligations arising under that lease. There is simply no ability to split the Lexon Bonds or the lease. If part of the lease is to be transferred then the entire Lexon Bond must be replaced. For the reasons set forth above in Point I (A), the Lexon Bonds cannot be assigned or assumed, and certainly a portion of a Lexon Bond cannot be unilaterally transferred to a new entity, while the remaining portion is abandoned. Lexon could, solely at the discretion of Lexon and after meeting underwriting and financial standards, issue new Bonds to the new entity; otherwise the Lexon Bonds must be replaced, and Lexon be provided with a release.

41.     The Disclosure Statement lacks any information concerning the attempted splitting of the Lexon Bonds amongst the various restructuring transactions and provides no legal basis to support this endeavor.

**D.     Debtors possess the funds necessary to provide for the Obligations and should not be able to abandon or allow their Plan to jettison its Obligations to Lexon**

42.     As referenced above, the Debtors, as principal, retain the primary Obligations under the Lexon Bonds and those Obligations cannot simply be passed to Lexon to fulfil.   In this case, the Disclosure Statement reveals that the Debtors have, or will have, approximately $650 million in unencumbered funds. *See* Disclosure Statement at pp. 1-10

43.     It cannot be the case that Debtors can evade established law regarding abandonment of hazardous property simply because it asserts that someone else can step into the Debtors' shoes to handle environmental issues and prevent an emergency situation. The test for abandonment focuses on the debtor's actions and the impact of its abandonment of owned property, rather than the potential that some third party may step in to clean up the debtor's environmental mess.   *See generally Midlantic*, 474 U.S. 494.

44.     Further, the surety bonds are not property of the Estate.   *See In re Lockard*, 884 F.2d 1171, 1177 (9th Cir. 1989) (a contractor does not have a property interest in surety bond issued by third-party to guarantee its performance)(citing cases); *In re Petroleum Piping Contractors*, 211 BR 290, 311-12 (Bankr. N.D. Ind. 1997) (a payment bond given by a surety for the bankruptcy debtor to a project owner is not property of the estate); *In re McLean Trucking Co.*, 74 B.R. 820, 827 (Bankr. W.D. N.C. 1987) (surety bond for workers' compensation claims not asset of the estate). *But see In re War Eagle Construction Co.*, 283 B.R. 193, 196 (S.D. W.Va. 2002) (noting that bankruptcy court held: "Upon review of the various cash deposits and instruments constituting the Bond, the Court determines that the Bond is an asset of the bankruptcy estate …," but holding that letter of credit part of the performance

14

bond was not an asset of the estate). The Lexon Bonds therefore cannot be part of the Debtors' "plan" to satisfy their Obligations, nor can they be the basis to approve the abandonment of the Abandoned Assets.

45.     Further, a surety bond is not insurance, it is a credit agreement. *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 139 n.19 (1962) ("suretyship is not insurance"); *Buck Run Baptist Church v. Cumberland Surety Insurance Co., Inc.*, 983 S.W. 2d 501, 504 (Ky. 1998) ("a contract of suretyship is not a contract of insurance."). The surety relationship involves three separate parties, including the principal, who is the primary obligor, the obligee, the party to whom the principal and surety owe a duty, and the surety, the secondary obligor. *Gallagher*, The Law of Surety § 1 (American Bar Association, Tort and Insurance Practice Section, 1993). The Kentucky Supreme Court distinguished insurance policies and surety bonds as follows: with an insurance policy, "[t]he insurer undertakes the obligation based on an evaluation of the market's wide risks and losses. An insurer expects losses, and they are actually predicted… [i]n contrast, a surety bond is written based on an evaluation of a particular contractor and the capacity to perform a given contract. Compensation for the issuance of a surety bond is based on fact-specific evaluation of the risks involved in each individual case. No losses are expected." *Buck Run Baptist Church*, 983 S.W. 2d at 504-505. Far different from insurance, a surety bond is more like a credit transaction, and "surety bonds, issued by compensated sureties are meant to function as credit accommodations which the surety anticipates no loss." Armen Shahinian*, The General Agreement of Indemnity,* in THE LAW OF SURETYSHIP 487 (Edward G. Gallagher ed. 2d ed. 2000). Under the principals of surety law, the principal is an indemnitor to the surety. *See Safeco Ins. Co. of America v. Mountaineer Grading Co.*, Civil Action No. 2:10–cv–01301, 2012 WL 830158, at * 9 (S.D.W.Va. Mar. 09, 2012) ("Generally, the common law provides that a surety is entitled to indemnification from the principal for amounts paid pursuant to a bond. … However, a surety may rely

on this implicit indemnification obligation only when there is no express indemnification contract.")(citing *Perkins v. Hall*, 123 W. Va. 707, 17 S.E.2d 795, 801 (W.Va.1941); Richard A. Lord, *Williston on Contracts* § 61:59 (4th ed. 2011); *Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983); 18 Michie's Jurisprudence of Virginia and West Virginia, Suretyship § 30 (1996)).

