# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| FIELDWOOD ENERGY LLC *et al.*[1] | Case No. 20-33948 (MI) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 722, 723, 724** |

## OBJECTION OF ENI US OPERATING CO. INC. AND
## ENI PETROLEUM US LLC TO APPROVAL OF DEBTORS' DISCLOSURE
## STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The Debtors in these chapter 11 cases (these "Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL AND PROCEDURAL SUMMARY .........................................................5

    A.    The Debtors' Business and Eni's Sale of Assets ...........................................5

    B.    Eni's Pre-Plan Meeting with the Debtors .....................................................7

    C.    Post-Plan Discussions with the Debtors and Status of Properties ...............8

ARGUMENT ............................................................................................................10

    A.    The Debtors' Current Disclosure Remains Insufficient to Make an
           Informed Judgment Regarding the Plan .....................................................10

           i.    The Debtors Have Provided Limited Information Regarding
                 Potential Administrative Expense Claims ..................................13

           ii.    The Debtors Have Provided Limited Information on the
                 Disposition of Certain Properties ..............................................14

    B.    Absent Certain Modifications or Clarifications, the Plan is Patently
           Unconfirmable ............................................................................................15

           i.    The Plan is Not Proposed in Good Faith and Therefore Violates
                 Section 1129(a)(3) of the Bankruptcy Code ..............................16

           ii.    The Plan Impermissibly Bifurcates Executory Contracts ..........18

           iii.    The Debtors Have Not Provided a Liquidation Analysis and
                 Therefore the Plan Cannot Satisfy Section 1129(a)(7) of the
                 Bankruptcy Code .......................................................................20

            iv.    If Predecessors Have *Midlantic* Claims, the Debtors Cannot Pay
                 Administrative Expense Claims in Full, and Therefore the Plan Is
                 Not Feasible in Violation of Sections 1129(a)(9) and (11) of the
                 Bankruptcy Code .......................................................................20

            v.    The Plan Contains Impermissible Releases in Violation of Section
                 524(e) of the Bankruptcy Code, and the Releases Should Be
                 Modified Now to Address this Plan Confirmation Hurdle ..........23

           vi.    The Credit Bid Transaction Toggle is a Potential Sub Rosa Plan in
                 Violation of Section 363(b) of the Bankruptcy Code .................24

           vii.    The Plan Misclassifies Claims in Violation of Section 1122(a) of
                 the Bankruptcy Code..................................................................25

RESERVATION OF RIGHTS ..................................................................................26

CONCLUSION..........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Coastal Energy Inc.*,
399 B.R. 805 (Bankr. S.D. Tex. 2009) ....................................................17, 21, 22

*In re Anglo-Suisse Offshore Partners, LLC*,
Case No. 15-36566 (Bankr. S.D. Tex. 2016)..........................................................22

*In re ATP Oil & Gas Corp.*,
2014 WL 61408 (Bankr. S.D. Tex. 2014)..............................................................19

*In re ATP Oil & Gas Corp.*,
Case No. 12-36187 (MI) (Bankr. S.D. Tex. 2012) ...........................................18, 19

*In re Braniff Airways*,
700 F.2d 935 (5th Cir. 1983) .................................................................................24

*Matter of Cajun Elec. Power Co-op, Inc.*,
150 F.3d 503 (5th Cir. 1998) .................................................................................10

*Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*,
2018 WL 5113124 (N.D. Tex. 2018)......................................................................23

*In re Dune Energy, Inc.*,
Case No. 15-10336 (HCM) (W.D. Tex. 2015) .......................................................18

*In re Greystone III Joint Venture*,
995 F.2d 1274 (5th Cir. 1991) ...............................................................................25

*In re Gulf Coast Oil Corp.*,
404 B.R. 407 (Bankr. S.D. Tex. 2009) .............................................................24, 25

*In re H.L.S. Energy Co.*,
151 F.3d 434 (5th Cir. 1998) ...........................................................................21, 22

*In re Made in Detroit, Inc.*,
299 B.R. 170 (Bankr. E.D. Mich. 2003).................................................................21

*In re Metrocraft Pub. Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ..........................................................10, 11, 13

*In re MFlex Corp.*,
172 B.R. 854 (Bankr. W.D. Tex. 1994)..................................................................15

*Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*,
474 U.S. 494 (1986)........................................................3, 4, 14, 17, 20, 21, 22

*Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*,
197 Fed. Appx. 285 (5th Cir. 2006).......................................................................19

*Norris Square Civic Ass'n v. Saint Mary Hosp.*,
86 B.R. 393 (E.D. Pa. 1988) ..................................................................................17

*In re Pac. Lumber Co.*,
   584 F.3d 229 (5th Cir. 2009) ...........................................................................................23

*In re Pizza of Hawaii, Inc.*,
   761 F.2d 1374 (9th Cir. 1985) .........................................................................................21

*In re Sanders*,
   2015 WL 7568469 (Bankr. S.D. Miss. 2015) ..................................................................15

*In re Shoreline Energy, LLC*,
   Case No. 16-35571 (DRJ) (Bankr. S.D. Tex. 2016) .........................................................18

*Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*,
   83 F.3d 735 (5th Cir. 1996) .............................................................................................19

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) ............................................................................13

**Statutes**

11 U.S.C. § 363(b) ................................................................................................................24

11 U.S.C. § 365 ......................................................................................................................4

11 U.S.C. § 503 ....................................................................................................................22

11 U.S.C. § 524(e) ...............................................................................................................23

11 U.S.C. § 554 ................................................................................................................3, 21

11 U.S.C. § 1122 .......................................................................................................4, 25, 26

11 U.S.C. § 1125 .....................................................................................................10, 15, 24

11 U.S.C. § 1126 ..................................................................................................................24

11 U.S.C. § 1129 .............................................................................3, 4, 16, 18, 20, 21, 24

28 U.S.C. § 959(b) ...............................................................................................................17

43 U.S.C. § 1332 ..................................................................................................................17

43 U.S.C. § 1333 ..................................................................................................................19

**Regulations**

30 C.F.R. § 250.1701 .....................................................................................................4, 14, 19

30 C.F.R. § 250.1702 ........................................................................................................14, 22

30 C.F.R. § 250.1710 ..............................................................................................................14

30 C.F.R. § 250.1725 ..............................................................................................................14

30 C.F.R. § 556.64(h)(1) .........................................................................................................14

30 C.F.R. § 556.710 ...........................................................................................................4, 20

Eni US Operating Co. Inc. and Eni Petroleum US LLC (together, "Eni") hereby file this objection (the "Objection") to the motion [Docket No. 724] (the "Disclosure Statement Motion") for entry of an order approving the adequacy of the disclosure statement [Docket No. 723] (the "Disclosure Statement") for the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 722] (the "Plan")[2] filed by the above-captioned debtors and debtors in possession (the "Debtors"). In support of this Objection, Eni respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In the Disclosure Statement, the Debtors describe the Plan, which is patently unconfirmable as a matter of law as currently proposed, and linked to an untested strategy in bankruptcy court to sell valuable producing assets to their secured lenders while offloading or abandoning "bad" assets—and their attendant liabilities, totaling billions—to other joint and several parties with insufficient financial contribution from the Debtors, their secured lenders or the Debtors' surety bond providers. The Debtors propose three major restructuring transactions through the Plan that become effective on the Effective Date:

    a.    A sale of certain Deepwater Assets and Shelf Assets to a credit-bidding entity formed by the Debtors' Prepetition FLTL Lenders and DIP Lenders ("NewCo," and such transaction, the "Credit Bid Transaction");

    b.    A divisive merger, pursuant to which Fieldwood Energy LLC will be divided into Fieldwood Energy I LLC ("FWE I") and Fieldwood Energy III LLC ("FWE III"), with certain Legacy Apache Properties being vested in FWE I and other assets of the Debtors not otherwise sold, vested in FWE I, or included as Abandoned Properties (as defined below) being vested in FWE III; and

    c.    Abandonment of certain properties (the "Abandoned Properties") to entities who are predecessor owners or co-working interest owners in the chain of title.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan and Disclosure Statement, as applicable.

Through these transactions, the Debtors propose to satisfy (or, in significant part, force others to satisfy) plugging and abandonment ("P&A") and decommissioning obligations of approximately $9 billion.[3] While the Disclosure Statement contains inadequate information related to some of Eni's most pressing questions about the Plan—including, among others, (i) what specific platforms, wells, pipeline segments, flowlines and other facilities the Debtors intend to include in the Abandoned Properties, (ii) the current state of the Abandoned Properties, including pending non-compliances with applicable law and the condition of platforms that remain inaccessible following the hurricane season, (iii) the P&A costs the Debtors anticipate with respect to assets to be decommissioned by FWE I and FWE III, and (iv) the P&A costs the Debtors anticipate with respect to the Abandoned Properties—the Debtors have begun to make such information privately available to Eni and, upon information and belief, other predecessors in interest and sureties. Accordingly, while the Debtors are in the process of providing information, at the time of filing this Objection Eni has significant questions outstanding. Notably, in the bucket of Abandoned Properties (for which BSEE estimates $1.3 billion in decommissioning liabilities), Debtors propose *zero* contribution, notwithstanding Debtors' joint and several responsibility under non-bankruptcy law.

      2.      Even if Eni were satisfied with the disclosure in the Disclosure Statement (Eni currently is not), Eni has serious concerns about the confirmability of the Debtors' unprecedented Plan structure, particularly the potential failure to address the Debtors' P&A and decommissioning liabilities associated with the Abandoned Properties. Upon examination, the Plan largely resembles a chapter 7 liquidation masquerading as a chapter 11 reorganization. It is premised on the forced

---

[3] Various federal agencies filed proofs of claim (Claim Nos. 893-902), which assert, in the aggregate, $9 billion in decommissioning-related claims.

-2-

return of certain of the Debtors' assets to the government and, ultimately, relies on the resources of predecessors in interest, other working interest holders, the sureties and, potentially, the public to satisfy billions in decommissioning liabilities (under the guise of "abandonment"), while siphoning off the best producing assets for the secured lenders.

