IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.*[1] | § | CASE NO.  20-33948 (MI) |
| | § | |
| Debtors. | § | Jointly Administered |

**CHEVRON U.S.A. INC. AND NOBLE ENERGY, INC.'S OBJECTION TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
(I) THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) PROPOSED VOTING AND TABULATION PROCEDURES,
(III) PROCEDURES FOR EXECUTORY CONTRACT ASSUMPTION AND
ASSIGNMENT, AND (IV) PROCEDURES FOR ASSIGNMENT
AND TRANSFER OF PROPERTY OF THE ESTATE**

[Relating to Dkt. Nos. 723 & 724]

Chevron  U.S.A. Inc. ("CUSA") and Noble Energy, Inc. ("Noble") (collectively "Chevron"),

by and through their undersigned counsel, pursuant to Bankruptcy Code Section 1125 and

Bankruptcy Rule 3017, submit this Objection to Fieldwood Energy LLC's, and its Debtor

Affiliates, (collectively, the "Debtors" or "Fieldwood") *Motion for Entry of an Order (I)*

*Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures*

*With Respect to Confirmation of Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms*

*of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures*

*and Related Materials, (V) Scheduling Certain Dates With Respect Thereto, and (VI) Granting*

*Related Relief* [Dkt. No. 724] (the "Motion") and the *Disclosure Statement For The Joint Chapter*

---

[1]  Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

4837-4188-2844, v. 2

*11 Plan Of Reorganization of Fieldwood Energy LLC and Its Debtor Affiliates* [Dkt. No. 723] (the

"Disclosure Statement").[2] In support of this Objection, Chevron respectfully states as follows:

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Disclosure Statement, the Plan, and the Motion, as applicable.

4837-4188-2844, v. 2

**TABLE OF CONTENTS**

I.   SUMMARY OF OBJECTION ........................................................................................ 6

II.  FACTUAL BACKGROUND ...................................................................................... 16

    A.  Debtors Own Significant Assets that Are Aging and Require Maintenance ................... 16

    B.  Debtors Are Not in Compliance with Safety and Environmental Regulations ................ 17

    C.  Chevron Appears in the Chain of Title of Many of Debtors' Leases ............................... 20

    D.  Debtors Are Solely Liable to Satisfy Obligations on an Unknown Number of Assets .... 22

    E.  The Bankruptcy Case and Plan ....................................................................................... 22

        *1.  The Credit Bid Sale of the "Good Assets"* .................................................................. 23

        *2.  The Allocation of Select Leases Between FWE I and FWE III* .................................. 24

        *3.  The Purported Forced Return of Leases to Predecessors* ........................................... 25

III. ARGUMENT & AUTHORITIES .............................................................................. 26

    A.  The Disclosure Statement Cannot Be Approved Because It Does Not Contain Adequate Information as Required by Bankruptcy Code Section 1125. ................................................. 26

        *1.  Debtors Must Submit a Disclosure Statement With Adequate Information to Allow Parties to Make Informed Decisions to Accept or Reject the Plan* ........................................ 26

            *a.  There is inadequate disclosure regarding the Credit Bid Transaction* .................... 28

            *b.  There is inadequate disclosure regarding the approximately 750 leases to be allocated to FWE I or FWE III, or forcibly returned to the Predecessors* ........................ 31

            *c.  There is inadequate disclosure of ongoing civil and criminal investigations of Debtors' operation and maintenance of their assets* ........................................................ 32

            *d.  There is inadequate disclosure regarding the use of a divisive merger to "allocate" the assets of Debtors between FWE I and FWE III* .......................................................... 33

            *e.  There is inadequate disclosure regarding the Plan's transfer of assets and liabilities to FWE I* .......................................................................................................... 34

            *f.  There is inadequate disclosure regarding the Plan's allocation of assets and liabilities to FWE III* ....................................................................................................... 36

            *g.  There is inadequate disclosure regarding the Plan's treatment of the Abandoned Properties* .......................................................................................................... 38

            *h.  There is inadequate disclosure regarding the financial analyses relevant to consideration of the Plan* ............................................................................................... 42

            *i.  There is inadequate disclosure regarding administrative claims for the satisfaction of Debtors' decommissioning obligations* ................................................... 43

            *j.  There is no disclosure regarding the estimated return to creditors in a Chapter 7 liquidation of Debtors, and why proceeding with the current Plan is in the overall best interest of the estate and its creditors* ............................................................ 43

4837-4188-2844, v. 2

   *k. There is inadequate disclosure regarding Releases to be granted under the Plan* ... 44

 B. The Disclosure Statement Cannot Be Approved Because the Plan is Patently Unconfirmable ................................................................................................................. 45

 C. The Proposed Voting and Tabulation Procedures Fail to Provide Class 6 Creditors the Affirmative Ability to Vote in Their Claim in the Dollar Amount that the Plan Seeks to Impose Upon Them ............................................................................................................. 47

 D. The proposed timeframes for filing critical documents via the Plan Supplement and time periods for objections fail to provide proper notice and an opportunity to object .................. 49

IV. RESERVATION OF RIGHTS ......................................................................................... 50

V. CONCLUSION ................................................................................................................. 51

CERTIFICATE OF SERVICE ............................................................................................. 51

4837-4188-2844, v. 2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997)...................................45

*In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) ..........................................45

*In re American Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009) ...................43

*In re Applegate Prop., Ltd.*, 133 B.R. 827, 829-31 (Bankr. W.D. Tex. 1991)...................26

*In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).....................................45

*In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016) ...................26, 27

*In re Eastern Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991).....................45

*In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) .......................................................27

*In re H.L.S. Energy Co., Inc.*, 1551 F.3d 434 (5th Cir. 1998) ..........................................43

*In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986) ...................................................27

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)) ...........27, 28

*In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).................................26

*Mabey v. Southwestern Elec. Power Co.* (*In re Cajun Elec. Power Coop, Inc.*), 150 F.3d 503, 518 (5th Cir. 1998)...........................................................................................................27

*Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) ................26

**Statutes**

11 U.S.C. § 1125(a) ...........................................................................................................26

43 U.S.C. § 1331................................................................................................................17

43 U.S.C. § 1337(d) ...........................................................................................................28

**Regulations**

30 C.F.R. § 556.403 ...........................................................................................................17

30 C.F.R. § 556.403(c) .......................................................................................................29

30 C.F.R. § 556.400 .......................................................................................................17, 28

30 C.F.R. § 556.403(a) .......................................................................................................28

30 C.F.R. § 556.700 .......................................................................................................17, 29

30 C.F.R. § 556.704 ...........................................................................................................29

30 C.F.R. § 556.900 *et seq.*.................................................................................................31

4837-4188-2844, v. 2

# I.    SUMMARY OF OBJECTION

1.    The Debtors have current and expected decommissioning and plugging and abandonment obligations of approximately ***$9 billion.***[3]   How these enormous obligations are dealt with is critically important to the creditors of the estate, regulatory agencies, U.S. taxpayers, and the energy industry in the Gulf of Mexico. The Disclosure Statement describes a Plan that, at its core, is a liquidation of Debtors' assets masquerading as a "reorganization." Behind Debtors' smoke and mirrors is a liquidating plan that attempts (i) to shuffle around billions of dollars of decommissioning obligations to newly-created special purpose entities without clear ability of those entities to satisfy such obligations, (ii) to foist ***billions of dollars***[4] of safety and environmental obligations upon the U.S. government, taxpayers, and others; and (iii) to obtain a discharge of Debtors' pre-petition liabilities along with broad releases for themselves and favored parties.

2.    What the liquidating Plan attempts to achieve, and how it seeks to do so, are truly *unprecedented*. Debtors' Plan is fundamentally flawed; it violates the Bankruptcy Code and applicable law, including regulatory requirements that govern the offshore energy industry.   The liquidating Plan has three main components. *First*, the Plan transfers selected revenue-generating assets via a credit bid sale to NewCo—a special purpose entity owned by Debtors' lenders and managed by the same, twice-failed Debtors' management team.   This sale component benefits the lenders and harms creditors by removing the ability for this revenue to satisfy the billions of dollars

---

[3] Various federal agencies filed proofs of claim (Claim Nos. 893-902), which assert in the aggregate $9 billion in decommissioning-related claims.

[4] This number relates to the Abandoned Properties and is based on publicly available P50 and P90 probabilistic cost estimates (*i.e.*, that there is a 50% or 90% probability that the actual cost will be less than the estimated cost) from the Bureau of Safety and Environmental Enforcement ("BSEE"). This also includes costs for non-federal leases derived from BSEE's per well and per platform costs.

4837-4188-2844, v. 2

of Debtors' environmental, safety, and decommissioning obligations.  *Second*, the Plan transfers to newly formed special purpose entities (*i.e.*, FWE I and FWE III) more than 500 negative value leases along with their safety, environmental, and contractual obligations. These entities are designed to wind down these former parts of the Debtors' business.  However, according to the Debtors, these entities will receive all the estates' "available funds."  Even with the infusion of these funds, there are significant questions about these new entities' financial ability to satisfy their decommissioning obligations.  Moreover, based on how the Debtors have constructed the first and second components of their liquidating Plan, it appears no other funding exists for the more than *$1 billion* of remaining decommissioning obligations.  This means that the Debtors' Plan appears to treat similarly-situated creditors very differently; it selects certain creditors to receive some benefit and others to receive none.

3.      Under the *third* component of Debtors' Plan, Debtors propose to walk away from and forcibly "return" 187 leases in their Abandoned Properties category to unidentified "Predecessors." Debtors' Plan would require that Predecessors and others—including U.S. taxpayers—satisfy Debtors' *billions* of dollars of decommissioning, safety, and environmental obligations, along with related contractual obligations. This part of the Plan presents serious obstacles in addition to the obvious inequitable and unfair treatment.  It violates core tenants of the Bankruptcy Code and other federal law and regulations, which make it clear that no lease can be transferred to any party without its consent.  And even if consent existed, which it does not, no applicable law permits Debtors to transfer already-terminated leases, of which there are many.

4.      Because the Plan does not contemplate an actual reorganization in which a restructured Fieldwood emerges, owns and operates its business, and retains Fieldwood employees, no legal basis exists under the Bankruptcy Code for a discharge or a release.  In reality,

Debtors' Plan is a liquidation that is largely premised on the compelled use of other people's money to satisfy Debtors' multi-billion dollars of safety, environmental, and other liabilities.

5. As identified above, among the Plan's foundations is the forced "return" of certain of the Debtors' assets to Predecessors. Such a forced return of assets would be unprecedented. Critically, no legal basis exists to compel "Predecessors" to accept any leases or other contracts associated with and integral to the ownership and/or operation of such assets. Nor do Debtors provide any alternative path to achieve the proposed transactions. This fatal flaw, and others addressed below, render the Plan facially unconfirmable and warrant outright denial of Debtors' request for approval of the Disclosure Statement. No additional disclosure could cure these foundational problems. But even if Debtors could overcome these fatal flaws, other numerous and significant deficiencies remain that preclude approval of the Disclosure Statement and confirmation of the Plan.

