## ASSUMPTION AGREEMENT

This Assumption Agreement ("**Agreement**") is dated as of the 8th day of July, 2014, and is executed by and among JX Nippon Oil Exploration (U.S.A.) Limited, formerly known as Nippon Oil Exploration U.S.A. Limited ("**Nippon**"), Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), and Fieldwood Energy Offshore LLC, fka SandRidge Energy Offshore, LLC ("**Fieldwood**"). Each of Nippon, Black Elk and Fieldwood may be referred to hereafter as a "**Party**" and all collectively referred as the "**Parties**".

## RECITALS

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated as of August 5, 2010, as amended by Amendment to Purchase and Sale Agreement dated as of August 30, 2010, (said agreement, as amended, is referred to hereafter as the "**Nippon PSA**") Nippon, as seller, conveyed to Black Elk, as buyer, certain assets all as more particularly identified therein, including assets situated within or associated with the following fields as more fully described on Exhibit "A" attached hereto (collectively, the "**Subject Fields**", and each a "**Subject Field**"), to-wit:

GI 116 (Hickory) Field – OCS-G 13943 (GI 110), OCS-G 13944 (GI 116)

VK 780 (Specter) Field – OCS-G 13673 (VK 779), OCS-G 6884 (VK 780), OCS-G 15436 (VK 824)

WD 133 Field – OCS-G 19843 (WD 121), OCS-G 13645 (WD 122)

A redacted copy of the Nippon PSA has been provided by Black Elk to SandRidge. All capitalized terms used herein but not defined herein are as defined in the Nippon PSA, unless otherwise expressly noted. However, for the purposes of this Agreement and as used herein, the term "**Assets**" as defined in the Nippon PSA is hereby limited to rights, interests and obligations associated with the Subject Fields.

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated effective March 13, 2014, effective March 1, 2014, Black Elk, as seller, conveyed to Fieldwood, as purchaser, all of its rights and interests in and to and affecting the Subject Fields (the "**Black Elk PSA**").

**WHEREAS**, in connection with the Nippon PSA, Black Elk provided Nippon with, among other performance bonds, a performance bond for each of the Subject Fields, namely:

(a)     Bond No. K08024807, issued by Westchester Fire Insurance Company ("**Westchester**") in favor of Nippon, providing for a penal sum in the amount of $975,000.00, in order to secure the performance by Black Elk of all of Black Elk's P&A Obligations associated with the GI 116 (Hickory) Field (the "**Black Elk/Hickory Bond**");

EXHIBIT "3"

(b)     Bond No. 105375541, issued by Travelers Casualty and Surety Company of America ("**Travelers**") in favor of Nippon, providing for a penal sum in the amount of $128,000.00, in order to secure the performance by Black Elk of all of Black Elk's P&A Obligations associated with the VK 780 (Specter) Field (the "**Black Elk/Specter Bond**"); and

(c)     Bond No. K08024881, issued by Westchester in favor of Nippon, providing for a penal sum in the amount of $756,000.00, in order to secure the performance by Black Elk of all of Black Elk's P&A Obligations associated with the WD 133 Field (the "**Black Elk/WD 133 Bond**").

For the purposes of this Agreement, the three performance bonds specifically identified above are hereinafter collectively referred to as the "**Black Elk Bonds**"; and all references hereafter, or in any attachment hereto, to a "**Seller Bond**" for one of the Subject Fields shall be deemed a reference to the replacement Fieldwood Bond (as defined hereafter) for such field, unless otherwise expressly noted.

**WHEREAS**, in connection with the terms and provisions set forth in Section 6.4 of the Nippon PSA, a revised estimate of the cost to perform the P&A Obligations associated with each of the Subject Fields, among other properties, based on 2012 rates was prepared by TSB Offshore Inc. ("**TSB**") dated March 21, 2014. As set forth in the above-referenced TSB report, the revised estimate to perform the P&A Obligations for each of the Subject Fields is as follows:

GI 116 (Hickory) Field: $1,651,851.00

VK 780 (Specter) Field: $115,988.00

WD 133 Field: $1,676,556.00

**WHEREAS**, in connection with Fieldwood's acquisition from Black Elk of all of Black Elk's rights, interests and obligations associated with the Subject Fields, Fieldwood has agreed to provide Nippon with replacement performance bonds for the Black Elk Bonds, providing for a penal sum with respect to each of the Subject Fields as set forth above and utilizing the form and reflecting all of the terms and provisions of the performance bond attached hereto as Exhibit "B", duly executed by Fieldwood as "**Principal**" and by the "**Surety**" identified therein (collectively, the "**Fieldwood Bonds**", each a "**Fieldwood Bond**").

**WHEREAS**, subject to and in accordance with the express terms and provisions of this Agreement, Nippon is willing to accept the Fieldwood Bonds in replacement of the Black Elk Bonds.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein, the benefits to be derived by each Party hereunder, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

**1.**

Fieldwood assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all P&A Obligations associated with the Assets and shall defend, indemnify, hold harmless and forever release Nippon and its Affiliates, and all of their respective stockholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, "**Nippon Indemnified Parties**") from and against any and all Liabilities arising from, based upon, related to or associated with such P&A Obligations. For the purposes of this Agreement, the term "**P&A Obligations**" means all obligations and liabilities of Fieldwood, its successors and assigns, as the successor in interest to Black Elk with respect to the Assets, concerning: (i) properly plugging, re-plugging and abandoning the Well, (ii) the dismantling, decommissioning, abandoning and removing of the Well and the Property, and (iii) cleaning up, restoration and/or remediation of the seabed underlying the Subject Fields, all in accordance with the terms and provisions of the federal offshore leases associated with each of the Subject Fields, as more particularly described on Exhibit "A" hereto (the "**Leases**"), regulations, orders and directives of the U.S. Department of the Interior, Bureau of Ocean Energy Management ("**BOEM**"), Bureau of Safety and Environmental Enforcement ("**BSEE**") and any other state or federal governmental authority, and in accordance with all applicable laws (including environmental laws). For the purposes of this Agreement, the term "**Well**" means all oil and gas wells (whether producing, inactive, temporarily or permanently abandoned, shut-in or otherwise) located on the Leases or on other leases or lands with which the Leases may have been pooled or unitized, and the term "**Property**" means all platforms, facilities, equipment, pipelines and personal property existing on or associated with the Leases.

**2.**

In order to secure Fieldwood's obligation to perform and satisfy all P&A Obligations associated with the Assets, simultaneous with the execution of this Agreement by all of the Parties, Fieldwood has delivered to Nippon the Fieldwood Bonds in replacement of the Black Elk Bonds.

**3.**

Upon Nippon's receipt of the Fieldwood Bonds, Nippon shall execute the Fieldwood Bonds as "**Obligee**" and, subject to the notice requirement provided for in Section 5 below, issue to (i) Travelers a directive to release the Black Elk/Hickory Bond, and (ii) Westchester a directive to release the Black Elk/Specter Bond and the Black Elk/WD 133 Bond, which releases shall be effective as of but not before the effective date of the Fieldwood Bonds.

**4.**

As a material consideration for Nippon's execution of this Agreement, Fieldwood assumes all of Black Elk's obligations and responsibilities with respect to all the terms and provisions of Section 6.4(b) through (i) of the Nippon PSA (a copy of which is attached hereto as Exhibit "C"), to the extent and only to the extent that same apply to the Assets subject, however, to the following clarifications, modifications and/or amendments:

- References in Section 6.4(b) - (i) to Seller and Buyer shall, for the purposes of this Agreement, refer to Nippon and Fieldwood, respectfully, and to their respective successors and assigns.

- September 30, 2016 will be deemed to be the next biennial anniversary date for the Subject Fields and no estimate of the P&A Obligations Costs nor increase in the Seller Bond for the Subject Fields will be due before that date.

- For the purposes of this Agreement, Schedule 6.4(b) provided for in the Nippon PSA is replaced with Schedule 6.4(b) attached hereto and is limited to P&A Elements associated with the Subject Fields.

- In connection with the calculation of future estimates of the P&A Obligations Costs attributable to the Assets conducted from time to time by one of the Consulting Firms, the engagement of such firm will be a joint engagement by Nippon and Fieldwood, such firm will contract with both such parties and any correspondence, meetings (in person or telephonic) with such firm shall be jointly participated in by Nippon and Fieldwood, unless either Nippon or Fieldwood chooses not to so participate.

- If future estimates of the P&A Obligations Costs associated with the Subject Fields, calculated in accordance with the provisions of the Nippon PSA, increase, Fieldwood shall be solely responsible for providing an additional Seller Bond.

- If future estimates of the P&A Obligations Costs associated with the Subject Fields, calculated in accordance with the provisions of the Nippon PSA, decrease, and upon completion of P&A Obligations that would require Nippon to cancel a Seller Bond or reduce the penal sum of a Seller Bond, such cancellations or reductions shall be applied to the Fieldwood Bond.

