## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **FIELDWOOD ENERGY LLC**, *et al.*,[1] | § | Case No. 20-33948 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**OBJECTION OF ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY, AND SIRIUS AMERICA INSURANCE COMPANY TO THE MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING DISCLOSURE STATEMENT AND FORM AND MANNER OF NOTICE OF DISCLOSURE STATEMENT HEARING; (II) ESTABLISHING SOLICITATION AND VOTING PROCEDURES; (III) SCHEDULING CONFIRMATION HEARING; (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED PLAN; (V) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (VI) APPROVING PROCEDURES FOR OBJECTIONS TO THE ASSIGNMENT AND TRANSFER OF PROPERTY OF THE ESTATE; (VII) APPROVING BID SUBMISSION DEADLINE AND PROCEDURES FOR SUBMISSION OF HIGHER OR BETTER BIDS; AND <u>(VIII) GRANTING RELATED RELIEF</u>**
**(Relates to Docket Nos. 723 and 724)**

---

[1] The Debtors, each of which have filed a separate voluntary petition, are: Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Inc.; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC.

## **TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ............................................................................. 2

II.    BACKGROUND .............................................................................................. 6

       A.     Procedural Background............................................................................ 6

       B.     Factual Background ................................................................................ 8

              i.     The Nature of the Debtors' Operations ..................................... 8

              ii.    Regulation of the Company's Businesses ................................. 8

              iii.   The Surety Bond Program ......................................................... 9

              iv.    The Surety Bonds Issued on Behalf of the Debtors by the Sureties .......... 10

III.   OBJECTIONS................................................................................................. 11

       A.     The Disclosure Statement Fails to Provide Adequate Information as
              Required by Section 1125 of the Bankruptcy Code............................. 11

              i.     The Disclosure Statement Fails to Provide Adequate Information
                     Regarding the Regulatory Approval Required to Confirm the
                     Proposed Plan............................................................................. 13

              ii.    The Disclosure Statement Fails to Provide Adequate Information
                     Regarding How FWE I, FWE III and the Credit Bid Purchaser
                     Will Address BOEM Financial Assurance/Bonding Requirements
                     Post-Effective Date .................................................................... 14

              iii.   The Disclosure Statement Fails to Provide Adequate Information
                     Regarding the Sureties' Material Modification and Impairment of
                     Suretyship Status Defenses to the BOEM Bonds if the Government
                     Fails to Require the Emerging Entities to Post Their Own Bonding........ 14

              iv.    The Disclosure Statement Fails to Provide Adequate Information
                     Regarding the Post-Effective Date Indemnity and Premium-
                     Payment Obligations of the Debtors, FWE I, FWE III and Credit
                     Bid Purchaser ............................................................................. 15

i

v.    *The Disclosure Statement Fails to Provide Adequate Information Regarding the Surety Bonds' Status as Non-Assumable Financial Accommodations and the Debtors' Cure Obligations* ............................ 17

vi.   *The Disclosure Statement Fails to Provide Adequate Information Regarding the Substitution of Principal Doctrine, and the Common Law Right of Sureties to be Exonerated, Indemnified and Obtain Quia Timet Relief and the Impact it will have on the Plan* ....................... 18

vii.  *The Disclosure Statement Fails to Provide Adequate Information Regarding the Credit Bid Purchase Agreement* ........................................ 20

viii. *The Disclosure Statement Fails to Provide Adequate Information Regarding FWE I's Assumption of the "Obligations for Damage to Property Included in the FWE I Assets or the GOM Shelf Oil and Gas Properties"* ................................................................................... 21

ix.   *The Disclosure Statement Fails to Provide Adequate Information Regarding the Alleged $5 Million in Improper Withdrawals the Debtors Made from Trust A* ................................................................... 22

x.    *The Disclosure Statement Fails to Provide Adequate Information Regarding the $224 Million Being Paid by Credit Bid Purchaser* ........... 23

xi.   *The Disclosure Statement Fails to Provide Adequate Information Regarding Financial Models/Projections Demonstrating FWE I's Ability to Meet its Financial Obligations Post-Effective Date* ................. 23

xii.  *The Disclosure Statement Fails to Provide Adequate Information Regarding the Liquidation Analysis* ......................................................... 24

xiii. *The Disclosure Statement Fails to Provide Adequate Information Regarding the Value of the Legacy Apache Properties and the Sale Efforts of Fieldwood* .................................................................................. 25

B.    The Disclosure Statement Should Not Be Approved Because the Plan is Patently Unconfirmable ......................................................................................... 25

i.    *The Plan is Unconfirmable Because the Debtors Cannot Abandon Hazardous Properties Without the Court Imposing Conditions Protecting the Public's Health and Safety* ............................................... 26

ii.   *The Plan is Unconfirmable Because the Plan Contains No Provisions for Obtaining Surety Bonds/Financial Assurance for FWE I, FWE III or Credit Bid Purchaser to Operate in the GOM* .......... 30

         *iii.*    *The Plan is Unconfirmable Because the Surety Bonds are Non-Assumable Financial Accommodations, Unless the Surety Consents to Assumption* .............................................................. 34

         *iv.*    *The Plan is Unconfirmable Because the Debtors Have Taken No Actions in Attempting to Sell the Legacy Apache Properties and therefore the Plan is Not Proposed in Good Faith* .................................. 38

         *v.*    *The Plan is Unconfirmable Because Apache is Being Treated Differently than Similarly Situated Creditors* .......................................... 41

   C.    The Voting Procedures Should Not be Approved because they Purport to Give the Sureties and Predecessor Owners Only $1 in Voting Rights ................. 42

IV.    JOINDER OF OTHER SURETIES' OBJECTIONS ...................................................... 43

V.    RESERVATION OF RIGHTS ...................................................................................... 43

VI.    CONCLUSION............................................................................................................. 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408 (S.D. Ga. 1980)............................35

*In re Acis Capital Management, L.P.*, 603 B.R. 300 (N.D. Tex. 2019) ........................................33

*In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977 (Bankr. N.D. Ga. 1980) ...............................37

*In re Am. Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009) .................................27, 28

*Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138 (1940)............................25, 26

*In re American Capital Equipment, LLC*, 688 F.3d 145 (3d Cir. 2012)........................................25

*In re ATP Oil & Gas Corp.*, 2013 WL 3157567 (Bankr. S.D. Tex. June 19, 2013)................27, 28

*Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.*, 983 S.W.2d 501(Ky. 1998)...35

*In re Cantu*, 2009 WL 1374261 (Bankr. S.D. Tex. May 15, 2009)................................................42

*In re CBBT, L.P.*, 2011 WL 1770438 (S.D. Tex. May 9, 2011)....................................................25

*In re Charrington Worldwide Enterprises, Inc.*, 98 B.R. 65 (Bankr. M.D. Fla. 1989) ...............37

*In re Coal Stripping, Inc.*, 215 B.R. 500 (Bankr. W.D. Pa. 1997)..............................................35

*In re Coal Stripping, Inc.*, 222 B.R. 78 (Bankr. W.D. Pa. 1998)................................................29

*In re Conseco, Inc.*, 330 B.R. 673 (Bankr. N.D. Ill. 2005).........................................................33

*In re Cont'l Airlines Corp.*, 60 B.R. 903 (Bankr. S.D. Tex. 1986) .............................................42

*In re CSC Indus., Inc.*, 232 F.3d 505 (6th Cir. 2000) .................................................................41

*In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009).......................12, 38

*In re Divine Ripe, L.L.C.*, 554 B.R. 395 (Bankr. S.D. Tex. 2016)...........................................12, 13

*Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857 (Bankr. M.D. Fla. 1990)............34, 37

*In re Energy Future Holdings Corp.*, 648 Fed. Appx. 277 (3d Cir. 2016)...................................41

*In re Evans Products Co.*, 91 B.R. 1003 (Bankr. S.D. Fla. 1988)...............................................35

*Evergreen Nat. Indem. Co. v. Herndon*, 2008 WL 1867770 (N.D. Tex. Apr. 25, 2008) .............15

*In re Falcon V, L.L.C.*, 620 B.R. 256 (Bankr. M.D. La. 2020)............................................ *passim*

*In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991)......................................................................11

*Fid. & Deposit Co. of Maryland v. Edward E. Gillen Co.*, 926 F.3d 318 (7th Cir. 2019) ...........19

*In re Friedman*, 2012 WL 5409194 (Bankr. D. Ariz. Nov. 5, 2012)............................................41

*Gundle Lining Const. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201 (5th Cir. 1996) ...............15

*Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 2010 WL 11545232 (S.D. Tex. Dec. 2, 2010)...18

*In re James River Coal Co.*, 306-0411, 2006 WL 2548456 (M.D. Tenn. Aug. 31, 2006)............35

*In re Lacy*, 183 B.R. 890 (Bankr. D. Colo. 1995)......................................................................33

*Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305 (Fed. Cir. 2011) ...........................36

*In re Metrocraft Pub. Servs, Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984) .....................................12

*Meyer v. Building & Realty Service Co.*, 196 N.E. 250 (Ind. 1935).............................................35

*Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986)................... *passim*

*In re Mirant Corp.*, 197 Fed. Appx. 285 (5th Cir. 2006)............................................................16

*Nat'l Am. Ins. Co. v. Boh Bros. Const. Co., Inc.*, 700 So. 2d 1363 (Ala. 1997)..........................35

*Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962).............................................................29, 35

*In re Pecht*, 57 B.R. 137 (Bankr. E.D. Va. 1986).......................................................................26

*In re Prime, Inc.*, 15 B.R. 216 (Bankr. W.D. Mo. 1981).............................................................37

*Matter of Provider Meds, L.L.C.*, 907 F.3d 845 (5th Cir. 2018) ................................................34

*In re Roy Gooden Plumbing & Sewer Co., Inc.*, 156 B.R. 635 (Bankr. E.D. Mo. 1993) .............33

*In re Scioto Valley Mortg. Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988) ........................................11

*In re Stanley Hotel, Inc.*, 13 B.R. 926 (Bankr. D. Colo. 1981)......................................................11

*In re Star Ambulance Serv., LLC*, 540 B.R. 251 (Bankr. S.D. Tex. 2015)..............................38, 39

*In re Sun Runner Marine, Inc.*, 945 F.2d 1089 (9th Cir. 1991) .....................................................37

*In re Texans CUSO Ins. Grp., LLC*, 426 B.R. 194 (Bankr. N.D. Tex. 2010) ...............................42

