IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
|  | § |  |
| In re: | § | Chapter 11 |
|  | § |  |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | Case No. 20-33948 (MI) |
|  | § |  |
| Debtors.[1] | § | (Jointly Administered) |
|  | § |  |

**EMERGENCY MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING
ENTRY INTO BACKSTOP COMMITMENT LETTER, (II) APPROVING
OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON MARCH 18, 2021 AT 1:30 P.M. (PREVAILING CENTRAL TIME). YOU MAY PARTICIPATE IN THE HEARING BY AUDIO/VIDEO CONNECTION.**

**PLEASE NOTE THAT THROUGH THE ENTRY OF GENERAL ORDER 2020-10 ON MARCH 24, 2020, GENERAL ORDER 2020-11 ON APRIL 27, 2020, GENERAL ORDER 2020-17 ON JUNE 12, 2020, GENERAL ORDER 2020-18 ON JUNE 29, 2020, GENERAL ORDER 2020-19 ON AUGUST 7, 2020, AND GENERAL ORDER 2020-20 ON OCTOBER 19, 2020, THE COURT INVOKED AND THEN EXTENDED AND MODIFIED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Preliminary Statement

1.      The Debtors achieved a critical case milestone by filing their joint chapter 11 plan [Docket No. 722] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") and related disclosure statement

2

[Docket No. 723] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**"). The restructuring contemplated by the Plan is the result of months of good faith and arm's length discussions with the Debtors' key stakeholders and reflects the support of the DIP Lenders, the FLTL Lenders holding approximately 84.11% of the FLTL Claims, the SLTL Lenders holding approximately 30.42% of the SLTL Claims, and Apache Corporation ("**Apache**"), the predecessor in interest for the vast majority of the Debtors' Shelf Assets.[2] Reaching this broad consensus and obtaining a new-money investment for a path that preserves the core of the Debtors' business is an especially significant accomplishment for the Debtors in the midst of an unprecedented and challenging operating environment.

  2. An integral component of the Debtors' restructuring is the recapitalization of the Debtors' business pursuant to the sale and transfer of certain specified Deepwater Assets and Shelf Assets (collectively, the "**Acquired Interests**") to the Prepetition FLTL Lenders through a Credit Bid Transaction.[3] The Credit Bid Transaction will, among other things, facilitate the (i) recapitalization of the Debtors' business as a financially stronger, more streamlined company; (ii) preservation of over 1,000 employee and contractor jobs; (iii) maximization of the value of the specified Deepwater Assets and specified Shelf Assets for the benefit of the Debtors' estates, their creditors and other stakeholders; and (iv) acceleration of the safe and responsible decommissioning

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Backstop Commitment Letter (each as defined herein), as applicable. The summaries of the terms from the Backstop Commitment Letter included in the motion are qualified in their entirety by reference to the actual terms of the Backstop Commitment Letter, and in the event of an inconsistency therewith, the terms of the Backstop Commitment Letter shall govern.

[3] The Plan also provides that the FLTL Lenders will receive their *pro rata* share of 100% of the new equity interests (the "**New Equity Interests**") in the indirect parent of the Credit Bid Purchaser ("**NewCo**").

and plugging and abandonment of oil and gas properties throughout the Gulf of Mexico at no cost to U.S. taxpayers.

3.      As part of the purchase price, Credit Bid Purchaser will (i) credit bid a portion of the claims arising under the Prepetition FLTL Credit Agreement (as defined in the Plan), in an aggregate amount up to the FLTL Claims Allowed Amount (as defined in the Plan), (ii) pay cash in the amount of the Cash Portion (as defined in the Credit Bid Purchase Agreement, attached hereto as **Annex D** to the attached Backstop Commitment Letter), (iii) deliver, or cause to be delivered, the GUC Warrants (as defined in the Plan), and (iv) assume certain liabilities as set forth in a purchase and sale agreement among FWE, certain of its affiliates, NewCo and the Credit Bid Purchaser (the "**Credit Bid Purchase Agreement**").[4]

4.      The Credit Bid Purchaser's capital structure will consist of:

(a) a $119 million first lien term loan facility, resulting from the assumption of the Allowed FLFO Claims by the NewCo Entities as modified to the extent set forth in the First Lien Exit Facility Documents; and

(b) an up to $185 million new money second lien term loan facility (the "**Second Lien Exit Facility**") to ensure (i) the Credit Bid Purchaser has no less than $100 million of cash on hand on the Effective Date, and (ii) up to $85 million in proceeds will be used by the Credit Bid Purchaser to purchase the Acquired Interests (the "**New Money Investment**").  In addition, at any time after the Effective Date and subject to satisfaction of certain conditions, the Credit Bid Purchaser will be permitted to borrow up to $50 million under an incremental facility, which incremental facility will not be committed on the Effective Date.[5]

---

[4] The Debtors and the Consenting FLTL Lenders continue to negotiate and finalize the terms of the Credit Bid Purchase Agreement.

[5] Credit Bid Purchaser will also raise an additional $20 million in capital through a $20 million equity rights offering (the "**Equity Rights Offering**").  All Prepetition FLTL Lenders will be allowed to participate in the Equity Rights Offering in accordance with the rights offering procedures (the "**Equity Rights Offering Procedures**").  In addition, the Debtors are currently in the process of negotiating a backstop commitment agreement with certain ERO Backstop Parties (as defined in the Plan), pursuant to which such parties will agree to fully backstop the Equity Rights Offering in exchange for, among other things, an ERO Backstop Commitment Premium (as defined in the Plan).

