IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.,* | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |

**OBJECTION OF THE HANOVER INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA; AND XL SPECIALTY INSURANCE COMPANY TO THE DISCLOSURE STATEMENT AND/OR CHAPTER 11 PLAN OF THE DEBTORS**

"A bankruptcy petition is not a grant of immunity. Bankruptcy debtors are not different from any citizen in that they must comply with state and federal laws." Hon. Marvin J. Isgur *In re American Coastal Energy Inc.* 399 B.R. 805, 810 (Bankr. S. D. Tex. 2009)

The Hanover Insurance Company ("Hanover"), Liberty Mutual Insurance Company ("Liberty"), Travelers Casualty & Surety Company of America ("Travelers"), and XL Specialty Insurance Company ("XL") (collectively the "Sureties") file this their Objection to the Disclosure Statement[1] and/or Joint Chapter 11 Plan[2] of the Debtors.[3] In support, the Sureties respectfully state as follows:

**SUMMARY**

1. The Debtors are asking this Court to permit the following scenario:

    • Despite signing up as an operator of oil wells in the Gulf of Mexico and taking on the environmental responsibilities that flow, the Debtors want to

---

[1] Dkt. 723

[2] Dkt. 722

[3] The Debtors, each of which have filed a separate voluntary petition, are: Dynamic Offshore Resources NS, LLC; Fieldwood Energy LLC; Fieldwood Energy Inc.; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC.

> walk away and have someone else clean up their mess (both literally and figuratively).

- The Debtors' solution is that any impacted parties – whether predecessors in the chain of title, the federal government, or the public at large – simply look to surety bonds for recourse. This is despite the fact that there appears to be plugging and abandonment ("P&A") liability that exceeds bonds in place.[4]

- This means that the Debtors expect $1 billion + in surety credit for free. Not only do they not want to pay for these products, but they are asking the Court to strip indemnity rights of all sureties and toss the indemnity agreements into the waste basket.

2. The Bankruptcy Code is not a sword. It also is not a tool for avoiding state and federal laws, and most notably, the obligation to manage environmental hazards in the same way that would be required outside of the bankruptcy context. There is real oil in the Gulf of Mexico and the Debtors cannot pull up stakes and hope that someone else will fix the problem. This is not a Chapter 7 liquidation where there is no available capital to address the situation. Rather, the Debtors seek to use a Chapter 11 reorganization to cherry pick the good assets from the bad and then contribute no capital towards honoring the environmental obligations for the assets that are proposed to be abandoned.[5] The Court should not permit the strategic decision of the Debtors to avoid their environmental responsibilities based on not only the requirements of the Bankruptcy Code, but also the line of authority pursuant to *Midlantic National Bank* and its progeny (which the Court knows well).

3. In addition, the disclosure statement is inadequate when it comes to proposed abandonment of property, as it seeks to "abandon to" certain entities, which is inconsistent with

---

[4] *See e.g.,* Dkt. 759

[5] While the Bankruptcy Code is designed to protect the honest but unfortunate debtor, as one commentator notes, it is an open question as to "what extent a debtor, who has not adequately provided for the cleanup and removal of the toxic and hazardous waste, is honest and merely unfortunate." Leonard J. Long, *Burdensome Property, Onerous Laws, and Abandonment: Revisiting Midlantic National Bank v. New Jersey Department of Environmental Protection*, 21 Hofstra L. Rev. 63, 65 n.10 (1992).

<u>**OBJECTION TO DISCLOSURE STATEMENT AND/OR CHAPTER 11 PLAN**</u>                                                  Page 2

Section 554 of the Bankruptcy Code. Moreover, even if the Debtors could select who they would like to abandon assets to, they seek to "slice and dice" assets covered by various PSAs and surety bonds. Such items are not divisible and cannot be torn apart piecemeal, with a bond continuing in force to cover some assets that are sold and/or assumed and others that are now abandoned to a separate entity. Rather, and this goes to nearly every aspect of the Debtors' plan, if there are going to be continued operations – whether by a third-party, a reorganized debtor, or a predecessor in the chain of title – there necessarily needs to be new bonds issued, which would be complete with the standard trappings of a surety bond program, including payment of premiums, indemnity, posting of adequate collateral, etc.

