IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, et al. | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**HCC INTERNATIONAL INSURANCE COMPANY PLC'S <u>CORRECTED</u>[2] OBJECTION TO THE DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF <u>FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS</u>**
[Relates to Docket No. 723]

HCC International Insurance Company PLC ("***HCCI***") files this objection to the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Docket No. 723] (the "***Disclosure Statement***")[3], and in support would show the Court as follows:

**SUMMARY**

1. The Disclosure Statement cannot be approved by the Bankruptcy Court because it lacks "adequate information" as required by section 1125(a) of the Bankruptcy Code. Further, there are a number of defects set forth in the Plan and Disclosure Statement that make the Plan inherently and/or patently unconfirmable, which also preclude approval of the Disclosure Statement.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Exhibit 1 was inadvertently omitted from the previously-filed version of this Objection.

[3] Just prior to the filing of this objection, the Debtors filed an Amended Disclosure Statement [Docket No. 1022]. HCCI has not had an opportunity to review the Amended Disclosure Statement in detail, but an initial review suggests that the majority of HCCI's objection have not been addressed. HCCI reserves the right to file any additional objections to the Amended Disclosure Statement.

1

2. The Disclosure Statement is woefully insufficient given the size of the Debtors' operations and the complexity and breadth of the assets involved. In part, these Disclosure Statement deficiencies include:

   i. The Disclosure Statement contains very little information regarding the projected financial resources of FWE I, an entity to be created under the Plan. In particular, the Disclosure Statement contains no information reflecting the value of FWE I's reserves or its expected cash flow. Thus, there is no objective means to evaluate FWE I's viability post-confirmation. This is particularly important in light of the stated restrictions on FWE I's ability to acquire assets or access the capital markets.

   ii. The Disclosure Statement lacks sufficient information regarding the source and/or whereabouts of funds available to FWE I for decommissioning, which appears to be FWE I's primary purpose.

   iii. The Disclosure Statement lacks sufficient information regarding the economics of the proposed Apache agreement. Under the Plan, Apache is waiving certain claims against the Debtors including a claim for $5,000,000.00 in "funds allegedly improperly withdrawn from Trust A." [Apache Term Sheet Implementation Agreement p.2]. There is no information related to how the allegedly withdrawn funds were used or how their alleged improper withdrawal will impact FWE I's and FWE III's ability to perform their decommissioning obligations. The Disclosure Statement also fails to state the source of the funds that will be required to pay Apache's purported fees and expenses of up to $4,000,000.00, which are required under the agreement.

   iv. The Disclosure Statement does not contain sufficient information to determine how the Debtors' indemnity obligations to HCCI will be addressed under the Plan. The Plan, which seeks to implement the Debtors' agreement with Apache, appears to divide the bonds and letters of credit (hereinafter "Bonds", as defined below) between FWE I and FWE III but does not indicate how that division is proposed to be made or how the indemnity obligations related to the Bonds will be addressed. Further, the Disclosure Statement lacks any legal or factual basis for dividing the Bonds between the entities or for the proposed (but undisclosed) treatment of the associated indemnity obligations.

   v. The Bonds cover multiple properties and leases, and the Plan and Disclosure Statement appear to divide various properties and leases between FWE I and FWE III. The Disclosure Statement lacks sufficient information regarding how the Bonds covering multiple properties and/or leases will be (or can properly be) divided between these entities, if at all.

3. Further, the Disclosure Statement and Plan contain a number of defects that render the Plan unconfirmable on its face. In part, these defects include:

      i. The Plan seeks to impermissibly alter the Decommission Agreement between the Debtors and Apache, thereby directly prejudicing HCCI's rights under the agreement and increasing the risk to the related Bonds. **Exhibit 1** attached hereto identifies additional amendments that the Debtors and Apache are attempting to make to the Decommission Agreement via the plan process.

      ii. The Disclosure Statement and Plan seek to implement improper third-party releases against non-Debtor entities. Such releases appear to potentially include releases of any claims HCCI may have against Apache (both non-debtor entities).

      iii. The Plan purports to alter the integrated arrangement that underlies and supports the Bonds, thus forcing HCCI into acceptance of the continuance of its Bonds with one entity coupled with the potential the transfer (or rejection) of its indemnity agreements to another entity. Given the integrated transactional nature of these arrangements, separating the Bonds from their respective indemnity agreements is improper, and the transfer of such Bonds to different entities without the surety's consent is also improper.

      iv. The Bonds and their related indemnity agreements are financial accommodations. Without consent from the relevant surety, such financial accommodations cannot be assumed or assigned pursuant to 11 U.S.C. § 365(c)(2).

