IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, et al.[1] | § | CASE NO. 20-33948 (MI) |
| | § | |
| Debtors. | § | Jointly Administered |

**MARATHON OIL COMPANY'S OBJECTION TO DEBTORS' DISCLOSURE STATEMENT, PROCEDURES FOR ASSUMPTION OF EXECUTORY CONTRACTS AND TRANSFER OF PROPERTY OF THE ESTATE**

[Relating to Docket Nos. 723 and 724]

Marathon Oil Company ("Marathon"), pursuant to § 1125 of title 11 of chapter 11 §§ 101 – 1532 (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), submits this Objection to Fieldwood Energy LLC's, and its affiliates (collectively, "Debtors'") Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures With Respect to Confirmation of Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates With Respect Thereto, and (VI) Granting Related Relief [Dkt. No. 724] (the "Motion") and the Disclosure Statement for the Joint Chapter 11 Plan Of Reorganization of

---

[1] Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

MARATHON'S OBJECTION TO DISCLOSURE STATEMENT        Page 1 of 15

Fieldwood Energy LLC and Its Debtor Affiliates [Dkt. No. 723] (the "<u>Disclosure Statement</u>").[2] In support of this Objection, Marathon states as follows:

## I.
## FACTUAL BACKGROUND

1. On August 3 and 4, 2020 (collectively, the "<u>Petition Date</u>"), Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107(a) and 1108. No trustee or examiner has been appointed in these cases.

2. On January 1, 2021, Debtors filed the Joint Chapter 11 Plan Of Fieldwood Energy LLC And Its Debtor Affiliates (the "<u>Plan</u>") [Dkt. No. 723-1] and the Disclosure Statement. The Plan reorganizes the Debtors via three separate transactions: (a) a credit bid sale; (b) the allocation of leases between FWE I and FWE III by divisive merger; and (c) the abandonment of the remaining leases and attempted imposition of decommissioning liabilities on its predecessors.

    **A.**    *The Credit Bid Sale*

3. The Plan provides for the credit bid sale of 117 federal and state oil and gas leases [Dkt. No. 723-1, pp. 90-93] to NewCo (a special purpose entity to be created by the Credit Bid Purchaser), which is owned by certain of Debtors' lenders.

4. NewCo, in turn, will hire the "vast majority of Debtors' employees and management team." [Dkt. No. 723, p. 17]. Neither NewCo, nor the valuable assets of Debtors, will be liable for the remaining environmental and decommissioning liabilities.[3] NewCo expressly

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Disclosure Statement, the Plan, and the Motion, as applicable.

[3] It is Marathon's contention, and one that it believes is not disputed, that the cash positive assets, after consideration of decommissioning costs versus the projected net revenue of continued operation of the wells, are what is being rafted into NewCo to the betterment of its secured lenders at the Predecessor creditors' expense.

excludes the assumption of liabilities related to the approximately 750 other leases currently owned by Debtors. [Dkt. No. 723-1, pp. 44-45]. The assets to be sold to NewCo could be used (and should be used) to satisfy all Debtors' current and anticipated decommissioning obligations. But instead, Debtors want to siphon valuable assets away for the benefit of their lenders and management, leaving the larger obligations for others to satisfy. Such terms violate key regulatory principles.

5. Additionally, there is no disclosure as to why the $224 million cash payment and capitalization of NewCo from the Credit Bid Purchaser would not be used to satisfy the outstanding environmental and decommissioning obligations on leases not sold to NewCo.

6. Relatedly, there is improper disclosure of the sources or uses of funds to be paid into and available for the estates.

B. *The Allocation of Select Leases Between FWE I and FWE III*

7. The Plan implements a divisive merger to transfer or "allocate" more than 550 leases to FWE I [Dkt. No. 723-1, pp. 94 – 108] and 21 leases to FWE III. [Dkt. No. 723-1, pp. 109 – 110]. The Debtors created FWE I to own and decommission certain legacy leases sold by Apache to Debtors. FWE I will be funded by cash flow from the allocated leases, up to $50 million from Debtors, and up to $400 million in credit provided by Apache to support the abandonment of wells and decommissioning of platforms. [Dkt. No. 723, p. 19]. In return, it appears that Apache is seeking a third-party release via this Plan.

