IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>FIELDWOOD ENERGY LLC *et al.*[1]<br><br>                          Debtors. | Chapter 11<br><br>Case No. 20-33948 (MI)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 722, 723, 724, 1020, 1022** |

**SUPPLEMENTAL OBJECTION OF ENI US OPERATING CO. INC. AND
ENI PETROLEUM US LLC TO APPROVAL OF DEBTORS' DISCLOSURE
STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Eni US Operating Co. Inc. and Eni Petroleum US LLC (together, "Eni") hereby file this supplemental objection (the "Supplemental Objection") to their initial objection [Docket No. 937] (the "Initial Objection")[2] to Debtors' motion [Docket No. 724] (the "Disclosure Statement Motion") for entry of an order approving the adequacy of the disclosure statement [Docket No. 723] (the "Disclosure Statement"), as amended by the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1022] (the "Amended Disclosure Statement") for the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 722] (the "Plan"), as amended by the *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1020] (the "Amended

---

[1] The Debtors in these chapter 11 cases (these "Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Eni incorporates by reference all of the points raised in its Initial Objection and repeats them as if fully set forth in this Supplemental Objection.

Plan")[3] filed by the above-captioned debtors and debtors in possession (the "Debtors"). In support of this Supplemental Objection, Eni respectfully states as follows:

## PRELIMINARY STATEMENT

1. Little has changed since the Debtors filed the Plan and Disclosure Statement on January 1, 2021. Despite numerous conversations between the Debtors, their stakeholders, and the Regulatory Authorities (as defined below), in filing the Amended Plan and Amended Disclosure Statement the Debtors have simply run down the clock and done very little to remedy the confirmation and disclosure infirmities identified in detail by Eni, a multitude of other predecessors in interest,[4] and likely others prior to the objection deadline. Instead, the Debtors continue to exclude the requisite "adequate information" required under section 1125 of the Bankruptcy Code, while boasting about robust settlement accomplishments that, in reality, are nothing like the Debtors have described. Even if the disclosure was adequate (Eni continues to insist it is not), the Debtors have not fixed (and cannot fix at this stage) the patently unconfirmable plan through which the Debtors attempt to sell valuable producing assets to the Debtors' secured lenders while offloading or abandoning "bad" assets—and their attendant liabilities and ongoing non-compliances. Under the Debtors' proposed plan, these ongoing non-compliances (including over 200 unresolved Incidents of Non-Compliance ("INCs")) and these liabilities (totaling billions) are tossed at the feet of the Regulatory Authorities and other joint and several parties, with essentially no financial contribution from the Debtors, their secured lenders, or the Debtors'

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Amended Plan and Amended Disclosure Statement, as applicable.

[4] Many of the predecessors in interest and sureties have already filed objections to the original Plan and Disclosure Statement and are expected to file supplemental objections to the Amended Plan and Amended Disclosure Statement, as well. *See, e.g.*, Docket Nos. 880, 883, 884, 900, 924, 932, 937, 981, 983, 996, 1030, 1032, 1033, 1034, 1035, 1036 and 1040.

uncollateralized surety bond providers. And, most notably, without the consent of the Regulatory Authorities, the Amended Plan crumbles.

2.  The trivial delta between the Plan and Disclosure Statement and Amended Plan and Amended Disclosure Statement does not result from a lack of effort on Eni's part (or on the part of the other predecessors in interest and sureties). Eni has had numerous discussions with other predecessors in interest, sureties and the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Department of Interior ("DOI") and the Department of Justice ("DOJ" and, collectively with BOEM, BSEE, and DOI, the "Regulatory Authorities"), all of whom share the same concerns regarding the Debtors' Plan and Disclosure Statement and have filed (or will file) objections to the Debtors' Disclosure Statement Motion. Further, Eni, the other predecessors, the sureties, and the Regulatory Authorities have collectively and individually explained their concerns to the Debtors and have attempted to find a solution to the Abandoned Properties under the Amended Plan in concert with the Debtors. And yet, despite the good faith efforts of Eni, the other predecessors, sureties and the Regulatory Authorities, thus far the Debtors have been unwilling to cure the fatal flaws in their Plan. Instead, the Amended Plan and Amended Disclosure Statement reflect only (a) an inexplicable settlement at the top of their capital structure coupled with an acceleration of their backstop transactions (without sufficient evidence of the efforts the Debtors underwent to find alternative, third party financing instead of settling on insider, self-serving financing by the lenders who will benefit from the "good" assets under the Amended Plan)[5]; and (b) an increase in value to trade creditors only, at the expense of other unsecured creditors, providing disparate recoveries amongst unsecured

