# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY, LLC, *et al.*,[1] | § | Case No. 20-33948 (MI) |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |

## OBJECTION OF XTO OFFSHORE, INC., HHE ENERGY COMPANY, AND XH LLC TO THE DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY, LLC AND ITS AFFILIATED DEBTORS

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

COME NOW XTO Offshore, Inc., HHE Energy Company, and XH LLC (collectively, "XTO"), and file this Objection (the "Objection") to the *Disclosure Statement for the Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Disclosure Statement")[2] [Docket No. 723] with respect to the *Joint Chapter 11 Plan of Fieldwood Energy, LLC and its Affiliated Debtors* (the "Joint Plan") [Docket No. 722].

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Defined terms in the Disclosure Statement are given the same meaning in this Objection.

---

## **Table of Contents**

I.   Summary Statement.................................................................................6

II.  Background Information Relating to The XTO Leases..........................................7

III. The Joint Plan ...................................................................................8

IV.  Applicable Federal Environmental Regulations ...............................................10

    a.  When decommissioning obligations accrue ..................................................11

    b.  Joint and several liability..............................................................11

    c.  Liability of operator ...................................................................11

    d.  Operator's Priority Liability...........................................................11

    e.  When decommissioning is required .......................................................11

    f.  Appointment and change of operator......................................................11

    g.  Operator's liability after assignment...................................................11

    h.  Joint and several liability for decommissioning costs ..................................12

V.   BSEE's Estimate of the P&A Obligation .....................................................12

VI.  The Disclosure Statement Must Contain "Adequate Information" ...............................13

VII. Summary of Objections .......................................................................13

    A.  The Disclosure Statement fails to address the Debtors' administrative obligation for the decommissioning costs of the Abandoned Properties.........................................14

    B.  The Disclosure Statement fails to address how the Abandoned Properties can be Abandoned without compliance with the Federal Regulations ...............................17

        i.   *The Disclosure Statement fails to address how the Abandoned Properties May be abandoned in violation of the Federal Regulations* .........................22

        ii.  *Title to the Abandoned Properties may not be vested in any Predecessor Through abandonment*.................................................................25

        iii. *The Disclosure Statement does not address who will operate the Abandoned Properties post-abandonment or the Debtors' obligations as operators*........26

    C.  The Disclosure Statement does not address relinquishment or termination of the Abandoned Leases...............................................................28

D. The Disclosure Statement fails to address the burdens which the Abandoned Properties will place on the Government ................................................................. 29

E. The Disclosure Statement fails to disclose how the Debtor's cash and cash equivalents will be used under the Joint Plan ............................................................ 30

F. The Disclosure Statement fails to provide adequate information in relation to the properties to be abandoned ................................................................................. 31

    a. Terminated and Relinquished Leases ........................................................ 32

    b. Facilities on each abandoned Lease .......................................................... 32

    c. Post-abandonment M&M Obligations ........................................................ 33

    d. Estimates of P&A Costs .............................................................................. 33

    e. Wells on each property ............................................................................... 33

    f. Debtors as Operators .................................................................................. 34

    g. Partial Abandonment .................................................................................. 34

    h. Incident on Non-compliance Notices .......................................................... 34

G. The Disclosure Statement fails to provide sufficient information regarding whether available surety bonds for the benefit of BOEM exist to secure P&A and M&M Obligations ............................................................................................................. 35

H. The Disclosure Statement fails to provide sufficient information regarding available third-party surety bonds ......................................................................................... 36

VIII. The Joint Plan is Unconfirmable ........................................................................... 36

IX. Reservation of Rights .............................................................................................. 37

CERTIFICATE OF SERVICE ....................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.)*, 960 F.2d 23 (5th Cir. 1992) ............13
*In re American Coastal Energy*, 399 B.R. 805 (Bankr. S.D. Tex. 2009)....... 12, 15, 16, 18, 20, 23
*In re Commonwealth Oil Refinery Co.*, 805 F.2d 1175 (5th Cir. 1986).........................................21
*In re Anthony Ferrante & Sons, Inc.*, 119 B.R. 45 (D.N.J. 1990).......................................19, n.12
*In re ATP Oil & Gas Corp.*, 2014 Bankr. LEXIS 1050 (Bankr. S.D. Tex. March 18, 2014)............
................................................................................................................................. 12, 16, 17, 26
*In re Dewsnup*, 908 F.2d 588 (10th Cir. 1990), aff'd 502 U.S. 410 (1992) .........................25, n.16
*In re Doyle Lumber, Inc.,* 137 B.R. 197 (Bankr. W.D. Va. 1992).......................................19, n.11
*In re FCX, Inc.*, 96 B.R. 49 (Bankr. E.D.N.C. 1989) .........................................................19, n.10
*In re Microfab, Inc.*, 105 B.R. 161 (Bankr. D. Mass. 1989)...............................................19, n.12
*In re Northstar Offshore Group, LLC*, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex.
July 10, 2020) ........................................................................................................12, 16, 27
*In re Peerless Plating Co.*, 70 B.R. 943 (Bankr. W.D. Mich. 1987) .................................19, n.12
*In re Pilz Compact Disc, Inc.*, 229 B.R. 630 (Bankr. E.D. Pa. 1999) ...............................25, n.15
*In re Renaissance Stone Works, LLC*, 373 B.R. 817 (Bankr. E.D. Mich. 2007) ...............25, n.17
*In re Sheffield Oil Co., Inc.*, 162 B.R. 339 (Bankr. M.D. Ala. 1993)...................................19, n. 9
*In re Smith-Douglas, Inc.* 856 F.2d 12 (4th Cir. 1998) .......................................................19, n. 9
*In re St. Lawrence Corp.*, 239 B.R. 720 (Bankr. D.N.J. 1999)............................................19, n. 9
*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503
(5th Cir. 1998)..........................................................................................................................13
*Midlantic National Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, (1986)..................................
.......................................................................................6, n. 3, 14, n. 8, 15, 18, 20, 21
*Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434 (5th Cir. 1998)........................15, 21, 23
*Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142 (5th Cir.
1988) .......................................................................................................................................13

**Statues**

11 U.S.C. § 554(a) ....................................................................................................... 17, 18, 21
11 U.S.C. § 1125(a)(1)...........................................................................................................13
11 U.S.C. § 1125(b) ...............................................................................................................13
28 U.S.C. § 959(b).................................................................................................................15

**Regulations**

30 C.F.R. § 250.1701(a) ................................................................................................... 11, 12
30 C.F.R. § 250.173...............................................................................................................32
30 C.F.R. § 250.1702..............................................................................................................11
30 C.F.R. § 250.1703......................................................................................................11, 29
30 C.F.R. § 250.1710....................................................................................................11, 29, 32
30 C.F.R. § 250.1725....................................................................................................11,29, 32
30 C.F.R. § 550.101(b)...........................................................................................................23
30 C.F.R. § 550.143......................................................................................................11, 27
30 C.F.R. § 550.144......................................................................................................11, 27
30 C.F.R. § 556.05(d).............................................................................................................27
30 C.F.R. § 556.05(e).............................................................................................................27
30 C.F.R. § 556.65(g).............................................................................................................27
30 C.F.R. § 556.604......................................................................................................29, n. 22
30 C.F.R. § 556.604(d) ......................................................................................................11, 12

30 C.F.R. § 556.604(e) ...................................................................................................11, 12
30 C.F.R. § 556.605(e) ..........................................................................................................11
30 C.F.R. § 556.605(g) ......................................................................................... 11, 17, 29, n. 22
30 C.F.R. § 556.710...........................................................................................................29, n. 22
30 C.F.R. § 556.805.......................................................................................... 11, 27, 29, n. 22
30 C.F.R. § 556.1101 .............................................................................................................29

I.  **Summary Statement**

1.      The Debtors' assets chiefly consist of offshore oil and gas leases in the Gulf of Mexico.  Many of these leases are non-economic and have or will soon terminate.  Some leases may have already been relinquished back to the U.S. Government.  This will trigger billions of dollars of P&A Obligations (as defined below) to decommission these offshore leases.  Despite the Debtors' obligation to satisfy these P&A Obligations under the federal environmental regulations, the Joint Plan seeks to abandon more than 187 offshore oil and gas properties and, with them, the Debtors' obligation to pay the P&A Obligations for the decommissioning of these properties.  However, the law is clear that the Debtors cannot abandon offshore oil and gas leases subject to substantial P&A Obligations in violation of state and federal environmental regulations aimed at protecting the health and safety of the public.  The Disclosure Statement never explains how the Debtors propose to satisfy the requirements of the U.S. Supreme Court's *Midlantic* opinion in order to abandon these properties.[3]

2.      Under the decisions of this Court, the Debtors' P&A Obligations constitute administrative expenses of their bankruptcy estates.  The Disclosure Statement fails to even address these huge administrative obligations or explain how the Debtors can escape responsibility for their P&A Obligations. Moreover, the Joint Plan fails to provide for a safe and orderly transition of the Abandoned Properties to a replacement operator or provide for any maintenance and monitoring of the properties post-abandonment.  Similarly, the Disclosure Statement does not adequately address what will happen to these properties post-abandonment or specify which portion of the post-abandonment decommissioning, maintenance and monitoring costs must be borne by the government (i.e., taxpayers), existing working interest owners and/or predecessors-in-interest.  Although the abandonment of approximately 187 offshore oil and gas properties will give rise to a number of immediate environmental and safety

---

[3] *See Midlantic National Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, (1986).

concerns, the Disclosure Statement fails to include adequate information, particularly with respect to the properties sought to be abandoned and the P&A Obligations relating to these properties, sufficient to permit XTO to make an informed decision regarding the Joint Plan.

