IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| Fieldwood Energy LLC, et al., | § § | Case No. 20-33948 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

## OBJECTION OF ZURICH AMERICAN INSURANCE COMPANY TO DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS
[relates to ECF No. 723]

Zurich American Insurance Company ("**Zurich**"), files this *Objection to Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (the "**Objection**"), and respectfully shows as follows:

## I.
## INTRODUCTION

1.     Through their Joint Chapter 11 Plan (the "**Plan**") hatched last summer, and at the absolute nadir of market value, the Debtors allowed their first lien secured lenders to cherry-pick only the valuable assets from these bankruptcy estates to be acquired through a credit bid purchase to maximize value for these lenders.  Surety bond providers like Zurich are restricted under the Plan from looking to those purchased assets for recovery on their claims.  Under the Plan, the Debtors have also permitted Apache Corporation ("**Apache**") to receive operational control of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422) (collectively, the "**Debtors**").

Legacy Apache Assets (placed into FWE I). This would allow Apache to force the use of the surety bonds to pay for immediate P&A liabilities on those assets, while still retaining any residual value in the FWE I assets for Apache and delay payments of its own regulatory obligation. This "residual value" is retained in the form of a security interest granted to Apache - who is a contingent unsecured creditor on these assets - in exchange for a "loan" that only Apache can choose to provide to FWE I. This loan is intended to replace Apache's own P&A liability exposure to government regulators. The Plan is manifestly unfair to Zurich and other surety bond providers on the FWE I assets because it does not permit these Zurich and other surety bond providers – who are also contingent unsecured creditors on these assets - with similar rights to: (a) participate in the management and control of these assets or (b) ascertain the real market value of the assets and perhaps conduct a sale process to a solvent buyer; and (c) receive security or other residual value in these assets.

2.      The Disclosure Statement is insufficient[2] primarily because it does not attempt to separately value and provide financial projections for the four separate surviving post-reorganization entities: (1) Purchased Assets purchased through the Credit Bid Transaction with Newco (defined later herein), (2) FWE I (comprising mostly the Legacy Apache Assets (defined later herein)), (3) FWE III and (4) the Abandoned Assets. There are still remaining unanswered questions as to the feasibility of the operations of FWE I, the regulatory approvals required for this entity to operate, the extraordinary third-party releases associated with these assets, the ability to satisfy administrative expenses, and the successors' ability to obtain future surety credit. Zurich

---

[2] Notwithstanding Docket No. 1022, which are additional Disclosure Statement exhibits filed by Debtors on the day of the deadline to file objections. Some of the objections raised herein may be resolved by the new information provided by Debtors, but Zurich has had insufficient time to review and analyze the data. There remains additional information requested by Zurich that the Debtors agreed to provide pursuant to the Protective Order that would not be included in Docket No. 1022.

may decide to support the structures created under the Plan as long it is treated fairly and equitably, and in a similar manner as Apache. However, the Debtors must first provide sufficient information to justify the viability of these post-reorganization entities. Although the Debtors have attempted in recent days to provide more detailed and up-to-date information, the Disclosure Statement remains inadequate.

3.      For the foregoing reasons, approval of the Debtors' Disclosure Statement must be denied because (i) it lacks crucial and fundamental information about the Plan and thereby is preventing the Debtors' creditors and parties-in-interest from making an informed judgment about the Plan and (ii) the Plan, in its current form, is inherently unconfirmable because it contravenes the Bankruptcy Code and Supreme Court precedent.

## II.
## BACKGROUND FACTS

4.      On August 3, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") commencing cases for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to manage and operate their businesses as debtors in possession pursuant to 11 U.S.C. § 1107 and 1108.

5.      On January 1, 2021, the Debtors filed the Disclosure Statement (the "**Disclosure Statement**") and the *Joint Chapter 11 Plan of Fieldwood Energy, LLC and Its Affiliated Debtors* (the "**Plan**") [ECF No. 722].

6.      In the Plan, the Debtors propose through the Credit Bid Transaction and Plan of Merger[3] to place certain assets of the estate into four main buckets:

---

[3] Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Plan and/or Disclosure Statement.

(1) <u>Purchased Oil & Gas Lease Interests</u> – certain Deepwater Assets and Shelf Assets are to be sold to an entity formed by the Debtors' Consenting FLTL Lenders (the Credit Bid Purchaser identified in the Plan) ("**Newco**") in exchange for a credit bid of debt and a cash contribution under the Credit Bid Purchase Agreement[4];

(2) <u>FWE I</u> - assets assigned to FWE I are the Legacy Apache Properties, which are assets associated with the Debtors' 2013 acquisition from Apache, although they are not all the assets sold by Apache to the Debtors under the Apache PSA[5] (certain valuable assets are withheld from the Legacy Apache Assets). FWE I will "own, operate, plug and abandon, and decommission" the Legacy Apache Assets. This Apache Transaction will be accomplished through the Apache Term Sheet Implementation Agreement and the Apache Definitive Documents, which include, among several other documents, the: (i) Plan of Merger; (ii) FWE Energy I LLC Agreement; (iii) Transition Services Agreement ("**TSA**") with Newco; and (iv) Farmout Agreement with Newco. Apache will also provide liquidity of $400,000,000 from the Standby Credit Facility Documents (collectively, the "**Apache Transaction**");

(3) <u>FWE III</u> - assets assigned to FWE III are primarily assets not associated with the Legacy Apache Assets – i.e., the Debtors "remaining assets"; and

(4) <u>Abandoned Assets</u> - certain assets that are called Abandoned Assets, which are carved out of the other assets because the Debtors view these assets as properly allocated to predecessors-in-interest or joint owners for which such third-parties are jointly and severally liable on any P&A Obligations.

(collectively, the "**Post-Plan Entities**").

