IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
|  | ) |  |
| FIELDWOOD ENERGY LLC, *et al.*,[1] | ) | CASE NO. 20-33948 (MI) |
|  | ) |  |
| DEBTORS. | ) | JOINTLY ADMINISTERED |
|  | ) |  |

**PHILADELPHIA INDEMNITY INSURANCE COMPANY'S OBJECTION TO THE
DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF FIELDWOOD
ENERGY LLC AND ITS AFFILIATED DEBTORS**

Comes now, Philadelphia Indemnity Insurance Company ("Philadelphia"), by and through its undersigned counsel, and objects to the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Dkt Entry No. 723] and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*[2] [Dkt Entry No. 1022] (collectively the "Disclosure Statement"). In support of its objection, Philadelphia respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors' *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan") [Dkt Entry No. 722], generally divides the Debtors' assets and liabilities into

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] The Debtors filed the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Amended Disclosure Statement") on March 16, 2021. Philadelphia is evaluating the thousand plus pages in the Amended Disclosure Statement and reserves all rights in relation thereto.

1

four categories: FWE I Assets,[3] Purchased Oil & Gas Lease Interests, FWE III Assets, and Abandoned Properties. Prior to the Debtors' bankruptcy filing, creditors of the parent-Debtor Fieldwood Energy LLC, including Philadelphia, held claims (either directly or indirectly) against the assets and cash flows of all the Debtors. The Plan attempts to limit these claims by ring-fencing each category of assets. In Philadelphia's case, it is unable to seek recoveries from the Purchased Oil & Gas Lease Interests, the Debtors' most profitable assets (which are being transferred to the Credit Bid Purchaser) and at best, can look to FWE I. Moreover, the Plan bestows significant consideration on Apache, in the form of defacto control over FWE I and related option value, which is not available to other unsecured creditors, including Philadelphia.

2. The Plan's preferred treatment of Apache and the Debtors' failure to market the FWE I Assets for sale in any way render the Plan patently unconfirmable. Although Apache and Philadelphia are similarly situated creditors (unsecured creditors with contingent liability on the Legacy Apache Assets), Apache receives unique consideration that is unavailable to Philadelphia. Apache's relationship to the Debtors as a party to the RSA and a consent party under Plan only magnifies the unfairness of Apache's preferred treatment. Section 1123(a)(4) and the Supreme Court's teachings in *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) confirm the commonsense conclusion that such disparate treatment precludes confirmation.

3. The Plan is not proposed in good faith because the Debtors have failed to market the FWE I Assets (the bulk of the Debtors' assets) for sale. On the Petition Date, this decision may have been defensible. It certainly is not today with WTI prices increasing and many oil field service providers carrying idle equipment. The primary goal of the Bankruptcy Code in a liquidation case (like this one) is maximizing the value of a debtor's estate for its creditors. This

---

[3] All capitalized terms that are not defined in this Objection have the meanings ascribed them in the Disclosure Statement.

2

objective is reflected in the good faith inquiry under 11 U.S.C. § 1124(a)(3).  The failure to market the FWE I Assets to maximize their value for the Debtors' estates undermines any assertion that the Plan is proposed in good faith and confirmable.

4.     Even if the Disclosure Statement were not patently unconfirmable, it provides scant information concerning FWE I for Philadelphia and other parties in interest to evaluate.  The Debtors' discussion of FWE I's feasibility did not include any meaningful financial projections until early this morning.  There is no statement concerning whether the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE" and collectively with BOEM, the "Regulators")) support or even consent to the divisional merger that will form FWE I.  Similarly, there is no explanation for the granting of third-party releases, injunctions, and exculpations, which as proposed, contravene the Bankruptcy Code and Fifth Circuit precedent.  The Disclosure Statement is also bereft of any explanation of how the Debtors' successors under the Plan intend to obtain the surety credit that is required for them to operate.  Lastly, the Disclosure Statement does not explain the basis for the disparate treatment of Apache and the value of the consideration it receives on account of its general unsecured claims, notwithstanding its substantially similar status as Philadelphia.

5.     The feasibility of FWE I, the required regulatory approval, the extraordinary third-party relief, and the successors' ability to obtain future surety credit, the disparate treatment of Apache are all foundational aspects of the Debtors' Plan.  In sum, the Disclosure Statement fails to provide adequate information explaining these issues and should not be approved.

## **BACKGROUND**

6.     On August 3, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Court") commencing cases for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to 11 U.S.C. § 1107 and 1108.

8.    The Debtors' cases are being jointly administered for procedural purposes pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

9.    On August 18, 2020, the U.S. Trustee appointed the Creditor's Committee pursuant to 11 U.S.C. § 1102. No trustee or examiner has been appointed in these chapter 11 cases.

10.    The Debtors, together with the non-debtor affiliates, are an independent exploration and production company with operations primarily located in the Gulf of Mexico. Additional information regarding the Debtors' business and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "Dane Declaration"). [Dkt Entry No. 29].

