# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY, LLC, *et al.* | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

---

## RLI INSURANCE COMPANY'S OBJECTION TO DEBTORS'
## DISCLOSURE STATEMENT AND PROPOSED VOTING PROCEDURES
### [Relates to Docket No. 723, 724, 1022]

---

RLI Insurance Company ("RLI"), by and through undersigned counsel, hereby offers this Objection (the "Objection") to the Disclosure Statement [Docket No. 723, 1022] of Fieldwood Energy, LLC and its affiliated debtors (collectively, the "Debtors") filed in connection with the Joint Plan of Reorganization (the "Plan") [Docket No. 722, 1020].[2] RLI objects and reserves rights as follows:

---

[1]  The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2]  Debtors filed an Amended Chapter 11 Plan [Docket No. 1020] and Disclosure Statement [Docket No. 1021] overnight on March 16 with a proposed objection deadline of March 19 at 4pm. The Amended Plan and Disclosure Statement include thousands of pages of pleadings and exhibits, many of which are being provided for the first time, and which effect substantive additions and changes to many aspects of the Plan, including financing, classifications of claims, plan distributions and impairments, organization structure, asset assignments, and releases. RLI objects to the limited time provided to review and analyze the Amended Plan and Disclosure Statement prior to the Objection deadline, particularly in light of Debtors' decisions to delay proceedings for their

1

## I.   PRELIMINARY STATEMENT

1.   Just two years after emerging from bankruptcy, Debtors find themselves back in front of this Court with a Plan that is unprecedented in both scope and effect. Debtors propose transferring their most valuable assets to a newly created special-purpose entity owned by Debtors' lenders and managed by Debtors' twice-failed management team, while simultaneously shedding billions of dollars of safety and environment obligations associated with negative value leases onto the U.S. Government, co-working interests owners, predecessors, and sureties. Most egregiously, Debtors intend to simply abandon and walk away from nearly two hundred oil and gas leases in the Gulf of Mexico with no actionable plan and no meaningful financial contribution to address the safety and environmental concerns being left behind. Debtors' blatant and ongoing disregard for regulatory concerns and environmental safety cannot be ignored and should not be rewarded by this Court. Because Debtors' Plan contravenes regulatory requirements, the Bankruptcy Code, and equity, it is inherently unconfirmable and the Disclosure Statement should not be approved.

## II.   BACKGROUND

2.   Debtors operate independent exploration and production companies focused on development of offshore oil and gas assets in the Gulf of Mexico. Debtors' assets include, among other things, oil and gas leases, wells, platforms, rights of way, and contracts that have been acquired through various purchases since 2013. As part of

---

own purposes numerous times. RLI further reserves the right to raise any and all objections to the Amended Plan and Disclosure Statement after having sufficient time to analyze the newly filed pleadings and attachments.

acquiring these assets, Debtors agreed to be responsible for decommissioning obligations that are required to be performed pursuant to BOEM and other regulatory agency regulations. It should be noted that assuming decommissioning obligations for existing oil and gas assets is not some unexpected consequence of the purchase—it is a core feature of Debtors' business model of acquiring and producing these assets.

3.    In the ordinary course of business, Debtors are required to provide surety bonds to certain regulatory agencies and other third parties to secure the performance of obligations relating to oil and natural gas exploration and production operations, including obligations related to the decommissioning of Debtors' oil and gas properties.

4.    From time to time, RLI[3] issued certain surety bonds (collectively, the "Bonds") on behalf of Debtors, or a subsidiary, parent, predecessor in interest, affiliate, or division of Debtors, to secure obligations to third-party obligees, including but not limited to those Bonds summarized on Appendix A attached hereto.[4] Debtor, or a subsidiary, parent, predecessor in interest, affiliate, or division of Debtor, has executed and delivered one or more Indemnity Agreements identified in Appendix B, pursuant to which Debtor may be required to pay all premiums, provide collateral, indemnify and exonerate RLI, and hold RLI harmless from and against any and all liability, damage, loss, cost, and expense

---

[3]    RLI is a specialty property and casualty insurance and surety bond company with a principal place of business of 9025 N. Lindbergh Drive Peoria, IL 61615.

[4]    Appendix A may contain Bonds as to which liability has been extinguished by the obligees, by the terms of the Bond, or by operation of law. RLI reserves the right to amend and supplement Appendix A. A copy of any and/or all of the Bonds can be obtained upon request.

that RLI has incurred or will incur in connection with (1) the furnishing of the Bonds or (2) the enforcement of the Indemnity Agreements.

