IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.,* | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**DECLARATION OF JOHN-PAUL HANSON IN SUPPORT OF EMERGENCY
MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING ENTRY
INTO BACKSTOP COMMITMENT LETTER, (II) APPROVING
OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

I, John-Paul Hanson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Houlihan Lokey Capital, Inc. ("**Houlihan**"), where I am Head of Houlihan's Oil and Gas Group, and am a senior banker in the firm's Financial Restructuring Group with respect to the oil and gas industry and sub-sectors. I am based out of Houlihan's Houston office located at 1001 Fannin St., Suite 4650, Houston, TX 77002. Houlihan is the investment banker for Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"). Houlihan and its senior professionals have extensive experience

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

1

with reorganizations and restructurings of distressed companies, both out-of-court and in chapter 11 proceedings.

2. I submit this declaration (the "**Declaration**") on behalf of Houlihan in support of the relief requested in the *Emergency Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* (the "**Backstop Motion**").

3. Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Houlihan employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein. I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional retained as the Debtors' investment banker in these chapter 11 cases.

## Qualifications

4. I specialize in advising public and private oil and gas companies and their lenders and investors, including in the context of complex financial restructurings. Before joining Houlihan in 2001, I was a manager of alternative lending at Commonfund Mortgage Corp., where I structured whole loan and portfolio fundings, sales, and securitizations involving a variety of asset-backed lending transactions. Earlier in my career, I held a similar position at MoneyLine Lending. I began my career in finance, trading fixed income securities at NNJ, a private family wealth fund formerly based in San Francisco, California. I have an M.B.A., with a concentration

in Finance, from the University of Maryland's Robert H. Smith School of Business and a dual B.A. degree, *cum laude*, in Italian and International Finance from Brigham Young University. I am FINRA certified with Series 7 and 63 licenses.

5. I have extensive experience as an advisor in corporate restructurings, public and private debt and equity offerings, and mergers and acquisitions. I have advised many companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to offshore Gulf of Mexico businesses, including *ATP Oil & Gas Corp.*, *Bennu Oil & Gas, LLC*, *Energy XXI Ltd.*, *Cobalt International Energy, Inc.*, and Fieldwood Energy LLC's previous restructuring. In addition, I have advised numerous companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to onshore U.S. and international E&P companies, including *Berry Petroleum, LLC, Sandridge Energy, Inc., Sheridan Production Partners (I and II), PA Resources, Halcon Resources Corporation, BPZ Resources, Inc., Chesapeake Energy Corporation, All American Oil & Gas, Breitburn Energy Partners, Jones Energy Corporation,* and *Endeavour International Corporation*, among many others within the energy industry and a variety of other sectors. I have previously submitted declarations and/or affidavits and proffered testimony in multiple cases. I have authored, co-authored, and spoken on various topics, including Trends in Oil & Gas Finance, Capital and Valuation, and financing markets and valuation dynamics in a distressed environment, among others.

6. In March 2020, the Debtors retained Houlihan as their investment banker to assist with the Debtors' evaluation of strategic alternatives. Since that time, members of my team and I have worked closely with the Debtors' management and other professionals the Debtors retained in these chapter 11 cases to analyze the Debtors' business affairs, assets and liabilities,

financial position, contractual arrangements, and various proposed strategic transactions. I, and the Houlihan team, have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

## Background

7. Prior to and after the Petition Date, the Company, its advisors and my team at Houlihan engaged in discussions with the Company's creditor constituency regarding the terms of a restructuring that would include a recapitalization of the Debtors' business.[2] After several months of negotiations, the parties to the Debtors' Restructuring Support Agreement, including the Consenting FLTL Lenders, agreed on the terms of a Plan that implements a credit bid transaction through which the Debtors' specified Deepwater Assets and Shelf Assets will be transferred to its Prepetition FLTL Lenders through a Credit Bid Transaction to a newly-formed entity (the "**Credit Bid Purchaser**") through a purchase and sale agreement (the "**Credit Bid Purchase Agreement**").[3]

