**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| FIELDWOOD ENERGY, LLC, *et al.*,[1] | § § | Case No. 20-33948 (MI) |
| | § § | (Jointly Administered) |
| Debtors. | § | |

**OBJECTION OF XTO OFFSHORE, INC., HHE ENERGY COMPANY, AND XH LLC TO DEBTORS' SECOND MOTION FOR ENTRY OF AN ORDER FURTHER EXTENDING EXCLUSIVE PERIODS PURSUANT TO SECTION 1121(d) OF BANKRUPTCY CODE**

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

COME NOW XTO Offshore, Inc., HHE Energy Company, and XH LLC (collectively, "XTO"), and file this Objection (the "Objection") to *Debtor's Second Motion for Entry of an Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of Bankruptcy Code* (the "Motion") [Docket No. 930]. In support of the Objection, XTO respectfully represents:

**PRELIMINARY STATEMENT**

1. The Debtors cannot demonstrate an ability to confirm a viable plan and, thus, cannot show that "cause" exists to extend the exclusive periods. The Debtors have not proposed – and have not indicated a willingness to propose – a plan that satisfies the Debtors' substantial P&A Obligations under federal environmental regulations. Rather, the Joint Plan seeks to abandon more than 187 offshore oil and gas properties and, with them, the Debtors' obligation to pay the P&A Obligations for the decommissioning of these properties. However, the law is clear that the Debtors cannot abandon offshore oil and gas leases subject to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

substantial P&A Obligations in violation of state and federal environmental regulations aimed at protecting the health and safety of the public. Moreover, the Joint Plan wholly fails to provide a means for satisfying the billions of dollars in administrative claims arising from the Debtors' P&A Obligations. Consequently, the Joint Plan is unconfirmable as a matter of law, and the Debtors cannot demonstrate an ability to propose a viable plan as a condition to extension of the exclusive periods.

2. There is no basis to further extend exclusivity to facilitate the Debtors' misplaced efforts to confirm a plan for which feasibility depends on avoiding billions of dollars in environmental liabilities.

## PROCEDURAL BACKGROUND

3. On August 3 and 4, 2020 (collectively, the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§1107(a) and 1108. No trustee or examiner has been appointed in these cases.

4. The Debtors' Exclusive Filing Period and Exclusive Solicitation Period were initially set to expire on December 1, 2020, and January 30, 2021, respectively.

5. On December 1, 2020, the Debtors filed *Debtors' Motion for Entry of an Order Extending Exclusive Periods Pursuant to Section 1121(d) of Bankruptcy Code* [Docket No. 625[ (the "First Motion to Extend"). On January 8, 2021, the Court entered its *Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending Exclusive Periods* [Docket No. 751], extending the Exclusive Filing Period and Exclusive Solicitation Period approximately ninety (90) days through and including March 1, 2021 and April 30, 2021, respectively.

6. On March 1, 2021, the Debtors filed the Motion seeking an additional ninety (90) day extension of the Exclusive Filing Period and Exclusive Solicitation Period through and including May 31, 2021 and July 29, 2021, respectively.

## THE DEBTORS' JOINT PLAN

**A.     Procedural Background**

7.      On January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 722].  On March 15, 2021, the Debtors filed the *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1020] (the "Joint Plan").

8.      On January 1, 2021, the Debtors filed *the Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Debtor Affiliates* [Docket No. 723].  On March 16, 2021, the Debtors filed *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1022] (the "Disclosure Statement").

9.      The first Disclosure Statement was initially set for hearing on February 3, 2021, and has since been adjourned and reset five (5) times.  The Disclosure Statement is currently set for hearing on March 24, 2021.

10.     On January 12, 2021, XTO filed *Objection of XTO Offshore, Inc., HHE Energy Company, and XH LLC to the Joint Chapter 11 Plan of Fieldwood Energy, LLC and its Affiliated Debtors* [Docket No. 759].  On February 22, 2021, XTO filed its *Objection of XTO Offshore, Inc., HHE Energy Company, and XH LLC to the Disclosure Statement for the Joint Chapter 11 Plan of Fieldwood Energy, LLC and its Affiliated Debtors* [Docket No. 900].

