## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| FIELDWOOD ENERGY LLC *et al.*[1] | Case No. 20-33948 (MI) |
| Debtors. | (Jointly Administered) |
| | **Re:  Docket No. 930** |

### OBJECTION OF ENI PETROLEUM US LLC AND
### ENI US OPERATING CO. INC. TO DEBTORS' SECOND
### MOTION FOR ENTRY OF AN ORDER FURTHER EXTENDING EXCLUSIVE
### PERIODS PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE

Eni US Operating Co. Inc. and Eni Petroleum US LLC (together, "Eni") hereby file this

limited objection (this "Objection") to the *Debtors' Second Motion for Entry of an Order Further*

*Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* filed on March

1, 2021 [Dkt. No. 930] (the "Motion").[2] In support of this Objection, Eni respectfully represents

as follows:

### PRELIMINARY STATEMENT

1.      The Debtors have misused their exclusivity for more than seven months, driving

this case toward a patently unconfirmable Plan for the benefit of their secured lenders, Apache and

Fieldwood's management team.  The Debtors' misuse of their exclusivity discriminates against

---

[1]  The Debtors in these chapter 11 cases (these "Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

other predecessors like Eni and has drawn notable (and insurmountable) objections from a wide body of creditors. Indeed, the Debtors have failed to heed black-letter law that prohibits shirking their plugging and abandonment ("P&A") and decommissioning liabilities via abandonment, ignoring a chorus of protests from the Regulatory Authorities (defined below), whose approval is required to effect any of the transactions embedded in the current plan proposed by the Debtors. The Debtors have ignored the predecessors to the Abandoned Properties who, following confirmation and consummation of the current Plan (which is being opposed), would be expected to jointly and severally perform and pay for the Debtors' responsibilities for P&A and decommissioning of the Debtors' legacy oil and gas properties. The Debtors' unconfirmable Plan contains no solution to the Debtors' proposed abandonment of liabilities that the Regulatory Authorities estimate at $1.3 billion, which does not include costs to resolve approximately 200 ongoing non-compliances associated with the Abandoned Properties.

2.      Notably, the Debtors' motive is more than transparent. The Debtors' unwillingness to address these infirmities drags their estates closer to a scenario where only the Debtors' management team has the information necessary to maintain the assets following confirmation. Unsurprisingly, the Debtors propose that their management team can continue to maintain the assets following confirmation of the proposed Plan, provided that the predecessors pay the management fees and expenses of the Debtors' management team and that the predecessors take legal responsibility if an environmental harm arises.  Despite the Debtors' self-serving strategy and utter failure to propose a confirmable plan, as evinced by the myriad of objections to the Debtors' Disclosure Statement, the Debtors have asked this Court for time for a "do over" to allow them to stay at the wheel exclusively to propose a plan until May 31, 2021. This Court should see

through the Debtors' façade, and deny the Debtors' requested extension and permit other parties in interest the opportunity to propose an alternative.

3.       Allowing the Debtors to be the sole force driving these Cases forward prevents input from other parties who may be ready to put forward a value-maximizing solution that satisfies the areas of bankruptcy and non-bankruptcy law that the Debtors currently neglect. This is a particularly galling thought, given Eni and the other stakeholders have made significant progress over the past month and half developing a potential solution for treatment of the Abandoned Properties that may garner creditor consensus, and the Debtors have failed to provide a meaningful response.  Even more importantly, the momentum achieved by Eni, the predecessors and the sureties has the support of the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Department of Interior ("DOI") and the Department of Justice ("DOJ" and, collectively with BOEM, BSEE, and DOI, the "Regulatory Authorities").[3] The Debtors have largely ignored these efforts to date, and the Debtors' underlying reasoning seems clear: the lenders are in control of these Cases, are providing the entirety of the funding for the bankruptcy, and support a plan that delivers them the Debtors' "cherry-picked assets" while leaving the Debtors' "bad liabilities" behind. Any interference by creditors or the Regulatory Authorities would be unwelcome.

