IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 20-33948 (MI) |
| **Fieldwood Energy LLC,** *et al.*, | § | |
| | § | Chapter 11 |
| Debtors. | § | |
| | § | Jointly Administered |

### UNITED STATES' OBJECTION TO THE DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

[*Relates to Doc. Nos. 1020 and 1022*]

[*Filing Deadline Extension Granted to 11:59 PM CT on 3/22/21*]

The United States, on behalf of the United States Department of the Interior ("Interior"), hereby files this objection (the "Objection") with respect to the adequacy of the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (Doc. No. 1022) (the "Disclosure Statement"), pursuant to 11 U.S.C. § 1125; and in support of its Objection, respectfully states as follows:

### PRELIMINARY STATEMENT

1.  The Disclosure Statement should not be approved absent modification or conditioning, as set forth below, because: (i) the Disclosure Statement fails to provide "adequate information" as required by 11 U.S.C. § 1125; and (ii) the proposed Amended Joint Chapter 11 Plan (the "Plan"), as currently filed, is patently unconfirmable.

2.  The Disclosure Statement fails to provide "adequate information" as required by Section 1125(a)(1) of the Bankruptcy Code because, among other things, the Disclosure Statement fails to estimate the cost of the Debtors' nondischargeable requirement to perform its

1

Decommissioning Obligations, including but not limited to well plugging and abandonment operations, facility and pipeline decommissioning and removal, and site clearance (the "Decommissioning Obligations").

3. The Chapter 11 Plan, as currently proposed, patently cannot be confirmed because: (1) the Plan attempts to assign Federal lease interests to third-parties without acknowledging the required consent of the United States; and (2) the Plan attempts to discharge and absolve the Debtors and Post-Effective Date Debtors of certain of the Debtors' nondischargeable statutory, regulatory, and contractual Decommissioning Obligations, presenting an imminent risk to public health and safety.

## BACKGROUND

4. The Debtors are engaged in oil and gas exploration and production in the Gulf of Mexico. Doc. No. 1022 at 32.[1] The Debtors state they own an interest in over 350 oil and gas leases, many of which were granted by Interior. *Id.* at 34. The Disclosure Statement acknowledges that the Debtors are jointly and severally liable for Decommissioning Obligations, along with prior lessees ("Predecessors"). *Id.* at 35.

5. The Disclosure Statement states that the Debtors have obtained $175 million in bonding to secure Debtors' Decommissioning Obligations to Interior. *Id.* However, the Disclosure Statement does not list the estimated cost of Debtors' Decommissioning Obligations.

6. The Disclosure Statement indicates that under the Plan, some property interests will be abandoned ("Abandoned Properties"), and that the Debtors are in discussions with Predecessors "in an effort to ensure that responsibility" is "transitioned in an orderly manner" and "explor[e] the potential to negotiate consensual, commercial arrangements." *Id.* at 22.

---

[1] For the Disclosure Statement and Plan, page numbers refer to the numbering in the ECF Headers.

However, the Disclosure Statement does not estimate the Decommissioning Obligations for the Abandoned Properties, or specify what, if any, arrangements have been made with Predecessors to complete these Decommissioning Obligations.  Nor does the Disclosure Statement make any effort to disclose the physical condition and status of the facilities and wells located on the Abandoned Properties.  Likewise, the Disclosure Statement does not indicate that any plan is in place to safely transition operational control of the Abandoned Properties from the Debtors to any other entity post-Confirmation, other than stating that discussions are occurring.

7. The Disclosure Statement states that via divisive merger, federal property interests granted by the United States to the various Debtors will automatically be allocated and vested into third-parties post-Effective Date "without further act or deed" nor requiring the consent of the United States.  *Id*. at 14; Doc. No. 1022-2 at 56.

8. The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-56, grants the United States jurisdiction over the mineral resources found in submerged lands on the OCS.  *See* 43 U.S.C. § 1332(1).  The Secretary of the Interior controls the disposition of mineral resources in the OCS through oil and gas leases.  *See* 43 U.S.C. § 1337(a)(1).  Interior manages OCS leases through its Bureau of Ocean Energy Management ("BOEM"), Bureau of Safety and Environmental Enforcement ("BSEE"), and Office of Natural Resources Revenues ("ONRR").

