IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> FIELDWOOD ENERGY LLC *et al.*[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 20-33948 (MI) <br><br> (Jointly Administered) <br><br> **Re: Docket No. 1023** |

**OBJECTION OF ENI US OPERATING CO. INC. AND
ENI PETROLEUM US LLC TO APPROVAL OF EMERGENCY
MOTION OF DEBTORS FOR ORDER (I) AUTHORIZING ENTRY
INTO BACKSTOP COMMITMENT LETTER, (II) APPROVING
OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

Eni US Operating Co. Inc. and Eni Petroleum US LLC (together, "Eni") hereby file this objection (the "Objection") to the *Emergency Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1023] (the "Backstop Motion")[2] filed by the above-captioned debtors and debtors in possession (the "Debtors"). In support of this Objection, Eni respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Despite facing serious roadblocks, the Debtors remain intent on pushing a patently unconfirmable plan structure since the beginning of 2021. On January 1, 2021, the Debtors filed

---

[1] The Debtors in these chapter 11 cases (these "Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Backstop Motion.

the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 722] (the "Plan"), as amended by the *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1020] (as further amended, the "Amended Plan")[3] and the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 723] (the "Disclosure Statement"), as amended by the *Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1022] (the "Amended Disclosure Statement"), which have met a multitude of objections from concerned sureties, predecessors (including Eni) and even the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), the Department of Interior ("DOI") and the Department of Justice ("DOJ" and, collectively with BOEM, BSEE, and DOI, the "Regulatory Authorities").[4]

2. The objections from the foregoing parties all share a similar concern: the Amended Plan is an untested, patently unconfirmable plan structure that attempts to sell valuable producing assets to the Debtors' secured lenders while offloading or abandoning "bad" assets—and their attendant liabilities and ongoing non-compliances. Under the Debtors' proposed plan, these ongoing non-compliances (including over 200 unresolved Incidents of Non-Compliance ("INCs")) and these liabilities (totaling billions) are tossed at the feet of the Regulatory Authorities and other

---

[3] On March 23, 2021, immediately prior to the filing of this Objection and on the eve of the hearing on the Amended Disclosure Statement and Backstop Motion, the Debtors filed their *Second Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1098] (the "Second Amended Plan"). Eni reserves its right to raise further objections based on a more detailed review of the transaction described therein, and is filing this Objection in the interest of time given the Debtors' decision to pursue an emergency hearing for the Backstop Motion.

[4] Eni filed a supplemental objection to the Amended Disclosure Statement on March 19, 2021 [Docket No. 1066] (the "Supplemental Objection"). Many other predecessors in interest and sureties have likewise filed objections to the Disclosure Statement and Amended Disclosure Statement, as applicable. *See, e.g.*, Docket Nos. 880, 883, 884, 900, 924, 932, 937, 981, 983, 996, 1030, 1032, 1033, 1034, 1035, 1036 and 1040. Most notably, on March 22, 2021, the Regulatory Authorities filed the *United States' Objection to the Disclosure Statement for Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Dkt. 1095].

joint-and-several parties with essentially no financial contribution from the Debtors, their secured lenders, or the Debtors' uncollateralized surety bond providers. While the Debtors purport to have "resolved" additional confirmation issues with additional funding from their lenders, insurmountable roadblocks pervade the Debtors' attempted confirmation of the Amended Plan, regardless of whatever changes occur at the top of the Debtors' capital structure.

3. As more fully described in the *Objection of Eni US Operating Co. Inc. and Eni Petroleum US LLC to Approval of Debtors' Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 937] (the "Disclosure Statement Objection") and the Supplemental Objection, the Debtors face tremendous obstacles in their pursuit of confirmation of the Amended Plan, most notable of which is the complete disregard for the Debtors' responsibilities with respect to the Abandoned Properties (as defined in the Plan) under *Midlantic Nat'l Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494 (1986). Despite the clear ruling of *Midlantic* and the litany of objections from predecessors, the Debtors have made no changes to the Amended Plan or Amended Disclosure Statement to address their evidentiary burden at confirmation regarding the proposed state in which the Debtors intend to leave the Abandoned Properties upon exit, or how they intend to fund potential administrative claims associated with the plugging and abandonment and decommissioning associated with the Abandoned Properties. Indeed, unless a settlement is reached or the Debtors deviate from their current path, an order denying confirmation of the Amended Plan is a *fait accompli*. This endgame poses the following question: what is the Debtors' rush to obtain this Court's approval of the Backstop Commitment Letter locking the Debtors into onerous fees and other compensation payable to the lenders when it is possible—if not probable—that the Amended Plan will not be confirmed, thus obviating any need for the proposed financing?

