# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.,*** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## NOTICE OF FILING OF DISCLOSURE STATEMENT FOR THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS

**PLEASE TAKE NOTICE** that on March 23 2021, the Debtors filed the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1102] (the "**March 23 Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that on March 24, 2021, the Debtors filed the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1117] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that annexed hereto as **Exhibit A** is a blackline of the Disclosure Statement compared against the March 23 Disclosure Statement.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

PLEASE TAKE FURTHER NOTICE that annexed hereto as **Exhibits B** and **C**, are blacklines of Exhibit A (Plan) and Exhibit F (Plan Release Provisions) to the Disclosure Statement compared against the corresponding original exhibits filed with the March 23 Disclosure Statement.

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Disclosure Statement and the other relief requested in the *Motion of Debtors for Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; (VII) Approving Bid Submission Deadline and Procedures for Submission of Higher or Better Bids; and (VIII) Granting Related Relief* [Docket No. 724] (the "**Motion**") is currently scheduled to commence on March 24, 2021, at 1:30 p.m. (prevailing Central Time) before the Honorable Marvin Isgur, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Street, Houston, Texas 77002. In accordance with the *Notice of Adjournment of Hearing to Approve Disclosure Statement* [Docket No. 1038], the deadline by which parties in interest could object to the Disclosure Statement and the other relief requested in the Motion was extended to March 19, 2021, at 4:00 p.m. (prevailing Central Time).

Dated:  March 24, 2021
　　　　Houston, Texas

Respectfully submitted,

*/s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Matt.Barr@weil.com
　　　　Jessica.Liou@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that, on March 24, 2021, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Alfredo R. Pérez*
Alfredo R. Pérez

**<u>Exhibit A</u>**

**Blackline of Disclosure Statement**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |

**DISCLOSURE STATEMENT FOR ~~SECOND~~THIRD AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*

Dated: March ~~23~~24, 2021
        Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

# DISCLOSURE STATEMENT, DATED MARCH ~~23~~24, 2021

**Solicitation of Votes on the
Plan of Reorganization of**

## FIELDWOOD ENERGY LLC, *ET AL.*

THIS SOLICITATION OF VOTES (THE "<u>SOLICITATION</u>") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE ~~SECOND~~THIRD AMENDED JOINT CHAPTER 11 PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "<u>DEBTORS</u>") ATTACHED HERETO AS <u>EXHIBIT A</u> (AS MAY BE FURTHER MODIFIED, AMENDED OR SUPPLEMENTED FROM TIME TO TIME, AND TOGETHER WITH ALL EXHIBITS AND SCHEDULES THERETO, THE "<u>PLAN</u>").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN <u>IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON APRIL 26, 2021</u> UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MARCH 24, 2021 (THE "<u>RECORD DATE</u>").

---

### RECOMMENDATION BY THE DEBTORS

The board of directors of Fieldwood Energy Inc. ("**FWE Parent**") and each of the governing bodies for each of its affiliated debtors have approved the transactions contemplated by the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Subject to the terms and provisions of that certain *Restructuring Support Agreement* dated as of August 4, 2020 (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**RSA**"), the following parties have agreed to vote in favor of or otherwise support the Plan:

- holders of approximately 87% in aggregate principal amount of Claims under the Debtors' Prepetition FLTL Credit Agreement (as defined herein);

- holders of approximately 88.71% in aggregate principal amount of Claims under the Debtors' Prepetition SLTL Credit Agreement (as defined herein); and

- Apache Corporation.

In addition, the Debtors' Plan is supported by [the Prepetition FLFO Lenders holding 100% of the FLFO Claims and] the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "**Creditors' Committee**").

The Creditors' Committee strongly recommends that all holders of General Unsecured Claims vote to accept the Plan, and that all holders of Unsecured Trade Claims elect for their claims to be treated as Unsecured Trade Claims, execute Trade Agreements, and vote to accept the Plan.

---

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**NEITHER THIS DISCLOSURE STATEMENT NOR THE MOTION SEEKING APPROVAL THEREOF CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS UNLAWFUL.**

**THE OFFER OF, ISSUANCE OF, AND DISTRIBUTION OF THE NEW EQUITY INTERESTS (OTHER THAN THE BACKSTOP COMMITMENT PREMIUM EQUITY INTERESTS, THE NEW MONEY WARRANTS, AND ANY NEW EQUITY INTERESTS ISSUED UPON EXERCISE OF THE NEW MONEY WARRANTS OR UNDER THE MANAGEMENT INCENTIVE PLAN), THE SUBSCRIPTION RIGHTS, THE SLTL WARRANTS, AND THE GUC WARRANTS UNDER <u>ARTICLE IV</u> OF THE PLAN, AND ANY NEW EQUITY INTERESTS ISSUED UPON EXERCISE OF THE SUBSCRIPTION RIGHTS, THE SLTL WARRANTS, OR THE GUC WARRANTS,**

SHALL BE EXEMPT, PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE, WITHOUT FURTHER ACT OR ACTIONS BY ANY PERSON, FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ALL RULES AND REGULATIONS PROMULGATED THEREUNDER, AND ANY OTHER APPLICABLE SECURITIES LAWS, TO THE FULLEST EXTENT PERMITTED BY SECTION 1145 OF THE BANKRUPTCY CODE.

THE ISSUANCE AND SALE, AS APPLICABLE, OF THE SECOND LIEN BACKSTOP COMMITMENT PREMIUM EQUITY INTERESTS TO BE ISSUED PURSUANT TO THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE ERO BACKSTOP PREMIUM, AND THE NEW MONEY WARRANTS TO BE ISSUED PURSUANT TO THE NEW MONEY WARRANT AGREEMENT (INCLUDING ANY NEW EQUITY INTERESTS ISSUED UPON EXERCISE OF THE NEW MONEY WARRANTS) ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER.

WITH RESPECT TO THE FOREGOING SECURITIES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER, SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT. WITH RESPECT TO THE FOREGOING SECURITIES ISSUED PURSUANT TO SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR REGULATION D THEREUNDER, OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND

NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THE DISCLOSURE STATEMENT) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS THE VOLATILITY OF AND POTENTIAL FOR SUSTAINED LOW OIL AND NATURAL GAS PRICES, THE SUPPLY AND DEMAND FOR OIL AND NATURAL GAS, CHANGES IN COMMODITY PRICES FOR OIL AND NATURAL GAS, THE DEBTORS' ABILITY TO MEET PRODUCTION VOLUME TARGETS, THE UNCERTAINTY OF ESTIMATING PROVED RESERVES AND UNPROVED RESOURCES, THE DEBTORS' ABILITY TO DEVELOP PROVED UNDEVELOPED RESOURCES AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESS. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND POST-EFFECTIVE DATE DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

iv

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) THE HOLDERS OF ALL CLAIMS THAT VOTE TO ACCEPT THE PLAN, (II) THE HOLDERS OF ALL CLAIMS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) THE HOLDERS OF ALL CLAIMS AND INTERESTS THAT WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DID NOT OPT OUT, AND (V) THE RELEASED PARTIES (EVEN IF SUCH RELEASED PARTY PURPORTS TO OPT OUT OF THE RELEASES SET FORTH THEREIN).

HOLDERS OF CLAIMS IN VOTING CLASSES (1, 3, 4, 5, 6A, AND 6B) HAVE RECEIVED A BALLOT THAT INCLUDES THE OPTION TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 10.7(B) OF THE PLAN.  HOLDERS OF CLAIMS AND INTERESTS IN NON-VOTING CLASSES (2, 8 AND 10) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAIN RELEASES.  SEE EXHIBIT F FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

    A.     Overview of Restructuring Transactions ............................................... 2

    B.     Credit Bid Transaction ........................................................................... 5

        1.     M&A Process ............................................................................ 6

        2.     Negotiations with Consenting Creditors ................................. 6

        3.     Pro Forma Capital Structure of Credit Bid Purchaser ............ 7

    C.     Further Transaction Proposals ............................................................... 9

    D.     Apache Transactions and FWE I ........................................................... 9

    E.     FWE III ................................................................................................. 11

    G.     Abandoned Properties ........................................................................... 12

        1.     Discussions with the Government, Predecessors, CIOs, and Sureties ................................................................................... 13

        2.     Agreed Activities on Abandoned Properties, Operational Transition Packets, and 90-Day Transition Services Agreements relating to Abandoned Properties ............................................ 13

        3.     Potential Consensual, Commercial Arrangements with Predecessors ........................................................................... 14

        4.     Notice to Predecessors and CIOs ........................................... 15

    H.     363 Credit Bid Transaction ................................................................... 15

    I.     Settlement with the Creditors' Committee ............................................ 16

    J.     Settlement with the Ad Hoc Group of SLTL Lenders .......................... 18

    K.     Recommendation ................................................................................... 19

    L.     Confirmation Timeline .......................................................................... 19

    M.     Inquiries ................................................................................................ 20

II. SUMMARY OF PLAN TREATMENT ........................................................................ 20

III. OVERVIEW OF DEBTORS ....................................................................................... 23

    A.     General Overview .................................................................................. 23

    B.     Debtors' Corporate History and Structure ............................................ 24

        1.     Corporate History .................................................................... 24

        2.     Debtors' Corporate and Governance Structure ....................... 28

    C.     Equity Ownership .................................................................................. 29

    D.     Prepetition Indebtedness ....................................................................... 30

i

| | | | |
|---|---|---|---|
| | 1. | First Lien First Out Credit Agreement | 30 |
| | 2. | First Lien Term Loan Agreement | 31 |
| | 3. | Second Lien Term Loan Agreement | 32 |
| | 4. | Intercreditor Agreements | 32 |
| | 5. | DB Receivables Facility | 33 |
| | 6. | Surety Bonds | 33 |
| | 7. | Unsecured Claims | 33 |
| | 8. | Intercompany Claims | 33 |
| IV. | KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES | | 34 |
| | A. | Cost Reduction | 34 |
| | B. | Vendor and Surety Issues | 35 |
| | C. | Prepetition Restructuring Efforts | 35 |
| V. | OVERVIEW OF CHAPTER 11 CASES | | 37 |
| | A. | Commencement of Chapter 11 Cases and First Day Motions | 37 |
| | B. | First Day Motions | 37 |
| | C. | Procedural Motions and Retention of Professionals | 37 |
| | D. | Appointment of Creditors' Committee | 38 |
| | E. | Postpetition Hedging Agreements and Treatment of Hedging Obligations Under the Plan | 39 |
| | F. | Final Hearing on Vendor, Insurance, Cash Management, and DIP Motion | 39 |
| | G. | The Creditors' Committee's Challenge Rights | 40 |
| | H. | Statements and Schedules, and Claims Bar Dates | 40 |
| | I. | Extension of Debtors' Exclusivity | 41 |
| | J. | Motion to Approve Second Lien Backstop Commitment Letter | 41 |
| | K. | Motion to Assume Sublease | 43 |
| | L. | Vendor Program | 43 |
| | M. | Lien Analysis | 43 |
| | P. | Regulatory Matters | 46 |
| | Q. | Emergency Motion to Compel BP to Perform Under Executory Contracts | 47 |
| VI. | RESTRUCTURING TRANSACTIONS AND PLAN IMPLEMENTATION | | 48 |
| | A. | Approval of Credit Bid Transaction | 48 |
| | B. | Approval of Apache Transactions | 49 |
| | C. | Approval of Abandonment of Abandoned Properties | 50 |

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
SECURITIES LAWS ................................................................................................51

A.    Section 1145 of the Bankruptcy Code and Subscription Transfers ...............51

B.    Section 4(a)(2) of the Securities Act and Subscription Transfers ................52

VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...........54

A.    Consequences to the Debtors ........................................................................55

1.    Cancellation of Debt and Reduction of Tax Attributes ....................55

2.    Limitation of NOL Carryforwards and Other Tax Attributes ..........56

3.    Sale of Certain Assets ......................................................................57

4.    Potential Transfer of Assets to a Liquidating Trust .........................57

B.    Consequences to Holders of Certain Claims .................................................58

1.    Taxable Exchange – Structure of Credit Bid Transaction ...............58

2.    Distributions in Discharge of Accrued OID or Interest ...................60

3.    Character of Gain or Loss ................................................................60

4.    Disposition of New Equity Interests ................................................61

5.    Exercise and Disposition of the SLTL Warrants and GUC
Warrants ...........................................................................................61

6.    Disposition of Interests in the Single Share .....................................61

7.    Tax Treatment of Subscription Rights .............................................62

C.    Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests ......63

1.    Classification of Liquidating Trust ..................................................63

2.    General Tax Reporting by Liquidating Trust and its Beneficiaries ......63

D.    Information Reporting and Back-Up Withholding ........................................64

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................65

A.    Certain Bankruptcy Law Considerations ......................................................65

1.    Risk of Termination of RSA .............................................................65

2.    Risk of Non-Confirmation of the Plan .............................................66

3.    Risk of Non-Consensual Confirmation and Conversion into
Chapter 7 Cases ...............................................................................66

4.    Risk of Non-Occurrence of the Effective Date ................................66

5.    Risks Related to Possible Objections to the Plan .............................67

6.    Parties in Interest May Object to Plan's Classification of Claims
and Interests .....................................................................................67

7.    Conditions to Credit Bid Transaction May Not Be Satisfied ...........67

|  | 8. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved | 67 |

B. Additional Factors Affecting the Value of NewCo and its Subsidiaries ... 68

    1.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary ... 68

    2.    Risks Associated with the Debtors' Business and Industry ... 68

C. Factors Relating to New Equity Interests to Be Issued under Plan ... 70

    1.    Market for Equity of NewCo ... 70

    2.    Potential Dilution ... 70

    3.    Significant Holders ... 70

    4.    New Equity Interests Subordinated to NewCo's Indebtedness ... 70

    5.    Valuation of NewCo Not Intended to Represent Trading Value of New Equity Interests of NewCo ... 71

    6.    No Intention to Pay Dividends ... 71

D. Factors Relating to Second Lien Backstop Commitment Letter ... 71

    1.    Bankruptcy Court Might Not Approve Second Lien Backstop Commitment Letter ... 71

E. Risks Related to Equity Rights Offerings and ERO Backstop Agreements ... 71

    1.    Bankruptcy Court Might Not Approve FLTL Equity Rights Offering Procedures or SLTL Equity Rights Offering Procedures ... 71

    2.    Debtors May Not Secure ERO Backstop Agreements ... 71

F. Risks Related to Recoveries for Holders of General Unsecured Claims Under the Plan ... 72

    1.    Allowed General Unsecured Claims Could be More than Projected ... 72

    2.    Residual Distributable Value of the Single Share of Post-Effective Date FWE Parent ... 72

G. Additional Factors ... 72

    1.    Debtors Could Withdraw Plan ... 72

    2.    Debtors Have No Duty to Update ... 72

    3.    No Representations Outside the Disclosure Statement Are Authorized ... 73

    4.    No Legal or Tax Advice Is Provided by the Disclosure Statement ... 73

    5.    No Admission Made ... 73

    6.    Certain Tax Consequences ... 73

X. VOTING PROCEDURES AND REQUIREMENTS ... 73

|  | A. | Voting Deadline | 73 |
|  | B. | Voting Procedures | 74 |
|  | C. | Parties Entitled to Vote | 74 |
|  |  | 1. Fiduciaries and Other Representatives | 76 |
|  |  | 2. Agreements Upon Furnishing Ballots | 76 |
|  |  | 3. Change of Vote | 76 |
|  | D. | Waivers of Defects, Irregularities, etc. | 76 |
|  | E. | Further Information, Additional Copies | 77 |
| XI. | CONFIRMATION OF PLAN | | 77 |
|  | A. | Confirmation Hearing | 77 |
|  | B. | Objections to Confirmation | 77 |
|  | C. | Requirements for Confirmation of Plan | 79 |
|  |  | 1. Acceptance of Plan | 79 |
|  |  | 2. Best Interests Test | 80 |
|  |  | 3. Feasibility | 81 |
|  |  | 4. Valuation | 83 |
| XII. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN | | 83 |
|  | A. | Alternative Plan of Reorganization | 83 |
|  | B. | Sale under Section 363 of the Bankruptcy Code | 83 |
|  | C. | Liquidation Under Chapter 7 of Bankruptcy Code | 84 |
| XIII. | CONCLUSION AND RECOMMENDATION | | 84 |

| **Exhibit A:** | **Plan** |
|---|---|
| **Exhibit B:** | **Leases, Rights of Way and Rights of Use and Easement Related to Purchased Oil & Gas Lease Interests** |
| **Exhibit C:** | **Leases, Rights of Way and Rights of Use and Easement Related to FWE I Oil & Gas Lease Interests** |
| **Exhibit D:** | **Leases, Rights of Way and Rights of Use and Easement Related to FWE III Oil & Gas Lease Interests** |
| **Exhibit E:** | **Leases, Rights of Way and Rights of Use and Easement Related to Abandoned Properties** |
| **Exhibit F:** | **Plan Release Provisions** |
| **Exhibit G:** | **Credit Bid Purchase Agreement** |
| **Exhibit H:** | **First Lien Exit Facility ~~Term Sheet [To come.]~~ Commitment Letter** |
| **Exhibit I:** | **Second Lien Exit Facility Term Sheet** |
| **Exhibit J:** | **Apache Term Sheet Implementation Agreement** |
| **Exhibit K:** | **Organizational Chart** |
| **Exhibit L:** | **Liquidation Analysis** |
| **Exhibit M:** | **Valuation Analysis** |

**Exhibit N:**    **Financial Projections**
**Exhibit O:**    **Chevron Term Sheet**

# I.
# INTRODUCTION

Fieldwood Energy LLC ("**FWE**") and its debtor affiliates[2] (each, a "**Debtor**," and collectively, the "**Debtors**" or the "**Company**") submit this disclosure statement (including any exhibits and schedules hereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**") in connection with the Solicitation of votes on the ~~Second~~Third *Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* dated March ~~23~~24, 2021 attached hereto as **Exhibit A** (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"). The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on August 3, 2020 and August 4, 2020 (as applicable, the "**Petition Date**"). The Debtors' chapter 11 cases are being jointly administered for procedural purposes only (together, the "**Chapter 11 Cases**").

The purpose of the Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. The Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.[3]

As described more fully below, the Plan provides for a comprehensive set of restructuring transactions, including consummation of the Credit Bid Transaction and the Apache Transactions (each as defined below), which are collectively designed to (i) recapitalize and preserve the going concern value of specified Debtors' Deepwater Assets and Shelf Assets (each as defined below) and the jobs of over 1,000 employees and contractors, (ii) maximize recoveries to the Debtors' stakeholders, and (iii) ensure that all plugging and abandonment and decommissioning obligations (the "**P&A Obligations**") are addressed in a methodical and safe manner by responsible parties, as determined by Bureau of Safety and Environmental Enforcement ("**BSEE**").

The restructuring contemplated by the Plan is a significant achievement for the Debtors, developed in the midst of an unprecedented and challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of their creditors, equity holders and estates, and represents the best available alternative at this time. Indeed, the Plan is supported by several of the Debtors' key stakeholders, including the DIP Lenders, the Prepetition FLTL Lenders holding approximately 87% of the FLTL Claims, the Prepetition SLTL Lenders holding

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[3] Capitalized terms used in the Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

approximately 88.71% of the SLTL Claims, [the Prepetition FLFO Lenders holding 100% of the FLFO Claims,] the Creditors' Committee, and Apache Corporation ("**Apache**"), the predecessor in interest for the vast majority of the Debtors' Shelf Assets. Moreover, the Plan is the culmination of extensive arm's length negotiations that have occurred over the past several months with, among others, the Debtors' Consenting Creditors (as defined below), Apache, and the Creditors' Committee and reflects ongoing discussions the Debtors have had with the Debtors' regulators, including representatives from the Bureau of Ocean Energy Management ("**BOEM**"), BSEE, the Department of Interior ("**DOI**") and the Department of Justice ("**DOJ**"), the FLFO Lender, and other key constituencies.

## A. *Overview of Restructuring Transactions*

Pursuant to the RSA by and among the Debtors, lenders holding approximately 87% of the Company's debt under the FLTL Credit Agreement (the "**Consenting FLTL Lenders**"), lenders holding approximately 88.71% of the Company's debt under the SLTL Credit Agreement (the "**Consenting SLTL Lenders**," and, together with the Consenting FLTL Lenders, the "**Consenting Creditors**"),[4] and Apache (together with the Debtors, the Consenting Creditors, and any subsequent person or entity that becomes a party to the RSA, the "**RSA Parties**"), the RSA Parties agreed to support the transactions set forth therein and in the term sheet memorializing the agreement between certain of the Debtors and Apache and certain of its affiliates regarding the framework for a restructuring with respect to the Legacy Apache Properties (as defined below) (the "**Apache Term Sheet**").

Consistent with the RSA, and as discussed in greater detail below, the Plan provides for, among other things, the following transactions to occur on the Effective Date for the below categories of assets and related liabilities:

- **Specified Deepwater Assets and Shelf Assets**: The Debtors will consummate the sale of certain of their assets, including specified Deepwater Assets and Shelf Assets (each defined below), (collectively, the "**Purchased Oil & Gas Lease Interests**") to a new entity ("**Credit Bid Purchaser**") formed at the direction of the Consenting FLTL Lenders for aggregate consideration of approximately $1.03 billion, consisting of (i) a credit bid of the Allowed FLTL Claims up to the FLTL Claims Allowed Amount, (ii) cash in the amount up to approximately $105 million[5], (iii) the GUC Warrants, (iv) the SLTL Warrants, and (v) the assumption of certain liabilities set forth in the Credit Bid Purchase Agreement, including the assumption of the Allowed FLFO Claims remaining following distribution of the FLFO Distribution Amount (approximately $139 million of the FLFO Claims Allowed Amount *less* the approximately $119 million of the principal amount of the First Lien Exit Facility) (the "**Credit Bid Transaction**"). A schedule of the oil and gas leases, rights-of-way and rights-of-use and easement included as part

---

[4] Since the RSA was executed on August 4, 2020, additional lenders holding FLTL Claims and/or SLTL Claims have executed joinders to the RSA, including the members of the Ad Hoc Group of SLTL Lenders (as defined below).

[5] The Credit Bid Purchase Agreement caps the total cash consideration to be paid by Credit Bid Purchaser for the Credit Bid Acquired Interests at an amount equal to (i) the proceeds of the up to $185 million Second Lien Exit Facility, plus (ii) the proceeds of the approximately $40 million Equity Rights Offerings, minus (iii) $120 million.

of the Purchased Oil & Gas Lease Interests is annexed hereto as **Exhibit B**[6] (which may be amended, modified, or supplemented from time to time).

- **Legacy Apache Properties**: After the consummation of the Credit Bid Transaction, FWE will implement a divisive merger pursuant to which FWE will be divided into Fieldwood Energy I LLC ("**FWE I**") and Fieldwood Energy III LLC ("**FWE III**"). Through the divisive merger, FWE I will be allocated and vested with certain assets FWE acquired from Apache (the "**Legacy Apache Properties**") and related liabilities and obligations. FWE I will, among other things, own, operate, plug and abandon, and decommission the Legacy Apache Properties. A schedule of the oil and gas leases, rights-of-way, and rights-of-use and easement related to the Legacy Apache Properties is annexed hereto as **Exhibit C**[7] (which may be amended, modified, or supplemented from time to time).[8]

- **FWE III Properties**: Through the divisive merger, FWE III will be allocated and vested with all of FWE's assets other than the Purchased Oil & Gas Lease Interests, Legacy Apache Properties and Abandoned Properties (defined below) (the "**FWE III Properties**"). FWE III will, among other things, own, operate, plug and abandon, and decommission the FWE III Properties and related assets and liabilities. The oil and gas leases, rights-of-way, and rights-of-use and easement related to the FWE III Properties includes those listed on the schedule annexed hereto as **Exhibit D**[9] (which may be amended, modified, or supplemented from time to time).

- **FWE IV Properties**: In accordance with an executed, non-binding term sheet with Chevron U.S.A. Inc. ("**CUSA**") which is attached hereto as **Exhibit O** (the "**Chevron Term Sheet**") and described in further detail below, FWE will create a new entity, Fieldwood Energy IV LLC ("**FWE IV**"), through a divisive merger and FWE IV will be allocated and vested with certain interests in a portion of the leases assigned previously to FWE by CUSA (and its predecessors and affiliates), and with the platforms, wells, pipelines and equipment (including production equipment) located on and attributable to the CUSA interest in such leases, and

---

[6] For ease of reference, a copy of the exhibit in excel is available at the following link: http://media.primeclerk.com/fieldwoodenergy/ExhibitBLeasesRelatedtoPurchasedOilGasLeaseInterests.xlsx and in pdf at: http://media.primeclerk.com/fieldwoodenergy/ExhibitBLeasesRelatedtoPurchasedOilGasLeaseInterests.pdf

[7] For ease of reference, a copy of the exhibit in excel is available at the following link: http://media.primeclerk.com/fieldwoodenergy/ExhibitCLeasesRelatedtoFWEIOilGasLeaseInterests.xlsx and in pdf at: http://media.primeclerk.com/fieldwoodenergy/ExhibitCLeasesRelatedtoFWEIOilGasLeaseInterests.pdf

[8] For any lease that is listed on **Exhibit C** (**Leases Related to FWE I Oil & Gas Interests**) and also on any of **Exhibits B, D or E**, (i) FWE I is to obtain solely the right, title and interest of FWE obtained from Apache in such lease and (ii) the interests to be obtained by the Credit Bid Purchaser or FWE III or to be abandoned, as applicable, shall be all right, title and interest of FWE in such lease (less such right, title and interest obtained from Apache).

[9] For ease of reference, a copy of the exhibit in excel is available at the following link: http://media.primeclerk.com/fieldwoodenergy/ExhibitDLeasesRelatedtoFWEIIIOilGasLeaseInterestss.xlsx and in pdf at: http://media.primeclerk.com/fieldwoodenergy/ExhibitDLeasesRelatedtoFWEIIIOilGasLeaseInterests.pdf

any hydrocarbons produced from such leases, if applicable (collectively "**FWE IV Properties**").

- **Abandoned Properties**: Immediately upon the occurrence of the Effective Date, certain of the Debtors' assets (the "**Abandoned Properties**") will be abandoned pursuant to sections 105(a) and 554(a) of the Bankruptcy Code. The Debtors anticipate that BSEE will issue orders compelling either all or certain entities who are in the chain of title (collectively, the "**Predecessors**") and/or current co-working interest owners (collectively, the "**CIOs**") for each of the Abandoned Properties to perform the P&A Obligations for each respective property. A schedule of the oil and gas leases, rights-of-way, and rights-of-use and easement related to the Abandoned Properties is annexed hereto as **Exhibit E**[10] (which may be amended, modified, or supplemented from time to time).[11] As further detailed below, the Debtors have taken several steps to facilitate the safe and orderly operational transfer of the Abandoned Properties currently operated by the Debtors and are working to reach long-term commercial agreements similar to the FWE I structure with interested Predecessors for assuming operational control for Abandoned Properties operated by the Debtors. The Debtors (i) have dedicated approximately $6 million, in addition to amounts spent in the ordinary course, on safety related repairs and improvements on the Abandoned Properties and (ii) have provided Predecessors detailed operational information on the Abandoned Properties. Additionally, for any Predecessor with whom a consensual arrangement has not yet been agreed to, Credit Bid Purchaser will offer a 90-day transition period post-Effective Date during which Credit Bid Purchaser will offer to manage at the requesting Predecessor's cost and on its behalf any of the Abandoned Properties.

*Satisfaction and Treatment of Claims and Interests*

In addition, the Plan provides for the resolution, satisfaction, settlement and discharge of claims against and interests in the Debtors and their estates. All holders of Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Postpetition Hedge Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Other Secured Claims will have their claims satisfied in full, either through payment in Cash or other treatment as specified in the Plan.

All holders of Allowed FLFO Claims will receive their Pro Rata Share of the FLFO Distribution Amount and all remaining Allowed FLFO Claims will be assumed by the NewCo Entities, as modified to the extent set forth in the First Lien Exit Facility Documents.

---

[10] For ease of reference, a copy of the exhibit in excel is available at the following link: http://media.primeclerk.com/fieldwoodenergy/ExhibitELeasesRelatedtoAbandonedProperties.xslx and in pdf at: http://media.primeclerk.com/fieldwoodenergy/ExhibitELeasesRelatedtoAbandonedProperties.pdf

[11] A Serial Register for the FWE III Properties and Abandoned Properties is available at the following link: http://media.primeclerk.com/fieldwoodenergy/SerialRegisters.pdf

All holders of Allowed FLTL Claims will receive their Pro Rata Share of (i) 100% of the equity in NewCo (subject to dilution as set forth in section 4.4 of the Plan) and (ii) the FLTL Subscription Rights.

All holders of Allowed SLTL Claims will receive their Pro Rata Share of the SLTL Warrants and the SLTL Subscription Rights.

Holders of Unsecured Trade Claims that have executed Trade Agreements will receive in the aggregate Cash in the amount of the lesser of (i) $8 million and (ii) 14% of the aggregate amount of Allowed Unsecured Trade Claims.

The holders of Allowed General Unsecured Claims will receive their Pro Rata Share of the GUC Warrants (defined below) and any residual distributable value of the Post-Effective Date Debtors and FWE I after satisfaction of (i) Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Postpetition Hedge Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed Unsecured Trade Claims, all Cure Amounts and (ii) all fees, expenses, costs and other amounts pursuant to the Plan and incurred by the Post-Effective Date Debtors in connection with post-Effective Date operations and wind-down.

All holders of other claims against the Debtors or existing equity interests in FWE Parent will not receive a recovery under the Plan.

To facilitate the implementation of the Plan, the Plan provides for (i) the funding of a claims reserve for Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Other Secured Claims, Allowed Unsecured Trade Claims, and Cure Amounts; (ii) the Professional Fee Escrow; (iii) the Plan Administrator Expense Reserve; and (iv) the payment of other fees and expenses, such as fees and expenses incurred under the DIP Order, fees and expenses incurred in connection with implementing the Apache Transactions, and the fees and expenses of the Ad Hoc Secured Lenders' advisors.

The Plan also includes injunctions, releases, and exculpations in sections 10.5, 10.6, 10.7, 10.8, and 10.9. The relevant provisions regarding such injunctions, releases, and exculpations provided under the Plan are annexed hereto as **Exhibit F**. Section 10.7(b) of the Plan provides for releases by holders of claims and interests (the "**Third Party Release**"). Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes, by reference, each of the related provisions and definitions under the Plan, and, furthermore, shall constitute the Bankruptcy Court's finding that the Third-Party Release is (i) consensual, (ii) essential to the confirmation of the Plan, (iii) given in exchange for the good and valuable consideration provided by the Released Parties, (iv) a good faith settlement and compromise of the claims released by the Third-Party Release, (v) in the best interests of the Debtors and their estates, (vi) fair, equitable and reasonable, (vii) given and made after due notice and opportunity for hearing, and (viii) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release. You are advised and encouraged to review and consider the Plan carefully, including the release, exculpation and injunction provisions, as your rights might be affected.

**B.   _Credit Bid Transaction_**

Before and following the Petition Date, the Debtors explored a dual-track restructuring, where they conducted a robust marketing process for the Deepwater Assets while also engaging in negotiations with the Consenting Creditors regarding the terms of a restructuring that would include a recapitalization through a sale of the specified Deepwater Assets and Shelf Assets to the Prepetition FLTL Lenders through a credit bid transaction.

**1.    M&A Process**

Before the Petition Date, the Company commenced a robust sale and marketing process (the "**M&A Process**") for the Company's Deepwater Assets through its investment banker, Houlihan Lokey Capital, Inc. ("**Houlihan**").

Houlihan, which specializes in advising companies in the oil & gas industry with respect to traditional mergers and acquisitions, asset level acquisitions and divestitures, financial restructuring and recapitalization transactions, conducted the M&A Process from June 30, 2020 through September 3, 2020.  Houlihan marketed the Deepwater Assets to 47 parties identified as potential third party buyers.  Houlihan's outreach covered a broad spectrum of national and international strategic buyers and financial sponsors who were believed to be potential buyers of the Debtor's Deepwater Assets and have the financial wherewithal to support the proposed transaction.  Following the Petition Date, Houlihan continued the M&A Process, which ultimately resulted in 18 parties executing confidentiality agreements and obtaining access to a virtual data room ("**VDR**"), 15 management presentations, and receipt of approximately 12 written bid letters and other indications of interest.  In addition, Houlihan provided the Creditors Committee's advisors with access to all of the information provided to potential buyers, including access to the VDR.  After analyzing the bids and the financial condition of the bidders and consulting with the DIP Lenders and Consenting FLTL Lenders, the Debtors determined that none of the bids received was actionable.

**2.    Negotiations with Consenting Creditors**

Concurrently with the M&A Process, the Debtors continued to engage with the Consenting Creditors regarding the terms of a comprehensive restructuring in accordance with the restructuring term sheet attached as **Exhibit A** to the RSA (the "**Restructuring Term Sheet**"), which provides, in relevant part, that subject to all consent rights of the applicable Consenting Creditors under the RSA, the Debtors' restructuring may include the following transactions:

> "**Specified Assets**.  As determined and agreed by the Company, the Requisite DIP Commitment Parties and Requisite FLTL Lenders, through conveyance(s) or divisional merger(s), the transfer or other disposition of all or substantially all of the Specified Assets to one or more purchasers or a new entity ("**Lender NewCo**") to be formed at the direction of the Requisite DIP Commitment Parties and the Requisite FLTL Lenders through (i) a standalone sale or sales pursuant to section 363 of the

Bankruptcy Code either via a credit bid or otherwise, (ii) a sale or sales pursuant to a Plan either via a credit bid or otherwise, or (iii) an equitization transaction pursuant to a Plan."

Following several months of negotiations, the Debtors, the Ad Hoc Group of Secured Lenders, and Apache agreed on the terms of the Plan and negotiated a substantially final version of the purchase and sale agreement, by and between FWE, the other seller parties, and the Credit Bid Purchaser, together with any and all related agreements, exhibits, and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time (the "**Credit Bid Purchase Agreement**"), a copy of which is attached hereto as **Exhibit G**.

On the Effective Date of the Plan, pursuant to sections 105, 363, 365, 1123, 1129, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid Acquired Interests will be transferred to, and the Credit Bid Acquired Interests owned by the Debtors will vest free and clear of all Liens[12] (other than Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which will vest free and clear of all Liens), Claims, charges, Interests, or other encumbrances, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, and (ii) all Credit Bid Assumed Liabilities will be assumed by the Credit Bid Purchaser. Moreover, the vast majority of the Debtors' employees and management team will continue to be employed by Credit Bid Purchaser.

### 3. Pro Forma Capital Structure of Credit Bid Purchaser

Upon the Effective Date, the Debtors estimate that Credit Bid Purchaser will have up to $304 million in funded debt, comprised of approximately $119 million from the First Lien Exit Facility and up to $185 million from the Second Lien Exit Facility. In addition, the Credit Bid Purchaser is anticipated to raise $40 million through the Equity Rights Offerings on the Effective Date. Of the estimated up to $225 million of new money that the Credit Bid Purchaser is anticipated to raise, $120 million will be used to capitalize the Credit Bid Purchaser's balance sheet, and the remainder will be used to fund the cash portion of the Credit Bid Consideration.

Credit Bid Purchaser's capital structure will consist of:

- *First Lien Exit Facility*. A $118,599,082.31 first lien term loan facility resulting from the assumption of the Allowed FLFO Claims remaining following distribution of the FLFO Distribution Amount (approximately $139 million of the FLFO Claims Allowed Amount *less* the approximately $119 million of the principal amount of the First Lien Exit Facility). A copy of the First Lien Exit Facility Commitment Letter, with the First Lien Exit Facility Term Sheet as an attachment thereto, will be attached hereto as **Exhibit H**.

- *Second Lien Exit Facility*. An up to $185 million second lien term loan facility to be fully backstopped by the Second Lien Backstop Parties in accordance with

---

[12] Provided that the Retained Properties (as defined in the Apache Implementation Agreement) shall be transferred in accordance with the Decommissioning Agreement.

and subject to the terms and conditions of the Second Lien Backstop Commitment Letter, as further described below in Section V.I. The facility will be comprised of loans in an amount equal to (i) $100 million plus (ii) an additional amount equal to the lesser of (x) $85 million and (y) the amount necessary to provide the Credit Bid Purchaser with no less than $120 million of cash on hand on the Effective Date, after giving effect to all transactions to occur on the Effective Date. 25% of the up to $85 million of new money raised through a debt offering will be allocated to certain of the Second Lien Backstop Parties and 75% will be offered to all DIP Lenders, including the Second Lien Backstop Parties and their applicable affiliates, on a *pro rata* basis. In addition, at any time after the Effective Date, the Credit Bid Purchaser will be permitted to borrow up to $50 million under an incremental facility, which incremental facility will not be committed on the Effective Date. $100 million of the proceeds of the Second Lien Term Loan Facility will fund the initial capital needs of the Credit Bid Purchaser, and up to $85 million in proceeds will be used by the Credit Bid Purchaser to purchase the Credit Bid Acquired Assets. A copy of the Second Lien Exit Facility Term Sheet is attached hereto as **Exhibit I**.

Credit Bid Purchaser will raise additional capital through the Equity Rights Offerings:

- **FLTL Equity Rights Offering.** All Prepetition FLTL Lenders will be allowed to participate in a $20 million (the "**FLTL Equity Rights Offering Amount**") equity rights offering (the "**FLTL Equity Rights Offering**") in accordance with the rights offering procedures (the "**FLTL Equity Rights Offering Procedures**"). In addition, the Debtors intend to negotiate the terms of a backstop commitment agreement (the "**FLTL ERO Backstop Agreement**") with certain DIP Lenders and certain FLTL Lenders that elect to participate in the backstop (the "**FLTL ERO Backstop Parties**"), pursuant to which the FLTL ERO Backstop Parties will agree to fully backstop the FLTL Equity Rights Offering in exchange for, among other things, a backstop commitment premium equal to 8% of the FLTL Equity Rights Offering Amount, to be issued at a 30% discount to the equity value of NewCo on the Effective Date. In the coming days, the Debtors plan to file an emergency motion seeking approval of the FLTL Equity Rights Offering Procedures and entry into the FLTL ERO Backstop Agreement and will request that a hearing on such motion be heard no later than the deadline for filing the Plan Supplement.

