1

1          IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4   IN RE:                    §      CASE NO. 20-33948-11
                              §
5   FIELDWOOD ENERGY, LLC AND §      HOUSTON, TEXAS
    OFFICIAL COMMITTEE OF      §
6   UNSECURED CREDITORS,       §      WEDNESDAY,
                              §      MARCH 24, 2021
7            DEBTORS.          §      1:30 P.M. TO 3:32 P.M.

8       STATUS CONFERENCE/DISCLOSURE STATEMENT (VIA ZOOM)

9            BEFORE THE HONORABLE MARVIN ISGUR
                UNITED STATES BANKRUPTCY JUDGE

10

11

12

         APPEARANCES:                (SEE NEXT PAGE)
13

14

15      (Recorded via CourtSpeak; No log notes)

16

17

18

19

20            TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23            www.judicialtranscribers.com

24

     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1                       APPEARANCES (VIA ZOOM):

2

3   FOR THE DEBTORS:              WEIL GOTSHAL AND MANGES, LLP
                                  Alfredo R. Perez, Esq.
4                                 700 Louisiana
                                  Suite 1700
5                                 Houston, Texas  77002
                                  713-546-5040
6

7   FOR THE UNITED STATES:        US DEPARTMENT OF JUSTICE
                                  Serajul F. Ali, Esq.
8                                 PO Box 875
                                  Ben Franklin Station
9                                 Washington, DC  20044
                                  202-307-0488
10

11  FOR ENI US OPERATING AND
    ENI PETROLEUM US:             BRACEWELL, LLP
12                                Mark E. Dendinger, Esq.
                                  CityPlace 1
13                                34th Floor
                                  185 Asylum Street
14                                Hartford, CT  06103
                                  860-256-8541
15

16  FOR XTO OFFSHORE:             FORSHEY PROSTOCK, LLP
                                  J. Robert Forshey, Esq.
17                                777 Main Street
                                  Suite 1550
18                                Fort Worth, Texas  76102
                                  817-877-8855
19

20  FOR MARATHAN OIL COMPANY:     BONDS ELLIS EPPICH SCHAFER
                                  JONES, LLP
21                                Clay M. Taylor, Esq.
                                  420 Throckmorton Street
22                                Suite 1000
                                  Fort Worth, Texas  76102
23                                817-405-6900

24

25

1                           ZOOM APPEARANCES (CONTINUED):
2

3   FOR ASPEN, BERKLEY,
    EVEREST AND SIRIUS:              CHIESA SHAHINIAN & GIANTOMASI,
4                                    PC
                                     Darren Grzyb, Esq.
5                                    One Boland Drive
                                     West Orange, New Jersey  07052
6                                    973-530-2077

7
    FOR HCCI/USSIC:                  LOCKE LORD, LLP
8                                    Philip G. Eisenberg, Esq.
                                     600 Travis
9                                    Suite 3400
                                     Houston, Texas  77002
10                                   713-226-1304

11
    FOR AD HOC GROUP OF
12  SECURED LENDERS:                 DAVIS POLK & WARDWELL, LLP
                                     Damian S. Schaible, Esq.
13                                   450 Lexington Avenue
                                     New York, New York  10017
14                                   212-450-4580

15

16

17  (Please also see Electronic Appearances.)

18

19

20

21

22

23

24

25

1    HOUSTON, TEXAS; WEDNESDAY, MARCH 24, 2021; 1:30 P.M.

2         THE COURT:  All right.  Good afternoon.  We're

3    here in the Fieldwood Energy case.  It's 20-33948.

4         I'm going to ask for a status report from Debtors'

5    counsel and from there, we'll take status reports from

6    others that might want to disagree with wherever they say we

7    are.

8         So if Debtors' counsel would please press five

9    star one time on your phone, we'll get your line activated?

10        (Pause in the proceedings.)

11        THE COURT:  Mr. Perez, good morning -- or good

12   afternoon.

13        MR. PEREZ:  Good afternoon, Your Honor.

14   Alfredo Perez.  Unfortunately my webcam says webcam load had

15   reached so it won't let me join, but I can see you.  And I

16   apologize for dialing in a few minutes later than normal.

17        THE COURT:  What we've done is try to limit the

18   number of webcams so that we'd be able to see everybody on

19   one page, which means I'm going to go ahead and ask -- yeah,

20   there are a couple of people just dropped off.  Why don't

21   you try again to join if you would, Mr. Perez?

22        MR. PEREZ:  Okay.  Thank you, Your Honor.

23   Your Honor, thank you for hearing us today.  We are prepared

24   to go forward with respect to both our Disclosure Statement

25   Hearing as well as the Motion to approve the backstop, the

1  second lien backstop commitment.  We have two witnesses as

2  well as obviously legal argument.  We have recently in the

3  last 72 hours reached agreement with the next largest

4  predecessor after Apache, which is Chevron, and they have

5  withdrawn their objection to the Disclosure Statement today.

6          And in addition to that, Your Honor, since we were

7  last here, we have agreements with both the UCC as well as

8  the second lien lenders.  So those have all be incorporated

9  into the Plan.  And we have firm financing with respect to

10  both the first lien and the second lien that will be used in

11  order to fund the Plan and go forward.  So we're prepared to

12  go forward, Your Honor, and address the various objections

13  that have been raised.  We have two witnesses and at the

14  Court's direction, we're prepared to go forward.

15          THE COURT:  So as you know, we've held in earlier

16  cases that *Midlantic* vest rights in the Government and not

17  in private individuals unless they are -- have the ability

18  to assert the rights of the Government.  Mr. Chenna

19  (phonetic) I believe on behalf of the United States has

20  filed a relatively extensive objection but says if there's a

21  provision in the Plan that says this will be done once you

22  get agreement so that, in fact, all the decommissioning is

23  handled -- I'm putting this in my words, not yours --

24  handled to the satisfaction of the Government, they would

25  then support conditional approval of the Disclosure

1 Statement so long as everything was conditioned on that.

2       What's your response to that position by the

3 United States?

4       MR. PEREZ:  Your Honor, several fold.  Number one,

5 we have been working extensively with the United States with

6 Serajul Ali from the Department of Justice as well as

7 various attorneys from the Department of Interior that

8 are -- that represent BSEE, who is one of the regulatory

9 agencies, as well as BOEM and so we've had extensive

10 discussions with them.  And, Your Honor, we welcome the

11 opportunity at the Confirmation Hearing to demonstrate to

12 the Court that we have met the *Midlantic* standards, I think,

13 and we are hoping to do that to the Government's

14 satisfaction.  And, Your Honor, when I get into my

15 presentation, I will -- we'll demonstrate to the Court that

16 we are well on our way, if not substantially there, to

17 getting the type of consensus that the Government is looking

18 for.

19       Your Honor, to the extent that there is a

20 conditional approval, while I certainly don't think it's

21 necessary, we would very much be prepared to meet our burden

22 at the Confirmation Hearing that we have satisfied the

23 *Midlantic* standards and that either consensually or in the

24 event that we haven't been able to reach full consensus,

25 based on the Court's ruling, we would be able to go forward.

1   But again, I think we've had a very positive, cordial

2   relationship with the Government and I think we're doing the

3   best we can to address their concerns, but at the end of the

4   day it's really whether we meet the *Midlantic* standards and

5   I think we will be prepared to show that we do.

6           THE COURT:  Yeah.  No, I didn't think they filed

7   an angry pleading, and I'll let them speak for themselves,

8   but I want to find out what they would mean by "conditional

9   approval" perhaps.

10          So if I can get whoever wants to speak for the

11  United States, Mr. Serajul Ali, or whoever's going to do

12  that, if you would press five star one time on your phone.

13  Get an opening statement from you if we could please.

14          Good afternoon.

15      (No audible response.)

16          THE COURT:  You may have you own line muted so let

17  me get you to unmute your telephone if you would.  Oops,

18  hold on, I didn't get it.  My fault.  Let's try that again.

19          MR. ALI:  Good afternoon, Your Honor.

20  Serajul Ali, United States Department of Justice, on behalf

21  of the United States.

22          THE COURT:  Good afternoon.  I can hear you now.

23  Sorry, I pressed a button wrong.

24          MR. ALI:  Thank you, Your Honor.  I don't know if

25  we wanted to go into full argument, but just preliminarily

1  the United States has been working with both the

2  stakeholders and the Debtors to try to set a potential

3  resolution to resolve a number of things, but I think the

4  biggest concern we have is the so-called abandoned

5  properties without a decommissioning plan other than, "Hey,

6  the Government can go after predecessors."  And I understand

7  the Debtors were able to reach an agreement with Chevron

8  very recently, which has reduced the number of abandoned

9  property for which there is no decommissioning plan beyond

10  looking to predecessors at the behest of the Government.

11       And throughout these negotiations, we've been

12  hearing from both sides.  I think the stakeholders are

13  saying that if the Disclosure Statement is approved, the

14  Debtors are just going to try to push through the Plan with

15  all its problems in hopes of confirmation.  On the other

16  hand, we're hearing from the Debtors that we really need to

17  get a disclosure statement approved and that will reduce the

18  resistance to kind of finalizing deals on the part of the

19  predecessors.

20       And the Government is really committed to trying

21  to have a consensual resolution here so I think if the Court

22  believes that conditional approval would facilitate a

23  consensual resolution, we will not oppose that, but we

24  really don't want the conditional approval of the Disclosure

25  Statement to result and the Debtors trying to confirm the

1   Plan in its currently form right now at a confirmation

2   hearing.  We think that would be pointless.

3          And while I'm on the subject, I wanted to respond

4   to a statement in paragraph 27 of the Debtors' reply brief.

5   I think it -- which reads, "The Government's acknowledgement

6   that the Plan may be confirmable."  I want to be clear that

7   we don't think the Plan in its current form is confirmable.

8   We think it's patently unconfirmable.  However we recognize

9   the possibility through further negotiation and modification

10  of the Plan there may be a confirmable plan down the road.

11  And if the Court feels that conditional approval of the

12  Disclosure Statement would be the best avenue to facilitate

13  reaching the consensual resolutions in order to get to a

14  confirmable plan, we would not oppose that.

15         But if the Debtors are thinking they want to get a

16  conditional approval here and present the current Plan at a

17  confirmation hearing, we would be against that.

18         THE COURT:  And what would it be conditioned on?

19         MR. ALI:  Well, Your Honor, at the very basic

20  level to make sure that all the abandoned properties have a

21  decommissioning plan beyond "Well, the Government can just

22  call on predecessors to take care of that," I think there's

23  a huge hole in the Plan right now in that there really is

24  nothing to address those properties beyond the Government

25  can go after predecessors.  And I think fundamentally the

1  Debtors bear responsibility for that decommissioning and if

2  they're not able to do that themselves, they need to reach

3  agreements with predecessors to ensure that's done.

4       THE COURT:  And, Mr. Perez, if I were to

5  conditionally approve it, what would you think the

6  conditional approval would be?  Right now there really isn't

7  adequate information to understand how each individual

8  property would be decommissioned so at a minimum, I think I

9  would require a supplement that talks about property by

10 property, here is how the Debtor proposed to decommission.

11      MR. PEREZ:  Your Honor, we've provided every

12 single scrap of paper that does that and in my presentation

13 I will tell it.  It would be -- the information that we've

14 provided, which by the way many of the predecessors have

15 chosen not to look at, is 60 gigabytes or 40 gigabytes and

16 so for anyone to say that they don't have the information of

17 every single potentially abandoned property and what an

18 operating transition plan is is just simply not the case and

19 we have the evidence to do it.  It's not in this document

20 but --

21      THE COURT:  I'm not talking about an operating

22 transition plan.

23      Do you provide a decommissioning plan for each of

24 the properties that you propose to abandon?

25      MR. PEREZ:  Yes, Your Honor, there is a plan that

1  shows how you would transition and what you would do once

2  you did it.  Yes, Your Honor, we've done that.

3           THE COURT:  And is part of that, as Mr. Ali has

4  described, of the Government can sue a predecessor to make

5  them do it?

6           MR. PEREZ:  Your Honor, the premise of the Plan is

7  that there were -- we have -- in fact, Your Honor, if I

8  could, if I could get -- if you could turn it over to

9  Ms. Choi and let me just put up one slide, which I think

10  will address the Court's concern?

11           THE COURT:  Sure.  Hold on a second.  I've got way

12  too many people there to find here.

13           Ms. Choi, let me get you press -- turn on your

14  camera if you would please.  There we go.  Thank you,

15  Ms. Choi.  Hold on.  All right.  Ms. Choi, you're welcome to

16  turn your camera back off, but that allowed me to find you

17  to make you the presenter.  Yes.

18           MR. PEREZ:  And if you could turn to page 5?

19           Your Honor, we had some slides, but let me just go

20  to this one because I think this addresses the Court's

21  concern.  The pie chart please.

22           So, Your Honor, when we -- so the Debtor has

23  approximately an estimate a billion-nine of asset retirement

24  obligations.  When we filed the case, we had consensual

25  resolution for NewCo, which are the assets that are going to

1  be sold.  That's 16 percent of the obligation.  And this is

2  net to Fieldwood.  This is what Fieldwood would be

3  responsible.

