IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § § | Case No. 20-33948 (MI) |
| Debtors.[1] | § § § | (Jointly Administered) |

**EMERGENCY MOTION OF DEBTORS FOR ORDER (I) APPROVING
ENTRY INTO FIRST LIEN EXIT FACILITY COMMITMENT LETTER AND
RELATED FEE LETTER, (II) AUTHORIZING INCURRENCE
AND PAYMENT OF CERTAIN FEES AND COSTS IN CONNECTION
THEREWITH, AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON April 9, 2021 AT 2:00 P.M. (PREVAILING CENTRAL TIME). YOU MAY PARTICIPATE IN THE HEARING BY AUDIO/VIDEO CONNECTION.**
>
> **PLEASE NOTE THAT THROUGH THE ENTRY OF GENERAL ORDER 2020-10 ON MARCH 24, 2020, GENERAL ORDER 2020-11 ON APRIL 27, 2020, GENERAL ORDER 2020-17 ON JUNE 12, 2020, GENERAL ORDER 2020-18 ON JUNE 29, 2020, GENERAL ORDER 2020-19 ON AUGUST 7, 2020, AND GENERAL ORDER 2020-20 ON OCTOBER 19, 2020, THE COURT INVOKED AND THEN EXTENDED AND MODIFIED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS. IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**
>
> **YOU MAY VIEW VIDEO VIA GOTOMEETING. TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION. TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE. ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING. TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU. SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR. UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE". SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

**Preliminary Statement**

1. The Debtors achieved a critical case milestone by filing their joint chapter 11 plan [Docket No. 1115] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**") and related disclosure statement [Docket

No. 1117] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Disclosure Statement**"). The restructuring contemplated by the Plan is the result of months of discussions with the Debtors' key stakeholders and reflects the support of, among others, the DIP Lenders, the Prepetition FLFO Lenders, the FLTL Lenders holding approximately 87% of the FLTL Claims, the Prepetition SLTL Lenders holding approximately 88.71% of the SLTL Claims, the unsecured creditors' committee (the "**Creditors' Committee**"), and Apache Corporation ("**Apache**"), the predecessor in interest for the vast majority of the Debtors' Shelf Assets.[2] Reaching this broad consensus and obtaining a new-money investment for a path that preserves the core of the Debtors' business is an especially significant accomplishment for the Debtors in the midst of an unprecedented and challenging operating environment.

2. An integral component of the Debtors' restructuring is the recapitalization of the Debtors' business pursuant to the sale and transfer of certain specified Deepwater Assets and Shelf Assets (collectively, the "**Acquired Interests**") to the Prepetition FLTL Lenders through a Credit Bid Transaction pursuant to that certain purchase and sale agreement among FWE, certain of its affiliates, NewCo, and the Credit Bid Purchaser (the "**Credit Bid Purchase Agreement**").[3] The Credit Bid Transaction will, among other things, facilitate the (i) recapitalization of the Debtors' business as a financially stronger, more streamlined company; (ii) preservation of over 1,000 employee and contractor jobs; (iii) maximization of the value of the specified Deepwater

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Commitment Letter and the Fee Letter (each as defined herein), as applicable. The description and summaries of the terms from the Commitment Letter and the Fee Letter included in the motion are qualified in their entirety by reference to the actual terms of the Commitment Letter and the Fee Letter, and in the event of an inconsistency therewith, the terms of the Commitment Letter and the Fee Letter, as applicable, shall govern.

[3] The Plan also provides that the Prepetition FLTL Lenders will receive their Pro Rata share of 100% of the new equity interests (the "**New Equity Interests**") in the indirect parent of the Credit Bid Purchaser ("**NewCo**").

3

Assets and specified Shelf Assets for the benefit of the Debtors' estates, their creditors and other stakeholders; and (iv) acceleration of the safe and responsible decommissioning and plugging and abandonment of oil and gas properties throughout the Gulf of Mexico at no cost to U.S. taxpayers.

