IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FIELDWOOD ENERGY LLC, *et al.*, | § | Case No. 20-33948 (MI) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

### DECLARATION OF JOHN-PAUL HANSON IN SUPPORT OF EMERGENCY MOTION OF DEBTORS FOR ORDER (I) APPROVING ENTRY INTO FIRST LIEN EXIT FACILITY COMMITMENT LETTER AND RELATED FEE LETTER, (II) AUTHORIZING INCURRENCE AND PAYMENT OF CERTAIN FEES AND COSTS IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

I, John-Paul Hanson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Houlihan Lokey Capital, Inc. ("**Houlihan**"), where I am Head of Houlihan's Oil and Gas Group, and am a senior banker in the firm's Financial Restructuring Group with respect to the oil and gas industry and sub-sectors. I am based out of Houlihan's Houston office located at 1001 Fannin St., Suite 4650, Houston, TX 77002. Houlihan is the investment banker for Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"). Houlihan and its senior professionals have extensive experience

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

1

with reorganizations and restructurings of distressed companies, both out-of-court and in chapter 11 proceedings.

2. I submit this declaration (the "**Declaration**") on behalf of Houlihan in support of the relief requested in the *Emergency Motion of Debtors for Order (I) Approving Entry into First Lien Exit Facility Commitment Letter and Related Fee Letter, (II) Authorizing Incurrence and Payment of Certain Fees and Costs in Connection Therewith, and (III) Granting Related Relief* (the "**Motion**").

3. Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Houlihan employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein. I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional retained as the Debtors' investment banker in these chapter 11 cases.

### Qualifications

4. I specialize in advising public and private oil and gas companies and their lenders and investors, including in the context of complex financial restructurings. Before joining Houlihan in 2001, I was a manager of alternative lending at Commonfund Mortgage Corp., where I structured whole loan and portfolio fundings, sales, and securitizations involving a variety of asset-backed lending transactions. Earlier in my career, I held a similar position at MoneyLine Lending. I began my career in finance, trading fixed income securities at NNJ, a private family

wealth fund formerly based in San Francisco, California. I have an M.B.A., with a concentration in Finance, from the University of Maryland's Robert H. Smith School of Business and a dual B.A. degree, *cum laude*, in Italian and International Finance from Brigham Young University. I am FINRA certified with Series 7 and 63 licenses.

5. I have extensive experience as an advisor in corporate restructurings, public and private debt and equity offerings, and mergers and acquisitions. I have advised many companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to offshore Gulf of Mexico businesses, including *ATP Oil & Gas Corp.*, *Bennu Oil & Gas, LLC*, *Energy XXI Ltd.*, *Cobalt International Energy, Inc.*, and Fieldwood Energy LLC's previous restructuring. In addition, I have advised numerous companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to onshore U.S. and international E&P companies, including *Berry Petroleum, LLC, Sandridge Energy, Inc., Sheridan Production Partners (I and II), PA Resources, Halcon Resources Corporation, BPZ Resources, Inc., Chesapeake Energy Corporation, All American Oil & Gas, Breitburn Energy Partners, Jones Energy Corporation,* and *Endeavour International Corporation*, among many others within the energy industry and a variety of other sectors. I have previously submitted declarations and/or affidavits and proffered testimony in multiple cases. I have authored, co-authored, and spoken on various topics, including Trends in Oil & Gas Finance, Capital and Valuation, and financing markets and valuation dynamics in a distressed environment, among others.

6. In March 2020, the Debtors retained Houlihan as their investment banker to assist with the Debtors' evaluation of strategic alternatives. Since that time, members of my team and I have worked closely with the Debtors' management and other professionals the Debtors

3

retained in these chapter 11 cases to analyze the Debtors' business affairs, assets and liabilities, financial position, contractual arrangements, and various proposed strategic transactions. I, and the Houlihan team, have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

## Background

7. Prior to and after the Petition Date, the Company, its advisors and my team at Houlihan engaged in discussions with the Company's creditor constituencies regarding the terms of a restructuring that would include a recapitalization of the Debtors' business.[2] After several months of negotiations, the parties to the Debtors' Restructuring Support Agreement, including the Consenting FLTL Lenders, agreed on the terms of a Plan that implements a credit bid transaction through which the Debtors' specified Deepwater Assets and Shelf Assets will be transferred to its Prepetition FLTL Lenders through a Credit Bid Transaction to a newly-formed entity (the "**Credit Bid Purchaser**") pursuant to that certain purchase and sale agreement among FWE, certain of its affiliates, NewCo, and the Credit Bid Purchaser (the "**Credit Bid Purchase Agreement**").[3]

8. The Company, Goldman Sachs Bank USA ("**GS Bank**"), the Prepetition FLFO Lenders and their respective professional advisors have negotiated that certain *Commitment Letter* (collectively with the Annexes thereto, and as may be amended from time to time in accordance therewith, the "**Commitment Letter**"), pursuant and subject to which GS Bank will (i) act as sole arranger, administrative agent, and collateral agent in connection with the First Lien

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Commitment Letter, the Fee Letter (each as defined herein) or the Debtors' joint chapter 11 plan [Docket No. 722] (the "**Plan**"), as applicable.

