Exhibit "A"

# BP EXHIBIT 2

## REDACTED

EXECUTION VERSION

PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

FOR

MISSISSIPPI CANYON BLOCK 562 (ISABELA)

AND

MISSISSIPPI CANYON 519 UNIT (MC 519 UNIT)

PRODUCTION HANDLING

AT THE MISSISSIPPI CANYON BLOCK 474 NA KIKA (HOST)

BY AND BETWEEN

BP EXPLORATION & PRODUCTION, INC.
(NA KIKA HOST OWNER)
AND

NOBLE ENERGY, INC.,
BP EXPLORATION & PRODUCTION, INC.,
RED WILLOW OFFSHORE, LLC AND
HOUSTON ENERGY DEEPWATER VENTURES I, LLC
("MC 519 UNIT PRODUCERS")

AND

NOBLE ENERGY, INC. AND
BP EXPLORATION & PRODUCTION, INC.
("ISABELA PRODUCERS")

AND

NOBLE ENERGY, INC., BP EXPLORATION & PRODUCTION, INC.,
RED WILLOW OFFSHORE, LLC AND
HOUSTON ENERGY DEEPWATER VENTURES I, LLC
("LSPS OWNERS")

EFFECTIVE SEPTEMBER 21, 2010

Execution Version


BP Exhibit 2
20-33948 (MI)

EXECUTION VERSION

# TABLE OF CONTENTS

Production Handling and Operating Services Agreement

**ARTICLE I – CONTRACT APPLICATION** ........................................................ 2

   1.1    APPLICATION IN GENERAL ........................................................... 2
   1.2    APPLICATION TO OTHER AGREEMENTS .................................... 3

**ARTICLE II – DEFINITIONS AND EXHIBITS** ................................................ 4

   2.1    PREFACE ............................................................................................ 4
   2.2    DEFINITIONS ..................................................................................... 5
   2.3    EXHIBITS ......................................................................................... 19

**ARTICLE III – INFRASTRUCTURE AND FACILITIES** ................................ 20

   3.1    SATELLITE WELL SYSTEM ........................................................... 20
   3.2    LOOP SUBSEA PRODUCTION SYSTEM ....................................... 21
   3.3    FACILITY ACCESS MODIFICATIONS ......................................... 22

**ARTICLE IV - SERVICES** ................................................................................. 25

   4.1    GENERAL ......................................................................................... 25
   4.2    WELL UNLOADING ........................................................................ 26
   4.3    PARTIES RESPONSIBILITIES ...................................................... 26
   4.4    USE OF PLATFORM/RISER SPACE ............................................. 26
   4.5    ENERGY SOURCES ........................................................................ 27
   4.6    COMMUNICATION EQUIPMENT ................................................ 27
   4.7    EMERGENCY RESPONSE ............................................................. 27

**ARTICLE V – FEES & EXPENSES** .................................................................. 28

   5.1    OPERATING AND MAINTENANCE EXPENSES ........................ 28
   5.2    FUEL, FLARE AND VENT GAS .................................................... 39
   5.3    INFRASTRUCTURE ACCESS AND HANDLING FEES ............. 39
   5.4    FUTURE GOVERNMENTAL REGULATIONS ............................ 43
   5.5    OWNER'S EXPENSE ...................................................................... 44
   5.6    HOST SHUT DOWN COMPENSATION ....................................... 44
   5.7    ROYALTIES AND TAXES .............................................................. 47
   5.8    THIRD PARTY CONTRACTORS ................................................. 47
   5.9    ALLOCATION FACTORS .............................................................. 47

**ARTICLE VI - CAPACITY** .............................................................................. 48

   6.1    HOST CAPACITY ........................................................................... 48
   6.2    SATELLITE LEASES CAPACITY ................................................ 48
   6.3    INTERRUPTIBLE CAPACITY ...................................................... 49
   6.4    PRODUCTION PRIORITIZATION ............................................... 49
   6.5    PRODUCTION COMPATIBILITY ................................................ 50

**ARTICLE VII – PROCEDURES AND PERMITTING** ...................................... 52

   7.1    METERING AND ALLOCATION PROCEDURES ........................ 52
   7.2    PERMITS .......................................................................................... 53
   7.3    COMMINGLING OF PRODUCTION ........................................... 53
   7.4    RE-ALLOCATIONS ........................................................................ 54
   7.5    OIL QUALITY BANK AND NGL BANK ...................................... 54
   7.6    LSPS LINE FILL .............................................................................. 54

EXECUTION VERSION

ARTICLE VIII – GATHERING AND TRANSPORTATION ..................................................... 54

| 8.1 | PRODUCT DISPOSITION | 54 |
| 8.2 | GAS IMBALANCES | 55 |
| 8.3 | PRODUCT TRANSPORTATION | 55 |
| 8.4 | PIPELINE PENALTIES | 55 |

ARTICLE IX – SUSPENSION OF OPERATIONS AND FORCE MAJEURE ....................... 56

| 9.1 | NOTICE | 56 |
| 9.2 | SUSPENSION OF OBLIGATION | 56 |
| 9.3 | RESOLUTION | 56 |
| 9.4 | SUSPENSION OF OPERATION | 57 |

ARTICLE X – TERM, DEFAULT, AND TERMINAITON ..................................................... 59

| 10.1 | TERM OF AGREEMENT | 59 |
| 10.2 | DEFAULT | 59 |
| 10.3 | TERMINATION BY OWNER | 60 |
| 10.4 | TERMINATION BY PRODUCERS | 61 |
| 10.5 | RESPONSIBILITIES AND OBLIGAITONS AT TERMINATION | 62 |

ARTICLE XI – LIABILITIES AND INDEMNIFICAITON ..................................................... 64

| 11.1 | LIABILITIES | 64 |
| 11.2 | INDEMNIFICATION WITH RESPECT TO WARRANTY OF TITLE | 68 |
| 11.3 | WAIVER OF CONSEQUENTIAL DAMAGES | 69 |
| 11.4 | INDIVIDUAL OBLIGATIONS | 69 |
| 11.5 | GROSS NEGLIGENCE/WILLFUL MISCONDUCT | 70 |

ARTICLE XII – INSURANCE AND BONDS ............................................................................. 70

| 12.1 | INSURANCE | 70 |
| 12.2 | BONDS | 70 |

ARTICLE XIII – SUCCESSORS AND ASSIGNS ..................................................................... 71

| 13.1 | SUCCESSORS AND ASSIGNS | 71 |
| 13.2 | ASSIGNMENT | 71 |

ARTICLE XIV - NOTICES ........................................................................................................ 72

| 14.1 | GIVING AND RESPONDING TO NOTICES | 72 |
| 14.2 | CONTENT OF NOTICE | 76 |

ARTICLE XV - ADMINISTRATIVE AND MISCELLANEOUS ........................................... 76

| 15.1 | INFRASTRUCTURE DISCLAIMER | 76 |
| 15.2 | DISCLAIMER OF WARRANTIES | 76 |
| 15.3 | HOST ACCESS & BOARDING | 77 |
| 15.4 | REPRESENTATIONS AND WARRANTIES | 78 |
| 15.5 | WARRANTY OF TITLE | 79 |
| 15.6 | STANDARD OF PERFORMANCE | 79 |
| 15.7 | PRODUCERS' EMPLOYEES, CONSULTANTS, AND CONTRACTORS | 79 |
| 15.8 | HOST OPERATOR'S EMPLOYEES, CONSULTANTS, AND CONTRACTORS | 79 |
| 15.9 | FURTHER ASSURANCES | 80 |
| 15.10 | NON-COMPLIANCE CITATIONS | 80 |
| 15.11 | DISPUTE RESOLUTION | 80 |
| 15.12 | WAIVERS | 80 |
| 15.13 | REMEDIES | 81 |
| 15.14 | NO THIRD PARTY BENEFICIARIES | 81 |
| 15.15 | CONFIDENTIALITY PROVISIONS | 81 |

EXECUTION VERSION

15.16    COMMITMENT OF OIL AND GAS RESERVES................................................................82
15.17    COMPLIANCE WITH LAWS AND REGULATIONS............................................83
15.18    CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT ..............85
15.19    INTEGRATED AND ENTIRE AGREEMENT ...........................................................86
15.20    AMENDMENT AND MODIFICATION......................................................................86
15.21    SURVIVABILITY...........................................................................................................86
15.22    EXISTING AGREEMENTS............................................................................................87

ARTICLE XVI - EXECUTION ....................................................................................................87

16.1    EFFECT.............................................................................................................................87
16.2    COUNTERPARTS.............................................................................................................87

# PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

## PREAMBLE

This **PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT** together with its attached Exhibits (**"Agreement"**) effective as of September 21, 2010, (**"Effective Date"**) is entered into by and between BP EXPLORATION & PRODUCTION, INC. (**"BP"**), hereinafter referred to as the **"Owner"**, in its capacity as a co-owner of the **"Host"** (as defined herein below), and BP; NOBLE ENERGY, INC. (**"Noble"**); RED WILLOW OFFSHORE, LLC (**"Red Willow"**); and HOUSTON ENERGY DEEPWATER VENTURES I, LLC (**"HEDV"**), hereinafter referred to collectively as the **"Producers"**, in their respective capacity as co-owners of each of the **"Satellite Leases"** (as defined herein below); and BP, Noble, Red Willow, and HEDV, hereinafter referred to collectively as the **"LSPS Owners"** in their capacity as co-owners of the **"Loop Subsea Production System"** or **"LSPS"** (as defined herein below). Each signatory hereto is sometimes referred to singularly as a **"Party"** or collectively as the **"Parties"**.

## WITNESSETH:

**WHEREAS**, BP and Noble are the co-owners of the Isabela Lease; and

**WHEREAS**, BP, Noble, Red Willow and HEDV are the co-owners of the MC-519 Unit Leases; and

**WHEREAS**, the LSPS Owners are the co-owners of the **"Loop Subsea Production System"** or **"LSPS"**; and

**WHEREAS**, the Satellite Leases and the **"Satellite Well System"** (as defined herein below) are operated by the **"Satellite Operators"** (as defined herein below); and

**WHEREAS**, the **"Loop Subsea Production System"** or **"LSPS"** (as defined herein below) is operated by the **"LSPS Operator"** (as defined herein below); and

**WHEREAS**, the Owner is a co-owner of the **"Host Leases"** (as defined herein below) and the Host; and

Execution Version                                1

1   **WHEREAS**, the Host Leases and the Host are operated by the **"Host Operator"**
2   (as defined herein below); and

3   **WHEREAS**, the Producers desire to deliver **"Satellite Production"** (as defined
4   herein below) to the Host at the **"Entry Point(s)"** (as defined herein below) via the
5   **"LSPS"**; and

6   **WHEREAS**, the Producers desire to utilize the Host for the processing and
7   handling of Satellite Production so as to deliver Oil and Gas allocated to the Satellite
8   Leases to the **"Delivery Point(s)"** (as defined herein below); and

9   **WHEREAS**, the Producers desire that the Owner (i) connect the **"Satellite
10  System"** to the Host and (ii) install control, monitoring and maintenance equipment
11  associated with the **"Satellite System"** on the Host; and

12  **WHEREAS**, the Owner and Host Operator are willing to accommodate these
13  desires and requests under the terms and conditions set forth below.

14  **NOW, THEREFORE**, in consideration of the premises, the mutual covenants
15  and agreements contained herein, and other good and valuable consideration, the receipt
16  and sufficiency of which are hereby acknowledged, the Parties agree as follows:

17
18
19  ## ARTICLE I - CONTRACT APPLICATION
20
21  **1.1    Application in General**

22  This Agreement governs and applies to the rights and obligations of the Parties
23  relating, without limitation, to the (i) connection of the Satellite System to the
24  Host, (ii) installation of Facility Access Modifications on the Host, (iii)
25  processing and handling on the Host of Satellite Production delivered to the Entry
26  Point(s) via the LSPS, (iv) the delivery by the Owner to the Producers at the
27  Delivery Point of Oil and Gas allocated to the Satellite Leases, (v) Production
28  Handling Services by the Owner as set forth in Section 4.1.1 (*Production
29  Handling Services*) of this Agreement and (vi) Operating Services by the Owner
30  as described in Section 4.1.2 (*Operating Services for LSPS*) of this Agreement
31  and Section 4.1.3 (*Operating Service for Satellite Well System*) of this Agreement.
32  Conversely, this Agreement does not apply to the processing and handling of
33  **"Third Party Production"** (as defined herein below) on the Host or to the
34  operation of a Third Party Production system connected to the LSPS and/or the
35  Host. Accordingly, the Producers and/or the LSPS Owners do not have the right
36  to sublease all or part of their rights hereunder except as set forth in Article XIII

(*Successors and Assigns*) of this Agreement; and therefore, the Producers and/or the LSPS Owners, either individually or jointly, are prohibited from becoming and do not hold the right to become a sublessor for all or any portion of their rights hereunder. ***Notwithstanding anything to the contrary herein, the rights, duties, and obligations of the Parties under this Agreement shall be subject and subordinate to the Na Kika Obligations (as defined herein below), however, nothing in this Agreement shall be construed as Noble, Red Willow or HEDV contractually assuming the Na Kika Obligations.*** Owner, in its capacity as co-owner of the Host, will endeavor to secure approval from Shell Offshore Inc. to share copies of the redacted Na Kika Obligations with Producers for informational purposes only. Owner will endeavor to ensure that subsequent modifications to the Na Kika Obligations will not materially adversely impact the Parties rights under this Agreement, to the extent possible.

**1.2    Application to Other Agreements**

**1.2.1**   Except for the Operating Services with respect to the LSPS described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("**LSPSOA**") being negotiated by and among the LSPS Owners shall govern the rights, duties and obligations among the LSPS Owners associated with: (i) the building and operation of the LSPS; and (ii) the decision-making process among the LSPS Owners related to this Agreement

**1.2.2**   Except for the Operating Services with respect to the Isabela Lease described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the Isabela Joint Operating Agreement ("**Isabela JOA**") attached as Exhibit "L" to this Agreement and effective as of April 2, 2007 by and between BP and Noble as the owners of the Isabela Lease  shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the Isabela Lease; (ii) those portions of the Satellite Well System located on the Isabela Lease; and (iii) the decision-making process between the owners of the Isabela Lease related to this Agreement.

**1.2.3**   Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of the MC 519 Unit Operating Agreement ("**MC 519 UOA**") effective as of January 1, 2009 by and between the BP, Noble, Red Willow and HEDV as the owners of the MC 519 Unit Leases shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on the MC 519 Unit Leases; and (iii) the decision-making process between the owners of the MC 519 Unit Leases related to this Agreement.

**1.2.4**  It is not the intention of the Parties to amend or otherwise modify the terms and conditions of the LSPSOA, the Isabela JOA or the MC 519 UOA, except where expressly stated herein.

**1.2.5**  Except for the Operating Services agreed to be performed by the Host Operator hereunder, it is not the intent or purpose of this Agreement, nor should it be construed as expanding or reducing, the rights and duties of any of the Parties to conduct operations associated with: (i) the LSPS pursuant to the LSPSOA; (ii) the Isabela Lease pursuant to the Isabela JOA; or (iii) the MC 519 Unit Leases pursuant to the MC 519 UOA. As between the parties to such agreements, the provisions of those agreements shall continue to govern the authority delegated to the operators under those agreements and the approval of any operations or authority for expenditures required by the terms of those agreements.

**1.2.6**  In the event of a conflict between the terms of this Agreement and the terms of the Isabela JOA, the MC 519 UOA or the LSPSOA relative to the Producers' and LSPS Owners' utilization of the Host and the Services and related activities that are described in this Agreement, the terms of this Agreement shall prevail over the terms of such agreements.

**1.2.7**  Notwithstanding anything to the contrary in this Agreement, it is the intent of the Parties hereto that if any of the Producers are liable to the Owner or Host Operator for overhead on a cost or an expenditure incurred under the terms of this Agreement, then such Producers shall not be liable for overhead on such cost or expenditure under the terms of the LSPSOA, the Isabela JOA or the MC 519 UOA.

**1.2.8**  Except as otherwise expressly provided for in this Agreement, it is the intent of the Parties hereto that all costs and expenses charged by the Owner or the Host Operator  under this Agreement will be charged to the respective Satellite Operator or the LSPS Operator. Subsequently, the respective Satellite Operator shall charge such costs and expenses (without the application of overhead) to the respective Producer, and the LSPS Operator shall charge such costs and expenses (without the application of overhead) to the respective LSPS Owner.

## ARTICLE II - DEFINITIONS AND EXHIBITS

**2.1**  **Preface**

As used in this Agreement (or in the Exhibits attached hereto), the terms **"Agreement"**, **"Effective Date"**, **"Owner"**, **"Parties"**, **"Party"**, **"LSPS Owners"** and **"Producers"** have the meanings set forth hereinabove.  Other capitalized

terms used throughout this Agreement (or in the Exhibits attached hereto) and not listed in Section 2.2 (*Definitions*) of this Agreement have the meanings ascribed to them elsewhere in this Agreement (or in the Exhibits attached hereto).

## 2.2   Definitions

The following capitalized terms have the meanings ascribed to them.

2.2.1   "**Abandonment Notice**" has the meaning ascribed to it in Section 10.5.4(a) (*Responsibilities and Obligations at Termination*) of this Agreement.

2.2.2   "**Adjusted Isabela Capacity**" means Isabela Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Isabela Lease after December 31, 2014, all as further described in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.3   "**Adjusted MC 519 Unit Capacity**" means MC 519 Unit Capacity for each (a) oil, (b) gas, and (c) water, which is available to the MC 519 Unit Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.4   "**Adjusted Satellite Capacity**" means Satellite Capacity for each (a) oil, (b) gas, and (c) water, which is available to the Satellite Leases after December 31, 2014 all as further described in Article 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.5   "**Affiliate**" means any corporation, limited liability company or partnership (including a limited partnership) or other entity owned or controlled by a Party.  The term "**Affiliate**" of a Party includes any parent corporation(s), partnership or other entity that directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock (or other interests) having the right to vote for directors of a Party, and also includes any other corporation, partnership or other entity in which the parent corporation(s) directly or indirectly owns or controls fifty percent (50%) or more of the voting stock (or other interests) in the other corporation.

- Ownership or control by a Party is deemed to exist if a Party directly or indirectly owns or controls fifty percent (50%) or more of the outstanding stock of the corporation having the right to vote for directors of the corporation [or fifty percent (50%) or more of the interests in the partnership or other entity].

- The stock (or interests in a partnership or other entity) owned or controlled by a Party includes all stock (or other interests) directly or indirectly owned or controlled by any other corporation, partnership or other entity owned or controlled by a Party.

**2.2.6** "**Barrel**" or "**Bbl**" means forty-two (42) United States standard gallons at standard conditions of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia) at sea level at sixty degrees Fahrenheit (60°F).

**2.2.7** "**British Thermal Unit**" or "**Btu**" means the quantity of heat required to raise the temperature of one (1) pound in weight of pure water one degree Fahrenheit (1°F) from fifty-eight and five-tenths degrees (58.5°) Fahrenheit to fifty-nine and five-tenths degrees (59.5°) Fahrenheit at a constant pressure of fourteen and seventy-three hundredths pounds per square inch absolute (14.73 psia at sea level) and determined on a gross, dry basis.

**2.2.8** "**Business Day**" means a period of twenty-four (24) consecutive hours exclusive of Saturdays, Sundays and legal holidays.

**2.2.9** "**BOEMRE**" means the United States Department of the Interior, Bureau of Ocean Energy Management, Regulation and Enforcement or any successor thereof with jurisdictional authority over the matters governed by this Agreement.

**2.2.10** "**Capital Expenditure**" means any expenditure, except for those made in connection with repair operations that are intended to put or return the Host to its normal use conditions, that: (a) extends the useful life of the Host as it then exists (or any material portion thereof) beyond one (1) year; or (b) that materially enhances the useful life of the Host as it then exists (or any material portion thereof).

**2.2.11** "**Claim/Loss**" and "**Claims/Losses**" shall mean all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage, regardless of how such claims and/or losses may be characterized. Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, demands, suits, causes of action (including actions in rem or in personam, at law or in equity), obligations, judgments, interest, costs, expenses, fines, penalties, losses, assessments, judgments and awards whether created by law, equity, contract, tort, arbitration, voluntary

settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity, the unseaworthiness of any vessel, the unairworthiness of any aircraft or any condition or pre-existing condition (whether known or unknown). The terms also include reasonable attorneys' fees, court costs, and other reasonable costs of litigation resulting from the defense of any Claim/Loss or cause of action within the scope of the indemnities in this Agreement.

2.2.12  "**Confidential Information**" means (i) the terms and conditions of this Agreement, (ii) the production profiles provided by Satellite Operator or their representatives pursuant to this Agreement, (iii) the measurement and allocation reports and data (including, without limitation, data associated with production quality), and (iv) the well test data.

2.2.13  "**Connected With**" shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to."   For avoidance of doubt, the indemnities in this Agreement are intended to be broad and cover all Claims/Losses in any way connected to the performance of the Agreement, including any Claims/Losses associated with any presence on any premises, and including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the Host.

2.2.14  "**COPAS**" means the Council of Petroleum Accountants Societies Inc.

2.2.15  "**COPAS Adjustment**" means the adjustment factor provided by Model Form Interpretation 50 "Overhead Adjustment Index ("**MFI-50**")" which is effective April 1st of each calendar year, as published by COPAS or any replacement overhead adjustment guideline document published by COPAS.

2.2.16  "**Day**" means a period of twenty-four (24) consecutive hours, beginning at 12:00 a.m. central time.

2.2.17  "**Default**" has the meaning ascribed to it in Section 10.2 (*Default*) of this Agreement.

2.2.18  "**Defend**" or "**Defense**" shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a

result of defending against a Claim/Loss as required by this Agreement, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Agreement.

**2.2.19**   "**Deferred Host Leases Gas Production**" or "**DGPC**" shall have the meaning ascribed to it in Section 5.6.2(b) *(Compensation Methodology)* of this Agreement.

**2.2.20**   "**Deferred Host Leases Oil Production**" or "**DOPC**" shall have the meaning ascribed to it in Section 5.6.2(a) *(Compensation Methodology)* of this Agreement.

**2.2.21**   "**Delivery Point(s)**" means:

(a)   for Gas, the point  where the Gas departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

(b)   for Oil, the point where the Oil departs the Host as set forth on Exhibit "A-1" *(Delivery Point)* to this Agreement.

**2.2.22**   "**Dollar**" and "**$**" means the lawful currency of the United States of America.

**2.2.23**   "**Entry Point(s)**" means the point(s) at the outlet flange of the connection between the LSPS and the Host where Satellite Production enters the Host as set forth on Exhibit "A-2" *(Entry Point)* to this Agreement.

**2.2.24**   "**Environmental Protection Agency**" or "**EPA**" shall have the meaning ascribed to it in Section 5.4.2 *(Future Governmental Regulations)* of this Agreement.

**2.2.25**   The phrases "**even if caused by the Negligence/Fault**" or "**even if contributed to by the joint or concurrent Negligence/Fault**" shall, except to the extent expressly otherwise provided for in this Agreement, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply:

(a)   without regard to any conflicting rules of liability under any applicable law or regulation;

(b) without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention; and

(c) without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases **"even if caused by the Negligence/Fault"** or **"even if contributed to by the joint or concurrent Negligence/Fault"** shall not apply to or include the gross negligence or willful misconduct of any member of the Owner's Group, Host Operator, or any member of the Satellite Group, whichever is seeking indemnity.

2.2.26 **"Expense Category"** has the meaning ascribed to it in Section 5.1.3(b)(ii) *(General Principle for Costs Charging)* of this Agreement.

2.2.27 **"Expense Type"** has the meaning ascribed to it in Section 5.1.3(b)(i) *(General Principle for Costs Charging)* of this Agreement.

2.2.28 **"Facility Access Modifications"** has the meaning ascribed to it in Section 3.3.1 *(Facility Access Modifications)* of this Agreement.

2.2.29 **"Facility Access Modifications Dedicated System"** has the meaning ascribed to it in Section 5.1.3(b)(ii)(c) *(General Principle for Costs Charging)* of this Agreement

2.2.30 **"Force Majeure"** means events which are beyond the reasonable control of the Party claiming suspension and which, by the exercise of due diligence, such Party would not have been able to avoid or overcome, and only if such events materially affects a Party's ability to perform its obligations hereunder, including but not limited to:

(a) flood, storm, loop current, eddy, hurricane, earthquake, adverse weather conditions, high sea states, or other acts of God;

(b)    fire, explosion, loss of well control, oil spill, or other environmental catastrophe, natural or man made;

(c)    war, terrorist actions, actions of the public enemy, blockade, insurrection, civil disturbance, labor dispute, strike, lockout, or other industrial disturbance, compliance with any law, order rule, or regulation, governmental action or delay including the inability to secure permits or permit approvals as needed;

(d)    inability to secure materials or equipment; or

(e)    any other causes (other than a cause arising under a contract with a Third Party), whether similar or dissimilar.

2.2.31    "Galapagos Area Loop Subsea Production System Construction and Operating Agreement" or "LSPSOA" has the meaning ascribed to it in Section 1.2.1 (*Application of Other Agreements*) of this Agreement.

2.2.32    "Gas" or "gas" means any mixture of gaseous hydrocarbons, consisting of methane and heavier liquefiable hydrocarbons and inert and noncombustible gases which are extracted from the subsurface of the earth, including any condensate recovered on the Host and re-injected in a downstream pipeline.

2.2.33    "Gas Export Pipeline" means the gas export pipeline that transports Gas from the Gas Delivery point (currently owned and operated by the Okeanos Gas Gathering Company, LLC) which originates at the Host, and terminates at the connection to Main Pass Block 260.

2.2.34    "Gas Production" means the Gas and associated substances produced from the Host Leases, both or each of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.35    "Gas System Host Dedicated Facility" has the meaning ascribed to it in Section 5.1.4(d) (*Cost Charging Procedure*) of this Agreement.

2.2.36    "Handling Fee" or "HF" has the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

2.2.37    "Host" means all equipment and facilities located between the Entry Point(s) and the Delivery Point, including the offshore semi-

submersible floating platform located on Mississippi Canyon Block 474, and the Facility Access Modifications, but excluding the LSPS and the Satellite Well System.

2.2.38    **"Host Capacity"** means the capacity available as stated for (a) Oil, (b) Gas and (c) water produced as a component of hydrocarbon production, all as further described in Exhibit "B" (*Host Capacity*) to this Agreement.

2.2.39    **"Host Common Facilities"** has the meaning ascribed to it in Section 5.1.3(b)(ii)(e) (*General Principles for Costs Charging*) of this Agreement.

2.2.40    **"Host Dedicated Facility"** has the meaning ascribed to it in Section 5.1.3(b)(ii)(d) (*General Principles for Costs Charging*) of this Agreement.

2.2.41    **"Host Gas Production"** means Gas attributable to Host Production.

2.2.42    **"Host Leases"** means the oil and gas leases that are governed by the Na Kika JOA, as such may be amended from time to time, including but not limited to OCS-G 07937, OCS-G 07938, OCS-G 07944, OCS-G 09808, OCS-G 09821, OCS-G 08823, OCS-G 08831, OCS-G 09837 and, OCS-G 09838 covering and affecting Mississippi Canyon Blocks 383, 385, 429, 430, 520, 522, 566, 607, and 608, respectively, in the Gulf of Mexico.

2.2.43    **"Host Leases Production"** means Oil, Gas, water, and associated substances produced from the Host Leases and processed and handled on the Host.

2.2.44    **"Host Measurement and Allocation Procedures"** or **"Host M&A"** means the measurement and allocation procedures and/or methodologies implemented by the Host Operator for the allocation of production to all inlet sources on the Host, as may be amended from time to time.

2.2.45    **"Host Oil Production"** means Oil attributable to Host Production.

2.2.46    **"Host Operator"** means the operator of the Host named pursuant to the Na Kika Obligations, currently BP or its successors or assigns.

**2.2.47**    "**Host Production**" means all Oil, Gas, water, and associated substances processed and handled on the Host.

**2.2.48**    [**Intentionally omitted.**]

**2.2.49**    "**Indemnify**" or "**Indemnification**" shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless."

**2.2.50**    "**Indemnitee**" shall refer to the Person seeking indemnity (or release) under this Agreement.

**2.2.51**    "**Indemnitor**" shall refer to the Party against whom indemnity (or release) is sought under this Agreement.

**2.2.52**    "**Infrastructure Access Fee**" or "**IAF**" shall have the meaning ascribed to it in Section 5.3 (*Infrastructure Access and Handling Fees*) of this Agreement.

**2.2.53**    "**Isabela Capacity**" means 20 MBO/d (gross), 20 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of Isabela Production. Isabela Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

**2.2.54**    "**Isabela First Production**" means the date of the initial introduction of Isabela Production at the Entry Point(s).

**2.2.55**    "**Isabela JOA**" has the meaning ascribed to it in Section 1.2.2 (*Application to Other Agreements*) of this Agreement.

**2.2.56**    "**Isabela Lease**" means the oil and gas lease OCS-G 19966 covering and affecting Mississippi Canyon Block 562 in the Gulf of Mexico.

**2.2.57**    "**Isabela Operator**" means the operator as designated under the terms of the Isabela JOA.

**2.2.58**    "**Isabela Production**" means Oil, Gas and water produced from the Isabela Lease.

**2.2.59** "Latest Fully Allocated Production Month" means the last production month that was reported by a Satellite Lease Operator to the BOEMRE on the Oil & Gas Operations Report (OGOR) Form MMS-4054, or its replacement form as designated by the BOEMRE or its successor agency with jurisdictional control over such matters. For example, February calendar month production is reported to the BOEMRE on the OGOR during the calendar month of April.

**2.2.60** "Laws" means any laws, rules and regulations of the United States of America or any duly constituted instrumentality thereof and all other governmental bodies, agencies and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended, enacted, promulgated or issued.

**2.2.61** "LEB" means one (1) liquid equivalent Barrel determined by treating as one (1) LEB each: one (1) Barrel of Oil, one (1) Barrel of water, or five and eight tenths (5.8) MSCF of Gas.

**2.2.62** "Loop Subsea Production System" or "LSPS" has the meaning ascribed to it in Section 3.2 (*Loop Subsea Production System*) of this Agreement.

**2.2.63** "LSPS Direct Expense" has the meaning ascribed to it in Section 5.1.3(b)(ii)(b) (*General Principles for Costs Charging*) of this Agreement.

**2.2.64** "LSPS Operator" means that Person designated as operator under the terms and provisions of the LSPSOA between the LSPS Owners governing the LSPS or any successor LSPS Operator selected pursuant to the provisions of the LSPSOA. As of the Effective Date the LSPS Operator is BP.

**2.2.65** "LSPS Owners" has the meaning ascribed to it in the preamble of this Agreement.

**2.2.66** "LSPS Owners Group" means the following entities and Persons individually and collectively: each of the LSPS Owners and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

2.2.67     "**LSPSOA**" has the meaning ascribed to it in Section 1.2.1 (*Application to Other Agreements*) of this Agreement.

2.2.68     "**MBO/d**" means one thousand (1,000) Barrels of Oil per Day.

2.2.69     "**MBtu**" means one thousand (1,000) Btu's.

2.2.70     "**MBW/d**" means one thousand (1,000) Barrels of water per Day.

2.2.71     "**MC 519 Unit**" means the unit formed by that certain Unit Agreement for Outer Continental Shelf Exploration, Development and Production Operations dated effective January 1, 2009 by and between Noble, Red Willow, HEDV, bearing Contract Number 754309001.

2.2.72     "**MC 519 Unit First Production**" means the date of the initial introduction of MC 519 Unit Production at the Entry Point(s).

2.2.73     "**MC 519 Unit Capacity**" means 20 MBO/d (gross), 50 MMSCF/d (gross), and 7.5 MBW/d (gross) of processing and handling capacity through the Host that is available for the processing and handling of MC 519 Unit Production. MC 519 Unit Capacity is subject to priorities (and reduction) as defined in Section 6.4 (*Production Prioritization*) of this Agreement. MC 519 Unit Capacity is subject to capacity re-determination as established in Section 6.2.2 (*Adjusted Satellite Capacity*) of this Agreement.

2.2.74     "**MC 519 Unit Leases**" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519; and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico, insofar and only insofar as such leases cover depths below fifteen thousand (15,000) feet TVD.

2.2.75     "**MC 519 Unit Operating Agreement**" or "**MC 519 UOA**" has the meaning ascribed to it in Section 1.2.3 (*Application of Other Agreements*) of this Agreement.

2.2.76     "**MC 519 Unit Operator**" means the operator as designated under the terms of the MC 519 UOA.

2.2.77     "**MC 519 Unit Production**" means the Oil, Gas and water produced from MC 519 Unit Leases.

**2.2.78**  "**MFI-50**" has the meaning ascribed to it in Section 2.2.14 (*COPAS Adjustment*) of this Agreement.

**2.2.79**  "**Minimum Monthly Fee**" has the meaning ascribed to it in Section 5.3.5(a) (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6(a) (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement.

**2.2.80**  "**MMBtu**" means one million (1,000,000) Btu's.

**2.2.81**  "**MMSCF**" means one million (1,000,000) "**Standard Cubic Feet**" (as defined herein below).

**2.2.82**  "**MMSCF/d**" means one million (1,000,000) Standard Cubic Feet per Day.

**2.2.83**  "**MSCF**" means one thousand (1,000) Standard Cubic Feet.

**2.2.84**  "**MSCF/d**" means one thousand (1,000) Standard Cubic Feet per Day.

**2.2.85**  "**Na Kika HUA**" means that certain Guiding Principles for a Na Kika Host Utilization Agreement dated May 17th, 2004, as amended, expanded or replaced, from time to time.

