**IN WITNESS WHEREOF,** the above bound parties have executed this instrument under their several seals this [●] day of [●], 2021, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

|_____|

Principal

Attest:

_____     By:_____

Name: _____

Title: _____

|_____|

Surety

Attest:

_____     By:_____

Name: _____

Title: _____

**Apache Corporation**

Obligee

Attest:

_____     By:_____

Name: _____

Title: _____

#93765485v6 (3311541-11)
#93765485v11

**Exhibit "A"**

Attached to and made a part of that certain Performance Bond No. _____ dated [●]  [●], 2021, by [_____], as Principal, [_____], as Surety and Apache Corporation, as Obligee.

**THE PROPERTY**

Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated effective June 1, 2000 by and between the United States of America as Lessor and Anadarko Petroleum Corporation as Lessee, bearing Serial No. OCS-G 21685 and covering all of Block 308, South Timbalier Area, South Additional, OCS Leasing Map, Louisiana Map No. 6A.

[Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act dated effective May 1, 2003 by and between the United States of America as Lessor and Magnum Hunter Production, Inc., as Lessee, bearing Serial No. OCS-G 24987 and covering all of Block 287, South Timbalier Area, South Additional, OCS Leasing Map, Louisiana Map No. 6A.]

[End of Exhibit "A"]

#93765485v6 (3311541-11)
#93765485v11

**<u>Exhibit 8</u>**

**Standby Loan Agreement**

STANDBY LOAN AGREEMENT

dated as of

_____, 2021

between

FIELDWOOD ENERGY I LLC,
and
GOM SHELF LLC

as Borrowers,

and

APACHE CORPORATION,

as Lender

## TABLE OF CONTENTS

Page

Article I Definitions ...................................................................................................1
    Section 1.01      Defined Terms.........................................................................1
    Section 1.02      Terms Generally......................................................................13
    Section 1.03      Accounting Terms; GAAP......................................................13

Article II The Advances.............................................................................................14
    Section 2.01      Loans; Commitment Increase.................................................14
    Section 2.02      The Note.................................................................................15
    Section 2.03      Borrowing Procedures; Requests for Borrowings .................15
    Section 2.04      Funding of Borrowings..........................................................15
    Section 2.05      Repayment of Loans...............................................................15
    Section 2.06      Prepayment of Loans..............................................................15
    Section 2.07      Interest...................................................................................15
    Section 2.08      Payments Generally; Allocation of Proceeds.........................16
    Section 2.09      Indemnity for Returned Payments ..........................................16

Article III Representations and Warranties................................................................17
    Section 3.01      Organization; Powers..............................................................17
    Section 3.02      Authorization; Enforceability .................................................17
    Section 3.03      Governmental Approvals; No Conflicts ..................................17
    Section 3.04      Properties................................................................................17
    Section 3.05      Litigation and Environmental Matters ...................................18
    Section 3.06      Compliance with Laws and Agreements; No Default .............18
    Section 3.07      Taxes......................................................................................18
    Section 3.08      ERISA....................................................................................18
    Section 3.09      Disclosure...............................................................................19
    Section 3.10      Material Contracts..................................................................19
    Section 3.11      Insurance................................................................................19
    Section 3.12      Security Interest in Collateral.................................................19
    Section 3.13      Use of Proceeds......................................................................19
    Section 3.14      Anti-Corruption Laws and Sanctions.....................................19
    Section 3.15      Affiliate Transactions.............................................................20
    Section 3.16      Solvency.................................................................................20

Article IV Conditions.................................................................................................20
    Section 4.01      Effective Date ........................................................................20
    Section 4.02      Each Credit Event...................................................................22

Article V Affirmative Covenants...............................................................................24
    Section 5.01      Financial Statements and Other Information ..........................24
    Section 5.02      Notices of Material Events......................................................25
    Section 5.03      Existence; Conduct of Business..............................................26
    Section 5.04      Payment of Obligations..........................................................26

i

Section 5.05    Maintenance of Properties ..................................................................26
Section 5.06    Books and Records; Inspection Rights .........................................26
Section 5.07    Compliance with Laws and Material Contractual Obligations......26
Section 5.08    Use of Proceeds................................................................................27
Section 5.09    Accuracy of Information..................................................................27
Section 5.10    Insurance ..........................................................................................27
Section 5.11    Further Assurances...........................................................................27

Article VI Negative Covenants .............................................................................................28
Section 6.01    Indebtedness.....................................................................................28
Section 6.02    Liens ................................................................................................28
Section 6.03    Fundamental Changes ......................................................................28
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.......28
Section 6.05    Asset Sales .......................................................................................29
Section 6.06    Sale and Leaseback Transactions ....................................................29
Section 6.07    Swap Agreements .............................................................................29
Section 6.08    Restricted Payments; Certain Payments of Indebtedness ..............29
Section 6.09    Transactions with Affiliates ............................................................29
Section 6.10    Restrictive Agreements....................................................................29
Section 6.11    Amendment of Organizational Documents; Material Contracts...................30
Section 6.12    Amendment or Termination of Material Relationships ...............30
Section 6.13    Excess Cash Flow ............................................................................30

Article VII Events of Default...................................................................................................30

Article VIII Miscellaneous .......................................................................................................32
Section 8.01    Notices .............................................................................................32
Section 8.02    Waivers; Amendments.....................................................................33
Section 8.03    Expenses; Indemnity; Damage Waiver ...........................................34
Section 8.04    Successors and Assigns....................................................................35
Section 8.05    Survival ............................................................................................36
Section 8.06    Counterparts; Integration; Effectiveness.........................................36
Section 8.07    Severability ......................................................................................36
Section 8.08    Right of Setoff..................................................................................36
Section 8.09    Governing Law; Jurisdiction; Consent to Service of Process......37
Section 8.10    WAIVER OF JURY TRIAL.............................................................37
Section 8.11    Headings...........................................................................................38
Section 8.12    Interest Rate Limitation ...................................................................38
Section 8.13    No Advisory or Fiduciary Responsibility ........................................38
Section 8.14    Joint and Several Liability ...............................................................39
Section 8.15    NOTICE OF FINAL AGREEMENT ................................................40

DEBTORS' EX. NO. 5
1052 of 1570

SCHEDULES:
Schedule 3.04(a) – Real Property
Schedule 3.04(b) – Intellectual Property
Schedule 3.11 – Insurance
Schedule 3.16 – Affiliate Transactions


EXHIBITS:
Exhibit A – Note
Exhibit B – Borrowing Request
Exhibit C – Compliance Certificate

**STANDBY LOAN AGREEMENT**

STANDBY LOAN AGREEMENT dated as of _____, 2021 (as it may be amended, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among FIELDWOOD ENERGY I LLC, a Texas limited liability company ("<u>Fieldwood</u>"), GOM SHELF LLC, a Delaware limited liability company ("<u>GOM</u>", together with Fieldwood, the "<u>Borrowers</u>") and APACHE CORPORATION, a Delaware corporation, as Lender.

The parties hereto agree as follows:

ARTICLE I

<u>Definitions</u>

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.  For the avoidance of doubt, no Co-Borrower shall constitute an Affiliate of Lender nor shall Lender constitute an Affiliate of any Co-Borrower.

"<u>Anti-Corruption Laws</u>" means all state or federal laws, rules, and regulations of any jurisdiction applicable to the Borrowers from time to time concerning or relating to bribery or corruption.

"<u>Apache Bond Rate</u>" means the stated per annum rate of interest charged on the debt securities most recently issued under an indenture of Apache Corporation or successor thereto as of the date immediately preceding each Borrowing Request, and if two series of such debt securities are issued on the same day, the stated per annum rate of interest on the series with a tenor most comparable to the remaining tenor hereof.

"<u>Availability Period</u>" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitment.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>BOC</u>" means the Texas Business Organizations Code, as amended and in effect at the time of this Agreement.

"<u>Borrower Guarantee</u>" means each certain Guarantee, dated as of the date hereof, by each Co-Borrower of the other Borrower's Secured Obligations for the benefit of the Lender, as each such Guarantee may be amended, restated, supplemented, or otherwise modified from time to time.

HOU 3972592v21

"<u>Borrowing Request</u>" means a request by any Co-Borrower for a Loan in accordance with <u>Section 2.03</u>.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in Houston, Texas are authorized or required by law to remain closed.

"<u>Change in Control</u>" means _____[1] shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of Fieldwood and indirectly through Fieldwood, 100% of the outstanding voting Equity Interests of GOM Shelf, in each case, on a fully diluted basis.

"<u>Change in Law</u>" means the occurrence after the date of this Agreement of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty or (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority.

"<u>Co-Borrower</u>" means any one of the Borrowers.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means any and all property owned by any Co-Borrower, whether now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations.

"<u>Collateral Documents</u>" means, collectively, the Mortgages, the Security Agreement, the Deposit Account Control Agreement, and any other agreements, instruments, and documents executed and delivered by the Borrowers in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, mortgages, deeds of trust, pledges, collateral assignments, and financing statements, now or hereafter executed by the Borrowers and delivered to the Lender.

"<u>Commitment</u>" means the commitment of the Lender to make Loans hereunder in an aggregate principal amount at any time outstanding up to $200,000,000, as such amount may be increased pursuant to <u>Section 2.01(b)</u>.

"<u>Compliance Certificate</u>" has the meaning assigned to such term in <u>Section 5.01(c)</u>.

"<u>Confirmation Order</u>" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, which, if and to the extent such confirmation order directly affects the Lender in its capacity as such or pertains to any of the Loan Documents or other Apache Definitive Documents (as defined in that certain Apache Term Sheet Implementation Agreement, dated January 1, 2021,  by and among Borrowers, Lender, Apache

---

[1] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Shelf, Inc., and Apache Deep Water LLC), shall be in form and substance reasonably acceptable to the Lender.

"Consolidated EBITDA" means for the Borrowers, for any period, the sum of (a) Consolidated Net Income for such period, plus (b) without duplication and to the extent deducted in determining such Consolidated Net Income (i) interest expense for such period, plus (ii) income tax expense for such period, plus (iii) consolidated depreciation and amortization for such period.

"Consolidated Net Income" means, for any period, the consolidated net income (or loss) of Fieldwood and its consolidated subsidiaries for such period, as determined in accordance with GAAP.

"Contractor" means a Person which is a party in the capacity as prime contractor under the Decommissioning Contract with any Co-Borrower.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Decommissioning" has the meaning given to such term in the Decommissioning Agreement.

"Decommissioning Agreement" means that certain Decommissioning Agreement dated as of September 30, 2013 by and among Apache Corporation, a Delaware corporation, Apache Shelf, Inc., a Delaware corporation, and Apache Deepwater LLC, a Delaware limited liability company, Apache Shelf Exploration LLC, a Delaware limited liability company, Fieldwood Energy LLC, a Delaware limited liability company, and GOM Shelf LLC, a Delaware limited liability company, as amended by (i) that certain First Amendment to Decommissioning Agreement dated as of September 30, 2013, (ii) that certain Second Amendment to Decommissioning Agreement dated as of September 30, 2013, (iii) that certain Third Amendment to Decommissioning Agreement dated effective as of April 25, 2017, (iv) that certain Fourth Amendment to Decommissioning Agreement dated effective as of September 1, 2017 (as such Fourth Amendment to Decommissioning Agreement was amended by that certain Letter Agreement by and among the Parties dated January 3, 2018), and (v) that certain Fifth Amendment to Decommissioning Agreement dated effective as of April 11, 2018.

"Decommissioning Contract" means each services contract in effect from time to time by and between either or both of the Co-Borrower and any Contractor for all or any portion of the Decommissioning remaining to be conducted on or after the Effective Date.

"Decommissioning Plan" has the meaning assigned to such term in Section 4.01(k).

"Debtor" means Fieldwood Energy LLC.

"<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Divisive Merger Documents</u>" means the certificate of division, the plan of division, the certificate of merger and all other documents filed with respect to the Borrowers with the Texas Secretary of State related to the creation of Fieldwood Energy I LLC and Fieldwood Energy II LLC.

"<u>Document</u>" has the meaning assigned to such term in the UCC.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the U.S.

"<u>Effective Date</u>" means the date on which the conditions specified in <u>Section 4.01</u> are satisfied (or waived in accordance with <u>Section 8.02</u>), which shall also be the date on which the plan of reorganization confirmed by the Confirmation Order becomes effective.

"<u>Environmental Laws</u>" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Co-Borrower, directly or indirectly, resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equipment</u>" has the meaning assigned to such term in the Security Agreement.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with any Co-Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"<u>Event of Default</u>" has the meaning assigned to such term in <u>Article VII</u>.

"Excess Cash Flow" means for any fiscal quarter of the Borrowers, the sum, without duplication, of (a) Consolidated EBITDA for such period, minus (b) voluntary payments on Indebtedness made by any Co-Borrower minus (c) interest expense paid in cash by any Co-Borrower during such period, minus (d) the amount of taxes paid in cash by any Co-Borrower for such period, minus (e) the aggregate amount of interest payments and operating expenditures estimated for the following three (3) month period, minus (f) the amount of working capital needed by the Borrowers for the following three (3) months for performance of Borrowers' obligations under the Decommissioning Agreement, and (g) minus, during 2021 and 2022 only, the amount (up to an aggregate amount of $80,000,000 during each such year) actually spent by Borrowers on Decommissioning of the Applicable Properties (as defined in the Decommissioning Agreement) during each of calendar year 2021 and calendar year 2022.

"Financial Statements" has the meaning assigned to such term in Section 5.01.

"Funding Account" has the meaning assigned to such term in Section 4.01(g).

"GAAP" means generally accepted accounting principles in the U.S in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement or any other Loan Document, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be Indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter), in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"GOM Shelf Properties" has the meaning given to such term in the Limited Liability Company Agreement of Fieldwood.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

DEBTORS' EX. NO. 5

"Hazardous Materials" means:  (a) any substance, material, or waste that is included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste," or words of similar import in any Environmental Law; (b) those substances listed as hazardous substances by the United States Department of Transportation (or any successor agency) (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) (40 C.F.R. Part 302 and amendments thereto); and (c) any substance, material, or waste that is petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed (to the extent of the value of the property of such Person securing such Indebtedness), (g) all Guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances and (k) obligations under any liquidated earn-out.

"Indemnitee" has the meaning assigned to such term in Section 8.03(b).

"Inventory" has the meaning assigned to such term in the UCC.

"JDA" means that certain Joint Development Agreement dated as of the Effective Date by and among the Borrowers and Fieldwood Energy II LLC.

"JOA" means each and every Joint Operating Agreement in effect from time to time by and among the Borrowers, Fieldwood Energy II LLC and third parties, if any.

"Leases" has the meaning given to such term in the Decommissioning Agreement.

"LC Drawing Amount" has the meaning given to such term in the Decommissioning Agreement.

"Legacy Apache Properties" has the meaning given to such term in the Limited Liability Company Agreement of Fieldwood.

"Lender" means Apache Corporation, its successors and permitted assigns.

"<u>Letters of Credit</u>" has the meaning given to such term in the Decommissioning Agreement and includes all letters of credit outstanding from time to time pursuant to the Decommissioning Agreement.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Limited Liability Company Agreement of Fieldwood</u>" or "<u>Fieldwood's Limited Liability Company Agreement</u>" means that certain Limited Liability Company Agreement of Fieldwood dated as of the date hereof, as may be amended, supplemented, or otherwise modified from time to time with the prior written approval of Lender.

"<u>Loan Documents</u>" means, collectively, this Agreement, the promissory note issued pursuant to this Agreement, each Collateral Document, each Borrower Guarantee, and each other agreement, instrument, document and certificate identified in <u>Section 4.01</u> executed and delivered by the Borrowers to, or in favor of, the Lender and including each other pledge, power of attorney, consent, assignment, contract, notice, and each other agreement, now or hereafter executed by or on behalf of the Borrowers and delivered to the Lender in connection with this Agreement.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Loans</u>" means any loan made pursuant to <u>Section 2.01</u>.

"<u>Manager</u>" has the meaning given to such term in Fieldwood's Limited Liability Company Agreement.

"<u>Master Facilities Agreement</u>" means the Master Facilities Use, Access, Production Handling and Transportation Agreement dated as of September 30, 2013 by and among Lender, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM.

"<u>Material Adverse Effect</u>" means a circumstance or condition that could, individually or in the aggregate, materially adversely affect the business, assets, operations, properties, or condition (financial or otherwise) of the Borrowers and their subsidiaries, taken as a whole.

"<u>Material Contract</u>" means each of (i) the Decommissioning Agreement, (ii) the Decommissioning Contract, (iii) the JOA, (iv) the JDA, (v) the Turnkey Removal Contract, (vi) the Trust A Trust Agreement, (vii) the Trust A NPI Conveyance, (viii) the Trust A-1 NPI Conveyance (ix) the Letters of Credit, (x) the Permitted Surety Bonds, (xi) the Recharacterization Mortgages, (xii) the PSA, (xiii) the Master Facilities Agreement and (xiv) other Transaction Documents, in each case, as in effect from time to time.

DEBTORS' EX. NO. 5
1060 of 1570

"Maturity Date" means the earliest to occur of (a) termination of the Decommissioning Agreement, (b) expiration of the period comprised of the fifth (5th) anniversary of the Effective Date (the "Initial Period") and automatic successive 12-month periods thereafter until the tenth (10th) anniversary of the Effective Date, each expiring on the next anniversary of the Effective Date (each an "Annual Period"), unless no later than 60 days before expiration of the Initial Period or the then Annual Period, as applicable, Lender has delivered written notice to Borrowers that the Maturity Date will occur upon expiration of the Initial Period or the then Annual Period, respectively (if the same is a Business Day, or if not then the immediately next succeeding Business Day), and (c) any date on which the Commitment is reduced to zero or otherwise terminated pursuant to the terms of Article VII.

"Maximum Rate" means the maximum rate of nonusurious interest permitted from day to day by applicable law, including Chapter 303 of the Texas Finance Code (the "Finance Code") (and as the same may be incorporated by reference in other Texas statutes). To the extent that Chapter 303 of the Finance Code is relevant to Lender for the purposes of determining the Maximum Rate, the Lender may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right the Lender may have subsequently, under applicable law, to change the method of determining the Maximum Rate.

"Mortgages" means, collectively, the mortgages or deed of trust executed by the Borrowers to the Lender providing a Lien on all Real Property owned or leased by such Borrowers.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Note" means the promissory note executed by the Borrowers payable to the Lender, in substantially the form of Exhibit A attached hereto, as same may be amended, extended or modified and all promissory notes executed in renewal, extension, modification or substitution thereof.

"Permitted Liens" means, with respect to any Person, (a) pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure plugging and abandonment obligations or public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business; (b) Liens imposed by law, such as landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review; (c) Liens for taxes, assessments or other governmental charges not yet due or payable or that are being contested in good faith by appropriate

DEBTORS' EX. NO. 5
1061 of 1570

proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books; (d) Liens pursuant to partnership agreements, oil, gas and/or mineral leases, farm-out agreements, division orders, contracts for the sale, delivery, purchase, exchange, or processing of oil, gas and/or other hydrocarbons, unitization and pooling declarations and agreements, operating agreements, development agreements, area of mutual interest agreements, forward sales of oil, natural gas and natural gas liquids, and other agreements which are customary in the oil, gas and other mineral exploration, development and production business and in the business of processing of gas and gas condensate production for the extraction of products therefrom; (e) any easements, rights of way, restrictions, defects or other exceptions to title and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount, are not incurred to secure Indebtedness, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the businesses of the Borrowers; (f) Liens existing by operation of law that cannot be abrogated by contract for rights of setoff in a depository relationship with banks and non-negotiable contractual rights of setoff in customary documentation establishing a depository account with a bank, in each case, not granted in connection with the issuance of Indebtedness, and bankers Liens and rights and remedies as to deposit accounts and (g) Liens created under the Recharacterization Mortgages.

"Permitted Surety Bonds" has the meaning given to such term in the Decommissioning Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Co-Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Projections" has the meaning assigned to such term in Section 3.09.

"PSA" has the meaning given to such term in the Decommissioning Agreement.

"Real Property" means all real property that was, is now, or may hereafter be owned, occupied, or otherwise controlled by any Co-Borrower pursuant to any contract of sale, lease or other conveyance of any legal interest in any real property to any Co-Borrower.

"Recharacterization Mortgages" has the meaning given to such term in the Decommissioning Agreement.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

DEBTORS' EX. NO. 5
1062 of 1570

"Related Party Agreement" means any agreement, arrangement, or understanding between or among any Co-Borrower or any of its Affiliates, on the one hand, and the independent director of Fieldwood, the sole manager of Fieldwood or any member or officer of any Co-Borrower or any of its Affiliates, or any Affiliate of the independent director of Fieldwood, the sole manager of Fieldwood or any member or officer of a Co-Borrower or any of its Affiliates, on the other.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any Hazardous Materials into the environment.

"Remaining Decommissioning" has the meaning given to such term in the Decommissioning Agreement.

"Requirement of Law" means, with respect to any Person, any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests, or any payment (whether in cash, securities or other property) including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Restructuring Support Agreement" means the Restructuring Support Agreement, dated as of August 4, 2020, by and among (a) Fieldwood Energy LLC, a Delaware limited liability company, and including the Fieldwood PSA Parties (as defined therein); (b) the Consenting FLTL Lenders (as defined therein); (c) the Consenting SLTL Lenders (as defined therein); and (d) Lender.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

"Secured Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and

other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Agreement, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Agreement, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to <u>clauses (a)</u> through <u>(e)</u> above, whether or not (i) such Secured Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Secured Obligations are allowable under <u>Section 502(b)(2)</u> of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Secured Obligations is reduced to judgment, or (iv) such Secured Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

"<u>Secured Parties</u>" means (a) the Lender, (b) Apache Shelf, Inc., Apache Deepwater LLC and Apache Shelf Exploration LLC, and (c) the successors and assigns of each of the foregoing.

"<u>Security Agreement</u>" means that certain Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Borrowers and the Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any Co-Borrower (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Lender, on behalf of the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Service Provider</u>" means, collectively, any service provider hired by the sole manager of Fieldwood pursuant to Section 7.04 of the Limited Liability Company Agreement of Fieldwood to perform all operations and plugging and abandonment and decommissioning activities with respect to the Borrowers' properties or assets.

"<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the

ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Suspension Period" has the meaning given to such term in the Decommissioning Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Texas Divided LLC" means any Texas LLC which has been formed upon consummation of a Texas LLC Division.

"Texas LLC" means any limited liability company organized or formed under the laws of the State of Texas.

"Texas LLC Division" means the statutory division of any Texas LLC into two or more Texas LLC's pursuant to the BOC.

"Transaction Documents" has the meaning given to such term in the Decommissioning Agreement.

"Transactions" means the execution, delivery and performance by the Borrowers of this Agreement and the other Loan Documents, the borrowing of Loans and the use of the proceeds thereof.

"Trust A" has the meaning given to such term in the Decommissioning Agreement.

"Trust A Account" has the meaning given to such term in the Decommissioning Agreement.

"Trust A Funding Default" means the Funding Default (as defined in the Decommissioning Agreement) in respect of January 2021 in the amount of [$50 million].

"Trust A Funding Default Loan" means a Loan in an amount up to and sufficient to cure the Trust A Funding Default.

"Trust A NPI Conveyance" has the meaning given to such term in the Decommissioning Agreement.

"Trust A-1 NPI Conveyance" has the meaning given to such term in the Decommissioning Agreement.

"Trust A Trust Agreement" has the meaning given to such term in the Decommissioning Agreement.

DEBTORS' EX. NO. 5
1065 of 1570

"Turnkey Removal Contract" has the meaning given to such term in the Decommissioning Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Texas or in any other state, the laws of which are required to be applied in connection with the issue of perfection of security interests.

"U.S." means the United States of America.

Section 1.02   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.03   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP; provided that, if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrowers notify the Lender that the Borrowers request an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof (or if the Lender notifies the Borrowers that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or

13

such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (a) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrowers at "fair value", as defined therein and (b) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

ARTICLE II

The Advances

Section 2.01    Loans; Commitment Increase.

(a)    Subject to the terms and conditions set forth herein, the Lender agrees to make one or more revolving loans to the Borrowers from time to time during the Availability Period in an aggregate principal amount at any time outstanding up to but not exceeding the Commitment. The Lender shall have no obligation to make any Loan if a Default or Event of Default has occurred and is continuing.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow hereunder.

(b)    At any time prior to the Maturity Date, the Borrowers, acting jointly, may request an increase in the Commitment (the "Commitment Increase"); provided that the Commitment Increase shall be subject to Lender's approval and satisfaction of each of the following conditions, all in Lender's sole discretion: (i) the Commitment Increase shall not cause the Commitment to exceed $400,000,000, (ii) at the time of such request and on the effective date of the Commitment Increase, both before and after giving effect thereto, no Default or Event of Default shall exist, (iii) the Borrowers shall deliver to Lender a joint written request for the Commitment Increase at least ten (10) Business Days prior to the desired effective date thereof, and (iv) together with such request, Borrowers shall deliver (A) a certificate of the Manager of each Co-Borrower stating that (1) the representations and warranties of such Co-Borrower contained in the Loan Documents are true and correct as though made on and as of the effective date of such Commitment Increase (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date, and (2) on the effective date of the Commitment Increase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, and (B) resolutions of each Co-Borrower authorizing the Commitment Increase, in form and substance reasonably satisfactory to Lender.  Upon Lender's approval of the Commitment Increase in its sole discretion, satisfaction of each of the foregoing conditions in Lender's sole discretion, and delivery to Lender of a duly executed amended and restated Revolving Note in the amount of the Commitment (upon giving effect to the Commitment Increase), the Commitment Increase shall become effective.

14

Section 2.02    The Note.   The obligation of the Borrowers to repay the Loans shall be evidenced by the Note executed by the Borrowers, payable to the Lender, in the principal amount of the Commitment.

Section 2.03    Borrowing Procedures; Requests for Borrowings.   To request a Loan, any Co-Borrower shall notify the Lender of such request in writing (delivered by hand, fax or e-mail) in the form attached hereto as Exhibit B and signed by such Co-Borrower not later than 10:00 a.m., Houston time, five (5) Business Days before the date of the proposed Loan.   Each such Borrowing Request shall be irrevocable.   Each such written Borrowing Request shall specify the following information:

(a)      the aggregate amount of the requested Loan, which amount shall be consistent with the applicable Borrowing Package;

(b)      the date of such Loan, which shall be a Business Day; and

(c)      the aggregate principal amount of all Loans then outstanding.

Section 2.04    Funding of Borrowings.   The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the requesting Co-Borrower by wire transfer to the Funding Account.

Section 2.05    Repayment of Loans.

(a)      Borrowers, jointly and severally, hereby unconditionally promises to pay the Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b)      Repayments of Loans shall be accompanied by accrued interest on the amounts repaid.

Section 2.06    Prepayment of Loans.

(a)      The Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, without penalty or premium.

(b)      Within five (5) Business Days after the quarterly financial statements have been delivered pursuant to Section 5.01(b), the Borrowers shall prepay the Loans in an amount equal to 100% of Excess Cash Flow for the immediately preceding fiscal quarter.   Each Excess Cash Flow payment shall be accompanied by a certificate signed by the Manager certifying the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance reasonably satisfactory to Lender.

Section 2.07    Interest.

(a)      Each Loan shall bear interest at a rate per annum equal to the applicable Apache Bond Rate plus 4%.   Following receipt of any Borrowing Request, Lender shall promptly notify Borrowers of the Apache Bond Rate that will be applicable to the requested Loan.

15

(b)     Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrowers, declare that all Loans shall bear interest at a rate per annum equal to 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraph of this Section.

(c)     All accrued unpaid interest on each Loan shall be payable semiannually on January 31st and July 31st of each year during the term of this Agreement (unless such date is not a Business Day in which the payment is due on the next succeeding Business Day) and on the Maturity Date, with the first installment of interest due and payable on the first such date following the making of the initial Loan hereunder until the principal amount of each such Loan is paid in full.  Notwithstanding the forgoing, interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)     All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.08    Payments Generally; Allocation of Proceeds.

(a)     Each Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or otherwise) prior to 5:00 p.m., Houston time, on the date when due, in immediately available funds, without set-off or counterclaim, and each Borrower shall be jointly and severally liable for all such payment obligations.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender to such account as the Lender shall from time to time specify in a notice to the Borrowers.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)     Any proceeds of Collateral received by the Lender after an Event of Default has occurred and is continuing and if the Lender so elects, such funds shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lender, in its capacity as such, from the Borrowers, second, to pay interest then due and payable on the Loans ratably, third, to prepay principal on the Loans, and fourth, to the payment of any other Secured Obligation due to the Secured Parties from the Borrowers, and finally, to the Borrowers or otherwise as required by law or court order.  The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all proceeds and payments received pursuant to the first sentence of this clause (b) to any portion of the Secured Obligations.

Section 2.09    Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Secured Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of

proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Secured Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender.  The provisions of this <u>Section 2.09</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds.  The provisions of this <u>Section 2.09</u> shall survive the termination of this Agreement.

ARTICLE III

<u>Representations and Warranties</u>

To induce Lender to enter into this Agreement, each Co-Borrower represents and warrants to the Lender that:

Section 3.01   <u>Organization; Powers</u>.  Each Co-Borrower (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and (iii) is in good standing in every jurisdiction where such qualification is required.

Section 3.02   <u>Authorization; Enforceability</u>.  The Transactions are within each Co-Borrower's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which such Co-Borrower is a party has been duly executed and delivered by such Co-Borrower and constitutes a legal, valid and binding obligation of such Co-Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03   <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate such Co-Borrower's organizational documents or any Requirement of Law applicable to such Co-Borrower, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon a Co-Borrower or the assets of such Co-Borrower, or give rise to a right thereunder to require any payment to be made by such Co-Borrower, and (d) will not result in the creation or imposition of any Lien on any asset of such Co-Borrower, except Liens created pursuant to the Loan Documents.

Section 3.04   <u>Properties</u>.

(a)      As of the date of this Agreement, <u>Schedule 3.04(a)</u> sets forth the address of each parcel of Real Property that is owned or leased by any Co-Borrower.  Each of the leases and

17

subleases listed on Schedule 3.04(a) is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each Co-Borrower has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property.

(b)      Each Co-Borrower owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 3.04(b), and the use thereof by such Co-Borrower does not infringe in any material respect upon the rights of any other Person, and each Co-Borrower's rights thereto are not subject to any licensing agreement or similar arrangement.

Section 3.05    Litigation and Environmental Matters.

(a)      Except as disclosed to the Lender in writing, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or to the knowledge of any Co-Borrower, threatened against or affecting such Co-Borrower or  that involve any Loan Document or the Transactions.

(b)      Except as disclosed to the Lender in writing, no Co-Borrower (1) has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability, and  (2) no Co-Borrower (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or (ii) has become subject to any Environmental Liability, except, in the case of each of (1) and (2)(i) and (ii), as would not reasonably be expected to have a Material Adverse Effect.

Section 3.06    Compliance with Laws and Agreements; No Default.  Except as disclosed to the Lender in writing, each Co-Borrower is in compliance in all material respects with all Requirements of Law applicable to it or its property, except for Decommissioning obligations for which Lender has received notice of such Co-Borrower's non-compliance from the applicable Governmental Authority. No Default has occurred and is continuing.

Section 3.07    Taxes.  Each Co-Borrower has timely filed or caused to be filed all income and other material Tax returns and reports required to have been filed and has paid or caused to be paid all income and other material Taxes required to have been paid by it, except Taxes that are not yet delinquent or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside by such Co-Borrower on its books.  No Tax liens have been filed on the assets of any Co-Borrower, and no claims are being asserted in writing by any Governmental Authority with respect to any unpaid Taxes of such Co-Borrower (other than those being contested in good faith by appropriate proceedings).

Section 3.08    ERISA.    No Co-Borrower nor any ERISA Affiliate maintains or contributes to, or has any obligation under, any Plan.

DEBTORS' EX. NO. 5

Section 3.09  <u>Disclosure</u>.  The reports, financial statements, certificates and other information (other than forward-looking information (the "<u>Projections</u>") or information of a general economic or industry specific nature) furnished in writing by or on behalf of the Borrowers to the Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, taken as a whole, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u> that, with respect to Projections, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered.

Section 3.10  <u>Material Contracts</u>.  No Co-Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Material Contract (excluding any default resulting from such Co-Borrower's failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement). Except as disclosed on <u>Schedule 3.10</u>, no Co-Borrower is obligated by more than (i) $100,000 under any individual contract, commitment, or other liability or obligation or (ii) $500,000 in the aggregate under all such contracts, commitments, liabilities, or obligations, and in the case of (i) and (ii), excluding Material Contracts, this Agreement, and any other contract to which Co-Borrower is a party or by which it or its properties are bound and which was entered into in the ordinary course of business, is not material to Co-Borrower, and will not adversely affect its ability to perform its obligations under the Loan Documents.

Section 3.11  <u>Insurance</u>.  <u>Schedule 3.11</u> sets forth a description of all insurance maintained by or on behalf of the Borrowers as of the Effective Date.  As of the Effective Date, all premiums in respect of such insurance have been paid.  Each Co-Borrower believes that the insurance maintained by it is adequate and is customary for companies engaged in the same or similar businesses operating in the same or similar locations.

Section 3.12  <u>Security Interest in Collateral</u>.  The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of the Lender and such Liens constitute (or will constitute upon completion of the filings and other actions required pursuant to the Loan Documents) perfected and continuing Liens on the Collateral to the extent required to be perfected pursuant to the Loan Documents, securing the Secured Obligations, (a) enforceable against the Borrowers and all third parties in accordance with the terms hereof and thereof, subject only to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and (b) having priority over all other Liens (other than Permitted Liens) on the Collateral.

Section 3.13  <u>Use of Proceeds</u>.  The proceeds of the Loans have been used and will be used, whether directly or indirectly as set forth in <u>Section 5.08</u>.

Section 3.14  <u>Anti-Corruption Laws and Sanctions</u>.  Each Co-Borrower is in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  No Borrowing, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

DEBTORS' EX. NO. 5
1072 of 1570

Section 3.15    Affiliate Transactions.  Other than any transaction permitted pursuant to Section 6.09, there are no existing or proposed agreements, arrangements, understandings or transactions between or among any Co-Borrower and any Affiliates of a Co-Borrower, or between or among any Affiliate of a Co-Borrower or any subsidiary of any Co-Borrower.

Section 3.16    Solvency.  The fair market value of each Co-Borrower's assets exceeds, and after giving effect to each Loan will exceed, such Co-Borrower's total liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations). The fair saleable value of each Co-Borrower's property exceeds, and after giving effect to each Loan will exceed, the amount required to pay its debts and other liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) as such debts and other liabilities mature.  Each Co-Borrower is, and after giving effect to each Loan will be, able to pay its debts and liabilities (including subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) as such debts and other liabilities mature.  Each Co-Borrower's assets do not, after giving effect to each Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted, excluding only asset retirement obligations from such determination. For purposes of this Section, each reference to asset retirement obligations mean those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 hereof.

ARTICLE IV

Conditions

Section 4.01    Effective Date.  The obligations of the Lender to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02) and, subject thereto, shall become effective simultaneously with confirmation of the plan of reorganization pursuant to the Confirmation Order:

(a)      Credit Agreement and Loan Documents.  The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed by the Borrowers and (ii) duly executed copies of the other Loan Documents in form and substance satisfactory to Lender.

(b)      Certificates; Certified Certificate of Incorporation; Good Standing Certificates. The Lender shall have received (i) a certificate of each Co-Borrower, dated the Effective Date and executed by an authorized Person of such Co-Borrower, which shall (A) certify the resolutions adopted by written consent of the Manager of such Co-Borrower authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signature of each Person authorized to sign on behalf of such Co-Borrower the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the Divisive Merger Documents certified by the Texas Secretary of State and a true and correct copy of its limited liability company agreement, and (ii) a certificate of fact for of such Co-Borrower from the Texas Secretary of State.

DEBTORS' EX. NO. 5
1073 of 1570

(c)    <u>Manager's Certificate</u>.  The Lender shall have received a certificate, signed by the Manager or other appropriately authorized Person of each Co-Borrower, dated as of the Effective Date (i) stating that no Default has occurred and is continuing, and (ii) stating that the representations and warranties contained in the Loan Documents are true and correct as of such date.

(d)    <u>Fees and Expenses</u>.  The Lender shall have received all fees required to be paid and all expenses required to be reimbursed for which invoices have been submitted on or prior to the Effective Date (including the reasonable fees and expenses of legal counsel).

(e)    <u>Confirmation Order</u>.  The Lender or its counsel shall have received a signed copy of the Confirmation Order and notice that the effective date of the plan of reorganization contained therein has occurred.

(f)    <u>Lien Releases</u>.  The Lender shall have received satisfactory evidence that all Liens granted upon any of the property of the Borrowers constituting Collateral (other than Permitted Liens) are terminated as of the Effective Date.

(g)    <u>Funding Account</u>.  The Lender shall have received a notice setting forth the deposit account of each Co-Borrower (each a "<u>Funding Account</u>", collectively, the "<u>Funding Accounts</u>") to which the Lender is authorized by such Co-Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

(h)    <u>Control Agreements</u>.  The Lender shall have received deposit account control agreements for the Funding Accounts and each operating account of Borrowers required to be provided pursuant to the Security Agreement.

(i)    <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by <u>Section 6.02</u>), shall be in proper form for filing, registration or recordation.

(j)    <u>Insurance</u>.  The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of <u>Section 5.10</u> of this Agreement.

(k)    [<u>Intentionally Blank</u>]

(l)    <u>Capitalization</u>. Lender shall have received written evidence, in form and substance satisfactory to Lender, that the capitalization funds received by the Borrowers upon their formation in the amount of $50,000,000 has been fully utilized under the Decommissioning Plan during the bankruptcy of the Debtor or any unused amount has been funded to the Funding Account.

(m)    <u>Material Contracts</u>.  Lender shall have received copies of all Material Contracts.

DEBTORS' EX. NO. 5
1074 of 1570

(n)   <u>Financial Information</u>. The Lender shall have received (i) an unaudited consolidated balance sheet of Borrowers and their subsidiaries as of the Effective Date and (ii) historical lease operating statements for the assets of each Co-Borrower and its subsidiaries for each month during the 24-month period immediately preceding the Effective Date, and in the case of (i) and (ii), in form and substance reasonably satisfactory to Lender and after giving effect to the divisive merger that is part of the plan of reorganization confirmed by the Confirmation Order.

(o)   <u>Other Documents</u>.  The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested, including a customary written opinion or opinions of the Borrowers' counsel as to due authorization, execution and delivery, and enforceability of the Loan Documents and perfection of the security interests granted thereby, addressed to the Lender, in form and substance satisfactory to the Lender, and rendered by Weil Gotshal & Manges LLP or a comparable law firm satisfactory to Lender.

The Lender shall notify the Borrowers of the Effective Date, and such notice shall be conclusive and binding.

Section 4.02   <u>Each Credit Event</u>.  The obligation of the Lender to make (i) each Loan under <u>Article II</u> hereof (other than a Trust A Funding Default Loan) is subject to the satisfaction of the following conditions and (ii) the Trust A Funding Default Loan is subject to the satisfaction of the following conditions except conditions (c), (e), (k), and (l):

(a)   The representations and warranties of each Co-Borrower set forth in the Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date.

(b)   At the time of and immediately after giving effect to such Loan, no Default shall have occurred and be continuing.

(c)   All amounts in the Trust A Account, the Letters of Credit, and the Permitted Surety Bonds have been fully exhausted or are not available to pay or reimburse Lender for Decommissioning.

(d)   The Decommissioning Agreement is in full force and effect, has not been terminated and has become the obligation of the Borrowers under the Confirmation Order and/or the Divisive Merger Documents.

(e)   Other than any Co-Borrower's failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement, there are no uncured events that constitute or would result in the nonperformance, default, or breach by any Co-Borrower under the Decommissioning Agreement.

(f)   Since the Effective Date, none of the events set forth in <u>Article VII</u> of the Decommissioning Agreement have occurred, nor has any Co-Borrower assigned, conveyed, sold,

farmed out or otherwise transferred any of the Leases other than with respect to (i) farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood and (ii) conveyances or other transfers consummated in accordance with the JOA or JDA.

(g)      Since the Effective Date, no Co-Borrowers has received cash from the Trust A Account, including, but not limited to, pursuant to Section 4.3(b) and Section 4.5 of the Decommissioning Agreement.

(h)      Since the Effective Date, no Co-Borrowers has caused a reduction in the LC Drawing Amount, including, not limited to, pursuant to Section 4.3(b) of the Decommissioning Agreement.

(i)      A Suspension Period shall not have commenced and be continuing.

(j)      Lender has received a copy of the Decommissioning Contract, in form and substance satisfactory to the Lender, for the Decommissioning to be funded with a borrowing, together with a schedule showing (i) all subcontracts awarded as of the Borrowing Request, including names, types of work, subcontract amounts and percentage retainage provided in said subcontracts, (ii) the amount of general conditions and an estimate of value for each subcontract not awarded as of such date, and (iii) a total overall schedule of value.

(k)      Lender shall have received the following in form and substance reasonably satisfactory to Lender (collectively, a "Borrowing Package", together with any amendments, modifications or supplements of the same) at least ten (10) Business Days prior to the date of the requested Loan (which, for the avoidance of doubt, may be submitted in advance of the identification of a proposed borrowing date):

(i)      a certification from Borrowers in favor of Lender that (i) the Decommissioning to be made with the proceeds of a proposed Borrowing Request is contemplated by the Decommissioning Plan then in effect (both as to amount of such requested Loan and as to the timing of such requested Loan), (ii) that the proposed use of the proceeds therefrom is for cost and expenses in compliance with the Decommissioning Plan then in effect and (iii) Borrowers shall have sufficient funds (on a pro forma basis (reasonably projected, on a good faith basis) after giving effect to the Loan requested) to pay all accrued interest due under Section 2.07(c) for the following six (6) month period;

(ii)      a certification from the Contractor in the form acceptable to Lender with respect to the requested Loan, detailing the Decommissioning covered or to be covered by the Borrowing, itemizing any estimated costs and expenses of such Decommissioning and/or including copies of invoices itemizing costs and expenses incurred with respect to such Decommissioning, as applicable;

(iii)      partial lien waivers or releases of lien for all lienable work done and materials delivered with respect to such Decommissioning covered in the request, to the extent applicable (for purposes of clarity, this only applies to work performed prior to the date of the Borrowing Package);

(iv)    to the extent not previously delivered to Lender, copies of all permits, orders, certificates, licenses and approvals required under applicable Requirements of Law for the Decommissioning (collectively, the "Required Approvals") as of the date of the requested Loan and copies of all subcontracts; *provided, however*, with respect to any Required Approvals that have not been issued as of the date of submission of a Borrowing Package, Co-Borrower shall include with the Borrowing Package Co-Borrower's certification and covenant in form and substance reasonably satisfactory to Lender that (i) Co-Borrower has received from the applicable Governmental Authority indication that such Required Approvals will be issued to Co-Borrower, specifying the expected time of issuance thereof, (ii) Co-Borrower diligently shall pursue such Required Approvals, and (iii) Co-Borrower promptly shall deliver to Lender copies of such Required Approvals upon receipt thereof; *provided further, however*, Lender shall have discretion to decline any Borrowing Request that is not preceded or accompanied by copies of all Required Approvals; and

(v)    such additional documentation reasonably requested by Lender.

(l)    <u>Decommissioning Plan</u>.    Lender and Borrowers shall have agreed to a decommissioning plan in form and substance reasonably acceptable to Lender (the "Decommissioning Plan").

ARTICLE V

<u>Affirmative Covenants</u>

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, in each case without any pending draw, each Co-Borrower covenants and agrees with the Lender that:

Section 5.01    <u>Financial Statements and Other Information</u>.  Fieldwood will furnish to the Lender:

(a)    within 105 days after the end of each fiscal year, its audited consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows as of the end of and for such year prepared under AICPA auditing standards, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants acceptable to the Lender (without a "going concern" or like qualification, commentary, or exception (except to the extent that any such qualification, commentary, or exception expressly indicates that after giving effect to the exclusion of asset retirement obligations reflected on the accompanying balance sheet, there would be no such qualification, commentary, or exception), and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of the Borrowers in accordance with GAAP consistently applied;

(b)    within 50 days after the end of each of its fiscal quarters (including the fourth quarter), its consolidated balance sheet and related consolidated statements of operations,

24

members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of such fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by Fieldwood as presenting fairly in all material respects the consolidated financial condition and results of operations of the Borrowers in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with any delivery of financial statements under clause (a) or (b) above (collectively or individually, as the context requires, the "Financial Statements"), a certificate of the Manager of Fieldwood in substantially the form of Exhibit C (the "Compliance Certificate") (i)  certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) to the extent any Loan has been advanced hereunder, certifying that Borrowers have sufficient funds to pay all accrued interest due under Section 2.07(c) for the following six (6) month period;

(d)     as soon as available, but in any event no later than 60 days after the end of each fiscal year, commencing with the fiscal year ending December 31, 2020, a detailed operating budget for the next fiscal year forecasting revenue, operating costs, and capital expenses for each fiscal quarter in form reasonably satisfactory to the Lender;

(e)     as soon as available, but in no event later than 15 Business Days after the end of each calendar month, a statement in a form reasonably satisfactory to Lender showing all operating data including operating expenses and revenue for each Co-Borrower for such calendar month; and

(f)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of each Co-Borrower, or compliance with the terms of this Agreement, as the Lender may reasonably request, including, without limitation, Decommissioning cost estimates and calculations.

Section 5.02   Notices of Material Events. Each Co-Borrower will furnish to the Lender prompt (but in any event within five (5) Business Days) after each Co-Borrower obtains knowledge thereof) written notice of the following:

(a)     the occurrence of any Default;

(b)     receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Co-Borrower that (i) seeks damages in excess of $250,000, (ii) alleges criminal misconduct by any Co-Borrower, (iii) alleges the violation of, or seeks to impose remedies under any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, or (iv) asserts liability on the part of any Co-Borrower in excess of $250,000 in respect of any tax, fee, assessment, or other governmental charge; or

DEBTORS' EX. NO. 5
1078 of 1570

(c)      a breach by any Co-Borrower of any covenant under the Decommissioning Agreement (other than Borrowers' failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement); provided that, if a written notice of such breach has been given to Lender in connection with the Decommissioning Agreement, such notice shall not be required to be provided under this <u>Section 5.02</u>.

Each notice delivered under this Section shall be accompanied by a statement of the applicable authorized Person of each Co-Borrowers setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03   <u>Existence; Conduct of Business</u>.  Each Co-Borrower will (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

Section 5.04   <u>Payment of Obligations</u>.  Each Co-Borrower will pay or discharge all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except those which are being contested by Borrowers in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

Section 5.05   <u>Maintenance of Properties</u>.  The Borrowers will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear and performance of its obligations under the Decommissioning Agreement excepted; provided, however, that nothing in this Agreement shall provided, however, that nothing in this Agreement shall prevent the Borrowers from relinquishing or allowing any Leases to expire or terminate, in each case in the ordinary course of the Borrowers' business.

Section 5.06   <u>Books and Records; Inspection Rights</u>.  Each Co-Borrower will (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, during normal business hours, to visit and inspect its properties, conduct at such Co-Borrower's premises field examinations of such Co-Borrower's assets, liabilities, books and records, including examining and making extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times, as often as reasonably requested at the Borrowers' expense.

Section 5.07   <u>Compliance with Laws and Material Contractual Obligations</u>.  Each Co-Borrower will (a) comply with each Requirement of Law applicable to it or its property (including, without limitation, Environmental Laws) in all material respects and (b) perform in all material respects its obligations under material agreements to which it is a party.  Each Co-Borrower will enforce policies and procedures designed to ensure compliance by such Co-

DEBTORS' EX. NO. 5
1079 of 1570

Borrower, and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 5.08    Use of Proceeds.

(a)    The proceeds of the Loans (except the Trust A Funding Default Loan) will be used only for payment or reimbursement of costs associated with plugging, facility and well removal and abandonment, and other actions permitted or required by the Decommissioning Agreement.  The proceeds of the Trust A Funding Default Loan will be used only to fund Trust A.

(b)    No Co-Borrower will request or use any Borrowing and shall procure that its directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 5.09    Accuracy of Information.  Each Co-Borrower will ensure that, other than the Projections described below, any information, including financial statements or other documents, material to the Loan Documents or the transactions contemplated thereby, furnished in writing to the Lender by the Manager of such Co-Borrower in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder contains no material misstatement of fact or omits to state any material fact, in each case necessary to make the statements therein, in the light of the circumstances under which they were made and taken as a whole, not misleading; provided that, with respect to the Projections, each Co-Borrower will cause the Projections to be prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.10    Insurance.  Each Co-Borrower will maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  Each Co-Borrower will furnish to the Lender information in reasonable detail as to the insurance so maintained.

Section 5.11    Further Assurances.  Each Co-Borrower will execute and deliver such further instruments as may be reasonably requested by Lender to carry out the provisions and purposes of this Agreement and the other Loan Documents and to preserve and perfect the Liens of Lender in the Collateral.

DEBTORS' EX. NO. 5
1080 of 1570

ARTICLE VI

Negative Covenants

Until the Commitment shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document shall have been paid in full, each Co-Borrower covenants and agrees with the Lender that:

Section 6.01   Indebtedness.  No Co-Borrower will create, incur, assume or suffer to exist any Indebtedness, except the Secured Obligations.

Section 6.02   Liens.  No Co-Borrowers will create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except for Permitted Liens.

Section 6.03   Fundamental Changes.

(a)     No Co-Borrower will enter into a fundamental business transaction (as defined in the BOC) including a merger, consolidation, interest exchange, conversion or sale of all or substantially all of such Co-Borrower's Real Property or other assets (including, in each case, pursuant to a Texas LLC Division).

(b)     No Co-Borrower will wind-up, dissolve, liquidate, or terminate or initiate any bankruptcy, insolvency or similar proceeding.

(c)     No Co-Borrower will file any motion seeking to amend, modify or alter, in any way, the Confirmation Order.

(d)     No Co-Borrower will (i) revoke any voluntary decision to wind-up or cancel the required winding up of such Co-Borrower due to an event specified in Section 11.051 of the BOC or (ii) reinstate such Co-Borrower after termination.

(e)     No Co-Borrower will (i) conduct or be involved in any business or operations other than operating or plugging and abandoning and decommissioning the Legacy Apache Properties or the GOM Shelf Properties or (ii) engage in any activity or take any action with respect to its properties or assets, other than in the ordinary course of business.

(f)     No Co-Borrower will change its fiscal year or any fiscal quarter from the basis in effect on the date hereof.

(g)     No Co-Borrowers will change the accounting basis upon which its financial statements are prepared.

Section 6.04   Investments, Loans, Advances, Guarantees and Acquisitions.  No Co-Borrower will form any subsidiary or enter into any joint venture or similar business arrangement after the date hereof, or purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of

DEBTORS' EX. NO. 5
1081 of 1570

the foregoing) of, make or permit to exist any loans, advances or capital contributions to, Guarantee (except for the Borrower Guarantees) any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase, farm-in or otherwise acquire any assets of any other Person, except:

(a)     farm-in or farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood; and

(b)     conveyances or other transfers consummated in accordance with the JOA or JDA.

Section 6.05   Asset Sales.  No Co-Borrower will sell, transfer (including any disposition of property to a Texas Divided LLC pursuant to a Texas LLC Division), farmout, lease or otherwise dispose of any asset, including any Equity Interest owned by it, except:

(a)     farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood; and

(b)     conveyances or other transfers consummated in accordance with the JOA or JDA.

Section 6.06   Sale and Leaseback Transactions.  No Co-Borrower will enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 6.07   Swap Agreements.  No Co-Borrower will enter into any swap agreement (other than for physical swaps of less than one year in duration) without the Lender's prior consent in its sole discretion.

Section 6.08   Restricted Payments; Certain Payments of Indebtedness.  No Co-Borrower will declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

Section 6.09   Transactions with Affiliates.  No Co-Borrower will (a) enter into, amend, waive any provision of, or any of its rights under, or terminate any Related Party Agreement or (b) sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) farmout transactions consummated in accordance with Section 7.06 of the Limited Liability Company Agreement of Fieldwood, (ii) conveyances or other transfers consummated in accordance with the JOA or JDA and (iii) the transition services agreement entered into between any Co-Borrower and Fieldwood Energy II as of even date herewith, as may be amended or replaced in its entirety.

Section 6.10   Restrictive Agreements.  No Co-Borrower will enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of such Co-Borrower to create, incur or permit to exist any Lien upon any of its property or assets securing the Secured Obligations.

Section 6.11   <u>Amendment of Organizational Documents; Material Contracts</u>.   (a) No Co-Borrower will (i) amend, modify, supplement or waive any provision of, or any of its rights under, its certificate of formation or organization, as applicable, its limited liability company agreement or any other organizational document of such Co-Borrower or (ii) issue additional Equity Interests or admit additional Persons as members under the limited liability company agreement of such Co-Borrower.

(b)      No Co-Borrower will (i) amend, modify, supplement, or waive any provision of, or any of its rights under, or terminate any Material Contract, or (ii) enter into any joint operating agreement with respect to the operatorship of the Real Properties or any joint development agreement relating to the Real Properties except as otherwise permitted in <u>Sections 6.04</u> or <u>6.05</u> hereof.

Section 6.12   <u>Amendment or Termination of Material Relationships</u>.   No Co-Borrower will (a) remove, replace or materially change the work to be performed by the Service Provider or (b) remove, replace or materially change the powers, rights or responsibilities of the sole manager or independent director of Fieldwood.

Section 6.13   <u>Excess Cash Flow</u>.   No Co-Borrower shall use Excess Cash Flow for any purpose other than fulfilling its Secured Obligations and obligations under the Decommissioning Agreement.

ARTICLE VII

<u>Events of Default</u>

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)      the Borrowers shall fail to pay (i) any principal of any Loan or (ii) any interest on any Loan or other amount payable under this Agreement or any other Loan Document when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise and, in the case of clause (ii), such failure shall continue for five (5) Business Days;

(b)      any representation or warranty made or deemed made by or on behalf of any Co-Borrower in or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished by any Co-Borrower pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(c)      any Co-Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Sections 5.01, 5.02(a)</u>, <u>5.03</u>, <u>5.08</u> or <u>5.10</u> or in <u>Article VI</u>;

(d)      any Co-Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified

30

in clause (a) or (c) of this Article), and such failure shall continue unremedied for a period of thirty (30) days after the earlier of such Co-Borrower's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement or of any other Loan Document;

(e)  an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Co-Borrower or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Co-Borrower or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(f)  any Co-Borrower shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (e) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Co-Borrower or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(g)  any Co-Borrower shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally, to pay its debts as they become due;

(h)  one or more judgments for the payment of money in an aggregate amount in excess of $250,000 (to the extent not covered by insurance) shall be rendered against any Co-Borrower and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Co-Borrower to enforce any such judgment or any Co-Borrower shall fail within thirty (30) days to discharge one or more non-monetary judgments or orders;

(i)  a Change in Control shall occur;

(j)  except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien;

(k)  any Collateral Document or any Borrower Guarantee shall (other than pursuant to the terms thereof) fail to remain in full force or effect or any action shall be taken by any Co-Borrower to discontinue or to assert the invalidity or unenforceability of any Collateral Document or any Borrower Guarantee;

(l)       any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Co-Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(m)       any default (other than a failure to comply with the reimbursement obligations in Section 2.7 of the Decommissioning Agreement) by any Co-Borrower shall occur under the Decommissioning Agreement;

(n)       any default under a Material Contract which could result in the termination of such Material Contract; and

(o)       any breach of Article VII (Management) of Fieldwood's Limited Liability Company Agreement or any failure to obtain Lender's prior written consent in accordance with any provision of Fieldwood's Limited Liability Company Agreement;

then, and in every such event (other than an event with respect to a Co-Borrower described in clause (e) or (f) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers; and in the case of any event with respect to a Co-Borrower described in clause (e) or (f) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers.  Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Secured Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII

Miscellaneous

Section 8.01    Notices.

(a)       Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or electronic communication (to the extent provided in clause (b) below), as follows:

DEBTORS' EX. NO. 5

    (i)       if to Borrowers at:

                        _____

                        _____

                        _____

                        Attention: _____

    (ii)      if to the Lender at:

                        Apache Corporation
                        2000 Post Oak Boulevard, Suite 100
                        Houston, Texas 77056
                        Attention: Treasurer and Nora Dobin
                        e-mails: ben.rodgers@apachecorp.com and nora.dobin@apachecorp.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by fax shall be deemed to have been given when sent, _provided_ that if not given during normal business hours for the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day of the recipient, or (iii) delivered through electronic communication to the extent provided in paragraph _(b)_ below shall be effective as provided in such paragraph.

(b)     Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications (including e-mail); _provided_ that the foregoing shall not apply to notices pursuant to _Article II_ unless otherwise agreed by the Lender.  Each of the Lender or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; _provided_ that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), _provided_ that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(c)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 8.02   <u>Waivers; Amendments</u>.

(a)     No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other

33

right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Co-Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and the Lender.

Section 8.03    Expenses; Indemnity; Damage Waiver.

(a)    Borrowers shall pay or reimburse Lender for any and all out-of-pocket expenses (including attorneys', auditors', and accountants' fees, charges, and disbursements) incurred or paid by Lender in connection with the preparation, execution, and delivery of the Loan Documents, subject to the $4,000,000 cap specified in the Restructuring Support Agreement or the Confirmation Order for fees and expenses of Lender related to the formation of Borrowers and restructuring of Debtor.  Borrowers also shall pay or reimburse Lender for any and all out-of-pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) incurred or paid by Lender in connection with the administration of the Loan Documents and the enforcement, collection, or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of pocket expenses incurred during any workout, restructuring, or negotiations in respect of such Loans.

(b)    The Borrowers, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Co-Borrower, or any Environmental Liability related in any way to any Co-Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE

DEBTORS' EX. NO. 5
1087 of 1570

BORROWERS AND EACH CO-BORROWER AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

(c)     To the extent permitted by applicable law, each of the Co-Borrower and the Lender agrees that it shall not assert, and hereby waives, any claim against the other, (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Co-Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)     All amounts due under this Section shall be payable promptly after written demand therefor.

Section 8.04    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Co-Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by any Co-Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed) of the Borrowers, provided that the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Lender within five (5) Business Days after having received notice thereof, and provided further that no consent of the Borrowers shall be required if an Event of Default has occurred and is continuing.

(c)     The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender.

DEBTORS' EX. NO. 5
1088 of 1570

Section 8.05   <u>Survival</u>.   All covenants, agreements, representations, and warranties made by the Borrowers in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and so long as the Commitment has not expired or terminated. The provisions of <u>Section 8.03</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans and the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

Section 8.06   <u>Counterparts; Integration; Effectiveness</u>.

(a)      This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.   Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)      Delivery of an executed counterpart of a signature page of this Agreement by fax, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 8.07   <u>Severability</u>.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.08   <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by the Lender, to or for the credit or the account of any Co-

DEBTORS' EX. NO. 5
1089 of 1570

Borrower against any of and all the Secured Obligations, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of the Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender may have.

Section 8.09   Governing Law; Jurisdiction; Consent to Service of Process.

(a)      The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Texas, but giving effect to federal laws applicable to national banks.

(b)      Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. federal or Texas State court sitting in Houston, Texas in any action or proceeding arising out of or relating to any Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such state court or, to the extent permitted by law, in such federal court.  Each of the parties hereto agrees that a final judgment, non-appealable in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Co-Borrower or its properties in the courts of any jurisdiction.

(c)      Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 8.10   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND

(B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 8.11   <u>Headings</u>.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 8.12   <u>Interest Rate Limitation</u>.   No provision of this Agreement or of any other Loan Documents shall require the payment or the collection of interest in excess of the Maximum Rate.   If any excess of interest in such respect is hereby provided for, or shall be adjudicated to be so provided, in any other Loan Documents or otherwise in connection with this Agreement, the provisions of this Section shall govern and prevail and no Co-Borrower or the sureties, guarantors, successors or assigns of such Co-Borrower shall be obligated to pay the excess amount of such interest or any other excess sum paid for the use, forbearance or detention of sums loaned pursuant hereto.   In the event Lender ever receives, collects or applies as interest any such sum, such amount which would be in excess of the maximum amount permitted by applicable law shall be applied as a payment and reduction of the principal of the indebtedness evidenced by the Note; and, if the principal of the Note been paid in full, any remaining excess shall forthwith be paid to Borrowers.   In determining whether or not the interest paid or payable exceeds the Maximum Rate, Borrowers and Lender shall, to the extent permitted by applicable law, (a) characterize any non-principal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the entire contemplated term of the indebtedness evidenced by the Note so that interest for the entire term does not exceed the Maximum Rate

Section 8.13   <u>No Advisory or Fiduciary Responsibility</u>.   In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Co-Borrower acknowledges and agrees that:  (a) (i) the arranging and other services regarding this Agreement provided by the Lender are arm's-length commercial transactions between the Borrowers, on the one hand, and the Lender, on the other hand, (ii) the Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) the Borrowers are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) the Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, or any other Person and (ii) the Lender has no obligation to the Borrowers with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Lender may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, and the Lender has no obligation to disclose any of such interests to the Borrowers.   To the fullest extent permitted by law, each Co-Borrower hereby waives and releases any claims that it may have against the Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

DEBTORS' EX. NO. 5
1091 of 1570

Section 8.14    Joint and Several Liability.

(a)      Each Co-Borrower acknowledges and agrees that it is the intent of the parties that each Co-Borrower be primarily liable for the Secured Obligations as a joint and several obligor. It is the intention of the parties that, with respect to liability of any Co-Borrower hereunder arising solely by reason of its being jointly and severally liable for Loans and other Secured Obligations by other Borrower, the obligations of such Co-Borrower shall be absolute, unconditional, and irrevocable irrespective of:

(i)      any lack of validity, legality, or enforceability of this Agreement or any Loan Document as to any other Co-Borrower;

(ii)      the failure of the Lender: (A) to enforce any right or remedy against any Co-Borrower or any other Person (including any surety) under the provisions of this Agreement or otherwise, or (B) to exercise any right or remedy against any surety of, or Collateral securing, any obligations;

(iii)      any change in the time, manner, or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other extension, compromise, or renewal of any Secured Obligations;

(iv)      any reduction, limitation, impairment, or termination of any Secured Obligations with respect to any other Co-Borrower for any reason, including any claim of waiver, release, surrender, alteration, or compromise, and shall not be subject to (and each Co-Borrower hereby waives any right to or claim of) any defense (other than the defense of payment in full of the Secured Obligations) or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations with respect to any other Co-Borrower;

(v)      any addition, exchange, release, surrender, or nonperfection of any Collateral, or any amendment to, or waiver or release or addition of, or consent to departure from, any guaranty held by the Lender securing any of the Secured Obligations; or

(vi)      any other circumstance which might otherwise constitute a defense (other than the defense of payment in full of the Secured Obligations) available to, or a legal or equitable discharge of, any other Co-Borrower, any surety or any guarantor.

(b)      Each Co-Borrower agrees that its liability hereunder and its liability under any of the Loan Documents shall continue to be effective or be reinstated, as the case may be, if at any time any payment (in whole or in part) of any of the Secured Obligations is rescinded or must be restored by Lender upon the insolvency, bankruptcy, or reorganization of any Co-Borrower as though such payment had not been made.

(c)      Each Co-Borrower hereby expressly waives: (i) notice of the Lender's acceptance of this Agreement; (ii) notice of the existence or creation or non-payment of all or any of the

Secured Obligations other than notices expressly provided for in this Agreement; (iii) presentment, demand, notice of dishonor, protest, acceleration and the notice of intent to accelerate, and all other notices whatsoever other than notices expressly provided for in this Agreement; and (iv) all diligence in collection or protection of, or realization upon, the Secured Obligations or any part thereof, any obligation hereunder, or any security for or Guarantee of any of the foregoing, subject, however, in the case of Collateral in the possession of Lender to such Person's duty to use reasonable care in the custody and preservation of such Collateral.

(d)     No delay on the Lender's part in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by any of the Lenders of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.  No action of Lender permitted hereunder shall in any way affect or impair any such Lender's rights or any Co-Borrower's Secured Obligations under this Agreement or the other Loan Documents.

Section 8.15   NOTICE OF FINAL AGREEMENT.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWERS:

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By:_____
Name: _____
Title: _____

GOM SHELF LLC,
a Delaware limited liability company

By:_____
Name: _____
Title: _____

*[Signature Page to Standby Loan Agreement]*

LENDER:

APACHE CORPORATION,
a Delaware corporation, as Lender


By: _____
Name: _____
Title: _____

**SCHEDULE 3.04[2]**

<u>Properties</u>

---

[2] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.04 - 1

# SCHEDULE 3.11[3]

## Insurance

---

[3] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.11 - 1

DEBTORS' EX. NO. 5

# SCHEDULE 3.16[4]

<u>Affiliate Transactions</u>

---

[4] To be completed in a manner mutually agreeable to all parties as a condition to Apache's execution.

Schedule 3.16 - 1

**EXHIBIT A**

<u>Form of Note</u>

<u>NOTE</u>

$200,000,000                                          _____, 20[●]


FOR VALUE RECEIVED, each of the undersigned, FIELDWOOD ENERGY I LLC, a Texas limited liability company ("<u>Fieldwood</u>") and GOM SHELF LLC, a Delaware limited liability company ("<u>GOM</u>" together with Fieldwood, the "<u>Borrowers</u>"), jointly and severally, promises to pay to APACHE CORPORATION, a Delaware corporation (the "<u>Lender</u>"), at the place and times provided in the Loan Agreement referred to below, the principal sum of TWO HUNDRED MILLION DOLLARS ($200,000,000) or, if less, the unpaid principal amount of all Loans made by the Lender from time to time pursuant to that certain Standby Loan Agreement, dated as of _____, 20[●] (as it may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>") by and among the Borrowers and the Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Loan Agreement.

The unpaid principal amount of this Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Loan Agreement and shall bear interest as provided in <u>Section 2.07</u> of the Loan Agreement.  All payments of principal and interest on this Note shall be payable in lawful currency of the United States in immediately available funds to the Lender in accordance with the Loan Agreement.

This Note is entitled to the benefits of, and evidences the Secured Obligations incurred under, the Loan Agreement, to which reference is made for a statement of the terms and conditions on which each Borrower is permitted and required to make prepayments and repayments of principal of the Secured Obligations evidenced by this Note and under which such Secured Obligations may be declared to be immediately due and payable.

This Note and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note shall be governed by, and construed in accordance with, the law of the State of Texas.

The Borrowers hereby waive all requirements as to diligence, presentment, demand of payment, protest and, except as required by the Loan Agreement, notice of any kind with respect to this Note.

This Note may be transferred or assigned solely in accordance with the terms and provisions of the Loan Agreement.

Exhibit A - 1

This Note may be executed in multiple counterparts, each of which, for all purposes, shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Note as of the day and year first above written.

**FIELDWOOD ENERGY I LLC,**
a Texas limited liability company

By:_____
Name:_____
Title:_____


**GOM SHELF LLC,**
a Delaware limited liability company

By:_____
Name:_____
Title:_____

Exhibit A - 2

**EXHIBIT B**[5]

<u>Form of Borrowing Request</u>

<u>BORROWING REQUEST</u>

_____, 20__

Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056
Attention:      Treasurer and Nora Dobin
Email: ben.rodgers@apachecorp.com and nora.dobin@apachecorp.com

Apache Corporation,

Reference is made to that certain Loan Agreement, dated as of _____ (the "<u>Loan Agreement</u>"), among Fieldwood Energy I LLC ("<u>Fieldwood</u>"), GOM Shelf LLC ("<u>GOM</u>", together with Fieldwood, the "<u>Borrowers</u>" and each individually, a "<u>Co-Borrower</u>") and Apache Corporation ("<u>Lender</u>").  Terms defined in the Loan Agreement are used herein with the same meanings.  This notice constitutes a Borrowing Request and Borrowers hereby request a Loan under the Loan Agreement, and in that connection Borrowers specify the following information with respect to the Loan requested hereby:

(A)     Principal amount of the requested Loan: _____

(B)     Effective date of such requested Loan (which is a Business Day): _____

(C)     the aggregate principal amount of all Loans then outstanding: _____

Borrowers hereby represent and warrant that all conditions in <u>Section 4.02</u> of the Loan Agreement are satisfied.

Borrowers have caused this Borrowing Request to be executed and delivered by its [Authorized Officer/Manager] this ___ day of _____, 20__.

Very truly yours,

[FIELDWOOD ENERGY I LLC]

By: _____
Name:

_____
[5] Form to be mutually agreeable to all parties as a condition to Apache's execution.

Title:


[GOM SHELF LLC]


By: _____
Name:
Title:

Exhibit B - 2

EXHIBIT C[6]

Form of Compliance Certificate


COMPLIANCE CERTIFICATE

In connection with that certain Standby Loan Agreement, dated as of _____ (the "Loan Agreement"), among Fieldwood Energy I, LLC ("Fieldwood"), GOM Shelf LLC ("GOM", together with Fieldwood, the "Borrowers") and Apache Corporation ("Lender"), the undersigned, the Manager of Fieldwood does hereby certify, pursuant to Section 5.01(c) of the Loan Agreement, as follows (capitalized terms hereinafter used having the meaning specified in the Loan Agreement):

1.      In accordance with Sections 5.01(a) or (b) of the Loan Agreement, the consolidated balance sheet and related consolidated statements of operations, members' equity and cash flows financial statements of Fieldwood and its consolidated Subsidiaries as of _____, 20__ present fairly in all material respects their consolidated financial condition and results of operations in accordance with GAAP at such date.

2.      No Default has occurred and is continuing [other than _____].[7]

3.      As of the date hereof, the outstanding principal balance of all Loan advanced under the Loan Agreement is $_____. The Borrowers have sufficient funds to pay all accrued interest due under Section 2.07(c) of the Loan Agreement for the following six (6) month period.

IN WITNESS WHEREOF, I have hereunto set my hand as of this ___ day of _____, _____.


_____
Name:
Title: Manager


---

[6] Form to be mutually agreeable to all parties as a condition to Apache's execution.
[7] If Default has occurred, Borrower shall specify details thereof and any action taken or proposed to be taken with respect thereto.

Exhibit C - 1

## **Exhibit 9**

**Security Agreement**

## SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (this "Security Agreement") is entered into as of [●] by and among **FIELDWOOD ENERGY I LLC**, a Texas limited liability company ("Fieldwood"), **GOM SHELF LLC**, a Delaware limited liability company ("GOM", together with Fieldwood, the "Grantors") and **APACHE CORPORATION**, a Delaware corporation ("Lender") on behalf of itself and the other Secured Parties (as defined in the Loan Agreement (as defined below)).

### RECITALS

**WHEREAS**, the Grantors and Lender are entering into a Standby Loan Agreement dated as of [●] (the "Loan Agreement").

**WHEREAS**, the Grantors are entering into this Security Agreement in order to induce Lender to enter into and extend credit under the Loan Agreement.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.     **DEFINITIONS**.

1.1     **Reference to Security Agreement**.  Unless otherwise specified, all references herein to Articles, Sections, Recitals, and Schedules refer to Articles and Sections of, and Recitals and Schedules to, this Security Agreement.  All Schedules include amendments and supplements thereto from time to time.

1.2     **Principles of Construction**.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neutral, as the context indicates is appropriate.  Whenever the words "include," "includes" or "including" are used in this Security Agreement, they shall be deemed to be followed by the words "without limitation".  All references to agreements and other contractual Instruments shall be deemed to include subsequent amendments, permitted assignments, and other modifications thereto, but only to the extent such amendments, assignments, and other modifications are not prohibited by the terms of any Loan Document.  Furthermore, any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time.

1.3     **Definitions**.  Unless otherwise defined herein, or the context hereof otherwise requires, each term defined in either the Loan Agreement or the UCC is used in this Security Agreement with the same meaning; *provided that*, if the definition given to such term in the Loan Agreement conflicts with the definition given to such term in the UCC, the Loan Agreement definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail.  As used herein, the following terms have the meanings indicated:

"Account" means any "account," as such term is defined in Section 9.102(a)(2) of the UCC.

"Account Debtor" means any person who is obligated on a Receivable.

"Cash Collateral Account" has the meaning set forth in Section 5.5.

HOU 3972802v7

"Chattel Paper" means any "chattel paper", as such term is defined in Section 9.102(a)(11) of the UCC, including all Electronic Chattel Paper and Tangible Chattel Paper.

"Collateral" has the meaning set forth in Section 2.1.

"Collateral Records" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all property (real or personal) assigned, hypothecated, or otherwise securing any Collateral and shall include any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"Commercial Tort Claims" means any "commercial tort claim", as such term is defined in Section 9.102(a)(13) of the UCC, including all commercial tort claims listed on Schedule 3.8.

"Contractual Obligations" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"Control" has the meaning set forth in Sections 7.106, 8.106, 9.104, 9.105, 9.106, or 9.107 of the UCC, as applicable.

"Copyright Licenses" means any and all agreements providing for the granting of any right in or to Copyrights, including each agreement referred to on Schedule 3.15.

"Copyrights" means all United States and foreign copyrights, including copyrights in software and databases, whether registered or unregistered, and, with respect to any and all of the foregoing:  (a) all registrations and applications therefor, including the registrations and applications referred to on Schedule 3.15; (b) all extensions and renewals thereof; (c) all rights corresponding thereto throughout the world; (d) all rights to sue for past, present and future infringements thereof; and (e) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Copyright or any Copyright licensed under any Copyright License.

"Default Rate" means a rate of interest equal to 2% plus the highest rate otherwise applicable to any Loan advanced to a Grantor under the Loan Agreement.

"Deposit Accounts" means any "deposit account", as such term is defined in Section 9.102(a)(29) of the UCC, including those deposit accounts identified on Schedule 3.8, and any account which is a replacement or substitute for any of such accounts, together with all monies, Instruments, certificates, checks, drafts, wire transfer receipts, and other property deposited therein and all balances therein.

"Documents" means any "document", as such term is defined in Section 9.102(a)(30) of the UCC.

"Electronic Chattel Paper" means any "electronic chattel paper", as such term is defined in Section 9.102(a)(31) of the UCC.

2

DEBTORS' EX. NO. 5
1106 of 1570

"Equipment" means: (a) any "equipment", as such term is defined in Section 9.102(a)(33) of the UCC; (b) all machinery, equipment, furnishings, Fixtures, motor vehicles, rolling stock; and (c) any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (in each case, regardless of whether characterized as equipment under the UCC).

"Excluded Accounts" means (a) any deposit accounts exclusively used for employee trust, payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any employees of the Grantors, (b) any deposit account which is used as an escrow account or fiduciary or trust account and solely contains deposits made for the benefit of another Person (other than any Grantor), and in which such deposits are held on behalf of, and for the benefit of, such other Person, including, but not limited to working interest owners, royalty owners and the like, and (c) any other deposit account that is pledged to a third party to the extent such Lien is a Permitted Lien.

"Excluded Property" means, collectively, (a) any permit or license or any Contractual Obligation of any Grantor (i) that prohibits or requires the consent of any Person other than the Grantors or their Affiliates which has not been obtained as a condition to the creation by such Grantor of a Lien on any right, title, or interest in such permit, license, or Contractual Obligation related thereto or (ii) to the extent that any Requirement of Law applicable thereto prohibits the creation of a Lien thereon, but only to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other Requirement of Law; provided, however, "Excluded Property" shall not include any proceeds, products, substitutions, or replacements of Excluded Property (unless such proceeds, products, substitutions, or replacements would otherwise constitute Excluded Property) and (b) Excluded Accounts.

"Fixtures" means any "fixtures", as such term is defined in Section 9.102(a)(41) of the UCC.

"General Intangibles" means: (a) any "general intangibles", as such term is defined in Section 9.102(a)(42) of the UCC; and (b) all interest rate or currency protection or hedging arrangements, computer software, computer programs, all tax refunds and tax refund claims, all licenses, permits, concessions and authorizations, all contract rights, all joint venture interests, partnership interests, or membership interests that do not constitute a Security, all Material Contracts, and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" means: (a) "goods", as that term is defined in Section 9.102(a)(44) of the UCC; (b) all Inventory; and (c) all Equipment (in each case, regardless of whether characterized as goods under the UCC).

"Grantors" has the meaning set forth in the preamble, and "Grantor" means any one of the Grantors.

"Instrument" means any "instrument", as such term is defined in Section 9.102(a)(47) of the UCC.

"Intellectual Property" means, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses.

"Inventory" means any "inventory", as such term is defined in Section 9.102(a)(48) of the UCC.

"Investment Related Property" means: (a) any "investment property", as such term is defined in Section 9.102(a)(49) of the UCC; and (b) all Pledged Equity Interests (regardless of whether such interest is classified as investment property under the UCC).

3

DEBTORS' EX. NO. 5
1107 of 1570

"Letter-of-Credit Right" means any "letter-of-credit right", as such term is defined in Section 9.102(a)(51) of the UCC.

"Material Contracts" means: (a) all of Grantors' rights, titles, and interests in, to, and under those contracts listed on Schedule 3.8, including all rights of any Grantor to receive moneys due and to become due under or pursuant to the Material Contracts; (b) all rights of Grantors to receive Proceeds of any insurance, indemnity, warranty, or guaranty with respect to the Material Contracts; (c) all claims of Grantors for damages arising out of or for breach of or default under the Material Contracts; and (d) all rights of Grantors to compel performance and otherwise exercise all rights and remedies under the Material Contracts.

"Maximum Liability" has the meaning set forth in Section 6.2(a).

"Money" means "money" as defined in Section 1.201(b)(24) of the UCC.

"Patent Licenses" means all agreements providing for the granting of any right in or to Patents, including each agreement referred to on Schedule 3.15.

"Patents" means all United States and foreign patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including: (a) each patent and patent application referred to on Schedule 3.15; (b) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof; (c) all rights corresponding thereto throughout the world; (d) all inventions and improvements described therein; (e) all rights to sue for past, present and future infringements thereof; (f) all licenses, claims, damages, and Proceeds of suit arising therefrom; and (g) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Patent or any Patent licensed under any Patent License.

"Pledged Equity Interests" means all Pledged Stock, Pledged LLC Interests, and Pledged Partnership Interests.

"Pledged LLC Interests" means all membership interests owned by a Grantor in any limited liability company, including all membership interests listed on Schedule 3.8 and the certificates, if any, representing such membership interests as such interest may be increased or otherwise adjusted from time to time, including (a) all of such Grantor's right, title, and interest in any and all distributions, issues, profits, and shares (including rights in the nature of warrants, purchase options, or options to acquire any property or further interest in such limited liability company) payable or distributable by such limited liability company, whether in cash or otherwise, whether for capital or income or surplus or otherwise, including distributions upon liquidation, dissolution, revision, reclassification, split-up, or other change or transaction affecting such limited liability company, or as a sale, refinancing, or other capital transaction affecting any assets or property of such limited liability company; (b) all of such Grantor's right, title, and interest as a member with respect to such limited liability company and the company agreement, operating agreement, or limited liability company agreement; (c) all of such Grantor's rights under the company agreement, operating agreement, or limited liability company agreement; (d) all of such Grantor's right to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the company agreement, operating agreement, or limited liability company agreement, or otherwise to control, manage, or direct the affairs of such limited liability company; and (e) all of such Grantor's right to terminate, amend, supplement, modify or waive performance under, the company agreement, operating agreement, or limited liability company agreement, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder; and (f) all Proceeds therefrom.

4

DEBTORS' EX. NO. 5
1108 of 1570

"Pledged Partnership Interests" means all partnership interests owned by a Grantor in any general partnership, limited partnership, limited liability partnership, or other partnership, including all partnership interests listed on Schedule 3.8 and the certificates, if any, representing such partnership interests as such interests may be increased or otherwise adjusted from time to time, including (a) all of such Grantor's right, title, and interest in any and all distributions, issues, profits, and shares (including rights in the nature of warrants, purchase options, or options to acquire any property or further interest in such partnership) payable or distributable by such partnership, whether in cash or otherwise, whether for capital or income or surplus or otherwise, including distributions upon liquidation, dissolution, revision, reclassification, split up, or other change or transaction affecting such partnership, or as a sale, refinancing, or other capital transaction affecting any assets or property of such partnership; (b) all of Grantor's right, title, and interest as a partner with respect to such partnership and the partnership agreement or other agreement governing such partnership; (c) all of Grantor's rights under the partnership agreement or other agreement governing such partnership; (d) all of Grantor's right to vote upon, approve, or consent to (or withhold consent or approval to) any matter pursuant to the partnership agreement or other agreement governing such partnership, or otherwise to control, manage, or direct the affairs of such partnership; and (e) all of Grantor's right to terminate, amend, supplement, modify, or waive performance under, the partnership agreement or other agreement governing such partnership, or perform thereunder, and to compel performance and otherwise to exercise all remedies thereunder; and (f) all Proceeds therefrom.

"Pledged Stock" means all shares of capital stock owned by a Grantor, including all shares of capital stock described on Schedule 3.8, and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, including all voting rights with respect to such Pledged Stock and all dividends, distributions, cash, warrants, rights, options, Instruments, securities, and other property or Proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such shares.

"Proceeds" means any "proceeds," as such term is defined in Section 9.102(a)(65) of the UCC and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to a Grantor from time to time with respect to any of the Collateral, (b) any and all payments (in any form whatsoever) made or due and payable to a Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Collateral by any Governmental Authority (or any Person acting under color of Governmental Authority), and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Receivables" means the Accounts, Chattel Paper, Documents, Instruments, Investment Related Property, or Commercial Tort Claims, and any other rights or claims to receive Money which are General Intangibles or which are otherwise included as Collateral, together with all of the applicable Grantor's rights, if any, in all Collateral Support and Supporting Obligations related thereto.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Requirement of Law" means, with respect to any Person, any statute, law (including common law), treaty, rule, regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

5

DEBTORS' EX. NO. 5
1109 of 1570

"Secured Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Security Agreement or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Grantor following the occurrence of an Event of Default, (e) obligations and liabilities of the Grantors to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Security Agreement, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Grantor under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Secured Obligations arise or accrue before or after the filing by or against any Grantor of a petition under the Bankruptcy Code, or any similar filing by or against any Grantor under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Secured Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Secured Obligations is reduced to judgment, or (iv) such Secured Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.:

"Security" has the meaning set forth in Section 8.102(a)(15) of the UCC.

"Supporting Obligation" means all "supporting obligations" as defined in Section 9.102(a)(78) of the UCC.

"Tangible Chattel Paper" means any "tangible chattel paper", as such term is defined in Section 9.102(a)(79) of the UCC.

"Trademark Licenses" means any and all agreements providing for the granting of any right in or to Trademarks, including each agreement referred to on Schedule 3.15.

"Trademarks" means all United States and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing, including: (a) the registrations and applications referred to on Schedule 3.15; (b) all extensions or renewals of any of the foregoing; (c) all of the goodwill of the business connected with the use of and symbolized by the foregoing; (d) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill; and (e) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Trademark or any Trademark licensed under any Trademark License.

"Trade Secret Licenses" means any and all agreements providing for the granting of any right in or to Trade Secrets, including each agreement referred to on Schedule 3.15.

6

HOU 3972802v7

"Trade Secrets" means all trade secrets and all other confidential or proprietary information and know-how, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all Documents and things embodying, incorporating, or referring in any way to such Trade Secret, including: (a) the right to sue for past, present, and future misappropriation or other violation of any Trade Secret; and (b) all products and Proceeds of the foregoing, including any income, royalties, and awards and any claim by any Grantor against third parties for past, present, or future infringement of any Trade Secrets or any Trade Secrets licensed under any Trade Secret License.

2.    **GRANT OF SECURITY INTEREST**.

2.1    **Security Interest**.  To secure the prompt and complete payment and performance of the Secured Obligations when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any similar provisions of other applicable laws), each Grantor hereby grants to Lender a continuing security interest in, a Lien upon, and a right of set off against, and hereby assigns to Lender as security, all personal property of such Grantor, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Secured Obligations at any time granted to or held or acquired by Lender, collectively, the "Collateral"), including:

(a)    Accounts;

(b)    Chattel Paper;

(c)    Commercial Tort Claims;

(d)    Deposit Accounts;

(e)    Documents;

(f)    General Intangibles;

(g)    Goods;

(h)    Instruments;

(i)    Letter of Credit Rights;

(j)    Money;

(k)    Fixtures;

(l)    Intellectual Property;

(m)    Material Contracts;

(n)    Investment Related Property;

(o)    to the extent not otherwise included above, all Collateral Records, Collateral Support, and Supporting Obligations relating to any of the foregoing; and

HOU 3972802v7

(p)     to the extent not otherwise included above, all accessions to, substitutions for, and all replacements, products, Proceeds of the foregoing, including Proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage, or destruction of any Collateral.

If the security interest granted hereby in any rights of any Grantor under any contract included in the Collateral is expressly prohibited by such contract, then the security interest hereby granted therein nonetheless remains effective to the extent allowed by Article 9 of the UCC or other applicable law but is otherwise limited by that prohibition.  Notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property; *provided* that with respect to Excluded Property to be covered by clause (a)(i) of the definition thereof, such Excluded Property shall be identified on Schedule 3.16; *provided further that* if and when any Property shall cease to be Excluded Property, a Lien on and security in such Property shall be deemed granted therein.  Furthermore, notwithstanding any contrary provision, each Grantor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

2.2     **Grantor Remains Liable**.  Notwithstanding anything to the contrary contained herein, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Lender of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, and Lender shall not be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.3     **Authorization to File Financing Statement**s.   Each Grantor hereby irrevocably authorizes Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by Subchapter E of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Each Grantor agrees to furnish any such information to Lender promptly upon request.

3.     **REPRESENTATIONS AND WARRANTIES**.  Each Grantor represents and warrants to Lender that:

3.1     **Title; Authorization; Enforceability; Perfection**.  (a) Each Grantor has good and valid rights in and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Permitted Liens, and has full power and authority to grant to Lender the security interest in such Collateral; (b) the execution and delivery by each Grantor of this Security Agreement has been duly authorized, and this Security Agreement constitutes a legal, valid and binding obligation of such Grantor and creates a security interest enforceable against such Grantor in all

8

DEBTORS' EX. NO. 5
1112 of 1570

now owned and hereafter acquired Collateral subject to applicable bankruptcy, insolvency, reorganization; moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law; (c)(i) upon the filing of all UCC financing statements naming each Grantor as "debtor" and Lender as "secured party" and describing the Collateral in the filing offices set forth opposite such Grantor's name on Schedule 3.4 hereof, (ii) upon delivery of all Instruments, Chattel Paper, and certificated Pledged Equity Interest, (iii) upon sufficient identification of Commercial Tort Claims, (iv) upon execution of a control agreement establishing Lender's Control with respect to any Deposit Account, (v) upon consent of the issuer or any nominated person with respect to Letter of Credit Rights, and (vi) to the extent not subject to Article 9 of the UCC, upon recordation of the security interests granted hereunder in Intellectual Property in the applicable intellectual property registries, including the United States Patent and Trademark Office and the United States Copyright Office, the security interests granted to Lender hereunder constitute valid and perfected first priority Liens, subject only to Permitted Liens.

3.2    **Conflicting Legal Requirements and Contracts**.  Neither the execution and delivery by any Grantor of this Security Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof (a) will not violate such Grantors organizational documents or any Requirement of Law applicable to such Grantor, (b) will not violate or result in a default under any indenture, agreement or other Instrument binding upon a Grantor or the assets of such Grantor, or give rise to a right thereunder to require any payment to be made by such Grantor, and (a) will not result in the creation or imposition of any Lien on any asset of such Grantor, except Liens created pursuant to the Loan Documents.

3.3    **Governmental Authority**. No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents is required either (a) for the pledge by any Grantor of the Collateral pursuant to this Security Agreement or for the execution, delivery, or performance of this Security Agreement by any Grantor, or (b) for the exercise by Lender of the rights provided for in this Security Agreement or the remedies in respect of the Collateral pursuant to this Security Agreement.

3.4    **Grantor Information**.  Each Grantor's exact legal name, jurisdiction of organization, type of entity, state issued organizational identification number and the location of its principal place of business, or chief executive office  and of the books and records relating to the Receivables, are disclosed on Schedule 3.4; no Grantor has other places of business except those set forth on Schedule 3.4.  Except as noted on Schedule 3.4 hereto, all such books, records, and Collateral are in such Grantor's possession.  No Grantor has done business under any other name (including any trade-name or fictitious business name) except for those names set forth on Schedule 3.4.  Except as provided on Schedule 3.4, no Grantor has changed its name, jurisdiction of organization, principal place of business, or chief executive office or its corporate structure in any way.

3.5    **Property Locations**.  The Inventory, Equipment, and Fixtures are located solely at the locations described on Schedule 3.5.

3.6    **No Financing Statements or Control Agreements**.  Other than (i) the financing statements and control agreements with respect to this Security Agreement and (ii) financing statements or control agreements exclusively for Permitted Liens, there are no other financing statements or control agreements covering any Collateral.

HOU 3972802v7

DEBTORS' EX. NO. 5
1113 of 1570

3.7     **Maintenance of Collateral**.  All tangible Collateral which is necessary to any Grantor's business is in good repair and condition, ordinary wear and tear excepted, and none thereof is a Fixture except as specifically referred to herein on Schedule 3.5.

3.8     **Collateral**.  Schedule 3.8 accurately lists all Deposit Accounts, Commercial Tort Claims, Material Contracts, Pledged Equity Interests and all letters of credit, in which any Grantor has any right, title, or interest.  All information supplied by any Grantor to Lender with respect to any of the Collateral is true, correct, and complete in all material respects.

3.9     **Deposit, Commodity, and Securities Accounts**.  Schedule 3.8 correctly identifies all Deposit Accounts in which a Grantor has an interest and the institutions holding such accounts, including whether any such Deposit Account is an Excluded Account.  Each Grantor is the sole account holder of each such account and such Grantor has not consented to, and is not otherwise aware of, any person (other than Lender) having Control over, or any other interest in, any such account or the property credited thereto.

3.10     **Receivables**.  Each Receivable (a) is the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor, (b) is and will be enforceable in accordance with its terms, (c) is not subject to any setoffs, defenses, taxes, counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business), and (d) is in compliance with all applicable laws, whether federal, state, local or foreign.

3.11     **Letter of Credit Rights**.  All letters of credit to which any Grantor has rights is listed on Schedule 3.8, and such Grantor has obtained the consent of each issuer or the nominated person of any letter of credit to the assignment of the Proceeds of the letter of credit to Lender.

3.12     **Instruments and Chattel Paper**.  All Instruments and Chattel Paper have been delivered to Lender, together with corresponding endorsements duly executed by the applicable Grantor in favor of Lender, and such endorsements have been duly and validly executed and are binding and enforceable against such Grantor in accordance with their terms.

3.13     **Material Contracts**.  All Material Contracts to which any Grantor is a party are set forth on Schedule 3.8.  True and correct copies of all such Material Contracts have been furnished to Lender.  Each Material Contract is in full force and effect; there have been no amendments, modifications, or supplements to any Material Contract of which Lender has not been advised in writing; and no default, breach, or potential default or breach has occurred and is continuing under any Material Contract, except as disclosed on Schedule 3.8.  No Material Contract prohibits assignment or requires consent of or notice to any person in connection with the assignment to Lender hereunder, except such as has been given or made.

3.14     **Investment Related Property**.

(a)     Schedule 3.8 sets forth all of the Pledged Stock, Pledged LLC Interests, and Pledged Partnership Interests owned by any Grantor, and such Pledged Equity Interests constitute the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests, or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule.

(b)     Except as set forth on Schedule 3.8, no Grantor has acquired any equity interests of another entity or substantially all the assets of another entity within the past five (5) years.

10

HOU 3972802v7

(c)     Each Grantor is the record and beneficial owner of the Pledged Equity Interests owned by it free of all Liens (other than Permitted Liens), rights or claims of other persons, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests.

(d)     No consent of any person including any other partner (general, limited, or otherwise), any other member of a limited liability company, any other shareholder, or any other trust beneficiary is necessary or desirable in connection with the creation, perfection, or first priority status of the security interest of Lender in any Pledged Equity Interests or the exercise by Lender of the voting or other rights provided for in this Security Agreement or the exercise of remedies in respect thereof.

(e)     None of the Pledged Equity Interests are or represent interests in issuers that (i) are registered as investment companies or (ii) are dealt in or traded on securities exchanges or markets.

(f)     Except as otherwise set forth on Schedule 3.8, all of the Pledged Equity Interests are or represent interests in issuers that have not opted to be treated as securities under the UCC of any jurisdiction.

(g)     (i) Each Grantor has delivered to Lender all stock, member certificates, or other Instruments or Documents representing or evidencing the Pledged Equity Interests, *together with* corresponding assignment or transfer powers duly executed in blank by such Grantor, and such powers have been duly and validly executed and are binding and enforceable against such Grantor in accordance with their terms and (ii) to the extent such Pledged Equity Interests are uncertificated, each Grantor has taken all actions necessary or desirable to establish Lender's Control over such Pledged Equity Interests.

3.15     **Intellectual Property**.

(a)     All of the Intellectual Property is subsisting, valid, and enforceable.   The information contained on Schedule 3.15 is true, correct, and complete.  All issued Patents, Patent Licenses, Trademarks, Trademark Licenses, Copyrights, Copyright Licenses, Trade Secret, and Trade Secret Licenses of each Grantor are identified on Schedule 3.15.

(b)     Each Grantor is the sole and exclusive owner of the entire and unencumbered right, title, and interest in and to the Intellectual Property purported to be owned by such Grantor free and clear of any Liens, including any pledges, assignments, licenses, user agreements, and covenants by such Grantor not to sue third persons, other than Permitted Liens.

(c)     No third party is infringing, or in such Grantor's reasonable business judgment, may be infringing, any of such Grantor's rights under the Intellectual Property.

(d)     Each Grantor has performed and will continue to perform all acts and has paid and will continue to pay all required fees and taxes to maintain each and every item of the Intellectual Property in full force and effect throughout the world, as applicable.

(e)     Each of the Patents and Trademarks identified on Schedule 3.15 has been properly registered with the United States Patent and Trademark Office and in corresponding offices throughout the world (where appropriate) and each of the Copyrights identified on Schedule 3.15

11

DEBTORS' EX. NO. 5
1115 of 1570

has been properly registered with the United States Copyright Office and in corresponding offices throughout the world (where appropriate).

(f)     To the best of each Grantor's knowledge, no claims with respect to the Intellectual Property have been asserted and are pending (i) to the effect that the sale, licensing, pledge, or use of any of the products of such Grantor's business infringes any other party's valid copyright, trademark, service mark, trade secret, or other intellectual property right, (ii) against the use by such Grantor of any Intellectual Property used in such Grantor's business as currently conducted, or (iii) challenging the ownership or use by such Grantor of any of the Intellectual Property that Grantor purports to own or use, nor, to such Grantor's knowledge, is there a valid basis for such a claim described in this Section 3.15.

3.16     **Excluded Property**.  Except as set forth on Schedule 3.16, the Grantors do not own or have any right, title, or interest in any Excluded Property.

4.     **COVENANTS**.  From the date of this Security Agreement, and thereafter until this Security Agreement is terminated:

4.1     **General**.

(a)     **Inspection**.  Each Grantor will permit representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, during normal business hours, (a) to inspect the Collateral, (b) to examine and make copies of the records of such Grantor relating to the Collateral, and (c) to discuss the Collateral and the related records of such Grantor with, and to be advised as to the same by, such Grantor's officers, employees, and accountants (and, in the case of any Receivable, with any Account Debtor), all at such reasonable times, as often as reasonably requested by the Lender at the Grantors' expense.

(b)     **Records and Reports; Notification of Default or Event of Default**.  Each Grantor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Lender such reports relating to the Collateral at such intervals as Lender shall from time to time request.  Each Grantor will give prompt (but in any event, with five (5) Business Days after each Grantor obtains knowledge thereof) notice in writing to Lender of the occurrence of any Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral.  Each Grantor shall mark its books and records to reflect the security interest of Lender under this Security Agreement.

(c)     **Financing Statements and Other Actions; Defense of Title**.  Each Grantor will deliver to Lender all financing statements and execute and deliver control agreements and other Documents and take such other actions as may from time to time be requested by Lender in order to maintain a first priority (subject to Permitted Liens)perfected security interest in and, in the case of Investment Related Property, Deposit Accounts (other than Excluded Accounts), Letter-of-Credit Rights, and Electronic Chattel Paper, Control of, the Collateral.  Each Grantor will take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of Lender in the Collateral and the priority thereof against any Lien.

(d)     **Disposition of Collateral**.  No Grantor will sell, lease, license, or otherwise dispose of the Collateral except dispositions specifically permitted pursuant to the Loan Agreement.

HOU 3972802v7

(e)　　**Lien**s.  No Grantor will create, incur, or suffer to exist any Lien on the Collateral except the security interest created by this Security Agreement or a Permitted Lien.

(f)　　**Change in Location, Jurisdiction of Organization or Name**.  No Grantor will (i) have any Inventory, Equipment, Fixtures, or Proceeds or products thereof (other than Inventory and Proceeds thereof disposed of as permitted by <u>Section 4.1(d)</u>) at a location other than a location specified on <u>Schedule 3.5</u>, (ii) maintain records relating to the Receivables at a location other than at the location specified on <u>Schedule 3.8</u>, (iii) maintain a place of business at a location other than a location specified on <u>Schedule 3.5</u>, (iv) change its name or taxpayer identification number, (v) change its mailing address, or (vi) change its jurisdiction of organization, unless such Grantor shall have given Lender not less than thirty (30) days' prior written notice thereof, and Lender shall have determined that such change will not adversely affect the validity, perfection, or priority of Lender's security interest in the Collateral.  Prior to making any of the foregoing changes, each Grantor shall execute and deliver all such additional Documents and perform all additional acts as Lender, in its sole discretion, may request in order to continue or maintain the existence and priority of its security interest in all of the Collateral.

(g)　　**Taxe**s.  Each Grantor will pay when due all taxes, assessments, and governmental charges and levies upon the Collateral in accordance with the Loan Agreement.

(h)　　**Other Financing Statement**s.  No Grantor will authorize any other financing statement naming it as debtor covering all or any portion of the Collateral other than a financing statement exclusively for a Permitted Lien.

4.2　　**Receivable**s.  No Grantor will make or agree to make any discount, credit, rebate, or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except in accordance with its present policies and in the ordinary course of business.  Except as otherwise provided in this Security Agreement, each Grantor will, at such Grantor's sole expense, collect all amounts due or hereafter due to such Grantor under the Receivables and enforce such Grantor's rights under all Collateral Support or Supporting Obligation with respect to the Receivables.

4.3　　**Inventory and Equipment**.

(a)　　**Maintenance of Good**s.  Each Grantor will do all things necessary to maintain, preserve, protect, and keep the Inventory and the Equipment in good repair and working and saleable condition.

(b)　　**Insuranc**e.  Each Grantor will maintain insurance coverage in accordance with the terms of the Loan Agreement.

(c)　　**Certificate**s **of Title**.  With respect to any item of Equipment which is covered by a certificate of title and indication of a security interest on such certificate is required as a condition of perfection, upon the request of Lender, each Grantor shall cause Lender's security interest to be properly indicated thereon.

4.4　　**Account**s.

(a)　　**Verification of Account**s.  Lender shall have the right, at any time or times hereafter, in its name or in the name of a nominee of Lender, to verify the validity, amount, or any other matter relating to any Accounts, by mail, telephone, telegraph, or otherwise.

HOU 3972802v7

DEBTORS' EX. NO. 5
1117 of 1570

(b)     **Disputed Accounts; Limitation on Modification of Account**s.  No Grantor will, without Lender's prior written consent, grant any extension of the time for payment of any of the Accounts, compromise, compound, or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof, or allow any credit or discount whatsoever thereon other than trade discounts granted in the ordinary course of business of such Grantor.

(c)     **Notice to Account Debtor**.  Lender may, in its sole discretion, at any time or times after an Event of Default has occurred, and without prior notice to any Grantor (i) notify any or all Account Debtors that the Accounts have been assigned to Lender and that Lender has a security interest therein and (ii)  direct any or all Account Debtors to make all payments upon the Accounts directly to Lender.  Lender shall furnish Grantors with a copy of any such notice.

4.5     **Intellectual Property**.

(a)     **Maintenance of Right**s.  Each Grantor shall preserve and maintain all of its material rights in the Intellectual Property and protect its Intellectual Property from infringement, unfair competition, cancellation, or dilution by all appropriate action necessary in such Grantor's reasonable business judgment, including the commencement and prosecution of legal proceedings to recover damages for infringement and to defend and preserve its rights in the Intellectual Property.

(b)     **No Abandonment**.  No Grantor shall abandon any of the Intellectual Property necessary to the conduct of its business.

(c)     **License**s.  (i) No Grantor shall sell or assign any of its interest in any of the Intellectual Property other than in the ordinary course of business for full and fair consideration without the prior written consent of Lender; (ii) no Grantor shall grant any license or sublicense with respect to any of its Intellectual Property without the prior written consent of Lender; and (iii) each Grantor shall maintain the quality of any and all products and services with respect to which the Intellectual Property is used.

(d)     **No Conflicting Agreement**s.  No Grantor shall enter into any agreement, including any licensing agreement, that is or may be inconsistent with such Grantor's obligations under this Security Agreement or any of the other Loan Documents.

(e)     **Additional Intellectual Property**.  Each Grantor shall give Lender prompt written notice if such Grantor shall obtain rights to or become entitled to the benefit of any Intellectual Property not identified on Schedule 3.15.  Each Grantor shall execute and deliver any and all Patent Security Agreements, Copyright Security Agreements, or Trademark Security Agreements, each in form and substance satisfactory to Lender, as Lender may request to evidence Lender's Lien on such Intellectual Property.

(f)     **Obligation upon Default**.  On and after the occurrence of an Event of Default, each Grantor shall obtain any consents, waivers, or agreements necessary to enable Lender to exercise its rights and remedies with respect to the Intellectual Property.

4.6     **Instruments; Chattel Paper; and Documents**.  Each Grantor will (a) deliver to Lender immediately upon execution of this Security Agreement the originals of all Chattel Paper and Instruments (if any then exists), (b) hold in trust for Lender upon receipt and immediately thereafter deliver to Lender any Chattel Paper and Instruments constituting Collateral, (c) mark conspicuously all Chattel Paper and Instruments (other than any delivered to Lender) with an appropriate reference to the security interest of

14

HOU 3972802v7

Lender, and (d) upon Lender's request, deliver to Lender (and thereafter hold in trust for Lender upon receipt and immediately deliver to Lender) any Document evidencing or constituting Collateral.

4.7     **Deposit Accounts**.  With respect to any Deposit Account (other than an Excluded Account), each Grantor shall (a) maintain such accounts at the institutions described on Schedule 3.8, (b) deliver to each depository bank a control agreement in form and substance satisfactory to Lender with respect to Lender's rights in such account and obtain the execution of such control agreement by each institution stating that the pledge of such account has been recorded in the books and records of such institution and that Lender shall have exclusive Control over such deposit account, and (c) deliver to Lender all certificates or Instruments, if any, now or hereafter representing or evidencing such deposit accounts, accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to Lender.  Without Lender's consent, no Grantor shall establish any additional deposit accounts (other than an Excluded Account), unless such deposit accounts are subject to Lender's exclusive Control.

4.8     **Commercial Tort Claims**.  If any Grantor at any time holds or acquires a Commercial Tort Claim, such Grantor shall (a) immediately forward to Lender written notification of any and all Commercial Tort Claims, including any and all actions, suits, and proceedings before any court or Governmental Authority by or affecting such Grantor; and (b) execute and deliver such statements, Documents and notices and do and cause to be done all such things as may be required by Lender, or required by law, including all things which may from time to time be necessary under the UCC to fully create, preserve, perfect, and protect the priority of Lender's security interest in any Commercial Tort Claims.

4.9     **Letter-of-Credit Rights**.  If any Grantor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of any Grantor, such Grantor shall promptly notify Lender thereof in writing and, at Lender's request, such Grantor shall, pursuant to an agreement in form and substance satisfactory to Lender, either (a) arrange for the issuer or any confirmer of such letter of credit to consent to an assignment to Lender of the Proceeds of any drawing under the letter of credit or (b) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the Proceeds of any drawing under the letter of credit are to be applied to the Secured Obligations as provided in the Loan Agreement.

4.10     **Investment Related Property**.

(a)     **No Modification of Rights and Obligation**.  Without the prior written consent of Lender, no Grantor shall vote to enable or take any other action to: (i) amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially changes the rights of such Grantor with respect to any Investment Related Property or adversely affects the validity, perfection or priority of Lender's security interest; (ii) permit any issuer of any Pledged Equity Interest to issue any additional stock, partnership interest, limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any stock or other equity interest of any nature of such issuer; (iii) permit any issuer of any Pledged Equity Interest to dispose of all or a material portion of its assets; (iv) waive any default under or breach of any terms of organizational document relating to the issuer of any Pledged Equity Interest; or (v) cause any issuer of any Pledged Equity Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Equity Interests to be treated as securities for purposes of the UCC; *provided*, *however*, notwithstanding the foregoing, if any issuer of any Pledged Equity Interests takes any such action in violation of the foregoing in this clause (v), such Grantor shall promptly notify Lender in writing of any such

15

DEBTORS' EX. NO. 5
1119 of 1570

election or action and, in such event, shall take all steps necessary, advisable, or requested to establish Lender's Control thereof.

     (b)    **Performance of Underlying Obligation**s.  Each Grantor shall comply with all of its obligations under any shareholders' agreement, limited liability company agreement, partnership agreement, or other agreement relating to Pledged Equity Interests and shall enforce all of its rights with respect to any Investment Related Property.

     (c)    **Changes in Capital Structure of Issuer**s.  Without the prior written consent of Lender, no Grantor shall permit any issuer of any Pledged Equity Interest to merge or consolidate.

     (d)    **Consent of Grantor**.  To the extent the consent of a Grantor, whether in its capacity as a partner, member, general partner, managing member, shareholder, issuer, or otherwise, is required for the transfer, conveyance, or encumbrance of all or any portion of the Pledged Equity Interests in any corporation, partnership, or limited liability company, such Grantor hereby irrevocably (a) consents to the transfer or conveyance of the Pledged Equity Interests pursuant to Lender's exercise of its rights and remedies under this Security Agreement or any of the other Loan Documents, at law or in equity, (b) consents to the admission of Lender, its nominees, or any other transferee of any Pledged Equity Interest as a shareholder, member (including as the managing member), or partner (including as the general partner) of such corporation, limited liability company, or partnership, and (c) agrees that all terms and conditions in the constituent documents applicable to the pledge of any Pledged Equity Interest, the enforcement thereof, the transfer of any Pledged Equity Interest or the admission of Lender, its nominees, or any other transferee of any Pledged Equity Interest as a shareholder, member (including as the managing member), or partnership (including as the general partner) of such corporation, limited liability company, or partnership have been satisfied or waived.  Each Grantor hereby irrevocably agrees not to vote to amend the applicable constituent documents to provide that its equity interests are securities governed by Article 8 of the UCC, and hereby agrees and acknowledges that any such vote shall be invalid and any such amendment shall be void ab initio.

     (e)    **Voting of Securitie**s.  Prior to the occurrence of an Event of Default, each Grantor is entitled to exercise all voting rights pertaining to any Pledged Equity Interests; *provided, however*, that no vote shall be cast or consent, waiver, or ratification given or action taken without the prior written consent of Lender which would (i) be inconsistent with or violate any provision of this Security Agreement or any other Loan Document or (ii) amend, modify, or waive any term, provision or condition of the certificate of incorporation, bylaws, certificate of formation, or other charter document, or other agreement relating to, evidencing, providing for the issuance of, or securing any Collateral; and *provided further* that such Grantor shall give Lender at least ten (10) Business Days' prior written notice that it intends to exercise, or the reasons for refraining from exercising, any voting or other consensual rights pertaining to the Collateral or any part thereof which might have a material adverse effect on the value of the Collateral or any part thereof.  On and after the occurrence of an Event of Default and if Lender elects to exercise such right, the right to vote any Pledged Equity Interests shall be vested exclusively in Lender.  To this end, each Grantor hereby irrevocably constitutes and appoints Lender the proxy and attorney-in-fact of such Grantor, with full power of substitution, to vote, and to act with respect to, any and all Collateral that is Investment Related Property Interests standing in the name of such Grantor or with respect to which such Grantor is entitled to vote and act, subject to the understanding that such proxy may not be exercised unless an Event of Default has occurred.  The proxy herein granted is coupled with an interest, is irrevocable, and shall continue until the termination of this Security Agreement pursuant to Section 6.13.

HOU 3972802v7

4.11   **Fixtures**. For any Collateral that is a Fixture or an accession which has been attached to real estate or other goods prior to the perfection of the security interest of Lender, Grantor shall furnish Lender, upon demand, a disclaimer of interest in each such Fixture or accession and a consent in writing to the security interest of Lender therein, signed by all persons having any interest in such Fixture or accession by virtue of any interest in the real estate or other goods to which such Fixture or accession has been attached.

4.12   **Use and Operation of Collateral**. Should any Collateral come into the possession of Lender, Lender may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Lender in respect of such Collateral. Each Grantor covenants to promptly reimburse and pay to Lender, at Lender's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Lender in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Default Rate until repaid and, together with such interest, shall be payable by Grantor to Lender upon demand and shall become part of the Secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Grantors, and Lender shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Lender, Lender shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

4.13   **Certain Proceeds**. Notwithstanding any contrary provision herein, any and all Proceeds of any Collateral consisting of cash, checks and other non-cash items shall be part of the Collateral hereunder. Any cash Proceeds of the Collateral which come into the possession of Lender on and after the occurrence of an Event of Default (including insurance Proceeds) may, at Lender's option, be applied in whole or in part to the Secured Obligations (to the extent then due), be released in whole or in part to or on the written instructions of such Grantor for any general or specific purpose, or be retained in whole or in part by Lender as additional Collateral.

4.14   **Further Assurances**. At any time and from time to time, upon the request of Lender, and at the sole expense of Grantors, each Grantor shall promptly execute and deliver all such further Instruments and Documents and take such further actions as Lender may reasonably request or deem necessary or desirable (a) to assure Lender that its security interests hereunder are perfected with a first priority Lien (subject only to Permitted Liens), (b) to carry out the provisions and purposes of this Security Agreement, including (i) the filing of such financing statements as Lender may require, (ii) executing control agreements with respect to the Collateral, in each case naming Lender, as secured party, in form and substance satisfactory to Lender, (iii) furnishing to Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail, (iv) the deposit of all certificates of title issuable with respect to any of the Collateral and noting thereon the security interest hereunder, (v) taking all actions required by law in any relevant UCC, and (vi) to ensure that a Lien and security interest is granted on any of the Excluded Property set forth in clause (a) of the definition of "Excluded Property", such Grantor shall use its best efforts to obtain any required consents from any Person with respect to any permit or license or any Contractual Obligation with such Person entered into by such Grantor that requires such consent as a condition to the creation by such Grantor of a Lien on any right, title or interest in such permit, license or Contractual Obligation related thereto. A carbon, photographic, or other reproduction of this Security Agreement or of any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement and may be filed as a financing statement.

HOU 3972802v7

DEBTORS' EX. NO. 5
1121 of 1570

5.      **REMEDIES UPON EVENT OF DEFAULT**

5.1      **Remedies**.  On and after the occurrence of an Event of Default under the Loan Agreement or any other Loan Document, Lender may exercise any or all of the following rights and remedies:

(a)      **Contractual Remedies**.  Those rights and remedies provided in this Security Agreement, the Loan Agreement, or any other Loan Document, *provided that* this Section 5.1(a) shall not limit any rights or remedies available to Lender prior to the occurrence of an Event of Default.

(b)      **Legal Remedies**.  Those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement.

(c)      **Disposition of Collateral**.  Without notice except as specifically provided in Section 5.2(c) or elsewhere herein, sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as Lender may deem commercially reasonable.  Neither Lender's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale.  Each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(d)      **Distributions**.  On and after the occurrence of an Event of Default, all payments and distributions made to any Grantor upon or with respect to the Collateral shall be paid or delivered as directed by Lender, and each Grantor agrees to take all such action as Lender may deem necessary or appropriate to cause all such payments and distributions to be made to Lender.  Further, Lender shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Lender.  Such issuer shall be fully protected in relying on the written statement of Lender that it then holds a security interest which entitles it to receive such payments and distributions.  Any and all Money and other property paid over to or received by Lender hereunder shall be retained by Lender as additional collateral hereunder and may be applied in accordance with Section 5.10 hereof.

(e)      **Use of Premises**.  Lender shall be entitled to occupy and use any premises owned or leased by any Grantor where any of the Collateral or any records relating to the Collateral are located until the Secured Obligations are paid or the Collateral is removed therefrom, whichever first occurs, without any obligation to pay such Grantor for such use and occupancy.

5.2      **Grantor's Obligations Upon Event of Default**.  Upon the request of Lender on and after the occurrence of an Event of Default, each Grantor will:

(a)      **Assembly of Collateral**.  Assemble and make available to Lender the Collateral and all records relating thereto at any place or places specified by Lender.

(b)      **Lender Access**.  Permit Lender, by Lender's representatives and agents, to enter any premises where all or any part of the Collateral, or the books and records relating thereto, or

HOU 3972802v7

DEBTORS' EX. NO. 5
1122 of 1570

both, are located, to take possession of all or any part of the Collateral and to remove all or any part of the Collateral.

(c)     **Notice of Disposition of Collateral**.  Each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to any Grantor, addressed in accordance with Section 6.13, at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made.  Lender shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  Subject to the provisions of applicable law, Lender may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Lender may further postpone such sale by announcement made at such time and place.

5.3     **Condition of Collateral; Warranties**.  Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.  Lender may sell the Collateral without giving any warranties as to the Collateral.  Lender may specifically disclaim any warranties of title or the like.  This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

5.4     **Collection of Receivables**.  On and after the occurrence of an Event of Default, Lender may at any time in its sole discretion, by giving Grantors written notice, elect to require that the Receivables be paid directly to Lender.  In such event, each Grantor shall, and shall permit Lender to, promptly notify the Account Debtors under the Receivables of Lender's interest therein and direct such Account Debtors to make payment of all amounts then or thereafter due under the Receivables directly to Lender.  Upon receipt of any such notice from Lender, each Grantor shall thereafter hold in trust for Lender, all amounts and Proceeds received by it with respect to the Receivables and immediately and at all times thereafter deliver to Lender all such amounts and Proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements.  Lender shall hold and apply funds so received as provided by the terms of Section 5.10.  If after the occurrence of an Event of Default, any Account Debtor fails or refuses to make payment on any Collateral when due, Lender is authorized, in its sole discretion, either in its own name or in the name of Grantors, to take such action as Lender shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Each Grantor agrees that Lender may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as Lender in its sole discretion shall determine or abandon any Receivable, and any such action by Lender shall be commercially reasonable so long as Lender acts in good faith based on information known to it at the time it takes any such action.  Regardless of any other provision hereof, however, Lender shall never be (a) liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, or (b) under any duty whatsoever to anyone except Grantors to account for funds that it shall actually receive hereunder.

5.5     **Cash Collateral Account**.  On and after the occurrence of an Event of Default, Lender shall have, and each Grantor hereby grants to Lender, the right and authority to transfer all funds on deposit in the Deposit Accounts to a "Cash Collateral Account" (herein so called) maintained with a depository institution acceptable to Lender and subject to the exclusive direction, domain, and Control of Lender, and no disbursements or withdrawals shall be permitted to be made by any Grantor from such Cash Collateral Account.  Such Cash Collateral Account shall be subject to the security interest in favor of Lender herein created, and each Grantor hereby grants a security interest to Lender in and to such Cash Collateral Account and all checks, drafts, and other items ever received by any Grantor for deposit therein.  Furthermore, if an

DEBTORS' EX. NO. 5
1123 of 1570

Event of Default has occurred, Lender shall have the right, at any time in its discretion without notice to any Grantor, (a) to transfer to or to register in the name of Lender or nominee any certificates of deposit or deposit instruments constituting Deposit Accounts and shall have the right to exchange such certificates or Instruments representing Deposit Accounts for certificates or Instruments of smaller or larger denominations and (b) to take and apply against the Secured Obligations any and all funds then or thereafter on deposit in the Cash Collateral Account or otherwise constituting Deposit Accounts.

       5.6      **Intellectual Property**.  For purposes of enabling Lender to exercise its rights and remedies under this Security Agreement and enabling Lender and its successors and assigns to enjoy the full benefits of the Collateral, each Grantor hereby grants to Lender an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to Grantor) to use, license, or sublicense any of the Intellectual Property.  Each Grantor shall provide Lender with reasonable access to all media in which any of the Intellectual Property may be recorded or stored and all computer programs used for the completion or printout thereof.  This license shall also inure to the benefit of all successors, assigns, and transferees of Lender.  On and after the occurrence of an Event of Default, Lender may require that Grantor assign all of their right, title, and interest in and to the Intellectual Property or any part thereof to Lender or such other person as Lender may designate pursuant to Documents satisfactory to Lender.  If no Event of Default has occurred, Grantors shall have the exclusive, non-transferable right and license to use the Intellectual Property in the ordinary course of business and the exclusive right to grant to other persons licenses and sublicenses with respect to the Intellectual Property for full and fair consideration.

       5.7      **Investment Related Property**.  Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "Securities Act") and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If Lender determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Equity Interest to be sold hereunder from time to time to furnish to Lender all such information as Lender may request in order to determine the number and nature of interest, shares, or other Instruments included in the Investment Related Property which may be sold by Lender in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder.  In case of any sale of all or any part of the Investment Related Property on credit or for future delivery, such Collateral so sold may be retained by Lender until the selling price is paid by the purchaser thereof, but Lender shall not incur any liability in case of the failure of such purchaser to take up and pay for such assets so sold and in case of any such failure, such Collateral may again be sold upon like notice.  Lender, instead of exercising the power of sale herein conferred upon them, may proceed by a suit or suits at law or in equity to foreclose security interests created hereunder and sell such Investment Related Property, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction.

HOU 3972802v7

DEBTORS' EX. NO. 5
1124 of 1570

5.8     **Record Ownership of Securities**.  On and after the occurrence of an Event of Default, Lender at any time may have any Collateral that is Pledged Equity Interests and that is in the possession of Lender, or its nominee or nominees, registered in its name, or in the name of its nominee or nominees, as Lender; and, as to any Collateral that is Pledged Equity Interests so registered, each Grantor shall execute and deliver (or cause to be executed and delivered) to Lender all such proxies, powers of attorney, dividend coupons, or orders, and other Documents as such Lender may reasonably request for the purpose of enabling Lender to exercise the voting rights and powers which it is entitled to exercise under this Security Agreement or to receive the dividends and other distributions and payments in respect of such Collateral that is Pledged Equity Interests or Proceeds thereof which it is authorized to receive and retain under this Security Agreement.

5.9     **Sales on Credit**.  If Lender sells any of the Collateral upon credit, Grantors will be credited only with payments actually made by the purchaser, received by Lender, and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Lender may resell the Collateral and Grantors shall be credited with the Proceeds of the sale.

5.10     **Application of Proceeds**.  On and after the occurrence of an Event of Default, the Proceeds of the Collateral shall be applied by Lender to payment of the Secured Obligations in accordance with Section 2.08 of the Loan Agreement.  If the Proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be liable for the deficiency and the fees of any attorneys employed by Lender to collect such deficiency.

5.11     **Power of Attorney**.  Each Grantor hereby appoints Lender and Lender's designee as its attorney, with power: (a) on and after the occurrence of an Event of Default, to endorse such Grantor's name on any checks, notes, acceptances, money orders, or other forms of payment or security that come into Lender's possession; (b) to sign such Grantor's name on any invoice, bill of lading, warehouse receipt, or other negotiable or non-negotiable Document constituting Collateral, on drafts against customers, on assignments of Accounts, on notices of assignment, financing statements, and other public records, and to file any such financing statements by electronic means with or without a signature as authorized or required by applicable law or filing procedure; (c) so long as any Event of Default has occurred, to notify the post office authorities to change the address for delivery of any Grantor's mail to an address designated by Lender and to receive, open, and dispose of all mail addressed to any Grantor; (d) to send requests for verification of Accounts to customers or Account Debtors; (e) to complete in any Grantor's name or Lender's name, any order, sale, or transaction, obtain the necessary Documents in connection therewith, and collect the Proceeds thereof; (f) to clear Inventory through customs in any Grantor's name, Lender's name, or the name of Lender's designee, and to sign and deliver to customs officials powers of attorney in any Grantor's name for such purpose; (g) to the extent that any Grantor's authorization given in Section 2.3 of this Security Agreement is not sufficient, to file such financing statements with respect to this Security Agreement, with or without such Grantor's signature, or to file a photocopy of this Security Agreement in substitution for a financing statement, as Lender may deem appropriate, and to execute in such Grantor's name such financing statements and amendments thereto and continuation statements which may require such Grantor's signature; and (h) subject to the terms and conditions of this Security Agreement and, if applicable, after Lender has determined that any Grantor has failed to take any action required under the Loan Agreement, this Security Agreement or any other Loan Documents, to do all things reasonably necessary to carry out the terms and conditions of the Loan Agreement and this Security Agreement.  Each Grantor ratifies and approves all acts of such attorney.  None of Lender or a Secured Party or their attorneys will be liable for any acts or omissions or for any error of judgment or mistake of fact or law except for their willful misconduct, or gross negligence as determined by a court of competent jurisdiction in final and non-appealable judgment.  This power, being coupled with an interest, is irrevocable until this Security Agreement is terminated in accordance with Section 6.16.

21

DEBTORS' EX. NO. 5
1125 of 1570

6.      **GENERAL PROVISIONS**.

6.1      **Joint and Several Obligations of Grantors**.

(a)      Each Grantor is accepting joint and several liability hereunder with other persons that have executed or will execute a Security Agreement in consideration of the financial accommodation to be provided by the holders of the Secured Obligations, for the mutual benefit, directly and indirectly, of each Grantor and in consideration of the undertakings of each Grantor to accept joint and several liability for the Secured Obligations of each of them.

(b)      Each Grantor, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Secured Obligations, it being the intention of the parties hereto that all the Secured Obligations shall be the joint and several Secured Obligations of each Grantor without preferences or distinction among them.

6.2      **Limitation of Obligations**.

(a)      The provisions of this Security Agreement are severable, and in any action or proceeding involving any applicable law affecting the rights of creditors generally, if the Secured Obligations of any Grantor under this Security Agreement would otherwise be held or determined to be avoidable, invalid, or unenforceable on account of the amount of such Grantor's liability under this Security Agreement, then, notwithstanding any other provision of this Security Agreement to the contrary, the amount of such liability shall, without any further action by Grantors or Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Grantor's "Maximum Liability"). This Section 6.2 with respect to the Maximum Liability of each Grantor is intended solely to preserve the rights of Lender hereunder to the maximum extent not subject to avoidance under applicable law, and none of Grantors or any other Person shall have any right or claim under this Section 6.2(a) with respect to the Maximum Liability, except to the extent necessary to ensure that the Secured Obligations of Grantors hereunder shall not be rendered voidable under applicable law.

(b)      Each Grantor agrees that the Secured Obligations may at any time and from time to time exceed the Maximum Liability of such Grantor, and may exceed the aggregate Maximum Liability of all other Grantors, without impairing this Security Agreement or affecting the rights and remedies of Lender. Nothing in this Section 6.2(b) shall be construed to increase any Grantor's Secured Obligations hereunder beyond its Maximum Liability.

(c)      Notwithstanding any or all of the Secured Obligations becoming unenforceable against any Grantor or the determination that any or all of the Secured Obligations shall have become discharged, disallowed, invalid, illegal, void, or otherwise unenforceable as against any Grantor (whether by operation of any present or future law or by order of any court or governmental agency), the Secured Obligations shall, for the purposes of this Security Agreement, continue to be outstanding and in full force and effect.

6.3      **NO RELEASE OF GRANTORS**.   THE OBLIGATIONS OF GRANTORS UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED, OR TERMINATED, AND GRANTORS SHALL NOT BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (other than pursuant to Section 6.16), including (and whether or not the same

22

DEBTORS' EX. NO. 5
1126 of 1570

shall have occurred or failed to occur once or more than once and whether or not Grantors shall have received notice thereof):

> (a)     (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance, or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition, or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of, the Secured Obligations;

> (b)     (i) any failure to obtain, (ii) any release, composition, or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of, any Loan Documents;

> (c)     (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any release, compromise, settlement, or extension of the time of payment of any Secured Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any Lien upon, (iv) any subordination of any Lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness, or other unenforceability of any Lien or intended Lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

> (d)     any termination of or change in any relationship between Grantors and Lender or the addition or release (subject to <u>Section 6.5</u>) of any other Grantor;

> (e)     any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of, or other indulgence with respect to, any right, remedy, or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment, or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Lender in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

> (f)     ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF GRANTORS UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF GRANTORS HEREUNDER OR DISCHARGE GRANTORS FROM ANY OBLIGATION HEREUNDER.

6.4     **Subordination of Certain Claim**s.  Any and all rights and claims of a Grantor against another Grantor or against any other Person or property, arising by reason of any payment by any Grantors to Lender pursuant to the provisions, or in respect, of this Security Agreement shall be subordinate, junior, and subject in right of payment to the prior and indefeasible payment in full of all Secured Obligations to Lender, and until such time, each Grantor defers all rights of subrogation, contribution, or any similar right and until such time, agrees not to enforce any such right or remedy Secured Party may now or hereafter have against another Grantor or any endorser of all or any part of the Secured Obligations and any right to participate in, or benefit from, any security given to Lender to secure any of the Secured Obligations.  All Liens and security interests of each Grantor, whether now or hereafter arising and howsoever existing, in assets of another Grantor or any assets securing the Secured Obligations shall be and hereby are subordinated to the rights and interests of Lender and in those assets until the prior and indefeasible final

DEBTORS' EX. NO. 5
1127 of 1570

payment in full of all Secured Obligations to Lender. If any amount shall be paid to any Grantor contrary to the provisions of this Section 6.4 at any time when any of the Secured Obligations shall not have been indefeasibly paid in full, such amount shall be held in trust for the benefit of Lender and shall forthwith be turned over in kind in the form received to Lender (duly endorsed if necessary) to be credited and applied against the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Loan Agreement.

6.5     **Recovered Payment**s. The Secured Obligations shall be deemed not to have been paid, observed, or performed, and Grantors' Secured Obligations under this Security Agreement in respect thereof shall continue and not be discharged, to the extent that any payment, observance, or performance thereof by any Grantor is recovered from or paid over by or for the account of Lender for any reason, including as a preference or fraudulent transfer or by virtue of any subordination (whether present or future or contractual or otherwise) of the Secured Obligations, whether such recovery or payment over is effected by any judgment, decree, or order of any court or governmental agency; by any plan of reorganization; or by settlement or compromise by Lender (whether or not consented to by Grantors) of any claim for any such recovery or payment over. Each Grantor hereby expressly waives the benefit of any applicable statute of limitations and agrees that it shall be liable hereunder whenever such a recovery or payment over occurs.

6.6     **No Waiver**. No delay or omission of Lender to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment, or other variation of the terms, conditions, or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Lender and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Lender until the Secured Obligations have been paid in full.

6.7     **Lender Performance of Grantor's Obligation**s. Without having any obligation to do so, Lender may perform or pay any Secured Obligation which any Grantor has agreed to perform or pay in this Security Agreement and each Grantor shall, jointly and severally, reimburse Lender for any amounts paid by Lender pursuant to this Section 6.7. Each Grantor's Secured Obligation to reimburse Lender pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

6.8     **Specific Performance of Certain Covenant**s. Each Grantor acknowledges and agrees that a breach of any of the covenants contained in Sections 4.1(c), 4.1(e), 4.6, 5.4, 5.5, 5.6, 5.10, 5.11, or 6.9 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breaches; therefore each Grantor further agrees, without limiting the right of Lender to seek and obtain specific performance of other Secured Obligations of such Grantor contained in this Security Agreement, that the covenants of such Grantor contained in the Sections referred to in this Section 6.8 shall be specifically enforceable against such Grantor.

6.9     **Disposition**s **Not Authorized**. No Grantor is authorized to sell or otherwise dispose of the Collateral except as permitted in the Loan Agreement. Notwithstanding any course of dealing between any Grantor and Lender or other conduct of Lender, no authorization to sell or otherwise dispose of the Collateral shall be binding upon Lender unless such authorization is in writing signed by Lender.

6.10    **Waiver**s. Except to the extent expressly otherwise provided herein or in other Loan Documents and to the fullest extent permitted by applicable law, each Grantor waives (a) any right to require Lender to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Lender may have; (b) with respect to the Secured Obligations, presentment and demand for payment,

DEBTORS' EX. NO. 5
1128 of 1570

protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

6.11     **Benefit of Agreement**.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of Grantors, Lender, the Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign its rights or delegate its Secured Obligations or duties under this Security Agreement or any interest herein, without the prior written consent of Lender.

6.12     **Survival**.  All representations and warranties of each Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.  Without prejudice to the survival of any other Secured Obligation of each Grantor hereunder, the Secured Obligations and any other obligations of each Grantor under Sections 6.14 and 6.18 shall survive termination of this Security Agreement.

6.13     **Sending Notices**.  Whenever any notice is required or permitted to be given under the terms of this Security Agreement, the same shall be given in accordance with the Loan Agreement.

6.14     **Taxes and Expenses**.  Any taxes (including income taxes) payable or ruled payable by federal or state authority in respect of this Security Agreement shall be paid by each Grantor, together with interest and penalties, if any.  Grantors shall, jointly and severally, reimburse Lender for any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Security Agreement in accordance with Section 8.03 of the Loan Agreement. Grantors also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with the administration of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral).  In addition, Grantors shall be, jointly and severally, obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Grantor concerning any matter arising out of or connected with this Security Agreement, any Collateral or the Secured Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law.  Any and all costs and expenses incurred by each Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by such Grantor.

6.15     **Headings**.  The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

6.16     **Termination**.  This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until (a) the Loan Agreement has terminated pursuant to its express terms and (b) all of the Secured Obligations have been indefeasibly paid and performed in full and no commitments of Lender which would give rise to any Secured Obligations are outstanding; *provided that* the termination of this Security Agreement under this Section 6.16 is subject to Section 6.5.

6.17     **GOVERNING LAW/VENUE**.

HOU 3972802v7

(A)    THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(C)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(a)    EACH PARTY TO THIS SECURITY AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

6.18    **Indemnity**.  EACH GRANTOR DOES HEREBY ASSUME ALL LIABILITY FOR THE COLLATERAL, FOR THE SECURITY INTEREST OF LENDER, AND FOR ANY USE, POSSESSION, MAINTENANCE, AND MANAGEMENT OF ALL OR ANY OF THE COLLATERAL, INCLUDING ANY TAXES ARISING AS A RESULT OF, OR IN CONNECTION WITH, THE TRANSACTIONS CONTEMPLATED HEREIN, AND HEREBY ASSUMES LIABILITY FOR, AND SHALL INDEMNIFY AND HOLD LENDER AND ITS SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES HARMLESS FROM AND AGAINST, ANY AND ALL CLAIMS, CAUSES OF ACTION, OR LIABILITY FOR INJURIES TO, OR DEATHS OF, PERSONS AND DAMAGE TO PROPERTY, HOWSOEVER ARISING FROM OR INCIDENT TO SUCH USE, POSSESSION, MAINTENANCE, AND MANAGEMENT, WHETHER SUCH PERSONS BE AGENTS OR

26

DEBTORS' EX. NO. 5
1130 of 1570

EMPLOYEES OF GRANTOR OR OF THIRD PARTIES, OR SUCH DAMAGE BE TO PROPERTY OF GRANTOR OR OF OTHERS.

THE GRANTORS, JOINTLY AND SEVERALLY, SHALL INDEMNIFY THE LENDER, AND EACH RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE GRANTORS AND EACH GRANTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

WITHOUT LIMITING ANY OTHER PROVISION OF THIS SECURITY AGREMEENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE GRANTORS AND THE LENDER AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE OTHER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL RELIEVE ANY GRANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

6.19    **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR

HOU 3972802v7

RELATING TO THIS SECURITY AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

6.20    **FINAL AGREEMENT**.  THIS SECURITY AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.**
**SIGNATURE PAGE TO FOLLOW.**

HOU 3972802v7

DEBTORS' EX. NO. 5
1132 of 1570

**IN WITNESS WHEREOF**, Grantors and Lender have executed this Security Agreement as of the date first above written.

GRANTOR:

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By:      _____
Name;    _____
Title:   _____

GOM SHELF LLC,
a Delaware limited liability company

By:      _____
Name;    _____
Title:   _____

*[Signature Page to Security Agreement]*

LENDER:

APACHE CORPORATION


By: _____
Name: _____
Title: _____

**SCHEDULE 3.4[1]**

**GRANTOR INFORMATION**

1.    Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief Executive Office /
Place of Business and Organizational Identification Number of each Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Place of Business | Organization I.D.# |
|---|---|---|---|---|
| FIELDWOOD ENERGY I LLC | Limited Liability Company | Texas | 2000 W. Sam Houston Pkwy S., Suite 1600, Houston, Texas 77042 | [●] |
| GOM SHELF LLC | Limited Liability Company | Delaware | 2000 W. Sam Houston Pkwy S., Suite 1600, Houston, Texas 77042 | [●] |

2.    Other Names (including any Trade-Name or Fictitious Business Name) under which each Grantor
has conducted business:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
| [●] | [●] |

3.    Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business
and Corporate Structure within past five (5) years:

| Full Legal Name | Change in Name, Jurisdiction, Chief Executive Office, Sole Place of Business or Corporate Structure |
|---|---|
| [●] | [●] |

4.    Financing Statements:

| Name of Grantor | Filing Jurisdiction(s)[2] |
|---|---|
| FIELDWOOD ENERGY I LLC | Texas |

---

[1] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.
[2] Solely with respect to personal property

Schedule 3.4 – Page 1

HOU 3972802v7

| GOM SHELF LLC | Delaware |
|---|---|

**SCHEDULE 3.5[3]**

**PROPERTY LOCATIONS**

1.      Locations owned by Grantor

      None.

2.      Locations leased by Grantor as lessee

| Name of Grantor | Location of Equipment, Inventory, and Fixtures |
|---|---|
| [•] | [•] |

---

[3]To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

Schedule 3.5 – Page 1

**SCHEDULE 3.8[4]**

**COLLATERAL**

1.      1.      Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name | Excluded (Y/N) |
|---------|------------------------|----------------|--------------|----------------|
| [●] | [●] | [●] | [●] | [●] |

2.      Commercial Tort Claims:

        None.

3.      Material Contracts:

| Name of Grantor | Material Contracts |
|-----------------|--------------------|
|                 |                    |

4.      Letters of Credit:

        None.

5.      Investment Related Property:

| Grantor | Issuer | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | % of Outstanding LLC Interests of the Limited Liability Company |
|---------|--------|--------------------|--------------------------|----------------------|----------------------------------------------------------------|
| [●] | [●] | [●] | [●] | [●] | [●] |

---

[4] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

DEBTORS' EX. NO. 5
1138 of 1570

**SCHEDULE 3.15**

**INTELLECTUAL PROPERTY**
**PATENTS AND PATENT LICENSES**

1.      Patents

        None.

2.      Patent Licenses

        None.

## TRADEMARKS AND TRADEMARK LICENSES

3.      Trademarks

        None.

4.      Trademark Licenses

        None.

## COPYRIGHTS AND COPYRIGHT LICENSES

5.      Copyrights

        None.

6.      Copyright Licenses

        None.

## TRADE SECRETS AND TRADE SECRET LICENSES

7.      Trade Secrets

        None.

8.      Trade Secret Licenses

        None

HOU 3972802v7

**SCHEDULE 3.16**[5]

**EXCLUDED COLLATERAL**

| Name of Grantor | Description of Excluded Collateral |
|---|---|
|  |  |

---

[5] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

DEBTORS' EX. NO. 5
1140 of 1570

**Exhibit 10**

**Guarantee (Fieldwood Energy I LLC)**

## GUARANTEE

**THIS GUARANTEE** (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Guarantee") is executed as of _____, 20[●], by FIELDWOOD ENERGY I LLC, a Texas limited liability company ("Guarantor"), in favor of APACHE CORPORATION, a Delaware corporation ("Lender"), on behalf of itself and the other Secured Parties (as defined in the Loan Agreement described below).

### INTRODUCTORY PROVISIONS:

A.      This Guarantee is given in connection with that certain Standby Loan Agreement dated as of _____, 20[●] among Guarantor, GOM Shelf LLC, a Delaware limited liability company ("GOM"), and the Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement").

B.      GOM is (i) a Co-Borrower under the Loan Agreement and (ii) a wholly owned subsidiary of Guarantor.

C.      Guarantor will derive substantial direct and indirect benefit from the transactions contemplated by the Loan Agreement and the other Loan Documents.

D.      Guarantor is executing and delivering this Guarantee to induce the Lender to provide Loans to Borrowers, including GOM, under the Loan Agreement.

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor hereby guarantees to Lender the prompt payment and performance of the Guaranteed Obligations, this Guarantee being upon the following terms and conditions:

1.      **Defined Terms**.  Any capitalized term used in this Guarantee and not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.  In addition, the following terms have the following meanings:

"Dispute" means any action, dispute, claim, or controversy of any kind, whether in contract or tort, statutory, or common law, legal or equitable, now existing or hereafter arising, under or in connection with, or in any way pertaining to, this Guarantee and each other document, contract, and instrument required hereby, or now or hereafter delivered to Lender in connection herewith, or any past, present, or future extensions of credit and other activities, transactions, or obligations of any kind related directly or indirectly to any of the foregoing documents, including, without limitation, any of the foregoing arising in connection with the exercise of any self-help, ancillary, or other remedies pursuant to any of the foregoing documents.

"Guaranteed Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Guarantee, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified

015292.0273537 HOU 3973071v5

party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Guarantee, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Guaranteed Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Guaranteed Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Guaranteed Obligations is reduced to judgment, or (iv) such Guaranteed Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

2.      **Payment**.  Guarantor hereby unconditionally and irrevocably guarantees to Lender, for itself and the other Secured Parties, as a guaranty of payment and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, by lapse of time, by acceleration of maturity, demand, or otherwise, and at all times thereafter, of the Guaranteed Obligations. This Guarantee covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by Lender in stages or installments.  The guaranty of Guarantor as set forth in this Guarantee is a continuing guaranty of payment and performance.  Guarantor acknowledges and agrees that Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from any Co-Borrower or any other party.  Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity, or otherwise, Guarantor shall immediately pay the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth in the Loan Agreement.

3.      **Primary Liability of Guarantor**.

(a)      This Guarantee is an absolute, irrevocable, and unconditional guaranty of payment and performance.  Guarantor is and shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guarantee, as a primary obligor.

(b)      In the event of default, including, but without limitation, an Event of Default, in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due, whether by their terms, by acceleration, or otherwise, Guarantor shall, without notice or demand of any kind or nature (other than as required by the Loan Agreement), promptly pay the amount due thereon to Lender in lawful money of the United States of America and perform the obligations to be performed hereunder, and it shall not be necessary for Lender in order to enforce such payment and performance by Guarantor first, or contemporaneously, to institute suit or exhaust remedies against the Borrowers or any other Person liable on the Guaranteed Obligations, or to enforce any rights, remedies, powers, privileges, or benefits of Lender against any collateral or any other security or collateral which shall ever have been given to secure the Guaranteed Obligations.

2

DEBTORS' EX. NO. 5
1143 of 1570

(c)     Suit may be brought or demand may be made against Guarantor or any other guaranty in favor of Lender covering all or any part of the Guaranteed Obligations, or against any one or more of them, separately or together, without impairing the rights of Lender against Guarantor.  Any time that Lender is entitled to exercise its rights or remedies hereunder, Lender may in its sole discretion elect to demand payment and/or performance.  If Lender elects to demand performance, then it shall at all times thereafter have the right to also demand payment until all of the Guaranteed Obligations have been paid and performed in full.  If Lender elects to demand payment, then it shall at all times thereafter have the right to also demand performance until all of the Guaranteed Obligations have been paid and performed in full.

4.     **Other Guaranteed Obligations**.  If Guarantor becomes liable for any indebtedness owing by any other Co-Borrower to Lender by endorsement or otherwise, other than under this Guarantee, such liability shall not in any manner be impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by Lender.

5.     **Waiver of Subrogation**.  Notwithstanding anything to the contrary contained herein, until the Guaranteed Obligations and any amounts payable under this Guarantee have been indefeasibly paid and performed in full and any commitments of Lender with respect to the Guaranteed Obligations are terminated, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, or contribution arising from the existence or performance of this Guarantee or any of the Loan Documents.  This waiver is given to induce Lender to make the Loans to Borrowers.

6.     **Subordinated Debt**.  All indebtedness, liabilities, and obligations of any Co-Borrower or its Affiliates to Guarantor (the "Subordinated Debt") now or hereafter existing, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations.  Until such time as the Guaranteed Obligations are paid and performed in full and all commitments to lend under the Loan Documents have terminated, Guarantor agrees not to receive or accept any payment from any Co-Borrower with respect to the Subordinated Debt at any time an Event of Default exists before or after giving effect thereto; and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender in the form received, to be applied to the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under this Guarantee.

7.     **Obligations Not to be Diminished**.  Guarantor hereby agrees that its obligations under this Guarantee shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event (other than Payment and Performance in Full (as defined below)), including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor:  (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any full or partial release of the liability of any Co-Borrower or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the dissolution, insolvency, or bankruptcy of any Co-Borrower, any other guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to any Co-Borrower, Guarantor, or any other party ever liable for any or all of

3

DEBTORS' EX. NO. 5
1144 of 1570

the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by any Co-Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the non-perfection of any security interest or Lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of Lender to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate, partnership, or limited liability company, as applicable, existence, structure, or ownership of any Co-Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, any Co-Borrower or Guarantor.

8.    **Waivers**.  Guarantor waives for the benefit of Lender and the other Secured Parties:  (a) any right to revoke this Guarantee with respect to future indebtedness; (b) any right to require Lender to do any of the following before Guarantor is obligated to pay the Guaranteed Obligations or before Lender may proceed against Guarantor: (i) sue or exhaust remedies against any Co-Borrower or any other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies or (iii) enforce rights against any Co-Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of Lender's enforcement of rights against Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (d) if both Guarantor and any Co-Borrower or any other Person have pledged assets to secure the Guaranteed Obligations, any right to require Lender to proceed first against any such other collateral before proceeding against any collateral pledged by Guarantor; (e) except as expressly required hereby, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guarantee, presentment, notice of protest, notice of dishonor, notice of the incurring by any Co-Borrower of additional indebtedness, notice of any suit or other action by Lender against any Co-Borrower or any other Person, any notice to any Person liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guarantee; (f) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, other than the defense that the Guaranteed Obligations has been fully performed and indefeasibly paid in full in cash; (g) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, and (iii) any requirement that Lender protect, secure, perfect, or insure any security interest or Lien or any property subject thereto; and (h) each of the foregoing rights or defenses regardless whether they arise under (i) *Section 43.001–005* of the Tex. Civ. Prac. & Rem. Code, as amended, (ii) *Section 17.001* of the Tex. Civ. Prac. & Rem. Code as amended, (iii) *Rule 31* of the Texas Rules of Civil Procedure, as amended, and (iv) common law, in equity, under contract, by statute, or otherwise.

This Guarantee shall not be affected by the genuineness, validity, regularity, or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection, or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of Guarantor under this Guarantee, and Guarantor hereby

015292.0273537 HOU 3973071v5

irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

9.    **Insolvency**.  Should Guarantor become insolvent (as such concept is described in Section 3.16 of the Loan Agreement, including, for the avoidance of doubt, excepting asset retirement obligations from Guarantor's liabilities), or fail to pay Guarantor's debts (including, but without limitation, subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Lender granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between Guarantor and Lender, a fully matured, due, and payable obligation of Guarantor to Lender (without regard to whether Borrowers are then in default under the Loan Agreement or whether the Obligations, or any part thereof is then due and owing by Borrowers to Lender), payable in full by Guarantor to Lender upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.  For purposes of this Section, each reference to asset retirement obligations means those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 of the Loan Agreement.

10.    **Termination; Reinstatement**.  Guarantor's obligations hereunder shall remain in full force and effect until all commitments to lend under the Loan Documents have terminated and the Guaranteed Obligations have been paid and performed in full ("Payment and Performance in Full").  If at any time any payment of the principal or interest or any other amount payable by Borrowers under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of any Co-Borrower or otherwise, then Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

11.    **Stay of Acceleration**.  Should any other Co-Borrower voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant), all Guaranteed Obligations shall nonetheless be payable by Guarantor immediately if requested by Lender.

12.    **Representations and Warranties**.  The representations and warranties made by Guarantor in Article III of the Loan Agreement are hereby incorporated by reference as if stated verbatim herein.

13.    **No Fraudulent Transfer**.  It is the intention of Guarantor and Lender that the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to Guarantor (collectively, "Fraudulent Transfer Laws").  Accordingly, notwithstanding anything to the contrary contained in this Guarantee or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations but subject to the following proviso, the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be limited to that amount which after giving effect thereto would not (a) render Guarantor insolvent, (b) result in the fair saleable value of the assets of Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b), and (c) of this Section 13 are determined under the Fraudulent Transfer Laws or other applicable law by a court of competent jurisdiction in a proceeding actually pending before such court; *provided, however*, that such limitation shall apply if and only to the extent that by reason of such clauses (a), (b), or (c), the obligations of Guarantor hereunder would otherwise be set aside, terminated,

5

DEBTORS' EX. NO. 5
1146 of 1570

annulled, or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court.  For purposes of this Guarantee, the term "applicable law" means as to Guarantor each statute, law, ordinance, regulation, order, judgment, injunction, or decree of the United States or any state or commonwealth, any municipality, any foreign country, or any territory, possession, or governmental authority applicable to Guarantor.

14.     **Successors and Assigns**.  This Guarantee is for the benefit of Lender and the other Secured Parties and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the Loan Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred therewith. This Guarantee is binding on Guarantor and Guarantor's successors and permitted assigns; *provided that*, Guarantor may not assign its obligations under this Guarantee without obtaining Lender's prior written consent, and any assignment purported to be made without Lender's prior written consent shall be null and void.

15.     **LOAN AGREEMENT**.  THE LOAN AGREEMENT, AND ALL OF THE TERMS THEREOF, ARE INCORPORATED HEREIN BY REFERENCE, THE SAME AS IF STATED VERBATIM HEREIN, AND GUARANTOR AGREES THAT LENDER MAY EXERCISE ANY AND ALL RIGHTS GRANTED TO IT UNDER THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WITHOUT AFFECTING THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTEE.

16.     **Setoff Rights**.  If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by Lender to or for the credit or the account of Guarantor against any and all the Guaranteed Obligations, irrespective of whether or not Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The rights of Lender hereunder are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

17.     **Time of Essence**.  Time shall be of the essence in this Guarantee with respect to all of Guarantor's obligations hereunder.

18.     **GOVERNING LAW; VENUE; SERVICE OF PROCESS**.

(a)     THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. GUARANTOR AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY

6

DEBTORS' EX. NO. 5
1147 of 1570

OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. GUARANTOR HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    EACH PARTY TO THIS GUARANTEE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTEE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.THIS GUARANTEE AND ANY CONTROVERSY, DISPUTE, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS GUARANTEE, THE OTHER LOAN DOCUMENTS, ANY BREACH THEREOF, THE TRANSACTIONS CONTEMPLATED THEREBY, OR ANY OTHER DISPUTE BETWEEN OR AMONG THE PARTIES HERETO (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND INTERPRETED PURSUANT TO THE LAWS OF THE STATE OF TEXAS; PROVIDED THAT LENDER SHALL RETAIN ALL RIGHTS UNDER FEDERAL LAW. THE PARTIES HEREBY AGREE THAT ANY LAWSUIT, ACTION, OR PROCEEDING THAT IS BROUGHT (WHETHER IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, OR THE ACTS, CONDUCT, OR OMISSIONS OF LENDER OR ANY OF ITS AGENTS, SUCCESSORS, OR ASSIGNS OR OF ANY OF THE OBLIGATED PARTIES IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT OF ANY OF THE LOAN DOCUMENTS SHALL BE BROUGHT IN A STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN HOUSTON, TEXAS. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF SUCH COURTS, (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH LAWSUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, AND (C) FURTHER WAIVES ANY CLAIM THAT IT MAY NOW OR HEREAFTER HAVE THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. GUARANTOR AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED AT THE ADDRESS FOR NOTICES REFERENCED IN THE LOAN AGREEMENT.

19.    **Notices**.  Whenever any notice is required or permitted to be given under the terms of this Guarantee, the same shall be given in accordance with the Loan Agreement.

20.    **Expenses**.  Guarantor hereby agrees to pay on demand any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Guarantee in accordance with Section 8.03 of the Loan

015292.0273537 HOU 3973071v5

Agreement. Guarantor also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with the administration of this Guarantee. In addition, Guarantor shall be obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Guaranteed Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Guarantor concerning any matter arising out of or connected with this Guarantee, any Collateral, or the Guaranteed Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law. Any and all costs and expenses incurred by Guarantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Guarantor.

21.    **Indemnification and Survival**. GUARANTOR SHALL INDEMNIFY THE LENDER, AND EACH RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF GUARANTOR AND GUARANTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

THE OBLIGATIONS AND LIABILITIES OF GUARANTOR UNDER THIS SECTION 20 SHALL NOT BE LIMITED OR RESTRICTED BY THE EXISTENCE OF, OR ANY TERMS OF, THE GUARANTY OF PAYMENT UNDER SECTION 2 OF THIS GUARANTEE AND SHALL SURVIVE THE PAYMENT AND PERFORMANCE IN FULL OF THE GUARANTEED OBLIGATIONS AND TERMINATION OF THIS GUARANTEE.

22.    **Amendments; Counterparts**. This Guarantee may be amended only by an instrument in writing executed by Guarantor and acknowledged by Lender.

015292.0273537 HOU 3973071v5

23.     **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION.

24.     **Limitation on Liability**.  WITHOUT LIMITING ANY OTHER PROVISION OF THIS GUARANTEE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE LENDER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS GUARANTEE, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL RELIEVE GUARANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

25.     **FINAL AGREEMENT**.  THIS GUARANTEE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW]**

015292.0273537 HOU 3973071v5

DEBTORS' EX. NO. 5
1150 of 1570

**EXECUTED** as of the first date herein set forth.

**GUARANTOR:**

FIELDWOOD ENERGY I LLC,
a Texas limited liability company

By:_____
Name:_____
Title:_____

Guarantee – Signature Page

015292.0273537 HOU 3973071v5

**Exhibit 11**

**Guarantee (GOM Shelf LLC)**

## GUARANTEE

**THIS GUARANTEE** (as it may be amended, restated, supplemented or otherwise modified from time to time, this "Guarantee") is executed as of_____, 20[●], by GOM SHELF LLC, a Delaware limited liability company ("Guarantor"), in favor of APACHE CORPORATION, a Delaware corporation ("Lender"), on behalf of itself and the other Secured Parties (as defined in the Loan Agreement described below).

## INTRODUCTORY PROVISIONS:

A.     This Guarantee is given in connection with that certain Standby Loan Agreement dated as of _____, 20[●] among Guarantor, Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood"), and the Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement").

B.     Fieldwood is a Co-Borrower under the Loan Agreement.

C.     Guarantor is a wholly owned subsidiary of Fieldwood and will derive substantial direct and indirect benefit from the transactions contemplated by the Loan Agreement and the other Loan Documents.

D.     Guarantor is executing and delivering this Guarantee to induce the Lender to provide Loans to Borrowers, including Fieldwood, under the Loan Agreement.

**NOW, THEREFORE**, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor hereby guarantees to Lender the prompt payment and performance of the Guaranteed Obligations, this Guarantee being upon the following terms and conditions:

1.     **Defined Term**s.  Any capitalized term used in this Guarantee and not otherwise defined herein shall have the meaning ascribed to such term in the Loan Agreement.  In addition, the following terms have the following meanings:

"Dispute" means any action, dispute, claim, or controversy of any kind, whether in contract or tort, statutory, or common law, legal or equitable, now existing or hereafter arising, under or in connection with, or in any way pertaining to, this Guarantee and each other document, contract, and instrument required hereby, or now or hereafter delivered to Lender in connection herewith, or any past, present, or future extensions of credit and other activities, transactions, or obligations of any kind related directly or indirectly to any of the foregoing documents, including, without limitation, any of the foregoing arising in connection with the exercise of any self-help, ancillary, or other remedies pursuant to any of the foregoing documents.

"Guaranteed Obligations" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, (b) all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (c) all costs and expenses, including all attorneys' fees and legal expenses, incurred by Lender to preserve and maintain the Collateral, collect the obligations described herein or described in the other Loan Documents, and enforce this Guarantee, the Security Agreement, the Mortgage or any rights under any other Loan Documents, (d) the obligation to reimburse any amount that Lender (in its sole and absolute discretion) elects to pay or advance on behalf of any Co-Borrower following the occurrence of an Event of Default, (e) obligations and liabilities of the Borrowers to the Lender, any Secured Party or any indemnified party, individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect,

HOU 3973079v2

joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, in all cases arising or incurred under this Guarantee, under any of the other Loan Documents, under the Decommissioning Agreement or in respect of any of the Loans made or any reimbursement or other obligations incurred under any of the foregoing, (f) all amounts owed under any extension, renewal, or modification of any of the foregoing and (g) any of the foregoing that arises after the filing of a petition by or against any Co-Borrower under the Bankruptcy Code, even if the obligations due do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise; in each case with respect to clauses (a) through (e) above, whether or not (i) such Guaranteed Obligations arise or accrue before or after the filing by or against any Co-Borrower of a petition under the Bankruptcy Code, or any similar filing by or against any Co-Borrower under the laws of any jurisdiction, or any bankruptcy, insolvency, receivership or other similar proceeding, (ii) such Guaranteed Obligations are allowable under Section 502(b)(2) of the Bankruptcy Code or under any other insolvency proceedings, (iii) the right of payment in respect of such Guaranteed Obligations is reduced to judgment, or (iv) such Guaranteed Obligations are liquidated, unliquidated, similar, dissimilar, related, unrelated, direct, indirect, fixed, contingent, primary, secondary, joint, several, or joint and several, matured, disputed, undisputed, legal, equitable, secured, or unsecured.

2.      **Payment**.  Guarantor hereby unconditionally and irrevocably guarantees to Lender, for itself and the other Secured Parties, as a guaranty of payment and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, by lapse of time, by acceleration of maturity, demand, or otherwise, and at all times thereafter, of the Guaranteed Obligations. This Guarantee covers the Guaranteed Obligations, whether presently outstanding or arising subsequent to the date hereof, including all amounts advanced by Lender in stages or installments.  The guaranty of Guarantor as set forth in this Guarantee is a continuing guaranty of payment and performance.  Guarantor acknowledges and agrees that Guarantor may be required to pay and perform the Guaranteed Obligations in full without assistance or support from any Co-Borrower or any other party.  Guarantor agrees that if all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether on the scheduled payment date, by lapse of time, by acceleration of maturity, or otherwise, Guarantor shall immediately pay the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth in the Loan Agreement.

3.      **Primary Liability of Guarantor**.

(a)      This Guarantee is an absolute, irrevocable, and unconditional guaranty of payment and performance.  Guarantor is and shall be liable for the payment and performance of the Guaranteed Obligations, as set forth in this Guarantee, as a primary obligor.

(b)      In the event of default, including, but without limitation, an Event of Default, in payment or performance of the Guaranteed Obligations, or any part thereof, when such Guaranteed Obligations become due, whether by their terms, by acceleration, or otherwise, Guarantor shall, without notice or demand of any kind or nature (other than as required by the Loan Agreement), promptly pay the amount due thereon to Lender in lawful money of the United States of America and perform the obligations to be performed hereunder, and it shall not be necessary for Lender in order to enforce such payment and performance by Guarantor first, or contemporaneously, to institute suit or exhaust remedies against the Borrowers or any other Person liable on the Guaranteed Obligations, or to enforce any rights, remedies, powers, privileges, or benefits of Lender against any collateral or any other security or collateral which shall ever have been given to secure the Guaranteed Obligations.

(c)      Suit may be brought or demand may be made against Guarantor or any other guaranty in favor of Lender covering all or any part of the Guaranteed Obligations, or against any

HOU 3973079v2

one or more of them, separately or together, without impairing the rights of Lender against Guarantor.  Any time that Lender is entitled to exercise its rights or remedies hereunder, Lender may in its sole discretion elect to demand payment and/or performance.  If Lender elects to demand performance, then it shall at all times thereafter have the right to also demand payment until all of the Guaranteed Obligations have been paid and performed in full.  If Lender elects to demand payment, then it shall at all times thereafter have the right to also demand performance until all of the Guaranteed Obligations have been paid and performed in full.

4.      **Other Guaranteed Obligations**.  If Guarantor becomes liable for any indebtedness owing by any other Co-Borrower to Lender by endorsement or otherwise, other than under this Guarantee, such liability shall not in any manner be impaired or affected hereby, and the rights and remedies hereunder shall be cumulative of any and all other rights and remedies that Lender may ever have against Guarantor.  The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy by Lender.

5.      **Waiver of Subrogation**.  Notwithstanding anything to the contrary contained herein, until the Guaranteed Obligations and any amounts payable under this Guarantee have been indefeasibly paid and performed in full and any commitments of Lender with respect to the Guaranteed Obligations are terminated, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, or contribution arising from the existence or performance of this Guarantee or any of the Loan Documents.  This waiver is given to induce Lender to make the Loans to Borrowers.

6.      **Subordinated Debt**.  All indebtedness, liabilities, and obligations of any Co-Borrower or its Affiliates to Guarantor (the "Subordinated Debt") now or hereafter existing, due or to become due to Guarantor, or held or to be held by Guarantor, whether created directly or acquired by assignment or otherwise, and whether evidenced by written instrument or not, shall be expressly subordinated to the Guaranteed Obligations.  Until such time as the Guaranteed Obligations are paid and performed in full and all commitments to lend under the Loan Documents have terminated, Guarantor agrees not to receive or accept any payment from any Co-Borrower with respect to the Subordinated Debt at any time an Event of Default exists before or after giving effect thereto; and, in the event Guarantor receives any payment on the Subordinated Debt in violation of the foregoing, Guarantor will hold any such payment in trust for Lender and forthwith turn it over to Lender in the form received, to be applied to the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under this Guarantee.

7.      **Obligations Not to be Diminished**.  Guarantor hereby agrees that its obligations under this Guarantee shall not be released, discharged, diminished, impaired, reduced, or affected for any reason or by the occurrence of any event (other than Payment and Performance in Full (as defined below)), including, without limitation, one or more of the following events, whether or not with notice to or the consent of Guarantor:  (a) the taking or accepting of collateral as security for any or all of the Guaranteed Obligations or the release, surrender, exchange, or subordination of any collateral now or hereafter securing any or all of the Guaranteed Obligations; (b) any full or partial release of the liability of any Co-Borrower or the full or partial release of any other guarantor or obligor from liability for any or all of the Guaranteed Obligations; (c) the dissolution, insolvency, or bankruptcy of any Co-Borrower, any other guarantor, or any other party at any time liable for the payment of any or all of the Guaranteed Obligations; (d) any renewal, extension, modification, waiver, amendment, or rearrangement of any or all of the Guaranteed Obligations or any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (e) any adjustment, indulgence, forbearance, waiver, or compromise that may be granted or given by Lender to any Co-Borrower, Guarantor, or any other party ever liable for any or all of the Guaranteed Obligations; (f) any neglect, delay, omission, failure, or refusal of Lender to take or prosecute any action for the collection of any of the Guaranteed Obligations or to foreclose or take or

3

DEBTORS' EX. NO. 5
1155 of 1570

prosecute any action in connection with any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (g) the unenforceability or invalidity of any or all of the Guaranteed Obligations or of any instrument, document, or agreement evidencing, securing, or otherwise relating to any or all of the Guaranteed Obligations; (h) any payment by any Co-Borrower or any other party to Lender is held to constitute a preference under applicable bankruptcy or insolvency law or if for any other reason Lender is required to refund any payment or pay the amount thereof to someone else; (i) the settlement or compromise of any of the Guaranteed Obligations; (j) the non-perfection of any security interest or Lien securing any or all of the Guaranteed Obligations; (k) any impairment of any collateral securing any or all of the Guaranteed Obligations; (l) the failure of Lender to sell any collateral securing any or all of the Guaranteed Obligations in a commercially reasonable manner or as otherwise required by law; (m) any change in the corporate, partnership, or limited liability company, as applicable, existence, structure, or ownership of any Co-Borrower; or (n) any other circumstance which might otherwise constitute a defense available to, or discharge of, any Co-Borrower or Guarantor.

8.     **Waivers**.  Guarantor waives for the benefit of Lender and the other Secured Parties:  (a) any right to revoke this Guarantee with respect to future indebtedness; (b) any right to require Lender to do any of the following before Guarantor is obligated to pay the Guaranteed Obligations or before Lender may proceed against Guarantor: (i) sue or exhaust remedies against any Co-Borrower or any other guarantors or obligors, (ii) sue on an accrued right of action in respect of any of the Guaranteed Obligations or bring any other action, exercise any other right, or exhaust all other remedies or (iii) enforce rights against any Co-Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (c) any right relating to the timing, manner, or conduct of Lender's enforcement of rights against Borrower's assets or any collateral pledged by any Co-Borrower to secure the Guaranteed Obligations; (d) if both Guarantor and any Co-Borrower or any other Person have pledged assets to secure the Guaranteed Obligations, any right to require Lender to proceed first against any such other collateral before proceeding against any collateral pledged by Guarantor; (e) except as expressly required hereby, promptness, diligence, notice of any default under the Guaranteed Obligations, notice of acceleration or intent to accelerate, demand for payment, notice of acceptance of this Guarantee, presentment, notice of protest, notice of dishonor, notice of the incurring by any Co-Borrower of additional indebtedness, notice of any suit or other action by Lender against any Co-Borrower or any other Person, any notice to any Person liable for the obligation which is the subject of the suit or action, and all other notices and demands with respect to the Guaranteed Obligations and this Guarantee; (f) any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, other than the defense that the Guaranteed Obligations has been fully performed and indefeasibly paid in full in cash; (g) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof, and (iii) any requirement that Lender protect, secure, perfect, or insure any security interest or Lien or any property subject thereto; and (h) each of the foregoing rights or defenses regardless whether they arise under (i) *Section 43.001–005* of the Tex. Civ. Prac. & Rem. Code, as amended, (ii) *Section 17.001* of the Tex. Civ. Prac. & Rem. Code as amended, (iii) *Rule 31* of the Texas Rules of Civil Procedure, as amended, and (iv) common law, in equity, under contract, by statute, or otherwise.

This Guarantee shall not be affected by the genuineness, validity, regularity, or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection, or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of Guarantor under this Guarantee, and Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

4

DEBTORS' EX. NO. 5
1156 of 1570

9.     **Insolvency**. Should Guarantor become insolvent (as such concept is described in Section 3.16 of the Loan Agreement, including, for the avoidance of doubt, excepting asset retirement obligations from Guarantor's liabilities), or fail to pay Guarantor's debts (including, but without limitation, subordinated, liquidated, unliquidated, disputed, and contingent liabilities and commitments excepting only asset retirement obligations) generally as they become due, or voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant) that could suspend or otherwise adversely affect the rights and remedies of Lender granted hereunder, then, in any such event, the Guaranteed Obligations shall be, as between Guarantor and Lender, a fully matured, due, and payable obligation of Guarantor to Lender (without regard to whether Borrowers are then in default under the Loan Agreement or whether the Obligations, or any part thereof is then due and owing by Borrowers to Lender), payable in full by Guarantor to Lender upon demand, which shall be the estimated amount owing in respect of the contingent claim created hereunder.  For purposes of this Section, each reference to asset retirement obligations means those which would be reflected on a balance sheet conforming with the requirements of Section 5.01 of the Loan Agreement.

10.     **Termination; Reinstatement**.  Guarantor's obligations hereunder shall remain in full force and effect until all commitments to lend under the Loan Documents have terminated and the Guaranteed Obligations have been paid and performed in full ("Payment and Performance in Full").  If at any time any payment of the principal or interest or any other amount payable by Borrowers under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of any Co-Borrower or otherwise, then Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

11.     **Stay of Acceleration**.  Should any other Co-Borrower voluntarily seek, consent to, or acquiesce in the benefit or benefits of any bankruptcy, insolvency, or similar law, or become a party to (or be made the subject of) any proceeding provided for by any bankruptcy, insolvency, or similar law (other than as a creditor or claimant), all Guaranteed Obligations shall nonetheless be payable by Guarantor immediately if requested by Lender.

12.     **Representations and Warranties**.  The representations and warranties made by Guarantor in Article III of the Loan Agreement are hereby incorporated by reference as if stated verbatim herein.

13.     **No Fraudulent Transfer**.  It is the intention of Guarantor and Lender that the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be in, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar laws applicable to Guarantor (collectively, "Fraudulent Transfer Laws").   Accordingly, notwithstanding anything to the contrary contained in this Guarantee or any other agreement or instrument executed in connection with the payment of any of the Guaranteed Obligations but subject to the following proviso, the amount of the Guaranteed Obligations guaranteed by Guarantor by this Guarantee shall be limited to that amount which after giving effect thereto would not (a) render Guarantor insolvent, (b) result in the fair saleable value of the assets of Guarantor being less than the amount required to pay its debts and other liabilities (including contingent liabilities) as they mature, or (c) leave Guarantor with unreasonably small capital to carry out its business as now conducted and as proposed to be conducted, including its capital needs, as such concepts described in clauses (a), (b), and (c) of this Section 13 are determined under the Fraudulent Transfer Laws or other applicable law by a court of competent jurisdiction in a proceeding actually pending before such court; *provided, however*, that such limitation shall apply if and only to the extent that by reason of such clauses (a), (b), or (c), the obligations of Guarantor hereunder would otherwise be set aside, terminated, annulled, or avoided for such reason by a court of competent jurisdiction in a proceeding actually pending before such court.  For purposes of this Guarantee, the term "applicable law" means as to Guarantor each statute, law, ordinance, regulation, order, judgment, injunction, or decree of the United States or any state

5

or commonwealth, any municipality, any foreign country, or any territory, possession, or governmental authority applicable to Guarantor.

14. **Successors and Assigns**. This Guarantee is for the benefit of Lender and the other Secured Parties and their successors and assigns, and, in the event of an assignment of the Guaranteed Obligations in accordance with the provisions of the Loan Agreement, or any part thereof, the rights and remedies hereunder, to the extent applicable to the Guaranteed Obligations so assigned, may be transferred therewith. This Guarantee is binding on Guarantor and Guarantor's successors and permitted assigns; *provided that*, Guarantor may not assign its obligations under this Guarantee without obtaining Lender's prior written consent, and any assignment purported to be made without Lender's prior written consent shall be null and void.

15. **LOAN AGREEMENT**. THE LOAN AGREEMENT, AND ALL OF THE TERMS THEREOF, ARE INCORPORATED HEREIN BY REFERENCE, THE SAME AS IF STATED VERBATIM HEREIN, AND GUARANTOR AGREES THAT LENDER MAY EXERCISE ANY AND ALL RIGHTS GRANTED TO IT UNDER THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS WITHOUT AFFECTING THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTEE.

16. **Setoff Rights**. If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits at any time held and other obligations at any time owing by Lender to or for the credit or the account of Guarantor against any and all the Guaranteed Obligations, irrespective of whether or not Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured. The rights of Lender hereunder are in addition to other rights and remedies (including other rights of setoff) which Lender may have.

17. **Time of Essence**. Time shall be of the essence in this Guarantee with respect to all of Guarantor's obligations hereunder.

18. **GOVERNING LAW; VENUE; SERVICE OF PROCESS**.

(a)     THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF TEXAS, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS.

(b)     EACH     PARTY     HERETO     HEREBY     IRREVOCABLY     AND UNCONDITIONALLY     SUBMITS,     FOR     ITSELF     AND     ITS     PROPERTY,     TO     THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR TEXAS STATE COURT SITTING IN HOUSTON, TEXAS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. GUARANTOR AGREES THAT A FINAL JUDGMENT, NON-APPEALABLE IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTEE OR

6

DEBTORS' EX. NO. 5
1158 of 1570

ANY OTHER LOAN DOCUMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     EACH     PARTY     HERETO     HEREBY     IRREVOCABLY     AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. GUARANTOR HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY TO THIS GUARANTEE IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.01 OF THE LOAN AGREEMENT. NOTHING IN THIS GUARANTEE OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS GUARANTEE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.THIS GUARANTEE AND ANY CONTROVERSY, DISPUTE, CLAIM, OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS GUARANTEE, THE OTHER LOAN DOCUMENTS, ANY BREACH THEREOF, THE TRANSACTIONS CONTEMPLATED THEREBY, OR ANY OTHER DISPUTE BETWEEN OR AMONG THE PARTIES HERETO (WHETHER IN CONTRACT, TORT, OR OTHERWISE) SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND INTERPRETED PURSUANT TO THE LAWS OF THE STATE OF TEXAS; PROVIDED THAT LENDER SHALL RETAIN ALL RIGHTS UNDER FEDERAL LAW. THE PARTIES HEREBY AGREE THAT ANY LAWSUIT, ACTION, OR PROCEEDING THAT IS BROUGHT (WHETHER IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, OR THE ACTS, CONDUCT, OR OMISSIONS OF LENDER OR ANY OF ITS AGENTS, SUCCESSORS, OR ASSIGNS OR OF ANY OF THE OBLIGATED PARTIES IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT OF ANY OF THE LOAN DOCUMENTS SHALL BE BROUGHT IN A STATE OR FEDERAL COURT OF COMPETENT JURISDICTION LOCATED IN HOUSTON, TEXAS. GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF SUCH COURTS, (B) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE AS TO THE VENUE OF ANY SUCH LAWSUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, AND (C) FURTHER WAIVES ANY CLAIM THAT IT MAY NOW OR HEREAFTER HAVE THAT ANY SUCH COURT IS AN INCONVENIENT FORUM. GUARANTOR AGREES THAT SERVICE OF PROCESS UPON IT MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED AT THE ADDRESS FOR NOTICES REFERENCED IN THE LOAN AGREEMENT.

19.     **Notice**s.  Whenever any notice is required or permitted to be given under the terms of this Guarantee, the same shall be given in accordance with the Loan Agreement.

20.     **Expens**e.  Guarantor hereby agrees to pay on demand any and all out of pocket expenses (including attorneys', auditors', and accountants' fees) paid or incurred by Lender in connection with the preparation, execution, and delivery of this Guarantee in accordance with Section 8.03 of the Loan Agreement. Guarantor also shall reimburse Lender for any and all out of pocket expenses and internal charges (including attorneys', auditors', and accountants' fees, and time charges of attorneys, paralegals, auditors, and accountants who may be employees of Lender) paid or incurred by Lender in connection with

7

HOU 3973079v2

the administration of this Guarantee.  In addition, Guarantor shall be obligated to pay all of the costs and expenses incurred by Lender, including attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Guaranteed Obligations, or in the prosecution or defense of any action or proceeding by or against Lender or Guarantor concerning any matter arising out of or connected with this Guarantee, any Collateral, or the Guaranteed Obligations, including any of the foregoing arising in, arising under, or related to, a case under any bankruptcy, insolvency, or similar law.  Any and all costs and expenses incurred by Guarantor in the performance of actions required pursuant to the terms hereof shall be borne solely by Guarantor.

       21.    **Indemnification and Survival**.  GUARANTOR SHALL INDEMNIFY THE LENDER, AND EACH RELATED PARTY OF THE LENDER (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, INCREMENTAL TAXES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THE LOAN DOCUMENTS OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS OR ANY OTHER TRANSACTIONS CONTEMPLATED HEREBY, (II) ANY LOAN OR THE USE OF THE PROCEEDS THEREFROM, (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY GRANTOR, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY GRANTOR, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE. WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF GUARANTOR AND GUARANTOR AGREES THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.

       THE OBLIGATIONS AND LIABILITIES OF GUARANTOR UNDER THIS SECTION 21 SHALL NOT BE LIMITED OR RESTRICTED BY THE EXISTENCE OF, OR ANY TERMS OF, THE GUARANTY OF PAYMENT UNDER SECTION 2 OF THIS GUARANTEE AND SHALL SURVIVE THE PAYMENT AND PERFORMANCE  IN FULL OF THE GUARANTEED OBLIGATIONS AND TERMINATION OF THIS GUARANTEE.

       22.    **Amendments; Counterparts**.  This Guarantee may be amended only by an instrument in writing executed by Guarantor and acknowledged by Lender.

       23.    **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING

8

DEBTORS' EX. NO. 5
1160 of 1570

TO THIS GUARANTY, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). GUARANTOR (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS IN THIS SECTION.

24.    **Limitation on Liability**.  WITHOUT LIMITING ANY OTHER PROVISION OF THIS GUARANTEE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AGREES THAT IT SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST THE LENDER, (I) FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF INFORMATION OR OTHER MATERIALS OBTAINED THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS (INCLUDING THE INTERNET), OR (II) ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS GUARANTEE, ANY OTHER LOAN DOCUMENT, OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL RELIEVE GUARANTOR OF ANY OBLIGATION IT MAY HAVE TO INDEMNIFY AN INDEMNITEE AGAINST SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES ASSERTED AGAINST SUCH INDEMNITEE BY A THIRD PARTY.

25.    **FINAL AGREEMENT**.  THIS GUARANTEE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;**
**SIGNATURE PAGES FOLLOW]**

HOU 3973079v2

**EXECUTED** as of the first date herein set forth.

           **GUARANTOR:**

           GOM SHELF LLC,
           a Delaware limited liability company

           By:_____
           Name:_____
           Title:_____

Guarantee – Signature Page

DEBTORS' EX. NO. 5
1162 of 1570

**Exhibit 12**

**Form of Mortgages**

(AL, LA, MS, TX)

PREPARED BY, AND WHEN RECORDED
OR FILED, PLEASE RETURN TO:

Hunton Andrews Kurth LLP
600 Travis, Suite 4200
Houston, Texas 77002
Attn: Harve Truskett
Phone: (713) 220-4532

MORTGAGE, DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL,
SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT
(Standby Loan Agreement)

FROM

FIELDWOOD ENERGY I LLC
(Organizational ID: [_____])
Address:        2000 W. Sam Houston Pkwy S.
                Suite 1600
                Houston, TX 77042
Telephone No.:  (713) 630-8914

AND

GOM SHELF LLC
(Organizational ID: 3250958)
Address:        2000 W. Sam Houston Pkwy S.
                Suite 1600
                Houston, TX 77042
Telephone No.:  (713) 630-8914

1

HOU 3972706v13

TO

[_____],TRUSTEE

| | |
|---|---|
| Address: | 2000 Post Oak Boulevard, Suite 100 Houston, TX 77056 |
| Telephone No.: | (713) 296-6000 |

AND TO

APACHE CORPORATION,
as Collateral Agent

| | |
|---|---|
| Address: | 2000 Post Oak Boulevard, Suite 100 Houston, TX 77056 |
| Telephone No.: | (713) 296-6000 |

2

HOU 3972706v13

**A CARBON, PHOTOGRAPHIC, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.**

<u>**A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT. IN CERTAIN STATES, A POWER OF SALE MAY ALLOW THE TRUSTEE OR THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE MORTGAGOR UNDER THIS INSTRUMENT.**</u>

**THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.**

**THIS INSTRUMENT SECURES PAYMENT OF FUTURE ADVANCES.**

**THIS INSTRUMENT COVERS PROCEEDS OF MORTGAGED PROPERTY.**

**THIS INSTRUMENT COVERS MINERALS, AS EXTRACTED COLLATERAL AND OTHER SUBSTANCES OF VALUE THAT MAY BE EXTRACTED FROM THE EARTH (INCLUDING WITHOUT LIMITATION OIL AND GAS) AND THE ACCOUNTS RELATED THERETO, WHICH WILL BE FINANCED AT THE WELLHEADS OF THE WELL OR WELLS LOCATED ON THE PROPERTIES DESCRIBED IN <u>EXHIBIT A</u> HERETO. THIS FINANCING STATEMENT IS TO BE FILED OR FILED FOR RECORD, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF THE RECORDERS OF THE COUNTIES OR PARISHES LISTED ON THE EXHIBITS HERETO AND IN THE UCC RECORDS OF ANY LOUISIANA PARISH. THE MORTGAGOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE AND IMMOVABLE PROPERTY CONCERNED, WHICH INTEREST IS DESCRIBED IN THE EXHIBITS ATTACHED HERETO.**

**PORTIONS OF THE MORTGAGED PROPERTY ARE GOODS THAT ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND DESCRIBED IN OR REFERRED TO IN THE EXHIBIT HERETO. THIS FINANCING STATEMENT IS TO BE FILED FOR RECORD OR RECORDED, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF EACH COUNTY OR PARISH IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED OR WHICH IS ADJACENT TO THE OUTER CONTINENTAL SHELF AND IN THE UCC RECORDS OF ANY LOUISIANA PARISH. THE MORTGAGOR IS THE OWNER OF RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS OR THE UCC RECORDS.**

To the Chancery Clerk of the Judicial Districts of Mississippi Counties, if any, referred to on <u>Exhibit A</u> attached hereto: The real property described herein lies offshore within the reasonable projected seaward extension of the relevant county or parish boundary.

**Line of Credit Mortgage.** THIS MORTGAGE ALSO SECURES A LINE OF CREDIT AS DEFINED IN MISS. CODE ANN. § 89-1-49 SUCH THAT SATISFACTION OF RECORD SHALL ONLY BE ACCOMPLISHED AND EXTINGUISHMENT SHALL ONLY OCCUR AS PROVIDED IN SUBSECTION (5) OF MISS. CODE ANN. § 89-5-21.

iv

DEBTORS' EX. NO. 5
1167 of 1570

**THIS MORTGAGE, DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT** (this "Mortgage") is entered into effective as of [_____, 20[●]] (the "Effective Date") by Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood"), and GOM Shelf LLC, a Delaware limited liability company ("GOM" and collectively with Fieldwood, the "Mortgagor"), (i) in favor of [_____], as Trustee for the benefit of Apache Corporation, in its capacity as collateral agent for itself and the other Secured Parties (as such term is defined in the Loan Agreement), together with its successors and assigns in such capacity, the "Mortgagee"), for its benefit and the benefit of the other Secured Parties, and (ii) in favor of Mortgagee, for its benefit and the benefit of the other Secured Parties, in each case with respect to all Mortgaged Properties (as hereinafter defined) and with respect to all UCC Collateral (as hereinafter defined).

## RECITALS

A.    Fieldwood, GOM, and Apache Corporation, as the Lender (as such term is defined in the Loan Agreement) executed a Standby Loan Agreement dated as of [_____, 20[●]] (such agreement, as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") pursuant to which, upon the terms and conditions stated therein, the Lender agreed to make loans and other extensions of credit to the Mortgagor.

B.    GOM is a wholly-owned subsidiary of Fieldwood.

C.    The Loan Agreement, the Note (as such term is defined in the Loan Agreement) issued pursuant thereto, the other Loan Documents (as such term is defined in the Loan Agreement), the Decommissioning Agreement (as such term is defined in the Loan Agreement), and any other agreement, instrument, document, or certificate executed by the Buyer (as such term is defined in the Decommissioning Agreement) or its Affiliates and delivered to Mortgagee or its Affiliates under or in connection with the Decommissioning Agreement or transactions contemplated by the Decommissioning Agreement are collectively referred to herein as the "Secured Transaction Documents".

D.    The Mortgagee and the Secured Parties have conditioned their obligations under the Secured Transaction Documents upon the execution and delivery by the Mortgagor of this Mortgage, and the Mortgagor has agreed to enter into this Mortgage to secure all obligations owing to the Mortgagee and the Secured Parties under the Secured Transaction Documents.

**THEREFORE,** in order to comply with the terms and conditions of the Secured Transaction Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor hereby agrees as follows:

SECTION 1
DEFINITIONS

1.1.    Terms Defined Above. As used in this Mortgage, each term defined above has the meaning indicated above.

1

HOU 3972706v13

      1.2.   <u>UCC and Other Defined Terms</u>. Each capitalized term used in this Mortgage and not defined in this Mortgage shall have the meaning ascribed to such term in the Loan Agreement. Any capitalized term not defined in either this Mortgage or the Loan Agreement shall have the meaning ascribed to such term in the Applicable UCC. The rules of construction and other interpretive provisions specified in Article I of the Loan Agreement and Section 8.11 of the Loan Agreement shall apply to this Mortgage, including terms defined in the preamble and recitals to this Mortgage.

      1.3.   <u>Definitions</u>.

      "<u>Applicable UCC</u>" means the provisions of the Uniform Commercial Code presently in effect in the jurisdiction in which the relevant UCC Collateral is situated or that otherwise is applicable to the creation or perfection of the Liens described herein or the rights and remedies of Mortgagee under this Mortgage.

      "<u>Collateral</u>" means collectively all the Mortgaged Property and all the UCC Collateral.

      "<u>Contractual Obligations</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its property is bound.

      "<u>Deed of Trust Properties</u>" means that portion of the Mortgaged Property located in the States of Texas or Mississippi, or which are located within (or cover or relate to properties located within) the Outer Continental Shelf or other offshore area adjacent to the States of Texas or Mississippi over which the United States of America asserts jurisdiction and to which the laws of the States of Texas or Mississippi are applicable with respect to this Mortgage and/or the Liens or security interests created hereby.

      "<u>Event of Default</u>" has the meaning ascribed to such term in <u>Section 5.1</u>.

      "<u>Fixture</u>" means any Oil and Gas Property, fixtures or immovable properties which as a result of being incorporated into realty or structures or improvements located therein or thereon, with the intent that they remain there permanently, constitute fixtures or immovable properties under the laws applicable where such Oil and Gas Property is located.

      "<u>Future Advances</u>" means future obligations and future advances that the Mortgagee or any Secured Party may make pursuant to any Secured Transaction Document.

      "<u>Hydrocarbon Interests</u>" means all rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to the oil and gas leases, oil, gas and mineral leases, wellbore interests, and/or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, and other interests and estates and the lands and premises covered or affected thereby, including any reserved or residual interests of whatever nature, in each case, that are described on <u>Exhibit A</u> (or in any instrument or document described or referred to in <u>Exhibit A</u>).

2

DEBTORS' EX. NO. 5
1169 of 1570

"Hydrocarbons" means all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals that may be produced and saved from or attributable to the Oil and Gas Properties, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests or other properties constituting Oil and Gas Properties.

"Indemnified Parties" means the Trustee, the Mortgagee, each Secured Party and their Related Parties.

"Mortgaged Property" means the Oil and Gas Properties and other properties and assets described in Section 2.1(a) through Section 2.1(f).

"Obligations" has the meaning assigned to such term in Section 2.3.

"Oil and Gas Properties" means (a) the Hydrocarbon Interests; (b) the properties now or hereafter pooled or unitized with the Hydrocarbon Interests; (c) all presently existing or future unitization, communitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules or other official acts of any Governmental Authority and units created solely among working interest owners pursuant to operating agreements or otherwise) that may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including, without limitation, production sharing contracts and agreements, production sales contracts, farmout agreements, farm-in agreements, area of mutual interest agreements, and equipment leases, described or referred to in this Mortgage or that relate to any of the Hydrocarbon Interests or interests in the Hydrocarbon Interests or the production, sale, purchase, exchange, processing, handling, storage, transporting or marketing of the Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, the lands pooled or unitized therewith and the Mortgagor's interests therein, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, the lands pooled or unitized therewith and the Mortgagor's interests therein; and (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, the rights, titles, interests and estates described or referred to above, that are now owned or that are hereafter acquired by the Mortgagor, including, without limitation, any and all property, real or personal, immoveable or moveable, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property or the lands pooled or unitized therewith, including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants, pipeline systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements, servitudes, licenses and other surface and subsurface rights, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Mortgaged Properties" means that portion of the Mortgaged Property

DEBTORS' EX. NO. 5
1170 of 1570

located in the States of Alabama or Louisiana, or which are located within (or cover or relate to properties located within) the Outer Continental Shelf or other offshore area adjacent to the States of Alabama or Louisiana over which the United States of America asserts jurisdiction and to which the laws of the States of Alabama or Louisiana are applicable with respect to this Mortgage and/or the Liens or security interests created hereby.

"Permitted Encumbrances" means "Permitted Liens" as such term is defined in the Loan Agreement.

"Termination Date" shall mean the date on which all Obligations are paid or, as applicable, performed in full.

"Trustee" means [_____] of Apache Corporation whose address for notice hereunder is c/o Apache Corporation, 2000 Post Oak Boulevard, Suite 100, Houston, TX 77056, and any successors and substitutes in trust hereunder.

"UCC Collateral" means the property and other assets described in Section 2.2.

SECTION 2
GRANT OF LIEN AND OBLIGATIONS

2.1.    Grant of Liens. To secure payment of the Obligations when due, the Mortgagor does by these presents hereby:

GRANT, BARGAIN, SELL, WARRANT, MORTGAGE, ASSIGN, TRANSFER, PLEDGE, HYPOTHECATE and CONVEY to the Trustee WITH A POWER OF SALE, for the use and benefit of the Mortgagee and the Secured Parties, all of the following properties, rights and interests relating to the Deed of Trust Properties; and

GRANT, BARGAIN, SELL, CONVEY, MORTGAGE, ASSIGN, WARRANT, PLEDGE AND HYPOTHECATE to Mortgagee, with mortgage covenants, and upon the statutory mortgage condition for the breach of which this Mortgage may be subject to foreclosure as provided by law, and grant to Mortgagee a POWER OF SALE (pursuant to this Mortgage and applicable law) with respect to, all of the following properties, rights and interests relating to the Other Mortgaged Properties:

(a)      All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to the Oil and Gas Properties.

(b)      All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to all geological, geophysical, engineering, accounting, title and other technical or business data concerning the Oil and Gas Properties or the Hydrocarbons, and all books, files, records, magnetic media, computer records and other forms of recording or obtaining access to such data.

4

HOU 3972706v13

(c)     All rights, titles, interests and estates now owned or hereafter acquired by the Mortgagor in and to all Hydrocarbons.

(d)     Any property that may from time to time hereafter, by delivery or by writing of any kind, be subjected to the Liens hereof by the Mortgagor or by anyone on the Mortgagor's behalf; and the Trustee and/or the Mortgagee are hereby authorized to receive the same at any time as additional security hereunder.

(e)     All of the rights, titles and interests of every nature whatsoever now owned or hereafter acquired by the Mortgagor in and to the Oil and Gas Properties and all other rights, titles, interests and estates and every part and parcel thereof, including, without limitation, any rights, titles, interests and estates as the same may be enlarged by the discharge of any payments out of production or by the removal of any charges or Permitted Encumbrances to which any of such Oil and Gas Properties or other rights, titles, interests or estates are subject or otherwise; all rights of the Mortgagor to Liens securing payment of proceeds from the sale of production from any of such Oil and Gas Properties, together with any and all renewals and extensions of any of such related rights, titles, interests or estates; all contracts and agreements supplemental to or amendatory of or in substitution for the contracts and agreements described or mentioned above; and any and all additional interests of any kind hereafter acquired by the Mortgagor in and to such related rights, titles, interests or estates.

(f)     All of the Mortgagor's rights, titles and interests in and to all surface fees and fee estates described in Exhibit A (or in any instrument or document described or referred to in Exhibit A), if any, compressor sites, settling ponds, equipment or pipe yards, office sites and all property and fixtures located thereon, whether such surface fees, fee estates, compressor sites, settling ponds, equipment or pipe yards, office sites, office buildings, fee simple estates, leasehold estates or otherwise, together with all present and future rights, titles, easements and estates now owned or hereafter acquired by the Mortgagor under or in connection with such interest.

TO HAVE AND TO HOLD (i) the Deed of Trust Properties unto Trustee, and its successors or substitutes in this trust, and to its or their successors and assigns, in trust, for the benefit of the Mortgagee, as agent for the Mortgagee and Secured Parties, however, upon the terms, provisions and conditions herein set forth, and (ii) the Other Mortgaged Properties unto Mortgagee, and Mortgagee's successors and assigns, for the ratable benefit of the Mortgagee and Secured Parties, upon the terms, provisions and conditions herein set forth.

It is the intention of the Mortgagor and the Mortgagee herein to cover and affect hereby all interests that the Mortgagor may now own or may hereafter acquire in and to the interests and Oil and Gas Properties described on Exhibit A (or in any instrument or document described or referred to in Exhibit A), even though the Mortgagor's interests or the property be incorrectly described on Exhibit A (or in any instrument or document described or referred to in Exhibit A) or a description of a part or all of the interests or property described on Exhibit A (or in any instrument or document described or referred to in Exhibit A) or the Mortgagor's interests therein be omitted, and notwithstanding that the interests as specified on Exhibit A (or in any instrument or document described or referred to in Exhibit A) may be limited to particular lands, specified depths or particular types of property interests.

HOU 3972706v13

DEBTORS' EX. NO. 5
1172 of 1570

2.2.    Grant of Security Interest. To further secure payment of the Obligations when due, the Mortgagor hereby grants to the Mortgagee, for its benefit and the benefit of the Secured Parties, a security interest in and to all of the following (whether now or hereafter acquired by operation of law or otherwise):

(a)    all As-Extracted Collateral from or attributable to the Oil and Gas Properties;

(b)    all Fixtures on the Mortgaged Property described or to which reference is made herein or on Exhibit A; and

(c)    to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing.

2.3.    Obligations. This Mortgage is executed and delivered by the Mortgagor to secure the payment and performance when due of the following (the "Obligations"):

(a)    the Secured Obligations;

(b)    all sums advanced or costs or expenses incurred by Mortgagee, any of the Secured Parties, or the Related Parties of the Mortgagee or such Secured Party (whether by it directly or on its behalf by the Trustee), which are made or incurred pursuant to, or allowed by, the terms of this Mortgage plus interest thereon from the date of the advance or incurrence until reimbursement of Mortgagee, such Secured Party, or such Related Party charged at a per annum rate equal to the maximum nonusurious interest rate under applicable law; and

(c)    all renewals, extensions, modifications, amendments, rearrangements and substitutions of all or any part of the above whether or not Mortgagor or any other obligor thereof executes any agreement or instrument.

2.4.    Fixture Filing, Etc. Without in any manner limiting the generality of any of the other provisions of this Mortgage: (i) some portions of the goods described or to which reference is made herein are or are to become Fixtures on the land described or to which reference is made herein or on Exhibit A; (ii) the security interests created hereby under applicable provisions of the Applicable UCC will attach to all As-Extracted Collateral and all other Hydrocarbons; (iii) this Mortgage is to be filed of record in the real estate records or other appropriate records as a financing statement; and (iv) the Mortgagor is the record owner of the real estate or interests in the real estate or immoveable property comprised of the Mortgaged Property.

2.5.    Pro Rata Benefit. This Mortgage is executed and granted for the pro rata benefit and security of the Mortgagee and the Secured Parties to secure the Obligations for so long as same remains unsatisfied or unpaid, as applicable, and thereafter until the Termination Date.

2.6.    Excluded Properties. Notwithstanding anything herein to the contrary, in no event shall the Mortgaged Property include, and the Mortgagor shall not be deemed to have granted a Lien under this Mortgage in, any of the Mortgagor's right, title or interest in any of the following property but only to the extent such property constitutes personal property (collectively, "Excluded

6

DEBTORS' EX. NO. 5
1173 of 1570

Property"), and for the avoidance of doubt, Excluded Property shall not include real or immovable property, including the Hydrocarbon Interests, Hydrocarbons, or As-Extracted Collateral or Fixtures:

(a)     any permit or license or any Contractual Obligation of Mortgagor (i) that prohibits or requires the consent of any Person other than Mortgagor or any Affiliate of Mortgagor which has not been obtained as a condition to the creation by Mortgagor of a Lien on any right, title, or interest in such permit, license, or Contractual Obligation or (ii) to the extent that any Requirement of Law applicable thereto prohibits the creation of a Lien thereon, but only to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the Applicable UCC or any other Requirement of Law; provided, however, Excluded Property shall not include any proceeds, products, substitutions, or replacements of Excluded Property (unless such proceeds, products, substitutions, or replacements would otherwise constitute Excluded Property); or

(b)     any personal property constituting "Excluded Property" as such term is defined in the Security Agreement.

2.7.    Maturity. The Obligations have a maximum maturity date of the tenth (10th) anniversary of the Effective Date, subject to the terms and conditions of the Loan Agreement, including without limitation, (a) Lender's right to decline to extend the maturity date of the Obligations beyond the fifth (5th) anniversary date of the Effective Date and each such anniversary date thereafter, (b) earlier termination of the Decommissioning Agreement, and (c) rights of acceleration or prepayment.

2.8.    Loans; Maximum Amount.

(a)     As to all Mortgaged Property, including without limitation, such Mortgaged Property located in the State of Louisiana, or located within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such State are applicable, the Obligations secured by such Mortgaged Property shall not, at any time or from time to time, exceed an aggregate maximum amount of $2,000,000,000.

(b)     As to all other Mortgaged Property the Mortgagor declares that the principal amount of all loans that the Lender has committed to advance on the date hereof shall not exceed $200,000,000, as such amount may be increased with Lender's approval pursuant to the Loan Agreement to $400,000,000.

SECTION 3
ASSIGNMENT OF AS-EXTRACTED COLLATERAL

3.1.    Assignment.

(a)     The Mortgagor has absolutely and unconditionally assigned, transferred, conveyed and granted a security interest, and does hereby absolutely and unconditionally assign, transfer, convey and grant a security interest, to the Mortgagee, for its benefit and the benefit of the Secured Parties in and to the property described in Sections 2.1 and 2.2, including, without

7

limitation, all of its As-Extracted Collateral from or attributable to the Oil and Gas Properties and all of the revenue and proceeds now and hereafter attributable to such Oil and Gas Properties.

(b)    If an Event of Default shall occur and only for so long as such event shall be continuing, after written notice is provided to the Mortgagor by the Mortgagee, and to the extent permitted by applicable law:

(i)    All Hydrocarbons and products thereof shall be delivered into pipe lines connected with the Mortgaged Property, or to the purchaser thereof, to the credit of the Mortgagee, for its benefit and the benefit of the Secured Parties and all such revenues and proceeds thereof shall be paid directly to the Mortgagee, at its offices as designated by Mortgagee from time to time, with no duty or obligation of any party paying the same to inquire into the rights of the Mortgagee to receive the same, what application is made thereof, or as to any other matter;

(ii)    The Mortgagor agrees to perform all such acts, and to execute all such further assignments, transfers and division orders and other instruments as may be reasonably required or desired by the Mortgagee, after receipt of a written request from the Mortgagee, in order to have said proceeds and revenues so paid to the Mortgagee and, in addition to any and all rights of a secured party under Sections 9-607 and 9-609 of the Applicable UCC, the Mortgagee is fully authorized to receive and receipt for said revenues and proceeds, to endorse and cash any and all checks and drafts payable to the order of the Mortgagor or the Mortgagee for the account of the Mortgagor received from or in connection with said revenues or proceeds and to hold the proceeds thereof in a Deposit Account of the Mortgagee, Secured Party, or any Related Party at an acceptable commercial bank at Mortgagee's selection as additional collateral securing the Obligations, and to execute transfer and division orders in the name of the Mortgagor, or otherwise, with warranties binding the Mortgagor (all proceeds received by the Mortgagee pursuant to this grant and assignment shall be applied as provided in Section 5.14);

(iii)    The Mortgagee shall not be liable for any delay, neglect or failure to effect collection of any proceeds or to take any other action in connection therewith or hereunder, but the Mortgagee shall have the right, at its election after written notice is provided to the Mortgagor, in the name of the Mortgagor or otherwise, to prosecute and defend any and all actions or legal proceedings deemed advisable by the Mortgagee in order to collect such funds and to protect the interests of the Mortgagee and/or the Mortgagor, with all costs, expenses and attorneys' fees incurred in connection therewith being paid by the Mortgagor; and

(iv)    The Mortgagor hereby appoints the Mortgagee as its attorney-in-fact to pursue any and all rights of the Mortgagor to Liens in the Hydrocarbons securing payment of proceeds of runs attributable to the Hydrocarbons, which power of attorney shall be coupled with an interest and shall be irrevocable until the Termination Date.

(c)    The Mortgagor does hereby specifically agree that third-parties shall be entitled to rely, and shall be fully protected in relying, upon any written notice by the Mortgagee that an Event of Default has occurred and is continuing for the purposes of clause (b) above.

3.2.    No Modification of Payment Obligations. Nothing herein contained shall modify or otherwise alter the obligation of the Mortgagor to make prompt payment of all amounts

8

HOU 3972706v13

constituting Obligations when and as the same become due regardless of whether the proceeds of the As-Extracted Collateral and Hydrocarbons are sufficient to pay the same and the rights provided in accordance with the foregoing assignment provision shall be cumulative of all other security of any and every character now or hereafter existing to secure payment of the Obligations. Nothing in Section 3.1 or this Section 3.2 is intended to be an acceptance of Collateral in satisfaction of the Obligations.

## SECTION 4
## REPRESENTATIONS, WARRANTIES AND COVENANTS

The Mortgagor hereby represents, warrants and covenants as follows:

4.1.    Title. The Mortgagor has good and defensible title to and is possessed of the Hydrocarbon Interests and has good title to the UCC Collateral. The Collateral is free of all Liens except Permitted Encumbrances.

4.2.    Defend Title. This Mortgage is, and always will be kept, as a first priority Lien upon the Collateral, subject to the Permitted Encumbrances. The Mortgagor will not create or suffer to be created or permit to exist any Lien, security interest or charge prior or junior to or on a parity with the Lien of this Mortgage upon the Collateral or any part thereof other than Permitted Encumbrances. Subject to any Permitted Encumbrances, the Mortgagor will warrant and defend the title to the Collateral against the claims and demands of all other Persons whomsoever and will maintain and preserve the Lien created hereby (and its priority) until the Termination Date. If (i) an adverse claim be made against or a cloud develop upon the title to any part of the Collateral other than a Permitted Encumbrance or (ii) any Person shall challenge the priority or validity of the Liens created by this Mortgage, then the Mortgagor agrees to defend immediately against such adverse claim or take appropriate action to remove such cloud, in each case, at the Mortgagor's sole cost and expense. The Mortgagor further agrees that the Trustee and/or the Mortgagee may take such other action as they deem advisable to protect and preserve their interests in the Collateral, and in such event the Mortgagor will indemnify the Trustee and/or the Mortgagee against any and all cost, attorneys' fees and other expenses that they may incur in defending against any such adverse claim or taking action to remove any such cloud. For the avoidance of doubt, Section 4.1 and this Section 4.2 shall not restrict, and are subject to, any disposition permitted by the Loan Agreement.

4.3.    Not a Foreign Person. The Mortgagor is not a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e., the Mortgagor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and any regulations promulgated thereunder).

4.4.    Excluded Properties. Except as set forth on Schedule 4.4, the Mortgagor does do not own or have any right, title, or interest in any Excluded Property.

## SECTION 5
## RIGHTS AND REMEDIES

5.1.    Event of Default. An Event of Default under the Loan Agreement shall be an "Event of Default" under this Mortgage.

9

HOU 3972706v13

DEBTORS' EX. NO. 5
1176 of 1570

5.2.   Foreclosure and Sale.

(a)   If an Event of Default shall occur and be continuing, to the extent provided by applicable Requirement of Law, the Mortgagee shall have the right and option to proceed with foreclosure by directing the Trustee to proceed with foreclosure and to sell all or any portion of such Mortgaged Property at one or more sales, as an entirety or in parcels, at such place or places in otherwise such manner and upon such notice as may be required by law, or, in the absence of any such requirement, as the Mortgagee may deem appropriate, and to make conveyance to the purchaser or purchasers. Where the Mortgaged Property is situated in (or adjacent to, in the case of offshore properties) more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by law), and all such Mortgaged Property may be sold in any such jurisdiction and any such notice shall designate the jurisdiction where such Mortgaged Property is to be sold. Nothing contained in this Section 5.2 shall be construed so as to limit in any way any rights to sell the Mortgaged Property or any portion thereof by private sale if and to the extent that such private sale is permitted under the Requirement of Law of the applicable jurisdiction or by public or private sale after entry of a judgment by any court of competent jurisdiction so ordering. The Mortgagor hereby irrevocably appoints, effective upon the occurrence and during the continuance of an Event of Default, the Trustee and the Mortgagee, with full power of substitution, to be the attorney-in-fact of the Mortgagor and in the name and on behalf of the Mortgagor to execute and deliver any deeds, transfers, conveyances, assignments, assurances and notices that the Mortgagor ought to execute and deliver and do and perform any and all such acts and things that the Mortgagor ought to do and perform under the covenants herein contained and generally, to use the name of the Mortgagor in the exercise of all or any of the powers hereby conferred on the Trustee and/or the Mortgagee. At any such sale: (i) whether made under the power herein contained or any other legal enactment, or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for the Trustee or the Mortgagee, as appropriate, to have physically present, or to have constructive possession of, the Mortgaged Property (the Mortgagor hereby covenanting and agreeing to deliver any portion of the Mortgaged Property not actually or constructively possessed by the Trustee or the Mortgagee immediately upon the Mortgagee's demand) and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually present and delivered to purchaser at such sale, (ii) each instrument of conveyance executed by the Trustee or the Mortgagee shall contain a special warranty of title, binding upon the Mortgagor and its successors and assigns, (iii) each and every recital contained in any instrument of conveyance made by the Trustee or the Mortgagee shall conclusively establish the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law and appointment of any successor trustee hereunder, (iv) any and all prerequisites to the validity thereof shall be conclusively presumed to have been performed, (v) the receipt of the Trustee, Mortgagee or of such other party or officer making the sale shall be a sufficient discharge to the purchaser or purchasers for its purchase money and no such purchaser or purchasers, or its assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money, or be in any way answerable for any loss, misapplication or nonapplication thereof, (vi) to the fullest extent permitted by law, the Mortgagor shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against the Mortgagor, and against any and all other persons claiming or to claim the property sold or any part thereof, by,

10

DEBTORS' EX. NO. 5
1177 of 1570

through or under the Mortgagor, and (vii) to the extent and under such circumstances as are permitted by law, the Mortgagee may be a purchaser at any such sale, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the Obligations (in the order of priority set forth in <u>Section 5.14</u>) in lieu of cash payment.

   (b) If an Event of Default shall occur and be continuing, then (i) the Mortgagee shall be entitled to all of the rights, powers and remedies afforded a secured party by the Applicable UCC with reference to the UCC Collateral and/or (ii) the Trustee or the Mortgagee may proceed as to any Collateral in accordance with the rights and remedies granted under this Mortgage or applicable law in respect of the Collateral. Such rights, powers and remedies shall be cumulative and in addition to those granted to the Trustee or the Mortgagee under any other provision of this Mortgage or under any other Loan Document or Secured Transaction Document. Written notice mailed to the Mortgagor as provided herein at least ten (10) days prior to the date of public sale of any part of the Collateral that is personal property subject to the provisions of the Applicable UCC, or prior to the date after which private sale of any such part of the Collateral will be made, shall constitute reasonable notice.

   (c) Cumulative of the foregoing and the other provisions of this <u>Section 5.2</u>:

   (i) <u>State of Texas</u>: As to any portion of the Deed of Trust Properties located in the State of Texas (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), such sales of all or any part of such Deed of Trust Properties shall be conducted within any county (whether or not the counties in which such Deed of Trust Properties are located are contiguous) in the State of Texas in which any part of such Deed of Trust Properties is situated or which lies shoreward of any Deed of Trust Property (i.e., to the extent a particular Deed of Trust Mortgaged Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), in accordance with the provisions of Chapter 51 of the Texas Property Code (or any successor statutes of the State of Texas then in force governing sales of real estate under powers conferred by deed of trust), after having given notice of such sale in accordance with such statutes.

   **<u>A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW TRUSTEE TO TAKE THE MORTGAGED PROPERTIES AND SELL THEM WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON A DEFAULT BY MORTGAGOR UNDER THIS MORTGAGE.</u>**

   (ii) <u>State of Louisiana</u>: As to any portion of the Other Mortgaged Properties located in the State of Louisiana (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), Mortgagee may foreclose this Mortgage by executory process, or any other process, subject to, and on the terms and conditions required or permitted by, applicable law, and shall have the right to appoint a keeper of such Other Mortgaged Properties. Solely for purposes of Louisiana executory process, Mortgagor acknowledges the Obligations, whether now existing or to arise hereafter, and for

11

HOU 3972706v13

DEBTORS' EX. NO. 5

1178 of 1570

Mortgagor, Mortgagor's personal representatives, successors and assigns, hereby confesses judgment for the full amount of the Obligations in favor of the Mortgagee for the benefit of the Mortgagee and Secured Parties. Mortgagor further agrees that Mortgagee may cause all or any part of the applicable Other Mortgaged Properties to be seized and sold after due process of law, Mortgagor waiving the benefit of all laws or parts of laws relative to the appraisement of property seized and sold under executory process or other legal process, and consenting that all or any part of such Other Mortgaged Properties may be sold without appraisement, either in its entirety or in lots and parcels, as Mortgagee may determine, to the highest bidder for cash or on such terms as the plaintiff in such proceedings may direct. Mortgagor hereby waives (i) the benefit of appraisement provided for in articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure and all other laws conferring the same; (ii) the notice of seizure provided for in articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iii) the three (3) days delay provided for in articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (iv) all other laws providing rights of notice, demand, appraisement, or delay. Mortgagor expressly authorizes and agrees that Mortgagee shall have the right to appoint a keeper of such Other Mortgaged Properties pursuant to the terms and provisions of La. R.S. 9:5131 et seq. and La. R.S. 9:5136 et seq., which keeper may be Mortgagee, any agent or employee thereof, or any other person, firm, or corporation. Compensation for the services of the keeper is hereby fixed at five percent (5%) of the amount due or sued for or claimed or sought to be protected, preserved, or enforced in the proceeding for the recognition or enforcement of this Mortgage and shall be secured by the Liens and security interests of this Mortgage.

        (iii)   <u>State of Mississippi</u>: As to any portion of the Deed of Trust Properties located in the State of Mississippi (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), any sale of any part of such Deed of Trust Properties shall be made after having published notice of the day, time, place and terms of sale in a newspaper published in the county in which the Deed of Trust Property is situated or which lies shoreward of such Deed of Trust Properties (i.e. to the extent a particular Deed of Trust Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), or, if none is so published, in some paper having a general circulation therein, for three consecutive weeks preceding the date of sale; and by posting one notice of such sale at the courthouse of such county for said period of time. Trustee shall have the power to select the county or judicial district in which the sale shall be made, newspaper advertisement published, and notice of sale posted in the event the Deed of Trust Property is located in, or lies seaward from, more than one county or in two judicial districts in the same county. Trustee in said trust shall have the full power to fix the day, time, place and terms of sale and may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices in the conduct of the sale but in the name of and on behalf of Trustee, his substitute or successor. In connection with the foregoing, Mortgagor waives the provisions of Section 89-1-55 of the Mississippi Code of 1972, recompiled and laws amendatory thereto, if any, as far as said section restricts the right of Trustee to offer at sale more than 160 acres at one time and Trustee may, in his discretion, offer the Mortgaged Property as a whole or in such part or parts as he may deem desirable regardless of the manner in which it may be described. Any sale made by Trustee hereunder may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. Mortgagor also waives the provisions of Section 89-1-59 of the Mississippi Code of 1972,

HOU 3972706v13

DEBTORS' EX. NO. 5
1179 of 1570

recompiled and laws amendatory thereto, insofar as said section allows Mortgagor to reinstate an accelerated debt. Subject to the requirement under Section 89-5-45 of the Mississippi Code of 1972 which requires that an appointment be recorded prior to the commencement of foreclosure proceedings, if Trustee shall have given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

(iv)     State of Alabama: As to any portion of the Other Mortgaged Properties located in the State of Alabama (or within the offshore area over which the United States of America asserts jurisdiction and to which the laws of such state are applicable with respect to this Mortgage and/or the Liens or security interests created hereby), expenses of retaking, holding, preparing for sale, selling or the like shall be borne by Mortgagor and shall include Mortgagee's attorney's fees and legal expenses, all of which shall be secured by this Mortgage. Upon the occurrence of an Event of Default, Mortgagee shall have the right to cause any of the Other Mortgaged Properties which are subject to the security interest of Mortgagee hereunder to be sold at any one or more public or private sales as permitted by applicable law. Any such disposition may be conducted by an employee or agent of the Mortgagee. Any person, including Mortgagor or Mortgagee, shall be eligible to purchase any part or all of such property at any such sale. Mortgagee shall give Mortgagor at least five (5) days' prior written notice of the time and place of any public sale or other disposition of such property or of the time of or after which any private sale or other intended disposition is to be made, and if such notice is sent to the Mortgagor as provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notification to Mortgagor. Notwithstanding any contrary provision in this Mortgage, the Decommissioning Agreement, or any of the other Secured Transaction Documents, if an Event of Default shall have occurred, this Mortgage shall be subject to foreclosure and may be foreclosed as now provided by law in the case of past-due mortgages; and the Mortgagee shall be authorized to take possession of the Other Mortgaged Property and, after giving at least twenty-one (21) days' notice of the time, place and terms of sale by publication once a week for three consecutive weeks in some newspaper published in the county in which the Other Mortgaged Property is situated or which lies shoreward of such Other Mortgaged Property (i.e. to the extent a particular Other Mortgaged Property lies offshore within the reasonable projected seaward extension of the relevant county boundary), to sell the Other Mortgaged Property in front of the courthouse door of said county, at public outcry, to the highest bidder for cash, and to apply the proceeds of such sale as specified herein. The Mortgagor agrees that the Mortgagee may bid at any sale had under the terms of this Mortgage and may purchase the Other Mortgaged Properties if the highest bidder therefor. At the foreclosure sale the Other Mortgaged Properties may be offered for sale and sold as a whole without first offering it in any other manner or it may be offered for sale and sold in any other manner the Mortgagee may elect. The power of sale granted herein is a continuing power and shall not be fully exercised until all of the Other Mortgaged Properties not previously sold shall have been sold or all of the secured indebtedness and other obligations secured hereby have been satisfied in full.

5.3.     Substitute Trustees and Agents. The Trustee or Mortgagee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee or Mortgagee, including the posting of notices and the conduct of sale, but in the name and on behalf of the Trustee or Mortgagee. If the Trustee or Mortgagee shall have given notice of sale hereunder, any successor or substitute trustee or mortgagee agent thereafter

HOU 3972706v13

DEBTORS' EX. NO. 5
1180 of 1570

appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute trustee or mortgagee agent conducting the sale.

5.4.    <u>Judicial Foreclosure; Receivership</u>. Upon the occurrence of and during the continuance of an Event of Default, the Mortgagee shall have the right and power to proceed by a suit or suits in equity or at law, whether for the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, or for any foreclosure hereunder or for the sale of the Collateral under the judgment or decree of any court or courts of competent jurisdiction, or for the appointment of a receiver pending any foreclosure hereunder or the sale of the Collateral under the order of a court or courts of competent jurisdiction or under executory or other legal process, or for the enforcement of any other appropriate legal or equitable remedy.

5.5.    <u>Foreclosure for Installments</u>. Upon the occurrence of and during the continuance of an Event of Default, the Mortgagee shall also have the option to proceed with foreclosure in satisfaction of any installments of the Obligations that have not been paid when due either through the courts or by directing the Trustee to proceed with foreclosure in satisfaction of the matured but unpaid portion of the Obligations as if under a full foreclosure, conducting the sale as herein provided and without declaring the entire principal balance and accrued interest and other Obligations then due; such sale may be made subject to the unmatured portion of the Obligations, and any such sale shall not in any manner affect the unmatured portion of the Obligations, but as to such unmatured portion of the Obligations this Mortgage shall remain in full force and effect just as though no sale had been made hereunder. It is further agreed that upon the occurrence of and during the continuance of an Event of Default, several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Obligations, it being the purpose hereof to provide for a foreclosure and sale of the security for any matured portion of the Obligations without exhausting the power to foreclose and sell the Mortgaged Property for any subsequently maturing portion of the Obligations.

5.6.    <u>Separate Sales</u>. Upon the occurrence of and during the continuance of an Event of Default, the Collateral may be sold in one or more parcels and to the extent permitted by applicable Requirement of Law in such manner and order as the Mortgagee, in its sole discretion, may elect, it being expressly understood and agreed that the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

5.7.    <u>Possession of Mortgaged Property</u>. If an Event of Default shall have occurred and be continuing, then, to the extent permitted by applicable law, the Trustee or the Mortgagee shall have the right and power to enter into and upon and take possession of all or any part of the Collateral in the possession of the Mortgagor, its successors or assigns, or its or their agents or servants, and may exclude the Mortgagor, its successors or assigns, and all persons claiming under the Mortgagor, and its or their agents or servants wholly or partly therefrom; and, holding the same, the Mortgagee may use, administer, manage, operate and control the Collateral and conduct the business thereof to the same extent as the Mortgagor, its successors or assigns, might at the time do and may exercise all rights and powers of the Mortgagor, in the name, place and stead of the Mortgagor, or otherwise as the Mortgagee shall deem best.

14

DEBTORS' EX. NO. 5
1181 of 1570

5.8.    Occupancy After Foreclosure. In the event there is a foreclosure sale hereunder and at the time of such sale the Mortgagor or the Mortgagor's heirs, devisees, representatives, successors or assigns or any other person claiming any interest in the Collateral by, through or under the Mortgagor, are occupying or using the Mortgaged Property or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either the landlord or tenant, or at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; to the extent permitted by applicable law, the purchaser at such sale shall, notwithstanding any language herein apparently to the contrary, have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the Mortgaged Property (such as an action for forcible entry and detainer) in any court having jurisdiction. Furthermore, notice of termination by the Trustee or the Mortgagee to the Mortgagor shall be deemed to be written demand for the premises pursuant to Ala. Code Section 6-5-233.

5.9.    Remedies Cumulative, Concurrent and Nonexclusive. Every right, power, privilege and remedy herein given to the Trustee or the Mortgagee shall be cumulative and in addition to every other right, power and remedy herein specifically given or now or hereafter existing in equity, at law or by statute (including specifically those granted by the Applicable UCC in effect and applicable to the Collateral or any portion thereof). Each and every right, power, privilege and remedy whether specifically herein given or otherwise existing may be exercised from time to time and so often and in such order as may be deemed expedient by the Trustee or the Mortgagee, and the exercise, or the beginning of the exercise, or the abandonment, of any such right, power, privilege or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter any other right, power, privilege or remedy. No delay or omission by the Trustee or the Mortgagee or any Secured Party in the exercise of any right, power or remedy shall impair any such right, power, privilege or remedy or operate as a waiver thereof or of any other right, power, privilege or remedy then or thereafter existing.

5.10.    Discontinuance of Proceedings. If the Trustee or the Mortgagee shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under any Loan Document or Secured Transaction Document or available at law and shall thereafter elect to discontinue or abandon same for any reason, then it shall have the unqualified right so to do and, in such an event, the parties shall be restored to their former positions with respect to the Obligations, this Mortgage, the Loan Agreement, the Collateral and otherwise, and the rights, remedies, recourses and powers of the Trustee and the Mortgagee, as applicable, shall continue as if same had never been invoked.

5.11.    No Release of Obligations. Neither the Mortgagor nor any other Person hereafter obligated for payment of all or any part of the Obligations shall be relieved of such obligation, to the extent the Obligations remain due and owing, by reason of: (a) the release, regardless of consideration, of the Mortgaged Property or any portion thereof or interest therein or the addition of any other property to the Mortgaged Property; (b) any agreement or stipulation between any subsequent owner of the Mortgaged Property and the Mortgagee extending, renewing, rearranging or in any other way modifying the terms of this Mortgage without first having obtained the consent of, given notice to or paid any consideration to the Mortgagor or such other Person, and in such

15

DEBTORS' EX. NO. 5
1182 of 1570

event the Mortgagor and all such other Persons shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged in writing by the Mortgagee; or (c) by any other act or occurrence save and except upon the Termination Date.

5.12.   Release of and Resort to Collateral. The Mortgagee may release, regardless of consideration, any part of the Collateral without, as to the remainder, in any way impairing, affecting, subordinating or releasing the Lien created in or evidenced by this Mortgage or its stature as a prior Lien, in and to the Collateral, provided that Permitted Encumbrances may exist, and without in any way releasing or diminishing the liability of any Person liable for the repayment of the Obligations. For payment of the Obligations, the Mortgagee may resort to any other security therefor held by the Mortgagee in such order and manner as the Mortgagee may elect.

5.13.   Waiver of Redemption, Notice and Marshalling of Assets, Etc. To the fullest extent permitted by law, the Mortgagor hereby irrevocably and unconditionally waives and releases (a) all benefits that might accrue to the Mortgagor by virtue of any present or future moratorium law or other law exempting the Collateral from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment and (b) any right to a marshalling of assets or a sale in inverse order of alienation. If any law referred to in this Mortgage and now in force, of which the Mortgagor or its successor or successors might take advantage despite the provisions hereof, shall hereafter be repealed or cease to be in force, such law shall thereafter be deemed not to constitute any part of the contract herein contained or to preclude the operation or application of the provisions hereof. If the laws of any state that provides for a redemption period do not permit the redemption period to be waived, the redemption period shall be specifically reduced to the minimum amount of time allowable by statute.

5.14.   Application of Proceeds. The proceeds of any sale of the Mortgaged Property or any part thereof and all other monies received in any proceedings for the enforcement hereof or otherwise, whose application has not elsewhere herein been specifically provided for, shall be applied:

(a)   First, to the payment of all reasonable expenses incurred by the Trustee or the Mortgagee incident to the enforcement of this Mortgage, the Loan Agreement, or any other Loan Document or Secured Transaction Document to collect any portion of the Obligations, including expenses of any entry or taking of possession, of any sale, of advertisement thereof, and of conveyances, and court costs, compensation of agents and employees, a reasonable commission to the Trustee acting and reasonable legal fees, and to the payment of all other reasonable charges, expenses, liabilities and advances incurred or made by the Trustee or the Mortgagee under this Mortgage or in executing any trust or power hereunder; and

(b)   Second, as set forth in the Loan Agreement.

5.15.   Resignation of Operator. In addition to all rights and remedies under this Mortgage, at law and in equity, if any Event of Default shall occur and be continuing and the Trustee or the Mortgagee shall exercise any remedies under this Mortgage with respect to any portion of the Mortgaged Property (or the Mortgagor shall transfer any Mortgaged Property "in lieu of"

16

DEBTORS' EX. NO. 5
1183 of 1570

foreclosure) whereupon the Mortgagor is divested of its title to any of the Collateral, the Mortgagee shall have the right to request that any operator of any Mortgaged Property that is either the Mortgagor or any Affiliate of the Mortgagor to resign as operator under the joint operating agreement applicable thereto, and no later than 60 days after receipt by the Mortgagor of any such request, the Mortgagor shall resign (or, to the extent it is able to do so, cause such other Person to resign) as operator of such Collateral.

5.16.   Indemnity. THE INDEMNIFIED PARTIES SHALL NOT BE LIABLE, IN CONNECTION WITH ANY ACTION TAKEN, FOR ANY LOSS SUSTAINED BY THE MORTGAGOR RESULTING FROM AN ASSERTION THAT THE MORTGAGEE HAS RECEIVED FUNDS FROM THE PRODUCTION OF HYDROCARBONS CLAIMED BY THIRD PERSONS OR ANY ACT OR OMISSION OF ANY INDEMNIFIED PARTY IN ADMINISTERING, MANAGING, OPERATING, OR CONTROLLING THE MORTGAGED PROPERTY **INCLUDING SUCH LOSS THAT MAY RESULT FROM THE ORDINARY NEGLIGENCE OF AN INDEMNIFIED PARTY** UNLESS SUCH LOSS IS CAUSED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF THE INDEMNIFIED PARTY SEEKING INDEMNITY OR ANY OF ITS RELATED PARTIES. NO INDEMNIFIED PARTY SHALL BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY, OR LIABILITY OF THE MORTGAGOR. EACH OF FIELDWOOD AND GOM AGREES TO PAY, SHALL INDEMNIFY THE INDEMNIFIED PARTIES FROM, AND HOLDS EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGEMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS', AUDITORS', AND ACCOUNTANTS' FEES) TO WHICH ANY OF THEM MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO PREPARATION, EXECUTION, AND DELIVERY OF THIS MORTGAGE, TO THE EXTENT THE MORTGAGOR WOULD BE REQUIRED TO DO SO PURSUANT TO (i) SECTION 8.03 OF THE LOAN AGREEMENT, (ii) THE DECOMMISSIONING AGREEMENT, OR (iii) ANY OTHER SECURED TRANSACTION DOCUMENT. EACH OF FIELDWOOD AND GOM AGREES TO PAY, SHALL INDEMNIFY THE INDEMNIFIED PARTIES FROM, AND HOLD EACH OF THEM HARMLESS AGAINST, ANY AND ALL LOSSES, LIABILITIES, CLAIMS, DAMAGES, PENALTIES, JUDGEMENTS, DISBURSEMENTS, COSTS, AND EXPENSES (INCLUDING ATTORNEYS', AUDITORS', AND ACCOUNTANTS' FEES) TO WHICH ANY OF THEM MAY BECOME SUBJECT WHICH DIRECTLY OR INDIRECTLY ARISE FROM OR RELATE TO THE ENFORCEMENT, PERFORMANCE, AND ADMINISTRATION OF THIS MORTGAGE TO THE EXTENT THE MORTGAGOR WOULD BE REQUIRED TO DO SO PURSUANT TO (i) SECTION 8.03 OF THE LOAN AGREEMENT, (ii) THE DECOMMISSIONING AGREEMENT, OR (iii) ANY OTHER SECURED TRANSACTION DOCUMENT. THE LIABILITIES OF THE MORTGAGOR AS SET FORTH IN THIS SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS MORTGAGE.

5.17.   Failure to Perform. The Mortgagor agrees that if it fails to perform any act or to take any action that it is required to perform or take hereunder or pay any money that the Mortgagor is required to pay hereunder, the Mortgagee, in the Mortgagor's name or its or their own name or names, may, but shall not be obligated to, perform or cause to perform such act or take such action or pay such money.

HOU 3972706v13

DEBTORS' EX. NO. 5
1184 of 1570

SECTION 6
THE TRUSTEE

6.1.     Duties, Rights, and Powers of Trustee. The Trustee shall have no duty to see to any recording, filing or registration of this Mortgage or any other instrument in addition or supplemental thereto, or to give any notice thereof, or to see to the payment of or be under any duty in respect of any tax or assessment or other governmental charge that may be levied or assessed on the Mortgaged Property, or any part thereof, or against the Mortgagor, or to see to the performance or observance by the Mortgagor of any of the covenants and agreements contained herein. The Trustee shall not be responsible for the execution, acknowledgment or validity of this Mortgage or of any instrument in addition or supplemental hereto or for the sufficiency of the security purported to be created hereby, and makes no representation in respect thereof or in respect of the rights of the Mortgagee. The Trustee shall have the right to consult with counsel upon any matters arising hereunder and shall be fully protected in relying as to legal matters on the advice of counsel. The Trustee shall not incur any personal liability hereunder except for the Trustee's own willful misconduct; and the Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine.

6.2.     Successor Trustee. The Trustee may resign by written notice addressed to the Mortgagee or be removed at any time with or without cause by an instrument in writing duly executed on behalf of the Mortgagee. In case of the death, resignation or removal of the Trustee, a successor may be appointed by the Mortgagee by instrument of substitution complying with any Requirement of Law, or, in the absence of any such requirement, without formality other than appointment and designation in writing. Written notice of such appointment and designation shall be given by the Mortgagee to the Mortgagor, but the validity of any such appointment shall not be impaired or affected by failure to give such notice or by any defect therein. Such appointment and designation shall be full evidence of the right and authority to make the same and of all the facts therein recited. Upon the making of any such appointment and designation, this Mortgage shall vest in the successor all the estate and title in and to all of the Mortgaged Property, and the successor shall thereupon succeed to all of the rights, powers, privileges, immunities and duties hereby conferred upon the Trustee named herein, and one such appointment and designation shall not exhaust the right to appoint and designate an additional successor but such right may be exercised repeatedly until the Termination Date has occurred. To facilitate the administration of the duties hereunder, the Mortgagee may appoint multiple trustees to serve in such capacity or in such jurisdictions as the Mortgagee may designate.

6.3.     Retention of Moneys. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and the Trustee shall be under no liability for interest on any moneys received by him hereunder.

SECTION 7

18

HOU 3972706v13

MISCELLANEOUS

7.1.   <u>Releases</u>.

(a)   <u>Full Release</u>. On the Termination Date, the Mortgagee shall forthwith cause satisfaction and discharge of this Mortgage to be entered upon the record at the expense of the Mortgagor and shall execute and deliver or cause to be executed and delivered such instruments of satisfaction and reassignment as may be reasonably necessary or desirable for the release of the Liens created hereby on the Mortgaged Property. Other than as set forth in the foregoing sentence, this Mortgage shall remain and continue in full force and effect and be binding in accordance with and to the extent of its terms upon the Mortgagor and the successors and assigns thereof and shall inure to the benefit of the Mortgagee and the Secured Parties and their respective successors, indorsees, transferees and assigns; notwithstanding that from time to time prior to the Termination Date, the Mortgagor may be free from any Obligations.

(b)   <u>Other Releases</u>. The Mortgagee, at the request and sole expense of the Mortgagor, shall promptly execute and deliver to the Mortgagor all releases, re-conveyances or other documents reasonably necessary or desirable for the release of the Liens created hereby on the Mortgaged Property, which shall include, without limitation, the agreement of the Mortgagee (on behalf of itself and on behalf of the Secured Parties) to release the security interests in, and the Liens on, the Collateral granted herein and created hereby, (i) upon any disposition by the Mortgagor of any Mortgaged Property (other than to each other or any subsidiary of Fieldwood or GOM) that is permitted under the Loan Agreement and (ii) to the extent that the Loan Agreement provides for such release with respect to the Mortgaged Property.

(c)   <u>Possession of Notes</u>. The Mortgagor acknowledges and agrees that possession of any promissory note issued to the Lender that evidences the Loans extended by the Lender to the Mortgagor (or any replacements of any said promissory note or other instrument evidencing any part of the Obligations) at any time by the Mortgagor or any other guarantor shall not in any manner extinguish the Obligations or this Mortgage, and the Mortgagor shall have the right to issue and reissue any of such promissory notes from time to time as its interest or as convenience may require, without in any manner extinguishing or affecting the Obligations or the Lien of this Mortgage.

7.2.   <u>Severability</u>. If any provision hereof is invalid or unenforceable in any jurisdiction, the other provisions hereof shall remain in full force and effect in such jurisdiction and the remaining provisions hereof shall be liberally construed in favor of the Mortgagee and the Secured Parties in order to effectuate the provisions hereof. The invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of any such provision in any other jurisdiction.

7.3.   <u>Successors and Assigns</u>. The terms used to designate any party or group of persons shall be deemed to include the respective heirs, legal representatives, successors and assigns of such Persons.

7.4.   <u>Satisfaction of Prior Encumbrance</u>. To the extent that proceeds of the Loan Agreement are used to pay any indebtedness secured by any outstanding Lien against the

19

DEBTORS' EX. NO. 5
1186 of 1570

Mortgaged Property then the parties agree that: (a) such proceeds have been advanced at the Mortgagor's request, and (b) the Mortgagee and the Secured Parties shall be subrogated to any and all rights and Liens owned by any owner or holder of such outstanding Liens, irrespective of whether said Liens are or have been released. It is expressly understood that, in consideration of the payment of such other indebtedness, the Mortgagor hereby waives and releases all demands and causes of action for offsets and payments to, upon and in connection with the said indebtedness. This Mortgage is made with full substitution and subrogation of the Trustee and the Mortgagee and their successors and assigns in and to all covenants and warranties by others heretofore given or made in respect of the Mortgaged Property or any part thereof.

7.5.    <u>Application of Payments to Certain Obligations</u>. If any part of the Obligations cannot be lawfully secured by this Mortgage or if any part of the Collateral cannot be lawfully subject to the Lien hereof to the full extent of the Obligations, then all payments made shall be applied on said Obligations first in discharge of that portion thereof that is not secured by this Mortgage.

7.6.    <u>Nature of Covenants</u>. The covenants and agreements herein contained shall constitute covenants running with the land and interests covered or affected hereby and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto.

7.7.    <u>Notices</u>. All notices, requests and demands pursuant hereto shall be made in accordance with Section 8.01 of the Loan Agreement.

7.8.    <u>Expenses</u>. The Mortgagor agrees to pay any and all reasonable and documented out of pocket expenses (including attorneys', auditors' and accountants' fees, charges, and disbursements) that may be paid or incurred by the Mortgagee in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Mortgagor under this Mortgage to the extent the Mortgagor would be required to do so pursuant to (i) Section 8.03 of the Loan Agreement, (ii) the Decommissioning Agreement, or (iii) any other Secured Transaction Document.

7.9.    <u>Counterparts</u>. This Mortgage is being executed in several counterparts, all of which are identical, except that to facilitate recordation, if the Mortgaged Property is situated in (or adjacent to, in the case of offshore properties) more than one county or parish, descriptions of only those portions of the Mortgaged Property located in the county or parish in which a particular counterpart is recorded may be attached as <u>Exhibit A</u> to such counterpart. Each of such counterparts shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same instrument. Complete copies of this Mortgage containing the entire <u>Exhibit A</u> have been retained by the Mortgagee.

7.10.    <u>Governing Law</u>. This Mortgage shall be governed and construed in accordance with the laws of the State of Texas, without regard to the laws that might be applicable under conflicts of laws principles; provided, however, that, with respect to any portion of the Mortgaged Property located outside of the State of Texas, the laws of the place in which such property is located in, or offshore area adjacent to (and State law made applicable as a matter of Federal law), shall apply

HOU 3972706v13

DEBTORS' EX. NO. 5
1187 of 1570

to the extent of procedural and substantive matters relating only to the creation, perfection, foreclosure of Liens and enforcement of rights and remedies against the Mortgaged Property.

7.11.   <u>Financing Statement; Fixture Filing</u>. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all Fixtures included within the Mortgaged Property and is to be filed or filed for record in the real estate records, mortgage records or other appropriate records of each jurisdiction where any part of the Mortgaged Property (including said fixtures) are situated (or adjacent to, in the case of offshore properties), and may also be filed in the offices of the Bureau of Land Management and/or the Bureau of Ocean Energy Management. This Mortgage shall also be effective as a financing statement covering As-Extracted Collateral (including oil and gas and all other substances of value that may be extracted from the ground) and accounts financed at the wellhead or minehead of wells or mines located on the properties subject to the Applicable UCC and is to be filed for record in the real estate records, UCC records or other appropriate records of each jurisdiction where any part of the Mortgaged Property is situated (or adjacent to, in the case of offshore properties). This Mortgage also constitutes a security agreement under the Applicable UCC, and creates a security interest in all that property (and the proceeds thereof) included in the Mortgaged Property which might otherwise be deemed "personal property". Notwithstanding any release of any or all of that property included in the Mortgaged Property which is deemed "real property", any proceedings to foreclose this Mortgage or its satisfaction of record, the terms hereof shall survive as a security agreement with respect to the security interests created hereby and referred to above until the repayment or satisfaction in full of the obligations of Mortgagor as are now or hereafter evidenced by the Secured Transaction Documents.

7.12.   <u>Filing of Financing Statements</u>. Pursuant to the Applicable UCC, the Mortgagor authorizes the Mortgagee, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Mortgaged Property without the signature of the Mortgagor in such form and in such offices as the Mortgagee reasonably determines appropriate to perfect the security interests of the Mortgagee under this Mortgage. The Mortgagor also authorizes the Mortgagee, its counsel or its representative, at any time and from time to time, to file or record such financing statements that describe the collateral covered thereby as "all assets of the Mortgagor", "all personal property of the Mortgagor" or words of similar effect. The Mortgagor shall pay all costs associated with the filing of such instruments.

In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor: | Fieldwood Energy I LLC |
| Address of Debtor: | 2000 W. Sam Houston Pkwy S., Suite 1600 Houston, Texas 77042 Attention: _____ |
| State of Formation/Location: | Texas |

HOU 3972706v13

DEBTORS' EX. NO. 5
1188 of 1570

| | |
|---|---|
| Name of Debtor: | GOM Shelf LLC |
| Address of Debtor: | 2000 W. Sam Houston Pkwy S., Suite 1600 Houston, Texas 77042 Attention: _____ |
| State of Formation/Location: | Delaware |
| Name of Secured Party: | Apache Corporation As Collateral Agent |
| Address of Secured Party: | 2000 Post Oak Boulevard Suite 100 Houston, Texas 77056 |
| Owner Record of Real Property: | Fieldwood Energy I LLC and GOM Shelf LLC |

7.13.   Limit on Obligations and Collateral. It is the intention of the Mortgagor, the Mortgagee and the Secured Parties that this Mortgage not constitute a fraudulent transfer or fraudulent conveyance under any state or federal law that may be applied hereto. The Mortgagor and, by the Mortgagee's acceptance hereof, the Mortgagee and the Secured Parties hereby acknowledge and agree that, notwithstanding any other provision of this Mortgage, the indebtedness secured hereby shall be limited to the maximum amount of indebtedness that can be incurred or secured by the Mortgagor without rendering this Mortgage voidable under applicable law relating to fraudulent conveyances or fraudulent transfers.

7.14.   Appearance, Resolutions. For purposes of Louisiana law, including but not limited to the availability of executory process, Mortgagor has appeared on this date before the undersigned Notary Public and witnesses in order to execute this Mortgage. Mortgagor also attaches hereto, as Annex I, a written consent authorizing the execution and delivery of this Mortgage.

7.15.   Paraph. Mortgagor acknowledges that no promissory note or other instrument has been presented to the undersigned Notary Public to be paraphed for identification herewith.

7.16.   Acceptance by Mortgagee. In accordance with the provisions of Louisiana Civil Code article 3289, Mortgagee has accepted the benefits of the Mortgage without the necessity of execution by Mortgagee.

7.17.   Notary Public. The parties relieve and release the undersigned notary public of any duty to produce and attach mortgage or conveyance certificates.

HOU 3972706v13

22

7.18.   _Appointment of Mortgagee as Collateral Agent_.  By accepting the benefits hereof or any other Collateral Document, each other Secured Party hereby appoints Apache Corporation to act as collateral agent on its behalf hereunder and thereunder, and authorizes Apache Corporation, as Mortgagee, to take such actions on its behalf and to exercise such powers as are delegated to the Mortgagee by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.

7.19.   _Joint and Several Obligations of Mortgagor_.

(a)     Each of Fieldwood and GOM is accepting joint and several liability hereunder with each other and other Persons that have executed or will execute a Mortgage in consideration of the financial accommodation to be provided by the holders of the Obligations, for the respective mutual benefit, directly and indirectly, of Fieldwood and GOM and in consideration of the respective undertakings of Fieldwood and GOM to accept joint and several liability for the Obligations of each of them.

(b)     Each of Fieldwood and GOM, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other and each other Person that have executed or will execute a Mortgage with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several Obligations of Fieldwood, GOM, and each other Person that have executed or will execute a Mortgage without preferences or distinction among them.

7.20.   _Decommissioning Obligations_.  In all instances where Fieldwood defaults on its decommissioning obligations (including, with respect to the Mortgaged Property) and, in response to an order by the Bureau of Safety and Environmental Enforcement ("BSEE"), the Bureau of Ocean Energy Management ("BOEM"), their respective successor agencies, any other governmental authority having jurisdiction over such decommissioning obligations or other applicable governmental authority, or to a contractual obligation (in each case, a "Decommissioning Obligation"), Mortgagee or another third party (as the case may be, the "Applicable Decommissioning Operator") conducts or seeks to conduct such decommissioning operations as the then-present designated operator or as the decommissioning operator specifically appointed for such operations by BOEM, BSEE or other applicable governmental authority, Mortgagor shall fully cooperate with and support in all respects the Applicable Decommissioning Operator and shall make available to the Applicable Decommissioning Operator and, upon its request, to the extent such activity is permitted under the underlying agreement, assign to the Applicable Decommissioning Operator all documentation, plans, files, permits, contracts, contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to Mortgagor in connection with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation, each such assignment made solely as the rights relate to such Decommissioning Obligation.  In furtherance of these obligations imposed on Mortgagor, but not by way of limitation in any way, Mortgagor hereby:

HOU 3972706v13

DEBTORS' EX. NO. 5
1190 of 1570

(a)      Authorizes the Applicable Decommissioning Operator to perform all required decommissioning operations on any Mortgagor property or infrastructure (including all Mortgaged Property) that is the subject of a Decommissioning Obligation.

(b)      Provides and grants boarding access to the Applicable Decommissioning Operator for any infrastructure owned by Mortgagor, or to which Mortgagor has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of Mortgagor.   The foregoing boarding access rights shall automatically apply to any infrastructure designated by the Applicable Decommissioning Operator as being necessary or convenient to support such decommissioning operations.

(c)      Assigns and quitclaims any salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator so that such value can be monetized by the Applicable Decommissioning Operator and applied to each Mortgagor's defaulting share of the applicable Decommissioning Obligations.

(d)      Grants to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and, upon notice from the Applicable Decommissioning Operator, shall assign to the Applicable Decommissioning Operator, solely as they relate to such Decommissioning Obligation, any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who might have obligations to pay for or contribute to all or any part of the Decommissioning Obligations.

(e)      Assigns, whether or not covered by clause (d) above, all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses which may be available to Mortgagor for any property (including all Mortgaged Property) made the subject of a Decommissioning Obligation.

In addition, each Mortgagor hereby agrees to (i) fully release and hold the Applicable Decommissioning Operator harmless from any claims associated in any way with any operation conducted by the Applicable Decommissioning Operator in the performance of Decommissioning Obligations **(INCLUDING SUCH CLAIMS THAT MAY RESULT FROM THE ORDINARY NEGLIGENCE OF THE APPLICABLE DECOMMISSIONING OPERATOR)** and (ii) execute one or more counterparts of the certificate attached hereto as Exhibit B evidencing each Mortgagor's agreements, assignments, and designations hereunder, from time to time, immediately upon request of the Applicable Decommissioning Operator.  Each Mortgagor further agrees to execute such other agreements or instruments as may be requested by the Applicable Decommissioning Operator to effectuate or carry out the intents and agreements set forth in this Section 7.20.  The liabilities of Mortgagor as set forth in this Section 7.20 shall survive the termination of this Mortgage.  The provisions of this Section 7.20 of this Mortgage shall be binding on all successors and assigns of Mortgagor for all purposes.

24

HOU 3972706v13

[SIGNATURES BEGIN NEXT PAGE]

DEBTORS' EX. NO. 5
1192 of 1570

THUS DONE AND PASSED in the foregoing jurisdiction this [_____], 20[●] to be effective for all purposes as of the Effective Date, in my presence and in the presence of the undersigned competent witnesses who hereunto sign their names with Mortgagor and me, Notary, after reading of the whole.

WITNESSES                                      FIELDWOOD ENERGY I LLC


_____                By: _____
Printed Name:                                   Name: _____
                                                Title: _____
_____
Printed Name:


                                                GOM SHELF LLC


                                                By: _____
                                                Name: _____
                                                Title: _____


                    _____
                    NOTARY PUBLIC for the State of _____

                    Full name printed: _____


Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral,
Security Agreement, Fixture Filing and Financing Statement

HOU 3972706v13

STATE OF TEXAS                    §
                                 §
COUNTY OF [HARRIS]               §

**TEXAS**            This instrument was acknowledged before me on this __ day of _____, 20[●], by _____, _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, on behalf of said limited liability company.

**MISSISSIPPI**      Personally appeared before me, the undersigned authority in and for said county and state, on this ____ day of _____, 20[●], within my jurisdiction, the within named _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed [he/she] executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

**ALABAMA**          I, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as _____ of FIELDWOOD ENERGY I LLC, a Texas limited liability company, is signed to the foregoing instrument or conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument/conveyance, [he/she], as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand this ___ day of _____, 20[●].

IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the [City of Houston, Harris County, Texas] on [_____, 20[●]].

_____
NOTARY PUBLIC, State of Texas

Printed Name: _____

_____
[SEAL]

Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral,
Security Agreement, Fixture Filing and Financing Statement

HOU 3972706v13

STATE OF TEXAS       §
                               §

COUNTY OF [HARRIS]    §

**TEXAS**           This instrument was acknowledged before me on this __ day of _____, 20[●], by _____, _____ of GOM SHELF LLC, a Delaware limited liability company, on behalf of said limited liability company.

**MISSISSIPPI**   Personally appeared before me, the undersigned authority in and for said county and state, on this ____ day of _____, 20[●], within my jurisdiction, the within named _____ of GOM SHELF LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed [he/she] executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

**ALABAMA**     I, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as _____ of GOM SHELF LLC, a Delaware limited liability company, is signed to the foregoing instrument or conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument/conveyance, [he/she], as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

      Given under my hand this ___ day of _____, 20[●].

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal in the [City of Houston, Harris County, Texas] on [_____, 20[●]].

                         _____
                         NOTARY PUBLIC, State of Texas

                         Printed Name: _____

_____
[SEAL]

Signature Page to Mortgage, Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement

HOU 3972706v13

## EXHIBIT A[1]

## LEGAL DESCRIPTION

[TO COME]

---

[1] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

HOU 3972706v13

## EXHIBIT B

### CERTIFICATION OF RIGHTS

With respect to any decommissioning obligations for which Apache Corporation, or any of its subsidiaries, or a third party designated by Apache Corporation or one of its subsidiaries (as the case may be, the "Applicable Decommissioning Operator") either (a) conducts or seeks to conduct pursuant to an order from the Bureau of Safety and Environmental Enforcement ("BSEE"), the Bureau of Ocean Energy Management ("BOEM"), their respective successor agencies, or any other governmental authority having jurisdiction over such decommissioning obligations or (b) becomes obligated to perform pursuant to any contractual obligation (in each case, such decommissioning obligations being hereinafter referred to as "Decommissioning Obligations"), Fieldwood Energy I LLC ("FWE I") hereby certifies that it has:

1.     Assigned to such Applicable Decommissioning Operator all documentation, plans, files, permits, decommissioning spreads, contracts, and contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to FWE I in conjunction with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation;

2.     Authorized the Applicable Decommissioning Operator to perform all required decommissioning operations on any FWE I property or infrastructure that is the subject of a Decommissioning Obligation;

3.     Granted boarding access to the Applicable Decommissioning Operator for any infrastructure owned by FWE I, or to which FWE I has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of FWE I;

4.     Assigned and quitclaimed to the Applicable Decommissioning Operator any salvaged property or materials and the salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator;

5.     Granted to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and assigned to the Applicable Decommissioning Operator any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who have obligations to pay for or contribute to all or any part of the Decommissioning Obligations; and

HOU 3972706v13

6.      Assigned all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses available to FWE I for any property made the subject of a Decommissioning Obligation.

FWE I further authorizes any co-owner, counterparty, contractor, or other person or entity to rely on the foregoing certifications in taking in action or making any payment or contribution as may be requested or directed by the Applicable Decommissioning Operator toward the fulfillment of the applicable Decommissioning Obligations.

FIELDWOOD ENERGY I LLC

_____

By:      _____

Name: _____

Title:   _____

HOU 3972706v13

DEBTORS' EX. NO. 5
1198 of 1570

**SCHEDULE 4.4[2]**

**EXCLUDED PROPERTIES**

| Name of Mortgagor | Description of Excluded Property |
|---|---|
|  |  |

---

[2] To be completed in a manner mutually acceptable to all parties as a conditions to Apache's execution.

**Exhibit 13**

**Form of Amendment to Unit Operating Agreement**

**AMENDMENT TO**
**UNIT OPERATING AGREEMENT**

This Amendment to the Unit Operating Agreement (this "Amendment") is made and entered into effective the _____ day of_____, 202__ (the "Effective Date"), by and between [Fieldwood Energy II LLC], ("Fieldwood"), GOM Shelf LLC, ("GOM Shelf"), and Apache Shelf Exploration LLC, ("Apache").  The entities named hereinabove are hereinafter sometimes referred individually as "Party" and collectively as "Parties".

**WITNESSETH**

     **WHEREAS**, Conoco Inc. ("Conoco"), Atlantic Richfield Company, ("ARCO"), Texaco Producing Inc. ("Texaco") and Oxy USA Inc. ("Oxy") entered into a Unit Operating Agreement dated January 1, 1989, ("the West Delta Grand Isle Unit Agreement"); and

     **WHEREAS**, Fieldwood, GOM Shelf, and Apache are successors in interest to Conoco, ARCO, Texaco, and OXY in the West Delta Grand Isle Unit Operating Agreement insofar and only insofar as it covers the depths described on Exhibit ___ hereto[1] (the West Delta Grand Isle Unit Operating Agreement insofar as it covers these depths, the "Operating Agreement"); and

     **WHEREAS,** Fieldwood, GOM Shelf, and Apache desire to amend the West Delta Grand Isle Unit Operating Agreement.

     **NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby amend the Unit Operating Agreement insofar as it pertains to, covers, and burdens the interests of the Parties in and to the lands, leases, and depths covered by the Unit Operating Agreement as follows:

**ARTICLE 3.1**
**EXHIBITS**

**Article 3.1 Exhibits** is amended by inserting the following immediately following "3.1.5  Exhibit "E".  Gas Balancing Agreement.":

     "3.1.6   Exhibit "F".  Form of Surety Bond.

     3.1.7   Exhibit "G" Form of Assignment."

**ARTICLE 4**
**OPERATOR**

**Article 4.1** is amended by deleting the entire Article and replacing it with the following:[2]

     "[Fieldwood Energy II LLC] is hereby designated as Operator."

**ARTICLE 11**
**DEVELOPMENT OPERATIONS**

**Article 11.8 Facilities** is amended by deleting such Article in its entirety and replacing it with the following:

---

[1] Note to Draft: Exhibit to cover those depths which are only owned by the parties to this amendment.

#93792895v11

The affirmative vote of all Parties having a combined Participating Interest of one hundred percent (100%) in the wells to be served by the proposed Facilities shall constitute approval.

## ARTICLE 12
## NON-CONSENT OPERATIONS

**Article 12.2.1 Production Reversion Penalties** is amended by deleting the entire Article and replacing it with the following:

"Such interest, rights and title shall remain vested in each Participating Party until the wells comprising such Non-Consent Operations are plugged and abandoned and decommissioned. Upon the commencement of such Non-Consent Project, the Non-Participating Party(ies) shall execute and deliver to the Participating Parties an assignment of their interest, rights and title in the Non-Consent Project on the form of Assignment attached hereto as Exhibit G."

## ARTICLE 14
## WITHDRAWAL

**Article 14 Withdrawal** is amended by deleting the Article in its entirety and replacing it with the following:

"**14.1 Withdrawal.** Subject to this Article 14.1, any Party may withdraw from this Agreement as to the Unit Area and the Leases, wells, Platforms and Facilities used in operations on such Unit Area (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw (the "withdrawal notice"). The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice. Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties". The withdrawal notice and the written notice(s) to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Unit Area, Leases, wells, Platforms, Facilities, Production, and other property and equipment owned under this Agreement.

**14.2    Response to Withdrawal Notice.** Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

**14.2.1 Unanimous Withdrawal.** If all the other Parties join in the withdrawal,

(a)    no assignment of Working Interests shall take place;

(b)    subject to Article 13.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)    the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEM or the applicable successor agency within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

(d)    notwithstanding anything to the contrary in Article 13 (Abandonment and Salvage), Operator shall:

1)    furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and

2)    cease operations and begin to permanently plug and abandon all

#93792895v11

wells and remove all Facilities and Platforms in accordance with the abandonment plan.

**14.2.2  No Additional Withdrawing Parties.**  If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

**14.2.3  Acceptance of the Withdrawing Parties' Interests.**  If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty- (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight (48) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 14.2.1 (Unanimous Withdrawal) will apply.

**14.2.4  Effects of Withdrawal**.  Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility.  The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 14.1 (Withdrawal) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties, including, without limitation, assignments of their Working Interests in substantially the same form as attached hereto as Exhibit "G".  Additionally, the Parties shall take such further actions as are necessary or appropriate to register the assignment of the Withdrawing Party's and Other Withdrawing Parties' Working Interests with BOEM or the applicable successor agency.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

#93792895v11

**14.3      Limitation on and Conditions of Withdrawal**

**14.3.1  Prior Expenses**.  The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages, Production imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, or (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal.  Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 14.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Facilities, and other materiel and equipment in which such Withdrawing Party or Other Withdrawing Party, as applicable, has an ownership interest as part of the Joint Account, less their respective Participating Interest shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote of one or more Parties having a majority interest.  This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C".  At its option, before withdrawing, each of the Withdrawing Party and Other Withdrawing Parties shall either (i) pay Operator, (ii) provide Operator with a surety bond in substantially the same form as attached hereto as Exhibit "F" in a penal sum equal to, or (iii) deposit into an escrow account, in each case for the benefit of the Remaining Parties, the amount allocated to such Withdrawing Party or Other Withdrawing Party as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to such Party before the effective date of the withdrawal; provided, however, that the Withdrawing Party or Other Withdrawing Party may condition its delivery of such payment or bond upon the Remaining Parties' acceptance of the assignment made pursuant to Article 14.2.4.  All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**14.3.2  Confidentiality.**  The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement.  The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**14.4  Emergencies and Force Majeure.**  Notwithstanding anything herein to the contrary, no Party may withdraw during an event of force majeure as described in Article 24.1 or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the force majeure event or emergency.  The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the force majeure event or emergency, including but not limited to the drilling of relief wells, containment, and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the force majeure event or emergency."

**ARTICLE 21**
**DISPOSITION OF PRODUCTION**

**Article 21.1 Facilities to Take in Kind** is deleted in its entirety.

#93792895v11

## ARTICLE 25
## SUCCESSORS, ASSIGNS AND PREFERENTIAL RIGHT TO PURCHASE

**Article 25.3 Transfer of Interest** is deleted in its entirety and replaced with the following:

"25.3  Transfer of Interest.  Subject to the provisions of Section 25.2 hereof and except as provided in 25.3.1 (Exceptions to Transfer Notice), notice of any Party's attempted transfer of Working Interest in the Unit Area, whether directly through an assignment, transfer, or conveyance or indirectly through a merger, consolidation, or similar transaction or series of transactions, (a "Transfer of Interest") shall be provided by written notice to Operator and the other Parties ("the transfer notice").  Any Transfer of Interest shall be made to a party qualified by the BOEM and any other applicable regulatory agency to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Operating Agreement.  All Transfers of Interest must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties ("Consent").  Such Consent shall not be unreasonably withheld, delayed, or conditioned, and shall not require remuneration of any kind except for amounts owed pursuant to the terms hereof.  Notwithstanding the foregoing, the non-transferring Parties' Consent can be conditioned on requiring reasonable proof of the prospective transferee's ability to perform its obligations under this Agreement and reasonable financial assurances from such prospective transferee.  Such financial assurances required by the non-transferring Parties may include bonds, letters of credit, and other conditions providing sufficient evidence of such prospective transferee's ability to perform its obligations under this Operating Agreement to the reasonable satisfaction of the non-transferring Parties.[3]  Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part, and shall also include a provision that the transferee be bound by all the terms and conditions of this Operating Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities accrued under this Agreement prior to the effective date of the Transfer of Interests, and the security rights under Article 8.6 (Security Rights) shall continue to burden the working interest transferred and to secure the payment of those obligations and liabilities.  Subject to the immediately preceding sentence, but otherwise notwithstanding anything to the contrary herein, the restrictions and obligations in this Article 25.3 shall not apply to any Transfer of Interest from a Party to an Affiliate of such Party.

25.3.1  Exceptions to Transfer Notice. Notwithstanding any contrary provision of this Agreement, the transfer notice and the Consent are not required when a Party proposes to (i) mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of oil or gas production executed as further security for the debt secured by that security device, collectively a "Financing Transaction"), any wells, Platforms, Facilities, or other equipment, or (ii) transfer, assign, or otherwise convey all or a portion of its Working Interests to either Affiliates or pursuant to the preferential rights purchase; provided that the penultimate sentence of Section 25.3 shall apply to any such transfer, assignment, or conveyance of a Party's Working Interest to an Affiliate or pursuant to a preferential right to purchase.  However, an assignment of Working Interest arising from a Financing Transaction shall be expressly made subject and subordinated to this Agreement.

25.3.2  Effective Date of Transfer of Interest.  Subject to the requirements in this Article 25.3, a Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the transfer notice.  No Transfer of Interest, other than those provided in Article 14 (Withdrawal), is binding on the Parties unless and until (i) the non-transferring Parties have provided their Consent to the Transfer of Interest (other than those provided in Article 25.3.1), (ii) if necessary, the assignor or assignee provides all remaining Parties with a photocopy of a fully executed Transfer of Interest, an fully executed BOEM "Designation of Operator" form and a designation of oil spill responsibility form, and (iii) evidence of

---

[3] NTD: This amendment will be signed by FWE I and [FWE II] upon the divisive merger and after the Credit Bid Sale.  As a result, this provision will not be in place so as to apply to the Credit Bid Sale.  However, it should apply to all subsequent transfers.

#93792895v11

receipt of all necessary approvals by the BOEM or any applicable successor agency.  The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest.  All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

     25.3.3   <u>Form of Transfer of Interest</u>.  Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Operating Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Operating Agreement.  Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

### Exhibit "A"

Exhibit "A" to the Operating Agreement containing the Description of Leases, Working Interests, and Unit Area Interests of the Parties and Designated Representatives is hereby deleted and replaced in its entirety with Exhibit "A" attached hereto and made a part of this Amendment.

### Exhibit "B"

Exhibit "B" to the Operating Agreement containing the Insurance Requirements is hereby deleted and replaced in its entirety with Exhibit "B" attached hereto and made a part of this Amendment.

### Exhibit "C"

Exhibit "C" to the Operating Agreement containing the Accounting Procedures is hereby deleted and replaced in its entirety with Exhibit "C" attached hereto and made a part of this Amendment.

### Exhibit "F"

Exhibit "F" containing the form of Surety Bond attached hereto and made a part of this Amendment is hereby attached to and made a part of the Operating Agreement as Exhibit "F" thereto.

### Exhibit "G"

Exhibit "F" containing the form of Assignment attached hereto and made a part of this Amendment is hereby attached to and made a part of the Operating Agreement as Exhibit "G" thereto.

This Amendment may be executed in separate counterparts, each of which, when executed, shall be deemed to be an original and all of which when together shall constitute one and the same Amendment.  An email copy or printable PDF version of a counterpart executed by a Party shall be acceptable evidence of the execution of that counterpart by that Party and shall be binding upon that Party.

This Amendment shall be binding on the Parties as to all of their respective interests covered and burdened by the Unit Operating Agreement.  To the extent any other person, entity, or party holding interests that are included in and bound and burdened by in and to the Unit Operating Agreement, this Amendment shall not be binding on such other person, entity, or party unless or until they ratify and adopt this Amendment; provided, however, this Amendment shall bind and burden each Party executing a counterpart hereof or such other person, entity, or party so ratifying and adopting this Amendment and the respective interests held by such Party or other person, entity, or party.

The captions in this Amendment are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Amendment.

#93792895v11

Except as expressly amended in this Amendment, all other terms and conditions of the Unit Operating Agreement remain in full force and effect as originally executed.  Except as otherwise defined in this Amendment, capitalized terms used herein shall have the same meaning as defined in the Operating Agreement.  In the event of a conflict between the terms and conditions of this Amendment and the terms and conditions of this Unit Operating Agreement, then the terms and conditions of this Amendment shall prevail.

Upon execution by the Parties, this Amendment shall be binding upon and inure to the benefit of the Parties and their respective approved successors and assigns.

This Amendment shall be governed by and construed in accordance with the Applicable Law provisions set forth in Article 22 of the Unit Operating Agreement, *mutatis mutandis*.

Each Party represents that upon execution of this Amendment, it has secured all necessary management approvals or other corporate approvals necessary to make this Amendment a fully binding contract.

    **IN WITNESS WHEREOF**, the Parties have executed this Amendment on the day and year set forth below, effective as of the Effective Date.

**GOM SHELF LLC**                                   **[FIELDWOOD ENERGY II LLC]**

By:_____                     By:_____

Title:_____                    Title:_____

Date:_____                     Date:_____

**APACHE SHELF EXPLORATION LLC**

By:_____

Title:_____

Date:_____

#93792895v11

# EXHIBIT "2"

**Attached to and made a part of that certain Amendment to [Unit Operating Agreement] dated [●], by and between (among) [●], as Operator, and [●].**

# EXHIBIT "B"

## INSURANCE PROVISIONS

I.  Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account.  Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Section A.   Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

A..  <u>Workers' Compensation and Employer's Liability</u>.

1..  Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

2.  Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

3..  Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.  Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder.   With the exception of [●] and/or [●] which shall have the option to self insure, each Party, at its own expense, must carry its own coverage for the types of insurance and with limits as set forth in each Paragraphs A-G below.  Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability.   All uninsured losses and all damages to jointly owned property shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto.

Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to effect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

A.  <u>Commercial General Liability and Business Automobile Liability</u>.  Coverage for all operations conducted hereunder with a combined single limit each occurrence of $1,000,000 ("for assured's interest").   Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.   Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

B.  <u>Vessels</u>. All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of at least $1,000,000 ("for assured's interest") per occurrence.

C.  <u>Aircraft</u>. All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of at least $5,000,000 ("for assured's interest") per occurrence.

D.  <u>Excess Liability</u>. Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence ("for assured's interest"), excess of all primary liability limits in the insurance specified in Paragraphs A-C.

1

DEBTORS' EX. NO. 5
1208 of 1570

E.   <u>Extra Expense Liability</u>.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and $5,000,000 per occurrence for Care, Custody and Control coverage.

F.   <u>Financial Responsibility Insurance</u>:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.   <u>Contractors</u>:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.

END OF EXHIBIT "B"

DEBTORS' EX. NO. 5
1209 of 1570



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**EXHIBIT "3"**

**Attached to and made a part of that certain Amendment to |•| dated effective |•|, by and between |•|, as Operator, and |•|, as Non-Operator.**

# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of  that certain [•]dated [                    ] , by and between [                    ],

As Operator and [                                    ] as Non-Operators

_____

_____

### I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

1.  **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel

#4334419.1



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

2. **STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3.   ADVANCES AND PAYMENTS BY THE PARTIES**

A.   Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B.   Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1)   being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2)   being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3)   being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4)   charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4.   ADJUSTMENTS**

A.   Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B.   All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1)   a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2)   an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3)   a government/regulatory audit, or

(4)   a working interest ownership or Participating Interest adjustment.

**5.   EXPENDITURE AUDITS**

A.   A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B.  The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C.  The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D.  If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E.  ☐ (*Optional Provision – Forfeiture Penalties*)
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*



**6.   APPROVAL BY PARTIES**

A.   GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____one_____ (___1%___) or more Parties, one of which is the Operator, having a combined working interest of at least _____fifty_____ percent (__50___%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.   RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.   LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or  that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)   If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property . The Operator shall consistently  apply the selected alternative.

(2)   If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

not to exceed _____eight_____ percent (___8%) per annum; provided, however, depreciation shall not be charged when the equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

## 7.   AFFILIATES

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_50,000.00_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_50,000.00_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

## 8.   DAMAGES AND LOSSES TO JOINT PROPERTY

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

## 9.   LEGAL EXPENSE

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

## 10.   TAXES AND PERMITS

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11.   INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12.   COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13.   ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14.   ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15.   OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1     • human resources
2     • management
3     • supervision not directly charged under Section II.2 (*Labor*)
4     • legal services not directly chargeable under Section II.9 (*Legal Expense*)
5     • taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
6     • preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with
7       governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing,
8       interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.
9

10 Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing
11 overhead functions, as well as office and other related expenses of overhead functions.
12

13 **1.   OVERHEAD—DRILLING AND PRODUCING OPERATIONS**
14

15     As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this
16     Section III, the Operator shall charge on either:
17

18     ☑   **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
19
20

21     A.   TECHNICAL SERVICES
22

23     (i)   Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major
24         *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
25         related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical
26         Services:
27

28         ☑   **(Alternative 1 – Direct)** shall be charged <u>**direct**</u> to the Joint Account.
29

30     (ii)   Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major
31         *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
32         related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical
33         Services:
34

35         ☑   **(Alternative 1 – All Overhead)** shall be covered by the <u>**overhead**</u> rates.
36

37         ☐   **(Alternative 2 – All Direct)** shall be charged <u>**direct**</u> to the Joint Account.
38
39

40     Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations
41     set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section
42     III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.
43

44 B.   OVERHEAD—FIXED RATE BASIS
45

46     (1)   The Operator shall charge the Joint Account at the following rates per well per month:
47

48         Drilling Well Rate per month $ _40,000.00_____ (prorated for less than a full month)
49

50         Producing Well Rate per month $ _4,000.00_____
51

52     (2)   Application of Overhead—Drilling Well Rate shall be as follows:
53

54       (a)   Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion
55           equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall
56           begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion
57           equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling
58           and/or completion operations for fifteen (15) or more consecutive calendar days.
59

60       (b)   Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more
61           consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date
62           operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges
63           shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.
64

65     (3)   Application of Overhead—Producing Well Rate shall be as follows:
66

      (a)   An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for
          any portion of the month shall be considered as a one-well charge for the entire month.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(b)   Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c)   A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d)   An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e)   Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)   The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

2.   **OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____2_____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1)   _____5_____% of total costs if such costs are less than $100,000; plus

(2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

(3)   _____2_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3. AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

D.   CONDITION

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

**3.   DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4.   SPECIAL PRICING PROVISIONS**

A.   PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.   SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

C.   MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

**1.   DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

**2.   NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

**Exhibit "F"**

**PERFORMANCE BOND**

**Bond No.**_____                                                        **Amount** _____

**Know All by These Presents,**

That we,        [Name]
               [Address]
               [Address]

(hereinafter called the Principal), as Principal, and Surety


a corporation duly organized under the laws of the State of [●] (hereinafter called the Surety), as Surety, are held and firmly bound unto

               [Name]
               [Address]
               [Address]

(hereinafter called the Obligee), in the maximum penal sum of            ($     ) (hereinafter called the Maximum Penal Sum); for the payment of which we, the said Principal and the said Surety, bind ourselves, our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

Sealed with our seals and dated this        day of September, 2020.

WHEREAS, the Principal and Obligee are parties to that certain Joint Operating Agreement dated effective as of [_____] (the "Agreement") covering in relevant part the oil and gas lease covering the properties described on Exhibit "A" attached hereto and made a part hereof (the "Property");

WHEREAS, pursuant to the Agreement, Principal has exercised its right to withdraw from the Agreement and to assign to Obligee its interests in and to the Property and associated equipment and facilities that are subject to and covered by the Agreement as of the effective date of the Principal's withdrawal from the Agreement (the "Faciities"); and

WHEREAS, pursuant to the Agreement, Principal has agreed to provide this surety bond as security for Principal's obligation to pay for its proportionate share of the costs to complete the plugging, abandonment, decommissioning, and site clearance of the Property and Facilities (the "Commitment") insofar as such have accrued as of the effective date of Principal's withdrawal from the Agreement.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal shall well and truly keep, duly, and timely pay its Commitment upon the completion of the plugging, abandonment, decommissioning, and site clearance of the Lease and Facilities, then this obligation shall be null and void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1)    In the event the Principal fails to timely pay the Commitment and the Obligee has presented to the Surety a written notice that the Principal is in default, and such condition has persisted for

thirty (30) days after written notice of such default has been given by certified mail to Principal and to the Surety at their last known addresses, the Surety shall pay to the Obligee an amount equal to the Principal's working interest share of the actual charges incurred by Obligee in performing the plugging, abandonment, decommissioning, and site clearance for the Property and the Facilities insofar as such obligations comprised a part of the Commitment hereunder within twenty (20) days of Surety's receipt of Obligee's invoice for such operations, but not exceeding the Penal Sum (reduced, as applicable) and the obligations associated with this Bond shall then be considered null and void to the extent paid.

2)   Principal shall have the right to post security, in substantially the same form of a bond hereof or other acceptable security in the Obligee's reasonable discretion in the amount necessary to replace this Bond.  If so posted, the Obligee will not unreasonably withhold acceptance of such security in lieu of this Bond and issue unconditional release of this bond within thirty (30) days of its acceptance of such other security.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE AGREEMENT TO THE CONTRARY, THE LIABILITY OF THE PRINCIPAL AND SURETY UNDER THIS BOND IS CONTINUOUS UNTIL THE COMMITMENT IS SATISFACTORILY COMPLETED.**

No (i) delay, neglect, or failure of the Obligee to proceed promptly to enforce any rights it might have against Principal under the Agreement or otherwise or to proceed promptly in the premises in case of any default on the part of the Principal, (ii) lack of enforceability or other defense or offset right in respect of any obligation of Principal or any right to Obligee under the Agreement or otherwise in respect of the Commitment, or (iii) the insolvency, bankruptcy, or receivership of Principal, shall in any degree relieve the Principal and the Surety or any of them of their obligations under this Performance Bond; and Principal and Surety hereby waive any defense or argument they may in relation to their obligations under this Performance Bond in connection with any of the foregoing.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Principal, the Obligee named herein, as the case may be, or their respective heirs, executors, administrators, or successors of the Obligee, as the case may be.

This Performance Bond may not be amended, supplemented, or modified except pursuant to a written instrument duly executed by the Principal, Surety, and Obligee. No course of conduct, dealing, or performance shall amend, supplement, or modify this Performance Bond unless incorporated into a written instrument referenced in the preceding sentence.

This Bond shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws rules and principles. Principal, Surety, and Obligee agree that any dispute arising out of this Performance Bond shall be brought and heard exclusively in the state or federal courts sitting in Harris County, Texas, and all of them irrevocably consent to the jurisdiction of said courts and do hereby waive any objections they may have to the laying of venue in such courts, including objections based upon grounds that such venue is inconvenient.

The Obligee will issue a release of this Bond within a reasonable time period following the earlier to occur of (i) the full performance, satisfaction, and extinguishment of the Commitment in accordance with all applicable laws, rules, regulations, and orders and (ii) the full performance by Surety of its obligations under this Bond, in each case, no later than thirty (30) days after the Commitment or such performance has been completed.

The Principal and the Surety agree that, notwithstanding any termination of any of the leases or rights of way that may comprise any part of the Property, whether pursuant to their terms, by operation of law, or

otherwise, this Performance Bond shall remain in full force and effect until the earlier of to occur of (i) the Commitment having been truly and faithfully performed, satisfied, and extinguished and (ii) the full performance by Surety of its obligations under this Bond.

Surety represents that it (i) is duly authorized by the proper public authorities to transact the business of indemnity and suretyship in the state where it executed this Performance Bond, and represents that it is qualified to be surety and guarantor on bonds and undertakings, which certificate has not been revoked; (ii) has duly executed a power of attorney, appointing the hereinafter named representative as its duly authorized deputy, as the true and lawful attorney-in-fact of such Surety, upon whom may be served all lawful process in any action or processing against such Surety in any court or before ay officer, arising out of or founded upon this Performance Bond or any liability hereunder; and (iii) does hereby agree and consent that such service, when so made, shall be valid service upon it, and that such appointment shall continue in force and effect and be irrevocable so long as any liability against it remains outstanding hereunder.

This bond may signed by the Principal and Surety with either a digital or original signature, either of which shall be legally-valid and enforceable. This bond may be transmitted to the Obligee by mail, fax, or electronic transmission. For the avoidance of doubt, any electronic PDF version of this bond received by the Obligee shall be an operative instrument and may be used by the Obligee as it would a hardcopy original.


**PRINCIPAL**


By: _____


**SURETY COMPANY**


By: _____

**EXHIBIT A**

**THE PROPERTY**

Exhibit "G"

## ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [●], 20[●], but effective as of 12:01 a.m. Central Standard Time, on [●] (the "**Effective Time**"), is from [●], a [●] [●], with an office at [●] ("**Assignor**") to [●], a [●] [●], with an office at [●] ("**Assignee**"), Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, effective as of the Effective Time, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assets. For the purposes of this Assignment, "**Assets**" means all of all of Assignor's right, title, and interests (real personal, mixed, contractual or otherwise) in, to and under or derived from the following:

1. The oil and gas lease(s) (whether one or more, the "**Lease**,") described on Exhibit "A" attached hereto and made a part hereof.

2. Any and all wells, whether producing, shut-in, temporarily abandoned, plugged and abandoned, or otherwise located on the Lease (the "**Wells**");

3. All equipment and facilities associated with or used in connection with the production and operation of the Wells;

4. Any and all contracts and agreements governing or pertaining to the Lease or the Wells (collectively, the "**Contracts**"), including, without limitation, that certain Joint Operating Agreement dated as of [●] by and between [●] and [●], as amended, insofar and only insofar as such Contracts apply to the Lease or the Wells.

Assignor warrants title to the Assets, unto Assignee, its successors and assigns, against all persons claiming or to claim the same or any part thereof BY, THROUGH OR UNDER ASSIGNOR, BUT NOT OTHERWISE. THE ASSETS ARE ASSIGNED "AS IS, WHERE IS", AND, EXCEPT AS PROVIDED FOR HEREIN, ASSIGNOR MAKES NO, AND EXPRESSLY DISCLAIMS AND NEGATES ANY, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO **(a)** MERCHANTABILITY OF THE ASSETS, **(b)** FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, **(c)** CONDITION OF THE ASSETS, AND **(d)** CONFORMITY OF THE ASSETS TO MODELS OR SAMPLES OF MATERIALS.

TO HAVE AND TO HOLD the Assets subject to the following terms and conditions:

1.    <u>Agreements</u>. This Assignment is made subject to and is burdened by the terms, covenants, and conditions contained in the Contracts. Assignee agrees to be bound by, assume the obligations arising under, and perform all of the terms, covenants, and conditions contained in the Contracts to the extent same relate to the Lease and the Wells.

1

        2.     <u>Compliance with Laws</u>. This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued, or enacted by a governmental entity having jurisdiction; and Assignee agrees to comply with the same on and after the Effective Time.

        2.     <u>Successors and Assigns</u>. The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

        3.     <u>Redhibition Waiver</u>.  ASSIGNEE: (i) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (ii) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (iii) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR THE ASSETS.

        4.     <u>UTPCPL Waiver</u>.  TO THE EXTENT APPLICABLE TO THE ASSETS OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (i) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (ii) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (iii) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

        5.     <u>Separate Assignments Required by Government Entities</u>. Some of the properties conveyed by this Assignment may require approval to transfer by a government entity, and as such may require separate assignment instruments made on officially approved forms, or forms acceptable to such government entity, in sufficient multiple originals to satisfy applicable statutory and regulatory requirements. The interests conveyed by such separate assignments are the same, and not in addition to, the interests conveyed in this Assignment.  Assignor and Assignee agree to execute such additional instruments as may be necessary to obtain the approval of the applicable governmental entities for such assignment; and Assignor shall be responsible for recording such assignments.  In addition, it is contemplated that this Assignment will be recorded in the appropriate Parish within the State of Louisiana and the interests conveyed pursuant hereto are the same, and not in addition to, and this assignment shall not constitute multiple transfers of such interests by virtue of the recordation of this Assignment in more than one Parish.

DEBTORS' EX. NO. 5
1229 of 1570

      EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

<b><u>ASSIGNOR:</u></b>

**WITNESSES:**

[●]

_____  By: _____
Name: _____  Name:  [●]
                                   Title:   [●]

_____
Name: _____


<b><u>ASSIGNEE:</u></b>

**WITNESSES:**

[●]

_____  By: _____
Name: _____  Name:  [●]
                                   Title:   [●]

_____
Name: _____

3

STATE OF [●]                              §

COUNTY OF [●]                      §

      On this ____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

STATE OF [●]                              §

COUNTY OF [●]                      §

      On this ____ day of _____, [●], before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is [●] of [●], a [●] [●], and that the instrument was signed on behalf of said company and that [he/she] acknowledged the instrument to be the free act and deed of the company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

4

**EXHIBIT A**

**THE LEASE**

DEBTORS' EX. NO. 5
1232 of 1570

**Exhibit 14**

**Farmout Agreement**

## FARMOUT AGREEMENT

This Farmout Agreement ("**Agreement**") dated as of [_____], 2021 ("**Execution Date**"), but effective as of the Effective Date, is by and among [Fieldwood Energy I LLC, a Texas limited liability company, and GOM Shelf LLC, a Delaware limited liability company] (collectively "**Owner**") and [Fieldwood Energy II LLC, a Texas limited liability company] ("**Fieldwood II**"). Owner and Fieldwood II may each be referred to herein as a "**Party**" and collectively as the "**Parties**".

### W I T N E S S E T H

WHEREAS, Fieldwood II desires to farm into the development of, operation of, and production of hydrocarbons from the Development Area, subject to the terms and conditions set forth herein; and

WHEREAS, Owner and Fieldwood II desire to set forth their agreements regarding their joint participation in the development of, operation of, and production of hydrocarbons from the Development Area.

NOW, THEREFORE, in consideration of the mutual benefits to each Party, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE I.
### DEFINITIONS

**Section 1.1.**   **Defined Terms**.   As used in this Agreement, each of the following terms is defined below:

"**Abandonment Notice**" is defined in <u>Section 4.10(a)</u>.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Owner shall not be deemed an Affiliate of Fieldwood II, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" is defined in the preamble above.

"**Apache**" means Apache Corporation, a Delaware corporation, and/or its designated Affiliate that is a predecessor of Owner in the chain of title of any applicable property of Owner.

"**Base Assignment Form**" is defined in <u>Section 4.5(b)</u>.

Error! Unknown document property name.

"**BOEM**" means the Bureau of Ocean Energy Management of the United States Department of the Interior, and any successor Governmental Authorities thereto.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Houston, Texas.

"**Capital Development Project**" means either a (i) Rework or Recompletion Project or (ii) a Sidetrack, Bypass, Or Deepening Project.

"**Capital Development Project Costs**" means any and all out-of-pocket costs and expenses incurred in developing, preparing for, and completing a Capital Development Project and conducting all other operations set forth in the applicable Proposal attributable to Owner Interests in the Project, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Commence(s)**" means (i) with respect to any Rework or Recompletion Project, the entry into the well using the equipment necessary to begin the operation to either rework or plug back the existing completion, as applicable, and (ii) with respect to a Sidetrack, Bypass, or Deepening Project or an Election Well, the commencement of actual drilling of new hole through the turning of a drill bit into the earth, in each case, with a rig, coiled tubing unit, or other equipment capable of completing the applicable Project.

"**Company Agreement**" means that certain Limited Liability Company Agreement of Fieldwood Energy I LLC, a Texas limited liability company, dated [•], 2021.

"**Decommissioning Agreement**" means that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC, as amended from time to time.

"**Development Area**" means the state submerged lands and Outer Continental Shelf blocks and acreage held by the leases set forth on Exhibit A.

"**Effective Date**" means [EMERGENCE DATE].

"**Election Period**" is defined in Section 4.1.

"**Election to Participate**" means the form presented by Fieldwood II to Owner with a Proposal pursuant to which Owner can elect to participate in a Proposal.

"**Election Well**" means a new well in the Development Area.

"**Election Well Costs**" means, subject to the terms of the applicable Operating Agreement, any and all out-of-pocket costs and expenses attributable to Owner Interests incurred in drilling, evaluating, completing, and equipping an Election Well to its Objective Depth and conducting all other operations set forth in the applicable Proposal, including, without limitation,

2

Error! Unknown document property name.

all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"**Evaluation Data**" means Seismic Data and other data and information relating to a Prospect Area or, if applicable, the Objective Formation(s) as to a Capital Development Project or an Election Well in the possession of Fieldwood II that was materially relied upon by Fieldwood II in the determination of the Prospect, including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (*e.g.*, migration, AVO, *etc.*).

"**Execution Date**" is defined in the preamble above.

"**Excess Net Profit**" means the Net Profit from a Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Agreement, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Fieldwood II, or another operator pursuant to Section 4.4, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"**Existing Burdens**" means the following, to the extent that Owner Interests are burdened by or subject to them as of the time a Proposal is made with respect to such Owner Interests:

(a)     Lessors' royalties (including, without limitation, sliding scale royalties and royalties measured by net profits), overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and similar burdens on or measured by production from or allocated to the proceeds thereof;

(b)     The terms of leases, unit agreements, pooling agreements, operating agreements, production sales contracts, areas of mutual interest or similar obligations entered into in the ordinary course of the oil and gas industry, and any other contracts, agreements, rights, and instruments applicable to the Owner Interests that are binding on Owner;

(c)     Preferential rights to purchase all or any portion of the Owner Interests;

(d)     Third Party consent requirements and similar restrictions that are applicable to any transfer of all or any portion of the Owner Interests; and

(e)     Rights of reassignment arising upon final intention to abandon or release the Owner Interests.

3

Notwithstanding anything herein to the contrary, as provided in Section 4.5(h), the term "Existing Burdens" when used in connection with an Election Well or the FWII Earned Interest shall not include the Trust NPIs.

"**Expert**" means Netherland, Sewell & Associates or such other reservoir engineering consultant as may be mutually agreed by the Parties or determined pursuant to Section 4.12.

"**Fieldwood II**" is defined in the preamble above.

"**Force Majeure**" means any event or circumstance or combination thereof beyond the reasonable control of the Party claiming to be impacted by such event or circumstance that prevents such Party from performing its obligations under this Agreement, but only to the extent such Party is actually prevented or hindered from so performing, which events or circumstances include acts of God, fires, floods, hurricanes, storms, tornados, earthquakes, landslides, lightning, loop currents, washouts, epidemics, pandemics, or other natural disaster; arrests, restraints, actions, delays, or inaction of any Governmental Authority; strikes, lockouts, or other industrial disturbances; acts of the public enemy, wars, invasions, blockades, embargos, sanctions, sabotage, insurgency, terrorism, civil wars, civil disturbances, riots, malicious mischief, or insurrections of any kind; explosions; breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe; refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability or delays of a Party to obtain rights of way, necessary materials, supplies or permits not caused by the failure of the Party claiming to have been affected by Force Majeure to pay for or take diligent and prompt actions to obtain such rights of way, necessary materials, supplies, or permits; or labor strikes or work stoppages.

"**FWII Earned Interest**" means with respect to an Election Well (a) one hundred percent (100%) of Owner Interests (determined at the time the Election Well Proposal is made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in the Prospect Area associated with the Prospect to be developed by such Election Well until Fieldwood II has reached the Recovery Threshold relative to such Election Well, and reducing to (b) fifty percent (50%) of Owner Interests (determined at the time the Election Well Proposal was made, reduced by any burdens (except the Trust NPIs), reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Election Well Proposal was made) in such Prospect Area from and after that time at which Fieldwood II has reached the Recovery Threshold relative to such Election Well.  For the avoidance of doubt, Owner's working interest, for purposes of the foregoing calculations and otherwise, excludes (i) Owner Interests insofar as they relate to any other wells that are located within the applicable Prospect Area and in existence as of the time the Election Well Proposal is made, regardless of whether such other wells are then or may thereafter be completed within any Objective Formation in the Prospect Area and (ii) Owner's ORRI.

"**FWII NPI**" means, with respect to the production resulting from any Capital Development Project, a net profits interest equal to (i) 100% of the Excess Net Profit until Fieldwood II has reached the Recovery Threshold and (ii) from and after such time that Fieldwood II has reached the Recovery Threshold, fifty percent (50%) of the Excess Net Profit.

4

Error! Unknown document property name.

"**Governmental Authority**" means any federal, state, municipal, tribal, local, or similar governmental authority, regulatory or administrative agency, court or arbitral body, or any subdivision of any of the foregoing.

"**Law**" means any applicable statute, writ, law, rule, regulation, ordinance, order, judgment, injunction, award, determination, or decree of a Governmental Authority.

"**MCFD**" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60°F) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"**Net Profit**" means, with respect to production attributable to Owner Interests obtained as a result of a Capital Development Project, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the well that is the subject of the Capital Development Project during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such well, (3) all severance or other taxes measured or calculated based upon production from such well (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable to Owner's net revenue interest in the proceeds of production from the completion resulting from such Capital Development Project received for that applicable production month.

"**Objective Depth**" means, with respect to an Election Well, the depth that is sufficient to test the applicable Objective Formation(s), or the specific footage depth set forth in the Proposal, whichever is the greater depth, for such Election Well.

"**Objective Formation(s)**" means, with respect to an Election Well, the formations, intervals, or sands that are proposed to be tested, as set forth in the Proposal for such Election Well.

"**Operating Agreement**" means any Subject Operating Agreement or Third Party Operating Agreement.

"**Operating Costs**" has the meaning set forth in the definition of "Net Profits."

"**ORRI**" means, with respect to any FWII Earned Interest or any FWII NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the FWII Earned Interest or FWII NPI, as applicable and further proportionately reduced as the FWII Earned Interests or the FWII NPI may be reduced pursuant to the terms of this Agreement as a result of Fieldwood II achieving the Recovery Threshold with respect to any Project, which ORRI shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI for the completed interval that is the subject of the particular Capital Development Project is an Existing Burden

5

Error! Unknown document property name.

and, as a result, shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"**Owner**" is defined in the preamble above.

"**Owner Interests**" means, with respect to any Proposal and the Project to be carried out pursuant to such Proposal, the rights, title, and interests of Owner in the lands and leases in the applicable portion of the Development Area that is to be developed by such Project, determined as of the date such Proposal is made (reduced by any burdens, reversions, pay-outs, back-ins, or other contractual interests springing or arising after such time, but existing at the time such Proposal was made), and including the Owner's proportionate share of any non-consenting party's interest in the applicable Project that may be allocable to Owner under an applicable Third Party Operating Agreement for only so long as such interest is allocated to Owner in accordance with the terms of such Third Party Operating Agreement.

"**Owner Percentage**" means the difference between (i) the Owner Interests in a Prospect Area that is developed by an Election Well and (ii) the FWII Earned Interest.

"**P&A**" means the plugging, abandonment, and removal of any wells, facilities, platforms, pipelines, or other equipment and the restoration and remediation of the land and seabed in accordance with all applicable Laws and the terms and conditions of any applicable leases, contracts, and agreements, including the removal, surface and subsurface restoration, site clearance, and disposal of the wells, well cellars, fixtures, platforms, flowlines, pipelines, structures, and personal property located on or associated with assets and properties and the lands burdened thereby, the flushing, pickling, burial, removal, or capping of all associated flowlines, field transmission and gathering lines, pipelines, pit closures, the restoration of the surface and seabed, site clearance, and any disposal of related waste materials and hazardous substances.

"**P&A Costs**" means the costs and expenses to conduct P&A.

"**P&A Well**" is defined in Section 4.10(a).

"**Party**" or "**Parties**" is defined in the preamble above.

"**Permitted Encumbrances**" means the following:

(a)     The Existing Burdens;

(b)     Liens for current taxes or assessments not yet delinquent or, if delinquent, being contested in good faith by appropriate actions diligently pursued;

(c)     Materialmen's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law) or if delinquent, being contested in good faith by appropriate actions diligently pursued;

6

Error! Unknown document property name.

(d)      All rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the transfer of the Owner Interests;

(e)      All rights reserved to or vested in any Governmental Authorities to control or regulate any of the Development Area in any manner and all obligations and duties under all applicable Laws, rules, and orders of any such Governmental Authorities or under any franchise, grant, license or permit issued by any such Governmental Authorities; and

(f)      Easements, rights-of-way, servitudes, and permits or other burdens or encumbrances that individually or in the aggregate would not be reasonably likely to materially detract from the value of or materially interfere with the use, development, operation or ownership of the Development Area subject thereto or affected thereby.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"**Pre-Existing Net Profit**" means the forecast of Net Profit that would have been realized over the applicable period in which Excess Net Profit is being calculated if the Capital Development Project had not been undertaken, as such forecast is agreed upon by and between the Parties using the forward strip pricing for crude oil and natural gas as provided by NYMEX as of the date the Proposal for such Capital Development Project was delivered to Owner. If, after ten (10) Business Days following the expiration of the Election Period applicable to a Capital Development Project, the Parties have not yet agreed on the Pre-Existing Net Profit for the well that is the subject of such Capital Development Project, then either Party may submit the determination of such Pre-Existing Net Profit to the Expert pursuant to Section 4.12 below.

"**Project**" means either an Election Well or a Capital Development Project, as applicable.

"**Project Notice**" is defined in Section 3.2.

"**Project Security**" means security, in form and amount reasonably acceptable to Owner (with Apache's reasonable consent), to cover Fieldwood II's obligations and liabilities hereunder associated with (i) with respect to an Election Well, Owner's share of the P&A obligations and liabilities, including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party, for such Election Well and (ii) with respect to a Sidetrack, Bypass, or Deepening Project, the well that is sidetracked, bypassed, or deepened, including, without limitation, Owner's share of incremental P&A obligations and liabilities (including P&A Costs, environmental liability, obligations, or liabilities owed to any vendors, co-owners, Governmental Authorities, or Third Party) for such sidetrack, bypass, or deepening well.

"**Proposal**" means a proposal to drill, evaluate, complete, and equip an Election Well or undertake a Capital Development Project, as the case may be, proposed by Fieldwood II to the Owner on lands or facilities in the Development Area. For the avoidance of doubt, a Proposal may not include more than one Election Well or one proposed completion or recompletion of an existing well, as applicable.

7

Error! Unknown document property name.

"**Prospect**" means a geologic structural or stratigraphic trap located within any Development Area that is believed to have the potential for accumulations of hydrocarbons, to the extent such Development Area also covers or includes such geologic structure or stratigraphic trap.

"**Prospect Area**" is defined in Section 4.5(a).

"**Recovery Threshold**" means, with respect to a Capital Development Project, Fieldwood II's recovery from the Net Profit it receives attributable to such project of an amount equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Fieldwood II in performing the relevant Project and, with respect to an Election Well, Fieldwood II's recovery from the FWII Earned Interest it receives attributable to such well of an amount equal to one hundred percent (100%) of the Election Well Costs incurred by Fieldwood II in performing the relevant Project.

"**Representatives**" means a Person's directors, officers, partners, members, managers, employees, agents, investors, or advisors (including attorneys, accountants, consultants, bankers, and financial advisors) and any representatives of those advisors, and, in the case of Owner, expressly includes its contractor providing contract operating services for Owner together with such contractor's employees, agents, and representatives.

"**Revenue**" has the meaning set forth in the definition of "Net Profits."

"**Rework or Recompletion Project**" means a development operation on an existing well in the Development Area to either (i) work-over the then-current completion in such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or extend the productive life of such completion or (ii) plug and abandon the then-current completion in such existing well and recomplete the well at a shallower interval.

"**Seismic Data**" means any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shot hole drilling information, digital shot point locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing or other like information customarily used in connection with oil and/or gas exploration.

"**Sidetrack, Bypass, or Deepening Project**" means a development operation on an existing well in the Development Area to plug and abandon the then-current completion and conduct sidetracking, bypassing, or deepening operations on such existing well in an effort to increase or resume production, cause such well to produce in paying quantities, increase production or reserves, or to extend the productive life of such well.

"**Subject Operating Agreement**" is defined in Section 4.5(a).

"**Technical Review Meeting**" is defined in Section 3.2(b).

8

Error! Unknown document property name.

"**Term**" is defined in Section 2.1.

"**Third Party**" means any Person that is not a Party or any Affiliate of any Party.

"**Third Party Operating Agreement**" is defined in Section 4.5(c).

"**Transaction Documents**" means this Agreement, the TSA, and each other agreement, document, certificate, or instrument delivered pursuant hereto or thereto.

"**Trust A NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

"**Trust A-1 NPI**" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"**Trust NPIs**" means the Trust A NPI and the Trust A-1 NPI, collectively.

"**TSA**" means that certain Transition Services Agreement by and among the Parties dated [•], 2020.

"**Well Data**" means any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports), and any related reports filed with the BOEM.

**Section 1.2.    Exhibits.**  The following exhibits are incorporated herein and made a part hereof:

Exhibit A        Development Area (Including Oil and Gas Leases)

Exhibit B        Form of Net Profits Interest Assignment

Exhibit C        Form of Election Well Assignment

Exhibit D        Form of Operating Agreement

9

**Error! Unknown document property name.**

## ARTICLE II.
## TERM

**Section 2.1.    Term**.    This Agreement shall be effective for a period commencing on the Effective Date and expiring upon the earlier to occur of (i) the date two (2) years after the Effective Date, and (ii), as to each lease, the expiration of such lease comprising a part of the Development Area (including any and all renewals, replacements, and extensions of such lease) (the "**Term**").

**Section 2.2.    Effect of Termination**.    After the expiration of the Term, this Agreement shall terminate and be of no further force and effect; provided, however, that (i) the provisions of this Section 2.2 and Sections 3.2(d), 3.3, 4.8, 4.11, 5.3, 5.4, 5.5, and 5.14, the proviso in the third sentence of Section 3.2(a) and the last sentence of Section 4.5(g), and (ii) any and all rights, obligations and remedies hereunder that have accrued on or prior to the expiration of the Term of this Agreement, shall survive the termination of this Agreement indefinitely; and, provided, further, that any rights, obligations, and remedies in any Transaction Document that by their nature are intended to survive termination or expiration of this Agreement shall so survive. Notwithstanding anything herein to the contrary, termination of this Agreement will not affect the rights of Fieldwood II hereunder to any Proposals presented to Owner before the end of the Term.

## ARTICLE III.
## PROSPECT GENERATION

**Section 3.1.    Evaluation of Possible Prospect.**    To assist Fieldwood II in its evaluation of the Development Area, Owner will exercise reasonable efforts to provide Fieldwood II with access to all materials either in its possession or those materials which it is entitled to review regarding the Development Area, including any Evaluation Data, but only to the extent Fieldwood II is permitted to view such materials pursuant to any contract or agreement to which such materials may be subject.  In the event that Fieldwood II desires to present a Proposal, it shall provide a notice to Owner as set forth below.

**Section 3.2.    Notice of Prospects or Capital Development Project**.

(a)    Notice.  With respect to any Proposal being made by Fieldwood II, Fieldwood II shall provide a written notice to the Owner (a "**Project Notice**"), which shall include the following information:

(i)    a description of the Proposal in reasonable detail (including, if such Proposal relates to an Election Well, all potentially productive zones, the proposed Objective Depths, the proposed Objective Formations, together with descriptions of the Prospect(s) and the associated Prospect Area(s));

(ii)    a good faith, preliminary estimate of Capital Development Project Costs or the Election Well Costs, as the case may be;

10

Error! Unknown document property name.

(iii)    a good faith, preliminary estimate of any and all P&A Costs for a Sidetrack, Bypass or Deepening or Election Well, as the case may be, and

(iv)    an Election to Participate.

For the avoidance of doubt, the following shall be void and deemed automatically withdrawn by Fieldwood II: (i) Proposals for which Owner does not have the requisite authority, under the applicable Operating Agreement, to make such Proposal and (ii) Proposals that conflict with any ongoing, approved, or previously proposed operations under any applicable Operating Agreement.  If Owner receives a Proposal for a Capital Development Project to be performed on a well which Owner either (A) desires to continue producing from its then-current completion or (B) desires to conduct an operation that is in conflict with the Capital Development Project proposed by Fieldwood II, Owner may, on or before the expiration of the Election Period for such Proposal, send written notice to Fieldwood II that it rejects the Proposal pursuant to the foregoing grounds, in which case the applicable Proposal shall be deemed to have been withdrawn and void; *provided* that if Owner rejects such a Proposal and undertakes or agrees to participate in the Project that was the subject of such rejected Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such opportunity on the same terms as set forth in the original Proposal and this Agreement.  If, after diligent efforts, Fieldwood II or the Parties are unable to proceed with the operations contemplated under a Proposal because of conflicts with existing operating agreements (or other restrictions affecting the applicable Owner Interests) that existed as of the time the Proposal was made, either Party may send notice to the other Party terminating the affected Proposal.  For the avoidance of doubt, the Parties recognize and agree that nothing in this Agreement shall prevent an Owner from conducting any projects, operations, or activities or from participating in projects, operations, or activities that may be proposed or offered by a Third Party or from entering into any agreements or contracts, including, without limitation, farmouts, sales, or assignments, affecting the Owner Interests, in all cases, without any obligation to offer Fieldwood II the opportunity to participate in any such project, operations, or activities or to obtain the consent of Fieldwood II, unless (x) any such project, operations, or activities were proposed by Fieldwood II under a Proposal received by Owner prior to such Owner's receipt of the proposal from a Third Party and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

(b)    <u>Technical Review Meeting</u>.  Fieldwood II will present the Proposal and all related Evaluation Data to the Owner and to Apache (for purposes of obtaining its consent) at an in-person meeting at the offices of Fieldwood II (a "**Technical Review Meeting**") to be held on a mutually agreed Business Day during Fieldwood II's normal business hours no later than ten (10) Business Days after delivery of the applicable Project Notice.  At either Party's request, the meeting may be held online via technology that allows a Party to share screens with the other Party and Apache, such as Zoom, Skype, WebEx, or Microsoft Teams.  Each Party shall use reasonable efforts to ensure that the Technical Review Meeting is attended by a reasonably sufficient number of technical representatives of such Party and, in the case of Owner, Apache, who are familiar with and capable of presenting and/or discussing the Proposal with the other Party and Apache.

11

Error! Unknown document property name.

(c)     _Access to Evaluation Data_.  Until the end of the Election Period, Fieldwood II shall make Evaluation Data with respect to a Proposal available for review and evaluation by the Owner, at the Owner's expense, in Fieldwood II's offices during Fieldwood II's normal business hours or available through a virtual data room or similar electronic platform. Likewise, Owner will provide Fieldwood II with reasonable access to any Evaluation Data in its possession with respect to a Proposal, including but not limited to well files, logs, and data. Notwithstanding the foregoing, neither Party shall be obligated to disclose such Evaluation Data when such disclosure would violate any Third Party contract or agreement binding on a Party or applicable to such Evaluation Data.

(d)     _Confidentiality_.  Each Party shall, and shall cause its Affiliates and its and their respective Representatives (and Owner shall cause Apache) to, keep the Proposals, all Evaluation Data, Well Data, and Seismic Data of the other Party, information relating to the Proposal and information from the Technical Review Meeting, to the extent prepared by or received from the other Parties, strictly confidential, and no Party or any of its Affiliates or any of its or their respective Representatives shall disclose such Proposals, Evaluation Data, Well Data, or Seismic Data, information relating to the Proposal, or information from the Technical Review Meeting to any Third Party other than Apache or except as required under a Third Party Operating Agreement.  With respect to Evaluation Data, Well Data, and Seismic Data, these disclosure restrictions shall terminate upon the later to occur of (i) two years after the date on which the Technical Review Meeting took place with respect to the applicable Proposal and (ii) the date on which such Evaluation Data, Well Data, or Seismic Data, as applicable, is no longer subject to disclosure restrictions under an agreement or contract with a Third Party.  With respect to the Proposal itself, these disclosure restrictions shall terminate upon the later to occur of (x) the date on which the Project that is the subject of such Proposal is Commenced and (y) that date on which such Proposal terminates, is withdrawn, or is deemed to have been withdrawn.

**Section 3.3.   Waiver of Liability with Respect to Evaluation Data**.  The information included in a Project Notice and any other Evaluation Data or Well Data furnished by Fieldwood II or Owner, as applicable, pursuant to this Agreement shall be provided for informational purposes only.  Each Party is responsible for and shall make its own decisions with respect to Evaluation Data, Well Data, or the opinions or analysis of the other Party that may be provided. (A) FIELDWOOD II DOES NOT MAKE, AND THE OWNER WAIVES AND REPRESENTS AND WARRANTS THAT OWNER HAS NOT AND WILL NOT RELY UPON, AND (B) OWNER DOES NOT MAKE, AND FIELDWOOD II WAIVES AND REPRESENTS AND WARRANTS THAT FIELDWOOD II HAS NOT AND WILL NOT RELY UPON: ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT OR ANY OTHER INSTRUMENT, AGREEMENT, OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE EVALUATION DATA, WELL DATA, OR ANY OTHER OPINION OR ANALYSIS THAT MAY BE PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (I) THE CONTENTS, CHARACTER, OR NATURE OF ANY DESCRIPTIVE SUMMARY, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL DATA, SEISMIC DATA, WELL DATA, EVALUATION DATA, RESERVE DATA, RESERVE REPORTS, RESERVE

12

Error! Unknown document property name.

INFORMATION (AND ANY ANALYSIS OR INTERPRETATION OF ANY OF THE FOREGOING) RELATING TO ANY SEISMIC DATA OR EVALUATION DATA OR ANY OF THE PROPOSALS, (II) THE QUANTITY, QUALITY, OR RECOVERABILITY OF HYDROCARBONS IN OR FROM ANY PROPOSAL, (III) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM ANY PROPOSAL, OR ANY PRODUCTION OR DECLINE RATES, OR (IV) ANY OTHER RECORD, FILES, MATERIALS, OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT MAY HAVE BEEN MADE AVAILABLE, DELIVERED, OR COMMUNICATED TO THE OTHER PARTY IN CONNECTION WITH THE REVIEW AND EVALUATION OF THE SEISMIC DATA, WELL DATA, OR EVALUATION DATA PURSUANT TO THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL LIMIT ANY PARTY'S RIGHTS OR REMEDIES PURSUANT TO ANY OTHER AGREEMENT BETWEEN THE PARTIES OTHER THAN THIS AGREEMENT OR PURSUANT TO ANY INSTRUMENT OR AGREEMENT DELIVERED PURSUANT TO THIS AGREEMENT.

## ARTICLE IV.
## JOINT DEVELOPMENT OPERATIONS

**Section 4.1.     Election to Participate**.  The Owner may elect to participate in a valid Proposal by delivering its written Election to Participate to Fieldwood II no later than 5:00 p.m. in Houston, Texas on the first Business Day that is on or after the date thirty (30) days after the Business Day the Owner received the applicable Project Notice (the "**Election Period**"). The failure of Owner to make a timely written election to participate in a valid Proposal by the expiration of the Election Period shall be deemed to be Owner's election not to participate in such Proposal.  If the Owner delivers to Fieldwood II prior to the expiration of the applicable Election Period a valid written Election to Participate, then, subject to the terms of any applicable Third Party Operating Agreement and the terms and conditions of this Agreement, such election shall constitute a valid and binding obligation of the Parties to participate in the operations set forth in such Proposal upon the terms of this Agreement.

**Section 4.2.     Rework or Recompletion Projects.**     If the Proposal is for a Rework or Recompletion Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Rework or Recompletion Project at its sole risk and expense only after the Pre-Existing Net Profit relating to such Rework or Recompletion Project has been determined either by agreement of the Parties or by the Expert.  In such event (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Rework or Recompletion Project and attributable to Owner Interests and (ii) upon completing the Rework or Recompletion Project as a successful completion, Fieldwood will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Rework or Recompletion Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%).  The assignment of the FWII NPI to Fieldwood II pursuant to this Section 4.2 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner

13

**Error! Unknown document property name.**

hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, (i) upon completion of the Rework or Recompletion Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project and attributable to Owner Interests and (ii) if the Rework or Recompletion Project results in a dry hole or if Fieldwood II does not reach the Recovery Threshold relative to a Rework or Recompletion Project, Fieldwood II shall be solely responsible for any loss it incurred as a result of conducting such Project and shall have no right of recovery or recourse against Owner relative to such loss; provided that Fieldwood II shall not be responsible for paying for or conducting P&A activities on such well, except that, in the event of a dry hole or unsuccessful completion attempt, prior to removing any equipment used to conduct the applicable Rework or Recompletion Project, Fieldwood II shall, at its sole cost and expense, take such additional actions as are necessary to leave the well in a condition that will not require Owner to take additional actions or perform any additional operations on such well in order to leave the well in a satisfactory condition under then-current regulations. For the avoidance of doubt, for the purpose of this Section 4.2, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.3.    Sidetrack, Bypass, or Deepening Project.**    If the Proposal is for a Sidetrack, Bypass, or Deepening Project and Owner does not reject such Proposal as contemplated under Section 3.2(a) then Fieldwood II may proceed with the Sidetrack, Bypass, or Deepening Project at its sole risk and expense; provided, however, that before it may proceed with such Proposal, within thirty (30) days of the expiration of the Election Period, (a) Fieldwood II must provide Owner with Project Security for the operations contemplated under such Proposal and (b) the Pre-Existing Net Profit relating to such Sidetrack, Bypass, or Deepening Project shall have been determined either by agreement of the Parties or by the Expert.  If Fieldwood II fails to timely provide Owner with Project Security with respect to any Proposal, then such Proposal shall automatically terminate and have no further or ongoing force or effect and shall be deemed to have been withdrawn by Fieldwood II; and, in such event, Fieldwood II may not proceed with the Project contemplated under the applicable Proposal.  In the event Fieldwood II proceeds with a Sidetrack, Bypass, or Deepening Project as permitted herein, (i) Fieldwood II shall pay 100% of the Capital Development Project Costs associated with the Sidetrack, Bypass, or Deepening Project and attributable to Owner Interests, (ii) following the completion of the Sidetrack, Bypass, or Deepening Project as a successful completion, Fieldwood II will receive an assignment of the FWII NPI in a form substantially the same as Exhibit B attached hereto, reserving unto Owner the ORRI, (iii) except for P&A Costs as set forth below in clause (iv), upon either completion or termination of the Sidetrack, Bypass, or Deepening Project, Fieldwood II shall not be responsible for any expenses, costs, losses, or operations associated with the well that is the subject of such Project, and (iv) at such time as P&A work and activities are performed on the well that is the subject of such Sidetrack, Bypass, or Deepening Project, Fieldwood II shall pay to Owner fifty percent (50%) of Owner's share of the incremental P&A Costs, if any, incurred by the Sidetrack, Bypass, or Deepening Project.  Owner shall have the right to cash call Fieldwood II for its share of P&A Costs due hereunder; and, in such event, Fieldwood II shall pay Owner such cash called amounts within thirty (30) days of its receipt of such cash call request.  Owner shall promptly following completion of the P&A notify

14

Error! Unknown document property name.

Fieldwood II of the incremental costs incurred and reimburse Fieldwood II for any overpayment, if applicable. For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Sidetrack, Bypass, or Deepening Project, the FWII NPI will be reduced from one hundred percent (100%) to fifty percent (50%). The assignment of the NPI to Fieldwood II pursuant to this Section 4.3 shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) be subject to the ORRI reserved by Owner hereunder, and (4) be limited as further described in Section 4.9(a). For the avoidance of doubt, with respect to any Sidetrack, Bypass, or Deepening Project undertaken by Fieldwood II, (A) Owner shall have no liability or responsibility to Fieldwood II in the event Fieldwood II is unable to reach the Recovery Threshold relative to such Project, and (B) regardless of whether Fieldwood II reaches the Recovery Threshold relative to such Project, Fieldwood II shall be responsible for fifty percent (50%) of Owner's share of the incremental P&A Costs caused by the subject of the Sidetrack, Bypass, or Deepening Project. For the avoidance of doubt, for the purpose of this Section 4.3, so long as Owner does not reject such Proposal as contemplated under Section 3.2(a) and subject to the other terms of this Agreement, Fieldwood II may proceed with the activities contemplated in the Proposal regardless of whether Owner elects to participate.

**Section 4.4.**   **Fieldwood II Project Manager**.  In the event Fieldwood II is not the contract operator of an Owner Interest at the time of a Proposal or at the time a Capital Development Project is performed, Fieldwood II shall be the project manager on behalf of Owner for the operation, and Owner shall take reasonable actions necessary to cause the then current operator or contract operator to promptly proceed with the operations described in the Proposal at Fieldwood II's direction. In furtherance of such right of Fieldwood II to be the project manager for such operation, Owner, to the extent it has the ability to do so, hereby grants to Fieldwood II the following rights as the project manager: (i) the right to directly consult with, advise, and direct the then current operator or contract operator, as applicable, regarding such operation, provided that Owner's Representatives shall be included in any such consultations, (ii) access to all books, records, data, and information relating to such operation (including any daily or other periodic operations reports), provided that such access shall be subject to the same restrictions on access and disclosure as apply to Evaluation Data under Section 3.2, and (iii) access to all facilities relating to such operation subject to Fieldwood II's execution of a mutually agreeable boarding agreement. All reasonable out-of-pocket costs incurred by Fieldwood II in performing the foregoing activities as such project manager shall be included in the Capital Development Project Costs for the applicable Project.

**Section 4.5.**   **Election Well.**

(a)   Operating Agreement.  If the Proposal is for the drilling of an Election Well, then contemporaneously with Owner electing to participate in an Election Well, to the extent not in conflict with any existing Third Party Operating Agreements, the Parties shall execute and deliver to each other an operating agreement in substantially the form attached hereto as Exhibit D (each, a "**Subject Operating Agreement**") setting forth the Owner Percentage and FWII Earned Interest, and the "Contract Area" under such Subject Operating Agreement shall be limited to the Prospect Area to be assigned to Fieldwood II under this Section 4.5(a) if Fieldwood II were to become entitled to such assignment hereunder; provided, however, if

15

Error! Unknown document property name.

Fieldwood II does not earn the assignment to be made pursuant to Section 4.5(b) with respect to any Proposal for which the Parties have executed a Subject Operating Agreement, then such Subject Operating Agreement shall be deemed to have terminated, and the Parties shall take such further actions and execute such additional documents as may be necessary or appropriate to evidence the termination of such Operating Agreement.  With respect to each Prospect that may be the subject of a Proposal for an Election Well, the "**Prospect Area**" associated with any such Prospect shall be limited to (i) such area as may be reasonably developed and drained by such individual well without need for further development within the applicable Prospect Area and (ii) depths from the top of shallowest Objective Formation tested by such Election Well down to the stratigraphic equivalent of one hundred (100) feet below the base of the deepest Objective Formation tested by such Election Well from which production is commenced within two (2) years after spudding such Election Well.

(b)     _Owner Participation_. If Owner elects to participate in an Election Well, then Fieldwood II shall provide Owner with Project Security for the Election Well, and then, only after providing Owner with such Project Security, may proceed with the Election Well at its sole risk and expense.  In such event, (i) Fieldwood II (A) shall pay 100% of the Election Well Costs associated with the Election Well and attributable to Owner Interests and (B) upon completing the Election Well as a successful completion, will receive an assignment of the FWII Earned Interest applicable to such Election Well in a form substantially the same as Exhibit C attached hereto (the "**Base Assignment Form**"), subject to Section 4.9(c), and shall receive the FWII Earned Interest share of Revenue and bear the FWII Earned Interests share of Operating Costs relative to the Project until Fieldwood II has reached the Recovery Threshold relative to such Project, and (ii) thereafter, the ongoing Revenue and Operating Costs, and including P&A Costs, associated with the Project shall be received and borne by the Parties in accordance with the Owner Percentage and FWII Earned Interest, provided that Owner shall not bear any portion of the ORRI or the Operating Costs incurred prior to Fieldwood II reaching the Recovery Threshold.  For the avoidance of doubt, at such time as Fieldwood II has reached the Recovery Threshold for such applicable Election Well, the FWII Earned Interest will be reduced from one hundred percent (100%) of the applicable Owner Interests to fifty percent (50%) of such Owner Interests, in each case still subject to the ORRI.  The assignment of the FW II Earned Interest to Fieldwood II pursuant to this Section 4.5(b) shall: (1) be subject to this Agreement, (2) be "as-is," without warranties of any kind, and expressly subject to all agreements and matters of record, and Permitted Encumbrances, (3) reserve unto Owner the ORRI, and (4) convey the applicable FWII Earned Interest as further described in Section 4.9(b).  For the avoidance of doubt, if the Election Well is a dry hole or results in a completion for which Fieldwood does not reach the Recovery Threshold, then Fieldwood II shall be solely responsible for bearing such loss and for performing the P&A associated with Owner Interests in such well, including paying all such associated P&A Costs.

(c)     _Third Party Operating Agreements_.   During the Term, in the event that any Prospect Area is subject to any existing operating agreement other than a Subject Operating Agreement (each a "**Third Party Operating Agreement**"), then the terms of such Third Party Operating Agreement shall govern and control.  In the event the Prospect Area for a Proposal is subject to a Third Party Operating Agreement, Owner agrees to take such reasonable actions as may be required by the terms of such agreement to propose the Proposal to the other parties to

16

Error! Unknown document property name.

such agreement; provided, that Fieldwood II shall assist Owner in taking such actions as may reasonably be requested by Owner.

(d)     Operating Agreement Conflicts.    To the extent that the provisions of this Agreement conflict with the provisions of any Third Party Operating Agreement, then solely between the Parties, the provisions of this Agreement shall govern and control, *mutatis mutandis*; provided, however, upon commencement of any Election Well, the provisions of any applicable Operating Agreement shall govern all further elections and operations with respect to such Election Well and any subsequent operations within a Prospect Area.

(e)     Operator Designation.   To the extent permitted by applicable Law and subject to the terms of any Third Party Operating Agreement, upon written request of Owner (with the consent of Apache acting reasonably) for each Prospect Area associated with an Election Well pursuant to which Fieldwood II earns a FWII Earned Interest, Fieldwood II shall be designated and assume the responsibilities of operator of each such Prospect Area. In such event, Owner agrees to take reasonable actions in assisting Fieldwood II in having all co-owners of such Prospect Area agree to such designation and to execute the required documentation for such designation.

(f)     Existing Facilities.    Subject to (i) the terms of any applicable Third Party Operating Agreement and applicable Law and (ii) the condition of the applicable facilities and any operations then being conducted thereon, to the extent Owner has the ability to grant Fieldwood II such rights, Fieldwood II shall be entitled to access and use existing facilities owned by Owner to the extent necessary to drill, evaluate, complete, equip, and produce any Election Well, free of costs except Third Party costs and the fees described in Section 4.11 (which costs shall be Election Well Costs), and Owner shall take commercially reasonable actions to help facilitate Fieldwood II's right to access such facilities.  In so accessing any of Owner's facilities, Fieldwood II shall execute and deliver to Owner a boarding agreement or such other instrument as may be reasonably required by Owner in its reasonable discretion to permit Fieldwood II's access to such facilities and to allocate risks associated with Fieldwood II's operations on such facilities.

(g)     Elections Not to Participate.   Notwithstanding anything herein to the contrary, if the Proposal is to drill an Election Well and Owner does not elect to participate within the Election Period, then the Proposal shall expire, and neither Party shall have any obligation to the other with respect to the Proposal and Fieldwood II shall have no right to proceed with drilling the Election Well.  If Owner or its successors or assigns undertake to drill the Election Well described in the Proposal within two (2) years after expiration of the Election Period for such Proposal, then Owner shall offer Fieldwood II the right (exercisable for a period of 30 days) to participate in such Election Well on the same terms as set forth in the original Proposal and this Agreement.

(h)     Trust NPIs.   The Parties recognize and agree that this Agreement constitutes a "Farmout Agreement" under Section 7.4 of the Decommissioning Agreement with respect to Election Wells and the FWII Earned Interests earned by Fieldwood II.  As a result, the FWII

17

Error! Unknown document property name.

Earned Interests to be transferred to Fieldwood II pursuant to Section 4.5(b) shall be transferred free and clear of the Trust NPIs.

**Section 4.6.    Withdrawal or Termination of Proposals.**

(a)    Subject to any applicable Third Party Operating Agreement, Fieldwood II may withdraw a Proposal at any time prior to the mobilization of materials and equipment toward the commencement of operations under the Proposal.  If a Proposal is withdrawn by Fieldwood II or deemed to have been withdrawn as provided in this Agreement, then all terms of this Agreement shall be interpreted as if such Proposal was never made.

(b)    Notwithstanding Section 4.6(a), with respect to any Project for which Fieldwood II has the right to proceed hereunder, the Proposal for such Project shall be deemed to have automatically terminated and been withdrawn if Fieldwood II does not (i) Commence the applicable Project within one hundred twenty (120) days (excluding any extension expressly agreed to in writing by the Parties) following Fieldwood II's making of such Proposal and (ii) thereafter diligently and continuously perform such Project until completed, subject to extensions of the foregoing time period to the extent Fieldwood II is prevented from either Commencing or performing such Project by events of Force Majeure; provided that Fieldwood II shall make reasonably diligent efforts to overcome such events of Force Majeure.  In the event any Project is deemed terminated or withdrawn, Owner shall promptly return to Fieldwood II any Project Security it provided to Owner under this Agreement in connection with such Proposal.

(c)    If a Proposal is terminated pursuant to Section 4.6(b) as a result of Fieldwood II's failure to timely Commence performance of a Project, then (i) the applicable Owner may elect to conduct the Project that was the subject of such Proposal without any obligation to offer Fieldwood II the opportunity to participate in such Project notwithstanding any term in this Agreement to the contrary and (ii) if Owner has not so elected and Fieldwood II desires to conduct the Project that was the subject of such terminated Proposal, it must resubmit a new Proposal for such Project which shall be subject to the terms of this Agreement in all respects.

**Section 4.7.    Project Security.**  With respect to any Project for which Fieldwood II has provided Owner with Project Security hereunder, upon the occurrence of the Recovery Threshold for such Project, the Owner agrees that the principal amount of such Project Security shall be proportionately reduced in an amount corresponding to the reduction of Fieldwood II's responsibility for costs and expenses attributable to such Project including the reduction of its P&A obligations; and the Parties agree to execute such instruments or take such other actions as may be reasonably necessary to evidence such reduction.

**Section 4.8.    Liability for Operations.**

**(a)    With respect to any operations conducted by Fieldwood II or its contractors on any Capital Development Project or Election Well, as between Owners and Fieldwood II, Fieldwood II shall be solely responsible and liable for, and shall fully indemnify, defend, and hold harmless Owners, their affiliated and subsidiary companies, contractors (other than Fieldwood II), representatives, and consultants, and all of their respective**

18

Error! Unknown document property name.

**officers, directors, and employees, from and against any and all claims, demands, suits, causes of action, judgments, fines, penalties, or orders relating to or arising out of the operations so conducted by Fieldwood II or its contractors, including, without limitation, incidents of non-compliance, civil penalties, personal injuries, property damage, or pollution, without regard to the negligence (whether sole, joint, or concurrent, or active or passive), strict liability, or other fault of the foregoing indemnified Persons, <u>except to the extent resulting from the gross negligence or willful misconduct of any of the foregoing indemnified Persons.</u>**

(b)     **Notwithstanding anything herein to the contrary, in no event shall Fieldwood II be liable for any damages or claims arising in whole or in part from its failure or inability to reach the Objective Depths or Objective Formations.**

**Section 4.9.     <u>Assignments</u>.**

(a)     <u>NPI Assignments</u>.  If Fieldwood II is entitled to receive an assignment of a FWII NPI in connection with any Capital Development Project, such assignment shall be limited to the interval completed or worked over as a result of such operation.

(b)     <u>Election Well Assignments</u>.  If Fieldwood II is entitled to receive an assignment from Owner in connection with any Proposal for an Election Well, such assignment shall, subject to Section 4.9(c) below, be limited to the applicable oil and gas lease(s) insofar as it pertains to each Prospect Area that is developed by the Election Well and the depths as specified in Section 4.5(a) above.

(c)     <u>BOEM Assignments</u>.  To the extent any Prospect Area in which Fieldwood II earns an assignment of the FWII Earned Interest hereunder covers all or a part of one or more aliquots in which BOEM would recognize Fieldwood II's ownership, then in conjunction with the assignment of the FWII Earned Interest and notwithstanding the Base Assignment Form, the Parties agree to execute and file appropriate BOEM-0150 forms from the pertinent Owner to Fieldwood II and covering fifty percent (50%) of Owner's BOEM recognized operating rights in and to such aliquot(s) from the surface to one hundred feet (100') below the deepest depth drilled of the applicable Election Well (utilizing the Base Assignment Form attached as Exhibit A thereto) ("***BOEM OR Assignments***").  In such event, the Parties recognize and agree that such BOEM OR Assignments must be filed with BOEM or such other required Governmental Authorities.  In the event any such Governmental Authorities fail to accept or approve any such BOEM OR Assignments, the Parties will fully cooperate in the development of an assignment and any other filings or instruments that will comply with the requirements of such Governmental Authority's filing and approval procedures (or such other filing procedures as may be hereafter promulgated) or as will accomplish the intent of this Agreement, together with assignments to be filed in the adjacent county or parish records reasonably necessary to give effect to the intent of this Agreement and provide Third Parties with notice of any such assignments.  Notwithstanding the foregoing, if, as a result of circumstances beyond the reasonable control of Owner and Fieldwood II, the assignment will not be approved by BOEM, the Parties will file the BOEM OR Assignment in the non-required records maintained by BOEM for the applicable lease or leases.

19

Error! Unknown document property name.

(d)   ORRI.  It is understood and agreed that the ORRI reserved by the applicable Owner under any certain assignment made pursuant to the terms of this Agreement shall apply to all renewals, extensions, and other similar arrangements (and/or interests therein) of the applicable subject lease(s). Only a new lease taken by Fieldwood II, its successors or assigns, within one (1) year after expiration or release of a such applicable subject lease and which covers the same lands, shall be considered a renewal or extension for the purposes hereof.

**Section 4.10.   Rights upon Abandonment of Certain Wells**.

(a)   Abandonment Notice.   Subject to the terms of all applicable Third Party Operating Agreements, in the event that Owner and/or the other joint owners in any of the Owner Interests, if any, desire to permanently plug and abandon a well in the Development Area that was producing on the Execution Date (each a "**P&A Well**"), Owner (or, if the TSA is then in effect, Fieldwood II) shall provide Fieldwood II, no later than the earlier of (A) fifteen (15) days prior to the election deadline set forth in the applicable Third Party Operating Agreement, if any, for which the Owner must elect whether to permanently plug and abandon such well and (B) one hundred and twenty (120) days prior to the commencement of such plugging, abandonment, dismantling, or decommissioning, a written notice to Fieldwood II (with a copy to Owner and Apache) ("**Abandonment Notice**") that identifies such P&A Well and, if there are no other then-completed wells within such applicable aliquot, the leasehold interests in the aliquot within which such P&A Well is then completed and for which BOEM would recognize an assignment of such interest to Fieldwood II (the "**P&A Leasehold**"); provided that if the TSA is then in effect or if Fieldwood II or its Affiliate is then the contract service provider to Owners, Owners shall not be obligated to provide any such Abandonment Notice to Fieldwood II.  Notwithstanding anything herein to the contrary, Owners shall have no liability or obligations to Fieldwood II as a result of the failure to provide Fieldwood II with any Abandonment Notice.

(b)   Right to Acquire P&A Well.   Subject to the terms of any Third Party Operating Agreement, Fieldwood II may elect to acquire all or any P&A Well and the corresponding P&A Leasehold, if any, by delivering a written election to acquire same no later than ten (10) days after Fieldwood II's receipt of an Abandonment Notice.  If Fieldwood II fails to deliver a written election to acquire any P&A Well prior to or on the date ten (10) days after receipt of an Abandonment Notice, such failure shall be deemed an election not to acquire any such P&A Well.  Notwithstanding anything in this Agreement to the contrary, Fieldwood II's election to acquire any P&A Well may be accepted or rejected by Owner in Owner's sole discretion.

(c)   Effect of Exercise.   If Fieldwood II validly elects to acquire any P&A Well and the corresponding P&A Leasehold, if any, such election shall constitute a binding obligation of Fieldwood II to acquire Owner Interests in same no later than the later of (i) sixty (60) days after Fieldwood II's election or (ii) the date Fieldwood II obtains all applicable pre-assignment approvals, qualifications, right of use easements, and permits required under applicable Laws and contracts to acquire and operate (if applicable) such P&A Well and P&A Leasehold, if any.  Owner and Fieldwood II shall execute and deliver to Fieldwood II such forms and instruments reasonably requested by Fieldwood II or Owner, including an assignment in form mutually agreeable to the Parties; provided, however, that the P&A Well and P&A Leasehold, if any,

20

Error! Unknown document property name.

shall be assigned subject to this Agreement, "as-is" and without warranties of any kind, and expressly subject to all agreements and matters of record and all existing encumbrances. In consideration for such assignment, Fieldwood II shall assume, and perform and indemnify, defend, and hold harmless Owner, from the P&A Costs with respect to such P&A Well and P&A Leasehold, if any; however, Owner shall retain liability for and indemnify, defend, and hold harmless Fieldwood II for all other obligations related to the time period prior to the assignment. In connection with delivery of the assignment hereunder, at the sole cost and expense of Fieldwood II, the Owner shall deliver to, or cause to be delivered to, Fieldwood II all Well Data and all other records and information in its possession with respect to the P&A Well in a manner reasonably agreed to by the Parties. Owner shall cooperate with Fieldwood II to execute any assignment, designation of operator, or any other instrument reasonably required by Fieldwood II to consummate the intent of this Section 4.10, including Fieldwood II becoming the owner and designated operator of the P&A Well and P&A Leasehold, if any.

**Section 4.11. Processing Fees**. Subject to any applicable Third Party Operating Agreement and in the absence of any other agreement between the Parties governing the processing of production at any facility owned or operated by Owner, Fieldwood II agrees to pay Owner the following fees for the FWII Earned Interest share of production processed at any facility owned by Owner:

    (a)   $2.00 per barrel for oil/condensate;

    (b)   $1.50 per barrel for water; and

    (c)   $0.20 per MCF for gas.

As used herein, "MCF" means one thousand cubic feet measured at standard pressure and temperature, defined to as cubic feet of volume at 60 degrees Fahrenheit and 14.7 pounds per square inch and a "barrel" is 42 U.S. gallons.

Effective March 1 of each year during which any production from a Project conducted under this Agreement is processed under this Section 4.11, the fees to be charged hereunder shall be adjusted by multiplying the rates then in effect by the percentage increase, if any, in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor for all Urban Consumers, specifically, the "All Items" Unadjusted Expenditure Category (the "CPI-U"), from (i) December 31 of the year immediately preceding the year then just ended to (ii) December 31 of the year just ended. For the avoidance of doubt, no adjustment will be made in the event of a decrease in the CPI-U for an applicable year.

For the avoidance of doubts, the "Operating Costs" used for the purpose of calculating the FWII NPI and for determining when Fieldwood II has reached the Recovery Threshold shall include the processing fees provided herein with respect to FWII NPI share of production resulting from the Capital Development Project. For the purpose of this Section 4.11, the FWII NPI share means fifty percent (50%) of Owner's Interest in the production.

**Section 4.12. Expert Determination of Pre-Existing Net Profit**. If, as contemplated in the definition of Pre-Existing Net Profit, a Party submits the determination of Pre-Existing Net Profit

21

Error! Unknown document property name.

with respect to any Capital Development Project to the Expert, the procedures set forth in this Section 4.12 shall apply. Prior to submitting such matter to the Expert, the Party intending to make the submission shall provide written notice to the other Party of such intent. If the Parties are still unable to agree upon the Pre-Existing Net Profit within five (5) Business Days following the other Party's receipt of the notice provided herein, then the Party intending to submit the matter to the Expert may so submit such matter to the Expert for final and binding determination. To submit the determination of Pre-Existing Net Profit to the Expert, the submitting Party shall provide the Expert and the other Party with written notice of its request to have the Expert determine Pre-Existing Net Profit. Within five (5) Business Days of providing that notice, the Parties shall each provide the Expert with (a) such data and information as is necessary for the Expert to be able to determine the Pre-Existing Net Profit, which data and information shall include applicable Well Data, Evaluation Data, and production data relating to the well that is the subject of such proposed Capital Development Project and (b) such Party's estimate of the Pre-Existing Net Profit. The Expert shall, within five (5) Business Days of receiving such data and information, make its calculation of the Pre-Existing Net Profit using the data and information it has received from the Parties and the most recently available forward curve strip pricing for crude oil and natural gas as provided by NYMEX as of the date preceding the Expert's determination. In making its determination hereunder, the Expert (i) shall be bound by the provisions of this Section 4.12 and the related definitions and (ii) may not assign a value to the Pre-Existing Net Profit greater than the value provided by Owner or less than the value provided by Fieldwood II. If, prior to the Expert finalizing its determination of the Pre-Existing Net Profit, the Parties reach agreement, then they may withdraw the matter from the Expert. The determination of the Expert shall be (x) final and binding on the Parties and (y) final and non-appealable for all purposes hereunder. The fees and expenses of the Expert under this Section 4.12 shall be borne one half by the Owner and one half by Fieldwood II. If the party selected as the Expert is unable or unwilling to serve as the Expert hereunder, then the Expert shall be selected by lot from among the nationally recognized independent reserves or reservoir engineering firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.

## ARTICLE V.
## MISCELLANEOUS

**Section 5.1.    Notices**. All notices, copies, and other communications that are required or that may be given pursuant to this Agreement (including notices to change the below information) shall be (a) sufficient in all respects if given in writing, in English, and delivered by both email and, additionally, by mail, facsimile, or recognized courier service to the Party to be noticed or copied pursuant to the contact information below that corresponds with the applicable form of notice and (b) deemed received when actually delivered (as reflected by the courier's receipt, facsimile record, or similar electronic receipt (as to email transmissions) or without receipt of invalid delivery):

If to Fieldwood II:

_____

_____

22

Error! Unknown document property name.

_____
Attn: _____
Telephone:  (___) ___-____
Fax:  (___) ___-____
Email:  _____

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

If to Owner:

Attn:  _____
Telephone:
Fax:  (___) ___-____
Email:  _____

with a copy to:
Apache Corporation
2000 Post Oak Blvd., Suite 100
Attention:  Brian Erickson
Attention:  Brett Cupit
Telephone:  (713) 296-6000
Email:  brian.erickson@apachecorp.com
Email:  brett.cupit@apachecorp.com

or to such other address or addresses as the Parties or Apache may from time to time designate in writing.

**Section 5.2.    Conflicts**.  To the extent that any provision of this Agreement conflicts with the provisions of the TSA, then as solely between the Parties, the provisions of this Agreement shall govern and control.    Additionally, Owner's elections in this Agreement are subject to the Company Agreement, and Fieldwood II hereby acknowledges the approval rights of Apache contained therein.

**Section 5.3.    Governing Law**.  This Agreement shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

**Section 5.4.    Venue**.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute,

23

Error! Unknown document property name.

claim, or controversy arising out of or in relation to or in connection with this Agreement, and each of the Parties hereto agrees that any action instituted by it against the other with respect to any such dispute, controversy, or claim will be instituted exclusively in the state and federal district courts located in Harris County, Texas.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH DISPUTE ARISING OUT OF THIS AGREEMENT BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.

**Section 5.5.   Waiver of Jury Trial**.  EACH OF THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ACTIONS OF ANY OTHER PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT THEREOF.

**Section 5.6.   Expenses**.  Except as provided in another agreement, all fees, costs, and expenses incurred by Fieldwood II and Owner in negotiating this Agreement shall be paid by the Party incurring the same, including, without limitation, legal fees, costs, and expenses.

**Section 5.7.   Compliance with Law**.  Each Party agrees that it will comply with applicable Laws, rules, regulations, and orders of Governmental Authority in the performance of this Agreement.

**Section 5.8.   Amendment**.  This Agreement may be amended or modified only by a duly authorized agreement in writing that makes reference to this Agreement executed by each Party and consented to by Apache acting reasonably.

**Section 5.9.   Waiver**.  Any failure by any Party to comply with any of its obligations, agreements, or conditions herein contained may be waived by the Party to whom such compliance is owed by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner.  No waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 5.10.  Entire Agreement**.  This Agreement (together with the Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any term sheets or oral agreements that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

**Section 5.11.  Assignment**.  No Party may assign any interest in this Agreement without the prior written consent of the other Party(ies).  This Agreement is personal to the Parties, and any attempted assignment shall be void *ab initio*; provided that the foregoing shall not apply if Fieldwood II assigns this Agreement along with its personnel to an Affiliate.  Neither assignment

24

Error! Unknown document property name.

nor consent to assignment shall relieve or release the assignor from its obligations under this Agreement, without an express written release signed by the other Party or Parties. Notwithstanding anything herein to the contrary, this Agreement is personal between Owner and Fieldwood II and shall not constitute a covenant running with the lands included in the Development Area or a burden on any Owner Interests except as to a particular Owner Interest for which (x) Owner has received a Proposal from Fieldwood II relating to such Owner Interest and (y) such Fieldwood II Proposal has not terminated, been withdrawn, or deemed to have been withdrawn.

**Section 5.12.   Binding Effect**.   The covenants, provisions, and conditions contained in each Assignment given pursuant to this Agreement are agreed and acknowledged to be covenants running with the land and the respective interests of the Parties and will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

**Section 5.13.   Further Assurances**.   Subject to the terms and conditions of this Agreement, each Party shall use its reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable, under applicable Law or otherwise, to consummate the transactions contemplated by this Agreement.   The Parties agree to and shall execute and deliver such other documents, certificates, agreements, and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement in accordance with the terms hereof.

**Section 5.14.   Construction**.

(a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The Schedules and Exhibits attached to this Agreement shall not amend or modify this Agreement, but the facts (as distinguished from agreements) stated therein are incorporated herein for all purposes.

(b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).   Terms defined in the singular have the corresponding meanings in the plural, and vice versa.   Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.   The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation."   The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.   The term "or" is not exclusive.

(d)    The terms "day" and "days" mean and refer to calendar day(s).   The terms "year" and "years" mean and refer to calendar year(s).   If any action is to be taken or given on or by a

25

Error! Unknown document property name.

particular calendar day, and such calendar day is not a Business Day, then such action shall be deferred until the next Business Day.

(e)     Owner and Fieldwood II have each participated in the negotiation and drafting of this Agreement and if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)     The phrase "made available" means that such Party or one of its Affiliates or Representatives has had the opportunity prior to the date hereof to review such documents or materials at the offices of another Party or its Affiliates.

(h)     All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(i)     The serial comma is sometimes included and sometimes omitted.  Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 5.15.  <u>No Partnership</u>**.  Except as otherwise expressly provided in this Agreement, (a) nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit, or other business entity between or among the Parties and (b) for federal and state income tax purposes, the Parties do not intend that the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder apply to the transactions described in this Agreement.

**Section 5.16.  <u>Severability</u>**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 5.17.  <u>Third Party Beneficiaries</u>**.  Apache is an express third-party beneficiary of all of the representations and covenants of Owner and Fieldwood II contained in this Agreement. However, Owner and Fieldwood II acknowledge and agree that, except for the third-party beneficiary rights expressly granted to Apache in this Section, this Agreement is entered solely for the benefit of the Parties hereto and shall not create any rights, including without limitation third-party beneficiary rights, in favor of any other party.

26

**Error! Unknown document property name.**

**Section 5.18.  Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

[Remainder of Page Intentionally Blank]

27

**Error! Unknown document property name.**

Executed as of the Execution Date but effective as of the Effective Date.

**OWNER:**

**[FIELDWOOD ENERGY I LLC]**

By: _____
Name:
Title:

**GOM SHELF LLC**

By: _____
Name:
Title:

**FIELDWOOD II:**

**[FIELDWOOD ENERGY II LLC]**

By: _____
Name:
Title:

Signature Page to Farmout Agreement

**Error! Unknown document property name.**

**EXHIBIT A**

**DEVELOPMENT AREA (INCLUDING OIL AND GAS LEASES)**

[See Attached]

ADD:

| | |
|---|---|
| Exhibit B | Form of Net Profits Interest Assignment |
| Exhibit C | Form of Election Well Assignment |
| Exhibit D | Form of Operating Agreement |

## ASSIGNMENT OF NET PROFITS INTEREST

This ASSIGNMENT OF NET PROFITS INTEREST ("**Assignment**") dated [_____, 202\_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time[1]**"), is from [Fieldwood Energy I LLC, a Texas limited liability company / GOM Shelf LLC, a Delaware limited liability company], with an office at [●] ("**Assignor**") to [Fieldwood Energy II LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042][2] ("**Assignee**").  Assignor and Assignee sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned NPI (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned NPI under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned NPI" means with respect to production from the Interval, a net profits interest equal to (i) one hundred percent (100%) of the Excess Net Profit until Assignee has reached the Recovery Threshold with respect to such Interval and (ii) from and after such time that Assignee has reached the Recovery Threshold with respect to such Interval, automatically reducing to fifty percent (50%) of the Excess Net Profit.

"Capital Development Project" means the Capital Development Project (as defined in the Farmout Agreement) resulting in this Assignment.

---

[1] Note to Draft: Effective Time shall be the date the Proposal was made.
[2] Note to Draft: Entity name to be determined.

#93828439v11

"Capital Development Project Costs" means any and all out-of-pocket costs and expenses incurred in (i) developing, preparing for, and completing the Capital Development Project and (ii) conducting all other operations set forth in the Proposal which costs and expenses are, in each case, attributable to Assignor's right, title, and interest in and to the Interval, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

"Excess Net Profit" means the Net Profit from the Capital Development Project over any applicable period, minus the Pre-Existing Net Profit.  For the purposes of this Assignment, the Pre-Existing Net Profit that would have been realized over such period if the Capital Development Project had not been undertaken will be deemed to be zero ($0) for a recompletion where the well's production data from the most recent three (3) months of production prior to the date Assignee, or another operator pursuant to Section 4.4 of the Farmout Agreement, applies for a permit to modify the applicable well shows the existing completion producing at average rates of less than fifty (50) barrels of oil per day or, if the well is a gas well, three hundred (300) MCFD of gas; provided, however, periods during which the well was intermittently shut-in during such three (3) month period shall be excluded from the calculation of average production so that such average is not artificially lowered as a result of any such intermittent shut-ins.

"Existing Burdens" has the meaning given such term in the Farmout Agreement, as such is applied to Assignor's interest in the Well at the time the Proposal was made.

"Farmout Agreement" means that certain Farmout Agreement dated [●] by and between Fieldwood Energy I LLC and GOM Shelf, collectively as Owner, and [Fieldwood Energy II LLC].

"Interval" means the completed or reworked interval from [●] feet TVDSS to [●] feet TVDSS in the Lease as such production is obtained from the Well.

"Lease" means that oil and gas lease [OCS or State of Louisiana No.   ] dated         granted by     in favor of      .

"MCFD" means thousand cubic feet of gas per day, as measured at a base temperature of sixty degrees Fahrenheit (60ºF) and a base pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

"Net Profit" means, with respect to Assignor's rights, title, and interest in and to the production from the Interval, the difference obtained by subtracting Operating Costs from Revenue; where (i) "Operating Costs" equals the sum of (1) direct operating costs related to the Well during the applicable production month, including platform, facility, processing, and pipeline operating costs and fees allocated equally amongst all producing wells on or tied back to such platform, if applicable, (2) all Existing Burdens on such Interval, (3) all severance or other taxes measured or calculated based upon production from such Interval (but for the avoidance of doubt, excluding income taxes and ad valorem taxes), and (4) the ORRI, and (ii) "Revenue" equals the net revenue attributable

#93828439v11

to Assignor's net revenue interest in the proceeds of production from the Interval for that applicable production month.

"ORRI" means, with respect to the Assigned NPI, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned NPI, as applicable and further proportionately reduced as the Assigned NPI may be reduced pursuant to the terms of the Farmout Agreement as a result of Assignee achieving the Recovery Threshold with respect to the Interval; provided however, for the avoidance of doubt, any payment made pursuant to the Trust A NPI or the Trust A-1 NPI with regard to production from the Interval shall reduce on a dollar for dollar basis the amount of any ORRI payment during a particular payment period.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Pre-Existing Net Profit" means _____ [3].

"Proposal" means the Proposal (as defined in the Farmout Agreement) for the Capital Development Project.

"Recharacterization Mortgages" means those certain Mortgages and Deeds of Trust from Fieldwood Energy LLC and GOM Shelf LLC to Matthew Dundrea, Trustee, and Apache Corporation, as Collateral Agent, dated as of September 30, 2013, as amended, covering and securing the Trust A NPI and the Trust A-1 NPI.

"Recovery Threshold" means, with respect to the Capital Development Project, Assignee's recovery from the Assigned NPI equal to one hundred percent (100%) of the Capital Development Project Costs incurred by Assignee in performing such Capital Development Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Trust A NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust A, as NPI Owner, covering the properties and interests described therein.

---

[3] Note to Draft: Since this will be determined prior to the time this assignment is made, suggest that we include this information in the assignment so that the amount of the Assigned NPI can be determined.

DEBTORS' EX. NO. 5
1265 of 1570

"Trust A-1 NPI" means that certain net profits overriding royalty interest created and conveyed under and pursuant to those certain Conveyances of Net Profits Overriding Royalty Interest dated September 30, 2013, as supplemented and amended from time to time, from Fieldwood Energy LLC and GOM Shelf LLC, as Grantor, and the Fieldwood Decommissioning Trust B, as NPI Owner, covering the properties and interests described therein, as such net profits overriding royalty interest was amended, assigned, and partially released pursuant to that certain Assignment, Amendment, and Partial Release of Net Profits Overriding Royalty Interest dated as of April 11, 2018 by and between Fieldwood Energy LLC, GOM Shelf LLC, the Fieldwood Decommissioning Trust B, and the Fieldwood Decommissioning Trust A.

"Well" means the [●] well located on [●].

2.    Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Farmout Agreement.

3.    ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.    Warranties.  EXCEPT AS SET FORTH BELOW, THIS ASSIGNMENT IS MADE, AND THE ASSIGNED NPI IS CONVEYED AND ASSIGNED HEREUNDER, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR CHARACTER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF TITLE, FITNESS FOR ANY PARTICULAR PURPOSE, MARKETABILITY, MERCHANTABILITY, FREEDOM FROM DEFECTS, QUALITY OR PRESENCE OF HYDROCARBONS OR RESERVES, AND ANY OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY; AND ASSIGNOR DOES HEREBY DISCLAIM AND ASSIGNEE WAIVES ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES. THE ASSIGNED NPI SHALL BE ASSIGNED TO ASSIGNEE FREE AND CLEAR OF ANY AND ALL MORTGAGES, LIENS, AND ENCUMBRANCES CREATED BY, THROUGH, OR UNDER FIELDWOOD ENERGY LLC AND/OR ASSIGNOR AND ANY OF THEIR AFFILIATES, EXCLUDING THE TRUST A NPI, THE TRUST A-1 NPI, AND THE RECHARACTERIZATION MORTGAGES WHICH SHALL CONTINUE TO BURDEN THE ASSIGNED NPI, BUT WHICH WILL AFFECT THE ORRI IN THE MANNER DESCRIBED IN THE DEFINITION OF ORRI.

5.    Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.    Successors and Assigns.  The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

#93828439v11

7.    <u>Redhibition Waiver</u>.  ASSIGNEE: (I) WAIVES ALL RIGHTS IN REDHIBITION PURSUANT TO LOUISIANA CIVIL CODE ARTICLES 2520, ET SEQ.; (II) ACKNOWLEDGES THAT THIS EXPRESS WAIVER SHALL BE CONSIDERED A MATERIAL AND INTEGRAL PART OF THIS SALE AND THE CONSIDERATION THEREOF; AND (III) ACKNOWLEDGES THAT THIS WAIVER HAS BEEN BROUGHT TO THE ATTENTION OF ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.    <u>UTPCPL Waiver</u>.  TO THE EXTENT APPLICABLE TO THE ASSIGNED NPI OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, *ET SEQ.*).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.    <u>Further Assurances</u>.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.    <u>Governing Law</u>.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.    <u>Jurisdiction and Venue</u>.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes.  Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.    <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Page to Follow]*

#93828439v11

**Page 5 of 7**

EXECUTED on the day and year first referenced above, but effective as of the Effective Time.

**ASSIGNOR:**

**WITNESSES:**

**[FIELDWOOD ENERGY I LLC / GOM SHELF LLC]**

_____

Name: _____

By: _____
Name: _____
Title: _____

_____

Name: _____

STATE OF [●]                               §
                                                      §
COUNTY OF [●]                           §

     On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy I LLC / GOM Shelf LLC], a [Texas / Delaware] limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

#93828439v11

**ASSIGNEE:**

**WITNESSES:**                          **[FIELDWOOD ENERGY II LLC]**

_____
Name: _____          By: _____
                                         Name: _____
                                         Title: _____

_____
Name: _____


STATE OF [●]                    §
                                §
COUNTY OF [●]                   §

      On this _____ day of _____, 202_, before me appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy II LLC], a Delaware limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of the Members and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____

.

DEBTORS' EX. NO. 5
1269 of 1570

## ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE ("**Assignment**") dated [_____, 202_], but effective as of 12:01 a.m. Central Standard Time, on [●], 202_ (the "**Effective Time**[1]"), is from [Fieldwood Energy I LLC, a Texas limited liability company / GOM Shelf LLC, a Delaware limited liability company], with an office at [●] ("**Assignor**") to [Fieldwood Energy II LLC, a Delaware limited liability company, with an office at 2000 West Sam Houston Parkway South, Suite 1200, Houston, Texas 77042] ("**Assignee**"). Assignor and Assignee are sometimes individually referred to herein as, a "**Party**" and collectively referred to herein as, the "**Parties**".

FOR Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby GRANTS, BARGAINS, SELLS, CONVEYS and ASSIGNS to Assignee the Assigned Interest (as defined below), reserving unto Assignor the ORRI.

TO HAVE AND TO HOLD the Assigned Interest under Assignee subject to the ORRI and the following terms and conditions:

1.      As used in this Assignment, the following terms shall have the meanings ascribed to them below:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one (1) or more intermediaries or otherwise; provided, however, that, for the purposes of this Agreement, Assignor shall not be deemed an Affiliate of Assignee, and *vice versa*. For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Assigned Interest" means (subject to and excluding (i) the ORRI and (ii) all of Assignor's rights, title, and interests in and to all Other Wells) (a) one hundred percent (100%) of Assignor's right, title, and interest as of the Effective Time in and to the Prospect Area until Assignee has reached the Recovery Threshold with respect to the Well and (b) from and after such time that Assignee has reached the Recovery Threshold with respect to such Well, automatically reducing to fifty percent (50%) of Assignor's rights, title, and interest as of the Effective Time in and to the Prospect Area.

"Decommissioning Agreement" means the Decommissioning Agreement dated September 30, 2013 by and among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, and Apache Shelf Exploration LLC, collectively as Seller, and Fieldwood Energy LLC and GOM Shelf LLC, collectively as Buyer, as such has been amended from time to time.

---

[1] Note to Draft: Effective Time shall be the date the Proposal was made.

3336694-3
#93828438v9

"Existing Burdens" has the meaning given such term in the Farmout Agreement, as such is applied to Assignor's interest in the Well immediately prior to the Effective Time.

"Farmout Agreement" means that certain Farmout Agreement dated [●] by and between Fieldwood Energy I LLC and GOM Shelf, collectively as Owner, and [Fieldwood Energy II LLC].

"Leases" means the oil and gas lease(s) described on Exhibit "A" attached hereto and made a part hereof.

"ORRI" means, with respect to the Assigned Interest, an overriding royalty interest equal to twenty-five percent (25%) less Existing Burdens proportionately reduced to the Assigned Interest, as applicable and further proportionately reduced as the Assigned Interest may be reduced pursuant to the terms of the Farmout Agreement as a result of Assignee achieving the Recovery Threshold.

"Other Wells" means any and all wells located within the Prospect Area as of the Effective Time other than the Well.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization, joint venture, or any other legally recognizable entity.

"Project" means the Project (as defined in the Farmout Agreement) with respect to the Well.

"Proposal" has the meaning given such term in the Farmout Agreement.

"Prospect Area" means the Leases, limited as to the lands described on Exhibit "B" attached hereto and made a part hereof, limited in depth from the stratigraphic equivalent of the top of the formation found at [●] feet TVDSS as identified on the [●] log down to and including the stratigraphic equivalent of 100 feet below the base of the formation, as such base is found at [●] feet TVDSS as identified on the [●] log.

"Recovery Threshold" means, with respect to the Well, Assignee's recovery from the Assigned Interest an amount equal to one hundred percent (100%) of the Well Costs incurred by Assignee with respect to such Project.

"Third Party" means any Person who is not a Party or any Affiliate of any Party.

"Well" means the [●] well, API No. _____ , located on OCS _____ [●].

"Well Costs" means, to the extent attributable to Assignor's right, title, and interest in and to the Well, any and all out-of-pocket costs and expenses incurred in (i) drilling, evaluating, completing, and equipping the Well and (ii) conducting all other operations set forth in the applicable Proposal for such Well, including, without limitation, all reasonable Third Party engineering costs, legal costs, and permitting costs, but excluding overhead and general and administrative costs.

#93828438v9

DEBTORS' EX. NO. 5
1271 of 1570

2.      Agreements.  This Assignment is made subject to and is burdened by the Existing Burdens and the terms of the Farmout Agreement.

3.      ORRI.  The ORRI is expressly reserved unto Assignor hereunder and shall be a non-operating, non-expense-bearing, overriding royalty interest, free of cost and expense of production, operations, marketing, and delivery of the hydrocarbons to the applicable delivery points.

4.      Warranties.  Except as provided in the following sentences, this Assignment is made, and the Assigned Interest is conveyed and assigned hereunder, without representation or warranty of any kind or character, including, without limitation, warranties of title, fitness for any particular purpose, marketability, merchantability, freedom from defects, quality or presence of hydrocarbons or reserves, and any other representations and warranties, express or implied, at law or in equity; and Assignor does hereby disclaim and Assignee waives any and all such representations or warranties.  The Assigned Interest is conveyed and assigned to and accepted by Assignee in its "AS IS, WHERE IS" condition and state of repair, and with all faults and defects, without any representation, warranty, or covenant of any kind or nature, express, implied or statutory.  Notwithstanding any of the foregoing, Assignor warrants that the Assigned Interest are being assigned to Assignee free and clear of any and all mortgages, liens, and encumbrances created by, through, or under Fieldwood Energy LLC, Assignor or any affiliate of either entity.  Assignor and Assignee expressly agree and understand that this assignment is made pursuant to the Farmout Agreement and, as such, is subject to the terms of Section 7.4 of the Decommissioning Agreement so that the Assigned Interests transferred to Assignee hereunder shall not be subject to the Trust A NPI or the Trust A-1 NPI, as such terms are defined in the Farmout Agreement; provided however, that all of Assignor's rights, title, and interests in and to the Prospect Area not assigned to Assignee hereunder, including such rights, title, and interests held by Assignor from and after the time Assignee has reached the Recovery Threshold with respect to the Well shall remain subject to the Trust A NPI and the Trust A-1 NPI.

5.      Compliance with Laws.  This Assignment is made subject to all applicable laws, statutes, ordinances, permits, decrees, orders, judgments, rules, and regulations that are promulgated, issued or enacted by a governmental entity having jurisdiction, and Assignee agrees to comply with the same on and after the Effective Time.

6.      Successors and Assigns.   The terms, covenants, and conditions contained in this Assignment are binding upon and inure to the benefit of the Parties and their respective successors and assigns, and such terms, covenants, and conditions are covenants running with the land and with each subsequent transfer or assignment of the Assets or any part thereof.

7.      Redhibition Waiver.  Assignee: (i) waives all rights in redhibition pursuant to Louisiana Civil Code Articles 2520, et seq.; (ii) acknowledges that this express waiver shall be considered a material and integral part of this sale and the consideration thereof; and (iii) acknowledges that this waiver has been brought to the attention of

#93828438v9

DEBTORS' EX. NO. 5
1272 of 1570

ASSIGNEE, HAS BEEN EXPLAINED IN DETAIL AND THAT ASSIGNEE HAS VOLUNTARILY AND KNOWINGLY CONSENTED TO THIS WAIVER OF WARRANTY OF FITNESS AND WARRANTY AGAINST REDHIBITORY VICES AND DEFECTS FOR INTERESTS ASSIGNED AND CONVEYED HEREUNDER.

8.     UTPCPL Waiver.   TO THE EXTENT APPLICABLE TO THE ASSIGNED INTEREST OR ANY PORTION THEREOF, ASSIGNEE HEREBY WAIVES THE PROVISIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (LA. R.S. 51:1402, ET SEQ.).  ASSIGNEE WARRANTS AND REPRESENTS THAT IT: (I) IS EXPERIENCED AND KNOWLEDGEABLE WITH RESPECT TO THE OIL AND GAS INDUSTRY GENERALLY AND WITH TRANSACTIONS OF THIS TYPE SPECIFICALLY; (II) POSSESSES THE REQUISITE KNOWLEDGE, EXPERIENCE, AND EXPERTISE TO EVALUATE INDEPENDENTLY THE MERITS AND RISKS OF THE TRANSACTIONS HEREIN CONTEMPLATED; AND (III) IS NOT IN A SIGNIFICANTLY DISPARATE BARGAINING POSITION.

9.     Further Assurances.  Each Party covenants and agrees to execute and deliver to the other Party all such additional reasonable instruments and other documents and will do all such other reasonable acts and things as may be reasonably necessary to accomplish the intent of this Assignment.

10.     Governing Law.  This Assignment shall be governed and construed in accordance with the Laws of the State of Texas, without regard to the Laws that might be applicable under conflicts of laws principles.

11.     Jurisdiction and Venue.  Each Party consents to personal jurisdiction in any action brought in the United States federal and state courts located in the State of Texas with respect to any dispute, claim, or controversy arising out of or in relation to or in connection with this Assignment, and each of the Parties hereto agrees that any action with respect to any such dispute, controversy, or claim will be determined exclusively in a state or federal district court located in Harris County, Texas, and they do hereby irrevocably submit to the exclusive jurisdiction of such courts for such purposes. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the venue of any such dispute arising out of this assignment brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

12.     BOEM Assignment Form.  The Parties acknowledge and agree that this Assignment may be attached to a Form BOEM-0151 or other assignment form required by a governmental authority (a "Government Required Form").  The Parties agree that, to the extent of any conflict between this Assignment and any such Government Required Form the Parties may execute in connection herewith, such Government Required Form shall control to extent required by applicable law for the Bureau of Ocean Energy Management (or other applicable governmental authority) to approve the Parties' assignment hereunder.

13.     Counterparts.  This Assignment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same Assignment.

*[Signature Pages to Follow]*

Page 4 of 8

#93828438v9

EXECUTED by Assignor in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**WITNESSES:**

**ASSIGNOR:**

**[FIELDWOOD ENERGY I LLC / GOM SHELF LLC]**

_____
Name: _____

By: _____
Name: _____
Title: _____

_____
Name: _____

| STATE OF [●] | § |
| COUNTY OF [●] | § |
| | § |

On this ____ day of _____, 202_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy I LLC / GOM Shelf LLC], a [Texas / Delaware] limited liability company, and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.

_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

Page 5 of 8

#93828438v9

EXECUTED by Assignee in the presence of the undersigned competent witnesses on the date and year referenced in the notarial acknowledgment below, but effective as of the Effective Time.

**ASSIGNEE:**

**WITNESSES:**                                    **[FIELDWOOD ENERGY II LLC]**


_____     By: _____
Name: _____       Name: _____
                                                 Title: _____

_____
Name: _____



STATE OF [●]                          §
                                      §
COUNTY OF [●]                         §

      On this \_\_\_\_ day of _____, 202\_, before me, the undersigned notary public in and for the foregoing jurisdiction, appeared [●] to me personally known, who, being by me duly sworn (or affirmed) did say that [he/she] is the [●] of [Fieldwood Energy II LLC, a Delaware limited liability company], and that the instrument was signed on behalf of the limited liability company and by the authority of its governing authority and that [he/she] acknowledged the instrument to be the free act and deed of the limited liability company.


_____
NOTARY PUBLIC
STATE OF [●]
COUNTY OF [●]
Printed Name: _____
Notarial Commission No._____
My commission expires: _____

#93828438v9

**EXHIBIT "A"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN [FIELDWOOD ENERGY I LLC / GOM SHELF LLC], AS ASSIGNOR, AND [FIELDWOOD ENERGY II LLC], AS ASSIGNEE**

**THE LEASES**

#93828438v9

**EXHIBIT "B"**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN ASSIGNMENT AND BILL OF SALE DATED [●] BY AND BETWEEN [FIELDWOOD ENERGY I LLC / GOM SHELF LLC], AS ASSIGNOR, AND [FIELDWOOD ENERGY II LLC], AS ASSIGNEE**

**THE PROSPECT AREA**

Page 8 of 8

DEBTORS' EX. NO. 5
1277 of 1570

EXHIBIT "D"

Attached to and made a part of that certain Farmout Agreement dated effective _____
\_\_, 202\_, by and between _____, as Operator, and _____, as Non-
Operators

# OFFSHORE OPERATING AGREEMENT

_____

## (OPERATOR)

## AND

_____,

_____, and _____

## (NON-OPERATORS)

## COVERING

## [_____]

## EFFECTIVE _____, 20\_\_

#93828440v3
#93828440v5

# Table of Contents

**ARTICLE 1 – APPLICATION** .................................................................................................1

1.1    APPLICATION TO EACH LEASE ......................................................................................1

**ARTICLE 2 – DEFINITIONS** ..................................................................................................1

2.1    ADDITIONAL TESTING ...................................................................................................1
2.2    AFFILIATE ....................................................................................................................1
2.3    AUTHORIZATION FOR EXPENDITURE (AFE) ..................................................................1
2.4    BOEMRE .....................................................................................................................1
2.5    COMPLETE, COMPLETING, COMPLETION .......................................................................1
2.6    COMPLETION EQUIPMENT .............................................................................................1
2.7    CONFIDENTIAL DATA ....................................................................................................2
2.8    DEEPEN, DEEPENING ....................................................................................................2
2.9    DEVELOPMENT FACILITIES ...........................................................................................2
2.10   DEVELOPMENT OPERATION ...........................................................................................2
2.11   DEVELOPMENT WELL ....................................................................................................2
2.12   EXPLORATORY OPERATION ............................................................................................2
2.13   EXPLORATORY WELL .....................................................................................................2
2.14   EXPORT PIPELINES ........................................................................................................2
2.15   FORCE MAJEURE ...........................................................................................................2
2.16   HYDROCARBONS ...........................................................................................................2
2.17   JOINT ACCOUNT ...........................................................................................................2
2.18   LEASE ..........................................................................................................................3
2.19   NON-CONSENT OPERATION ...........................................................................................3
2.20   NON-CONSENT PLATFORM ............................................................................................3
2.21   NON-CONSENT WELL ....................................................................................................3
2.22   NON-OPERATOR(S) .......................................................................................................3
2.23   NON-PARTICIPATING PARTY ..........................................................................................3
2.24   NON-PARTICIPATING PARTY'S SHARE ............................................................................3
2.25   OBJECTIVE DEPTH .........................................................................................................3
2.26   OBJECTIVE HORIZON .....................................................................................................3
2.27   OFFSITE HOST FACILITIES .............................................................................................3
2.28   OPERATOR ....................................................................................................................3
2.29   PARTICIPATING INTEREST ..............................................................................................3
2.30   PARTICIPATING PARTY ...................................................................................................3
2.31   PLATFORM ....................................................................................................................3
2.32   PRODUCIBLE RESERVOIR ...............................................................................................3
2.33   PRODUCIBLE WELL .......................................................................................................4
2.34   PRODUCTION INTERVAL .................................................................................................4
2.35   RECOMPLETE, RECOMPLETING, RECOMPLETION .............................................................4
2.36   REWORK, REWORKING ..................................................................................................4
2.37   SIDETRACK, SIDETRACKING ..........................................................................................4
2.38   TAKE-IN-KIND FACILITIES .............................................................................................4
2.39   TRANSFER OF INTEREST .................................................................................................4
2.40   WORKING INTEREST ......................................................................................................4

**ARTICLE 3 – EXHIBITS** .......................................................................................................4

3.1    EXHIBITS ......................................................................................................................4

1

    *3.1.1 Exhibit "A"* ...................................................................................................4
    *3.12 Exhibit "B"* ...................................................................................................5
    *3.13 Exhibit "C"* ...................................................................................................5
    *3.14 Exhibit "D"* ...................................................................................................5
    *3.15 Exhibit "E"* ...................................................................................................5
    *3.16 Exhibit "F"* ...................................................................................................5
3.2    CONFLICTS .............................................................................................................5

**ARTICLE 4 – OPERATOR** ...........................................................................................5

4.1    OPERATOR .............................................................................................................5
4.2    CIRCUMSTANCES UNDER WHICH OPERATOR MUST CONDUCT A NON-CONSENT OPERATION.......................5
4.3    OPERATOR'S CONDUCT OF A NON-CONSENT OPERATION IN WHICH IT IS A NON-PARTICIPATING PARTY .......5
4.4    RESIGNATION OF OPERATOR .....................................................................................5
4.5    REMOVAL OF OPERATOR .........................................................................................6
4.6    SELECTION OF SUCCESSOR .......................................................................................6
4.7    EFFECTIVE DATE OF RESIGNATION OR REMOVAL .........................................................6
4.8    DELIVERY OF PROPERTY .........................................................................................6

**ARTICLE 5 – AUTHORITY AND DUTIES OF OPERATOR** ..............................................7

5.1    EXCLUSIVE RIGHT TO OPERATE ...............................................................................7
5.2    WORKMANLIKE CONDUCT .......................................................................................7
5.3    LIENS AND ENCUMBRANCES .....................................................................................7
5.4    EMPLOYEES AND CONTRACTORS ..............................................................................7
5.5    RECORDS .............................................................................................................7
5.6    COMPLIANCE .........................................................................................................7
5.7    CONTRACTORS .......................................................................................................7
5.8    GOVERNMENTAL REPORTS .......................................................................................8
5.9    INFORMATION TO PARTICIPATING PARTIES ................................................................8
5.10   INFORMATION TO NON-PARTICIPATING PARTIES………………………………………… ………… …..8

**ARTICLE 6 – VOTING AND VOTING PROCEDURES** ....................................................9

6.1    VOTING PROCEDURES .............................................................................................9
    *6.1.1 Voting Interest* ...........................................................................................9
    *6.1.2 Vote Required* ...........................................................................................9
    *6.1.3 Votes* …………… …………………… ……… ……………………………9
    *6.1.4 Meetings* ...................................................................................................9

**ARTICLE 7 – ACCESS** .................................................................................................9

7.1    ACCESS TO LEASE .................................................................................................9
7.2    REPORTS .............................................................................................................9
7.3    CONFIDENTIALITY ...............................................................................................10
7.4    LIMITED DISCLOSURE ...........................................................................................10
7.5    LIMITED RELEASES TO OFFSHORE SCOUT ASSOCIATION ...........................................10
7.6    MEDIA RELEASES ................................................................................................10

**ARTICLE 8 – EXPENDITURES** ....................................................................................11

8.1    BASIS OF CHARGE TO THE PARTIES .........................................................................11
8.2    AFES ..................................................................................................................11
8.3    EMERGENCY AND REQUIRED EXPENDITURES ............................................................11
8.4    ADVANCE BILLINGS .............................................................................................11
8.5    COMMINGLING OF FUNDS .......................................................................................11
8.6    SECURITY RIGHTS ................................................................................................11
    *8.6.1 Mortgage in Favor of Operator* ...............................................................11

2

|  | *8.6.2 Security Interest in Favor of Operator* | 12 |
|  | *8.6.3 Mortgage in Favor of the Non-operator Parties* | 13 |
|  | *8.6.4 Security Interest in Favor of the Non-operator(s)* | 14 |
|  | *8.6.5 Recording* | 15 |
|  | *8.6.6 The Memorandum of Operating Agreement and Financing Statement* | 16 |
| 8.7 | UNPAID CHARGES AND DEFAULT | 16 |
| 8.8 | CONFESSION OF JUDGMENT; EXECUTORY PROCESS | 16 |

**ARTICLE 9 – NOTICES** ........................................................................................**17**

| 9.1 | GIVING AND RECEIVING NOTICES | 17 |
| 9.2 | CONTENT OF NOTICE | 18 |
| 9.3 | RESPONSE TO NOTICES | 18 |
|  | *9.3.1 Platform and/or Development Facilities Proposals* | 18 |
|  | *9.3.2 Well Proposals* | 18 |
|  | *9.3.3 Proposal for Multiple Operations* | 18 |
|  | *9.3.4 Other Matters* | 18 |
| 9.4 | FAILURE TO RESPOND | *18* |
| 9.5 | RESPONSE TO COUNTERPROPOSALS | 18 |
| 9.6 | TIMELY WELL OPERATIONS | 18 |
| 9.7 | TIMELY PLATFORM / DEVELOPMENT FACILITIES OPERATIONS | 19 |

**ARTICLE 10 – EXPLORATORY OPERATIONS** ...........................................**19**

| 10.1 | PROPOSING OPERATIONS | 19 |
| 10.2 | COUNTERPROPOSALS | 19 |
| 10.3 | OPERATIONS BY ALL PARTIES | 19 |
| 10.4 | SECOND OPPORTUNITY TO PARTICIPATE | 19 |
| 10.5 | OPERATIONS BY FEWER THAN ALL PARTIES | 20 |
|  | *10.5.1 First Exploratory Well* | 20 |
| 10.6 | EXPENDITURES APPROVED | 20 |
| 10.7 | CONDUCT OF OPERATIONS | 20 |
| 10.8 | COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH | 20 |
|  | *10.8.1 Election by Participating Parties* | 20 |
|  | *10.8.2 Priority of Operations* | 21 |
|  | *10.8.3 Second Opportunity to Participate* | 21 |
|  | *10.8.4 Operations by Fewer Than All Parties* | 21 |
|  | *10.8.5 Subsequent Operations* | 22 |
| 10.9 | WELLS PROPOSED BELOW DEEPEST PRODUCIBLE RESERVOIR | 22 |

**ARTICLE 11 – DEVELOPMENT OPERATIONS** ..............................................**23**

| 11.1 | PROPOSING OPERATIONS | 23 |
| 11.2 | COUNTERPROPOSALS | 23 |
| 11.3 | OPERATIONS BY ALL PARTIES | 23 |
| 11.4 | SECOND OPPORTUNITY TO PARTICIPATE | 23 |
| 11.5 | OPERATIONS BY FEWER THAN ALL PARTIES | 23 |
| 11.6 | EXPENDITURES APPROVED | 24 |
| 11.7 | CONDUCT OF OPERATIONS | 24 |
| 11.8 | COURSE OF ACTION AFTER REACHING OBJECTIVE DEPTH | 24 |
|  | *11.8.1 Election by Fewer Than All Parties* | 24 |
|  | *11.8.2 Priority of Operations* | 24 |
|  | *11.8.3 Second Opportunity to Participate* | 25 |
|  | *11.8.4 Operations by Fewer Than All Parties* | 25 |
|  | *11.8.5 Subsequent Operations* | 25 |

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1281 of 1570

**ARTICLE 12 – PLATFORM AND DEVELOPMENT FACILITIES** ...................................................**26**

12.1   PROPOSALS .............................................................................................................26
12.2   COUNTERPROPOSALS ...............................................................................................26
    *12.2.1 Operations by All Parties* ................................................................................26
    *12.2.2 Second Opportunity to Participate* .................................................................26
    *12.2.3 Operations by Fewer Than All Parties* ...........................................................26
12.3   OWNERSHIP AND USE OF THE PLATFORM AND DEVELOPMENT FACILITIES ................27
12.4   RIGHTS TO TAKE IN KIND ........................................................................................27
12.5   EXPANSION OR MODIFICATION OF A PLATFORM AND/OR DEVELOPMENT FACILITIES ....28
12.6   OFFSITE HOST FACILITIES ........................................................................................28

**ARTICLE 13 – NON-CONSENT OPERATIONS** ...........................................................**29**

13.1   NON-CONSENT OPERATIONS .....................................................................................29
    *13.1.1 Non-interference* ...........................................................................................29
    *13.1.2 Multiple Completion Limitation* ....................................................................29
    *13.1.3 Metering* .......................................................................................................29
    *13.1.4 Non-consent Well* ..........................................................................................29
    *13.1.5 Cost Information* ...........................................................................................29
    *13.1.6 Completions* ..................................................................................................30
13.2   RELINQUISHMENT OF INTEREST ................................................................................30
    *13.2.1 Production Reversion Recoupment* .................................................................30
    *13.2.2 Non-production Reversion* ..............................................................................31
13.3   DEEPENING OR SIDETRACKING OF NON-CONSENT WELL ...........................................31
13.4   DEEPENING OR SIDETRACKING COST ADJUSTMENTS ..................................................31
13.5   SUBSEQUENT OPERATIONS IN NON-CONSENT WELL ...................................................31
13.6   OPERATIONS IN A PRODUCTION INTERVAL .................................................................32
13.7   OPERATIONS UTILIZING A NON-CONSENT PLATFORM AND/OR DEVELOPMENT FACILITIES ....32
13.8   DISCOVERY OR EXTENSION FROM NON-CONSENT DRILLING ......................................32
13.9   ALLOCATION OF PLATFORM / DEVELOPMENT FACILITIES COSTS TO NON-CONSENT OPERATIONS ...............33
    *13.9.1 Charges* .........................................................................................................33
    *13.9.2 Operating and Maintenance Charges* ............................................................34
13.10   ALLOCATION OF COSTS BETWEEN ZONES .................................................................34
13.11   LEASE MAINTENANCE OPERATIONS .........................................................................34
    *13.11.1 Participation in Lease Maintenance Operations* ............................................34
    *13.11.2 Accounting for Non-participation* ................................................................35
13.12   RETENTION OF LEASE BY NON-CONSENT WELL .......................................................35
13.13   NON-CONSENT PREMIUMS .....................................................................................36

**ARTICLE 14 – ABANDONMENT, SALVAGE, AND SURPLUS** .................................**36**

14.1   PLATFORM SALVAGE AND REMOVAL COSTS ............................................................36
14.2   ABANDONMENT OF PLATFORMS, DEVELOPMENT FACILITIES, OR WELLS ..................36
14.3   ASSIGNMENT OF INTEREST .......................................................................................36
14.4   ABANDONMENT OPERATIONS REQUIRED BY GOVERNMENTAL AUTHORITY ...............36
14.5   DISPOSAL OF SURPLUS MATERIAL ...........................................................................37

**ARTICLE 15 – WITHDRAWAL** ...................................................................................**37**

15.1   RIGHT TO WITHDRAW .............................................................................................37
15.2   RESPONSE TO WITHDRAWAL NOTICE .......................................................................37
    *15.2.1 Unanimous Withdrawal* .................................................................................37
    *15.2.2 No Additional Withdrawing Parties* ...............................................................38
    *15.2.3 Acceptance of the Withdrawing Parties' Interests* ..........................................38
    *15.2.4 Effects of Withdrawal* ...................................................................................38
15.3   LIMITATION ON AND CONDITIONS OF WITHDRAWAL ................................................38
    *15.3.1 Prior Expenses* ..............................................................................................38
    *15.3.2 Confidentiality* .............................................................................................39

4

    *15.3.3 Emergencies and Force Majeure* ..................................................................................39

**ARTICLE 16 – RENTALS, ROYALTIES, AND OTHER PAYMENTS**...........................................**39**

16.1    OVERRIDING ROYALTY AND OTHER BURDENS .................................................................39
16.2    SUBSEQUENTLY CREATED INTEREST .............................................................................39
16.3    PAYMENT OF RENTALS AND MINIMUM ROYALTIES ......................................................40
16.4    NON-PARTICIPATION IN PAYMENTS ..............................................................................40
16.5    ROYALTY PAYMENTS ...................................................................................................40

**ARTICLE 17 -  TAXES** ..................................................................................................**40**

17.1    PROPERTY TAXES ........................................................................................................40
17.2    CONTEST OF PROPERTY TAX VALUATION .....................................................................41
17.3    PRODUCTION AND SEVERANCE TAXES .........................................................................41
17.4    OTHER TAXES AND ASSESSMENTS ...............................................................................41

**ARTICLE 18 – INSURANCE** ...........................................................................................**41**

18.1    INSURANCE .................................................................................................................41
18.2    BONDS ........................................................................................................................41

**ARTICLE 19 – LIABILITY, CLAIMS, AND LAWSUITS**..........................................................**41**

19.1    INDIVIDUAL OBLIGATIONS ..........................................................................................41
19.2    NOTICE OF CLAIM OR LAWSUIT ..................................................................................41
19.3    SETTLEMENTS .............................................................................................................42
19.4    DEFENSE OF CLAIMS AND LAWSUITS ..........................................................................42
19.5    LIABILITY FOR DAMAGES ...........................................................................................42
19.6    INDEMNIFICATION FOR NON-CONSENT OPERATIONS ....................................................42
19.7    DAMAGE TO RESERVOIR, LOSS OF RESERVES AND PROFIT ...........................................42
19.8    NON-ESSENTIAL PERSONNEL .......................................................................................43

**ARTICLE 20 – INTERNAL REVENUE PROVISION** ............................................................**43**

20.1    INTERNAL REVENUE PROVISION ..................................................................................43

**ARTICLE 21 – CONTRIBUTIONS** ...................................................................................**43**

21.1    NOTICE OF CONTRIBUTIONS OTHER THAN ADVANCES FOR SALE OF PRODUCTION ..........43
21.2    CASH CONTRIBUTIONS .................................................................................................43
21.3    ACREAGE CONTRIBUTIONS ..........................................................................................43

**ARTICLE 22 – DISPOSITION OF PRODUCTION** ...............................................................**44**

22.1    TAKE-IN-KIND FACILITIES ..........................................................................................44
22.2    DUTY TO TAKE IN KIND ..............................................................................................44
22.3    FAILURE TO TAKE OIL AND CONDENSATE IN KIND .......................................................44
22.4    FAILURE TO TAKE GAS IN KIND ..................................................................................44
22.5    EXPENSES OF DELIVERY IN KIND .................................................................................45

**ARTICLE 23 – APPLICABLE LAW, JURISDICTION, AND VENUE**..........................................**45**

23.1    APPLICABLE LAW ........................................................................................................45
23.2    JURISDICTION AND VENUE ...........................................................................................45

**ARTICLE 24 – LAWS, REGULATIONS, AND NONDISCRIMINATION** ...................................**45**

24.1    LAWS AND REGULATIONS ...........................................................................................45
24.2    NONDISCRIMINATION ..................................................................................................45

**ARTICLE 25 – FORCE MAJEURE** ...................................................................................**45**

25.1    FORCE MAJEURE .........................................................................................................45

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1283 of 1570

**ARTICLE 26 – SUCCESSORS AND ASSIGNS** .................................................................**46**

26.1   TRANSFER OF INTEREST .................................................................................. 46
     *26.1.1 Exceptions to Transfer Notice* ........................................................... 46
     *26.1.2 Effective Date of Transfer of Interest* ................................................ 46
     *26.1.3 Form of Transfer of Interest* ............................................................ 46
     *26.1.4 Warranty* ........................................................................................ 47

**ARTICLE 27 – ADMINISTRATIVE PROVISIONS** ...........................................................**47**

27.1   TERM ............................................................................................................ 47
27.2   WAIVER ......................................................................................................... 47
27.3   WAIVER OF RIGHT TO PARTITION ................................................................... 47
27.4   COMPLIANCE WITH LAWS AND REGULATIONS ................................................ 47
     *27.4.1 Severance of Invalid Provisions* ....................................................... 47
     *27.4.2 Fair and Equal Employment* ............................................................. 48
27.5   CONSTRUCTION AND INTERPRETATION OF THIS AGREEMENT .......................... 48
     *27.5.1 Headings for Convenience* ................................................................ 48
     *27.5.2 Article References* ............................................................................ 48
     *27.5.3 Gender and Number* ......................................................................... 48
     *27.5.4 Future References* ............................................................................ 48
     *27.5.5 Currency* ......................................................................................... 48
     *27.5.6 Optional Provisions* ......................................................................... 48
     *27.5.7 Joint Preparation* ............................................................................ 48
     *27.5.8 Integrated Agreement* ...................................................................... 48
     *27.5.9 Binding Effect* ................................................................................. 49
     *27.5.10 Further Assurances* ....................................................................... 49
     *27.5.11 Counterpart Execution* ................................................................... 49
27.6   RESTRICTED BIDDING .................................................................................... 49
27.7   GOVERNING AGREEMENT ............................................................................... 49

**EXHIBIT "A"** ..........................................................................................................**1**

**EXHIBIT "B"** *(Insurance Provisions)* ........................................................................**1**

**EXHIBIT "C"** (COPAS) ............................................................................................**1**

**EXHIBIT "D"** *(Non-Discrimination Provisions)*............................................................**1**

**EXHIBIT "E"** *(Gas Balancing Provisions)* .................................................................**1**

6

# OFFSHORE OPERATING AGREEMENT

This Offshore Operating Agreement (the "Agreement'), made effective the___ day of_____,  20__, by the signers hereof, their respective heirs, successors, legal representatives, and assigns, herein referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, the Parties own or control a leasehold interest in the Lease identified in Exhibit "A" and desire to explore, develop, produce, and operate the Lease pursuant to this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants in this Agreement, along with other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

# ARTICLE 1
# APPLICATION

**1.1**    **Application to Each Lease**

This Agreement applies separately to each oil and gas Lease or portion thereof described in Exhibit "A".

# ARTICLE 2
# DEFINITIONS

**2.1**    **Additional Testing**

An operation not previously approved in the AFE and proposed for the specific purpose of obtaining additional subsurface data.

**2.2**    **Affiliate**

For a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) "control" means the ownership by one (1) person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**2.3**    **Authorization for Expenditure (AFE)**

An authority to expend funds prepared by a Party to estimate the costs to be incurred in conducting an operation under this Agreement.

**2.4**    **BOEMRE**

1

The Bureau of Ocean Energy Management and/or Bureau of Safety and Environmental Enforcement, United States Department of Interior, or their successor agency.  Where appropriate, the reference to BOEMRE shall include the appropriate state agency.

**2.5**     **Complete, Completing, Completion**

An operation to complete a well for initial Hydrocarbon production in one (1) or more Producible Reservoirs, including but not limited to setting production casing, perforating the casing, stimulating the well, installing Completion Equipment, and/or conducting production tests.

**2.6**     **Completion Equipment**

That certain equipment on an Exploratory Well or a Development Well required to be installed before the movement of a well-completion rig off that well:

(a)      under 30 CFR 250.502, or any succeeding order or regulation issued by the BOEMRE, up to and including the tree, and

(b)      by any other regulatory agency having jurisdiction, including but not limited to a caisson and navigational aids.

**2.7**     **Confidential Data**

The information and data obtained under this Agreement, including but not limited to geological, geophysical, and reservoir information; originals and copies of logs; core and core analysis; and other well information including but not limited to the progress, tests, or results of a well drilled or an operation conducted under this Agreement, except data or information that becomes public other than by breach of this Agreement or as agreed to in writing by the Participating Parties.

**2.8**     **Contract Area**

The "Contract Area" described in Exhibit "A".

**2.9**     **Deepen, Deepening**

A drilling operation conducted in an existing wellbore below the Objective Depth to which the well was previously drilled.

**2.9**     **Development Facilities**

Production equipment other than Completion Equipment that is installed on or outside the Lease in order to handle or process Hydrocarbon production. Development Facilities include, but are not limited to:

(a)      compression, separation, dehydration, generators, treaters, skimmers, bunkhouses, and metering equipment;

(b)      the flowlines, gathering lines, or lateral lines that deliver Hydrocarbons and water

      1      from the Completion Equipment to the Platform or to Offsite Host Facilities, or

      2      from the Platform to Export Pipelines; and

(c)      injection and disposal wells.

**2.10**    **Development Operation**

An operation on the Lease other than an Exploratory Operation.

2

**2.11    Development Well**

A well or portion of a well proposed as a Development Operation.

**2.12    Exploratory Operation**

An operation that is conducted on the Lease and that is any of the following:

(a)      proposed to Complete an Exploratory Well;

(b)      proposed for an Objective Horizon that is not a Producible Reservoir; or

(c)      proposed for an Objective Horizon that has a Producible Well, but that will be penetrated at a location where the distance between the midpoint of the Objective Horizon to be penetrated by the proposed operation and the midpoint of the same Objective Horizon where it is actually penetrated by a Producible Well will be at least two thousand (2,000) feet for a gas Completion and at least one thousand (1,000) feet for an oil Completion.

**2.13    Exploratory Well**

A well or portion of a well proposed as an Exploratory Operation.

**2.14    Export Pipelines**

Pipelines to which a gathering line or lateral line downstream of the Platform and/or Development Facilities or, if there is no Platform, the Completion Equipment, is connected and that are used to transport Hydrocarbons or produced water to shore.

**2.15    Force Majeure**

An event or cause that is reasonably beyond the control of the Party claiming the existence of such event or cause and that reasonably prevents such Party from fulfilling its obligations under this Agreement,  including, but not limited to, a flood, a storm, a hurricane, a loop current/eddy, or other act of God, a fire, loss of well control, an oil spill, or other environmental catastrophe, a war, a terrorist act, a civil disturbance, a labor dispute, a strike, a lockout, compliance with a law, order, rule, or regulation, governmental action or delay in granting necessary permits or permit approvals, and the inability to secure materials or a rig.

**2.16    Hydrocarbons**

Oil and/or gas and associated liquid and gaseous by-products (except helium) that may be produced from a wellbore located on the Lease.

**2.17    Joint Account**

This term has the same definition as the defined term "Joint Account" in Exhibit "C" (Accounting Procedure).

**2.18    Lease**

Each oil and gas lease identified in Exhibit "A" and the lands covered by that lease.

**2.19    Non-consent Operation**

An operation conducted on the Lease by fewer than all Parties, which subjects the Non-participating Party to Article 13 (Non-Consent Operations).

**2.20    Non-consent Platform**

3

DEBTORS' EX. NO. 5
1287 of 1570

A Platform owned by fewer than all Parties.

**2.21    Non-consent Well**

An Exploratory Well or a Development Well owned by fewer than all Parties.

**2.22    Non-operator(s)**

A Party other than Operator.

**2.23    Non-participating Party**

A Party other than a Participating Party.

**2.24    Non-participating Party's Share**

The Participating Interest that a Non-participating Party would have had if all Parties had participated in the operation.

**2.25    Objective Depth**

A depth sufficient to test the lesser of the Objective Horizon or the specific footage depth stated in the AFE and approved by the Participating Parties.

**2.26    Objective Horizon**

The interval consisting of the deepest zone, formation, or horizon to be tested in an Exploratory Well, Development Well, Deepening operation, or Sidetracking operation, as stated in the AFE and approved by the Participating Parties.

**2.27    Offsite Host Facilities**

Development and handling facilities that (a) are located off the Lease and (b) are either owned by one (1) or more third parties or by one (1) or more Participating Parties in a well, whose interests in the development and handling facilities differ from their respective Working Interest shares in the well.

**2.28    Operator**

The Party designated as Operator pursuant to Article 4 of this Agreement.

**2.29    Participating Interest**

The percentage of the costs and risks of conducting an operation under this Agreement that a Participating Party agrees, or is otherwise obligated, to pay and bear.

**2.30    Participating Party**

A Party that executes an AFE for a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under this Agreement.

**2.31    Platform**

An offshore structure on the Lease that supports Wells, Completion Equipment, or Development Facilities, whether fixed, compliant, or floating, and the components of that structure, including but not limited to caissons or well protectors to the extent that same are not Completion Equipment, rising above the water line and used for the exploration, development, or production of Hydrocarbons.   The term "Platform" shall also mean any offshore equipment or template (excluding templates used for drilling operations) and any component thereof, other than

4

Completion Equipment (including but not limited to flow lines and control systems), that is resting on or attached to the sea floor and used to obtain production of Hydrocarbons.

**2.32**   **Producible Reservoir**

An underground accumulation of Hydrocarbons (a) in a single and separate natural pool characterized by a distinct pressure system, (b) not in Hydrocarbon communication with another accumulation of Hydrocarbons, and (c) into which a Producible Well has been drilled.

**2.33**   **Producible Well**

A well that is drilled under this Agreement and that (a) is producing Hydrocarbons; (b) is determined to be, or meets the criteria for being determined to be, capable of producing Hydrocarbons in paying quantities under an applicable order or regulation issued by the governmental authority having jurisdiction; or (c) is determined to be a Producible Well by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, even if the well has been plugged and permanently or temporarily abandoned.

**2.34**   **Production Interval**

A zone or interval producing or capable of producing Hydrocarbons from a well without Reworking operations.

**2.35**   **Recomplete, Recompleting, Recompletion**

An operation whereby a Completion in one (1) Producible Reservoir is abandoned in order to attempt a Completion in a different Producible Reservoir within the existing wellbore.

**2.36**   **Rework, Reworking**

An operation conducted in a well, after it has been Completed in one (1) or more Producible Reservoirs, to restore, maintain, or improve Hydrocarbon production from one (1) or more of those Producible Reservoirs, but specifically excluding drilling, Sidetracking, Deepening, Completing, or Recompleting the well.

**2.37**   **Sidetrack, Sidetracking**

The directional control and intentional deviation of a well to change the bottom-hole location, whether it be to the original Objective Depth or formation or another bottom-hole location not deeper than the stratigraphic equivalent of the initial Objective Depth, unless the intentional deviation is done to straighten the hole or to drill around junk in the hole or to overcome other mechanical difficulties.

**2.38**   **Take-in-Kind Facilities**

Facilities that (i) are not paid for by the Joint Account and (ii) are installed for the benefit and use of a particular Party or Parties to take its or their share of Hydrocarbon production in kind.

**2.39**   **Transfer of Interest**

A conveyance, assignment, transfer, farmout, exchange, or other disposition of all or part of a Party's Working Interest.

**2.40**   **Working Interest**

5

The record title interest, or where applicable, the operating rights of each Party in and to each Lease (expressed as the percentage provided in Exhibit "A").  If a Party's record title interest is different from its operating rights, the Working Interest of each Party is the interest provided in Exhibit "A".

Any capitalized terms used herein, but not defined herein, shall have the meaning attributable to them in that certain Farmout Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____ and _____ (the "Farmout Agreement").

# ARTICLE 3
# EXHIBITS

**3.1** **Exhibits**

The following exhibits are attached to this Agreement and incorporated into this Agreement by reference:

**3.1.1** **Exhibit "A"**

Operator, Description of Lease, Division of Interests, and Notification Addresses

**3.1.2** **Exhibit "B"**

Insurance provisions.

**3.1.3** **Exhibit "C"**

Accounting procedure.

**3.1.4** **Exhibit "D"**

Non-discrimination Provisions.

**3.1.5** **Exhibit "E"**

Gas Balancing Agreement.

**3.1.6** **Exhibit "F"**

Memorandum of Operating Agreement and Financing Statement.

**3.2** **Conflicts**

If a provision of an exhibit, except Exhibits "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision in the body of this Agreement shall prevail. If a provision of Exhibit "D" or "E" is inconsistent with a provision in the body of this Agreement, the provision of the exhibit shall prevail.

6

# ARTICLE 4
# OPERATOR

**4.1     Operator**

_____ is designated as Operator of the Lease.  The Parties shall promptly execute and provide Operator with all documents required by the BOEMRE in connection with the designation of _____ as Operator or with the designation of any other Party as a substitute or successor Operator.  Unless agreed to the contrary by all Parties hereto, Operator shall also be classified as the designated applicant for oil spill financial responsibility purposes and each Non-operator Party shall promptly execute the appropriate documentation reflecting this designation and promptly provide same to Operator for filing with BOEMRE.

**4.2     Circumstances Under Which Operator Must Conduct a Non-Consent Operation**

If:

(a)     a drilling rig is on location and Operator becomes a Non-participating Party in a supplemental AFE for an Exploratory Operation, or Development Operation, or

(b)     Operator becomes a Non-participating Party in an operation to be conducted from a Platform operated by Operator,

Operator, as a Non-participating Party, shall conduct the Non-consent Operation on behalf of the Participating Parties and at the Participating Parties' sole cost and risk under Article 13 (Non-Consent Operations).

**4.3     Operator's Conduct of a Non-Consent Operation in Which it is a Non-participating Party**

When, under Article 4.2 (Circumstances Under Which Operator Must Conduct a Non-Consent Operation), Operator conducts a Non-consent Operation in which it is a Non-participating Party, it shall follow the practices and standards in Article 5 (Exclusive Right to Operate). Notwithstanding anything to the contrary in Exhibit "C", Operator shall not be required to proceed with the Non-consent Operation until the Participating Parties have advanced the total estimated costs of the Non-consent Operation to Operator.  Operator shall never be obligated to expend any of its own funds for the Non-consent Operation in which it is a Non-participating Party.

**4.4     Resignation of Operator**

Subject to Article 4.6 (Selection of Successor), Operator may resign at any time by giving written notice to the Parties, except that Operator may not without the other Parties' consent resign during a Force Majeure or an emergency that poses a threat to life, safety, property, or the environment.  If Operator or its Affiliates cease to own a Working Interest, Operator automatically shall be deemed to have resigned as Operator without any action by the Non-operator(s).

**4.5     Removal of Operator**

Operator may be removed by an affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding

7

Operator's Working Interest if:

(a)     Operator becomes insolvent or unable to pay its debts as they mature, makes an assignment for the benefit of creditors, commits an act of bankruptcy, or seeks relief under laws providing for the relief of debtors;

(b)     a receiver is appointed for Operator or for substantially all its property or affairs;

(c)     a Transfer of Interest by Operator (excluding an interest assigned to an Affiliate) reduces Operator's Working Interest to less than the Working Interest of any Non-operator, whether accomplished by one (1) or more Transfer of Interest.

(d)     Operator commits a substantial breach of a material provision of this Agreement and fails to cure the breach within thirty (30) days after notice of the breach.

4.6     **Selection of Successor**

On resignation or removal of Operator, a successor Operator shall be selected from among the Parties by an affirmative vote of one (1) or more Parties having a combined Working Interest of fifty percent (50%) or more.  If the resigned or removed Operator is not entitled to vote, fails to vote, or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the Parties owning a combined Working Interest of fifty percent (50%) or more of the remaining Working Interest after excluding the Working Interest of the resigned or removed Operator.  If Operator assigns all or a part of its Working Interest, under Article 4.4 (Resignation of Operator) or Article 4.5(c), the Party that acquired all or a part of the former Operator's Working Interest shall not be excluded from voting for a successor Operator.  If there are only two (2) Parties to this Agreement when Operator resigns or is removed, the Non-operator automatically has the right, but not the obligation, to become Operator.  If no Party is willing to become Operator, this Agreement shall terminate under Article 27.1 (Term).

4.7     **Effective Date of Resignation or Removal**

The resignation or removal of Operator shall become effective as soon as practical but no later than 7:00 a.m. on the first day of the month following a period of ninety (90) days after the date of resignation or removal, unless a longer period is required for the Parties to obtain approval of the designation of the successor Operator, and designated applicant for oil spill financial responsibility purposes, by the BOEMRE; however, in no event shall the resignation or removal of Operator become effective until a successor Operator has assumed the duties of Operator.  The resignation or removal of the outgoing Operator shall not prejudice any rights, obligations, or liabilities resulting from its operatorship.  The successor Operator may charge the Joint Account for reasonable costs incurred in connection with copying or obtaining the former Operator's records, information, or data except when the change of Operator results from a merger, consolidation, reorganization, or sale or transfer to an Affiliate of Operator.

4.8     **Delivery of Property**

On the effective date of resignation or removal of Operator, the outgoing Operator shall deliver or

8

transfer to the successor Operator custodianship of the Joint Account and possession of all items purchased for the Joint Account under this Agreement, all Hydrocarbons that are not the separate property of a Party, and all equipment, materials, and appurtenances purchased for the Joint Account under this Agreement, which are not already in the possession of the successor Operator.   The outgoing Operator shall further use its reasonable efforts to transfer to the successor Operator, as of the effective date of the resignation or removal, its rights as Operator under all contracts exclusively relating to the activities or operations conducted under this Agreement, and the successor Operator shall assume all obligations of Operator that are assignable under the contracts.   The Parties may audit the Joint Account and conduct an inventory of all property and all Hydrocarbons that are not the separate property of a Party, and the inventory shall be used in the accounting to all Parties by the outgoing Operator of the property and the Hydrocarbons that are not the separate property of a Party.  The inventory and audit shall be conducted under Exhibit "C".

# ARTICLE 5
# AUTHORITY AND DUTIES OF OPERATOR

5.1   **Exclusive Right to Operate**

Unless otherwise provided in this Agreement, Operator shall have the exclusive right and duty to conduct operations (or cause them to be conducted) under this Agreement.   In performing services under this Agreement for the Non-operators, Operator shall be an independent contractor, not subject to the control or direction of Non-operators, except for the type of operation to be undertaken in accordance with the voting and election procedures in this Agreement.   No Party shall be deemed to be, or hold itself out as, the agent or fiduciary of another Party.

5.2   **Workmanlike Conduct**

Operator shall timely commence and conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances.  OPERATOR SHALL NOT BE LIABLE TO NON-OPERATORS FOR LOSSES SUSTAINED OR LIABILITIES INCURRED, EXCEPT AS MAY RESULT FROM OPERATOR'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.   Operator shall never be required under this Agreement to conduct an operation that it believes would be unsafe or would endanger persons, property, or the environment. Unless otherwise provided in this Agreement, Operator shall consult with Non-operators and keep them informed of all important matters.

5.3   **Liens and Encumbrances**

Operator shall endeavor to keep the Lease, wells, Platforms, Development Facilities, and other equipment free from all liens and other encumbrances occasioned by operations hereunder,

9

except those provided in Article 8.6 (Security Rights).

5.4     **Employees and Contractors**

Operator shall select employees and contractors and determine their number, hours of labor, and compensation.

5.5     **Records**

Operator shall keep or cause to be kept accurate books, accounts, and records of activities or operations under this Agreement in compliance with the Accounting Procedure in Exhibit "C". Unless otherwise provided in this Agreement, all records of the Joint Account shall be available to a Non-operator as provided in Exhibit "C".  Operator shall use good-faith efforts to ensure that the settlements, billings, and reports rendered to each Party under this Agreement are complete and accurate.

5.6     **Compliance**

Operator shall comply, and shall require all agents and contractors to comply, with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to comply with all applicable laws, rules, regulations, and orders of governmental authorities having jurisdiction.

5.7     **Contractors**

Operator may enter into contracts with qualified and responsible independent contractors for the design, construction, installation, drilling, production, or operation of wells, Platforms, and Development Facilities. Operator shall, in its discretion, use competitive bidding to procure goods and services for the benefit of the Parties.  All drilling operations conducted under this Agreement shall be conducted by properly qualified and responsible drilling contractors under current competitive contracts.  A drilling contract will be presumed to be a current competitive contract if it (a) was made within twelve (12) months before the commencement of the well and (b) contains terms, rates, and provisions that, when the contract was made, did not exceed those generally prevailing in the area for operations involving substantially equivalent rigs that are capable of conducting the drilling operation.  At its election, Operator may use its own or an Affiliate's drilling equipment, derrick barge, tools, or machinery to conduct drilling operations, but the work shall be (i) performed by Operator or its Affiliate acting as an independent contractor, (ii) approved by written agreement with the Participating Parties before commencement of operations, and (iii) conducted under the same terms and conditions and at the same rates as are customary and prevailing in competitive contracts of third parties doing work of similar nature.

5.8     **Governmental Reports**

Operator shall make reports to governmental authorities it has a duty to make as Operator and shall furnish copies of the reports to the Participating Parties.  Each Non-operator Party shall take all action, including the execution of all documents and forms, as necessary for Operator to make

10

such reports to governmental authorities.

**5.9**    **Information to Participating Parties**

Except as provided in Article 8.7.1, Operator shall furnish each Participating Party at its request the following information, if applicable, for each activity or operation conducted by Operator:

**5.9.1**    A copy of the application for permit to drill and all amendments thereto.

**5.9.2**    A daily drilling report (or Reworking report or Recompletion report, if applicable), giving the depth, corresponding lithological information, data on drilling fluid characteristics, information about drilling or operational difficulties or delays, if any, and other pertinent information, by facsimile transmission or electronic mail within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) for well operations conducted in the preceding twenty-four (24)-hour period.

**5.9.3**    A complete report of each core analysis.

**5.9.4**    A copy of each electrical survey, currently as it is run; all data for each radioactivity log, temperature survey, deviation or directional survey, caliper log, and other log or survey obtained during the drilling of the well; and, on completion of the well, a composite of all electrical-type logs, insofar as is reasonable and customary.

**5.9.5**    A copy of all well test results, bottom-hole pressure surveys, and fluid analyses.

**5.9.6**    On written request received by Operator before commencement of drilling, samples of cuttings and cores taken from the well (if sufficient cores are retrieved), packaged in containers furnished by Operator at the expense of the requesting Party, marked as to the depths from which they were taken, and shipped at the expense of the requesting Party by express courier to the address designated by the requesting Party.

**5.9.7**    To the extent possible, twenty-four (24) hours' advance notice of, and access to, logging, coring, and testing operations.

**5.9.8**    A monthly report on the volume of Hydrocarbons and water produced from each well.

**5.9.9**    A copy of each report made to a governmental authority having jurisdiction.

**5.9.10**   On written request, other pertinent information available to Operator, including but not limited to those portions of the contracts to be used for the benefit of the Joint Account and that pertain to the Lease, but excluding Operator's proprietary or secret information and its subsurface interpretations.

**5.10**    **Information to Non-participating Parties**

Operator shall furnish each Non-participating Party a copy of each Operator's governmental report that is available to the public and associated with the applicable Non-consent Operation. Until the applicable recoupment under Article 13 (Non-consent Operations) is complete, a Non-participating Party shall not receive or review any other information specified by Article 5.9 (Information to Participating Parties), except as may be necessary for a payout audit of the Non-consent Operation.

11

# ARTICLE 6
## VOTING AND VOTING PROCEDURES

**6.1     Voting Procedures**

Unless otherwise provided in this Agreement, each matter requiring approval of the Parties shall be determined as follows:

**6.1.1    Voting Interest**

Subject to Article 8.6 (Security Rights), each Party shall have a voting interest equal to its Working Interest or its Participating Interest, as applicable.

**6.1.2    Vote Required**

Unless expressly stated to the contrary herein, a matter requiring approval of the Parties shall be decided by the affirmative vote of one (1) or more Parties having a combined voting interest of more than fifty percent (50%).  If there are only two (2) Parties to this Agreement, the matter shall be determined by the Party having a majority voting interest or, if the interests are equal, the matter shall require unanimous consent.

**6.1.3    Votes**

The Parties may vote at a meeting; by telephone, promptly confirmed in writing to Operator; by electronic mail; or by facsimile transmission.  Operator shall give each Party prompt notice of the results of the voting.

**6.1.4    Meetings**

Meetings of the Parties may be called by Operator on its own motion or at the request of one or more Parties having a collective voting interest of not less than twenty-five percent (25%).  Except in an emergency, no meeting shall be called on less than ten (10) days' advance written notice, and the notice of meeting shall include the meeting agenda prepared by Operator or the requesting Party.  The representative of Operator shall be chairman of each meeting.  Only matters included in the agenda may be discussed at a meeting, but the agenda and items included in the agenda may be amended before or during the meeting by unanimous agreement of all Parties.

# ARTICLE 7
## ACCESS

**7.1     Access to Lease**

Except as provided in Article 8.7.1, each Party shall have access, at its sole risk and expense and at all reasonable times, to the Lease, Platform, Development Facilities, and Joint Account assets to inspect activities, operations, and wells in which it participates, and to pertinent records and data.  A Non-operator shall give Operator at least twenty-four (24) hours' notice of the Non-

12

#93828440v3
#93828440v5

operator's intention to visit the Lease.  To protect Operator and the Non-operators from lawsuits, claims, and legal liability, if it is necessary for a person who is not performing services for Operator directly related to the joint operations, but is performing services solely for a Non-operator or pertaining to the business or operations of a Non-operator, to visit, use, or board a rig, well, Platform, or Development Facilities subject to this Agreement, the Non-operator shall give Operator advance notice of the visit, use, or boarding, and shall secure from that person an agreement, in a form satisfactory to Operator, indemnifying and holding Operator and Non-operators harmless, or shall itself provide the same hold harmless and indemnification in favor of Operator and other Non-operators before the visit, use, or boarding.

7.2     **Reports**

On written request, Operator shall furnish a requesting Party any information not otherwise furnished under Article 5 (Authority and Duties of Operator) to which that Party is entitled under this Agreement.  The costs of gathering and furnishing information not furnished under Article 5 shall be charged to the requesting Party. Operator is not obligated to furnish interpretative data that was generated by Operator at its sole cost.

7.3     **Confidentiality**

Except as otherwise provided in Article 7.4 (Limited Disclosure), Article 7.5 (Limited Releases to Offshore Scout Association), Article 7.6 (Media Releases), and Article 21.1 (Notice of Contributions Other Than Advances for Sale of Production), and except for necessary disclosures to governmental authorities having jurisdiction, or except as agreed in writing by all Participating Parties, no Party or Affiliate shall disclose Confidential Data to a third party.  This Article 7.3 shall remain in force and effect during the term of this Agreement and for one (1) year after termination of this Agreement.

7.4     **Limited Disclosure**

A Party may make Confidential Data to which it is entitled under this Agreement available to:

(a)     outside professional consultants and reputable engineering firms for the purpose of evaluations and/or submitting bids;

(b)     gas transmission companies for Hydrocarbon reserve or other technical evaluations;

(c)     reputable financial institutions for study before commitment of funds;

(d)     governmental authorities having jurisdiction or the public, to the extent required by applicable laws or by those governmental authorities;

(e)     the public, to the extent required by the regulations of a recognized stock exchange;

(f)     third parties with which a Party is engaged in a bona fide effort to effect a merger or consolidation, sell all or a controlling part of that Party's stock, or sell all or substantially all assets of that Party or an Affiliate of that Party;

(g)     an Affiliate of a Party;

(h)     such limited well information that is typically disclosed by Operator's representative

13

#93828440v3
#93828440v5

during meetings of the Offshore Oil Scouts Association; and

(i)      third parties with which a Party is engaged in a bona fide effort to sell, farm out, or trade all or a portion of its interest in the Lease.

Confidential Data made available under Articles 7.4(f) and 7.4(h) shall not be removed from the custody or premises of the Party making the Confidential Data available to third parties described in those Articles.  A third party permitted access under Articles 7.4, (a), (b), (c), (f), and (h) shall first agree in writing neither to disclose the Confidential Data to others nor to use the Confidential Data, except for the purpose for which it was disclosed.  The disclosing Party shall give prior notice to the other Parties that it intends to make the Confidential Data available.

7.5      **Limited Releases to Offshore Scout Association**

Operator may disclose Confidential Data to the Offshore Oil Scouts Association at their regularly scheduled meetings.  The Confidential Data that may be disclosed is limited to information concerning well locations, well operations, and well completions to the extent reasonable and customary in industry practice or required under the by-laws of the Offshore Oil Scouts Association.

7.6      **Media Releases**

Except as unanimously agreed by the Participating Parties or otherwise permitted by this Article, no Party shall issue a news or media release about operations on the Lease.  In an emergency involving extensive property or environmental damage, operations failure, loss of human life, or other clear emergency, and for which there is insufficient time to obtain the prior approval of the Parties, Operator may furnish the minimum, strictly factual, information necessary to satisfy the legitimate public interest of the media and governmental authorities having jurisdiction.  Operator shall then promptly advise the other Parties of the information furnished in response to the emergency.


# ARTICLE 8
# EXPENDITURES

8.1      **Basis of Charge to the Parties**

Subject to the other provisions of this Agreement, Operator shall pay all costs incurred under this Agreement, and each Party shall reimburse Operator in proportion to its Participating Interest.  All charges, credits, and accounting for expenditures shall be made and done pursuant to Exhibit "C".

8.2      **AFEs**

Before undertaking an operation or making a single expenditure to be in excess of Two Hundred Thousand Dollars ($200,000.00), and before conducting an activity or operation to drill, Sidetrack, Deepen, Complete, Rework, or Recomplete a well (regardless of the estimated cost), Operator

14

#93828440v3
#93828440v5

shall submit an AFE for the operation or expenditure to the Parties for approval.  Operator shall also furnish an informational AFE to all Parties for an operation or single expenditure estimated to cost Two Hundred Thousand Dollars ($200,000.00) or less, but in excess of Fifty Thousand Dollars ($50,000.00).   Operator shall notify the Participating Parties as soon as reasonably possible when it appears that the cost of an ongoing activity or operation, before its completion, will exceed the original AFE by more than one hundred twenty-five percent (125%).   This overexpenditure notice shall be furnished to the Participating Parties as a supplemental AFE for informational purposes only and is not subject to an election by any of the Parties.

**8.3     Emergency and Required Expenditures**

Notwithstanding anything in this Agreement to the contrary, Operator is hereby authorized to conduct operations and incur expenses that in its opinion are reasonably necessary to safeguard life, property, and the environment in case of an actual or imminently threatened blowout, explosion, accident, fire, flood, storm, hurricane, catastrophe, or other emergency, and the expenses shall be borne by the Participating Parties in the affected operation.  Operator shall report to the Participating Parties, as promptly as practical, the nature of the emergency and the action taken.  Operator is also authorized to conduct operations and incur expenses reasonably required by statute, regulation, order, or permit condition or by a governmental authority having jurisdiction, which expenses shall be borne by the Participating Parties in the affected operation, subject to Exhibit "C".

**8.4     Advance Billings**

Operator may require each Party to advance its respective share of estimated expenditures pursuant to Exhibit "C".

**8.5     Commingling of Funds**

Funds received by Operator under this Agreement may be commingled with its own funds.

**8.6     Security Rights**

In addition to any other security rights and remedies provided by law with respect to services rendered or materials and equipment furnished under this Agreement, for and in consideration of the covenants and mutual undertakings of Operator and the Non-operator(s) herein, the Parties shall have the following security rights:

**8.6.1     Mortgage in Favor of Operator**

Each Non-operator(s) hereby grants to Operator a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease, (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease, and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)      This mortgage is given to secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising,

15

pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of Operator herein shall secure the payment of all costs and other expenses properly charged to such Party, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in Exhibit "C" attached hereto (the "Accounting Procedure") or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If any Non-operator(s) Party does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, Operator shall have the additional right to notify the purchaser or purchasers of the defaulting Non-operator's(s') production and collect such costs and other expenses out of the proceeds from the sale of the defaulting Non-operator's(s') share of production until the amount owed has been paid.  Operator shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Non-operator's(s) share of production if the amount owing is uncontested.  Any purchaser of such production shall be entitled to rely on Operator's statement concerning the amount of costs and other expenses owed by the defaulting Non-operator(s) and payment made to Operator by any purchaser shall be binding and conclusive as between such purchaser and such defaulting Non-operator(s).

(ii)     The maximum amount for which the mortgage herein granted by each Non-operator(s) shall be deemed to secure the obligations and indebtedness of such Non-operator(s) to Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of each Non-operator(s)").  Except as provided in the previous sentence (and then only to the extent that such limitations are required by law), the entire amount of obligations and indebtedness of each Non-operator(s) to Operator is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of each Non-operator(s), the liability of each Non-operator(s) under this Agreement and the mortgage and security interest granted hereby shall be limited to (and Operator shall not be entitled to enforce the same against such Non-operator(s) for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in the attached Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of such Non-operator(s) pursuant to this Agreement.

**8.6.2     Security Interest in Favor of Operator**

16

To secure the complete and timely performance of and payment by each Non-operator(s) of all obligations and indebtedness of every kind and nature, whether now owed by such Non-operator(s) or hereafter arising, pursuant to this Agreement, each Non-operator Party hereby grants to Operator a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the lands or offshore blocks covered by the Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of the Non-operator(s) in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.  To the extent susceptible under applicable law, the security interest granted by each Non-operator(s) hereunder covers: (a) all substitutions, replacements, and accessions to the property of such Non-operator(s) described herein and is intended to cover all the rights, titles, and interests of such Non-operator(s) in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of such Non-operator(s) in connection with the Lease, or the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of each Non-operator(s) in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of each Non-operator(s) in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)      all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization

17

#93828440v3
#93828440v5

agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)    all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights of way, and similar rights and privileges that relate to or are appurtenant to any of the Lease(s).

**8.6.3    Mortgage in Favor of the Non-operator Parties**

Operator hereby grants to each Non-operator(s) a mortgage, hypothecate, and pledge of and over all its rights, titles, and interests in and to (a) the Lease; (b) the oil and gas in, on, under, and that may be produced from the lands within the Lease; and (c) all other immovable property or other property susceptible of mortgage situated within the Lease.

(i)      This mortgage is given to secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement.  To the extent susceptible under applicable law, this mortgage and the security interests granted in favor of each Non-operator(s) herein shall secure the payment of all costs and other expenses properly charged to Operator, together with (a) interest on such indebtedness, costs, and other expenses at the rate set forth in the Accounting Procedure or the maximum rate allowed by law, whichever is the lesser, (b) reasonable attorneys' fees, (c) court costs, and (d) other directly related collection costs.  If Operator does not pay any such uncontested costs and other expenses or perform its obligations under this Agreement when due, the Non-operator(s) shall have the additional right to notify

18

#93828440v3
#93828440v5

the purchaser or purchasers of Operator's production and collect such costs and other expenses out of the proceeds from the sale of Operator's share of production until the amount owed has been paid.  The Non-operator(s) shall have the right to offset the amount owed against the proceeds from the sale of Operator's share of production if the amount owing is uncontested.   Any purchaser of such production shall be entitled to rely on the Non-operator(s)' statement concerning the amount of costs and other expenses owed by Operator and payment made to the Non-operator(s) by any purchaser shall be binding and conclusive as between such purchaser and Operator.

(ii)     The maximum amount for which the mortgage herein granted by Operator shall be deemed to secure the obligations and indebtedness of Operator to all Non-operator(s) as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000) in the aggregate (the "Limit of the Mortgage of Operator").  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of Operator to the Non-operator(s) is secured hereby without limitation.  Notwithstanding the foregoing Limit of the Mortgage of Operator, the liability of Operator under this Agreement and the mortgage and security interest granted hereby shall be limited to (and the Non-operator(s) shall not be entitled to enforce the same against Operator for an amount exceeding) the actual obligations and indebtedness (including all interest charges, costs, attorneys' fees, and other charges provided for in this Agreement or in Exhibit "F") outstanding and unpaid and that are attributable to or charged against the interest of Operator pursuant to this Agreement.

**8.6.4   Security Interest in Favor of the Non-operator(s)**

To secure the complete and timely performance of and payment by Operator of all obligations and indebtedness of every kind and nature, whether now owed by Operator or hereafter arising, pursuant to this Agreement, Operator hereby grants to each Non-operator(s) a continuing security interest in and to all its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands or offshore blocks covered by the Lease or attributable to the Lease when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all Platforms, wells, facilities, fixtures, other corporeal property whether movable or immovable, whether now or hereafter placed on the offshore blocks covered by the

19

Lease or maintained or used in connection with the ownership, use, or exploitation of the Lease, and other surface and sub-surface equipment of any kind or character located on or attributable to the Lease and the cash or other proceeds realized from the sale, transfer, disposition, or conversion thereof.  The interest of Operator in and to the oil and gas produced from or attributable to the Lease when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Lease.   To the extent susceptible under applicable law, the security interest granted by Operator hereunder covers: (a) all substitutions, replacements, and accessions to the property of Operator described herein and is intended to cover all the rights, titles and interests of Operator in all movable property now or hereafter located on or used in connection with the Lease, whether corporeal or incorporeal; (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of Operator in connection with the Lease, the oil and gas produced from or attributable to the Lease, whether now owned and existing or hereafter acquired or arising, including, without limitation, all interests of Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Lease; and (c) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of Operator in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to the Lease, including the following:

(i)      all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Exhibit "A", to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Lease, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Lease;

(ii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without

20

#93828440v3
#93828440v5

limitation, those contracts and agreements that are described on Exhibit "A", to the extent, and only to the extent that those contracts and agreements cover or include all or any portion of the Lease; and

(iii)     all its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Lease.

### 8.6.5   Recording

To provide evidence of, and to further perfect the Parties' security rights created hereunder, on request, each Party shall execute and acknowledge the attached Exhibit "F" (the "Memorandum of Operating Agreement and Financing Statement") in multiple counterparts as appropriate.  The Parties authorize Operator to file the Memorandum of Operating Agreement and Financing Statement in the public records set forth below to serve as notice of the existence of this Agreement as a burden on the title of Operator and the Non-operator(s) to their interests in the Lease and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law and to attach an original of the Memorandum of Operating Agreement and Financing Statement to a standard UCC-1 for filing in the UCC records set forth below to perfect the security interests created by the Parties in this Agreement.  Such Memorandum of Operating Agreement and Financing Statement shall be amended from time to time on acquisition of additional leasehold interests in the Lease, and the Parties shall, within five (5) business days following request by one (1) of the Parties hereto, execute and furnish to the requesting Party for recordation any such amendment.

### 8.6.6   The Memorandum of Operating Agreement and Financing Statement

The Memorandum of Operating Agreement and Financing Statement is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes adjacent to the lands or offshore blocks covered by the Lease pursuant to La. R.S. 9:2731 et seq., (b) the mortgage records of such parish(es) or county(ies), (c) the appropriate Uniform Commercial Code records, and (d) the records of the BOEMRE as a non–required filing.  A copy of such filed or recorded instrument(s) shall be furnished to Non-operator(s) once received by Operator.

## 8.7   Unpaid Charges and Default

### 8.7.1   If a Party fails to pay the charges due under this Agreement within sixty (60) days after receipt of Operator's statement, and if Operator then issues a notice of default and the default is not cured in the time and manner provided below, the other Participating Parties shall, on Operator's request, pay the unpaid amount in proportion to their Participating Interests.  Each Party paying its share of the unpaid amount shall be

21

subrogated to Operator's security rights, to the extent of the payment.  In addition to other remedies provided by this Agreement or by law, if a Party does not pay, when due, its share of the charges under this Agreement, Operator may give that Party notice that unless payment is made within thirty (30) days after receipt of Operator's notice, the Party shall be in default if the amount owing is uncontested.  A Party in default shall have no further access to the Lease, maps, records, data, or other information obtained in connection with operations.  If a Party believes that Operator's charges, or a portion thereof, are incorrect, that Party shall nevertheless pay the charges claimed by Operator and may notify Operator that the charges are in dispute.  Thereafter, Operator and the Non-operator(s) shall attempt to resolve the issue within sixty (60) days after receipt of payment.  A defaulting Party shall not be entitled to vote or exercise an election on any matter until that Party's payments are current.  The voting interest of each non-defaulting Party shall be in the proportion its Participating Interest bears to the total Participating Interests of all non-defaulting Parties. For each operation approved while a Party is in default, the defaulting Party shall be deemed to have voted not to participate in that operation.

8.7.2   The first sentence of Article 8.6.1(ii) of this Agreement shall be applicable only when both of the following conditions have been met: (i) Operator has fully complied with the provisions of this Agreement that are intended for the prevention of such a default, including, without limitation, timely advance billings, reasonable efforts to timely collect payment for advance billings as well as all monthly billings, providing due notice of default to a party that fails to make timely payment as required and recording of a fully executed Memorandum of Operating Agreement and Financing Statement as set forth in Exhibit "F", and (ii) the defaulting party is any Party other than Operator or its assigns.

**8.8     Confession of Judgment; Executory Process**

To the extent the Contract Area is located adjacent to Louisiana and to the extent allowed under La. C.C.P. art. 2631 et seq., each Party may use executory process to enforce the mortgage and security rights granted hereunder as to any property subject hereto.  Therefore, each Non-operator Party hereby confesses judgment in favor of the Operator up to the full amount secured hereunder as set forth in Article 8.6.1 (Mortgage in Favor of the Operator), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Non-operator Party, the mortgage or security interests shall, at the option of the Operator, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for the Operator, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same

22

being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold without appraisal, which is hereby expressly waived, by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law. Furthermore, the Operator hereby confesses judgment in favor of each Non-operator Party up to the full amount secured hereunder as set forth in Article 8.6.3 (Mortgage in Favor of the Non-operator Parties), and does by these present, consent, agree, and stipulate that, in the event the mortgage or security interests or any charges thereon not being promptly and fully paid when the same becomes due and payable, or in the event of failure to comply with any of the obligations herein set forth, or the breach of this Agreement in any of its parts by such Operator, the mortgage or security interests shall, at the option of such Non-operator Party, become due and payable, anything therein contained to the contrary notwithstanding, and it shall be lawful for such Non-operator Party, as holder or the mortgage or security interests, without making a demand and without notice or putting in default, the same being hereby expressly waived, to cause all and singular the property herein mortgaged or secured to be seized and sold by executory process issued by a competent court or to proceed with enforcement of its mortgage or security interest in any other manner provided by law.

# ARTICLE 9
# NOTICES

9.1   **Giving and Receiving Notices**

Except as otherwise provided in this Agreement, all AFEs and notices required or permitted by this Agreement shall be in writing and shall be delivered in person or by mail, courier service, or electronic mail, or facsimile transmission, with postage and charges prepaid, addressed to the Parties at the addresses in Exhibit "A". When a drilling rig is on location and standby charges are accumulating, however, notices pertaining to the rig shall be given orally or by telephone. All telephone or oral notices permitted by this Agreement shall be confirmed as soon as reasonably practical thereafter by written notice. A notice shall be deemed to have been delivered only when received by the Party to which it was directed, and the period for a Party to deliver a response thereto begins on the date the notice is received. "Receipt", for oral or telephone notice, means actual and immediate communication to the Party to be notified, and for written notice, means actual delivery of the notice to the address of the Party to be notified, as specified in this Agreement, or to the facsimile machine of that Party. A responsive notice shall be deemed to have been delivered when the Party to be notified is in receipt of same. When a response is required in forty-eight (48) hours or less, however, the response shall be given orally or by telephone, electronic mail, or facsimile transmission within that period. If a Party is unavailable to accept delivery of a notice required to be given orally or by telephone, the notice may be

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1307 of 1570

delivered by any other method specified in this Article 9.1.  A message left on an answering machine or with an answering service or other third person shall not be deemed to be adequate telephonic or oral notice.

**9.2    Content of Notice**

An AFE or a notice requiring a response shall indicate the maximum response time specified in Article 9.3 (Response to Notices).  A proposal for a Platform and/or Development Facilities shall include an AFE containing a description of the Platform and/or Development Facilities, including but not limited to location and the estimated costs of design, fabrication, transportation, and installation.   A proposal for a well operation shall include an AFE describing the estimated commencement date, the proposed depth, the objective formation or formations to be penetrated or tested, the Objective Horizon, the surface and bottom-hole locations, proposed directional or horizontal drilling operations, the type of equipment to be used, and the estimated costs of the operation, including but not limited to the estimated costs of drilling, testing, and Completing or abandoning the well. If a proposed operation is subject to Article 13.11 (Lease Maintenance Operations), the notice shall specify that the proposal is a Lease Maintenance Operation. A proposal for multiple operations on more than one (1) well location by the same rig shall contain separate AFEs or notices for each operation and shall specify in writing in what order the operations will be conducted. Each Party shall respond to each proposed multiple operation in the manner provided in Article 9.3.3 (Proposal for Multiple Operations).

**9.3    Response to Notices**

Except as provided in Article 9.1, each Party's response to a proposal shall be in writing to the proposing Party. Unless otherwise provided in this Agreement, the response time shall be as follows:

**9.3.1    Platform and/or Development Facilities Proposals**

Each Party shall respond within sixty (60) days after its receipt of the AFE or notice for a Platform and/or Development Facilities.

**9.3.2    Well Proposals**

Except as provided in Article 9.3.3 (Proposal for Multiple Operations), each Party shall respond within thirty (30) days after receipt of the well, Rework, or Recompletion proposal, but if (a) a drilling rig is on location, (b) the proposal relates to the same well or its substitute, and (c) standby charges are accumulating, a response shall be made within forty-eight (48) hours after receipt of the proposal, including Saturdays, Sundays, and federal holidays.

**9.3.3    Proposal for Multiple Operations**

When a proposal is made to conduct multiple Development Operations at separate well locations using the same rig, each Party shall respond (a) to the well operation taking

24

precedence, within thirty (30) days after receipt of the proposal; and (b) to each subsequent well location, within forty-eight (48) hours after completion of approved operations at the prior location and notification thereof by Operator.

**9.3.4    Other Matters**

For all other matters requiring notice, each Party shall respond within thirty (30) days after receipt of notice.

**9.4    Failure to Respond**

Failure of a Party to respond to a proposal or notice, to vote, or to elect to participate within the period required by this Agreement shall be deemed to be a negative response, vote, or election.

**9.5    Response to Counterproposals**

Should a counterproposal be allowed under this Agreement, responses to that counterproposal must be made within the response period for the original proposal.

**9.6    Timely Well Operations**

Unless otherwise provided, an approved well shall be commenced within one hundred eighty (180) days after the date when the last applicable election on that well may be made.  Wells shall be deemed to have commenced on the day charges commence under the drilling contract for that well. Subject to Exhibit "C", if a proposal for a well is deemed to have been withdrawn, all costs incurred in the preparation for or in furtherance of that well will be chargeable to the Parties that voted to participate in the well proposal for that well.

**9.7    Timely Platform / Development Facilities Operations**

Unless otherwise provided, Operator shall commence, or cause to commence, the construction, acquisition, or refurbishment of an approved proposal for a Platform and/or Development Facilities within one hundred eighty (180) days after the date when the last applicable election on that Platform and/or Development Facilities may be made.  The construction, acquisition, or refurbishment of an approved Platform and/or Development Facilities proposal shall be deemed to have commenced on the date the contract is awarded for the design, acquisition, fabrication, or refurbishment of the Platform and/or Development Facilities.  Subject to Exhibit "C", regardless of whether or not the construction, acquisition, or refurbishment of a Platform and/or Development Facilities is commenced, all costs incurred by Operator, attributable to that activity, shall be paid by the Participating Parties.

# ARTICLE 10
# EXPLORATORY OPERATIONS

**10.1    Proposing Operations**

A Party may propose an Exploratory Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation

25

**10.2     Counterproposals**

When an Exploratory Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Exploratory Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 10.5 (Operations by Fewer Than All Parties), the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the proposal first received by the Parties shall take precedence.  Except for the response period provided in this Article 10.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**10.3     Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**10.4     Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**10.5     Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 10.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless

26

DEBTORS' EX. NO. 5
1310 of 1570

otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

### 10.5.1 First Exploratory Well

If a Party elects to be a Non-participating Party in the drilling of the first Exploratory Well on the Lease, then, as of the last applicable election date, each Non-participating Party shall be deemed to have relinquished its entire Working Interest in the Lease to the Participating Party.  If such first Exploratory Well is commenced timely after the last applicable election date and is drilled to the proposed Objective Depth or deepest Objective Horizon, whichever is lesser, in accordance with this Agreement, each Non-participating Party shall execute an assignment of its entire Working Interest in the Lease to the Participating Party(ies) in proportion to their interests in such first Exploratory Well.

### 10.6 Expenditures Approved

Approval of an Exploratory Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

### 10.7 Conduct of Operations

After commencement of drilling an Exploratory Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and that render further operations impracticable. If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 10.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

### 10.8 Course of Action After Reaching Objective Depth

When an Exploratory Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed as set forth in the approved AFE and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's

27

recommendation for further operations in the well, and the following provisions shall apply:

**10.8.1   Election by Participating Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.   The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

**10.8.2   Priority of Operations**

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1    Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2    Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

3    Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

4    Complete at the Objective Horizon.

5    Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed at the deepest depth shall take precedence.)

6    Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7    Temporarily abandon.

8    Plug and abandon.

**10.8.3   Second Opportunity to Participate**

If there are more than two (2) Participating Parties and fewer than all but one (1) or more

28

Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

**10.8.4   Operations by Fewer Than All Parties**

If, after the election (if applicable) made under Article 10.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**10.8.5   Subsequent Operations**

On completion of an operation conducted under Article 10.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a Producible Well, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well under Articles 10.8.1 through 10.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well or if all Participating Parties elect to

29

plug and abandon the well, subject to Article 14 (Abandonment and Salvage), Operator shall permanently plug and abandon the well at the cost and risk of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

**10.9    Wells Proposed Below Deepest Producible Reservoir**

If a proposal is made to conduct an Exploratory Operation involving the drilling of a well to an Objective Horizon below the base of the deepest Producible Reservoir, a Party may elect within the applicable period to limit its participation in the operation down to the base of the deepest Producible Reservoir.  For purposes of this Article 10.9, a Party that elects to limit its participation in the operation down to the base of the deepest Producible Reservoir shall be referred to as "Shallow Participant" and a Party that elects to participate in the entire operation shall be referred to as "Deep Participant".  If a Party elects to limit its participation to the base of the deepest Producible Reservoir, Operator shall prepare and submit to the Shallow Participant, for informational purposes, a separate AFE covering operations down to the deepest Producible Reservoir.  The Shallow Participant shall be a Participating Party in, and shall pay and bear the costs and risks of, each operation to the base of the deepest Producible Reservoir, according to its Participating Interest.  The Shallow Participant shall be a Non-participating Party in each operation below the deepest Producible Reservoir, and the operation shall be considered a Non-consent Operation, and the provisions of Article 13 (Non-consent Operations) shall apply.  If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Deep Participant shall reimburse the Shallow Participant for its share of the actual well costs to the base of the deepest Producible Reservoir.  Payment shall be due within thirty (30) days after receipt of notice of the well being completed below the deepest Producible Reservoir.  If the well is Completed and produces Hydrocarbons from a horizon below the deepest Producible Reservoir, the Shallow Participant shall reimburse the Deep Participant for its Working Interest share of the actual well costs to the base of the deepest Producible Reservoir in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), on the earlier of the time that (a) the well is plugged back to a horizon above the base of the deepest Producible Reservoir, as determined when the original well was proposed, (b) the well is plugged and abandoned, or (c) the amount to be recouped by the Deep Participant under Article 13 (Non-consent Operations) is recovered.

# ARTICLE 11
# DEVELOPMENT OPERATIONS

**11.1    Proposing Operations**

A Party may propose a Development Operation in accordance with Article 9 (Notices) to the other Parties that are entitled to vote or make an election in regard to that operation.

30

DEBTORS' EX. NO. 5
1314 of 1570

**11.2     Counterproposals**

When a Development Operation is proposed, a Party may, within seven (7) days (exclusive of Saturdays, Sundays, and federal holidays) after receipt of the AFE or notice for the original proposal, make a counterproposal to conduct an alternative Development Operation by sending an AFE or notice to such Parties in accordance with Article 9 (Notices).  The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, such Parties shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal.  If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 11.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall prevail.  Except for the response period provided in this Article 11.2, a counterproposal shall be subject to the same terms and conditions as the original proposal.

**11.3     Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**11.4     Second Opportunity to Participate**

If there are more than two (2) Parties to this Agreement and if fewer than all but one (1) or more Parties elect to participate, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**11.5     Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made under Article 11.4 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation have elected to participate in the proposed operation, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be

31

obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.

**11.6    Expenditures Approved**

Approval of a Development Operation shall cover all necessary expenditures associated with the operation proposed in the AFE or notice that are incurred by Operator in connection with (a) preparations for drilling; (b) the actual drilling; (c) evaluations, such as testing, coring, and logging; and (d) plugging and abandonment.

**11.7    Conduct of Operations**

After commencement of a Development Well, Operator shall diligently conduct the operation without unreasonable delay until the well reaches the Objective Depth, unless the well encounters, at a lesser depth, impenetrable conditions or mechanical difficulties that cannot be overcome by reasonable and prudent operations and render further operations impracticable.  If a well does not reach its Objective Depth as a result of the conditions mentioned in this Article 11.7, the operation shall be deemed to have been completed and Article 13 (Non-consent Operations) shall apply to each Non-participating Party for the portion of the well drilled.

**11.8    Course of Action After Reaching Objective Depth**

When a Development Well has been drilled to its Objective Depth and reasonable testing, coring, and logging have been completed and the results have been furnished to the Participating Parties, Operator shall notify the Participating Parties of Operator's recommendation for further operations in the well and the following provisions shall apply:

**11.8.1    Election by Fewer Than All Parties**

A Participating Party shall have the right to propose another operation by notifying Operator and the other Participating Parties of its proposed operation within twenty-four (24) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's notice.   The Participating Parties shall notify Operator within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, of receipt of Operator's proposal whether the Participating Parties elect to (a) participate in a recommended operation, or (b) not participate in a recommended operation.  Failure to respond shall be deemed to be an election not to participate in any of the recommended operations.

32

#93828440v3
#93828440v5

### 11.8.2   Priority of Operations

If all Participating Parties elect to participate in the same proposed operation, Operator shall conduct the operation at their cost and risk.  If more than one (1) operation is approved by one (1) or more Participating Parties having a combined Working Interest of fifty percent (50%) or more, the approved operation with the lowest number as indicated below shall take precedence:

1       Additional Testing, coring, or logging.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

2       Complete at the Objective Horizon.

3       Complete above the Objective Horizon.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

4       Deepen.  (If conflicting proposals are approved, the operation proposed to the deepest depth shall take precedence.)

5       Sidetrack.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

6       Other operations.  (If conflicting proposals are approved, the proposal receiving the largest percentage of Working Interest approval shall take precedence, and in the event of a tie between two (2) or more approved proposals, the approved proposal first received by the Parties shall take precedence.)

7       Temporarily abandon.

8       Plug and abandon.

### 11.8.3   Second Opportunity to Participate

If there are more than two (2) Participating Parties and if fewer than all but one (1) or more Participating Parties elect to participate in an operation, the proposing Party shall notify the Participating Parties of the elections made, whereupon a Party originally electing not to participate in the proposed operation may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk. If there are only two (2) Participating Parties, there shall not be a second opportunity to elect to participate.

### 11.8.4   Operations by Fewer Than All Parties

33

#93828440v3
#93828440v5

If, after the election (if applicable) made under Article 11.8.3 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the proposed operation that takes precedence, the proposing Party shall notify the Participating Parties and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests that it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of the costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of costs and risks attributable to the Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and the provisions of Article 13 (Non-consent Operations) shall apply.  If such agreement is not obtained, however, the operation shall not be conducted and the effect shall be as if the proposal had not been made.  If a Participating Party in a well elects not to participate in the Deepening or Sidetracking operation in the well, such non-consenting Party shall become a Non-participating Party in all operations conducted in the Deepened or Sidetracked portion of the well after that election.

**11.8.5   Subsequent Operations**

On the completion of an operation conducted under Article 11.8 (Course of Action After Reaching Objective Depth), if the well is not either (a) Completed as a well capable of producing Hydrocarbons in paying quantities, or (b) temporarily abandoned or permanently plugged and abandoned, Operator shall notify the Participating Parties of Operator's recommendation for operations in the well under Articles 11.8.1 through 11.8.4, which again shall apply.  If sufficient approval is not obtained to conduct a subsequent operation in a well, or if all Participating Parties elect to plug and abandon the well, subject to Article 14 (Abandonment, Salvage, and Surplus), Operator shall permanently plug and abandon the well at the expense of all Participating Parties.  Each Participating Party shall be responsible for its proportionate share of the plugging and abandonment costs associated with the operation in which it participated.

# ARTICLE 12
# PLATFORM AND DEVELOPMENT FACILITIES

34

#93828440v3
#93828440v5

**12.1   Proposals**

A Party may propose the fabrication or acquisition and installation of a Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices).

**12.2   Counterproposals**

When a Platform and/or Development Facilities is proposed under Article 12.1, a Party may, within seven (7) days after receipt of the AFE or notice for the original proposal, make a counterproposal to fabricate or otherwise acquire and install said Platform and/or Development Facilities by sending an AFE or notice to the other Parties in accordance with Article 9 (Notices). The AFE or notice shall indicate that the proposal is a counterproposal to the original proposal.  If one (1) or more counterproposals are made, each Party shall elect to participate in either the original proposal, one (1) counterproposal, or neither the original proposal nor a counterproposal. If two (2) or more proposals receive the approval of the number of Parties and combined Working Interests required by Article 12.5 (Operations By Fewer Than All Parties), the proposal receiving the largest percentage Working Interest approval shall be deemed approved, and if two (2) or more approved proposals receive the same Working Interest approval, the approved proposal first received by the Parties shall be deemed approved.

**12.2.1   Operations by All Parties**

If all Parties elect to participate in the proposed operation, Operator shall conduct the operation at their cost and risk.

**12.2.2   Second Opportunity to Participate**

If there are more than two (2) Parties and if fewer than all but one (1) or more Parties elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Parties of the elections made, whereupon a Party originally electing not to participate may then elect to participate by notifying the proposing Party within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of such notice.  If all Parties elect to participate in the Platform and/or Development Facilities, Operator shall timely commence the fabrication and installation of the Platform and/or Development Facilities at their cost and risk.  If there are only two (2) Parties to this Agreement, there shall not be a second opportunity to elect to participate, and if the Participating Party agrees to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Party, and the provisions of Article 13 (Non-consent Operations) shall apply.

**12.2.3   Operations by Fewer Than All Parties**

If there are more than two (2) Parties to this Agreement and if, after the election made

35

Case 20-33948   Document 1261-7   Filed in TXSB on 04/12/21   Page 274 of 524

Case 20-33948   Document 1254-2   Filed in TXSB on 04/09/21   Page 225 of 475

under Article 12.2.2 (Second Opportunity to Participate), fewer than all but one (1) or more Parties having the requisite Working Interest to approve the operation elect to participate in the Platform and/or Development Facilities, the proposing Party shall notify the Participating Parties, and each Participating Party shall have forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, after receipt of the notice to notify the proposing Party of the portion of the costs and risks attributable to the total Non-participating Parties' interests it elects to pay and bear.  Unless otherwise agreed by the Participating Parties, each Participating Party may, but shall not be obligated to, pay and bear that portion of costs and risks attributable to the total Non-participating Parties' interests in the ratio that the Participating Party's interest bears to the total interests of all Participating Parties that elect to pay and bear a portion of the costs and risks attributable to the total Non-participating Parties' interests.  Failure to respond shall be deemed to be an election not to pay or bear any additional costs or risks.  If the Participating Parties agree to pay and bear one hundred percent (100%) of the costs and risks of the operation, Operator shall conduct the operation as a Non-consent Operation for the benefit of the Participating Parties, and except as provided in Article 12.4 (Rights to Take in Kind), the provisions of Article 13.2.1.(b) shall apply.  If such agreement is not obtained, however, the fabrication and installation of the Platform and/or Development Facilities shall not be commenced, and the effect shall be as if the proposal had not been made.

**12.3    Ownership and Use of the Platform and Development Facilities**

The Participating Parties in the Development Facilities own all the excess capacity of the Development Facilities and the excess weight, space, and buoyancy of the Platform.  Each Participating Party in the Development Facilities does not have the right to use its Participating Interest share of the excess capacity, weight, space, and buoyancy for hydrocarbon production from outside the Lease.  Each Participating Party in the Development Facilities or Platform must obtain the unanimous approval of the other Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  It must negotiate the payment of a fee with the Participating Parties in the Development Facilities or Platform in order to utilize any portion of the excess capacity, weight, space, and buoyancy.  Each of the Participating Parties in the Development Facilities or Platform shall receive its Participating Interest share of all fees derived from the utilization of the excess capacity, weight, space, and buoyancy.  All hydrocarbon production from outside the Lease shall be processed under a "Facilities Use and Production Handling Agreement" unanimously agreed to by the Participating Parties in the Development Facilities.

**12.4    Rights to Take in Kind**

Nothing in this Article 12 shall act to limit a Party's rights under Article 22 (Disposition of

36

#93828440v3
#93828440v5

Production), or to otherwise separately dispose of its share of Hydrocarbon production.  If a Party elects (a) not to participate in an approved Development Facilities proposal and (b) to separately dispose of its share of Hydrocarbon production (the "Separately Disposing Party"), the Separately Disposing Party (c) shall not be subject to the provisions of Article 13.2.1.(b), but must provide proof to the Participating Parties in the approved Development Facilities proposal, within seven (7) days from the last applicable response date to the Development Facilities proposal, that it has entered into fabrication and transportation contracts to separately dispose of its own share of Hydrocarbon production.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is sufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, it shall immediately (i) become a Participating Party in the Development Facilities and utilize the Development Facilities for its share of Hydrocarbon production, (ii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the Development Facilities had it elected to participate in the Development Facilities under Article 12.1 or 12.2, and (iii) assume its share of the risks and liabilities associated with the construction and ownership of the Development Facilities as of the date of commencement of the operations to construct same. The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under this Article 12.4, shall own the original Development Facilities based on their Participating Interest share in the original Development Facilities.  If a Separately Disposing Party fails to provide such proof by that deadline and if there is insufficient capacity for the Development Facilities to accommodate the Separately Disposing Party's share of the Hydrocarbons, the Separately Disposing Party shall (i) become a Participating Party in the original Development Facilities and utilize the available capacity in the original Development Facilities, if any, for its share of Hydrocarbon production, (ii) pay one hundred percent (100%) of the costs of an expansion or modification of the Development Facilities, which is required to accommodate all or a portion of its share of the Hydrocarbons, and assume one hundred percent (100%) of the risks and liabilities associated with (a) the construction, installation and commissioning of the expanded or modified Development Facilities and (b) the utilization of the expanded or modified Development Facilities for thirty (30) days after the commencement of Hydrocarbon production through same, (iii) pay to the Participating Parties in the approved Development Facilities proposal an amount equal to two hundred percent (200%) of what would have been the Separately Disposing Party's share of the costs and expense of the original Development Facilities had it elected to participate in the original Development Facilities under Article 12.1 or 12.2, and (iv) assume its share of the risks and liabilities associated with the construction and ownership of the original Development Facilities as of the date of commencement of the operations to construct the original

37

Development Facilities.  The Participating Parties in the original Development Facilities and the Separately Disposing Party, which becomes a Participating Party in the original Development Facilities under Article 12.4(i), shall own the expanded or modified Development Facilities based on their Participating Interest share in the original Development Facilities, and the Participating Parties in the original Development Facilities shall assume their Participating Interest share of the risks and liabilities associated with the ownership of the expanded or modified Development Facilities thirty (30) days after that the expanded or modified Development Facilities have been utilized.

**12.5     Expansion or Modification of a Platform and/or Development Facilities**

After installation of a Platform and/or Development Facilities, any Participating Party in that Platform and/or Development Facilities may propose the expansion or modification of that Platform and/or Development Facilities by written notice (along with its associated AFE) to the other Participating Parties in that Platform and/or Development Facilities.  That proposal requires approval by one (1) or more of the Participating Parties in the Platform and/or Development Facilities with more than fifty percent (50%) of the Participating Interest in the Platform and/or Development Facilities.  If approved, that proposal will be binding on all Participating Parties in that Platform and/or Development Facilities, and Operator shall commence that expansion or modification at the sole cost and risk of all the Participating Parties in that Platform and/or Development Facilities unless otherwise agreed.

**12.6     Offsite Host Facilities**

If one (1) or more Parties with more than fifty percent (50%) of the Participating Interest in Hydrocarbon production agree that Hydrocarbon production can most effectively be processed and handled by an Offsite Host Facilities, Operator, on behalf of the Participating Parties, shall use reasonable efforts to secure a formal "Facilities Use and Production Handling Agreement" from the owners of the Offsite Host Facilities.  If Operator does secure access to Offsite Host Facilities in a Facilities Use and Production Handling Agreement, each Participating Party shall have the right, but not the obligation, to utilize its Participating Interest share of the capacity so secured.  This Article 12.6 shall not constitute a limit on a Party's right to install its own Take-in-Kind Facilities under Article 22 (Disposition of Production).

# ARTICLE 13
# NON-CONSENT OPERATIONS

38

#93828440v3
#93828440v5

**13.1    Non-consent Operations**

Operator shall conduct Non-consent Operations at the sole cost and risk of the Participating Parties in accordance with the following provisions:

**13.1.1    Non-interference**

Non-consent Operations shall not interfere unreasonably with operations approved by all the Parties.

**13.1.2    Multiple Completion Limitation**

Subject to Article 10.9, a Non-consent Operation shall not be conducted in a well having multiple Completions unless (a) each Completion is owned by the same Parties in the same proportions; (b) the well is incapable of producing from any Completion; or (c) all Participating Parties in the well consent to the operation.

**13.1.3    Metering**

In Non-consent Operations, Hydrocarbon production shall be determined on the basis of appropriate well tests, unless separate metering devices are required by a governmental authority having jurisdiction.

**13.1.4    Non-consent Well**

Operations on a Non-consent Well shall not be conducted in a Producible Reservoir without approval of all Parties unless (a) the Producible Reservoir is designated in the notice as a Completion objective; (b) Completion of the well in the Producible Reservoir will not increase the rates of Hydrocarbon production that are prescribed and approved for the Producible Reservoir by the governmental authority having jurisdiction; and (c) the horizontal distance between the vertical projections of the midpoint of the Producible Reservoir in the well and an existing well currently completed in and producing from the same Producible Reservoir will be at least one thousand (1,000) feet for an oil-well Completion or two thousand (2,000) feet for a gas-well Completion.

**13.1.5    Cost Information**

Operator shall, within one hundred twenty (120) days after completion of a Non-consent Operation, furnish the Parties either (a) an inventory and an itemized statement of the cost of the Non-consent Operation and equipment pertaining thereto, or (b) a detailed statement of the monthly billings.  Each quarter thereafter, while the Participating Parties are being reimbursed under Article 13.2.1 (Production Reversion Recoupment), Operator shall furnish the Non-participating Parties a quarterly statement detailing all costs and liabilities incurred in the Non-consent Operation, together with a statement of the quantities of Hydrocarbons produced from it and the amount of the proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production from the Non-consent Operation for the preceding quarter.  Operator shall prepare the monthly statement of the quantities of Hydrocarbons produced and the amounts of the proceeds

39

#93828440v3
#93828440v5

from the sale of Non-participating Parties' relinquished Hydrocarbon production based on the proceeds received for Operator's share of Hydrocarbon production.  When Operator's payout calculation indicates that payout has occurred, Operator shall promptly notify all Parties.  The Participating Parties that assumed a portion of the Non-participating Parties' relinquished interest shall then provide Operator all information pertaining to the cumulative proceeds received from the sale of the Non-participating Parties' relinquished Hydrocarbon production.  Operator shall revise the payout date using the actual proceeds from the sale of the Non-participating Parties' relinquished Hydrocarbon production and administer any subsequent adjustments between the Parties.

### 13.1.6   Completions

For determinations under Article 13.1 (Non-consent Operations), each Non-consent Operation in a single wellbore shall be accounted for separately.

## 13.2   Relinquishment of Interest

On commencement of Non-consent Operations, other than Non-consent Operations governed by Article 10.5 (Operations by Fewer Than All Parties) or Article 13.7 (Operations Utilizing a Non-consent Platform and/or Development Facilities), each Non-participating Party's interest and leasehold operating rights in the Non-consent Operation and title to Hydrocarbon production resulting therefrom; and if Article 13.8 (Discovery or Extension from Non-consent Drilling) is effective, one-half (1/2) of each Non-participating Party's interest and leasehold operating rights and title to Hydrocarbon production from wells mentioned in Article 13.8 (Discovery or Extension from Non-consent Drilling), shall be owned by and vested in each Participating Party in proportion to its Participating Interest, or in the proportions otherwise agreed by the Participating Parties, for as long as the Non-Consent Operation is being conducted or Hydrocarbon production is obtained therefrom, subject to the following:

### 13.2.1   Production Reversion Recoupment

When the Participating Parties have recouped out of Hydrocarbon production from the Non-consent Operations attributable to the Non-participating Party's interest an amount, which when added to amounts received under Article 13.3 (Deepening or Sidetracking of Non-consent Well), equals the sum of the following:

(a)     Eight hundred percent (800%) of the Non-participating Party's share of the costs of the following Non-consent Exploratory Operations, or six hundred percent (600%) of the Non-participating Party's share of the costs of the following Non-consent Development Operations: drilling, testing, Completing, Recompleting, Deepening, Sidetracking, Reworking, plugging back, and temporarily abandoning a well, reduced by the Non-participating Party's Share of a cash contribution received under Article 21.2 (Cash Contributions);

40

DEBTORS' EX. NO. 5
1324 of 1570

(b)     If applicable, three hundred percent (300%) of Non-participating Party's Share of the cost of Platforms and/or Development Facilities approved under Article 12.1 (Proposal) or Article 12.2 (Counterproposals); such recoupment is limited to the Non-participating Party's Share of the Hydrocarbon production that utilize such Platform and/or Development Facilities;

(c)     Two hundred percent (200%) of the Non-participating Party's Share of the cost charged in accordance with Article 13.9 (Allocation of Platform / Development Facilities Costs to Non-consent Operations) of using an existing Platform / Development Facilities; and

(d)     the Non-participating Party's Share of the costs of operation, maintenance, treating, processing, gathering, and transportation, including but not limited to an Offsite Host Facilities' handling fees, as well as lessor's royalties and severance, Hydrocarbon production, and excise taxes,

the relinquished interests of the Non-participating Party shall automatically revert to the Non-participating Party as of 7:00 a.m. of the day after the recoupment occurs. Thereafter, the Non-participating Party shall own the same interest in the Non-consent Well, equipment pertaining thereto, including but not limited to any Platform or Development Facilities, and the Hydrocarbon production therefrom as the Non-participating Party would have owned or been entitled to if it had participated in the Non-consent Operation. On reversion, the Non-participating Party shall become a Participating Party and, as such, shall become liable for its proportionate share of the further costs of the operation as set forth in this Agreement and Exhibit "C".

### 13.2.2   Non-production Reversion

If the Non-consent Operation fails to obtain Hydrocarbon production or if the operation results in Hydrocarbon production that ceases before complete recoupment by the Participating Parties under Article 13.2.1 (Production Reversion Recoupment), such leasehold operating rights shall revert to each Non-participating Party, except that all Non-consent Wells, Platforms, and Development Facilities shall remain vested in the Participating Parties (but the salvage value in excess of the sum remaining under Article 13.2.1 shall be credited to all Parties).

### 13.3   Deepening or Sidetracking of Non-consent Well

If a Participating Party proposes to Deepen or Sidetrack a Non-consent Well, a Non-participating Party may then elect to participate in the Deepening or Sidetracking operation by notifying Operator within thirty (30) days, or within forty-eight (48) hours, including Saturdays, Sundays, and federal holidays, if a rig is on location and standby charges are being incurred, after receiving notice of the proposal.  A Non-participating Party that elects to participate in Deepening or

41

Sidetracking the well, as proposed, shall immediately pay the Participating Parties, in accordance with Article 13.4 (Deepening or Sidetracking Cost Adjustments), its Working Interest share of actual well costs (excluding logging, coring, testing, and Completion costs other than the cost of setting any casing or Completion Equipment that is used in the Deepening or Sidetracking), less all amounts recovered by the Participating Parties from the proceeds of Hydrocarbon production from the well, as if the Non-participating Party had originally participated to the initial objective depth or formation, in the case of a Deepening operation, or the depth at which the Sidetracking operation is initiated.   Thereafter, the Non-participating Party shall be deemed to be a Participating Party for the Deepening or Sidetracking operations, and Article 13.2.1(a) shall not apply to that Party for the Deepened or Sidetracked portion of the well.  The initial Participating Parties, however, shall continue to recoup out of the proceeds of Hydrocarbon production from the non-consent portion of the well any balance for the Non-consent Well remaining to be recovered under Article 13.2.1 (Production Reversion Recoupment), less the amounts paid by the Non-participating Party under this Article 13.3.

**13.4**     **Deepening or Sidetracking Cost Adjustments**

If a proposal is made to Deepen or Sidetrack a Non-consent Well, a well cost adjustment will be performed as follows:

(a)     Intangible drilling will be valued at the actual cost incurred by the Participating Parties.

(b)     Tangible materials will be valued in accordance with the provisions of Exhibit "C".

(c)     For Sidetracking operations, the values determined in Articles 13.4(a) and 13.4(b) shall be reduced by the amount allocated to that portion of the well from the surface to one hundred feet (100') below the point at which the Sidetracking was initiated.  Such allocations shall be consistent with the guidelines recommended by the applicable Council of Petroleum Accountants Societies ("COPAS") Guideline, as amended from time to time.

(d)     Amortization/depreciation shall be applied to both intangible and tangible values at the rate of ten percent (10%) per annum from the date the well commenced Hydrocarbon production to the date operations commence to Deepen or Sidetrack the well, provided, however, that the value of tangible materials after applying depreciation shall never be less than fifty percent (50%) of the value determined in Article 13.4(b).

**13.5**     **Subsequent Operations in Non-consent Well**

Except as provided in Article 13.3 (Deepening or Sidetracking of Non-consent Well), an election not to participate in the drilling, Sidetracking, or Deepening of a well shall be deemed to be an election not to participate in any subsequent operations in the well before full recovery by the Participating Parties of the Non-participating Party's recoupment amount.

**13.6**     **Operations in a Production Interval**

42

#93828440v3
#93828440v5

A Participating Party in a Production Interval may propose Rework or Sidetrack operations within that Production Interval, or to permanently plug and abandon that Production Interval in a well; however, no Production Interval in a well shall be abandoned without the unanimous approval of the Participating Parties in the Production Interval.  If a proposal, estimated to exceed the amount specified in Article 8.2 (Authorization), is made to Rework or Sidetrack a Production Interval and the Participating Parties elect to participate in the proposed operation, Operator shall conduct the operation at their sole cost and risk.  If fewer than all but one (1) or more Parties having a combined Participating Interest of fifty percent (50%) or more elect to participate in the proposed operation, Operator shall conduct the Reworking or Sidetracking operation at the cost and risk of the Participating Parties owning an interest in the Production Interval.  A proposal to Rework an interval, other than a Production Interval, shall be made and approved in accordance with Article 11.5 (Operations by Fewer Than All Parties).

**13.7    Operations Utilizing a Non-consent Platform and/or Development Facilities**

Except as otherwise provided in Article 12.4 (Rights to Take in Kind) and this Article 13.7, if applicable, a Party that did not originally participate in a Platform and/or Development Facilities shall be a Non-participating Party for all operations utilizing the Platform and/or Development Facilities and shall be subject to Article 13.2 (Relinquishment of Interest). Notice, in accordance with Article 9 (Notices), shall be given to the Non-participating Party for all wells proposed to be drilled from or tied back to the Non-consent Platform and/or handled by non-consent Development Facilities.    If a Non-participating Party in a Non-consent Platform and/or Development Facilities desires to participate in the drilling of any such well proposed by the Participating Parties in the Platform and/or Development Facilities, the Non-participating Party desiring to join in the proposed well shall first pay the Participating Parties in the Platform and/or Development Facilities its proportionate share of the cost of the Platform and/or Development Facilities, including but not limited to costs of material, fabrication, transportation, and installation plus any remaining amounts to be recouped under Article 13.2.1(b).  The Non-participating Party shall remit payment to Operator and Operator shall (a) reimburse the Participating Parties in the Platform and/or Development Facilities in the same proportions they are sharing in the Platforms and/or Development Facilities recoupment account, and (b) credit the applicable payout account. On payment of that amount, the original Non-participating Party shall become an owner and a Participating Party in the Platform and/or Development Facilities in the same manner as if recoupment had occurred under Article 13.2.1 (Production Reversion Recoupment), and may participate in all future wells drilled from or tied back to the Platform. As to well operations conducted from the Platform and/or Development Facilities before payment under this Article 13.7, the original Non-participating Party shall remain a Non-participating Party in such Non-consent Operations until such time as the entire recoupment balance applicable to all such Non-consent Operations in the aggregate has occurred, as provided for in Articles 13.2.1(a) and

43

#93828440v3
#93828440v5

13.2.1(d).

**13.8    Discovery or Extension from Non-consent Drilling**

If a Non-consent Well (a) discovers a new Producible Reservoir or (b) extends an existing Producible Reservoir beyond its recognized boundaries, as unanimously agreed by the Participating Parties in all existing wells currently producing from the existing Producible Reservoir before commencement of drilling operations, the recoupment of costs for the well shall be governed by Article 13.2 (Relinquishment of Interest) and shall be recovered by the Participating Parties in one (1) of the following ways:

(a)    if the Non-consent Well is not completed and produced, recoupment shall be out of one-half (1/2) of each Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest; or

(b)    if the Non-consent Well is completed and produced, recoupment shall be out of the Non-participating Party's Share of all Hydrocarbon production from the Non-consent Well and one-half (1/2) of the Non-participating Party's interest in Hydrocarbon production from all subsequently drilled and completed wells on the Lease that are completed in the Producible Reservoir discovered, or in that portion extended, by the Non-consent Well and in which the Non-participating Party has a Participating Interest.

**13.9    Allocation of Platform / Development Facilities Costs to Non-consent Operations**

Non-consent Operations shall be subject to further conditions as follows:

**13.9.1    Charges**

If a well is drilled or produced from a Platform and/or is produced through Development Facilities whose Participating Parties are different from the Participating Parties in that well or if the Participating Parties' Participating Interest shares in that Platform and/or Development Facilities are different from their Participating Interest shares in that well, the rights of the Participating Parties in that well and the costs to use the Platform and/or Development Facilities for that well shall be determined as follows:

(a)    The Participating Parties in that well shall pay to Operator a one-time slot usage fee for the use of a slot on the Platform equal to two percent (2%) of the cost of the Platform.  Within fifteen (15) days of its receipt of that fee, Operator shall distribute to the Participating Parties in the Platform their Participating Interest share of that payment.  For purposes of calculating the slot usage fee, the total cost of the Platform shall be reduced by one-half percent (0.5%) per month, commencing on the date the Platform was installed and continuing every month thereafter until the month actual drilling operations on that well is commenced; however, the total cost of the Platform shall not be reduced by more than fifty

44

#93828440v3
#93828440v5

percent (50%) of the total Platform's costs.  The cost of additions to the Platform shall be reduced in the same manner commencing the first month after the addition is installed.   If that well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate unless those Parties commence drilling a substitute well for the abandoned well through the same slot within ninety (90) days of the abandonment. If that substitute well is abandoned having never produced Hydrocarbons, the right of the Participating Parties in that well to use the Platform slot through which the well was drilled shall terminate.   The slot usage fee shall not apply to a slot deemed to be "surplus".  A slot may be deemed surplus only by the unanimous agreement of the Participating Parties in the Platform.

(b)     The Participating Parties in that well shall pay to the owners of the Development Facilities a lump sum equal to that portion of the total cost of those Development Facilities that the throughput volume of the Non-consent Operation bears to the current total design throughput volume of the Development Facilities. Throughput volume shall be estimated by Operator in barrels produced per day (with 1 barrel of oil equaling 5.8 mcf of gas), using an average daily volume of the first three (3) months of Hydrocarbon production from the Non-consent Operation.   For purposes of calculating the Development Facilities lump sum payment, the total cost of the Development Facilities shall be reduced by one-half percent (0.5%) per month, commencing from the date when the Development Facilities were installed and continuing every month thereafter until the first month during which Hydrocarbon production from the Non-consent Operation commences, but the total cost of the Development Facilities shall not be reduced more than fifty percent (50%) of the total Development Facilities' cost.  If a modification, expansion, or addition to the Development Facilities is made after commencing first Hydrocarbon production and before connection of the Non-consent Operation to the Development Facilities, the Development Facilities lump sum payment shall be reduced in the same manner described above, from the month in which the Development Facilities modification, expansion, or addition is completed until the first month during which Hydrocarbon production from the Non-consent Operation is commenced.

Payment of sums under this Article 13.9.1 is not a purchase of an additional interest in the Platform or the Development Facilities.  Such payment shall be included in the total amount that the Participating Parties are entitled to recoup out of Hydrocarbon production from the Non-consent Well.

45

**13.9.2   Operating and Maintenance Charges**

The Participating Parties shall pay all costs necessary to connect a Non-consent Well to the Platform and/or Development Facilities and that proportionate part of the costs of operating and maintaining the Platform and/or Development Facilities applicable to the Non-consent Well.  Platform operating and maintenance costs that are costs not directly attributable to a wellbore shall be allocated equally to all actively producing Completions. Operating and maintenance costs for the Development Facilities shall be allocated on a volume throughput basis, that is, in the proportion that the volume throughput of the well bears to the total volume throughput of all wells connected to the Development Facilities. Volume throughput, as used in this Article 13.9.2, shall be determined by considering all Hydrocarbons and water volumes.

**13.10   Allocation of Costs Between Zones**

Except as provided in Article 10.9 (Wells Proposed Below Deepest Producible Reservoir), if for any reason the Participating Interests of the Parties in a well are not the same for the entire depth or the Completion thereof, the costs of drilling, Completing, and equipping the well shall be allocated in an equitable manner, as agreed by the Parties, based on the value and allocation recommended in the applicable COPAS Guideline, as amended from time to time.

**13.11   Lease Maintenance Operations**

An operation proposed within the last one (1) year of the primary term or, subsequent thereto, an operation proposed to perpetuate the Lease or portion thereof at its expiration date or otherwise, including but not limited to well operations, regulatory relief (for example, course of action necessary to satisfy the statutory or regulatory requirements of the governmental authority having jurisdiction), and other Lease operations, shall be deemed to be a "Lease Maintenance Operation."  To invoke this Article 13.11, a notice or an AFE that proposes an operation must state that the proposed operation is a Lease Maintenance Operation.

**13.11.1 Participation in Lease Maintenance Operations**

A Party may propose a Lease Maintenance Operation by giving notice to the other Parties.  If fewer than all Parties elect to participate in the proposed Lease Maintenance Operation, the proposing Party shall notify the Parties of the elections made. Each Party electing not to participate shall then have a second opportunity to participate in the proposed operation by notifying the other Parties of its election within forty-eight (48) hours after receipt of the notice.  A Lease Maintenance Operation shall not require minimum approval, either of the number of Parties or the percentage of the voting interests of the Parties otherwise required in Article 6.1.2 (Vote Required). For a Lease Maintenance Operation to be conducted, the Participating Parties must agree to pay and bear one hundred percent (100%) of the costs and risks of the operation. If more than one (1) Lease Maintenance Operation is proposed, the operation with the greatest

46

percentage approval shall be conducted. Notwithstanding the recoupment provisions of this Agreement, a Party electing not to participate in a well operation proposed as a Lease Maintenance Operation shall promptly assign, effective as of the date the operation commences, to the Participating Parties all its right, title, and interest in and to that portion of the Lease that would otherwise expire and the property and equipment attributable thereto, in accordance with Article 26 (Successors, Assigns). In the event of such assignment, the assigning Party shall retain all obligations and liabilities incurred before the effective date of such assignment, and the Participating Parties that are assigned such interest may require the assigning Party to provide reasonable financial assurances including but not limited to posting a performance bond (in an amount, form and with a surety acceptable to the Participating Parties) for the retained liabilities for such assigned interest. If more than one (1) Lease Maintenance Operation is proposed and there is a tie between two (2) proposed operations, both operations shall be conducted and the costs and risks of conducting both operations shall be paid and borne by the Participating Parties. If the drilling of a well is undertaken as a Lease Maintenance Operation, further operations conducted by the Participating Parties in the well shall be governed by Article 10.9 (Course of Action After Reaching Objective Depth) or Article 11.9 (Course of Action After Reaching Objective Depth), whichever applies. If more than one (1) well operation is conducted, any of which would perpetuate the Lease or such portion thereof, an assignment shall not be required from a Party participating in any such well operation.

### 13.11.2  Accounting for Non-participation

If, after one (1) year from completion of a well operation conducted as a Lease Maintenance Operation, the Lease or portion thereof is being perpetuated by a Lease Maintenance Operation, as provided in Article 13.11.1 (Participation in Lease Maintenance Operations), Operator shall render a final statement, if applicable, to the assigning Party for its share of all expenses attributed to the assigned interest before the effective date of the assignment, plus any credit or deficiency in salvage value calculated under Article 15.3.1 (Prior Expenses). The assigning Party shall settle any deficiency owed the non-assigning Parties within thirty (30) days after receipt of Operator's statement.

### 13.12  Retention of Lease by Non-consent Well

If, at the expiration of the primary term of the Lease, one (1) or more Non-consent Wells, except wells drilled under Article 10.5.1 (First Exploratory Well) provision of Article 10.5 (Operations by Fewer Than All Parties), if selected, are the only wells perpetuating the Lease, Operator shall give written notice to each Non-participating Party that the Non-consent Wells are serving to perpetuate the Lease. Each Non-participating Party shall, within thirty (30) days after receipt of

47

Operator's written notice, elect one (1) of the following:

(a)      to assign its entire interest in the Lease to the Participating Parties in the proportions in which the Non-consent Wells are owned subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses); or

(b)      to pay the Participating Parties, within sixty (60) days after its election, the lesser of its proportionate share of the actual well costs of the wells, as if the Non-participating Party had originally participated, or the balance of the recoupment account.  The payment shall be made to Operator and credited to the account of each Participating Party.  The Non-participating Party shall remain as a Non-participating Party until full recoupment is obtained, but the payment shall be credited against the total amount to be recouped by the Participating Parties.

A Non-participating Party that fails to make the required election shall be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  If a Non-participating Party elects to make payment under Article 13.12(b) but fails to make the required payment within sixty (60) days after its election, the Non-participating Party shall either remain liable for the obligation to pay or, by unanimous vote of the Participating Parties, be deemed to have elected under Article 13.12(a) to relinquish its entire interest in the Lease.  Each relinquishing Non-participating Party shall promptly execute and deliver an assignment of its interest to the Participating Parties, in accordance with Article 26 (Successors and Assigns) subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**13.13   Non-Consent Premiums**

A non-consent premium paid by a Non-Participating Party to the Participating Parties shall be allocated to the Participating Parties based on their original Participating Interest share in the Non-consent Operation that generated the non-consent premium.

# ARTICLE 14
# ABANDONMENT, SALVAGE, AND SURPLUS

**14.1   Platform Salvage and Removal Costs**

When the Parties owning wells, Platforms, and/or Development Facilities unanimously agree to dispose of the wells, Platforms, and/or Development Facilities, it shall be disposed of by Operator in the time and manner approved by the Parties. The costs, risks, and net proceeds, if any, for the disposal shall be shared by the Parties in proportion to their Participating Interests therein.

**14.2   Abandonment of Platforms, Development Facilities, or Wells**

Except as provided in Article 10 (Exploratory Operations) and Article 11 (Development Operations), a Participating Party may propose the abandonment of a Platform and Development Facilities or wells by notifying the other Participating Parties.  No Platform and Development

48

Facilities or wellbore shall be abandoned without the unanimous approval of the Participating Parties.  If the Participating Parties do not approve abandoning the Platform and Development Facilities or wells, Operator shall prepare a statement of the abandoning Party's share of estimated abandonment costs, less its share of estimated salvage value, as determined by Operator pursuant to Exhibit "C".  The Party desiring to abandon it shall pay Operator, on behalf of the Participating Parties for that Party's share of the estimated abandonment costs, less its share of estimated salvage value, within thirty (30) days after receipt of Operator's statement.  If the Party that shall serve as Operator after a Party abandons its interest does not qualify by BOEMRE as exempt from supplemental bonding requirements, then the Party desiring to abandon its interest may place its share of the estimated abandonment costs, less its estimated salvage value, in escrow, with such escrowed funds made available to Operator upon abandoning Party's receipt of all necessary end of operations reports and site clearance and restoration report.  If an abandoning Party's respective share of the estimated salvage value is greater than its share of the estimated costs, Operator, on behalf of the Participating Parties, shall pay a sum equal to the deficiency to the abandoning Party within thirty (30) days after the abandoning Party's receipt of Operator's statement.

**14.3    Assignment of Interest**

Each Participating Party desiring to abandon a Platform and Development Facilities or wells under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells) shall assign, effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in the Platform and Development Facilities or wells and the equipment therein and its ownership in the Hydrocarbon production from the wells.  A Party so assigning shall be relieved from further liability for the Platform and Development Facilities or wells, except liability for payments under Article 14.2 (Abandonment of Platforms, Development Facilities, or Wells).

**14.4    Abandonment Operations Required by Governmental Authority**

A well abandonment or Platform and Development Facilities removal required by a governmental authority having jurisdiction shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be shared by the Parties owning the well or Platform and Development Facilities in proportion to their Participating Interests therein.  No approval by the Parties will be necessary for Operator to proceed with the government-required well abandonment, or Platform and Development Facilities removal. Operator shall provide the Parties with an informational AFE before commencing such an abandonment or removal.

**14.5    Disposal of Surplus Material**

Material and equipment acquired hereunder may be classified as surplus by Operator when deemed no longer needed in present or foreseeable operations.  Operator shall determine the value and cost of disposing of the materials in accordance with Exhibit "C".  If the material is

49

classified as junk or if the value, less cost of disposal, is less than or equal to Fifty Thousand Dollars ($50,000), Operator shall dispose of the surplus materials in any manner it deems appropriate.  If the value, less the cost of disposal of the surplus material, is greater than Fifty Thousand Dollars ($50,000), Operator shall give written notice thereof to the Parties owning the material. Unless purchased by Operator, the surplus material shall be disposed of in accordance with the method of disposal approved by the Parties owning the material.  Proceeds from the sale or transfer of surplus material shall be promptly credited to each Party in proportion to its ownership of the material at the time of retirement or disposition.

# ARTICLE 15
# WITHDRAWAL

**15.1    Right to Withdraw**

Subject to this Article 15.1, any Party may withdraw from this Agreement as to the Lease (the "Withdrawing Party") by giving prior written notice to all other Parties stating its decision to withdraw ("the withdrawal notice").   The withdrawal notice shall specify an effective date of withdrawal that is at least sixty (60) days, but not more than ninety (90) days, after the date of the withdrawal notice.  Within thirty (30) days of receipt of the withdrawal notice, the other Parties may join in the withdrawal by giving written notice of that fact to Operator ("written notice to join in the withdrawal") and on giving written notice to join in the withdrawal are "Other Withdrawing Parties".  The withdrawal notice and the written notice to join in the withdrawal are unconditional and irrevocable offers by the Withdrawing Party and the Other Withdrawing Parties to convey to the Parties that do not join in the withdrawal ("the Remaining Parties") the Withdrawing Party's and the Other Withdrawing Parties' entire Working Interest in the Lease, Hydrocarbon production, and other property and equipment owned under this Agreement.

**15.2    Response to Withdrawal Notice**

Failure to respond to a withdrawal notice is deemed a decision not to join in the withdrawal.

### 15.2.1  Unanimous Withdrawal

If all the other Parties join in the withdrawal,

(a)    no assignment of Working Interests shall take place;

(b)    subject to Article 14.4, no further operations may be conducted under this Agreement unless agreed to by all Parties;

(c)    the Parties shall abandon all activities and operations within the Lease and relinquish all of their Working Interests to the BOEMRE within one hundred twenty (120) days of the conclusion of the thirty (30) day joining period; and

(d)    notwithstanding anything to the contrary in Article 14 (Abandonment, Salvage and Surplus), Operator shall:

50

> 1) furnish all Parties a detailed abandonment plan, if applicable, and a detailed cost estimate for the abandonment within one hundred eighty (180) days after the conclusion of the thirty (30) day joining period; and
>
> 2) cease operations and begin to permanently plug and abandon all wells and remove all Facilities in accordance with the abandonment plan.

### 15.2.2   No Additional Withdrawing Parties

If none of the other Parties join in the withdrawal, the Remaining Parties must accept an assignment of their Participating Interest share of the Withdrawing Party's Working Interest.

### 15.2.3   Acceptance of the Withdrawing Parties' Interests

If one (1) or more but not all of the other Parties join in the withdrawal and become Other Withdrawing Parties, within forty-eight (48) hours (excluding Saturdays, Sundays, and federal holidays) of the conclusion of the thirty (30) day joining period, each of the Remaining Parties shall submit to Operator a written rejection or acceptance of its Participating Interest share of the Withdrawing Party's and Other Withdrawing Parties' Working Interest.  Failure to make that written rejection or acceptance shall be deemed a written acceptance.  If the Remaining Parties are unable to select a successor Operator, if applicable, or if a Remaining Party submits a written rejection and the other Remaining Parties do not agree to accept one hundred percent (100%) of the Withdrawing Party's and Other Withdrawing Parties' Working Interest within fifteen (15) days of the conclusion of the forty-eight- (48-) hour period to submit a written rejection or acceptance, the Remaining Parties will be deemed to have joined in the withdrawal, and Article 15.2.1 (Unanimous Withdrawal) will apply.

### 15.2.4   Effects of Withdrawal

Except as otherwise provided in this Agreement, after giving a withdrawal notice or a written notice to join in the withdrawal, the Withdrawing Party and Other Withdrawing Parties are not entitled to approve or participate in any activity or operation in the Lease, other than those activities or operations for which they retain a financial responsibility. The Withdrawing Party and Other Withdrawing Parties shall take all necessary steps to accomplish their withdrawal by the effective date referred to in Article 15.1 (Right to Withdraw) and shall execute and deliver to the Remaining Parties all necessary instruments to assign their Working Interest to the Remaining Parties.  A Withdrawing Party and Other Withdrawing Parties shall bear all expenses associated with their withdrawal and the transfer of their Working Interest.

## 15.3   Limitation on and Conditions of Withdrawal

### 15.3.1   Prior Expenses

The Withdrawing Party and Other Withdrawing Parties remain liable for their Participating

51

DEBTORS' EX. NO. 5
1335 of 1570

Interest share of the costs of all activities, operations, rentals, royalties, taxes, damages, Hydrocarbon imbalances, or other liability or expense accruing or relating to (i) obligations existing as of the effective date of the withdrawal, (ii) operations conducted before the effective date of the withdrawal, (iii) operations approved by the Withdrawing Party and Other Withdrawing Parties before the effective date of the withdrawal, or (iv) operations commenced by Operator under one (1) of its discretionary powers under this Agreement before the effective date of the withdrawal. Before the effective date of the withdrawal, Operator shall provide a statement to the Withdrawing Party and Other Withdrawing Parties for (1) their respective shares of all identifiable costs under this Article 15.3.1 and (2) their respective Participating Interest shares of the estimated current costs of plugging and abandoning all wells and removing all Platforms, Development Facilities, and other material and equipment owned by the Joint Account, less their respective Participating Interest Shares of the estimated salvage value of the assets at the time of abandonment, as approved by vote. This statement of expenses, costs, and salvage value shall be prepared by Operator under Exhibit "C". Before withdrawing, the Withdrawing Party and Other Withdrawing Parties shall pay Operator, for the benefit of the Remaining Parties, the amounts allocated to them as shown in the statement for all obligations and liabilities they have incurred and all obligations and liabilities attributable to them before the effective date of the withdrawal. All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, that the Withdrawing Party and Other Withdrawing Parties placed (or caused to be placed) on their Working Interest shall be fully satisfied or released before the effective date of its withdrawal (unless the Remaining Parties are willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

**15.3.2 Confidentiality**

The Withdrawing Party and Other Withdrawing Parties will continue to be bound by the confidentiality provisions of Article 7.3 (Confidentiality) after the effective date of the withdrawal but will have no further access to technical information relating to activities or operations under this Agreement. The Withdrawing Party and Other Withdrawing Parties are not required to return to the Remaining Parties Confidential Data acquired before the effective date of the withdrawal.

**15.3.3 Emergencies and Force Majeure**

No Party may withdraw during a Force Majeure or emergency that poses a threat to life, safety, property, or the environment but may withdraw from this Agreement after termination of the Force Majeure or emergency. The Withdrawing Party and Other Withdrawing Parties remain liable for their share of all costs and liabilities arising from the

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1336 of 1570

Force Majeure or emergency, including but not limited to the drilling of relief wells, containment and clean-up of oil spills and pollution, and all costs of debris removal made necessary by the Force Majeure or emergency.

# ARTICLE 16
# RENTALS, ROYALTIES, AND OTHER PAYMENTS

16.1    **Overriding Royalty and Other Burdens**

If the Working Interest or Participating Interest of a Party is subject to an overriding royalty, Hydrocarbon production payment, net profits interest, mortgage, lien, security interest, or other burden or encumbrance, other than lessor's royalty and other burdens listed in Exhibit "A", the Party so burdened shall pay and bear all liabilities and obligations created or secured by the burden or encumbrance and shall indemnify and hold the other Parties harmless from all claims and demands for payment asserted by the owners of the burdens or encumbrances. If a Party becomes entitled to an assignment under this Agreement, or as a result of Non-consent Operations hereunder becomes entitled to receive a relinquished interest, as provided in Article 13.2 (Relinquishment of Interest), otherwise belonging to a Non-participating Party whose Working Interest in the operations is so burdened or encumbered, the Party entitled to receive the assignment from the Non-participating Party or the relinquished interest of the Non-participating Party's Hydrocarbon production shall receive same free and clear of all such burdens and encumbrances, and the Non-participating Party whose interest is subject to the burdens and encumbrances shall hold the Participating Parties harmless for the burdens and encumbrances, and will bear same at its own expense.

16.2    **Subsequently Created Interest**

Notwithstanding anything in this Agreement to the contrary, if a Party, after execution of this Agreement, creates an overriding royalty, Hydrocarbon production payment, net profits interest, carried interest, or any other interest out of its Working Interest that the Parties do not unanimously agree to list on Exhibit "A" (hereinafter called "Subsequently Created Interest"), the Subsequently Created Interest shall be made specifically subject to this Agreement. If the Party owning the interest from which the Subsequently Created Interest was established fails to pay, when due, its share of costs, and if the proceeds from the sale of Hydrocarbon production under Articles 8.6 (Security Rights) are insufficient for that purpose, or elects to abandon a well, or elects to relinquish its interest in the Lease, the Subsequently Created Interest shall be chargeable with a pro rata portion of all costs in the same manner as if the Subsequently Created Interest were a Working Interest, and Operator may enforce against the Subsequently Created Interest the lien and other rights granted or recognized under this Agreement to secure and enforce collection of costs chargeable to the Subsequently Created Interest.  The rights of the

53

owner of the Subsequently Created Interest shall be, and hereby are, subordinated to the rights granted or recognized by Article 8.6 (Security Rights).

**16.3**    **Payment of Rentals and Minimum Royalties**

Operator shall pay in a timely manner, for the joint account of the Parties, all rental, minimum royalties, and other similar payments accruing under the Lease and shall, on request, submit evidence of each such payment to the Parties. Operator shall not be held liable to the other Parties in damages for loss of the Lease or interest therein if, through mistake or oversight, a rental, minimum royalty, or other payment is not paid or is erroneously paid.  The loss of a Lease or interest therein resulting from Operator's failure to pay, or erroneous payment of rental or minimum royalty shall be a joint loss, and there shall be no readjustment of interests.  For Hydrocarbon production delivered in kind by Operator to a Non-operator or to another for the account of a Non-operator, the Non-operator shall provide Operator with information about the Non-operator's proceeds received or the value of the Hydrocarbon production taken in kind in order that Operator may make payments of minimum royalties due.

**16.4**    **Non-participation in Payments**

A Party that desires not to pay its share of a rental, minimum royalty, or similar payment shall notify the other Parties in writing at least sixty (60) days before the payment is due. Operator shall then make the payment for the benefit of the Parties that do desire to maintain the Lease.  In such event, the Non-participating Party shall assign to the Participating Parties, on their request, the portions of its interest in the Lease maintained by the payment.  The assigned interest shall be owned by each Participating Party in proportion to its Participating Interest. The assignment shall be made in accordance with Article 27 (Successors and Assigns) and shall be subject to the assignor's retained obligations under Article 15.3.1 (Prior Expenses).

**16.5**    **Royalty Payments**

Each Party shall be responsible for and shall separately bear and properly pay or cause to be paid all royalty and other amounts due on its share of Hydrocarbon production taken in accordance with state or federal regulations, as may be amended from time to time.  Adjustments shall be made among the Parties in accordance with Exhibit "E" (Gas Balancing Agreement). During a period when Participating Parties in a Non-consent Operation are receiving a Non-participating Party's share of Hydrocarbon production, the Participating Parties shall bear and properly pay, or cause to be paid, the Lease royalty on the Hydrocarbon production taken, and shall hold the Non-participating Parties harmless from liability for the payment.

# ARTICLE 17
# TAXES

**17.1**    **Property Taxes**

54

#93828440v3
#93828440v5

Operator shall render property covered by this Agreement for ad valorem taxation, if applicable, and shall pay the property taxes for the benefit of each Party.  Operator shall charge each Party its share of the tax payments.  If the ad valorem taxes are based in whole or in part on separate valuations of each Party's Working Interest, notwithstanding anything in this Agreement to the contrary, each Party's share of property taxes shall be in proportion to the tax value generated by that Party's Working Interest.

**17.2    Contest of Property Tax Valuation**

Operator shall timely and diligently protest to a final determination each tax valuation it deems unreasonable.  Pending such determination, Operator may elect to pay under protest.  On final determination, Operator shall pay the taxes and the interest, penalties, and costs accrued as a result of the protest. In either event, Operator shall charge each Party its share of any amounts due, and each Party shall be responsible for reimbursing Operator for any such amounts paid.

**17.3    Production and Severance Taxes**

Each Party shall pay, or cause to be paid, all production and severance taxes due on Hydrocarbon production that it receives under this Agreement.

**17.4    Other Taxes and Assessments**

Operator shall pay other applicable taxes (other than income taxes, excise taxes, or other similar types of taxes) or assessments and charge each Party its share.

# ARTICLE 18
# INSURANCE

**18.1    Insurance**

Operator shall provide and maintain the insurance prescribed in Exhibit "B" and charge those costs to the Joint Account.  No other insurance shall be carried for the benefit of the Parties under this Agreement, except as provided in Exhibit "B".

**18.2    Bonds**

Operator shall obtain and maintain all bonds or financial guarantees required by an applicable law, regulation, or rule.  The costs of those bonds or financial guarantees acquired exclusively for the conduct of activities and operations under this Agreement shall be charged to the Joint Account, including an amount equivalent to the reasonable cost of that bond or financial guarantee if Operator provides that bond or guarantee itself and does not engage a third party to do so. Operator shall require all contractors to obtain and maintain all bonds required by an applicable law, regulation, or rule.

# ARTICLE 19
# LIABILITY, CLAIMS, AND LAWSUITS

#93828440v3
#93828440v5

**19.1    Individual Obligations**

The obligations, duties, and liabilities of the Parties under this Agreement are several, not joint or collective.  Nothing in this Agreement shall ever be construed as creating a partnership of any kind, joint venture, agency relationship, association, or other character of business entity recognizable in law for any purpose.  In their relations with each other under this Agreement, the Parties shall not be considered to be fiduciaries or to have established a confidential relationship, except as specifically provided in Article 7.3 (Confidentiality) and Article 7.4 (Limited Disclosure), but rather shall be free to act at arm's length in accordance with their own respective self-interests.  Each Party shall hold all other Parties harmless from liens and encumbrances on the Lease arising as a result of its acts.

**19.2    Notice of Claim or Lawsuit**

If, on account of a matter involving activities or operations under this Agreement, or affecting the Lease, a claim is made against a Party, or if a party outside this Agreement files a lawsuit against a Party, or if a Party files a lawsuit, or if a Party receives notice of a material administrative or judicial hearing or other proceeding, that Party shall give written notice of the claim, lawsuit, hearing, or proceeding ("Claim") to the other Parties as soon as reasonably practical.

**19.3    Settlements**

Operator may settle a Claim, or multiple Claims arising out of the same incident, involving activities or operations under this Agreement or affecting the Lease, if the aggregate expenditure does not exceed five hundred thousand dollars ($500,000.00) and if the payment is in complete, or substantially complete, settlement of these Claims.  If the amount required for settlement exceeds this amount, the Parties shall determine the further handling of the Claims under Article 19.4 (Defense of Claims and Lawsuits).

**19.4    Defense of Claims and Lawsuits**

Operator shall supervise the handling, conduct, and prosecution of all Claims involving activities or operations under this Agreement or affecting the Lease.  Claims may be settled in excess of the amount specified in Article 19.3 (Settlements) if the settlement is approved by vote in accordance with Article 6.1.2 of the Participating Parties in the activity or operation out of which the Claim arose, but a Party may independently settle a Claim or the portion of a Claim that is attributable to its Participating Interest share alone as long as that settlement does not directly adversely affect the interest or rights of the other Participating Parties. Legal expenses shall be handled in accordance with Exhibit "C".

**19.5    Liability for Damages**

**UNLESS SPECIFICALLY PROVIDED OTHERWISE IN THIS AGREEMENT, LIABILITY FOR LOSSES, DAMAGES, COSTS, EXPENSES OR CLAIMS INVOLVING ACTIVITIES OR**

56

OPERATIONS UNDER THIS AGREEMENT OR AFFECTING THE LEASE THAT ARE NOT COVERED BY OR IN EXCESS OF THE INSURANCE CARRIED FOR THE JOINT ACCOUNT SHALL BE BORNE BY EACH PARTY IN PROPORTION TO ITS PARTICIPATING INTEREST SHARE IN THE ACTIVITY OR OPERATION OUT OF WHICH THAT LIABILITY ARISES, EXCEPT TO THE EXTENT THAT LIABILITY RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A PARTY, IN WHICH CASE THAT PARTY SHALL BE SOLELY RESPONSIBLE FOR LIABILITY RESULTING FROM ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**19.6    Indemnification for Non-consent Operations**

TO THE EXTENT ALLOWED BY LAW, THE PARTICIPATING PARTIES WILL HOLD THE NON-PARTICIPATING PARTIES (AND THEIR AFFILIATES, AGENTS, INSURERS, DIRECTORS, OFFICERS, AND EMPLOYEES) HARMLESS AND RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST ALL CLAIMS, DEMANDS, LIABILITIES, REGULATORY DECREES, AND LIENS FOR ENVIRONMENTAL POLLUTION AND PROPERTY DAMAGE OR PERSONAL INJURY, INCLUDING SICKNESS AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF NON-CONSENT OPERATIONS, AND ANY LOSS AND COST SUFFERED BY A NON-PARTICIPATING PARTY AS AN INCIDENT THEREOF, EXCEPT WHERE THAT LOSS OR COST RESULTS FROM THE SOLE, CONCURRENT, OR JOINT NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT OF THAT NON-PARTICIPATING PARTY, IN WHICH CASE EACH PARTY SHALL PAY OR CONTRIBUTE TO THE SETTLEMENT OR SATISFACTION OF JUDGMENT IN THE PROPORTION THAT ITS NEGLIGENCE, FAULT, OR STRICT LIABILITY OR WILLFUL MISCONDUCT CAUSED OR CONTRIBUTED TO THE INCIDENT. IF AN INDEMNITY IN THIS AGREEMENT IS DETERMINED TO VIOLATE LAW OR PUBLIC POLICY, THAT INDEMNITY SHALL THEN BE ENFORCEABLE ONLY TO THE MAXIMUM EXTENT ALLOWED BY LAW.

**19.7    Damage to Reservoir, Loss of Reserves and Profit**

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT, NO PARTY IS LIABLE TO ANY OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION DAMAGE TO A RESERVOIR, LOSS OF HYDROCARBONS, LOSS OF PROFITS, OR BUSINESS INTERRUPTIONS, HOWSOEVER THE SAME MAY BE CAUSED.

**19.8    Non-essential Personnel**

A NON-OPERATOR THAT REQUESTS TRANSPORTATION OR ACCESS TO A DRILLING RIG, PLATFORM, VESSEL, OR OTHER FACILITY USED FOR ACTIVITIES OR OPERATIONS UNDER THIS AGREEMENT SHALL HOLD THE OTHER PARTIES HARMLESS AND SHALL RELEASE, DEFEND, AND INDEMNIFY THEM AGAINST (I) ALL CLAIMS, DEMANDS, AND

#93828440v3
#93828440v5

**LIABILITIES FOR PROPERTY DAMAGE AND (II) ALL CLAIMS, DEMANDS, AND LIABILITIES FOR ANY LOSS OR COST SUFFERED BY A PARTY AS AN INCIDENT THEREOF, INCLUDING BUT NOT LIMITED TO INJURY, SICKNESS, AND DEATH, CAUSED BY OR OTHERWISE ARISING OUT OF THAT TRANSPORTATION OR ACCESS, OR BOTH, EXCEPT TO THE EXTENT THAT LOSS OR COST RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PARTY SO INDEMNIFIED AND PROTECTED.**

## ARTICLE 20
## INTERNAL REVENUE PROVISION

**20.1   Internal Revenue Provision**

Notwithstanding any provision in this Agreement to the effect that the rights and liabilities of the Parties are several, not joint or collective, and that the Agreement and the activities and operations under this Agreement do not constitute a partnership under state law, each Party elects to be excluded from the application of all or any part of the provisions of Subchapter K, Chapter 1, Subtitle A, of the Internal Revenue Code of 1986, as amended, or similar provisions of applicable state laws regardless of whether for federal income tax purposes this Agreement and the activities and operations under this Agreement are regarded as a partnership.

## ARTICLE 21
## CONTRIBUTIONS

**21.1   Notice of Contributions Other Than Advances for Sale of Production**

Each Party shall promptly notify the other Parties of all offers of contributions that it may obtain, or contributions it is attempting to obtain, for the drilling of a well or the conducting of an operation on the Lease.  Payments received as consideration for entering into a contract for the sale of Hydrocarbon production from the Lease, loans, and other financial arrangements shall not be considered contributions for the purpose of this Article 21.  No Party shall release or obligate itself to release Confidential Data in return for a contribution from a third party without prior written consent of the Participating Parties or Parties having the right to participate in the well.

**21.2   Cash Contributions**

If a Party receives a cash contribution for drilling a well on the Lease or conducting an activity or operation on the Lease, the cash contribution shall be paid to Operator, and Operator shall credit the amount thereof to the Parties in proportion to their Participating Interests in the well or the Platform and/or Development Facilities.  If the well is a Non-consent Well, the amount of the contribution shall be deducted from the cost specified in Article 13.2.1(a) before computation of the amount to be recouped out of Hydrocarbon production.

58

**21.3     Acreage Contributions**

If a Party receives an acreage contribution for the drilling of a well on the Lease, the acreage contribution shall be shared by each Participating Party that accepts it in proportion to its Participating Interest in the well.  As between the Participating Parties, this Agreement shall apply separately to the acreage.


# ARTICLE 22
# DISPOSITION OF PRODUCTION

**22.1     Take-in-Kind Facilities**

Subject to Article 22.2, a Party may, at its sole cost and risk, construct Take-in-Kind Facilities to take its share of Hydrocarbon production in kind.

**22.2     Duty to Take in Kind**

Each Party shall own and, at its own cost and risk, shall take in kind or separately dispose of its share of the oil, gas, and condensate produced and saved from the Lease, excluding Hydrocarbon production used by Operator in activities or operations conducted under this Agreement, subject to this Article 22.   In order to avoid interference with operations on or regarding the Platform, the Development Facilities, and the Lease, a Party exercising its right to construct Take-in Kind Facilities ("the Take in Kind Party") shall provide Operator with a list of equipment it deems necessary for its Take in Kind Facilities ("the components") along with its notice informing Operator of its election to take in kind.  If Operator, in its sole discretion, agrees to install and operate the Take-in Kind Facilities, Operator shall purchase the components and install it on behalf of the Take in Kind Party at the Take in Kind Party's sole risk and cost, including but not limited to any fees, penalties or other costs incurred as a result of any cancellation of placed orders as may be requested by the Take in Kind Party.   Operator shall provide the Take in Kind Party with monthly updates on the progress of the ordering and installation of the Take in Kind Facilities.  Operator, based on the instructions of the Take in Kind Party, shall install and operate all the components.   Operator shall not be responsible for any losses or damages to the components or the Take in Kind Party's Hydrocarbon production metered, treated, processed, or transported by the components unless such losses or damages are the result of Operator's gross negligence or willful misconduct.  If Operator refuses or fails to install the Take-in Kind Facilities by one hundred twenty (120) days before the deadline provided in Section 12.4, the Take-in Kind Party shall have the right to install and operate the Take-in Kind Facilities providing that such operations do not interfere with existing operations or proposed operations that have been approved under terms of this Agreement.

#93828440v3
#93828440v5

**22.3    Failure to Take Oil and Condensate in Kind**

Notwithstanding Article 22.2 (Duty to Take in Kind), if a Party fails to take in kind or dispose of its share of the oil or condensate, Operator shall have the right, but not the obligation, subject to revocation at will by the Party owning the Hydrocarbon production, to purchase for its own account, sell to others, or otherwise dispose of all or part of the Hydrocarbon production at the same price at which Operator calculates and pays lessor's royalty on its own portion of the oil or condensate.  Operator shall notify the non-taking Party when the option is exercised. A purchase or sale by Operator of any other Party's share of the oil or condensate shall be for such reasonable periods of time as are consistent with the minimum needs of the industry under the circumstances, but in no event shall a contract be for a period in excess of one (1) year. Proceeds of the oil or condensate purchased, sold, or otherwise disposed of by Operator under this Article 22.3 shall be paid to the Party that had, but did not exercise, the right to take in kind and separately dispose of the oil or condensate.  Operator, in disposing of another Party's oil or condensate, shall not be responsible for making any filing with regulatory agencies not required by law to be made by it in respect to another Party's share of oil or condensate.  Unless required by governmental authority having jurisdiction or by judicial process, no Party shall be forced to share an available market with a non-taking Party.

**22.4    Failure to Take Gas in Kind**

Article 22.3 (Failure to Take Oil and Condensate in Kind) shall not apply to gas produced from the Lease.  In no event shall Operator be responsible for, or obligated to dispose of, another Party's share of gas production.  If for any reason a Party fails to take or market its full share of gas as produced, that Party may later take, market, or receive a cash accounting for its full share in accordance with Exhibit "E".

**22.5    Expenses of Delivery in Kind**

A cost that is incurred by Operator in making delivery of a Party's share of Hydrocarbons or disposing of same shall be paid by the Party.

# ARTICLE 23
# APPLICABLE LAW, JURISDICTION, AND VENUE

**23.1    Applicable Law**

THIS AGREEMENT AND THE RELATIONSHIP OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE GENERAL MARITIME LAW, OR IF THE GENERAL MARITIME LAW IS NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD OTHERWISE REFER THE MATTER TO THE LAWS OF ANOTHER JURISDICTION; PROVIDED HOWEVER, THAT NO LAW THEORY OR PUBLIC POLICY

60

#93828440v3
#93828440v5

SHALL BE GIVEN EFFECT THAT WOULD UNDERMINE, DIMINISH, OR REDUCE THE EFFECTIVENESS OF THE WAIVER DAMAGES PROVIDED IN THE PRECEDING ARTICLE 19.7, IT BEING THE EXPRESS INTENT, UNDERSTANDING, AND AGREEMENT OF THE PARTIES THAT SUCH WAIVER IS TO BE GIVEN THE FULLEST EFFECT, NOTWITHSTANDING THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), GROSS NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, OR OTHER LEGAL FAULT OF A PARTY HERETO.

**23.2     Jurisdiction and Venue**

For every dispute that arises under this Agreement, including any claim of breach of this Agreement, the Parties hereby consent to the exclusive jurisdiction and venue of a Federal court or Texas state court sitting in Houston, Texas.

# ARTICLE 24
# LAWS, REGULATIONS, AND NONDISCRIMINATION

**24.1     Laws and Regulations**

This Agreement and operations under this Agreement are subject to all applicable laws, rules, regulations, and orders by all governmental authorities claiming jurisdiction now and in the future. A provision of this Agreement found to be contrary to or inconsistent with any such law, rule, regulation, or order shall be deemed to have been modified accordingly.

**24.2     Nondiscrimination**

In performing work under this Agreement, the Parties shall comply and Operator shall require each independent contractor to comply with the governmental requirements in Exhibit "D" and with Articles 202(1) to (7), including Executive Order 11246, as amended.

# ARTICLE 25
# FORCE MAJEURE

**25.1     Force Majeure**

If a Party is unable, wholly or in part because of a Force Majeure, to carry out its obligations under this Agreement, other than the obligation to make money payments, that Party shall give the other Parties prompt written notice of the Force Majeure with sufficient particulars about it. Effective on the date notice is given, the obligations of the Party, so far as they are affected by the Force Majeure, shall be suspended during, but no longer than, the continuance of the Force Majeure.  Time is of the essence in the performance of this Agreement, and every reasonable effort will be made by the Party to avoid delay or suspension of any work or acts to be performed under this Agreement.  The requirement that the Force Majeure be remedied with all reasonable dispatch shall not require a Party to settle strikes or other labor difficulties.

61

## ARTICLE 26
## SUCCESSORS AND ASSIGNS

**26.1    Transfer of Interest**

Except as provided in 26.1.1 (Exceptions to Transfer Notice), a Transfer of Interest shall be provided by written notice to Operator and the other Parties ("the Transfer Notice").  Any Transfer of Interest shall be made to a party qualified by the BOEMRE to own leases in the Gulf of Mexico, and is financially capable of assuming the corresponding obligations under this Agreement.  The non-transferring Parties' consent can be conditioned on requiring the proposed transferee to provide (i) replacement financial assurances for any financial assurances previously provided by the transferring Party and (ii) additional reasonable financial assurances of the party to which the working interest is to be transferred and its ability to perform its obligations under this Agreement, after giving due consideration to the replacement financial assurances to be provided pursuant to clause (i).  All Transfers of Interest to any Person must be approved by and consented to in writing by the non-transferring Parties for any assignment made hereunder to be valid and binding upon the non-transferring Parties.  Any Transfer of Interest shall contain a provision in the assignment requiring that the non-transferring Parties' written consent must also be obtained before any future Transfer of Interest under this Agreement in whole or in part to any Person, and shall also include a provision that the party to which the working interest is transferred to be bound by all the terms and conditions of this Agreement.  No Transfer of Interest shall release a Party from its obligations and liabilities under this Agreement, and the security rights under Article 8.6 (Security Rights) shall continue to burden the Working Interest transferred and to secure the payment of those obligations and liabilities.

**26.1.1    Exceptions to Transfer Notice**

Notwithstanding any contrary provision of this Agreement, the Transfer Notice is not required when a Party proposes to mortgage, pledge, hypothecate, or grant a security interest in all or a portion of its Working Interest (including Assignments of Hydrocarbon production executed as further security for the debt secured by that security device), in any wells, Platforms, Development Facilities, or other equipment.   However, an encumbrance arising from the financing transaction shall be expressly made subject and subordinated to this Agreement.

**26.1.2    Effective Date of Transfer of Interest**

A Transfer of Interest becomes effective twenty (20) days after the day all Parties are in receipt of the Transfer Notice.  No Transfer of Interest, other than those provided in Article 15.1 (Right to Withdraw) and Article 26.1.1 (Exceptions to Prior Written Notice), is binding on the Parties unless and until (i) the assignor or assignee provides all remaining

#93828440v3
#93828440v5

Parties with a photocopy of a fully executed Transfer of Interest, an executed BOEMRE "Designation of Operator" form and a designation of oil spill responsibility form, and (ii) evidence of receipt of all necessary approvals by the BOEMRE. The Parties shall promptly undertake all reasonable actions necessary to secure those approvals and shall execute and deliver all documents necessary to effectuate that Transfer of Interest. All costs attributable to a Transfer of Interest are the sole obligation of the assigning Party.

**26.1.3   Form of Transfer of Interest**

Any Transfer of Interest shall incorporate provisions that the Transfer of Interest is subordinate to and made expressly subject to this Agreement and provide for the assumption by the assignee of the performance of all the assigning Party's obligations under this Agreement. Any Transfer of Interest not in compliance with this provision is voidable by the non-assigning Parties.

**26.1.4   Warranty**

Any Transfer of Interest, vesting, or relinquishment of Working Interest between the Parties under this Agreement shall be made without warranty of title, except as provided in the next sentence. All liens, charges, and other encumbrances, including but not limited to overriding royalties, net profits interest, and production payments, which a Party placed (or caused to be placed) on its Working Interest shall be fully satisfied or released before the effective date of a Transfer of Interest, vesting, or relinquishment of Working Interest between that Party and another Party under this Agreement (unless the other Party is willing to accept the Working Interest subject to those liens, charges, and other encumbrances).

# ARTICLE 27
## ADMINISTRATIVE PROVISIONS

**27.1   Term**

This Agreement shall remain in effect so long as a Lease remains in effect and thereafter until (a) all wells have been abandoned and plugged or turned over to the Parties owning an interest in the Lease on which the wells are located; (b) all Platforms, Development Facilities, and equipment have been disposed of by Operator in accordance with Article 14 (Abandonment, Salvage, and Surplus); (c) all Claims as defined in Article 19 (Liability, Claims, and Lawsuits) have been settled or otherwise disposed of; and (d) there has been a final accounting and settlement by all Parties. In accordance with Article 4.5 (Selection of Successor Operator), this Agreement will terminate if no Party is willing to become Operator, effective after all conditions in clauses (a) through (d) above have been completed. In accordance with Article 15.2.1

63

(Unanimous Withdrawal), this Agreement will terminate if all Parties elect to withdraw, effective after all conditions in clauses (a) through (d) above have been completed.  Termination of this Agreement shall not relieve a Party of a liability or obligation accrued or incurred before termination and is without prejudice to all continuing confidentiality obligations or other obligations in this Agreement.

**27.2    Waiver**

A term, provision, covenant, representation, warranty, or condition of this Agreement may be waived only by written instrument executed by the Party waiving compliance.  The failure or delay of a Party in the enforcement or exercise of the rights granted under this Agreement shall not constitute a waiver of said rights nor shall it be considered as a basis for estoppel.  Time is of the essence in the performance of this Agreement and all time limits shall be strictly construed and enforced.

**27.3    Waiver of Right to Partition**

Each Party waives the right to bring an action for partition of its interest in the Lease, wells, Platform, Development Facilities, and other equipment held under this Agreement, and covenants that during the existence of this Agreement it shall not resort at any time to an action at law or in equity to partition any or all of the Lease and lands or personal property subject to this Agreement.

**27.4    Compliance with Laws and Regulations**

This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Lease.

**27.4.1    Severance of Invalid Provisions**

If, for any reason and for so long as, a clause or provision of this Agreement is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, or unconscionable under a present or future law or interpretation thereof, the remainder of this Agreement will not be affected by that illegality or invalidity.  An illegal or invalid provision will be deemed severed from this Agreement, as if this Agreement had been executed without the illegal or invalid provision.  The surviving provisions of this Agreement will remain in full force and effect unless the removal of the illegal or invalid provision destroys the legitimate purposes of this Agreement, in which event this Agreement shall be null and void.

**27.4.2    Fair and Equal Employment**

Each of the Parties is an Equal Opportunity Employer, and the equal opportunity provisions of 30 CFR 270 and 41 CFR 60-1, as amended or modified, are incorporated in this Agreement by reference.   The affirmative-action clauses concerning disabled veterans and veterans of the Vietnam era (41 CFR 60-250) and the affirmative-action

64

clauses concerning employment of the handicapped (41 CFR 60-741) are also incorporated in this Agreement by reference. In performing work under this Agreement, the Parties shall comply with (and Operator shall require each independent contractor to comply with) the governmental requirements in Exhibit "D" that pertain to non-segregated facilities.

**27.5    Construction and Interpretation of This Agreement**

### 27.5.1  Headings for Convenience

Except for the definition headings in Article 2 (Definitions), all the table of contents, captions, numbering sequences, and paragraph headings in this Agreement are inserted for convenience only and do not define, expand, or limit the scope, meaning, or intent of this Agreement.

### 27.5.2  Article References

Except as otherwise provided in this Agreement, each reference to an article of this Agreement includes all the referenced article and its sub-articles.

### 27.5.3  Gender and Number

The use of pronouns in whatever gender or number is a proper reference to the Parties to this Agreement though the Parties may be individuals, business entities, or groups thereof. Reference in this Agreement to the singular of a noun or pronoun includes the plural and vice versa.

### 27.5.4  Future References

A reference to a Party includes such Party's successors and assigns and, in the case of governmental bodies, persons succeeding to their respective functions and capacities.

### 27.5.5  Currency

Any amounts due or payable under this Agreement shall be paid in United States currency.

### 27.5.6  Optional Provisions

If any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed, or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in regard to the subject matter of the "Optional" provision.

### 27.5.7  Joint Preparation

This Agreement shall be deemed for all purposes to have been prepared through the joint efforts of the Parties and shall not be construed for or against one (1) Party or the other as a result of the preparation, submittal, drafting, execution, or other event of negotiation hereof.

### 27.5.8  Integrated Agreement

This Agreement contains the final and entire agreement of the Parties for the matters

65

DEBTORS' EX. NO. 5
1349 of 1570

covered by this Agreement and, as such, supersedes all prior written or oral communications and agreements.  This Agreement may not be modified or changed except by written amendment signed by the Parties.

### 27.5.9 Binding Effect

To the extent that it is assignable, this Agreement shall bind and inure to the benefit of the Parties and their respective successors and assigns, and shall constitute a covenant running with the land comprising the Lease.  This Agreement does not benefit or create any rights in a person or entity that is not a Party to this Agreement.

### 27.5.10 Further Assurances

Each Party will take all actions necessary and will sign all documents necessary to implement this Agreement.  Except as otherwise provided in this Agreement, within thirty (30) days after their receipt of a valid written request for those documents from a Party, all other Parties shall prepare and execute the documents.

### 27.5.11 Counterpart Execution

This Agreement may be executed by signing the original or a counterpart.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all Parties had signed the same agreement.  No Party shall be bound to this Agreement until all Parties have executed a counterpart or the original of this Agreement.  This Agreement may also be ratified by a separate instrument that refers to this Agreement and adopts by reference all provisions of this Agreement.  A ratification shall have the same effect as an execution of this Agreement.

### 27.6 Restricted Bidding

If more than one (1) Party is ever on the list of restricted joint bidders for Outer Continental Shelf ("OCS") lease sales, as issued by the BOEMRE under 30 CFR 256.44, as amended, the Parties shall comply with all statutes and regulations regarding restricted joint bidders on the OCS.

### 27.7 Governing Agreement

The Parties to this Agreement are also Parties to that certain Farmout Agreement dated effective _____ __, 20__, by and between _____, _____, _____, _____, and _____.   The Parties agree that should any conflict arise between the terms and conditions of this Agreement and the terms and conditions of the Farmout Agreement, the terms and conditions of the Farmout Agreement shall govern.

**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the day and year first above written.

66

#93828440v3
#93828440v5

**WITNESSES:**                          **[_____]**

_____          By: _____

_____          Title:

**WITNESSES:**                          **[_____]**

_____          By: _____

_____          Title:

**WITNESSES:**                          **[_____]**

_____          By: _____

_____          Title:

**WITNESSES:**                          **[_____]**

_____          By: _____

_____          Title:

**WITNESSES:**                          **[_____]**

_____          By: _____

_____          Title:

67

<u>**EXHIBIT "A"**</u>

Attached to and made a part of that certain Offshore Operating Agreement dated effective \_\_\_\_\_ _____ \_\_, 20\_\_, by and between _____, as Operator, and _____, as Non-Operators.

**I.**   <u>**OPERATOR**</u>

[_____]

**II.**   <u>**NON-OPERATOR(S)**</u>

[_____]
[_____]
[_____]
[_____]

**III.**   <u>**DESCRIPTION OF CONTRACT AREA**</u>

**IV.**   <u>**WORKING INTEREST OF THE PARTIES**</u>

| <u>**PARTY**</u> | <u>**WI %**</u> |
|---|---|
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | X |
| [_____] | 50% |

**V.**   <u>**ADDRESSES AND CONTACT NUMBERS**</u>

| | |
|---|---|
| [_____] | [_____] |
| [_____] | [_____] |
| [_____] | [_____] |
| Attention: | Attention: |
| Phone: | Phone: |
| Fax: | Fax: |
| | |
| [_____] | [_____] |
| [_____] | [_____] |
| [_____] | [_____] |
| Attention: | Attention: |
| Phone: | Phone: |
| Fax: | Fax: |

1

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

**VI.**     **BURDENS AND CONTRACTS IN CONTRACT AREA**

2

#93828440v3
#93828440v5

## EXHIBIT "B"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## INSURANCE PROVISIONS

I.      Operator shall carry the insurance specified in Section I with the limits stipulated below for the joint account.  Operator shall have the right to charge the joint account premiums for the insurance coverage required by this Exhibit "B."  Such premiums shall be allocated to the joint account using a fair and reasonable method based on the nature of the operations covered by this Agreement.

      A.      <u>Workers' Compensation and Employer's Liability</u>.

          1.      Workers' Compensation and Employer's Liability Insurance covering the employees of Operator engaged in operations hereunder in compliance with all applicable State and Federal Laws.

          2.      Coverage under U. S. Longshore and Harbor Worker's Compensation Act, extended to include the Outer Continental Shelf.

          3.      Extension of Coverage B of policy to provide for not less than $1,000,000 ("for assured's interest") for death or bodily injury to one person in any one accident; coverage also to include Employer's Liability under Admiralty Jurisdiction, including the Jones Act, with Marine and Voluntary Compensation Endorsement providing for a limit of liability of not less than $1,000,000 per accident and an endorsement for transportation, maintenance, wages and cure, all with same limits, as well as an endorsement to the effect that a claim "in rem" shall be treated as a claim against the insured.

II.     Operator shall not be obligated or authorized to obtain or carry on behalf of the joint account any additional insurance covering the Parties or the operations to be conducted hereunder.  Each Party, at its own expense, must carry its own coverage for the types of insurance and with the minimum limits as set forth in each of Paragraphs A-G below. Each Party must provide Operator prior to commencement of operations a certificate of insurance or other evidence of coverage demonstrating coverage with the required limits of liability.  All losses and all damages to jointly owned property, except losses covered by insurance carried for the joint account, shall be borne by the Parties in proportion to their respective interests, unless the loss is caused by the gross negligence or willful misconduct of a Party hereto.  The insurance coverages required herein represent minimum requirements and do not limit or invalidate any indemnity or other obligation of the Parties under this Agreement.  A Party's failure to secure the required insurance coverages or the required endorsements on the policies or any denial of coverage by underwriters does not relieve such Party or limit its liabilities or obligations under this Agreement.

      Any Party, at its own expense, may acquire such additional insurance as it may deem necessary to protect its own interest against claims, losses, damages or destruction to property arising out of operations hereunder.

1

#93828440v3
#93828440v5

Each Party hereby waives its rights of recovery against all other Parties to this agreement and agrees that all insurance covering its interest in the jointly owned property will be suitably endorsed to affect a waiver of subrogation as per the indemnity and obligations assumed within the agreement.

A.   <u>Commercial General Liability and Business Automobile Liability</u>.  Coverage for all operations conducted hereunder with a combined single limit each occurrence, and in the aggregate, of $1,000,000 ("for assured's interest").  Said Commercial General Liability Insurance shall also include contractual liability coverage, sudden and accidental pollution coverage.  Automobile liability insurance shall include coverage for owned, hired and non-owned vehicles and mobile equipment licensed for highway use.

B.   <u>Vessels</u>. All vessels chartered by any Party shall be covered Protection and Indemnity coverage, with limits of $1,000,000 ("for assured's interest") per occurrence and in the aggregate.

C.   <u>Aircraft</u>. All aircraft owned or chartered by any Party shall be covered by Aircraft Liability Insurance with limits of $5,000,000 ("for assured's interest") per occurrence and in the aggregate.

D.   <u>Excess Liability</u>. Each Party shall carry Excess Liability insurance in the amount of $50,000,000 per occurrence and in the aggregate ("for assured's interest"), excess of all primary liability limits in the insurance specified in Sections A-C.

E.   <u>Extra Expense Liability</u>.  Extra expense liability coverage including control of well, seepage, pollution and contamination coverage, cleanup and/or containment coverage, re-drilling and/or restoring, and care, custody and control shall be carried by each Party with limits of liability of $75,000,000 per occurrence and in the aggregate and $5,000,000 per occurrence and in the aggregate for Care, Custody and Control coverage.

F.   <u>Financial Responsibility Insurance</u>:  Operator shall demonstrate coverage, as required by the Bureau of Ocean Energy Management pursuant to the Oil Pollution Act of 1990 as per CFR Part 253 "Final Rule for Oil Spill Financial Responsibility", according to the applicable governmental guidelines.

G.   <u>Contractors</u>:  Operator shall use reasonable efforts to require all contractors working or performing services hereunder to comply with the workers' compensation and employer's liability laws, both State and Federal, and said contractors or others performing services shall be required to procure and maintain appropriate insurance coverage as deemed by Operator for the types of operations undertaken.  All insurance shall be endorsed to include the Operator and the Parties as additional insureds, except for Worker's Compensation.  All such policies shall be endorsed with a Waiver of Subrogation in favor of Operator and the Parties.

END OF EXHIBIT "B"

2

#93828440v3
#93828440v5



COPAS 2005 Accounting Procedure
Recommended by COPAS

# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

1    Attached to and made part of  that certain Offshore Operating Agreement dated [_____] , by and between [_____],
2    As Operator and [_____] as Non-Operators

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

1. **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

#4334419.1

1



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1   **"Joint Property"** means the real and personal property subject to the Agreement.
2
3   **"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other
4   governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions
5   contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted,
6   promulgated or issued.
7
8   **"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.
9
10   **"Non-Operators"** means the Parties to the Agreement other than the Operator.
11
12   **"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and
13   gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping,
14   heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of
15   offshore operations, all of which are located offshore.
16
17   **"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.
18
19   **"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of
20   Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other
21   facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.
22
23   **"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.
24
25   **"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as
26   "Party."
27
28   **"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees,
29   or is otherwise obligated, to pay and bear.
30
31   **"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of
32   the costs and risks of conducting an operation under the Agreement.
33
34   **"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.
35
36   **"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual
37   railhead may not exist.
38
39   **"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a
40   receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication,
41   scheduling and dispatching center; and other associated functions serving the Joint Property.
42
43   **"Supply Store"** means a recognized source or common stock point for a given Material item.
44
45   **"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by
46   engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint
47   Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second
48   paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-
49   Operator, Non-Operator Affiliates, and/or third parties.
50
51   **2.   STATEMENTS AND BILLINGS**
52
53   The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the
54   preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all
55   charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified
56   and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications.
57   Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.
58
59   The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances
60   and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper
61   copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and
62   bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of
63   weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via
64   email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings
65   electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written
66   notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)
2



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

3. **ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

4. **ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

5. **EXPENDITURE AUDITS**

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

3



1     those Non-Operators approving such audit.
2
3     The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after
4     completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month
5     requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be
6     supported with sufficient documentation.
7
8     A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to
9     the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator
10     hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to
11     comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with
12     the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against
13     the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations,
14     provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or
15     I.5.C.
16
17   B.   The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator
18     receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive
19     response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion
20     thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section
21     I.3.B (*Advances and Payments by the Parties*).
22
23   C.   The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator
24     shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator
25     shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not
26     adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response
27     to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately
28     granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and*
29     *Payments by the Parties*).
30
31   D.   If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after
32     Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution
33     meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable.
34     The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting
35     shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with
36     authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution
37     reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the
38     Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself.
39     Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information
40     supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may
41     be discussed at subsequent meetings until each such issue is resolved.
42
43     If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall
44     be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute
45     shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present
46     at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to
47     ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any
48     Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60)
49     days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other
50     provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or
51     to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.
52
53   E.   ☐ *(Optional Provision – Forfeiture Penalties)*
54     *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-*
55     *Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been*
56     *withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that*
57     *were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response*
58     *of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made,*
59     *without interest, to the Joint Account.*
60
61 **6.**   **APPROVAL BY PARTIES**
62
63   A.   GENERAL MATTERS
64
65     Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting
66     Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

4



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____one_____ (___1%___) or more Parties, one of which is the Operator, having a combined working interest of at least _____fifty_____ percent (___50___%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purpose of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

1.   **RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

2.   **LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1)   Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees providing First Level Supervision,

(4)   Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

DEBTORS' EX. NO. 5
1360 of 1570



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D.   Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E.   Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F.   Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G.   Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H.   Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

3.   **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4.   **TRANSPORTATION**

A.   Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B.   Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1)  If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2)  If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

5.   **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6.   **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A.   The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed _____eight_____ percent (_____8_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

DEBTORS' EX. NO. 5
1361 of 1570



equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B.   In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7.   AFFILIATES**

A.   Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $__50,000.00_____  If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B.   For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $__50,000.00_____ in a given calendar year.

C.   The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8.   DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9.   LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10.   TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11.  INSURANCE

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12.  COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13.  ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration,  and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14.  ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15.  OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

### III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are  jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

8



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1      •   human resources
2      •   management
3      •   supervision not directly charged under Section II.2 (*Labor*)
4      •   legal services not directly chargeable under Section II.9 (*Legal Expense*)
5      •   taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
6      •   preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with
7         governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing,
8         interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.
9

10   Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing
11   overhead functions, as well as office and other related expenses of overhead functions.
12

13   **1.**     **OVERHEAD—DRILLING AND PRODUCING OPERATIONS**
14

15      As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this
16      Section III, the Operator shall charge on either:
17

18      ☑    **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
19

20
21      A.    TECHNICAL SERVICES
22
23      (i)     Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major*
24           *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
25           related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical
26           Services:
27
28           ☑    **(Alternative 1 – Direct)** shall be charged <u>**direct**</u> to the Joint Account.
29

30      (ii)    Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major*
31           *Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages,
32           related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical
33           Services:
34
35           ☑    **(Alternative 1 – All Overhead)** shall be covered by the <u>**overhead**</u> rates.
36
37           ☐    **(Alternative 2 – All Direct)** shall be charged <u>**direct**</u> to the Joint Account.
38
39

40      Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations
41      set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section
42      III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.
43

44   B.    OVERHEAD—FIXED RATE BASIS
45

46      (1)    The Operator shall charge the Joint Account at the following rates per well per month:
47

48           Drilling Well Rate per month $  40,000.00          (prorated for less than a full month)
49
50           Producing Well Rate per month $  4,000.00       
51
52      (2)    Application of Overhead—Drilling Well Rate shall be as follows:
53
54      (a)    Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion
55           equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall
56           begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion
57           equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling
58           and/or completion operations for fifteen (15) or more consecutive calendar days.
59
60
61
62
63
64
65
66

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)
9



    (b)    Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3)    Application of Overhead—Producing Well Rate shall be as follows:

    (a)    An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

    (b)    Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

    (c)    A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

    (d)    An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

    (e)    Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4)    The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

**2.    OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.   If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1)   _____5_____% of total costs if such costs are less than $100,000; plus

    (2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   _____2_____% of total costs in excess of $1,000,000.

B.   If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1)   _____5_____% of total costs if such costs are less than $100,000; plus

    (2)   _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3)   _____2_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.   **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

### IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.   **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

DEBTORS' EX. NO. 5
1366 of 1570



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

   (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

   (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

12



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. CONDITION

   (1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

   (2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

       Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

       If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

       Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

   (3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

       The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

   (4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section I.6.A (*General Matters*).

   (5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

   (1) Preparation Costs

       Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

   (2) Loading and Unloading Costs

       Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

A.  PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B.  SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C.  MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

14



COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

1. **DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

2. **NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

DEBTORS' EX. NO. 5
1370 of 1570

## EXHIBIT "D"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## Non-Discrimination Provisions

During the performance of this Agreement, the "contractor" (meaning and referring separately to each party hereto) agrees, unless exempt therefrom to comply with all provisions of Executive Order 11246 which are incorporated herein by reference, and (a) if contractor has more than 50 employees or contracts with another party hereto in excess of $10,000, contractor must file Standard Form 100 (EEO 1), (b) if contractor has 50 or more employees and a contract of $50,000 or more, contractor is required to develop a written "Affirmative Action Compliance Program" for each of its establishments according to the Rules and Regulations published by the United States Department of Labor in 41 CFR, Chapter 60. Further, contractor hereby certifies that it does not now and will not maintain any facilities provided for its employees in a segregated manner or permit its employees to perform their services at any location under its control where segregated facilities are maintained, as such segregated facilities are defined in Title 41, Chapter 60 1.8, Code of Federal Regulations, revised as of January 1, 1969, unless exempt therefrom. Contractor further warrants that no other law, regulation or ordinance of the United States, or any state, or any governmental authority or agency has been violated in the manufacture, procurement or sale of any good furnished, work performed or service rendered pursuant to this contract.

Unless exempt by rules, regulations or orders of the United States Secretary of Labor, issued pursuant to Section 204 of Executive Order 11246, dated September 24, 1965, during the performance of this contract, the contractor agrees as follows:

(1)     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national original. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)     The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3)     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

1

#93828440v3
#93828440v5

(4)    The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations and relevant orders of the Secretary of Labor.

(5)    The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records and accounts by the contracting agency and the Secretary of Labor for purposes of investigating to ascertain compliance with such rules, regulations and orders.

(6)    In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, or by rule, regulation or order of the Secretary of Labor, or as otherwise provided by law.

(7)    The contractor will include the provisions of paragraph (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor.  The contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance; provided, however, that in the event the contractor becomes involved in, or is result of such direction by the contracting agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

(8)    Contractor agrees and covenants that none of its employees or employees of its subcontractors who provided services pursuant to this contract are unauthorized aliens, as defined in the Immigration, Reform and Control Act of 1986.


[End of Exhibit "D"]

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1372 of 1570

## EXHIBIT "E"

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## GAS BALANCING PROVISIONS

1. **DEFINITIONS**

   The following definitions shall apply to this Agreement:

   1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

   1.02 "Balancing Area" shall mean **(select one):**

   ■ each well drilled pursuant to **the Lease** that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

   ☐ all the acreage and depths subject to the Operating Agreement.

   _____
   _____
   _____

   1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

   1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost before its sale or delivery from the Balancing Area.

   1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

   1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

   1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

   1.08 "Operator" shall mean the individual or entity designated as the operator of the well(s) located in the Balancing Area.

   1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

   1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

   1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Lease covering the Balancing Area.

   **1.13 ("Intentionally Deleted")**

   1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

   1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its

1

#93828440v3
#93828440v5

Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16  ☐ **(Optional)** "Winter Period" shall mean the month(s) of _____November and December_____ in one calendar year and the month(s) of _____January and February_____ in the succeeding calendar year.

## 2.   BALANCING AREA

2.1  If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ■ MMBtus.

## 3.   RIGHT OF PARTIES TO TAKE GAS

3.1  Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement. Operator shall provide each Party with an estimate of its Full Share of Current Production and the estimated sustainable Gas volumes for Makeup Gas by the 15th calendar day of the month before the month of production. The Parties recognize that Operator's estimates are no more than estimates, and that these estimated volumes may vary from the actual Gas sales volumes during the month. Operator will, insofar as reasonably possible and practical, notify (by telephone or facsimile) the Parties of significant variances in production volumes relative to nominations where these variances could be reasonably expected to result in penalties being imposed by pipeline/purchases. Operator will notify all the parties of scheduled operations that will impact sustained production.

3.2  Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3  When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4  All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5  Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6  In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obliged only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obliged to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party. Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale, and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof.

## 4. IN-KIND BALANCING

4.1  Effective the first day of any calendar month following at least _____thirty(_____30 )_ days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current

2

#93828440v3
#93828440v5

Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying fifty_____ percent (50%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty_____ percent ( 50%) of its Full Share of CurrentProduction for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ **(Optional Seasonal Limitation on Makeup - Option 1)** Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the _____(_____) months immediately preceding the Winter Period.~~

4.2 ☐ **(Optional - Seasonal Limitation on Makeup - Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than twenty-five percent_____ percent ( 25 %) of its Full Share

of Current Production for Makeup Gas during the Winter Period.

~~4.3 ☐ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, on the demand of the Operator or any Underproduced Party, up to ____percent (_____%) of such Overproduced Party's Full Share of Current Production.~~

**5. STATEMENT OF GAS BALANCES**

5.1   The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2   If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1   Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

**6.2   (Intentionally Deleted)**

~~6.2.1 ☐ **(Optional For use only with Section 6.2 Alternative 1 Entitlement)** On written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

~~6.2 ☐ **(Alternative 2 Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.~~

**6.3   (Intentionally Deleted)**

**7.   CASH SETTLEMENTS**

7.1   On the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash Settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2   Within ninety (90) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

3

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1375 of 1570

7.3  ■ **(Alternative 1 - Direct Party-to-Party Settlement)** Within ninety (90) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash Settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3  □ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 □ **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have the right at any time on thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4  ■ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party before monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual. The method of valuation for cash settlement will be First In First Out (FIFO).

~~7.4  □ **(Alternative 2 - Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5  The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ■ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser on resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

~~7.5.2 □ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ■ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom before sale.

7.6  To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the simple average of the spot sales prices published for the applicable geographic area in the first issue of Inside F.E.R.C.'s Gas Market Report, *~~Natural Gas Week and Natural Gas Intelligence~~ for such month. Should those publications cease to exist, a mutually acceptable pricing bulletin shall be used. * published by McGraw Hill for deliveries at Henry Hub, subject to reasonable base adjustments between the point of delivery to the applicable pipeline transportation system and the point at which the index price applies

7.7  Interest compounded at the ~~rate of~~ Prime rate in effect at Citibank N.A. of New York, plus one percent (1%) percent (_____%) per annum or the maximum lawful

4

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1376 of 1570

rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8   In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind at such rates, quantities, times and sources as may be agreed on by the Underproduced Party. If the Parties are unable to agree on the manner in which such in-kind settlement gas will be furnished within ninety (90) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9   ■ (Optional   Interim   Cash   Balancing)   ~~At   any   time   during   the   term   of   this   Agreement,   any   Overproduced   Party may,   in   its   sole   discretion,   make   cash   settlement(s)   with   the   Underproduced   Parties   covering   all   or   part   of   its   outstanding   Gas imbalance,   provided   that   such   settlements   must   be   made   with   all   Underproduced   Parties   proportionately   based   on   the   relative imbalances   of   the   Underproduced   Parties,   and   provided   further   that   such   settlements   may   not   be   made   more   often   than   once every   twenty-four   (24)   months.   Such   settlements   will   be   calculated   in   the   same   manner   provided   above   for   final   cash settlements.   The   Overproduced   Party   will   provide   Operator   a   detailed   accounting   of   any   such   cash   settlement   within   thirty   (30) days   after   the   settlement   is   made.~~.

**8.   TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after     thirty_____(30) days' prior written notice to the Operator and shall last no longer than seventy-two_____(72) hours. Consent of parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.

**9.   OPERATING COSTS (Intentionally Deleted)**

**10.   LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**11.   AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement, but any statements rendered by Operator shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless with the said twenty-four (24) month period an Underproduced Party takes written exception thereto and makes claim on Overproduced Party for adjustment.

**12.   MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the **Lease**, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this

5

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1377 of 1570

Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the **Lease** shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding on the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the **Lease,** or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. On receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event federal tax regulations require a uniform method of computing taxable income by all Parties, the Parties agree to negotiate in good faith to develop such a uniform method that is in accordance with the requirement of said tax regulations.

**13.   ASSIGNMENT AND RIGHTS ON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ■ **(Optional - Cash Settlement on Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least sixty(_____60) days after closing the transaction. Such notice shall contain a preliminary gas settlement statement detailing the quantity of Overproduction owed by the Overproduced Party to each Underproduced Party and the value of such Overproduction, calculated in accordance with Section 7.4 and 7.6 hereof. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within _____sixty_____(____60____) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party ~~on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii)~~ within 120 days after the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in

Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning ~~sixty (60) days~~ following the 121st day after closing of

6

#93828440v3
#93828440v5

after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3  The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

7

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1379 of 1570

**EXHIBIT "F"**

Attached to and made a part of that certain Offshore Operating Agreement dated effective _____ _____ __, 20__, by and between _____, as Operator, and _____, as Non-Operators.

## MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT

**To be filed in the conveyance records and in the mortgage records and as a
non-standard financing statement in accordance with Paragraph 6.0 herein.**

1.0     This Memorandum of Operating Agreement and Financing Statement (this "Memorandum") is effective as of the effective date of the Operating Agreement referred to in Paragraph 2.0 below and is executed by the undersigned, duly authorized representative of [_____] (the "Operator"), and is executed by the undersigned, duly authorized representatives of [_____],[_____],[_____], and [_____] (the "Non-Operators").  Operator and Non-Operators may be referred to herein individually as a "Party" and together as the "Parties".

2.0     The Operator and Non-Operators are Parties to that certain Operating Agreement effective _____ ___, 20__ (the "Operating Agreement"), which Operating Agreement provides for the exploration, development and operation of the oil and gas leases described in Exhibit "A" of the Operating Agreement (hereinafter called the "Contract Area") and which designates [_____], as the Operator, to conduct such operations for itself and the Non-Operators.

3.0     Among other provisions, the Operating Agreement (a) provides for certain liens, mortgages, pledges and security interests to secure payment by the Parties of their respective share of costs and other obligations under the Operating Agreement, (b) contains an Accounting Procedure, which establishes, among other things, interest to be charged on indebtedness, certain costs, and other expenses under the Operating Agreement at the rate set forth therein, and (c) includes non-consent clauses which establish that Parties who elect not to participate in certain operations shall (i) be deemed to have relinquished their interest in production until the carrying consenting Parties recover their costs of such operations plus a specified amount or (ii) forfeit their interest in certain Contract Area or portions thereof involved in such operations.

4.0     The Operator hereby certifies that a true and correct copy of the Operating Agreement is on file and is available for inspection by third parties at the offices of the Operator at the address set forth in this Memorandum.

5.0     In addition to any other security rights and remedies provided for by law with respect to services rendered or materials and equipment furnished under the Operating Agreement, for and in consideration of the covenants and mutual undertakings of the Operator and the Non-Operators set forth in the Operating Agreement, the Operator and the Non-Operators hereby agree as follows:

5.1     To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now

1

#93828440v3
#93828440v5

owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grants to the Operator a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands covered by the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.2    To secure the performance of and payment by the Non-Operators of all obligations and indebtedness of the Non-Operators pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Non-Operators hereby grant to the Operator a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use, or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area, and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.   The interest of the Non-Operators in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.   To the extent permissible under applicable law, the security interest granted by the Non-Operators hereunder covers (i) all substitutions, replacements, and accessions to the property of the Non-Operators described herein and is intended to cover all of the rights, titles, and interests of the Non-Operators in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (ii) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Non-Operators in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Non-Operators in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the Contract Area, and (iii) all rights, claims, general intangibles, and proceeds, whether now existing or hereafter acquired, of the Non-Operators in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

2

#93828440v3
#93828440v5

DEBTORS' EX. NO. 5
1381 of 1570

(1) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements, and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the  Contract Area;

(2) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachement "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(3) all rights, titles, and interests of the Non-Operators, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.3     As applicable to the jurisdiction of operations under the Operating Agreement, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) shall constitute a non-standard form of financing statement under the terms of Chapter 9 of the Louisiana Commercial Laws, La. R.S. 10:9-101 et seq. (the "Uniform Commercial Code," as adopted in the State of Louisiana) and, as such, for the purposes of the security interest in favor of the Operator, may be filed for record in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Operator being the secured party and the Non-Operators being the debtors with respect to such filing.

5.4     The maximum amount for which the mortgage herein granted by the Non-Operators shall be deemed to secure the obligations and indebtedness of such Non-Operators to the Operator as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) (the "Limit of the Mortgage of the Non-Operators"). Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Non-Operators to the Operator is secured hereby without limitation. Notwithstanding the foregoing Limit of the Mortgage of the Non-Operators, the liability of the Non-Operators under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Operator shall not be entitled to enforce the same against the Non-Operators for, an amount exceeding) the actual obligations and

3

#93828440v3
#93828440v5

indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid that are attributable to or charged against the interest of the Non-Operators pursuant to the Operating Agreement.

5.5     To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a mortgage, hypothec, and pledge of and over all of its rights, titles, and interests in and to (a) the Contract Area, (b) the oil and gas in, on, under, and that may be produced from the lands included within the Contract Area, and (c) all other immovable property susceptible of mortgage situated within the Contract Area.

5.6     To secure the performance of and payment by the Operator of all obligations and indebtedness of the Operator pursuant to the Operating Agreement, whether now owed or hereafter arising, and to the extent susceptible under applicable law, the Operator hereby grants to the Non-Operators a continuing security interest in and to all of its rights, titles, interests, claims, general intangibles, proceeds, and products thereof, whether now existing or hereafter acquired, in and to (a) all oil and gas produced from the lands covered by the Contract Area or attributable to the Contract Area when produced, (b) all accounts receivable accruing or arising as a result of the sale of such oil and gas (including, without limitation, accounts arising from gas imbalances or from the sale of oil and gas at the wellhead), (c) all cash or other proceeds from the sale of such oil and gas once produced, and (d) all platforms, wells, facilities, fixtures, other corporeal property, whether movable or immovable, whether now or hereafter placed on the property covered by the Contract Area or maintained or used in connection with the ownership, use or exploitation of the Contract Area, and other surface and sub-surface equipment of any kind or character located on or attributable to the Contract Area and the cash or other proceeds realized from any sale, transfer, disposition or conversion thereof.  The interest of the Operator in and to the oil and gas produced from or attributable to the Contract Area when extracted and the accounts receivable accruing or arising as the result of the sale thereof shall be financed at the wellhead of the well or wells located on the Contract Area.  To the extent permissible under applicable law, the security interest granted by the Operator hereunder covers (a) all substitutions, replacements, and accessions to the property of the Operator described herein and is intended to cover all of the rights, titles and interests of the Operator in all movable property now or hereafter located upon or used in connection with the Contract Area, whether corporeal or incorporeal, (b) all rights under any gas balancing agreement, farmout rights, option farmout rights, acreage and cash contributions, and conversion rights of the Operator in connection with the Contract Area, or the oil and gas produced from or attributable to the Contract Area, whether now owned or existing or hereafter acquired or arising, including, without limitation, all interests of the Operator in any partnership, tax partnership, limited partnership, association, joint venture, or other entity or enterprise that holds, owns, or controls any interest in the

4

#93828440v3
#93828440v5

Contract Area, and (c) all rights, claims, general intangibles, and proceeds of the Operator, whether now existing or hereafter acquired, in and to the contracts, agreements, permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area, including the following:

(i)     all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from any present or future operating, farmout, bidding, pooling, unitization, and communitization agreements, assignments, and subleases, whether or not described in Attachment "1," to the extent, and only to the extent, that such agreements, assignments, and subleases cover or include any of its rights, titles, and interests, whether now owned and existing or hereafter acquired or arising, in and to all or any portion of the Contract Area, and all units created by any such pooling, unitization, and communitization agreements and all units formed under orders, regulations, rules, or other official acts of any governmental authority having jurisdiction, to the extent and only to the extent that such units cover or include all or any portion of the Contract Area;

(ii)    all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all presently existing and future advance payment agreements, and oil, casinghead gas, and gas sales, exchange, and processing contracts and agreements, including, without limitation, those contracts and agreements that are described on Attachment "1" to the extent, and only to the extent, that those contracts and agreements cover or include all or any portion of the Contract Area; and

(iii)   all rights, titles, and interests of the Operator, whether now owned and existing or hereafter acquired or arising, in, to, and under or derived from all existing and future permits, licenses, rights-of-way, and similar rights and privileges that relate to or are appurtenant to any of the Contract Area.

5.7     For the purposes of the security interest in favor of the Non-Operators, this Memorandum (including a carbon, photographic, or other reproduction thereof and hereof) may be filed as a non-standard form of financing statement pursuant to the Uniform Commercial Code in the office of the Clerk of Court of any parish in the State of Louisiana and/or any county in the State of Texas, as applicable, with the Non-Operators being the secured Party and the Operator being the debtor with respect to such filing.

5.8     The maximum amount for which the mortgage herein granted shall be deemed to secure the obligations and indebtedness of the Operator to the Non-Operators as stipulated herein is hereby fixed in an amount equal to Twenty-Five Million Dollars ($25,000,000.00) in the aggregate (the "Limit of the Mortgage of the Operator"), irrespective of the total number of Non-Operators party to the Operating Agreement at any time.  Except as provided in the previous sentence (and then only to the extent such limitations are required by law), the entire amount of obligations and indebtedness of the Operator to the Non-Operators is secured hereby without limitation.

5

#93828440v3
#93828440v5

Notwithstanding the foregoing Limit of the Mortgage of the Operator, the liability of the Operator under this Memorandum and the mortgage and security interest granted hereby shall be limited to (and the Non-Operators shall not be entitled to enforce the same against Operator for, an amount exceeding) the actual obligations and indebtedness (including all interest charges, Costs, attorneys' fees, and other charges provided for in this Memorandum or in the Operating Agreement) outstanding and unpaid and that are attributable to or charged against the interest of the Operator pursuant to the Operating Agreement.

6.0     As applicable to the jurisdiction of operations under the Operating Agreement, to serve as notice of the existence of the Operating Agreement as a burden on the title of the Operator and the Non-Operators to their interests in and to the Contract Area, and for purposes of satisfying otherwise relevant recording and filing requirements of applicable law, this Memorandum is to be filed or recorded, as the case may be, in (a) the conveyance records of the parish or parishes in which the lands included within the Contract Area are located or adjacent pursuant to La. R.S. 9:2731 et seq., and/or the conveyance records of the county or counties in which the lands included in the Contract Area or located or adjacent (b) the mortgage records of such parish or parishes and/or county or counties, and (c) the appropriate Uniform Commercial Code records. All parties to the Operating Agreement are identified on Attachment "1" hereto.

7.0     If performance of any obligation under the Operating Agreement or payment of any indebtedness created thereunder does not occur or is not made when due under the Operating Agreement or upon default of any covenant or condition of the Operating Agreement, in addition to any other remedy afforded by law, each Party to the Operating Agreement and any successor to such Party by assignment, operation of law, or otherwise, shall have, and is hereby given and vested with, the power and authority to foreclose the mortgage, pledge, and security interest established in its favor herein and in the Operating Agreement in the manner provided by law and to exercise all rights of a secured Party under the Uniform Commercial Code.  If the Non-Operators do not pay its indebtedness or perform its obligations under the Operating Agreement when due, the Operator shall have the additional right to notify the purchaser or purchasers of the Non-Operator's production and collect such indebtedness out of the proceeds from the sale of the Non-Operator's share of production until the amount owed has been paid. The Operator shall have the right to offset the amount owed against the proceeds from the sale of the Non-Operator's share of production.  Any purchaser of such production shall be entitled to rely on the Operator's statement concerning the amount of indebtedness owed by the Non-Operators and payment made to the Operator by any purchaser shall be binding and conclusive as between such purchaser and the Non-Operators.

8.0     Upon expiration of the Operating Agreement and the satisfaction of all obligations and indebtedness arising thereunder, the Operator, on behalf of all parties to the Operating Agreement, shall file of record an appropriate release and termination of all security and other rights created under the Operating Agreement and this Memorandum executed by all Parties to the Operating Agreement.  Upon the filing of such release and termination instrument, all benefits and obligations under this Memorandum shall terminate as to all Parties who have executed or ratified this Memorandum.  In addition, at any time prior to the filing of such

6

DEBTORS' EX. NO. 5
1385 of 1570

release and termination instrument, each of the Operator and the Non-Operators shall have the right to (i) file a continuation statement pursuant to the Uniform Commercial Code with respect to any financing statement filed in their favor under the terms of this Memorandum and (ii) reinscribe this act in the appropriate mortgage records.

9.0     It is understood and agreed by the Parties hereto that if any part, term, or provision of this Memorandum is held by the courts to be illegal or in conflict with any law of the state where made, the validity of the remaining portions or provisions shall not be affected, and the rights and obligations of the Parties shall be construed and enforced as if the Memorandum did not contain the particular part, term, or provision held to be invalid.

10.0    This Memorandum shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns. The failure of one or more persons owning an interest in the Contract Area to execute this Memorandum shall not in any manner affect the validity of the Memorandum as to those persons who execute this Memorandum.

11.0    A party having an interest in the Contract Area may ratify this Memorandum by execution and delivery of an instrument of ratification, adopting and entering into this Memorandum, and such ratification shall have the same effect as if the ratifying party had executed this Memorandum or a counterpart thereof.  By execution or ratification of this Memorandum, such party hereby consents to its ratification and adoption by any party who acquires or may acquire any interest in the Contract Area.

12.0    This Memorandum may be executed or ratified in one or more counterparts and all of the executed or ratified counterparts shall together constitute one instrument.  For purposes of recording in each of the records described in Paragraph 6 above, duplicate copies of this Memorandum with individual signature pages attached thereto may be filed of record, one copy of each to be indexed in the name of the Operator, as grantor, and one copy of each to be indexed in the name of the Non-Operators, as grantor, and duplicate copies of this Memorandum with individual signature pages attached thereto may be filed in the appropriate Uniform Commercial Code records, one filing for the Operator, as secured Party, and another filing for the Non-Operators, as secured Party.  The respective addresses of the Operator, as both secured Party and debtor, and the Non-Operators, as both debtor and secured Party, at which information with respect to the security interests created in the Operating Agreement may be obtained, are set forth in Paragraph 1.0 of this Memorandum.

13.0    The Operator and the Non-Operators hereby agree to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered, any instrument or take any action necessary or appropriate to effectuate the terms of the Operating Agreement or any Exhibit, instrument, certificate or other document pursuant thereto.

14.0    Whenever the context requires, reference herein made to the single number shall be understood to include the plural, and the plural shall likewise be understood to include the singular, and specific enumeration shall not exclude the general, but shall be construed as cumulative.

7

#93828440v3
#93828440v5

EXECUTED on the dates set forth below each signature but made effective as of _____ _, 20__.

**OPERATOR**:

WITNESSES:                                      [_____]

_____                By:_____
Printed Name:  _____

_____
Printed Name:  _____      Date:_____

**NON-OPERATORS**:

WITNESSES:                                      [_____]

_____                By:_____
Printed Name:  _____

_____
Printed Name:  _____      Date:_____

8

#93828440v3
#93828440v5

WITNESSES:                                      [_____]


_____          By:_____
Printed Name: _____

_____          Date:_____
Printed Name: _____


WITNESSES:                                      [_____]


_____          By:_____
Printed Name: _____

_____          Date:_____
Printed Name: _____


WITNESSES:                                      [_____]


_____          By:_____
Printed Name: _____

_____          Date:_____
Printed Name: _____


9

#93828440v3
#93828440v5

**ACKNOWLEDGMENT**

**THE STATE OF _____**   §
                              §
**COUNTY OF _____**      §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.


                         _____
                         Notary Public in and for the State of Texas


**THE STATE OF _____**   §
                              §
**COUNTY OF _____**      §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.


                         _____
                         Notary Public in and for the State of Texas


**THE STATE OF _____**   §
                              §
**COUNTY OF _____**      §

     On this _____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

     In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.


                         _____
                         Notary Public in and for the State of Texas

#93828440v3
#93828440v5

**THE STATE OF** _____ §
                                §
**COUNTY OF** _____ §

On this ____ day of _____, 20__, before me appeared _____, to me personally known, who, being by me duly sworn, did say that she is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

**THE STATE OF TEXAS** §
                      §
**COUNTY OF HARRIS** §

On this ____ day of _____, 20__, before me appeared_____, to me personally known, who, being by me duly sworn, did say that he is the _____ of [_____], a [_____], and that said instrument was signed in behalf of said [_____] by authority of its [_____] and said appearer acknowledged said instrument to be the free act and deed of said [_____].

In witness whereof, I have hereunto set my official hand and seal on the date hereinabove written.

_____
Notary Public in and for the State of Texas

11

#93828440v3
#93828440v5

**ATTACHMENT "1"**

Attached to and made a part of the Memorandum of Operating Agreement and Financing Statement by and between _____, as Operator, and _____, as Non-Operators

I.   <u>DESCRIPTION OF LANDS AND LEASES WITHIN THE "LEASE"</u>

II.  <u>OPERATOR</u>

[_____]

III. <u>INTEREST OF THE PARTIES</u>

IV.  <u>NAMES AND ADDRESSES OF PARTIES FOR NOTIFICATION PURPOSES</u>

[_____]          [_____]
[_____]          [_____]
[_____]          [_____]
Attention:                 Attention:
Phone:                     Phone:
Fax:                       Fax:

[_____]          [_____]
[_____]          [_____]
[_____]          [_____]
Attention:                 Attention:
Phone:                     Phone:
Fax:                       Fax:

[_____]
[_____]
[_____]
Attention:
Phone:
Fax:

12

#93828440v3
#93828440v5

**<u>Exhibit 15</u>**

**Transition Services Agreement**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement dated and effective as of _____, 202_ (the "Effective Date") (this "Agreement") is by and among [FIELDWOOD ENERGY II LLC], a Delaware limited liability company (the "Operator"), FIELDWOOD ENERGY I LLC, a Texas limited liability company ("Fieldwood Energy I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner"). Operator and Owners are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM") or the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior ("BSEE") or pursuant to a joint operating (or similar) agreement, of certain of the Assets (as defined below) (such Assets while operated by an Owner, the "Operated Assets");

**WHEREAS**, Fieldwood Energy I is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, in accordance with the Plan, the Owners do not have, as of the date hereof, employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, Operator has agreed to provide certain operational, technical, and administrative services with respect to the Assets, upon the terms and conditions set forth herein, until the end of each respective Service Term (as defined below).

**NOW, THEREFORE**, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  TRANSITION SERVICES

**Section 1.1      Services**. Subject to the terms of this Agreement, Operator shall provide or cause to be provided the transition services described on Exhibit A (collectively, the "Services") for all of Owners' assets (the "Assets") in accordance with the standard of performance set forth in Section 1.2 below for the period, subject to the provisions of ARTICLE V, with respect to each Service (as to each Service, the "Service Term") set forth on Exhibit A.

**Section 1.2      Standard of Performance**. Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services (a) in substantially the same manner as such Services were provided by Fieldwood Energy LLC or its Affiliates with respect to the Assets prior to the date hereof, (b) as a reasonably prudent operator as the contract service provider hereunder would perform such Services, (c) in a good and workmanlike manner, (d) with due diligence and dispatch, (e) in accordance with good oilfield practices, and (f) in compliance with

#93623206v14
#93623206v16
#93623206v18

all Laws (as defined below), licenses, authorizations and permits; **PROVIDED, HOWEVER, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL OPERATOR HAVE ANY OBLIGATIONS OR LIABILITY TO ANY OWNER GROUP MEMBER EXCEPT FOR DAMAGES BOTH (I) ARISING OUT OF THIS AGREEMENT AND (II) CAUSED BY, ARISING OUT OF, OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF OPERATOR GROUP (AS HEREIN DEFINED)**. For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority (as defined below) having jurisdiction. In providing the Services to the Owners, Operator may use, at its discretion, its own personnel or the personnel of any of its Affiliates or employ the services of contractors, subcontractors, vendors, or other third parties. For purposes of this Agreement, "Affiliates" with respect to a Party means any person or entity that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue. For the avoidance of doubt, neither of the Owners nor any of their subsidiaries shall constitute an Affiliate of Operator for purposes of this Agreement.

     **Section 1.3**    <u>Independent Contractor</u>. At all times during the performance of Services by Operator, all persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from each Owner and not employees of each Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owners on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by each Owner or any Affiliate of each Owner. Operator will not be required to provide any Services the provision of which would violate applicable Laws. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owners to generate Owners' goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory, borrowed, or otherwise, are statutory employees of each Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that such Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time.

     **Section 1.4**    <u>Records</u>. Operator shall use commercially reasonable efforts to maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to each Service rendered hereunder for a period of the later of (i) three (3) years following the end of the calendar year during which the end of the Service Term for such Service occurs or (ii) such other

2

#93623206v16
#93623206v18

time required by applicable Law. All such receipts, invoices, reports, and other documents are the property of Owners.

Section 1.5    **Representatives**. Each Party shall, at all times during the Service Term, keep one or more representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services.  For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 7.2 of this Agreement. Operator's representatives are designated along with their contact information on Exhibit B. Each Owner's representative shall be the Sole Manager of Fieldwood Energy I. Each Party may replace any of its representatives or designate such other representatives from time to time by written notice to the other Parties delivered pursuant to Section 7.2.  At all times while this Agreement remains in effect, each Owner shall cause at least one of its representatives to be included on such Owner's BOEM "qualification card" as an authorized signatory for such Owner.

Section 1.6    **Limitation of Services**.

(a)    Notwithstanding anything herein to the contrary, Owners acknowledge certain personnel of Operator and/or its Affiliates involved in the provision of the Services may leave the employment of such Operator and/or its Affiliates or terminate their employment or contract with such Operator or its Affiliates during the term of this Agreement. The Services shall not include providing any technical evaluations regarding any proposals for drilling, reworking, or other capital expenditure projects, or the new development of any assets which are proposed by Operator under the Farmout Agreement (as defined herein). Operator makes no representation or warranty regarding the ability of Operator and/or its Affiliates to retain any employees, contractors, or subcontractors and neither Operator nor any of its Affiliates shall have any liability to an Owner as to the result of the loss of any such employees, contractors, or subcontractors. Operator and its Affiliates shall use commercially reasonable efforts to report all information accurately, but shall not be responsible for the accuracy or completeness of any information furnished by any other party for inclusion in any reports or for results obtained by use of any inaccurate information so furnished.

(b)    Notwithstanding any other provision in this Agreement or the Agency Agreement (attached as Exhibit C hereto) to the contrary:

(i)    Operator shall have no obligation to be designated with BOEM, BSEE, or any other applicable state, local, or federal governmental entity (each individually, a "Governmental Authority"; and collectively, "Governmental Authorities") as a designated operator, designated applicant, designated payor, or responsible party for any of the Assets;

(ii)    Operator shall have no obligation to post any bond or other security on behalf of any Owner or to make any payment directly out of Operator's own funds for any Services;

3

#93623206v16
#93623206v18

(iii) Operator shall have no obligation to provide any Service for which a third party is obligated or permitted (under a joint operating agreement, contract services agreement or otherwise) to provide the same service for the applicable Owner; provided, however, that Operator's use of a subcontractor to perform any part of the Services shall not excuse Operator from the obligation to perform such Services;

(iv) each Owner acknowledges and agrees that it will remain responsible for having an authorized representative, and will cause at least one authorized representative to be, readily available (1) to sign and submit on its behalf various forms, filings, payments and other communications with BOEM, BSEE or other Governmental Authority with respect to the Assets and (2) to cooperate and coordinate with Operator with respect to the Services;

(v) each Owner acknowledges and agrees that it will remain responsible for providing any bond or security, or subject to <u>Section 3.6</u>, making any payment, to any third party that may be required in connection with any Assets or Services; and

(vi) if Operator co-owns any lease, right-of-way or other asset with an Owner, Operator shall not be required to provide any Services to (or provide any election for) such Owner in a manner different from what Operator provides for itself with respect to such co-owned asset.

(vii) if Operator reasonably believes that it cannot perform any Service without creating a breach of an agreement to which an Owner is a party or an Asset is bound, and/or violating the Law, then Operator shall have no obligation to perform such Service and such Service shall no longer be included within the Services, and Operator shall give prompt, written notice of such issue to Owners, prior to the discontinuation of such Service, with detailed descriptions of the agreement in question and the breach and/or violation Operator believes will be created.  In the event such possible breach and/or violation is cured or remedied within thirty (30) days following Owners' receipt of such notice, Operator may perform such Service only insofar as performance would not create the breach or violation.

(c)    In the performance of the Services, Operator must obtain consent of the applicable Owner(s) to perform any of the following actions on behalf of such Owner(s):

(i) make any payment to renew or extend a lease;

(ii) plug and abandon any well;

(iii) execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements related to the

4

#93623206v16
#93623206v18

Assets (other than an agreement in the ordinary course of business with a service provider using agreements substantially in the form previously used or other forms reasonably approved by such Owner);

(iv)  (a) borrow or lend money; (b) participate in futures, derivatives, or hedging activities; (c) purchase or sell any of the Assets or transfer or dispose of any equipment, material or supplies on any Asset; (d) execute any indemnification, release, or waiver, except for standard indemnities, releases, and waivers that are included in normal and routine operational services contracts, (e) take any other action not in the ordinary course of business; (f) incur any cost or expense for geophysical items (including acquisition, processing, reprocessing, or interpretation); (g) make a capital or expense expenditure or series of related capital or expense expenditures in relation to any particular project of $100,000 or more net to either Owner's interest, including, without limitation, expenditures for repair and maintenance projects and workover and recompletion projects; provided, however, this limitation does not apply to routine operational costs; or (h) assume, guarantee, or otherwise become liable or responsible (whether directly, contingently, or otherwise) for the liabilities of any other person or any indebtedness, except to the extent such assumptions, guarantees or otherwise becoming liable or responsible for the liabilities or indebtedness are standard obligations included in normal and routine operational services contracts; and

(v)  enter into any contract with respect to any of the foregoing in this Section 1.6.

(d)     The Services will be used by the Owners in connection with the operation of the Assets of Owners and, as necessary, to assist in the transition of the operation of the Assets to Owner or another service provider.  All products of Services performed hereunder by Operator for Owners or otherwise in respect of the Assets shall belong exclusively to Owners, and Operator shall retain no ownership, interest, or rights therein.

(e)     Operator and each Owner shall use commercially reasonable efforts to obtain, and to keep and maintain in effect (or to cause their respective Affiliates to obtain, and to keep and maintain in effect), all governmental or third party licenses and consents required for the provision of any Service by Operator in accordance with the terms of this Agreement.  The direct, out-of-pocket costs relating to obtaining any such licenses or consents shall be borne by Owners; and none of Operator or any of its Affiliates shall be required to pay any money or other consideration or grant any other accommodation to any person (including any amendment to any contract) or initiate any action, suit, or proceeding against any person to obtain any such license or consent.  Operator shall have no obligation to provide any Services which require any such licenses or consents which are not obtained.  In the event Owners choose to pursue any action, suit, or proceeding against any person to obtain such license or consent, Operator shall use commercially reasonable efforts to assist Owner in such efforts; provided that Operator shall not be obligated to incur any out-of-pocket costs in providing such assistance.

5

DEBTORS' EX. NO. 5
1397 of 1570

(f)　　The Parties are entering into that certain Farmout Agreement of even date herewith (the "Farmout Agreement"), and, therefore, any technical evaluation regarding any drilling, reworking, or other capital expenditure projects that may be proposed by Operator to Owners pursuant to the Farmout Agreement shall not constitute part of the Services to be provided hereunder.  Costs and expenses included in the calculation of the Recovery Threshold (as defined in the Farmout Agreement) may not also be included in the costs charged to the Owners hereunder.

Section 1.7　　**Operator's Access to Assets**.  To the extent reasonably necessary for Operator to perform the Services, Owners shall provide Operator unrestricted access to all the Operated Assets and, except to the extent prohibited by contract, all Seismic Data, Well Data, intellectual property and records included in the Assets and, upon Operator's reasonable request from time to time, shall cooperate with Operator in Operator's provision of Services. Operator agrees that it shall use such Operated Assets and the Seismic Data, Well Data, intellectual property and records included in the Assets only for the performance of the Services under this Agreement and for use under the Farmout Agreement; provided, however, Operator shall only be found to have breached this Section 1.7 if it uses such Operated Assets or such Seismic Data, Well Data, intellectual property, or records to (i) compete with Owner in Owner's business of the operation of the Assets where the Assets are located or (ii) to conduct activities that are not related to the Assets or the operation of the Owners' business. Nothing in this Section 1.7 shall restrict Operator's use of the Operated Assets and such Seismic Data, Well Data, intellectual property, and records to the extent Operator has the right to use such assets, data, and information pursuant to any other agreement between Operator and any Owner and to the extent Operator owns or has an interest in such assets, data, or information.

## ARTICLE II. COMPENSATION

Section 2.1　　**Compensation for Services**. During the Service Term set forth on Exhibit A for each Service, each Owner shall pay to and reimburse Operator the amounts determined pursuant to Section 3.1 below for the provision of the Services to such Owner.

Section 2.2　　**Overhead**. COPAS recoveries from third parties related to the Operated Assets shall be accounted for on behalf of the Owners. There shall be no separate charge by Operator relating to its overhead (including, but not limited to, head office overhead, field overhead, bonuses, and severances). For the avoidance of doubt, the costs to be paid by Owners to Operator pursuant to Section 3.1 are intended to compensate Operator fully for its overhead associated with the performance of Services.  Nothing in this Section shall limit Operator's rights to collect and retain overhead with respect to properties co-owned by Operator or any of its Affiliates and an Owner that Operator operates on its own behalf.

## ARTICLE III.　　　PAYMENT AND DEFAULT

Section 3.1　　**Submission of Invoice**. Operator shall submit a written invoice (the "Invoice") to Owners on or before the fifteenth (15th) Business Day of each month setting forth an itemized accounting of the actual costs incurred in the preceding month, or as applicable, the

6

#93623206v16
#93623206v18

preceding months for which an invoice was not issued, for the Services provided by Operator.  For the purposes of this Agreement, "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

For shared costs, such as salaried and hourly personnel, IT systems, and other office related infrastructure and overhead, Operator shall allocate those costs as follows:

(a)     For "people" costs, Operator shall bill Owners for actual time incurred by its full-time employees in performing Services hereunder.  The hourly rate of each Operator employee shall be equal to the annual payroll cost (including salary, vacation pay, target bonus, 401(k) match, and payroll taxes) of the employee divided by 2,080 hours.  Any hours accrued and billed by third-party contractors must be approved by Owners in advance of incurring such costs.

For illustrative purposes, two actual employees are shown below:

| Empl ID | Operator Office | Position | Vacation Hours | Target Bonus % | Salary | Vacation | Target Bonus | 6% 401(k) Match | Taxes | Total | Hourly |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1692 | TX | Revenue Accountant | 160 | 15% | 85,000 | 7,083 | 12,750 | 5,865 | 7,763 | 118,461 | 57.00 |
| 2060 | TX | Production Engineer | 160 | 30% | 145,000 | 12,083 | 43,500 | 11,310 | 11,872 | 223,765 | 108.00 |

(b)     For all other shared costs, Operator shall bill Owners for the proportionate use in the performance of the Services hereunder.  The proportionate use shall be determined by the Total Hours Billed divided by the Total Employee Hours.  "Total Hours Billed" is equal to the total number of hours recorded by Operator's full-time employees in performing Services hereunder and "Total Employee Hours" is equal to Operator's average daily headcount of full-time employees performing Services hereunder during the applicable month multiplied by eight hours multiplied by the number of Business Days in the month.

All other shared costs includes the following:
(i)   IT-related costs (IT systems and software)
(ii)  Healthcare and other benefits (benefits cost and administration)
(iii) Office supplies and other expenses
(iv)  Communications
(v)   Miscellaneous shared costs

For example, assuming an average daily headcount of 275 full-time employees performing Services hereunder and 20 Business Days in the applicable month, Total Employee Hours for the month would equal 44,000 hours (275 employees x 20 Business Days x 8 hours).  If the Total Hours Billed for the month is 30,000, then the Owners' proportionate use would be 68%; and Operator would bill Owners for 68% of these other shared costs.

For the purposes of allocating the other shared costs, Operator shall require that its employees maintain detailed time records measured in 60 minute increments.

7

DEBTORS' EX. NO. 5
1399 of 1570

(c)      For direct pass-through costs, Operator shall bill Owners for the actual costs incurred for the performance of the Services.  Direct pass-through costs shall include:

> (i)   Office rent plus operating expenses for the floors 16, 17, and 18 at the Briar Lake One Office in Houston, Texas;

> (ii)  Office rent plus operating expenses for seventy-five percent (75%) of the space leased by Operator at the Pinhook Tower in Lafayette, Louisiana;

> (iii) Contracted professional fees (legal, audit, reserve engineering, etc.); and

> (iv)  Any other actual, out-of-pocket costs incurred that are identified as directly associated with the performance of the Services hereunder.

**Section 3.2    Payment of Invoices**. Absent manifest error in inclusion or omission of items or calculations contained in an Invoice (if there is a manifest error, Owners will correct such error and show such recalculation), the applicable Owner shall pay within fifteen (15) Business Days of such Owner's receipt of an Invoice the amounts invoiced to such Owner by wire transfer of immediately available funds to the bank account designated on the Invoice by Operator. Adjustment credits or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of an Owner's written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this Agreement until paid. Each Owner shall have access to and the right to audit all records supporting such Invoiced amounts for the period set forth in <u>Section 1.4</u>.

**Section 3.3    Payment Disputes**. Owners may object to any invoiced amounts for any Service at any time before, at the time of, or after payment is made; provided such objection is made in writing to Operator no later than sixty (60) days after receipt of such Invoice.  Payment of any amount set forth in an Invoice shall not constitute approval thereof, or waive Owners' audit rights as set forth herein.  The Parties shall meet as expeditiously as possible to resolve any dispute. If the Parties fail to reach agreement in writing as to any disputed amounts invoiced by Operator under <u>Section 3.1</u> above within sixty (60) days after Operator's receipt of such objection, then upon written notice of dispute to the other Party, either Party may submit the matters that remain in dispute to Grant Thornton LLP (the "<u>Accounting Referee</u>") for review and final and binding resolution.  If any person selected as Accounting Referee is unable or unwilling to serve as a referee hereunder, then the Accounting Referee shall be selected by lot from among the independent national accounting firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder.  Owners and the Operator shall, not later than seven (7) days prior to the hearing date set by the Accounting Referee, each submit a written brief to the Accounting Referee (and a copy thereof simultaneously to the other Party) with dollar figures for settlement of the disputes as to any amounts owed by Operator. The hearing will be scheduled as soon as is acceptable to the Accounting Referee, but not earlier than seven (7) days after the date for submission of the settlement briefs, and shall be conducted

8

DEBTORS' EX. NO. 5
1400 of 1570

on a confidential basis. The Accounting Referee shall consider only those items or amounts which were identified in a notice in dispute delivered hereunder and which remain in dispute, together with the written briefs, and such other documents submitted therewith, and the Accounting Referee's decision resolving the matters in dispute shall be based upon and be consistent with the terms and conditions in this Agreement. In deciding any matter, the Accounting Referee (i) shall be bound by the provisions of this Section 3.3 and the related definitions and (ii) may not assign a value to any disputed item greater than the greatest value for such item claimed by either the Operator or Owners or less than the smallest value for such item claimed by the Operator or Owners in their respective calculations delivered hereunder. The Accounting Referee shall render a decision resolving the matters in dispute (which decision shall include a written statement of findings and conclusions) promptly after the conclusion of the hearing, unless the Parties reach agreement prior thereto and withdraw the dispute from the Accounting Referee. The Accounting Referee shall provide to the Parties an explanation in writing of the reasons for its decisions regarding the amounts disputed in the applicable notice. The decision of the Accounting Referee shall be (i) final and binding on the Parties and (ii) final and non-appealable for all purposes hereunder. The fees and expenses of the Accounting Referee under this Section 3.3 shall be borne one half by the Operator and one half by Owners. The fees and disbursements of Operator's independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 3.3 shall be borne by the Operator, and the fees and disbursements of Owners' independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this Section 3.3 shall be borne by Owners.

**Section 3.4    Owner Default**. It shall constitute a default on behalf of an Owner (an "Owner Default") if such Owner fails to timely pay any Invoiced amount for Services provided pursuant to this Agreement in accordance with the provisions of this ARTICLE III or perform any covenants of such Owner under this Agreement or the Agency Agreement, which failure, in the case of a payment default, continues for at least fifteen (15) days following receipt of written notice to such Owner that such Invoiced amount is past due or, in all other instances, at least thirty (30) days following receipt of written notice to such Owner that such performance is required; provided, however, that if such Owner cannot reasonably cure such failure within such thirty (30) day period, no Owner Default shall be deemed to occur provided such Owner demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Owner Default, Operator may, in addition to all other remedies available at Law or at equity, (i) suspend all or any portion of the provision of Services hereunder to the applicable Owner that is the subject of the Owner Default, including Services for which payment is outstanding, until such time as the Owner Default is cured and all unpaid, undisputed Invoiced amounts for Services to Operator under this Agreement for such suspended Services are paid in full or (ii) terminate this Agreement effective immediately (provided, however, that Operator may not terminate this Agreement for a specific Owner Default of non-payment (1) within thirty (30) days after Operator has provided written notice of such Owner Default to Apache Corporation ("Apache") or (2) if within such thirty (30)-day period after the provision of notice to Apache, Operator is paid the applicable amount owing) and be entitled to any amounts owed to Operator by Owner hereunder together with interest on such amount at a rate equal to 5% per annum, calculated daily on the basis of a year of 365 days and the actual number of days elapsed (the "Rate") from the date due, until such undisputed

9

#93623206v16
#93623206v18

amounts, together with all accrued and unpaid interest thereon, are paid in full; provided, however, that Operator may not suspend or terminate Services reasonably determined by Operator to be critical to the safety of the operation of the subject Assets until such time as Operator can make the Assets safe for handover to Owners or their designee. All costs related to making the Assets safe for handover to Owners or their designee shall be borne by Owners in addition to any other amount due and owing to Operator.

Section 3.5    **Operator Default**. Subject to Section 3.4 above, it shall constitute a default on behalf of Operator (an "Operator Default") if Operator fails to provide a Service to an Owner in accordance with the terms and conditions of this Agreement, which failure is not by reason of an Owner Default or, subject to the requirements and limitations of Section 7.1, Force Majeure and continues for at least thirty (30) days following receipt of written notice to Operator; provided, however, that if Operator cannot reasonably cure such failure within such thirty (30) day period, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken reasonable steps to cure such failure within such thirty (30) day period and diligently prosecutes such cure to completion. Upon the occurrence of an Operator Default, Owners may, in addition to any other rights or remedies available at law, in equity, or by contract, terminate this Agreement or specific Services provided hereunder within the time frame specified by Owners in a written notice to Operator so terminating this Agreement.

Section 3.6    **Third Person Services**. Owners recognize that Operator may hire third parties to provide certain portions of the Services and the Owners shall be responsible for the payment of amounts due to such third parties, which are incurred from and after the Effective Date with respect to the Assets, which payment shall be made either through the cash call mechanism described herein, through a direct payment to such third party, or as such may be included on an Invoice as contemplated herein. Operator may issue a cash-call to the applicable Owner in advance of the month in which such third-party costs will be incurred on behalf of such Owner, and such Owner shall pay such cash call within the later of (i) five (5) Business Days after receipt of the cash call and (ii) five (5) Business Days prior to the month in which payment is due to the third party. In the event Operator incurs costs not included in such cash call, such costs will be included in an Invoice, and the applicable Owner shall reimburse Operator at the same time and in the same manner as the payment described in Section 3.1. If the cash-call amount is more than the amount actually expended, Operator will credit the overpayment to the applicable Owner in the next Invoice or the next cash-call for future third party service costs, whichever occurs first. Any such Invoice or cash-call for which any overpayment has been applied shall reflect the credit for such overpayment at the time it is submitted to such Owner. For the avoidance of doubt, the costs charged to Owners under Section 3.1 of this Agreement are to compensate Operator for (i) the cost of its employees who are necessary in connection with those Services to be provided herein and (ii) other general and administrative costs that are necessary in connection with the Services to be provided herein, and such costs are not third-party costs for purposes of this Agreement. Costs to be reimbursed or prepaid pursuant to this Section 3.6 shall not be duplicative of Operator's other fees or reimbursements under this Agreement.

Section 3.7    **Sales Taxes**. Any sales, use, value-added or similar taxes paid hereunder for Services that Operator is required to pay or incur as a result of such Services shall be passed on to, and be the obligation of, the applicable Owner to which such Services are provided as an

10

DEBTORS' EX. NO. 5
1402 of 1570

explicit surcharge and shall be paid by such Owner in addition to any payments for Services as set forth in Section 3.1 above, whether included in the applicable Invoice, or added retroactively, such that the amount received by the Operator shall be as if no such taxes had been imposed. If such Owner submits to Operator a timely and valid resale or other exemption certificate sufficient to support the exemption from sales taxes, then such taxes will not be added to the invoices for Services payable pursuant to this ARTICLE III; provided, however, that if Operator is ever required to pay such taxes, such Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Government Authority. The Parties will cooperate to contest any invalid sales or use taxes imposed on the Services and to minimize the imposition of any such sales taxes.

Section 3.8   **Notice to Apache of Owner Default**.  If an Owner Default relating to payment occurs and is not cured within the fifteen (15) or thirty (30), as applicable, day period allowed for Owner to cure such Owner Default as described in Section 3.4, then Operator shall submit a written notice to Apache providing reasonable detail of the Owner Default and the amount required to cure such Owner Default.

## ARTICLE IV.   TERM OF AGREEMENT

Section 4.1   **Term**.  No Services shall be provided after the expiration of the Service Term with respect to such Services, except by the mutual written agreement of the Parties; provided, however, that this Agreement shall terminate in its entirety after the end of the Service Term of the Operating Services as described in Section 1.1 of Exhibit A. The Service Term with respect to certain Services may also be terminated prior to the expiration of the applicable Service Term by following the procedures set forth in ARTICLE V.

## ARTICLE V.  CESSATION OF SERVICES

Section 5.1   **Discontinuation of Services**. The Owners acting jointly may, with or without cause and for any or no reason, terminate the Service Term and discontinue any particular Service by giving Operator not less than ninety (90) days (or the lesser period, if any, as set forth in Exhibit A with respect to such Service) prior written notice of such discontinuation, to be effective on the last day of the month specified by Owners in their notice, which month shall not occur earlier than the third month following the date on which Owners have given Operator such written notice of termination. In the case of each discontinued or terminated Service, as applicable, Owners shall be liable to Operator for all costs, expenses, losses, and obligations Operator remains obligated to pay under the terms hereunder or under any other existing contract related to such Services, including as a result of such discontinuation or termination and including any and all actual, documented out-of-pocket amounts reasonably incurred by Operator solely arising from the discontinuation, winding down or termination of such Services hereunder, provided that, Operator shall provide Owners with a notice of a preliminary estimate of such costs within thirty (30) days of its receipt of the applicable notice of discontinuance or termination. The Operator may, with or without cause, terminate the Service Term for the Services as a whole by giving Owners not less than one hundred eighty (180) days prior written notice of such discontinuation,

11

#93623206v16
#93623206v18

to be effective on the last day of the month specified by Operator in its notice, which month shall not occur earlier than the sixth month following the date on which Operator has given Owners such written notice of termination; provided, however, if the Owners are able to transition the performance of Services to a new provider prior to the expiration of such time period, Owners and Operator may mutually agree to terminate the Services prior to the expiration of such one hundred eighty (180) day period.  Operator shall provide commercially reasonable assistance to Owners in transitioning the performance of the Services to a third party or to Owners; provided that the applicable compensation for Services so transitioned shall continue until the termination thereof in accordance herewith and Owners shall pay any actual, documented out-of-pocket costs incurred for the transition of such Services.

Section 5.2   **Termination Fee**. The Parties agree and acknowledge that Operator will be damaged in the event Owners terminate any particular Service or this Agreement pursuant to Section 5.1 within six (6) months of the Effective Date and that such damages would be difficult or impossible to calculate.  In such event, as liquidated damages and not as a penalty, Owners will pay to Operator, in addition to the amounts payable by Owners under Section 5.1, an early termination fee equal to the lesser of (i) Three Million Three Hundred Thousand U.S. Dollars $3,300,000.00 and (ii) the amount of severance for each employee who provided the particular Services related to the Assets whose employment with Operator is severed as a result of the termination of this Agreement by Owners pursuant to Section 5.1, which amount shall be the equivalent sum of two (2) month's salary for each severed employee, based on the monthly salary of the pertinent employee of Fieldwood Energy LLC as in effect on October 1, 2020.  Upon request by Owners, Operator shall provide Owners with an estimate of the amount of the severance payments it anticipates with respect to clause (ii) in the preceding sentence.  Within thirty (30) days from receipt by Operator of the notice of termination from Owners provided in Section 5.1, Operator will provide Owners a list of the applicable employees who are to be severed from their employment with Operator and their salaries.

Section 5.3   **Procedures Upon Discontinuation or Termination of Services**. Upon the discontinuation or termination of all Services hereunder, this Agreement shall terminate and be of no further force and effect, except as to obligations accrued prior to the date of discontinuation or termination; provided, however, that ARTICLES VI and VII, Section 1.4, the second sentence of Section 1.7, and Owners' audit rights under Section 3.2 of this Agreement shall survive such discontinuation or termination.

Section 5.4   **Transition of Operations**.  During the applicable notice period provided in Section 5.1 and subject to the next sentence, Operator shall deliver all documents, records, and other data to the extent included in the Assets that are in the Operator's possession, including, without limitation, information, data, know-how, interpretations, contracts, and other rights and privileges with respect to each Owner's wells, production, leases, and all Evaluation Data, Seismic Data, and Well Data, to the applicable Owner of such Assets or its designee in a timely, practical manner; provided, however, if the delivery of any such data or material would be a breach of any agreement between Operator and a third party, Operator may withhold delivery of such data and material and shall provide notice to Owners of the reasons for such withholding; provided, further, that Operator may keep copies of any documents, records, and other data included in the Operated Assets that are co-owned between the Operator and Owner (with Owner being provided the

12

#93623206v16
#93623206v18

originals of such documents, records, and other data) and Operator may keep copies of any documents, records, or other data included in any other Assets in which Operator also has an interest. If Owners are able to overcome any such potential breach, Operator shall promptly deliver such data and materials to Owners. During the term of this Agreement, Operator shall not enter into any agreement(s) hereunder for the benefit or use of Owners or in connection with Owners' assets that prohibits assignment of such agreement to Owners. If such documents, records, or data pertain to the Assets and to other properties owned by Operator that are not included in the Assets, then Operator (i) is not required to deliver any portions of such documents, records, or data that relate to assets or properties other than the Assets and (ii) may retain copies of such documents, records, or data to the extent such relates to the assets or properties that are not part of the Assets, or Operator owns or has interest in such documents, records, or data. Notwithstanding anything to the contrary herein, Operator may retain copies of any documents, records, or data pertaining to Assets for which Operator (i) has submitted a Proposal (as such term is defined in the Farmout Agreement) that has not been rejected, withdrawn, deemed withdrawn, or terminated under the Farmout Agreement or (ii) is conducting or has conducted a Project (as such term is defined in the Farmout Agreement) pursuant to the Farmout Agreement. The Parties agree to preserve as a priority during any transition of operations the safety of individuals and the environment in compliance with all Laws and Governmental Authorities. For the purposes of this Agreement, the term "Evaluation Data" shall mean Seismic Data and other data and information relating to the Assets including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (e.g., migration, AVO, etc.); the term "Seismic Data" shall mean any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shothole drilling information, digital shotpoint locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of the foregoing, or other like information customarily used in connection with oil and/or gas exploration; and the term "Well Data" shall mean any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports) and any related reports filed with the BOEM or BSEE.

Section 5.5   **Marketing Contracts**. Upon termination of this Agreement pursuant to the terms hereof, to the extent Operator is the owner of such contracts or agreements, Operator shall immediately assign to Fieldwood Energy I its rights to all contracts or agreements related to the Marketing Services described on Exhibit A hereto and take such actions as may be reasonably necessary to obtain any required consents for such assignments; provided, however, that Operator shall not be required (i) to assign any contract if such assignment would be in breach of an agreement with a third party to which Operator is a party or (ii) to provide any monetary or non-monetary consideration for such consent unless paid by Owner. During the term of this Agreement, Operator shall not enter into any agreement(s) for the benefit or use of the Owners or in connection with the operation of the Assets that prohibits assignment to Owners.

13

#93623206v16
#93623206v18

## ARTICLE VI.       INDEMNITIES; DISCLAIMERS

**Section 6.1     Owners' Indemnification Obligations**. Notwithstanding any knowledge or investigation of any person, Owners agree, to the fullest extent permitted by applicable Laws, to assume, release, indemnify, defend, and hold harmless Operator, and its equity-holders, parent, affiliates, and subsidiary companies together with its and all of their respective officers, directors, managers, employees, in-house legal counsel, agents, and representatives, and the respective successors, spouses, relatives, dependents, heirs, and estate of any of the foregoing (excluding any members of the Owner Group) (the "Operator Group") against and from all claims, demands, complaints, losses, fines, penalties, citations, damages, causes of action, suits, judgments, orders, expenses, or costs, including court costs, reasonable attorneys' fees, and expert witnesses' fees (collectively "Damages") caused by or arising out of or resulting from this Agreement or the provision of Services pursuant to this Agreement, but only to the extent such Damages are not attributable to (i) the breach of Operator's agreement contained in Section 1.7 above regardless of whether such breach was caused by Operator's gross negligence or willful misconduct, or (ii) the gross negligence or willful misconduct of Operator. Owners shall reimburse any Operator Group member entitled to indemnity hereunder for its legal and other expenses incurred in connection with defending any claim with respect to such Damages, which reimbursement shall be made promptly after receipt by Owners of a written request therefor accompanied by reasonable supporting documentation with respect to the legal and other expenses for which such Operator Group member seeks reimbursement. **THE FOREGOING INDEMNITY OBLIGATIONS SHALL APPLY WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE OPERATOR GROUP, (ii) STRICT LIABILITY, (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP.**

**Section 6.2     Operator's Indemnity Obligations**.     OPERATOR SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ASSUME, RELEASE, INDEMNIFY, DEFEND, AND HOLD HARMLESS OWNERS, AND THEIR EQUITY-HOLDERS, PARENT, AFFILIATES, AND SUBSIDIARY COMPANIES, CO-LESSEES, CO-OWNERS, PARTNERS, JOINT VENTURERS, TOGETHER WITH ITS AND ALL OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, IN-HOUSE LEGAL COUNSEL, AGENTS, AND REPRESENTATIVES, AND THE RESPECTIVE SUCCESSORS, SPOUSES, RELATIVES, DEPENDENTS, HEIRS, AND ESTATE OF ANY OF THE FOREGOING (EXCLUDING ANY MEMBERS OF THE OPERATOR GROUP) (THE "OWNER GROUP") AGAINST AND FROM ALL DAMAGES CAUSED BY OR ARISING OUT OF OR RESULTING FROM (i) THE BREACH OF OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION Section 7.4 OR (ii) THE GROSS

14

#93623206v16
#93623206v18

NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THIS AGREEMENT.

**Section 6.3**    **Disclaimers**.    EXCEPT WITH RESPECT TO OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION 7.4 BELOW, BUT OTHERWISE NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, OPERATOR MAKES NO, AND DISCLAIMS ANY, REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THIS AGREEMENT OR THE PERFORMANCE OR RESULTS OF THE SERVICES.    EXCEPT WITH RESPECT TO (i) ANY BREACH OF OPERATOR'S AGREEMENT CONTAINED IN SECTION 1.7 ABOVE OR SECTION 7.4 BELOW, OR (ii) THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE OPERATOR GROUP IN THE PERFORMANCE OF SERVICES UNDER THIS AGREEMENT, OPERATOR EXPRESSLY DISCLAIMS, AND OWNERS AGREE THAT THE OPERATOR GROUP SHALL BE FREE FROM, ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION WITH RESPECT TO THE SERVICES THAT IS MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ANY OWNER GROUP MEMBER (INCLUDING ANY OPINION, INFORMATION, PROJECTION, EVALUATIONS, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY OWNER GROUP MEMBER BY ANY OPERATOR GROUP MEMBER).

**Section 6.4**    **Laws; Application**.    The indemnification obligations in this ARTICLE VI are intended to comply with applicable Laws. To the extent such indemnification provisions are found to violate any applicable Law, or in the event any applicable Law is enacted or amended so as to cause these provisions to be in violation therewith, this Agreement shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by the applicable Law.

**Section 6.5**    **Limitations**.    EXCEPT FOR THIRD PARTY CLAIMS FOR WHICH ANY PARTY IS OBLIGATED TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OTHER PARTY'S GROUP UNDER THIS AGREEMENT, BUT OTHERWISE NOTWITHSTANDING ANY OTHER TERM OF THIS AGREEMENT TO THE CONTRARY, NEITHER OPERATOR NOR ANY OWNER SHALL BE LIABLE TO THE OTHER PARTY'S GROUP UNDER THIS AGREEMENT FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGE RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, EXCEPT SUCH AS MAY BE AWARDED TO THIRD PARTIES. EXCEPT FOR BREACHES OF OPERATOR'S OBLIGATIONS CONTAINED IN SECTION 7.4, OPERATOR SHALL NOT BE LIABLE TO THE OWNER GROUP FOR ANY AMOUNTS IN THE AGGREGATE GREATER THAN THE AMOUNTS ACTUALLY RECEIVED BY OPERATOR UNDER THIS AGREEMENT; PROVIDED, HOWEVER, THAT THIS LIMITATION SHALL NOT APPLY TO DAMAGES OWNER MAY OWE TO A THIRD PARTY TO THE EXTENT ARISING OUT OF OPERATOR'S BREACH OF ITS OBLIGATIONS CONTAINED IN SECTION 1.7.

15

#93623206v16
#93623206v18

### ARTICLE VII.     MISCELLANEOUS

**Section 7.1**     <u>Force Majeure</u>.  In the event that Operator is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Operator's delivery of written notice, so far as Operator is prevented by such Force Majeure or other causes herein specified, Operator's obligation shall be suspended during the continuance of any inability so caused, and Operator will not be liable to Owners for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the reasonable control of Operator and includes, without limiting the generality of the foregoing: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, pandemics, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Operator to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Operator to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Operator. During the continuation of a Force Majeure event, Operator shall act diligently to overcome the impediments caused by such event and use its commercially reasonable efforts to promptly resume performance of its obligations under this Agreement.

**Section 7.2**     <u>Notices</u>.  Any  notice, request, instruction, correspondence or other document to be given hereunder by any Party to another (herein collectively called "<u>Notice</u>") shall be in writing and delivered by email and additionally in person or by courier service requiring acknowledgement of receipt or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, or by electronic mail (provided that notices by electronic mail shall also be sent by one of the other permitted means to be effective), as follows:

If to Fieldwood Energy I:

      Fieldwood Energy I LLC
      ADDRESS
      Attn:
      Phone:
      Email:

with a copy to:

16

#93623206v16
#93623206v18

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

If to Operator:

[Fieldwood Energy II LLC]
2000 W. Sam Houston Pkwy S. Suite 1200
Houston, Texas 77042
Attn:   Thomas R. Lamme
Phone: (713) 969-1107
Email:   tlamme@fwellc.com

with a copy to:

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

If to GOM Shelf:

GOM Shelf LLC
ADDRESS
Attn:
Phone:
Email:

with a copy to:

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, TX  77056
Attn: Brian Erickson
Phone:  713-296-6000
Email:  brian.erickson@apachecorp.com

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office. Notice given by electronic mail shall be effective upon

17

#93623206v16
#93623206v18

delivery if delivered to a working email address during the recipient's normal business hours, or at the beginning of the recipient's next Business Day if not delivered during the recipient's normal business hours.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address, electronic or otherwise, to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that only Apache Corporation may change its address for copies and such copies may not be amended, discontinued, or delayed without Apache Corporation's express written consent.

Section 7.3     **No Joint Venture or Partnership**. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or other business entity between or among the Parties, and for federal and state income  tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

Section 7.4     **No Fiduciary Duty**. It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party. Operator agrees that if it handles cash on behalf of any Owner hereunder, it shall do so as an agent of Owner and shall be reasonably prudent in the handling of such cash as if it were handling its own cash. Notwithstanding anything herein to the contrary, Operator shall reimburse Owner dollar for dollar for the misappropriation of cash of the Owner handled by Operator pursuant to this Agreement by any member of the Operator Group; *provided*, that the Parties hereby acknowledge that the disposition of Owners' cash in Operator's good faith performance of the Services pursuant to its reasonable business judgment shall not constitute "misappropriation" hereunder.

Section 7.5     **Entire Agreement**. This Agreement (together with the Exhibits hereto, including the Agency Agreement attached as Exhibit C) and the SEMS Bridging Agreement & Interface Document among Owners and Operator dated the date hereof (the "SEMS Agreement") constitute the entire agreement among the Parties with respect to the subject hereof and supersedes any other representations, understandings or agreements (whether written, oral or otherwise) that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof.  The Parties agree that Apache Corporation is a third-party beneficiary with respect to the notice requirements under Sections 3.4 and 3.8.

Section 7.6     **Successors and Assignments**. This Agreement is personal as to Operator and Owners and shall not be assigned by Operator without Owners' consent or any Owner without Operator's consent; provided that the foregoing shall not apply if Operator assigns this Agreement in total (i) along with all of its personnel who are performing any part of the Services hereunder to an Affiliate, provided that no such assignment by Operator to an Affiliate shall relieve Operator of its obligations under this Agreement, or (ii) to an acquirer of all or substantially all of Operator's

18

#93623206v16
#93623206v18

business or all or substantially all of Operator's employees providing Services hereunder. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors, assigns, and legal representatives.

      **Section 7.7**    **Amendment**.  This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

      **Section 7.8**    **Construction**.

      (a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

      (b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

      (c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

      (d)    The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s).

      (e)    Operator and Owners have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

      (f)    The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

      (g)    All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

      (h)    The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

19

DEBTORS' EX. NO. 5
1411 of 1570

Section 7.9   **Severability**. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

Section 7.10   **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

Section 7.11   **Governing Law**. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

Section 7.12   **WAIVER OF JURY TRIAL**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.13   **Disputes**. Any disputes arising out of or relating to this Agreement shall be resolved exclusively by the state or federal courts located in Houston, Texas.

*[Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.]*

#93623206v16
#93623206v18

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**OPERATOR**:

[FIELDWOOD ENERGY II LLC]


By: _____
Name: _____
Title:  _____


**OWNERS:**

FIELDWOOD ENERGY I LLC


By: _____
Name:
Title:


GOM SHELF LLC


By: _____
Name:
Title:


*[Signature page to Transition Services Agreement]*

1" = "1" "015292.0000004 EMF_US 81940058v14" "" 015292.0000004 EMF_US 81940058v14
#93623206v14
#93623206v16
#93623206v18

<u>**EXHIBIT A**</u>

<u>**TO TRANSITION SERVICES AGREEMENT**</u>

**SERVICES**

1.      **Asset Management Services**. Subject to the terms of this Agreement, Operator shall provide the following Services with respect to the Assets.

**1.1      Operating Services**.

(a)      Start of Service Term. Effective Date.

(b)      End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>.

(c)      Services:  Providing the following operating services with respect to the Operated Assets (except to the extent limited by <u>Section 1.6</u> of this Agreement):

(i)      Complying with, and causing the Operated Assets to be operated in compliance in all material respects with, all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits as such Operating Services may have been generally provided by Fieldwood Energy LLC immediately before the divisive merger for Fieldwood Energy I; provided that nothing in this provision shall require Operator to make on behalf of an Owner any filing, payment, or submission (or otherwise take any action) that, under applicable Law, may be made only by a party designated with BOEM, BSEE, or other Governmental Authority as a designated operator, designated applicant, designated payor, or responsible party for such Owner or that could make Operator directly liable or responsible to BOEM, BSEE, or other Governmental Authority, or any other third party with respect to any of the Assets in which event Operator shall prepare the necessary filing or submission and provide it to the applicable Owner to file or submit or, in the case of a payment, notify the applicable Owner of such payment so that such Owner can make such payment.

(ii)      Until the end of the Service Term, serve as each Owner's authorized agent with respect to the Operated Assets of such Owner, in accordance with the terms hereof and any applicable operating agreements and similar contracts (if any), by performing the following as and when needed:

Exhibit A – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

(A)     purchasing (either directly or as agent for Owners) supplies, materials, tools, and equipment associated with the Operated Assets, provided that the costs of such that are paid directly by Operator will be reimbursed by the applicable Owner to Operator, further, provided that without such Owner's prior written consent Operator will not purchase any single item with respect to the Operated Assets if such purchase would result in a charge or cost to such Owner greater than one million dollars ($1,000,000.00) for any single item or five million dollars ($5,000,000.00) in the aggregate as to all such items during any calendar year.  Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from such Owner's receipt of Operator's request;

(B)     contracting (either directly or as agent for Owners) for services associated with the physical operation of the Operated Assets, provided that the costs associated with such services will be paid directly by the Owner of such Operated Assets or reimbursed to Operator by such Owner, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an affiliate of Operator or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(C)     executing, amending, or extending contracts (either directly or as agent for Owners) associated with the physical operation of the Operated Assets in the normal course of business, provided that the costs associated with such execution, amendment or extension of the contracts will be paid directly by the Owner of such Operated Assets or reimbursed by such Owner to Operator, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Operated Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Service Term for the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(D)     functioning as each Owner's agent in such Owner's capacity as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Operated Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable

Exhibit A – Page 2
Transition Services Agreement

#93623206v16
#93623206v18

agreement as if it were such Owner. Such Owner and Operator shall enter into an Agency Agreement in the form attached hereto as <u>Exhibit C</u> (the "<u>Agency Agreement</u>");

(E)    functioning as each Owner's agent under the applicable master service agreements, work orders, purchase orders and similar service contracts related to the Operated Assets with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement; and

(F)    functioning as each Owner's agent in representing such Owner in its capacity as the owner of the Operated Assets in all dealings and communications with Governmental Authorities, provided that such Owner reimburses Operator for any fees, fines, or penalties associated with such dealings and communications, further, provided that Operator must obtain the prior approval of such Owner before Operator agrees to a fine or penalty in excess of one hundred twenty five thousand dollars ($125,000) (it being understood and agreed that no Owner's consent is required for any such fee or penalty to which Owner has no right to approve, reject, or appeal under applicable Law). Operator will provide such Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by such Owner.

**1.2 Production Marketing, Marketing Services, and Marketing Accounting Services:**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Production Marketing, Marketing Services and Marketing Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

(c)    Services: Providing the following production marketing, marketing services and marketing accounting services with respect to the Assets (except as limited by <u>Section 1.6</u> of this Agreement):

(i)    For each third party agreement with respect to the Assets that each Owner and Operator mutually agree, Operator shall function as the agent for such Owner with all rights and authority to communicate with the service providers and take all actions under the applicable

Exhibit A – Page 3
Transition Services Agreement

#93623206v16
#93623206v18

agreement as if it were such Owner, pursuant to the Agency Agreement;

(ii) Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices Operator reasonably believes to be representative of market value. Upon request, Operator will provide Owner summaries of the scheduled oil and gas or plant statements;

(iii) Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(iv) Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements of an Owner with respect to its Assets.

**1.3     Treasury and Accounting Services:**

(a)     Start of Service Term. Effective Date.

(b)     End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Expenditure Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

(c)     Services: Providing the following treasury and accounting services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

(i) Managing any bank accounts, trusts, etc. of an Owner associated with the operation of the Assets;

(ii) Performing all expenditure accounting functions for each Owner relating to such Owner's Assets, including for such Owner's

Exhibit A – Page 4
Transition Services Agreement

#93623206v16
#93623206v18

payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

(iii)   Managing the collection of any joint interest billings and revenue relating to the Assets;

(iv)   Performing as needed all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

(v)   Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from third parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service;

(vi)   Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business; and

(vii)   Identifying to the applicable Owner, and making payments for lease rentals, shut-in royalties, minimum royalties, payments in lieu of production, royalties, overriding royalties, production payments, net profit payments, and other similar burdens that are associated with the ownership and operation of the Assets; provided, however, that the consent of the applicable Owner shall be required for the actions set forth in Section 1.6(c) of the Agreement.

**1.4    Land Administration Services.**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may notify Operator in writing thirty (30) days prior to the end of any month if such Owner wishes to terminate the Land Administration Services effective as of the end of such month and such Services shall terminate at the end of such month.

Exhibit A – Page 5
Transition Services Agreement

#93623206v16
#93623206v18

(c)      Services: Providing the following land administration services with respect to the Assets (except as limited by <u>Section 1.6</u> of this Agreement):

  (i)      Administering and maintaining all leases and agreements relating to the Assets;

  (ii)     Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

  (iii)    Maintaining and updating all royalty payment reports and databases;

  (iv)     Maintaining and updating all royalty suspense accounts, reports, and databases and administering escheat duties in accordance with established State rules and regulations;

  (v)      Maintaining and updating all accounts, reports, and databases associated with compulsory pooled interests related to the Assets;

  (vi)     Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

  (vii)    Identifying for payment by Owner and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

  (viii)   Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

  (ix)     Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

**1.5     Supply Chain**.

  (a)      Start of Service Term. Effective Date.


  (b)      End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>; provided, however, that each Owner may notify Operator in writing ten (10) Business Days prior to the end of any month if such Owner wishes to terminate the applicable Services as of the end of such Month and such Services shall terminate at the end of such month.

Exhibit A – Page 6
Transition Services Agreement

#93623206v16
#93623206v18

     (c)     Services. Providing the following supply chain services with respect to the Operated Assets (except as limited by Section 1.6 of this Agreement):

     (i)     Operator shall provide procurement services with respect to the Operated Assets;

     (ii)     Except as it relates to marketing contracts, which shall be covered by Section 1.2 of this Exhibit A, Operator shall provide Contract Administration Services with respect to the Operated Assets; and

     (iii)     Operator shall function as the agent for each Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement.

**2.**     **Hourly Services**. Operator shall provide the following Services with respect to the Assets in a manner substantially consistent with Operator's general practices for similarly situated assets:

**2.1**     **Legal.**

     (a)     Start of Service Term. Effective Date.

     (b)     End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

     (c)     Services. Providing the following legal services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

     (i)     Review and negotiation of contracts with service providers and other third parties;

     (ii)     Management of litigation, government investigations, and other disputes as directed by such Owner; and

     (iii)     Directing outside counsel engaged by such Owner in providing advice and counsel to such Owner with respect to the Assets and the

Exhibit A – Page 7
Transition Services Agreement

#93623206v16
#93623206v18

various legal matters that may arise from time to time related thereto.

**2.2**    **Finance and Tax.**

    (a)    Start of Service Term. Effective Date.

    (b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

    (c)    Services.  Providing the following supply finance and tax services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

        (i)    Preparation of projections, analyses and reports related to the Assets;

        (ii)    Review and negotiation of financing agreements, including hedging agreements; and

        (iii)    Preparation and administration of all federal, state, and local tax processes, including the preparation of appropriate tax returns and/or directing outside tax preparers in the preparation of any tax matters and/or activities related to the Assets.

**2.3**    **Insurance.**

    (a)    Start of Service Term. Effective Date.

    (b)    End of Service Term. On the date of the discontinuation of Services as set forth in Section 5.1; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

    (c)    Services. Providing the following insurance services with respect to the Assets (except as limited by Section 1.6 of this Agreement):

        (i)    Review and negotiation of insurance documents and agreements, including bonds, insurance policies, and similar agreements;

Exhibit A – Page 8
Transition Services Agreement

#93623206v16
#93623206v18

(ii)    Management of any claims made or to be made under the applicable insurance policies, bonds, and similar agreements as directed by such Owner; and

(iii)    Procure and maintain insurance coverages on behalf of the applicable Owner(s) that are customary for a reasonably prudent operator with properties, equipment, and other assets similar to the Assets and operations in the Gulf of Mexico and in amounts commensurate with operations and obligations in this Agreement. Such requirements shall include, but shall not be limited to, insurance as required by applicable Law.

**2.4**    **Financial Reporting and Audit Services.**

(a)    Start of Service Term. Effective Date.

(b)    End of Service Term. On the date of the discontinuation of Services as set forth in <u>Section 5.1</u>; provided, however, that each Owner may discontinue these Services by providing Operator ten (10) days prior written notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period. The terms of <u>Section 2.4 (d)(i)</u> shall survive the termination of this Agreement for such period of time as is necessary for such Owner or its representatives to conduct the review and audit of financial statements prepared under <u>Section 2.4 (d)(ii)</u> or for the review and audit of financial statements prepared subsequent to discontinuation of Services where financial results are included for the applicable periods the Services were provided.

(c)    Services. Providing the following supply financial reporting and audit services with respect to the Assets (except as limited by <u>Section 1.6</u> of this Agreement):

(i)    Facilitate and coordinate the review and audit of such Owner's business records in the normal course of business or as required in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC;

(ii)    Preparing financial statements and/or directing outside accounting personnel in the preparation and maintenance of audit reports and financial statements and any required filings or reporting in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC; and

Exhibit A – Page 9
Transition Services Agreement

#93623206v16
#93623206v18

(iii)     Auditing the books and records of third parties related to activities under operating, production handling, and other similar agreements in the normal course of business or as reasonably requested by such Owner.

[*Remainder of Page Intentionally Left Blank*]

Exhibit A – Page 10
Transition Services Agreement

#93623206v16
#93623206v18

DEBTORS' EX. NO. 5
1423 of 1570

**EXHIBIT B**

**TO TRANSITION SERVICES AGREEMENT**

OPERATOR REPRESENTATIVES LIST

[NTD: List will include name, title and contact information for the individuals in charge of performing each Service.]

Exhibit C – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

**EXHIBIT C**

**TO TRANSITION SERVICES AGREEMENT**

FORM OF AGENCY AGREEMENT

Exhibit C – Page 1
Transition Services Agreement

#93623206v16
#93623206v18

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement") is made effective as of _____, 202_ ("Effective Date") by and between [Fieldwood Energy II LLC], a Delaware limited liability company ("Operator"), and Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner"). Each capitalized term not defined herein shall have the meaning ascribed to such term in that certain Transition Services Agreement dated as of the Effective Date (the "Transition Services Agreement") between Operator and Owner.

WHEREAS, Fieldwood I is a resulting entity of a divisive merger effected in connection with the final plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

WHEREAS, Owners are the owners of various assets, comprising certain oil and gas properties and related equipment, contracts, and other assets located primarily in the Gulf of Mexico (the "Assets");

WHEREAS, of even date herewith, Operator and Owners entered into that certain Transition Services Agreement, which agreement provides for Operator to provide Owners certain services related to Owners' interests in the Assets; and

WHEREAS, Operator and Owners desire that Operator administer those certain services described on Exhibit A to the Transition Services Agreement during the Service Term for each applicable Service as set forth in the Transition Services Agreement; and

WHEREAS, subject to the limitations and obligations of Operator pursuant to this Agreement and the Transition Services Agreement, Owners desire that Operator act as agent for Owners for all matters related to certain of the third-party agreements set forth on Schedule 1 of this Agreement (the "Third Party Contracts") and related to representation of each Owner as the owner of the Assets in all dealings and communications with Governmental Authorities, or as may be mutually agreed upon from time to time by Owners and Operator in writing.

NOW THEREFORE, in consideration of the mutual premises, covenants, and agreements contained herein, the benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Operator and Owners hereby agree as follows:

1.      **Appointment of Agent**. Subject to the limitations and obligations of Operator pursuant to this Agreement and the Transition Services Agreement (including particularly but without limitation Section 1.6 thereof), Owners hereby appoint Operator, and Operator hereby accepts and

Exhibit C – Page 2
Transition Services Agreement

#93623206v16
#93623206v18

agrees to act as the agent for Owners, in all respects, under the Third Party Contracts and in all dealings and communications with any Governmental Authorities related to the Assets or operations related thereto. Unless expressly permitted by Owners or to the extent permitted under the Transition Services Agreement, no other party shall be authorized to act on behalf of Owners with respect to such Third Party Contracts. Operator's authority as agent for Owners shall be subject to the following limitations and obligations:

> (a)     Operator shall hold such Third Party Contracts for the benefit of Owners and shall exercise all rights available to Operator with respect to such third-party agreements in accordance with the Transition Services Agreement;

> (b)     Operator shall use commercially reasonable efforts to maintain and keep such Third Party Contracts in full force and effect;

> (c)     Operator shall not transfer, sell, hypothecate, encumber, relinquish, or cause the termination of such Third Party Contracts;

> (d)     Operator shall not materially amend, or extend any of such Third Party Contracts, except as allowed in the Transition Services Agreement;

> (e)     The foregoing notwithstanding, Operator does not assume any obligation under any Third Party Contract and shall not be deemed to have assumed any such obligation under the Third Party Contract by reason of acting as Owners' agent hereunder or by the existence of this Agreement, except as set forth in the Transition Services Agreement; and

> (f)     With respect to dealings and communications with Governmental Authorities, Operator shall act in a manner consistent with the limitations of the Transition Services Agreement.

Requests for approval of any action restricted by this Agreement shall be delivered to the sole manager of Owners, provided that Operator may take whatever actions it deems in good faith to be required in the event of an emergency.

**2.     Indemnity.** Except for Damages resulting from Operator's gross negligence or willful misconduct or from Operator's breach of the agreement contained in Section 1.7 or Section 7.4 of the Transition Services Agreement, Operator and Owners hereby acknowledge and agree that all Damages and obligations arising out of or attributable to Operator's service as Owners' agent hereunder shall constitute obligations for which Owners shall indemnify, defend, and hold harmless the Operator Group (excluding any member of Owner Group), and Section 6.1 of the Transition Services Agreement shall apply to such indemnification obligations hereunder, mutatis mutandis **(WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR OR ANY OTHER MEMBER OF THE**

Exhibit C – Page 3
Transition Services Agreement

#93623206v16
#93623206v18

OPERATOR GROUP OR ANY OTHER PERSON OR OPERATOR'S BREACH OF THE AGREEMENT CONTAINED IN <u>SECTION 1.7</u> OR <u>SECTION 7.4</u> OF THE TRANSITION SERVICES AGREEMENT, (ii) STRICT LIABILITY, (iii) THE UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF THE OPERATOR GROUP). Sections <u>6.1</u>, <u>6.2</u>, <u>6.3</u>, <u>6.4</u> and <u>6.5</u> of the Transition Services Agreement are hereby incorporated by reference, *mutatis mutandis.*

3.      **Power of Attorney.**  This Agreement shall serve as a general power of attorney. Each Owner hereby grants Operator, and Operator hereby accepts, a power of attorney for Operator to serve as the attorney-in-fact and agent for such Owner and to take any and all actions to effectuate the purpose and activities described in the Transition Services Agreement, including, but not limited to, taking any action under the Third Party Contracts, entering into any agreement, and representing Owners in certain dealings and communications with Governmental Authorities related to the Assets or operations related thereto.  This power of attorney is subject to the limitations of the Transition Services Agreement and this Agreement and shall terminate upon the termination of the Transition Services Agreement.

4.      **Miscellaneous Provisions.**

(a)      Term. The authority for Operator to act as each Owner's agent shall be effective as of the date hereof and shall terminate and be revoked as to each such third-party agreement at the end of each applicable Service Term for each applicable Service as set forth in the Transition Services Agreement, unless sooner revoked by notice in writing from Owner to Operator and to each third party no longer entitled to rely on the agency created by this Agreement.

(b)      Transition Services Agreement. This Agreement is being entered into in conjunction with the Transition Services Agreement whereby Operator shall provide certain Services as such term is defined therein. Operations of the oil and gas properties and collection and disbursement of all revenues and payment of expenses associated with such third-party agreements will be handled in accordance with the Transition Services Agreement.

(c)      Entire Agreement. This Agreement and the SEMS Bridging Agreement & Interface Document among Owners and Operator dated the date hereof constitutes the full understanding of Operator and Owners and a complete and exclusive statement of the terms and conditions of the agreement relating to the subject matter hereof and supersedes all prior negotiations, understandings, and agreements, whether written or oral, between Operator and Owners with respect thereto. This Agreement does not modify or amend any

Exhibit C – Page 4
Transition Services Agreement

#93623206v16
#93623206v18

terms or provisions of the Transition Services Agreement. Notwithstanding anything herein to the contrary, in the event of any conflict between that the terms of this Agreement and terms of the Transition Services Agreement, the terms of the Transition Services Agreement or any agreement contemplated thereby shall prevail.

(d)     Amendments. No alteration, modification, amendment, or change in this Agreement shall be effective or binding on any party unless the same is in writing and is executed by Operator and Owners.

(e)     Enforceability. This Agreement shall be enforceable by and against Operator, Owners, and their respective heirs, successors, permitted assignees, and legal representatives.

(f)     Assignment. This Agreement is personal to the parties hereto.  Neither Operator nor Owners shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Transition Services Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

(g)     Governing Law. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

(h)     Disputes. Any disputes arising out of or relating to this Agreement shall be subject to the terms set forth in Sections 7.12 and 7.13 of the Transition Services Agreement.

(i)     Multiple Counterparts. This Agreement may be executed, either originally or by electronic reproduction, by the parties hereto in multiple counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same instrument.

[*Remainder of page intentionally left blank; signature page follows.*]

Exhibit C – Page 5
Transition Services Agreement

#93623206v16
#93623206v18

This Agreement is executed and delivered by Operator and Owner effective as of the Effective Date.

OPERATOR:

[FIELDWOOD ENERGY II LLC]


By: _____
Name: _____
Title:   _____


OWNER:

FIELDWOOD ENERGY I LLC


By: _____
Name: _____
Title:   _____

GOM Shelf, LLC


By: _____
Name: _____
Title:   _____

Exhibit C – Page 6
Transition Services Agreement

#93623206v16
#93623206v18

STATE OF TEXAS                              §

COUNTY OF HARRIS                            §

      This instrument was acknowledged before me on this____ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy II LLC, a Delaware limited liability company, on behalf of said company.

                                       _____
                                       Notary Public in and for the State of Texas

STATE OF TEXAS                                                    §

COUNTY OF HARRIS                                                  §

This instrument was acknowledged before me on this ___ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy I LLC, a Texas limited liability company, on behalf of said company.

                                       _____
                                       Notary Public in and for the State of Texas

STATE OF TEXAS                                                    §

COUNTY OF HARRIS                                                  §

This instrument was acknowledged before me on this ___ day of _____, 202_ by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of GOM Shelf, LLC, a Delaware limited liability company, on behalf of said company.

                                       _____
                                       Notary Public in and for the State of Texas

Exhibit C – Page 7
Transition Services Agreement

#93623206v16
#93623206v18

## SCHEDULE 1

## TO SERVICES AGREEMENT

THIRD-PARTY AGREEMENTS

[NTD:  These are specific marketing, transportation and processing and other service agreements.]

Schedule 1 – Page 1
Agency Agreement

#93623206v16
#93623206v18

**SCHEDULE 2**

**TO SERVICES AGREEMENT**

EXCLUDED ASSETS

[NTD:  These are the assets which will be co-owned by Owner and Operator and subject to separate operating agreements.]

Schedule 1 – Page 2
Agency Agreement

#93623206v16
#93623206v18

DEBTORS' EX. NO. 5
1433 of 1570

**Exhibit 16**

**SEMS Bridging Agreement**

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

This Bridging Agreement dated and effective as of _____, 202_ (the "Effective Date") (this "Agreement") is by and among [FIELDWOOD ENERGY II LLC, a Delaware limited liability company][1] (the "Contractor"), FIELDWOOD ENERGY I LLC, a Texas limited liability company (the "Fieldwood Energy I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner").  Contractor and Owners are sometimes referred to collectively as the "Parties" and individually as a "Party".

**WHEREAS**, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM"), of certain of the assets owned by such Owner as of the Effective Date (the "Assets");

**WHEREAS**, Fieldwood Energy I is a resulting entity of a divisive merger effected in connection with the confirmed plan of reorganization of Chapter 11 Case 20-33948, *In re: Fieldwood Energy LLC et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Plan");

**WHEREAS**, in accordance with the Plan, the Owners do not have employees and require a third party to provide operational, technical, and administrative services for the Assets;

**WHEREAS**, pursuant to the Transition Services Agreement dated and effective as of the Effective Date by and among the Parties (the "Transition Services Agreement"), Contractor has agreed to provide certain operational, technical, and administrative services with respect to the ownership and operation of the Assets, upon the terms and conditions set forth therein, until the end of each respective Service Term (as defined therein).

In furtherance of and solely in connection with the Services (as such term is defined in the Transition Services Agreement) provided by Contractor pursuant to the Transition Services Agreement (the "Services") the Parties agree as follows:

1. **MANAGEMENT SYSTEM IMPLEMENTATION**
   For the purposes of providing the Services, Contractor agrees that it has used commercially reasonable efforts to;
   A. review the requirements of 30 CFR 250.1900 and the American Petroleum Institute's Recommended Practices for Development of a Safety and Environmental Management Program for Offshore Operations and Facilities (API RP 75) as incorporated by reference;
   B. identify and review other safety, health, environmental, integrity and quality requirements relevant to the organizational department of Contractor that is providing services for Fieldwood Energy I on the Gulf of Mexico Outer Continental Shelf ("OCS"), such as those found in Contractor's own standards and in regulations promulgated by U.S. government agencies, such as:
      I.    The Bureau of Safety and Environmental Enforcement (BSEE)
      II.   The United States Coast Guard (USCG)
      III.  The Environmental Protection Agency (EPA);

---

DEBTORS' EX. NO. 5
1435 of 1570

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

**C.** determine all requirements, to include from sources listed above, that are applicable to Contractor's provision of Services to Fieldwood Energy I on the Gulf of Mexico OCS;

**D.** develop and properly implement safety, health and environmental programs and/or management systems to enable compliance with those applicable requirements set forth above;

**E.** systematically monitor and assess the effectiveness of those systems set forth above on a departmental or unit level; and

**F.** Continuously improve those systems where appropriate.

## 2. SEMS INTERFACE DOCUMENT

This SEMS Bridging Agreement and Interface Document identifies whose environmental, health and safety manuals, policies, procedures and responsibilities shall prevail at the work site and for the activities involved pursuant to the Transition Services Agreement. Contractor shall use commercially reasonable efforts to deliver all documents indicated in this document upon request of Owners at any time or for any reason at the sole discretion of Owners. Notwithstanding anything in this Agreement to the contrary, Contractor and its subcontractors shall not have any obligation under this Agreement to provide any service or item in this Agreement to the extent Contractor is not required to provide any such service under the Transition Services Agreement.

## 3. SUBCONTRACTORS

Contractor shall direct its subcontractor who are providing Services under the Transition Services Agreement to comply with the requirements of this Agreement and shall disseminate to such subcontractors the information appropriate and necessary for such subcontractors to comply with this Agreement.

## 4. AGREEMENT

**A.** By signing below, each Party affirms, agrees to and endorses the contents of this Agreement.

**B.** EACH PARTY HERETO AGREES THAT IN NO EVENT SHALL CONTRACTOR HAVE ANY LIABILITY TO OWNERS HEREUNDER EXCEPT FOR DAMAGES BOTH (I) ARISING OUT OF THIS AGREEMENT AND (II) THOSE CAUSED BY, ARISING OUT OF, OR RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR.

**C.** Except for Damages resulting from Contractor's gross negligence or willful misconduct, Contractor and Owners hereby acknowledge and agree that all claims, demands, complaints, losses, fines, penalties, citations, damages, causes of action, suits, judgments, orders, expenses, or costs, including court costs, reasonable attorneys' fees, and expert witnesses' fees ("Damages") arising out of or attributable to this Agreement shall constitute obligations for which Owners shall indemnify, defend, and hold harmless Contractor, and Section 6.1 of the Transition Services Agreement shall apply to such indemnification obligations hereunder, mutatis mutandis (WHETHER OR NOT SUCH DAMAGES ARISE OUT OF (i) NEGLIGENCE (INCLUDING SOLE, SIMPLE, CONCURRENT, ACTIVE, OR PASSIVE NEGLIGENCE OR OTHERWISE), BUT EXPRESSLY NOT INCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR, (ii) STRICT LIABILITY, (iii) THE

#93792897v5

DEBTORS' EX. NO. 5
1436 of 1570

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

UNSEAWORTHINESS OF ANY VESSEL OR THE UNAIRWORTHINESS OF ANY AIRCRAFT OR (iv) ANY VIOLATION OF ANY LAW, RULE, REGULATION, OR ORDER RELATED TO THE OWNERSHIP OR OPERATION OF THE ASSETS, INCLUDING APPLICABLE ENVIRONMENTAL LAWS, EXCEPT IN THE EVENT THAT SUCH DAMAGES OR VIOLATION IS CAUSED BY OR RESULTS FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CONTRACTOR).

**D.** This Agreement shall terminate automatically upon the termination of the Transition Services Agreement.

**E.** The provisions of Article VII of the Transition Services Agreement shall apply *mutatis mutandis* to this Agreement.

**F.** This Agreement is personal to the parties hereto. Neither Contractor nor Owners shall assign, convey, transfer, or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party unless such assignment is permitted under the Transition Services Agreement. Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

## <u>INSTRUCTIONS</u>

1) The checked box (**"F1"** for Owners, **"F2"** for Contractor or both) indicates responsibility for the particular item.
2) Review and understand each Party's responsibility for each item or question.
3) For items with shared or dual responsibility of both Owners <u>and</u> Contractor, see additional comments or details.
4) Upon complete review of this Agreement, a member of Owner and Contractor's executive management team is to then properly sign and date this document.
5) Once properly signed, dated and fully executed by both Owner and Contractor, this entire document <u>is then considered a Controlled Document,</u> whereby only changes can be made upon written agreement of all Parties.
6) Any specific issue not listed below shall be submitted and approved by all Parties prior to the execution of work.
7) All matters below are with respect to Services provided by Contractor.

3315019-2

Page **3** of **6**

#93792897v5

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| ITEM | F2 | F1 | ADDITIONAL DETAILS |
|---|---|---|---|
| **ELEMENT 1: GENERAL** | | | |
| Establishing goals and performance measures, appoint management representatives responsible for carrying out SEMS activities | X | | Beginning upon signature of this document, operations performed on Fieldwood Energy I's leases, rights of way, rights of use and easements will adhere to Contactor's SEMS plan |
| Performing annual review of SEMS program in accordance with 250.1909(d) | X | | |
| **ELEMENT 2: SAFETY & ENVIRONMENTAL INFORMATION** | | | |
| Policies and procedures to create or modify the safety & environmental information (i.e. P&IDs, SAFE charts, control systems, NPDES) | X | | |
| To maintain red-line drawings or as built drawings for all modifications to the facility | X | | |
| Well permit or drilling permit approvals and procedures (APM) | X | | |
| **ELEMENT 3: HAZARDS ANALYSIS** | | | |
| Conduct, manage, and communicate the hazards analysis (facility level) | X | | |
| Job safety analysis (JSA) for activities involving equipment, materials or processes led by Contractor. (Note: All personnel performing work must be included in the creation of the JSA.) | X | | |
| JSA for activities involving equipment, materials or processes owned by sub-contractors | X | | |
| **ELEMENT 4: MANAGEMENT OF CHANGE (MOC)** | | | |
| Identify and control hazards caused by changes made to Contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards caused by changes made to the sub-contractor's equipment, materials, operating conditions, operating procedures and personnel, including a means to communicate the change to all affected personnel | X | | |
| Identify and control hazards by managing changes to existing drilling programs, well design, SAFE charts, control systems, etc. | X | | |
| **ELEMENT 5: OPERATING PROCEDURES** | | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes | X | | |
| Operating procedures that provide instructions for conducting safe and environmentally sound activities and address equipment or processes owned by sub-contractors or used by Contractor | X | | |
| **ELEMENT 6: SAFE WORK PRACTICES and CONTRACTOR SELECTION** | | | |
| Bypassing critical protections | X | | |
| Confined space entry | X | | |
| Electrical work & isolation of hazardous energy (Lock out / tag out) | X | | |
| Hot work | X | | |

3315019-2

Page **4** of **6**

#93792897v5

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Crane operations, lifting & rigging | X | | |
| Simultaneous operations planning | X | | |
| Working at heights | X | | |
| Spill reporting procedures | X | | |
| Well control procedures | X | | |
| Safe work practices other than those listed above | X | | |
| Safe work practices (other than those listed above) on a third-party owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. that is contracted by Contractor | X | | |
| Selection of sub-contractors to work under the supervision of Contractor | X | | |
| **ELEMENT 7: TRAINING** | | | |
| Verify all personnel are trained to conduct their assigned duties in a safe and environmentally sound manner. | X | | |
| **ELEMENT 8: MECHANICAL INTEGRITY** | | | |
| Verify that all critical equipment owned, operated or maintained by Contractor is designed, procured, fabricated, installed, calibrated and maintained in accordance with service requirements, OEM recommendations or industry standards | X | | |
| Verify that inspections and tests for critical equipment owned, operated or maintained by Contractor are documented in accordance with regulatory requirements and industry standards.  At a minimum, the documentation must include the date of the inspection/test, the name, position, and signature of the inspector/tester, the equipment's serial number or other unique identifier, a description of the test performed, and the results of the inspection or test | X | | |
| Assure that well control equipment, such as BOP's are tested and maintained according to OEM and regulatory requirements and conditions of approval of the drilling permit application | X | | |
| **ELEMENT 9: PRE-STARTUP SAFETY REVIEW (PSSR)** | | | |
| Conduct the pre-startup safety and environmental review (including appropriate safety, environmental, operating, maintenance, training and emergency information) for commissioning of new or significantly modified facilities | X | | |
| **ELEMENT 10: EMERGENCY RESPONSE AND CONTROL** | | | |
| Maintain and revise accordingly emergency response and control plans | X | | |
| Emergency response and control plan for use during an emergency when working on a sub-contractor owned facility, such as a drilling rig, lift boat, derrick barge, motor vessel, etc. contracted by Contractor | X | | |
| **ELEMENT 11: INCIDENT INVESTIGATION** | | | |
| Investigation of incidents | X | X | Owner reserves the right to participate as necessary |
| Investigation of incidents that occur on a sub-contractor owned facility (rig, derrick barge, lift boat, motor vessel, etc.) by a third party | X | X | Owner reserves the right to participate as necessary |
| **ELEMENT 12: AUDITING** | | | |

3315019-2

Page **5** of **6**

#93792897v5

## SEMS BRIDGING AGREEMENT & INTERFACE DOCUMENT

| | | | |
|---|---|---|---|
| Manage/facilitate/execute SEMS auditing in accordance with 30 CFR 250.1920 | X | X | Owner reserves the right to conduct audits as necessary of the Contractor SEMS |
| **ELEMENT 13: RECORDKEEPING & DOCUMENTATION** | | | |
| Record retention, management and control of all records pertaining to scope of operations | X | X | Contractor will maintain all records and share records and documentation as required or requested by Owner |
| **ELEMENT 14: STOP WORK AUTHORITY** | | | |
| Ensure all personnel have the authority to stop work | X | X | |
| **ELEMENT 15: ULTIMATE WORK AUTHORITY (UWA)** | | | |
| Establish person with ultimate work authority (UWA) and communicate UWA to all crewmembers | X | | |
| For situations that may develop during drilling, workover and P&A operations, such as well control or other emergency conditions that may require the UWA responsibility to shift to another individual | X | | As designated in job planning, the UWA will be communicated to all. On sub-contractor owned facilities, sub-contractor is responsible for providing Contractor with UWA designated Parties |
| In the event that stop work authority is initiated for imminent risk or danger, work can only resume after the person with UWA has granted approval | X | | |
| **ELEMENT 16: EMPLOYEE PARTICIPATION** | | | |
| Employee participation and involvement program | X | | |
| **ELEMENT 17: REPORTING UNSAFE WORKING CONDITIONS** | | | |
| Any person may report to BSEE any hazardous or unsafe working condition or possible violation on any facility engaged in OCS activities. In addition, Contractor will provide, at request of Owner, any reports necessary to ascertain working knowledge of unsafe working conditions | X | X | |

**OWNER APPROVAL**
**Fieldwood Energy I LLC**

By:_____
(SIGNATURE)

**GOM Shelf LLC**

By:_____
(SIGNATURE)

_____
Owner Authorized Representative
(PRINT NAME)

Title: _____

Date: _____

**CONTRACTOR APPROVAL**
**[Fieldwood Energy II LLC]**

By:_____
(SIGNATURE)

_____
Contractor Authorized Representative:
(PRINT NAME)

Title: _____

Date: _____

3315019-2

Page **6** of **6**

#93792897v5

**Exhibit 17**

**Amended BriarLake Sublease**

*Execution Version*

# FOURTH AMENDMENT
# TO SUBLEASE AGREEMENT

THIS FOURTH AMENDMENT TO SUBLEASE AGREEMENT (this "Amendment") is made and entered into as of the __ day of _____, 202_, by and between APACHE CORPORATION, a Delaware corporation ("Sublessor"), and FIELDWOOD ENERGY LLC, a Delaware limited liability company ("Sublessee").

WHEREAS, Sublessor and Sublessee entered into that certain Sublease Agreement, dated as of September 30, 2013, pertaining to certain space in the building known as One BriarLake Plaza located at 2000 West Sam Houston Parkway South, Houston, Texas (the "Original Sublease"), as amended by that certain First Amendment to Sublease Agreement, dated as of January 2, 2014, between Sublessor and Sublessee (the "First Amendment"), as further amended by that certain Second Amendment to Sublease Agreement, dated as of September 7, 2017, between Sublessor and Sublessee (the "Second Amendment"), and as further amended by that certain Third Amendment to Sublease Agreement, dated as of May 21, 2018, between Sublessor and Sublessee (the "Third Amendment", and the Original Sublease, the First Amendment, the Second Amendment, and the Third Amendment collectively, the "Sublease");

WHEREAS, commencing August 3, 2020, Sublessee and certain affiliates of Sublessee filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") initiating their respective cases pending under chapter 11 of title 11 of the United States Code styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948 (MI) (the "Chapter 11 Case"); and

WHEREAS, Sublessor and Sublessee desire to further amend the Sublease pursuant to this Amendment.

NOW, THEREFORE, for and in consideration of the foregoing and for other good and valuable consideration and of the mutual agreements hereinafter set forth, Sublessor and Sublessee stipulate, covenant, and agree as follows:

1.      All undefined capitalized terms used in this Amendment shall have the meaning given to them in the Sublease.  The term "Effective Date" means the first day of the month after occurrence of each of (i) Sublessee's express assumption of the Sublease, as amended by this Amendment, with approval of such assumption by order of the Bankruptcy Court in form and substance reasonably acceptable to Sublessor, (ii) Sublessee's payment in full to Sublessor of all amounts owed by Sublessee to Sublessor pursuant to the Sublease, which, as of the date hereof, are indicated on Schedule 1 attached hereto, and (iii) Prime Lessor's execution and delivery to Sublessor of its written consent to this Amendment.

2.      On and as of the Effective Date, expiration of the Sublease Term pursuant to Section 3.01 of the Original Sublease is hereby amended as follows:

(a)      The Sublease Term shall expire on October 31, 2024, unless terminated earlier pursuant to the terms of the Sublease, as amended by this Amendment.

(b)      Sublessee shall have the right and option to terminate the Sublease Term as to any of (i) all of floor 12 of the Subleased Premises, (ii) all of floor 15 of the Subleased Premises, or (iii) Suite B0300 in the basement level of the Subleased Premises, with any such termination in the case of (i), (ii), and (iii) being effective no earlier than after occurrence of each of (1) effectiveness of Sublessee's Plan of Reorganization (defined below), (2) consummation of the Credit Bid Transaction, (3) consummation of the transactions contemplated by the Divisive Merger Documents (defined below), (4) the second anniversary of the Effective Date, and (5) timely delivery of Requisite Notice (defined below).

(c)      Sublessee shall have the right and option to terminate the Sublease Term as to any of (i) all of floor 16 of the Subleased Premises, (ii) all of floor 17 of the Subleased Premises, (iii) all of floor 18 of the Subleased Premises, (iv) Suite B0150 in the basement level of the Subleased Premises, or (v) Suite B0200 in the basement level of the Subleased Premises, with any such termination in the case of (i), (ii), (iii), and (iv) being effective no earlier than after occurrence of each of (1) effectiveness of Sublessee's Plan of Reorganization, (2) consummation of the Credit Bid Transaction, (3) consummation of the transactions contemplated by the Divisive Merger Documents, (4) termination of the Transition Services Agreement (defined below), (5) termination of the Service Provider Agreement (defined below), if any, and (6) timely delivery of Requisite Notice.

(d)  To exercise any option under Section 2(b) or 2(c) of this Amendment, Sublessee must deliver to Sublessor no later than six months before the date on which the termination is to be effective a written notice of such exercise, specifying the eligible whole floor or whole floors or basement Suite or Suites in respect of which such early termination of the Sublease Term is to apply, certifying that such exercise complies with the requirements of Section 2(b) or 2(c) hereof, as applicable, and specifying the effective date of such termination, which can be no earlier than six months after the date on which such notice is delivered to Sublessor ("Requisite Notice").

As used in this Amendment, the following terms have the indicated meaning:

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"Confirmation Order" means the confirmation order entered in the Bankruptcy Case which, if and to the extent such confirmation order directly affects Sublessor in its capacity as such or pertains to the Sublease, as amended by this Amendment, or other Apache Definitive Documents (as defined in that certain Apache Term Sheet Implementation Agreement, dated as of the date hereof, by and among Sublessee, GOM Shelf LLC, Sublessor, Apache Shelf, Inc., and Apache Deep Water LLC), shall be in form and substance reasonably acceptable to Sublessor.

"Credit Bid Transaction" means the sale of certain of the Sublessee's deepwater assets and other assets to FWII, which sale may be effectuated through the Plan of Reorganization or as a standalone sale outside of the Plan of Reorganization pursuant to section 363 of the Bankruptcy Code with approval by order of the Bankruptcy Court in form and substance reasonably acceptable to Sublessor with respect to provisions affecting the Sublease or this Amendment.

DEBTORS' EX. NO. 5
1443 of 1570

"Divisive Merger Documents" means the certificate of division, the plan of division, the certificate of merger, and other documents included in, and confirmed by, the Confirmation Order and filed by or on behalf of Sublessee with the Texas Secretary of State.

"Fieldwood Energy I LLC" or "FWI" means a Texas limited liability company resulting from implementation of the Divisive Merger Documents, with the composition and structure of the ownership, management, assets, and liabilities of such company being satisfactory to Sublessor.

"FWII" means an entity to be formed and organized under the laws of a state of the United States of America at the direction of the Prepetition FLTL Lenders (as defined in the RSA) for the purposes of the Credit Bid Transaction, with the composition and structure of the ownership, assets, and liabilities of such entity being reasonably satisfactory to Sublessor, it being agreed that the ownership, assets and liabilities of such entity shall be deemed to be reasonably satisfactory to Sublessor so long as it is consistent with the description of such entity referred to as "Fieldwood II" in the RSA.

"Plan of Reorganization" means the plan of reorganization of Sublessee included in, and confirmed by, the Confirmation Order, including, without limitation, the Assignment (defined in Section 7 below) and FWII Assumption (defined in Section 7 below).

"RSA" means that certain Restructuring Support Agreement, dated as of August 4, 2020, by and among Sublessee and certain affiliates of Sublessee, certain of its affiliates specified therein, Sublessor, and the Consenting Creditors (as defined in the RSA), as the same may be amended, restated, or otherwise modified in accordance with its terms.

"Service Provider Agreement" means a service provider agreement if entered into by FWI or Sublessor and FWII pursuant to which FWII is service provider to perform all operations and/or plugging and abandonment and decommissioning activities with respect to the properties or assets of FWI and GOM Shelf LLC, a Delaware limited liability company, and its successors and assigns.

"Transition Services Agreement" means a transition services agreement between FWI and FWII in form and substance attached as Exhibit A to FWI's Limited Liability Company Agreement and to be entered into upon the effectiveness of the Plan of Reorganization.

3.      On and as of the Effective Date, each of (i) Section 3.05 of the Original Sublease, relating to a mutual option to extend the Sublease Term, (ii) Section 17.02 of the Original Sublease, relating to Vacated Space, and (iii) Section 5 of the Third Amendment, relating to a right of first refusal, is terminated.

4.      On and as of the Effective Date, (i) Base Rent for purposes of the first sentence in Section 4.01 of the Original Sublease, Section 3 of the Second Amendment, and Section 3 of the Third Amendment, and (ii) Storage Space Rental for purposes of Section 16.01 of the Original Sublease are hereby amended such that Sublessee shall pay Sublessor, without setoff or deduction whatsoever, except as expressly set forth in the Sublease, the following amounts for the indicated Subleased Premises commencing on the Effective Date through expiration of the Sublease Term, which amounts shall be in addition to Sublessee's Proportionate Share of Operating Expenses of the Building and all other amounts payable by Sublessee under the Sublease, as amended hereby:

3

| Subleased Premises | Square Footage | Annual Base Rent/ Sq. Ft. | Amount/Month | Amount/Year |
|---|---|---|---|---|
| Floor 12 | 24,632 | $10.00 | $20,526.67 | $246,320.00 |
| Floor 15 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 16 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 17 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Floor 18 | 25,865 | $10.00 | $21,554.17 | $258,650.00 |
| Suite B0300 | 3,704 | $10.00 | $3,086.67 | $37,040.00 |
| Suite B0200 | 1,149 | $10.00 | $957.50 | $11,490.00 |
| Suite B0150 | 740 | $10.00 | $616.67 | $7,400.00 |
| *Total* | 133,685 | | $111,404.17 | $1,336,850.00 |

5.      On and as of the Effective Date, Sublessee shall have no right under Article X of the Original Sublease to request Sublessor to exercise Sublessor's right to lease additional parking spaces attributable to the Subleased Premises or to substitute unreserved parking spaces attributable to the Subleased Premises for reserved parking spaces.

6.      The Sublease remains in full force and effect in accordance with its terms and as of the Effective Date, as amended by Sections 2, 3, 4 and 5 of this Amendment.  As of the Effective Date, all references in the Sublease to "Sublease" shall mean the Sublease, as amended by this Amendment.

7.      After the Effective Date and upon effectiveness of Sublessee's Plan of Reorganization, consummation of the Credit Bid Transaction and the transactions contemplated by the Divisive Merger Documents, full performance by Sublessee of Sublessee's obligations under the Sublease to the date of effectiveness of the Assignment, and the FWII Assumption, Sublessee hereby assigns to FWII the rights and delegates to FWII the duties of Sublessee under the Sublease, as amended by this Amendment (the "Assignment").  Upon effectiveness of the Assignment, FWII's execution and delivery to Sublessor of the below counterpart of this Amendment shall constitute FWII's assumption of, and FWII's agreement to fully and timely perform the obligations of Sublessee arising from and after the date of effectiveness of the Assignment under, the Sublease, as amended to the date thereof (the "FWII Assumption"), whereupon FWII shall be bound as Sublessee under the Sublease, as so amended, and all references in the Sublease, as so amended, to "Sublessee" shall mean FWII.

8.      Each party warrants to the other that it has had no dealing with any broker or agent except Cushman & Wakefield of Texas, Inc. in connection with the negotiation or execution of this Amendment.  Each party agrees to indemnify the other party and hold the other party harmless from and against any and all costs, expenses, or liability for commissions, fees, or other compensations or charges which are based on any agreement or understanding such party may have had with any broker or agent with respect to this Amendment.

9.      For purposes of Section 1.04 of the Sublease, Sublessee's address for notice is updated to be as set forth beneath its signature below.

10.      The parties may execute this Amendment in multiple original counterparts, each of which shall have the full force and effect of an original but constituting only one instrument.

4

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, duly authorized representatives of the parties hereto have executed this Amendment as of the day and year first above written.

**SUBLESSOR:**

**APACHE CORPORATION,**
a Delaware corporation


By: _____
Name:  Timothy R. Custer
Title:    Senior Vice President, Commercial

**SUBLESSEE:**

**FIELDWOOD ENERGY LLC,**
a Delaware limited liability company


By: _____
Name: _____
Title: _____

Fieldwood Energy LLC
2000 W. Sam Houston Pkwy. South, Suite 1200
Houston, TX 77042
Fax:  713.969.1099
Attention:_____

5

**FWII COUNTERPART**

Upon existence of FWII, effectiveness of Sublessee's Plan of Reorganization, and consummation of the Credit Bid Transaction and transactions contemplated by the Divisive Merger Documents, an authorized representative of FWII executes this Amendment pursuant to Section 7 hereof on the date written below to evidence FWII's assumption of, and agreement to be bound by, and fully and timely perform the obligations of Sublessee arising from and after the date written below under, the Sublease, as amended to the date written below.

**FWII:**

_____,
a _____


By: _____
Name: _____
Title: _____

Date Signed:_____

Address:

_____
_____
_____
Fax:_____
Attention: _____

6

Fieldwood

**RENT**

|  | PRE-PETITION | | | | | | | | POST-PETITION | | | | TOTAL 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |  |
| Billed | $435,297.63 | $435,297.63 | $435,297.63 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | $435,220.68 | 451,236.95 | 451,236.95 | $5,254,911.55 |
| Rec'd | $ 450,178.00 | $ 450,140.00 | $ 405,383.00 | $ 435,221.00 | $ 435,221.75 | $ 435,221.29 | $ 435,221.00 | $ 435,221.00 | $ 435,221.00 | $ 435,221.00 | 451,756.00 | 451,756.00 | $ 5,255,761.04 |
| Difference | ($14,880.37) | ($14,842.37) | $29,914.63 | ($0.32) | ($1.07) | ($0.61) | ($0.32) | ($0.32) | ($0.32) | ($0.32) | ($519.05) | ($519.05) | ($849.49) |

**Rent - Total Pre-Petition**    $189.25
**Rent - Total Post-Petition**    ($1,038.74)

**RESERVED/VIP PARKING**

|  | PRE-PETITION | | | | | | | | POST-PETITION | | | |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Billed | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 530.43 | $ 151.55 | $ 1,017.55 | $ 1,017.55 | $ 6,960.52 |
| Rec'd | $ 530.43 | $ 530.43 | $ 530.43 | $ - | $ 530.43 | $ - | $ - | $ - | $ 530.43 | $ - | $ - | $ - | $ 2,652.15 |
| Difference | $ - | $ - | $ - | $ 530.43 | $ - | $ 530.43 | $ 530.43 | $ 530.43 | $ - | $ 151.55 | $ 1,017.55 | $ 1,017.55 | $ 4,308.37 |

**Parking - Total Pre-Petition**    $1,591.29
**Parking - Total Post-Petition**    $2,717.08

**ANCILLARY**

|  | PRE-PETITION | | | | | | | | POST-PETITION | | | |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Billed | $ 5,670.00 | $ 4,282.36 | $ 5,924.37 | $ 12,282.77 | May-June | $ 7,305.30 | $ 4,002.69 | $ 5,140.25 | $ 6,657.35 | $ 3,505.70 | $ 3,532.09 | $ 3,499.98 | $ 61,802.86 |
| Rec'd | $ 5,670.00 | $ 4,282.36 | $ 5,924.37 | $ - | | $ - | $ - | $ 69.49 | $ - | $ - | $ - | $ - | $ 15,946.22 |
| Difference | $ - | $ - | $ - | $ 12,282.77 | $ - | $ 7,305.30 | $ 4,002.69 | $ 5,070.76 | $ 6,657.35 | $ 3,505.70 | $ 3,532.09 | $ 3,499.98 | $ 45,856.64 |

**Parking - Total Pre-Petition**    $ 23,590.76
**Parking - Total Post-Petition**    $ 22,265.88

| SUMMARY | Pre-Petition | Post-Petition |
|---|---|---|
| Rent | $189.25 | ($1,038.74) |
| Parking | $1,591.29 | $2,717.08 |
| Ancillary | $ 23,590.76 | $ 22,265.88 |
| TOTAL | $25,371.30 | $23,944.22 |

**Exhibit 18**

**Certification of Rights**

CERTIFICATION OF RIGHTS

With respect to any decommissioning obligations for which Apache Corporation, or any of its subsidiaries, or a third party designated by Apache Corporation or one of its subsidiaries (as the case may be, the "**Applicable Decommissioning Operator**") either (a) conducts or seeks to conduct pursuant to an order from the Bureau of Safety and Environmental Enforcement ("**BSEE**"), the Bureau of Ocean Energy Management ("**BOEM**"), their respective successor agencies, or any other governmental unit having jurisdiction over such decommissioning obligations or (b) becomes obligated to perform pursuant to any contractual obligation (in each case, such decommissioning obligations being hereinafter referred to as "**Decommissioning Obligations**"), FWE I hereby certifies that it has:

1.  Assigned to such Applicable Decommissioning Operator, to the extent such activity was permitted under the underlying agreement, all documentation, plans, files, permits, contracts, and contract rights, boarding rights, access rights, utilization rights, applicable litigious rights, rights to payment, rights to reimbursement, rights to contribution, audit rights, and any other benefit available to FWE I in conjunction with applicable decommissioning operations which are the subject of the applicable Decommissioning Obligation, each such assignment was made solely as the rights relate to such Decommissioning Obligation;

2.  Authorized the Applicable Decommissioning Operator to perform all required decommissioning operations on any FWE I property or infrastructure that is the subject of a Decommissioning Obligation;

3.  Granted boarding access to the Applicable Decommissioning Operator for any infrastructure owned by FWE I, or to which FWE I has contract access rights, as such may be necessary or convenient for the Applicable Decommissioning Operator or its contractors, representatives, or designees, or the employees, agents, or consultants of any of them, to perform and fulfill each applicable Decommissioning Obligation, without need of further authorization or agreement of FWE I;

4.  Assigned and quitclaimed to the Applicable Decommissioning Operator any salvaged property or materials and the salvage value for any property or infrastructure decommissioned by the Applicable Decommissioning Operator;

5.  Granted to the Applicable Decommissioning Operator access to all contracts applicable to any and all properties and infrastructure associated with the applicable Decommissioning Obligation and assigned to the Applicable Decommissioning Operator, solely as they relate to such Decommissioning Obligation, any contract and/or contract rights or benefits necessary or convenient to the performance of the Decommissioning Obligation or to the rights or ability of the Applicable

[Exhibit to Apache Term Sheet Implementation Agreement]

Decommissioning Operator to collect and obtain contributions from any and all applicable third parties who have obligations to pay for or contribute to all or any part of the Decommissioning Obligations; and

6.      Assigned all rights to payment, rights to reimbursement, and rights to contribution for decommissioning expenses available to FWE I for any property made the subject of a Decommissioning Obligation.

FWE I further authorizes any co-owner, counterparty, contractor, or other person or entity to rely on the foregoing certifications in taking in action or making any payment or contribution as may be requested or directed by the Applicable Decommissioning Operator toward the fulfillment of the applicable Decommissioning Obligations.

FIELDWOOD ENERGY I LLC


_____

By:      _____

Name:   _____

Title:   _____

[Exhibit to Apache Term Sheet Implementation Agreement]

**<u>Exhibit B</u>**

**Schedule of Defined Terms for Required Confirmation Order Provisions**

"**Decommissioning Agreement**" means that Decommissioning Agreement dated as of September 30, 2013, by and among the Apache PSA Parties, FWE, and the other parties thereto.

["**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.][1]

"**Permitted Post-Closing Liens**" means with respect to the properties allocated to Fieldwood Energy I LLC and the GOM Shelf LLC properties, the Liens created by or pursuant to the Recharacterization Mortgages or Standby Loan Agreement.

"**Recharacterization Mortgages**" has the meaning given to such term in the Decommissioning Agreement.

"**Standby Loan Agreement**" means that certain Standby Loan Agreement dated as of [_____, 20[●]] by and among Fieldwood Energy I LLC, GOM Shelf LLC, and Apache as lender thereunder.

---

[1] NTD: Definition of Lien to be discussed.

**<u>Exhibit 19</u>**

**Sole Manager Agreement**

[COMPANY LETTERHEAD]

[SOLE MANAGER NAME]
[ADDRESS]
[DATE]

Dear [SOLE MANAGER NAME],

      This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby you agree to provide the services to be performed by the "Sole Manager" on behalf of or in the service of Fieldwood Energy I LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2020 (such agreement, as it may be amended, supplemented, or modified from time to time, the "**Company Agreement**"), a copy of which is attached as <u>Exhibit A</u> hereto.  As used in this Agreement, the term "**Parties**" shall refer to both you and the Company and "**Party**" shall refer to you or the Company.

**Section 1.**     <u>Services</u>.

      (a)     The Company hereby agrees to employ you, and you hereby accept such employment, as the Sole Manager (as defined in the Company Agreement) to perform for or provide to the Company the services that are specified in the Company Agreement to be performed or provided by the Sole Manager or that are otherwise delegated or assigned to you by the Independent Director (as defined in the Company Agreement) in accordance with the Company Agreement (the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

      (b)     The scope of the Services to be performed or provided by you as the Sole Manager and your authority to take actions on behalf of the Company as the Sole Manager shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement, as well as any limitations imposed by the Independent Director in connection with those Services that are delegated or assigned to you by the Independent Director.  The Services shall include the services described on Schedule I attached hereto.

      (c)     You shall devote your full business time, attention, skill, and best efforts to performing or providing the Services and to the furtherance of the Company's interests. You shall perform or provide the Services and carry out the responsibilities reasonably related thereto, to the best of your ability, in a diligent, trustworthy, and businesslike manner for the purpose of advancing the business of the Company.

      (d)     Your principal place of employment shall be at [COMPANY'S CORPORATE OFFICE ADDRESS] subject to business travel as needed to fulfill your employment duties and responsibilities.

**Section 2.**     <u>**Term of Employment**</u>.  The term of your employment under this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Sole Manager by the Company for any reason, with the consent of Apache Corporation, a Delaware corporation ("**Apache**"), and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (such period of time, the "**Employment Period**"). **You acknowledge and understand that your employment with the Company will be at-will, meaning that you or the Company (with Apache's consent) may terminate the employment relationship at any time, with or without Cause (as defined herein), and with or without notice and for any reason or no particular reason.** Although your compensation [and benefits] may change from time to time, the at-will nature of your employment

may only be changed by an express written agreement signed by the Independent Director, and shall be subject to the prior written consent of Apache.

**Section 3.**      **Compensation**.

(a)      In consideration for your performing or providing the Services and any duties related thereto and the rights granted to the Company in this Agreement, the Company shall pay you an initial base salary of $[●] per year[, subject to review from time to time], payable [biweekly][monthly] and subject to all withholdings and deductions as required by law.

(b)      You shall also be entitled to receive the compensation described on Schedule II attached hereto, subject to the conditions described on Schedule II.

(c)      [All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.]

(d)      The Company shall pay or reimburse you for all expenses (including travel expenses) reasonably incurred by you during the Employment Period in connection with performing or providing the Services or carrying out the responsibilities reasonably related thereto, provided that you shall provide to the Company reasonable documentation or evidence of expenses for which you seek reimbursement.

**Section 4.**      **Intellectual Property Rights**.

(a)      The Company is, and will be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Services and work related thereto performed or provided by you under this Agreement and the Company Agreement (collectively, the "**Deliverables**") and all other writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, and materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, modified, conceived, or reduced to practice in the course of your performing or providing the Services or other work performed in connection with the Services or this Agreement or the Company Agreement (collectively, and including the Deliverables, "**Work Product**"), including all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know-how, and other confidential or proprietary information, and other intellectual property rights (collectively "**Intellectual Property Rights**") therein.  You agree that the Work Product is hereby deemed "work made for hire" as defined in 17 U.S.C. § 101 for the Company and all copyrights therein automatically and immediately vest in the Company.  If, for any reason, any Work Product does not constitute a "work made for hire," you hereby irrevocably assign to the Company, for no additional consideration, your entire right, title, and interest throughout the world in and to such Work Product, including all Intellectual Property Rights therein, including the right to sue for past, present, and future infringement, misappropriation, or dilution thereof.

(b)      You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Work Product, Intellectual Property Rights, or other confidential information of the Company.

(c)      Notwithstanding Section 4(a), to the extent that any of your pre-existing materials identified in Schedule III are incorporated in or combined with any Deliverable or otherwise necessary for the use or exploitation of any Work Product, you hereby grant to the Company an irrevocable, worldwide, perpetual, royalty-free, non-exclusive license to use, publish, reproduce, perform, display, distribute, modify, prepare derivative works based upon, make, have made, sell, offer to sell, import, and otherwise

2

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

exploit such preexisting materials and derivative works thereof.  The Company may assign, transfer, and sublicense such rights to others without your approval.

(d)     As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company ("**Company Materials**"), including all Intellectual Property Rights therein.  You have no right or license to reproduce or use any Company Materials except solely during the Employment Period to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business.  All other rights in and to the Company Materials are expressly reserved by the Company.  You have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 5.**     **Confidentiality**.

(a)     You acknowledge that you will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement and the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, [OTHER CONFIDENTIAL INFORMATION,] seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its affiliates, or their suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**").  Any Confidential Information that you access or develop in connection with the Services or any work related thereto, including but not limited to any Work Product, shall be subject to the terms and conditions of this Section 5.  You agree not to use any Confidential Information for any purpose except as required in the performance of the Services.  You shall notify the Independent Director and Apache immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)     Confidential Information shall not include information that:

(i)     is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)     is communicated to you by a third party that had no confidentiality obligations with respect to such information.

(c)     Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency.

(d)     Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**").  Notwithstanding any other provision of this Agreement:

(i)     You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)     is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

DEBTORS' EX. NO. 5
1455 of 1570

(B)      is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)      If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)      file any document containing the trade secret under seal; and

(B)      do not disclose the trade secret, except pursuant to court order.

**Section 6.       Representations and Warranties.**

(a)      You represent and warrant to the Company that:

(i)      you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)      your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject, including, without limitation, any non-competition, non-solicitation, or other work-related restrictions imposed by a current or former employer;

(iii)      you will inform the Independent Director about any non-competition, non-solicitation, or other work-related restrictions to which you are subject and provide the Independent Director with as much information about them as possible, including any agreements between you and your current or former employer describing such restrictions on your activities;

(iv)      you will not:  (1) remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer or (2) use or disclose any such confidential information of your current or former employer during the course and scope of your employment with the Company;

(v)      you will discuss any questions you may have about ownership of particular documents or other information with your current or former employer before removing or copying the documents or information for use in connection with your employment with the Company;

(vi)      you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

(vii)      you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

(b)      The Company hereby represents and warrants to you that:

4

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

(i)      it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(ii)      the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action.

**Section 7.      Indemnification.**  You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement.

**Section 8.      Insurance.**  The Company shall, at its own expense, provide directors' and officers' liability insurance coverage to you in your capacity as the Sole Manager, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company.  The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 9.      Termination.**

(a)      You or the Independent Director on behalf of the Company (in the case of the Independent Director, subject to the prior consent or approval of Apache as provided in the Company Agreement) may terminate this Agreement without Cause upon 60 calendar days' written notice to the other Party.  In the event of termination by you pursuant to this clause (a), the Company shall pay you on a pro-rata basis for any portion of your salary then due and payable for any Services completed up to and including the date of such termination.  In the event of termination by the Independent Director on behalf of the Company pursuant to this clause (a), the Company shall pay you six months of your base salary from and after the date of such termination.

(b)      The Independent Director on behalf of the Company (subject to the prior consent and approval of Apache) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below), or, if the event giving rise to Cause is an event subject to clause (d) of the definition of Cause, then effective following any applicable right to cure set forth by the Independent Director in the written notice of termination if you do not cure the applicable failure(s), violation(s), breach(es), action(s), or inaction(s) giving rise to Cause within the cure period specified in the written notice of termination you receive from the Independent Director. You may terminate this Agreement, effective immediately upon written notice to the Independent Director (with a copy provided by you to Apache), if the Company breaches any material provision of this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Company does not cure such breach within thirty (30) calendar days after the Independent Director's and Apache's receipt of your written notice of termination containing a description of the breach giving rise to the termination notice.  As used herein, "**Cause**" means a good faith finding by the Independent Director (subject to the prior consent and approval of Apache) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized disclosure by you of material Confidential  Information or Intellectual Property Rights of the Company or any of its Affiliates or Subsidiaries; (c) your conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d)  your failure to perform your material duties as the Sole Manager of the Company in accordance with this Agreement, as reasonably determined by the Independent Director (subject to the prior consent and approval of Apache), or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Independent Director (subject to the prior consent and approval of Apache) has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition the Independent Director shall provide written notice to you of any such

5

DEBTORS' EX. NO. 5
1457 of 1570

failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Independent Director will offer the Sole Manager (subject to the consent and approval of Apache) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Independent Director, in the exercise of its good faith judgment, deems such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Independent Director shall only be required to give the Sole Manager such notice and opportunity to cure one time.  In the event of termination by the Independent Director on behalf of the Company pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your salary then due and payable for any Services completed up to and including the effective date of such termination.

(c)     Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)     deliver to the Company all Deliverables (whether complete or incomplete) and all materials, equipment, and other property provided for your use by the Company;

(ii)     deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)     permanently erase all the Confidential Information from your personal computer systems; and

(iv)     certify in writing to the Company that you have complied with the requirements of this clause.

(d)     The terms and conditions of clause (c) and this clause (d) of Section 9 and Sections 4, 5, 6, 7, 10, **Error! Reference source not found.**, 11, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 10.**     **Non-Competition**.

(a)     You acknowledge that (i) the Company and its affiliates will be engaged in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the Legacy Apache Properties (as defined in the Company Agreement) and the GOM Shelf Properties (as defined in the Company Agreement) during the Employment Period and thereafter; (ii) during the Employment Period, you will be actively and significantly involved in the day-to-day operations of the Company and its affiliates as the Sole Manager pursuant to the Company Agreement in carrying out the activities of the Company and its affiliates described in the immediately preceding clause (i); (iii) you occupy a position of trust and confidence with the Company and its affiliates during the Employment Period; and (iv) you will become familiar with the Company's and its affiliates' trade secrets and with other proprietary and confidential information (including the Confidential Information) concerning the Company and its affiliates and their respective operations and businesses.

(b)     During the Restricted Period (as defined below) in the Restricted Territory (as defined below), you shall not, directly or indirectly (whether as an owner, partner, shareholder, agent, officer, director, employee, independent contractor, consultant, or otherwise), own, operate, manage, control, invest in, perform services for, or engage or participate in any manner in, or render services to (alone or in association with any person or entity) or otherwise assist any person or entity that engages in, or owns, invests in, operates, manages, or controls any venture or enterprise that engages in, acquiring, disposing of, owning, operating, plugging and abandoning, or decommissioning oil and gas properties.

6

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

(c)      The term "**Restricted Period**" means the period of time from the date of this Agreement until 24 months after the termination of your employment relationship with the Company or any successor thereto for any reason (whether pursuant to a written agreement or otherwise). The Restricted Period shall be extended for a period equal to any time period that you are in violation of this Section 10. Nothing contained in Section 10(b) shall be construed to prevent you from investing in the stock of any competing corporation listed on a national securities exchange or traded in the over-the-counter market, but only if you are not involved in the business of said corporation and if you and your associates (as such term is defined in Regulation 14(A) promulgated under the Securities Exchange Act of 1934, as amended and as in effect on the date hereof), collectively, do not own more than an aggregate of 1.0% of the stock of such corporation.

(d)      The term "**Restricted Territory**" means the Gulf of Mexico.

(e)      The Parties acknowledge that the business of the Company and its affiliates is the Gulf of Mexico and that you are performing or providing the Services to the Company and its affiliates throughout the Restricted Territory. If any court of competent jurisdiction at any time deems the Restricted Period unreasonably lengthy, or the Restricted Territory unreasonably extensive, or any of the covenants set forth in this Section 10 not fully enforceable, the other provisions of this Section 10, and this Agreement in general, will nevertheless stand and to the full extent consistent with law continue in full force and effect, and it is the intention and desire of the parties that the court treat any provisions of this Agreement that are not fully enforceable as having been modified to the minimum extent deemed necessary by the court to render them reasonable and enforceable and that the court enforce them to such extent (for example, that the Restricted Period be deemed to be the longest period permissible by law, but not in excess of the length provided for in Section 10(b), and the Restricted Territory be deemed to comprise the largest territory permissible by law under the circumstances but not in excess of the territory provided for in Section 10(b)).

**Section 11.      Additional Acknowledgments**.

(a)      You acknowledge and agree that (i) the Services to be performed or provided by you to the Company as Sole Manager under the Company Agreement are of a special and unique character; (ii) you will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing and operational strategies by virtue of your employment; and (iii) the restrictive covenants and other terms and conditions of this Agreement (including, but not limited to, those in Sections 5 and **Error! Reference source not found.** of this Agreement) are reasonable and reasonably necessary to protect the legitimate business interest of the Company and its affiliates.

(b)      You further acknowledge that (i) the benefits provided to you under this Agreement, including the amount of your compensation, reflect, in part, your obligations and the Company's rights under this Agreement, including, but not limited to, those in Sections 5 and 10 of this Agreement; (ii) you have no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (iii) you will not suffer undue hardship by reason of full compliance with the terms and conditions of Sections 5 and 10 of this Agreement or the Company's enforcement thereof.

**Section 12.      Assignment**.   Neither you nor the Company shall assign any rights or obligations under this Agreement without the prior written consent of the other Party. Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*. Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

7

DEBTORS' EX. NO. 5
1459 of 1570

**Section 13.     Remedies.**  In the event you breach or threaten to breach Section 5 and Section 10 of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security.  This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.     Disputes.**  Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

**Section 15.     Governing Law, Jurisdiction, and Venue.**  This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.     Miscellaneous.**

(a)     You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

(b)     All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

| | |
|---|---|
| If to [SOLE MANAGER NAME]: | [SOLE MANAGER ADDRESS]<br>Attention: [SOLE MANAGER NAME]<br>Email: [EMAIL ADDRESS] |
| [with a copy to<br>(which shall not constitute notice): | Apache Corporation<br>2000 Post Oak Boulevard, Suite 100<br>Houston, Texas 77056<br>Attention: [●]<br>Email: [●]][1] |
| If to the Company: | Fieldwood Energy I LLC |

---

[1] **Note to Draft:** Apache notice information to be confirmed.  Does Apache want to receive copies of notices sent to Independent Director or the Company or just those sent to the Company?

8

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

DEBTORS' EX. NO. 5
1460 of 1570

[COMPANY ADDRESS]
Attention: Independent Director
Email: [INDEPENDENT DIRECTOR
EMAIL ADDRESS][2]

with a copy to
(which shall not constitute notice):          Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056
Attention: [●]
Email: [●]

     (c)     This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

     (d)     This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance.  Notwithstanding the foregoing, the Parties agree to amend or modify this Employment Agreement as is necessary to comply with the requirements of Section 409A of the Code.

     (e)     If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

     (f)     This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

*(Signature page follows)*

---

[2] **Note to Draft:** Confirm that notices to the Company under this Agreement would be addressed to the Independent Director.

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY I LLC**

By: _____
Name:
Title:

ACCEPTED AND AGREED:

_____
Name:
Date:

## SCHEDULE I

## SERVICES

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

**SCHEDULE II**

**COMPENSATION**

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

## SCHEDULE III

1. PRE-EXISTING MATERIALS:  [IDENTIFY SOLE MANAGER'S PRE-EXISTING MATERIALS]

**EXHIBIT A**

**Limited Liability Company Agreement of
Fieldwood Energy I LLC**

(See attached)

1" = "1" "EMF_US 81957797v3 " "" EMF_US 81957797v3

**Exhibit 20**

**Independent Director Agreement**

[COMPANY LETTERHEAD]

[INDEPENDENT DIRECTOR NAME]
[ADDRESS]
[DATE]

Dear [INDEPENDENT DIRECTOR NAME],

This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby you agree to provide the services to be performed by the "Independent Director" on behalf of or in the service of Fieldwood Energy I LLC, a Texas limited liability company (the "**Company**"), as more fully set forth and described in the Limited Liability Company Agreement of the Company, dated as of [●], 2020 (such agreement, as it may be amended, supplemented or modified from time to time, the "**Company Agreement**"), a copy of which is attached as Exhibit A hereto.  As used in this Agreement, the term "**Parties**" shall refer to both you and the Company and "**Party**" shall refer to you or the Company.

**Section 1.**      **Services**.

(a)      The Company hereby engages you, and you hereby accept such engagement, as the Independent Director (as defined in the Company Agreement) to provide to the Company the services specified in the Company Agreement to be performed or provided by the Independent Director (the "**Services**"), such Services to be performed or provided on the terms and subject to the conditions set forth in the Company Agreement and this Agreement.

(b)      Except as otherwise set forth in the Company Agreement, the Company shall not control the manner or means by which you perform or provide the Services.

(c)      As set forth in Schedule 1, the Company shall provide you with access to its premises, materials, information, and systems to the extent necessary for the performance of the Services.  Unless otherwise specified in Schedule 1, you shall furnish, at your own expense, the materials, equipment, and other resources necessary to perform the Services.

(d)      You shall comply with all rules and procedures communicated to you in writing by the Company, including those related to safety, security, and confidentiality.

(e)      Any provisions in this Agreement or the Company Agreement that may appear to give the Company the right to direct you as to the details of performing the Services or doing work related thereto or to exercise a measure of control over the performance of the Services or doing the work related thereto shall be deemed to mean that you shall follow the desires of the Company in the results of the Services or the work related thereto only; provided, however, that the scope of the Services to be performed or provided by you as Independent Director and your authority to take actions on behalf of the Company as Independent Director shall be subject to the limitations thereon as set forth in the Company Agreement and this Agreement.

**Section 2.**      **Term**.  The term of this Agreement shall commence as of the date set forth above and shall continue until the earlier of (a) the date on which you are removed as the Independent Director by the Company, with the consent of Apache Corporation, a Delaware corporation ("**Apache**"), and (b) the [tenth] anniversary of this Agreement, unless extended annually thereafter (the "**Term**").

DEBTORS' EX. NO. 5
1468 of 1570

**Section 3.**         **Fees and Expenses**.

(a)         As full compensation for performance of the Services and any work related thereto and the rights granted to the Company in this Agreement, the Company shall pay you a fixed annual fee of $[●] (the "**Fees**"), payable on the dates set forth in Schedule 1.  You acknowledge that you will receive an IRS Form 1099-MISC from the Company, and that you shall be solely responsible for all federal, state, and local taxes, as set out in Section 4(b).

(b)         You are solely responsible for any travel or other costs or expenses incurred by you in connection with the performance of the Services, and in no event shall the Company reimburse you for any such costs or expenses.

(c)         The Company shall pay all the Fees in accordance with the payment schedule set forth on Schedule 1.

**Section 4.**         **Relationship of the Parties**.

(a)         You are an independent contractor of the Company, and this Agreement shall not be construed to create any association, partnership, joint venture, employment, or agency relationship between you and the Company for any purpose.  Except as expressly set forth in the Company Agreement, you have no authority (and shall not hold yourself out as having authority) to bind the Company and you shall not make any agreements or representations on the Company's behalf without the Company's prior written consent.

(b)         Without limiting Section 4(a), you will not be eligible to participate in any benefits or benefit plans offered by the Company to its employees, and the Company will not be responsible for withholding or paying any income, payroll, Social Security, or other federal, state, or local taxes, making any insurance contributions, including for unemployment or disability, or obtaining workers' compensation insurance on your behalf.  You shall be responsible for, and shall indemnify the Company against, all such taxes or contributions, including penalties and interest.  Any persons employed or engaged by you in connection with the performance of the Services or any work related thereto shall be your employees or contractors and you shall be fully responsible for them and indemnify the Company against any claims made by or on behalf of any such employee or contractor.

**Section 5.**         **Intellectual Property Rights**.

(a)         The Company is, and will be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Services and work related thereto performed or provided by you under this Agreement and the Company Agreement (collectively, the "**Deliverables**") and all other writings, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, and materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, modified, conceived, or reduced to practice in the course of your performing or providing the Services or other work performed in connection with the Services or this Agreement or the Company Agreement (collectively, and including the Deliverables, "**Work Product**"), including all patents, copyrights, trademarks (together with the goodwill symbolized thereby), trade secrets, know-how, and other confidential or proprietary information, and other intellectual property rights (collectively "**Intellectual Property Rights**") therein.  You agree that the Work Product is hereby deemed "work made for hire" as defined in 17 U.S.C. § 101 for the Company and all copyrights therein automatically and immediately vest in the Company.  If, for any reason, any Work Product does not constitute a "work made for hire," you hereby irrevocably assign to the Company, for no additional consideration, your entire right, title, and interest throughout the world in and to such Work Product,

2

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

including all Intellectual Property Rights therein, including the right to sue for past, present, and future infringement, misappropriation, or dilution thereof.

(b)     You shall protect the assets of the Company from misuse or misappropriation, including, without limitation, any Work Product, Intellectual Property Rights, or other confidential information of the Company.

(c)     Notwithstanding Section 5(a), to the extent that any of your pre-existing materials identified in Schedule 1 are incorporated in or combined with any Deliverable or otherwise necessary for the use or exploitation of any Work Product, you hereby grant to the Company an irrevocable, worldwide, perpetual, royalty-free, non-exclusive license to use, publish, reproduce, perform, display, distribute, modify, prepare derivative works based upon, make, have made, sell, offer to sell, import, and otherwise exploit such preexisting materials and derivative works thereof.  The Company may assign, transfer, and sublicense such rights to others without your approval.

(d)     As between you and the Company, the Company is, and will remain, the sole and exclusive owner of all right, title, and interest in and to any documents, specifications, data, know-how, methodologies, software, and other materials provided to you by the Company ("**Company Materials**"), including all Intellectual Property Rights therein.  You have no right or license to reproduce or use any Company Materials except solely during the Term to the extent necessary to perform your obligations under this Agreement in furtherance of the Company's business.  All other rights in and to the Company Materials are expressly reserved by the Company.  You have no right or license to use the Company's trademarks, service marks, trade names, logos, symbols, or brand names.

**Section 6.     Confidentiality.**

(a)     You acknowledge that you will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement and the Company Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, [OTHER CONFIDENTIAL INFORMATION,] seismic information, projected production, projected cost and expenses (including projected plugging and abandonment and decommissioning costs) or operations of the Company, its affiliates, or their suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**").  Any Confidential Information that you access or develop in connection with the Services or any work related thereto, including but not limited to any Work Product, shall be subject to the terms and conditions of this Section 6.  You agree not to use any Confidential Information for any purpose except as required in the performance of the Services.  You shall notify the Company immediately in the event you become aware of any loss or disclosure of any Confidential Information.

(b)     Confidential Information shall not include information that:

(i)     is or becomes generally available to the public other than through your breach of this Agreement; or

(ii)     is communicated to you by a third party that had no confidentiality obligations with respect to such information.

(c)     Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency.

3

DEBTORS' EX. NO. 5
1470 of 1570

(d)     Notice of Immunity Under the Defend Trade Secrets Act of 2016 ("**DTSA**"). Notwithstanding any other provision of this Agreement:

(i)     You will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A)     is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)     is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(ii)     If you file a lawsuit for retaliation by the Company for reporting a suspected violation of law, you may disclose the Company's trade secrets to your attorney and use the trade secret information in the court proceeding if you:

(A)     file any document containing the trade secret under seal; and

(B)     do not disclose the trade secret, except pursuant to court order.

**Section 7.     Representations and Warranties.**

(a)     You represent and warrant to the Company that:

(i)     you have the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of your obligations in this Agreement and the Company Agreement;

(ii)     your entering into this Agreement with the Company and your performance of the Services or any work related thereto do not and will not conflict with or result in any breach or default under any other agreement to which you are subject;

(iii)     you have the required skill, experience, and qualifications to perform the Services and any work related thereto, you shall perform the Services and such work in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services and you shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

(iv)     you shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services or any work related thereto.

(b)     The Company hereby represents and warrants to you that:

(i)     it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

(ii)     the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action.

4

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

**Section 8.**      **Indemnification**. You shall be entitled to indemnification by the Company on the terms and subject to the conditions set forth in the Company Agreement.

**Section 9.**      **Insurance**.  The Company shall, at its own expense, provide directors' and officers' liability insurance coverage to you in your capacity as the Independent Director, in an amount and on terms reasonably customary for directors and officers of oil and gas exploration and production companies that are similarly situated to the Company.  The Company shall notify you of the existence of and any termination, cancellation, or material adverse changes to such insurance coverage provided to you.

**Section 10.**      **Termination**.

(a)      You may resign as Independent Director and terminate this Agreement at any time without Cause (as defined below), or the Sole Manager on behalf of the Company (in the case of termination on behalf of the Company, subject to the prior consent or approval of Apache as provided in the Company Agreement) may remove you as Independent Director and terminate this Agreement without Cause at any time, in each case upon 60 calendar days' advance written notice to the other Party.  In addition, this Agreement shall terminate upon your death and any disability that renders you unable to perform the Services. In the event of termination by you or the Sole Manager on behalf of the Company pursuant to this clause (a) or upon your death or disability, the Company shall pay you (or your estate in the event of your death) on a pro-rata basis for any Fees then due and payable for any Services completed up to and including the effective date of such termination.

(b)      The Sole Manager on behalf of the Company (subject to the prior consent and approval of Apache) may terminate this Agreement, effective immediately upon written notice to you, for "**Cause**" (as defined below), or, if the event giving rise to Cause is an event subject to clause (d) of the definition of Cause, then effective following any applicable right to cure set forth by the Sole Manager in the written notice of termination if you do not cure the applicable failure(s), violation(s), breach(es), action(s), or inaction(s) giving rise to Cause within the cure period specified in the written notice of termination you receive from the Sole Manager. You may terminate this Agreement, effective immediately upon written notice to the Sole Manager (with a copy provided by you to Apache), if the Company breaches any material provision of this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Company does not cure such breach within thirty (30) calendar days after the Sole Manager's and Apache's receipt of your written notice of termination containing a description of the breach giving rise to the termination notice.  As used herein, "**Cause**" means a good faith finding by the Sole Manager (subject to the prior consent and approval of Apache) of: (a) the commission by you of an act of fraud, dishonesty, or embezzlement against the Company or any of its Affiliates or Subsidiaries, or any customer or client thereof; (b) the unauthorized disclosure by you of material Confidential  Information or Intellectual Property Rights of the Company or any of its Affiliates or Subsidiaries; (c) your conviction (or a plea by you or on your behalf of nolo contendere) for: (i) a felony or (ii) a crime involving fraud, dishonesty or moral turpitude; or (d)  your failure to perform your material duties as the Independent Director of the Company in accordance with this Agreement, as reasonably determined by the Sole Manager (subject to the prior consent and approval of Apache), or if you intentionally, or with gross negligence, take action (or elect not to take action) or engage in conduct adverse to the interests of the Company, its Affiliates, it Subsidiaries, or its or their assets, business or business opportunities that the Sole Manager (subject to the prior consent and approval of Apache) has reasonably determined is or could be materially injurious to the Company; provided, however, that prior to a termination for Cause under clause (d) of this definition the Sole Manager shall provide written notice to you of any such failure(s), violation(s), breach(es), action(s), or inaction(s) upon which the Company intends to rely as the basis for a termination for Cause and the Sole Manager will offer the Independent Director (subject to the consent and approval of Apache) no less than five (5) calendar days to cure such failure(s), violation(s), breach(es), action(s), or inaction(s) (as applicable) if the Sole Manager, in the exercise of its good faith judgment, deems such failure(s),

5

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

violation(s), breach(es), action(s), or inaction(s) (as applicable) to be capable of cure; provided, further, that the Sole Manager shall only be required to give the Independent Director such notice and opportunity to cure one time.  In the event of termination by the Company pursuant to this clause (b) for Cause or by you pursuant to this clause (b), the Company shall pay you on a pro-rata basis for any portion of your Fees then due and payable for any Services completed up to and including the effective date of such termination.

(c)  Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, you shall promptly after such expiration or termination:

(i)  deliver to the Company all Deliverables (whether complete or incomplete) and all materials, equipment, and other property provided for your use by the Company;

(ii)  deliver to the Company all tangible documents and other media (including any copies), containing, reflecting, incorporating, or based on the Confidential Information;

(iii)  permanently erase all the Confidential Information from your personal computer systems; and

(iv)  certify in writing to the Company that you have complied with the requirements of this clause.

(d)  The terms and conditions of clause (c) and this clause (d) of Section 10 and Sections 4, 5, 6, 7, 8, 11, **Error! Reference source not found.**, 12, 13, 14, and 15 shall survive the expiration or termination of this Agreement.

**Section 11.**     **Other Business Activities.**  You may be engaged or employed in any other business, trade, profession, or other activity that does not place you in a conflict of interest with the Company; provided that during the Term, you shall not be engaged in any business activities that do or may compete with the business of the Company without having first provided the Company with written notice of such proposed engagement not less than 75 calendar days prior to such engagement.

**Section 12.**     **Assignment.**  Neither you nor the Company shall assign any rights or obligations under this Agreement without the prior written consent of the other Party.  Any purported assignment in violation of the foregoing sentence shall be deemed null and void *ab initio*.  Subject to the limits on assignment stated in this Section 12, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the Parties and their respective successors and assigns.

**Section 13.**     **Remedies.**  In the event you breach or threaten to breach Section 6 or **Error! Reference source not found.** of this Agreement, you hereby acknowledge and agree that monetary damages would not afford an adequate remedy and that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief restraining such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security.  This equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**Section 14.**     **Disputes.**  Subject to Section 13, any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services or work related thereto that you provide to the Company, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute, shall be submitted to and decided by federal or state courts sitting in Harris County, Texas.

6

DEBTORS' EX. NO. 5
1473 of 1570

**Section 15.**     **Governing Law, Jurisdiction, and Venue**.  This Agreement and all related documents including all exhibits and schedules attached hereto and all matters arising out of or relating to this Agreement and the Services or work related thereto provided hereunder, whether sounding in contract, tort, or statute for all purposes shall be governed by and construed in accordance with, the laws of the State of Texas (including its statutes of limitations), without giving effect to the conflict of laws principles that would cause laws of any jurisdiction other than those of the State of Texas to apply.

**Section 16.**     **Miscellaneous**.

     (a)     You shall not export, directly or indirectly, any technical data acquired from the Company, or any products utilizing any such data, to any country in violation of any applicable export laws or regulations.

     (b)     All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing, and shall be delivered by email and additionally by (i) personal delivery, (ii) nationally recognized overnight courier (with all fees prepaid), or (iii) certified or registered mail (in each case of clause (iii), return receipt requested, postage prepaid).  Except as otherwise provided in this Agreement, a Notice is effective only if (x) the receiving Party has received the Notice and (y) the Party giving the Notice has complied with the requirements of this Section 16(b).  Any Notice must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a Notice given in accordance with this Section 16(b)):

| | |
|---|---|
| If to [INDEPENDENT DIRECTOR NAME]: | [INDEPENDENT DIRECTOR ADDRESS]<br>Attention: [INDEPENDENT DIRECTOR NAME]<br>Email: [EMAIL ADDRESS] |
| [with a copy to<br>(which shall not constitute notice): | Apache Corporation<br>2000 Post Oak Boulevard, Suite 100<br>Houston, Texas 77056<br>Attention: [●]<br>Email: [●]][1] |
| If to the Company: | Fieldwood Energy I LLC<br>[COMPANY ADDRESS]<br>Attention: Sole Manager<br>Email: [SOLE MANAGER EMAIL ADDRESS] |
| with a copy to<br>(which shall not constitute notice): | Apache Corporation<br>2000 Post Oak Boulevard, Suite 100<br>Houston, Texas 77056<br>Attention: [●]<br>Email: [●] |

     (c)     This Agreement, together with the applicable provisions of the Company Agreement and any other documents expressly incorporated herein by reference, and related exhibits and schedules,

---

[1] **Note to Draft:** Apache notice information to be confirmed.  Does Apache want to receive copies of notices sent to Independent Director or the Company or just those sent to the Company?

DEBTORS' EX. NO. 5
1474 of 1570

constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

(d)     This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party, and any of the terms thereof may be waived only by a written document signed by each Party or, in the case of waiver, by the Party waiving compliance.

(e)     If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(f)     This Agreement may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

(*Signature page follows*)

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

If this Agreement accurately sets forth our understanding, kindly execute the enclosed copy and return it to the undersigned.

Very truly yours,

**FIELDWOOD ENERGY I LLC**

By: _____
Name:
Title:

ACCEPTED AND AGREED:

_____
Name:
Date:

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

## <u>SCHEDULE 1</u>

1.  ACCESS PROVIDED BY COMPANY:  [PREMISES,] [MATERIALS,] [INFORMATION,] AND [SYSTEMS]

2.  PAYMENT SCHEDULE:  Fees shall be paid on a pro rata basis [quarterly][monthly] on the last day of such [fiscal quarter][month] of the Company, beginning with the first such date occurring following the date of this Agreement.

3.  DELIVERABLES:  [IDENTIFY DELIVERABLES]

4.  PRE-EXISTING MATERIALS:  [IDENTIFY INDEPENDENT DIRECTOR`S PRE-EXISTING MATERIALS]

**EXHIBIT A**

**Limited Liability Company Agreement of
Fieldwood Energy I LLC**

(See attached)

1" = "1" "EMF_US 81856673v4 " "" EMF_US 81856673v4

**Exhibit 21**

**Form of Contract Services Agreement**

## CONTRACT SERVICES AGREEMENT

This Contract Services Agreement dated and effective as of _____, 202_ (the "Effective Date") (this "Agreement") is by and among [•] (the "Operator"), FIELDWOOD ENERGY I LLC, a Texas limited liability company (the "Fieldwood Energy I") and GOM SHELF LLC, a Delaware limited liability company ("GOM Shelf" and, together with Fieldwood Energy I, the "Owners", and each, an "Owner").  Operator and Owners are sometimes referred to collectively as the "Parties" and individually as a "Party".

WHEREAS, each Owner is the operator, as designated by the Bureau of Ocean Energy Management of the United States Department of the Interior ("BOEM"), of certain of the Assets (as defined below);

WHEREAS, Owners and Fieldwood Energy II LLC, a Texas limited liability company, have entered into that certain Transition Services Agreement dated [•], 202_ (as such agreement may be amended from time to time, the "Transition Agreement"), pursuant to which Fieldwood Energy II LLC agreed to provide certain transition services to Owners with respect to the Assets, on the terms and subject to the conditions set forth therein; and

WHEREAS, upon the termination of the Transition Agreement as to the Assets, Owners desire to engage Operator to perform the Services (as defined below) with respect to the oil and gas properties described on **Schedule I** (the "Assets"), and Operator desires to perform such Services, subject to the terms hereof.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, covenants, conditions, and agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.  SERVICES

**Section 1.1**   **Services**. Subject to the terms of this Agreement, Owners hereby engage Operator to perform, or cause to be performed, all those certain operations and activities with respect to the Assets, as more particularly identified on **Exhibit A** (the "Services"), in accordance with the Approved Budget and reasonable written instructions provided from time to time during the Term of this Agreement to Operator by the Sole Manager of Fieldwood Energy I on behalf of the Owners.

**Section 1.2**   **Decommissioning**. In addition to the operations and activities identified on **Exhibit A**, the Services shall include plugging, abandonment, removal, site clearance, site survey, remediation, disposal, restoration operations, and any other decommissioning activities associated with (i) the Assets described or identified on **Exhibit B** in accordance with the timing set forth on **Exhibit B** (the "Decommissioning Plan") and (ii) all other Assets, to the extent not included in the Decommissioning Plan, as and when required by (a) applicable Laws, including, without limitation, the rules and regulations of BOEM, the Bureau of Safety and Environmental Enforcement ("BSEE"), or any other local, state, or federal governmental entity having jurisdiction over the Assets (collectively, "Governmental Authorities") or (b) applicable contracts (in the case of the decommissioning covered by this clause (ii), "Remaining Decommissioning" and together

DEBTORS' EX. NO. 5
1480 of 1570

with the Decommissioning Plan, "Required Decommissioning"). Promptly upon determining, learning, or being notified that Remaining Decommissioning is or will be required, Operator shall provide written Notice to Owner(s) describing the applicable Remaining Decommissioning in reasonable detail and setting forth the date by which such Remaining Decommissioning is required to be completed and Operator's preliminary estimate of the costs for Operator to perform the applicable Remaining Decommissioning. Required Decommissioning shall be performed in accordance with the rules and regulations of BOEM, BSEE, and all other applicable Governmental Authorities having jurisdiction, applicable Laws, and in compliance with the terms of all applicable leases, contracts, or agreements pertaining to such Required Decommissioning. Within thirty (30) Business Days after the completion of any Required Decommissioning, or any part thereof, and any other activities required by the BSEE or other applicable Governmental Authorities having jurisdiction, Operator will provide Owners with: (1) copies of the final reports submitted to BSEE or such other Governmental Authorities; (2) an affidavit or sworn declaration signed by an appropriately authorized senior officer of Operator attesting to completion thereof; (3) a statement identifying all costs incurred in connection therewith (the "Statement"); and (4) such other documentation as requested by Sole Manager of Fieldwood Energy I on behalf of Owners. Operator will include with the Statement all available back up accounting documentation reasonably necessary to support the information reflected thereon.

**Section 1.3     Standard of Performance**. Subject to the terms of this Agreement, Operator shall perform or cause to be performed the Services (a) as a reasonably prudent operator, (b) in a good and workmanlike manner, (c) with due diligence and dispatch, (d) in accordance with good oilfield practices, and (e) in compliance with all applicable Laws, licenses, leases, contracts, authorizations and permits. Operator shall only use the Assets (including Seismic Data, Well Data, intellectual property, and records included in the Assets) for the performance of the Services under this Agreement, and for no other purpose. For purposes of this Agreement, "Laws" means any and all applicable laws, statutes, codes, constitutions, ordinances, decrees, writs, injunctions, orders, judgments, principles of common law, rules, licenses, leases, authorizations, or regulations (including environmental laws) that are promulgated, issued, or enacted by any Governmental Authority having jurisdiction.

**Section 1.4     Independent Contractor**. At all times during the performance of Services by Operator, all Persons performing such Services who shall be in the employ and/or under the control of Operator or its Affiliates (including agents, contractors, temporary employees, and consultants) shall be independent from each Owner and not employees of each Owner and shall not be entitled to any payment, benefit, or perquisite directly from Owners on account of such Services, including, but not limited to, group insurance and participation in any employee benefit and pension plans maintained by each Owner or any Affiliate of each Owner. Notwithstanding any other provision contained elsewhere in this Agreement, in all cases where the Operator is performing Services under this Agreement offshore the State of Louisiana or are otherwise covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq., the Parties acknowledge and agree that all such operations pursuant to this Agreement are an integral part of and are essential to the ability of the Owners to generate Owners' goods, products, or services, and that whenever Services and work are performed hereunder in or offshore Louisiana, or the Louisiana Workers' Compensation Act may be applicable, the employees of Operator and their contractors providing such Services or performing such work, if any, whether direct, statutory,

2

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

borrowed, or otherwise, are statutory employees of each Owner in accordance with the Louisiana Worker's Compensation Act, La. Rev. Stat. § 23.1021 et seq. and the protections afforded a statutory employer under Louisiana Law shall apply. In such event, Operator agrees that such Owner is and shall be deemed a statutory employer of Operator's employees for the sole purposes of La. Rev. Stat. § 23.1061(A)(3), as the same may be amended from time to time. For purposes of this Agreement, (i) "Affiliate" with respect to a Party means any Person that controls, is controlled by or is under common control with such Party where control means the direct or indirect power to direct the management of the entity at issue and (ii) "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

Section 1.5    **Records**.  Operator shall maintain or cause to be maintained true and correct records of all receipts, invoices, reports, and such other documents as are customarily maintained by Operator for its own operations relating to the Services rendered hereunder for a period of the later of (i) three (3) years following the end of the calendar year during which this Agreement terminates and (ii) such other time required by applicable Law.  All such receipts, invoices, reports, and other documents are the property of Owners.

Section 1.6    **Representatives**. Each Party shall, at all times during the Term, keep representatives available either by telephone, electronic mail, or in person during normal business hours, to receive communications from the other Party regarding the day-to-day Services and to respond to inquiries concerning the performance of the day-to-day Services.  For the avoidance of doubt, all Notices required or permitted hereunder shall be delivered pursuant to Section 8.2 of this Agreement. Operator's representatives are designated on **Exhibit C**. Owners' representative is the Sole Manager of Fieldwood Energy I. Operator and Owners may replace any of its representatives or designate such other representatives from time to time by written Notice to the other Party delivered pursuant to Section 8.2.

Section 1.7    **Compliance**. Operator shall comply with all Laws and in accordance with the terms and provisions of the contracts, agreements, leases, and other instruments applicable to the operation of the Assets.  Operator shall prepare and file all reports and be responsible for all compliance with and communications on behalf of Owners to satisfy the reporting requirements of any Governmental Authorities for operations conducted by Operator hereunder.

Section 1.8    **Limitation of Services**.

(a)    Unless otherwise expressly required or allowed by this Agreement, Operator shall (i) not abandon or permit any contracts, agreements, leases, and other instruments applicable to the Assets to lapse or expire (except any abandonment or termination pursuant to their terms or as required by any Governmental Authorities), (ii) not do, perform, or authorize or agree to bind or obligate Owners or the Assets with respect to any matter outside the scope of the Services contemplated by this Agreement without the prior written consent of Owners, and (iii) prevent the Assets or portions thereof from becoming burdened or encumbered by any liens, charges, security interests, and encumbrances as a result of Operator's acts or omissions in providing the Services.

3

DEBTORS' EX. NO. 5
1482 of 1570

(b)    Except to the extent expressly authorized pursuant to this Agreement, Operator shall not, without the prior written consent of Owners:

(i)   make any payment to renew, extend, or otherwise perpetuate a lease; provided that Operator shall give Owner Notice of any such payment needed to so renew, extend, or perpetuate a lease;

(ii)  plug and abandon any well, unless such well is part of Required Decommissioning;

(iii) execute, amend, waive, release, extend, terminate, or otherwise modify any of the governmental approvals, leases, or other agreements of the Assets;

(iv)  (a) borrow or lend money on behalf of Owner; (b) participate in futures, derivatives, or hedging activities with respect to the Assets or any production therefrom; (c) purchase or sell any of the Assets or transfer or dispose of any equipment, material, or supplies on or comprising any part of an Asset; (d) execute any indemnification, release, or waiver on behalf of Owner or with respect to any Asset; (e) take any other action on behalf of Owner or pertaining to the Assets not in the ordinary course of business; (f) incur any cost or expense for geophysical items on behalf of Owner (including acquisition, processing, reprocessing, or interpretation); (g) make a capital expenditure or series of related capital expenditures on behalf of Owner not set forth in or in accordance with the Approved Budget for the applicable period, after giving effect to Permitted Variance (as defined below); or (h) assume, guarantee, or otherwise become liable or responsible (whether directly, contingently or otherwise) for the liabilities of any other Person or any indebtedness on behalf of Owner; or

(v)   enter into any contract on behalf of Owner with respect to any of the foregoing in this <u>Section 1.8(b)</u>.

## ARTICLE II.  BUDGET

**Section 2.1    Periodic Budget**.  As of the date hereof, Owners have approved the operating and general and administrative budget for the period beginning on the date hereof and ending on [•] 31, 202[•] (the "<u>Initial Period</u>"), and attached as **Exhibit E** (the "<u>Initial Periodic Budget</u>").  On or before sixty (60) days prior to the end of Initial Periodic Budget or any subsequent Approved Budget period, Operator shall prepare and present to Owners, for Owners' approval, a proposed operating and general and administrative budget for the period of time specified by Owners (i.e. quarterly, annual, etc.) substantially in the format of the Initial Annual Budget. The proposed periodic budget is subject to Owners' approval in all respects; provided, however, that Operator agrees to timely address any issues that Owners might have raised with Operator with respect to such proposed budget. The Initial Periodic Budget, and the budget for any subsequent period that is approved by Owners, as any such budget may be modified or amended from time to time with the approval of Owners, is referred to as an "<u>Approved Budget</u>."

4

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

**Section 2.2**    **Annual Budget Variance Report**. No later than ten (10) Business Days after the first day of the month, the Operator shall deliver to the Owners a rolling monthly and cumulative variance report (the "Budget Variance Report"). The Budget Variance Report shall measure performance against both the prior month of the Approved Budget and on a cumulative basis for the given budget period and shall include calculations that demonstrate that the Operator is in compliance with the Permitted Variance (defined below).

**Section 2.3**    **Thirteen Week Cash Flow Budget**. As of the date hereof, Owners have approved the thirteen week cash flow budget for the period beginning on the date hereof and ending thirteen weeks after the date hereof, and attached as **Exhibit F** (the "Approved TWCF Budget"). Every ten (10) Business Days thereafter, the Operator may propose an updated budget (the "Proposed TWCF Budget") to the Owners, (i) which such report, shall set forth in comparative form the projected cash receipts and disbursements of the Operator in respect of the Services performed by Operator pursuant to this Agreement for the succeeding thirteen-week period, for all collections and disbursements, consistent in form and substance (other than Dollar amounts) with the Approved TWCF Budget. Each Proposed TWCF Budget and the Approved TWCF Budget delivered shall be accompanied by a certificate from an appropriately authorized senior officer of the Operator certifying that such projections were prepared in good faith on the basis of the assumptions stated herein, which assumptions were believed by the preparer thereof to be reasonable at the time prepared. The Sole Manager of Fieldwood Energy I, acting in its sole and absolute discretion, may approve such Proposed TWCF Budget on behalf of Owners, and upon such approval such Proposed TWCF Budget will then become the "Approved TWCF Budget" then in effect.

**Section 2.4**    **TWCF Variance Report**. Within ten (10) Business Days following the Effective Date, and every other week thereafter during the Term (each a "Test Date"), the Operator shall deliver to Owners a bi-weekly variance report (the "TWCF Variance Report"). The TWCF Variance Report shall measure performance against both the prior weeks of the Approved TWCF Budget and on a cumulative basis for the given prior four weeks and shall include calculations that demonstrate that the Operator is in compliance with the Permitted Variance.

**Section 2.5**    **Permitted Variance**. On each Test Date, Operator shall demonstrate in each such TWCF Variance Report that, in the period covered by such TWCF Variance Report, the aggregate actual disbursements, do not exceed the sum of the aggregate amount budgeted therefor in the Approved Budget for such period by more than ten percent (10%) of the budgeted amount (the "Permitted Variance"). Certification of compliance with this Section 2.5 shall be provided on such Test Date, concurrently with delivery of each TWCF Variance Report and shall have been certified by an appropriately authorized senior officer of the Operator and be in a form satisfactory to the Owners.

**Section 2.6**    **Proposals**. If and as necessary, Operator shall, by Notice to Owners, propose operations to Owners on the Assets representing expenditures that are not included in an Approved Budget and that are considered by Operator as prudent, judged by it as if it were the owner of the Assets. Notices of proposed operations shall include an AFE (in a form substantially similar to **Exhibit G** attached hereto), which shall include the proposed operation or service, and

5

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

the estimated costs of such operation or service. Operator shall further consult with Owners in connection with the evaluation of any such proposed operations. Operator shall also notify Owners of any Notice of a proposed operation received by Operator from a third party that is not included in an Approved Budget. Operator will follow the instructions of Owners with respect to each proposed operation and provide timely Notices or responses as may be required. Notwithstanding anything to the contrary contained herein, Operator may conduct or approve any operation in response to an emergency or prevention of an impending emergency and incur expenditures with respect thereto without the approval of Owners and shall be entitled to reimbursement for all such expenditures; provided, however, that Operator shall promptly provide Notice to Owners in the event of emergency actions or operations. Operator shall provide any technical evaluations regarding any drilling, reworking, or other capital expenditure projects that may be requested by Owners. With respect to any proposals made to Owners which Owners have not approved, Operator shall maintain a report of all such proposals and provide such report to Owners upon any Owner's request.

### ARTICLE III.        COMPENSATION

**Section 3.1    Compensation for Services**. For the provision of the Services, Owners shall pay Operator in accordance with **Exhibit H** ("Operator Compensation").

**Section 3.2    Overhead**. COPAS recoveries from third parties related to the Assets shall be accounted for on behalf of Owners. There shall be no separate charge by Operator relating to its overhead (including, but not limited to, head office overhead, field overhead, bonuses, and severances). For the avoidance of doubt, the Operator Compensation fully compensates Operator for its overhead.

### ARTICLE IV.        PAYMENT AND DEFAULT

**Section 4.1    Submission of Invoice**. Operator shall submit a written invoice (the "Invoice") to Owners on or before the fifteenth (15th) Business Day of each month setting forth the Operator Compensation for the preceding month for the Services provided by Operator and all out-of-pocket expenses incurred by Operator to the extent incurred in the performance of the Services. Notwithstanding anything in this Agreement to the contrary, (i) all charges, out-of-pocket expenses, and other disbursements to Operator are subject to and shall not exceed the Approved Budget with respect to such charges, out-of-pocket expenses, and other disbursements for the applicable period, after giving effect to Permitted Variance and (ii) after giving effect to Permitted Variance, Operator shall be solely responsible for any and all costs and expenses incurred by the Operator or associated with the Services.

**Section 4.2    Payment of Invoices**. Excluding amounts that are subject to dispute pursuant to Section 4.3, Owners shall pay within thirty (30) Business Days of Owners' receipt of an Invoice the amounts invoiced to such Owner by wire transfer of immediately available funds to the bank account designated by Operator. Adjustment credits or debits shall be shown on the Invoice next succeeding the Invoice in which the adjustment is made. Operator shall provide reasonable back-up and supporting documents related to any Invoice within five (5) Business Days of Owners' written request. Any preexisting obligation to make payment for the Services provided hereunder or out-of-pocket costs of Operator shall survive the termination of a Service and this

6

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

Agreement until paid. Owners shall have access to and the right to audit all records supporting such Invoiced amounts for the period set forth in <u>Section 1.5</u>.

      **Section 4.3**    <u>**Payment Disputes**</u>. Owners may object to any Invoiced amounts for any Service at any time before, at the time of, or after payment is made.  Payment of any amount set forth in an Invoice shall not constitute approval thereof, or waive Owners' audit rights as set forth herein.  The Parties shall meet as expeditiously as possible to resolve any dispute. If the Parties fail to reach agreement in writing as to any disputed amounts invoiced by Operator under Section 4.1 above, upon written Notice of dispute to the other Party, either Party may submit the matters that remain in dispute to [_____] (the "<u>Accounting Referee</u>") for review and final and binding resolution.  If any Person selected as Accounting Referee is unable or unwilling to serve as a referee hereunder, then the Accounting Referee shall be selected by lot from among the independent national accounting firms that have not represented any Party or its Affiliates at any time during the three-year period of time immediately preceding its designation hereunder. Owners and the Operator shall, not later than seven (7) days prior to the hearing date set by the Accounting Referee, each submit a written brief to the Accounting Referee (and a copy thereof simultaneously to the other Party) with dollar figures for settlement of the disputes as to any amounts owed by Operator. The hearing will be scheduled as soon as is acceptable to the Accounting Referee, but not earlier than seven (7) days after the date for submission of the settlement briefs, and shall be conducted on a confidential basis. The Accounting Referee shall consider only those items or amounts which were identified in a notice in dispute delivered hereunder and which remain in dispute, together with the written briefs, and such other documents submitted therewith, and the Accounting Referee's decision resolving the matters in dispute shall be based upon and be consistent with the terms and conditions in this Agreement. In deciding any matter, the Accounting Referee (i) shall be bound by the provisions of this <u>Section 4.3</u> and the related definitions and (ii) may not assign a value to any disputed item greater than the greatest value for such item claimed by either the Operator or Owners or less than the smallest value for such item claimed by the Operator or Owners in their respective calculations delivered hereunder. The Accounting Referee shall render a decision resolving the matters in dispute (which decision shall include a written statement of findings and conclusions) promptly after the conclusion of the hearing, unless the Parties reach agreement prior thereto and withdraw the dispute from the Accounting Referee.  The Accounting Referee shall provide to the Parties an explanation in writing of the reasons for its decisions regarding the amounts disputed in the applicable notice. The decision of the Accounting Referee shall be (i) final and binding on the Parties and (ii) final and non-appealable for all purposes hereunder.  Payment of any disputed amounts shall be made within fifteen (15) Business Days after the earlier to occur of (i) the Parties' agreement in writing as to such disputed amounts and (ii) the rendered decision of the Accounting Referee. The fees and expenses of the Accounting Referee under this <u>Section 4.3</u> shall be borne one half by the Operator and one half by Owners. The fees and disbursements of Operator's independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this <u>Section 4.3</u> shall be borne by the Operator, and the fees and disbursements of Owners' independent auditors and other costs and expenses incurred in connection with the services performed with respect to any dispute under this <u>Section 4.3</u> shall be borne by Owners.

      **Section 4.4**    <u>**Owner Default**</u>. It shall constitute a default on behalf of an Owner (an "<u>Owner Default</u>") if such Owner fails to timely pay any Invoiced amount for Services provided

7

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

pursuant to this Agreement in accordance with the provisions of this Article IV or perform any covenants of such Owner hereunder, which failure, in the case of a payment default, continues undisputed for at least thirty (30) days following receipt of written Notice to such Owner that such Invoiced amount is past due or, in all other instances, at least sixty (60) days following receipt of written Notice to such Owner that such performance is required; provided, however, that if such Owner cannot reasonably cure such failure within such sixty (60) day period, no Owner Default shall be deemed to occur provided such Owner demonstrates that it has taken steps to cure such failure within such sixty (60) day period and diligently prosecutes such cure to completion.

**Section 4.5    Operator Default**. Subject to Section 4.4 above, it shall constitute a default on behalf of Operator (an "Operator Default") if Operator fails to provide a Service to an Owner in accordance with the terms and conditions of this Agreement, which failure continues for at least ten (10) days following receipt of written Notice to Operator; provided, however, that if Operator cannot reasonably cure such failure within such ten (10) day period, no Operator Default shall be deemed to occur provided Operator demonstrates that it has diligently taken all reasonable steps to cure such failure within such ten (10) day period and diligently prosecutes such cure to completion; provided, however, any such failure that is not cured by Operator within thirty (30) days of Owner's written Notice shall be deemed an Operator Default.

**Section 4.6    Sales Taxes**.  Any sales taxes paid hereunder for Services that Operator is required to pay or incur shall be passed on to the Owner to which such Services are provided as an explicit surcharge and shall be paid by such Owner in addition to any Operator Compensation, whether included in the applicable Invoice, or added retroactively. If such Owner submits to Operator a timely and valid resale or other exemption certificate that is sufficient to support the exemption from sales taxes, then such taxes will not be added to the Operator Compensation payable pursuant to this Article IV; provided, however, that if Operator is ever required to pay such taxes, such Owner will promptly reimburse Operator for such tax, including any interest, penalties, and attorney's fees assessed thereon by the applicable Government Authority. The Parties will cooperate to contest any invalid sales taxes imposed on the Services and to minimize the imposition of any such sales taxes.

## ARTICLE V. TERM OF AGREEMENT

**Section 5.1    Term**. Unless earlier terminated as hereinafter provided, this Agreement will (i) have an initial term of [•] ([•]) years commencing on the Effective Date (the "Initial Term"), and (ii) automatically be renewed thereafter on a [year-to-year] basis until terminated as provided herein  (the "Extension Term" and together with the Initial Term, the "Term"), unless either Party gives the other Party written Notice of its intent not to renew this Agreement not less than one hundred twenty (120) days prior to the end of the Initial Term or Extension Term, as applicable; provided, however, that each Owner may, with or without cause and for any or no reason, terminate this Agreement applicable to any or all of the Assets owned by such Owner upon sixty (60) days prior written Notice to Operator.  Notwithstanding anything in this Agreement to the contrary, each Owner may discontinue certain Services as more particularly set forth on **Exhibit A**, and, upon such discontinuation, Owners may revise the Approved Budget accordingly.

8

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

## ARTICLE VI.        TERMINATION

**Section 6.1    Owner Termination**. Each Owner may terminate this Agreement applicable to the Assets owned by such Owner sooner than described in Section 5.1 by Notice to Operator delivered not less than thirty (30) days before the effective of such termination (i) if an Owner incurs a Loss resulting from or associated with the Services and such Loss was the result of Operator's failure to meet the Standard of Performance set forth in <u>Section 1.3</u>; (ii) in the event of Operator Default; (iii) if Operator is guilty of negligence or misconduct in the performance of the Services; (iv) if any conviction of, or plea of nolo contendere to, any felony or to any crime or offense, including any involving acts of theft, fraud, embezzlement, moral turpitude, or similar conduct, by any officer of Operator, (v) if there is instituted by or against Operator any proceedings under the United States Bankruptcy Code, under any other bankruptcy law, or under any other law for the relief of debtors now or hereafter existing, or a receiver is appointed for all or substantially all of the assets of Operator, and such proceeding is not dismissed or such receiver is not discharged, as the case may be, within thirty (30) days thereafter; or (vi) if Operator shall (A) become insolvent, (B) generally fail to, or admit in writing its inability to, pay debts as they become due, (C) make a general assignment for the benefit of creditors or (D) apply for, consent to or acquiesce in, the appointment of a trustee, receiver, or other custodian.

**Section 6.2    Operator Termination**. Operator may terminate this Agreement sooner than described in Section 5.1 by Notice to Owners delivered not less than thirty (30) days before the effective of such termination (i) in the event of Owner Default that has continued unabated for 120 days after written Notice thereof has been delivered to such Owner and Apache Corporation ("<u>Apache</u>"); (ii) if there is instituted by or against Owners any proceedings under the United States Bankruptcy Code, under any other bankruptcy law, or under any other law for the relief of debtors now or hereafter existing, or a receiver is appointed for all or substantially all of the assets of Owners, and such proceeding is not dismissed or such receiver is not discharged, as the case may be, within thirty (30) days thereafter; or (iii) if Owners shall (A) become insolvent, (B) generally fail to, or admit in writing its inability to, pay debts as they become due, (C) make a general assignment for the benefit of creditors (excluding permitted assigns) or (D) apply for, consent to or acquiesce in, the appointment of a trustee, receiver, or other custodian; provided, however, that Operator may not terminate Services reasonably determined by Owners to be critical to the safety of the operation of the Assets until such time as Operator can make the Assets safe for handover to Owners or their designee.

**Section 6.3    Survival**. Upon termination of this Agreement, the provisions of this Agreement shall forthwith become void and the Parties shall have no liability or obligation with respect to provisions; provided, however, that the termination of this Agreement shall not relieve any Party from any expense, liability, or other obligation (including as to a breach of any provision hereof) or remedy hereof which has accrued or attached prior to the date of such termination; provided, however, that <u>Article VI</u>, <u>Article VII</u>, <u>Section 1.4</u>, <u>Section 1.7</u>, the second sentence of <u>Section 1.3</u>, and Owners' audit rights under <u>Section 4.2</u> of this Agreement, together with such terms from Article VIII as are necessary or appropriate for the proper application of such surviving Articles, Sections, or provisions, shall survive such discontinuation or termination.

**Section 6.4    Transition of Operations**. Upon termination of this Agreement, Operator shall: (i) cooperate with Owners to facilitate a timely transition of all operations concerning the

9

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

Assets and the Services; (ii) promptly deliver to Owners, or its representative, to the extent in Operator's possession, copies of all documents, records, and other data related to the Assets in the Operator's possession, including, without limitation, information, data, know-how, interpretations, contracts, and other rights and privileges with respect to each Owner's wells, production, leases, and all Evaluation Data, Seismic Data, and Well Data to the Assets and other information reasonably requested by Owners, in each case, relating to the Assets or the Services performed by Operator hereunder to the extent such records and information are not already in the possession of Owners; (iii) promptly tender and pay to Owner all amounts received by Operator from Owners that are in the possession of Operator as of the effective date of such termination and relate to periods after the date of termination; and (iv) within sixty (60) days from the effective date of such termination, prepare and tender to Owners a final and complete statement setting forth all amounts, if any, that are due and owing to Operator in accordance with this Agreement.  For the purposes of this Agreement, the term "Evaluation Data" shall mean Seismic Data and other data and information relating to the Assets including, without limitation, to the extent applicable, relevant geological and geophysical interpretations and information, including the most recent reports, interpretations, and maps, and all specialty processing and analysis of Seismic Data (e.g., migration, AVO, etc.); the term "Seismic Data" shall mean any and all seismic data, two-dimensional multifold seismic data, three-dimensional seismic data, stacked and migrated processed sections, digital field tapes, stacked tapes, support data relating thereto, stick and quality control segments, receiver and bin center locations, stacking velocities, shothole drilling information, digital shotpoint locations, magnetic, surface, and other surveys, seismic sections, surface and subsurface maps, plats, charts, and any interpretations of any of the foregoing, or other like information customarily used in connection with oil and/or gas exploration; and the term "Well Data" shall mean any logs, core samples, other geological and geophysical data or similar data created during drilling operations, any engineering records or reports (including wellbore schematics), any drilling records or reports (including detailed daily drilling reports) and any related reports filed with the BOEM.

## ARTICLE VII.     INDEMNITIES

**Section 7.1   Operator's Indemnity Obligations**.     The Operator agrees to **INDEMNIFY, DEFEND AND HOLD HARMLESS** Owners, their Affiliates, and their respective parent, subsidiary and affiliated companies, its and their joint owners, co-lessees, partners, joint venturers, and the officers, directors, agents, consultants, contractors, invitees, insurers and employees of all of the foregoing, and other representatives (each, an "Owner Indemnified Party") from and against any and all claims, causes of action, losses, demands, costs, expenses, penalties, or liabilities together with all costs and fees in connection with the same including reasonable attorneys' fees (collectively, "Losses"), and to reimburse each Owner Indemnified Party for all reasonable expenses as they are incurred in investigating, preparing, pursuing, or defending any claim, action, proceeding, or investigation (collectively, "Actions"), whether or not in connection with pending or threatened litigation and whether or not any Owner Indemnified Party is a party, in each case to the extent such Losses have resulted from an Operator Indemnified Party's (a) bodily injury, personal injury, or death, (b) loss or destruction of or damage to any Operator Indemnified Party's property of any kind, (c) performance of the Services in a manner that is inconsistent with the Standard of Performance set forth in Section 1.3, or (d) breach of this Agreement; *provided, however*, that such indemnity shall exclude Losses to the extent resulting from an Owner Indemnified Party's bad faith, fraud, gross negligence, or willful

10

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

misconduct or breach of this Agreement as determined by the final non-appealable judgment of a court of competent jurisdiction.

**Section 7.2    Owners' Indemnification Obligations**. The Owners agrees to **INDEMNIFY, DEFEND AND HOLD HARMLESS** Operator, its Affiliates, and its and their respective parent, subsidiary and affiliated companies, its and their joint owners, co-lessees, partners, joint venturers, and their officers, directors, agents, consultants, contractors, invitees, insurers and employees of all of the foregoing, and other representatives (each an "Operator Indemnified Party") from and against any Losses, and to reimburse each Operator Indemnified Party for all reasonable expenses as they are incurred in investigating, preparing, pursuing, or defending any Actions, whether or not in connection with pending or threatened litigation and whether or not any Operator Indemnified Party is a party, in each case to the extent such Losses have resulted from an Owner Indemnified Party's (a) bodily injury, personal injury, or death,  (b) bad faith, fraud, gross negligence, or willful misconduct, or (c) breach of this Agreement; *provided, however*, that such indemnity shall exclude Losses to the extent resulting from an Operator Indemnified Party's bad faith, fraud, gross negligence, or willful misconduct or breach of this Agreement.

**Section 7.3    Insurance Support**. Operator, as indemnitor, agrees to obtain, for the benefit of indemnitee, liability insurance and/or qualified self-insurance sufficient to support their indemnity obligations. If Operator fails to carry such insurance, then it is agreed that Operator has qualified self-insurance. The obligations in this Article VII are independent of and in addition to any other provisions in this Agreement, and shall not be prejudiced, reduced, or limited by any insurance coverage requirements or insurance coverage actually maintained.

**Section 7.4    Indemnification Procedure**. Whenever any claim arises for indemnification hereunder, the indemnified Person shall promptly notify the indemnifying Party of the claim and, when known, the facts constituting the basis for such claim, except that in the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, except as otherwise expressly provided in this Article VII, such Notice shall specify, if known, the amount or an estimate of the amount of the Losses asserted by such third party.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a third party, the indemnifying Party, may, upon Notice to the indemnified Person, assume the defense of any such claim or legal proceeding. Except with the written consent of the indemnified Person, the indemnifying Party shall not consent to the entry of any judgment or settlement arising from any such claim or legal proceedings which, in each case, provides for any non-monetary relief or does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnified Person of a release from all Losses in respect thereof, unless in the latter case the indemnifying Party has actually paid to the indemnified Person the full amount of such judgment or settlement.  Any indemnified Person shall be entitled to participate in (but not control) the defense of any such claim or litigation resulting therefrom.  If the indemnifying Party upon Notice to the indemnified Person does not elect to control the litigation as provided above, the indemnified Person may defend against such claim or litigation in such manner as it may deem appropriate, including, without limitation, settling such claim or litigation, after giving Notice of the same to the indemnifying Party, on such terms as such indemnified Person may deem appropriate, and the indemnifying Party shall

11

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

promptly reimburse the indemnified Person from time to time as such Losses are incurred.  All indemnification hereunder shall be effected by payment of cash or delivery of a certified or official bank check in the amount of the indemnification Losses.

### Section 7.5    Savings Provisions.

(a)    If any provision contained in this Agreement conflicts with, is prohibited by or violates public policy under any federal, state, or other applicable Law determined to be applicable to a particular situation arising under or involving this Agreement or any Services hereunder, it is understood and agreed that the conflicting, prohibited, or violating provision shall be deemed automatically amended in that situation to the extent—but only to the extent—necessary to conform with, not be prohibited by, and avoid violating public policy under such applicable Law.  No other provisions of this Agreement shall be amended or affected thereby.  The Parties agree that the exculpatory, indemnification, and hold harmless provisions herein shall be modified or altered only insofar as required by a jurisdiction purporting to limit such provisions, it being the intention of both Parties to enforce to the fullest extent, all terms and conditions herein agreed to.

(b)    Section 7.5(a) applies to the extent, and only to the extent, that:

(i)    the Texas Oilfield Anti-Indemnity Act (or a similar statute of another jurisdiction, excluding Louisiana) applies to this Agreement or any Services performed hereunder and would render void, unenforceable, or voidable any obligations hereunder, including any set forth in Article VII; then each Party agrees to carry supporting insurance in equal amounts of the types and in the minimum amounts as specified in the insurance requirements hereunder and if a Party's insurance is deficient or unavailable for any reason, then such Party agrees and shall be deemed  to have approved self funded or self insurance. It is the intention of the Parties hereto that the Party to whom indemnity is owed will receive the benefit of such indemnity regardless of what may happen after this Agreement is signed that might affect the insurance required to be obtained by the Party owing the indemnity; or

(ii)    the Louisiana Oilfield Indemnity Act (La. R.S. 9:2780, as the same may be amended from time to time), applies to this Agreement or any Services performed hereunder and would render void, unenforceable, or voidable any obligations hereunder, including any set forth in Article VII; then each Party who would be the indemnified party under the indemnity provisions contained herein (the "Paying Party") shall have the option to pay to the underwriter(s) of the other Party who would be the indemnifying party ("Indemnitor" or "Primary Insured") the premium required by those underwriters to extend such Primary Insured's policies of liability insurance covering bodily injury or death as required by the  indemnity provisions of this Agreement, by (i) naming the Paying Party (and the other members of that Party's Group, being either the Operator Indemnified Parties or the

12

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

Owner Indemnified Parties, as required by the indemnity provisions of this Agreement) as additional insured(s), (ii) waiving subrogation against such additional insured(s), and (iii) designating such insurance as primary coverage on behalf of such additional insured(s). In the event that a Party makes this election, the Primary Insured will introduce the Paying Party to the Primary Insured's insurance broker(s)/agent(s) and those broker(s)/agent(s) will coordinate among the Paying Party and the Primary Insured's underwriters to facilitate the Paying Party's negotiation of such coverage, premium, billing, payment, notice, and renewal arrangements with those underwriter(s) as the Paying Party may, in its sole discretion, deem advisable.  All costs and expenses of and in connection with such arrangements shall be for the account of the Paying Party, and invoices and payments in respect of such arrangements shall be exchanged directly between the Paying Party and the Primary Insured's underwriters (directly or through such underwriters' authorized broker(s)/agent(s)).

## ARTICLE VIII.    MISCELLANEOUS

**Section 8.1    Force Majeure.**   In the event  that Operator is rendered unable, wholly or in part, by Force Majeure or other causes herein specified, to carry out all or any of its obligation under this Agreement, it is agreed that on Operator's delivery of written Notice, so far as Operator is prevented by such Force Majeure or other causes herein specified, Operator's obligation shall be suspended during the continuance of any inability so caused, and Operator will not be liable to Owners for any interruptions of service, any delays, or any failure to perform under this Agreement caused by such Force Majeure. For the avoidance of doubt, any delays, interruptions or failures to perform caused by such occurrences shall not be deemed to be a breach or failure to perform under this Agreement. The term "Force Majeure" means occurrences beyond the control of Operator and includes, without limiting the generality of the foregoing: acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, landslides, lightning, earthquakes, fires, storms, hurricanes, tropical storms, loop currents, floods, washouts, arrests, and restraints of the Government, either federal or state, civil or military, civil disturbances, explosions, sabotage, malicious mischief, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, refusal or inability of resale owner(s) or transporter(s) to take deliveries due to events of Force Majeure, inability of Operator to obtain right-of-way, necessary materials, supplies, or permits not caused by the failure of Operator to pay for or negligence to obtain such rights-of-way, necessary materials, supplies, or permits, an order, directive, or restraint issued or imposed by any Governmental Authority, regulatory body or court having jurisdiction. It is understood and agreed that the settlement of strikes or other labor difficulties shall be entirely within the discretion of Operator. During the continuation of a Force Majeure event, Operator shall act diligently to overcome the impediments caused by such event and Operator will perform its obligations under this Agreement to the fullest extent possible under the circumstances during such Force Majeure and, thereafter, in full upon cessation of the Force Majeure.

**Section 8.2    Notices.** Any notice, request, instruction, correspondence, or other document to be given hereunder by any Party to another (herein collectively called "Notice") shall be in writing and delivered in person or by courier service requiring acknowledgement of receipt

13

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

or mailed by certified mail, postage prepaid and return receipt requested, or by overnight delivery service, as follows:

If to Owners:

      Fieldwood Energy I LLC
      ADDRESS
      Attn:
      Phone:

with a copy to:

      Apache Corporation
      2000 Post Oak Blvd, Suite 100
      Houston, TX  77056
      Attn: Brian Erickson
      Phone:  713-296-6000

If to Operator:

      [•]
      [•]
      [•]
      [•]

with a copy to:

      Apache Corporation
      2000 Post Oak Blvd, Suite 100
      Houston, TX  77056
      Attn: Brian Erickson
      Phone:  713-296-6000

Notice given by personal delivery or courier shall be effective upon actual receipt. Notice given by mail shall be effective upon actual receipt or, if not actually received, the fifth Business Day following deposit with the U.S. Post Office.  If a date specified herein for giving any Notice or taking any action is not a Business Day (or if the period during which any Notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such Notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. Any Party may change any address to which Notice is to be given to it by giving Notice as provided above of such change of address; provided that only Apache may change its address for copies and such copies may not be amended, discontinued, or delayed without Apache's express written consent.

      **Section 8.3**    <u>**No Joint Venture or Partnership**</u>. Nothing in this Agreement is intended to create, or shall be construed as creating, a partnership, joint venture, association for profit or

14

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

other business entity between or among the Parties, and for federal and state income tax purposes, the Parties elect to be excluded from the application of the provisions of Subchapter K, Chapter 1, Subtitle A of the Internal Revenue Code of 1986, as amended, as permitted and authorized by Section 761 of said Code and the regulations promulgated thereunder.

**Section 8.4    No Fiduciary Duty.**    It is expressly understood and agreed that this Agreement is a purely commercial transaction between the Parties and that nothing stated herein shall operate to create any fiduciary duty which a Party shall owe to the other Party, except with respect to the handling of cash by Operator on behalf of either Owner.

**Section 8.5    Entire Agreement**. This Agreement (together with the Exhibits hereto, including the Agency Agreement attached as **Exhibit D**) constitutes the entire agreement among the Parties with respect to the subject hereof and supersedes any other agreements, whether written or oral, that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby or the subject hereof. The Parties agree that Apache Corporation is a third-party beneficiary of Section 6.2 and Section 8.2 of this Agreement.

**Section 8.6    Successors and Assigns**. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors, assigns, and legal representatives.

**Section 8.7    Assignment**. This Agreement is personal to Operator, and Operator may not assign this Agreement without the prior written consent of Owners, which may be withheld by Owners for any reason or no reason in their sole discretion. Any assignment or transfer in violation of the forgoing provisions shall be null and void. No assignment or transfer of this Agreement shall relieve the assigning Party of any expense, liability, or other obligation (including as to a breach of any provision) or remedy hereof which has accrued or attached prior to the date of such assignment.

**Section 8.8    Amendment**. This Agreement may be amended or modified in whole or in part, and terms and conditions may be waived, only by a duly authorized agreement in writing which makes reference to this Agreement executed by each Party.

**Section 8.9    Construction**.

(a)    All article, section, schedule, and exhibit references used in this Agreement are to articles and sections of, and Schedules and Exhibits to, this Agreement, unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    Unless otherwise indicated, with respect to either Party, the terms "ordinary course of business" or "ordinary course" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of such Party.

(c)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms

15

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "include", "includes" or "including" do not limit the preceding terms and shall be deemed to be followed by the words "without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The term "or" is not exclusive.

(d)     The terms "day" and "days" mean and refer to calendar day(s). The terms "year" and "years" mean and refer to calendar year(s). The term "Business Day" shall mean any day other than a Saturday or a Sunday or a day on which federally chartered banking institutions in Houston, Texas, are authorized by Law to close, but for purposes of Notices or other communications given hereunder, means before 4:00 p.m. on such day in the city of Houston, Texas.

(e)     Operator and Owners have each participated in the negotiation and drafting of this Agreement, and, if an ambiguity should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement.

(f)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(g)     All references to currency herein shall be to, and all payments required hereunder shall be paid in, United States Dollars.

(h)     The serial comma is sometimes included and sometimes omitted. Its inclusion or omission shall not affect the interpretation of any phrase.

**Section 8.10     <u>Severability</u>**. Subject to <u>Section 7.5</u>, if any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The Parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the Parties to the greatest extent legally permissible.

**Section 8.11     <u>Counterparts</u>**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

16

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

Section 8.12   **Governing Law**. This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

Section 8.13   **WAIVER OF JURY TRIAL**.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.14   **Disputes**. Any disputes arising out of or relating to this Agreement shall be resolved exclusively by the state or federal courts located in Houston, Texas; and the Parties irrevocably submit to the jurisdiction and venue of such courts for such purposes.

*[Remainder of Page Intentionally Left Blank. Signature Page(s) to Follow.]*

2" = "1" "015292.0000004 EMF_US 81940058v3" ""

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the date first above written.


**OPERATOR**:

[•]


By: _____
Name: _____
Title: _____


**OWNERS:**

FIELDWOOD ENERGY I LLC


By: _____
Name:
Title:


GOM SHELF LLC


By: _____
Name:
Title:


Contract Services Agreement2" = "1" "015292.0000004 EMF_US 81940058v3" ""

Schedule I – Page 1
Contract Services Agreement
2" = "1" "015292.0000004 EMF_US 81940058v3" ""

DEBTORS' EX. NO. 5
1498 of 1570

## EXHIBIT A

## TO CONTRACT SERVICES AGREEMENT

**SERVICES**

**1.     Asset Management Services**. Operator shall provide the following Services with respect to the Assets.

**1.1     Operating Services**.

(a)     Services:

(i) Complying with, and causing the Assets to be operated in compliance with all state and federal Laws and regulations, including, but not limited to, following all required health, safety and environmental Laws, regulations and programs (such as SEMS), complying with all regulatory filing and reporting requirements, and obtaining all necessary permits.

(ii) Until the end of the Term, serve as contract operator of the Assets, in accordance with the terms hereof and any applicable operating agreements and similar contracts (if any), such Services may include:

(A)     purchasing supplies, materials, tools, and equipment associated with the Assets, provided that the costs of which will be reimbursed by the applicable Owner to Operator in accordance with and subject to the Approved Budget, further, provided that without such Owner's prior written consent or express inclusion within the Approved Budget, Operator will not purchase any single item with respect to the Assets if such purchase would result in a charge or cost to such Owner greater than one million dollars ($1,000,000.00) for any single item or ten million dollars ($10,000,000.00) aggregate as to all such items in any consecutive twelve (12) month period.  Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from such Owner's receipt of Operator's request;

(B)     contracting for services associated with the physical operation of the Assets, provided that the costs associated with such services will be paid directly by the Owner of such Assets or reimbursed to Operator by such Owner, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to any of the Assets if such contract (1) is with an affiliate of Operator or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Term with respect to the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

Exhibit A – Page 1
Contract Services Agreement

(C)     executing, amending, or extending contracts associated with the physical operation of the Assets in the normal course of business, provided that the costs associated with such execution, amendment or extension of the contracts will be paid directly by the Owner of such Assets or reimbursed by such Owner to Operator, further, provided that without such Owner's prior written consent Operator will not contract for any of such services with respect to either of the Assets if such contract (1) is with an Affiliate of Operator; or (2) would obligate such Owner for a period more than ninety (90) days after the end of the Term with respect to the Operating Services. Such Owner's consent shall be deemed granted unless such Owner notifies Operator to the contrary within ten (10) Business Days from receipt of Operator's request;

(D)     functioning as operator under the applicable joint operating agreements, production handling agreements, and other similar operating agreements related to the Assets as agent for the Owner of such Assets with all rights and authority to communicate with co-lessees and non-operating parties and take all actions under the applicable agreement as if it were such Owner. Such Owner and Operator shall enter into an Agency Agreement in the form attached hereto as **Exhibit D** (the "Agency Agreement");

(E)     functioning as each Owner's agent under the applicable master service agreements, work orders, purchase orders and similar service contracts related to the Assets with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement; and

(F)     functioning as each Owner's agent in representing such Owner in its capacity as the owner of the Assets in all dealings and communications with Governmental Authorities, provided that such Owner reimburses Operator for any fees, fines, or penalties associated with such dealings and communications, further, provided that such Owner must approve in order for the Operator to agree to a fine or penalty in excess of one hundred twenty five thousand dollars ($125,000).  Operator will provide such Owner copies of all correspondence with Governmental Authorities, other than routine correspondence, on a periodic basis or as requested by such Owner.

**1.2 Production Marketing, Marketing Services and Marketing Accounting Services**:

(a)     Services:

Exhibit A – Page 2
Contract Services Agreement

(i)    For each third party agreement with respect to the Assets that each Owner and Operator mutually agree, Operator shall function as the agent for such Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement;

(ii)    Performing all marketing, gas control, crude oil and gas scheduling, contract administration, and other similar services necessary to sell production associated with the Assets in a manner substantially consistent with Operator's or its personnel's current general practices, provided that all marketing shall be at prices that are representative of market value. Operator will provide Owners summaries of the scheduled oil and gas or plant statements upon request;

(iii)    Performing all revenue and marketing accounting functions relating to the Assets, including the calculation and payment of royalty and overriding royalties, transportation, cash out, netback pricing, weighted average sales price, and other marketing accounting functions performed in the normal course of business; and

(iv)    Management of all lease of platform space agreements, production handling agreements, pipeline interconnect agreements, boarding agreements, midstream facility ownership and/or contract operating agreements, and other similar agreements.

**1.3    Treasury and Accounting Services:**

(a)    Each Owner may notify Operator in writing thirty (30) days prior to the end of any production month if such Owner wishes to terminate the Expenditure Accounting Services as of the end of such month, and such Services shall terminate at the close of accounting business for such production month.

(b)    Services:

(i)    Managing any bank accounts, trusts, etc. associated with the operation of the Assets;

(ii)    Performing all expenditure accounting functions relating to the Assets, including the payment of all invoices and subsequent billing of same to all working interest owners, AFE maintenance, and maintenance of property/cost center numbers;

(iii)    Managing the collection of any joint interest billings and revenue relating to the Assets;

(iv)    Performing all the calculations of severance, ad valorem/property, and sales and use taxes, but excluding state or federal income, margin, or excise taxes;

(v)    Performing all of the property, revenue, and royalty accounting services related to the Assets, including properly disbursing payments to and collecting payments from third parties and working interest, royalty, and overriding royalty owners as required by such accounting services as well as rental, severance or production taxes, right of way payments, leasehold, minimum or advance payments due in the normal course of business, and annual 1099 reporting as required by the Internal Revenue Service; and

(vi)    Performing all the calculations and preparation of monthly gas and oil balancing and payout statements in the ordinary course of business.

**1.4    Land Administration Services.**

(a)    Each Owner may notify Operator in writing thirty (30) days prior to the end of any month if such Owner wishes to terminate the Land Administration Services effective as of the end of such month and such Services shall terminate at the end of such month.

(b)    Services:

(i)    Administering and maintaining all leases and agreements relating to the Assets;

(ii)    Maintaining and updating all lease, ownership, contract, and property records and databases relating to the Assets;

(iii)    Maintaining and updating all royalty payment reports and databases;

(iv)    Maintaining and updating all royalty suspense accounts, reports and databases and administering escheat duties in accordance with established State rules and regulations;

(v)    Maintaining and updating all accounts, reports and databases associated with compulsory pooled interests related to the Assets;

Exhibit A – Page 4
Contract Services Agreement

(vi)    Generating, verifying, processing, approving, and signing all internal and external division orders and transfer orders required in the normal course of business;

(vii)    Identifying, paying and appropriately invoicing all rentals, surface, right of way, shut-in payments, and other payments required by the leases or other agreements relating to the Assets;

(viii)    Maintaining all land, contract, division of interest, lease files, and other files relating to the subject land administration functions; and

(ix)    Such other administrative services as Operator administered or caused to be administered to maintain the leases or agreements relating to the Assets.

1.5    **Supply Chain**.

(a)    Each Owner may notify Operator in writing ten (10) Business Days prior to the end of any month if such Owner wishes to terminate the applicable Services as of the end of such Month and such Services shall terminate at the end of such month.

(b)    Services.

(i)    Operator shall provide procurement services with respect to the Assets;

(ii)    Except as it relates to marketing contracts, which shall be covered by Section 1.2 of this **Exhibit A**, Operator shall provide Contract Administration Services with respect to the Assets; and

(iii)    Operator shall function as the agent for each Owner with all rights and authority to communicate with the service providers and take all actions under the applicable agreement as if it were such Owner, pursuant to the Agency Agreement.

2.    **Hourly Services**. Operator shall provide the following Services with respect to the Assets in a manner substantially consistent with Operator's general practices for similarly situated assets:

2.1    **Legal.**

(a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

(b)    Services.

Exhibit A – Page 5
Contract Services Agreement

      (i)      Review and negotiation of contracts with service providers and other third parties;

      (ii)     Management of litigation, government investigations, and other disputes as directed by such Owner; and

      (iii)    Directing outside counsel engaged by such Owner in providing advice and counsel to such Owner with respect to the Assets and the various legal matters that may arise from time to time related thereto.

**2.2**    **Finance and Tax.**

    (a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

    (b)    Services.

      (i)      Preparation of projections, analyses, and reports related to the Assets;

      (ii)     Review and negotiation of financing agreements, including hedging agreements; and

      (iii)    Preparation and administration of all federal, state, and local tax processes, including the preparation of appropriate tax returns and/or directing outside tax preparers in the preparation of any tax matters and/or activities related to the Assets.

**2.3**    **Insurance.**

    (a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.

    (b)    Services.

      (i)      Review and negotiation of insurance documents and agreements, including bonds, insurance policies, and similar agreements;

      (ii)     Management of any claims made or to be made under the applicable insurance policies, bonds, and similar agreements as directed by such Owner; and[1]

---

[1] [NTD: To confirm in which party's name the insurance contracts will be.]

(iii)    Procure and maintain insurance coverages that are customary for a reasonably prudent operator with properties, equipment, and other assets similar to the Assets and operations in the Gulf of Mexico and in amounts commensurate with operations and obligations in this Agreement. Such requirements shall include, but shall not be limited to, insurance as required by applicable Law.

**2.4    Financial Reporting and Audit Services.**

(a)    Each Owner may discontinue these Services by providing Operator ten (10) days prior written Notice of its desire to do so, and such Services shall terminate at the end of such ten (10) day period.  The terms of Section 2.4 (c)(i) shall survive the termination of this Agreement for such period of time as is necessary for such Owner or its representatives to conduct the review and audit of financial statements prepared under Section 2.4 (c)(ii) or for the review and audit of financial statements prepared subsequent to discontinuation of Services where financial results are included for the applicable periods the Services were provided.

(b)    Services.

(i)    [Facilitate and coordinate the review and audit of such Owner's business records in the normal course of business or as required in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC;][2]

(ii)    Preparing financial statements and/or directing outside accounting personnel in the preparation and maintenance of audit reports and financial statements and any required filings or reporting in accordance with the terms of the Limited Liability Agreement of Fieldwood Energy I LLC; and

(iii)    Auditing the books and records of third parties related to activities under operating, production handling, and other similar agreements in the normal course of business or as reasonably requested by such Owner.

*[Remainder of Page Intentionally Left Blank]*

---

[2] [NTD: Assumes Operator will facilitate 3rd party audits for financial reporting and for COPAS JV audits.]

## EXHIBIT B

## TO CONTRACT SERVICES AGREEMENT

DECOMMISSIONING PLAN

## EXHIBIT C

## TO CONTRACT SERVICES AGREEMENT

OPERATOR REPRESENTATIVES LIST

[NTD: List will include name, title and contact information for the individuals in charge of performing each Service.]

**EXHIBIT D**

**TO CONTRACT SERVICES AGREEMENT**

FORM OF AGENCY AGREEMENT

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement"), effective as of 12:01 a.m. Central Time on ("Effective Date"), is by and between [•], a [•] ("Operator"), and Fieldwood Energy I LLC, a Texas limited liability company ("Fieldwood Energy I") and GOM Shelf LLC, a Delaware limited liability company ("GOM Shelf"). Fieldwood Energy I and GOM Shelf are each referred to herein as "Owner" and collectively as "Owners". Each capitalized term not defined herein shall have the meaning ascribed to such term in that certain Contract Services Agreement dated as of _____, 202_ (the "Contract Services Agreement") between Operator and Owners.

**WHEREAS**, of even date herewith, Operator and Owners entered into that certain Contract Services Agreement, which agreement provides for Operator to provide Owner certain services related Owners' interests in the Assets; and

**WHEREAS**, Operator and Owners desire that Operator administer those certain services described on **Exhibit A** to the Contract Services Agreement; and

**WHEREAS**, subject to the limitations and obligations of Operator pursuant to this Agreement and the Contract Services Agreement, Owners desire that Operator act as agent for Owners for all matters related to certain of the third-party agreements set forth on Attachment 1 of this Agreement (the "Third Party Contracts") and related to representation of Owners as the owner of the Assets in all dealings and communications with Governmental Authorities, or as may be mutually agreed upon from time to time by Owners and Operator in writing.

**NOW THEREFORE**, in consideration of the mutual premises, covenants, and agreements contained herein, the benefits to be derived by each party hereunder and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Operator and Owners hereby agree as follows:

1.    **Appointment of Agent**. Subject to the limitations and obligations of Operator pursuant to this Agreement and the Contract Services Agreement, Owners hereby appoints Operator, and Operator hereby accepts and agrees to act as the agent for Owners, in all respects, under the Third Party Contracts and in all dealings and communications with any Governmental Authorities related to the Assets or operations related thereto. Unless expressly permitted by Owners or to the extent permitted under the Contract Services Agreement, no other party shall be authorized to act on behalf of Owners with respect to such Third Party Contracts. Operator's authority as agent for Owners shall be subject to the following limitations and obligations:

(a)    Operator shall hold such Third Party Contracts for the benefit of Owners and shall exercise all rights available to Operator with respect to such third-party agreements in accordance with the Contract Services Agreement;

(b)    Operator shall maintain and keep such Third Party Contracts in full force and effect;

(c)    Operator shall not transfer, sell, hypothecate, encumber, relinquish, or cause the termination of such Third Party Contracts;

Exhibit D – Page 2
Contract Services Agreement

(d)     Operator shall not amend, or extend any of such Third Party Contracts, except as allowed in the Contract Services Agreement;

(e)     The foregoing notwithstanding, Operator does not assume any obligation under any Third Party Contract and shall not be deemed to have assumed any such obligation under the Third Party Contract by reason of acting as Owners' agent hereunder or by the existence of this Agreement, except as set forth in the Contract Services Agreement; and

(f)     With respect to dealings and communications with Governmental Authorities, Operator shall act in a manner consistent with the limitations of the Contract Services Agreement.

Requests for approval of any action restricted by this Agreement shall be delivered to the Sole Manager of Fieldwood Energy I on behalf of Owners, provided that Operator may take whatever actions it deems in good faith to be required in the event of an emergency.

**2.     Indemnity.** The indemnity obligations of Operator and Owners in Section 1.7 and Article 7 of the Contract Services Agreement shall apply to this Agreement, *mutatis mutandis.*

**3.     Power of Attorney.** This Agreement shall serve as a general power of attorney. Owners hereby grants Operator, and Operator hereby accepts, a power of attorney for Operator to serve as the attorney-in-fact and agent for Owners and to take any and all actions to effectuate the purpose and activities described in the Contract Services Agreement including, but not limited to, taking certain actions under the Third Party Contracts, entering into any agreement, and representing Owners in all dealings and communications with Governmental Authorities related to the Assets or operations related thereto.  This power of attorney is subject to the limitations of the Contract Services Agreement and this Agreement and shall terminate upon the termination of this Agreement.

**4.     Miscellaneous Provisions.**

(a)     Term. The authority for Operator to act as Owners' agent shall be effective as of the date hereof and shall terminate and be revoked as to each such third-party agreement at the end of the Term for each applicable Service as set forth in the Contract Services Agreement, unless sooner revoked by Notice in writing from Owners to Operator and to each third party no longer entitled to rely on the agency created by this Agreement.

(b)     Contract Services Agreement. This Agreement is being entered into in conjunction with the Contract Services Agreement whereby Operator shall provide certain Services as such term is defined therein. Operations of the oil and gas properties and collection and disbursement of all revenues and payment of expenses associated with such third-party agreements will be handled in accordance with the Contract Service Agreement.

(c)     Entire Agreement. This Agreement constitutes the full understanding of Operator and Owners and a complete and exclusive statement of the terms and conditions of the agreement relating to the subject matter hereof and supersedes all prior negotiations,

understandings, and agreements, whether written or oral, between Operator and Owners with respect thereto. This Agreement does not modify or amend any terms or provisions of the Contract Services Agreement. Notwithstanding anything herein to the contrary, in the event of any conflict between that the terms of this Agreement and terms of the Contract Services Agreement, the terms of the Contract Services Agreement or any agreement contemplated thereby shall prevail.

(d)      <u>Amendments.</u> No alteration, modification, amendment, or change in this Agreement shall be effective or binding on any party unless the same is in writing and is executed by Operator and Owners.

(e)      <u>Enforceability.</u> This Agreement shall be enforceable by and against Operator, Owners, and their respective heirs, successors, permitted assignees, and legal representatives.

(f)      <u>Assignment.</u> This Agreement is personal to the parties hereto.  Operator shall not assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement without the prior written consent of the other party or parties unless such assignment is permitted under the Contract Services Agreement.  Any attempted assignment without appropriate consent shall be voidable at the sole discretion of the non-assigning party.

(g)      <u>Governing Law.</u> This Agreement shall be governed by, construed under, and enforced in accordance with the laws of the State of Texas without regard to the principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction.

(h)      <u>Disputes.</u> Any disputes arising out of or relating to this Agreement shall be subject to the terms set forth in <u>Section 8.13</u> and <u>Section 8.14</u> of the Contract Services Agreement.

(i)      <u>Multiple Counterparts.</u> This Agreement may be executed, either originally or by electronic reproduction, by the parties hereto in multiple counterparts, each of which shall be deemed an original for all purposes, and all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank; signature page follows.]*

Exhibit D – Page 4
Contract Services Agreement

This Agreement is executed and delivered by Operator and Owners effective as of the Effective Date.

OPERATOR:

[•]

By: _____
Name: _____
Title:   _____

OWNERS:

FIELDWOOD ENERGY I LLC

By: _____
Name: _____
Title:   _____

GOM SHELF LLC

By: _____
Name: _____
Title:   _____

Exhibit D – Page 5
Contract Services Agreement

DEBTORS' EX. NO. 5

STATE OF TEXAS                             §

COUNTY OF HARRIS                           §

        This instrument was acknowledged before me on this____ day of _____, by _____, as _____ of [•], a [•], on behalf of said company.

                                    _____
                                    Notary Public in and for the State of _____


STATE OF TEXAS                                     §

COUNTY OF HARRIS                                   §


This instrument was acknowledged before me this ____ day of _____, by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of Fieldwood Energy I LLC, a Texas limited liability company, on behalf of said company.

                                    _____
                                    Notary Public in and for the State of Texas


STATE OF TEXAS                                     §

COUNTY OF HARRIS                                   §


This instrument was acknowledged before me this ____ day of _____, by _____, known to me to be the person whose name is subscribed to the foregoing instrument as _____ of GOM Shelf LLC, a Delaware limited liability company, on behalf of said company.

                                    _____
                                    Notary Public in and for the State of Texas


Exhibit D – Page 6
Contract Services Agreement

**ATTACHMENT 1**

**TO AGENCY AGREEMENT**

THIRD-PARTY AGREEMENTS

[NTD:  These are specific marketing, transportation and processing and other service agreements.]

**<u>EXHIBIT E</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

INITIAL ANNUAL BUDGET

**<u>EXHIBIT F</u>**

**<u>TO CONTRACT SERVICES AGREEMENT</u>**

APPROVED TWCF BUDGET

## EXHIBIT G

## TO CONTRACT SERVICES AGREEMENT

FORM OF AFE

**EXHIBIT H**

**TO CONTRACT SERVICES AGREEMENT**

OPERATOR COMPENSATION

**SCHEDULE I**

**TO CONTRACT SERVICES AGREEMENT**

**ASSETS**

Schedule I – Page 1
Contract Services Agreement

DEBTORS' EX. NO. 5
1519 of 1570

**Exhibit 22**

**Credit Bid Purchase Agreement Terms**

The terms set forth below are acceptable to Apache and the Debtors to address the Specified Credit Bid Terms in the Credit Bid Purchase Agreement (or an alternative purchase and sale agreement conveying the Credit Bid Acquired Interests to a buyer):

(i)     Credit Bid Purchaser (or an alternative purchaser under a purchase and sale agreement conveying the Credit Bid Acquired Interests to a buyer) ("**Buyer**") shall assume the Credit Bid Assumed Liabilities, which will include all liabilities and obligations of FWE for (x) Closing Date Payables (as defined below), (y) obligations for personal injury or damage to third party property arising from the ownership or operation of the FWE I Assets (as defined in the Plan of Merger) or the GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger) for which a claim has been made prior to 7:00 a.m. on the Effective Date, but only to the extent of the deductible or retention amount under applicable insurance policies covering such claims, and (z) the FWE II Retained Properties Payables (as defined below), and the Purchase Agreement will include an obligation of Buyer to pay, or to cause to be paid, all Credit Bid Assumed Liabilities and the closing date payables of GOM Shelf and FW GOM Pipeline Inc. (with such closing date payables to be determined consistent with Closing Date Payables).

(ii)     FWE I shall have the right to send all invoices it receives for any of the Credit Bid Assumed Liabilities and all closing date payables of GOM Shelf and FW GOM Pipeline Inc. (with such closing date payables to be determined consistent with Closing Date Payables) to Buyer for payment.

(iii)     The Purchase Agreement shall define "Closing Date Payables" as expenses of FWE incurred but not yet paid as of 7:00 a.m. on the Effective Date attributable to the FWE I Oil and Gas Properties (as defined in the Plan of Merger) and the GOM Shelf Oil and Gas

Properties, including, without limitation, (w) payables arising from the exploration of and production and sale of oil and gas from the FWE I Oil and Gas Properties and the GOM Shelf Oil and Gas Properties, (x) payables to third parties on account of third party working interest owners for which a joint interest billing receivable is included in the Closing Accounts Receivable (as defined below), (y) obligations for Royalties (as defined in the Plan of Merger) in respect of the FWE I Assets or the GOM Shelf Oil and Gas Properties payable on account of Hydrocarbons (as defined in the Plan of Merger,) produced and sold prior to and unpaid as of 7:00 a.m. on the Effective Date (provided that if a Royalty reporting, miscalculation, or underpayment claim is asserted after 7:00 a.m. on the Effective Date with respect to any Royalty paid prior to 7:00 a.m. on the Effective Date such claim or obligation shall not be deemed a Closing Date Payable, except to the extent any reporting, miscalculation, or underpayment claim totals more than one million U.S. dollars ($1,000,000) and arises out of the willful misconduct of the person or persons performing such reporting, calculations, or payments as determined by a final, non-appealable judgment of a court or other tribunal having jurisdiction), and (z) fines and penalties levied or imposed by governmental authorities prior to 7:00 a.m. on the Effective Date in respect of the FWE I Assets or the GOM Shelf Oil and Gas Properties to the extent not otherwise covered by a settlement with applicable governmental authorities entered into prior to the Effective Date that fully excuses payment (other than as provided in such settlement and for which FWE I shall have no obligation) of such fines and penalties, whether classified on the books and records as an account payable or otherwise; ***provided, that,*** the definition of "Closing Date Payables" in the Purchase Agreement shall expressly exclude (1) obligations for FWE I Suspense Funds (as defined in the Plan of Merger), (2) Interim Unpaid P&A Expenses (as defined in the Plan of Merger), (3) obligations to pay Royalties on Hydrocarbons produced from FWE I Oil and Gas Properties or

GOM Shelf Oil and Gas Properties and sold from and after 7:00 a.m. on the Effective Date, (4) obligations for damage to property included in the FWE I Assets or the GOM Shelf Oil and Gas Properties, (5) fines or penalties levied or imposed by governmental authorities after 7:00 a.m. on the Effective Date with respect to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties, (6) P&A Obligations and Decommissioning (as defined in the Plan of Merger) expenses, or (7) obligations satisfied, compromised, settled, released or discharged pursuant to the Plan and Confirmation Order

(iv)     All payables of FWE arising from the exploration of and production and sale of oil and gas from the Retained Properties, including payables to third parties on account of third party working interest owners for which a joint interest billing receivable is included in the accounts receivable of FWE in respect of the Retained Properties (such accounts receivable, the "**Retained Properties AR**"), incurred prior to and unpaid as of 7:00 a.m. on the Effective Date, whether classified on the books and records as an account payable or otherwise (such payables, the "**Retained Properties Payables**"), will also be assumed by, and will constitute Credit Bid Assumed Liabilities of, Buyer pursuant to the Purchase Agreement (and the Retained Properties, and the Retained Properties AR will be assigned to Buyer pursuant to the Purchase Agreement and will constitute Credit Bid Acquired Interests in the same manner as will Closing Accounts Receivable (excluding any obligation of the type described in Section 3(b) of the Plan of Merger). In addition FWE II will assume all obligations on the Retained Properties on a go-forward basis following the consummation of the credit bid sale transaction to the Credit Bid Purchaser.

(v)     FWE (and, following consummation of the Divisive Merger, FWE III) will use efforts consistent with past practice to collect Closing Accounts Receivable (including by offsetting amounts owed to FWE under applicable joint operating agreements or otherwise) and

remit proceeds collected (including by offset), net of any cost of collection incurred by FWE III or FWE I, to Buyer, provided neither FWE III nor FWE I shall be obligated to incur any costs or institute any legal proceedings to collect Closing Accounts Receivable.  Buyer will agree that Buyer and its subsidiaries shall pay (and shall indemnify and hold harmless FWE (and following consummation of the Divisive Merger, FWE I and FWE III) from and against) any and all Credit Bid Assumed Liabilities.

(vi)     The accounts receivable to be assigned to Buyer pursuant to the Credit Bid Purchase Agreement ("**Closing Accounts Receivable**") will include all accounts receivable of FWE attributable to the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger) as of 7:00 a.m. on the Effective Date, including all accounts receivable attributable to the sale of oil or gas produced and sold from the FWE I Oil and Gas Properties or the GOM Shelf Oil and Gas Properties prior to 7:00 a.m. on the Effective Date and joint interest billing receivables for expenses paid by FWE as of 7:00 a.m. on the Effective Date or for which a payable is included in the Closing Date Payables but expressly excluding receivables as described in item (xiv) and clauses (ii)-(v) of item (xvi) of Part A of Schedule I of the Plan of Merger, Prepaid JIB Cash Amount (as defined in the Plan of Merger), and JIB Advance AR (as defined in the Plan of Merger).  The Purchase Agreement will provide that Buyer and its subsidiaries shall pay (and shall indemnify FWE I and FWE III against) any and all Credit Bid Assumed Liabilities.  FWE will also assign the FWE II Retained Properties AR to Buyer as part of the Credit Bid Acquired Interests.

**Exhibit 23**

**Spill Control Membership Agreements**

Deepwater:  HWCG (membership), NRC (MSA)

FW1:  Clean Gulf (membership), Forefront (MSA), and TRG (MSA)

**<u>Exhibit L</u>**
**Organizational Chart**

Case 20-33948   Document 1254-2   Filed in TXSB on 04/09/21   Page 431 of 475

# Fieldwood Energy Organization Chart – Debt Overlay



**Exhibit M**
**Liquidation Analysis**

A.    **Introduction**

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.[1]   This requirement is customarily referred to as the "best interests" of creditors test.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared this hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and the accompanying notes to this Liquidation Analysis.

The first step in determining whether the Plan satisfies the best interests test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the chapter 7 conversion.

The next step is to reduce that gross amount by (i) the costs and expenses of the chapter 7 cases, (ii) the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets up to the value of such assets, and (iii) the amount of additional administrative expense claims and priority claims arising from the use of the chapter 7 process for the purposes of liquidation.  Any remaining Cash would be allocated to unsecured creditors and interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

B.    **Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their financial and legal advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code; it is not intended, and should not be used, for any other purpose.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, to which this exhibit is attached as Exhibit M.

The underlying financial information in the Liquidation Analysis, and the values stated herein, have not been subject to review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions, upon which certain of the assumptions are based, are subject to change. As a result, the actual amount of the Claims against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis. The Debtors have not estimated, and the Liquidation Analysis does not take into account: (i) the tax consequences that may result from the liquidation of the Debtors' assets; (ii) the avoidance of any prepetition liens and recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions; or (iii) certain of the Claims that may be entitled to priority under the Bankruptcy Code, including certain administrative priority Claims under sections 503(b) and 507(b) of the Bankruptcy Code. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in these Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid administrative priority Claims relating to wind-down costs and chapter 7 trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

## C.   Basis of Presentation

This Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to Chapter 7 cases on or about May 1, 2021 (the "Liquidation Date"). It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold, on a piecemeal basis or as a whole, and the Cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) first, to pay wind-down expenses and other Allowed administrative priority Claims; (ii) second, to pay the secured portions of Allowed Claims relating to the respective collateral; and (iii) third, to pay other priority Claims. Any remaining net Cash would be

distributed to creditors holding Allowed general unsecured Claims, including any unsecured deficiency Claims.

### D.   Assumptions and Analysis

The timeframe associated with the liquidation analysis is uncertain and there is no assurance that the recoveries assigned to the assets would in fact be realized.  Under Section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.

In the event of a chapter 7 liquidation, it is likely that a chapter 7 liquidation would (i) incur increased costs and expenses arising from fees payable to the Trustee in bankruptcy and professional advisors to the Trustee, (ii) erode value of any remaining assets in the context of a forced sale or takeover, and (iii) result in the potentially substantial increase in Claims that would dilute creditor recoveries.

**1.   Increased Fees and Expenses.**  This Liquidation Analysis assumes that the Debtors' costs of liquidation under chapter 7 would include the fees payable to the Trustee as well as those fees that might be payable to attorneys and other professionals that the Trustee might engage.  Other liquidation costs include the expenses incurred during the Chapter 11 Cases that are allowed as administrative priority Claims in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims.

**2.   Increased Costs and Additional Claims Incurred by a Delayed Liquidation**.  This Liquidation Analysis assumes the operations of the Debtors will cease and that the Plan construct associated with FWE I, FWE III, the Abandoned Properties and the Credit Bid Acquired Interests would no longer apply.  Each of these groups of properties or assets were evaluated for how they would be treated in a hypothetical chapter 7 liquidation scenario.

For the Credit Bid Acquired Interests, it is assumed that the Prepetition FLTL Lenders, in conjunction with the FLFO Lenders, will credit bid their outstanding debt or otherwise seize their collateral.  The Trustee would be responsible for abandoning or otherwise winding-down all of the Debtors' assets that are not sold or otherwise seized by the Prepetition FLTL Lenders and/or the Prepetition FLFO Lenders, including the FWE I Properties, the FWE III Properties, and the Abandoned Properties.  As a result, the Debtors expect they would need additional funding to wind-down the estates.

For the FWE I Assets, it is assumed that the Apache Implementation Agreement is no longer in place upon a chapter 7 conversion and that the Trustee would attempt to negotiate an alternative agreement with Apache (or other third party) with respect to the Legacy Apache Properties.  It is assumed that the Debtors would continue to remain financially responsible for maintaining the Legacy Apache Properties while such negotiations were pending.  As a result, the Debtors expect that the failure to consummate the Apache Implementation Agreement would substantially increase the costs of administering the FWE I Assets to the Debtors and their estates.

For the Abandoned Properties and FWE III Properties, the plan and timing for abandoning these properties and transitioning to predecessors in the chain-of-title or other responsible parties the plugging and abandonment and decommissioning responsibilities associated with these properties is unclear and not currently knowable without the Plan in place. The Debtors believe, however, that any such transition would be significantly delayed by several months, if not longer, as a result of the Debtors' cessation of operations and the loss and disruption to the Debtors' workforce responsible for facilitating such transition. In addition, the Trustee would likely determine that additional professionals would need to be retained to help aid the Trustee in facilitating such transition. If the Debtors continued to be financially and legally responsible for maintaining the Abandoned Properties and FWE III Properties, it is expected they would incur in excess of approximately $7.5 million in carrying costs each month beyond the Liquidation Date. Further, any litigation associated with abandoning the Abandoned Properties and FWE III Properties would result in additional professional fees and expenses to the Debtors and their estates and additional delays in the transition.

The process of liquidating the Debtors' businesses would also be subject to review by numerous regulatory agencies, including BOEM and BSEE, which would likely further delay the liquidation process. In the event litigation was necessary to resolve claims asserted in the chapter 7 case, such delay would likely be further prolonged and involve additional costs to the Debtors and their estates.

**3. Other Additional Claims.** This Liquidation Analysis further assumes that additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

## E.   <u>Conclusion</u>

The Debtors estimate that, in a chapter 7 liquidation, the aggregate value of all property of the Debtors that is not subject to prepetition liens would total no more than approximately $11 million to $15 million. To provide a recovery to holders of general unsecured Claims, the value of such property would need to exceed the outstanding amounts due under the Debtors' senior secured superpriority postpetition DIP Facility and the estimated Allowed administrative priority Claims that arose in the Chapter 11 Cases and additional Allowed administrative priority Claims arising in the chapter 7 cases.

As detailed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C.  § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 22] (the "<u>DIP Motion</u>"), and as approved in the final order approving the DIP Motion [Docket No. 346] (the "<u>Final DIP Order</u>"), the outstanding amounts owed by the Debtors under the DIP Facility is

secured by a senior lien on effectively all of the Debtors' assets.  It is assumed that as of the Liquidation Date, the Debtors will owe approximately $10 million under the DIP Facility.

In addition to satisfying the $10 million DIP Facility, the estimated amount needed to plug and abandon and decommission the FWE III Properties in a chapter 7 liquidation would likely be substantially greater than the up to $27 million under the Plan currently allocated to plug and abandon and decommission the FWE III Properties, which the Debtors assumed under the Plan would be efficiently and cost-effectively wound-down in the two years after the Effective Date.    Additionally, expenses associated with maintaining the Apache Legacy Properties and the Abandoned Properties, as further described above, would require further incremental funding.  As such, given the shortfall in the value of the Debtors' assets relative to the additional expenses and Claims that would need to be satisfied in full before a recovery could be provided to holders of Allowed general unsecured Claims, it is expected that no distributions would be available for any general unsecured creditors, including the Prepetition SLTL Lenders.

Based on the foregoing, the Debtors believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 liquidation, including all Allowed secured Claims, would be equal to, or less than, the value of distributions provided to each Class under the Plan, and many of the distributions made in a chapter 7 case liquidation would likely not occur until several months after the Liquidation Date, thus lowering the expected value of such distributions.

**<u>Exhibit N</u>**
**Valuation Analysis**

## Estimated Values

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.[1] THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. THIS VALUATION SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for purposes of the *Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (as may be further amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Plan") and the *Disclosure Statement for Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (as may be further amended, modified, or supplemented from time to time, and together with all exhibits and schedules thereto, the "Disclosure Statement"), Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), as financial advisor and investment banker to the Debtors, has estimated the values of the NewCo Entities[2], as well as the FWE I Entities[3], FWE III, and the Abandoned Properties (collectively, the "Subject Entities") pro forma for the transactions contemplated by the Plan.

In particular, Houlihan Lokey has estimated: (i) the enterprise value and implied equity value of the NewCo Entities on a going concern basis (the "NewCo Valuation") and (ii) the Residual Distributable Value (which is determined with reference to the enterprise value of the FWE I Entities (the "FWE I Valuation") and the asset value of FWE III (the "FWE III Valuation")).

In connection with performing the analyses described herein, Houlihan Lokey, among other things: (i) consulted with the Debtors' senior management team regarding the Debtors' assets, operations and future prospects; (ii) reviewed the Debtors' historical financial information; (iii) reviewed the Debtors' internal financial and operating data, including the Debtors' reserves database; (iv) reviewed the Debtors' estimates of plugging and abandonment ("P&A") obligations and the availability of surety bonds and other forms of financial assurance; (v) reviewed the Debtors' asset development plans and the NewCo Projections (as defined

---

[1] Capitalized terms used, but not defined herein, have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

[2] "NewCo Entities" shall be defined in the Plan as, collectively, Credit Bid Purchaser and the entities that wholly-own it, including Intermediate, Holdings, and NewCo. For the avoidance of doubt, the NewCo Entities do not include the FWE I Entities, FWE III, or the Abandoned Properties.

[3] "FWE I Entities" shall be defined in the Plan as, collectively, FWE I and its post-Effective Date subsidiaries, GOM Shelf LLC and FW GOM Pipeline, Inc.

below); and (v) reviewed market data and other publicly available third-party information and conducted other studies, analyses, and inquiries Houlihan Lokey deemed appropriate.

The valuation information set forth in this section is based on the application of standard valuation techniques. The estimated values set forth in this section: (i) do not purport to constitute an appraisal of the assets of the Subject Entities; (ii) do not constitute an opinion on the terms and provisions or fairness from a financial point of view to any person of the consideration to be received by such person under the Plan; (iii) do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan; and (iv) do not necessarily reflect the actual market value that might be realized through a sale or liquidation.

In preparing the estimates set forth below, Houlihan Lokey has relied upon the accuracy, completeness, and fairness of information furnished by the Debtors. Houlihan Lokey did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Debtors or the Subject Entities. Houlihan Lokey did not conduct an independent investigation into any of the legal or accounting matters affecting the Subject Entities, and therefore makes no representation as to their potential impact on the valuation analyses described herein.

The Debtors' financial projections for the NewCo Entities (the "NewCo Projections") and the FWE I Entities (the "FWE I Projections") (collectively, the "Projections") are attached as Exhibit O to the Disclosure Statement. The NewCo Valuation set forth herein assumes that the NewCo Entities will achieve the NewCo Projections in all material respects. The FWE I Valuation set forth herein assumes that the FWE I Entities will achieve the FWE I Projections in all material respects. Houlihan Lokey has relied on the Debtors' representation and warranty that the Projections: (i) have been prepared in good faith; (ii) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (iii) reflect the Debtors' best currently available estimates; and (iv) reflect the good faith judgments of the Debtors. Houlihan Lokey does not offer an opinion as to the attainability of the Projections. As disclosed in the Disclosure Statement, the future results of the NewCo Entities and the FWE I Entities are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Houlihan Lokey, and consequently are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of March 5, 2021. Events and conditions subsequent to this date, including updated Projections or changes to the reserves, estimated decommissioning expenses and timing, as well as other factors, could have a substantial effect upon the estimated values set forth herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the estimated values. For purposes of this valuation, Houlihan Lokey has assumed that no material changes that would affect value will occur between March 5, 2021 and the contemplated Effective Date.

In determining the estimates set forth herein, Houlihan Lokey did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Houlihan Lokey believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the analysis. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

## Valuation Approaches

The following is a summary of analyses performed by Houlihan Lokey to arrive at its recommended range of estimated values for each of the Subject Entities.

### A.    Net Asset Value

The net asset value ("NAV") analysis estimates the value of a subject company using the present value of the cash flows forecasted to be generated by its oil and gas reserves and other assets.

For the purpose of the NewCo Valuation, Houlihan Lokey evaluated the cash flows (after necessary operating and capital expenditures) forecasted to be generated by the NewCo Entities' proved and probable reserve categories, and incorporated the effect of the NewCo Entities' P&A obligations. Houlihan Lokey calculated the present value of these cash flows using a range of discount rates that varied by reserve category. The enterprise value was then determined by incorporating various corporate expenses and other necessary operating items not included in the reserves database, including: facilities and maintenance expense; general and administrative expenses ("G&A"); insurance costs; certain accounts payable incurred by the Debtors and assumed by the NewCo Entities; production handling agreement income; and the items described in the below paragraph titled "Other Sources of Value."

For the purpose of the FWE I Valuation, Houlihan Lokey evaluated the cash flows (after necessary operating and capital expenditures) forecasted to be generated by the FWE I Entities' proved and probable reserve categories, and incorporated the effect of the FWE I Entities' P&A obligations. Houlihan Lokey calculated the present value of these cash flows using a range of discount rates that varied by reserve category. The enterprise value was then determined by incorporating various corporate expenses and other necessary operating items not included in the reserves database, including: facilities and maintenance expenses; G&A expenses; insurance costs; and the effect of the Farmout Agreement.

For the purpose of the FWE III Valuation, Houlihan Lokey determined through analysis of available information and discussions with management that all of the FWE III properties were shut-in as of March 5, 2021 and not anticipated to be returned-to-production prior to their decommissioning. Therefore, Houlihan Lokey ascribed no value to FWE III's reserves. Houlihan Lokey incorporated the effect of FWE III's P&A obligations. Houlihan Lokey did not incorporate G&A expenses or other corporate items because it is anticipated that the Plan

Administrator will engage one or more of the NewCo Entities to decommission the FWE III properties.

For the purpose of the Abandoned Properties Valuation, Houlihan Lokey evaluated the cash flows (after necessary operating and capital expenditures) forecasted to be generated by the Abandoned Properties' proved and probable reserve categories, and incorporated the effect of the Abandoned Properties' P&A obligations. Houlihan Lokey calculated the present value of these cash flows using a range of discount rates that varied by reserve category. Houlihan Lokey did not incorporate G&A expenses or other corporate items because, in connection with the Plan, the Abandoned Properties will be abandoned immediately upon the occurrence of the Effective Date of the Plan.

### B.    Comparable Company Analysis

The comparable company analysis estimates the value of a subject company by comparison to publicly traded companies (each, a "Selected Peer") with characteristics similar to the subject company. Under this approach, the enterprise value for each Selected Peer is determined by examining the trading price(s) of its equity securities and adding either the aggregate amount or market value of its outstanding net debt. Such enterprise value is then commonly expressed as a multiple of key operating and asset metrics (e.g., EBITDA[4], production, and proved developed reserves). The subject company's enterprise value is then calculated by applying the Selected Peer multiples to the subject company's key operating and asset metrics.

For the purpose of the NewCo Valuation, Houlihan Lokey identified Selected Peers based on their business plan, geographic location, reserves characteristics and hydrocarbon composition, profitability, cost profile, scale, and other characteristics deemed relevant. In addition, Houlihan Lokey incorporated in its estimate of enterprise value: certain accounts payable incurred by the Debtors and assumed by the NewCo Entities; and the items described in the below paragraph titled "Other Sources of Value."

Houlihan Lokey did not use the comparable company analysis to estimate the value of the FWE I Entities, FWE III, or the Abandoned Properties due to the absence of publicly traded companies that are comparable to those entities.

### C.    Precedent Transactions Analysis

The precedent transactions analysis estimates the value of a subject company by comparison to previously completed merger and acquisition and divestiture transactions (the "Selected Transactions") involving companies or assets with characteristics similar to the subject company. Under this approach, the value of each Selected Transaction is commonly expressed as a multiple of key operating and asset metrics (e.g., cash flow or production). The subject

---

[4] EBITDA defined as: earnings before interest, taxes, depreciation, depletion, and amortization.

company's value is then calculated by applying the Selected Transaction multiples to the subject company's key operating and asset metrics. To the extent the Selected Transactions relate to asset—rather than corporate—transactions, the subject company's asset value is then adjusted by the present value burden of its corporate items (e.g., G&A expenses) to determine the enterprise value.

For the purpose of the NewCo Valuation, Houlihan Lokey focused on asset transactions and identified Selected Transactions based on their closing date, commodity price environment, geographic location, relative size, reserves characteristics and hydrocarbon composition, P&A characteristics, and other characteristics deemed relevant. Houlihan Lokey incorporated in its estimate of enterprise value (in addition to the items mentioned above) certain accounts payable incurred by the Debtors and assumed by the NewCo Entities; and the items described in the below paragraph titled "Other Sources of Value."

For the purpose of the FWE I Valuation, Houlihan Lokey focused on asset transactions and identified Selected Transactions using criteria similar to those used in the NewCo Valuation, but with a particular emphasis on precedent transactions featuring a relatively high ratio of P&A obligations to reserves value.

Houlihan Lokey did not use the precedent transactions analysis to estimate the value of FWE III or the Abandoned Properties due to a lack of precedent transactions that are comparable to those entities.

###       D.       Other Sources of Value

As noted above, Houlihan Lokey incorporated certain other assets—which are described below—into its analyses. The value of these assets was estimated using standard oil and gas valuation methodologies and was determined to be less than 10% of the NewCo Entities' enterprise value.

- *Fieldwood Mexico*: Pursuant to the Plan, certain of the NewCo Entities will hold a 10% equity interest in Fieldwood Mexico.

- *Farmout Agreement*: Pursuant to the Plan, Credit Bid Purchaser will be party to a Farmout Agreement under which it will have the right for two years to present capital projects to FWE I relating to the Legacy Apache Properties.

### Enterprise Value of NewCo Entities

As a result of the analysis described herein, Houlihan Lokey estimated the enterprise value of the NewCo Entities to be approximately $880 million to $1,170 million, with a mid-point of $1,030 million. The implied equity value range is approximately $690 million to $980 million, with a midpoint of $840 million, based on assumed pro forma net debt of $190 million as of the assumed Effective Date (which comprises the approximately $119 million First Lien

Exit Facility, plus estimated $171 million Second Lien Exit Facility, less approximately $100 million of cash on hand).

## **Residual Distributable Value**

Residual Distributable Value is determined by (i) the value of the membership interests of FWE I; (ii) the value of the membership interests of FWE III; (iii) the amount of cash remaining in the Claims Reserve after the payment of all relevant Allowed Claims and Cure Amounts; (iv) the amount of cash remaining in the Plan Administrator Expense Reserve after the dissolution of the Post-Effective Date Debtors; and (v) the amount of cash remaining in the Professional Fee Escrow after Allowed Fee Claims have been addressed.

Houlihan Lokey estimated the enterprise value of the FWE I Entities to be approximately negative $220 million to positive $170 million, with a mid-point of negative $30 million. Therefore, the membership interests of FWE I are estimated to have no inherent value. However, there is the possibility that the FWE I Entities' asset value could exceed its P&A obligations and other liabilities depending upon future commodity prices, financial assurance, and other factors. As a result, the membership interests of FWE I do have option value, which Houlihan Lokey estimated using a Black-Scholes analysis. Houlihan Lokey's Black-Scholes analysis inputs included (i) for the underlying value input: asset value gross of P&A obligations, net of corporate items such as G&A and insurance, and based on a development program that is more moderate than the one assumed in the FWE I Valuation and which reflects the FWE I Entities' anticipated development activity given liquidity considerations; (ii) for the strike price input: P&A obligations adjusted for certain types of financial assurance; (iii) for the volatility input: a volatility based on the observed historical volatility of certain commodity indices and publicly traded comparable company equities; (iv) for the time-to-expiration input: the estimated weighted-average remaining economic life of producing reserves; and (v) for the risk-free interest rate: the yield of the applicable U.S. Treasury Note.

Houlihan Lokey estimated the enterprise value of FWE III to be approximately negative $31 million to negative $25 million, with a mid-point of negative $28 million. The valuation range reflected Houlihan Lokey's determination that FWE III has no asset value because its wells are currently shut-in and are not anticipated to be returned-to-production prior to being decommissioned. As a result of the analysis described herein, Houlihan Lokey estimated the membership interests of FWE III to have no inherent value and no option value, and therefore to not contribute to Residual Distributable Value.

For the purpose of the Residual Distributable Value analysis, Houlihan Lokey assumed that the amount of cash funded into each of the Claims Reserve, the Plan Administrator Expense Reserve, and the Professional Fee Escrow, is not greater than the amount of payments made in respect of the applicable claims and, therefore, that Residual Distributable Value is not impacted by these reserves and escrows.

As a result of the analysis described above, Houlihan Lokey estimated the Residual Distributable Value to be approximately $19 million, with an estimated potential low value of $0 and an estimated potential high value of $120 million, with such values comprising option value and not inherent value. The non-linear range reflects that the value of an out-of-the-money warrant increases exponentially as underlying value approaches the strike price.

### Additional Considerations

The estimates of value set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations, changes in the financial markets, or changes to the regulatory framework. Additionally, these estimates of value represent hypothetical enterprise and equity values, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Houlihan Lokey's estimated valuation range does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan. The estimated values set forth herein do not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Houlihan Lokey or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**<u>Exhibit O</u>**
**Financial Projections**

**Exhibit O**

**Financial Projections**

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the preparation and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed the ability of the NewCo Entities to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Debtors also analyzed the financial outlook of the FWE I Entities and FWE III.

The Debtors' management team ("Management") prepared the financial projections of the the NewCo Entities (the "NewCo Projections") and the FWE I Entities (the "FWE I Projections") (together, the "Projections") for the period from May 2021 through December 2025 (the "Projection Period"). The Projections are based on a number of assumptions regarding the future performance of Credit Bid Purchaser's and FWE I's operations.

The Debtors' analysis of FWE III is addressed below in the section titled "A. Methodology."

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS, THE NEWCO ENTITIES, OR THE FWE I ENTITIES CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE NEWCO ENTITIES' AND THE FWE I ENTITIES' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors*, to which this exhibit is attached as Exhibit O.

ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS
AND FOOTNOTES.

### General Assumptions

**A.    Methodology**

Management developed a business plan for each of the NewCo Entities and the FWE I
Entities for the Projection Period based on estimates relating to: (i) the forecasted production of oil
and gas reserves; (ii) commodity prices; (iii) hedges; (iv) operating expenses; (v) general and
administrative ("G&A") costs; (vi) capital expenditures and plugging and abandonment ("P&A")
costs; (vii) cash income taxes; (viii) restructuring items; and (ix) capital structure.

The NewCo Projections reflect that the Credit Bid Purchaser is being established as a going
concern entity, with a business plan based on an active new drill development plan and workover
program. The FWE I Projections reflect that the FWE I Entities will operate with a business plan
based on an operating plan commensurate with the ongoing decommissioning of its properties in
accordance with the Apache Definitive Documents.

As of March 5, 2021, the FWE III properties were substantially all shut-in and were
forecasted to generate *de minimis*, if any, production prior to their decommissioning. The costs to
operate and decommission the FWE III properties are reflected in the: (i) $5-15 million of cash to
be funded under the Plan; and (ii) $12-22 million of future commitments from the NewCo Entities.
Therefore the Debtors have not prepared separate financial projections relating to FWE III.

**B.    Presentation**

The NewCo Projections are presented on a consolidated basis with respect to the NewCo
Entities. The FWE I Projections are presented on a consolidated basis with respect to the legal
entities to comprise the FWE I Entities. The Projections assume the consummation of the Plan as
described in the Disclosure Statement.

**C.    Emergence Date**

The Effective Date of the Chapter 11 Cases is assumed to be April 30, 2021.

### Assumptions with Respect to the Projections

**A.    Production**

Production forecasts are based on, among other things, Management's best efforts to
forecast: (i) the decline rate of existing production; and (ii) the performance of wells forecasted to
be developed or otherwise brought online during the Projection Period.

DEBTORS' EX. NO. 5
1543 of 1570

Changes in the NewCo Entities' development plan may have a material impact on the number of wells developed and the forecasted production attributable to such wells. The actual production of existing and new wells could vary considerably from the assumptions used to prepare the NewCo Projections.

### B.  Commodity Pricing

Crude oil prices are based on West Texas Intermediate ("WTI") futures contracts traded on the New York Mercantile Exchange ("NYMEX"). Natural gas prices are based on Henry Hub futures contracts traded on the NYMEX.

Realized oil prices are forecasted by applying the following adjustments to March 5, 2021 WTI futures prices: (i) a premium spread of approximately $1.87 per barrel on average over the projection period for the NewCo Entities and the FWE I Entities to reflect that a portion of the NewCo Entities' and the FWE I Entities' crude oil receives Louisiana Light Sweet ("LLS") pricing; and (ii) a discount of $1.17-1.63 per barrel for the NewCo Entities and $4.00 per barrel for the FWE I Entities to reflect various customary marketing expenses. Realized natural gas prices are forecasted by applying the following adjustments to March 5, 2021 Henry Hub futures prices: (i) a BTU adjustment factor of approximately 105% per MMbtu / Mcf; and (ii) a discount of $0.04 / Mcf for the NewCo Entities and $0.05 / Mcf for the FWE I Entities to reflect various customary marketing expenses. Natural gas liquids ("NGL") prices reflect estimated realizations of approximately 29% of WTI futures for NewCo and 25% of WTI futures for the FWE I Entities, based primarily on historical differentials.

Management's commodity pricing estimates are consistent with its pre-petition and industry practices, and the Debtors believe that they are reasonable under the circumstances. Set forth below are the realized prices underlying the Projections:

### Realized Prices

|  | May - Dec 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|
| **NewCo Entities:** | | | | | |
| Oil Price ($/bbl) | $65.32 | $59.87 | $55.93 | $54.38 | $53.87 |
| Gas Price ($/Mcf) | 3.00 | 2.81 | 2.65 | 2.67 | 2.69 |
| NGL Price ($/bbl) | 18.73 | 17.30 | 16.34 | 15.78 | 15.57 |
| | | | | | |
| **FWE I Entities:** | | | | | |
| Oil Price ($/bbl) | $61.99 | $56.23 | $52.56 | $50.53 | $49.61 |
| Gas Price ($/Mcf) | 2.95 | 2.75 | 2.61 | 2.60 | 2.60 |
| NGL Price ($/bbl) | 15.96 | 14.58 | 13.68 | 13.19 | 12.96 |

4

C.    **Hedging**

As of March 5, 2021 the Debtors had not hedged any oil or natural gas volumes beyond the end of April 2021.

D.    **Operating Expenses**

Operating expenses include: (i) direct operating expenses; (ii) repair and maintenance expenses ("R&M"); (iii) transportation expenses; (iv) workover expenses; and (v) insurance expenses. The Projections reflect Management's estimates of these costs.

E.    **General and Administrative**

G&A costs include: (i) personnel; (ii) rent; and (iii) other corporate overhead costs necessary to manage the business and comply with regulatory requirements. The Projections reflect Management's estimates of these costs. A portion of the NewCo Entities' G&A costs are forecasted to be expensed and a portion are forecasted to be capitalized. The FWE I Entities' G&A costs are forecasted to be expensed.

F.    **Capital Expenditures & Plugging and Abandonment Costs**

The NewCo Entities' forecasted capital expenditures include: (i) deepwater drilling and completion ("D&C") activity and well stimulations; (ii) shelf recompletions; (iii) facilities, seismic, and land expenditures; and (iv) non-drilling related expenditures. The NewCo Projections reflect Management's estimates of the costs for each project.

The FWE I Entities' forecasted capital expenditures include: (i) recompletions; and (ii) facilities, seismic, and land expenditures.

P&A costs reflect Management's estimate of the P&A activities and costs to be incurred by the NewCo Entities and the FWE I Entities. During the Projection Period, the NewCo Entities are forecasted to pay approximately $28.0 million of P&A costs. During the Projection Period: (i) the FWE I Entities are forecasted to pay approximately $215.1 million of P&A costs; and (ii) it is anticipated that additional P&A costs will be addressed pursuant to the Decommissioning Agreement and the separate security provided thereunder.

Set forth below are the forecasted capital expenditures and P&A costs during the Projection Period:

**Capital Expenditures and P&A Costs**

|  | May - Dec 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|
| **NewCo Entities:** | | | | | |
| D&C & Recompletion | $3.9 | $82.6 | $102.9 | $136.9 | $91.4 |
| Facilities, Seismic, & Land | 15.5 | 13.0 | 13.0 | 13.0 | 13.0 |
| Remaining CapEx Items | 8.8 | 0.0 | 8.8 | 0.0 | 8.8 |
| **Total Capital Expenditures** | **$28.2** | **$95.6** | **$124.7** | **$149.9** | **$113.2** |
| P&A | $4.7 | $5.6 | $5.9 | $5.9 | $5.9 |
| **Total CapEx & P&A** | **$33.0** | **$101.2** | **$130.7** | **$155.8** | **$119.1** |
|  | | | | | |
| **FWE I Entities:** | | | | | |
| Recompletion | $23.4 | $30.0 | $30.0 | $30.0 | $30.0 |
| Facilities, Seismic, & Land | 5.5 | 5.4 | 5.4 | 3.9 | 3.9 |
| **Total Capital Expenditures** | **$28.9** | **$35.4** | **$35.4** | **$33.9** | **$33.9** |
| P&A | $77.3 | $75.8 | $34.3 | $19.5 | $8.2 |
| **Total CapEx & P&A** | **$106.2** | **$111.2** | **$69.7** | **$53.3** | **$42.1** |

### G. Cash Income Taxes

For U.S. federal income tax purposes, each NewCo Entity is (i) treated as an association taxable as a corporation and (ii) a member of the consolidated group of which NewCo is the common parent. Accordingly, NewCo will be responsible for the payment of any U.S. federal income taxes owed on account of the taxable income of the NewCo Entities (including the Credit Bid Purchaser). During the Projection Period, the amount of cash U.S. federal income taxes to be paid by NewCo is forecasted to be zero.

For U.S. federal income tax purposes, FWE I is treated as an entity disregarded as separate from FWE Parent. Accordingly, FWE I is not a separate taxpayer and FWE Parent is liable for the payment of any U.S. federal income taxes owed on account of the taxable income of FWE I, taking into account the other items of income, gain, loss, and deduction of FWE Parent. During the Projection Period, the amount of cash U.S. federal income taxes to be paid by FWE Parent on account of its ownership of FWE I is forecasted to be zero.

### H. Restructuring Items

Management, in consultation with the Debtors' advisors, has identified restructuring-specific items to be assumed by the NewCo Entities, including: (i) net working capital items incurred by the Debtors during the post-petition period (estimated to be approximately $47 million

6

as of the date hereof); (ii) future commitments to FWE III; and (iii) certain employee claims, among other items.

### I.        Capital Structure

The NewCo Projections reflect the First Lien Exit Facility and the Second Lien Exit Facility on the terms described in the Plan. The NewCo Entities are forecasted to have approximately $100 million of cash on hand on the Effective Date pro forma for the transactions contemplated by the Plan. The key sources and uses that determine the amount of the NewCo Entities' cash on hand on the Effective Date include, among other things: (i) the Debtors' cash balance immediately prior to the Effective Date; (ii) the amount of cash to be funded into the Claims Reserves (including the Professional Fee Escrow) and Plan Administrator Expense Reserve; (iii) other restructuring transaction costs, including, among others, the capitalization amount provided to FWE I, the repayment of Allowed DIP Claims and hedge claims (if any), initial cash payments to FWE III, and the General Unsecured Claims Cash Pool; and (iv) the net proceeds from the Exit Facilities and the equity rights offering.

The FWE I Entities are forecasted to have approximately $25 million of unrestricted cash on hand on the Effective Date pro forma for the transactions contemplated by the Plan. In addition, the FWE I Entities are forecasted to benefit from an approximately $48 million positive working capital adjustment following the Effective Date. In addition, under the Decommissioning Agreement, separate security has been previously provided to secure plugging, abandonment, and decommissioning obligations associated with the Legacy Apache Properties, including $238 million of Trust A cash and approximately $498 million in letters of credit and surety bonds (payable in accordance with their terms and conditions). Moreover, Apache will provide liquidity in the form of up to $400 million of proceeds to be used by the FWE I Entities to perform plugging, abandonment, and decommissioning in accordance with the terms and conditions of the Standby Credit Facility Documents.

DEBTORS' EX. NO. 5
1547 of 1570

## NewCo Projections

| ($ millions) | May - Dec 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Daily Net Production (mboe/d) | 31 | 30 | 37 | 32 | 33 |
| *% Liquids* | *82%* | *81%* | *81%* | *80%* | *79%* |
| **Total Revenue** | **$408** | **$535** | **$617** | **$516** | **$523** |
| **Operating Expense:** | | | | | |
| Direct Operating | ($58) | ($99) | ($114) | ($96) | ($99) |
| R&M | (11) | (15) | (14) | (14) | (14) |
| Transportation | (13) | (23) | (33) | (29) | (31) |
| Workover | (31) | (19) | (19) | (19) | (19) |
| Insurance | (12) | (18) | (18) | (18) | (18) |
| **Total Operating Expenses** | **($124)** | **($173)** | **($198)** | **($176)** | **($181)** |
| G&A | ($12) | ($18) | ($18) | ($18) | ($18) |
| Hedge Gain / (Loss) | - | - | - | - | - |
| **EBITDA** | **$272** | **$344** | **$401** | **$322** | **$323** |
| Cash Income Taxes | - | - | - | - | - |
| Capitalized G&A | (17) | (25) | (25) | (25) | (25) |
| Capital Expenditures | (28) | (96) | (125) | (150) | (113) |
| P&A | (5) | (6) | (6) | (6) | (6) |
| Change in NWC | 1 | 17 | (3) | (4) | 4 |
| Restructuring Items | (51) | (17) | - | - | - |
| **Unlevered Cash Flow** | **$172** | **$218** | **$242** | **$137** | **$182** |
| Cash Interest | ($16) | ($21) | ($19) | ($18) | ($17) |
| Amortization | (19) | (33) | (15) | (15) | (15) |
| **Levered Cash Flow** | **$138** | **$164** | **$207** | **$104** | **$150** |
| **Cash Balance** | | | | | |
| Beginning Cash | $100 | $238 | $402 | $610 | $714 |
| Levered Cash Flows | 138 | 164 | 207 | 104 | 150 |
| **Ending Cash** | **$238** | **$402** | **$610** | **$714** | **$864** |
| **Key Metrics** | | | | | |
| First Lien Exit Facility Debt | $100 | $68 | $53 | $38 | $23 |
| Net First Lien Exit Facility Debt | NM | NM | NM | NM | NM |
| Total Debt | $271 | $239 | $224 | $209 | $194 |
| Net Total Debt | 33 | NM | NM | NM | NM |
| First Lien Exit Facility Leverage Ratio[2] | 0.2x | 0.2x | 0.1x | 0.1x | 0.1x |
| Total Leverage Ratio[2] | 0.7x | 0.7x | 0.6x | 0.7x | 0.6x |
| LTM EBITDA / Interest Expense[2] | 26.0x | 15.3x | 19.7x | 16.3x | 17.2x |
| Net First Lien Exit Facility Leverage Ratio[2] | NM | NM | NM | NM | NM |
| Net Total Leverage Ratio[2] | 0.1x | NM | NM | NM | NM |
| Cash | $238 | $402 | $610 | $714 | $864 |

---

[2] May - Dec 2021 leverage metrics are based on annualized EBITDA.

8

## **FWE I Projections**

| ($ millions) | **May - Dec 2021** | **2022** | **2023** | **2024** | **2025** |
|---|---|---|---|---|---|
| Daily Net Production (mboe/d) | 28 | 27 | 25 | 24 | 22 |
| *% Liquids* | *67%* | *62%* | *57%* | *54%* | *52%* |
| **Total Revenue** | **$309** | **$379** | **$321** | **$279** | **$250** |
| | | | | | |
| **Operating Expense:** | | | | | |
| Direct Operating | ($133) | ($173) | ($167) | ($156) | ($148) |
| R&M | (23) | (30) | (26) | (19) | (15) |
| Transportation | (8) | (10) | (8) | (7) | (5) |
| Workover | (6) | (8) | (7) | (6) | (5) |
| Insurance | (8) | (11) | (10) | (8) | (8) |
| **Total Operating Expenses** | **($179)** | **($232)** | **($218)** | **($195)** | **($181)** |
| G&A | ($22) | ($33) | ($32) | ($31) | ($30) |
| Hedge Gain / (Loss) | - | - | - | - | - |
| **EBITDA** | **$108** | **$115** | **$71** | **$54** | **$40** |
| | | | | | |
| Cash Income Taxes | - | - | - | - | - |
| Capitalized G&A | - | - | - | - | - |
| Capital Expenditures | (29) | (35) | (35) | (34) | (34) |
| P&A[3] | (77) | (76) | (34) | (19) | (8) |
| Change in Net Working Capital | 48 | (3) | (2) | (4) | (2) |
| **Unlevered Cash Flow** | **$50** | **-** | **-** | **($3)** | **($4)** |
| | | | | | |
| Cash Interest | - | - | - | - | - |
| **Levered Cash Flow** | **$50** | **-** | **-** | **($3)** | **($4)** |
| | | | | | |
| **Unrestricted Cash Balance[4]** | | | | | |
| Beginning Balance | $25 | $75 | $75 | $75 | $72 |
| Levered Cash Flows | 50 | - | - | (3) | (4) |
| **Ending Balance** | **$75** | **$75** | **$75** | **$72** | **$68** |

---

[3] Additional decommissioning activities may be performed in accordance with the Decommissioning Agreement to the extent of available security.

[4] Excludes Trust A cash.

9

**<u>Exhibit P</u>**
**Chevron Term Sheet**



Thomas R. Lamme
*Senior Vice President and General Counsel*
*Direct: 713-969-1107*
*Email: TLamme@fwellc.com*

March 22, 2021

**VIA EMAIL**

Jennifer M. Welshons
Counsel
Chevron North America Exploration and Production Company
(a division of Chevron U.S.A. Inc.)
1400 Smith Street
Houston, TX  77002

  Re:  *Fieldwood/Chevron Term Sheet*

Dear Ms. Welshons:

Attached as <u>Exhibit A</u> is the agreed upon term sheet dated March 22, 2021, by and between Fieldwood Energy LLC ("**Fieldwood**") and Chevron U.S.A. Inc. ("**Chevron**" and, together with Fieldwood, the "**Parties**") supporting the restructuring of the portion of Fieldwood's business relating to certain assets described therein as the "FWE IV Assets" (the "**Fieldwood/Chevron Term Sheet**").

By executing this letter agreement, each of the undersigned Parties agrees (i) to work to implement the terms of the Fieldwood/Chevron Term Sheet and (ii) to negotiate the definitive documents described therein in good faith and in accordance with the terms of the Fieldwood/Chevron Term Sheet.

The Parties may execute and deliver this letter agreement by electronic reproduction and in multiple counterparts, each of which shall constitute an original and all of which shall be one and the same document.  This letter agreement shall be governed by the laws of the State of Texas without regard to any choice of law principles.

Regards,

*Thomas R. Lamme*

Thomas R. Lamme
Senior Vice President and General Counsel

Enclosure

cc:  Michael T. Dane, *via email* MDane@Fwellc.com

IN WITNESS WHEREOF, the undersigned Parties have executed this letter agreement as of the date first written above.

**FIELDWOOD ENERGY LLC**

By: _Thomas R. Lamme_____
Name: Thomas R. Lamme
Title: Senior Vice President and General Counsel

[Fieldwood Signature Page to Letter Agreement]

**CHEVRON U.S.A. INC.**

By: _____
Name: Ryan G. Schneider
Title: Land Management Officer

**EXHIBIT A**

FIELDWOOD/CHEVRON TERM SHEET

*This Term Sheet is an expression of interest only and creates no legally binding commitment by either party to negotiate any specific transaction or enter into any agreement. It is expressly understood that no liability or obligation of Fieldwood or Chevron of any nature whatsoever is intended to or will be created hereunder with respect to this Term Sheet or related discussions or writings or the transactions contemplated hereby and that this Term Sheet is neither a contract nor a binding offer. It is understood and agreed that any transaction is expressly conditioned, among others, upon approval by Fieldwood and Chevron, the execution and delivery by Fieldwood and Chevron or their affiliates of definitive written agreements, in form and substance satisfactory to Fieldwood and Chevron in their sole discretion, and the satisfaction of the conditions set forth therein. Fieldwood and Chevron expressly agree that this Term Sheet does not contain all terms that would be required to be agreed to in order to enter into any definitive agreement. Each party is responsible for its own costs and expenses, including those of its legal advisors in conjunction with this Term Sheet.*

| CHEVRON / FIELDWOOD COMMERCIAL TERM SHEET |
|---|

Fieldwood Energy LLC ("**FWE**") to create a new entity, Fieldwood Energy IV LLC ("**FWE IV**"), via a Texas divisive merger.

**I. Term Sheet Expiration Date**

FWE and Chevron U.S.A. Inc ("**CUSA**") shall work together in good faith to negotiate the definitive documents contemplated below and any other agreements required to implement the transaction contemplated in this Term Sheet, in each case in accordance with the terms and conditions set forth herein ("**Definitive Documents**"), provided that  this Term Sheet shall terminate if the parties have not fully agreed and finalized all such required Definitive Documents on or before midnight one business day before the deadline for filing objections to the o the Plan Confirmation Hearing as scheduled by the bankruptcy court for In Re: Fieldwood Energy LLC, et al, Chapter 11, Case No. 20-33948 (MI) (the "**Bankruptcy**") ("**Termination Date**").

**II. Condition Precedent to Effectiveness**

In addition to any other conditions precedent that may be agreed by the parties, it shall be a condition precedent to the effectiveness of the Definitive Documents that FWE IV will have been granted to the satisfaction of the parties to the Definitive Documents all necessary approvals by applicable regulatory authorities to act as a qualified operator in the Gulf of Mexico for the FWE IV Assets (as defined below) for which it will be required to assume operatorship under the Definitive Documents.  In the event that FWE IV has not been granted such approval(s) by the Termination Date, but the Definitive Documents have been finalized as of the Termination Date, the effective date of the Definitive Documents shall be automatically extended on a day-by-day basis until all such approval(s) are received (or until such condition is waived by CUSA, at its sole discretion); provided that, in the event FWE IV has not been granted all such approvals by July 1, 2021, this Term Sheet and any and all executed Definitive Documents shall automatically terminate on such date. For the avoidance of doubt, in no event shall the failure to finalize and execute any Definitive Document result in any such extension after the Termination Date.

**III. Withdrawal of Objection**

In conjunction with the execution of this Term Sheet or promptly thereafter, FWE and CUSA will enter into a mutually agreed stipulation and order that will provide, among other things, that: (i) with respect to the Disclosure Statement For Joint Chapter 11" filed by FWE on January 1, 2021, as amended, in the Bankruptcy (the "**Disclosure Statement**"), CUSA will withdraw its objection to the approval of the Disclosure Statement filed February 12, 2021, upon filing the stipulation, and (ii) CUSA will not refile the objection or any other objection to FWE's Disclosure Statement or Plan of Reorganization at any time prior to the Termination Date.

DEBTORS' EX. NO. 5
1555 of 1570

**IV. FWE IV Assets**

Assets to be allocated to FWE IV are restricted to the rights, title and interests in specific FWE IV assets and the liabilities and obligations associated with those designated assets as described herein.  FWE IV shall be the designated operator for the assets allocated to it herein, unless otherwise expressly agreed by the parties. "**Closing**" shall take place in conjunction with the effectiveness of the divisive merger and simultaneous execution and delivery of the Definitive Documents, subject to and following due diligence review of the assets by CUSA, as described below.

*Designated FWE IV Assets*

At Closing, FWE shall allocate to FWE IV certain interests in the leases assigned previously to FWE by CUSA (and its predecessors and affiliates) as described in Exhibit "A" attached hereto, which are a portion of the interests acquired from CUSA that are described in the Abandoned Properties category under the FWE Disclosure Statement, or as otherwise agreed.

FWE IV assets will include the oil and gas leases contributed to FWE IV in accordance with the foregoing (or the section below on Agreed FWE III (Winddown Leases)), together with the platforms, wells, pipelines and equipment (including production equipment) located on and attributable to the CUSA interest in such leases, and any hydrocarbons produced from such leases, if applicable (collectively "**FWE IV Assets**").

*Agreed FWE III (Winddown Leases)*

FWE IV will not be allocated any FWE leases that are currently allocated to Fieldwood Energy III LLC ("**FWE III**") in the Disclosure Statement (the "**FWE III (Winddown Leases)**"); provided that a particular FWE III (Winddown Lease) scheduled on Exhibit B attached hereto may be allocated to FWE IV under the following circumstances: (i) if such lease is required by the government to be replaced by other leases during the Chapter 11 process, or (ii) if CUSA and FWE agree to have such lease allocated to FWE IV.  For the avoidance of doubt, CUSA or an affiliate must be a predecessor in the chain of title as noted on BOEM's Serial Register Page of any FWE III (Winddown Lease) lease/asset allocated to FWE IV.

If any such FWE III (Winddown Leases) leases/assets are to be allocated to FWE IV in accordance with (i) in the preceding, then an amount not less than 50% of FWE's predecessor-in-interest share of the funding designated and allocated to FWE III for decommissioning such lease/asset; or, if such lease/asset is allocated to FWE in accordance with (ii) in the preceding, then the agreed upon amount of funding designated and allocated to FWE III for decommissioning such lease/asset ( in either case, the "**FWE III Lease Payment Amount**") shall be paid by FWE into the  Escrow Account for general use at Closing.

**V. FWE IV Governance and Operations**

*Divisive Merger*

FWE IV will be a new Texas limited liability company formed via the divisive merger of FWE (an existing Texas limited liability company) after conversion from a Delaware limited liability company.  FWE IV will be allocated all FWE IV Assets, identified in accordance with the terms hereof, and all associated operating and decommissioning liabilities allocated to FWE IV via a Plan of Merger.  All other assets or liabilities of FWE will remain with a FWE entity and/or be allocated to or assumed and assigned by the various entities described in the Bankruptcy.  To the extent any of the oil and gas leases contained within the FWE IV Assets are terminated leases and as such not transferable, or are not transferrable for any other reason, CUSA and FWE shall negotiate in good faith in order to determine a mutually agreeable structure whereby FWE IV shall be allocated or otherwise obtain certain agreed rights

and obligations associated with such oil and gas leases and the FWE IV assets relating thereto, including, if applicable, the right to act as decommissioning contractor for such FWE IV assets and contractual rights to recover against predecessors-in-interest, surety bond providers and other applicable persons.

*LLC Company Agreement (LLC Agreement)*

Operating agreement of FWE IV addressing governance, management and funding of FWE IV executed at closing. Terms and conditions will include, among others:

1.   Fieldwood Energy Inc. will be sole member and owner of FWE IV.

2.   Sole Manager hired, with approval of CUSA, will be sole officer and employee of FWE IV and will run FWE IV in accordance with the terms of the LLC agreement.

3.   CUSA will have certain consent rights under LLC Agreement, enforceable in its capacity as a third party beneficiary to the agreement.

4.   Sole purpose of the company will be to wind-down and decommission FWE IV Assets.

5.   FWE IV must obtain prior written consent of CUSA before conducting any of the following activities:

   •   Engage in any business or activity other than plugging and abandoning the FWE IV Assets and/or, if applicable, maintaining current production on the FWE IV Assets,

   •   Use revenue or free cash flow for any purpose other than for funding Permitted Third Party Costs, Permitted LOE Charges and, if applicable, payment into the Escrow Account relating to the decommissioning of the FWE IV Assets,

   •   Approve any decommissioning plan for the FWE IV Assets and/or retain any other decommissioning subcontractor other than the NewCo,

   •   Incur any indebtedness,

   •   Replace, remove or change the powers of the Sole Manager,

   •   Replace or remove the NewCo under the Contract Operator Agreement or amend, waive or fail to enforce any provision of the Contract Operator Agreement,

   •   Divest any of the FWE IV Assets or acquire any other assets, or

   •   Declare bankruptcy, liquidate or otherwise terminate the existence of the company or any of its subsidiaries.

6.   FWE IV will provide CUSA with regular informational updates from FWE IV, including monthly and quarterly financial reports and an annual financial audit by an independent accountant approved by CUSA; provided that Ernst and Young is deemed to be pre-approved as an independent accountant.

7.   As a condition precedent to the effectiveness of the Turnkey Removal Agreement (and the other Definitive Documents), FWE IV will become a qualified operator in the Gulf of Mexico.

8.   FWE and CUSA will coordinate as appropriate to assist FWE IV on bonding requirements, with costs allocated in "*Funding and Cost Allocation*", below.

9.  FWE IV will use reasonable efforts to obtain reimbursement/contribution for decommissioning activity that is available under contract or applicable law, including as to predecessors-in-interest to the extent practicable and available surety bonding.[1]

10. FWE IV shall obtain the written consent of CUSA prior to entering settlement negotiation(s) or agreeing to a settlement and/or initiating dispute resolution, including with respect to obtaining contributions from predecessor-in-interest for decommissioning or funds from surety bonds for decommissioning.

11. The costs and expenses associated with the formation and administration of FWE IV and the operations conducted by the company shall be allocated as to forth under "*Funding and Cost Allocation*", below.

*Funding and Cost Allocation*

1.  FWE will be responsible for all costs associated with formation of FWE IV in connection with the divisive merger.  Funds required for the ongoing operations of FWE IV shall be provided as set forth in "Contract Operator Agreement and Operating Costs", below.

2.  FWE will provide all funds for any premiums for organizational/areawide bonding requirements.

## VI. Turnkey Removal Agreement

1.  CUSA, FWE IV and NewCo to enter into the Turnkey Removal Agreement whereby, upon agreement of the price for a decommissioning project, NewCo will decommission the FWE IV Assets on a lump sum, turnkey payment basis, and NewCo will earn a single pre-agreed payment (turnkey amount) in exchange for completing such decommissioning project. NewCo will have profit opportunity if it is able to perform a decommissioning project for lower cost than the pre-agreed turnkey amount, and NewCo will bear the risk that the costs of a decommissioning project exceeds the pre-agreed turnkey amount. All such turnkey amounts shall be determined on a 100% (gross) basis and shall cover all costs, expenses and overhead associated with a particular decommissioning project, including all third party costs, any fixed and/or capital costs, tax, etc.

2.  At Closing, the parties shall determine the turnkey amounts for all decommissioning projects under the Turnkey Removal Agreement (leases operated by FWE IV) and shall agree on the decommissioning projects scheduled to be conducted during the first year after Closing under the Turnkey Removal Agreement, all of which shall be attached to the Turnkey Removal Agreement.  Additionally, the parties shall agree on certain qualified conditions for the decommissioning projects ("**Qualified Conditions**"), which such Qualified Conditions, if present, can, at the election of either NewCo or CUSA, as applicable, and subject to the notice requirements set forth in the Definitive Documents, cause the parties to adjust the applicable turnkey amount for a particular project or agree on alternative cost arrangement; provided that such Qualified Conditions shall be set forth in the Definitive Documents and shall be limited to (i) material changes in government regulations that can reasonably be expected to materially increase or decrease the applicable cost of decommissioning a particular project and (ii) as otherwise mutually agreed in the Definitive Documents to by the parties.  In the event the parties are unable to agree to the adjusted turnkey amount or an alternative cost arrangement due to an occurrence of a Qualified Condition, the parties shall follow the method set forth in the Definitive Documents.

4

3.     For all decommissioning projects to be conducted after the first anniversary of Closing, at least 90 prior to each anniversary of Closing, NewCo will provide CUSA final turnkey amounts for decommissioning projects to be completed in the next successive 12-month period, which final amounts may be the same or updated from the original schedule. Such amounts shall become the agreed upon turnkey amounts for the applicable 12 month period if such amount has not been updated from the original scheduled amount or if CUSA does not object in writing to an updated turnkey amount within 30 days of delivery of the final turnkey amounts. The parties will work in good faith to agree on a final turnkey amount; provided that, if the parties fail to reach agreement on a final turnkey amount for a particular project within 30 days of such objection, the parties shall follow the method set forth in the Definitive Documents. FWE IV will work in good faith with CUSA to determine applicable sources of committed third party funding payments on an asset-by-asset basis prior to commencement of the work for a particular decommissioning project, including (i) available bonds, and (ii) contributions from predecessors-in-interest.

4.     Services provided by NewCo pursuant to the Turnkey Removal Agreement will include performing decommissioning operations to an agreed operational and regulatory performance standard on behalf of FWE IV on agreed terms and conditions. For purposes of clarity, FWE and CUSA agree that NewCo will meet such required standard if it performs such decommissioning operations consistent with required laws, rules and regulations promulgated by governing regulatory agencies, including but not limited to BOEM and BSEE, and consistent with any applicable third party contracts (the "**Performance Standards**").

5.      For each decommissioning project, CUSA shall pay its share of the agreed turnkey payment (as described in "*Funding Obligations and Cost Allocation*", below) into the Escrow Account when FWE IV has received funds or secured a contractual commitment (such as AFE approval) for full funding of the applicable decommissioning project.

6.     Newco shall not undertake the applicable decommissioning project until full funding of the applicable turnkey amount has been agreed to by CUSA and NewCo, including receiving funds or securing a contractual commitment (such as an AFE approval) from applicable third parties, including any Other FWE Party (defined below). Subject to 7 below, CUSA shall authorize, and NewCo shall receive, payment of the full agreed turnkey amount from the Escrow Account (as payment on behalf of FWE IV) upon delivery to FWE IV and CUSA of the filings and other evidence required by BOEM and BSEE or any other applicable governmental authority, including requisite approvals or regulatory concurrence, to support NewCo's representation that all decommissioning obligations with respect to the applicable assets have been satisfied.

7.     If any individual asset subject to the Turnkey Removal Agreement results in an agreed turnkey amount in excess of $5 million or if the aggregate amount of agreed turnkey amounts in effect at any one time for multiple assets subject to the Turnkey Removal Agreement is in excess of $10 million, NewCo and CUSA will agree on milestone payments to be paid in the above manner upon completion of interim decommissioning activities. In no event shall milestone payments equal 100% of the total turnkey amount. Payment of a final percentage of the agreed turnkey amount of 25% shall remain in the applicable Escrow Account until completion of the work in accordance with the terms of the Turnkey Removal Agreement.

DEBTORS' EX. NO. 5
1559 of 1570

8.    CUSA retains the right to terminate the Turnkey Removal Agreement as to a particular asset and/or require FWE IV to competitively bid the decommissioning services with respect to a particular asset in the event NewCo is unable to (or otherwise fails to) perform the services in compliance with Government issued timelines or in the event NewCo is in breach of the Turnkey Removal Agreement, including, but not limited to, the Performance Standards with respect to a particular asset.  In the event of termination, CUSA shall be refunded any funds deposited in the Escrow Account for the particular asset decommissioning.

9.    With respect to certain FWE IV Assets for which such activities will be required or otherwise advisable / agreed at Closing, NewCo will perform , and FWE IV will engage NewCo to perform and will reimburse or otherwise pay up to $5 million for, operations necessary to safe-out and otherwise perform preparatory activities to put such FWE IV Assets into a mechanical and operational state such so that they are ready to be decommissioned (up to the $5 million cap on these costs, "**Initial Safe Out**"); provided that NewCo shall not be required to perform any such work without funding therefor from either FWE IV or CUSA.

*Funding Obligations and Cost Allocation*

1.    CUSA will pay 100% of the turnkey amount agreed by the parties to be owed by CUSA for a particular FWE IV Asset decommissioning project when due; provided that in the event there are any other current working interest owner(s) with an interest in the applicable decommissioning project (or the underlying lease or assets), including FWE I or any other entity surviving the FWE divisive merger at Closing, whether as a co-working interest owner in an asset or otherwise ("**Other FWE Party**"), CUSA shall only be required to pay its predecessor-in-interest share of the FWE IV working interest percentage share of the applicable turnkey amount.   In the event there are other predecessors-in-interest to the FWE IV Asset (excluding CUSA and the predecessors to CUSA), CUSA shall have the right to elect whether or not to pay 100% of the turnkey amount prior to commencement of work.

2.    CUSA's obligation to pay the turnkey amount for a particular decommissioning project (or its applicable share of the turnkey amount if there are other current working interest owners) shall be subject to reduction (and/or reimbursement) in conjunction with the following (each, a "**CUSA Payment Reduction**"):

    a.    CUSA's obligation to pay the turnkey amount shall be reduced by any funds or contributions that FWE IV secures or otherwise collects from other predecessors-in-interest or otherwise with respect to CUSA's share of the turnkey amount or, if any such funds are collected after the turnkey amount is paid in full, such amounts shall be paid to CUSA as reimbursement such that CUSA's funded amount is equal to its predecessor-in-interest percentage for the particular decommissioning project.

    b.    In the event that there are any funds received from NPI Revenue Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay a particular turnkey amount.

    c.    In the event that there are any funds associated with any FWE III Lease Payment Amounts available in the Escrow Account, CUSA shall have the option to utilize such funds to reduce its obligation to pay the FWE III (Winddown Lease) decommissioning turnkey amount or be provided to FWE IV for general use.

    d.    In the event that CUSA is in breach of any of its obligations under a Definitive Document, CUSA Payment Reduction shall exclude subparts (b) and (c) above.

DEBTORS' EX. NO. 5
1560 of 1570

3.  FWE will contribute at Closing $5,000,000 into the FWE IV Escrow Account to cover the Initial Safe Out.  FWE IV will pay NewCo for performing the Initial Safe Out upon completion of individual works scopes with such funds from the Escrow Account; Newco shall not be required to undertake any work scopes if funds therefor are not already in the FWE IV Escrow Account.

4.  In no event shall CUSA be required to pay for or otherwise contribute funds in relation to (and no funds in the applicable Escrow Account or any other contribution by CUSA shall be used in any manner for) any of the following ("**Excluded CVX Costs**"):

    a.  Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by FWE IV-

    b.  Any costs , damages, fines, penalties or liabilities owed to third parties, governmental fines and penalties, environmental liabilities, employment claims and/or any costs, expenses, claims or other liability relating to action taken by NewCo in breach of, and subject to, the Turnkey Removal Agreement or Contract Operating Agreement or arising due to the negligence, gross negligence or willful misconduct of NewCo and

    c.  Any costs, damages, fines, penalties or liabilities related to any orphan assets on the FWE IV Assets (as determined with reference to CUSA's predecessor interest in the applicable assets - FWE and CUSA will reasonably agree to the applicable definition of orphan assets).

5.  NewCo shall be responsible for, and otherwise pay, or pay or reimburse FWE IV for, any Excluded CVX Costs arising under 4(b) or 4(c) above.

**VII. Contract Operator Agreement and Operating Costs**

1.  FWE IV and NewCo will enter into a Contract Operator Agreement whereby NewCo manages the administrative and corporate expenses of FWE IV along with the FWE IV Assets for a period of 5 years, subject to agreed-upon conditions for assignment.

2.  Management of the properties shall include, but not be limited to, as services provided: Operations, Production Marketing (for assets that are producing), Accounting and Land Administration.

*Funding Obligations and Cost Allocation*

1.  NewCo will manage the FWE IV Assets at no charge to FWE IV, and NewCo shall bear all amounts associated with such activity, including any corporate activity and administrative overhead of FWE IV, in conjunction with such management obligation, other than any third party costs.  If circumstances change (including changes to the assets or regulations covering operations), NewCo may charge a reasonable, mutually agreed fee for such services.  The parties agree that third party costs associated with the operations of the FWE IV Assets or management of FWE IV, but not including overhead costs, such as rent or equipment lease payments ("**Permitted Third Party Costs**") shall be paid by funds from the Escrow Account and shall be billed directly to FWE IV.  To the extent that any Permitted Third Party Costs are not covered by available funds from the Escrow Account, CUSA shall reimburse and contribute such Permitted Third Party Costs to the Escrow Account on a monthly basis in arrears.

2.  Notwithstanding Item 1 above, to the extent FWE IV or NewCo, through a shared services agreement, incurs lease operating expenditures associated with a permitted operation on or

in relation to a particular FWE IV Asset that would properly be chargeable as OPEX under a joint operating agreement (e.g., lease operating expenses), including, but not limited to, costs related to visitation fees, insurance costs, repair and maintenance, or safe-out costs ("**Permitted LOE Costs**"), such Permitted LOE Costs shall be paid for first by funds from revenue generated from the FWE IV Assets and then by CUSA by payment into the Escrow Account on a monthly basis in arrears; provided that, in the event that a particular lease or asset has co-working interest owners, any obligation to contribute Permitted LOE Costs (whether from the Escrow Account or otherwise) shall be limited to the proportionate share of such costs corresponding to FWE IV's working interest.  For the avoidance of doubt, Newco shall not be obligated to either provide any such services without funding therefor or to advance any funds for FWE IV.  Additionally, NewCo's assumption of expenses in (1) above and Excluded CVX Costs shall not be included as or deemed Permitted LOE Costs.

3.    Notwithstanding the foregoing, Permitted Third Party Costs and Permitted LOE Costs shall not include any amounts relating to or otherwise associated with (including any operating expenses or overhead allocated to) any Excluded CVX Costs.

## VIII. Escrow Accounts

The parties shall agree to the establishment of the appropriate bank account(s) and escrow account(s) to support the transactions described in this Term Sheet, including but not limited to one operating account and at least one escrow account for the amounts to be paid pursuant to the Turnkey Removal Agreement (as applicable, the "**Escrow Agreement**").

1.    Contributions to the Escrow Account, shall be as fully described in the Definitive Agreements, but include not less than:

    a.   FWE will contribute at Closing $5,000,000 as payment for the Initial Safe Out.

    b.   Subject to item 2.a below, FWE IV will grant at Closing a net profits interests on all FWE IV Assets or otherwise agree with CUSA on the treatment of net profits ("**FWE IV NPI**").  The FWE IV NPI will pay all net profits from production generated by the FWE IV Assets, after deducting royalties and taxes and less amounts required to cover operating expenditures of FWE IV, into the Escrow Account ("**NPI Revenue Amount**").

    c.   Funds obtained from third parties, including any Other FWE Party, in support of decommissioning activity for FWE IV Assets, including contributions from other predecessors-in-interest and proceeds from surety bonds paid directly to FWE IV, will be paid into the FWE IV Escrow Account and, to the extent practicable, designated for use for the particular asset.

    d.   For any FWE III (Winddown Lease) asset allocated to FWE IV in accordance with the provisions above, the corresponding FWE III Lease Payment Amount shall be contributed to the FWE IV Escrow Account by FWE at Closing.

    e.   Any agreed turnkey payments made by CUSA in accordance with the Turnkey Removal Agreement or any decommissioning amounts, whether turnkey or otherwise, received from other co-working interest owners, if applicable.

2.    Contributions to the operating account:

    a.   All revenue from FWE IV Assets will be received into the operating account.  If any net revenue exists, after paying Permitted Third Party Costs and Permitted LOE Costs, FWE IV will fund the NPI Revenue Amount out of the operating account.

DEBTORS' EX. NO. 5
1562 of 1570

3.  Distributions to NewCo:

    a.  Funds required to perform the Initial Safe Out, up to $5,000,000 funded at Closing, as such P&A prep activities are performed.

    b.  Turnkey payments upon completion of decommissioning services in accordance with the Turnkey Removal Agreement, including any agreed upon milestone payments.

    c.  Reimbursement for Permitted Third Party Costs and Permitted LOE Costs in accordance with the Contract Operating Agreement.

4.  Distributions to CUSA:

    a.  With respect to any funds associated with a CUSA Payment Reduction amount that are received into the Escrow Account, after CUSA has made an applicable turnkey payment.

5.  Distributions to FWE IV:

    a.  Costs of FWE IV, including operating costs.

    b.  Decommissioning costs to the extent not covered under the Turnkey Removal Agreement.

**IX. Other Agreements to be Negotiated**

*Joint Development Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.


*Shared Services Agreement*

Parties: FWE IV and NewCo, terms to be mutually agreed.


*Neptune Spar Transition Services Agreement*

Parties: NewCo and CUSA

Terms: Transition services provided by NewCo at CUSA's cost for the period prior to commencement of CUSA's campaign covering decommissioning of the Neptune Spar and related equipment and infrastructure.


*Deepwater Assets Decommissioning Fund*

Parties: NewCo and CUSA

Terms:

1. Subject to paragraph 2 below, NewCo will deliver to CUSA on the second anniversary of closing of the transaction described herein a $25 million irrevocable surety bond issued by a Qualifying Surety, for which CUSA shall be the sole private beneficiary and which CUSA shall be entitled to call to cover and/or to reimburse certain decommissioning costs on the CVX Deepwater Assets (defined below) as described in item 4 below ("**Deepwater Surety Bond**"). For purposes of this agreement a "Qualifying Surety" means an insurance company or financial institution that is rated equivalent to at least "A+" (by S&P or Fitch), "A1" (by Moody's), or "B++" (by AM Best), by any two of such four credit rating agencies. Subject to 6 below, in order to be released from its obligations hereunder, NewCo shall ensure any buyer of the deepwater assets provides a replacement Deepwater Surety Bond.

2. If NewCo is not able to provide the Deepwater Surety Bond after utilizing commercially reasonable efforts or does not deliver a letter of credit of equal amount to the Deepwater Surety Bond from a mutually agreed upon qualified issuing bank, NewCo will grant a net profits interest equivalent to 5% of the net profits of production from the CVX Deepwater Assets ("**Deepwater NPI**"), which shall pay funds into a decommissioning escrow account until the funds in such account equal $25 million ("**Deepwater Escrow Account**"); provided that when the Deepwater Escrow Account reaches $25 million, the Deepwater NPI shall be returned to NewCo and terminated.

3. If NewCo has funded any portion of the Deepwater Escrow Account, to the extent NewCo provides a qualifying Deepwater Surety Bond in any face amount or an irrevocable standby letter of credit in any amount from a mutually agreed upon qualified issuing bank, NewCo shall be entitled to draw down (and not be required to replenish) from the Deepwater Escrow Account an amount equal to the face amount of the Deepwater Surety Bond or the amount of the letter of credit.

DEBTORS' EX. NO. 5
1564 of 1570

4.  The funds in the Deepwater Escrow Account will be made available to CUSA and/or the Deepwater Surety Bond (or letter of credit) will be callable by CUSA, in each case for the purposes of covering decommissioning costs incurred by CUSA for certain NewCo deepwater or shelf assets acquired originally by FWE from CUSA or any current affiliate of CUSA, in each case as such assets are designated on Exhibit C attached hereto ("**CVX Deepwater Assets**") in the event that CUSA or any of its affiliates is ever held liable therefor or otherwise incurs such costs.

5.  NewCo will have the right to use any funds in such account to perform decommissioning activities on the CVX Deepwater Assets.

6.  The security requirements described hereunder shall terminate, and any security shall be released to NewCo, upon the occurrence of any of the following:

    a.  The Turnkey Removal Agreement terminates as a result of an uncured material breach by CUSA (provided that NewCo is not also in material breach);

    b.  NewCo performs decommissioning activities equal to or in excess of $25 million on the CVX Deepwater Assets;

    c.  NewCo establishes an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency; or

    d.  NewCo sells all or substantially all of its deepwater assets (including all or substantially all of the CVX Deepwater Assets) in an asset transaction or a corporate or equivalent transaction to a buyer with an S&P credit rating equal to BBB or better or an equivalent credit rating with any other established rating agency.

In the event of 6(c), if NewCo's S&P credit rating drops below a BBB (or equivalent), NewCo shall re-establish the Deepwater Surety Bond or letter of credit at the level of security immediately prior to being released under 6(c), within 60 days or, if it fails to do so, the Deepwater NPI shall come into effect, subject to the provisions described above on any reduction or release.

11

**X. Other**

In the event NewCo has an unpaid balance due to CUSA for any reason under the Definitive Agreements, and that unpaid balance remains due and unpaid for 90 days, CUSA expressly reserves the right to set-off any amounts due to NewCo under the Turnkey Removal Contract or any reimbursement under the Contract Operating Agreement.

At Closing and/or upon qualification as an operator, CUSA and FWE IV shall execute BOEM-0150 "Assignment of Record Title in Federal OCS Oil and Gas Lease" documentation to effectuate the transfer of record title currently held by CUSA to FWE IV in the following leases

- Ship Shoal 175 OCS-G05550

**XI. Due Diligence**

In conjunction with negotiations with FWE, CUSA to commence and perform due diligence of assets and related contracts within the scope of FWE IV.  Successful completion of such due diligence (and FWE providing the required materials to CUSA) shall be a condition precedent to the effectiveness of the Definitive Documents.

In accordance with the foregoing, FWE shall provide CUSA with electronic access to the information and materials set forth below promptly after agreeing to this Term Sheet:

1. All contracts applicable to the assets or used in conjunction with the FWE IV Assets, including operating agreements, production handling arrangements, hydrocarbon transportation, processing and marketing agreements, third party service provider contracts, PSAs, farmouts and any agreements relating to decommissioning,

2. All bonds, letters of credit, standby funds or other financial arrangements relating to the FWE IV Assets, including any such arrangements in support of decommissioning, and

3. All government permits, orders and notices relating to the FWE IV Assets or the operation thereof, including any INCs and copies of all BSEE communication relating thereto.

Notwithstanding the information specifically requested above, the scope of CUSA's due diligence will include access to all relevant information relating to the FWE IV Assets that may be requested by CUSA from time to time, which FWE IV shall provide to CUSA in a timely manner following receipt of a request by CUSA.

*[Remainder of page intentionally left blank.]*

DEBTORS' EX. NO. 5
1566 of 1570

**Exhibit "A"**
**FWE IV Assets**

| Area / Block | Lease Number |
|---|---|
| BA A-105 | G01757 |
| BA A-133 | G02665 |
| EB 158 | G02645 |
| EB 159 | G02646 |
| EB 160 | G02647 |
| EB 161 | G02648 |
| EC 331 | G08658 |
| EC 332 | G09478 |
| EI 342 | G02319 |
| HI A-550 | G04081 |
| MP 77 | G04481 |
| SM 132 | G02282 |
| SM 136 | G02588 |
| SM 137 | G02589 |
| SM 150 | G16325 |
| SM 66 | G01198 |
| SS 169 | 00820 |
| SS 206 | G01522 |
| SS 207 | G01523 |
| ST 169 | G01253 |
| ST 195 | G03593 |
| VR 196 | G19760 |
| VR 207 | G19761 |
| VR 261 | G03328 |

End of Exhibit "A"

**Exhibit "B"**
**FWE III (Winddown Leases)**

| Area / Block | Lease Number |
|---|---|
| GI 83 | G03793 |
| HI A-446 | G02359 |
| MP 154 | G30337 |
| VR 332 | G09514 |
| VK 113 | G16535 |
| VK 251 | G10930 |
| VK 340 | G10933 |
| VR 314 | G05438 |
| WC 290 | G04818 |

End of Exhibit "B"

**Exhibit "C"**
***CVX Deepwater Assets***

| Area / Block | Lease Number (OCS-) |
|:---:|:---:|
| GI 39 | 00127 |
| GI 40 | 00128 |
| GI 41 | 00130 |
| GI 42 | 00131 |
| GI 46 | 00132 |
| GI 47 | 00133 |
| GI 48 | 00134 |
| GI 43 | 00175 |
| WD 70 | 00182 |
| WD 71 | 00838 |
| WD 94 | 00839 |
| WD 95 | G01497 |
| WD 96 | G01498 |
| SM 149 | G02592 |
| VR 363 | G09522 |
| VR 371 | G09524 |
| VR 362 | G10687 |
| GC 282 | G16727 |
| MC 562 | G19966 |
| MC 563 | G21176 |
| GC 679 | G21811 |
| GC 768 | G21817 |
| MC 992 | G24133 |
| MC 993 | G24134 |
| GC 238 | G26302 |
| MC 519 | G27278 |
| EW 834 | G27982 |
| MC 697 | G28021 |
| MC 698 | G28022 |
| MC 948 | G28030 |
| MC 742 | G32343 |
| MC 949 | G32363 |
| EW 790 | G33140 |
| MC 793 | G33177 |
| EW 835 | G33707 |
| MC 782 | G33757 |
| MC 171 | G34428 |
| MC 172 | G34429 |
| MC 297 | G34434 |
| GC 40 | G34536 |
| GC 41 | G34537 |
| EW 1009 | G34878 |
| EW 1010 | G34879 |
| EW 1011 | G34880 |
| MC 80 | G35311 |
| MC 474 | G35825 |
| MC 518 | G35828 |
| GI 32 | 00174 |
| GI 39 | 00126 |

| Area / Block | Lease Number (OCS-) |
|---|---|
| GI 41 | 00129 |
| GI 44 | 00176 |
| GI 52 | 00177 |
| WD 67 | 00179 |
| WD 68 | 00180 |
| WD 69 | 00181 |

End of Exhibit "C"