IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 20-33948-11 |
| | § | |
| FIELDWOOD ENERGY LLC, | § | HOUSTON, TEXAS |
| ET AL, | § | FRIDAY, |
| | § | APRIL 9, 2021 |
| DEBTORS. | § | 1:59 P.M. TO 2:42 P.M. |

MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(RECORDED VIA COURTSPEAK; NO LOG NOTES)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (VIA ZOOM):

For the Debtors: WEIL GOTSHAL & MANGES LLP
Alfredo R. Perez, Esquire
Clifford Carlson, Esquire
700 Louisiana, Ste. 1700
Houston, Texas 77002
713-546-5040

For the Ad Hoc Group of Secured Lenders: DAVIS POLK & WARDWELL LLP
Damian Schaible, Esquire
450 Lexington Ave.
New York, New York
212-450-4580

For HCC International Insurance Company: LOCKE LORD, LLP
Elizabeth Guffy, Esquire
2000 Bagby Street
Houston, Texas 77002
713-226-1328

For Everest, Berkley, Aspen and Sirius: CHIESA SHAHINIAN & GIANTOMASI
Scott A. Zuber, Esquire
One Boland Drive
West Orange, New Jersey 07052
973-325-1500

For Ecopetrol America LLC: SQUIRE PATTON BOGGS (US) LLP
Kelly Singer, Esquire
1 E. Washington St., Ste. 2700
Phoenix, Arizona 85004
602-528-4099

For BP Exploration & Production Inc.: GREENBERG TRAURIG, LLP
Craig Duewall, Esquire
300 West 6th St., Ste. 2050
Austin, Texas 78701
512-320-7200

Karl Burrer, Esquire
1000 Louisiana St., Ste. 1700
Houston, Texas 77002
713-374-3500

(Please also see Electronic Appearances.)

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
| --- | --- | --- | --- | --- |
| None | | | | |

| EXHIBITS: | Marked | Offered | Received |
| --- | --- | --- | --- |
| Declaration at ECF No. 1225-3 | | | 14* |
| Declaration at ECF No. 1225-8 | | | 14* |

*Admitted solely for the purpose of considering the motions

HOUSTON, TEXAS; FRIDAY, APRIL 9, 2021; 1:59 P.M.

THE COURT: All right, good afternoon. We're here in the Fieldwood Energy case. It's case 20-33948. We're going to start with a status report from Debtors' counsel. If anyone wants to make an additional status report, feel free, and then we'll move into any opening statements or evidence, as appropriate.

If you're going to make the opening status report for Debtor, would you please press five-star one time on your phone? Mr. Perez, good afternoon.

MR. PEREZ: Good afternoon, Your Honor. Alfredo Perez. Can you hear me?

THE COURT: I can.

MR. PEREZ: Thank you, Your Honor. So, Your Honor, I'm happy to report that I believe we have a substantially consensual hearing today with respect to both the exclusivity as well as the two backstop motions.

I think we have been able to work through all of the issues. All but one of the formal objections have been withdrawn. The one remaining objection, we spoke with counsel for that party and they are not going forward with respect to pressing that objection.

They wanted to note -- and at the appropriate time we will note that that objection -- or the not failure to prosecute that objection is without prejudice to any of

their rights, and that they reserve all their rights with respect to all other matters and just for purposes of this. And we're happy to make that stipulation.

We did receive, shortly prior to the filing of the last -- and we did file an amended agenda, which I think reflects that, at Docket No. 1246.

We did receive a reservation of rights from Ecopetrol relating to their concern about the effect of these financings on their liens pursuant to their JOA's, and obviously nothing -- the approval of the two backstop motions don't impact that. And we're happy to note their reservation of rights, but that is not -- you know, it wasn't a formal objection.

So, Your Honor, I believe that, you know, obviously we'd like to make an evidentiary record based on the exhibits. And although Mr. Dane and Mr. Hansen are both here present, I don't believe that we will need any testimony because I think the two matters are largely consensual.

THE COURT: Mr. Perez, thank you for the status.

Mr. Schaible? Mr. Schaible?

MR. SCHAIBLE: Your Honor, I was just raising my in case helpful. But for the record, Damien Schaible on behalf of the Ad Hoc Group of Secured Creditors.

Your Honor, we agree obviously with the Debtors,

and have been working with the predecessors and the sureties, and I would just mention to the Court that while people are certainly not agreed with respect to the Plan at this point, we have been -- we have been continuing to work to try reach resolutions wherever we can, as we had represented to the Court we would. And we will continue to do so.

