

HUNTON ANDREWS KURTH LLP
600 TRAVIS, SUITE 4200
HOUSTON, TEXAS 77002-2929

TEL   713 • 220 • 4200
FAX   713 • 220 • 4285

ROBIN RUSSELL
DIRECT DIAL: 713 • 220 • 4086
EMAIL: rrussell@HuntonAK.com

FILE NO: 015292.0273537

April 30, 2021

The Honorable Marvin Isgur
U.S. Bankruptcy Judge
515 Rusk, 4th Floor, Courtroom 404
Houston, Texas 77002

Re:    *In re: Fieldwood Energy LLC, et al.*, Case No. 20-33948 (MI)
       Scheduling Order [Docket No. 1224], entered on April 6, 2021

Dear Judge Isgur:

Apache Corporation ("Apache") asks the Court to quash a subpoena served by Everest Reinsurance Company ("Everest") and HCC International Insurance Company PLC ("HCCI"). The subpoena requires Apache to produce a 30(b)(6) witness and produce documents on May 10, 2021.  As further discussed below, the subpoena is untimely, seeks information on purely legal matters, and is not proportional to the needs of this bankruptcy case as required by Rule 26 of the Federal Rules of Civil Procedure.

### Relevant Facts

On August 3 and August 4, 2020, Fieldwood Energy LLC ("FWE") and its debtor affiliates (collectively, the "Debtors") commenced their chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.

Apache Corporation ("Apache") is a party to that certain Restructuring Support Agreement, dated as of August 4, 2020 ("RSA"), with the Debtors and other parties (collectively, the "RSA Parties") in which Apache agreed, to the extent doing so does not impair the Decommissioning Security (as defined therein) or Apache's ability to draw on the Decommissioning Security in any respect, to support the Debtors' Plan of Reorganization. Under the Debtors' current Plan, all of the Debtors' assets and obligations under the Decommissioning Agreement (as defined in the Plan) will vest in Fieldwood Energy I LLC ("FWE I") by virtue of a divisive merger.

HUNTON
ANDREWS KURTH

The Honorable Marvin Isgur
April 30, 2021
Page 2

On January 5, 2021, in recognition of issues raised by various sureties—including but not limited to Everest and HCCI, U.S. Specialty Insurance Company, and Philadelphia Indemnity Insurance Company (collectively, the "Sureties")—and their significance to this bankruptcy, the Court set a January 20, 2021 deadline for the Sureties to file an adversary proceeding to resolve outstanding legal issues prior to the confirmation hearing.  *In re Fieldwood Energy, LLC, et al.*, No. 20-33948 (MI) Hr'g Tr. at 29:16-30:3-5 (Bankr. S.D.TX. Jan. 4, 2021).  None of the Sureties filed an adversary proceeding nor, until recently, even raised any such issues further with Apache.

On April 6, 2021, the Court entered a scheduling order (the "Scheduling Order") allowing the Sureties (i) until April 14, 2021 to serve discovery related to confirmation matters; and (ii) from April 2, 2021 through and including May 10, 2021 to conduct fact witness depositions [Docket No. 1224].  None of the Sureties served discovery on Apache nor, until after this deadline, even raised the need for discovery from Apache.

On April 16, 2021, counsel for Everest and HCCI sent an eight-page letter to Apache detailing legal arguments that allegedly "discharge" their and Philadelphia Indemnity Insurance Company's obligations to honor over $150 million worth of surety bonds with Apache as the obligee (the "Surety Letter").  A copy of the Surety Letter is enclosed as Exhibit A.

On April 21, 2021, counsel for Everest and HCCI sent a subpoena (the "Subpoena") to Apache noticing Apache's deposition pursuant to Fed. R. Civ. P. 30(b)(6) for May 10, 2021, and also requesting documents be produced after the Court-ordered deadline.  A copy of the Subpoena is enclosed as Exhibit B.

### The Subpoena should be quashed in its entirety

The document requests in the Subpoena are barred because Apache was not served with the Subpoena until a week *after* the discovery request deadline in the Scheduling Order.  There is no good cause for Everest or HCCI's delay in serving discovery.  As discussed above, the Sureties identified their concerns to the Court in January and had ample opportunity to litigate those matters if they desired.  Nothing new has occurred in the months since, much less after the discovery request deadline, to justify the late requests.

