# **EXHIBIT A**

**Surety Letter**



**CHIESA SHAHINIAN & GIANTOMASI PC**

ONE BOLAND DRIVE
WEST ORANGE, NJ 07052

csglaw.com

**DARREN GRZYB**
dgrzyb@csglaw.com
(O) 973.530.2077
(F) 973.530.2277

April 16, 2021

*Via Email and Regular Mail*
Robin Russell, Esq.
Hunton Andrews Kurth
600 Travis Street
Suite 4200
Houston, TX 77002

  Re: Surety: Everest Reinsurance Company
    Bond No.: ES00001441
    Bonded Contract: Decommissioning Agreement
    In Re: Fieldwood Energy LLC, Case No. 20-33948

Ms. Russell:

  My firm represents Everest Reinsurance Company ("Everest") in connection with the above-referenced Payment Bond (the "Everest Bond") that Everest, as surety, issued on behalf of Fieldwood Energy LLC ("Fieldwood"), as principal, in favor of Apache Corp. ("Apache"), as obligee, relating to the Decommissioning Agreement dated September 30, 2013.[1]  While the Everest Bond was issued on Everest paper, Everest is a party to a certain Claims Sharing Agreement with HCC International Insurance Company PLC ("HCCI") relating to the Everest Bond, with each surety thereunder responsible for their allocated share of liability.  My firm also represents Everest, as well as other sureties, in Fieldwood's bankruptcy case (the "Bankruptcy").  The Decommissioning Agreement is supported by:  (a) cash in Trust A in the current amount of $238 million; and (b) a total of $498 million in surety bonds, including the Everest Bond (collectively, the "Decommissioning Bonds") and letters of credit, which are guaranteed by surety companies (collectively, the "Decommissioning Letters of Credit" and, with the Decommissioning Bonds, collectively, the "Decommissioning Security").  HCCI, Zurich American Insurance Company, U.S. Specialty Insurance Company and Philadelphia Indemnity Insurance Company (collectively, the "Sureties"), which, along with Everest, issued bonds relating to the Decommissioning Security and are likewise impacted.

  Accordingly, we hereby advise Apache that the agreements it has negotiated with Fieldwood as part of the Bankruptcy, without the Sureties' knowledge, consent or participation, directly affect Apache's ability to continue to rely upon the Decommissioning Security.  The transaction Apache has negotiated with Fieldwood will result in, among other effects:  (a) discharge of the Sureties by reason of Apache's and

---

[1] For simplicity, this letter refers to Apache and its affiliates, collectively, as "Apache" and Fieldwood and its affiliates, collectively, as "Fieldwood," unless identifying a subsidiary or affiliate is material to the discussion.

Robin Russell, Esq.
April 16, 2021
Page 2

Fieldwood's material alteration of the Decommissioning Agreement; (b) impairment of the suretyship status of the Sureties; (c) payment to Apache and satisfaction under the Decommissioning Agreement; and (d) interference by Apache with the Sureties' relationship with its principal, Fieldwood. Apache has failed to consider the Sureties' position and, as of the date of this letter, has not agreed to meet in good faith to discuss a better solution than what is set forth in the Plan.

    **I.**    ***Relevant Facts***

    **The Surety Indemnity Agreements**: Prior to the issuance of each of the bonds that relate to the Decommissioning Security, Fieldwood was required to execute standard, surety indemnity agreements in favor of the issuing surety. Apache, as an operator of oil and gas leases in the Gulf of Mexico, is well aware of the requirements for surety indemnity agreements and the standard terms associated with such agreements. Under the Agreement of Indemnity that Fieldwood executed for Everest (the "Everest Indemnity Agreement"), Fieldwood was obligated to, among other things: (a) pay all premiums when due; and (b) indemnify Everest and save it harmless from and against any and all costs and damages incurred by reason of Everest's execution of the Everest Bond. In order to secure Fieldwood's obligations to Everest, Fieldwood granted Everest a security interest in "all goods (including inventory, equipment and any accessories thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property supporting obligations, any Contract or contract rights or rights to payment of money, insurance claims and proceeds, and all general intangibles." Fieldwood further agreed to not "change or convert its respective individual, corporate or partnership status to the extent such change has the effect of limiting, reducing or shielding the liability of … the entity." These are standard requirements for bonding in this industry and the other Sureties involved with the Decommissioning Security were given the same or similar protections in the indemnity agreements that Fieldwood executed in their favor.

