**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------------- X
                                                                  :
In re:                                                            :  Chapter 11
                                                                  :
FIELDWOOD ENERGY LLC, *et al.*,                                   :  Case No. 20-33948 (MI)
                                                                  :
            Debtors.                                              :  (Jointly Administered)
                                                                  :
---------------------------------------------------------------- (

**OBJECTION OF ASPEN AMERICAN INSURANCE COMPANY, BERKLEY
INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS
AMERICA INSURANCE COMPANY TO APACHE CORPORATION'S EMERGENCY
MOTION [ECF NO. 1333] TO QUASH SUBPOENA, OR IN THE ALTERNATIVE, FOR
A PROTECTIVE ORDER**

Aspen American Insurance Company ("Aspen"), Berkley Insurance Company ("Berkley"), Everest Reinsurance Company ("Everest") and Sirius America Insurance Company ("Sirius"), joined by Philadelphia Indemnity Insurance Company, HCCI, Lexon Insurance Company, Liberty Mutual Insurance Company, Zurich American Insurance Company and North American Specialty Insurance Company (collectively, the "Sureties"), hereby file this Objection to Apache Corporation's ("Apache") Emergency Motion [ECF No. 1333] (the "Emergency Motion") to Quash Subpoena, or in the Alternative, for a Protective Order.  In support of their Objection, the Sureties state as follows:

**PRELIMINARY STATEMENT**

1.      The Sureties respectfully submit that this Court should deny the relief requested by Apache in its entirety.  Apache states in its papers that the Subpoena was served by Everest and HCCI, but that is incorrect.  Apache appears to be under the impression that the Subpoena seeks only those documents and information related to the issues set forth in the letter sent from Everest

to Apache on April 16, 2021 (the "Apache Letter"), which is also incorrect.  The Subpoena was issued by Aspen, Berkley, Everest and Sirius, and was issued in coordination with several other sureties impacted by the FWE I construct—sureties that issued both private and government bonds. So as a preliminary matter, the equation by Apache of the issues in the Apache Letter with the issues in the Subpoena is a misunderstanding.  The issues sought to be explored in the Subpoena are related to confirmation and are unrelated to the Apache Letter.

2.      The Subpoena was issued to Apache because Apache is a party to the Restructuring Support Agreement ("RSA").  The creation of FWE I is a primary component of this multi-billion-dollar decommissioning bankruptcy.  As set forth below, if the Plan as it is currently constructed is approved, Apache will be in effective control of FWE I.  The Sureties have concerns about the feasibility of FWE I, whether the Plan serves the best interest of general unsecured creditors and whether Apache is given undue preferential treatment.  The intent and business plans of Apache in controlling FWE I post-confirmation are relevant to whether the Plan should be confirmed, and the impact of the Plan on the surety bonds.  These issues affect all sureties with bonds related to the FWE I Assets[1]—not just Everest and HCCI, and those other sureties with private bonds in favor of Apache.

3.      Given that the expected plugging and abandonment costs for the FWE I Assets are estimated to be in the billions of dollars, a deposition of Apache and requiring Apache to bring documents to the deposition is certainly proportional to the needs of the case.

4.      With respect to the documents, the Subpoena is not untimely as suggested by Apache.  This Court's prior Scheduling Order provided for a deadline of April 14, 2021 to serve

---

[1] Terms not defined herein have the same meaning as set forth in the Plan and the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Dkt Entry No. 1285].

HB: 4823-4832-9192.1

"Discovery Requests."  As set forth more fully below, a subpoena to a third party for documents is not a "Discovery Request."  A "Discovery Request" refers to *requests* for interrogatories, *requests* for production, *requests* to inspect land, etc. served *on a party* to the litigation.  A subpoena duces tecum is not a "request."  It is a court order.  This distinction between a "discovery request" and a subpoena duces tecum is reflected in several cases discussed below.  And there is a split amongst the courts as to whether scheduling orders even apply to third party subpoenas.  Some courts hold that third party subpoenas are unaffected by scheduling orders.  And some courts hold the opposite.  However, as discussed below, the courts in the latter category were almost all dealing with third party subpoenas that were issued well after the close of all discovery (fact and expert).  They were not dealing with a "discovery request" deadline in a scheduling order or subpoenas issued in the middle of fact discovery.  Those courts were also relying on a prior version of Fed. R. Civ. P. 26 which expressly included Rule 45 subpoenas in the definition of discovery—something that has been written out of the current rule.  At the very least the term "discovery requests" is ambiguous and the Sureties respectfully submit that they should not be prejudiced because of that.

