**<u>Exhibit C</u>**

**Revised FWE I LLCA**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY I LLC

*(a Texas Limited Liability Company)*

### [●], 2021

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

Error! Unknown document property name.

## TABLE OF CONTENTS

**ARTICLE I      DEFINITIONS** ........................................................................................**1**

    **Section 1.01    Definitions** .................................................................................**1**
    **Section 1.02    Interpretation** ..........................................................................**12**

**ARTICLE II     ORGANIZATION** ..................................................................................**12**

    **Section 2.01    Formation** .................................................................................**12**
    **Section 2.02    Name** .........................................................................................**13**
    **Section 2.03    Principal Office** ......................................................................**13**
    **Section 2.04    Registered Office; Registered Agent** .....................................**13**
    **Section 2.05    Purposes; Powers** ....................................................................**13**
    **Section 2.06    Term** .........................................................................................**14**

**ARTICLE III    CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ...........................**14**

    **Section 3.01    Initial Capital Contributions** .................................................**14**
    **Section 3.02    Additional Capital Contributions** ..........................................**15**
    **Section 3.03    Maintenance of Capital Accounts** ..........................................**15**
    **Section 3.04    Succession Upon Transfer** ......................................................**15**
    **Section 3.05    Negative Capital Accounts** .....................................................**15**
    **Section 3.06    No Withdrawals from Capital Accounts** .................................**16**
    **Section 3.07    Treatment of Loans from Members** ........................................**16**
    **Section 3.08    Modifications** ..........................................................................**16**

**ARTICLE IV    MEMBERS** .............................................................................................**16**

    **Section 4.01    No Personal Liability** .............................................................**16**
    **Section 4.02    No Withdrawal** ........................................................................**16**
    **Section 4.03    No Interest in Company Property** ...........................................**16**
    **Section 4.04    Certification of Membership Interests** ...................................**17**
    **Section 4.05    Meetings of Members** .............................................................**17**
    **Section 4.06    Action Without Meeting** .........................................................**18**
    **Section 4.07    Power of Members** ..................................................................**19**
    **Section 4.08    Similar or Competitive Activities; Business Opportunities** ...**19**

**ARTICLE V     ALLOCATIONS** ....................................................................................**19**

    **Section 5.01    Allocation of Net Income and Net Loss** ................................**19**
    **Section 5.02    Regulatory and Special Allocations** .......................................**19**
    **Section 5.03    Tax Allocations** .......................................................................**20**
    **Section 5.04    Allocations in Respect of Transferred Membership Interests** ...**22**

i

**ARTICLE VI    DISTRIBUTIONS** ................................................................**22**

    **Section 6.01    General** ................................................................**22**

    **Section 6.02    Tax Advances** ................................................................**23**

    **Section 6.03    Tax Withholding; Withholding Advances** ........................**24**

    **Section 6.04    Distributions in Kind** ................................................**25**

**ARTICLE VII    MANAGEMENT** ................................................................**25**

    **Section 7.01    Management of the Company** ....................................**25**

    **Section 7.02    Independent Director** ................................................**25**

    **Section 7.03    Sole Manager** ................................................................**26**

    **Section 7.04    Service Provider** ................................................**26**

    **Section 7.05    Actions Requiring Independent Director Consent** ............**27**

    **Section 7.06    Actions Requiring Apache Consent** ..............................**28**

    **Section 7.07    Compensation and Reimbursement of the Independent Director, the Sole Manager, the Service Provider and Credit Bid Purchaser** ....................**31**

    **Section 7.08    No Personal Liability** ................................................**31**

    **Section 7.09    Funding Capital Expenditures** ....................................**32**

**ARTICLE VIII    TRANSFER** ................................................................**33**

    **Section 8.01    General Restrictions on Transfer** ..............................**33**

**ARTICLE IX    EXCULPATION AND INDEMNIFICATION** ....................**34**

    **Section 9.01    Exculpation of Covered Persons** ................................**34**

    **Section 9.02    Liabilities and Duties of Covered Persons** ..................**35**

    **Section 9.03    Indemnification** ................................................**36**

    **Section 9.04    Survival** ................................................................**38**

**ARTICLE X    ACCOUNTING; TAX MATTERS** ................................**38**

    **Section 10.01    Financial Statements and Other Information** ............**38**

    **Section 10.02    Inspection Rights** ................................................**39**

    **Section 10.03    Income Tax Status** ................................................**40**

    **Section 10.04    Tax Matters Representative** ....................................**40**

    **Section 10.05    Tax Returns** ................................................**41**

    **Section 10.06    Company Funds** ................................................**42**

**ARTICLE XI    WINDING UP AND TERMINATION** ............................**42**

    **Section 11.01    Events Requiring Winding Up** ................................**42**

    **Section 11.02    Effectiveness of Termination** ................................**42**

    **Section 11.03    Liquidation** ................................................**42**

Error! Unknown document property name.

**Section 11.04  Certificate of Termination**...................................................................**44**
**Section 11.05  Survival of Rights, Duties, and Obligations**.........................................**44**
**Section 11.06  Recourse for Claims**...............................................................................**44**

**ARTICLE XII   MISCELLANEOUS**.....................................................................................**44**
   **Section 12.01  Expenses**....................................................................................................**44**
   **Section 12.02  Further Assurances**..................................................................................**45**
   **Section 12.03  Confidentiality**..........................................................................................**45**
   **Section 12.04  Notices**......................................................................................................**46**
   **Section 12.05  Headings**...................................................................................................**47**
   **Section 12.06  Severability**...............................................................................................**47**
   **Section 12.07  Entire Agreement**....................................................................................**48**
   **Section 12.08  Successors and Assigns**...........................................................................**48**
   **Section 12.09  No Third-Party Beneficiaries**.................................................................**48**
   **Section 12.10  Amendment**..............................................................................................**48**
   **Section 12.11  Waiver**......................................................................................................**48**
   **Section 12.12  Governing Law**.........................................................................................**48**
   **Section 12.13  Submission to Jurisdiction**......................................................................**49**
   **Section 12.14  Waiver of Jury Trial**...............................................................................**49**
   **Section 12.15  Equitable Remedies**.................................................................................**49**
   **Section 12.16  Attorney's Fees**........................................................................................**49**
   **Section 12.17  Remedies Cumulative**.............................................................................**49**
   **Section 12.18  Counterparts**............................................................................................**50**

| EXHIBIT A | FORM OF TRANSITION SERVICES AGREEMENT |
|---|---|
| SCHEDULE A | MEMBERS SCHEDULE |
| SCHEDULE B | INDEPENDENT DIRECTOR'S COMPENSATION |
| SCHEDULE C | SOLE MANAGER'S COMPENSATION |
| SCHEDULE D | ACCOUNTING PROCEDURES FOR APACHE OFFICERS AND EMPLOYEES |

Error! Unknown document property name.

