1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4  IN RE:                    §    CASE NO. 20-33948-11
                             §    HOUSTON, TEXAS
5  FIELDWOOD ENERGY, LLC,    §    THURSDAY,
                             §    MAY 6, 2021
6           DEBTOR.          §    3:57 P.M. TO 5:04 P.M.

7

                     MOTIONS HEARING (VIA ZOOM)
8
                 BEFORE THE HONORABLE MARVIN ISGUR
9                UNITED STATES BANKRUPTCY JUDGE

10

11

12       APPEARANCES:                    SEE NEXT PAGE

13

14

15       (Recorded via CourtSpeak; No log notes)

16

17

18

19

20                 TRANSCRIPTION SERVICE BY:

21           JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                   935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                      281-277-5325
23              www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                        <u>APPEARANCES (VIA ZOOM)</u>:

2

3    FOR THE MOVANT:              CHIESA SHAHINIAN & GIANTOMASI,
                                  PC
4                                 Darren Grzyb, Esq.
                                  One Boland Drive
5                                 West Orange, NJ  07052

6

7    FOR HCCI:                    LOCKE LORD, LLP
                                  Philip Eisenberg, Esq.
8                                 600 Travis, Suite 3400
                                  Houston, TX  77002
9

10   FOR APACHE CORPORATION:      HUNTON ANDREWS KURTH, LLP
                                  Robin Russell, Esq.
11                                Michael D. Morfey, Esq.
                                  600 Travis, Ste. 4200
12                                Houston, TX  77002

13   FOR ZURICH AMERICAN
     INSURANCE COMPANY:           CLARK HILL STRASBURGER
14                                Duane J. Brescia, Esq.
                                  720 Brazos St., Ste. 700
15                                Austin, TX  78701

16   FOR PHILADELPHIA INDEMNITY
     INSURANCE COMPANY:           MANIER & HEROD
17                                Robert W. Miller, Esq.
                                  1201 Demonbreun St., Ste. 900
18                                Nashville, TN  37203

19   FOR BP EXPLORATION &
     PRODUCTION, INC.:            GREENBERG TRAURIG, LLP
20                                Craig Duewall, Esq.
                                  1000 Louisiana, Ste. 1800
21                                Houston, TX  77002

22

23

24   (Please also see Electronic Appearances.)

25

1      HOUSTON, TEXAS; THURSDAY, MAY 6, 2021; 3:57 P.M.

2           THE COURT:  All right.  Good afternoon.  We're in

3  the *Fieldwood Energy case.*  Appearances of all have been

4  made electronically.  If you haven't made your electronic

5  appearance, please make it as soon as you get off the phone

6  this afternoon.

7           We're going to start with the emergency motion

8  filed by Apache.  If I can get lead on that for Apache as

9  well as lead for the respondent, I would ask you to press

10 five star on your phone.

11      (Pause in the proceeding.)

12           THE COURT:  All right.  Good afternoon, Mr. --

13 I'm sorry.  I always have trouble with your name.  Is it

14 Grzyb?

15           MR. GRZYB:  Yes, Your Honor.  It's -- it's Darren

16 Grzyb, Kay Deshane (phonetic) and -- and Josh Mossia

17 (phonetic) for the opponents for the motion, Aspen, Berkley,

18 Everes, and Sirius, Your Honor.

19           THE COURT:  Thank you.

20           Ms. Russell?

21           MS. RUSSELL:  Good afternoon, Your Honor.  This

22 is Robin Russell on behalf of Apache Corporation.  And I

23 have my partner, Mike Morfey, here with me today.

24           THE COURT:  Thank you.

25           Mr. Morfey, is that --

1          MR. BRESCIA:  Your Honor, I would like --

2          THE COURT:  -- you?

3          Mr. Morfey, did I just add you from 713-220-4163?

4          MR. MORFEY:  Yes, you did, Your Honor.  Good

5   afternoon.

6          THE COURT:  Good afternoon, Mr. Morfey.

7          All right.  It's Mr. Morfey, your motion.

8          MR. GRZYB:  Your Honor, may I -- may I, this is

9   Darren Grzyb, Your Honor.  Apologize -- apologize for

10  interrupting.

11          May I ask that you add Robert Miller, and Phil

12  Eisenberg, and perhaps Duane Brescia?

13          THE COURT:  I've got them.  Let's see, I've got

14  one person here from 585-729-0803.  Who is that?

15          MR. MILLER:  Yes, Your Honor.  That's Robert

16  Miller on behalf of Philadelphia Indemnity Insurance

17  Company.  Thank you.

18          THE COURT:  Mr. Miller.  Good afternoon.

19          MR. MILLER:  Good afternoon.

20          THE COURT:  Got Mr. Brescia here.  Mr. Brescia,

21  good afternoon to you.

22          MR. BRESCIA:  Good afternoon, Your Honor.  Duane

23  Brescia for Zurich American Insurance Company.

24          THE COURT:  I don't have anyone else that has

25  pressed five star one time.  There we go.  There's someone

1   else that just came in.  Hold on.

2         (Pause in the proceeding.)

3               THE COURT:  Mr. Eisenberg, good afternoon.

4               MR. EISENBERG:  Good afternoon, Your Honor.

5   Philip Eisenberg on behalf of HCCI.

6               THE COURT:  Thank you.

7               Is there anyone else that needs to be added at

8   this point?

9         (No audible response.)

10              THE COURT:  All right.  Mr. Morfey, why don't you

11  go ahead, please?

12              MR. MORFEY:  Your Honor, if it pleases the Court,

13  Ms. Russell is going to address a couple of preliminary

14  matters.  And then I will take it away.

15              THE COURT:  However you all want to handle it is

16  fine.  Ms. Russell?

17              MS. RUSSELL:  Thank you, Your Honor.

18              We're here on a discovery dispute.  And Mike

19  Morfey is going to be presenting on that --

20        (Transmission disrupted)

21              MS. RUSSELL:  -- but I thought that it would be

22  best to start by addressing some statements that were made

23  (transmission disrupted) objection.  What I think is --

24              MR. MORFEY:  Ms. Russell, we're having trouble

25  with -- we're having trouble with your phone.

1           MS. RUSSELL:  All right.  Is that any better?

2           THE COURT:  Seems to be.

3           MS. RUSSELL:  Is that any better?

4           THE COURT:  Seems to -- yeah.  I think it's

5   working once that phone is closer to you.

6           MS. RUSSELL:  All right.

7           So we'd like to begin by addressing some

8   statements that were made in the surety's objections, which

9   I think explain the fundamental disconnect between the plan

10  and the surety's discovery requests.

11          So in paragraph 23 of the objection, the sureties

12  make two curious statements.  First, that both Apache and

13  the sureties will be creditors appealed with one (telephone

14  feedback) following the defensive merger.  And second, that

15  the sureties' positions in Fieldwood One Capital Structure

16  is likely to be the full term security.

17          So I'd like to address each of those.  In the

18  2018 Fieldwood restructuring, Apache agreed to allow 150

19  million of the letter of credit exposure to be replaced by

20  bonds if they were a functional equivalent of credit.

21          So as the Court knows, the independence

22  principal, it tells us that the contract of indemnification

23  or reimbursement between the Debtor and the surety, or the

24  issuer of the letter of credit is independent.  It is a pre-

25  petition contract and obligation that under 502(e) is often

1    contingent and unliquidated.  And even is independent of the

2    obligation under the bond or the letter of credit to someone

3    in Apache's shoes.

4         So it is unclear to us how the sureties are

5    characterizing themselves as creditors of Fieldwood One,

6    which is the new entity that would be created after

7    confirmation.

