## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

### DECLARATION OF JOHN-PAUL HANSON IN SUPPORT OF EMERGENCY MOTION OF DEBTORS FOR ORDER (I) APPROVING RIGHTS OFFERING PROCEDURES AND RELATED FORMS, (II) AUTHORIZING DEBTORS TO CONDUCT RIGHTS OFFERINGS IN CONNECTION WITH DEBTORS' PLAN OF REORGANIZATION, (III) AUTHORIZING ENTRY INTO EQUITY BACKSTOP COMMITMENT AGREEMENTS, (IV) APPROVING <u>OBLIGATIONS THEREUNDER, AND (V) GRANTING RELATED RELIEF</u>

I, John-Paul Hanson, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Houlihan Lokey Capital, Inc. ("**Houlihan**"), where I am Head of Houlihan's Oil & Gas Group, and am a senior banker in the firm's Financial Restructuring Group with respect to the oil and gas industry and sub-sectors.  I am based out of Houlihan's Houston office located at 1001 Fannin St., Suite 4650, Houston, TX 77002.  Houlihan is the investment banker for Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

(collectively, the "**Debtors**").  Houlihan and its senior professionals have extensive experience with reorganizations and restructurings of distressed companies, both out-of-court and in chapter 11 proceedings.

2.      I submit this declaration (the "**Declaration**") on behalf of Houlihan in support of the relief requested in the *Emergency Motion of Debtors for Order (I) Approving Rights Offering Procedures and Related Forms, (II) Authorizing Debtors to Conduct Rights Offerings in Connection with Debtors' Plan of Reorganization, (III) Authorizing Entry into Equity Backstop Commitment Agreements, (IV) Approving Obligations Thereunder, and (V) Granting Related Relief* (the "**Rights Offering Motion**").

3.      Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Houlihan employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional.  If called to testify, I could and would testify to each of the facts set forth herein.  I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional retained as the Debtors' investment banker in these chapter 11 cases.

### Qualifications

4.      I specialize in advising public and private oil and gas companies and their lenders and investors, including in the context of complex financial restructurings.  Before joining Houlihan in 2001, I was a manager of alternative lending at Commonfund Mortgage Corp., where I structured whole loan and portfolio fundings, sales, and securitizations involving a variety of

asset-backed lending transactions.  Earlier in my career, I held a similar position at MoneyLine Lending.  I began my career in finance, trading fixed income securities at NNJ, a private family wealth fund formerly based in San Francisco, California.  I have an M.B.A., with a concentration in Finance, from the University of Maryland's Robert H. Smith School of Business and a dual B.A. degree, *cum laude*, in Italian and International Finance from Brigham Young University.  I am FINRA certified with Series 7 and 63 licenses.

5. I have extensive experience as an advisor in corporate restructurings, public and private debt and equity offerings, and mergers and acquisitions.  I have advised many companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to offshore Gulf of Mexico businesses, including *ATP Oil & Gas Corp.*, *Bennu Oil & Gas, LLC*, *Energy XXI Ltd.*, *Cobalt International Energy, Inc.*, and Fieldwood Energy LLC's previous restructuring.  In addition, I have advised numerous companies, creditors, and investors in connection with in-court and out-of-court restructurings and recapitalizations relating to onshore U.S. and international E&P companies, including *Berry Petroleum, LLC, Sandridge Energy, Inc., Sheridan Production Partners (I and II), PA Resources, Halcon Resources Corporation, BPZ Resources, Inc., Chesapeake Energy Corporation, All American Oil & Gas, Breitburn Energy Partners, Jones Energy Corporation,* and *Endeavour International Corporation*, among many others within the energy industry and a variety of other sectors.  I have previously submitted declarations and/or affidavits and proffered testimony in multiple cases.  I have authored, co-authored, and spoken on various topics, including Trends in Oil & Gas Finance, Capital and Valuation, and financing markets and valuation dynamics in a distressed environment, among others.

