## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR ORDER (I) APPROVING
RIGHTS OFFERING PROCEDURES AND RELATED
FORMS, (II) AUTHORIZING DEBTORS TO CONDUCT
RIGHTS OFFERINGS IN CONNECTION WITH DEBTORS'
PLAN OF REORGANIZATION, (III) AUTHORIZING ENTRY INTO
EQUITY BACKSTOP COMMITMENT AGREEMENTS, (IV) APPROVING
<u>OBLIGATIONS THEREUNDER, AND (V) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422). The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX 77042.

**EMERGENCY RELIEF HAS BEEN REQUESTED.  A HEARING WILL BE CONDUCTED ON THIS MATTER ON May 28, 2021 AT 11:00 A.M. (PREVAILING CENTRAL TIME).  YOU MAY PARTICIPATE IN THE HEARING BY AUDIO/VIDEO CONNECTION.**

**PLEASE NOTE THAT THROUGH THE ENTRY OF GENERAL ORDER 2020-10 ON MARCH 24, 2020, GENERAL ORDER 2020-11 ON APRIL 27, 2020, GENERAL ORDER 2020-17 ON JUNE 12, 2020, GENERAL ORDER 2020-18 ON JUNE 29, 2020, GENERAL ORDER 2020-19 ON AUGUST 7, 2020, AND GENERAL ORDER 2020-20 ON OCTOBER 19, 2020, THE COURT INVOKED AND THEN EXTENDED AND MODIFIED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.  IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT (832) 917-1510.  YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE ISGUR'S CONFERENCE ROOM NUMBER IS 954554.**

**YOU MAY VIEW VIDEO VIA GOTOMEETING.  TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION.  TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGEISGUR" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE ISGUR'S HOME PAGE ON THE SOUTHERN DISTRICT OF TEXAS WEBSITE.  ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF THE HEARING.  TO MAKE YOUR ELECTRONIC APPEARANCE, GO TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE AND SELECT "BANKRUPTCY COURT" FROM THE TOP MENU.  SELECT "JUDGES' PROCEDURES," THEN "VIEW HOME PAGE" FOR JUDGE ISGUR.  UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE".  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN MAY 28, 2021.**

Fieldwood Energy LLC ("**FWE**" or the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

<u>**Preliminary Statement**</u>

1.      On April 14, 2021, the Bankruptcy Court held a hearing at which it approved the Debtors' *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of*

2

*Fieldwood Energy LLC*, dated April 15, 2021 (Docket No. 1285) (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Disclosure Statement**") and granted related relief and thereafter entered an order (Docket No. 1286) (the "**Disclosure Statement Order**") with respect thereto.  The Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the Debtors' *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors*, dated April 15, 2021 (Docket No. 1284) (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"), which provides for a comprehensive restructuring of the Debtors' business through a Credit Bid Transaction, the implementation of one or more divisive mergers under Texas law, the decommissioning of certain assets, and the abandonment of other assets.

2.      The restructuring contemplated by the Plan is the result of months of good faith and arm's length discussions with Debtors' key stakeholders and reflects the support of the DIP Lenders, the Prepetition FLFO Lenders holding 100% of the FLFO Claims, the Prepetition FLTL Lenders holding approximately 87% of the FLTL Claims, and the Prepetition SLTL Lenders holding approximately 88% of the SLTL Claims, the official committee of unsecured creditors (the "**Creditors' Committee**"), and as of the date hereof three significant predecessors in interest with respect to the vast majority of the Debtors' Shelf Assets (Apache Corporation ("**Apache**"), Chevron U.S.A. Inc., and Eni Petroleum US LLC.[2]  The broad support for the Plan obtained by the Debtors in the midst of an unprecedented and challenging operating environment represents a significant accomplishment.

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Rights Offering Procedures or the Plan (each as defined herein), as applicable.

3.      To implement the Debtors' comprehensive restructuring, the Plan contemplates, among other things, (i) a new money rights offering to Prepetition FLTL Lenders (the "**FLTL Rights Offering**") pursuant to which the Prepetition FLTL Lenders will receive subscription rights (the "**FLTL Subscription Rights**") to purchase New Equity Interests issued by NewCo (the "**Rights Offering Shares**") in an aggregate amount of $20 million (the "**FLTL Rights Offering Amount**"),  in accordance with the proposed procedures in substantially final form annexed hereto as **Exhibit A-1** (the "**FLTL Rights Offering Procedures**"), as described more fully herein; and (ii) a new money rights offering to Prepetition SLTL Lenders (the "**SLTL Rights Offering**" and, together with the FLTL Rights Offering, the "**Rights Offerings**"), pursuant to which the Prepetition SLTL Lenders will receive subscription rights (the "**SLTL Subscription Rights**" and, together with the FLTL Subscription Rights, the "**Subscription Rights**") to purchase Rights Offering Shares in an aggregate amount of $20 million (the "**SLTL Rights Offering Amount**" and, together with the FLTL Rights Offering Amount, the "**Rights Offerings Amount**"), in accordance with the proposed procedures in substantially final form annexed hereto as **Exhibit A-3** (the "**SLTL Rights Offering Procedures**" and, together with the FLTL Rights Offering Procedures, the "**Rights Offering Procedures**") as described more fully herein.

4.      To ensure that the anticipated funding is obtained through the Rights Offerings, the Debtors have negotiated (i) with the FLTL ERO Backstop Parties (as defined in the Plan), that certain *FLTL Backstop Commitment Agreement*, annexed hereto as **Exhibit B-1** (the "**FLTL Equity Backstop Commitment Agreement**"), pursuant to which, the FLTL ERO Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the $20 million FLTL Rights Offering; and (ii) with the SLTL ERO Backstop Parties (as defined in the Plan and, together with the FLTL ERO Backstop Parties, the "**Backstop Parties**"), that

4

certain *SLTL Backstop Commitment Agreement*, annexed hereto as **Exhibit B-2** (the "**SLTL Equity Backstop Commitment Agreement**" and together with the FLTL Equity Backstop Commitment Agreement, the "**Backstop Agreements**")[3], pursuant to which, the SLTL ERO Backstop Parties have committed, subject to the terms and conditions thereof, to fully backstop the $20 million SLTL Rights Offering.  The funds generated from the Rights Offerings help to facilitate the successful implementation of the Plan and appropriately capitalize the NewCo Entities and Post-Effective Date Debtors, and the commitments made by the Backstop Parties provide the appropriate assurances that the Debtors will receive sufficient funding upon the close of the Credit Bid Transaction to satisfy their obligations under the Plan.

5.      The Debtors propose the following dates relating to the Rights Offerings and the backstop funding:

| Summary of Material Dates Relating to Rights Offering Procedures | |
| --- | --- |
| Hearing on Approval of Rights Offering Procedures and Backstop Agreements | May 28, 2021 at 11:00 a.m. Prevailing Central Time |
| Subscription Record Date | May 31, 2021 |
| Subscription Commencement Date | June 3, 2021 |
| Confirmation Hearing Date | June 9, 2021 at 9:00 a.m. Prevailing Central Time |
| Subscription Expiration Date | 5:00 p.m. New York City Time on June 21, 2021 |

6.      The Debtors' decision to implement the Rights Offerings pursuant to the Rights Offering Procedures and to enter into the Backstop Agreements and pay any amounts required thereunder represents a sound exercise of the Debtors' business judgment.  The Backstop

---

[3] **Exhibit B-1** and **Exhibit B-2** represent substantially final, but unexecuted, drafts of the FLTL Equity Backstop Commitment Agreement and SLTL Equity Backstop Commitment Agreement.  Upon execution of the Backstop Agreements, the Debtors will file with this Court executed copies thereof, with a blackline reflecting any changes, in advance of the hearing on this Motion seeking approval thereof.

