**<u>Exhibit B-1</u>**

**SLTL Backstop Commitment Agreement**

SLTL BACKSTOP COMMITMENT AGREEMENT

AMONG

FIELDWOOD ENERGY INC.

AND

THE BACKSTOP PARTIES PARTY HERETO

Dated as of May 27, 2021

# TABLE OF CONTENTS

PAGE

Section 1.   THE RIGHTS OFFERING. ...............................................................3

Section 2.   THE BACKSTOP COMMITMENTS. ...............................................6

Section 3.   TRANSFER OF BACKSTOP COMMITMENT. ...............................7

Section 4.   BACKSTOP PARTY DEFAULT. .....................................................8

Section 5.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY...........8

Section 6.   REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES............12

Section 7.   ADDITIONAL COVENANTS OF THE COMPANY..............................14

Section 8.   ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES. ..............15

Section 9.   TRANSACTION EXPENSES. ............................................................16

Section 10.  SUPPORT OF PLAN. .....................................................................16

Section 11.  363 CREDIT BID TRANSACTION ..................................................16

Section 12.  CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES ................17

Section 13.  CONDITIONS TO THE OBLIGATIONS OF THE COMPANY. ..............18

Section 14.  SURVIVAL OF REPRESENTATIONS AND WARRANTIES. ................19

Section 15.  TERMINATION. ............................................................................19

SECTION 16. INDEMNIFICATION OBLIGATIONS. .............................................21

SECTION 17. TAX TREATMENT. ....................................................................23

Section 18.  NOTICES.....................................................................................23

Section 19.  SURVIVAL. .................................................................................25

Section 20.  ASSIGNMENT; THIRD PARTY BENEFICIARIES. .............................25

Section 21.  COMPLETE AGREEMENT. ............................................................25

Section 22.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.........................................25

Section 23.  COUNTERPARTS. ........................................................................26

Section 24.  ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES........26

Section 25.  AMENDMENTS AND WAIVERS. ....................................................26

Section 26.  SPECIFIC PERFORMANCE. ............................................................27

Section 27.  NO RECOURSE. ..........................................................................27

Section 28.  OTHER INTERPRETIVE MATTERS.................................................28

i

## INDEX OF DEFINED TERMS

| Term | Section |
| --- | --- |
| 363 Credit Bid Transaction | 11 |
| Affiliate | 3(b)(i) |
| Agreement | Preamble |
| Antitrust Laws | Section 5(e)(ii) |
| Backstop Commitment Percentage | Recitals |
| Backstop Commitment Premium | 2(b) |
| Backstop Commitments | 2(a)(ii) |
| Backstop Funding Deadline | 1(g)(v) |
| Backstop Funding Notice | 1(g) |
| Backstop Party(ies) | Preamble |
| Backstop Party Shares | 6(g) |
| Backstop Transfer Notice | 3(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business Day | 1(d)(3) |
| Chapter 11 Cases | Recitals |
| Chosen Courts | 22 |
| Commitment Approval Order | 7(c)(i) |
| Company | Preamble |
| Confirmation Order | Recitals |
| Control | 3(b)(ii) |
| Debtors | Preamble |
| Defaulting Backstop Party | 4 |
| Disclosure Statement | Recitals |
| Disclosure Statement Order | Recitals |
| Effective Date | Recitals |
| Eligible Claims | 1(a) |
| Eligible Holder | 1(a) |
| FLTL Backstop Agreement | Recitals |
| Funding Account | 1(g)(iv) |
| Funding Amount | 1(g)(iii) |
| HSR Act | Section 5(e)(ii) |
| Indemnification Obligations | 16(b) |
| Indemnified Claim | 16(c) |
| Indemnified Person | 16(b) |
| Indemnifying Party | 16(b) |
| Joinder | 12(l) |
| Losses | 16(b) |
| Material Adverse Effect | 5(d) |
| NewCo | Preamble |
| Non-Recourse Party | 27 |
| Outside Date | 15(a)(ii) |
| Party(ies) | Preamble |

| Term | Section |
|------|---------|
| Per Share Price | Recitals |
| Permitted Transferee | 3(a) |
| Plan | Recitals |
| Related Fund | 3(b) |
| Required Backstop Parties | Recitals |
| Restructuring Support Agreement (RSA) | Recitals |
| Rights Offering Amount | Recitals |
| Rights Offering Procedures | 1 |
| Rights Offering Shares | Recitals |
| Rights Offering Subscription Form | 1(d)(1) |
| Securities Act | 1(b) |
| Subscription Agent | 1(d)(1) |
| Subscription Expiration Deadline | 1(d)(3) |
| Subscription Record Date | Recitals |
| Transaction Expenses | 9(a)(ii) |
| Unsubscribed Shares | Recitals |

## SLTL BACKSTOP COMMITMENT AGREEMENT

This SLTL BACKSTOP COMMITMENT AGREEMENT (including exhibits and schedules attached hereto and incorporated herein, this "**Agreement**"), dated as of May 27, 2021 is made by Fieldwood Energy Inc., a Delaware corporation  (the "**Company**"), on behalf of itself and each of its affiliates listed on **Schedule 2** hereto (collectively, together with the Company, the "**Debtors**"), the Backstop Parties set forth on **Schedule 1** hereto (each referred to herein, individually, as a "**Backstop Party**" and, collectively, as the "**Backstop Parties**"), and, upon execution of the Joinder (as defined herein), a Delaware corporation, which shall be the direct or indirect owner of 100% of the equity interests of the Credit Bid Purchaser ("**NewCo**") . The Company and each Backstop Party is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**". Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

WHEREAS the Debtors and certain of the Backstop Parties and certain other parties are party to that certain Restructuring Support Agreement dated as of August 4, 2020 (as may be amended, modified, or supplemented from time to time, in accordance with its terms, the "**Restructuring Support Agreement**" or "**RSA**");

WHEREAS, on August 4, 2020, the Debtors commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**");

WHEREAS, on April 14, 2021, the Bankruptcy Court held a hearing at which it approved  the Debtors' *Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC*, dated April 15, 2021 [Docket No. 1285] (including any exhibits and schedules thereto and as may be further amended, supplemented or modified, the "**Disclosure Statement**") and granted related relief and thereafter entered an order [Docket No. 1286] (the "**Disclosure Statement Order**") with respect thereto;

WHEREAS, the Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the Debtors' *Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors, dated April 15, 2021* [Docket No. 1284] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, the "**Plan**"), which provides for the restructuring of the Company's capital structure and financial obligations;

WHEREAS, in accordance with the Plan, the Credit Bid Purchaser or another special purpose entity shall be formed by or at the direction of the Prepetition FLTL Lenders for the purpose of consummating the Credit Bid Transaction or a 363 Credit Bid Transaction;

WHEREAS, in accordance with the Plan, NewCo shall be formed by or at the direction of the Prepetition FLTL Lenders;

WHEREAS, pursuant to (i) subscription and contribution agreements by and among NewCo and certain of its subsidiaries, NewCo shall assign and transfer (indirectly) to Credit Bid Purchaser the rights under the Subscription Rights to receive NewCo stock in exchange for the Per Share Price thereunder, (ii) the Credit Bid Purchase Agreement, Credit Bid Purchaser shall transfer the Subscription Rights, together with certain other property, to the Sellers (as defined therein) thereunder in consideration for the assets to be acquired thereunder, and (iii) the Plan, the Subscription Rights (along with the other consideration being provided to holders of Allowed SLTL Claims under the Plan) shall be distributed to the Prepetition SLTL Lenders in satisfaction and discharge of the SLTL Claims;

WHEREAS, notwithstanding the foregoing, pursuant to this Agreement, the Plan, and the Commitment Approval Order (as defined below), the Company shall be required to implement the Rights Offering on behalf of NewCo, and distribute in respect of the Eligible Claims Subscription Rights to purchase the New Equity Interests issued by NewCo on the effective date of the Plan (the "**Effective Date**");