46.     As a result, the Debtors cannot simply choose to abandon the Abandoned Properties upon the theory that Lexon will pay for any Obligations upon abandonment, especially given the Debtors have disclosed the enormous amount of encumbered funds at their disposal. The Debtors are required to use the unencumbered funds to satisfy their Obligations under the Lexon Bonds.

**E.     Lexon is entitled to an Administrative Expense Claim for the payment of any Obligations arising out of the Abandoned Properties under the Lexon Bonds**

47.     Pursuant to 30 C.F.R. § 250.1701(a) and (b), applicable to offshore oil and gas leases, lessees, operating rights owners and right-of-way owners have continuing decommissioning obligations:

> (a) Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met.
>
> (b) All holders of a right-of-way are jointly and severally liable for meeting decommissioning obligations for facilities on their right-of-way, including right-of-way pipelines, as the obligations accrue and until each obligation is met.

30 C.F.R. § 250.1701(a) and (b).

48.     Pursuant to 30 C.F.R. § 250.1703, when facilities are no longer useful for operations, they must be decommissioned. Decommissioning includes permanently plugging wells, removing platforms and other facilities decommissioning pipelines, and clearing the seafloor of obstructions. *Id.* Additionally, 30 C.F.R. § 250.1710 requires that wells on a lease must be permanently plugged within one (1) year after the lease terminated.

49.     If the foregoing decommissioning requirements are not followed, the Bureau of Safety and Environmental Enforcement ("BSEE") may issue and serve a notice of noncompliance identifying the obligations.  30 C.F.R. § 250.1451.  If the violations are not timely corrected, BSEE may levy penalties of as much as $5,000 per violation per day beginning with the date of the notice of noncompliance. 30 C.F.R. § 250.1453.  Accordingly, to the extent the Abandoned Properties include oil and gas leases that would be subject to P&A obligations, the Debtors are exposed to potential post-petition fines and penalties of tens of thousands of dollars per day if the Obligations, which Lexon could potentially be compelled to perform for the Debtor, are not performed.

50.     11 U.S.C. § 503(b)(1) provides, in pertinent part, that:

> [T]here shall be allowed administrative expenses...including –
> (1)(A) the actual, necessary costs and expenses of preserving the estate.

51.     As this Court and others have previously recognized, "a bankruptcy petition is not a grant of immunity," and debtors-in-possession are required to comply with state and federal laws. *See, e.g.*, *In re American Coastal*, 399 B.R. at 805. The Obligations take on particular importance because "idle infrastructure poses a potential threat to the OCS environment and 'the presence of idle platforms may harm navigation safety." *See Cutting Underwater Technologies, USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 520 (5th Cir. 2012) (citations omitted). Logically, the post-petition costs and expenses of compliance with state and federal laws are administrative in nature, and this conclusion is supported by the case law.

52.     The Fifth Circuit has previously addressed the precise issue whether § 503(b)(1)(A) applies to P&A obligations, such as the Obligations arising under the Lexon Bonds, as an administrative expense. *E.g, In the Matter of H.L.S. Energy Co, Inc.*, 151 F.3d at 437 ("The question is whether *Reading* and § 503(b)(1)(A) apply here to characterize the state's claims as administrative expenses,

imbued with priority status"). The Fifth Circuit answered that question in the affirmative, holding that P&A obligations are afforded administrative priority.

53.     In *H.L.S.*, the debtor had interests in several oil and gas wells, many of which were unproductive and inactive. Texas law required that wells that had been inactive for one year be plugged. Although the subject oil and gas wells had been operated by the debtor before commencement of the bankruptcy case, the one year period did not conclude until after commencement of the case. After selling off its valuable assets and the estate retained only the unproductive wells, the case was converted to a chapter 7. The State of Texas asserted an administrative claim for the P&A work expenses, and the Trustee objected, contending that the P&A work did not "benefit" the estate as required by § 503(b)(1)(A). The Fifth Circuit rejected the Trustee's narrow interpretation of the "benefit" requirement, holding instead that the fulfillment of the estate's regulatory obligations:

> "Can only be seen as a benefit to the estate...The unplugged unproductive wells operated as a legal liability on the estate, a liability capable of generating losses in the nature of substantial fines every day the wells remained unplugged."