3.      While section 554 of the Bankruptcy Code provides the Debtors with a mechanism for ridding the estate of property that is either (a) burdensome to the estate or (b) of inconsequential value and benefit to the estate, the Debtors do not have the unlimited and unfettered ability to abandon property when doing so violates state law "reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.,* 474 U.S. 494, 507 (1986). Under *Midlantic*, bankruptcy courts have historically allowed abandonment only when public health or safety is not at risk from "imminent and identifiable harm" following the proposed abandonment. If there is such a public health or safety risk and the *Midlantic* rule prevents abandonment, the law requires the Debtors remediate the property prior to the bankruptcy court approving the abandonment. Here, the Debtors have offered insufficient evidence as to the state of the properties they propose to abandon to assess whether *Midlantic* situations are present.  However, from what little information the Debtors have provided, there is reason for serious concern. If Eni and other stakeholders are forced to undertake the remediation and endure the cleanup costs, these stakeholders (including predecessors in interest like Eni) are jointly and severally liable to perform the P&A associated with such property under applicable non-bankruptcy law. Further a party (like Eni) with a portion of such responsibility is entitled to an allowed Administrative Expense Claim against the Debtors on account of the P&A obligations, and payment in full, in cash, of such allowed Administrative Expense Claims on the Effective Date of the Plan pursuant to section 1129(a)(9) of the Bankruptcy Code. When compounded across all

predecessors with similar rights, the Debtors have a so-called "admin claim problem," and the Debtors' proposed Plan cannot be confirmed as a matter of law absent demonstrating their financial wherewithal to pay all such Administrative Expense Claims in cash. Since the Debtors have yet to demonstrate that their Plan is feasible in light of these requirements, there are significant issues regarding the prospects of confirmation, leaving serious questions whether this Court should approve the Disclosure Statement that describes a Plan fraught with confirmation issues.

4.  In addition to grave *Midlantic* issues, the Plan contains other flaws that may thwart confirmation, including without limitation:

- By separately classifying the Class 5 SLTL Claims from the Class 6 General Unsecured Claims (yet providing recoveries for both from the same *de minimis* cash pool), the Debtors attempt to gerrymander claims in violation of section 1122 of the Bankruptcy Code;

- The Debtors propose to (a) assume only parts of certain leases and abandon other parts of the same leases in violation of section 365 of the Bankruptcy Code and (b) limit the post-confirmation liabilities assumed by FWE I, FWE III and/or NewCo to only the assumed portions of such leases in violation of 30 C.F.R. §§ 250.1701 and 556.710, ignoring the well-settled principles of executory contract assumption and rejection law requiring the Debtors to assume or reject these leases in total;

- The Debtors have yet to provide a liquidation analysis and, accordingly, are unable to show that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code; and

- To ensure the Debtors' first-lien lenders will still get to take the "good" assets out of bankruptcy, the Debtors have embedded a *sub rosa* toggle provision in the Plan that allows the first-lien lenders to effectuate the Credit Bid Transaction as a standalone transaction, independent of confirmation of the Plan itself (and without the protections a confirmation process affords Eni and other major creditors of the Debtors) if either (a) the Plan is not confirmed by a certain outside date or (b) the Allowed Administrative Expense Claims against the Debtors exceed a certain amount.

5.  Accordingly, even though Eni is in discussions with the Debtors and hopeful that any Disclosure Statement infirmities will be cured by the Disclosure Statement hearing, there remain legitimate concerns about the contents of the Plan. Between the information requests from

all predecessors in interest, sureties and the DOJ in these Cases, the Debtors no doubt have full plates. Given the Debtors' trickling out of necessary information (indeed, as of the filing of this Objection, the Debtors have neither shared a draft of nor filed the supplement to their Disclosure Statement and are still in the process of providing the necessary granular information related to their proposed Abandoned Properties), Eni questions whether the Debtors' accelerated timeline is appropriate. Further, given that the Regulatory Entities (as defined below) have not yet affirmatively approved the Debtors' proposed Plan structure, continuing discussions with these parties prior to confirmation may well lead to an entirely new Plan structure, or a Plan structure with material modifications that would potentially require a new Disclosure Statement and attendant motion, or a re-solicitation of votes from creditors on the revised Plan. Accordingly, Eni does not believe the Debtors' insistence on pushing forward at its current pace makes sense in light of these uncertainties.

6.      Eni wants to be part of the Debtors' solution but, at this stage, Eni has grave concerns regarding confirmability of the Debtors' proposed Plan and open questions surrounding the information in the Disclosure Statement. For these reasons, and as further described below, Eni respectfully requests this Court deny the Disclosure Statement Motion at this time and award further relief as it deems just and proper.

## FACTUAL AND PROCEDURAL SUMMARY

### A.      The Debtors' Business and Eni's Sale of Assets

7.      The Debtors are currently the largest operators and owners of leases in the Gulf of Mexico, having achieved their size through the acquisition of leases from other companies and the purchase of smaller operators with OCS leases. The shallow water leases, which predominate the approximately 750 leases not subject to the Credit Bid Transaction, often have wells, platforms, pipelines, and leases dating back to the 1950s. Production from these shallow water leases has

largely been depleted and their aging infrastructure inherently requires extensive maintenance and costly decommissioning.

8.    Prior to these Cases, Eni sold assets to the Debtors directly via one transaction and indirectly via two transactions:

a.    The Purchase and Sale Agreement dated December 1, 2015, by and between Eni Petroleum US LLC and Eni US Operating Co. Inc., as Sellers, and Fieldwood Energy Offshore LLC, as Purchaser (including the Guaranty dated December 1, 2015 in favor of Eni Petroleum US LLC and Eni US Operating Co. Inc., by Fieldwood Energy, LLC) (the "Comal Transaction");

b.    The Purchase and Sale Agreement dated November 1, 2013, by and among Anadarko Petroleum Corporation and Anadarko US Offshore Corporation and Eni Petroleum US LLC, as Sellers, and Noble Energy, Inc., as Purchaser (the "Neptune Agreement") (as amended and supplemented by the First Amendment to the Neptune Spar Purchase and Sale Agreement, dated July 21, 2016, but effective as of October 1, 2014) and the subsequent letter agreement dated May 21, 2018, between Eni Petroleum US LLC and Noble Energy, Inc. and Fieldwood Energy LLC, whereby Eni granted consent to Noble Energy, Inc.'s assignment of the Neptune Agreement to Fieldwood Energy LLC (the "Neptune Spar Transaction"); and

c.    The Purchase and Sale Agreement dated effective October 1, 2009 (with a Closing date of January 27, 2010) by and between Eni Petroleum US LLC, as Seller, and XTO Offshore, Inc., as Purchaser and the subsequent Assignments of Record Title Interest and Operating Rights Interest in Federal OCS Oil and Gas Leases from XTO Offshore, Inc., as Assignor, to Dynamic Offshore Resources, LLC and Dynamic Offshore Resources NS, LLC, as Assignees, effective August 1, 2011 (the "XTO Transaction").

9.    Since the closing of each respective transaction above, Eni has neither operated any of the attendant assets transferred nor had any possessory interest therein. However, under compulsion of the general bar date established in these proceedings, Eni filed protective proofs of claim nos. 461, 462, 468, 497, 500, 601, and 693 relating to the Debtors' continuing obligations under the Comal Transaction, Neptune Spar Transaction, XTO Transaction, and the potential for Eni to assert Administrative Expenses Claims for joint and several liability associated with the P&A obligations related to the assets proposed for abandonment.

B.     **Eni's Pre-Plan Meeting with the Debtors**

10.     Prior to filing the Plan and the Disclosure Statement, the Debtors contacted Eni to inform them of their contemplated restructuring plan. Specifically, on November 19, 2020, the Debtors provided Eni with an abbreviated presentation that described at a high level, among other things, the Debtors' divisive strategy to abandon assets in the fields Galveston 151, Ship Shoal 246/247/248/270/271, Vermilion 313, and West Cameron 72 (the "Relevant Abandoned Leases"). The Debtors provided Eni a list of applicable bonds maintained in those fields, but they gave no other specific information regarding the leases targeted for abandonment. Additionally, the Debtors indicated that they were in regular discussions with the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Department of Interior ("DOI") and the Department of Justice ("DOJ" and, collectively with BOEM, BSEE, and DOI, the "Regulatory Entities") regarding their abandonment scheme, but they did not provide sufficient detail on the discussions or say whether these regulatory entities had approved of the Debtors' proposed structure. To date, Eni is unaware of any approval (explicit or otherwise) by the Regulatory Entities regarding the Debtors' proposed Plan structure.

11.     Using information recently provided by the Debtors (discussed further below), Eni is still in the process of determining its expected P&A and decommissioning liabilities for the Relevant Abandoned Leases if the Plan is confirmed in the form currently proposed. BSEE estimates that total P&A and decommissioning costs will be approximately $111 million for the Relevant Abandoned Leases, with approximately $60 million of such costs on account of Eni's

interest alone.[4] However, actual decommissioning costs may well be (and frequently are) far higher than BSEE's estimate.

12.      Eni's records indicate that the Relevant Abandoned Leases are secured by approximately $48 million in performance and supplemental bonds. However, of this total amount of coverage, $28 million is for the benefit of BOEM. The amount of bond coverage available for Eni's benefit is approximately $20 million, but the sureties will surely oppose any claims by beneficiaries under the bonds.[5] Using BSEE's potentially understated P&A estimates, if Eni were left to perform all P&A of the Relevant Abandoned Leases and pay for the associated costs, absent reaching an agreement with BOEM to utilize the bond on which it is a beneficiary, and with access only to the bond for which Eni is direct beneficiary, Eni's exposure would still be (a) approximately $91 million if responsible for the total interest in the Relevant Abandoned Leases; or (b) approximately $40 million if responsible only for Eni's own net interests. Depending on the state of the Relevant Abandoned Leases on the Effective Date, Eni is entitled to an Administrative Expense Claim against the Debtors on account of this shortfall.

**C.      Post-Plan Discussions with the Debtors and Status of Properties**

13.      On January 1, 2021, the Debtors filed their Plan and Disclosure Statement. Since the filing of the Plan and Disclosure Statement, Eni has met and conferred with representatives of the Debtors and the Regulatory Entities on several occasions regarding the contents of this Objection, but as of the filing of this Objection the parties have not reached a consensual resolution regarding Eni's stated concerns. In response to informal objections raised by multiple creditor

---

[4] A full chart detailing BSEE's estimated P&A and decommissioning costs for each of the Relevant Abandoned Leases is attached hereto as **Exhibit A**.

[5] *See* Bond No. 2196705 in the amount of $24,215,000 on behalf of Fieldwood Energy Offshore LLC (as Principal) in favor of Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, as Obligee) and corresponding reduction rider decreasing bond by $4,265,000, attached hereto as **Exhibit B** and **Exhibit C** respectively.

parties in these discussions, the Debtors began providing access to disclosure materials on February 8, 2021, including information regarding the leases subject to each of the aforementioned Plan transactions. Eni is continuing to review information as it becomes available, but it is unclear at this point if the Disclosure Statement's infirmities will be cured by this additional information as of Disclosure Statement hearing.