6. Debtors are among the largest operators and owners of leases in the Gulf of Mexico, and their Plan threatens to set a dangerous precedent in the Gulf and elsewhere by leaving behind approximately 750 leases (*i.e.*, those leases not sold to NewCo) with no information on the status of their aging platforms and wells, and no realistic proposal to address and fund associated safety and environmental obligations. [Dkt. No. 723, p. 26]. The Disclosure Statement, for example, has *no information* about the status or condition of the assets on the leases, or how Debtors would address hundreds of reported safety violations relating to their physical condition; *no information* on Debtors' process to safely and orderly transfer ongoing operations covering thousands of wells and platforms to others; and *no information* as to how many of the assets would be left to taxpayers to address.[5] The Plan also has *no information* regarding the current co-owners and predecessors in

---

[5] In response to numerous requests by Chevron and others, the Debtors just recently agreed to make a database with certain lease information available, conditioned upon parties signing a pre-existing Protective

4837-4188-2844, v. 2

chain of title for each lease. In fact, the Plan fails to recognize (or completely ignores) key distinction between co-owners and predecessors – *i.e.*, that current co-owners will *first* be responsible for Debtors' liabilities. Instead, Debtors group together, as "Predecessors," both the predecessors-in-interest and the current co-owners of working interests. [Dkt. No. 723, p. 3]. This failure to distinguish current co-owners and predecessors-in-title with respect to liability obscures how creditors could be impacted by the Plan and underscores the importance of this information, which has not been disclosed by Debtors.

7.      Debtors should be well aware of the essential nature of such information and should not resist fully disclosing it given their professed "commit[ment] to maintaining safe and efficient operations, with the paramount goal of protecting personnel, the environment, and its facilities." [Dkt. No. 723, p. 27]. Fulsome disclosure is all the more critical given alarming reports of Debtors' unsafe operation and maintenance of their assets. In 2020 alone, Debtors received more than 200 Incidents of Non-Compliance ("INCs") issued by BSEE. Yet Debtors disclose nothing about these INCs, how many remain outstanding, or how the Plan would address them. Indeed, the U.S. Department of Justice recently indicted two Fieldwood platform supervisors for alleged criminal acts of disregarding safety and environmental regulations, including fraudulent reporting and "misrepresentations in inspection records" that give an "artificial impression" of compliance.[6] The

---

Order. It is unknown to what extent, if any, the database information addresses the myriad of problems with the Disclosure Statement. Perhaps more troubling is that Debtors' delay in providing this information will not permit parties even close to adequate time to evaluate the voluminous and complex data on a lease-by-lease basis prior to the hearing on approval of the Disclosure Statement. Parties should not be prejudiced by the manner in which the Debtors have slow-played providing relevant information.

[6] *See United States v. Huse*, 21-2-00002 (E.D. La.) ("Huse Indictment") [Dkt. no. 1]; *see also United States v. Wall*, 2:21-cr-00001 (E.D. La.) ("Wall Indictment") [Dkt. No. 1]. The indictments indicate Messrs. Wall and Huse are employees of "Company A." Fieldwood's contemporaneous press release and the platforms identified in the indictment indicate that Fieldwood is Company A. Fieldwood's press release, which was issued on the same date as the indictments, states, "Fieldwood understands that the United States Attorney for the Eastern District of Louisiana has issued indictments against **two Fieldwood employees** regarding

Department of Justice alleges that operators joked that the motto on one of Fieldwood's largest producing platforms was "*Safe and sound until production's down*."[7]  Here, production is *down* on an untold number of leases[8] and Debtors must disclose information to evaluate whether the assets are, indeed, *safe and sound*.  Creditors, as the intended targets of a return of these assets, must have information about their condition.  The Disclosure Statement contains none of this important information.

8.  Creditors are also entitled to know whether the newly created special purpose entities—NewCo, FWE I and FWE III—will be adequately capitalized to satisfy the safety and environmental obligations the Plan seeks to transfer to them, or whether these entities are destined later to file their own petitions under the Bankruptcy Code and demand, once again, that others satisfy their obligations.  In particular, the NewCo and FWE III transactions appear to be premised on providing no new financial security to cover the decommissioning obligations that each is assuming.  Federal regulations require lease assignees to provide new security in amounts determined by Department of the Interior, but there is no such mechanism in the Plan for that basic compliance.  Further, for FWE III, there is a reference to an existing $9 million bond, but no other information is provided. Last, based on information known to date, the estimated costs to

---

alleged misconduct that occurred several years ago at three platforms. https://www.fieldwoodenergy.com/wp-content/uploads/2021/01/Action-by-US-Attorneys-Office.pdf (emphasis added); https://www.nola.com/news/environment/article_3e9760ba-5a9f-11eb-b0eb-7beb452a34df.html ("Federal court documents refer to Fieldwood Energy as "Company A," but the firm has acknowledged the indictments in a news release."); *see also https://www.reuters.com/article/us-usa-crime-fieldwood-energy-idUKKBN29P05Z.* In addition, the three platforms at issue in the indictments are located on leases OCS-G04126 and OCS-G00175, which Debtors own and are identified in Fieldwood's Disclosure Statement.

[7]  Wall Indictment, ¶ 7 [Dkt. No. 1, 3].

[8]  The Disclosure Statement also omits information regarding the production status of any lease.

4837-4188-2844, v. 2

decommission the 21 leases to be transferred to FWE III is two to three times the maximum capitalization for that entity. The numbers simply do not work.

9. The unprecedented nature of the Plan and the serious questions raised by the proposed transactions make it imperative that Debtors' Disclosure Statement complies with Section 1125 of the Bankruptcy Code. Debtors must provide adequate information about how their proposed Plan affects creditors so that creditors and regulators can make informed decisions to accept or reject it. The current Disclosure Statement falls woefully short of this legal requirement and Chevron, therefore, objects to its approval.

10. In addition to objecting to the facially unconfirmable nature of the Plan, Chevron objects that the Disclosure Statement omits significant essential information, including but not limited to the following material information:

**a. Debtors have failed to disclose information regarding the Credit Bid Transaction**.

    i. Debtors must disclose NewCo's ability to obtain and maintain the necessary regulatory approvals and qualifications. [Objection, ¶ 41]

    ii. Debtors must disclose the Credit Bid Agreement, which contains among other information the list of assets and liabilities to be sold to NewCo. [Objection, ¶ 42]

    iii. Debtors must disclose NewCo's ability to satisfy its obligation to safely *maintain* the assets, including by providing proper financial accommodation consistent with the level of the decommissioning obligations for those transferred assets. [Objection, ¶ 43]

    iv. Debtors must disclose NewCo's ability to satisfy its obligation to safely *operate* the assets, including by providing proper financial accommodation consistent with the level of the decommissioning obligations for those transferred assets. [Objection, ¶ 43]

    v. Debtors must disclose NewCo's ability to satisfy its obligation to safely *decommission* the assets, including by providing proper financial accommodation consistent with the level of the decommissioning obligations for those transferred assets. [Objection, ¶ 43]

    vi. Debtors must disclose the estimated cost to decommission the leases transferred to NewCo, NewCo's ability to provide the financial assurance mandated by the

Bureau of Ocean Energy Management ("BOEM") and the source and true value of such financial security.  [Objection, ¶ 44]

vii.  Debtors must disclose the sources of all the funds in the estate including the $224 million being paid by the Credit Bid Purchaser, to understand how and where those funds are to be allocated.  [Objection, ¶ 45]

**b.  Debtors have wholly failed to disclose any information regarding the condition of approximately 750 leases that would be allocated to FWE I, FWE III, or forcibly returned to Predecessors.**

i.  For each of the approximately 750 leases not sold to NewCo, Debtors must disclose the operating status, the condition of any wells and platforms, all unresolved INCs and other safety concerns, the ownership and development history, and the period for which any leases have been terminated or relinquished.  [Objection, ¶ 46]

ii.  For each of the approximately 750 leases not sold to NewCo, Debtors must disclose the cost to perform outstanding decommissioning obligations, the extent of any bonding that secures Debtors' decommissioning obligations, the ability to access those bonds, and any unsecured associated liabilities that would fall to the taxpayers.  [Objection, ¶ 47]

**c.  Debtors have failed to disclose information regarding active civil and criminal investigations into, or related to, their platform operations and maintenance practices.**

i.  Debtors must disclose whether they and/or additional employees are the targets of any active criminal or civil investigation.  [Objection, ¶ 48]

ii.  Debtors must disclose the extent of the platforms supervised by Messrs. Huse and Wall and whether they will be hired by NewCo to supervise platforms transferred to NewCo.  [Objection, ¶ 49]

iii.  Debtors must disclose all policies and procedures relevant to the inspection of unmanned platforms and Debtors' efforts to ensure compliance with all associated regulations.  [Objection, ¶ 50]

**d.  Debtors have failed to disclose adequate information regarding the Plan's use of a divisive merger to allocate assets and liabilities among FWE I and FWE III.**

i.  Debtors must disclose FWE I's and FWE III's ability to obtain and maintain the necessary regulatory approvals and qualifications.  [Objection, ¶ 51]

ii.  Debtors must disclose the cost to cure any pre-petition defaults by Debtors relating to contracts that would be allocated and/or assigned to FWE I and FWE III. [Objection, ¶ 52]

**e. Debtors have failed to disclose adequate information regarding the assets and liabilities to be allocated to FWE I.**

    i. Debtors must disclose the identity of each Debtor entity that owns a working interest, the percentage working interest, and details regarding the Predecessors involved.  [Objection, ¶ 53]

    ii. Debtors must disclose if they intend to allocate less than their entire lease interests to FWE I, the extent of any partial interest so allocated, and how this would be accomplished.  [Objection, ¶ 54]

    iii. Debtors must disclose the nature of the interests allocated to FWE I that are described as "Incremental Interests."  [Objection, ¶ 55]

**f. Debtors have failed to disclose adequate information regarding the assets and liabilities to be allocated to FWE III.**

    i. Debtors must disclose the reason for allocating the 21 Schedule E leases to FWE III and excluding other leases.  [Objection, ¶ 56]

    ii. Debtors must disclose how FWE III would be capitalized.  [Objection, ¶ 57]

    iii. Debtors must disclose what adequate assurance exists that FWE III could satisfy its obligations, including its decommissioning obligations.  [Objection, ¶ 58]

    iv. Debtors must disclose the source of the $9 million in security, how the security would serve as a "backstop," and on what terms and conditions FWE III could utilize these funds to satisfy its environmental and decommissioning obligations. [Objection, ¶ 59]

    v. Debtors must disclose FWE III's ability to provide the financial assurance required by BOEM.  [Objection, ¶ 60]