- For the purposes of this Agreement, the third sentence in Section 6.4(f) of the Nippon PSA is replaced with the following sentence: "In the event Buyer performs or completes P&A Obligations with respect to one or more of the Leases in the Subject Fields at a cumulative cost in excess of One Million dollars ($1,000,000) during a calendar year in which the biennial estimate is not planned to be conducted, Seller shall, upon receipt

of appropriate P&A Documentation with respect to such performance or completion, instruct the Bonding Company to cancel or proportionately reduce, as the case may be, the penal sum of the Fieldwood Bond pertaining to the Lease(s) in which the P&A Element associated with such P&A Obligations have been completed or performed by an amount equal to the bond amounts associated with each such P&A Element, as reflected on Schedule 6.4(b) attached hereto."

- Provided that Fieldwood is in full compliance with all of its obligations and responsibilities under and pursuant to this Agreement, in the event Fieldwood assigns all rights and interests acquired by it in and to the Assets comprising a Subject Field (including, without limitation, the Leases comprising such Subject Field), to a third party, Fieldwood shall have the right to request that the Fieldwood Bond with respect to such Subject Field be released and contemporaneously therewith replaced with such third party's performance bond.  Upon delivery to Nippon of an acceptable replacement bond, any such requests for release will be governed by the release provisions expressly set forth in the Fieldwood Bond pertaining to such Subject Field (see the fourth to last paragraph of the Fieldwood Bond) and the provisions of Section 6.4(b) through (i) of the Nippon PSA.  In such connection, such third party assignee will be obligated to enter into an assumption agreement providing for terms substantially the same as those set forth in this Agreement, and the surety company for the third party replacement bond shall be, as specified in Section 6.4(d) of the Nippon PSA, a surety company acceptable to Nippon and that is authorized and admitted to do business in the jurisdictions where the Assets are located, that is and remains approved by the United States Treasury and the Bureau of Ocean Energy Management, and its successor entities, that is listed in the Federal Register and licensed by the State of Texas (or other jurisdiction acceptable to Nippon) to execute bonds as a surety.  Travelers Casualty and Surety Company of America, U.S. Specialty Insurance Company or RLI Underwriters are acceptable to Nippon as surety companies to the extent they also comply with the remaining above noted provisions set forth in Section 6.4(d) of the Nippon PSA.

**5.**

Reference is hereby made for all purposes to that certain Agreement Regarding P&A Obligations, dated as of September 29, 2010, executed by and between Nippon, Black Elk and Apache Corporation ("**Apache**"), pertaining to the Black Elk Bonds, among other performance bonds more particularly referenced therein ("**Tri-Party Agreement**").  As more particularly set forth in Section 3 of the Tri-Party Agreement, it is necessary to provide written notice to Apache not less than thirty (30) days prior to the execution of a release of the Black Elk Bonds.  It is the Parties' understanding that Fieldwood Energy, LLC ("**Fieldwood**") has succeeded to all of Apache's rights under the Tri-Party Agreement with respect to the Subject Fields.  Nippon's

agreement to release the Black Elk Bonds, is subject to the waiver or satisfaction of the thirty (30) day prior written notice obligation to Fieldwood, as the successor to Apache, with respect to the Tri-Party Agreement.

**6.**

Notwithstanding anything to the contrary set forth in this Agreement or in the Fieldwood Bonds, Black Elk, as between Black Elk and Nippon, will not be relieved of the P&A Obligations associated with the Assets in the event of a default by Fieldwood with respect to its performance of the P&A Obligations with respect to the Assets; such P&A Obligations of Black Elk shall continue notwithstanding the transfer to Fieldwood and notwithstanding any terms and conditions to the contrary as may be stated in any applicable operating agreement. The above provision, however, as between Black Elk and Fieldwood and their respective successors and assigns, is not intended and will not serve to modify, abridge or change in any way the rights and obligations owed by Fieldwood to Black Elk pursuant to the Black Elk PSA.

**7.**

Any further amendments or modifications of this Agreement, insofar as same pertain to the Fieldwood Bonds and Fieldwood's assumption of Black Elk's obligations and responsibilities with respect to the terms and provisions of Section 6.4(b) through (i) of the Nippon PSA, shall not be binding unless agreed to in writing between Nippon, or its successors and assigns, and Fieldwood, or its successors and assigns, and any such amendment or modification shall not require the joinder of or ratification by Black Elk, provided, however, that no such amendment or modification, without joinder by Black Elk, shall affect any right or increase any obligation of Black Elk under this Agreement or the Nippon PSA or release Fieldwood from any obligation under the Black Elk PSA.

**8.**

If any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby and each other term, covenant, condition and provision shall be valid and enforceable to the fullest extent provided by law.

**9.**

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES OR PRINCIPLES.**

**10.**

**THE PARTIES HEREBY AGREE THAT ANY ACTION PERMITTED BY THIS AGREEMENT TO BE COMMENCED IN COURT SHALL BE BROAD AND MAINTAINED EXCLUSIVELY IN FEDERAL OR STATE COURT LOCATED IN**

HARRIS COUNTY, TEXAS, AND EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY TEXAS STATE COURT OR UNITED STATES DISTRICT COURT SITTING IN HOUSTON, TEXAS, AND IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY OR HEREAFTER HAVE TO THE LAYING OF VENUE IN SUCH FORUMS AND AGREES NOT TO PLEAD OR CLAIM THAT ANY ACTION IN SUCH FORUMS WOULD BE INCONVENIENT. EACH PARTY AGREES THAT A JUDGMENT IN ANY DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON JUDGMENT OR ANY OTHER MATTER PROVIDED BY LAW.

## 11.

TO THE FULLEST EXTENT PROVIDED BY APPLICABLE LAW, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, IN ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE PARTIES EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.

## 12.

No further transfer or assignment of any interest in and to the Assets will be made by Fieldwood unless such transfer or assignment is expressly made subject to the terms and provisions of this Agreement and such transferee or assignee assumes, in writing, all of Fieldwood's obligations set forth hereunder. The provisions of this section shall be binding upon Fieldwood and upon its successors and assigns.

## 13.

This Agreement may be executed in one or more counterparts, each of which shall be binding on the Party or Parties so signing but shall not be effective unless and until each of the Parties executes this instrument or a counterpart hereof.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement effective as of the date first above written, in the presence of the undersigned competent witnesses.

**WITNESSES**:

Print Name: Frank Davis III

Print Name: Nancy C Krasinski

Print Name: Frank Davis III

Print Name: Nancy C Krasinski

Print Name: Robert Sengdskotten

Print Name: Viviana Bravo-Pojas

**JX Nippon Oil Exploration (U.S.A.) Limited**

By: _____

Steven K. Fly
Vice President

**Black Elk Energy Offshore Operations, LLC**

By: _____

Jeff Shulse
Chief Financial Officer

**Fieldwood Energy Offshore LLC**

By: _____

John H. Smith
Vice President Land and Business Development

## ACKNOWLEDGEMENTS

STATE OF TEXAS                      §

COUNTY OF HARRIS               §

On this, the 10ᵗʰ day of July, 2014, before me, the undersigned Notary Public in and for the State of Texas, personally appeared Steven R. Fly, to me personally known, who being by me duly sworn, did say that he is the Vice President of JX Nippon Oil Exploration (U.S.A.) Limited, a Delaware corporation, and acknowledged that he, in such capacity was authorized to and executed the foregoing instrument as the free act and deed of said corporation for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.



Notary Public, State of Texas
Notary Name: Wanda N. Brothers
My Commission Expires on: July 17, 2018

STATE OF TEXAS                      §

COUNTY OF HARRIS               §

On this 10ᵗʰ day of July, 2014, before me, the undersigned Notary Public in and for the State of Texas, personally appeared Jeff Shulse, to me personally known, who being by me duly sworn, did say that he is the Chief Financial Officer of Black Elk Energy Offshore Operations, LLC, a Texas limited liability company, and that the instrument was signed on behalf of the company by authority of its _____ and that he acknowledged the instrument to be the free act and deed of the company.



Notary Public, State of Texas
Notary Name: Wanda N. Brothers
My Commission Expires on: July 17, 2018

STATE OF TEXAS          §

COUNTY OF HARRIS      §

   On this 8th day of July, 2014, before me, the undersigned Notary Public in and for the State of Texas, personally appeared John H. Smith, to me personally known, who being by me duly sworn, did say that he is the Vice President Land and Business Development of Fieldwood Energy Offshore LLC, a Delaware limited liability company, and that the instrument was signed on behalf of the company by authority of its _Manager_ and that he acknowledged the instrument to be the free act and deed of the company.