*Texas Extrusion Corp. v. Lockheed Corp.* (*In re Texas Extrusion Corp.*), 844 F.2d 1142 (5th Cir. 1988) ....................................................................................................................................11, 12

*In re Texscan Corp.*, 976 F.2d 1269 (9th Cir. 1992) .....................................................................35

*The Ins. Co. of the State of Pennsylvania v. A-Unique Home Builders, Inc.*, 2005 WL 2044960 (S.D. Tex. Aug. 24, 2005)...........................................................................................................15

*In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013 (11th Cir. 1992) ...........................................37

*In re Tri Union Development Corp.*, 314 B.R. 611 (Bankr. S.D. Tex. 2012)..............................29

*In re Tri-Union Dev. Corp.*, 479 B.R. 425 (Bankr. S.D. Tex. 2012)..............................................14

*Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951 (10th Cir. 1977) ...............................................................................................................................18, 33

*In re TS Indus., Inc.*, 117 B.R. 682 (Bankr. D. Utah 1990) ..........................................................37

*United States v. Great Am. Ins. Co. of NY*, 791 F. Supp. 2d 1337 (Fed. Cir. 2011)....................36

*In re Valrico Square Ltd. P'ship*, 1133 B.R. 794 (Bankr. S.D. Fla. 1990)...................................26

*Washington Int'l Ins. Co. v. United States*, 138 F. Supp.2d 1314 (Ct. Int'l Trade 2001) .............14

*In re Wegner Farms Co.*, 49 B.R. 440 (Bankr. N.D. Iowa 1985)...........................................34, 37

## Statutes

11 U.S.C. § 365(b)(1) ....................................................................................................................17

11 U.S.C. § 365(c)(2)..................................................................................................3, 17, 34, 37

11 U.S.C. § 502(c) .........................................................................................................................42

11 U.S.C. § 503(b)(1)(A)...........................................................................................................3, 28

11 U.S.C. § 506(a)(1)......................................................................................................................41

11 U.S.C. § 554 ........................................................................................................................8, 9ff

11 U.S.C. § 1102(a)(1)......................................................................................................................7

11 U.S.C. § 1107(a)...........................................................................................................................7

11 U.S.C. § 1108 ...............................................................................................................................7

11 U.S.C. § 1123(a)(4).......................................................................................................40, 41, 42

11 U.S.C. § 1125 .............................................................................................................................11

11 U.S.C. § 1129(a)(1)......................................................................................................................3

11 U.S.C. § 1129(a)(3)..................................................................................................3, 30, 38, 40

11 U.S.C. § 1129(a)(7)....................................................................................................................24

11 U.S.C. § 1129(a)(9)....................................................................................................................28

11 U.S.C. § 1129(a)(11)..................................................................................................................24

## Other Authorities

74 Am. Jur. 2d Suretyship § 66...............................................................................................18, 33

30 C.F.R. § 250.1703......................................................................................................................27

30 C.F.R. § 556.700........................................................................................................................13

30 C.F.R. § 556.900.............................................................................................3, 14, 30, 33, 34

30 C.F.R. § 556.901.............................................................................................3, 14, 31, 32, 34

72 C.J.S. Principal and Surety § 254 ........................................................................19
72 C.J.S. Principal and Surety § 256 ........................................................................19
72 C.J.S. Principal and Surety § 259 ........................................................................18

Aspen American Insurance Company ("Aspen"), Berkley Insurance Company ("Berkley"), Everest Reinsurance Company ("Everest"), and Sirius America Insurance Company ("Sirius" and together with Aspen, Berkley and Everest, the "Sureties"), by and through their undersigned counsel, hereby file this *Objection of Aspen American Insurance Company, Berkley Insurance Company, Everest Reinsurance Company, and Sirius America Insurance Company to the Motion of Debtors for Entry of Order (i) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (ii) Establishing Solicitation and Voting Procedures; (iii) Scheduling Confirmation Hearing; (iv) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (v) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (vi) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; (vii) Approving Bid Submission Deadline and Procedures for Submission of Higher or Better Bids; and (viii) Granting Related Relief* (the "Objection").[2]   In support of the Objection, the Sureties respectfully submit as follows:

## I.     **PRELIMINARY STATEMENT**

1.      The Debtors in this bankruptcy comprise one of the largest oil and gas companies operating in the Gulf of Mexico, which company owns oil and gas assets with billions of dollars of associated plugging and abandonment obligations.  As part of this bankruptcy, the Debtors seek to walk away from more than a billion dollars' worth of those plugging and abandonment obligations, and the Debtors have no plan in place with respect to the transfer of those properties upon abandonment and what will happen with the properties in the event there is no entity to which

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement and Exhibits attached thereto. [Docket No. 723].

2

to abandon those properties, resulting in a significant risk to the public's health and safety. *Midlantic* does not permit such a course of action, which directly exposes the public to risk from unattended wells and spills from those wells, which spills could be significant and have disastrous consequences.

2.        Moreover, it is well-settled that post-petition decommissioning obligations are generally entitled to administrative expense priority under 11 U.S.C. § 503(b)(1)(A).  The Plan provides no funding for such decommissioning obligations, which upon information and belief, are so significant as to render the Plan not feasible.

3.        Additionally, the Plan hinges upon the use of the existing surety bonds to fund the decommissioning obligations of the Debtors, which is legally impermissible, as surety bonds are non-assumable financial accommodations under 11 U.S.C. § 365(c)(2), and therefore the Plan violates 11 U.S.C. 1129(a)(1), and (3).  Even if the surety bonds could be assumed, the surety bonds are nowhere near sufficient to satisfy the outstanding P&A obligations of the Debtors.  The new entities being formed under the Plan—FWE I, FWE III and Credit Bid Purchaser—will all require new bonding in order to operate, and that bonding must be sufficient to ensure compliance with all obligations of those entities under their leases. 30 C.F.R. §§ 556.900, 556.901.  The Plan appears to ignore this legal requirement that FWE I, FWE III and Credit Bid Purchaser obtain their own surety bonds, but rather provides that the new entities will be allowed to rely upon the surety bonds issued to the pre-petition entities, which bonds may not be relied upon by entities other than the principals named therein.  Nor is there any funding provided in the Plan for the obligations of the new entities to obtain new bonding.  And if the Government fails to require the Debtors to obtain this new bonding as it is required to do under the regulations, then the sureties would have potential impairment of suretyship status/material modification defenses to all of the BOEM

3

bonds, which is not disclosed and which will impact the likelihood of regulatory approval of the Plan. Assumption of the surety bonds would also require the curing of all obligations associated with the surety bonds including the indemnity agreements, and the assignees of the surety bonds would have to provide adequate assurance of future performance.

4.     The Plan also violates the Substitution of Principal Doctrine. Case law is clear that the substitution of a principal on a bond without the surety's consent is not permitted and results in a discharge of the surety. Even if the substitution of a principal did not result in a discharge of the surety, the improperly substituted principals would become the primary obligors on the bond. The debtor named in each bond is the principal obligor of each bond. It is not the beneficiary of the bond. Thus the derivation of the name "principal." It is the principal that has the primary obligation under each bond to perform, as well as the obligation to exonerate, indemnify and hold harmless the surety. The principal has no right to require the surety to perform in its place. Rather, it is the surety that has the right to require the principal to perform. And if the surety has reason to be fearful that in the future the principal will be unable to perform its obligation, the surety has the right to require that the principal collateralize it against potential loss (*i.e.*, *quia timet* rights). None of this is disclosed. Nor is it disclosed whether or how the emerging entities would be able to fulfill these obligations.

5.     Debtors propose to have the bonds improperly transferred to new principals and assign to those principals the benefits of those bonds without any of the associated burdens, which they cannot do. For purposes of analogy, assume the existence of a triple net house lease guaranteed by an uncle for his tenant nephew. Upon the bankruptcy of the nephew, the owner of the house cannot agree that the tenant nephew can designate a new tenant to replace him, and that the new tenant would be able to rely upon the existing guarantee from the uncle and the new tenant

would have no obligation to pay rent or assume the maintenance obligations.  If the owner agreed to such terms, he/she would be unable to recover from the guarantor by virtue of the substitution of the principal.  What Debtors' Plan proposes is to convert their primary obligations into assets to assign for the benefit of preferred creditors.  That is impermissible alchemy.  Debtors simply have no ability to convert liabilities into assets and their disclosure of this mythical ability is misleading and nonsense in fact and law.

6.     The Plan has also been structured in a way so as to benefit creditor Apache and the unsecured portion of its claim at the expense of the other unsecured creditors.  Upon information and belief, there is significant value to be extracted from the Legacy Apache Properties, but to extract that value, capital must be injected into FWE I.  As the Plan is currently constructed, there is next-to-no capital being provided to FWE I, and the only way that FWE I can obtain capital is either (1) via a farmout agreement with the Credit Bid Purchaser (with Apache's consent), under which the Credit Bid Purchaser retains a significant amount of the profits, or (2) via a Standby Credit Facility being funded by Apache in the amount of $400 million.  The Standby Credit Facility, pursuant to the Standby Loan Agreement, may not be drawn on until all of the surety bonds and letters of credit in Trust A have been exhausted.  In other words, Apache seeks to inject capital into FWE I to maximize the value of those assets and deplete them only after the sureties and letter of credit lenders are out of the picture.  This will serve to significantly reduce the unsecured portion of Apache's claim while the other unsecured creditors get no such favorable treatment.  Not only does Apache get to maximize the value of the FWE I assets and deplete them for its sole benefit, but Apache's "loan"—which is not really a "loan" at all given that Apache has the obligation to pay for decommissioning in any event—has to be paid back by FWE I at a significant interest rate.  The only difference between Apache paying the government directly for

the decommissioning or via "loans" to FWE I, is that if it engages in the latter "loan" transactions, Apache gets to collect interest on its "loans" and inject capital into the assets and extract that additional value for its sole benefit to fund decommissioning and thereby significantly reduce the unsecured portion of its claim at the expense of other creditors.

7.      The net result will be to have Apache profit from the structure it has designed to the detriment of other creditors and joint and several obligors or sureties for those joint and several obligors.  This is not a plan designed to minimize the damages associated with Debtors' failure to meet their plugging and abandonment obligations.  Rather it is a plan designed to benefit Apache and increase the loss of the sureties and other creditors.  The reality of this arrangement is not disclosed fairly in the Disclosure Statement in plain and clear terms.  The Disclosure Statement does not project what profits are likely to be made by FWE I via "loans" from Apache which will serve to lessen Apache's decommissioning exposure; how the wells going into FWE I might otherwise be sold separately for the benefit of all creditors; or what their individual values might be and how those values might reduce the losses of all creditors, not just profit Apache.  Nor does the Disclosure Statement disclose that other operators in the Gulf of Mexico, including other leaseholders holding fractional interests in the same leases being set aside for the benefit of Apache, have made offers to purchase these fractional interests and the terms of those offers.