5.     To ensure that the necessary funding is obtained for the Credit Bid Purchaser, the Company, the Backstop Parties (as defined below) and their respective professional advisors have negotiated a substantially final form of that certain *Backstop Commitment Letter* (the "**Backstop Commitment Letter**") to be entered into by and among the Company and those certain entities listed on Schedule I to the Backstop Commitment Letter (the "**Backstop Parties**" and each individually, a "**Backstop Party**") and, when formed, joined into by each of (i) NewCo, (ii) Holdings,[6] and (iii) Credit Bid Purchaser.  Pursuant to the Backstop Commitment Letter, the Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the Second Lien Exit Facility resulting in an aggregate commitment of $185 million (the "**Aggregate Commitment**"); provided, that the commitment of each Backstop Party, individually, is limited to the percentage of the Second Lien Exit Facility set forth opposite such Backstop Party's name on Schedule I to the Backstop Commitment Letter.  Twenty-five percent (25%) of the New Money Investment raised through the Second Lien Exit Facility will be allocated to certain of the Backstop Parties and seventy-five percent (75%) will be offered to all DIP Lenders, including the Backstop Parties and their applicable affiliates, on a *pro rata* basis.

6.     In exchange for the commitments and obligations of the Backstop Parties under the Backstop Commitment Letter, each Backstop Party will be entitled to, among other things: (i) its *pro rata* share of a backstop commitment premium equal to $14.8 million, representing 8% of the amount of the Aggregate Commitment, to be paid by NewCo in the form of New Equity Interests in NewCo at a discount of 30% to equity value (the "**Backstop Commitment Premium**"); (ii) its New Money Second Lien Term Loans

---

[6] "**Holdings**" will be a newly-formed Delaware limited liability company that will be wholly-owned by NewCo and will be the indirect owner of 100% of the equity interests of Credit Bid Purchaser.

Allocation Percentage of warrants for up to 24% of the New Equity Interests in NewCo (the "**New Money Warrants**"); (iii) in the event of an Alternative Transaction (as defined below), its *pro rata* share of an Alternative Transaction Premium (as defined in the Backstop Commitment Letter) equal to 5% of the Aggregate Commitment, to be paid by the Company in cash and which shall become payable on (A) the date of the consummation of any sale, transfer or other disposition of all or a material portion of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) to any person or persons other than the Credit Bid Purchaser, (B) the date of the consummation of any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests to any person or persons other than the Credit Bid Purchaser, or (C) the date of the consummation of any plan of reorganization, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or any of the other Debtors (other than (x) the "Restructuring" and "Restructuring Transactions" as defined in and contemplated under the Restructuring Support Agreement, or (y) any liquidation under Chapter 7 of the Bankruptcy Code pursuant to which a material portion of the Acquired Interests are a part of the liquidating estate) without the use of the commitments under the Backstop Commitment Letter, regardless of whether such plan or other transaction contemplates a sale of assets of the Debtors, a recapitalization or any alternative structure (any such transaction contemplated by clauses (A), (B), or (C), an "**Alternative Transaction**"); *provided* that the Alternative Transaction Premium shall not become due in the event that (a) the Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Backstop Commitment Letter) or (b) if the Credit Bid Purchase Agreement is terminated due to (x) Credit Bid Purchaser's breach, (y) if the Backstop Parties commit to support the Equity Rights Offering and the Equity Rights Offering is not consummated

as a result of the breach of such commitment by a Backstop Party, or (z) the Credit Bid Purchaser being unable to credit bid (the foregoing clauses (x) through (z), the "**Specified Exceptions**"); (iv) the reimbursement of the Backstop Parties for all reasonable and documented out-of-pocket fees, costs and expenses (including the fees and expenses of counsel) incurred in connection with the Second Lien Exit Facility whether or not the Closing Date occurs or any Second Lien Exit Facility Documents are executed and delivered or any extensions of credit are made under the Second Lien Facility (the foregoing reimbursement obligations, the "**Expense Reimbursement**"), to be paid by Holdings or the Credit Bid Purchaser; *provided* that the Company shall be liable for the Expense Reimbursement in the event, and solely in the event, of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the occurrence of the Closing Date), *provided, further* that the Company shall have no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception; and (v) the obligations of the Company, NewCo, Holdings and Credit Bid Purchaser, as set forth in section 5 of the Backstop Commitment Letter, to indemnify the Backstop Parties under certain circumstances (the "**Indemnification Obligations**"); *provided* that the Indemnification Obligations of the Company (but not any other parties) shall terminate upon the earlier to occur of the Closing Date and the termination of the Credit Bid Purchase Agreement due to the occurrence of any Specified Exception (clauses (iii)–(v), collectively, the "**Commitment Protections**").

7.     The Debtors are confident that entry into and performance under the Backstop Commitment Letter will maximize the value of the estates.  The Backstop Commitment Letter and the terms set forth therein are the result of extensive negotiations between the Debtors, the Backstop Parties and their respective professional advisors, and assures that the Credit Bid

Purchaser has a source of necessary new capital committed to fund its capital needs and consummate the Credit Bid Transaction. *See* Hanson Decl. ¶ 9. Moreover, the benefits provided to the Debtors by the Backstop Parties' entry into the Backstop Commitment Letter are commensurate with the Backstop Commitment Premium, the New Money Warrants, and the Commitment Protections provided to the Backstop Parties in exchange for their substantial commitments under the Backstop Commitment Letter.