4. Nothing in the disclosure statement and/or plan addresses these issues, including the assets that would be sold to the credit bid purchaser. There is no indication or discussion about how the new purchaser would address its surety needs. As bonds are financial accommodations that cannot be assumed and assigned, there should be a mechanism for replacement of existing bonds and the reissuance of new bonds on behalf of any phoenix that arises from these ashes pursuant to normal underwriting standards of whatever surety elects to take on such risk.

5. Ultimately, if the Debtors are able to implement the plan as currently formulated, it will directly result in a chilling of the surety marketplace, as it will become apparent to sureties that indemnity agreements can be disregarded, premiums can go unpaid, and liability can be avoided by the principal obligor on the bonds to the detriment of the sureties – and again, with no recourse for indemnity, which is the backbone of suretyship and the distinguishing characteristic from insurance. Not only would this directly result in a significant increase to even obtain a product, but there is a high likelihood that sureties will exit the market altogether. This would lead to a crumbling of the oil and gas industry, as bonds are required to operate. This goes back to the

idea in the first place that environmental obligations cannot be abandoned, and as noted, that should not be permitted here.

6. In the interest of time and economy, the Sureties also join the objections by other interested sureties filed concurrently and incorporate herein the arguments, exhibits, authority provided in those objections. Thus, for the reasons briefed herein, as well as the reasons in those joined objections, the Disclosure Statement should be rejected because it does not adequately describe or identify a proposed plan of reorganization that could be confirmable by this Court.

## BACKGROUND AND PROCEDURAL HISTORY

7. As part of operating their business, the Debtors are required under state and/or federal laws to secure surety bonds tied to P&A responsibilities. As it relates to the Sureties, the following bonds were issued on behalf of the Debtors (or some combination of the Debtors and its affiliates):

- A $100 million performance bond issued by Liberty, Hanover, and Travelers in favor of Noble Energy, Inc. ("Noble") tied to the Neptune Spar, wells, and associated subsea equipment.

- A $90 million performance bond issued by Travelers and XL in favor of Noble tied to the PSA between the Debtors and Noble dated February 14, 2018. Upon information and belief, this bond (along with a companion bond issued by two other sureties) covered all Noble assets other than the Neptune Spar, wells, and associated subsea equipment.

- A $55 million performance bond issued by Liberty and another surety (Sirius America Insurance Company, who has objected to the Disclosure Statement) in favor of Marathon Oil relating to the Troika Field, including wells, pipelines and subsea infrastructure.

- A $1.9 million performance bond issued by Liberty in favor of XH, LLC (and Apache is related as well) tied to the East Cameron Field.

- A $1.7 million right-of-way bond issued by Hanover in favor of Marathon and BOEM related to Troika.

8. In connection with these bonds, the Debtors and/or affiliates executed various contractual agreements of indemnity in favor of each surety and are obligated to each surety as a principal under applicable state surety common law. These indemnity agreements are collectively attached as Exhibit 1.

9. On August 3, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10. On September 14, 2020, the Court entered the *Final Order (I) Authorizing Debtors to (A) Continue Insurance Programs, and Surety Bond Program, and (B) Pay Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief*.[6]

11. On January 1, 2021, the Debtors filed the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "Disclosure Statement").[7] Also on January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "Plan").[8]

12. The Disclosure Statement of the Debtors indicates an intention to abandon in full all assets covered by the $100 million Neptune Spar bond, as well as selected, cherry picked assets covered by the $90 million Noble bond (e.g., Swordfish G15441 and G15445) without the provision of funds or other support for P&A responsibilities. The two bonds related to Troika would be in the bucket of assets sold to the credit bid purchaser. The final bond related to East Cameron would be divested into FWE I.

---

[6] Dkt. 340

[7] Dkt. 723

[8] Dkt. 722

## ARGUMENTS AND AUTHORITIES

A.    **Summary of Objection**

13.    Section 1125 of the Bankruptcy Code requires a debtor to disclose adequate information needed for an interested party to assess the appropriateness of the proposed plan, taking into account the complexities of the case. *See generally, Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988). In the case of the Disclosure Statement, although lengthy, there is critical information missing; there are also patent deficiencies in light of the overall proposed plan. These include:

    a.    The stated intention to "abandon" environmental responsibilities, which would be in contravention of the Debtors' obligations under state and/or federal law.

    b.    The notion that the Debtors can "abandon to" under Section 554, which is impermissible.