4. Additionally, in their motion seeking approval of the Disclosure Statement [Docket No. 724] (the "*Disclosure Statement Motion*"), the Debtors seek to impose voting restrictions on some Class 6 creditors that are inconsistent with the Bankruptcy Code and its underlying policies. In order to ensure that its rights are not improperly abridged, HCCI objects to this relief as well.

5. Based on the foregoing and as set forth more fully below, the Court should deny approval of the Disclosure Statement.

## BACKGROUND

6. On August 3, 2020 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7. The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3

8. The Debtors, together with the non-debtor affiliates (collectively, the "***Company***") are an independent exploration and production company operating in the Gulf of Mexico.

9. HCCI has a financial interest in two (2) guarantees issued on behalf of the Debtors (the "***Bonds***") to secure certain of the Debtors' payment or performance obligations to Apache Corporation in connection with the decommissioning agreement date September 30, 2013, as varied by five subsequent amendments. HCCI's aggregate liability under these Bonds is $100,000,000.00. HCCI's financial interest in these Bonds arises from various agreements in place with the issuers of such Bonds, entered into with the knowledge of the Debtors and is supported by a General Indemnity Agreement dated January 14, 2016 between Fieldwood Energy LLC and certain of its affiliated debtors. A schedule of Bonds and their respective issuers is set forth below:

| Detail | "Everest Surety Bond" | "Deutsche Bank SBLC" |
|---|---|---|
| **Reference Number** | ES00001441 | 839BGC1600430 |
| **Nature** | Surety Bond | Standby Letter of Credit |
| **Issuer** | Everest Reinsurance Company | Deutsche Bank AG New York Branch |
| **Principal** | Fieldwood Energy LLC | Fieldwood Energy LLC |
| **Beneficiary** | Apache Corporation | Apache Corporation |
| **Penal Amount** | $ 75,000,000 | $ 50,000,000 |
| **HCCI's Interest** | $ 50,000,000 | $ 50,000,000 |
| **HCCI's Reference** | BU/MA/00197 | BS/MA/00089 |

## OBJECTION TO DISCLOSURE STATEMENT

10. The Disclosure Statement lacks the necessary "adequate information". Section 1125(b) of the Bankruptcy Code states that the proponent of a plan may not solicit acceptances or rejections of a proposed plan from holders of claims or interests unless the proposed plan is transmitted to the holders with "a written disclosure statement approved, after notice and a

4

hearing, by the court as containing adequate information." Section 1125(a)(1) defines "adequate information" in this context as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, <u>that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan</u>, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information

11 U.S.C. §1125(a)(1) (emphasis added). "[A] proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferritti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). A disclosure statement must provide enough information to enable a "reasonable creditor" to make an informed decision as to whether or not to accept a proposed plan. *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).

11. The determination of what is adequate information is subjective and made on a case by case basis. *Id.* Ultimately, what is "adequate information" is within the discretion of the bankruptcy court. *Id.* The Disclosure Statement, in its current form, is incomplete and vague and, therefore, does not provide adequate information as required by the Bankruptcy Code.

<u>*The Disclosure Statement cannot be approved because it lacks information that is crucial to the evaluation of the proposed Plan.*</u>

12. HCCI has identified a number of serious deficiencies in the information provided to creditors through Disclosure Statement. One of the most glaring of these deficiencies is the Disclosure Statement's lack of information regarding the source of funds available to FWE I for

5

decommissioning and any other operations. The Disclosure Statement does not provide any information regarding the value of the reserves or projected cash flow related to the properties that are proposed to be allocated to it under the Plan. This type of information is critical to a determination as to whether FWE I will be able to perform its allocated obligations to operate and decommission the properties in question.

13. Information regarding FWE I's financial viability is important for at least two reasons. First, as provided in the Apache Term Sheet, FWE I will not be permitted to incur additional debt from any entity other than Apache. This means that Apache will be able to act as a gatekeeper should FWE I require additional capital to continue operations or perform its decommissioning obligations. The only additional capital contemplated by the Apache Term Sheet is the "Standby Facility" which cannot be utilized until the funds in the Trust A account and bonds and letters of credit have been exhausted or are otherwise unavailable to pay or reimburse Apache for decommissioning. If Apache chooses not to provide the required capital, FWE will not be able to obtain it elsewhere without Apache's permission. This limitation on future access to capital and the requirement to call upon the Bonds prior to accessing the sole source of permitted additional funding contemplated by the Apache Term Sheet emphasizes the need for sufficient information to evaluate FWE I's expected post-confirmation financial ability.