8. The Disclosure Statement fails to disclose the purpose of FWE III or why it was created. On information and belief, those are the negative value "assets" that Apache was not responsible for, and there is not a "deep pocket" predecessor. But the Disclosure Statement itself contains no information about how or on what basis Debtors selected the leases that are to be

allocated to FWE III. There is no explanation why Debtors' capitalization of FWE III is a paltry $27 million although the BSEE estimates for its liabilities are in the $50-$80 million range to decommission the 21 leases allocated to FWE III (of which 16 have already terminated or been relinquished). No explanation is given on the methods FWE III will implement to raise the necessary cash to fulfill its decommissioning obligations. The Disclosure Statement is also silent on the timeline for FWE III to either decommission these leases or whether FWE III will be financially solvent to perform this work.

### C. *The Abandonment of Undesirable Leases to Predecessors*

9. There are unknown rights-of-way, rights-of-use, and other assets that will not be transferred to NewCo or transferred between FWE I and FWE III, among the 187 listed leases on Schedule F that constitute Abandoned Properties. [Dkt. No. 723- 1, pp. 111 – 116]. Debtors expressly intend to "return" all of the Abandoned Properties to unidentified Predecessors (defined as "entities who are predecessor owners in the chain of title or co-working interest owners"). [Dkt. No. 723, p. 14]. The Disclosure Statement neither identifies the underlying legal basis for returning the leases to the Predecessors nor are the Predecessors even identified.

10. It appears that the Debtors' lenders will release their liens on the abandoned assets, and those leases allocated to FWE I and FWE III, in an attempt to avoid the costs of maintaining and properly decommissioning their collateral.

## II.
## LEGAL ANALYSIS

### A. The Disclosure Statement Lacks Adequate Information as Required by Bankruptcy Code § 1125.

11. Marathon objects to the Disclosure Statement because it lacks information sufficient to allow creditors to make an informed decision on whether to accept or reject the Plan.

In many instances, it contains incomplete, inaccurate, or misleading information – or no information at all. The Disclosure Statement must be amended to address Marathon's objections and issues raised herein. If Debtors fail to do so, the Court should not approve the Disclosure Statement.

12. Bankruptcy Code §1125(b) requires that a disclosure statement contain "adequate information," which is defined as "information of a kind, and in sufficient detail . . . [to enable] a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a); *In re Texas Extrusion Corp*., 844 F.2d 1142, 1157 (5th Cir. 1988), cert. denied, 488 U.S. 926 (1988); *In re Divine Ripe, L.L.C*., 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016); *In re Applegate Prop., Ltd*., 133 B.R. 827, 829-31 (Bankr. W.D. Tex. 1991).

13. The obligation to provide adequate information is "pivotal." *Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc*., 157 B.R. 100, 102 (S.D. Tex. 1993). For a creditor to fairly evaluate the results of a proposed plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution."). Whether or not adequate information is given is left to the judicial discretion of the court and will necessarily be governed by the circumstances of the case. *See Mabey v. Southwestern Elec. Power Co*. (*In re Cajun Elec. Power Coop, Inc*.), 150 F.3d 503, 518 (5th Cir. 1998).

14. Courts consider numerous factors when determining the sufficiency of the information in a disclosure statement, including but not limited to: (i) a description of the available

assets and their value; (ii) the estimated return to creditors under a chapter 7 liquidation; (iii) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (iv) information relevant to the risks posed to creditors under the plan; and (v) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers. *See In re Divine Ripe, L.L.C*., 554 B.R. at 401-02 (listing 19 non-exhaustive factors set forth in *In re Metrocraft Pub. Servs., Inc*., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).[4]

      **B.**    *The Credit Bid Sale is inadequately disclosed.*

15. Here, the Disclosure Statement fails to provide sufficient information necessary for a hypothetical creditor to make an informed decision when voting on the Plan. In its current form, the Disclosure Statement is deficient with respect to critical Plan-related issues, and thus fails to

---

[4] *In re Metrocraft*, codifies 19 non-exhaustive factors for evaluating the adequacy of:

> 1) the events which led to the filing of a bankruptcy petition;
> 2) a description of the available assets and their value;
> 3) the anticipated future of the company;
> 4) the source of information stated in the disclosure statement;
> 5) a disclaimer;
> 6) the present condition of the debtor while in Chapter 11;
> 7) the scheduled claims;
> 8) the estimated return to creditors under a Chapter 7 liquidation; 9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
> 10) the future management of the debtor;
> 11) the Chapter 11 plan or a summary thereof;
> 12) the estimated administrative expenses, including attorneys' and accountants' fees;
> 13) the collectability of accounts receivable;
> 14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
> 15) information relevant to the risks posed to creditors under the plan;
> 16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
> 17) litigation likely to arise in a non-bankruptcy context;
> 18) tax attributes of the debtor; and
> 19) the relationship of the debtor with affiliates.