---

[5] The Debtors' filing of the Backstop Motion (as defined below) on an emergency basis presents its own problems; Eni and other parties are currently reviewing the Backstop Motion and may well object prior to the hearing on the Amended Disclosure Statement.

creditors with no business rationale to justify the Debtors' decision to treat similar creditors differently.[6] Unsurprisingly, with virtually no changes or disclosures that positively affect Eni (or any other predecessor), Eni still objects to the Amended Plan and Amended Disclosure Statement.

3. To reiterate from the Initial Objection, Eni truly desires to be part of the solution and has worked, behind the scenes, to develop a potential solution in concert with counsel to the other predecessors, the sureties and Regulatory Authorities. Eni has had several discussions with the Debtors to try and move forward productively. Perhaps additional time is needed for good faith negotiations to continue, in which case a continuance of the hearing is in order to permit the discussions to unfold. In the event the Debtors fail to engage with Eni on a solution, Eni has no choice but to continue to press its objections to the Amended Plan and Amended Disclosure Statement.

## ARGUMENT

4. In addition to the issues contained in Eni's Initial Objection, the Amended Plan and Amended Disclosure Statement present several unique issues that invite further objection by Eni.

**A. The Disclosure Statement Still Provides Inadequate Information Regarding the Abandoned Properties in Violation of Section 1125 of the Bankruptcy Code and its Threshold Requirement for "Adequate Information"**

5. In recognition of their section 1125 obligations, the Debtors have made several improvements to their previous lack of disclosure (including providing a liquidation analysis, a valuation analysis and financial projections). Yet, the Debtors' disclosure regarding the Abandoned Properties (and their attendant liabilities) remains incomplete at best—and misleading

---

[6] The Debtors make significant note of the Amended Plan and Amended Disclosure Statement having the support of the official committee of unsecured creditors (the "UCC"); it is worth noting that the UCC is composed solely of trade creditors, and accordingly, should not be seen as a representative cross section of the holders of General Unsecured Claims. *See, e.g.*, Notice of Reconstitution of Official Committee of Unsecured Creditors [Docket No. 895].

-4-

at worst—rendering the Amended Disclosure Statement incapable of being approved by this Court in its current form.

6. In fairness to the Debtors, they took small strides over the past two and half months to improve the information in the initial Disclosure Statement, including, among others, the disclosures in Articles I.A regarding the process for decommissioning the Abandoned Properties, I.D regarding the Debtors' INCs and bonding associated with the Abandoned Properties, I.E regarding the Debtors' overriding objection to mitigate the government's liability with respect to the Abandoned Properties, and IX regarding discussions with certain predecessors related to the treatment of the Abandoned Properties. To the Debtors' credit, the above passages provide more information regarding the significant issues the Debtors face in confirming the Amended Plan. However, the disclosure provided is far from adequate and still evinces that the Debtors have yet to find a way to solve the single biggest problem standing in the way of confirmation—the Debtors' half-baked abandonment of the Abandoned Properties.

7. While the Debtors provide some discussion in the Amended Disclosure Statement of conversations between the Debtors, their stakeholders and the Regulatory Authorities, the Debtors fail to provide adequate information on this point in two ways. <u>First</u>, the Debtors fail in the Amended Disclosure Statement to describe adequately what Eni believes are the Regulatory Authorities' views of the Plan. At the time of the filing of this Supplemental Objection, the Regulatory Authorities have indicated to Eni and the other predecessors in interest they will be filing an objection to the Amended Disclosure Statement to express those views. The manner in which the Debtors describe the ongoing discussions makes it seem as though a mere wrinkle needs to be ironed out to garner full consensus from their opponents including the Regulatory Authorities, but the situation is far graver: without the consent of the Regulatory Authorities, the