## II. Background Information Relating to the XTO Leases

3.      On or about July 29, 2011, XTO Offshore, Inc., HHE Energy Company, and XH, LLC, as sellers, entered into a Purchase and Sale Agreement with Dynamic Offshore Resources, LLC ("Dynamic Offshore"), as buyer. The transaction was effective August 1, 2011 and includes some of the properties which the Debtors now seek to abandon.

4.      Dynamic Offshore is believed to have changed its name through a merger with Sandridge Energy Offshore, LLC ("Sandridge Energy"). Thereafter, the membership interests in Sandridge Energy were purchased by one of the Debtors[4] and the entity renamed as Fieldwood Energy Offshore, LLC ("Fieldwood Offshore"). According to the chapter 11 petition filed in Case No 20-22950, Fieldwood Offshore was previously known as Dynamic Offshore and Sandridge Energy. Consequently, the entity originally known as Dynamic Offshore is referred to hereinafter as Fieldwood Offshore.

5.      The Debtors propose to abandon approximately 187 offshore leases which are designated in the Disclosure Statement as the "Abandoned Properties". There are likely several billion dollars in costs associated with the plugging, abandonment and decommissioning of the Abandoned Properties, including plugging and abandoning the wells on the seabed, removing pipelines associated with the well (also on the seabed) and removing any platform used in connection with the lease. These costs are referred to in the Disclosure Statement as the "P&A Obligations". As germane to XTO, the Abandoned Properties include approximately twenty (20)

---

[4] Fieldwood Offshore's Schedules [Docket No. 441] at page 20 contains an organizational chart which reflects that Fieldwood Offshore is owned 100% by Fieldwood Energy, LLC, and was formerly known as Sandridge Energy Offshore, LLC. Fieldwood Offshore's petition reflects that it was formerly known as Dynamic Offshore Resources, LLC.

---

**Objection to Debtors' Disclosure Statement**                                    **Page 7**

leases (collectively, the "XTO Leases")[5] which were a part of the 2011 sale transaction with Fieldwood Offshore.

6.      The Joint Plan seeks to shift the P&A Obligations onto third-parties by abandoning the properties back to the Debtors' predecessors-in-title (collectively referred to in the Disclosure Statement as the "Predecessors", and each individually a "Predecessor"). The Disclosure Statement contains very little information about the Abandoned Properties, the abandonment process, or the likely result of this process. These issues are the focus of this Objection.

### III.  The Joint Plan

7.      This Objection mainly deals with the provisions of the Disclosure Statement addressing the Abandoned Properties. The Debtors' best assets are being cherry picked and will be transferred to a Newco based on a transaction with the lenders referred to in the Disclosure Statement as the "Credit Bid Transaction". The treatment of the remaining leases, which do not appear to be economically viable, is also directly driven by the Debtors' attempt to avoid their P&A Obligations as to those properties.

8.      For this purpose, the Debtors have divided the assets remaining after the Credit Bid Transaction into three (3) groups or tranches. The first tranche is composed of the properties transferred to FWE I for which Apache is a Predecessor. The driving impetus for this transaction is Apache's joint and several liability for the P&A Obligations in relation to these properties. These properties, as well as the attendant P&A Obligations, are to be passed on to Apache and FWE I through this transaction.

9.      The second tranche is composed of the group of properties transferred to FWE III and which are referred to as the "FWE III Properties". The FWE III Properties are also not

---

[5] The XTO Leases include the following properties listed in Exhibit "D" to the Disclosure Statement: G 01027; G 01028; G 01029; G 01037; G 01038; G 01172; G 01216; G 01522; G 01523; G 01197; G 02311; G 02600; G 02750; G 02254; G 02549; G 22679; G 22792; G 13607; G 02220; and G 02549.

economically viable and represent properties for which the Debtors do not believe there is a solvent Predecessor to pay for the P&A Obligations to decommission these properties. Consequently, the FWE III Properties have been retained in FWE III, although it is unclear whether the limited assets remaining in that entity will actually be sufficient to cover the P&A Obligations.

10.     Lastly, the third tranche consists of the Abandoned Properties.  The XTO Leases are a part of this group.  This group includes properties which are also uneconomic, although the Debtors believe that there is a solvent Predecessor as to each property who has the financial ability to pay the P&A Obligations.  The Joint Plan proposes to abandon these properties to the Predecessors and to allow the Debtors to simply walk away from their billion-dollar environmental obligation to decommission these properties.

11.     Under the applicable federal regulations, a predecessor-in-title to the Debtors may be jointly and severally liable for the P&A Obligations which accrued while the Predecessor held record title.  The Joint Plan appears to be premised on the tacit assumption that, based on this potential liability, the Predecessors will step in and take over the properties once abandoned.  As discussed below, the potential liability of the Predecessors for the P&A Obligations does not require them to either accept back the record title to any of the Abandoned Properties or to assume the liability and burdens to act as the operators of the properties post-abandonment.  XTO will not accept back title to the XTO Leases or agree to act as the operator.  Likely, the other Predecessors will likewise refuse to accept back title to any of the properties or to serve as a replacement operator in place of one of the Debtors.  In that case, if the Debtors are permitted to abandon the properties, there will be no one to take title to the properties, no one to act as the operator, no Predecessor to address the P&A Obligations after the interest was assigned away, and no one to monitor and maintain the properties or to address any future environmental events in relation to any of the 187 properties.

12.      A key omission from the Disclosure Statement is that it fails to provide any information regarding the facilities located on the 187 Abandoned Properties from which the potential P&A Obligations can be reasonably assessed and quantified.  Each of the properties may have multiple wells and pipelines on the seabed and a platform.  The facilities are generally older and have been in service for several decades.  According to an objection filed by Chevron (the "Chevron Objection"), the Abandoned Properties contain 1,175 wells, 281 pipelines and 271 platforms.[6]  The Department of the Interior has filed 10 proofs of claim against the Debtors totaling over $9.0 billion.  The Department of Interior has filed proof of claim 894 against Fieldwood Offshore for decommissioning and P&A Obligations of $2.54 billion.  Consequently, it is fair to project that the P&A Obligations on the Abandoned Properties will total into the billions of dollars.

13.      However, there is no reason for any Predecessor to assume the substantial additional liability of a record interest owner or to agree to assume an operating interest in any of the Abandoned Properties.  To XTO's knowledge, no Predecessor has agreed to accept title to any of the Abandoned Properties or to act as operator.  The Disclosure Statement is wholly inadequate because it fails to address in any manner how the Debtors can abandon the properties in violation of the applicable federal environmental regulations.  If such an abandonment is a possibility, the Disclosure Statement fails to address how the properties will be handled post-abandonment, including who will be the operator, and what will be done with the hundreds of wells, pipelines and platforms which will remain on the properties post-abandonment.

### IV.  Applicable Federal Environmental Regulations

14.      The Abandoned Properties are regulated by the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Environmental Safety and Enforcement ("BSEE").

---

[6]  *See Objection* [Docket No. 880] filed by Chevron U.S.A. Inc. and Noble Energy, Inc.

BOEM has promulgated regulations governing the decommissioning of offshore leases.  This includes the following regulations which are collectively referred to as the "<u>Federal Regulations</u>":

        a.       <u>When decommissioning obligations accrue.</u>  Decommissioning obligations accrue when a well is drilled or a platform, pipeline or other facility is installed on the lease. 30 C.F.R. 250.1702.

        b.       <u>Joint and several liability</u>.  Decommissioning obligations are joint and several among current and former record title owners and operating right owners. However, such joint and several liability is limited to any liability which accrued while the party held a record title interest. 30 C.F.R. 250.1701(a), 556.604(d) and (e)).

        c.       <u>Liability of operator</u>.  The operator is liable for all monetary obligations relating to the lease, including decommissioning expenses. 30 C.F.R. 556.605(g).

        d.       <u>Operator's Priority Liability</u>.  The operator is primarily liable for monetary obligations pertaining to the portion of the lease subject to the operating rights, and the record title owners are secondarily liable. 30 C.F.R. 556.605(e) and (g).

        e.       <u>When decommissioning is required</u>.  Facilities on a lease must be decommissioned when they are no longer useful for operations and within a year following lease termination. 30 C.F.R. 250.1703 and 1710.  Wells must be permanently plugged within one year of lease termination. 30 C.F.R. 1725.

        f.       <u>Appointment and change of operator</u>.  The operator must be approved by BOEM and the operator may not be changed absent the consent of BOEM. 30 C.F.R. 550.143 and 550.144.

        g.       <u>Operator's liability after assignment</u>.  An operator remains liable for all obligations of the lease that accrued during the period for which the entity owned the operating rights, up through the date of the assignment, including any decommissioning obligations that accrued during that period.  The operator's liability continues after the assignment as to decommissioning obligations accruing while that entity was operator. 30 C.F.R. 556.805.