7.    Under the Apache Transaction, FWE I will only have one officer, the Sole Manager, an "independent" director *selected by Apache*, and no employees. Pursuant to the TSA, the Apache Transaction will rely on access to employees of Newco in order to conduct operations. The Apache Transaction grants Apache de-facto control over FWE I, control which is well beyond any right granted to Apache under the Decommissioning Agreement ("**DA**") (defined later herein). For example, Sections 7 and Section 10 of the FWE I Operating Agreement[6] grants Apache:

(a)    Veto rights over the selection of the independent director of FWE I, who cannot be removed without Apache's consent [Section 7.02] (*not* in the DA);

---

[4] See p. 2, 4-6 of the Disclosure Statement.
[5] Defined elsewhere herein.
[6] See Exhibit G-6 to the Disclosure Statement.

(b)     Consent rights over removal of the sole manager of FWE I [Section 7.03] (*not* in the DA);

(c)     Consent and information rights for bids for service providers to conduct P&A operations [Section 7.04] (*expanded* from the DA);

(d)     Consent rights as to sales, fundamental business transactions, or Farm-ins [Section 7.06] (*expanded* from the DA);

(e)     Consent rights as to Farm-outs [Section 7.06] (*expanded* from the DA);

(f)     Right of first refusal and information rights for the funding of capital expenditures [Section 7.09];

(g)     Information rights as to monthly operating data and operating budget [Section 10.01];

(h)     Inspection rights [Section 10.01];

(i)     Consent rights with regard to any development activities, including those with positive or accretive investment profile [Section 7.06] (*not* in DA and more harmful to FWE I because Apache can now force accelerated decommissioning, whereas before, the Debtors could extend P&A requirements by continued incremental production); and

(j)     Incur indebtedness other than provided by Apache, even if such indebtedness is on more favorable terms or used for positive or accretive investment activities [Section 7.06].

(collectively, the "**Consent Rights**").  Additionally, Apache has rights over the selection of P&A service providers. Any dispute as to the propriety of any action under the DA was previously subject to expert review, which is now removed in favor of Apache's discretion.  Also, Apache is granted a security interest in the assets of FWE I as collateral for the backstop loan facility, described in the Plan as a Standby Facility.

8.     Apache has filed proofs of claim against the Debtors' estates asserting that it is partially secured by a Trust A (defined later herein) and the Legacy Apache Surety Bonds in amounts of approximately $736,000,000 with an unsecured deficiency claim of $546,750,000.[7]

---

[7] See, Proof of Claim Nos. 230, 238, 236, and 238.

### III.
### <u>ZURICH'S SURETY INTERESTS</u>

9.      As discussed at earlier points in these bankruptcy cases, the surety bonds issued to the Debtors' are not all similarly situated.  Zurich's surety bond interests are primarily related to liabilities associated with the Legacy Apache Assets.  When Apache sold certain assets to the Debtors (the "**Legacy Apache Assets**") pursuant to a Purchase and Sale Agreement dated July 18, 2013 (the "**Apache PSA**"),[8] the parties entered into a decommissioning agreement dated September 30, 2013, as amended and supplemented (the "**Decommissioning Agreement**" and/or the "**DA**"), under which Apache's continuing decommissioning liabilities to government regulators would be satisfied by the Debtors. Pursuant to the Decommissioning Agreement, the Debtors were required to, among other things, collateralize their obligations to Apache by assuring that approximately $500,000,000 in Apache's P&A exposure would be secured by the issuance of one or more letters of credit and/or surety bonds issued to benefit Apache. In partial response, on November 12, 2015, the Debtors caused the issuance of four standby letters of credit by Deutsche Bank AG New York Branch ("**Deutsche Bank**") in favor of Apache in the total sum of $300,000,000.[9]  As a condition for the issuance of the Deutsche Bank L/Cs, Deutsche Bank required the Debtors to obtain surety bonds to collateralize Deutsche Bank's payment obligation. On November 9, 2015, Zurich issued four surety bonds in the total penal sum of $300,000,000 with Deutsche Bank as the obligee and the Debtor Fieldwood Energy LLC as the principal. Specifically, Zurich issued bond numbers LPM9181831, LPM9181832, LPM9181833[10], and

---

[8] See Disclosure Statement pp. 7-8 for additional background about the Apache-related assets.
[9] Specifically, Deutsche Bank issued standby letters of credit numbers 830BGC1500968, 839BGC1500969, and 839BGC1500970 each in the amount of $67,557,357.00 and standby letter of credit number 839BGC1500971 in the amount of $97,327,931.00 (collectively, the "**Deutsche Bank L/Cs**"). These parties also entered into that certain Continuing Agreement for Standby Letters of Credit dated November 9, 2015 (the "**Deutsche Bank Continuing Agreement**").
[10] Each with a bond penal limit of $67,557,356.00.

LPM9181834[11] related to the Deutsche Bank L/Cs (collectively, the "**Zurich Bonds**"). As a condition of the issuance of the Zurich Bonds and other prior Zurich bonds, Zurich required the Debtor Fieldwood Energy LLC to enter into a General Agreement of Indemnity dated September 18, 2014 (the "**Zurich GAI**").[12]

  10. The waterfall provisions of the Decommissioning Agreement that may create liability for the Debtors under the Zurich Bonds and the Zurich GAI are generally summarized as follows: the Debtors have primary responsibility to conduct decommissioning operations under the Decommissioning Agreement under a mutually agreed upon schedule. If the Debtors fail to complete these requirements, or if Apache is ordered to undertake decommissioning by a government regulator (a "**Government P&A Order**"), and Apache incurs expenses associated with a Government P&A Order, then Apache can be reimbursed first by funds held in a trust ("**Trust A**") created by the Decommissioning Agreement (currently with approximate amount of $235,000,000 in assets). If Trust A is exhausted, then Apache may request a draw on the Deutsche Bank L/Cs. Thereafter, Deutsche Bank may demand payment on the Zurich Bonds in accordance with their terms. When Zurich pays Deutsche Bank, the Debtors then become liable to Zurich under the Zurich GAI. Separately, Apache may also draw on 100% the Deutsche Bank L/Cs if the Debtors fail to pay the annual fees due on the Deutsche Bank L/Cs and they are due to expire.