11.    On January 1, 2021, the Debtors filed the Disclosure Statement and the Plan. On March 16, the Debtors' filed

## PHILADELPHIA'S BOND AND INDEMNITY AGREEMENT

12.    In 2013, the Debtors purchased certain properties from Apache Corporation (the "Legacy Apache Properties") and agreed to assume the decommissioning liabilities (also known as plugging and abandonment obligations or "P&A Obligations") associated with Legacy Apache Properties. These P&A Obligations are overseen by the Regulators. The Debtors' P&A Obligations with respect to the Legacy Apache Properties are governed by a decommissioning agreement between, on the one hand, certain of the Debtors and on the other hand, Apache (the "2013 Decommissioning Agreement"). If the Debtors were unable or unwilling to satisfy their P&A Obligations under 2013 Decommissioning Agreement, and Apache satisfies the associated

4

P&A Obligations, Apache can reimburse itself from certain trust funds ("Trust A"),[4] and upon the exhaustion of Trust A, draw upon letters of credit.

13.     On February 15, 2018, the Debtors filed voluntary chapter 11 bankruptcy cases (the "2018 Bankruptcy Cases") in the Court.  The Debtors commenced their 2018 Bankruptcy Cases with a pre-negotiated chapter 11 plan (the "2018 Chapter 11 Plan").  The 2018 Chapter 11 Plan was confirmed by the beginning of April 2018.  As part of the 2018 Chapter 11 Plan, the Debtors entered into the Fifth Amendment to the Decommissioning Agreement (the "Fifth Amendment"). Under the Fifth Amendment, the Debtors were authorized to replace up to $148.7 million of letters of credit under the Decommissioning Agreement with an equivalent amount of surety bonds in a form and substance acceptable to Apache.  These surety bonds are treated *pari passu* with the remaining letters of credit.  However, the waterfall of priority among the sources of funds available to Apache in the event of a default by the Debtors under the Decommissioning Agreement remained unchanged (*i.e.* Trust A must be exhausted before Apache can draw upon any surety bonds or letters of credit).

14.     On September 27, 2018, Philadelphia issued Bond No. PB03251500040 (the "Bond") in the penal sum of $73,000,000 on behalf of Debtor-Fieldwood Energy, LLC, in favor of Apache as obligee.    The Bond assures the Debtors' P&A Obligations under the Decommissioning Agreement, as amended by the Fifth Amendment.  Philadelphia issued the Bond as consideration for the execution by Debtor-Fieldwood Energy, LLC of a General Indemnity Agreement on September 26, 2018 (the "Indemnity Agreement").   Among other things, the Indemnity Agreement obligates the Debtors to: (a) indemnify and hold harmless Philadelphia from and against any claim or liability arising as a result of having issued the Bond, (b) procure the discharge and release of the Bond, and (c) post collateral for the Bond and for any unreleased

---

[4] Originally, a Trust B also existed but it was combined with Trust A under the Fifth Amendment (as defined below).

4821-4359-5736, v. 2

liability. Everest Reinsurance Company, HCC International Insurance Company and Zurich American Insurance Company (collectively, the "Other Legacy Apache Sureties" and together with Philadelphia, the "Legacy Apache Sureties") also issued surety bonds (together with the Bond, the "Legacy Apache Bonds") assuring the Debtors' Debtors' P&A Obligations under the Decommissioning Agreement pursuant to the Fifth Amendment.[5]

15. Apache has filed proofs of claim against the Debtors' estates asserting that it is partially secured by Trust A and the Legacy Apache Surety Bonds in amounts of approximately $736,000,000, with an unsecured deficiency claim of $546,750,000. *See, e.g.*, [Proof of Claim Nos. 230, 238, 236, 238]. Philadelphia filed a proof of claim against the Debtor-Fieldwood Energy LLC's estate asserting an unsecured claim in the amount of $73,000,000.00. [Proof of Claim No. 710]. The Other Legacy Apache Sureties have also filed unsecured proofs of claim against the Debtors' estates. *E.g.*, [Proof of Claim Nos. 639, 658, 791].

## PLAN AND DISCLOSURE STATEMENT

16. The Plan contemplates dividing the Debtors' assets and liabilities into four categories. The Purchased Oil & Gas Lease Interests will be purchased by the Credit Bid Purchaser (an entity owned and controlled by the Consenting FLTL Lenders) pursuant to a $426 million credit bid and cash consideration of approximately $224 million. The Credit Bid Purchaser will assume certain liabilities set forth in the Credit Bid Purchase Agreement but will be otherwise free from all other liabilities owed by the Debtors. FWE I and FWE III will be organized as new stand-alone entities pursuant to a divisive merger. FWE I will be allocated and vested with the Legacy Apache Properties and related liabilities and obligations, including the Decommissioning Agreement. FWE I will be capitalized approximately $28 million by the Debtors.[6] The Plan also

---

[5] Zurich American Insurance Company Legacy Apache Bonds assure Deutsche Bank's letters of credit.
[6] This amount reflects a maximum capitalization of $50 million minus the accrual of post-petition decommissioning spend by the Debtors on the Legacy Apache Properties of $22 million.

contemplates the abandonment of certain Abandoned Properties to Predecessors under 11 U.S.C. § 554.

17.     In conjunction with the divisive merger and establishment of FWE I, the Plan contemplates various agreements as part of the Apache Term Sheet Implementation Agreement. Among these agreements are: (i) new limited liability company operating agreement for FWE I (the "FWE I LLC Agreement"), (ii) a transition services agreement between FWE I and the Credit Bid Purchaser (the "FWE I TSA"), and (iii) a farmout agreement between Credit Bid Purchaser and FWE I (the "FWE I Farmout Agreement").