5.      On August 3 and August 4, 2020, Debtors each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. The cases are jointly administered under Case No. 20-33948.

6.      On January 1, 2021, the Debtors filed their Plan and Disclosure Statement [Docket Nos. 722 and 723]. The Plan essentially proposes that Debtors' assets be divided into four categories: (1) Specified Deepwater and Shelf Assets to be sold to a credit bid purchaser ("NewCo");[5] (2) Legacy Apache Properties to be operated by an administrator ("FWE I");[6] (3) other certain properties to be operated by an administrator ("FWE III");[7] and (4) other certain properties to be abandoned pursuant to sections 105(a) and 554(a) of the Bankruptcy Code ("Abandoned Properties").[8]

7.      Debtors' properties are primarily composed of oil and gas leases that are subject to various State and Federal laws and regulations requiring proper decommissioning of the wells, platforms, pipelines, and other equipment used for operations to protect the public safety. The Bonds issued by RLI conditionally guarantee

---

[5]    *See* Exhibit B to the Disclosure Statement [Docket No. 1022].

[6]    *See* Exhibit C to the Disclosure Statement [Docket No. 1022].

[7]    *See* Exhibit D to the Disclosure Statement [Docket No. 1022].

[8]    *See* Exhibit E to the Disclosure Statement [Docket No. 1022].

the Debtors' performance of decommissioning obligations on certain of Debtors' properties, including many of the proposed Abandoned Properties.

8.      As discussed in detail below, the Disclosure Statement lacks adequate information and should not be approved because crucial and fundamental information about the restructuring transactions contemplated by the Plan is omitted from both the Plan and Disclosure Statement, preventing the Debtors' creditors and parties in interest from making an informed judgment about the Plan. Moreover, the Plan described by the Disclosure Statement contravenes the Bankruptcy Code as well as clear precedent from the Supreme Court, U.S. Fifth Circuit, and this Court because it does not provide for decommissioning of the proposed Abandoned Properties. Because the Plan is inherently unconfirmable as described, the Disclosure Statement should not be approved for this reason as well.

### III.     LAW AND ARGUMENT

#### A.      Standard for Disclosure Statement Approval

9.      Meaningful and accurate disclosure is at the heart of the reorganization process. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) ("Disclosure is the 'pivotal' concept in chapter 11 reorganization."); *c.f. In re Coastal Plains, Inc.*, 179 F.3d 197, 208 (5th Cir. 1999) (the importance of a debtor's duty of disclosure in a bankruptcy case "cannot be overemphasized.") (*citing Oneida*, 848 F.2d at 414). A debtor's disclosure statement must contain "adequate information," which is defined by the Bankruptcy Code to include:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

10. The "adequate information" requirement ensures that holders of claims and interests against a debtor "receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991) (emphasis in original); *see also Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("[A] disclosure statement is an informational document generally regarded as being intended to provide those who are entitled to vote on a plan with sufficient information to make an informed decision.").

11. A determination as to what constitutes adequate information for purposes of a disclosure statement must be determined on a case-by-case basis. *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir. 1988). Regardless of what form the information takes, however, the disclosure statement "must clearly and succinctly inform the average [ ] creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 18–19 (Bankr. D.N.H. 1991).

6

12.    Relevant factors in evaluating the adequacy of a disclosure statement include:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *accord In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401–02 (Bankr. S.D. Tex. 2016) (citing *Metrocraft* factors); *In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996) (same); *In re Cypresswood Land Partners, I,* 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) (applying the *Metrocraft* standard).

13.    In addition to considering whether a disclosure statement provides "adequate information," the Court may also consider whether, based on the disclosure statement, the proposed plan of reorganization violates applicable provisions of the Bankruptcy Code. *U.S. Brass Corp.*, 194 B.R. at 422; *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr.

N.D. Cal. 2003); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988). Thus, a bankruptcy court may address confirmability issues in advance a hearing on confirmation. *See, e.g., In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1985) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation. Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate.").

14.     When there is "a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 153–154 (3d Cir. 2012) (internal quotation marks and citation omitted); *see also In re Filex*, 116 B.R. 37, 71 (Bankr. S.D.N.Y. 1990) ("[A]pproval of a disclosure statement for a plan which will not, nor can not, be confirmed by the Bankruptcy Court is a misleading and artificial charade which should not bear the imprimatur of the court.").