8. To ensure that the necessary funding is obtained for the Credit Bid Purchaser, the Company, the Backstop Parties (as defined below) and their respective professional advisors have negotiated that certain *Backstop Commitment Letter* (the "**Backstop Commitment Letter**") entered into by and among the Company and those certain entities listed on Schedule I to the Backstop Commitment Letter (the "**Backstop Parties**" and each individually, a "**Backstop Party**") and, when formed, joined into by each of (i) NewCo, (ii) Holdings,[4] and (iii) Credit Bid

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Backstop Motion or the Debtors' joint chapter 11 plan [Docket No. 722] (the "**Plan**"), as applicable.

[3] The Plan provides that the FLTL Lenders will receive their *pro rata* share of 100% of the new equity interests (the "**New Equity Interests**") in the indirect parent of the Credit Bid Purchaser ("**NewCo**"). The Debtors and the Consenting FLTL Lenders continue to negotiate and finalize the terms of the Credit Bid Purchase Agreement.

[4] "**Holdings**" will be a newly-formed Delaware limited liability company that will be wholly-owned by NewCo and will be the indirect owner of 100% of the equity interests of Credit Bid Purchaser.

4

Purchaser.  A copy of the Backstop Commitment Letter is annexed to the Backstop Motion as **Exhibit A**.  Pursuant to the Backstop Commitment Letter, the Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the Second Lien Exit Facility resulting in an aggregate new money commitment of $185 million (the "**Aggregate Commitment**"); provided, that the commitment of each Backstop Party, individually, is limited to the percentage of the Second Lien Exit Facility set forth opposite such Backstop Party's name on Schedule 1 to the Backstop Commitment Letter.  Twenty-five percent (25%) of the New Money Investment raised through the Second Lien Exit Facility will be allocated to certain Backstop Parties and seventy-five percent (75%) will be offered to all DIP Lenders, including the Backstop Parties and their applicable affiliates, on a *pro rata* basis.

9. I believe entry into and performance under the Backstop Commitment Letter will maximize the value of the estates and is in the best interests of the Debtors.  The Backstop Commitment Letter and the terms set forth therein are the result of extensive negotiations between the Debtors, the Backstop Parties and their respective professional advisors.  The Backstop Commitment Letter assures that the Credit Bid Purchaser has a source of necessary new capital committed to fund its capital needs and consummate the Credit Bid Transaction.  The benefits provided to the Debtors by the Backstop Parties' substantial commitments under the Backstop Commitment Letter are commensurate with the Backstop Commitment Premium, the New Money Warrants, and the Commitment Protections provided to the Backstop Parties.

## Terms of the Backstop Commitment Letter

10. Pursuant to the Backstop Commitment Letter, the Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the up to $185 million Second Lien Exit Facility.  The Backstop Commitment Letter also offers the opportunity to all

DIP Lenders, including the Backstop Parties and their applicable affiliates, to provide a percentage of the New Money Investment on a *pro rata* basis.

11. In exchange for the commitments and obligations of the Backstop Parties under the Backstop Commitment Letter, each Backstop Party will be entitled to, among other things: (i) its *pro rata* share of a backstop commitment premium equal to $14.8 million, representing 8% of the amount of the Aggregate Commitment, to be paid by NewCo in the form of New Equity Interests in NewCo at a discount of 30% to equity value (the "**Backstop Commitment Premium**"); (ii) its New Money Second Lien Term Loans Allocation Percentage of warrants for up to 24% of the New Equity Interests in NewCo (the "**New Money Warrants**"); (iii) in the event of an Alternative Transaction (as defined below), its *pro rata* share of an Alternative Transaction Premium (as defined in the Backstop Commitment Letter) equal to 5% of the Aggregate Commitment, to be paid by the Company in cash and which shall become payable on (A) the date of the consummation of any sale, transfer or other disposition of all or a material portion of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) to any person or persons other than the Credit Bid Purchaser, (B) the date of the consummation of any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests to any person or persons other than the Credit Bid Purchaser, or (C) the date of the consummation of any plan of reorganization, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or any of the other Debtors (other than (x) the "Restructuring" and "Restructuring Transactions" as defined in and contemplated under the Restructuring Support Agreement, or (y) any liquidation under Chapter 7 of the Bankruptcy Code pursuant to which a material portion of the Acquired Interests are a part of the liquidating estate) without the use of the