11.     In addition to the XTO Objections, at least twenty-five (25) other Disclosure Statement objections or Joinders to objections have been filed.

**B.     The Abandoned Properties**

12.     Under the Joint Plan, the Debtors' best assets are being cherry picked and will be transferred to a Newco based on a transaction with the lenders referred to in the Disclosure Statement as the "Credit Bid Transaction".  The treatment of the remaining leases, which do not appear to be economically viable, is directly driven by the Debtors' attempt to avoid their P&A Obligations as to those properties.

13. For this purpose, the Debtors have divided the assets remaining after the Credit Bid Transaction into three (3) groups or tranches. The first tranche is composed of the properties transferred to FWE I for which Apache is a Predecessor. The driving impetus for this transaction appears to be Apache's joint and several liability for the P&A Obligations in relation to these properties. These properties, the revenues from their continued production, and any attendant P&A Obligations, are to be passed on to Apache and FWE I through this transaction.

14. The second tranche is composed of the group of properties transferred to FWE III and which are referred to as the "FWE III Properties". The FWE III Properties are also not economically viable and represent properties for which the Debtors do not believe there is a solvent Predecessor to pay for the P&A Obligations to decommission these properties. Consequently, the FWE III Properties have been retained in FWE III, although it is unclear whether the limited assets remaining in that entity will actually be sufficient to cover the P&A Obligations.

15. Lastly, the third tranche consists of approximately 187 offshore leases which are designated in the Disclosure Statement as the "Abandoned Properties." This group includes properties which are also uneconomic, although the Debtors believe that there is a solvent predecessor-in-title ("Predecessor") or current co-working interest owner ("CIO") as to each property who has the financial ability to pay the P&A Obligations. As germane to XTO, the Abandoned Properties include approximately twenty (20) leases (collectively, the "XTO Leases").[2]

16. The Joint Plan proposes to abandon these properties and to allow the Debtors to simply walk away from their billion-dollar environmental obligation to decommission these properties. There are likely several billion dollars in costs associated with the plugging,

---

[2] The XTO Leases include the following properties listed in Exhibit "E" to the Disclosure Statement: G 01027; G 01028; G 01029; G 01037; G 01038; G 01172; G 01216; G 01522; G 01523; G 01197; G 02311; G 02600; G 02750; G 02254; G 02549; G 22679; G 22792; G 13607; G 02220; and G 02549.

---

**Objection to Debtors' Second Motion to Extend Exclusive Periods**                               **Page 4**

abandonment and decommissioning of the Abandoned Properties, including plugging and abandoning the wells on the seabed, removing pipelines associated with the well (also on the seabed) and removing any platform used in connection with the lease.  These costs are referred to in the Disclosure Statement as the "P&A Obligations".

17. The Abandoned Properties are generally older and have been in service for several decades.  According to an objection filed by Chevron (the "Chevron Objection"), the Abandoned Properties contain 1,175 wells, 281 pipelines and 271 platforms.[3]  The Department of the Interior has filed 10 proofs of claim against the Debtors totaling over $9.0 billion.  The Department of Interior has filed proof of claim 894 against Fieldwood Offshore for decommissioning and P&A Obligations of $2.54 billion.  Consequently, it is fair to project that the P&A Obligations on the Abandoned Properties will total into the billions of dollars.

18. Under the applicable federal regulations, a predecessor-in-title to the Debtors may be jointly and severally liable for the P&A Obligations which accrued while the Predecessor held record title.  The Joint Plan appears to be premised on the tacit assumption that, based on this potential liability, the Predecessors will step in and take over the properties once abandoned.  However, the potential liability of the Predecessors for the P&A Obligations does not require them to either accept back the record title to any of the Abandoned Properties or to assume the liability and burdens to act as the operators of the properties post-abandonment.  Indeed, there is no reason for any Predecessor to assume the substantial additional liability of a record interest owner or to agree to assume an operating interest in any of the Abandoned Properties.  To XTO's knowledge, no Predecessor has agreed to accept title to any of the Abandoned Properties or to act as operator.