4.       If the Court were to permit a further extension of exclusivity in these Cases, it would embolden the Debtors to continue seeking confirmation of a patently unconfirmable plan or, at best, cause the Debtors to go back to the drawing board on a plan structure that may or may not involve all of their creditors and predecessors, rather than just a select few for the betterment of

---

[3]  Eni has been informed that the Regulatory Authorities have received an extension from the Debtors to file their objection to the Amended Disclosure Statement (defined below) by no later than 11:59 p.m. (CST) on Monday, March 22, 2021. Accordingly, any representations about the Regulatory Authorities in this Objection are based on significant substantive discussions with the Regulatory Authorities, but without review of any formal objection.

their secured lenders. The Debtors used the prior extension of exclusivity to gain $20 million in incremental additional financing from its secured lenders through an equity rights offering and make a deal with a subset of their unsecured creditors—their trade vendors—but have otherwise made no headway on the abandonment of billions in P&A and decommissioning liabilities that the Debtors seek to unload onto the predecessors (a tactic for which the Regulatory Authorities have shown no support and, without such support, the Debtors cannot proceed to confirmation).

5.    To demonstrate "cause" for extension of exclusivity, the Debtors must prove by a preponderance of evidence they are entitled to an extension under a factor-based test. As discussed below, the Debtors fail a number of the most important factors courts consider in evaluating a debtor's entitlement to control of the plan process. These cases are ready to be opened up to input from the entire capital structure and stakeholders. The Debtors are free to continue driving in the wrong direction, but they must not be able to take all of the creditors with them and continue towards a dead end. The Court should deny the Motion and potentially allow other creditors and stakeholders to take the wheel.

### FACTUAL AND PROCEDURAL SUMMARY[4]

6.    On January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 722] (the "Plan") and the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 723] (the "Disclosure Statement"). In short, the Disclosure Statement described a patently unconfirmable Plan, linked to an untested strategy in bankruptcy court to sell valuable producing

---

[4] A full history of these Cases leading up to the Motion is contained in the *Objection of Eni US Operating Co. Inc. and Eni Petroleum US LLC to Approval of Debtors' Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 937] (the "Initial Disclosure Statement Objection") and the numerous other objections filed to the Disclosure Statement and Amended Disclosure Statement (each as defined herein). Eni incorporates by reference all of the points raised in its Initial Disclosure Statement Objection and repeats them as if fully set forth in this Objection.

assets to the Debtors' secured lenders while offloading or abandoning "bad" assets—and their attendant liabilities, totaling billions—to other joint and several parties with insufficient financial contribution from the Debtors, their secured lenders or the Debtors' surety bond providers.

7.     Unsurprisingly, as a result of the Plan, Eni and other predecessors, as well as sureties and the Regulatory Authorities (collectively, the "Stakeholders") began holding discussions among each other and with the Debtors, during which the Stakeholders expressed three overriding sentiments: (1) the Plan is patently unconfirmable due to treatment of the Abandoned Properties (among other confirmation infirmities) and, as of the filing of this Objection, does not enjoy the support of any Stakeholder, including most importantly the Regulatory Authorities; (2) a better solution is possible, primarily one that involves concessions on all sides and allows both the Debtors and the Stakeholders to share responsibilities to the benefit of the public health and safety; and (3) the Debtors have provided insufficient information for predecessors to assess whether and when a safe transition of the Abandoned Properties could be achieved. With those factors in mind, the Stakeholders have made significant progress in brainstorming viable solutions; in contrast, the Debtors have doubled down on their unworkable plan structure and have still not provided essential information to plan for a safe transition.

8.     On March 15, 2021, the Debtors filed the *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1020] (the "Amended Plan") and the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1022] (the "Amended Disclosure Statement"). Despite over two and a half months passing between the filing of the Plan and Disclosure Statement and the Amended Plan and Amended Disclosure Statement, the Debtors have made no identifiable progress in solving their roadblocks to confirmation of the Amended Plan as it relates to the

Stakeholders. Instead, the Debtors have altered their plan structure as it relates to their FLFO group and struck a deal with a subset of the Debtors' unsecured creditors—the trade creditors—which can hardly be viewed as a positive outcome for the benefit of the Debtors' estate as a whole.[5] The Stakeholders have relayed a potential concept to the Debtors to remedy some of their Plan issues, but as of the filing of this Objection, the Debtors have yet to engage the Stakeholders substantively or otherwise slow their pace toward the doomed Amended Disclosure Statement hearing and, if permitted to pass through to confirmation, their equally fatal Amended Plan confirmation hearing.