9. The Secretary of the Interior's authority to regulate and manage OCS leases is delegated to BOEM, which manages those leases in accordance with federal law.  *See* 30 C.F.R. § 550.101.  To ensure that OCS lessees develop mineral resources in a safe and environmentally responsible manner, federal law requires lessees to post sufficient security to guarantee their lease obligations.  *See* 30 C.F.R. § 556.901.  BOEM establishes and manages those financial assurance requirements.  30 C.F.R. § 550.101.  BOEM also has plenary authority to grant or

deny the assignment or sublease of any OCS lease or operating rights interest. 30 C.F.R. § 556.700, 556.800.

10. The Secretary of the Interior's authority to ensure proper safety and environmental compliance by lessees and grant holders is delegated to BSEE for oversight and enforcement. *See* 30 C.F.R. § 250.101. The continued maintenance, monitoring, and decommissioning of structures and facilities associated with federal OCS leases are of paramount concern to Interior as the environmental steward of the OCS for the United States. *See* 43 U.S.C. § 1332 (stating as policy of the United States that: (1) the OCS be developed "subject to environmental safeguards" and (2) operations be conducted in a safe manner to prevent or minimize the likelihood of occurrences that may cause damage to the "environment or to property, or endanger life or health"). BSEE's continued oversight and enforcement abilities are essential to the public health and safety on the OCS and in the Gulf region.

11. The OCSLA and its implementing regulations, as well as the terms and conditions of the offshore oil and gas leases granted by Interior (the "Federal Leases") and other applicable laws and regulations, require the Debtors to, among other things: (i) permanently plug all wells; (ii) remove all platforms and other facilities; (iii) decommission all pipelines; and (iv) clear the seafloor of all obstructions created by the lease and pipeline right-of-way operations within one year after lease termination. 43 U.S.C. § 1334; 30 C.F.R. §§ 250.1006, 250.1703, 250.1710 and 250.1725. In addition, the Debtors must return lease or pipeline rights-of-way to a condition that meets the requirements of regulations of BSEE and other agencies that have jurisdiction over decommissioning activities. *See* 30 C.F.R. § 250.1700.

12. Offshore decommissioning obligations accrue when the lessees or the owners or holders of operating rights:

> (a) Drill a well;
>
> (b) Install a platform, pipeline, or other facility;
>
> (c) Create an obstruction to other users of the OCS;
>
> (d) Are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction;
>
> \* \* \*
>
> (f) Re-enter a well that was previously plugged according to this subpart.

30 C.F.R. § 250.1702.

13. The Debtors are responsible for meeting the decommissioning obligations on the Federal Leases until each obligation is met. *See* 30 CFR § 250.1701.

14. The OCSLA and other applicable law and regulations also require the Debtors to satisfy various monitoring and maintenance obligations (the "Monitoring and Maintenance Obligations") including, without limitation, with respect to offshore outer continental shelf leases: (i) performing pollution inspections, and making any necessary maintenance or repairs associated therewith, in compliance with 30 C.F.R. §250.300 and 30 C.F.R. §250.301; (ii) monitoring casing pressure for wells in compliance with 30 C.F.R. §§ 250.518, 250.519 and 250.520; (iii) bringing navigational aids for fixed structures and vessels in compliance with 33 C.F.R. §143.15; (iv) maintaining either a boat landing or heliport in service in compliance with 30 C.F.R. 250.132 to properly perform pollution inspections and maintenance or repairs and allow BSEE to safely conduct any inspections; (v) demonstrating oil spill financial responsibility ("OSFR") to BOEM pursuant to The Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.* and its implementing regulations found in 30 C.F.R. Part 553; and (vi) maintenance of an approved

5

SEMs program pursuant to 30 C.F.R. Part 250, Subpart S. [2]