4.	On top of that, significant questions remain about the necessity of the transactions described in the Backstop Motion. Eni finds it peculiar not only that the Credit Bid Purchaser is eager to bind the Debtors to potentially onerous Commitment Protections (defined below), but that the Credit Bid Purchaser has deemed it necessary to bolster its own credit bid on the backs of the Debtors' estates. One is left to wonder why the Credit Bid Purchaser needs the Debtors' estates to raise its funds. Unfortunately, neither the Amended Disclosure Statement nor the Hanson Declaration (defined below) provide answers to these questions.

5.	On the same day the Debtors filed the Amended Plan and Amended Disclosure Statement, the Debtors filed the Backstop Motion on an emergency basis, seeking a hearing just two days after filing (subsequently extended to one week after filing). Prior to the filing of the Backstop Motion, the Debtors had provided in the Plan that confirmation of the Plan would be deemed approval of, among other documents, the Backstop Commitment Letter. *See* Plan, § 5.10(b). While the Plan kept open the possibility that entry into the Backstop Commitment Letter could be approved prior to confirmation, there was no indication that the Debtors would be seeking approval on an emergency basis with only one week's notice (much less 48 hours' notice). The Debtors cannot demonstrate the requisite "cause" for this Court to consider the Backstop Motion under the guise of an emergency, especially when almost three months will have elapsed from the initial filing of the Plan and Disclosure Statement until this Court's consideration of the Backstop Motion during the last week of March.

6.	Importantly, even if the Debtors were not seeking to proceed on an emergency basis, there is no justification to proceed with approval of the Backstop Motion even on ordinary notice at the hearing on the Amended Disclosure Statement. Rather, approval should be considered in conjunction with a hearing to consider confirmation of the Amended Plan (if the Debtors make

it that far). Entry into the Backstop Commitment Letter will solidify certain uses of estate resources as protections and premiums for the Backstop Parties. Specifically:

    a.    **Backstop Commitment Premium**: NewCo shall pay a backstop commitment premium to the Backstop Parties in the form of New Equity Interests in NewCo with a value of $14.8 million (representing 8% of the amount of the Aggregate Commitment), to be paid by NewCo at a discount of 30% to equity value. Backstop Commitment Letter, § 4(a).

    b.    **Alternative Transaction Premium**: An amount equal to 5% of the Aggregate Commitment shall be payable by the Company in cash on (A) the date of the consummation of any sale, transfer or other disposition of all or a material portion of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) to any person or persons other than the Credit Bid Purchaser, (B) the date of the consummation of any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests to any person or persons other than the Credit Bid Purchaser, or (C) the date of the consummation of any plan of reorganization, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or any of the other Debtors (other than (x) the "Restructuring" and "Restructuring Transactions" as defined in and contemplated under the Restructuring Support Agreement, or (y) any liquidation under Chapter 7 of the Bankruptcy Code pursuant to which a material portion of the Acquired Interests are a part of the liquidating estate) without the use of the commitments under the Backstop Commitment Letter, regardless of whether such plan or other transaction contemplates a sale of assets of the Debtors, a recapitalization or any alternative structure. The Alternative Transaction Premium shall not become due in the event that (a) the Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Backstop Commitment Letter) or (b) any Specified Exception Applies.[5] *Id.*, § 4(c).

    c.    **Expense Reimbursement Obligations**: The Backstop Parties will be reimbursed for all reasonable and documented out-of-pocket fees, costs and expenses (including the fees and expenses of counsel) incurred in connection with the Second Lien Exit Facility whether or not the Closing Date occurs or any Second Lien Exit Facility Documents are executed and delivered or any extensions of credit are made under the Second Lien Facility, to be paid by Holdings or the Credit Bid Purchaser. The Company shall be liable for the Expense Reimbursement in the event, and solely in