- **SLTL Equity Rights Offering.** All Prepetition SLTL Lenders will be allowed to participate in a $20 million (the "**SLTL Equity Rights Offering Amount**") equity rights offering (the "**SLTL Equity Rights Offering**") in accordance with the rights offering procedures (the "**SLTL Equity Rights Offering Procedures**"). In addition, the Debtors intend to negotiate the terms of a backstop commitment agreement (the "**SLTL ERO Backstop Agreement**") with the Ad Hoc Group of SLTL Lenders who will participate in the backstop (the "**SLTL ERO Backstop Parties**"), pursuant to which the SLTL ERO Backstop Parties will agree to fully backstop the SLTL Equity Rights Offering in exchange for, among other things, a backstop commitment premium equal to 8% of the SLTL Equity Rights Offering Amount, to be issued at a 30% discount to

the equity value of NewCo on the Effective Date. In the coming days, the Debtors plan to file an emergency motion seeking approval of the SLTL Equity Rights Offering Procedures and entry into the SLTL ERO Backstop Agreement and will request that a hearing on such motion be heard no later than the deadline for filing the Plan Supplement.

### C. *Further Transaction Proposals*

The Debtors and Consenting Creditors have been willing to consider actionable proposals from third-parties for transactions that would provide consideration to the Debtors' estates in an amount that exceeds the Credit Bid Amount plus the value of any other consideration provided by the Credit Bid Purchaser to the Debtors pursuant to the Credit Bid Purchase Agreement and the Plan (the aggregate consideration under the Credit Bid Purchase Agreement is currently approximately $1.03 billion, but for the avoidance of doubt, the Credit Bid Amount may be increased up to the FLTL Claims Allowed Amount).

The Debtors continued to consider such proposals pursuant to certain procedures as provided for in the Disclosure Statement Motion (as defined below), up through February 26, 2021, the Bid Deadline. Moreover, the procedures provided, among other things, that in evaluating whether any third-party bids qualify as a Qualified Bid (as defined in the Disclosure Statement Motion), the Debtors may consider several factors including, but not limited to, (i) the amount and form of consideration of the purchase price, (ii) the assets included in or excluded from the bid, (iii) the value to be provided to the Debtors and their estates, (iv) the transaction structure and execution risk, and (v) the impact on all key stakeholders. Moreover, to the extent the Debtors received one or more Qualified Bids on or before the Bid Deadline, the Debtors would have, no later than three (3) Business Days after the Bid Deadline, filed with the Court a notice of receipt of such Qualified Bid(s) and the Debtors' proposed procedures for selecting the highest or otherwise best bid, including, but not limited to, any procedures for submitting revised bids and/or holding an auction to the extent the Debtors determine holding an auction will maximize value to the Debtors' estates. For the avoidance of doubt, the Credit Bid Purchaser (i) shall be deemed a Qualified Bidder that is allowed to participate in any bidding and auction process held by the Debtors and (ii) may increase the Credit Bid Amount of their proposal up to the FLTL Claims Allowed Amount of $1,142,688,815.28 in principal plus any accrued but unpaid interest or fees under the Prepetition FLTL Credit Agreement as of the Petition Date.

Since the Debtors filed the Disclosure Statement Motion, the Debtors have executed at least one confidentiality agreement with an interested party and provided such party additional information regarding its business and access to the VDR. Any third party that sought to submit a Qualified Bid by the Bid Deadline and had demonstrated that it had the ability to submit a Qualified Bid obtained access to the VDR after executing a confidentiality agreement on customary terms that were reasonable to the Debtors.

### D. *Apache Transactions and FWE I*

In accordance with the RSA, the Debtors, the Consenting Creditors, and Apache have negotiated final forms of the definitive documents providing for the transactions contemplated by, or relating to, the Apache Term Sheet (the "**Apache Definitive Documents**"). The documents comprising the Apache Definitive Documents are identified in that certain *Apache*

*Term Sheet Implementation Agreement*, dated January 1, 2021 by and between FWE and GOM Shelf LLC (collectively, the "**Fieldwood PSA Parties**"), on one hand, and Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC (collectively, the "**Apache PSA Parties**"), on the other (the "**Implementation Agreement**"), a copy of which is attached hereto as **Exhibit J**.

The transactions contemplated under the Apache Definitive Documents (collectively, the "**Apache Transactions**") include, among other things, (i) FWE's assumption of any executory contracts[13] or unexpired leases required to implement the Apache Transactions pursuant to the Plan, (ii) FWE's conversion from a Delaware limited liability company to a Texas limited liability company, (iii) FWE's division into FWE I and FWE III in accordance with that certain *Agreement and Plan of Merger of Fieldwood Energy LLC into Fieldwood Energy I LLC and Fieldwood Energy III LLC* (the "**Plan of Merger**"), and (iv) the Credit Bid Purchaser, FWE I and FWE III's entry into various other agreements required to implement the Apache Transactions.

Below is a brief description of FWE I.[14]

FWE I will engage in the ownership and operation of the FWE I Assets, including addressing the FWE I Obligations in accordance with applicable laws and regulations and the Decommissioning Agreement. Certain of those FWE I Obligations will include the plugging and abandonment of wells and the ultimate decommissioning of platforms and offshore infrastructure in the Gulf of Mexico. FWE I will be managed by the Sole Manager selected by the Debtors and Apache in accordance with the Apache Term Sheet, the identity of which will be disclosed in the Plan Supplement before the Confirmation Hearing. Operations of the properties will initially be performed by the Credit Bid Purchaser under a transition services agreement (the "**TSA**") between the parties. Upon any termination of the TSA, FWE I may elect, with the consent of Apache and in accordance with the FWE I LLC Agreement, to have a third-party service provider operate the properties. The Credit Bid Purchaser will employ the vast majority of Debtors' employees post-Effective Date, which will ensure that operations will continue to be handled during the TSA period by personnel with the most experience with these properties. The TSA does not have a specified term, which means it may continue in effect for an extended period of time; however, FWE I and the Credit Bid Purchaser respectively hold a 90-day and a 180-day termination right. Cash flow generated from operations of the Legacy Apache Properties will be used primarily to pay for costs under the TSA and for plugging, abandonment, and decommissioning activities.

In addition to the liquidity provided through cash flows from the Legacy Apache Properties, (i) the Debtors will provide liquidity by capitalizing FWE I on the Effective Date with $50 million minus the accrual of post-petition decommissioning spend by the Debtors on the Legacy Apache Properties, which the Debtors project will be approximately $25 million, and (ii) Apache will provide liquidity in the form of up to $400 million of proceeds to be used by

---

[13] To the extent the Decommissioning Agreement (as discussed further below) is an executory contract, it will be assumed and become the obligation of FWE I under the Plan of Merger.

[14] The descriptions of the assets and obligations in this section is for informational purposes only and are qualified in their entirety by reference to the Apache Definitive Documents.

FWE I to perform plugging, abandonment, and decommissioning in accordance with the terms and conditions of the Standby Credit Facility Documents.

Under the Decommissioning Agreement, separate security has previously been provided to Apache to secure plugging, abandonment, and decommissioning obligations associated with the Apache Legacy Properties, including approximately $238 million in funds in Trust A (defined below) and approximately $498 million in letters of credit and surety bonds (payable in accordance with their terms and conditions).

### E.  *FWE III*

FWE III will be allocated and vested with those rights, assets, and properties relating to the FWE III Oil & Gas Interests (collectively, the "**FWE III Assets**") and those liabilities and obligations relating to the FWE III Assets (the "**FWE III Obligations**").

On the Effective Date, FWE III will be capitalized with approximately $27 million of capital through a combination of approximately (i) $5-15 million of cash on hand and (ii) $12-22 million in future cash commitments from the Credit Bid Purchaser, which the Debtors believe will provide the Plan Administrator with adequate funding to operate the FWE III Assets, and satisfy the FWE III Obligations, including the P&A Obligations associated with the FWE III Assets.  Moreover, an additional $12 million in outstanding security provided by surety bonds will be available to backstop any of the FWE III Obligations (in accordance with the terms and conditions of such bonds).

Upon the Effective Date, the Plan Administrator, the identity of which will be disclosed before the Confirmation Hearing, will serve as the sole officer, director, or manager of FWE III and perform all duties in accordance with the terms of the Plan and Plan Administrator Agreement, a copy of which will be filed in the Plan Supplement.  The Plan Administrator's powers and authority include, among other things, engaging in the ownership, operation, plugging and abandonment, and decommissioning of the FWE III Assets, including the FWE III Oil & Gas Lease Interests.

All of the membership interests of FWE I and FWE III will be owned by FWE Parent, as reorganized on the Effective Date ("**Post-Effective Date FWE Parent**").  On the Effective Date, one share of Post-Effective Date FWE Parent common stock (the "**Single Share**") will be issued to the Plan Administrator to hold in trust as custodian for the benefit of holders of Allowed General Unsecured Claims and the Single Share will be recorded on the books and records maintained by the Plan Administrator.

### F.  *FWE IV*

Over the past several months, the Debtors and CUSA have been in negotiations regarding a consensual arrangement similar to the agreement reached with Apache at the outset of these chapter 11 cases.  The Debtors are pleased to report that these efforts have culminated in an agreement-in-principle with CUSA on a framework for treatment of the FWE IV Properties, which is memorialized in Chevron Term Sheet attached hereto as **Exhibit O**.

The Chevron Term Sheet contemplates that the parties will work in good faith to negotiate the definitive documents and any other agreements required to implement the

transaction contemplated in the Chevron Term Sheet in each case in accordance with the terms and conditions set forth herein ("**Chevron Definitive Documents**"). The key terms of the Chevron Term Sheet provide, among others:

- **FWE IV Properties**. FWE will create a new entity, FWE IV, via a Texas divisive merger and FWE IV will be allocated and vested with the FWE IV Properties.

- **Turnkey Removal Agreement**. CUSA, FWE IV and Credit Bid Purchaser will enter into the Turnkey Removal Agreement whereby, upon agreement of the price for a decommissioning project, Credit Bid Purchaser will decommission the corresponding FWE IV Properties on a lump sum, turnkey payment basis, and Credit Bid Purchaser will earn a single pre-agreed payment (turnkey amount) in exchange for completing such decommissioning project. The Turnkey Removal Agreement provides, among other things, that FWE will contribute at Closing $5,000,000 into an escrow account to cover operations to prepare the FWE IV Properties for decommissioning and that FWE IV will pay Credit Bid Purchaser as it performs such work. Credit Bid Purchaser shall not be required to undertake any decommissioning project until funds therefor are in the FWE IV escrow account and funding obligations of co-working interest owners or other predecessors-in-interest have been agreed on by the parties.

- **Contractor Operator Agreement**. FWE IV and Credit Bid Purchaser will enter into a Contract Operator Agreement whereby Credit Bid Purchaser will manage the administrative and corporate expenses of FWE IV along with the FWE IV Properties for a period of 5 years, subject to agreed-upon conditions for assignment.

- **Net Profits**. FWE IV will pay all net profits from production generated by the FWE IV Properties, after deducting royalties and taxes and less amounts required to cover operating expenditures of FWE IV into an escrow account to be used for decommissioning.

- **Neptune Spar Transition Services Agreement**. Credit Bid Purchaser will enter into a transition services agreement for transition services to be provided by Credit Bid Purchaser at CUSA's cost for the period prior to commencement of CUSA's campaign covering decommissioning of the Neptune Spar and related equipment and infrastructure.

- **Deepwater Assets Surety Bond**. Credit Bid Purchaser will deliver to CUSA on the second anniversary of closing of the transaction described in the Chevron Term Sheet a $25 million irrevocable surety bond issued by a qualifying surety, for which CUSA shall be the sole private beneficiary and which CUSA shall be entitled to call to cover and/or to reimburse certain decommissioning costs of certain assets of Credit Bid Purchaser described in the Chevron Term Sheet. If Credit Bid Purchaser does not provide the surety bond, it will establish an escrow fund and provide a five percent (5%) net profit interest on its production until the escrow fund has received $25 million.

### G. *Abandoned Properties*

Immediately upon the occurrence of the Effective Date of the Plan, all of the Abandoned Properties shall be automatically abandoned by the Debtors pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, without further notice or order of the Court. The Debtors anticipate that BSEE will issue orders compelling either all or certain of the Predecessors and/or CIOs for each of the Abandoned Properties to perform the P&A Obligations for each respective property. Debtors have been coordinating with BSEE, Predecessors and CIOs on the safe and orderly operational transfer of the Abandoned Properties.

### 1. Discussions with the Government, Predecessors, CIOs, and Sureties

Since before the Petition Date, the Company has been in active discussions with BOEM and BSEE, as well as representatives from DOI and DOJ, to keep the U.S. government apprised of the Company's restructuring efforts and plans with respect to its properties. The Company has continued discussions with the DOI, DOJ, BOEM and BSEE on a regular basis regarding the structure of the Plan and progress on the Apache Definitive Documents and has provided the DOI, DOJ, BOEM and BSEE with diligence and operational updates on the Debtors' various properties and leases. Additionally, the Debtors are actively engaging in discussions with Predecessors that are being facilitated by the DOI and DOJ for the purpose of ensuring that the Predecessors have access to, and are provided with, appropriate and adequate information on the Abandoned Properties that the Debtors operate to inform them of actions required to take over operational control of such Abandoned Properties.

The Debtors have also been in regular discussions with many of the Predecessors and CIOs regarding the terms of their proposed restructuring, including the Debtors' intent to abandon the Abandoned Properties, in an effort to ensure that responsibility for such Abandoned Properties and the related P&A Obligations are transitioned in an orderly manner to the Predecessors or CIOs, as the case may be, while also exploring the potential to negotiate consensual, commercial arrangements similar to the FWE I structure. To help facilitate these discussions, the Debtors have responded to numerous formal and informal information and document requests, providing such Predecessors and CIOs with access to extensive diligence regarding the Abandoned Properties and other aspects of the Debtors' restructuring and Plan in the form of, among other things, presentations tailored to certain predecessors' potential exposure for P&A Obligations and liability and ways to mitigate such potential liability, access to an online tool (the "**Relativity Site**") that allows for easy sorting to review federal offshore leases and provides relevant information pertaining to each lease interest, including the field, block, lease number, type, rights owned, effective date, expiration date, operator, working interest, and status of the lease. In addition, for each of the FWE III Oil & Gas Lease Interests and Abandoned Properties, the Relativity Site provides (i) all identified predecessors in title and working interest owners, (ii) current record title ownership and chain of record title information, (iii) asset/liability ownership detail, (iv) BOEM bonds with ID number, beneficiary, surety and description tied to each lease, (v) 3rd party bonds with ID number, beneficiary, surety and description, and (vi) BSEE and FWE estimates of asset retirement obligation ("**ARO**") information, including gross/net amounts and asset count information. The Debtors have also been in discussions with their surety providers and have responded to numerous formal and informal information and document requests from the sureties by producing thousands of

documents, granting sureties with access to the Relativity Site, and providing certain sureties with presentations tailored to their potential exposure for P&A liability and ways to mitigate such potential liability.

**2.      Agreed Activities on Abandoned Properties, Operational Transition Packets, and 90-Day Transition Services Agreements relating to Abandoned Properties**

To facilitate the safe and orderly operational transition of the Abandoned Properties currently operated by the Debtors and the assumption of the P&A Obligations related to same, the Debtors are taking the following actions:

- The Debtors have dedicated approximately $6 million, in addition to amounts spent in the ordinary course, on safety related repairs and improvements on the Abandoned Properties. Despite the circumstances in which the Debtors find themselves and the intention to abandon properties under the Plan, the Debtors have continued to expend resources on the Abandoned Properties during the pendency of the Chapter 11 Cases.

- The Debtors are in the process of completing comprehensive operational transition packets of information ("**OTP**") organized by each abandoned platform and its associated wells and infrastructure, which will provide Predecessors and CIOs with information, or access to information, of a kind and detail that a potential purchaser of such property would require, including extensive information regarding, among other things, the condition of the Abandoned Properties and related equipment (including the status of any applicable Incidents of Non-Compliance, "**INCs**"), all files, records, databases, data, and other information related to the properties, and all applicable permits and regulatory requirements. The Debtors provided the first OTPs to the affected Predecessors during the week of March 1, 2021, and will provide the remaining OTPs to Predecessors and CIOs on a rolling basis as soon as they are ready over the coming weeks.

Additionally, Credit Bid Purchaser will offer a 90-day transition period post-Effective Date during which Credit Bid Purchaser will manage any of the Abandoned Properties at the requesting Predecessor's cost. Beginning the week of March 1, 2021, the Debtors, on behalf of Credit Bid Purchaser, provided identified Predecessors with a form of transition services agreement pursuant to which Credit Bid Purchaser will provide operational and other ancillary services in the same or similar manner that the Debtors have handled those services in the past with respect to the Abandoned Properties. The vast majority of employees of the Debtors will be employed by the Credit Bid Purchaser post-Effective Date, ensuring that the most knowledgeable and experienced personnel will continue to maintain the properties in a safe manner. To the extent any of the funds relating to the $6 million amount described above remained unspent at the end of this period with respect to a specific Abandoned Property, such funds will be provided to the respective Predecessor or spent as agreed.

3. **Potential Consensual, Commercial Arrangements with Predecessors**

The Debtors continue to work toward reaching long-term commercial agreements similar to the FWE I and FWE IV structures with various Predecessors. Under such long-term consensual, commercial agreements, Credit Bid Purchaser would continue for a specified period the management of certain identified Abandoned Properties and the expedient decommissioning of the asset base under terms to be agreed by the parties. A term sheet outlining terms available to all Predecessors that will require operatorship capabilities related to the Abandoned Properties has been provided to all relevant Predecessors. The Debtors have provided (and will continue to provide) the DOI, DOJ, BOEM and BSEE with regular updates on the status of their negotiations with each of the Predecessors.

Although the Debtors are hopeful that these discussions will result in consensual arrangements, there can be no guarantee that the relevant Predecessors will be willing to enter into consensual arrangements with the Debtors regarding the orderly transition of the Abandoned Properties and related assets. As such, following entry of the Confirmation Order, the Debtors will continue to work—whether on a consensual or nonconsensual basis—with each such Predecessor and, if applicable, CIO to ensure the smooth and safe transition of the Abandoned Properties.

4. **Notice to Predecessors and CIOs**

As detailed in the *Motion Of Debtors For Entry of Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of The Estate; (VII) Approving Bid Submission Deadline and Procedures for Submission of Higher or Better Bids; and (VIII) Granting Related Relief* filed contemporaneously herewith (the "**Disclosure Statement Motion**"), the Debtors will serve each Predecessor and CIO with a copy of the order approving the Disclosure Statement and notice of the intent to abandon the Abandoned Properties pursuant to the Plan by first class mail or overnight mail.

## H. *363 Credit Bid Transaction*

Pursuant to section 5.2(c) of the Plan, (x) if the Confirmation Date does not occur before the Confirmation Outside Date or (y) if the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount (the next Business Day after the occurrence of (x) or (y), the ("**Toggle Date**"), then, with the consent of the Required DIP Lenders and Requisite FLTL Lenders, the Debtors will:

  (i) within 7 days of the Toggle Date, file a motion (the "**Toggle Motion**"), in form and substance acceptable to the Debtors, the Required DIP Lenders and Requisite FLTL Lenders, seeking entry of an order of the Bankruptcy Court approving a credit bid sale transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders)

pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement (which terms shall be acceptable to the Debtors, the Requisite FLTL Lenders, and Required DIP Lenders), free and clear of all Liens (other than (i) any and all Liens securing the FLFO Claim or the First Lien Exit Facility or (ii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clause (i) above to the extent contemplated by the First Lien Exit Facility Documents), Claims, charges, Interests, or other encumbrances, the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights that are applicable to the Credit Bid Acquired Interests;

(ii)    within 15 days of the Toggle Date and subject to the reasonable consent of Apache, the Requisite FLTL Lenders, the Required DIP Lenders and the Debtors, amend the Apache Definitive Documents as reasonably required to effectuate the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders); provided that no such actions shall require the Apache PSA Parties to alter the economics of the Apache Definitive Documents without the Apache PSA Parties' express written consent; and

(iii)   within 35 days of the Toggle Date, obtain entry of an order of the Bankruptcy Court approving the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders).

## I.  *Settlement with the Creditors' Committee*

On March 9, 2021, the Debtors, together with the Consenting Creditors, reached an agreement in principle with the Creditors' Committee.  That agreement is reflected in the Plan and provides, among other things, that:

- An unsecured creditor that is a third-party provider of goods or services to the Debtors and holds a claim arising from the provision of such goods and services (a "**Trade Creditor**") may elect to have its claim treated as an Unsecured Trade Claim; [15]

- Holders of Unsecured Trade Claims will agree (i) to enter into a Trade Agreement (as defined in the Plan) on trade terms that are no less favorable than the terms provided to the Debtors prior to the Petition Date, and (ii) to waive any and all liens against the Debtors, their assets and any co-owned assets, or any other affiliated person or entity (including any co-working interest owner of the Debtors), or any such person's or entity's respective assets or property (real or personal), regardless of the statute or other legal authority upon which the lien is

---

[15] A Trade Creditor that does not elect to have its claim treated as an Unsecured Trade Claim, or that does not agree to enter into a Trade Agreement or waive its liens as provided in the Plan, will have its claim treated as a General Unsecured Claim in Class 6B.

asserted, held or asserted by the Trade Creditor relating to the Unsecured Trade Claim;[16]

- Such holders of Allowed Unsecured Trade Claims in Class 6A that have executed Trade Agreements will receive Cash in the aggregate amount of the lesser of (i) $8 million and (ii) 14% of the Allowed Amount of Allowed Unsecured Trade Claims.  Pursuant to the Trade Agreements;

- Holders of Allowed General Unsecured Claims in Class 6B will receive their Pro Rata Share of (i) 8-year warrants for 3.5% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of the Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and SLTL Tranche 1 Warrants, but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the GUC Warrant Agreement; *provided*, that if the SLTL Tranche 2 Warrants are exercised, the GUC Warrants shall be subject to adjustment or true-up as necessary to retain such percentage after giving effect to the exercise of the SLTL Tranche 2 Warrants (the "**GUC Warrants**") and (ii) any distributable value of the Post-Effective Date Debtors and FWE I after satisfaction of (x) Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Postpetition Hedge Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed FLFO Claims, all Cure Amounts and (y) all fees, expenses, costs and other amounts pursuant to the Plan and incurred by the Post-Effective Date Debtors in connection with post-Effective Date operations and wind-down;

- the GUC Warrants will be held by FWE Parent for distribution in accordance with the Plan.  In addition, to the extent all of the Cash distributable to holders of Allowed Unsecured Trade Claims is not distributed on or about the Effective Date, any such undistributed Cash will be held by FWE Parent for future distribution in accordance with the Plan;

- a person or entity selected by the Creditors' Committee, subject to the consent of the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, with such consent not to be unreasonably withheld, will be appointed as Plan Administrator and the Plan Administrator Expense Reserve shall be funded with $8 million in Cash;

- FLTL Deficiency Claims shall not receive any distribution or recovery under the Plan;

[16] The Debtors and Creditors' Committee are continuing to discuss but are not in agreement as to the definition of "Trade Agreement" as set forth in the Plan and, specifically, the extent of a Trade Creditor's waiver of liens. The Creditors' Committee reserves all rights in that regard.

- on the Effective Date, the Post-Effective Date Debtors shall be deemed to have released all preference actions pursuant to section 547 of the Bankruptcy Code against the holders of Unsecured Trade Claims and General Unsecured Claims (in each case, solely in their capacity as holders of Unsecured Trade Claims and General Unsecured Claims, as applicable);

- the Creditors' Committee's will waive, as of the Effective Date, its right as provided in the DIP Order (defined below) to assert any Challenge to certain of the Lenders' asserted liens;

- the Creditors' Committee will support and not object to the Plan; and

- the Creditors' Committee will submit a letter to holders in Classes 6A and 6B of General Unsecured Claims recommending that such holders vote to accept the Plan.

### J. *Settlement with the Ad Hoc Group of SLTL Lenders*

The Debtors filed their initial plan of reorganization on January, 1, 2021 [Docket No. 722] (the "**Initial Plan**"), with the support and the Ad Hoc Group of Secured Lenders and Apache, and subsequently filed an amended plan on March 15, 2021 [Docket No. 1020] (the "**March 15 Plan**"), with the additional support of the Creditors' Committee.

In March 2021, certain of the Prepetition SLTL Lenders formed an ad hoc group represented by Kasowitz Benson Torres LLP (the "**Ad Hoc Group of SLTL Lenders**"). The Ad Hoc Group of SLTL Lenders raised issues with respect to the Debtors' restructuring, the Initial Plan, and the March 15 Plan, including the valuation analysis prepared by Houlihan, attached hereto as **Exhibit M** and the value of the recovery being offered to the Prepetition SLTL Lenders under the March 15 Plan. The Ad Hoc Group of SLTL Lenders believed that they were entitled to additional value on account of their secured claim, given the increases to oil and gas prices between the date of filing the Initial Plan and the March 15 Plan.

The Debtors, the Consenting Creditors, and the Ad Hoc Group of SLTL Lenders, and their respective advisors, engaged in vigorous, arm's-length negotiations to resolve all of their respective issues on a consensual basis. The negotiations were a success, and on March 16, 2021, the Debtors, together with the Consenting Creditors, reached an agreement in principle with the Ad Hoc Group of SLTL Lenders (the "**SLTL Settlement**"). In particular, the SLTL Settlement improves recoveries for SLTL Claims under the Plan, compared to the Initial Plan. That agreement is reflected in the Plan and provides, among other things, that:

- Holders of Allowed SLTL Claims will be separately classified from General Unsecured Claims and will receive their Pro Rata Share of (i) 8-year warrants for 25% of the New Equity Interests, with a strike price set at a $1,321 million equity value, with no Black-Scholes protections (the "**SLTL Tranche 1 Warrants**"), (ii) 8-year warrants for 32.5% of the New Equity Interests, with a strike price at $1,585 million equity value, with no Black-Scholes protections (the "**SLTL Tranche 2 Warrants**" and, together with the SLTL Tranche 1 Warrants, the "**SLTL Warrants**"), and (iii) subscription rights to acquire New Equity Interests

with an aggregate value equal to $20 million, issued at a 30% discount to the equity value of NewCo on the Effective Date;

- The Ad Hoc Group of SLTL Lenders will backstop the incremental $20 million equity rights offering, with an 8% backstop fee, which is payable in equity at a 30% discount to the equity value of NewCo on the Effective Date; and

- The Debtors will pay the reasonable professional fees of Kasowitz Benson Torres LLP.

As a result of the SLTL Settlement, the Ad Hoc Group of SLTL Lenders now support the Plan. The Plan is also supported by the Consenting Creditors, Apache, [the Prepetition FLFO Lenders,] and the Creditors' Committee. The terms of the SLTL Settlement have been embodied in the Plan and will be approved pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code via entry of the Confirmation Order, which will include findings that, among other things, the compromises and settlements under the Plan, including, but not limited to, the SLTL Settlement, are in the best interests of the Debtors, their Estates, their creditors, and other parties in interest and are fair equitable, and well within the range of reasonableness.

The Debtors believe that the Plan, as modified to implement the SLTL Settlement, represents the best available path to the Debtors to reorganize and maximize value for their stakeholders benefit.

### K. *Recommendation*

The Debtors are confident that they can implement the Restructuring described above to maximize stakeholder recoveries. Confirmation of the Plan will facilitate the reorganization and recapitalization of the Debtors' deepwater E&P business into a more streamlined efficient enterprise that will help preserve the jobs of in excess of 1,000 employees and contractors and its ability to successfully exploit oil and gas assets in the Gulf of Mexico to generate revenue and pay royalties to the U.S. Government. Moreover, the Debtors believe that the Plan does so in a manner where the P&A Obligations will continue to be performed in a safe and responsible manner by the relevant parties (as determined by BSEE) and will accelerate the decommissioning work performed on multiple wells, pipelines, platforms, and other facilities and substantially reduce the number of platforms in the Gulf of Mexico. For these reasons, among others, the Debtors strongly recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan.

### L. *Confirmation Timeline*

The Debtors seek to move forward expeditiously with the Solicitation of votes and a hearing on confirmation of the Plan in an effort to minimize the continuing accrual of administrative expenses. Accordingly, subject to the Bankruptcy Court's approval, the Debtors are proceeding on the following timeline with respect to the Disclosure Statement and the Plan:

| Hearing on Approval of Disclosure Statement | March 24, 2021 1:30 p.m. (prevailing Central Time) |
| --- | --- |

| Plan Supplement Filing | April 16, 2021 at 4:00 p.m. (prevailing Central Time) |
| --- | --- |
| Voting Deadline | April 26, 2021 at 4:00 p.m. (prevailing Central Time) |
| Deadline to Object to Confirmation of Plan | April 26, 2021 at 4:00 p.m. (prevailing Central Time) |
| Deadline to File (i) Reply to Plan Objection(s) and (ii) Brief in Support of Plan Confirmation | May 3, 2021 |
| Confirmation Hearing | May 4, 2021 at [ ] (prevailing Central Time), subject to the Bankruptcy Court's schedule |

### M. *Inquiries*

If you have any questions about the packet of materials you have received, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at (855) 631-5346 (toll free from the United States or Canada) or +1 (917) 460-0913 (international). Additional copies of the Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address:

Fieldwood Energy LLC Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
New York, NY 10165

Copies of the Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.primeclerk.com/FieldwoodEnergy/. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## II.
## SUMMARY OF PLAN TREATMENT

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. The Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes will be treated as set forth in Section 3.6 of the Plan.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount | Approx. Percentage Recovery |
|---|---|---|---|---|
| 1 (Other Secured Claims) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Post-Effective Date Debtors, such holder shall receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code, including by providing such holder with the "indubitable equivalent" of their Allowed Other Secured Claim (which, for the avoidance of doubt, may be in the form of a multi-year promissory note or other financial instrument); *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. | Impaired **(Entitled** to vote) | $4.2 million - $9.5 million | 100% |
| 2 (Priority Non-Tax Claims) | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall, at the option of the Debtors or the Post-Effective Date Debtors (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; *provided,* that any Allowed Priority Non-Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. | Unimpaired **(Not entitled** to vote because presumed to accept) | $0 – $500,000 | 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount | Approx. Percentage Recovery |
|---|---|---|---|---|
| 3 (FLFO Claims)[17] | Except to the extent that a holder of an Allowed FLFO Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of such Allowed FLFO Claim, (a) each holder of an Allowed FLFO Claim shall receive its Pro Rata Share of the FLFO Distribution Amount and (b) all remaining Allowed FLFO Claims shall be assumed by the NewCo Entities as modified to the extent set forth in the First Lien Exit Facility Documents. The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility. | Impaired **(Entitled** to vote) | $138,599,082.31 | 100% |
| 4 (FLTL Claims) | Except to the extent that a holder of an Allowed FLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed FLTL Claim and in consideration for the Credit Bid Transaction, each holder of an Allowed FLTL Claim shall receive its Pro Rata Share of:<br>(i) 100% of the New Equity Interests, subject to dilution by (w) the Backstop Commitment Equity Premium Interests, (x) the New Equity Interests issued upon exercise of the Subscription Rights, (y) any New Equity Interests issued upon the exercise of the New Money Warrants, SLTL Warrants, or the GUC Warrants, and (z) any New Equity Interests issued pursuant to the Management Incentive Plan; and<br>(ii) the FLTL Subscription Rights. | Impaired **(Entitled** to vote) | $1,142,688,815.28 [16][17] | 44.7% -45.4% |

---

[17] As of the date hereof, the Prepetition FLFO Administrative Agent and the Prepetition FLFO Lenders have not accepted or agreed to the terms or provisions of the Plan or any transaction contemplated by the Plan. All of the Prepetition FLFO Administrative Agent's and the Prepetition FLFO Lenders' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Plan. The filing of the Plan by the Debtors does not and shall not constitute or imply the Prepetition FLFO Administrative Agent's or the Prepetition FLFO Lenders' consent to any term or provision of the Plan. All of the Debtors' rights with respect to such amendments and modifications are reserved. For the avoidance of doubt, the filing of the Plan does not in any way affect the ongoing consent rights of the DIP Lenders, the Consenting FLTL Lenders, Apache, and the Debtors under the Restructuring Support Agreement.

[16] $1,142,688,815.28 is the principal amount of the Allowed FLTL Claims. In addition, as of the Petition Date, $39,370,574.84 of accrued but unpaid interest or fees were due and owing under the Prepetition FLTL Credit Agreement.

[17] $1,142,688,815.28 is the principal amount of the Allowed FLTL Claims. In addition, as of the Petition Date, $39,370,574.84 of accrued but unpaid interest or fees were due and owing under the Prepetition FLTL Credit Agreement.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount | Approx. Percentage Recovery |
|---|---|---|---|---|
| 5 (SLTL Claims) | Except to the extent that a holder of an Allowed SLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed SLTL Claim, each holder of an Allowed SLTL Claim shall receive its Pro Rata Share of:<br>(i) the SLTL Warrants; and<br>(ii) the SLTL Subscription Rights. | Impaired<br><br>(**Entitled** to vote) | $517,500,000.00[19][18] | 16.7% -35.4% |
| 6A (Unsecured Trade Claims) | Except to the extent that a holder of an Allowed Unsecured Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed Unsecured Trade Claim, each holder of an Allowed Unsecured Trade Claim that has executed a Trade Agreement shall receive:<br>(i) if 14% of the aggregate amount of all Allowed Unsecured Trade Claims is less than or equal to $8,000,000, Cash in an amount equal to 14% of the Allowed amount of such holder's Allowed Unsecured Trade Claim; or<br>(ii) if 14% of the aggregate amount of Allowed Unsecured Trade Claims is greater than $8,000,000, its Pro Rata share of $8,000,000. | Impaired<br><br>(**Entitled** to vote) | $43.2 million - $51.9 million | 14% |
| 6B (General Unsecured Claims) | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or after the Effective Date, in full and final satisfaction of and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such holder's Allowed General Unsecured Claim, its Pro Rata Share of:<br>(i) the GUC Warrants; and<br>(ii) any Residual Distributable Value. | Impaired<br><br>(**Entitled** to vote) | $963 million - $1,138 million | 0.8% - 14.3% |
| 7 (Intercompany Claims) | On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Post-Effective Date Debtors' discretion. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | N/A | 0% - 100% |

---

[19][18] $517,500,000.00 is the principal amount of the Allowed SLTL Claims. In addition, as of the Petition Date, $26,073,707.75 of accrued but unpaid interest or fees were due and owing under the Prepetition SLTL Credit Agreement.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount | Approx. Percentage Recovery |
|---|---|---|---|---|
| 8 (Subordinated Securities Claims) | All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims. | Impaired<br><br>(**Not entitled** to vote because deemed to reject) | $0 | 0% |
| 9 (Intercompany Interests) | On the Effective Date, all Intercompany Interests, in the Debtors' or the Post-Effective Date Debtors' discretion, shall be adjusted, reinstated, cancelled, or discharged in the Debtors' or Post-Effective Date Debtors' discretion. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | N/A | 0% - 100% |
| 10 (Existing Equity Interests) | On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect. | Impaired<br><br>(**Not entitled** to vote because deemed to reject) | N/A | 0% |

## III.
## OVERVIEW OF DEBTORS

### A. *General Overview*

The Company is one of the largest oil and gas exploration and production companies in the Gulf of Mexico (the "**GOM**"). Its portfolio of properties includes both deepwater assets and shallow water assets in the GOM. The majority of the Company's shallow water assets were acquired in 2013 when the Company purchased the Legacy Apache Properties from Apache. The Company's other shallow water assets were acquired through multiple other subsequent transactions including its 2014 acquisition of certain subsidiaries of SandRidge Energy, Inc. comprising its Gulf Coast division (the shallow water "**Non-Apache Properties**" and, together with the shallow water Legacy Apache Properties, the "**Shelf Assets**"). The Company subsequently acquired a number of deepwater assets in 2018 when it purchased Noble Energy, Inc.'s deepwater business (the "**Noble Properties**") as part of its previous chapter 11 case discussed below. Since 2018, the Company has acquired additional interests in its Noble Properties and additional deepwater assets to further diversify and complement its portfolio of properties (together with the Noble Properties, the "**Deepwater Assets**").

Despite the Company's strategic growth plans and diversified mix of properties, the Company's liquidity profile has become volatile in recent years, primarily as a result of (i) the precipitous decline in crude oil prices starting in 2014 and then again in 2020 and (ii) more recently, the effects of the COVID-19 pandemic. These adverse market conditions first led the

Company to restructure its balance sheet pursuant to prepackaged chapter 11 cases commenced in February of 2018 – *In re Fieldwood Energy LLC*, Case No. 18-30649 (DRJ) (the "**2018 Restructuring**").  In April 2018, the Bankruptcy Court entered an order confirming the Company's plan of reorganization, pursuant to which the Company reduced its funded debt obligations by more than $1.6 billion and acquired the Noble Properties.  Since the 2018 Restructuring, however, worsening market conditions coupled with significant decommissioning costs related to its Shelf Assets have resulted in reduced liquidity for the Company.