4         We then have Fieldwood 1, which is the Legacy

5  Apache assets.  That's about 63 percent.  Again that was

6  done consensually.

7         In connection with our Plan, we had agreed to fund

8  Fieldwood 3, and Fieldwood 3 were the assets which we

9  thought did not have solvent predecessors that -- and I

10 think one of them was Black Elk -- things like that that we

11 don't think for the most part -- these were challenged

12 property and we put in there because we didn't we could do

13 it.

14         The balance, the remaining 20 percent, were

15 properties that had otherwise solvent predecessors.  About

16 7 percent of that other 20 percent was Chevron and those are

17 the assets that are the subject of Fieldwood 4 that was just

18 filed.  I was -- I think it was -- the term sheet was

19 actually finalized and the objection withdrawn yesterday.

20        The remaining 13 percent that's what we're really

21 solving for.  We've already taken care of 87 percent.  And

22 that 13 percent, about 10 or 11 of that are just five more

23 predecessors and then there's some cats and dogs.  But we're

24 talking about five predecessors that are roughly 11 of that

25 13 percent.

1       So, Your Honor, we have been working very

2  diligently.  We have brought the solutions.  The whole

3  purpose of this was that there wouldn't be any impact on the

4  taxpayer but the way that the Bankruptcy Code is written,

5  all we can do is abandon.  The ability of a predecessor to

6  step in only occurs once the Government issues an order.

7  And we've solved for 87 percent.  We're hoping to be able to

8  solve for that other 13 percent.  But right now, that's all

9  we're doing.  We've provided the information.  They know

10  what it is.  They have that information to the extent that

11  they want it.

12       But this was a plan -- I mean, the premise of the

13  Plan hasn't changed since we filed on August -- at the

14  beginning of August and --

15       THE COURT:  So what happens if the predecessor

16  doesn't do the work under the Plan?

17       MR. PEREZ:  Your Honor, the property is abandoned

18  as of the effective date of the Plan.  All right.  If the

19  predecessor doesn't do the work, the Government will -- the

20  Government presumably will order the predecessor to do the

21  work.

22       THE COURT:  And they don't.

23       Can the Government then come back to Fieldwood?

24       MR. PEREZ:  Your Honor, I don't think so.  I mean,

25  I don't think -- I mean, Fieldwood -- obviously there will

1   be a Fieldwood that will remain -- that will actually remain

2   (indiscernible).  But it's not going to be a financially

3   responsible party at that time.  I will have the ability to

4   do the work for Fieldwood 3, which is kind of the remaining

5   entity, and that's going to be capitalized with at $27

6   million to do the work for those entities that don't have

7   solvent predecessors.

8          THE COURT:  So under *Midlantic*, you abandon and

9   for whatever reason -- and the Government does their best to

10   go after a predecessor and for whatever that false, you

11   think under *Midlantic* you can be discharged of a secondary

12   obligation for the Government to come back.  If you turn out

13   to be wrong and the predecessor does not do the work?

14          MR. PEREZ:  Your Honor, I'm not sure that the word

15   "discharge" is the right word.  At that point, there simply

16   will be no Fieldwood to be able to do the work.  That's it.

17   I'm not sure that you're talking about that they're

18   discharged and we go away.

19          But, Your Honor, let me take a step back because -

20   - and as I was going to go forward -- and I'm happy to go

21   into my slides because I think it addresses a lot of these

22   issues -- we have offered all of these predecessors two

23   things.  One, just a normal PSA transition services

24   agreement where we would actually continue to manage the

25   property until they were in the position to come forward and

1  take over obviously at their cost.  But we've agreed --

2  we've given them all a transition services.  And, in fact,

3  beyond that, Your Honor, we have also sent them term sheets,

4  which we were obviously able to negotiate with our two

5  largest, Apache and Chevron, to actually do the work on a

6  go-forward basis again at their cost.

7          So what we're really talking here is not an

8  environmental issue, it's not a safety issue, it's really a

9  cost issue and who bears the cost.  That's what this is

10 about.

11         THE COURT:  What I'm worried about -- I'm not --

12 and the day may come when I need to worry about this.  I'm

13 not worried today about whether -- who bears the cost

14 between you and a predecessor.  I am worried about what

15 happens if the predecessor doesn't bear the cost and whether

16 the United States can be left holding the bag.  That's why

17 I'm raising this today question.  I'm not if that's

18 consistent with *Midlantic* nor do I know that you need it if

19 you have enough confidence that the predecessors will, in

20 fact, do the work once the Government compels them to do the

21 work and that they are solvent to do the work.  For you to

22 have a solvent entity that remains on the hook may be a risk

23 you're willing to take.  I don't know, but that's the

24 problem that we're having.

25         Let me -- I've got somebody else that wanted to

1    speak on these issues.  And then we're going to let anybody

2    else that wants to do an opening statement and then we're

3    going to come back and let you do your slide show.

4            Mr. Schaible, go ahead please.

5            MR. SCHAIBLE:  Your Honor, can you hear me okay?

6            THE COURT:  I can, Mr. Schaible.  Good afternoon.

7            MR. SCHAIBLE:  Thank you, Your Honor.  Good

8    afternoon.  Your Honor, as you know, Damian Schaible from

9    Davis Polk, on behalf of the Ad Hoc Group of secured

10   parties.  We are the effective plan sponsors here.  I just

11   wanted to -- we can speak more in true argument on the

12   issues of today.  I just wanted to -- again what the Debtor

13   said in that we are committed to seeking wherever possible

14   consensual resolutions with respect to the remaining 13

15   percent.

16           There is no chance -- and Your Honor knows me well

17   enough and certainly knows the other professionals on this

18   call well enough to know that we are not going to take

19   approval of the Disclosure Statement as carte blanche to not

20   negotiate.  As Mr. Perez mentioned, we have worked with the

21   Debtors to help to provide enormous amounts of information

22   to the remaining 13 percent and just as we worked hard to

23   get the first 87 percent done, we're going to work to try to

24   get the remaining 13 percent done.

25           And, Your Honor, what I'm hearing in a lot of the

1  arguments being made the predecessors and sureties here is

2  really just a leverage game, Your Honor.  In other words,

3  they don't want you to approve the Disclosure Statement.

4  They want you to say to us "I'm not going to let this case

5  continue at pace unless you get a deal at any price with the

6  remaining 13 percent."  And that, Your Honor, is just not

7  right for the Estate and it's not right for this business

8  that we're trying to save frankly.

9         THE COURT:  But, Mr. Schaible, in other cases, as

10 I think probably everybody here has done the research and

11 knows, I've allowed the liability to be dumped involuntarily

12 on the predecessors with no planning and no protections, but

13 I did that with government consent.  And if the Government's

14 not going to consent to that, I don't know that that's the

15 end of the road, but I don't understand why the Government

16 wouldn't have the right to come back to a solvent entity if

17 their actions against a predecessor failed.  And so asking

18 me to say though that you can dump it on a predecessor that

19 is going to contest it and if they win that contest, the

20 Government holds the bag may not be the route that you want

21 to take here.  But I don't imagine that at the end of the

22 day I'm going you to get people's consent for things because

23 that would mean that the most stubborn person wins and

24 that's not what I'm in the mood to do ever.  But if you

25 can't reach a deal with them, they may end up in a freefall

1  situation, the Government may sue them but you all still may

2  be the obligor of last results through the P&A if for

3  whatever reason that fails.  I'm just -- I'm trying to tell

4  you a potential path here that may work, but the idea of

5  saying, "We're going to leave it up to predecessors who

6  aren't willing to do it and if the Government fails against

7  the predecessors, we win, the predecessors win, the

8  Government loses," I don't think matches what *Midlantic*'s

9  requirement is.  That's why I'm trying to bring this up now.

10         MR. SCHAIBLE:  Understood, Your Honor, and I

11  appreciate the thinking.  Again these are interesting

12  confirmation issues, if we get to plan confirmation and we

13  have not been able to reach agreement.

14         What we're working to do is reach agreement with

15  the Government in the first instance, reach agreement with

16  the predecessors, but if the Government says, "You know

17  what?  I'm really sorry, but I'm not going to reach

18  agreement with you unless," to Your Honor's point, the most

19  stubborn in the remaining 13 percent goes along.  Then, Your

20  Honor, I have a prediction: we're going to have a very real

21  problem.  And the 87 percent that we've otherwise resolved

22  is going to be at risk as well as the 13 percent because the

23  Plan requires hundreds of millions of dollars of new money

24  to come in --

25         THE COURT:  And the Government in the end may

1   agree that if you've got it down to a small enough number

2   that everything is okay because the Government wants 97

3   percent of the problem solved.  They'll still have 3 percent

4   predecessor liability.  The Government may say, "Okay.

5   That's what I've done before."

6          But if the Plan is that if all the -- if a

7   predecessor and the Government simultaneously say, "No," and

8   you are in effect discharged from the liability, somebody's

9   going to have a real uphill battle on how that works under

10  *Midlantic*.

11         MR. SCHAIBLE:  Again, Your Honor, I would propose

12  that we address those issues at confirmation if we have to.

13  Again the predecessors are emboldened and I know not

14  intentionally by this Court, but unintentionally be this

15  Court and/or by the Government to say, "Well, they have no

16  path out unless they get a deal with me so I'm in the cat

17  bird's seat and I'm going to require a deal that

18  (indiscernible).

19         THE COURT:  I think I'm saying the opposite.

20  There is a path out.  It's a path you haven't chosen to

21  take.

22         MR. SCHAIBLE:  Yes, Your Honor.  And I think you

23  can understand that when holders are being asked to put in

24  hundreds of millions of dollars just to do the work that

25  they are required to do and to stand up for the obligations

1  that they've agreed to take as part of the 87 percent that's

2  consensual, I'm going to have a heavy lift telling people,

3  "Put hundreds of millions of dollars in and you're still

4  going to be behind the remaining 13 percent."

5       But give us time, Your Honor, I guess is my point.

6  This case has been in for seven months and frankly a bit

7  faltering because we've been trying to get the deals and

8  we're excited today, Your Honor, and as Mr. Perez will lay

9  out to Your Honor, to have reached a deal with the

10  Creditors' Committee and the second liens and the first

11  liens and our group and Chevron and Apache.  We're racking

12  up a particularly impressive list of deals that we've gotten

13  done to try to get this case and this company to a place

14  where it can emerge from bankruptcy.  We're going to have a

15  couple more months in between the Disclosure Statement

16  approval and the Plan, but if we all throw up our hands and

17  say because we're concerned about the remaining 13 percent,

18  we're not going to let this case continue at pace, then we

19  just end up stuck in the mud and empowering that 13 percent.

20       So if we have to make changes as part of the deal

21  with the Government, we're happy to talk to the Government

22  about what we can rationally do.  We intend to continue the

23  dialog with the Government and we'll try to reach resolution

24  with them.  And we just need -- we need time to do that

25  but --

1         THE COURT:  Mr. Schaible, to be clear, I think the

2   Government has a giant club, but in the end, I think you can

3   do things independent of the Government consent.

4         MR. SCHAIBLE:  Yes, Your Honor.  We believe that

5   very --

6         THE COURT:  I'm not *Midlantic* bars you from

7   abandoning a property if you retain liability for the

8   cleanup.  Maybe it does.  We'll see.  I get your point.

9         Let me hear from Mr. Dendinger.  Go ahead please,

10  sir.

11        MR. DENDINGER:  Yes.  Good afternoon, Your Honor.

12  Mark Dendinger from Bracewell for the Record.  I represent

13  ENI.  ENI is part of the -- I'll borrow from the Debtors'

14  graphic here -- the 13 percent.

15        THE COURT:  The stubborn 13 percent,

16  Mr. Dendinger.

17        MR. DENDINGER:  What's that?

18        THE COURT:  I said the stubborn 13 percent

19  apparently, right?

20        MR. DENDINGER:  Yeah, the stubborn 13 percent,

21  Your Honor.  I'll take that torch.  The predecessors -- so

22  this represents Exxon, Marathon, Hess, a number of the other

23  predecessors that have lodged objections to the Disclosure

24  Statement today, Your Honor, including Chevron until about

25  24 hours ago and Chevron has elected to go its own way in

1   these cases.

2          But, Your Honor, we have been in discussions as

3   amongst the predecessor group for at least a month, maybe

4   two months.  Let's split the baby and say it's been six

5   weeks of concerted discussions as amongst the predecessors.

6   In addition, we have involved the Federal Government in our

7   discussions.  And most recently, Your Honor, we have

8   involved the surety bond providers both with respect to the

9   abandoned property bucket as well as with regard to the

10  Fieldwood 3 and the Fieldwood 1 and frankly the NewCo

11  entities under the Debtors' proposed Plan.  And the Debtors'

12  proposed Plan, Your Honor, I'll say was the Plan as of

13  January 1.  I think the Debtor has made wholesale and

14  substantial revisions to the Plan within the last 24 hours,

15  which begs the question, Your Honor, frankly out of the gate

16  whether or not we ought to be before the Court today on a

17  disclosure statement approval motion given the wholesale

18  changes to the Plan.  Frankly, Your Honor, I'm continuing to

19  review those changes and discussing those changes with my

20  client.  But I rise today because the predecessors have

21  anointed me to speak on behalf the predecessors to be

22  followed on as we get further into the hearing regarding

23  some of the line item and/or in the lease details and

24  confirmation objections that the predecessors would raise

25  with regard to the Plan that's proposed by the Debtor.