3. The Credit Bid Purchaser's capital structure will consist of:

(a) a $118,599,082.31 first lien term loan facility (the "**First Lien Exit Facility**"), that will be assumed and assigned by the NewCo Entities as set forth in the Credit Bid Purchase Agreement; and

(b) an up to $185 million new money second lien term loan facility (the "**Second Lien Exit Facility**") to ensure (i) the Credit Bid Purchaser has no less than $120 million of cash on hand on the Effective Date, and (ii) up to $85 million in proceeds will be used by the Credit Bid Purchaser to purchase the Acquired Interests (the "**New Money Investment**"). In addition, at any time after the Effective Date and subject to satisfaction of certain conditions, the Credit Bid Purchaser will be permitted to borrow up to $50 million under an incremental facility, which incremental facility will not be committed on the Effective Date.[4]

4. Pursuant and subject to the terms of that certain *Commitment Letter* (collectively with the Annexes thereto, and as may be amended from time to time in accordance therewith, the "**Commitment Letter**"), Goldman Sachs Bank USA ("**GS Bank**") will (i) act as sole arranger, administrative agent, and collateral agent in connection with the First Lien Exit Facility, and (ii) commit to provide the full $118,599,082.31 principal amount of the First Lien Exit Facility, in each case, on the terms and subject to the conditions set forth in the Commitment

---

[4] Credit Bid Purchaser will also raise an additional $40 million in capital through (i) a $20 million equity rights offering to all Prepetition FLTL Lenders (the "**FLTL Equity Rights Offering**") in accordance with the rights offering procedures (the "**FLTL Equity Rights Offering Procedures**"), and (ii) a $20 million equity rights offering to all Prepetition SLTL Lenders (the "**SLTL Equity Rights Offering**" and, together with the FLTL Equity Rights Offering, the "**Equity Rights Offerings**") in accordance with the rights offering procedures (the "**SLTL Equity Rights Offering Procedures**"). In addition, the Debtors are currently in the process of negotiating backstop commitment agreements with certain ERO Backstop Parties (as defined in the Plan), pursuant to which such parties will agree to fully backstop the Equity Rights Offerings in exchange for, among other things, backstop commitment premiums.

Letter.[5] Certain fees for the administration services GS Bank provides related to the First Lien Exit Facility are set forth in a separate fee letter entered into by the Company and GS Bank (as may be amended from time to time, the "**Fee Letter**" and together with the Commitment Letter, the "**Commitment Agreements**"). Copies of the Commitment Letter and the Fee Letter are annexed hereto as **Exhibit A** and **Exhibit B**, respectively.

5. In exchange for the commitments and obligations set forth in the Commitment Agreements, subject to Court approval, the Company has agreed that, among other things: (i) a newly-formed Delaware limited liability company (the "**Borrower**"), which shall be wholly-owned, directly, by NewCo, shall pay GS Bank an administration fee in an amount per year equal to $50,000, payable in advance in quarterly installments, commencing on the Closing Date (as defined in **Annex B** to the Commitment Letter), and on the last day of each full fiscal quarter ending thereafter for so long as the First Lien Exit Facility remains outstanding (the "**Administration Fee**"); (ii) the Company shall reimburse GS Bank for all reasonable and documented out-of-pocket fees and expenses (including but not limited to, the reasonable fees, disbursements and other charges of all legal counsel to GS Bank (limited to one primary counsel to GS Bank and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)) and examiners, search fees, due diligence expenses, transportation expenses, and appraisal, environmental, audit, and consultant costs and expenses) incurred in connection with the First Lien Exit Facility, a syndication thereof, the

---

[5] The Lenders under the First Lien Exit Facility will be the Prepetition FLFO Lenders and their successors and permitted assigns from time to time party to the First Lien Exit Facility Credit Agreement and, at the option of GS Bank, one or more other financial institutions selected by GS Bank and reasonably acceptable to the Borrower (collectively, the "**First Lien Exit Facility Lenders**").

preparation of the definitive documentation therefor and the other transactions contemplated thereby, regardless of whether any of the transactions contemplated by the Commitment Agreements are consummated (the "**Expense Reimbursement**"); and (iii) the Company shall indemnify GS Bank under certain circumstances and subject to certain limitations as more fully set forth in **Annex A** to the Commitment Letter (the "**Indemnification Obligations**").