[3] The Plan provides that the Prepetition FLTL Lenders will receive their *pro rata* share of 100% of the new equity interests the ("**New Equity Interests**") in the indirect parent of the Credit Bid Purchaser ("**NewCo**").

4

Exit Facility, and (ii) commit to provide the full $118,599,082.31 principal amount of the First Lien Exit Facility, in each case, on the terms and subject to the conditions set forth in the Commitment Letter.[4]  Certain fees for the administration services GS Bank provides related to the First Lien Exit Facility are set forth in a separate fee letter entered into by the Company and GS Bank (as may be amended from time to time, the "**Fee Letter**" and together with the Commitment Letter, the "**Commitment Agreements**").  Copies of the Commitment Letter and the Fee Letter are annexed to the Motion as **Exhibit A** and **Exhibit B**, respectively.

9. I believe entry into and performance under the Commitment Agreements will maximize the value of the estates and is in the best interests of the Debtors.  The Commitment Letter and the Fee Letter are the result of extensive negotiations between the Debtors, GS Bank, the Prepetition FLFO Lenders and their respective professional advisors.  The benefits provided to the Debtors by GS Bank pursuant to the Commitment Agreements are commensurate with the Administration Fee, the Expense Reimbursement, and the Indemnification Obligations provided to GS Bank in exchange for their obligations under the Commitment Agreements.

### Terms of the Commitment Agreements

10. In exchange for the commitments and obligations set forth in the Commitment Agreements, subject to Court approval, the Company has agreed that, among other things: (i) a newly-formed Delaware limited liability company (the "**Borrower**"), which shall be wholly-owned, directly, by NewCo, shall pay GS Bank an administration fee in an amount per year equal to $50,000, payable in advance in quarterly installments, commencing on the Closing

---

[4] The Lenders under the First Lien Exit Facility will be the Prepetition FLFO Lenders and their successors and permitted assigns from time to time party to the First Lien Exit Facility Credit Agreement and, at the option of GS Bank, one or more other financial institutions selected by GS Bank and reasonably acceptable to the Borrower (collectively, the "**First Lien Exit Facility Lenders**").

5

Date (as defined in **Annex B** to the Commitment Letter), and on the last day of each full fiscal quarter ending thereafter for so long as the First Lien Exit Facility remains outstanding (the "**Administration Fee**"); (ii) the Company shall reimburse GS Bank for all reasonable and documented out-of-pocket fees and expenses (including but not limited to, the reasonable fees, disbursements and other charges of all legal counsel to GS Bank (limited to one primary counsel to GS Bank and, if reasonably necessary, of one local counsel in each relevant jurisdiction and one additional regulatory or other specialist counsel for each relevant area of expertise (in each case, which may be a single firm for multiple jurisdictions)) and examiners, search fees, due diligence expenses, transportation expenses, and appraisal, environmental, audit, and consultant costs and expenses) incurred in connection with the First Lien Exit Facility, a syndication thereof, the preparation of the definitive documentation therefor and the other transactions contemplated thereby, regardless of whether any of the transactions contemplated by the Commitment Agreements are consummated (the "**Expense Reimbursement**"); and (iii) the Company shall indemnify GS Bank under certain circumstances and subject to certain limitations as more fully set forth in **Annex A** to the Commitment Letter (the "**Indemnification Obligations**").

### Sound Business Reasons Support Entry Into the Commitment Letter and the Fee Letter

11.     I believe that sound business reasons exist to enter into the Commitment Letter and Fee Letter.  The Commitment Letter and Fee Letter are the culmination of extensive good-faith, arm's-length negotiations among the Debtors and their key economic stakeholders. The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the restructuring framework contemplated by the Plan and carefully considered their options for financing the Credit Bid Purchaser.

12. As a part of these restructuring negotiations, the Debtors, in consultation with the Prepetition FLFO Lenders, the Required DIP Lenders, the Consenting Creditors, and their respective advisors, thoroughly evaluated the potential funding needed on an aggregate basis to implement the Plan. The parties discussed possible sources for raising the additional capital required, whether from existing lenders or from third parties.

13. In addition to running the M&A sale process, my team and I contacted several potential capital providers outside the Company's existing lender group to determine if any viable and cost-effective options for exit financing would be available. These efforts included informal conversations with parties that had previously expressed some interest in providing financing for a debtor-in-possession facility or in purchasing the Deepwater Assets, as well as new parties that were given the opportunity to conduct diligence on the Company and its assets.