**2.2.86**  "**Na Kika JOA**" means that certain Na Kika Complex Joint Operating Agreement dated April 30, 1998 including addendum(s), as amended from time to time (including adding additional leases). As of the Effective Date the parties to the Na Kika JOA are Shell Offshore Inc. and BP.

**2.2.87**  "**Na Kika Obligations**" means all rights, duties and obligations (existing or future) between Shell Offshore Inc. and BP (or their respective successors or assigns) related to, or in connection with, the Host, including without limitation the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement (including exhibits), and any gas balancing procedures, oil quality bank, and/or natural gas liquids bank, which might be implemented by the Host owners.

**2.2.88**  "**Negligence/Fault**" shall mean and include, except to the extent expressly otherwise provided, negligence, strict liability, other premises liability, unseaworthiness, unairworthiness, liability for defective equipment, and breach of statutory duty, whether or not resulting from preexisting conditions, and, except to the extent

expressly otherwise provided, whether or not such Negligence/Fault is sole, direct, indirect, contributory, concurrent, joint, comparative, active, or passive.

2.2.89  "NGL" means natural gas liquid(s).

2.2.90  "Non-Conforming Production" has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

2.2.91  "Non-Performing Party" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.92  "Non-Satellite Production" means Oil, Gas, water, and all associated substances produced from sources other than the Satellite Leases and processed and handled on the Host.

2.2.93  "Notice Period" has the meaning ascribed to it in Section 10.2.1(*Default*) of this Agreement.

2.2.94  "OEB" means one (1) oil equivalent Barrel determined by treating as one (1) OEB each: one (1) Barrel of Oil or five and eight tenths (5.8) MSCF of Gas.

2.2.95  "Oil" or "oil" means any mixture of hydrocarbons, regardless of gravity, originally and naturally occurring as liquids and includes all condensate, distillate, and other liquid hydrocarbons recovered by use of conventional separators on the Host.

2.2.96  "Oil Export Pipeline" means the oil export pipeline known as Na Kika Oil Pipeline, which originates at the Host and terminates at a connection to the Delta Pipeline System at MP 69P that transports Oil from the Oil Delivery Point.

2.2.97  "Oil Production" means Oil and associated substances produced from the Host Leases, both or either of the Satellite Leases or Third Party Leases, whichever is applicable.

2.2.98  "Operating Services" means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.99  "Owner" has the meaning ascribed to it in the preamble of this Agreement.

**2.2.100** "Owner's Group" means the following entities and Persons individually and collectively: Owner and it's respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

**2.2.101** [Intentionally Omitted]

**2.2.102** "Permanent Cessation of Production" means the event which occurs when production has not been restored from the last producing well on the     Isabela Lease or the MC 519 Unit Leases in accordance with 30 CFR Part 250 of the federal regulations concerning suspensions of production or other operations or such other regulations promulgated by the relevant governing authority.

**2.2.103** "Person" means any individual or entity, including, without limitation, any corporation, limited liability company, joint venture, joint stock company, general or limited partnership, trust, agency, association, organization, governmental authority, or other entity.

**2.2.104** "Prevailing Gas Price" means the arithmetic average of the high price and the low price, for the pertinent month, of the Destin Pipeline Company L.L.C one hundred percent (100%) index price used for pipeline imbalance settlements, or such other published monthly index price defined in the Na Kika Obligations.

**2.2.105** "Prevailing Oil Price" means the arithmetic average of the high price and the low price on a day posted in the publication known as Argus Crude, as published by Argus Media, Inc. under the heading HLS ("Heavy Louisiana Sweet") or such other published index defined in the Na Kika Obligations.

**2.2.106** "Prior Twelve Months Allocated Production" means the twelve (12) prior calendar months of allocated production prior to the Host Operator's approval of the expenditure. If there are less than twelve (12) months of fully allocated production, the allocation volumes from inception of production will be utilized, plus a value of zero given to months with no production. Once the relative throughput is determined for an expenditure, the allocation percentages assigned to the leases / fields will not change for that expenditure.

2.2.107 **"Producers"** has the meaning ascribed to it in the preamble of this Agreement.

2.2.108 **"Producers' Group"** means the following entities and Persons individually and collectively: each of the Producers and their respective parent, subsidiaries and Affiliates (including any after acquired companies), co-lessees, co-owners, partners or joint venturers, other contractors, sub-contractors and vendors of any tier and their respective officers, directors, shareholders, employees, agents, invitees and representatives of all those entities.

2.2.109 [Intentionally Omitted.]

2.2.110 **"Production Handling Services"** means those services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

2.2.111 **"Reduced Satellite Fields Capacity"** has the meaning ascribed to it in Section 6.4 (*Production Prioritization*) of this Agreement.

2.2.112 **"Satellite Capacity"** means Isabela Capacity and MC 519 Unit Capacity combined.

2.2.113 **"Satellite Field Start Up Agreement"** means that certain Satellite Field Start-Up Agreement between BP and Shell Offshore Inc. dated May 17, 2004 as amended, expanded or replaced from time to time.

2.2.114 **"Satellite First Production"** means the date of the initial introduction of Satellite Production at the Entry Point(s).

2.2.115 **"Satellite Gas Production"** means Gas attributable to Satellite Production.

2.2.116 **[Intentionally Omitted]**

2.2.117 **"Satellite Leases"** means the Isabela Lease and/or the MC 519 Unit Leases.

2.2.118 **"Satellite Lease Direct Expense"** has the meaning ascribed to it in Section 5.1.3(b)(ii)(a) (*General Principles for Costs Charging*) of this Agreement.

2.2.119 **"Satellite Oil Production"** means Oil attributable to Satellite Production.

**2.2.120**   "**Satellite Operating Problem**" has the meaning ascribed to it in Section 6.5.2 (*Non-Conforming Satellite Production*) of this Agreement.

**2.2.121**   "**Satellite Operator(s)**" means the operator of the Isabela Lease and the operator of the MC 519 Unit Leases or any successors thereof selected pursuant to the terms and provisions of the Isabela JOA and the MC 519 JOA, respectively.

**2.2.122**   "**Satellite Production**" means the stream of Oil, Gas, water, and associated substances produced from the Satellite Leases.

**2.2.123**   "**Satellite System**" means the LSPS and the Satellite Well System.

**2.2.124**   "**Satellite System Owners**" means all of the Producers (each in its capacity as an owner of the Satellite Leases) and all of the LSPS Owners (each in its capacity as an owner of the LSPS)

**2.2.125**   "**Satellite Well System**" has the meaning ascribed to it in Section 3.1.1 (*Satellite Well System*) of this Agreement.

**2.2.126**   "**Services**" means the Production Handling Services and the Operating Services as set forth in Exhibit "E" (*Host Services*) to this Agreement.

**2.2.127**   "**Standard Cubic Foot**" or "**SCF**" means that quantity of Gas that occupies one (1) cubic foot of space when held at a base temperature of sixty degrees (60°) Fahrenheit and a pressure of fourteen and seventy-three hundredths (14.73) pounds per square inch absolute (psia).

**2.2.128**   "**Third Party**" means any Person other than the Owner, the Host Operator, the Producers, and any Party hereto.

**2.2.129**   "**Third Party Leases**" means oil and gas leases owned by a Third Party, whose production is processed and handled on the Host.

**2.2.130**   "**Third Party Production**" means Oil, Gas, water, and all associated substances produced from Third Party Leases.

## 2.3   Exhibits

All references in this Agreement to "Exhibits", without further qualification mean the Exhibits listed below and attached to this Agreement. Each Exhibit listed below is made a part of this Agreement, and is deemed incorporated into the body

of this Agreement by reference, as completely as if the full text of each Exhibit were contained within the text of this Agreement.

Exhibit "A-1": Delivery Point(s)
Exhibit "A-2": Entry Point(s)
Exhibit "B":    Host Capacity
Exhibit "C":    Accounting Procedures
Exhibit "D":    Host Facilities Schematics
Exhibit "E":    Host Services
Exhibit "F":    Operating & Maintenance Expenses
Exhibit "G":    Host Fluid Limits/Operating Parameters
Exhibit "H":    Insurance Provisions
Exhibit "I":    Dispute Resolution Procedures
Exhibit "J":    Certification of Non-Segregated Facilities
Exhibit "K":    Approved AFE's
Exhibit "L":    Isabela JOA

If the provisions of any of the Exhibits listed above conflict with any provisions of the body of this Agreement, the provisions of the body of this Agreement will prevail except as to Exhibits "G" and "H" each provision of which shall prevail over any provision of the body of this Agreement.

## ARTICLE III - INFRASTRUCTURE AND FACILITIES

**3.1   Satellite Well System**

**3.1.1**   The Producers at their sole cost, risk, liability, and expense will own, design, procure, fabricate, transport, and install each Satellite Well System (**"Satellite Well System"**) and any modifications thereto, which includes, but is not limited to, the following components:

(a)   All facilities and equipment upstream of the LSPS including, but not limited to, the wells, well jumpers, subsea wellheads, choke tie-in bases, umbilicals and terminations, flying leads, flowlines, and wellhead master and wing valves associated with producing and gathering Satellite Production.

**3.1.2**   Each Satellite Operator will provide, in a timely manner, at the Host Operator's discretion, the design and specifications of its respective Satellite Well System to the Owner.  The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to each Satellite Operator within ninety (90) Days of its receipt of each Satellite Wells System design and

specifications. Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's reasonable judgment. Each Satellite Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

3.1.3 The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.1.2 *(Satellite Well System)* of this Agreement.

3.1.4 Each Satellite Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of its respective Satellite Well System and its connection to the LSPS, at the sole cost and expense of the respective Producers.

3.2 **Loop Subsea Production System**

3.2.1 Subject to Section 3.2.4 *(Loop Subsea Production System)* of this Agreement, the LSPS Owners in accordance with provisions of the LSPSOA at their sole cost, risk, liability, and expense will design, procure, fabricate, test, transport, install, or cause to be installed, interconnected and commissioned the Loop Subsea Production System ("**LSPS**") and any modifications thereto, which includes, but is not limited to, the following components:

All facilities and equipment upstream of all Entry Point(s) as set forth on Exhibit "A-2" *(Entry Poin(t)s)* to this Agreement but downstream of the Satellite Well System including, but not limited to, choke tie-in bases, subsea manifolds, umbilicals and terminations, flowlines, flowline risers, associated with producing and gathering Satellite Production. The LSPS will be owned by the LSPS Owners. For purposes herein, "upstream" is from the Entry Point(s) towards the Satellite Leases.

3.2.2 The LSPS Operator will provide, in a timely manner the design and specifications of the LSPS to the Owner. The Host Operator and the Owner shall review such design and specifications and the Host Operator will submit its required modifications to the LSPS Operator within ninety (90) Days of its receipt of the LSPS design and specifications. Such required modifications shall be limited to those which are necessary to prevent adverse impacts or negatively influence the ongoing operations of the Host, in the Host Operator's sole judgment. The LSPS Operator shall revise its plan and specifications to conform to the required modifications submitted by the Host Operator.

**3.2.3**   The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.2.2 *(Loop Subsea Production System)* of this Agreement.

**3.2.4**   The LSPS Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the LSPS and its connection to the Host, at the sole cost and expense of the LSPS Owners.

**3.2.5**   The Host Operator shall determine the timing and scheduling of all activities and operations involving the connection and commissioning of the LSPS to the Host in order to provide for the safety of individuals involved in such activities and operations, to protect the environment, and to minimize interruption of Host Lease operations, Satellite Lease operations and/or Host downtime.

**3.3**   **Facility Access Modifications**

**3.3.1**   All facilities and equipment added to and located on the Host required for the Production Handling Services and all modification to the Host required for the connection of the LSPS to the Host (collectively, the **"Facility Access Modifications"**) will be installed on the Host at a location thereon acceptable to the Owner and Host Operator.   The Facility Access Modifications, specifically excluding the LSPS, will be designed, procured, and fabricated by the Host Operator, and will be installed and interconnected with other facilities on the Host, as well as commissioned, by the Host Operator. For reference purposes, an equipment layout and process flow schematic depicting the Host facilities and the interface between the Facility Access Modifications and the Host facilities is included as Exhibit "D" *(Host/Satellite Facilities Schematic)* to this Agreement. For the avoidance of doubt, the Facility Access Modifications are part of the Host and not part of the LSPS.  All Facility Access Modifications (including any modifications thereto) will be owned by the Owner whether such facilities are procured and/or funded by the Host Operator, the Owner, the Producers, the LSPS Operator or the LSPS Owners.

The Facility Access Modifications include, but are not limited to:

|       |                                   |
|-------|-----------------------------------|
| (i)   | Inlet separator(s);               |
| (ii)  | Process liquids cooling;          |
| (iii) | Boarding valves and topside choke; |
| (iv)  | Flowline pig launchers and receivers; |
| (v)   | Methanol injection;               |
| (vi)  | Subsea chemical injection;        |
| (vii) | Riser Gas lift compression;       |

(ix)   Oil, Gas and water metering and fluid sampling equipment;

(x)   Hydraulic Power Unit ("**HPU**");

(xi)   the Topsides Umbilical Termination Assembly ("**TUTA**"); and

(xii)   the Master Control Station ("**MCS**").

**3.3.2**   The Producers of the Isabela Lease have, in accordance with the terms and conditions of the Isabela JOA, each approved and executed the following BP authorization for expenditures ("**AFE**"):

| BP's AFE Number | Description | Gross Amount, ($ million) |
|---|---|---|
| Z1-005DG | Integrated Project Team | 16.3 |
| Z1-0067Y | Integrated Project Mgmt | 9.9 |
| Z1-00601 | Long Leads | 35.0 |
| Z1-006DN | Project Mgmt | 25.2 |
| Z1-006DN (Supplement) | Project Mgmt | 10.8 |
| Z1-006DQ | Topsides | 23.8 |
| Z1-006DQ (Supplement) | Topsides | 5.2 |
| Z1-007DQ | Topsides Fab & Install | 82.4 |

Execution of this Agreement shall be deemed approval by the Producers of the AFE's set forth above ("**Approved AFE's**") attached as Exhibit "K" to this Agreement, in accordance with the Isabela JOA. Approximately One Hundred Twenty Nine Million Six Hundred Thousand and No/100 Dollars ($129,600,000) of the funds contained in the Approved AFE's represent costs that have and/or will be incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components. Upon execution of this Agreement, the Producers of the Isabela Lease and the Producers of the MC 519 Unit Leases agree that the Host Operator shall, in accordance with the Isabela JOA and the Isabela accounting procedures, directly charge and invoice Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Lease fifty percent (50%) of the Approved AFE's as they relate to the Facility Access Modifications. The Producers of the MC 519 Unit Leases agree to reimburse the Producers of the Isabela Lease in accordance with the Isabela JOA, for their 50% share of any of the Approved AFE's set forth in this Section 3.3.2 (*Facility Access Modifications*) of this Agreement as they relate to the Facility Access Modifications that were approved prior to the Effective Date of this Agreement.

Subsequent to the Effective Date of this Agreement, the Host Operator will directly charge and invoice pursuant to the Isabela JOA and Exhibit "C" (*Accounting Procedure*) of the Isabela JOA, Producers of the Isabela Lease fifty percent (50%) and Producers of the MC 519 Unit Leases fifty percent (50%) of all future AFE's in addition to those within the Approved AFE's incurred by the Host Operator for the design, permitting, procurement, fabrication, testing, transportation, installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components pursuant to Section 4.4 (*Use of Platform/Riser Space*) of this Agreement. However, the Host Operator shall not be required to proceed with the installation, hook-up, interconnection, and/or commissioning of the Facility Access Modifications, and for construction and/or making available sufficient, adequate buoyancy and deck space for those components until the Producers have advanced the estimated costs of such to the Host Operator. The Host Operator shall never be obligated to expend any of its own funds for such costs. The interconnection of the LSPS to the Host shall be carried out by the Host Operator upon receipt of notice of completion of construction of the LSPS from the LSPS Operator. The commissioning of the Satellite System shall be carried out by the LSPS Operator in coordination with the Host Operator. The Host Operator shall determine the timing and scheduling of all activities and operations involving the commissioning of the LSPS and the interconnection of the LSPS to the Host.

3.3.3  The Host Operator shall not charge or invoice the Owner for any activities or operations contemplated in Section 3.3.2 (*Facility Access Modifications*) of this Agreement.

3.3.4  The Host Operator is responsible for acquiring all necessary permits, licenses, authorizations, inspections and approvals required for the construction and installation of the Facility Access Modifications at the sole cost and expense of the Producers.

3.3.5  Owner will endeavor, subject to the Na Kika Obligations, to provide Producers with priority use of the Facility Access Modification for Production Handling Services of Satellite Production during the term of this Agreement.

## ARTICLE IV - SERVICES

### 4.1    General

Pursuant to the terms of this Agreement, the Owner agrees to provide the Services and the Owner agrees to cause the Host Operator to perform the Services with respect to the Satellite System and the Satellite Production delivered to the Host commencing as soon as reasonably possible after the commissioning of the Satellite System and its connection to the Host. The Owner, the Host Operator, nor anyone employed by them, will be deemed for any purpose to be the employees, contractors, agents, consultants, servants, or representatives of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator in the performance of any Services or part thereof in any manner dealt with hereunder. Except as otherwise provided herein, neither the Producers nor the Satellite Operator(s) nor the LSPS Owners nor the LSPS Operator will have direction or control of the Owner or the Host Operator, their employees, contractors, agents, consultants, servants, or representatives in the performance of any Services or part thereof under this Agreement. Except as provided in Article I, it is not the intent or purpose of this Agreement, nor should it be construed as changing, the rights and duties of the Producers or the Satellite Operator(s) or the LSPS Owners or the LSPS Operator to conduct operations associated with the Satellite Leases or the Satellite System.

### 4.1.1    Production Handling Services

The Owner will provide through the Host Operator the Production Handling Services for Satellite Production in accordance with Exhibit "E" (*Host Services*) to this Agreement. The Owner will provide the Production Handling Services for Satellite Production after such production passes through the Entry Point(s) and until production enters the Delivery Point(s).

### 4.1.2    Operating Services for LSPS

The Owner will provide through the Host Operator the Operating Services for the LSPS in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the LSPS, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

### 4.1.3  Operating Services for Satellite Well System

The Owner will provide through the Host Operator the Operating Services for the Satellite Well System in accordance with Exhibit "E" (*Host Services*) to this Agreement. With respect to the Operating Services, the Owner will operate, inspect, maintain, and repair the Satellite Well System, but only to the extent that such functions can be performed from or on the Host by the Host Operator's regular operating personnel with the standard equipment and/or tools typically available on the Host in accordance with the Host Operator's day to day operating procedures and guidelines and as specified under Exhibit "E" (*Host Services*) to this Agreement.

## 4.2  Well Unloading

The unloading of completion fluids (e.g. chemicals, fracture fluids, acids, and/or water, etc.) associated with Satellite Leases shall be carried out only with the Host Operator's prior consent. In connection with the granting of such consent, the Host Operator may require the Satellite Operators to comply with such standards and procedures as set by the Host Operator in its sole discretion.

## 4.3  Parties' Responsibilities

### 4.3.1  Producers' Responsibilities

The Producers will retain responsibility for all Satellite Well System operations that are not performed from or on the Host including, but not limited to, downhole well operations and flowline repairs and maintenance.

### 4.3.2  LSPS Owners' Responsibilities

The LSPS Owners will retain responsibility for all LSPS operations that are not performed from or on the Host including, but not limited to flowline repairs and maintenance.

## 4.4  Use of Platform/Riser Space

### 4.4.1  Sufficient weight capacity, buoyancy, and deck space exists on the Host, within the rights of the Owner under the Na Kika Obligations, for the installation of the Facility Access Modifications.

### 4.4.2  If sufficient weight capacity, buoyancy and deck space is unavailable in the future to allow the Host Operator to perform the Services because of additional Host Leases Production being handled on the Host pursuant to Section 6.4 (*Production Prioritization*) of this Agreement, or if costs and expenses are required to construct and/or make such sufficient weight

capacity, buoyancy and deck space available, because of such occurrence, then the Host Operator is responsible for the design, procurement, fabrication and construction or removal of equipment required to create the required sufficient weight capacity, buoyancy and deck space to allow the Host Operator to perform the Services. However, the Producers and the LSPS Owners are responsible for all actual costs incurred by the Owner in and for such activities and operations referenced above and required to allow the Host Operator to perform the Services. The Host Operator in accordance with Exhibit "B" (*Accounting Procedures*) to this Agreement will directly charge and invoice the Producers of the Isabella Lease for fifty percent (50%) of such costs and the Producers of the MC 519 Unit Leases for fifty percent (50%) of such costs. All Host modifications made under Sections 4.4.1 and 4.4.2 will be owned by Owner.

4.4.3   The Producers and/or the LSPS Owners have the right to use only so much of the weight capacity, buoyancy and deck space on the Host which is essential for the installation of the Facility Access Modifications on the Host.

## 4.5   Energy Sources

The Owner will provide energy sources for carrying out of the Services, as may be necessary to fulfill the obligations set forth pursuant to this Agreement from Owner's existing energy sources.

## 4.6   Communication Equipment

The Owner, through Host Operator, will provide access, at the Producers' or the LSPS Owners' sole cost and expense, to the existing communication equipment (i.e. telephones) on the Host, subject to the Host Operator's guidelines, for use by the Satellite Operator(s) or the LSPS Operator associated with the performance of Operating Services by the Host Operator. The Owner may also provide to the Producers and LSPS Owners, at their sole cost and expense, and subject to any mutually acceptable agreement(s) that may be required, data transmission communication line(s), as well as other forms of communication (e.g. microwave transmissions, fiber optic) which are part of the design and specifications contemplated in Section 3.2 (*Loop Subsea Production System*) of this Agreement Section 3.3 (*Facility Access Modification*) of this Agreement, and Section 3.1 (*Satellite Well System*) of this Agreement.

## 4.7   Emergency Response

4.7.1   In the event of an emergency, including, but not limited to, a hydrocarbon leak, explosion, fire, storm, inclement weather or any other situation

which threatens life, the environment, or property, the Host Operator, with no admission or presumption of liability, may promptly take such action as is deemed appropriate by the Host Operator under the circumstances to remedy or alleviate such emergency. Such action includes, but is not limited to, discontinuing the Services, shutting-in the Satellite Leases' subsea wells and/or the LSPS, and initiating emergency response operations. The Host Operator will promptly notify, given the emergency circumstances, the Satellite Operator(s) and/or the LSPS Operator of such emergency by telephone, followed by written notification of the emergency and remedial actions taken.

4.7.2   All emergency response costs incurred by the Host Operator which are attributable to the LSPS and/or the Satellite Well System(s) will be reimbursed to the Host Operator by the LSPS Owners and/or the respective Producers, as the case may be. Accordingly, the Host Operator will directly charge and invoice the LSPS Operator on behalf of the LSPS Owners and/or the Satellite Operator(s), on behalf of the respective Producers for such costs.

4.7.3   Each Satellite Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the respective Satellite Well System. The LSPS Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the LSPS. The Host Operator is responsible for making any reports required by governmental agencies for emergencies attributable to the Host. The Parties will cooperate to the extent necessary in preparing such reports. All Parties will be provided a copy of any reports filed with governmental agencies in connection with emergency response operations.

4.7.4   Subsequent to the emergency, the Host Operator will have the option to conduct a root cause analysis of the event, activity or equipment from which the emergency arose. The cost of the root cause analysis, and any mitigation measures taken to address the issue raising the emergency, shall be paid for by the Owner and/or the Producers and/or the LSPS Owners who caused the emergency, as determined by the Host Operator.

## ARTICLE V - FEES & EXPENSES

### 5.1   Operating and Maintenance Expenses

The Producers and the LSPS Owners shall reimburse the Host Operator, on a monthly basis for expenses incurred for the direct or indirect benefit of each Party as illustrated on Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement and as defined in this Article V (*Fees & Expenses*).

### 5.1.1   Producers' Expenses

The Producers are solely responsible for (i) the Satellite Lease Direct Expenses; (ii) Facility Access Modifications Dedicated System expenses; (iii) the Host Dedicated Facility expenses; and (iv) the Host Common Facilities expenses which are allocated to the Producers pursuant to Section   5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice each Satellite Operator, on behalf of the Producers, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

### 5.1.2   LSPS Owners' Expenses

The LSPS Owners are solely responsible for the LSPS Direct Expenses which are allocated to the LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement, including Host Operator overhead. The Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners, who are responsible on a monthly basis for the expenses within Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement..

### 5.1.3   General Principles for Cost Charging. The following general principles are applicable to the charging of all expenses (exclusive of Capital Expenditure) incurred by the Host Operator:

(a)   Costs for the direct and exclusive benefit of either the LSPS or any one of the Satellite Leases will be charged directly to the respective LSPS Operator or Satellite Operator.

(b)   Costs incurred for the benefit of multiple fields will be treated as indirect costs and subject to an allocation procedure. Indirect costs will be charged based on allocated production, as determined by the Expense Type (as defined herein below) and Expense Category (as defined herein below) of the costs incurred.

i.   The "**Expense Type**" will be determined based upon the initial estimated cost of any project or single expenditure. All associated expenditures will retain such expense classification even if the actual total expenditure level would have resulted in a different Expense Type. However, if there is a material variance between the actual total expenditure and the initial estimate for the project or single expenditure that was originally classified as Routine Expense, these costs will be re-allocated as a Non-Routine Expense if the re-allocation would materially alter the

charges to the applicable Producers and Host Leases. Expense Type will determine the period of throughput to be taken into consideration and will be classified into the following:

(a) Routine Expenses are projects or single expenditures estimated to cost less than or equal to Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the total gross Latest Fully Allocated Production Month; and

(b) Non-Routine Expenses are projects or single expenditures estimated to cost in excess of Three Hundred Thousand and No/100 Dollars ($300,000) which will be allocated based on the Prior Twelve Months Allocated Production prior to the Host Operators' approval of the expenditure.

ii. The "**Expense Category**" will determine the type of throughput (oil, gas, or LEB of entitlement production) which will be used to allocate costs. Operating expenses will be classified into the following "Expense Category":

(a) "**Satellite Leases Direct Expense**" includes costs relative to a specific well or group of wells on a Satellite Lease that produce bulk production to the Host for initial separation and processing. Activities included in the Satellite Leases Direct Expense Category include, but are not limited to, the following that are solely attributable to specific Satellite Lease(s):

i. All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii. Expenses for labor, spare parts, replacement parts, tools and equipment rental.

iii. All intervention, remote operating vehicle, facility repairs (including subsea components and control systems located on the Host), non-routine well or fluid testing (beyond that required for measurement and allocation of production), and unloading and commissioning expenses.

iv.     Emergency response.

v.      Expenses for chemicals (excluding MEG that is injected into the umbilical distribution header) and fluid disposal costs. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as set forth on Exhibit "E" (*Host Services*) to this Agreement.

vi.     Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Satellite Leases' requirements) of consumables, equipment and supplies.

vii.    Non-Routine Expenses for operations at the Host to assist in the diagnosis of subsea and operational problems (e.g. special monitoring of pressures, temperatures and flow rates).

viii.   Software design and modification costs, including but not limited to, programming costs to incorporate a new well from an existing Satellite Lease.

ix.     Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable well or its associated jumper where the problem is located.

(b)     "LSPS Direct Expense" includes costs relative to the LSPS. Activities included in the LSPS Direct Expense include, but are not limited to, the following that are solely attributable to the LSPS:

i.      All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii.     Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii.    Expenses for chemicals and fluid disposal costs. Charge the LSPS and not the specific well in which chemicals are injected to facilitate delivery to the LSPS, if the sole

purpose of the chemical injection is for the benefit of the entire LSPS. This chemical expense shall be in addition to the bulk handling, storage and injection of chemicals as per Exhibit "E" (*Host Services*) to this Agreement.

iv.    All intervention, remote operated vehicle, pigging (including freeing stuck pigs), hot oiling, emergency response, repairs, and unloading & commissioning expenses.

v.    Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the LSPS's requirements) of consumables, equipment and supplies.

vi.    Expenses for services on gas lift risers and injection equipment not associated with compression.

vii.    Expenses for operation and maintenance inspection of the loop pigging systems.

viii.    Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning of the LSPS shall be charged to the LSPS Direct Expense as a Non Routine expense, if the location can be identified to the source of the problem.

(c)    **"Facility Access Modifications Dedicated System"** includes costs relative to the Facility Access Modifications. Activities included in the Facility Access Modifications Dedicated System, include, but are not limited to, the following that are solely attributable to the Facility Access Modifications:

i.    All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditure).

ii.    Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii.    Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to

accommodate the Facility Access Modifications Dedicated System's requirements) of consumables, equipment and supplies.

iv.   Expenses for gas lift equipment and services on gas lift injection equipment not associated with compression.

v.   Special fluid sampling from Facility Access Modifications separators beyond that required under the measurement and allocation procedures.

vi.   Costs incurred due to design flaws, defects, incomplete or inadequate construction, fabrication or commissioning shall be charged to the applicable Facility Access Modifications Dedicated System as a Non Routine Expense, if the location can be identified to the source of the problem.

(d)   **"Host Dedicated Facility"** includes costs relative to equipment located on the Host that is dedicated to service specific oil or gas processing, handling and delivery to the Delivery Point(s). Activities included in the Host Dedicated Facility category include, but are not limited to, the following that are solely attributable to specific Host Dedicated Facility:

i.   All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures.)

ii.   Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

iii.   Expenses for chemicals and fluid disposal.

iv.   All intervention, non-routine testing (including fluid tests not required by the measurement and allocation of production), emergency response, repairs and commissioning.

v.   Expenses for unscheduled or special transportation (either a special trip or the added cost for a scheduled trip to use a larger or specially equipped vessel to accommodate the Host Dedicated Facilities'

requirements) of consumables, equipment and supplies.

vi.    Expenses for riser gas lift compression.

vii.    Expenses for the Gas System Host Dedicated Facility includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger and condensate free water knock out.

viii.    Expenses for the Oil System Host Dedicated Facility includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps.

(c)    **"Host Common Facilities"** include costs relative to equipment located on the Host that is shared or provides service to a combination of the Host Leases, Satellite Leases, and/or Third Party Production. Activities included in Host Common Facilities include, but are not limited to, the following that are solely attributable to Host Common Facilities, unless otherwise indicated:

i.    All Routine and Non-Routine operating and maintenance expenses (excluding Capital Expenditures) not specifically identified as Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

ii.    Expenses for labor, spare parts, replacement parts, tools, equipment rental, and other consumables.

iii.    Expenses for chemicals associated with processing or chemicals not specifically associated with a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated Facility, or Host Dedicated Facility.

iv.    Expenses for labor, spare parts, replacement parts, tools, and equipment rental.

v.    All ROV, structure or intervention, non-routine testing (including fluid tests not required by the Host M&A), emergency response, unloading, repairs and commissioning.

vi.    Routine well testing, surface fluid sampling (BS&W, gas, water, etc) on inlet separators, metering, allocation of production and reporting as required per the Host M&A or other governing agreement. (Does not include routine maintenance of meters and samplers associated with inlet separators).

vii.    Expenses related to the documenting and reporting routine well performance of the subsea wells tied back to the Host and performance of the Host.

viii.    Produced water and solids handling, treating and disposal expenses (excluding well unloading expenses).

ix.    Utilities (Electrical power, instrument air, control systems, office, quarters, galley, crane, communications center, potable water, ventilation systems, etc.).

x.    Transportation for personnel, equipment, spare parts and consumables to and from shore base, except for rig operations and except for special trips benefiting only a specific Satellite Leases Direct Expense, LSPS Direct Expense, Facility Access Modifications Dedicated System, or Host Dedicated Facility.

xi.    On-site (on the host) instruction and training of operations personnel on the host.

xii.    Expenses for routine on-site operation and maintenance benefitting all subsea production system components installed on the Host.

xiii.    General administrative services for all operations based on the Host including, but not limited to order, receipt and verification of receipt of parts, tools, supplies and services and manage on-site inventories of such items.

xiv.    Simulator and production allocation software costs not associated with a tie-in of a new production steam.

xv.     General emergency response preparedness on the Host (availability of materials, etc.).

**5.1.4  Cost Charging Procedure.** The following cost charging procedure will be implemented by the Host Operator for the different possible permutations of Expense Type and Expense Category for costs and expenses incurred by the Host Operator.

(a)     Satellite Leases Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of either the Isabela Lease or MC 519 Unit Leases will be borne by the respective Producers but billed to the Satellite Operator. The Satellite Operator(s) will not reapply an overhead charge to Satellite Leases Direct Expense for charges passed down to Producers, once overhead has been applied from the Host Operator.

  i.    Costs for Isabela Lease well(s) associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the Isabela Producers but billed to the Isabela Satellite Operator.

  ii.   Costs for the MC 519 Unit Leases well(s), associated jumper line(s) and other dedicated subsea equipment upstream of the LSPS will be borne by the MC 519 Unit Producers but billed to the MC 519 Unit Operator.

(b)     LSPS Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the LSPS will be borne by the respective LSPS Owners but billed to the LSPS Operator. The LSPS Operator will not reapply an overhead charge to LSPS Direct Expense for charges passed down to LSPS Owners, once overhead has been applied from the Host Operator.

  i.    Routine Expenses shall be allocated to the LSPS Owners utilizing the LSPS based on the proportion between i) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the LSPS and ii) the total OEB throughput in the LSPS during such month.

ii. Non-Routine Expenses shall be allocated to the LSPS Owners utilizing (or that have utilized) the LSPS based on the proportion between (a) the Prior Twelve Months Allocated Production on an OEB basis for the respective LSPS Owners utilizing the LSPS and (b) the total OEB throughput in the LSPS during such period.