THE COURT: Mr. Schaible, thank you.

Is there anyone else that wants to make any status report that might vary from what Mr. Perez said, and is there anyone that objects if we allow him or his firm to now present their *prima facie* case?

Ms. Guffy, good afternoon. Let me get that line activated. Good afternoon, Ms. Guffy.

MS. GUFFY: Your Honor, just one point. Mr. Perez keeps referring to backstop motions, plural. And because we do have concerns about another backstop motion that is going to be filed, I just wanted to make it clear for the record that this is not the backstop -- there's only one backstop motion today. And we talked about this earlier with Mr. Perez.

This does not -- this backstop motion does not affect -- it is not part of the settlement that they reached with the second lienholders and has to do with the treatment of those claims as a separate class.

And I just wanted to make sure that that was clear because there's just the one backstop motion.

MR. PEREZ: Your Honor, that's -- Ms. Guffy's partially correct. This is not -- this does not have to do with the backstop motion that we will be filing with respect to the second lien equity backstop. But this does have to do with the two backstop motions for debt.

The first lien backstop motion, which involves Goldman Sachs as our First Lien First Out creditor, and then our second lien backstop motion, which involves the clients represented by Mr. Damien Schaible who -- and they are the First Lien Term Loan Debtor.

So it's those two motions. It does not involve -- there will be two other backstop motions for equity raised -- for equity raised. One involving the First Lien Term Loan, and the other one involving the Second Lien Term Loan Lenders. So I just wanted to make that clear.

THE COURT: Ms. Guffy, does that satisfy the clarification that you needed?

MS. GUFFY: Well, I'm still a little confused as to which other motion is a backstop motion. I assumed the second entry on the agenda is a backstop motion. And what is the other that is also a backstop motion. I see a commitment letter for exit financing.

MR. PEREZ: We call that the backstop motion, Your

Honor. That's the commitment letter for exit financing.

MS. GUFFY: Ahh. Well, that explains it, Your Honor. I'm sorry.

MR. PEREZ: Okay, yeah.

THE COURT: All right, thank you.

Mr. Zuber? Mr. Zuber, good afternoon.

MR. ZUBER: Good afternoon, Your Honor. I have nothing to add, really. I just wanted to confirm with Mr. Perez said. We have had extensive discussions, and on behalf of our four clients, Aspen, Everest, Berkley, and Sirius, we do not intend to press forward with our objections or our joinders to other objections today, but with an understanding that's with a full reservation of rights with respect to all other issues. So just echoing what Mr. Perez said for the record.

THE COURT: I'll confirm that as well, if that makes you feel any better, as well as for all others that have filed an objection or withdrawing it. You're not withdrawing it in terms of what your confirmation objections might be or your disclosure objections might be, or anything other than these particular motions that are on file today. Does that help any, Mr. Zuber?

MR. ZUBER: Thank you, Your Honor.

THE COURT: All right, thank you.

MR. ZUBER: Yes, Your Honor. Thank you.

THE COURT: Thank you. Does anyone else have any additions they need to make before we move into the evidentiary portion?

(No response.)

THE COURT: All right. Mr. Perez, who's going to take the lead on that?

MR. PEREZ: Your Honor, I'm going to take it. I'm going to take the lead. If we had had actual argument, other people were going to do it, but since it's just hopefully a matter of putting the evidence on, I was going to do that.

THE COURT: All right.

MR. PEREZ: So, Your Honor, with respect to the first item, which is the Debtors' Second Amended Motion for Entry of an Order Extending the Exclusive Periods at ECF No. 930, Your Honor, we would request that the Court take judicial notice of the record in this case, as well as the scheduling order that the Court entered on 1224, which shows what the schedule is in this case and the fact that we are contemplating to have a confirmation hearing on June 9th, Your Honor.

So on the basis of the record in this case and the fact that there does not appear to be any opposition at this time, and we do have a confirmation hearing currently set for June 9th, we would request an extension.

Unfortunately, we may have to seek a further extension, just -- at the appropriate time. But the way this was drafted, it was a 90-day extension. And we request that the Court enter it on the basis of the record in the case.

THE COURT: And where is the form of order that you're asking me to sign?

MR. PEREZ: So the form of order that I'm asking you to sign, Your Honor, is at Document 930.

THE COURT: Okay. So that hasn't been amended at all by agreement. It's the original order?