The 30(b)(6) deposition should likewise be quashed.  While the Scheduling Order technically does not set a deadline for noticing depositions, the timing, target, and subject matter of the 30(b)(6) deposition call for it to be quashed.  Everest and HCCI had every opportunity to initiate an adversary proceeding and conduct discovery with respect to their complaints about the Plan.  They chose not to do so.  Now Everest and HCCI target Apache, a non-debtor and mere supporter of the Plan, for a 30(b)(6) deposition at the eleventh hour.  But even more



The Honorable Marvin Isgur
April 30, 2021
Page 3

importantly, the subject of Everest and HCCI's deposition topics—as clearly set forth in the Surety Letter—relates to the *legal* consequences flowing from the Plan and the Apache Definitive Documents and the subjective intent of Apache regarding same. Discovery is unnecessary because the effect of those agreements is determined as a matter of law and Apache's intent regarding same is of no probative value. *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, 393 F. Supp. 3d 515, 526 (S.D. Tex. 2018) ("[T]he interpretation of an unambiguous contract presents a purely legal issue, well-suited for summary judgment."); *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017) ("When a contract's language is unambiguous, courts must 'construe the contract as a matter of law." (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). And even if probative evidence could arise from a 30(b)(6) deposition of Apache, the miniscule value of that evidence on the legal matters raised in the Surety Letter is not proportional to the needs of the bankruptcy case as required by Federal Rule of Procedure 26. *See* Fed. R. Civ. P. 26(b)(1) (limiting discovery to relevant matters "proportional to the needs of the case" considering, among other factors, "whether the burden or expense of discovery outweighs its likely benefit."). For all of these reasons, the Subpoena should be quashed in its entirety.

### The topics for examination set forth in the Subpoena are improper

The topics for examination in the Subpoena are also improper. Topics 4, 5, 6, 7, 10, and 11 each focus on "Apache's intent" with respect to particular agreements:

4. Apache's intent with respect to the Standby Credit Facility and use of the funds thereunder.

5. Apache's intent with respect to the Farmout Agreement.

6. Apache's intent with respect to the Joint Development Agreement.

7. Apache's intent with respect to the Transition Services Agreement.

\*\*\*

10. Apache's intent with respect to the BOEM surety bonds for the Legacy Apache Properties

11. Apache's intent with respect to the Trust A surety bonds Trust A Cash.

These topics are not only of no probative value, they are also impermissibly vague. It is unclear whether Everest and HCCI seek Apache's intent as to the meaning of the agreements



The Honorable Marvin Isgur
April 30, 2021
Page 4

or its intent as to future actions relating to the agreements. This ambiguity violates Rule 30(b)(6), which requires a party to describe the matters for examination with "reasonable particularity". Fed. R. Civ. P. 30(b)(6). Regardless, neither subject is a proper deposition topic in this bankruptcy case. Apache's subjective intent as to the meaning of the agreements is irrelevant because unambiguous contracts are construed as a matter of law. *Brumitt*, 519 S.W.3d 95 at 105. Apache's intent as to hypothetical future events has no bearing on the confirmability of the Debtors' Plan.

Topics 1, 2, 3, and 8 each pertain to FWE I, which will be created by virtue of a divisive merger of Fieldwood in the Plan. To the extent any responsive information exists on these topics, the Debtors, not Apache, are the appropriate parties to depose.

Lastly, topic 9 focuses on "[c]ommunications between Apache and the government related to the use of the BOEM surety bonds for the Legacy Apache Properties." Even if the Subpoena defined "BOEM surety bonds" (which is does not), Apache's communications with the government on that topic have no bearing on confirmation of the Plan in this case.

### Conclusion

Apache is merely an RSA party. The Subpoena is not timely, particularly given the Sureties' deadline to commence an adversary proceeding on these issues months ago. The topics raised in the Surety Letter and the Subpoena all relate to legal matters that the Court can rule on as a matter of law, without the need to burden Apache with discovery that does nothing to resolve the confirmability of the Plan. Accordingly, Apache respectfully requests that the Court quash the Subpoena in its entirety and grant Apache all other relief to which it is entitled.

Very truly yours,

Robin Russell

Enclosures:
Surety Letter, Subpoena

## EXHIBIT A

**Surety Letter**



**CHIESA SHAHINIAN & GIANTOMASI PC**

ONE BOLAND DRIVE
WEST ORANGE, NJ 07052

**csglaw.com**

**DARREN GRZYB**
dgrzyb@csglaw.com
(O) 973.530.2077
(F) 973.530.2277

April 16, 2021

*Via Email and Regular Mail*
Robin Russell, Esq.
Hunton Andrews Kurth
600 Travis Street
Suite 4200
Houston, TX 77002

> Re:    **Surety: Everest Reinsurance Company**
> **Bond No.: ES00001441**
> **Bonded Contract: Decommissioning Agreement**
> **In Re: Fieldwood Energy LLC, Case No. 20-33948**

Ms. Russell:

My firm represents Everest Reinsurance Company ("Everest") in connection with the above-referenced Payment Bond (the "Everest Bond") that Everest, as surety, issued on behalf of Fieldwood Energy LLC ("Fieldwood"), as principal, in favor of Apache Corp. ("Apache"), as obligee, relating to the Decommissioning Agreement dated September 30, 2013.[1]  While the Everest Bond was issued on Everest paper, Everest is a party to a certain Claims Sharing Agreement with HCC International Insurance Company PLC ("HCCI") relating to the Everest Bond, with each surety thereunder responsible for their allocated share of liability.  My firm also represents Everest, as well as other sureties, in Fieldwood's bankruptcy case (the "Bankruptcy").  The Decommissioning Agreement is supported by:  (a) cash in Trust A in the current amount of $238 million; and (b) a total of $498 million in surety bonds, including the Everest Bond (collectively, the "Decommissioning Bonds") and letters of credit, which are guaranteed by surety companies (collectively, the "Decommissioning Letters of Credit" and, with the Decommissioning Bonds, collectively, the "Decommissioning Security").  HCCI, Zurich American Insurance Company, U.S. Specialty Insurance Company and Philadelphia Indemnity Insurance Company (collectively, the "Sureties"), which, along with Everest, issued bonds relating to the Decommissioning Security and are likewise impacted.

Accordingly, we hereby advise Apache that the agreements it has negotiated with Fieldwood as part of the Bankruptcy, without the Sureties' knowledge, consent or participation, directly affect Apache's ability to continue to rely upon the Decommissioning Security.  The transaction Apache has negotiated with Fieldwood will result in, among other effects:  (a) discharge of the Sureties by reason of Apache's and

---

[1] For simplicity, this letter refers to Apache and its affiliates, collectively, as "Apache" and Fieldwood and its affiliates, collectively, as "Fieldwood," unless identifying a subsidiary or affiliate is material to the discussion.

Robin Russell, Esq.
April 16, 2021
Page 2

Fieldwood's material alteration of the Decommissioning Agreement; (b) impairment of the suretyship status of the Sureties; (c) payment to Apache and satisfaction under the Decommissioning Agreement; and (d) interference by Apache with the Sureties' relationship with its principal, Fieldwood. Apache has failed to consider the Sureties' position and, as of the date of this letter, has not agreed to meet in good faith to discuss a better solution than what is set forth in the Plan.

## I.    Relevant Facts

**The Surety Indemnity Agreements**: Prior to the issuance of each of the bonds that relate to the Decommissioning Security, Fieldwood was required to execute standard, surety indemnity agreements in favor of the issuing surety. Apache, as an operator of oil and gas leases in the Gulf of Mexico, is well aware of the requirements for surety indemnity agreements and the standard terms associated with such agreements. Under the Agreement of Indemnity that Fieldwood executed for Everest (the "Everest Indemnity Agreement"), Fieldwood was obligated to, among other things: (a) pay all premiums when due; and (b) indemnify Everest and save it harmless from and against any and all costs and damages incurred by reason of Everest's execution of the Everest Bond. In order to secure Fieldwood's obligations to Everest, Fieldwood granted Everest a security interest in "all goods (including inventory, equipment and any accessories thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property supporting obligations, any Contract or contract rights or rights to payment of money, insurance claims and proceeds, and all general intangibles." Fieldwood further agreed to not "change or convert its respective individual, corporate or partnership status to the extent such change has the effect of limiting, reducing or shielding the liability of … the entity." These are standard requirements for bonding in this industry and the other Sureties involved with the Decommissioning Security were given the same or similar protections in the indemnity agreements that Fieldwood executed in their favor.

**The Pre-Petition Bonded Contract and Decommissioning Security**: The terms and conditions of Apache's ability to draw upon the Decommissioning Security are set forth in the Decommissioning Agreement and the Decommissioning Bonds and/or Decommissioning Letters of Credit. Apache cannot look to the Decommissioning Security until the Trust A Cash is exhausted and has been spent on plugging and abandonment required by law or contract.

Under the Everest Bond, Apache commences the claim processes for decommissioning by issuing a Decommissioning Drawing Request in the form attached to the bond. In order for Apache to recover under a Decommissioning Drawing Request, Apache has to certify, among other things that: (i) Apache is entitled to make a drawing in the amount demanded "pursuant to the terms and conditions of the Payment Bond and of the Decommissioning Agreement;" (ii) Fieldwood "has failed to reimburse and pay [Apache] for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement);" and (iii) Apache has "complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement."