    **The Pre-Petition Bonded Contract and Decommissioning Security**: The terms and conditions of Apache's ability to draw upon the Decommissioning Security are set forth in the Decommissioning Agreement and the Decommissioning Bonds and/or Decommissioning Letters of Credit. Apache cannot look to the Decommissioning Security until the Trust A Cash is exhausted and has been spent on plugging and abandonment required by law or contract.

    Under the Everest Bond, Apache commences the claim processes for decommissioning by issuing a Decommissioning Drawing Request in the form attached to the bond. In order for Apache to recover under a Decommissioning Drawing Request, Apache has to certify, among other things that: (i) Apache is entitled to make a drawing in the amount demanded "pursuant to the terms and conditions of the Payment Bond and of the Decommissioning Agreement;" (ii) Fieldwood "has failed to reimburse and pay [Apache] for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement);" and (iii) Apache has "complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement."

    In order for a Reimbursable Event to arise under the Decommissioning Agreement, which could possibly allow Apache to draw on the Decommissioning Security, a Government Authority or any other Person must seek to cause Apache to conduct Decommissioning that is "**required in accordance with applicable Law or contract**." The emphasized language is the definition of "Government Decommissioning" under the agreement. (Decom. Agreement, ¶ 2.7) Upon receiving a "Seller Notice" from Apache, Fieldwood has the right to object to whether such Government Decommissioning is required under applicable Law or contract by issuing a "Buyer Notice." (Id.) If Apache and Fieldwood are unable to resolve disputes as to whether a Reimbursable Event has arisen, there are procedures in the Decommissioning Agreement aimed at arriving at a fair decision by a neutral Expert appointed by the Parties. It is important to note that, pre-petition, Fieldwood

Robin Russell, Esq.
April 16, 2021
Page 3

was motivated to perform as the primary obligor under the Decommissioning Agreement and the Decommissioning Security and to ensure no improper demands were made upon the Decommissioning Security because Fieldwood owed the Sureties an obligation of indemnity and exoneration and the obligation to collateralize the Sureties for losses or potential losses in accordance with the surety indemnity agreements and the common law.

**The Plan of Reorganization and the Definitive Apache Documents:** By entering into the RSA[2] and the Definitive Apache Documents, Apache has materially altered the fundamental character of the Sureties' principal, Fieldwood, as well as the terms of Decommissioning Agreement, to the detriment, and likely discharge, of the Sureties. Without the Sureties' knowledge or consent, Apache negotiated and entered into the RSA and Apache Term Sheet prior to the filing of Fieldwood's bankruptcy petition. Furthermore, without the Sureties' knowledge or consent, Apache negotiated the Definitive Apache Documents as part of Fieldwood's Plan of Reorganization (the "Plan").

Once the Plan goes effective, Fieldwood's assets will all be transferred to newly-formed entities or abandoned. Under the Plan, Fieldwood proposes to create Fieldwood I ("FWE I") as a new single-purpose entity to own and operate the Legacy Apache Assets. The Plan apparently seeks to have FWE I assume the Decommissioning Security. Yet, the Plan also seeks to eviscerate the Sureties' rights of indemnity, exoneration and to be held and kept harmless, notwithstanding the fact that the Plan calls for the assumption of the bonded contract, the Decommissioning Agreement. Article 4(ix) of the Implementation Agreement provides:

> (ix) With respect to all bonds and letters of credit constituting Decommissioning Security, all claims for premiums, fees, reimbursement, indemnification, or any other claims, fixed, contingent, liquidated, unliquidated, or otherwise against the Debtors held by the companies issuing the bonds or letters of credit, shall neither be allocated to nor become the obligations of FWE I under the Plan of Merger. Notwithstanding the foregoing, all rights of the Apache PSA Parties with respect to such bonds and letters of credit shall be preserved as against such bonding companies and letter of credit issuers in all respects. The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee.