5.       In the alternative to requesting that this Court find that the term "discovery requests" does not encompass third party subpoenas for documents, the Sureties request that this Court extend the "discovery request" deadline by seven days to April 21, 2021, the date that Apache was served with the Subpoena.[2]  There is no prejudice to Apache in extending the deadline,

---

[2] To the extent this Court believes that the Sureties may not properly seek affirmative relief in Opposition papers, the Sureties request leave to file a stand-alone emergency motion seeking to extend the "Discovery Request" deadline by seven days.  The Sureties include this alternative request for relief in their Opposition papers for purposes of efficiency, to avoid duplicative litigation and because of the emergent nature of this dispute.

HB: 4823-4832-9192.1

and the extension of the deadline should have no impact on any other dates in the Court's Scheduling Order. Apache knew that the Sureties were going to serve a Subpoena five days after the "discovery request" deadline, when the Sureties asked Apache's counsel if it would accept service of the Subpoena on behalf of Apache.

## RELEVANT FACTS

6.      Pre-petition, the Sureties issued many surety bonds in favor of Apache as obligee, as well as the government as obligee, related to the FWE I Assets. The majority of the bonds assure the Debtors' decommissioning obligations to Apache and the Bureau of Ocean Energy Management ("BOEM"), subject to the terms of the bonds and applicable law. The Debtors' decommissioning obligations to Apache arise out of a 2013 Purchase and Sale Agreement between Apache and certain of the Debtors for the sale of the Legacy Apache Properties to the Debtors. The Debtors' decommissioning obligations to BOEM arise as a matter of law based upon the Debtors' leasehold interests in the FWE I offshore oil and gas assets.

7.      On August 3 and 4, 2020, the Debtors filed their chapter 11 bankruptcy cases with Apache's backing pursuant to the RSA dated August 4, 2020.

8.      On January 4, 2021, the Court held a hearing on the *Debtors' Motion for Entry of an Order Extending Exclusive Periods Pursuant to Section 1121(d) of Bankruptcy Code* [Dkt Entry No. 625] (the "Exclusivity Motion") and associated objections, which Apache's counsel attended (the "Exclusivity Motion Hearing"). *See* [Dkt Entry No. 735]. Certain of the sureties had objected to the Exclusivity Motion because the Exclusivity Motion suggested that surety bond premiums were being paid to the sureties in the ordinary course, which the sureties argued was inaccurate. [Dkt Entry No. 686]. After a colloquy with lawyers for various sureties, the Court determined that if the sureties wanted to resolve the administrative expense status of the surety bond premiums

HB: 4823-4832-9192.1

prior to confirmation, they could file an adversary proceeding on or before January 20, 2021.

Consistent with the Court's oral ruling, the Court entered the *Order Pursuant to Section 1121(d)*

*of the Bankruptcy Code Extending Exclusive Periods* (the "Exclusivity Order") [Dkt Entry No.

751]  Paragraphs 4 and 6 of the Exclusivity Order are relevant:

> 4.      Any of the Debtors' surety providers (collectively, the "Sureties")
> may, but shall not be required to, commence an adversary proceeding on or
> before January 20, 2021 (the "Adversary Proceeding Deadline") requesting
> that this Court determine whether the Sureties hold administrative expense
> claims pursuant to section 503(b) of the Bankruptcy Code against any of the
> Debtors for surety bond premiums on account of surety bonds that were
> issued prior to the Petition Date.
>
> . . .
>
> 6.      For the avoidance of doubt, (i) nothing herein waives, alters, or
> amends any of the Sureties' rights, claims or defenses in this case or
> otherwise, including any right to file a motion for allowance and payment
> of administrative expense claim pursuant to section 503(b) of the
> Bankruptcy Code; (ii) the establishment of the Adversary Proceeding
> Deadline does not prevent or alter any of the Sureties' rights to object to
> plan confirmation on any grounds or to apply to this Court for any form of
> relief; (iii) nothing herein waives, alters, or amends any of the Sureties'
> rights, claims or defenses with respect to any collateral; and (iv) nothing
> herein waives, alters, or amends any of the Debtors' rights, claims or
> defenses.

See **Exhibit A**.

9.      On January 1, 2021, the Debtors filed the initial version of their chapter 11 plan,

which they have amended four times, culminating in the solicitation version. The Plan

contemplates the establishment of FWE I pursuant to a divisive merger.  In conjunction therewith,

the Plan contemplates various agreements as part of the Apache Term Sheet Implementation

Agreement (collectively, the "Apache Implementation Agreements").     The Apache

Implementation Agreements include: (a) a limited liability company operating agreement for FWE

HB: 4823-4832-9192.1

I (the "FWE I Operating Agreement"); (b) a transition services agreement between FWE I and the Credit Bid Purchaser (the "FWE I TSA"); and (c) a farmout agreement between Credit Bid Purchaser and FWE I (the "FWE I Farmout Agreement"). Under the FWE I Operating Agreement, FWE I will only have one officer: the Sole Manager; one director: the Independent Director; and no employees. It will rely on access to employees of the Credit Bid Purchaser pursuant to the FWE I TSA in order to conduct operations.

10.     The FWE I Operating Agreement grants Apache de facto control over FWE I. More specifically, Section 7 and Section 10 of the FWE I Operating Agreement, the FWE I TSA, and the FWE I Farmout Agreement grant Apache numerous rights regarding governance, management, and operational control (collectively, these rights are referred to as the "Apache Control Rights") over FWE I. The specific sections of the FWE I Operating Agreement include: (a) veto rights over the selection of the independent director of FWE I, who cannot be removed without Apache's consent [Section 7.02]; (b) consent rights over removal of the sole manager of FWE I [Section 7.03]; (c) consent and information rights for bids for service providers to conduct P&A operations [Section 7.04]; (d) consent rights as to sales, fundamental business transactions, or farmins [Section 7.06]; (e) consent rights as to farmouts [Section 7.06]; (f) consent rights with regard to any development activities, including those with positive or accretive investment profile [Section 7.06]; (g) the ability to block FWE I from incurring debt other than loans funded by Apache, even if such indebtedness is on more favorable terms of use for accretive investment activities [Section 7.06]; (h) right of first refusal and information rights for the funding of capital expenditures [Section 7.09]; (i) information rights as to monthly operating data and operating budget [Section 10.01]; and (j) inspection rights [Section 10.01]. Additionally, Apache enjoys consent rights over

6

the selection of P&A service providers under the FWE I TSA and rights under the FWE I Farmout Agreement.

11.     Although Apache attempts to downplay the effect of these provisions and its status as an RSA party and consent party to various provisions in the Plan, in reality Apache is the quasi-proponent of the Plan concerning FWE I.   There is reason the operative documents are characterized as the "**Apache** Term Sheet Implementation Agreement."

12.     On April 6, 2021, the Court entered a *Scheduling Order* [Dkt Entry No. 1224] (the "Scheduling Order") **Exhibit B**, which set April 14, 2021 as the deadline to serve "Discovery Requests" and May 10, 2021 as the deadline for fact witness depositions.

13.     On April 21, 2021, Aspen, Berkley, Everest and Sirius, in coordination with several other sureties, served a subpoena on Apache noticing Apache's deposition pursuant to Fed. R. Civ. P. 30(b)(6) for May 10, 2021, and requesting production of certain documents.   See **Exhibit C**. Apache filed a Letter Brief to quash the Subpoena on April 30, 2021.   [Dkt Entry No. 1322].   This Court granted leave for Apache to file an emergency motion on May 3, 2021.   [Dkt Entry No. 1330].   Apache filed its Emergency Motion on May 5, 2021.   [Dkt Entry No. 1333].