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY I LLC

This Limited Liability Company Agreement of Fieldwood Energy I LLC, a Texas limited liability company (the "**Company**"), dated as of [●], 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member[1] executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.  Capitalized terms not defined where used in this Agreement shall have the meanings assigned to such terms in ARTICLE I of this Agreement.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on [●], 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company will own (i) the Legacy Apache Properties subject to the operational liabilities in connection therewith, including plugging and abandonment and decommissioning liabilities relating to the Legacy Apache Properties, and (ii) the equity interests of GOM Shelf;

**WHEREAS,** in accordance with the Term Sheet, [●] has been appointed to serve as the initial Independent Director of the Company in accordance with this Agreement; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the operation and management of the Company;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.**  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Acceptance Notice**" has the meaning set forth in Section 7.09.

---

[1] NTD: Please confirm identity of Initial Member and the equity holders of the Initial Member.

Error! Unknown document property name.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

      (a)     crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

      (b)     debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings. For the avoidance of doubt, neither Apache nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Apache**" means Apache Corporation, a Delaware corporation, and its successors or assigns.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

2

"**Approved Providers**" has the meaning set forth in Section 7.02(a).

"**BOC**" means the Texas Business Organizations Code, as amended and in effect at the time of this Agreement.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)    the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)    immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)    the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)    the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)    the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

(d)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset

3

pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, in form and substance reasonably acceptable to Apache.

"**Continuance**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

Error! Unknown document property name.

"**Credit Bid Purchaser**" means [_____],[2] a Delaware limited liability company, and its successors and assigns.

"**Credit Bid Purchaser Documents**" means the agreements entered into between the Credit Bid Purchaser and the Company in connection with the Plan of Reorganization, including but not limited to the Farmout Agreement, Transition Services Agreement, and the Credit Bid Purchaser Contract Services Agreement, if executed.

"**Credit Bid Purchaser Contract Services Agreement**" means, in the event the Credit Bid Purchaser becomes the Service Provider under Section 7.04 of this Agreement, the Contract Services Agreement to be entered into between the Credit Bid Purchaser and the Company in the form attached to the Implementation Agreement, which, if executed, will be deemed the Service Provider Agreement hereunder.

"**Decommissioning Agreement**" means that certain Decommissioning Agreement, dated as of September 30, 2013, by and among Apache, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood and GOM Shelf, as amended by (i) the First Amendment thereto dated as of September 30, 2013, (ii) the Second Amendment thereto dated as of September 30, 2013, (iii) the Third Amendment thereto dated effective as of April 25, 2017, (iv) the Fourth Amendment thereto dated effective as of September 1, 2017, as amended by that certain Letter Agreement dated January 3, 2018, and (v) the Fifth Amendment thereto dated effective as of April 11, 2018.

"**Decommissioning Security**" means the funds available from Trust A, the letters of credit, and the bonds from time to time outstanding pursuant to the Decommissioning Agreement or documents or instruments related thereto.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the certificate of division, the plan of division, the certificate of merger, and other documents filed by or on behalf of Fieldwood with respect to the Company with the Texas Secretary of State related to the divisive merger pursuant to the Plan of Merger and the formation of the Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

---

[2] <u>NTD</u>: Name to be confirmed.

**Error! Unknown document property name.**

"**Equity Securities**" means any and all Membership Interests of the Company and any securities of the Company convertible into, exchangeable for, or exercisable for, such Membership Interests, and warrants or other rights to acquire such Membership Interests.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager.  In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Farmout Agreement**" means that certain Farmout Agreement of even date herewith by and between the Company and Credit Bid Purchaser in the form attached to the Implementation Agreement.

"**Fieldwood**" means, prior to the effectiveness of the divisive merger pursuant to the Plan of Merger, Fieldwood Energy LLC, and, from and after the effectiveness of the divisive merger pursuant to the Plan of Merger, Fieldwood Energy III, LLC, a Texas limited liability company. and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**GOM Shelf**" means GOM Shelf LLC, a Delaware limited liability company, and its successors and assigns.

"**GOM Shelf Properties**" means those assets or properties owned by GOM Shelf.

Error! Unknown document property name.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Implementation Agreement**" means the [Second Amended Apache Term Sheet Implementation Agreement].

"**Independent Director**" means, initially, [●], or such other Person as may be designated or become the Independent Director pursuant to the terms of this Agreement. The Independent Director shall constitute a "manager" (as that term is defined in the BOC) of the Company.

"**Information Notice**" has the meaning set forth in Section 7.09.

"**Initial Member**" has the meaning set forth in the term Member.

"**Legacy Apache Properties**" means the list of assets set forth on Schedule I to the Plan of Merger.

"**Legacy Apache Properties PSA**" means that Purchase and Sale Agreement, dated as of July 18, 2013, between Apache and certain of its affiliates, Fieldwood and certain of its affiliates, and GOM Shelf, as such agreement has been amended.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Member**" means (a) each Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the Company's books and records as the owner of Membership Interests.  The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

7

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(f)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(g)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(h)     any gain or loss (including Simulated Gain) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(i)     any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(j)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(k)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining

8

Error! Unknown document property name.

Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(l)       any items which are specially allocated pursuant to Section 5.02 hereof shall not be taken into account in computing Net Income or Net Loss.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.02 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood into the Company and Fieldwood Energy III LLC, dated as of [●], 2021, and adopted by Fieldwood .

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

"**Qualified Person**" has the meaning set forth in Section 7.02(a).

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Recharacterization Mortgages**" has the meaning assigned to such term in Section 6.7 of the Decommissioning Agreement.

"**Regulatory Allocations**" has the meaning set forth in Section 5.02(f).

"**Rejection Notice**" has the meaning set forth in Section 7.09.

"**Related Party Agreement**" means any agreement, arrangement, or understanding between or among the Company or any of its Affiliates, on the one hand, and the Independent Director, the Sole Manager or any member or officer of the Company or any of its Affiliates, or any Affiliate of the Independent Director, the Sole Manager or any member or officer of the

Error! Unknown document property name.

Company or any of its Affiliates; in each case, as such agreement may be amended, modified, supplemented, or restated in accordance with the terms of this Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Restructuring Support Agreement**" means the Restructuring Support Agreement, dated as of August 4, 2020, by and among (i) Fieldwood and including the Fieldwood PSA Parties (as defined therein); (ii) the Consenting FLTL Lenders (as defined therein); (iii) the Consenting SLTL Lenders (as defined therein); and (iv) Apache.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service Provider**" has the meaning set forth in Section 7.04(a).