8         As to the fulcrum security, if we look at the

9    plan, Fieldwood One is going to be owned by Fieldwood

10   Energy, Inc., which in turn is owned by the plan

11   administrator.  And the general unsecured creditors of --

12   and I'll assume for this purpose that the sureties will end

13   up having a claim.  They will be in that category of general

14   unsecured creditors which will have the interest in residual

15   value of Fieldwood Energy, Inc.

16        So they have no direct ownership interest in

17   Fieldwood One.  And they'll have no relationship as a

18   creditor in Fieldwood One.

19        So the -- the subpoena that has been issued

20   focuses principally on information related to Fieldwood One,

21   and its business plan, and things that are completely within

22   the control of the Debtor as the owner of equity of

23   Fieldwood One.  And it will be managed by someone hired by

24   the Debtor who has worked with the Debtor in preparing the

25   projections with Fieldwood One.  Apache is not going to own

1   Fieldwood One.  It's not going to control Fieldwood One.

2          The second part of the request is asking for

3   testimony by Apache with respect to its intent of how it

4   will perform in the future on a list of documents, you know,

5   each of which have an integration clause, each of which is

6   going to be a binding contract at confirmation.

7          There's no assertion that any of those agreements

8   are ambiguous.  And, in fact, they're not.  They can all be

9   looked out on their face as presenting the intent of the

10  parties.

11         So the request in the context of the plan seems

12  to -- to not make sense, quite frankly.  And with that, I

13  would like to turn it over to Mr. Morfey who can address the

14  legal aspects of the subpoena.

15         THE COURT:  Ms. Russell, is it your position that

16  Apache not only has no control in Fieldwood One, but has no

17  ability to select persons who will be in control of

18  Fieldwood One?

19         MS. RUSSELL:  In the original selection of John

20  Graham, it did have input.  And Apache does have certain

21  consent rights.  If there is a -- a desire on behalf of

22  Fieldwood One to dismiss or replace John Graham, then there

23  would be a consent right.  And you will see then a -- a next

24  iteration of one of the documents that we have made clear

25  that if -- if they are seeking to remove a manager for, you

1  know, gross negligence or willful misconduct, that they can

2  do that with our consent.

3          THE COURT:  All right.  Thank you.

4          MS. RUSSELL:  But we --

5          THE COURT:  No.  Go ahead.  I didn't mean to

6  interrupt.  I thought you were done.

7          MS. RUSSELL:  No.  We -- we -- it -- it is not

8  our intention to control.  And we do not view certain

9  consent rights with respect to fundamental aspects of

10  Fieldwood One and its stated mission to just do the

11  decommissioning on the legacy Apache assets that any consent

12  rights that we have are just to insure that that purpose is

13  upheld.

14          THE COURT:  All right.  Thank you, Ms. Russell.

15  I'm -- we're getting a little static, and I don't know if

16  it's from you.  But just to try and be sure, I'm going to go

17  ahead and mute your line.  And if that turns out to be

18  something that interferes with your ability to participate,

19  press five star, wave, do something so that I can put you

20  back on so --

21          MS. RUSSELL:  Thank you.  And I --

22          THE COURT:  -- whoops.  I just cut you off.

23          So all right, Mr. Morfey, go ahead.

24          MR. MORFEY:  Thank you, Your Honor.

25          So, Your Honor, just a little bit of brief

1   background to set the table on -- on where we're going in

2   terms of the timeline.  So on April 6th the Court entered the

3   Scheduling Order governing the deadlines for discovery

4   leading up to confirmation.  And the Court specifically set

5   a deadline of April 14th for discovery requests to be served.

6         The Court did not distinguish between written

7   discovery and by way of request for production,

8   interrogatories, or a subpoena.  It was just all discovery

9   requests had to be served by April 14th.

10        That period passed.  And Apache didn't see any

11  discovery whatsoever from the sureties.  On April 16th, we

12  received what we call in our emergency motion the surety

13  letter from counsel for Everest and HCCI.  And the -- the

14  surety letter, it's an eight page letter.  And it goes into

15  great detail about a number of legal arguments that the

16  sureties contend may inhibit, or do inhibit, Apache's

17  ability to draw on surety bonds and decommissioning security

18  that's at issue in this bankruptcy.

19        So we received that two days after the April 14

20  discovery deadline.  We get this letter outlining all of the

21  legal issues.  And then a week after that on April 21st, we

22  are served, Apache is served, with the subpoena that we're

23  here on today.

24        And the subpoena has document requests, documents

25  that should be produced at this deposition that's currently

1  scheduled for May 10th, as well as a number of 30(b)(6)

2  topics that they're seeking to depose Apache on.

3          Here's our problem with that.  With respect to

4  the document requests embedded in the subpoena, we believe

5  that those requests are, frankly, untimely and not proper.

6  Because they're clearly after that April 14th deadline that

7  the Court set.

8          I don't believe it's appropriate to split the

9  hair of whether is that a document request?  Is it a

10 discovery request?  Is it a -- is it a subpoena?  The Court

11 entered its order for discovery requests to be served on

12 April 14th.  I'm not going to presume to know what was in

13 Your Honor's mind, but just reading it on its face, when I

14 see discovery requests, I believe the intent likely was if

15 you want documents, you need to get your requests out by

16 April 14th.  And that didn't happen.

17         So I think the document requests are pretty easy.

18 The -- the, perhaps more interesting issue is, should this

19 30(b)(6) deposition go forward at all.  Obviously, Apache is

20 a non-Debtor in this case.  The requests as Ms. Russell

21 touched on, are at least in my experience, pretty unusual

22 for a 30(b)(6) deposition.

23         There are six requests that begin with the phrase

24 "Apache's intent with respect to," and then a written

25 contract is named.  It's the standby credit facility, the

1  farm-out agreement, joint development agreement, et cetera.

2  Those six requests that ask for a corporate representative

3  to testify on Apache's subjective intent with respect to

4  those documents.

5          That raises a number of problems.  The -- the

6  first is, these are written, unambiguous contracts that can

7  be interpreted as a matter of law, and frankly, should be.

8  What Apache's intent was or wasn't in entering into those

9  agreements doesn't matter.  There's no allegation of

10  ambiguity.  And the Court will construe those as a matter of

11  law.

12          So discovery as to Apache's intent is irrelevant

13  on those grounds.  Now maybe, and I'll confess, it's -- it's

14  somewhat confusing as to where the -- the intent is going.

15  Is it going to the documents?  Is it going to as to what's

16  going to happen in the future?

17          If it goes to what's happening in -- in the

18  future, those types of hypothetical events aren't

19  appropriate for a corporate representative deposition.

20          I don't, frankly, even know, Your Honor, how I

21  would prepare a witness as you're obligated to under the

22  Rules, to field question on what do you intend to do in the

23  future with respect to the joint development agreement.

24          That's far too speculative.  It's hypothetical.

25  It's overly broad.  And it's improper for a 30(b)(6)

1 document.  So those are the -- the problems with the intent

2 topics.

3          The other topics -- topics, one, two, three, and

4 eight pertain to Fieldwood One.  For example, topic one is,

5          "Going forward plans for Fieldwood One,

6          including decommissioning plan, capital

7          projects, and plans to obtain new

8          bonding."

9          Those are questions for Fieldwood One and the

10 Debtors.  Those aren't questions for Apache.  We don't

11 control Fieldwood One.

12          And the other questions, or excuse me, the other

13 topics in those categories, one, two, three, and eight are

14 similar to that.  They relate to Fieldwood One and we don't

15 believe that they're appropriately directed to Apache.

16          Lastly, topic nine has to do with communications

17 between Apache and the Government regarding (indiscernible)

18 surety bonds.  That topic is not going to move the needle in

19 our estimate on confirmation one way or the other.