6.      In March 2020, the Debtors retained Houlihan as their investment banker to assist with the Debtors' evaluation of strategic alternatives.  Since that time, members of my team and I have worked closely with the Debtors' management and other professionals the Debtors retained in these chapter 11 cases to analyze the Debtors' business affairs, assets and liabilities, financial position, contractual arrangements, and various proposed strategic transactions.  I, and the Houlihan team, have become familiar with the Debtors' capital structure, liquidity needs, and business operations.  Additionally, my team and I led the negotiations on the terms of the Debtors' exit financing, including the Rights Offerings (as defined below).

## **The Rights Offering**

7.      Prior to and after the Petition Date, the Company, its advisors and my team at Houlihan engaged in discussions with the Company's creditor constituencies regarding the terms of a restructuring that would include a recapitalization of the Debtors' business.[2]  The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the presented restructuring framework and carefully considered their options for financing the transactions to be consummated pursuant to the Plan, including the Credit Bid Transaction.  In order to help ensure that the Debtors could implement the transactions and distributions contemplated by the Plan and that the NewCo Entities have ample capital to support their operations post-Effective Date, the Debtors determined that, in addition to the First Lien Exit Facility and new money Second Lien Exit Facility, a new money equity rights offering would assist in appropriately capitalizing the NewCo Entities and Post-Effective Date Debtors.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Backstop Agreements (as defined herein) or the Debtors' joint chapter 11 plan (Docket No. 1284) (the "**Plan**"), as applicable.

8.     Accordingly, the Plan provides for two new money rights offerings (the "**Rights Offerings**") in accordance with (i) the proposed procedures attached to the Rights Offering Motion as **Exhibit A-1** (the "**FLTL Rights Offering Procedures**"), pursuant to which the Prepetition FLTL Lenders will receive subscription rights (the "**FLTL Subscription Rights**") to purchase New Equity Interests issued by NewCo (the "**Rights Offering Shares**") in an aggregate amount of $20 million (the "**FLTL Rights Offering Amount**"), and (ii) the proposed procedures attached to the Rights Offering Motion as **Exhibit A-3** (the "**SLTL Rights Offering Procedures**" and, together with the FLTL Rights Offering Procedures, the "**Rights Offering Procedures**"), pursuant to which the Prepetition SLTL Lenders will receive subscription rights (the "**SLTL Subscription Rights**" and, together with the FLTL Subscription Rights, the "**Subscription Rights**") to purchase Rights Offering Shares in an aggregate amount of $20 million (the "**SLTL Rights Offering Amount**" and, together with the FLTL Rights Offering Amount, the "**Rights Offerings Amount**").   The Rights Offerings, which will provide $40 million in new capital, are an important financing component of the Plan.

9.     To ensure that the funding is obtained through the Rights Offerings, the Debtors have negotiated (i) with the FLTL ERO Backstop Parties (as defined in the Plan), that certain *FLTL Backstop Commitment Agreement*, annexed hereto as **Exhibit B-1** (the "**FLTL Equity Backstop Commitment Agreement**"), pursuant to which, the FLTL ERO Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the $20 million FLTL Rights Offering; and (ii) with the SLTL ERO Backstop Parties (as defined in the Plan and, together with the FLTL ERO Backstop Parties, the "**Backstop Parties**"), that certain *SLTL Backstop Commitment Agreement*, annexed hereto as **Exhibit B-2** (the "**SLTL Equity Backstop Commitment Agreement**" and together with the FLTL Equity Backstop Commitment

Agreement, the "**Backstop Agreements**"), pursuant to which, the SLTL ERO Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the $20 million SLTL Rights Offering.  The funds generated from the Rights Offerings help to facilitate the successful implementation of the Plan and appropriately capitalize the NewCo Entities and Post-Effective Date Debtors, and the commitments made by the Backstop Parties provide the appropriate assurances that the Debtors will receive sufficient funding upon the close of the Credit Bid Transaction to satisfy their obligations under the Plan.