5

Agreements are the product of extensive negotiations between the Debtors and their advisors on the one hand and the Backstop Parties and their advisors on the other, and were entered into only after careful consideration by the Debtors' management in consultation with their experienced financial and legal advisors.  Significantly, the Backstop Agreements ensure that, in accordance with their terms and conditions, the Credit Bid Purchaser has a fully backstopped source of capital committed to appropriately capitalize the NewCo Entities and consummate the Credit Bid Transaction and, upon Closing, the Debtors will have sufficient funds to satisfy their obligations under the Plan.  The various protections afforded the Backstop Parties by the Backstop Agreements, including the Commitment Obligations (as defined below), are integral components of the backstop arrangements, and the Backstop Parties would not have entered into their respective commitments under the Backstop Agreements without them.  Moreover, the benefits and committed funding that the Debtors will receive upon entry into the Backstop Agreements are commensurate with the economic consideration provided to the Backstop Parties in exchange for their substantial economic commitments under the Backstop Agreements and the costs associated with committing and reserving substantial capital for a significant period of time.  Such economic consideration is consistent with comparable exit financing arrangements routinely approved in this district as well as in comparable cases in other districts.

7.     Obtaining approval of the Debtors' entry into the Backstop Agreements as well as authority to satisfy the obligations thereunder, will help to ensure the success of the Debtors' restructuring efforts.  Therefore, the Debtors have concluded that the implementation of the Rights Offerings pursuant to the Rights Offering Procedures and the Debtors' entry into the Backstop Agreements are in the best interests of all stakeholders and represent sound exercises of

the Debtors' business judgment.  Based on the foregoing and the reasons set forth below, the Debtors respectfully submit that the Motion should be approved.

### Relief Requested

8.      By this Motion, pursuant to sections 105(a), 363(b), 503(b) and 507(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), the Debtors request entry of an order (i) approving the Rights Offering Procedures and Rights Offering Materials (as defined herein); (ii) authorizing the Debtors to conduct the Rights Offerings; (iii) authorizing the Debtors to enter into the Backstop Agreements; (iv) approving all obligations thereunder, including the Backstop Commitment Premiums, the Indemnification Obligations, and the Transaction Expenses (each as defined herein) in accordance with the terms of the Backstop Agreements; and (v) granting related relief.

9.      A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit C** (the "**Proposed Order**").

10.      Contemporaneously herewith, the Debtors have filed the *Declaration of John-Paul Hanson in Support of Emergency Motion of Debtors For Order (I) Approving Rights Offering Procedures and Related Forms, (II) Authorizing Debtors to Conduct Rights Offerings in Connection with Debtors' Plan of Reorganization, (III) Authorizing Entry Into Equity Backstop Commitment Agreements, (IV) Approving Obligations Thereunder, and (V) Granting Related Relief* (the "**Hanson Declaration**").

7

**Jurisdiction**

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

12.     Commencing on August 3, 2020 (the "**Petition Date**"), the Debtors each filed with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

13.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

15.     On August 18, 2020, the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

16.     Additional information regarding the Debtors' business, capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Dane in Support of Debtors' Chapter 11 Petitions and First Day Relief* (Docket No. 29).

**Summary of the Rights Offering Procedures**

17.     Following the entry of the Proposed Order, the Debtors will commence the Rights Offerings, pursuant to which (i) eligible FLTL Lenders will be offered FLTL Subscription Rights to acquire their *pro rata* share of Rights Offering Shares at an aggregate purchase price of up to $20 million, which the FLTL ERO Backstop Parties have agreed to backstop in full and committed to fund on the Effective Date; and (ii) eligible SLTL Lenders will be offered SLTL

8

Subscription Rights to acquire their *pro rata* share of Rights Offering Shares at an aggregate purchase price of up to $20 million, which the SLTL ERO Backstop Parties have agreed to backstop in full and committed to fund on the Effective Date.

18.     The following chart summarizes the principal terms of the Rights Offering Procedures, which represent the product of extensive arm's-length negotiations among the Debtors and the Backstop Parties: [4]

| Summary of Material Terms of Rights Offering Procedures | |
|---|---|
| **Rights Offering Eligibility** | FLTL Rights Offering:<br>Each holder of an Allowed FLTL Claim (as defined in the Plan) on the Subscription Record Date (as defined below) (such Allowed FLTL Claims, "**Eligible FLTL Claims**" and a holder of Eligible FLTL Claims, an "**Eligible FLTL Holder**") will receive Subscription Rights with respect to their claims under the Prepetition FLTL Credit Agreement held or beneficially held by such Eligible FLTL Holder as of the Subscription Record Date to subscribe for its *pro rata* share (measured as the principal amount of all Eligible FLTL Claims held by such Eligible FLTL Holders as compared to the aggregate principal amount of Eligible FLTL Claims held by all Eligible FLTL Holders, in each case as of the Subscription Record Date) of the Rights Offering Shares.<br><br>Eligible FLTL Holders have the right, but not the obligation, to participate in the FLTL Rights Offering.  Only Eligible FLTL Holders as of the Subscription Record Date may participate in the FLTL Rights Offering.<br><br>SLTL Rights Offering:<br>Each holder of an Allowed SLTL Claim (as defined in the Plan) on the Subscription Record Date (as defined below) (such Allowed SLTL Claims, "**Eligible SLTL Claims**" and together with the Eligible SLTL Claims, the "**Eligible Claims**" and a holder of Eligible SLTL Claims, an "**Eligible SLTL Holder**" and together with the Eligible FLTL Holders, the "**Eligible Holders**") will receive Subscription Rights with respect to their claims under the Prepetition SLTL Credit Agreement held or beneficially held by such Eligible SLTL Holder as of the Subscription Record Date to subscribe for its *pro rata* share (measured as the principal amount of all Eligible SLTL Claims held by such Eligible SLTL Holders as compared to the aggregate principal amount of Eligible SLTL Claims held by all Eligible SLTL Holders, in each case as of the Subscription Record Date) of the Rights Offering Shares. |

---

[4] This summary is qualified in its entirety by the terms of the Rights Offering Procedures.  In the event of any conflict between this summary and the terms of the Rights Offering Procedures, the terms of the Rights Offering Procedures shall control and govern.