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "**Confirmation Order**"), consummation of the Plan, and the other conditions specified in Section 12 and Section 13 hereof, on the Effective Date,  New Equity Interests will be offered, sold and issued pursuant to the Rights Offering and this Agreement (the "**Rights Offering Shares**") *pro rata* to all Eligible Holders (as defined below) of SLTL Claims at an aggregate purchase price of $20,000,000 (the "**Rights Offering Amount**") at $55.53 per **share** (the "**Per Share Price**") which may be subscribed for by all Eligible Holders (as defined below) of Eligible Claims (as defined below) on or before May 31, 2021 (the "**Subscription Record Date**");

WHEREAS, in order to facilitate the Plan and the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A) the Company has agreed to consummate the Plan and (B) each Backstop Party, severally and not jointly, has agreed to purchase, on the Effective Date, (i) all Rights Offering Shares allocated to such Backstop Party based on its ownership of Eligible Claims (and on the ownership of Eligible Claims owned by certain of its Related Funds, solely to the extent such Eligible Claims are held by its Related Funds as of the Subscription Record Date), and (ii) such Backstop Party's percentage (its "**Backstop Commitment Percentage**"), as set forth on **Schedule 1** opposite such Backstop Party's name, of all Rights Offering Shares that are not purchased by other Eligible Holders (as defined below) of Eligible Claims pursuant to the Rights Offering (the "**Unsubscribed Shares**");

WHEREAS, as consideration for their respective Backstop Commitments, the Backstop Parties will receive, on the Effective Date, the Backstop Commitment Premium (as defined below);

WHEREAS, for purposes of this Agreement, "**Required Backstop Parties**" shall mean Backstop Parties holding more than 50% in aggregate amount of the Backstop Commitments of all Backstop Parties (excluding any Defaulting Backstop Parties and their corresponding Backstop Commitments); and

WHEREAS, substantially contemporaneous with the execution and delivery of this Agreement, the Company is entering into a Backstop Commitment Agreement with certain of the FLTL Lenders (the "**FLTL Backstop Agreement**").

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Backstop Parties agree as follows:

Section 1.   THE RIGHTS OFFERING.  The Rights Offering will be conducted in accordance with the Rights Offering Procedures attached as Exhibit A-3 to the *Motion of Debtors for Order (I) Approving Rights Offering Procedures and Related Forms, (II) Authorizing Debtors to Conduct Rights Offerings in Connection with Debtors' Plan of Reorganization, (III) Authorizing Entry Into Equity Backstop Commitment Agreements, (IV) Approving Obligations Thereunder, and (V) Granting Related Relief* (the "**Rights Offering Procedures**") and as follows:

(a)  Pursuant to the Plan, each holder of an SLTL Claim as of the Subscription Record Date (each such holder, an "**Eligible Holder**") will receive Subscription Rights in exchange for their claims under the Prepetition SLTL Credit Agreement held or beneficially held by such Eligible Holder as of the Subscription Record Date (such claims being, "**Eligible Claims**") to subscribe for its *pro rata* share (measured as the principal amount of Eligible Claims held by such Eligible Holder as compared to the aggregate principal amount relating to such Eligible Claims held by all Eligible Holders, in each case as of the Subscription Record Date) of the Rights Offering Shares, subject to certain other customary representations and warranties.

(b)  Subject to the terms and conditions of this Agreement, the Company hereby undertakes to distribute the Subscription Rights for Rights Offering Shares to Eligible Holders of Eligible Claims pursuant to the Plan and the Rights Offering Procedures. The Rights Offering will be conducted in accordance with the Rights Offering Procedures in reliance on the exemption from registration under the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder (the "**Securities Act**") provided in Section 1145 of the Bankruptcy Code, and all Rights Offering Shares (other than the Unsubscribed Shares purchased by the Backstop Parties pursuant to this Agreement) will be issued by NewCo pursuant to Section 1145 of the Bankruptcy Code and accordingly shall be exempt from registration under the Securities Act as provided in the Plan and the Disclosure Statement. The offer and sale of the Unsubscribed Shares purchased by the Backstop Parties pursuant to this Agreement shall be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D thereunder, and the Plan and the Disclosure Statement shall each include a statement to such effect.

(c)  The Company will distribute the Subscription Rights to purchase the Rights Offering Shares at the Per Share Price in respect of Eligible Claims. Each Eligible Holder of Eligible Claims as of the Subscription Record Date will receive a

Subscription Right to subscribe for its *pro rata* share of the Rights Offering Shares at the Per Share Price.

(d)  (1) The Company will provide, or cause to be provided, to each Eligible Holder of Eligible Claims a subscription form (the "**Rights Offering Subscription Form**"), whereby each Eligible Holder of Eligible Claims may exercise its Subscription Rights in whole or in part, *provided* that such Eligible Holder of Eligible Claims (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the subscription agent for the Rights Offering selected by the Company (the "**Subscription Agent**") in advance of the Subscription Expiration Deadline (as defined below) and (ii) (A) if such Eligible Holder is not a Backstop Party, such Eligible Holder pays the aggregate purchase price of the Rights Offering Shares elected to be purchased by the Eligible Holder of Eligible Claims by wire transfer of immediately available funds prior to the Subscription Expiration Deadline to an account established by the Subscription Agent for the Rights Offering or (B) if such Eligible Holder is a Backstop Party, such Backstop Party pays, in accordance with Section 1(g), the aggregate purchase price of its Rights Offering Shares and those Rights Offering Shares to be purchased by such Backstop Party pursuant to certain Subscription Rights allocated to certain of its Related Funds (which Subscription Rights will be allocated to such Backstop Party's Related Funds based on Eligible Claims held by its Related Funds as of the Subscription Record Date).

(2)  No less than one (1) Business Day (as defined below) in advance of the Subscription Expiration Deadline, (A) the Company shall deliver to each Backstop Party a notice setting forth such Backstop Party's allocation of Rights Offering Shares for which it may exercise its Subscription Rights and (B) each Backstop Party shall timely and properly exercise its rights to purchase its allocated portion of the Rights Offering Shares, pursuant to the procedures set forth in the preceding clause (1) and the Rights Offering Procedures, subject to payment in accordance with Section 1(g).  For the avoidance of doubt, each Backstop Party shall fully exercise all Subscription Rights allotted to it for the purchase of the Rights Offering Shares (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party pursuant to certain Subscription Rights allocated to certain of its Related Funds**,** which Subscription Rights will be allocated to such Backstop Party's Related Funds based on Eligible Claims held by its Related Funds as of the Subscription Record Date).

(3)  For purposes of this Agreement, the "**Subscription Expiration Deadline**" means 5:00 p.m. New York City time on such date that is specified in the Rights Offering Procedures or such other date as the Company, subject to the approval of the Required Backstop Parties, may specify in a notice provided to the Eligible Holders of Eligible Claims before 9:00 a.m. New York City time on the Business Day before the then-effective Subscription Expiration Deadline. For purposes of this Agreement, "**Business Day**" means any day of the year on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

Debtors' Exhibit No. 10
Page 9 of 44

(e)  NewCo will issue the Rights Offering Shares to the Eligible Holders of Eligible Claims with respect to which Subscription Rights were validly exercised by such Eligible Holders of Eligible Claims upon the Effective Date.  The portion of Rights Offering Shares issued to an Eligible Holder who elects to acquire such Rights Offering Shares shall be rounded down to the nearest whole share.