*H.L.S.*, 151 F.3d at 438. Accordingly, expenses incurred to bring a debtor in compliance with state law were actual and necessary costs of preserving the estate. *Id.*

54.     Like in *H.L.S.*, Debtors are "unquestionably obligated to plug the wells," i.e. perform the P&A obligations. *Id.* Further, as in *H.L.S.*, Debtors' estates will incur post-petition liabilities in the form of fines and penalties if the Obligations are not performed. Accordingly, as the Fifth Circuit recognized was the case in *H.L.S.*, it also the case here that the P&A obligations are an actual, necessary cost and expense of preserving the estate which would be afforded administrative priority under § 503(b)(1)(A).

55.     In *In re American Coastal Energy, Inc.*, this Court discussed *H.L.S.* and correctly concluded that the rationale underlying *H.L.S.* also applied where the environmental obligations arose

18

pre-petition. 399 B.R. 805, 809 (Bankr. S.D. Tex. 2009). In *American Coastal*, the debtor's obligation to perform P&A work arose pre-petition and the Texas Railroad Commission issued "plug and abandon" orders pre-petition. *Id.* at 807-8. The debtor proposed a plan that classified the P&A expenses as general unsecured claims, and the Commission objected on the basis that the expenses were entitled to administrative priority. *Id.* at 808. The Court identified the issue as "whether an environmental claim 'arises post-petition' even when its genesis is the debtor's pre-petition conduct." *Id.* at 809. Relying on the "substantial guidance" provided by precedent from the Supreme Court and other circuit courts, the Court concluded, "a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law is not contingent upon whether the obligation arose before or after the bankruptcy filing." *Id.* at 811. The Court further noted that because the applicable regulations imposed a "continuing duty" to decommission the wells at issue, that continuing duty makes the obligation a post-petition obligation, albeit with pre-petition antecedents. *Id.* Thus, the Court concluded that the analysis of whether the obligations "arose" pre-petition or post-petition was a superficial one and focused its analysis instead on "whether the obligation continues to arise anew with the passage of each day." *Id.* Based on its analysis, the Court correctly concluded that "expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition." *Id.* at 816.

56.     Subsequently, in *ATP Oil & Gas Corp.*, 2014 WL 1047818 (Bankr. S.D. Tex. 2014), this Court analyzed a claim made by a non-governmental party who had accomplished "safe out" work necessitated by a BSEE order that debtor shut in offshore operations. The Court held that both the "safe out" work and maintenance and repair work qualified as administrative expenses. The debtor contended, as did the debtors in *American Coastal* and *H.L.S. Energy*, that the work did not benefit the estate. The Court held, however, that services do not have to relate solely to the continuation of the business as a

going concern to be costs of "preserving the estate," that services that aid in achieving an orderly liquidation or abandonment qualify. The Court also rejected the debtor's contention that because the platform at issue was owned by the debtor jointly with a non-debtor affiliate and the debtor and non-debtor co-owner were co-liable for environmental liabilities, the ability to satisfied the environmental obligations from the non-debtor's liability precludes an administrative expenses: "The fact that ATP IP also had a legal obligation to make the platform safe for abandonment does not affect ATP's obligations. ... [A] debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law does not change just because another entity has the same obligation." *Id.*, at *7.

57.     The obligation to operate an estate in accordance with laws requiring the plugging and abandonment of wells was also recently addressed, albeit outside of the bankruptcy context, by the Northern District of Texas. In *U.S. Securities and Exchange Commission v. Harris*, No. 3:09-CV-1809-B (N.D. Tex. 4/18/2016), a court appointed receiver had been ordered to marshal, conserve, hold and "where necessary" operate seized assets. Slip op. at 1. Rather than try to pass the obligation to plug and abandon non-productive oil wells to buyers of the estate's properties, the receiver used estate funds to have the wells plugged and abandoned before the properties were sold. In commenting on the propriety of the receiver's actions, which may have led to lowered net proceeds from the sale, the District Court, citing *H.L.S. Energy, supra*, held

> This means that federal receivers must comply with state law, and cannot abandon property if doing so would violate it. *In re H.L.S. Energy Co., Inc.*, 151 F.3d at 438.
>
> Here, New Mexico regulatory law clearly requires oil well operators to plug wells prior to abandoning them. N.M. Admin. Code § 19.15.25. Thus, the Receiver had to comply with New Mexico law and could not simply abandon the oil wells. Therefore, the Court concludes that discharging her duty to remedy environmental and regulatory violations did not result in a breach of her other duties to marshal and maintain assets for the Receivership Estate. Accordingly, the Receiver reasonably and diligently discharged her duties and is entitled to fair compensation.