14.     While information is still forthcoming, Eni has discovered that several of the Relevant Abandoned Leases are ill-prepared for the Debtors' proposed abandonment and are still subject to regulatory non-compliance measures. From January 1, 2020 through February 8, 2021, the Debtors received over 200 Incidents of Non-Compliance ("INC") from BSEE, including 31 INCs mandating that a facility be shut in until the INC is remedied.[6] Further, Eni's research shows that, of the 13 relevant platforms associated with the Relevant Abandoned Leases, 10 have been issued INCs by BSEE, five of which were issued as recently as 2020. Further, Eni has reason to believe that some of the Relevant Abandoned Leases may be in such a state of disrepair that they cannot be safely abandoned pursuant to the Plan unless the Debtors perform significant work prior to such action. For instance, several platforms in Vermilion 313 have not undergone an in-person inspection since January 2020 and are believed to be in such a state of disrepair that a party designated by the Regulatory Entities to perform decommissioning work could not safely access and inspect the platforms.

15.     None of this information, however, is contained in the Disclosure Statement, and it is unclear how the Debtors propose to transition responsibility for these Relevant Abandoned

---

[6] Per the BSEE Data Center: Fieldwood Energy LLC received 78 Warning INCs, 63 Component Shut-In INCs, and 21 Facility Shut-in INCs: Fieldwood Energy Offshore LLC received 60 Warning INCs, 24 Component Shut-In INCs, and 9 Facility Shut-In INCs; Fieldwood SD Offshore LLC received 2 Warning INCs and 2 Component Shut-In INCs; GOM Shelf LLC received 10 Warning INCs and 3 Component Shut-In INCs; and Bandon Oil & Gas, LP received 1 Warning INC and 1 Facility Shut-in INC.

Leases in a safe and compliant manner. Eni and the other predecessors thus far have received select information regarding the proposed Abandoned Properties, none of which appears to address these regulatory issues or any work (or lack thereof) the Debtors have undertaken to resolve such issues. While more disclosure may illuminate their thinking, Eni questions the need to unduly rush this process by moving forward with the Disclosure Statement and Plan at the Debtors' current pace.

## ARGUMENT

### A. The Debtors' Current Disclosure Remains Insufficient to Make an Informed Judgment Regarding the Plan

16.     Pursuant to section 1125 of the Bankruptcy Code, a disclosure statement should not be approved unless it contains "adequate information," that is, information sufficient to enable those with claims against or interests in the Debtor "to make an informed judgment about the plan." 11 U.S.C. §§ 1125(a)(1), 1125(b). The determination of what constitutes "adequate information" for purposes of disclosure should be made on a case-by-case basis and "[b]oth the kind and form of information required are left essentially to the judicial discretion of the court" based on the circumstances of each case. *Matter of Cajun Elec. Power Co-op, Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (citation omitted). *Metrocraft* provides 19 non-exhaustive factors for evaluating the adequacy of a disclosure statement, which include:

    a.     The events which led to the filing of a bankruptcy petition;
    b.     A description of the available assets and their value;
    c.     The anticipated future of the company;
    d.     The source of information stated in the disclosure statement;
    e.     A disclaimer;
    f.     The present condition of the debtor while in Chapter 11;
    g.     The scheduled claims;
    h.     The estimated return to creditors under a Chapter 7 liquidation;
    i.     The accounting method utilized to produce financial information and the name of the accountants responsible for such information;
    j.     The future management of the debtor;
    k.     The Chapter 11 plan or a summary thereof;
    l.     The estimated administrative expenses, including attorneys' and accountants' fees;
    m.    The collectability of accounts receivable;

n.    Financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

o.    Information relevant to the risks posed to creditors under the plan;

p.    The actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

q.    Litigation likely to arise in a non-bankruptcy context;

r.    Tax attributes of the debtor; and

s.    The relation of the debtor with affiliates.

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

17.    While some of the above factors have been adequately disclosed in the Plan, and others are in the process of being disclosed privately to Eni, critical information is still trickling in from the Debtors and is unlikely to be provided by the Disclosure Statement hearing. Eni and other stakeholders have concerns about the Debtors' failure in the Disclosure Statement to disclose the following material information necessary to fully evaluate the proposed Plan:[7]

    **a.    The Debtors fail to disclose information regarding the Credit Bid Transaction.**

- The Debtors have not yet disclosed the credit bid agreement memorializing the Credit Bid Transaction, which contains, among other items, the list of assets and liabilities to be sold to NewCo.

- The Debtors have not disclosed the source of all funds in the estate including the $224 million being paid by the Credit Bid Purchaser, which is essential to understanding how and where those funds are to be allocated.

- The Debtors have not disclosed information sufficient to show NewCo's ability to satisfy its obligations to safely maintain, operate, and decommission the assets, including by providing proper financial accommodation consistent with the obligations for the transferred assets.

---

[7] Other predecessors in interest have already voiced their objections to the Debtors' lack of disclosure. Eni references and incorporates the objections to the Disclosure Statement raised by Chevron U.S.A. Inc. and Noble Energy, Inc. in their *Objection to Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) Proposed Voting and Tabulation Procedures, (III) Procedures for Executory Contract Assumption and Assignment, and (IV) Procedures for Assignment and Transfer of Property of the Estate* [Docket No. 880]. Eni further references and incorporates the objections raised in the Eni references the *Objection of XTO Offshore, Inc., HHE Energy Company, and XH LLC to the Disclosure Statement for The Joint Chapter 11 Plan of Fieldwood Energy, LLC and Its Affiliated Debtors* [Docket No. 900].

- The Debtors have not yet disclosed all policies and procedures relevant to the inspection of the unmanned platforms and the Debtors' efforts to ensure compliance with all associated regulations.

**b.  The Debtors fail to disclose information regarding the proposed divisive merger that allocates assets and liabilities among FWE I and FWE III.**

- The Debtors have not made disclosures sufficient to show FWE I's and FWE III's ability to obtain and to maintain the regulatory approvals and qualifications necessary to operate their respective assets.

- The Debtors have not disclosed the cost to cure any pre-petition defaults by the Debtors relating to contracts that would be allocated and/or assigned to FWE I and FWE III.

- The Debtors have not disclosed any partial interests to be assigned to FWE I, the procedure for assigning such partial interests, if any, and the nature of interests assigned to FWE I that are described as "Incremental Interests."

- The Debtors have not disclosed what adequate assurance exists that FWE I and FWE III can satisfy their obligations, including decommissioning obligations and providing any required financial assurance.

**c.  The Debtors fail to disclose critical information regarding the leases and other unidentified properties that constitute the Abandoned Properties.**

- The Debtors have not identified all assets comprising the Abandoned Properties with reasonable particularity, including any related executory contracts, unexpired federal leases, and other associated rights that they propose to forcibly "return" to the government.

- The Debtors have not described the legal basis and process through which they propose to safely force the "return" of the Abandoned Properties. The Debtors must describe how they propose to resolve objections related to the return of these properties. The Debtors must identify agreements reached with creditors or other interested parties related to the Abandoned Properties.

- The Debtors have not described the regulatory approvals necessary to "return" the Abandoned Properties and how these approvals would be obtained.

- The Debtors have not identified the cost to cure each of their pre-petition defaults on contracts necessary for the safe "return," continued operation, and timely decommission of the Abandoned Properties.

d. **The Debtors fail to disclose information essential to evaluating the Plan of reorganization.**

- The Debtors have not disclosed a liquidation analysis, a valuation analysis, or other financial projections that support the assumptions underlying the plan. The absence of such an analysis, which is required for creditors to determine whether the Disclosure Statement describes a Plan that meets the "best interests" test, is not justified by the token payment to unsecured creditors proposed in the Plan that might not otherwise be available in a liquidation scenario. Rather, the analysis is of heightened importance when Debtors have failed to maintain certain assets in compliance with applicable law and Debtors now propose to abandon such assets without any contribution towards resolving these concerns.

- The Debtors have not disclosed the nature and amount of Administrative Expense Claims that could be asserted. The Debtors must describe how the Plan will address these Administrative Expense Claims.

- The Debtors have not provided a rationale for why the case should not be converted to Chapter 7, and why proceeding with the current Plan is in the best overall interest of creditors.

18.     Eni and other predecessors in interest have continued to work with the Debtors to achieve the necessary disclosures. The Debtors provided access to a significant amount of information on February 8, 2021 and have delayed the initial Disclosure Statement hearing via several adjournments to facilitate additional disclosure. The Debtors have promised that more information regarding the status of the Abandoned Properties will be provided on a rolling basis, but as of the filing of this Objection, no such information has been provided.

i.     **The Debtors Have Provided Limited Information Regarding Potential Administrative Expense Claims**

19.     In addition to the specific concerns listed above, the Disclosure Statement as filed fails to provide an accurate description or estimation of the Debtors' Administrative Expense Claims. Where administrative expenses are expected to be an integral part of a plan, a disclosure statement must contain an accurate estimate of the debtor's administrative expense claims. *In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996) (citing *Metrocraft*, 39 B.R. at

568). Eni is continuing to work with the Debtors to obtain such information and resolve these issues. Specifically, Eni is working with the Debtors to determine what funds from the Debtors will be available to plug and abandon and decommission assets vested in FWE I and FWE III, as well as to facilitate an orderly transition of assets proposed to be abandoned. Further, Eni is working with the Debtors to determine what funds will be available for the Claims Reserve (and, accordingly, the payment of Allowed Administrative Expenses Claims, among other Claims) established by section 5.13 of the Plan.

20.     Eni is also working with the Debtors to determine the Debtors' joint and several liability for P&A and decommissioning obligations on all properties on the outer continental shelf ("OCS") for which the Debtor is either a record title interest owner or an operating rights owner pursuant to applicable federal regulations, including 30 C.F.R. §§ 250.1701, 250.1702(d), 250.1710, 250.1725 and 556.64(h)(1). Eni is hopeful that it can come to an understanding with the Debtors so as to avoid any potential *Midlantic* arguments, but absent adequate disclosure, Eni reserves its rights to object on this point at the Disclosure Statement hearing.