**g. Debtors have failed to disclose adequate information regarding the 187 leases and other unidentified property comprising the Abandoned Properties.**

    i. Debtors must describe the process they propose to resolve objections by Predecessors related to the forced "return" of the Abandoned Properties. [Objection, ¶ 62]

    ii. Debtors must describe how the Plan will treat the Abandoned Properties and any associated contracts, if a Predecessor does not accept, or is not "forced" to accept, an Abandoned Property or its associated contracts.  [Objection, ¶ 63]

    iii. Debtors must identify all "orphan obligations" for which no Predecessor exists to satisfy and for which taxpayers would bear the cost to decommission.  [Objection, ¶ 64]

4837-4188-2844, v. 2

     iv.   Debtors must identify all assets comprising the Abandoned Properties with reasonable particularity, including the executory contracts, unexpired federal leases, rights-of-way, and rights-of-use-and-easement that would be forcibly "returned" to unidentified Predecessors. [Objection, ¶ 65]

     v.   Debtors must describe the process to safely transfer operating wells, platforms, and other lease facilities to identified Predecessors. [Objection, ¶ 66]

     vi.   Debtors must identify *which* of the 187 leases will be "returned" to *which* Predecessors and describe the process that will determine which Predecessor, among potentially several Predecessors, will be compelled to accept the forced "return" of each particular lease. [Objection, ¶ 67]

     vii.   Debtors must describe the legal basis and process to force the "return" of the Abandoned Properties to Predecessors. [Objection, ¶ 68]

     viii.   Debtors must identify agreements reached with creditors or other interested parties, including agreements for the "return" of the Abandoned Properties or performance of Debtors' decommissioning obligations. [Objection, ¶ 68]

     ix.   Debtors must describe the regulatory approvals required to "return" the Abandoned Properties to Predecessors and how these approvals would be obtained. [Objection, ¶ 68]

     x.   Debtors must identify the cost to cure each of their pre-petition defaults on contracts necessary for the safe "return," continued operation, and timely decommissioning of the Abandoned Properties. [Objection, ¶ 69]

**h. There is no disclosure of the liquidation analysis, valuation analysis, financial projections or other financial analyses and underlying assumptions that purport to justify the Plan**. [Objection, ¶ 70]

**i. There is inadequate disclosure regarding administrative claims.**

     i.   Debtors must identify the estimated cost of administrative claims that could be asserted and the nature of those claims. [Objection, ¶ 71]

     ii.   Debtors must describe how the Plan will address the administrative claims. [Objection, ¶ 71]

**j. There is no disclosure regarding the estimated return to creditors in a Chapter 7 liquidation of Debtors, and why proceeding with the current Plan is in the overall best interest of the estate and its creditors.**

     i.   There is no disclosure as to why Debtors should not convert the case to Chapter 7 [Objection, ¶ 72].

4837-4188-2844, v. 2

    **k. There is inadequate disclosure regarding the releases to be granted to the Released Parties.**

        i. Debtors must explain the basis for the Plan's grant of broad releases in what is, in effect, a plan of liquidation.  [Objection, ¶ 73]

        ii. Debtors must explain why certain non-debtors such as Apache that may owe other creditors contribution for decommissioning costs are included in the definition of Released Parties.  [Objection, ¶ 73]

    11.    Debtors' Motion not only seeks approval of the Disclosure Statement but also extensive relief including approval of voting and tabulation procedures, as well as procedures for responding to the various Plan proposed transactions.  As set forth below, each of these procedures have obvious, facial flaws and require significant changes that, among other things, provide adequate notice to creditors and contract parties.

    **a. The voting and tabulation procedures fail to provide Class 6 creditors the affirmative ability to vote their claim in the dollar amount that the Plan seeks to impose upon them.**

        i. Class 6 creditors should be affirmatively entitled to vote the amount of the economic harm that the Plan seeks to impose on them.   [Objection, ¶ 46]

    **b. Debtors' proposed dates for filing critical documents via the Plan Supplement and time periods for objections to the Plan transactions fail to provide proper notice and an opportunity to object.**

        i. The Plan Supplement, as it includes critical documents and information, must be filed at least 14 days before the Plan Objection Deadline, not the 7 days proposed, so that creditors and contract counter-parties receive sufficient notice as to whether their contracts and/or related claims are being assumed and assigned.  [Objection, ¶ 48]

        ii. Relatedly, the Credit Bid Transaction documents included in the Plan Supplement must be filed at least 14 days before any deadline to object to that transaction, including at least 14 days before objections to the assumption and assignment of contracts, not the 7 days proposed so that creditors and contract counter parties are provided fair and proper notice and an opportunity to object.  [Objection, ¶ 48]

        iii. The proposed contract cure notice must be filed and served at least 14 days prior to any objection deadline so that creditors and contract counter-parties are provided fair and proper notice and opportunity to object; the current proposal provides as little as two (2) days' notice before objections are due.  [Objection, ¶ 48]

4837-4188-2844, v. 2

iv. All the documents and exhibits related to the FWE I and FWE III transactions must be filed so that creditors and contract counter-parties are provided at least 14 days' notice with an opportunity to object, along with a definitive date after which no further amendments to the lease assets can occur. [Objection, ¶ 48]

12. For these reasons and the reasons set forth and described more fully herein, Chevron objects to the Disclosure Statement and Plan described therein. Chevron further requests that the Disclosure Statement not be approved until adequate disclosure of the information requested in this Objection is provided. If Debtors fail to do so, Debtors' Plan will remain patently unconfirmable and there is no valid basis for any aspect of the confirmation process to continue.

## II.     FACTUAL BACKGROUND

### A.  Debtors Own Significant Assets that Are Aging and Require Maintenance.

13. Debtors, despite having only existed since 2012, describe themselves as one of the largest oil and gas exploration and production companies in the Gulf of Mexico, especially in the shallow waters of the Outer Continental Shelf ("OCS"). [Dkt. No. 723, p. 26]. Debtors' achieved this size through aggressive acquisition of leases from other companies and the purchase of smaller operators with significant OCS leases.

14. The shallow water leases, which predominate the approximately 750 leases not sold to NewCo, often have wells, platforms, pipelines, and other lease facilities dating back to the 1950s, 1960s, and 1970s. Production from these leases has largely been depleted. Their aging infrastructure inherently requires extensive maintenance and can be difficult and costly to decommission.

15. Debtors do not disclose how many wells, platforms, and pipelines exist on these 750 leases. Preliminary review of the public records by Chevron, however, indicates that the 187 leases comprising the Abandoned Properties appear to contain 1715 wells, 276 platforms, and 281

4837-4188-2844, v. 2

pipelines. Debtors seek the Court's approval to walk away from environmental and regulatory liabilities on the Abandoned Properties with associated costs estimated to range from $1.6 billion to $2.7 billion.[9]

### B. Debtors Are Not in Compliance with Safety and Environmental Regulations.

16.     The exploration and production of minerals on the OCS is subject to the terms of the leases granted by the U.S. Department of the Interior, the Outer Continental Shelf Lands Act (43 U.S.C. § 1331 *et seq.*), and its implementing regulations.  Each lessee must be qualified to hold an OCS lease (30 C.F.R. § 556.400), is subject to disqualification for the failure to satisfy its obligations (30 C.F.R. § 556.403), must receive BOEM's approval for the transfer of any lease interest (30 C.F.R. § 556.700), and is responsible for permanently abandoning all wells and decommissioning all platforms and lease facilities within one year of the cessation of production or the lease's termination (30 C.F.R. §§ 250.1701 and 1703 *et seq*).  This regulatory scheme is intended to ensure the safe operation of leases and the timely completion of all end-of-lease obligations for the protection of the environment and the public's health and safety.

17.     Debtors' operations have drawn significant regulatory scrutiny.  In 2020 alone, routine BSEE inspections of Fieldwood's platforms and records resulted in more than 200 INCs, including 12 INCs mandating that a facility be shut in until the INC is remedied to BSEE's satisfaction.[10]  Due to Debtors' failure to disclose information regarding these INCs (or any other

---

[9]  The range of cost estimates to decommission these assets is based on BSEE's P50 and P90 probabilistic cost estimates (*i.e.*, that there is a 50% or 90% probability that the actual cost will be less than the estimated cost). The costs for the remaining 48 non-federal leases were derived from BSEE's per well and per platform costs.

[10] Per the BSEE Data Center: Fieldwood Energy LLC received 66 Warning INCs, 57 Component Shut-In INCs, and 9 Facility Shut-In INCs; Fieldwood Energy Offshore LLC received 51 Warning INCs, 22 Component Shut-In INCs, and 4 Facility Shut-In INCs; Fieldwood SD Offshore LLC received 2 Warning

4837-4188-2844, v. 2

INCs), it is unknown how many of these INCs (and potentially others that pre-date 2020) are unresolved. It is also unknown what work must be performed and the associated costs to remedy these INCs and safely operate or even gain physical access to Debtors' assets. Debtors must disclose information regarding their plans to address these INCs before assets are transferred or "returned."

18. Debtors' operations have also drawn the scrutiny of the Department of Justice. On January 15, 2021, the Department of Justice indicted Patrick Huse, who is alleged to be Fieldwood's "Person-in-charge" of the manned platform MP-310A and responsible for ensuring that operations on this platform complied with all federal laws and regulations.[11] Mr. Huse was charged with knowingly discharging oil into the Gulf and failing to report the discharge when, despite being aware of it, he allegedly refused to shut in production to allow for the repair or replacement of equipment that was causing the discharge.[12] Mr. Huse was separately charged with falsifying inspection logs by indicating on multiple occasions that mandated inspections of unmanned, satellite platforms were performed when, in fact, no such inspections occurred.[13] These alleged "misrepresentations in inspection records" are described in the indictment as providing an "artificial impression" of compliance with federal regulations.[14]

19. The Department of Justice also indicted Fieldwood employee Brandon Wall for allegedly rendering safety systems inaccurate and negligently causing a spill.[15] The indictment

---

INCs and 2 Component Shut-In INCs; GOM Shelf LLC received 9 Warning INCs and 3 Component Shut-In INCS; and Bandon Oil & Gas, LP received 1 Warning INC.

[11] Huse Indictment, ¶ 3 [Dkt. no. 1, p. 2].

[12] *Id.*, ¶¶ 8-11 [Dkt. no. 1, pp. 3-4].

[13] *Id.*, Counts 4-8 [Dkt. no. 1, pp. 5-7].