Notary Public, State of Texas
Notary Name: _Viviana Bravo-Rojas_
My Commission Expires on: _Sept. 7, 2016_

**Exhibit "A"**
**Attached to and made a part of that certain**
**Assumption Agreement dated July 8, 2014**

**Description of Subject Fields**

1.      Grand Isle 116 (Hickory Field) consists of the following two OCS Leases:

Oil and Gas Lease of Submerged lands bearing Serial number OCS-G 13943
dated effective as of  August 1, 1993, and covering all of Block 110, Grand Isle Area,
South Addition, as shown on OCS Louisiana Leasing Map, LA7A.

Oil and Gas Lease of Submerged lands bearing Serial number OCS-G 13944
dated effective as of  July 1, 1993, and covering all of Block 116, Grand Isle Area, South
Addition, as shown on OCS Louisiana Leasing Map, LA 7A.

II.      Specter Field consists of the following three OCS Leases INSOFAR and ONLY
INSOFAR  as they relate to the wellbores of the OCS-G 15436 A-7 Well  (API #
608164034800-S01)  and the  OCS-G 13673 A-5 Well (API # 608164033900-S01):

Oil and Gas Lease of Submerged Lands bearing Serial number OCS-G 13673 dated
effective as of August 1, 1992, and covering all of Block 779, Viosca Knoll, as shown on
OCS official protraction diagram, NH16-07.

Oil and Gas Lease of Submerged Lands bearing Serial number OCS-G 06884 dated
effective as of June 1, 1984, and covering all of Block 780, Viosca Knoll, as shown on
OCS official protraction diagram, NH16-07.

Oil and Gas Lease of Submerged Lands bearing Serial number OCS-G 15436 dated
effective as of September 1, 1995, and covering all of Block 824, Viosca Knoll, as shown
on OCS official protraction diagram, NH16-07.

III.      West Delta 133 Field consists of the following two Leases:

Oil and Gas Lease of Submerged Lands bearing Serial number OCS-G 19843 dated
effective as of August 1, 1998, and covering all of Block 121, West Delta Area, South
Addition, as shown on OCS Louisiana Leasing Map, LA8A.

Oil and Gas Lease of Submerged Lands bearing Serial number OCS-G 13645 dated
effective as of August 1, 1992, and covering all of Block 122, West Delta Area, South
Addition, as shown on OCS Louisiana Leasing Map, LA8A.

End of Exhibit "A"

**Exhibit "B"**
**Attached to and made a part of that certain**
**Assumption Agreement dated July 8, 2014**


**[Attach copy of Fieldwood Bond]**

BOND NO. B008837

## PEFORMANCE BOND

KNOW ALL PERSONS BY THESE PRESENTS:

THAT, **Fieldwood Energy Offshore LLC** ("Principal"), a Delaware limited liability company, with its principal offices at 2000 W. Sam Houston Parkway South, Suite 1200, Houston, TX 77042, and **U.S. Specialty Insurance Company** ("Surety"), with an office at 13403 Northwest Freeway, Houston, Texas 77040, are held and firmly bound unto **JX Nippon Oil Exploration (U.S.A.) Limited** ("Obligee"), with its principal office at One Riverway, Suite 1600, Houston, TX 77056, in the penal sum of One Million Six Hundred Fifty One Thousand Eight Hundred Fifty One and No/100 Dollars ($1,651,851.00) lawful money of the United States of America for the payment of which penal sum Principal and Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, Principal has entered into a Purchase and Sale Agreement (the "Agreement") with Black Elk Energy Offshore Operations, LLC ("Black Elk") dated as of March 13, 2014, as amended, which provides for the sale and assignment, from Black Elk to the Principal, of the interests of Black Elk in certain oil and gas leases and properties including the oil and gas lease described on Annex 1 to this Bond (whether one or more, the "Lease"), together with all rights and obligations in connection therewith, and also provides for the sale and assignment to Principal of all wells (whether one or more, the "Well"), platforms, facilities, equipment, pipelines and personal property existing on the Lease as of the date of the Agreement (the Lease, the Well and such platforms, facilities, equipment, pipelines and personal property being collectively referred to as the "Property");

WHEREAS, Principal and Surety agree that notwithstanding the subsequent termination of the Lease, whether by operation of law or otherwise, this Bond shall remain in full force and effect until the P&A Obligations (as such term is defined below) have been fully performed and discharged;

WHEREAS, as used in this Bond the term "P&A Obligations" means all obligations and liabilities of Principal concerning: (i) properly plugging, re-plugging and abandoning the Well, (ii) the dismantling, decommissioning, abandoning and removing of the Well and Property, and (iii) cleaning up, restoration and/or remediation of the Property in accordance with the Lease, regulations, orders and directives of the U.S. Department of the Interior, Bureau of Ocean Energy Management ("BOEM") and any other state or federal governmental authority; and applicable laws (including environmental laws);

WHEREAS, Principal has promised to deliver to Obligee this Bond in connection with the consummation of the sale and assignment of the Property to Principal pursuant to the Agreement and in connection with that certain Assumption Agreement dated as of June 5th, 2014, by and between Principal, Obligee and Black Elk ("Assumption Agreement");

WHEREAS, Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; and

BOND NO. B008837

WHEREAS, Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this Bond or any liability hereunder; and does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

NOW THEREFORE, notwithstanding anything contained herein to the contrary, if said Principal or Surety shall fully perform and discharge the P&A Obligations in respect of the Property (as evidenced by providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations), then this Bond and the obligations hereunder shall be null and void.

ADDITIONALLY, if as to any Property, Obligee is required by the BOEM, or other governmental authority, to perform any of the P&A Obligations (or a demand is made upon Obligee by a co-obligor of Principal to contribute toward the costs of performing any of the P&A Obligations), then prior to any performance by Obligee with respect to the P&A Obligations (or payment by Obligee to Principal's co-obligor of a share of the estimated costs of performing the P&A Obligations if a demand for such payment is made on Obligee), Surety agrees to pay to Obligee an amount reasonably estimated by Obligee as necessary or appropriate to perform the P&A Obligations (or to pay its share of the estimated costs for the P&A Obligations if demand is made by Principal's co-obligor) in an amount up to, but not exceeding, the penal amount of this Bond.

FURTHERMORE, it is agreed that Surety shall have no obligation to Principal, Obligee or any other person or entity for any loss suffered by Principal, Obligee or any other person or entity by reason of acts or omissions which are or could be covered by Obligee's or Principal's general liability insurance, products liability insurance or completed operations insurance. In no event shall Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the penal sum of this Bond.

It is further agreed that Surety shall not be liable for any provisions of the Agreement or specifications respecting the procurement of or coverages provided by an insurance, nor shall Surety be liable under any hold harmless and/or indemnification agreements entered into by Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in performing the P&A Obligations.

If Principal fails to perform any of the P&A Obligations in accordance with the terms of the Agreement, then Principal shall have 30 days following receipt of notice of default from Obligee in which to fully cure or remedy such default. Obligee agrees to provide Surety with a copy of each such default notice. If the default covered by such default notice is not cured or remedied within such 30 day period, then upon the expiration of such 30 day period such default shall constitute a "Principal Default" for purposes of this Bond. Any suit under this Bond with

BOND NO. B008837

respect to a Principal Default must be instituted before the expiration of one (1) year from the date of such Principal Default, and subject to such one (1) year time limitation, Surety irrevocably consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Agreement or of the Exhibits of Schedules attached thereto shall release Principal and Surety or any of them from their liability under this Bond, notice to Surety of any such amendment or supplement being hereby waived.

No (i) assignment of the Agreement or of the Lease by Principal, its successors and assigns, (ii) delay, neglect or failure of Obligee to proceed promptly to enforce the Agreement or to proceed promptly in the premises in case of any default on the part of Principal, (iii) lack of enforceability or other defense or offset right in respect of any obligation of Principal or right of Obligee under the Agreement or otherwise in respect of the P&A Obligations, or (iv) the insolvency, bankruptcy or receivership of Principal, shall in any degree relieve Principal or Surety (as applicable) of any of its obligations under this Bond.

HOWEVER, if upon assignment of the Agreement or the Lease or any of the Property by Principal, its successors or assigns, Principal shall cause its assignee (i) to post security with Obligee, in the form of a bond or other security, in the amount of and covering the same obligations as stated herein, and otherwise containing terms and issued by parties that are approved by Obligee and (ii) to assume (in a written instrument approved by Obligee) all P&A Obligations in respect of the Property, then Obligee will accept such security in lieu of this Bond and issue an unconditional release of this Bond within 60 days of Obligee's acceptance of such other security (provided, there shall be excluded from such release any obligations required to be performed by Principal or Surety under this Bond prior to the date of such assignment; and provided further, no such release of this Bond shall limit or modify any of the obligations of the Principal under the Agreement).