8.      In addition to the foregoing deficiencies, there are numerous other deficiencies with the Disclosure Statement and Plan which are discussed in detail below.  The Plan is unconfirmable on its face and "adequate information" has not been provided to the creditors.

## II.      BACKGROUND

### A.      PROCEDURAL BACKGROUND

9.      On August 3, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

6

(as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, thereby commencing the above-styled and jointly administered bankruptcy case, seeking to reorganize their financial affairs.

10.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

11.     On August 4, 2020, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and the Surety Bond Program, and (B) Pay Certain Obligations with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (the "Surety Bond Motion"). [Dkt. No. 4].

12.     On the same day, the Debtors filed the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "Dane Declaration"). [Dkt. No. 29].

13.     On August 18, 2020, pursuant to section 1102(a)(1) of the Bankruptcy Code, the Office of the United States Trustee for Region 7, Southern and Western Districts of Texas appointed the Official Committee of Unsecured Creditors. [Dkt. No. 183].

14.     On January 1, 2021, the Debtors filed the (i) *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan"); (ii) *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Disclosure Statement"); and (iii) *Motion of Debtors For Entry of Order (i) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (ii) Establishing Solicitation and Voting Procedures; (iii) Scheduling Confirmation Hearing; (iv) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (v) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (vi) Approving Procedures for*

7

*Objections to the Assignment and Transfer of Property of the Estate; (vii) Approving Bid Submission Deadline and Procedures for Submission of Higher or Better Bids; and (viii) Granting Related Relief.* [Dkt. Nos. 722, 723 and 724].

15.     The proposed Plan contemplates a series of transactions whereby the Debtors' assets will either be (i) transferred to one of three newly created entities (*i.e.*, FWE I, FWE III or the Credit Bid Purchaser), or (ii) abandoned. [Dkt. No. 723, pp. 13-14]. In effect, the Debtors seek to ringfence their good assets for the benefit of their secured creditors and to divest their bad assets into FWE I, FWE III or abandon them altogether, pursuant to section 554 of the Bankruptcy Code.

**B.     FACTUAL BACKGROUND**

   ***i.   The Nature of the Debtors' Operations***

16.     The Debtors, together with their non-debtor affiliates (collectively, the "Company"), comprise one of the largest independent oil and gas exploration and production ("E&P") companies operating in the Gulf of Mexico (the "GOM"). [Dkt. No. 29, ¶¶ 5 and 17]. The Company is focused on the acquisition, exploration and development of offshore assets located in the shallow water and deepwater GOM and Gulf Coast Regions of the United States. *Id.* at ¶ 5.

17.     The Company's assets include, among other things: (a) more than 350 oil and gas leases (the "O&G Leases"); (b) hundreds of wells; (c) more than 300 operated platforms spread over 1.5 million gross acres; (d) pipelines; (e) facilities; and (f) rights of way (collectively, the "GOM Assets"). Additionally, the Company is party to hundreds of farmout, unitization and joint operating agreements that govern the operations of the GOM Assets. *Id.* at ¶¶ 19 and 23.

   ***ii.   Regulation of the Company's Businesses***

18.     As the operator of the GOM Assets, the Company is subject to local, state and federal laws and regulations in each jurisdiction in which it operates. *Id.* at ¶22. Such laws and

regulations address, among other things, the operation of wells and facilities, environmental protection, and exploration and development activities. *Id.* Among the obligations imposed on E&P companies by such laws and regulations is the duty to provide for the plugging and abandonment ("P&A") of wells and decommissioning of assets (*i.e.* platforms, facilities, pipelines, etc.) associated with their E&P operations (collectively, the "P&A Obligations"). *Id.* at ¶¶ 22, 24.

19.     A substantial number of the O&G Leases were issued by the U.S. Department of the Interior and cover real property situated in federal waters. *Id.* at ¶23.  Such leases are subject to the oversight and regulation by the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE"), including, but not limited to (a) BOEM's approval of exploration, development and production plans, and (b) BSEE's permitting process, which regulates, among other things, engineering and construction plans, safety procedures, P&A and removal of infrastructure. *Id.* at ¶ 23.

### iii.  The Surety Bond Program

20.     In order to secure certain of its obligations (including P&A Obligations) to third parties, the Debtors in the ordinary course of business provide surety bonds to such third parties, including, but not limited to, certain agencies of the U.S. Government (the "Surety Bond Program"). [Dkt. No. 4, ¶ 28].  The Surety Bond Program generally covers two categories of third parties: (1) federal and state governmental units and other public agencies, and (2) contract counterparties to whom the Debtors have obligations related to various plugging, abandonment and decommissioning activities. *Id.* at ¶ 28.  In conjunction with providing a surety bond, the Debtors either (a) enter into an indemnity agreement with the surety that issues the bond or (b) provide full cash collateralization of the surety bond. *Id.* at ¶ 29.  The failure to maintain surety bonds in favor of the federal government and states adjacent to the GOM would result in the

revocation of the necessary approvals for the Company to continue its operations in the GOM. *Id.* at ¶ 34.

### iv. *The Surety Bonds Issued on Behalf of the Debtors by the Sureties*

21.     Prior to the Petition Date, the Sureties issued several surety bonds on behalf of the Debtors to assure their payment and/or performance obligations in connection with the GOM Assets, as well as certain other obligations.   As of the Petition Date, Aspen has issued approximately $19.2 million in surety bonds; Berkley has issued approximately $74 million in surety bonds; Everest has issued approximately $45.5 million in surety bonds; and Sirius has issued approximately $46.5 million in surety bonds (each a "Surety Bond" and collectively the "Surety Bonds").[3]  The majority of the Surety Bonds were issued to assure the P&A Obligations associated with the GOM Assets.

22.     The Sureties issued their respective Surety Bonds as consideration for the execution by the Debtors of certain indemnity agreements (each an "Indemnity Agreement" and collectively, the "Indemnity Agreements") that, among other things, obligate the Debtors to: (a) exonerate, indemnify and hold harmless the Sureties from and against any claim or liability arising as a result of having issued the Surety Bonds; (b) procure the discharge and release of the Surety Bonds; and (c) post collateral for any such Surety Bonds upon demand by the Sureties for any unreleased liability.[4]

---

[3] A spreadsheet of the Surety Bonds and corresponding obligations is attached hereto as **Exhibit A**.  True and correct copies of the Surety Bonds are attached hereto as **Exhibit B**.

[4] True and correct copies of the Indemnity Agreements are attached hereto as **Exhibit C**.

23.     An indemnity agreement running from the principal to the surety is a standard condition for the execution of bonds by sureties for principals, such as Debtors, and is a critical component of the surety and principal relationship.

### III.     OBJECTIONS

#### A.     THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE

24.     The purpose of a disclosure statement is "to inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan. . ." *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981).   The disclosure statement is the primary source of information creditors and other parties in interest rely upon in making informed decisions about a debtor's plan of reorganization. *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) (Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (A proposed disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."); *see also Texas Extrusion Corp. v. Lockheed Corp.* (*In re Texas Extrusion Corp.*), 844 F.2d 1142, n.21 (5th Cir. 1988) (noting that a creditor not actively participating in a bankruptcy proceeding primarily relies on a disclosure statement to obtain its information).   To properly serve this purpose, the Bankruptcy Code requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail, . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C.

§ 1125.  Whether a disclosure statement contains "adequate information" is determined on a case-by-case basis. *In re Texas Extrusion Corp.*, 844 F.2d at 1156-57.

25.     The courts in the Southern District of Texas utilize a non-exhaustive list of factors to be considered when analyzing whether a disclosure statement contains "adequate information." *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 400-02 (Bankr. S.D. Tex. 2016); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009).  These are known as the *Metrocraft* factors, which were originally formulated in *In re Metrocraft Pub. Servs, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  The factors are: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in the non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with the affiliates. *In re Divine Ripe, L.L.C.*, 554 B.R. at 401-02 (citing *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. at 568).

26.     The Disclosure Statement in this matter should not be approved because it omits basic information about matters of primary concern to the Sureties and therefore does not contain "adequate information."

### i.     The Disclosure Statement Fails to Provide Adequate Information Regarding the Regulatory Approval Required to Confirm the Proposed Plan

27.     Under the Plan, the Debtors propose to strip Fieldwood of all its good assets, create three new entities and purportedly assign these new entities the right to operate the GOM Assets that are not being abandoned.  However, any transfer of the O&G Leases and related platforms, pipelines, facilities and rights of way must first be approved by BOEM. *See* 30 C.F.R. § 556.700 ("With BOEM approval, you may assign your whole, or a partial record title interest in your entire lease, or in any aliquot(s) thereof.").

28.     Despite alleging "ongoing discussions" with the Government in parts of the Disclosure Statement, [Dkt. No. 723, pp. 12, 13, 20 and 46], elsewhere the Debtors acknowledge that they have not secured Government approval for the new entities that are being created under the Plan to operate after the Plan is confirmed. *Id.* at p. 50, 52.  This is a significant detail that is missing from the Disclosure Statement and goes to the feasibility of the Plan.