8.      Accordingly, entry into the Backstop Commitment Letter is in the best interests of all creditors, and the Debtors submit that the determination to enter into and perform under the Backstop Commitment Letter is a sound exercise of the Debtors' business judgment and should be approved.

### Relief Requested

9.      Pursuant to sections 105(a), 363, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), the Debtors request entry of an order authorizing them to enter into and perform under the Backstop Commitment Letter and approving all obligations thereunder, including the Backstop Commitment Premium, the New Money Warrants, and the Commitment Protections.

10.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

11.     Contemporaneously herewith, the Debtors have filed the *Declaration of John-Paul Hanson in Support of Emergency Motion of Debtors For Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* (the "**Hanson Declaration**").

<u>**Jurisdiction**</u>

12.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**Background**</u>

13.     Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

14.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

16.     On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (and as may be reconstituted from time to time, the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

17.     Additional information regarding the Debtors' business, capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief*
[Docket No. 29].

**Backstop Commitment Letter**[7]

**A.      Background**

18.      Prior to and after the Petition Date, the Company and its advisors at
Houlihan Lokey Capital, Inc. ("**Houlihan**") engaged in discussions with the Company's creditor
constituency regarding the terms of a restructuring that would include a recapitalization through a
sale of the Acquired Assets via a credit bid to a newly-formed entity.  *See* Hanson Decl. ¶ 7.  After
several months of extensive negotiations, the parties to the Debtors' RSA, including the FLTL
Lenders, agreed on the terms of a Plan that implements the Credit Bid Transaction.

> *i.      The Capitalization of the Credit Bid Purchaser and Procurement of the Second Lien Exit Facility*

19.      As a part of these restructuring negotiations, the Debtors, the Prepetition
FLFO Lenders, the Required DIP Lenders, the Consenting Creditors, and their respective advisors
thoroughly diligenced both the *pro forma* capital required at the Credit Bid Purchaser to best
position it for future success and the potential funding needed on an aggregate basis to implement
the Plan, including ensuring necessary funds will be available to finalize the settlement agreement
with Apache, provide sufficient value for the proposed settlement agreement with the Creditors'
Committee, and achieve consensus among the Prepetition FLFO Lenders in order to preserve
estate resources.  *See* Hanson Decl. ¶ 13.  Specifically, members of the Ad Hoc Group of Secured
Lenders agreed to backstop the necessary second lien exit financing, waive hundreds of millions
of dollars of the undersecured deficiency portion of the FLTL Claims to reduce the size of the

---

[7] A copy of the Backstop Commitment Letter is annexed hereto as **Exhibit B**.

unsecured claims pool sharing the value available for *pro rata* distribution to unsecured creditors, as well as further backstop an equity rights offering to pay down a portion of the First Lien Exit Facility.  *See* Hanson Decl. ¶ 13.

20.     Houlihan contacted several potential capital providers outside the Company's existing lender group to determine if any viable and cost-effective options for exit financing would be available.  *See* Hanson Decl. ¶ 14.  These efforts included informal conversations with parties that had previously expressed some interest in providing financing for a debtor-in-possession facility or in purchasing the Deepwater Assets, as well as new parties that were given the opportunity to conduct diligence on the Company and its assets.  *See* Hanson Decl. ¶ 14.  However, the onset of and continuing challenges posed by the COVID-19 pandemic, the impact on demand for oil and resulting commodity prices and the lack of available capital in the upstream exploration and production sector significantly reduced the competitive market for the Company's exit financing, and increased the risks of closing the recapitalization.  *See* Hanson Decl. ¶ 15.

21.     Despite the outreach efforts, no serious interest in providing exit financing emerged on reasonable terms and amount from any party outside the Company's existing lender group, let alone on terms competitive with those offered by the Debtors' existing DIP Lenders. *See* Hanson Decl. ¶ 16.  Having fully explored their alternatives, the Company and their advisors decided to move forward with the only commercially reasonable exit financing option available under the circumstances, and extensively negotiated the terms of the Second Lien Exit Facility with the Ad Hoc Group of Secured Lenders and their advisors.  *See* Hanson Decl. ¶ 16.

ii.     *Negotiations related to the Backstop Commitment Letter*

22.     After the initial round of negotiations resulted in a general agreement as to the terms the Second Lien Exit Facility, the Company and Houlihan determined that a backstop would be necessary to ensure that newly-committed funding could be ensured for the Credit Bid Purchaser and NewCo – specifically resulting in the New Money Investment.  *See* Hanson Decl. ¶ 17.  In order to "lock in" the New Money Investment and other commitments under the Second Lien Exit Facility, the Debtors engaged in further negotiations with the Ad Hoc Group of Secured Lenders, and their advisors, which culminated in a backstop commitment agreement whereby the up to $185 million new money Second Lien Exit Facility will be fully backstopped.  *See* Hanson Decl. ¶ 17.  Significantly, the terms of the Backstop Commitment Letter ensure that the Credit Bid Purchaser has a source of necessary new capital committed to fund its initial capital needs and consummate the Credit Bid Transaction.  *See* Hanson Decl. ¶ 17.