    c.    Lack of cost analysis and related information that would permit the Sureties or other creditors to evaluate Debtors' proposal to "abandon" the P&A responsibilities and related assets. In particular, Debtors have not provided sufficient financial detail on whether additional capital improvements to the Neptune Spar could extend its useful life.

    d.    Lack of any information on a surety bond program for any reorganized entity, including the lender credit bid purchaser. As bonds are financial accommodations that cannot be assumed and assigned, the credit bid purchaser should obtain new bonds that would replace any existing Debtor obligations, and this would involve execution of indemnity agreements, payment of premiums, etc. The Debtors cannot avoid indemnity obligations tied to P&A liability and essentially get surety credit

for free. None of these issues are properly addressed in the Disclosure Statement or the Plan, which would make the Plan patently unconfirmable.

e. An intention of the Debtors to slice and dice obligations – including PSAs and bonds – with some assets to be sold to a credit bid purchaser and some assets to be abandoned.

14. Accordingly, not only is the Disclosure Statement lacking necessary information, the information that has been provided reveals the plan would be patently unconfirmable. Accordingly, the Court should reject the Disclosure Statement as currently presented.

**B.     Abandonment of Environmental Obligations**

15. As noted at the outset of this Objection, this Court has held that "[a] bankruptcy petition is not a grant of immunity. Bankruptcy debtors are not different from any citizen in that they must comply with state and federal laws." *In re American Coastal*, 399 B.R. at 810; *see also Matter of H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998) ("Thus, a combination of Texas and federal law placed on the trustee an inescapable obligation to plug the unproductive wells, an obligation that arose during the chapter 11 proceedings.").

16. Thus, the Debtor and, while the case remains open, its Trustee has the duty pursuant to 28 U.S.C. § 959(b) to comply with state and federal laws, including the plugging and abandonment and decommissioning requirements regulated by the United States Department of the Interior. *In re American Coastal*, 399 B.R. at 811 ("The fact that the debtor does not intend to operate the property does not diminish its duty under § 959 to manage the property in accordance with state law."). The rationale for this lies in the U.S. Supreme Court's seminal opinion of *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 502, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

17. In analyzing a proposed abandonment under Section 554, the Supreme Court noted "[i]n codifying the judicially developed rule of abandonment, Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and federal laws." *Id* at 501. Accordingly, the Court went on to hold that "[n]either the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety." *Id.* at 502; *see also In re Peerless Plating Co.,* 70 B.R. 943 (Bankr. W.D. Mich. 1987) (implicit duty on the trustee to remediate by expending **all of the estate's unencumbered funds**) (emphasis added); *In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118, 122 (6th Cir. 1987) (holding that a Chapter 7 trustee was not permitted to abandon or to possess property "in continuous violation of that same law.")

18. Importantly, the presence of predecessors in the chain of title or any surety bonds does not impact this analysis or otherwise relieve the Debtors of their primary responsibility to address environmental issues, including P&A obligations. This Court has held that "a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law does not change just because another entity has the same obligation." *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *7 (Bankr. S.D. Tex. Mar. 18, 2014); *see also H.L.S. Energy Co., Inc.*, 151 F.3d 434 at 436. Thus, the Debtors cannot use the Bankruptcy Code to escape such an obligation.

19. As for the Disclosure Statement, there is no information as to the impact of any proposed abandonment vis-à-vis regulatory and environmental responsibilities, nor does the Disclosure Statement reflect the Department of the Interior's perspective as the governing body (i.e., BOEM and BSEE). Additionally, to the extent the proposed abandonment triggers regulatory and environmental obligations, the Disclosure Statement fails to provide information explaining

how those obligations would be satisfied. This is not a Chapter 7 liquidation, and as such, the Debtors are required to set aside capital to address their P&A responsibilities. There is no information in the Disclosure Statement that indicates the Debtors could not meet these obligations; to the contrary, they could be satisfied, but the Debtors believe it would be strategically advantageous to abandon the bad assets and walk away from that liability. This is impermissible, and as such, the Plan is patently unconfirmable on this ground alone.