14. Additionally, this information is essential to evaluate whether the proposed allocation of assets between FWE I and FWE III will result in a fraudulent transfer. The Texas divisive merger statute under which the proposed division of FWE into FWE I and FWE III will be made does not protect the allocation of assets from a claim of fraudulent transfer. As the court concluded in *Kerr McGee Corp. v. Tronox, Inc. (In re Tronox, Inc.)*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013), a series of corporate restructurings that culminates in a resulting entity's

6

undercapitalization can constitute an actionable fraudulent transfer. Given the nature of the proposed divisive merger, creditors, including HCCI, should be given sufficient information through the Disclosure Statement to determine whether that transaction will give rise to a fraudulent transfer.

15. There are other more specific financial issues related to FWE I that the Disclosure Statement does not address. For example, there is no mention of the source of the funds that will be required to cover Apache's purported fees and expenses of up to $4,000,000.00. Additionally, the Plan lacks any information regarding the $5,000,000.00 in "funds allegedly improperly withdrawn from Trust A." [TSA p.2]. There is no information as to how the Debtors purportedly used these funds or how their alleged improper withdraw may impact FWE I and FWE III and their ability to perform their decommissioning obligations.

16. The Disclosure Statement also appears to contain a number of inconsistencies, leaving creditors without sufficient information to understand how the proposed Plan will actually work. Of particular interest to HCCI is the fact that the Disclosure Statement provides both inconsistent and incomplete information as to how the Debtors' indemnity obligations to HCCI will be addressed under the Plan. The Plan, which seeks to implement the Debtors' agreements with Apache, appears to divide Bonds between FWE I and FWE III, but the Disclosure Statement contains little to no legal or factual basis for how the Bonds will be divided between the entities or how the associated indemnity obligations will be addressed. Moreover, there appear to be inconsistencies in the Disclosure Statement regarding which obligations will follow the assets.

17. For example, Section 4(ix) of the Apache Term Sheet Implementation Agreement (the "*TSA*") states:

> "*With respect to all bonds and letters of credit constituting Decommissioning Security, all claims* for premiums, fees, reimbursement, indemnification, or any other claims, fixed, contingent, liquidated, or otherwise *against the Debtors* held by the companies issuing the bonds or letters of credit, *shall neither be allocated to nor become the obligations of FWE I* under the Plan of Merger.  [Apache Term Sheet Implementation Agreement § 4(ix)].

On the other hand, the Section titled "Assumption of Obligations" of the Term Sheet for Fieldwood Energy LLC Restructuring (the "***Term Sheet***") states:

> *Fieldwood I shall continue to be responsible for all of Fieldwood's obligations under the Decommissioning Agreement* dated as of September 30, 2013 among the Apache PSA Parties and the Fieldwood PSA Parties (as amended, the "Decommissioning Agreement") and the PSA, *including* all related contracts, and *all contracts relating to insurance, surety bonds*, letters of credit, and other decommissioning security assets *and all other obligations relating to the Legacy Apache Properties* (except to the extent reimbursement or indemnification obligations with respect to the surety bonds and letters of credit are discharged through the bankruptcy), but shall not be responsible for any other obligations or Fieldwood related to its other assets.

18.     Thus, it is unclear whether the Plan proposes that FWE I "be responsible for . . . all other obligations relating to the Legacy Apache Properties," which would include the indemnity obligations associated with the Bonds, as the Term Sheet states, or whether the Plan proposes that the indemnification obligations associated with the FWE I Assets not "be allocated to nor become the obligations of FWE I," as the TSA indicates.  Given the fundamental nature of this important question, the Disclosure Statement's failure to provide clarity is a major defect.

19.     By way of another example of inconsistency, the Disclosure Statement asserts both that:

> "FWE I will engage in the ownership and operation of the FWE I Assets, including addressing the FWE I Obligations in accordance with the applicable laws and regulations and the Decommissioning Agreement" [Disclosure Statement § I.D.1.].
>     and

8

> "To the extent the Decommissioning Agreement is an executory contract, it will be assumed and become an obligation of FWE I under the Plan of Merger." [Disclosure Statement § I.D. n.7].

But the Disclosure Statement sidesteps this question of whether the Decommissioning Agreement is an executory contract to be assumed. If the Debtors intend to treat the Decommissioning Agreement as an executory contract, the Disclosure Statement should address how the cure claims under that Agreement will be addressed and how the Bonds and their associated indemnity obligations—required under the Decommissioning Agreement—will not be obligations of FWE I as Section 4(ix) of the TSA asserts. Alternatively, if the Debtors believe that the Decommissioning Agreement is not an executory contract, the Disclosure Statement should state how it is to be treated under the Plan.