*In re Metrocraft*, 39 B.R. at 568.

satisfy the disclosure requirements of Bankruptcy Code §1125(a). There is insufficient disclosure of the Credit Bid Transaction. Just as importantly, there is no discussion regarding the steps the Debtors have taken to obtain the necessary consents and approvals from federal and state regulators.

16. The regulations require that every company demonstrate that it is qualified to own a lease or operate under a lease on the OCS. 30 C.F.R. § 556.400. BOEM may disqualify a company from acquiring a lease if that company (or its principals) fails to satisfy due diligence requirements on other leases (30 C.F.R. § 556.403(a) citing 43 U.S.C. § 1337(d)) or is determined to have an unacceptable operating performance. 30 C.F.R. § 556.403(c). In addition, BOEM must approve all transfers of non-economic lease interests. 30 C.F.R. § 556.700 et seq. BOEM may disapprove where the "transferor or transferee" has unsatisfied obligations, including well abandonment and decommissioning obligations. 30 C.F.R. § 556.704. The Disclosure Statement provides no information on either steps taken by Debtors to obtain necessary regulatory approvals or how NewCo will comply with these regulations or the outcome under the Plan if the Credit Bid Transaction is not approved by the regulators.

17. The Debtors have not disclosed the Credit Bid Purchase Agreement. Accordingly, the Debtors have not adequately explained NewCo's ability to fulfill its obligations. The Disclosure Statement omits information on the anticipated costs that NewCo must incur to (i) maintain lease platforms and facilities; (ii) remedy INCs relating to the unknown Credit Bid Acquired Assets; (iii) operate such assets; (iv) permanently abandon wells; and (v) decommission lease platforms and facilities. The Disclosure Statement also omits any financial analysis of the projected revenues from the unknown Credit Bid Acquired Assets.

18. The Debtors have not provided a detailed plan on how they will satisfy their financial obligations to BOEM. Every operator is required by the regulations to provide financial assurance in the form and amount approved by BOEM. These financial assurances are essential to guarantee the performance of lease obligations as a condition to the approval of any transfer of lease interests. *See* 30 C.F.R. § 556.900 et seq. The Disclosure Statement; however, contains no information regarding NewCo's provision of financial assurance to BOEM.

19. There is no Disclosure of the Allocation of the Cash Portion of the Credit Bid Transaction. Debtors have not disclosed how the $224 million Credit Bid Purchaser will be allocated amongst the estates.

20. There is insufficient disclosure regarding the approximately 750 leases to be allocated to FWE I or FWE III, or those leases Debtors are attempting to forcibly return to the Predecessors. There is no information on the chain of title to permit Marathon to determine the full extent of its decommissioning liability. There are also leases between Marathon and one or more Debtors that are missing from the various lease exhibits attached to the Disclosure Statement. Although that list may subsequently change, it is insufficient to allow Marathon to properly determine its decommissioning liability. The Disclosure Statement must also provide information on the extent of outstanding well abandonment and platform decommissioning costs for each lease. The Debtor has this information given the scope of its decommissioning operations, and it should be disclosed [Dkt. No. 723, p. 27].

C. *The use of a divisive merger allocating certain assets of Debtors between FWE I and FWE III is inadequately disclosed.*

21. The Disclosure Statement has not provided adequate information on how the divisive merger will be accomplished within the requirements of the applicable federal regulations and the Bankruptcy Code. The Disclosure Statement fails to address whether contracts allocated

to FWE I and FWE III under the Plan are assumed and assigned. The contracts include leases, joint operating agreements, production handling agreements, purchase and sale agreements and other related contracts necessary to understand Marathon's decommissioning liability. Marathon has no information about how and when contract cure notices will be provided, how and when adequate assurance of future performance will be provided, and the process for it to assert the rights and remedies provided in the Bankruptcy Code. Without this information, Marathon cannot determine if the Plan adequately addresses the necessary cost to Debtors to cure any defaults as to those contracts and whether FWE I and FWE III will be solvent enough to provide adequate assurance of future performance to it.

22. There is inadequate disclosure regarding the Plan's transfer of assets and liabilities to FWE I. The Disclosure Statement does not provide information regarding the extent of interests to be transferred to FWE I, including whether the interests are the entirety of Debtors' interests in a particular lease or unit, undivided as to an entire lease or unit, or specific to wells and platforms on the lease or unit. The Plan seeks, at least with respect to some interests, to transfer the same lease to FWE I and forcibly return the same lease to Predecessors. There is no information or explanation provided to explain this treatment. The Disclosure Statement lacks necessary information to permit Marathon to determine the Debtors' "Incremental Interests" in leases, wells, and platforms or facilities that will be transferred to FWE I. [Dkt. No. 723- 1, pp. 413-416].