Amended Plan crumbles.[7] Second, the Debtors make short shrift of the continued flow of information coming from the Debtors regarding the Abandoned Properties; indeed, the Debtors are in the process of providing additional information to allow predecessors to understand the condition of the proposed Abandoned Properties, including the relevant data rooms and the OTPs (which have yet to be provided). In addition, the Debtors gloss over the significant degradation of the proposed Abandoned Properties and the sizable Administrative Expense Claims anticipated to result from the Debtors' decommissioning obligations under *Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494 (1986). The Debtors still fail to provide an estimate of the Debtors' Specified Administrative Expense Claims, aside from providing for their toggle to a standalone 363 transaction should such claims total more than $35 million. Accordingly, while the Debtors have made strides and provided more information in the Amended Disclosure Statement than previously, it is amazing the Debtors have taken two and half months to make such small strides, and yet they expect the Court to approve the Amended Disclosure Statement anyway and permit solicitation of votes on the Amended Plan absent any viable path forward amongst the Debtors, their stakeholders and the Regulatory Authorities in relation to the Abandoned Properties.

**B.** **The Disclosure Statement Provides Inadequate Information Regarding the Change in Treatment of the FLFO Claims in Further Violation of Section 1125 of the Bankruptcy Code**

8. Despite the significant inadequacies described above, the Plan, as originally filed, appeared to reflect a settled agreement at the top of the Debtors' capital structure. Specifically, the FLFO Claims were originally expected to receive the FLFO Distribution, *i.e.*, cash in the full amount of the FLFO Claims. Accordingly, holders of allowed FLFO Claims were unimpaired

---

[7] Indeed, without the consent of the Regulatory Authorities, not only does the Debtors' strategy with respect to the Abandoned Properties fail, but the Debtors cannot consummate the FWE I / Apache transactions, thus eviscerating the Amended Plan entirely.

under the Plan and receiving a full recovery. However, without any explanation in the Amended Disclosure Statement, the Amended Plan has now rolled a significant portion of the FLFO Claims into a First Lien Exit Facility and reduced the FLFO Distribution Amount to cash in the amount of the FLFO Claims, less the principal amount of the Exit Facility, thus impairing the holders of FLFO Claims. *See* Amended Plan, § 4.3.

9. The Debtors do not address the impairment scheme under the Amended Disclosure Statement. It is possible that this is one piece of the restructuring of the Debtors' capital structure that includes, among others, the transactions proposed in the *Emergency Motion of Debtors for Order (I) Authorizing Entry Into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1023] (the "Backstop Motion"), but without adequate disclosure surrounding the decision to impair the FLFO Claims under what previously appeared to be a suitable balance sheet restructuring, Eni is left wondering if the impairment is designed to create a potential impaired, accepting class of creditors to vote for the Amended Plan and pave the way for confirmation over other creditor dissention.

**C. The Disclosure Statement Provides Inadequate Information Regarding the Bifurcation of the General Unsecured Claims in Even Further Violation of Section 1125 of the Bankruptcy Code, and, Eventually, Sections 1122, 1123 and 1129 of the Bankruptcy if the Debtors Proceed to Plan Confirmation**

10. In addition to the structural changes at the top of the Debtors' capital structure, in the Amended Disclosure Statement and Amended Plan the Debtors champion a new deal with the UCC whereby the previous class of General Unsecured Claims has been bifurcated into Class 5A Unsecured Trade Claims, which will receive their pro rata share of the lesser of (i) Cash in an amount equal to 14% of the aggregate amount of all Allowed Unsecured Trade Claims or (ii) Cash in an amount equal to $8,000,000, and Class 5B General Unsecured Claims, which will receive their pro rata share of (i) the GUC Warrants and (ii) any residual value of the parent Debtor entity

after satisfaction of Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and all Cure Amounts. The impetus behind this bifurcation is currently unknown (though the fact that the UCC is composed primarily of trade creditors is telling), but absent a business justification, the bifurcation presents confirmation issues.

11. Section 1122 of the Bankruptcy Code provides, "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). As such, section 1122 does not require similarly situated claims to be in the same class. 7 Collier on Bankruptcy ¶ 1122.03 (16th 2020). Section 1123(a)(1) further provides: "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests." 11 U.S.C. § 1123(a)(1). And under section 1129(a)(1) of the Bankruptcy Code, "[t]he court shall confirm a plan only if . . . . [t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Under Fifth Circuit progeny too, proper classification of claims is essential to ensure similar claims are treated similarly, and similar claims should be placed in the same class. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991). The rule in the Fifth Circuit is defined by *Greystone*, and it is clear: "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Id.*; *see also Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 174 (5th Cir. 2011). Claims can receive disparate treatment for "good business reasons," but if the debtor's given reasons for the disparate treatment are an attempt to hide its intent to gerrymander the voting process, the classification should not be approved. 995 F.2d at 1279; *see also In re Pacific Lumber Co.*, 584

-8-

F.3d 229, 251 (5th Cir. 2009) ("Permissible justifications vary with circumstances, but in many bankruptcies, the proffered reasons . . . will be insufficient to warrant separate classification.") (internal citations omitted).