---

     h.    <u>Joint and several liability for decommissioning costs</u>.  The liability for decommissioning obligations are joint and several among current and former record title and operating rights owners 30 C.F.R. 250.1701(a), 556.604(d), and (e)).

     15.    The Debtors' attempt to abandon the Abandoned Properties, and thereby avoid the P&A Obligations associated with them, must be assessed against the backdrop of the Federal Regulations.  This issue must also be addressed in view of this Court's prior opinions regarding the Debtors' duty to comply with environmental regulations, including the following three (3) opinions:

     a.    *In re American Coastal Energy*, 399 B.R. 805 (Bankr. S.D. Tex. 2009);

     b.    *In re ATP Oil & Gas Corp.*, 2014 Bankr. LEXIS 1050 (Bankr. S.D. Tex. March 18, 2014; and

     c.    *In re Northstar Offshore Group, LLC*, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. July 10, 2020).

## V.  BSEE's Estimate of the P&A Obligation

     16.    The potential P&A Obligations to decommission certain of the XTO Leases, as estimated by BSEE ("<u>BSEE Estimates</u>") are reflected in the attached **Exhibit "A"**.  Even using the most conservative P50[7] cost estimate, the total decommissioning costs total approximately $394.4 million for sixteen (16) of the XTO Leases.  Using a P70 cost estimate, the estimated decommissioning costs for these properties total approximately $496.0 million.  As noted above, BSEE has filed a proof of claim against Fieldwood Offshore for $2.54 billion in decommissioning costs.  Consequently, it is likely that the decommissioning costs for all 187 properties included in the Abandoned Properties will be several billion dollars.

---

[7]  The P50 estimate is one which, according to the BSEE estimate, has a 50/50 probability of covering in full the actual costs.  The P70 estimate is one which BSEE estimates has a 70% probability of covering in full the actual costs.  The P90 estimate is one which BSEE estimates has a 90% probability of covering the actual costs.

## VI. <u>The Disclosure Statement Must Contain "Adequate Information".</u>

17.     A party cannot solicit the acceptance or rejection of a plan without transmitting to creditors voting on the plan a written disclosure statement approved by the court as containing adequate information.  11 U.S.C. § 1125(b).  Section 1125(b) of the Bankruptcy Code provides:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.  11 U.S.C. § 1125(b).

18.     Section 1125(a)(1) defines "adequate information" to include "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 518 (5th Cir. 1998); 11 U.S.C. § 1125(a)(1).  "The determination of what is adequate information is subjective and made on a case-by-case basis. This determination is largely within the discretion of the bankruptcy court." *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir.1988), vacated on other grounds, *Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.),* 960 F.2d 23 (5th Cir.1992).

## VII. <u>Summary of Objections</u>

19.     The following is a summary of this Objection to the Disclosure Statement:

- •     The Disclosure Statement ignores the multi-billion-dollar administrative claim for the P&A Obligations and never articulates how the Debtors propose to either address or avoid this liability (*See* part VII.A., paras. 20 through 26, below).

- •     The Disclosure Statement fails to articulate the mechanism or basis by which the Abandoned Properties may be abandoned in violation of the Federal Regulations relating to decommissioning the properties (*See* part VII.B.(i), paras. 27 through 42, below).

---

- The Disclosure Statement fails to explain how any of the Abandoned Properties may be abandoned so as to vest title in any Predecessor (*See* part VII.B.(ii), paras. 43 through 45, below).

- The Disclosure Statement fails to address the status of the hundreds of wells, pipelines, and platforms which will remain behind if the properties are abandoned or explain who will act as operator post-abandonment (*See* part VII.B.(iii), paras. 46 through 50, below).

- The Disclosure Statement fails to address the termination and relinquishment of the Abandoned Properties (*See* part VII.C., para. 51, below).

- The Disclosure Statement fails to address the burden which the abandonment of the Abandoned Properties will place on the Government and taxpayers (*See* part VII.D., paras. 52 through 54, below).

- The Disclosure Statement fails to fully explain how the Debtors' assets will be allocated under the Joint Plan (*See* part VII.F., paras.55 through 57, below).

- The Debtors' counsel has represented that the properties will be abandoned in accordance with the U.S. Supreme Court's *Midlantic* decision.[8]  The Disclosure Statement fails to provide any information from which any party may assess either the current status of any of the properties or how the public health, safety and welfare is to be protected.  (*See* part VII.G., paras. 58 through 60, below).

- The Disclosure Statement fails to fully address the status of the various bonds allegedly covering the properties (*See* part VII.H. and I., paras. 61 through 64, below).

**A. The Disclosure Statement fails to address the Debtors' administrative obligation for the decommissioning costs of the Abandoned Properties.**

20. The Debtors are required to operate and manage the property of their bankruptcy estates in compliance with applicable non-bankruptcy law.  By federal statute, the assets of a

---

[8] *See Midlantic National Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, (1986).

bankruptcy estate must be operated and managed in compliance with applicable state law (28 U.S.C., Section 959(b)).  As the Supreme Court's *Midlantic* opinion notes, "Congress has repeatedly expressed its legislative determination that the [bankruptcy] trustee is not to have *carte blanche* to ignore non-bankruptcy law." *Midlantic National Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 502 (1986).  The Fifth Circuit has likewise affirmed the principle that a bankruptcy estate may not operate in violation of applicable environmental or safety laws, both state and federal.  *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 438 (5th Cir. 1998).  This Court has applied *Midlantic* and *H.L.S. Energy* to mandate that bankruptcy estates are not exempt from compliance with applicable environmental laws and regulations.  *In re American Coastal Energy*, 399 B.R. 805, 816 (Bankr. S.D. Tex. 2009).

21.     *American Coastal Energy* dealt with the debtor's obligation under Texas law to plug and abandon wells.  Because compliance with these environmental laws was a duty of the estate, the cost of such compliance gave rise to an administrative claim against the estate.  This Court explained the concept as follows:

> Because the debtor-in-possession is required to operate the estate in accordance with state law, post-petition expenditures necessary to bring the estate into compliance with the law are necessary for the debtor's rehabilitation. The need to bring the estate into compliance with state environmental and safety laws is no less significant than the need to maintain commercial relations with trade-creditors that provide the raw materials of the debtor's business. A debtor cannot operate an estate in violation of environmental and safety laws.

*American Coastal*, 399 B.R. at 816.  As a result, because "expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition," this Court held that a claim for plugging costs was entitled to administrative priority.  *Id.* at 816-17.

22.	*In re ATP Oil & Gas Corp.*, this Court again concluded that expenditures for remedying violations of applicable environmental and safety laws were necessary to preserve the estate regardless of whether the liability for violation of the environmental laws first occurred before or after the filing of the bankruptcy petition. *In re ATP Oil & Gas Corp*, 2014 Bankr. LEXIS 1050 *21 (Bankr. S.D. Tex. March 18, 2014).  As a result, the Court found that a claim for post-petition "safe out" work on a production platform was entitled to administrative priority.  This Court concluded that ATP, is the operator, had a *Midlantic* duty to make the platform safe for abandonment, and that work performed by a third party to render the platform safe for abandonment was entitled to allowance as an administrative expense.  *Id.* at *20-21.

23.	The rationale underlying *American Coastal* and *ATP Oil & Gas* was most recently applied in *In re Northstar Offshore Group, LLC*, 2020 Bankr. LEXIS 1811 (Bankr. S.D. Tex. July 10, 2020).  This Court followed *American Coastal* to conclude that the debtor had a continuing post-petition duty to administer and hold the estate's assets in accordance with applicable state and federal law.  The debtor's remediation obligations constituted the type of continuing post-petition duties identified in *American Coastal*, the performance of which was required to conform with the law and, therefore, constituted a necessary cost for preserving the estate entitled to treatment as an administrative expense.  *Id.* at * 38 and *39 (citing *American Coastal*, 399 B.R. at 11-12).

24.	In the Disclosure Statement, the Debtors evidence an intent to abandon the Abandoned Properties.  However, as this Court concluded in *American Coastal Energy*, the fact that the bankruptcy estate does not intend to operate the property going forward does not diminish the estate's duty to manage and operate the property in accordance with applicable law. *American Coastal*, 399 B.R. at 811.  As the Disclosure Statement also notes, the Debtors' Predecessors in title will be liable for certain of the P&A Obligations based on their status as the former holder of a record interest in a property sought to be abandoned.  However, as the Court

also concluded in *ATP Oil & Gas*, "a debtor's obligation to expend funds to bring the estate into compliance with state health and safety law does not change just because another entity has the same obligation." *ATP Oil & Gas*, 2014 Bankr. LEXIS 1050 at *21. Consequently, the potential joint and several liability of the Predecessors for the P&A Obligations does not lessen or release the Debtors' from their own liabilities for the decommissioning costs as the current record title owners and the operators of the Abandoned Properties.

25.     As here applicable, the Federal Regulations are clear that the Debtors are jointly and severally liable for the P&A Obligations as the owners of record interests in the Abandoned Properties. Indeed, Section III(B)(1)(c) of the Disclosure Statement admits that, pursuant to the applicable Federal Regulations, the Debtors as owners of record interests are jointly and severally liable for the P&A Obligations. Independently of the Debtors' liability as the owners of record interests, the Debtors also have primary liability for these decommissioning expenses as to properties where one of the Debtors acts as the operator. 30 C.F.R. 556.605(g).