  11. Zurich filed four proofs of claim against the various Debtor entities obligated on the Zurich GAI estate asserting an unsecured claim in the amount of $300,000,000.00.[13]

  12. Surety bonds are different and distinct from insurance policies. First, surety bonds are three-party instruments between (i) the primary obligor (Debtor Fieldwood Energy, LLC

---

[11] With a bond penal limit of $97,327,931.00.

[12] Copies of the Zurich Bonds and the Zurich GAI are attached to Proof of Claim Nos. 787, 791, 793 and 834 filed by Zurich.

[13] See, Proof of Claim Nos. 787, 791, 793 and 834.

pursuant to the DA and L/Cs), who is named as principal on the bond and remains primarily liable for all permit obligations, (ii) the obligee, to which the Debtors owe performance and payment of their obligations under the DA and L/Cs, and (iii) the surety, who is secondarily liable to the obligee. *Nat'l Am. Ins. Co. v. Boh Bros. Constr. Co.*, 700 So. 2d 1363, 1366 (Ala. 1997) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985)). In the event of a default by the primary obligor (i.e., the principal), the surety is answerable to the obligee to perform the bonded obligation if the conditions of the bond are otherwise satisfied. See *A.J. Kellos Constr. Co. v. Balboa Ins.* Co., 495 F. Supp. 408, 412 (S.D. Ga. 1980) (citing Restatement of Security § 82 (1941)).

13. Second, surety bonds, including the Zurich Bonds, are non-assumable financial accommodations. 11 U.S.C. § 365(c)(2); *In re Wegner Farms*, 49 B.R. 440 (N.D. Iowa 1985); *In re Edwards Mobile Home Sales, Inc.*, 119 B.R. 857 (Bankr. M.D. Fla. 1990). A surety is also discharged from its liability under its bond if there is an involuntary substitution of the principal under the bond because such change constitutes a material alteration of the surety's risk. See, e.g., *95 Lorimer, LLC v. Insur. Co. of State of Pennsylvania*, 789 N.Y.S.2d 833 (N.Y. Sup. Ct. 2004) (holding that a change in "composition or structure" of the principal discharged the surety from its bond obligations); *Becker v. Faber*, 19 N.E.2d 997, 999 (N.Y. 1939) ("This court has said that the '[surety]'s obligation is *strictissimi juris*, and he is discharged by any alteration of the contract to which his guaranty applied, whether material or not, and the courts will not inquire whether it is or is not to his injury'"); *Leila Hosp. & Health Ctr. v. Xonics Medical Sys., Inc.*, 948 F.2d 271, 275 (6th Cir. 1991) ("surety law suggests that a substitution of obligors releases the surety because it creates a different contract on which they never intended to become liable").

# IV.
## ARGUMENT AND AUTHORITIES

**A.**     **The Disclosure Statement Does Not Contain Adequate Information as Required by Bankruptcy Code § 1125 and Cannot Be Approved.**

    14.     The Disclosure Statement does not contain information sufficient to allow unsecured creditors to make an informed decision whether to accept or reject the Plan and in some instances contains incomplete, inaccurate or misleading information. The Fifth Circuit and courts within have opined that "the importance of this disclosure duty cannot be overemphasized" and "[t]he three most important words in the bankruptcy system are: disclose, disclose, disclose." *In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999); *In re Bigler, LP*, 443 B.R. 101, 117 (Bankr. S.D. Tex. 2010). Here, the Disclosure Statement does not adequately disclose the information required under § 1125 and should be amended to address the issues raised below.

    (1)     <u>Applicable Legal Standard.</u>

    15.     Section 1125(b) requires that a disclosure statement contain "adequate information" before a plan of reorganization is approved and votes are solicited.[14] 11 U.S.C. § 1125(b); *In re Woerner*, 783 F.3d 266, 271 (5th Cir. 2015). Adequate information means that the disclosure must contain "information of a kind, and in sufficient detail…that would enable a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan…" 11 U.S.C. § 1125(a)(1); *Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998); *In re Texas Extrusion Corp*, 844 F.2d 1142, 1157 (5th Cir. 1988), cert. den., 488 U.S.

---

[14]11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 518 (5th Cir. 1998) ("The legislative history of § 1125 indicates that, in determining what constitutes adequate information with respect to a particular disclosure statement . . . the kind and form of information are left essentially to the judicial discretion of the court and that the information required will necessarily be governed by the circumstances of each case.") (internal citations omitted); *Floyd v. Hefner*, 2006 WL 2844245, at *30 (S.D. Tex. Sept. 29, 2006) (noting that what constitutes "adequate information" is a flexible standard)

926 (1988); *In re American Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988).

Adequacy "of information is a determination that is relative both to the entity (e.g.

complexity/amount of assets being reorganized or liquidated) and to the sophistication of the

creditors." *In re Rodriguez Gas & Oil Serv., Inc.*, 2008 Bankr. LEXIS 2718 (Bankr. S.D. Tex.

2008) (finding that the disclosure statement did not provide adequate information).

16.     Courts frequently consider the following nineteen factors in evaluating the

adequacy of a disclosure statement:

> (1) the events which led to the filing of a bankruptcy petition; (2) a
> description of the available assets and their value; (3) the anticipated
> future of the company; (4) the source of information stated in the
> disclosure statement; (5) a disclaimer; (6) the present condition of
> the debtor while in Chapter 11; (7) the scheduled claims; (8) the
> estimated return to creditors under a Chapter 7 liquidation; (9) the
> accounting method utilized to produce financial information and the
> name of the accountants responsible for such information; (10) the
> future management of the debtor; (11) the Chapter 11 plan or a
> summary thereof; (12) the estimated administrative expenses,
> including attorneys' and accountants' fees; (13) the collectability of
> accounts receivable; (14) financial information, data, valuations or
> projections relevant to the creditors' decision to accept or reject the
> Chapter 11 plan; (15) information relevant to the risks posed to
> creditors under the plan; (16) the actual or projected realizable value
> from recovery of preferential or otherwise voidable transfers; (17)
> litigation likely to arise in a non-bankruptcy context; (18) tax
> attributes of the debtor; and (19) the relationship of the debtor with
> affiliates.