18.     Under the FWE I Operating Agreement, FWE I will only have one officer, the Sole Manager, and no employees.  It will rely on access to employees of the Credit Bid Purchaser pursuant to the FWE I TSA in order to conduct operations.

19.     The FWE I Operating Agreement grants Apache defacto control over FWE I.  More specifically, Section 7 and Section 10 of the FWE I Operating Agreement grant Apache:

a.  Veto rights over the selection of the independent director of FWE I, who cannot be removed with Apache's consent [Section 7.02] (**not** in the Decommissioning Agreement);

b.  Consent rights over removal of the sole manager of FWE I [Section 7.03] (**not** in the Decommissioning Agreement);

c.  Consent and information rights for bids for service providers to conduct P&A operations [Section 7.04] (**expanded** from the Decommissioning Agreement),

d.  Consent rights as to sales, fundamental business transactions, or farmins [Section 7.06] (**expanded** from the Decommissioning Agreement),

e.  Consent rights as to farmouts [Section 7.06] (**expanded** from the Decommissioning Agreement);

7

      f.    Consent rights with regard to any development activities, including those with positive or accretive investment profile [Section 7.06] (**not** in Decommissioning Agreement);

      g.    Incur indebtedness other than provided by Apache, even if such indebtedness is on more favorable terms of use for positive or accretive investment activities [Section 7.06];

      h.    Right of first refusal and information rights for the funding of capital expenditures [Section 7.09]

      i.    Information rights as to monthly operating data and operating budget [Section 10.01], and

      j.    Inspection rights [Section 10.01]

Additionally, Apache enjoys consent rights over the selection of P&A service providers under the FWE I TSA and rights under the FWE I Farmout Agreement.  Moreover, as collateral for the backstop loan facility described in the Plan as a Standby Facility, Apache is granted a security interest in the assets of FWE I.

    20.    The Plan does not separately classify Apache, Philadelphia, or the Other Legacy Apache Sureties.  They all hold unsecured claims in Class 6.

<u>**OBJECTION**</u>

<u>**The Plan is Patently Unconfirmable**</u>

    21.    Bankruptcy courts have the authority to refuse approval of disclosure statements when the chapter 11 plans underlying them are unconfirmable.  *See, e.g.*, *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012); *In re Sanders*, 2015 WL 7568469 at *5 (Bankr. S.D. Miss. 2015) (reiterating that "it is well settled that a bankruptcy court may disapprove a disclosure statement, even if it contains adequate information, if there is a defect that renders a proposed plan

8

Case 20-33948 Document 1083-39 Filed in TXSB on 03/22/21 Page 9 of 26

'inherently or patently unconfirmable.'"); *In re MFlex Corp.*, 172 B.R. 854, 856 (Bankr. W.D. Tex. 1994) (noting that the disclosure statement was previously denied by the court because it described a plan that was not confirmable).

22.     The Debtors' preferred treatment of Apache, to the detriment of similarly situated creditors like Philadelphia, violates 11 U.S.C. § 1123(a)(4), which must be satisfied for confirmation under 11 U.S.C. § 1129(a)(1). Both Apache and Philadelphia are unsecured creditors of the Debtors with contingent liability associated with the decommissioning of the Legacy Apache Assets. Yet, under the Apache Term Sheet Implementation Agreement, Apache enjoys defacto control over FWE I. This control is valuable consideration that Apache receives on account of its claim without such value being tested by the market. Because Philadelphia does not receive this consideration, the Plan impermissibly treats similarly situated creditors differently and cannot be confirmed.

23.     The Debtors' failure to market the FWE I Assets in any way constitutes a failure to maximize value of their estates and undermines any assertion that the Plan is proposed in good faith as required by 11 U.S.C. § 1129(a)(3). Given the primacy of maximizing distributions as a goal of the Bankruptcy Code and the good faith inquiry's focus on the Bankruptcy Code's objectives, the Plan was not proposed in good faith.

a)     ***The Plan's Preferred Treatment of Apache Violates 11 U.S.C. § 1123(a)(4)***

24.     Equality of treatment for claims in the same class is "a central policy of the Bankruptcy Code." *Begier v. IRS*, 496 U.S. 53, 58 (1990). The Bankruptcy Code, and specifically § 1123(a)(4), requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."

9

4821-4359-5736, v. 2

25.     Section 1123(a)(4) "guarantees that each [claim] will be treated equally."  *See, e.g.,*

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R.

337, 363 (S.D.N.Y. 2007).  For instance, when a creditor was required to "release a unique, direct

claim in order to participate in the $3 million Fund [with other creditors]," the treatment violated

11 U.S.C. § 1123(a)(4).  *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986).

26.     A plan's treatment for a claim or interest includes the property or opportunities

received by the holder thereof on account of that claim or interest, not just cash distributions.  *In*

*re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (analyzing whether an

opportunity to backstop a rights offering was treatment under the plan by determining whether the

opportunity was provided to its recipients on account of their claims).  Control of an enterprise and

its governance is valuable property irrespective of the value of the underlying assets.  *Norwest*

*Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988) ("[i]ndeed, even in a sole proprietorship,

where 'going concern' value may be minimal, there may still be some value in the control of the

enterprise").