**B.      The Disclosure Statement Fails to Include Adequate Information to Allow Creditors to make an Informed Decision Regarding the Plan and Restructuring Transactions**

15.     Debtors' Disclosure Statement should not be approved because it fails to provide adequate information about the proposed restructuring transactions and how

Debtors' assets will be safely operated and decommissioned upon the effective date of the Plan.

16.     As an initial point, as noted above, Debtors have just filed an Amended Chapter 11 Plan [Docket No. 1020] and Disclosure Statement [Docket No. 1021] that include thousands of pages of pleadings and exhibits, many of which are being provided for the first time, and which effect substantive additions and changes to many aspects of the Plan, including financing, classifications of claims, plan distributions and impairments, organization structure, asset assignments, and releases. Bankruptcy Rule 3017 provides that "after a disclosure statement is filed in accordance with Rule 3016(b), the court shall hold a hearing on at least 28 days' notice to the debtor, creditors, equity security holders and other parties in interest…" Here, Debtors have filed the Amended Plan and Disclosure Statement just eight days before the hearing, and just three days before objections are to be filed. RLI objects to the limited time provided to review and analyze the Amended Plan and Disclosure Statement, particularly in light of Debtors' decisions to delay proceedings for their own purposes numerous times.

17.     As for the proposed restructuring transactions, the Disclosure Statement describes a sale of "Specified Deepwater Assets and Shelf Assets" to a Credit Bid Purchaser formed by consenting FLTL Lenders for aggregate consideration of approximately $1.03 billion, consisting of "(i) a credit bid of the Allowed FLTL Claims up to the FLTL Claims Allowed Amount, (ii) cash in the amount up to approximately $105 million, (iii) the GUC Warrants, and (iv) the assumption of certain liabilities set forth in the Credit Bid Purchase Agreement, including the assumption of the Allowed FLFO

9

Claims remaining following distribution of the FLFO Distribution Amount (approximately $139 million of the FLFO Claims Allowed Amount *less* the approximately $119 million of the principal amount of the First Lien Exit Facility) (the '**Credit Bid Transaction**')." Disclosure Statement [Docket No. 1022], p. 2.

18.     Debtors have provided only cursory information regarding the marketing process for the assets being sold to Debtors' lenders forming "NewCo," which is needed to determine whether Debtors have obtained the best offer for these assets. Importantly, creditors are unable to determine whether Debtors made a good-faith attempt to market the assets to a potential cash bidder that could provide additional funds to satisfy decommissioning obligations, particularly in light of the recent dramatic increases in oil prices.

19.     Even accepting Debtors' conservative estimates, NewCo is projected to generate over $500 million in yearly revenue from day one and amass a staggering $864 million in cash on hand in just four years.[9] Debtors fail entirely to justify allowing these highly profitable assets to be transferred to Debtors' lenders while safety and environmental obligations on many of Debtors' remaining assets are completely ignored by the Plan.

20.     Absent this necessary information regarding the Credit Bid Transaction, creditors are left with no way to evaluate this sale that, from the surface, appears to involve most if not all of the Debtors' profitable assets and effectively serves as an end-around to

---

[9]     *See* NewCo Projections at Docket No. 1022-3, page 445.

benefit certain secured lenders while environmental and decommissioning obligations are left to be paid for by predecessors, sureties, and the public. The Disclosure Statement fails entirely to provide an explanation for why such an arrangement should be allowed, and Debtors have a responsibility to timely disclose such information so that creditors can "make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1).

21.　The Disclosure Statement also fails to provide details regarding decommissioning liabilities for the proposed FWE I and III entities, which are believed to total billions of dollars. This information is needed to determine whether the FWE I and III entities are viable and can meet future asset decommissioning obligations. Moreover, since these entities will purportedly fund the "Residual Distributable Value" recovery, this information is relevant to creditors' evaluation of the proposed distribution.[10]

22.　The Disclosure Statement also fails to provide any summary of financial projections and decommissioning liabilities for the proposed "Abandoned Properties." Debtors summarily contend that the Abandoned Properties are burdensome to the estate, but fail to provide the information regarding the assets and associated obligations necessary for that contention to be meaningfully evaluated.