commitments under the Backstop Commitment Letter, regardless of whether such plan or other transaction contemplates a sale of assets of the Debtors, a recapitalization or any alternative structure (any such transaction contemplated by clauses (A), (B), or (C), an "**Alternative Transaction**"); *provided* that the Alternative Transaction Premium shall not become due in the event that (a) the Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Backstop Commitment Letter) or (b) if the Credit Bid Purchase Agreement is terminated due to (x) Credit Bid Purchaser's breach, (y) if the Backstop Parties commit to support the Equity Rights Offering and the Equity Rights Offering is not consummated (as a result of the breach of such commitment by a Backstop Party, or (z) the Credit Bid Purchaser being unable to credit bid (the foregoing clauses (x) through (z), the "**Specified Exceptions**"); (iv) the reimbursement of the Backstop Parties for all reasonable and documented out-of-pocket fees, costs and expenses (including the fees and expenses of counsel) incurred in connection with the Second Lien Exit Facility whether or not the Closing Date occurs or any Second Lien Exit Facility Documents are executed and delivered or any extensions of credit are made under the Second Lien Facility (the foregoing reimbursement obligations, the "**Expense Reimbursement**"), to be paid by Holdings or the Credit Bid Purchaser; *provided* that the Company shall be liable for the Expense Reimbursement in the event, and solely in the event, of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the occurrence of the Closing Date), *provided, further* that the Company shall have no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception; and (v) the obligations of the Company, NewCo, Holdings and Credit Bid Purchaser, as set forth in section 5 of the Backstop Commitment Letter, to indemnify the Backstop Parties under certain circumstances (the "**Indemnification Obligations**");

7

*provided* that the Indemnification Obligations of the Company (but not any other parties) shall terminate upon the earlier to occur of the Closing Date and the termination of the Credit Bid Purchase Agreement due to the occurrence of any Specified Exception (clauses (iii)–(v), collectively, the "**Commitment Protections**").

### Sound Business Reasons Support Entry Into Backstop Commitment Letter

12. I believe that sound business reasons exist to enter into the Backstop Commitment Letter. The Backstop Commitment Letter is the culmination of extensive good-faith, arm's-length negotiations among the Debtors and their key economic stakeholders. The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the restructuring framework contemplated by the Plan and carefully considered their options for financing the Credit Bid Purchaser.

13. As a part of these restructuring negotiations, the Debtors, the Prepetition FLFO Lenders, the Required DIP Lenders, the Consenting Creditors, and their respective advisors thoroughly evaluated both the *pro forma* capital required to best position the Credit Bid Purchaser for future success and the potential funding needed on an aggregate basis to implement the Plan, including ensuring necessary funds will be available to finalize the settlement agreement with Apache, provide sufficient value for the proposed settlement agreement with the Official Committee of Unsecured Creditors, and achieve consensus among the Prepetition FLFO Lenders in order to preserve estate resources. Specifically, members of the Ad Hoc Group of Secured Lenders agreed to backstop the necessary second lien exit financing, waive hundreds of millions of dollars of the undersecured deficiency portion of the FLTL Claims to reduce the size of the unsecured claims pool sharing the value available for *pro rata* distribution to unsecured creditors,

8

as well as further backstop an equity rights offering to pay down a portion of the First Lien Exit Facility.