19. In that case, if the Debtors are permitted to abandon the properties, there will be no one to take title to the properties, no one to act as the operator, no Predecessor to address

---

[3] *See Objection* [Docket No. 880] filed by Chevron U.S.A. Inc. and Noble Energy, Inc.

the P&A Obligations after the interest was assigned away, and no one to monitor and maintain the properties or to address any future environmental events in relation to any of the 187 properties. Through the Joint Plan, the Debtors seek to do little more than throw the keys on the table, walk away, and hope a significant environmental event does not occur post-abandonment.

20. As a result, the Joint Plan wholly fails to satisfy the U.S. Supreme Court's *Midlantic* opinion in order to abandon these properties.[4] Moreover, the Joint Plan fails to provide a means for paying the billions of dollars in expenses associated with the P&A Obligations, which constitute administrative expenses under decisions of this Court.[5] Moreover, the Joint Plan does not even provide the funds needed to satisfy the hundreds of outstanding incidents of non-compliance (INCs) on the properties, make the repairs needed to ensure the properties are accessible, ensure a safe and orderly transition of the Abandoned Properties to a replacement operator or provide for any maintenance and monitoring of the properties post-abandonment.

21. In sum, there is no reason to extend exclusivity based on an unconfirmable plan whose feasibility depends on the Debtors walking away from billions of dollars in P&A Obligations.

## ARGUMENT AND AUTHORITIES

22. A chapter 11 debtor has the exclusive right to file a plan within the first 120 days after the commencement of a case. *See* 11 U.S.C. § 1121(b). However, "[a]ny party in interest" may file a plan if the debtor fails to file a plan or obtain acceptance of a filed plan within the exclusive periods provided by section 1121. *See* 11 U.S.C. § 1121(c). Section 1121 "represents a congressional acknowledgement that creditors, whose money is invested in the

---

[4] *See Midlantic National Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

[5] *See In re American Coastal Energy,* 399 B.R. 805, 808 (Bankr. S.D Tex. 2009) (Isgur, J.); *In re ATP Oil & Gas Corp.,* 2014 Bankr. LEXIS 1050, *21 (Bankr. S.D. Tex. March 18, 2014).

enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987). By allowing interested parties to file a plan of reorganization after the expiration of the debtor's exclusive periods, section 1121 provides a "relative balance of negotiating strength between debtors and creditors during the reorganization process." *In re Grossinger's Assoc.,* 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990).

23. Section 1121(d)(1) of the Bankruptcy Code provides that the "court may for cause reduce or increase" a debtor's exclusive periods for filing and soliciting a plan. The Bankruptcy Code does not define "cause," but courts have held that section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of 'cause.'" *Geriatrics Nursing Home, Inc. v. First Fid. Bank, N.A. (In re Geriatrics Nursing Home, Inc.),* 187 B.R. 128, 132 (D.N.J. 1995). The debtor bears the burden on the issue of "cause", and "the debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts." *Official Committee of Unsecured Creditors of Mirant Americas Generation, L.L.C. v Mirant Corp. (In re Mirant Corp.)*, 2004 U.S. Dist. LEXIS 19796, *7-8 (N.D. Tex. Sept. 30, 2004).

24. In determining whether "cause" exists to extend the debtor's exclusive periods, the Fifth Circuit has admonished that:

> [A]ny bankruptcy court involved in an assessment of whether "cause" exists should be mindful of the legislative goal behind § 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.

*In re Timbers,* 808 F.2d at 372. Further, a motion to extend exclusivity is a "serious matter" which should "be granted neither routinely nor cavalierly." *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) (quotation omitted); *see also In re Borders Group., Inc.,* 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011).