## **ARGUMENT**

### I.    The Debtors Have Failed To Show That Cause Exists For An Extension And Are Not Entitled To A Further Extension of the Exclusive Period

9.      The Bankruptcy Code provides that, after notice and a hearing, a bankruptcy court may "for cause" increase a debtor's exclusive period to file a plan of reorganization and complete solicitation of votes for such plan. *See* 11 U.S.C. § 1121(d)(1). A debtor has the burden of proof to make "a clear showing" that cause exists in order to support an extension of the exclusivity period. *See In re Mirant*, No. 4-04-CV-476-A. 4-04-CV-530-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004); *In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Tex. 1987) ("[a] debtor seeking to extend the 120-day exclusivity period bears the burden of proof and must show that cause exists for granting an extension."); *see also In re Curry Corp.*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992); *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011); *In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990) ("[t]he party seeking a change in this statutory time period bears the burden of proving that the requisite cause exists").

---

[5] Both of these changes also present confirmation issues and, in response, Eni filed the *Supplemental Objection of Eni US Operating Co. Inc. and Eni Petroleum US LLC to Approval of Debtors' Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 1066] (the "Supplemental Objection").

10.     The Bankruptcy Code does not define "cause." Rather, courts may determine whether cause exists at their discretion. *See Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1160 (5th Cir. 1988); *see also In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y 2006) (citing *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997)); *First Am. Bank of N.Y. v. Southwest Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986). Courts typically rely on the following factors: (a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. *In re Express One Intern., Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

A.      **The Debtors Have Failed to Demonstrate Any Progress Toward or Prospects of a Viable Plan, Despite Spending Significant Time and Professional Fees in Bankruptcy**

11.     The Debtors argue that they have made significant progress over the last seven months (i) finalizing transaction documents and (ii) negotiating with key stakeholders. *See* Motion, ¶ 2 (specifying documents to be the Credit Bid Purchase Agreement, the First Lien Exit Facility, the Second Lien Exist Financing and Backstop Commitment, among others); ¶ 3 (listing discussions with Regulators, Predecessors, and CIOs; Sureties; Vendors; and the Creditors Committee); ¶ 4 (also listing progress in other litigation and resolving an investigation by regulators).

12.     None of this progress has brought these Cases any closer to a confirmable plan structure, even after spending over seven months in bankruptcy. The Debtors' Plan is not viable because it is a transaction designed to allow the Debtors to walk away from billions in P&A and decommissioning liabilities without paying their share, in direct violation of *Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494 (1986).[6] No amount of incremental fundraising or fiddling with transaction documents can cure this fundamental defect underpinning the Debtors' proposed restructuring transactions and yet, the Debtors show no signs of deviation from this patently unconfirmable path.

13.     Further, while the Debtors have interfaced with the Stakeholders, the sum of the Debtors' outreach has been a slow trickle of information regarding the Abandoned Properties, which remains incomplete as the Debtors are a mere two days away from the hearing to consider approval of the Amended Disclosure Statement. The Debtors filed the Amended Disclosure Statement on March 16, 2021, but failed to answer key questions raised by the Stakeholders regarding the Debtors' objective to abandon the Abandoned Properties and force the predecessors to take responsibility for these assets and attendant oil and gas leases. It is unsurprising the Debtors have remained coy; these questions are not answerable because the Debtors' proposed abandonment scheme is not workable. No amount of additional disclosure can cure the fundamental defects with the Debtors' Plan and no extension of time during which the Debtors have unfettered exclusivity is likely to induce them to change course. Accordingly, the Debtors have spent an inordinate amount of time and professional fees sitting in bankruptcy, during which

---

[6] Numerous objections have been lodged to the Plan and Disclosure Statement. Eni does not intend to repeat these objections in full, but rather incorporates them by reference. *See, e.g.*, Docket Nos. 759, 833, 880, 900, 924, 932, 937, 954, 955, 978, 979, 980, 981, 983, 990, 992, 993, 996, 1007, 1030, 1032, 1033, 1034, 1035, 1036, 1040 and 1056.

the oil and gas markets have improved exponentially, yet they have little progress to show for it and scarce prospects toward filing a workable plan.