15. Decommissioning Obligations and related regulatory obligations are not "Claims" as defined by Section 101(5) of the Bankruptcy Code, but are instead mandatory, nondischargeable *performance* obligations intended to protect the public health and safety. *See Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 116 (5th Cir. 1993) (holding that creditors entitled to an equitable remedy *are not required to select a suboptimal remedy of money damages*) (emphasis added); *see also United States v. Apex Oil Co.*, 579 F.3d 734, 737-38 (7th Cir. 2009) (equitable remedy under Resource Conservation and Recovery Act was not dischargeable); *Torwico Electronics, Inc. v. State of New Jersey, Department of Environmental Protection (In re Torwico Electronics, Inc.)*, 8 F.3d 146, 151 (3d Cir. 1993) (equitable remedy compelling cleanup of environmental hazard was not a "claim" under the Code where no option to pay in lieu of cleanup); *United States v. LTV Corporation (In re Chateaugay Corporation)*, 944 F.2d 997, 1008 (2d Cir. 1991) ("any order that to any extent ends or ameliorates continued pollution is . . . not a 'claim'"); *The New Mexico Environment Department v. Mark IV Industries, Inc. (In re Mark IV Industries, Inc.)*, 438 B.R. 460, 467–68 (Bankr. S.D.N.Y. 2010) (setting forth factors to determine "whether a cleanup obligation is dischargeable").

16. Neither the Federal Leases nor any other applicable law or regulation give a lessee the option of paying money to Interior in lieu of *performing* its Decommissioning Obligations. Thus, the Debtors' Decommissioning Obligations are nondischargeable performance obligations that cannot be satisfied by a money judgment.

17. Finally, federal law forbids any sale, exchange, transfer or assignment of a

---

[2] The list of Monitoring and Maintenance Obligations set forth in this Objection are not meant to be exhaustive and Interior expressly reserves the right to enforce any and all Monitoring and Maintenance Obligations whether described in this Objection or not.

6

Federal Lease to a third party without the approval of the Secretary of the Interior. *See* 43 U.S.C § 1337(e), 30 CFR §§ 556.700 and 556.800.

## ARGUMENT

### I. THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT PROVIDE ADEQUATE INFORMATION

18. Pursuant to Section 1125 of the Bankruptcy Code, a disclosure statement should not be approved unless it contains "adequate information," that is, information sufficient to enable those with claims against or interests in the debtor "to make an informed judgment about the plan." 11 U.S.C. §§ 1125(a)(1) and 1125(b). "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court." *In re Little*, 126 B.R. 861, 867 (Bankr. N.D. Miss. 1991). The determination of what constitutes "adequate information" for purposes of disclosure should be made on a case-by-case basis and "[b]oth the kind and form of information required are left essentially to the judicial discretion of the court" based on the circumstances of each case. *Matter of Cajun Elec. Power Co-op, Inc.*, 150 F.3d 503, 518 (5th Cir. 1998).

19. In addition to other deficiencies, the Disclosure Statement does not state the Debtors' estimated cost for the Decommissioning Obligations. In particular, the Disclosure Statement does not state the estimated cost of the Decommissioning Obligations for the Abandoned Properties.[3] The Disclosure Statement suggests that the Debtors do not intend to comply with their mandatory, nondischargeable performance obligations to satisfy the Decommissioning Obligations as to the Abandoned Properties. Rather, the Debtors represent that they are exploring "consensual, commercial arrangements" with Predecessors who are

---

[3] For simplicity, the discussion of Decommissioning Obligations will focus on the Abandoned Properties. However, other Decommissioning Obligations exist, and are not discussed in sufficient detail by the Disclosure Statement.

jointly and severally liable (with the Debtors) for the Decommissioning Obligations.

20. Upon information and belief, the estimated costs for the Decommissioning Obligations for the Abandoned Properties alone are well over a billion dollars.