---

[5] Specified Exceptions include if the Credit Bid Purchase Agreement is terminated due to (x) Credit Bid Purchaser's breach, (y) of the Backstop Parties commit to support the Equity Rights Offering and the Equity Rights Offering is not consummated as a result of the breach of such commitment by a Backstop Party, or (z) the Credit Bid Purchaser being unable to credit bid.

    the event, of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the occurrence of the Closing Date). The Company shall have no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception.[6] *Id.*, § 5.

  d. **Indemnification Obligations**: The Backstop Parties shall be indemnified from and against all claims, damages, liabilities and out-of-pocket expenses that may be incurred by or asserted or awarded against any Protected Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) any aspect of the Second Lien Exit Facility (or any use made or proposed to be made with the proceeds thereof) or this Backstop Commitment Letter, in each case except to the extent such claim, damage, liability or expense (a) in any case (x) is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from fraud, the gross negligence or willful misconduct or, or a material breach of this Backstop Commitment Letter by, such Protected Party (y) arises from any claim, action, suit, inquiry, litigation, investigation or proceeding that does not involve an act or omission of you or any of your respective affiliates and that is brought by any Protected Party against any other Protected party or (b) in the case of indemnification by the Company pursuant to this paragraph, is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from fraud, negligence, gross negligence or willful misconduct of, or a material breach of this Backstop Commitment Letter by, any of Credit Bid Purchaser, NewCo or Holdings. *Id.*, § 5.

7. Given that the path to confirmation is anything but certain absent a settlement of the *Midlantic* issues facing the Debtors, Eni believes that rushing headlong to solidify the Debtors'

---

[6] Termination events include, among others: (a) the Commitment Approval Order shall not have been entered on or prior to the date that is 7 days after the date the Backstop Commitment Letter is fully executed (provided that, with the consent of the Majority Backstop Parties, the date may be extended to a date not later than 14 days after the date of the full execution of Backstop Commitment Letter; (b) if the Credit Bid Transaction is to be consummated pursuant to the Plan, the Confirmation Order shall not have been entered by the Bankruptcy Court on or prior to May 10, 2021; (c) if the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan, an order of the Bankruptcy Court, in form and substance acceptable to the Majority Backstop Parties, approving the 363 Credit Bid Transaction shall not have been entered by the Bankruptcy Court on or prior to the date that is 35 days after the Toggle Date; (d) the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount; (e) the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or a trustee or examiner shall be appointed with respect to all or substantially all of the Debtors with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; and (f) any of the Debtors shall make or enter into any material nonordinary course stipulation, settlement or other agreement with any governmental, regulatory or agency that is not in form and substance reasonably acceptable to the Majority Backstop Parties.

obligations under the Backstop Commitment Letter now would be more problematic than beneficial. It would essentially lock the Debtors into pursuing the instant Amended Plan with the lenders and potentially foregoing alternative transactions with third-party lenders and buyers given the dramatic improvement in the oil and gas markets since these Cases were filed. Accordingly, Eni respectfully submits this Court should deny entry into the Backstop Commitment Letter at this time.

**ARGUMENT**

**A.    The Debtors Have Not Demonstrated Why the Backstop Motion Should be Heard on an Emergency Basis**

8.    As a threshold matter, the Debtors initially sought a hearing on the Backstop Motion only 48 hours after filing, and subsequently adjourned the hearing date to a week after filing. The Debtors have proffered no reason for such emergency treatment. Even if the Debtors determined that it was in their interest to have the Backstop Motion heard prior to the confirmation hearing, they have not provided any compelling reason to have it heard on a week's notice, particularly where robust discovery may be warranted.