### B. *Debtors' Corporate History and Structure*

### 1. Corporate History

FWE was established in December 2012 as a portfolio company of certain energy funds of Riverstone Holdings LLC, a private energy and power-focused investment firm.  The Company operates an energy business focused on the acquisition, development, exploration, and production of oil and natural gas properties.  The Company's oil and natural gas assets consist primarily of producing oil and natural gas properties located primarily offshore in the GOM.  FWE was initially capitalized in September 2013 in connection with the acquisition of shallow water assets from Apache.[20][19]  In early 2014, the Company completed an acquisition of certain GOM assets from SandRidge Energy, Inc.[21][20]  In connection with the 2018 Restructuring, the Company acquired the deepwater Noble Properties.  Since 2018, the Company has grown its deepwater asset base through opportunistic acquisitions of additional deepwater assets and through a strategic exploration and development program by drilling and completing five deepwater wells near facilities that FWE either owns, operates, or to which is has a contractual right to flow-back.  The combination of FWE's shallow water and deepwater properties makes it one of the largest oil and gas exploration and production companies in the GOM by leasehold and operated production.

The following map illustrates the locations of the Debtors' oil and natural gas properties as of the Petition Date:

---

[20][19] Debtor GOM Shelf LLC and FW GOM Pipeline, Inc. were also acquired in this acquisition.

[21][20] The following Debtors were acquired in this transaction:  Dynamic Offshore Resources NS, LLC, Fieldwood Energy Offshore LLC, Fieldwood Onshore LLC, Fieldwood SD Offshore LLC, Bandon Oil and Gas GP, LLC, Bandon Oil and Gas, LP, Fieldwood Energy SP LLC, Galveston Bay Pipeline LLC, and Galveston Bay Processing LLC.



As of the Petition Date, the Debtors had over 300 operated platforms spread across more than 1.5 million gross acres. The Debtors employ over 600 employees across their offices in Houston, Lafayette, and offshore. In addition, the Debtors have approximately 500 additional contractor personnel on their facilities on a daily basis. The Debtors maintain operational control over greater than 95% of their diversified asset base. During the first three months of 2020, the Debtors have produced, on average, 79,410 barrels of oil equivalent per day. In a typical year, the Debtors spend significant sums on helicopters, drilling rigs, and various marine vessels to support operations, including support for producing fields, workovers, recompletions, ongoing maintenance, drilling, and decommissioning activities.

Additionally, as one of the largest facility and well owners in the GOM, the Debtors have an extensive well plugging and abandonment ("**P&A**") and decommissioning programs. In recent years, the Company has maintained a robust staff specifically dedicated to managing P&A and decommissioning operations. The Company has performed a significant amount of well-P&A work in-house using Company-owned spreads and specialized employees.

The Company prides itself on being an industry leader in establishing vigorous systems to manage its risk associated with offshore GOM operations effectively and is committed to maintaining safe and efficient operations, with the paramount goal of protecting personnel, the environment, and its facilities. To mitigate risk and support the Company's daily operations, the Company maintains a multi-tier insurance program. The Company's current energy package policy includes insurance coverage for pollution as well as third-party pollution liabilities, control of well, and property damage from operational and windstorm risk. In addition, the Company requires each of its contractors working on its facilities to maintain insurance coverage appropriate for the services provided by the contractor and for the contractor to name the Company as an additional insured under its insurance policies. The Company also requires each contractor to provide contractual indemnification to the Company for bodily injury and property damage arising out of the contractor's operations.

(a)     Regulation of Debtors' Business and Decommissioning Obligations

The Debtors are subject to the local, state, and federal laws and regulations in the jurisdictions where they operate. The laws and regulations that impact the Debtors' operations

include those relating to the operation of wells and facilities (including platforms, pipelines, and gathering or processing units), environmental protection, health and safety, and oil and natural gas exploration and development.

The Company's operations in the GOM include a substantial number of oil and gas leases situated in federal waters and issued by the U.S. Department of the Interior. Specifically, the Company owns an interest in over 350 oil, gas, and mineral leases ("**Oil and Gas Leases**"), and is party to hundreds of joint operating agreements, unitization agreements, and farm-out agreements governing operations of the Oil and Gas Leases. Of their Oil and Gas Leases, almost all are offshore leases granted by BOEM or its predecessor entity. Operation of the Oil and Gas Leases in the GOM is subject to regulation by BOEM and BSEE (as well as other federal agencies including the Environmental Protection Agency and the United States Coast Guard) and requires compliance with the regulations of these agencies and other federal regulations and orders issued pursuant to various federal laws, including the Outer Continental Shelf Lands Act. For offshore operations, lessees must obtain BOEM approval for exploration, development, and production plans before the commencement of such operations. In addition to permits required from other agencies such as the U.S. Environmental Protection Agency, lessees must obtain a permit from BSEE before commencing drilling and must comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, well containment, P&A, and removal of infrastructure facilities. The Company has some operations in Texas and Louisiana; those operations are subject to regulation by various state regulators.

(b)     <u>Obligations to the United States Government</u>

To cover the various obligations of lessees and operators, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production on a lease, BOEM may require that lessees post surety bonds or other acceptable financial assurances that such obligations will be met. As of the Petition Date, the Debtors have obtained approximately $175 million in surety bonds for the benefit of BOEM to secure various of the Debtors' P&A Obligations.

(c)     <u>Obligations to Third Parties</u>

Pursuant to BSEE regulations, the Company is jointly and severally liable for P&A obligations with all current and prior owners in the chain of title for all P&A liability that was accrued during the prior and current owners' ownership period. Therefore, in connection with many of its acquisitions of oil and gas properties, the Company has entered into various arrangements with the sellers that establish how the decommissioning of the subject oil and gas properties will be addressed in compliance with BOEM and BSEE regulations, including (as discussed below) with Apache.

<u>Obligations to Third Parties Excluding Apache</u>. As stated, the Debtors have entered into various arrangements with third parties concerning P&A Obligations assumed or that may arise during the Debtors' ownership of any acquired assets. In connection with the P&A Obligations owed to third parties (other than Apache), the Debtors have obtained approximately $494 million

in surety bonds and maintain less than $10 million in escrow deposits, in each case for the benefit of such third parties.

Obligations to Apache.  As explained above, the Company, in 2013, purchased the Legacy Apache Properties from Apache and agreed to assume decommissioning liabilities for certain properties that Apache previously owned and operated (the Legacy Apache Properties together with the previously owned and operated properties, the "**Apache Properties**").  The Debtors' decommissioning obligations owed to Apache with respect to the Apache Properties is governed by the provisions of the Decommissioning Agreement.

Under the Decommissioning Agreement, the Debtors must spend a minimum amount ($80 million through 2022) each year on decommissioning the Apache Properties or fund any shortfall into a decommissioning trust for which Apache holds a beneficial interest (the "**Trust A**").  If the Company fails to perform the decommissioning required by the government, Apache may perform the decommissioning itself and seek reimbursement from the Company.  If the Debtors fail to reimburse Apache, then Apache may then seek reimbursement first from proceeds held in Trust A and then from certain letters of credit or surety bonds issued for its benefit and described below.  Any amounts collected by Apache under the letters of credit or surety bonds, but not used for reimbursement for Apache decommissioning work, are required to be deposited into Trust A.

Under the Decommissioning Agreement and related documents, as amended in connection with the 2018 Restructuring, the Company has provided Apache with the following security and credit support relating to decommissioning of the Apache Properties:

- Approximately $498 million in letters of credit, provided that the Company has the right to replace up to $150 million of letters of credit with an equivalent amount of surety bonds in form and substance acceptable to Apache, which the Debtors have exercised;

- The conveyance of net profits interests into Trust A; and

- A first-priority springing lien on the assets of Trust A upon certain conditions being fulfilled, including the condition that the NPIs are recharacterized by the Bankruptcy Court.

Each month, the Debtors are obligated to deposit certain of the net profits generated by certain of the Apache Properties into Trust A.  Certain funds in Trust A may be reimbursed to the Debtors if the Company certifies that the required minimum spend on decommissioning will be performed in the applicable year, and other funds in Trust A continue to accrue until the amounts therein equal approximately $300 million.  As the Company decommissions the Apache Properties, funds in Trust A and the amount of the letters of credit or surety bonds may be reduced if they together exceed 125% of the Debtors' remaining decommissioning liabilities under the Decommissioning Agreement.  Under FWE's decommissioning program, the Company has performed approximately $1.4 billion of decommissioning work, and has plugged and abandoned over 1,100 wells, 400 pipelines, and 380 platforms and other facilities through year-end 2019.

In connection with the 2018 Restructuring, the Debtors and Apache amended the Decommissioning Agreement to its current form. Under the Apache Term Sheet, all of the Debtors' obligations under the Decommissioning Agreement will continue with FWE I.

        (d)     <u>2018 Restructuring</u>

On February 15, 2018, the Debtors commenced the 2018 Restructuring in the Bankruptcy Court. Pursuant to a pre-packaged plan of reorganization (the "**2018 Plan**"), the Debtors reduced their total funded debt from approximately $3.3 billion to $1.7 billion and reduced the Company's annual debt service obligations by up to $128 million.

Additionally, pursuant to the 2018 Plan, the Company acquired the deepwater Noble Properties for a purchase price of approximately $480 million, before customary adjustments. The Noble Properties have increased the Company's base of cash-flow positive assets meaningfully and have provided accretive value to the Debtors through operational efficiencies and synergies with the Debtors' existing assets. The Company's purchase of the Noble Properties was funded by a portion of the proceeds from an equity rights offering to certain of the Company's then-second lien lenders (the "**2018 Rights Offering**").

        (e)     <u>Other Matters</u>

FWE is the indirect owner of economic interests in approximately 10% of Fieldwood Mexico, with the remaining 90% owned primarily by Riverstone V FW Holdings, LLC and its affiliates. Fieldwood Mexico is not a debtor in these Chapter 11 Cases. Fieldwood Mexico is the designated operator of the undeveloped Ichalkil and Pokoch fields in Mexico and splits all costs and profits equally with its Mexican partner, PetroBal, S.A.P.I. de C.V. FWE manages Fieldwood Mexico and provides technical and administrative services to Fieldwood Mexico pursuant to various service agreements on arm's-length terms.

## 2.     Debtors' Corporate and Governance Structure

FWE Parent is approximately 49% owned by Riverstone Holdings LLC and certain of its affiliates, approximately 49.5% owned by its previous lenders and participants of the 2018 Rights Offering, and approximately 1.5% owned by employees through settlements of restricted stock units issued under a management incentive plan. Collectively, the Debtors consist of 14 entities registered under the laws of Delaware, Texas, and Louisiana. The Debtors also own two wholly-owned, non-debtor, domestic affiliates formed in Delaware and a wholly-owned, non-debtor, non-domestic affiliate formed in the Netherlands. A chart illustrating the Debtors' organizational structure as of the Petition Date is annexed hereto as **Exhibit K**.

All of the other Debtors are wholly-owned, direct or indirect subsidiaries of FWE Parent. FWE Parent's Board of Directors (the "**Board**") functions as the Debtors' governing board with respect to the decision-making underlying these Chapter 11 Cases. The Board has seven members. Before July 8, 2020, G.M. McCarroll served as Chairman of the Board. He was also the Debtors' President and Chief Executive Officer. G.M. McCarroll resigned his positions effective as of July 1, 2020 pursuant to a separation agreement with the Company and continues to provide transition services at the Board's direction under a consulting agreement. The Board thereafter resolved to create an Executive Leadership Team (the "**ELT**") in lieu of appointing an

individual to replace G.M. McCarroll as Chief Executive Officer. The Board has appointed Michael T. Dane (Senior Vice President and Chief Financial Officer), Thomas R. Lamme (Senior Vice President and General Counsel), and Gary D. Mitchell (Senior Vice President – Production) to serve on the ELT. In addition, the Board formed the Leadership Transition Committee (the "**LTC**") to oversee the ELT. Jim LaChance, an independent director, who joined the Board on July 8, 2020, is the sole member of the LTC.

Each Debtor other than FWE Parent is either a member-managed or manager-managed limited liability company or a corporation with a one-person or two-person board of directors, with the exception of one partnership entity that is managed by its general partner. FWE Parent's Board consists of the following seven directors:

| Name | Position |
|------|----------|
| Mark S. Boyadjian | Independent Director |
| Jason Dillow | Director |
| Bartow Jones | Director |
| Jim LaChance[21] | Independent Director |
| N. John Lancaster | Director |
| Jason Mudrick | Director |
| James H. Painter | Independent Director |

The Company has highly experienced managers for its operations. The Company's core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Michael T. Dane | Senior Vice President and Chief Financial Officer |
| Thomas R. Lamme | Senior Vice President, General Counsel, and Secretary |
| Gary D. Mitchell | Senior Vice President, Production |
| Gary Janik | Senior Vice President, Reservoir Engineering, Acquisitions and Mexico |
| John Seeger | Senior Vice President, Operations |
| John Smith | Senior Vice President, Business Development |

### C. *Equity Ownership*

The following entities own, directly or indirectly, 10% or more of equity interests in FWE Parent:

a) Certain funds sponsored by, or affiliated with, Riverstone Holdings LLC collectively own approximately 49% of common stock in FWE Parent (the "**Common Stock**").

b) Certain funds sponsored by, or affiliated with, Bardin Hill Investment Partners LP collectively own approximately 12% of the Common Stock.

---

[21] Jim LaChance was appointed a director in July 2020. The terms of his engagement are governed by that certain *Independent Director Agreement*, dated July 12, 2020.

c)  Certain funds sponsored by, or affiliated with, Mudrick Capital Management LP collectively own approximately 11% of the Common Stock.

Each of the Debtors other than FWE Parent is directly or indirectly wholly-owned by FWE Parent.

### D.  *Prepetition Indebtedness*

Immediately before the Petition Date, the Debtors' funded prepetition indebtedness was approximately $1,800 million, consisting of the following:

| Facility | Maturity | Principal |
|---|---|---|
| Fieldwood - First Lien Debt Obligations | | |
| First Lien First Out Term Loans | 12/31/2021 | $139 million |
| First Lien Last Out Term Loans | 04/11/2022 | $1,143 million |
| Fieldwood - Second Lien Debt Obligations | | |
| Second Lien Term Loans | 04/11/2023 | $518 million |
| Total Funded Debt | | $1,800 million |

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.

### 1.  First Lien First Out Credit Agreement

Certain of the Debtors are parties to that certain *Second Amended and Restated Credit Agreement-First Out*, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified before the date hereof, the "**Prepetition FLFO Credit Agreement**") between FWE, as borrower, FWE Parent, as holdings, Goldman Sachs Bank USA, as administrative agent (the "**Prepetition FLFO Administrative Agent**"), Cantor Fitzgerald Securities ("**CFS**"), as collateral agent (in its capacity as such, the "**Prepetition FLFO Collateral Agent**"), and the Lenders (as defined therein) from time to time party thereto (the "**Prepetition FLFO Lenders**").  The Prepetition FLFO Credit Agreement establishes (i) a term loan credit facility that matures on December 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (the "**Initial FLFO Term Loans**") are outstanding, (ii) a multi-draw term loan credit facility that matures on December, 31, 2021, pursuant to which an aggregate principal amount of approximately $50 million in term loans (together with the Initial FLFO Term Loans, the "**FLFO Term Loans**") are outstanding, and (iii) a revolving credit facility that matures on December 31, 2021, pursuant to which (a) an aggregate principal amount of approximately $17 million in revolving loans is outstanding and (b) a reimbursement obligation in favor of the Prepetition FLFO Administrative Agent with respect to approximately $22 million in drawn letters of credit is outstanding, plus, in each case, any applicable interest, fees, and other amounts.

Certain of the Debtors guaranteed the Obligations (as defined in the Prepetition FLFO Credit Agreement (the "**FLFO Obligations**")) of FWE pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018, among FWE, FWE Parent, certain other Debtors as guarantors (collectively, with FWE Parent, the "**FLFO Guarantors**") and the

FLFO Collateral Agent. In order to secure the FLFO Obligations and the guarantee provided with respect to the FLFO Obligations, each of FWE and the FLFO Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain *Second Amended and Restated Collateral Agreement*, dated as of June 28, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified before the date hereof, the "**FLFO Collateral Agreement**") among FWE, the FLFO Guarantors, the Prepetition FLFO Administrative Agent, and the Prepetition FLFO Collateral Agent. In addition to the liens and security interests granted pursuant to the Prepetition FLFO Collateral Agreement, FWE and certain of the FLFO Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLFO Credit Agreement, the "**FLFO Mortgages**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi, and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

### 2. First Lien Term Loan Agreement

Certain of the Debtors are parties to that certain *Amended and Restated First Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition FLTL Credit Agreement**"), among FWE, as borrower, FWE Parent, as holdings, the lenders from time to time party thereto (the "**Prepetition FLTL Lenders**" and, together with the Prepetition FLFO Lenders, the "**Prepetition First Lien Lenders**"), and Cantor Fitzgerald Securities, as administrative agent and collateral agent (the "**Prepetition FLTL Administrative Agent**" and, together with the Prepetition FLFO Administrative Agent and the Prepetition FLFO Collateral Agent, the "**Prepetition First Lien Agents**"). As of the Petition Date, the aggregate amount outstanding under the FLTL Credit Agreement was approximately $1,142,688,815.28, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors guaranteed the Obligations (as defined in the FLTL Credit Agreement (the "**FLTL Obligations**")) of FWE pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018, among FWE, FWE Parent, certain other Debtors as guarantors (collectively, with FWE Parent, the "**FLTL Guarantors**") and the FLTL Administrative Agent. In order to secure the FLTL Obligations and the guarantee provided with respect to the FLTL Obligations, each of FWE and the FLTL Guarantors granted, or confirmed their continuing grant of, a first priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified before the date hereof, the "**FLTL Collateral Agreement**", and, together with the FLFO Collateral Agreement, the "**First Lien Collateral Agreements**") among FWE, the FLTL Guarantors and the FLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the FLTL Collateral Agreement, FWE and certain of the FLTL Guarantors granted, or confirmed their continuing grant of, first priority Mortgages (as defined in the FLTL Credit Agreement and, together with the FLFO Mortgages, the "**First Lien Mortgages**", the First Lien Mortgages, together with the First Lien Collateral Agreements and any other "Security Documents" as defined in the Prepetition FLFO Credit Agreement and Prepetition FLTL Credit Agreement, respectively, the "**First Lien Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi, and Texas, and otherwise in jurisdictions where recordation

with BOEM was required. The security interest and lien securing the FLTL Obligations is *pari passu* with the security interest and lien securing the FLFO Obligations; however, pursuant to the terms of the Pari Passu Intercreditor Agreement (as defined below), any proceeds from the collateral securing the FLFO Obligations and the FLTL Obligations are required to be applied first towards the repayment of the FLFO Obligations and, thereafter, towards the repayment of the FLTL Obligations.

### 3. Second Lien Term Loan Agreement

Certain of the Debtors are parties to that certain *Amended and Restated Second Lien Credit Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition SLTL Credit Agreement**" and, together with the Prepetition FLFO Credit Agreement and Prepetition FLTL Credit Agreement, the "**Prepetition Credit Agreements**"), among FWE, as borrower, FWE Parent, as holdings, the lenders from time to time party thereto (the "**Prepetition SLTL Lenders**" and, together with the Prepetition First Lien Lenders, the "**Prepetition Lenders**"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (the "**Prepetition SLTL Administrative Agent**" and, together with the Prepetition First Lien Agents, the "**Prepetition Administrative Agents**"). As of the Petition Date, the aggregate amount outstanding under the Prepetition SLTL Credit Agreement was approximately $517,500,000, plus any unpaid interest, fees, premiums, or other amounts due thereunder (collectively, the "**SLTL Claims**").

Certain of the Debtors guaranteed the Obligations (as defined in the SLTL Credit Agreement (the "**SLTL Obligations**")) of FWE pursuant to that certain *Amended and Restated Guarantee Agreement*, dated as of April 11, 2018, among FWE, FWE Parent, certain other Debtors as guarantors (collectively, with FWE Parent, the "**SLTL Guarantors**") and the Prepetition SLTL Administrative Agent. In order to secure the SLTL Obligations and the guarantee provided with respect to the SLTL Obligations, each of FWE and the SLTL Guarantors granted, or confirmed their continuing grant of, a second priority security interest in, and lien upon, substantially all of their material personal property, subject to customary exceptions, pursuant to that certain Amended and Restated Collateral Agreement, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified before the date hereof, the "**SLTL Collateral Agreement**") among FWE, the SLTL Guarantors and the SLTL Administrative Agent, as collateral agent. In addition to the liens and security interests granted pursuant to the SLTL Collateral Agreement, FWE and certain of the SLTL Guarantors granted, or confirmed their continuing grant of, second priority Mortgages (as defined in the SLTL Credit Agreement, and, together with the First Lien Mortgages, the "**Mortgages**", the Mortgages, together with the First Lien Security Documents and any other "Security Documents" as defined in the SLTL Credit Agreement, the "**Security Documents**") on certain oil and gas properties located in Alabama, Louisiana, Mississippi, and Texas, and otherwise in jurisdictions where recordation with BOEM was required.

### 4. Intercreditor Agreements

The relative contractual rights of the Prepetition FLFO Lenders, on the one hand, and the Prepetition FLTL Lenders, on the other hand, are governed by that certain *Pari Passu Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and

restated, supplemented, or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**"). The Pari Passu Intercreditor Agreement controls the rights and obligations as among the holders of the FLFO Obligations (the "**Prepetition FLFO Secured Parties**"), the holders of the FLTL Obligations (together with the Prepetition FLFO Secured Parties, the "**Prepetition First Lien Credit Agreement Secured Parties**") and certain other providers of Secured Hedge Agreements (as defined in the Pari Passu Intercreditor Agreement) with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

The relative contractual rights of the Prepetition First Lien Credit Agreement Secured Parties, on the one hand, and holders of the SLTL Obligations (the "**Prepetition Second Lien Secured Parties**"), on the other hand, are governed by that certain *Intercreditor Agreement*, dated as of April 11, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Senior Intercreditor Agreement**"). The Senior Intercreditor Agreement controls the rights and obligations of the Prepetition First Lien Credit Agreement Secured Parties and the Prepetition Second Lien Secured Parties with respect to, among other things, priority of security over collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection.

5. **DB Receivables Facility**

Certain of the Debtors and a non-Debtor affiliate are parties to that certain *Master Receivables Purchase Agreement* dated as of December 23, 2019 among FWE, as originator, FW FinCo LLC, as seller, Deutsche Bank AG New York Branch, as administrative agent, Deutsche Bank Trust Company Americas, as a purchaser and the other purchasers party thereto (the "**DB Receivables Facility**"). As of the Petition Date, there were no amounts due and owing on the DB Receivables Facility. Subsequent to the Petition Date, the DB Receivables Facility terminated on its own terms.

6. **Surety Bonds**

Before the Petition Date, the Company had approximately $1.165 billion in surety bonds that it maintains to satisfy various contractual and regulatory requirements. As stated above, this includes approximately $177 million in surety bonds for the benefit of BOEM. This also includes $498 million in surety bonds and contracts similar to surety bonds, which either have been issued directly to Apache on the Company's behalf or have been issued to Deutsche Bank as collateral for an equal dollar amount of letters of credit that Deutsche Bank has issued to Apache on the Company's behalf.

7. **Unsecured Claims**

Further, in the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations. However, a significant number of the Debtors' prepetition trade obligations have been satisfied by the Debtors in accordance with first day relief granted by the Bankruptcy Court (as described below).

### 8. Intercompany Claims

In the ordinary course of business, intercompany transactions (collectively, "**Intercompany Transactions**," and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**") occur when, among other things, (i) FWE receives funds on behalf of Debtor and non-Debtor affiliates and managed entities (the "**Non-Debtor Affiliates**"), (ii) FWE makes payments and disbursements on behalf of Debtor and Non-Debtor Affiliates, and (iii) funds are transferred between and among the Debtors and the Non-Debtor Affiliates (primarily between FWE, Fieldwood Mexico, and SP 49 Pipeline LLC).

Debtor to Debtor Intercompany Transactions and Intercompany Claims are not generally settled by actual transfers of cash among the Debtors. Instead, the Debtors track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled. The accounting system requires that all general ledger entries be balanced at the legal-entity level and, therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet. This results in a net balance of zero when consolidating all intercompany accounts. Additional detail regarding Intercompany Transactions and Intercompany Claims is set forth in the Cash Management Motion (defined below).

## IV.
## KEY EVENTS LEADING TO
## COMMENCEMENT OF CHAPTER 11 CASES

The Company proactively took a number of steps before filing these Chapter 11 Cases in an effort to deleverage its balance sheet, bolster liquidity, address near-term interest payments, and maximize value for stakeholders. The Company, however, has continued to face a challenging commodity price environment, which has constrained its liquidity and affected operations. Ultimately, the precipitous decline in oil prices from the combined effect of the COVID-19 pandemic and general deterioration of commodity prices forced the Company to pursue restructuring transactions.

### A.  *Cost Reduction*

The Company commenced production shut-ins during late March 2020 in response to the deteriorating commodity price environment. Initially, twenty-nine (29) low-margin shelf fields were shut-in, resulting in a savings of approximately $5 million in monthly operating expenses. The Company, thereafter, commenced a broad shut-in during late April 2020 due to the continued oil price collapse. The Company effectively shut-in all operated production fields other than eight (8) dry gas fields and one shelf field. For deepwater assets, all properties except one non-operated field were shut-in from late April 2020 to June 2020. The Company was able to limit its operating expenses during the shut-in period.

In addition to the shut-ins, the Company has implemented other cost savings measures, such as a reduction in force, salary reductions for certain staff and contractors, including a 10%

salary cut for corporate employees earning more than $150,000 per year, elimination of the matching program under the 401(k) plan for employees, and stricter vendor management practices.

### B. *Vendor and Surety Issues*

As a result of the foregoing, before the Petition Date, several of the Company's vendors and surety providers took action, or threatened to take action, to secure payments of alleged amounts that are either due and owing or may become due and owing in the future. For example, in the months leading up to the Petition Date, the Company received numerous demands from several of its surety providers requesting that the Company either release them from their bonds, or, in the alternative, post collateral in the amounts of their unreleased bonds. In fact, after sending one or more demand letters, two sureties filed lawsuits against the Company. In one lawsuit, filed in the United States District Court for the Southern District of Texas (Houston Division), Travelers Casualty and Surety Company of America ("**Travelers**") alleges that defendants have breached certain obligations under an indemnity agreement and seeks, among other relief, an injunction requiring the defendants to either release Travelers from certain performance bonds or provide collateral to secure defendants' obligations under the indemnity agreements in the amount of $60,000,000. FWE is also a defendant in a lawsuit filed by Aspen American Insurance Company ("**Aspen**") in the District Court of Harris County, Texas. Aspen's complaint alleges FWE breached its contract with Aspen by failing to post collateral sufficient to protect Aspen in the event of claims being made under certain performance bonds issued by Aspen. Aspen seeks monetary damages as a result of the alleged breach. The Debtors have filed answers to both lawsuits, contesting (among other allegations) that they breached the indemnity agreements and that the surety providers are entitled to any equitable relief such as an injunction. Both lawsuits are currently stayed by the automatic stay.

### C. *Prepetition Restructuring Efforts*

Before filing these Chapter 11 Cases, the Company took several steps to attempt to address its capital structure and liquidity needs without a comprehensive in-court restructuring. Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service their outstanding debt on a go-forward basis and to maintain the liquidity necessary to operate their businesses and preserve long-term viability and enterprise value.

As a result, the Company determined that a restructuring transaction was necessary to position itself for long term success. The Debtors retained Weil, Gotshal & Manges LLP ("**Weil**"), as restructuring counsel, and Houlihan, as investment banker, to explore strategic alternatives and assist in developing and implementing a comprehensive plan to restructure its balance sheet. The Debtors also retained AlixPartners, LLP ("**AlixPartners**"), as financial advisor, to assist in preparing their operations for a potential chapter 11 restructuring as part of their contingency plan.

As discussions regarding a potential restructuring transaction progressed, it became necessary for the Company to seek forbearances under its Credit Agreements to provide additional time for negotiations over potential restructuring transactions to develop. On May 7, 2020, the Company entered into certain *Temporary Limited Forbearance and Amendment*

agreements (collectively, the "**TLF Agreements**") with consenting lenders for each Prepetition Credit Agreement (collectively, the "**TLF Consenting Lenders**"). The TLF Agreements required the TLF Consenting Lenders to forbear from exercising their respective rights and remedies under the Credit Agreements with respect to certain defaults by the Company under the various Credit Agreements. Among the defaults were the Company's failure to deliver a Conforming Audit Opinion (as defined under the TLF Agreements) to the FLFO Administrative Agent, the Company's failure to satisfy its reimbursement obligations with respect to payment under a certain letter of credit in accordance with the FLFO Credit Agreement, and the Company's failure to make certain interest payments under the Credit Agreements, including interest payments that became due on April 30, 2020 in the amount of approximately $1.3 million under the FLFO Credit Agreement, $20 million under the FLTL Credit Agreement, and $11.7 million under the SLTL Credit Agreement.

As part of the TLF Consenting Lenders' agreement to forbear from exercising their contractual rights with respect to defaults under the Credit Agreements, the TLF Consenting Lenders and the Company agreed to certain forbearance milestones. The milestones were intended to help facilitate negotiations to ensure continued progress toward a potential restructuring transaction. The milestones included, among other things, the Company's requirement to deliver to the TLF Consenting Lenders, and/or their agents or advisors by dates certain, a strategic monthly operating plan, a comprehensive restructuring term sheet, a 13-week consolidated weekly cash flow forecast, and a DIP budget.

Thereafter, the Company and TLF Consenting Lenders executed four amendments to the TLF Agreements, including to extend the forbearance periods thereunder, with the most recent amendments extending the forbearance periods to July 31, 2020. The forbearance periods were further extended by email leading up to the Petition Date.

During the months leading up to the Petition Date, the Company worked alongside its lenders and other stakeholders to formulate strategic alternatives. These efforts culminated in an agreement with Apache on the framework for a restructuring with respect to the Legacy Apache Properties. The framework is memorialized in the Apache Term Sheet, executed on July 31, 2020. The Apache Term Sheet is attached as **Exhibit B** to the Restructuring Term Sheet, which is annexed to **Exhibit A** of the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 29] (the "**First Day Declaration**"). A summary of the Apache Term Sheet is set forth in paragraphs 8-11 of the First Day Declaration. As explained above, given that the P&A Obligations related to the Legacy Apache Properties are among the Company's most significant liabilities, the terms set forth under the Apache Term Sheet form the cornerstone of the Debtors' restructuring and provide a resolution for one of the Debtors' most significant liabilities.

After extensive negotiations, the Company reached an agreement with Apache and the Ad Hoc Group of Secured Lenders on the Restructuring Term Sheet and the RSA, both of which further refined the terms of the Debtors' reorganization. The RSA, which was executed on August 4, 2020, is attached to the First Day Declaration as **Exhibit A**, with the Restructuring Term Sheet attached thereto as **Exhibit A**. A summary of the Restructuring Term Sheet and RSA is set forth in paragraphs 12-13 of the First Day Declaration. With the framework for the Debtors' restructuring in place, the Debtors filed for chapter 11.

# V.
# OVERVIEW OF CHAPTER 11 CASES

### A.  *Commencement of Chapter 11 Cases and First Day Motions*

On August 3, 2020 and August 4, 2020, the Debtors commenced their Chapter 11 Cases. The Debtors continue managing their properties and operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.  *First Day Motions*

On August 4, 2020, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Restrict certain transfers of equity interests in the Debtors (the "**NOL Motion**") [Docket Nos. 50, 327];

- Pay certain prepetition taxes and assessments [Docket No. 60];

- Continue paying employee wages and benefits [Docket No. 51];

- Continue insurance and surety bond programs (the "**Insurance Motion**") [Docket Nos. 152, 340];

- Obtain postpetition financing and use of cash collateral (the "**DIP Motion**") [Docket Nos. 58, 346];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms (the "**Cash Management Motion**") [Docket Nos. 49, 341];

- Pay certain prepetition interest owner obligations, joint interest billings, and operating expenses (the "**JIB/Critical Vendor Motion**") [Docket Nos. 62, 342]; and

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 61].

### C.  *Procedural Motions and Retention of Professionals*

The Debtors have filed various motions regarding procedural issues that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases.  The Bankruptcy Court granted substantially all of the relief request in such motions and entered various orders authorizing the Debtors to, among other things:

38

- Jointly administer the Debtors' estates [Docket No. 17];

- File a consolidated creditor matrix and list of 30 largest unsecured creditors and modify the requirement to file a list of equity security holders [Docket No. 57];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 367];

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 293];

- Extend the deadline to remove civil actions [Docket No. 631];

- Extend the deadline to file Bankruptcy Rule 2015.3 reports [Docket No. 638]; and

- Extend the deadline to assume or reject unexpired leases of nonresidential real property [Docket No. 712].

The Debtors filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include (i) AlixPartners; (ii) Houlihan, as investment banker; (iii) Weil, as counsel to the Debtors; (iv) Jones Walker LLP; (v) Ryan LLC; and (vi) Prime Clerk LLC, as claims, noticing, and solicitation agent. The Bankruptcy Court has entered orders authorizing the retention of certain of these professionals [Docket Nos. 412 (AlixPartners), 530 (Houlihan), 355 (Weil), 411 (Jones Walker), 1014 (Ryan LLC), and 19 (Prime Clerk)]. The Debtors reserve the right to seek and retain additional professionals. As of the date hereof, 29 professionals utilized in the ordinary course filed declarations regarding their retention by the Debtors.

### D.  *Appointment of Creditors' Committee*

On August 18, 2020, the Creditors' Committee was appointed by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases [Docket No. 183]. The original members of the Creditors' Committee included (i) Oceaneering International, Inc.; (ii) Subsea 7 US LLC; (iii) Halliburton Energy Services, Inc.; (iv) TETRA Technologies, Inc.; and (v) Workstrings International, L.L.C. The Creditors' Committee has retained Stroock & Stroock & Lavan LLP ("**Stroock**") and Pachulski Stang Ziehl & Jones LLP ("**Pachulski**") as co-counsel[2322], and Conway MacKenzie, LLC ("**Conway**") as its financial advisor. The Bankruptcy Court entered orders authorizing the Creditors' Committee's retention of such professionals [Docket Nos. 471 (Stroock), 472 (Conway), and 1044 (Pachulski)]. The Creditors Committee is currently comprised of: (i) Sea Robin Pipeline, LLC, (ii) Aggreko, LLC, and (iii) Partco, LLC.

---

[2322] On February 19, 2021, the Creditors' Committee filed the *Application for Approval of the Employment of Pachulski Stang Ziehl & Jones LLP as Co-Counsel to the Official Committee of Unsecured Creditors, Effective as of January 20, 2021* [Docket No. 894] to retain Pachulski as its counsel, in place of Cole Schotz P.C.

### E. Postpetition Hedging Agreements and Treatment of Hedging Obligations Under the Plan

On August 18, 2020, the Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) Enter into and Perform Under New Postpetition Hedging Agreements, and (B) Grant Related Liens and Superpriority Claims, and (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 185] (the "**Hedging Motion**"). On August 24, 2020, the Bankruptcy Court entered the *Emergency Order (I) Authorizing Debtors to (A) Enter into and Perform Under New Postpetition Hedging Agreements and (B) Grant Related Liens and Superpriority Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* [Docket No. 242] (the "**Hedging Order**").

Pursuant to the Hedging Order, the Debtors have entered into and performed under new financial derivative transactions pursuant to contracts (the "**Postpetition Hedging Agreements**" and the claims arising thereunder, the "**Hedging Obligations**") in the ordinary course of business. In accordance with the DIP Order and Hedging Order, the Debtors have secured and otherwise ensured payment of the Hedging Obligations by providing the hedging counterparties: (a) superpriority administrative claims on account of the Hedging Obligations under section 364(c)(1) of the Bankruptcy Code, which are *pari passu* with the DIP Obligations (as defined in the DIP Order) provided under the DIP Order, and (b) first-priority liens in the DIP Collateral which are *pari passu* with the DIP Liens.

Pursuant to Section 2.7 of the Plan, on (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day on which the Allowed Postpetition Hedge Claim becomes due and owing in accordance with the terms of and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities, each holder of an Allowed Postpetition Hedge Claim shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Postpetition Hedge Claim will have agreed upon in writing; *provided*, that any Allowed Postpetition Hedge Claim assumed by the Credit Bid Purchaser in accordance with the foregoing clause (y) pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. Nothing herein shall modify any of the contractual rights under a Postpetition Hedging Agreement of a holder of an Allowed Postpetition Hedge Claim in their capacity as a holder of an Allowed Postpetition Hedge Claim.

### F. Final Hearing on Vendor, Insurance, Cash Management, and DIP Motion

On August 22, 2020, the Bankruptcy Court entered the *Order Continuing the Hearing on the Motions* [Docket No. 221], which continued the hearing on the Insurance Motion, Cash Management Motion, JIB/Critical Vendor Motion, NOL Motion, and DIP Motion to consider granting the requested relief on a final basis for August 24, 2020 to September 14, 2020 (the

"**Final Hearing**"). On September 11, 2020, the Bankruptcy Court entered a final order on the NOL Motion [Docket No. 327].

Before the Final Hearing, eight parties objected or joined in objections to the Insurance Motion, Cash Management Motion, and JIB Critical Vendor Motion [Docket Nos. 189, 311, 196, 197, 212, 284, 306, 308]. The Debtors filed revised proposed orders reflecting changes made by the Debtors to resolve these objections [Docket Nos. 332, 338, 337], which the Bankruptcy Court entered on a final basis at the Final Hearing [Docket Nos. 340, 341, 342].