1        But from 30,000 feet, Your Honor, I was anointed
2   to say we're part of the good news story.  On behalf of any
3   ENI specifically, which is my client, and on behalf of the
4   other predecessors, we believe there's the potential for
5   consensual resolution here, Your Honor, and in fact we've
6   been in discussions with Weil and Mr. Perez as recently as
7   within the last week regarding a consensual resolution of
8   issues here, Your Honor.  And two days after we presented
9   our consensual resolution, which was characterized as
10  Fieldwood 4, Mr. Perez essentially said there's no economic
11  ask and there are some other issues here including without
12  limitation who is signed on to this potential proposal,
13  which frankly, Your Honor, was (indiscernible) of about 60-
14  plus attorneys representing 10-plus predecessors and surety
15  bond providers to a consensual resolution that may provide
16  the Debtors a way out of this bankruptcy.  And the answer we
17  got back, Your Honor, was "There are some blanks in the
18  proposal and we're not certain who has signed on to the
19  proposal so we're not willing to engage today with regard to
20  the proposal."  I'm not suggesting that's bad faith, good
21  faith what have you, Your Honor.  I'm just simply trying to
22  lay the groundwork for today hearing, which is we have spent
23  a considerable amount of time trying to derive a
24  constructive resolution to the Debtors' abandonment problem
25  and the Debtors frankly have a tremendous abandonment

1    problem on their hands.  If the Court is inclined to approve

2    the Disclosure Statement, I could tell you my client as well

3    as other predecessors-in-interest will take their eye off

4    the ball of consensual resolutions and will be pressed to

5    proceed on a litigious path toward a confirmation, a

6    contested confirmation hearing where we will be lodging on

7    behalf of ENI and the other predecessors will be lodging on

8    behalf of their respective clients the *Midlantic* issues Your

9    Honor has forecast here for the parties today.

10            And so we're not certain why it is the case that

11    the Debtors are leaving the lion's share of the abandoned

12    property in a bucket to the side.  In our mind, Your Honor,

13    they have favored cutting a deal with a trade creditor

14    (indiscernible) Creditors' Committee where they've removed

15    $5 million of a cash bucket and replaced it with an $8

16    million cash bucket for trade creditors only.  We're not

17    certain, Your Honor, why the first and second lien lenders

18    who are the credit bidding parties under this proposed

19    Bankruptcy Plan would be permitted to clear the debts on the

20    Disclosure Statement Hearing today, Your Honor, only to put

21    in not one, not two, but three backstop rights offerings

22    saddling the Estates with tremendous amounts of economic

23    ramifications and payments from the Debtors to the current

24    creditors in the capital structure when there hasn't been a

25    third-party marketing of external financing as far as the

1  predecessors are concerned for folks outside the incumbent

2  capital structure in a vastly-improved oil and gas market to

3  put in additional financing into these cases.

4          And frankly the forecast -- and I think ENI may

5  stand alone on this issue, Your Honor, but with regard to

6  the backstop commitment Motion for a (indiscernible) of the

7  three backstops that are within 24 hours of this hearing, if

8  that is into this Plan and Disclosure Statement, the notion

9  that creditors would have adequate notice and opportunity to

10  review those productions and sign off and set these cases on

11  a trajectory towards confirmation again in our mind in a

12  somewhat self-serving manner to protect incumbent

13  representatives of the current capital structure ignoring a

14  billion dollars plus of abandoned properties, creditors,

15  Your Honor, who have viable *Midlantic* claims and even if it

16  was --

17          THE COURT:  I just -- you mentioned this before

18  and I think you probably know I've already ruled that

19  creditors don't hold *Midlantic* claims, the Government holds

20  *Midlantic* claims and there's a vast difference in those.

21          MR. DENDINGER:  Yes.  Thank you, Your Honor.  And

22  to the extent that we're a derivative creditor of the

23  Government, I think what you've heard from the Government

24  today and as I read the Government's --

25          THE COURT:  I don't think today you're a

1  derivative creditor of the Government.  I'm not sure you get

2  to assert their rights at all and that's -- what I held

3  before is the Government gets to assert its own rights.  I

4  just don't want there to be secrets about that.  You heard

5  me pushing me the Debtor pretty hard that I didn't think

6  what they did -- why they are currently proposing probably

7  fits within *Midlantic*, but that doesn't extend to say that

8  an individual predecessor-in-interest has *Midlantic* rights.

9  The Government has *Midlantic* rights.  And if the Government

10 believes that taking the picture as a whole they are better

11 off solving, as I said before, 97 percent of the problem and

12 suing predecessors who are involuntarily there for 3

13 percent, the Government can make that decision and I don't

14 see why the 3 percent predecessors-in-interest have any

15 *Midlantic* rights.

16         *Midlantic* does not derive from the language of the

17 Code.  It derives from the protection of the Government's

18 environmental responsibilities.  That's the Government's

19 decision, not yours.

20         MR. DENDINGER:  Fair enough, Your Honor.  And if I

21 accept that verbatim without retort, I think what you've

22 heard from --

23         THE COURT:  You need to.  You're more than welcome

24 to disagree with it.  I mean just trying to tell you --

25         MR. DENDINGER:  Sure.

1          THE COURT:  -- what I've ruled before.  And

2    arguing something as make something patently unconfirmable,

3    which is the burden today, is difficult if it's something

4    I've already ruled on the opposite way.  That's the only

5    point.

6          MR. DENDINGER:  And I'm aware of Your Honor's

7    ruling and that's -- I appreciate Your Honor's candor and

8    that is a fair statement, of course, to make as a matter of

9    Record.  I guess what I would say is I think you've heard

10   from the Government, they're not supportive of the Plan as

11   proposed.  I think you've heard from the Debtor.  The Debtor

12   has controlled the entirety of the capital structure and

13   they would like to put forward a disclosure statement today

14   and they've made erroneous statements in their Disclosure

15   Statement with regard to the amount of consensus that have

16   procured from other factions of the current capital

17   structure including without limitation any and other

18   predecessors.

19          The Government is the large stick.  That's near

20   direct quote if not a paraphrase of what I believe I heard

21   Your Honor say and what I believe to be the case is: the

22   Government is not accepting of the Plan as proposed.

23   Unfortunately, Your Honor, within the last week, the

24   predecessors have proposed a consensual resolution of the

25   issues that are before the Debtors here today to get through

1   the Disclosure Statement Hearing and ultimately proceed at

2   pace to the Confirmation Hearing and the Debtor have given

3   the predecessors that control nearly a billion dollars of

4   the liabilities associated with abandoned properties bucket

5   (indiscernible).

6           And I've not spoken with Mr. Schaible.  I know

7   Mr. Schaible very well.  I have not spoken with them, nor

8   have I spoken with any of the other lenders.  And if the

9   lenders are ultimately essentially, as Mr. Schaible said,

10  the plan sponsor of sorts here, perhaps that's the

11  disconnect?  But at the end of the day, Your Honor, I think

12  if the Disclosure Statement is approved today, what you will

13  hear from my client -- me, on behalf of my client, as well

14  as on behalf of about 10 other predecessors that are

15  siphoned into the artificially constructed abandoned

16  property bucket is: we are going to have to wage war on the

17  *Midlantic* issues.

18          We are going to have to wage war in taking a

19  myriad of depositions of the Debtors' management team and

20  the Debtors' remaining professionals including their

21  financial advisors on issues including without limitation to

22  best interest of creditors test.  We are going to have to

23  wage independent of that confirmation related issues with

24  regard to the artificial bifurcation of recoveries.

25          THE COURT:  Let's talk -- let me talk about the

1   issues that I'm here on today.

2          You're welcome to litigate so do we have issues

3   that you want to talk about today?

4          MR. DENDINGER:  The issues, Your Honor, I think in

5   sum that we would want to talk about today are: we're not

6   sure what the rush is to approve a disclosure statement

7   today.  We're not certain, on behalf of the predecessors,

8   why a better course may be to push the pause button,

9   potentially have the parties mediate potentially with the

10  assistance of Judge Jones or another mediator some of the

11  issues that impact singularly the abandoned properties

12  bucket and the hope would be that on the other side of the

13  mediation or on the other side of the push pause button,

14  that the Debtors and the predecessors including my client

15  might be able to reach a consensual resolution to achieve

16  the Debtors' desired outcome, which is approval of their

17  Disclosure Statement and confirmation of their Plan under

18  what are undoubtedly dire circumstances for all parties

19  involved.  Thank you, Your Honor.

20         THE COURT:  Thank you.  From 817-821-9170, let me

21  get that line active.  Who do we have on that line?

22         MR. FORSHEY:  Thank you, Your Honor.

23  Bobby Forshey, Forshey and Prostock.  We're appearing today

24  on behalf of XTO Offshore, Your Honor.

25         THE COURT:  Mr. Forshey, good afternoon.

1          MR. FORSHEY:  Thank you, Your Honor.  Not wishing

2   to go over ground the Court has already covered with others,

3   I'd like to point out that while we done necessarily agree

4   with the 13 percent as presented by Mr. Perez, I would point

5   out that that 13 percent or whatever it is is going to be a

6   hole in the bucket of well over a million dollars.  So if

7   you look at that and say, "Well, we've covered the vast

8   majority of it," it maybe be true that the majority is

9   covered, but what's left uncovered is a truly huge and

10  staggering environmental liability that's going to involve

11  the four Chevron deal, 180-some-odd leases, over 1100 wells,

12  271 platforms, 281 pipelines.

13          We understand the idea, Your Honor, the *Midlantic*

14  rights.   Those regulatory rights are granted to the

15  Government.  But I also believe that there are a couple of

16  conditions that have not been satisfied and that approving a

17  disclosure statement today would be basically and completely

18  futile.  As we read the regulations, if the Debtors intend

19  to assign those federal leases to either NewCo, FWE-1, FWE-3

20  or the newly proposed FWE-4 with Chevron, BOEM and BSEE must

21  consent to those assignments.  BOEM and BSEE must consent to

22  the Debtors withdrawing as the operators and substituting

23  someone else.  My understanding, Your Honor, is that BOEM

24  and BSEE have not consented to that and it's my

25  understanding --

1              THE COURT:  BOEM and BSEE have not consented, but

2     BOEM and BSEE have said that they don't oppose a conditional

3     approval of the Disclosure Statement and they know how to

4     exercise their own rights.

5              MR. FORSHEY:  I agree, Your Honor.  I agree to

6     that.  But then there's also the second thing is that the

7     Plan contemplates bonds being transferred.  I think the

8     bonding lawyers are going to be here and speak for

9     themselves is that their clients, I don't believe -- and

10    it's indicated in their objections -- are going to agree to

11    that.  Those bonds simply cannot be assigned and changed

12    creating a new principal.  I would --

13             THE COURT:  They can be drawn.

14             MR. FORSHEY:  Well, they can be drawn, but I don't

15    understand to imply a draw, Your Honor, so much as they're

16    going to be assigned.  The final thing --

17             THE COURT:  Well, the problem -- I mean, the whole

18    problem I have on that issue with bonding companies comes up

19    pretty often is the Government let's say currently has a

20    hundred million bond from someone.  If that bond doesn't get

21    renewed or if that bond goes into default, the Government

22    can simply have 100 million of cash instead of $100 million

23    bond and the bonding company has no defense to that.  So

24    these things work out.  I'm not terribly worried about them

25    because the hammer in the bonds is so severe against the

1  bonding company any of -- and they don't get any outs and

2  that's how come everybody takes their bonds and they're such

3  good bonding companies.  All that that invites is a draw.

4           MR. FORSHEY:  Your Honor, I guess our observation

5  would be: how does that work though with the bonds that are

6  going to be transferred ostensively to NewCo and FWE-1 and

7  FWE-3 (indiscernible)?

8           THE COURT:  If they're not transferred, the

9  beneficiary of the bond draws on it.  The beneficiary then

10 has the 100 million of cash and the beneficiary almost

11 always look to 100 million of cash instead of 100 million

12 bond.

13          MR. FORSHEY:  Okay.  All right.  Lastly,

14 Your Honor, we would agree with what ENI said is that we

15 think the worst thing that you could do here is to grant any

16 type of approval of the Disclosure Statement.  If you do

17 that, the parties are going to change their pace very

18 radically from one of attempting to reach a consensual

19 agreement to going forward with discovery and litigation and

20 all the things that you have to do to prepare for a

21 contested confirmation hearing.

22          We have made good faith efforts and are continuing

23 to make discussions with both the Debtors and the Government

24 and hoping to come up with some type of framework by which

25 we can have a consensual resolution.  But at the end of the

1  day, that's probably the only really good option available

2  to the Court and the Debtors is going to be some form of

3  consensual resolution.