6. The Debtors are confident that entry into and performance under the Commitment Agreements will maximize the value of the estates. The Commitment Letter and the Fee Letter are the result of extensive negotiations between the Debtors, GS Bank, the Prepetition FLFO Lenders and their respective professional advisors. *See* Hanson Decl. ¶ 9. Moreover, the benefits provided to the Debtors by GS Bank pursuant to the Commitment Agreements are commensurate with the Administration Fee, the Expense Reimbursement, and the Indemnification Obligations provided to GS Bank in exchange for their obligations under the Commitment Agreements.

7. Accordingly, the Company's entry into and performance under the Commitment Letter and the Fee Letter is in the best interests of all creditors, and the Debtors submit that the determination to enter into and perform under the Commitment Letter and the Fee Letter is a sound exercise of the Debtors' business judgment and should be approved.

## Relief Requested

8. Pursuant to sections 105(a), 362, 363, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), the Debtors request entry of an order approving their entry into and performance under the

6

Commitment Letter and Fee Letter, including the incurrence of the obligations thereunder, and authorizing payment of the fees and costs in connection therewith, including, as applicable, the Administration Fee, the Expense Reimbursement, and any Indemnification Obligations.

9. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "**Proposed Order**").

10. Contemporaneously herewith, the Debtors have filed the *Declaration of John-Paul Hanson in Support of Emergency Motion of Debtors For Order (I) Approving Entry into First Lien Exit Facility Commitment Letter and Related Fee Letter, (II) Authorizing Incurrence and Payment of Certain Fees and Costs in Connection Therewith, and (III) Granting Related Relief* (the "**Hanson Declaration**").

## Jurisdiction

11. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

12. Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

13. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

15. On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (and as may be reconstituted from time to time, the "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

16. Additional information regarding the Debtors' business, capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 29].

## Commitment Agreements

**A.     Background**

17. Prior to and after the Petition Date, the Company and its advisors at Houlihan Lokey Capital, Inc. ("**Houlihan**") engaged in discussions with the Company's creditor constituencies regarding the terms of a restructuring that would include a recapitalization through a sale of the Acquired Assets via a credit bid to a newly-formed entity. *See* Hanson Decl. ¶ 7. After several months of extensive negotiations, the parties to the Debtors' RSA, including the FLTL Lenders, agreed on the terms of a Plan that implements the Credit Bid Transaction.

      *i.   The Capitalization of the Credit Bid Purchaser and Procurement of the First Lien Exit Facility*

18. As a part of these restructuring negotiations, the Debtors, in consultation with the Prepetition FLFO Lenders, the Required DIP Lenders, the Consenting Creditors, and their respective advisors, thoroughly diligenced the potential funding needed on an aggregate basis to implement the Plan. *See* Hanson Decl. ¶ 12. The parties discussed possible sources for raising the additional capital required, whether from existing lenders or from third parties. *See* Hanson Decl. ¶ 12.

8

19. Houlihan contacted several potential capital providers outside the Company's existing lender group to determine if any viable and cost-effective options for exit financing would be available. *See* Hanson Decl. ¶ 13. These efforts included informal conversations with parties that had previously expressed some interest in providing financing for a debtor-in-possession facility or in purchasing the Deepwater Assets, as well as new parties that were given the opportunity to conduct diligence on the Company and its assets. *See* Hanson Decl. ¶ 13. However, the onset of and continuing challenges posed by the COVID-19 pandemic, the impact on demand for oil and resulting commodity prices and the lack of available capital in the upstream exploration and production sector significantly reduced the competitive market for the Company's exit financing, and increased the risks of closing the recapitalization. *See* Hanson Decl. ¶ 14.

20. Despite the outreach efforts, no serious interest in providing exit financing emerged on reasonable terms and amount from any party outside the Company's existing lender group, let alone on terms competitive with those offered by the Debtors' existing lenders. *See* Hanson Decl. ¶ 15. Having fully explored their alternatives, the Company and their advisors decided to move forward with the only commercially reasonable exit financing options available under the circumstances, and extensively negotiated the terms of the First Lien Exit Facility with GS Bank, the Prepetition FLFO Lenders and their respective advisors. *See* Hanson Decl. ¶ 15.