14. However, a combination of factors including the continuing challenges posed by the COVID-19 pandemic, the impact on demand for oil and resulting commodity prices, and the lack of available capital in the upstream exploration and production sector significantly limited the Company's options for obtaining exit financing.

15. Although Houlihan engaged in outreach efforts, no serious interest in providing exit financing emerged on reasonable terms and amount from any party outside the Company's existing lender group, let alone on terms competitive with those offered by the Debtors' existing lenders. Having fully explored their alternatives, the Company decided to move forward with the only commercially reasonable exit financing options available under the circumstances, and extensively negotiated the terms of the First Lien Exit Facility with GS Bank, the Prepetition FLFO Lenders and their respective advisors.

16. After the initial round of negotiations led to an agreement in principle on the business terms of the First Lien Exit Facility, and in order to ensure committed capital under the First Lien Exit Facility, the Company engaged in further negotiations with the Prepetition FLFO Lenders, and their advisors, which culminated in the Commitment Agreements, which, subject to the terms thereof, ensure the agreement on the $118,599,082.31 First Lien Exit Facility.

17. The Commitment Agreements and the First Lien Exit Facility were thoroughly negotiated to procure the best possible terms for the Company given the complexity and risks of the restructuring contemplated by the Plan and the operational and financial challenges faced by companies in the E&P sector. After reviewing and comparing the terms of exit facilities in similar restructurings with those provided in the Commitment Agreements, including the Administration Fee, Expense Reimbursement, and Indemnification Obligations, my team and I determined that the terms of the Commitment Agreements are consistent with market terms for companies facing similar circumstances as the Debtors, particularly in this environment and for companies operating in the upstream oil and gas industry.

18. As a result of these discussions with the advisors and counsel to the Prepetition FLFO Lenders, and my team's assessment of the availability of financing terms in the marketplace, the Debtors determined that it would be in the best interests of the Company and its stakeholders to enter into the Commitment Agreements, subject to this Court's approval.

19. The First Lien Exit Facility is a critical element of the Debtors' restructuring, as well as key to the Debtors' ability to consummate the Plan. The Commitment Agreements provide the Debtors and other key stakeholders with assurances that the Debtors will be able to successfully effectuate the Restructuring Transactions. Without the commitment to provide the First Lien Exit Facility, Credit Bid Purchaser would be forced to either (i) bear the risk

of having insufficient funding to capitalize its reorganized business and consummate the distributions under the Plan or (ii) procure additional capital elsewhere at a greater cost to the Debtors' estates and stakeholders (to the extent such capital is even available).  Furthermore, the Commitment Agreements ensure GS Bank's support for the Plan by providing that GS Bank will (i) support the Plan and not object to or support any other person or entity in objecting to or otherwise opposing the Plan, (ii) timely vote or cause to be voted the Allowed FLFO Claims in favor of the Plan, and (iii) not change or withdraw (or cause to direct to be changed or withdrawn) any such vote in favor of the Plan until the earlier of (x) the Termination Date (as defined in the Commitment Letter) or (y) the occurrence of any of the events listed on Annex D attached thereto.

20. Therefore, the Debtors submit that entry into the Commitment Agreements is in the best interest of the Debtors' estates and an appropriate exercise of business judgment.

### The Administration Fee, Expense Reimbursement, and Indemnification Obligations Should Be Approved

21. I believe the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are necessary inducements and reasonable compensation for GS Bank to enter into the Commitment Agreements, which will provide significant benefits to the Debtors' estates by, among other things, securing the commitment to provide the First Lien Exit Facility. Given the substantial investment and commitment represented by the First Lien Exit Facility, the Debtors submit that the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are necessary to the successful implementation of the Plan and without these protections, GS Bank would not have agreed to the commitments set forth in the Commitment Agreements.

22. Further, the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are reasonable in light of the magnitude of the Debtors' chapter 11

cases and the tangible benefit to the estates of having a substantial committed investment in the Credit Bid Purchaser. Notably, the Administration Fee will be paid entirely by the Borrower and imposes no cash costs on the Debtors.

23. My team and I compared the fully-negotiated Administration Fee, the Expense Reimbursement and the Indemnification Obligations to similar commitments and fees in other cases and determined they are market-based and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases. Accordingly, I believe that the Administration Fee, the Expense Reimbursement and the Indemnification Obligations are reasonable and commensurate with the size and nature of the transaction.

Dated: March 26, 2021

                                              */s/ John-Paul Hanson*
                                              John-Paul Hanson
                                              Managing Director
                                              Houlihan Lokey Capital, Inc.