(c) Facility Access Modifications Dedicated System (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the Facility Access Modifications will be borne by the respective Producers but billed to the applicable Satellite Operator(s). The applicable Satellite Operator(s) will not reapply an overhead charge to Facility Access Modifications Dedicated System costs for charges passed down to Producers, once overhead has been applied from the Host Operator.

i. Routine Expenses shall be allocated to the Producers utilizing the Facility Access Modifications based on the proportion between (a) the Latest Fully Allocated Production Month on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Satellite Production on an OEB basis in the Facility Access Modifications during such month.

ii. Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Facility Access Modifications based on the proportion between (a) the Prior Twelve Months Allocated Produced on an OEB basis for the respective Producers utilizing the Facility Access Modifications and (b) the total Prior Twelve Months Allocated Production of Satellite Production on an OEB basis in the Facility Access Modifications.

(d) Expenses for the Gas System Host Dedicated Facility, which includes, but is not limited to, the intermediate booster compressor, MEG ring main, MEG injection system, MEG reclamation system, condensate production heat exchanger & condensate free water knock out as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement and shall be allocated to the Satellite Leases connected to the Gas System Host Dedicated Facility in accordance with the following:

i. Routine Expenses shall be allocated to the Satellite Leases utilizing the Gas System Host Dedicated Facility based on the proportion between (a) the Latest Fully Allocated

Production Month Gas Production for the respective Satellite Leases and (b) the total Gas Production throughput at the Host during such month.

    ii.    Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Gas System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Gas Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Gas Production throughput at the Host.

A well is considered to be connected to the Gas System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the condensate free water knock out, and/or Gas from the inlet separator flows to the booster gas compressor or the dehydration system.

(e)    Expenses for the Oil System Host Dedicated Facility, which includes, but is not limited to, the bulk production heat exchanger, methanol system, crude oil free water knock out, hull flow assurance tanks (wet and dry oil), hull flow assurance ring main piping and hull flow assurance pumps as set forth on Exhibit "D" (*Host Facilities Schematic*) to this Agreement and shall be allocated to the Satellite Leases connected to the Oil System Host Dedicated Facility in accordance with the following:

    i.    Routine Expenses shall be allocated to the Satellite Leases utilizing the Oil System Host Dedicated Facility based on the proportion between (a) Latest Fully Allocated Production Month Oil Production for the respective Satellite Leases and (b) the total Oil Production throughput at the Host during such month.

    ii.    Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Oil System Host Dedicated Facility based on the proportion between (a) the Prior Twelve Months Allocated Production of Oil Production for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total Oil Production throughput at the Host.

A well is considered to be connected to the Oil System Host Dedicated Facility when it flows into a separator with a liquids outlet flowing into the oil free water knock out.

(f)     Expenses for the Host Common Facilities shall be allocated to the Satellite Leases connected to the Host in accordance with the following:

i.      Routine Expenses shall be allocated to the Satellite Leases utilizing the Host based on the proportion between (a) the Latest Fully Allocated Production Month relative LEB throughput for the respective Satellite Leases and (b) the total LEB throughput at the Host during such month.

ii.     Non-Routine Expenses shall be allocated to the Satellite Leases utilizing (or that have utilized) the Host based on the proportion between (a) the Prior Twelve Months Allocated Production of LEB throughput for the respective Satellite Leases and (b) the Prior Twelve Months Allocated Production of total LEB throughput at the Host.

## 5.2   Fuel, Flare and Vent Gas

Host fuel, flare and vent gas consumption will be allocated on a monthly basis to the Owner for Non-Satellite Production handling and to the Producers for Satellite Production handling in accordance with this Section 5.2. The value of such gas is not included in Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

5.2.1   Fuel, flare and vent gas consumed by certain production handling equipment and facilities located on the Host will be allocated to each Satellite Lease in accordance with the Host M&A.

5.2.2   Each calendar month, the Host Operator will allocate and deduct from each Satellite Lease's share of Gas available for sale its allocated share of fuel, flare and vent gas.

## 5.3   Infrastructure Access and Handling Fees

In addition to the direct expenses and indirect expenses provided for in Section 5.1 (*Operating and Maintenance* Expenses) of this Agreement and in consideration for: (i) access to the Host; (ii) utilization of Host facilities, including, but not limited to, riser porches and umbilical boarding facilities; (iii) utilization of buoyancy and riser space for the LSPS; (iv) utilization of buoyancy and deck space for the Facility Access Modifications; and (v) for the Services provided by the Owner, the Satellite Operators on behalf of the Producers will pay the Owner consistent with the Host M&A and in accordance with Exhibit "C" (*Accounting Procedures*) to this Agreement, an Infrastructure Access Fee ("IAF"

or "**Infrastructure Access Fee**") and Handling Fee ("**HF**" or "**Handling Fee**") for those committed oil and gas reserves set forth only in Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement on a monthly basis, as follows:

### 5.3.1 Infrastructure Access Fee for Isabela Production

(a) Isabela Producers will pay an IAF of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b) Isabela Producers will pay an IAF of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c) The IAF for Isabela Oil and Gas within this Section 5.3.1 will be adjusted starting on April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 1.

### 5.3.2 Infrastructure Access Fee for MC 519 Unit Production

(a) MC 519 Unit Producers will pay an IAF of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b) MC 519 Unit Producers will pay an IAF of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c) The IAF for MC 519 Unit Oil and Gas within this Section 5.3.2 will be adjusted starting on April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the IAF currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a) and (b) in this Section 5.3 2.

### 5.3.3 Handling Fee for Isabela Production

(a) Isabela Producers will pay an Oil handling fee of ▮▮▮ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b) Isabela Producers will pay a Gas handling fee of ▮▮▮ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c) Isabela Producers will pay a water handling fee of ▮▮▮ per Barrel of water allocated to each Producer on a monthly basis.

(d)    The handling fees for Isabela Oil, Gas, and water within this Section 5.3.3 will be adjusted April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 3.

### 5.3.4   Handling Fee for MC 519 Unit Production

(a)    MC 519 Unit Producers will pay an Oil handling fee of ██████ per Barrel of Oil Production allocated to each Producer on a monthly basis.

(b)    MC 519 Unit Producers will pay a Gas handling fee of ██████ per MSCF of Gas Production allocated to each Producer on a monthly basis.

(c)    MC 519 Unit Producers will pay a water handling fee of ██████ per Barrel of water allocated to each Producer on a monthly basis.

(d)    The handling fees for MC 519 Unit Oil, Gas, and water within this Section 5.3.4 will be adjusted April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the Handling Fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in (a), (b), and (c) in this Section 5.3 4.

### 5.3.5   Isabela Lease Minimum Monthly Fee

(a)    Effective as of the first Day of the month following Isabela Lease First Production, if the summation of (i) Infrastructure Access Fees for Isabela Production for each product (Oil, Gas) set forth in Section 5.3.1 (*Infrastructure Access Fee for Isabela Production)* of this Agreement, and (ii) Handling Fees for Isabela Production for each product (Oil, Gas, and water) set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement is less than Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) in any calendar month, the Isabela Operator on behalf of the Producers will be charged and agree to pay to the Host Operator, a fee of Three Hundred and Fifty Thousand and No/100 Dollars ($350,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for Isabela Production set forth in Section 5.3.1 and Section 5.3.3 of this Agreement.

(b)    The Isabela Producer's obligation to pay the Host Operator the Isabela Lease minimum monthly fee set forth in Section 5.3.5 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling Isabela Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by Isabela Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

(c)    The Isabela Lease minimum monthly fee will be adjusted April 1, 2008 and annually thereafter. The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.5 (a) of this Agreement.

### 5.3.6   MC 519 Unit Leases Minimum Monthly Fee

(a)    Effective as of the first Day of the month following MC 519 Unit First Production, if the summation of (i) Infrastructure Access Fees for MC 519 Unit Production for each product (Oil, Gas) set forth in Section 5.3.2; and (ii) Handling Fees for MC 519 Unit Production for each product (Oil, Gas, and water) set forth in Section 5.3.4 is less than One Hundred and Fifty Thousand and No/100 Dollars ($150,000) in any calendar month the MC 519 Unit Operator on behalf of the MC 519 Unit Producers will be charged and agree to pay to the Host Operator, a fee of One Hundred and Fifty Thousand and No/100 Dollars ($150,000) for the Services provided under this Agreement for such calendar month, in lieu of the calculated monthly Infrastructure Access Fees and Handling Fees for MC 519 Unit Production set forth in Sections 5.3.2 and 5.3.4 of this Agreement.

(b)    The MC 519 Producer's obligation to pay the Host Operator the minimum monthly fee set forth in Section 5.3.6 (a) of this Agreement will be suspended in the event the Host is incapable of processing and handling MC 519 Unit Production for a period greater than fifteen (15) Days in a calendar month as a result of problems occurring at the Host or as a result of conditions of the Host outlined in Articles 9.4.1 (a) to (g) of this Agreement, unless such problems are caused by MC 519 Unit Production and/or operations related to the LSPS, or as a result of a Force Majeure event affecting the Satellite System.

(c)    The MC 519 Unit Leases minimum monthly fee will be adjusted April 1, 2010 and annually thereafter. The adjustment shall be computed by multiplying the minimum monthly fee currently applicable by the COPAS Adjustment, but will never be less than the initial amount set forth in Section 5.3.6 (a) of this Agreement.

5.3.7   Payment of the minimum monthly fees set forth in Section 5.3.5 (*Isabela Lease Minimum Monthly Fee*) of this Agreement and Section 5.3.6 (*MC 519 Unit Leases Minimum Monthly Fee*) of this Agreement does not mitigate, eliminate or be in lieu of any obligation to deliver Satellite Production to the Host pursuant to this Agreement, including but not limited to Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement.

5.3.8   In no event shall Host Operator charge overhead for Infrastructure Access Fees and Handling Fees set forth in Section 5.3 (*Infrastructure Access Fee and Handling Fees*) of this Agreement.

## 5.4   Future Governmental Regulations

5.4.1   The Parties agree that the Handling Fee for produced water, as escalated, attributable to the Satellite Leases as set forth in Section 5.3.3 (*Handling Fee for Isabela Production*) of this Agreement and Section 5.3.4 (*Handling Fee for MC 519 Unit Production*) of this Agreement will be increased to reflect future increased costs associated with modifications due to government regulations or Laws affecting discharge requirements of treated produced water into the Gulf of Mexico, which are verifiable and attributable to Satellite Production. Such modifications could involve monitoring, testing, or treating (includes adding chemicals) the produced water. The Host Operator will provide justification and a rationale for such cost increase for the Producers' review.

5.4.2   In addition to Section 5.4.1 (*Future Governmental Regulations*) of this Agreement, the Parties recognize that the regulatory environment could change during the term of the Agreement and such change could result in unforeseen costs to the Owner in order to maintain compliance therewith. Accordingly, the Parties do hereby agree that in the event the Owner incurs additional costs due to changes in federal, state or industry regulations, rules or codes set forth by the Environmental Protection Agency ("EPA"), BOEMRE, Department of Homeland Security, or similar governing authority which regulations are directly related to the provision of Services hereunder, then the Parties will agree on a methodology similar to the methodology set forth in this Article V (*Fees*

& *Expenses*) of this Agreement by which such costs will be recovered by the Owner.

## 5.5    Owner's Expenses

The Owner is responsible for expenses not allocated to the Producers and LSPS Owners pursuant to Section 5.1 (*Operating and Maintenance Expenses*) of this Agreement.

## 5.6    Host Shut Down Compensation

### 5.6.1   Compensation for Owner

(a)    The Owner shall be compensated by the Producers for any and all Host Leases Oil and Gas Production which is deferred due to Host downtime that is solely attributable to the fabrication, construction, installation, hookup, tie-in, inspection, commissioning and/or operation of facilities (including, without limitation, the LSPS and Facility Access Modifications) required to handle Satellite Production. As calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement, the Host Operator will directly charge and invoice the Producers for deferred production compensation and the corresponding Producer will pay such invoice as provided herein. The deferred production compensation calculated in Section 5.6.2 (*Compensation Methodology*) of this Agreement will be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers.

(b)    In addition to deferred Production compensation, the Owner shall be reimbursed by the Producers for any incremental costs incurred by the Owner because of:

(i)    the costs associated with Host shutdown which are solely attributable to the Producers' related work activities or operations shall be billed fifty percent (50%) to Isabela Lease Producers and fifty percent (50%) to MC 519 Unit Leases Producers. The Host Operator will directly charge and invoice each of the Satellite Operator for its share of such incremental costs; and

(ii)    the costs associated with Host shutdown which are solely attributable to a Producer's related work activities or operations on either the Isabela Lease or the MC 519 Unit Leases shall be billed one hundred percent (100%) to the

Satellite Operator whose Satellite Lease was responsible for the Host shutdown. The Host Operator will directly charge and invoice the applicable Satellite Operator.

(c) The Owner shall be reimbursed by the LSPS Owners for any incremental costs incurred by the Owner because of a Host shutdown which is solely attributable to LSPS work activities or operations and not directly attributable to any of the Satellite Leases. The Host Operator will directly charge and invoice each of the LSPS Owners, for its share of such incremental costs which the LSPS Owners will pay as provided herein.

## 5.6.2   Compensation Methodology

(a) Compensation for Deferred Host Leases Oil Production ("**DOPC**") as outlined in Section 5.6.1(a) (*Compensation for Owner*) of this Agreement is equal to:

$$DOPC = (AOPR) \times (SDD) \times (POP) \times (0.35)$$

Where:   AOPR  =  the average daily volume of Host Leases Oil Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in gross Barrels per Day, i.e., without any reduction for royalty),

SDD  =  the duration of such Host shutdown (expressed in Days to the nearest one-hundredth of a Day), and

POP  =  the average Prevailing Oil Price during the duration of such Host shutdown (expressed in Dollars per Barrel).

(b) Compensation for Deferred Host Leases Gas Production ("**DGPC**") as outlined in Section 5.6.1(a) of this Agreement is equal to:

$$DGPC = (AGPR) \times (HV) \times (SDD) \times (PGP) \times (0.35)$$

Where:   AGPR  =  the average daily volume of Host Leases Gas Production delivered to the Delivery Point during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown

(expressed in gross MSCF per Day, i.e., without any reduction for royalty),

HV = the average daily Btu content of the Host Lease Gas Production during the first fourteen (14) Days of the twenty-one (21) Days immediately preceding initiation of the Host shutdown (expressed in MMBtu per MSCF),

SDD = the duration of the Host shutdown (expressed in Days, to the nearest one-hundredth of a day), and

PGP = the average Prevailing Gas Price during the duration of the Host shutdown (expressed in Dollars per MMBtu).

### 5.6.3   Duration of Shutdown

(a) At least thirty (30) Days prior to a scheduled shutdown of the Host, the Host Operator will provide the Producers and Owner an estimate of the duration of such shutdown which is solely attributable to LSPS and/or Satellite Leases' related work activities.

(b) Within sixty (60) Days immediately following completion of a shutdown of the Host, the Host Operator will provide the Producers and Owner with a final report and statement of amounts due as per Section 5.6 (*Host Shut Down Compensation)* reflecting the actual work done and its duration.   As per Exhibit "C" *(Accounting Procedures)* each Producer shall pay the amount invoiced.

### 5.6.4   Deferred Compensation for Producers

If operations are conducted on the Host to provide for handling of Third Party Production, and such operations result in Satellite Production being shut-in, then the Producers shall be entitled to share in any deferred compensation paid by such Third Party to the Owner because of such operations.   The sharing of future deferred compensation shall be in the ratio of Satellite Leases Oil Production and Gas Production to total Oil Production and Gas Production processed and handled at the Host prior to the shutdown.

**5.6.5**   In no event shall Host Operator charge overhead for DOPC and DGPC set forth in Section 5.6.2 (*Compensation Methodology*) of this Agreement.

**5.7**   **Royalties and Taxes**

**5.7.1**   Each Producer will be solely responsible for payment of the royalties and taxes attributable to its share of Oil Production and Gas Production.

**5.7.2**   This Agreement and the operations hereunder are not intended to create, and will not be construed to create a joint venture, association or partnership with respect to the Parties. If, for United States federal income tax purposes, this Agreement is regarded as a partnership, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter "K", Chapter 1, Subtitle "A" of the United States Internal Revenue Code of 1986, as amended ("**Code**"), to the extent permitted and authorized by Section 761(a) of the Code and the regulations promulgated thereunder, or similar provisions of applicable state laws.

**5.8**   **Third Party Contractors**

The Host Operator may, in its sole discretion, utilize the services of Third Party contractors for the purposes of providing the Services and/or implementing this Agreement.   The costs of such Third Party services shall be chargeable in accordance with Exhibit "E" (*Operating and Maintenance Expenses*) to this Agreement.

**5.9**   **Allocation Factors.**

The following allocation factors will be used throughout this Agreement in accordance with Section 7.1 (Measurement and Allocation Procedures) of this Agreement:

(a)   Each lease LEB allocation factor shall be the sum of the barrel equivalent of entitlement production (Oil Production, Gas Production, and allocated water), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

(b)   Each lease Gas Production allocation factor shall be the entitlement gas production (sales, fuel, flare, vent, and gas lift allocated to gas wells and to oil wells), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

(c)    Each lease Oil Production allocation factor shall be the entitlement oil production (sales, fuel, flare, vent, and hot oiling allocated to gas wells as condensate and to oil wells as crude oil), as calculated utilizing the total gross Latest Fully Allocated Production Month or Prior Twelve Months Allocated Production, as applicable.

## ARTICLE VI - CAPACITY

**6.1**    **Host Capacity**

Subject to the remaining provisions of this Article VI, (Capacity) of this Agreement the Owner will provide, but does not warrant or guarantee, to the Producers capacity for production processing and handling on the Host for Satellite Production. However, upon partial or entire loss of or damage to the Host (or any component of the Host) resulting from any incident, the Owner will have no obligation to repair or replace the Host or any component thereof for purposes of (i) re-connecting the LSPS to the Host, (ii) re-installing the Facility Access Modifications on the Host, (iii) resuming the Production Handling Services or (iv) re-initiating the Operating Services. Notwithstanding the foregoing, nothing contained in this Agreement limits or restricts the Owner from entering into other agreements for the utilization of the Host and/or its related equipment and facilities.

**6.2**    **Satellite Leases Capacity**

Contingent upon the Producers delivering Satellite Production to the Host that conforms to the operating and fluid parameters set forth on Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, and subject to Section 6.4 (*Production Prioritization*) of this Agreement the Owner agrees to process and handle Satellite Production at production rates not to exceed each of Isabela Capacity or MC 519 Unit Capacity respectively. Producers' utilization of Isabela Capacity and MC 519 Unit Capacity for Satellite Production is subject to curtailment as provided in Section 6.4 (*Production Prioritization*) of this Agreement. Isabela Capacity and MC 519 Unit Capacity will be determined individually for each of the Satellite Leases and for each product (Oil, Gas, and water) on a daily throughput basis.

(a)    The amount of Isabela Capacity and MC 519 Unit Capacity for any single product (i.e. Oil, Gas, or water) will not be exceeded by the respective Satellite Leases in order to allow the Producers of such Satellite Leases to fully utilize the Satellite Capacity for another product from such Satellite Leases.

(b)     In the event the Producers do not utilize the Isabela Capacity and MC 519 Unit Capacity, respectively, during a calendar month, the Owner has the right to utilize, as it deems necessary and free of cost, any unused capacity for such calendar month on an interruptible basis and the Producers will not have the right to make-up such production capacity.

### 6.2.1   Initial Satellite Fields Capacity

Initial Isabela Capacity shall be the capacity required for processing Isabela Production on the Host and shall be set initially at the volumes set forth in Section 2.2.53 (*Isabella Capacity*) of this Agreement. Initial MC 519 Unit Capacity shall be the capacity required for processing MC 519 Unit Production on the Host and shall be set initially at the volumes set forth in Section 2.2.73(*MC 519 Unit Capacity*) of this Agreement.

### 6.2.2   Adjusted Satellite Capacity

Every calendar year after the later of Dec 31st, 2014 or the year in which Isabella First Production or MC 519 Unit First Production occurs, the Isabela Capacity and the MC 519 Unit Capacity will be re-determined individually for the next calendar year. The Adjusted Isabela Capacity and the Adjusted MC 519 Unit Capacity will be defined as one hundred percent (100%) of the actual average daily production for such Satellite Field (excepting Satellite Fields or Host related downtime and/or curtailment) processed at the Host during the expiring calendar year. However, in no event will the quantity of adjusted capacity for Isabela Production handling or MC 519 Unit Production handling exceed the quantity of initial capacity set forth in Section 2.2.53 (*Isabella Capacity*) of this Agreement and Section 2.2.73 (*MC 519 Unit Capacity*) of this Agreement respectively.

### 6.3   Interruptible Capacity

Subject to Section 6.4 (*Production Prioritization*) of this Agreement, Satellite Leases can use available Host Capacity in excess of Isabela Capacity (or Adjusted Isabela Capacity, if applicable) and MC 519 Unit Capacity (or Adjusted MC 519 Unit Capacity, if applicable) respectively on an interruptible basis, without additional approval from Owner. All terms and conditions from this Agreement apply to production using interruptible capacity.

### 6.4   Production Prioritization

At all times Host Leases Production shall have priority use of the Host and Host Capacity over any Satellite Production. At all times Isabela Production shall have priority use of Owner's share of Host and Host Capacity over MC 519 Unit

Production and Third Party Production. At all times, MC 519 Unit Production shall have priority use of Owner's share of Host and Host Capacity over any Third Party Production processed and handled on the Host after the Effective Date. In the event of an interruption or reduction in Host Capacity, Isabela Capacity and MC 519 Unit Capacity for Oil, Gas and water will be reduced ("**Reduced Satellite Fields Capacity**") as set forth below. Notwithstanding the foregoing, the Host Operator shall endeavor to ensure that the Isabela Capacity and the MC 519 Unit Capacity shall not be less than "production in paying quantities" as stipulated by the BOEMRE for such Satellite Lease.

### 6.4.1   Processing Facility Constraints

(a)   In the event of an interruption or reduction, whether permanent or temporary, in the Host Capacity due to: (i) a Force Majeure event or in preparation for a Force Majeure event, (ii) a planned or unplanned partial or complete shutdown of the Host or any component of the Host for maintenance, repair, replacement, construction or inspections, (iii) a constraint in the Oil Export Pipeline or Gas Export Pipeline, or (iv) a Host equipment/facility upset or other such operating problems, then the Host Operator may make reasonable and prudent efforts to promptly restore normal operations while maintaining safe and efficient production handling operations and in a manner facilitating the resumption of normal operations. During such interruption or reduction in Host Capacity, the Host Operator will allocate the available Host Capacity to the extent it is safe and practical to do so, in accordance with the priorities provided in Section 6.4 (*Product Prioritization*) of this Agreement.

6.4.2   During time periods when the Host or any component thereof is partially or totally shut-in, the Isabela Capacity and MC 519 Unit Capacity will be adjusted in accordance with the priorities provided in Section 6.4.(*Production Prioritization*) of this Agreement to the extent necessary and the Producers will not have the right to make-up such production.

## 6.5   Production Compatibility

The Producers' access to capacity for production processing and handling on the Host set forth in this Article VI (*Capacity*) assumes that the operating parameters/conditions of the Satellite System, and each of the Isabela Production and the MC 519 Unit Production arriving at the Entry Point(s) fully conform to specifications and characteristics stipulated in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement. Additionally, the terms and conditions of this Agreement were established and agreed to by the Parties based on the assumption that the operating parameters/conditions of the Satellite System and the Satellite Production arriving at all Entry Point(s) fully conform to such specifications and characteristics.

### 6.5.1   Conforming Fluids

If Satellite Production arriving at an Entry Point(s) conforms to all of the specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement, then any incremental operating costs which may result from handling Satellite Production on the Host, which are not classified as Satellite Leases Direct Expense in Exhibit "F" (*Operating and Maintenance Expenses*) or otherwise designated as costs to be borne solely by the Producers, will be treated as Host Common Facilities in Exhibit "F" (*Operating and Maintenance Expenses*) to this Agreement.

### 6.5.2   Non-Conforming Satellite Production

If Satellite Production arriving at an Entry Point(s) does not conform to one or more of the operating parameters and/or specifications contained in Exhibit "G" (*Host Fluid Limits/Operating Parameters*) to this Agreement ("**Non-Conforming Production**"), as evidenced to the extent possible by at least three (3) fluid samples taken within a period of seven (7) consecutive Days, and such non-conformance (i) results in incremental Host operating costs, (ii) causes a reduction in the Host Capacity, (iii) causes other operational problems on the Host, or (iv) causes any problem with the Oil Export Pipeline and/or Gas Export Pipeline (hereinafter collectively or individually referred to as a "**Satellite Operating Problem**"), the Host Operator may endeavor, but the Owner is not obligated, to accept and handle such Non-Conforming Production or at its sole discretion may decide to shut-in the well(s) or curtail Isabela Production and/or MC 519 Unit Production, as the case may be, until the Satellite Operating Problem has been rectified by the corresponding Producers in accordance with the following:

(a)     The applicable Producers are solely responsible for all costs and expenses incurred by the Host Operator and/or the Owner:

      (i)     directly resulting from the Satellite Operating Problem (including, without limitation, deferred production); and/or

      (ii)     for reasonable measures taken to rectify or mitigate the Satellite Operating Problem, and/or

      (iii)     which are associated with the Satellite Operating Problem until such problem has been rectified.

The Host Operator will directly charge and invoice the applicable Satellite Operator(s), on behalf of the corresponding Producers, for such costs and expenses.

(b)     Subject to the emergency provisions included in Section 4.7 (*Emergency Response*) of this Agreement and after identifying the Satellite Operating Problem, but prior to initiating any measures to rectify such problem which would result in material expenditures, the Host Operator will provide the respective Producers (with an information copy to the Owner) with a written proposal for measures to rectify the Satellite Operating Problem and an estimate of the associated costs.   Notwithstanding the foregoing, the respective Producers shall be responsible for all costs and expenses of all damages or repairs to the Host in connection with Satellite Operating Problems.

(c)     The Producers will have thirty (30) Days from their receipt of the Host Operator's written proposal submitted pursuant to Section 6.5.2(b) (*Non-Conforming Satellite Production*) of this Agreement to approve such proposal in writing. Failure to respond shall be deemed a non-approval.  Should the respective Producers and the Owner fail to determine a mutually acceptable technical alternative to mitigate the incompatibility, the Host Operator has the right to discontinue the Services set forth in Section 4.1.1 (*Production Handling Services*) of this Agreement and Section 4.1.3 (*Operating Services for Satellite Well System*) of this Agreement with respect to the Satellite Production causing the Satellite Operating Problems.

## ARTICLE VII - PROCEDURES AND PERMITTING

### 7.1     Measurement and Allocation Procedures

**7.1.1**   Satellite Production and Non-Satellite Production will be sampled, metered and allocated in accordance with procedures developed and implemented by the Host Operator in compliance with the commingling permit issued by the BOEMRE. The allocation of Satellite Production to the Entry Point will be handled in accordance with the Host M&A. The Host M&A will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS, and the Satellite Well System will apportion Host Production to the Satellite Leases in the same manner as other Host Production is apportioned to the Host Leases and Third Party Leases.

7.1.2   The implementation of the Host M&A is (i) conditioned upon approval by the BOEMRE of the surface commingling application referred to in Section 7.2.1 (*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto; (ii) subject to and in accordance with the BOEMRE approved surface commingling application referred to in Section 7.2.1(*Surface Commingling Permit*) of this Agreement and any subsequent amendments and/or waivers thereto, and (iii) in accordance with BOEMRE requirements set forth in 30 CFR Part 250 Subpart L and any subsequent amendments and/or waivers thereof.

## 7.2   Permits

### 7.2.1   Surface Commingling Permit

Satellite Production will not be accepted at the Entry Point(s) and will not flow across the Host without first obtaining all required surface commingling permits.  The Host Operator will prepare and submit, or cause to be prepared and submitted, any and all required surface commingling permit applications to the BOEMRE (for surface commingling of Satellite Production with Non-Satellite Production) in accordance with all applicable laws, rules and regulations of governmental bodies having jurisdictional authority.  The Producers and Owner will cooperate with the Host Operator to the extent necessary to achieve BOEMRE approval of the initial surface commingling application, amendment thereto or subsequently required applications.

### 7.2.2   Other Permits

The Satellite Operators, on behalf of the relevant Producers, and the LSPS Operator, as applicable, will obtain, or caused to be obtained, all other required approvals, permits, consents, orders or other documents, without limitation, from all appropriate jurisdictional authorities to produce the Satellite Leases, transport Satellite Production to the Host, and dispose/transport Satellite Production from the Host.  Each Satellite Operator, the LSPS Operator, and the Host Operator will cooperate with each other to the extent necessary to obtain such permits, licenses, authorizations and regulatory approvals.

## 7.3   Commingling of Production

At the sole discretion of the Host Operator, the Host Operator may elect to commingle Satellite Production on the Host with Non-Satellite Production. At the direction of the LSPS Operator to the Host Operator, the Host Operator shall commingle MC 519 Unit Production with Isabela Production.

## 7.4   Re-Allocations

Notwithstanding the audit time period set forth in Exhibit "C" (*Accounting Procedures*) to this Agreement, in the event: (i) the BOEMRE requires the Host Operator for any reason to re-allocate production between the Host Leases, Satellite Leases, and/or Third Party Leases; or (ii) a re-allocation is required as the result of a re-allocation pursuant to the Host M&A, the Host Operator has the right to re-allocate production to/from the Host Leases and the Satellite Leases and/or Third Party Leases by implementing: (i) the requirements of the approved surface commingling permit, as may be amended from time to time; or (ii) the Host M&A re-allocations, utilizing reasonable industry practices/standards and regulatory requirements.

## 7.5   Oil Quality Bank and NGL Bank

The Host Operator reserves the right to develop and implement procedures for an oil quality bank and/or a natural gas liquid(s) ("NGL") bank (or gas processing plant NGL sub-allocation) to address quality differences between Host Leases Production, Satellite Production and/or Third Party Production. Such procedures will, to the extent reasonably practicable, use industry practices/standards and, subject to the technical limitations/capabilities of the Host, the LSPS and the Satellite Well System, will have the objective of providing a fair and equitable compensation methodology among all sources of Host Production.

## 7.6   LSPS Line Fill

Owner shall provide, via Host dry oil hull inventory, LSPS line fill after installation of the LSPS. After Satellite First Production, the volume of Host dry oil hull inventory used for LSPS line fill will be credited back to the Owner.

# ARTICLE VIII - GATHERING AND TRANSPORTATION

## 8.1   Product Disposition

Commencing at the Delivery Point, the Producers will (i) take in kind and remain solely and separately responsible for the disposition, transportation, and sale of Satellite Production and (ii) bear all costs and liabilities associated with such disposition, transportation, and sale. The Owner will have no liability for any costs of production transportation, production processing, penalties and/or associated costs downstream of the Delivery Point which are attributable to the Satellite Production and/or allocated to the Producers (individually and/or jointly).

**8.2    Gas Imbalances**

Owner will endeavor to implement a Gas balancing procedure at the Host to handle Gas imbalances between Host Lease Production, Satellite Production and Third Party Production on a commercially reasonable basis. Until such Gas balancing procedure has been agreed upon by the Parties and the Host Operator, the Host Operator will timely provide to the Parties a record of any Gas production imbalances created on the Host on a monthly basis. The Parties taking Gas production above their entitlements shall pay royalties on such production, and the Parties and Host Operator will make a good faith effort to resolve any imbalances for a month in the succeeding month.

**8.3    Product Transportation**

Each of the Producers will enter into transportation arrangements or agreements with the owners of the Oil Export Pipeline and/or the Gas Export Pipeline, as appropriate, at its own sole cost and expense for its share of Satellite Production.

**8.3.1**    The Parties, independently, will be responsible for submitting, or causing to be submitted, Gas and/or Oil nominations, as applicable, to the transporter(s) of such product for their individual respective share of the appropriate Satellite Production and Host Leases, and for advising the Host Operator of such nomination. The Parties, independently, will also be responsible for cooperating with the Host Operator and the transporters of the Gas and/or Oil to keep their nominations in balance with their respective deliveries on the Gas and/or Oil transporters' pipeline system. The Parties will, to the extent possible, endeavor to cause the nominations of their respective Gas and/or Oil production to closely approximate their actual production.

**8.3.2**    To the extent required under this Agreement, the Host Operator will furnish test and production information to the Parties to adjust nominations.

**8.4    Pipeline Penalties**

**8.4.1**    Any penalties assessed by Gas or Oil transporters attributable to the Satellite Production will be the responsibility of the Producers, unless such penalties are attributable to the Host Operator's sole fault, and then Host Operator will be responsible for such penalties. Any penalties assessed by the Gas or Oil transporters attributable to the Host Leases Production will be the responsibility of the Owner.

**8.4.2**    Any costs or penalties imposed by the Gas Export Pipeline or the Oil Export Pipeline on the Host Operator as a result of operational flow

orders, unscheduled Gas, unauthorized Gas, Gas pipeline imbalances, or Oil pipeline imbalances with transporters, as described herein, will be borne by each Party, independently, in the proportion that its nomination, failure to nominate, failure to properly regulate production volumes, fault, negligence, or liability without fault, caused such imbalance and/or penalties, except such as may result from the Host Operator's gross negligence or willful misconduct.

## ARTICLE IX - SUSPENSION OF OPERATIONS AND FORCE MAJEURE

### 9.1   Notice

A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure will promptly give written notice to that effect to the other Party or Parties stating in reasonable detail the circumstances underlying such Force Majeure.

### 9.2   Suspension of Obligation

The obligations of the Party  giving such notice as provided in Section 9.1 (*Notice*) of this Agreement, so far as they are affected by such Force Majeure, will be suspended during the continuance of any liability so caused, but for no longer period, and such cause will be remedied with all reasonable diligence.   If such Party is a Producer, then the suspended obligations include the payment of the minimum monthly fee as provided in Section 5.3.5(b) *(Isabela Lease Minimum Monthly Fee)* and Section 5.3.6(b) *(MC 519 Unit Lease Minimum Monthly Fee)*. No Party is liable to the other Party or Parties for failure to perform any of its obligations under this Agreement, other than the obligation to pay monies due hereunder (except as provided in the foregoing sentence) to the extent such performance is hindered, delayed or prevented by Force Majeure.