MR. PEREZ: It is the original order. It has not been amended by agreement, Your Honor.

THE COURT: All right. Is there anyone that has any issue at this stage with the substance or the form of the order that is at 930-1? If so, please speak up if I already enabled your line, or press five-star if you wish to.

(No response.)

THE COURT: All right. I'm seeing no party that wishes to raise an objection. I do take judicial notice of our own documents, the schedule that we've set for confirmation. I find that the motion, now unopposed, sets forth good cause for the extensions of exclusivity. The allegations in it are admitted solely for the purpose of

the extension of exclusivity, and will extend.

I'm looking now at just the exact order. It should be up on your screen.

MR. PEREZ: Yes, Your Honor.

THE COURT: May I ask, just for the purpose of not spending more administrative funds, whether anyone objects to the Court, on its own motion, extending through June 15th-ish, just so that we're not coming back right away and doing -- I don't even need to do a similar extension, I don't think, on that. You know, just extending that until June 15th.

If anybody has a problem with that, please voice it, just -- it's more than fair to voice an objection to it. I'm just trying to not bring everybody back for sort of a useless hearing again.

(No response.)

THE COURT: All right. The exclusivity order has been signed. Exclusivity is extended through June 15th. And I have signed the order and I have now placed it in docketing. Ms. Do will get it docketed shortly.

Where do you want to go next?

MR. PEREZ: Thank you, Your Honor. I'm sure Mr. Dane will be happy not to incur the additional fees, so thank you very much. Your Honor, next --

THE COURT: Well, I know that I just took some

money out of your pocket, but Mr. Dane, you can keep it in yours.

MR. PEREZ: It's Mr. Barr's pocket for the most part, Your Honor, but --

THE COURT: Okay.

MR. PEREZ: So, Your Honor, next I'd like to take the two other motions that I've kind of referred to as the backstop motions. One is the Emergency Motion for Entry Into A Backstop Commitment Letter, Docket No. 1023.

And then the other motion, which I've been referring to it as a backstop, but it's the Emergency Motion for an Order Approving Entry Into the First Lien Exit Facility and Related Fee Letter, and Authorizing the Incurrence and Payment of Certain Fees and Costs, Docket No. 1165.

Your Honor, with respect to this motion, and again solely for the purposes of this hearing -- and we've conferred with all the parties -- we would like to admit into evidence the two declarations by Mr. Hansen, who is present in the courtroom, or in the virtual courtroom.

And, Your Honor, I believe that they are 1225-4 and 1225-9, but I've got to tell you that when I went to look at the file versions, I just couldn't make out whether that was correct or not. So I apologize, I may not --

THE COURT: Well, let me just take a look now, and

I will open up and show you what you've asked me to admit before we admit it.

So this document which is 1225-4, which I don't think is what you want to have admitted.

MR. PEREZ: Yeah. So let's try 1225-3, Your Honor.

THE COURT: 1225-3 is the declaration by Mr. Hansen, one of the two.

MR. PEREZ: Yeah. One of the two. And then so the other one is likely 1225-8.

THE COURT: 1225-8. Is there any objection to the admission of 1225-3 and 1225-8 solely for the purposes of consideration of ECF 1165 and ECF 1023? If so, please speak up or press five-star on your phone if you haven't yet been authorized to speak.

(No response.)

THE COURT: All right. 1225-3 and 1225-8 are both admitted of the purpose of those two motions only.

MR. PEREZ: Thank you, Your Honor. And just by way of brief background, and certainly Mr. -- to the Court -- to the extent the Court has any questions, Mr. Hansen is here. But just by way of background, these two commitments, the backstop motion and the exit commitment, form the basis of the funding of the new Plan.

One involves a loan -- our First Lien First Out

Loan that will be, in essence, refinanced by Goldman Sachs. That is the exit commitment letter that is at Docket 1165. And then -- and the backstop commitment that was at Docket 1023, that is the actual funding amount pursuant to which the Debtors will have access to significant cash. It's an equity raised of about $185 million. And the Debtors would have sufficient funds to fund the Plan and the various payments under the Plan.

And with that, Your Honor, and the two -- the declarations, we would request that the Court enter the two orders.

THE COURT: Thank you.

Is there any party that has any cross-examination for Mr. Hansen? If so, you may ask your question or press five-star and I'll enable you to ask a question.

(No response.)

THE COURT: All right. I'm showing no questions for Mr. Hansen.