In order for a Reimbursable Event to arise under the Decommissioning Agreement, which could possibly allow Apache to draw on the Decommissioning Security, a Government Authority or any other Person must seek to cause Apache to conduct Decommissioning that is "**required in accordance with applicable Law or contract**." The emphasized language is the definition of "Government Decommissioning" under the agreement. (Decom. Agreement, ¶ 2.7) Upon receiving a "Seller Notice" from Apache, Fieldwood has the right to object to whether such Government Decommissioning is required under applicable Law or contract by issuing a "Buyer Notice." (Id.) If Apache and Fieldwood are unable to resolve disputes as to whether a Reimbursable Event has arisen, there are procedures in the Decommissioning Agreement aimed at arriving at a fair decision by a neutral Expert appointed by the Parties. It is important to note that, pre-petition, Fieldwood

Robin Russell, Esq.
April 16, 2021
Page 3

was motivated to perform as the primary obligor under the Decommissioning Agreement and the Decommissioning Security and to ensure no improper demands were made upon the Decommissioning Security because Fieldwood owed the Sureties an obligation of indemnity and exoneration and the obligation to collateralize the Sureties for losses or potential losses in accordance with the surety indemnity agreements and the common law.

**The Plan of Reorganization and the Definitive Apache Documents:** By entering into the RSA[2] and the Definitive Apache Documents, Apache has materially altered the fundamental character of the Sureties' principal, Fieldwood, as well as the terms of Decommissioning Agreement, to the detriment, and likely discharge, of the Sureties. Without the Sureties' knowledge or consent, Apache negotiated and entered into the RSA and Apache Term Sheet prior to the filing of Fieldwood's bankruptcy petition. Furthermore, without the Sureties' knowledge or consent, Apache negotiated the Definitive Apache Documents as part of Fieldwood's Plan of Reorganization (the "Plan").

Once the Plan goes effective, Fieldwood's assets will all be transferred to newly-formed entities or abandoned. Under the Plan, Fieldwood proposes to create Fieldwood I ("FWE I") as a new single-purpose entity to own and operate the Legacy Apache Assets. The Plan apparently seeks to have FWE I assume the Decommissioning Security. Yet, the Plan also seeks to eviscerate the Sureties' rights of indemnity, exoneration and to be held and kept harmless, notwithstanding the fact that the Plan calls for the assumption of the bonded contract, the Decommissioning Agreement. Article 4(ix) of the Implementation Agreement provides:

> (ix) With respect to all bonds and letters of credit constituting Decommissioning Security, all claims for premiums, fees, reimbursement, indemnification, or any other claims, fixed, contingent, liquidated, unliquidated, or otherwise against the Debtors held by the companies issuing the bonds or letters of credit, shall neither be allocated to nor become the obligations of FWE I under the Plan of Merger. Notwithstanding the foregoing, all rights of the Apache PSA Parties with respect to such bonds and letters of credit shall be preserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee.

[Dkt. No. 723-1, p. 129].

Under the Plan, Fieldwood is ceding control of FWE I to Apache. The Limited Liability Company Agreement of Fieldwood I LLC (the "FWE I LLC Agreement") requires Apache's consent for FWE I to carry out all regular business functions other than operating or decommissioning the Legacy Apache Properties. Apache's consent is required for FWE I to incur debt other than pursuant to the Standby Facility being extended by Apache. Apache's consent is required for FWE I to use free cash for any purpose other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation. Apache's consent is required for FWE I to make or receive any capital contribution. Apache's consent is

---

[2]  Capitalized terms not otherwise defined in this letter have the meaning set forth in Fieldwood's proposed chapter 11 plan.

Robin Russell, Esq.
April 16, 2021
Page 4

required for FWE I to grant a lien.  Under the FWE I LLC Agreement, the Sole Manager of FWE I serves at the consent of Apache and can be removed by Apache.

FWE I has vowed to not take any position in any proceeding opposed to or inconsistent with Apache's ability to draw on the cash in Trust A or the Decommissioning Security.  In short, FWE I will be completely controlled and dominated by Apache if the Plan, as it is currently written, is confirmed, and Apache will be able to determine for itself whether it can draw on the Decommissioning Security.

## II.    *Reservation of Claims and Defenses by Everest and the Other Sureties*

Everest, and the other Sureties, submit that their bonds may be not assumed by FWE I or the debtor or any other entity as part of the Bankruptcy, without the Sureties' consent.  This is likely to be a contentiously litigated issue in the Bankruptcy.  To the extent the Plan is nonetheless confirmed, the Sureties submit that the Plan cannot alter their rights or defenses under the Decommissioning Security with respect to potential future claims by Apache.  Moreover, the Plan cannot alter the Sureties' rights of subrogation, common law indemnity, quia timet, and/or reimbursement, and the Sureties' participation in the Bankruptcy will not constitute a waiver or alteration of any of the Sureties' rights or defenses, unless the Sureties expressly agree to such waiver or alteration. Indeed, one of the goals of this letter is to demonstrate to Apache that, in the event the Plan is confirmed in its current form, Apache's ability to continue to rely upon the Decommissioning Security will be altered.  Therefore, it behooves Apache to cooperate with the Sureties to modify the Plan in a manner that is acceptable to both the Sureties and Apache.