[Dkt. No. 723-1, p. 129].

Under the Plan, Fieldwood is ceding control of FWE I to Apache. The Limited Liability Company Agreement of Fieldwood I LLC (the "FWE I LLC Agreement") requires Apache's consent for FWE I to carry out all regular business functions other than operating or decommissioning the Legacy Apache Properties. Apache's consent is required for FWE I to incur debt other than pursuant to the Standby Facility being extended by Apache. Apache's consent is required for FWE I to use free cash for any purpose other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation. Apache's consent is required for FWE I to make or receive any capital contribution. Apache's consent is

---

[2] Capitalized terms not otherwise defined in this letter have the meaning set forth in Fieldwood's proposed chapter 11 plan.

Robin Russell, Esq.
April 16, 2021
Page 4

required for FWE I to grant a lien.  Under the FWE I LLC Agreement, the Sole Manager of FWE I serves at the consent of Apache and can be removed by Apache.

FWE I has vowed to not take any position in any proceeding opposed to or inconsistent with Apache's ability to draw on the cash in Trust A or the Decommissioning Security.  In short, FWE I will be completely controlled and dominated by Apache if the Plan, as it is currently written, is confirmed, and Apache will be able to determine for itself whether it can draw on the Decommissioning Security.

    **II.**  *Reservation of Claims and Defenses by Everest and the Other Sureties*

Everest, and the other Sureties, submit that their bonds may be not assumed by FWE I or the debtor or any other entity as part of the Bankruptcy, without the Sureties' consent.  This is likely to be a contentiously litigated issue in the Bankruptcy.  To the extent the Plan is nonetheless confirmed, the Sureties submit that the Plan cannot alter their rights or defenses under the Decommissioning Security with respect to potential future claims by Apache.  Moreover, the Plan cannot alter the Sureties' rights of subrogation, common law indemnity, quia timet, and/or reimbursement, and the Sureties' participation in the Bankruptcy will not constitute a waiver or alteration of any of the Sureties' rights or defenses, unless the Sureties expressly agree to such waiver or alteration. Indeed, one of the goals of this letter is to demonstrate to Apache that, in the event the Plan is confirmed in its current form, Apache's ability to continue to rely upon the Decommissioning Security will be altered.  Therefore, it behooves Apache to cooperate with the Sureties to modify the Plan in a manner that is acceptable to both the Sureties and Apache.

    **III.**  *The Plan, if Confirmed in its Current Form, Will Discharge the Sureties Due to the Material Alteration of the Sureties' Obligation under the Bonds*

A material alteration of the bonded contract without the surety's consent will result in the discharge of the surety.  *See Metlife Capital Credit Corp. v. Gulf Coast Plating, Inc.*, 1987 WL 14375, at *2 (S.D. Tex. June 15, 1987) ("Generally, under Texas law, any contract alteration between a principal debtor and a creditor discharges a guarantor. A guarantor is obligated only in respect to the contractual agreement of the obligee and principal obligor and any material alteration of such guaranty agreement completely discharges the guarantor's undertaking."); *Veldekens v. GE GFS Holdings, Inc.*, 2009 WL 10693904, at *7 (S.D. Tex. Aug. 3, 2009) ("A guarantor is discharged if the material alteration 'imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification' or 'would otherwise cause the secondary obligor a loss.'") (quoting Restatement (Third) of Suretyship and Guaranty § 41 (1996) (the "Restatement")).