## THE SUBPOENA IS TIMELY

14.     As made clear in the Exclusivity Order, no deadline was set regarding discovery at the Exclusivity Motion Hearing.   The only deadline set was a pre-confirmation deadline for filing an adversary proceeding regarding payment of surety bond premiums.   It is unclear why Apache thinks that this surety bond premium adversary complaint deadline has anything to do with Apache or other confirmation issues.   And although Apache cites a portion of the transcript from the Exclusivity Motion Hearing, Apache fails to attach the transcript to its Emergency Motion so the

HB: 4823-4832-9192.1

Sureties do not know what it is referencing.  In any event, it is irrelevant because the Order granting the extension of exclusivity is clear.

15.     Additionally, the Scheduling Order only applies to "Discovery Requests."  A subpoena to a third party is not a "Discovery Request" as that term is commonly used.  That term is commonly used to refer to requests for interrogatories, requests for admission, requests to inspect land, and requests for production of documents *on a party*.  It is not used to refer to a subpoena on a third party to produce documents.  A subpoena commanding a third party to produce documents is not a "request" at all, but a court order.  *King v. Fid. Nat. Bank of Baton Rouge*, 712 F.2d 188, 191 (5th Cir. 1983) (noting that a subpoena is a court order and that a party that fails to comply with a subpoena is subject to sanctions); *In re Rosenthal*, CIV.A. H-04-186, 2008 WL 983702, *8 (S.D. Tex. Mar. 28, 2008) ("A subpoena is a court order that requires a person to who it is directed to give testimony or produce evidence.") (citing 9 Charles R. Richey, *Moore's Federal Practice* § 4502[1] (3d ed. 2007)).

16.     There is a split among courts as to whether a scheduling order even applies to third party subpoenas. Some courts hold that a scheduling order does not apply to third party subpoenas. *E.g.*, *Multi-Tech Sys., Inc. v. Hayes Microcomputer Products, Inc.*, 800 F. Supp. 825, 854 (D. Minn. 1992) (upholding a magistrate judge's ruling that a third-party subpoena duces tecum was not a discovery request and thus was not subject to the court's scheduling order for discovery); *Mayberry v. Trans Union, LLC*, CV 18-3262, 2020 WL 1904591, *3 (E.D. Pa. Apr. 17, 2020) (upholding a predecessor judge's finding that subpoena duces tecums served on third parties were not subject to discovery deadlines in the scheduling order); *O'Boyle v. Jensen*, 150 F.R.D. 519, 520 (M.D. Pa. 1993) (holding that subpoenas addressed to third parties are not affected by a court's scheduling order, and that the scheduling order only applies to discovery in the form of

HB: 4823-4832-9192.1

interrogatories or depositions. "It was not intended to preclude, and does not preclude, parties gathering additional information on their own case or that of their opponent through independent lines of inquiry . . .").

17.      Other courts hold that scheduling orders do apply to third party subpoenas.  *E.g.*, *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 444-45 (D. Minn. 1997) ("[T]o allow a party to continue with formal discovery—that is, discovery which involves the authority of the Court—whether in the guise of Rule 45, or any of the other discovery methods recognized by Rule 26(a)(5), after the discovery deadline unnecessarily lengthens [sic] discovery process, and diverts the parties' attention, from the post-discovery aspects of preparing a case for Trial . . ."); *Alper v. United States*, 190 F.R.D. 281, 283-84 (D. Mass. 2000) (holding that a subpoena to a third party for documents constitutes "discovery" within the meaning of Rules 26 and 34, and therefore must comply with a court's discovery schedule); *Dreyer v. GACS Inc.*, 204 F.R.D. 120, 122-23 (N.D. Ind. 2001) (holding that third party subpoenas are subject to a court's scheduling order because they constitute discovery under Rule 26 and 34).