"**Service Provider Agreement**" has the meaning set forth in Section 7.04(a).

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2), provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

"**Standby Facility**" means a secured line of credit to be provided by Apache to the Company and GOM Shelf to fund the ongoing plugging and abandonment and decommissioning of the Legacy Apache Properties and the GOM Shelf Properties, which shall become available to advance funds to the Company and for use in accordance with the Standby Facility Documentation. The Standby Facility shall be secured by a first-priority lien on all the assets of the Company (including all of the equity interests of GOM Shelf) and on all the GOM Shelf Properties, provided that such lien shall also secure the obligations of the Company to Apache under the Decommissioning Agreement.

Error! Unknown document property name.

"**Standby Facility Documentation**" means the Standby Loan Agreement, dated as of [●], 2020, by and between the Company and GOM Shelf, as borrowers, and Apache, as lender, and all of the other agreements, documents and instruments related thereto governing or setting forth terms and conditions of the Standby Facility or of the loans/borrowings made thereunder.

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the lesser of (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided, however*, that if at any time Fieldwood Energy Inc. has a cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated July 31, 2020, among Fieldwood and certain of its Affiliates, on the one hand, and Apache and certain of its Affiliates, on the other hand.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by a Person.  "**Transfer**" when used as a noun shall have a

correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the transition services agreement in form and substance attached to the Implementation Agreement and attached hereto as Exhibit A.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Trust A**" means the Fieldwood Decommissioning Trust A, a Delaware statutory trust.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02   Interpretation.**  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**ARTICLE II**
**ORGANIZATION**

**Section 2.01   Formation**.

12

(a)     The Company was formed on [●], 2021, pursuant to the provisions of the BOC, upon the filing, or constructive filing with the Divisive Merger Documents, of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)     This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members, the Sole Manager and the Independent Director shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Member, the Sole Manager or the Independent Director are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02   Name.**  The name of the Company is "Fieldwood Energy I LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement.  The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03   Principal Office.**  The principal office of the Company is located at [●], or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and Apache.

**Section 2.04   Registered Office; Registered Agent.**

(a)     The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)     The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

**Section 2.05   Purposes; Powers.**

(a)     The purposes of the Company are to engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the Legacy Apache Properties and to cause GOM Shelf to engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the GOM Shelf Properties, and to engage in any and all activities necessary or incidental to the foregoing purposes.

13

(b)      At the date of this Agreement, the Company has no assets other than (i) the Legacy Apache Properties, including any accounts receivable associated with the Legacy Apache Properties accruing after the effective date of the Plan of Reorganization and any cash flow generated from the Legacy Apache Properties after the effective date of the Plan of Reorganization (such cash flow shall be reinvested and used to fund operating expenditures, to fund plugging and abandonment and decommissioning activities associated with the Legacy Apache Properties and the GOM Shelf Properties, to fund capital expenditures on the Legacy Apache Properties approved and authorized in accordance with this Agreement, and to repay amounts outstanding, if any, under the Standby Facility); (ii) 100% of the limited liability company interests or other equity interests in GOM Shelf; and (iii) the initial capitalization provided by Fieldwood pursuant to the divisive merger in an amount equal to $50 million *minus* the actual plugging and abandonment and decommissioning expenses incurred by Fieldwood between the date of its bankruptcy petition filing on August 3, 2020, and the effective date of the Plan of Reorganization.

(c)      At the date of this Agreement, the Company has no liabilities other than (i) operational liabilities accruing after the effective date of the Plan of Reorganization (including any accounts payable associated with the Legacy Apache Properties accruing after the effective date of the Plan of Reorganization), (ii) plugging and abandonment and decommissioning liabilities and obligations (A) relating to the Legacy Apache Properties and (B) of GOM Shelf relating to the GOM Shelf Properties, (iii) obligations under the Decommissioning Agreement and the Legacy Apache Properties PSA, and (iv) obligations under the Standby Facility Documentation.

(d)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

### ARTICLE III
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company shall have the property and assets identified in clauses (i) through (iii) in Section 2.05(b), which shall constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.02   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager and, in connection with an issuance of additional Membership Interests, made in compliance with Section 7.06(e).  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.03   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.03.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)   Each Member's Capital Account shall be increased by the amount of:

(i)   such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)   any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)   any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)   Each Member's Capital Account shall be decreased by:

(i)   the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)   the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)   the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.04   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.04, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.05   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make

15

any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.06   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.07   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.03(a)(iii), if applicable.

**Section 3.08   Modifications.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

## ARTICLE IV
## MEMBERS

**Section 4.01   No Personal Liability.**  Except as otherwise provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02   No Withdrawal.**  So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03   No Interest in Company Property.**  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

16

**Section 4.04   Certification of Membership Interests.**

(a)      The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b)      In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

> THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

> THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05   Meetings of Members.**

(a)      Meetings of the Members may be called by (i) the Sole Manager or (ii) a Member or group of Members holding a majority of the Membership Interests.

(b)      Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)      Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons

participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)     On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)     The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)     Subject to Section 4.06, Section 7.05, Section 7.06, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06   Action Without Meeting.**

(a)     Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)     A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)     If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07   Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08   Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses.  None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

## ARTICLE V
## ALLOCATIONS

**Section 5.01   Allocation of Net Income and Net Loss.**  For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.02, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.02   Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 5.01:

(a)     If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 5.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member

19

Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.02(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)      In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible.  This Section 5.02(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)      Simulated Depletion and Simulated Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.  Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)      The allocations set forth in subsections Section 5.02(a), Section 5.02(b), Section 5.02(c), Section 5.02(d) and Section 5.02(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.03   Tax Allocations.**

(a)      Subject to Section 5.03(b), Section 5.03(c), and Section 5.03(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.01 and Section 5.02, except

Error! Unknown document property name.

that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.01 and Section 5.02.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in Section 1.01(c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)     Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain.  The allocations described in this Section 5.03(e) are intended to be applied in accordance with the Members' "interests in

21

partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.03(b) and 5.03(c). The provisions of this Section 5.03(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company. Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company. The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto. When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.03(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.03 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.04   Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01   General.**

(a)     Subject to Section 6.02, distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Transition Services Agreement or the Service Provider Agreement, (ii) the repayment in full to Apache of any outstanding principal amounts borrowed by the