20          What difference does it make what communications

21 Apache may or may not have had with the Government about the

22 surety bonds? The bonds say what they say.  They're a

23 written instrument.  They can be construed as a matter of

24 law.

25          And, frankly, Your Honor, that's -- that last

1  topic kind of the what's the benefits here.  What is the

2  benefit of this discovery for confirmation versus the burden

3  on Apache is really the -- the sum and substance of the

4  whole issue.

5          Rule 26, as Your Honor knows, requires discovery

6  to be proportional to the needs of the case.  That obviously

7  means there has to be a need.  There has to be a need.  And

8  the Court is allowed to weigh that need against the benefits

9  and burdens on the parties that are required to respond.

10          There is no need for confirmation purposes to get

11  into these issues.  These -- these written contracts can be

12  and should be construed as a matter of law.  Intent doesn't

13  matter.  What may happen in the future isn't the issue as to

14  whether the plan is confirmable or not.  The plan speaks for

15  itself.  The contracts speak for themselves.  We don't need

16  to have discovery on hypothetical future events.  And it's

17  not appropriate.

18          And so, Your Honor, what -- what we would propose

19  is that the subpoena be quashed in its entirety.  No

20  30(b)(6) deposition because it's not appropriate.  No

21  document requests because they're packaged within an

22  inappropriate 30(b)(6) subpoena and they're untimely.

23          And with that, Your Honor, I will pass the

24  argument to my learned opposing counsel.

25          THE COURT:  All right.  All right.  Who's going

1   to take the lead for the subpoenaing parties?  Is that going

2   to be you, Mr. Grzyb?

3          MR. GRZYB:  Yes.  If -- if it pleases the Court.

4   I will go first, Your Honor.

5          I represent four of the sureties, Aspen, Berkley,

6   Everest, and Sirius.  All of my clients are impacted by the

7   creation of Fieldwood One.  Everest has a common-law bond as

8   a part of that 2018 transaction in which Apache is the

9   obligee.  My other surety clients have gold bonds, which

10  everyone on the call that's appearing today, has an

11  understanding of what that means, the objection about the

12  alleged vagueness with respect to that term I think is --

13  lacks merit.

14         So I will be addressing the subpoena and the

15  30(b)(6) topics and the relevance to the sureties' likely

16  plan of -- or -- or potential plan of objecting to the

17  confirmation of the plan.

18         Robert Miller represents Philadelphia Indemnity

19  Insurance Company will be addressing some of the 1123(a)(6)

20  and (a)(7) issues that we have with respect to the plan, and

21  it's relevance to the subpoena.  And some of my other

22  colleagues, Mr. Eisenberg and Mr. Brescia, may chime in with

23  respect to the need for this discovery, this third-party

24  discovery.

25         Now my -- my opening comments talk about --

1          THE COURT:  So let -- let -- let's go -- let's go

2    the question -- to that question.

3          I -- what gave your client the authority to send

4    out a subpoena?

5          MR. GRZYB:  Well within the rules of -- Federal

6    Rules of Civil Procedure, Your Honor, and including as

7    incorporated by the Bankruptcy Rules.

8          THE COURT:  Only if they're a party, right?  They

9    got to be a party.

10        (Pause in the proceeding.)

11         THE COURT:  A random person off the street can't

12   send a subpoena.  A party can send a subpoena.  Your

13   client's a party.  Think that's probably the easy answer.

14         But if your client's a party, why isn't

15   Mr. Morfey's client a party?  So I don't understand how we

16   make a distinction that says you can send out a legitimate

17   subpoena, but he's not a party.  Cause it seems to me if

18   we're going to say that he's not a party, we got to say

19   you're not a party.

20         And the whole logic just doesn't make sense to

21   me.  How did you get to send this out?  You a party?

22         MR. GRZYB:  Well, I -- I would agree, Your Honor,

23   that we're -- we're a party participating in this bankruptcy

24   and a likely objector.

25         THE COURT:  Well you're either a party or not a

1 party.  If you're a party, they're a party.  Tell me how

2 you're a party and they're not a party.  Cause that's the

3 situation that you got to win in order to be timely.

4         (Pause in the proceeding.)

5             MR. GRZYB:  And as well, I don't know that I

6 would agree with that, Your Honor.  Because the -- the

7 definition -- the notice for the deposition on this subpoena

8 is timely.  I don't think that they can argue that it's not

9 timely.

10            THE COURT:  No.  Wait a minute.  Wait a minute.

11            MR. GRZYB:  Right?

12            THE COURT:  Wait.  Stop for a minute.

13            Explain to me how if you're a party, they are not

14 a party.  Only parties can send subpoena.  But if they are a

15 party, you whole argument is, that the subpoena wasn't

16 governed by the discovery order.

17            But you acknowledge in there that if it was, in

18 fact, sent to a party, it would be controlled by the

19 discovery order.  You can't obfuscate the discovery order by

20 then sending out a subpoena rather than sending out a

21 request for production.  And I think we're all -- I think

22 you'll acknowledge that.

23            So I need to understand how you can both send out

24 the subpoena and claim they are not a party.

25            MR. GRZYB:  Well, I would say, Your Honor, that

1  under the Scheduling Order, that was a sort of a negotiated

2  and --

3              THE COURT:  I would say that you should answer my

4  question.

5              MR. GRZYB:  I -- I -- I'm trying to, Your Honor.

6              THE COURT:  Well let's do that.

7              MR. GRZYB:  And --

8              THE COURT:  How are you a party that can send out

9  a subpoena and they are not a party?

10             MR. GRZYB:  Well, I -- I -- forgive me if I'm

11 wrong, Your Honor.  But I think you're asking me why should

12 we not have served discovery requests on Apache --

13             THE COURT:  No, I'm asking you --

14             MR. GRZYB:  -- for its documents --

15             THE COURT:  I'm asking you how you are a party

16 and they are not a party.

17         (Pause in the proceeding.)

18             THE COURT:  How are those two facts both truth?

19         (Pause in the proceeding.)

20             MR. GRZYB:  I think that's -- respectfully, I

21 think that's a semantical difference.

22             THE COURT:  No, you're making the semantical

23 difference --

24             MR. GRZYB:  We are --

25             THE COURT:  -- by arguing they're not a party.

1   That's what's silly about this.

2            They're a party.  You're a party.  You're late.

3        (Pause in the proceeding.)

4            THE COURT:  Or you can argue to me that, in fact,

5   if you look at the rules you're not a party until you file

6   something, at which point you had no authority to send out

7   the deposition notice.

8            MR. GRZYB:  Well, I -- I would argue, Your Honor,

9   that we're not late --

10           THE COURT:  I mean a subpoena.  Excuse me.

11           MR. GRZYB:  -- that we're not late, Your Honor,

12   because the -- the -- the deadline for document demands,

13   discovery requests, related to the negotiated scheduling

14   order that we argued about and submitted to Your Honor with

15   the Debtors.

16           We were the objecting group as sureties that

17   said, you know, we needed more time.  We needed some factual

18   discovery from the Debtor.  And we argued and negotiated

19   that scheduling order with the Debtors in light of their

20   confirmation hearing objective and what they needed to do to

21   prepare their case, and what we needed to do to prepare our

22   case.

23           So the -- the -- that deadline for discovery

24   requests related to our interactions with the Debtor.  So

25   whether we're a party or not a party --

1          THE COURT:  That is -- that is not the argument

2   that you made in your written response.  The argument you

3   made was that Mr. Morfey's client wasn't a party and,

4   therefore, you could send out a subpoena.

5          I want to hear an answer to my question, based

6   upon what logical basis can your client be a party and their

7   client is not a party.  Cause I can't figure out the answer

8   to that.

9       (Pause in the proceeding.)