10.     The Rights Offering Procedures have been designed, in consultation with the Ad Hoc Group of Secured Lenders and the Ad Hoc Group of Prepetition SLTL Lenders, to transmit efficiently all materials necessary for participation in the Rights Offerings, including the subscription forms for the FLTL Rights Offering and the SLTL Rights Offering (collectively, the "**Subscription Forms**" and together with the Rights Offering Procedures, the "**Rights Offering Materials**"), annexed to the Rights Offering Motion as **Exhibit A-2** and **Exhibit A-4**, respectively.  The Rights Offering Materials have been drafted to ensure the clear communication of the requirements for, and to facilitate, such participation.

11.     Moreover, I understand that the economics of the Rights Offering were disclosed in the Disclosure Statement and the Plan filed with the Court on March 23, 2021, almost two months prior to the filing of the Rights Offering Procedures (and their related exhibits), and provides all stakeholders eligible to participate in the Rights Offerings with adequate information regarding the Rights Offerings and allows such stakeholders to make an informed investment decision as to their participation in the Rights Offerings.

12.     The Rights Offering Procedures are reasonable and comparable to procedures and forms that have been approved in connection with similar rights offerings.

6

13.     I believe that the Court's approval of the Rights Offering Procedures and the Rights Offering Materials, and authorization to conduct the proposed Rights Offerings, is in the best interests of the Debtors' estates, creditors, and other parties in interest.

### The Backstop Agreements

14.     Undoubtedly, the Backstop Parties are conferring a material benefit to the Debtors' estates as they help pave the way for the Debtors' comprehensive restructuring of their business and successful exit from chapter 11, preserving over 1,000 jobs and maximizing recoveries to the Debtors' stakeholders.

15.     In light of the substantial amount of capital the Backstop Parties have committed, the contemplated reservation of capital over a significant duration in order to assure the successful implementation of the Plan, the time and expense the Backstop Parties incurred in negotiation of the Backstop Agreements and will continue to incur as the parties proceed to Plan confirmation, and the Backstop Parties' exposure to the risk that their efforts could result in opportunity cost if the Plan is not approved by the Court, the Backstop Parties conditioned their commitment on the approval of the following:

a)     *Backstop Commitment Premiums* of 8.0% of the Rights Offering Amount, payable in the form of New Equity Interests issued by NewCo (the "**Backstop Commitment Premiums**");

b)     *Indemnification Obligations* owed by the Debtors prior to the Effective Date and by NewCo on and after the Effective Date to the Backstop Parties under certain circumstances (subject to certain customary carve-outs) (the "**Indemnification Obligations**"); and

c)   *Transaction Expenses* for the reasonable fees and expenses of the Ad Hoc Group of Secured Lenders Advisors, the Prepetition FLTL Agents Advisors and Kasowitz Benson Torres LLP, solely to the extent they have been and are actually incurred in connection with the negotiation, preparation and implementation of the Backstop Agreements and other agreements and transactions contemplated therein (the "**Transaction Expenses**").

Absent these protections, the Backstop Parties would not have agreed to the binding commitments to backstop the Equity Rights Offerings.  Indeed, if the Commitment Obligations are not approved, the Backstop Parties' commitment to the backstop the Rights Offerings will be jeopardized as the Backstop Parties' would have the right to terminate the Backstop Agreements.

16.   My team and I compared the Backstop Commitment Premiums and other Commitment Obligations to similar commitments and fees in other cases and determined they are market-based and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases.  Additionally, the Backstop Commitment Premiums here are consistent with the backstop premium already approved by the Court with respect to the new money Second Lien Exit Facility.  *See Order (I) Authorizing the Debtors to Enter into Backstop Commitment Letter, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (Docket No. 1248).