Debtors' Exhibit No. 1
9 of 36

| | |
|---|---|
| | Eligible SLTL Holders have the right, but not the obligation, to participate in the SLTL Rights Offering.  Only Eligible SLTL Holders as of the Subscription Record Date may participate in the SLTL Rights Offering. |
| **Rights Offering Subscription Agent** | Prime Clerk LLC (the "**Subscription Agent**" or "**Prime Clerk**") |
| **Subscription Record Date** | May 31, 2021 (the "**Subscription Record Date**") |
| **Subscription Period** | The Rights Offerings shall commence on June 3, 2021 (the "**Subscription Commencement Date**").  The Rights Offerings shall expire at 5:00 p.m. New York City time on June 21, 2021, unless extended as required by law or by order of the Bankruptcy Court or by the Debtors (for any reason) with the consent of the applicable Required Backstop Parties (as defined in the applicable Backstop Agreement) and the reasonable consent of the Required DIP Lenders and the Requisite FLTL Lenders (such time and date, as may be amended, the "**Subscription Expiration Deadline**"). |
| **Issuance of Rights** | Each Eligible Holder is entitled to subscribe for up to its *pro rata* share of the Rights Offering Shares. |
| **Exercise of Subscription Rights; Payment for Subscription Rights** | In order to validly exercise its Subscription Rights, each Eligible Holder that is not a Backstop Party must:<br><br>i.   return a duly completed and executed Rights Offering Subscription Form (as defined in the applicable Rights Offering Procedures) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and<br>ii.   promptly upon returning its Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form.<br><br>In order to validly exercise its Subscription Rights, each Eligible Holder that is a Backstop Party must:<br><br>i.   return a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and<br>ii.   no later than the applicable Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the applicable Backstop Agreement), to the Subscription Agent by wire transfer ONLY of immediately available funds in accordance with the instructions in the written notice delivered by the Debtors to the |

10

| | |
|---|---|
| | Backstop Parties in accordance with the applicable Backstop Agreements (a "**Backstop Funding Notice**").<br><br>All Eligible Holders must deliver their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and (with respect to the Eligible Holders that are not Backstop Parties) payment of the applicable Aggregate Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder directly to the Subscription Agent on or before the Subscription Expiration Deadline. In all cases, Eligible Holders that are Backstop Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the Rights Offering Shares elected to be purchased by such Eligible Holder directly to the Subscription Agent no later than the Backstop Funding Deadline. |
| **Transfer Restriction; Revocation** | The Subscription Rights are not detachable from the Eligible Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the Rights Offering Shares, the FLTL Claims, the SLTL Claims and any related claims) (collectively, "**transfer**" or "**transferred**"), except that an Eligible Holder that is a party to the FLTL Equity Backstop Commitment Agreement or the SLTL Equity Backstop Commitment Agreement, as applicable, may transfer any portion or all of its Subscription Rights separate and independent from its Eligible Claim to a Permitted Transferee (as defined in, and in accordance with, the FLTL Equity Backstop Commitment Agreement or the SLTL Equity Backstop Commitment Agreement, as applicable).<br><br>Any transfer or assignment following the Subscription Record Date of the corresponding Eligible Claim (except with respect to (i) the settlement of Eligible Claims held on the Subscription Record Date, (ii) Eligible SLTL Claims held by an Eligible SLTL Holder that is a party to the SLTL Equity Backstop Commitment Agreement in accordance with the SLTL Equity Backstop Commitment Agreement, or (iii) Eligible FLTL Claims held by an Eligible FLTL Holder that is a party to the FLTL Equity Backstop Commitment Agreement in accordance with the FLTL Equity Backstop Commitment Agreement) shall void the Subscription Right, and neither such Eligible Holder nor the purported transferee will receive any Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights.<br><br>However, in connection with the exercise of the Subscription Rights, the person exercising such Subscription Rights shall have the right to designate the receipt of the Rights Offering Shares to another person that is a Related Fund or a custodian (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit A to the Rights Offering Subscription Form. Any such designation and delivery of Rights Offering Shares shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.<br><br>Once an Eligible Holder has properly exercised its Subscription Rights, subject to the terms and conditions of the Rights Offering Subscription Form and the |

11

| | |
|---|---|
| | FLTL Equity Backstop Commitment Agreement or the SLTL Equity Backstop Commitment Agreement in the case of any Backstop Party, such exercise will be irrevocable. |
| **Return of Payment** | Unless the Effective Date has occurred, the applicable Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of (i) termination of the Restructuring Support Agreement with respect to the Consenting FLTL Lenders or the Consenting SLTL Lenders, as applicable (each as defined in the Restructuring Support Agreement) in accordance with its terms, (ii) termination of the applicable Backstop Agreement in accordance with its terms, and (iii) the Outside Date (as defined in the applicable Backstop Agreement). Upon termination of the Rights Offering, any cash paid to the Subscription Agent will be returned, without interest, to the applicable Eligible Holder as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated. For the avoidance of doubt, the Subscription Agent shall not be required to return funds received by it in excess of an Eligible Holder's Aggregate Purchase Price where such funds do not exceed twenty dollars ($20). |
| **Modification of Procedures** | With the prior written consent of the applicable Required Backstop Parties and (x) the Required DIP Lenders and Requisite FLTL Lenders, in the case of the FLTL Rights Offering Procedures, or (y) the reasonable consent of the Required DIP Lenders and the Requisite FLTL Lenders, in the case of the SLTL Rights Offering Procedures, the Debtors reserve the right to modify the applicable Rights Offering Procedures, or adopt additional procedures consistent with such Rights Offering Procedures, to effectuate such Rights Offerings and to issue the Rights Offering Shares; *provided*, *however*, that the Debtors shall provide prompt written notice to each applicable Eligible Holder of any material modification to the applicable Rights Offering Procedures made after the Subscription Commencement Date. In so doing, and subject to the consent of the applicable Required Backstop Parties, Required DIP Lenders and Requisite FLTL Lenders, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate and implement such Rights Offering and the issuance of the Rights Offering Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Rights Offering Subscription Form without the consent of the Eligible Holder that is a party thereto, except as otherwise provided herein.

The Debtors may undertake procedures to confirm that each participant in the FLTL Rights Offering or the SLTL Rights Offering, as applicable, is in fact an Eligible Holder, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary. |

19.     The Rights Offering Procedures have been designed to transmit efficiently all materials necessary for participation in the Rights Offerings, including the subscription forms

12

for the FLTL Rights Offering and the SLTL Rights Offering (collectively, the "**Subscription Forms**" and together with the Rights Offering Procedures, the "**Rights Offering Materials**"), annexed hereto as **Exhibit A-2** and **Exhibit A-4**, respectively. The Rights Offering Materials have been drafted to ensure the clear communication of the requirements for, and to facilitate, such participation. Each Eligible Holder will receive the applicable Rights Offering Materials by e-mail following entry of the Proposed Order. Thus, the Rights Offering Materials afford the Prepetition FLTL Lenders and Prepetition SLTL Lenders, respectively, a fair and reasonable opportunity to participate in the Rights Offerings.

## Summary of Backstop Agreements

20.    The Rights Offerings Amount of $40 million of new money proceeds generated from the backstopped Rights Offerings is an integral component to the closing of the Credit Bid Transaction, implementation of the Plan and, ultimately, the recapitalization of the Debtors' business. The commitments made by the Backstop Parties under the Backstop Agreements help to ensure that the Credit Bid Purchaser is adequately capitalized to fund its go-forward obligations and consummate the Credit Bid Transaction and, upon Closing, the Debtors will have sufficient funds to satisfy their obligations under the Plan.