(f)  If the Subscription Agent for any reason does not receive from an Eligible Holder of Eligible Claims both a timely and duly completed Rights Offering Subscription Form and timely payment for the Rights Offering Shares being purchased by such Eligible Holder of Eligible Claims, the Rights Offering Procedures shall provide that, unless otherwise approved by the Company and the Required Backstop Parties, such Eligible Holder of Eligible Claims shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

(g)  As soon as reasonably practicable following the Subscription Expiration Deadline, but, in any event, no later than four (4) Business Days prior to the Effective Date and on the same date as delivered under the FLTL Backstop Agreement, the Company, on behalf of NewCo, will deliver to each Backstop Party by email delivery a written notice (the "**Backstop Funding Notice**") of: (i) the number of Rights Offering Shares that such Backstop Party has subscribed to purchase pursuant to such Backstop Party's Rights Offering Subscription Form (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party pursuant to certain Subscription Rights allocated to certain of its Related Funds as provided on **Schedule 1,** which Subscription Rights will be allocated to such Backstop Party's Related Funds based on Eligible Claims held by its Related Funds as of the Subscription Record Date) and the aggregate purchase price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate purchase price therefor; (iii) the aggregate number of Unsubscribed Shares to be issued and sold to such Backstop Party based upon each Backstop Party's Backstop Commitment Percentage and the aggregate purchase price therefor (together with the amounts referenced in (i), such Backstop Party's "**Funding Amount**"); (iv) wire instructions for a segregated account (the "**Funding Account**"), which will be an account held in an agreed upon, nationally recognized financial institution if the Required Backstop Parties so request, to which such Backstop Party shall deliver an amount equal to its Funding Amount; and (v) the estimated deadline for delivery of the Funding Amount which shall be one (1) Business Day before the expected Effective Date (the "**Backstop Funding Deadline**"); *provided* that, such date shall be the same date as the Backstop Funding Deadline under the FLTL Backstop Agreement; *and, provided*, further that each Backstop Party shall use commercially reasonable efforts to deliver the Funding Amount as soon as practicable following delivery of the Backstop Funding Notices but in no event later than the Backstop Funding Deadline. Each Backstop Party shall deliver and pay its applicable Funding Amount by wire transfer in immediately available funds in U.S. dollars into the Funding Account. If this Agreement is terminated pursuant to Section 15 after such delivery, such funds shall be released to the respective Backstop Party, without any interest accrued thereon, promptly following such termination.

5

Section 2.   THE BACKSTOP COMMITMENTS.

(a)  On the basis of the representations and warranties contained herein, but subject to the conditions set forth in Section 12, each of the Backstop Parties, severally and not jointly, agrees to:

(i)   subscribe for, in accordance with Section 1(d)(2), and purchase, in accordance with Section 1(g), the Rights Offering Shares allocated to such Backstop Party (including, for the avoidance of doubt, those Rights Offering Shares to be purchased by such Backstop Party pursuant to certain Subscription Rights allocated to certain of its Related Funds, which Subscription Rights will be allocated to such Backstop Party's  Related Funds based on Eligible Claims held by its Related Funds as of the Subscription Record Date) at the aggregate purchase price therefor based upon the Per Share Price; and

(ii)   purchase, in accordance with Section 1(g), its Backstop Commitment Percentage of the Unsubscribed Shares at the aggregate purchase price therefor based upon the Per Share Price (together with its commitment pursuant to Section 2(a)(i), the "**Backstop Commitments**").

(b)  On the basis of the representations and warranties herein contained, as consideration for the Backstop Commitments and the other undertakings of the Backstop Parties herein, NewCo will pay to the Backstop Parties, in the aggregate, on the Effective Date, a nonrefundable aggregate premium in an amount equal to 8% of the Rights Offering Amount (the "**Backstop Commitment Premium**"), which Backstop Commitment Premium shall be deemed fully earned by the Backstop Parties upon the execution of this Agreement, in the form of shares of New Equity Interests (issued at the Per Share Price), which shall be allocated among the Backstop Parties *pro rata* based on each Backstop Party's Backstop Commitment Percentage. The shares issued in respect of the Backstop Commitment Premium shall be issued in reliance upon the exemption from registration under the Securities Act provided in section 4(a)(2) of the Securities Act and/or Regulation D thereunder, and the Plan and the Disclosure Statement shall each include a statement to such effect.

(c)  On the Effective Date, the Backstop Parties will purchase only such amount of Rights Offering Shares and Unsubscribed Shares as is listed in the Backstop Funding Notice, without prejudice to the rights of NewCo or the Backstop Parties to seek later an upward or downward adjustment if the amount of Rights Offering Shares or Unsubscribed Shares in such Backstop Funding Notice is inaccurate and in such event, the respective obligations to fund additional purchase price or issue additional Rights Offering Shares or Unsubscribed Shares shall survive notwithstanding such Backstop Funding Notice.

(d)  Delivery of the Unsubscribed Shares, Rights Offering Shares and Backstop Commitment Premium will be made by NewCo to the respective Backstop Parties on

the Effective Date upon the release of the Funding Amount of each Backstop Party from the Funding Account, upon which time such funds shall be delivered to NewCo by wire transfer of immediately available funds to the account specified by the Company, on behalf of NewCo, to the Backstop Parties at least twenty four (24) hours in advance.

(e)  Delivery of the shares in connection with the Backstop Commitment Premium will be made by NewCo to the respective Backstop Parties on the Effective Date.

Section 3.    TRANSFER OF BACKSTOP COMMITMENT.

(a)  Each Backstop Party's Backstop Commitment (excluding its Subscription Rights) shall only be transferable, in whole or in part, to a Permitted Transferee (as defined below); *provided* that the transferring Backstop Party shall give notice of its intent to transfer its Backstop Commitment (other than to a Related Fund (as defined below)), whether in whole or in part, ("**Backstop Transfer Notice**") to the non-transferring Backstop Parties and such non-transferring Backstop Parties shall have a right, but not an obligation, for a period of ten (10) days following receipt of the Backstop Transfer Notice (or such period ending three (3) days prior to the Backstop Funding Date, if sooner) to purchase its *pro rata* share thereof based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-transferring Backstop Parties purchasing such transferring Backstop Party's Backstop Commitment, on the terms described in the Backstop Transfer Notice.  If such non-transferring Backstop Parties do not elect to purchase all of the Backstop Commitment offered in the Backstop Transfer Notice, then the transferring Backstop Party shall have the right to complete such transfer to any third party who is a Permitted Transferee on terms and conditions that are at least as favorable in the aggregate to such transferring Backstop Party as the terms and conditions set forth in the Backstop Transfer Notice. Any Permitted Transferee of the Backstop Commitment shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the Restructuring Support Agreement and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations, including such financial information as may reasonably be requested by the Company or its representatives demonstrating the ability of the Permitted Transferee to fund the entire amount of its existing Backstop Commitment plus the amount of the Backstop Commitment transferred to such Permitted Transferee. "**Permitted Transferee**" means (i) a Related Fund or (ii) any other Backstop Party.

(b)  Notwithstanding the foregoing, a Backstop Party may assign its Backstop Commitment (including its Subscription Rights), to any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Backstop Party, an Affiliate thereof or the same investment manager, advisor or subadvisor as the Backstop Party or an Affiliate of such investment manager, advisor or subadvisor (each, a "**Related Fund**") without submitting a Backstop Transfer Notice, in which

case such Related Fund transferee shall agree in writing to be bound by the representations, warranties, covenants and obligations of such transferring Backstop Party under this Agreement and the Restructuring Support Agreement, shall make the representations set forth in Section 6 hereof as of the date of such transfer as if it was a Backstop Party, and shall, as a condition of such transfer, provide the Company and the non-transferring Backstop Parties with evidence reasonably satisfactory to them that such transferee is reasonably capable of fulfilling such obligations. In such event, the assigning Backstop Party shall remain fully obligated for its Backstop Commitment. For purposes of this Agreement, (i) "**Affiliate**" shall mean with respect to any specified Person (as defined below), any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls (as defined below), is Controlled by or is under common Control with such specified Person and (ii) "**Control**" shall mean, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by," "Controlled" and "under common Control with" shall have correlative meanings.