20

Slip op. at 18.

58.     As in *H.L.S.*, *American Coastal*, *ATP* and *S.E.C. v. Harris*, the Debtors' are subject to regulations designed to protect the public health or safety from environmental hazards. These regulations impose on Debtor ongoing obligations, "arising anew with the passage of each day," to decommission its facilities. *American Coastal*, 399 B.R. at 811. Accordingly, the costs and expenses of compliance would be actual and necessary costs of preserving the estate, which would entitle Lexon to an administrative expense if it is required to perform the Obligations in lieu of the Debtors. As a result, since the Debtors likely have the funds necessary to pay for the Obligations itself, it should do so since any payment by Lexon to perform the Obligations would be entitled to administrative expense priority.

## POINT II

## THE PLAN IS PATENTLY UNCONFIRMABLE

**A.      The Debtors proposed abandonment of the Abandoned Properties is in violation of 28 U.S.C. § 959(b)**

59.     As referenced above, the Debtors' Disclosure Statement reveals they have, or will have, approximately $650 million in unencumbered funds. The Debtors should not be permitted to escape their Obligations under the Lexon Bonds, which cover the Abandoned Properties, when they possess the funds necessary to satisfy those Obligations.

60.     The Bankruptcy Code requires the Debtors to manage and operate property in their possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). Courts have held that "it is inescapable to avoid the conclusion that 28 U.S.C. § 959(b) requires a debtor to conform to applicable federal, state, and local law in conducting its business." *Norris Square Civic Ass'n v. Saint Mary Hosp.*, 86 B.R. 393, 398 (E.D. Pa. 1988). As noted above, the Supreme Court in *Midlantic* has recognized that this obligation extends to a debtor's

21

performance of its environmental obligations: "[w]here the Bankruptcy Code has conferred special powers upon the trustee and where there was no common-law limitation on that power, Congress has expressly provided that the efforts of the trustee to marshal and distribute the assets of the estate must yield to governmental interest in public health and safety." 474 U.S. at 502.

61.   In *American Coastal*, this Court recognized that the applicable provisions of the Texas Natural Resources Code are designed to protect the public health and safety. 399 B.R. at 813.   This Court quoted the legislature in finding:

> "that the protection of water and land of the state against pollution of the escape of oil or gas is in the public interest. In the exercise of the police power of the state, it is necessary and desirable to provide additional means so that wells that are drilled for the exploration, development, or production of oil or gas, or as injection of sale water disposal wells, and that have been abandoned and are leaking salt water, oil, gas or other deleterious substances into freshwater formations on the surface of the land, may be plugged, replugged, or repaired by or under the authority and direction of the commission."

*American Coastal*, 399 B.R. at 813 (citing Tex Nat. Res. Code Ann. § 89.001.

62.   Additionally, the laws of the State of Texas and Louisiana, which are the states where the overwhelming majority of the Lexon Bonds cover, have laws governing the P&A of oil wells to promote the public health and safety of its citizenry and environment.  *See e.g.* Tex. Nat. Res. Code § 89.011 ("the operator of a well shall properly plug the well when required and in accordance with the commission's rules that are in effect at the time of the plugging"); 16 Tex. Admin. Code § 3.9 (requiring "plugging operations on each dry or inactive well must be commenced within a period of one year after drilling or operations cease."); LA Rev. Stat. § 30:34 (providing "no person shall abandon a well…without first placing a properly made plug both above and below the gas-producing sand…" and setting forth penalties for failure to perform the plugging obligations); LA Rev. Stat. § 30:74 (regarding the commissioner's right to retain a lien in on the property to insure plugging and abandonment of the wells is complete, and providing penalties to owners or operators who do not comply with the relevant

provisions).   Furthermore, the federal regulations referenced above under 30 C.F.R. § 250 *et seq.*, provide that operators are required to perform decommissioning obligations and provide for penalties if they fail to perform the same.