> **ii.     The Debtors Have Provided Limited Information on the Disposition of Certain Properties**

21.     Eni is continuing to work with the Debtors to obtain information regarding the mechanics of the Plan's implementation—primarily the designation of assets to be purchased, vested in FWE I and FWE III, or abandoned. As an initial matter, the Debtors also fail to disclose in the Disclosure Statement that they cannot sell, transfer, or assign any of their interests in their OCS leases without explicit approval of BOEM. Accordingly, Eni is working with the Debtors to determine the likelihood of such governmental approvals and the likelihood of sizable Administrative Expense Claims to follow.

22.     Additionally, the Debtors fail to disclose the mechanism through which they expect to use the abandonment process to vest title in a predecessor in interest. Eni has not agreed to accept title to any of the Abandoned Properties. While Eni is aware that certain environmental regulations impose joint and several liability for certain P&A obligations, Eni is not aware of— nor does the Disclosure Statement reveal—any mechanism through which the Debtors may force predecessors in interest to accept title to the properties they propose to abandon. In its current form, the Disclosure Statement proposes abandoning properties without identifying the parties who will take title or even the potential future operators or designated operators of the properties. Eni and other stakeholders must have this information to evaluate the Debtors' proposed Plan.

23.     Finally, Eni is working with the Debtors to determine the state of each of the Relevant Abandoned Leases and the actions undertaken (or to be undertaken) by the Debtors to transition such properties (particularly those Abandoned Properties subject to INCs). This information is necessary for Eni to determine what its potential costs will be as a result of the Plan and what the potential universe of Administrative Expense Claims facing the Debtors may be.

24.     At this point it is not certain that all of these informational infirmities will be cured by the Disclosure Statement hearing; however, the Debtors and Eni continue to work to close these gaps. As such, to the extent adequate information (as defined in section 1125 of the Bankruptcy Code) is not provided by the Disclosure Statement hearing, Eni reserves its right to object on these grounds.

**B.     Absent Certain Modifications or Clarifications, the Plan is Patently Unconfirmable**

25.     It is well-settled that bankruptcy courts have the authority to refuse approval of disclosure statements when the chapter 11 plans underlying them are not confirmable. *See, e.g.*, *In re MFlex Corp.*, 172 B.R. 854, 856 (Bankr. W.D. Tex. 1994) (noting that the disclosure statement was previously denied by the court because it described a plan that was not confirmable); *In re*

*Sanders*, 2015 WL 7568469 at *5 (Bankr. S.D. Miss. 2015) (reiterating that "it is well settled that a bankruptcy court may disapprove a disclosure statement, even if it contains adequate information, if there is a defect that renders a proposed plan 'inherently or patently unconfirmable.'").

26.     While Eni is working with the Debtors and stands ready to work toward a consensual resolution in these Cases, the Plan, as filed, is patently unconfimable. The Debtors are hopeful that their discussions will illuminate a path forward in which the Debtors fairly allocate their decommissioning responsibilities to all predecessors in interest, and distribute their remaining assets to their creditors accordingly; however, unless and until such a path becomes clearer, Eni has legitimate concerns surrounding the Plan's confirmability.

### i.     The Plan is Not Proposed in Good Faith and Therefore Violates Section 1129(a)(3) of the Bankruptcy Code

27.     As discussed above, the Debtors are embarking on an untested path and (as of the time of filing this Objection) are still in the process of providing adequate information about the Plan process and feasibility. Through the Plan as written, the Debtors seek to abandon properties relating to the Debtors' OCS leases without providing for payment, in full, in cash of the Debtors' share of decommissioning and P&A obligations. This is in direct contravention to section 1129(a)(3) of the Bankruptcy Code, which provides that "[t]he court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Depending on the state of the Abandoned Properties, any proposed abandonment thereof cannot include the abandonment of the Debtors' corresponding—but independent—regulatory obligations that are intended to protect the environment or the public health and safety without affording predecessors in interest the ability to seek Administrative Expenses Claims

against the Debtors as a result. Any such abandonment is explicitly prohibited by the Supreme Court's directive in *Midlantic,* 474 U.S. at 507.

28.     The Bankruptcy Code requires a debtor to manage and operate property in its possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound if in possession thereof." 28 U.S.C. § 959(b). Courts have held that "it is inescapable to avoid the conclusion that 28 U.S.C. § 959(b) requires a debtor to conform with *applicable federal, state, and local law* in conducting its business." *Norris Square Civic Ass'n v. Saint Mary Hosp.*, 86 B.R. 393, 398 (E.D. Pa. 1988) (emphasis added). The Supreme Court has recognized that this obligation extends to a debtor's performance of its environmental obligations. *See In re Am. Coastal Energy Inc.*, 399 B.R. 805, 810 (Bankr. S.D. Tex. 2009) (citing *Midlantic,* 474 U.S. at 507 ("[T]rustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.")).

29.     The performance of the decommissioning obligations attendant to the Abandoned Properties, including the plugging of inactive wells and removal of unused facilities is of paramount importance to DOI as environmental steward of the OCS. *See* 43 U.S.C. § 1332 (stating as policy of the United States that (1) the OCS be developed "subject to environmental safeguards" and (2) operations be conducted in a safe manner to prevent or minimize the likelihood of occurrences that may cause damages to the "environment or property, or endanger life or health.").

30.     Section 5.12 of the Plan provides for the abandonment of the Abandoned Properties and states: "[e]xcept as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever

arising from or relating to the post-Effective Date period with regards to the Abandoned Properties." Plan § 5.12.

31.     As currently proposed in the Plan, the Debtors are attempting to shed unliquidated P&A obligations without sharing in liability costs with stakeholders like predecessors in interest and working interest holders. Given the number of stakeholders impacted by the Debtors' unprecedented scheme, the Plan can hardly be construed to have been proposed in good faith as required under section 1129(a)(3) of the Bankruptcy Code. Perplexingly, the Plan does not even currently recognize the claims of predecessors in interest as possible Administrative Expense Claims (depending on the condition of the Abandoned Properties), in direct violation of state and federal law, not to mention public policy. Other Debtors have come to agreements in the past that allow abandonment subject to the debtor's agreement to provide either security or recovery costs,[8] but the Plan, as written, makes no such concessions, and instead favors the first-lien lenders' interests to the grave detriment of other creditors by conveniently ignoring the wave of Administrative Expense Claims.

**ii.     The Plan Impermissibly Bifurcates Executory Contracts**

32.     In addition to failing to account for the likely massive Administrative Expense Claims, the Plan relies on an impermissible bifurcation of certain of the Debtors' leases. Exhibits C-F of the Disclosure Statement list leases that are to be either (a) purchased pursuant to the Credit Bid Transaction, (b) vested in FWE I, (c) vested in FWE III, or (d) abandoned (such schedule of

---

[8] *See, e.g.*, *In re ATP Oil & Gas Corp.*, Case No. 12-36187 (MI) (Bankr. S.D. Tex. 2012) (predecessor ultimately agreed to decommissioning liabilities in exchange for existing bonding and an administrative claim); *In re Dune Energy, Inc.*, Case No. 15-10336 (HCM) (W.D. Tex. 2015) (predecessor maintained consent rights over asset sale and agreed that any purchaser would assume P&A liabilities, bonding would remain in place and $830,000 would remain in escrow); *In re Shoreline Energy, LLC*, Case No. 16-35571 (DRJ) (Bankr. S.D. Tex. 2016) (debtor reached settlement providing that debtor would establish escrow account prior to closing and stalking horse would transfer cash to that account for cleanup costs; also assigned certain proceeds from sale toward cleanup costs and some payments that would have otherwise been paid to general unsecured creditors).

Abandoned Properties, attached as Exhibit F to the Disclosure Statement, the "<u>Abandoned Properties Schedule</u>"). *See* Disclosure Statement, Ex. C-F. However, certain leases appear on multiple exhibits. The Debtors, in their discussions with Eni, have explained that for single leases that were acquired in separate parts from different entities, individual interests in each lease may be treated differently.[9]

33.     Courts have recognized that "it is well established that as a general proposition an executory contract must be assumed or rejected in its entirety." *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 197 Fed. Appx. 285, 288 (5th Cir. 2006) (citing *Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996)) (internal quotation marks omitted). This means "that the debtor cannot choose to accept the benefits of a contract and reject its burdens to the detriment of the other party to the agreement." *Id.* at 288-89 (internal quotation marks omitted).[10] Additionally, federal regulations provide in no uncertain terms that "[l]essees and owners of operating rights are *jointly and severally responsible* for meeting decommissioning obligations for facilities on leases . . . ." 30 C.F.R. § 250.1701 (emphasis added). Further, "if you assign your record title interest, as an assignor you remain liable for all

---

[9] For example, the Debtors currently list Lease No. G15740 in Block Galveston 151 on both the list of assets to be vested in FWE I and the Abandoned Properties Schedule. The Debtors have informed Eni that they intend only to vest the 25% of such lease acquired from Apache and abandon the remaining 75% acquired from Eni.

[10] BOEM has consistently taken the position that OCS leases like the ones described in Exhibits C-F to the Disclosure Statement are executory contracts. *See In re ATP Oil & Gas Corp.*, 2014 WL 61408 (Bankr. S.D. Tex. 2014). In *ATP*, ATP conveyed prepetition various overriding royalty interests ("<u>ORRI</u>") and net profit interests ("<u>NPI</u>") in production from certain offshore leases. During the chapter 11 cases, the holders (claimants) of the ORRIs and NPIs commenced litigation against ATP seeking a declaration from the court regarding the proper characterization of the interests conveyed to them. The claimants argued that pursuant to Louisiana law, Texas law, and the plain language of the conveyance documents, the interest were vested real-property interests and could not be assumed or assigned. ATP argued to the contrary that the ORRIs and NPIs were personal property rights under OCSLA and disguised financings. DOI intervened and argued that federal law applied, and the leases and interests thereunder were executory contracts and unexpired leases. DOI further contended that applicable Louisiana Law and Texas law (which characterized interests as vested real-property interests) conflicted with applicable federal law and therefore, pursuant to section 1333(a)(2)(A) of the Outer Continental Shelf Lands Act ("<u>OCSLA</u>"), did not apply. While the court analyzed Louisiana law in its decision (determining whether the ORRIs and NPIs were disguised financing transactions), the court did not determine the proper characterization of the nature of an offshore oil and gas lease interest.

obligations, monetary and non-monetary, that accrued in connection with your lease during the period in which you owned the record title interest, up to the date BOEM approves your assignment." 30 C.F.R. § 556.710. Accordingly, the Debtors' attempt to divide the leases and shirk their responsibilities likely violates both bankruptcy and non-bankruptcy law, presenting legitimate confirmation concerns.