[14] *Id.*

[15] Wall Indictment, Counts 1 and 2 [Dkt. no. 1, p. 2].

states that Mr. Wall was the supervisor aboard the GI-43AA platform, which is described as one of Fieldwood's *most profitable platforms*.[16] He allegedly instructed operators to place safety systems on "by-pass" to avoid systems from automatically shutting-in production.[17] This allegedly resulted in the discharge of oil.[18] The alleged conduct increased the revenue generating ability of the platform, but "made the platform less safe and increased the risk of pollution events such as oil discharges."[19]

20.     These indictments raise serious concerns and questions about the condition of Debtors' other assets.  It is currently unknown whether other criminal or civil investigations into Debtors' operations exist, the extent of Messrs. Huse and Wall's involvement with other platforms, and whether any of Debtors are also under investigation.  It is also unknown whether Messrs. Huse and Wall are included in the "vast majority of Debtors' employees and management team" that will operate NewCo's assets. [Dkt. No. 723, p. 17].  With no information whatsoever in Debtors' disclosures related to these important issues, creditors and other stakeholders are left completely in the dark with respect potential safety issues and whether a concrete, pre-funded plan exists to ensure any such issues are addressed.

21.     Due to Debtors' deficient disclosures, it is not known whether Debtors have performed other significant safety and environmental obligations mandated by the regulations. Review of the publicly available information indicates that at least 37 of the 187 leases comprising the Abandoned Properties were terminated or relinquished prior to Debtors filing their petitions. In the absence of production from these leases, Debtors' were required to begin permanently

---

[16] Wall Indictment, ¶ 5 [Dkt. no. 1, p. 2].

[17] *Id.*, ¶ 8 [Dkt. No. 1, p. 3].

[18] *Id.*, ¶ 10 [Dkt. No. 1, p. 3].

[19] *Id.,* ¶ 6 [Dkt. No. 1, p. 2].

4837-4188-2844, v. 2

abandoning the 135 wells, 12 platforms, and 15 pipelines reported to still exist on these leases. Based on the information available related to these leases, Debtors do not appear to have satisfied their obligations and, with respect to several leases, have defaulted on their obligations to decommission leases within one year of their termination or relinquishment.[20] Debtors' failure to decommission these terminated or relinquished leases is significant, as BSEE estimates that it may cost more than $81 million to satisfy these decommissioning obligations alone.[21]

### C.  Chevron Appears in the Chain of Title of Many of Debtors' Leases.

22.     Chevron sold interests in more than 40 leases, including the associated wells, platforms, and pipelines to Debtors (or companies that would ultimately merge with or be acquired by Debtors) in multiple transactions dating back to 2004.  Each transaction generally included Debtors' assumption of obligations to decommission the leases when required, and an agreement to indemnify Chevron for any such costs if Debtors failed to perform.  Disclosure by Debtors of pertinent lease information likely will show additional leases sold to Debtors by others in which Chevron appears in the chain of title.  This missing information highlights how creditors can be impacted by the Plan and why the missing information is so important for creditors to understand the potential implications of Debtors' Plan.

23.     Many leases that Debtors operate and in which they now own 100% of the working interests are the result of Debtors' acquisition of a partial interest from Chevron, and remaining interests from one or more other parties.[22]  For many of these leases, Chevron is jointly and severally liable (along with those other parties from whom Debtors also acquired a partial interest)

---

[20] *See e.g.,* leases OCS-G16325 and OCS-G21580.

[21] BSEE's publicly available P50 decommissioning cost estimate for these 37 leases is $81,737,257 and P90 decommissioning cost estimate is $132,195,505.

[22] Lease OCS-G16325 is one of many examples where Debtors acquired 100% record title interest and operating rights from Chevron (50%) and Apache (50%).

4837-4188-2844, v. 2

for obligations that accrued during its ownership in the event Debtors fail to satisfy their decommissioning obligations.[23]  For many other leases, Debtors' current co-owners (*i.e.*, other parties that currently own a portion of the working interest in a lease along with Debtors) remain primarily liable to satisfy the regulatory obligations with respect to those leases.[24] The Plan, however, does not recognize this key distinction between co-owners and predecessors – *i.e.*, that current co-owners will *first* be responsible for Debtors' liabilities.  Instead, Debtors group together, as "Predecessors," both the predecessors-in-interest and the current co-owners of working interests. [Dkt. No. 723, p. 3].  This failure to distinguish current co-owners and predecessors-in-title with respect to liability obscures how creditors could be impacted by the Plan.

24.     The economic harm to Chevron under the Plan is unclear due to the inadequate disclosure of information. Chevron's preliminary review of publicly available information suggests that BSEE may allege that Chevron is jointly and severally liable to satisfy certain obligations on 44 leases, one right-of-use easement, and an additional property that was subject of an INC. The BSEE decommissioning cost estimates made available on its website for these properties exceed more than $500 million gross.[25]  The actual economic harm that the Plan seeks to impose on Chevron, however, depends on critical information known to Debtors, which is not currently disclosed, such as whether Debtors intend to "return" a particular lease to Chevron, the extent to which bonds may satisfy certain obligations, and the extent to which Chevron may be entitled to contribution from other parties.

---

[23] Lease OCS-G15441 is one of many examples where Debtors now own 100% record title interest and operating rights.  This lease was previously owned by numerous companies in various percentages and at various times.

[24] Lease OCS-G00196 is one of many examples of lease with other current working interest owners—Cox Oil subsidiary EPL Oil & Gas owns 75% of the record title and operating rights.

[25] This "gross" figure is based on BSEE's P50 decommissioning cost estimate for leases that Chevron has identified to date and does not represent a "net" liability of Chevron.

4837-4188-2844, v. 2

**D. Debtors Are Solely Liable to Satisfy Obligations on an Unknown Number of Assets.**

25.     There are many wells, platforms, and pipelines for which Debtors are solely liable under the regulations for abandonment or decommissioning. Such liabilities are often referred to in the industry as "orphan obligations." Debtors are solely liable for these orphan obligations because they have, for example, drilled new wells, sidetracked wells from existing wellbores, or installed new platforms or pipelines. By way of example, based on information known to date, Debtors drilled 10 such wells on leases they acquired from Chevron.[26] Debtors also installed at least one new platform on other sole-liability leases.[27] Any such wells, platforms, or pipelines, if not abandoned or decommissioned by Debtors, would be "orphaned" with no other responsible party for the associated obligations. Other assets can also become "orphaned" if no co-owner exists and there are no financially solvent companies remaining in the chain of title, or when lease terms predating the 1970s, of which there are many, do not provide for predecessor liability. In all of these instances, the burden to satisfy orphan obligations, including safety and environmental obligations, falls on taxpayers. It is known that the Plan would create orphan obligations; however, Debtors have disclosed no information at all regarding the orphan obligations that would be created by the Plan and the cost burden to taxpayers.

**E. The Bankruptcy Case and Plan.**

26.     On August 3 and 4, 2020 (the "Petition Date"), each of Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Since the Petition Date, Debtors have

---

[26] These orphan wells have the following API numbers: 608114021702, 608114021801, 608114071600, 608114071601, 608114071602, 608114071603, 608114037101, 608114043803, 177064097900, 177114156600, 177054047903, 177124002001, 177124002701, 177192021702, 177192021703, 177192023101, 177124029401, 177124067400, 177192021701, 177194036501, 177074083102, 427094099501, 177124045901, 177124047402, 177164029004, 177164035100, and 177084025801.

[27] *See* lease OCS-G03793, complex ID 2181.

4837-4188-2844, v. 2

continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108. No trustee or examiner has been appointed in these cases.

27.     On November 20, 2020, CUSA submitted 16 proofs of claim in the bankruptcy cases and Noble submitted two proofs of claim.  These claims were a combination of liquidated amounts, unliquidated amounts, and in certain circumstances for contingent claims.

28.     On January 1, 2021, Debtors filed the *Joint Chapter 11 Plan Of Fieldwood Energy LLC And Its Debtor Affiliates* (the "Plan") [Dkt. No. 723-1] and the Disclosure Statement.  The Plan presently has 3 major components:

*1.     The Credit Bid Sale of the "Good Assets"*

29.     The Plan provides for the credit bid sale of 117 federal and state oil and gas leases [Dkt. No. 723-1, pp.  90-93] to NewCo (a special purpose entity to be created by the Credit Bid Purchaser), which is owned by certain of Debtors' lenders.[28]  NewCo, in turn, will hire the "vast majority of Debtors' employees and management team." [Dkt. No. 723, p. 17].  In an attempt to ensure that neither NewCo, nor these favored assets of Debtors, will be liable for remaining environmental and decommissioning liabilities, NewCo expressly excludes the assumption of liability related to the approximately 750 other leases currently owned by Debtors. [Dkt. No. 723-1, pp. 44-45].  As such, the assets to be sold to NewCo could be used (and should be used) to satisfy all Debtors' current and anticipated decommissioning obligations.  Instead, Debtors want to siphon valuable assets away for the benefit of their lenders and management, leaving the larger obligations for others to satisfy.  Such terms violate key regulatory principles.  There is no disclosure as to why the $224 million cash payment from the Credit Bid Purchaser would not be

---

[28] The Plan provides that a sale could occur to a higher bidder.  However, the Disclosure Statement notes that Debtors extensively marketed their assets pre-bankruptcy and no acceptable offer was submitted. Based on this information, it does not appear that a true third-party sale will occur.

4837-4188-2844, v. 2

used to satisfy the outstanding environmental and decommissioning obligations on leases not sold to NewCo. There is no proper disclosure of the sources or uses of funds to be paid into and available for the estates.

### 2. *The Allocation of Select Leases Between FWE I and FWE III*

30.     The Plan broadly addresses a portion of the leases not sold to the Credit Bid Purchaser by using a divisive merger to transfer or "allocate" more than 550 leases to FWE I [Dkt. No. 723-1, pp. 94 – 108] and 21 leases to FWE III. [Dkt. No. 723-1, pp. 109 – 110]. FWE I is being created to implement the Apache Term Sheet and own and decommission certain legacy leases sold by Apache to Debtors. FWE I will be funded by cash flow from the allocated leases, up to $50 million from Debtors, and up to $400 million in credit provided by Apache to support the abandonment of wells and decommissioning of platforms. [Dkt. No. 723, p. 19].

31.     The Disclosure Statement fails to provide information as to why, or for what reason, FWE III is being created. Debtors disclose no information regarding how or on what basis they selected the leases that would be allocated to FWE III. Nor do Debtors explain why its capitalization is only approximately $27 million, when BSEE estimates that it will cost $50-$80 million to decommission the 21 leases allocated to FWE III (of which 16 have already terminated or been relinquished).[29] There is no information explaining how or where FWE III would obtain the money necessary to complete its decommissioning obligations (let alone continue to safely maintain or operate the leases). It is unknown how long it will take FWE III to decommission these leases, and there is a significant question as to whether FWE III will have the continuing financial ability to perform this work.