No right or action shall accrue on this Bond to or for the use of any person or entity other than Principal and Obligee and their respective successors and assigns.

This Bond may not be amended, supplemented or modified except pursuant to a written instrument duly executed by Principal and Surety and consented to in writing by Obligee, whether pursuant to the terms and provisions of the Assumption Agreement or as mutually agreed to by such parties.  No course of conduct, dealing or performance shall amend, supplement or modify this Bond unless incorporated into a written instrument referenced in the preceding sentence.  This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws, rules and principles.

Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) the full performance of the P&A Obligations by Principal and (ii) the full performance by Surety of its obligations under this Bond, but in no instance later than 30 days following Surety or Principal providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed

BOND NO. B008837

by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations.

IN WITNESS WHEREOF, the Principal and Surety have executed this instrument under their seals this 5th day of June, 2014, the name and seal of each such party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

WITNESS/ATTEST:

Fieldwood Energy Offshore  LLC
("Principal")

By: _____ (Seal)
Name: _Howard M. Tate_
Title: _Vice President_

Date: _7/7/14_

WITNESS/ATTEST:

Myisha S. Jefferson

U.S. Specialty Insurance Company
("Surety")

By: _____ (Seal)
Name: _Michele K. Tyson_
Title: _Attorney-in-Fact_

Date: _June 5, 2014_

WITNESS/ATTEST:

Frank Davis III
Assistant Secretary

OBLIGEE ACCEPTANCE

JX Nippon Oil Exploration (U.S.A.) Limited
("Obligee")

By: _____ (Seal)
Name: _Steven R. Fry_
Title: _Vice President_

Date: _July 8, 2014_

BOND NO. B008837

**Annex I**
**to**

**Principal: Fieldwood Energy Offshore LLC**
**Bond No. B008837**

| Field Name | Block | Lease No. | Amount |
|---|---|---|---|
| GI 116 (Hickory) Field | GI 116<br>GI 110 | OCS-G 139443<br>OCS-G 13943 | $1,651,851.00 |
| | | **Total Bond Amount:** | **$1,651,851.00** |

Page 5 of 5

# TEXAS COMPLAINT NOTICE

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| 1  To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| 2  You may contact your agent. | Puede comunicarse con su agente. |

3  You may call the company's toll free telephone number for information or to make a complaint at:

1-800-486-6695

Usted puede llamar de numerero de telefono gratis de la compania para informacion o para someter una queja al:

1-800-486-6695

4  You may also write to the company:

601 S. Figueroa St., Suite 1600<br>Los Angeles, CA 90017

Usted tambien puede escribir a la compañía:

601 S. Figueroa St., Suite 1600<br>Los Angeles, CA 90017

5  You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

(800) 252-3439

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

(800) 252-3439

6  You may write the Texas Department of Insurance:
P.O. Box 149104<br>Austin, TX 78714-9104<br>Fax No.: (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us

Puede escribir al Departamento de Seguros de Texas:
P.O. Box 149104<br>Austin, TX 78714-9104<br>Fax No.: (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us

7

## PREMIUM OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

## ATTACH THIS NOTICE TO YOUR POLICY:

8

This notice is for information only and does not become part or condition of the attached document.

## DISPUTAS SOBRE PRIMAS O RECLAMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la companie primero.  Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZA:

Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

# POWER OF ATTORNEY

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
**UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

KNOW ALL MEN BY THESE PRESENTS: That American Contractors Indemnity Company, a California corporation, Texas Bonding Company, an assumed name of American Contractors Indemnity Company, United States Surety Company, a Maryland corporation and U.S. Specialty Insurance Company, a Texas corporation (collectively, the "Companies"), do by these presents make, constitute and appoint:

### Edwin H. Frank, III, Michele K. Tyson or W. Russell Brown, Jr. of Houston, Texas

its true and lawful Attorney(s)-in-fact, each in their separate capacity if more than one is named above, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings or other instruments or contracts of suretyship to include riders, amendments, and consents of surety, **providing the bond penalty does not exceed** **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*Three Million\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** **Dollars ($ \*\*3,000,000.00\*\* ).**
This Power of Attorney shall expire without further action on December 8, 2016. This Power of Attorney is granted under and by authority of the following resolutions adopted by the Boards of Directors of the Companies:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings, including any and all consents for the release of retained percentages and/or final estimates on engineering and construction contracts, and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached.

IN WITNESS WHEREOF, The Companies have caused this instrument to be signed and their corporate seals to be hereto affixed, this
_____ June 5, 2014

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
**UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

Corporate Seals

By: _____
**Daniel P. Aguilar, Vice President**

State of California
County of Los Angeles        SS:
On ____ June 5, 2014 ____, before me, Vanessa Wright, a notary public, personally appeared Daniel P. Aguilar, Vice President of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _____        (Seal)

V. WRIGHT
Commission # 1996319
Notary Public - California
Los Angeles County
My Comm. Expires Dec 8, 2016

I, Jeannie Lee, Assistant Secretary of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Companies, which is still in full force and effect; furthermore, the resolutions of the Boards of Directors, set out in the Power of Attorney are in full force and effect.

In Witness Whereof, I have hereunto set my hand and affixed the seals of said Companies at Los Angeles, California this   5th   day of ____ June ____, 2014.

Corporate Seals

Bond No. B008837
Agency No. ____8353

_____
**Jeannie Lee, Assistant Secretary**

BOND NO. B008839

## PEFORMANCE BOND

KNOW ALL PERSONS BY THESE PRESENTS:

THAT, **Fieldwood Energy Offshore LLC** ("Principal"), a Delaware limited liability company, with its principal offices at 2000 W. Sam Houston Parkway South, Suite 1200, Houston, TX 77042, and **U.S. Specialty Insurance Company** ("Surety"), with an office at 13403 Northwest Freeway, Houston, Texas 77040, are held and firmly bound unto **JX Nippon Oil Exploration (U.S.A.) Limited** ("Obligee"), with its principal office at One Riverway, Suite 1600, Houston, TX 77056, in the penal sum of One Million Six Hundred Seventy Six Thousand Five Hundred Fifty Six and No/100 Dollars ($1,676,556.00) lawful money of the United States of America for the payment of which penal sum Principal and Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, Principal has entered into a Purchase and Sale Agreement (the "Agreement") with Black Elk Energy Offshore Operations, LLC ("Black Elk") dated as of March 13, 2014, as amended, which provides for the sale and assignment, from Black Elk to the Principal, of the interests of Black Elk in certain oil and gas leases and properties including the oil and gas lease described on Annex 1 to this Bond (whether one or more, the "Lease"), together with all rights and obligations in connection therewith, and also provides for the sale and assignment to Principal of all wells (whether one or more, the "Well"), platforms, facilities, equipment, pipelines and personal property existing on the Lease as of the date of the Agreement (the Lease, the Well and such platforms, facilities, equipment, pipelines and personal property being collectively referred to as the "Property");

WHEREAS, Principal and Surety agree that notwithstanding the subsequent termination of the Lease, whether by operation of law or otherwise, this Bond shall remain in full force and effect until the P&A Obligations (as such term is defined below) have been fully performed and discharged;

WHEREAS, as used in this Bond the term "P&A Obligations" means all obligations and liabilities of Principal concerning: (i) properly plugging, re-plugging and abandoning the Well, (ii) the dismantling, decommissioning, abandoning and removing of the Well and Property, and (iii) cleaning up, restoration and/or remediation of the Property in accordance with the Lease, regulations, orders and directives of the U.S. Department of the Interior, Bureau of Ocean Energy Management ("BOEM") and any other state or federal governmental authority; and applicable laws (including environmental laws);

WHEREAS, Principal has promised to deliver to Obligee this Bond in connection with the consummation of the sale and assignment of the Property to Principal pursuant to the Agreement and in connection with that certain Assumption Agreement dated as of June 5th, 2014, by and between Principal, Obligee and Black Elk ("Assumption Agreement");

WHEREAS, Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; and

BOND NO. B008839

WHEREAS, Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this Bond or any liability hereunder; and does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

NOW THEREFORE, notwithstanding anything contained herein to the contrary, if said Principal or Surety shall fully perform and discharge the P&A Obligations in respect of the Property (as evidenced by providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations), then this Bond and the obligations hereunder shall be null and void.

ADDITIONALLY, if as to any Property, Obligee is required by the BOEM, or other governmental authority, to perform any of the P&A Obligations (or a demand is made upon Obligee by a co-obligor of Principal to contribute toward the costs of performing any of the P&A Obligations), then prior to any performance by Obligee with respect to the P&A Obligations (or payment by Obligee to Principal's co-obligor of a share of the estimated costs of performing the P&A Obligations if a demand for such payment is made on Obligee), Surety agrees to pay to Obligee an amount reasonably estimated by Obligee as necessary or appropriate to perform the P&A Obligations (or to pay its share of the estimated costs for the P&A Obligations if demand is made by Principal's co-obligor) in an amount up to, but not exceeding, the penal amount of this Bond.