29.     The ability of these new entities to operate is the lynchpin of the Plan.  The Plan of Merger states: "Note to Draft: Now that FWE I is no longer the surviving entity under the divisive merger, to confirm whether BOEM qualification will be permitted to 'vest' in FWE I or whether FWE I will be required to obtain its owner qualification separate from FWE's qualification (which will inure to FWE III instead)." *Id.* at n.11.  The Debtors face a significant challenge in obtaining approval from the Government for the new entities to operate.

ii.  *The Disclosure Statement Fails to Provide Adequate Information Regarding How FWE I, FWE III and the Credit Bid Purchaser Will Address BOEM Financial Assurance/Bonding Requirements Post-Effective Date*

30.     The Debtors fail to disclose how the post-Effective Date financial assurance/bonding requirements that BOEM will impose on FWE I, FWE III and Credit Bid Purchaser will be satisfied. *See* 30 C.F.R. § 556.900 (setting forth the base bonding/financial assurance requirements); 30 C.F.R. § 556.901 (setting forth the additional bonding requirements). These financial assurance/bonding requirements are not discretionary and require bonding/financial assurance sufficient to ensure that FWE I, FWE III and Credit Bid Purchaser will comply with their lease and regulatory obligations, including plugging and abandonment. 30 C.F.R. §§ 556.900, 556.901.  Debtors should be required to disclose the source of the funding for the bonding/financial assurance to operate the Credit Bid Acquired Interests, FWE I and FWE III.

iii. *The Disclosure Statement Fails to Provide Adequate Information Regarding the Sureties' Material Modification and Impairment of Suretyship Status Defenses to the BOEM Bonds if the Government Fails to Require the Emerging Entities to Post Their Own Bonding*

31.     As set forth above, each of the emerging entities will require new bonding in order to operate, and the Government, per the regulations, is required to obtain that bonding in an amount sufficient to ensure that those entities will be able to comply with their lease and regulatory obligations.  If the Government fails to require such bonding and allows those entities to operate and deplete the value of those leases with no funds remaining to satisfy the plugging and abandonment obligations, and the sureties are required to perform under their bonds based upon the Government's failure to act, then the sureties would have potential impairment of suretyship status and/or material modification defenses to any claims on the BOEM bonds by the Government. *See In re Tri-Union Dev. Corp.*, 479 B.R. 425, 440-42 (Bankr. S.D. Tex. 2012) (holding that a surety may have a claim against BOEM for impairment of suretyship status where

14

BOEM has a duty to act and fails to do so, thereby impairing the surety's remedies or increasing its risk under the bond); *Washington Int'l Ins. Co. v. United States*, 138 F. Supp.2d 1314, 1330-31 (Ct. Int'l Trade 2001) ("The federal common law is clear that when a surety's contractual obligation is materially altered without its knowledge or consent in a manner that increases its risk, the surety is to be discharged to the extent that it is prejudiced or damaged.").  There is nothing in the Disclosure Statement advising creditors of these potential defenses of the sureties to the BOEM bonds and how it will impact the obtaining of regulatory approval for this transaction.

### iv. *The Disclosure Statement Fails to Provide Adequate Information Regarding the Post-Effective Date Indemnity and Premium-Payment Obligations of the Debtors, FWE I, FWE III and Credit Bid Purchaser*

32.     The obligations of a principal to exonerate, indemnify, hold the surety harmless and pay all premiums, pursuant to a standard indemnity agreement, are integrated elements of a surety and principal contractual relationship. *See, e.g.*, *In re Falcon V, L.L.C.*, 620 B.R. 256, n.44 (Bankr. M.D. La. 2020) (citing an indemnity agreement and noting that "Debtors have a continuing duty to perform under the surety bond program by paying premiums, indemnifying [the surety] for any amounts paid to claimants on the bonds, posting collateral as security and granting [the surety] reasonable access to books, records and accounts."); *Evergreen Nat. Indem. Co. v. Herndon*, CIV.A.3:07-CV-0184-B, 2008 WL 1867770, *1 (N.D. Tex. Apr. 25, 2008) (citing an indemnity agreement between a principal and surety which required the principal to "exonerate, save harmless, indemnify, and keep indemnified the Surety from and against [any and all loss]"); *Gundle Lining Const. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (same); *The Ins. Co. of the State of Pennsylvania v. A-Unique Home Builders, Inc.*, CIV.A. H-04-1154, 2005 WL 2044960, *3 (S.D. Tex. Aug. 24, 2005) (same).

33.     The Debtors state in the Apache Term Sheet Implementation Agreement that:

(ix) With respect to all bonds and letters of credit constituting Decommissioning Security, all claims for premiums, fees, reimbursement, indemnification, or any other claims, fixed, contingent, liquidated, unliquidated, or otherwise against the Debtors held by the companies issuing the bonds or letters of credit, shall neither be allocated to nor become the obligations of FWE I under the Plan of Merger. Notwithstanding the foregoing, all rights of the Apache PSA Parties with respect to such bonds and letters of credit shall be preserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee.

[Dkt. No. 723-1, p. 129].

34.     Although inferences can be drawn, this paragraph does not adequately apprise the Sureties with respect to post-Effective Date indemnity and/or premium-payment obligations of the Debtors, FWE I, FWE III and Credit Bid Purchaser.

35.     Debtors' apparent intent in the Plan is to have the surety bonds survive confirmation without either the associated (1) indemnity obligations, or (2) premium-payment obligations. Hypothetically, this could result in the Sureties being forced to extend surety credit for the next 10-15 years, so that the emerging entities can legally operate, and never receiving any premiums associated with that credit. The Sureties should be entitled to a definitive statement from the Debtors whether this is in fact the intent of their Plan. And if the intent of the Plan is in fact for the surety bonds to be assumed without the associated indemnity agreements, this would not be permissible as the Debtors cannot assume only part of a contract. *In re Mirant Corp.*, 197 Fed. Appx. 285, 288-89 (5th Cir. 2006) ("It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety . . . the debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement.") (citations omitted); *In re Falcon V, L.L.C.*, 620 B.R. 256, 264 (Bankr. M.D. La. 2020) (noting that a surety bond and indemnity agreement must be construed together as a single contract);

Restatement (Second) of Contracts § 202 (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). Debtors cannot assume the benefits of a contract without the associated burdens as they appear to propose under the Plan. If the Debtors are permitted to assume the surety bonds, they would also be required to assume their obligations as the primary obligors under the bonds as well as their obligations with respect to the balance of their contractual agreement with the surety under their indemnity agreement.

### v. *The Disclosure Statement Fails to Provide Adequate Information Regarding the Surety Bonds' Status as Non-Assumable Financial Accommodations and the Debtors' Cure Obligations*

36.     As set forth more fully in the non-confirmability section of this Objection, the surety bonds at issue in this bankruptcy are non-assumable financial accommodations as set forth in and construed under section 365(c)(2) of the Bankruptcy Code.[5] The Disclosure Statement fails to address this fact. Instead, the Plan purports to allow the successor entities to assume the surety bonds, which they cannot do. Surety bonds are executory contracts which cannot be assumed under section 365 absent the consent of the sureties.

37.     Even if the surety bonds were assumable, in order to be assumed and assigned all breaches of all obligations associated with the surety bonds would have to be cured and adequate assurance of future performance provided by the assignee. *See* 11 U.S.C. § 365(b)(1). This includes adequate assurance that the assignee will perform under the Indemnity Agreements and/or perform its common law indemnity and exoneration obligations associated with the surety bonds. It also includes adequate assurance that the assignee will comply with all obligations associated with the leases which the sureties bonded, including decommissioning obligations. There is

---

[5] See *infra* section D(iii).

nothing in the Disclosure Statement that sets forth the means by which the Debtors intend to cure the breaches of their lease obligations prior to any assumption and/or assignment.   Upon information and belief, and by way of example, the Debtors have several pending Incidents of Noncompliance ("INCs") from BSEE which they have failed to discuss in their Disclosure Statement and which may be violations of their leases.   Debtors have failed to provide any discussion as to how those INCs will be cured by the Debtors prior to confirmation so as to provide the basis for any assumption and/or assignment of the leases.

> **vi.** ***The Disclosure Statement Fails to Provide Adequate Information Regarding the Substitution of Principal Doctrine, and the Common Law Right of Sureties to be Exonerated, Indemnified and Obtain Quia Timet Relief and the Impact it will have on the Plan***

38.     The principal on a surety bond may not be substituted absent consent of the surety, and if the principal is substituted, it may result in a discharge of the surety. 74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

39.      The Debtors fail to discuss in their Disclosure Statement the Substitution of Principal Doctrine and how it impacts the Plan.   Instead, the Debtors appear to suggest in the Disclosure Statement that the surety bonds will remain in place post-Effective Date and FWE I, FWE III and Credit Bid Purchaser will be the new principals.   If that is the case, it would result in a potential discharge of the sureties' obligations under the bonds because of the improper substitution of principal.

40.     Even if the sureties' obligations were not discharged, the Disclosure Statement fails to address how the surviving entities will address their common law indemnification and

18

exoneration obligations owed to the sureties. 72 C.J.S. Principal and Surety § 259 ("A surety who

pays the debt is entitled to recover from the principal the amount so paid."); *Int'l Fid. Ins. Co. v.*

*Sweet Little Mexico Corp.*, CV B-09-206, 2010 WL 11545232, *6 (S.D. Tex. Dec. 2,

2010), *aff'd*, 665 F.3d 671 (5th Cir. 2011) ("Even without an indemnity agreement, a surety . . .

who pays the debt of its principal has an equitable right at common law to indemnification."); *Fid.*

*& Deposit Co. of Maryland v. Edward E. Gillen Co.*, 926 F.3d 318, 322 (7th Cir. 2019) ("When

the person to whom performance is owed comes to the surety to collect, the surety may use

exoneration to force its principal to perform, thus releasing the surety from its secondary

obligation."); *Am. Sur. Co. of New York v. Lewis State Bank*, 58 F.2d 559, 560 (5th Cir. 1932)

(discussing a surety's right to exoneration); 72 C.J.S. Principal and Surety § 256 (same).  Thus, if

this Court permits the substitution of the principal on the bonds, those substituted principals (FWE

I, FWE III and Credit Bid Purchaser) would all be required to exonerate and indemnify the sureties

and there is nothing in the Disclosure Statement that discloses to the creditors the impact of such

obligations on the Plan.

41.    There is also nothing in the Disclosure Statement about the sureties' right to bring

an action in *quia timet* to force a principal to post collateral to ensure that there is no loss by the

surety, if the surety believes a loss may be forthcoming. *Am. Sur. Co. of New York v. Lewis State*

*Bank*, 58 F.2d at 560 (discussing a surety's *quia timet* rights); 72 C.J.S. Principal and Surety § 254

(noting that a surety has the right to force the principal to post collateral as security for probable

bond liability).  In this matter the Plan proposes the creation of special purpose vehicles for the

purpose of exploiting assets for the benefit of the secured creditors and undersecured creditor

Apache.  There is nothing in the Disclosure Statement regarding how the emerging entities will

accumulate sufficient assets to fund the decommissioning obligations as to which they will become

the primary obligor under the impermissible assumption of bonds proposed by the Debtors.  In the absence of adequate capitalization sufficient to meet plugging and abandonment obligations, the sureties will be insecure regarding the ability of these impermissibly substituted primary obligors to meet their obligations under the bonds.  As a result, the sureties would be entitled to *quia timet* relief against the emerging entities in the form of collateralization with respect to the bonded plugging and abandonment obligations.