23.     The Backstop Commitment Letter was heavily negotiated to procure the best possible terms for the Company given the complexity and risks of the restructuring contemplated by the Plan and the operational and financial challenges faced by companies in the E&P space.  *See* Hanson Decl. ¶ 18.  Importantly, the Company and its advisors were able to negotiate meaningful limitations on the terms of the Backstop Commitment Premium, New Money Warrants, Alternative Transaction Premium, Expense Reimbursement and Indemnification Obligations, a backstop of the full amount of the Aggregate Commitment Amount, and certain other terms and concessions relating to the covenants and conditions precedent.  *See* Hanson Decl. ¶ 18.  After reviewing and comparing the terms of backstop arrangements in similar restructurings with those provided in the Backstop Commitment Letter, including the Backstop Commitment Premium, the New Money Warrants and Commitment Protections, Houlihan determined that the terms of the Backstop Commitment Letter are market-based and comparable

to those that this and other courts have approved in other recent large and complex chapter 11 cases.  *See* Hanson Decl. ¶ 18.

24.     As a result of these discussions with the Ad Hoc Group of Secured Lenders and its advisors, advisors and counsel to the Prepetition FLFO Lender, and Houlihan's own assessment of the availability of financing terms in the marketplace, the Debtors determined that it would be in the best interests of the Company and its stakeholders to enter into the Backstop Commitment Letter, subject to this Court's approval.  *See* Hanson Decl. ¶ 17–18.

**B.      Summary of Principal Terms of the Backstop Commitment Letter**

25.     The up to $185 million of new money proceeds generated from the backstopped Second Lien Exit Facility are essential to the successful implementation of the Plan, the closing of the Credit Bid Transaction and, ultimately, the recapitalization of the Debtors' business as a reorganized entity.  As discussed in Section A, above, the principal terms of the Backstop Commitment Letter were extensively negotiated over the course of 2 months.  The commitments made by the Backstop Parties under the Backstop Commitment Letter ensure that the Credit Bid Purchaser will be adequately capitalized upon the Effective Date.

26.     The following chart summarizes the principal terms of the Backstop Commitment Letter:

| Summary of Material Terms of Second Lien Exit Facility Backstop Commitment Letter | |
| --- | --- |
| **Backstop Commitment**<br><br>Section 1 | The Backstop Parties have committed to backstop the Second Lien Exit Facility in an aggregate commitment in an amount of $185,000,000 (the "**Aggregate Commitment**"). |
| **Allocation to Other DIP Lenders**<br><br>Section 3 | The Backstop Parties intend to offer the other DIP Lenders the opportunity to provide a portion of the Second Lien Exit Facility on the Closing Date. |

| Summary of Material Terms of<br>Second Lien Exit Facility Backstop Commitment Letter | |
|---|---|
| **Backstop Commitment Premium**<br><br>Section 4(a) | NewCo shall pay a backstop commitment premium to the Backstop Parties in the form of New Equity Interests in NewCo with a value of $14.8 million (representing 8% of the amount of the Aggregate Commitment), to be paid by NewCo at a discount of 30% to equity value. |
| **New Money Warrants**<br><br>Section 4(b) | On the Closing Date, NewCo shall issue to each Second Lien Term Lender (or any entity affiliated or related to such Second Lien Term Lender and designated in writing by such Second Lien Term Lender) a percentage of the New Money Warrants equal to the New Money Second Lien Term Loans Allocation Percentage of such Second Lien Term Lender on the Closing Date. |
| **Alternative Transaction Premium**<br><br>Section 4(c) | An amount equal to 5% of the Aggregate Commitment shall be payable by the Company in cash on (A) the date of the consummation of any sale, transfer or other disposition of all or a material portion of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) to any person or persons other than the Credit Bid Purchaser, (B) the date of the consummation of any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests to any person or persons other than the Credit Bid Purchaser, or (C) the date of the consummation of any plan of reorganization, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or any of the other Debtors (other than (x) the "Restructuring" and "Restructuring Transactions" as defined in and contemplated under the Restructuring Support Agreement, or (y) any liquidation under Chapter 7 of the Bankruptcy Code pursuant to which a material portion of the Acquired Interests are a part of the liquidating estate) without the use of the commitments under the Backstop Commitment Letter, regardless of whether such plan or other transaction contemplates a sale of assets of the Debtors, a recapitalization or any alternative structure.<br><br>The Alternative Transaction Premium shall not become due in the event that (a) the Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Backstop Commitment Letter) or (b) any Specified Exception applies. |
| **Expense Reimbursement Obligations**<br><br>Section 5 | The Backstop Parties will be reimbursed for all reasonable and documented out-of-pocket fees, costs and expenses (including the fees and expenses of counsel) incurred in connection with the Second Lien Exit Facility whether or not the Closing Date occurs or any Second Lien Exit Facility Documents are executed and delivered or any extensions of credit are made under the Second Lien Facility, to be paid by Holdings or the Credit Bid Purchaser.<br><br>The Company shall be liable for the Expense Reimbursement in the event, and solely in the event, of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the occurrence of the Closing Date). |