C.  **The Debtors Cannot "Abandon To"**

20. The Debtors intend to abandon property to predecessors in the chain of title, purportedly pursuant to Section 554 of the Bankruptcy Code. Specifically, the Debtors state:

> Immediately upon the occurrence of the Effective Date, certain of the Debtors' assets (the "Abandoned Properties") **will be abandoned** pursuant to sections 105(a) and 554(a) of the Bankruptcy Code **to entities who are predecessor owners** in the chain of title or co-working interest owners (collectively, the "Predecessors") . . . .[9]

21. "[U]pon abandonment . . . the trustee is . . . divested of control of the property because it is no longer part of the estate . . . . Property abandoned under [Section] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (quoting 5 COLLIER ON BANKRUPTCY § 554.02[3]) (citing 11 U.S.C. § 554; *In re Lair*, 235 B.R. 1, 22 (Bankr. M.D. La. 1999)). This is why a sister court in this District has found:

> Property may not be abandoned by the Debtor's estate directly to Amegy because the Code contemplates that property is either (a) "abandoned to the debtor" when the case is closed; See 11 U.S.C. § 554(c); or, if the case is not yet closed, (b) abandoned to no one in particular, leaving anyone who claims to have any interest in the property to take whatever action under applicable law they deem appropriate to protect their interest. Here, because the case is not closed, the Property can only be abandoned to no one in particular.

---

[9] Dkt. 723, pg. 3, 9 (emphasis added)

**OBJECTION TO DISCLOSURE STATEMENT AND/OR CHAPTER 11 PLAN**                            Page 9

*In re Perry*, 394 B.R. 852, 856–57 (Bankr. S.D. Tex. 2008) (Bohn, J.).

22. In addition, even if the Debtors could "abandon to" (which they cannot), there is no detail in the Disclosure Statement indicating any sort of agreement by the predecessors in the chain of title. Indeed, Noble – the obligee on bonds for multiple assets that the Debtors seek to abandon – has objected to the Disclosure Statement because of the attempt by the Debtors to impermissibility shift liability. It is likewise expected that other interested parties will object, including multiple, major predecessors, as well as BOEM and/or BSEE. This, of course, makes sense as any regulatory body necessarily needs to approve the transfer of a lease. *See e.g.*, 43 C.F.R. §§ 3512.17, 3512.25. The way that the Disclosure Statement and/or Plan are set up circumvents the regulations governing the transfer and effectively takes the regulatory body out of the process completely as the entity responsible for oversight. A debtor should not be permitted to use the Bankruptcy Code to get around these regulations – this is the same rationale as why a debtor should not be able to avoid its environmental responsibilities.

23. To the extent necessary, the Sureties also object to the idea that any of the abandoned properties could be "deemed rejected" as indicated by the Debtors in Section 5.12 of the Plan. In the interest of economy, the Sureties will not set forth all of the arguments in this Objection, but for the same reasons why a debtor cannot avoid environmental responsibilities, as well as the nature of a suretyship obligation, the Debtors should not be permitted to "reject" bonded assets and walk away from their primary obligations.

**D.** **The Disclosure Statement Does Not Address the Current or Future Surety Program**

    *i.*    *Principles of Suretyship and the Current Bond Program*

24. Unlike insurance, which is a two-party relationship, surety bonds are tripartite agreements in which the named principal is the primary obligor and the surety is the secondary

obligor on the bonded obligation owing to the obligee. *Nat'l Am. Ins. Co. v. Boh Bros. Const. Co., Inc.*, 700 So. 2d 1363, 1366 (Ala. 1997) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985)); *A.J. Kellos Constr. Co. v. Balboa Ins. Co.*, 495 F. Supp. 408, 412 (S.D. Ga. 1980) (citing RESTATEMENT OF SECURITY § 82 (1941)); *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 139 n.19, 83 S. Ct. 232, 236, 9 L. Ed. 2d 190 (1962) ("Suretyship is not insurance.").

25. As a result, "[while a]n insurer expects losses, and they are actually predicted . . . [i]n contrast, a surety bond is written based on an evaluation of a particular contractor and the capacity to perform a given contract. Compensation for the issuance of a surety bond is based on fact specific evaluation of the risks involved in each individual case. **No losses are expected**." *Buck Run Baptist Church v. Cumberland Surety Insurance Co., Inc.*, 983 S.W. 2d 501, 504-05 (Ky. 1998) (emphasis added). This is the primary reason why indemnity is at the very heart of suretyship. ROBERT F. CUSHMAN ET. AL, HANDLING FIDELITY SURETY, AND FINANCIAL RISK CLAIMS 162 (2nd ed., Wiley 1990).