20. As reflected above, the Disclosure Statement is inconsistent and lacks legal and factual basis regarding the treatment of HCCI's Bonds and related indemnity agreements. The Disclosure Statement lacks adequate information for HCCI to determine how the Debtors intend to treat its Bonds and related indemnity agreements under the Plan.

21. The Disclosure Statement is also inconsistent in its description of the assets of the Debtors are to be allocated under the Plan. It describes a series of transactions pursuant to which various oil and gas leases owned by the Debtors are to be allocated into four separate buckets, *i.e.*, those allocated to FWE I, those retained by FWE III, those sold under the Credit Bid, and those to be abandoned. The information provided as to how the Debtors' leases will be allocated is both insufficient and contradictory. For example, some leases appear to be allocated to more than one of the four buckets. The Debtors should provide either revised lists reflecting the allocation of the lease or provide a detailed explanation why some leases appear in multiple buckets. If the Debtors are proposing to split certain leases between two or more buckets (*e.g.*, between FWE I and FWE III) and presumably split the Bonds associated with those leases in the

9

same manner, HCCI asserts that its Bonds, and their associated indemnity agreements, cannot be divided.

*The Disclosure Statement cannot be approved because the proposed Plan is unconfirmable on its face.*

22. It is well established that a disclosure statement should not be approved if the chapter 11 plan it describes is unconfirmable on its face. *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (compiling cases and citing In re Main St. AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999)) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed."); *see also In re Digerati Techs., Inc.*, No. 13-33264, 2014 WL 2203895, at *3 (Bankr. S.D. Tex. May 27, 2014) (Bohm, J.) (quoting *In re Beyond.com Corp.*, 289 B.R. 138 (Bankr. N.D. Cal. 2003)) ("[T]he court denied approval of the debtor's disclosure statement '[b]ecause the underlying plan is patently unconfirmable.'"); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible.") (internal citations omitted). There are several provisions of the proposed Plan that render it unconfirmable as written and, therefore, the Disclosure Statement should not be approved.[4]

23. The Plan seeks to impermissibly alter the Decommission Agreement between the Debtors and Apache, thereby directly prejudicing HCCI's rights under the Agreement and increasing its risk as to the related Bonds. While the Debtors and Apache may have the right to modify the Decommissioning Agreement, that right does not permit them to alter the Agreement in a manner that materially changes HCCI's risks while holding it to its original obligations.

---

[4] This is not a complete list of all of HCCI's objections to the Plan. HCCI brings these plan objections to the Court's attention solely for the purpose of demonstrating additional reasons why the Disclosure Statement should not be approved, and HCCI reserves its rights to raise these and all other objections to the Plan at the appropriate time.

10

**Exhibit 1** attached hereto identifies additional amendments that the Debtors and Apache are attempting to make to the Decommission Agreement via the plan process.

24. For example, Apache has agreed to provide the Fieldwood entities with significant releases for matters or defaults under the Decommissioning Agreement, including the release of decommissioning obligations that occured prior to the effective date of the Plan. These releases would include, among other things, any claims for misappropriation of funds, including the $5,000,000.00 allegation regarding Trust A. The scope of the proposed releases substantially increases the risk that FWE I and/or FWE III will lack sufficient funds to cover their current and ongoing decommissioning obligations; thereby increase the risk that the Bonds will be called.

25. The scope of the proposed releases under the plan also purports to implement releases against non-Debtor entities. The scope of these releases is beyond what is authorized under the Bankruptcy Code and applicable Fifth Circuit law. *See In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (compiling the following Fifth Circuit cases on the subject: *In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir. 1993); *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995)) ("These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions."). Moreover, these releases appear to potentially include releases of any claims HCCI may have against Apache (both non-debtor entities).

26. More problematic, the Plan appears to provide that the Bonds will be separated from their underlying indemnity agreements. This proposed outcome would drastically alter the integrated arrangement that underlies and supports the Bonds. As a result, HCCI would be

forced to continue to perform under its Bonds after their assignment to a new entity while its indemnity rights would remain with another entity (or, perhaps, be rejected or discharged). Given the integrated nature of the transactions and arrangements relating to the Bonds, separating the Bonds from their respective indemnity agreements is improper and unauthorized by the Bankruptcy Code. For the same reasons, the transfer of the Bonds to different entities without the surety's consent is also improper.

27. While it is less than clear from the Disclosure Statement whether the Debtors intend to treat the Bonds and their related indemnity agreements as executory contracts, it is clear that they should not be treated as such. The Bonds and their related indemnity agreements are financial accommodations. Section 365(c)(2) makes it clear that a contract or agreement that constitutes a financial accommodation is not subject to assumption and assignment—certainly not without consent from the relevant surety. This is an additional flaw in the Plan that renders it unconfirmable as written.