23. There is inadequate disclosure regarding the Plan's allocation of assets and liabilities to FWE III. There is no disclosure of the 21 leases allocated to FWE III. There is inadequate disclosure of how FWE III will receive additional cash to operate and decommission the 21 leases and their related wells and platforms. There is also no information about the $9 million in security bonds. There is inadequate information of how FWE III will be in a position

to provide adequate assurance to BOEM that it can fulfill its obligations. FWE III's decommissioning liabilities could well exceed its proposed capitalization leaving it unable to fulfill its obligations to BOEM.

### D. *There is inadequate disclosure of the Plan's treatment of the Abandoned Properties.*

24. The Plan relies on Debtors' alleged ability to shift their decommissioning liability to Marathon and other Predecessors. Marathon is only one of many companies in the chain of title for the majority of leases listed. The leases previously owned by Marathon are currently owned and operated by multiple companies. The Disclosure Statement lacks specific details about how these assets will be returned to Marathon such as whether Marathon will take record title or interest in the abandoned leases, the process of obtaining regulatory approval of the return of these assets, the treatment of orphan liabilities created by the Plan, or any agreements with Marathon to accept the return of these assets. The Debtors also do not disclose the number of platforms on leases included as Abandoned Properties that are still operating or producing. Moreover, the Debtors have not provided an alternative to the return of the leases in the event the Court denies this treatment under the Plan.

25. The Disclosure Statement has failed to identify each co-owner and/or prior owners in the chain of title compelled to accept each abandoned lease. The Disclosure Statement loosely defines Predecessors in toto without differentiating between current co-owners and predecessors. Additionally, the abandonment of the Debtors' current operatorship and ownership in a lease requires other current co-owners to select a replacement operator pursuant to the terms of their lease-specific joint operating agreement. If such replacement operator is selected and approved, then no decommissioning obligations are triggered by the Debtors' proposed abandonment.

26. Should current co-owners decide not to install a new operator, stop production, and trigger decommissioning obligations, the current co-owners would have the primary obligation to decommission such leases. *See* 30 C.F.R. § 250.1701(a). The current practice is that federal regulators will look to predecessors in title to satisfy those obligations after all current lessees and owners of operating rights fail to perform lease decommissioning obligations. *See* 30 C.F.R. § 556.710. All this information is necessary for Marathon to understand its treatment under the Plan.

E. **The Disclosure Statement lacks adequate financial information sufficient to permit Marathon to vote on the Plan.**

27. The Disclosure Statement provides neither a liquidation analysis, valuation analysis, nor financial projections. Instead, this critical information is included in the blank exhibits "To Come." [Dkt. 723, p. 11]. Because this information is missing, there is no indication that either Marathon or other creditors would be better off if the case was converted to chapter 7 and a trustee appointed. This case is essentially a liquidation that carves out select assets to the benefit of the Debtors' lenders. By not disclosing this information, it is impossible for Marathon to evaluate whether the exorbitant costs associated with administering this case is necessary or whether these estates would be better served by a chapter 7 trustee. This information is necessary for Marathon to properly evaluate the Plan.

28. Debtors have failed to disclose administrative claims for their decommissioning obligations. The Disclosure Statement does not contain information about any administrative claims that could be asserted by third parties, including claims for post-bankruptcy plugging and abandonment costs, which are generally entitled to administrative priority. *See In re H.L.S. Energy Co., Inc.*, 1551 F.3d 434 (5th Cir. 1998); *In re American Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009). At a minimum, the Disclosure Statement must provide information about the

range of potential administrative expenses for the Abandoned Properties, describe how the Plan will satisfy these administrative expenses, and the risk to confirmation in the absence of sufficient funds to satisfy such claims.

### F. There is inadequate disclosure about the Releases authorized under the Plan.

29. The Disclosure Statement offers no explanation why the Plan is providing a release in a liquidation, including broad third-party releases to generic categories of non-debtors [Dkt. No. 723-1 p. 83, (Releasing Parties include, among others, "the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out...")]. Apache is included as a Released Party under the Plan [Dkt. No. 723, p. 83]. The Disclosure Statement does not explain how such a release will impact the potential joint and several liability of Apache to third parties. Such a release may bar any claim by Marathon or countless other Creditors against Apache from seeking contribution for the costs incurred to satisfy the Debtors' decommissioning obligations. The Disclosure Statement must provide information on: (i) the types of claims being released; (ii) parties receiving a release; and (iii) the consideration provided for the release from each non-debtor released party.