12. The Debtors have offered no disclosure as to their reasons for the proposed bifurcation of General Unsecured Claims. To the extent the newly bifurcated Unsecured Trade Claims are receiving better treatment because of their importance to the Credit Bid Purchaser, which appears to be the Debtors' admission,[8] it is unclear at this point why their enhanced recoveries should come at the expense of other General Unsecured Claims, rather than simply being assumed by the Credit Bid Purchaser. The Debtors may well have a business justification for this bifurcation, but Eni is skeptical given the Debtors have presented a credit bid plan with a complete liquidation following the transfer of "good" assets, that any business justification is credible. Until a sufficient justification is presented, the Court should not approve the Amended Disclosure Statement.

## RESERVATION OF RIGHTS

13. Eni submits this Supplemental Objection without prejudice to, and with full express reservation of, the rights of Eni to supplement and amend this Supplemental Objection further and to introduce evidence at any hearing related to this Supplemental Objection, and to object to the Plan or Disclosure Statement each as amended from time to time on any and all grounds including those covered in the Initial Objection and this Supplemental Objection. Moreover, Eni reserves its

---

[8] The Debtors' Disclosure Statement initially neglected to provide an estimated allowed amount and recovery for Class 6 General Unsecured Claims; however, given the expected size of the Class 6 General Unsecured Claims prior to bifurcation, and the size of the General Unsecured Claims Cash Pool ($5 million), recoveries were expected to be *de minimis* at best. Disclosure Statement, Art. II. In contrast, under the Amended Disclosure Statement, the Debtors now estimate that holders of Class 5A Unsecured Trade Claims will receive approximately 14% of the allowed amount of their claims, while Class 5B General Unsecured Claims are expected to receive between 0.2% and 8.7% of the allowed amount of their claims. Amended Disclosure Statement, Art. II.

right to invoke each issue, fact, legal basis, and matter identified in this Supplemental Objection as a basis for denying confirmation of the Plan as amended pursuant to any applicable provision of the Bankruptcy Code, regardless of the particular subsection of this Supplemental Objection in which the issue is raised.

## CONCLUSION

Accordingly, Eni requests that the Court enter an order (i) (a) denying the Amended Disclosure Statement or (b) adjourning the hearing on the Amended Disclosure Statement to permit additional discussions with Eni, the other stakeholders and Regulatory Authorities; and (ii) granting such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

Case 20-33948 Document 1086 Filed in TXSB on 03/22/21 Page 10 of 12

-11-

**BRACEWELL LLP**

By:    /s/ *William A. (Trey) Wood III*
        William A. (Trey) Wood III
        711 Louisiana Street, Suite 2300
        Houston, Texas 77002
        Telephone: (713) 223-2300
        Facsimile: (800) 404-3970
        Email: trey.wood@bracewell.com

        Mark E. Dendinger (admitted *pro hac vice*)
        CityPlace I, 34th Floor
        185 Asylum Street
        Hartford, Connecticut 06103
        Telephone: (860) 947-9000
        Facsimile: (800) 404-3970
        Email: mark.dendinger@bracewell.com

        Jason B. Hutt (admitted *pro hac vice*)
        2001 M Street, NW
        Suite 900
        Washington, DC 20036
        Telephone: (202) 828-5800
        Facsimile: (800) 404-3970
        Email: jason.hutt@bracewell.com

        *Counsel to Eni US Operating Co. Inc. and*
        *Eni Petroleum US LLC*

#8026123.3

## **CERTIFICATE OF SERVICE**

    The undersigned certifies that on March 19, 2021, a true and correct copy of this document was served by electronic means as listed on the Court's ECF noticing system.

                                                          */s/ William A. (Trey) Wood III*
                                                          William A. (Trey) Wood III