26.     The P&A Obligations run into the billions of dollars. The costs to comply with the Federal Regulations to decommission the Abandoned Properties are entitled to the treatment as an administrative expense. However, the Disclosure Statement is completely silent on this billion-dollar administrative obligation and how it will be handled under the Joint Plan. The Disclosure Statement should address this issue on a property-by-property basis. If the Debtors intend to attempt to avoid this huge obligation through abandoning the properties, then the Disclosure Statement should clearly so state and address the mechanism for the proposed action and the likely results and impact of abandoning 187 separate properties with over a thousand wells and hundreds of pipelines and platforms.

**B.     The Disclosure Statement fails to address how the Abandoned Properties can be abandoned without compliance with the Federal Regulations.**

27.     Although section 554(a) of the Bankruptcy Code generally permits debtors to abandon property that is either burdensome or of inconsequential value to the estate, a debtor

is not immune from state and federal laws of general applicability and "cannot abandon contaminated estate property if state health or safety law prohibits such abandonment." *American Coastal*, 399 B.R. at 810. In *Midlantic*, the Supreme Court determined that section 554(a) does not preempt all state and local laws and that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic*, 474 U.S. at 507. Abandonment of such properties may not be authorized "without formulating conditions that will adequately protect the public's health and safety." *Id.*

28.     As this Court notes in *American Coastal*, the *Midlantic* holding is policy driven. *American Coastal*, 399. B.R. at 811. The opinion does not rely upon the provisions of the Bankruptcy Code. Instead, the decision rests on a policy decision. "The history on which *Midlantic* was crafted led the [U.S. Supreme] Court to adopt a policy that a bankruptcy trustee's powers were subservient to the state's health and safety concerns." *Id.* It was the application of this policy, and the corollary duties arising out of the policy, which drove this Court's decision in *American Coastal Energy* and the later decisions in *ATP Oil & Gas* and *Northstar Offshore*.

29.     Footnote 9 to the *Midlantic* opinion states that this policy rendering the bankruptcy trustee's powers subservient to state health and safety laws is limited as follows:

•      This exception did not "encompass speculative or indeterminate future violation of these laws."

•      The abandonment powers are not limited "by laws or regulations not reasonably calculated to protect the public health and safety from imminent and identifiable harm." Stated in the affirmative, the abandonment powers are limited by laws which are "reasonably calculated to protect the public health and safety from imminent and identifiable harm." As explained below, this limitation focuses on the nature of the laws to be violated by the abandonment and does not consider the potential harm which might arise upon abandonment from the specific environmental condition or hazard at issue.

30.     Some courts have wrongly construed the second limitation above as allowing abandonment if there is no imminent danger to the public's health.[9]  This approach focuses on the environmental hazard and the potential impact of allowing the abandonment of the property on the public health and safety in view of the specific environmental hazard at issue.[10]  In sum, these cases incorrectly apply footnote 9 to allow the bankruptcy court to approve abandonment of property of the estate in violation of environmental laws based on the court's assessment of the potential risk of imminent and immediate harm to the public health and safety.[11]  These cases basically purport to assess the degree to which the applicable environmental hazard presents an identifiable and imminent threat of harm to the public health and safety, and then decide accordingly whether or not to permit abandonment of the property.

31.     However, other opinions adopt an approach which correctly focuses on the nature of the law to be violated by the abandonment.[12]  These cases do not consider the potential harm arising out of the environmental hazard and, instead, adopt an approach similar to that adopted by this Court.

32.     This first approach above, which focuses on the nature and extent of the environmental hazard involved, misreads and misapplies the actual text of footnote 9.  The second limitation, on its face, refers to laws and regulations "not reasonably calculated to protect the public health or safety from imminent and identifiable harm."  This limitation does not

---

[9]  *In re Smith-Douglas, Inc.,* 856 F.2d 12, 16 (4th Cir. 1998); *In re Sheffield Oil Co., Inc.,* 162 B.R. 339, 341 (Bankr. M.D. Ala. 1993) ("[A] mere violation of environmental laws, without imminent harm, does not bar abandonment); *In re St. Lawrence Corp.,* 239 B.R. 720, 724 (Bankr. D.N.J. 1999) ("Following *Midlantic,* abandonment of contaminated real property is permitted unless there is a showing of imminent and identifiable harm").

[10]  *In re FCX, Inc.,* 96 B.R. 49, 54-55 (Bankr. E.D.N.C. 1989) (Abandonment is not allowed "when there is an immediate threat to the public health and safety and an imminent danger of death or illness").

[11]  *In re Doyle Lumber, Inc.,* 137 B.R. 197, 201-02 (Bankr. W.D. Va. 1992).

[12]  *In re Peerless Plating Co.,* 70 B.R. 943, 947 (Bankr. W.D. Mich. 1987) (Under *Midlantic,* a trustee may abandon a property unless (i) the environmental law so onerously interferes with bankruptcy adjudication, (ii) the legislature did not reasonably design the environmental law to protect the public's health or safety from identical hazards, and (iii) the violation the abandonment carries would be merely speculative or indeterminate); *In re Microfab, Inc.,* 105 B.R. 161, 169 (Bankr. D. Mass. 1989) (*Midlantic* requires full compliance with environmental laws); *In re Anthony Ferrante & Sons, Inc.,* 119 B.R. 45, 49 (D.N.J. 1990) (*Midlantic* requires the problem to be remediated prior to abandonment if this would violate a law which was reasonably designed to protect the public's welfare).

address the potential severity of the environmental hazard at issue or the potential impact of

that condition upon the health or safety of the public.  Instead, it addresses the nature of the

laws or regulations which will be violated by the abandonment and whether those laws are

reasonably calculated to protect the public health and safety from imminent and identifiable

harm.  The key issue is the nature of the laws for the protection of public health and safety

which are to be violated by abandonment, not the nature and extent of the environmental

hazard which is subject to such laws.  There is no need to determine whether the environmental

hazard itself is an immediate and identifiable harm.  It is sufficient if the laws to be violated by

abandonment protect the public health and safety from identifiable hazards.

33.     *American Coastal* cites *National Gypsum*[13] and its statement that the allowable

administrative expense was limited to "conditions that posed an imminent and identifiable harm

to environment and public health."  As this Court correctly noted, *Midlantic* looks to the nature of

the statute being violated and not whether the environmental condition gives rise to a threat for

imminent identifiable harm.  In this regard, this Court stated as follows:

> This Court respectfully disagrees with the limitation placed by the
> <u>National Gypsum</u> Court.  The Court reads the Supreme Court's
> *Midlantic* opinion to require the Court to determine whether the
> debtor is violating a statute "reasonably designed to protect the
> public health or safety from identified hazards, "not the extent to
> which particular conduct imposes actual and imminent threats,
> <u>Midlantic</u>, 474 U.S. at 507 ("we hold that a trustee may not abandon
> property in contravention of a state statute or regulation that is
> reasonably designed to protect the public health or safety from
> identified hazards").  *This Court need not make a determination*
> *whether the environmental hazard presents an imminent or*
> *identifiable harm.  It is enough that the Commission's claim arises*
> *from a state law designed to protect the public from an identified*
> *hazard.  It is not the Court's prerogative to replace the legislature's*
> *judgment with its own judgment as to what conduct constitutes a*
> *sufficient threat to the public.*

*American Coastal*, 399 B.R. at 813 (emphasis added).

34.     This means that the Debtors may not abandon the Abandoned Properties in

---

[13]  139 B.R. 397, 413 (N.D. Tex. 1992).

violation of laws and regulations reasonably designed to protect the public's health or safety from identifiable hazards. Consequently, the correct focus is on whether the Federal Regulations are laws reasonably designed to protect the public health and safety from identifiable environmental hazards. This is consistent with the limited Fifth Circuit authority on point. The *H.L.S. Energy* opinion simply states, citing *Midlantic*, as follows: "Furthermore, a bankruptcy trustee may not abandon property in contravention of a state law reasonably designed to protect public health and safety." *H.L.S. Energy*, 151 F.3d at 438. The opinion then goes on to address the debtor's plugging and abandonment obligations under Texas law and implicitly treats this as a law reasonably designed to protect public health or safety.

35. The opinion in *Commonwealth Oil Refinery Co.* adopts the same view, and states as follows:

> In *Midlantic*, the Supreme Court held that there was a limited exception to the trustee's abandonment power created under 11 U.S.C. § 554(a) for those cases where abandonment would thwart "laws or regulations… reasonably calculated to protect the public health or safety from imminent and identifiable harm." 106 S. Ct. at 762-63, n.9.

> In *Midlantic*, the Court recognized an exception to the power of a trustee to abandon property but limited that exception to those instances in which abandonment would violate laws or regulations "reasonably calculated to protect the public health or safety from imminent and identifiable harm." Id. at 762-63, n.9.

*Commonwealth Oil Refinery Co.*, 805 F.2d. 1175, 1182 and 1185. (5th Cir. 1986).