*In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); see also *In re

Divine Ripe, L.L.C.,* 554 B.R. 395, 401-20 (adopting *Metrocraft* factors); *In re Cypresswood Land

Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) (adopting *Metrocraft* factors).

17.     Whether or not adequate information is determined on a case-by-case basis that

falls within the sound discretion of the court, taking into account all of the circumstances of the

case. *In re Cajun Elec. Power Coop, Inc.,* 150 F.3d at 518; *Matter of Texas Extrusion Corp.*, 844

F.2d 1142, 1157 (5th Cir. 1988); See S. Rep. No. 989, 95th Cong., 2d Sess. 121 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5907.  This includes information relevant to the risks of the creditors under the terms and provisions of the plan. *In re Cajun Elec. Power Coop, Inc.,* 150 F.3d at 518.

  (2) <u>Disclosure Statement Objections.</u>

  18. Here, although the Disclosure Statement provides information about the Debtors' business and an explanation for their need to file for bankruptcy, the Disclosure Statement fails to provide information necessary for unsecured creditors to make an informed decision when voting on the Plan. ***Zurich acknowledges that on the morning of the current deadline to file objections (March 16, 2021), Debtors filed additional exhibits [Dkt No. 1022] ostensibly to respond to many of the creditors objections already filed.  These new exhibits may resolve some or all of the objections raised below, but Zurich has had insufficient time to review, evaluate and respond to the new exhibits.  Zurich reserves the right to amend or supplement this objection***.

  19. In its current form, the Disclosure Statement is both facially and substantively deficient with respect to critical Plan-related issues, and thus, fails to satisfy the basic disclosure requirements of § 1125(a). The glaring deficiencies in the Disclosure Statement include:

    (a) *The Disclosure Statement Fails to Adequately Describe the Nature, Value and Extent of the Assets to Be Assigned to FWE I.*

  20. According to the Plan, certain assets that were originally purchased from Apache are to be assigned to FWE I. The Disclosure Statement claims that the Plan will "ensure that all plugging and abandonment and decommissioning obligations [the "**P&A Obligations**"] are allocated to appropriate parties for performance in a responsible and safe manner."[15]  This

---

[15] See Disclosure Statement, p. 1 and elsewhere.

ambiguous statement is not supported by appropriate information to allow Zurich to adequately assess the viability of FWE I, which is the source of exposure under the Zurich Bonds. While the Debtors have tried to provide detailed information to Zurich through the court-approved Protective Order, there remains insufficient information about the FWE I properties.

21.     The Disclosure Statement does not include financial projections for FWE I. Thus, Zurich is unable to ascertain the solvency of FWE I post-confirmation and the adequacy of future cash flows to cover future P&A liabilities. The only description regarding future revenues included in the Disclosure Statement suggests that the FWE I assets will produce 25,000/boe per day.[16] However, the Disclosure Statement fails to provide historical analysis of the properties to allow creditors to compare current production and the Disclosure Statement estimate.

22.     Further, there are no forecasts of future oil and gas production, revenues, operating costs or operating cash flows associated with the FWE I assets or any of the other Post-Plan Entities resulting from the Plan. Additionally, there are also no projected revenues, operating costs, operating cash flows or timing associated with the expected 25,000/boe per day that is listed in the Disclosure Statement. The Debtors should provide useful financial projections and the basis for the assumptions used to generate the projections for the FWE I and the other Post-Plan Entities to determine if the companies can remain solvent long enough to ensure that all P&A liabilities will be satisfied.

23.     Without this information, Zurich cannot determine the amount of the potential drawdown of the Zurich Bonds.  Based on the omissions discussed above, the Debtors cannot satisfy any feasibility analysis required to confirm a Chapter 11 Plan, especially as to the FWE I assets.

---

[16] See p. 63 of Disclosure Statement.

(b)     *The Disclosure Statement Fails to Adequately Describe the Debtors'*
         *Plugging and Abandonment Obligations Related to the FWE I Assets.*

24.     The Disclosure Statement is devoid of any meaningful analysis of the P&A

Obligations associated with the FWE I assets. This analysis is the primary information necessary

to determine the feasibility of FWE I as a surviving entity. The glaring omission makes it

impossible to assess whether the Plan is fair to Zurich and other sureties, whose contingent and

secondary liabilities will be determined by this analysis.

25.     The Disclosure Statement estimates that FWE I will have $965 million to $1.16

billion in *total* obligations; however, the Bureau of Safety and Environmental Enforcement

("**BSEE**") estimates that the Debtor Fieldwood Energy LLC's total P&A obligations will exceed

$4.7 billion.[17]   The Disclosure Statement does not separately identify the P&A obligations for

FWE I.  Due to the wide range of potential obligations, additional information is needed for Zurich

to understand the true obligations associated with the FWE I assets.

26.     Furthermore, although the current plan does contain some information, it does not

provide any documentation to support the claim of estimated P&A costs. Supporting

documentation has been requested for the calculations the Debtors are using for its estimates of

P&A liabilities associated with the FWE I assets disclosed in the Disclosure Statement and in the

Ryder Scott reserve report (provided confidentially under the Protective Order). This information

should include detailed descriptions of the assets and the methodologies the Debtors use for

estimating costs for abandoning the assets. Also, the Debtors should supply any third-party

engineering report that has been utilized for cost estimates or that has been provided to government

agencies per disclosure requirements. This information is standard information the Debtors should

---

[17] See proof of claim, No. 896 filed in this case. The total P&A for all of the Debtors is estimated at approximately
$9.0 billion. See Claim Nos. 895-902.

possess and should be readily available to disclose. Zurich and other sureties obligated to the FWE I assets have specifically asked for the Debtors YE 2020 ARIES database, upon which a significant amount of this information can be obtained. On several occasions, the Debtors have agreed to provide access to the ARIES database pursuant to the Protective Order, but as of the date of filing this Objection, have failed to do so. The Disclosure Statement should not be allowed to go forward until this database access is provided and Zurich has a reasonable amount of time to evaluate the information contained therein.