27.     The Supreme Court's teachings in *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N.*

*LaSalle St. P'ship* instruct that where a claim holder receives value because it holds that claim, the

holder receives that value as treatment under a plan of reorganization.  526 U.S. 434, 441 (1999).

In a context that cannot be meaningfully distinguished from the consideration received by Apache,

the Supreme Court held that a "new value" plan that sold the reorganized debtor's equity to the

debtor's prepetition interest-holders "without extending an opportunity to anyone else either to

compete for that equity or to propose a competing reorganization plan" violated 11 U.S.C.

§1129(b)(2)(B)(ii), which governs permissible distributions under a chapter 11 plan, codifying the

"absolute priority rule."  *Id.* at 436.  "[T]he exclusiveness of the opportunity, with its protection

against the market's scrutiny," rendered the prepetition interest holders' right to purchase the

equity a property interest extended "on account of" those interests and thus, the plan could not be confirmed. *Id*. at 456.

28.     In *LaSalle*, the Supreme Court explained that a holder of a claim or interest receives property solely on account of "new money" - rather than as treatment under a plan of reorganization - only if the holder has paid "top dollar" for that property. *Id*. If a holder of a claim or interest has paid less than "top dollar" for property, there is a loss of value on the part of the debtor and a corresponding gain on the part of the holder, to the unjustifiable detriment of the debtor's estate and its stakeholders. *Id*. at 456-57.

29.     *LaSalle* is clear, an exclusive right provided to a claim holder and the corresponding unjustified loss of value to the debtor cannot be assumed away as part of a larger transaction. *Id*. at 456.

> It is no answer to this to say that the exclusive opportunity should be treated merely as a detail of the broader transaction that would follow its exercise, and that in this wider perspective no favoritism may be inferred, since the old equity partners would pay something, whereas no one else would pay anything.

In other words, the transfer of value on account of a claim cannot be cleansed by incorporating it into transactions contemplated by a chapter 11 plan.

30.     Two factors demonstrated the "causal relationship" between the claim and the consideration: first, the exclusivity of the offer (in *LaSalle*, the opportunity to invest in new equity was offered exclusively to old equity), and second, the lack of a market test (in *LaSalle* there was no market test of the new equity investment). *Id.* at 454-57. The combination of these factors— limiting access to certain stakeholders and shielding the terms of the investment from a market test— were problematic:

> If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there

11

> is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii). Id. at 456 (emphasis added).

Accordingly, when the rights granted by the chapter 11 plan are both exclusive to prior holders (*i.e.* unavailable to similarly situated parties) and shielded from a market test (*i.e.* not sold at "top dollar"), such a right is received "because of [such claim holder's] prior interest." *Id.*

31.     Apache's control over FWE I triggers both requirements identified by *LaSalle*. First, it is an exclusive valuable property right that Apache receives under the Plan.  No other unsecured creditors receive these rights.  Irrespective of the going-concern value of FWE I (which, as detailed below, Philadelphia believes is positive and sellable), the control of FWE I is valuable as it will allow Apache to manipulate FWE I's operations to ensure that the Legacy Apache Bonds are called as soon as possible while residual value remains that Apache can capture to limit the draw under the Standby Facility or allow Apache to foreclose on its security interests and then operate FWE I profitably.[7]  In sum, this control is very valuable, otherwise Philadelphia would not be asserting the prejudice caused Apache's receipt of it.  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 209 (1988) ("there is great common sense in petitioners' contention that 'obviously, there is some going concern value here, or the parties would not have been litigating over it for the last three years.'").

32.     Although Apache asserts that it is partially secured, it is black-letter law that when a debtor lacks an equitable (as opposed to possessory) interest in an asset, it cannot grant a security interest.  *E.g.*, *Rohweder v. Aberdeen Production Credit Ass'n*, 765 F.2d 109, 112 (8th Cir.1985); *Rameker v. Federal Railroad Administration (In re Chicago, Madison & Northern Ry. Co.)*, 36

---

[7] On the Petition Date, this hypothetical would have seemed farfetched but with WTI approaching $70/barrel, it is much more reasonable to think that Apache could foreclose and monetize the FWE I assets.

B.R. 292, 298 (Bankr. W.D. Wis. 1984). Debtors have no equitable interest in trust funds, *e.g.,* 11 U.S.C. § 541(d); *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990), or surety bonds. *E.g.*, *Ohio v. Mansfield Tire & Rubber Co. (In re Mansfield Tire & Rubber Co.)*, 660 F.2d 1108, 1113 (6th Cir. 1981) *McLean Trucking Co. v. Dep't of Indust. Relations (In re McLean Trucking Co.)*, 74 B.R. 820, 827 (Bankr. W.D.N.C. 1987). Thus, neither the Trust A Funds nor the Legacy Apache Surety Bonds can serve as Apache's collateral, which leaves Apache as an unsecured creditor, just like Philadelphia and the Other Legacy Apache Sureties.[8] Apache's preferred treatment is not fair to other unsecured creditors – it is the contrapositive of *AOV* – here the creditor is receiving a unique benefit rather than unique discrimination. Either way, 11 U.S.C. § 1123(a)(4) is violated and the chapter 11 plan cannot be confirmed.