23.　The Disclosure Statement fails to adequately explain how funds in the estate, including the proposed cash to be paid by the Credit Bid Purchaser, are being allocated. Moreover, Debtors have offered no explanation or justification for the proposal to allocate

---

[10]　Debtors' newly filed Disclosure Statement makes it unclear whether the Residual Distributable Value will apply to both FWE I and FWE III, or just FWE I.

estate funds for decommissioning of assets in FWE I and III, while ignoring the Abandoned Properties.

24.     The Disclosure Statement also fails to explain how the Debtors intend to "abandon" these various Federal and State leases that are subject to ongoing environmental obligations, and Debtors have not disclosed a plan for obtaining regulatory approval for the assignments and abandonments being proposed.

25.     The Disclosure Statement fails to adequately explain how the proposed abandonment of leases will impact contractual counterparties, including coworking-interest owners and predecessors-in-interest. Debtors appear to contemplate cherry-picking certain assets while abandoning others that were part and parcel of the same agreements, in contravention of the Bankruptcy Code. The Disclosure Statement lacks sufficient information to fully evaluate these issues and fails to explain how Debtors intend to assign and abandon the properties as proposed under the law.

26.     The Disclosure Statement fails to adequately advise and explain how Debtors intend to continue required insurance and surety bonding for the emerging concerns. Surety bonds and the associated agreements are executory contracts in most instances; but because they are financial accommodations, they are not subject to assumption or assignment pursuant to 11 U.S.C. § 365(c)(2). *See Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990); *In re Wegner Farms Co.*, 49 B.R. 440, 446 (Bankr. N.D. Iowa 1985); *In re Falcon V, L.L.C.*, 620 B.R. 256, 265 (Bankr. M.D. La. 2020); *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019-20 (11th Cir. 1992). As such, the ongoing concerns will be required to obtain new bonding for both the entities and the

12

leases. How this bonding is to be obtained, and whether Debtors have any viable plan to do so, are important issues that will impact sureties' evaluation of the Plan.

27.     Without full disclosure of the details discussed above regarding the restructuring transactions and the associated assets and liabilities for each proposed category of the restructured concern and the Abandoned Properties, creditors and other parties in interest are unable to make an informed judgment about the Plan, and thus the Disclosure Statement should not be approved.

**C.    Debtors' Disclosure Statement and Plan Do Not Provide for a Means to Pay Administrative Expenses Associated with Decommissioning the Abandoned Properties, and thus the Plan Is Inherently Unconfirmable**

28.     Chapter 11 plans must provide for the payment in full of all administrative expenses on the effective date of the plan unless the holders of such administrative expenses agree to a different treatment. 11 U.S.C. § 1129(a)(9)(A); *In re American Coastal Energy*, 309 B.R. at 808.

29.     Debtors seek to abandon certain properties under Section 554(a) of the Bankruptcy Code, including a number of leases used to conduct oil and gas operations in the Outer Continental Shelf, Louisiana, and Texas. Debtors contend in their Disclosure Statement that the properties to be abandoned are "burdensome to the Debtors' estates." *See* Disclosure Statement [Doc. No. 1022], p. 48. However, the Disclosure Statement does not explain how this determination was made, nor does it provide any estimation of liabilities and decommissioning costs associated with the proposed Abandoned Properties. On information and belief, the proposed Abandoned Properties identified in Exhibit E of

13

the Disclosure Statement are subject to hundreds of millions of dollars in decommissioning costs pursuant to Federal and State regulations.

30.     As this Court is aware, Debtors are unable to abandon properties "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 106 S. Ct. 755, 88 L. Ed. 2d 859 (1986); *see also Matter of H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998) ("a bankruptcy trustee may not abandon property in contravention of a state law reasonably designed to protect public health or safety."); *In re American Coastal Energy, Inc.*, 399 B.R. 805, 813 (Bankr. S.D. Tex. 2009) ("This Court need not make a determination whether the environmental hazard presents an imminent or identifiable harm. It is enough that the claim arises from a state law designed to protect the public from an identified hazard").

31.     Federal and State regulations regarding decommissioning of oil and gas leases are reasonably designed to protect the public health or safety from identifiable harm. *See, e.g., American Coastal Energy*, 399 B.R. at 813 ("the applicable provisions of the Texas Natural Resources Code [requiring the plugging and remediation of wells] are reasonably designed to protect the public health and safety."); *Matter of H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998) ("there is no question that under Texas law, the owner of an operating interest is required to plug wells that have remained unproductive for a year . . . Thus, a combination of Texas and federal law placed on the trustee an inescapable obligation to plug the unproductive wells").