14.     In addition to running the M&A sale process, my team and I contacted several potential capital providers outside the Company's existing lender group to determine if any viable and cost-effective options for exit financing would be available. These efforts included informal conversations with parties that had previously expressed some interest in providing financing for a debtor-in-possession facility or in purchasing the Deepwater Assets, as well as new parties that were given the opportunity to conduct diligence on the Company and its assets.

15.     However, a combination of factors including the continuing challenges posed by the COVID-19 pandemic, the impact on demand for oil and resulting commodity prices, and the lack of available capital in the upstream exploration and production sector significantly limited the Company's options for obtaining exit financing.

16.     Although Houlihan engaged in outreach efforts, no serious interest in providing exit financing emerged on reasonable terms and amount from any party outside the Company's existing lender group, let alone on terms competitive with those offered by the Debtors' existing DIP Lenders. Having fully explored the Company's alternatives, the Debtors decided to move forward with the only commercially reasonable exit financing option available under the circumstances, and extensively negotiated the terms of the Second Lien Exit Facility with the Ad Hoc Group of Secured Lenders and its advisors.

17.     After the initial round of negotiations led to an agreement in principle on the business terms of the Second Lien Exit Facility, the Debtors and their advisors determined that a commitment to backstop the Second Lien Exit Facility would be necessary to ensure that sufficient funding was committed to capitalize the Credit Bid Purchaser and NewCo. In order to

ensure committed capital under the Second Lien Exit Facility, we negotiated the terms of the backstop commitment agreement, pursuant to which the Backstop Parties agreed to fully backstop the up to $185 million new money Second Lien Exit Facility. Significantly, the terms of the Backstop Commitment Letter ensure that the Credit Bid Purchaser has a source of necessary new capital committed to fund its initial capital needs and consummate the Credit Bid Transaction.

18. The Backstop Commitment Letter was heavily negotiated to procure the best possible terms for the Company given the complexity and risks of the restructuring contemplated by the Plan and the operational and financial challenges faced by companies in the E&P space. Importantly, the Company and its advisors were able to negotiate several significant concessions, including meaningful limitations on the terms of the Backstop Premium, New Money Warrants, Alternative Transaction Premium, Expense Reimbursement and Indemnification Obligations, a backstop of the full amount of the Aggregate Commitment Amount, and certain other terms and concessions relating to the covenants and conditions precedent. After reviewing and comparing the terms of backstop arrangements in similar restructurings with those provided in the Backstop Commitment Letter, including the Backstop Commitment Premium, the New Money Warrants and Commitment Protections, my team and I determined that the terms of the Backstop Commitment Letter are consistent with market terms for companies facing similar circumstances as the Debtors, particularly in this environment and for companies operating in the upstream oil and gas industry.

19. The Backstop Commitment Letter is a critical element of the Debtors' restructuring, as well as key to the Debtors' ability to consummate the Plan and the Credit Bid Transaction. The Backstop Commitment Letter provides the Debtors and other key stakeholders with assurances that the Credit Bid Purchaser will have sufficient working capital and liquidity

10

(including ensuring $100 million of cash on hand immediately after the Effective Date) to operate its business. Moreover, the Backstop Commitment Letter provides the Debtors with assurance that they will receive sufficient funding from the Credit Bid Transaction to satisfy their obligations under the Plan and Plan of Merger. Without the Backstop Parties' commitments to provide the Credit Bid Purchaser with up to the $185 million in financing, Credit Bid Purchaser would be forced to either (i) bear the risk of having insufficient funding to capitalize its reorganized business and fund the distributions under the Plan or (ii) procure additional capital elsewhere at a greater cost to the Debtors' estates and stakeholders (to the extent such capital is even available).

20. Therefore, the Debtors submit that entry into the Backstop Commitment Letter is in the best interest of the Debtors' estates and an appropriate exercise of business judgment.