25.     Bankruptcy courts have traditionally used a variety of factors in determining whether "cause" exists to extend the debtor's exclusive periods, such as: (a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. *In re Express One Int'l*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

26.     Importantly, a chapter 11 debtor must be able to demonstrate an ability to propose a viable plan in order to establish "cause" to extend the exclusive periods. *In re Southwest Oil Co.*, 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987) ("The debtor in a Chapter 11 case is also required to demonstrate that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization within a reasonable time.") (citations omitted).  Further, "[a] reasonable probability cannot be grounded solely on speculation. The Code requires the debtor to prove that an effective reorganization is possible." *Id.*

27.     Here, the Debtors fail this most basic test.  The Debtors cannot demonstrate an ability – or even a willingness – to propose a plan that meets the *Midlantic* requirements or to provide for the payment of administrative claims associated with the Debtors' P&A Obligations. As such, the Joint Plan is unconfirmable.  No legitimate purpose could be served in further extending the Debtors' exclusive opportunity to seek acceptances of a plan that is patently unconfirmable.

28. Among other objections to the Joint Plan, XTO and numerous other parties have identified the following Joint Plan deficiencies:

### A. The Debtors Cannot Abandon their P&A Obligations relating to the Abandoned Properties in Violation of Applicable State and Federal Law

29. In the Disclosure Statement, the Debtors assert that the "Abandoned Properties are burdensome to the Debtors' estates." See Disclosure Statement [Docket No. 1022], p. 48, VI(C). As a result, the Debtors seek to abandon such properties under section 105(a) and 554(a) of the Bankruptcy Code. The Debtors' Disclosure Statement does not articulate the basis for their determination that the Abandoned Properties are burdensome or provide the total estimated costs to perform the P&A Obligations associated with the Abandoned Properties. However, as discussed above, XTO Energy believes the Debtors are seeking to abandon the Abandoned Properties, including the Leases, because such properties are subject to billions of dollars in plugging, abandoning and decommissioning costs.

30. Although section 554(a) of the Bankruptcy Code generally permits debtors to abandon property that is either burdensome or of inconsequential value to the estate, a debtor is not immune from state and federal laws of general applicability and "cannot abandon contaminated estate property if state health or safety law prohibits such abandonment." *American Coastal Energy*, 399 B.R. at 810. Indeed, more than thirty years ago, in *Midlantic*, the Supreme Court determined that section 554(a) does not preempt all state and local laws and, therefore, "the Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety." *Midlantic*, 474 U.S. at 506-07. Consequently, the Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 507.

31. In this case, the Debtors presently own and operate deep water and shallow water offshore oil and gas properties located in the Gulf of Mexico. The oil and gas properties

sought to be abandoned by the Debtors are believed to be subject to billions of dollars in P&A Obligations. Moreover, the applicable federal and state environmental statutes and regulations requiring the plugging, abandoning and decommissioning of the Debtors' offshore oil and gas properties are reasonably designed to protect the public health or safety from imminent and identifiable harm. *E.g., American Coastal Energy,* 399 B.R. at 813 ("the applicable provisions of the Texas Natural Resources Code [requiring the plugging and remediation of wells] are reasonably designed to protect the public health and safety."). As a result, the Count cannot permit the Debtors to abandon the Abandoned Properties without formulating conditions that will adequately protect the public's health and safety.

32. The Debtors' Joint Plan does not provide for payment of the costs associated with performing the P&A Obligations pertaining to the Abandoned Properties, including the Leases. Although the Disclosure Statement provides that the Debtors have obtained $494 million in surety bonds pertaining to the Abandoned Properties (See Disclosure Statement, p. 24, § III(B)(1)(c)), XTO reasonably believes the Debtors' surety bonds will not be sufficient to pay for the billions of dollars in P&A Obligations relating to the Abandoned Properties. Consequently, unless the Debtors can demonstrate that the $494 million in existing surety bonds is sufficient to cover all of the P&A Obligations for the Abandoned Properties, or the Joint Plan is modified to provide for the performance of all such P&A Obligations by the Debtors, it cannot be confirmed in contravention of state and federal environmental regulations requiring the plugging, abandoning and decommissioning of the Abandoned Properties, including the Leases.