B.    **The Debtors Have Provided No Evidence That An Additional Extension of Exclusivity Will Help Them Reach A Viable Plan**

14.    The Debtors are pursuing a Plan that enriches their secured lenders even if the transaction never goes effective. These stakeholders are incentivized to pursue confirmation even if the Amended Plan is rendered ineffective by the failure to procure the Regulatory Authorities' endorsement. First and foremost, the FLTL Lenders benefit from a plan toggle provision that, in the event that (a) Amended Plan is either not confirmed by the Confirmation Outside Date or (b) the Debtors face over $35 million in Specified Administrative Expenses (a trigger that seems inescapable given the $1.3 billion of plugging and abandonment and decommissioning obligations impacted by the Abandoned Properties bucket), requires the Debtors to conduct a Credit Bid Transaction under section 363 of the Bankruptcy Code that will transfer the Debtors' "cherry-picked" assets to their secured lenders with insufficient funding for the Debtors' remaining assets and liabilities of the estate. Amended Plan at 5.2(c). Second, the Backstop Parties will reap an Alternative Transaction Premium equal to 5% of the $185 million total offering in the event that the Debtors trigger certain commitment protections. Backstop Commitment Letter § 4(c).

15.    Further, the Debtors are pursuing a plan that enriches their management team by gatekeeping information such that the management team is the only party with the requisite information necessary to maintain the Abandoned Properties after confirmation and then (unsurprisingly) providing for a transition plan that involves their management team managing the assets on the predecessors' dime without any legal responsibility for environmental harm. Indeed, even in attempting to improperly offload the Abandoned Properties, the Debtors are priming themselves to continue to benefit without absorbing any of the risk.

16.     Accordingly, there is currently little incentive for the Debtors to change their course because their secured lenders are driving the process for the Debtors, providing all of the funding, and are primed to recover significantly even if the Amended Plan is not confirmed. The only conceivable reason at this point for the Debtors' litany of adjournments is to exhaust the Stakeholders and run out the clock. The Court should not permit the Debtors to retain control until May 31, 2021 under this dire fact pattern. The Debtors have used their exclusivity entitlement to look out solely for their secured lenders, Apache, and their management team.  They have crafted a patently unconfirmable Plan predicated on impairing their first liens to try to cram the Amended Plan down on other classes. While the parties at the top of the Debtors' capital structure may have bound themselves to this outcome (which is unsurprising given their motivation to take the "cherry-picked" assets, shed billions of dollars in liabilities, and ride upside in the oil and gas markets), the Court does not need to subject all stakeholders to this absurdity and should not allow it to continue unabated. The Court should deny the Motion and open up the possibility to alternatives.

## **RESERVATION OF RIGHTS**

17.     Eni submits this Objection without prejudice to, and with full express reservation of, the rights of Eni to supplement and amend this Objection further and to introduce evidence at any hearing related to this Objection. Moreover, Eni reserves its right to invoke each issue, fact, legal basis, and matter identified in this Objection as a basis for denying confirmation of the Plan as amended pursuant to any applicable provision of the Bankruptcy Code, regardless of the particular subsection of this Objection in which the issue is raised.

## **CONCLUSION**

Accordingly, Eni requests that the Court enter an order (i) denying the Motion; and (ii) granting such other and further relief as it deems just and proper.

**BRACEWELL LLP**

By: /s/ *William A. (Trey) Wood III*
   William A. (Trey) Wood III
   711 Louisiana Street, Suite 2300
   Houston, Texas 77002
   Telephone: (713) 223-2300
   Facsimile: (800) 404-3970
   Email: trey.wood@bracewell.com

   Mark E. Dendinger (admitted *pro hac vice*)
   CityPlace I, 34th Floor
   185 Asylum Street
   Hartford, Connecticut 06103
   Telephone: (860) 947-9000
   Facsimile: (800) 404-3970
   Email: mark.dendinger@bracewell.com

   Jason B. Hutt (admitted *pro hac vice*)
   2001 M Street, NW
   Suite 900
   Washington, DC 20036
   Telephone: (202) 828-5800
   Facsimile: (800) 404-3970
   Email: jason.hutt@bracewell.com

   *Counsel to Eni US Operating Co. Inc. and*
   *Eni Petroleum US LLC*

DM-#8022155

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 22, 2021, a true and correct copy of this document was served by electronic means as listed on the Court's ECF noticing system.

/s/ William A. (Trey) Wood III
William A. (Trey) Wood III