21. In the Disclosure Statement, it is unclear: (a) what the Debtors' Monitoring and Maintenance and Decommissioning Obligations are as to, among other things, the Abandoned Properties; and (b) whether Predecessors shall complete those Decommissioning Obligations given the Debtors' ostensible inability to do so (despite the fact that the Debtors' cannot discharge the Decommissioning Obligations).[4]

22. The Debtors' omission of the considerable estimated costs for the nondischargeable Decommissioning Obligations for the Abandoned Properties alone renders the Disclosure Statement woefully inadequate to allow creditors to make an informed judgment about the Debtors' Plan, and thus the Court should deny approval of the Disclosure Statement absent modification or conditioning, as set forth below.

## II. THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN, AS CURRENTLY PROPOSED, CANNOT BE CONFIRMED

23. Prior to confirming the Plan, this Court has a mandatory independent duty to determine whether the standards set forth in § 1129 of the Bankruptcy Code have been satisfied. *In re Williams,* 850 F.2d 250, 253 (5th Cir. 1988); *In re Lively*, 467 B.R. 884, 888 (Bankr. S.D. Tex. 2012).

---

[4] In light of this ostensible inability to perform, the Debtors' estates could incur substantial administrative expense liabilities on account of unsatisfied Decommissioning Obligations. *See In re Amer. Coastal Energy Inc.*, 399 B.R. 805, 809 (Bankr. S.D. Tex. 2009) ("The Fifth Circuit has held that an expense incurred post-petition to remedy a post-petition environmental liability is an administrative expense under § 503(b)(1)(A)."). While Fifth Circuit has not considered whether post-petition expenses incurred to remedy a pre-petition environmental obligation are administrative expenses, several other Circuit Courts have found—in reliance on *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494 (1986)—that they are administrative expenses because they "actual and necessary costs of preserving the estate." *Id.* at 809–14.

24. It is well-settled that bankruptcy courts in this Circuit and throughout the nation have the authority to refuse approval of disclosure statements when the Chapter 11 plans underlying them are not confirmable. *See, e.g., In re M Flex Corp.*, 172 B.R. 854, 856 (Bankr. W.D. Tex. 1994) (noting that the disclosure statement was previously denied by the court because it was not confirmable); *In re First Energy Sols. Corp.*, 606 B.R. 720, 731 (Bankr. N.D. Ohio 2019) (explaining that "courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."); *In re David Sanders*, Case No. 14-02271, 2015 WL 7568469 at *5 (Bankr. S.D. Miss. Nov. 23, 2015) (finding "it is well-settled that a bankruptcy court may disapprove a disclosure statement, even if it contains adequate information, if there is a defect that renders a proposed plan 'inherently or patently unconfirmable'"); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994); *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992). Courts do so "to avoid engaging in a wasteful and fruitless exercise of sending the disclosure statements to creditors and soliciting votes on the proposed plan when the plan is unconfirmable on its face." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) ("*Atlanta West*").

25. Thus, while a determination of whether a debtor's plan satisfies the requirements of 11 U.S.C. § 1129 is generally addressed at confirmation, courts consider whether a plan is confirmable at the disclosure statement stage to conserve judicial resources and the debtor's estate. *Atlanta West*, 91 B.R. at 622. Accordingly, in ruling on the adequacy of the Disclosure

Statement, this Court should address whether the Plan can be confirmed on its face.

26. The Debtors are prohibited from abandoning or evading their nondischargeable Decommissioning Obligations by *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494 (1986). As this Court has previously held, "expenses incurred to comply with . . . federal environmental or safety laws are actual and necessary costs of preserving the estate" that cannot be discharged through the Debtor's bankruptcy proceeding. *In re Amer. Coastal Energy, Inc.*, 399 B.R. at 812; *In re H.L.S. Energy Co.*, 151 F.3d 434, 438 (5th Cir. 1998).

27. As to the Abandoned Properties, the Disclosure Statement and Plan suggest that the Debtors expect or hope that Predecessors will complete Decommissioning Obligations. However, neither the Disclosure Statement nor the Plan specifies whether and to what extent any such arrangements are in place. Likewise, neither the Disclosure Statement nor the Plan state that any transition plan is currently in place to ensure the safe and orderly transfer of operational control of the Abandoned Properties from the Debtors to any other entity or to ensure satisfaction of the Decommissioning Obligations.