9.    The Debtors' rush to have the Backstop Motion approved on such a tight turnaround is even more confounding when considered in relation to other restructuring transactions the Debtors seek to implement. For example, the Amended Plan introduces a $20 million equity rights offering to be backstopped by certain FLTL Lenders and DIP Lenders (the "FLTL ERO"); further, the Second Amended Plan, filed on the eve of the Disclosure Statement hearing, introduces yet another $20 million equity rights offering to be backstopped by the SLTL Lenders (the "SLTL ERO"). To date, the Debtors have not filed any analogous motions to approve entry into these backstop agreements, but have indicated in the Second Amended Disclosure Statement that such

motions will be filed on an emergency basis "in the coming days." Second Amended Disclosure Statement, Art. I.B.3.

10. The Debtors have ostensibly known about the transactions in the Backstop Motion since prior to the filing of the Plan and Disclosure Statement at the beginning of 2021. Why they must now make a mad dash to have the Backstop Motion approved is a mystery, particularly where the FLTL ERO and SLTL ERO are equally important components of the Debtors' plan structure. It makes little sense to rush and have these heard in piecemeal at the expense of due process; instead, approval of these transactions should be considered simultaneously. Accordingly, the Court should deny hearing the Backstop Motion on an emergency basis.

**B.     The Debtors Have Not Provided a Sufficient Business Justification to Support Approval of the Backstop Motion at this Time**

11. Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). As a general matter, courts in the Fifth Circuit will approve the use of estate property outside the ordinary course of business if the debtor can demonstrate that such use is "supported by an articulated business justification, good business judgment, or sound business reasons." *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016).

12. The Debtors fail to tell an accurate story in the Amended Disclosure Statement in terms of the vast improvement in the oil and gas industry (and attendant positive impact on the Debtors' borrowing base, and asset value) since these Cases were filed. While Debtors have offered trade creditors an $8 million cash recovery, this is only $3 million greater than the $5 million pot previously set aside for all unsecured creditors under the Plan. The uptick in the offshore oil and gas industry begs for further improvement in recoveries to creditors, including

holders of claims related to the Debtors' abandonment scheme. Futures in oil have now climbed above $60 bbl, a stark contrast from the snapshot of trading when the Debtors entered bankruptcy on August 3-4, 2020 (and even from the date the Debtors filed the Plan and Disclosure Statement).[7] There may be third-party lenders who are willing to put in the backstop commitment, instead of the existing lenders to bolster their own plan recoveries.

13. However, without sufficient disclosure regarding the Debtors' marketing process, Eni cannot accurately assess the necessity of the transactions proposed in the Backstop Motion. Concurrently with the Backstop Motion, the Debtors filed the *Declaration of John-Paul Hanson in Support of Emergency Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1024] (the "Hanson Declaration"). The Hanson Declaration provides a vague overview of the Debtors' marketing process, but omits specific timelines, numbers of parties contacted, and any disclosure around communications between such parties. As a result, the Debtors have provided almost no information to support a finding that the Backstop Motion is a sound exercise of business judgment, particularly where the offshore oil and gas industry has markedly improved over the course of these Cases.

14. Were entry into the Backstop Commitment Letter still subject to confirmation of the Amended Plan (as originally contemplated under the Plan), interested parties would be able to request discovery and take depositions of members of Houlihan Lokey Capital, Inc. responsible for the marketing process. Indeed, both the Plan and Amended Plan provided that confirmation would be deemed approval of, among other things, the Backstop Commitment Letter. *See* Amended Plan, § 5.11 (b) ("Confirmation shall be deemed approval of . . . the Second Lien

---

[7] *See* www.bloomberg.com/energy

Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith . . .), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser will be authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities . . . ."). Instead, the Debtors seek to implement the contemplated transactions on eight days' notice, months in advance of confirmation of the Amended Plan and without sufficient time for interested parties to fully understand the Debtors' marketing process. Absent more clarity than is provided in the Hanson Declaration or an opportunity to question the Debtors and their advisors on the marketing process, there is no showing that the Debtors must commit precious estate resources at this time.

15. Further, as described more fully in Eni's Disclosure Statement Objection and its Supplemental Objection, the Debtors' Amended Disclosure Statement describes a plan structure that is rife with confirmation problems. While Eni is hopeful that a settlement between the Debtors, the predecessors, sureties and Regulatory Authorities may be reached, the Debtors do not currently have a workable path to confirmation. As a result, the Debtors are far more likely to trigger the Commitment Protections and thereby unnecessarily drain valuable estate resources. Accordingly, the Backstop Motion should be denied at this time and, if sufficient progress on a workable solution for the Abandoned Properties is reached, taken up in connection with confirmation (as contemplated by the Debtors' original plan).