Seventeen parties objected or joined in objections to the DIP Motion [Docket Nos. 188, 192, 196, 200, 201, 202, 203, 205, 206, 211, 212, 213, 216, 218, 222, 230, 284]. Following the Final Hearing, the Debtors filed a revised proposed order reflecting changes made by the Debtors to (i) resolve objections raised by various parties in interest and (ii) address comments raised by the Bankruptcy Court at the Final Hearing [Docket No. 344], which the Bankruptcy Court entered on a final basis on September 15, 2020 (the "**DIP Order**") [Docket No. 346]. The DIP Order authorized the Debtors to obtain the DIP Facility, a multiple-draw senior secured term loan facility in a principal amount not to exceed $100 million. On the closing date, the Debtors borrowed an aggregate principal amount equal to $10 million under the DIP Facility. To date, the Debtors have not made any additional draws under the DIP Facility.

### G. The Creditors' Committee's Challenge Rights

Pursuant to the DIP Order, the Creditors' Committee was provided the right to challenge certain stipulations made by the Debtors in the DIP Order regarding, among other things, the validity, perfection, and priority of certain pre-petition liens, "by no later than (i) 75 days after enter of this Final Order, (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph" (the "**Challenge Period**"). On November 25, 2020, the Court entered the *Stipulation and Agreed Order Extending the Official Committee of Unsecured Creditors' Challenge Period Under the Final DIP Order* [Docket No. 603], which extended the Challenge Period to December 18, 2020.

The Committee investigated the validity of the secured lenders' liens and the other items subject to the Challenge Period, and ultimately concluded that certain unencumbered assets existed, which conclusion was disputed by the Debtors and DIP Lenders. On December 21, 2020, the Court entered the *Stipulation and Agreed Order by and Among the Debtors, the Prepetition Agents and the Official Committee of Unsecured Creditors Extending the Challenge Period as to Preserved Claims* [Docket No. 680], further extending the Challenge Period until February 8, 2021 with respect to certain assets that the Creditors' Committee determined are not subject to valid pre-petition liens and do not constitute pre-petition collateral. The parties subsequently entered into additional stipulations further extending the Challenge Period, while the Creditors' Committee, Debtors and Consenting Creditors engaged in negotiations concerning treatment of unsecured creditors' Claims under the Plan. In light of the settlement in principle discussed above, the parties anticipate further extending the Challenge Period and that the Creditors' Committee will waive all challenges upon approval of the settlement and confirmation of the Plan as of the Effective Date.

### H. *Statements and Schedules, and Claims Bar Dates*

On October 14, 2020, the Bankruptcy Court entered an order approving (i) November 25, 2020 as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**"); and (ii) February 1, 2021 as the deadline for all governmental units to file a proof of Claim [Docket No. 466].

The Debtors provided notice of the Bar Date to all known creditors and parties in interest, and published notice of the Bar Date in the national edition of the *New York Times*.

On October 13, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs detailing known Claims against the Debtors. [Docket Nos. 429-456]. Further, as of the date hereof, over 882 proofs of Claim had been filed against the Debtors. The Debtors continue to review and refine their analysis of the filed Claims.

Further, the Debtors intend to reject certain executory contracts pursuant to the Plan. Any counterparty to an executory contract that is rejected must file and serve a proof of Claim on the applicable Debtor that is party to the applicable executory contract to be rejected by no later than the applicable bar date set forth in the Plan or the Bankruptcy Court order governing such rejection.

### I. *Extension of Debtors' Exclusivity*

On December 1, 2020, the Debtors filed a motion seeking to extend the exclusive periods pursuant to section 1121(d) of the Bankruptcy Code (the "**Exclusivity Motion**") [Docket No. 625].

On January 4, 2021, the Bankruptcy Court held a hearing on the Exclusivity Motion. On January 8, 2021, the Bankruptcy Court entered the *Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusive Period* [Docket No. 751] (the "**Exclusivity Order**"), pursuant to which the Debtors' exclusive period in which to file a chapter 11 plan was extended from December 1, 2020, through and including March 1, 2021 and the Debtors' exclusive period in which to solicit acceptances of its chapter 11 plan was extended from January 30, 2021, through and including April 30, 2021. In addition, the Bankruptcy Court established procedures under the Exclusivity Order to provide the Company's surety providers the option to commence an expedited adversary proceeding on or before January 20, 2021 requesting that the Bankruptcy Court determine whether the surety providers hold administrative expense claims pursuant to section 503(b) of the Bankruptcy Code against any of the Debtors for surety bond premiums on account of surety bonds that were issued prior to the Petition Date. No surety providers filed such an adversary proceeding.

On March 1, 2021, the Debtors filed a motion seeking a further extension of the exclusive periods for filing a chapter 11 plan and soliciting a chapter 11 through May 31, 2021 and July 29, 2021 [Docket No. 930].

### J. ***Motion to Approve Second Lien Backstop Commitment Letter***

As described above, the Credit Bid Purchaser's capital structure will consist of (i) the First Lien Exit Facility and (ii) an up to $185 million Second Lien Exit Facility, which includes a New Money Investment of up to $85 million.

In order to ensure the commitments under the Second Lien Exit Facility, including the New Money Investment, the Debtors have agreed to enter into the a backstop commitment letter (the "**Second Lien Backstop Commitment Letter**") to be entered into by and among the Debtors, the Credit Bid Purchaser, NewCo, and the entities listed on Schedule I thereto (collectively, the "**Second Lien Backstop Parties**" and each individually, a "**Second Lien Backstop Party**"). Pursuant to the Second Lien Backstop Commitment Letter, the Second Lien Exit Facility will be fully backstopped by the Second Lien Backstop Parties pursuant to the terms thereof, resulting in an aggregate commitment of $185 million (the "**Aggregate Commitment**"). The terms of the Second Lien Backstop Commitment Letter ensure that the Credit Bid Purchaser has a source of necessary new capital committed to fund its initial capital needs and consummate the Credit Bid Transaction.

In exchange for the commitments and obligations of the Second Lien Backstop Parties under the Second Lien Backstop Commitment Letter, each Second Lien Backstop Party will be entitled to, among other things: (i) its *pro rata* share of a backstop commitment premium equal to $14.8 million, representing 8% of the amount of the Aggregate Commitment, to be paid by NewCo in the form of New Equity Interests in NewCo at a discount of 30% to equity value (the "**Second Lien Backstop Commitment Premium**"); (ii) its New Money Second Lien Term Loans Allocation Percentage of warrants for up to 24% of the New Equity Interests in NewCo (the "**New Money Warrants**"); (iii) in the event of an Alternative Transaction (as defined below), its *pro rata* share of an Alternative Transaction Premium (as defined in the Second Lien Backstop Commitment Letter) equal to 5% of the Aggregate Commitment, to be paid by the Company in cash and which shall become payable on (A) the date of the consummation of any sale, transfer or other disposition of all or a material portion of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) to any person or persons other than the Credit Bid Purchaser, (B) the date of the consummation of any series of sales, transfers or other dispositions of any portion of the Acquired Interests that, when taken collectively, constitutes a disposition of all or a material portion of the Acquired Interests to any person or persons other than the Credit Bid Purchaser, or (C) the date of the consummation of any plan of reorganization, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or any of the other Debtors (other than (x) the "Restructuring" and "Restructuring Transactions" as defined in and contemplated under the Restructuring Support Agreement, or (y) any liquidation under Chapter 7 of the Bankruptcy Code pursuant to which a material portion of the Acquired Interests are a part of the liquidating estate) without the use of the commitments under the Second Lien Backstop Commitment Letter, regardless of whether such plan or other transaction contemplates a sale of assets of the Debtors, a recapitalization or any alternative structure (any such transaction contemplated by clauses (A), (B), or (C), an "**Alternative Transaction**"); *provided* that the Alternative Transaction Premium shall not become due in the event that (a) the Second Lien Backstop Parties shall have failed to comply with the PA Execution Covenant (as defined in the Second Lien Backstop Commitment Letter) or (b) if the Credit Bid Purchase Agreement is terminated due to (x) Credit Bid Purchaser's breach, (y) if the Second Lien

Backstop Parties commit to support the FLTL Equity Rights Offering and the FLTL Equity Rights Offering is not consummated as a result of the breach of such commitment by a Second Lien Backstop Party, or (z) the Credit Bid Purchaser being unable to credit bid (the foregoing clauses (x) through (z), the "**Specified Exceptions**"); (iv) the reimbursement of the Second Lien Backstop Parties for all reasonable and documented out-of-pocket fees, costs and expenses (including the fees and expenses of counsel) incurred in connection with the Second Lien Exit Facility whether or not the Closing Date occurs or any Second Lien Exit Facility Documents are executed and delivered or any extensions of credit are made under the Second Lien Facility (the foregoing reimbursement obligations, the "**Expense Reimbursement**"), to be paid by Holdings or the Credit Bid Purchaser; *provided* that the Company shall be liable for the Expense Reimbursement in the event, and solely in the event, of the termination of the commitments of the Backstop Parties under the Backstop Commitment Letter (other than a termination as a result of the occurrence of the Closing Date), *provided, further* that the Company shall have no liability for the Expense Reimbursement if the Credit Bid Purchase Agreement is terminated due to the occurrence of any Specified Exception; and (v) the obligations of the Company, NewCo, Holdings and Credit Bid Purchaser, as set forth in section 5 of the Backstop Commitment Letter, to indemnify the Backstop Parties under certain circumstances (the "**Indemnification Obligations**"); *provided* that the Indemnification Obligations of the Company (but not any other parties) shall terminate upon the earlier to occur of the Closing Date and the termination of the Credit Bid Purchase Agreement due to the occurrence of any Specified Exception (clauses (iii)–(v), collectively, the "**Commitment Protections**").

On March 16, 2021, the Debtors filed the *Emergency Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Letter, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 1023] (the "**Second Lien Backstop Motion**"), seeking entry of an order approving, among other things, their entry into the Second Lien Backstop Commitment Letter and approval of the Commitment Protections provided for therein. The Debtors have requested a hearing to be held on the Second Lien Backstop Motion on the date of the Disclosure Statement hearing.

### K. *Motion to Assume Sublease*

In connection with the Apache Definitive Documents, Apache and FWE agreed to certain modifications of that certain Sublease Agreement, dated as of September 30, 2013 between Apache, as sublessor, and FWE, as sublessee, pertaining to certain office space in Houston, Texas (the "**Sublease Agreement**"), as set forth in that certain Fourth Amendment to Sublease Agreement (the "**Sublease Amendment**"), which is attached to the Implementation Agreement as **Exhibit 17**. Pursuant to the Sublease Amendment, FWE will pay a substantially reduced rental rate to Apache. Additionally, the Sublease Amendment contains favorable termination rights for FWE.

On February 10, 2021, the Debtors filed the *Emergency Motion of Debtors for Entry of Order (I) Approving Debtors' Entry into Sublease Amendment and (II) Authorizing Debtors' Assumption of Sublease Agreement* [Docket No. 869], seeking entry of an order (i) approving the Debtors' entry into the Sublease Amendment and (ii) authorizing the Debtors' assumption the Sublease Agreement. On February 22, 2021, the Bankruptcy Court entered the *Order (I) Approving Debtors' Entry Into Sublease Amendment and (II) Authorizing Debtors' Assumption of Sublease Agreement* [Docket No. 898].

### L.  *Vendor Program*

The Debtors and their advisors have been managing relations with the Debtors' vendors through the Debtors' vendor program by completing 153 trade agreements resolving approximately $136.7 million of prepetition claims and continuing to work towards completing an additional 11 trade agreements representing an additional $5.6 million of prepetition claims.

### M. *Lien Analysis*

Before and following the Petition Date, the Debtors' advisors conducted an independent analysis of the quality and amount of the mortgages filed in association with the Debtors' three tranches of secured funded debt.  A combination of the Company's books and records, its filings with BOEM and other mortgage documents were reviewed to determine (i) the technical validity of all filed mortgages to assure that individual mortgage forms satisfied relevant technical legal requirements (the "**Technical Validity Analysis**") and (ii) the lien coverage ratio, or the amount of mortgaged oil and gas asset leases to total reserve asset lease amounts, as well as the amount of any unencumbered properties (the "**Lien Coverage Analysis**").  Additionally, the Company's trial balance, inventory records, and investments in subsidiaries were reviewed to determine the net book value of any potentially unencumbered non-oil and gas assets.

The Technical Validity Analysis included a comprehensive search of BOEM filings and other mortgage documents in Texas, Louisiana, Alabama, and Mississippi.  In connection with FWE's exit from its previous chapter 11 filing, in 2018, Weil manually reviewed each of the mortgage documents to determine whether (i) the document is legible, (ii) the mortgagor name is correct, (iii) the mortgagee name is correct, (iv) the trustee name is correct, (v) party signatures are present, (vi) the document is notarized, and (vii) the document is properly recorded (stamped with book/liber/volume number, page number, date, and time).  In addition, Weil manually reviewed each of the mortgage documents to determine the following: (i) within each secured loan tranche, relative to the base form for that tranche, the language of the grant, the language of the security agreement, enforcement provisions, the description of debt, whether the mortgage has a valid "catchall/all assets in county" provision, and (ii) documented discrepancies between tranches of debt.[24]

Moreover, the Lien Coverage Analysis was performed using the Company's Mid-year 2020 Oneline Reserve Report and initial mortgage analysis (the "**MY'20 Report**").  The coverage ratio of mortgaged oil and gas asset leases to total reserve asset lease amounts (PV-9), based on the MY'20 Report, are as follows for each of the secured debt tranches:

| **Lien Coverage by Secured Debt (Proved Reserves)** | |
| --- | --- |
| **Loan** | **Total Lien Coverage**[25] |
| First Lien First Out | 95.5% |

---

[24] Certain mortgages were filed after Weil's review following the 2018 Restructuring to fix discrepancies between the tranches of debt.

[25] Defined as the ratio of mortgaged oil and gas reserve asset amount to total oil and gas reserve asset amount.

| First Lien Term Loan | 95.5% |
|---|---|
| Second Lien Term Loan | 95.5% |

| **Lien Coverage by Secured Debt (Proved + Probable)**[2625] | |
|---|---|
| **Loan** | **Total Lien Coverage**[2726] |
| First Lien First Out | 94.5% |
| First Lien Term Loan | 94.5% |
| Second Lien Term Loan | 94.5% |

For each of the secured debt tranches, the Debtors determined that their prepetition secured lenders had valid, perfected liens in over 95.5% of the Debtors' proved reserves.

### N. *Independent Investigation*

Jim LaChance was appointed to the Board on July 8, 2020. Mr. LaChance was selected by the Board for his strong background serving as an independent director and his extensive business and restructuring experience. Since his appointment, Mr. LaChance has actively participated as a member of the Board with management and the Company's advisors on the Restructuring. This includes approval of entry into the RSA and the commencement of the Chapter 11 Cases.

In addition, in his capacity as an independent director of FWE Parent, Mr. LaChance oversaw an investigation into certain claims and estate causes of action that are proposed to be released pursuant to the Plan (the "**Independent Investigation**"). The Independent Investigation also included a review of certain non-de minimis pledges of collateral and transfers of interests made by the Company within the 90-day period leading up to the Petition Date in connection with its entry into forbearance and amendment agreements, dated May 7, 2020, with the required Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders.

Weil, as counsel to the Company, assisted Mr. LaChance in evaluating the colorability of those certain potential claims and estate causes of action. The Independent Investigation took place over the course of several months and included extensive factual and legal analysis. In connection with the Independent Investigation, Weil conducted five separate interviews of three different individual members of management or the Board, and reviewed approximately 700 documents comprising several thousand pages.

Based upon the results of the Independent Investigation, Mr. LaChance concluded and therefore recommended to the Board that it is in the best interests of the Company and its

---

[2625] Capital expenditures required for probable reserves would be a function of the development plan for those reserves.

[2726] Defined as the ratio of mortgaged oil and gas reserve asset amount to total oil and gas reserve asset amount.

stakeholders to pursue the Plan and grant the releases provided for in the Plan. Mr. LaChance's determination was based upon, among other things, no valuable colorable claims having been identified against the officers, directors or shareholders in the Independent Investigation and the significant value provided by the Consenting Creditors in pursuing the Plan which would allow the Company to (i) reorganize as a more streamlined, cost-effective going-concern business, (ii) save over 1,000 jobs, and (iii) facilitate the safe, responsible, and accelerated decommissioning of properties, pipelines, and platforms in the Gulf of Mexico.

### O.  *Adversary Complaint Against Atlantic Maritime Services, LLC*

After two lawsuits (the "**Lawsuits**") were filed post-petition on November 13, 2020 against certain of the Debtors' co-working interest owners in the United States District Court for the Eastern District of Louisiana, the Debtors commenced an adversary proceeding styled *Adversary Case No. 20-03476 Fieldwood Energy LLC, et al. v. Atlantic Maritime Services, LLC* (the "**Atlantic Proceeding**")*,* seeking entry of an order extending the automatic stay to enjoin Atlantic Maritime Services, LLC ("**Atlantic**") from prosecuting the lawsuits and obtained a preliminary injunction temporarily enjoining Atlantic from prosecuting the Lawsuits against the Debtors' co-working interest owners.  On November 25, 2020, following a hearing on the Debtors' motion for preliminary injunction, the Bankruptcy Court held that filing the Lawsuits violated the automatic stay and that continued prosecution of the Lawsuits would result in further violations of the automatic stay.  Accordingly, the Bankruptcy Court entered an order granting a temporary preliminary injunction enjoining Atlantic from prosecuting the Lawsuits against the Debtors' co-working interest owners [Atlantic Proceeding, Docket No. 10] (the "**Stay Extension Order**").

On December 8, 2020, the Bankruptcy Court entered the *Stipulation and Order Extending the Automatic Stay to Certain of Debtors' Co-Working Interest Owners*, which extended the Stay Extension Order through and including the earliest to occur of (i) the effective date of any confirmed chapter 11 plan, (ii) sale of the properties subject to Atlantic's alleged liens giving rise to the Lawsuits (as defined in the Stay Extension Order), and (iii) through and including 11:59 p.m. (prevailing Central Time) on April 15, 2021.

### P.  *Regulatory Matters*

The offshore oil and gas industry is heavily regulated by the Department of the Interior pursuant to the Outer Continental Shelf Lands Act[27] ("**OCSLA**") and OCSLA's implementing regulations found primarily at 30 CFR 250 *et seq.*  (OCSLA and the implementing regulations the "**Regulations**") and also by other agencies such as the Environmental Protection Agency and the United States Coast Guard under other federal statutes.  For the Debtors' properties in Louisiana and Texas, those states have their own detailed regulations, which apply to leases on the respective lands and waters of the states.

The primary regulatory enforcement mechanism utilized by the Department of Interior through BSEE is conducting scheduled and unscheduled inspections of offshore facilities and operations to ensure that facilities and operations are in compliance with the Regulations.  In the event BSEE inspectors discover that conditions of FWE's offshore structures or operations

---

[27] 43 U.S.C. §§1331 *et seq.*

violate the Regulations, BSEE may issue an INC (i.e., an Incident of Non-Compliance) which often includes an order to remediate non-complying conditions or operations. At BSEE's discretion and based on the severity of the non-compliance, BSEE may also impose civil penalties for the INC and further impose civil penalties for each day the non-compliance with the Regulations continues.[29][28] Typically, the total amount of BSEE civil penalties paid by the offshore oil and gas industry (i.e., for the entire Gulf of Mexico) is approximately $1-2 million per year.[30][29] As a part of its restructuring process and with the aim to resolve as much liability to the government as possible in the restructuring process, FWE and the Department of Interior have commenced discussions to resolve all outstanding civil penalty liability. FWE expects to resolve the civil penalty liability in line with historical trends, although the discussions are ongoing and the outcome of the discussions is difficult to predict with precision.

In addition, since 2016, FWE has responded to requests from the U.S. Attorney's Offices for the Eastern and Western Districts of Louisiana in connection with the investigation of certain civil and criminal matters. Two employees of FWE were indicted in the Eastern District of Louisiana on January 15, 2021 for violations of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1)(A), 1319(c)(2)(A), 3121(b)(3), 1321(b)(5) and OCSLA, 43 U.S.C. §§ 1350(c)(2), 1350(c)(3). One employee was indicted in relation to a negligent and knowing discharge, failure to report the discharge at Main Pass 310 in 2015 and falsely representing company records to BSEE. A second employee was indicted for a negligent discharge at Grand Isle 43 in January 2018 and with rendering safety systems inoperable. FWE has not been charged, is cooperating with the authorities and will continue discussions with the government as appropriate.

On February 10, 2021, in a resolution of the investigations of the U.S. Attorney's Office for the Eastern District of Louisiana (the "**USAO**"), including those relating to Main Pass 310 and Grand Isle 43, FWE entered into a Non-Prosecution Agreement with the USAO in respect of certain civil and criminal violations alleged by the USAO without any criminal plea or indictment against FWE or its officers or directors. The NPA requires FWE to undertake certain obligations, including cooperating with the USAO and other federal agencies, admitting to findings of fact that its employees and third-party contractors committed certain criminal violations, and undertaking certain corrective and remedial actions, including the payment of a $2 million fine, payable in four equal installments over a two year period. Should FWE remain in compliance with its obligations under the NPA, then the USAO has agreed to not prosecute FWE or any of its officers or directors during the term of the NPA or thereafter for any alleged violations of federal civil and criminal laws related to conduct described in the NPA or any other conduct for which FWE has been under investigation by the USAO as of the effective date of the NPA. The NPA is to remain in effect until the later of (i) two years from the date the Bankruptcy Court approves the $2 million fine and (ii) until the complete payment of the fine.

On February 18, 2021, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Non-Prosecution Agreement with the United States Attorney's Office for the Eastern District of Louisiana and (II) Granting Related Relief* [Docket No. 893], seeking entry of an order (i) approving the Debtors' entry into the NPA and performance of the obligations

---

[29][28] 30 CFR 250.1400 *et seq.* Currently, the maximum civil penalty is $44,675 per day. See https://www.bsee.gov/what-we-do/safety-enforcement-division/civil-penalties

[30][29] *See e.g.*, 2020 civil penalties totaling $1.3 million: https://www.bsee.gov/sites/bsee.gov/files/fiscal-year-2020-cp-report.pdf

thereunder and (ii) granting related relief.  On March 15, 2021, the Bankruptcy Court entered the *Order (I) Approving Non-Prosecution Agreement with the United States Attorney's Office for the Eastern District of Louisiana and (II) Granting Related Relief* [Docket No. 1004].

The NPA applies only to the United States Attorney's Office for the Eastern District of Louisiana and does not bind any other federal, state, or local prosecuting, administrative, or regulatory agencies (although the NPA does resolve all civil penalty exposure arising out of the incidents subject to the investigation).

### Q. *Emergency Motion to Compel BP to Perform Under Executory Contracts*

The Company is a co-working interest owner and operator of a well in the Gulf of Mexico that is part of the Galapagos field ("**Genovesa**").  Genovesa was drilled in June-July 2019.  Genovesa connects to a host platform called Na Kika, which is partially owned by BP Production & Exploration Inc. ("**BP**"), via an undersea loop system ("**LSPS**"), which is jointly owned by the Company, BP, and others, and operated by BP.  In April 2020, FWE first learned that there was an anomaly in the LSPS, which was later determined to be a small leak.  FWE did not cause the anomaly in the LSPS, something with which BP agrees.  Remediating the leak through a short-term single flowline project ("**SFLP**"), as opposed to a longer-term loop system restoration project (which is still necessary), is the necessary step to bringing Genovesa online and initiating production for this well.

Production on the lease on which Genovesa is located ceased in April 2020, meaning that, under the applicable regulations, the lease would expire one year later unless production is restored or other lease saving activities occur or BSEE authorizes a suspension of production ("**SOP**").  On January 20, 2021, the U.S. Department of the Interior released Order 3395, which limits consideration of lease extensions, among other things, to political appointees.  It is, therefore, uncertain whether an SOP would be granted.

Accordingly, on January 27, 2021, the Company filed an *Emergency Motion to Compel BP Production & Exploration Inc. to Perform Pre-Petition Contracts* [Docket No. 792], asking the Court to order BP to perform its obligations under the operative agreements by requiring BP to either complete the short-term SFLP itself or allow the Company to do so in time to get Genovesa online by April 2021.  The Court held a contested evidentiary hearing on February 2, 2021, at which it orally ruled that, among other things, BP had been "behaving in a remarkably poor way," "intentionally delayed," acted in "bad faith," "in breach," and "needs to stop acting with excuses."  The Court ordered BP to perform the necessary activities to bring Genovesa online by April 5, 2021, or, in the alternative, gave BP the option to elect to turn over operatorship of the short-term SFLP to FWE and to support FWE as needed to bring Genovesa online by April 5, 2021.  BP elected the second option, and the Court entered an order to this effect on February 3, 2021 at Docket No. 845.  Since the date of the order, BP and FWE have worked cooperatively on the SFLP project and, subject to good weather and timely permitting, continue to be on pace to meet the target date for production.

# VI.
# RESTRUCTURING TRANSACTIONS AND PLAN IMPLEMENTATION

Pursuant to the Plan, the Debtors are seeking approval of, among other things, (i) entry into and consummation of the Credit Bid Transaction (subject to the terms of the Credit Bid Purchase Agreement), (ii) entry into and consummation of the Apache Transactions pursuant to Bankruptcy Rule 9019 and the Apache Definitive Documents, including the Plan of Merger, (iii) the continued operation and decommissioning of the FWE III Properties, and (iv) the abandonment of the Abandoned Properties.

## A. *Approval of Credit Bid Transaction*

As discussed above, the Company conducted a robust sale and marketing process for the Company's Deepwater Assets from June 30, 2020 through September 2, 2020 and, at the conclusion of such process, the Debtors determined that none of the bids they received was actionable.

Concurrently with that process, the Debtors negotiated with the Consenting FLTL Lenders the terms of the Credit Bid Transaction, which provides that Credit Bid Purchaser will acquire the Credit Bid Acquired Interests in exchange for aggregate consideration of approximately $1.03 billion consisting of (i) a credit bid of the Allowed FLTL Claims (up to the FLTL Claims Allowed Amount), (ii) cash in the amount of up to $105 million,[31][30] (iii) the GUC Warrants, (iv) the SLTL Warrants, and (v) assumption of certain liabilities set forth in the Credit Bid Purchase Agreement, including the assumption of the Allowed FLFO Claims remaining following distribution of the FLFO Distribution Amount. Accordingly, the Debtors have determined that the Credit Bid Transaction is currently the highest and otherwise best available transaction in light of, among other factors, the fact that the Credit Bid Purchase Agreement and Plan collectively provide for a going-concern transaction that maximizes the long-term value of the Debtors' business, provides for the continued employment of over 1,000 employees and contractors, and maximizes the consideration available for distribution to the Debtors' creditors under the Plan. As such, the Debtors submit that the Credit Bid Transaction is in the best interests of the Debtors and their estates.

## B. *Approval of Apache Transactions*

Pursuant to the Apache Term Sheet, the Company, the Consenting Creditors, and Apache agreed to, among other things, negotiate mutually agreeable Apache Definitive Documents no later than 45 days after the Petition Date, which deadline the parties mutually agreed to extend to January 1, 2021. In addition, the RSA provides that it shall be a DIP Commitment Parties Termination Event (as defined in the RSA) if the Company shall not have complied with the deadline requiring the finalization of the Apache Definitive Documents by no later than 75 days after the Petition Date, which deadline the parties mutually agreed to extend to January 1, 2021.

Following months of extensive negotiations, on January 1, 2021, the parties finalized the Apache Definitive Documents and certain of the Debtors, Apache, and certain of its affiliates

---

[31][30] The Credit Bid Purchase Agreement caps the total cash consideration to be paid by Credit Bid Purchaser for the Credit Bid Acquired Interests at an amount equal to (i) the proceeds of the up to $185 million Second Lien Exit Facility, plus (ii) the proceeds of the approximately $40 million Equity Rights Offerings, minus (iii) $120 million.

entered into the Implementation Agreement, an agreement whereby parties thereto agreed to execute and deliver the Apache Definitive Documents on or before the Effective Date of the Plan.

The Apache Definitive Documents include, among other things, the Plan of Merger, which provides, among other things, that as of the Effective Date:

- FWE I will be formed, all of the FWE I Assets will be allocated to, possessed by, and vested in FWE I, pursuant to the terms of the Plan of Merger, and all of the FWE I Obligations will be allocated to and will vest in, and will constitute liabilities and obligations of, FWE I; and

- FWE will maintain its separate existence and continue as a surviving entity as FWE III, all of the assets of FWE other than the Credit Bid Acquired Interests, the FWE I Assets, and the Abandoned Properties, will be allocated to, possessed by, and vested in FWE III, pursuant to the terms of the Plan of Merger, and all of the liabilities and obligations of FWE remaining other than the Credit Bid Assumed Liabilities and the FWE I Obligations will be allocated to and will vest in, and will constitute liabilities and obligations of, FWE III.

Other Apache Definitive Documents include (i) the Sublease Amendment described above in Section V.J, pursuant to which FWE will pay a substantially reduced rental rate to Apache, as sublessor, and which contains favorable termination rights, (ii) the TSA between FWE I and Credit Bid Purchaser, and (iii) a Farmout Agreement between Credit Bid Purchaser and FWE I (the "**Farmout Agreement**"). To facilitate the transition process, pursuant to the TSA, the Credit Bid Purchaser will provide operational, technical, and administrative services to FWE I to operate the FWE I Assets during the period following the Effective Date. The Farmout Agreement provides, among other things, that Credit Bid Purchaser will have the right for two years to present capital projects to FWE I relating to the Legacy Apache Properties, which will give FWE I the option to participate, in its sole discretion, under the terms mutually agreed and set forth in the Farmout Agreement.

In addition, section 10.7 of the Plan provides for mutual releases by (among other parties) the Apache PSA Parties, the Debtors, and the Consenting Creditors, provided, however, that no party will be released to the extent such release would impair the Decommissioning Security or the Apache PSA Parties' ability to draw on the Decommissioning Security, in any respect.

The Plan is being proposed as a motion to approve, among other things, the Apache Transactions pursuant to Bankruptcy Rule 9019 and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

The Apache Transactions provide considerable benefits to the Debtors' estates and other key stakeholders, including, among other things, (i) limiting the Debtors' exposure to the decommissioning liabilities related to the Legacy Apache Properties, (ii) advancing discussions

with other parties in interest regarding a comprehensive restructuring, including the Consenting Creditors, BOEM and BSEE, and other predecessors in interest, (iii) reducing the rent charged to FWE pursuant to the Sublease Amendment, and (iv) substantially accelerating the decommissioning work performed on multiple wells, pipelines, platforms, and other facilities in the Gulf of Mexico.

### C. *Approval of Abandonment of Abandoned Properties*

In the Debtors' business judgment, the Abandoned Properties are burdensome to the Debtors' estates. As discussed above, since before the Petition Date, the Debtors have been in active discussions with BOEM and BSEE regarding the development of the Plan and proposed treatment of the Debtors' properties, including the Debtors' intention to abandon certain properties. Moreover, as detailed above, Debtors have also been coordinating with the Predecessors and CIOs on the safe and orderly operational transfer of the Abandoned Properties.

## VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The offer, issuance and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, and the GUC Warrants to holders of Allowed FLTL Claims and General Unsecured Claims under Article IV of the Plan, and the New Equity Interests issued upon exercise of the Subscription Rights, the SLTL Warrants, or the GUC Warrants, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

The issuance and sale of the Second Lien Backstop Commitment Premium Equity Interests to be issued pursuant to the Second Lien Backstop Commitment Letter, the FLTL ERO Backstop Commitment Premium, the SLTL ERO Backstop Commitment Premium, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) to be issued pursuant to the New Money Warrant Agreement is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder.

### A. *Section 1145 of the Bankruptcy Code and Subscription Transfers*

The above described securities to be issued pursuant to section 1145 of the Bankruptcy Code (the "**1145 Securities**") may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such 1145 Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act ("**Rule 144**") which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

### B. _Section 4(a)(2) of the Securities Act and Subscription Transfers_

With respect to the above described securities issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**Private Placement Securities**"), such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

None of the Debtors, NewCo and its subsidiaries, including the Credit Bid Purchaser, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in the Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests, the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants), the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

* * * * *

*Legends*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Equity Interests held by holders of 10% or more of the outstanding New Equity Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all Private Placement Securities, will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON THE EFFECTIVE DATE, HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and NewCo or its subsidiaries, including the Credit Bid Purchaser, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of any such securities. The Debtors and NewCo or its subsidiaries, including the Credit Bid Purchaser, as applicable, also reserve the right to stop the transfer of any such securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain U.S. Holders (as defined below) of Claims that will receive cash or other property under the Plan. The following summary does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired, deemed to reject the Plan or otherwise entitled to payment in full in cash under the Plan. In addition, this summary does not address the consequences to holders of Allowed FLFO Claims, as we understand that they have engaged outside counsel to advise them as to the federal income tax consequences of the Plan to them.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury Regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change (including pursuant to any potential future legislation which may be enacted in response to the COVID-19 pandemic) or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts. Accordingly, there is no assurance that the IRS would not take a contrary position as to the federal income tax consequences described herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated

investment companies, tax-exempt organizations, trusts, governmental authorities or agencies, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in foreign currency, persons who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income and accrual method taxpayers that report income on an "applicable financial statement"). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion below assumes that the Credit Bid Transaction contemplated by the Plan (and the 363 Credit Bid Transaction, if applicable) will be a fully taxable transaction for U.S. federal income tax purposes. However, the Plan allows for alternative structures that may include transactions that are different from those described in the anticipated structure below. Any deviations from the anticipated structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors, holders of Claims and holders of Interests described herein. It is intended that, and this discussion assumes, that each component transaction of the anticipated structure will be fully taxable for U.S. federal income tax purposes. If, contrary to this assumption, any component transaction of the anticipated structure is not fully taxable for U.S. federal income tax purposes, the tax consequences of any such transactions could be materially different than as described herein. Each U.S. Holder should consult its own tax advisor.

Additionally, this discussion assumes that (i) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form; (ii) except where otherwise indicated, the Claims and non-cash consideration received are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code; and (iii) each Class of Claims that votes on the Plan is an Accepting Class.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### A. *Consequences to the Debtors*

For U.S. federal income tax purposes, each of the Debtors is (i) a member of an affiliated group of corporations of which Fieldwood Energy Inc. is the common parent and which files a single consolidated U.S. federal income tax return (the "**Tax Group**"), or (ii) disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group. The Tax Group estimates that as of December 31, 2020, the Debtors will have approximately $394 million of U.S. federal net operating loss ("**NOL**") carryforwards and over $190 million in

estimated consolidated federal interest expense carryforwards under Section 163(j) of the Tax Code. None of the Debtors' NOLs are subject to limitation under Section 382 of the Tax Code due to a prior ownership change. The amount of any such NOLs and other tax attributes, including any deductions for payments of Claims under the Plan, remain subject to audit and potential adjustment by the IRS.

### 1. Cancellation of Debt and Reduction of Tax Attributes

In general, the Tax Code provides that a debtor must recognize cancellation of debt ("**COD**") income upon the elimination or reduction of debt for insufficient consideration. The amount of COD income generally is equal to the amount by which the adjusted issue price of cancelled debt exceeds the sum of the amount of cash and the fair market value of any other property given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. One such exception to such income recognition is provided for any COD arising by reason of the discharge of the debtor's indebtedness in a bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt. In such case, the Tax Code generally requires the debtor to reduce certain of its tax attributes—such as current year NOLs and NOL carryforwards, tax credits, capital loss carryforwards, and tax basis in assets—by the amount of any such excluded COD income. Although not free from doubt, it is expected that carryover of disallowed interest expense would not be a tax attribute subject to such reduction. If advantageous, the debtor can elect to reduce the basis of depreciable property before any reduction in its NOL carryforwards or other tax attributes. Also, where the Debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

The Debtors expect to incur a substantial amount of COD as a result of the implementation of the Plan with a corresponding reduction in its tax attributes. The amount of such COD and resulting tax attribute reduction will depend primarily on the fair market value of the assets that are the subject of the Credit Bid Transaction (or 363 Credit Bid Transaction) and, in turn the New Equity Interests, Subscription Rights, SLTL Warrants, and GUC Warrants. In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs. Accordingly, the Debtors do not expect such reduction to have a material impact on their ability to utilize their existing consolidated NOLs and other tax attributes against any gain recognized in the Credit Bid Transaction (or 363 Credit Bid Transaction).

### 2. Limitation of NOL Carryforwards and Other Tax Attributes

Under the Tax Code, any NOLs and certain other tax attributes of a corporation (collectively, "**Pre-Change Losses**") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of Section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan. As discussed above, due in part to the resulting attribute reduction from the incurrence of COD, the Debtors may not have significant tax attributes remaining following the implementation of the Plan to which Section 382 of the Tax

Code would apply. Nevertheless, the following provides a brief description of the operation of Section 382 of the Tax Code in the event there are any Pre-Change Losses to which Section 382 of the Code could apply.

Under Section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in Section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income or tax liability is subject to an annual limitation.

In general, the amount of the annual limitation to which a corporation in bankruptcy that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately after the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., approximately 1.6% for ownership changes occurring in March 2021).

This annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. Under Section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The Debtors do not expect this exception to be of any material benefit, even if otherwise applicable.

As indicated above, the Debtors may not have significant (if any) tax attributes remaining to which Section 382 of the Tax Code would apply after the reduction in tax attributes under the COD rules, whether or not the annual limitation rules apply.