4        We would respectfully submit, Your Honor, that if

5  you approve the Disclosure Statement, everybody -- to quote

6  what was said previously, people are going to take their

7  eyes off of the ball of settlement and they're going to be

8  forced just by the (indiscernible) of events to begin

9  preparing for a contested confirmation hearing.  I don't

10 think that's --

11        THE COURT:  There's a point at which that has to

12 occur.  As to whether today is the point is a different

13 question.  But I'm not letting one person hold everything

14 up.  That's not what I have right now.

15        MR. FORSHEY:  Well, if --

16        THE COURT:  Don't ask me to divest this authority

17 in a 100 percent consensual plan.  That's now what the

18 Bankruptcy Code's about.  People get to object.

19        MR. FORSHEY:  Yes, sir.

20        THE COURT:  Debtors to (indiscernible) people

21 objecting.

22        MR. FORSHEY:  And, no, sir, we're not suggesting

23 that the Court has to stay its hand until such time as

24 everybody agrees because as you paid out in that case, the

25 most stubborn and unreasonable person in the room wins.

1          What we are suggesting is that it's probably going
2   to be a significant chill on the negotiations for a
3   resolution to be negotiated and that today is not the day to
4   approve the Disclosure Statement.
5          THE COURT:  Today may not be, but you and others
6   can do two things at one time.
7          Mr. Eisenberg, go ahead please.
8          MR. EISENBERG:  Thank you, Your Honor.
9   Philip Eisenberg, on behalf of HCCI and United States
10  Specialty Insurance Company.  Together they have about
11  $170 million in bonding exposure here.  And I've been in
12  Your Honor's court before.  I've heard all the things in *ATP*
13  and *Black Elk* and some of these other cases and so we
14  understand all of that.
15         THE COURT:  Nothing new today so far, right?
16         MR. EISENBERG:  Nothing new today, Your Honor.
17  And I'll repeat to you just because it's fresh.  First of
18  all, they do need bonding on a going forward basis for the
19  new periods of liability for any operations of the
20  properties post-confirmation.  The old bonds won't do it,
21  won't cover those periods.
22         THE COURT:  Right.
23         MR. EISENBERG:  Old bonds won't cover exposures
24  after assignments and when those bonds were issued to
25  predecessors, the Government will have that exposure.  And

1  the Government can't just call a bond on a property that's

2  operating.  That's supposed to be continued to operate.

3  There actually has to be a default under the regulations.

4  And so -- and Your Honor's heard me say that before as well

5  so nothing new there.

6          THE COURT:  And we haven't gotten to the point

7  where (indiscernible) drawing on the bonds didn't solve the

8  problem.

9          MR. EISENBERG:  Well, right.  And so we're trying

10  to get there, but we're here on disclosure, Your Honor.  And

11  so much has happened in the last 24 hours that Your Honor

12  asked the question: is today the day to approve a disclosure

13  statement?

14          THE COURT:  I think that's the hard question,

15  Mr. Eisenberg.  It isn't whether the Plan -- it may

16  eventually be whether the Plan is non-confirmable as a

17  matter of law, but I agree with you that the massive changes

18  may mean that we don't do something today, which other

19  people are arguing as well, but I'm glad you're focusing in.

20          MR. EISENBERG:  I am focusing on that, Your Honor,

21  because for the first time today, I saw Exhibit N, which was

22  one page, which was the five-year plan for Fieldwood 1 and

23  the feasibility of Fieldwood 1 is at the center of this.

24  Mr. Perez is a wonderful lawyer.  He has my respect, he's a

25  colleague, he's a comrade, he does a great job.  But on the

1  63 percent with Fieldwood 1, feasibility of that entity on a

2  going forward basis is critical here.  And I just got that

3  one page this morning when I woke up and I printed it out

4  and it's one page.  And we've been trying to get that for

5  the last seven months.  We've been holding fire here on this

6  Disclosure Statement for two and a half months.

7          Mr. Schaible says we're going to have months more

8  to go.  I agree with him on that.  And we've had a pending

9  2004 noticed to them.  We've been trying to put all the

10  pieces of the elephant together and we're going to continue

11  to do that.  We now have at least a bare bones five-year

12  analysis that we need to get behind, we need to test, we

13  need to question and analyze and ask for backup information.

14  And to the extent we disagree with them on the feasibility

15  of that, that's 63 percent of its total solution here.

16          It hasn't been disclosed until this morning and

17  that's the tough part for me.  Your Honor knows that we know

18  how to object, we know how to litigate.  We're not here to

19  do that.  We're actually trying just to fundamentally dot

20  the Is and cross the Ts here.  We've got our own consultant.

21  We've been working very cooperatively with them, but we're

22  going to need a month to digest what came in the last two

23  days and then and only then can we decide whether or not

24  we're going to need to have examinations of these folks,

25  test these things, get alternatives and see how that works.

1 Because at the heart of this, the viability of Fieldwood 1

2 is critical because if it can't function, then this whole

3 plan falls apart.

4      One of the other key components that just came

5 yesterday is the charging that's going to happen to

6 Fieldwood 1 by NewCo.  We didn't have those assumptions,

7 those parameters, that level of overhead and detail to go in

8 there and see do we have a viable going forward company.

9 We've got at least three levels of overheard that I can tell

10 on Fieldwood 1: NewCo, the Trustee, Apache's oversight and

11 fees and there may be more.  We just haven't been able to

12 peel the onion back.

13      And so for that fundamental reason, while it's

14 13 percent or 20 percent that hasn't been done, the 63

15 percent at the heart of this, the Fieldwood 1 entity, we are

16 just beginning to get a glimmer of what or how that could be

17 feasible because if that comes back here in six or eight

18 months, Your Honor, what Your Honor had said about the

19 Government can they come back, it's not just on the 13

20 percent.  It's what are they going to do about the 63

21 percent.

22      And we really want to engage a positive deal here.

23 We understand what our bonding exposure is.  It's a

24 financial accommodation.  But right now, from a disclosure

25 statement standpoint, we're just getting to the point where

1    we can now see what it is that the Debtors are really

2    proposing here.  It took them two shots to get the Apache

3    deal.  We've been two and a half months tinkering with the

4    disclosure and I think we need another 30 days.

5          And if in 30 days we come back, they've got some

6    more P&A agreements, a Fieldwood 5, a Fieldwood 6, then --

7    and we can see where we are from the standpoint of how we're

8    going to go forward with a contested confirmation, then

9    that's fine, Your Honor.  But to force us to a conditional

10   disclosure right now, what are you going to gain by that

11   from the standpoint of who is it that's going to benefit

12   from the conditional disclosure?  I don't think this is a

13   traditional case where you need a conditional disclosure

14   like that.  We need real disclosure here.

15         And while Mr. Perez is correct, it's a lot of

16   gigabytes, he's also correct it's a lot of gigabytes.  And

17   until we know where their gigabytes are landing, we really

18   can't test this and we're entitled to a process like that.

19   And in a case this big that's taken then so long to get this

20   done, as Your Honor might recall, like before they filed, it

21   took them several months to get the Apache plan together in

22   the first place before they could even come in.  Then it

23   took them several months to retrofit the Apache plan.

24         THE COURT:  I do think I get your point.  Thank

25   you.

1          MR. EISENBERG:  Okay.  Thank you, Your Honor.

2          THE COURT:  Mr. Taylor?

3          MR. TAYLOR:  (No audible response).

4          THE COURT:  Mr. Taylor?

5          MR. TAYLOR:  (No audible response).

6          THE COURT:  Mr. Taylor, if I could get you --

7          MR. TAYLOR:  I muted myself.  I'm sorry, Your

8 Honor.

9          THE COURT:  No problem.

10          MR. TAYLOR:  Your Honor, I won't belabor the

11 points that have already been made, but I do think that we

12 need a pause here and the pause is necessitated because, for

13 instance, my client has come across this pie chart that

14 we're all looking at, has potential liability scattered in

15 each of the Fieldwood 1 buckets, the NewCo bucket, the

16 Chevron bucket and the 13 percent bucket.  It is important

17 to understand exactly what Apache is getting out of this

18 deal, which is quite frankly very difficult to tell and you

19 can't tell without a very intensive 2,000-page document

20 review exactly what they're getting.

21          I think what they're getting out of it is they're

22 getting about $50 million worth of cash provided to them,

23 interest of 4 percent over their bond rate, a $4 million

24 restructuring fee and transfer of $238 million in bonds and

25 498 million in letters of credit.  But are those bonds and

1  letters of credit just tied to those property?  Maybe so,

2  but I can't tell.

3         Same thing with NewCo, they're getting whatever

4  the excess value is over the credit bid amounts plus

5  whatever they're putting in in cash.  Well, what is that

6  value?  What is that PV10?  It's not described.  But they're

7  wrapping up those good assets to the detriment of the bond

8  assets and my client is asked me, "Well, are we getting fair

9  treatment under this or are the abandoned assets just

10  getting left behind?"

11         Now again we like Fieldwood 1, we like NewCo

12  because we don't want to have to pick up the baton on those.

13  We don't want the Government coming after us for those and

14  we have significant liabilities as I said in each bucket.

15  But we have to be able to understand that.  And if Your

16  Honor conditionally approves the Disclosure Statement, what

17  I think we're going to see is that we're going to get the

18  proverbial rush to the courthouse that bankruptcy is

19  supposed to prevent where everybody just grabs whatever cash

20  they can wring out of the Debtor and/or the lenders.  At

21  some point they'll break because the value proposition isn't

22  for that.  It doesn't make sense for them anymore.  But

23  we're going to end up with the very situation the Bankruptcy

24  Court is supposed to prevent and instead of, quote, "fair

25  and equitable treatment," we're going to have just cash

1  grabs here and there and end up with potentially not liable

2  Fieldwood 1's, NewCo's and Chevron's agreement.  It's just

3  an agreement to agree.  I don't know if Your Honor has had

4  time to read it, but I barely have myself, but there's

5  really an agreement to agree and they can pull out of it

6  whenever they want.  And if there's any other solvent

7  predecessor that they can go after, they don't really have

8  to fund that bucket anyway.  At least that's the way I read

9  it, but maybe I read it wrong.

10        So I think we need to hit the pause button here so

11  that we can move forward on a consensual basis, which I

12  think hopefully we're close to that Fieldwood 4 concept that

13  you saw last night filed, but maybe it was yesterday

14  afternoon, is exactly the type of (indiscernible) that we

15  were discussing on a global basis, but there were holes in

16  it.

17        And the dollar ask, as Mr. Perez very much pointed

18  out along with some other valid points, had not been

19  formulated yet because we don't know what the value

20  (indiscernible) is that the lenders are getting and we don't

21  know exactly what Apache's getting and that's why it's hard

22  for us to formulate a number.

23        So I hope that provided some insight as to why we

24  should hit pause, but I'm happy to answer any questions.

25              THE COURT:  Thank you, Mr. Taylor.  And I

1  apologize, I don't understand how to pronounce your name

2  even though you have pronounced it before, Mr. Grzyb?

3          MR. GRZYB:  That's very close, Your Honor.

4  Darren Grzyb.  I'm here with Cage Dishney (phonetic) and

5  John Tomasi (phonetic).  We have four sureties: Everest,

6  Berkley, Aspen and Sirius.  I'm here to discuss the Apache

7  private party bond issues and my partner, Scott Zuber, will

8  be here to discuss more of the overarching surety concerns

9  we have with respect to this Disclosure Statement.

10          I echo the comments by Mr. Eisenberg with whom

11  I've been working closely throughout this bankruptcy because

12  his client and my client, Everest, are on a joint bond with

13  respect to Apache.  There are two other sureties involved in

14  the Apache decommissioning security.  We are willing to do

15  the work to see -- and we've retained our own experts to see

16  if this Plan as to the alleged 63 percent works and in

17  connection with the overall Plan of Reorganization.  The

18  Debtors will -- have been trumpeting both on that reply that

19  we got early this morning and here that they provided a

20  projection and go forward cash flows in the newly-filed

21  Exhibits M and N, but we don't know what the basis for that

22  information is.  It's a one or two-page.  It says that

23  they're relying upon the data provided by the Debtor, but we

24  don't know what that is and we can't study it and it has --

25  the data that went into those projections was not turned

1 over.

2        The second comment I would have with respect to

3 the Fieldwood 1 bucket, Your Honor, is that the 63 percent,

4 to the extent it is relying upon the nearly half a billion

5 dollars in private surety credit is not solved vis-à-vis

6 Fieldwood 1.  What we feel the Debtors have structured a

7 transaction with, or obligee, that has materially altered

8 the risks that the surety undertook when it wrote these

9 bonds in favor of Apache in connection with the 2013

10 Purchase and Sale Agreement.  That was an arm's length Tran

11 whereby our principal, Fieldwood, had an indemnification

12 obligation back to us and they had to the right to contest

13 whether or not a decommissioning event had arisen under that

14 bonded contract.

15        That transaction has been completely altered as

16 between Apache and Fieldwood without the sureties' consent.