> ii. *Negotiations related to the Commitment Agreements*

21. After the initial round of negotiations resulted in a general agreement as to the terms the First Lien Exit Facility, and in order to "lock in" the commitments under the First Lien Exit Facility, the Debtors engaged in further negotiations with the Prepetition FLFO Lenders, and their advisors, which culminated in the Commitment Agreements, which, subject to the terms thereof, ensure the agreement on the $118,599,082.31 First Lien Exit Facility. Hanson Decl. ¶ 16.

22. The Commitment Agreements and the First Lien Exit Facility were thoroughly negotiated to procure the best possible terms for the Company given the complexity and risks of the restructuring contemplated by the Plan and the operational and financial challenges faced by companies in the E&P sector. *See* Hanson Decl. ¶ 17. After reviewing and comparing the terms of exit facilities in similar restructurings with those provided in the Commitment Agreements, including the Administration Fee, Expense Reimbursement, and Indemnification Obligations, Houlihan determined that the terms of the Commitment Agreements are market-based and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases. *See* Hanson Decl. ¶ 17.

23. As a result of these discussions with the advisors and counsel to the Prepetition FLFO Lenders, and Houlihan's own assessment of the availability of financing terms in the marketplace, the Debtors determined that it would be in the best interests of the Company and its stakeholders to enter into the Commitment Agreements, subject to this Court's approval. *See* Hanson Decl. ¶ 18.

### Summary of Material Terms of the Commitment Agreements

24. As discussed above, the $118,599,082.31 First Lien Exit Facility is essential to the successful implementation of the Plan, the closing of the Credit Bid Transaction and,

ultimately, the recapitalization of the Debtors' business as a reorganized entity. As discussed in Section A, above, the principal terms of the Commitment Letter and the First Lien Exit Facility were extensively negotiated. The Commitment Agreements ensure that the Credit Bid Purchaser will be adequately capitalized upon the Effective Date.

25. The following chart summarizes the principal terms of the Commitment Agreements:

| **Summary of Material Terms of the Commitment Agreements[6]** ||
|---|---|
| **First Lien Exit Facility**<br><br>Commitment Letter | A senior secured first lien term loan facility in an amount of $118,599,082.31. |
| **Administration Fee**<br><br>Fee Letter | The Company hereby agrees that the Borrower shall pay to GS Bank, solely for its own account, an administration fee in an amount per year equal to $50,000, payable in advance in quarterly installments, commencing on the Closing Date (as defined in Annex B to the Commitment Letter), and on the last day of each full fiscal quarter ending thereafter for so long as any First Lien Term Loan or commitment under the First Lien Exit Facility shall be outstanding; provided that the payment made on the Closing Date shall be prorated for the period beginning on the Closing Date through the last day of the fiscal quarter in which the Closing Date occurs. GS Bank reserves the right to review and adjust such annual administrative agent fee on an annual basis and at the time any material amendment is requested. |
| **Expense Reimbursement Obligations**<br><br>Commitment Letter | The Company agrees to reimburse GS Bank from time to time on demand for all reasonable and documented out-of-pocket fees and expenses (including, but not limited to, the reasonable fees, disbursements and other charges of all legal counsel to GS Bank (limited to one primary counsel to GS Bank and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)) and examiners, search fees, due diligence expenses, transportation expenses, and appraisal, environmental, audit, and consultant costs and expenses) incurred in connection with the First Lien Exit Facility, a syndication thereof, the preparation of the definitive documentation therefor |

---

[6] The following summary of the terms of the Commitment Letter and the Fee Letter is subject entirely to the respective terms thereof. If there are any inconsistencies between the following summary and the Commitment Letter and/or Fee Letter, then the Commitment Letter and/or Fee Letter, as applicable, shall control. Unless otherwise indicated, capitalized terms used in the following summary shall have the meanings ascribed to them in the Commitment Letter and/or Fee Letter and section or paragraph references used in the following summary correspond to the Commitment Letter and/or Fee Letter, as applicable.