### 9.3   Resolution

A Party claiming Force Majeure will:  (i) diligently use all reasonable and prudent efforts to remedy or remove the cause, condition, or event or circumstance of such Force Majeure, (ii) promptly give written notice to the other Parties of the anticipated termination of the Force Majeure, (iii) resume performance of any suspended obligation as soon as reasonably possible after termination of the Force Majeure, and (iv) not be obligated to settle any labor dispute except on terms acceptable to it in its sole discretion.

## 9.4    Suspension of Operations

9.4.1    In addition to the rights granted under Section 4.7 (*Emergency Response*) of this Agreement and Section 9.2 (*Suspension of Obligations*) of this Agreement, the Host Operator has the right to suspend the Services set forth in this Agreement to the extent necessary, at its sole discretion, for only the following:

(a)    To ensure the safety of persons, property or the environment; or

(b)    To address the operational integrity or operational problems on the Host, or any other equipment or facilities located on the Host or connected thereto, including the Satellite System and any other production system(s) and/or downstream operations, facilities, or equipment; or

(c)    To remedy conditions which render the Host, Satellite System, any other production system(s) and/or downstream operations, facilities, or equipment unsafe; or

(d)    To access or conduct an analysis (e.g. root cause analysis) of any incident on the Host and take whatever action is necessary to ensure re-occurrence of the incident is minimized or eliminated.

(e)    To conduct any construction, modifications, maintenance, repairs, change or addition to the Host, or any other equipment or facilities located on the Host, connected thereto (including, without limitation the Satellite System) and/or on or in connection with downstream facilities; or

(f)    To prepare for or respond to the existence of a Force Majeure condition, as further described in Section 2.2.30 (*Force Majeure*) of this Agreement; or

(g)    To comply with Laws; or

(h)    To avoid participating in un-permitted operations due to the failure of the LSPS Operator or the Satellite Operator(s) to obtain necessary permits, authorizations or approvals to conduct an operation or if the permit is suspended; or

(i)    To address a Satellite Operating Problem; or

(j)    Due to any material breach of this Agreement by the Producers or the LSPS Owners, including, but not limited to, the failure by the

Satellite Operators or the LSPS Operator to pay invoices submitted under Article V (*Fees & Expenses*) of this Agreement and Exhibit "C" (*Accounting Procedures*) to this Agreement subject to Section 9.4.4 herein below; or

(k)    Due to the failure by the Parties to mutually agree on a fair methodology by which the Owner will recover any increased costs associated with changes in governmental regulations as described in Section 5.4 (*Future Governmental Regulations*) of this Agreement, subject to Section 9.4.4 herein below; or

(l)    The Producers' or the LSPS Owners' failure to provide proper notice in connection with the Services set forth in this Agreement; or

(m)    The Producers' or the LSPS Owners' failure to conduct operations in accordance with this Agreement, subject to Section 9.4.4 herein below.

9.4.2    The Producers specifically understand that operations and activities on facilities downstream of the Host may impact operations on the Host. Further, at is sole discretion, the Host Operator has the right to shut down the Host and temporarily discontinue the Services contemplated by this Agreement for any necessary repairs or changes to the Host or any downstream facility. In such cases neither the Host Operator nor the Owner will have any liability to the Producers for deferred production, lost production, or any other direct, indirect or consequential damages.

9.4.3    The Host Operator will notify the relevant Parties in writing in the event of any of the occurrences listed above in Section 9.4.1 (*Suspension of Operations*) of this Agreement. The Host Operator has no liability to the Producers or the LSPS Owners for deferred production, lost production, deferred revenue, loss of revenue, damage to flowlines, wells or reservoirs, loss of wells or any direct, indirect or consequential damages arising from such shutdowns. Whenever reasonably possible, the Host Operator agrees to give the Producers, the LSPS Operator and the Satellite Operators reasonable advance notice of any scheduled shutdowns of the Host.

9.4.4    In the event of the occurrence of one (1) or more of the events listed in Sections 9.4.1(j), 9.4.1(k), 9.4.1(l) and 9.4.1(m) of this Agreement, prior to shutting down any operations and activities on the Host or discontinuing the Services, the Host Operator will give the LSPS Operator and/or the respective Satellite Operator(s), as the case may be, written notice of the occurrence of such event. In the event the LSPS Owners

and/or the Producers, as the case may be, do not cure same within thirty (30) Days after receipt of such written notice, the Host Operator has the right to shutdown the operations and activities and/or discontinue the Services without incurring any liability or obligation to the Producers. However, if the event specified in the notice is of such a nature that it reasonably cannot be corrected within the thirty (30) Day period (other than the Producers' obligations to make payments of money due hereunder) and the Producers begin within said period and continue to take corrective action and thereafter diligently carry such corrective action to completion, the Host Operator will not shutdown the operations and activities on the Host or discontinue the Services related to the Host.

9.4.5   Should the Host Operator suspend the Services for reasons described in Section 9.4.1 (*Suspension of Operations*) of this Agreement, the Host Operator will as soon as reasonably possible after the shutdown event has been addressed, re-establish such Services; provided, however, notwithstanding the provisions of Section 15.16 (*Commitment of Oil and Gas Reserves*) of this Agreement, in the event the duration of such suspension of operations continues for more than ninety (90) consecutive Days, then the affected Producer(s) shall have the right to temporarily re-deliver the Isabela Production and/or the MC 519 Unit Production, as the case may be, to an alternate facility for the provisions of services, similar in nature to the Production Handling Services. Upon withdrawal of the suspension of operations, then such temporary re-delivery will be suspended as soon as reasonably possible and the Isabela Production and MC 519 Unit Production will be delivered back to the Host for Production Handling Services.

## ARTICLE X - TERM, DEFAULT, AND TERMINATION

**10.1   Term of Agreement**

As of the Effective Date, this Agreement will continue to be in force and effect until it is terminated pursuant to the voluntary and involuntary provisions set forth in Sections 10.2 (*Default*) of this Agreement, 10.3 (*Termination by Owner*) of this Agreement, and 10.4 (*Termination by Producers*) of this Agreement.

**10.2   Default**

A Party ("**Non-Performing Party**") shall be in default hereunder ("**Default**") upon the occurrence of any of the following events:

10.2.1 The failure to perform or comply with any material covenant, term, condition, obligation or other material provision contained in this

Agreement when such failure has not been remedied by the Non-Performing Party within sixty (60) Days (**"Notice Period"**) following receipt of written notice from another Party describing the alleged non-performance or non-compliance with particularity and demanding that such non-performance or non-compliance be cured or remedied; provided, however, that there is no Default if the failure cannot reasonably be cured within such Notice Period so long as:

(a)     the Non-Performing Party commences and continues reasonable efforts to remedy or cure said failure promptly upon receipt of the written notice;

(b)     the Non-Performing Party continues these efforts after the Notice Period and until the failure has been cured or remedied; and

(c)     such remedy or cure has been affected within a reasonable period of time.

**10.2.2** The entry of a Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; or

**10.2.3** The material breach of any representation or warranty contained in Section 15.4 (*Representations and Warranties*) of this Agreement and Section 15.5 (*Warranty of Title*) of this Agreement.

In the event a Non-Performing Party is in Default, any performing Party may terminate this Agreement upon written notice thereof to the Non-Performing Party as per the terms of this Section 10.2 (*Default*) of this Agreement; provided, however, that if the owners of one of the Satellite Leases are the Non-Performing Party, any performing Party may terminate this Agreement only as to such owners.  In the event of termination for Default, the Non-Performing Party remains liable for all duties, obligations and liabilities incurred prior to the termination date.

**10.3    Termination by Owner**

**10.3.1** The Owner has the right to terminate this Agreement with respect to the Isabela Lease and its respective Satellite Well System or with respect to the MC 519 Unit Leases and its respective Satellite Well System or with respect to the LSPS, without penalty, as applicable, in the following circumstances:

(a)     In the event the respective Satellite Operator(s), Producers, LSPS Operator or LSPA Owners are in Default; or

(b) On not less than ninety (90) Days written notice by the Host Operator to the relevant Satellite Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

(c) On not less than sixty (60) Days written notice by the Host Operator to the relevant Satellite Operator, if no Satellite Production is delivered to the respective Entry Point for any reason attributable to such Satellite Field Operator, including Force Majeure, for any period of twelve (12) consecutive calendar months during which the Host was available to receive Satellite Production, following the Effective Date of this Agreement.

10.3.2 This Agreement terminates with respect to the Isabela Lease and its respective Satellite Well System and/or with respect to the MC 519 Unit Leases and its respective Satellite Well System and/or with respect to the LSPS, without penalty on not less than one hundred and twenty (120) Days written notice by the Host Operator to the LSPS Operator and/or the relevant Satellite Operator, if destruction of, major damage to, or total or constructive loss of the Host occurs and the Owner elects to not repair or replace the Host for use to provide the Services. The Owner has no obligation to replace or repair the Host.

10.4 **Termination by Producers**

10.4.1 The Producers of each of the Isabela Lease and the MC 519 Unit Leases, upon their respective unanimous agreement, have the right to terminate this Agreement with respect to the Isabela Lease and/or the MC 519 Unit Leases, as the case may be, in the following circumstances:

(a) The Owner is in Default; or

(b) On not less than ninety (90) Day(s) written notice by the respective Satellite Operator to the Host Operator, if the BOEMRE issues a decision disapproving the surface commingling permit application submitted by the Host Operator pursuant to Section 7.2.1(*Surface Commingling Permit*) of this Agreement or any other necessary permits and the Owner and relevant Satellite Operator agree that such decision will not be appealed or a revised application has not been filed; or

(c)    On not less than sixty (60) Day(s) written notice by the respective Satellite Operator to the Host Operator, if no production handling capacity is available for Satellite Production for any reason, including Force Majeure following Satellite First Production equal to the lesser of (i) twelve (12) consecutive calendar months, (ii) the time period set forth in a suspension of production issued to the respective Satellite Operator by the BOEMRE, or (iii) the time period allowed for suspension of operations or production by the relevant Satellite Lease in the event the BOEMRE refused to issue a suspension of production.

10.4.2  This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the respective Satellite Operator to the Host Operator, if delivery of Isabela Production or MC 519 Unit Production to the Host is not technically feasible or economically justifiable in the sole judgment of the relevant Producers. The Agreement termination in this Section 10.4.2 shall only apply to the Satellite Lease affected with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.3  This Agreement terminates with respect to either the Isabela Lease or the MC 519 Unit Leases on not less than one hundred and twenty (120) Day(s) written notice by the relevant Satellite Operator to the Host Operator, upon Permanent Cessation of Production, if the Isabela Production or the MC 519 Unit Production, as the case may be. The Agreement termination in this Section 10.4.3 shall only apply to the Satellite Lease affected by the Permanent Cessation of Production with no impact on the applicability of the Agreement to the other Satellite Lease, if it continues to produce Oil and Gas or is otherwise being held by operations.

10.4.4  This Agreement may be terminated with respect to one of the Satellite Leases without affecting the other. This Agreement shall remain in full force and effect with respect to the Satellite Lease not being terminated. This Agreement may not be terminated by a Party for a reason attributable to another Party if such two (2) Parties are the same Person.

## 10.5   Responsibilities and Obligations at Termination

The Parties have the following responsibilities upon termination of this Agreement and/or Permanent Cessation of Production from the Isabela Lease and/or the MC 519 Unit Leases:

**10.5.1** Upon termination of this Agreement as to all Satellite Leases, the LSPS Operator is responsible for:

    (a)    the disconnection of the LSPS from the Entry Point(s);

    (b)    the removal of the LSPS located within one thousand and five hundred (1500) feet of the Host; and

    (c)    the repair of any damages to the Host resulting from the operations described in Section 10.5.1(a) and Section 10.5.1(b) above if deemed necessary by the Owner.

The disconnection and removal work contemplated in this Section 10.5.1 shall be at the LSPS Owners sole cost and expense, and shall be performed pursuant to a schedule approved by the Host Operator.

**10.5.2** Disconnection of the LSPS in accordance with Section 10.5.1 (*Responsibilities and Obligations at Termination*) of this Agreement will be commenced by the LSPS Operator within twelve (12) months subsequent to the termination of this Agreement as to all Satellite Leases and the LSPS Operator will diligently complete such disconnection and removal. All disconnection and removal work performed by or on behalf of the LSPS Owners will be performed in compliance with all applicable Laws, orders, permits, rules, regulations and requirements of appropriate governmental agencies.

**10.5.3** In the event the LSPS Operator fails to timely perform its disconnection and removal obligations within the applicable time periods as specified in Section 10.5.2 (*Responsibilities and Obligations at Termination*) of this Agreement, the Host Operator may at its election perform such work and invoice the LSPS Operator on behalf of the LSPS Owners, for all actual costs and expenses associated with the disconnection and removal work plus a thirteen per cent (13%) overhead. However, prior to the Host Operator performing such disconnection and removal work, the Host Operator is required to give the LSPS Operator written notice of its intent to perform the disconnection and removal work. In the event the LSPS Operator does not commence and continue disconnection and removal work within thirty (30) Days after receipt of such written notice, the Host Operator has the right to perform disconnection and removal work related to the LSPS without incurring any liability or obligation to the LSPS Operator for such disconnection and removal work. In the event the Host Operator conducts the disconnection and removal work, the Host Operator will directly charge and invoice the LSPS Operator, on behalf of the LSPS Owners who are responsible for any costs associated with such disconnection and removal work.

10.5.4 The Owner is responsible for the abandonment of the Host including, but not limited to, the Facility Access Modifications.

(a) During the term hereof, notwithstanding the automatic termination of this Agreement, as specified under Article X (*Term, Default, and Termination*) of this Agreement, if (i) the Owner determines in its sole judgment that it is no longer economic to operate the Host, and (ii) the Owner determines it will permanently cease operations of will abandon the Host then the Host Operator will give written notice thereof to the Producers ("**Abandonment Notice**"). Within ninety (90) Days following the date of the Host Operator's Abandonment Notice, the Parties will mutually agree to pursue one of the following options:

(i) Terminate this Agreement as of a mutually acceptable effective date. Failure to reach agreement between the Producers and the Owner on an effective date under this option within such ninety (90) Days shall result in termination of this Agreement; or

(ii) Negotiate an agreement to provide otherwise. Failure to reach a definitive agreement between the Producers and Owner on a future course of action under this option within such ninety (90) Days shall result in termination of this Agreement.

10.5.5 Upon termination of this Agreement, each Party remains responsible for any accrued financial obligations by that Party with respect to another Party under the terms of this Agreement and will promptly settle such obligations, including any unpaid invoices.

## ARTICLE XI - LIABILITIES AND INDEMNIFICATION

### 11.1 Liabilities

For purposes of this Article XI (*Liabilities and Indemnification*), in the event that a Party is a Producer, LSPS Owner and Owner, then all of said Party's actions in performing any of the functions contemplated in Section 11.1.1 are conclusively presumed to have been performed in the role of LSPS Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.2 are conclusively presumed to have been performed in the role of Owner. Similarly, all of said Party's actions in performing any of the functions contemplated in Section 11.1.3 are conclusively presumed to have been

performed in the role of Producer.   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, THIS ARTICLE XI *(LIABILITIES AND INDEMNIFICATION)* SHALL GOVERN THE INDEMNITY AND DEFENSE OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT.

11.1.1 <u>LSPS OWNERS' INDEMNITY OBLIGATIONS FOR LSPS OWNERS</u>: LSPS OWNERS SHALL INDEMNIFY OWNER'S GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

    (a)   all injuries to, deaths, or illnesses of any member of LSPS Owners Group; and

    (b)   all damages to or losses of any property of any member of LSPS Owners Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, LSPS OWNERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.

11.1.2 <u>OWNER'S INDEMNITY OBLIGATIONS FOR OWNER</u>: OWNER SHALL INDEMNIFY LSPS OWNERS GROUP AND PRODUCERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

    (a)   all injuries to, deaths, or illnesses of any member of Owner's Group; and

    (b)   all damages to or losses of any property of any member of Owner's Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF LSPS OWNERS GROUP, PRODUCERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, OWNER SHALL NOT INDEMNIFY LSPS OWNERS GROUP OR PRODUCERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF LSPS OWNERS GROUP OR PRODUCERS GROUP FOR SUCH CLAIMS/LOSSES.

11.1.3 PRODUCERS' GENERAL INDEMNITY OBLIGATIONS FOR PRODUCERS: PRODUCERS SHALL INDEMNIFY OWNER'S GROUP AND LSPS OWNERS GROUP FROM AND AGAINST ALL CLAIMS/LOSSES FOR THE FOLLOWING WHEN CONNECTED WITH THIS AGREEMENT:

(a) all injuries to, deaths, or illnesses of any member of Producers Group; and

(b) all damages to or losses of any property of any member of Producers Group,

EVEN IF CAUSED BY THE NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; AND TO THE EXTENT CAUSED BY THE NEGLIGENCE/FAULT OF THE PRODUCERS GROUP, EVEN IF CONTRIBUTED TO BY THE JOINT OR CONCURRENT NEGLIGENCE/FAULT OF OWNER'S GROUP, LSPS OWNERS GROUP OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, PRODUCERS SHALL NOT INDEMNIFY ANY MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP TO THE EXTENT ANY THIRD PARTY IS CONTRACTUALLY OR LEGALLY OBLIGATED TO INDEMNIFY SUCH MEMBER OF OWNER'S GROUP OR LSPS OWNERS GROUP FOR SUCH CLAIMS/LOSSES.

### 11.1.4 NOTICE AND DEFENSE

(a) The Indemnitee shall promptly give to the Indemnitor notice in writing of (i) any Claim/Loss that has been made known to the representative of Indemnitee as referenced in this Article XI (*Liabilities and Indemnification*) of this Agreement, or (ii) proceedings commenced for which Indemnification is claimed. Such notice shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the Claim/Loss against the Indemnitee. Notwithstanding the foregoing, if the Indemnitor is obligated to Indemnify the Indemnitee (or any other Person pursuant to this Agreement), lack of prompt notice shall not be a defense available to the Indemnitor except to the extent prejudice against the Indemnitor has resulted from such lack of prompt notice.

(b) The Indemnitor shall confer with the Indemnitee concerning the Defense of any such Claim/Loss proceedings but, subject to the provisions of this Article XI (*Liabilities and Indemnification*) of this Agreement and any other applicable provisions of this Agreement, if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitor or its insurer shall retain control of the conduct of such Defense, including but not limited to the selection and management of counsel. The Indemnitee shall cooperate to the extent reasonably necessary to assist the Indemnitor in defending the Claim/Loss. Notwithstanding the foregoing, however, even if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, neither Party shall effect settlement of or compromise any such Claim/Loss proceedings without having obtained the prior written consent of the other Party. If the Indemnitee does not consent to a settlement that the Indemnitor is willing to accept, then the Indemnitor's liability shall be limited to the amount for which the lawsuit could have been settled (including all Defense costs incurred by Indemnitor). If the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitee may, upon written notice to the Indemnitor and at the Indemnitee's sole cost and expense, select its own counsel to participate in and be present for the defense of any such Claim/Loss proceeding, provided such counsel shall not take any action in the course of such Claim/Loss proceeding to prejudice the Indemnitor's Defense of such Claim/Loss proceeding.

(c) Should the Indemnitor contest the Defense obligation and not assume the full Defense of the Claim/Loss, the Indemnitee may defend such Claim/Loss in such manner as it may deem appropriate, including, without limitation, settling such Claim/Loss, after giving prior written notice of the same to the Indemnitor, on such terms and conditions as the Indemnitee may deem reasonable and appropriate. The Indemnitor shall reimburse the Indemnitee for costs incurred in connection with such Claim/Loss, including the cost of settlement, within thirty (30) Days from receipt of any invoice for such costs.

(d) For avoidance of doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term ""Indemnify"" or ""Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct is alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct. However, in the event that the Indemnitee is found by a final and unappealable decision of a court of competent jurisdiction to have been grossly negligent or to have acted with willful misconduct, then the Indemnitee shall refund all Defense costs attributable to the defense of the Indemnitee's gross negligence or willful misconduct.

## 11.2 Indemnification With Respect to Warranty of Title

### 11.2.1 Satellite Production

THE RELEVANT PRODUCERS WILL INDEMNIFY, OWNER'S GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF SATELLITE PRODUCTION AND ANY ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

### 11.2.2 Non-Satellite Production

OWNER WILL INDEMNIFY THE RELEVANT PRODUCERS' GROUP AND LSPS OWNERS GROUP AGAINST ALL CLAIMS, SUITS, ACTIONS, DEBTS, LIENS, ACTS, DAMAGES, COSTS, LOSSES AND EXPENSES BROUGHT BY ANY PERSON(S) CHALLENGING, OR CLAIMING AN ENTITLEMENT TO, THE OWNERSHIP OF THE NON-SATELLITE PRODUCTION AND ANY

ROYALTIES OR OTHER INTERESTS BURDENING SUCH OWNERSHIP.

**11.3    Waiver of Consequential Damages**

    (a)    EACH PARTY:

        (i)    AGREES THAT ONLY ACTUAL DAMAGES SHALL BE RECOVERABLE BY IT AGAINST ANY OTHER PARTY'S GROUP EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.; AND

        (ii)    HEREBY WAIVES ANY RIGHT TO RECOVER SPECIAL, PUNITIVE, CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT FROM OR AGAINST ANY OTHER PARTY'S GROUP, INCLUDING, WITHOUT LIMITATION, CLAIMS FOR LOSS OR DEFERMENT OF PRODUCTION OR LOST OR DEFERRED PROFITS OR BUSINESS INTERRUPTION, DAMAGE TO WELL(S) OR RESERVOIRS, OR LOSS OF WELL(S), EVEN IF CAUSED BY A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

    (b)    THE INDEMNITY OBLIGATIONS CONTAINED IN THIS AGREEMENT INCLUDE INDEMNIFICATION FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL OR EXEMPLARY DAMAGES FOR CLAIMS/LOSSES ARISING UNDER THIS AGREEMENT SUFFERED BY AN UNAFFILIATED THIRD-PARTY AND 11.3(a)(i) AND 11.3(a)(ii), ABOVE, SHALL NOT APPLY TO THE EXTENT SUCH PARTY OWES SUCH DAMAGES TO AN UNAFFILIATED THIRD-PARTY IN CONNECTION WITH A THIRD-PARTY CLAIM, IN WHICH EVENT SUCH DAMAGES SHALL BE RECOVERABLE.

**11.4    Individual Obligations**

Except as otherwise provided herein, the Owner, LSPS Owners, Isabela Lease owners (collectively) and the MC 519 Unit owners (collectively) will be responsible only for their respective share of the costs and liabilities incurred as provided in this Article XI (*Liabilities and Indemnification*) of this Agreement. Except as provided in Section 5.7 (*Royalty and Taxes*) of this Agreement, nothing contained herein will ever be construed as creating a partnership, joint venture, association or other character of business entity recognizable in law for any purpose. Each Party will hold all the other Parties harmless from liens and

encumbrances on the Host Leases, Host, Satellite Leases, and LSPS as a result of its acts.

**11.5   Gross Negligence/Willful Misconduct**

The terms "gross negligence" and "willful misconduct" as used in this Agreement shall not include the definition set forth in the Oil Pollution Act of 1990 as amended ("**OPA 90**"). It being the intent of the Parties that even though an act or omission is deemed "gross negligence" or "willful misconduct" under OPA 90, such act or omission must meet the standards set forth by the laws of the State of Texas for "gross negligence" or "willful misconduct" in order to relieve a Party of its indemnification obligations hereunder.

## ARTICLE XII - INSURANCE AND BONDS

**12.1   Insurance**

**12.1.1** Throughout the term of this Agreement, each Party hereto, at its sole cost and expense, will procure such insurance (or self insure, only allowed if the parent company of an original signatory Party hereto or an Affiliate of an original signatory Party has a credit rating of S&P A- or the equivalent) as it deems necessary in discharging its obligations hereunder, including those necessary to protect against all claims for damages, risk of losses and contractual indemnities covered by this Agreement. All policies of insurance purchased which are intended to cover any damages, liabilities, expenses, losses, claims, costs (including attorneys' fees), suits and causes of action incurred by a Party hereunder will be properly endorsed to waive the insurer's rights of subrogation, under any such policies, against the other Parties hereto (or said Parties' respective insurers) when said Party is released from liability or loss or damage pursuant to this Agreement, and may name the other Parties (subject to such other Parties' approval) as an additional insured in the proportion that indemnity obligations are assumed hereunder.

**12.1.2** The Host Operator, LSPS Operator, Satellite Operators and Producers will maintain the insurance coverage provided in Exhibit "H" (*Insurance Provisions*) to this Agreement.

**12.2   Bonds**

The Host Operator, LSPS Operator and the Satellite Operators will obtain and maintain any and all bonds required to be carried by any applicable law, regulation, or rule. The Host Operator, LSPS Operator and the Satellite Operator

1  will require all contractors to obtain and maintain all bonds required to be carried
2  by any applicable law, regulation, or rule.

## ARTICLE XIII - SUCCESSORS AND ASSIGNS

**13.1  Successors and Assigns**

This Agreement is binding upon and inures to the benefit of the Parties and their
respective heirs, successors and assigns.  Each Party will incorporate in any
assignment or transfer of its interest in the Host, the Isabela Lease, the MC 519
Unit Leases or the LSPS a provision that such assignment is subject to this
Agreement.

**13.2  Assignment**

**13.2.1** The Producers and the LSPS Owners or each individual member of the
Producers and the LSPS Owners have the right at any time to assign its or
their rights and obligations in this Agreement in whole or in part to an
Affiliate without the prior written consent of the Owner, or to any Third
Party that is financially responsible with the prior written consent of the
Owner, such consent not to be unreasonably withheld.  The sale or transfer
of any ownership interest in the Satellite Leases and the LSPS will not be
subject to the prior written consent of the Owner but will be made subject
to the rights, duties and obligations of this Agreement, and any such
transferee will be obligated to ratify and join this Agreement.  Written
notice of the completion of any sale or transfer must be given to the Host
Operator within sixty (60) Days of the completion of such transaction and
no assignment will be effective until such sixty (60) Days time period
concludes.  The Producers remain responsible for any costs incurred by
the Producers, under the terms of this Agreement prior to (a) the Producers
receipt of written consent of the assignment from the Owner, (b) Host
Operator's receipt of written notice of the assignment and (c) the
assignee's ratification and joinder to this Agreement.

**13.2.2** The sale or transfer by the Owner of any ownership interest in the Host
will be made subject to the Owner's rights, duties and obligations under
this Agreement, and any such transferee of such rights, duties and
obligations is obligated to ratify and join this Agreement.  Written notice
of the completion of any such sale or transfer must be given to the
Producers within thirty (30) Days of the completion of such transaction.

Execution Version                    71

## ARTICLE XIV - NOTICES

14.1  **Giving and Responding to Notices**

Unless otherwise specifically provided herein to the contrary, all notices, responses, demands, waivers, consents and other communications required or permitted to be given under this Agreement will be made in writing, and delivered to the designated representative in person, by facsimile transmission (followed by a telephone call confirming receipt), by U.S. mail, by overnight express or courier, in each instance with proof of delivery. Notices and responses are deemed to have been duly given and to have become effective (i) upon receipt if delivered in person; (ii) upon receipt if given by facsimile so long as receipt is confirmed by telephone, (iii) two (2) Business Days after having been delivered to an air courier for overnight delivery; or (iv) upon receipt after having been deposited in the U.S. mail, in each instance all fees prepaid. Any such notice is required to and will be directed to the Party, or its permitted assignee. Failure to timely respond to any matter requiring consent is deemed a negative response to such proposal. The following addresses will remain effective until such time as a Party changes its address for notice by giving to the other Parties in accordance with this Section 14.1 (*Giving and Responding to Notices*) of this Agreement.

If to the Isabela Operator, to:

> Payments:
>
> BP America Production Company
> P.O. Box 848129
> Dallas, Texas 75284-8129
>
>
> Operational Matters:
>
> BP Exploration & Production, Inc.
> 200 Westlake Park Blvd.
> Houston, Texas 77079
> Attn: Starlee Waligura, Na Kika Area Operations Manager
> Telephone: (281) 366-1494
> Facsimile: (281) 366 2512
>
> Notices:
>
> BP Exploration & Production, Inc.
> 200 Westlake Park Blvd.
> Houston, Texas 77079
> Attn: Kemper Howe, Gulf of Mexico Land Manager
> Telephone: (281) 366-1278
> Facsimile: (281) 366-7569

If to the MC 519 Unit Operator, to:

    Payments:

Noble Energy, Inc.
P.O. Box 909
Ardmore, Oklahoma 73042
Attn: Accounts Payable, Deepwater Gulf of Mexico

    Operational Matters:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Charles I. Hutto, Deepwater Production Manager
Telephone:  (281) 876-6277
Facsimile:  (281) 876-3000

    Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Daniel S. Mills, Deepwater Land Manager
Telephone:  (281) 874-6063
Facsimile:  (281) 876-6300


If to the Host Operator, to:

    Payments:

BP America Production Company
P.O. Box 848129
Dallas, Texas 75284-8129


    Operational Matters:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Starlee Waligura, Na Kika Area Operations Manager
Telephone: (281) 366-1494
Facsimile: (281) 366-2512

Notices:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Kemper Howe, Gulf of Mexico Land Manager
Telephone: (281) 366-1278
Facsimile: (281) 366-7569

If to the Owner, to:

Notices:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Kemper Howe, Gulf of Mexico Land Manager
Telephone: (281) 366-1278
Facsimile: (281) 366-7569

If to the Producers and LSPS Owners  to:

(a)     BP Exploration & Production, Inc.

Notices:

BP Exploration & Production, Inc.
200 Westlake Park Blvd.
Houston, Texas 77079
Attn: Kemper Howe, Gulf of Mexico Land Manager
Telephone: (281) 366-1278
Facsimile: (281) 366-7569

Production Nomination Notices:

BP Exploration & Production, Inc.
201 Helios Way
Houston, Texas 77079
Attn: Tim Cooper, Operations Services Representative
Telephone: (713) 323-5824
Facsimile: (713) 323-7468

1
2
3

4
5
6
7
8
9
10
11

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

29
30
31
32
33
34
35
36

(b)   Noble Energy, Inc.

Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Daniel S. Mills, Deepwater Land Manager
Telephone:  (281) 874-6063
Facsimile:  (281) 876-6300

Production Nomination Notices:

Noble Energy, Inc.
100 Glenborough Drive, Suite 100
Houston, Texas 77067
Attn: Melissa Lawrence, Gas Control Manager
Telephone:  (281)-876-8853
Facsimile:  (281)876-8845

(c)   Red Willow Offshore, LLC

Notices:
1415 Louisiana St., Ste. 3650
Houston, Texas 77002
Attn: Rex Richardson
Telephone: (281)-822-7509
Facsimile: (281)-822-7501

Production Nomination Notices:

14933 Highway 172
P.O. Box 369
Ignacio. Colorado 81137
Attn: Cindy Percell
Telephone:  (970)-563-5212 (Direct)
               (970)-563-5210 (Main)
Facsimile:  (970)-563-5211

(d)     Houston Energy Deepwater Ventures I, LLC

Notices:

1415 Louisiana St. Ste. 2400
Houston, Texas 77002
Attn: P. David Amend
Telephone:  713-586-5712
Facsimile:  713-650-8305

Production Nomination Notices:

1415 Louisiana St. Ste. 2400
Houston, Texas 77002
Attn: P. David Amend
Telephone:  713-586-5712
Facsimile:  713-650-8305

**14.2    Content of Notice**

Any notice which requires a response within a time period will indicate the applicable response time.  Any notice must contain sufficient detail to allow the Parties to adequately evaluate the scope, timing, costs, etc. of the matter/proposal.

## ARTICLE XV - ADMINISTRATIVE AND MISCELLANEOUS

**15.1    Infrastructure Disclaimer**

THE PRODUCERS HAVE INSPECTED THE HOST AND THE PRODUCERS ASSUME ALL RISKS TO THE COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS ATTENDANT  OR RELATED TO THE PLACING OF COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS THEREON, AND WILL HOLD THE OWNER HARMLESS FROM ANY LOSS OR DAMAGE OR DESTRUCTION TO SAID COMPONENTS OF THE FACILITY ACCESS MODIFICATIONS RESULTING FROM, ARISING OUT OF, OR RELATED IN ANY WAY TO THE HOST, OR ANY DEFECT IN, OR FAILURE OF SAME, REGARDLESS OF WHETHER SUCH DEFECT, FAILURE, OR OTHER CONDITION OF THE HOST IS DUE TO THE SOLE OR JOINT NEGLIGENCE OR FAULT OF THE OWNER.

**15.2    Disclaimer of Warranties**

THE PRODUCERS AND THE LSPS OWNERS ACKNOWLEDGE THAT, NOTWITHSTANDING ANY PROVISION HEREIN TO THE CONTRARY, THE HOST AND ANY INFRASTRUCTURE, FLOWLINE, PLATFORM,

FACILITY, EQUIPMENT OR OTHER PROPERTY, PERSONAL OR REAL, MOVABLE OR IMMOVABLE LOCATED THEREON OR CONNECTED THERETO ARE ACCEPTED BY THE PRODUCERS AND BY THE LSPS OWNERS AND ARE PROVIDED "AS IS", "WITH ALL FAULTS", WITHOUT ANY STATUTORY, EXPRESS, OR IMPLIED WARRANTIES OR REPRESENTATIONS INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS, QUALITY, MERCHANTABILITY, OR CONDITION.   THE   PRODUCERS   AND   THE   LSPS   OWNERS ACKNOWLEDGE THAT THE OWNER HAS NOT MADE, AND THE OWNER   HEREBY   EXPRESSLY   DISCLAIMS   ANY   SUCH REPRESENTATIONS OR WARRANTIES.   EXCEPT AS OTHERWISE PROVIDED HEREIN, THE PRODUCERS AND THE LSPS OWNERS EXPRESSLY ASSUME THE RISK THAT ANY DEFECT IN OR FAILURE OF SUCH HOST, INFRASTRUCTURE, PLATFORM, FACILITY, EQUIPMENT, OR PROPERTY MAY RENDER SUCH ITEMS UNFIT FOR THE PURPOSES SET FORTH HEREIN.