Is there anyone that wishes to introduce any additional evidence, either in favor of or in opposition to either of the two pending motions?

(No response.)

THE COURT: All right. I'm going to grant both motions. Effectively, these work as options fairly -- oh, wait, we do have somebody that wishes to speak.

Whoever had wanted to speak, you apparently pressed five-star a second time. There you go. So don't press it again, please, because I lose it if you press it another time.

All right, we have Attorney Singer, and let me get your line -- there we go. Go ahead, please.

MR. SINGER: Sorry about that, Judge.

THE COURT: That's all right. I just -- it's just that I can't -- if you press it a second time, it turns off the signal that you want to talk, and then I can't find you so -- glad to have you back.

MR. SINGER: Yes.

THE COURT: You must have pressed it a third time to get back in.

MR. SINGER: I did. I pressed it the first time, and then you said no one raised their hand, so I pressed it again thinking that I didn't press it right the first time.

Your Honor, Kelly Singer on behalf of Ecopatrol. With Mr. Perez' statements earlier about a reservation of rights, that issue is for another day and it's not for today. So with those statements on the record, we have no issue at all with the two motions or the orders.

THE COURT: Mr. Singer, thank you. I did actually have a chance to read your motion. I don't think that it is implicated by what we're doing today, and I agree that all

your rights should be reserved. I appreciate the explanations that you gave, and thank you.

MR. SINGER: Thank you, Your Honor.

THE COURT: All right. What I find is that we have jurisdiction over this under 28 U.S.C. Section 1334. These are both financing motions that are core under 28 U.S.C. Section 157.

With respect to the financing motions, they effectively -- at a reasonably high price, but one to which no one is raising any objection -- give the Debtors options to require people to provide the financing if the financing isn't otherwise provided. Those options are then set up so that the Debtors, if they get a confirmed Plan, will have the financing available to confirm a Plan.

This does not commit us to confirming the Plan. It simply gives the Debtors the flexibility that if they get a Plan confirmed or, at confirmation, to prove feasibility to be certain that the financing is there.

I don't think that the prices are unreasonable. They're supported by the record in the case, and no party is raising any objection to that. It is plainly in the best interest of the estate to try to tie up financing so that the Debtors do have exit options under the proposed Plan, if it can be confirmed. I'm therefore approving both motions.

Mr. Perez, did the form of order change on those

or is it the same form?

MR. PEREZ: Your Honor, I believe it's the same form or order. I would just defer to Mr. Carlson on that, but I'm pretty sure it's the same form.

THE COURT: Let's see. I have somebody else that wants to speak. Let me see who that is. That may be Mr. Carlson.

Ms. Guffy, go ahead, please.

(No response.)

THE COURT: You have your own line muted, Ms. Guffy. I think.

MS. GUFFY: Yes, I did. Just for a housekeeping matter, Your Honor, I'm looking at the documents that were filed, and I believe that Mr. Hansen's second declaration is the 1225-8, not 7. I just want to have a clear record.

THE COURT: I intended to admit 1225-3 and 1225-8, is what we admitted.

MS. GUFFY: 7 was said, Your Honor, and that was -- I was just trying to make sure we had the right document.

THE COURT: Thank you. Sorry about my error.

Mr. Carlson, can I get you to press five-star one time on your phone to confirm the correct orders?

I see you. Hold on. Mr. Carlson, did Mr. Perez make a mistake or does he have that right?

MR. CARLSON: Mr. Perez is correct. The forms of

order that we filed with the motions are the correct ones.

THE COURT: All right, thank you. Let me open those up. (Brief pause.) Both orders have been signed and both orders have been sent to Ms. Do for docketing.

What else do we have on today's agenda that we should cover, or what's not on the agenda that we should cover?

MR. PEREZ: Your Honor, nothing further on the agenda. Thank you very much. Your Honor, we did have, as per the Court's scheduling order, the conference earlier today with the sureties and the government, and we've had several conferences with the predecessors, Your Honor.

I believe that the issues, if any, for next Wednesday, have been significantly narrowed, and so we're continuing to work on that on a daily basis, for the disclosure statement hearing that is scheduled for next Wednesday, Your Honor. And I'll just leave it at that.

THE COURT: I think I do have somebody from 512-320-7260 that wanted to speak. Who do we have from that number?

MR. DUEWALL: Thank you, Your Honor. Craig Duewall with Greenberg Traurig on behalf of BP, Your Honor.