## III.   *The Plan, if Confirmed in its Current Form, Will Discharge the Sureties Due to the Material Alteration of the Sureties' Obligation under the Bonds*

A material alteration of the bonded contract without the surety's consent will result in the discharge of the surety.  *See Metlife Capital Credit Corp. v. Gulf Coast Plating, Inc.*, 1987 WL 14375, at *2 (S.D. Tex. June 15, 1987) ("Generally, under Texas law, any contract alteration between a principal debtor and a creditor discharges a guarantor. A guarantor is obligated only in respect to the contractual agreement of the obligee and principal obligor and any material alteration of such guaranty agreement completely discharges the guarantor's undertaking."); *Veldekens v. GE GFS Holdings, Inc.*, 2009 WL 10693904, at *7 (S.D. Tex. Aug. 3, 2009) ("A guarantor is discharged if the material alteration 'imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification' or 'would otherwise cause the secondary obligor a loss.'") (quoting Restatement (Third) of Suretyship and Guaranty § 41 (1996) (the "Restatement")).

The elements of a material alteration giving rise to a discharge of the surety are:  "(1) the existence of a material alteration to the underlying contract; (2) lack of consent to the alteration; and (3) harm resulting from the alteration." *Frost National Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App. 2000).  The test is whether the alteration of the bonded contract "causes it to fail to reflect the meaning and intent of the parties to the agreement."  *Id.*  The reason behind the rule is "to prevent unsavory deals between a holder and a maker designed to disadvantage the guarantor."  *In re Murchison*, 102 B.R. 545, 548 (Bankr. N.D. Tex. 1988).  Moreover, the discharge rule stems from it being "plainly inequitable for two parties to a tripartite transaction to agree that the third party be liable."  *Id.*

Turning to this case, the deal constructed by Fieldwood and Apache, without the Sureties' consent, is precisely the type of unsavory transaction that the discharge rule is designed to prevent.  The Decommissioning Agreement, with its amendments, was an arm's length transaction between Apache and Fieldwood relating to

Robin Russell, Esq.
April 16, 2021
Page 5

the 2013 acquisition by Fieldwood of the Legacy Apache Properties.  Fieldwood was completely independent of Apache.  Under the Decommissioning Agreement, Apache could only look to Fieldwood to pay Reimbursable Amounts, which were actual out-of-pocket expenses that arose as a result of Government Decommissioning.  Under the Decommissioning Agreement, Fieldwood had the right to dispute whether Apache had properly requested that Fieldwood perform Government Decommissioning and the right to have the dispute resolved by an independent, third-party Expert.  Apache could not draw upon the Decommissioning Security unless it could certify that a Reimbursable Event had arisen and that Apache was entitled to payment of a Reimbursable Amount.  Fieldwood was required to indemnify, exonerate and hold the Sureties harmless for losses under the Bonds, so Fieldwood had an incentive to perform the Decommissioning Agreement as primary obligor and to ensure it was not being asked to fulfill Decommissioning that was beyond the scope of its agreement with Apache. Moreover, the Sureties had the right to be placed in collateral by Fieldwood to secure Fieldwood's indemnity obligations to the Sureties.

The Plan, and the Definitive Apache Documents, materially alter the fundamental nature of the Decommissioning Agreement, resulting in a discharge of the Sureties.  Although Fieldwood and Apache do not admit it, the terms of the Plan and the Definitive Apache Documents are nothing less than a modification of the Decommissioning Agreement and a hard reset of the parties' obligations under it.  Moreover, under the Plan, Apache will essentially be on both sides of the Decommissioning Security.  It will be in control of FWE I.  FWE I is obligated to take no action that would compromise Apache's ability to draw on the Decommissioning Security, and thus Apache is apparently granted the ability to decide for itself whether a Reimbursable Event has arisen.  The Decommissioning Agreement and Decommissioning Security, as modified by the Plan, are completely different agreements than the agreements for which the Sureties agreed to provide security.  The Plan exponentially and unnecessarily increases the risk of the Sureties under the Decommissioning Security.

The Plan also materially alters the Sureties' risk by purporting to completely eviscerate the Sureties' common law and contractual exoneration and indemnity rights against Fieldwood.  The Plan proposes to give FWE I the benefits of the Decommissioning Security without also assigning to it the related obligations to the Sureties.  Further, even if the surety indemnity agreements were to be assigned to FWE I, the Sureties' rights would be impaired because FWE I could not grant collateral security to the Sureties without Apache's consent.