The elements of a material alteration giving rise to a discharge of the surety are:  "(1) the existence of a material alteration to the underlying contract; (2) lack of consent to the alteration; and (3) harm resulting from the alteration."  *Frost National Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App. 2000).  The test is whether the alteration of the bonded contract "causes it to fail to reflect the meaning and intent of the parties to the agreement."  *Id.*  The reason behind the rule is "to prevent unsavory deals between a holder and a maker designed to disadvantage the guarantor."  *In re Murchison*, 102 B.R. 545, 548 (Bankr. N.D. Tex. 1988).  Moreover, the discharge rule stems from it being "plainly inequitable for two parties to a tripartite transaction to agree that the third party be liable." *Id.*

Turning to this case, the deal constructed by Fieldwood and Apache, without the Sureties' consent, is precisely the type of unsavory transaction that the discharge rule is designed to prevent.  The Decommissioning Agreement, with its amendments, was an arm's length transaction between Apache and Fieldwood relating to

Robin Russell, Esq.
April 16, 2021
Page 5

the 2013 acquisition by Fieldwood of the Legacy Apache Properties. Fieldwood was completely independent of Apache. Under the Decommissioning Agreement, Apache could only look to Fieldwood to pay Reimbursable Amounts, which were actual out-of-pocket expenses that arose as a result of Government Decommissioning. Under the Decommissioning Agreement, Fieldwood had the right to dispute whether Apache had properly requested that Fieldwood perform Government Decommissioning and the right to have the dispute resolved by an independent, third-party Expert. Apache could not draw upon the Decommissioning Security unless it could certify that a Reimbursable Event had arisen and that Apache was entitled to payment of a Reimbursable Amount. Fieldwood was required to indemnify, exonerate and hold the Sureties harmless for losses under the Bonds, so Fieldwood had an incentive to perform the Decommissioning Agreement as primary obligor and to ensure it was not being asked to fulfill Decommissioning that was beyond the scope of its agreement with Apache. Moreover, the Sureties had the right to be placed in collateral by Fieldwood to secure Fieldwood's indemnity obligations to the Sureties.

The Plan, and the Definitive Apache Documents, materially alter the fundamental nature of the Decommissioning Agreement, resulting in a discharge of the Sureties. Although Fieldwood and Apache do not admit it, the terms of the Plan and the Definitive Apache Documents are nothing less than a modification of the Decommissioning Agreement and a hard reset of the parties' obligations under it. Moreover, under the Plan, Apache will essentially be on both sides of the Decommissioning Security. It will be in control of FWE I. FWE I is obligated to take no action that would compromise Apache's ability to draw on the Decommissioning Security, and thus Apache is apparently granted the ability to decide for itself whether a Reimbursable Event has arisen. The Decommissioning Agreement and Decommissioning Security, as modified by the Plan, are completely different agreements than the agreements for which the Sureties agreed to provide security. The Plan exponentially and unnecessarily increases the risk of the Sureties under the Decommissioning Security.

The Plan also materially alters the Sureties' risk by purporting to completely eviscerate the Sureties' common law and contractual exoneration and indemnity rights against Fieldwood. The Plan proposes to give FWE I the benefits of the Decommissioning Security without also assigning to it the related obligations to the Sureties. Further, even if the surety indemnity agreements were to be assigned to FWE I, the Sureties' rights would be impaired because FWE I could not grant collateral security to the Sureties without Apache's consent.

The sum effect of the Plan is to equate the Decommissioning Security with cash for FWE I's plugging and abandonment obligations, to be drawn upon as desired by Apache, with no ability by the Sureties to contest FWE I's ability to draw on the Decommissioning Security. The Sureties did not pledge cash as collateral for Fieldwood's obligations under the Decommissioning Agreement, and the attempt to convert the Decommissioning Security to a cash equivalent is a material alteration that gives rise to a discharge of the Sureties for any future claim by Apache.

    IV.  ***The Plan, if Confirmed in its Current Form, Will Result in an Impairment of the Sureties***

As obligee and/or ultimate beneficiary under the Decommissioning Bonds, Apache owes the Sureties well-defined obligations, including (i) ensuring that the risk to the surety on the underlying bonded transaction is not increased, as discussed above; (ii) ensuring that that the principal's ability to reimburse the surety is not impaired; (iii) ensuring that the principal's ability to perform is not impaired; and (iv) ensuring that the surety's subrogation rights are preserved. *See* Restatement (Third) of Suretyship & Guaranty § 37 (1996) (hereinafter the "Restatement"); *United States v. Great Am. Ins. Co. of NY*, 791 F. Supp. 2d 1337, 1359-60 (Fed. Cir. 2011), *aff'd sub nom. United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013); *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313-14 (Fed. Cir. 2011).