18.      However, almost all of the courts in the latter group were dealing with subpoenas that were issued well after the close of all discovery (fact and expert).  They were not dealing with a "discovery request" deadline in a court's scheduling order, and they certainly were not dealing with third-party subpoenas issued in the midst of fact discovery.  Almost all of the courts in the latter group also relied upon a prior version of Rule 26 which specifically mentioned Rule 45 subpoenas as a form of discovery—something that has been written out of the current rule. *Compare Mortgage Info. Servs., Inc. v. Kitchens*, 210 F.R.D. 562, 566 (W.D.N.C. 2002) (holding that third party subpoenas are subject to a court's scheduling order—"[a]s other courts have noted, this conclusion is essentially mandated by the text of Rule 26, which expressly incorporates Rule

HB: 4823-4832-9192.1

45 subpoenas into its definition of discovery.") *with* Fed. R. Civ. P. 26 (no longer including a reference to Rule 45 subpoenas in its definition of discovery).

19.     The Sureties believe that the term "Discovery Requests" clearly does not encompass third party subpoenas for documents.  But at the very least, the term is ambiguous and the Sureties should not suffer prejudice because of the term.  There are numerous cases which clearly distinguish a subpoena duces tecum from a "discovery request."  *E.g.*, *E.E.O.C. v. Holmes & Holmes Indus., Inc.*, 2:10-CV-955-DAK-PMW, 2011 WL 5118306, *1 (D. Utah Oct. 27, 2011) ("Through discovery requests and a subpoena [duces tecum] to Beatblazer, Defendants sought the production of copies of lyrics and videos for each and every song Plaintiffs have written, produced, or otherwise published."); *290 Pratt St., LLC v. Gen. Motors Corp.*, CIV. 3:05CV489 (WWE), 2007 WL 1203582, *1 (D. Conn. Apr. 18, 2007) ("Plaintiff's motion to compel compliance with the subpoena duces tecum and discovery requests is GRANTED."); *U.S. S.E.C. v. TenFold Corp.*, 2:03-CV-00442 TC, 2005 WL 7874298, *2 (D. Utah Aug. 19, 2005) ("If any party receives a subpoena or discovery request calling for production of any document or information covered by this Order, that party must immediately notify TenFold."); *People v. Marrero*, 587/20, 2021 WL 1419041, *2 (N.Y. Sup. Ct. Apr. 13, 2021) (addressing a subpoena duces tecum served on a hospital for medical records and noting that the HIPAA statute 45 C.F.R. § 164.512(e) expressly permits disclosure of protected health information "[i]n response to a subpoena, discovery request, or other lawful process . . .").

20.     In the alternative to requesting that this Court find that the term "Discovery Requests" does not include third party subpoenas, the Sureties request that this Court extend the "Discovery Requests" deadline by seven days so that the Subpoena served on Apache is timely. Apache knew about the Subpoena five days after the deadline and Apache was served with the

HB: 4823-4832-9192.1

Subpoena seven days after the deadline. There is no prejudice to Apache and extending the deadline should not have any impact on any other deadlines in the Court's Scheduling Order. And to the extent there is any impact, it is due to Apache's own actions in waiting nine days to file its application to this Court to quash the Subpoena.

## APACHE'S INTENTIONS IN EXERCISING ITS CONTROL RIGHTS ARE RELEVANT

21.      The 30(b)(6) deposition topics and supporting documentation are relevant to confirmation. Apache complains that the agreements associated with the Apache Term Sheet Implementation Agreements speak for themselves and any background is irrelevant. The Apache Implementation Agreements do not govern the sale of widgets—they control the management, corporate governance, and operations of FWE I. These documents do not exist in a vacuum. It is not only what the provisions say but why they exist, how they came to exist, and how they are intended to be used that is relevant.