22

Company under the Standby Facility and the payment of any accrued interest or premium thereon, in each case, pursuant to the Standby Facility Documentation, (iii) the reimbursement to Apache and its Affiliates for any and all costs and expenses incurred by Apache or any of its Affiliates (A) in performing services on behalf of the Company in connection with the Legacy Apache Properties or the GOM Shelf Properties pursuant to a services contract between Apache or any of its Affiliates and the Company, (B) pursuant to the penultimate sentence of Section 12.01 in connection with evaluating any matter specified in Section 7.06 for which Apache's consent is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, and (C) pursuant to or as may be required in connection with the Decommissioning Agreement or plugging and abandonment and decommissioning of the Legacy Apache Properties or the GOM Shelf Properties, unless otherwise reimbursed in accordance with the Decommissioning Agreement, and (iv) the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties.  After making all distributions required for a given Fiscal Year under Section 6.02 and repaying/paying all amounts then due and outstanding under the Standby Facility as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

### Section 6.02   Tax Advances.

(a)     At least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)     If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

23

(c)      If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)      Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03   Tax Withholding; Withholding Advances.**

(a)      **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)      **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative) based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.   Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution).  Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c)      **Indemnification.**  Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

24

(d) **Overwithholding.** None of the Company, the Sole Manager or the Independent Director shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04   Distributions in Kind.**

(a) Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b) Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01   Management of the Company.** The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of the Sole Manager ("**Sole Manager**"). Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02   Independent Director.**

(a) The Independent Director shall (i) be a natural person who is not, nor for the prior five years has been, a director, officer, employee, trade creditor or equityholder (or spouse, parent, sibling or child of any of the foregoing) of (A) Fieldwood or any Affiliate of Fieldwood or (B) any prior or current lender of Fieldwood (a natural person satisfying such condition set forth in this clause (i), a "**Qualified Person**") and (ii) be provided by Citadel SPV, Global Securitization Services, LLC, Corporation Service Company, CT Corporation, [Lord Securities Corporation],[3] Wilmington Trust Company,

---

[3] NTD: Does this entity still exist? They are now at Citadel SPV. Lord does not exist.

or, if none of those companies is then in the service of providing professional independent directors, another nationally recognized company selected by Fieldwood (or, following the divisive merger of Fieldwood pursuant to § 10.008 of the BOC, Credit Bid Purchaser) subject to Apache's prior consent, which may be given or withheld in its sole discretion (such providers collectively, the "**Approved Providers**"). [●] is the Qualified Person provided by an Approved Provider that, as of the date of this Agreement, has been appointed to serve as the initial Independent Director and has also been approved to serve as the initial Independent Director for the Company in connection with the Confirmation Order entered by the Bankruptcy Court for the Southern District of Texas before which the reorganization of Fieldwood was being conducted.

(b)     The Independent Director may not be removed without Apache's prior written consent, which may be given or withheld in its sole discretion. If the Independent Director is removed with Apache's written consent or the Independent Director resigns or otherwise ceases to serve in such capacity, then the Company (acting by majority vote of its Members) shall select another Qualified Person from the Approved Providers to serve as the Independent Director.

**Section 7.03   Sole Manager.**   The Company shall not have any officers or employees other than a Sole Manager. In accordance with the procedure for the selection of the Sole Manager set forth in the Term Sheet, [●] has been selected and designated to serve as the initial Sole Manager. The Sole Manager may not be removed without Apache's prior written consent, which may be given or withheld in its sole discretion. In the event that the Sole Manager is removed with Apache's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:  Apache and the Company (acting through the Independent Director for all purposes under this Section 7.03, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.03) shall each provide the other with a list of three natural persons, each having a minimum of five years of relevant experience in the energy sector; and if one or more names appear on both Apache's and the Company's lists, then the Company will select, and the Member(s) shall cause the Company to select, the new Sole Manager from those common names; if, however, there are no common names between Apache's and the Company's lists, then Apache and the Company (acting through the Independent Director, who shall solicit input from Credit Bid Purchaser) shall each have the right to strike two names from the other's list, and the new Sole Manager shall be selected by the Independent Director from the remaining two names.

**Section 7.04   Service Provider.**

(a)     Subject to the Transition Services Agreement, the Sole Manager shall hire one or more third-party service provider(s) (whether one or more, collectively, the "**Service Provider**") to perform all operations and plugging and abandonment and decommissioning activities with respect to the Company's and GOM Shelf's properties or assets in a manner consistent with the procedures set forth in this Section 7.04. The Sole Manager shall solicit and obtain a bid for the work to be performed by each Service Provider from not less than three qualified candidates, each of which must (i) have a minimum of five years of relevant experience and (ii) not be, as of such date when bids are submitted, an Affiliate of Apache;

26

such bids shall detail the scope, terms and conditions of the work to be performed, along with the price to be paid for the performance of such work.  The Company shall share copies of each such bid received with Apache promptly following receipt thereof. Following the receipt of such bids, with Apache's prior written consent (which may be given or withheld in its sole discretion), the Sole Manager shall select the candidate whose bid contains the lowest price and best terms for the work to be performed, in view of their relevant experience (all as determined in good faith by the Sole Manager and consented to by Apache), to serve as the Service Provider, and shall cause the Company to enter into an agreement with such Service Provider (such agreement, a "**Service Provider Agreement**") to provide services contemplated in this Section 7.04; provided that, immediately prior to executing such Service Provider Agreement, the Sole Manager shall have confirmed that the proposed Service Provider satisfies the candidate qualifications detailed in clause (ii) of the immediately prior sentence (as if being considered on the date of such Service Provider Agreement rather than the date when bids are submitted), and if the proposed Service Provider does not satisfy such candidate qualifications, the Sole Manager shall then reconsider the submitted bids and select another candidate in accordance with the requirements of this sentence as if the previously selected candidate had not submitted a bid. Any Service Provider Agreement shall be in such form and contain such terms as the Sole Manager determines in good faith to be appropriate and consistent with this Section 7.04.  In the event that the Sole Manager elects to remove the Service Provider or the Service Provider otherwise ceases to provide its services in such capacity, then the Sole Manager shall again bid out the work, and shall select the Person to serve as the successor Service Provider, in accordance with the foregoing procedures of this Section 7.04.  The Credit Bid Purchaser shall be deemed to satisfy the requirements of a candidate for the Service Provider under this Section 7.04(a).