10         MR. GRZYB:  If -- Your Honor, I -- I'm not -- I'm

11  not trying to avoid the question, Your Honor.  I think

12  the -- the import of Apache in terms of its control over

13  Fieldwood One, and I disagree with the characterization of

14  my colleagues and adversary that they're not going to

15  consult Apache, because the documents -- I'm sorry,

16  Fieldwood One --

17         THE COURT:  Yeah.  Look.

18         MR. GRZYB:  That's clearly --

19         THE COURT:  This isn't going to go anywhere if

20  you won't answer the question.  So let me see if one of your

21  co-counsel wants to tell me how it is possible that the

22  sureties are parties who sent out the subpoenas, but that

23  Apache is not a party.  Somebody wants to tell me that,

24  otherwise, I'm simply going to find these aren't timely.

25         And if you then want to move, and I understand

1  there is like a footnote or something that says, change the

2  discovery deadline, well that's a whole different question.

3  And I'm not doing that on about two hours' notice.

4          But I want to understand.  Otherwise, I'm simply

5  going to grant the motion, because it was untimely

6  discovery.  And I'm not going to play a game and classify

7  you as a party and then not as a party because you think you

8  want the discovery.  I think that's gamesmanship.

9          So somebody needs to explain how one side's a

10 party and the other side's not.  Who wants to do it?

11     (Pause in the proceeding.)

12          THE COURT:  All right.  I'm granting the motion.

13 The subpoena is quashed.

14          MR. EISENBERG:  Your Honor, I -- Your Honor?

15          THE COURT:  Go ahead.

16          MR. EISENBERG:  Your Honor, I apologize.  This is

17 Philip Eisenberg.

18          The -- are you quashing the document portion of

19 the 30(b)(6) notice?

20          THE COURT:  I'm quashing the entire subpoena.

21          MR. EISENBERG:  Well, why -- why would we not be

22 able to take depositions?  There was no deadline for

23 depositions for corporate representatives on topics by the

24 14th.  We had a different deadline for depositions.

25          And -- and so, I'm -- I'm not sure I understand.

1    I understand the 30(b)(6) notice was on topics.  The -- the

2    request for the documents was, to the extent that the

3    representatives will be relying on any documents, that, you

4    know, it -- it's part and parcel of the -- of the -- of the

5    30(b)(6) subpoena.  But the deposition itself is different

6    than the actual document.

7              THE COURT:  Okay.  Take -- take -- take --

8              MR. EISENBERG:  And I don't understand --

9              THE COURT:  Take me to the order, Mr. Eisenberg,

10   and tell -- and show me where you are --

11             MR. EISENBERG:  Okay.

12             THE COURT:  -- in that order.

13        (Pause in the proceeding.)

14             MR. EISENBERG:  Okay.  I'm trying to -- I'm

15   trying to get my -- my technology to work here.  I

16   apologize.

17             THE COURT:  No, I mean, I -- I'm happy to open it

18   up if you can just tell me what order you're telling me sets

19   out a separate deposition schedule.

20             MR. EISENBERG:  Well, no.  We have a

21   scheduling -- we have a scheduling order for depositions.

22             THE COURT:  Yeah.  I just want to see that.

23             MR. EISENBERG:  And --

24             THE COURT:  I want to see that so that I can --

25             MR. EISENBERG:  Yeah.  I --

1          THE COURT:  -- follow with the argument.

2          MR. EISENBERG:  Can somebody -- I -- I don't have

3  that in my hand.

4          THE COURT:  Or give me the date of it.

5          MR. BRESCIA:  And, Your Honor, this is Duane

6  Brescia.  If I may, and I think it's Docket Number 1224

7  dated April 6th.

8          MR. MILLER:  That is correct.  This is Robert

9  Miller.

10          THE COURT:  Okay.  I've got that open.

11          MR. EISENBERG:  Thank you, Your Honor.  I

12  apologize for not being able to work --

13          THE COURT:  No.

14          MR. EISENBERG:  -- the -- to be on the train and

15  open my other documents at the same time.

16          THE COURT:  Okay.

17          MR. EISENBERG:  I'm working with my internet

18  people.

19      (Pause in the proceeding.)

20          MR. EISENBERG:  Mr. Mayer brought me a copy of

21  it.

22          So we have a -- a -- a witness deposition

23  deadline through May 10th.  And the -- the discovery request

24  was and as Your Honor said, that was discovery request.

25  This is a 30(b)(6) for a witness, a corporate

1  representative.  And we had till May 10th to accomplish that.

2          THE COURT:  You -- you don't think --

3          MR. EISENBERG:  So --

4          THE COURT:  And -- and -- and, you know, I'm

5  willing to listen to this.  But I assume the discovery

6  requests include requests for deposition.

7          MR. EISENBERG:  No, Your Honor.  Well, I didn't

8  assume that, Your Honor.  I -- we felt that discovery

9  requests were written discovery.  And then once we got the

10 written discovery, we would schedule a deposition.  That's

11 the process that we're engaged in.

12         I've got -- discovery -- I did not believe that

13 the fact witness depositions are a different deadline.  And

14 we have till May 10th to -- to accomplish that.

15         THE COURT:  I thought that was -- no, I thought

16 that was for the taking of the depositions, not for the

17 request for the depositions.

18         MR. EISENBERG:  Well then that is our confusion,

19 Your Honor.

20         I -- we did not --

21         THE COURT:  Okay.

22         MR. EISENBERG:  -- understand that at all.

23 And -- and I understand their position on the documents and

24 the part of the 30(b)(6).  I thought that is -- that's

25 usually done typically for the ease of the witness, really,

1  to be honest with you.  Cause they're going to refer to what

2  they looked at to prepare.

3           But no, Your Honor, we clearly thought we had

4  till May 10th to get the fact witness depositions done,

5  including the scheduling of them.  We didn't know we had to

6  notice them of who we wanted to depose by April 14th.

7  That -- that would be -- I -- I did not understand that,

8  Your Honor.

9           THE COURT:  Well, certainly, you were supposed

10 to --

11          MR. EISENBERG:  And -- and it is not

12 (indiscernible) --

13      (Counsel and Court speaking concurrently.)

14          THE COURT:  There was supposed to be a planning

15 meeting.

16          MR. EISENBERG:  -- on purpose and

17 (indiscernible).

18          THE COURT:  Were there -- was there

19 correspondence amongst the parties coming out of that

20 disclosure statement, the planning meeting, that would have

21 clarified this in some way?

22          MR. EISENBERG:  From the standpoint of not --

23 we -- we did not schedule any of these depositions until we

24 were going to get the -- the discovery responses, Your

25 Honor.  And, I mean, get the request out.

1            We -- as far as I know, we did not, between the

2  parties, say who do you want to depose now.

3            THE COURT:  Well the completion of responses --

4            MR. EISENBERG:  And they depended --

5            THE COURT:  -- to the discovery requests is April

6  30.  And the deposition deadline is May 10th, but it started

7  April 2nd.  So I'm not sure that's consistent.

8        (Pause in the proceeding.)

9            MR. EISENBERG:  Well, Your Honor, I'm -- I'm just

10 trying to explain why, if Your Honor's asking us why the

11 actual deposition didn't get scheduled, because it was not

12 requested before --

13            THE COURT:  No, I -- I --

14            MR. EISENBERG:  -- at that, in fact --

15            THE COURT:  I'm hearing that.  And -- and then

16 let me hearing from Mr. Morfey what his position is about

17 depositions, the oral depositions.

18            MR. MORFEY:  Sure, Your Honor.

19            And -- and I'll be candid with the Court.  I was

20 not a party to any of the conversations that went into the

21 background of this document.  All I can do is read it on its

22 face.