17.   The Commitment Obligations are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having the certainty that incremental funding will be available to help capitalize the NewCo Entities and consummate the Credit Bid Transaction and the Plan.  Notably, the Backstop Commitment Premiums are payable

entirely in equity of NewCo (*i.e.* New Equity Interests) and impose no cash costs on the Debtors, and, no cash termination fee is payable if the Backstop Agreements are terminated.

18.     Furthermore, approval of the Transaction Expenses is warranted.  The Backstop Parties already have expended significant time and effort negotiating the Backstop Agreement, including substantial due diligence, protracted negotiations, and the preparation and negotiation of the documents necessary in connection therewith.  Reimbursing such fees and expenses is customary in other similar transactions to address the substantial efforts expended by backstopping parties.

19.     The Backstop Agreements are an important component of the Debtors' restructuring.  The Backstop Agreements help to provide the Debtors, and other key stakeholders, with assurances that the Credit Bid Purchaser will have sufficient working capital to operate its business and, after the Closing of the Credit Bid Transaction, the Debtors will have sufficient cash proceeds to fund their obligations under the Plan.

20.     The Backstop Commitment Premiums and other Commitment Obligations are necessary inducements and reasonable compensation for the Backstop Parties to enter into the Backstop Agreements, which will provide significant benefits to the Debtors' estates by, among other things, securing $40 million in incremental funding.  Given the substantial investment and commitment of the Backstop Parties, I believe that the Commitment Obligations are necessary to help facilitate the successful implementation of the Rights Offerings and Plan.

21.     In light of the foregoing, I believe that the terms of the Backstop Agreements, including the Backstop Commitment Premiums, the Indemnification Obligations, and the Transaction Expenses are fair and reasonable in consideration of the cost of capital and the certainty the Backstop Agreements provide the Debtors with respect to their restructuring process.

22.     The Debtors have evaluated the risks and the costs associated with entry into the Backstop Agreements, including the Backstop Commitment Premiums, and considered those factors when determining the appropriate capitalization for the NewCo Entities and the Post-Effective Date Debtors and determined that the risks are outweighed by the benefits of having a source of committed, incremental financing to help ensure sufficient funds to implement the transactions contemplated by Credit Bid Transaction and the Plan.  The Debtors have soundly determined that the Rights Offerings and Backstop Agreements minimize their risk and maximize value for their stakeholders.

23.     The Debtors' decision to implement the Rights Offerings pursuant to the Rights Offering Procedures and to enter into the Backstop Agreements and pay any amounts required thereunder represents a sound exercise of the Debtors' business judgment.  The Backstop Agreements are the product of extensive good-faith, arm's-length negotiations between the Debtors and their advisors on the one hand and the Backstop Parties and their advisors on the other, and were entered into only after careful consideration by the Debtors' management in consultation with their experienced financial and legal advisors.  Significantly, the Backstop Agreements ensure that, in accordance with their terms and conditions, the Credit Bid Purchaser has a fully backstopped source of capital committed to help fund its initial capital needs and consummate the Credit Bid Transaction and, upon Closing, the Debtors will have sufficient funds to satisfy their obligations under the Plan.  The various protections afforded the Backstop Parties by the Backstop Agreements, including the Commitment Obligations (as defined below), are integral components of the backstop arrangements, and the Backstop Parties would not have entered into their respective commitments under the Backstop Agreements without them.  I believe the benefits and committed funding that the Debtors will receive upon entry into the Backstop Agreements are

commensurate with the economic consideration provided to the Backstop Parties in exchange for their substantial economic commitments under the Backstop Agreements and the costs associated with committing and reserving substantial capital for a significant period of time.

24.     In light of the benefits that will inure to the Debtors and their estates as a result of the Backstop Parties' commitment of capital through the Backstop Agreements, the Debtors submit that entry into the Backstop Agreements and performance thereunder, is in the best interest of the Debtors' estates and should be approved by this Court.


Dated: May 20, 2021

                              */s/ John-Paul Hanson*
                              John-Paul Hanson
                              Managing Director
                              Houlihan Lokey Capital, Inc.