21.    In exchange for the commitments and obligations of the FLTL ERO Backstop Parties under the FLTL Equity Backstop Commitment Agreement, NewCo has agreed to pay to the FLTL ERO Backstop Parties a nonrefundable aggregate premium in an amount equal to 8% of the FLTL Rights Offering Amount (the "**FLTL Backstop Commitment Premium**"), payable in the form of New Equity Interests issued by NewCo; the Debtors and NewCo have agreed to indemnify the FLTL ERO Backstop Parties and FLTL Subagent under certain circumstances, as further described in the FLTL Equity Backstop Commitment Agreement

13

(the "**FLTL Indemnification Obligations**"); and the Debtors have agreed to reimburse the FLTL ERO Backstop Parties for the reasonable fees and expenses of the Ad Hoc Group of Secured Lenders Advisors, the Prepetition FLTL Agents and the Prepetition FLTL Agents Advisors, solely to the extent they have been and are actually incurred in connection with the negotiation, preparation and implementation of the FLTL Equity Backstop Commitment Agreement and the other agreements and transactions contemplated therein, whether prior to or after the date of the FLTL Equity Backstop Commitment Agreement (the "**FLTL Transaction Expenses**"). Likewise, NewCo has agreed to pay to the SLTL ERO Backstop Parties a nonrefundable aggregate premium in an amount equal to 8% of the SLTL Rights Offering Amount (the "**SLTL Backstop Commitment Premium**" and, together with the FLTL Backstop Commitment Premium, the "**Backstop Commitment Premiums**"), payable in the form of New Equity Interests issued by NewCo; the Debtors and NewCo have agreed to indemnify the SLTL ERO Backstop Parties under certain circumstances, as further described in the SLTL Equity Backstop Commitment Agreement (the "**SLTL Indemnification Obligations**" and, together with the FLTL Indemnification Obligations, the "**Indemnification Obligations**"); and the Debtors have agreed to reimburse the SLTL ERO Backstop Parties for the reasonable fees and expenses of Kasowitz Benson Torres LLP, solely to the extent they have been and are actually incurred in connection with (i) the negotiation, preparation and implementation of the SLTL Equity Backstop Commitment Agreement and other agreements and transactions contemplated therein and (ii) in furtherance of the Restructuring Transactions (the "**SLTL Transaction Expenses**" and, together with the FLTL Transaction Expenses, the "**Transaction Expenses**").

14

22.     The following chart summarizes the principal terms of the Backstop Agreements:[5]

| Summary of Material Terms of Backstop Agreements | |
|---|---|
| **Backstop Commitments**<br><br>*See* BCA § 2(a) | Each of the Backstop Parties, severally and not jointly, agrees to: (i) subscribe for and purchase the Rights Offering Shares allocated to such Backstop Party at the aggregate purchase price therefor based upon the Per Share Price of $55.53 per share; and (ii) purchase its Backstop Commitment Percentage of the Unsubscribed Shares (as defined in the Backstop Agreement) at the aggregate purchase price therefor based upon the Per Share Price of $55.53 per share (together with its commitment pursuant to (i), the "**Backstop Commitments**"). |
| **Backstop Commitment Premium**<br><br>*See* BCA § 2(b) | NewCo will pay to the Backstop Parties, in the aggregate, on the Effective Date, a nonrefundable aggregate premium in an amount equal to 8% of the Rights Offering Amount, which shall be deemed fully earned by the Backstop Parties upon the execution of the Backstop Agreement, in the form of shares of New Equity Interests (issued at the Per Share Price), which shall be allocated among the Backstop Parties *pro rata* based on each Backstop Party's Backstop Commitment Percentage. |
| **Transaction Expenses**<br><br>*See* BCA § 9 | Until the earlier to occur of (x) the Closing and (y) the termination of the Backstop Agreement in accordance with its terms, the Debtors agree to pay the reasonable fees and expenses of certain advisors, as further set forth in the Backstop Agreement.  The Transaction Expenses shall, upon entry of the Commitment Approval Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code. |
| **FLTL Indemnification Obligations**<br><br>*See* FLTL BCA § 16 | Prior to the Effective Date, the Company and, following the Effective Date, NewCo shall indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties except to the extent otherwise provided for in the Backstop Agreement) that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the  FLTL Equity Backstop Commitment Agreement, the SLTL Equity Backstop Commitment Agreement, the Plan and the transactions contemplated thereby, including, without limitation, the Backstop Commitments, the Rights Offering, the payment of the Backstop Commitment Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person |

---

[5]  This summary of the Backstop Agreements is qualified in its entirety by the actual terms and provisions of the Backstop Agreements.  To the extent that the summary conflicts with the Backstop Agreements, the Backstop Agreements shall govern.  Capitalized terms used in this section but not otherwise defined herein shall have the meaning ascribed to such terms in the Backstop Agreements.  This summary references "Backstop Parties" and "Backstop Agreement" generically and is intended to be read as applying separately as a summary of each of the FLTL Equity Backstop Commitment Agreement and the SLTL Equity Backstop Commitment Agreement, which contain substantially the same terms.

|  | is a party thereto, whether or not such proceedings are brought by the Company or its equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal expenses of Davis Polk and Wardwell LLP and Haynes and Boone LLP as counsel to the Backstop Parties (and any other local or special counsel retained by the Backstop Parties), and Seward & Kissel LLP as counsel to the FLTL Subagent, incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by the Agreement, the SLTL Backstop Agreement or the Plan are consummated or whether or not the Agreement is terminated; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Defaulting Backstop Party or any Indemnified Person related thereto, caused by such default by such Backstop Party, (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person,  or (iii) resulting from any event or occurrence following the Effective Date, including any Loss of an investment in NewCo. |
|---|---|
| **SLTL Indemnification Obligations**<br><br>*See* SLTL BCA § 16 | Prior to the Effective Date, the Company and, following the Effective Date, NewCo shall indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons, in each case in their capacity as such, from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties except to the extent otherwise provided for in this Agreement) that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the SLTL Equity Backstop Commitment Agreement and the transactions contemplated thereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Commitment Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company or its equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal expenses of Kasowitz Benson Torres LLP as counsel to the Backstop Parties incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein); *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Defaulting Backstop Party or any Indemnified Person related thereto, caused by such default by such Backstop Party, (ii) to the extent they are found by a final, non-appealable |