Section 4.   BACKSTOP PARTY DEFAULT.  Any Backstop Party that fails to timely fund its Backstop Commitment or fully exercise all Subscription Rights held by it in the Rights Offering (a "**Defaulting Backstop Party**") will be liable for the consequences of its breach and the parties hereto can enforce rights of money damages and/or specific performance upon the failure to timely fund by the Defaulting Backstop Party.  Each of the non-defaulting Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such Defaulting Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-defaulting Backstop Parties assuming such Defaulting Backstop Party's Backstop Commitment.  No Defaulting Backstop Party shall be entitled to any portion of the Backstop Commitment Premium. The Backstop Commitment Premium allocated to the Defaulting Backstop Party shall be reallocated, *pro rata*, to the non-defaulting Backstop Parties who have assumed the Defaulting Backstop Party's Backstop Commitment.

Section 5.   REPRESENTATIONS AND WARRANTIES OF THE COMPANY.  The Company represents and warrants to, and agrees with, the Backstop Parties, NewCo and the Credit Bid Purchaser as set forth below. Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof and as of the Effective Date.

(a)  *Organization and Qualification*.  The Company and each of its subsidiaries is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. The Company and each of its subsidiaries is duly qualified or authorized to do business

and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not be reasonably likely to result in a Material Adverse Effect (as defined below).

(b) *Power and Authority*.

(i) The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Commitment Approval Order, the Confirmation Order and consummation of the Plan, to perform its obligations hereunder. The Company has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement.

(ii) The Company has the requisite corporate power and authority to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and as of the Effective Date will have taken all necessary corporate action required for the performance by it of the Plan.

(c) *Execution and Delivery; Enforceability*. Subject to the entry of the Disclosure Statement Order, the Commitment Approval Order, and the Confirmation Order or an order of the Bankruptcy Court approving the 363 Credit Bid Transaction pursuant to section 363 of the Bankruptcy Code, this Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto. Upon entry of the Commitment Approval Order and assuming this Agreement has been duly authorized, executed and delivered by the Backstop Parties, each of the obligations hereunder will constitute the valid and legally binding obligations of the Company and enforceable against the Company in accordance with its terms.

(d) *No Conflict*. Subject to entry of the Commitment Approval Order, the distribution of the Subscription Rights and the execution and delivery by the Company of this Agreement and compliance by it with all of the provisions hereof and the consummation of the transactions contemplated hereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company or any of its subsidiaries; and (iii) assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having

9

jurisdiction over the Company or any of its subsidiaries or any of their respective properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  "**Material Adverse Effect**" means a result, event, occurrence, change, circumstance, development or consequence that, individually or in the aggregate, would reasonably be expected to (a) materially and adversely affect the value, condition (financial or otherwise) or results of operations of the Acquired Interests (as defined in the Credit Bid Purchase Agreement) taken as a whole or (b) materially and adversely affect the ability of the Company to perform their obligations under this Agreement or the documents executed in connection with the Credit Bid Purchase Agreement or consummate the transactions contemplated therein; *provided*, that, with respect to clause (a) only, any result, event, occurrence, change, circumstance, development or consequence to the extent resulting from any of the following matters shall not be taken into account in determining whether a Material Adverse Effect has occurred: (i) changes in financial or securities markets generally; (ii) changes in general economic or political conditions in the United States or worldwide; (iii) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Acquired Interests are located, including, but not limited to, changes in the market price of oil and natural gas; (iv) actions taken after the date of this Agreement as required by this Agreement or with the written consent of the Majority Backstop Parties; (v) the commencement or pendency of the Bankruptcy Cases and any adverse effects resulting therefrom, (vi) entering into the Credit Bid Purchase Agreement or the announcement of the transactions contemplated in the Credit Bid Purchase Agreement (provided, that this clause (vi) shall not be excluded with respect to the representations and warranties and related conditions contained in this Credit Bid Purchase Agreement that address the consequences of the execution, announcement or performance of this Agreement or the consummation of the transactions contemplated hereby); (vii) acts of God, including hurricanes, storms or other naturally occurring events; (viii) acts or failures to act of Governmental Units, except as a result of any action or inaction by or on behalf of the Company; (ix) any epidemic, pandemic or disease outbreak (including the COVID-19 virus) or hostilities, terrorist activities or war or any similar disorder and, in each case, governmental actions related thereto; (x) matters that are cured or no longer exist by the earlier of Effective Date and the termination of this Agreement; (xi) any change in laws or in GAAP and any interpretations thereof from and after the Effective Date;  (xii) any reclassification or recalculation of reserves in the ordinary course of business (xiii) natural declines in well performance;(xiv) the departure of officers or directors of the Company after the Effective Date; (xvi) any objections in the Bankruptcy Court to (A) this Agreement and the other ancillary documents and the transactions contemplated in the Credit Bid Purchase Agreement, or (B) the reorganization of any Company and any related plan of reorganization or disclosure statement; and (xvii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit the Company from consummating the transactions contemplated by the Credit Bid Purchase Agreement) or any actions or omissions of the Company in compliance therewith; *provided*, that, with respect to clauses (i) through (iii), (vii), (viii), (ix) and (xi) any such result, event, occurrence, change, circumstance, development or consequence

shall not be disregarded to the extent that it has had a disproportionate effect on the Acquired Interests relative to similar oil and gas assets in the Gulf of Mexico held by other participants in the industries in which the Acquired Interests are operated.

(e) *Consents and Approvals*. Subject to entry of the Commitment Approval Order, and assuming the accuracy of the Backstop Parties' representations and warranties in Section 6, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries is required for the distribution of the Subscription Rights the execution and delivery by the Company of this Agreement and compliance by them with all of the provisions hereof (including payment of the Indemnification Obligations and the Transaction Expenses of the Backstop Parties as required herein) and the consummation of the transactions contemplated hereby, except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. "**Antitrust Laws**" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "**HSR Act**") and any similar law enforced by any governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and all other applicable laws that are designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition or effectuating foreign investment.

(f) *No General Solicitation*. Neither the Company nor any Affiliate thereof or any Person acting on its or any of their behalf has engaged, or will engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the sale of the Unsubscribed Securities or the sale of the Rights Offering Shares subject to the Subscription Rights. Other than this Agreement and the documents and agreements expressly contemplated under the Plan (including the Rights Offering Procedures), none of the Company or any Affiliate thereof has entered into any agreement or arrangement with any Person in relation to the sale of the Unsubscribed Shares or the sale of the Rights Offering Shares subject to the Subscription Rights. None of the Company, any of its Affiliates or any Person acting on its or their behalf, directly or indirectly, has made or will make any

offers or sales of any security, or has solicited or will solicit offers to buy, or otherwise has negotiated or will negotiate in respect of, any security, under circumstances that would require the registration of any of the securities offered or sold in connection with the Rights Offering or under this Agreement under the Securities Act.

> Section 6.    REPRESENTATIONS AND WARRANTIES OF THE BACKSTOP PARTIES.  Each of the Backstop Parties, severally and not jointly, represents and warrants to, and agrees with, the Company as set forth below. Each representation, warranty and agreement is made as of the date hereof and as of the Effective Date.

(a)  *Formation*.  Such Backstop Party has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

(b)  *Power and Authority*.  Such Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)  *Execution and Delivery*.  This Agreement has been duly and validly executed and delivered by such Backstop Party and constitutes its valid and binding obligation, enforceable against such Backstop Party in accordance with its terms.

(d)  *Securities Laws Compliance*.  The Unsubscribed Shares will not be offered for sale, sold or otherwise transferred by such Backstop Party except pursuant to an effective registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(e)  *Purchase Intent*.  Such Backstop Party is acquiring the Unsubscribed Shares for its own account or for the accounts for which it is acting as investment advisors or manager, and not with a view to distributing or reselling such Unsubscribed Shares or any part thereof.  Such Backstop Party understands that such Backstop Party must bear the economic risk of this investment indefinitely, unless the Unsubscribed Shares are registered pursuant to the Securities Act and any applicable state securities or Blue Sky laws or an exemption from such registration is available, and further understands that it is not currently contemplated that any Unsubscribed Shares will be registered at the time of issuance.