63.    Because the Debtor "cannot abandon property or operate an estate in violation of an environmental law", the Debtors abandonment, or confirmation of a Plan that includes abandonment, prior to exhausting all the estates' funds, cannot be approved. *See American Coastal*, 399 B.R. at 810; *Cf. Oldco M Corp.*, 438 B.R. 775, 785 (Bankr. S.D.N.Y. 2010 ("A state might well have reasonable grounds to object if a sale resulted in an administrative claim for future environmental response costs against a debtor that still owned the property becoming a general unsecured claim (or no claim at all) against the debtor, and a possibly uncollectible claim against a financially weak or unwilling buyer").

64.    The Supreme Court left open the possibility that environmental liabilities could be "so significant in relation to the Debtor's ability to pay that characterizing all or a portion of an environmental claim as an administrative expense may unduly 'interfere with the bankruptcy court adjudication itself.'" *Midlantic*, 474 U.S. at 507.  Such circumstances may arise where "the estate lacks unencumbered assets with which to comply" with the state law at issue. *See, e.g., In re St. Lawrence Corp.*, 248 B.R. 734, 739 n.6 (D. N.J. 2000) *See also Smith-Douglass, Inc.*, 856 F.2d at 17 ("We affirm the finding that unconditional abandonment was appropriate in light of the estate's lack of unencumbered assets, coupled with the absence of serious public health and safety risks posed by the conditions in this case…."). Even if the Debtors lack unencumbered assets that may be used to comply with their reclamation obligations, *Midlantic* nonetheless requires that the secured creditor's "position regarding its priority over the estate assets… yield in light of the competing environmental harms." *In re Environmental Waste Control, Inc.*, 125 B.R. at 546, 552 (N.D. Ind. 1991.  As the Fourth Circuit has explained, *Midlantic* applies in all instances; however, it is merely applied more strictly if the estate has

unencumbered assets. *See Smith-Douglas, Inc.*, 856 F.2d at 17 ("accordingly, where the estate has unencumbered assets, the bankruptcy court should require stricter compliance with state environmental law before abandonment is permitted"); *see also In re Environmental Waste Control, Inc.*, 125 B.R. at 552 ("the applicable legal authority suggests that [the Debtor] must comply with environmental law and pursue cleanup and corrective action at the landfill, regardless of its financial insolvency… [and despite] the futility of corrective action."). As the Sixth Circuit held in *In re Wall Tube & Metal Products Co.*, 831 F. 2d 118, 123 (6th Cir. 1987), "the protection of innocent creditors would not be furthered by a contrary holding that permits creditors to benefit from their silence while the debtor violates the law." Accordingly, even under a more lenient *Midlantic* standard, the Debtors wholesale repudiation of all of their Obligations running to the Abandoned Properties through the Lexon Bonds should not be permitted.

65.     It would seem even more important to force conduct to fit appropriate legitimate state laws on chapter 11 debtors who continue to hold themselves out as operating entities.

66.     It is respectfully submitted that it is just as important to prevent continuing and worsening of environmental violations of state law as it is any other state law. Chapter 11 Debtors, such as the ones here who are reorganizing, should be held to state law standards like any other operating business.

**B.     The Releases in the Disclosure Statement and Plan are Overbroad**

67.     While issues related to releases and injunctions are usually presented as objections to confirmation of the Plan, the Disclosure Statement contains impermissible provisions regarding Settlement, Compromise and Release of Claims and Interests, which language is mirrored in Article X of the Plan. These releases and third-party releases are overbroad and cannot be approved.

68.     The "hallmarks of permissible non-consensual releases" include "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." However, "even if the

threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied," "the broader context of the *Continental* discussion" provides that such releases should be approved only "in the context of extraordinary cases" such as mass tort litigation cases. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001), *appeal dismissed*, 280 B.R. 339 (D. Del. 2002) (citing *In re Continental Airlines*, 203 F.3d 203, 214-17 (3d Cir. 2000)).

69.     The Released Parties, as defined in the Plan, include:

> (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) the Consenting Creditors, (e) the Prepetition Agents, (f) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (g) the Exit Facility Agents, (h) the Exit Facility Lenders, (i) the Backstop Parties, (j) the Apache PSA Parties, (k) with respect to each of the foregoing Persons in clauses (a) through (j), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*See* Plan, Article I(1.1).

70.     The Releasing Parties, as defined in the Plan include:

> (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein)

*See Id.*

25

71.     In addition, the Plan includes an impermissibly overbroad exculpation clause, and/or one not appropriate in this case.