### iii. The Debtors Have Not Provided a Liquidation Analysis and Therefore the Plan Cannot Satisfy Section 1129(a)(7) of the Bankruptcy Code

34.     Section 1129(a)(7) requires that "[w]ith respect to each impaired class of claims or interests (A) each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . ." 11 U.S.C. § 1129(a)(7). This test, often referred to as the "best interests" test, ensures that creditors are no worse-off under a debtor's chapter 11 plan than they are in a liquidation under chapter 7. However, without a liquidation analysis, stakeholders have no way to evaluate whether or not the Debtors satisfy the best interests test. Though the Debtors have created a *de minimis* cash pool for unsecured creditors, this cannot take the place of a legitimate liquidation analysis that informs creditors of their standing vis-à-vis a traditional chapter 7 liquidation. Accordingly unless a liquidation analysis is provided, the Debtors cannot satisfy section 1129(a)(7) of the Bankruptcy Code.

### iv. If Predecessors Have *Midlantic* Claims, the Debtors Cannot Pay Administrative Expense Claims in Full, and Therefore the Plan Is Not Feasible in Violation of Sections 1129(a)(9) and (11) of the Bankruptcy Code

35.     Section 1129(a)(9) requires, "with respect to a claim of a kind specified in section . . . 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on

account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9). In addition, and as a separate evidentiary requirement for Plan confirmation, section 1129(a)(11) of the Bankruptcy Code, commonly referred to as the "feasibility test," requires a finding by the court that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization. 11 U.S.C. § 1129(a)(11). "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985); *see also In re Made in Detroit, Inc.*, 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003). As of the time of filing this Objection, the Debtors have not submitted evidence of their ability to pay allowed Administrative Expenses Claims in full as required by section 1129(a)(9) of the Bankruptcy Code (which such claims will likely consist of the significant cleanup costs absorbed by Eni and other predecessors), suggesting the Debtors' proposed Plan may not be feasible in violation of section 1129(a)(11) of the Bankruptcy Code.

36. Abandonment is governed by section 554 of the Bankruptcy Code, as interpreted by the Supreme Court in *Midlantic*. Section 554 provides: "After notice and a hearing, the trustee may abandon any *property* of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554 (emphasis added). The statute thus addresses property, not liability. The Fifth Circuit and this court have held that *Midlantic* prevents a trustee from abandoning unproductive oil and gas wells that have not yet been plugged. *In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998); *Am. Coastal Energy, Inc.*, 399 B.R. at 810. In particular, the Fifth Circuit held in *H.L.S. Energy* that a trustee could not abandon its interest in unproductive oil and gas wells and thereby eliminate the plugging obligations associated with those wells because such abandonment would "contraven[e] . . . a state law reasonably designed

to protect public health or safety." 151 F.3d at 438. The court also found that, because the unproductive oil and gas wells could not be abandoned under *Midlantic*, the costs associated with plugging them were "necessary" costs of preserving the debtor's estate, which qualified for administrative expense priority under section 503(b)(1)(A). *Id.* at 438-39.

37.     Contrary to the Debtors' misguided assertions, under applicable law and regulations, even after abandonment of the properties on the Abandoned Properties Schedule, the Debtors maintain regulatory and contractual obligations to plug and abandon or pay their share of P&A costs, and the Debtors cannot "abandon" their way out of these liabilities by simply confirming and substantially consummating their Plan. *See* 30 C.F.R. § 250.1702; *see also In re Anglo-Suisse Offshore Partners, LLC*, Case No. 15-36566 (Bankr. S.D. Tex. 2016) (Docket No. 63 at 2); *Am. Coastal*, 399 B.R at 816. In addition to the Debtors retaining P&A responsibility for these assets, depending on the condition of the wells at the time of this proposed abandonment, other working interest owners or predecessors in title will have claims against the Debtors to the extent of any P&A obligations they will absorb, which will give rise to additional Administrative Expense Claims and executory contract rejection damages claims from other working interest owners or predecessors in title. Given the magnitude of potential Administrative Expense Claims looming against the Debtors,[11] the proposed Plan is not feasible absent certain clarifications or modifications.

---

[11] Further, other expenses not discussed in the Disclosure Statement—namely premium payments on the Debtors' $1.17 billion in surety bonds—may qualify as Administrative Expense Claims. Many of the Debtors' sureties have already documented their position that bond premiums qualify as administrative expenses. *See, e.g.*, *Limited Objection of Aspen American Insurance Company, Berkley Insurance Company, Everest Reinsurance Company and Sirius America Insurance Company to Debtors' Motion [ECF No. 625] Seeking Entry of an Order Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 686]. It is likely that these premiums will also add to the wealth of Administrative Expense Claims the Debtors have failed to disclose. Although there is no binding case law on this issue, this Court in *In re Am. Coastal Energy, Inc.* acknowledged that expenses incurred in order to bring a debtor in compliance with state law were actual and necessary costs under section 503(b) of the Bankruptcy Code. 399 B.R. at 810. This alone weighs heavily in determining whether premiums for sureties required by state law would qualify as Administrative Expense Claims.

> **v.** **The Plan Contains Impermissible Releases in Violation of Section 524(e) of the Bankruptcy Code, and the Releases Should Be Modified Now to Address this Plan Confirmation Hurdle**

38.     Section 10.7(b) of the Plan contains broad releases for, among others, the Debtors, the Post-Effective Date Debtors, the DIP Agent and DIP Lenders, the Consenting Creditors, the Prepetition Agents, NewCo and all of its subsidiaries, the Exit Facility Agents, the Exit Facility Lenders, the Backstop Parties and the Apache PSA Parties that appear to release the Debtors from all environmental liabilities other than to the extent such a release would impair the Decommissioning Security provided pursuant to the Apache PSA.

39.     Under Fifth Circuit case law, these non-consensual releases are repeatedly struck by courts. *See In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (striking non-debtor releases, including releases of the debtors' officers and directors, except with respect to creditors' committee and members); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, 2018 WL 5113124, at *20-23 (N.D. Tex. 2018) (reversing bankruptcy court's approval of injunction and exculpation provisions that released non-debtor third parties, such as the debtor's parent company, officers, and directors).

40.     Further, section 5.12 of the Plan provides that "Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim against the Debtors, the Post-Effective Date Debtors or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties." Plan § 5.12. Notably, the "Post-Effective Date Debtors" includes FWE III, but excludes NewCo (or its subsidiaries, including the Credit Bid Purchaser) and FWE I. Plan § 1.1. This attempt to limit the liability of certain reorganized entities and the first-lien lenders cannot be confirmed under operative Fifth Circuit progeny and, accordingly, presents serious confirmation issues.

###### vi. The Credit Bid Transaction Toggle is a Potential Sub Rosa Plan in Violation of Section 363(b) of the Bankruptcy Code

41. While the Plan provides for the Credit Bid Transaction as one of the three major restructuring transactions necessary to reorganize, section 5.2(c) of the Plan provides for a mechanism by which to carry out the Plan's mandates (specifically, divesting the Debtors' estates of producing assets via the Credit Bid Transaction) in the event the Plan cannot be confirmed or Administrative Expense Claims exceed a certain (currently undisclosed) amount. Plan § 5.2(c). The effect of this provision, if invoked, is to implement the most salient transaction contemplated by the Plan (stripping the good assets and delivering them to the secured lenders, while leaving the bad assets—and the attendant decommissioning liabilities—behind) without any of the voting requirements or creditor protections provided for in a typical plan setting.

42. Under precedent in the Fifth Circuit, a court cannot approve a sale of a debtor's assets if "the transaction would effectively evade the 'carefully crafted scheme' of chapter 11 and avert the chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009); *see also In re Braniff Airways*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

43. The goal of the toggle provision is clear: in the event the Debtors are faced with massive Administrative Expense Claims (which is likely) and cannot get a plan of reorganization confirmed, the Debtors' Prepetition FLTL Lenders and DIP Lenders can still carry out the most meaningful parts of the Plan and divest the Debtors' estates of producing assets, leaving little value to the Debtors' remaining stakeholders. However, unlike in a plan setting, the toggle provides no

opportunity for creditors to vote, leaving precious few plan options and most likely resulting in conversion or dismissal with virtually no value to the estates, similar to *Gulf Coast*. Such a toggle should not be confirmed.[12]

### vii. The Plan Misclassifies Claims in Violation of Section 1122(a) of the Bankruptcy Code

44. The Bankruptcy Code requires a plan to classify creditors' claims. 11 U.S.C. § 1122. While debtors are given freedom to classify claims, the Fifth Circuit enforces a clear restriction on classification: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991).[13] The Debtors can only separately classify similar claims in two scenarios, neither of which are satisfied here: (a) an administrative convenience class pursuant to section 1122(b) of the Bankruptcy Code or (b) with the consent of the separately classified claimants. Instead, in the instant case, the Debtors have separately classified the out-of-the-money Prepetition SLTL Lenders, presumably to manufacture a favorable cram down scenario.[14] The Debtors' proposed rejection and abandonment of certain executory contracts and unexpired leases may leave the Debtors with sizeable Class 6 General Unsecured Claims that may defy

---

[12] Additionally, the mechanics of the toggle are confounding; the Debtors do not make clear how section 5.2(c) can be enacted if the Plan is not confirmed. From a logistical perspective, it makes little sense to have a sale toggle (triggered in part by a plan's failure to reach confirmation) that is dependent on plan confirmation, as the latter negates the former.

[13] In *Greystone*, the Fifth Circuit considered whether a secured creditor's deficiency claim could be classified separately from general unsecured claims. *Id.* at 1278-79. The court found that it could not and that the debtor provided no valid justification for the separate classification as the classes were receiving substantially similar treatment. *Id.* Further, that the deficiency claim was bifurcated by operation of the Bankruptcy Code was insufficient to warrant separate classification. *Id.*

[14] Notably, as disclosed in the *Amended Joint Verified Statement of Davis Polk & Wardwell LLP and Haynes and Boone, LLP Pursuant to Federal Rules of Bankruptcy Procedure 2019* [Docket No. 778], there is significant crossover between the Prepetition FLTL Lenders and the Prepetition SLTL Lenders. Specifically, Bank of America, N.A., CIFC Asset Management LLC, INVESCO Senior Secured Management, Inc., and Nuveen Asset Management, LLC all hold economic interests in both the Prepetition FLTL Credit Agreement and the Prepetition SLTL Credit Agreement.

administrative convenience and otherwise block confirmation. To the extent the Prepetition SLTL Lenders are unsecured and left only with deficiency claims, they should be properly classified with the General Unsecured Claims in order to satisfy section 1122 of the Bankruptcy Code.