---

[29] The cost estimate was obtained from the BSEE Data Center and reflects BSEE's P50 and P90 estimated costs to permanently abandon wells, decommission platforms, remove lease pipelines, and perform site clearance.

### 3.    *The Purported Forced Return of Leases to Predecessors*

32.    While the Plan is opaque as to plans for the unknown rights-of-way, rights-of-use, and other assets that are not transferred to NewCo or transferred between FWE I and FWE III, it appears that 187 listed leases on Schedule F constitute the Abandoned Properties. [Dkt. No. 723-1, pp. 111 – 116].  Debtors expressly intend to "return" all of the Abandoned Properties to unidentified Predecessors (defined as "entities who are predecessor owners in the chain of title or co-working interest owners").  [Dkt. No. 723, p. 14].  However, the Disclosure Statement identifies neither the legal basis for accomplishing this forced return nor the identity of the purported Predecessor that would be forced to accept each of the 187 leases.

33.    Though the Plan and Disclosure Statement are unclear, the lenders with liens and mortgages on the Abandoned Properties presumably will release their liens and mortgages as they too seek to avoid paying for the costs of maintaining and properly decommissioning their collateral.  While the Disclosure Statement contemplates that Predecessors may object to the forced return of assets, the Disclosure Statement and Plan contain no conditions or provisions for what happens to the Abandoned Properties (and the viability of the Plan, itself) if such forced transfer fails.  Further, there is no disclosure of the associated contracts that relate to the Abandoned Properties or what happens to those contracts when the forced return fails.

34.    On February 3, 2021, Chevron submitted a written request for additional information regarding the properties that Debtors seek to compel Chevron to accept as the result of the Plan but to date has not received any responsive information back from the Debtors.  On February 11, 2021—mere days before the deadline to submit objections to the Disclosure Statement—Debtors agreed to make available to Chevron (and others) certain information.  In this

short time, Chevron has not been able to evaluate whether the information is responsive to its requests, verify its accuracy, or assess whether it satisfies any issues raised in this Objection.

## III.    ARGUMENT & AUTHORITIES[30]

### A.  The Disclosure Statement Cannot Be Approved Because It Does Not Contain Adequate Information as Required by Bankruptcy Code Section 1125.

35.    As discussed herein, Chevron objects to the Disclosure Statement because it does not contain information sufficient to allow creditors to make an informed decision whether to accept or reject the Plan.  In many instances, it contains incomplete, inaccurate, or misleading information – or no information at all.  The Disclosure Statement must be amended to address the objections and issues raised herein.  If Debtors fail to do so, the Court should not approve the Disclosure Statement.

#### 1.    *Debtors Must Submit a Disclosure Statement With Adequate Information to Allow Parties to Make Informed Decisions to Accept or Reject the Plan.*

36.    Bankruptcy Code Section 1125(b) requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a); *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988); *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016); *In re Applegate Prop., Ltd.*, 133 B.R. 827, 829-31 (Bankr. W.D. Tex. 1991).

37.    The obligation to provide adequate information is "pivotal." *Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993).  For a creditor to fairly evaluate

---

[30] Chevron incorporates by reference all discussion, information, arguments, and authorities in Sections I and Section II and hereby asserts objections on all grounds asserted in these and in any and all other Sections of this Objection and any other objection to the Disclosure Statement by any other party.

4837-4188-2844, v. 2

the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution."). Whether or not adequate information is given is left to the judicial discretion of the court and will necessarily be governed by the circumstances of the case. *See Mabey v. Southwestern Elec. Power Co.* (*In re Cajun Elec. Power Coop, Inc.*), 150 F.3d 503, 518 (5th Cir. 1998).

38.     Courts consider numerous factors when determining the sufficiency of the information in a disclosure statement, including but not limited to: (i) a description of the available assets and their value; (ii) the estimated return to creditors under a chapter 7 liquidation; (iii) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (iv) information relevant to the risks posed to creditors under the plan; and (v) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers. *See In re Divine Ripe, L.L.C.*, 554 B.R. at 401-02 (listing 19 non-exhaustive factors set forth in *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).

39.     *In re Metrocraft*, codifies 19 non-exhaustive factors for evaluating the adequacy of a disclosure statement, which include:

1)     the events which led to the filing of a bankruptcy petition;
2)     a description of the available assets and their value;
3)     the anticipated future of the company;
4)     the source of information stated in the disclosure statement;
5)     a disclaimer;
6)     the present condition of the debtor while in Chapter 11;
7)     the scheduled claims;
8)     the estimated return to creditors under a Chapter 7 liquidation;

9)      the accounting method utilized to produce financial information and the name of the accountants responsible for such information;

10)    the future management of the debtor;

11)    the Chapter 11 plan or a summary thereof;

12)    the estimated administrative expenses, including attorneys' and accountants' fees;

13)    the collectability of accounts receivable;

14)    financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

15)    information relevant to the risks posed to creditors under the plan;

16)    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

17)    litigation likely to arise in a non-bankruptcy context;

18)    tax attributes of the debtor; and

19)    the relationship of the debtor with affiliates.

*In re Metrocraft*, 39 B.R. at 568.

> ### i.    *The Disclosure Statement is both facially and substantively deficient with respect to critical Plan-related issues.*

40.    Here, although the Disclosure Statement provides some information about Debtors' businesses and their explanation for the need to file for bankruptcy, the Disclosure Statement fails to provide sufficient information necessary for unsecured creditors to make an informed decision when voting on the Plan.  In its current form, the Disclosure Statement is both facially and substantively deficient with respect to critical Plan-related issues, and thus fails to satisfy the disclosure requirements of Bankruptcy Code Section 1125(a).  The glaring deficiencies in the Disclosure Statement generally include that:

> #### a.  *There is inadequate disclosure regarding the Credit Bid Transaction.*

41.    **No Disclosure of the Process to Obtain Required Regulatory Consents and Approvals.**  The regulations require that every company demonstrate that it is qualified to own a lease or operate under a lease on the OCS.  30 C.F.R. § 556.400.  BOEM may disqualify a company from acquiring a lease if that company (or its principals) does not meet due diligence requirements on other leases (30 C.F.R. § 556.403(a) *citing* 43 U.S.C. § 1337(d)) or is determined to have an

unacceptable operating performance. 30 C.F.R. § 556.403(c). In addition, BOEM must approve all transfers of non-economic lease interests. 30 C.F.R. § 556.700 *et seq*. BOEM may disapprove where the "transferor or transferee" has unsatisfied obligations, including well abandonment and decommissioning obligations. 30 C.F.R. § 556.704. The Disclosure Statement provides no information as to how Debtors and NewCo will satisfy these regulations. The public record demonstrates a history of unresolved INCs (including more than 200 INCs in 2020 alone), billions of dollars of unperformed lease obligations, and alleged acts and omissions involving unsafe maintenance and operation of assets that are the subject of criminal allegations. By way of example, Debtors propose to transfer to NewCo the GI-43AA platform, which is the subject of the Wall indictment and is described as one of Debtors' most profitable platforms. However, Debtors disclose no information regarding the status of the associated lease or the criminal allegations that directly touch and concern the safety of maintenance and operations of this asset. Debtors' operating history is all the more relevant given that NewCo would employ the *same* management team and employees responsible for Debtors' operations. Debtors, therefore, must provide adequate disclosure of information on (i) whether NewCo is or can be qualified; (ii) the risk that NewCo will be disqualified; and (iii) the risk that BOEM will not approve the transfer of Debtors' assets to it. Lastly, the Disclosure Statement needs to disclose what happens to the Plan in the event the NewCo sale is not approved or in the event that approval of the NewCo sale is conditioned in a way that NewCo fails to satisfy.

42.     **No Disclosure of the Credit Bid Purchase Agreement.** Debtors state that the failure of certain conditions set forth in the Credit Bid Purchase Agreement constitutes a risk to the Plan. [Dkt. No. 723, p. 61 at ¶7]. But Debtors do not provide the Credit Bid Purchase Agreement, effectively rendering this risk disclosure meaningless. Moreover, the non-disclosed

Credit Bid Purchase Agreement is referenced in the Disclosure Statement to identify the "Credit Bid Acquired Interests" and the "Credit Bid Assumed Liabilities." Given that Debtors have failed to disclose the agreement, there is no meaningful information regarding these assets and liabilities. The cursory list of lease interests in Exhibit C to the Disclosure Statement, which is expressly subject to change by Debtors and with no proposed deadline as to when such modifications can be made, is insufficient. These circular disclosures effectively provide no information and are one of the many reasons why the Disclosure Statement fails to meet the requirements of the Section 1125. Debtors must disclose information on the Credit Bid Purchase Agreement and provide creditors adequate time to analyze it.

43. **No Disclosure of NewCo's Ability to Meet Its Obligations.** There is significant concern that NewCo is created to siphon away revenues and then walk away from its safety and environmental obligations, just as Debtors and their same management team seek to do here. The Disclosure Statement omits information on the anticipated costs that NewCo must incur to (i) maintain lease platforms and facilities; (ii) remedy INCs relating to the unknown Credit Bid Acquired Assets; (iii) operate such assets; (iv) permanently abandon wells; and (v) decommission lease platforms and facilities. The Disclosure Statement also omits any financial analysis of the projected revenues from the unknown Credit Bid Acquired Assets. Debtors must provide this information so that creditors can evaluate whether NewCo has the financial ability to meet its obligations, which is a disclosed risk to the Plan [Dkt. No. 723 p. 62 at ¶2].

44. **No Disclosure of NewCo's Plans to Meet Required Financial Assurance Obligations to BOEM.** Every operator is required by the regulations to provide financial assurance in the form and amount approved by BOEM. These financial assurances are essential to guarantee the performance of lease obligations, and as a condition to the approval of any transfer

4837-4188-2844, v. 2

of lease interests.  *See* 30 C.F.R. § 556.900 *et seq*.  The Disclosure Statement, however, does not provide information regarding NewCo's provision of financial assurance to BOEM.  Given that NewCo's ability to meet BOEM's financial assurance requirements is a condition to Debtors' ability to transfer any lease interests, these issues inherently constitute a material risk to the Plan.  As such, Debtors must provide adequate disclosure of information on the amount and source of financial assurance to be provided by NewCo and Newco's ability to satisfy the costs of such financial assurance.

45.     **No Disclosure of the Allocation of the Cash Portion of the Credit Bid Transaction.**  Debtors have failed to disclose how the $224 million paid by the Credit Bid Purchaser to the estates is being allocated.  There is no disclosure of sources or uses of these funds, or other existing funds of the estates.