FURTHERMORE, it is agreed that Surety shall have no obligation to Principal, Obligee or any other person or entity for any loss suffered by Principal, Obligee or any other person or entity by reason of acts or omissions which are or could be covered by Obligee's or Principal's general liability insurance, products liability insurance or completed operations insurance. In no event shall Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the penal sum of this Bond.

It is further agreed that Surety shall not be liable for any provisions of the Agreement or specifications respecting the procurement of or coverages provided by an insurance, nor shall Surety be liable under any hold harmless and/or indemnification agreements entered into by Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in performing the P&A Obligations.

If Principal fails to perform any of the P&A Obligations in accordance with the terms of the Agreement, then Principal shall have 30 days following receipt of notice of default from Obligee in which to fully cure or remedy such default. Obligee agrees to provide Surety with a copy of each such default notice. If the default covered by such default notice is not cured or remedied within such 30 day period, then upon the expiration of such 30 day period such default shall constitute a "Principal Default" for purposes of this Bond. Any suit under this Bond with

respect to a Principal Default must be instituted before the expiration of one (1) year from the date of such Principal Default, and subject to such one (1) year time limitation, Surety irrevocably consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Agreement or of the Exhibits of Schedules attached thereto shall release Principal and Surety or any of them from their liability under this Bond, notice to Surety of any such amendment or supplement being hereby waived.

No (i) assignment of the Agreement or of the Lease by Principal, its successors and assigns, (ii) delay, neglect or failure of Obligee to proceed promptly to enforce the Agreement or to proceed promptly in the premises in case of any default on the part of Principal, (iii) lack of enforceability or other defense or offset right in respect of any obligation of Principal or right of Obligee under the Agreement or otherwise in respect of the P&A Obligations, or (iv) the insolvency, bankruptcy or receivership of Principal, shall in any degree relieve Principal or Surety (as applicable) of any of its obligations under this Bond.

HOWEVER, if upon assignment of the Agreement or the Lease or any of the Property by Principal, its successors or assigns, Principal shall cause its assignee (i) to post security with Obligee, in the form of a bond or other security, in the amount of and covering the same obligations as stated herein, and otherwise containing terms and issued by parties that are approved by Obligee and (ii) to assume (in a written instrument approved by Obligee) all P&A Obligations in respect of the Property, then Obligee will accept such security in lieu of this Bond and issue an unconditional release of this Bond within 60 days of Obligee's acceptance of such other security (provided, there shall be excluded from such release any obligations required to be performed by Principal or Surety under this Bond prior to the date of such assignment; and provided further, no such release of this Bond shall limit or modify any of the obligations of the Principal under the Agreement).

No right or action shall accrue on this Bond to or for the use of any person or entity other than Principal and Obligee and their respective successors and assigns.

This Bond may not be amended, supplemented or modified except pursuant to a written instrument duly executed by Principal and Surety and consented to in writing by Obligee, whether pursuant to the terms and provisions of the Assumption Agreement or as mutually agreed to by such parties.  No course of conduct, dealing or performance shall amend, supplement or modify this Bond unless incorporated into a written instrument referenced in the preceding sentence.  This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws, rules and principles.

Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) the full performance of the P&A Obligations by Principal and (ii) the full performance by Surety of its obligations under this Bond, but in no instance later than 30 days following Surety or Principal providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed

BOND NO. B008839

by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations.

     IN WITNESS WHEREOF, the Principal and Surety have executed this instrument under their seals this 5th day of June, 2014, the name and seal of each such party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

WITNESS/ATTEST:

_John D Fox_ (handwritten)

WITNESS/ATTEST:

_Myisha S. Jefferson_ (handwritten)
Myisha S. Jefferson

Fieldwood Energy Offshore LLC
("Principal")

By: _(signature)_ (Seal)
Name: _Howard M Tara_ (handwritten)
Title: _Vice President_ (handwritten)

Date: _7/7/14_ (handwritten)

U.S. Specialty Insurance Company
("Surety")

By: _Michele K. Tyson_ (signature) (Seal)
Name: Michele K. Tyson
Title: Attorney-in-Fact

Date: June 5, 2014

OBLIGEE ACCEPTANCE

JX Nippon Oil Exploration (U.S.A.) Limited
("Obligee")

WITNESS/ATTEST:

_Frank Davis III_ (handwritten)
Frank Davis III
Assistant Secretary

By: _(signature)_ (Seal)
Name: Steven R. Fly
Title: Vice President

Date: _July 8, 2014_ (handwritten)

Page 4 of 5

BOND NO. B008839

**Annex I**
**to**

**Principal: Fieldwood Energy Offshore LLC**
**Bond No. B008839**

| Field Name | Block | Lease No. | Amount |
|---|---|---|---|
| West Delta Block 133 Field | WD Block 121 WD Block 122 | OCS-G 19843 OCS-G 13645 | $1,676,556.00 |
| | | **Total Bond Amount:** | **$1,676,556.00** |

Page 5 of 5

# TEXAS COMPLAINT NOTICE

## IMPORTANT NOTICE

1  To obtain information or make a complaint:
2  You may contact your agent.

3  You may call the company's toll free telephone number for information or to make a complaint at:

1-800-486-6695

4  You may also write to the company:

601 S. Figueroa St., Suite 1600<br>Los Angeles, CA 90017

5  You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

(800) 252-3439

6  You may write the Texas Department of Insurance:
P.O. Box 149104<br>Austin, TX 78714-9104<br>Fax No.: (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us

7
## PREMIUM OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

## ATTACH THIS NOTICE TO YOUR POLICY:

8
This notice is for information only and does not become part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:
Puede comunicarse con su agente.

Usted puede llamar de numerero de telefono gratis de la compania para informacion o para someter una queja al:

1-800-486-6695

Usted tambien puede escribir a la compañía:

601 S. Figueroa St., Suite 1600<br>Los Angeles, CA 90017

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

(800) 252-3439

Puede escribir al Departamento de Seguros de Texas:

P.O. Box 149104<br>Austin, TX 78714-9104<br>Fax No.: (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us

## DISPUTAS SOBRE PRIMAS O RECLAMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la companie primero. Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZA:

Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

# POWER OF ATTORNEY

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
**UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

KNOW ALL MEN BY THESE PRESENTS: That American Contractors Indemnity Company, a California corporation, Texas Bonding Company, an assumed name of American Contractors Indemnity Company, United States Surety Company, a Maryland corporation and U.S. Specialty Insurance Company, a Texas corporation (collectively, the "Companies"), do by these presents make, constitute and appoint:

**Edwin H. Frank, III, Michele K. Tyson or W. Russell Brown, Jr. of Houston, Texas**

its true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings, or other instruments or contracts of suretyship to include riders, amendments, and consents of surety, providing the bond penalty does not exceed ********************Three Million******************** Dollars ($  **3,000,000.00**  ).

This Power of Attorney shall expire without further action on December 8, 2016. This Power of Attorney is granted under and by authority of the following resolutions adopted by the Boards of Directors of the Companies:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings, including any and all consents for the release of retained percentages and/or final estimates on engineering and construction contracts, and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached.

IN WITNESS WHEREOF, The Companies have caused this instrument to be signed and their corporate seals to be hereto affixed, this _____ June 5, 2014 _____

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
Corporate Seals   **UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

  

By: _____
**Daniel P. Aguilar, Vice President**

State of California
County of Los Angeles   SS:

On ___ June 5, 2014 ___, before me, Vanessa Wright, a notary public, personally appeared Daniel P. Aguilar, Vice President of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct. WITNESS my hand and official seal.

Signature _____ (Seal)

I, Jeannie Lee, Assistant Secretary of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Companies, which is still in full force and effect; furthermore, the resolutions of the Boards of Directors, set out in the Power of Attorney are in full force and effect.

In Witness Whereof, I have hereunto set my hand and affixed the seals of said Companies at Los Angeles, California this 5th day of ___ June ___, 2014.

Corporate Seals

  

Bond No.: B008839
Agency No.: 28353

_____
**Jeannie Lee, Assistant Secretary**

BOND NO. B008838

**PEFORMANCE BOND**

KNOW ALL PERSONS BY THESE PRESENTS:

THAT, **Fieldwood Energy Offshore LLC** ("Principal"), a Delaware limited liability company, with its principal offices at 2000 W. Sam Houston Parkway South, Suite 1200, Houston, TX 77042, and **U.S. Specialty Insurance Company** ("Surety"), with an office at 13403 Northwest Freeway, Houston, Texas 77040, are held and firmly bound unto **JX Nippon Oil Exploration (U.S.A.) Limited** ("Obligee"), with its principal office at One Riverway, Suite 1600, Houston, TX 77056, in the penal sum of One Hundred Fifteen Thousand Nine Hundred Eighty Eight and No/100 Dollars ($115,988.00) lawful money of the United States of America for the payment of which penal sum Principal and Surety bind themselves, their successors and assigns, jointly, severally, and in solido, firmly by these presents.