### vii. *The Disclosure Statement Fails to Provide Adequate Information Regarding the Credit Bid Purchase Agreement*

42.     Exhibit 22 of the Apache Term Sheet Implementation Agreement sets forth some of the terms on which the Credit Bid Purchaser, Debtors and Apache Corporation ("Apache") have agreed to include in an eventual Credit Bid Purchase Agreement. [Dkt. No. 723-2, p. 475]. However, this "snippet" of terms is woefully inadequate to inform the Sureties of the precise terms of the Credit Bid Purchase Agreement.

43.     Set forth below is a non-exhaustive list of the deficiencies of the Disclosure Statement related to the proposed Credit Bid Transaction:

  a.     fails to address how the Credit Bid Purchaser will satisfy bonding/financial assurance requirements with BOEM post-Effective Date;

  b.     fails to address how the Credit Bid Purchaser will satisfy premium-payment obligations for the surety bonds that will be required in order to operate;

  c.     fails to address how the Credit Bid Purchaser will satisfy indemnification obligations associated with the surety bonds; and

  d.     fails to address how decommissioning will be handled.  For example, will a trust be set up for payment of P&A Obligations, similar to Trust A in FWE I?  Will a certain percentage of Credit Bid Purchaser's revenue be set aside for decommissioning?  Or will the secured creditors pull the profit out of the new entity, deplete its assets, and expect the sureties to step in and complete decommissioning?

44.     As stated previously, the obligations of the principal to indemnify, exonerate and hold the surety harmless are integrated conditions of a surety's willingness to extend surety credit to a bond principal.  The Disclosure Statement does not state how the Credit Bid Purchaser intends to obtain new surety credit, which is required in order to operate the Credit Bid Acquired Interests, nor does the Disclosure Statement provide how the Credit Bid Purchaser intends to satisfy its indemnity and exoneration obligations to the sureties.  This information is critical to understanding the Plan as the Credit Bid Purchaser, as a special purpose entity, will have obstacles to overcome in convincing the sureties to provide surety credit and in demonstrating to the Government that the Credit Bid Purchaser has the financial wherewithal to legally operate the Credit Bid Acquired Interests.

45.     There are numerous unanswered questions with respect to the Credit Bid Purchase Agreement.  The snippet provided is insufficient and omits critical information needed by the Sureties to understand the Plan.  The Credit Bid Purchase Agreement is a critical document to the Plan and should be required to be produced to the Sureties in advance of the Disclosure Statement Hearing, with sufficient time for the Sureties to review and potentially object to the contents therein.

**viii. The Disclosure Statement Fails to Provide Adequate Information Regarding FWE I's Assumption of the "Obligations for Damage to Property Included in the FWE I Assets or the GOM Shelf Oil and Gas Properties"**

46.     In Exhibit 22 to the Apache Term Sheet Implementation Agreement, which contains the snippet of the proposed terms of the Credit Bid Purchase Agreement, the terms state that the Credit Bid Purchaser is assuming "Closing Date Payables," as that term is defined therein. [Dkt. No. 723-2, p. 475-477].  There are exceptions to the assumption of "Closing Date Payables" however, and those exceptions are to be retained obligations of FWE I. *Id.* at 477.

47.     Included within the exceptions to the Closing Date Payables is an exception for "obligations for damage to property included in the FWE I Assets or the GOM Shelf Oil and Gas Properties." *Id.* at 476-77.  This statement is vague and ambiguous as to what it means, and what specific property damage obligations are to be retained by FWE I.  Does it mean that FWE I retains obligations for property damage to the FWE I Assets?  Does it mean that FWE I retains obligations for property damage caused by the FWE I Assets?  Does it mean both?  Are there currently significant property damage obligations that the Debtors intend to include within this retention of liabilities?

48.     The magnitude of this proposed retention of liabilities could be significant and directly impact the financial viability of FWE I post-Effective Date.  The Sureties should be entitled to this information to aid in their analysis of the feasibility of FWE I.

### ix. The Disclosure Statement Fails to Provide Adequate Information Regarding the Alleged $5 Million in Improper Withdrawals the Debtors Made from Trust A

49.     In the Apache Term Sheet Implementation Agreement, Debtors disclose that an audit was conducted with respect to funds held in a certain trust created in connection with the Decommissioning Agreement ("Trust A"). [Dkt. No. 723-1, p. 119].  The Debtors further disclose that Apache alleges that $5 million was improperly withdrawn from Trust A in contravention of the terms of the Decommissioning Agreement. *Id.*  The Debtors define this as the "Apache Trust A Claims." *Id.*  The Debtors provide no additional information regarding the Apache Trust A Claims.

50.     Everest, and other sureties in this litigation, provided bonding on behalf of the Debtors in favor of Apache in connection with the Decommissioning Agreement (the "Decommissioning Bonds").  The funds in Trust A are specially earmarked for P&A Obligations related to the Legacy Apache Properties.   Subject to the terms and conditions of the

Decommissioning Agreement and the Decommissioning Bonds, Apache cannot look to the Decommissioning Bonds for P&A Obligations regarding the Legacy Apache Properties until the Trust A Cash, as that term is defined in the Decommissioning Agreement, is exhausted. Without providing any details as to the circumstances surrounding the allegedly improper withdrawal of $5 million in cash from Trust A, Apache is waiving its claim against Fieldwood for the withdrawal, which is prejudicial to the sureties that provided the Decommissioning Bonds. Assuming Apache's claim that $5 million was improperly withdrawn from Trust A is true, that will directly affect the sureties and provide a potential defense (at least a partial defense) to performance under the Decommissioning Bonds. Thus, the Sureties should be entitled to more detailed information regarding the circumstances of the alleged improper $5 million withdrawal from Trust A.

### x. *The Disclosure Statement Fails to Provide Adequate Information Regarding the $224 Million Being Paid by Credit Bid Purchaser*

51.     In is not clear in the Disclosure Statement how the $224 million being provided by Credit Bid Purchaser to purchase the Credit Bid Acquired Interests, [Dkt. No. 723, p. 13], is being allocated in the Plan. To the extent not properly allocated elsewhere, these funds should be used to fund the decommissioning obligations of the Debtors to protect the health and safety of the public. The Sureties should be entitled to a definitive statement from the Debtors as to how these funds are being allocated under the Plan.

### xi. *The Disclosure Statement Fails to Provide Adequate Information Regarding Financial Models/Projections Demonstrating FWE I's Ability to Meet its Financial Obligations Post-Effective Date*

52.     In the Disclosure Statement, Debtors devote only two small paragraphs to the financial viability of FWE I under the Plan. [Dkt. No. 723, pp. 63, 64]. The Disclosure Statement fails to provide any information regarding: (a) the magnitude of expected post-Effective Date operating expenses for FWE I; (b) the expected post-Effective Date revenue to be generated by

FWE I; (c) the projected amount of monies that will be paid to the Credit Bid Purchaser under the Transition Services Agreement to operate the FWE I Assets; or (d) the projected monies that will have to be paid to third parties in connection with the FWE I Assets.  Indeed, the Debtors fail to provide any financial projections or analyses related to the post-Effective Date operations of FWE I, other than noting in conclusory terms that there are Trust A assets (including surety bonds and letters of credit) and a Standby Credit Facility backing up the P&A Obligations of that entity.

53.     Even assuming, *arguendo*, that the Trust A assets and Standby Credit Facility are adequate to cover the P&A Obligations associated with the property to be transferred to FWE I, which is questionable, it is possible that FWE I's post-Effective Date operating expenses could exceed its revenues to such an extent that it is not a viable entity, thus rendering the Plan not feasible. 11 U.S.C. § 1129(a)(11) ("The Court shall confirm a plan only if . . . [c]onfirmation of the plan is not likely to be followed by the liquidation, or further need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.").

54.     The Disclosure Statement does not provide adequate information necessary for creditors to determine the likelihood that FWE I will be able to meet its obligations post-Effective Date and that confirmation of the Plan would not likely be followed by liquidation or further financial reorganization.

***xii. The Disclosure Statement Fails to Provide Adequate Information Regarding the Liquidation Analysis***

55.     Debtors do not provide any liquidation analysis as part of their Disclosure Statement, and simply note that the liquidation analysis is "[t]o come." [Dkt. 23, p.11].  A liquidation analysis is an integral part of a disclosure statement and without it there is not adequate

information for the creditors to assess whether the Plan satisfies the best interest of creditors test as set forth in section 1129(a)(7) of the Bankruptcy Code.

### xiii. The Disclosure Statement Fails to Provide Adequate Information Regarding the Value of the Legacy Apache Properties and the Sale Efforts of Fieldwood

56.     As set forth more fully in the non-confirmability section of this Objection, upon information and belief there is potentially significant value to be extracted from the Legacy Apache Properties, and there are potential buyers in the market for these assets.[6]  Debtors provide no valuation analysis in their Disclosure Statement with respect to the Legacy Apache Properties, nor do Debtors detail any efforts to market and sell these assets.  Marketing and selling these assets could provide significant value to the estate, rather than undertaking a plan that solely benefits Credit Bid Purchaser and the unsecured portion of Apache's claim.

## B.   THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE

57.     "Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage." *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012) (citing *In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011)).  However, "[c]ourts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *Id.* at 154 (citing numerous cases) (internal quotation marks omitted); *see also In re CBBT, L.P.*, 2011 WL 1770438, *3 (S.D.

---

[6] See *infra* section D(iv).

Tex. May 9, 2011) (rejecting disclosure statement filed by the debtor because the plan was unconfirmable on its face).

58.     In determining whether a plan is unconfirmable, the Court's role is "not merely . . . ministerial," but involves "scrutiny of the circumstances" surrounding a plan. *Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145 (1940).  A plan is "patently unconfirmable" if: "(1) confirmation defects cannot be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 155.  In such circumstances, a court will not approve a disclosure statement because doing so would impose unnecessary cost and expense in solicitation and would cause estate professionals to waste time and resources of the estate and Court. *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (rejecting a disclosure statement and noting that proceeding with an unconfirmable plan would subject the estate to needless expense); *In re Valrico Square Ltd. P'ship*, 1133 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

i.     ***The Plan is Unconfirmable Because the Debtors Cannot Abandon Hazardous Properties Without the Court Imposing Conditions Protecting the Public's Health and Safety***

59.     Section 5.12 of the Plan states as follows:

## 5.12 Abandonment of Certain Properties

Immediately upon the occurrence of the Effective Date, the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties are abandoned pursuant to the Plan without further notice to or order of the Bankruptcy Court pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable. The Abandoned Properties shall not be allocated to nor vest in the Post-Effective Date Debtors or NewCo and its subsidiaries, including the Credit Bid Purchaser. Except as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties. Nothing in this Plan or the Confirmation

> Order shall be construed as barring, waiving, or limiting the United States' rights
> to assert a claim against the Debtors, the Post-Effective Date Debtors or any co-
> lessees or predecessors in interest with respect to the Abandoned Properties for any
> decommissioning obligations for the Abandoned Properties.