14

| | |
|---|---|
| **Summary of Material Terms of** <br> **Second Lien Exit Facility Backstop Commitment Letter** | |
| | The Company shall have no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception. |
| **Indemnification Obligations** <br><br> Section 5 | The Backstop Parties shall be indemnified from and against all claims, damages, liabilities and out-of-pocket expenses that may be incurred by or asserted or awarded against any Protected Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) any aspect of the Second Lien Exit Facility (or any use made or proposed to be made with the proceeds thereof) or this Backstop Commitment Letter, in each case except to the extent such claim, damage, liability or expense (a) in any case (x) is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from fraud, the gross negligence or willful misconduct of, or a material breach of this Backstop Commitment Letter by, such Protected Party (y) arises from any claim, action, suit, inquiry, litigation, investigation or proceeding that does not involve an act or omission of you or any of your respective affiliates and that is brought by an Protected Party against any other Protected Party or (b) in the case of indemnification by the Company pursuant to this paragraph, is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from fraud, negligence, gross negligence or willful misconduct of, or a material breach of this Backstop Commitment Letter by, any of Credit Bid Purchaser, NewCo or Holdings. <br><br> The Indemnification Obligations of the Company (but not any other parties) shall terminate upon the earlier to occur of the Closing Date and the termination of the Credit Bid Purchase Agreement due to the occurrence of any Specified Exception. |
| **Termination** <br><br> Section 9 | Majority Backstop Parties may terminate the Backstop Commitment Letter if: <br><br> (a) the Restructuring Support Agreement is terminated or expires in accordance with its terms; <br><br> (b) the Commitment Approval Order shall not have been entered on or prior to the date that is 7 days after the date the Backstop Commitment Letter is fully executed (provided that, with the consent of the Majority Backstop Parties, the date under this clause (b) may be extended to a date not later than 14 days after the date of this Backstop Commitment Letter is fully executed); <br><br> (c) if the Credit Bid Transaction is to be consummated pursuant to the Plan, the Confirmation Order shall not have been entered by the Bankruptcy Court on or prior to May 10, 2021; <br><br> (d) if the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan, an order of the Bankruptcy Court, in form and substance acceptable to the Majority Backstop Parties, approving the 363 |

| Summary of Material Terms of |
| Second Lien Exit Facility Backstop Commitment Letter |

Credit Bid Transaction shall not have been entered by the Bankruptcy Court on or prior to the date that is 35 days after the Toggle Date;

(e) the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount;

(f) other than as contemplated and permitted by the Credit Bid Purchase Agreement, the Company or any other Debtor executes a binding written agreement (other than a non-disclosure agreement) for, or executes any definitive documentation relating to, any financing that would replace, in whole or in part, the Second Lien Exit Facility (including financing that would serve as the "Second Lien Exit Facility" under the Plan or a Credit Bid Transaction other than the Second Lien Exit Facility) without the prior written consent of the Majority Backstop Parties;

(g) other than as contemplated and permitted by the Credit Bid Purchase Agreement, the Company or any other Debtor executes a binding written agreement (other than a non-disclosure agreement) for, or executes any definitive documentation relating to, the transfer, disposition, assignment or contribution of any material portion of the Credit Bid Acquired Interests to any party other than the Credit Bid Purchaser (or another special purpose entity formed by the Majority Backstop Parties for the purpose of consummating the Credit Bid Transaction or a 363 Credit Bid Transaction, as applicable) without the prior written consent of the Majority Backstop Parties;

(h) the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or a trustee or examiner shall be appointed with respect to all or substantially all of the Debtors with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(i) the Credit Bid Purchase Agreement shall not have been entered into in a form acceptable to the Majority Backstop Parties on or prior to the Plan Supplement Filing Date established by the Bankruptcy Court or shall have been terminated or shall cease to be in full force and effect;

(j) after entry thereof, the Commitment Approval Order is reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in each case without the consent of the Majority Backstop Parties; or

(k) any of the Debtors shall make or enter into any material non-ordinary course stipulation, settlement or other agreement with any governmental, regulatory or agency that is not in form and substance reasonably acceptable to the Majority Backstop Parties.

| | **Summary of Material Terms of**<br>**Second Lien Exit Facility Backstop Commitment Letter** |
|---|---|
| **Conditions Precedent**<br><br>Annex B | The conditions to the closing and the initial funding of the Second Lien Exit Facility, unless waived by the Majority Backstop Parties, include, among other things:<br><br>(i) the entry of an order by the Bankruptcy Court, in form and substance acceptable to the Debtors and the Majority Backstop Parties, approving the Backstop Commitment Letter, including the Backstop Commitment Premium, the Alternative Transaction Premium, the indemnification obligations thereunder and other fees and expenses payable thereunder;<br><br>(ii) (a) either (1) the entry of the Confirmation Order in form and substance acceptable to the Debtors and the Majority Backstop Parties (which shall be a Final Order) and the occurrence of the Effective Date, or (2) the entry of the 363 Sale Order (which shall be a Final Order); and (b) the closing of the Credit Bid Transaction or the 363 Credit Bid Transaction, as applicable;<br><br>(iii) the negotiation, execution and delivery of the Second Lien Exit Facility Documents (including, without limitation, security documentation) and the New Money Warrant Agreement, in form and substance acceptable to the Debtors and the Majority Backstop Parties;<br><br>(iv) no default or event of default under the Second Lien Exit Facility shall exist or would result from the consummation of the transactions contemplated on the Closing Date;<br><br>(v) all fees, premiums and expenses required to be paid to the Second Lien Exit Facility Agent, the Backstop Parties and Participating DIP Lenders at or prior to the closing and initial funding of the Second Lien Exit Facility, in each case, pursuant to the terms of the Backstop Commitment Letter, the Second Lien Exit Facility Documents and the Plan shall have been paid or shall be paid and the New Money Warrants shall be issued substantially concurrently with the funding of the Second Lien Exit Facility;<br><br>(vi) the funding of the Claims Reserve in the Claims Reserve Amount, which Claims Reserve Amount shall be acceptable to the Debtors and the Majority Backstop Parties, shall have occurred;<br><br>(vii) the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date shall not have been projected at any time prior to the Confirmation Date to exceed the Toggle Amount;<br><br>(viii) the aggregate unrestricted cash and cash equivalents of the Borrower and its subsidiaries as of the Closing Date on a pro forma basis (including after payment of Restructuring Expenses) shall not be less than $100.0 million;<br><br>(ix) the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect; |