26. As a requirement of bonding, the Debtors executed multiple contractual agreements of indemnity in favor of each of the Sureties. Generally, these indemnity agreements obligate the Debtors to: (a) pay all premiums due; (b) indemnify and hold harmless the Sureties from and against any claim or liability arising as a result of having issued any bond, (c) procure the discharge and release of any bond, and/or (d) post collateral as determined by a surety to be necessary to protect against possible loss. Yet, these indemnity agreements simply reiterate what is already the common law. *See* Lawrence Lerner and Peter Karney, *Ch. 13, Salvage/Subrogation Rights, in* BOND DEFAULT MANUAL 449, 453-56 (Duncan L. Clore et al. eds., 3rd ed., Am. Bar. Ass'n 2005).

27. A leading treatise on suretyship explains:

> A promisor in suretyship is entitled to full indemnity from the principal for all loss occasioned by the default of the latter, and may call upon him for reimbursement,

> not only for what he is required to pay in satisfaction of the debt, but also for all reasonable expenses incurred in the matter of the adjustment of his liability. If the surety is sued he may recover the costs of litigation from the principal. Where a joint action is brought against the principal and surety there is additional justification for the rule that the surety may recover costs of the principal.

ARTHUR STEARNS AND NATHAN P. FEINSINGER, THE LAW OF SURETYSHIP 512 (4th ed., The W.H. Anderson Company 1934); *see also* RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR. § 22 (1996) ("when the principal obligor is charged with notice of the secondary obligation it is the duty of the principal obligor to reimburse the secondary obligor. . . .").

28. Common law indemnity has been continually enforced by Texas Courts since at least 1931. *Fox v. Kroeger*, 35 S.W.2d 679, 681 (1931); *see also Felker v. Thomas*, 83 S.W.2d 1055, 1058-59 (Tex. Civ. App.—El Paso 1935, no writ); *Texas Constr. Associates, Inc. v. Balli*, 558 S.W.2d 513, 519-20 (Tex. Civ. App.—Corpus Christi 1977, no writ); *Am. Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W.2d 173, 175 (Tex. App.—Hous. [14th Dist.] 1989, no writ); *Old Republic Sur. Co. v. Palmer*, 5 S.W.3d 357, 362 (Tex. App.—Texarkana 1999, no pet.).

29. Accordingly, the Debtors have not only a contractual obligation, but a common-law obligation, to honor their principal responsibilities under any surety bond, and in the event of a loss by the surety, an unmistakable obligation to indemnify all losses that are incurred. The Debtors should not be permitted to use the Bankruptcy Code as an end around these responsibilities. Moreover, as addressed *infra*, as surety bonds are financial accommodations that cannot be assigned, the Debtors must address their ongoing responsibilities as part of any proposed reorganization and/or liquidation. Nothing in this regard, however, is addressed in the Disclosure Statement; moreover, the notion that the Debtors can walk away from indemnity responsibilities would make any plan patently unconfirmable.

30. This is not a case where the Debtors are simply going out of business and will cease to exist. They very much will continue to exist and have made clear (with apparently the input of the lenders) an intention to strategically select the best assets. Indemnity, however, must flow and continue, and as noted, bankruptcy is not a tool for allowing a party to get credit for free – particularly surety credit.

ii. *Lack of Disclosure on a Future Surety Program*

31. Surety bonds are financial accommodations. *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 49 B.R. 440, 446 (Bankr. N.D. Iowa 1985); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th Cir. 1992); Michael L. Cook & Gerald F. Munitz, BANKRUPTCY LITIGATION MANUAL, *Assumption of Executory Contracts* § 6.03 (2021).

32. Accordingly, because a surety bond is necessarily an extension of credit tied to underwriting standards for each issuing surety, a surety is never under an obligation to extend surety credit on a go forward basis or to an entity that has not been approved by underwriting. For this reason, bonds issued by a surety (whether pre-petition or post-petition) cannot be assigned and do not simply transfer through the bankruptcy to a reorganized entity, a purchaser, or any other interested party. The Sureties rely on this aspect of surety bonding when underwriting surety bonds and changing the non-assignability of the surety bonds would fundamentally alter the risk underwritten by each Surety. The Disclosure Statement, however, does not recognize this feature of surety bonding, whether dealing with the assets that are proposed to be abandoned or the assets that would be purchased by the credit bid lender group (or, for that matter, any assets that would ultimately be divested to FWE I).