*The Debtors' attempt to unfairly restrict the voting rights of some Class 6 creditors should be denied.*

28. In addition to seeking approval of the Disclosure Statement, the Debtors also seek the Court's approval of the application of the following "hierarchy" to Class 6 Claims (and only Class 6 Claims):

> The amount of each General Unsecured Claim, for voting purposes only, shall be established pursuant to the following hierarchy:
>
> (a) If a Claim has been estimated or otherwise Allowed for voting purposes by order of this Bankruptcy Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Bankruptcy Court;
>
> (b) If (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement reached between the Debtors and the holder of the Claim (whether such stipulation, settlement, or

12

>agreement is filed or not), such Claim is temporarily Allowed in the amount set forth in the stipulation, settlement, or other agreement;
>
>(c) If neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a proof of claim timely filed in accordance with the Bar Date Order as of the Voting Record Date, *provided that, if the amount set forth on a timely-submitted proof of claim is wholly unliquidated, contingent, and/or disputed, then the Claim shall be temporarily Allowed for voting purposes in the amount of $1.00*; and
>
>(d) If neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules, provided that, if the Claim appearing on the Debtors' Schedules is unliquidated, contingent, disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes.

Disclosure Statement Motion, ¶ 38 (emphasis added).

29. This proposed "hierarchy" is unfair to holders of Class 6 Claims. First, it would automatically apply to all Class 6 Claims without requiring the Debtors to identify which claims fall into each of the four categories. Thus, Class 6 creditors would be left guessing as to how their claims will be affected by the Debtors' proposed treatment. Moreover, the relief requested by the Debtors does not address the treatment of Class 6 Claims that are only partially contingent or unliquidated.

30. Second, the Debtors' proposal unfairly shifts the burden of affirmative action to the Class 6 creditor. Rather than requiring the Debtor to specify which Class 6 Claims it contends are contingent or unliquidated, it puts the onus on the creditors to take action—perhaps unnecessarily—to ensure that their rights are protected in the event that the Debtors later take the position that their claims have been reduced for voting purposes under the proposed "hierarchy."

31. Third, the Debtors' proposal discriminates against the holders of Class 6 Claims. The proposed "hierarchy" applies only to Class 6 Claims and not to any other Class. This is discriminatory on its face and should not be allowed.

13

32. And finally, the Rule 3018(a) Deadline proposed by the Debtors is unworkable. The Disclosure Statement Motion asks that the Deadline be set as February 26, 2021. Disclosure Statement Motion, ¶ 40. As the Court is aware, that date has long passed. To the extent that the Court does approve the Debtors' proposed "hierarchy," the Rule 3018(a) Deadline should be set for a date that will give holders of Class 6 Claims sufficient notice and opportunity to make the filings necessary to protect their rights and to obtain a ruling from the Court on those filings.

## CONCLUSION

33. In summary, the Disclosure Statement fails to provide adequate information necessary for an investor to make an informed judgment about the plan. The missing information is material. HCCI and the other creditors in this chapter 11 case, as in all such cases, are entitled to a meaningful and reasonably accurate disclosure statement that will allow them to fully evaluate the proposed Plan and its effect on their claims. This Disclosure Statement will not enable them to do so; therefore, it cannot be approved.

34. Additionally, there are serious flaws in the proposed Plan that also support denial of approval of the Disclosure Statement, and the Debtors seek to unfairly restrict the voting rights of the holders of Class 6 Claims.

## PRAYER

For the foregoing reasons, HCCI respectfully requests that the Court enter an order denying approval of the Disclosure Statement and granting HCCI such other and further relief as the Court deems just and proper.

Dated: March 16, 2021

Respectfully submitted,

*/s/ Elizabeth M. Guffy*
Philip G. Eisenberg
Texas Bar Number 24033923

        Elizabeth M. Guffy
Texas Bar Number 08592525
Simon R. Mayer
Texas Bar Number 24060243
Locke Lord LLP
600 Travis Street, Suite 2800
Houston, TX 77002
Telephone:  713-226-1200
Facsimile:  713-226-3717
Email: peisenberg@lockelord.com
      eguffy@lockelord.com
      simon.mayer@lockelord.com

*Attorneys for*
*HCC International Insurance Company PLC*

### Certificate of Service

    I certify that on March 18, 2021, a copy of the foregoing document was served electronically via the Court's Electronic Case Filing System on all parties registered for such service, including, but not limited to, counsel for the Debtors.

*/s/  Elizabeth M. Guffy*
Elizabeth M. Guffy