### G. The Proposed Voting Procedures Deprive Class 6 Creditors of the Ability to Vote Their Claims in the Dollar Amount that the Plan Imposes Upon Them.

30. Marathon, and similarly situated Predecessors, should be allowed to vote the extent of their decommissioning liability for returned assets under the Plan. The idea that it be allowed to vote $1 against the multiple millions in contingent proposed liabilities is absurd. Marathon's claim for voting purposes should be based on BSEE's publicly available P50 estimate of the cost to decommission each lease abandoned by Debtors under the Plan. Class 6 creditors should be granted the affirmative ability to vote claims in an amount pursuant to BSEE's publicly available

P50 cost estimates for decommissioning obligations on leases associated with the Abandoned Properties. The Debtors improperly seek to transfer billions of dollars in liability to Marathon and other Predecessors without allowing them to vote the extent of their contingent claims. The real value of Marathon's claims under the Plan must be acknowledged in the voting and tabulation process.

### H. The arbitrarily imposed timeframes for filing critical documents by Plan Supplement and time periods for Creditors' objections lack due process.

31. The stated timeframes for submission of critical documents and proposed objection deadlines are clearly inadequate and deprive Creditors and affected parties of proper notice and an opportunity to object. The Plan Supplement includes critical documents and information on the Credit Bid Transaction and the Schedule of Assumed Contracts for that transaction, and the Debtors' proposed deadline between receipt of that information and for filing objections is a mere 7 days. Creditors and contract counter-parties are entitled to at least 14 days' notice to understand the Credit Bid Transaction and how it might affect them, whether their contracts are being assumed and assigned, and to obtain information on cure amounts and adequate assurance of future performance.

32. Here, given the lack of transparency and the complexities of the proposed Plan, it will be impossible for creditors to understand their position and rights even with a longer deadline period. The Debtors' contract cure notice in connection with the Credit Bid Transaction is only 10 days before the Confirmation Hearing while requesting that objections be due on the Plan Objection Deadline. Similarly, all documents and information related to the FWE I and FWE III transactions must be fully, rather than partially, disclosed so that creditors have at least 14 days' notice and an opportunity to object. As discussed above, there is no information or even a process for the assumption and assignment of contracts required in each of those transactions. Contract

counter-parties have no information on cure amounts or adequate assurance. As for NewCo, FWE I and FWE III transactions, Debtors improperly maintain the unilateral ability to make changes to the schedules and exhibits yet provide creditors with an insufficient objection deadline. Creditors should have no less than 14 days' notice to object to any amendments to any supplements to Debtors' schedules and Plan exhibits.

## III.
## RESERVATION OF RIGHTS

33. Marathon reserves the right to assert any of these objections to the Disclosure Statement, as well as any other objections, to confirmation of the Plan. To the extent Marathon is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan (including the Plan Supplement, Valuation Analysis, Liquidation Analysis, and Financial Projections) that may be filed after any deadline for objecting to the Disclosure Statement or confirmation of the Plan, Marathon further reserves the right to object thereto on any basis whatsoever. Marathon further reserves the right to raise additional and other objections to the Disclosure Statement prior to or at the hearing thereon.

34. Marathon adopts and incorporates herein all objections to the Disclosure Statement asserted by other parties.

Marathon requests that this Court: (i) sustain this Objection; (ii) deny the relief requested in the Motion; and (iii) grant to Marathon such other and further relief to which it is justly entitled.

Dated: March 1, 2021

                                        Respectfully submitted by,

                                        */s/Clay M. Taylor*
                                        Clay M. Taylor
                                        Texas State Bar No. 24033261
                                        M. Jermaine Watson

        Texas State Bar No. 24063055
        J. Robertson Clarke
        Texas State Bar No. 24108098
        **BONDS ELLIS EPPICH SCHAFER JONES LLP**
        420 Throckmorton Street
        Suite 1000
        Fort Worth, Texas 76102
        (817) 405-6900 telephone
        (817) 405-6902 facsimile
        Email: Clay.Taylor@bondsellis.com
        Email: Jermaine.Watson@bondsellis.com
        Email: Robbie.Clarke@bondsellis.com

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on March 1 2021, a copy of the foregoing document was served on all parties requesting service via the Court's ECF system.

        */s/ M. Jermaine Watson*
        M. Jermaine Watson