36. The Joint Plan states in section 5.12 that the Abandoned Properties shall not be allocated to nor vest in the Post-Effective Date Debtors nor Newco and its subsidiaries. The Disclosure Statement specifically states that the Debtors intend to abandon the Abandoned Properties (including the XTO Leases) back to Predecessors.[14] Consequently, the Joint Plan

---

[14] For example, the second full paragraph on page 3 of the Disclosure Statement regarding the Abandoned Properties states that the Abandoned Properties "will be abandoned pursuant to sections 105(a) and 554(a) to entities who are predecessor owners in the chain of title or co-working interest owners," meaning the Predecessors. Paragraph VI.C. on page 35 states, "The Debtors have also been in regular discussions with certain of the Predecessors regarding the Joint Plan and the Debtors' intention to abandon the Abandoned Properties to the

appears to contemplate that the Abandoned Properties will be abandoned and that the act of abandonment will vest title to the Abandoned Leases back into the Predecessors. By so doing, the Debtors apparently intend to avoid the P&A Obligations associated with the properties. This raises three (3) issues relating to disclosure. First, the Disclosure Statement fails to explain how under *Midlantic* the Debtors can abandon the Abandoned Properties in violation of the Federal Regulations, laws which are clearly intended to protect the public health and safety from identifiable environmental hazards. Second, the Disclosure Statement fails to explain how title to any of the Abandoned Properties can be vested in any Predecessor. The Debtors may not use abandonment as a vehicle to force any Predecessor to take title to any of the Abandoned Properties or to agree to replace one of the Debtors as operator. Third, the Disclosure Statement does not explain who will act as operator post-abandonment or how the Debtors intend to address their primary liability as operators for the decommissioning costs. The Disclosure Statement likewise offers no explanation how, under *Midlantic*, the Debtors as operators can abandon the properties in violation of the Federal Regulations.

### *i. The Disclosure Statement fails to address how the Abandoned Properties may be abandoned in violation of the Federal Regulations.*

37. Debtors' counsel has stated to various potential Predecessors that the Abandoned Properties will be abandoned through the Joint Plan in compliance with *Midlantic*. Unfortunately, the Disclosure Statement fails to explain how the Abandoned Properties may be abandoned in violation of the Federal Regulations, something which can only be done if this Court concludes that the Federal Regulations are not laws intended to protect the public health and safety from imminent and identifiable harm. In the same vein, the Disclosure Statement never articulates what, if anything, the Debtors have done to satisfy their *Midlantic* duties or to

---

Predecessors." The final full paragraph on page 9 (under section I.D. 3) states, "Moreover, following entry of the Confirmation Order, the Debtors will work in good faith with each such Predecessor to ensure the smooth and safe return of the Abandoned Properties to the Predecessors pursuant to the Joint Plan."

---

bring the Abandoned Properties into compliance with the Federal Regulations for decommissioning. These issues are obviously substantial given that the Abandoned Properties include over a thousand wells and hundreds of pipelines and platforms, all resting on the seabed of the Gulf of Mexico, which must be decommissioned.

38.   On their face, the Federal Regulations relating to the decommissioning of the leases and the associated structures in and under the water are clearly "reasonably calculated to protect the public health and safety from imminent and identifiable harm." Indeed, the Fifth Circuit's opinion in *H.L.S. Energy* recognized that similar plugging and abandonment laws and regulations enacted by the State of Texas constituted laws reasonably calculated to protect public health and safety. *H.L.S. Energy*, 151 F.3d at 438. Likewise, in *American Coastal*, this Court concluded that the plugging and abandonment provisions of the Texas Natural Resources Code are reasonably designed to protect the public health and safety. *American* Coastal, 399 B.R. at 813-14. Similarly, the Federal Regulations address the plugging and abandonment of the wells on the instant offshore properties. The BOEM regulations (including the Federal Regulations) are intended to protect the public health and welfare by ensuring the development and production of oil and gas offshore is such as to "[c]onform to sound conservation practice to preserve, protect and develop mineral resources of the OCS [Outer Continental Shelf] to…[b]alance orderly energy resource development with protection of the human, marine and coastal environments…" 30 C.F.R., 550.101(b). Indeed, Executive Order 13547, entitled "Stewardship of the Ocean, Our Coasts, the Great Lakes" (July 19, 2010) proclaims a federal ocean policy which states: "America's stewardship of the ocean, our coasts and the Great Lakes is intrinsically linked to environmental sustainability, human health and well-being, national prosperity , adapting to climate and other environmental changes…." Against this backdrop, the decommissioning obligations imposed by the Federal Regulations are clearly reasonably intended to protect the public health and safety against identifiable environmental hazards.

39. Moreover, the violation of the Federal Regulations in this case is neither speculative nor indeterminate. The leases have terminated, or will soon terminate, giving rise to an immediate and real violation of the Federal Regulations based on Debtors' obligation to decommission the leases. Indeed, many of the leases are likely to have already terminated and some may have already been relinquished. Unfortunately, the Disclosure Statement is silent on this key issue as well.

40. Additionally, despite the substantial environmental and safety issues associated with the Debtors' potential abandonment in place of hundreds of offshore wells, pipelines and platforms, the Disclosure Statement does little more than pay lip service to the Debtors' duty to protect the health and safety of the public. For example, on page 1 of the Disclosure Statement, the Debtors state that the Joint Plan is designed to "ensure that all [P&A Obligations] are allocated to appropriate parties for performance in a responsible and safe manner." Likewise, on page 10 (Section I.E), the Disclosure Statement provides that, "the P&A Obligations will continue to be performed in a safe and responsible manner by the relevant parties and will accelerate the decommissioning work . . . in the Gulf of Mexico." Although the Debtors acknowledge the need to decommission the Abandoned Properties, they never explain what will happen to the Abandoned Properties post-abandonment or how the P&A Obligations are to be performed in a responsible manner. The Debtors cannot force the Predecessors to either retake title or operate the Abandoned Properties long after they were assigned to the Debtors. The reality here is that the Debtors have no plan in place to decommission the properties other than to throw the keys on the table, walk away, and hope there is not a catastrophic environmental event post-abandonment while no one is operating the facilities. Clearly, this fails to even arguably satisfy the requirements of *Midlantic* to abandon the properties.

41. The Disclosure Statement must explain in reasonable detail how the Debtors can justify the proposed abandonment of each of the Abandoned Properties in violation of the Federal Regulations in order to avoid their P&A Obligations. The Disclosure Statement must

also provide a full explanation, as to each of the 187 Abandoned Properties, on a property-by-property basis, of the specific facts and circumstances, or the specific actions taken by the Debtors, which satisfy the requirements of the Federal Regulations. as well as a property-by-property analysis as to the specific manner in which the Debtors intend to protect the public health and safety in satisfaction of their *Midlantic* duties. If the Debtors intend to do nothing but walk away from the properties, the Disclosure Statement needs to so state.

42. However, the Joint Plan does not appear to make even a pretense of complying with Debtors' *Midlantic* obligations and, as such, the Joint Plan is unconfirmable. There is no good reason to approve any disclosure statement as to an unconfirmable plan.

> ### ii. *Title to the Abandoned Properties may not be vested in any Predecessor through abandonment.*

43. While abandonment divests the bankruptcy estate of the asset, it cannot be used to force a third-party to take title to any asset. Abandonment acts to divest the bankruptcy estate of the asset to be abandoned.[15] Abandonment "is not a transfer of property but simply 'a divesture of all of the estate's interest in the property.'"[16] As another opinion notes, abandonment divests the estate of the asset, the result of which is that the interests in the debtor may have had in the property are no longer included within the bankruptcy estate.[17] As the court further notes, "There is no authority in the Bankruptcy Code for the abandonment of property of the estate to a creditor or any party other than the debtor."[18] This led the court to finally conclude that "[a]bandonment does not and cannot convey to any third-party any of the estate's (or the debtor's) legal or equitable interests in the property."[19]

---

[15] *In re Pilz Compact Disc, Inc.*, 229 B.R. 630, 638-39 (Bankr. E.D. Pa. 1999).

[16] *Id.* at 639 (citing *In re Dewsnup*, 908 F.2d. 588., 590 (10th Cir. 1990), aff'd 502 U.S. 410 (1992)).

[17] *In re Renaissance Stone Works, LLC*, 373 B.R. 817, 820 (Bankr. E.D. Mich. 2007).

[18] *Id.*

[19] *Id.*

44.     XTO has not agreed to accept title to any interest in any of the Abandoned Leases.  XTO believes that the other Predecessors will take the same position.  Therefore, the Disclosure Statement should disclose by what mechanism Debtors propose to vest title to the Abandoned Leases in XTO or any other Predecessor.  If the Debtors admit that this cannot be done except with the consent of the Predecessor to whom the properties are being abandoned, the Disclosure Statement should so state.[20]

45.     However, the Disclosure Statement is clear that the Abandoned Leases do not vest in any of the Reorganized Debtors nor in Newco.  Given that title to the Abandoned Properties cannot vest in XTO or any Predecessor who does not agree to take title, the Disclosure Statement should explain who, if anyone, will take title to the Abandoned Properties upon abandonment.[21]  The Disclosure Statement is completely silent on this key issue which runs counter to the implicit assumption that the Predecessors will step in to take over the properties from the Debtors.  In that instance, the Disclosure Statement needs to clearly disclose what happens to the Abandoned Properties post-abandonment if no Predecessor agrees to take title to the property.

   ### iii.     The Disclosure Statement does not address who will operate the Abandoned Properties post-abandonment or the Debtors' obligations as operators.