        (c)     *The Disclosure Statement Fails to Include Any Financial Projections for the FWE I Assets.*

27.     In order to confirm the Plan, § 1129(a)(11) requires that the Debtors prove that, "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed by the plan." *In re Cavu/Rock Properties Project I, LLC*, 530 B.R. 349, 355 (W.D. Tex. 2015), aff'd sub nom. *In re Cavu/Rock Properties Project I, L.L.C*, 637 F. App'x 123 (5th Cir. 2016). This is known as the "feasibility test." *Id.* To date, the Debtors have not provided any future *pro formas* under which the feasibility of FWE I can be measured.

        (d)     *The Disclosure Statement Fails to Adequately Describe the Marketing Efforts, If Any, That Were Done Regarding the FWE I Assets.*

28.     The Disclosure Statement describes the M&A Process, both prepetition and post-petition, related to the Debtors' Deepwater Assets to be sold to Newco. However, there is no mention of any prepetition or post-petition marketing of the FWE I Assets. Without a good faith attempt to market the FWE I assets, or any portion of its assets, there is no ability to compare value received from an arm's length sale of the FWE I assets versus the Debtors' Plan to operate the assets to end of life *with no future investment*. An increase in the price of the assets in FWE I

through a comparison could offset surety liability, but any effort in this regard can be prematurely forfeited by Apache in a rush to plug and abandon.[18] For instance, the FWE I assets have potential production and incremental capital projects that could be valuable to another party or could alleviate future P&A obligations via investment and generate incremental cash flows and extend the life of the properties.

29.     The Disclosure Statement fails to provide marketing information in four primary areas. First, the Disclosure Statement does not provide a capital budget contemplated for Newco (as part of the Farmout Agreement), nor a forecast of revenues derived from future capital investments. Without this information, it appears that the future capital investments are structured in such a way to benefit Apache and/or Newco, but to the detriment of FWE I creditors such as Zurich.

30.     Second, the Disclosure Statement also does not provide Zurich with sufficient information to make a fair market analysis of the terms put forth in the Farmout Agreement with Newco. Including the lack of information explaining a significant gathering and processing fee charged to FWE I for infrastructure originally representing assets that were initially to the benefit of the Surety provider.

31.     Third, the self-serving nature of the FWE I structure is most obvious in the allocation of P&A liability for any proposed farmout wells.  Under the Farmout Agreement, FWE I will incur 100% of the P&A liability for unsuccessful wells, which is not customary in the oil & gas industry. But for successful wells, FWE I will receive only a 50% working interest, which kicks in only after all capital investment costs have been recovered in full by Newco. This farmout

---

[18] Currently, under the TSA, FWE I must use (and enrich) Newco for all P&A activity.

structure amounts to "P&A free" exploration opportunities for Newco. Alternatively, a third-party sale, which has not been attempted by the Debtors, could yield significantly better value.

32.     Fourth, under the Farmout Agreement, future FWE I capital projects are proposed as a right, but not an obligation, accruing solely to Newco. However, the Disclosure Statement does not disclose whether, or if at all, any "proved behind pipe" and "proved undeveloped reserves" exist and may to be produced; nor does it disclose the value of any of the potential recovery, given projected capital costs over any given period of time. The Disclosure Statement should provide analysis of prospective FWE I capital projects so that the sureties can analyze the Plan's fairness to all FWE I contingent creditors, not just that which was accepted and agreed to by Apache. In the absence of a planned capital projects analysis, it is improper for rights associated with the Farmout Agreement to block any attempt by FWE I to develop capital projects that prospectively reduce the sureties contingent and unliquidated liabilities.

33.     Accordingly, the Disclosure Statement should not be approved due to the Debtors' lack of provided information and transparency into the marketing of the FWE I assets.

      (e)     *The Disclosure Statement Lacks Any Meaningful Analysis of Regulatory Approval for the Apache Transactions*.

34.     Issues revolving around the regulatory approval of the Debtors' Plan as well as the P&A Obligations are deficient. In the Disclosure Statement, the Debtors state several times that they continue to have ongoing discussions with the Bureau of Ocean Energy Management ("**BOEM**")[19] (and presumably BSEE) regarding their restructuring efforts and plans with respect to the Shelf Assets, but the Debtors do not set forth whether BOEM has approved of this restructuring, nor do the Debtors address the financial assurance/bonding requirements that BOEM

---

[19] See pp. 1, 2, 9, 35 of the Disclosure Statement.

will impose on FWE I and the Credit Bid Purchaser post-confirmation and how those requirements are going to be satisfied.[20]

35.     The Plan cannot be confirmed if BOEM either (a) does not approve of the assignment of the leases to FWE I and/or Credit Bid Purchaser,[21] or if (b) FWE I and/or Credit Bid Purchaser are unable to satisfy the financial assurance/bonding requirements imposed by BOEM. The entire Plan relies upon these two unanswered issues and the creditors are entitled to this information. Moreover, this information is critical to determining the exposure to the sureties under the Plan.