33.     Apache may suggest its *in rem* decommissioning obligations on the Legacy Apache Assets distinguish it from other unsecured creditors, irrespective of its classification. That argument may differentiate it from other unsecured creditors, but it does not create any daylight between Apache and the Legacy Apache Sureties, which also have the obligation to assure the Debtors' decommissioning of the Legacy Apache Assets under the Decommissioning Agreement.

34.     Second, the control granted to Apache over FWE I was never marketed (similar to FWE I itself). The control was granted to an entity with a relationship with the Debtors not unlike the insiders in *LaSalle* as Apache is the largest predecessor of the Debtors, a party of the RSA, a consent party for Plan, and a party receiving a release under the Plan. In sum, Apache is treated like an insider under the Plan and it should not receive the benefit of that treatment to the detriment of other unsecured creditors.

35.     Apache will likely argue that it received defacto control over FWE I in consideration for providing the Standby Facility, not on account of its claims against the Debtors'

---

[8] Philadelphia reserves the right to object to Apache's proofs of claim on the basis of them being secured.

estates. This argument is untenable. The Standby Facility simply reflects Apache's attempt to best leverage its status as a predecessor on the Legacy Apache Assets and its liability to United States Government and the Regulators. If Trust A is exhausted and the Legacy Apache Bonds are fully drawn and depleted, Apache, as predecessor to the Debtors, would be next in line for meeting the P&A Obligations under the Legacy Apache Assets. Instead of stepping up to pay (like many of the Debtors' other predecessors are being asked to do), Apache can obtain the benefit of the Standby Facility or potentially use it as vehicle to foreclose on FWE I's assets. The benefit to the Debtors' estates of the Standby Facility is illusory. The transfer of control rights over FWE I violates 11 U.S.C. § 1123(a)(4).

      **b)**      *The Debtors' Failure to Market the FWE I Assets Means the Plan is Not Proposed in Good Faith*

36.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). The term "good faith" is not defined in the Bankruptcy Code, but the requirement of good faith is generally interpreted as meaning that there is "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Madison Hotel Assocs.*, 749 F.2d 410, 424-425 (7th Cir. 1984) (internal quotation marks omitted). Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan." *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004) (emphasis added). Courts must consider "the totality of the circumstances" surrounding the plan's development and proposal. *In re Madison Hotel Assocs.*, 749 F.2d at 425.

37.     The primary objective of the Bankruptcy Code is to maximize the value of a debtor's estate and distribute that value to holders of claims and interests on account of those claims and interests. *See e.g., 203 N. LaSalle St. P'ship, 526 U.S. at 453* (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)) (observing that the Bankruptcy Code's recognized policy is

14

"maximizing property available to satisfy creditors"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Tenn-Fla Partners v. First Union Nat'l Bank of Fla.*, 229 B.R. 720, 736 (W.D. Tenn. 1999), *aff'd*, 226 F.3d 746 (6th Cir. 2000) (denying confirmation of a plan on the basis that debtor had failed to maximize value of the estate for the benefit of creditors by not obtaining the highest available price for property to be sold upon confirmation). Section 1129(a)(3) of the Bankruptcy Code requires plan proponents to satisfy this primary objective.

38.     The failure to market the FWE I Assets violates 11 U.S.C. § 1129(a)(3) because it does not maximize the value of the Debtors' estates. As the Court and all parties in interest know, the price for WTI has increased markedly in last few months. Yet, FWE I has not been marketed in any way.

### Inadequate Information

39.     Even if the Plan is not patently unconfirmable, the Disclosure Statement does not provide the parties in interest who are entitled to vote on the Plan with adequate information as required by 11 U.S.C. § 1125(a)(1). Whether a disclosure statement contains "adequate information" is decided on case-by-case basis. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1156-57 (5th Cir. 1988). The Debtors, as the proponents of the Disclosure Statement, bear the burden of demonstrating that the disclosure statement contains "adequate information." *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719-20 (Bankr. E.D. Cal. 1992).

40.     The Bankruptcy Code requires disclosure statements to contain sufficient and accurate information since the disclosure statement is intended to be the primary source of information upon which creditors and shareholders make an informed judgment about a chapter

4821-4359-5736, v. 2

11 plan. *See, e.g., Prudential Ins. Co. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1342 (8th Cir. 1985); *In re Rock Broad. of Idaho*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993); *In re Jeppson*, 66 B.R. 269, 291 (Bankr. D. Utah 1986). Mere statements of opinion or belief, without accompanying factual support, are inadequate to support a disclosure statement. *See In re Beltrami Enters.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) ("Conclusory allegations or opinions without supporting facts are generally not acceptable") (citations omitted).