14

32.     Moreover, jurisprudence from this Court and the U.S. Fifth Circuit confirms that costs associated with decommissioning oil and gas wells are for the benefit of the estate and are entitled to administrative priority. *See H.L.S. Energy*, 151 F.3d at 438 (decommissioning costs were a benefit to the state and entitled to administrative priority); *American Coastal Energy*, 309 B.R. at 816-17 ("expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition"); *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, No. 12-36187 (Bankr. S.D. Tex. March 18, 2014) (coming to the same conclusion and further explaining that "a debtor's obligation to expend funds to bring the estate into compliance with a state health and safety law does not change just because another entity has the same obligation.").

33.     Pursuant to the jurisprudence discussed above, all costs associated with the Debtors' decommissioning obligations for the proposed Abandoned Properties constitute administrative expenses entitled to administrative priority under section 503(b)(1)(A), regardless of the fact that such obligations may arise from prepetition contracts, and regardless of whether other parties may be held secondarily liable for such obligations.

34.     Because the Disclosure Statement and Plan do not provide for a means of paying decommissioning costs for the Abandoned Properties as administrative expenses, the Plan is inherently unconfirmable, and the Disclosure Statement should not be approved.

15

## IV.    THE PROPOSED VOTING PROCEDURES SHOULD BE REJECTED AS AN IMPROPER ATTEMPTED DILUTION OF SURETY CREDITORS' VOTES

35.     Debtors' proposed voting procedures are ambiguous at best and must be clarified before any vote on the Plan can occur. Moreover, any proposed dilution of RLI's claim amount for voting purposes is inconceivable in the face of Debtors' Plan which specifically and intentionally attempts to dump tens of millions of dollars of decommissioning liability on RLI.

36.     On November 25, 2020, RLI timely filed a proof of claim against each debtor in the partially unliquidated, unsecured amount of **$77,685,901**.

37.     In paragraph 38 of the Disclosure Statement Motion, Debtors seek approval to temporarily allow for voting purposes currently contingent, unliquidated, and/or disputed Class 6 claims (Allowed General Unsecured Claims) in the amount of $1.00 (see paragraph 38(c), applying where timely proofs of claim are filed).[11]

38.     Whereas the Plan itself proposes the abandonment of numerous leases—and, as more fully set forth above, essentially attempts to foist decommissioning obligations upon sureties like RLI, in accordance with the terms of their bonds—even the unmatured and contingent aspects of RLI's claims will be rendered liquidated and noncontingent by the proposed Plan itself. Under these circumstances, a $1.00 claim for voting purposes is a bald attempt to deny RLI the ability to vote in accordance with full extent of the economic harm that would be imposed on RLI by the Plan, if confirmed.

---

[11]    Debtors' recently filed Amended Plan and Disclosure Statement do not include the same classifications of claims and Debtors have not provided details for how these inconsistencies are to be addressed.

39.     Although creditors like RLI are empowered to file motions to estimate their claims for voting purposes under Bankruptcy Rule 3018, RLI submits that this Court will be needlessly burdened with a vast number of such motions without more nuanced treatment of surety claims for voting purposes.

40.     RLI specifically joins in the observation of Chevron U.S.A Inc. and Noble Energy, Inc.: "It seems cynical to propose a voting process that does not affirmatively recognize and permit creditors to vote their claim in a dollar amount equal to the economic harm that the Plan seeks to impose on them." [*Objection to Debtors' Motion for Entry of an Order Approving (I) The Adequacy of the Disclosure Statement, (II) Proposed Voting and Tabulation Procedures, and (III) Procedures for Executory Contract Assumption and Assignment and (IV) Procedures for Assignment and Transfer of Property of the Estate*, Dkt. 880, at ¶ 81].[12]