### The Backstop Commitment Premium, the New Money Warrants and the Commitment Protections Under Backstop Commitment Letter Should Be Approved

21. As described above, pursuant to the Backstop Commitment Letter, the Backstop Parties have committed a substantial amount of capital to ensure the successful implementation of the Plan. In view of that commitment and the circumstances of these cases, including the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the Debtors' estates that will be realized through the consummation of the Credit Bid Transaction and other transactions under the Plan, I believe that the consideration being provided to the Backstop Parties for such commitment, including Backstop Commitment Premium, New Money Warrants, and the Commitment Protections (including the Alternative Transaction Premium, the Expense Reimbursement, and the Indemnification Obligations) are reasonable in amount, appropriately compensate those parties for their cost of capital and the assurances they are providing to the process, and are necessary to maximize the value of the Debtors' estates.

11

22. Approval of the Backstop Commitment Premium, the New Money Warrants and Commitment Protections, including the Alternative Transaction Premium, is a condition precedent to the Backstop Parties' obligations under the Backstop Commitment Letter. Agreeing to the Backstop Commitment Premium, the New Money Warrants and Commitment Protections are reasonable and necessary given (i) the significant benefit to the estates of having a commitment of the Backstop Parties to provide exit financing in an amount to ensure that the Credit Bid Purchaser is adequately capitalized and (ii) the costs incurred by the Backstop Parties engaging with the Debtors and negotiating the terms of the Backstop Commitment Letter and other transaction documents. Under these circumstances, the Backstop Commitment Premium, the New Money Warrants and the Commitment Protections are reasonable in amount and necessary to maximize the value of the Debtors' estates.

23. I believe that payment of the Expense Reimbursement Obligations, in accordance with the terms of the Backstop Commitment Letter, is warranted. Over the past several months, the Backstop Parties have spent substantial time and expense conducting diligence and submitting proposals regarding potential restructuring transactions with the Debtors. The Backstop Parties have also incurred significant expenses negotiating and drafting the Backstop Commitment Letter and Second Lien Facility Documents, and will continue to incur significant costs until the Plan is consummated. While the Backstop Parties wait for the Plan to be consummated, they are exposed to risk, including fluctuations in the value of the Acquired Interests and that their efforts could result in a tremendous opportunity cost if the Plan is not confirmed by the Court and consummated by the parties. Moreover, reimbursing such fees and expenses is customary in other similar transactions to address the substantial efforts expended by backstopping parties.

24. The Backstop Commitment Premium, the New Money Warrants and Commitment Protections are integral parts of the Backstop Commitment Letter, and without these protections, the Debtors have been advised that the Backstop Parties would not have agreed to the binding commitments to backstop the Second Lien Exit Facility. Indeed, if the Backstop Commitment Premium, the New Money Warrants, and Commitment Protections are not approved, the Backstop Parties' commitment to the backstop the Second Lien Exit Facility will be jeopardized as the Backstop Parties' would have the right to terminate the Backstop Commitment Letter.

25. Notably, the Company's obligation to provide the Commitment Protections is subject to several limitations under the Backstop Commitment Letter. The Company is only liable with respect to the Expense Reimbursement in the event of the termination of the Commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the Closing Date) and the Company has no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to Credit Bid Purchaser's breach or the Credit Bid Purchaser being unable to credit bid.

26. Further, the Backstop Commitment Premium, the New Money Warrants, and the Commitment Protections are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having a substantial committed investment in the Credit Bid Purchaser. Notably, the Backstop Commitment Premium and the New Money Warrants are payable entirely in equity of NewCo (*i.e.* New Equity Interests and warrants for New Equity Interests, respectively) and imposes no cash costs on the Debtors if the Debtors consummate the Plan.

27. In light of the benefits that will inure to the Debtors and their estates as a result of the Backstop Parties' commitment of capital through the Backstop Commitment Letter, the Debtors submit that entry into the Backstop Commitment Letter and performance thereunder, is in the best interest of the Debtors' estates and should be approved by this Court.

Dated: March 15, 2021

                                                        /s/ John-Paul Hanson
                                                      John-Paul Hanson
                                                      Managing Director
                                                      Houlihan Lokey Capital, Inc.