**B.    The Debtors' Environmental Liabilities Constitute Administrative Expenses under Section 503(b)(1)(A)**

33. Section 503(b)(1)(A) defines an "administrative expense" to include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "The Fifth Circuit has held that post-petition plugging and abandonment obligations are generally entitled

to administrative priority." *American Coastal Energy,* 309 B.R. at 808 (*citing Tex. v. Lowe (In re H.L.S. Energy Co., Inc.)*, 1551 F.3d 434, 437 (5th Cir. 1998)).  Consequently, the Debtors' post-petition P&A Obligations constitute administrative expenses.  *Id.*

34. In addition, even if the Debtors' P&A Obligations arise from prepetition conduct or leases, they are nevertheless entitled to administrative expense priority under section 503(b)(1)(A).  Indeed, in *American Coastal*, this Court found that post-petition expenditures required to remedy prepetition environmental liabilities constitute administrative expenses under section 503(b)(1)(A).  *American Coastal Energy*, 309 B.R. at 817.  The Court explained its rationale as follows:

> Because the debtor-in-possession is required to operate the estate in accordance with state law, post-petition expenditures necessary to bring the estate into compliance with the law are necessary for the debtor's rehabilitation. The need to bring the estate into compliance with state environmental and safety laws is no less significant than the need to maintain commercial relations with trade-creditors that provide the raw materials of the debtor's business. A debtor cannot operate an estate in violation of environmental and safety laws.

*Id.* at 816.  As a result, because "***expenditures for remedying violations of environmental and safety laws are necessary to preserve the estate, regardless of whether liability for the state law violation first occurred before or after the filing of a bankruptcy petition***," the Court held that a claim for plugging costs was entitled to administrative priority.  *Id.* at 816-17 (emphasis added).

35. In a subsequent opinion, *In re ATP Oil & Gas Corp.*, the Court again interpreted *Midlantic* as placing a duty upon the debtor to make the properties safe for abandonment under state law and concluded that expenditures for remedying violations of applicable environmental and safety laws were necessary to preserve the estate regardless of whether the liability for violation of the environmental laws first occurred before or after the filing of the bankruptcy petition. *In re ATP Oil & Gas Corp.,* 2014 Bankr. LEXIS 1050 at *21.  The Court further found that "a debtor's obligation to expend funds to bring the estate into compliance with a state health

and safety law does not change just because another entity has the same obligation." *Id.* As a result, the Court found that a claim for post-petition "safe out" work on a production platform was entitled to administrative priority.

36. Consequently, under *Midlantic*, *American Coastal Energy,* and *ATP Oil & Gas Co.*, all costs associated with the Debtors' P&A Obligations constitute administrative expenses entitled to administrative priority under section 503(b)(1)(A) regardless of the fact that such obligations may arise from prepetition contracts and/or other parties may be jointly and severally liable to the U.S. government for such P&A Obligations.

**C.  The Joint Plan Does Not Satisfy Section 1129(a)(1)(A) or 1129(a)(11) of the Bankruptcy Code Because It Does Not Provide for the Payment of the Debtors' P&A Obligations as Administrative Expenses**

37. A chapter 11 plan must provide for the payment in full of all administrative expenses on the effective date of the plan, unless the holders of such administrative expenses agree to a different treatment.  11 U.S.C. § 1129(a)(9)(A); *American Coastal Energy*, 309 B.R. at 808.  Section 2.1 of the Debtors' Joint Plan provides for the payment in full of all allowed administrative expenses on the later of (i) the effective date of the Joint Plan or (ii) the first business day that is thirty (30) days after the administrative claim becomes an allowed administrative claim.  *See* Joint Plan [Docket No. 1022], section 2.1, p. 27.  Moreover, section 5.13 of the Joint Plan provides that "Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim against the Debtors, the Post-Effective Date Debtors or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties."  *See* Joint Plan [Docket No. 1020], section 5.13, p. 46.