28. Moreover, regardless of whatever "consensual, commercial arrangements" are reached with Predecessors, the Debtors still have a nondischargeable regulatory obligation to Interior to decommission all of their operated and non-operated properties. *See* 30 CFR Part 250 subpart Q.

29. Applicable regulations and lease terms require the Debtors, and any jointly and severally liable parties (including all current and predecessor record title interest owners and operating rights owners holding an interest at the time the obligation accrued), to permanently plug all wells and remove all platforms and other facilities within one year after lease or grant termination. *See* 30 CFR Part 250 subpart Q.

30. Thus, unless the Plan is modified to expressly: (1) except the Debtors' Decommissioning Obligations, including those Decommissioning Obligations arising from the Abandoned Properties, from discharge or release; (2) demonstrate that a transition plan is in place to protect the public from imminent risk to health and safety as to the transfer of operational control of the Abandoned Properties; and (3) provide for full compliance with the Debtors' nondischargeable Decommissioning Obligations, the Plan is patently unconfirmable, and thus the Court should deny approval of the Disclosure Statement.

## STAKEHOLDER NEGOTIATIONS

31. In light of the United States' grave concern that the plan as formulated is patently unconfirmable, there are substantial ongoing negotiations between the Debtors, the Predecessors, and the Sureties regarding treatment of the Abandoned Properties (the "Stakeholder Negotiations").

32. The United States believes that the Stakeholder Negotiations have the potential to result in consensual arrangements for the safe and orderly transition of operational control of the Abandoned Properties and provide for full compliance with the Debtors' nondischargeable Decommissioning Obligations arising from the Abandoned Properties.

33. If the Stakeholder Negotiations result in comprehensive agreements between the Debtors, the Predecessors, and the Sureties, the United States believes that such agreements may enable the Debtors to obtain Plan Confirmation. Importantly, however, these negotiations are still in early stages and will require additional time than the Debtors currently propose for their confirmation timeline.[5]

---

[5] In addition, resolution of the Stakeholder Negotiations will likely require contribution of additional funding from the Debtors towards satisfying their Decommissioning Obligations for the Abandoned Properties. Such additional funding is not currently provided for in the Plan, and represents a significant hurdle to achieving resolution of the Stakeholder Negotiations. This hurdle in the Stakeholder Negotiations may benefit from mediation.

34. Accordingly, to allow the Stakeholder Negotiations to continue, the United States is willing to support conditional approval of the Disclosure Statement, specifically if it is conditioned upon the Debtors reaching consensual agreements between the Predecessors and the Sureties that provide for full compliance with the Debtors' nondischargeable Decommissioning Obligations arising from the Abandoned Properties prior to confirmation of the Plan.

## **CONCLUSION**

35. For the foregoing reasons, the United States respectfully asks that the Court deny approval of the Disclosure Statement absent modification or conditioning to address the United States' concerns set forth in this Objection, and to grant such other and further relief that the Court deems just and proper.

*[signature page follows]*

Dated:  March 22, 2021  Respectfully submitted,

**JENNIFER LOWERY**
Acting United States Attorney

**BRIAN BOYNTON**
Acting Assistant Attorney General
Civil Division
U.S. Department of Justice

**RUTH A. HARVEY**
Director
**MARGARET M. NEWELL**
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

 /s/ *Serajul F. Ali*
**SERAJUL F. ALI**
Admitted *Pro Hac Vice*
DC Bar No.:  478505
Trial Attorney
**J. ZACHARY BALASKO**
Admitted *Pro Hac Vice*
W. Va. State Bar No.: 12954
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 307-0488
             (202) 514-7162
Facsimile: (202) 514-9163
E-mail:  serajul.ali@usdoj.gov
         john.z.balasko@usdoj.gov

**Attorneys for the United States of America, on behalf of the United States Department of the Interior**

13

## **CERTIFICATE OF SERVICE**

The undersigned certifies that he served a true and correct copy of the foregoing United States' Objection on the parties receiving ECF notification in this case on March 22, 2021.

*/s/ Serajul F. Ali*
Serajul F. Ali