16. Lastly, Commitment Protections notwithstanding, the Debtors have not shown why the Credit Bid Purchaser must rely on the Debtors to raise funds for them in the first place. If the Credit Bid Purchaser intends to purchase the Acquired Interests, it should not be the Debtors'

responsibility to spearhead that fundraising (and, consequently, the Debtors' risk of triggering the Commitment Protections).

C.  **The Debtors' Proposed Timing Chills Potentially Value-Maximizing Proposals**

17.     In addition to failing to show a business justification for premature entry into the Backstop Commitment Letter, the Debtors gloss over the very real possibility that such precipitous action at this time will chill any potential influx of value into the Debtors' estates beyond what is proposed in the Amended Plan. Given the improvements in the oil and gas market, it is not unreasonable to assume that a new marketing process could possibly uncover value to the estates beyond that provided in the Amended Plan. However, the Commitment Protections vitiate any incentive the Debtors or other interested parties may have to explore any added value by handing the lenders additional compensation if the Debtors elect to pursue an alternative transaction. The lenders are at the top of the capital structure and stand to benefit the most from their credit bid for the "good" assets under the Amended Plan. There is no reason to lock the Debtors into this structure except for sapping the Debtors' motivation to pursue alternative potentially value-maximizing transactions outside of the existing capital structure. Maybe no transactions exist in the market, but the Debtors owe it to their creditors to consider all options to maximize estate value and not settle with incumbent financing on eight days' notice.

18.     Indeed, while it is by no means a certainty that additional value would be realized from a re-marketing process, approving entry into the Backstop Commitment Letter at this point cuts off any possibility. If the Debtors and the predecessors, sureties, and Regulatory Authorities are unable to reach a settlement, and ultimately this Court requires further amendment of the Amended Plan to address the looming administrative claim burden on the Debtors due to their proposed treatment of the Abandoned Properties, then the Debtors may well have to start from square one and find new financing for a plan with sufficient funding for administrative claims. The

Backstop Motion seeks to tie the Debtors' hands by imposing Commitment Protections that serve no purpose other than to pad the lenders' pockets even further than the credit bid will accomplish, and to divert value from the Debtors' estates and other creditors in the process. This Court should deny the Backstop Motion accordingly.

## RESERVATION OF RIGHTS

19. This Objection is submitted without prejudice to, and with full express reservation of, the rights of Eni to supplement and amend this Objection and to introduce evidence at any hearing related to this Objection, and to object to the Backstop Motion, as amended from time to time, on any and all grounds including those raised in this Objection or any supplement thereof. Moreover, Eni reserves its right to invoke each issue, fact, legal basis, and matter identified in the Objection as a basis for denying approval of the Backstop Motion pursuant to any applicable provision of the Bankruptcy Code, regardless of the particular subsection of this Objection in which the issue is raised.

## CONCLUSION

Accordingly, Eni requests that the Court enter an order (i) denying approval of the Backstop Motion; and (ii) granting such other and further relief as it deems just and proper.

-13-

**BRACEWELL LLP**

By: /s/ *William A. (Trey) Wood III*
William A. (Trey) Wood III
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (800) 404-3970
Email: trey.wood@bracewell.com

Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970
Email: mark.dendinger@bracewell.com

Jason B. Hutt (admitted *pro hac vice*)
2001 M Street, NW
Suite 900
Washington, DC 20036
Telephone: (202) 828-5800
Facsimile: (800) 404-3970
Email: jason.hutt@bracewell.com

*Counsel to Eni US Operating Co. Inc. and Eni Petroleum US LLC*

## CERTIFICATE OF SERVICE

  The undersigned certifies that on March 23, 2021, a true and correct copy of this document was served by electronic means as listed on the Court's ECF noticing system.

                */s/ William A. (Trey) Wood III*
                William A. (Trey) Wood III