**3.      Sale of Certain Assets**

Pursuant to the Plan, the Debtors will sell certain assets in the Credit Bid Transaction (or the 363 Credit Bid Transaction, if applicable) and abandon certain assets. The discussion herein assumes that such assets will be disposed of in the Credit Bid Transaction or abandonment and that the Credit Bid Transaction or the abandonment, as applicable, will be treated as a taxable transaction. As a result, for U.S. federal income tax purposes the Debtors are expected to recognize income, gain, loss, or deduction in the Credit Bid Transaction or upon abandonment, as applicable. The Credit Bid Purchaser would obtain a new cost basis in the assets acquired based on the fair market value of such assets on the Effective Date, but would not succeed to any tax attributes of the Debtors (such as NOLs, tax credits or tax basis in assets).

The Debtors expect that the Debtors' current year deductions, NOL carryforwards, and other tax attributes generally should be available to offset some or all of the tax gains or income that might be recognized. Depending on the value of the transferred assets, the timing of when such sales or transfers occur, and the availability of and any limitations on the Debtors' tax attributes for applicable federal (as well as state and local) income tax purposes, the Debtors may

incur certain income tax liabilities relating to such transfers. This discussion assumes that asset sales described in this paragraph will be fully taxable for U.S. federal income tax purposes.

If, contrary to that assumption, the Credit Bid Transaction (or the 363 Credit Bid Transaction, if applicable) is not fully taxable for U.S. federal income tax purposes, the tax consequences of any such transactions to the Debtors (and holders of certain Claims) could be materially different than that described herein. Each U.S. Holder should consult its own tax advisor.

### 4. Potential Transfer of Assets to a Liquidating Trust

Pursuant to the Plan, the Plan Administrator may, anytime on or after the Effective Date, transfer certain of Debtors' remaining assets to a Liquidating Trust (as defined below) on behalf of all or a portion of the respective claimants, holders of Existing Equity Interests, and/or other stakeholders, if the Plan Administrator determines that it is in the best interests of the Debtors and respective stakeholders. The transfer of assets by the Plan Administrator to a Liquidating Trust will be treated as a sale of the assets at fair market value, which may result in the recognition of gain or loss by the Debtors, depending in part on the value of such assets on the date of such transfer to the liquidating trust relative to the Debtors' tax basis in such assets. *See* Section VII.C, "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests" below for discussion.

### B. *Consequences to Holders of Certain Claims*

The following discussion applied to U.S. Holders of Allowed FLTL Claims, Allowed SLTL Claims, Allowed Unsecured Trade Clams, and Allowed General Unsecured Claims. For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Claims or Existing Equity Interests that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust, or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

1. **Taxable Exchange – Structure of Credit Bid Transaction**

This discussion assumes that, pursuant to the Credit Bid Transaction, the Debtors will receive all or a portion of the New Equity Interests, Subscription Rights, SLTL Warrants, GUC Warrants, and cash as consideration for the sale of the Credit Bid Acquired Interests in a taxable transaction for U.S. federal income tax purposes, and that the consideration received will then be distributed to holders of Claims in accordance with the Plan.

However, this is not the only manner in which the Credit Bid Transaction could be structured. For example, certain holders of Allowed FLTL Claims may instead transfer, in whole or in part, their Allowed Claims to the Credit Bid Purchaser in exchange for New Equity Interests and FLTL Subscription Rights, whereupon such Credit Bid Purchaser will then use such Allowed Claims together with the SLTL Subscription Rights, SLTL Warrants, GUC Warrants and cash (and any remaining New Equity Interests and FLTL Subscription Rights) to acquire the Credit Bid Acquired Interests, similarly in a taxable transaction for U.S. federal income tax purposes. The Debtors would then distribute the consideration so received in accordance with the Plan, including with respect to Allowed Claims that were not part of the consideration in the Credit Bid Transaction, also in a taxable transaction for U.S. federal income tax purposes. Accordingly, all holders of Allowed Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan to them.

In addition, a single share of reorganized FWE Parent common stock representing all of the outstanding equity of reorganized FWE Parent (the "**Single Share**") and, in respect of which, any Residual Distributable Value will be distributable to holders of Allowed General Unsecured Claims. Accordingly, for U.S. federal income tax purposes, the holders of Allowed General Unsecured Claims should be treated as receiving a direct ownership interest in the Single Share in addition to receiving the GUC Warrants.

Accordingly, the following discussion assumes that, pursuant to the Plan, the Debtors will distribute:

(i)  the New Equity Interests and FLTL Subscription Rights to holders of Allowed FLTL Claims in satisfaction and discharge of any of their Allowed Claims that are not transferred to the Credit Bid Purchaser as described above,

(ii)  SLTL Warrants and SLTL Subscription Rights to holders of Allowed SLTL Claims in satisfaction and discharge of their Allowed Claims,

(iii) cash to holders of Allowed Unsecured Trade Claims in satisfaction and discharge of any of their Allowed Claims, and

(iv)  GUC Warrants and beneficial interests in the Single Share to holders of Allowed General Unsecured Claims in satisfaction and discharge of their Allowed Claims.

A U.S. Holder of an Allowed FLTL Claim, Allowed SLTL Claim, Allowed Unsecured Trade Claim, or Allowed General Unsecured Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of any non-

cash consideration and the amount of any cash received (other than to the extent received in respect of a Claim for accrued but unpaid interest and possibly accrued OID) and (ii) the U.S. Holder's adjusted tax basis in the Allowed Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section VII.B.3, "Character of Gain or Loss," below. The U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section VII.B.2, "Distributions in Discharge of Accrued Interest or OID," below.

In the event of the subsequent disallowance of any Disputed Unsecured Trade Claim or Disputed General Unsecured Claim, it is possible that a U.S. holder of a previously Allowed Claim in such Class may receive additional distributions in respect of its Claim as Disputed Claims are resolved, except to the extent of any portion of such distribution treated as an interest income under the imputed interest provisions of the Tax Code. As a result, it is possible that recognition of any loss realized by such U.S. Holder with respect to its Allowed Claim may be deferred until all Disputed Claims within such Class have been Allowed or Disallowed. Alternatively, it is possible that a U.S. Holder of a previously Allowed Claim will have additional gain. The discussion herein assumes that the installment method does not apply, either because the exchange is not eligible or because the U.S. Holder elects out of such treatment.

A U.S. Holder's tax basis in any New Equity Interests, Subscription Rights, SLTL Warrants, GUC Warrants and in any interest in the Single Share received will equal the fair market value of such interests at the time of receipt, and the U.S. Holder's holding period with respect thereto generally will begin on the day following the Effective Date (or, with respect to the GUC Warrants, the day following receipt thereof).

## 2. Distributions in Discharge of Accrued OID or Interest

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of an Allowed Claim is received in satisfaction of interest accrued or OID accrued, in each case during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of an Allowed Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Section 6.12 of the Plan provides that the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest

(including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

### 3. Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the receipt of cash and other consideration in satisfaction of such Claims.

### 4. Disposition of New Equity Interests

The U.S. federal income tax treatment of the New Equity Interests depends on, among others, the U.S. federal income tax classification of NewCo and the Credit Bid Purchaser and the terms and structure of the transaction in which a U.S. Holder acquires such Interests. In general, unless a nonrecognition provision applies to a future disposition, U.S. Holders will recognize capital gain or loss upon the sale or exchange of the New Equity Interests in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Equity Interests held and (ii) the sum of the cash and the fair market value of any property received from such disposition. However, if NewCo and the Credit Bid Purchaser are classified as a partnership or other passthrough entity for U.S. federal income tax purposes, all or a portion of such gain may be taxable as ordinary income. Any such capital gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Equity Interests is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations. All holders are urged to consult their tax advisors regarding the tax treatment of the New Equity Interests.

### 5. Exercise and Disposition of the SLTL Warrants and GUC Warrants

A U.S. holder of an SLTL Warrant or GUC Warrant generally will not recognize gain or loss upon the exercise of such warrant. A U.S. holder's tax basis in New Equity Interests received upon exercise of an SLTL Warrant or GUC Warrant will be equal to the sum of the holder's tax basis in the SLTL Warrant or GUC Warrant, as applicable, and the exercise price. The holder will commence a new holding period with respect to the New Equity Interests received.

If the terms of the SLTL Warrant or GUC Warrant provide for any adjustment to the number of shares of New Equity Interests for which the SLTL Warrant or GUC Warrant may be exercised or to the exercise price of the SLTL Warrant or GUC Warrant, such adjustment may, under certain circumstances, result in constructive distributions that could be taxable to the holder of the SLTL Warrant or GUC Warrant. Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable to the U.S. holders of the New Equity Interests.

Upon the lapse or disposition of an SLTL Warrant or GUC Warrant, the U.S. holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending on whether the requisite holding period was satisfied.

### 6. Disposition of Interests in the Single Share

In general, unless a nonrecognition provision applies to a future disposition, U.S. Holders of an interest in the Single Share will generally recognize capital gain or loss upon the sale or exchange of their interest in the Single Share received in satisfaction of their Claims in an amount equal to the difference between (i) the holder's adjusted tax basis in its interest in the Single Share held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such capital gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its interest in the Single Share is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

However, any gain recognized by a U.S. Holder upon a disposition of its interest in the Single Share received in exchange for its Claims (or any stock or property received for such interest in the Single Share in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

7.      **Tax Treatment of Subscription Rights**

The characterization of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes as the exercise of options to acquire New Equity Interests is uncertain given that the Subscription Rights must be exercised prior to the Effective Date, and the receipt and exercise of the Subscription Rights pursuant to the Plan could be viewed as an integrated transaction pursuant to which part of the underlying New Equity Interests are treated as acquired directly in satisfaction of a holder's Allowed FLTL Claims or Allowed SLTL Claims and part are treated as acquired for cash.  Unless otherwise indicated, the discussion herein assumes that the Subscription Rights are respected as options to acquire New Equity Interests (including the discussion above regarding the calculation of gain or loss).

Regardless of the characterization of the Subscription Rights, a holder of Subscription Rights generally would not recognize any gain or loss upon the exercise of such Subscription Rights.  A holder's aggregate tax basis in the New Equity Interests received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid upon exercise of the Subscription Rights and (ii) the holder's tax basis in the Subscription Rights.

A holder's holding period in the New Equity Interests received upon exercise of a Subscription Right generally should commence the day following the exercise of the Subscription Right.

It is uncertain whether a holder that receives but does not exercise a Subscription Right should be treated as receiving anything of additional value in respect of its Allowed FLTL Claim or Allowed SLTL Claim, as applicable.  If the Subscription Rights are respected for U.S. federal income tax purposes as options to acquire New Equity Interests, and a holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the Subscription Right, upon such lapse of the Subscription Right the holder generally would recognize a loss to the extent of the holder's tax basis in the Subscription Right.  In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied.

### C.  Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests

1.      **Classification of Liquidating Trust**

The Plan Administrator may determine, in its discretion and from time to time, that in order to carry out and implement the provisions of the Plan certain assets should be transferred to a liquidating trust for the benefit of one or more classes of stakeholders.  In such event, it is intended that the liquidating trust will be structured to qualify as a "liquidating trust" for U.S. federal income tax purposes (a "Liquidating Trust"), and the following discussion so assumes.

In general, a Liquidating Trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Any Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the

Liquidating Trust (including, without limitation, the Debtors, stakeholders receiving interests in the Liquidating Trust, and the trustee of the Liquidating Trust) will be required to treat the transfer of the underlying assets to the Liquidating Trust as (1) a transfer of such assets (subject to any obligations relating to those assets) directly to the stakeholders receiving interests in the Liquidating Trust (other than to the extent any of the assets are allocable to Disputed Claims), followed by (2) the transfer of such assets by such stakeholders to the Liquidating Trust in exchange for interests in the Liquidating Trust. Accordingly, except in the event of contrary definitive guidance, stakeholders receiving interests in the Liquidating Trust would be treated for U.S. federal income tax purposes as the grantors and owners of their respective shares of the underlying assets of the Liquidating Trust (other than such assets as are allocable to Disputed Claims).

Although this discussion assumes that any Liquidating Trust will be treated as a "liquidating trust" for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS will not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the U.S. Holders receiving interests in the Liquidating Trust could vary from those discussed herein.

## 2. General Tax Reporting by Liquidating Trust and its Beneficiaries

For all U.S. federal income tax purposes, all parties to the Liquidating Trust (including, without limitation, the Debtors, stakeholders receiving interests in the Liquidating Trust, and the trustee of the Liquidating Trust) must treat the Liquidating Trust as a grantor trust of which the holders of beneficial interests in the Liquidating Trust (as determined for U.S. federal income tax purposes) are the owners and grantors, and such holders as the direct owners of an undivided interest in the underlying assets of the Liquidating Trust (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The trustee of the Liquidating Trust will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The trustee of the Liquidating Trust also will annually send to each holder of a beneficial interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, holders of beneficial interests in the Liquidating Trust with respect to such holder's undivided interest in the underlying assets of the Liquidating Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of Claims receiving interests in the liquidating trust.

As soon as reasonably practicable after the transfer of the assets to the Liquidating Trust, the trustee of the Liquidating Trust will make a good faith valuation of such assets. All parties to

the Liquidating Trust (including, without limitation, the Debtors, holders of Claims receiving interests in the liquidating trust, and the trustee of the liquidating trust) must report consistently with such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a U.S. Holder with respect to its beneficial interests in the Liquidating Trust are not dependent on the Liquidating Trust distributing any cash or other proceeds, subject to any portion(s) of the Liquidating Trust allocable to Disputed Claims. Thus, a U.S. Holder of Allowed Claims receiving interests in the Liquidating Trust may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the U.S. Holder. In general, other than in respect of cash retained on account of Disputed Claims, a distribution of cash by the Liquidating Trust will not be separately taxable to a beneficial owner of the Liquidating Trust since the beneficial owner is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). U.S. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The trustee of the Liquidating Trust will comply with all applicable governmental withholding requirements. If any beneficiaries of the Liquidating Trust are not U.S. persons, the trustee of the Liquidating Trust may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower rate under applicable income tax treaty). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences the Plan, including owning an interest in the Liquidating Trust.

### D. *Information Reporting and Back-Up Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails to properly report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated,

including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A. *Certain Bankruptcy Law Considerations*

### 1. **Risk of Termination of RSA**

The RSA contains certain provisions that give the parties the ability to terminate the RSA under various conditions. As noted above, termination of the RSA could result in loss of support for the Plan by important creditor constituencies. Any loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan and could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with regulators, vendors, suppliers, employees, and customers. If the RSA is terminated, each vote or any consent given by any of the Consenting FLTL Lenders, the Consenting SLTL Lenders and Apache before such termination will be deemed null and void *ab initio*.

### 2. **Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Further, a number of parties, primarily certain Predecessors and sureties, have asserted that the Plan will not satisfy all requirements for confirmation, including assertions that the Debtors cannot abandon the

Abandoned Properties as proposed and the Debtors cannot satisfy all administrative expense claims in full. The Debtors disagree with such assertions.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent chapter 11 plan.

### 3.   Risk of Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Section C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit L** (the "**Liquidation Analysis**"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 4.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and that there is not a material risk that the Debtors will not be able to obtain all necessary governmental approvals (including any regulatory approval from BOEM and BSEE, and, if applicable, antitrust approval), there can be no assurance as to the timing of the Effective Date. Certain transactions contemplated under the Plan may require a review under the Hart-Scott-Rodino Antitrust Improvements Act. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, none of the transactions set forth in Article V of the Plan shall have been consummated, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

5.      **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant provisions of the Bankruptcy Code and other applicable law, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection. As of the date hereof, the Debtors have received multiple objections to the Plan. The objections assert, among other things, that the Debtors cannot abandon certain estate property. *See, e.g.* objection filed by XTO Offshore, Inc., HHE Energy Company, and XH LLC [Docket No. 759]. While the Debtors believe that they will overcome any objections challenging the Debtors' ability to abandon certain properties, including XTO's objection, the Debtors cannot predict with certainty how such objections will be resolved.

6.      **Parties in Interest May Object to Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

7.      **Conditions to Credit Bid Transaction May Not Be Satisfied**

The closing of the Credit Bid Transaction in connection with consummation of the Plan remains contingent on a number of conditions set forth in the Credit Bid Purchase Agreement. There is a risk that one or more of these conditions may not be met, thus preventing consummation of the Credit Bid Transaction.

8.      **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, the Released Parties, or Apache, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B. Additional Factors Affecting the Value of NewCo and its Subsidiaries

1.     **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained herein or in a supplement to this Disclosure Statement is, by nature, forward-looking and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Credit Bid Purchaser, including the timing, confirmation, and consummation of the Plan, customer demand for the Credit Bid Purchaser's oil and gas or services, inflation, and other unanticipated market and economic conditions.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of the Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorist attacks, or health epidemics, may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

2.     **Risks Associated with the Debtors' Business and Industry**

The risks associated with the Debtors' business and industry include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key executives and to maintain various licenses and approvals necessary for NewCo and its subsidiaries (including the Credit Bid Purchaser) and FWE I to conduct their businesses;

- risk and uncertainties relating to the ability to complete definitive documentation in connection with any financing and the amount, terms and conditions of any such financing;

- risk and uncertainties relating to the Debtors' ability to obtain requisite support for the Plan from various stakeholders; the Debtors' ability to confirm and consummate the Plan;

- risk and uncertainties relating to NewCo's and its subsidiaries' (including the Credit Bid Purchaser), FWE I's, and FWE III's ability to satisfy all of their obligations under the Plan;

- risk and uncertainties relating to events outside of the Debtors' control, including an epidemic or outbreak of an infectious disease, such as the novel coronavirus

70

-

(COVID-19), and the potential effects on operations and/or on domestic and international demand for crude oil and natural gas, delays, supply chain disruptions, travel restrictions, and other events resulting therefrom that may impact the oil and gas industry;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions;

- the volatility and potential for sustained low oil and natural gas prices;

- the supply and demand for oil and natural gas and potential risks relating to agreements and negotiations among members of the Organization of the Petroleum Exporting Countries;

- technological advances affecting energy consumption;

- the development and exploitation of alternative fuels and unconventional hydrocarbon production, including shale;

- changes in commodity prices and basis differentials for oil and natural gas;

- the ability to meet production volume targets;

- the uncertainty of estimating proved reserves and unproved resources;

- the ability to develop proved undeveloped reserves;

- the future level of operating and capital costs;

- the ability to obtain necessary governmental approvals for proposed exploration and production projects and to successfully construct and operate such projects;

- actions by credit ratings agencies, including potential downgrades;

- credit and performance risk of lenders, trading counterparties, customers, vendors, suppliers and third party operators;

- general economic and weather conditions in geographic regions or markets served, or where operations are located, including the risk of a global recession and negative impact on demand for oil and/or natural gas;

- the uncertainties associated with governmental regulation, including any potential changes in federal and state tax laws and regulations; and

- competition.

71

### C. Factors Relating to New Equity Interests to Be Issued under Plan

1.    **Market for Equity of NewCo**

There is currently no market for the New Equity Interests of NewCo, and there can be no assurance as to the development or liquidity of any market for any such New Equity Interests.

NewCo is under no obligation to list the New Equity Interests on any national securities exchange. Therefore, there can be no assurance that any of the foregoing New Equity Interests will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such New Equity Interests could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for NewCo. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

2.    **Potential Dilution**

The ownership percentage represented by the New Equity Interests of NewCo distributed on the Effective Date under the Plan, will be subject to dilution from the Second Lien Backstop Commitment Premium Equity Interests, the New Equity Interests issued upon exercise of the Subscription Rights and the New Equity Interests issued upon the exercise of the New Money Warrants, the SLTL Warrants, or the GUC Warrants, New Equity Interests issued pursuant to the Management Incentive Plan Management Incentive Program, any other shares that may be issued in connection with the Plan or post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

3.    **Significant Holders**

Certain holders of Prepetition Claims are expected to acquire a significant ownership interest in NewCo pursuant to the Plan. Such holders, if their decisions are aligned, may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of NewCo and, consequently, have an impact upon the value of the New Equity Interests of NewCo.

4.    **New Equity Interests Subordinated to NewCo's Indebtedness**

In any subsequent liquidation, dissolution, or winding up of NewCo, the New Equity Interests would rank below all debt claims against NewCo. As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of NewCo until after all NewCo's obligations to their debt holders have been satisfied.

5.   **Valuation of NewCo Not Intended to Represent Trading Value of New Equity Interests of NewCo**

The valuation of NewCo is not intended to represent the trading value of equity in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such New Equity Interests at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of the New Equity Interests.  The actual market price of the New Equity Interests is likely to be volatile.  Many factors, including factors unrelated to the Credit Bid Purchaser's actual operating performance and other factors not possible to predict, could cause the market price of equity to rise and fall.  Accordingly, the value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests in the public or private markets.

6.   **No Intention to Pay Dividends**

NewCo may not pay any dividends on the New Equity Interests and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Equity Interests may depend entirely upon any future appreciation in the value of the New Equity Interests.  There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain their initial value.

### D.  *Factors Relating to Second Lien Backstop Commitment Letter*

1.   **Bankruptcy Court Might Not Approve Second Lien Backstop Commitment Letter**

The Bankruptcy Court's approval of the Second Lien Backstop Commitment Letter is crucial to consummating the restructuring contemplated by the Plan.  Failure to obtain the Bankruptcy Court's approval of the Second Lien Backstop Commitment Letter could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

### E.  *Risks Related to Equity Rights Offerings and ERO Backstop Agreements*

1.   **Bankruptcy Court Might Not Approve FLTL Equity Rights Offering Procedures or SLTL Equity Rights Offering Procedures**

The Bankruptcy Court's approval of the FLTL Equity Rights Offering Procedures and SLTL Equity Rights Offering Procedures is crucial to consummating the restructuring contemplated by the Plan.  Failure to obtain the Bankruptcy Court's approval of the FLTL Equity Rights Offering Procedures or the SLTL Equity Rights Offering Procedures could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

## 2. Debtors May Not Secure ERO Backstop Agreements

Although the Debtors expect to secure a commitment to fully backstop the $40 million Equity Rights Offerings and obtain Bankruptcy Court approval of the ERO Backstop Agreements, the Debtors have not yet finalized the terms of the ERO Backstop Agreements and cannot guarantee that such agreement commitment will be secured and approved by the Bankruptcy Court. Failure to secure such commitment and obtain Bankruptcy Court approval of the ERO Backstop Agreements could prevent the Debtors from consummating the Plan and the transactions contemplated thereby.

### F. *Risks Related to Recoveries for Holders of General Unsecured Claims Under the Plan*

#### 1. Allowed General Unsecured Claims Could be More than Projected

The estimate of Allowed General Unsecured Claims and recoveries for Holders of Allowed General Unsecured Claims set forth in the Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amounts of Allowed General Unsecured Claims may significantly vary from the estimated amounts contained in the Disclosure Statement. Such difference may materially and adversely affect, among other things, the recoveries to Holders of Allowed General Unsecured Claims under the Plan.

#### 2. Residual Distributable Value of the Single Share of Post-Effective Date FWE Parent

Although the Debtors will endeavor to value the residual distributable value of the Single Share of the Post-Effective Date FWE Parent held for the benefit of the holders of Allowed General Unsecured Claims (which will be included as a supplement to this Disclosure Statement), there can be no certainty that such estimated value will materialize into any distributions to holders of Allowed General Unsecured Claims.

The residual distributable value of the Single Share of the Post-Effective Date FWE Parent will necessarily be affected by, among other things: (i) recoveries generated in connection with the operation of the remaining assets of the Post-Effective Date Debtors and FWE I; (ii) the outcome of objections to Claims; and (iii) the cost and expenses of such actions and generally administering the Post-Effective Date Debtors and FWE I.

### G. *Additional Factors*

#### 1. Debtors Could Withdraw Plan

The Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

#### 2. Debtors Have No Duty to Update

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since

that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VIII thereof.

### X.
### VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a claim or interest in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

#### A. *Voting Deadline*

All Eligible Holders have been sent a Ballot together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON APRIL 26, 2021, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**Telephone: (855) 631-5346 (toll free from U.S. or Canada)**
**or +1 (917) 460-0913 (international)**
**E-mail: fieldwoodballots@primeclerk.com (with "Fieldwood" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B. *Voting Procedures*

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent or (b) submit a Ballot electronically via the E-Ballot voting platform on Prime Clerk's website by visiting https://cases.primeclerk.com/FieldwoodEnergy, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### C. *Parties Entitled to Vote*

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan

76

cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 1 — Other Secured Claims
Class 3 — FLFO Claims
Class 4 — FLTL Claims
Class 5 — SLTL Claims
Class 6A —Unsecured Trade Claims
Class 6B — General Unsecured Claims

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above. Trade Creditors may elect to have their Claims treated as Unsecured Trade Claims by indicating such election on the Ballot.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the

amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 1.        Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### 2.        Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, the Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 3.        Change of Vote

Any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### D.        *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy

Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E. *Further Information, Additional Copies*

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## XI.
## CONFIRMATION OF PLAN

### A. *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. In a motion filed contemporaneously with the filing of this Disclosure Statement, the Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B. *Objections to Confirmation*

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof. The following parties may be served at the below addresses.

**Debtors** at
Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attn: Michael Dane
       Thomas R. Lamme

**Counsel to Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
          Clifford Carlson (Clifford.Carlson@weil.com)

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Matthew S. Barr (Matt.Barr@weil.com)
          Jessica Liou (Jessica.Liou@weil.com)

**Counsel to the Ad Hoc Group of Secured Lenders** at
Haynes and Boone, LLP
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Attn:   Charles A. Beckham Jr. (charles.beckham@haynesboone.com)
          Martha Wyrick (martha.wyrick@haynesboone.com)

– and –

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:   Damian S. Schaiable (damian.schiable@davispolk.com)
          Natasha Tsiouris (natasha.tsiouris@davispolk.com)
          Josh Sturm (joshua.sturm@davispolk.com)

**Counsel to the Creditors' Committee** at

Pachulski Stang Ziehl & Jones LLP
440 Louisiana Street, Suite 900
Houston, Texas 77002
Attn:    Michael D. Warner (mwarner@pszjlaw.com)
          Benjamin L. Wallen (bwallen@pszjlaw.com)

– and –

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn:   Kristopher M. Hansen (khansen@stroock.com)
          Frank A. Merola (fmerola@stroock.com)
          Jonathan D. Canfield (jcanfield@stroock.com)
          Sherry J. Millman (smillman@stroock.com)

**Office of the U.S. Trustee** at
Office of the U.S. Trustee for Region 7
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn:   Hector Duran (Hector.Duran@usdoj.gov)
          Stephen Statham (Stephen.Statham@usdoj.gov)

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

### C.   *Requirements for Confirmation of Plan*

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (iii) feasible.

### 1.        Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.  Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.   The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.   The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

## 2. Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds

available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit L.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the abilities of each of FWE I, FWE III, and NewCo and its subsidiaries, including the Credit Bid Purchaser, to meet their respective obligations under the Plan.

#### (a) **FWE I**

The Debtors believe that FWE I will have sufficient funds and resources to meet, or otherwise satisfy, its obligations under the Plan going forward. As discussed above, the Debtors will capitalize FWE I on the Effective Date with $50 million minus the accrual of post-petition decommissioning spend by the Debtors on the Legacy Apache Properties, which the Debtors project shall be approximately $25 million. Additional funds will be available post-Effective Date through cash flows generated from operations of the Legacy Apache Properties, which the Debtors project will produce approximately 25,000 barrels of oil equivalent per day, and through loans of up to $400 million to be provided by Apache in accordance with the terms and conditions of the Standby Credit Facility Documents to be used by FWE I to perform P&A Obligations. Additionally, under the Decommissioning Agreement, separate security has previously been provided to Apache to secure P&A Obligations associated with the Apache Legacy Properties, including approximately $238 million in funds in Trust A and approximately $498 million in letters of credit and surety bonds (payable in accordance with their terms and conditions). As set detailed in **Exhibit M**, Houlihan Lokey estimated the enterprise value of FWE I to be approximately negative $220 million to positive $170 million, with a mid-point of negative $30 million.

Based on the Debtors' estimate of approximately $965 million to $1.16 billion in total FWE I Obligations, including all P&A Obligations associated with the Legacy Apache Properties, and the funds and resources described above, the Debtors believe that the Plan provides the ability for FWE I to meet, or otherwise satisfy, its obligations under the Plan.

#### (b) **FWE III**

83

-

The Debtors further believe that FWE III will have sufficient funds to meet its obligations under the Plan. FWE III will be capitalized with approximately $27 million of capital through a combination of approximately (i) $5-15 million of cash on hand and (ii) $12-22 million in future cash commitments from the Credit Bid Purchaser, which the Debtors believe will provide the Plan Administrator with adequate funding to implement the Plan, operate the FWE III Assets, and satisfy the FWE III Obligations, including the P&A Obligations associated with the FWE III Assets and wind down costs. Moreover, an additional $12 million in outstanding security provided by surety bonds will be available to backstop any of the FWE III Obligations (in accordance with the terms and conditions of such bonds). In addition, the Plan Administrator will engage the services of Credit Bid Purchaser to leverage its staff's extensive experience managing P&A and decommissioning work to efficiently and safely complete FWE III's P&A obligations.

Therefore, based on Houlihan Lokey's estimated asset value of FWE III of approximately negative $28 million, as detailed in **Exhibit M**, the Debtors believe that FWE III is sufficiently capitalized to satisfy all of its obligations.

(c)  **Credit Bid Purchaser**

The Debtors believe that the Credit Bid Purchaser will have sufficient funds to meet its obligations under the Plan, including those obligations related to the Credit Bid Acquired Interests. The Debtors submit that the Credit Bid Purchaser can provide adequate assurance of future performance under the assumed executory contracts and unexpired leases. If the Plan is confirmed, the Credit Bid Purchaser will acquire specified Deepwater Assets and Shelf Assets with a significantly de-levered balance sheet and reduction in annual debt service obligations. Based on the Debtors' projected cash on hand on the Effective Date, the Debtors estimate that Credit Bid Purchaser will have up to $304 million in funded debt, composed of approximately $119 million from the First Lien Exit Facility and up to $185 million from the Second Lien Exit Facility. In addition, the Credit Bid Purchaser is anticipated to raise $40 million through the Equity Rights Offerings on the Effective Date. Of the estimated up to $225 million of new money that the Credit Bid Purchaser is anticipated to raise, $120 million will be used to capitalize the Credit Bid Purchaser's balance sheet, and the remainder will be used to fund the cash portion of the Credit Bid Consideration.

The Debtors have also prepared the consolidated financial projections for the Credit Bid Purchaser (the "**Financial Projections**") for the fiscal years 2021 through 2025 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are attached hereto as **Exhibit N**.

Accordingly, the Debtors believe that the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial

Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

### 4. Valuation

The Debtors and Houlihan believe that the valuation of Credit Bid Purchaser implied by the Credit Bid Transaction is currently the best measure of fair market value for the assets and associated liabilities included in the Credit Bid Transaction given, among other reasons, (i) the robust M&A Process conducted by Houlihan and (ii) the terms of the Credit Bid Transaction are the result of good faith, arm's length, and comprehensive negotiations between the Debtors and the Consenting FLTL Lenders and their respective financial and legal advisors based on in-depth due diligence and a determination of the value maximizing development, production and operation of the assets included in the Credit Bid Transaction. Notwithstanding the foregoing, Houlihan has prepared a valuation analysis of NewCo, which is attached hereto as **Exhibit M**.

## XII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A. *Alternative Plan of Reorganization*

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' business or (b) an orderly liquidation of their assets. The Debtors, however, believe

that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B. *Sale under Section 363 of the Bankruptcy Code*

Upon the Toggle Event, the Debtors intend to seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets to the Credit Bid Purchaser pursuant to section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, the Debtors do not believe that a standalone sale of their assets pursuant to section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims and Interests under the Plan.

### C. *Liquidation Under Chapter 7 of Bankruptcy Code*

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit L.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### XIII.
### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 1, 3, 4, 5, 6A, and 6B to vote in favor thereof.

*[Remainder of Page Intentionally Left Blank]*

**Exhibit B**

**Blackline of Amended Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## ~~SECOND~~THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## FIELDWOOD ENERGY LLC AND ITS AFFILIATED DEBTORS[2]

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: March ~~23~~24, 2021
        Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

[2] ~~As of the date hereof, the Prepetition FLFO Administrative Agent and the Prepetition FLFO Lenders have not accepted or agreed to the terms or provisions of this Plan or any transaction contemplated by this Plan. All of the Prepetition FLFO Administrative Agent's, and the Prepetition FLFO Lenders' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Plan. All of the Debtors' rights with respect to such amendments and modifications are reserved. For the avoidance of doubt, the filing of this Plan does not in any way affect the ongoing consent rights of the DIP Lenders and the Consenting FLTL Lenders under the Restructuring Support Agreement.~~

# Table of Contents

**ARTICLE I.    DEFINITIONS AND INTERPRETATION.** ....................................................... **1**

　1.1　Definitions. ............................................................................................................... 1
　1.2　Interpretation; Application of Definitions; Rules of Construction. ..................... ~~29~~27
　1.3　Reference to Monetary Figures. ......................................................................... ~~29~~27
　1.4　Controlling Document. ......................................................................................... ~~29~~28
　1.5　Certain Consent Rights ......................................................................................... ~~29~~28

**ARTICLE II.   ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.** ............................................................................................... **~~30~~28**

　2.1　Treatment of Administrative Expense Claims. .................................................. ~~30~~28
　2.2　Treatment of Fee Claims. ..................................................................................... ~~30~~29
　2.3　Treatment of DIP Claims. ..................................................................................... ~~31~~30
　2.4　Payment of Fees and Expenses Under DIP Order. ............................................ ~~32~~30
　2.5　Treatment of Priority Tax Claims. ...................................................................... ~~32~~30
　2.6　Restructuring Expenses. ....................................................................................... ~~32~~31
　2.7　Postpetition Hedge Claims. ................................................................................. ~~33~~31

**ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS.** ............................... **~~33~~32**

　3.1　Classification in General. ..................................................................................... ~~33~~32
　3.2　Formation of Debtor Groups for Convenience Only. ....................................... ~~33~~32
　3.3　Summary of Classification of Claims and Interests. ......................................... ~~34~~32
　3.4　Special Provision Governing Unimpaired Claims. ........................................... ~~34~~33
　3.5　Separate Classification of Other Secured Claims. ............................................ ~~34~~33
　3.6　Elimination of Vacant Classes. ........................................................................... ~~34~~33
　3.7　Voting Classes; Presumed Acceptance by Non-Voting Classes. ..................... ~~35~~33
　3.8　Voting; Presumptions; Solicitation. .................................................................... ~~35~~33
　3.9　Cramdown. .............................................................................................................. ~~35~~34
　3.10　No Waiver. ............................................................................................................. ~~35~~34

**ARTICLE IV.   TREATMENT OF CLAIMS AND INTERESTS.** ......................................... **~~36~~34**

　4.1　Class 1: Other Secured Claims. ........................................................................... ~~36~~34
　4.2　Class 2: Priority Non-Tax Claims. ...................................................................... ~~36~~34
　4.3　Class 3: FLFO Claims. .......................................................................................... ~~36~~35
　4.4　Class 4: FLTL Claims. ........................................................................................... ~~37~~35
　4.5　Class 5A: Unsecured Trade Claims. .................................................................... ~~38~~36
　4.6　Class 5B: General Unsecured Claims. ................................................................. ~~38~~36
　4.7　Class 6: Intercompany Claims. ............................................................................ ~~38~~37
　4.8　Class 7: Subordinated Securities Claims. ........................................................... ~~39~~37
　4.9　Class 8: Intercompany Interests. ......................................................................... ~~39~~37
　4.10　Class 9: Existing Equity Interests. ..................................................................... ~~39~~37
　4.11　Treatment of Vacant Classes. ............................................................................. ~~39~~38

**ARTICLE V.   MEANS FOR IMPLEMENTATION.** ............................................................ **~~40~~38**

　5.1　Plan Settlement; Compromise and Settlement of Claims, Interests, and Controversies. ~~40~~38
　5.2　Credit Bid Transaction; Confirmation Outside Date. ........................................ ~~40~~38
　5.3　Equity Rights Offering. ......................................................................................... ~~42~~41
　5.4　New Equity Interests. ............................................................................................. ~~43~~41
　5.5　NewCo Organizational Documents ..................................................................... ~~43~~42

| | | |
|---|---|---|
| 5.6 | New Money Warrants and GUC Warrants | 43~~42~~ |
| 5.7 | Plan of Merger | 44~~42~~ |
| 5.8 | Single Share | 44~~43~~ |
| 5.9 | Plan Administrator | 44~~43~~ |
| 5.10 | Plan Funding. | 47~~46~~ |
| 5.11 | The Exit Facilities | 47~~46~~ |
| 5.12 | Apache Definitive Documents. | 49~~47~~ |
| 5.13 | Abandonment of Certain Properties | 49~~48~~ |
| 5.14 | Establishment of Claims Reserve. | 50~~48~~ |
| 5.15 | Plan Administrator Expense Reserve. | 50~~48~~ |
| 5.16 | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 50~~49~~ |
| 5.17 | Corporate Action. | 51~~50~~ |
| 5.18 | Cancellation of Existing Securities and Agreements. | 52~~50~~ |
| 5.19 | Cancellation of Certain Existing Security Interests. | 53~~51~~ |
| 5.20 | Intercompany Interests; Corporate Reorganization. | 53~~52~~ |
| 5.21 | Restructuring Transactions. | 53~~52~~ |
| 5.22 | Liquidating Trust. | 54~~52~~ |
| 5.23 | Securities Exemptions. | 54~~53~~ |
| 5.24 | Closing of Chapter 11 Cases. | 56~~54~~ |