17 So, when I say that that 63 percent is not solved, vis-à-vis

18 the surety, what we're looking at here is, down the road,

19 post-confirmation, if the plan is confirmed as it is

20 currently constructed, we're headed for a significant

21 dispute between us and Apache, our group and Apache.  And I

22 think that is very relevant, Your Honor, to the concerns

23 that you raised previously with respect to the abandoned

24 bucket, to the extent the Government has concerns about

25 Apache as a predecessor's own owner's solvency.

1          THE COURT:  All right.

2          MR. GRZYB:  Those are my comments, Your Honor.

3          THE COURT:  All right.  Thank you, sir.

4          Mr. Perez, I'm going to certainly let you do your

5  sideshow, as promised, but let me ask you a question before

6  we get there.  And I think Mr. Carlson also wanted to buzz

7  in, I don't know if there's still something live he needs to

8  deal with.

9          MR. CARLSON:  No, Your Honor.  We can cover it in

10 the slide show when we get to it.

11         THE COURT:  When are you looking for a

12 confirmation hearing, Mr. Perez?

13         MR. PEREZ:  Your Honor, we'd like to have it

14 probably late April, beginning of May, so, you know, six

15 weeks out, and around -- probably the beginning of May.

16         THE COURT:  So let me tell you what I want to

17 contemplate, and you can try and talk me out of this in your

18 slide.  I do think an awful lot of information got dumped.

19 You know I was in hearings this morning, I haven't read your

20 responses yet in view of those hearings.

21         I am inclined to give you a confirmation date

22 today, sometime in late May, and to come back on the

23 disclosure statement hearing on April 14th.  And the April

24 14th, assuming we approve the disclosure statement, you

25 would then have your hearing in late May.  I don't want to

1  slow the case down precipitously, but I do think an awful

2  lot of infomration is being dumped on people.  It may be

3  that you ca  persuade me we should come back, you know, in

4  two or three days, but I have a feeling that's really not

5  enough, given the magnitude of what you're doing.

6           But I am inclined to give quite a bit of time

7  here.  People need to start getting prepared for a

8  confirmation hearing, they can start that today.  Everybody

9  is here that really cares.  I'll give you a date today, but

10 not approve the disclosure statement or the backstop until

11 the April 14th hearing at 2:30, and then assume that we're

12 going to work through it until we get it approved, one way

13 or the other.  I mean, the issue is going to be adequate

14 information.

15          MR. PEREZ:  Yeah.  Your Honor, with all due

16 respect, I really do think, if we're going to take a pause,

17 I think it should be, you know, a pause until later this

18 week.  I think -- and we're happy to put on Mr. Dane --

19 that, you know, delaying this -- that much -- you know, this

20 company is fragile, and we need to move on.  And if our plan

21 is not confirmable, we need to know that earlier, sooner,

22 rather than later.  We think the plan is confirmable.

23          And so I'd like to talk to the Court -- I don't --

24 I think that the information -- there has been new

25 information, I won't -- I'm not going to deny that -- and

1  there's been a lot of paper filed, but I think it's all

2  absolutely consistent with what was filed on day one of the

3  case.  There really isn't anything that is new or material.

4  And the issues -- for instance, this whole issue about

5  whether Fieldwood I is feasible, that -- those projections

6  have been out there, since I think at least the 16th.

7          But putting that aside, that's a classic

8  confirmation issue, Your Honor.  And what they failed to

9  mention is the fact that they -- that Fieldwood I will have

10 two hundred and fifty mil -- $238 million in cash going in,

11 that is in the trust, that is only available to

12 (indiscernible) --

13          THE COURT:  (Indiscernible).

14          MR. PEREZ:  -- company, that it's going to have

15 the security, including letters of credit, you know, for

16 three -- for -- that total about 497 million, and has a

17 standby loan from Apache to the tune of $400 million.

18          I mean, you didn't hear the whole -- you didn't

19 hear the whole story, but that's what we're going to put on

20 at confirmation, Your Honor.

21          THE COURT:  But it's not Fieldwood --

22          MR. PEREZ:  I'm not -- I'm --

23          THE COURT:  But it's not Fieldwood I that's

24 bothering me, it's the brand-new deals you're just

25 disclosing, which are --

1          MR. PEREZ:  But your --

2          THE COURT:  That's great.

3          MR. PEREZ:  But --

4          THE COURT:  But I mean, you started off this

5    hearing --

6          MR. PEREZ:  But --

7          THE COURT:  -- by telling me what great recent

8    progress you've made.  People need an opportunity to absorb

9    that great recent progress.

10         MR. PEREZ:  Well, but let -- can we turn to slide

11   -- to the third --

12         THE COURT:  I'll let you do your whole slide --

13   why don't you do your whole slide presentation?  I don't you

14   I'd let you do it.  I was trying to tell you where I am

15   right now, given the arguments I've heard.  And let me see

16   the slides.

17         MR. PEREZ:  I -- it --

18         THE COURT:  Whatever you want to show me.

19         MR. PEREZ:  Why don't we go back to the time line

20   slide.

21         So, Your Honor, you know, we filed back in August

22   (indiscernible) and at that time, we had the Apache term

23   sheet, as well as the RSA, with the first lien -- with the

24   first lien -- with the, you know, FLTL.  We then filed the

25   disclosure statement on January 1st, and the motion.  And

1   then we've been working throughout that whole time.

2          The -- we then filed a UCC settlement on the 8th,

3   which was after extensive discussions with them about that.

4          On the 15th and 16th, we filed an updated plan and

5   disclosure statement, which had, you know, all of the

6   information regarding which of the leases went where and

7   where -- and you know, in essence, who was going to get

8   what.  It also had the credit bid PSA, as well as the

9   commitment because we need cash to get out.  Subsequently,

10  on the 16th, we had an agreement with the second

11  lienholders, which was incorporated into the plan.  And

12  then, on the 22nd, we executed a term sheet with Chevron.

13         So, if -- Your Honor, if you'd turn to the next

14  page.  What we're trying to do is we're trying to get a plan

15  that addresses all the P&A liabilities, without any cost to

16  the taxpayer.  I -- we believe and we will be able to

17  demonstrate at the confirmation hearing that, as it relates

18  to NewCo, Fieldwood I, Fieldwood III, and the abandoned

19  properties, it -- assuming that the orders are issued with

20  respect to the predecessors, that those will be addressed.

21         We had situations, Your Honor, where there were

22  not solvent predecessors or otherwise, you know, properties

23  that were distressed.  Those were put into Fieldwood III,

24  and the debtors are funding $27 million to do that, to

25  address those properties, that we didn't think had a home.

1          And so -- and Your Honor, the -- you know, the

2   whole issue with the sureties, I mean, that's going to have

3   to be addressed, and I think the Court kind of thought it

4   the same way, you know, they can either spend the bond or

5   there will be a draw.

6          And then, Your Honor, just to make sure that we

7   understand -- and I want to -- I really want to emphasize

8   number four because we have the situation -- and I'm not --

9   I'm a glass half-full person, not a glass half-empty.  We

10  have the situation where, you know, the other 87 percent, as

11  Mr. Schaible said, could unravel because it is dependent on

12  significant funding from the credit bid purchaser.

13         So let me turn to the next page, and I'll do this

14  one quickly, which is:  NewCo -- there's a hundred-and-

15  eighty-five-million-dollar second lien that is going to be

16  funded to both support the feasibility of the new credit bid

17  purchaser, but also, and most importantly, to provide the

18  funding for -- to provide the funding that's going to fund

19  all of the other entities, that's going to fund -- what's

20  needed in Fieldwood I.

21         And the agreements with respect to Fieldwood I

22  have been out there, they haven't changed.  There is --

23  nothing has really changed.  The financial support, you

24  know, that 25 million has to come from somewhere, and that's

25  part of the money from the credit bid purchaser.  Fieldwood

1  III, there's $27 million there that would come from

2  Fieldwood Purchaser.  In connection with the Fieldwood IV

3  Chevron term sheet, there's $5 million of seed money that

4  will also be funded.  And the debtor has committed to spend

5  the money, to make sure that there's egress as a result of

6  all the storms with respect to all of the property.  And

7  that's about, you know, four or 5 million.  So Your Honor,

8  that's there.

9       Let me go to the next slide.  All right.  The pie

10  chart, I think we've seen.  And Your Honor, again, I really

11  do think that we will be able to demonstrate that we have

12  actually solved for all but 13 percent; and that, you know,

13  in essence, that we have solvent predecessors with respect

14  to that 13 percent that could stand up.

15       Let me -- if you would skip over to Slide 8, skip

16  over the next slide and go to the next.  Yeah, the next one.

17       Part of what -- part of when we started -- and

18  we've been engaged with the Government, Your Honor, since

19  before we filed the case.  And certainly, within the last

20  six months, they have asked us, you know, to do -- to

21  provide information to make sure that there is -- that there

22  are, you know, operational transition plans, which would

23  show -- so that there isn't a situation where a property

24  gets left unattended or that there is a potential safety

25  problem.

1           Your Honor, every single request that we have

2    received, probably except for the ones that we've received

3    within the last week, we've responded to.  We have set up

4    both a Relativity site, which all the predecessors, all the

5    sureties can see who is in the line of title, who has record

6    title.  We have set up information with respect to the

7    condition.

8           This 22,938 documents, which are like 40 gigabytes

9    of information, that has been there for weeks.  And it

10   wasn't all put there together because, literally, we've had

11   teams of people at the company making sure that we had --

12   that the information existed in these tools, in both the Box

13   site and the Relativity site that had the information that

14   would allow -- if we were the ones that were taken over,

15   that would allow us to take over and know what we needed to

16   do, what the condition of the platform was, what the

17   condition of the very things ...

18          And we're talking -- in the abandoned bucket,

19   people are talking about billions of dollars of liability.

20   I think that, based on our estimate -- and obviously BSEE

21   has an estimate, the individuals have an estimate, but we

22   have an estimate that -- you know, we've probably done more

23   decommissioning in the Gulf than any other entity or close

24   to it.  We have an estimate, and our estimate, you know, our

25   total exposure is about a billion nine and, you know, 13

1  percent would be a little bit over -- a little bit over, you

2  know, 150 or so million, maybe, you know, closer to 200

3  million, Your Honor.  But this amount is what we think is

4  the liability attributable to our working interests in these

5  wells.  So people are talking about billions of dollars,

6  that's not what this is.

7          And with respect to, you know, formal document

8  requests, you know, we have been providing information.

9  Right now, we've complied with all of those requests

10  together, so ...

11          And you know, Your Honor, in the next -- in the

12  next page, and the page -- the next page shows what

13  information was available in those sites.  And then the

14  following page, Your Honor, shows, you know, what it is that

15  we have done.  So we have -- in essence, the company has

16  focused almost entirely that making sure that the

17  information that anybody would need in order to transition,

18  that they have, that there's nothing lacking.  And so, for -

19  - and you know, the door is open.  We're continuing, on a

20  daily basis, to get new requests and to provide -- and to

21  provide new information.

22          So, if we can go to the next slide, Your Honor,

23  this is what -- this is what we were going to propose, in

24  terms of the schedule.  And while, you know, we understand

25  the Court's position, you know, if we're going to do

1  something, let's try to do it the least amount of time.  I

2  think, you know, another two weeks for the disclosure

3  statement, I mean, if we can push it -- if the Court is

4  inclined to push it out, I would try to keep the

5  confirmation hearing the following week, after the May 4th.

6           I mean, and we'll be prepared to dual-track it.

7  And to the extent people, you know, want to litigate, we're

8  -- we can do that, as well as engage in settlement

9  discussions.  And the -- there's only about 4 or 5

10 predecessors that form that 13 percent, and we've had --

11 we've talked to all of them.  So, I mean, if they can't do

12 two things at once, there's nothing I can do about that,

13 Your Honor.

14          But I really do think -- and obviously, I have Mr.

15 Dane prepared to testify as to the information contained in

16 the disclosure statement, as well as the debtors' business

17 need to try to move forward with this, you know, on a

18 reasonable time frame.

19          THE COURT:  All right.  Was that the whole slide

20 show, or is there more?

21          MR. PEREZ:  The other slides -- the other slides,

22 Your Honor, are Mr. Carlson's addressing some of the -- your

23 -- some of the objections and -- but I think we've kind of

24 heard all of the objections already.  So, unfortunately, Mr.

25 Carlson may not be able to address the objections.

1          THE COURT:  So, look, I'll just say one of the

2    reasons why I've proposed April 14th is just because the

3    State Bar is that Thursday and Friday before.  I was

4    actually hoping to do it the prior week.  Let me just look

5    at that.

6        (Pause in proceedings)

7          THE COURT:  Okay.  Anybody else?  Let me see, I've

8    got one other person who wants to speak.  Let me see if I've

9    got them.

10        (Pause in proceedings)

11          THE COURT:  Hold on, I'm having a bit of a

12   software problem on the phone system.  Give me just a

13   second.

14          Ms. Moses, go ahead, please.

15          MS. MOSES:  Your Honor, Leann Moses on behalf of

16   JX Nippon Oil Exploration.

17          I just wanted -- I do not want to reiterate

18   everything that has been said already, but I do think it is

19   critical that there be given additional time for all of the

20   predecessors.  And Nippon is not only a predecessor, but has

21   interests in the other buckets, as well.  But contrary to

22   statements that have been made, I don't think we're in the

23   13 percent that are stubborn.