| **Summary of Material Terms of the Commitment Agreements[6]** ||
|---|---|
| | and the other transactions contemplated by the Commitment Letter, regardless of whether any of the transactions contemplated by the Commitment Letter are consummated. |
| **Indemnification Obligations**<br><br>Commitment Letter Annex A | In the event that GS Bank, any of its affiliates, officers, partners, directors or equivalents, agents, employees and controlling persons or any Eligible Assignee, as the case may be, of Goldman Sachs (each, an "**Indemnified Person**"), becomes involved in any capacity in any action, proceeding or investigation brought by or against any person or entity, including any of your affiliates, shareholders, partners, members, or other equity holders, in connection with or as a result of either this arrangement or any matter referred to in this Commitment Letter or the Fee Letter (together, the "Letters"), the Company agrees to periodically reimburse such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith (but limited, in the case of legal fees and expenses, to one counsel to such Indemnified Persons taken as a whole and, solely in the case of a conflict of interest, one additional counsel to all affected Indemnified Persons, taken as a whole (and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions) to all such persons, taken as a whole and, solely in the case of any such conflict of interest, one additional local counsel (which may be a single firm for multiple jurisdictions) to all affected Indemnified Persons, taken as a whole, in each such relevant jurisdiction (limited, in the case of legal counsel, to one counsel to such Indemnified Persons, taken as a whole, and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)). |
| **Termination**<br><br>Commitment Letter | GS Bank's commitment under the Commitment Letter shall terminate upon the first to occur of (a) the conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (b) a trustee or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases, (c) any occurrence, development or change after the date of the execution of the Commitment Letter, that has had or could be reasonably expected to have a material adverse effect on the business, assets, operations, properties or financial condition of the Borrower or the Company or their respective subsidiaries (taken as a whole) or on the value of, or ability to take a security interest in, a material portion of the collateral (<u>provided</u> that, for the avoidance of doubt, any change, development or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the pendency of the Chapter 11 Cases shall not constitute a material adverse effect); (d) (i) the Company having failed to file a motion with the Bankruptcy Court seeking approval of the Commitment Letter and the Fee Letter no later than two days following the execution date of the Commitment Letter (or such later date as GS Bank shall agree in its sole discretion), which motion shall be in form and substance satisfactory to GS Bank and (ii) the Bankruptcy Court having not entered an order approving the Company's entry into this Commitment Letter and the Fee Letter and related relief no later than 15 days following the execution date of the Commitment Letter (or, if delayed solely by reason of action |

12

| | **Summary of Material Terms of the Commitment Agreements[6]** |
|---|---|
| | of the Bankruptcy Court despite the Company's best efforts to have such order by the date that is 15 days following the execution date of the commitment letter, 30 days following such execution date) (or in any case, such later date as GS Bank shall agree in its sole discretion), which shall be in form and substance satisfactory to GS Bank and (e) the earlier of (i) the Outside Expiration Time (as defined in the Second Lien Backstop Commitment Letter (which is as defined in the Plan) and (ii) July 31, 2021, in either case, unless such date is extended by us in writing (including by email) in our discretion or the closing of the First Lien Exit Facility, on the terms and subject to the conditions contained herein, shall have been consummated on or before such date |
| **Conditions**<br><br>Commitment Letter | GS Bank's commitments are subject to the following conditions: (a) the accuracy and completeness in all material respects (but without duplication of materiality) of all representations that the Company, the Borrower and their respective subsidiaries made to GS Bank in the First Lien Exit Facility Documents (as defined in the Plan) and the Company's compliance in all material respects with the terms of the Commitment Letter and the Fee Letter; and (b) the satisfaction of all conditions precedent set forth in the First Lien Exit Facility Documents described in **Annex B** to the Commitment Letter under the Section entitled "Conditions Precedent". |

## Relief Requested Should Be Granted

26. Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Fifth Circuit has held that debtors may use property outside of the ordinary course under section 363(b) where the debtor can articulate some business justification or sound business reason to support the use. *See e.g., In re BNP Petroleum Corp., 642 F. App'x 429, 435 (5th Cir. 2016)*; *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir.2010) ("A sale of assets under § 363... is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

27. The business judgment standard under section 363(b) is "flexible and encourages discretion." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors)."). Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citation omitted).

## A. Sound Business Reasons Support Entry into the Commitment Letter and the Fee Letter

28. The Debtors submit that sound business reasons exist to grant the relief requested herein. The Commitment Letter and Fee Letter are the culmination of extensive negotiations among the Debtors and their key economic stakeholders. The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the presented restructuring framework and carefully considered their options for financing the Credit Bid Purchaser. *See* Hanson Decl. ¶ 11.