### 15.3   Host Access & Boarding

(a)   Each Satellite Operator and the LSPS Operator will provide the Host Operator with at least fifteen (15) Days prior reasonable notice of, and obtain prior permission for, any intent to board the Host to conduct operations as contemplated herein.   This notice must include a detailed description of the operation(s) to be conducted, a summary of anticipated work procedures, a summary of the tools and equipment that are anticipated to be used when performing the operation(s), the anticipated work schedule, as well as a brief description of the number of Satellite Operator employees or LPSP Operator employees, or their contractors' or subcontractors' employees or agents requesting boarding permission and the length of stay.   Furthermore, this notice must conform to the Host Operator's standard requirements for a "work permit", as amended from time to time.   Upon receipt of such prior reasonable notice, and if the Host Operator determines, in its sole discretion, that there will be no unreasonable conflict or interference with its own operations, the Host Operator will provide the Satellite Operator, at the Producers' sole cost, risk, liability and expense, or the LSPS Operator at the LSPS Owners' sole cost, risk, liability  and expense, rights of ingress and egress to certain space on the Host for the purposes of installing the LSPS or Facility Access Modifications or the Satellite Well System as provided for herein. Such ingress and egress, and all activities conducted hereunder will be subject to the strict observance of all of the Host Operator's safety policies and procedures applicable to the Host including, but not limited to, any required safety training by Host Operator.   Furthermore, such visit will be under the direction of and supervised by Host Operator personnel. Except with the express authorization of the Host Operator, neither the Satellite

Operator, nor the LSPS Operator nor their contractor or subcontractor employees or agents, have the right to observe any drilling, workover or other operations conducted by the Host Operator or any Third Parties on the Host.

(b) In the event of an emergency or critical event involving the Satellite System, the Satellite Operator or the LSPS Operator may contact the Host Operator and request immediate ingress and egress to certain space on the Host for purposes of conducting activities to respond to such emergency. If the Host Operator determines, in its sole discretion, that there will be no unreasonable conflict or interference with its own operations and that such ingress and egress is necessary to respond to such emergency or critical event, the Host Operator will provide such temporary rights of ingress and egress at the sole cost, risk, liability and expense of the Satellite Operator and/or the LSPS Operator.

**15.4    Representations and Warranties**

15.4.1 Each Party represents and warrants to the other Parties that on and as of the Effective Date hereof:

(a) It is duly formed and validly existing and in good standing under the laws of its state or jurisdiction of formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b) The execution and delivery of this Agreement has been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c) It has the entire requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d) The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreement pursuant to which it or its property is bound, to its knowledge, any applicable Laws; and

(e) This Agreement is valid, binding and enforceable against it in accordance with its terms, subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity).

**15.4.2** Owner represents and warrants to the Producers that:

(a) As of the Effective Date, there is no Third Party Production being handled on Owner's share of the Host.

(b) Owner has the power and authority to bind the Host Operator to perform the duties and obligations described for the Host Operator under this Agreement only to the extent Owner has authority to do so pursuant to the Na Kika Obligations.

**15.5 Warranty of Title**

**15.5.1** Each Producer warrants title to its share of Satellite Production to be handled by the Host Operator and indemnifies the Owner pursuant to Section 11.2.1 (*Satellite Production*) of this Agreement.

**15.5.2** Owner warrants title to its share of the Host Production to be handled on the Host and indemnifies the Producers pursuant to Section 11.2.2 (*Non-Satellite Production*) of this Agreement.

**15.6 Standard of Performance**

The Host Operator, the Owner, each Satellite Operator and the LSPS Operator will conduct all operations in a proper and workmanlike manner in accordance with methods and practices customarily used in sound oil and gas field practice and with that degree of diligence reasonable and ordinarily exercised by an experienced prudent operator engaged in a similar activity under the same or similar circumstances.

**15.7 Producers' Employees, Consultants, and Contractors**

The Producers will endeavor to keep the Host and all Satellite Production and Non-Satellite Production free from all liens and encumbrances which might arise by reason of the operations conducted under this Agreement or any other agreements affecting the Satellite Leases.

**15.8 Host Operator's Employees, Consultants, and Contractors**

The Owner will endeavor to keep the Host, and all Satellite Production and Non-Satellite Production free from all liens and encumbrances which might arise by reason of the operations conducted under this Agreement affecting the Host Leases.

### 15.9   Further Assurances

Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement.  In case, at any time after the execution of this Agreement, any further action is deemed necessary or desirable to carry out its purposes, the proper officers, directors, or other appropriate representatives of the Parties will take or cause to be taken all such reasonably necessary action.

### 15.10   Non-Compliance Citations

The respective Satellite Operator will be responsible for any non-compliance citations issued by governmental agencies with respect to the Satellite Well System or the Satellite Leases, and such citations will be promptly reported to the Host Operator.  The LSPS Operator will be responsible for any non-compliance citations issued by governmental agencies with respect to the LSPS, and such citations will be promptly reported to the Host Operator.   The Owner will be responsible for any non-compliance citations issued by governmental agencies with respect to the Host Leases or the Host and such citations will be promptly reported to the Satellite Operator and the LSPS Operator.

### 15.11   Dispute Resolution

Any claim, controversy or dispute arising out of, relating to or in connection with the interpretation of this Agreement or any activity or operation conducted or to be conducted hereunder, shall be resolved in accordance with the mediation and binding arbitration procedures set forth in Exhibit "I" (*Dispute Resolution Procedures*) to this Agreement.  However, claims for Indemnification between or among the Parties shall be excluded from this provision when they arise out of or are related to a lawsuit filed by a Third Party.  For economy of legal resources, the Parties' claims for Indemnification shall be resolved in conjunction with such judicial proceeding.

### 15.12   Waivers

Neither action taken (including, without limitation, any investigation by or on behalf of a Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction.  A waiver by any Party of a particular right, including, without limitation, breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**15.13  Remedies**

The rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity.  Nothing herein will be considered an election of remedies.

**15.14  No Third Party Beneficiaries**

Except to the extent a Third Party is expressly given rights herein, any agreement herein contained, expressed or implied, will be only for the benefit of the Parties and their respective legal representatives, successors, and assigns, and such agreements or assumptions will not inure to the benefit of any other Person whomsoever, it being the intention of the Parties that no Person will be deemed a Third Party beneficiary to this Agreement except to the extent a Third Party is expressly given rights herein.

**15.15  Confidentiality Provisions**

15.15.1  The Parties agree to keep in secrecy and confidence until the termination of this Agreement the Confidential Information, save and except:

(a)  to their respective Affiliates, subcontractors and consultants and their respective employees, servants or agents actively engaged in the operations hereunder to the extent that they need to know for purposes related to this Agreement;

(b)  if and to the extent it is required or requested to do so by any law or by any court or regulatory agency or authority in any jurisdiction, provided that the disclosing Party will, if permitted to do so, notify the other Parties in writing as soon as possible upon becoming aware of any such requirement so that the non-disclosing Parties may seek a protective order or other remedy.  A disclosing Party shall furnish only such Confidential Information as is legally required an/or compelled and will use its reasonable efforts to obtain confidential treatment for any Confidential Information disclosed; or

(c)  to any bona fide financially responsible prospective assignee of all or any portion of a Party's interest in the Host and/or Host Leases or Satellite System and/or Satellite Leases (whichever the case may be) provided that such prospective assignee has executed a confidentiality agreement requiring it to maintain the secrecy and confidentiality of the Confidential Information.

**15.15.2**   Notwithstanding the foregoing, the provision of confidentiality, use, and disclosure above will not apply to information:

(a)   which was in the public knowledge or literature at the time of disclosure by any Party hereunder;

(b)   which was already in the possession of any Party at the time of disclosure hereunder without obligation of confidentiality;

(c)   which was or is subsequently developed by any Party without use of the Confidential Information;

(d)   which subsequent to disclosure hereunder and without fault of the disclosing Party becomes part of the public knowledge; or

(e)   which is disclosed to any Party (without the obligation of confidentiality) by a Third Party having, to the best knowledge of the receiving Party, the legal right to do so.

**15.15.3**   Any Party who assigns its interest in this Agreement remains bound by the confidentiality obligations of this Agreement as to any Confidential Information obtained throughout the term of this Agreement.

**15.15.4**   All Confidential Information made available to the Parties hereunder will be done so on an "as is" basis without any warranties, either express or implied, as to the accuracy, validity, or utility of such information. In no event will any Party be liable for any damages of whatever nature arising out of, or resulting from, making the Confidential Information available under this Agreement.

## 15.16   Commitment of Oil and Gas Reserves

Subject to Article X (*Term, Default, and Termination*) of this Agreement, for the life of the Satellite Leases, the Producers commit to:  (i) deliver all Satellite Production to the Host for production handling, except that the Producers reserve unto themselves, their successors and assigns, the right : (a) to use quantities of Satellite Production sufficient to satisfy Satellite Leases' development and operations including, but not limited to, additional recovery operations and the use of gas for fuel, flaring, pigging, drilling, deepening, reworking, or other such lease operations, (b) to use quantities of Satellite Production sufficient to satisfy any royalty interest in Satellite Production that the royalty owner may elect to take in kind, and (c) for the Producers of the MC 519 Unit Leases to elect to process at a facility other than the Host any oil and/or gas production from such leases  produced from above the depth of fifteen thousand (15,000) feet total vertical depth.

### 15.17  Compliance with Laws and Regulations

This Agreement and all of the terms and conditions contained herein, and the respective obligations of and the operations conducted by the Parties, are expressly subject to and will remain subject to and comply with all valid and applicable laws, orders, rules, and regulations of any federal, state, or local governmental authority having jurisdiction over the Host Leases and the Satellite Leases, as well as the Host and the LSPS. Each of the Parties hereto agree that they will at all times maintain their respective facilities and leases and conduct their operations thereon in accordance with all valid and applicable laws.

No Party will suffer a forfeiture or be liable in damages to the other Parties for any delays or damages or any failure to act, due, occasioned or caused by reason of laws respecting the activities or operations covered hereby and such delays or damages, will not be deemed to be a breach of or failure to perform under this Agreement.

### 15.17.1  Applicable Law:  TO THE MAXIMUM EXTENT PERMISSIBLE, THE GENERAL MARITIME LAWS OF THE UNITED STATES SHALL GOVERN THE VALIDITY, CONSTRUCTION, INTERPRETATION, AND EFFECT OF THIS AGREEMENT, EXCLUDING ANY CHOICE OF LAW RULES WHICH WOULD OTHERWISE REQUIRE THE APPLICATION OF LAWS OF ANY OTHER JURISDICTION.  IN THE EVENT MARITIME LAW IS HELD TO BE INAPPLICABLE BY A COURT OF COMPETENT JURISDICTION, THE LAWS OF THE ADJACENT STATE OF THE SATELLITE LEASES HEREUNDER SHALL APPLY UNLESS (i) OTHERWISE PROVIDED IN THIS AGREEMENT OR (ii) APPLICATION OF SUCH LAW TO A PARTICULAR PROVISION WOULD PREVENT ENFORCEMENT OF SUCH PROVISION, IN WHICH CASE THE LAW APPLICABLE TO SUCH PROVISION SHALL BE ANY POTENTIALLY APPLICABLE LAW THAT WOULD ALLOW ENFORCEMENT OF SAID PROVISION AS WRITTEN.

### 15.17.2  Severance of Invalid Provisions: The Parties intend that every provision of this Agreement, the Exhibits attached hereto, and the documents incorporated herein by reference be severable. If any term or other provision of this Agreement is found to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will remain in full force and effect.  The illegality, invalidity or unenforceability of any provisions hereof will not affect the legality, validity or enforceability of the remainder of this Agreement.  In the case of conflict between the

provisions of this Agreement and the provisions of any applicable laws or regulations, the provisions of the laws or regulations will govern over the provisions of this Agreement. If, for any reason and for so long as, any clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable or unconscionable under any present or future law (or interpretation thereof), the remainder of this Agreement will not be affected by such illegality or invalidity. Any such invalid provision will be deemed severed from this Agreement as if this Agreement had been executed with the invalid provision eliminated. Any term or provisions of this Agreement that is invalid or unenforceable in any jurisdiction will be ineffective only as to such jurisdiction and then only to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, each provision will be interpreted to be only so broad as is enforceable. A bankruptcy or similar trustee must accept or, to the extent permitted by Law, reject this Agreement in its entirety.

15.17.3 **Fair and Equal Employment:** Each of the Parties is an Equal Opportunity Employer. To the extent that this Agreement may be subject to Executive Order 11246, as amended, the equal opportunity provisions (41 CFR 60-1) are incorporated herein by reference. If the Non-Discrimination in the OCS provisions of 30 CFR 270 apply to this Agreement and the operations conducted under it, the provisions of 30 CFR 270 are also incorporated by reference. To the extent required by applicable Laws and regulations, this Agreement also includes and is subject to the affirmative action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative action clauses concerning employment of the handicapped (41 CFR 60-741), which clauses are incorporated herein by reference. In performing work under this Agreement, the Parties agree to comply with (and the Host Operator and the Satellite Operator, as applicable, will require each independent contractor to comply with) the governmental requirements set forth in Exhibit "J" (*Certification of Non-Segregation of Facilities*) to this Agreement, pertaining to non-segregated facilities. This Agreement and the Parties are also subject to any other applicable rules and regulation relating to non-discrimination that may be promulgated from time to time by any governmental body having jurisdiction over the subject matter of this Agreement. The Owner and the Producers do not condone in any way the use of illegal drugs or controlled substances. The Host Operator and the Satellite Operator, as applicable, will maintain in effect a drug free workplace policy.

### 15.18 Construction and Interpretation of this Agreement

The construction and interpretation of the terms of this Agreement will be governed by the following conventions:

**15.18.1** **Heading for Convenience**: All references in this Agreement to articles, sections, subsections and Exhibits hereof will refer to the corresponding article, section, subsection or Exhibit of this Agreement, unless specific reference is made to such articles, sections, subsection or exhibit of another document or instrument. All titles or headings to Articles, subarticles or other divisions of this Agreement except Article II (*Definitions and Exhibits*) or the Exhibits hereto are only for the convenience of the Parties and will not be construed to have any effect or meaning with respect to the other content of such Articles, subarticles or other divisions, such other content being controlling as to the agreement between the Parties.

Except as otherwise provided in this Agreement, each reference to an article of this Agreement will include the entire referenced article including its sections and subsections. Except as otherwise provided in this Agreement, each reference to a section in this Agreement will include all of the section including its subsections. Except as otherwise provided in this Agreement, each reference to an Exhibit in this Agreement will include all of the Exhibit including articles, sections and subsections.

**15.18.2** **Gender**: All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, will include all other genders.

**15.18.3** **Number**: Whenever the context requires, reference herein made to the singular will be understood to include the plural, and the plural will likewise be understood to include the singular.

**15.18.4** **Independent Representation**: The Owner, the LSPS Owners and each individual Producers declare that they have contributed to the drafting of this Agreement or have had it reviewed by their counsel before signing it. Each agrees that it has been purposefully drawn and correctly reflects their understanding of the transaction that it contemplates. Accordingly, this Agreement, though drawn by one Party, will be considered for all purposes as prepared through the joint efforts of the Parties, and will not be construed unfairly and unreasonably and not more strictly against one Party or another Party as a result of the preparation. Each Party has had the benefit of independent representation with respect to the subject matter of this Agreement.

### 15.19  Integrated and Entire Agreement

This Agreement, and the Exhibits attached thereto, constitute the entire and final agreement between the Parties pertaining to the subject matter hereof and as such supersedes all prior agreements, understandings, negotiations, and discussion, whether oral or written.  There are no representations, warranties, promises, or other agreements, oral or written, between the Parties in connection with the subject matter hereof, other than those specifically set forth in this Agreement or in documents delivered pursuant to this Agreement.

Upon execution of this Agreement by all of the Parties, this Agreement will supersede and replace all previous negotiations, understandings, promises, or discussions, whether written or oral, relative to the subject matter of this Agreement.  Each of the Parties acknowledges that no Party has made any promise, representation or warranty that is not expressly stated in this Agreement.

### 15.20  Amendment and Modification

Except as otherwise provided in this Agreement, all amendments, supplements, and modification to this Agreement will be in writing and executed by all of the Parties.  This Agreement will not be modified or changed except by a written amendment signed by all of the Parties.

### 15.21  Survivability

The provisions, including any obligations associated therewith, relating to the payment of invoices, audit, abandonment, indemnity, regulatory compliance, representation, warranty, and confidentiality, will survive the cancellation or termination of this Agreement without regard to any action taken pursuant to this Agreement, including without limitation, the execution of any documents affecting an interest in real property or any investigation made by the Party asserting the breach thereof. Notwithstanding the foregoing, the indemnification provisions contained in Article XI (*Liabilities and Indemnification*) to this Agreement will survive until the later of (i) judicial declaration of the expiration of the applicable statute of limitations or (ii) all claims arising hereunder have been concluded. Accordingly, cancellation or termination of this Agreement will not relieve any Party from and costs, expenses, or liability accrued or incurred prior to the cancellation or termination of this Agreement, and the provisions of this Agreement will continue in force for such additional time as necessary until all claims or lawsuits have been settled or otherwise disposed of and a final accounting and settlement has been made under this Agreement.

**15.22   Existing Agreements**

Unless specifically excepted or reserved, and to the extent that they are binding on the Owner, the Producers, the LSPS Owners and the Owner agree that this Agreement will be made subject to (and Producers and the LSPS Owner accepts that this Agreement is subject to) any and all valid and existing reservations, exceptions, limitations, contracts, agreements, licenses, leases, grants and all other agreements or instruments affecting the Host (i) which are of record with the BOEMRE or official county/parish records, (ii) of which Producers have actual or constructive notice or knowledge, including, without limitation, any matter included or referenced in materials made available to Producers by the Owners for their review prior to the execution of this Agreement, or (iii) which are part of the Na Kika Obligations.

# ARTICLE XVI - EXECUTION

**16.1   Effect**

Upon its execution by all of the Parties, this Agreement will become effective as of the Effective Date and will be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors, and assigns.

**16.2   Counterparts**

This Agreement may be executed by signing the original or a counterpart thereof. If this Agreement is executed in multiple counterparts, each counterpart will be deemed an original and all counterparts when taken together will constitute but one and the same Agreement with the same effect as if all of the Parties had signed the same instrument. This Agreement may also be ratified by separate instrument referring to this Agreement and adopting by reference all the provisions of this Agreement. A ratification will have the same effect as an execution of the original Agreement.

**[Remainder of this page intentionally left blank]**

IN WITNESS WHEREOF, this Agreement is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.

**OWNER**

**BP EXPLORATION & PRODUCTION, INC.** (Owner)

By:

Name: PETER A ZWART

Title: CFO

Date: 21 SEP 010

**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION, INC.** (Isabela Producer and Operator)

By:

Name: PETER A ZWART

Title: CFO

Date: 21 SEP 010

**NOBLE ENERGY, INC.** (Isabela Producer)

By:

Name: John T. Lewis

Title: Vice President

Date: 9/21/10

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC.** (MC 519 Unit Producer and Operator)

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _9/21/10_

**BP EXPLORATION & PRODUCTION, INC.** (MC 519 Unit Producer)

By: _____

Name: _PETER A ZWART_

Title: _CFO_

Date: _21 SEP 010_

**RED WILLOW OFFSHORE, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION, INC.** (LSPS Owner and Operator)

By: _Peter Zwart_

Name: _PETER ZWART_

Title: _CFO_

Date: _21 SEP 010_

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _9/21/10_

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

MC 519 UNIT PRODUCERS

NOBLE ENERGY, INC. (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

BP EXPLORATION & PRODUCTION, INC. (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

RED WILLOW OFFSHORE, LLC (MC 519 Unit Producer)

By: _____

Name: _____Robert J. Voorhees_____

Title: _____President and COO_____

Date: _____September 21, 2010_____

HOUSTON ENERGY DEEPWATER VENTURES I, LLC (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

1 **LSPS OWNERS**
2
3 **BP EXPLORATION & PRODUCTION, INC.** (LSPS Owner and Operator)
4
5 By: _____
6
7 Name: _____
8
9 Title: _____
10
11 Date: _____
12
13
14 **NOBLE ENERGY, INC.** (LSPS Owner)
15
16 By: _____
17
18 Name: _____
19
20 Title: _____
21
22 Date: _____
23
24
25 **RED WILLOW OFFSHORE, LLC** (LSPS Owner)
26
27 By: _____
28
29 Name: Robert J. Voorhees
30
31 Title: President and COO
32
33 Date: September 21, 2010
34
35
36 **HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)
37
38 By: _____
39
40 Name: _____
41
42 Title: _____
43
44 Date: _____
45

Execution Version                                    90

**MC 519 UNIT PRODUCERS**

<u>NOBLE ENERGY, INC.</u> (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

<u>BP EXPLORATION & PRODUCTION, INC.</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

<u>RED WILLOW OFFSHORE, LLC</u> (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

<u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (MC 519 Unit Producer)

By: _Carl Amend_

Name: _P. DAVID Amend_

Title: _Vice President LAND_

Date: _September 21, 2010_     _AMS_

1   **LSPS OWNERS**
2
3   <u>BP EXPLORATION & PRODUCTION, INC.</u> (LSPS Owner and Operator)
4
5   By: _____
6
7   Name: _____
8
9   Title: _____
10
11  Date: _____
12
13
14  <u>NOBLE ENERGY, INC.</u> (LSPS Owner)
15
16  By: _____
17
18  Name: _____
19
20  Title: _____
21
22  Date: _____
23
24
25  <u>RED WILLOW OFFSHORE, LLC</u> (LSPS Owner)
26
27  By: _____
28
29  Name: _____
30
31  Title: _____
32
33  Date: _____
34
35
36  <u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (LSPS Owner)
37
38  By: _____
39
40  Name: _P. DAVID Amend_
41
42  Title: _Vice President LAND_
43
44  Date: _September 21, 2010_            AM
45

Execution Version                    90

1
2

<u>EXHIBIT "A-1"</u>
**Delivery Point(s)**

3
4
5
6

Attached to and made part of that certain Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

7
8

<u>(a) Gas export</u>

9
10

**Gas departs Host as export production at riser basket flange**

11
12
13
14
15

P&ID:
565A-00-661AQ



16
17
18

**[Remainder of this page intentionally left blank]**

<u>EXHIBIT "A-1"</u>
**Delivery Point(s)**

Attached to and made part of that certain Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

<u>(b) Oil export</u>

**Oil departs Host as export production at riser basket flange**

P&ID:
565A—00—661X



[Remainder of this page intentionally left blank]

**EXHIBIT "A-2"**
**Entry Point(s)**

Attached to and made part of that certain Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

**Satellite Production enters Host at boarding valves**

P&ID:
565A-00-661K3

P&ID:
565A-00-661K3

Isabela boarding valve

Santiago/Santa Cruz boarding valve



[Remainder of this page intentionally left blank]

1
2
## EXHIBIT "B"

3
4     Attached to and made part of that certain Production Handling and Operating
5 Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS
  OWNERS and PRODUCERS
6
7
## HOST CAPACITY

8
9
10    The **"Host Capacity"** shall be the Oil, Gas, and water handling capacity for the
11 Host as shown below.
12

| Oil | 130 MBO/d |
| Gas | 500 MMSCF/d |
| Water | 50 MBW/d |

13
14
15    **[The remainder of this page intentionally left blank]**
16

## EXHIBIT "C"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

Accounting Procedures

## I. GENERAL PROVISIONS

1. **Definitions**

All terms used in this Accounting Procedure, if not otherwise defined below, shall have the same meaning as in the Agreement to which this Accounting Procedure is attached.

"**Affiliate**" as defined in the Agreement and includes Affiliates as specified herein. Affiliates of the Operator and Non-Operator shall include, but not be limited to, those entities or groups listed on Appendix A to this Exhibit C or their successors.

"**Controllable Material**" means Material which at the time of acquisition or disposition is so classified in the Material Classification Manual as most recently recommended by the Council of Petroleum Accountants Societies.

"**First Level Supervision**" means those employees whose primary function in Joint Operations is the direct oversight of the Operator's employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices

- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

"**Joint Account**" means the account showing the charges paid and credits received in the conduct of the Joint Operations and which are to be shared by the Parties.

"**Joint Operations**" means all operations necessary or proper for the development, operation, protection, maintenance, repair, abandonment and restoration of the Joint Property.

"**Joint Property**" means the real and personal property subject to the Agreement to which this Accounting Procedure is attached.

"**Material**" means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

"**Non-Operators**" means one (1) or more of the following (exclusive of the Host Operator): (i) Satellite Operator(s), on behalf of the Producers, (ii) the LSPS Operator, on behalf of the LSPS Owners, and/or (iii) the Producers, as applicable and as stipulated in the Agreement..

"**Offshore Facilities**" means platforms and support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations.

"**Off-site**" means any location that is not considered On-site as defined in this Accounting Procedure.

"**On-site**" means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include, but not be limited to a platform, the Production System, that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, Material storage facilities, staging areas from which Joint Operations are conducted, and other facilities, such as Remote Technology Centers, regardless of its location and whether the facility or equipment is owned by the Joint Account.

"**Personal Expenses**" means travel, transportation, meals, accommodations, temporary living expenses, relocation costs, and other reimbursable expenses of Host Operator's employees, employees of Affiliates, or of third parties performing chargeable functions.

"**Remote Technology Center (RTC)**" means a facility, regardless of whether located On-site or Off-site, having dedicated technical and /or operations staffing, that directly monitors and/or controls Joint Operations on a real-time basis.

"**Shore Base Facilities**" means onshore support facilities that during development, maintenance and producing operations provide such services to the Joint Property as receiving and transshipment point for supplies, materials and equipment; debarkation point for production personnel and services,; communication, scheduling and dispatching center; other associated functions benefiting the Joint Property.

"**Technical Employees**" means those employees having special and specific engineering, geological or other professional skills, and whose primary function in Joint Operations is the handling of specific operating conditions and problems for the benefit of the Joint Property. Technical Employees include employees of the Parties, Affiliates and third parties providing services in support of Joint Operations.

2. **Statements and Billings**

   A.  The Host Operator and Owner shall bill the appropriate Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements which identify the authority for expenditure, lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material may be summarized by major Material classification. Audit exceptions shall be separately and clearly identified.

3. **Advances and Payments by Non-Operators**

   A.  If gross expenditures for the Joint Account (except for expenditures for Facility Access Modifications) are expected to exceed $500,000.00 in the next succeeding month's operations, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the month's operations. Non-Operators are required to advance their proportionate share of the estimated costs of any Facility Access Modifications per Article 3.3.2 of the Agreement.

   Unless otherwise provided in the Agreement, any billing for such advance shall be payable within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Host Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month.

   B.  Each Non-Operator shall pay its proportionate share of all bills within fifteen (15) days of receipt date. If the payment due date for such bill falls

on a weekend or on a statutory holiday, the payment will be due on the preceding business day. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Wall Street Journal on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser. In addition, the delinquent party shall bear attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the Wall Street Journal ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed.

4.  **Adjustments**

A.    Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof, provided, however, all bills and statements (including payout status statements) related to expenditures rendered during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said period a Party takes specific detailed written exception thereto and makes claim for adjustment.

B.    All adjustments initiated by the Parties except those described in (1) through (5)   below are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Joint Account statement or payout status statement. Adjustments made beyond the twenty-four month period are limited to the following

(1)    a physical inventory of Controllable Material as provided for in Section V.

(2)    an offsetting entry (whether in whole or in part) which is the direct result of a specific joint interest audit exception granted by the Party relating to another property.

(3)    a government/regulatory audit.

(4)    changes in working interest ownership

(5)    volume or value reallocation pursuant to the terms or procedures of the Agreement which may impact the volume or value used to calculate billings and/or payments for the Joint Account.

5.    **Expenditure Audits**

A.    A Non-Operator, upon notice in writing to Host Operator, Owner, and other Non-Operators, shall have the right to audit the Owner's and/or the Host Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year, provided, however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner which will result in a minimum of inconvenience to the Owner and/or Host Operator.  The Owner and Host Operator shall bear no portion of the Non-Operator's audit costs incurred under this paragraph unless agreed to by the Owner and/or Host Operator.  The audits shall not be conducted more than once each year without prior approval of the Owner and/or Host Operator, whichever is applicable, except upon the resignation or removal of the Host Operator, and shall be made at the expense of those Non-Operators approving such audit.  The lead audit company's audit report shall be issued within one hundred and eighty (180) days after completion of the audit field work provided, however, the one hundred and eighty (180) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required by Paragraph 4.A. above.  All claims shall be supported with sufficient documentation.  Failure to issue the report within the prescribed time or to take specific written exception within the twenty-four (24) month period will preclude the Non-Operator from taking exception to any charge billed within the time period audited.

B.    A timely filed audit report or any timely submitted response thereto shall suspend the running of any applicable statute of limitations regarding claims made in the audit report.  While any audit claim is being resolved, the applicable statute of limitations will be suspended.  Failure, however, to comply with the deadlines provided herein shall cause the statue to commence running again.

The Owner and/or Host Operator, whichever is applicable, shall allow or deny all exceptions in writing to an audit report within one hundred and eighty (180) days after receipt of such report.  Denied exceptions should be accompanied by a substantive response.

C.    The lead audit company shall reply to the Owner's and/or Host Operator's response to an audit report within ninety (90) days of receipt, and the Owner and/or Host Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt.

D. The lead audit company or Owner and/or Host Operator may call an audit resolution conference for the purpose of resolving audit issues/exceptions that are outstanding at least eighteen (18) months after the date of the audit report. The meeting will require one month's written notice to the Owner and/or Host Operator and all audit participants, be held at the Owner's and/or Host Operator's office or other mutually agreed upon location, and require the attendance of representatives of the Owner and/or Host Operator and each audit participant responsible for the area(s) in which the exceptions are based and who have authority to resolve issues on behalf of their company. The lead audit company will coordinate the response/position of the Non-Operators and continue to maintain its traditional role throughout the audit resolution process.

Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. An audit resolution conference may be held as often as agreed to by the Parties. Issues unresolved at one conference can be discussed at subsequent conferences until each such issue is resolved.

E. Non-Operator charges shall be subject to the above audit requirements.

F. The preceding provisions shall not preclude the Parties from conducting revenue audits.

6. **Approval by Parties**

Where an approval or other agreement of the Parties is expressly required under other sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, Host Operator shall notify all Parties of the proposal, and the agreement or approval of a majority in interest of the Parties shall be controlling.

## II. DIRECT CHARGES

The Host Operator shall directly charge the Joint Account with the following items in accordance with the Agreement:

1. **Rentals and Royalties**

Lease rentals, royalties, rights of use and easements paid by the Operator, on behalf of Joint Operations.

2.    **Labor**

A.    Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 (Chargeability of Incentive Compensation Programs), for:

  (1)    Operator's field employees directly employed in the conduct of Joint Operations.

  (2)    Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses or other facilities serving the Joint Property if such costs are not included in rates charged under Section II.6 (Equipment and Facilities Furnished by Operator).

  (3)    Operator's employees providing First Level Supervision.

  (4)    Salaries and wages of Technical Employees providing On-site and Off-site technical services for Joint Operations.

B.    Cost of holiday, vacation, sickness and disability benefits and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Paragraph 2 of this Section II, excluding severance payments or other termination allowances. Such costs under this Paragraph 2.B. may be charged on a "when and as paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Paragraph 2. of this Section II. If percentage assessment is used, the rate shall be based on the Host Operator's cost experience.

C.    Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Section II.2.

D.    Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Paragraph 2 of this Section 2.

E.    Relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2. Relocation costs may only be charged for a domestic employee transferred within the United States and assigned to the Joint Property full-time for a minimum of twelve (12) months.

F.    Training costs as specified in COPAS MFI-35 (Charging of Training Costs to the Joint Account) for personnel whose salaries and wages are

chargeable under Section II.2.   This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training.  The training cost shall be charged or allocated to the property or properties directly benefiting from the training.  The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Current cost of established plans for employee benefits, as described in COPAS MFI-27 (Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation), applicable to the Host Operator's or Owner's labor costs chargeable to the Joint Account under Sections II.2. based on the Host Operator's or Owner's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, whose salaries and wages are chargeable under Section II.2 to the extent such awards pertain to services provided for activities or operations conducted under the Agreement.

3.   **Material**

Material purchased or furnished by the Host Operator for Joint Operations as provided under Section IV.  Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations.  The accumulation of surplus stocks shall be avoided.

4.   **Transportation**

Transportation of the Host Operator or Owner employees, Affiliates, or contractor personnel necessary for Joint Operations.  Transportation of Material between the Joint Property and another property, or from the Host Operator/Owner's warehouse or other storage point to the Joint Property, shall be charged to the receiving property, and transportation of Material from the Joint Property to Host Operator / Owner's warehouse or other storage point shall be paid for by the Joint Property using the methods in Section IV.1 for freight associated with Direct Purchases and Section IV.2.B for freight associated with transfers.

5.   **Services**

The cost of goods, services, equipment and utilities provided by third parties except for goods and services covered by Section III (Overhead), or Section II.7 (Affiliates), or Section II.9 (Legal Expense).  Awards paid to contractors shall be chargeable to the extent such awards pertain to services provided for activities or operations conducted under this Agreement.