THE COURT: Good afternoon, Mr. Duewall.

MR. DUEWALL: Thank you, Your Honor. I rise today, along with Mr. Burrer from our firm, Your Honor, to

bring to the Court's attention certain issues that we're having regarding access to information and transparency in part of the -- as part of the informal and formal discovery process, and wanted to bring some quick issues to the Court's attention, please.

THE COURT: All right. What have you got?

MR. DUEWALL: Thank you, Your Honor. Last week, I think we had heard from the Debtor that they were hoping to have expedited discovery. We'd have a rolling production, we'd have informal discovery requests based on collaborative discovery.

And I was left with the impression, after last week's hearing, Your Honor, that we were going to have an aggressive schedule, but we were going to have an open and honest and transparent process as it related to disclosure of information.

Unfortunately, just one week later, Judge, we've hit our first bump in the road. Following the hearing last week, we sent emails over to Debtor and we asked for some simple information that arises in importance from the disclosure -- their disclosure statement.

Can I share my screen quickly with you, Judge?

THE COURT: Sure. Hold on just a second. All right, you're presenting.

MR. DUEWALL: Thank you, Your Honor. And I draw

the Court's reference to Document 1117, specifically page 6 of that document filed with the Court.

And so as we began to engage in informal and now formal discovery, we're seeking discovery that relates to disclosures made, specifically on this page and as it relates to two specific items.

The representations that they make for us, Your Honor, here is that pre-petition, the company engaged in a robust sales process. Their words, robust sales process. And we're seeking information as it relates to that process.

They tell us that Houlihan, which we all recognize, specializes in the sale of these types of assets, and they engaged in a process from June through September where they marketed it to 47 different companies, 47 potential different buyers. They outreached a broad spectrum of national and international buyers and financial sponsors.

They tell us that following the petition date, they continued the process which ultimately resulted in 18 parties executing confidentiality agreements, 15 management presentations, 12 written bid letters or other indications of interest. And they tell us that Houlihan provided the Creditors' Committee with access to all of this information that was in the virtual data room.

And that based upon analyzing all this information

they got back with the bid, that they determined that none of the bids that they received was actionable.

And so, naturally, Your Honor, we sent them requests regarding the fact that we'd like access to the virtual data room and we also wanted the 12 bid letters that they had received. And we've done this now for the better part of over a week, if we will -- just one moment. I'm there. Here we go.

And so we started last week sending emails over to opposing counsel, just informally requesting this information. We started, you know, with an informal email requesting the information, access to the virtual data room, the bid letters. We followed that up this week on Tuesday, when we didn't get a response with a second ask for information. That resulted in a telephone call between myself and Mr. Perez where we discussed the information.

And we were informed for the first time that the data room no longer existed, but they have a new data room. So we asked for access to that data room. We were told we might have to execute a NDA, which we didn't object to, but we reminded counsel that there was a protective order in place that already protected the production of information, and that we wanted the bid letters.

We were told at that time that we would probably have to submit a formal discovery request for that, which

we had previously done and we've done again. And so then following that, we had another meet-and-confer, where my partner, Karl Burrer sent over to Mr. Perez a request on behalf of BP, Hess, Hunt, XTO.

We sent a consolidated request, which we understood that the Debtors wanted to see when possible, asking for 14 different items. We sent that over. We had a call yesterday regarding those items.

And we reached a resolution on all of the items, Your Honor, except for 8, 9 and 10 of the list, the joint request that we sent over which, of course, the results -- and has to deal with the virtual data room, the other data rooms that they referenced, and the 15 management presentations and bid letters that we received.

And so we tried to get those responses and they no longer exist. We were told they weren't relevant and that it relates to Newco and isn't relevant.

And so, Your Honor, I take this opportunity to preview the issue that's coming with the Court, which is the fact that we're entitled to this information, we're entitled to these disclosures for many -- many important reasons, not the least of which is the fact that the lenders have seen them, the creditors, the Creditors' Committee have seen them, potential bidders have seen them.

The documents have been shared around, and so

we're just asking for the same information that others have seen, the 47 other companies that looked at it. The 15 or 12 bidders that submitted bids certainly saw it. And so I don't know that there's any good reason or good cause not to share this information with us.

At the end of the day, Your Honor, the information is important with regard to value. The value of the deal that's being proposed. The value as it relates to: Can they contribute more? Can they do better with P&A obligations. It's important with regard to the cash that they're putting in to take a look at this robust process that generated a result now. You know, can they do better? Should they do better?