The sum effect of the Plan is to equate the Decommissioning Security with cash for FWE I's plugging and abandonment obligations, to be drawn upon as desired by Apache, with no ability by the Sureties to contest FWE I's ability to draw on the Decommissioning Security.  The Sureties did not pledge cash as collateral for Fieldwood's obligations under the Decommissioning Agreement, and the attempt to convert the Decommissioning Security to a cash equivalent is a material alteration that gives rise to a discharge of the Sureties for any future claim by Apache.

IV.     ***The Plan, if Confirmed in its Current Form, Will Result in an Impairment of the Sureties***

As obligee and/or ultimate beneficiary under the Decommissioning Bonds, Apache owes the Sureties well-defined obligations, including (i) ensuring that the risk to the surety on the underlying bonded transaction is not increased, as discussed above; (ii) ensuring that that the principal's ability to reimburse the surety is not impaired; (iii) ensuring that the principal's ability to perform is not impaired; and (iv) ensuring that the surety's subrogation rights are preserved. *See* Restatement (Third) of Suretyship & Guaranty § 37 (1996) (hereinafter the "Restatement"); *United States v. Great Am. Ins. Co. of NY*, 791 F. Supp. 2d 1337, 1359-60 (Fed. Cir. 2011), *aff'd sub nom. United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013); *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313-14 (Fed. Cir. 2011)

Robin Russell, Esq.
April 16, 2021
Page 6

The surety will be discharged if the obligee impairs the surety's recourse against the principal by (a) releasing the principal from the duty to pay money; (b) impairing the value of collateral securing the underlying obligation; or (c) any other act or omission that impairs (i) the principal's performance of the underlying obligation, (ii) the principal's obligation to reimburse the surety, or (iii) the surety's right of restitution or subrogation.  Restatement § 37; *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992) ("The defense of impairment of collateral is based on the creditor's obligation to use ordinary care to secure and preserve collateral in its possession from waste, injury, or loss.  If the creditor breaches his duty, the surety is discharged on the note to the extent of his loss."); *Webb v. Finger Contract Supply Co.*, 447 S.W.2d 906, 907 (Tex. 1969) ("The prejudice to the surety by impairment of his subrogation rights … discharges the surety to the extent of the value of the security surrendered."); *id.* at 908 (discharging the guarantor because the creditor, "in subordinating the security which protected [the guarantor's] right to subrogation, diverted the whole security and destroyed the nature of the obligation which [the guarantor] guaranteed").

In this case, under the Plan, Apache seeks to impair the suretyship status of the Sureties in multiple ways, all of which may result in the discharge of the Sureties.  First, Apache, along with Fieldwood and the Credit Bid Purchaser (collectively, the "RSA Parties"), have dramatically increased the risk that Fieldwood will not be able to perform its obligations as primary obligor because they are transferring many of Fieldwood's profitable assets to the Credit Bid Purchaser, likely depriving FWE I, upon Plan confirmation, of sufficient cash flow to pay for current or soon to arise P&A obligations for the Legacy Apache Properties.  The RSA Parties have severely diminished the Sureties' collateral by transferring all of the Debtors' assets to newly-created entities that, per the Plan, will have no obligation to the Sureties.  This, of course, severely impairs the Sureties' rights of subrogation, reimbursement and indemnity.  Apache is also impairing the Sureties' rights by releasing Fieldwood from certain defaults under the Decommissioning Agreement that arose prior to the Effective Date of the Plan, which may, by way of example and among other things, result in the waiver of a $1,514,236.00 million claim against Fieldwood for diversion of Trust A Cash.

The Sureties believe that there is value in the Legacy Apache Properties that could be marketed or extracted by FWE I at some point in the future.  If the Sureties are required to perform under the Decommissioning Security, the profit derived from that value should fund the Sureties' indemnity, subrogation and/or reimbursement rights.  If Apache intends under the Plan to cut off those rights of the Sureties, then the Sureties are discharged of any obligation under the Decommissioning Security.

V.     ***The Plan, if Confirmed in its Current Form, Gives Rise to a Substitution of Principal***

The principal on a surety bond may not be substituted absent consent of the surety, and if the principal is substituted, it will result in a discharge of the surety.  74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

Under the Plan, Apache purportedly seeks to be able to draw on the Decommissioning Security even though it has agreed to a dissolution of the Sureties' principal, Fieldwood, and has agreed to the creation of FWE I to operate, decommission and plug and abandon the Legacy Apache Properties.  The Sureties never consented to substitute FWE I for Fieldwood, and the attempt by Apache to effectuate such a substitution is improper and will result in a discharge of the Sureties.