Robin Russell, Esq.
April 16, 2021
Page 6

The surety will be discharged if the obligee impairs the surety's recourse against the principal by (a) releasing the principal from the duty to pay money; (b) impairing the value of collateral securing the underlying obligation; or (c) any other act or omission that impairs (i) the principal's performance of the underlying obligation, (ii) the principal's obligation to reimburse the surety, or (iii) the surety's right of restitution or subrogation. Restatement § 37; *see also T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992) ("The defense of impairment of collateral is based on the creditor's obligation to use ordinary care to secure and preserve collateral in its possession from waste, injury, or loss. If the creditor breaches his duty, the surety is discharged on the note to the extent of his loss."); *Webb v. Finger Contract Supply Co.*, 447 S.W.2d 906, 907 (Tex. 1969) ("The prejudice to the surety by impairment of his subrogation rights … discharges the surety to the extent of the value of the security surrendered."); *id.* at 908 (discharging the guarantor because the creditor, "in subordinating the security which protected [the guarantor's] right to subrogation, diverted the whole security and destroyed the nature of the obligation which [the guarantor] guaranteed").

In this case, under the Plan, Apache seeks to impair the suretyship status of the Sureties in multiple ways, all of which may result in the discharge of the Sureties. First, Apache, along with Fieldwood and the Credit Bid Purchaser (collectively, the "RSA Parties"), have dramatically increased the risk that Fieldwood will not be able to perform its obligations as primary obligor because they are transferring many of Fieldwood's profitable assets to the Credit Bid Purchaser, likely depriving FWE I, upon Plan confirmation, of sufficient cash flow to pay for current or soon to arise P&A obligations for the Legacy Apache Properties. The RSA Parties have severely diminished the Sureties' collateral by transferring all of the Debtors' assets to newly-created entities that, per the Plan, will have no obligation to the Sureties. This, of course, severely impairs the Sureties' rights of subrogation, reimbursement and indemnity. Apache is also impairing the Sureties' rights by releasing Fieldwood from certain defaults under the Decommissioning Agreement that arose prior to the Effective Date of the Plan, which may, by way of example and among other things, result in the waiver of a $1,514,236.00 million claim against Fieldwood for diversion of Trust A Cash.

The Sureties believe that there is value in the Legacy Apache Properties that could be marketed or extracted by FWE I at some point in the future. If the Sureties are required to perform under the Decommissioning Security, the profit derived from that value should fund the Sureties' indemnity, subrogation and/or reimbursement rights. If Apache intends under the Plan to cut off those rights of the Sureties, then the Sureties are discharged of any obligation under the Decommissioning Security.

V. ***The Plan, if Confirmed in its Current Form, Gives Rise to a Substitution of Principal***

The principal on a surety bond may not be substituted absent consent of the surety, and if the principal is substituted, it will result in a discharge of the surety. 74 Am. Jur. 2d Suretyship § 66 (noting that a substitution of principal not assented to by the surety discharges the surety from liability); *Trustees of Carpenters & Millwrights Health Benefit Tr. Fund v. Kipco Co.*, 567 F.2d 951, 954 (10th Cir. 1977) (noting that "generally, a surety will not be liable for the default of a new principal to whose substitution it has not consented").

Under the Plan, Apache purportedly seeks to be able to draw on the Decommissioning Security even though it has agreed to a dissolution of the Sureties' principal, Fieldwood, and has agreed to the creation of FWE I to operate, decommission and plug and abandon the Legacy Apache Properties. The Sureties never consented to substitute FWE I for Fieldwood, and the attempt by Apache to effectuate such a substitution is improper and will result in a discharge of the Sureties.