22.      Confirmation of the Plan requires the Debtors to satisfy all applicable Bankruptcy Code provisions. 11 U.S.C. § 1129(a)(1). Section 1123 governs the contents of the Plan. Three of section 1123's provisions are central to the Sureties' concerns: (a)(4), (a)(6), and (a)(7).[3] The theme running through each of these subsections is fairness and equality of treatment. Section 1123(a)(4) requires all creditors classified in the same class to receive the same treatment. Sections 1123(a)(6) and (a)(7) work together to ensure that the voting rights and management of a new entity are fair and equitable. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1362 (9th Cir. 1986). In evaluating a debtor's satisfaction of these provisions, the Ninth Circuit

---

[3] Depending on the results of discovery, some of the Sureties may also make a lack of good faith argument under 11 U.S.C. § 1129(a)(3), which further supports taking Apache's deposition and the production of documents.

HB: 4823-4832-9192.1

identified three relevant factors: "the shareholders' interest in participating in the corporation, the desire to preserve the debtor's reorganization, and the overall fairness of the provisions." *Id.* To ensure overall fairness, control of corporate governance and management must mirror capital structure of the entity. *In re Ahead Commc'ns Sys., Inc.* 395 B.R. 512, 518 (D. Conn. 2008). The parties whose money and interests are in jeopardy should have control. The stakes for ensuring fairness and equity are high. Indeed, "[t]he drafters of section 1123(a)(6) expressed concern with ensuring a 'fair and equitable reorganization,' which 'is literally the last chance to conserve for [the creditors'] values that corporate financial stress or insolvency have placed in jeopardy.'" *Ahead*, 395 B.R. at 518 (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 11 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5797).

23.      The Apache Control Rights grant Apache control over FWE I at the expense of its other stakeholders, particularly the Sureties. The Plan classifies both Apache and the Sureties as holders of General Unsecured Claims in Class 6B. Yet, Apache enjoys the Apache Control Rights while the Sureties are left without any control. This contrast is further amplified by the fact that both Apache and the Sureties will be creditors of FWE I following the divisive merger based on liabilities associated with the Legacy Apache Properties. Moreover, under the terms of the Standby Facility, FWE I must exhaust the Decommissioning Security (the surety bonds and Trust A) prior to drawing on the Standby Facility. Given that FWE I is a winddown entity, it is creditors, not membership holders, who should be represented in the corporate governance, management, and operational control.[4] Based on the Debtors' valuation analysis, the Sureties' position in the

---

[4] This is particularly true for FWE I, as it is contemplated that it will be organized under Texas law. Upon insolvency, the fiduciary duties of management do not automatically shift to creditors. *E.g.*, *Tow v. Bulmahn (In re ATP Oil & Gas Corp.*), 711 F. App'x 216, 221 (5th Cir. 2017). This is likely in part why Apache, as a go-forward creditor of FWE I under the Decommissioning Agreement, just like the Sureties, bargained for the Apache Control Rights.

HB: 4823-4832-9192.1

FWE I capital structure is likely the fulcrum security. *See* Disclosure Statement, Exhibit O. Apache's control of FWE I's management, governance, and operations of FWE I does not reflect this reality.

24.     Bankruptcy Rule 7026(b)(1) provides that discovery may be had regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "Information can be relevant even if it only leads to other relevant information." *CSC Trust Co. of Del. v. Energy Future Intermediate Holdings Company LLC (In re Energy Future Holdings Corp.)*, 513 B.R. 651, 656-57 (Bankr. D. Del. 2014). "The standard for relevancy, however, is construed more loosely in the discovery context than at trial." *Id.* at 657 (citations and internal quotations omitted). As a result, the standard for discovery is broad: "discovery is ordinarily allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." *Id.* at 656.