(b)     Upon the effectiveness of the Plan of Reorganization, the Company shall enter into the Transition Services Agreement and the Farmout Agreement with Credit Bid Purchaser.  Pursuant to the Transition Services Agreement, Credit Bid Purchaser shall provide transitional operations for the Company in accordance with the terms of the Transition Services Agreement.  The Company and Credit Bid Purchaser (in its sole discretion) may mutually agree that Credit Bid Purchaser shall become the Service Provider, at the effective time of which the Transition Services Agreement shall terminate, and the Sole Manager shall cause the Company to enter into the Service Provider Agreement with Credit Bid Purchaser.  Furthermore, as provided in the Transition Services Agreement, the Transition Services Agreement may be terminated by the Company, in its sole discretion, in accordance with the terms of the Transition Services Agreement.

**Section 7.05  Actions Requiring Independent Director Consent and Service Provider.**  Without the prior consent of the Independent Director (which consent may be given or withheld in the sole discretion of the Independent Director), and the Company shall not do, or enter into any commitment to do, and shall not cause or permit GOM Shelf to do, or enter into any commitment to do, any of the following:

(a)     amend, modify, supplement or waive the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries;

27

(b)      remove or replace the Sole Manager or the Service Provider;

(c)      enter into a fundamental business transaction (as such term is defined in the BOC), including a merger, consolidation, interest exchange, conversion or sale of all or substantially all of the Company's or GOM Shelf's properties or assets;

(d)      wind-up, dissolve, liquidate or terminate the Company or any of its Subsidiaries prior to the occurrence of any event set forth in Section 11.01 or enter into a receivership or initiate a bankruptcy proceeding involving the Company or any of its Subsidiaries;

(e)      revoke a voluntary decision to wind up the Company or GOM Shelf or cancel the required winding up of the Company due to an event specified in § 11.051 of the BOC; or

(f)      reinstate the Company or GOM Shelf after termination.

Except as provided in the fourth sentence of Section 9.02(a), in exercising its rights and performing its duties under this Agreement (including pursuant to this Section 7.05), the Independent Director shall have fiduciary duties of loyalty and care similar to that of a director of a business corporation organized under the BOC.

**Section 7.06   Actions Requiring Apache Consent.**  Without the prior written consent of Apache (which written consent may be given or withheld in Apache's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, and shall not cause or permit GOM Shelf to do, or enter into any commitment to do, any of the following:

(a)      conduct or be involved in any business or operations other than (i) operating or plugging and abandoning and decommissioning the Legacy Apache Properties, (ii) causing GOM Shelf to operate or plug and abandon and decommission the GOM Shelf Properties, and (iii) performing its obligations under the Credit Bid Purchaser Documents and the Services Provider Agreement;

(b)      purchase or farm-in any properties or assets or sell any of the Company's or GOM Shelf's properties or assets; provided that, following receipt of any such written consent from Apache to purchase or farm-in any properties or assets, other than with respect to usual and ordinary G&A and operating expenditures required to own and maintain such properties or assets, no additional funds of, or available to, the Company or GOM Shelf shall be spent with respect to such properties or assets without the prior written consent of Apache (which written consent may be given or withheld in Apache's sole discretion), provided further, however, that if any Person makes an unsolicited proposal to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties on fair market terms and conditions (including fair market rates of return), then the Company shall be obligated to market (or cause GOM Shelf to market) such farm-in opportunity and accept (or cause GOM Shelf to accept) the highest and best offer for such farm-in opportunity as long as the farm-in transaction would be accretive to the Company's consolidated cash

28

flow, and in such instance no consent from Apache will be required if Apache has made or bid on such farm-in opportunity;

(c)      farm-out any of the Company's or GOM Shelf's properties or assets; provided, however, if any Person makes an unsolicited proposal to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties on fair market terms and conditions (including fair market rates of return), then the Company shall be obligated to market (or cause GOM Shelf to market) such farm-in opportunity and accept (or cause GOM Shelf to accept) the highest and best offer for such farm-in opportunity as long as the farm-in transaction would be accretive to the Company's consolidated cash flow, and in such instance no consent from Apache will be required if Apache has made or bid on such farm-in opportunity;

(d)      incur indebtedness for borrowed money other than pursuant to the Standby Facility, pledge or grant Liens on any properties or assets of the Company or GOM Shelf other than those provided pursuant to the Standby Facility Documentation and the Recharacterization Mortgages, or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person; provided, however, the Company may (i) establish a working capital line of credit secured by Liens subordinated in all respects to the Liens and payment obligations provided for in the Standby Facility Documentation, (ii) draw on such line of credit solely for the business purposes specified in 7.06(a), and (iii) repay up to $50,000,000 of such debt in the ordinary course of its business prior to repayment of the obligations secured by Liens in favor of Apache;

(e)      issue additional Membership Interests or any other Equity Securities or admit additional Members to the Company, or issue additional equity interests of or admit additional members to GOM Shelf;

(f)      use its free cash flow (after operating expenses, including fees paid under the Credit Bid Purchaser Documents and the Services Provider Agreement) for any purposes other than fulfilling its obligations to Apache under the Decommissioning Agreement and the Standby Facility Documentation for so long as the obligations thereunder have yet to be satisfied in full (for the avoidance of doubt, Apache's consent shall be required for any development activities proposed by Credit Bid Purchaser under the Farmout Agreement);

(g)      make any loan, advance, or capital contribution or make any investment in any Person;

(h)      enter into, amend, waive, or terminate any Related Party Agreement;

(i)      amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement, or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without Apache's prior written consent shall be void *ab initio* and without effect);

Error! Unknown document property name.

(j)      engage in any activity or take any action with respect to its properties or assets, other than in the ordinary course of business;

(k)      select, remove (other than for gross negligence or willful misconduct), or replace, or change the work to be performed by, the Service Provider;

(l)      remove (other than for gross negligence or willful misconduct), replace, or change the powers, rights, or responsibilities of, the Sole Manager or the Independent Director;

(m)      establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.09;

(n)      settle any lawsuit, action, dispute, or other proceeding or otherwise assume any liability or agree to the provision of any equitable relief by the Company or GOM Shelf;

(o)      enter into a fundamental business transaction (as such term is defined in the BOC), including a merger, consolidation, interest exchange, conversion, or sale of all or substantially all of the Company's or GOM Shelf's properties or assets;

(p)      wind-up, dissolve, liquidate, or terminate the Company or any of its Subsidiaries or initiate a bankruptcy proceeding involving the Company or any of its Subsidiaries;

(q)      revoke a voluntary decision to wind up the Company or GOM Shelf or cancel the required winding up of the Company due to an event specified in § 11.051 of the BOC; or

(r)      reinstate the Company or GOM Shelf after termination.