23            I -- I consider deposition notices to fall within

24 the broader umbrella of -- of discovery and, therefore, they

25 are discovery requests.  That -- that -- that's how I

1   interpret that term.

2        (Pause in the proceeding.)

3            THE COURT:  Look, if there's somebody else who

4   wants to address this, that's fine.

5            What I would suggest we do is that for not I'm

6   going to quash the written part on the party, party issue.

7   As to whether the depositions were intended to be allowed

8   after that, I had intended -- I had believed that when I

9   signed the order, I mean, you all proposed the order, that a

10  deposition request would be a discovery request.

11           There may be communications between the parties

12  that show something different than that.  Or it may be

13  appropriate to grant relief from the order if there is

14  ambiguity that is now appearing that wasn't there before.

15           But I want the parties to have an opportunity to

16  review their correspondence, and their files, and to see if,

17  in fact, it was the intent of the parties, cause I mean, in

18  fairness you all drafted this order.  I -- I know what I

19  thought it said.

20           But if there was something in the correspondence

21  that indicated something different than the plain meaning,

22  and that is the depositions could be requested, you know,

23  after April 14th, I -- I want to see that.  And I don't want

24  to try and make a decision today before people can go scour

25  their files about that.

1        I'm also not precluding a motion to alter the

2   discovery deadlines if that's appropriate.  But I -- I don't

3   know that's going to be appropriate.  The fact that this is

4   important, I don't know that alone is good enough.

5        I mean, it was important enough that we went

6   through this whole discovery schedule so that we could get

7   to a deadline and get everybody prepared for it.  But

8   I'll -- I will allow Mr. Eisenberg on your argument, people

9   to submit written communications that might reflect

10  something different, or a motion.

11       MR. EISENBERG:  Well, we -- we -- we appreciate

12  that, Your Honor.  And -- and I think you can -- one of --

13  one of the indicators here with regard to the differences

14  between written discovery and -- and -- and oral

15  depositions, Your Honor, is the response -- the motion that

16  you got from Apache.

17       The -- the -- the -- the written discovery, they

18  addressed because of the April 14th deadline.  The topics

19  themselves, I don't believe they were arguing that a

20  30(b)(6) witness fell within that.

21       We -- we certainly didn't understand discovery

22  requests.  We thought that that meant written discovery

23  requests.  We did not believe that was to take depositions.

24  We thought we had through the 10th of May without an

25  extension for cause to -- to do that, Your Honor.  And --

1    and --

2              THE COURT:  Part of this goes to the party, party

3    issue --

4              MR. EISENBERG:  -- and I will --

5              THE COURT:  -- because what's normal, of course,

6    is you submit a notice of deposition, not a subpoena.  But

7    let me see what --

8              MR. EISENBERG:  Right.

9              THE COURT:  -- the correspondence shows.

10             And if you want to include that argument, you can

11   include it.  I think you're being hit cold by what I'm

12   getting -- what I'm saying going to do.  And I want to give

13   you a chance to prepare to argue against to not to do it

14   without notice.

15             MR. EISENBERG:  We -- no, we certainly don't --

16   we appreciate that, Your Honor.

17             We certainly believe that there's any real crisis

18   here.  Apache, as Your Honor knows, until Apache entered

19   into its agreement with the Debtor, they couldn't even file

20   the bankruptcy.  For them to minimize their role here I

21   think is -- is -- is -- is, you know --

22             THE COURT:  I'm not hearing them minimize their

23   role.

24             MR. EISENBERG:  -- well combines the end of --

25             THE COURT:  I'm -- I'm hearing them minimize

1  their future level of control.  And there is a big

2  difference in those two.  And I -- it may be that -- that

3  the documents say something different.  Let me get you all

4  to file something.

5           Mr. Miller, you wanted to address this as well?

6  Or -- or does that satisfy what you wanted to suggest?

7           MR. MILLER:  Your Honor, thank you for coming

8  back to me.

9           I would only see my role as being more to deal

10  with Ms. Russell's artful argument.  So I appreciate

11  Mr. Eisenberg's statement and I think it's appropriate for

12  us to give a further statement to the Court on this issue.

13           THE COURT:  Thank you.

14           MR. GRZYB:  May I add one -- one more point, Your

15  Honor.  This is Darren Grzyb again.

16           THE COURT:  Of course.

17           MR. GRZYB:  In looking at, you know, numbered

18  paragraph two of the scheduling order.  It provides a

19  mechanism by which the parties are to meet and confer if

20  there's discovery dispute.

21           Now I see that there -- there are dates in the

22  scheduling order.  But my view of paragraph two, Your Honor,

23  is that if reasonable counsel can discuss without involving

24  the Court's time, modifications to these dates, that that's

25  covered by paragraph two.

1          So to the extent we relate with respect to the

2    documents, then it would seem a reasonable interpretation of

3    the order and paragraph two, that this -- the dates have a

4    little play in them, provided that we're not asking for a

5    modification of the confirmation order for our date.

6          THE COURT:  I -- I hear you.  And I'm going to

7    let you all file what you want to file about -- if -- if you

8    can't reach an agreement.  And I would suggest the parties

9    do meet and confer.  If you all can't reach an agreement,

10   I'm saying you can file a motion to change the deadlines.

11   We'll get that -- we'll listen to you.

12          MR. GRZYB:  Appreciate that, Your Honor.

13          THE COURT:  All right.  I'm going to grant the

14   motion provisionally, subject to the oral depositions being

15   allowed, based on an interpretation of my own order, and

16   subject to a motion to extend deadlines which will be

17   considered on its merits.  But for today, I'm quashing.

18          Let's go to BP.

19       (Pause in the proceeding.)

20          THE COURT:  Mr. Duewall, good afternoon.

21          MR. DUEWALL:  Good afternoon, Your Honor, Craig

22   Duewall on behalf of BP.  I wanted to confirm that my audio

23   is clear, Your Honor.

24          THE COURT:  It is.  Thank you.

25          And Mr. Perez.

1          MR. PEREZ:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.  All right.  I think

3 this is BP's motion.

4          MR. DUEWALL:  Yes, Your Honor.  Thank you.

5          BP today brings forth a Motion to Compel and

6 seeks production of three categories of items or

7 information.  One, the offers received by Fieldwood during

8 the pre-petition and post-petition sales process.  Two, the

9 identity of the parties that executed NDA's, and potentially

10 entered and -- and looked at the data room during the sales

11 process.  And lastly, we're seeking production of the

12 management presentations and the sales process video data --

13 data room that's referenced in the Debtor's disclosures.

14          We previewed this issue previously before the

15 Court.  But just as background, the Court will recall that

16 in Document 1285, the -- the Disclosure Statement, which was

17 filed with the Court on 4/15/21.  And I'm specifically

18 referencing page 17 of 99.

19          The -- the Debtors discussed their M&A process.

20 Within that paragraph there they talk about the robust sales

21 and marketing process that they engaged in.  They tell us

22 that occurred between June of 2020 and September of 2020.

23 They say that it continued post -- after the petition date

24 that that process continued.  They make representations

25 about the 18 parties that executed this confidentiality

1  agreement, the 15 management presentations, the 12 written

2  bid letters and other indications of interest, and they --

3  and they conclude by telling us that that information was --

4  was made available to the creditors committee.

5        And so that's the background of the information

6  that -- that we're seeking discovery on today, Your Honor.

7  The -- the motion that we filed and that is at document

8  1337, and on page 2 of our motion, we specifically itemize

9  and list the interrogatory number 4 there on page 2 of the

10  motion where we're seeking the identity of those parties

11  that I just described.  Request for production number 24 and

12  25 referenced the video, the VDR, the video data room, in

13  the disclosure statement.  And then the request for

14  production number 26 asks for the 15 management

15  presentations and the 12 written bid letters and other

16  indications of interest.