16

| | |
|---|---|
| | judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person, (iii) resulting from any event or occurrence following the Effective Date, including any Loss of an investment in NewCo, or (iv) as to any Backstop Party (or any Indemnified Person related thereto) that has breached the terms of the Restructuring Support Agreement or defaulted on any of its obligations thereunder. The Indemnification Obligations in the SLTL Equity Backstop Commitment Agreement are subject to further limitations as set forth therein. |
| **Conditions Precedent to the Obligations of the Backstop Parties**<br><br>*See* BCA § 12 | The obligations of the Backstop Parties to purchase Rights Offering Shares and Unsubscribed Shares pursuant to their respective Backstop Commitments on the Effective Date are subject to the satisfaction of the following conditions (unless waived by the Required Backstop Parties (as defined in the applicable Backstop Agreement)), except where the failure to satisfy any such condition results solely from the failure by any Backstop Party to comply with the Backstop Agreement:<br><br>• *Commitment Approval Order*. The entry of the Commitment Approval Order, which Commitment Approval Order shall be a Final Order.<br><br>• *Plan and Confirmation Order*. The entry of the Confirmation Order, which, solely with respect to any terms applicable to the Rights Offering, shall be in form and substance reasonably acceptable to the Debtors and the applicable Required Backstop, which, in the case of the FLTL Equity Backstop Commitment Agreement, must be a Final Order.<br><br>• *Conditions to the Plan*. The conditions to the occurrence of the Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Effective Date shall have occurred or be deemed to have occurred.<br><br>• *Rights Offering*. The Rights Offering shall have commenced and shall have been conducted in all material respects in accordance with the Backstop Agreement and the applicable Rights Offering Procedures, and the Subscription Expiration Deadline shall have occurred.<br><br>• *Backstop Funding Notice*. The Backstop Parties shall have received a Backstop Funding Notice.<br><br>• *Valid Issuance*. The Rights Offering Shares shall be, upon (i) payment of the aggregate purchase price as provided herein and (ii) the Effective Date, validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.<br><br>• *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring. |

Debtors' Exhibit No. 1
17 of 36

|  | |
|---|---|
|  | • *Representations and Warranties.*<br><br>    o  The representations and warranties of the Company contained in Sections 5(a) and (d) of the Backstop Agreement qualified as to materiality or Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent made as of a specific date, as of such date); and<br><br>    o  all other representations and warranties of the Company contained in Section 5 of the Backstop Agreement shall be true and correct (without giving effect to any qualification set forth therein as to "materiality", "Material Adverse Effect" or other qualifications based on the word "material" or similar phrases) on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent made as of a specific date, as of such date), except, where the failure of such representations and warranties to be so true and correct does not have, and would not reasonably be expected to have, a Material Adverse Effect (as defined in the Backstop Agreement).<br><br>• *Covenants.* The Company shall have performed and complied in all material respects with all material obligations and agreements required in the Backstop Agreement to be performed or complied with by it prior to the Effective Date.<br><br>• *Backstop Commitment Premium; Transaction Expenses.* All premiums and other amounts, including the Backstop Commitment Premium and Transaction Expenses, required to be paid or reimbursed by the Company or NewCo, as applicable, to the Backstop Parties as of the Effective Date shall have been so paid or reimbursed.<br><br>• *Restructuring Support Agreement.* The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect with respect to the Backstop Parties.<br><br>• *NewCo Entities.* NewCo and Credit Bid Purchaser shall have signed a joinder and become a party to the Backstop Agreement and all the representations and warranties in Section 2 of such joinder shall be true and correct in all material respects. |
| **Conditions Precedent to the Obligations of the Company**<br>*See* BCA § 13 | The obligations of the Company pursuant to the Backstop Agreement are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with the Backstop Agreement:<br><br>• *Plan and Confirmation Order.* The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court, and which |

Debtors' Exhibit No. 1

<table>
<tr>
<td></td>
<td>

shall have become a Final Order, shall each be consistent in all material respects with the RSA.

- *Conditions to the Plan*. The conditions to the occurrence of the Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Effective Date shall have occurred or be deemed to have occurred.

- *Rights Offering*. The Rights Offering shall have been conducted and the Subscription Expiration Deadline shall have occurred.

- *Funding Amount*. Each Backstop Party shall have wired its Funding Amount into the Funding Account.

- *Representations and Warranties*. The representations and warranties of the Backstop Parties set forth in the Backstop Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent given as of a specific date, as of such date).

- *Covenants*. The Backstop Parties shall have performed and complied in all material respects with all obligations and agreements required by the Backstop Agreement to be performed or complied with by the Backstop Parties on or prior to the Effective Date.

- *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

- *NewCo Entities*. NewCo and Credit Bid Purchaser shall have signed the NewCo Entities Joinder and become a party to the Backstop Agreement.

</td>
</tr>
<tr>
<td>

**Specified Covenants of the Company**

*See* BCA § 7

</td>
<td>

The Company agrees with the Backstop Parties as follows:

- *Support of the Plan*. The Company agrees that, for the duration of the Support Period (as defined in the Restructuring Support Agreement), the Company shall, and shall cause each of its subsidiaries included in the definition of "Company" in the Restructuring Support Agreement to use commercially reasonable efforts to (i) obtain approval of the Plan and consummate the Restructuring Transactions (as defined in the Restructuring Support Agreement), including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (A) is inconsistent with the Restructuring Support Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of the Restructuring Support

</td>
</tr>
</table>

19

Agreement, including by preventing the consummation of the Restructuring Transactions and (ii) obtain orders of the Bankruptcy Court necessary to consummate the Restructuring Transactions.

- *Confirmation Order.* The Company shall use its commercially reasonable efforts to obtain approval of the Plan. The Company shall provide to counsel to the Backstop Parties, a draft of any proposed Confirmation Order and a reasonable opportunity to review and comment on such proposed order prior to such proposed order being filed with the Bankruptcy Court.

- *Commitment Approval Order.* The Company shall use its commercially reasonable efforts to (i) obtain the entry of an order by the Bankruptcy Court, in form and substance acceptable to the Debtors and the Required Backstop Parties, approving the Backstop Agreement, including the Backstop Commitment Premium, the Transaction Expenses, and the Indemnification Obligations (the "**Commitment Approval Order**") and (ii) cause the Commitment Approval Order and any incorporated Orders to become Final Orders including by requesting that such Orders be a final Order immediately upon entry by the Bankruptcy Court pursuant to a waiver of Bankruptcy Rules 3020 and 6004(h), as applicable), in each case, as soon as reasonably practicable following the filing of the motion seeking entry of the Commitment Approval Order. The Company shall provide to counsel for the Backstop Parties copies of the proposed Commitment Approval Order, and any incorporated Orders, and a reasonable opportunity to review and comment on such Orders prior to such Orders being filed with the Bankruptcy Court.

- *Rights Offering.* The Company shall undertake its obligations with respect to the Rights Offering in accordance with the Plan and the Rights Offering Procedures.

- *Form D and Blue Sky.* To the extent required before the Effective Date, the Company, on behalf of NewCo, shall timely file a Form D with the SEC with respect to the Unsubscribed Shares, to the extent required under Regulation D of the Securities Act. To the extent required, the Company shall, on or before the Effective Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify for sale or issuance to the Backstop Parties the Unsubscribed Shares under applicable securities and "blue sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions. To the extent required on or before the Effective Date, the Company shall pay all fees and expenses in connection with satisfying these obligations.