(f)  *Investor Status*.  Such Backstop Party is an Accredited Investor.  Such Backstop Party understands that the Unsubscribed Shares are being offered and sold to such Backstop Party in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company, the Credit Bid Purchaser and NewCo are relying upon the truth and accuracy of, and such Backstop Party's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Backstop Party set forth herein in order

to determine the availability of such exemptions and the eligibility of such Backstop Party to acquire Unsubscribed Shares. Such Backstop Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Shares. Such Backstop Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time). Except for the representations and warranties expressly set forth in this Agreement, such Backstop Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of the Company, the Credit Bid Purchaser or NewCo. Such Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and its subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

(g)  *Consents and Approvals*.  Assuming the accuracy of the Company's representations and warranties in Section 5, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over such Backstop Party or any of its properties is required for the purchase of the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares or the shares issued pursuant to the Backstop Commitment Premium (collectively, the "**Backstop Party Shares**")  by the Backstop Parties hereunder and the execution and delivery by such Backstop Party of this Agreement and performance of and compliance by it with all of the provisions hereof and thereof (and the consummation of the transactions contemplated hereby and thereby), except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by this Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by this Agreement with applicable state filing agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a material adverse effect on the ability of such Backstop Party to perform its obligations under this Agreement.

(h)  *Sufficiency of Funds*.  Such Backstop Party will have sufficient immediately available funds to make and complete the payment of the Funding Amount on the Backstop Funding Deadline.

(i)  *Legend*.  Each Backstop Party understands that all securities acquired by it as Unsubscribed Shares or issued in satisfaction of the Backstop Commitment Premium pursuant to this Agreement, if certificated, shall bear, or if uncertificated,

shall be deemed to include, a customary Securities Act legend for "restricted securities" and customary stop order instructions will be entered on the books of the Company's transfer agent in respect of such securities.

(j) *No Brokers Fee*.  Such Backstop Party is not a party to any contract with any Person that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Rights Offering Shares or the Unsubscribed Shares.

Section 7.   ADDITIONAL COVENANTS OF THE COMPANY.  The Company agrees with the Backstop Parties as follows:

(a) *Support of the Plan*. The Company agrees that, for the duration of the Support Period (as defined in the Restructuring Support Agreement), the Company shall, and shall cause each of its subsidiaries included in the definition of "Company" in the Restructuring Support Agreement to use commercially reasonable efforts to (i) obtain approval of the Plan and consummate the Restructuring Transactions (as defined in the Restructuring Support Agreement), including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases or for relief that (A) is inconsistent with the Restructuring Support Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of the Restructuring Support Agreement, including by preventing the consummation of the Restructuring Transactions and (ii) obtain orders of the Bankruptcy Court necessary to consummate the Restructuring Transactions.

(b) *Confirmation Order*. The Company shall use its commercially reasonable efforts to obtain approval of the Plan. The Company shall provide to counsel to the Backstop Parties, in accordance with Section 18, a draft of any proposed Confirmation Order and a reasonable opportunity to review and comment on such proposed order prior to such proposed order being filed with the Bankruptcy Court.

(c) *Commitment Approval Order*. The Company shall use its commercially reasonable efforts to (i) obtain the entry of an order by the Bankruptcy Court, in form and substance acceptable to the Debtors and the Required Backstop Parties, approving this Agreement, including the Backstop Commitment Premium, the Transaction Expenses, and the Indemnification Obligations (the "**Commitment Approval Order**") and (ii) cause the Commitment Approval Order and any incorporated Orders to become Final Orders including by requesting that such Orders be a final Order immediately upon entry by the Bankruptcy Court pursuant to a waiver of Bankruptcy Rules 3020 and 6004(h), as applicable), in each case, as soon as reasonably practicable following the filing of the motion seeking entry of the Commitment Approval Order. The Company shall provide to counsel for the Backstop Parties copies of the proposed Commitment Approval Order, and any incorporated Orders, and a reasonable

14

opportunity to review and comment on such Orders prior to such Orders being filed with the Bankruptcy Court.

(d) *Rights Offering*.  The Company shall undertake its obligations with respect to the Rights Offering in accordance with the Plan and the Rights Offering Procedures.

(e) *Form D and Blue Sky*. To the extent required before the Effective Date, the Company, on behalf of NewCo, shall timely file a Form D with the SEC with respect to the Unsubscribed Shares, to the extent required under Regulation D of the Securities Act.  To the extent required, the Company shall, on or before the Effective Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify for sale or issuance to the Backstop Parties the Unsubscribed Shares under applicable securities and "blue sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions. To the extent required on or before the Effective Date, the Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 7(e).

(f) *Unsubscribed Shares*.  The Company, in consultation with counsel for the Backstop Parties, shall determine the amount of Unsubscribed Shares, if any, and, in good faith, provide a Backstop Funding Notice that accurately reflects the amount of Unsubscribed Shares as so determined and to provide to the Backstop Parties a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as the Backstop Parties may reasonably request.

Section 8.   ADDITIONAL COVENANTS OF THE BACKSTOP PARTIES.  Each of the Backstop Parties agrees with the Company, severally and not jointly, as follows:

(a) *Approvals*.  Except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Backstop Parties shall use reasonable efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary in connection with seeking any governmental approval, exemption or authorization from any governmental authority under any Antitrust Laws, that are necessary to consummate and make effective the transactions contemplated by this Agreement. Each Backstop Party shall reasonably promptly notify the Company (and furnish to it copies, if requested) of any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Company in advance to the extent permitted by applicable law and gives the Company a reasonable opportunity to attend and participate thereat.   The Backstop Parties shall not take any action that is intended or reasonably likely to

15

materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement.

Section 9.   TRANSACTION EXPENSES.

(a)  Until the earlier to occur of (x) the Closing and (y) the termination of this Agreement in accordance with its terms, the Debtors agree to pay in accordance with Section 9(b) the reasonable fees and expenses of Kasowitz Benson Torres LLP, solely to the extent they have been and are actually incurred in connection with (i) the negotiation, preparation and implementation of this Agreement, the amendment to the RSA and the other agreements and transactions contemplated hereby and (ii) in furtherance of the Restructuring Transactions (the "**Transaction Expenses**"). The Transaction Expenses shall, upon entry of the Commitment Approval Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

(b)  The Transaction Expenses accrued through the date on which the Commitment Approval Order is entered shall be paid as Restructuring Expenses (as defined in the Plan) on or after the Effective Date pursuant to the Plan. For the avoidance of doubt, the Transaction Expenses shall not be payable by the Debtors in the event of a termination of this Agreement pursuant to Section 15(b)(i) and 15(c)(i) and the Backstop Parties shall promptly reimburse the Company for all Transaction Expenses paid by the Company prior to any such termination; *provided* that for the avoidance of doubt, the Transaction Expenses shall still be due and payable to any Backstop Party that shall not have been the cause of the termination of this Agreement pursuant to Section 15(b)(i) and 15(c)(i).

Section 10.  SUPPORT OF PLAN.  Each Backstop Party agrees, severally and not jointly,  that, for the duration of the Support Period, such Backstop Party shall comply with Section 3(a) of the Restructuring Support Agreement, to the extent applicable.

Section 11.  363 CREDIT BID TRANSACTION.  In the event the credit bid sale transaction to the Credit Bid Purchaser (or another special purpose bidding entity formed by or at the direction of the Prepetition FLTL Lenders) is pursued pursuant to section 363 as contemplated in the Plan (the "**363 Credit Bid Transaction**"), the Parties agree to support and take reasonable steps to facilitate the Credit Bid Transaction, and cooperate in good faith with the Required DIP Lenders and Requisite FLTL Lenders to facilitate the 363 Credit Bid Transaction, including, without limitation, by making any amendments to this Agreement; provided that any such amendments are (i) consistent with the SLTL Term Sheet (as defined in the RSA)  or (ii) do not materially and adversely impact the rights of the Backstop Parties under this Backstop Agreement or the treatment of the holders of Allowed SLTL Claims  under the SLTL Term Sheet.