72.     Section 524(e) of the Bankruptcy Code limits the effect of a debtor's discharge: "discharge of a debt of the debtor does not affect the liability of any entity on, or the property of any other entity for, such debt."

73.     The releases included in the Plan attempt to discharge the liabilities of other non-debtor entities in violation of Section 524(e).  As a result, the Plan does not comply with the requirements of 11 U.S.C. §1129(a)(2) and cannot be confirmed.

74.     The proposed releases in Article X of the Plan do not seem to differentiate between the liabilities of the Debtors resulting from the clear statutory provisions that obligate responsible parties to conduct P&A obligations, from the wide-sweeping releases being given to virtually anyone who has had anything to do with this case.  Additionally, the Disclosure Statement does not provide any explanations or discussion as to the grounds to support the overly broad releases of the Debtors or third parties. Creditors, including Lexon, should receive the necessary justification and explanation behind these releases.

75.     In addition, Articles 10.6 and 10.9 of the Plan provides for injunctions against actions as to third-parties that creditors do not appear to have an ability to challenge or opt-out of such relief being granted.

76.     By this Objection, Lexon is advising that, in the absence of an agreement with the Debtors, the Credit Purchaser, FWE I, FWE III or any other related or affiliated entities, it does not intend to release any Indemnitors or third-party, as they should not be afforded the benefit of a discharge injunction.

**C.** **The sheer size of the 11 USC 503 (b)(1)(A) expenses render the Plan patently unconfirmable**

77.     As set forth in Point 1 Section E above, the administrative priority nature of the P&A obligations will need to paid pursuant to 11 U.S.C. § 1129(a)(9) in order for the Plan to be confirmed.

78.     Unless a creditor entitled to an administrative expense claim has consented to different treatment, the creditor's administrative expense claim must be paid in full on the effective date of the plan.

79.     Lexon does not consent to any alternative treatment other than payment in full.

80.     According to the BSEE Data Center Website the ARO liabilities that would remain in each of the debtors designated asset buckets are:

a) Schedule C : +/-$1.6 Billion across 31 leases

b) Schedule D, FWE I +/- $4.5 Billion across 264 leases

c) Schedule E, FEW III +/- $54 Million across 14 leases

d) Schedule F, Abandonment +/- $1.3 Billion across 76 leases

81.     Leaving aside the +/-$6.154 Billion of ARO in the transferred claims schedules, the Debtors still face at least +/- $1.3 Billion of priority administrative expense claims from the proposed abandonment schedule. The existing Disclosure Statement and Plan do not provide for any such payments, nor do they indicate that any such sums of money exist to be utilized in this fashion.

82.     Without the ability to cover the 11 U.S.C. §503(b)(1)(A) expenses, the Plan is patently unconfirmable and the Disclosure Statement should be denied approval.

## JOINDER

83.     To the extent objections to the Disclosure Statement filed, or to be filed, by other sureties do not expressly conflict with the objections contained herein, Lexon hereby joins and incorporates by

reference all objections and arguments made by the other sureties in objecting to the Disclosure Statement.

## **RESERVATION OF RIGHTS**

84.     Nothing herein shall be considered a waiver of any rights or claims that Lexon might have against the Debtors, their subsidiaries and affiliates.  The submission of this Objection by Lexon is not intended as, and shall not be construed as:

    a.    Lexon's admission of any liability or waiver of any defenses or limitations of any rights of Lexon with respect to any claims against one or more of the Lexon Bonds or under the Indemnity Agreement;

    b.    Lexon's waiver or release of any rights to exoneration it may have against any one with respect to its obligations pursuant to the Lexon Bonds;

    c.    Lexon's waiver or release of its right to be subrogated to the rights of one or more parties paid pursuant to the Lexon Bonds;

    d.    An election of remedies; or

    e.    Consent to the determination of Debtors' liability to Lexon by a particular Court, including, without limitations, the Bankruptcy Court.

## **CONCLUSION**

For the foregoing reasons, Lexon respectfully requests that this Court deny the relief requested in the Disclosure Statement Motion and grant such and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Lee E. Woodard*
Lee E. Woodard, Esq.
HARRIS BEACH PLLC
333 W. Washington Street, Suite 200
Syracuse, New York 13202
Telephone: (315) 423-7100
Email: bkemail@harrisbeach.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of March 2021, a true and correct copy of the foregoing Joinder was served via the Court's electronic case filing system (CM/ECF) to all parties registered to receive such notice in the above-captioned case.

/s/ Lee E. Woodard
Lee E. Woodard