45. For the foregoing reasons, the Debtors have presented a Plan that contains several obvious flaws that must be cured prior to confirmation. The Debtors, the Regulatory Entities, and Eni are still attempting to work collaboratively toward a resolution of their respective issues, but to the extent the Debtors are unable (or unwilling) to cure these deficiencies, this Court should deny approval of the Disclosure Statement Motion to avoid a waste of judicial and estate resources by soliciting votes on a Plan destined to fail.

## RESERVATION OF RIGHTS

46. This Objection is submitted without prejudice to, and with full express reservation of, the rights of Eni to supplement and amend this Objection and to introduce evidence at any hearing related to this Objection, and to further object to the Plan or Disclosure Statement on any and all grounds. Moreover, Eni reserves its right to invoke each issue, fact, legal basis, and matter identified in the Objection as a basis for denying confirmation of the Plan pursuant to any applicable provision of the Bankruptcy Code, regardless of the particular subsection of this Objection in which the issue is raised.

## CONCLUSION

Accordingly, Eni requests that the Court enter an order (i) denying the Disclosure Statement; and (ii) granting such other and further relief as it deems just and proper.

**BRACEWELL LLP**

By:   /s/ *William A. (Trey) Wood III*
        William A. (Trey) Wood III
        711 Louisiana Street, Suite 2300
        Houston, Texas 77002
        Telephone: (713) 223-2300
        Facsimile: (800) 404-3970
        Email: trey.wood@bracewell.com

        Mark E. Dendinger (admitted *pro hac vice*)
        CityPlace I, 34th Floor
        185 Asylum Street
        Hartford, Connecticut 06103
        Telephone: (860) 947-9000
        Facsimile: (800) 404-3970
        Email: mark.dendinger@bracewell.com

        *Counsel to Eni US Operating Co. Inc., and*
        *Eni Petroleum US LLC*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on March 3, 2021, a true and correct copy of this document was served by electronic means as listed on the Court's ECF noticing system.

*/s/ William A. (Trey) Wood III*
William A. (Trey) Wood III

**BSEE DECOMMISSIONING CHART**
**Fieldwood Abandoned Properties**

| | BSEE P90 ESTIMATE P&A | BSEE Deterministic Cost Estimate | Total BSEE Estimate | NET TO ENI INTEREST |
|---|---|---|---|---|
| GA 151 | $183,730.00 | $0.00 | $183,730.00 | $61,243.33 |
| SS 246 | $26,350,880.00 | $576,742.00 | $26,927,622.00 | $26,927,622.00 |
| SS 247 | $20,237,927.00 | $294,659.00 | $20,532,586.00 | $6,500,616.73 |
| SS 248 | $16,212,256.00 | $1,343,346.00 | $17,555,602.00 | $4,388,900.50 |
| SS 249 | $10,201,317.00 | $0.00 | $10,201,317.00 | $2,550,329.25 |
| WC 72 | $6,413,727.00 | $218,356.00 | $6,632,083.00 | $4,974,062.25 |
| VR 313 | $28,746,353.00 | $321,506.00 | $29,067,859.00 | $14,533,929.50 |
| **TOTAL:** | $108,346,190.00 | $2,754,609.00 | $111,100,799.00 | $59,936,703.56 |

| = | | Total BSEE Decommissioning Obligation |
|---|---|---|
| = | | Total Eni portion of liability based on % of prior Lease ownership |

Bond No. 2196705

# PERFORMANCE  BOND

**KNOW ALL MEN BY THESE PRESENTS:**

    **THAT** we, Fieldwood Energy Offshore LLC,  with its principal office at One Briar Lake Plaza, Suite 1200, 2000 West Sam Houston Parkway South, Houston, Texas 77042, (hereinafter called the "Principal") and North American Specialty Insurance Company, with an office at 650 Elm Street, Manchester, New Hampshire 03101 (hereinafter called the "Surety"), are held and firmly bound unto Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively hereinafter called the "Obligee"), each with its principal office at 1200 Smith Street, Suite 1700, Houston, Texas 77002, in the penal sum of Twenty Four Million Two Hundred and Fifteen Thousand and No/100 Dollars ($24,215,000.00) lawful money of the United States of America (the "Penal Sum") for the payment of which sum the Principal and the Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.  All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

    **WHEREAS**, Principal and Obligee have entered into that certain Purchase and Sale Agreement dated effective December 1, 2015 (hereinafter called the "Purchase Agreement"), which Purchase Agreement is by reference made a part hereof and which provides for the sale and assignment from the Obligee to the Principal of the interests of Obligee in the oil and gas leases, contracts, properties, wells, platforms, facilities, equipment, pipelines and personal property defined therein as the "Assets", together with, among other rights and obligations, all Plugging, Abandonment and Decommissioning Obligations of the Principal associated therewith; and

    **WHEREAS**, the Principal and the Surety agree that, notwithstanding the termination of the WC 130 Lease prior to the date hereof or the subsequent termination of any or all of the other oil and gas leases described on Exhibit A-1 to the Purchase Agreement, whether by operation of law or otherwise, this Performance Bond (the "Bond") shall remain in full force and effect until all Plugging, Abandonment and Decommissioning Obligations of Principal associated with the Assets identified on Exhibit A to this Bond have been truly and faithfully performed and discharged, subject to the terms and conditions hereof; and

    **WHEREAS,** the Principal has promised to deliver to the Obligee at Closing a performance bond in the form hereof executed by Principal and Surety; and

    **WHEREAS,** the Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; and

    **WHEREAS,** the Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this Bond or any liability hereunder; and does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.



Bond No. 2196705

**NOW, THEREFORE,** the Principal and the Surety agree as follows:

The Surety hereby guarantees the full and faithful performance by Principal of, and compliance by the Principal with the applicable provisions of the Purchase Agreement requiring the Principal to timely and fully perform and satisfy, the Plugging, Abandonment and Decommissioning Obligations associated with the Assets identified on Exhibit A to this Bond.

**PROVIDED, HOWEVER,** the Surety is hereby authorized and directed to reduce the Penal Sum at any time upon presentation by the Principal to the Surety of a bond reduction rider (in substantially the same form attached as Exhibit H to the Purchase Agreement) executed and acknowledged by the Principal and the Obligee; underlined provided, however, in the event, and only in the event, the Obligee fails to execute and acknowledge a bond reduction rider in accordance with the terms and conditions of the Purchase Agreement, the Surety is hereby authorized and directed to reduce the Penal Sum upon the occurrence of one of the following:

(1) presentation by the Principal to the Surety of a letter from an officer of Principal certifying (a) that, on or before the sixty-first (61st) day prior to the presentation of such letter to the Surety, the Principal filed with BSEE (or any successor regulatory authorities) a site clearance verification for the applicable Lease(s) indicating that all Plugging, Abandonment and Decommissioning Obligations with respect to such Lease(s) had been completed, (b) that, at no time prior to the presentation of such letter to the Surety, has Fieldwood or any Affiliate of Fieldwood received notice (whether written, verbal or otherwise) from any Governmental Authority indicating that further action(s) are required to complete all such Plugging, Abandonment and Decommissioning Obligations, (c) that the Principal notified the Obligee of the Principal's entitlement to the reduction in the amount of the Performance Bond in accordance with Section 7.18(d) of the Purchase Agreement and (d) that the Obligee failed to execute and deliver to Principal a bond reduction rider in accordance with Section 7.18(d) of the Purchase Agreement;

(2) presentation by the Principal to the Surety of a letter from an officer of Principal certifying (a) that, on or before the thirty-first (31st) day prior to the presentation of such letter to the Surety, the BSEE and/or BOEM (or any successor regulatory authorities) public databases indicated that all Plugging, Abandonment and Decommissioning Obligations for the applicable Lease(s) were completed, (b) that the Principal notified the Obligee of the Principal's entitlement to the reduction in the amount of the Performance Bond in accordance with Section 7.18(d) of the Purchase Agreement and (c) that the Obligee failed to execute and deliver to Principal a bond reduction rider in accordance with Section 7.18(d) of the Purchase Agreement; or

(3) presentation by the Principal to the Surety of a letter from an officer of Principal (a) certifying (i) that, on or before the thirty-first (31st) day prior to the presentation of such letter to the Surety, the Principal posted a supplemental bond(s) to the BOEM for the applicable Lease(s) and/or Rights of Way, (ii) that the Principal notified the Obligee of the Principal's entitlement to the reduction in the amount of the Performance Bond in accordance with Section 7.18(c)(ii)(A) of the Purchase Agreement and (iii) that the Obligee failed to execute and deliver to Principal a bond reduction rider in accordance with Section 7.18(c)(ii)(A) of the Purchase Agreement, and (b) enclosing a copy of such supplemental bond(s) posted by Purchaser to the BOEM (or any successor regulatory authorities) pursuant to Section 7.18(c)(ii)(A) of the Purchase Agreement.

IndemCo

Bond No. 2196705

Principal and the Surety agree that, notwithstanding the termination of the WC 130 Lease prior to the date hereof or the subsequent termination of any or all of the other Leases described on Exhibit A-1 to the Purchase Agreement, whether by operation of law or otherwise, this Bond shall remain in full force and effect until all Plugging, Abandonment and Decommissioning Obligations of the Principal associated with the Assets identified on Exhibit A to this Bond have been truly and faithfully performed and discharged, subject to the terms and conditions hereof.

**PROVIDED, FURTHER THAT,** including to the extent the Principal may be liable for any expenses, fees, penalties, damages (either direct, indirect or consequential) related to the Plugging, Abandonment and Decommissioning Obligations described above, or to the extent the Obligee may incur any attorney's fees or court costs or other expenses of litigation in the event of a contest over the Surety's denial of the obligation (or any part thereof), the maximum obligation of the Surety for claims under this Bond, whether one or more, concurrent or otherwise, shall be the Penal Sum reduced, as applicable, as provided for herein.

**FURTHERMORE,** it is agreed that the Surety shall, but without limiting or reducing the obligations of Surety under this Bond, have no obligation to the Principal, or any other person or entity for any loss suffered by the Principal, or any other person or entity by reason of acts or omissions which are covered by the Principal's general liability insurance, products liability insurance, completed operations insurance or any other insurance.