> ### b.  *There is inadequate disclosure regarding the approximately 750 leases to be allocated to FWE I or FWE III, or forcibly returned to the Predecessors.*

46.     **No Disclosure of Lease Information.**  The Plan's impact on each lease will be different in light of the fact that each lease has different histories of ownership and development. The Disclosure Statement, however, provides no information about the leases other than a cursory listing of leases in exhibits that is expressly subject to change.  Disclosure of each lease's chain of title, current working interest owners, operating status, and compliance with all safety and environmental regulations is critical to evaluate the Plan.[31]  Debtors must disclose all unresolved INCs and how and when they will remedy those INCs.  This information is necessary to evaluate

---

[31] As noted in footnote 5 above, in the last couple of days Debtors made conditionally available a database that they assert has significant data on a lease-by-lease basis.  Because this information was not made available until recently, Chevron has not had the ability to access, fully review, or evaluate the information it contains.  As such, it is unknown at this time which of the disclosure failures have been satisfied, if any.

the proposed creation of FWE I and FWE III and ensure Debtors are adequately addressing all imminent health and safety concerns.

47. **No Disclosure of Outstanding Obligations.** The Disclosure Statement must also provide information on the extent of outstanding well abandonment and platform decommissioning costs for each lease. This includes providing their cost estimates for liabilities associated with each lease, pertinent details regarding the security applicable to each lease (including the obligations of any surety companies), and the extent of potentially unsecured liabilities for each lease. This information is critical to evaluate the Plan's disparate treatment of various leases, as well as to quantify the burden that the Plan seeks to impose on creditors and taxpayers. This information clearly exists given Debtors' significant in-house decommissioning operations [Dkt. No. 723, p. 27] and as such must be disclosed.

### c. *There is inadequate disclosure of ongoing civil and criminal investigations of Debtors' operation and maintenance of their assets.*

48. **No Disclosure of Civil and Criminal Investigations.** The recent indictments have revealed that two employees were investigated and charged with operating platforms in a criminal manner. The indictments allege fraudulent reporting and acts involving "misrepresentations in inspection records" that gave the "artificial impression" of compliance with federal regulations, among other serious allegations that also implicate health and safety considerations. Given the widespread nature of allegations occurring on multiple platforms over several years, Debtors must also disclose whether they or their employees are the subjects of any other criminal or civil regulatory investigations related to their operation of assets in the Gulf and, if so, provide information regarding the investigations.

49. **No Disclosure of Other Platforms that Were Supervised by Messrs. Huse and Wall.** The Huse and Wall indictments raise the question of whether the alleged acts and omissions

are isolated or if there are potentially further reaching safety-related concerns. Debtors must identify all other platforms that Messrs. Huse and Wall supervised, the results of any internal investigations into the incidents giving rise to the Huse and Wall indictments, and any audits performed by Debtors or third parties on compliance with safety and environmental regulations. In addition, Debtors must disclose whether Messrs. Huse and Wall will become new employees of NewCo and continue to supervise platforms in the Gulf.

50. **No Disclosure of Debtors' Relevant Policies and Procedures.** The Huse and Wall indictments raise additional questions regarding Debtors' policies and procedures on two other important issues. First, there is no information regarding Debtors' policies and procedures for inspecting platforms. The increased age of many of Debtors' platforms potentially warrants increased, more fulsome inspections. The absence of robust policies and procedures increases the risk that not even Debtors have identified imminent safety and environmental problems associated with their assets. Second, there is no information regarding Debtors' efforts to ensure that their employees complied with all regulations (the undisclosed INCs alone suggest otherwise). The indictments raise questions regarding the strength of Debtors' compliance policies and procedures and the extent to which operations on other platforms comply with the regulations, all of which constitute a risk to the Plan that must be disclosed.

> ### d. There is inadequate disclosure regarding the use of a divisive merger to "allocate" the assets of Debtors between FWE I and FWE III.

51. **No Disclosure of the Required Regulatory Consents and Approvals.** The Disclosure Statement must provide adequate information as to whether BOEM will (i) require FWE I and FWE III each to be separately qualified to conduct operations in the Gulf of Mexico; (ii) disqualify Debtors, FWE I and/or FWE III from conducting operations in the Gulf of Mexico due to Debtors' unresolved INCs and defaults of their decommissioning obligations for leases to

33

be abandoned; (iii) approve of the transfer of leases to FWE I, and/or FWE III; or (iv) permit the transfer or division of area-wide operator bonds, supplemental bonds, or other securities to FWE I and/or FWE III. Indeed, Debtors must disclose how the divisive merger will be accomplished within the requirements of the applicable federal regulations and the Bankruptcy Code.

52. **No Disclosure of Cure Costs.** The Disclosure Statement does not address whether contracts to be "allocated" by Debtors to FWE I and FWE III will be assumed and assigned. These contracts may include the leases, joint operating agreements, production handing agreements, and other related contracts necessary for the continued production or orderly decommissioning of the leases. Creditors and contract counter-parties have no information about how and when contract cure notices will be provided, how and when adequate assurance of future performance by the assignee will be provided, and the process for parties to assert the rights and remedies provided to them in the Bankruptcy Code. This information is essential to understand if the Plan adequately addresses the necessary cost to Debtors to cure any defaults as to those contracts and how FWE I and FWE III will be able to provide adequate assurance of future performance to contract counter-parties.

> **e. There is inadequate disclosure regarding the Plan's transfer of assets and liabilities to FWE I.**

53. **No Disclosure as to the Allocation of Partial Interests.** The Disclosure Statement does not provide information regarding the extent of interests to be transferred to FWE I, including whether the interests are the entirety of Debtors' interests in a particular lease or unit, undivided as to an entire lease or unit, or specific to wells and platforms on the lease or unit. The Plan seeks, at least with respect to some interests, to transfer the same lease to FWE I and forcibly return the

same lease to Predecessors.[32] There is no information or explanation provided as to this inconsistency. Debtors, therefore, must disclose the nature of the interest they propose to transfer with respect to each lease (*e.g.*, undivided or limited to a particular part of the lease or an asset), the extent of the interest allocated to FWE I, and the process by which Debtors will gain regulatory approval of such a partial allocation.

54.     **No Disclosure of the Particular Debtor from whom the Interest Would be Allocated.** It appears as though multiple Debtors may own interests in a lease that would be partially allocated to FWE I. The Disclosure Statement, however, does not identify which Debtor's interest (or if multiple Debtors' interests) would be allocated. For example, the Plan purports to both allocate lease OCS-G04481 to FWE I and return the lease to an unidentified Predecessor. Debtors collectively own 100% of the record title of this lease with approximately 26% owned by Fieldwood Energy LLC and approximately 74% owned by Fieldwood Energy Offshore Energy LLC. It matters which Debtor is allocating which interest to FWE I because Chevron (and others) are only predecessors to the interests owned by Fieldwood Energy Offshore LLC. Debtors must disclose in adequate detail *which* interests are being allocated from *which* Debtors.

55.     **No Disclosure on the Incremental Interests.** The Disclosure Statement does not provide information on the nature of the "Incremental Interests" in leases, wells, and platforms or facilities that will be transferred to FWE I, as such term is undefined and unclear. [Dkt. No. 723-1, pp. 413-416]. This information is necessary to understand what is meant by the Plan's use of the term "Incremental Interests," the nature of these interests, and why these interests are distinguished from other interests transferred to FWE I.

---

[32] Some of the many examples of the Plan's allocation of partial interests include lease OCS-G01757 (*compare* Dkt. No. 723-1, p. 95 *with* p. 112), lease OCS-G03328 (*compare* Dkt. No. 723-1 p. 106 *with* p. 1114), and lease OCS-G034257 (*Id.*).

        *f.   There is inadequate disclosure regarding the Plan's allocation of assets and liabilities to FWE III.*

56.    **No Disclosure on the Disparate Treatment of the 21 leases to be "Allocated" to FWE III.**  This entity, its purpose, and its role in the larger Plan remain a mystery.  The Disclosure Statement does not provide information indicating why FWE III's sole assets will be the 21 identified leases, 16 of which have already terminated or been relinquished and are incapable of generating any revenues.  No disclosures are made on the reasons Debtors have allocated these 21 leases to FWE III, nor do Debtors disclose any information as to why the Plan does not transfer other leases to FWE III.  Debtors must provide this information so that creditors can evaluate whether these 21 leases will receive more favorable, or worse treatment, under the Plan. Information regarding the disparate treatment of leases will be relevant to any creditors with claims related to other leases.

57.    **Inadequate Disclosure as to FWE III's Capitalization.**  The Disclosure Statement's discussion of FWE III's capitalization raises more questions than it answers.  The Plan provides "approximately $27 million" in capitalization for FWE III, which is identified to arise from $5-15 million of cash on hand and $12-22 million in future cash commitments from the Credit Bid Purchaser [Dkt. No. 723, p. 19].  The Disclosure Statement, however, omits any information regarding the terms of the cash contribution and the process and terms by which FWE III will receive future cash commitments from the Credit Bid Purchaser.  Debtors must disclose this additional information so that creditors can evaluate whether FWE III's capitalization is real or illusory.

58.    **No Disclosure of Any Adequate Assurance of FWE III's Ability to Meet Future Obligations.**  There is an inexplicable gap between FWE III's $27 million capitalization (which the Disclosure Statement recognizes could be as little as $17 million) and BSEE's estimated cost

of $50 million to $80 million to decommission the 21 leases and related wells and platforms. Debtors fail to disclose information regarding the manner in which such funds will be applied to the assets and, if the funds are for the purpose of decommissioning the associated leases, the amounts that will be earmarked to address such work for each lease.  Given that only five of the leases are producing (and in unknown quantities), there is inadequate information as to how FWE III will have the financial ability to safely operate, maintain, and ultimately perform its lease obligations.  Moreover, the obligation to decommission the 16 terminated or relinquished leases is immediately due, thus requiring FWE III to incur significant costs imminently.  Debtors must provide adequate information on how they will assure that FWE III can satisfy these significant safety and environmental liabilities.

59. **No Disclosure as to FWE III's Access to Existing Security.**  The Disclosure Statement does not provide information as to how the $9 million in outstanding security [Dkt. No. 723, p. 19] will be available as a "backstop" to satisfy FWE III's obligations.  The information provided regarding this security is inconsistent.  Debtors suggest this security is akin to cash that can freely be used to satisfy FWE III's obligations; however, in another instance, Debtors suggest that the use of this security is limited to the undisclosed "terms and conditions of such bonds." [Dkt. No. 723, p. 19].  Debtors must provide information regarding this security, including the obligations secured, to whom the security is payable, and the terms and conditions of such bonds.