WHEREAS, Principal has entered into a Purchase and Sale Agreement (the "Agreement") with Black Elk Energy Offshore Operations, LLC ("Black Elk") dated as of March 13, 2014, as amended, which provides for the sale and assignment, from Black Elk to the Principal, of the interests of Black Elk in certain oil and gas leases and properties including the oil and gas lease described on Annex 1 to this Bond (whether one or more, the "Lease"), together with all rights and obligations in connection therewith, and also provides for the sale and assignment to Principal of all wells (whether one or more, the "Well"), platforms, facilities, equipment, pipelines and personal property existing on the Lease as of the date of the Agreement (the Lease, the Well and such platforms, facilities, equipment, pipelines and personal property being collectively referred to as the "Property");

WHEREAS, Principal and Surety agree that notwithstanding the subsequent termination of the Lease, whether by operation of law or otherwise, this Bond shall remain in full force and effect until the P&A Obligations (as such term is defined below) have been fully performed and discharged;

WHEREAS, as used in this Bond the term "P&A Obligations" means all obligations and liabilities of Principal concerning: (i) properly plugging, re-plugging and abandoning the Well, (ii) the dismantling, decommissioning, abandoning and removing of the Well and Property, and (iii) cleaning up, restoration and/or remediation of the Property in accordance with the Lease, regulations, orders and directives of the U.S. Department of the Interior, Bureau of Ocean Energy Management ("BOEM") and any other state or federal governmental authority; and applicable laws (including environmental laws);

WHEREAS, Principal has promised to deliver to Obligee this Bond in connection with the consummation of the sale and assignment of the Property to Principal pursuant to the Agreement and in connection with that certain Assumption Agreement dated as of June 5th, 2014, by and between Principal, Obligee and Black Elk ("Assumption Agreement");

WHEREAS, Surety represents that it is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; and

BOND NO. B008838

WHEREAS, Surety represents that it has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or proceeding against such Surety in any court or before any officer, arising out of or founded upon this Bond or any liability hereunder; and does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

NOW THEREFORE, notwithstanding anything contained herein to the contrary, if said Principal or Surety shall fully perform and discharge the P&A Obligations in respect of the Property (as evidenced by providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations), then this Bond and the obligations hereunder shall be null and void.

ADDITIONALLY, if as to any Property, Obligee is required by the BOEM, or other governmental authority, to perform any of the P&A Obligations (or a demand is made upon Obligee by a co-obligor of Principal to contribute toward the costs of performing any of the P&A Obligations), then prior to any performance by Obligee with respect to the P&A Obligations (or payment by Obligee to Principal's co-obligor of a share of the estimated costs of performing the P&A Obligations if a demand for such payment is made on Obligee), Surety agrees to pay to Obligee an amount reasonably estimated by Obligee as necessary or appropriate to perform the P&A Obligations (or to pay its share of the estimated costs for the P&A Obligations if demand is made by Principal's co-obligor) in an amount up to, but not exceeding, the penal amount of this Bond.

FURTHERMORE, it is agreed that Surety shall have no obligation to Principal, Obligee or any other person or entity for any loss suffered by Principal, Obligee or any other person or entity by reason of acts or omissions which are or could be covered by Obligee's or Principal's general liability insurance, products liability insurance or completed operations insurance. In no event shall Surety be obligated to pay, in the aggregate, for all claims hereunder, an amount exceeding the penal sum of this Bond.

It is further agreed that Surety shall not be liable for any provisions of the Agreement or specifications respecting the procurement of or coverages provided by an insurance, nor shall Surety be liable under any hold harmless and/or indemnification agreements entered into by Principal in relation to personal injury or property damage or any other loss sustained by third parties in any way connected to or arising out of the work and/or operations of any party in performing the P&A Obligations.

If Principal fails to perform any of the P&A Obligations in accordance with the terms of the Agreement, then Principal shall have 30 days following receipt of notice of default from Obligee in which to fully cure or remedy such default. Obligee agrees to provide Surety with a copy of each such default notice. If the default covered by such default notice is not cured or remedied within such 30 day period, then upon the expiration of such 30 day period such default shall constitute a "Principal Default" for purposes of this Bond. Any suit under this Bond with

respect to a Principal Default must be instituted before the expiration of one (1) year from the date of such Principal Default, and subject to such one (1) year time limitation, Surety irrevocably consents to be sued in any court in the State of Texas, hereby irrevocably submitting itself to the jurisdiction of said courts.

No amendment of or supplement to the terms or provisions of the Agreement or of the Exhibits of Schedules attached thereto shall release Principal and Surety or any of them from their liability under this Bond, notice to Surety of any such amendment or supplement being hereby waived.

No (i) assignment of the Agreement or of the Lease by Principal, its successors and assigns, (ii) delay, neglect or failure of Obligee to proceed promptly to enforce the Agreement or to proceed promptly in the premises in case of any default on the part of Principal, (iii) lack of enforceability or other defense or offset right in respect of any obligation of Principal or right of Obligee under the Agreement or otherwise in respect of the P&A Obligations, or (iv) the insolvency, bankruptcy or receivership of Principal, shall in any degree relieve Principal or Surety (as applicable) of any of its obligations under this Bond.

HOWEVER, if upon assignment of the Agreement or the Lease or any of the Property by Principal, its successors or assigns, Principal shall cause its assignee (i) to post security with Obligee, in the form of a bond or other security, in the amount of and covering the same obligations as stated herein, and otherwise containing terms and issued by parties that are approved by Obligee and (ii) to assume (in a written instrument approved by Obligee) all P&A Obligations in respect of the Property, then Obligee will accept such security in lieu of this Bond and issue an unconditional release of this Bond within 60 days of Obligee's acceptance of such other security (provided, there shall be excluded from such release any obligations required to be performed by Principal or Surety under this Bond prior to the date of such assignment; and provided further, no such release of this Bond shall limit or modify any of the obligations of the Principal under the Agreement).

No right or action shall accrue on this Bond to or for the use of any person or entity other than Principal and Obligee and their respective successors and assigns.

This Bond may not be amended, supplemented or modified except pursuant to a written instrument duly executed by Principal and Surety and consented to in writing by Obligee, whether pursuant to the terms and provisions of the Assumption Agreement or as mutually agreed to by such parties. No course of conduct, dealing or performance shall amend, supplement or modify this Bond unless incorporated into a written instrument referenced in the preceding sentence. This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws, rules and principles.

Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) the full performance of the P&A Obligations by Principal and (ii) the full performance by Surety of its obligations under this Bond, but in no instance later than 30 days following Surety or Principal providing to Obligee evidence reasonably acceptable to Obligee reflecting that the P&A Obligations have been fully performed, together with an affidavit signed

BOND NO. B008838

by an officer of Principal attesting to such performance and identifying the Property associated with the performance of such P&A Obligations.

IN WITNESS WHEREOF, the Principal and Surety have executed this instrument under their seals this 5th day of June, 2014, the name and seal of each such party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

WITNESS/ATTEST:

_____

Fieldwood Energy Offshore LLC ("Principal")

By: _____ (Seal)
Name: Howard Tate
Title: Vice President

Date: 7/7/14

WITNESS/ATTEST:

_____
Myisha S. Jefferson

U.S. Specialty Insurance Company ("Surety")

By: Michele K. Tyson (Seal)
Name: Michele K. Tyson
Title: Attorney-in-Fact

Date: June 5, 2014

WITNESS/ATTEST:

_____
Frank Davis III
Assistant Secretary

OBLIGEE ACCEPTANCE

JX Nippon Oil Exploration (U.S.A.) Limited ("Obligee")

By: _____ (Seal)
Name: Steven R. Fly
Title: Vice President

Date: July 8, 2014

Page 4 of 5

BOND NO. B008838

**Annex I**
**to**

**Principal: Fieldwood Energy Offshore LLC**
**Bond No. B008838**

| Field Name | Block | Lease No. | Amount |
|---|---|---|---|
| VK 780 (Specter) Field | VK Block 780<br>VK Block 824<br>VK Block 779 | OCS-G 6884<br>OCS-G 15436<br>OCS-G 13673 | $115,988.00 |
| | | **Total Bond Amount:** | **$115,988.00** |

Page 5 of 5

# TEXAS COMPLAINT NOTICE

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

1  To obtain information or make a complaint:

2  You may contact your agent.

Para obtener informacion o para someter una queja:
Puede comunicarse con su agente.