[Dkt. No. 723-1, pp. 44-45].

60. The Schedule of Abandoned Properties, attached to the Disclosure Statement as Exhibit F, lists numerous properties that the Debtors seek to abandon under the Plan (the "Abandoned Properties"). The Abandoned Properties have associated P&A Obligations that are imposed pursuant to BOEM regulations that are intended to protect the public's health and safety. *See* 30 C.F.R. § 250.1703; *In re ATP Oil & Gas Corp.*, No. 12-36187, 2013 WL 3157567 (Bankr. S.D. Tex. June 19, 2013).

61. It is well-settled law, under the holding in *Midlantic Nat. Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986), that "[t]he Bankruptcy Court does not have the power to authorize an abandonment [of hazardous property] without formulating conditions that will adequately protect the public's health and safety." *Id.* at 506-07. "Accordingly . . . we hold that a [debtor] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 507.

62. This Court has issued at least two separate opinions discussing *Midlantic—In re ATP Oil & Gas Corp.*, No. 12-36187, 2013 WL 3157567 (Bankr. S.D. Tex. June 19, 2013) and *In re Am. Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009). In *In re ATP* this Court permitted the abandonment of certain oil and gas properties based upon a finding that the conditions imposed upon the Debtors were sufficient to protect the public's health and safety in connection with the plugging and abandonment obligations of certain oil and gas properties. 2013 WL 3157567 at *2. One of those conditions was that the United States, if it were required to undertake decommissioning of the properties, was permitted to pursue the predecessors-in-interest

27

to the properties for some or all of the decommissioning costs. *Id.* The other condition was that the United States maintained an administrative claim against the Debtors for all costs associated with decommissioning efforts undertaken by the government, pursuant to a settlement agreement between the parties. *Id.*

63.    Notably, this Court in *In re ATP* was faced with only $100 million dollars' worth of plugging and abandonment obligations for the abandoned properties. *Id.* at *1. In contrast, the Debtors in this matter seek to abandon properties which, upon information and belief, have more than a billion dollars of associated plugging and abandonment obligations. While $100 million is not an insignificant number, when analyzing the risk to the public it should be considered that the problem here is more than tenfold.

64.    Although the United States (through its various agencies) has the ability to seek contribution from predecessors-in-interest, some of the plugging and abandonment obligations are, upon information and belief, "orphan" obligations with no predecessor-in-interest liable for such obligations.[7] The magnitude of these orphan obligations is unclear because Debtors fail to include any discussion of such obligations in their Disclosure Statement. These orphan obligations are a direct risk to the public's health and safety, in violation of *Midlantic*.

65.    It is well-settled that post-petition decommissioning obligations generally constitute administrative expenses of a bankruptcy estate pursuant to section 503(b)(1)(A) of the Bankruptcy Code. *In re Am. Coastal Energy Inc.*, 399 B.R. at 809 ("The Fifth Circuit has held that an expense incurred post-petition to remedy a post-petition environmental liability is an

---

[7] "Orphan" obligations are plugging and abandonment obligations for which there are either: (1) no jointly and severally liable co-owners or predecessor owners, or (2) the jointly and severally liable co-owners or predecessor owners are not financially solvent. Thus, orphan obligations are the responsibility of taxpayers.

administrative expense under § 503(b)(1)(A).") (citing *Tex v. Lowe* (*In re H.L.S. Energy Co., Inc.* 151 F.3d 434, 434 (5th Cir. 1998)).   At a minimum, just as in *In re ATP*, the government should maintain an administrative claim for all of the Debtors' P&A Obligations.   This is especially true given the magnitude of the P&A Obligations associated with the Abandoned Properties compared to the magnitude of the abandoned properties at issue in *In re ATP*.   Moreover, section 1129(a)(9) of the Bankruptcy Code requires payment of administrative claims in full as a condition to confirmation of a chapter 11 plan.   If the administrative claims cannot be paid in full, which upon information and belief they cannot, then the Plan is unconfirmable.[8]

66.   The Plan is also unconfirmable under *Midlantic* because it fails to provide for a transition plan for the orderly transfer of the Abandoned Properties to their co-owners or predecessor owners.   In the Disclosure Statement, the Debtors state that "[i]immediately upon the occurrence of the Effective Date, certain of the Debtors' assets . . . will be abandoned . . . to entities who are predecessor owners in the chain of title or co-working interest owners." [Dkt. No. 723, p. 14].   This is not a sufficient plan to protect the public's health and safety and leaves open numerous questions.   Among other things, the "plan" for transition:

    (a)    does not reveal which co-working interest owner or predecessor owner will take over the operation of each property;

    (b)    does not reveal whether such co-working interest owner or predecessor owner has agreed or is operationally capable to take over each property;

    (c)    does not identify when and in what manner the co-working interest owner or predecessor owner will come into possession of the property;

---

[8] To the extent the Government has administrative priority with respect to the decommissioning costs, the Sureties would subrogate to those rights. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962) ("And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed."); *In re Tri Union Development Corp.*, 314 B.R. 611, 616 (Bankr. S.D. Tex. 2012) (holding that a surety was subrogated to the government's rights, including priority rights); *In re Coal Stripping, Inc.*, 222 B.R. 78, 82 (Bankr. W.D. Pa. 1998) (same).

29

(d)  does not identify the "orphan" properties for which there is no co-working interest owner or predecessor owner to which to abandon the property; and

(e)  does not reveal what will happen with the "orphan" properties, who they will be transferred to and in what manner, and whether those entities have agreed to accept the "orphan" properties.

67.  Because of the lack of a plan for transition of the Abandoned Properties, there could potentially be Abandoned Properties for which there is no entity to receive and take over the operation of the property, which circumstance directly puts the public's health and safety at risk. Debtors' dropping the keys on the table and walking away from active oil and gas operations with no plan for who is going to take over the operations, and no plan for who is going to monitor the wells to ensure that there are not unattended wells leaking oil and gas into the ocean is the precise type of risk to the public that the *Midlantic* Court was concerned about.

68.  Accordingly, because the Plan does not properly protect the public's health and safety, the Plan is patently unconfirmable pursuant to 11 U.S.C. § 1129(a)(3).

### *ii.*  *The Plan is Unconfirmable Because the Plan Contains No Provisions for Obtaining Surety Bonds/Financial Assurance for FWE I, FWE III or Credit Bid Purchaser to Operate in the GOM*

69.  30 C.F.R. § 556.900 provides the base bonding requirements before BOEM will approve the assignment of a lease in the GOM.  It states in relevant part:

> This section establishes bond requirements for the lessee of an OCS oil and gas or sulfur lease.
>
> (a) Before BOEM will issue a new lease or approve the assignment of an existing lease to you as lessee, you or another record title owner for the lease must:
>
> (1) Maintain with the Regional Director a $50,000 lease bond that guarantees compliance with all terms and conditions of the lease; or

    (2) Maintain a $300,000 area-wide bond that guarantees compliance with all the terms and conditions of all your oil and gas and sulfur leases in the area where the lease is located; or

    (3) Maintain a lease or area-wide bond in the amount required in § 556.901(a) or (b).

    . . .

  (g) You may pledge alternative types of security instruments instead of providing a bond if the Regional Director determines that the alternative security protects the interests of the United States to the same extent as the required bond.

    (1) If you pledge an alternative type of security under this paragraph, you must monitor the security's value.  If its market value falls below the level of bond coverage required under this subpart, you must pledge additional securities to raise the value of the securities pledged to the required amount.

    (2) If you pledge an alternative type of security, you must include authority for the Regional Director to sell the security and use the proceeds when the Regional Director determines that you failed to satisfy any lease obligation.

  70.    30 C.F.R. § 556.901(b) provides the base bonding requirements before a lessee may conduct any development or production activities on a lease.  It states in relevant part:

  (b) This paragraph explains what bonds you (the lessee) must provide before lease development and production activities commence.

    (1)(i) You must furnish the Regional Director a $500,000 bond that guarantees compliance with all the terms and conditions of the lease by the earliest of:

      (A) The date you submit a proposed development and production plan (DPP) or development operations coordination document (DOCD) for approval; or

      (B) The date you submit a request for approval of the assignment of a lease on which a DPP or DOCD has been approved.

    . . .

    (iii) You may satisfy the bond requirement of this paragraph by providing a new bond or by increasing the amount of your existing bond.

    . . .

31

71.     30 C.F.R. § 556.901(d) provides the additional bonding requirements for lessees in

the GOM.  It states in relevant part:

> (d) The Regional Director may determine that additional security (i.e.,
> security above the amounts prescribed in § 556.900(a) and paragraphs
> (a) and (b) of this section) is necessary to ensure compliance with the
> obligations under your lease, the regulations in this chapter, and the
> regulations in 30 CFR chapters II and XII.
>
> (1) The Regional Director's determination will be based on his/her
>     evaluation of your ability to carry out present and future financial
>     obligations demonstrated by:
>
>     (i) Financial capacity substantially in excess of existing and
>         anticipated lease and other obligations, as evidenced by audited
>         financial statements (including auditor's certificate, balance
>         sheet, and profit and loss sheet).
>
>     (ii) Projected financial strength significantly in excess of existing
>          and future lease obligations based on the estimated value of
>          your existing OCS lease production and proven reserves for
>          future production.
>
>     (iii) Business stability based on five years of continuous operation
>           and production of oil and gas or sulfur in the OCS or in the
>           onshore oil and gas industry.
>
>     (iv) Reliability in meeting obligations based on:
>
>         (A) Credit rating; or
>
>         (B) Trade references, including names and addresses of other
>             lessees, drilling contractors, and suppliers with whom you
>             have dealt; and
>
>     (v) Record of compliance with laws, regulations, and lease terms.
>
> (e) The Regional Director will determine the amount of additional bond
>     required to guarantee compliance.  The Regional Director will consider
>     potential underpayment of royalty and cumulative decommissioning
>     obligations.
>
> . . .