| | |
|---|---|
| **Summary of Material Terms of** | |
| **Second Lien Exit Facility Backstop Commitment Letter** | |
| | (x) the terms and conditions of the First Lien Exit Facility shall be acceptable to the Majority Backstop Parties, the conditions precedent to the effectiveness of the First Lien Exit Facility shall have been satisfied or duly waived in writing and the First Lien Exit Facility shall close substantially simultaneously with the Second Lien Exit Facility; |
| | (xi) Credit Bid Purchaser shall have received, or shall receive substantially simultaneously with the closing of the Second Lien Exit Facility, gross proceeds in an amount of no less than $20 million through an equity rights offering on terms and conditions acceptable to the Debtors and the Majority Backstop Parties (the "**Equity Rights Offering**"); and |
| | (xii) all other conditions precedent described or set forth in the Credit Bid Purchase Agreement shall be satisfied or such conditions precedent shall have been waived in accordance with the terms of such documents and with the consent of the Majority Backstop Parties (except those conditions precedent that by their nature are to be satisfied concurrently with the Credit Bid Transaction Closing, the Effective Date or the closing of the 363 Credit Bid Transaction, as applicable; provided that such conditions shall be satisfied concurrently at such times). |

## Relief Requested Should Be Granted

27.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Fifth Circuit has held that debtors may use property outside of the ordinary course under section 363(b) where the debtor can articulate some business justification or sound business reason to support the use.  *See e.g., In re BNP Petroleum Corp., 642 F. App'x 429, 435 (5th Cir. 2016)*; *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir.2010) ("A sale of assets under § 363... is subject to court approval and must be supported

by an articulated business justification, good business judgment, or sound business reasons."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

28.     The business judgment standard under section 363(b) is "flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors).").  Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citation omitted).

## A.     Sound Business Reasons Support Entry into Backstop Commitment Letter

29.     The Debtors submit that sound business reasons exist to grant the relief requested herein.  The Backstop Commitment Letter is the culmination of extensive negotiations among the Debtors and their key economic stakeholders.  The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the presented restructuring framework and carefully considered their options for financing the Credit Bid Purchaser.  *See* Hanson Decl. ¶ 12.

30.     The Backstop Commitment Letter is a critical element of the Debtors' restructuring, as well as key to the Debtor's ability to consummate the Plan.  The Backstop Commitment Letter provides the Debtors, and other key stakeholders, with assurances that the Credit Bid Purchaser will have sufficient working capital and liquidity (ensuring $100 million of cash on hand immediately after the Effective Date) to operate its business.  *See* Hanson Decl. ¶ 19.

Without the Backstop Parties' commitments to provide the Credit Bid Purchaser with up to the $185 million in debt financing, Credit Bid Purchaser would likely have had to source more expensive capital elsewhere at a greater cost to the Debtors' estates and stakeholders, assuming such capital were available elsewhere, or if such capital were not available, the Debtors would have insufficient funding to capitalize its reorganized business and fund the distributions under the Plan.  *See* Hanson Decl. ¶ 19.   Therefore, the Debtors submit that entry into the Backstop Commitment Letter is in the best interest of the Debtors' estates and an appropriate exercise of business judgment.

**B.      The Backstop Commitment Premium, the New Money Warrants and the Commitment Protections Under Backstop Commitment Letter Should Be Approved**

31.      In consideration of the Backstop Parties' substantial commitments under the Backstop Commitment Letter and to compensate the Backstop Parties for the considerable time and expense they have incurred during the negotiation process, and will continue to incur as the parties proceed to Plan confirmation, the Backstop Commitment Letter provides for the Backstop Commitment Premium, New Money Warrants and the Commitment Protections (including the Alternative Transaction Premium, the Expense Reimbursement and the Indemnification Obligations).

32.      The Backstop Commitment Premium, the New Money Warrants and the Commitment Protections are necessary inducements and reasonable compensation for the Backstop Parties to enter into the Backstop Commitment Letter, which will provide significant benefits to the Debtors' estates by, among other things, securing an $185 million commitment to fund the acquisition of the Acquired Interests and capitalize the Credit Bid Purchaser.  Given the substantial investment and commitment of the Backstop Parties, the Debtors submit that the

Backstop Commitment Premium, the New Money Warrants and the Commitment Protections are necessary to the successful implementation of the Second Lien Exit Facility and Plan.