33. If the credit bid purchasing group has a desire to operate wells on a go forward basis, and thereby take on P&A obligations, that necessarily will require bonding pursuant to federal and/or state laws. The current bonds issued on behalf of the Debtors (and/or any affiliates) will not transfer to any purchasing entity. As noted above, the Government has oversight when it comes to the transfer of a permit or lease. Indeed, the CFR specifically contemplates a new bond being provided in the case of a transfer. *See* 43 C.F.R. § 3453.2-4 (". . . the transferee shall submit either a written consent from the surety to the substitution of the transferee as principal or a new bond with the transferee as principal.").

34. The Disclosure Statement is silent about how the credit bid purchasing group would handle bonding needs. While the right answer is for that group to obtain new bonds after going through the standard underwriting process (which would entail paying premiums, execution of indemnity agreements, and possibly the posting of collateral), there is no indication that this has been addressed or even investigated by the credit bid group. Thus, to the extent that there is some misbelief that the credit bid group can simply have the current bonds ride through the bankruptcy, that is improper and would make any plan patently unconfirmable.

35. The same is true with respect to any assets that flow into FWE I. As the Debtors contemplate a divestiture of assets and formation of a new entity, that entity necessarily must go through the rigors of the normal underwriting process. Thus, although the Sureties are hopeful that FWE I will be properly capitalized (although this is not apparent from the face of the Disclosure Statement) to honor P&A obligations, the very fact that there is a new entity handling those obligations requires replacement of any existing bonds. This most readily relates to the Liberty bond relating to the East Cameron Field that is identified above.

### E.   Bonds and the Underlying Assets are not Divisible

36. As noted, bonds – like other lines of credit – are not, by their very nature, transferable, assignable, or assumable without the consent of the issuing surety and a cure of all defaults. The same rationale applies in the sense that they are not divisible. In the present case, bonds were issued to address the P&A obligations of the Debtors in connection with purchase of assets from predecessor entities – in the case of the Sureties, Noble and Marathon. The Debtors have indicated a plan to pick certain assets purchased as part of a single PSA with Noble and bonded by Travelers and XL, abandon the assets they do not like (i.e., Swordfish leases), and then try and sell the assets they do like to the credit bid group of lenders (presumably this was also part of negotiating more favorable purchase by these lenders). Bonds, however, do not work that way. As noted, if there is any permutation of the underlying asset base, that involves replacement of the bond. While there is a separate question as to whether or not the Sureties should have any liability if any sort of abandonment is approved by this Court, certainly bonds cannot be chopped up and apportioned to various buckets. This goes back to the idea that there needs to be new bonds on behalf of any operator on a go forward basis.

37. Ultimately, the Disclosure Statement is silent on any of these issues and does not contain adequate information for the Sureties – or any other interested party – to understand how suretyship would look for the attempted split of the bonds.

### RESERVATION OF RIGHTS AND PRAYER

38. The Sureties reserve all of their rights, claims, defenses, and remedies with respect to the proposed Disclosure Statement and/or Plan of Reorganization, including the right to amend or supplement this Objection, submit additional briefing, participate in any discovery or be heard

in any hearing or trial related to the Disclosure Statement and/or Plan. The Sureties further reserve any and all rights under any bond, contract, indemnity agreement, or applicable law.

39. For the foregoing reasons, the Sureties request that the Court reject the Disclosure Statement for failing to provide creditors with adequate information, or in the alternative, rule that the Disclosure Statement provides for a patently unconfirmable Plan on which votes should not be solicited and, in each instance, grant such other relief as may be just and proper.

Dated: March 16, 2021

> Respectfully submitted,
>
> **LANGLEY LLP**
>
> */s/ Brandon K. Bains*
> Keith A. Langley
> State Bar No. 11919500
> Brandon K. Bains
> State Bar No. 24050126
> P.O. Box 94075
> Southlake, TX  76092
> Telephone: 214.722.7160
> klangley@l-llp.com
> bbains@l-llp.com
>
> **ATTORNEYS FOR THE HANOVER INSURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY, TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, AND XL SPECIALTY INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all parties receiving electronic notification in this case from the Court ECF system on this the 16th of March 2021.

> */s/ Brandon K. Bains*
> Brandon K. Bains