46.     Both the *ATP Oil & Gas* and *Northstar Offshore* opinions recognize that the operator of a property owes a separate, primary obligation to comply with the applicable environmental regulations.  For example, in *ATP Oil & Gas*, this Court noted that, "ATP, as operator of the *Innovator* had a *Midlantic* duty to make the Innovator Platform safe for abandonment under state law."  *ATP Oil & Gas*, 2014 Bankr. LEXIS 1015 at *19-20.  In

---

[20]  XTO is aware of the potential joint and several liability of record title owners for certain P&A Obligations under the applicable regulations.  However, there is no mechanism by which XTO can be compelled to assume title to any of the Abandoned Properties based on these regulations.

[21]  Some of the Abandoned Properties may have been relinquished back to the Government.  In those cases, the leasehold may no longer exist.  However, the various structures and facilities used in connection with the Abandoned Properties, including the well head, any pipelines and any platform well still exist.

*Northstar Offshore*, the Court noted, "Medco was the operator, Northstar was not. As between Medco and Northstar, Medco had the operating obligation to perform the decommissioning." *Northstar Offshore,* 2020 Bankr. LEXIS at *39.

47.     This concept of the operator's primary liability is carried forward in the Federal Regulations. As operators of many of the Abandoned Properties, the Debtors are subject to an independent obligation as the operator to decommission the properties. Under the Federal Regulations, the operator has joint and several liability for the P&A Obligations. 30 C.F.R. 556.05 (d) and (e) provides that the operator is liable for obligations (including non-monetary lease obligations) pertaining to the portion of the lease subject to the operator's operating rights and which accrued while acting as operator. 30 C.F.R. 556.65(g) is clear that the operator has primary liability for all such monetary obligations: "You [the operator] are primarily liable for monetary obligations pertaining to that portion of the lease subject to your operating rights, and the record title owners are secondarily liable." An operator may not resign or be replaced by another operator without the consent of BOEM. 30 C.F.R. 550.143 and 550.144. However, the operator is not relieved of its accrued obligations through an assignment of the operating rights. 30 C.F.R. 556.805.

48.     The operating obligations placed on the operators are separate and distinct from Debtors' obligations as the owners of a record title in the properties. Moreover, the Debtors cannot resign as operators without the consent of BOEM. 30 C.F.R. 550.143 and 550.144. Abandoning the properties, assuming that his can even be done in violation of the Federal Regulations, does not release the Debtors from their independent and primary obligations as the operator. The Disclosure Statement should also disclose how the Debtors propose to satisfy the huge administrative liability imposed on them as the operators of the Abandoned Properties for the P&A Obligations. If the Debtors contend that this operating liability will be avoided through abandonment of the properties, the Disclosure Statement should clearly and expressly explain the legal mechanism through which this is to be accomplished or how the

Debtors can resign as operator without BOEM's consent and with no replacement operator in place.

49.     XTO is a potential Predecessor as to approximately twenty (20) of the Abandoned Properties sold to Fieldwood Offshore in 2011.  One of the Debtors is also believed to act as the operator on at least fourteen (14) of these leases.  To XTO's knowledge, BOEM has not given the required consent to the Debtors to resign as the operator of any of the leases, and no one has agreed to accept the position of the post-abandonment operator in place of Debtors.  Given the huge potential liabilities inherent in assuming the operating rights as to these properties, it seems very unlikely that any Predecessor will agree to replace the Debtors as the operator.  Consequently, if the Debtors are released as operators, it appears that no one will act as operator.

50.     The lack of an operator will have serious immediate repercussions.  The operator has an obligation to conduct regular inspections of the facilities to detect leaks, spills or other potential issues which may harm the environment.  The Disclosure Statement never addresses who will undertake these monitoring and maintenance (M&M) duties post-abandonment.  The Disclosure Statement also fails to explain what will happen if an actual leak, spill, or an environmental event occurs in connection with any of the hundreds of wells or pipelines.  The Disclosure Statement leaves the Court and creditors to speculate as to who (if anyone) will act as operator post-abandonment and by what mechanism this will be accomplished and funded. If the post-abandonment properties are going to be orphans without an operator in place, the Disclosure Statement needs to so state.  This key issue, which relates to an immediate and pressing issue of public health and safety, should be clearly and specifically addressed in the Disclosure Statement.

**C.     The Disclosure Statement does not address relinquishment or termination of the Abandoned Leases.**

51.     The Disclosure Statement should specifically reflect which of the leases have

terminated and the date of termination. When a lease terminates, BOEM accepts relinquishment of the lease from the owners. 30 C.F.R. 556.1101. This requires the filing of Form BOEM-0152 to obtain approval of the relinquishment from the BOEM. In addition, any such relinquishment remains subject to the continuing obligations to perform all decommissioning obligations to the satisfaction of the BOEM Director. 30 C.F.R. 556.1101. Likewise, the Disclosure Statement should disclose which of the Abandoned Properties have been relinquished and the date of relinquishment. As to other non-relinquished properties, the Disclosure Statement should disclose the manner in which the relinquishment of the remainder of the Abandoned Properties will be addressed, and whether relinquishment is even possible with the unaddressed decommissioning costs as to these properties. This information is also important to determine the timeline for decommissioning, which must generally be done within a year of termination. 30 C.F.R. 250.1703, 1710 and 1725.

**D.   The Disclosure Statement fails to address the burdens which the Abandoned Properties will place on the Government.**

52.   A premise seemingly baked into the Disclosure Statement is that the Government will not be burdened by the abandonment of the Abandoned Properties. This is in part based on the assumption that the entire burden will fall on the Predecessors based on their potential joint and several liability for the P&A Obligations. However, this overstates the potential liability of each of the Predecessors. Each Predecessor is only liable for P&A Obligations which accrue while the Predecessor was a holder of record title, meaning that the Predecessor's joint and several obligation extends only as to drilling, exploration and other activities which were undertaken while or before the Predecessor held record title.[22] A

---

[22] 30 C.F.R 556.604 provides that record title owners are liable for obligations "which accrue while it holds record title." 30 C.F.R. 556.605(g) provides that an operator is jointly and severally liable with record title owners for "obligations which accrued during the time you hold your operating rights interest." As assignor remains liable for P&A Obligations that accrued in connection with a lease "during the time period in which you owned the record title interest, up to the date BOEM approves your assignment." 30 C.F.R. 556.710. Similarly, the holder of the operating rights (who does not hold record title) who assigns the operating rights remain liable for all obligations of the lease that accrued during the period in which the operator owned the operating rights 30 C.F.R. 556.805.

Predecessor has no liability for decommissioning costs which relate to wells drilled, or facilities installed, after the Predecessor ceased to be a record owner. Consequently, the cost to the Government to decommission any wells and facilities installed after the Debtors became owners should be specifically disclosed.

53. Likewise, the Predecessors also are not, by virtue of their prior ownership of record interests, required to undertake the ongoing monitoring and maintenance (M&M) activities as to the hundreds of wells, pipelines and platforms to detect leaks, spills, or other issues. A Predecessor also has no obligation to clean up or remediate any environmental event, such as a spill or discharge, which might take place years after the Predecessor ceased to be the owner of a record title interest in the property. Once abandoned, especially if there is no operator, these expenses apparently fall through to the Government. The Disclosure Statement should disclose and acknowledge that the Government (and taxpayers) will be burdened with a huge potential liability for the M&M obligations and any subsequent environmental events on a go-forward basis.

54. Here, for example, XTO assigned its interest in the XTO Leases to Fieldwood Offshore effective August 1, 2011. Whatever liability XTO may have for the P&A Obligations, this will not extend to wells drilled, or facilities installed, from and after August 1, 2011. In addition, XTO has no duty to provide ongoing M&M services or to remediate environmental events occurring more than a decade after XTO ceased to be a record owner of the XTO Leases. If these burdens in fact will fall through to the Government under the Joint Plan, this needs to be addressed and disclosed in the Disclosure Statement.

**E.    The Disclosure Statement fails to disclose how the Debtor's cash and cash equivalents will be used under the Joint Plan.**

55. According to the Disclosure Statement, the Debtors will receive, among other consideration, "cash in the amount of $224 million" in connection with the Credit Bid Transaction (*See* Disclosure Statement, p. 13, section I(A)). There is no clear explanation in the Disclosure

Statement as to how this $224 million is to be used pursuant to the Joint Plan. The Disclosure Statement also states that FWE III will retain approximately $27 million in capital, as well as other assets. The Disclosure Statement fails to fully reflect the source of this cash or what assets are to be retained by FWE III.

56.     The Monthly Operating Report (MOR) [Docket No. 820] for the period ended December 31, 2020, reflects on the Debtors' consolidated balance sheet $266.6 million in current assets, including cash and cash equivalents of $97.2 million, account receivables and operating revenues of $61.5 million and inventory of $37.2 million. Current liabilities are reflected at $171.9 million, leaving an excess of current assets over current liabilities of approximately $105 million. The Disclosure Statement does not explain the disposition of these assets or how the $105 million in potential equity is to be applied under the Joint Plan.