>(f)     *The Disclosure Statement is Devoid of Any Discussion About the Treatment of the Zurich Bonds and the Zurich GIA.*

36.     The proposed treatment of the Zurich Bonds and the Zurich GIA is not defined. The Debtors state in the Apache Term Sheet Implementation Agreement that:

> (ix) With respect to all bonds and letters of credit constituting Decommissioning Security, all claims for premiums, fees, reimbursement, indemnification, or any other claims, fixed, contingent, liquidated, unliquidated, or otherwise against the Debtors held by the companies issuing the bonds or letters of credit, shall neither be allocated to nor become the obligations of FWE I under the Plan of Merger. Notwithstanding the foregoing, all rights of the Apache PSA Parties with respect to such bonds and letters of credit shall be preserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties **under which any federal, state or local governmental entity is an obligee**.[22]

This paragraph does not adequately apprise Zurich with respect to the status of the post-confirmation Debtors or the FWE I indemnity obligations under the Zurich Bonds. Further, Deutsche Bank, for whom the Zurich Bonds were issued, is not a "federal, state or local governmental entity" obligee. Accordingly, Zurich cannot tell if the Debtors' intent in this

---

[20] See 30 C.F.R. §§ 556.900, 556.901 and 556.902 for the BOEM bonding requirements.
[21] *See* 30 C.F.R. § 556.700 ("With BOEM approval, you may assign your whole, or a partial record title interest in your entire lease, or in any aliquot(s) thereof").
[22] See p. 12 of the Apache Term Sheet Implementation Agreement (emphasis added).

bankruptcy is to have Zurich Bonds survive the bankruptcy without the associated indemnity obligations, especially against FWE I. It is Zurich's position that at a minimum, the surviving FWE I should become an indemnitor to the Zurich GAI. Thus, the Disclosure Statement should not be approved without additional information regarding the treatment of the obligations pursuant to the Zurich Bonds.

       (g)     *The Disclosure Statement Fails to Plainly Identify and Describe the Release/Injunction/Exculpation Provisions of the Plan.*

37.    The Disclosure Statement identifies a complicated and weaving structure of third-party releases, injunctions and exculpations, many of which relate to and include releases between Apache and the Debtors. Specifically, the "Apache Trust A Claims", as defined in the Apache Term Sheet Implementation Agreement, are not described in enough detail to determine if the settlement and release provisions related thereto are appropriate under the circumstances and will meet the standard of Bankruptcy Rule 9019. Further, the Disclosure Statement does not describe how and whether Zurich's separate rights as a surety are abrogated or compromised by the releases granted to Apache. Zurich contends that the Plan cannot purport to release any of Zurich's rights of subrogation or exoneration that flow through the Debtors or that could be asserted against Apache.

38.    Accordingly, there is not enough information to enable voters to make an informed voting decision and the Disclosure Statement thus should not be approved. *See, e.g., Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 713 (4th Cir. 2011) (simply listing the factors for releases is "meaningless in the absence of specific factual findings explaining why this is so.").

(h)     *Miscellaneous Objections.*

39.     The Disclosure Statement as filed on January 1, 2021 omitted numerous documents that may or may not be filed[23] or known to creditors prior to the Disclosure Statement objection deadline or any hearing on approval of the Disclosure Statement. Such documents include*:*

    (i)     *Exhibit I* (Liquidation Analysis),

    (ii)    *Exhibit J* (Valuation Analysis),

    (iii)   *Exhibit K* (Financial Projections),

    (iv)    *Exhibit L* (First Lien Exhibit Facility Term Sheet); and

    (v)     *Exhibit N* (Credit Bid Purchase Agreement).

Even if these documents are filed just prior to any objection deadline, there will not be time for any meaningful analysis or response by creditors. Furthermore, there is no indication that the Debtors intend to file such exhibits that separately examine FWE I, FWE III, Newco and the Abandoned Assets to determine if each Plan Entity can meet the standards set forth in the Bankruptcy Code necessary to confirm the Plan.

**B.     The Disclosure Statement Cannot Be Approved Because the Plan Is Patently Unconfirmable.**

40.     As alluded to in Section A, there are numerous areas of the Disclosure Statement that fail to provide adequate information; thus, the Disclosure Statement should not be approved, and the Plan cannot be confirmed without a more detailed analysis from the Debtors. Regardless of the level of disclosures in this regard, a handful of matters present threshold issues that make the Plan patently unconfirmable.

---

[23] See Footnote 2.

    (1)    <u>Applicable Legal Standard.</u>

    41.    Even when a disclosure statement provides appropriate disclosure to creditors, "a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed." *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) (citing cases) (emphasis added); see also, e.g., *In re Miller*, No. 96-81663, 2008 WL 191256, at *3 (Bankr. W.D. La. Jan. 22, 2008) (citing *In re Cardinal Congregate I,* 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990)). Notably, the determination of whether a disclosure statement contains "adequate information" can be subjective, but the Court does not have discretion to approve a plan that violates the provisions of § 1129, and the Court should not approve a disclosure statement that describes such a plan. *In re EQK Bridgeview Plaza, Inc.*, No. 10-37054-SGJ-11, 2011 WL 2458068, at *2 (Bankr. N.D. Tex. June 16, 2011) ("The court has also earlier declined to approve one disclosure statement filed by the Debtor in this case (at the urging of all of the Debtor's secured lenders), for the reason that the plan which it accompanied seemed patently unconfirmable."); *In re U.S. Brass Corp.,* 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible.").

    42.    As noted by the Third Circuit, "ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage." *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012) (citing *In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011)). However, "courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *Id.* at 154 (citing

numerous cases) (internal quotation marks omitted); see also *In re CBBT, L.P.*, 2011 WL 1770438, *3 (S.D. Tex. 2011) (rejecting disclosure statement filed by the debtor because the plan was unconfirmable on its face).

43.     The statutory basis for the bankruptcy court's power to deny a disclosure statement when the corresponding plan is unconfirmable is an interpretation of § 105, which allows courts to control its own docket and resources from being consumed by the consideration of a disclosure statement and plan that does not comply with confirmation requirements. *In re Am. Capital Equip.*, LLC, 688 F.3d 145, 154 (3d Cir. 2012). Courts following this interpretation of § 105 reason "that the estate and parties should not bear the expense and effort required by the full confirmation process if there is a fatal flaw that makes the plan unconfirmable as a matter of law." *In re K Lunde, LLC*, 513 B.R. 587, 590 (Bankr. D. Colo. 2014).