41.     Section 1125(a)(1) clarifies that "adequate information" requires sufficient detail as "would enable a hypothetical reasonable investor to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). Although the term "adequate information" is not susceptible to a precise definition, case law under 11 U.S.C. § 1125 has produced a list of factors, disclosure of which may be mandatory under the facts and circumstances of a particular case, to meet the statutory requirement of adequate information. *In re Feretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991); *In re Microwave Prods. of Am.*, 100 B.R. 376, 378 (Bankr. W.D. Tenn. 1989); *In re Metrocraft Pub. Servs, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). Such factors that may be required to be disclosed include:

(a)     The circumstances that gave rise to the filing of the bankruptcy petition;

(b)     A complete description of the available assets and their value;

(c)     The anticipated future of the debtor, with accompanying financial projections;

(d)     The source of the information provided in the disclosure statement;

(e)     The condition and performance of the debtor while in chapter 11;

(f)     Information regarding claims against the estate, including those allowed, disputed, and estimated;

(g)     A liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

16

(h)     The accounting and valuation methods used to produce the financial information in the disclosure statement;

(i)     Information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

(j)     A summary of the plan;

(k)     An estimate of all administrative expenses, including attorneys' fees and accountants' fees;

(l)     The collectability of any accounts receivable;

(m)     Any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

(n)     Information relevant to the risks being taken by the creditors and interest holders;

(o)     The actual or projected value that can be obtained from avoidable transfers;

(p)     The existence, likelihood and possible success of nonbankruptcy litigation;

(q)     The tax consequences of the plan; and

(r)     The relationship of the debtor with affiliates.

*In re Divine Ripe, L.L.C.,* 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016).

42.     The following is a summary of the various aspects of the Disclosure Statement that lack adequate information

> **a)     *The Disclosure Statement Lacks Adequate Information Because it Does Not Included Projected Financials for FWE I***

43.     The Debtors' projected "financials" for FWE I are that "it will produce approximately 25,000 barrels of oil equivalent per day." *Disclosure Statement*, at 63.  Although the Amended Disclosure Statement includes projections for FWE I, conspicuously absent is any

discussion of how long such production levels are anticipated to continue or estimations of proven and unproven reserves.

44.     The Debtors simply rely upon the assumption that the Trust A Funds, the Legacy Apache Bonds (including the Bond), letters of credit, and the Standby-Facility, together with the meagre initial capitalization, are greater than the P&A Obligations associated with the Legacy Apache Assets.  Even if this true, the sources of funds are not treated *parri passu* and it is highly relevant for Philadelphia (and other similarly situated sureties), in deciding whether to support the Plan, to understand whether the Debtors' projections for FWE I anticipate that the Trust A Funds plus FWE I's net profits are sufficient to satisfy the P&A Obligations associated with the Legacy Apache Assets and if not, what is the anticipated shortfall.

      **b)**    ***The Disclosure Statement Lacks Adequate Information Because it Fails to Reveal the Outstanding and Projected P&A Obligations in Connection with the Legacy Apache Properties***

45.     The pending and projected decommissioning to be performed in connection with the Legacy Apache Properties is a, if not the, key input for assessing the feasibility of FWE I as a stand-alone entity.  The Debtors estimate that there is approximately $965 million to $1.16 billion in total FWE I P&A Obligations, including all P&A Obligations associated with the Legacy Apache Properties.  This disclosure paints an incomplete picture as the Debtors fail to identify how much of this total is associated with the Legacy Apache Properties and the Decommissioning Agreement.  Meanwhile, the Regulators have filed proofs of claim asserting that estimates that Debtor Fieldwood Energy's total P&A obligations will exceed $4.7 billion.[9]  Given the outsized importance of the P&A Obligations to the viability of FWE I, the Debtors should be required to disclose this information.

---

[9] *See* [Proof of Claim No. 896] filed in this case.  The total P&A for all Debtors is estimated at approximately $9.0 billion.  *See* [Proof of Claim Nos. 895-902].

      c)      ***The Disclosure Statement Lacks Adequate Information Regarding the Status of Regulatory Approval***

46.      The Debtors cannot effectively consummate the divisional merger and form FWE I without the approval from the Regulators. Although the Debtors recite that they are engaging with the Regulators, there is no disclosure of the status of these negotiations. Indeed, without approval of the Regulators, the Debtors cannot assign or otherwise transfer leases to FWE I. *See* 30 C.F.R. § 556.700.[10] The current status of the Debtors' negotiations with the Regulators and whether they have obtained approval, in full or in part, for the transactions contemplated by the Plan is one of paramount importance and should be disclosed.

      d)      ***The Disclosure Statement Lacks Adequate Information Regarding the Regarding the Proposed Release and Exculpation Provisions***

47.      The release and exculpation provisions proposed in the Plan apply to a broad range of parties, including, the Debtors, the Post-Effective Date Debtors, the Apache PSA Parties, and each of their respective affiliates, predecessors, successors, and assigns. *See* Debtors Art. I. 1.1 "Released Parties". However, the Disclosure Statement lacks adequate information regarding these release and exculpation provisions. For instance, there is little if any description of: (a) the claims that would be released if the Debtors' Plan is approved, (b) what consideration (if any) is being given by the released parties in exchange for the releases, or (c) how such provisions are in any way consistent with applicable Fifth Circuit precedent and applicable law. This is particularly true concerning non-consensual third-party injunctions contained in Articles 10.6 and 10.9 of the Plan. It is clear that such non-consensual injunctions are forbidden by Fifth Circuit case law. *E.g.*, *Bank of New York Trust Company, N.A. v. Official Committee of Unsecured Creditors (In re Pac. Lumber Co.)*, 584 F.3d 229, 240 (5th Cir. 2009); *Feld v. Zale Corporation (In re Zale Corportion)*,

---

[10] This is also true regarding the Purchased Oil & Gas Leases that are contemplated by the Plan as being transferred to the Credit Bid Purchaser.

62 F.3d 746, 760 (5th Cir. 1995); *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018), *aff'd sub nom. on other grounds*, 782 F. App'x 339 (5th Cir. 2019).