---

[12]    The foregoing objection is made out of an abundance of caution, and without waiving RLI's position that its claims are predominately not contingent and unliquidated. RLI is a surety creditor, whose bonds ensure Debtors' compliance with state and federal regulations by providing the requisite financial assurance that Debtors' various lease obligations, including P&A and decommissioning obligations, will be performed. As partial consideration for RLI's issuance of surety bonds, certain Debtors executed and delivered indemnity agreements in favor of RLI. [Reference is made to those indemnity agreements executed and delivered by: Fieldwood Energy, LLC (June 14, 2018); Dynamic Offshore Resources, LLC (May 18, 2009); SandRidge Energy Inc. (October 26, 2006, and as amended); SPN Resources, LLC (December 4, 2013), and Panaco, Inc. (March 27, 2003)]. Each indemnity agreement unambiguously requires the indemnitor to provide security "in form and amounts acceptable to the Surety" upon demand. RLI is not only entitled to rely on this collateral security provision of its indemnity agreements, but to claim the specific performance thereof—even in the absence of realized bond loss. *See, e.g., Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431 (9th Cir. 1984). Yet, Debtors rejected RLI's June 5, 2020 collateral demand in the amount of $69,453,127.00. Accordingly, RLI submits that its claims are predominately not contingent and are liquidated in the amount $69,453,127, at least as to the individual Debtor-indemnitors. However, because RLI's claims embrace other unliquidated and contingent amounts—and thus may be partially or inaccurately labelled as "unliquidated"—it is plausible that RLI's claims would nonetheless be subject to the proposed $1.00 valuation for purposes of voting.

## V.    ADOPTION OF SURETY OBJECTIONS

41.    Upon information and belief, several other sureties that bonded certain obligations of the Debtors will be filing objections to the Disclosure Statement of Debtors as well. To the extent those objections do not conflict with the objections contained herein, RLI hereby joins and incorporates by reference all objections and arguments made by the other sureties in objecting to the Disclosure Statement.

## VI.    RESERVATION OF RIGHTS

42.    RLI hereby expressly reserves all rights, including, without limitation, all of their rights, claims, defenses, and remedies with respect to the Debtors (or other parties) and all matters in their cases, including but not limited to RLI's rights to assert any claims, rights of setoff, or rights of recoupment under relevant agreements, applicable law, or otherwise. Nothing in this Objection is intended to be, or should be construed as, a waiver by RLI of any of its rights under the Bonds, the Indemnity Agreements, the Bankruptcy Code, or applicable law. RLI reserves the right to amend or supplement this Objection, raise new objections, and to join in the objections of other parties.

## VII.    CONCLUSION

43.    RLI respectfully request that the Court decline to approve the Disclosure Statement in its current form because: (a) it lacks "adequate information" as required by Bankruptcy Code section 1125, and (b) it describes a Plan that contains features contrary to the applicable provisions of the Bankruptcy Code and established precedent.

18

**WHEREFORE**, RLI Insurance Company respectfully request that the Court enter an order that (i) sustains this Objection; and (ii) grants to RLI such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Elliot Scharfenberg*
RYAN D. DRY (TX No. 24050532)
ELLIOT SCHARFENBERG (LA No. 35304)
(*pro hac vice*)
JONATHAN ORD (LA No. 35274) (*pro hac vice*)
KREBS FARLEY & DRY, PLLC
400 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3570
Facsimile: (504) 299-3582
Email: rdry@krebsfarley.com
escharfenberg@krebsfarley.com
jord@krebsfarley.com

CHAD L. SCHEXNAYDER (AZ No. 009832)
(*pro hac vice*)
JENNINGS, HAUG & CUNNINGHAM, LLP
2800 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004
Telephone: (602) 234-7800
Facsimile: (602) 277-5595
E-mail: CLS@JHC.Law

*Counsel for RLI INSURANCE COMPANY*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of March 2021, a true and correct copy of the foregoing **Objection** was sent via ECF Noticing to all parties registered to receive CM/ECF Notices in these chapter 11 cases.