38. As an initial matter, although section 5.13  purports to preserve the United States' "rights to assert a claim" against the Debtors or Post-Effective Date Debtors (and all co-lessees and predecessors in interest) with respect to the Abandoned Properties, such preservation is illusory because the immediately preceding sentence provides that "the Debtors, their Estates,

and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties." In other words, although the United States' ability to "assert a claim" against the Debtors and Post-Effective Date Debtors for their P&A Obligations relating to the Abandoned Properties is purportedly preserved, the United States' ability to recover from the Debtors or Post-Effective Date Debtors on any such claim for P&A Obligations is precluded by the immediately preceding sentence in section 5.13 of the Joint Plan. As a result, this provision of the Joint Plan preserves nothing in relation to the Debtors and Post-Effective Date Debtors, and instead only preserves the United States' ability to pursue claims for the P&A Obligations against the Debtors' co-lessees and predecessors in interest. Indeed, in order for the purported carve-out for the United States' ability to *assert a claim* against the Debtors or Post-Effective Date Debtors for P&A Obligations to be meaningful, the Joint Plan must provide that nothing in the Joint Plan or Confirmation Order shall impair the Debtors' or the Post-Effective Date Debtors' *liability* to the United States for the Debtors' P&A Obligations relating to the Abandoned Properties.

39. Unless the Joint Plan is amended to preserve the Debtors' and the Post-Effective Date Debtors' liability to the United States (or any other governmental entity) for the P&A Obligations relating to the Abandoned Properties, and the Debtors' financial projections in support of the Joint Plan clearly demonstrate the Debtors' or Post-Effective Date Debtors' ability to satisfy the billions of dollars owed by the Debtors for P&A Obligations for the Abandoned Properties as administrative expenses, the Joint Plan fails to satisfy section 1129(a)(9)(A) of the Bankruptcy Code and cannot be confirmed.

40. The Joint Plan also is not feasible under section 1129(a)(11) of the Bankruptcy Code because it fails to demonstrate that confirmation "is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). Consequently, unless the Joint Plan is amended to clearly provide for the payment of all of the Debtors' P&A Obligations relating to the Abandoned

Properties as administrative expenses, and the Debtors' financial projections demonstrate the Debtors' and Post-Effective Date Debtors' ability to pay such P&A Obligations, the Joint Plan cannot be confirmed.

### CONCLUSION

41. The Debtors' Joint Plan is fatally flawed and cannot be confirmed. Moreover, the Debtors have not shown an interest in proposing a viable plan that addresses their P&A obligations under *Midlantic*. Without the prospect of a viable plan, the Debtors cannot meet their burden to establish "cause" for an extension of the exclusive periods. Indeed, it would be futile and counterproductive to provide the Debtors with additional time, to the exclusion of all other interested parties, to file and seek the acceptance of a plan that cannot be confirmed. Extending exclusivity for a futile purpose will not move the case forward or facilitate the negotiation of a consensual plan. To the contrary, further extending exclusivity would only serve to alter the negotiation balance carefully crafted into section 1121, which the Fifth Circuit advises should be "faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *In re Timbers,* 808 F.2d at 372.

42. For the foregoing reasons, the Court should decline to further extend the Debtors' exclusive periods as proposed in the Motion. Instead, the Court should permit section 1121 to perform its intended purpose and allow other interested parties to propose an alternative plan.

43. XTO therefore respectfully requests that the Court deny the Motion and grant such other and further relief as is just and proper.

DATED: March 22, 2021                    Respectfully Submitted,

/s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Lynda L. Lankford
State Bar No. 11935020

FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, Texas 76102
Telephone: (817) 877-8855
Facsimile:  (817) 877-4151
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR XTO OFFSHORE, INC., HHE ENERGY COMPANY, AND XH LLC


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served upon all parties receiving electronic notice via the Court's CM/ECF system on March 22, 2021.

/s/ J. Robert Forshey
J. Robert Forshey

L:\BFORSHEY\XTO - Fieldwood Energy (CrR) #6145\Pleadings 20-33948 (MI)\Obj to Motion to Extend Exclusive Periods 3.22.21.docx