**ARTICLE VI.  DISTRIBUTIONS.** | | 56~~54~~ |

| | | |
|---|---|---|
| 6.1 | Distributions Generally. | 56~~54~~ |
| 6.2 | No Postpetition Interest on Claims. | 56~~55~~ |
| 6.3 | Date of Distributions. | 56~~55~~ |
| 6.4 | Distribution Record Date. | 56~~55~~ |
| 6.5 | Distributions after Effective Date | 57~~55~~ |
| 6.6 | Delivery of Distributions. | 57~~55~~ |
| 6.7 | Unclaimed Property. | 57~~56~~ |
| 6.8 | Satisfaction of Claims. | 57~~56~~ |
| 6.9 | Manner of Payment under Plan. | 58~~56~~ |
| 6.10 | De Minimis Cash Distributions. | 58~~56~~ |
| 6.11 | No Distribution in Excess of Amount of Allowed Claim. | 58~~57~~ |
| 6.12 | Allocation of Distributions Between Principal and Interest. | 58~~57~~ |
| 6.13 | Setoffs and Recoupments. | 58~~57~~ |
| 6.14 | Withholding and Reporting Requirements. | 59~~57~~ |
| 6.15 | Claims Paid by Third Parties. | 59~~58~~ |
| 6.16 | Claims Payable by Third Parties. | 60~~58~~ |

**ARTICLE VII.  PROCEDURES FOR DISPUTED CLAIMS.** | | 60~~59~~ |

| | | |
|---|---|---|
| 7.1 | Allowance of Claims. | 60~~59~~ |
| 7.2 | Claims Objections. | 60~~59~~ |
| 7.3 | Estimation of Claims. | 60~~59~~ |
| 7.4 | Adjustment to Claims Register Without Objection. | 61~~60~~ |
| 7.5 | Time to File Objections to Claims. | 61~~60~~ |
| 7.6 | Disallowance of Claims. | 61~~60~~ |
| 7.7 | Amendments to Claims. | 61~~60~~ |
| 7.8 | No Distributions Pending Allowance. | 62~~60~~ |
| 7.9 | Distributions After Allowance. | 62~~60~~ |
| 7.10 | Claims Resolution Procedures Cumulative. | 62~~61~~ |

**ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** ......................... ~~62~~61

| | | |
|---|---|---|
| 8.1 | General Treatment. .......................... | ~~62~~61 |
| 8.2 | Determination of Cure Amounts and Deemed Consent. .......................... | ~~63~~62 |
| 8.3 | Rejection Damages Claims. .......................... | ~~65~~63 |
| 8.4 | Survival of the Debtors' Indemnification Obligations. .......................... | ~~65~~64 |
| 8.5 | Insurance Policies. .......................... | ~~65~~64 |
| 8.6 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......................... | ~~66~~64 |
| 8.7 | Reservation of Rights. .......................... | ~~66~~65 |

**ARTICLE IX. CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.** ...... ~~66~~65

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Effective Date. .......................... | ~~66~~65 |
| 9.2 | Waiver of Conditions Precedent. .......................... | ~~69~~67 |
| 9.3 | Effect of Failure of a Condition. .......................... | ~~69~~68 |

**ARTICLE X. EFFECT OF CONFIRMATION.** .......................... ~~70~~68

| | | |
|---|---|---|
| 10.1 | Binding Effect. .......................... | ~~70~~68 |
| 10.2 | Vesting of Assets. .......................... | ~~70~~68 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. .......................... | ~~70~~68 |
| 10.4 | Pre-Confirmation Injunctions and Stays. .......................... | ~~71~~69 |
| 10.5 | Injunction Against Interference With Plan. .......................... | ~~71~~69 |
| 10.6 | Plan Injunction. .......................... | ~~71~~70 |
| 10.7 | Releases. .......................... | ~~72~~70 |
| 10.8 | Exculpation. .......................... | ~~76~~74 |
| 10.9 | Injunction Related to Releases and Exculpation. .......................... | ~~77~~75 |
| 10.10 | Subordinated Securities Claims. .......................... | ~~77~~76 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. .......................... | ~~77~~76 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. .......................... | ~~78~~76 |
| 10.13 | Indemnification and Reimbursement Obligations. .......................... | ~~78~~76 |

**ARTICLE XI. RETENTION OF JURISDICTION.** .......................... ~~79~~77

| | | |
|---|---|---|
| 11.1 | Retention of Jurisdiction. .......................... | ~~79~~77 |

**ARTICLE XII. MISCELLANEOUS PROVISIONS.** .......................... ~~81~~79

| | | |
|---|---|---|
| 12.1 | Payment of Statutory Fees .......................... | ~~81~~79 |
| 12.2 | Exemption from Certain Transfer Taxes. .......................... | ~~81~~79 |
| 12.3 | Request for Expedited Determination of Taxes. .......................... | ~~81~~80 |
| 12.4 | Dates of Actions to Implement Plan. .......................... | ~~81~~80 |
| 12.5 | Amendments. .......................... | ~~82~~80 |
| 12.6 | Revocation or Withdrawal of Plan. .......................... | ~~83~~80 |
| 12.7 | Severability. .......................... | ~~83~~81 |
| 12.8 | Governing Law. .......................... | ~~83~~81 |
| 12.9 | Immediate Binding Effect. .......................... | ~~83~~81 |
| 12.10 | Successors and Assigns. .......................... | ~~84~~81 |
| 12.11 | Entire Agreement. .......................... | ~~84~~82 |
| 12.12 | Computing Time. .......................... | ~~84~~82 |
| 12.13 | Exhibits to Plan. .......................... | ~~84~~82 |
| 12.14 | Notices. .......................... | ~~84~~82 |
| 12.15 | Reservation of Rights. .......................... | ~~86~~83 |
| 12.16 | Dissolution of Creditors' Committee. .......................... | ~~86~~84 |

Each of Fieldwood Energy LLC; Fieldwood Energy Inc.; Dynamic Offshore Resources NS, LLC; Fieldwood Energy Offshore LLC; Fieldwood Onshore LLC; Fieldwood SD Offshore LLC; Fieldwood Offshore LLC; FW GOM Pipeline, Inc.; GOM Shelf LLC; Bandon Oil and Gas GP, LLC; Bandon Oil and Gas, LP; Fieldwood Energy SP LLC; Galveston Bay Pipeline LLC; and Galveston Bay Processing LLC (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.      DEFINITIONS AND INTERPRETATION.

### 1.1      *Definitions*.

The following terms shall have the respective meanings specified below:

***363 Credit Bid Transaction*** means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchaser pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement in accordance with Section 5.2(c) of this Plan.

***Abandoned Properties*** means the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties (as amended, supplemented, or otherwise modified from time to time).

***Accepting Class*** means a class of Claims or Interests that votes to accept this Plan in accordance with section 1126 of the Bankruptcy Code.

***Ad Hoc Group of Secured Lenders*** means the ad hoc group of holders of Prepetition FLTL Loans and Prepetition SLTL Loans that is represented by the Ad Hoc Group of Secured Lenders Advisors.

***Ad Hoc Group of Secured Lenders Advisors*** means Davis Polk & Wardwell LLP, Haynes and Boone LLP, Gordon, Arata, Montgomery, Barnett, McCollam, Duplantis & Eagan, LLC, Rothschild & Co US Inc. and Intrepid Financial Partners, LLC and any local or foreign advisors.

***Ad Hoc Group of Prepetition SLTL Lenders*** means that certain ad hoc group of holders of Prepetition SLTL Loans that is represented by the Ad Hoc Group of Prepetition SLTL Advisors.

***Ad Hoc Group of Prepetition SLTL Lenders Advisors*** means only Kasowitz Benson Torres LLP.

*Additional Predecessor Agreement* means any consensual agreement that the Debtors may enter into prior to the Confirmation Date with any entity or entities in the chain of title, co-working interest owner(s), or other related party for any of the Abandoned Properties.

*Additional Predecessor Agreement Documents* means any agreements or documents contemplated by and necessary to the consummation of an Additional Predecessor Agreement.

*Administrative Expense Claim* means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than DIP Claims and Postpetition Hedge Claims), including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (b) Fee Claims.

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar dates established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order (including the DIP Order). With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Post-Effective Date Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. If a Claim is Allowed only in part, any provisions hereunder with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim. Notwithstanding the foregoing, unless expressly waived herein, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable.

*Amended Organizational Documents* means the certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, stockholders agreement, and the operating agreements or other similar organizational or formation documents, as applicable, of the Post-Effective Date Debtors.

*Apache* means Apache Corporation.

*Apache Definitive Documents* has the meaning set forth in the Apache Implementation Agreement.

*Apache Fees and Expenses* has the meaning set forth in the Apache Implementation Agreement.

*Apache Implementation Agreement* means that certain Implementation Agreement, dated January 1, 2021, by and among Debtor Fieldwood Energy LLC and Debtor GOM Shelf LLC, on the one hand, and the Apache PSA Parties on the other hand, as may be amended, restated, or otherwise modified pursuant to the terms thereof; *provided* that such amendment, restatement, or other modification is reasonably acceptable to the Debtors, the Apache PSA Parties, the Required DIP Lenders and Requisite FLTL Lenders.

*Apache Implementation Costs* has the meaning ascribed to "Implementation Costs" in the Apache Implementation Agreement.

*Apache PSA Parties* means, collectively, Apache, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC.

*Apache Term Sheet* has the meaning set forth in the Restructuring Support Agreement.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

*Assumption Dispute* means an unresolved objection regarding assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code).

*Avoidance Actions* means all claims and causes of action that may be commenced by or on behalf of the Debtors pursuant to sections 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code or similar nonbankruptcy law, including similar or related state or federal statute and common law.

*Backstop Commitment Premium Equity Interests* means the Second Lien Backstop Commitment Premium Equity Interests, the FLTL ERO Backstop Commitment Premium Equity Interests, and the SLTL ERO Backstop Commitment Premium Equity Interests.

*Bankruptcy Code* means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any

reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

*Business Day* means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

*Cash* means legal tender of the United States of America.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including claims and causes of action arising under section 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code), (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer or preferential transfer claim.

*Chapter 11 Case(s)* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

*Claims Reserve* means one or more segregated accounts not subject to the Liens of the Prepetition Agents or DIP Agent, which shall be established on or immediately before the Effective Date and funded on the Effective Date with Cash to pay (or reserve for payment of) any (i) Allowed Administrative Expense Claims, (ii) Allowed Priority Tax Claims, (iii) Allowed Priority Non-Tax Claims, (iv) Allowed Other Secured Claims, (v) Allowed Unsecured Trade Claims, and (vi) Cure Amounts; *provided*, *however*, that all Cash remaining in the Claims Reserve after payment of all relevant Allowed Claims and Cure Amounts in accordance with the

terms of this Plan shall constitute Residual Distributable Value; *provided further* that the funding of the Claims Reserve shall be consistent with the terms of the Second Lien Backstop Commitment Letter.

**Claims Reserve Amount** means the aggregate amount of Cash, as determined by the Debtors with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders and (ii) the reasonable consent of the Creditors' Committee solely with respect to the amount of the Claims Reserve on account of Allowed Unsecured Trade Claims, necessary to satisfy all (a) Allowed Administrative Expense Claims, (b) Allowed Priority Tax Claims, (c) Allowed Priority Non-Tax Claims, (d) Allowed Other Secured Claims, (e) Allowed Unsecured Trade Claims, and (f) Cure Amounts, which aggregate amount shall be funded into the Claims Reserve on the Effective Date.

**Class** means any group of Claims or Interests classified under the Plan pursuant to section 1122 and 1123(a)(1) of the Bankruptcy Code.

**Collateral** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court, in form and substance acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, ~~[the Prepetition FLFO Administrative Agent]~~[3], and the Creditors' Committee, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**Confirmation Outside Date** means May 10, 2021 or such later date as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

**Consenting Creditors** means the Prepetition FLTL Lenders, together with their respective successors and permitted assigns, and the Prepetition SLTL Lenders, together with their respective successors and permitted assigns, that are party to, or have executed a joinder to, the Restructuring Support Agreement.

---

[3] ~~[NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]~~

*Credit Bid Acquired Interests* has the meaning ascribed to "Acquired Interests" set forth in the Credit Bid Purchase Agreement.

*Credit Bid Assumed Liabilities* has the meaning ascribed to "Assumed Liabilities" set forth in the Credit Bid Purchase Agreement.

*Credit Bid Consent Rights* means any right of consent, notice, and other similar rights, if any, that are applicable to the sale of the Credit Bid Acquired Interests in connection with the Credit Bid Purchase Agreement.

*Credit Bid Permitted Encumbrances* has the meaning ascribed to "Permitted Encumbrances" set forth in the Credit Bid Purchase Agreement.

*Credit Bid Purchase Agreement* means that certain Purchase and Sale Agreement, by and between Fieldwood Energy LLC, the other seller parties, and the Credit Bid Purchaser and NewCo, together with any and all related agreements, annexes, exhibits and schedules in connection therewith, as amended, supplemented or otherwise modified from time to time, which shall be in form and substance (i) acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders [and (ii) reasonably acceptable to the: *provided* that any modifications to the Credit Bid Purchase Agreement from the version attached to the draft of the Disclosure Statement at Docket No. 1022 shall require the consent of the Prepetition FLFO Administrative Agent solely(not to be unreasonably withheld with respect to the following clauses (b) and (e)) to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims or such modification (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the draft of the Disclosure Statement at Docket No. 1022 that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders]⁴, and a substantially final copy of which shall be filed as an exhibit to the Disclosure Statement and included in the Plan Supplement.

*Credit Bid Purchaser* means [   ], a newly formed special purpose bidding entity, as purchaser of certain of the Debtors' assets pursuant to and in accordance with the Credit Bid Purchase Agreement.

---

⁴ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

*Credit Bid Preferential Purchase Rights* has the meaning ascribed to "Preferential Right" set forth in the Credit Bid Purchase Agreement.

*Credit Bid Transaction* means the sale of the Credit Bid Acquired Interests to the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement.

*Credit Bid Transaction Closing* means "Closing" as defined in the Credit Bid Purchase Agreement.

*Creditors' Committee* means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be reconstituted from time to time.

*Cure Amount* means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Notice* means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease of the Debtors that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (b) any Cure Amount to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

*D&O Policy* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability providing coverage to the Debtors and in effect or purchased as of the Petition Date.

*Debtor(s)* has the meaning set forth in the introductory paragraph of the Plan.

*Debtor in Possession* means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*Decommissioning Agreement* means that Decommissioning Agreement, dated as of September 30, 2013, by and among the Apache PSA Parties, Fieldwood Energy LLC, and the other parties thereto.

*Decommissioning Security* has the meaning set forth in the Apache Implementation Agreement.

*Definitive Documents* has the meaning set forth in the Restructuring Support Agreement.

*DIP Agent* means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its

successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

**DIP Claim** means any Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Credit Agreement.

**DIP Documents** has the meaning set forth in the DIP Order.

**DIP Facility** means the postpetition senior secured debtor-in-possession term loan credit facility approved by the DIP Order.

**DIP Facility Credit Agreement** means the credit agreement governing the terms of the DIP Facility, dated as of August 24, 2020, by and among Fieldwood Energy LLC, as borrower, FWE Parent, as holdings, the DIP Agent, and the DIP Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order.

**DIP Lenders** means the lenders from time to time party to the DIP Facility Credit Agreement.

**DIP Order** means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 346], authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility, as may be amended, supplemented or modified from time to time.

**Disclosure Statement** means the disclosure statement in support of the Plan, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, (ii) reasonably acceptable to the Creditors' Committee solely for matters relating to the treatment of holders of General Unsecured Claims or Unsecured Trade Claims, and (iii) reasonably acceptable to the Prepetition FLFO Administrative Agent]⁵, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means, with respect to a Claim, (a) any Claim, which Claim is disputed under this Plan (including pursuant to section 7.1 of this Plan) or otherwise or as to which the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, have

---

⁵ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent, disputed or undetermined, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Post-Effective Date Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*Distribution Date* means the date or dates, including the Initial Distribution Date, as determined by the Plan Administrator in accordance with the terms of this Plan, on which the Plan Administrator makes a Distribution to holders of Allowed Claims.

*Distribution Record Date* means, except as otherwise provided in the Plan, the date that is two business days before the Effective Date or such other date as is designated by the Debtors with the consent of the Requisite FLTL Lenders and the Required DIP Lenders.

*Divisive Merger* means a divisive merger pursuant to Sections 10.001, 10.002, 10.008 and 10.302 of the Texas Business Organizations Code.

*Effective Date* means the date which is the first Business Day on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.1 of the Plan have been satisfied or waived in accordance with the terms of the Plan, and (b) no stay of the Confirmation Order is in effect.

*Entity* means an "entity," as defined in section 101(15) of the Bankruptcy Code.

*Equity Rights Offerings* means, collectively, the FLTL Equity Rights Offering and the SLTL Equity Rights Offering.

*ERO Backstop Agreements* means, collectively, the FLTL ERO Backstop Agreement and the SLTL ERO Backstop Agreement.

*ERO Backstop Parties* means, collectively, the FLTL ERO Backstop Parties and the SLTL ERO Backstop Parties.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) [the Prepetition FLFO Secured Parties][6], (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h)

---

[6] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth

the Prepetition FLTL Administrative Agent, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*Existing Equity Interests* means shares of common stock of FWE Parent that existed immediately before the Effective Date.

*Exit Facilities* means the First Lien Exit Facility and the Second Lien Exit Facility.

*Exit Facility Agents* means the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent.

*Exit Facility Documents* means the First Lien Exit Facility Documents and the Second Lien Exit Facility Documents.

*Exit Facility Lenders* means the First Lien Exit Facility Lenders and the Second Lien Exit Facility Lenders.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

*Fieldwood U.A. Interests* has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

*Final Order* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has: (a) not been reversed, stayed, modified or amended, as to which the time to appeal, petition for certiorari or

in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

move for reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration or rehearing was sought; *provided*, *however*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

*First Lien Exit Facility* means the facility under the First Lien Exit Facility Credit Agreement.

*First Lien Exit Facility Agent* means the administrative agent under the First Lien Exit Facility Credit Agreement.

*First Lien Exit Facility Commitment Letter* means that certain commitment letter, in form and substance acceptable to the Required DIP Lenders, the Requisite FLTL Lenders, the Debtors, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent, to be entered into by and among Fieldwood Energy LLC and the First Lien Exit Facility Agent, as may be amended, supplemented, or modified from time to time, pursuant and subject to the terms thereof, pursuant to which, among other things, GS Bank (as defined therein) agreed to act as the sole arranger, administrative agent and collateral agent in connection with the First Lien Exit Facility and to commit to provide First Lien Exit Facility in accordance with the terms and conditions set forth therein.

*First Lien Exit Facility Credit Agreement* means that certain credit agreement to be entered by the Credit Bid Purchaser, the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders on the Effective Date that shall govern the First Lien Exit Facility which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the First Lien Exit Facility Term Sheet and otherwise be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

*First Lien Exit Facility Documents* means, collectively, the First Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be in form and substance acceptable to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

*First Lien Exit Facility Lenders* means the lenders party to the First Lien Exit Facility Credit Agreement.

*First Lien Exit Facility Term Sheet* means a term sheet attached to the First Lien Exit Facility Commitment Letter and to be attached to the Disclosure Statement, as may be

amended, supplemented or modified from time to time with the consent of the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders.

***FLFO Claims*** means all Claims arising from or based upon the Prepetition FLFO Credit Agreement.

***FLFO Claims Allowed Amount*** means the aggregate principal amount of $138,599,082.31 plus any accrued and unpaid ~~non-default~~ interest (accruing at the default rate to the extent provided under the Prepetition FLFO Credit ~~Agreement based, at the option of the Debtors, on the "LIBOR" rate, as provided in the Prepetition FLFO Credit~~ Agreement), fees, costs, and other expenses arising under, and payable pursuant to, the Prepetition FLFO Credit Agreement on or before the Effective Date, which shall not be subject to ~~defense, counterclaim or offset of any kind~~any avoidance, reduction, setoff, offset, recharacterization, subordination, counterclaims, cross claims, defenses, disallowance, impairments, or any other challenges under applicable law or regulation by any Entity. Notwithstanding the foregoing, on the Effective Date any amount accrued pursuant to Section 2.08(b) of the Prepetition FLFO Credit Agreement and any amounts accrued in respect of Yield Maintenance Premium or any Prepayment Fee (each as defined in the Prepetition FLFO Credit Agreement), if any, shall be deemed discharged, released, and waived by all holders of Allowed FLFO Claims and the FLFO Claims Allowed Amount shall not be increased on account of such amounts as a result of such discharge, release, and waiver.

***FLFO Distribution Amount*** means Cash in the amount of the FLFO Claims Allowed Amount *less* the initial aggregate principal amount of the First Lien Exit Facility, as set forth in the First Lien Exit Facility Commitment Letter.

***FLTL Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition FLTL Credit Agreement.

***FLTL Claims Allowed Amount*** means $1,142,688,815.28 in principal plus any accrued but unpaid interest or fees due under the Prepetition FLTL Credit Agreement as of the Petition Date.

***FLTL Deficiency Claim*** means any FLTL Claim or portion thereof that is not Secured, if any.

***FLTL Equity Rights Offering*** means that certain rights offering pursuant to which each holder of Allowed FLTL Claims is entitled to receive FLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the FLTL Equity Rights Offering Amount in accordance with the FLTL Equity Rights Offering Procedures, the terms and conditions of which shall be (i) acceptable to the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the

First Lien Exit Facility Agent]̶,⁷ and (iii) reasonably acceptable to the Requisite SLTL Lenders solely to the extent that it directly and adversely impacts the holders of Allowed SLTL Claims.

**FLTL Equity Rights Offering Amount** means $20,000,000.

**FLTL Equity Rights Offering Procedures** means the procedures for the implementation of the FLTL Equity Rights Offering to be approved by the Bankruptcy Court.

**FLTL ERO Backstop Agreement** means that certain [Equity Backstop Commitment Agreement], in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders [and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent]̶⁸, to be entered into by and among Fieldwood Energy LLC, NewCo, and the FLTL ERO Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to which the FLTL ERO Backstop Parties agreed to, among other things, backstop the FLTL Equity Rights Offering with the terms and conditions set forth therein.

[**FLTL ERO Backstop Commitment Percentage** has the meaning set forth in the FLTL ERO Backstop Agreement.]

[**FLTL ERO Backstop Commitment Premium** means a premium equal to 8% of the FLTL Equity Rights Offering Amount payable to the FLTL ERO Backstop Parties with the FLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the FLTL ERO Backstop Agreement.]

[**FLTL ERO Backstop Commitment Premium Equity Interests** means an amount of New Equity Interests equal to the value of the FLTL ERO Backstop Commitment Premium as further set forth in the FLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

**FLTL ERO Backstop Parties** means those parties that agree to backstop the FLTL Equity Rights Offering pursuant to the FLTL ERO Backstop Agreement, each in its respective capacity as such.

**FLTL Subscription Rights** means the subscription right to acquire New Equity Interests with an aggregate value equal to the FLTL Rights Offering Amount offered in accordance with the FLTL Equity Rights Offering Procedures; *provided, however*, that such

---

⁷ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

⁸ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

[**FLTL Unsubscribed Shares** has the meaning set forth in the FLTL ERO Backstop Agreement].

**FWE I** means an entity formed on the Effective Date by Divisive Merger under the name Fieldwood Energy I LLC pursuant to the Plan of Merger.

**FWE I LLC Agreement** means the limited liability company agreement of FWE I, which shall be in substantially the form attached to the Apache Implementation Agreement.

**FWE I Assets** has the meaning set forth in the Plan of Merger.

**FWE I Obligations** has the meaning set forth in the Plan of Merger.

**FWE I Sole Manager** has the meaning ascribed to the term "Sole Manager" in the FWE I LLC Agreement, and shall include the sole manager appointed to FWE I upon the Effective Date and any successor thereto.

**FWE III** means the surviving entity under the name Fieldwood Energy III LLC following the Divisive Merger pursuant to the Plan of Merger.

**FWE III LLC Agreement** means the limited liability company agreement of FWE III, a form of which shall be included in the Plan Supplement.

**FWE III Assets** has the meaning set forth in the Plan of Merger.

**FWE III Obligations** has the meaning set forth in the Plan of Merger.

**FWE Assets** means, collectively, the FWE I Assets and FWE III Assets.

**FWE Parent** means Debtor Fieldwood Energy Inc.

**General Unsecured Claim** means any Claim against a Debtor, other than a DIP Claim, Postpetition Hedge Claim, Administrative Expense Claim (including a Fee Claim), FLFO Claim, FLTL Claim, SLTL Claim, Other Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Unsecured Trade Claim, Subordinated Securities Claim, or Intercompany Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court. For the avoidance of doubt, General Unsecured Claims shall not include FLTL Deficiency Claims or SLTL Deficiency Claims.

**GUC Warrant Agreement** means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the GUC Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Requisite SLTL Lenders and the Creditors' Committee and which shall

contain provisions as favorable as the provisions in the SLTL Tranche 1 Warrant Agreement or SLTL Tranche 2 Warrant Agreement.

*GUC Warrants* means 8-year warrants for 3.5% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and SLTL Tranche 1 Warrants, but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the GUC Warrant Agreement; *provided*, that if the SLTL Tranche 2 Warrants are exercised, the GUC Warrants shall be subject to adjustment or true-up as necessary to retain such percentage after giving effect to the exercise of the SLTL Tranche 2 Warrants.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligation* means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

*Initial Distribution* means the first Distribution that the Plan Administrator makes to holders of Allowed Claims.

*Initial Distribution Date* means the date on which the Plan Administrator shall make the Initial Distribution, which shall not be less than five Business Days after the Effective Date.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than any Existing Equity Interest.

*Interest* means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or

in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Management Incentive Plan* means the post-Effective Date management incentive plan of NewCo which shall provide for [up to] 10% of New Equity Interests on a fully diluted basis or other equity or similar interests in NewCo to be reserved for directors, managers, officers, and employees of NewCo or a subsidiary of NewCo (including the Credit Bid Purchaser) to be distributed on terms to be determined by the board of directors of NewCo.

*New Equity Interests* means the equity interests of NewCo to be issued (i) on the Effective Date (including the Backstop Commitment Premium Equity Interests and upon the exercise of the Subscription Rights), (ii) upon exercise of the New Money Warrants, the SLTL Warrants, or the GUC Warrants, (iii) under the Management Incentive Plan, or (iv) on or after the Effective Date as otherwise permitted pursuant to the NewCo Organizational Documents.

*New Intercreditor Agreement* means that certain Intercreditor Agreement, to be dated as of the Effective Date, by and among the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent and the Credit Bid Purchaser, the form of which shall be contained in the Plan Supplement, acceptable [to the Prepetition FLFO Administrative Agent, the First Lien Exit Facility Agent, the Requisite FLFO Lenders,] ⁹ the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders*.*

*NewCo* means [ ], which is the direct or indirect owner of 100% of the equity interests of the Credit Bid Purchaser.

*NewCo Entities* means, collectively, NewCo and each of its direct and indirect subsidiaries.

*NewCo Organizational Documents* means the form of certificate of formation, limited liability company agreement, agreement of limited partnership, articles of incorporation, bylaws, trust agreements, or such other applicable formation documents of the NewCo and any of its subsidiaries, including any shareholders' or stockholders' agreement, which shall be (i) acceptable to the Debtors, the Requisite FLTL Lenders, and the Required DIP Lenders and [(ii) (a) if NewCo or any of its subsidiaries are to be formed in a jurisdiction outside of the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent or (b) if NewCo or any of its subsidiaries are to be formed in a jurisdiction within the United States, reasonably acceptable to the Prepetition FLFO Administrative Agent solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims or First Lien Exit Facility Lenders.]¹⁰

---

⁹ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

¹⁰ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth

*New Money Consideration* means, in the aggregate, the amount of Cash provided to the Debtors by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement.

*New Money Investment* means the investment of up to $85 million in Cash into Credit Bid Purchaser by the New Money Second Lien Exit Facility Lenders in connection with, and upon consummation of, the Second Lien Exit Facility, subject to the terms of the Second Lien Backstop Commitment Letter.

*New Money Second Lien Exit Facility Lenders* means the lenders party to the Second Lien Exit Facility Credit Agreement participating in the New Money Investment.

*New Money Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the New Money Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders and Requisite FLTL Lenders.

*New Money Warrants* means 7-year warrants for up to 24% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the Subscription Rights, but excluding the effect of any New Equity Interests issuable upon exercise of the SLTL Warrants and GUC Warrants and any New Equity Interest issuable pursuant to the Management Incentive Plan), with a strike price of $0.01, the terms of which shall be set forth in the New Money Warrant Agreement and which shall be issued and allocated in a manner consistent with the Second Lien Backstop Commitment Letter.

*Other Secured Claim* means any Secured Claim against a Debtor other than a Priority Tax Claim, FLFO Claim, FLTL Claim, and SLTL Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be amended, supplemented or modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

~~commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]~~

*Plan Administrator* means a person or entity selected by the Creditors' Committee, subject to the consent of the Debtors, Required DIP Lenders, and Requisite FLTL Lenders, with such consent not to be unreasonably withheld, that is charged with overseeing the tasks outlined in Section 5.9 of this Plan, or any successor thereto. The identity of the Plan Administrator shall be disclosed to the Bankruptcy Court before the Confirmation Hearing.

*Plan Administrator Agreement* means an agreement setting forth the economic arrangement and terms pursuant to which the Plan Administrator will perform its duties under this Plan.

*Plan Administrator Expense Reserve* means a segregated account not subject to the Liens of the Prepetition Agents or DIP Agent established by the Plan Administrator in accordance with Section 5.15 of this Plan.

*Plan Administrator Expense Reserve Amount* means Cash in an amount equal to $8,000,000 to be funded into the Plan Administrator Expense Reserve on the Effective Date.

*Plan Distribution* means any initial or periodic payment or transfer of consideration to holders of Allowed Claims made under the Plan.

*Plan of Merger* means that certain Agreement and Plan of Merger, which shall be in substantially the form attached to the Apache Implementation Agreement.

*Plan of Merger Consent Rights* means any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of assets in connection with the Plan of Merger.

*Plan of Merger Preferential Purchase Rights* means any preferential right to purchase, right of first refusal, right of first offer, drag-along rights, tag-along rights, and similar right the operation of which is triggered by the vesting of the FWE Assets in connection with the Plan of Merger.

*Plan Settlement* means the settlement of certain Claims and controversies pursuant to Section 5.1 of the Plan.

*Plan Supplement* means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, which shall include: (a) the Amended Organizational Documents (if any), (b) information regarding the sole manager and independent director to be appointed at FWE I to the extent known and determined and other information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (c) a schedule of retained Causes of Action, (d) the Schedule of Assumed Contracts, (e) the Plan Administrator Agreement; (f) the Credit Bid Purchase Agreement; (g) the NewCo Organizational Documents; (h) the Apache Definitive Documents; (i) the First Lien Exit Facility Agreement; (j) the Second Lien Exit Facility Agreement; (k) the New Intercreditor Agreement; (l) the New Money Warrant Agreements; (m) the GUC Warrant Agreement; and (n) any Additional Predecessor Agreement; *provided*, *however*, that the Debtors shall have the right to amend documents contained in, and

exhibits thereto, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement (including the consent rights set forth therein).

*Postpetition Hedging Agreements* has the meaning set forth in that certain *Emergency Order (I) Authorizing Debtors to (A) Enter Into and Perform Under New Postpetition Hedging Agreements and (B) Grant Related Liens and Superiority Claims, (II) Modifying Automatic Stay, and (III) Granting Related Relief* entered on August 24, 2020 (ECF No. 242).

*Postpetition Hedge Claim* means a Claim arising pursuant to any Postpetition Hedging Agreement.

*Post-Effective Date Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, including FWE III. For the avoidance of doubt, the Post-Effective Date Debtors does not include NewCo or its subsidiaries (including the Credit Bid Purchaser), or FWE I.

*Post-Effective Date FWE Parent* means FWE Parent, as reorganized on the Effective Date in accordance with this Plan.

*Prepetition Agents* means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, and the Prepetition SLTL Agent.

*Prepetition FLFO Administrative Agent* means Goldman Sachs Bank USA, solely in its capacity as administrative agent under the Prepetition FLFO Credit Agreement.

*Prepetition FLFO Advisors* means Vinson & Elkins, LLP, Shipman & Goodwin LLP (in its capacity as counsel to the Prepetition FLFO Collateral Agent), Opportune LLP, and any local or foreign advisors.

*Prepetition FLFO Collateral Agent* means Cantor Fitzgerald Securities, solely in its capacity as collateral agent under the Prepetition FLFO Credit Agreement.

*Prepetition FLFO Credit Agreement* means that certain *Second Amended and Restated Credit Agreement- First Out*, dated as of June 28, 2019, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, and the Prepetition FLFO Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

*Prepetition FLFO Lenders* means the Lenders (as defined in the Prepetition FLFO Credit Agreement) holding Prepetition FLFO Loans immediately before the Effective Date.

*Prepetition FLFO Loans* means the Loans (under and as defined in the Prepetition FLFO Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition FLFO Secured Parties** means, collectively, the Prepetition FLFO Administrative Agent, the Prepetition FLFO Lenders, and the other Secured Parties (as defined in the Prepetition FLFO Credit Agreement) under the Prepetition FLFO Credit Agreement.

**Prepetition FLTL Administrative Agent** means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the Prepetition FLTL Credit Agreement.

**Prepetition FLTL Credit Agreement** means that certain *Amended and Restated First Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition FLTL Administrative Agent, and the Prepetition FLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition FLTL Lenders** means the Lenders (as defined in the Prepetition FLTL Credit Agreement) holding Prepetition FLTL Loans immediately before the Effective Date.

**Prepetition FLTL Loans** means the Loans (under and as defined in the Prepetition FLTL Credit Agreement) outstanding immediately before the Effective Date.

**Prepetition SLTL Administrative Agent** means Cortland Capital Market Services LLC, solely in its capacity as administrative agent and collateral agent under the Prepetition SLTL Credit Agreement.

**Prepetition SLTL Credit Agreement** means that certain *Amended and Restated Second Lien Term Loan Agreement*, dated as of April 11, 2018, by and among Fieldwood Energy LLC, as borrower, Fieldwood Energy Inc., as holdings, the Prepetition SLTL Administrative Agent, and the Prepetition SLTL Lenders, and the other parties thereto, as in effect immediately before the Effective Date.

**Prepetition SLTL Lenders** means the Lenders (as defined in the Prepetition SLTL Credit Agreement) holding Prepetition SLTL Loans immediately before the Effective Date.

**Prepetition SLTL Loans** means the Loans (under and as defined in the Prepetition SLTL Credit Agreement) outstanding immediately before the Effective Date.

**Principal FLFO Amount** has the meaning set forth in Section 4.3.

**Priority Non-Tax Claim** means any Claim other than an Administrative Expense Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

**Professional Person(s)** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Professional Fee Escrow** means an escrow account established and funded pursuant to section 2.2 of the Plan.

**Professional Fee Escrow Amount** means the aggregate unpaid Fee Claims through the Effective Date as estimated in accordance with section 2.2 of the Plan.

**Released Parties** means, collectively, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) ~~[the Prepetition FLFO Secured Parties]~~,[11] (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Administrative Agent, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

**Releasing Parties** means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out,

---

[11] ~~[NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]~~

and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

      ***Required DIP Lenders*** has the meaning set forth in the Restructuring Support Agreement.

      ***Requisite FLFO Lenders*** means, as of the date of determination, Prepetition FLFO Lenders holding at least a majority of the outstanding Prepetition FLFO Loans (inclusive of validly executed but unsettled trades) held by the Prepetition FLFO Lenders as of such date.

      ***Requisite FLTL Lenders*** has the meaning set forth in the Restructuring Support Agreement.

      ***Requisite SLTL Lenders*** has the meaning set forth in the Restructuring Support Agreement.

      ***Residual Distributable Value*** means any distributable value of the Single Share of Post-Effective Date FWE Parent held by the Plan Administrator (a) after satisfaction of Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, all Cure Amounts and (b) after satisfaction of all fees, expenses, costs and other amounts pursuant to the Plan and incurred by the Post-Effective Date Debtors in connection with post-Effective Date operations and wind-down.

      ***Restructuring*** means the restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

      ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by (i) the Ad Hoc Group of Secured Lenders, (ii) [the Prepetition FLFO Secured Parties],¹² and (iii) the Ad Hoc Group of Prepetition SLTL Lenders in connection with the Chapter 11 Cases, including the fees and expenses of the Ad Hoc Group of Secured Lenders Advisors, [the Prepetition FLFO Advisors,] ¹³ and Ad Hoc Group of Prepetition SLTL Lenders Advisors, in each case payable in accordance with the terms of any applicable agreements, engagement letters or fee letters executed with such parties or pursuant to the terms of the DIP Order and without the requirement for the filing of retention applications, fee applications, or any other application in the Chapter 11 Cases, which shall not be subject to any offset, defense, counterclaim, reduction, or creditor credit and, to the extent incurred prior to the Effective Date, shall be Allowed as Administrative Expense Claims upon incurrence; *provided*, *however*, Restructuring Expenses of the Ad Hoc Group of Prepetition SLTL Lenders shall be limited to

---

¹² [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

¹³ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

and consist solely of the reasonable fees and expenses incurred by the Ad Hoc Group of Prepetition SLTL Lenders Advisors in their capacity as counsel to the Ad Hoc Group of Prepetition SLTL Lenders, and solely to the extent such fees and expenses have been incurred in support of the Restructuring Transactions and so long as the Ad Hoc Group of Prepetition SLTL Lenders are parties to the Restructuring Support Agreement.