24          No one has actually reached out to Nippon, despite

25   filing an early objection to the disclosure statement.

1    There has been representations that term sheets and that

2    operational transition packets have been provided.  None of

3    that has been provided to my client.  So we are in need of

4    additional information.  We have objected to the disclosure

5    statement for failure to provide additional information.

6    And we think that's still necessary.

7           We appreciate what Mr. Perez is saying about

8    wanting to move this matter forward, but the parties are

9    entitled to adequate time to be able to even read all the

10   materials.  And just in the last, you know, 24 to 48 hours,

11   hundreds of pages of documents and pleadings have been

12   filed, and we really do need adequate time to be able to

13   review everything and know if our questions have been

14   answered.  And hopefully, in the meantime, someone from the

15   debtor will reach out to us, so that we can see what we can

16   resolve.

17          THE COURT:  All right.  Thank you, Ms. Moses.

18          Mr. Ali.

19          MR. ALI:  Thank you, Your Honor.

20          I think the one point that hasn't come out so far

21   is, while the debtors have worked with perhaps Apache for a

22   long period of time, I think it's fair to say, for a lot of

23   the predecessors that fall in the abandoned bucket, those

24   discussions have not started in earnest until probably well

25   after the disclosure statement and plan were filed January

1   1st.  And I think that we can see consensual resolutions

2   reached there, and that could occur with more time.

3          But I think we were hoping that -- you know, I

4   think, as someone previous asked, that this hearing could

5   continue -- be continued for about a month, and perhaps have

6   a status conference with the Court in two weeks, to see if

7   there has been more progress on the consensual resolution;

8   however, Your Honor, has stated April 14th might be the date

9   that the Court was thinking.  We would ask Your Honor not to

10  consider a date prior to April 14th, and to allow time for a

11  status conference before the April 14th date, if Your Honor

12  chooses to continue until that date.

13          THE COURT:  All right.  Thank you, Mr. Ali.

14          Mr. Zuber.

15      (No verbal response)

16          THE COURT:  Mr. Zuber?

17      MR. ZUBER:  Thank you, Your Honor.  This is Scott

18  Zuber.  I'm with the New Jersey firm of Chiesa, Shahinian &

19  Giantomasi, and along with Randy Rios and Tim Million of the

20  Husch Blackwell firm, we represent four sureties that issued

21  pre-petition surety bonds.  Those sureties are Aspen

22  American Insurance Company, Berkley Insurance -- excuse me

23  -- Berkley Insurance Company, Everest Reinsurance Company,

24  and Sirius American Insurance Company.  We've got a total of

25  penal sum bond exposure, about $185 million.

1          I don't want to -- I don't want belabor the point,

2   but on behalf of our clients, we, too, think that the

3   disclosure statement hearing should be adjourned and re-

4   noticed.  As the Court is well aware, Bankruptcy Rule 3017

5   requires a twenty-eight-day notice.

6          You know, there were substantive modifications

7   made within the past 24 or 48 hours.  The modifications are

8   comprised of hundreds of pages.  The changes include a

9   purported settlement between the debtors and Chevron and the

10  creation of a new entity, a Fieldwood IV entity.  The term

11  sheet is fairly complex, it talks about execution of

12  definitive documents.  It talks -- it refers to a turnkey

13  removal agreement, a contractor/operator agreement, and a

14  transition services agreement.  We believe these are

15  important and substantive changes.  We have not, quite

16  frankly, had an opportunity to review and analyze all these

17  issues; and we think, therefore, that the disclosure

18  statement hearing should be put off.  But I don't want to

19  belabor that point.

20          Your Honor, I'd like to just talk a little bit

21  about, you know, my clients, which have issued surety bonds

22  to insure various plugging and abandonment obligations in

23  the Gulf of Mexico.  Each surety issued its respective bonds

24  as consideration for the execution by the debtors of certain

25  indemnity agreements that, among other things, obligate the

1  debtors to exonerate, indemnify, and hold harmless the
2  sureties from and against claims or liability arising as a
3  result of having issued the bonds, to procure the discharge
4  and release of the surety bonds, and to post collateral for
5  the bonds upon demand by the sureties for any unreleased
6  liability.
7        As we've set forth in our papers, Your Honor, an
8  indemnity agreement running from the principal to the surety
9  is a standard condition for the execution of bonds by
10  sureties for principal, such as, in this case, the debtors,
11  as a critical component of the surety and principal
12  relationship.
13        We've attached copies of our bonds and our
14  indemnity agreements to our witness and exhibit list, which
15  we filed on March 19th at Docket Number 1063.  And at some
16  point, we would like to have those moved into evidence.  We
17  sent an email through our local counsel to Mr. Alfredo --
18  I'm sorry -- Mr. Perez, and from my understanding, there's
19  no objection to admitting those documents.
20        THE COURT:  Is there any contest that you have an
21  unsecured claim for the indemnification obligation?  I don't
22  know that anyone is disputing that.
23        MR. ZUBER:  Well, Your Honor --
24        THE COURT:  It's just --
25        MR. ZUBER:  -- I don't -- I don't think it's so

1  much an issue of whether we have an unsecured claim.  We

2  have no collateral, but we have certain rights that appear

3  to be -- are proposed to be trampled here, Your Honor.  I

4  mean, you know, most importantly, you know, it's unclear to

5  me that the plan -- that, under the plan, the debtors don't

6  seek to assume and assign our surety bonds.  And as we've

7  briefed fairly extensively, and as I've argued --

8            THE COURT:  Right.

9            MR. ZUBER:  -- to Your Honor earlier in this case,

10  you know, we don't believe that the surety bonds -- which

11  are both executory, but non-assumable -- can be assumed and

12  assigned.

13            THE COURT:  I understand that.

14            MR. ZUBER:  You know, we bonded --

15            THE COURT:  But what you end up with, if they get

16  drawn on, because they can't be assumed and assigned, is an

17  unsecured claim, right?

18            MR. ZUBER:  Well, but there --

19            THE COURT:  (Indiscernible).

20            MR. ZUBER:  -- conditions to that -- there are

21  conditions to that draw, Your Honor.  And they are drawn --

22            THE COURT:  (Indiscernible) --

23            MR. ZUBER:  -- first of all, they can't be

24  drawn --

25            THE COURT:  -- and you can --

1          MR. ZUBER:  -- without default --

2          THE COURT:  You can defend --

3          MR. ZUBER:  -- conditions having been met.

4          THE COURT:  So you can defend against the draw.

5          MR. ZUBER:  Right, we can defend against the draw.

6   And if we --

7          THE COURT:  Right.

8          MR. ZUBER:  If there is a drawn, then we would

9   have certain rights of subrogation that would survive.

10          THE COURT:  Well, I don't know --

11          MR. ZUBER:  And --

12          THE COURT:  It's a different question as to

13   whether you can be subrogated to the rights of the

14   Government --

15          MR. ZUBER:  Well --

16          THE COURT:  -- right?

17          MR. ZUBER:  -- I mean, we'll certainly reserve

18   that argument for confirmation, but we believe that we can.

19   The Government is our obligee; and, to the extent that a

20   performing surety performs, then it has subrogation rights.

21   And I'm not aware of any reason why we would not be

22   subrogated to the rights of the Government in this --

23          THE COURT:  You're subrogated, potentially, to

24   their monetary claim, but I doubt you're subrogated to their

25   regulatory claims, which means you don't fall under

1  Midlantic.

2          MR. ZUBER:  Well, okay.  Well, then we can address

3  that further at the confirmation hearing.

4          But you know, what concerns us a lot is that the

5  debtors appear to be trying to package what is a liability.

6  That's what a surety bond is to the bond principal.  It's

7  not an asset; it's a liability.  And they're trying to

8  package that into a newly formed subsidiary entity, by way

9  of a divisive merger, and to divert these valuable assets

10 for the benefit of certain preferred creditors, thereby

11 effectively assuming a credit accommodate that they --

12          THE COURT:  What --

13          MR. ZUBER:  -- can't assume.

14          THE COURT:  What valuable --

15          MR. ZUBER:  I think --

16          THE COURT:  -- assets are they diverting?

17          MR. ZUBER:  Well, there are --

18          THE COURT:  You said --

19          MR. ZUBER:  -- a lot of assets --

20          THE COURT:  -- they're diverting --

21          MR. ZUBER:  -- (indiscernible).

22          THE COURT:  -- some valuable assets, that they're

23 diverting --

24          MR. ZUBER:  Well, we think that there are assets

25 -- well, we -- again, my partner Darren Grzyb talked a

1  little bit about the Apache deal.  We believe that there are

2  assets there that are valuable, and that are not being

3  properly marketed and used, and that there are assets being

4  given over to NewCo, the credit bid purchaser, and without

5  the credit bid purchaser agreeing to undertake concomitant

6  obligations.

7          They don't -- you know, NewCo doesn't get the

8  right to rely upon our bonds; they're not assumable and

9  assignable.  If they want to -- if they want to become NewCo

10  and they want to obtain assets from the debtor, then they

11  have to post their own surety bonds.  And if they seek to

12  rely upon our surety bonds, that's impermissible, they can't

13  do that.  So, you know, we do not agree to extend credit to

14  anybody but the debtors.

15          You know, we think these are disclosure issues, as

16  well.  Again, you know, we think these are attempted end

17  runs around Section 365.  You know, the debtors filed their

18  lengthy objection overnight.  I know Your Honor said he

19  didn't have an opportunity to fully review that.  But --

20          THE COURT:  Right.

21          MR. ZUBER:  -- you know, in various parts, in

22  response to certain objections, they indicate that their --

23  the plan doesn't say anywhere that they intend to assume or

24  assign the surety bonds.  Well, you know, that seems to be

25  inconsistent with what we believed or understood was going

1  on.

2         And in fact, you know, if you look at -- if you

3  look at Page 32 of 66 of their response, they make it clear

4  that they do intend to rely upon our pre-petition surety

5  bond.  There's a reference in Subparagraph (p) to $12

6  million in surety bonds available to secure plugging and

7  abandon obligations for the Fieldwood III assets.  They also

8  seem to be looking to rely upon our bonds as to Fieldwood I,

9  as with respect to the credit bid purchaser.

10         So, you know, to the extent the plan contemplates

11  that our bonds are going to flow through to a newly created

12  entity, that would constitute, by definition, an assumption

13  of a non-assumable accommodation.  And you know, if NewCo

14  intends to operate and, you know, pump oil and gas and to

15  draw upon our credit, then they need to -- they need to get

16  their own bonds or they need to have our consent.

17         THE COURT:  Well, we'll see what happens.  My

18  guess is, if the United States makes a draw on your bond,

19  they're going to probably pay it, but that will be a

20  confirmation issue.

21         All right.  Did I hear --

22         MR. ZUBER:  Right.  And just -- right.

23         THE COURT:  (Indiscernible).

24         MR. ZUBER:  I was just going to say, Your Honor,

25  if they make a demand on our bonds, then, you know, they've

1   impaired our rights.  We -- you know, we'll likely not honor

2   the demand.  But I guess that --

3                 THE COURT:  (Indiscernible).

4                 MR. ZUBER:  -- will be fleshed out as we go

5   forward.  Thank you, Your Honor.

6                 THE COURT:  Ms. McPorter.

7        (No verbal response)

8                 THE COURT:  From (713) 374-3672.

9                 MS. HEYEN:  Good afternoon, Your Honor.  This is

10  Shari Heyen and Karl Burrer of Greenberg Traurig, for BP

11  Exploration & Production.

12                THE COURT:  Thank you.  I had you down as Katie

13  McPorter, for some reason.  Sorry (indiscernible).

14                MS. HEYEN:  Thank you for hearing us, Your Honor.

15  And thank you for appreciating the seriousness and magnitude

16  of the issues before Your Honor.

17                As the Court is aware and the other parties are

18  aware, this case involves over $9 billion in potential P&A

19  liabilities.  And specifically, with respect to BP,

20  Fieldwood is seeking to abandon 16 leases, asserting that BP

21  is a predecessor-in-title concerning 274 wells, 14

22  structures, and 22 pipelines.  And the BSEE estimate for the

23  P&A on these leases is over $400 million.

24                But yet, the predecessors have received important

25  information at the very last minute before this hearing.

1    So, for example, I believe that a redline of the disclosure

2    statement was filed at 2 a.m. this morning.  At 8:21 a.m.

3    this morning, the data room was populated with the INCs, or

4    incidents of noncompliance.  And so BP needs time to analyze

5    and see how that implications -- what implications there are

6    to BP and to determine, you know, its ability to perform

7    under any P&A obligations.

8            But that opportunity is foreclosed because we have

9    not had an ample opportunity to discuss that with our client

10   representatives, and it -- these last-minute filings -- and

11   I think the Court appreciates the insight of the other

12   predecessors on the phone -- it really compromises our

13   ability to make informed decisions and arguments about the

14   newly filed disclosure statement and the newly populated

15   data room.