29. The First Lien Exit Facility is a critical element of the Debtors' restructuring, as well as key to the Debtor's ability to consummate the Plan. The Commitment Agreements provide the Debtors, and other key stakeholders, with assurances that the Debtors will be able to successfully effectuate the Restructuring Transactions. Without the commitment to provide the First Lien Exit Facility, Credit Bid Purchaser would likely have had to source more expensive capital elsewhere at a greater cost to the Debtors' estates and stakeholders, assuming

such capital were available elsewhere, or if such capital were not available, the Debtors would be unable to sufficiently capitalize the reorganized business and consummate the distributions under the Plan. Furthermore, the Commitment Agreements ensure GS Bank's support for the Plan by providing that GS Bank will (i) support the Plan and not object to or support any other person or entity in objecting to or otherwise opposing the Plan, (ii) timely vote or cause to be voted the Allowed FLFO Claims in favor of the Plan, and (iii) not change or withdraw (or cause to direct to be changed or withdrawn) any such vote in favor of the Plan until the earlier of (x) the Termination Date (as defined in the Commitment Letter) or (y) the occurrence of any of the events listed on Annex D attached thereto.

30. Therefore, the Debtors submit that entry into the Commitment Agreements is in the best interest of the Debtors' estates and an appropriate exercise of business judgment.

**B. The Administration Fee, Expense Reimbursement, and Indemnification Obligations Should Be Approved**

31. In consideration of the commitments under the Commitment Agreements, the Commitment Agreements provide for the Debtors' incurrence and payment of the obligations thereunder, including the Administration Fee, the Expense Reimbursement and the Indemnification Obligations.

32. The Administration Fee, the Expense Reimbursement and the Indemnification Obligations are necessary inducements and reasonable compensation for GS Bank to enter into the Commitment Agreements, which will provide significant benefits to the Debtors' estates by, among other things, securing the commitment to provide the First lien Exit Facility. Given the substantial investment and commitment represented by the First Lien Exit Facility, the Debtors submit that the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are necessary to the successful implementation of the Plan and without these

protections, the Debtors have been advised that GS Bank would not have agreed to the commitments set forth in the Commitment Agreements. *See* Hanson Decl. ¶ 21.

33. Further, the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having a substantial committed investment in the Credit Bid Purchaser. Notably, the Administration Fee will be paid entirely by the Borrower, and imposes no cash costs on the Debtors.

34. The Debtors' investment banker compared the fully-negotiated Administration Fee, the Expense Reimbursement and the Indemnification Obligations to similar commitments and fees in other cases and determined they are market-based and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases. *See* Hanson Decl. ¶ 23. Accordingly, the Debtors submit that the Administration Fee, the Expense Reimbursement and the Indemnification Obligations, are reasonable and commensurate with the size and nature of the transaction.

35. Further, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Commitment Agreements is necessary for an expeditious path towards confirmation of the Plan, which after months of hard-fought negotiations, has the support of the Consenting Creditors and Apache and will ensure that the Credit Bid Purchaser is adequately capitalized. Accordingly, the Debtors believe that application of section 105(a) of the Bankruptcy Code forms a basis to grant the relief requested.

### Request for Relief Pursuant to Bankruptcy Rules 6004(h)

36. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). In order to provide immediate protection to the First Lien Term Lenders and GS Bank and preserve the benefits of the Commitment Agreements, the Debtors request that the Proposed Order be effective immediately upon entry and that the 14-day stay period under Bankruptcy Rules 6004(h) be waived.

### Notice

37. Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

### No Previous Request

38. No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

[*Remainder of page intentionally left blank*]

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: March 26, 2021
Houston, Texas

Respectfully submitted,

*/s/ Alfredo R. Pérez*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Matt.Barr@weil.com
          Jessica.Liou@weil.com

*Attorneys for Debtors
and Debtors in Possession*

**Certificate of Service**

      I hereby certify that, on March 26, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                                */s/ Alfredo R. Pérez*
                                                Alfredo R. Pérez