**6.** **Equipment and Facilities Furnished by Host Operator**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Host Operator or Owner will be charged as follows and / or as indicated in Appendix B to this Exhibit C:

A.   Operator shall charge the Joint Account for use of Host Operator-owned equipment and facilities, including but not limited to Shore Base Facilities, Offshore Facilities, Remote Technology Centers, warehouses used to store Joint Property, or other facilities at rates commensurate with the costs of ownership and operation. Equipment and facilities owned by the Host Operator, will be charged to the Joint Account at the Host Operator's actual cost. Such costs may include all expenses which would be chargeable pursuant to this Section II if such equipment were jointly owned, depreciation using straight line depreciation method, interest on investment (less gross accumulated depreciation) not to exceed twelve percent (12%) per annum. In addition, for platforms, subsea production systems, and production facilities the rate may include an element of the estimated cost of abandonment, reclamation and dismantlement. Charges for depreciation will no longer be allowable once the equipment has been fully depreciated. Actual cost shall not exceed the average prevailing commercial rate.

B.   In lieu of charges in Paragraph 6.A. above, equipment and facilities, including Shore Base and Offshore Facilities, owned by the Host Operator may be charged to the Joint Account at the average prevailing commercial rate for such equipment or facility. If an average commercial rate is used to bill the Joint Account, the Host Operator shall adequately document and support such rate and periodically review and update the rate.

C.   When applicable for Host Operator owned or leased motor vehicles, the Host Operator shall use rates published by the Petroleum Motor Transport Association or such other organization recognized by COPAS as the official source of such rates. When such rates are not available, the Host Operator shall comply with the provisions of Paragraph 6.A. or 6.B. above.

**7.** **Affiliates**

Affiliate Materials, facilities, and services provided for the Joint Operations shall be chargeable to the Joint Account as herein provided.

A.   An Affiliate of the Host Operator providing services for Joint Operations regardless of work location, shall be chargeable to the Joint Account at the

rate and/or amount that the Affiliate customarily charges the Host Operator for its services.

B. The Parties agree that Affiliate records relating to Materials, facilities or services provided by an Affiliate are not subject to and will not be made available for audit. However, if Affiliate charges are based on rates, the audit of the Affiliate charges shall be limited to verification that the units or basis to which the rates were applied are correct. Upon request by any Party, the Host Operator or Owner shall furnish a certificate of its independent accounting firm confirming that rates or amounts charged by an Affiliate reflect actual cost and do not include any element of profit.

8.   **Damages and Losses To Joint Property**

Costs or expenses necessary to repair, replace or abandon the Joint Property resulting from damages or losses incurred, except to the extent such costs result from a Party's gross negligence or willful misconduct.

9.   **Legal Expense**

The Host Operator may not charge for services of the Host Operator's legal staff or fees and expenses of outside attorneys unless approved by the Parties, except that title examinations and curative work shall be chargeable, unless otherwise provided for in the Agreement. Other types of legal expense, other than attorney fees, such as recording fees and handling, settling, or otherwise discharging litigation, claims, and liens necessary to protect or recover the Joint Property shall be chargeable

10.   **Taxes and Permits**

All taxes and permits of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Host Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct

If ad valorem taxes paid by the Host Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to Parties will be made in accordance with the tax value generated by each Party's working interest.

11.   **Insurance**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties.  If Joint Operations are conducted at locations where the

Host Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Host Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

### 12. Communications

Costs of acquiring, leasing, installing, operating, repairing, maintaining dismantling or abandoning communication facilities or systems including radio, microwave, satellite and fiber optics cable systems / facilities between the Joint Property and the Host Operator's offices. In the event communication facilities systems serving the Joint Property are Host Operator-owned, charges to the Joint Account shall be made as provided in Paragraph 6 of this Section II.

### 13. Computer Systems

Costs of purchasing, leasing, installing, operating, repairing, maintaining, dismantling or abandoning computer systems including hardware, software, system support and personnel in direct support of Joint Operations. If the computer systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (Equipment and Facilities Furnished by Operator

### 14. Ecological, Environmental and Safety

A.   Costs incurred for technical services, engineering and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety Hazards Act (OSHA) or other regulatory authorities.

Ecological and Environmental costs incurred for the benefit of the Joint Property resulting from laws, rules, regulations, or orders for archaeological and geophysical surveys relative to identification and protection of cultural resources and/or other environmental or ecological surveys as may be required by the Minerals Management Service or other regulatory authority.

Also, costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable laws and regulations are chargeable.

Ecological and environmental costs incurred by the Host Operator as deemed by the Host Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

B.   Safety costs incurred for the benefit of the Joint Property to conduct and/or implement safe operational practices/guidelines as a result of laws, rules, regulations, or orders or as recommended for voluntary compliance. Examples are the requirements mandated by the Occupational Safety and Hazards Act (OSHA), Safety and Environmental Management Program (SEMP), Process Safety Management (PSM), and/or requirements which may be mandated/recommended by similar programs or by other current or successor regulatory agencies. Safety costs incurred by the Operator as deemed by the Operator to be appropriate for prudent operations are also chargeable to the extent such costs directly benefit Joint Operations.

C.   Environmental, ecological, and safety training costs for personnel whose time would otherwise be chargeable under Paragraph 14.A or B above, regardless of whether training is mandated by statute or regulatory agency, is chargeable to the Joint Account.

D.   Safety and other team accomplishment awards for personnel chargeable to the Joint Account shall be chargeable to the Joint Account.

In the event of a conflict between the provisions of this Section II, Paragraph 14 and Section III, Paragraphs i. and ii., Section II, Paragraph 14 shall prevail.

## 15. Abandonment and Reclamation

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by governmental, regulatory, or judicial authority.

## 16. Other Expenditures

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III and which is of direct benefit to the Joint Property and is incurred by the Host Operator in the necessary and proper conduct of the Joint Operations.

## III. OVERHEAD

As compensation for administrative, supervision, office services and warehousing costs, the Host Operator shall charge the Joint Account in accordance with this Section III.

Unless otherwise agreed to by the Parties, such charge shall be in lieu of costs and expenses of all offices and salaries or wages plus applicable burdens and expenses of all personnel, except those directly chargeable under Section II. The cost and expense of services from outside sources in connection with matters of taxation, traffic, accounting or matters before or involving governmental agencies shall be considered as included in the overhead rates provided for in this Section III unless directly chargeable under Section II or such costs are agreed to by the Parties as a direct charge to the Joint Account.

i.   Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or the cost of professional consultant services and contract services of technical personnel directly employed on the Joint Property:

(  ) shall be covered by the overhead rates.

(X) shall not be covered by the overhead rates.

ii.  Except as otherwise provided in Paragraph 1 of this Section III, the salaries, wages and Personal Expenses of Technical Employees and/or costs of professional consultant services and contract services of technical personnel either temporarily or permanently assigned to and directly employed in the operation of the Joint Property:

(  ) shall be covered by the overhead rates.

(X) shall not be covered by the overhead rates.

1.   **Overhead – Operating, Major Construction and Catastrophe**

As compensation for overhead in connection with Operating, Major Construction and Catastrophe operations, the Host Operator shall charge on a:

(X)  Percentage Basis as follows:

2.   **Overhead - Operating**

An Operating Rate of thirteen percent (13%) of the cost of operating the Joint Property. The cost of operating the Joint Property includes, but is not limited to, the costs described in these sections of Article V.5.1.3 (b) ii of the Agreement: (a) Satellite Leases Direct Expense, (b) LSPS Direct Expense, (c) Facility Access Modifications Dedicated System, (d) Host Dedicated Facility and (e) Host Common Facilities and 5.4.2 - Future Governmental Regulations and as described in Article IV Section 4.7.2 - Emergency Response.

The Operating Rate shall be applied to all costs in connection with Joint Operations, except those costs of Major Construction and Catastrophes.

The cost of Infrastructure Access and/or Handling Fees, Compensation for Deferred Host Leases Oil Production and for Deferred Host Leases Gas Production, Minimum Monthly Fees, all salvage credits, the value of injected substances purchased for secondary recovery and all taxes and assessments which are levied, assessed and paid upon the mineral interest in and to the Joint Property shall be excluded from the calculation of overhead.

3. **Overhead - Major Construction**

To compensate the Host Operator for overhead costs incurred in the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantling for abandonment of platforms and related production facilities, the Host Operator shall either negotiate a rate prior to the beginning of construction, or shall charge the Joint Account for overhead in accordance with the following for any Major Construction project. Major Construction projects include, but are not limited to, work described in these sections of Article III - Infrastructure and Facilities of the Agreement: 3.1 - Satellite Well System, 3.2 - Loop Subsea Production System, 3.3 - Facility Access Modifications, 4.4 - Use of Platform/Riser Space.

Since the Host Operator will charge engineering, design and drafting costs related to the project directly to the Joint Account:

     4 % of total costs

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single project shall not be treated separately.

In the event of any conflict between the provisions of this Section III and any of the provisions under Section II, the provisions of Section II shall govern.

4. **Overhead - Catastrophe**

To compensate Host Operator for overhead costs incurred in the event of expenditures resulting from a single occurrence due to oil spill, blowout, explosion, fire, storm, hurricane, or other catastrophes as agreed to by the Parties, which are necessary to restore the Joint Property to the equivalent condition that existed prior to the event causing the expenditures, Host Operator shall either negotiate a rate prior to charging the Joint Account or shall charge the Joint Account for overhead based on the following:

Catastrophe Overhead will be charged at the same applicable rates and terms as Section III Paragraphs 2 and 3 (Operating and Major Construction).

Expenditures subject to the overheads above will not be reduced by insurance recoveries, and no other overhead provisions of this Section III shall apply.

### 5.  Amendment of Rates

The Overhead rates provided for in this Section III may be amended from time to time only by mutual agreement between the Parties hereto, if in practice, the rates are found to be insufficient or excessive.

## IV. MATERIAL PURCHASES, TRANSFERS AND DISPOSITION

The Host Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Host Operator normally provides all Material for use on the Joint Property but does not warrant the Material furnished. At the Host Operator's option, Material may be supplied by Non-Operators.

### 1.  Direct Purchases

Direct purchases shall be charged to the Joint Account at the price paid by the Host Operator after deduction of all discounts received. A direct purchase is determined to occur when an agreement is made between the Host Operator and a third party for the acquisition of Materials for a specific well site or location. Material provided by the Host Operator under "vendor stocking programs," where the initial use if for a Joint Property and title of the Material does not pass from the vendor until usage, is considered a direct purchase. If Material is found to be defective or is returned to the vendor for any other reason, credit shall be passed to the Joint Account when adjustments have been received by the Host Operator from the manufacturer, distributor, or agent.

### 2.  Transfers

A transfer is determined to occur when the Host Operator furnishes     Material from its storage facility or from another operated property. Additionally, the Host Operator has assumed liability for the storage costs and changes in value and has previously secured and held title to the transferred Material. Similarly, the removal of Material from a Joint Property to the Host Operator's facility or to another operated property is also considered a transfer. Material that is moved from the Joint Property to a temporary storage location pending disposition may remain charged to the Joint Account and is not considered a transfer.

A.    Pricing

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of transfer. Transfers of new Material will be priced using one of the following new Material bases:

(1)    Published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS). The HPMs and the associated date of published price to which they should be applied will be published by COPAS periodically.

      (a)    For oil country tubulars and line pipe, the published price shall be based upon eastern mill (Houston for special end) carload base prices effective as of date of movement, plus transportation cost as defined in Section IV, Paragraph 2.B.

      (b)    For other Material, the published price shall be the published list price in effect at date of movement, as listed by a supply store nearest the Joint Property (where material is normally available) capable of supplying the material, or point of manufacture, plus transportation costs as defined in Section IV, Paragraph 2.B.

(2)    A price quotation that reflects a current realistic acquisition cost may be obtained from a supplier/manufacturer.

(3)    Historical purchase price may be used, providing it reflects a current realistic acquisition cost on date of movement. Sufficient price documents should be available to Non-operators for purposes of verifying Material transfer valuation.

(4)    As agreed to by the Parties.

(5)    When higher than specification grade or size tubulars from Host Operator's inventory are used on the Joint Property, Host Operator shall charge the Joint Account at the equivalent price for well design specification tubulars.

B.    Freight

Transportation costs should be added to the Material transfer price based on one of the following:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the railway receiving point nearest the Joint Property based on the carload weight basis as recommended by COPAS in Bulletin 21 and current interpretations.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the railway receiving point nearest the Joint Property. For transportation costs from other than eastern mills, the 30,000-pound Specialized Motor Carriers interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the Specialized Motor Carriers rate per weight of tubing transferred to the railway receiving point nearest the Joint Property.

(3) Transportation costs for special end tubular goods shall be calculated using the 30,000-pound Specialized Motor Carriers interstate truck rate from Houston, Texas, to the railway receiving point nearest the Joint Property.

(4) Transportation costs for Material other than that described in Section IV, Paragraphs 2.B(1) through (3), if applicable, shall be calculated from the supply store or   point of manufacture, whichever is appropriate, to the railway receiving point nearest the Joint Property.

C. Condition

(1) Condition "A" - New and unused Material in sound and serviceable condition shall be charged at one hundred percent of the price as determined in Section IV, Paragraphs 2.A and B. Material transferred from the Joint Property that was not placed in service on the Joint Property shall be credited as charged without gain or loss. Any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking charge. All refurbishing costs required or necessary to return the material to original condition, or to correct handling or transportation damages and other related costs will be born by the divesting property. The Joint Account is responsible for Material preparation, handling and transportation costs for new and unused Material charged to the property either through a direct purchase or transfer.   Any preparation costs performed, including any internal or external coating and wrapping, will be credited on new Material provided these costs were not repeated for the receiving property.

(2)   Condition "B" - Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined by the pricing guidelines in Section IV, Paragraphs 2.A and B. All refurbishing costs required or necessary to return the material to Condition B, or to correct handling or transportation damages and other related costs will be born by the divesting property.

If the Material was originally charged to the joint Account as used Material and placed in service on the Joint Property, the Material will be credited at the condition percentage most recently recommended by COPAS times the price as determined in Section IV, Paragraphs 2.A and B.

Used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" - Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced at the condition percentage most recently recommended by COPAS times the price determined in Section IV, Paragraphs 2.A and B. The cost of reconditioning shall be charged to the receiving property provided Condition C value, plus cost of recondition, does not exceed Condition B value.

(4)   Condition "D" - Other Material that is no longer suitable for its original purpose but usable for some other purpose is considered Condition D Material. Included under Condition "D" are also obsolete items or Material that does not meet original specifications but still has value and can be used in other services as a substitute for items with different specifications. Due to the condition or value of other used and obsolete items, it is not possible to price these items under Section IV, Paragraph 2.A. The price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material. In some instances, it may be necessary or desirable to have the Material specially priced as agreed to by the Parties.

(5)   Condition "E" - Junk shall be priced at prevailing scrap value prices.

D.   Other Pricing Provisions

    (1)   Preparations Costs

Costs incurred by the Host Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices reflective of the Host Operator's actual costs of the services. Documentation must be retained to support the cost of service. New coating and/or wrapping may be charged per Section IV, Paragraph 2.A.

    (2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS Bulletin 21.

**3.   Disposition of Surplus**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Host Operator may purchase, but shall be under no obligation to purchase, the interest of Non-operator in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Host Operator. To avoid the accumulation of surplus materials, the Host Operator should make good faith efforts to dispose of surplus within 12 months through buy/sale agreements, trade, sale to a third party, division in-kind, or other dispositions as agreed to by the Parties.

The Host Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Host Operator's expenditure limit as set forth in the Operating Agreement to which this Accounting Procedure is attached without the prior approval of the Non-Operator. If the gross sale value exceeds the Operating Agreement expenditure limit, the disposal must be agreed to by the Parties.

The Host Operator may dispose of Condition D and E Material under procedures normally utilized by the Host Operator without prior approval.

4. **Special Pricing Provisions**

A.   Premium Pricing

Whenever Material is not readily replaceable due to national emergencies, strikes, or other unusual causes over which the Host

Operator has no control, the Host Operator may charge the Joint Account for the required Material at the Host Operator's actual cost incurred in providing such Material, in making it suitable for use, and in moving it to the Joint Property provided notice in writing is furnished to Non-Operators of the proposed charge prior to use and to billing Non-Operators for such Material. During premium pricing periods, each Non-Operator shall have the right to furnish in-kind all or part of his share of such Material suitable for use and acceptable to the Host Operator by so electing and notifying the Host Operator within ten (10) days after  receiving notice from the Host Operator.

B.   Shop-Made Items

Shop-made items may be priced using the value of the Material used to construct the item plus labor costs.  If the Material is from a scrap or junk account, the Material may be priced at either twenty-five percent of the current price as determined in Section IV, Paragraph 2A, or scrap value, whichever is higher, plus costs to fabricate the item.

C.   Mill Rejects

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent of K-55/J-55 price as determined in Section IV, Paragraphs 2.A and B.  Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Host Operator shall maintain records of Controllable Material charged to the Joint Account, as defined in the COPAS Material Classification Manual, with sufficient detail to perform the physical inventories requested unless directed otherwise by the Non-Operators.

Adjustments to the Joint Account by the Host Operator resulting from a physical inventory of jointly owned Controllable Material are limited to the six months following the taking of the inventory.  Charges and credits for overages or shortages will be valued

for the Joint Account based on condition B prices in effect on the date of physical inventory and determined in accordance with Section IV, Paragraphs 2.A and B unless the inventorying Parties can prove another Material condition applies.

**1.    Directed Inventories**

With an interval of not less than five years, physical inventories shall be performed by the Host Operator upon written request of a majority in working interests of the Non-Operators.

Expenses of directed inventories will be borne by the Joint Account and may include the following:

A.    Audit per diem rate for each inventory person in line with the auditor rates determined, adjusted, and published each April by COPAS. The per diem should also be applied to a reasonable number of days for pre-inventory work and for report preparation. The amount of time required for this additional work may vary from inventory to inventory.

B.    Actual travel including Host Operator-provided transportation and personal expenses for the inventory team.

C.    Reasonable charges for report typing and processing.

The Host Operator is expected to exercise judgment in keeping expenses within reasonable limits. Unless otherwise agreed, costs in connection with any post-report follow-up work in settling the inventory will be absorbed by the Non-Operator incurring such costs. Any anticipated disproportionate costs should be discussed and agreed upon prior to commencement of the inventory.

When directed inventories are performed, all Parties shall be governed by such inventory.

**2.    Non-Directed Inventories**

A.    Host Operator Inventories

Periodic physical inventories that are not requested by the Non-Operator may be performed by the Host Operator at the Host Operator's discretion. The expenses of conducting such Host Operator inventories shall not be charged to the Joint Account.

B.  Non-Operator Inventories

Any Non-Operator(s) may conduct an inventory at reasonable times, at their sole cost and risk with prior notification to the Host Operator of at least thirty (30) days.

C.  Other Inventories

Other inventories may be taken whenever there is any sale or change of interest.  When possible, the selling Party should notify all other owners 30 days prior to the anticipated closing date.  When there is a change in Host Operator of the Joint Property, an inventory by the former and new Host Operator should be taken.

The expenses of conducting such other inventories shall be charged to the Joint Account.

**[Remainder of this page intentionally left blank]**

## APPENDIX A

Attached to and Made a Part of Exhibit C – Accounting Procedure

## AFFILIATES

1)    BP Exploration and Production Technology (EPT) Group or successor

2)    BP Central Development Organization (CDO) or successor

**[Remainder of this page intentionally left blank]**

1

**APPENDIX B**

Attached to and Made a Part of Exhibit C – Accounting Procedure

EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR

A.   Host Operator may charge the Joint Account an allocated portion of the cost of the Preservation and Maintenance Facility (PMF) or successor. The PMF will be used to secure, preserve and maintain Gulf of Mexico materials for drilling and completions, wells, operations and subsea projects. The PMF costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

B.   Host Operator may charge the Joint Account an allocated portion of the cost of the Houma Learning Center (HLC) or successor. The HLC is used to provide training to the Host Operator's personnel. The HLC costs will be charged pursuant to the provisions of Section II, Paragraph 6 of this Accounting Procedure.

C.   Host Operator may charge the Joint Account an allocated portion of the cost of the Advanced Collaborative Environments Facility (ACE) or successor. This Remote Technology Center is located offsite of the Joint Property with technology for communicating with field operations and optimizing well performance and reducing field operating expenses on a real time/on-line basis. The ACE costs to be charged shall include all costs (regardless of location) incurred by the Host Operator to operate the ACE and will be charged pursuant to the provisions of Section II.6 of this Accounting Procedure. Such charges shall include, but are not limited, to the following:  facilities, communications, computers, software, system support, and ACE personnel provided by the Operator, contract services or Affiliates.

**[Remainder of this page intentionally left blank]**

Execution Version

# EXHIBIT "D"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective
September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## HOST FACILITIES SCHEMATIC



1
2
3
4
5
6
7

8
9
10

## EXHIBIT "E"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## HOST SERVICES

The Owner shall provide the LSPS Owners and Producers with certain Services under the terms of this Agreement.   Said Services shall (i) be implemented in a manner consistent with the general direction provided by the Host Operator, and (ii) follow procedures mutually agreed upon by the LSPS Operator, Satellite Operators, and Host Operator which shall be furnished in written form if requested by the Host Operator. The cost of said Services shall be handled in accordance with Article V of this Agreement. Said Services shall include the following:

1.   Production handling services between the Entry Point and the Delivery Point shall include:

   (a) Operation, inspection, maintenance, and repair of the Host, including utilities necessary for the safe, reliable operation of the Host
   (b) LSPS Production receiving
   (c) Oil inlet heat exchanger
   (d) Separation
   (e) Gas dehydration
   (f) Flash gas compression
   (g) Boost gas compression
   (h) Vapor recovery compression
   (i) Oil treating
   (j) Hot oiling and/or pigging
   (k) Condensate re-injection
   (l) Metering, allocation and shipping
   (m) Solids and produced water treating and disposal
   (n) Utilities (electrical power, instrument air, access to fuel gas system) on the Host from Owner's existing sources
   (o) Pressure relief via the Host flare system
   (p) Bulks (e.g., supplies, materials, chemicals, parts, equipment) handling on the Host
   (q) Bulks (e.g., supplies, materials, chemicals, parts, equipment) transportation and personnel transportation from shore to the Host on a space available basis
   (r) Storage space on the Host for consumables and spare parts on a space available basis

2.   Operation of the Satellite Well Systems and LSPS as can be performed from the Host, including, but not limited to:

(a) Operation of well controls, valves, chokes and safety devices

(b) Operation of all platform controls and equipment

(c) Operation of all safety shutdown devices related to the Satellite Well System and LSPS in accordance with regulations of the BOEMRE

(d) Reporting to the Satellite Operators, as soon as practicable, any significant well, equipment, production, safety, regulatory or logistical problem associated with the Satellite Well System(s)

(e) Reporting to the Satellite Operators with daily reports of Satellite Production and maintaining records of all information and reports transmitted, and

(f) Providing all materials, supplies, labor and supervision required in connection with such activities

3.  Normal and routine maintenance of the Satellite Well Systems and LSPS equipment installed on the Host, including, but not limited to,

(a) Providing consumables such as chokes, orifice plates, glycol and methanol

(b) Ordering receiving and verifying receipt of parts, tools, supplies and services

(c) Scheduling, performing and reporting of all required tests on safety systems, and

(d) Providing all materials, supplies, labor and supervision required in connection with such activities

4.  Integrity testing of the subsea Christmas trees and system valves, including, but not limited to, downhole safety valves.

5.  Well testing, pressure build-up tests, blowdown operations, monitoring of well parameters (including annulus pressure, downhole pressure and temperature, wellhead pressure, metering data and temperature), and adjustment of normal well parameters.

6.  Monitoring of Satellite Well Systems and LSPS parameters, including manifold pressure and temperature, platform arrival pressure and temperature, and other normal parameters.

7.  Operations as can be performed from the Host that are needed to assist in the diagnosis of subsea and operational problems (e.g., monitoring of pressures, temperatures, and flowrates).

8.  Bulk handling, including the transportation (between shore and the Host) of supplies, chemical (chemical as used throughout this Agreement includes methanol) and equipment required for the support of the Satellite Well System and LSPS.

9.   Storage of chemicals, other consumables, and spare parts on the Host for the Satellite Well System and LSPS on a space-available basis.

10.   Initial response with the Satellite Operator(s) and LSPS Operator's personnel to equipment breakdowns associated with Satellite Well System and LSPS components located on the Host.

11.   Initial response to emergency situations attributable to the Satellite Well System and LSPS equipment located on the Host and to other subsea facilities, as requested by the Satellite Operator(s) and/or LSPS Operator, (e.g., spills, leaks). The Host Operator shall promptly notify the Satellite Operator(s) and LSPS Operator of such emergency situation and consult on response measures taken and planned. The Host Operator shall continue initial emergency response operations until (i) the appropriate Operator's personnel are directing emergency response and inform the Host Operator that the LSPS Operator or Satellite Operator will assume control of the emergency response operations underway and (ii) the appropriate regulatory agency(s) approve the transfer of control of the response operations to the Satellite Operator or LSPS Operator. The impacted Operator will coordinate emergency response with the Host Operator as necessary for all emergency response activities.

12.   At the request of the Satellite Operator and/or the LSPS Operator, the Host Operator shall, at its discretion, perform subsea remote operated vehicle ("**ROV**") inspections of the Satellite Well System and LSPS in connection with regularly scheduled ROV inspections. The LSPS Operator and Satellite Operators and the Host Operator shall use reasonable efforts to minimize associated mobilization/demobilization costs by coordinating such inspections with the Host and Host subsea production system ROV operations. ROV inspections shall be at time intervals prescribed by the BOEMRE and shall include:

   (a) Piping and equipment associated with the Satellite Well System and LSPS;
   (b) The route of the Satellite Well System and LSPS.

13.   Hot oiling/pigging operations associated with the LSPS flowlines at the discretion of the LSPS Operator and coordinated with the Host Operator, pursuant to hot oiling/pigging procedures mutually agreed to between the Host Operator and LSPS Operator.

14.   Gas lift operations associated with the LSPS flowlines/risers at the discretion of the LSPS Operator and coordinated with the Host Operator, pursuant to gas lift procedures mutually agreed to between the Host Operator and LSPS Operator.

15.   Disposal of flowline hydrostatic test water during initial instillation of the Satellite Well System and LSPS.

16. Chemical injection services for the Satellite Well System and LSPS, including the monitoring of injection rates, injection pressures and other typical injection parameters.

17. Utilities and electrical power for the Satellite Well System and LSPS from Host existing sources.

18. Real-time data and documentation relative to the performance of the services listed above:

   (a) that may be required for regulatory compliance reporting,
   (b) that is consistent with the documentation procedures utilized by the Host Operator, and
   (c) as mutually agreed by the Satellite Operators, the LSPS Operator, and Host Operator

19. If subsea isolation valves (SSIVs) are installed then at the discretion of the Host Operator (for the Satellite System) and LSPS Operator (for the Satellite Well System), integrity testing of the flowline SSIVs in accordance with the subsea production system procedures, and monitoring and control of the flowline SSIVs through the Host emergency shutdown system.

20. Upon mutual agreement by the Host Operator and the Satellite Operator(s) on acceptable Satellite Lease Production inlet parameters, the Producers shall be allowed to unload the Satellite Lease wells to the Host upon the conclusion of well completion operations or workovers on the Satellite wells. Such agreement by the Host Operator shall not be unreasonably withheld. After such agreement is reached, said well unloading services shall be performed by the Host Operator. The Satellite Operators shall be solely responsible for all actual incremental costs incurred by the Host Operator in providing the services described in this Section 20, including, but not limited to:

   (a) costs associated with additional and/or third-party equipment and/or personnel the Host Operator may elect to use or have on standby in connection with Satellite well unloading operations, and
   (b) the repair of any damage to, or the replacement of, equipment on the Host and all facilities located thereon, including but not limited to the Facility Access Modifications, Host Dedicated Facility, Host Common Facilities, the Oil Export Pipeline, and the Gas Export Pipeline, to the extent such damage or replacement results from the Satellite Leases unloading operations.

   Well unloading operations shall conclude when, in the sole judgment of the Host Operator, Production from the well being unloaded is suitable for introduction into the normal process flow for production handling on the Host.

1   21.   The Satellite Operators shall retain responsibility for all Satellite Well System
2         operations that are not performed from or on the Host including, but not limited
3         to, downhole well operations.

4

5                     **[Remainder of this page intentionally left blank]**

**EXHIBIT "F"**

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## OPERATING AND MAINTENANCE EXPENSES

| BP Cost Center | Cost Category | Allocation Basis | Included Satellites | Field Products | WI Splits | Systems Included |
|---|---|---|---|---|---|---|
| SEG 7008508 | MC 519 Unit Leases [Satellite Leases Direct Expense] | | | | | Starting Point = Wellbore. Includes Santa Cruz / Santiago subsea production skid and jumper line(s) Ending point = Santa Cruz / Santiago jumper line(s) interconnection to the LSPS |
| 1000679936 | MC 519 & MC 563 Expenses on behalf of Operator | Bill 100% Noble. Noble will bill its JV partners | OCS-G 27278 #1 - Santa Cruz OCS-G 21176 - Santiago | N/A | | |
| SEG 7008503 | Isabela Lease [Satellite Leases Direct Expense] | WI | OCS-G 19966 - Isabela | N/A | | Starting Point = Wellbore Includes Isabela subsea production skid and jumper line(s) Ending point = Isabela jumper line(s) interconnection to the LSPS |

1

| SEG 7008540 | Looped Subsea Production System (LSPS) [LSPS Direct Expense] | OEB throughput utilizing the Latest Fully Allocated Production Month(s) | OCS-G 19966 - Isabela OCS-G 27278 #1 - Santa Cruz OCS-G 21176 - Santiago | OEB | n/a | Starting points = Downstream of MC 519 Unit Leases and Isabela Lease jumper lines Includes - Choke tie-in bases, subsea manifolds, umbilicals and terminations, flowline, flowline risers Ending point (1) = MC 519 Unit Leases LSPS leg riser boarding valve Ending point (2) = Isabela Lease LSPS leg riser boarding valve |
|---|---|---|---|---|---|---|
| SEG 7008540 | Facility Access Modifications [Facility Access Modifications Dedicated System] | OEB throughput utilizing the Latest Fully Allocated Production Month(s) | OCS-G 19966 - Isabela OCS-G 27278 #1 - Santa Cruz OCS-G 21176 - Santiago | OEB | n/a | Starting point (1) = MC 519 Unit Leases flowline riser leg boarding valve Starting point (2) = Isabela Lease flowline riser leg boarding valve Includes:  All equipment added to and located on the Host required for the processing and handling of Satellite Production.   Inlet seperators, process liquids cooling, boarding valves and topsides choke, flowline pig launchers and receivers, methanol injection, subsea chemical injection, riser Gas lift compression, Oil and Gas and water metering and fluid sampling equipment,  hydraulic power unit, topsides umbilical termination assembly, master control station Ending point (1) = Departing ball valve for inlet separator (MBD 2080) and inlet heat exchanger (HAL 2060) Ending point (2) = Departing ball valve for inlet separator (MBD 2079) and inlet heat exchanger (HAL 2059) |

1

| SEG 1000548933 | Gas System Host (Host Dedicated Facility) | Gas throughput utilizing the Latest Fully Allocated Production Month(s) | Gas | n/a | Starting point 1 = Downstream of departing ball valves from gas inlet separators. Systems including, but not limited to, the Intermediate booster compressor, MEG Injection system, MEG ring main, MEG reclamation system, bulk condensate heat exchanger and condensate FWKO Ending Point = Departing ball valves from the condensate FWKO and booster gas compressor |
| SEG 1000563825 | Oil System Host (Host Dedicated Facility) | Oil throughput utilizing the Latest Fully Allocated Production Month(s) | Oil | n/a | Starting Point 1 = Downstream of departing ball valves from HAL 2059, HAL 2060 Starting Point 2 = Inlet shutdown valves to LACT charge pumps on the Oil Shipping Systems Systems including, but not limited to, crude bulk heat exchanger, crude oil FWKO, methanol system, hull flow assurance tanks (wet & dry oil), riser gas compressor package, field gas compressor packages, hull flow assurance ring main piping, hull flow assurance pumps, and oil shipping systems Ending Point 1 = Departing ball valves from the oil FWKO Ending point 2 = Oil pipeline connection point. Upstream flanges of the inlet valve to the pig launcher and the valve allowing bypass of the pig launcher on the Satellite Field (s) boarding valve on the Host Facility. |

| SEG 1000548925 | Host Common Equipment (Host Common Facilities) | Throughput utilizing the Latest Fully Allocated Production Month(s) | East Anstey MC607 - OCS-G 9837 MC 608 OCS-G 9838 Herschel / Fourier Unit MC520 - OCS-G 982119 MC521 - OCS-G 8822 MC522 - OCS-G 8823 MC565 - OCS-G 11002 MC566 OCS-G 8831 Ariel Unit MC385 - OCS-G 7938 MC429 - OCS-G 7944 MC430 - OCS-G 9808 Kepler MC383 - | LEB | n/a | Starting Point = Downstream of ball valves leaving booster gas compressor condensate FWKO and oil FWKO. Systems including but no limited to: electrical generation systems, quarters, galley, hull systems, gas dehydration systems, bulk oil treater, treater degassing separator vapor recovery unit(s) waste-heat recovery systems (with the exception of those included in Dedicated Facilities), utility air systems, produced water systems, platform drainage systems, fuel gas systems, sea-water systems, wet and dry oil tanks, sales gas meters / compression systems (with the exception of those included in Dedicated Facilities), diesel systems, flare systems, heliport, boat docking facilities, utility buildings, fire water systems, potable water systems, emergency pump, communications systems, safety equipment buoys, sewage treatment systems, computer assisted operations equipment, radar systems and platform cranes. Note W-3 and N-3 Riser baskets utilized by Export Pipelines are part of the HOST. All systems on the Host Facility NOT identified as Dedicated Systems, Host Dedicated Facilities or Export Pipelines. Ending Point 1 = Gas pipeline connection point, connection of the lower face of the tie-in spool to the flange located directly above the gas pipeline SCR flex joint located in the W-3 riser basket. Ending Point 2 = Upsream of inlet shutdown valves to LACT charge pumps on the Oil Shipping Systems. |



OCS-G
7937
**Coulomb
(S)**
MC657
OCS-G
8496
**Coulomb
(N)**
MC613
OCS-G
19974
**Isabela
Lease**
MC562
OCS-G
19966
**MC 519
Unit
Leases**
MC519
OCS-G
27278
MC563
OCS-G
21176

"

1
2
3
4
5
6
7
8

## EXHIBIT "G"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## HOST FLUID LIMITS/OPERATING PARAMETERS

**Composite Value**

1. **Pressure and Temperature:**
   a. Minimum delivery pressure at the Entry Point(s) — 0 psig
   b. Maximum delivery pressure at the Entry Point(s) — 11,000 psig
   c. Minimum delivery temperature at the Entry Point(s) — 39 °F
   d. Maximum delivery temperature at the Entry Point(s) — 235 °F

2. **Compositional Limits:**
   a. $H_2S$ — <0.25 grains $H_2S$/100 scf
   b. $CO_2$ — <2 mole percent
   c. $N_2$ and $CO_2$ combined — <3 mole percent
   d. Wax — <6% by weight on stabilized atmospheric samples)
   e. Asphaltenes — <8% by weight on stabilized atmospheric samples)
   f. Methanol — <50 ppm
   g. Sand content in liquid — <1 lb / 1000 bbl,
   h. Sand content in gas — <0.1 lb / 1,000,000 scf
   i. Scale — none
   j. Dead Oil API Gravity — 20 – 60
   k. Dead Oil Viscosity at 100 °F — <50 cp
   l. Dead Oil Viscosity at 39 °F — <1,100 cp
   m. Dead Oil Wax Appearance Temperature — 120 ° F
   n. Gas Oil Ratio — 50,000 scf / bbl (max. design basis)
   o. Total Acid Number — < 0.4 mg KOH/g

9
10

[Remainder of this page intentionally left blank]

Execution Version

1

## EXHIBIT "H"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## INSURANCE PROVISIONS

Host Operator, LSPS Operator, Satellite Operators and Producers shall, at all times during the term of this Agreement, carry and pay for the following types and amounts of insurance, as specified herein, with the exception of Worker's Compensation insurance which shall only be carried by and paid for by Host Operator, LSPS Operator and Satellite Operators. The Producers obligation to carry and pay for the insurance described herein can be met solely by a Satellite Operator, individually or in the aggregate by the associated Producers (values shown herein are on a gross basis).