I think we need to look at these documents to see and determine that. It's important with regard to settlement. We're going to be making the request, the formal request, for mediation in this matter. We want to mediate this case. And as we're going towards mediation and trying to mediate and resolve the matter, that process is only going to be aided by better transparency, more transparency, not less of it. And so we ask for it in that context too.

At the end of the day, I think it's important that we determine if this robust process was exactly that, a robust process. Was it an open, honest, intellectually

honest process that obtained a fair and proper result.

You know, they've referenced these materials in the disclosure statement. They can't now hide behind the fact that they don't think it's relevant. If it wasn't relevant, I don't know that they would have made these statements in the disclosure settlement.

I've mentioned that it's important to settlement. It's important that -- for us to execute our duties to the Court, our good faith duties to try to get the case resolved, the duties that our clients have to try to analyze what is being proposed, what the liabilities are going to be at the end of the day. If there's going to be enough there to solve some of these very important environmental issues that are going to exist. And so they're important for those reasons.

And, Judge, I don't believe it's burdensome. These are documents that exist in the ordinary course of business. They've been made available to other people. I think all they have to do is flip a switch and provide us access. We'd be willing to sign an NDA. We've already signed the protective order. I think the NDA's a little bit overkill. But we've signed the protective order, we've agreed to be bound by it.

And so at the end of the day, Your Honor, I think that for this process -- at least a process that represents

that it started itself with an attempt to sell assets, to sell and market the assets. They created a data room. Show us the data room. Show us what exists now.

I don't think the previous data room's been destroyed, Your Honor. I think they could -- they could put it back up in the flip of a switch. They have it saved somewhere, I'm sure. Show us the bids. Show us why you rejected the bids.

I just think that as part of this transparent process, that these are documents that we should be entitled to and see, and so I preview this issue knowing that we don't have a Motion to Compel now in front of the Court, but I anticipate if we can't get some resolution, one is coming quickly.

THE COURT: I appreciate the preview. I'm a little concerned that you would make an allegation that you know the data room exists still, without having information about that. That's a pretty serous allegation. It's entirely possible that it doesn't exist in the old form, and I just want to be careful when I listen to what you say.

But I gather you're not asking me to do anything today. I will allow Mr. Carlson or Mr. Perez to answer if you want or wait until Wednesday to deal with this, given that it was a preview by Mr. Duewall.

MR. DUEWALL: Thank you, Your Honor. And I'd like

to just clarify that I was not making the allegation. I was just expressing my skepticism.

THE COURT: I am simply asking that you be careful about that.

MR. DUEWALL: Thank you.

THE COURT: I think your wording went beyond skepticism.

MR. DUEWALL: Thank you, Your Honor.

MR. PEREZ: Your Honor, this is Alfredo Perez. So I think we need to put this into context. This is BP asking for information about credit bid Newco and in particular the Jana Vasa Well (phonetic). So this -- and the information that is in the existing data room is kind of the well level information about the economics that a purchaser would want.

So this is -- this is literally, you know, allowing the fox in the henhouse, and it's not like the Court hasn't heard testimony about the relationship that we had with BP in connection with the Jana Vasa Well (phonetic). This has nothing to do with any asset other than the assets that are going to credit bid Newco. Which, by the way, Your Honor, BP expressly declined to participate in the sales process.

It was a sales process that for historical purposes, we're not -- there's not going to be any testimony

that the value is informed by this. I mean, Mr. Hansen is perform -- has performed a valuation, we have a credit bid. He's going to be -- you know, we're providing the expert report. All of that information is going in there.

There's no -- there's nothing in this that is the basis for his valuation. This was done as a historical -- you know, we did this -- you know, it was historical and it has nothing to do other than allowing a competitor -- an express competitor who prob -- you know, and again, it's probably for another day, but the Court already heard, you know, a long night of testimony on this and it's just an effort for them to get this information, which has nothing to do with the abandoned property, this has nothing to do with the valuation of Newco, it has nothing to do with any item that could possibly, Your Honor, be at issue in confirmation, other than an effort by a competitor to get information from us with respect to a well which we're going to have a dispute on the basis of, you know, the reasons why they took the actions that they took, Your Honor.

So I'm happy to -- I'm happy to wait until they file something, and we'll address it at that time on an evidentiary basis.