Robin Russell, Esq.
April 16, 2021
Page 7

VI.     ***The Plan as Drafted Constitutes Payment to Apache or Performance by Fieldwood of its Obligations under the Decommissioning Agreement, Thereby Discharging the Sureties***

Absent the Plan and Definitive Apache Documents, Apache would likely be left with an undersecured, contingent claim against Fieldwood for plugging and abandonment obligations.  As a predecessor owner, Apache would have to pay for Government Decommissioning to the extent such decommissioning was not covered by the Trust A Cash and the Decommissioning Security.  Under the Plan, rather than having to pay for Government Decommissioning after the Trust A bonds and cash are exhausted, Apache is permitted to loan FWE I up to $400 million, in exchange for a blanket lien on all the Legacy Apache Assets and the receipt of significant interest.  At the point in time in which all of the Trust A Cash and  Decommissioning Security have been exhausted, the Legacy Apache Assets are likely to be much more economical than they are currently due to the completion of P&A and the continued recovery from historically low oil prices.  The provision of a blanket lien on oil and gas assets and significant interest could constitute payment by Fieldwood of its obligations under the Decommissioning Agreement.  Moreover, the ability to control FWE I, and if and how FWE I disposes of the Legacy Apache Assets, to the exclusion of the Sureties' rights, could constitute payment by Fieldwood of its obligations under the Decommissioning Agreement, which could result in a discharge of the Sureties.  *See generally* TXJUR Suretyship § 85 (under Texas law, "[w]hen payments are made from the proceeds or fruits of the very contract or transaction covered by the obligation of a surety, and when the source of funds is known to the creditor or person receiving the payments, the surety equitably is entitled to have the payments applied to the discharge of the debt for which the surety is bound even though a different application has been made by the creditor")  (citing *Aetna Cas. & Sur. Co. v. Hawn Lumber Co.*, 97 S.W.2d 460 (Tex. 1936), *opinion modified by* 98 S.W.2d 167 (Tex. 1936)).

VII.    ***Apache's Actions Have Tortiously Interfered with the Sureties' Business Relationship with their Principal***

"The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) the occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the claimant's damage; and (4) actual damage or loss occurred."  *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 856-57 (Tex. App. 2001).  Interference must induce an actual breach.  *Id.*

In this case, Apache has tortiously interfered with the Sureties' contractual relationship with its principal, Fieldwood.  The contracts at issue are the surety indemnity agreements.  Apache, as an industry participant, is aware of the existence and terms of surety indemnity agreements.  Neither Apache nor Fieldwood invited the Sureties to participate in the preparation of the RSA, the Plan or the Definitive Apache Documents.  Apache has agreed for Fieldwood to transfer all its assets to entities that are purportedly beyond the reach of the Sureties, in breach of the indemnity agreements.  The Implementation Agreement negotiated by Apache expressly contemplates Fieldwood's breach of the indemnity agreements.  Apache has negotiated a deal in which the emerging entity would not have to pay renewal premiums, in further breach of the indemnity agreements.   The tortious interference by Apache has already caused Fieldwood to materially breach the indemnity agreements as Fieldwood is in default of its obligation to pay renewal premiums to the Sureties.

As noted above, the Sureties object to the Plan as it is currently constructed.  The Sureties filed objections to the Disclosure Statement and will contest confirmation unless the Plan is modified to provide more equitable treatment of the Sureties.  Nothing herein shall be construed as any kind of acknowledgement that the Sureties agree that their bonds can be assumed by the Debtors without their consent or that their indemnity agreements can be separated from their bonds.  As noted above, this letter is to advise Apache that if the Plan is nonetheless confirmed, Apache may not be able to recover under the Decommissioning Security.

Robin Russell, Esq.
April 16, 2021
Page 8


While the Sureties are interested in a meeting with Apache and, if necessary, the Debtors, the items set out above are a result of Apache's unilateral conduct and unwillingness to engage with the Sureties.

The Sureties expressly reserve all rights, claims and defenses, and waive none.

Very truly yours,

*Darren Grzyb*

Darren Grzyb
Member

cc:   Christopher Ward
      Duane Brescia
      Philip Eisenberg
      Elizabeth Guffy
      Robert Miller
      Jase Brown

## EXHIBIT B

**Subpoena**

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of ___ Texas _____

In re ___ Fieldwood Energy, LLC _____
_____**Debtor**_____

*(Complete if issued in an adversary proceeding)*

Case No. ___ 20-33948 _____

Chapter _____ 11 _____

_____
_____**Plaintiff**_____
v.
_____
_____**Defendant**_____

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: ___ Apache Corp. FRCP 30(b)(6) Designee _____
*(Name of person to whom the subpoena is directed)*

[X] *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| PLACE Zoom invitation to be provided to your attorney Robin Russell prior to the deposition | DATE AND TIME May 10, 2021 at 1:00 p.m. (CST) |
|---|---|

The deposition will be recorded by this method:
   Stenographically

[X] *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
   See attached Rider for Deposition Topics and Documents to be Produced.

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 4/21/21

CLERK OF COURT

_____      OR      /s/ Darren Grzyb
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* _____, who issues or requests this subpoena, are:

Everest Reinsurance Company, Berkley Insurance Company, Sirius America Insurance Company, Aspen American Insurance Company

Darren Grzyb - One Boland Drive, West Orange NJ 07052 - dgrzyb@csglaw.com - 973-530-2077

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

***Please note that pursuant to FRCP 30(b)(6) you have a duty to confer in good faith with the party serving this subpoena after receipt

B256 (Form 256 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: Apache Corp.
on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: 2000 Post Oak Blvd., Suite 100
Houston, TX 77056

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## Rider

Definitions[1]

1. "Communication" means, without limitation, letters; faxes; e-mail messages; conversations; and transmissions of ideas, information, or thoughts whether written, verbal, or otherwise.

2. "Document" means any and all paper records, files, and/or other tangible media in which information is maintained, preserved, or stored. The term "Document" includes, but is not limited to, all written or graphic material of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including, but not limited to. Communications, correspondence, letters, facsimiles, e-mails, memoranda, notes, contracts, agreements, releases, statements, reports, spreadsheets, data compilations, writings, photographs, drawings, graphs, charts, films, printouts, transcripts, calendars, appointment books, diaries, licenses, telegrams, books, newspapers, magazines, advertisements, periodicals, bulletins, maps, brochures, circulars, notices, pamphlets, rules, regulations, directives, teletype messages, voice messages, instant messages, meeting minutes, interoffice communications, financial statements, ledgers, books of account, proposals, software, hardware, prospectuses, offers, orders, receipts, working papers, time sheets, logs, movies, audio or video tapes and recordings, CD-ROMs, DVD-ROMS, microfilm, or any other materials similar to any of the foregoing, however denominated. The term "Document" includes any and all non-identical copies of a document, which contain additional writing, underlining, notes, deletions, or any other markings or notations, or which otherwise are not identical copies of the original document. The term "Document" includes any and all attachments and enclosures to any and all documents containing information responsive to the Discovery Requests. In addition, any "Document" Concerning only in part of the subjects of the Discovery Requests is covered in its entirety by this definition.

3. "Farmout Agreement" means the Farmout Agreement included in the Apache Term Sheet Implementation Agreement.

4. "Joint Development Agreement" means the document referenced in the Standby Loan Agreement at page 6.

5. "Related to" means concerning, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

6. "Standby Credit Facility" means the Standby Credit Facility that Apache is providing to FWE I pursuant to the Standby Loan Agreement.

7. "Standby Loan Agreement" means the Standby Loan Agreement included in the Apache Term Sheet Implementation Agreement.

---

[1] Definitions not provided herein shall be defined as set forth in the Plan and associated documents.

8. "Transition Services Agreement" means the Transition Services Agreement included in the Apache Term Sheet Implementation Agreement under which the Credit Bid Purchaser will provide transition services to FWE I.

Topics for Examination

1. Go forward plans for FWE I, including decommissioning plans, capital projects and plans to obtain new bonding.

2. All communications between Apache, Fieldwood and/or the secured lenders related to FWE I, including all negotiations related to the creation of FWE I and subsequent discussions and negotiations related to FWE I.

3. Any studies, analyses or financial projections conducted by Apache or on Apache's behalf related to FWE I.

4. Apache's intent with respect to the Standby Credit Facility and use of the funds thereunder.

5. Apache's intent with respect to the Farmout Agreement.

6. Apache's intent with respect to the Joint Development Agreement.

7. Apache's intent with respect to the Transition Services Agreement.

8. Marketing efforts for the FWE I Assets and any communications between Apache and prospective purchasers and/or parties that are asserting a right of first refusal with respect to any of the FWE I Assets.

9. Communications between Apache and the government related to the use of the BOEM surety bonds for the Legacy Apache Properties.

10. Apache's intent with respect to the BOEM surety bonds for the Legacy Apache Properties.

11. Apache's intent with respect to the Trust A surety bonds and Trust A Cash.

Documents to be Produced

1. All documents reflecting go-forward plans for FWE I, including decommissioning plans, intended capital projects and plans to obtain new bonding.

2. All documents reflecting Apache internal communications or communications with third parties regarding FWE I.

3. All studies, analyses, or financial projections related to FWE I.

4.  A copy of the Joint Development Agreement.

5.  All documents related to the existing surety bonds for the Legacy Apache Properties, including all documents related to FWE I's indemnity obligations to the surety companies.

6.  All documents reflecting offers received by Apache for the purchase of any of the Legacy Apache Properties from March 2020 to the present, and all responsive documents.

7.  All documents reflecting assertions of rights of first refusal received by Apache related to any of the Legacy Apache Properties from March 2020 to the present, and all responsive documents.