Robin Russell, Esq.
April 16, 2021
Page 7

VI. *The Plan as Drafted Constitutes Payment to Apache or Performance by Fieldwood of its Obligations under the Decommissioning Agreement, Thereby Discharging the Sureties*

Absent the Plan and Definitive Apache Documents, Apache would likely be left with an undersecured, contingent claim against Fieldwood for plugging and abandonment obligations. As a predecessor owner, Apache would have to pay for Government Decommissioning to the extent such decommissioning was not covered by the Trust A Cash and the Decommissioning Security. Under the Plan, rather than having to pay for Government Decommissioning after the Trust A bonds and cash are exhausted, Apache is permitted to loan FWE I up to $400 million, in exchange for a blanket lien on all the Legacy Apache Assets and the receipt of significant interest. At the point in time in which all of the Trust A Cash and Decommissioning Security have been exhausted, the Legacy Apache Assets are likely to be much more economical than they are currently due to the completion of P&A and the continued recovery from historically low oil prices. The provision of a blanket lien on oil and gas assets and significant interest could constitute payment by Fieldwood of its obligations under the Decommissioning Agreement. Moreover, the ability to control FWE I, and if and how FWE I disposes of the Legacy Apache Assets, to the exclusion of the Sureties' rights, could constitute payment by Fieldwood of its obligations under the Decommissioning Agreement, which could result in a discharge of the Sureties. *See generally* TXJUR Suretyship § 85 (under Texas law, "[w]hen payments are made from the proceeds or fruits of the very contract or transaction covered by the obligation of a surety, and when the source of funds is known to the creditor or person receiving the payments, the surety equitably is entitled to have the payments applied to the discharge of the debt for which the surety is bound even though a different application has been made by the creditor") (citing *Aetna Cas. & Sur. Co. v. Hawn Lumber Co.*, 97 S.W.2d 460 (Tex. 1936), *opinion modified by* 98 S.W.2d 167 (Tex. 1936)).

VII. *Apache's Actions Have Tortiously Interfered with the Sureties' Business Relationship with their Principal*

"The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) the occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the claimant's damage; and (4) actual damage or loss occurred." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 856-57 (Tex. App. 2001). Interference must induce an actual breach. *Id.*

In this case, Apache has tortiously interfered with the Sureties' contractual relationship with its principal, Fieldwood. The contracts at issue are the surety indemnity agreements. Apache, as an industry participant, is aware of the existence and terms of surety indemnity agreements. Neither Apache nor Fieldwood invited the Sureties to participate in the preparation of the RSA, the Plan or the Definitive Apache Documents. Apache has agreed for Fieldwood to transfer all its assets to entities that are purportedly beyond the reach of the Sureties, in breach of the indemnity agreements. The Implementation Agreement negotiated by Apache expressly contemplates Fieldwood's breach of the indemnity agreements. Apache has negotiated a deal in which the emerging entity would not have to pay renewal premiums, in further breach of the indemnity agreements. The tortious interference by Apache has already caused Fieldwood to materially breach the indemnity agreements as Fieldwood is in default of its obligation to pay renewal premiums to the Sureties.

As noted above, the Sureties object to the Plan as it is currently constructed. The Sureties filed objections to the Disclosure Statement and will contest confirmation unless the Plan is modified to provide more equitable treatment of the Sureties. Nothing herein shall be construed as any kind of acknowledgement that the Sureties agree that their bonds can be assumed by the Debtors without their consent or that their indemnity agreements can be separated from their bonds. As noted above, this letter is to advise Apache that if the Plan is nonetheless confirmed, Apache may not be able to recover under the Decommissioning Security.

Robin Russell, Esq.
April 16, 2021
Page 8

While the Sureties are interested in a meeting with Apache and, if necessary, the Debtors, the items set out above are a result of Apache's unilateral conduct and unwillingness to engage with the Sureties.

    The Sureties expressly reserve all rights, claims and defenses, and waive none.

                      Very truly yours,

                      *Darren Grzyb*

                      Darren Grzyb
                      Member

cc:    Christopher Ward
       Duane Brescia
       Philip Eisenberg
       Elizabeth Guffy
       Robert Miller
       Jase Brown