25.     As explained above, the standards for evaluating 11 U.S.C. §§ 1123(a)(6), and (a)(7) are flexible and consider the totality of the circumstances, including potential future results of the relevant provisions. The Ninth Circuit in *Acequia* recognized this reality and it did not limit its analysis to the plain language of the operative documents. In that case, the chapter 11 plan provided for the debtor's two shareholders to retain their interests but precluded them from voting for or removing the directors or officers during the pendency of the plan. *Acequia, Inc.*, 787 F.2d at 1361. Looking beyond the plan's provisions, the court affirmed the plan's stripping of the shareholders' control rights based upon the shareholders' prior behavior as well as how the provisions would shape the debtor's future governance. *Id.* at 1362. In sum, the Ninth Circuit recognized that the plan provisions cannot be analyzed without context and the parties' relationship to the provisions is equally relevant. *See also In re Energy Future Holdings Corp.)*, 513 B.R. 651,

HB: 4823-4832-9192.1

660-61 (Bankr. D. Del. 2014) (discovery concerning the debtors' solvency was relevant, assuming that terms of indenture agreement obligated debtor to pay a "make-whole" premium, as bearing on whether court would simply enforce terms of contract or could utilize equitable principles to adjust parties' obligations).

26.     The discovery sought in the Subpoena is relevant.  Just like the plan provisions in *Acequia*, the express language of the Apache Implementation Agreements only tells part of the story.  In addition to 11 U.S.C. §§ 1123(a)(6) and (a)(7), which speak directly to voting and management, other related provisions directly impact the propriety of voting and management provisions as part of an integrated organizational structure.  FWE I, as contemplated by the Plan, would be no different.  Indeed, the Apache Implementation Documents are an integrated transaction.  As a result, why Apache requested the Apache Control Rights, how they obtained the Apache Control Rights and how Apache intends to exercise the Apache Control Rights are *factual* issues and the Court will weigh these issues in assessing the overall fairness of the provisions and creditors' interests.[5]  Because the divisive merger is an integrated component of this process, the related topics in the Subpoena are also relevant.  Accordingly, the discovery sought pursuant to the Subpoena is relevant to whether the Plan satisfies 11 U.S.C. §§ 1123(a)(6), and (a)(7).

27.     Apache's revisionist account of the Exclusivity Motion Hearing; attempt to equate the Subpoena with the Apache Letter; and attempt to minimize its critical role in this case further confirm why the Subpoena is relevant.  Apache's obfuscation leaves the Sureties to infer that Apache's reasons for requesting the Apache Control Rights as well as their intentions in exercising

---

[5] Creditors' interests should be substituted for shareholders' because FWE I is a winddown entity.

those rights may not be aboveboard.  The discovery will allow the Sureties the opportunity to explore these relevant issues and possibly even narrow the Sureties' concerns.

## **CONCLUSION**

28.     For the foregoing reasons, the Sureties respectfully request that Apache's request to quash the Subpoena or be granted a protective order be denied in its entirety.

Dated: May 6, 2021

Respectfully submitted,

HUSCH BLACKWELL LLP

By:  */s/  Randall A. Rios*
    Randall A. Rios
    State Bar No. 16935865
    Timothy A. Million
    State Bar No. 24051055
    600 Travis, Suite 2350
    Houston, Texas  77002
    Tel:  713-525-6226
    Fax:  713-647-6884
    Email:  randy.rios@huschblackwell.com
    Email:  tim.million@huschblackwell.com

**CO-COUNSEL FOR ASPEN AMERICAN INSURANCE COMPANY, BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY AND SIRIUS AMERICA INSURANCE COMPANY**

And

HB: 4823-4832-9192.1

Armen Shahinian, Esq. (admitted *pro hac vice*)
(ashahinian@csglaw.com)
Scott A. Zuber, Esq. (admitted *pro hac vice*)
(szuber@csglaw.com)
Darren Grzyb, Esq. (admitted *pro hac vice*)
(dgrzyb@csglaw.com)
Terri Jane Freedman, Esq. (admitted *pro hac vice*)
(tfreedman@csglaw.com)

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange New Jersey 07052


**ATTORNEYS FOR ASPEN AMERICAN
INSURANCE COMPANY, BERKLEY
INSURANCE COMPANY, EVEREST
REINSURANCE COMPANY AND SIRIUS
AMERICA INSURANCE COMPANY**

HB: 4823-4832-9192.1

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 6, 2021, a copy of this document was served by electronic service on

all counsel of record *via* the Court's CM/ECF system.

*/s/ Timothy A. Million*
Timothy A. Million

HB: 4823-4832-9192.1