In addition to the foregoing, if (i)(A) the Company or GOM Shelf defaults on its plugging and abandonment and decommissioning obligations under the Decommissioning Agreement, (B) any Governmental Authority or any other Person seeks to cause Apache or its Affiliates to conduct plugging and abandonment or decommissioning activity that is required in accordance with Applicable Law or contract in respect of any of the Legacy Apache Properties or the GOM Shelf Properties, and (C) Apache conducts such plugging and abandonment or decommissioning activity or activities, or (ii) prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties, any letter of credit or bond that is part of the Decommissioning Security is not renewed in a manner consistent in all respects with the existing terms of such letter of credit or bond, then the Company shall, and the Independent Director and the Sole Manager shall cause the Company to:  (x) if applicable, as promptly as practicable after the Independent Director or the Sole Manager becomes aware of an event described in clause (ii) immediately above, provide written notice to Apache of the upcoming expiration of, and inability to renew, such letter of credit or bond in a manner consistent in all respects with the existing terms of such letter of credit or bond and (y) pay or reimburse Apache for the costs (which costs shall include, without limitation,

30

costs of compensation and benefits of officers and employees of Apache and its Affiliates that devote any of their productive time to performing or overseeing any of the plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties in accordance with the provisions on Schedule D attached hereto applied in a consistent manner as the application of COPAS procedures, which costs shall be determined in good faith by Apache based on the time spent by such employees in performing or overseeing such activities) and expenses incurred in conducting such activity or activities; provided, however, that, to the extent such costs are not direct, out-of-pocket costs incurred by Apache that are reimbursable under the Decommissioning Agreement, such costs shall be reimbursed to Apache only by draws on the Standby Facility which shall not be repaid by the Company unless and until all  surety bonds and letters of credit included within Decommissioning Security have been fully utilized by Apache or it is determined in good faith by Apache that it will have no further drawings under such bonds and letters of credit.

Furthermore, the Company shall provide written notice to Apache of (i) each request or proposal the Company or GOM Shelf receives from a Person to farm in to any of the Legacy Apache Properties or the GOM Shelf Properties and (ii) each prospective joint development under the Farmout Agreement.  In connection with each of the foregoing, the Company shall, and shall cause GOM Shelf to, provide Apache full and open access to all information that the Company or GOM Shelf has regarding each such opportunity.

**Section 7.07   Compensation and Reimbursement of the Independent Director, the Sole Manager, the Service Provider and Credit Bid Purchaser.**  The Independent Director shall be compensated for the services provided by such individual as the Independent Director of the Company in the amount as specified in Schedule B attached hereto. The Sole Manager shall be compensated for the services provided by such individual as the Sole Manager of the Company in the amount as specified in Schedule C attached hereto.  The Company shall reimburse the Independent Director and the Sole Manager for all ordinary, necessary, and direct third-party expenses incurred by the Independent Director and the Sole Manager, respectively, on behalf of the Company in carrying out the Company's business activities.  All reimbursements for expenses shall be reasonable in amount and shall not exceed $[●] in the aggregate for any Fiscal Year.  The Service Provider shall be compensated for the services provided by the Service Provider and reimbursed for the out-of-pocket costs and expenses incurred in connection therewith as shall be set forth in the applicable Service Provider Agreement.  Credit Bid Purchaser shall be compensated for its services under the Transition Services Agreement and reimbursed for the out-of-pocket costs and expenses incurred in connection therewith as set forth in the Transition Services Agreement.

**Section 7.08   No Personal Liability.**  Except as otherwise provided in the BOC, by Applicable Law, or expressly in this Agreement, neither the Independent Director nor the Sole Manager will be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Independent Director or the Sole Manager, as applicable.

Error! Unknown document property name.

**Section 7.09   Funding Capital Expenditures.**  Prior to the cessation of all production from, and completion of all plugging and abandonment and decommissioning activities on, the Legacy Apache Properties and the GOM Shelf Properties, if the Company receives a proposal that the Company engage in any project that is forecast to increase production or cash flow generated from the Legacy Apache Properties or the GOM Shelf Properties (excluding any proposed development activities pursuant to the Farmout Agreement), then the Sole Manager shall, through a written notice, offer to Apache the opportunity to fund the capital expenditures related to such project on behalf of the Company on terms and subject to conditions to be mutually agreed between the Company and Apache; provided that the Company acknowledges and agrees that if any such capital expenditures are funded, in whole or in part, out of funds then available to be borrowed by the Company under the Standby Facility, any additional properties or assets obtained or that come into existence as a result of the use of such borrowed amounts under the Standby Facility, including, without limitation, any increased production or cash amounts generated thereby, shall be pledged as additional security under the Standby Facility Documentation.  Such written notice provided to Apache shall include all available details about such opportunity, including, but not limited to, the forecast impact on production and cash flow from the Legacy Apache Properties or the GOM Shelf Properties, as appropriate.  Apache shall have a reasonable period (not to exceed 20 Business Days) following its receipt of such written notice to provide written notice to the Company of (a) Apache's election to fund any such capital expenditures and the terms and conditions that Apache proposes to apply thereto, including whether it will fund such capital expenditure, in whole or in part, using amounts then available to be borrowed by the Company under the Standby Facility (such notice, an "**Acceptance Notice**"), (b) Apache's election not to fund any such capital expenditures (such notice, a "**Rejection Notice**"), or (c) Apache's request for additional information it requires to fully evaluate the proposed project (such notice, an "**Information Notice**").  If Apache provides a timely Acceptance Notice, then the Company and Apache shall endeavor in good faith to negotiate the proposed terms and conditions that will apply thereto, and if mutually satisfactory terms are agreed to by the Company and Apache, such terms and conditions shall be documented as promptly as practicable and the closing of such agreement and funding(s) of such capital expenditures shall occur as so agreed.  If (i) Apache timely provides to the Company a Rejection Notice, (ii) Apache timely provides an Acceptance Notice but the Company and Apache are unable within 60 Business Days after the Company's receipt of the Acceptance Notice to agree upon mutually satisfactory terms and conditions applicable thereto, or (iii) Apache does not submit a timely response to the offer, then the offer for Apache to fund the capital expenditures of the Company in the applicable project shall be deemed rejected by Apache and the Company shall have 180 days within which to obtain third-party funding for such capital expenditures subject to, and in accordance with, the other terms and conditions of this Agreement (including, without limitation, Section 7.06); provided, however, if the Company is unable to obtain such funding subject to, and in accordance with, the other terms and conditions of this Agreement within such 180-day period, then the Company must again follow the procedures in this Section 7.09 and offer Apache the opportunity to fund such expenditures.  If Apache timely provides the Company with an Information Notice, then the Company shall endeavor in good faith to promptly provide the requested information to Apache, and following Apache's receipt of such information, Apache shall have the right to accept or reject such offer on the terms set forth in this Section 7.09.