17        The parties, Your Honor, in full disclosure, have

18  tried repeatedly to -- to resolve these issues.  We've had

19  numerous telephone calls, email exchanges, and we've been

20  unable to do so.  We believe that these materials should be

21  produced because they're relevant with regard to process,

22  value, feasibility.

23        We believe they get to the who, what, and why of

24  the M&A process described in the disclosure statement.  The

25  who being the individuals who looked at and executed the

1  NDA's.  The what being the bids and offers that were

2  received during the process.  And the why being the

3  information that was shared with these parties and potential

4  bidders that informed the actual bids and expressions of

5  interest that were received during that process.

6           And so who's executed the NDA and expressed an

7  interest, Your Honor.  Those 18 days get to the who, I

8  believe that that's a direct representation and analysis on

9  value.  And quite simply, Your Honor, I think most of the

10 parties have an understanding of who they think the players

11 are in terms of Gulf of Mexico interest or marketplace.

12          But who these parties were to enter the data room

13 and executed NDA's, give our experts who are also opining

14 with their own reasonable estimations of value a -- a -- a

15 determination as to whether that market is expanding or

16 contracting.

17          Are there new players that -- that entered and

18 expressed interest during this time period.  It was less

19 than 12 months ago.  Or -- or -- or who was looking around

20 the data room that forms what that sales process and market

21 looked like.  And it -- and it goes to value.

22          I -- I also think it's relevant with regard to

23 feasibility.  Because if a new company faces headwinds or

24 hardships in the future, an expending or contracting market

25 who the players are, sample in terms of empirical data

1    points with regard to who looked at it within the last 12

2    months.  It closes that feasibility if there's a need to go

3    seek capital credit, or even sales -- try to sell the

4    assets, again, during another sales process in the not too

5    distant future.

6            So that's why we want to know who expressed

7    interest, who signed the NDA's, and who was expressing

8    interest in the data room.  We're not looking, Your Honor,

9    to send those people discovery, harass those individuals.

10   We just want a list of who was looking at the assets.

11           Second, with regards to management presentations

12   and offers, and again, it's 5 -- or 15 management

13   presentations and 12 offers.  Twenty -- twenty-seven

14   documents or material responses to -- to this request.  Also

15   goes to value.  And also goes to feasibility.

16           There's no better data point.  And we can argue

17   about how much weight to put on the data point.  But there's

18   really no better data point in terms of what the market

19   spoke to these assets than when the sales process took

20   place.

21           The -- the market looked at the assets,

22   especially if -- if we see the market reflecting and opining

23   what the value of new co. assets are in the -- in the past

24   12 months is, again, an important data point with regard

25   to -- to value, feasibility, and the process that was

1   engaged in to obtain those offers or expressions of

2   interest.

3            Again, if they're forced to sell in the future,

4   try to -- try to access capital, fees, what the -- what the

5   market that existed within the past 12 months I think is

6   relevant of that --

7            THE COURT:  Mr. Duewall, are you asking for the

8   content of the offers or the identity of the offerors?

9            MR. DUEWALL:  Both, Your Honor.

10           THE COURT:  Why does the identity matter?

11           MR. DUEWALL:  The identity matters because

12  it's -- I would like to, and our experts would like to, see

13  the names of the -- the individuals who expressed interest.

14  And it gives context to the offers that were actually

15  received.

16           By way of example, if -- if there are, and I'm

17  just using a -- a number by point of reference.  If there's

18  20 active E&P operators in the Gulf of Mexico, I don't know

19  that to be the case.  I'm just using that as an example.

20           THE COURT:  No, that's fine.

21           MR. DUEWALL:  And -- and all -- and 18 of them

22  came into the data room and expressed interest.  There's

23  a -- there's a take away that can be taken there that the

24  market that currently exists for Gulf of Mexico properties

25  is limited to a number of companies that is currently

1  already there, or has been already -- already operating

2  there.

3          However, if the names -- if there's, you know, if

4  there's 10 companies out there that are generally believed

5  to be the operators, again, I'm not making a representation

6  that's the number, and we have 8 new companies who are

7  expressing interest in being active in the Gulf of Mexico,

8  then that, too, is a data point that it -- that -- that

9  provides at least some analysis and --

10          THE COURT:  So I -- I --

11          MR. DUEWALL:  -- and --

12          THE COURT:  I'm following you to the NDA's.

13  I'm -- I don't know that I'm going to do it.  But I

14  understand as to the NDA's why you would want the identity

15  of who signed an NDA.

16          I don't understand why you then need to be able

17  to know which of those entities are the ones who made

18  offers.

19      (Pause in the proceeding.)

20          MR. DUEWALL:  Oh, I see the Court's question.  If

21  that -- if that's what giving the Court concern, then I -- I

22  see the Court's point.  And I'd -- I'd be willing to --

23  to -- I think that's a legitimate and valid concern, Your

24  Honor.

25          If it -- if the -- if the Debtors are concerned

1  that they don't see that XYZ Company made this offer,

2  then -- then redact the offer.  And -- and -- but let us see

3  what the contents of the offer were so that we're able to

4  analyze how the market reacted to these assets being put up

5  for sale.

6          And -- and specifically, and what I think is

7  specifically important about the offers, is that, you know,

8  to the extent that, you know, the potential bidders were

9  making -- had conditions in their offers, or making offers

10 with regard to specific assets, I don't -- I don't know that

11 any of that's true, or -- or what those offers look like.

12         But I would be particularly -- it's of particular

13 importance to us to see these specific offers.  So I don't

14 know if the Court was suggesting that we not see the

15 particular offers.  But if the Court had pause with regards

16 to who made what offer, because that --

17         THE COURT:  Who made any offer.

18         MR. DUEWALL:  -- firm --

19         THE COURT:  I have some pause as to who made any

20 offer, you know.  It's one thing to say people come and look

21 at the data room.  I -- I need to hear from Mr. Perez why

22 that needs to be maintained confidentially.

23         MR. DUEWALL:  Sure.  And just so the Court --

24         THE COURT:  But you know --

25         MR. DUEWALL:  Sorry, Your Honor.

1          THE COURT:  -- you know, if -- if Shell made an

2    offer, it's -- I don't know why that matters who -- whether

3    it was Shell or Texaco.  It -- it might.  But I'm inclined

4    to think that ought to stay pretty confidential.

5          I don't know why you need, you know, they

6    emphasize in their response papers that by asking for the

7    entire data room, the granularity of the detail that would

8    require them with their competitor to go and redact

9    documents is just overwhelming.

10          And what you're focusing on are the management

11   presentations.  They didn't focus on that in their

12   objection.  So if you would move from the management

13   presentations, which are obviously going to be bigger

14   picture presentations, to the granularity that you end up

15   with by requesting 100 percent of the data room.

16          MR. DUEWALL:  Yes, Your Honor.  And just so that

17   the Court is clear before I move there, and I will move

18   there quickly.

19          We do not dispute that they can mark any of

20   this -- these materials confidential, expert's eyes only, or

21   the designation that they currently have them on -- under --

22          THE COURT:  I understand.

23          MR. DUEWALL:  -- is highly confidential so that

24   only the attorneys and the experts will see them.

25          So that will be true for whoever executed the

1 NDA's, or the presentations, or the offers, or the data room

2 information itself.  So I just want to make the Court is

3 clear --

4          THE COURT:  Yeah, I know that.

5          MR. DUEWALL:  -- on that as well.

6          Okay.  Thank you, Your Honor.

7          THE COURT:  So why the need for granuality.

8          MR. DUEWALL:  Lastly, with regard --

9          The granularity, Your Honor, I believe goes into

10 the -- the why of the process.  The -- the why of -- if you

11 know what the parties were looking at, I -- I believe it --

12 it gives better context and better clarity to the -- the

13 offers that were made.