*Unsubscribed Shares.* The Company, in consultation with counsel for the Backstop Parties, shall determine the amount of Unsubscribed Shares, if any, and, in good faith, provide a Backstop Funding Notice that accurately reflects the amount of Unsubscribed Shares as so determined and to provide to the Backstop Parties a certification by the Subscription Agent of the Unsubscribed

20

|  | Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as the Backstop Parties may reasonably request. |
|---|---|
| **Specified Covenants of the Backstop Parties**<br>*See* BCA § 8 | Each of the Backstop Parties agrees with the Company, severally and not jointly, as follows:<br><br>*Approvals and Support of Transactions Contemplated.* Except as set forth in the Backstop Agreement or with the prior written consent of the Company, during the period from the date of the Backstop Agreement to the earlier of the Effective Date and the date on which the Backstop Agreement is terminated in accordance with its terms, the Backstop Parties shall use reasonable efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any governmental authority under any Antitrust Laws, that are necessary to consummate and make effective the transactions contemplated by the Backstop Agreement.  Each Backstop Party shall reasonably promptly notify the Company (and furnish to it copies, if requested) of any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Company in advance to the extent permitted by applicable law and gives the Company a reasonable opportunity to attend and participate thereat.   The Backstop Parties shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by the Backstop Agreement. |
| **Termination Events**<br>*See* BCA § 15 | The Backstop Agreement may be terminated by (i) the mutual written consent of the Company and the Required Backstop Parties or (ii) either the Company or any Backstop Party if the Effective Date has not occurred on or prior to September 30, 2021 (the "**Outside Date**"), subject to the extension of such Outside Date by mutual agreement of the Required Backstop Parties and the Company.<br><br>Termination by the Company. The Company may terminate the Backstop Agreement by written notice to each Backstop Party upon the occurrence and during the continuance of any of the following:<br><br>• material breach by any Backstop Party, subject to a ten Business Day cure period; *provided* that the Company shall not have the right to terminate the Backstop Agreements pursuant to this provision if it is then in material breach; *and provided*, further, that prior to the Company being permitted to terminate the Backstop Agreement under this provision each of the non-breaching Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such breaching Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-breaching Backstop Parties assuming such breaching Backstop Party's Backstop Commitment, in |

21

|  | which case the Company shall not have the right to terminate the Backstop Agreement pursuant to this provision; |
|---|---|
|  | • the board of directors of the Company reasonably determines in good faith based upon the advice of outside counsel that failing to enter into an alternative transaction would be inconsistent with the exercise of its fiduciary duties under applicable law; |
|  | • the Credit Bid Purchase Agreement (as defined in the Plan) is terminated, unless the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan. |
|  | • the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring; or |
|  | • the Restructuring Support Agreement has been terminated in accordance with its terms, except as a result of a breach of the Restructuring Support Agreement by the Company or the other Debtors. |
|  | <u>Termination by the Required Backstop Parties</u>. The Required Backstop Parties may terminate the Backstop Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following: |
|  | • the Restructuring Support Agreement is terminated or expires in accordance with its terms, is terminated with respect to the FLTL Lenders in accordance with its terms or otherwise ceases to be in full force and effect; |
|  | • the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or a trustee or examiner shall be appointed with respect to all or substantially all of the Debtors with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or |
|  | • the Credit Bid Purchase Agreement (as defined in the Plan) is terminated, unless the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan. |
| **Fiduciary Out**<br>*See* BCA § 15(b)(ii) | The Company may terminate the Backstop Agreement by written notice to each Backstop Party if the board of directors of the Company reasonably determines in good faith based upon the advice of outside counsel that failing to enter into an alternative transaction would be inconsistent with the exercise of its fiduciary duties under applicable law. |

22

23.     In light of the substantial amount of capital the Backstop Parties have committed and the contemplated reservation of capital over a significant duration in order to assure the successful implementation of the Plan, and in view of that commitment and the circumstances of these cases, the Debtors believe that the terms of the Backstop Agreements, including the Backstop Commitment Premiums, the Indemnification Obligations, and the Transaction Expenses (collectively, the "**Commitment Obligations**") are fair and reasonable in consideration of the cost of capital and the certainty the Backstop Agreements provide the Debtors with respect to their restructuring process.

### Relief Requested Should Be Granted

**A.     The Rights Offerings and the Rights Offering Procedures are Appropriate and Should be Authorized**

24.     Implementation of the Rights Offering is authorized under section 363(b)(1) of the Bankruptcy Code, which empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In the Fifth Circuit, bankruptcy courts have authorized the use or sale of property of the estate outside the ordinary course of business when such use or sale is grounded upon a "sound business purpose" and is proposed in good faith.  *See, e.g.*, *In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).  Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational

23

business purpose." *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citation omitted).

25.     The Rights Offerings, which will provide $40 million in new capital to Credit Bid Purchaser and, upon Closing, through the proceeds of the Credit Bid Transaction help fund the Debtors' obligations under the Plan, are an important financing component of the Plan. The additional funding provided by the Rights Offerings will help to ensure that the Debtors can implement the transactions and distributions contemplated by the Plan, and that the NewCo Entities have ample capital to support their operations post-Effective Date.

26.     Implementation of the Rights Offerings is also authorized under section 105(a) of the Bankruptcy Code, which provides the Court with expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.  *See Matter of Oxfor Mgmt., Inc.*, 4 F.3d 1329, 1333 (5th Cir. 1993) ("Section 105(a) authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code"); *In re Cooper Props. Liquidation Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").  Because approval of the Rights Offering Materials and the procedures to implement the Rights Offerings is necessary to effectuate the Plan – which represents the Debtors' best means of protecting the value of their estates and maximizing recoveries for their creditors – the Debtors believe that the Court's application of section 105(a) of the Bankruptcy Code here is appropriate.

27.     The Rights Offerings also comport with the notice requirements of the Bankruptcy Code.  In most chapter 11 cases in which rights offerings are conducted, the rights offering is commenced after the bankruptcy court has approved the adequacy of the information contained in the debtors' disclosure statement.  Such a process is consistent with the principles underlying section 1145 of the Bankruptcy Code—that a filing with the Securities and Exchange Commission in connection with the offer and sale of a security, in compliance with applicable securities laws, should not be required in chapter 11 cases, where the bankruptcy court has ruled that the contents of the offering document (*i.e.*, the disclosure statement) contains "adequate information" as defined in section 1125(a)(1) of the Bankruptcy Code.  In this case, the Court has approved the adequacy of the Disclosure Statement, ensuring that all stakeholders entitled to participate in the Rights Offerings will have received adequate information when choosing to make their investment.

28.     In addition to the Disclosure Statement, the Rights Offering Procedures, Subscription Forms, and their related exhibits will also provide all stakeholders eligible to participate in the Rights Offerings with adequate information regarding the Rights Offerings to make an informed investment decision as to their participation in the Rights Offerings.  The Debtors submit that the Rights Offering Procedures are reasonable and comparable to procedures and forms that have been approved in connection with similar rights offerings.

29.     The Debtors also seek approval of their selection of Prime Clerk as the subscription agent.  Prime Clerk's professionals have experience serving as the subscription agent in connection with rights offerings in other complex chapter 11 cases.  Furthermore, Prime Clerk is also serving as the Debtors' noticing agent in these cases.  Approving the Debtors' selection of Prime Clerk as the subscription agent, therefore, will save estate resources and promote efficiency.