16

Section 12. CONDITIONS TO THE OBLIGATIONS OF THE BACKSTOP PARTIES. The obligations of the Backstop Parties to purchase Rights Offering Shares and Unsubscribed Shares pursuant to their respective Backstop Commitments on the Effective Date are subject to the satisfaction of the following conditions (unless waived by the Required Backstop Parties), except where the failure to satisfy any such condition results solely from the failure by any Backstop Party to comply with this Agreement:

(a) *Commitment Approval Order*. The entry of the Commitment Approval Order, which Commitment Approval Order shall be a Final Order.

(b) *Plan and Confirmation Order*. The entry of the Confirmation Order, which, solely with respect to any terms applicable to this Rights Offering or the SLTL Warrants, shall be in form and substance reasonably acceptable to the Debtors and the Required Backstop Parties.

(c) *Conditions to the Plan*. The conditions to the occurrence of the Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Effective Date shall have occurred or be deemed to have occurred.

(d) *Rights Offering*. The Rights Offering shall have commenced and shall have been conducted in all material respects in accordance with this Agreement and the Rights Offering Procedures, and the Subscription Expiration Deadline shall have occurred.

(e) *Backstop Funding Notice*. The Backstop Parties shall have received a Backstop Funding Notice in accordance with Section 1(g).

(f) *Valid Issuance*. The Rights Offering Shares shall be, upon (i) payment of the aggregate purchase price as provided herein and (ii) the Effective Date, validly issued and outstanding, and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(g) *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

(h) *Representations and Warranties*.

(i) The representations and warranties of the Company contained in Sections 5(a) and (d) qualified as to materiality or Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct in all material respects on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent made as of a specific date, as of such date); and

17

(ii)     all other representations and warranties of the Company contained in Section 5 shall be true and correct (without giving effect to any qualification set forth therein as to "materiality", "Material Adverse Effect" or other qualifications based on the word "material" or similar phrases) on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent made as of a specific date, as of such date), except, where the failure of such representations and warranties to be so true and correct does not have, and would not reasonably be expected to have, a Material Adverse Effect.

(i) *Covenants*.  The Company shall have performed and complied in all material respects with all material obligations and agreements required in this Agreement to be performed or complied with by it prior to the Effective Date.

(j) *Backstop Commitment Premium; Transaction Expenses.*  All premiums and other amounts, including the Backstop Commitment Premium and Transaction Expenses, required to be paid or reimbursed by the Company or NewCo, as applicable, to the Backstop Parties as of the Effective Date shall have been so paid or reimbursed.

(k) *Restructuring Support Agreement*. The Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect with respect to the Backstop Parties.

(l) *NewCo Entities*. NewCo and Credit Bid Purchaser shall have signed the joinder attached hereto as **Exhibit A** (the "**NewCo Entities Joinder**") and become a party to this Agreement and all the representations and warranties in Section 2 of the Joinder shall be true and correct in all material respects.

Section 13. CONDITIONS TO THE OBLIGATIONS OF THE COMPANY.  The obligations of the Company pursuant to this Agreement are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

(a) *Plan and Confirmation Order*.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court, and which shall have become a Final Order, shall each be consistent in all material respects with the RSA.

(b) *Conditions to the Plan*. The conditions to the occurrence of the Effective Date set forth in the Plan and the Confirmation Order shall have been satisfied or waived by the Company in accordance with the terms of the Plan, and the Effective Date shall have occurred or be deemed to have occurred.

(c) *Rights Offering*. The Rights Offering shall have been conducted and the Subscription Expiration Deadline shall have occurred.

(d) *Funding Amount.*  Each Backstop Party shall have wired its Funding Amount into the Funding Account.

18

(e) *Representations and Warranties.* The representations and warranties of the Backstop Parties set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Effective Date as if made on and as of the Effective Date (or, to the extent given as of a specific date, as of such date).

(f) *Covenants*. The Backstop Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Backstop Parties on or prior to the Effective Date.

(g) *No Restraint*. No judgment, injunction, decree or other legal restraint shall be in effect that prohibits the consummation of the Restructuring.

(h) *NewCo Entities*. NewCo and Credit Bid Purchaser shall have signed the NewCo Entities Joinder and become parties to this Agreement.

Section 14. SURVIVAL OF REPRESENTATIONS AND WARRANTIES. The representations and warranties made in this Agreement will not survive the Effective Date. Covenants and agreements that by their terms are to be satisfied after the Effective Date shall survive until satisfied in accordance with their terms, subject to termination pursuant to Section 15.

Section 15. TERMINATION.

(a) *Termination*. This Agreement may be terminated by (i) the mutual written consent of the Company and the Required Backstop Parties or (ii) either the Company or any Backstop Party if the Effective Date has not occurred on or prior to September 30, 2021 (the "**Outside Date**"), subject to the extension of such Outside Date by mutual agreement of the Required Backstop Parties and the Company.

(b) *Termination by the Company*. The Company may terminate this Agreement by written notice to each Backstop Party upon the occurrence and during the continuance of any of the following:

(i) any Backstop Party shall have breached any representation, warranty, covenant or other agreement made by such Backstop Party in this Agreement, and such breach or inaccuracy would, individually or in the aggregate, result in a failure of a condition set forth in Section 13(d), Section 13(e) or Section 13(f), if continuing on the Effective Date, being satisfied and such breach or inaccuracy is not cured by such Backstop Party by the earlier of (1) the tenth (10th) Business Day after the giving of notice thereof to such Backstop Party by the Company and (2) the Outside Date; *provided* that the Company shall not have the right to terminate this Agreement pursuant to this Section if it is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 12 being satisfied; and *provided, further*, that prior to the Company being permitted to terminate the Agreement under this Section each of the other non-

19

breaching Backstop Parties shall have the right, but not the obligation, to assume its *pro rata* share of such breaching Backstop Party's Backstop Commitment, based on the proportion of its Backstop Commitment to the aggregate amount of Backstop Commitments of all non-breaching Backstop Parties assuming such breaching Backstop Party's Backstop Commitment, in which case the Company shall not have the right to terminate this Agreement pursuant to this Section;

(ii)     the board of directors of the Company reasonably determining in good faith based upon the advice of outside counsel that failing to enter into an alternative transaction would be inconsistent with the exercise of its fiduciary duties under applicable law;

(iii)     the Credit Bid Purchase Agreement (as defined in the Plan) is terminated, unless the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan;

(iv)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring; or

(v)     the Restructuring Support Agreement has been terminated in accordance with its terms, except as a result of a breach of the Restructuring Support Agreement by the Company or the other Debtors.

(c)     *Termination by the Required Backstop Parties*.  The Required Backstop Parties may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

(i)     the Restructuring Support Agreement is terminated or expires in accordance with its terms, is terminated with respect to the SLTL Lenders in accordance with its terms or otherwise ceases to be in full force and effect;

(ii)     the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or a trustee or examiner shall be appointed with respect to all or substantially all of the Debtors with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(iii)     the Credit Bid Purchase Agreement (as defined in the Plan) is terminated, unless the 363 Credit Bid Transaction is pursued in accordance with Section 5.2(c) of the Plan.

(d)     *Effect of Termination*.  Subject to Section 19, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement. Notwithstanding anything contained herein, if this

20

Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination. No fees, including any commitment fees shall be due and owing hereunder following such termination.

Section 16.  INDEMNIFICATION OBLIGATIONS.

(a)    *Enforceability*. Notwithstanding anything in this Agreement to the contrary, in the event that (i) the Restructuring Support Agreement is terminated with respect to any Backstop Party in accordance with its terms, (ii) any Backstop Party does not timely vote to accept the Plan, or (iii) any Backstop Party objects to the Plan, supports any party that objects to the Plan or otherwise takes any other action opposing the Plan or the Restructuring Transactions, this Section 16 shall be of no further force or effect solely with respect to such Backstop Party (or any Indemnified Person related thereto) and any obligations of the Company or NewCo under this Section 16 (including without limitation the Indemnification Obligations) solely with respect to such Backstop Party (or any Indemnified Person related thereto) shall terminate *nunc pro tunc* as of the date hereof; *provided*, *however*, that if such Backstop Party, together with its Affiliates and Related Funds (including any Affiliates or Related Funds that are also Backstop Parties), (i) holds $25,000,000 or more in principal amount of SLTL Claims or (ii) has a Backstop Commitment Percentage greater than or equal to 10%, then Section 16 shall be of no further force or effect with respect to any Backstop Party or other Indemnified Person and any obligations of the Company or NewCo under this Section 16 (including without limitation the Indemnification Obligations) shall terminate *nunc pro tunc* as of the date hereof.