It is further agreed that, without limiting or reducing the obligations of the Surety under this Bond, the Surety shall not be liable for any provisions of the Purchase Agreement or specifications therein respecting the procurement of, or coverages provided by, any insurance, nor shall the Surety be liable under any hold harmless and/or indemnification agreements entered into by the Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of work and/or operations of any party in prosecuting the work to be performed under the Agreement.

Upon any failure by the Principal to carry out any or all of the Plugging, Abandonment and Decommissioning Obligations associated with the Assets identified on Exhibit A to this Bond and the Obligee has presented to the Surety a written notice that the Principal is in default of such Plugging, Abandonment and Decommissioning Obligations (in each case, the "Defaulted Plugging Abandonment and Decommissioning Obligations"), and such condition has persisted for thirty (30) days after written notice of such default has been given by certified mail to the Principal and to the Surety separately at their last known respective addresses, the Obligee shall then proceed to solicit at least two (2) written bids from generally recognized third party contractors with experience performing plugging, abandonment and decommissioning in the United States Gulf of Mexico for the performance of the Defaulted Plugging, Abandonment and Decommissioning Obligations and submit such third party bids to the Surety, following receipt of which the Surety shall, within thirty (30) days, either: (1) pay to the Obligee an amount equal to the lesser of such written third party bids, but not exceeding the Penal Sum (reduced, as applicable, as provided for herein), and the obligations associated with this Bond shall then be considered null and void to the extent paid; or (2) commence, or cause to be commenced, the necessary operations to perform the Defaulted Plugging, Abandonment and Decommissioning Obligations.

IndemCo

If the Surety shall decide, upon default by the Principal, to pay to the Obligee an amount equal to the lesser of the third party bids for the performance of the Defaulted Plugging, Abandonment and Decommissioning Obligations in accordance with the immediately preceding paragraph hereof, on or before the one hundred twentieth (120th) day following the completion of such Plugging, Abandonment and Decommissioning Obligations, the Obligee shall deliver to Surety a statement (the "Final Cost Statement") of the actual and verifiable costs and expenses actually incurred by Obligee to perform the Defaulted Plugging, Abandonment and Decommissioning Obligations, along with reasonable documentation in support thereof (including any third party invoices associated with the performance of such Defaulted Plugging, Abandonment and Decommissioning Obligations). If such costs and expenses, in the aggregate (the "Aggregate Cost Amount"), exceed the amount of the initial payment made hereunder by the Surety to the Obligee (the "Surety Payment Amount"), the Surety shall pay to Obligee, on or before the thirtieth (30th) day following the date of the Final Cost Statement, an amount equal to the positive difference between the Aggregate Cost Amount and the Surety Payment Amount. If the Surety Payment Amount exceeds the Aggregate Cost Amount, Obligee shall pay to the Surety, on or before the thirtieth (30th) day following the date of the Final Cost Statement, an amount equal to the positive difference between the Surety Payment Amount and Aggregate Cost Amount.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the performance of any Defaulted Plugging, Abandonment and Decommissioning Obligations of Principal, the Surety shall continue to perform, or cause the performance of, such obligations until such time as the Defaulted Plugging, Abandonment and Decommissioning Obligations have been truly and faithfully performed and discharged, thereby reducing the Penal Sum by an amount equal to the actual and verifiable costs and expenses incurred by the Surety to perform, or cause the performance of, the Defaulted Plugging, Abandonment and Decommissioning Obligations.

If the Surety shall decide, upon default by the Principal, to commence, or cause to be commenced, the performance of any Defaulted Plugging, Abandonment and Decommissioning Obligations of Principal, then **SURETY SHALL FULLY DEFEND, PROTECT, INDEMNIFY, HOLD HARMLESS, AND RENDER WHOLE OBLIGEE, ITS AFFILIATES, AND ITS AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, EMPLOYEES, OFFICERS, LENDERS, ADVISORS, REPRESENTATIVES, ACCOUNTANTS, ATTORNEYS, CONSULTANTS AND AGENTS (THE, "INDEMNIFIED PARTIES") FROM AND AGAINST EACH AND EVERY CLAIM, DEMAND OR CAUSE OF ACTION, AND ANY LIABILITY, COST, EXPENSE (INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEYS' FEES), OR CLAIMS WITH RESPECT TO DAMAGE OR LOSS IN CONNECTION THEREWITH, WHICH MAY BE MADE OR ASSERTED BY SURETY, ITS AGENTS, SUCCESSORS OR ASSIGNS, OR BY ANY THIRD PARTY OR PARTIES (INCLUDING, BUT NOT LIMITED TO, GOVERNMENTAL AGENCIES) ON ACCOUNT OF PERSONAL INJURY, DEATH, PROPERTY DAMAGE AND/OR ENVIRONMENTAL DAMAGE ARISING FROM OR IN CONNECTION WITH THE PERFORMANCE OF SUCH DEFAULTED PLUGGING, ABANDONMENT AND DECOMMISSIONING OBLIGATIONS, AND ANY CLAIMS AND/OR DEMANDS ASSOCIATED THEREWITH, CAUSED BY, ARISING OUT OF, OR INCIDENTAL TO THE PAST, PRESENT OR FUTURE CONDITION OR STATE OF REPAIR OF SAID ASSETS, OR THE OWNERSHIP AND USE THEREOF, UNDER THIS BOND, HOWSOEVER OCCURRING, INCLUDING, WITHOUT LIMITATION, WHETHER SUCH CLAIMS, DEMANDS, DAMAGES, LOSSES AND LIABILITIES, WITH OR WITHOUT FAULT, WERE CAUSED BY THE SURETY'S OR THE SURETY'S CONTRACTORS' OR SUBCONTRACTORS' SOLE NEGLIGENCE OR CONTRIBUTORY NEGLIGENCE, AND/OR**

IndemCo

Bond No. 2196705

**OBLIGEE'S CONTRIBUTORY NEGLIGENCE (EXCEPT TO THE EXTENT OF THE GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT OF OBLIGEE), OR IMPOSED ON SAID PARTIES OR OTHERS UNDER ANY THEORY OF STRICT LIABILITY BY OPERATION OF LAW, OR ANY COMBINATION THEREOF, OR ANY OTHER THEORY OF LAW PRIOR TO, AT THE TIME OF, OR SUBSEQUENT TO THE EFFECTIVE DATE HEREOF. SUCH INDEMNIFICATION BY SURETY SHALL NOT BE LIMITED TO THE ORIGINAL OR ANY AMENDED PENAL SUM OF THIS BOND BUT SHALL BE SUBJECT TO THE LIMITATION OF DAMAGES PROVIDED IN SECTION 12.4(B) OF THE PURCHASE AGREEMENT.**

Any suit under this Bond must be instituted before the expiration of two (2) years from the date on which a default by the Principal, as detailed herein, falls due or is discovered by the Obligee, whichever is later, and, subject to the two (2) year limitation, the Surety consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said court. The Surety hereby waives any defenses to liability on this Bond based on an unauthorized Principal signature.

No amendment of or supplement to the terms or provisions of the Purchase Agreement or of the exhibits attached thereto shall release the Principal and the Surety or any of them from their liability under this Bond, notice to the Surety of any such amendment or supplement being hereby waived, except to the extent that is herein provided.

No assignment of the Purchase Agreement or any or all of the Assets by the Principal, its successors or assigns, and no delay, neglect or failure of the Obligee to proceed promptly to enforce the Purchase Agreement or to proceed promptly in the premises in case of any default on the part of the Principal shall in any degree relieve the Principal and the Surety or any of them of their obligations under this Bond.

HOWEVER, if upon assignment of the Purchase Agreement or any or all of the Assets by the Principal, its successors or assigns, the Principal shall have the right, but not the obligation, to cause its assignee to post security, in the form of a bond substantially similar to the form hereof or other acceptable security in the Obligee's reasonable discretion, including the requirement that the replacement security is issued by a financial institution that is listed in the U.S. Treasury Department's Listing of Approved Sureties (Department Circular 570) with a single bond underwriting limitation of not less than $25,000,000 and an AM Best Rating of at least "A-,XIII" in the amount necessary to replace this Bond. If so posted, the Obligee will not unreasonably withhold acceptance of such security in lieu of this Bond and issue an unconditional release of this Bond within thirty (30) days of its acceptance of such other security.

No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Principal, the Obligee, their heirs, executors, administrators or successors.

NOW, THEREFORE, if the said Principal shall faithfully observe and honestly comply with the provisions contained herein and in the Purchase Agreement relating to the Plugging, Abandonment and Decommissioning Obligations with respect to the Assets, then this obligation shall become null and void and of no effect.



Bond No. 2196705

The Principal shall pay all premiums required to maintain this Bond in full force and effect until such time as the requirements for such Bond terminates in accordance with the provisions hereof. Surety stipulates and agrees that, regardless of the payment or nonpayment by Principal of any premiums owing with respect to this Bond, Surety's obligations under this Bond are continuing obligations and shall not be affected or discharged by any failure by Principal to pay any such premiums.

Written notices sent hereunder shall be sent by certified mail or trackable courier service to the following addresses (unless changed by a notice of change of address):

Fieldwood Energy Offshore LLC
2000 W. Sam Houston Parkway
Suite 1200
Houston, Texas 77042
Attention: John H. Smith

Eni Petroleum US LLC
Eni US Operating Co. Inc.
1200 Smith Street, Suite 1700
Houston, Texas 77002
Attention: Gary F. Clifford

North American Specialty Insurance Company
650 Elm Street
Manchester, New Hampshire 03101
Attention: Erik Janssens

(Remainder of page intentionally left blank)

IndemCo

Bond No. 2196705

**IN WITNESS WHEREOF**, the above bound parties have executed this instrument to be effective on December 1, 2015, the name of each corporate party duly signed by its undersigned representative pursuant to authority of its governing body.