60. **No Disclosure as to FWE III's Ability to Provide Financial Assurance to BOEM.**  FWE III is required to provide financial assurance to BOEM for the 21 leases.   There is inadequate information as to how FWE III will satisfy this obligation.  Sureties have already filed lawsuits seeking collateral of nearly $80 million in connection with bonds previously issued on behalf of Debtors.  There is a real risk that sureties will not be willing to provide the requisite

financial assurance on behalf of FWE III, especially when FWE III appears to be grossly undercapitalized. The Disclosure Statement fails to provide enough information regarding whether Debtors have obtained the requisite surety bonding commitments or whether any of Debtors' existing surety providers are willing to support the Plan and to continue providing surety bonding. Debtors must disclose how they will satisfy these financial assurance obligations to BOEM.

> **g.** ***There is inadequate disclosure regarding the Plan's treatment of the Abandoned Properties.***

61.     **No Disclosures on the Process to "Return" the Abandoned Properties to Predecessors.** One of the foundational steps in Debtors' Plan hinges on the forced "return" of the Abandoned Properties to unidentified Predecessors, which has no legal basis. Importantly, the Disclosure Statement does not describe the process for this unprecedented "return" of the Abandoned Properties. Chevron objects to a forced return of any of Debtors' interests, on behalf of itself and all affiliates.

62.     Again, while multiple companies have already asserted (or soon will) their objections to any Plan that attempts to transfer the property of Debtors' estate to particular companies via abandonment under Section 554 (or pursuant to any other provision of the Bankruptcy Code), the Plan as currently proposed provides no information regarding how this "return" will occur. Similarly, Debtors fail to disclose whether they seek to force Predecessors to take record title interest (or some other interest) in the Abandoned Properties upon their "return," the process for obtaining the regulatory approvals necessary to effectuate a transfer of the Abandoned Properties, the extent to which other contracts necessary for the operation or decommissioning of a lease would be forcibly assigned, and any information regarding Debtors' ability to obtain such required regulatory approvals. Debtors must also provide disclosures as to any final agreements reached with Predecessors to accept return of the Abandoned Properties, any

4837-4188-2844, v. 2

Predecessors that have stated they object or do not consent to the return of any Abandoned Properties, and how Debtors propose to achieve the compelled return of such property in the face of such objections, given the complete lack of authority or precedent for such compelled return. Debtors have failed to provide any of this critical information to date.

63.     **No Disclosure of What Will Become of the Abandoned Properties If the Court Sustains Objections to their Forced "Return."**   Debtors have provided no "Plan B" for what is to happen if the forced "return" fails.   This missing information is essential given the patently unconfirmable nature of this foundational aspect of the Plan.   The failure of the Disclosure Statement to address this critical issue results in the Plan being facially unconfirmable.

64.     **No Disclosure of Orphan Obligations.** There is inadequate disclosure as to the orphan obligations (*e.g.*, leases, wells, platforms, pipelines, *etc.*) that would be created by the Plan. The taxpayers will bear the sole cost to satisfy these unknown orphan obligations.   Despite Debtors' failure to disclose the extent of orphan obligations that would be created by the Plan, it is clear that assets with no Predecessors exist within the Abandoned Properties.   This incontrovertible fact is evidenced by the numerous orphan wells that would be created by the Plan on leases previously owned by Chevron.   However, the magnitude of this issue remains hidden by Debtors, both in terms of the number of orphan obligations and the potential cost to taxpayers. Just as important, there is no information on the condition of the orphan assets and whether any pose an imminent health and safety risk.   Debtors must disclose the full extent of the orphan obligations that would be created by the Plan, the cost to taxpayers to satisfy those obligations, and the current condition of such assets.

65.     **Inadequate Disclosure of the Abandoned Properties.**   The Disclosure Statement does not provide an adequate description of the assets that would be abandoned or "returned."   The

Plan states that the Abandoned Properties may include "Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements to be abandoned pursuant to Section 5.12 of this Plan." [Dkt. No. 723-1, p. 24]. But the only schedule provided is Exhibit F, which provides information only about *leases*. Given that the crux of the Plan is the forced "return" of the Abandoned Properties to Predecessors, Debtors must disclose the specific property that they propose will be "returned" under the Plan.

66. **No Disclosure as to the Current Co-Owner and Prior Owners for Each Lease.** The Disclosure Statement does not provide the identity of each current co-owner and/or prior owners that the Plan proposes will be compelled to accept the return of any given lease. Notably, as discussed herein, there is a significant difference between current co-owners and predecessors, but the Plan term "Predecessors" lumps them together. Debtors must disclose this information on a lease-by-lease basis as each lease may have multiple current co-owners and other predecessors in interest in its chain of title. Further, if Debtors abandon their current operatorship and ownership in a lease, the other current co-owners must then select a replacement operator pursuant to the terms of their lease-specific joint operating agreement. If a replacement operator is selected and approved, then no decommissioning obligations are triggered by the Debtors' abandonment. Moreover, even if the other current co-owners decide not to select a new operator, stop production, and trigger decommissioning obligations (none of which should be assumed), those current co-owners would have the primary obligation to decommission the lease. *See* 30 C.F.R. § 250.1701(a). Under current regulations and practice, only *after* all current lessees and owners of operating rights fail to perform lease decommissioning obligations would federal regulators look to predecessors in title to satisfy those obligations. *See* 30 C.F.R. § 556.710. All this information is critical to understand how the Debtors' proposed forced "return" of assets impacts creditors.

67. For the majority of the leases in which Chevron is in chain of title, Chevron is only one of many such companies. For example, lease OCS-G0481 was previously owned by Chevron as well as at least three additional, solvent companies in the chain of title. Many other leases previously owned by Chevron are currently owned and operated by multiple companies. For example, six companies currently own record title to lease OCS-G02388 and the current operating rights are divided among eight different companies. For all leases with co-owners, Debtors must outline the process that determines which co-owner will be compelled to receive the Abandoned Property and, if Fieldwood is the current operator, how Fieldwood intends to receive approvals for transfer of operatorship. For all leases without co-owners, Debtors must outline the process that determines which of several predecessors in interest will be compelled to receive the Abandoned Properties.

68. **No Disclosure of the Process to "Return" Abandoned Properties that Are Operated by Debtors.** Debtors do not disclose the number of platforms on leases included as Abandoned Properties that are still operating or producing. Notwithstanding this failure to disclose, Chevron has identified at least 19 of its prior leases included as Abandoned Properties that are currently producing or have ongoing operations of some nature. There are likely many other leases on Exhibit F that also have ongoing operations, but without disclosure on this point from Debtors, this important information remains unknown. Moreover, the Disclosure Statement does not disclose information as to how Debtors intend to safely (or legally) return the operation of the Abandoned Properties to Predecessors (or BOEM). What is Debtors' plan to safely effect this transfer? Will imminent safety and environmental issues be remedied by Debtors prior to their return? How will Debtors pay for this? Will any co-owners of working interests appoint a replacement operator? Is any Predecessor willing to operate any producing leases on this list that

are to be "returned" to them? If so, are such Predecessors qualified under the regulations to operate OCS leases? Does that Predecessor possess the technical and financial ability to safety operate, maintain, and ultimately decommission that lease? Debtors must disclose information necessary to answer each of these important questions.

69.     **No Disclosure as to Cure Costs.** The forcible return of producing leases formerly operated by Debtors requires the assignment of the suite of applicable contracts necessary to operate the Abandoned Properties (*e.g.*, joint operating agreements, unit operating agreements, production handing agreements, transportation agreements, *etc.*). Debtors fail to provide adequate information regarding whether pre-petition defaults by Debtors exist with respect to these contracts, whether such contracts would be assumed and assigned to the Predecessors and, if so, the cost to cure such contracts. If Debtors do intend for such contracts to be assigned to Predecessors, Debtors must disclose the grounds on which they attempt to rely for compelling Predecessors to accept assignment of such contracts. Even if not producing, there may be contracts necessary for decommissioning to occur (*e.g.* a right of access or right of use agreement) and there is no disclosure of such contracts nor is there any process provided for how any such necessary contracts would be, or could be, assumed and assigned.

> ### h. *There is inadequate disclosure regarding the financial analyses relevant to consideration of the Plan.*

70.     Debtors do not provide the liquidation analysis, valuation analysis, and financial projections, all of which are indicated to be exhibits "To Come." [Dkt. 723, p. 11]. This information, including all assumptions and facts underlying these analyses, is necessary for creditors to arrive at an informed decision to accept or reject the Plan.

4837-4188-2844, v. 2

    *i. There is inadequate disclosure regarding administrative claims for the satisfaction of Debtors' decommissioning obligations.*

  71. Debtors fail to identify a critical and real risk to the confirmation of their Plan related to their ability (or inability) to satisfy administrative claims. The Disclosure Statement does not contain information on, or even reference as a risk, the amount of administrative claims that could be asserted by third parties, including claims for post-bankruptcy plugging and abandonment costs, which are generally entitled to administrative priority. *See In re H.L.S. Energy Co., Inc.*, 1551 F.3d 434 (5th Cir. 1998); *In re American Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009). Given the potential size of such claims, the ability of the Debtors to confirm a Plan is in serious doubt unless the Debtors, as a starting point, can provide surety bonding commitments or some other financial security for the decommissioning and other potential environmental liabilities. As such, the Disclosure Statement needs to provide detail for the range of potential administrative expenses for the Abandoned Properties, how the Plan will satisfy these administrative expenses, and the risk to confirmation in the absence of sufficient funds to satisfy such claims.

    *j. There is no disclosure regarding the estimated return to creditors in a Chapter 7 liquidation of Debtors, and why proceeding with the current Plan is in the overall best interest of the estate and its creditors.*

  72. **No Disclosure as to Why Debtors Should Not Convert.** The Disclosure Statement omits any information on how Creditors would be treated in a chapter 7 liquidation as the referenced exhibit is "to come." This information is critical. It is a required element of confirmation under Section 1129(a) and is needed to understand why the estate is incurring, and will be incurring, the significant cost and expense by proceeding down the current path charted by the Plan. As noted at the outset, the Plan is a liquidation of Debtors and their estates, and it is important that creditors understand why, or under what assumptions, pursuing the current Plan is

better than having an independent Trustee liquidate the estates' properties. At this point, it is not clear why a Trustee could not pursue each of the current parts of the Plan, if they are not otherwise objectionable/violative of the Bankruptcy Code and other applicable laws and regulations. A Trustee could then also independently analyze if there are estate causes of action to pursue for the benefit of creditors holding the billions of dollars of unsecured claims. This omitted information is necessary for creditors to make an informed decision to accept or reject the Plan.

> **k. *There is inadequate disclosure regarding the Releases to be granted under the Plan.***

73. **No Disclosure of the Basis for Including Non-Debtor Releases.** The Disclosure Statement does not contain information as to why the Plan provides for a release in a liquidation, including broad third-party releases to generic categories of non-debtors [Dkt. No. 723-1 p. 83, (Releasing Parties include, among others, "the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out…")]. For example, non-debtor Apache, which appears with Chevron in the chains of title of several leases, is included in the definition of Released Parties. [Dkt. No. 723, p. 83]. There is no disclosure of information of how a "release" impacts potential joint and several liability by Apache to third parties. Apache may contend that the Plan's broad releases bar any claim by Chevron or countless other Creditors against it from seeking contribution for the costs incurred to satisfy Debtors' decommissioning obligations. The Disclosure Statement must provide information on (i) which claims are being released; (ii) who is receiving the release; and (iii) what consideration is being provided for the release by each non-debtor released party.