3  You may call the company's toll free telephone number for information or to make a complaint at:

Usted puede llamar de numerero de telefono gratis de la compania para informacion o para someter una queja al:

### 1-800-486-6695

### 1-800-486-6695

4  You may also write to the company:

Usted tambien puede escribir a la compañía:

601 S. Figueroa St., Suite 1600
Los Angeles, CA 90017

601 S. Figueroa St., Suite 1600
Los Angeles, CA 90017

5  You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

### (800) 252-3439

### (800) 252-3439

6  You may write the Texas Department of Insurance:
P.O. Box 149104
Austin, TX 78714-9104
Fax No.: (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

Puede escribir al Departamento de Seguros de Texas:

P.O. Box 149104
Austin, TX 78714-9104
Fax No.: (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

7

### PREMIUM OR CLAIM DISPUTES:

### DISPUTAS SOBRE PRIMAS O RECLAMOS:

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la companie primero. Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

### ATTACH THIS NOTICE TO YOUR POLICY:

### UNA ESTE AVISO A SU POLIZA:

8

This notice is for information only and does not become part or condition of the attached document.

Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

# POWER OF ATTORNEY

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
**UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

KNOW ALL MEN BY THESE PRESENTS: That American Contractors Indemnity Company, a California corporation, Texas Bonding Company, an assumed name of American Contractors Indemnity Company, United States Surety Company, a Maryland corporation and U.S. Specialty Insurance Company, a Texas corporation (collectively, the "Companies"), do by these presents make, constitute and appoint:

**Edwin H. Frank, III, Michele K. Tyson or W. Russell Brown, Jr. of Houston, Texas**

its true and lawful Attorney(s)-in-fact, each in their separate capacity if more than one is named above, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings, or other instruments or contracts of suretyship to include riders, amendments, and consents of surety, providing the bond penalty does not exceed ********************Three Million******************** Dollars ($ **3,000,000.00** ).

This Power of Attorney shall expire without further action on December 8,2016. This Power of Attorney is granted under and by authority of the following resolutions adopted by the Boards of Directors of the Companies:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings, including any and all consents for the release of retained percentages and/or final estimates on engineering and construction contracts, and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached.

IN WITNESS WHEREOF, The Companies have caused this instrument to be signed and their corporate seals to be hereto affixed, this _____ June 5, 2014 .

**AMERICAN CONTRACTORS INDEMNITY COMPANY   TEXAS BONDING COMPANY**
**UNITED STATES SURETY COMPANY   U.S. SPECIALTY INSURANCE COMPANY**

Corporate Seals

By: _____
**Daniel P. Aguilar, Vice President**

State of California
County of Los Angeles   SS:

On ___ June 5, 2014 ___, before me, Vanessa Wright, a notary public, personally appeared Daniel P. Aguilar, Vice President of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

V. WRIGHT
Commission # 1998319
Notary Public - California
Los Angeles County
My Comm. Expires Dec 8, 2016

I, Jeannie Lee, Assistant Secretary of American Contractors Indemnity Company, Texas Bonding Company, United States Surety Company and U.S. Specialty Insurance Company, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Companies, which is still in full force and effect; furthermore, the resolutions of the Boards of Directors, set out in the Power of Attorney are in full force and effect.

In Witness Whereof, I have hereunto set my hand and affixed the seals of said Companies at Los Angeles, California this 5th day of June , 2014.

Corporate Seals

Bond No. B008838
Agency No. ACIA18353

_____
**Jeannie Lee, Assistant Secretary**

**Exhibit "C"**
**Attached to and made a part of that certain**
**Assumption Agreement dated July 8, 2014**

**Section 6.4(b) - (i) of the Nippon PSA**

        (b)      In connection with its ownership of the Assets, Seller has previously engaged Proserv Offshore, Inc. (formerly Twachtman, Snyder & Bird, Inc. ("*POI*")) and JAB Energy Solutions ("*JAB*") to prepare an estimate of the total costs to perform all P&A Obligations associated with the Leases (the "*P&A Obligations Costs*"). Schedule 6.4(b) lists, to the extent possible based on information in Seller's possession, the individual P&A Obligations Costs for each Well, platform and pipeline (each, a "*P&A Element*") on or related to each Lease, that the parties agree, for the purposes of this Article 6.4, comprise, in the aggregate, the current estimated P&A Obligations Costs, together with (i) a description of the estimated amount of the supplemental bonds, as such term is commonly used by the BOE (such estimated amount is hereafter referred to as the "*Supplemental Bond Amount*", and each such bond is referred to as a "*Supplemental Bond*") that Buyer or its designee shall post with the BOE on or about the Closing Date with respect to the particular Lease to be covered by each Supplemental Bond as set forth on said Schedule 6.4(b), and (ii) the estimated amount of each Seller Bond (the "*Seller Bond Amount*") that shall be issued to Seller pursuant to Article 6.4(d). The bonds provided for in Article 6.4(b) and (d) shall be obtained by Buyer in the amounts based on the estimated P&A Obligations Costs listed in Schedule 6.4(b).

        Seller and Buyer agree that either POI or JAB is acceptable to the parties to prepare future estimates of the P&A Obligations Costs as provided elsewhere in this Article 6.4 (such firms mutually agreed to by the parties to conduct such estimates are referred to hereafter as the "*Consulting Firms*"). From time to time the parties may mutually agree in writing to change the identification of the Consulting Firms to conduct future estimates of the P&A Obligations Costs. On or before the second anniversary of the Closing Date and on each biennial anniversary date thereafter (unless a longer or shorter period is mutually agreed to in writing by the parties), Seller and Buyer will arrange for and obtain at the parties' joint expense an updated cost estimate of the then outstanding P&A Obligations Costs for each Lease from one of the Consulting Firms, and such updated estimate shall take into account the performance or completion of P&A Obligations with respect to any P&A Elements conducted with respect to the Assets subsequent to the prior estimate conducted by one of the Consulting Firms and identified in a P&A Report as set forth in Article 6.4(f). If the updated estimate for any Lease is less than or greater than the sum of the then current Supplemental Bond Amount and the Seller Bond Amount for such Lease, then Seller and Buyer will promptly revise Schedule 6.4(b) to reflect the decrease or increase, as the case may be, in the Seller Bond Amount for such Lease, and to obtain an amendment to such Seller Bond reflecting such decrease or increase (with Buyer to bear the cost of such amendment and to be responsible for any security required in connection with such amendment).

        (c)      Seller and Buyer shall contract with POI for each such biennial estimate as provided for above not less than sixty (60) days prior to each next ensuing biennial anniversary date, unless the parties mutually agree in writing to use a different Consulting Firm. The fees and expenses for the preparation and delivery of each such biennial estimate shall be borne equally by Seller and Buyer. In the event Buyer fails to join with Seller to timely engage and

obtain revised estimated P&A Obligations Costs as provided for above, Seller, after first providing written notice to Buyer of such failure and allowing Buyer ten (10) days to cure such failure, may obtain such estimate from one of the Consulting Firms and all costs incurred by Seller in such connection will be borne and paid by Buyer promptly upon written demand from Seller. Notwithstanding anything to the contrary set forth in this Article 6.4, Seller shall not be obligated to release or reduce the amount provided for in any Supplemental Bond or Seller Bond pursuant to the provisions of Article 6.4 if and while Buyer is in default with respect to its obligations under Article 6.4.

In connection with the future estimates of the P&A Obligations Costs to be conducted from time to time by one of the Consulting Firms, the parties agree to provide the Consulting Firm with such access to the Assets as may be necessary and appropriate in order to conduct such estimates. Such future estimates shall be conducted consistent, in all material respects, with the scope and manner (without regard to the expense of conducting the estimates as reflected therein) set forth in that certain 2010 Offshore Decommissioning Liability Study Update, Proserv Offshore Proposal No. PS-10-101-11, a copy of which has been provided to Buyer by Seller, unless the parties mutually agree in writing to a different scope and manner to conduct such future estimates.

(d)     Subject to the remaining provisions of Article 6.4, no later than Closing, Buyer shall obtain and at all times maintain (subject to Articles 6.4(b) and (f)) for a period not to exceed six months following the performance of all P&A Obligations relating to each Lease specified in <u>Schedule 6.4(b)</u>, a non-cancelable performance bond (each a "*Seller Bond*"), with respect to each Lease specified in <u>Schedule 6.4(b)</u> to be covered by a Seller Bond, naming Seller as obligee and loss payee and securing Buyer's performance with respect to the P&A Obligations relating to such Lease. Each Seller Bond shall be (i) substantially in the form attached as <u>Exhibit E</u>, (ii) in an amount equal to the Seller Bond Amount for the related Lease, subject to adjustment pursuant to Articles 6.4(b), (e) and (f), (iii) placed with a surety company or companies acceptable to Seller and that is authorized and admitted to do business in the jurisdictions where the Assets are located, that is and remains approved by the United States Treasury and the BOE, and that is listed in the Federal Register and licensed by the State of Texas (or other jurisdiction acceptable to Seller) to execute bonds as surety (whether one or more, the "*Bonding Company*"), and (iv) provided to Seller no later than two (2) Business Days prior to the Closing Date.