72.     As set forth in the regulations above, FWE I, FWE III and the Credit Bid Purchaser will all require new bonds/financial assurance be pledged to BOEM to meet their decommissioning obligations upon emergence.  The bonds/financial assurance pledged must be in an amount sufficient to "ensure compliance with obligations under [the] lease." *See* 30 C.F.R. § 556.901(d). The regulations are not permissive, and do not provide BOEM any flexibility in requiring that the bonds/financial assurance be provided.  Yet, the Debtors include nothing in their Disclosure Statement demonstrating how FWE I, FWE III and the Credit Bid Purchaser will comply with these BOEM regulations.

73.     To the extent the Debtors intend to argue that the emerging entities can rely upon the existing surety bonds to satisfy their obligations under § 556.900, that is not true.  Putting aside the fact that the surety bonds are non-assumable financial accommodations, the emerging entities cannot "pledge" surety bonds to BOEM wherein they are not the principal and in which they hold no interest.  The plain language of the regulations require that the assignee of a lease provide its own bonding/financial assurance.

74.     Moreover, this would result in an improper "substitution of principal," under the bonds, which would discharge the sureties' obligations thereunder. 74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

75.     The Debtors-in-Possession and the Post-Effective Date Debtors are distinct legal entities. *In re Acis Capital Management, L.P.*, 603 B.R. 300, 306 (N.D. Tex. 2019) (noting that a reorganized debtor is a new entity separate and distinct from the debtor); *In re Conseco, Inc.*, 330

33

B.R. 673, 682-83 (Bankr. N.D. Ill. 2005) ("The reorganized debtor is in fact a new legal entity separate and distinct from the debtor even if a new corporation is not formed to carry out the plan."); *In re Lacy*, 183 B.R. 890, n.1 (Bankr. D. Colo. 1995) ("At confirmation, the 'debtor' becomes the 'reorganized debtor'.  The reorganized debtor is a new legal entity."); *In re Roy Gooden Plumbing & Sewer Co., Inc.*, 156 B.R. 635, 637 (Bankr. E.D. Mo. 1993) (noting that a reorganized debtor operates as a new entity).

76.     Even if § 556.900 did not require new bonds (which it clearly does), additional bonding would be required under § 556.901 in an amount sufficient to "ensure compliance with obligations under [the] lease."  There is no question that when utilizing the formula set forth in § 556.901(d), the Regional Director will find that additional bonding is required to ensure compliance with all lease obligations.  Upon information and belief, the existing bonding is nowhere near sufficient to ensure compliance with the lease obligations for all of the leases being transferred to FWE I, FWE III and Credit Bid Purchaser.

77.     Therefore, the Plan is unconfirmable because the Debtors have failed to provide for funding to comply with the bonding/financial assurance requirements for FWE I, FWE III and Credit Bid Purchaser to operate upon emergence.  Those entities, which are legal and distinct from Debtors-in-Possession, cannot legally operate without surety bonds or financial assurance in place sufficient to "ensure compliance with obligations under [the] lease."

### iii. The Plan is Unconfirmable Because the Surety Bonds are Non-Assumable Financial Accommodations, Unless the Surety Consents to Assumption

78.     Pursuant to section 365 of the Bankruptcy Code, the Debtors "may not assume or assign any executory contract . . ., if-- . . . (2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations." 11 U.S.C. § 365(c)(2).  Although the term "executory contract" is not defined in the Bankruptcy Code, the Fifth Circuit has found that a

contract is executory if "performance remains due to some extent on both sides" and if "at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 851 (5th Cir. 2018).

79.    Courts have consistently held that surety bonds are "executory contracts." *See In re Wegner Farms Co.*, 49 B.R. 440, 446 (Bankr. N.D. Iowa 1985); *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 858 (Bankr. M.D. Fla. 1990); *In re Evans Products Co.*, 91 B.R. 1003, 1005-06 (Bankr. S.D. Fla. 1988).  There are a few cases which have held that non-cancellable surety bonds are not "executory contracts,"[9] however those cases are clearly incorrect as they misunderstand the tripartite nature of surety bonds.

80.    Unlike insurance, which is a two-party relationship, surety bonds are tripartite agreements in which the named principal is the primary obligor and the surety is the secondary obligor on the bonded obligation owing to the obligee. *Nat'l Am. Ins. Co. v. Boh Bros. Const. Co., Inc.*, 700 So. 2d 1363, 1366 (Ala. 1997) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985)); *A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 412 (S.D. Ga. 1980) (citing Restatement of Security § 82 (1941)); *Pearlman v. Reliance Ins. Co.*, 371 U.S. at 139 n. 19 ("Suretyship is not insurance."); *Meyer v. Building & Realty Service Co.*, 196 N.E. 250, 254 (Ind. 1935) ("We are clearly of the opinion that the contract here in question is a contract

---

[9] *In re Coal Stripping, Inc.*, 215 B.R. 500, 502-03 (Bankr. W.D. Pa. 1997) (holding that non-cancellable reclamation bond was not an executory contract because failure of the principal to perform did not excuse performance of the surety); *In re James River Coal Co.*, 306-0411, 2006 WL 2548456, *4 (M.D. Tenn. Aug. 31, 2006) (same); *In re Falcon V, L.L.C.*, 620 B.R. 256, 265 (Bankr. M.D. La. 2020) (holding that non-cancellable plugging and abandonment bond was not an executory contract because failure of the principal to perform did not excuse performance of the surety); *In re Texscan Corp.*, 976 F.2d 1269, 1273 (9th Cir. 1992) (holding that non-cancellable workers' compensation bond was not an executory contract because failure of the principal to pay premiums would not discharge the surety).

of suretyship and not an insurance policy."); *Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.*, 983 S.W.2d 501, 504 (Ky. 1998) ("A contract of suretyship is not a contract of insurance.").

81.     Under a surety bond, the principal has the primary obligation to perform.  The principal also has the duty to (a) make premium payments to the surety, (b) indemnify and exonerate the surety, and (c) post collateral to the surety on demand when there is a risk that the surety will have to perform.  The surety has the secondary obligation to perform, in the event of non-performance by the primary obligor.  The surety's obligation to perform runs in favor of the obligee, not the principal.  To obtain performance from the surety, the obligee owes its own set of performance obligations to the surety including, among other things, (i) taking actions to ensure that the risk to the surety on the underlying bonded transaction is not increased, (ii) taking actions to ensure that the principal's ability to reimburse the surety is not impaired, (iii) taking actions to ensure that the principal's ability to perform is not impaired, and (iv) taking actions to ensure that the surety's subrogation rights are preserved. *See* Restatement (Third) of Suretyship & Guaranty § 37 (1996); *United States v. Great Am. Ins. Co. of NY*, 791 F. Supp. 2d 1337, 1359-60 (Fed. Cir. 2011), *aff'd sub nom. United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013); *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313-14 (Fed. Cir. 2011). Failure of the obligee to comply with these obligations results in a full or partial discharge of the surety's obligations under the bond. Restatement (Third) of Suretyship & Guaranty § 37.

82.     Each of the cases in the footnote above, which found that non-cancellable surety bonds were not executory contracts because the surety's obligations were not discharged by a principal's failure to perform, were incorrectly decided because the decisions did not contemplate

that it is not the principal's non-performance that would discharge the surety, but rather the obligee's failure to perform its obligations that discharges the surety.

83.     Because all parties to the surety bonds at issue in this bankruptcy owe performance obligations, and because an obligee's failure to perform under a surety bond as set forth in the Restatement and under well-settled common law may result in a full or partial discharge of the surety's obligations under the bond, the bonds in this matter are clearly executory contracts.

84.     Under section 365(c)(2) of the Bankruptcy Code, Debtors may not assume an executory contract that is a financial accommodation.  Surety bonds are financial accommodations. *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 49 B.R. 440, 446 (Bankr. N.D. Iowa 1985); *In re Falcon V, L.L.C.*, 620 B.R. 256, 265 (Bankr. M.D. La. 2020); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th Cir. 1992); Michael L. Cook & Gerald F. Munitz, Bankruptcy Litigation Manual, Assumption of Executory Contracts § 6.03 (2021).

85.     The only exception to the inability of a debtor to assume executory contracts that are financial accommodations is when the counterparty to the contract consents to such assumption. *In re Charrington Worldwide Enterprises, Inc.*, 98 B.R. 65, 68 (Bankr. M.D. Fla. 1989), *aff'd sub nom. In re Charrington Worldwide Enter., Inc.*, 110 B.R. 973 (M.D. Fla. 1990) ("The legislative history of [365(c)(2)] leaves no doubt that this exception to the assumability of executory contracts was drafted for the purpose of assuring that contracts to extend credit which involves always a trust and confidence akin to personal contracts should not be assumable without the consent of the other party to the contract."); *In re TS Indus., Inc.*, 117 B.R. 682, 687-88 (Bankr. D. Utah 1990) (finding that financial accommodations contracts can be assumed with consent); *In re Prime, Inc.*, 15 B.R. 216, 218 (Bankr. W.D. Mo. 1981) (noting that although the plain language

of 365(c)(2) states that a financial accommodation contract cannot be assumed, "[t]he court is satisfied that, read in the context of the statutory powers given the trustee to operate a business, Section 365(c)(2) does permit assumption of a debt financing arrangement."); *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977, 988 (Bankr. N.D. Ga. 1980) (noting that financial accommodation contracts can be assumed with consent); *but see In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092-94 (9th Cir. 1991) (finding that plain language of § 365(c)(2) does not permit assumption even with consent); *In re Falcon V, L.L.C.*, 620 B.R. 256, 266-67 (Bankr. M.D. La. 2020) (same).

86.     The Sureties have no obligation to continue extending surety credit to the Debtors, and they have no obligation to extend surety credit for any entity other than the principal for whom they issued bonds.

87.     Thus, because the surety bonds are non-assumable financial accommodations and because the Plan relies on the use of the surety bonds to satisfy regulatory requirements to operate, including the plugging and abandonment obligations, the Plan is patently unconfirmable.

### iv.  *The Plan is Unconfirmable Because the Debtors Have Taken No Actions in Attempting to Sell the Legacy Apache Properties and therefore the Plan is Not Proposed in Good Faith*

88.     The Bankruptcy Code requires that a plan be proposed in good faith for it to be confirmed. 11 U.S.C. § 1129(a)(3).  Whether a plan is proposed in good faith is to be determined "in light of the totality of the circumstances surrounding establishment of the plan." *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015) (citing *In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013)).  "[T]o be proposed in good faith, a plan must fairly achieve a result consistent with the Bankruptcy Code." *In re Cypresswood Land Partners, I*, 409 B.R. 396, 425 (Bankr. S.D. Tex. 2009) (citing *In re Sun Country Dev., Inc.*, 764 F.2d 406,

408 (5th Cir. 1985)).  "The good faith requirement . . . speaks more to the process of plan development than to the content of the plan." *In re Star Ambulance Serv.*, 540 B.R. at 262.