33.     Agreeing to the Backstop Commitment Premium, the New Money Warrants and the Commitment Protections is reasonable and necessary given (i) the significant benefit to the estates of having a commitment of the Backstop Parties to provide exit financing in an amount to ensure that the Credit Bid Purchaser is adequately capitalized, (ii) the costs incurred by the Backstop Parties engaging with the Debtors and negotiating the terms of the Backstop Commitment Letter and other transaction documents, and (iii) the period of time between providing the commitment and  consummation of the Plan.  Under these circumstances, the Backstop Commitment Premium, the New Money Warrants and the Commitment Protections are reasonable in amount and necessary to maximize the value of the Debtors' estates.  *See* Hanson Decl. ¶ 22.

34.     The Backstop Parties have provided the means of implementing the Plan through the infusion of up to an additional $185 million of new money to capitalize the Credit Bid Purchaser, which will be used to fund a portion of the consideration paid for the acquisition of the Acquired Interests and provide Credit Bid Purchaser with $100 million cash on hand on the emergence date.  The Backstop Parties are conferring a material benefit to the Debtors' estates as they help lead the Debtors successfully out of bankruptcy, preserving the going concern value of specified Debtors' assets and preserving over 1,000 jobs, and maximizing recoveries to the Debtors' stakeholders.

35.     Over the past several months, the Backstop Parties have spent substantial time and expense conducting diligence and submitting proposals regarding potential restructuring transactions with the Debtors.  The Backstop Parties have also incurred significant expense

negotiating and drafting the Backstop Commitment Letter, and will continue to incur significant costs until the confirmation of a chapter 11 plan.  While the Backstop Parties wait for the Plan to be consummated, they are exposed to risk, including fluctuations in the value of the Acquired Interests and that their efforts could result in a tremendous opportunity cost if the Plan is not approved by the Court.  *See* Hanson Decl. ¶ 23.

36.     The Backstop Commitment Premium, the New Money Warrants and Commitment Protections are integral parts of the Backstop Commitment Letter, and without these protections, the Debtors have been advised that the Backstop Parties would not have agreed to the binding commitments to backstop the Second Lien Exit Facility.  *See* Hanson Decl. ¶ 24.  Indeed, if the Backstop Commitment Premium, the New Money Warrants, and Commitment Protections are not approved, the Backstop Parties' commitment to the backstop the Second Lien Exit Facility will be jeopardized, as the Backstop Parties' would have the right to terminate the Backstop Commitment Letter.  *See* Hanson Decl. ¶ 24.

37.     Further, the Backstop Commitment Premium, the New Money Warrants and the Commitment Protections are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having a substantial committed investment in the Credit Bid Purchaser.  Notably, the Backstop Commitment Premium and the New Money Warrants are payable entirely in equity of NewCo (*i.e.* New Equity Interests and warrants for New Equity Interests, respectively) and impose no cash costs on the Debtors if the Debtors consummate the Plan.

38.     As discussed above, the Debtors' investment banker compared the fully-negotiated Backstop Commitment Premium, the New Money Warrants and Commitment Protections to similar commitments and fees in other cases and determined they are market-based

and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases.  *See* Hanson Decl. ¶ 18.  Accordingly, the Debtors submit that the Backstop Commitment Premium, the New Money Warrants, and Commitment Protections, including the Alternative Transaction Premium, are reasonable and commensurate with the size and nature of the transaction.  Numerous bankruptcy courts, including those in this district, have approved backstop agreements that contain both a backstop premium and termination fee similar to the proposed Backstop Commitment Premium and Alternative Transaction Premium:

- *EP Energy*: commitment premium of 8% of the rights offering amount payable in common stock, and a termination fee of 8% payable in cash.  *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 18, 2019) (Docket No. 181) (subsequently amended by stipulation, *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 3, 2020) (Docket No. 1100) providing the termination fee was not payable if the backstop agreement was terminated consensually pursuant to its terms).

- *Ultra Petroleum*: put option premium of 7.5% of the rights offering amount payable in common stock, and a termination fee of 7.5% payable in cash.  *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bankr. S.D. Tex. Aug. 22, 2020) (Docket No. 610, 736).

- *24 Hour Fitness*: commitment premium of 10% of the rights offering amount payable in the form of new equity interests, and a termination fee of 10% payable in cash.  *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. Nov. 16, 2020) (Docket No. 1241).

- *American Commercial Lines*: commitment premium of 7% of the rights offering amount payable in preferred equity, and termination fee of 7%, payable in cash.  *In re Am. Commercial Lines Inc.*, No. 20-30982 (MI) (Bankr. S.D. Tex. Mar. 3, 2020) (Docket No. 193).

- *Chesapeake Energy*: non-refundable put option premium equal to 10% of the rights offering amount.  *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. Aug. 21, 2020) (Docket No. 899).

- *Bristow*: a commitment premium of 10% of the rights offering amount, payable in either common stock or preferred equity at commitment parties option, and a termination fee of 5% payable in cash.  *In re Bristow Group Inc.*, No. 19-32713 (Bankr. S.D. Tex. Oct. 8, 2018) (Docket No. 825).

- *Windstream*: commitment premium of 8% of the rights offering amount, payable in common equity, and termination fee of 8% of the rights offering amount, payable in cash.

*In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 12, 2020) (Docket No. 1806).[8]

39.     Similarly, approval of the Expense Reimbursement to the Backstop Parties is warranted.  The Backstop Parties already have expended significant time and effort negotiating the Backstop Commitment Letter and Second Lien Facility Documents, including substantial due diligence, protracted negotiations, and the preparation and negotiation of the documents necessary in connection therewith.  Reimbursing such fees and expenses is customary in other similar transactions to address the substantial efforts expended by backstopping parties.  *See* Hanson Decl. ¶ 23.