57.     The Debtors may have hundreds of millions of dollars which could be applied to the P&A Obligations. However, the Joint Plan allocates all of Debtors' assets to either Newco or decommissioning costs of properties transferred to FWE I and FWE III. Nothing is allocated to the billions of dollars in decommissioning costs in connection with the Abandoned Properties. As such, the Joint Plan discriminates unreasonably against the Predecessors in relation to the Abandoned Properties in violation of section 1129(b). Consequently, the holders of claims based on the Abandoned Properties are entitled to full disclosure as to how the Debtors' existing assets are being allocated among the different constituencies and properties. The Disclosure Statement fails to make this clear.

**F.     The Disclosure Statement fails to provide adequate information in relation to the properties to be abandoned.**

58.     The schedule of Abandoned Properties only describes the properties by lease numbers on Exhibit "D" to the Disclosure Statement. The Disclosure Statement contains no information about the individual properties themselves, including a description of the structures on the properties (wells, pipelines and platforms) or any other information from which any

Predecessor may be able to reasonably assess the nature and potential amount of the P&A Obligations or what (if anything) the Debtors have done toward the decommissioning the properties. Likewise, the Disclosure Statement fails to address the manner in which the Debtors intend to comply with *Midlantic*. Significantly, the Disclosure Statement also contains no information from which any Predecessor may assess as to each of the Abandoned Properties, whether the public health and safety will be protected as to the hundreds of wells, pipelines, and platforms which will still be in place on the properties post-abandonment. Unfortunately, the Disclosure Statement contains no information from which these key issues may be assessed, including how the Debtors intend to comply with their *Midlantic* duties or the Federal Regulations.

59.     The lack of adequate disclosure in relation to the Abandoned Properties on these issues include the following:

a.     <u>Terminated and Relinquished Leases</u>. The Disclosure Statement should disclose which of the properties have terminated or relinquished back to the Government, and the dates on which these events occurred. This disclosure is important to determine the timeline for decommissioning, which generally must be completed within one year after the termination of the lease. 30 C.F.R. 250.1710 and 1725.

b.     <u>Facilities on each abandoned Lease</u>. The 187 Abandoned Properties include various facilities for the production of oil and gas, including hundreds of wells, well heads, platforms, pipelines and other tangible things which will be subject to decommissioning, including potential removal, as a part of the P&A Obligations. Decommissioning obligations also include the removal of facilities located on the property. 30 C.F.R. 250.173, 1710 and 1725. As to each property included in the Abandoned Properties, the Disclosure Statement should disclose, in reasonable detail, the various tangible structures and other facilities located on each such property included within the Abandoned Properties. Moreover, without this information, XTO and other potential Predecessors cannot make an informed decision as to the potential

P&A Obligations associated with each such property. Without a complete understanding of the facilities on each lease, there is no basis to determine the potential decommissioning costs as to that property, or to assess how the public safety and welfare will be protected as to each of the Abandoned Properties, or the manner in which the Debtors intend to comply with their *Midlantic* duties as to these structures and facilities.

      c.     <u>Post-abandonment M&M Obligations</u>. The Disclosure Statement should address the post-abandonment M&M obligations on a property-by-property basis. This should include a property-by-property disclosure as to how this will be handled. This is essential to assess the burden which will be placed on the Government and to assess whether the public health and safety will be adequately protected.

      d.     <u>Estimates of P&A Costs</u>. As to each of the properties included in the Abandoned Properties, the Disclosure Statement should reflect the information available to the Debtors as to the potential P&A Costs for each such lease. The BSEE Estimates for the XTO Leases are set forth in the attached **Exhibit "A"**. The Disclosure Statement should also disclose the Debtors' own estimates of the P&A Obligations as to each of the properties ("<u>Debtors P&A Estimates</u>") and provide a reasonable explanation as to how these estimates were derived. The Disclosure Statement should also describe (a) what part, if any of the P&A Obligations have been performed by the Debtors to date, as well as the amount expended on such work to present, (b) what part, if any, of the P&A Obligations the Debtors intend to undertake through the Effective Date of the Joint Plan, (c) what part of the P&A Obligations the Debtors intend to shift onto third-parties post-abandonment, and (d) the manner in which the public health and safety have been properly protected as to each of the properties.

      e.     <u>Wells on each property</u>. The Disclosure Statement should likewise describe the wells located on each of the properties included in the Abandoned Properties, the nature of the hydrocarbons produced from each such well, whether the well head is on the seabed or a

---

**Objection to Debtors' Disclosure Statement**          **Page 33**

platform, whether the well is still producing and, if no longer producing, the date on which each well ceased to produce.

f.　　Debtors as Operators.  The Disclosure Statement should reflect the specific properties for which one of the Debtors is the operator and the date on which each became the operator of each specific property.

g.　　Partial Abandonment.  It appears that Debtors may seek to abandon portions of some leases while retaining some portion thereof or some rights in the lease.  If so, this needs to be clearly disclosed by identifying each such lease with particularity along with a specific description of what properties or rights Debtors intend to retain and which properties and rights Debtors intend to abandon.

h.　　Incident of Non-compliance Notices.  Upon detecting a violation of the applicable regulations, BSEE issues an Incident of Non-compliance (INC) to the offending party. According to the Chevron Objection, the Debtors have received more than 200 INC's from BSEE.  The existence and nature of any such INC notice by BSEE in relation to any property is crucial to allow any Predecessor to fully assess the status of any property and the P&A Obligations in connection with any property.  The Disclosure Statement should provide full information as to all INCs on a property-by-property basis.

60.　　Although disclosing the foregoing information will allow Predecessors to assess their potential P&A liability with respect to the Abandoned Properties for the period during which they were in the chain of title, the Disclosure Statement must still answer the more fundamental questions regarding how the public health and safety will be protected post-abandonment, including who will operate the properties, who will perform the necessary ongoing M&M, who will actually perform the necessary P&A Obligations (and when), and who will pay for any orphan P&A Obligations (i.e., liabilities that accrued after the Debtors acquired the properties). In sum, the Debtors have not explained how they can or will satisfy the requirements of *Midlantic*.  The Debtors' current intention of walking away from the Abandoned Properties,

without any plan to transition the properties to a replacement operator or otherwise ensure the P&A Obligations will be timely performed, is wholly inadequate to ensure the public's health and safety, and fails to even arguably comply with *Midlantic*.

**G.     The Disclosure Statement fails to provide sufficient information regarding whether available surety bonds for the benefit of BOEM exist to secure P&A and M&M Obligations.**

61.     The Disclosure Statement states that, as of the Petition Date, the Debtor had approximately $177 million in surety bonds for the benefit of BOEM to secure the Debtors' P&A Obligations. (Disclosure Statement, p. 28, III.B.1(b)). However, there is no information in the Disclosure Statement reflecting which properties are covered by bonds, the balance on each surety bond which is still available to secure P&A Obligations, and whether the available BOEM bonds secure or will secure properties that will be conveyed, retained, or abandoned by the Debtors.  Moreover, without such information on a property-by-property basis, Predecessors, such as XTO, cannot determine whether and to what extent such bonds may be available to defray P&A expenses for each of the relevant Abandoned Properties.  As such, the Disclosure Statement fails to provide sufficient information for any Predecessor to assess to what extent BOEM is secured as to each of the properties.

62.     Likewise, if the Debtors are permitted to abandon the Abandoned Properties, there will also be a significant gap period between abandonment and the completion of decommissioning during which the properties would not be monitored and maintained by the Debtors.  The Disclosure Statement does not address this gap period, the resulting risk to the public's health and safety, the potential costs to the government associated with the Abandoned Properties during this period, or whether the available BOEM bonds may be drawn on by the government for the purpose of hiring a replacement operator to perform the necessary M&M on the properties post-abandonment.  The Disclosure Statement does not provide adequate information regarding the BOEM bonds for parties to determine whether, or to what extent, such BOEM bonds would enable the government to cover the cost of ongoing M&M activity for the

Abandoned Properties post-abandonment until such time as the decommissioning is complete. Alternatively, if this is another cost that will fall on taxpayer's post-abandonment, then the Disclosure Statement needs to clearly state that this is the case.

**H. The Disclosure Statement fails to provide sufficient information regarding available third-party surety bonds.**

63. Although the Disclosure Statement provides that the Debtors have obtained $494 million in surety bonds relating to P&A Obligations owed to third parties (other than Apache) (*See* Disclosure Statement, p. 17, § III(B)(1)(c)), the Disclosure Statement does not disclose whether those bonds are available for properties to be conveyed, retained, or abandoned. Further, the Disclosure Statement does not specify how any of the bonds that relate to the Abandoned Properties are allocated to each property. This information is necessary to enable XTO, and other Predecessors, to determine whether the Debtors' surety bonds will be adequate to satisfy the Debtors' total P&A Obligations associated with the Abandoned Leases. This information, in turn, is relevant in determining whether the Debtors seek to abandon property in contravention of state and federal environmental regulations requiring the plugging, abandoning and decommission of the Abandoned Properties, including the leases.

64. For these reasons, the Disclosure Statement should be amended to provide the aggregate amount of surety bonds (or letters of credit) available for the Abandoned Properties, and, for each of the individual Abandoned Properties, what bonds (or letters of credit) are available, what properties or wells they cover, the identity of the applicable surety companies, the original amount of the bond, the amounts previously utilized and the balances remaining under each surety bond or letter of credit.

## VIII. The Joint Plan is Unconfirmable

65. The Debtors do not appear to make any pretense of satisfying their duties under *Midlantic*. Consequently, the Joint Plan is unconfirmable on its face, and approval of a disclosure statement serves no purpose.

## IX. <u>Reservation of Rights</u>

66.     This Objection is submitted without prejudice to, and with a full express reservation of, the rights of XTO to supplement and amend this Objection and to introduce evidence at any hearing relating to this Objection, and to further object to the Joint Plan on any and all grounds.  Moreover, XTO reserves its right to invoke each issue, fact, legal basis, and matter identified in the Objection as a basis for denying approval of the Disclosure Statement and confirmation of the Joint Plan pursuant to any applicable provision of the Bankruptcy Code, regardless of the particular subsection of this Objection in which the issue is raised**.**

DATED:  February 22, 2021                                    Respectfully Submitted,

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR XTO OFFSHORE, INC., HHE
ENERGY COMPANY, AND XH LLC

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served upon all parties receiving electronic notice via the Court's CM/ECF system on February 22, 2021.

/s/ J. Robert Forshey
J. Robert Forshey

L:\BFORSHEY\XTO - Fieldwood Energy (CrR) #6145\Pleadings\Objection to Disclosure Statement (BF & DTFR v) 2.22.21.docx

# Exhibit A

## Fieldwood BSEE Decommissioning Estimates

| Lease | Type | P50 | P70 | P90 | Deterministic |
|---|---|---|---|---|---|
| G0102 7 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $576,742.00 |
| | Platform Decom | $6,756,294.00 | $7,930,346.00 | $9,666,575.00 | $0.00 |
| | Platforms Site Clear Cost | $424,164.00 | $689,424.00 | $1,358,616.00 | $0.00 |
| | Wells Decom | $9,191,637.00 | $11,697,692.00 | $15,325,689.00 | $0.00 |
| | Subtotal for Lease | $16,372,095.00 | $20,317,462.00 | $26,350,880.00 | $576,742.00 |
| G0102 8 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $294,659.00 |
| | Platform Decom | $4,351,509.00 | $4,801,059.00 | $5,476,222.00 | $0.00 |
| | Platforms Site Clear Cost | $141,388.00 | $229,808.00 | $452,872.00 | $0.00 |
| | Wells Decom | $8,484,275.00 | $10,863,733.00 | $14,308,833.00 | $0.00 |
| | Subtotal for Lease | $12,977,172.00 | $15,894,600.00 | $20,237,927.00 | $294,659.00 |
| G0102 9 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $1,343,346.00 |
| | Platform Decom | $5,933,847.00 | $6,834,009.00 | $8,165,851.00 | $0.00 |
| | Platforms Site Clear Cost | $282,776.00 | $459,616.00 | $905,744.00 | $0.00 |
| | Wells Decom | $3,931,686.00 | $5,242,446.00 | $7,140,661.00 | $0.00 |
| | Subtotal for Lease | $10,148,309.00 | $12,536,071.00 | $16,212,256.00 | $1,343,346.00 |
| G0117 2 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $321,506.00 |
| | Platform Decom | $7,585,809.00 | $8,937,645.00 | $10,907,682.00 | $0.00 |
| | Platforms Site Clear Cost | $424,164.00 | $689,424.00 | $1,358,616.00 | $0.00 |
| | Wells Decom | $9,943,428.00 | $12,613,358.00 | $16,480,055.00 | $0.00 |
| | Subtotal for Lease | $17,953,401.00 | $22,240,427.00 | $28,746,353.00 | $321,506.00 |
| G0121 6 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $1,101,083.00 |
| | Platform Decom | $7,294,628.00 | $8,194,790.00 | $9,526,632.00 | $0.00 |
| | Platforms Site Clear Cost | $282,776.00 | $459,616.00 | $905,744.00 | $0.00 |
| | Wells Decom | $8,825,961.00 | $11,157,006.00 | $14,531,839.00 | $0.00 |
| | Subtotal for Lease | $16,403,365.00 | $19,811,412.00 | $24,964,215.00 | $1,101,083.00 |
| G0152 2 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $677,806.00 |
| | Platform Decom | $1,392,237.00 | $1,842,849.00 | $2,499,528.00 | $0.00 |
| | Platforms Site Clear Cost | $141,388.00 | $229,808.00 | $452,872.00 | $0.00 |
| | Wells Decom | $2,537,554.00 | $3,431,244.00 | $4,724,964.00 | $0.00 |

| | | | | | |
|---|---|---|---|---|---|
| | Subtotal for Lease | $4,071,179.00 | $5,503,901.00 | $7,677,364.00 | $677,806.00 |
| G0152 3 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $1,238,526.00 |
| | Platform Decom | $7,979,040.00 | $9,963,512.00 | $12,895,017.00 | $0.00 |
| | Platforms Site Clear Cost | $618,734.00 | $1,021,021.00 | $2,006,568.00 | $0.00 |
| | Wells Decom | $12,912,207.00 | $17,309,965.00 | $23,679,368.00 | $0.00 |
| | Subtotal for Lease | $21,509,981.00 | $28,294,498.00 | $38,580,953.00 | $1,238,526.00 |
| G0199 7 | Platform Decom | $2,260,415.00 | $3,160,577.00 | $4,492,419.00 | $0.00 |
| | Platforms Site Clear Cost | $335,958.00 | $561,405.00 | $1,100,824.00 | $0.00 |
| | Subtotal for Lease | $2,596,373.00 | $3,721,982.00 | $5,593,243.00 | $0.00 |
| G0222 0 | Platform Decom | $3,116,506.00 | $3,566,056.00 | $4,241,219.00 | $0.00 |
| | Platforms Site Clear Cost | $141,388.00 | $229,808.00 | $452,872.00 | $0.00 |
| | Wells Decom | $2,878,978.00 | $3,772,667.00 | $5,066,387.00 | $0.00 |
| | Subtotal for Lease | $6,136,872.00 | $7,568,531.00 | $9,760,478.00 | $0.00 |
| G0231 1 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $251,905.00 |
| | Platform Decom | $1,563,518.00 | $2,197,216.00 | $3,140,200.00 | $0.00 |
| | Platforms Site Clear Cost | $194,570.00 | $331,597.00 | $647,952.00 | $0.00 |
| | Wells Decom | $936,948.00 | $1,529,029.00 | $2,386,688.00 | $0.00 |
| | Subtotal for Lease | $2,695,036.00 | $4,057,842.00 | $6,174,840.00 | $251,905.00 |
| G0254 9 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $696,808.00 |
| | Platform Decom | $2,418,370.00 | $2,966,150.00 | $3,774,924.00 | $0.00 |
| | Platforms Site Clear Cost | $282,776.00 | $459,616.00 | $905,744.00 | $0.00 |
| | Wells Decom | $9,470,231.00 | $12,199,711.00 | $16,151,139.00 | $0.00 |
| | Subtotal for Lease | $12,171,377.00 | $15,625,477.00 | $20,831,807.00 | $696,808.00 |
| G0260 0 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $507,946.00 |
| | Platform Decom | $2,447,808.00 | $3,346,908.00 | $4,697,234.00 | $0.00 |
| | Platforms Site Clear Cost | $282,776.00 | $459,616.00 | $905,744.00 | $0.00 |
| | Wells Decom | $14,957,288.00 | $21,734,505.00 | $31,549,007.00 | $0.00 |
| | Subtotal for Lease | $17,687,872.00 | $25,541,029.00 | $37,151,985.00 | $507,946.00 |
| G0275 0 | Wells Decom Cost | $12,907,613.00 | $15,637,089.00 | $19,588,515.00 | $0.00 |
| G0275 4 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $4,784,400.00 |

| | | | | | |
|---|---|---|---|---|---|
| | Platform Decom | $12,099,732.00 | $13,273,784.00 | $15,010,013.00 | $0.00 |
| | Platforms Site Clear Cost | $424,164.00 | $689,424.00 | $1,358,616.00 | $0.00 |
| | Wells Decom | $19,320,946.00 | $23,439,367.00 | $29,401,644.00 | $0.00 |
| | Subtotal for Lease | $31,844,842.00 | $37,402,575.00 | $45,770,273.00 | $4,784,400.00 |
| G13607 | Platform Decom | $1,361,151.00 | $1,811,763.00 | $2,468,442.00 | $0.00 |
| | Platforms Site Clear Cost | $141,388.00 | $229,808.00 | $452,872.00 | $0.00 |
| | Wells Decom | $1,152,483.00 | $1,569,553.00 | $2,174,048.00 | $0.00 |
| | Subtotal for Lease | $2,655,022.00 | $3,611,124.00 | $5,095,362.00 | $0.00 |
| G22679 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $683,045.00 |
| | Platform Decom | $1,614,779.00 | $1,888,669.00 | $2,293,056.00 | $0.00 |
| | Platforms Site Clear Cost | $282,776.00 | $459,616.00 | $905,744.00 | $0.00 |
| | Wells Decom | $1,592,679.00 | $2,039,523.00 | $2,686,383.00 | $0.00 |
| | Subtotal for Lease | $3,490,234.00 | $4,387,808.00 | $5,885,183.00 | $683,045.00 |
| G22792 | Pipeline Decom | $0.00 | $0.00 | $0.00 | $2,084,400.00 |
| | TOTALS: | $370,333,873.00 | $468,666,567.00 | $617,654,753.00 | $27,039,944.00 |