44.     In making the determination as to whether a plan is unconfirmable, the court's role is "not merely . . . ministerial," but involves "scrutiny of the circumstances" surrounding a plan. *Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145 (1940). A plan is "patently unconfirmable" if: "(1) confirmation defects cannot be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Capital Equipment.*, LLC, 688 F.3d at 155. In such circumstances, a court will not approve a disclosure statement because doing so would impose unnecessary cost and expense in solicitation and would cause estate professionals to waste time and resources of the estate and court. *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (rejecting a disclosure statement and noting that proceeding with an unconfirmable plan would subject the estate to needless expense); *In re Valrico Square Ltd. P'ship*, 1133 B.R. 794,

796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

(2) The Plan Is Not Proposed In Good Faith Within the Meaning of § 1129(a)(3) of the Bankruptcy Code.

45. Section 1129(a)(3) provides that a plan of reorganization must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The term good faith in undefined but "[i]n the context of a Chapter 11 reorganization ... a plan is considered proposed in good faith 'if there is a reasonable likelihood that the Plan will achieve a result consistent with the standards prescribed under the Code.'" *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir.1987) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984)); accord *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (Bankr. 9th Cir.1988). Notably, "[t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir.1984).

46. Pursuant to the Bankruptcy Code and court interpretations, "two of the primary objectives underlying a chapter 11 bankruptcy [are] the resolution of disputed claims and distribution of value to creditors." *In re Think Fin., LLC*, No. 17-33964 (HDH), 2019 WL 8272638, at *6 (Bankr. N.D. Tex. Dec. 2, 2019); see also *In re Kemp*, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991). Accordingly, "one of the primary objectives of the bankruptcy process is to pay claims as much as possible." *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010). It follows from the primary objectives that "the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective." *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994).

47. The Plan was not proposed in good faith. As discussed herein, the Debtors have proposed an unconfirmable Plan—flawed in various important respects. Under the circumstances

discussed above, Debtors cannot demonstrate that they acted with "honesty and good intentions" when entering into the RSA and the Apache Term Sheet, and that the Plan's results will not be consistent with the Bankruptcy Code's goal of ratable distribution to creditors.

48.     Further, the Disclosure Statement makes no mention of the value of the Legacy Apache Assets and no mention of any efforts to market and sell the Legacy Apache Assets. These assets may have considerable value. The Debtors' attempt to slice and dice the estate's assets for the benefit of the FLTL Lenders and Apache and to stick certain properties into FWE I without a credible analysis as to P&A Obligations highlights the lack of good faith on the Debtors' part.

49.     Additionally, under the Plan, Newco reserves its right to propose new projects through the Farmout Agreement and the entire structure of the Apache Transactions provide preferential and beneficial rights to Newco and Apache, but not to the Apache-related sureties. Zurich and many other creditors have an interest in the proper operation and management of the Legacy Apache Assets, and the inclusion of these assets in a sale process would greatly reduce contingent exposure for those creditors and satisfy the primary objective of the Bankruptcy Code. Thus, the Debtors failure to seek to utilize the assets through a sale or the reorganization is a disregard of good faith and for the primary objective of prioritizing payment to creditors.

50.     Accordingly, for the reasons stated above, the Debtors' have failed to satisfy the requirement of good faith under § 1129(a)(3) and the plan is patently unconfirmable.

(3)     Unequal and Unfair Treatment of Claims.

51.     Based on the codification of two separate sections, it is apparent that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. I.R.S.*, 496 U.S. 53, 54 (1990). Pursuant to §§ 1129(b)(1) and 1123(a)(4), creditors that hold similar claims or interests against the debtor must receive equal treatment under a plan of reorganization.

Specifically, § 1123(a)(4) mandates that a plan incorporate equal treatment, and § 1129(b)(1) directs that a plan that does not provide equal treatment in an unfair discriminatory fashion, must be denied confirmation. Here, both of these provisions are violated by the Debtors, resulting in a patently unconfirmable Plan.

(a)    <em>§ 1129(b)(1) – Unfair Discrimination</em>

52.    The unfair discrimination provision in § 1129(b)(1) "ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Trib. Co.*, 972 F.3d 228, 240 (3d Cir. 2020). Specifically, "the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so." *In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009), subsequently aff'd sub nom. *In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011). Courts should "examine the facts and circumstances of the particular case to determine whether unfair discrimination exists." *Id.* at 171.

53.    As discussed in the Supreme Court's opinion of *LaSalle,* a plan's treatment for a claim or interest includes the property or opportunities received by the holder thereof on account of that claim or interest, not just cash distributions. *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 443 (1999); see also *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010). In *LaSalle*, the Supreme Court held that an exclusive opportunity provided to certain equity holders of the debtor to exclusively purchase the equity in the reorganized entity holds value and should be treated as an interest in property. *526 U.S. 434* at 455-55. Notably, the Court specifically commented that the exclusive opportunity should not "be treated merely as a detail of the broader transaction" and that it was incorrect to argue that there was no favoritism inferred. *Id.* at 456.

54.     Here, Apache holds a contingent unsecured claim whereby liability is contingent upon the performance of the FWE I assets, just like Zurich and several other sureties.  The only parties the Debtors' negotiated with under the RSA are the FLFO/FLTL Lenders and Apache. However, the only identified secured creditor classes are Class 3 (FLFO Claims) and Class 4 (FLTL Secured Claims).  Apache is not treated as a secured creditor, although Apache asserts in its proofs of claim that it is secured.[24]   The Plan does not specifically treat Apache in any specific class, so Apache must fall into Class 6 (General Unsecured Claims).  Further, the catch-all Class 1 (Other Secured Claims) does not specifically include Apache.[25]  The Disclosure Statement must identify whether the Debtors intend that Apache be treated as a Class 1 creditor.  Unless stated otherwise, Apache falls into Class 6 and is given massively preferential treatment under the Plan even though it is similarly situated to Zurich and the other sureties.

55.     Unless the Debtors affirmatively otherwise, the Plan intends for Apache's claims to be reclassified as contingent general unsecured claims.  In doing so, there is a presumption that the Plan unfairly discriminates against Zurich. Specifically, the rebuttable presumption of abuse arises when there is "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Nuverra*

---

[24] See Claim Nos. 930-939.  Although Apache can look to the Trust A assets and to the surety bonds/Deutsche Bank L/Cs for reimbursement of any liability obligations under the DA, those aspects do not make Apache a secured creditor *of the Debtors*.  Those sources of recovery are independent of the Debtors and inure solely for the benefit of Apache.
[25] To the extent that Apache is intended by the Plan to be included into Class 1, then Zurich reserves the right to object to the secured nature of Apache's claims. Notably, Rule 3007 establishes no time limit for objecting to the allowance of a claim. *In re Simmons*, 765 F.2d 547, 553 (5th Cir. 1985); see also *In re Kolstad*, 928 F.2d 171, 174 (5th Cir. 1991).

*Env't Sols., Inc.*, 590 B.R. 75, 90 (D. Del. 2018), aff'd, 834 F. App'x 729 (3d Cir. 2021), as amended (Feb. 2, 2021). Here, the Plan proposes to provide Apache with Consent Rights that are <u>*much greater*</u> than originally permitted by the DA, which is the operative document that Zurich and other sureties bonded. Apache has also managed to <u>turn its P&A liability to the US Government into a secured loan to FWE I and scoop up any remaining value in FWE I after the surety bonds related to FWE I are exhausted</u>. The Plan does not provide the same Consent Rights and security interests to Zurich. Under the holding of the Supreme Court's *LaSalle* opinion, and the presumption of abuse test, this treatment violates of the Bankruptcy Code's fair and equal treatment provisions. Thus, the Disclosure Statement should not be approved because the Plan is patently unconfirmable under § 1129(b)(1).

> (b)    *§ 1123(a)(4) – Equal Treatment*

56.    Furthermore, based on the Plan's unfair discriminatory treatment under § 1129(b)(1), the Plan cannot be confirmed due to its violation of § 1123(a)(4), which requires equal treatment of class members. *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 283 (3d Cir. 2016). As discussed above, Apache's claim is properly classified as a contingent unsecured claim based upon the performance of the FWE I assets and falls within the same class as Zurich. Under § 1123(a)(4), courts have interpreted "the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). This treatment need not be identical, but it must be approximately the same for all members of the class. *Id.*

57.    Furthermore, the policy underlying the Supreme Court's opinion of *LaSalle* should be instructive in the Courts application of § 1123(a)(4). *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. at 443. As mentioned above, in *LaSalle* the Supreme Court held

that an opportunity provided to a creditor is an interest distributed through the Plan that may be considered when evaluating the fair and equal treatment of a class. *Id.*

58.     As discussed above, Apache is exclusively given valuable Consent Rights and the right to turn their contingent liability into a security interest in FWE I. The entire Apache Transaction should be considered favorable treatment.  Disparate treatment of this kind is exactly what § 1123(a)(4) was enacted to prevent. Accordingly, the Plan is patently unconfirmable due to the Debtors' failure to treat Zurich and Apache similarly as required by § 1123(a)(4).

(4)     All Third-Party Releases Are Improper Under Fifth Circuit Precedent.

59.     The release and exculpation provisions proposed in the Plan apply to a broad range of parties, including, the Debtors, the Post-Effective Date Debtors, the Apache PSA Parties, and each of their respective affiliates, predecessors, successors, and assigns.[26]   However, the Disclosure Statement lacks adequate information regarding these release and exculpation provisions. It is clear that such non-consensual injunctions are forbidden by Fifth Circuit case law. *E.g.*, *Bank of New York Trust Company, N.A. v. Official Committee of Unsecured Creditors (In re Pac. Lumber Co.)*, 584 F.3d 229, 240 (5th Cir. 2009); *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018), *aff'd sub nom. on other grounds*, 782 F. App'x 339 (5th Cir. 2019).

---

[26] *See* Debtors' Plan, Art. I. 1.1 "Released Parties."

## V.
## JOINDER

60.     To the extent not contradicted by the arguments contained herein, Zurich also joins in to the arguments and authorities in the objections set forth by all other sureties and filed with this Court in response to the issues that are similar to Zurich.

## VI.
## RESERVATION OF RIGHTS

61.     To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, Zurich reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan. To the extent Zurich is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan (including the Plan Supplement, Valuation Analysis, Liquidation Analysis, and Financial Projections) that may be filed after any deadline for objecting to the Disclosure Statement or confirmation of the Plan, Zurich reserves its right to object thereto on any basis whatsoever. Zurich further reserves the right to raise further and other objections to the Disclosure Statement prior to or at the hearing thereon.

## VII.
## CONCLUSION

WHEREFORE, Zurich prays that this Court (i) sustain this Objection; (ii) deny approval of the Disclosure Statement; and (iii) grant Zurich such other and further relief to which it may be justly entitled.

Dated: March 16, 2021

Respectfully,

*/s/ Duane J. Brescia*
Duane J. Brescia
State Bar No. 24025265
**CLARK HILL STRASBURGER**
720 Brazos, Suite 700
Austin, TX 78701
(512) 499-3647 (direct)
(512) 499-3660 (fax)
dbrescia@clarkhill.com

Christopher R. Ward
State Bar No. 24008233
Audrey L. Hornisher
State Bar No. 24094369
**CLARK HILL STRASBURGER**
901 Main Street, Suite 6000
Dallas, TX 75202
(214) 651-2056 (direct)
(214) 651-4330 (fax)
ahornisher@clarkhill.com

**Counsel for Zurich American Insurance Company.**

## CERTIFICATE OF SERVICE

I certify that on this 16th day of March, 2021, a true and correct copy of the above pleading was served upon all parties via the Court's electronic case filing system (ECF).

*/s/ Duane J. Brescia*
Duane J. Brescia