48.     The Disclosure Statement simply attaches the relevant release and exculpation provisions from the Plan verbatim (*i.e.* without any explanatory information), and baldly asserts (again, without any explanation or evidence) that the releases are "in exchange for good and valuable consideration", and "in the best interests of the debtors, the estates, and all holders of claims and interests." *See Disclosure Statement*, Ex. B.

49.     This is simply not enough to enable voters to make an informed voting decision and the Disclosure Statement thus should not be approved. *See, e.g., Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 713 (4th Cir. 2011) (simply listing the factors for releases is "meaningless in the absence of specific factual findings explaining why this is so.").

> e)     *The Disclosure Statement Lacks Adequate Information Regarding the Successors of the Debtors' Ability and Intentions to Obtain Surety Bonds*

50.     Surety bonds create a three-party relationship among:  (1) the principal who is the primary obligor (the applicable Debtor in this case); (2) the party to whom the principal and surety owe a duty is the obligee; and (3) the surety, which is the secondary obligor.  As a result, a surety bond is a three-party contract.  *See, e.g.,* Restatement (Third) of Suretyship & Guarantee § 1 (1996); Edward G. Gallagher, The Law of Suretyship § 1 (1993).  Surety bonds are often required by obligees to protect their interests by providing financial assurances that the underlying obligations of the principal will be performed.  The surety in turn is protected by its right to indemnification from the principal.

51.     Simply put, the surety bonds provided by Philadelphia and the other Legacy Apache Sureties are a prerequisite for the Debtors' continued operations: this true for FWE I, FWE III, and

20

the Credit Bid Purchaser.  Specifically, surety bonds are required by the federal government to assure obligations to the Regulators, *see, e.g.*, 30 C.F.R. § 556.900; 30 C.F.R. § 556.901, and third parties.  Without surety bonds, the Debtors (and their contemplated successors under the Plan) cannot operate.  The Debtors understand and have articulated the importance of the Bonds, as illustrated in their *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and The Surety Bond Program, and (B) Pay Certain Obligations With Respect Thereto; (II) Granting Relief From Automatic Stay With Respect to Workers' Compensation Claims; and (III) Granting Related Relief* (the "Surety Motion") [Dkt Entry No. 4] where they asserted that "the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' performance of certain obligations," which included the Bond. *Surety Motion*, at 14.

52.     The Disclosure Statement fails to describe the Bond status as non-assumable financial accommodations and the impact of such status on the Debtors' ability to treat the Bond under the Plan.  Pursuant to 11 U.S.C. § 365, a debtor or trustee may generally assume or assign an executory contract.  However, 11 U.S.C. § 365(c)(2) precludes the assumption or assignment of financial accommodations. More specifically:

> (c)     The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> * * *
>
> > (2)     such a contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; . . . .

11 U.S.C. § 365(c)(2).  Financial accommodations are simply not subject to assumption and assignment as executory contracts.  According to the legislative history of 11 U.S.C. § 365(c)(2), "[t]he purpose of this section is to make clear that a party to a transaction which is based upon the

21

financial strength of a debtor should not be required to extend new credit to the debtor …" S. Rep. No. 95–989, 95th Cong. 2nd Sess. (1978) 58–59 5 U.S. Code & Admin. News (1978) p. 5844–45. Although undefined by the Bankruptcy Code, courts have defined financial accommodations as "contracts the principle purpose of which is to extend financing to or guarantee the financial obligations of the debtor." *See Citizens and S. Nat'l Bank v. Thomas B. Hamilton, Inc. (In re Thomas B. Hamilton Co., Inc.,* 969 F.2d 1013, 1020 (11th Cir. 1992); *see also Huntington Nat'l Bank Co. v. Alix (In re Cardinal Indus., Inc.)*, 146 B.R. 720, 731 (Bankr. S.D. Ohio 1992)("Courts have defined the term 'financial accommodation' as the extension of money or credit to accommodate another."). Surety bonds are directly based upon the financial strength of the debtor and obligate the surety "to make good on certain financial liabilities of the debtor in the event the debtor does not or cannot pay." *Wegner Farms v. Merchants Bonding Co. (In re Wegner Farms Co.),* 49 B.R. 440, 444 (Bankr. D. Iowa 1985); *c.f. Gov't Nat'l Mort. Corp. v. Adana Mort. Bankers, Inc. (In re Adana Mort. Bankers, Inc.)*, 12 B.R. 977, 987 (Bankr. N.D. Ga. 1980) ("[t]he obligation to pay money on the obligation of another is a financial accommodation"). Given that surety bonds guarantee the financial obligations of a debtor-principal, courts have roundly categorized surety bonds as contracts of financial accommodation under 11 U.S.C. § 365(c)(2). *See Thomas B. Hamilton Co., Inc.,* 969 F.2d at 1020; *Wegner Farms,* 49 B.R. at 444; *see also Edwards Mobile Home Sales, Inc. v. Ohio Casualty Ins. Co. (In re Edwards Mobile Home Sales, Inc.)*, 119 B.R. 857, 860 (Bankr. M.D. Fla. 1990). Because assumption is a precondition for assignment, *e.g.*, *Refco Inc. v. Cargill Inc. (In re Refco Inc.)*, No. 05-60006 (RDD), 2006 WL 2664215, at *2 (S.D.N.Y. Sept. 13, 2006), surety bonds' status as financial accommodations make them unassignable.

53.     As a financial accommodation, the Bond is not assumable or assignable by the Debtors pursuant to 11 U.S.C. § 365(c)(2). Consequently, unless Philadelphia consents to transfer

of the Bond to FWE I, it will be terminated. Accordingly, the Disclosure Statement should describe the process and timing for FWE I to obtain replacement surety bonds or post other collateral necessary for it to operate in the event it does not obtain consent from Philadelphia and the Debtors' other sureties. The Disclosure Statement should also address the source of collateral for any anticipated replacement bonds.

**f)**      *The Disclosure Statement Lacks Adequate Information Concerning the Consideration Received by Apache on Account of its Claims*

54. As explained previously, the Plan contemplates Apache's receipt of unique, valuable consideration on account of its unsecured claim against the Debtors. The Disclosure Statement fails to explain the value of this consideration, the basis for granting it to Apache, and how 11 U.S.C. § 1123(a)(4) is satisfied.

**g)**      *The Disclosure Statement Fails to Adequately Describe the Debtors' Efforts Maximize the Value of the FWE I Assets*

55. The Disclosure Statement describes in adequate detail the Debtors' value maximization efforts, both pre-petition and post-petition, related to Purchased Oil and Gas Lease Interests to be sold to the Credit Bid Purchaser. However, there is no mention of pre-petition or post-petition marketing of the FWE I Assets or the treatment of farmout opportunities.

56. Without a true good faith attempt to market FWE I Assets, or any portion thereof, there is no ability to compare value received from an arm's length sale of the FWE I Assets versus the Debtors' Plan to operate the assets to end of life with no future investment. The FWE I Assets have potential production value (especially as WTI prices rise) and incremental capital projects could be valuable to another party or could alleviate future P&A Obligations via investment and generate incremental cash flows and extend the life of the properties. This is potential value accretion could offset surety liability, but any effort in this regard can be prematurely forfeited by Apache through its control of FWE I's governance and operations.

23

57.     The Disclosure Statement provides neither a capital budget contemplated for the Credit Bid Purchaser (as part of the Farmout Agreement) nor a forecast of revenues derived from future capital investment.  Future capital investments are structured to benefit Apache and/or the Credit Bid Purchaser and prejudice FWE I's creditors, including Philadelphia.  The Disclosure Statement also does not provide Philadelphia with sufficient information to make a fair market analysis of the terms put forth in the Farmout Agreement with the Credit Bid Purchaser, including a significant gathering and processing fee charged to FWE I for infrastructure.  The self-serving nature of the FWE I structure is most obvious in the allocation of P&A Obligations for any proposed farmout wells.  Under the Farmout Agreement, FWE I will incur 100% of the P&A liability for unsuccessful wells.  But for successful wells, FWE I will receive only a 50% working interest, which applies only after all capital investment costs have been recovered in full by Credit Bid Purchaser.  This structure is fundamentally unfair to FWE I and suppresses its going concern value.  Alternatively, a third-party sale, which has not been attempted by Debtors, could yield significantly better value.

58.     Under the Farmout Agreement, future FWE I capital projects are proposed as a right, but not an obligation, accruing solely to Credit Bid Purchaser. However, the Disclosure Statement does not disclose if any "proved behind pipe" and "proved undeveloped reserves" exist and the potential value accretion associated with capital investment to tap these reserves. The Disclosure Statement should provide analysis of prospective FWE I capital projects so that the Legacy Apache Sureties can analyze the Plan's fairness to all FWE I contingent creditors, not just that which was accepted and agreed to by Apache.  In the absence of a planned capital projects analysis, it is improper for rights associated with the Farmout Agreement to block any attempt by FWE I to develop capital projects that prospectively reduce the sureties contingent and unliquidated liabilities.

4821-4359-5736, v. 2

## JOINDER

59.     To the extent not contradicted by the arguments contained herein, Philadelphia joins in the arguments and authorities in the objections set forth by all other sureties and filed with this Court in response to the issues that are similar to Philadelphia.

## CONCLUSION

60.     Philadelphia is hopeful that a solution concerning FWE I that is fair to all stakeholders can be developed.    However, the Plan as currently proposed is patently unconfirmable.  Moreover, even if it is not patently unconfirmable, the Disclosure Statement lacks adequate information regarding fundamental provisions in the Plan and should not approved absent revisions to address the inadequacies outlined in this Objection.  Philadelphia reserves all rights to amend this Objection up to and at the hearing on the Disclosure Statement.

> Respectfully submitted,
>
> MANIER & HEROD, P.C.
>
> /s/ Michael E. Collins
> Michael E. Collins (TX Bar No. 24029006)
> Robert W. Miller (admitted *pro hac vice*)
> 1201 Demonbreun St., Suite 900
> Nashville, TN  37203
> Telephone:     (615) 742-9350
> Facsimile:     (615) 242-4203
> E-mail:        mcollins@manierherod.com
>                rmiller@manierherod.com
>
> *Attorneys for Philadelphia Indemnity Insurance Company*

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served upon all parties receiving notice pursuant to the CM/ECF system on March 16, 2021.


/s/ Michael E. Collins
Michael E. Collins

4821-4359-5736, v. 2