*/s/ Elliot Scharfenberg*

19

## APPENDIX A: LIST OF BONDS

| BOND # | OBLIGEE | PRINCIPAL | AMOUNT |
|---|---|---|---|
| RLB0001509 | B P Exploration & Oil Inc. | Fieldwood SD Offshore LLC | $10,650,000.00 |
| RLB0002369 | Chevron U.S.A. Inc. | Fieldwood Energy Offshore LLC | $1,100,000.00 |
| RLB0002985 | B.O.E.M. | Davis Offshore, L.P. / Fieldwood Energy Offshore LLC | $300,000.00 |
| RLB0006669 | B.O.E.M. | Fieldwood Energy SP LLC | $3,000,000.00 |
| RLB0006670 | B.O.E.M. | Fieldwood Energy SP LLC | $300,000.00 |
| RLB0009112 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $409,536.00 |
| RLB0009122 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $155,472.00 |
| RLB0009134 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $493,434.00 |
| RLB0009150 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $225,624.00 |
| RLB0009156 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $144,096.00 |
| RLB0012977 | B.O.E.M. | Fieldwood Energy Offshore LLC | $300,000.00 |
| RLB0013334 | B.O.E.M. | Fieldwood Energy Offshore LLC | $3,000,000.00 |
| RLB0013981 | XTO Offshore, Inc., HHE Energy Company, and XH, LLC | Fieldwood Energy Offshore LLC | $39,807,255.00 |
| RLB0014014 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $454,464.00 |
| RLB0014015 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $172,528.00 |
| RLB0014017 | Noble Energy, Inc. | Fieldwood Energy Offshore LLC | $159,904.00 |
| RLB0014055 | Apache Shelf, Inc. | Fieldwood Energy Offshore LLC | $1,500,000.00 |

| RLB0014179 | Apache Corporation | Fieldwood Energy Offshore LLC | $2,000,000.00 |
| RLB0014462 | TDC Energy LLC and Petrobras | Dynamic Offshore Resources / Fieldwood Energy Offshore LLC | $1,400,000.00 |
| RLB0015298 | B.O.E.M. | Fieldwood Energy LLC | $3,000,000.00 |
| RLB0015299 | B.O.E.M. | Fieldwood Energy LLC | $300,000.00 |
| RLB0015309 | EOG Resources, Inc. | Fieldwood Energy LLC | $160,588.00 |
| RLB0015327 | Railroad Commission of Texas | Fieldwood Energy LLC | $425,000.00 |
| RLB0015432 | Chevron U.S.A. Inc. | Fieldwood Energy LLC | $500,000.00 |
| RLB0015434 | Chevron U.S.A. Inc. | GOM Shelf LLC / Fieldwood Energy LLC | $1,550,000.00 |
| RLB0015465 | Louisiana Office Of Conservation | Fieldwood Energy LLC | $25,000.00 |
| RLB0015468 | Louisiana Office Of Conservation | Fieldwood Onshore LLC | $25,000.00 |
| RLB0015513 | B.O.E.M. | Fieldwood Energy LLC | $545,000.00 |
| RLB0015517 | B.O.E.M. | Fieldwood Energy LLC | $200,000.00 |
| RLB0015532 | B.O.E.M. | GOM Shelf, LLC | $3,000,000.00 |
| RLB0015533 | B.O.E.M. | GOM Shelf, LLC | $300,000.00 |
| RLB0015572 | Louisiana Office Of Conservation | Fieldwood Energy LLC | $250,000.00 |
| RLB0015605 | B.O.E.M. | Fieldwood Energy LLC | $448,000.00 |
| RLB0015609 | B.O.E.M. | Fieldwood Energy LLC | $1,085,000.00 |
| RLB0015626 | B.O.E.M. | FW GOM Pipeline, Inc. | $300,000.00 |

## APPENDIX B: LIST OF INDEMNITY AND SECURITY AGREEMENTS

1. 2018 Application for Miscellaneous Surety & Indemnity Agreement for principal Fieldwood Energy, LLC, with additional corporate indemnitor Fieldwood Energy, Inc., with attachments;

2. 2013 Application for Miscellaneous Surety & Indemnity Agreement for principal Fieldwood Energy, LLC, with attachments;

3. 2009 Application for Miscellaneous Surety & Indemnity Agreement for principal Dynamic Offshore Resources, LLC, a predecessor in interest to Fieldwood Energy Offshore, LLC, with attachments;

4. 2006 Application for Miscellaneous Surety & Indemnity Agreement for principal SandRidge Energy Offshore, Inc. with 2013 amendment adding SandRidge Energy Offshore, LLC, a predecessor in interest to Fieldwood Energy Offshore, LLC, with attachments;

5. 2003 Application for Miscellaneous Surety & Indemnity Agreement for principal SPN Resources LLC, a predecessor in interest to Fieldwood Energy SP, LLC, with attachments;

6. 2003 Application for Miscellaneous Surety & Indemnity Agreements for principal Panaco, Inc., a predecessor in interest to Fieldwood SD Offshore, LLC, with attachments and other related historic indemnity agreements;

7. 1999 Escrow and Security Agreement between RLI Insurance Company and Panaco, Inc., a predecessor in interest to Fieldwood SD Offshore, Inc., with attachments.