*Restructuring Support Agreement* means that certain *Restructuring Support Agreement*, dated as of August 4, 2020, by and among Debtor Fieldwood Energy LLC, certain of its affiliates specified therein, the Consenting Creditors, and Apache, as the same may be amended, restated, or otherwise modified in accordance with its terms.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Credit Bid Transaction, including (a) the consummation of the transactions provided for under or contemplated by the Plan and any mergers, divisive mergers, amalgamations, consolidations, arrangements, continuances, transfers, conversions, sales, dispositions, or other corporate transactions necessary or appropriate to implement the Plan, (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan or the Credit Bid Transaction and that satisfy the requirements of applicable law, (c) the Equity Rights Offerings, (d) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, and (d) all other actions that the Debtors, the Post-Effective Date Debtors or NewCo (or any of its subsidiaries, including the Credit Bid Purchaser), as applicable, determine are necessary or appropriate and consistent with the Plan or the Credit Bid Transaction. For the avoidance of doubt, Restructuring Transactions includes the Credit Bid Transaction and the Divisive Merger effectuated pursuant to the Plan of Merger.

*Schedule of Abandoned Properties* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements to be abandoned pursuant to Section 5.14 of this Plan, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of Assumed Contracts* means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to this Plan, if any, as the same may be amended, modified, or supplemented from time to time.

*Schedule of FWE I Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that shall constitute FWE I Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of FWE III Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and

gas leases that shall constitute FWE III Assets, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedule of Purchased Oil & Gas Lease Interests* means a schedule (as may be amended, modified, or supplemented from time to time) of the Debtors' interests in the oil and gas leases that will be acquired by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement, a copy of which shall be filed with the Disclosure Statement and included in the Plan Supplement.

*Schedules* means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

*Second Lien Backstop Commitment Letter* means that certain backstop commitment letter, in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders [and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent][14], to be entered into by and among Fieldwood Energy LLC, the Credit Bid Purchaser and the Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to the terms thereof and consistent with the Restructuring Support Agreement, pursuant to which the Backstop Parties agreed to, among other things, backstop the Second Lien Exit Facility in accordance with the terms and conditions set forth therein.

*Second Lien Backstop Commitment Premium* means a premium equal to 8% of the maximum principal amount of the Second Lien Exit Facility (*i.e.* \$185,000,000) payable to the Backstop Parties with the Second Lien Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the Second Lien Backstop Commitment Letter.

*Second Lien Backstop Commitment Premium Equity Interests* means an amount of New Equity Interests equal to the value of the Second Lien Backstop Commitment Premium as further set forth in the Second Lien Backstop Commitment Letter; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*Second Lien Backstop Party* has the meaning set forth in the Second Lien Backstop Commitment Letter.

*Second Lien Exit Facility* means the facility under the Second Lien Exit Facility Credit Agreement*.

*Second Lien Exit Facility Agent* means the administrative agent under the Second Lien Exit Facility Credit Agreement.

¹⁴ [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

***Second Lien Exit Facility Credit Agreement*** means that certain credit agreement to be entered by the Credit Bid Purchaser, the Second Lien Exit Facility Agent and the Second Lien Exit Facility Lenders on the Effective Date that shall govern the Second Lien Exit Facility, which shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the Second Lien Exit Facility Term Sheet and otherwise be in form and substance (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders [and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.][15]

***Second Lien Exit Facility Documents*** means, collectively, the Second Lien Exit Facility Credit Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, the terms of which documents shall be (i) acceptable to the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders [and (ii) reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent.][16]

***Second Lien Exit Facility Lenders*** means the lenders party to the Second Lien Exit Facility Credit Agreement.

***Second Lien Exit Facility Term Sheet*** means the term sheet filed with the Disclosure Statement, as may be amended from time to time with (i) the consent of the Required DIP Lenders and Requisite FLTL Lenders [and (ii) the reasonable consent of the Prepetition FLFO Administrative Agent and First Lien Exit Facility Agent.][17]

***Secured*** means, when referring to a Claim: (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

---

[15] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[16] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[17] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

            ***Security*** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

            ***SLTL Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the Prepetition SLTL Credit Agreement.

            ***SLTL Claims Allowed Amount*** means $517,500,000.00 in principal, plus any accrued but unpaid interest or fees due under the Prepetition SLTL Credit Agreement as of the Petition Date.

            ***SLTL Deficiency Claim*** means any SLTL Claim or portion thereof that is not Secured, if any.

            ***SLTL Equity Rights Offering*** means that certain rights offering pursuant to which each holder of Allowed SLTL Claims is entitled to receive SLTL Subscription Rights to acquire New Equity Interests in the aggregate amount of the SLTL Equity Rights Offering Amount in accordance with the SLTL Equity Rights Offering Procedures, the terms and conditions of which shall be reasonably acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent].[18]

            ***SLTL Equity Rights Offering Amount*** means $20,000,000.

            ***SLTL Equity Rights Offering Procedures*** means the procedures for the implementation of the SLTL Equity Rights Offering to be approved by the Bankruptcy Court.

            ***SLTL ERO Backstop Agreement*** means that certain [Equity Backstop Commitment Agreement], in form and substance reasonably acceptable to the Debtors, the Required DIP Lenders, the Requisite FLTL Lenders, the Requisite SLTL Lenders, the Prepetition FLFO Administrative Agent, and the First Lien Exit Facility Agent][19], to be entered into by and among Fieldwood Energy LLC, NewCo, and the SLTL ERO Backstop Parties, as may be amended, supplemented, or modified from time to time, pursuant to which the SLTL ERO Backstop Parties agreed to, among other things, backstop the SLTL Equity Rights Offering with the terms and conditions set forth therein[; *provided that*, the form of the [Equity Backstop Commitment Agreement] attached hereto as Exhibit [ ] shall be deemed acceptable to the Debtors, the Required DIP Lenders, Requisite FLTL Lenders and Requisite SLTL Lenders [and

---

[18] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[19] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

reasonably acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent].]

[*SLTL ERO Backstop Commitment Percentage* has the meaning set forth in the SLTL ERO Backstop Agreement.]

[*SLTL ERO Backstop Commitment Premium* means a premium equal to 8% of the SLTL Equity Rights Offering Amount payable to the SLTL ERO Backstop Parties with the SLTL ERO Backstop Commitment Premium Equity Interests in accordance with the terms set forth in the SLTL ERO Backstop Agreement.]

[*SLTL ERO Backstop Commitment Premium Equity Interests* means an amount of New Equity Interests equal to the value of the SLTL ERO Backstop Commitment Premium as further set forth in the SLTL ERO Backstop Agreement; *provided that* such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*SLTL ERO Backstop Parties* means those parties that agree to backstop the SLTL Equity Rights Offering pursuant to the SLTL ERO Backstop Agreement, each in its respective capacity as such.

*SLTL Subscription Rights* means the subscription right to acquire New Equity Interests with an aggregate value equal to the SLTL Rights Offering Amount offered in accordance with the SLTL Equity Rights Offering Procedures; *provided, however*, that such New Equity Interests shall be issued at a 30% discount to the equity value of NewCo on the Effective Date.

*SLTL Tranche 1 Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 1 Warrants, the form of which shall be acceptable to the Debtors, Required DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

*SLTL Tranche 1 Warrants* means 8-year warrants for 25% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants and GUC Warrants, but excluding the effect of any New Equity Interests issuable upon exercise of the SLTL Tranche 2 Warrants and any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,321,000,000, the terms of which shall be set forth in the SLTL Tranche 1 Warrant Agreement.

*SLTL Tranche 2 Warrant Agreement* means a warrant agreement to be entered into by and among NewCo and the warrant agent named therein that shall govern the terms of the SLTL Tranche 2 Warrants, the form of which shall be acceptable to the Debtors, Required

DIP Lenders, Requisite FLTL Lenders, the Creditors' Committee, and the Requisite SLTL Lenders.

*SLTL Tranche 2 Warrants* means 8-year warrants for 32.50% of the New Equity Interests (calculated on a fully diluted basis giving effect to the New Equity Interests to be issued pursuant to Section 4.4(a)(i) of this Plan, the New Equity Interests issuable upon the exercise of the Subscription Rights, the Backstop Commitment Premium Equity Interests, and the New Equity Interests issuable upon the exercise of the New Money Warrants, the SLTL Tranche 1 Warrants, and the GUC Warrants (excluding any adjustment or true-up of the GUC Warrants as described in the definition thereof), but excluding the effect of any New Equity Interests issuable in connection with the Management Incentive Plan), with a strike price set at an equity value equal to $1,585,200,000, the terms of which shall be set forth in the SLTL Tranche 2 Warrant Agreement.

[*SLTL Unsubscribed Shares* has the meaning set forth in the SLTL ERO Backstop Agreement].

*SLTL Warrants* means, collectively, the SLTL Tranche 1 Warrants and the SLTL Tranche 2 Warrants.

*Specified Administrative Expense Claims* means Administrative Expense Claims other than (a) Administrative Expense Claims that are to be assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement; (b) Cure Amounts; and (c) Fee Claims, Restructuring Expenses, any fees and expenses payable pursuant to sections 2.3 and 2.4 of this Plan, any fees and expenses payable or reimbursable by the Debtors or Post-Effective Date Debtors pursuant to the Second Lien Backstop Commitment Letter, Credit Bid Purchase Agreement, or First Lien Exit Facility Commitment Letter (including termination fees, if any), Apache Fees and Expenses and Apache Implementation Costs, and Statutory Fees.

*Standby Loan Agreement* has the meaning set forth in the Apache Implementation Agreement.

*Standby Credit Facility Documents* has the meaning set forth in the Apache Implementation Agreement.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subordinated Securities Claim* means a Claim that is subject to subordination in accordance with sections 510(b) of the Bankruptcy Code or otherwise.

*Subscription Rights* means, collectively, the FLTL Subscription Rights and SLTL Subscription Rights.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Toggle Amount* means $35,000,000 or such higher amount as may be mutually agreed between the Debtors, the Required DIP Lenders, and the Requisite FLTL Lenders.

*Toggle Date* has the meaning set forth in Section 5.2(c).

*Toggle Motion* has the meaning set forth in Section 5.2(c)(i).

*Trade Agreement* means a trade agreement entered into or to be entered into between the Debtors, [a NewCo Entity], and a Trade Creditor that will be provided by the Debtors to each Trade Creditor and that provides for, among other things, waiver of any and all liens against the Debtors, their assets and any co-owned assets, or any other affiliated person or entity (including any co-working interest owner of the Debtors), or any such person's or entity's respective assets or property (real or personal), regardless of the statute or other legal authority upon which the lien is asserted, held or asserted by the Trade Creditor relating to the Unsecured Trade Claim, and an agreement by such Trade Creditor to continue to provide post-Effective Date trade terms that are no less favorable than the terms provided to the Debtors prior to the Petition Date

*Trade Creditor* means a third-party provider of goods or services to the Debtors that holds an Unsecured Trade Claim against the Debtors arising from the provision of such goods and services.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*Unsecured Trade Claim* means any unsecured claim (or secured claim that becomes unsecured by agreement, settlement, or order of the Bankruptcy Court) of a Trade Creditor that is held by a Trade Creditor that has elected such claim to be treated as an Unsecured Trade Claim under this Plan and enters into or agrees to enter into a Trade Agreement; *provided*, *however*, that in no event shall any claim against the Debtors that arises in connection with a joint interest billing arrangement constitute an Unsecured Trade Claim.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means April 26, 2021 at 4:00 p.m. (Prevailing Central Time), or such date and time as may set by the Bankruptcy Court.

## 1.2 *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the

appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3 *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and the First Lien Exit Facility Commitment Letter, the First Lien Exit Facility Commitment Letter shall control. In the event of an inconsistency between the Plan and the Second Lien Backstop Commitment Letter, the Second Lien Backstop Commitment Letter shall control. The provisions of the Plan, the First Lien Exit Facility Commitment Letter, the Second Lien Backstop Commitment Letter, and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between (a) any provision of the Plan, the First Lien Exit Facility Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, or (b) any provision of the Plan, the Second Lien Backstop Commitment Letter, and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern.

### 1.5 *Certain Consent Rights*

Notwithstanding anything herein to the contrary, and without limiting the Debtors' fiduciary duties, any and all consent rights of any party set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, any supplement to the Disclosure Statement, any other Definitive Documents and any agreements or documents referenced in this Plan or the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

**ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

2.1     *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Administrative Expense Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

2.2     *Treatment of Fee Claims.*

(a)     Final Fee Applications.  All final requests for the allowance and payment of Fee Claims shall be filed no later than 45 days after the Effective Date unless such date is extended by order of the Bankruptcy Court.

(b)     Professional Fee Escrow Amount.  All Professional Persons shall estimate in good faith their unpaid Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors at least three (3) calendar days before the Effective Date; *provided, however*, that such estimate shall not limit or be deemed to limit the amount of the fees and expenses that are the subject of the Professional Person's final request for payment of Fee Claims. If a Professional Person does not provide such estimate, the Debtors and Post-Effective Date Debtors may estimate the unbilled fees and expenses of such Professional Person; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses incurred by, or payable to, such Professional Person.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Escrow Amount.

(c)     Professional Fee Escrow.  If the Professional Fee Escrow Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later

than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with cash equal to the Professional Fee Escrow Amount and no Liens, Claims, or interests will encumber the Professional Fee Escrow in any way. The Professional Fee Escrow (including funds held in the Professional Fee Escrow) will (i) not be and will not be deemed to be property of the Debtors or the Post-Effective Date Debtors and (ii) will be held in trust for the Professional Persons; *provided*, *however*, that funds remaining in the Professional Fee Escrow after all Allowed Fee Claims have been irrevocably paid in full will revert to the Post-Effective Date Debtors. Allowed Fee Claims will be paid in cash to such Professional Persons from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Claims are Allowed by an order of the Bankruptcy Court; *provided*, *however*, that the Debtors' obligations with respect to Fee Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Fee Claims and any other Allowed amounts owed to Professional Persons, the deficiency will be promptly funded to the Professional Fee Escrow from the Debtors' estates and/or by Post-Effective Date Debtors without any further action or order of the Bankruptcy Court.

(d)     Post-Effective Date Fees and Expenses. On and after the Effective Date, the Debtors and the Post-Effective Date Debtors, as applicable, will pay in cash in the ordinary course of business and without any further action or order of the Bankruptcy Court, the reasonable legal, professional, or other fees and expenses that are (i) related to implementation of the Plan and (ii) incurred by the Debtors or Post-Effective Date Debtors, as applicable, on and after the Effective Date.

On the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services provided after such date shall terminate, and the Debtors or Post-Effective Date Debtors may employ and pay any post-Effective Date fees and expenses of any Professional Person without any further notice to or action, order, or approval of the Bankruptcy Court.

## 2.3     *Treatment of DIP Claims.*

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder. In full and final satisfaction, settlement, release, and discharge of each Allowed DIP Claim, on the Effective Date, each holder of such Allowed DIP Claim shall receive either (a) payment in full in Cash or (b) such other treatment as to which the Debtors or the Post-Effective Date Debtors, as applicable, and the holder of such Allowed DIP Claims will have agreed upon in writing. On the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

## 2.4     *Payment of Fees and Expenses Under DIP Order.*

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the DIP Order, the

Debtors or the Post-Effective Date Debtors (as applicable) shall pay all fees, expenses, and disbursements of the DIP Agent and DIP Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Order. After the Effective Date, the Post-Effective Date Debtors shall continue to reimburse the DIP Agent and the DIP Lenders for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred by the DIP Agent and the DIP Lenders after the Effective Date in accordance with the terms of the DIP Documents. The Post-Effective Date Debtors shall pay all of the amounts that may become payable to the DIP Agent or any of the DIP Lenders in accordance with the terms of the DIP Documents and the DIP Order.

### 2.5 *Treatment of Priority Tax Claims.*

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (a) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (b) or such other treatment as to which the Debtors, the Post-Effective Date Debtors or NewCo and its subsidiaries (including the Credit Bid Purchaser) as applicable, and the holder of such Allowed Priority Tax Claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Post-Effective Date Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided, further*, that any Allowed Priority Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

### 2.6 *Restructuring Expenses.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay in full in Cash (to the extent not previously paid during the course of the Chapter 11 Cases) all outstanding Restructuring Expenses billed through the Effective Date, in accordance with the terms of the applicable orders, engagement letters, or other applicable contractual arrangements. All parties entitled to payment pursuant to this Section 2.6 shall estimate their accrued Restructuring Expenses before and as of the Effective Date and shall deliver such estimates to the Debtors at least three Business Days before the Effective Date; *provided,* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such parties. On the Effective Date, final invoices for all Restructuring Expenses incurred before and as of the Effective Date shall be submitted to the Debtors. In addition, the Debtors and the Post-Effective Date Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, consummation and defense of the Plan.

**2.7** *Postpetition Hedge Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day on which the Allowed Postpetition Hedge Claim becomes due and owing in accordance with the terms of and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities, each holder of an Allowed Postpetition Hedge Claim shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other treatment as to which the Debtors, the Post-Effective Date Debtors, or NewCo and its subsidiaries (including the Credit Bid Purchaser), as applicable, and the holder of such Allowed Postpetition Hedge Claim will have agreed upon in writing; *provided*, that any Allowed Postpetition Hedge Claim assumed by the Credit Bid Purchaser in accordance with the foregoing clause (y) pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties. Nothing herein shall modify any of the contractual rights under a Postpetition Hedging Agreement of a holder of an Allowed Postpetition Hedge Claim in their capacity as a holder of an Allowed Postpetition Hedge Claim.

**ARTICLE III.**     **CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.1** *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *however*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled before the Effective Date.

**3.2** *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3 *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Impaired | Yes |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | FLFO Claims | Impaired | Yes |
| Class 4 | FLTL Claims | Impaired | Yes |
| Class 5 | SLTL Claims | Impaired | Yes |
| Class 6A | Unsecured Trade Claims | Impaired | Yes |
| Class 6B | General Unsecured Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |

### 3.4 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Post-Effective Date Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5 *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of

determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Certain Impaired Classes**. Only holders of Allowed Claims in Classes 1, 3, 4, 5, 6A, and 6B are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

(b) **Presumed Acceptance by Unimpaired Classes**. Holders of Claims and Interests in Classes 2, 7 and 9 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c) **Deemed Rejection by Certain Impaired Classes**. Holders of Claims in Class 8 and Class 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9 *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10 *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

# ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1: Other Secured Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Post-Effective Date Debtors, such holder shall receive either (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired, or (iii) any other treatment consistent with the provisions of section 1129 of the Bankruptcy Code, including by providing such holder with the "indubitable equivalent" of their Allowed Other Secured Claim (which, for the avoidance of doubt, may be in the form of a multi-year promissory note or other financial instrument); *provided,* that any Allowed Other Secured Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)    **Impairment and Voting**:  Allowed Other Secured Claims are Impaired. Holders of Allowed Other Secured Claims are entitled to vote on the Plan.

### 4.2    *Class 2:  Priority Non-Tax Claims.*

(a)    **Treatment**:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall, at the option of the Debtors or the Post-Effective Date Debtors (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter; *provided,* that any Allowed Priority Non-Tax Claim assumed by the Credit Bid Purchaser pursuant to the Credit Bid Purchase Agreement shall be solely an obligation of the Credit Bid Purchaser and the holder of such assumed Claim shall have no recourse to or Claim against the Debtors or Post-Effective Date Debtors or their assets and properties.

(b)    **Impairment and Voting**:  Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.3   *Class 3:  FLFO Claims.*

(a)   **Treatment**:  Except to the extent that a holder of an Allowed FLFO Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of such Allowed FLFO Claim, (a) each holder of an Allowed FLFO Claim shall receive its Pro Rata Share of the FLFO Distribution Amount and (b) all remaining Allowed FLFO Claims shall be assumed by the NewCo Entities as modified to the extent set forth in the First Lien Exit Facility Documents.  The Liens securing the FLFO Claims that attach to the Credit Bid Acquired Interests shall be retained and deemed assigned to the First Lien Exit Facility Agent upon the Effective Date to secure the obligations under the First Lien Exit Facility.

(b)   **Impairment and Voting**:  FLFO Claims are Impaired.  Holders of Allowed FLFO Claims are entitled to vote on the Plan.

(c)   **Allowance**:  The FLFO Claims shall be deemed Allowed on the Effective Date in the FLFO Claims Allowed Amount.

### 4.4   *Class 4:  FLTL Claims.*

(a)   **Treatment:** Except to the extent that a holder of an Allowed FLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed FLTL Claim and in consideration for the Credit Bid Transaction, each holder of an Allowed FLTL Claim shall receive its Pro Rata Share of:

> (i)   100% of the New Equity Interests, subject to dilution by (w) the Backstop Commitment Equity Premium Interests, (x) the New Equity Interests issued upon exercise of the Subscription Rights, (y) any New Equity Interests issued upon the exercise of the New Money Warrants, SLTL Warrants, or the GUC Warrants, and (z) any New Equity Interests issued pursuant to the Management Incentive Plan; and

> (ii)   the FLTL Subscription Rights.

(b)   **Impairment and Voting**:  FLTL Claims are Impaired.  Holders of Allowed FLTL Claims are entitled to vote on the Plan.

(c)   **Allowance**: The FLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the FLTL Claims Allowed Amount.

### 4.5   *Class 5:  SLTL Claims.*

(d)   **Treatment:** Except to the extent that a holder of an Allowed SLTL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed SLTL Claim, each holder of an Allowed SLTL Claim shall receive its Pro Rata Share of:

<ol type="i" start="3">
<li>the SLTL Warrants; and</li>
<li>the SLTL Subscription Rights.</li>
</ol>

(e) **Impairment and Voting**: SLTL Claims are Impaired. Holders of Allowed SLTL Claims are entitled to vote on the Plan.

(f) **Allowance**: The SLTL Claims shall be deemed Allowed on the Effective Date in the aggregate amount of the SLTL Claims Allowed Amount.

### 4.6 *Class 6A: Unsecured Trade Claims.*

(a) **Treatment:** Except to the extent that a holder of an Allowed Unsecured Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction of and in exchange for such Allowed Unsecured Trade Claim, each holder of an Allowed Unsecured Trade Claim that has executed a Trade Agreement shall receive:

<ol type="i">
<li>if 14% of the aggregate amount of all Allowed Unsecured Trade Claims is less than or equal to $8,000,000, Cash in an amount equal to 14% of the Allowed amount of such holder's Allowed Unsecured Trade Claim; or</li>
<li>if 14% of the aggregate amount of Allowed Unsecured Trade Claims is greater than $8,000,000, its Pro Rata share of $8,000,000.</li>
</ol>

(b) **Impairment and Voting**: Unsecured Trade Claims are Impaired. Holders of Unsecured Trade Claims are entitled to vote on the Plan.

### 4.7 *Class 6B: General Unsecured Claims.*

(c) **Treatment:** Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or after the Effective Date, in full and final satisfaction of and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such holder's Allowed General Unsecured Claim, its Pro Rata Share of:

<ol type="i">
<li>the GUC Warrants; and</li>
<li>any Residual Distributable Value.</li>
</ol>

(b) **Impairment and Voting**: General Unsecured Claims are Impaired. Holders of General Unsecured Claims are entitled to vote on the Plan.

### 4.8 *Class 7: Intercompany Claims.*

(a) **Treatment**: On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b) **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

**4.9** *Class 8: Subordinated Securities Claims.*

(a) **Treatment**: All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

(b) **Impairment and Voting**: Allowed Subordinated Securities Claims are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Securities Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Securities Claims.

**4.10** *Class 9: Intercompany Interests.*

(a) **Treatment**: On the Effective Date, all Intercompany Interests, in the Debtors' or the Post-Effective Date Debtors' discretion, shall be adjusted, reinstated, cancelled, or discharged in the Debtors' or Post-Effective Date Debtors' discretion.

(b) **Impairment and Voting:** Intercompany Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

**4.11** *Class 10: Existing Equity Interests.*

(a) **Treatment**: On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect.

(b) **Impairment and Voting**: Allowed Existing Equity Interests are Impaired. Holders of Existing Equity Interests are not entitled to vote on the Plan.

**4.12** *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.     MEANS FOR IMPLEMENTATION.

### 5.1     *Plan Settlement; Compromise and Settlement of Claims, Interests, and Controversies.*

Subject to approval by the Bankruptcy Court in connection with confirmation of the Plan, the provisions of the Plan and other documents entered into in connection with the Plan constitute a good faith compromise and settlement among the Debtors, the Consenting Creditors and the Creditors' Committee of claims, Causes of Action and controversies among such parties, including all potential claims, Causes of Action and controversies related to the Challenge Period (as defined in the DIP Order) and any Challenge under the DIP Order, and are in consideration of the value provided to the Estates by the Consenting Creditors, including the value being provided to holders of Unsecured Trade Claims and General Unsecured Claims pursuant to Sections 4.6 and 4.7 hereof. The Plan shall be deemed a motion to approve the Plan Settlement and the good faith compromise and settlement of all of the claims, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  For the avoidance of doubt, nothing in this Plan or the Disclosure Statement shall require the Creditors' Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Notwithstanding the foregoing, the Creditors' Committee acknowledges that its entry into the Plan Settlement and its support for this Plan is consistent with its fiduciary duties.

Further, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

### 5.2     *Credit Bid Transaction; Confirmation Outside Date.*

(a)     If the Confirmation Date occurs on or before the Confirmation Outside Date or the Debtors, the Required DIP Lenders, and Requisite FLTL Lenders do not otherwise elect to pursue a 363 Credit Bid Transaction pursuant to Section 5.2(c) of the Plan, then, on the Effective Date, pursuant to sections 363, 1123, 1141(b) and 1141(c) of the Bankruptcy Code, in accordance with the Credit Bid Purchase Agreement, subject to the satisfaction or waiver of all applicable closing conditions under the Credit Bid Purchase Agreement, (i) all Credit Bid

Acquired Interests shall be transferred to, and the Credit Bid Acquired Interests owned by the Debtors shall vest free and clear of all Liens[20]-[2] (other than (i) any and all Liens securing the FLFO Claim or the obligations under the First Lien Exit Facility or (ii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clause (i) above to the extent contemplated by the First Lien Exit Facility Documents), Claims, charges, Interests, or other encumbrances, including the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights, and (ii) all Credit Bid Assumed Liabilities shall be assumed by the Credit Bid Purchaser.

(b)     In the event that the transaction pursuant to Section 5.2(a) of the Plan is consummated and in the event of any conflict whatsoever between the terms of the Plan and the Credit Bid Purchase Agreement with respect to the Credit Bid Transaction, the terms of the Credit Bid Purchase Agreement shall control, and the Plan shall be deemed to incorporate in their entirety the terms, provisions, and conditions of the Credit Bid Purchase Agreement.

(c)     (x) If the Confirmation Date does not occur before the Confirmation Outside Date or (y) if the estimated amount of Allowed Specified Administrative Expense Claims to be satisfied under the Plan on or after the Effective Date is projected at any time prior to the Confirmation Date to exceed the Toggle Amount (the next Business Day after the occurrence of (x) or (y), the ("**Toggle Date**"), then, with the consent of the Required DIP Lenders and Requisite FLTL Lenders, the Debtors shall:

(i)     within 7 days of the Toggle Date, file a motion (the "**Toggle Motion**"), in form and substance acceptable to the Debtors, the Required DIP Lenders and Requisite FLTL Lenders,  seeking entry of an order of the Bankruptcy Court approving a credit bid sale transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders) pursuant to section 363 of the Bankruptcy Code on substantially the same terms as provided in the Credit Bid Purchase Agreement (which terms shall be acceptable to the Debtors, the Requisite FLTL Lenders, and Required DIP Lenders), free and clear of all Liens (other than (i) any and all Liens securing the FLFO Claim or the First Lien Exit Facility or (ii) Credit Bid Permitted Encumbrances except in the case of Fieldwood U.A. Interests, which shall vest free and clear of all Liens other than Liens described in clause (i) above to the extent contemplated by the First Lien Exit Facility Documents), Claims, charges, Interests, or other encumbrances, the Credit Bid Consent Rights and the Credit Bid Preferential Purchase Rights that are applicable to the Credit Bid Acquired Interests;

(ii)     within 15 days of the Toggle Date and subject to the reasonable consent of Apache, the Requisite FLTL Lenders, the Required DIP Lenders and the Debtors, amend the Apache Definitive Documents

---

[20] Provided that the Retained Properties (as defined in the Apache Implementation Agreement) shall be transferred in accordance with the Decommissioning Agreement.

as reasonably required to effectuate the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders); provided that no such actions shall require the Apache PSA Parties to alter the economics of the Apache Definitive Documents without the Apache PSA Parties' express written consent; and

(iii) within 35 days of the Toggle Date, obtain entry of an order of the Bankruptcy Court approving the 363 Credit Bid Transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders).

(d) Notwithstanding anything herein to the contrary, upon the occurrence of the Toggle Date, if the transactions under the Toggle Motion (i) (a) individually or in the aggregate, results in a reduction of 10% or more of the total PV-10 of total 2P reserves comprising the assets acquired by the Credit Bid Purchaser (which shall be calculated by reference to the FWE YE2020 Internal Reserve Report (as of 5.1.21)), (b) results in any contract rights constituting material assets not being acquired by the Credit Bid Purchaser, (c) individually or in the aggregate, results in an increase by $40.0 million or more (which, for the avoidance of doubt, in the case of plugging and abandonment liabilities, shall be calculated on a present value basis) in liabilities assumed by the Credit Bid Purchaser, (d) relates to any change in treatment or recovery of the Prepetition FLFO Credit Agreement or First Lien Exit Facility, or (e) provide for any differences from the transaction under this Plan that are materially adverse to the interests of the First Lien Exit Facility Agent and the First Lien Exit Facility Lenders, and (ii) are not (a) reasonably acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(b) or (e), or (ii) acceptable to the Prepetition FLFO Agent with respect to the foregoing clause (i)(a),(c), or (d), then all rights of the Prepetition FLFO Secured Parties set forth in the Prepetition FLFO Credit Agreement and related documents to object to the Toggle Motion on any grounds are expressly preserved, and all of the Prepetition FLFO Secured Parties' claims, rights, and remedies are reserved for all purposes, including the right to obtain treatment and transaction structure different than as set forth in the Toggle Motion.

(e) ~~(d)~~ Notwithstanding anything in the Credit Bid Purchase Agreement or any agreement entered into pursuant to Section 5.2(c) of the Plan to the contrary, the Credit Bid Purchaser shall not be liable for any liability or obligation on account of any Claim or Interest that is compromised, settled, released or discharged pursuant to this Plan.

### 5.3 *Equity Rights Offerings*.

(a) On the Effective Date, the Debtors shall consummate the Equity Rights Offerings.

(b) [FLTL Equity Rights Offering. The FLTL Equity Rights Offering shall be fully backstopped by the FLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the FLTL ERO Backstop Agreement. The right to participate in the FLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the

circumstances described in the FLTL ERO Backstop Agreement. In accordance with the FLTL ERO Backstop Agreement and subject to the terms and conditions thereof, each of the FLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective [FLTL ERO Backstop Commitment Percentage] of the [FLTL Unsubscribed Shares]. In exchange for providing the backstop commitment for the Equity Rights Offering, the FLTL ERO Backstop Parties shall receive, among other things, the FLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the FLTL ERO Backstop Agreement.]

(c)     [SLTL Equity Rights Offering. The SLTL Equity Rights Offering shall be fully backstopped by the SLTL ERO Backstop Parties in accordance with and subject to the terms and conditions of the SLTL ERO Backstop Agreement. The right to participate in the SLTL Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the SLTL ERO Backstop Agreement. In accordance with the SLTL ERO Backstop Agreement and subject to the terms and conditions thereof, each of the SLTL ERO Backstop Parties, among other things, has agreed, severally but not jointly, to purchase, on or prior to the Effective Date, its respective [SLTL ERO Backstop Commitment Percentage] of the [SLTL Unsubscribed Shares]. In exchange for providing the backstop commitment for the SLTL Equity Rights Offering, the SLTL ERO Backstop Parties shall receive, among other things, the SLTL ERO Backstop Commitment Premium Equity Interests payable in accordance with the terms of the SLTL ERO Backstop Agreement.]

### 5.4     *New Equity Interests.*

(a)     On the Effective Date, NewCo is authorized to issue or cause to be issued and shall, issue the New Equity Interests for eventual distribution in accordance with the terms of this Plan without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Equity Interests shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Equity Interests issued pursuant to the Plan shall be duly authorized and validly issued.

(b)     On the Effective Date, NewCo and all holders of the New Equity Interests then outstanding shall be deemed to be parties to the NewCo Organizational Documents, where applicable, substantially in the form, or consistent with the term sheets, contained in the Plan Supplement, without the need for execution by any such holder. The NewCo Organizational Documents shall be binding on NewCo and its subsidiaries (including the Credit Bid Purchaser) and all parties receiving, and all holders of, New Equity Interests.

### 5.5     *NewCo Organizational Documents*

The NewCo Organizational Documents will be in form and substance acceptable to the Debtors, Requisite FLTL Lenders, and the Required DIP Lenders. After the Effective Date, the NewCo Organizational Documents may be amended or restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

### 5.6 *New Money Warrants, SLTL Warrants and GUC Warrants*

On or after the Effective Date, NewCo is authorized to issue or cause to be issued and shall, as provided for in this Plan, issue (i) the New Money Warrants for distribution to the New Money Second Lien Exit Facility Lenders, the SLTL Warrants to the holders of Allowed SLTL Claims, and the GUC Warrants to the holders of Allowed General Unsecured Claims, in each case in accordance with the terms of the Plan and Confirmation Order without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person and (ii) upon exercise of the New Money Warrants, New Equity Interests issuable upon exercise of the New Money Warrants. The New Money Warrants, the SLTL Warrants, and GUC Warrants shall be issued and distributed free and clear of all Liens, Claims, and other Interests. All of the New Money Warrants, the SLTL Warrants, and GUC Warrants issued pursuant to the Plan, including as contemplated by the Credit Bid Transaction and the Second Lien Exit Facility Term Sheet, and all New Equity Interests issued upon exercise of the New Money Warrants, the SLTL Warrants, and the GUC Warrants shall be duly authorized and validly issued.

### 5.7 *Plan of Merger*

(a)     On the Effective Date, but after the consummation of the transactions contemplated by the Credit Bid Purchase Agreement, Fieldwood Energy LLC shall adopt the Plan of Merger and, in accordance with the terms thereof and solely to the extent therein, upon the effective time of the Divisional Merger as provided for in the Plan of Merger, the (i) FWE Assets will be allocated to and vest in FWE I and FWE III pursuant to the terms of the Plan of Merger, in each case, free and clear of all Plan of Merger Consent Rights and Plan of Merger Preferential Purchase Rights; and (ii) the FWE I Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE I and the FWE III Obligations shall be allocated to and shall vest in, and shall constitute liabilities and obligations of, FWE III. Immediately after the effective time of the Divisive Merger as provided in the Plan of Merger, the only assets, properties and rights of, and the only liabilities and obligations of, (i) FWE I will be the FWE I Assets and FWE I Obligations and (ii) FWE III will be the FWE III Assets and FWE III Obligations.

(b)     All of the membership interests of FWE I and FWE III shall be owned by Post-Effective Date FWE Parent.

(c)     Notwithstanding anything to the contrary in the Plan of Merger, any claim or interest that is satisfied, compromised, settled, released or discharged pursuant to the Plan shall not constitute an FWE I Obligation or FWE III Obligation.

### 5.8 *Single Share*

(a)     On the Effective Date, one share of Post-Effective Date FWE Parent common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the holders of Allowed General Unsecured Claims and the Single Share shall be recorded on the books and records maintained by the Plan Administrator.

(b)     On the date that FWE Parent's Chapter 11 Case is closed in accordance with Section 5.25 of this Plan, the Single Share issued on the Effective Date pursuant to the Plan shall be deemed cancelled and of no further force and effect, provided that such cancellation does not adversely impact the Debtors' Estates.

### 5.9     *Plan Administrator*

(a)     *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court has entered an order or orders closing each of the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause; or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with this Plan.

(b)     *Authority*.  Subject to Section 5.9(c) of this Plan, the Plan Administrator shall have all the rights, powers, authority, and duties on behalf of each of the Debtors and Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process in accordance with the terms of this Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(ii)     make Distributions to holders of Allowed Claims and Interests in accordance with this Plan, including distributions from the Claims Reserve, Professional Fee Escrow and Plan Administrator Expense Reserve;

(iii)     exercise its reasonable business judgment to direct and control the Debtors or Post-Effective Date Debtors under this Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)     engage in the ownership, operation, plugging and abandonment, and decommissioning of the FWE III Assets, including the FWE III Oil & Gas Lease Interests;

(vi)     abandon any property determined by the Plan Administrator to be of *de minimis* value or burdensome to the Estates;

(vii) other than any Causes of Action released by the Debtors pursuant to this Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates;

(viii) retain, employ, terminate, or replace professionals to assist or represent it in performing its duties under this Plan;

(ix) pay all fees, expenses, debts, charges, and liabilities of the Post-Effective Date Debtors, including any Restructuring Expenses, from the Plan Administrator Expense Reserve or otherwise;

(x) comply with, and cause the Debtors and Post-Effective Date Debtors to comply with, the Debtors' or Post-Effective Date Debtors' continuing obligations under the Credit Bid Purchase Agreement;

(xi) maintain the books and records and accounts of the Debtors and Post-Effective Date Debtors;

(xii) establish and maintain bank accounts in the name of the Post-Effective Date Debtors;

(xiii) incur and pay reasonable and necessary expenses in connection with the performance of duties under this Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(xiv) following the Effective Date, pay any fees and expenses in Cash in accordance with Section 2.4 of this Plan;

(xv) administer each Debtor's and Post-Effective Date Debtors' tax obligations, including (i) filing tax returns and paying tax obligations and (ii) representing the interest and account of each Debtor, each Debtor's estate, or each Post-Effective Date Debtor before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xvi) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors or Post-Effective Date Debtor that are required hereunder, by any Governmental Unit or applicable law;

(xvii) pay statutory fees in accordance with Section 12.1 of this Plan;

(xviii) perform other duties and functions that are consistent with the implementation of the Plan or as the Plan Administrator reasonably deems to be necessary and proper to carry out the provisions of this Plan; and

(xix) close the Chapter 11 Cases pursuant to Section 5.25 of this Plan.

(c) *Board of Directors and Officers*.

(i) The officers and directors of the Debtors existing before the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii) Upon the Effective Date, the Plan Administrator shall serve as the sole officer, director, or manager of each Post-Effective Date Debtor. The Plan Administrator may also elect such additional managers(s) and officer(s) of each Post-Effective Date Debtor as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein. The Plan Administrator shall also have the power to act by written consent to remove any officer or manager of any Post-Effective Date Debtor at any time with or without cause.

(d) *Post-Effective Date Operations*. After the Effective Date, pursuant to this Plan, the Plan Administrator shall operate the Post-Effective Date Debtors without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(e) *Post-Effective Date Expenses*. On and after the Effective Date, all costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Post-Effective Date Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Post-Effective Date Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Plan Administrator Expense Reserve.

(f) *Indemnification*. Each of the Estates and the Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence or willful misconduct.

(g) *Cooperation*. The Debtors, the Post-Effective Date Debtors, the Plan Administrator, the FWE I Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser) and their respective professionals, as appropriate, shall cooperate with each other in relation to their respective activities and obligations in respect of this Plan, including objecting to, settling or otherwise reconciling claims as provided herein, and by providing reasonable, good-faith access to personnel, systems, and books and records and their respective personnel and consulting with each other to avoid duplication of effort; *provided*, *however*, that the Debtors, the Post-Effective Date Debtors, the Plan Administrator, the FWE I Sole Manager, and NewCo and its subsidiaries (including the Credit Bid Purchaser) and including its advisors,

if any) shall enter into a confidentiality agreement before sharing of any such documents and/or information to the extent deemed reasonably necessary by the Post-Effective Date Debtors, the Credit Bid Purchaser, or Plan Administrator, as applicable.

### 5.10 *Plan Funding.*

Plan Distributions of Cash shall be funded from, among other things, the Debtors' Cash on hand (including the proceeds of the DIP Facility), the New Money Consideration, and the proceeds of the Equity Rights Offerings.

### 5.11 *The Exit Facilities*

(a) On the Effective Date, the Credit Bid Purchaser shall execute and deliver the Exit Facility Documents and such documents shall become effective in accordance with their terms. On and after the Effective Date, the Exit Facility Documents shall constitute legal, valid, and binding obligations of the Credit Bid Purchaser and be enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Credit Bid Purchaser shall be authorized to incur the loans under the Exit Facilities and use the proceeds of such loans, in each case, in accordance with the terms of this Plan and the Exit Facility Documents without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Exit Facility Documents shall bind the Credit Bid Purchaser and each other Entity that enters into the Exit Facility Documents.

(b) Confirmation shall be deemed approval of the Exit Facility Documents (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or Post-Effective Date Debtors, as applicable, in connection therewith), the First Lien Exit Facility Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including any payments under the First Lien Exit Facility Commitment Letter)), and the Second Lien Backstop Commitment Letter (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith (including the Second Lien Backstop Commitment Premium and any other payments under the Backstop Agreement)), and, to the extent not approved by the Bankruptcy Court previously, the Credit Bid Purchaser will be authorized to, without further notice to the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documents, each as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Credit Bid Purchaser may deem to be necessary to enter into the Exit Facility Documents.

(c) On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facility Documents (i) shall be legal, binding,

and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Documents with the priorities established in respect thereof under applicable non-bankruptcy law and the New Intercreditor Agreement, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code, this Plan, the Confirmation Order or applicable non-bankruptcy law. To the extent provided in the Exit Facility Documents, the Exit Facility Agents are authorized, but not required, to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such liens or security interests.

(d)     On the Effective Date, the Credit Bid Purchaser, the First Lien Exit Facility Agent and the Second Lien Exit Facility Agent shall enter into the New Intercreditor Agreement substantially in the form contained in the Plan Supplement.

### 5.12   *Apache Definitive Documents.*

(a)     On the Effective Date following the consummation of the Plan of Merger and the Effective Time (as defined in the Plan of Merger), FWE I shall be authorized to execute, deliver, and enter into the Apache Definitive Documents, including the Standby Credit Facility Documents, without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Standby Loan Agreement shall constitute a legal, valid, binding and authorized obligation of FWE I, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Standby Loan Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b)     FWE I Sole Manager

(i)     Upon the Effective Date, the FWE I Sole Manager shall be appointed. Upon the Effective Date, the new governance structure of FWE I will be set forth in the FWE I LLC Agreement.

(ii)    On and after the Effective Date, the FWE I Sole Manager and Plan Administrator shall mutually cooperate to establish any procedures and protocols as they deem necessary to carry out their respective duties; *provided*, *however*, that any such procedures and protocols shall be consistent with the terms of this Plan and the Sole Manager Agreement (as defined in the Apache Implementation Agreement).

(iii)     FWE I shall indemnify and hold harmless the FWE I Sole Manager solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the FWE I Sole Manager's gross negligence or willful misconduct.

### 5.13  *Abandonment of Certain Properties*

Immediately upon the occurrence of the Effective Date, the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Properties are abandoned pursuant to the Plan without further notice to or order of the Bankruptcy Court pursuant to Sections 105(a) and 554(a) of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable.  The Abandoned Properties shall not be allocated to nor vest in the Post-Effective Date Debtors or NewCo and its subsidiaries, including the Credit Bid Purchaser.  Except as otherwise provided in this Plan or the Confirmation Order, the Debtors, their Estates, and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Properties. Nothing in this Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim against the Debtors, the Post-Effective Date Debtors or any co-lessees or predecessors in interest with respect to the Abandoned Properties for any decommissioning obligations for the Abandoned Properties.

### 5.14  *Establishment of Claims Reserve.*

On the Effective Date, the Debtors shall, with the consent of the Requisite FLTL Lenders and the DIP Lenders, establish and fund the Claims Reserve by depositing Cash, in the amount of the Claims Reserve Amount into the Claims Reserve.  The Claims Reserve shall be used to pay Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims (to the extent such Claims do not receive other treatment), Allowed Unsecured Trade Claims, and Cure Amounts in accordance with the terms of this Plan.  Any amounts remaining in the Claims Reserve after satisfaction of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, Allowed Unsecured Trade Claims, and Cure Amounts shall constitute Residual Distributable Value.

### 5.15  *Plan Administrator Expense Reserve.*

On or before the Effective Date, the Plan Administrator shall establish the Plan Administrator Expense Reserve.  On the Effective Date, the Plan Administrator shall deposit Cash in the Plan Administrator Expense Reserve Amount into the Plan Administrator Expense Reserve.  The Plan Administrator Expense Reserve shall be used by the Plan Administrator solely to satisfy the expenses of the Plan Administrator and the Post-Effective Date Debtors as set forth in this Plan.  Any amount remaining in the Plan Administrator Expense Reserve after the dissolution of all the Post-Effective Date Debtors shall constitute Residual Distributable Value.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for the purposes of carrying out its duties under this Plan.

**5.16** *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Post-Effective Date Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

(b)     On or after the Effective Date (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs, without prejudice to the rights of any party to a contract or other agreement with any Post-Effective Date Debtor, each Post-Effective Date Debtor may, in the sole discretion of the Plan Administrator, take such action as permitted by applicable law, the applicable Amended Organizational Documents or other applicable corporate governance documents, the Apache Definitive Documents, any Additional Predecessor Agreement Documents, as such Post-Effective Date Debtor may determine is reasonable and appropriate, including, causing:  (i) the consummation of a Divisional Merger as contemplated by the Plan of Merger, (ii) the taking of any action contemplated by any Additional Predecessor Agreement Documents and the consummation thereof (including the formation of a new entity or consummation of a divisional merger),  (iii) a Post-Effective Date Debtor to be merged into another Post-Effective Date Debtor or an affiliate of a Post-Effective Date Debtor; (iv) a Post-Effective Date Debtor to be dissolved; (v) the legal name of a Post-Effective Date Debtor to be changed; (vi) a Post-Effective Date Debtor to convert its form of entity; or (vii) the closure of a Post-Effective Date Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable (in any case, following the consummation of the Credit Bid Transaction), but subsequent to the consummation of the transactions contemplated by the Credit Bid Purchase Agreement if the Credit Bid Transaction occurs,   the Post-Effective Date Debtors, acting through the Plan Administrator, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including,  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate organizational documents governing the Post-Effective Date Debtors, including the Post-Effective Date Debtors' respective Amended Organizational Documents, and any amendments or restatements thereto, or any documents governing any Post-Effective Date Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including, without limitation, the

organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 5.17 *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) entry into or execution of the Credit Bid Purchase Agreement and consummation of the transactions contemplated therein, (ii) the assumption or assumption and assignment of executory contracts and unexpired leases as provided herein, (iii) the appointment of the Plan Administrator and the FWE I Sole Manager, (iv) the entry into or execution of the Apache Definitive Documents and all documentation relating thereto, including the Plan of Merger and Standby Credit Facility Documents, (v) the entry into or execution of any Additional Predecessor Agreement Documents and all documentation relating thereto, including any plan of merger, divisional merger, or the creation of a new entity, (vi) entry into or execution of the Exit Facility Documents (and any other documentation related thereto, including the New Intercreditor Agreement), (vii) any other Restructuring Transaction, and (viii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Post-Effective Date Debtors, and any corporate or limited liability company action required by the Debtors or the Post-Effective Date Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors.

(b)     On or before (as applicable) the Effective Date, the appropriate directors, officers, and managers of the Debtors, the Plan Administrator, or the FWE I Sole Manager, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan).     The authorizations and approvals contemplated by this Section 5.17 shall be effective notwithstanding any requirements under nonbankruptcy law.

### 5.18 *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under this Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, reimbursement obligations, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements: (i) the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing certain Intercompany Interests not modified by the Plan and any rights of any holder in respect thereof and (ii) the Decommissioning Agreement, and any and all

bonds and letters of credit constituting Decommissioning Security) shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, the Prepetition SLTL Administrative Agent, and the DIP Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective liens, including any charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan required to be paid pursuant to the applicable agreement; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, the Prepetition SLTL Administrative Agent, and the DIP Agent may have under this Plan, the applicable credit agreements, collateral agreements, or pledge agreements; and (5) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to this Plan or the applicable credit agreements; *provided*, *further*, that the Prepetition FLFO Administrative Agent, the Prepetition FLFO Collateral Agent, the Prepetition FLTL Administrative Agent, the Prepetition SLTL Administrative Agent, and the DIP Agent may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Post-Effective Date Debtors, as applicable to the extent not inconsistent with the Confirmation Order or this Plan.

### 5.19 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Post-Effective Date Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

Except, for the avoidance of doubt, with respect to any mortgages, deeds of trust, Liens, pledges, and any other security interests of the Prepetition FLFO Administrative Agent or the Exit Facility Agents, after the Effective Date and in accordance with the terms of the Confirmation Order, the Debtors or the Post-Effective Date Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to any Claim or Interest, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the Prepetition Agents, including, without limitation, UCC-3 termination statements and mortgage release documentation.

**5.20** *Intercompany Interests; Corporate Reorganization.*

To the extent reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be reinstated for the ultimate benefit of the holders of Claims and Interests as set forth in the Plan (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Post-Effective Date Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

**5.21** *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Post-Effective Date Debtors, acting through the Plan Administrator, or the FWE I Sole Manager, as applicable, may take all actions consistent with the Plan and the Confirmation Order, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

**5.22** *Liquidating Trust.*

In the event the Plan Administrator determines, in its discretion, that to carry out and implement the provisions of this Plan certain assets should be transferred to a liquidating trust for the benefit of one or more classes of Claims, (1) the terms of the liquidating trust shall be set forth in a liquidating trust agreement, (2) the liquidating trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code of which the holders of Claims who become the liquidating trust beneficiaries (as determined for U.S. federal income tax purposes) are the owners and grantors, consistent with the terms of the Plan, (3) the sole purpose of the liquidating trust shall be the liquidation and distribution of the assets transferred to the liquidating trust in accordance with Treasury Regulations section 301.7701-4(d), including the resolution of Claims, with no objective to continue or engage in the conduct of a trade or business, (4) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report consistently with such treatment (including the deemed receipt of the underlying assets, subject to applicable liabilities and obligations, by the holders of Allowed Claims, as applicable, followed by the deemed transfer of such assets to the liquidating trust), (5) all parties shall report consistently with the valuation of the assets transferred to the liquidating trust as determined by the trustee of the liquidating trust (or its designee), (6) the trustee of the liquidating trust shall be responsible for filing returns for the trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a), and (7) the trustee of the liquidating trust shall annually send to each holder of an interest in the liquidating trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the trustee of the liquidating trust of a private letter ruling if the trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the trustee), the trustee of the liquidating trust may timely

elect to (y) treat any portion of the liquidating trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 (and make any appropriate elections) and (z) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, (i) all parties (including the Debtors, holders of Claims, and the trustee of the liquidating trust) shall report for U.S. federal, state, and local income tax purposes consistently with the foregoing, and (ii) any tax imposed on the liquidating trust with respect to assets allocable to Disputed Claims (including any earnings thereon and any gain recognized upon the actual or deemed disposition of such assets) will be payable out of such assets and, in the event of insufficient Cash to pay any such taxes, the trustee of the liquidating trust may sell all or part of such assets to pay the taxes. The trustee of the liquidating trust may request an expedited determination of taxes of the liquidating trust, including any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the liquidating trust for all taxable periods through the dissolution of the liquidating trust.

### 5.23 *Securities Exemptions.*

(a) The offer, issuance, and distribution of the New Equity Interests (other than the Backstop Commitment Premium Equity Interests, the New Money Warrants, or any New Equity Interests issued upon exercise of the New Money Warrants or under the Management Incentive Plan), the Subscription Rights, the SLTL Warrants, and the GUC Warrants to holders of Allowed FLTL Claims, Allowed SLTL Claims, and General Unsecured Claims, as applicable, under Article IV of this Plan, and the New Equity Interests issued upon exercise of the Subscription Rights, the SLTL Warrants, or the GUC Warrants, shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or actions by any Person, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws, to the fullest extent permitted by section 1145 of the Bankruptcy Code. The New Equity Interests, the Subscription Rights, the SLTL Warrants, and GUC Warrants issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b) The issuance and sale of the Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) under this Plan shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and/or Regulation D thereunder. The Backstop Commitment Premium Equity Interests, and the New Money Warrants (including any New Equity Interests issued upon exercise of the New Money Warrants) issued in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration

requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

(c)     None of the Debtors, NewCo and its subsidiaries (including the Credit Bid Purchaser), or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants, under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants, the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

(d)     Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the New Equity Interests (including any New Equity Interests issued upon exercise of the Subscription Rights, the New Money Warrants, the SLTL Warrants or the GUC Warrants), the Subscription Rights, the New Money Warrants,  the SLTL Warrants, or the GUC Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 5.24     *Closing of Chapter 11 Cases.*

After the Effective Date, the Plan Administrator shall be authorized, but not directed, to submit an order to Bankruptcy Court under certification of counsel that is in form and substance acceptable to the U.S. Trustee that closes and issues a final decree for each of the Chapter 11 Cases.

## ARTICLE VI.     DISTRIBUTIONS.

### 6.1     *Distributions Generally.*

The Plan Administrator shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

### 6.2     *No Postpetition Interest on Claims.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3 *Date of Distributions.*

Except as otherwise provided in this Plan, the Plan Administrator shall make Plan Distributions to holders of Allowed Claims after (a) funding of the Professional Fee Escrow and (b) satisfaction in full or establishment of reserves sufficient to pay claims in the Claims Reserve, as soon as reasonably practicable after the Effective Date and thereafter, the Plan Administrator shall from time to time determine the subsequent Distribution Dates.

### 6.4 *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Plan Administrator shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 6.5 *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6 *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Administrator shall make all Distributions to any holder of an Allowed Claim as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents or (b) at the address in any written notice of address change delivered to the Debtors or the Plan Administrator, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any Distribution to any holder is returned as undeliverable, no Distribution or payment to such holder shall be made unless and until the Plan Administrator has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such Distribution shall be made to such holder without interest.

### 6.7 *Unclaimed Property.*

One year from the later of: (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions that remain payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Post-Effective Date Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to

such distribution shall be discharged and forever barred. The Post-Effective Date Debtors and the Plan Administrator shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

For the avoidance of doubt, a distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Post-Effective Date Debtors or the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors', the Post-Effective Date Debtors', or the Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

### 6.8 *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9 *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10 *De Minimis Cash Distributions.*

The Plan Administrator shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash in an amount less than one-hundred dollars ($100); *provided*, *however*, that if any Plan Distribution is not made pursuant to this Section 6.10, such Distribution shall be added to any subsequent Plan Distribution to be made on behalf of the holder's Allowed Claim. The Plan Administrator shall not be required to make any final Plan Distributions of Cash in an amount less than fifty dollars ($50) to any holder of an Allowed Claim. If the amount of any final Plan Distributions to holders of Allowed Claims would be fifty dollars ($50) or less, then no further Plan Distribution shall be made by the Plan Administrator and any surplus Cash shall be donated and distributed to a Tax Code § 501(c)(3) tax-exempt organization selected by the Plan Administrator.

### 6.11 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 6.12 *Allocation of Distributions Between Principal and Interest.*

Except with respect to the FLFO Claims of the Prepetition FLFO Secured Parties or as otherwise required by law, consideration received in respect of an Allowed Claim is

allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.13    *Setoffs and Recoupments.*

Each Post-Effective Date Debtor, or such entity's designee as instructed by such Post-Effective Date Debtor or the Plan Administrator, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Post-Effective Date Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Post-Effective Date Debtor(s), and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any claims, rights, or Causes of Action that a Post-Effective Date Debtor or its successor or assign may possess against such holder.

### 6.14    *Withholding and Reporting Requirements.*

(a)      *Withholding Rights*.  In connection with this Plan, any party issuing any instrument or making any Plan Distribution described in this Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all Plan Distributions pursuant to this Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to this Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, income, withholding, and other taxes, on account of such Plan Distribution.  Any party issuing any instrument or making any Plan Distribution pursuant to this Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Notwithstanding any provision in the Plan to the contrary, any party issuing any instrument or making any Plan Distribution pursuant to this Plan shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

(b)      *Forms*. Any party entitled to receive any property as an issuance or Plan Distribution under this Plan shall, upon reasonable request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other Person any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a non-U.S. Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Plan Administrator or such other Person.  If such request is made by the Plan Administrator or such other Person designated by

the Plan Administrator and the holder fails to comply before the date that is 210 days after the request is made, the amount of such Plan Distribution shall irrevocably revert to the Debtors and any Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

### 6.15 *Claims Paid by Third Parties.*

The Plan Administrator shall reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Post-Effective Date Debtors. If a holder of a Claim receives a Distribution from the Debtors or the Post-Effective Date Debtors on account of such Claim and also receives payment from a third party on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the Debtors or the Post-Effective Date Debtors, to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total Allowed amount of such Claim as of the date of any such Plan Distribution under this Plan. The failure of such holder to timely repay or return such Distribution shall result in the holder owing the Post-Effective Date Debtors interest on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

### 6.16 *Claims Payable by Third Parties.*

No Distributions shall be made on account of an Allowed Claim that is payable pursuant to one of the insurance policies to which the Debtors' are a beneficiary until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; *provided*, *however*, that this Section 6.16 shall not restrict Plan Distributions on an Allowed Claim that is Allowed in an amount that does not exceed an applicable self-insured retention or deductible amount under one or more such insurance policies. To the extent that one or more of the insurers agrees to satisfy a Claim in whole or in part, then immediately upon such insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims register by the Plan Administrator without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VII. PROCEDURES FOR DISPUTED CLAIMS.

### 7.1 *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Post-Effective Date Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2   *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Post-Effective Date Debtors (acting through the Plan Administrator), as applicable, shall be entitled to object to Claims.  Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Post-Effective Date Debtors and the Plan Administrator shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3   *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4   *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Post-Effective Date Debtors (at the direction of the Plan Administrator) upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5   *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Post-Effective Date Debtors, as such deadline may be extended from time to time.

### 7.6 *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Post-Effective Date Debtors.

### 7.7 *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Post-Effective Date Debtors.

### 7.8 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.9 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.10 *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Sections 8.4 or 8.5 of the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement, which Schedule of Assumed Contracts will identify executory contracts or unexpired leases for assumption and assignment to the Credit Bid Purchaser in accordance with the Credit Bid Purchase Agreement.  To the extent the Decommissioning Agreement is an executory contract, it will be assumed and become the obligation of FWE I under the Plan of Merger.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Credit Bid Purchaser or Post-Effective Date Debtors, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)    To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

(d)    Subject to the terms of the Credit Bid Purchase Agreement, the Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Assumed Contracts to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that, subject to

the terms of the Credit Bid Purchase Agreement, the Debtors may amend the Schedule of Assumed Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

## 8.2 *Determination of Cure Amounts and Deemed Consent.*

(a)    Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date in accordance with the terms of the Credit Bid Purchase Agreement or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)    The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign to the Credit Bid Purchaser in accordance with the terms of the Credit Bid Purchase Agreement the contract or lease in connection with this Plan or the Credit Bid Purchase Agreement and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Post-Effective Date Debtor, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Post-Effective Date Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 8.2(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)    If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court before such assumption being effective; provided, that, subject to the terms of the Credit Bid Purchase Agreement, the Debtors or Post-

Effective Date Debtors, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, subject to the terms of the Credit Bid Purchase Agreement, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease before the resolution of the Assumption Dispute; *provided*, that the Post-Effective Date Debtors or Credit Bid Purchaser, as applicable shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party.  The Debtors or Post-Effective Date Debtors, as applicable, subject to the terms of the Credit Bid Purchase Agreement, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, upon the assumption of such executory contract or unexpired leases.

### 8.3     *Rejection Damages Claims.*

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 6B (General Unsecured Claims).  A proof of such Claim must be filed with the Bankruptcy Court and served upon counsel for the Debtors, Post-Effective Date Debtor, or the Plan Administrator, as applicable, by the later of (i) thirty (30) days after the filing and service of the notice of the occurrence of the Effective Date; and (ii) thirty (30) days after entry of an Order rejecting such contract or lease if such contract or lease is the subject of a pending Assumption Dispute.**

### 8.4     *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of

whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Post-Effective Date Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Post-Effective Date Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5 *Insurance Policies.*

(a) All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by and vest in the applicable Debtors or the Post-Effective Date Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b) In addition, after the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

### 8.6 *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

### 8.7 *Reservation of Rights.*

(a) Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Post-Effective Date Debtors or their respective affiliates has any liability thereunder.

(b) Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other

rights of the Debtors or the Post-Effective Date Debtors under any executory or non-executory contract or unexpired or expired lease.

(c) Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Post-Effective Date Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(a) If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX. CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 9.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with the Plan:

(a) the Plan Supplement has been filed;

(b) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be a Final Order;

(c) the Definitive Documents shall be (i) consistent with the Restructuring Support Agreement and otherwise acceptable to the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement [and (ii) acceptable to the Prepetition FLFO Administrative Agent and the First Lien Exit Facility Agent solely to the extent provided and consistent with their consent and approval rights as set forth in this Plan;] [21]

(d) the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

(e) all conditions precedent to the effectiveness of the Apache Definitive Documents shall have been satisfied or waived by the party having the right to waive the same;

---

[21] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

(f)     the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the Restructuring Support Agreement in a manner consistent in all respects with the Plan and Restructuring Support Agreement;

(g)     the Amended Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(h)     the NewCo Organizational Documents shall become effective and in full force and effect as of the Effective Date;

(i)     [the conditions precedent to the effectiveness of the First Lien Exit Facility Commitment Letter shall have been satisfied or duly waived in writing;] [22]

(j)     the conditions precedent to the effectiveness of the Second Lien Backstop Commitment Letter shall have been satisfied or duly waived in writing;

(k)     the conditions precedent to the effectiveness of the FLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing;

(l)     the conditions precedent to the effectiveness of the SLTL ERO Backstop Agreement shall have been satisfied or duly waived in writing

(m)     [the conditions precedent to the effectiveness of the First Lien Exit Facility (as determined in the First Lien Exit Facility Documents and the First Lien Exit Facility Commitment Letter) shall have been satisfied or duly waived in writing and the First Lien Exit Facility Lenders and the First Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan][23];

(n)     the conditions precedent to the effectiveness of the Second Lien Exit Facility (as determined in the Second Lien Exit Facility Documents and the Second Lien Backstop Commitment Letter) shall have been satisfied or duly waived in writing and the Second Lien Exit Facility Lenders and the Second Lien Exit Facility shall have closed substantially simultaneously with the effectiveness of the Plan;

(o)     the New Intercreditor Agreement shall have been executed and delivered by each of the parties thereto;

(p)     the Equity Rights Offerings shall have been consummated;

---

[22] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[23] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

(q)     the conditions precedent to the effectiveness of the Credit Bid Purchase Agreement shall have been satisfied or duly waived in writing in accordance with the terms of the Credit Bid Purchase Agreement and the Credit Bid Transaction Closing shall have occurred or will occur simultaneously with the effectiveness of the Plan, including, without limitation, payment of the New Money Consideration by Buyers to Sellers at Closing pursuant to the terms thereof;

(r)     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents (other than any such authorization, consent, regulatory approval, ruling, or document that is customarily obtained or completed after assignment, conveyance or vesting of an applicable Asset) that, after giving effect to the entry of the Confirmation Order, are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(s)     no event of default under the DIP Documents shall have occurred or be continuing and an acceleration of the obligations or termination of the DIP Lenders' commitments under the DIP Documents shall not have occurred; and

(t)     all Restructuring Expenses shall have been indefeasibly paid in full in accordance with Section 2.6.

### 9.2     *Waiver of Conditions Precedent.*

(a)     With the prior written consent of the Required DIP Lenders, the Requisite FLTL Lenders, the conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 of the Plan may be waived, in whole or in part, by the Debtors, without leave of or order of the Bankruptcy Court; *provided that*, a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(c), (d), (e), and (f) of the Plan shall also require the prior written consent of the Apache PSA Parties; [*provided*, *further*, that a waiver of any of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(i), (m), (o), and (t) above shall also require the prior written (i) consent of the Prepetition FLFO Administrative Agent and the Exit First Lien Agent for all conditions precedent other than Section 9.1(d),(r), and (s) and (ii) reasonable consent for the conditions precedent in Section 9.1(r) and (s); *provided*, *further*, that a waiver of the conditions precedent to the occurrence of the Effective Date set forth in Sections 9.1(l), (p) and (t) shall also require the prior written consent of the Requisite SLTL Lenders.[24] If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not

---

[24] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## 9.3     *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the Effective Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Consenting Creditors, or any other Person.

## ARTICLE X.     EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2     *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order, or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Post-Effective Date Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Post-Effective Date Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests (other than any and all Liens securing the FLFO Claims or the obligations under the First Lien Exit Facility). Subject to the terms of the Plan, on and after the Effective Date, the Post-Effective Date Debtors and Plan Administrator may operate their businesses and may use,

acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Post-Effective Date Debtors may pay the charges that they incur on or after the Confirmation Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3    *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any obligations incurred in connection with or related to bonds and letters of credit (and any related agreements) issued before the Petition Date on behalf of the Debtors, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Post-Effective Date Debtor

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction Against Interference With Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Post-Effective Date Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Post-Effective Date Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Post-Effective Date Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Post-Effective Date Debtor, or an Estate from

exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**10.7**     *Releases.*

(a)     <u>RELEASES BY THE DEBTORS</u>.  **AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR**

RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b) **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT**

LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE RELEASING PARTIES OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH

**RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 10.7(B) OF THE PLAN, NO PARTY SHALL BE RELEASED TO THE EXTENT SUCH RELEASE WOULD IMPAIR THE DECOMMISSIONING SECURITY OR THE APACHE PSA PARTIES' ABILITY TO DRAW ON THE DECOMMISSIONING SECURITY, IN ANY RESPECT. FOR THE AVOIDANCE OF DOUBT, ANY AND ALL CLAIMS THE APACHE PSA PARTIES MAY HAVE AGAINST FWE I RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND ANY SECURITY OBTAINED, PROVIDED, OR PLEDGED IN CONNECTION WITH THE DECOMMISSIONING AGREEMENT WILL BE PRESERVED AND ANY AND ALL CLAIMS FWE I MAY HAVE AGAINST THE APACHE PSA PARTIES RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND THE DECOMMISSIONING SECURITY WILL BE PRESERVED.**

(c)      ***Release of Liens*.  Except as otherwise specifically provided in the Plan (including all Liens securing the FLFO Claims or the First Lien Exit Facility) or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  For the**

avoidance of doubt, all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I of the Plan of Merger) held by the Prepetition FLFO Secured Parties, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall be released, discharged, and of no further force or effect as of the Effective Date.

### 10.8 *Exculpation.*

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EXIT FACILITY DOCUMENTS, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, AND THE RESTRUCTURING TRANSACTIONS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, THE CREDIT BID PURCHASE AGREEMENT, THE NEW MONEY INVESTMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE

BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.10 *Subordinated Securities Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11 *Retention of Causes of Action and Reservation of Rights.*

(a) Except as otherwise provided in the DIP Order or Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Post-Effective Date Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

(b) Notwithstanding Section 10.11(a), on the Effective Date, the Post-Effective Date Debtors shall be deemed to have released all preference actions pursuant to section 547 of the Bankruptcy Code against the holders of Unsecured Trade Claims and General

Unsecured Claims (in each case, solely in their capacity as holders of Unsecured Trade Claims and General Unsecured Claims, as applicable).

### 10.12 *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13 *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity before, on or subsequent to the Petition Date shall be assumed by the Post-Effective Date Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Post-Effective Date Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## ARTICLE XI.      RETENTION OF JURISDICTION.

### 11.1 *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)      to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)      to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Fee Claims;

(j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)    to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)    to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)    to hear and determine matters related to the DIP Facility and the DIP Order; and

(t)    to enter a final decree closing each of the Chapter 11 Cases.

Notwithstanding anything in this Article XI to the contrary, as of the Effective Date, the Exit Facility Documents and any other documents related thereto, including the New Intercreditor Agreement, shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.    MISCELLANEOUS PROVISIONS.

### 12.1    *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, the Debtors or the Post-Effective Date Debtors, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under this Section 12.1 shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

**12.2** *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Standby Loan Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, parish, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**12.3** *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**12.4** *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

**12.5** *Amendments.*

(a)     Plan Modifications.  Subject to (i) the consent rights set forth in the Restructuring Support Agreement, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims [and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims][25], the Plan may be amended, modified, or supplemented by the Debtors in the manner

---

[25] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth

provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with (i) the consent of the Required DIP Lenders, and the Requisite FLTL Lenders, (ii) the reasonable consent of the Creditors' Committee solely to the extent that it adversely impacts the holders of General Unsecured Claims or Unsecured Trade Claims, [and (iii) the reasonable consent of the Prepetition FLFO Administrative Agent ~~solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims~~][26], may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors, subject to (i) the consent of the Required DIP Lenders and the Requisite FLTL Lenders [and (ii) the ~~reasonable~~applicable consent rights of the Prepetition FLFO Administrative Agent ~~solely to the extent that it directly and adversely impacts the holders of Allowed FLFO Claims~~][27], shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Restructuring Support Agreement or the First Lien Exit Facility Commitment Letter, as applicable, through the Effective Date.

(b)     Certain Technical Amendments. Before the Effective Date, the Debtors, subject to the consent rights set forth in the Restructuring Support Agreement, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

### 12.6     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn before the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and

---

in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[26] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

[27] [NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]

void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.7 *Severability.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Effective Date Debtors (as the case may be) and (c) nonseverable and mutually dependent.

### 12.8 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Texas, without giving effect to the principles of conflicts of laws thereof.

### 12.9 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Effective Date Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.10 *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.11 *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants,

agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.12  *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.13  *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.14  *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)     If to the Debtors:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  Michael Dane and Thomas R. Lamme

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Jessica Liou, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*

(b)     If to the DIP Lenders or FLTL Lenders:

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn: Damian Schaible, Esq. and Natasha Tsiouris, Esq.
Telephone: (212) 450-4000

Facsimile: (212) 701-5800

(c)    If to the Post-Effective Date Debtors:

[Plan Administrator]
[Plan Administrator Address]

 – and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., and Jessica Liou, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Post-Effective Date Debtors*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made before 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Post-Effective Date Debtors and Plan Administrator have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Post-Effective Date Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

**12.15** *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests before the Effective Date or (b) any holder of a Claim or Interest or other entity before the Effective Date.

**12.16** *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, provided that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications, and any relief related thereto, for compensation by Professional Persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

[*Remainder of Page Intentionally Left Blank*]

**Exhibit C**

**Blackline of Plan Release Provisions**

**Exhibit F**
**Plan Release Provisions**

**Definitions:**

      ***Exculpated Parties*** means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Post-Effective Date Debtors, (c) FWE I, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) ~~[~~the Prepetition FLFO Secured Parties~~]~~[1], (f) the Consenting Creditors, (g) the Prepetition FLFO Collateral Agent, (h) the Prepetition FLTL Administrative Agent, (i) the Prepetition SLTL Agent, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (l) the Exit Facility Agents, (m) the Exit Facility Lenders, (n) the Second Lien Backstop Parties, (o) the ERO Backstop Parties, (p) the Apache PSA Parties, and (q) with respect to each of the foregoing Persons in clauses (a) through (p) each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

      ***Released Parties*** means, collectively, (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the DIP Agent and DIP Lenders under the DIP Facility, (d) ~~[~~the Prepetition FLFO Secured Parties~~]~~[2]_ (e) the Consenting Creditors, (f) the Prepetition FLFO Collateral Agent, (g) the Prepetition FLTL Administrative Agent, (h) the Prepetition SLTL Agent, (i) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (j) NewCo and all of its subsidiaries (including the Credit Bid Purchaser), (k) the Exit Facility Agents, (l) the Exit Facility Lenders, (m) the Second Lien Backstop Parties, (n) the ERO Backstop Parties, (o) the Apache PSA Parties, and (p) with respect to each of the foregoing Persons in clauses (a) through (o), each of their current and former affiliates, and each such Entity's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their

---

[1] ~~[NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]~~

[2] ~~[NTD: subject to Prepetition FLFO Secured Parties consenting to the Plan and providing a written and binding commitment, by the Disclosure Statement hearing date, to provide the First Lien Exit Facility on the terms set forth in the First Lien Exit Facility Term Sheet or as otherwise agreed to by the Debtors, Required DIP Lenders, and Requisite FLTL Lenders.]~~

current and former officers, members, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives and other professionals, such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such, and any and all other persons or entities that may purport to assert any cause of action derivatively, by or through the foregoing entities.

*Releasing Parties* means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties (even if such Released Party purports to opt out of the releases set forth herein).

**Provisions:**

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Post-Effective Date Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Post-Effective Date Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Post-Effective Date Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold

Claims against, or Interests in, a Debtor, a Post-Effective Date Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**10.7     *Releases.***

(a)     **RELEASES BY THE DEBTORS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE CREDIT BID PURCHASE AGREEMENT, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR**

RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENTS, THE DECOMMISSIONING AGREEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b) **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT,**

4

THE EXIT FACILITY DOCUMENTS, AND THE RESTRUCTURING TRANSACTIONS, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT THE RELEASING PARTIES OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE CREDIT BID PURCHASE AGREEMENT, THE EXIT FACILITY DOCUMENTS, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, THE DECOMMISSIONING AGREEMENTS OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION,

TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 10.7(B) OF THE PLAN, NO PARTY SHALL BE RELEASED TO THE EXTENT SUCH RELEASE WOULD IMPAIR THE DECOMMISSIONING SECURITY OR THE APACHE PSA PARTIES' ABILITY TO DRAW ON THE DECOMMISSIONING SECURITY, IN ANY RESPECT. FOR THE AVOIDANCE OF DOUBT, ANY AND ALL CLAIMS THE APACHE PSA PARTIES MAY HAVE AGAINST FWE I RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND ANY SECURITY OBTAINED, PROVIDED, OR PLEDGED IN CONNECTION WITH THE DECOMMISSIONING AGREEMENT WILL BE PRESERVED AND ANY AND ALL CLAIMS FWE I MAY HAVE AGAINST THE APACHE PSA PARTIES RELATED TO THE DECOMMISSIONING AGREEMENT ARISING POST-EFFECTIVE DATE AND THE DECOMMISSIONING SECURITY WILL BE PRESERVED.

(c)     *Release of Liens*.  Except as otherwise specifically provided in the Plan (including all Liens securing the FLFO Claims or the First Lien Exit Facility) or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  For the avoidance of doubt, all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I

6

Assets (as defined in Part A of Schedule I of the Plan of Merger) held by the Prepetition FLFO Secured Parties, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall be released, discharged, and of no further force or effect as of the Effective Date.

      10.8    *Exculpation.*

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE CREDIT BID PURCHASE AGREEMENT, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EXIT FACILITY DOCUMENTS, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, AND THE RESTRUCTURING TRANSACTIONS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, THE CREDIT BID PURCHASE AGREEMENT, THE NEW MONEY INVESTMENT, THE EXIT FACILITY DOCUMENTS, THE FIRST LIEN EXIT FACILITY COMMITMENT LETTER, THE SECOND LIEN BACKSTOP COMMITMENT LETTER, THE EQUITY RIGHTS OFFERINGS, THE ERO BACKSTOP AGREEMENT, THE APACHE DEFINITIVE DOCUMENTS, ANY ADDITIONAL PREDECESSOR AGREEMENT DOCUMENTS, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY

7

APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9    *INJUNCTION RELATED TO RELEASES AND EXCULPATION.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

WEIL:\97880162\3\45327.0005WEIL:\97880162\4\45327.0005