16           And so our concern is just a real concern over due

17   process.  And we are squarely supportive of moving the

18   disclosure statement to mid-April and continuing the

19   confirmation hearing to a later date as well.  Thank you,

20   Your Honor.

21           THE COURT:  Thank you, Ms. Heyen.

22           Mr. Brescia?

23           MR. PEREZ:  Your Honor, can I respond to that?

24           THE COURT:  Not yet.

25           Mr. Brescia.

1            MR. BRESCIA:  Thank you, Your Honor.  This is

2   Duane Brescia, I'm representing Zurich, one of the sureties

3   in this matter.  Can you hear me okay?

4            THE COURT:  I can hear you fine, Mr. Brescia.

5            MR. BRESCIA:  Okay.  Thank you.

6            So I'm not going to repeat what a lot of the other

7   sureties have discussed, but for background, we do represent

8   Zurich.  They are associated with the Fieldwood I assets,

9   which were the Apache assets.  We've bonded ultimate Apache

10  liability of $300 million.

11           So a couple of things that we've talked about from

12  Mr. Perez -- and I'll acknowledge that his office and the

13  debtors have tried to give us a lot of information.  We've

14  received a ton of information, as you can see, but what we

15  haven't received is current information, which has been

16  requested for months.  In early January, we got a one-year-

17  old Ryder Scott report.  In mid-February, we got a midyear

18  2020 report, and later in February we got some data from

19  October.  Now all of that is pretty helpful.  But all we've

20  been requesting with respect to the disclosure statement is

21  the current status of those Fieldwood I wells and what the

22  current ARO is on those wells, and we still don't have that

23  information.

24           Now one of the things we've requested -- and this

25  is all subject to the protective order, so it won't

1   necessarily be disclosed to other parties who haven't signed

2   the protective order.  But we've requested a current Ares

3   database, which the debtors said they will provide to our

4   experts for a valuation.  That hasn't been provided yet, and

5   it may very well be, but I didn't want to let today go past

6   without at least -- whatever extension you're going to

7   grant, that there's a commitment from the debtor to provide

8   that information, which is the most current status of those

9   wells, before proceeding with the disclosure statement.

10          And I also note that the -- Chevron got a

11   stipulation with some additional information much more

12   detail than we've received as sureties.  And so I would at

13   least like, between now and whatever date the Court sets for

14   a disclosure statement, commitment to provide similar

15   information that's being provided to Chevron to all the

16   other sureties on the Fieldwood I wells.

17          And lastly, Your Honor, for today, you know, it's

18   been raised once or twice as a phrase, but hasn't really

19   been discussed, is the concept of the fair and equitable

20   treatment, which is a plan objection.  But what you heard

21   from the debtors today is the treatment afforded to Apache

22   is done, it's been done, it's been decided since last July,

23   and so that's not going to change.

24          But what the Court maybe hasn't heard yet is the

25   fact that Apache is just a contingent creditor on those

1   assets, just like everybody else, including the other

2   sureties, and so -- but they get all the powerful rights

3   granted under the implementation agreement, which lets

4   Apache run Fieldwood I.  They can consent to really

5   anything.  They can choose whether or not to try and sell

6   those assets.  They can choose whether or not to even grant

7   their loan to Fieldwood I, so they can control Fieldwood I

8   without giving other sureties that chance.

9         So we may, ultimately, be in favor of the

10  Fieldwood I structure.  But until we're given equal rights

11  to assess those assets and to maximize those assets as the

12  ultimate responsible party, I do think we have a patently

13  unconfirmable plan with respect to that 63 percent.  We are

14  not treated fairly and equitably and given the same rights

15  that Apache has.  So, unless that can be addressed, how

16  we're going to get there at confirmation on those issues, I

17  think we've got to pause everything until that can be

18  negotiated.  My client does remain open to negotiate that.

19        THE COURT:  Yeah, we're not going to pause for it

20  to be negotiated, but you can raise the objection at

21  confirmation.  Thank you.

22        Mr. Alaniz.

23        MR. ALANIZ:  Good afternoon, Your Honor.  Omar

24  Alaniz on behalf of Hess Corporation.

25        Your Honor, we understand from the debtors that

1   Hess is one of the five major predecessors that Mr. Perez

2   referred to earlier.  We're in the chain of title of seven

3   on -- of seven of those leases.  According to our -- the

4   information we pulled from BSEE's database on the P90 basis,

5   the total decommissioning estimate could be 150 million.

6          One thing that hasn't been discussed is also -- or

7   maybe I missed it -- is the orphan liabilities on some of

8   these leases.  We understand, on our leases at least, there

9   are about 9 million of orphan liabilities, so that's a

10  concern to us.

11         Our two other main concerns in these cases, Your

12  Honor:  One, that we not bear a disproportional share of the

13  legacy liability on the debtors' decommissioning

14  obligations; and, two, certainty on exposure.  And we think

15  that the debtors' plan of abandonment isn't an efficient way

16  to deal with its creditors and some of the environmental

17  issues.

18         As counsel for Eni mentioned, the predecessors

19  have spent several hours -- several days working on a

20  potential solution, and we objected to the disclosure

21  statement on the belief, and frankly the hope that the

22  debtors and the lenders will engage with us on developing

23  the consensual resolution.  I believe what I'm hearing from

24  the Court is headed in the direction that at least I

25  support, which is a resetting to April 14th of the

1  disclosure statement hearing, with a confirmation at the end

2  of May, and we think that probably strikes the right

3  balance.  We understand that the case is not going to be

4  paused.  We are hoping that, during that time, we will

5  continue to develop a potential framework, and that the

6  debtors and the lenders will engage with us.

7        THE COURT:  Thank you, Mr. Alaniz.

8        From (214) 722-7160?

9        MR. LANGLEY:  Your Honor, Keith Langley for

10  certain sureties.

11        THE COURT:  Mr. Langley --

12        MR. LANGLEY:  May I proceed?

13        THE COURT:  -- good afternoon.  Yes, sir.

14        MR. LANGLEY:  Good afternoon, Your Honor.

15        We agree with the sureties that have spoken.  And

16  we represent 4 sureties, $250 million.

17        The main issue here on information disclosure that

18  we want to speak to is just we would like information on

19  current safety and how to prevent oil in the Gulf.  And so,

20  to that extent, we also join with the Government and Mr. Ali

21  and think that the involvement of Your Honor, with guidance

22  to the parties here to avoid arguments -- we have very smart

23  people arguing.  But under the Code, the disclosure needs to

24  occur; we think it has not, and we think it can.  But we

25  like the idea, if Your Honor is so inclined, of having a

1  status conference before any continued disclosure statement

2  hearing.  Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Langley.

4          Mr. Prince.

5          MR. PRINCE:  Good afternoon, Your Honor.  This is

6  Jim Prince on behalf of Hunt Oil Company.  Can you hear me

7  okay?

8          THE COURT:  I can, Mr. Prince.  Good afternoon.

9          MR. PRINCE:  Good afternoon.

10         I get the sense that the Judge is going to give us

11  some more time.  And on behalf of Hunt, that is exactly what

12  --

13         THE COURT:  I don't think --

14         MR. PRINCE:  -- (indiscernible).

15         THE COURT:  I don't think they are, but I think I

16  am.

17         MR. PRINCE:  Yeah, and I'm very thankful for that,

18  Your Honor, because, from Hunt's perspective, we have been

19  out of the offshore Gulf of Mexico business for a decade.

20  We don't have the files and we don't have the people.

21         And when the debtor approached us in February with

22  a presentation that was about seven slides -- three of which

23  was explaining the bankruptcy, three of which was focused on

24  Hunt's particular interest of leases, and then one was a

25  slide of contact information -- look, this was an eye-

1  opening, oh my gosh, properties are perhaps trying to be

2  boomeranged back to us when we've been out of this business

3  for a decade.

4          So we have been trying to get up to speed as

5  quickly as we can.  We immediately joined the ad hoc

6  predecessor group, and we are thankful for all of the

7  participants in that group, and the Bracewell firm, in

8  particular, by providing some structure and some

9  organization.  And we have been on numerous calls over the

10 last couple of weeks to ultimately work towards a framework

11 of a solution, which was the framework for a solution.  That

12 name has now been borrowed by Chevron, so we'll have to come

13 up with something else.  But that solution had a lot of

14 merit, and I think I needs some time to allow the

15 constituents, including Mr. Schaible's constituents, to

16 ultimately engage with the ad hoc predecessor group because

17 I think it is a path forward.

18          On the issue of timing, there has been a lot of

19 information that has been -- you know, the word "dumped"

20 sounds bad, but a lot of -- a lot of information has been

21 filed recently.  I haven't had a chance to go through it, I

22 know my client has not either.  I heard Mr. Perez say that

23 there is a decommissioning plan on a lease-by-lease,

24 platform-by-platform, pipeline-by-pipeline, segment-by-

25 segment, somewhere in a data room.  I have -- we have not

1  looked at that, but that sounds like something we really

2  want to get our arms around because that could provide some

3  helpful information, as we launch into these negotiations

4  that we're going to be trying to get underway as quickly as

5  humanly possible.

6         There was a reference to a stipulation and order

7  that can be found at Docket 1113, and that's between the

8  debtor and Chevron.  And it's a little -- it's a little

9  surprising that one of the predecessors that has cut at

10  least an agreement to agree, but they need a stipulation and

11  order signed by Your Honor to get information, when

12  presumably they kind of have a deal that we're working on,

13  whereas everyone else is trying to get to a deal, but still

14  they need Your Honor to put forth a stipulation that has 50

15  kind of detailed document requests, and then a response date

16  that is really towards the April 16th time frame.

17         As far as -- that type of information that is

18  reflected in Docket 1113, Hunt would very much like to have

19  that information provided with respect to its situation, so

20  we can continue trying to ramp up and try to be productive

21  in negotiations and ultimately help this estate reach a

22  solution on a very complex problem.  Thank you, Your Honor.

23         THE COURT:  Thank you.  Thank you.

24         All right.  I promised you the last word.  Go

25  ahead, please, Mr. Perez.

1        MR. PEREZ:  Yes, Your Honor.  I don't know exactly

2   where to start, but let me start at the end there.

3        Your Honor, the information with respect to the

4   leases, the platforms, that's all available in those

5   transition plans.  If people haven't looked at it, they

6   haven't looked at it.  If they haven't had access to it and

7   they haven't -- those have been out there.  The Government

8   asked us to do a lease-by-lease, platform-by-platform

9   analysis, which we did.  And the company did a lot of work.

10  And frankly, it was exactly what we thought.  People weren't

11  going to look at it and come and complain to you about it,

12  so that's kind of number one.

13       Number two, Your Honor, just -- let me just

14  highlight one thing that counsel for BP said, that, today,

15  for the first time, they're hearing about the INCs, and that

16  was just populated.  In each of those transition plans that

17  have been out there for a while -- I don't know exactly when

18  BP's was done, but they've been out there for several weeks

19  or -- if not months -- all of the INCs were there.

20       And Your Honor, just as a complete aside, but as

21  we thought was going to be the case, I think the Genovesa

22  well is coming online tomorrow, you know, ahead of the April

23  5th date, that other people thought we would never do, and I

24  think Mr. Dane can testify to that.  But we actually have

25  done that, Your Honor.

1        Your Honor, we also have, today, the backstop

2   commitment motion, which is absolutely imperative that we

3   get that.  We need to have that financing in place.  The

4   actual cost to the debtor, if this doesn't go forward, is

5   minimal compared to what we lose if we don't get it.  So I

6   would definitely want to go forward with that today.

7        And Your Honor, I also would like to put Mr. Dane

8   on, so that the Court is fully aware of what each successive

9   week that we're not able to get out and fund is going to

10  cost because, you know, while a -- you know, while a delay,

11  you know, to the week of the 5th of April is, you know,

12  something that obviously we're going to need to live with,

13  if that what the Court is inclined, every day is a concern.

14  And I would certainly like to put, you know, Mr. Dane on to

15  talk about that because it's not -- you know, we have

16  literally been providing information full time for the last

17  month.

18        The fact that we're filing this in a disclosure

19  statement, information that's already been available that

20  we're putting in here -- not the deals that were put, those

21  were new -- and most of these issues, is Fieldwood I

22  feasible, that's a confirmation issue.  That's a

23  confirmation issue, that is not a disclosure statement

24  issue.  And there's no -- I can't imagine that, in order to

25  provide information, so that people can vote for the plan or

1   against the plan, that they need this information that is

2   otherwise available.

3          And this is -- we're literally taking the concept

4   of sufficient information that a reasonably prudent investor

5   would need to vote on the plan and carrying it, to the

6   extent that we've got to put all of this stuff in the

7   disclosure statement that, frankly, even doesn't -- isn't

8   even helpful.

9          The hard information to get to what would be a

10  transition to a predecessor who -- by the way, Your Honor,

11  what they haven't said is that they are jointly and

12  severally liable with respect to anything that they were in

13  the chain of title on.  No one has said that.  And the

14  sureties, they either have an obligation or they don't have

15  an obligation.  They have bonds, we have a view of it, and

16  we think they do.  And we think that the plan allows the

17  various parties to call on those bonds; and, if not, then

18  we'll make the draw.

19         But this delay for more information, constant

20  information, that's all we've been doing for the last couple

21  of months, Your Honor.  So, if the Court is inclined to

22  continue this, we do it the absolute least amount of time.

23  Maybe we can come back the week of April 5th, at the latest.

24  And we'd like to go forward with respect to the motion, the

25  backstop motion.

1          THE COURT:  So I'm going to give you the schedule

2    I currently intend to do.  If you then want to put Mr. Dane

3    on, you're obviously welcome to do that.  The problem with

4    doing that is, the minute you put him on, everyone that just

5    spoke is going to have questions for him, and I'm going to

6    allow people to ask anything that's relevant.  So be sure

7    you want that poison when you ask for it.

8          MR. PEREZ:  So, in other words, if I shoot that

9    bullet, I can't take it back?

10          THE COURT:  I believe that would be correct.

11          So here's the deal.  On March 29th, at 4:30, I

12   would like to have a discovery conference in the case, to be

13   sure that everyone that is sending and receiving discovery

14   is on board for how that is going to occur.

15          On April 9th, at two o'clock p.m., I'm going to

16   have two hearings:  One is a hearing to approve or not

17   approve the backstop; the other is a planning hearing for

18   the disclosure statement.  I want an outline at that

19   hearing, on April 9th, who the witnesses are going to be and

20   what the remaining objections are and how we're going to get

21   through a disclosure statement hearing.

22          The disclosure statement hearing will be April

23   14th at two o'clock.

24          Assuming that we approve a disclosure statement at

25   the April 14th hearing, the confirmation hearing will be on

1    May 17th, at 13 days beyond what the debtors have requested.

2    I don't think that's very long.

3            With respect to whether we need to fully re-notice

4    the disclosure statement hearing to which one party said we

5    did, we do not.  We have a properly noticed disclosure

6    statement hearing.  Amendments are normal, they're

7    considered part of the process.  To the extent that they are

8    substantive, that's just fine.

9            And to the extent that I need to shorten the

10   notice period, it is shortened.  No new notice needs to be

11   given beyond the docket entry.

12           If you want to put on Mr. Dane, that's fine;

13   otherwise, those are going to be your dates.  And you're

14   welcome to try and talk me out of it with testimony, but I'm

15   just -- you know what's going to happen.  And feel free, if

16   you want.

17           MR. PEREZ:  Well, Your Honor, the only comment I

18   would make is that our hundred-and-eighty-five-million-

19   dollar commitment expires next week, so we would need to

20   have the hearing on that before the expires.

21           THE COURT:  Mr. Schaible, can we do that on April

22   the 9th, on the date for the hearing?

23           MR. SCHAIBLE:  Your Honor, you know that I love to

24   say yes to you and do my best to say yes to you.  I

25   literally would have to go out to something like a dozen

1 parties and get people to agree to extend again.  The

2 debtors received until March 30th, currently.  I'm obviously

3 not telling Your Honor no.

4        But I would ask Your Honor to consider whether we

5 can proceed with that.  It's kind of easy, truthfully, and

6 isn't relevant with respect to all of these information

7 requests and demands, that truthfully seem to me very much

8 like further delay to advantage parties.

9        But putting that aside, the backstop is a pretty

10 easy one.  Under almost all circumstances, it's NewCo that's

11 bearing the cost of it.  It's only an alternative

12 transaction fee of less than $10 million that is only

13 payable to the extent the debtors do another transaction.

14 That is really what we're talking about.  And Your Honor, it

15 feels to me like we're supposed to do is lock that down and

16 then get to our disclosure statement as soon as we can.  I

17 believe Mr. Hansen is ready to testify to that.  And I would

18 ask -- I would ask Your Honor if we can do that.

19        THE COURT:  Mr. Schaible, tell your clients, when

20 you ask if they'll extent until April the 9th, that I've

21 reviewed it, and I'm not planning to ask or raise any -- ask

22 any questions or raise any objections at the hearing.  I

23 don't think that an adequate reason for giving that deadline

24 exists that I've seen so far in the record and encourage

25 your clients to make that agreement.  If not, I'll let the

1  debtor file another motion to get an emergency hearing for

2  it.  I'm not going to rule out this as a possibility, but

3  I'm not setting them up to blindside them with me coming in

4  and saying I think the backstop is ridiculous.  I thought

5  the backstop was pretty good.  I just want to give people a

6  chance to object to it.

7         MR. SCHAIBLE:  I was actually a little embarrassed

8  about it, truthfully, Your Honor.  I'm afraid other people

9  are going to use that against me in other cases.

10        Okay, Your Honor.  Heard and understood and

11  appreciated.  I'll obviously talk to the group.

12        THE COURT:  Mr. Schaible, thank you.

13        All right.  Is there anyone that now wants to

14  raise an objection to the schedule that I've announced?

15  Otherwise, that will be the deal.  Let's see.  Mr. Kuebel.

16     (No verbal response)

17        THE COURT:  Mr. Kuebel?

18        MR. KUEBEL:  Good afternoon, Your Honor.  I had

19  raised my hand to talk about some adequacy of disclosure

20  issues in response to Mr. Perez, but I have no objection to

21  the time table that you proposed, and I thank you for doing

22  it.  I think that will really help this case moving in the

23  right direction to clean up some of these adequate

24  information issues that do still persist.  But I --

25        THE COURT:  Thank you.

1        MR. KUEBEL:  I'll -- thank you.

2        THE COURT:  Ms. Russell?

3     (No verbal response)

4         THE COURT:  Ms. Russell?

5        MS. RUSSELL:  Thank you, Your Honor.  Apache has

6   been mentioned many times today, so I feel like I must make

7   some statement, but I will make it very brief.

8        We disagree with some of the legal and factual

9   characterizations that have been made today as to what is

10  happening with the plan with respect to Fieldwood I, but we

11  understand that those will be addressed in due course, in

12  connection with confirmation.  So we reserve all our rights

13  to do so, including specifically with respect to the

14  characterization of the bonds (indiscernible) for the

15  benefit of Apache as being assumed, transferred, or assigned

16  into a new entity because that is simply not how a

17  (indiscernible) works.  Thank you.

18        THE COURT:  Thank you, Ms. Russell.

19        All right.  Let me see if I have anyone else.

20        We're adopting the schedule that I announced.  I'm

21  going to repeat it, so everybody can take good notes of it.

22        I want it to be clear why I'm doing this schedule,

23  and that is I'm doing it because I believe that an awful lot

24  of information has been filed, as it should have been, and

25  that the situation is dynamic, as one would expect it to be.

1  But the dynamism of the situation has led to major -- very

2  major events in the last few days, and people ought to have

3  the right to absorb that and be sure they understand all the

4  information.  I don't think that, by filing this at the last

5  minute, that there was any problem with doing it.  I just

6  want to give people an opportunity to absorb it.

7       One reason I am not doing this, I'm not doing it

8  in order to give people an opportunity to negotiate.  People

9  can negotiate before disclosure statements are approved,

10 they can negotiate after disclosure statements are approved.

11 I'm happy if people negotiate, I'm happy if people want to

12 fight.

13       For those of you that are in that position of not

14 yet having a deal with the debtor, don't expect that, if you

15 hold out to the end, that the Court is going to come in and

16 say, well, they get at least as good of a deal as the people

17 who negotiated a deal got.  That ain't the way it works.

18 The last one to negotiate might get the best deal, if that's

19 what the debtor negotiates, and might get the worst deal, if

20 there isn't anything at all and they need to be forced into

21 the deal.

22       Every single P&A liability here is different,

23 every well is different.  Every piece of work that needs to

24 be done is different.  Coming in and saying that, because

25 Entity A got Deal X, we deserve, you know, X is probably not

1  an argument that's going to work because there are no two

2  people here who are identically situated.  And for -- you

3  know, I -- all of you have done an awful lot of P&A

4  litigation from what I can tell, and I have, too.  P&A

5  litigation is hard and it's hard fought.  I got no problem

6  with that.  I got no problem if there are holdouts, I got no

7  problem if there are fights.

8          Just don't hold out expecting that the Court is

9  going to come in and save you because I don't think that's

10 the way this works.  People who make deals generally get

11 better deals than what you get by compunction.  In the case

12 that we, you know, have been referencing, where the United

13 States came in and agreed to something that the creditors

14 opposed, the creditors would have been a whole lot better

15 off if they had done a deal.  I do encourage the debtors to

16 try and figure out a solution to the problem that I've

17 identified under Midlantic, but I think it's a confirmation

18 question, and I hope that you can come up with an answer

19 that is more satisfactory than what I'm hearing right now.

20         The dates and deadlines, just to repeat them:

21         On March 29th, at 4:30, we're going to have a

22 discovery conference.  If there is uncooperative discovery

23 in either direction, I will intervene and try and see to it

24 that discovery occurs, and that it occurs in a timely way

25 before the coming hearings.

1          I will note, however, that Mr. Perez says

2   everything is sitting there in a data room that people have

3   access to.  And I'll just tell you, if he demonstrates to me

4   that the information is in a data room, I'm not going to

5   make him segregate it out of the data room and give it to

6   you again.  And if you've had it for four weeks and haven't

7   looked in the data room, don't expect a whole lot of time to

8   look at it, you know, go look at it now.

9          The next hearing we're going to have is on April

10  the 9th, at two o'clock.  That hearing is going to determine

11  what to do with the backstop agreements.  That was filed on

12  an emergency basis.  I don't really say, other than the

13  deadline built within it -- which I don't mean to make light

14  of -- that we ought to be holding that hearing on that fast

15  of an emergency.  It looks like a very good idea to me, for

16  the debtor.  This is a debtor business judgment test.  I'll

17  hear the evidence of anybody that wants to challenge the

18  debtors' business judgment, but it looks smart to get a

19  backstop at what looked to be a pretty reasonable price.

20  That hearing is on April the 9th at two o'clock.

21          When we're done with the backstop hearing, we're

22  then going to move into a hearing that plans an April 14th

23  disclosure statement hearing.  I want to know what witnesses

24  we're going to have, I want to have an idea of what exhibits

25  we're going to have, and I want to schedule a hearing.

1       As my colleague David Jones says, disclosure

2   statements always get approved, sometimes they just take

3   time.  Giving time and expecting there to be adequate

4   information, if you think the information in there isn't

5   adequate, I want it to be specific what is needed, as I

6   intend to find a way, assuming there is adequate

7   information, to approve the disclosure statement hearing --

8   to approve the disclosure statement.  You may be here late

9   on the night of April the 14th.

10       On May the 17th, I'm going to set aside all days

11  to have a confirmation hearing in Fieldwood.  It will start

12  at nine o'clock.  I'm going to ask that the debtors have, at

13  the final disclosure statement hearing, a proposed form of

14  order that, not only approves the disclosure statement and

15  sets the confirmation hearing, but also sets the voting and

16  proposes to set the various voting and objection deadlines.

17  That's the schedule we're going to operate under.

18       Mr. Schaible, if your clients can't approve that,

19  then I need the debtors to file an emergency motion, asking

20  me to advance that hearing to the approved date.  I think

21  there's good reason for them to wait, but it would probably

22  create an emergency if they won't wait, but it's going to be

23  a pretty high burden of proof at that hearing.

24       MR. SCHAIBLE:  Understood, Your Honor.

25       THE COURT:  Thank you.

1          MR. PEREZ:  And Your Honor, just to preview with

2    the Court, there is a -- there are several other backstops

3    that we are going to seek approval of, and we'll hopefully

4    get those on file today or tomorrow, and we would like the

5    Court to hear them at the same time.

6          THE COURT:  You have to self-calendar --

7          MR. PEREZ:  Mr. Wallander --

8          THE COURT:  Self-calendar them for that date,

9    please.

10         MR. PEREZ:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12         MR. SCHAIBLE:  Your Honor, it's Damian Schaible.

13   May I be heard for one second?

14         THE COURT:  Of course, Mr. Mr. Schaible.

15         MR. SCHAIBLE:  Your Honor, understood on your

16   direction and appreciate the thoughtful schedule.

17         One question just because it may save a lot of

18   time and energy between now and, frankly, you know, the 9th

19   and the 14th, is:  Your Honor, do you want to continue to

20   hear patently unconfirmable arguments, or do you want people

21   to just focus on disclosure?

22         THE COURT:  If it's really patently unconfirmable,

23   I want to hear it.  I didn't hear anything today that makes

24   anything patently unconfirmable, so it better be something

25   new.

1          MR. SCHAIBLE:  Okay.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          All right.  I appreciate everybody's tolerance

4    with me today, I know it's been a hard, long hearing.  And

5    we'll go ahead and adjourn until 4:00 o'clock this -- until

6    5:00 o'clock this afternoon, excuse me.

7          MR. SCHAIBLE:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9       (Proceedings concluded at 3:32 p.m.)

10                        *  *  *  *  *

11          *I certify that the foregoing is a correct*

12    *transcript to the best of my ability due to the condition of*

13    *the electronic sound recording of the ZOOM/telephonic*

14    *proceedings in the above-entitled matter.*

15    */S/ MARY D. HENRY*

16    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19    *JTT TRANSCRIPT #63671*

20    *DATE FILED:  MARCH 25, 2021*

21

22

23

24

25