## REQUIRED INSURANCE COVERAGES

1.  Worker's Compensation insurance in statutory limits as prescribed by applicable law, covering all liabilities owed for compensation and other benefits under applicable state or federal worker's compensation laws, and Coverage B Employer's Liability Insurance in the amount of Ten Million and No/100 Dollars ($10,000,000); both the aforementioned statuary coverage and Coverage B shall contain endorsements naming HOST OPERATOR as Alternate Employer and providing coverages for voluntary compensation and occupational disease; and Maritime Coverage B for all of the above coverages and including transportation, wages, maintenance and cure, covering liability under the Longshore and Harbor Workers' Compensation Act, the Jones Act, the Outer Continental Shelf Lands Act, the General Maritime Law, and specifically including coverage for claims of masters and members of crews of vessels and claims under 33 U.S.C.A. §905(b) against any vessel. All policies required by the paragraph 1 shall provide that claims "in rem" shall be treated the same as claims "in personam."

2.  Commercial General Liability (Bodily Injury and Property Damage) Insurance including the following supplementary coverages:  (i) Contractual Liability to cover liability assumed under this Agreement; (ii) Products and Completed Operations (iii) Broad Form Property Damage Liability and (iv) Coverage for explosion, collapse and underground hazards. The limit of liability for all such insurance required under with this paragraph 2 shall not be less than One Hundred Million and No/100 Dollars ($100,000,000) combined single limit per occurrence. All policies required by this paragraph 2 shall provide that claims "in rem" shall be treated the same as claims "in personam."

3. Automobile Bodily Injury and Property Damage Liability Insurance. Such insurance shall extend to owned, non-owned, and hired automobiles used by Producers in connection with its operations. The limits of liability of such insurance shall be not less than Two Million and No/100 Dollars ($2,000,000) combined single limit per occurrence.

4. If vessels or barges are used in connection with this Agreement, the Party using or contracting for the use of such vessels or barges shall carry or cause to be carried Hull and Machinery Insurance, including collision liability, on all vessels and barges used in connection with work related to this Agreement with a limit equal to or greater than the fair market value of each such vessel and barge.

5. If vessels or barges are used in connection with this Agreement, the Party using or contracting for the use of such vessels or barges shall carry or cause to be carried Protection and Indemnity Insurance on all vessels and barges used in connection with work related to this Agreement including coverage for; injuries to or death of masters, mates, and crews, collision liabilities not covered under the vessel's H&M insurance, excess collision liabilities, and pollution liabilities. All policies required by this paragraph 5 shall have deleted therefrom the phrase "as required by contract" and the phrase "as owners of the vessel named herein" and all similar phrases purporting to limit the underwriter liability to that of an owner. The limit of such insurance shall not be less than the value of the vessel or Twenty Million and No/100 Dollars ($20,000,000) per occurrence, whichever is less. All policies required by the paragraph 5 shall provide that claims "in rem" shall be treated the same as claims "in personam."

6. If aircraft, including but not limited to helicopters, are used in connection with this Agreement, (excepting such aircraft and helicopters furnished by or employed for hire from Host Operator) the Party using or contracting for the use of such aircraft shall carry or cause to be carried Aircraft Liability (Bodily Injury- including liability to passengers – and Property Damage) insurance with an overall combined single limit per occurrence of not less than One Hundred Million and No/100 Dollars ($100,000,000).

7. The Producers, individually for their interest, or Satellite Operators, on behalf of the associated Producers, shall carry Operator's Extra Expense insurance including, but not limited to: coverage for control of well (including underground control of well); seepage, pollution, clean-up and contamination; evacuation expense; deliberate well firing, redrilling expenses and making wells safe. The limit for such insurance shall not be less than Two Hundred Fifty Million and No/100 Dollars ($250,000,000) combined single limit per occurrence.

**[Remainder of this page intentionally left blank]**

**EXHIBIT "I"**

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

**DISPUTE RESOLUTION PROCEDURES**

I.  **OVERVIEW**

    A.    <u>Description and Goals</u>.  Arbitration as used in this statement is a procedure whereby an Arbitrator resolves any claim(s), controversy(ies) or dispute(s) (the "Dispute") between the Parties arising out of, relating to or in connection with the Agreement, including the interpretation, validity, termination or breach thereof.

        (i)    Binding:  The arbitration process is binding on the Parties and this arbitration is intended to be a final resolution of any Dispute between the Parties as described above, to the same extent as a final judgment of a court of competent jurisdiction.  Each Party hereby expressly covenants that it shall not resort to court remedies except as provided for herein, and for preliminary relief in aid of arbitration.

        (ii)    Violation:  A non-prevailing Party shall pay all legal and court costs incurred by the other Party in connection with the enforcement of the final resolution of any Dispute under this Dispute Resolution Procedure.  Suits, actions or proceedings in connection with such enforcement shall be instituted in the United States District Court for the Southern District of Texas, and pursuant to Title IX of the United States Code.  Each Party waives any option or objection which it may now or thereafter have to the laying of the venue in any such suit, action or proceeding and irrevocably submits to the jurisdiction of such court in any such suit, action or proceeding.

    B.    <u>Duty to Negotiate</u>:  The Parties shall inform one another promptly following the occurrence or discovery of any item or event which might reasonably be expected to result in a Dispute in connection with the Agreement.  The Parties will attempt to resolve satisfactorily any such matters.

    C.    <u>Notice of Unresolved Dispute</u>:  Should a Dispute arise which the Parties cannot resolve satisfactorily, either Party may deliver to the other Party a written notice of the Dispute with supporting documentation as to the circumstances leading to the Dispute (the "Notice of Dispute").  The Parties, within ten (10) Days from delivery of such notice, shall then each appoint a management representative

("Management Representative") who has no prior direct involvement with the subject matter of the Notice of Dispute and who is duly authorized to investigate, negotiate and settle the Dispute. The Management Representative for each Party shall meet and confer as often as they deem reasonably necessary for a period not exceeding thirty (30) Days following the delivery of the Notice of Dispute in good faith negotiations to resolve the Dispute amicably. The parties in their sole discretion may also agree to utilize the service of a mediator pursuant to a joint engagement. Unless otherwise provided herein, all such notices shall be served in accordance with the provisions of the Agreement.

## II.    ARBITRATION PROCESS

A.    **Arbitration:** If the Parties are unable to resolve the Dispute within forty (40) Days following the receipt of the Notice of Dispute, or such additional time as may be mutually agreed, the matter shall be submitted to arbitration in accordance with the procedures set forth below.

B.    **Initiation of Arbitration:** The arbitration shall be initiated by either party delivering to the other a Notice of Intention to Arbitrate.

C.    **Governing Procedures:** Except as expressly provided herein, the arbitration shall be conducted in accordance with procedures that are mutually acceptable to the Parties, including limited depositionless discovery.

    (i)    Governing Law: The Arbitrator shall apply the governing substantive law of the state chosen by the Parties to the Agreement.

D.    **Arbitrator:** There shall be one Arbitrator, who shall be independent, impartial and experienced in arbitration proceedings. Arbitrator shall be experienced in the oil and gas industry and knowledgeable or specializing as to the subject matter involved in the Dispute. The Arbitrator shall be chosen as follows: the Parties shall have thirty (30) Days from the delivery of a Notice of Intention to Arbitrate to mutually agree on an Arbitrator. If the Parties cannot mutually agree within said thirty (30) Day period, then the Parties shall, within three (3) Days after expiration of the thirty (30) Day period, apply to the American Arbitration Association as the Appointing Authority, for the appointment of an Arbitrator for or on behalf of the Parties, and in such case the Arbitrator appointed by the Appointing Authority shall meet the criteria set forth in this Section II.D. and shall act as if mutually agreed to by the Parties.

    (i)    Conflicts: Any Arbitrator, prior to his or her appointment, shall disclose to the Parties all actual or perceived conflicts of interest and business relationships involving the Dispute or the Parties, including but not limited

to, any professional or social relationships, present or past, with any Party (or its affiliates), including any Party's (or its affiliates) directors, officers and supervisory personnel and counsel.   Any Party may challenge in writing the appointment or continued service of any Arbitrator for lack of independence, partiality or any other cause likely to impair such Arbitrator's ability to effectively participate in the proceedings or render a fair and equitable decision.   Where such challenge is made, the Appointing Authority shall uphold or dismiss the challenge.  In the event a challenge is upheld, the Arbitrator shall be replaced.  A replacement will be selected in the same manner as the original Arbitrator was selected.  If an Arbitrator resigns or becomes unable or unwilling to continue to serve as the Arbitrator, a replacement shall be selected in the same manner as that Arbitrator was chosen.

(ii)   Multi-Party Arbitrations:  Where more than two Parties are involved in the Dispute ("Multi-Party Arbitration"), all Parties shall jointly name and agree as the appointment of the Arbitrator meeting the criteria set forth in Section II.D. above.  If the Parties cannot agree as to the choice of the Arbitrator within the said thirty (30) Days, any of the Parties hereto may in like manner, within three (3) Days after written notice to the other Parties, apply to the Appointing Authority for the appointment of an Arbitrator meeting the criteria set forth in Section II.D. above.

(iii)   Management of the Arbitration:  The Arbitrator shall actively manage the proceedings as he or she deems best so as to make the same expeditious, economical and less burdensome and adversarial than litigation.

E.   **Confidentiality**:  All documents, briefs, testimony, transcripts, as well as, all Arbitrator decisions shall be confidential. Likewise, the views, suggestions, admissions, proposals and other information exchanged in the arbitration are confidential and are inadmissible in any other proceeding.

F.   **Costs and Expenses**:  The Parties involved in the dispute shall be equally responsible for all costs, fees and expenses incurred by the Arbitrator and any other incidental costs incurred in connection with the arbitration proceeding shall also be borne equally by the Parties.  Each Party is solely responsible for its own attorneys' fees and expenses incurred in the Arbitration.  In the event of a Multi-Party Arbitration, all costs and expenses shall be borne equally by all Parties.

G.   **Submissions**:  Within thirty (30) Days after the selection of the Arbitrator, each Party shall provide the Arbitrator with a short and plain submission defining the issues to be decided and the nature of the relief that the Arbitrator may award (the "Submission").   This Submission shall explicitly authorize the Arbitrator to

decide these issues.  This authorization shall stay in force for period no longer than nine (9) months from this Submission. If the Parties are unable to reach consensus as to the issues involved, the Arbitrator in his or her sole discretion shall frame the issues through a reasonable procedure.  The Arbitrator will render decisions on the specific issues established and shall fashion any remedy that the Arbitrator deems appropriate so long as that remedy is consistent with the Parties' Submissions hereunder.  Any money judgment entered by the Arbitrator shall be payable in U.S. dollars.

H. **Transcriptions**:   The presentations and argument will be transcribed for the benefit of the Arbitrator and the Parties.

I. **Discovery**:   Commencing thirty (30) Days after the receipt of the opposing Party's Submission, each Party may serve upon the other Party up to ten (10) requests for the production of documents, including subparts.  The requests shall be made in good faith and not be served for the purpose of delay or harassment. Each request shall describe the type of document(s) sought and each request shall be limited to documents that are relevant to a claim or defense in the Arbitration proceeding, or reasonably calculated to lead to the discovery of admissible evidence.  The requests need not be served all at once but may be served in stages.

  (i) The Party served with a request under this provision shall provide the adverse Party with copies of the requested documents, and identify the request to which each document is responsive, within twenty (20) Days of the receipt of the request.  If the Party served with a request objects to the production of any of the requested documents, it shall nevertheless produce within the permitted time all documents responsive to any request that is not objected to by that Party.

  (ii) A Party that is served with a request may challenge the propriety of the request within the time permitted for response by a short written objection which shall be forwarded to the adverse Party and to the Arbitrator. The adverse Party shall submit its response, if any, to the objecting Party and the Arbitrator within five (5) Days of receipt of the objection.   The Arbitrator shall consider the request, the objection and the response, if any, and decide whether the production shall be allowed or denied or whether the request should be modified within ten (10) Days after the submission of the adverse Party's response.

J. **Presentations**:   No later than twenty-five (25) Days prior to the date that presentations to the Arbitrator are to begin, each Party will submit to the Arbitrator and serve on the other Party a written position statement.  The original statement of each Party shall not exceed thirty-five (35) typewritten letter-size

pages. Each Party shall have the right to submit reply statements no later than fifteen (15) Days prior to the date of the presentation. Such reply statements shall not exceed fifteen (15) typewritten letter-size pages.

(i)     All documents and affidavits that a Party intends to use during its presentation shall be submitted to the Arbitrator and served on the other Party with the position and reply statements. All demonstrative exhibits shall be exchanged five (5) Days in advance of the presentations.

(ii)    The presentations to the Arbitrator shall extend for such time as the Arbitrator agrees to be appropriate. In the absence of any agreement, the presentations for both Parties shall extend for no longer than two (2) Days and shall be concluded within six (6) months after selection of the Arbitrator. Presentations of each Party shall occur successively with no intervening delay.

(iii)   Each Party shall make an oral and/or documentary presentation of its position in such order and in accordance with the time schedule established by the Arbitrator. The Arbitrator may question each of the presenters during or following any and all presentations.

The Arbitrator shall determine a reasonable time and location for the presentations.

**K.**     **Decision and Award:** The Arbitrator shall promptly (within sixty (60) Days of conclusion of the presentations or such longer period as the Parties may mutually agree) determine the claims of the Parties and render a final decision in writing. The decision shall state with specificity the findings of fact and conclusions of law on which it rests. The decision rendered by the Arbitrator may be enforced in accordance with Section I.A.(ii), above, and may only be appealed pursuant to Section L below. The decision shall be served upon each of the Parties by facsimile transmission and by first class mail.

(i)     If applicable law allows pre-award interest, the Arbitrator may, in his or her discretion, grant pre-award interest and, if so, such interest may be at commercial rates in the state chosen by the Parties pursuant to Section II.C.(i) during the relevant period. Each Party shall be responsible for its own attorney's fees and costs of arbitration. The Arbitrator shall not award consequential, punitive, indirect or other noncompensatory damages.

(ii)    Within ten (10) Days of receipt of the award either side may submit a Motion to Modify the award. A response shall be due within fifteen (15)

Days thereafter and the Arbitrator shall rule thereon within fifteen (15) Days after receipt of the response.

(iii)   Judgment on the award may be entered in a United States District Court for the Eastern District of Louisiana at any time within one year after the decision is made.

**L.**   **Vacation of Award and Appeal:**  An appeal from an order or judgment pursuant to this Section II.L. shall be instituted in the United States District Court for the Eastern District of Louisiana.  The court may vacate the award only if the award was procured by or through fraud or corruption.  Each Party waives any option or objection which it may now or thereafter have to the laying of the venue of any such suit, action or proceeding and irrevocably submits to the jurisdiction of the court in any such suit, action or proceeding.  Each Party agrees that a remedy at law for a violation of this Section II.L. may not be adequate and therefore agrees that the remedies of specific performance and injunctive relief shall be available in the event of any violation in addition to any other right or remedy at law or in equity to which any Party may be entitled.

**M.**   **Res Judicata:**  To the extent permitted by law, any decision of the Arbitrator shall not be res judicata or have any binding effect in any other litigation or arbitration where any Party to this Agreement may also be a party.

**[Remainder of this page intentionally left blank]**

## EXHIBIT "J"

Attached to and made part of that certain Deepwater Production Handling and Operating Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS OWNERS and PRODUCERS

## CERTIFICATION OF NONSEGREGATED FACILITIES

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not permit its employees to perform their services at any location under its control, where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in any Government contract between Contractor and Operator. As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors) prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity Clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES. A Certification of Non-segregated Facilities, as required by the May 9, 1967 order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i. e., quarterly, semi-annually or annually). (1968 MAR.) (Note: The penalty for making false statements in offers is prescribed in 18. U.S.C. 1001.) Whenever used in the foregoing Section, the term "contractor" refers to each party to this agreement.

1
2
3     <u>EXHIBIT "K"</u>
4
5        Attached to and made part of that certain Deepwater Production Handling and Operating
      Services Agreement dated effective September 21, 2010, by and between OWNER, LSPS
      OWNERS and PRODUCERS
6
7              **APPROVED AFE's**
8
9            **[Remainder of this page intentionally left blank]**

# bp

## AUTHORIZATION FOR EXPENDITURE

| | |
|---|---|
| SAP NO: | |
| LM(0618) | [ Select One ] ▼ |
| LM(0624) COST CENTER | |

| | | | | |
|---|---|---|---|---|
| DATE PREPARED: | 20-Mar-2008 | FINANCIAL MEMO NO: | GoM-FM-2008-23 | |
| OPERATOR: | BP | AFE NO: | ZI-005DG | |
| LEASE/UNIT/FACILITY: | Isabela | START DATE: | 4-Jan-2008 | |
| LEASE/FAC FLAC ID: | | END DATE: | | |
| WELL DESC/NAME/NO: | | SURFACE LOCATION: | | |
| WELL FLAC: | | BOTTOM HOLE LOC: | | |
| BUSINESS UNIT: | GoM | PRPSD TOTAL DEPTH: | | |
| BP WORKING INTEREST: | 67% | COUNTY/STATE: | GoM Offshore - Feder | |
| JOINT OPRTG AGRMNT NO: | | OPERATING FIELD: | Isabela | |
| SAP COST CENTER: | 1000000827 | HORIZON: (formation/prospect) | | |

| CAPITAL | |
|---|---|
| IE | A1 B&P Original Construction ▼ |
| Project Type | [ Select One ] ▼ |
| EXP COMP/ADDIT | [ Select One ] ▼ |
| REPLACEMENT ACCOUNTING | [ Select One ] ▼ |

| EXPENSE | |
|---|---|
| Project IDs | [ Select One ] ▼ |

| WELL TYPE: If Applicable | |
|---|---|
| [ Select One ] | ▼ |
| [ Select One ] | ▼ |
| [ Select One ] | ▼ |
| FIELD TRIAL - Required | |
| [ Select One ] | ▼ |
| COPAS Overhead - Required | |
| Major Construction | ▼ |

### PROJECT DESCRIPTION/COMMENTS

Project Name: Isabela IPT

In accordance with Article 12 of the Operating Agreement, BP proposes the formation of a Project Team to prepare a Development Plan for Isabela. The scope of work is to progress the development of a viable concept for Isabela. Consider HSE, Regulatory, Host and Expansion requirements and impacts. Ensure work performed by IPT will allow the Parties to evaluate the scope, timing, costs, and capacity of the proposed Development System

| WORKING INTEREST OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.670% | 66.670% | $10,843,041 | |
| Noble | 33.330% | 33.330% | $5,420,707 | |
| | | | $0 | |
| Total | 100% | Total 100% | Total Costs $16,263,748 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| | Technical Labor | $4,133,501 | $4,133,501 |
| | Subsea Engineering | $11,473,178 | $11,473,178 |
| | Wells Engineering (D&C) | $655,070 | $655,070 |
| | TOTAL PROJECT COST | $16,253,749 | $16,253,749 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | | | | |

NOTICE TO NONOPERATOR: Costs shown are estimates only. Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement.

PARTNER APPROVAL: YES __X__ NO _____ DATE 05-21-08.

COMPANY NAME / NONOPERATOR: Noble Energy, Inc.

PRINT NAME: David L. Stover   TITLE: Executive VP & COO

SIGNATURE: David L. Stover

| ADDITIONAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Steve Raymer | | March 28, 2008 |
| OPS MANAGER: | | | |
| PROJ GENERAL MANAGER: | Cathy Bogan | Catherine K Bogan | Mar 28, 2008 |
| COMMERCIAL / CONTROL: | Steve McMahon / Susan Jensen | S. McMahon | 03/28/08 |
| BUSINESS UNIT LEADER: | Craig Wiggs | | 3/31/08 |
| DOA (Delegation of Authority) | Verified Yes ____ No: ____ | Initial | |
| FINANCIAL TREATMENT | Verified Yes ____ No: ____ | Initial | |

Form #19  Rev: 5.29.07

**bp**

## AUTHORIZATION FOR EXPENDITURE

| | |
|---|---|
| SAP NO: | ZI-0067Y |
| | |

| | | | |
|---|---|---|---|
| DATE PREPARED: | 5/5/2009 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-55 |
| OPERATOR: | BP | AFE NO: | ZI-0067Y |
| LEASE/UNIT/FACILITY: | MC 562 | START DATE: | 05/01/09 |
| LEASE/FAC FLAC ID: | | END DATE: | 10/31/09 |
| WELL DESC/NAME/NO: | Isabela | SURFACE LOCATION: | MC 562 |
| WELL FLAC: | | BOTTOM HOLE LOC: | MC 562 |
| BUSINESS UNIT: | GoMDWV DWP | PRPSD TOTAL DEPTH: | |
| BP WORKING INTEREST: | 66.70% | COUNTY/STATE: | Federal Offshore |
| JOINT OPRTG AGRMNT NO: | MC-562 JOA | OPERATING FIELD: | Galapagos MC-562 |
| SAP COST CENTER: | 1000600427 | HORIZON: | (Miocene/prospect) |

**CAPITAL**

**EXPENSE**

**WELL TYPE - If Applicable**

**FIELD TRIAL - Required**

**COPAS Overhead - Required**

### PROJECT DESCRIPTION/COMMENTS    Project Name: Isabela - Integrated Project Management (Supplement)

Authorization is requested for Detail Engineering and Project Management Support for the Isabela IPT to cover expenditures up until October 31.  Spend includes PM and Engineering for MC 519  Original Isabela IPT AFE of $18.3m.

| Working Interest Owners | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.677% | 66.677% | $6,600,330 | |
| Noble | 33.33% | 33.337% | $3,299,670 | |
| | 0.000% | 0.000% | $0 | |
| Total    100% | Total    100% | Total Costs | $9,900,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| Tangible/Intangible | BP Project Management and Engineering Costs | $3,600,000 | |
| Tangible/Intangible | JPK Engineering | $4,200,000 | |
| Tangible/Intangible | Nelson Engineering | $2,100,000 | |
| | TOTAL PROJECT COST | $9,900,000 | $0 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Steve Raymer | Isabela Project Manager | xxxxxxxxx@xx.xxx | (281) 675-1270 |
| | Brian Burge | Project Services Lead | xxxx.xxxxx@xx.xxx | (281) 675-1567 |

NOTICE TO NONOPERATOR: Costs shown are estimates only.  Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation.  Overhead will be charged in accordance with the Joint Operating Agreement.

| PARTNER APPROVAL: | YES | X | NO | DATE | 06-12-09 |
|---|---|---|---|---|---|

COMPANY NAME / NONOPERATOR:  **Noble Energy, Inc.**

PRINT NAME  **John T. Lewis**    TITLE  **Vice President**

SIGNATURE  *John T. Lewis*

| ADDITIONAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Brian Burge | | |
| PROJ MANAGER | Steve Raymer | | 6 MAY 2009 |
| SUBSEA PROJ. GEN. MGR. | Starlee Welburn | | 6 May 2009 |
| FINANCE TEAM LEAD | Olga Sizykhova | | 6 May 2009 |
| DOA (Delegation of Authority) | Verified  Yes ✓  No ___ | KAR | 5/8/09 |
| FINANCIAL TREATMENT | Verified  Yes ✓  No ___ | KBD | |

Form 115  Rev 3.19.07

**bp**

## AUTHORIZATION FOR EXPENDITURE

SAP NO: Z1-00601
IPFORM) [ Select One ]
IPFOO M) COST CENTER

| | | | |
|---|---|---|---|
| DATE PREPARED: | 31-Oct-08 | FINANCIAL MEMO NO: | OCM-SPU-PM-2008-94 |
| OPERATOR: | BP | AFE NO: | Z1-00601 |
| LEASE UNIT/FACILITY: | Isabela | START DATE: | 1-Nov-08 |
| LEASE/FAC FLAC ID: | | END DATE: | |
| WELL OBSC/NAME/NO: | | SURFACE LOCATION: | |
| WELL FLAC: | | BOTTOM HOLE LOC: | |
| BUSINESS UNIT. | GoM | PRPSD TOTAL DEPTH: | |
| BP WORKING INTEREST: | 67% | COUNTY/STATE: | |
| JOINT OPRTG AGRMNT NO: | | OPERATING FIELD: | Isabela |
| SAP COST CENTER: | 1000000627 | HORIZON: (formation/prospect) | |

**CAPITAL**
Project: 21 BP Original Construction
Project TYPE [ Select One ] BF Capital Dev Facili...
EXP COMPONENT >> FF - Prod Facility [Select One]
REPLACEMENT ACCOUNTING [ Select One ]

**EXPENSE**
Project: [ Select One ]
WELL TYPE - If Applicable [ Select One ]
[ Select One ]
[ Select One ]
FIELD TRIAL - Required [ Select One ]
CDPAS Overhead - Required [ Select One ]
Major Construction

### PROJECT DESCRIPTION/COMMENTS

Project Name: Isabela - Long Lead Equipment

In accordance with Article 12 of the Operating Agreement, BP proposes to move forward with the commitment $35m total gross of Long Lead equipment for the Isabela Project, in order to achieve first Oil Commencing in 1Q 2011. This AFE is to cover Isabela Long Lead Equipment, primarily riser stress joints, umbilical tubes, and topsides equipment.

| WORKING INTEREST OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.670% | 66.670% | $23,334,500 | |
| Noble | 33.330% | 33.330% | $11,665,500 | |
| | | | $0 | |
| Total 100% | Total 100% | Total Costs | $35,000,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| | Stress Joints - Material | $4,500,000 | $4,500,000 |
| | Umbilical - Material | $20,000,000 | $20,000,000 |
| | Topsides - Material | $6,000,000 | $6,000,000 |
| | Other - UAP | $4,500,000 | $4,500,000 |
| | TOTAL PROJECT COST | $35,000,000 | $35,000,000 |

PROJECT CONTACTS:
NAME: Steve Baynter    TITLE: Project Manager
EMAIL: Stephen.Baynter@bp.com    PHONE: /281 675 1570

NOTICE TO NONOPERATOR: Costs shown are estimates only. Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement.

PARTNER APPROVAL:   YES  X   NO ____   DATE 1-12-09
COMPANY NAME / NONOPERATOR: Noble Energy, Inc.
PRINT NAME: John T. Lewis   TITLE: VP Southern Region
SIGNATURE: John T. Lewis

| ADDITIONAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Brian Burge | | 11/18/08 |
| DRLG / FAC MANAGER: | | | |
| PROJ GENERAL MANAGER: | Steve Raymer | | 11/18/08 |
| COMMERCIAL / CONTROL: | Olga Stoyanova | | 11/24/08 |
| ASSET MANAGER: | Starlee Watzura | | 11-24-08 |
| DOA (Delegation of Authority) | Verified  Yes ✓  No ____ | Init: KHR | 11-25-08 |
| FINANCIAL TREATMENT | Verified  Yes ✓  No ____ | Sroat: KRW | 11-25-08 |

Form 115 Rev. 11 21.07

**bp**

## AUTHORIZATION FOR EXPENDITURE

| | | | | |
|---|---|---|---|---|
| SAP NO: | Z1-006DN | | | |
| APPROM | | | | |
| APPROM COST CENTER | | | | |

| | | | |
|---|---|---|---|
| DATE PREPARED: | 5/28/2009 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-12 |
| OPERATOR: | BP | AFE NO: | Z1-006DN |
| LEASE/UNIT/FACILITY: | MC562 | START DATE. | 05/01/09 |
| LEASE/FAC FLAG ID: | | END DATE | 03/31/10 |
| WELL CESGN/NAME-NO. | 15100/3 | SURFACE LOCATION, | MC 562 |
| WELL FLAG | | BOTTOM HOLE LOC | MC 562 |
| BUSINESS UNIT: | GoM DW/ DWP | PRPSD TOTAL DEPTH. | |
| BP WORKING INTEREST. | 66.70% | COUNTY/STATE: | Federal Offshore |
| JOINT OPRTG AGRMNT NO: | MC 562 JOA | OPERATING FIELD. | Galapagos MC 562 |
| SAP COST CENTER | 100064237? | HORIZON | (formation/prospect) |

CAPITAL

EXPENSE

WELL TYPE - If Applicable

FIELD TRIAL - Required

COPAS Overhead - Required

**PROJECT DESCRIPTION/COMMENTS**   Project Name: Isabela / Galapagos / LSPS - Integrated Project Management

Authorization is requested for Detailed Engineering and Project Management expenditure leading to the issuance of Fabrication AFEs for the Isabela / Galapagos Project. This AFE includes engineering and PM for the Looped Subsea Production System (LSPS) and Topsides modifications per the Isabela Development Plan. This AFE is intended to be superseded by a new AFE with updated coowners and working interests following the signing of the LSPS agreement (or other agreement). Additional scope information can be found in the Isabela Development Plan. This AFE is required to meet the MC 562 SOP Milestones. This is part of the Final Design AFE package.

| WORKING INTEREST OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.700% | 66.700% | $16,750,191 | |
| Noble | 33.300% | 33.300% | $8,362,509 | |
| | 0.000% | 0.000% | $0 | |
| Total | 100% | Total 100% | Total Costs $25,172,700 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT-PRODUCER | DRY HOLE |
| Tangible/Intangible | Project Management Costs | $25,172,700 | |
| | TOTAL PROJECT COST | $25,172,700 | $0 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Max Vandenbossche | Isabela Project Manager | | (281) 366-1005 |
| | Bryan Burge | Project Services Lead | | (281) 872-1742 |

NOTICE TO NONOPERATOR: Costs shown are estimates only. Nonoperator should conditions itself that estimate at estate of any any in son the manner of an in a I be requested to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement

PARTNER APPROVAL:   YES  X   NO ____   DATE 10/15/09

COMPANY NAME / NONOPERATOR   Noble Energy, Inc.

PRINT NAME  David L. Stover   TITLE  President and COO

SIGNATURE  David L. Stover

| AFE FINAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR | STEVE BAYMLL | | |
| PROJ MANAGER | FOR Max Vandenbossche | | 8/10/09 |
| SUBSEA PROJ GEN MGR | Robert Mathias | | 8/10/09 |
| FINANCE TEAM LEAD | Brgina Sommerset | | 10 Aug 09 |
| COA (Delegation of Authority) | Verifed  Yes ✓  No ___ | | 10 Aug 09 |
| FINANCIAL TREATMENT | Verifed  Yes ✓  No ___ | | |

Form 115 Rev. 6 20 07

**bp**

## Supplement
## AUTHORIZATION FOR EXPENDITURE

| SAP NO | Z1-006DN |
|---|---|

| DATE PREPARED: | 3/30/2010 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-12 |
|---|---|---|---|
| OPERATOR: | BP | AFE NO: | |
| LEASE/UNIT/FACILITY: | MC562 | START DATE: | 05/01/09 |
| LEASE/FAC ID: | | END DATE: | 03/31/10 |
| WELL DESCNAME/NO: | Isabela | SURFACE LOCATION: | MC 562 |
| WELL FLAC: | | BOTTOM HOLE LOC: | MC 562 |
| BUSINESS UNIT: | GoMDW DWP | PROPD TOTAL DEPTH: | |
| BP WORKING INTEREST: | 66.70% | COUNTY/STATE: | Federal Offshore |
| JOINT OPRTG AGRMNT NO: | MC-562 JOA | OPERATING FIELD: | Galapagos MC-562 |
| SAP COST CENTER | 1000842371 | HORIZONE | |

**CAPITAL**

**EXPENSE**

**WELL TYPE**

**FIELD TYPE**

**PROJECT DESCRIPTION/COMMENTS**   Project Name: Isabela / Galapagos / LSPS - Integrated Project Management

Authorization is requested to Supplement this AFE in the amount of $10.8 M to cover costs increases in Subsea & Topsides detail engineering. This AFE includes engineering and PM for the Looped Subsea Production System (LSPS) and Topsides modifications per the Isabela Development Plan. This AFE is intended to be superceded by a new AFE with updated co-owners and working interests following the signing of the LSPS agreement (or other agreement).

| WORKING INTEREST OWNERs | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.700% | 66.700% | $24,012,000 | |
| Noble | 33.300% | 33.300% | $11,988,000 | |
| | 0.000% | 0.000% | $0 | |
| Total | 100% | Total 100% | Total Cost $36,000,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | | ESTIMATED GROSS COST | | |
|---|---|---|---|---|---|
| | | | Previous AFE Value | REVISED AFE Value | Supplement (if original) |
| Tangible/Intangible | Project Management Costs | | $25,172,700 | $36,000,000 | $10,827,300 |
| | | TOTAL PROJECT COST | $25,172,700 | $36,000,000 | $10,827,300 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Mira Vandenbossche | Isabela Project Manager | | (281) 366-1339 |
| | Brian Byrne | Project Services Lead | | (281) 675-1567 |

NOTICE TO NONOPERATOR: Costs shown are estimates only. Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement.

| PARTNER APPROVAL: | YES X | NO ____ | DATE ____ |
|---|---|---|---|

COMPANY NAME / NONOPERATOR:  Noble Energy, Inc.

PRINT NAME:  John T. Lewis   TITLE  Vice President

SIGNATURE:  *John T. Lewis*

| ADDITIONAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Brian Byrne | | 8/3/2010 |
| PROJ MANAGER | Mira Vandenbossche | | 9/12/2010 |
| SUBSEA PROJ. GEN. MGR. | Robert Marshall | | 5 Aug 2010 |
| FINANCE TEAM LEAD | RON WELLAND | | 9 AUG 2010 |
| COA [Delegation of Authority] | Verified Yes ✓  No ____ | Instr: AB for Allunay | 10 Aug 2010 |
| FINANCIAL TREATMENT | Verified Yes ✓  No ____ | Instr: AB for Allunay | 10 Aug 2010 |

Form 115  Rev. 5 29.07

**bp**

## AUTHORIZATION FOR EXPENDITURE

| | |
|---|---|
| SAP NO: | ZI-006DQ |
| IPGCM | |
| SPGCM COST CENTER | |

| | | | |
|---|---|---|---|
| DATE PREPARED: | 5/19/09 | FINANCIAL MEMO NO: | GOM-DEV-FM-2009-12 |
| OPERATOR: | BP | AFE NO: | ZI-006DQ |
| LEASE/UNIT FACILITY: | MC562 | START DATE: | 05/01/00 |
| LEASE/FAC PLAC ID: | | END DATE: | 03/31/10 |
| WELL DESIGNATION NO: | 15306 3 | SURFACE LOCATION: | MC 562 |
| WELL FLAC: | | BOTTOM HOLE LOC: | MC 562 |
| BUSINESS UNIT: | GoM DW DVP | PRPSD TOTAL DEPTH: | |
| BP WORKING INTEREST: | 66.79% | COUNTY/STATE: | Federal Offshore |
| JOINT OPRTG AGRMT NO: | MC-562 JOA | OPERATING FIELD: | Gatas-Hios MC-562 |
| SAP COST CENTER: | 1000042371 | HGP/QCN | (format or as spect) |

**CAPITAL**

| | | |
|---|---|---|
| Project | 21 - LW Original Construction | |
| Project Task | 04 - Capital Drawing Facilities (Plant Add) | |
| EAP COMPONENT | | |
| REPLACEMENT ACCOUNTING | | |

**EXPENSE**

| | |
|---|---|
| Project ID | |

**WELL TYPE - If Applicable**

**PROJECT DESCRIPTION/COMMENTS**   Project Name: Isabela / Galapagos - Topsides

Authorization is requested for Topsides Equipment & Pre-Installation activities starting prior to the issuance of Fabrication AFEs for the Isabela / Galapagos Project. This AFE includes Topsides modifications on the Na Kika platform per the Isabela Development Plan. This AFE is intended to be superseded by a new AFE with updated covenants and working milestones following the sign off of the MC 519 and MC 562 PHA agreement (or other agreement). Additional scope information can be found in the Isabela Development Plan. This AFE is required to meet the MC 562 SOP Milestones. This is part of the Final Design AFE package.

| WORKING INTEREST OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.790% | 66.790% | $15,674,500 | |
| Noble | 33.200% | 33.200% | $8,325,400 | |
| | 0.000% | 0.000% | $0 | |
| Total | 100% | Total 100% | Total Gross $23,900,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| Tangible/Intangible | Topsides | $20,000,000 | |
| Tangible/Intangible | Other UAP | $3,500,000 | |
| | TOTAL PROJECT COST | $23,500,000 | $0 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Mike Vandenberghe | Isabela Project Manager | | (281) 366-8790 |
| | Brad Burge | Project Services Lead | | (281) 971-1567 |

NOTICE TO NONOPERATORS: Costs shown are estimates only. Non-operators should consider these estimates in establishing any level on the monies which will be required to perform the proposed operation. Costs will be charged in accordance with the Joint Operating Agreement.

PARTNER APPROVAL:   YES  X   NO _____   DATE **10/15/09**

COMPANY NAME NONOPERATOR   Noble Energy, Inc.

PRINT NAME   David L. Stover   TITLE   President and COO

SIGNATURE   *David L. Stover*

| ADDITIONAL APPROVALS | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Brad Burge | | 8/6/09 |
| PROJ MANAGER | STEVE CARTER FOR Mike Vandenberghe | | 8/6/09 |
| SUBSEA PROJ GEN MGR | Robert Marshall | | 10 Aug 2009 |
| FINANCE TEAM LEAD | Brigitte Sowmater | | 10 Aug 2009 |
| DOA (Delegation of Authority) | Verified: Yes ✓ No ___ | | 11 Aug 09 |
| FINANCIAL TREATMENT | Verified: Yes ✓ No ___ | | 21 Aug 09 |
| Form 315 Rev 5-03-07 | | | |

**bp**

## Supplement
## AUTHORIZATION FOR EXPENDITURE

| SAP NO. | Z1-006DQ |
|---|---|

| | | |
|---|---|---|
| DATE PREPARED: | 3/30/2010 | FINANCIAL MEMO NO: | GoM-SPU-FM-2009-12 |
| OPERATOR: | BP | AFE NO: | |
| LEASE/UNIT/FACILITY: | MC562 | START DATE: | 08/01/09 |
| LEASE/FAC FLAC IC: | | EXEC DATE: | 12/31/10 |
| WELL DESC/NAME/NO: | Isabela | SURFACE LOCATION: | MC 562 |
| WELL FLAC: | | BOTTOM HOLE LOC: | MC 562 |
| BUSINESS UNIT: | GoM/Dw DWP | PRP'SD TOTAL DEPTH: | |
| BP WORKING INTEREST: | 66.70% | COUNTRY/STATE: | Federal Offshore |
| JOINT OPR'TG AGRMNT NO: | MC-562 /CA | OPERATING FIELD: | Galamoos VC-562 |
| BP COST CENTER: | 1000042371 | HORIZON: (formation/prospect) | |

**PROJECT DESCRIPTION/COMMENTS**   Project Name: Isabela / Galapagos = Tiepsides

Authorization is requested to supplement this AFE in the Amount of $5.2M in order to closeout P.O.'s assigned to this AFE for Topsides Equipment. This AFE includes Topsides modifications on the Na Kika platform per the Isabela Development Plan. This AFE is intended to be superseded by a new AFE with updated co-owners and working interests following the signing of the MC 519 and MC 562 FKA agreement (or other agreement).

| Working Interest OWNERS | Initial Wl % | Final Wl % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.700% | 66.700% | $79,343,000 | |
| Noble | 33.300% | 37.300% | $9,657,000 | |
| | 0.000% | 0.000% | $0 | |
| Total | 100% | Total 100% | Total Costs $26,000,000 | |

| TANGIBLE / INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | | |
|---|---|---|---|---|
| | | Previous AFE Value | REVISED AFE Value | Supplement/Overrun |
| Tangible/Intangible | Topsides | $30,300,000 | $29,600,000 | $6,700,000 |
| Tangible/Intangible | Other/LIAP | $3,500,000 | $0 | ($3,500,000) |
| | TOTAL PROJECT COST | $23,800,000 | $29,000,000 | $5,200,000 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Win Vandenbossche | Isabela Project Manager | | (281) 366-1239 |
| | Brue Byrd | Project Services Lead | | (281) 675-1567 |

NOTICE TO NONOPERATOR: Costs shown are estimates only. Nonoperators should not consider these estimates as establishing any limit on the monies which will be required to perform the proposed operation. Overhead will be charged in accordance with the Joint Operating Agreement.

**PARTNER APPROVAL:**   YES  X   NO ___   DATE: _____

COMPANY NAME / NONOPERATOR:   Noble Energy, Inc.

PRINT NAME   John T. Lewis   TITLE   Vice President

SIGNATURE:   John T. Lewis

| ADDITIONAL APPROVALS: | PRINT NAME | SIGNATURE | DATE |
|---|---|---|---|
| AFE ORIGINATOR: | Brue Byrd | | 8/2/2010 |
| PROJ MANAGER: | Win Vandenbossche | | 8/3/2010 |
| SUBSEA PACL GEN. MGR: | Robert Marshal | | 5 Aug 2010 |
| FINANCE TEAM LEAD | Roger McDonald   BEN WELLMAN | | 9 Aug 2010 |
| DOA (Delegation of Authority)   Vetted   Yes X   No: ___ | | Ini't AB for MWright | 10 Aug 2010 |
| FINANCIAL TREATMENT   Vetted   Yes X   No: ___ | | Ini't AB for AWright | 10 Aug 2010 |
| Form 111 Rev 3.25.07 | | | |

# bp

## AUTHORIZATION FOR EXPENDITURE

SAP NO. Z1-007DQ

| CAPITAL |
|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| DATE PREPARED: | 3/24/2010 | FINANCIAL MEMO NO. | | | | |
| OPERATOR: | BP | AFE NO. | | | | |
| LEASE UNIT/FACILITY: | MC562 | START DATE | 04/01/10 | | | |
| LEASE/AG FLAG ID | | END DATE | 12/30/11 | | | |
| WELL DESIGN MENG | Isabela | SURFACE LOCATION | MC 562 | | | |
| WELL FLAG: | | BOTTOM HOLE LOC. | MC 562 | | | |
| BUSINESS UNIT | GoMEX/GWA | PROP. TOTAL DEPTH | | | | |
| BP WORKING INTEREST: | 66.76% | COUNTY/STATE | Federal Offshore | | | |
| JOINT OPER'D AGRMT NO. | MC-562-JOA | OPERATING FIELD | Galapagos MC-562 | | | |
| SAP COST CENTER: | 1000642971 | HORIZON: | | | | |

PROJECT DESCRIPTION/COMMENTS   Project Name: Galapagos - Fabrication AFE - Topsides

Authorization is requested for Topsides Equipment & Installation services. This AFE includes Topsides modifications on the Na Kika platform per the Isabela Development Plan. This AFE is intended to be superseded by a new AFE with updated co-owners and working interests following the signing of the MC 519 and MC 562 PHA agreements (or other agreements). Additional scope information can be found in the Isabela Development Plan. This AFE is required to meet the MC 562 SOP Milestones.

| Working Interest OWNERS | Initial WI % | Final WI % | WI COST | NOTES |
|---|---|---|---|---|
| BP | 66.76% | 66.76% | $34,281,845 | |
| Noble | 33.33% | 33.33% | $27,404,479 | |
| | 0.00% | 0.00% | $0 | |
| Total | 100% | Total 100% | Total Cost $41,881,924 | |

| TANGIBLE/INTANGIBLE | DESCRIPTION | ESTIMATED GROSS COST | |
|---|---|---|---|
| | | PROJECT / PRODUCER | DRY HOLE |
| Intangible | Topsides PMT & Detail Engineering | $7,300,000 | |
| Tangible/Intangible | Topsides Procurement & Installation | $50,054,853 | |
| Tangible/Intangible | LWAP | $24,200,071 | |
| | | | |
| | TOTAL PROJECT COST | $82,385,924 | $0 |

| PROJECT CONTACTS: | NAME | TITLE | EMAIL | PHONE |
|---|---|---|---|---|
| | Mike Vandenberghe | | Galapagos Project Manager | |
| | Brian Byrne | | Project Services Lead | |

PARTNER APPROVAL:   YES  X   NO   DATE 08-17-2010

COMPANY NAME - INCORPORATED   Noble Energy, Inc.

PRINT NAME   John T. Lewis        TITLE   Vice President

SIGNATURE   John T. Lewis

| | | | |
|---|---|---|---|
| ADDITIONAL APPROVALS | 6 T. Y. T. NAME | SIGNATURE | DATE |
| AFE ORIGINATOR | Brian Byrne | | |
| PROJ MANAGER | Mike Vandenberghe | | 4/21/10 |
| SUBSEA PROJ. GEN. MGR. | Aileen Maxwell | | 23 Apr 2010 |
| FINANCE TEAM LEAD | Brigita Sommer | | 4/26/2010 |
| DOA (Delegation of Authority) | Verified  Yes __ No __ | | |
| FINANCIAL TREATMENT | Verified  Yes __ No __ | | |

## FIRST AMENDMENT OF THE PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

### PREAMBLE

This **FIRST AMENDMENT OF THE PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT** ("**First Amendment**") effective as of December 1, 2011, ("**Effective Date**") is entered into by and between BP EXPLORATION & PRODUCTION INC. ("**BP**"), hereinafter referred to as the "**Owner**", in its capacity as a co-owner of the "**Host**" (as defined herein below), and BP; NOBLE ENERGY, INC. ("**Noble**"); RED WILLOW OFFSHORE, LLC ("**Red Willow**"); and HOUSTON ENERGY DEEPWATER VENTURES I, LLC ("**HEDV**"), hereinafter referred to collectively as "**Producers**", in their respective capacity as co-owners of each of the "**Satellite Leases**" (as defined herein below); and BP, Noble, Red Willow, and HEDV, hereinafter referred to collectively as the "**LSPS Owners**" in their capacity as co-owners of the "**Loop Subsea Production System**" or "**LSPS**" (as defined herein below). Each signatory hereto is sometimes referred to singularly as a "Party" or collectively as the "**Parties**".

### RECITALS:

**WHEREAS**, BP and Noble are co-owners of the Isabela Lease; and

**WHEREAS**, BP, Noble, Red Willow and HEDV are co-owners of the MC-519 Unit Leases; and

**WHEREAS**, the LSPS Owners are co-owners of the "**Loop Subsea Production System**" or "**LSPS**"; and

**WHEREAS**, Noble, Red Willow, HEDV and BP, in their capacity as Producers, entered into that certain Production Handling and Operating Services Agreement ("**PHA**") dated effective September 21, 2010 with BP in its capacity as co-owner of the Host; and

**WHEREAS**, Noble, Red Willow, HEDV and BP, in their capacity as LSPS Owners, entered into that certain Galapagos Area Loop Subsea Production System Construction and Operating Agreement ("**LSPSOA**") dated effective December 1, 2011 with BP in its capacity as operator of the LSPS; and

**WHEREAS**, the Parties desire to amend the PHA pursuant to the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the premises, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  **MC 519 Unit Leases Depth.**
    (a)     Section 2.2.74 "**MC519 Unit Leases**" shall be deleted in its entirety and replaced with the following language:

    ""**MC 519 Unit Leases**" means the oil and gas leases OCS-G 27278 covering and affecting Mississippi Canyon Block 519 and OCS-G 21176 covering and affecting Mississippi Canyon Block 563 in the Gulf of Mexico."

    (b)     Section 15.16 **Commitment of Oil and Gas Reserves** shall be deleted in its entirety and replaced with the following language:

    "Subject to Article X (*Term, Default, and Termination*) of this Agreement, for the life of the Satellite Leases, the Producers commit to:  (i) deliver all Satellite Production to the Host for production handling, except that the Producers reserve unto themselves, their successors and assigns, the right: (a) to use quantities of Satellite Production sufficient to satisfy Satellite Leases' development and operations including, but not limited to, additional recovery operations and the use of gas for fuel, flaring, pigging, drilling, deepening, reworking, or other such lease operations; and (b) to use quantities of Satellite Production sufficient to satisfy any royalty interest in Satellite Production that the royalty owner may elect to take in kind."

2.  **LSPS Cost Charging Procedure.**

    Section 5.1.4(b) **Cost Charging Procedure** shall be deleted in its entirety and replaced with the following language:

    "(b)    LSPS Direct Expense (including Routine Expenses and Non-Routine Expenses) incurred at the Host strictly for the benefit of the LSPS will be borne by the respective LSPS Owners but billed to the LSPS Operator.  The LSPS Operator will not reapply an overhead charge to LSPS Direct Expense for charges passed down to LSPS Owners, once overhead has been applied from the Host Operator."

3.  **Accounting Procedures.**

    Exhibit C **Accounting Procedures, Article I General Provisions, Section 3. Advanced Payments by Non-Operators** shall be deleted in its entirety and replaced with the following language:

    "A.     Unless otherwise provided for in this Agreement, the Operator may require the Non-Operators to advance their share of estimated cash outlay (except for expenditures for Facility Access Modifications) for the succeeding month's operation within thirty (30) days after receipt of the billing or by the first Day of the month for which the advance is required, which ever is later. Operator shall adjust each monthly billing to reflect

advances received from the Non-Operators. Non-Operators are required to advance their proportionate share of the estimated costs of any Facility Access Modifications per Section 3.3.2 of this Agreement.

B.    Each Non-Operator shall pay its proportionate share of all bills within thirty (30) days of receipt date. If the payment due date for such bill falls on a weekend or on a statutory holiday, the payment will be due on the preceding business day. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Wall Street Journal on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser. In addition, the delinquent party shall bear attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the Wall Street Journal ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed."

4.    "BP Exploration & Production, Inc." shall be deleted in its entirety and replaced with "BP Exploration & Production Inc.".

5.    Except as set forth herein, all other terms and conditions of the PHA shall remain in full force and effect.

6.    This First Amendment may not be modified or amended except by written agreement executed by the Parties hereto.

7.    This First Amendment may be executed by signing the original or a counterpart thereof. If this First Amendment is executed in multiple counterparts, each counterpart will be deemed an original and all counterparts when taken together will constitute but one and the same Agreement with the same effect as if all of the Parties had signed the same instrument. This First Amendment may also be ratified by separate instrument referring to this First Amendment and adopting by reference all the provisions of this First Amendment. A ratification of this First Amendment will have the same effect as an execution of the original First Amendment.

8.    Capitalized terms used in this First Amendment not defined herein, shall have the same meaning given to them in the PHA.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

        Execution Version

IN WITNESS WHEREOF, this First Amendment is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.

**OWNER**

**BP EXPLORATION & PRODUCTION INC. (Owner)**

By: _____

Name: _____

Title: _____

Date: _____

**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION INC. (Isabela Producer and Operator)**

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC. (Isabela Producer)**

By: _____

Name: _____

Title: _____

Date: _____

4                    Execution Version

IN WITNESS WHEREOF, this First Amendment is executed by each Party through its duly authorized agent or representative on the date shown below the respective signature of each, but is effective as of the Effective Date.


**OWNER**

**BP EXPLORATION & PRODUCTION INC.** (Owner)

By: _____

Name: _____

Title: _____

Date: _____


**ISABELA PRODUCERS**

**BP EXPLORATION & PRODUCTION INC.** (Isabela Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____


**NOBLE ENERGY, INC.** (Isabela Producer)

By: _John T. Lewis_____

Name: _John T. Lewis_____

Title: _Vice President_____

Date: _January 20, 2012_____

4                                   Execution Version

MC 519 UNIT PRODUCERS

NOBLE ENERGY, INC. (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____


BP EXPLORATION & PRODUCTION INC. (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____


RED WILLOW OFFSHORE, LLC (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

D te: _____


HOUSTON ENERGY DEEPWATER VENTURES I, LLC (MC 519 Unit Producer)

By: _____

Name: _P. David Amend_____

Title: _Vice President Land____

Date: _1-18-12_____


5                        Execution Version

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC.** (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**BP EXPLORATION & PRODUCTION INC.** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (MC 519 Unit Producer)

By: _Robert J. Voorhees_

Name: Robert J. Voorhees

Title: President

Date: 1/20/12

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

5                    Execution Version

**MC 519 UNIT PRODUCERS**

**NOBLE ENERGY, INC.** (MC 519 Unit Producer and Operator)

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _January 20, 2012_

**BP EXPLORATION & PRODUCTION INC.** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

Execution Version

MC 519 UNIT PRODUCERS

NOBLE ENERGY, INC. (MC 519 Unit Producer and Operator)

By: _____

Name: _____

Title: _____

Date: _____

BP EXPLORATION & PRODUCTION INC. (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

RED WILLOW OFFSHORE, LLC (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

HOUSTON ENERGY DEEPWATER VENTURES I, LLC (MC 519 Unit Producer)

By: _____

Name: _____

Title: _____

Date: _____

Execution Version

LSPS OWNERS

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____


**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____


**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____


**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _~~David Amend~~_

Name: _P. David Amend_

Title: _Vice President LAND_

Date: _1-18-12_

Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _Robert J. Voorhees_

Title: _President_

Date: _1/20/12_

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

6                              Execution Version

**LSPS OWNERS**

**BP EXPLORATION & PRODUCTION INC.** (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

**NOBLE ENERGY, INC.** (LSPS Owner)

By: _John T. Lewis_

Name: _John T. Lewis_

Title: _Vice President_

Date: _January 20, 2012_

**RED WILLOW OFFSHORE, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

**HOUSTON ENERGY DEEPWATER VENTURES I, LLC** (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

6                    Execution Version

**LSPS OWNERS**

<u>BP EXPLORATION & PRODUCTION INC.</u> (LSPS Owner and Operator)

By: _____

Name: _____

Title: _____

Date: _____

<u>NOBLE ENERGY, INC.</u> (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

<u>RED WILLOW OFFSHORE, LLC</u> (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

<u>HOUSTON ENERGY DEEPWATER VENTURES I, LLC</u> (LSPS Owner)

By: _____

Name: _____

Title: _____

Date: _____

Execution Version

**SECOND AMENDMENT TO**
**PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT**

This Second Amendment to the Production Handling and Operating Services Agreement (this "**Agreement**") is made effective as of October 15, 2018 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**").  BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

WITNESSETH

WHEREAS, reference is made to that certain Production Handling and Operating Services Agreement effective as of September 21, 2010, by and between BP, Noble Energy, Inc., Red Willow and HEDV, as amended by that certain First Amendment of the Production Handling and Operating Services Agreement effective as of December 1, 2011, by and between BP, Noble Energy, Inc., Red Willow and HEDV (the "**PHA**"); and

WHEREAS, the Parties desire to amend the definition of MC 519 UOA of the PHA to reflect a newly contemplated joint operating agreement;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, Section 1.2.3 of the PHA shall be deleted in its entirety and replaced with the following:

> Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (Services) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of (a) the MC 519 Unit Operating Agreement effective as of January 1, 2009 by and between BP, Noble, Red Willow and HEDV as amended by that certain First Amendment of the Unit Operating Agreement and Establishment of Lease Offshore Operating Agreements, dated effective as of October 10, 2014, by and among BP, Red Willow, HEDV, Noble Energy, Inc., Deep Gulf Energy III, LLC, Ridgewood South Santa Cruz, LLC and ILX Prospect South Santa Cruz, LLC as the owners of that portion of the MC 519 Unit Leases that does not cover the Operating Rights Interest in the SW4 and S2 NW4 from 0 – 14,000' TVDSS (the "**CPN Prospect**"), hereinafter referred to as (the "**MC 519 Agreement**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on such portions of the MC 519 Unit Leases; (ii) those portions of the Satellite Well System located on such portions of the MC 519 Unit Leases; and (iii) the decision-making process between the owners of such portions of the MC 519 Unit Leases related to this Agreement and (b) the provisions of the CPN Prospect Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV as the owners of the MC 519 Unit Leases to the extent covering the CPN Prospect ("**CPN Prospect JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the CPN Prospect; (ii) those portions of the Satellite Well System located on the CPN Prospect; and (iii) the decision-making process between the owners of the CPN Prospect related to this Agreement.  In this Agreement, the term "**MC 519 UOA**" shall refer to both the MC 519 Agreement and CPN Prospect JOA, as applicable.

2.  The Parties hereby ratify Fieldwood as the successor in interest to Noble Energy, Inc. and agree that all references in the PHA to "Noble Energy, Inc." or "Noble" or similar references shall refer to Fieldwood as of the date Fieldwood was assigned its interest in the PHA.  All other terms and provisions of the PHA shall remain in full force and effect.

3.  This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

4.  This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _December 10, 2018_

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

[*Signature Page to the Second Amendment to the PHA*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By: _____
Name: John H. Smith
Title: Sr. V. P. Land + Business Development
Date: 12/6/18

**Red Willow Offshore, LLC**

By: _____
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 12|4|2018

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

[*Signature Page to the Second Amendment to the PHA*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name: _John H. Smith____
Title: _Sr. V.P. Land + Business Development_
Date: _12/6/18____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: _P. David Amend____
Title: _Vice President,_ Land
Date: _November 28, 2018_

*[Signature Page to the Second Amendment to the PHA]*

*Execution Version*

## THIRD AMENDMENT TO
## PRODUCTION HANDLING AND OPERATING SERVICES AGREEMENT

This Third Amendment to the Production Handling and Operating Services Agreement (this "**Agreement**") is made effective as of May 1, 2019 (the "**Effective Date**") by and among BP Exploration & Production Inc. ("**BP**"), Fieldwood Energy LLC ("**Fieldwood**"), Red Willow Offshore, LLC ("**Red Willow**") and Houston Energy Deepwater Ventures I, LLC ("**HEDV**"). BP, Fieldwood, Red Willow and HEDV may each be referred to herein as a "**Party**" or collectively as "**Parties**".

<u>WITNESSETH</u>

WHEREAS, reference is made to that certain Production Handling and Operating Services Agreement effective as of September 21, 2010, by and between BP, Noble Energy, Inc. (predecessor in interest of Fieldwood), Red Willow and HEDV, as amended by that certain (a) First Amendment of the Production Handling and Operating Services Agreement effective as of December 1, 2011, by and between BP, Noble Energy, Inc., Red Willow and HEDV and (b) Second Amendment of the Production Handling and Operating Services Agreement effective as of October 15, 2018, by and among BP, Fieldwood, Red Willow and HEDV (the "**PHA**"); and

WHEREAS, the Parties desire to amend the definition of MC 519 UOA of the PHA to reflect newly contemplated joint operating agreements, and to reflect a change in certain handling charges as more specifically set forth herein;

NOW, THEREFORE, in consideration of the promises, mutual covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  As of the Effective Date, Section 1.2.3 of the PHA shall be deleted in its entirety and replaced with the following:

    Except for the Operating Services with respect to the MC 519 Unit Leases described in Article IV (*Services*) of this Agreement which shall be performed by the Host Operator hereunder, the provisions of (a) the MC 519 Unit Operating Agreement effective as of January 1, 2009 by and between BP, Noble, Red Willow and HEDV (as the same may be further amended from time to time) as the owners of that portion of the MC 519 Unit Leases that covers the Record Title Interest in all of Mississippi Canyon Block 519, the Operating Rights Interest in the SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from 0 – 19,300' TVDSS (the "**MC 519 Unit Area**"), hereinafter referred to as (the "**MC 519 Agreement**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the MC 519 Unit Area; (ii) those portions of the Satellite Well System located on the MC 519 Unit Area; and (iii) the decision-making process between the owners of the MC 519 Unit Area related to this Agreement; (b) the provisions of the CPN Joint Operating Agreement effective as of October 15, 2018 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the same may be further amended from time to time) as the owners of the MC 519 Unit Leases to the extent covering the SW/4 and S/2 NW/4 of the Mississippi Canyon Block 519 from 0 – 14,000' TVDSS (the "**CPN Prospect**") (such agreement, the "**CPN Prospect JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the CPN Prospect; (ii) those portions of the Satellite Well System located on the CPN Prospect; and (iii) the decision-making process between the owners of the CPN Prospect related to this Agreement, (c) the Retained Operating Rights Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the

same may be further amended from time to time) as the owners of the MC 519 Unit Leases to the extent covering the Operating Rights Interest in (i) the N/2 NE/4, SW/4 NE/4, N/2 SE/4 NE/4 and N/2 NW/4 of Mississippi Canyon Block 519 and depths extending from the surface to 99,999' TVDSS, (ii) the S/2 NW/4 of Mississippi Canyon Block 519 and depths extending from 14,000' to 99,999' TVDSS, and (iii) the S/2 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 and depths extending from 19,300' to 99,999' TVDSS (the "**Retained Operating Rights Area**") (such agreement, the "**Retained Operating Rights JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the Retained Operating Rights Area; (ii) those portions of the Satellite Well System located on the Retained Operating Rights Area; and (iii) the decision-making process between the owners of the Retained Operating Rights Area related to this Agreement and (d) the SASC Joint Operating Agreement effective as of May 1, 2019 by and among BP, Fieldwood Energy LLC, Red Willow and HEDV (as the same may be further amended from time to time) as owners of the MC 519 Unit Leases to the extent covering the Operating Rights Interest in the SW/4 of Mississippi Canyon Block 519 and from depths extending from 14,000 – 19,300' TVDSS (the "**SASC Area**") (such agreement, the "**SASC JOA**") shall govern the rights, duties and obligations among such Producers associated with: (i) operations on the SASC Area; (ii) those portions of the Satellite Well System located on the SASC Area; and (iii) the decision-making process between the owners of SASC Area related to this Agreement.  In this Agreement, the term "**MC 519 UOA**" shall refer to the MC 519 Agreement, the CPN Prospect JOA, the Retained Operating Rights JOA and the SASC JOA, as applicable.

2. Notwithstanding anything contained to the contrary in the PHA, effective as of the Effective Date, with respect to the water that is produced from

    a. that certain well operated by Fieldwood Energy LLC and bearing API Well Number 608174116201 known as the Santa Cruz well, and

    b. that certain well operated by Fieldwood Energy LLC and bearing API Well Number 608174118401 known as the Santiago well,

the water handling fee set forth in Section 5.3.4(c) of the PHA for such water produced from the wells described in Sections 2(a) and 2(b) above shall be ▉▉▉▉ per Barrel of such water allocated to each Producer on a monthly basis and Section 5.3.4(d) of the PHA shall no longer apply to such water handling fees for the life of such wells.

3. Notwithstanding anything contained to the contrary in the PHA, effective as of the Effective Date, with respect to the first well that is successfully completed within the  SE/4 and S/2 SE/4 NE/4 of Mississippi Canyon Block 519 from depths extending from the surface to 19,300' from the surface TVDSS, the fee for the Oil, Gas and water that is produced from such well shall be as follows: (a) the Oil handling fee set forth in Section 5.3.4(a) of the PHA for such Oil shall be ▉▉▉▉ per Barrel of such Oil Production allocated to each Producer on a monthly basis, (b) the Gas handling fee set forth in Section 5.3.4(b) of the PHA for such Gas shall be ▉▉▉▉ per MSCF of such Gas Production allocated to each Producer on a monthly basis, (c) the water handling fee set forth in Section 5.3.4(c) of the PHA for such water produced shall be ▉▉▉▉ per Barrel of such water allocated to each Producer on a monthly basis, and (d) Section 5.3.4(d) of the PHA shall no longer apply to such Oil, Gas and water handling fees for such well.

4. All other terms and provisions of the PHA shall remain in full force and effect.

5. This Agreement may be executed in multiple counterparts, each of which when so executed shall be given the effect of execution of the original instrument. When so executed, the signatures of the Parties as attached hereto may be combined in, and treated, and given effect, for all purposes as a single instrument. The execution of this Agreement by electronic means shall have the same force and effect as delivery of an original document with original signatures and each Party may use such signatures as evidence of the execution and delivery of this Agreement by the Parties.

6. This Agreement shall be binding on the Parties, their successors and assigns forever.

[*Signature page to follow.*]

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By: _Danielle Scott_
Name: _Danielle Scott_
Title: _Authorized Person_
Date: _5/16/2019_

**Fieldwood Energy LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Red Willow Offshore, LLC**

By: _____
Name: _____
Title: _____
Date: _____

**Houston Energy Deepwater Ventures I, LLC**

By: _____
Name: _____
Title: _____
Date: _____

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:
Name:
Title:
Date:

**Fieldwood Energy LLC**

By:
Name: John H Smith
Title: Sr. Vice President
Date: 16 May 2019

**Red Willow Offshore, LLC**

By:
Name:
Title:
Date:

**Houston Energy Deepwater Ventures I, LLC**

By:
Name:
Title:
Date:

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By: _____
Name: Richard L. Smith
Title: Executive Vice President - Offshore
Date: 5/16/2019

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name:_____
Title:_____
Date:_____

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*

IN WITNESS WHEREOF, this Agreement is executed by each Party as of the date set forth below each Party's signature, but made effective as of the Effective Date.

**BP Exploration & Production Inc.**

By:_____
Name:_____
Title:_____
Date:_____

**Fieldwood Energy LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Red Willow Offshore, LLC**

By:_____
Name:_____
Title:_____
Date:_____

**Houston Energy Deepwater Ventures I, LLC**

By:_____
Name: P. David Amend
Title: Vice President, Land
Date: 5/16/2019

*[Signature Page to Third Amendment to Production Handling and Operating Services Agreement]*