MR. SCHAIBLE: Your Honor, this is Damian Schaible. May I be heard briefly?

THE COURT: Of course.

MR. SCHAIBLE: Your Honor, just to check in on what Mr. Perez said, we've had calls on this, and I do think it's instructive that counsel has pointed out that there were something like 15 items that needed to be provided, and all but these items have been provided or need to be provided as I said, Your Honor.

And it means a lot to me that what I say to this Court and other courts, we mean. We are working as hard as possible to get them information as quickly as possible and to work to continue to dialog to see if we can reach resolution, yet not promising that we'll be able to.

But these items, you know, my clients are not only credit bidding their good and perfected liens against these assets, but they're putting in under the Plan hundreds of millions of new dollars in order to build up and create this new enterprise. And my clients are going to be very, very sensitive, as you can imagine, I hope, Your Honor, about a competitor receiving well level information about assets that they are not going to own but they're going to be competing against.

We suggested that it could go to advisors. We suggested that it could stay away from the actual competitor. And what was related to us is that the M&A Department of the competitor needed to be able to review our well level information with respect to what will be

Newco. And that's something that just gives us quite a lot of pause, Your Honor.

THE COURT: Thank you, Mr. Schaible. I'm going to wait and I'll get a written motion and I'll get a written response and I'll hear this in due course.

I appreciate the heads up. Having said that, I'm getting old. I probably won't remember it by the time we get to the real hearings. We'll see what happens at the real hearing. Thank you all. Is there anything else that we --

MR. PEREZ: Thank you, Your Honor.

THE COURT: Is there anything else we should be taking up?

MR. PEREZ: No. Thank you very much. Appreciate the time.

MS. GUFFY: Thank you, Your Honor.

THE COURT: Does any other party have anything they wish to say today? Yes, go ahead.

(No response.)

THE COURT: All right, anyone else? Oh, there we go. Mr. Duewall, did you have something else? Go ahead.

(No response.)

THE COURT: I think you have your own line muted, Mr. Duewall.

MR. DUEWALL: Thank you, Your Honor. I'm so

sorry.

THE COURT: That's okay.

MR. DUEWALL: The other issue I raised during my presentation was the fact that we're going to be asking for discovery, and since we're all here, I think -- or not discovery, I'm sorry. Mediation. That since we're all here, we would certainly -- we make that ask.

I think that this would be a case that would benefit from mediation. I think all the parties would benefit getting together in front of a good mediator and trying to hammer out a settlement process and resolution, given the extensive issues and all the complexities involved. And would ask the Court if the Court would be willing to order us to mediation?

THE COURT: So what did the other parties say when you asked them that question out of court?

MR. PEREZ: Nobody's asked us.

THE COURT: Mr. Duewall? That was for Mr. Duewall.

MR. PEREZ: I'm sorry.

MR. DUEWALL: I was going to ask -- Mr. Burrer, I know he's been having party-level discussions on that issue, Your Honor. I had the floor but Mr. Burrer, I know, has been discussing it, I think, or other members of our team have been having those discussions.

THE COURT: All right. I'll wait until you're ready to -- having conferred with parties, then make an appropriate motion. I rarely -- but I mean rarely, I don't mean never -- order mediation that is not agreed to. I have done it, but by and large, if it's agreed to, I think I've rarely turned it down. And if it's not agreed to, I've rarely ordered it. But there have been exceptions to both of those, so let me let you confer and let's figure out where we are.

You can set it for an emergency hearing when you're ready to, Mr. Duewall. Just contact Ms. Do and she'll give you a hearing date.

MR. DUEWALL: Thank you, Your Honor.

THE COURT: What else do we need to do today? Hold on, I've got one more person that wants to speak.

(No response.)

THE COURT: So, Mr. Burrer, I don't understand why you can't call Mr. Carlson and work this out. My two former law clerks, you guys ought to be able to get together and solve this problem, don't you think?

MR. BURRER: Your Honor, we'll be on the phone shortly.

THE COURT: I thought so. Thank you. You all work on it and I suspect it'll get worked out. I'll talk to you all next week. Thank you.

MR. PEREZ: Thank you, Your Honor.

MS. GUFFY: Thank you, Your Honor.

MR. DUEWALL: Thank you, Your Honor.

THE COURT: We are in adjournment. You all have a good weekend. Stay safe.

MR. PEREZ: Okay.

(Proceedings adjourned at 2:42 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #63827*

*DATE FILED: APRIL 23, 2021*