Error! Unknown document property name.

# ARTICLE VIII
# TRANSFER

**Section 8.01  General Restrictions on Transfer.**

(a)     No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of:

(i)     Apache and the Company prior to (A) the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties, (B) the repayment in full of any and all amounts outstanding under the Standby Facility and the satisfaction of all obligations under the Standby Facility Documentation, (C) the payment or reimbursement by the Company or from funds available under the Decommissioning Security of the costs (which costs shall include, without limitation, costs of compensation and benefits of officers and employees of Apache and its Affiliates that devote any of their productive time to performing or overseeing any of the plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties in accordance with the provisions on Schedule D attached hereto applied in a consistent manner as the application of COPAS procedures) and expenses incurred by Apache and its Affiliates (1) in performing any plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties or (2) pursuant to or as may be required in connection with the Decommissioning Agreement, and (D) the reimbursement to Apache and its Affiliates for any and all costs and expenses incurred by Apache or any of its Affiliates pursuant to the penultimate sentence of Section 12.01 in connection with evaluating any matter specified in Section 7.06 for which Apache's consent is requested or required; and

(ii)     thereafter, the Company.

(b)     Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)     except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)     if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

Error! Unknown document property name.

(iii)   if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)   if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)   if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vi)   if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)   Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)   Subject to Section 7.06(e), no Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)   For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01   Exculpation of Covered Persons.**

(a)   **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director (including the Independent Director), shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)   **Standard of Care.**  Subject to Section 9.02(a) with respect to the Independent Director, no Covered Person shall be liable to the Company or any other

Error! Unknown document property name.

Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)     **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons.**

(a)     **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.  Notwithstanding anything to the contrary in this Article IX, to the fullest extent permitted by Applicable Law, and notwithstanding any duty otherwise existing at law or in equity, the Independent Director shall consider only the interests of the Company, including its creditors, in acting or otherwise consenting to matters requiring the consent of the Independent Director in this Agreement.  Except for duties to the Company as set forth in the immediately preceding sentence (including duties to the Members and the Company's creditors solely to the extent of their respective economic interests in the Company but excluding (i) all other interests of the Members, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part) and in the last sentence of Section 7.05, the Independent Director shall not have any fiduciary duties to the Members or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.  To the fullest extent permitted by law, the Independent Director shall not be liable to the Company, the Members or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Director acted in bad faith or engaged in willful misconduct.

35

(b)      **Duties.**      Except as provided in Section 9.02(a) with respect to the Independent Director, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification.**

(a)      **Indemnification.**   To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)      any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)      such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable

36

cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b)     **Control of Defense.**  Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding, provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby.  The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c)     **Reimbursement.**  The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d)     **Entitlement to Indemnity.**  The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)     **Insurance.**  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person

37

under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder.  If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)     **Funding of Indemnification Obligation.**  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g)     **Savings Clause.**  If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     **Amendment.**  The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04   Survival.**  The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, and termination of the Company.

## ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.**  The Company shall furnish to each Member and Apache the following reports:

(a)     **Annual Financial Statements.**  As soon as available, and in any event within 105 days after the end of each Fiscal Year, its audited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared under AICPA auditing standards, setting forth in each case in comparative form the figures for the previous Fiscal Year, all reported on by independent public accountants acceptable to each Member and Apache (without a "going concern" or like qualification, commentary, or exception (except to the extent that any such qualification, commentary, or exception expressly indicates that after giving effect to the

38

exclusion of asset retirement obligations reflected on the accompanying balance sheet, there would be no such qualification, commentary, or exception), and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial condition and results of operations of the Company and GOM Shelf in accordance with GAAP consistently applied;

(b)     **Quarterly Financial Statements.**  As soon as available, and in any event within 50 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company and GOM Shelf in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; and

(c)     **Monthly Operating Data.**  As soon as available, but in no event later than 15 Business Days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and Apache showing all operating data for the Company and GOM Shelf, including operating expenses and revenue for each of the Company and GOM Shelf, for such calendar month.

(d)     **Operating Budget.**  As soon as available, but in any event no later than 60 days after the end of each Fiscal Year of the Company, a detailed operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter in form reasonably satisfactory to each Member and Apache.

(e)     **Additional Information.**  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of each of the Company and GOM Shelf, as any Member or Apache may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.**  Upon reasonable notice from a Member or Apache, the Company shall afford each Member or Apache and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members or the Sole Manager or Independent Director, and to permit each Member or Apache and their respective Representatives to examine such documents and make copies thereof; and (c) any officers, senior employees, and public accountants of the Company, and to afford each Member or Apache and their respective Representatives the

39

opportunity to discuss and advise on the affairs, finances, and accounts of the Company with such officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or Apache and their respective Representatives such affairs, finances, and accounts).

**Section 10.03  Income Tax Status.**  It is the intent of the Company and the Members that the Company shall be treated as a partnership or a disregarded entity for U.S., federal, state, and local income tax purposes.  Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04  Tax Matters Representative.**

(a)     **Appointment.**  The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**").     If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the person designated as the Tax Matters Representative shall also serve in such capacity.  To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf.  The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member.  In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b)     **Tax Examinations and Audits.**  The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings.  Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

(c)     **US Federal Tax Proceedings.**  The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing

40

Error! Unknown document property name.

authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member Interest who may be considered current or former partners of the Company for federal tax purposes.

(d)     **Tax Returns.**  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)     **Section 754 Election.**  The Tax Matters Representative will make an election under Code Section 754, if the Company is to be taxed as a partnership for federal tax purposes.

(f)     **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business.  As soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

Error! Unknown document property name.

**Section 10.06  Company Funds.**  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager.  The funds of the Company shall not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

**ARTICLE XI**
**WINDING UP AND TERMINATION**

**Section 11.01  Events Requiring Winding Up.**  The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.06):

> (a)  upon the cessation of all production from, and completion of all plugging and abandonment and decommissioning on, the Legacy Apache Properties and the GOM Shelf Properties;

> (b)  the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

> (c)  the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which Apache has been given notice and an opportunity to participate.

Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and each of Apache, the Sole Manager, and the Independent Director provide their prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

**Section 11.02  Effectiveness of Termination.**  The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03  Liquidation.**  If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

42

(a)      **Liquidator.**   The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a person to act as the Liquidator.  The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)      **Accounting.**   As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c)      **Notice.**   The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d)      **Distribution of Proceeds.**   The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)      First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)      Second, to Trust A until the aggregate funds in Trust A are in an amount equal to 125% of the then Remaining Decommissioning (as defined in the Decommissioning Agreement);

(iii)      Third, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iv)      Fourth, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e)      **Discretion of Liquidator.**   Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities, Trust A, and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.  Any such distribution

43

in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.** Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator, the Independent Director, or any other Member.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.01 Expenses.** Except as otherwise expressly provided herein, in the Restructuring Support Agreement, or in the Confirmation Order, all costs and expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses. In addition to the immediately preceding sentence and the payment or reimbursement to Apache and its Affiliates for the costs and expenses of performing any plugging and abandonment and decommissioning activities with respect to the Legacy Apache Properties or the GOM Shelf Properties as provided in the final paragraph of Section 7.06, from time to time as Apache evaluates any matter specified in Section 7.06 for which its consent is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, the Company shall reimburse Apache for all costs and expenses incurred in connection therewith, with such reimbursement to be made regardless of whether Apache consents to such matter or provides an Acceptance Notice, Rejection Notice, or Information Notice to the Company with respect to such proposal. Apache's costs shall include, without limitation, third-party costs and the reimbursable costs of compensation and benefits of employees of Apache and its Affiliates who devote

productive time to evaluating any matter specified in Section 7.06 for which the consent of Apache is requested or required or any proposal for prospective funding of capital expenditures pursuant to Section 7.09, which costs shall be determined in good faith by Apache based on the time spent by such employees in conducting such evaluation. The reimbursement to be made pursuant to the immediately preceding sentences shall be made within 30 days of the Company's receipt of a statement from Apache specifying the costs to be so reimbursed.

**Section 12.02 Further Assurances.**   In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 12.03 Confidentiality.**

(a)      Each Member acknowledges that, during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)      Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the

Error! Unknown document property name.

provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

46

|                                             |                                                                                                                                 |
|---------------------------------------------|---------------------------------------------------------------------------------------------------------------------------------|
| **If to the Company:**                      | Fieldwood Energy I LLC<br>[COMPANY ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]                                  |
| with a copy to:<br>(which shall not<br>constitute notice) | Hunton Andrews Kurth LLP<br>600 Travis Street<br>Suite 4200<br>Houston, TX 77002<br>Attention: G. Michael O'Leary     |
| **If to the Independent Director:**         | [INDEPENDENT DIRECTOR ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]                                               |
| with a copy to:<br>(which shall not<br>constitute notice) | Hunton Andrews Kurth LLP<br>600 Travis Street<br>Suite 4200<br>Houston, TX 77002<br>Attention: G. Michael O'Leary     |
| **If to a Member**:                         | To the Member's respective mailing address as set forth on the Members Schedule.                                                 |

Section 12.05 **Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

Section 12.06 **Severability.**  If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

Error! Unknown document property name.

**Section 12.07 Entire Agreement.** This Agreement, together with the Certificate of Formation and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.** Except (a) with respect to certain rights reserved to Apache as set forth in this Agreement, which shall be for the benefit of and enforceable by Apache, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 12.10 Amendment.** Subject to Sections 2.02 and 7.06(i), no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Independent Director without the consent of or execution by the Members.

**Section 12.11 Waiver.** No waiver by any party or Apache of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or Apache, respectively. No waiver by any party or Apache shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

Error! Unknown document property name.

**Section 12.13  Submission to Jurisdiction.**  The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas.  Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.  Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14  Waiver of Jury Trial**.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15  Equitable Remedies.**  Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or Apache, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and Apache shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16  Attorney's Fees.**  In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17  Remedies Cumulative.**  The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

Error! Unknown document property name.

**Section 12.18 Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

FIELDWOOD ENERGY I LLC,
a Texas limited liability company


By:_____
[NAME]
[TITLE]


**The Initial Member:**

[_____]
a [_____]


By:_____
[NAME]
[TITLE]

**EXHIBIT A**

**FORM OF TRANSITION SERVICES AGREEMENT**

## SCHEDULE A

## MEMBERS SCHEDULE

| Member Name, and Address | Capital Contribution | Membership Interest |
|---|---|---|
| [_____]<br>[ADDRESS] | $[AMOUNT] | 100% |
| Total: | $[AMOUNT] | 100% |

Sch. A-1

**Error! Unknown document property name.**

**SCHEDULE B**

**INDEPENDENT DIRECTOR'S COMPENSATION**

[To be the market compensation needed to attract a qualified candidate to accept the position.]

Error! Unknown document property name.

**SCHEDULE C**

**SOLE MANAGER'S COMPENSATION**

[To be the market compensation needed to attract a qualified candidate to accept the position.]

Error! Unknown document property name.

**SCHEDULE D**

**ACCOUNTING PROCEDURES FOR APACHE OFFICERS AND EMPLOYEES**

I.      DIRECT CHARGES

1.      LABOR

A.      Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

  (1)      Apache's field employees directly employed on-site in the conduct of plugging and abandonment and decommissioning activities with respect to the applicable Legacy Apache Property or the GOM Shelf Property, and

  (2)      Apache's employees providing First Level Supervision.

Charges for Apache's employees identified in Section I.1.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing Apache's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section I.1.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section I.1.

B.      Apache's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable under Section I.1.A, excluding severance payments or other termination allowances. Such costs under this I.1.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable under Section I.1.A. If percentage assessment is used, the rate shall be based on Apache's cost experience.

C.      Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable under Sections I.1.A and B.

D.      Personal expenses of personnel whose salaries and wages are chargeable under Section I.1.A when the expenses are incurred in connection with directly chargeable activities.

E.      Apache's cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to Apache's labor costs chargeable under Sections I.1.A and B based on Apache's actual cost not to exceed 40%.

Error! Unknown document property name.

F.      Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section I.1.A.

## II. OVERHEAD

As compensation for costs not specifically identified as chargeable pursuant to Section I (Direct Charges), Apache shall be reimbursed in accordance with this Section II.

Functions included in the overhead rates regardless of whether performed by Apache, Apache's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- design and drafting
- inventory costs
- procurement
- administration
- accounting and auditing
- human resources
- management
- supervision not directly charged under Section I.1 (Labor)
- in-house legal services
- taxation
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the applicable Legacy Apache Property or GOM Shelf Property, other than on-site inspections.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and personal expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

To compensate Apache for overhead costs incurred in connection with any particular plugging and abandonment or decommissioning project conducted on any applicable Legacy Apache Property or GOM Shelf Property, the following overhead rates shall be applied to those costs incurred in the performance of such plugging, abandonment, and decommissioning activities:

(1)     5% of total costs if such costs are less than $100,000; plus

(2)     3% of total costs in excess of $100,000 but less or equal to $1,000,000; plus

(3)     2% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project

Error! Unknown document property name.