14          It's -- it's kind of the garbage in, garbage out

15 analysis.  If we know what -- what was in the data room, and

16 were able -- and our experts are able to look at it, glean

17 that information and see if at any --

18          THE COURT:  Well you -- you know what's in there

19 from the index.  The index may not be perfect, but that

20 tells you what's in there.  It doesn't tell you the

21 substance of what's in there.  And they've offered you the

22 index, as I understand it, to at least one of the data

23 rooms.

24          MR. DUEWALL:  They have, Your Honor.

25          But if you turn to document 1345, which is the

1   disclosures that was filed -- that were filed by Debtor's

2   counsel, document 1345, specifically page 4 of 10.

3          (Pause in the proceeding.)

4               THE COURT:  Go there.

5          (Pause in the proceeding.)

6               MR. DUEWALL:  They -- they have a copy of an

7   email that we sent to them during this process --

8               THE COURT:  Oh.  Right --

9               MR. DUEWALL:  -- of trying before --

10              THE COURT:  -- I -- I saw that.  And -- and I

11  know that you're saying look, some of this is

12  indecipherable.

13              But let me assume for a minute that you got a

14  listing that identified in the English language by name what

15  each of the 25,500 documents were.  Why do you need to see

16  what they say as opposed to what they were?

17              MR. DUEWALL:  If they -- if they're able to

18  produce such a -- and index, Your Honor, that may mitigate

19  our request.  I'm -- I -- I think that's rather burdensome.

20  And I think it's less burdensome just to produce the data

21  room itself, mark it highly confidential, allow our experts

22  to see it, and -- and allow them to access the data --

23              THE COURT:  I -- I --

24              MR. DUEWALL:  -- that way.  That --

25              THE COURT:  And -- and it -- and it may be.  It

1  may be.

2            I want to hear from them.  I mean, this is me

3  talking and not them talking.  But I'm -- that's why -- I'm

4  just probing what you really needed here.

5            If you had anything else, I'd go ahead,

6  Mr. Duewall, otherwise, I want to hear from Mr. Perez.

7            MR. DUEWALL:  That's it, Your Honor.  I won't

8  repeat myself, except for just to remind the Court that our

9  expert deadlines are Monday.  And so that's the reason we

10 needed to -- to emphasize these issues with the Court today.

11           THE COURT:  Happy you're here.

12           Mr. Perez?

13           MR. DUEWALL:  Thank you, Judge.

14           MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

15 Perez.

16           Your Honor, first, let me start by saying that to

17 our knowledge, BP has not filed a proof of claim in this

18 case.  They are a contract counter-party.  And as the Court

19 knows we've had disputes with them.  And -- and

20 unfortunately, I think we're going to have disputes with

21 them in the future regarding the operations of the -- the

22 Galapagos area, which is where the Genovesa (phonetic) well

23 is.

24           And so -- and they're also a -- a predecessor

25 with respect to some of the properties.  So I -- I actually

1  don't know in what context, cause they don't really identify

2  in what context that they're bringing this.

3           And we're -- the -- the plan contemplates several

4  transactions, including a divisive merger that establishes

5  Fieldwood One that we talked about earlier.  It also

6  contemplates that there'll be a sale of certain assets,

7  pursuant to the plan.

8           So those assets are -- are being sold.  So I

9  haven't been able to identify what the plan objection is

10 that these -- that these are going for.  They're talking

11 about feasibility.  I don't know which feasibility they're

12 talking about.

13          The -- the data room that we're talking about

14 that had the 15 -- the 15 management visitations.  And by

15 the way, that is one management presentation that was done

16 15 times.  It's not --

17          THE COURT:  Right.

18          MR. PEREZ:  -- 15 different management

19 presentations.

20          That data room relates to the offshore assets,

21 the deep water assets, which include all of the assets that

22 are the subject of the disputes that we have with BP.

23 And -- and -- and so those are the assets that are being

24 sold, pursuant to the credit bid under the plan.

25          I don't understand if the allegation is that in

1    September of last year we ran a bad process.  Even if that

2    were true, I'm not sure that that goes to any issue that's

3    triable in connection with confirmation, because we're not

4    relying on that process.

5          This is not a situation, Your Honor, where I'm

6    coming to the Court saying yes, we ran a great process,

7    therefore, you should sell it.  And -- and we're not doing

8    that here, Your Honor.

9          We -- we are selling pursuant to a credit bid to

10   secured lenders.  They're -- the -- the secured lenders,

11   when you add the -- the -- the first lien, first out -- the

12   first lien term loan and the second lien, which all have

13   good liens, and -- and -- and the -- and the values that

14   were ascribed pursuant to the plan and the credit bid

15   amount, you're still talking about a billion dollars of

16   claims that -- that will become unsecured claims.  Well more

17   than a billion dollars.

18         And, Your Honor, number one, they -- BP submitted

19   two different requests for production of documents.  One,

20   Your Honor, is at -- is -- it's Exhibit 6 in our witness and

21   exhibit list.  So it's document 1346-6 relating to issues

22   relating to them -- to them as a predecessor and things like

23   that.

24         We responded to all of that.  We responded

25   extensively to everyone, both in connection with formal

1  discovery as well as in connection with informal discovery,

2  which had been the topic of extensive discussions with you.

3         So, Your Honor, the -- for -- for -- for us --

4  and -- and -- and remember, Your Honor.  This is BP. They're

5  one of the largest operators in the Gulf.  For -- for them

6  to say that they don't know who's active in the Gulf and

7  what they're doing just defies logic.

8         So for them to want the people who we signed the

9  NDA's with, and the identity of each of the witnesses --

10 of -- of each, I'm sorry, of each of the -- of each of the

11 people who provided offers on a process that happened last

12 year that we're not relying on, we provided, you know,

13 Mr. Hanson's full valuation report with every document that

14 he considered in connection with that with respect to

15 valuation.

16         I'm not sure that I really understand what it is

17 that -- that -- that -- the basis for a -- a -- a process

18 that occurred that we're not relying on, that we didn't use

19 that happened last year.  I don't know how that informs

20 Mr. -- Mr. Hanson value.

21         I guess -- I'm not sure if they're -- if they're

22 going to argue, well it should be less or it should be more.

23 And I don't know how it has anything to do with feasibility,

24 you know, and I'm not even sure feasibility is -- is

25 relevant here.  We're selling assets under -- under a plan.

1          And -- and -- and the issue is do we, you know,

2     can we confirm the plan.

3          THE COURT:  No.  And I understand --

4          MR. PEREZ:  I'm not sure.

5          THE COURT:  But aren't you selling assets and

6     leaving people like BP with potential liabilities that

7     aren't going to be covered and the potential to have large

8     claims?

9          MR. PEREZ:  Absolutely, Your Honor.

10          So -- so to the extent that they -- they -- they

11     believe that the -- the value is not what it was, then --

12     then, you know, they'll have their expert report and they'll

13     say no.  They're stealing this.  They should -- they should

14     pay $500 million more.

15          Well, Your Honor, they say they should pay $500

16     million more.  We're still -- we're still 500 million in the

17     hole.  But -- but that -- but that's not really what this

18     goes to.

19          This goes to -- this goes to a process that

20     basically fails back in -- in last year.  And -- and -- and

21     furthermore, Your Honor, I have -- I probably had four or

22     five conversations with Mr. Duewall.

23          And I said tell me what it is that you want.

24     Tell me what your expert wants.  And they -- and other than

25     I want the data room, I've never heard what the -- they said

1 I want the down hole pressure for each of the wells.  I'm

2 sure that's in there.

3          The -- the image that we produced have 19,000

4 lines, 19,000 rows, each one representing one or more

5 documents.  And -- and -- and -- and they picked out, you

6 know, a handful that had -- that didn't have an appropriate

7 description, but there are 19,000 of them.

8          THE COURT:  I got that so I'm --

9          MR. PEREZ:  And -- and what is it --

10          THE COURT:  So tell me what the damage is, what

11 the imposition is, what the disadvantage is, of telling them

12 who signed NDA's.  Not who made offers, who signed NDA's.

13 Why is that terribly confidential?

14          MR. PEREZ:  We did not -- well, there is -- there

15 are confidentiality provisions.  But under a PEO (phonetic)

16 we can tell them who signed -- who signed NDA's.  We're

17 happy to do that.

18          In fact, and -- and -- and the other thing you

19 should know, Your Honor, is that the -- who had actually

20 went to BP, BP had no interest in doing this, other than

21 looking at Galapagos, which is the area that --

22          THE COURT:  Right.

23          MR. PEREZ:  -- we have a dispute about.

24          And then they decided they didn't want.  So it's

25 not like they didn't know what was going on at the time.

1          THE COURT:  But let me tell you what I think I

2    should order, and I want to hear you all argue against this.

3    This isn't an order yet.

4          I think with respect to the index, if there are

5    line items in the index that are unclear, including I think

6    they were nine of them or so, that were totally

7    uninterpretable to me, then the Debtor has to make the index

8    complete so that the names of the documents, or the

9    identification of the documents, are there.  The documents

10   need not be produced.

11         It may be that this will trigger something that

12   ought to get produced.  I don't know.  But it's not falling

13   within what I'm inclined to order produced.

14         Number two, a management presentation that is the

15   one that is the most complete.  If they're all identical, it

16   can just be one, needs to be produced.  It may redact the

17   name of the entity to whom it was presented.  And it may

18   redact any information concerning properties that are

19   subject to litigation with BP.  But the balance of the

20   management presentation I think should probably get

21   produced.

22         Number three, the offers that have been received

23   should be produced, redacting all information about who is

24   making the offer and any information concerning the

25   properties that are subject to the litigation with BP.

1          Tell me what's wrong with that order.

2      (Pause in the proceeding.)

3          THE COURT:  Go ahead.  I've got it -- I've never

4  heard you two not talk.  So it's good.

5          MR. PEREZ:  Yeah, Your Honor.  You know, looking

6  back at what the Court said, I -- I think I've made my

7  point.

8          THE COURT:  Okay.  Mr. Duewall, you okay?

9          MR. DUEWALL:  Thank you, Your Honor.

10          And just for the record, we've -- we've always

11  gotten along with opposing counsel.  And I don't want the

12  Court to think that we haven't.  Even through this process,

13  we've -- we've been able to do that.

14          THE COURT:  I --

15          MR. DUEWALL:  But the only thing that gives me

16  pause -- I'm sorry, Judge.

17          THE COURT:  No, I just -- I can't image it would

18  be any other way between the two of you all, but --

19          MR. DUEWALL:  Thank -- thank you, Your Honor,

20  the -- two -- two points of clarity, or -- or maybe several.

21          Number one, the -- the lines that we highlight in

22  that email, excuse me, there's literally 10,000 or so like

23  that.  And so just so the record is clear, we're happy to

24  get that charts updated as you've described.  But I do think

25  that may be burdensome and I acknowledge that here.  If

1  there's -- if there's another way that opposing counsel

2  wants to send that over, we'll gladly take a look at that.

3         Two, I don't -- I'm a little bit -- I don't know

4  what the modifier, and I'm not trying to be difficult, of

5  properties subject to potential litigation with BP or what

6  they're trying to accomplish with that, or what the Court's

7  concerns are.  Specifically, if we're able to mark it

8  attorney's eyes only, expert's eyes only, I -- I do think

9  that --

10        THE COURT:  Attorneys may be the last person who

11  they want to see if they've identified weaknesses in the

12  litigation.  So I don't know what's in there.

13        But you know the properties that you're involved

14  in.  You know them intimately.  You don't need that

15  information.  And the risk of interfering with the disputes

16  seems too great to me.  That's why I'm going it that way.

17        MR. DUEWALL:  Okay.  So that's pretty -- I

18  understand, Judge.

19        But if they -- if they offered us, even if the

20  offer was made subject to those properties, we'll still see

21  what the offer was, correct?

22        THE COURT:  You're going to see the offer, sure.

23        MR. DUEWALL:  Yes.  Yes.  Okay.

24        And I understand what the Court's asking.  I

25  think that's -- I think that's fine.

1          THE COURT:  Okay.  So Mr. Perez, you're telling

2    me that this is not, and -- and I'm -- I'm not holding

3    anybody to this.  Mr. Duewall is offering that maybe what

4    I've done makes you identify 10,000 lines.  I thought you

5    were telling me that it probably wasn't -- all that they've

6    identified are a handful.  You didn't say all that all that

7    there are is a handful.

8          You all need to talk about this.  If there's a

9    better way to do it than identifying the names, it's fine

10   with me.  You know, if you only give him the cover page of

11   the document or something like that, I don't care.

12          I need him to know what the document's subject

13   matter is so that his experts can look at that range of

14   stuff and be sure that the data room's, you know, complete.

15   Okay.

16          MR. DUEWALL:  And, Your Honor, is that something

17   we can have by five o'clock on Friday probably so our

18   experts could have the weekend to look it over before their

19   reports are due on Monday?

20          THE COURT:  If you can't get it by five o'clock

21   on Friday, then you and Mr. Perez, are going to agree on an

22   extension of the expert deadline so that they do have time

23   to look over it.

24          MR. PEREZ:  Thank you, Your Honor.

25          THE COURT:  All right.  Anything else we need to

1  do?  Thank you all.

2          MR. DUEWALL:  Nothing, Your Honor.  Thank you.

3          THE COURT:  By the way, I -- look.  I know that

4  all today was about discovery requests and people don't like

5  burdening the Court with discovery requests.  Please burden

6  me with that.

7          I would much rather have this to get to a

8  confirmation hearing where we're still having fights about

9  it.  Whether you like the calls or don't like the calls,

10  it's important we resolve discovery disputes.

11          So bring them if you need to.  Thank you.

12          MR. DUEWALL:  And, Your Honor -- Your Honor, just

13  so that we're clear.  Their -- their deadline to produce

14  everything to us is five o'clock Friday, I don't -- I just

15  wanted that made clear.

16          THE COURT:  Five o'clock on Friday, but if they

17  can't make that, then you're going to get an extension of

18  getting your expert reports.  And you all just need to work

19  through that.

20          I mean, look, if it's one document that's

21  delayed, I expect you guys to be reasonable about how that

22  extension's going to work.

23          MR. DUEWALL:  I -- I understand, Your Honor.  I

24  think they should probably be able to get us the

25  presentations and the offers by then.  If they need a little

1  bit of extra time to populate these fields, we will -- we'll

2  work with them.  Thank you, Judge.

3            THE COURT:  Thank you.  Thank you all.

4            I'm not going to do a written order, it's just

5  going to be a docket entry.

6            We are in adjournment.

7        (Proceeding adjourned at 5:04 p.m.)

8                          *  *  *  *  *

9            *I certify that the foregoing is a correct*

10  *transcript to the best of my ability due to the condition of*

11  *the electronic sound recording of the ZOOM/telephonic*

12  *proceedings in the above-entitled matter.*

13  */S/ MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #63964*

18  *DATE FILED:  MAY 14, 2021*

19

20

21

22

23

24

25