Debtors' Exhibit No. 1
25 of 36

30.     The Debtors further submit that the proposed Subscription Period—18 days—is a reasonable period of time for participants in the Rights Offerings to make an informed decision regarding whether to exercise, as applicable, their Subscription Rights.  Courts in this District have granted similar relief in approving rights offering procedures.  *See, e.g., In re NPC International, Inc.*, No. 20-33353 (DRJ) (Docket No. 826) (approving a 20–22 day subscription period); *In re 24 Hour Fitness Worldwide, Inc., et al.*, No. 20-11558 (KBO) (Docket No. 1241) (approving a 14 day subscription period); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Jan. 14, 2020) (Docket No. 691) (approving a similar subscription period); *see also In re Energy & Exploration Partners, Inc*., *et al*., No. 15-44931 (RFN) (Bankr. N.D. Tex. Mar. 18, 2016) (Docket No. 537) (approving similar rights offering procedures); *In re Reddy Ice Holdings Inc.*, No. 12-32349 (Bankr. N.D. Tex. Apr. 19, 2012) (Docket No. 105) (same); *In re Doctors Hosp. 1997*, L.P., No. 05-35291 (JB) (Bankr. S.D. Tex. May 8, 2006) (Docket No. 621) (same).

31.     In light of the foregoing, the Debtors respectfully submit that the Court's approval of the Rights Offering Procedures and the Rights Offering Materials, and authorization to conduct the proposed Rights Offerings, is in the best interests of the Debtors' estates, creditors, and other parties in interest.

**B.      The Court Should Authorize Entry into the Backstop Agreements**

32.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Fifth Circuit has held that debtors may use property outside of the ordinary course under section 363(b) where the debtor can articulate some business justification or sound business reason to support the use.  *See e.g., In re BNP Petroleum Corp.*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Cont'l Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor,

26

creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir.2010) ("A sale of assets under § 363 . . . is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

33.     The business judgment standard under section 363(b) is "flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors)."). Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citation omitted).

34.     The Debtors submit that sound business reasons exist to grant the relief requested herein.  The Backstop Agreements are the culmination of extensive good-faith, arm's-length negotiations among the Debtors and their key economic stakeholders.  The Debtors and their advisors spent months working closely with lenders and other stakeholders to develop the presented restructuring framework and carefully considered their options for financing the Credit Bid Transaction.  *See* Hanson Decl. ¶ 7.

35.     The Backstop Agreements are an important component of the Debtors' restructuring.  The Backstop Agreements help to provide the Debtors, and other key stakeholders,

27

with assurances that the Credit Bid Purchaser will have sufficient working capital to operate its business and, after the Closing of the Credit Bid Transaction, the Debtors will have sufficient cash proceeds to fund their obligations under the Plan.  Therefore, the Debtors submit that entry into the Backstop Agreements is in the best interests of the Debtors' estates and an appropriate exercise of business judgment.

1.   **Backstop Commitment Premiums, Commitment Obligations and Other Obligations Under Backstop Agreements Should Be Approved**

36.   In consideration of the Backstop Parties' substantial commitments under the Backstop Agreements and to compensate the Backstop Parties for the considerable time and expense they have incurred during the negotiation process, and will continue to incur as the parties proceed to Plan confirmation, the Backstop Agreements provide for the Commitment Obligations (including the Backstop Commitment Premiums, the Indemnification Obligations and the Transaction Expenses).

37.   The Backstop Commitment Premiums and other Commitment Obligations are necessary inducements and reasonable compensation for the Backstop Parties to enter into the Backstop Agreements, which will provide significant benefits to the Debtors' estates by, among other things, securing $40 million in incremental funding.  Given the substantial investment and commitment of the Backstop Parties, the Debtors submit that the Commitment Obligations are necessary to help facilitate the successful implementation of the Rights Offerings and Plan.

38.   Agreeing to the Commitment Obligations is reasonable and necessary given (i) the significant benefit to the estates of having a commitment of the Backstop Parties to provide incremental financing to help ensure the successful implementation of the transactions contemplated in the Plan and Credit Bid Purchase Agreement, (ii) the costs incurred by the Backstop Parties engaging with the Debtors and negotiating the terms of the Backstop Agreements

Debtors' Exhibit No. 1
28 of 36

and other transaction documents, and (iii) the period of time between providing the commitment and consummation of the Plan.  Under these circumstances, the Commitment Obligations are reasonable in amount and necessary to maximize the value of the Debtors' estates.  *See* Hanson Decl. ¶ 15, 17, 20.

39.     Undoubtedly, the Backstop Parties are conferring a material benefit to the Debtors' estates as they help pave the way for the Debtors' comprehensive restructuring of their business and successful exit from chapter 11, preserving over 1,000 jobs and maximizing recoveries to the Debtors' stakeholders.  *See* Hanson Decl. ¶ 14.

40.     Over the past few months, the Backstop Parties have incurred expenses negotiating and drafting the Backstop Agreements, and will continue to incur costs until the confirmation of the Plan, and through and after the Effective Date.  While the Backstop Parties wait for the Plan to be consummated, they are exposed to the risk that their efforts could result in opportunity cost if the Plan is not approved by the Court.  *See* Hanson Decl. ¶ 15.

41.     The Commitment Obligations are integral parts of the Backstop Agreements, and without these protections, the Debtors have been advised that the Backstop Parties would not have agreed to the binding commitments to backstop the Rights Offerings.  *See* Hanson Decl. ¶ 15.  Indeed, if the Commitment Obligations are not approved, the Backstop Parties' commitment to the backstop the Rights Offerings will be jeopardized as the Backstop Parties' would have the right to terminate the Backstop Agreements.  *See* Hanson Decl. ¶ 15.

42.      Further, the Commitment Obligations are reasonable in light of the magnitude of the Debtors' chapter 11 cases and the tangible benefit to the estates of having the certainty that incremental funding will be available to help capitalize the NewCo Entities and consummate the Credit Bid Transaction and the Plan.  Notably, the Backstop Commitment

29

Premiums are payable entirely in equity of NewCo (*i.e.* New Equity Interests) and impose no cash costs on the Debtors, and, no cash termination fee is payable if the Backstop Agreements are terminated.  *See* Hanson Decl. ¶ 17.

43.     As discussed above, the Debtors' investment banker compared the Backstop Commitment Premiums and other Commitment Obligations to similar commitments and fees in other cases and determined they are market-based and comparable to those that this and other courts have approved in other recent large and complex chapter 11 cases.  *See* Hanson Decl. ¶ 16. Accordingly, the Debtors submit that the Backstop Commitment Premiums and Commitment Obligations are reasonable and commensurate with the size and nature of the transaction. Numerous bankruptcy courts, including those in this district, have approved backstop agreements that contain a backstop premium similar to the proposed Backstop Commitment Premiums:

- *EP Energy*: commitment premium of 8% of the rights offering amount payable in common stock. *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 18, 2019) (Docket No. 181) (subsequently amended by stipulation, *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Mar. 3, 2020) (Docket No. 1100) providing the termination fee was not payable if the backstop agreement was terminated consensually pursuant to its terms).

- *Ultra Petroleum*: put option premium of 7.5% of the rights offering amount payable in common stock.  *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bankr. S.D. Tex. Aug. 22, 2020) (Docket No. 610, 736).

- *24 Hour Fitness*: commitment premium of 10% of the rights offering amount payable in the form of new equity interests.  *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. Nov. 16, 2020) (Docket No. 1241).

- *American Commercial Lines*: commitment premium of 7% of the rights offering amount payable in preferred equity.  *In re Am. Commercial Lines Inc.*, No. 20-30982 (MI) (Bankr. S.D. Tex. Mar. 3, 2020) (Docket No. 193).

- *Chesapeake Energy*: non-refundable put option premium equal to 10% of the rights offering amount.  *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. Aug. 21, 2020) (Docket No. 899).

- *Bristow*: a commitment premium of 10% of the rights offering amount, payable in either common stock or preferred equity at commitment parties option.  *In re Bristow Group Inc.*, No. 19-32713 (Bankr. S.D. Tex. Oct. 8, 2018) (Docket No. 825).

30

- _Windstream_: commitment premium of 8% of the rights offering amount, payable in common equity. *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 12, 2020) (Docket No. 1806).[6]

Additionally, the Backstop Commitment Premiums here are consistent with the backstop premium already approved by the Court with respect to the new money Second Lien Exit Facility. *See Order (I) Authorizing the Debtors to Enter into Backstop Commitment Letter, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (Docket No. 1248). *See* Hanson Decl. ¶ 15, 16.

44.     Similarly, approval of the Transaction Expenses is warranted.   The Backstop Parties already have expended significant time and effort negotiating the Backstop Agreement, including substantial due diligence, protracted negotiations, and the preparation and negotiation of the documents necessary in connection therewith.   Reimbursing such fees and expenses is customary in other similar transactions to address the substantial efforts expended by backstopping parties. *See* Hanson Decl. ¶ 18.

45.     The Debtors have evaluated the risks and the costs associated with entry into the Backstop Agreements, including the Backstop Commitment Premiums, and considered those factors when determining the appropriate capitalization for the NewCo Entities and the Post-Effective Date Debtors and determined that the risks are outweighed by the benefits of having a source of committed, incremental financing to help ensure sufficient funds to implement the transactions contemplated by the Credit Bid Transaction and the Plan. *See* Hanson Decl. ¶ 22.

---

[6] *See also In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) (Docket No. 367) (approving a commitment premium of 8% of the rights offering amount, payable in either equity at an undiscounted price or cash at commitment parties' option); *In re Chaparral Energy, Inc.*, No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) (Docket No. 651) (approving a commitment premium of 8.75% of the rights offering amount, payable in common shares, and a breakup premium of equal value, payable in cash); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Nov. 6, 2020) (Docket No. 1018) (approving commitment premium of 9.50% of the backstop cap payable in the form of new common shares).

Debtors' Exhibit No. 1
31 of 36

The Debtors have soundly determined that the Rights Offerings and Backstop Agreements minimize their risk and maximize value for their stakeholders.  *See*  Hr'g Tr. 136:18–22, *In re Chesapeake Energy Corp.*, No. 20-33233 (Bankr. S.D. Tex. Aug. 21, 2020) (Jones, J.) (THE COURT: "The debtor gets to make a risk assessment on entering and exiting bankruptcy. They just do. And my job . . . is to make sure that that risk assessment falls within a thoughtful, balanced, range of judgment.").  In this case, the Debtors' judgment is well within the bounds of reason.

46.     In light of the benefits that will inure to the Debtors and their estates as a result of the Backstop Parties' commitment of capital through the Backstop Agreements, the Debtors submit that entry into the Backstop Agreement, and their performance thereunder, including as it may relate to payment of (i) the Backstop Commitment Premiums upon the effective date of the Plan, (ii) the Indemnification Obligations, and (iii) the Transaction Expenses is justified, is in the best interests of the Debtors' estates, and should be approved by this Court.  *See* Hanson Decl. ¶ 24.

47.     Further, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Approval of the Backstop Agreements is necessary for an expeditious path towards confirmation of the Plan, which after months of hard-fought negotiations, has the support of, among others, the Consenting Creditors, Creditors' Committee, and Apache and will ensure that the Credit Bid Purchaser is adequately capitalized.  Accordingly, the Debtors believe that application of section 105(a) of the Bankruptcy Code forms a basis to grant the relief requested.

2.     **The Indemnification Obligations and Transaction Expenses Should Be Allowed as Administrative Expenses Pursuant to Sections 503(b) and 507(a)(2) of Bankruptcy Code**

48.     Section 503(b)(1)(A) of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under

32

section 502(f) of this title, including— (1)(A) the actual, necessary costs and expenses of preserving the estate . . . ." Further, section 507(a)(2) of the Bankruptcy Code provides that "administrative expenses allowed under section 503(b)" are entitled to priority.

49.     As detailed above, the Commitment Obligations represent a material inducement for the Backstop Parties to enter into the Backstop Agreement, which will provide a material benefit to the Debtors' estates. Compared to the substantial value provided by the Backstop Parties, the Transaction Expenses and Indemnification Obligations are a reasonable use of estate resources and should be accorded administrative expense priority. These payments constitute "actual, necessary costs and expenses of preserving the estate." 11 U.S.C § 503(b)(1)(A).

## Request for Relief Pursuant to Bankruptcy Rules 6004(h)

50.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). In order to provide immediate protection to the Backstop Parties, preserve the benefits of the Backstop Agreements and comply with their obligations under the Backstop Agreements, the Debtors request that the Proposed Order be effective immediately upon entry and that the 14-day stay period under Bankruptcy Rules 6004(h) be waived.

## Basis for Emergency Relief

51.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i). The Debtors believe that emergency consideration of the relief requested in this Motion is necessary to provide sufficient time to consummate the Rights Offerings without potentially delaying the Effective Date of the Plan, to the extent the Plan is confirmed. Furthermore, the material economic terms of the Rights Offerings

Debtors' Exhibit No. 1
33 of 36

and the Backstop Agreements, were publicly disclosed in the Debtors' Disclosure Statement almost two months ago.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

<u>**Notice**</u>

52.     Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

<u>**No Previous Request**</u>

53.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

[*Remainder of page intentionally left blank*]

34

Debtors' Exhibit No. 1
34 of 36

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: May 20, 2021
      Houston, Texas

                                      Respectfully submitted,

                                        */s/ Alfredo R. Pérez*
                                        WEIL, GOTSHAL & MANGES LLP
                                        Alfredo R. Pérez (15776275)
                                        Clifford W. Carlson (24090024)
                                        700 Louisiana Street, Suite 1700
                                        Houston, Texas 77002
                                        Telephone:  (713) 546-5000
                                        Facsimile:  (713) 224-9511
                                        Email:  Alfredo.Perez@weil.com

                                        -and-

                                        WEIL, GOTSHAL & MANGES LLP
                                        Matthew S. Barr (admitted *pro hac vice*)
                                        Jessica Liou (admitted *pro hac vice*)
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Email: Matt.Barr@weil.com
                                                       Jessica.Liou@weil.com

                                        *Attorneys for Debtors*
                                      *and Debtors in Possession*

**Certificate of Service**

I hereby certify that, on May 20, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Alfredo R. Pérez
Alfredo R. Pérez