(b)    *Company Indemnity*. Prior to the Effective Date, the Company and, following the Effective Date, NewCo (the "**Indemnifying Party**") shall indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons, in each case in their capacity as such (each, an "**Indemnified Person**" and such indemnification obligations, the "**Indemnification Obligations**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement and the transactions contemplated hereby, including the Backstop Commitments, the Rights Offering, the payment of the Backstop Commitment Premium or the use of the proceeds of the Rights Offering, the Transaction Expenses or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company or its equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal expenses of Kasowitz Benson Torres LLP as counsel to the Backstop Parties incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with

21

respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein); *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Defaulting Backstop Party or any Indemnified Person related thereto, caused by such default by such Backstop Party,  (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person, (iii) resulting from any event or occurrence following the Effective Date, including any Loss of an investment in NewCo, or (iv) as to any Backstop Party (or any Indemnified Person related thereto) that has breached the terms of the Restructuring Support Agreement or defaulted on any of its obligations thereunder.

(c)     *Indemnification Procedure*.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnified Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided*, that (A) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (B) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Section 16. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(d)     *Settlement of Indemnified Claims*.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party. If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 16. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii)

such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(e)     *Contribution*.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 16(b), then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the New Equity Interests in the Rights Offering contemplated by this Agreement and the Plan, bears to (ii) the Backstop Commitment Premium paid or proposed to be paid to the Backstop Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

(f)     *Treatment of Indemnification Payments*. All amounts paid by an Indemnifying Party to an Indemnified Person under this Section 16 shall, to the extent permitted by applicable law, be treated for all Tax purposes as adjustments to the purchase price for the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering and the Unsubscribed Shares purchased by such Indemnified Person. The provisions of this Section 16 are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop Parties would not have entered into this Agreement, and the obligations of the Company under this Section 16 shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this Section 16 without further order of the Bankruptcy Court.

Section 17. TAX TREATMENT.  Each of the Parties intends that, for U.S. federal income tax purposes, the Backstop Commitment Premium shall be treated as option premium, and not as "fixed or  determinable annual or periodical" income within the meaning of Section 1441 and 1442 of the Internal Revenue Code of 1986, as amended. Each Party shall file all tax returns consistent with such treatment. Each Party agrees that the Backstop Commitment Premium shall be free and clear of any withholding or deduction for any applicable taxes.

Section 18. NOTICES.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of

transmission), (c) five (5) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

If to Backstop Parties, to each of the undersigned Backstop Parties at the addresses listed on the signatures pages hereto,

with a copy to:

Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Attn: David Rosner, Esq.
        Matthew Stein, Esq.
(drosner@kasowitz.com)
(mstein@kasowitz.com)


If to the Company, to:

Fieldwood Energy LLC
2000 W. Sam Houston Parkway, S. Suite 1200
Houston, Texas 77042
Attention:  Michael Dane
        Thomas R. Lamme
Email:      MDane@fwellc.com
        TLamme@fwellc.com

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Rodney L. Moore
        Samuel C. Peca
        Matt Barr
        Alfredo R. Perez
        Jessica Liou
Email:      rodney.moore@weil.com
        samuel.peca@weil.com
        matt.barr@weil.com
        alfredo.perez@weil.com
        jessica.liou@weil.com

Debtors' Exhibit No. 10
Page 29 of 44

Section 19.  SURVIVAL.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in Section 15(d) and Section 17 through Section 25 shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

Section 20.  ASSIGNMENT; THIRD PARTY BENEFICIARIES. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto. Notwithstanding the previous sentence, the Backstop Parties' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Backstop Party to any Permitted Transferee (in accordance with Section 3).

Section 21.  COMPLETE AGREEMENT.  This Agreement (including the Exhibits, the Schedules, and the other documents and instruments referred to herein) constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

Section 22.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement (including the exhibits and schedules hereto), or the negotiation, execution, termination, performance or nonperformance of this Agreement (including the exhibits and schedules hereto), shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State, without regard to any conflict of laws principles thereof. Each party hereto agrees that it shall bring any action or proceeding in respect of any claim based upon, arising out of, or related to this agreement, any provision hereof or any of the transactions contemplated hereby, in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan of New York City (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (a) irrevocably submits to the exclusive jurisdiction of

25

the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto; *provided* that upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall be the sole Chosen Court. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 23. COUNTERPARTS. This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

Section 24. ACTION BY, OR CONSENT OR APPROVAL OF, THE BACKSTOP PARTIES. Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Backstop Parties, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Required Backstop Parties.

Section 25. AMENDMENTS AND WAIVERS.

(a)  This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Required Backstop Parties and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; *provided* that any modification of, or amendment or supplement to, this Agreement that would have the effect of (i) materially and adversely affecting any Backstop Party in a manner that is disproportionate to any other Backstop Party, (ii) increasing the aggregate purchase price to be paid by all of the Backstop Parties in respect of the Backstop Party Shares, (iii) increasing or decreasing any Backstop Party's Commitment Percentage (as set forth on **Schedule 1**) (other than as a result of a permitted transfer to which such Backstop Party is a party), or (iv) modifying this Section 25, shall require the prior written consent of each Backstop Party.

(b)  No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege

26

pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

Section 26.  SPECIFIC PERFORMANCE.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

Section 27.  NO RECOURSE.  Notwithstanding anything that may be expressed or implied in this Agreement or any other document, with respect to NewCo and Credit Bid Purchaser, no Person other than NewCo or Credit Bid Purchaser, as applicable (and their respective successors or assignees) has any obligation hereunder and no Person, or its Affiliates or its representatives, shall have any right of recovery under this Agreement or any other document against, and no personal liability under this Agreement or any other document shall attach to, NewCo's or Credit Bid Purchaser's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including the Parties, a "**Non-Recourse Party**"), whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of any party against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable law, whether in contract, tort or otherwise.  Without limiting the foregoing, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of NewCo or Credit Bid Purchaser or any of their respective Affiliates shall have any liability for any representations, warranties, obligations or liabilities of NewCo or the Credit Bid Purchaser under this Agreement for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or the Backstop Commitment Agreement.

Section 28.  OTHER INTERPRETIVE MATTERS.

(a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

Debtors' Exhibit No. 10
Page 33 of 44

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

FIELDWOOD ENERGY INC.

By:   _Thomas R. Lamme_____
Name:   Thomas R. Lamme
Title:   Senior Vice President and General Counsel

[Signature Page to SLTL Backstop Commitment Agreement]

[*Backstop Party signature pages on file with the Debtors.*]

**Schedule 1**

**Backstop Commitment Percentages**

[*intentionally omitted*]

**Schedule 2**

**Debtor Entities**

Dynamic Offshore Resources NS, LLC
Fieldwood Energy LLC
Fieldwood Energy Offshore LLC
Fieldwood Onshore LLC
Fieldwood SD Offshore LLC
Fieldwood Offshore LLC
FW GOM Pipeline, Inc.
GOM Shelf LLC
Bandon Oil and Gas GP, LLC
Bandon Oil and Gas, LP
Fieldwood Energy SP LLC
Galveston Bay Pipeline LLC
Galveston Bay Processing LLC

4

**<u>Exhibit A</u>**

NewCo Entities Joinder

5

**NEWCO ENTITIES JOINDER TO BACKSTOP COMMITMENT AGREEMENT**

This Joinder ("**Joinder**") to the SLTL Backstop Commitment Agreement, dated as of May 27, 2021 (as amended, supplemented or otherwise modified from time to time, the "**Backstop Commitment Agreement**"), by and among the Company, the Backstop Parties and, upon execution of this Joinder, [_____], a Delaware corporation ("**NewCo**"), [_____], a Delaware limited liability company ("**Credit Bid Purchaser**" and together with NewCo, the "**Joining Parties**") is executed and delivered by the Joining Parties as of [●], 2021.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Backstop Commitment Agreement.

Section 1.     Agreement to be Bound.  The Joining Parties hereby agree to and shall become and be bound by all of the terms and conditions and subject to all commitments and obligations, as applicable, of NewCo or the Credit Bid Purchaser, as applicable, under the Backstop Commitment Agreement.

Section 2.     Representations and Warranties of NewCo.

(a)     *Power and Authority*. NewCo has the requisite corporate power and authority to enter into, execute and deliver this Joinder and Backstop Commitment Agreement and, subject to entry of the Commitment Approval Order, the Confirmation Order and consummation of the Plan, to perform its obligations under this Joinder and the Backstop Commitment Agreement, including to issue and sell, the Rights Offering Shares. NewCo has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Joinder and the Backstop Commitment Agreement.

(b)     *NewCo Authorized Capital*. Upon the Effective Date, the authorized capital of NewCo shall be consistent with the terms of the Plan and Disclosure Statement (as defined below) and the issued and outstanding Rights Offering Shares shall be consistent with the terms of the Plan and Disclosure Statement.  Except as set forth in the Backstop Commitment Agreement or New Organizational Documents (as defined in the Approved Plan), as applicable, upon the Effective Date, NewCo will not be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, contract, arrangement or undertaking (including any preemptive right) that (i) obligates NewCo to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of capital stock of, or other equity or voting interests in, NewCo or any of its subsidiaries or any security convertible or exercisable for or exchangeable into any units or shares of capital stock of, or other equity or voting interests in NewCo or any of its subsidiaries, (ii) obligates NewCo to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or  undertaking (iii) restricts the transfer of any units or shares of capital stock of, or other equity interests in, NewCo or (iv) relates to the voting of any units or other equity interests in NewCo.

(c)     *Issuance*.  Subject to entry of the Commitment Approval Order, the distribution of the Subscription Rights and, subject to entry of the Confirmation Order and consummation of the Plan, the sale and issuance of the Rights Offering Shares, including the New Equity Interests subscribed for by the Backstop Parties in the Rights Offering, the Unsubscribed Shares and the

1

shares issued pursuant to the Backstop Commitment Premium, will have been duly and validly authorized and, when the Rights Offering Shares are issued and delivered against payment therefor in the Rights Offering or to the Backstop Parties under the Backstop Commitment Agreement, will be duly and validly issued and outstanding, fully paid, non-assessable and free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights, except as set forth herein, and other than liens pursuant to applicable securities laws.

(d)    *No Conflict*.  Subject to entry of the Commitment Approval Order, the distribution of the Subscription Rights, and, subject to entry of the Confirmation Order and consummation of the Plan, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the consummation of the Rights Offering, the sale, issuance and delivery of the Unsubscribed Shares pursuant to the terms of the Backstop Commitment Agreement, and the execution and delivery by NewCo of the Joinder and the Backstop Commitment Agreement and compliance by NewCo with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which NewCo or any of its subsidiaries is a party or by which NewCo or any of its subsidiaries is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of NewCo or any of its subsidiaries; and (iii) assuming the accuracy of the Backstop Parties' representations and warranties in Section 6 of the Backstop Commitment Agreement, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over NewCo or any of its subsidiaries or any of their respective properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)    *Consents and Approvals*.  Subject to entry of the Commitment Approval Order, and assuming the accuracy of the Backstop Parties' representations and warranties in Section 6 of the Backstop Commitment Agreement, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over NewCo or any of its subsidiaries is required for the distribution of the Subscription Rights, the sale, issuance and delivery of the Rights Offering Shares upon exercise of the Subscription Rights, the issuance, sale and delivery of Unsubscribed Shares to the Backstop Parties hereunder, the consummation of the Rights Offering by NewCo and the execution and delivery by NewCo of this Joinder and the Backstop Commitment Agreement and compliance by them with all of the provisions hereof and thereof (including payment of the Indemnification Obligations and the Transaction Expenses of the Backstop Parties as required herein) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order, (ii) filings, if any, pursuant to the HSR Act and the expiration or termination of all applicable waiting periods thereunder or any applicable notification, authorization, approval or consent under any other Antitrust Laws in connection with the transactions contemplated by the Backstop Commitment Agreement, (iii) the filing of any other corporate documents in connection with the transactions contemplated by the Backstop Commitment Agreement with applicable state filing

2

agencies, (iv) such consents, approvals, authorizations, registrations or qualifications as may be required under foreign securities laws, federal securities laws or state securities or Blue Sky laws in connection with the offer and sale of the Rights Offering Shares, Unsubscribed Shares and the Backstop Commitment Premium and (v) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f)     *Form D and Blue Sky*. NewCo shall timely file a Form D with the SEC with respect to the Unsubscribed Shares, to the extent required under Regulation D of the Securities Act. NewCo shall take such action as NewCo shall reasonably determine is necessary in order to obtain an exemption for, or to qualify for sale or issuance to the Backstop Parties the Unsubscribed Shares under applicable securities and "blue sky" Laws of the states of the United States (or to obtain an exemption from such qualification) and any applicable foreign jurisdictions. NewCo shall timely make all filings and reports relating to the offer and sale of the Backstop Party Shares required under applicable securities and "blue sky" Laws of the states of the United States following the Effective Date. Following the Effective Date, NewCo shall pay all fees and expenses in connection with satisfying its obligations under this Section 2(f).

(g)     *Share Legend*. Each certificate evidencing the Unsubscribed Shares and shares issued in respect of the Backstop Commitment Premium, and each certificate issued in exchange for or upon the transfer of any such shares, shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such shares are uncertificated, such shares shall be subject to a restrictive notation substantially similar to the Legend in the stock ledger or other appropriate records maintained by NewCo or its agent and the term "Legend" shall include such restrictive notation.

Section 3.     Governing Law. For the avoidance of doubt, Section 22 of the Backstop Commitment Agreement shall apply to this Joinder *mutatis mutandis*.

Section 4.     Notice. All notices and other communications given or made pursuant to this Joinder or the Backstop Commitment Agreement shall be sent to Joining Parties at the addresses set forth in signature pages hereto.

Section 5.     No Recourse. Notwithstanding anything that may be expressed or implied in this Joinder or any other document, with respect to NewCo or the Credit Bid Purchaser, no Person other than NewCo or the Credit Bid Purchaser, as applicable (and their respective successors or assignees) has any obligation hereunder and no Person, or its Affiliates or its representatives, shall have any right of recovery under this Joinder or any other document against,

3

and no personal liability under this Joinder or any other document shall attach to, NewCo's or the Credit Bid Purchaser's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including the Parties, a "Non-Recourse Party"), whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of any party against any Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable law, whether in contract, tort or otherwise.  Without limiting the foregoing, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of NewCo, the Credit Bid Purchaser or any of their respective Affiliates shall have any liability for any representations, warranties, obligations or liabilities of NewCo or the Credit Bid Purchaser under this Joinder for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or the Backstop Commitment Agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, NewCo has caused this Joinder to be executed as of the date first written above.

**[NewCo]**


By:_____
Name:
Title:


**<u>Notice Address</u>:**
[●]

Fax: [●]

Attention: [●]

Email: [●]

IN WITNESS WHEREOF, Credit Bid Purchaser has caused this Joinder to be executed as of the date first written above.

**[Credit Bid Purchaser]**


By:_____
Name:
Title:


<u>**Notice Address**</u>**:**
[●]

Fax: [●]

Attention: [●]

Email: [●]