WITNESSES:                                    *Fieldwood Energy Offshore LLC*

_Marie T. Morel_

_Paula Vera_                                  Principal

By: _John S_
(Name/Title)
John H. Smith
Vice President

WITNESSES:                                    *North American Specialty Insurance Company*

_Wendy E. Pierson_

_____                              Surety

By: _Michele K. Tyson_
Michele K. Tyson, Attorney-in-Fact

WITNESSES:                                    *Eni Petroleum US LLC*
                                              *Eni US Operating Co. Inc.*

_____                       Obligee

_____                       By: _____
                                              (Name/Title)

IndemCo

Bond No. 2196705

## Exhibit A

Attached to and made a part of Bond No. 2196705 issued by North American Specialty
Insurance Company on behalf of Fieldwood Energy Offshore LLC

| Area/Block | Lease Number |
|---|---|
| Galveston 151 | OCS-G 15740 |
| Ship Shoal 246 | OCS-G 1027 |
| Ship Shoal 247 | OCS-G 1028 |
| Ship Shoal 248 | OCS-G 1029 |
| Ship Shoal 249 | OCS-G 1030 |
| Vermilion 78 | OCS-G 4421 |
| Vermilion 313 | OCS-G 1172 |
| West Cameron 72 | OCS-G 23735 |
| West Cameron 100 | OCS-G 22510 |
| West Cameron 130 | OCS-G 12761 |

IndemCo

**NAS SURETY GROUP**

NORTH AMERICAN SPECIALTY INSURANCE COMPANY
WASHINGTON INTERNATIONAL INSURANCE COMPANY
WESTPORT INSURANCE CORPORATION

**GENERAL POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, THAT North American Specialty Insurance Company, a corporation duly organized and existing under laws of the State of New Hampshire, and having its principal office in the City of Manchester, New Hampshire and Washington International Insurance Company a corporation organized and existing under the laws of the State of New Hampshire and having its principal office in the City of Schaumburg, Illinois, and Westport Insurance Corporation, organized under the laws of the State of Missouri, and having its principal office in the City of Overland Park, Kansas each does hereby make, constitute and appoint:

EDWIN H. FRANK, III, W. RUSSELL BROWN, JR., and MICHELE K. TYSON

JOINTLY OR SEVERALLY

Its true and lawful Attorney(s)-in-Fact, to make, execute, seal and deliver, for and on its behalf and as its act and deed, bonds or other writings obligatory in the nature of a bond on behalf of each of said Companies, as surety, on contracts of suretyship as are or may be required or permitted by law, regulation, contract or otherwise, provided that no bond or undertaking or contract or suretyship executed under this authority shall exceed the amount of:

ONE HUNDRED TWENTY FIVE MILLION ($125,000,000.00) DOLLARS

This Power of Attorney is granted and is signed by facsimile under and by the authority of the following Resolutions adopted by the Boards of Directors of North American Specialty Insurance Company and Washington International Insurance Company at meetings duly called and held on March 24, 2000 and Westport Insurance Corporation by written consent of its Executive Committee dated July 18, 2011.

"RESOLVED, that any two of the President, any Senior Vice President, any Vice President, any Assistant Vice President, the Secretary or any Assistant Secretary be, and each or any of them hereby is authorized to execute a Power of Attorney qualifying the attorney named in the given Power of Attorney to execute on behalf of the Company bonds, undertakings and all contracts of surety, and that each or any of them hereby is authorized to attest to the execution of any such Power of Attorney and to attach therein the seal of the Company; and it is

FURTHER RESOLVED, that the signature of such officers and the seal of the Company may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be binding upon the Company when so affixed and in the future with regard to any bond, undertaking or contract of surety to which it is attached."

By _____
Steven P. Anderson, Senior Vice President of Washington International Insurance Company
& Senior Vice President of North American Specialty Insurance Company
& Senior Vice President of Westport Insurance Corporation

By _____
Mike A. Ito, Senior Vice President of Washington International Insurance Company
& Senior Vice President of North American Specialty Insurance Company
& Senior Vice President of Westport Insurance Corporation

IN WITNESS WHEREOF, North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation have caused their official seals to be hereunto affixed, and these presents to be signed by their authorized officers this this ___28th___ day of ___January___, 20_15_.

**North American Specialty Insurance Company**
**Washington International Insurance Company**
**Westport Insurance Corporation**

State of Illinois
County of Cook ss:

On this 28th day of ___January___, 20_15_, before me, a Notary Public personally appeared ___Steven P. Anderson___, Senior Vice President of Washington International Insurance Company and Senior Vice President of North American Specialty Insurance Company and Senior Vice President of Westport Insurance Company and ___Michael A. Ito___ Senior Vice President of Washington International Insurance Company and Senior Vice President of North American Specialty Insurance Company and Senior Vice President of Westport Insurance Corporation, personally known to me, who being by me duly sworn, acknowledged that they signed the above Power of Attorney as officers of and acknowledged said instrument to be the voluntary act and deed of their respective companies.

OFFICIAL SEAL
M KENNY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/04/2017

M. Kenny, Notary Public

I, ___Jeffrey Goldberg___, the duly elected ___Vice President and Assistant Secretary___ of North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney given by said North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation which is still in full force and effect.

IN WITNESS WHEREOF, I have set my hand and affixed the seals of the Companies this _1st_ day of ___December___, 20_15_.

Jeffrey Goldberg, Vice President & Assistant Secretary of Washington International Insurance Company &
North American Specialty Insurance Company & Vice President & Assistant Secretary of Westport Insurance Corporation

## REDUCTION RIDER

Rider No. 1

To be attached and form part of **Bond No. 2196705** issued by North American Specialty Insurance Company (**as Surety**), effective December 1, 2015

| | |
|---|---|
| In the amount of: | $24,215,000 |
| On behalf of: | Fieldwood Energy Offshore LLC (as Principal) |
| In favor of: | Eni Petroleum US LLC and Eni US Operating Co. Inc. (collectively, as Obligee) |

In consideration of the premium charged for the above bond, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually understood and agreed by the Principal, Surety, and Obligee that:

**The Bond amount shall be adjusted as follows:**

**This Bond amount shall be decreased by $4,265,000.**

**Total Revised Bond Amount is Now:**

**Nineteen Million and Nine Hundred and Fifty Thousand U.S. Dollars and NO/100 --- Dollars ($19,950,000).**

All other terms, limitations, and conditions of said bond except as herein expressly modified shall remain unchanged.

This rider shall be effective as of the 11th day of February 2016.

Signed, sealed and dated the ___8th___ day of March, 2016.

**Fieldwood Energy Offshore LLC**

By: _____
Name: _John H. Smith_
Title: _Senior Vice President_

**North American Specialty Insurance Company**
By: _____
Name: _Michele K. Tyson_
Title: _Attorney-in-Fact_

**Acknowledged By:**

**Eni Petroleum US LLC**

By: _____
Name: _Fabrizio Trilli_
Title: _President & CEO_

**Eni US Operating Co. Inc.**

By: _____
Name: _Fabrizio Trilli_
Title: _President & CEO_

### NAS SURETY GROUP

NORTH AMERICAN SPECIALTY INSURANCE COMPANY
WASHINGTON INTERNATIONAL INSURANCE COMPANY
WESTPORT INSURANCE CORPORATION

### GENERAL POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, THAT North American Specialty Insurance Company, a corporation duly organized and existing under laws of the State of New Hampshire, and having its principal office in the City of Manchester, New Hampshire and Washington International Insurance Company a corporation organized and existing under the laws of the State of New Hampshire and having its principal office in the City of Schaumburg, Illinois, and Westport Insurance Corporation, organized under the laws of the State of Missouri, and having its principal office in the City of Overland Park, Kansas each does hereby make, constitute and appoint:

EDWIN H. FRANK, III, W. RUSSELL BROWN, JR., and MICHELE K. TYSON

JOINTLY OR SEVERALLY

Its true and lawful Attorney(s)-in-Fact, to make, execute, seal and deliver, for and on its behalf and as its act and deed, bonds or other writings obligatory in the nature of a bond on behalf of each of said Companies, as surety, on contracts of suretyship as are or may be required or permitted by law, regulation, contract or otherwise, provided that no bond or undertaking or contract or suretyship executed under this authority shall exceed the amount of:

ONE HUNDRED TWENTY FIVE MILLION ($125,000,000.00) DOLLARS

This Power of Attorney is granted and is signed by facsimile under and by the authority of the following Resolutions adopted by the Boards of Directors of North American Specialty Insurance Company and Washington International Insurance Company at meetings duly called and held on March 24, 2000 and Westport Insurance Corporation by written consent of its Executive Committee dated July 18, 2011.

"RESOLVED, that any two of the President, any Senior Vice President, any Vice President, any Assistant Vice President, the Secretary or any Assistant Secretary be, and each or any of them hereby is authorized to execute a Power of Attorney qualifying the attorney named in the given Power of Attorney to execute on behalf of the Company bonds, undertakings and all contracts of surety, and that each or any of them hereby is authorized to attest to the execution of any such Power of Attorney and to attach therein the seal of the Company; and it is

FURTHER RESOLVED, that the signature of such officers and the seal of the Company may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be binding upon the Company when so affixed and in the future with regard to any bond, undertaking or contract of surety to which it is attached."

By _____
Steven P. Anderson, Senior Vice President of Washington International Insurance Company
& Senior Vice President of North American Specialty Insurance Company
& Senior Vice President of Westport Insurance Corporation

By _____
Mike A. Ito, Senior Vice President of Washington International Insurance Company
& Senior Vice President of North American Specialty Insurance Company
& Senior Vice President of Westport Insurance Corporation

IN WITNESS WHEREOF, North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation have caused their official seals to be hereunto affixed, and these presents to be signed by their authorized officers this this ___28th___ day of ___January___, 20 _15_.

North American Specialty Insurance Company
Washington International Insurance Company
Westport Insurance Corporation

State of Illinois
County of Cook     ss:

On this 28th day of ___January___, 20 _15_, before me, a Notary Public personally appeared ___Steven P. Anderson___, Senior Vice President of Washington International Insurance Company and Senior Vice President of North American Specialty Insurance Company and Senior Vice President of Westport Insurance Corporation and ___Michael A. Ito___ Senior Vice President of Washington International Insurance Company and Senior Vice President of North American Specialty Insurance Company and Senior Vice President of Westport Insurance Corporation, personally known to me, who being by me duly sworn, acknowledged that they signed the above Power of Attorney as officers of and acknowledged said instrument to be the voluntary act and deed of their respective companies.

OFFICIAL SEAL
M KENNY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/04/2017

M. Kenny, Notary Public

I, ___Jeffrey Goldberg___, the duly elected Vice President and Assistant Secretary of North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney given by said North American Specialty Insurance Company, Washington International Insurance Company and Westport Insurance Corporation which is still in full force and effect.

IN WITNESS WHEREOF, I have set my hand and affixed the seals of the Companies this _8th_ day of ___March___, 20 _16_.

Jeffrey Goldberg, Vice President & Assistant Secretary of Washington International Insurance Company &
North American Specialty Insurance Company & Vice President & Assistant Secretary of Westport Insurance Corporation