**B. The Disclosure Statement Cannot Be Approved Because the Plan is Patently Unconfirmable.**

    *i.*    *Applicable legal standard.*

74.     A disclosure statement for a facially defective plan cannot be approved as containing "adequate information" within the confines of Bankruptcy Code Section 1125. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (bankruptcy court can determine at the disclosure statement stage that a chapter 11 plan is unconfirmable). "If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *In re Eastern Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("notwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed.").

75.     In this context, a plan is patently or facially unconfirmable where "(1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Cap. Equip., LLC*, 688 F.3d at 154 (internal quotations omitted).

76.     Evaluating confirmability at the disclosure statement stage avoids "engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

77.     The Plan suffers from many statutory infirmities, which Debtors attempt to gloss past through inadequate disclosure. However, even with a complete lack of disclosure of a host of

critical categories of information, Debtors cannot avoid the fact that the Plan is facially unconfirmable because it relies on "abandoning" assets via a forced "return" to unidentified co-owners and prior owners. The return to Predecessors of the 187 leases comprising the Abandoned Properties is essential to Debtors' ability to move forward with each of the proposed transactions—the Credit Bid Sale, the transfers to FWE I and FWE III, and the treatment of the Abandoned Properties. As such, the confirmability of the Plan is premised on each of these components, including the forced return of each of these assets and the forced acceptance of the assignment of associated contracts. Because this cannot occur, the Plan fails.

78.     Debtors plainly state that "[i]mmediately upon the occurrence of the Effective Date, certain of Debtors' assets (the "Abandoned Properties") will be abandoned pursuant to sections 105(a) and 554(a) of the Bankruptcy Code *to entities who are predecessor owners in the chain of title or co-working interest owners* (collectively, the "Predecessors"). [Dkt. No. 723, p. 14]. Decisively, there is no legal basis to compel a predecessor in interest to accept such property and receive an assignment of all associated contracts. Nor does this Court possess the authority to force a prior owner to accept the return or assignment of such property. The Plan does not provide for an alternative treatment of the Abandoned Properties if they cannot be returned to Predecessors. The Plan, therefore, is facially unconfirmable because it contains *no viable plan* to address these 187 leases and the more than $1 billion in environmental liabilities.

79.     Given the infirmities that plague the Plan, Debtors must cure the defects embodied in the Plan before continuing with its efforts to obtain approval of the Disclosure Statement and solicitation of votes to accept or reject a plan.

4837-4188-2844, v. 2

**C. The Proposed Voting and Tabulation Procedures Fail to Provide Class 6 Creditors the Affirmative Ability to Vote in Their Claim in the Dollar Amount that the Plan Seeks to Impose Upon Them.**

80.     In paragraphs 38 and 62 of the Motion, Debtors seek approval of cookie-cutter procedures for voting and tabulation with respect to Class 6 unsecured creditor claims that are currently contingent, unliquidated and/or disputed.  Notably, the Plan demonstrates why a cookie-cutter voting process for currently contingent claims is not proper.  One of the foundational pillars of the Plan is the abandonment and forced "return" to Predecessors of 187 leases.  This abandonment and forced "return" would convert contingent, unliquidated claims (there is no credible argument that such claims are "disputed") of Predecessors into matured and liquidated claims in the billions of dollars.[33]  Under these circumstances, a $1 claim for voting purposes is nonsensical.

81.     The Court should value a creditor's claim for voting purposes using a methodology that employs impartial data and can be uniformly applied to creditors across all Debtors.  This can be achieved by using BSEE's publicly available P50 estimate of the cost to decommission each lease to be "returned" to each Predecessor.  For all of the reasons previously stated, it is unknown and unclear which leases the Plan would "return" to Chevron and to what extent.  A preliminary review of the publicly available information suggests that the leases (and facilities on rights-of-use) in which Chevron previously had an interest, whether in whole or in part, could cost more than $500 million to decommission in their entirety.[34]  Chevron is not alone in its inability to

---

[33] *See* footnote 9.

[34] This gross figure is derived from the BSEE P50 decommissioning cost estimates. Importantly, Chevron's ultimate decommissioning exposure if the Plan were confirmed remains unknown and uncertain; it depends on information not presently known to Chevron including the assets that Chevron would be ordered to decommission; the condition of those assets; the extent to which bonds or other security may reimburse Chevron for decommissioning costs; the existence and financial ability of other parties that may owe contribution for such decommissioning expenses; and other costs.

4837-4188-2844, v. 2

quantify its exposure. In their recent objection filed in this matter, XTO Energy, Inc. and HHE Energy Company and XH LLC have indicated that they previously owned approximately 20 leases included as Abandoned Properties suggesting that their potential economic harm may be significant.[35]  As such, if the Plan is approved and/or some proper and legally compliant type of abandonment with respect to certain leases is permitted by the Court, this would eliminate any reasonable argument that the claims may never come to fruition or are "purely contingent."  It seems cynical to propose a voting process that does not affirmatively recognize and permit creditors to vote their claim in a dollar amount equal to the economic harm that the Plan seeks to impose on them.  It is no valid answer that parties can file a motion to estimate their claim for voting purposes under Bankruptcy Rule 3018 because of what the Plan seeks to do – convert contingent claims into billions of dollars of liquidated claims.  Class 6 creditors should be granted the affirmative ability to vote claims in an amount pursuant to BSEE's publicly available P50 cost estimate for decommissioning obligations on leases associated with the Abandoned Properties.

82.     The Plan provides for only 3 voting classes, Classes 4, 5 and 6.  The votes of Predecessors in Class 6 should be properly recognized and counted in the dollar amount that the Plan seeks to force on them for the purpose of determining if the Class accepts or rejects the Plan. Having a neutral, industry-recognized cost estimate from the federal regulator responsible for oversight of decommissioning provides a reasoned, consistent, and respected basis for each Predecessor's claim.  It is possible that Debtors may attempt to take the position that the acceptance of Class 6 is not material and the Plan can be crammed down under Section 1129(b).  If this is Debtors' position, then there is no credible basis for Debtors to object to the recognition of such

---

[35] Objection of XTO Offshore, Inc., HHE Energy Company, and XH LLC to the Joint Chapter 11 Plan of Fieldwood Energy, LLC and its Affiliated Debtors. [Dkt. no. 759, p. 6].

claims for voting purposes, particularly given that these claim estimates directly relate to the very liabilities that Debtors seek to impose on Class 6 Predecessors. Again, Debtors seek to impose billions of dollars of obligations on Predecessors by converting contingent claims into matured, liquidated claims. The real value of the potential claims under the Plan proposed needs to be acknowledged in the voting and tabulation process.

> **D.** **The proposed timeframes for filing critical documents via the Plan Supplement and time periods for objections fail to provide proper notice and an opportunity to object.**

83.     The proposed timeframes for submission of critical documents and proposed objection deadlines are clearly inadequate and deprive Creditors and affected parties of proper notice and opportunity to object. Neither the Motion nor the Disclosure Statement attempt to provide any credible basis for such shortened time periods. First, the to-be-filed Plan Supplement includes critical documents and information on the Credit Bid Transaction and the Schedule of Assumed Contracts for that transaction, yet Debtors' proposed deadline between receipt of that information and for filing objections is only 7 days. Creditors and contract counter-parties are entitled to at least 14 days' notice to understand the specifics of the Credit Bid Transaction and how it might affect them, whether their contracts are being assumed and assigned, and obtain information on cure amounts and adequate assurance of future performance. Here, given the lack of transparency and the complexities of the proposed Plan, it would be challenging for creditors and contract counter-parties to understand their position and rights even with a longer deadline period.

84.     Further, Debtors propose to provide a contract cure notice in connection with the Credit Bid Transaction only 10 days before the Confirmation Hearing while requesting that objections be due on the Plan Objection Deadline. Per the requested dates, the Contract Cure

Notice is due March 7 but the Plan Objection Deadline is March 9 meaning contract counter-parties have only two days to object (presuming they even get actual notice) to the cure amount.

85.     Similarly, all documents and information related to the FWE I and FWE III transactions must be disclosed so that creditors have at least 14 days' notice and opportunity to object. As discussed above, there is no information or even process for assumption and assignment of contracts that would be part of each of those transactions. Contract counter-parties have no information on cure amounts or adequate assurance.

86.     Last, for each of the NewCo, FWE I and FWE III transactions, the Debtors assert the unilateral ability to make changes to the schedules and exhibits with no provision for proper notice or ability of affected parties to object. There should be a date certain by which the final exhibits, schedules, and contract lists are filed and then at least 14 days' notice to any affected parties to comply with basic requirements of due process.

## IV. RESERVATION OF RIGHTS

87.     To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, Chevron reserves the right to assert such objection, as well as any other objections, to confirmation of the Plan. To the extent Chevron is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan (including the Plan Supplement, Valuation Analysis, Liquidation Analysis, and Financial Projections) that may be filed after any deadline for objecting to the Disclosure Statement or confirmation of the Plan, Chevron reserves the right to object thereto on any basis whatsoever. Chevron further reserves the right to raise additional and other objections to the Disclosure Statement prior to or at the hearing thereon.

4837-4188-2844, v. 2

88.     Chevron adopts and incorporates herein all objections to the Disclosure Statement asserted by other parties.

## V. CONCLUSION

WHEREFORE, for the reasons discussed herein, Chevron respectfully requests that this Court: (i) sustain this Objection; (ii) deny the relief requested in the Motion; and (iii) grant to Chevron such other and further relief as the Court may deem just, proper and equitable.

Respectfully submitted,

ANDREWS MYERS, P.C.

/s/   Edward L. Ripley
EDWARD L. RIPLEY
Texas Bar No. 16935950
LISA M. NORMAN
Texas Bar No. 24037190
PATRICK A. KELLY
Texas Bar No. 24105273
1885 St. James Place, 15th Floor
Houston, Texas  77056
713-850-4200 – Telephone
713-850-4211 – Facsimile
eripley@andrewsmyers.com
lnorman@andrewsmyers.com
pkelly@andrewsmyers.com

**ATTORNEYS FOR CHEVRON U.S.A. INC.
AND NOBLE ENERGY, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, a true and correct copy of the foregoing Objection was served via the Court's Electronic Notification System on all parties entitled to such notice.

/s/   Edward L. Ripley
EDWARD L. RIPLEY

4837-4188-2844, v. 2