It is the intention of the parties that so long as P&A Obligations with respect to the Leases have not been fully performed, Buyer shall have secured and shall maintain, on a Lease by Lease basis, Seller Bonds and/or the Supplemental Bonds in an aggregate amount not less than the then current estimated P&A Obligations Costs for each Lease, as determined by the Consulting Firm provided for in Article 6.4(b) above, subject to such reductions as expressly provided for in Article 6.4(f).

(e)     If as to any Lease the Supplemental Bond for such Lease is released or terminated other than as a result of the performance of all P&A Obligations relating to such Lease (*e.g.*, the BOE accepts Buyer as a financially exempt company), then prior to or contemporaneous with such cancellation or termination Buyer shall cause the Seller Bond for such Lease to be increased by the amount of the Supplemental Bond so cancelled or terminated

or, if there is no Seller Bond outstanding for such Lease, cause a Seller Bond to be issued to Seller in the amount of such Supplemental Bond.

(f)     On or before each anniversary date of the Closing Date, Buyer will provide Seller with a written report from Buyer, including an affidavit signed by an officer of Buyer, detailing the extent to which P&A Obligations with respect to any P&A Element for any Lease have been conducted since the Closing Date, or the last anniversary date thereof, as the case may be, together with appropriate P&A Documentation associated with each such completed P&A Element (each, a "*P&A Report*").  Each such P&A Report shall be provided to the Consulting Firm thereafter hired to conduct the biennial estimate of the P&A Obligations Costs and the details of each such P&A Report shall be taken into account by such Consulting Firm in connection with its biennial estimate.  In the event Buyer performs or completes P&A Obligations with respect to one or more of the Leases at a cost in excess of Ten Million Dollars ($10,000,000.00) during a calendar year in which the biennial estimate is not planned to be conducted, Seller shall, upon receipt of the appropriate P&A Documentation with respect to such performance or completion, instruct the Bonding Company to cancel, or to reduce, as the case may be, the Seller Bond (if any) for the Lease on which the P&A Element associated with such P&A Obligations have been completed or performed by an amount equal to the bond amount associated with each such P&A Element.  Upon the full performance of the P&A Obligations relating to a Lease (as evidenced by the BOE sending a notice or letter to the Bonding Company stating that the Supplemental Bond covering such Lease has been cancelled or terminated due to the performance of such P&A Obligations or, if there is no Supplemental Bond covering such Lease, by furnishing Seller with evidence reasonably acceptable to Seller reflecting that such P&A Obligations have been fully performed), together with an affidavit signed by an officer of Buyer attesting to such performance and indentifying all Wells and Personal Property associated with the performance of such P&A Obligations, Seller shall upon receipt of such documentation, instruct the Bonding Company to cancel the Seller Bond (if any) covering such Lease.

(g)     As used in this Article 6.4, "*performance*", "*performed*", "*completion*" or "*completed*" shall mean compliance with all Laws, together with appropriate P&A Documentation.

(h)     If any Governmental Authority makes demand upon Seller to perform any of the P&A Obligations (or a demand is made upon another non-Buyer co-obligor for any of the P&A Obligations and a subsequent demand by such co-obligor is made upon Seller to contribute toward the costs of performing any of the P&A Obligations), Seller shall notify Buyer, who shall have the right to perform such P&A Obligations or to contribute such amount.  However, in the event Buyer fails to commence operations necessary to perform such P&A Obligations or fail to contribute such amount within thirty (30) days of Seller's notice, unless a shorter period of time is required by the Governmental Authority or the non-Buyer co-obligor, Seller, in addition to any other rights under the Seller Bond, may draw under the Seller Bond prior to any performance with respect to the P&A Obligations in an amount reasonably estimated by Seller as necessary or appropriate to perform the P&A Obligations (or to pay its share of the estimated costs for the P&A Obligations if demand is made by a non-Buyer co-obligor).

(i)     If any Governmental Authority makes demand upon Seller to perform any of the P&A Obligations, Seller shall notify Buyer, who shall have the right to perform such P&A

Obligations.  However, in the event Buyer fails to commence operations necessary to perform any such P&A Obligations within thirty (30) days of Seller's notice, unless a shorter period of time is required by the Governmental Authority, Seller shall have (and upon request Buyer shall take all actions necessary to cause Seller to have) immediate and unrestricted access to the Assets for the purpose of performing such P&A Obligations without the requirement of any further notice to Buyer or further consent or authorization from Buyer.  If required by any Governmental Authority, Buyer shall execute such designations of operator or other forms as may be required in order for Seller, or its designee, to perform such P&A Obligations.

## SCHEDULE 6.4(b)

### Attached to and made a part of that certain Assumption Agreement dated _____

### P & A OBLIGATIONS COSTS; SUPPLEMENTAL BOND AMOUNTS AND SELLER BOND AMOUNTS

| Field Name | Block | Platform | Water Depth | No. Conductors | No. Pipelines | No. Wells | Platform Gross | Pipeline Gross | Well Gross | Working Interest | Total Gross | Total Net | Supplemental Bond | Seller Bond |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GI116 | GI116 | GI116 A | 326 | 6 | 4 | 5 | $11,812,010 | $0 | $1,402,796 | 12.5% | $13,214,806 | $1,651,851 | | |
| | | GI116 A TOTAL | | | | | $11,812,010 | | $1,402,796 | | $13,214,806 | $1,651,851 | | |
| | | GI116 TOTAL | | | | | | | | | | $1,651,851 | $0 | $1,651,851 |
| Specter | Specter | VK 824 | 1040 | 2 | 0 | 2 | $1,072,445 | $0 | $377,399 | 8.0% | $1,449,844 | $115,988 | | |
| | | Specter TOTAL | | | | | $0 | | $1,600,000 | | $1,449,844 | $115,988 | | |
| | | Specter TOTAL | | | | | | | | | | $115,988 | $0 | $115,988 |
| WD133 | WD122 122A | 269 | 12 | 2 | 12 | $6,247,821 | $1,505,537 | $2,725,115 | 16.0% | $10,478,473 | $1,676,556 | | |
| | | WD133 TOTAL | | | | | $1,725,000 | $0 | $3,000,000 | | $10,478,473 | $1,676,556 | | |
| | | WD133 TOTAL | | | | | | | | | | $1,676,556 | $0 | $1,676,556 |
| | | TOTAL DECOMMISSIONING COST ESTIMATE | | | | | | | | | | $3,444,395 | $0 | $3,444,395 |



The Future of Energy, Resour(   )and Materials

**JX Nippon Oil Exploration (U.S.A.) Limited**

One Riverway, Suite 1600
Houston, TX 77056
www.nex.jx-group.co.jp

July 10, 2014

Fieldwood Energy LLC
2000 W. Sam Houston Pkwy. South
Suite 1200
Houston, Texas 77042

Attention:  Viviana Bravo-Rojas

Re: Assumption Agreement

Dear Madam:

Enclosed for your records, please find a copy of the fully executed, witnessed and acknowledged Assumption Agreement dated July 8, 2014, by and among JX Nippon Oil Exploration (U.S.A.) Limited, Black Elk Energy Offshore Operations, LLC, and Fieldwood Energy Offshore LLC (f/k/a SandRidge Energy Offshore). Please note that copies of the three Fieldwood Performance Bonds have been inserted into Exhibit "B".

Should you have any further questions in this regard, please call me at (713) 260-7432

Sincerely,

Frank Davis III
Land Manager

Encl. Assumption Agreement



Viviana Bravo-Rojas
Paralegal/Administrative Assistant
Direct: 713-969-1159
viviana.bravo-rojas@fwellc.com

July 8, 2014

Jeff Shulse
Chief Financial Officer
Black Elk Energy
11451 Katy Freeway, Ste. 500
Houston, Texas 77079

    *Re:  Assumption Agreement dated July 8, 2014, by and among JX Nippon Oil Exploration (U.S.A.) Limited, f/k/a Nippon Oil Exploration U.S.A. Limited ("Nippon"), Black Elk Energy Offshore Operations LLC ("Black Elk"), and Fieldwood Energy Offshore LL, f/k/a SandRidge Energy Offshore, LLC*

Dear Mr. Shulse:

    Please find enclosed one partially executed original, on behalf of Fieldwood Energy Offshore LLC, in connection with the above captioned matter.  Please feel free to contact me shall you have any questions regarding the enclosure.

        Sincerely,

        Viviana Bravo-Rojas

**Enclosure**