89.     Upon information and belief there is significant value to be extracted from the Legacy Apache Properties, and there are potential buyers in the market for these assets.  Yet, Debtors have made no effort in formulating their Plan to attempt to market and sell these assets.

90.     Even if a purchaser of the assets provided no monetary consideration for the assets, and simply agreed to assume the liabilities with Trust A remaining in place for the benefit of the purchaser, that would provide significant value to the estate—and specifically the sureties, predecessor owners and Apache.  The way the reorganization is currently structured provides little capital to invest in the FWE I assets, thereby greatly reducing the return on those assets.  All of the free cash flow of FWE I (after operating expenses) is to be used solely to fund decommissioning. [Dkt. No. 723-1, p. 460, section (f)] ("Without the prior written consent of Apache . . . the Company shall not do . . . any of the of the following: . . . use its free cash flow (after operating expenses) for any purposes other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation . . .").  It cannot be invested back into the company. *See id.*

91.     The only way for FWE I to maximize the value of its assets is to either (1) farm out the assets to the Credit Bid Purchaser (with Apache consent), in which circumstance the Credit Bid Purchaser retains a significant amount of the profits [Dkt. No. 723-2, p. 188], or (2) use capital loaned from Apache under its Standby Credit Facility to capitalize the assets and maximize their value [Dkt. No. 723-2, p. 4].

92.     The sole beneficiaries of this scheme are Apache and the Credit Bid Purchaser.  The Standby Credit Facility does not come into play until after all of the Decommissioning Security

39

(*i.e.*, Trust A and the surety bonds in Trust A) has been exhausted. [Dkt. No. 723-2, p.30, Section 4.02] ("The obligation of the Lender to make each Loan . . . is subject to the satisfaction of the following conditions: . . . (c) All amounts in the Trust A Account, the Letters of Credit, and the Permitted Surety Bonds have been fully exhausted or are not available to pay or reimburse Lender for Decommissioning.").  All of the surety bonds running in favor of BOEM will have been exhausted at this point as well.  In other words, there is no capital to invest in the FWE I Assets until the sureties are completely out of the picture and their surety bonds have been exhausted.

93.    This is patently unfair to the sureties who bonded these assets in reliance on the strength of the assets, which assets will have their value maximized and depleted solely in favor of the Credit Bid Purchaser and undersecured creditor Apache.  Not only does undersecured creditor Apache receive the benefit of maximizing and depleting the assets in its favor for purposes of completing the decommissioning, but it also receives a high interest rate from FWE I for all of the "loans" it makes under its Standby Credit Facility. [Dkt. No. 723-2, pp. 23-24].

94.    It is clear that the parties to the Restructuring Support Agreement have creatively crafted this Plan so as to extract all of the value associated with the Legacy Apache Properties solely for their benefit—which parties include undersecured creditor Apache, with an unsecured claim that is required to be treated no better than the other unsecured creditors.  The Debtors have made no attempt to market and sell the Legacy Apache Properties for this reason.  Upon information and belief, the Debtors have refused to consider reasonable offers for some or all of the assets that have already been made.  Nor do the provisions of the Fieldwood I LLC Agreement provide for the sale of the assets in the event a purchaser is found, which further protects the Restructuring Support Agreement parties' arrangement.

95.     This lack of marketing efforts to sell the Legacy Apache Properties, and the lack of a provision in the Fieldwood I LLC Agreement permitting the sale of the Legacy Apache Properties does not comport with the good faith requirement of section 1129(a)(3) of the Bankruptcy Code and thus the Plan is unconfirmable.

### v. The Plan is Unconfirmable Because Apache is Being Treated Differently than Similarly Situated Creditors

96.     For the same reasons discussed in the prior section, as well as elsewhere in this Objection, Apache is treated differently under the Plan than the other unsecured creditors in violation of 11 U.S.C. § 1123(a)(4) ("Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."); *In re Energy Future Holdings Corp.*, 648 Fed. Appx. 277, 283 (3d Cir. 2016) ("Section 1123(a)(4) embodies the principle that all similarly situated creditors in bankruptcy are entitled to equal treatment."); *In re CSC Indus., Inc.*, 232 F.3d 505, 508 (6th Cir. 2000) ("[A] fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally.").

97.     Whether Apache is viewed as a wholly unsecured creditor, or an undersecured creditor does not affect the analysis as even with an undersecured creditor, the unsecured portion of the creditor's claim must be treated no differently than other unsecured creditors' claims. § 12:7. Summary—Similar treatment of claims and interests, Chapter 11 Reorganizations § 12:7 (noting that section 1123(a)(4) "applies to claims, not to creditors . . . Thus, in the case of an undersecured creditor holding both a secured claim and an unsecured deficiency claim, section 1123(a)(4)'s mandate must be applied to each of those claims independently") (citing H.R. Rep. 95-595, p. 407 (1985)); *In re Friedman*, 4:07-BK-02135-JMM, 2012 WL 5409194, * 3 (Bankr. D. Ariz. Nov. 5,

41

2012) (holding that an undersecured creditor's deficiency claim was treated no differently than the other unsecured creditors' claims and therefore the treatment under the plan was proper); *see also* 11 U.S.C. § 506(a)(1).

98.     As stated previously, Apache's "loan" under the Standby Credit Facility is not a "loan" at all.  It is a thinly veiled attempt by Apache to use funds that it already owes as a jointly and severally liable predecessor owner and inject them into the FWE I Assets after the surety bonds and letters of credit are exhausted, and capitalize those assets and extract significant value from those assets for its sole benefit to reduce the unsecured portion of its claim.  Not only does it get to inject those assets with capital for its own benefit, but it is also entitled to a significant interest rate for extending its "loan." [Dkt. No. 723-2, p. 23, section 2.07].  And if FWE I defaults on the "loan" then Apache gets to foreclose on the FWE I Assets via the security interest it obtains in connection with its "loan." [Dkt. No. 723-2, p. 27, section 3.12].

99.     The entire arrangement between Apache and the Debtors, which was crafted behind closed doors without any of the other unsecured creditors' involvement, is a sham and is incredibly prejudicial to other unsecured creditors who are receiving no such favorable treatment, nor were they given the opportunity to participate in such favorable treatment.

100.    Thus, the Plan is unconfirmable because Apache's unsecured claim is being treated dissimilarly from similarly situated creditors in violation of 11 U.S.C. § 1123(a)(4).

**C.     THE VOTING PROCEDURES SHOULD NOT BE APPROVED BECAUSE THEY PURPORT TO GIVE THE SURETIES AND PREDECESSOR OWNERS ONLY $1 IN VOTING RIGHTS**

101.    In addition to the foregoing objections, the Sureties object to the proposed voting procedures which purport to provide numerous predecessor owners and sureties, whose claims are unliquidated and contingent and whose claims include billions of dollars in decommissioning obligations with only $1.00 in voting rights. [Dkt. No. 724, p. 19].  Such a procedure is manifestly

unfair to the predecessor owners and sureties whose claims dwarf those claims of other unsecured creditors.  This Court should order that the voting procedures be reformulated to permit the sureties and predecessor owners the ability to vote the true value of their claims. *See* 11 U.S.C. § 502(c); *In re Texans CUSO Ins. Grp., LLC*, 426 B.R. 194, 204 (Bankr. N.D. Tex. 2010) (noting that a court may estimate a contingent, unliquidated claim for voting purposes); *In re Cont'l Airlines Corp.*, 60 B.R. 903, 905 (Bankr. S.D. Tex. 1986) (same); *In re Cantu*, 08-70260, 2009 WL 1374261, *1-2 (Bankr. S.D. Tex. May 15, 2009) (same).

## IV.    JOINDER OF OTHER SURETIES' OBJECTIONS

102.    Upon information and belief, several other sureties that bonded certain obligations of the Debtors will also be filing objections to the Disclosure Statement.  Those objections are expected to be substantially similar in nature to this Objection.  To the extent the other sureties' objections do not expressly conflict with the objections contained herein, the Sureties hereby join and incorporate by reference all objections and arguments made by the other sureties in objecting to the Disclosure Statement.

## V.    RESERVATION OF RIGHTS

103.    The Sureties reserve all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Disclosure Statement in the event the Sureties' objections are not resolved prior to such hearing, to seek to introduce documents or other relevant information in support of the positions set forth in this Objection, and to raise any and all objections to confirmation of the Plan.

## VI.   <u>CONCLUSION</u>

104.    For the reasons stated herein, the Court should reject the Disclosure Statement for failing to provide creditors with adequate information, or in the alternative, rule that the Disclosure Statement provides for a patently unconfirmable Plan on which votes should not be solicited and, in each instance, grant such other relief as may be just and proper.  Additionally, the Court should order that the voting procedures be reformulated to permit the sureties and predecessor owners the ability to vote the true value of their claims instead of the $1.00 currently allotted to them.

Dated: March 12, 2021

Respectfully submitted,

HUSCH BLACKWELL LLP

By:  _/s/ Randall Rios_
    Randall A. Rios
    State Bar No. 16935865
    Timothy A. Million
    State Bar No. 24051055
    600 Travis, Suite 2350
    Houston, Texas 77002
    Tel:  713-525-6226
    Fax:  713-647-6884
    Email:  randy.rios@huschblackwell.com
    Email:  tim.million@huschblackwell.com

**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

-AND-

Armen Shahinian, Esq. (admitted *pro hac vice*)
(ashahinian@csglaw.com)
Scott A. Zuber, Esq. (admitted *pro hac vice*)
(szuber@csglaw.com)
Darren Grzyb, Esq. (admitted *pro hac vice*)
(dgrzyb@csglaw.com)
Jase A. Brown, Esq. (admitted *pro hac vice*)
(jbrown@csglaw.com)

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange New Jersey 07052

**ATTORNEYS FOR ASPEN AMERICAN
INSURANCE COMPANY, BERKLEY
INSURANCE COMPANY, EVEREST
REINSURANCE COMPANY AND SIRIUS
AMERICA INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 12, 2021, a copy of this document was served by electronic service on all counsel of record via the Court's CM/ECF system.

*/s/ Randall Rios*
Randall A. Ríos