40.     Notably, the Company's obligation to provide the Commitment Protections is subject to several limitations under the Backstop Commitment Letter.  The Company is only liable with respect to the Expense Reimbursement in the event of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the Closing Date) and the Company has no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception.  The Company shall have no liability with respect to the Indemnification Obligations (a) to the extent a claim for indemnification with respect thereto (i) resulted from the

---

[8] *See also In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) (Docket No. 367) (approving a commitment premium of 8% of the rights offering amount, payable in either equity at an undiscounted price or cash at commitment parties' option, and termination fee of 8% payable in cash); *In re Fieldwood Energy LLC, et al.,* No. 18-30648 (DRJ) (Bankr. S.D. Tex. Apr. 2, 2018) (Docket No. 259) (approving a commitment premium of 6% of the rights offering amount, payable in common stock, and a termination fee of 6% payable in cash); *In re Vanguard Natural Res., LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Mar. 20, 2017) (Docket No. 424) (approving a commitment premium of 6% of the rights offering amount, payable in common stock, and a termination fee of 6% payable in cash); *In re Chaparral Energy, Inc*., No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) (Docket No. 651) (approving a commitment premium of 8.75% of the rights offering amount, payable in common shares, and a breakup premium of equal value, payable in cash); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Nov. 6, 2020) (Docket No. 1018) (approving commitment premium of 9.50% of the backstop cap payable in the form of new common shares); *In re Halcón Resources Corporation*, Case No. 19-34446 (DRJ) (Bankr. S.D. Tex. Sept. 4, 2019) (Docket No. 224) (approving termination fee of 6% payable in cash); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Sept. 21, 2018) (Docket No. 1040) (approving termination fee of 14% payable in cash).

fraud, gross negligence or willful misconduct of, or a material breach of the Backstop Commitment Letter by, the party claiming indemnification, Credit Bid Purchaser, NewCo or Holdings, or (ii) arises from a claim that does not involve an act or omission by the Company, Credit Bid Purchaser, Holdings or NewCo or their respective affiliates and is brought by an indemnified party against any other indemnified party, or (b) after (i) the Closing Date or (ii) the termination of the Credit Bid Purchase Agreement due to any Specified Exception.  Additionally, the Company is not obligated to pay the Alternative Transaction Premium if (a) the Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Backstop Commitment Letter), or (b) the Credit Bid Purchase Agreement is terminated due to any Specified Exception.  These limitations on the Debtors' obligations are the result of extensive negotiations over the terms of the Backstop Commitment Letter and provide evidence that the remaining obligations of the Debtors are reasonable and necessary.

41.     In light of the benefits that will inure to the Debtors and their estates as a result of the Backstop Parties' commitment of capital through the Backstop Commitment Letter, the Debtors submit that entry into the Backstop Commitment Letter and their performance thereunder, including as it may relate to payment of (i) the Backstop Commitment Premium and New Money Warrants upon the effective date of the Plan, (ii) the Alternative Transaction Premium (if and when payable), (iii) the Expense Reimbursement, and (iv) the Indemnification Obligations, is justified, is in the best interests of the Debtors' estates, and should be approved by this Court. *See* Hanson Decl. ¶ 27.

42.     Further, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Approval of the Backstop Commitment Letter is necessary for an expeditious

path towards confirmation of the Plan, which after months of hard-fought negotiations, has the support of the Consenting Creditors and Apache and will ensure that the Credit Bid Purchaser is adequately capitalized.  Accordingly, the Debtors believe that application of section 105(a) of the Bankruptcy Code forms a basis to grant the relief requested.

## C.     The Expense Reimbursement, Indemnification Obligations, and the Alternative Transaction Premium Should Be Allowed as Administrative Expenses Pursuant to Sections 503(b) and 507(a)(2) of Bankruptcy Code

43.     Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— (1)(A) the actual, necessary costs and expenses of preserving the estate . . . ."  Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority.

44.     As detailed above, the Expense Reimbursement and Indemnification Obligations represent a material inducement for the Backstop Parties to enter into the Backstop Commitment Letter, which will provide a material benefit to the Debtors' estates.  Compared to the substantial value provided by the Backstop Parties, the Expense Reimbursement and Indemnification Obligations are a reasonable use of estate resources and should be accorded administrative expense priority.  These payments constitute "actual, necessary costs and expenses of preserving the estate."   11 U.S.C § 503(b)(1)(A).   Further, agreeing to the Alternative Transaction Premium was necessary to obtain the benefits of the Backstop Commitment Letter. Accordingly, in the event that the Alternative Transaction Premium becomes payable under the terms of the Backstop Commitment Letter, such expense should be an allowed administrative expense entitled to priority.

**Request for Relief Pursuant to Bankruptcy Rules 6004(h)**

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  In order to provide immediate protection to the Backstop Parties and preserve the benefits of the Backstop Commitment Letter, the Debtors request that the Proposed Order be effective immediately upon entry and that the 14-day stay period under Bankruptcy Rules 6004(h) be waived.

**Notice**

46.     Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

**No Previous Request**

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: March 16, 2021
Houston, Texas

Respectfully submitted,

*/s/ Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Matt.Barr@weil.com
        Jessica.Liou@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that, on March 16, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez